# **<u>EXHIBIT C-1</u>**

Susheel Kirpalani                          Mitchell A. Karlan         Hearing Date: December 18, 2017
James C. Tecce                             GIBSON, DUNN & CRUTCHER LLP
Julia Beskin                               200 Park Avenue
Jordan Harap                               New York, New York 10166
QUINN EMANUEL
  URQUHART & SULLIVAN LLP                   Counsel to GUC Trust
52 Madison Avenue
New York, NY 10010

Arthur J. Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, <u>et al.</u>,<br>f/k/a General Motors Corp., <u>et al.</u>,<br><br>                                     Debtors. | Chapter 11<br>Case No. 09-50026 (MG)<br>(Jointly Administered) |

**CONTENTIONS OF FACT AND LAW OF GENERAL MOTORS LLC
AND MOTORS LIQUIDATION COMPANY GUC TRUST
RELATING TO PLAINTIFFS' MOTION TO ENFORCE
UNEXECUTED SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

PAGE

I.     CONTENTIONS OF FACT ......................................................................... 2

    A.     FACTS RELEVANT TO FACTOR 1 (INTENT TO REQUIRE WRITING SIGNED BY ALL PARTIES TO BE BOUND ................................................................. 2

    B.     FACTS RELEVANT TO FACTOR 2 (NO AGREEMENT ON MATERIAL TERMS) ............ 10

    C.     FACTS RELEVANT TO FACTOR 3 (SIGNED WRITING REQUIRED) ............................ 14

    D.     FACTS RELEVANT TO FACTOR 4 (NO PARTIAL PERFORMANCE) ............................ 15

II.    CONTENTIONS OF LAW ......................................................................... 16

    A.     NEW YORK LAW GOVERNS QUESTION OF WHETHER BINDING AGREEMENT EXISTS ................................................................................................. 16

    B.     FACTOR 1:  EXPRESS TERMS OF PURPORTED AGREEMENT REFLECT STATED INTENT THAT AGREEMENT WILL NOT BECOME BINDING UNLESS SIGNED BY ALL PARTIES ...................................................................................... 17

    C.     FACTOR 2:  PARTIES DID NOT REACH AGREEMENT ON MATERIAL TERMS ............ 20

    D.     FACTOR 3:  CONSISTENT WITH NEW YORK LAW, UNEXECUTED SETTLEMENT AGREEMENT IS TYPE THAT MUST BE REDUCED TO SIGNED WRITING ............................................................................................... 21

    E.     FACTOR 4:  PARTIES DID NOT PARTIALLY PERFORM ALLEGED AGREEMENT ........ 22

# I.    CONTENTIONS OF FACT[1]

## A.    Facts Relevant To Factor 1 (Intent To Require Writing Signed By All Parties)

1.    The Unexecuted Settlement Agreement was negotiated and drafted by highly sophisticated counsel.

2.    Between June 6, 2017 and August 14, 2017, multiple drafts of the Unexecuted Settlement Agreement were exchanged among and reviewed by counsel for each of the GUC Trust, plaintiffs, and the unitholders.

3.    In a draft of the Unexecuted Settlement Agreement dated June 9, 2017, Gibson Dunn purposely inserted § 3.1 to ensure the agreement only would become "effective and binding" if and when all parties signed the contract.[2]

4.    Plaintiffs' counsel and the unitholders' counsel accepted and understood the import of § 3.1.[3]

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in New GM's Motion, Pursuant To 11 U.S.C. §§ 105(a) And 1109(b), Fed. R. Bankr. P. 2018 And 3020, And Pre-Trial Order, To Appear And Be Heard With Respect To Phase 1 Of Court's Consideration Of Plaintiffs' Enforcement Motion [ECF No. 14149] and the Joinder Of General Motors LLC In Motors Liquidation Company GUC Trust's Objection To Plaintiffs' Motion To Enforce Unexecuted Settlement Agreement [ECF No. 14172] (the "**Joinder**").  Citations to the "**Decl.**" refer to the Declaration of James C. Tecce filed concurrently with the Joinder [ECF No. 14173], and citations to "**GUC App.**" refer to the appendix submitted in connection with the Trust's opposition [ECF No. 14170].

[2]    Decl. Ex. F (AG0005147, at 5177 (June 9 email inserting § 3.1:  "[t]his Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the parties")); Ex. G (Martorana Tr. 200:25-201:25 (explaining he added § 3.1 because "there were a number of provisions that it was unclear as to when they would, in fact, become effective and we determined that it should be clear that … nothing in the agreement would become binding and effective until it was executed")); Decl. Ex. E (Williams Tr. 98:21-99:5 (§ 3.1 was expression of GUC Trust intent that "document had to be signed before it was final")).

[3]    See Decl. Ex. B (Weisfelner Tr. 87:17-23 (team became "aware of the desired addition of section 3.1 on or about June 9"), 89:7-9, 89:13-25 ("Q. … [§ 3.1 is] reflected in the final settlement agreement because … your team accepted it; correct?  A.  Everyone accepted all of the terms including that term, yes"), 91:7-21)); Decl. Ex. E (Williams Tr. 98:21-99:5, 200:1-14); Ex. C (Weintraub Tr. 71:17-72:7); Ex. D (Steel Tr. 92:7-19); Ex. G (Martorana Tr. 202:11-203:3).

5.      The first sentence of § 3.1, which was inserted on June 9 and states "[t]his Agreement shall become effective and binding on the Parties on the date which this Agreement is fully executed by each of the Parties," was never amended or removed from the Unexecuted Settlement Agreement at any point during the negotiations.  The first sentence of Section 3.1 of the Plaintiffs' Settlement Agreement in the June 9 Draft is identical to the first sentence of Section 3.1 in the Plaintiffs' Settlement Agreement.[4]

6.      The version of the Unexecuted Settlement Agreement that plaintiffs and the unitholders contend is binding on the GUC Trust contains § 3.1, contains a merger clause (§ 3.11), only can be amended "in a writing signed by all parties" (§ 3.12), provides for execution by delivery of signatures (§ 3.9), provides that New York law governs (§ 3.16), and contains performance obligations and termination rights that are triggered only if and when the agreement is signed by all parties (§§ 2.2, 2.9(a), 3.2(B)).

7.      The provisions of the Unexecuted Settlement Agreement, including, without limitation, §§ 2.2, 2.9(a), 3.1, 3.2(B), 3.9, 3.11, and 3.12, reflect the parties' objective intent that the agreement cannot become binding unless and until all parties affix their signatures.

8.      Through the provisions of the Unexecuted Settlement Agreement, which were reviewed and accepted by counsel to the plaintiffs and the unitholders, all parties from and after June 9 expressed an objective intent that the draft agreement would not become binding unless and until all parties affix their signatures.

---

[4] Compare Decl. Ex. F (AG0005147, at 5177 (June 9 email inserting § 3.1:  "[t]his Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the parties")), with Decl. Ex. A (Unexecuted Settlement Agreement, § 3.1:  "This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties.…")).

9.    The Unexecuted Settlement Agreement was never signed by any party or their counsel and was never dated.[5]  No Settlement Document was ever signed by any party or their counsel nor ever dated.

10.    Counsel for the GUC Trust never told either the plaintiffs' counsel or the unitholders' counsel that the GUC Trust had authorized its counsel to sign the Unexecuted Settlement Agreement.[6]

11.    The GUC Trust never authorized its counsel to sign the Unexecuted Settlement Agreement.[7]

12.    There has been no amendment or waiver of the requirement that the Unexecuted Settlement Agreement had to be signed by all parties to be binding and effective, and any amendment or waiver of § 3.1 must be in writing and signed by all parties pursuant to §§ 3.11 and 3.12.

13.    When the terms of the Unexecuted Settlement Agreement were negotiated, no counsel or party ever expressed an intention to amend or waive § 3.1 or any other provisions in the Unexecuted Settlement Agreement related to the signature requirement.[8]

---

[5]    See Decl. Ex. B (Weisfelner Tr. 22:13-16, 28:11-14, 30:5-17, 31:4-14, 34:3-5, 35:2-4, 65:23-66:5); Ex. C (Weintraub Tr. 13:12-15, 56:8-17); Ex. D (Steel Tr. 22:4-10, 28:1-11); Ex. E (Williams Tr. 191:21-193:20).

[6]    See GUC App. Ex. 6 (Weisfelner Dep. 105:1–6 ("Q. And what Mr. Martorana was indicating was that they were unlikely to have final approval from their client on August 14 of 2017; correct?  A. That's the word – those are the words that he uses, yes.")); GUC App. Ex. 10 (Golden Tr. 209:14–210:9 (stating that neither Matt Williams nor Keith Martorana ever told Daniel Golden they had been given permission to manually sign the settlement agreement)).

[7]    See Decl. Ex. U (Andrews Tr. 108:12-15 ("My statement is that the GUC Trust is signed off on the form of the documents.  I am not giving him authority to sign the document.")); GUC App. Ex. 11 (Andrews Tr. 156:14-15 ("I did not authorize Mr. Williams or Mr. Martorana to sign [the Unexecuted Settlement Agreement], no.")); GUC App. Ex. 5 (Martorana Tr. 203:8–10 ("Q. Did Beth Andrews ever authorize you to sign the agreement?  A. No, she did not.")).

[8]    See Decl. Ex. E (Williams Tr. 200:1-14 (no one ever communicated "that the agreement would become effective and binding on the parties even if was not signed")); Ex. C (Weintraub Tr. 71:17-72:7 (witness never told anyone, and was not told by anyone that "the settlement agreement would become effective and binding before it was signed")); Ex. D (Steel Tr. 92:7-19 (Martorana never told Steel "he was waiving the requirement of section 3.1,

14.    When the terms of the Unexecuted Settlement Agreement were negotiated, no counsel to the plaintiffs nor counsel to the GUC Trust ever stated they intended for the Unexecuted Settlement Agreement to be binding without all parties affixing their signatures to the document.

15.    When the terms of the Unexecuted Settlement Agreement were negotiated, plaintiffs' counsel commented on a different part of § 3.1 but left the execution requirement in the first sentence of the section unchanged.[9]

16.    When negotiating the terms of the Unexecuted Settlement Agreement, plaintiffs' counsel did not use the term "ministerial" to refer to the act of obtaining parties' signatures to the agreement.[10]

17.    Plaintiffs' counsel attempted, before and after August 14, through several written requests, to gather signatures and obtain a fully-signed copy of the Unexecuted Settlement Agreement.[11]

---

that the document not become binding until it full execution"); Ex. B (Weisfelner Tr. 91:7-21 (parties never said agreement would become effective before being signed)); Ex. G  (Martorana Tr. 202:11-23 (never told signing was "ministerial act" or that agreement would be effective without signatures)).

[9]    See Decl. Ex. H (GUC_0003887, at 3890 (July 10 email from plaintiffs' counsel proposing modifications to § 3.1 that would not change first sentence:  "section 3.1 must be similarly modified to have all the releases and waivers triggered by entry of the Settlement Order")).

[10]    Decl. Ex. B (Weisfelner Tr. 64:14-20, 99:22-100:4 (unable to recall using phrase "ministerial step")); GUC App. Ex. 14 (Steel Tr. 114:-115:4 ("never used" the words "ministerial matter" to Gibson Dunn)); Ex. 5 (Martorana Tr. 202:12-17 (no party ever conveyed that "they viewed the addition of signatures to be a merely ministerial act").

[11]    Decl. Ex. B (Weisfelner Tr. 6:9-47:14).  Compare Ex. D (Steel Tr. 17:18-24 (referring to signing as "ministerial")), with Ex. I (GUC_0001558 (Aug. 11 Steel email asking when "we can schedule signatures")); Ex. J (GUC_0001341 (Aug. 14 email stating "[w]e will update accordingly and send execution drafts as soon as possible")); Ex. K (GUC_0005638, at 5641 (Aug. 14 email sending "proposed final execution versions")); Ex. L (GUC_0005630 (Aug. 16 email asking "[w]hen are we actually signing the agreement / would think before the conference")).

5

18.    Plaintiffs' counsel's attempt to gather signatures to the Unexecuted Settlement Agreement confirms their understanding that signatures were required for the agreement to be binding.

19.    When negotiating the terms of the Unexecuted Settlement Agreement, it was anticipated, intended, understood, and agreed by all counsel and parties that a final document would in fact have to be signed.[12]

20.    In their communications with each other and with the Bankruptcy Court and the MDL 2543 Court, the GUC Trust's counsel, plaintiffs' counsel, and the unitholders' counsel repeatedly described the draft agreement as "proposed."[13]

21.    The emails exchanged among all the negotiating lawyers state repeatedly that drafts are subject to further review and to comment and approval from clients.

22.    Counsel to each of the GUC Trust, plaintiffs, and the unitholders included in their emails exchanging comments to or drafts of the Unexecuted Settlement Agreement a disclaimer stating, in sum and substance, that drafts remained "subject to ongoing review and comment from our clients."[14]

23.    No later than July 27, 2017, the GUC Trust's counsel clearly communicated to plaintiffs' counsel and the unitholders' counsel the distinction between their approval of the form

---

[12]    GUC App. Ex. 6 (Weisfelner Tr. 46:9–15 ("Q. Was it anticipated by you in August of 2017 that manual ink signatures would at some point be placed on pages nineteen and twenty of [Unexecuted Settlement Agreement]? A. To the extent I ever thought about it, yes.")).

[13]    Decl. Ex. Q (BR005531 (Aug. 14 email (referring to "proposed settlement"))); Ex. K (GUC_0005638, at 5641 (Aug. 14 email sending "proposed final execution versions")); Ex. R (Aug. 17 letter from unitholder counsel to Court referring to "final proposed settlement"); Ex. S (GUC_0013900 (Aug. 16 email (same))); Ex. NN (Tr., Aug. 11 MDL 2543 Conf. 38:11-15 (plaintiffs' counsel referring to "proposed settlement")).

[14]    GUC App. Ex. 3 (Weisfelner Decl. Ex. A, at 1 (August 3 email (attached document "remains subject to the ongoing review and comment of our client"))); GUC App. Ex. 12 (Golden Decl. Ex. A, at AG0000240 (August 8 email (same)); GUC App. Ex. 8 (GUC_0011029 (June 9 email (stating "the attached markup remains subject to further review and revision in all respects"))).

of the documents and the GUC Trust's agreement and ultimate assent to the deal—the latter of which only would be provided by actually signing the document.[15]

24.    The GUC Trust's counsel told plaintiffs' counsel on the evening of August 14 that final client sign-off had not been obtained.[16]

25.    Counsel to plaintiffs and the unitholders have testified to four different dates when the agreement allegedly became binding.[17]

26.    According to plaintiffs' sworn interrogatory answers, the agreement became binding on the parties by no later than August 12, 2017.[18]

27.    Counsel to plaintiffs and the unitholders do not agree whether the purported agreement they claim is binding on the GUC Trust is a written or an oral one.[19]

---

[15]    See Decl. Ex. T (GUC_0003459, at 3462 (July 27 email stating "[s]ign-off, with respect to the three documents (Settlement Agreement, Settlement Order, Claims Estimate Order), will likely come tomorrow. We'll keep you posted. Note, however, that signoff on the settlement itself is subject to the finalization of all other document[s] in a satisfactory manner and receipt of final approvals")); Ex. U (Andrews Tr. 108:12-15 ("My statement is that the GUC Trust is signed off on the form of the documents. I am not giving him authority to sign the document.")); Ex. E (Williams Tr. 103:19-20, 104:22-24, 186:2-24, 187:21-188:6, 191:21-193:20, 200:15-201:9 ("Q. To your mind, is there a difference between agreeing to the form of the documents and agreeing to transaction they may or may not reflect? … A. Yes, you would agree to the transaction when we signed the documents indicating you're bound to it.")); Ex. G (Martorana Tr. 203:8-18 (never received client authority to sign), 79:15-80:14 (explaining signoff on documents versus "actual entire corpus of the settlement")).

[16]    See Decl. Ex. K (GUC_0005638, at 5640 (Aug. 14 email stating "[a]t this point we do not have any further comments, but are obtaining final sign-off from our client"), 5638 (Aug. 14 email stating "[w]e are waiting for final approval from client, but unlikely to come tonight. You are, however, authorized to send current versions to New GM this evening")).

[17]    See Decl. Ex. B (Weisfelner Tr. 24:15-19 (August 12-13)); Ex. HH (Golden Tr. 130:13-20 (August 9)); Ex. D (Steel Tr. 51:15-52:2, 68:5-66:9 (July 28)); Ex. C (Weintraub Tr. 76:24-77:11 (August 12-14)).

[18]    See Ex. X (PIWD Plaintiffs' Counsel Supp. Obj. And Resp. No. 1 (August 12)).

[19]    See GUC App. Ex. 10 (Golden Tr. 208:14-24 (was both oral and written agreement with same terms)).

28.     The drafts of the Unexecuted Settlement Agreement changed between July 28 and August 14, including by adding new signatory parties and adjusting the amount of the notice cap.[20]

29.     The GUC Trust's August 14 Form 10-Q did not report that a settlement agreement had been reached with plaintiffs and instead stated only that negotiations were ongoing.[21]

30.     Had a binding agreement with plaintiffs been reached as of August 14, GUC Trust would have disclosed it in the Form 10-Q filed on that day.[22]

31.     The GUC Trust has never made a filing with the Securities and Exchange Commission indicating it entered into a final and binding settlement agreement with any plaintiff.

32.     The GUC Trust has never publically communicated that it reached a final and binding settlement agreement with any plaintiff.

33.     During and after the meeting on August 15 among counsel to New GM and counsel to the GUC Trust, New GM's counsel asked counsel to the GUC Trust whether it had entered into a binding contract; and, counsel for the GUC Trust responded that the Unexecuted Settlement Agreement had not been signed and therefore no binding contract yet existed.[23]

---

[20]    Compare GUC_0003520, 3538 (capping notice costs at $5 million), and GUC_0003544-45 (listing the signatory parties), with GUC App. Ex. 3 at 74 (capping notice costs at $6 million), and 81 (adding Andrews Myers, P.C. to the signatory parties).

[21]    Decl. Ex. M, at GUC_0010611 (Aug. 14 Form 10-Q (noting trust was "engaged in discussions … regarding … certain issues underlying the Late Claims Motions.  Such discussions have meaningfully progressed and remain ongoing")).

[22]    Decl. Ex. E (Williams Tr. 138:24-139:1 ("If we thought we had a binding deal, we would have put that in [the] 10-Q that we had a binding deal.")).

[23]    GUC App. Ex. 22 (Williams Tr. 128:15-20 (stating he told New GM "[w]e do not have a binding agreement")).

34.    After counsel to the GUC Trust shared a draft of its August 16 letter to the Court with counsel to plaintiffs and counsel to the unitholders stating the "Proposed Settlement is nearly final, but has not yet been executed by the parties and is not binding," neither plaintiffs' counsel nor the unitholders' counsel objected to that characterization of the alleged agreement; instead, plaintiffs' counsel remarked in a responding email that its draft letter to the Court "says a lot of the same."[24]

35.    Plaintiffs' stated position that the binding date of the agreement was "no later than August 12" is inconsistent with events that transpired after that date, including (a) the August 14 10-Q stating negotiations were ongoing; (b) plaintiffs' counsel's distribution of another version of the Unexecuted Settlement Agreement and request for comments on August 14; (c) the parties' providing additional comments on August 14; (d) plaintiffs' counsel's request for signatures on August 14; (e) email exchanges requesting further discussion of issues such as notice procedures and class certification before the Court conference; (f) the statement by GUC Trust Counsel to counsel for New GM on August 15 that a binding agreement with plaintiffs had not been reached; (g) GUC Trust counsel's letter to the Bankruptcy Court dated August 16 stating the purported agreement was not binding- shared with counsel to plaintiffs and the unitholders (neither of who objected to that characterization); and (h) plaintiffs' counsel's request for signatures on August 16.[25]

---

[24]    Decl. Ex. N (GUC_0000905 (Aug. 16 email attaching draft letter)); Ex. O (GUC_0000898 (Aug. 16 email from plaintiffs' counsel saying its letter "says a lot of the same")); Ex. JJ (GUC_0013946 (Aug. 16 email forwarding letter to unitholder counsel)).

[25]    Decl. Ex. J (GUC_0001341, at 1344 (Aug. 9 email referring to addition of new parties represented by Andrews Myers, P.C.), 1342 (Aug. 12 email referring to open issues between GUC Trust and unitholders)); Ex. CC (GUC_0001904 (Aug. 10 email stating "on the verge of being done")); Ex. DD (GUC0001792 (Aug. 11 email referring to "a walk away issue" being open)); Ex. M, at GUC_0010611 (Aug. 14 Form 10-Q); Ex. J (GUC_0001341 (Aug. 14 email stating "[w]e will update accordingly and send execution drafts as soon as possible")); Ex. K (GUC_0005638, at 5641 (Aug. 14 email sending "proposed final execution versions" and requesting "comments or questions")); Ex. L (GUC_0005630 (Aug. 16 email asking "[w]hen are we actually signing

## B.    Facts Relevant To Factor 2 (No Agreement On Material Terms)

36.    The Unexecuted Settlement Agreement requires in § 3.17 that each party has been "represented by an attorney with respect to this Agreement" who has "been duly authorized" by each party to sign the alleged agreement on its behalf.

37.    The lawyers for the plaintiffs whose names appear on the signature pages of the Unexecuted Settlement Agreement represent only a very small fraction of the millions of purchasers of Old GM vehicles who would be barred by the release and waiver provisions from further proceedings against the GUC Trust if the Unexecuted Settlement Agreement was found to be binding and ultimately approved by the Bankruptcy Court.

38.    Hagens Berman Sobol Shapiro LLP and Lieff Cabraser Heimann & Bernstein, LLP represent only two individuals who filed motions for authorization to file late proofs of claim.[26]

39.    Two other proposed signatory counsel (Brown Rudnick LLP and Goodwin Procter LLP) did not represent individual plaintiffs; rather, Brown Rudnick LLP was engaged solely by Hagens Berman Sobol Shapiro LLP and Lieff Cabraser Heimann & Bernstein, LLP, and Goodwin Procter LLP purports to have been engaged solely by Hilliard Munoz Gonzalez LLP and the Law Offices of Thomas J. Henry.[27]

---

the agreement / would think before the conference")); GUC App. Ex. 22 (Williams Tr. 128:15-20 (stating he told New GM "[w]e do not have a binding agreement")); Decl. Ex. N (GUC_0000905 (Aug. 16 email attaching draft letter)); Ex. JJ (GUC_0013946 (Aug. 16 email forwarding letter to unitholder counsel)); Decl. Ex. EE (BR006032 (Aug. 15 email referring to class certification issue)); Ex. FF (GUC_0000904 (Aug. 16 email (same))); Ex. GG (GUC_0000888 (Aug. 16 email (same))).

[26]  See Decl. Ex. V (Hagens engagement letters), Ex. B (Weisfelner Tr. 39:1-3 ("Q.  Were you acting on behalf of a class that was certified?  A.  No")).  See also Dkt. No. 14128-1 (Letter to Judge Furman (unexecuted agreement makes "assertions regarding the meaning of this Court's Order No. 8 appointing Plaintiffs Co-Lead Counsel in MDL 2543 and the authority of Co-Lead Counsel to represent and settle the purported claims of millions of non party individuals based on that order")).

[27]  See Decl. Ex. Z (Brown Rudnick engagement letter); Ex. B (Weisfelner Tr. 82:11-84:24 (authority derived from counsel)), Ex. C (Weintraub Tr. 10:11-23, 18:18-19:8 (needed co-counsel's authority to sign)).

40.    PIWD Counsel Hilliard Munoz Gonzalez LLP purports to represent no more than 175 individuals—and possibly much less than 175 individuals considering its recent motion in MDL 2543 (under seal) to terminate their representation of certain plaintiffs, which the MDL Court granted, and a related notice filed in this action withdrawing as counsel for numerous plaintiffs that moved for authority to file late proofs of claim, filings that concede the parties to the proposed agreement have changed.[28]

41.    PIWD Counsel Andrews Myers, P.C., in conjunction with other counsel, purports to represent approximately 347 individuals.[29]

42.    Plaintiffs either (a) were not aware of the settlement negotiations, (b) were not sent drafts of the agreement, (c) were not informed of its particular terms, (d) never provided their written consent to the proposed settlement, or (e) did not give specific authorization to sign the Unexecuted Settlement Agreement.[30]

---

[28]    See GUC App. Ex. 15 (Weintraub Tr. 22:5–8 (stating that Goodwin Proctor has filed "between one hundred seventy-five and two hundred and something" proofs of claim for clients of [HMG] whose interests are at issue); In re General Motors LLC Ignition Switch Lit., No. 14-MD-2543 (JMF) (S.D.N.Y. Oct. 26, 2017) (Dkt. No. 4769) (Mot. For Order Permitting Submission Of Supp. Decl. In Support Of Mot. To Withdraw Under Seal And In Camera, filed by Hilliard Martinez Gonzales LLP and Thomas J. Henry Injury Attorneys), (Dkt. No. 4840 (Order granting motion)); see also id. (Dkt. No. 14179) (Not. Of Withdrawal as Counsel of Record for Certain Movants under Omnibus Mot. by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths [Dkt. No. 13807], filed by Goodwin Procter LLP).

[29]    See Dkt. No. 14018 (Mot. to Allow Claims filed by Lisa M Norman on behalf of Additional Ignition Switch Pre-Closing Accident Plaintiffs); Dkt. No. 14046 (First Supp. to Mot. By Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths); Dkt. No. 14112 (Second Supp. to Mot. By Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths).

[30]    See Decl. Ex. W (Economic Loss Pl.'s Supp. Resp. No. 1 ("Counsel did not expressly inform claimants that they were negotiating these particular terms"), No. 2 ("Counsel did not seek claimants' written consent to the terms of the contract or proposed settlement"), No. 4 ("Counsel did not send drafts of the contract or the proposed settlement to claimants")); Ex. B (Weisfelner Tr. 44:20-24 (conceding no client authority and relying instead on notice procedures), 48:18-51:11, 79:13-80:21 (no discussions with, or authorizations from, named plaintiffs)); Ex. X (PIWD Counsel Supp. Resp. No. 12, 13 (did not send drafts of agreement to HMG Claimants), No. 11); Ex. Y (Additional Ignition Switch Pre-Closing Accident Pl.'s First Supp. Obj. and Resp. Nos. 10-13); Ex. KK (Mosley Tr. 17:4-9 (never saw agreement), 25:8-16 (never told counsel to sign and gave only general authority)); Ex. LL (Barton Tr. 22:9-14 (gave counsel general authority when engaged)).

43.     The Unexecuted Settlement Agreement was negotiated principally by attorneys located in New York, including Edward Weisfelner, Howard Steel, William Weintraub, Matthew Williams, Keith Martorana, Daniel Golden, Debra Newman, and Naomi Moss.

44.     The Unexecuted Settlement Agreement purports to resolve claims asserted in New York courts.

45.     As early as July 2017, plaintiffs' counsel and the unitholders' counsel discussed having the notice procedures "blessed" by the Bankruptcy Court before noticing the settlement motion to millions of individuals.[31]

46.     During the negotiations, despite having filed putative class proofs of claim, plaintiffs' counsel would not agree to seek certification of one or more classes of persons pursuant to Fed. R. Civ. P. 23; the GUC Trust only agreed to forgo class treatment if the Court would accept it.[32]

47.     Counsel to plaintiffs, the unitholders, and the GUC Trust agreed in early August 2017 to schedule a chambers conference with the Bankruptcy Court to preview the Unexecuted Settlement Agreement.[33]

48.     The GUC Trust and its counsel decided to not execute the draft agreement until after the August 17 conference in order to first obtain the Bankruptcy Court's reaction to possible infirmities in the settlement's substance, namely the use of the $10 billion estimate for

---

[31]     Decl. Ex. II (GUC_0004498, at 4502 (July 10 email: "[W]e need to have the form of notice blessed before we give it …. [T]his requires a separate motion re notice procedures and deadlines.  Why spend the money on notice only to find out at the hearing that Judge Glenn does not like what we did")).

[32]     See GUC App. Ex. 22 (Williams Tr. 240:7-15 ("[W]e were hopeful that the plaintiffs were going to have a plan to deal with [the absence of class certification] at the status conference").

[33]     See GUC App. Ex. 22 (Williams Tr. 145:10–20 (stating that the parties had scheduled the August 17 conference a couple weeks before)).

late filed claims and the attempt to bind millions of unknown individuals who have never filed

any claims without the protections afforded by class certification under Fed. R. Civ. P. 23.[34]

49.    The GUC Trust and its counsel did not intend to execute the Unexecuted

Settlement Agreement until after the August 17 conference regardless of whether it ever

negotiated an agreement with New GM.[35]

50.    Like counsel to the GUC Trust, counsel to the unitholders intended to use the

Bankruptcy Court's August 17 status conference as an opportunity to preview the settlement,

including its notice procedures, and to assess the Bankruptcy Court's reaction.[36]

51.    According to counsel to the unitholders, to the extent the Bankruptcy Court

directed at the August 17 conference that changes needed to be made to the proposed settlement,

then the Unexecuted Settlement Agreement would have been revised to address the Court's

concerns.[37]

---

[34]    See Decl. Ex. E (Williams Tr. 186:2-15 (intended at conference to give deal overlay:  "[t]o the extent that the Judge had significant concerns about the deal, whether it be the $10 billion claim or whether it be the lack of the Rule 23 or any of myriad of issues that he might, depending on what the judge said about those we may or may not have signed that agreement")); 187:21-188:6 ("[T]o the extent … the [J]udge didn't raise any significant issues, we were intending to sign the agreement.  To the extent the Judge raised huge issues and said you've got a Rule 23 problem here or you've got a $10 billion claim I'm never going to allow, at that time we didn't intend on signing."); Ex. U (Andrews Tr. 158:10-22 (same)); Ex. G (Martorana Tr. 204:7-23 (same)).  See also GUC App. Ex. 22 (Williams Tr. 147:22–148:4 ("From our point of view ... one of the big benefits of that settlement conference was going to be we were going to be able to take the judge's temperature as to whether or not he thought the deal made sense.")).

[35]    See Decl. Ex. E (Williams Tr. 191:21-192:3 ("[O]ur intention was not to sign the agreement until after—even if we didn't have anything from [N]ew GM, if [N]ew GM had never shown up, our intention was at least to wait until after that status conference.")); GUC App. Ex. 5 (Martorana Tr. 208:20-208:24 (would not sign until after August 17)).

[36]    Decl. Ex. OO (Tr., Hearing, Aug. 17 at 27:21-24 ([UNITHOLDER COUNSEL:]  "[t]he purpose of scheduling a status conference … was to preview the settlement, not to argue the merits, but really to preview the noticing procedures"), 28:11-15 ("[W]e wanted to get a sense from Your Honor before we went out and spent $6 million whether Your Honor thought that would be an appropriate scope of notice.")).  See also GUC App. Ex. 15 (Weintraub Tr. 63:18-23)).

[37]    See GUC App. Ex. 10 (Golden Tr. 208:5-13 (noting it "would behoove all the parties … to evaluate what the [J]udge said and make a determination whether it required any further changes")).

52.    In emails dated August 15 and August 16, GUC Trust counsel conveyed the issues that were likely to be raised at the August 17 status conference relating to class certification and notice to plaintiffs' counsel.[38]

53.    New GM and the GUC Trust have entered into the Forbearance Agreement, which by its own terms will terminate automatically if the Bankruptcy Court determines the Unexecuted Settlement Agreement is binding on the GUC Trust.[39]

### C.    Facts Relevant To Factor 3 (Signed Writing Required)

54.    The Unexecuted Settlement Agreement states in § 2.3 that the motion to approve the agreement, and the motion to approve the notice provisions relating to the agreement, will not be filed until the settlement is signed by all the parties.

55.    Plaintiffs' counsel has acknowledged the Unexecuted Settlement Agreement is the type of agreement that would need to be signed before being presented to the Court.[40]

56.    Mr. Martorana's electronic signature block, where annexed to his emails from his Gibson Dunn email address, is annexed automatically.[41]

---

[38]    Decl. Ex. FF (GUC_0000904 (Aug. 16 email requesting "update on class cert issue discussed the other day")); Ex. O (GUC_0000898 (Aug. 16 email: "We are gonna add 'and preview potential notice procedures' [to Court letter]" )); Ex. EE (BR006032 (Aug. 15 email referring to class certification issue)); Ex. FF (GUC_0000904 (Aug. 16 email (same))); Ex. GG (GUC_0000888 (Aug. 16 email (same))).

[39]    See, e.g., Dkt. No. 14095, Ex. A § 4.1(a)(v)).

[40]    See GUC App. Ex. 6 (Weisfelner Tr. 47:2-14 ("I think that motions and related papers including the settlement agreement ultimately, as a matter of record, as a ministerial act, needed to be signed")); GUC App. Ex. 14 (Steel Tr. 25:11-15 ("[W]hen we presented the documents to the judge, we would gather the electronic signatures affixed")).

[41]    See Decl. Ex. G (Martorana Tr. 206:19-207:4 (signature block is affixed automatically to emails)).

57.     None of the GUC Trust emails cited in support of the Enforcement Motion or the

unitholders' joinder thereto include a formally typed signature by the GUC Trust's counsel to the

Unexecuted Settlement Agreement.[42]

### D.     Facts Relevant To Factor 4 (No Partial Performance)

58.     While the Unexecuted Settlement Agreement sets forth obligations on the GUC

Trust and plaintiffs to provide certain consideration, no consideration was ever provided under

the agreement.[43]

59.     The lack of signatures to the Unexecuted Settlement Agreement renders several

sections materially incomplete or meaningless.[44]

60.     The GUC Trust (or its counsel) never stated before the MDL 2543 Court or the

Bankruptcy Court that the GUC Trust accepted the terms of the Unexecuted Settlement

Agreement or agreed to be bound by them.[45]

61.     The GUC Trust did not authorize anyone to discuss the proposed settlement at the

August 11, 2017 MDL conference.

---

[42]   See Dkt. No. 14093 (Weisfelner Decl. In Supp. Enforcement Mot., Exs. A–F (emails from Keith Martorana that do not contain a typed signature); Dkt. No. 14154 (Golden Decl. In Supp. Joinder, Exs. A–C, F, J–K (same)).

[43]   See Decl. Ex. A (Unexecuted Settlement Agreement §§ 2.2 (requiring the parties "[a]s soon as practicable following the execution of this Agreement" to "file" a "Settlement Motion" and "Claims Estimate Order"), 2.3(a) (requiring GUC Trust to pay $15 million within five days of effective date), 2.3(b) (imposing waiver and release of all plaintiffs' claims), 2.9(a) (requiring GUC Trust to provide nationwide public notice and fund $6 million of notice costs), 3.2(B) ("This Agreement shall be terminable ... on or before 30 days after execution of this Settlement Agreement")).

[44]   See Decl. Ex. A (Unexecuted Settlement Agreement §§ 3.2(B) ("This Agreement shall be terminable . . . on or before 30 days after execution of this Settlement Agreement"), 2.2 ("as soon as practicable following the execution of this Agreement, the parties shall file" a "Settlement Order" and "Claims Estimate Order"), 2.9 ("[a]s soon as practicable after the execution of this Agreement")).

[45]   Ex. NN (Tr., Aug. 11 MDL 2543 Conf. 38:11-15 (plaintiffs' counsel referring to "proposed settlement")).

15

62.     GUC Trust attorneys did not enter an appearance at the MDL 2543 status

conference on August 11 before Judge Furman but instead participated through a "listen-only"

telephone line without speaking capability.

63.     The GUC Trust decided prior to the August 17 conference before the Bankruptcy

Court that it would not proceed with the Unexecuted Settlement Agreement.

64.     The material terms of the Unexecuted Settlement Agreement and the GUC Trust's

acceptance of those terms were not stated on the record at the August 17 status conference before

the Bankruptcy Court.[46]

65.     Counsel to the unitholders advised the Bankruptcy Court during the August 17

status conference that the Unexecuted Settlement Agreement was not being submitted for

approval at that conference, that the conference was non-substantive, and that conference only

was intended to preview the alleged settlement and the notice procedures to gauge the Court's

reaction thereto.[47]

## II.    CONTENTIONS OF LAW

### A.    New York Law Governs Question of Whether Binding Agreement Exists

66.     The question of whether the Unexecuted Settlement Agreement is binding on the

GUC Trust is governed by New York law.[48]

67.     Whether the Court applies the four factors enunciated in <u>Winston v. Mediafare</u>

<u>Entm't Corp.</u>, 777 F.2d 78, 80 (2d Cir. 1985) or basic contract law, <u>e.g.</u>, 22 N.Y. Jur 2d

---

[46]    <u>See</u> Decl. Ex. OO (Tr., Hearing, Aug. 17).

[47]    Decl. Ex. OO (Tr., Hearing, Aug. 17 at 27:21-24 ([UNITHOLDER COUNSEL:]  "[t]he purpose of scheduling a status conference … was to preview the settlement, not to argue the merits, but really to preview the noticing procedures"), 28:11-15 ("[W]e wanted to get a sense from Your Honor before we went out and spent $6 million whether Your Honor thought that would be an appropriate scope of notice.")).

[48]    <u>See</u> Enforcement Mot. ¶ 34 ("The enforceability of the Settlement Agreement is governed by New York law.") (citing Unexecuted Settlement Agreement § 3.16)).

Contracts § 9 (enforceable agreement requires "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound"), the Unexecuted Settlement Agreement is not binding on any party.

68.    The four <u>Winston</u> factors are "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that usually is committed to writing."[49]

### B.    Factor 1:  Express Terms Of Purported Agreement Reflect Stated Intent That Agreement Will Not Become Binding Unless Signed By All Parties

69.    Under the facts presented, the first <u>Winston</u> factor is outcome determinative.[50]

70.    The Second Circuit's emphasis on the first <u>Winston</u> factor derives from the strict requirement of New York law that settlements must be reduced to signed writings—a principle that promotes the policy of fostering secure and candid settlement negotiations without fear that parties will become unwittingly or prematurely bound.[51]

---

[49]    <u>Winston</u>, 777 F.3d at 80.

[50]    <u>See</u> <u>Kaczmarcysk v. Dutton</u>, 414 F. App'x 354, 355 (2d Cir. 2011) (noting significance of first <u>Winston</u> factor); <u>RKG Holdings, Inc. v. Simon</u>, 182 F.3d 901, 901 (2d Cir. 1999) (noting action "can be dismissed solely on the basis of [this] express reservation" relevant to first <u>Winston</u> factor); <u>R.G. Group, Inv. v. Horn & Hardart Co.</u>, 751 F.2d 69, 75 (2d Cir. 1984) ("[C]onsiderable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed."); <u>H&R Block Tax Servs., LLC v. Strauss</u>, 2016 WL 5107114, at *4 (N.D.N.Y. Sept. 20, 2016) (linkage of contractual obligations to execution date reflects intent to require signatures; "where there is a writing between the parties showing that one party did not intend to be bound, a court need look no further than the first [<u>Winston</u>] factor"); <u>Nieves v. Cmty Choice Health Plan of Westchester, Inc.</u>, 2011 WL 5531018, at *2 (S.D.N.Y. Nov. 14, 2011) ("[If] … a party states its intent not to be bound until the agreement is fully executed, that fact is determinative").

[51]    <u>See</u> N.Y. C.P.L.R. § 2104 (requiring settlements to be reduced to properly subscribed writings); <u>Ciaramella v. Reader's Digest Ass'n</u>, 131 F.3d 320, 324 (2d Cir. 1997), 131 F.3d 320, 323 ("Enforcing premature oral settlements against the expressed intent of the parties will not further a policy of encouraging settlements. People may hesitate to enter into negotiations if they cannot control whether and when tentative proposals become binding."); <u>Winston</u>, 777 F.2d at 80 ("Because of this freedom to determine the exact point at which an agreement becomes binding, a party can negotiate candidly, secure in the knowledge that he will not be bound until execution."); <u>R.G. Group</u>, 751 F.2d at 71 ("[W]hen experienced business[persons] and lawyers are told explicitly

71.    Under New York law, the provisions of the Unexecuted Settlement Agreement, including, without limitation §§ 2.2, 2.9(a), 3.1, 3.2(B), 3.9, 3.12, 3.16, irrefutably establish the parties' objective intent that the agreement cannot become binding unless and until all parties affix their signatures.[52]

72.    The parties' intent as reflected in the provisions of the Unexecuted Settlement Agreement is corroborated further by the absence of any record evidence revealing an intent to amend or waive the signature requirement in the Unexecuted Settlement Agreement.[53]

73.    Satisfaction of the first Winston factor, that the terms of the Unexecuted Settlement Agreement reflect a stated intent that the agreement will not become binding unless signed by all parties, is outcome determinative and compels a finding that the Unexecuted Settlement Agreement is not binding on any party.

---

and clearly that a major and complex agreement will be binding only when put in writing, then they should be rather cautious about assuming something different.").

[52]    See Ciaramella, 131 F.3d at 324 (no binding agreement even though parties stated "we have a deal" when draft agreement would not become effective until "signed by [all parties];" that provision and merger clause were a clear indication "the parties did not intend to bind themselves until the settlement had been signed" and were given "considerable weight … [to] avoid frustrating the clearly-expressed intentions of the parties"); Kaczmarcysk, 414 F. App'x at 355 ("[W]ording in a settlement agreement that places great significance on the execution date evinces an intent not to create a binding settlement until some formal date of execution"); RKG, 182 F.3d at 901 (draft agreement stated it would have "no binding force unless and until it was signed"); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 262 (2d Cir. 1984) (mutual intent not to be bound was "conclusively establish[ed]" when parties accepted drafts of proposed contracts stating agreement would be binding when executed); H&R Block, 2016 WL 5107114, at *4 (linkage of contractual obligations to execution date reflects intent to require signatures); Smith v. Haag, 2015 WL 866893, at *5 (W.D.N.Y Mar. 2, 2015) (no intent to be bound when stipulation tied payment obligation to date agreement was "fully executed" and approved); Balaban-Krauss v. Exec. Risk Indem., Inc., 2014 WL 2927289, at *3 (N.D.N.Y. June 27, 2014) (merger clause persuasive evidence of intent to require signed writing); Nieves, 2011 WL 5531018, at *2 (merger clause indicated intent to not be bound); Davidson Pipe Co. Inc. v. Laventhol & Horwath, 1986 WL 2201, at *3 (S.D.N.Y. Feb. 11, 1986) (noting obligations were triggered by execution date).

[53]    See Ciaramella, 131 F.3d at 325 (noting no evidence of "an explicit waiver of the signature requirement"); R.G. Group, 751 F.2d at 76 ("There never was a written modification of the requirement that the contract be in writing" and no party ever "discussed dropping the writing requirement"); Nieves, 2011 WL 5531018, at *3-4 (rejecting argument that parties intended "to be bound by their oral and informal agreements … [as being] based on ex post facto evidence that attempts to divine the parties' intentions during the negotiations").

18

74.    New York law does not permit courts, when interpreting a contract, to ignore or rewrite provisions based on equities.[54]

75.    New York law does not permit courts, when interpreting a contract, to consider the subjective, unexpressed intent of parties to the purported agreement (or that of their counsel) for the purpose of (a) proving the existence of a binding written agreement, (b) amending or removing unambiguous provisions, or (c) proving a waiver of written provisions.[55]

76.    Repeated references to the alleged settlement agreement as "proposed" in counsels' communications among each other and to the Bankruptcy Court and the MDL 2543 Court confirm the agreement was not binding and instead was a mere draft or proposal.[56]

77.    The GUC Trust's counsel's communications to plaintiffs' counsel and the unitholders' counsel that the documents remain subject to ongoing client review confirms the GUC Trust's intent to not be bound absent a signed writing,[57] as does (a) adding § 3.1 to the Unexecuted Settlement Agreement; (b) reporting no binding agreement in the August 14 Form 10-Q; (c) stating in the August 14 Form 10-Q that negotiations remain ongoing; (c) indication

---

[54]    See In re DPH Holdings Corp., 553 B.R. 20, 27 (Bankr. S.D.N.Y. 2016) ("[A] court is not free to alter the [unambiguous] contract to reflect its personal notions of fairness and equity").

[55]    See Chesapeake Energy Corp., et al. v. Bank of N.Y. Mellon Trust, 773 F.3d 110, 114 (2d Cir. 2014) ("[T]he intent of the parties must be found within the four corners of [an unambiguous] contract."); In re AMR Corp., 730 F.3d 88, 98 (2d Cir. 2013) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); Springwell Corp. v. Falcon Drilling Co., Inc., 16 F. Supp. 2d 300, 309 (S.D.N.Y. 1998) ("[Oral] testimony cannot be used to create an agreement not found in writings."); Davidson, 1986 WL 2201, at *3 ("Subjective intent, including that of parties' counsel, is simply immaterial."); Henry L. Fox, Co. v. William Kaufman, Org., Ltd., 74 N.Y.2d 136, 142 (1989) ("[Writing] establishing a contractual relationship between the parties, [must] bear the signature of the party to be charged …. Parol evidence is admissible only to connect the papers, not to establish missing terms of the agreement.").

[56]    See Winston, 777 F.2d at 81 (use of "proposed settlement" and "proposed agreement" indicated agreements were "drafts or proposals" and not binding); Davidson, 1986 WL 2201, at *5 (same).

[57]    See Sprint Commc'ns Co. v. Jasco Trading, Inc., 5 F. Supp. 3d 323, 333-34 (S.D.N.Y. 2014) (no binding agreement: even if reservation of "right not to be bound" was "a mere formality … it was a reservation nonetheless"); Lamoille S. Supervisory Union v. Metro. Life Ins. Co., 2010 WL 5050560, at *3 (D. Vt. Nov. 24, 2010) (no binding agreement when counsels' email correspondence "indicates the parties were negotiating the final details of this written agreement and that the agreement would not be final absent client approval").

that if a binding settlement had been reached, it would have to have been required to disclose that in the Form 10-Q; and (d) statements to counsel to New GM at the August 15 meeting that the Unexecuted Settlement Agreement had not been signed, and therefore no binding contract existed.

78.    The actions of counsel to plaintiffs and the unitholders confirm their respective understandings of the GUC Trust's position that it did not consider itself bound to the agreement until it was signed by all parties thereto, including (a) accepting the addition of § 3.1 to the Unexecuted Settlement Agreement along with other provisions reflecting an intent to be bound only by a signed agreement e.g., §§ 2.2, 2.9(a), 3.1, 3.2(B), 3.9, 3.11, 3.12, 3.16; (b) attempting to gather signatures; (c) acknowledging the agreement would be signed before being filed with the Bankruptcy Court; and (d) raising no objection to the GUC Trust's characterization of the agreement in its draft August 16 letter to the Court as nonbinding and (e) plaintiffs' counsel statement that their draft letter to the Court "says a lot of the same."

## C.    Factor 2:  Parties Did Not Reach Agreement On Material Terms

79.    Plaintiffs' counsel could not have agreed to any material terms—and the alleged agreement is not binding—because plaintiffs' counsel did not have the authority from their purported clients to enter into a binding agreement with the GUC Trust.

80.    New York law governs whether plaintiffs' counsel have authority to bind their respective (purported) clients.[58]

---

[58]    See Johnson v. Nextel Commc'ns, Inc., 780 F.3d 128, 141 (2d Cir. 2015) ("Where plaintiffs' claim rests on state law, we apply the choice-of-law rules of the state in which the federal district court sits."); In re Gaston & Snow, 243 F.3d 599, 601 (2d Cir. 2001) (in federal-question cases, choice of law rules of forum state applies); Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 317 (1994) (New York courts examine place of contracting, place of negotiation, place of performance, location of subject matter, and domicile or place of business of contracting parties).

81.    Plaintiffs had to expressly provide authority to their counsel in order to enter into the Unexecuted Settlement Agreement.[59]

82.    Plaintiffs' counsel had no authority under § 3.17 or applicable law to agree to any material terms or otherwise enter into a binding agreement with the GUC Trust.

83.    In deciding to not sign the draft agreement until after the August 17 conference, the GUC Trust exercised the right for which it purposely negotiated in § 3.1 to not be bound without all parties affixing their signatures.[60]

### D.    Factor 3:  Consistent With New York Law, Unexecuted Settlement Agreement Is Type That Must Be Reduced To Signed Writing

84.    New York law requires that settlement agreements must be reduced to signed writings.[61]

85.    Given the complexity of the Unexecuted Settlement Agreement, including (a) the contemplated disposition of claims (the vast majority of which were not filed with the Bankruptcy Court) that plaintiffs' counsel assert exceed $10 billion, (b) $21 million in contemplated payments, and (c) intended notice to over 10 million individuals, and (d) purported

---

[59]    See Blakney v. Leathers, 867 N.Y.S.2d 145, 146 (2d Dep't 2008) ("An attorney must be specifically authorized to settle and compromise a claim, as an attorney has no implied power by virtue of his general retainer to compromise and settle his client's claim."); Martin v. Harrington, 47 Misc. 3d 1211(A), at *1 (N.Y. Sup. Ct. 2015) (same).

[60]    See Ciaramella, 131 F.3d at 325 ("By not signing, [Ciaramella] demonstrated that he withheld such consent."); Winston, 777 F.2d at 80-83 ("[I]f either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract"); R.G. Group, 751 F.2d at 74 (same); Stetson v. Duncan, 707 F. Supp. 657, 665 (S.D.N.Y. 1988) (parties nor counsel "ever thought their agreement would be 'final' prior to their clients' signatures on it").

[61]    See N.Y.C.P.L.R. § 2104 ("[A]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered."); Bonnette v. Long Island Coll. Hosp., 3 N.Y.3d 281, 286 (2004) (§ 2104 "on its face" permits no exceptions); Defeo v. Civitano, 756 N.Y.S.2d 879 (2d Dep't 2003) (unsigned release not effective)).

releases with respect to $32 billion already distributed by the GUC Trust, it is the type of agreement that must be reduced to a signed writing.[62]

86.    Under New York law, an agreement is "executed" when it either is signed by all parties or fully performed by all parties.[63]

87.    Because the relevant email correspondence referenced in the Enforcement Motion and the unitholders' joinder thereto does not contain purposely-inserted signatures, the "subscribed to" requirement imposed under New York law is not satisfied; a "pre-printed" or automatically generated email signature is insufficient.[64]

88.    The Unexecuted Settlement Agreement was neither fully nor partially performed.

**E.    Factor 4:  Parties Did Not Partially Perform Alleged Agreement**

89.    Preparing the Unexecuted Settlement Agreement and accompanying settlement documents does not constitute partial performance of an agreement for purposes of the fourth Winston factor.[65]

---

[62]    See Ciaramella, 131 F.3d at 326 (agreement's complexity confirms parties would not bind themselves orally); Winston, 777 F.2d at 83 (settlement agreements should be in writing; four-page agreement was "complex enough," and "the $62,500 at issue is not a trifling amount"); R.G. Group, 751 F.2d at 77 (With $80 million "at stake[,] a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone").

[63]    See Black's Law Dictionary 650 (9th ed. 2009) (defining "executed" as: "1. (Of a document) that has been signed <an executed will>. 2. That has been done, given, or performed < executed consideration>."); 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119–21 (2d Cir. 2011) (following Black's definition; noting that "[a] contract is frequently said to be executed when the document has been signed, or has been signed, sealed, and delivered" (emphasis added)); Burlington Insurance Co. v. Utica First Insurance Co., 896 N.Y.S.2d 433, 435 (2d Dep't 2010) ("[T]he purchase order was not signed at the time of the underlying plaintiff's alleged injury and, therefore, had not been 'executed' as of that time").

[64]    See Bayerische Landesbank v. 45 John St. LLC, 960 N.Y.S.2d 64, 65–66 (1st Dep't 2013) (subscribed by requirement not satisfied by emails "which contained a pre-printed signature"); see also Parma Tile Mosaic & Marble Co. v. Estate of Short, 87 N.Y.2d 524, 526 (1996) (§ 2104's "subscribed by" requirement not satisfied by "automatic imprinting, by a fax machine, of the sender's name at the top of each page transmitted"); Forcelli v. Gelco Corp., 972 N.Y.S.2d 570, 575-76 (2d Dep't 2013) (email author purposely signed its name, which constituted subscription to a settlement; message "contained [attorney's] printed name at the end … as opposed to an 'electronic signature'" which manifested "an intent that the name be treated as a signature").

[65]    See Grgurev v. Licul, 2016 WL 6652741, at *5 (S.D.N.Y. Nov. 10, 2016) (partial performance requires "some actual performance of the contract"); Smith, 2015 WL 866893, at *6 ("[P]reparing a written stipulation of settlement and/or mailing it … [do not] constitute[] partial performance"); Delgrosso v. City of New York, 2013 WL

90.    Statements made with respect to the settlement during the August 11 status conference before the MDL 2543 Court and the August 17 status conference before the Bankruptcy Court regarding the purported settlement do not constitute partial performance because (a) the material terms of the settlement and the GUC Trust's acceptance of those terms were not stated on the record and (b) the GUC Trust terminated its pursuit of the Unexecuted Settlement Agreement prior to the August 17 status conference.[66]

---

5202581, at *8 (E.D.N.Y. Sept. 13, 2013) ("[D]rafting of the settlement documents" not partial performance because "it does not constitute a change in position, and substantive rights of the parties have been affected"); Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 250 (E.D.N.Y. 2002) (where "no money exchanged hands" but active litigation ceased in four related cases in anticipation of a settlement, this factor did "not tip the balance in either direction").

[66]    See Winston, 777 F.2d at 79–82 (finding "no evidence of partial performance" when a status conference had been canceled and a 30-day order had been requested and issued); R.G. Group, 751 F.2d at 75 (performance must be "accepted by the party disclaiming the contract"); Balaban-Krauss, 2014 WL 2927289, at *3 ("[T]he exchange of various proposals regarding the language in the settlement agreement and release was not performance of an existing contract, but rather was part of the negotiations concerning a written agreement which was by the terms binding only when executed by the parties."); Edwards v. City of New York, 2009 WL 2865823, at *5 n.3 ("Even less persuasive is the defendants' contention that they somehow accomplished partial performance by alerting me to the purported settlement"); Sprint, 5 F. Supp. at 333-34 (counsel informing court that "parties expected the signing of the Settlement Agreement" was not binding when "the terms of the agreement were not discussed or agreed on the record"); Langreigh v. Grenbaum, 775 F. Supp. 2d 630, 636 (S.D.N.Y. 2011) ("[I]f one of the parties sought to repudiate the agreement  before partial performance, the fact that the other side persisted in performing would have little weight.").

Dated: New York, New York
      December 5, 2017

                      Respectfully submitted,

                      By:   /s/ *Mitchell A. Karlan*
                      Mitchell A. Karlan
                      **GIBSON DUNN & CRUTCHER, LLP**
                      200 Park Avenue
                      New York, NY 10166
                      Tel: 212-351-3800

                      *Counsel to GUC Trust*

                      By:    /s/ *James Tecce*
                      Susheel Kirpalani
                      James C. Tecce
                      Julia M. Beskin
                      Jordan Harap
                      **QUINN EMANUEL URQUHART & SULLIVAN, LLP**
                      51 Madison Avenue
                      New York, New York  10010
                      (212) 849 7199

                      -and-

                      Arthur J. Steinberg
                      Scott Davidson
                      **KING & SPALDING LLP**
                      1185 Avenue of the Americas
                      New York, New York  10036
                      Tel:  212-556-2158

                      *Counsel to General Motors LLC*