# **<u>EXHIBIT 1</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                :
In re:                                                :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,     :          Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., et al.,         :
                                                :
                                 Debtors.    :          (Jointly Administered)
------------------------------------------------------------X

## DIRECT TESTIMONY OF EDWARD S. WEISFELNER

I, Edward S. Weisfelner, under penalty of perjury, testify as follows:

1. I am a partner at the law firm of Brown Rudnick LLP, with offices at 7 Times Square, New York, New York 10036. Our firm serves as Designated Counsel for the Ignition Switch Plaintiffs[1] and certain Non-Ignition Switch Plaintiffs[2] (collectively, the "**Economic Loss Plaintiffs**") in the Bankruptcy Court. I respectfully submit this witness statement as my direct testimony in support of the *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, dated Sept. 11, 2017 [ECF No. 14092].[3]

2. The facts set forth herein are based on my personal knowledge, except as to certain matters that I believe to be true based on my review of documents produced in discovery or from other sources that I consider to be reliable.

---

[1] The term "**Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[2] The term "**Non-Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-118 and 14V-153.

[3] Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Case No. 09-50026 (MG).

1

I. **Initial Proceedings In The Bankruptcy Court And Second Circuit.**

3. Throughout 2014, New GM issued a multitude of recalls for safety defects, including, among others, recalls related to the Ignition Switch Defect and other defective ignition switches, side airbags and power steering. After the issuance of these recalls, numerous owners and lessees of defective Old GM and New GM vehicles filed lawsuits against New GM.

4. Many of the cases commenced against New GM were consolidated in a multi-district litigation in the United States District Court for the Southern District of New York before Judge Furman (the "**MDL**"). Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Martinez Gonzalez, LLP were individually and collectively appointed as Co-Lead Counsel in the MDL on August 15, 2014.[4] Mr. Berman and Ms. Cabraser were instructed to focus on Economic Loss Plaintiffs and Mr. Hilliard was instructed to focus on personal injury and wrongful death claimants.[5]

5. New GM sought to enjoin these lawsuits by filing various motions to enforce the Sale Order in the Bankruptcy Court.[6] Co-Lead Counsel retained Brown Rudnick LLP and Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation ("**Designated Counsel**") to respond to issues raised in the Bankruptcy Court. For efficiency purposes, Designated Counsel focused on issues related to the Economic Loss Plaintiffs.

---

[4] See Order No. 8, dated Aug. 15, 2014 [MDL ECF No. 249].

[5] See Order No. 13, dated Sept. 16, 2014 [MDL ECF No. 304].

[6] See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated April 21, 2014 [ECF No. 12807]. New GM also filed a motion to enforce the sale order with respect to the Non-Ignition Switch Plaintiffs, but adjudication of this motion was deferred pending resolution of the motions to enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs. *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808]; In re Motors Liquidation Co., 529 B.R. at 523.

6. To resolve the motions to enforce the Sale Order, the Bankruptcy Court first identified four threshold issues to be determined, including whether any of the claims asserted against New GM were claims against the Motors Liquidation Company GUC Trust (the "**GUC Trust**") and, if so, whether such claims should "nevertheless be disallowed/dismissed on grounds of equitable mootness . . . ." In re Motors Liquidation Co., 529 B.R. 510, 539-40 (Bankr. S.D.N.Y. 2015) (the "**April 2015 Decision**"). The Bankruptcy Court tolled the Ignition Switch Plaintiffs' time to file late claims against the GUC Trust until final resolution of the four threshold issues, including appeals.[7]

7. In April and June 2015, the Bankruptcy Court issued its decision and related judgment on these four threshold issues. See In re Motors Liquidation Co., 529 B.R. 510; *Judgment*, dated June 1, 2015 [ECF No. 13177] (the "**June 2015 Judgment**").

8. Among other things, the Bankruptcy Court held that the Ignition Switch Plaintiffs' and Ignition Switch Pre-Closing Accident Plaintiffs'[8] due process rights were violated because Old GM failed to provide them with constitutionally adequate notice of the November 30, 2009 bar date and that that failure prejudiced them in filing timely claims. See In re Motors Liquidation Co., 529 B.R. at 525, 574. The Bankruptcy Court recognized that the "obvious" remedy for this due process violation was permitting the Ignition Switch Plaintiffs and Ignition

---

[7] See *Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] at 3.

[8] The term "**Pre-Closing Accident Plaintiffs**" means those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale. The Pre-Closing Accident Plaintiffs are comprised of a subset of plaintiffs asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"). Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

3

Switch Pre-Closing Accident Plaintiffs to file late claims. See id. at 583. These bar date rulings were not appealed.

9. However, the Bankruptcy Court further held that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them" pursuant to the doctrine of equitable mootness. See id. at 528-29. According to the Bankruptcy Court, the GUC Trust was "funded by discrete bundles of assets—that had been reserved for identified claims under Old GM's reorganization plan—with no unallocated assets left for additional claims." Id. at 592. According to the Court, permitting Plaintiffs' claims against the GUC Trust would frustrate unitholders' "legitimate expectations" that the universe of claims could not increase. See id.

10. The Bankruptcy Court certified the April 2015 Decision and June 2015 Judgment for direct appeal to the Second Circuit.[9] Among the issues raised on appeal was whether "the Bankruptcy Court err[ed] in applying the doctrine of equitable mootness to the claims of the Ignition Switch Plaintiffs . . . ."[10]

11. Prior to and following the issuance of the April 2015 Decision and June 2015 Judgment, Designated Counsel and Co-Lead Counsel focused attention on issues related to the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' late claims against the GUC Trust, including (i) the allowance of late claims under the Plan,[11] the GUC Trust Agreement,[12] and the

---

[9] See *Order Pursuant to 28 U.S.C. § 158(d), Fed. R. Bankr. P. 8006(e), Certifying Judgment for Direct Appeal to Second Circuit*, dated June 1, 2015 [ECF No. 13178].

[10] *Appellants' Statement of Issues on Appeal and Amended Designation of Items to be Included in the Record on Appeal*, dated July 14, 2015 [ECF No. 13299].

[11] See *Second Amended Joint Chapter 11 Plan*, filed Mar. 18, 2011 [ECF No. 9836].

[12] See *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust and FTI Consulting, Inc., as trust monitor of the GUC Trust*, dated as of July 30, 2015 (the "**GUC Trust Agreement**").

4

Late Filed Claims Order;[13] and (ii) the structure of Section 3.2 of the Sale Agreement (the "**Accordion Feature**").[14]

12. The Accordion Feature obligates New GM to issue additional shares of New GM common stock (the "**Adjustment Shares**") if the Bankruptcy Court enters an order estimating the aggregate allowed general unsecured claims against the Old GM estate (a "**Claims Estimate Order**") at an amount exceeding $35 billion, with a maximum requirement of issuing 30 million shares if the claims estimation is equal to or exceeds $42 billion. See Sale Agreement § 3.2(c).

13. Recognizing this potential source of recovery for Plaintiffs' claims, with the approval of Co-Lead Counsel in the MDL, Designated Counsel began preliminary settlement discussions with the GUC Trust and Participating Unitholders[15] and I informed the Bankruptcy Court of these discussions at a hearing on July 16, 2015. See July 16, 2015 Hr'g Tr. 30:6-9. As I explained to the Bankruptcy Court, we were contemplating a mechanism by which, if Plaintiffs' claims were of a sufficient amount to trigger the Accordion Feature, Plaintiffs would obtain exclusive rights to the Adjustment Shares and would release all claims to current GUC Trust Assets and past distributions of GUC Trust Assets. See id. 38:19-39:13. We were also considering whether to wait to address class issues until after the Accordion Feature was triggered or pursue class certification for settlement purposes. See 44:23-46:6. Ultimately, these discussions in 2015 ended without a settlement.

---

[13] See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated Feb. 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[14] See Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009 (the "**Sale Agreement**")

[15] The "**Participating Unitholders**" are holders of approximately 65% of the GUC Trust Units outstanding.

5

14. In June 2015, in an effort to preserve GUC Trust Assets for potential late claims, certain Plaintiffs sought to stay distributions of the GUC Trust's assets pending the appeal of the April 2015 Decision and June 2015 Judgment.[16] Following an evidentiary hearing, the Bankruptcy Court ultimately granted the request for a stay, subject to the posting of a $10.6 million bond. See *Decision and Order on Request for Stay*, dated Oct. 14, 2015 [ECF No. 13501]. However, because the Plaintiffs could not post the requisite bond, the stay was never effectuated.

15. In July 2016, the Second Circuit issued its opinion on the appeal of the April 2015 Decision and June 2015 Judgment. See Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135, 166 (2d Cir. 2016). Among other things, the Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory. Id. at 169.

## II. Proceedings In The Bankruptcy Court On Remand.

16. Thereafter, the Bankruptcy Court entered an Order to Show Cause setting forth issues to be addressed by the Bankruptcy Court on remand (the "**2016 Threshold Issues**") and the procedures for resolving the 2016 Threshold Issues.[17] One 2016 Threshold Issue is whether Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs could satisfy the requirements

---

[16] See *The Ignition Switch Plaintiffs' and Certain Non-Ignition Switch Plaintiffs' Request for a Stay of Distributions of GUC Trust Assets and Response to Motion of Wilmington Trust Company, as GUC Trust Administrator and Trustee, for an Order Granting Authority (A) to Exercise New GM Warrants and Liquidate New GM Common Stock and (B) to Make Corresponding Amendments to the GUC Trust Agreement*, dated June 24, 2015 [ECF No. 13246]; *Joinder of the Ignition Switch Pre-Closing Accident Plaintiffs to the Ignition Switch Plaintiffs' and Certain Non-Ignition Switch Plaintiffs' Request for a Stay of Distributions of GUC Trust Assets and Response to Motion of Wilmington Trust Company, as GUC Trust Administrator and Trustee, for an Order Granting Authority (A) to Exercise New GM Warrants and Liquidate New GM Common Stock and (B) to Make Corresponding Amendments to the GUC Trust Agreement and Request for Stay of Distributions of GUC Trust Assets*, dated June 24, 2015 [ECF No. 13248].

[17] *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802] (the "Order to Show Cause").

6

for authorization to file late proof(s) of claim against the GUC Trust and whether such claims are equitably moot (the "**Late Proof of Claim Issue**").

17. With respect to the Late Proof of Claim Issue, the Bankruptcy Court ordered Brown Rudnick LLP and Goodwin Procter LLP, on behalf of their respective clients, to file motions seeking authority to file late proof(s) of claim (collectively, the "**Late Claim Motions**") with draft proofs of claim by December 22, 2016. See *Order to Show Cause* at 5 ¶ 1. The Bankruptcy Court instructed that the Late Claim Motions should only address the authority to file late proof(s) of claim and should not address other issues, such as whether a class proof of claim can be filed, class certification, discovery, or the merits of any late proof(s) of claim. See id. The Bankruptcy Court further instructed that briefing on the adjudication of any Late Claim Motions filed by Non-Ignition Switch Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues. See id. at 5 ¶ 2.

18. As directed by the Bankruptcy Court, Brown Rudnick assisted Co-Lead Counsel, on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, in filing a Late Claim Motion on December 22, 2016, attaching proposed class proofs of claim asserted on behalf of proposed class representatives for the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs (the "**Proposed Class Claims**").[18]

19. The Proposed Class Claims allege that Old GM knew of the Ignition Switch Defect, other ignition switch defects, defects in side airbags, and defects in power steering for

---

[18] See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] ("Plaintiffs' Late Claim Motion"). Goodwin Procter also filed a Late Claim Motion on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs. See *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated December 22, 2016 [ECF No. 13807] ("Pre-Closing Accident Plaintiffs' Late Claim Motion"). The Groman Plaintiffs and certain other plaintiffs represented by Gary Peller filed joinders to the late claims motions. In July and August 2017, certain Ignition Switch Pre-Closing Accident Plaintiffs represented by Andrews Myers, P.C. filed late claims motions.

7

years prior to the bar date and concealed the existence of these defects, causing Economic Loss Plaintiffs to overpay for defective vehicles and bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of recall.[19] Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the GUC Trust/Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of implied warranty of merchantability; and (v) negligence.[20]

20.    Thereafter, the parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary discovery, and filed briefs addressing two preliminary issues raised in the Late Claim Motions: (i) whether relief can be granted absent a showing of excusable neglect under the so-called Pioneer factors; and (ii) the applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the "**Initial Late Claim Motions Issues**").[21]

21.    In connection with the filing of the Late Claim Motions and the briefing on the Initial Late Claim Motions Issues, discussions to settle Plaintiffs' claims against the GUC Trust were renewed. Accordingly, at the May 17, 2017 hearing on the other 2016 Threshold Issues, I conveyed to the Court that there were active settlement discussions between certain Plaintiffs,

---

[19] Exhibit A to Plaintiffs' Late Claim Motion ¶¶ 9-258, 332; Exhibit B to Plaintiffs' Late Claim Motion ¶¶ 9-146, 249.

[20] Proposed Ignition Switch Class Claim ¶¶ 316-418; Proposed Non-Ignition Switch Class Claim ¶¶ 233-337.

[21] See *Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869]; *Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13871]; *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

the GUC Trust, and the Participating Unitholders that might obviate the need for oral argument on the Initial Late Claim Motions Issues. See Hr'g Tr. 266:12-19.[22] After this hearing, Matt Williams of Gibson Dunn sent me an email objecting to my disclosure of settlement discussions.[23] A hearing on these issues had not been scheduled.

### III. Settlement Negotiations.

22. Settlement discussions began between Designated Counsel and Co-Lead Counsel on behalf of the Economic Loss Plaintiffs, on the one hand, and Akin Gump Strauss Hauer & Feld LLP on behalf of Participating Unitholders, on the other. After we created the general settlement structure, Gibson Dunn & Crutcher LLP, on behalf of the GUC Trust, and Hilliard Martinez Gonzalez, LLP, the Law Offices of Thomas J. Henry and Goodwin Procter LLP, on behalf of certain Pre-Closing Accident Plaintiffs represented by those firms (the "**Initial Pre-Closing Accident Plaintiffs**"), were brought into the settlement discussions.[24] In the course of negotiations, I never dealt directly with anyone from Wilmington Trust Company, the trustee and trust administrator of the GUC Trust, or from FTI Consulting, Inc., the GUC Trust Monitor.

---

[22] Letters conveying that settlement discussions were on-going and that a hearing on the Initial Late Claims Motions Issue should not be scheduled were filed on June 16, June 30, and August 4, 2017. See *Letter re: Status of Settlement Discussions*, dated June 16, 2017 [ECF No. 13962]; *Letter re: Status of Settlement Discussions*, dated June 30, 2017 [ECF No. 13981]; *Letter re: Status of Settlement Discussions*, dated Aug. 4, 2017 [ECF No. 14027].

[23] PX-004 at BR002322.

[24] In August 2017, following discussions with the GUC Trust, certain Pre-Closing Accident Plaintiffs represented by Andrews Myers (the "**Additional Pre-Closing Accident Plaintiffs**") agreed to become signatories to the Settlement Agreement as written.

9

23. In creating a settlement structure, we relied upon the GUC Trust's exclusive authority to object to, resolve and seek estimation of Plaintiffs' claims.[25] In addition, we relied upon the GUC Trust's exclusive responsibility to request that New GM fulfill its obligation under the Sale Agreement to issue Adjustment Shares if the Accordion Feature were triggered.[26]

24. The basic structure of the contemplated settlement to resolve contested issues between the Plaintiffs and the GUC Trust was for the Plaintiffs to waive their ability to: (i) stay distributions from the GUC Trust; (ii) obtain priority on future distributions from the GUC Trust; and (iii) claw-back prior distributions to Unitholders. In exchange, the GUC Trust would pay a "Settlement Amount," pay reasonable costs and expenses for providing extensive notice of the settlement, and support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares. The Settlement Amount and Adjustment Shares would be placed in a Settlement Fund for the exclusive benefit of Plaintiffs.

25. After reaching a consensus regarding the basic structure of the contemplated settlement, on June 6, 2017, Howard Steel of Brown Rudnick sent Naomi Moss of Akin Gump an initial draft of the Settlement Agreement.[27] Between June 6, 2017 (when the initial draft of the Settlement Agreement was sent to the GUC Trust) and August 14, 2017 (when the final Settlement Agreement was provided to New GM), the parties exchanged versions of the Settlement Agreement approximately twenty-one times.

---

[25] See Plan § 7.3 ("[T]he GUC Trust Administrator . . . may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claims pursuant to section 502(c) of the Bankruptcy Code . . . ."); GUC Trust Agreement § 5.1(a) ("[O]bjections to, and requests for estimation of Disputed General Unsecured Claims against the Debtors may be interposed and prosecuted only by the GUC Trust Administrator."); GUC Trust Agreement §5.1(d) ("[T]he GUC Trust Administrator shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims against the Debtors . . . ."); GUC Trust Agreement § 5.1(e) ("The GUC Trust Administrator may at any time request that the Bankruptcy Court estimate any contingent claim, unliquidated claim or Disputed General Unsecured Claim pursuant to Section 502(c) of the Bankruptcy Code . . . .").

[26] See GUC Trust Agreement § 2.3(d).

[27] See PX-005 at BR007564.

26. In the course of settlement negotiations, I was focused on certain key issues, discussed below. At no point during the negotiation of the settlement documents did the GUC Trust or its counsel discuss with me or, to my knowledge, any other Plaintiffs' attorney that the GUC Trust's approval of the settlement would not be final or binding until the Settlement Agreement was physically signed or previewed with the Bankruptcy Court at a settlement conference.

### A. The Settlement Amount.

27. One point of discussion was the Settlement Amount to be paid by the GUC Trust. The initial June 6 draft of the Settlement Agreement by Brown Rudnick proposed a Settlement Amount of $15 million.[28] The July 5, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders kept the $15 million proposal, but added brackets around the $15 million.[29] The brackets were removed in the July 20, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders.[30]

### B. Evidence In Support Of The Claims Estimate Order.

28. A second point of discussion concerned the Claims Estimate Order. To enable the GUC Trust to support entry of the Claims Estimate Order, the Economic Loss Plaintiffs and Initial Pre-Closing Accident Plaintiffs provided the GUC Trust with separate proffers of evidence and expert reports describing in detail the alleged viability of the asserted claims, the alleged violation of due process rights in connection with the bar date and the alleged amount of damages.

---

[28] See PX-005 at BR007564-7578.

[29] See PX-013 at BR004491.

[30] See PX-026 at BR003004.

29. Howard Steel of Brown Rudnick provided an initial proffer of evidence and an expert report on the Economic Loss Plaintiffs' claims to Akin Gump to be shared with Gibson Dunn on May 9, 2017 and an updated version of the proffer of evidence to Akin Gump and Gibson Dunn on July 13, 2017.[31] The proffer of evidence sets forth the factual background for the Economic Loss Plaintiffs' claims and the amount of damages alleged. The report by Stephen Boedeker, an expert on surveys and statistical sampling, analyzes the Plaintiffs' damages claims based on a conjoint analysis conducted by Mr. Boedeker as managing director of Berkley Research Group.

30. On July 11, 2017, Bob Hilliard of Hilliard Martinez Gonzalez, LLP provided materials describing the personal injury and wrongful death claims of the Initial Pre-Closing Accident Plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts.[32] The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.

31. The valuation of the Economic Loss Plaintiffs' and Initial Pre-Closing Accident Plaintiffs' claims set forth in the proffered evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the Accordion Feature of the AMSPA.

32. As set forth in the Settlement Agreement, the GUC Trust's independent review of this evidence formed the basis of its agreement to support entry of the Claims Estimate Order.[33]

---

[31] See PX-002 at BR001936; PX-018 at BR002373.

[32] See PX-015 at BR000359.

[33] See PX-001 § 2.4 at BR005727-28.

12

### C.  Pursuing A Staged Settlement And Binding Absentee Claimants.

33. A third point of discussion concerned two related open issues raised by Akin Gump and Gibson Dunn that were resolved in the course of negotiations—creating a staged settlement process and binding absentee claimants.

34. The Settlement Agreement requires the parties to file a Settlement Motion seeking: (i) a Settlement Order approving the Settlement, directing the GUC Trust to pay a Settlement Amount, and waiving Plaintiffs' claims to current GUC Trust Assets and past distributions of GUC Trust Assets (the "**Waiver Provision**"); and (ii) a Claims Estimate Order.[34] We agreed early in negotiations that the payment of the Settlement Amount and the Waiver Provision would not be dependent on the outcome of the Claims Estimate Order. This would enable a two-step process whereby the Settlement Order could be entered first and a Claims Estimate Order could be entered later following further proceedings.

35. We also agreed that the attorneys who were signatories to the Settlement Agreement on behalf of certain Plaintiffs (the "**Signatory Plaintiffs**") would subsequently determine procedures for the administration and allocation of the Settlement Fund, subject to notice and an opportunity for all Plaintiffs to be heard. This would enable issues related to eligibility and allocation to be deferred until after the Accordion Feature was triggered and there was a significant *res* available to be allocated.

36. In connection with this staged settlement process, early in the negotiation process, the Participating Unitholders and the GUC Trust raised concerns about how to bind absentee claimants to the Settlement Order, in particular the Waiver Provision, and whether class certification for settlement purposes was necessary. On May 9, 2017, Daniel Golden of Akin

---

[34] See PX-001 §§ 2.2, 2.3, 2.4 at BR005726-5728.

13

Gump sent me an e-mail asking "whether you had further thoughts on how to include all plaintiff groups in the proposed settlement with the GUC Trust."[35]

37.     Designated Counsel and Co-Lead Counsel considered pursuing certification for a settlement class, but determined that class certification issues should not be dealt with until after the Accordion Feature had been triggered.  At that time, when there was a significant *res* to be distributed, the Signatory Plaintiffs could work with a magistrate judge to determine the details of the criteria for eligibility and allocation of the Settlement Fund.

38.     Throughout the negotiations, we consistently took the position that class certification was not necessary and that notice under Bankruptcy Rule 9019 would suffice, and made this position well known to the GUC Trust and Participating Unitholders.  The GUC Trust and Participating Unitholders both continued to negotiate the settlement despite knowing and ultimately conceding that certification of a settlement class was not necessary or contemplated. None of the twenty-one versions of the Settlement Agreement circulated among the parties over the course of more than two months provide for class certification.

39.     Instead, the parties focused on how to provide extensive notice of the Settlement Motion to Plaintiffs in order to bind them to the Settlement Order and the cost of such notice. The GUC Trust agreed to pay for extensive notice to Plaintiffs and other parties impacted by the Settlement Agreement, but negotiated for a cap on notice costs, with the Signatory Plaintiffs to pay for notice costs, if any, above the cap.[36]

40.     To determine the cost of notice and create a fulsome notice program, Co-Lead Counsel obtained bids for a notice program and engaged a notice provider, Cameron R. Azari, Esq., the Director of Legal Notice for Hilsoft Notifications, a business unit of Epiq Systems

---

[35] See PX-002 at BR001936.

[36] See, e.g., PX-006 at BR004613; PX-001 at BR005729.

14

Class Action and Claims Solutions.[37] Based on the bids received, the estimated cost of the contemplated notice ranged from $4 to $6 million. On August 9, 2017, Howard Steel of Brown Rudnick provided Naomi Moss of Akin Gump and Keith Martorana of Gibson Dunn with notice proposals to support its offer to set the notice cost cap at $6 million.[38] After several back and forth exchanges, Gibson Dunn ultimately agreed to this amount in August.[39]

41. The parties decided to seek court approval of the proposed notice procedures in advance of incurring the cost of notice. Accordingly, on July 25, 2017, Howard Steel of Brown Rudnick circulated initial drafts of a motion seeking approval of the notice procedures and forms of notice for Plaintiffs[40] and, on August 7, 2017, a declaration in support of the motion by the notice provider.[41] The parties planned to discuss notice issues at a conference with the Court before filing the motion seeking approval of notice procedures, as discussed further below.

42. At no point during negotiations or the finalization of the Settlement documentation did the GUC Trust or its counsel indicate that neither the GUC Trust nor its counsel would sign the Settlement Agreement or any of its ancillary documents prior to previewing the proposed notice procedures or any of the Settlement terms with the Bankruptcy Court.

### IV. Finalizing The Settlement Agreement, Informing New GM, And The GUC Trust's Subsequent Abandonment.

43. By no later than early August 2017, all of the material terms of the Settlement Agreement had been agreed to, the forms reflecting the same were substantially finalized,

---

[37] See PX-045 at BR006635.

[38] See id.

[39] See PX-001 at BR005729.

[40] See PX-029 at BR003073.

[41] See PX-044 at BR006376.

including the notices to those who would be bound by the Settlement, and the parties were working to schedule a conference with the Bankruptcy Court to present the Settlement and preliminarily discuss notice issues.

44. On August 2, 2017, Naomi Moss of Akin Gump informed Howard Steel of Brown Rudnick and Keith Martorana of Gibson Dunn that Judge Glenn was out the following week but would be in the week of August 14.[42]

45. Around this time, I was informed by Gibson Dunn that we had its consent to contact Arthur Steinberg, counsel for New GM, to discuss the Settlement and the planned Bankruptcy Court conference. Accordingly, on August 9, 2017, with the full knowledge and consent of the GUC Trust, Daniel Golden, counsel to the Participating Unitholders, and I called Arthur Steinberg and Andrew Bloomer, counsel to New GM, to inform New GM of the plan to present the Settlement papers to the Bankruptcy Court at a conference, determine New GM's availability for such a conference the following week, and inform New GM of the basic structure of the Settlement, including that the parties would seek a Claims Estimate Order as part of the Settlement. We also committed to provide Mr. Steinberg and Mr. Bloomer a final set of pleadings in advance of such a conference. Mr. Steinberg confirmed that he would be available for the planned conference.

46. Following this call, Mr. Golden circulated an email to the parties to "schedule an all hands call . . . to finalize all of the settlement documentation and motions" and requested that "[a]t this call please have the requisite people necessary to bind your respective clients."[43] This call was ultimately scheduled for August 11, following the MDL status conference before Judge Furman.

---

[42] See PX-037 at BR006091.

[43] See PX-047 at BR007012.

16

47. On August 11, 2017, Co-Lead Counsel Steve Berman previewed certain terms of the Settlement in open court at the MDL status conference.[44] Gibson Dunn attended the MDL status conference telephonically and did not object to the preview of the Settlement during or after the status conference. To my knowledge, no one from Gibson Dunn contacted Mr. Berman objecting to his statement to Judge Furman that a Settlement would be presented to the Bankruptcy Court the following week. New GM attended the MDL status conference and let Judge Furman know that New GM thought the Settlement was collusive and that New GM planned to seek to withdraw the reference to the Bankruptcy Court.[45] Numerous news outlets carried stories regarding the settlement following this conference.

48. Following the conference, the parties had the previously scheduled all hands call to finalize the documents. On that call, Gibson Dunn conveyed that they were done with comments to the documents.

49. Later that day, Howard Steel of Brown Rudnick circulated updated documents per the all hands call.[46] In response, on August 12, Keith Martorana of Gibson Dunn conveyed that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine."[47]

50. Keith Martorana of Gibson Dunn confirmed that resolution of that item occurred on the morning of August 14. That morning, Howard Steel of Brown Rudnick circulated final execution versions of the settlement documentation.[48]

---

[44] See Aug. 11 Hr'g Tr. 37:13-39:1.

[45] See id. 41:4-17.

[46] See PX-056 at BR005064.

[47] See PX-063 at BR005468.

[48] See PX-073 at BR005760.

17

51. By August 14, 2017, the parties had secured a conference with the Bankruptcy Court for August 17, 2017.[49]

52. On August 14, Mr. Golden of Akin Gump sent an email to the parties asking "who will be in position to send the final documentation" to Mr. Steinberg.[50] Howard Steel of Brown Rudnick offered to "send to him when everyone is signed off . . . ."[51]

53. Each party to the Settlement Agreement provided authorization to provide the final documents to New GM over email, including Keith Martorana of Gibson Dunn who stated that we were "authorized to send current versions to New GM this evening."[52] Accordingly, at 9:14 p.m., Howard Steel of Brown Rudnick sent the final versions of the Settlement documents to New GM's counsel, cc'ing counsel for the GUC Trust.[53]

54. The next day, on August 15, New GM filed a letter with the Bankruptcy Court requesting that the August 17 conference be cancelled, stating, among other things, that "the proposed settlement is legally improper, collusive and in bad faith."[54] Before the parties had a chance to file responsive letters, on August 16, the Bankruptcy Court entered an order keeping the August 17th date for the conference, to be held in open court on the record.[55]

55. Unbeknownst to the Plaintiffs' counsel, also on August 15, 2017, Gibson Dunn had a meeting with New GM, to which meeting counsel for the Participating Unitholders was precluded from attending. According to the GUC Trust, this meeting lasted two hours "at most,"

---

[49] See PX-067 at BR005770.

[50] See PX-078 at BR006024.

[51] See id.

[52] See PX-089 at BR005545.

[53] See PX-094 at BR005613.

[54] See *New GM's Position on Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m. Regarding Proposed Settlement of Late Claim Motions*, dated Aug. 15, 2017 [ECF No. 14053].

[55] See *Order re August 17, 2017 Court Conference*, dated Aug. 16, 2017 [ECF No. 14056].

18

consisting in large part of New GM reciting "execution risks" that the GUC Trust "already knew," including binding absentee claimants absent class certification.[56]

56. On the afternoon of August 16, 2017, the day before the August 17th status conference before the Bankruptcy Court, I received a call from Gibson Dunn informing us that the GUC Trust was pulling out of the Settlement Agreement.

57. Also on August 16, 2017, New GM and the GUC Trust submitted a joint letter to the Bankruptcy Court explaining that the GUC Trust was backing out of the Settlement and decided to enter into "a proposed settlement agreement with New GM that will be subject to this Court's approval."[57]

58. In response, that same day, Brown Rudnick filed the final Settlement documentation with the Bankruptcy Court.[58] The next day (August 17, 2017), Brown Rudnick filed a supplemental letter attaching relevant communications with the GUC Trust demonstrating the binding nature of the Settlement Agreement.[59]

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

Dated: December 5, 2017
    New York, New York

                                                /s/ Edward S. Weisfelner
                                                Edward S. Weisfelner

---

[56] See Aug. 17, 2017 Hr'g Tr. 16:14-21:14.

[57] See *Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated August 16, 2017 [ECF No. 14060].

[58] See *Letter to Judge Glenn in Response to GM's Letter Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m.*, dated August 16, 2017 [ECF No. 14061].

[59] See *Letter to Judge Glenn Supplementing Plaintiffs' Letter*, dated Aug. 17, 2017 [ECF No. 14062].