# <u>EXHIBIT 2</u>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X
                                                  :
In re:                                            :            Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,               :            Case No.: 09-50026 (MG)
            f/k/a General Motors Corp., et al.,   :
                                                  :
                            Debtors.              :            (Jointly Administered)
-----------------------------------------------------------------X

## <u>DIRECT TESTIMONY OF HOWARD S. STEEL</u>

I, Howard S. Steel, under penalty of perjury, testify as follows:

1.      I am a partner at the law firm of Brown Rudnick LLP, with offices at 7 Times Square, New York, New York 10036.  Our firm serves as Designated Counsel for the Ignition Switch Plaintiffs[1] and certain Non-Ignition Switch Plaintiffs[2] (collectively, the "**Economic Loss Plaintiffs**") in the Bankruptcy Court.  I respectfully submit this witness statement as my direct testimony in support of the *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, dated Sept. 11, 2017 [ECF No. 14092].[3]

2.      The facts set forth herein are based on my personal knowledge, except as to certain matters that I believe to be true based on my review of documents produced in discovery or from other sources that I consider to be reliable.

---

[1] The term "**Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[2] The term "**Non-Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-118 and 14V-153.

[3] Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Case No. 09-50026 (MG).

## I.    Preliminary Discussions To Create The Settlement Structure.

3.     Pursuant to the Order to Show Cause issued by the Bankruptcy Court,[4] Co-Lead Counsel[5] and Designated Counsel[6] on behalf of the Economic Loss Plaintiffs and Goodwin Procter LLP on behalf of certain Pre-Closing Accident Plaintiffs[7] filed motions seeking authority to file late proofs of claim (collectively, the "**Late Claim Motions**"), attaching draft proofs of claim, on December 22, 2016.[8]    Thereafter, the parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary discovery, and filed briefs addressing two preliminary issues raised in the Late Claim Motions.[9]

4.     In connection with the Late Claim Motions, settlement discussions began between Co-Lead Counsel and Designated Counsel on behalf of the Economic Loss Plaintiffs, on the one

---

[4]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802] (the "Order to Show Cause").

[5]    Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, and Robert C. Hilliard of Hilliard Martinez Gonzalez, LLP were individually and collectively appointed as Co-Lead Counsel in the MDL on August 15, 2014.  See Order No. 8, dated Aug. 15, 2014 [MDL ECF No. 249].  Mr. Berman and Ms. Cabraser were instructed to focus on Economic Loss Plaintiffs and Mr. Hilliard was instructed to focus on personal injury and wrongful death claimants.  See Order No. 13, dated Sept. 16, 2014 [MDL ECF No. 304].

[6]    Co-Lead Counsel retained Brown Rudnick LLP and Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation as Designated Counsel to brief issues in the Bankruptcy Court.

[7]    The term "**Pre-Closing Accident Plaintiffs**" means those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs are the "**Plaintiffs**."

[8]    See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] ("Plaintiffs' Late Claim Motion").  Goodwin Procter also filed a Late Claim Motion on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs.  See *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated December 22, 2016 [ECF No. 13807] ("Pre-Closing Accident Plaintiffs' Late Claim Motion").  The Groman Plaintiffs and certain other plaintiffs represented by Gary Peller filed joinders to the late claims motions.  In July and August 2017, certain Ignition Switch Pre-Closing Accident Plaintiffs represented by Andrews Myers, P.C. filed late claims motions.

[9]    See, e.g., *Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869].

hand, and Akin Gump Strauss Hauer & Feld LLP on behalf of Participating Unitholders,[10] on the other.  After we created the general settlement structure, Gibson Dunn & Crutcher LLP, on behalf of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"), and Hilliard Martinez Gonzalez, LLP, the Law Offices of Thomas J. Henry and Goodwin Procter LLP, on behalf of certain Pre-Closing Accident Plaintiffs represented by those firms (the "**Initial Pre-Closing Accident Plaintiffs**"), were brought into the settlement discussions.[11]

5.      In the course of negotiations, I never dealt directly with anyone from Wilmington Trust Company, the trustee and trust administrator of the GUC Trust, or FTI Consulting, Inc., the GUC Trust Monitor.

6.      The basic structure of the contemplated settlement was for the GUC Trust to:  (i) support entry of a Claims Estimate Order that would trigger New GM's obligation to issue the maximum amount of Adjustment Shares;[12] (ii) pay a "Settlement Amount;" and (iii) pay reasonable costs and expenses for providing notice of the settlement.  The Settlement Amount and Adjustment Shares would be placed in a Settlement Fund for the exclusive benefit of Plaintiffs.  In exchange, the Plaintiffs would waive their ability to: (i) stay distributions from the GUC Trust; (ii) obtain priority on future distributions from the GUC Trust; and (iii) claw-back prior distributions to Unitholders (the "**Waiver Provision**").

---

[10]  The "**Participating Unitholders**" are holders of approximately 65% of the GUC Trust Units outstanding.

[11]  In August 2017, following discussions with the GUC Trust, certain Pre-Closing Accident Plaintiffs represented by Andrews Myers (the "**Additional Pre-Closing Accident Plaintiffs**") agreed to become signatories to the Settlement Agreement as written.

[12]  Pursuant to Section 3.2 of the Sale Agreement, New GM is obligated to issue additional shares of New GM common stock (the "**Adjustment Shares**") if the Bankruptcy Court enters an order estimating the aggregate allowed general unsecured claims against the Old GM estate (a "**Claims Estimate Order**") at an amount exceeding $35 billion, with a maximum of issuing 30 million shares if the claims estimation is equal to or exceeds $42 billion.  See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser,* dated as of June 26, 2009, § 3.2(c).

7.     On May 9, 2017, I provided an initial proffer of evidence and an expert report on the Economic Loss Plaintiffs' claims and the amount of damages alleged to Akin Gump to be shared with Gibson Dunn.[13]   On July 13, 2017, I sent an updated proffer of evidence to Akin Gump and Gibson Dunn "providing more background and updated information."[14]   These proffers contained a detailed analysis of the claims that the Economic Loss Plaintiffs could assert in the Bankruptcy Court as well as an explanation of damages.

8.     On July 11, 2017, Bob Hilliard of Hilliard Martinez Gonzalez, LLP provided materials describing the personal injury and wrongful death claims of the Initial Pre-Closing Accident Plaintiffs and the amount of damages alleged.[15]

9.     The combined valuation of the Economic Loss Plaintiffs' claims and the Initial Pre-Closing Accident Plaintiffs' claims set forth in the proffers and expert reports is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares.

10.     An issue discussed early in the negotiation process was the concern raised by the Participating Unitholders and the GUC Trust about how to bind absentee claimants to the Settlement (in particular the Waiver Provision), and whether class certification for settlement purposes was necessary.

11.     Throughout the negotiations, Designated Counsel and Co-Lead Counsel consistently took the position that class certification was not necessary and made that position known to the GUC Trust and the Participating Unitholders.  The GUC Trust and Participating

---

[13]   See PX-002 at BR001936.

[14]   See PX-018 at BR002373.

[15]   See PX-015 at BR000359.

Unitholders both continued to negotiate the settlement despite knowing and ultimately conceding that certification of a settlement class was not necessary.

12.     Instead of discussing class certification for settlement purposes, we focused on how to provide extensive notice of the Settlement Motion seeking approval of the Settlement Agreement and Claims Estimate Order under Bankruptcy Rule 9019 in order to bind absentee claimants and the cost of such notice.

**II.     Settlement Negotiations Begin In Earnest And
         Agreement Is Reached On Certain Core Terms.**

13.     After reaching consensus regarding the basic structure of the contemplated settlement, on June 6, 2017, I sent Naomi Moss of Akin Gump an initial draft of the Settlement Agreement.[16]   Between June 6, 2017 (when the initial draft was sent to the GUC Trust) and August 14, 2017 (when the final draft was provided to New GM), the parties exchanged versions of the Settlement Agreement approximately twenty-one times.

14.     On June 9, 2017, Naomi Moss of Akin Gump provided Brown Rudnick with the collective comments of Akin Gump and Gibson Dunn to the initial draft of the Settlement Agreement.[17]  This draft maintained the general structure of the Settlement.  The main revisions included editing the definition of Plaintiffs to ensure the Waiver Provision would cover absentee claimants, adding the concept of a notice cost cap over which Plaintiffs would cover the cost of notice of the Settlement Motion, and expanding the Waiver Provision to include a waiver of any claims to assets of the Motors Liquidation Company Avoidance Action Trust.

---

[16]  PX-005 at BR007564.

[17]  PX-006 at BR004584.

15.     In this draft, Akin Gump and Gibson Dunn added boilerplate language that the Settlement Agreement "shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties."[18]

16.     This language was never discussed by the parties and Gibson Dunn never discussed with us any reservation, express or otherwise, that the Settlement Agreement could not be binding until signatures were placed on the document.

17.     Over the next month, up to and including July 18, 2017, the parties exchanged approximately eight mark-ups of the Settlement Agreement attached to emails containing boilerplate reservations that the drafts were subject to the ongoing review of co-counsel and/or clients.[19]  None of the emails specified that signatures were required before the Settlement would be binding.

18.     At this point, there was "a call to discuss some of the points that seem stalled so we can discuss our respective concerns."[20]  That call took place the next day, July 19, 2017, after which, on July 20, 2017, Keith Martorana of Gibson Dunn circulated "revised versions of the

---

[18]  See id.

[19]  See PX-008 at BR004675 (June 15 email from Brown Rudnick circulating Brown Rudnick comments, "subject to further review and revision in all respects, including by Lead Counsel and Hilliard / Weintraub"); PX-009 at BR004761 (June 23 email from Gibson Dunn circulating collective comments from Gibson Dunn and Akin Gump "subject to the ongoing review of GDC, AG and the Trust Administrator"); PX-011 at BR003749 (July 3 email from Brown Rudnick circulating collective Brown Rudnick and Goodwin Procter comments "[s]ubject to ongoing review of BR / GP / Berman, Cabraser, Hilliard"); PX-013 at BR004460 (July 6 email from Gibson Dunn circulating collective comments of Gibson Dunn and Akin Gump "subject to the ongoing review and comment of GDC, Akin Gump and the GUC Trust"); PX-017 at BR002330 (July 12 email from Gibson Dunn "intended to reflect our conversation from yesterday," "this document is being sent simultaneously to our clients and remains subject to ongoing review and comment"); PX-019 at BR002573 (July 14 Goodwin Procter email circulating collective Goodwin Procter and Brown Rudnick comments "subject to review and comment by Goodwin's and Brown Rudnick's respective clients and co-counsel"); PX-020 at BR002622 (July 17 Gibson Dunn email circulating collective Gibson Dunn and Akin Gump comments, "being sent simultaneously to our clients and thus remains subject to ongoing review and comment"); PX-021 at BR002669 (July 18 Goodwin Procter email circulating collective Goodwin Procter and Brown Rudnick comments; "Our respective clients and co-counsel are still reviewing these changes and the draft remains subject to further comments and changes.").

[20]  PX-021 at BR002669; PX-022 at BR002868.

settlement agreement which reflects the group's discussion yesterday" "being sent contemporaneously to our clients and remains subject to their ongoing review and comment."[21]

19.    By July 20, 2017, several key issues had been resolved.  One key issue resolved was the Settlement Amount.  The initial June 6 draft of the Settlement Agreement by Brown Rudnick proposed a Settlement Amount of $15 million.[22]  The July 5, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders kept the $15 million proposal, but added brackets around the $15 million figure.[23]  The brackets were removed in the July 20, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders.[24]

20.    Another issue resolved was whether to require side letters from Gary Peller and Golenbock, Wolf, Holdestein stating that they would not object to the settlement.  By July 20, 2017, the parties had decided not to include a side letter requirement.[25]

21.    An additional issue discussed was the timing of the waivers in the Settlement Agreement.[26]  By the July 20, 2017 version of the Settlement Agreement drafted by the GUC Trust and Participating Unitholders, the parties had agreed that the Plaintiffs' waiver of rights to current and past distributions of GUC Trust Assets and the GUC Trust's and related parties' waiver of rights to the Settlement Amount would be effective upon the Settlement Order becoming a final order and payment of the Settlement Amount.  The GUC Trust's and related

---

[21]  PX-026 at BR002969.

[22]  See PX-005 at BR007564-7578.

[23]  See PX-013 at BR004491.

[24]  See PX-026 at BR003004.

[25]  See, e.g., PX-021 at BR002669; PX-026 at BR003004.

[26]  See, e.g., PX-013 at BR004460; PX-017 at BR002330; PX-019 at BR002573; PX-021 at BR002669.

parties' waiver of rights to the Adjustment Shares would be effective upon the Settlement Order becoming a final order, payment of the Settlement Amount, and entry of the Claims Estimate Order. In addition, the GUC Trust had the ability to waive the final order requirement in these waivers.[27]

22.     The parties also discussed the amount of the notice cost cap (with proposals ranging from $15 million to $5 million) and whether amounts over the cap would be deducted from the Settlement Amount or covered by the Signatory Plaintiffs.[28] In connection with these discussions, on June 11, 2017, I sent Akin Gump an email detailing preliminary views on the cost of sending postcard notice to Plaintiffs to be shared with Gibson Dunn.[29] About a month later, on July 12, 2017, I sent Akin Gump and Gibson Dunn illustrative notice plans with projected costs.[30] On July 20, 2017, the notice cost cap amount was set at $5 million;[31] however, this amount was increased to $6 million in the August 7, 2017 version of the Settlement Agreement.

23.     Around this time, the parties began making progress on drafting: (i) the two orders to be attached the Settlement Agreement—the Settlement Order and Claims Estimate Order; and (ii) the two motions referenced in and required to implement the Settlement Agreement—the Settlement Motion and the motion seeking approval of notice procedures. On June 27, 2017, Keith Martorana of Gibson Dunn circulated the initial draft of the Settlement

---

[27] See PX-026 at BR003004; PX-029 at BR003073.

[28] See, e.g., PX-008 at BR004675; PX-013 at BR004460; PX-019 at BR002573; PX-020 at BR002622.

[29] See PX-007 at BR004622.

[30] See PX-016 at BR002323.

[31] See PX-026 at BR003004.

Order.[32]  On July 19, 2017, Jill Forster of Brown Rudnick circulated initial drafts of the Claims

Estimate Order and Settlement Motion.[33]  A few days later, on July 25, 2017, I circulated initial

drafts of the motion seeking approval of notice procedures and accompanying proposed long-

and short-form of notice to Plaintiffs.[34]

24.    On July 25, 2017, I circulated a draft of the Settlement Agreement revising the

notice provision to provide notice to individuals who owned or leased recalled vehicles on or

before November 30, 2009 (the bar date), rather than July 10, 2009 (the closing date),[35] and on

July 26, 2017, I circulated "light comments" to the Settlement Order and Claims Estimate

Order.[36]

25.    In response, on July 27, 2017, Keith Martorana of Gibson Dunn conveyed that the

"Settlement Agreement, Settlement Order and Claims estimate order generally look fine from a

GDC perspective (and client sign-off is pending)," but inquired why the notice date was

switched from the closing date to the bar date.[37]  I agreed to Gibson Dunn's one edit, responding,

"Please use 7/10," and asked whether Keith Martorana had obtained "client sign off."[38]  Keith

Martorana circulated the Settlement Agreement "incorporating that change" of using 7/10 and

answered that:

> I had a lengthy conversation with our client today, and they are discussing
> internally.  Sign-off, with respect to the three documents (Settlement Agreement,

---

[32]  See PX-010 at BR004718.

[33]  See PX-025 at BR002908.

[34]  See PX-029 at BR003073.

[35]  See id.

[36]  See PX-030 at BR003211.

[37]  Ex. PX-032 at BR003277.

[38]  Id.

Settlement Order, Claims Estimate Order) will likely come tomorrow.  We'll keep you posted.  Note, however, that sign-off on the settlement itself is subject to the finalization of all other document in a satisfactory manner and receipt of final approvals.[39]

26.    The following day, on July 28, 2017, Keith Martorana of Gibson Dunn recirculated the Settlement Agreement with "one change requested by [Brown Rudnick]" and clarified a factual issue in the preamble.  Keith Martorana also circulated the Settlement Order adding one sentence requested by Goodwin Procter reiterating that the Settlement was not intended to impair claims that Plaintiffs may have against New GM.  <u>This email contained no reservation of rights</u>.[40]

27.    After Bill Weintraub requested "a minor edit" to the definition of "PIWD Plaintiffs" in the Settlement Agreement, on August 2, 2017, Keith Martorana of Gibson Dunn agreed that "[t]his change is fine" and circulate a revised version of the Settlement Agreement with this change, again with no reservation of rights.[41]

**III.    The Parties Finalize The Settlement Documentation, Inform New GM About The Settlement, And Schedule The Court Conference.**

28.    On August 3, 2017, in response to my inquiry regarding Judge Glenn's availability in connection with scheduling a conference to present the Settlement to the Bankruptcy Court and preliminarily discuss notice issues, Naomi Moss of Akin Gump informed me and Keith Martorana of Gibson Dunn that the Judge is "out next week.  He is in the week after," *i.e.*, the week of August 14th.[42]

---

[39]  PX-032 at BR003277.

[40]  <u>See</u> PX-034 at BR003354.

[41]  Ex.PX-038 at BR006092.

[42]  PX-037 at BR006091.

29.     Accordingly, on August 3, 2017, when I circulated a draft letter providing the Bankruptcy Court with a status update regarding settlement discussions to Akin Gump and Gibson Dunn, I asked whether we should include that the parties "hope to be before the court week of 14th."   Keith Martorana of Gibson Dunn responded that we should not make the anticipated conference public "prior to speaking to New GM.  They will understandably go crazy."[43]  The letter was filed without any reference to the anticipated conference.[44]

30.     Also on August 3, 2017, Keith Martorana of Gibson Dunn circulated the Settlement documentation and described its edits as "minor clean-ups" or "slight changes," with the exception of Settlement Motion.[45]

31.     On August 7, 2017, I sent combined Brown Rudnick and Goodwin Procter comments to all Settlement documents and asked "Please let us know where we are final, and any comments / anything you would like to discuss."[46]  The edits included a proposal to increase the notice cost cap amount in the Settlement Agreement from $5 million to $6 million.   In addition, language was added to the Settlement Order and Claims Estimate Order clarifying that the Settlement was not intended to impact Plaintiffs' claims against New GM and several edits to the Settlement Motion were made.[47]   Among the documents circulated was a draft of the joint declaration of Co-Lead Counsel in support of the Settlement Motion.

---

[43]   PX-042 at BR006162.

[44]   See *Letter re: Status of Settlement Discussions Between the Ignition Switch Plaintiffs, Certain Non-Ignition Switch Plaintiffs, Certain Pre-Closing Accident Plaintiffs, and the GUC Trust*, dated Aug. 4, 2017 [ECF No. 14027].

[45]   See PX-041 at BR006164 (noting that the documents "remain[] subject to ongoing review and comment of our clients").

[46]   PX-044 at BR006376.

[47]   See id.

32.    To substantiate the $6 million notice cost cap amount proposal, on August 8, 2017, I sent Gibson Dunn and Akin Gump a notice proposal from Epiq.[48]  Matt Williams of Gibson Dunn responded that "[a]nything over the ([$]5/6 [million]) cap needs to be paid directly by the plaintiffs, not out of the 15mm" Settlement Amount.[49]

33.    Also on August 8, 2017, Keith Martorana informed us that Gibson Dunn was in discussions with Lisa Norman (who had filed a motion seeking authority to file late proofs of claim on behalf of certain Pre-Closing Accident Plaintiffs on July 28, 2017), and that Lisa Norman was amenable to becoming a signatory to the Settlement Agreement.[50]  Lisa Norman became a signatory without proposing any changes to the terms of the Settlement Agreement.

34.    Keith Martorana of Gibson Dunn attached to this email the combined Gibson Dunn and Akin Gump comments to the Settlement documentation.[51]  The edits to the Settlement Agreement included adding brackets around the proposed $6 million notice cost cap amount (which were removed in the August 11, 2017 version of the Settlement Agreement accepted by Gibson Dunn) and adding that the failure to obtain the Notice Order approving the notice procedures contemplated in the Settlement Agreement would be an automatic termination event. Edits to the other documents largely concerned adding clarifying language that Plaintiffs would have no further rights to payment from the GUC Trust other than the Settlement Amount and Adjustment Shares once the waiver was effective.

35.    Given that the Settlement Agreement was substantially finalized at this time, on August 9, 2017, Ed Weisfelner of Brown Rudnick and Danny Golden of Akin Gump called

---

[48]  See PX-045 at BR006635.

[49]  PX-049 at BR006977.

[50]  See PX-046 at BR006651.

[51]  Id. (noting that the documents are "subject to the ongoing review and comment of our clients").

Arthur Steinberg of King & Spalding and Andrew Bloomer of Kirkland & Ellis, counsel to New GM.  On the call, Ed Weisfelner and Danny Golden gave New GM "a heads up on the proposed settlement and our desire to have a chambers conference with Judge Glenn for some day next week" and committed to providing New GM "a final set of pleadings sufficiently in advance of a to be scheduled chambers conference."[52]

36.      In his August 9 email, Danny Golden of Akin Gump asked the parties to "schedule an all hands call for tomorrow to finalize all of the settlement documentation and motions. . . . It seems to me we need a final call to finalize the documents so we can schedule that chambers conference.  At this call please have the requisite people necessary to bind your respective clients."[53]  The call was eventually scheduled to take place on Friday, August 11, 2017 following a status conference in the MDL.

37.      In advance of the all hands call, on August 10, 2017, I sent Naomi Moss of Akin Gump, cc'ing Bill Weintraub of Goodwin Procter, an email with light wordsmithing and clarifying edits to the Settlement Motion, Settlement Agreement, and Claims Estimate Order, explaining "with hopes for an easy Friday for all – here are BR / GP final comments w/ commentary . . .  We pledge to use great efforts that if these are taken, no more ink to be shed from plaintiffs' side on the docs."[54]

---

[52]  PX-047 at BR007012.

[53]  Id. Emphasizing the goal of finality, Naomi Moss of Akin Gump reiterated this point on August 10 in an email to me and Bill Weintraub of Goodwin Procter, stating that "[t]he objective here is to have this be the final call on all outstanding issues.  We would like everyone on the phone so we can close everything out."  PX-050 at BR007420.  Danny Golden of Akin Gump further noted that "there will be no reservation of rights saying you need to check with your clients."  Id.

[54]  PX-052 at BR007488.

38.    On August 11, 2017, Co-Lead Counsel Steve Berman previewed certain terms of the settlement in open court at the status conference before Judge Furman in the MDL.[55]  Gibson Dunn attended the MDL status conference telephonically and subsequently did not object to the preview of the Settlement during or after the status conference.  At the conference, New GM made its objections to the Settlement clear and unmistakable, stating that "[t]his has got all the indicia of a collusive settlement."[56]  Several news outlets carried stories regarding the settlement following this conference.

39.    Following the conference, on August 11, 2017, the parties had the all hands call to finalize the documents.  On that call, Gibson Dunn conveyed that they were done with comments to the documents.  Also on that call, Steve Berman of Hagens Berman conveyed that he had announced the Settlement at the MDL status conference.  Gibson Dunn made no objection to the fact that Mr. Berman had told Judge Furman that a settlement had been reached.

40.    After the status conference and associated news reports, neither Brown Rudnick nor Co-Lead Counsel received any complaint from Gibson Dunn that a settlement had been announced at the status conference.

41.    That same afternoon of August 11, 2017, I circulated "[u]pdated docs per today's all-hands.  Hoping these are final and we can schedule signatures."[57]  In addition to various clean-up and wordsmithing edits in the Settlement documentation, I removed the brackets around the $6 million notice cost cap amount in the Settlement Agreement and clarified that the

---

[55]  See Aug. 11 Hr'g Tr. 37:13-39:1.

[56]  Aug. 11 Hr'g Tr. 41:16-17.

[57]  PX-056 at BR005064.

Settlement Agreement would not automatically terminate if the Bankruptcy Court entered a Notice Order that was reasonably acceptable to the Parties.

42.     On August 11, 2017 and August 12, 2017 initial drafts of Bob Hilliard's and Lisa Norman's declaration in support of the Settlement Motion were circulated.[58]

43.     On August 12, 2017, Keith Martorana of Gibson Dunn confirmed that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine."[59] This email did not include any reservation that counsel's comments were subject to client review of approval.

44.     In this same email, Keith Martorana of Gibson Dunn attached initial drafts of the notice to Unitholders and the Andrews Declaration.  The Andrews Declaration stated, *inter alia*, that "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions."[60]

45.     On August 12, 2017, I asked Keith Martorana "what's [the] open item" that he was discussing with Akin Gump.  In response, he explained that Akin Gump – not the GUC Trust – had questions about which court (the Bankruptcy Court or the District Court) would hear allocation proceedings regarding the Settlement Fund and that he "suspected they will get over this issue, but since it was their comment i can't sign-off for them."[61]

---

[58]   See PX-058 at BR005329; PX-062 at BR005373.

[59]   PX-063 at BR005468.

[60]   PX-063 at BR005477 ¶ 28.

[61]   PX-073 at BR005760.

46.    On Monday, August 14, 2017 I learned that the chambers conference was confirmed for Thursday, August 17, 2017.[62]

47.    Also on August 14, 2017, Keith Martorana of Gibson Dunn confirmed resolution of the one open item they were discussing with Akin, stating that "I spoke to Akin, and we are ok with this."[63]    The GUC Trust's "last point" was to edit the declarations in support of the Settlement Motion to "read that 'counsel to the Participating Unitholders' participated in negotiations," rather than stating that the Participating Unitholders participated in negotiations.[64]

48.    I responded that "We will updated accordingly and send execution drafts as soon as possible."[65]    I then circulated "proposed final execution versions of all of the documents. . . . Please let us know any comments or questions and confirm when you are signed off."[66]    These versions had all "draft" and "privileged and confidential" headings removed.    The remaining changes were:    (i) light edits by Brown Rudnick and Goodwin Procter to the Andrews Declaration and notice to Unitholders that had been circulated over the weekend; (ii) updating citations to the supporting declarations in the Settlement Motion; and (iii) Gibson Dunn's requested edit to clarify in the supporting declarations that counsel to the Participating Unitholders participated in negotiations.

49.    In response, Keith Martorana of Gibson Dunn requested one change to the notice to Unitholders regarding the percentage of GUC Trust Units held by the Participating

---

[62]    See PX-067 at BR005770.

[63]    PX-073 at BR005760.

[64]    Id.

[65]    Id.

[66]    PX-075 at BR005804.

Unitholders and stated that "[a]t this point we do not have any further comments, but are obtaining final sign-off from our client."[67]

50.    Next, Daniel Golden of Akin Gump asked, "Can someone please advise me who will be in a position to send the final documentation to Arthur [Steinberg] by cob today."  I responded that "[w]e can send to him when everyone signed off – please advise if you have not already."[68]

51.    I received confirmation that each party was signed off, specifically, confirmation from:  (i) Co-Lead Counsel and Designated Counsel on behalf of the Economic Loss Plaintiffs; (ii) Hilliard Martinez Gonzalez, the Law Offices of Thomas J. Henry, and Goodwin Procter on behalf of the Initial Pre-Closing Accident Plaintiffs; (iii) Andrews Myers on behalf of the Additional Pre-Closing Accident Plaintiffs; (iv) Akin Gump on behalf of the Participating Unitholders; and (v) Gibson Dunn on behalf of the GUC Trust.[69]

52.    Keith Martorana of Gibson Dunn wrote that "[w]e are waiting for final approval from client, but unlikely to come tonight.  You are, however, authorized to send current versions to New GM this evening."[70]  When I responded "want me to send now or wait? Want any language added to the note to Arthur," he wrote that "[y]ou can send now.  Nothing to add in the note."[71]

---

[67]  PX-078 at BR006024.

[68]  Id.

[69]  See  PX-077 at BR006006 (sign-off from Esserman); PX-081 at BR005593 (sign-off from Hillard/Henry; sign-off from Goodwin; sign-off from Hagens Berman); PX-085 at BR005790 (sign-off from Norman; sign-off from Lieff Cabraser; PX-089 at BR005545 (sign-off from Participating Unitholders "subject to guc trust being signed off"); id. (sign-off from GUC Trust).

[70]  Id.

[71]  Id.

53.    After receiving this response from Keith Martorana, I emailed the group and confirmed that I "[h]ave heard from everyone and going to send over to Arthur now, thanks."[72] In response, Danny Golden of Akin Gump asked that I "[s]end it but say it's confidential until it is filed; we are sending as a courtesy."[73]

54.    Accordingly, on August 14, 2017, at 9:14 p.m., I sent the final versions of the settlement documents to New GM's counsel, cc'ing counsel for the GUC Trust.[74]

55.    In sum, by August 14, 2017, all of the material terms of the Settlement Agreement had been agreed to by all of the parties, all of the parties had signed-off on the form of the Settlement Agreement and all related documentation, the parties had scheduled a conference with the Bankruptcy Court to present the Settlement and preliminarily discuss notice issues, and the parties had circulated the Settlement documentation to New GM.

56.    At no point during the negotiation of the settlement documents did the GUC Trust or its counsel discuss with me or, to my knowledge, any other Plaintiffs' attorney that the GUC Trust's approval of the settlement would not be final until the Settlement Agreement was signed or previewed with the Bankruptcy Court.

## IV.    **The GUC Trust Abandons The Settlement.**

57.    In the afternoon of August 16, 2017, I learned on a call from Gibson Dunn that the GUC Trust was abandoning the Settlement.

58.    I later learned at the August 17 conference before the Bankruptcy Court that this decision was made after an August 15, 2017 meeting between the Gibson Dunn and New GM

---

[72]    PX-091 at BR005550.

[73]    PX-090 at BR005601.

[74]    See PX-094 at BR005613.

that did not include the Participating Unitholders. I also learned at the August 17 conference that, according to Keith Martorana of Gibson Dunn, the meeting lasted two hours "at most," consisting in large part of New GM reciting "execution risks" that the GUC Trust "already knew," including binding absentee claimants absent class certification.[75]

59.    On August 15, 2017, the same day as the meeting with New GM, Gabi Gillett of Gibson Dunn sent me an email asking whether we had "thought more about" "the interplay between settlement and seeking class certification."[76] Without knowledge of the GUC Trust meeting with New GM, I believed this email related to preparing to respond to New GM's objection to our Settlement Agreement, announced by New GM at the August 11, 2017 MDL status conference and in an August 15, 2017 letter filed with the Bankruptcy Court, based on class certification issues. I did not speak to Gabi Gillett that day.

60.    Also on August 15, 2017, New GM filed a letter with the Bankruptcy Court requesting that the August 17 conference be cancelled, stating, among other things, that "the proposed settlement is legally improper, collusive and in bad faith" and issues related to the settlement should be heard by Judge Furman in the MDL because "issues that underlie the [Plaintiffs'] claims . . . are scheduled to be determined in the MDL," including "Rule 23 class-related issues . . . ."[77]

61.    Later that day, August 15, 2017, Naomi Moss of Akin Gump circulated to Brown Rudnick a draft letter in response to New GM's letter for the GUC Trust to file stating that:

---

[75]    See Aug. 17, 2017 Hr'g Tr. 16:14-21:14.

[76]    PX-100 at BR006032.

[77]    See *New GM's Position on Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m. Regarding Proposed Settlement of Late Claim Motions*, dated Aug. 15, 2017 [ECF No. 14053].

> The purpose of scheduling the Conference was to apprise the Court of the existence of the Proposed Settlement, which, if ultimately approved, would resolve the outstanding disputes between the GUC Trust and Unitholders, on the one hand, and the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs, on the other, and to discuss with the Court the contours of the proposed noticing procedures for the motion seeking approval of the Proposed Settlement.[78]

The draft letter further explains that the GUC Trust did not object to having the conference in open court and had no intention of seeking substantive relief at the conference.[79]  The Settlement is described as "proposed" because, until the Settlement Agreement is approved by the Court under Bankruptcy Rule 9019, it must be a "proposed" agreement.

62.    Early the next morning, at 3:37 a.m. on August 16, 2017, and after the August 15, 2017 meeting with New GM, Matt Williams of Gibson Dunn also sent me a draft letter, cc'ing Keith Martorana and Gabi Gillett of Gibson Dunn, stating, *inter alia*, that:

> The GUC Trust has no objection to the Conference proceeding on the record in open Court, rather than Chambers.  The purpose of scheduling the Conference was to update the Court on the status of a potential settlement between the GUC Trust, the Economic Loss Plaintiffs and the Pre-Closing Accident Plaintiffs (the "Proposed Settlement"), which Proposed Settlement is nearly final, but has not yet been executed by the parties and is non-binding.  There was never any intention of having a substantive discussion of the merits of the Proposed Settlement at the Conference, or seeking any substantive relief.[80]

63.    I quickly read this draft on my iphone, saw that it captured the key points from the prior Akin Gump draft (that the conference should go forward in open court and no substantive relief was being sought), and did not focus on the language regarding the Proposed Settlement being purportedly non-binding.  I responded at 8:16 a.m. on August 16, 2017 that "will send you

---

[78]  PX-105 at BR006034.

[79]  See id.

[80]  PX-106 at BR006081.

our draft shortly – says a lot of the same,"[81] meaning no objection to proceeding in open court and no substantive relief was being sought. Before sending the draft, the Bankruptcy Court entered an order keeping the August 17th date for the conference, to be held in open court on the record.[82] Thus, I never circulated our draft and the draft letters were never finalized or filed.

64.     Later that day, on August 16, 2017, I asked Naomi Moss of Akin Gump and Keith Martorana of Gibson Dunn when we would complete the administrative step of "actually signing agreement / would think before conference."[83]

65.     Subsequently, on August 16, 2017, New GM and the GUC Trust submitted a joint letter to the Bankruptcy Court explaining that the GUC Trust was backing out of the Settlement and had decided to enter into "a proposed settlement agreement with New GM that will be subject to this Court's approval."[84]

66.     In response, that same day (August 16, 2017), Brown Rudnick filed the final Settlement documentation with the Bankruptcy Court.[85] The next day (August 17, 2017), Brown Rudnick filed a supplemental letter attaching relevant communications with the GUC Trust demonstrating the binding nature of the Settlement Agreement.[86]

---

[81]   PX-111 at BR006071.

[82]   See Order re August 17, 2017 Court Conference, dated Aug. 16, 2017 [ECF No. 14056].

[83]   PX-112 at BR006083.

[84]   See Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m., dated August 16, 2017 [ECF No. 14060].

[85]   See Letter to Judge Glenn in Response to GM's Letter Update on Matters Related to the Late Claim Motions and the Chambers Conference Scheduled for August 17, 2017 at 3:00 p.m., dated August 16, 2017 [ECF No. 14061].

[86]   See Letter to Judge Glenn Supplementing Plaintiffs' Letter, dated Aug. 17, 2017 [ECF No. 14062].

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

Dated: December 5, 2017
      New York, New York

Howard S. Steel