# **EXHIBIT 3**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| In re:<br>MOTORS LIQUIDATION COMPANY, *et al.*,<br>f/k/a general motors corp., *et al.*,<br>Debtors. |
|---|

Chapter 11
Case No. 09-50026 (MG)

(Jointly Administered)

## DIRECT TESTIMONY OF WILLIAM P. WEINTRAUB

I, William P. Weintraub, under penalty of perjury, testify as follows:

1. I am a partner with the law firm of Goodwin Procter LLP, Counsel to Those Certain Pre-Closing Accident Plaintiffs[1] Represented by Hilliard Martinez Gonzales LLP and the Law Offices of Thomas J. Henry. I am the co-chair of Goodwin Procter's Financial Restructuring Group and have thirty-eight years of experience representing debtors and significant creditors in connection with bankruptcy proceedings and other restructuring matters.

2. I submit this direct testimony in support of the *Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, dated September 11, 2017 [ECF No. 14092]. This direct testimony is based on my own personal knowledge, except as to certain documents and testimony that I have reviewed which were produced in connection with this dispute.

---

[1] "**Pre-Closing Accident Plaintiffs**" means those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.

3. On December 22, 2016, pursuant to the Order to Show Cause issued by this Court,[2] I filed on behalf of certain Pre-Closing Accident Plaintiffs Represented by Hilliard Martinez Gonzales LLP and the Law Offices of Thomas J. Henry a motion seeking authority to file late proofs of claim and attaching late proofs of claim for the 175 Pre-Closing Accident Plaintiffs listed on Exhibit A to the motion.[3] The parties subsequently engaged in briefing and preliminary discovery with respect to the legal and factual issues raised by the Late Claims Motions.

4. During May 2017, I learned that settlement discussions had resumed with respect to the Late Claims Motions.[4] I first became actively involved in the negotiation of the Settlement Agreement by and among the Signatory Plaintiffs and the GUC Trust (the "Agreement") during June 2017. By the time I became actively involved, a draft Settlement Agreement had already been prepared which reflected the negotiating parties' agreement on the basic structure of the Agreement and certain core terms, including, but not limited to, a settlement payment by the GUC Trust, the release of certain claims, and agreement concerning a

---

[2] See *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802] (the "Order to Show Cause").

[3] See *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated December 22, 2016 [ECF No. 13807] ("Pre-Closing Accident Plaintiffs' Late Claim Motion"). On December 4, 2017, Goodwin Procter filed a *Notice of Withdrawal of Counsel of Record for Certain Movants Under Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths* [ECF No. 14179], which informed the Court that Goodwin Procter no longer serves as counsel of record for certain former clients of Hilliard Martinez Gonzales LLP and the Law Offices of Thomas J. Henry and will no longer be pursuing the Pre-Closing Accident Plaintiffs' Late Claims Motion on their behalf. Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs (collectively, the "**Economic Loss Plaintiffs**") also filed a motion seeking authority to file late claims. Collectively, they are the "**Late Claims Motions**."

[4] There had been tentative settlement discussions approximately one year earlier, but these discussions ceased without the parties reaching an agreement.

2

procedure to trigger issuance of the Adjustment Shares by New GM.[5] See PX-005, BR007564-7578.

5.  During July 2017, the parties exchanged numerous red-line drafts and worked hard to finalize the Agreement and related documentation. Every comment and concern I expressed to the contracting parties during the negotiations was eventually resolved to my satisfaction.

6.  By no later than early August 2017, the parties had agreed to all material terms of the Agreement, and also reached agreement on the form and language of multiple ancillary documents, pleadings, and orders that were in substantially final form.

7.  On August 3, 2017, Gibson Dunn attorney Keith Martorana, counsel for the GUC Trust, circulated updated versions of the Settlement Agreement, Settlement Order, Claims Estimate Order, Long-form Notice, Short-form Notice, and Settlement Motion. See PX-040, GP002042-2223. Mr. Martorana characterized all changes (except for those relating to the Settlement Motion) as "slight" and "minor clean-ups." Id. at GP002042-43. In addition, Mr. Martorana had deleted the phrases "DRAFT," "SUBJECT TO FRE 408," and "GDC/AG COMMENTS 8/2" from the top of the Settlement Agreement and replaced them with the phrase "EXECUTION VERSION." Id. at GP002130.

---

[5] Pursuant to Section 3.2 of the Sale Agreement, New GM is obligated to issue additional shares of New GM common stock (the "**Adjustment Shares**") if the Bankruptcy Court enters an order estimating the aggregate allowed general unsecured claims against the Old GM estate (a "**Claims Estimate Order**") at an amount exceeding $35 billion, with a maximum of issuing 30 million shares if the claims estimation is equal to or exceeds $42 billion. See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser*, dated as of June 26, 2009, § 3.2(c).

3

8.  On August 9, 2017, Akin Gump attorney Daniel Golden, counsel to the Participating Unitholders,[6] proposed that the parties have an "all hands" conference call "to finalize all of the settlement documentation and motions." PX-048, GP001540. Mr. Golden reported that earlier that day, Mr. Golden and Brown Rudnick attorney Ed Weisfelner, counsel for the Economic Loss Plaintiffs, had informed New GM's attorneys about the existence of the Agreement and the parties'—including the GUC Trust's—"desire to have a chambers conference with Judge Glenn for some day next week." Id. Mr. Golden and Mr. Weisfelner had committed to giving New GM's attorneys "a final set of the pleadings sufficiently in advance of a to be scheduled chambers conference" Id. Mr. Golden concluded: "It seems to me we need a final call to finalize the documents so we can schedule that chambers conference. At this call please have the requisite people necessary to bind your respective clients." Id. I understood that the parties wanted to finalize the documents quickly in order to provide New GM with the final documentation of the Agreement and to apprise the Court of the existence of the Agreement. Counsel for the GUC Trust was copied on this email and assented to the Agreement being provided to New GM in advance of the Court conference.

9.  The "all-hands" call occurred on August 11, 2017, after the MDL status conference. I participated in this call, along with counsel for the GUC Trust, the Participating Unitholders, and other counsel for Plaintiffs. During the August 11, 2017 call, the parties conducted a page-by-page review to resolve any final wording issues, and all counsel, including counsel for the GUC Trust, conveyed that they were done with the documents. Counsel for the GUC Trust never said that he lacked authority to bind the GUC Trust in any way nor did counsel for the GUC Trust or anyone else state that there were any open issues or reserve any rights with

---

[6] The "**Participating Unitholders**" are holders of approximately 65% of the GUC Trust Units outstanding.

4

respect to client review or approval. Counsel for the GUC Trust also did not object to the fact that Hagens Berman attorney Steve Berman, MDL Co-Counsel and counsel for the Economic Loss Plaintiffs, previewed certain terms of the Agreement to Judge Furman during the MDL status conference that morning.

10. Later in the day on August 11, 2017, following the "all hands" call, Brown Rudnick attorney Howard Steel, counsel for the Economic Loss Plaintiffs, circulated revised and updated documents to all parties stating: "Hoping these are final and we can schedule signatures. Please let us know if we missed anything." PX-057, GP000692-93.

11. On August 12, 2017, in response to updated drafts circulated after the "all hands" call, counsel for the GUC Trust, Mr. Martorana, stated that "[f]rom the GUC Trust perspective, all of the documents sent over by Howie [Steel] (subject to one item we are discussing with Akin in the Settlement Agreement) are fine." PX-064, GP00535-554. This email contained no reservation that the Agreement remained subject to client review or approval.

12. Pursuant to this same August 12, 2017 email, Mr. Martorana also transmitted for the first time the initial draft of the Declaration of Beth Andrews in support of the joint motion to approve the Agreement. See id. at GP00547-554; see also PX-065, GP000059-66 (final execution version of Andrews Declaration). It is my understanding based on her declaration that Ms. Andrews is a Vice President of Wilmington Trust Company ("WTC") and serves as the "lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust." PX-065, GP000059 at 60. In her Declaration in support of Court approval of the Agreement, which was provided to me by counsel for the GUC Trust, Ms. Andrews stated, among other things, that: (a) she was "duly authorized to submit this declaration . . . on behalf of WTC in its capacity as trustee for and administrator of the Motors Liquidation Company GUC Trust (the

"GUC Trust") (id. at 59); (b) "the Settlement is a prudent and reasonable exercise of business judgment because it presents the best option for the GUC Trust to maximize recovery for the benefit of the GUC Trust Beneficiaries while minimizing the substantial risk posed by the Late Claims Motions" (id. at 65); (c) "The Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides the such parties with substantial benefits." (id.); and (d) the Settlement "provides the best outcome for the GUC Trust Beneficiaries" (id. at 66). I provided no comments or suggested changes to the content of Ms. Andrews' Declaration.

13. On August 14, 2017, Mr. Steel, counsel for the Economic Loss Plaintiffs, circulated the "proposed final execution versions of all of the [Settlement] documents" and requested that the parties "confirm when you are signed off." PX-075, BR005804-6003. By this point, a Court conference had been scheduled for August 17, 2017. I understood that the purpose of the Court conference was to inform the Court of the existence of the Agreement and discuss the mechanics of seeking Court approval of the Agreement. I further understood that the parties intended to confirm (and did confirm) that the Agreement was final before the settlement papers were sent to New GM's attorneys in advance of the conference. See PX-079, GP000013-16 (Mr. Steel telling Mr. Golden that he would send the Agreement and accompanying documentation to New GM "when everyone signed off").

14. All parties to the Agreement "signed off." See, e.g., PX-092, GP000617 (Mr. Steel saying that he had "heard from everyone" and was sending the Agreement to New GM's attorney, Arthur Steinberg); PX-082, GP001298-1302 (e-mail stringing containing "sign off" from me, Robert Hilliard, and Steve Berman on behalf of Signatory Plaintiffs).

6

15. At no point prior to informing us that the GUC Trust did not intend to go forward with the Agreement did the GUC Trust or its counsel discuss with me, or to my knowledge, any other Plaintiffs' attorney, that the Agreement would not be binding absent formal signatures or that, despite universal "sign-offs," the GUC Trust might decide to withhold its representative's signature. Nor did counsel for the GUC Trust ever communicate any purported intention to withhold signing the Agreement until after the August 17, 2017 conference with the Court. From my perspective, it was important that the documents be final and the Agreement be in place ahead of the Court conference so that we would not be wasting the Court's time concerning an unfinished settlement that "might" go forward.

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing is true and correct.

Dated:  December 5, 2017
        New York, New York

William P. Weintraub