# **EXHIBIT 4**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:**<br><br>**MOTORS LIQUIDATION COMPANY,** *et al.*,<br>**f/k/a General Motors Corp.,** *et al.*,<br><br>**Debtors.** | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |

# DIRECT TESTIMONY OF DANIEL H. GOLDEN

I, Daniel H. Golden, under penalty of perjury, testify as follows:

1. I am a partner at the law firm Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), counsel for certain unaffiliated holders (the "Participating Unitholders") holding in excess of 65 percent of the beneficial units of the Motors Liquidation Company GUC Trust (the "GUC Trust").

2. I respectfully submit this witness statement as my direct testimony in support of the *Motion to Enforce the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust*, dated September 11, 2017 [ECF No. 14092] and the *Joinder of the Participating Unitholders in the Motion to Enforce*, dated November 13, 2017 [filed in unredacted form at ECF No. 14175].

3. The facts set forth herein are based on my personal knowledge, except as to certain matters that I believe to be true based on my review of documents produced in discovery or from other sources that I consider to be reliable.

4. In 2014, General Motors LLC ("New GM") recalled 2.1 million vehicles worldwide for a defective ignition switch. Shortly after the announcement of the initial wave of recalls, an ad hoc group of unaffiliated holders of the beneficial units of the GUC Trust, now

1

referred to as the Participating Unitholders, retained Akin Gump as counsel to represent their interests before the Bankruptcy Court with respect to matters relating to the recalls. Akin Gump and the Participating Unitholders have been intimately involved with these matters from their inception, first appearing before the Bankruptcy Court on May 2, 2014 at the initial status conference scheduled following New GM's request to enforce the Sale Order against the Ignition Switch Plaintiffs,[1] the Non-Ignition Switch Plaintiffs,[2] and the Pre-Closing Accident Plaintiffs[3] (collectively, the "Plaintiffs").

5.  From the beginning of the Participating Unitholders' involvement in this matter, Akin Gump, as counsel to the Participating Unitholders, has worked hand-in-glove with Gibson Dunn & Crutcher LLP ("Gibson Dunn"), counsel to Wilmington Trust Company ("Wilmington Trust"), as trustee for and administrator or the GUC Trust, toward their common goal of protecting the interests of all Unitholders and effectuating timely, optimal distributions of the GUC Trust corpus to those holders. To that end, Akin Gump engaged in regular dialogue with Gibson Dunn to discuss strategy, assess the merits of legal arguments and file joint pleadings on behalf of the Participating Unitholders and Wilmington Trust.

6.  In spring 2017, Edward Weisfelner of Brown Rudnick LLP ("Brown Rudnick"), designated counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, and I began discussing a potential settlement of motions filed by the Plaintiffs seeking authority

---

[1] The term "Ignition Switch Plaintiffs" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "Ignition Switch Defect").

[2] The term "Non-Ignition Switch Plaintiffs" refers to those plaintiffs asserting economic loss claims or persons suffering economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346, 14V-118 and 14V-153.

[3] The term "Pre-Closing Accident Plaintiffs" means those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident involving an Old GM vehicle that occurred prior to the closing of the Section 363 Sale.

2

to file late proofs of claim against the GUC Trust and similar claims that could be brought against the GUC Trust by similarly situated potential claimants (the "Late Claims Motions").[4] I kept the attorneys at Gibson Dunn, counsel to Wilmington Trust, apprised of these discussions.

7.   In or around May 2017, Gibson Dunn became actively involved in the negotiations with Brown Rudnick regarding a potential settlement of the Late Claims Motions.

8.   By early June 2017, Gibson Dunn, on behalf of Wilmington Trust, Akin Gump, on behalf of the Participating Unitholders, and Brown Rudnick, on behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs, reached an agreement on the general structure for a settlement of the Late Claims Motions (the "Plaintiff Settlement"), and the parties began to exchange drafts of the agreement memorializing the settlement (the "Settlement Agreement").[5]

9.   Shortly thereafter, in or around June 2017, William Weintraub of Goodwin Procter LLP, counsel to certain Pre-Closing Accident Plaintiffs represented by Hilliard Munoz Gonzales LLP and the Law Offices of Thomas J. Henry, also became involved in these negotiations.

10.  Negotiations between the parties continued in earnest throughout June and July 2017. By late July 2017, the parties agreed upon all of the material terms of the Plaintiff Settlement, and were close to finalizing the Settlement Agreement evidencing the Plaintiff Settlement, as well as ancillary documentation that would be necessary to seek the Court's approval of the Plaintiff Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.[6]

---

[4] Mr. Weisfelner and I had also briefly discussed the potential for a settlement between Plaintiffs and the GUC Trust in 2016, before the Late Claims Motions were filed.

[5] *See e.g.,* PX-006 BR004584.

[6] *See e.g.,* PX-032 BR003277–3348; PX-34 BR003354–3423, and PX-38 BR006092–6137.

3

11. The salient terms of the Plaintiff Settlement that were ultimately agreed upon were:

   a. the GUC Trust would fund up to $6 million in noticing costs (the "Noticing Costs") to ensure that, among other things, all parties subject to the recalls issued by New GM in 2014 received notice of the Plaintiff Settlement;

   b. those Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, and Pre-Closing Accident Plaintiffs who were signatories to the Settlement Agreement (the "Signatory Plaintiffs") and the GUC Trust would support the entry of a Settlement Order pursuant to which the GUC Trust would pay $15 million (the "Settlement Fund") to an account designated by the Signatory Plaintiffs, in exchange for a release by all Plaintiffs (as that term is defined in the Settlement Agreement) of any and all claims against assets currently held or previously distributed by the GUC Trust;

   c. the GUC Trust would support the entry of a Claims Estimate Order pursuant to which the Court would estimate Plaintiffs' claims against the GUC Trust at an amount equal to or in excess of $10 billion, which would trigger New GM's obligation to issue shares of New GM stock (the "Additional Shares") to the GUC Trust. Such Additional Shares, and the Settlement Fund, would be used solely to fund Plaintiffs' claims.

Under the terms of the Plaintiff Settlement, entry of the Settlement Order was not conditioned in any way upon entry of the Claims Estimate Order.[7]

12. The basis for the Participating Unitholders' desire to enter into the Plaintiff Settlement is straightforward. Plaintiffs' late claims against the GUC Trust could total tens of billions of dollars. While the Participating Unitholders believe that the GUC Trust has meritorious defenses against such claims, the GUC Trust cannot make final distributions until such claims are rejected pursuant to a final order or, if granted, finally adjudicated, each of which could take years. The Plaintiff Settlement offered significant benefits to the Participating Unitholders and other GUC Trust unitholders in that it capped the GUC Trust's total liability in connection with Plaintiffs' claims at $21 million (inclusive of noticing costs), avoided what could be years of litigation with Plaintiffs and the associated costs of such litigation, and

---

[7] PX-001 Settlement Agreement BR005717-5740.

4

significantly increased the likelihood that the GUC Trust would be able to make final distributions once the litigation between the Motors Liquidation Company Avoidance Action Trust and JPMorgan Chase (the "Avoidance Action") concluded.

13. At this point, the negotiating parties agreed that Mr. Weisfelner and I would contact Arthur Steinberg of King and Spalding LLP, counsel for New GM, to apprise New GM of the Plaintiff Settlement, and to inquire as to dates on which New GM's counsel would be available for a conference with the Court to inform the Court of the Plaintiff Settlement. That call took place on August 9, 2017.[8]

14. At the time that Mr. Weisfelner and I contacted Mr. Steinberg, it was my understanding that the Signatory Plaintiffs and the GUC Trust had reached an agreement on the Plaintiff Settlement. I would not have notified Mr. Steinberg of the Plaintiff Settlement had that not been my understanding.

15. Also on August 9, 2017, I emailed counsel for Wilmington Trust and counsel for the Signatory Plaintiffs to inform them that, consistent with our prior discussions, Mr. Weisfelner and I had given Mr. Steinberg "a heads up on the proposed settlement and our desire to have a chambers conference with Judge Glenn for some day next week," and had committed to providing New GM with "a final set of pleadings sufficiently in advance of a to be scheduled chambers conference."[9]

16. In that same email, I requested that the negotiating parties schedule an "all hands call … to finalize all of the settlement documentation and motions."[10] I further requested that

---

[8] PX-047 BR007012–7017.
[9] *Id.* at BR007012.
[10] *Id.*

5

each negotiating party "have the requisite people necessary to bind your respective clients."[11] Neither counsel to Wilmington Trust nor any other party objected to my request that they be prepared to bind their clients to the final settlement documentation on this "all hands call" or any time thereafter.

17. Shortly thereafter, Akin Gump, acting on behalf and with the consent of Wilmington Trust and the Signatory Plaintiffs, reached out to chambers to schedule a conference. As discussed with counsel for the parties to the Plaintiff Settlement, the purpose of scheduling this court conference was to apprise the Court of the Plaintiff Settlement, to discuss the noticing procedures proposed in connection therewith, and to enlist the Court's aid in obtaining the names and addresses of the parties that were subject to New GM recalls or had pre-Sale accident and death claims, so that such parties could be provided with notice of the Plaintiff Settlement. That conference was ultimately scheduled for August 17, 2017.

18. The "all hands call" I requested on August 9 took place on the morning of August 11, 2017. I participated in the call, along with counsel to Wilmington Trust and counsel to the Signatory Plaintiffs. The call lasted approximately one hour, during which the negotiating parties relayed some last-minute ministerial changes to the documentation supporting the Settlement Agreement. My understanding at the conclusion of the "all hands call" was that the parties had signed off on the Plaintiff Settlement and that the final Settlement Agreement and supporting documentation, consistent with the changes requested on the call, would be circulated to the parties for approval prior to circulating the documents to Mr. Steinberg.

---

[11] *Id.*

19.     At 3:09 p.m., Howard Steel of Brown Rudnick circulated among counsel to the Signatory Plaintiffs, the Participating Unitholders, and Wilmington Trust "updated doc[ument]s per today's all-hands."[12]

20.     The following day, August 12, 2017, in response to Mr. Steel's email, Keith Martorana of Gibson Dunn responded, "[f]rom the GUC Trust perspective, all of the documents sent over by Howie (subject to one item we are discussing with Akin in the Settlement Agreement) are fine."[13] Mr. Martorana's email also attached a draft declaration in support of the Plaintiff Settlement by Beth Andrews, a Vice President at Wilmington Trust and the Wilmington Trust representative leading Wilmington Trust's engagement as trustee of and administrator for the GUC Trust.[14] That declaration opines that "[t]he Settlement Agreement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries."[15]

21.     The "one open item" referenced in Mr. Martorana's email was whether the bankruptcy court or the bankruptcy court and the district court would have the ability to review the ultimate allocation of the settlement proceeds. Shortly thereafter, we resolved this issue.

22.     The following Monday, August 14, at 10:09 a.m., Mr. Martorana followed up on his August 12 email to Mr. Steel about the "one item we are discussing with Akin."[16] Mr. Martorana wrote: "Howie – I spoke to Akin and we are ok with this. So I think the last point is in the declarations it should read that 'counsel to the Participating Unitholders' participated in negotiations."[17]

---

[12] PX-056 BR005064–5293.
[13] PX-063 BR005468–5484.
[14] *Id*. at BR005477-5484.
[15] *Id.* at BR005483.
[16] PX-072 GUC_0007042.
[17] *Id.*

7

23. My understanding was that by the time of Mr. Martorana's email on August 12, Wilmington Trust had not only approved the Plaintiff Settlement but also the Settlement Agreement.

24. At 10:12 a.m. on August 14, I emailed Mr. Steinberg, counsel to New GM, informing him that a conference with the Court had been scheduled for 3:00 p.m. on August 17, 2017, and letting him know that the parties to the Settlement Agreement intended to send him "the final draft of the settlement documents at some point today."[18]

25. At 1:32 p.m. on August 14, Mr. Steel sent counsel for the Participating Unitholders, Wilmington Trust, and the Signatory Plaintiffs "proposed final execution versions of all of the documents."[19]

26. At 2:55 p.m. on August 14, before counsel for Wilmington Trust had responded to Mr. Steel's email attaching final execution versions of the Settlement Agreement, Gabriel Gillett of Gibson Dunn notified me that New GM's counsel had called him "a bit ago" asking for "one more opportunity to persuade us not to sign the settlement agreement."[20] Mr. Gillett informed me that counsel to Wilmington Trust would be meeting with counsel to New GM on August 15, and invited Akin Gump to join the meeting.[21]

27. Shortly thereafter, at 3:46 p.m., notwithstanding that Wilmington Trust had already signed off on the settlement documents (including the Settlement Agreement) without reservation, Mr. Martorana responded to Mr. Steel's email attaching final execution versions of

---

[18] PX-071 AG0000592.
[19] PX-075 BR005804.
[20] PX-093 AG0006849.
[21] *Id.*

8

the documents by stating "[a]t this point we do not have any further comments, but are obtaining final sign-off from our client."[22]

28. At 7:18 p.m. that same day, Matthew Williams of Gibson Dunn disinvited counsel to the Participating Unitholders from the August 15 meeting with New GM, stating that "we just heard from ARTHUR [Steinberg] that he apparently just wants to speak with the guck [sic] trust representatives."[23] I now know, however, that it was actually Gibson Dunn that suggested to New GM that the Participating Unitholders not attend the meeting.[24]

29. At 7:26 p.m. on August 14, Mr. Martorana responded to Mr. Steel's email attaching final execution versions of the documents by writing, "We are waiting for final approval from client, but unlikely to come tonight. You are, however, authorized to send current versions to New GM this evening."[25] I also now know that 9 minutes earlier, Mr. Martorana had received sign off from Wilmington Trust to send the final settlement documents to New GM.[26] I do not know why Mr. Martorana stated that he did not have final sign off from his client when he had already received it.

30. On August 14, at 9:14 p.m., Mr. Steel sent the final execution versions of the settlement documents to New GM's counsel, copying counsel to Wilmington Trust, the Signatory Plaintiffs and the Participating Unitholders.[27]

31. The following day, August 15, in a series of emails and a brief call late that afternoon, Mr. Williams told me that nothing much had happened at the meeting with New GM earlier that day. In addition, Mr. Martorana informed me that Mr. Steinberg, counsel to New GM,

---

[22] PX-087 GUC_0005648.
[23] PX-093 AG0006847 (capitalization in original).
[24] PX-084 GUC_0010399.
[25] PX-089 BR005545.
[26] PX-088 GUC_0013928.
[27] PX-094 BR005613.

9

would be opposing the scheduling of a chambers conference before the Court.[28] The lawyers from Gibson Dunn did not tell me or anyone else at Akin Gump that New GM had proposed that the GUC Trust enter into an alternative settlement with New GM, or that Gibson Dunn was considering doing so.

32.     Nevertheless, at 9:40 a.m. the next day, August 16, 2017, Mr. Martorana of Gibson Dunn requested a call with Akin Gump that occurred at 11:30 am that day.[29] On that call, Mr. Williams first asked me if I was sitting down, and then told me that Wilmington Trust did not intend to move forward with the Plaintiff Settlement, and had agreed instead to enter into an agreement with New GM (the "Forbearance Agreement").[30] The Forbearance Agreement provides that:

   a. the GUC Trust will not seek a claims estimation order or any distribution of the Adjustment Shares until final orders are entered respectively resolving (x) whether Plaintiffs may file late proofs of claims, and (y) all class-certification issues in connection with the multi-district litigation pending against New GM;

   b. New GM will reimburse Wilmington Trust for all professional fees and expenses incurred in connection with prosecuting the Forbearance Agreement and opposing the Late Claims Motions and related proofs of claim; and

   c. upon the resolution of the Avoidance Action, New GM and Wilmington Trust will engage in good faith discussions about whether New GM will pay a reasonable rate of return in the event that the GUC Trust is prepared to make a distribution to unitholders but cannot do so on account of litigation related to the Late Claims Motions (the "Delayed Distribution").

33.     Representatives from Wilmington Trust and Gibson Dunn have testified that they decided to back out of the Plaintiff Settlement and enter into the Forbearance Agreement because

---

[28] PX-139 AG0006840; *see also* PX-140 AG0006843.

[29] PX-116 AG0006844.

[30] To this day, I remain astounded by Wilmington Trust's hairpin turn to abandon the Plaintiff Settlement in favor of the far less favorable Forbearance Agreement. *See* PX-128 BR006078.

the Forbearance Agreement is more favorable to the GUC Trust than the Plaintiff Settlement.[31] I find this explanation impossible to believe, as the Forbearance Agreement is far less favorable for the GUC Trust and its beneficiaries than the Plaintiff Settlement. Specifically, the Plaintiff Settlement caps the GUC Trust's potential liability in connection with Plaintiffs' claims at $21 million (inclusive of noticing costs), while the Forbearance Agreement leaves the GUC Trust fully exposed to Plaintiffs' claims, which Plaintiffs allege to exceed $10 billion, and requires the GUC Trust to proceed with what could be years of litigation with Plaintiffs. Additionally, although the Forbearance Agreement requires New GM to agree to engage in good faith discussions about whether New GM will pay a reasonable rate of return if the Avoidance Action is resolved and the Late Claims Motions are the only impediment to the GUC Trust making final distributions, counsel to the GUC Trust has acknowledged that in the event that the GUC Trust corpus is not significantly reduced by the Avoidance Action, it is highly unlikely that New GM will agree to pay any meaningful rate of return.[32] Thus, the only concrete benefit provided to the GUC Trust by the Forbearance Agreement is New GM's agreement to pay the GUC Trust's fees and expenses in defending against the Late Claims Motions, which counsel to Wilmington Trust testified could be "as low as $1 million" per year.[33] This benefit pales in comparison to the benefits provided by the Plaintiff Settlement.

34.    Despite repeated questioning from the Participating Unitholders and their counsel in the days and weeks that followed, neither Wilmington Trust nor Gibson Dunn has been able to provide a cogent explanation as to why it suddenly chose to abandon the carefully negotiated

---

[31] Williams Dep. Tr., 190:21-24 (Nov. 13, 2017) ("Well, we decided before the hearing because we got what we viewed as a better deal with New GM"); Andrews Dep. Tr., 140:21-23 (Nov. 15, 2017) ("We felt it was a better settlement agreement and we made that decision quickly.").

[32] Martorana Dep. Tr., 184:4-11 (Nov. 20, 2017) ("Well, New GM isn't necessarily going to be – my view is that New GM isn't necessarily going to be willing to pay a significant dollar value of interest on an incredibly large corpus. It may be more than they are willing to or can bear.").

[33] Williams Dep. Tr., 232:2-6 (Nov. 20, 2017).

Plaintiff Settlement to which it had already agreed in lieu of the far less favorable Forbearance Agreement, or why it concealed its negotiations with New GM over the Forbearance Agreement from the Participating Unitholders before acquiescing to this agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: December 5, 2017
      New York, New York  /s/ Daniel H. Golden
                                                       Daniel H. Golden