# **EXHIBIT C-2**

09-50026-mg    Doc 14183-4    Filed 12/05/17    Entered 12/05/17 23:55:47    Exhibit C-2
Pg 2 of 14

| | | |
|---|---|---|
| Susheel Kirpalani | Arthur J. Steinberg | **Hearing Date:** December 18, 2017 |
| James C. Tecce | Scott Davidson | |
| Julia Beskin | **KING & SPALDING LLP** | |
| Jordan Harap | 1185 Avenue of the Americas | |
| **QUINN EMANUEL** | New York, New York 10036 | |
|   **URQUHART & SULLIVAN LLP** | | |
| 52 Madison Avenue | | |
| New York, NY 10010 | | |

*Counsel to General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al.,<br><br>                              Debtors. | Chapter 11<br>Case No. 09-50026 (MG)<br>(Jointly Administered) |

**CONTENTIONS OF FACT AND LAW WITH RESPECT TO MOTION OF GENERAL MOTORS LLC PURSUANT TO 11 U.S.C. §§ 105(a) AND 1109(b), AND FED. R. BANKR. P. 2018 AND 3020, AND PRE-TRIAL ORDER, TO APPEAR AND BE HEARD WITH RESPECT TO PHASE 1 OF COURT'S CONSIDERATION OF PLAINTIFFS' MOTION TO ENFORCE UNEXECUTED AND UNDATED SETTLEMENT AGREEMENT**

## I.    CONTENTIONS OF FACT[1]

1.   On June 1, 2009, the Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code.

2.   Old GM entered into an agreement to sell substantially all of its assets, i.e., the Sale Agreement, to an entity that became New GM in exchange for, inter alia, New GM common stock and warrants.[2]

3.   The Sale Agreement has a feature requiring New GM to provide additional shares of New GM common stock, i.e., the Adjustment Shares, if allowed general unsecured claims exceed a threshold amount.

4.   The Sale Agreement also explicitly states that New GM is a "party in interest" for purposes of that Agreement. The Adjustment Shares provision is part of the Sale Agreement.[3]

5.   If an order of the Bankruptcy Court estimates the "aggregate allowed general unsecured claims" against the Old GM bankruptcy estate in excess of $35 billion, section 3.2(c)

---

[1]   Capitalized terms not defined herein have the meanings ascribed to them in New GM's Motion, Pursuant To 11 U.S.C. §§ 105(a) And 1109(b), Fed. R. Bankr. P. 2018 And 3020, And Pre-Trial Order, To Appear And Be Heard With Respect To Phase 1 Of Court's Consideration Of Plaintiffs' Enforcement Motion [ECF No. 14149] and the Joinder Of General Motors LLC In Motors Liquidation Company GUC Trust's Objection To Plaintiffs' Mot. To Enforce Unexecuted Settlement Agreement [ECF No. 14172] (the "**Joinder**"). Citations to the "**Decl.**" refer to the Declaration of James C. Tecce filed concurrently with the Joinder [ECF No. 14173].

[2]   See Dkt. No. 2968-2 (Second Amendment and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009, as amended as of July 5, 2009). See also In re Motors Liquidation Co., 529 B.R. 510, 535 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub nom, Elliot v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016).

[3]   See Dkt. No. 2968-2 (Sale Agreement, at 98-99 (§ 9.11) ("Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and their respective permitted successor and assigns …. Subject to the preceding sentence, nothing express or implied in this Agreement is intended or shall be construed to confer upon or give to any Person, other than the Parties … any legal or equitable claims, benefits, rights or remedies of any nature whatsoever under or by reason of this agreement"))).

of the Sale Agreement provides for New GM to issue Adjustment Shares in accordance with the formula set forth in the Sale Agreement.[4]

6. Section 3.2(c) of the Sale Agreement does not apply unless and until allowed unsecured claims equal or exceed $35 billion.

7. To date, allowed unsecured claims do not equal or exceed $35 billion.

8. As of June 30, 2017, the total amount of allowed general unsecured claims against the Debtors' estates was $31,855,381,054, approximately $3.15 billion below the Adjustment Shares threshold, and $10.15 billion below the amount necessary to trigger the issuance of the maximum amount of Adjustment Shares allowed under the Sale Agreement.[5]

9. Between June and August 2017, the GUC Trust had discussions with counsel claiming to represent certain Ignition Switch Plaintiffs,[6] certain Non-Ignition Switch Plaintiffs,[7]

---

[4]  See Dkt. No. 2968-2 (Sale Agreement, at 124 (§3.2(c)) ("Sellers may, at any time, seek an Order of the Bankruptcy Court (the 'Claims Estimate Order') … estimating the aggregate allowed general unsecured claims against Sellers' estates. If in the Claims Estimate Order, the Bankruptcy Court makes a finding that the estimated aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will, within five (5) Business Days of entry of the Claims Estimate Order, issue additional shares of Common Stock (the 'Adjustment Shares') to Parent, as an adjustment to the Purchase Price, based on the extent by which such estimated aggregate general unsecured claims exceed $35,000,000,000 (such amount, the 'Excess Estimated Unsecured Claim Amount;' in the event this amount exceeds $7,000,000,000 the Excess Estimated Unsecured Claim Amount will be reduced to a cap of $7,000,000,000).")).

[5]  See Dkt. No. 13994 (Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report And Budget Variance Report as of June 30, 2017, dated July 21, 2017, at 4).

[6]  According to counsel for plaintiffs, the term "**Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or alleging economic losses who, as of July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047. See Decl. Ex. A (Unexecuted Settlement Agreement, at 3 (Preamble § S.a.)). Plaintiffs' counsel do not represent nearly all of those persons, have never been retained by them, and have no authority to speak or act for them.

[7]  According to counsel for plaintiffs, the term "**Non-Ignition Switch Plaintiffs**" refers to those plaintiffs asserting economic loss claims or alleging economic losses who, as of July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-346 and 14V-540, 14V-119 and 14V-153. See Decl. Ex. A (Unexecuted Settlement Agreement, at 3 (Preamble § S.b.)). Plaintiffs' counsel do not represent nearly all of those persons, have never been retained by them, and have no authority to speak or act for them.

3

and certain PIWD Plaintiffs[8] regarding a potential settlement of the Late-Claims Motions and the underlying claims against the GUC Trust. These discussions resulted in the drafting of the Unexecuted Settlement Agreement.

10. Under the Unexecuted Settlement Agreement, the GUC Trust would have been obligated to support a purported Claims Estimate Order that quantifies the Allowed General Unsecured Claims in excess of $42 billion and directs New GM to deliver 30 million shares of stock.[9]

11. New GM is the party to whom plaintiffs and the unitholders are looking to fund their alleged settlement.

12. New GM has a direct economic interest in whether the Unexecuted Settlement Agreement is determined to be binding on the GUC Trust.

13. If found to be binding, the Unexecuted Settlement Agreement would impose significant obligations on New GM.

    (a)    The Unexecuted Settlement Agreement contains "Key Objectives," including the pursuit of a purported "Claims Estimate Order" that (i) finds Allowed General Unsecured Claims in excess of $42 billion (even though the individuals before the bankruptcy court only include two persons seeking economic losses and a few hundred personal injury claimants) and (ii) directs New GM to deliver 30 million shares of stock under the Adjustment Shares provision contained in the Sale Agreement.[10]

---

[8] According to counsel for plaintiffs, the term "**PIWD Plaintiffs**" means "those certain Ignition Switch Pre-Closing Accident Plaintiffs represented by PIWD Counsel," and "**PIWD Counsel**" means "(i) Robert C. Hilliard of Hilliard Munoz Gonzalez, LLP and Thomas J. Henry of the Law Offices of Thomas J. Henry, but solely for the Pre-Closing Accident Plaintiffs represented by the two law firms; and (ii) Lisa M. Norman of Andrew Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm." Decl. Ex. A (Unexecuted Settlement Agreement, at 8 (§§ 1.43, 1.44)).

[9] If this contested matter proceeds past Phase 1 (and New GM believes it should not), New GM reserves any and all rights to argue in Phase 2 that the Unexecuted Settlement Agreement does not trigger any of New GM's obligations under the Sale Agreement or the Adjustment Shares Provision (§ 3.2), and nothing herein should be considered an admission or waiver with respect to any such defense.

[10] See Decl. Ex. A (Unexecuted Settlement Agreement, at 7 (¶ 1.29 ("Key Objectives" definition))); id. at 5 (¶ LL ("The GUC Trust acknowledges the key objectives of the Signatory Plaintiffs in entering into this Agreement are to (i) achieve the funding of the Settlement Fund … and (iii) take or to cause to be taken all

4

(b) Entry of the purported "Claims Estimate Order" annexed to the Unexecuted Settlement Agreement would affirmatively impose the obligations outlined in the Key Objectives on New GM.[11]

(c) The Unexecuted Settlement Agreement would require New GM to provide to plaintiffs, at its own expense, the names and addresses of millions of individuals to facilitate service of the settlement motion.[12]

(d) The proposed Claims Estimate Order provides that New GM's contribution of the Adjustment Shares will be without prejudice to any rights that any plaintiffs had against New GM, including successor liability claims against New GM in the Ignition Switch MDL.[13]

---

steps necessary to require New GM to issue the maximum amount of Adjustment Shares and to make the value of the Settlement Fund and the Adjustment Shares available to satisfy, in part, the Plaintiffs' claims …. [T]he GUC Trust, based upon its review of the expert report and proffer of evidence provided by Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs and the expert report and proffer of evidence provided by certain Pre-Closing Accident Plaintiffs, agrees to provide the cooperation and assistance provided for herein relating to the issuance of a Claims Estimate Order … and to seek to estimate for allowance purposes, and not dispute the amount of estimated claims thereunder.")).

[11] See Decl. Ex. A (Unexecuted Settlement Agreement, at 1 (¶ D ("Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate Allowed General Unsecured Claims against the Sellers (the 'Claims Estimate Order') at an amount exceeding … $35,000,000,000 … then New GM must … issue the Adjustment Shares."))); id. at 4 (¶¶ FF (GUC Trust counsel has been furnished with "expert reports and proffers of evidence indicating the amount of damages for the Ignition Switch Plaintiffs', certain Non-Ignition Switch Plaintiffs', and certain Pre-Closing Accident Plaintiffs' asserted claims, if ultimately determined to be Allowed General Unsecured Claims against Old GM and/or the GUC Trust, would be greater than the amount necessary to trigger New GM's obligations to issue the Adjustment Shares in the maximum amount under the AMSPA")); id. at 11 (¶ 2.4 ("[T]he GUC Trust, based on its review of the expert report and proffer of evidence provided … agrees that it shall support the entry of a Claims Estimate Order…."); see also Dkt. No. 14093-10 (Enforcement Mot., Ex. J (proposed Claims Estimate Order) ¶¶ 4-6 (confirming Allowed General Unsecured Claims exceed $42 billion, directing New GM to issue $30,000,000 Adjustment Shares—while preserving claims against New GM, and stating that "[w]ithin five (5) business days of entry of this Order, New GM shall issue 30 million shares of New GM common stock (the Adjustment Shares) or the value of the Adjustment Shares, to an account designated by the Signatory Plaintiffs")).

[12] See Dkt. No. 14093-16 (Enforcement Mot., Ex. P (Mot. for Order Approving Notice Procedures with Respect to Proposed Settlement By and Among the Signatory Plaintiffs and the GUC Trust), at Ex. A (Proposed Order Approving Notice Procedures With Respect to Proposed Settlement By and Among the Signatory Plaintiffs and the GUC Trust), at 2 ("ORDERED that, no later than two (2) days after the entry of this Order, New GM shall turn over to the Parties the names and addresses of (A) all persons in the United States who, as of July 10, 2009, owned or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Order.")).

[13] See Dkt. No. 14093-10 (Enforcement Mot., Ex. J (proposed Claims Estimate Order) ¶ 6)).

5

14.     A decision in Phase 1 has a direct effect on New GM's rights under the Forbearance Agreement it entered into with the GUC Trust. On September 12, 2017, the GUC Trust administrator and New GM executed the Forbearance Agreement, and the GUC Trust filed a motion seeking its approval by the Court, in which New GM joined.[14] Under the terms of the Forbearance Agreement between New GM and the GUC Trust, if the Court finds the Unexecuted Settlement Agreement is binding, then the Forbearance Agreement terminates automatically.

15.     The result of Phase 1 determines whether there will be a Phase 2. A second litigation phase would include the expenditure of substantial New GM resources to contest, among other things, the propriety of a Claims Estimate Order and approval of an agreement without entry of Fed. R. Civ. P. 23 protections.

16.     New GM has at least as much of a financial stake as the unitholders in the outcome of Phase 1 and Phase 2. New GM is seeking to protect itself from an improper attempt to compel the issuance of 30 million shares of New GM stock.

17.     Moreover, Plaintiffs' counsel has admitted New GM's significant interest in matters relating to the Unexecuted Settlement Agreement, including their previewing the Unexecuted Settlement Agreement with New GM before the August 17, 2017 status conference and their notice to New GM to attend that conference.

18.     During a hearing on July 16, 2015, the Bankruptcy Court observed, when discussing the potential impact of a settlement between the GUC Trust and plaintiffs that could trigger the Adjustment Shares, that while "[t]he principal attention that a judge gives to [a 9019

---

[14]  See Dkt. No. 14095 (Mot. of the Motors Liquidation Co. GUC Trust Administrator Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 1142(b) and Bankruptcy Rule 3020(d) to Authorize Entry into Forbearance Agreement with General Motors LLC ("**Forbearance Agreement**")); Dkt. No. 14096 (Joinder of General Motors LLC in Mot. of Motors Liquidation Co. GUC Trust Administrator Pursuant to Bankruptcy Code Sections 105(a), 363(b), and 1142(b) and Bankruptcy Rule 3020(d) to Authorize Entry into Forbearance Agreement).

6

motion] is whether the estate is giving away the store[,] … we also look to see whether parties while acting in the interest of the estate are nevertheless inappropriately adversely affecting parties who aren't at the table[. T]hat's the more significant concern here."[15]

19.     At that hearing, plaintiffs' counsel conceded New GM "has an economic interest in not having the accordion [Adjustment Shares] trigger[ed]."[16]

20.     Overall, in this long-running bankruptcy case, New GM has been granted standing to brief and appear and be heard, <u>inter alia</u>, (a) on issues in connection with the Late-Claims Motions,[17] and (b) in the contested matter that involved the GUC Trust, Green Hunt Wedlake, Inc., as trustee for General Motors Nova Scotia Finance Company, and the current and former noteholders of General Motors Nova Scotia Finance Company.

21.     Finally, New GM has participated in the discovery relating to Phase 1 and coordinated its litigation efforts with the GUC Trust.

## II.    CONTENTIONS OF LAW

22.     New GM is a party in interest with standing to appear and be heard in Phase 1 under section 1109(b) of the Bankruptcy Code and Bankruptcy Rule 2018(a).

---

[15]    <u>See</u> Dkt. No. 13399 (Jul. 16, 2015 Hr. Tr. 42:7-19).

[16]    <u>Id.</u> at 43:6-7; <u>see also id.</u> at 42:24-43:6 ("I think the only party that could stand up and say they're being adversely affected aside from plaintiffs … would be New GM.  It's New GM's stock that would have to be forked over …."). Indeed, at this hearing, Plaintiffs' counsel expressed his "presum[ption]" that New GM would have "***all the time and due process it needs and wants in order to ensure that its rights are protected*** before it literally has to turn over 10 million shares of New GM stock." <u>Id.</u> at 43:11-15 (emphasis added).

[17]    <u>See</u> Dkt. No. 13869 (Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising from Late Claim Mots. Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, And Certain Ignition Switch Pre-Closing Accident Plaintiffs).

7

23.     Pursuant to 11 U.S.C. § 1109(b), "[a] 'party in interest,' including the debtor, the trustee, a creditor's committee, an equity security holders' committee, a creditor,[18] an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."

24.     Pursuant to Fed. R. Bankr. P. 2018(a), "[i]n a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."

25.     The parties specifically enumerated in section 1109(b) are non-exclusive, and section 1109(b) does not require that parties be third-party beneficiaries of a contract to have standing to appear and be heard in a dispute concerning whether the contract is binding on the parties.[19]

26.     The Bankruptcy Code does not define "party in interest," the term is interpreted broadly to allow parties affected by the chapter 11 case to be heard.[20]

27.     In applying section 1109(b), "courts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation."  In re Texaco Inc., 81 B.R. 820, 828 (Bankr. S.D.N.Y. 1988) (citing In re Amatex Corp., 755 F.2d 1034, 1042 (3d. Cir. 1985)).

---

[18]   New GM filed a proof of claim in the bankruptcy cases, see Proof of Claim No. 71111, and the GUC Trust has ongoing obligations to New GM under the Sale Agreement.

[19]   See In re Residential Capital, LLC, 2013 WL 6698365, at *3 (Bankr. S.D.N.Y. Dec. 19, 2013) ("In the context of chapter 11 cases, the Code provides a non-exclusive list of 'parties in interest'"); In re Global Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011) (same).

[20]   In re Residential Capital, LLC, 2013 WL 6698365, at *3; see also In re Global Indus. Techs., Inc., 645 F.3d at 210 ("The list of potential parties in § 1109(b) is not exclusive.  The section has been construed to create a **broad right of participation** in Chapter 11 cases." (emphasis added)); In re Stone Barn Manhattan LLC, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) ("Although the term 'party in interest' is not defined by the Bankruptcy Code or Rules, courts construe its meaning broadly to insure fair representation of all constituencies impacted in any significant way by a Chapter 11 case.").

8

28.     New GM has standing to appear and be heard in connection with Phase 1 because, among other things, the Unexecuted Settlement Agreement imposes significant obligations on New GM, New GM is the primary target of the Unexecuted Settlement Agreement, and New GM is the party to whom plaintiffs and the unitholders are looking to fund the alleged settlement.[21]

29.     Proposed targets of an agreement—like New GM here—have standing to challenge any and all aspects of that agreement, regardless of whether they are parties to it.[22]

30.     The Parties' decision to bifurcate the issues into two phases does not impact the standing analysis. Party-in-interest standing is interpreted broadly to allow the participation of parties who are affected by the litigation; it does not restrict standing to those whose rights will be finally and ultimately resolved.[23]

---

[21]    See, e.g., In re Glob. Indus. Techs., Inc., 645 F.3d at 212 (liability insurers had standing under § 1109(b) to contest plan that increased insurers' pre-petition liability exposure by more than 27 times: "when a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed. In short, they at least have bankruptcy standing."); In re Residential Capital, LLC, 2015 WL 629416, at *3 (S.D.N.Y. 2015) ("[C]ourts in this Circuit have held that a party in interest is one that has a sufficient interest in the outcome of the case that would require representation, or a pecuniary interest that will be directly affected by the case."); In re Stone Barn Manhattan LLC, 405 B.R. at 74 (noting law is well-settled "that a pecuniary interest directly affected by the bankruptcy proceeding provides standing under § 1109(b)"); In re Texaco Inc., 81 B.R. at 828 (party in interest includes any entity with "sufficient stake in the outcome of the proceeding so as to require representation").

[22]    See In re Heating Oil Partners, LP, 422 F. App'x 15, 16-17 (2d Cir. 2011) ("AHA's pecuniary interest here is the default judgment … for which it will indemnify [debtor] in full or in part…. Without a doubt, AHA, which has a personal stake in whether the default judgment is void, is a party in interest pursuant to section 1109(b)."). See also In re Stone Barn Manhattan LLC, 405 B.R. at 74 (debtors in separate chapter 11 case had standing to object to settlement given their interest in escrow account from which settlement was proposed to be funded); In re Sapphire Development, LLC, 523 B.R. 1, 5-6 (D. Conn. 2014) (judgment creditor of trustee of sole owner of debtor was a "party in interest" under section 1109(b) when "[a]n outcome of the bankruptcy proceeding that distributed any part of the property or proceeds therefrom to [debtor's] other creditors would … harm his interest[,]" and that interest is not "purely derivative of another party's rights"); In re Standard Insulations, Inc., 138 B.R. 947, 950 (Bankr. W.D.Mo. 1992) (insurers exposed to claims against debtor were "parties in interest" under section 1109(b) where "[d]ebtor's insurance [was] the only asset of consequence" and "[t]he insurers [were] responsible for payment of injury claims caused by exposure to debtor's products during covered periods").

[23]    See, e.g., In re Residential Capital, LLC, 2013 WL 6698365, at *3 ("'Party in interest' is interpreted broadly to allow parties *affected* by the chapter 11 case to be heard." (emphasis added)); In re Global

9

09-50026-mg    Doc 14193-4    Filed 12/03/17    Entered 12/03/17 23:55:47    Exhibit C-2
Pg 11 of 14

31.     The presence of subsequent defenses in Phase 2 does not preclude a finding of standing in Phase 1.[24] New GM's substantive legal rights and legal expenses could be impacted by the adjudication of Phase 1 issues because: (a) the Forbearance Agreement will terminate automatically if the Court finds the Unexecuted Settlement Agreement is binding on the GUC Trust and (b) potential Phase 2 litigation would result in substantial New GM legal expenses to contest the legal propriety of the alleged settlement.

32.     Granting New GM standing to participate in Phase 1 comports with the principles underlying section 1109(b) and generally furthers the purposes of the Bankruptcy Code.[25]

33.     New GM's right to participate in Phase 1 is also consistent with Bankruptcy Rule 2018(a). New GM easily satisfies each of the factors relevant to whether it can participate pursuant to Bankruptcy Rule 2018(a), i.e., "1) whether the moving party has an economic or similar interest in the matter; 2) whether the interests of the moving party are adequately

---

Indus. Techs., Inc., 645 F.3d at 210 (Section 1109(b) "has been construed to create a broad right of participation in Chapter 11 cases."); In re Stone Barn Manhattan LLC, 405 B.R. at 74 ("Although the term 'party in interest' is not defined by the Bankruptcy Code or Rules, courts construe its meaning broadly to insure fair representation of all constituencies *impacted in any significant way* by a Chapter 11 case." (emphasis added)); In re Teligent, Inc., 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) (noting section 1109(b) standing entitles entities with interests in dispute "*to assert that interest with respect to any issue to which it pertains*" (emphasis added)) .

[24]     See, e.g., In re Global Indus. Techs., Inc. 645 F.3d at 213-14 (plan's creation of trust "led to a manifold increase in … claims," which "constitutes a tangible disadvantage to [the insurers who], *despite having their coverage defenses available*, will be faced with coverage obligations to the [trust] in a world that recognizes the existence of over 4,600 … claims, as opposed to a pre-Plan world that recognized only 169" (emphasis added)); In re Suffolk Regional Off-Track Betting Corp., 462 B.R. 397, 413 (Bankr. E.D.N.Y. 2011) ("If Churchill Downs has standing to be heard on the issue of assumption or rejection of the Amended Term Sheet in this bankruptcy case, it has standing to be heard on the threshold issue of Suffolk OTB's entitlement to commence this bankruptcy case.").

[25]     See In re Heating Oil Partners, LP, 422 F. App'x at 17 ("When interpreting the meaning of [party in interest under section 1109(b)], 'we are governed by the Code's purposes.'") (quoting In re Comcoach Corp., 698 F.2d 571, 573 (2d Cir. 1983));  7 Collier on Bankruptcy ¶ 1109.02[3][b] (§ 1109(b) "guarantees that every person with a direct stake in the proceedings has an opportunity to be heard with respect to any issue in the case that is pertinent to his or her interests"); 7 Collier on Bankruptcy ¶ 1109.04[2][b] ("A fundamental purpose of section 1109(b) is to grant any party with a financial stake in the case the right … to participate with respect to the judicial determination of any issue bearing on the ultimate disposition of his or her interest.").

10

09-50026-mg    Doc 14183-4    Filed 12/03/17    Entered 12/03/17 23:53:47    Exhibit C-2
Pg 12 of 14

represented by the existing parties; 3) whether the intervention will cause undue delay to the proceedings; and 4) whether the denial of the movant's request will adversely affect their interest."[26]

34. Among other things, New GM's interests are not adequately represented by other parties; the GUC Trust has significantly different (and less onerous) obligations under the Unexecuted Settlement Agreement than New GM, and New GM's participation will not cause delay because New GM will not duplicate the GUC Trust's efforts.[27]

35. The Supreme Court has identified three aspects of Article III standing: (1) an injury in fact, which is an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection

---

[26] In re First Interregional Equity Corp., 218 B.R. 731, 736 (Bankr. D.N.J. 1997).

[27] See e.g., Fed. R. Bankr. P. 2018(a) (authorizing Court to "permit any interested entity to intervene generally or with respect to any specified matter"); In re Caldor Corp., 303 F.3d 161, 172 n.9 (2d Cir. 2002) ("[Rule] 2018 governs permissive intervention in a case …. [and] is not inconsistent with a broad interpretation of § 1109(b) because [Rule] 2018 applies to entities that are not parties in interest and not entitled to intervene as of right under § 1109(b)"); 9 Collier On Bankruptcy ¶ 2018.04[3] (noting cause justifying Rule 2018(a) intervention includes "an economic or similar interest in the case or one of its aspects … an entity's concern with precedential ramifications of an aspect of a case ... [or] no other entity exists to adequately protect [the movant's] position and that intervention would not result in undue delay or prejudice"); In re Narcisse, No. 96-21345 NHL, 2013 WL 1316706, at *3 (Bankr. E.D.N.Y. Mar. 29, 2013) (City of New York permitted to appear and be heard under Rule 2018(a) in connection with motion to reopen a chapter 7 case, which was initiated to allow the prosecution of a personal injury action, because "the City may become indebted to th[e] bankruptcy estate if there is a recovery in the Personal Injury Action."); In re Zhejiang Topoint Photovoltaic Co., Ltd., No. 14-24549 (GMB), 2015 WL 2260647, at *4–6 (Bankr. D.N.J. May 12, 2015) (granting creditor standing to appear under Rule 2018(a) because party with a direct interest in litigating dispute was "almost entirely owned and completely controlled by the Debtors" and, consequently, the creditor's interest "lack[ed] representation because the SPVs, which hold the direct rights against the Debtors, are sitting idly and will not enforce their own rights against the Debtors."); In re Alterra Healthcare Corp., 353 B.R. 66, 70–71 (Bankr. D. Del. 2006) (permitting Philadelphia Newspapers, LLC to appear under Bankruptcy Rule 2018(a) to oppose a Motion to File under Seal the Application to Approve Nine Settlements because the Newspaper asserted "an actual injury to itself" in that "the Seal Orders prevent[ed] it from obtaining access[,]" and "[t]he Reorganized Debtor ha[d] not articulated sufficient prejudice to it to warrant denial of the motion to intervene."); In re Torrez, 132 B.R. 924, 936–37 (Bankr. E.D. Cal. 1991) (allowing creditor, Northwestern Mutual Life Insurance Company, to appear under Bankruptcy Rule 2018(a) in a motion to reconvert case back to chapter 11 because "Debtors reconverted their case to Chapter 11 expressly to place themselves in a position allowing them to make a concerted effort to set aside the foreclosure by Northwestern" and, therefore, "[t]he proposed action reference setting aside the foreclosure may dramatically effect Northwestern's position" and "no other entity exists to adequately protect Northwestern's position.").

11

between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. In re MF Global Holdings Ltd., 469 B.R. at 188 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

36.    New GM has standing under Article III of the U.S. Constitution for the same reasons New GM is a party in interest under section 1109(b).[28] Moreover, the injury New GM will face should the Bankruptcy Court find the Unexecuted Settlement Agreement binding is concrete and particularized.

37.    New GM meets the prudential standing requirements of the third-party standing doctrine.

38.    Prudential standing bars litigants "from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." Kane v. Johns-Manville Corp., 843 F.2d 636, 643 (2d Cir. 1988) (holding creditor with existing asbestos claim lacked standing to assert the rights of future claimants).

39.    There is a justiciable controversy. New GM is not enforcing a third-party's rights with respect to the Unexecuted Settlement Agreement. The Unexecuted Settlement Agreement imposes significant obligations directly on New GM, and New GM is asserting its own rights to challenge any and all aspects of an agreement that imposes onerous obligations on it. Moreover, New GM is seeking to protect its rights under the Forbearance Agreement, which is dependent on the Court's ruling in Phase 1.

---

[28]    See In re Sapphire Development, LLC, 523 B.R. 1, 6 (D. Conn. 2014) (although "standing requirements of 11 U.S.C. § 1109 supplement rather than replace constitutional standing requirements[, …] where parties … have a clear financial stake in the outcome of a bankruptcy proceeding, they also meet the constitutional requirements of an injury in fact that can be fairly traced to the challenged conduct and is redressible by a favorable decision from the court"); In re Global Indus. Techs., Inc., 645 F.3d at 211 ("Persuasive authority indicates that Article III standing and standing under the Bankruptcy Code are effectively coextensive."); 7 Collier on Bankruptcy ¶ 1109.04[4][a] ("In almost every instance, the outcome of any particular proceeding in a chapter 11 case will have a sufficient effect on the interests of stakeholders generally so that their participation in the proceeding will satisfy the standing aspect of the case or controversy requirement.").

12

40. By inviting the Participating Unitholders to appear and be heard even though they are not signatories to the Unexecuted Settlement Agreement, Plaintiffs have conceded that having a financial stake in the outcome of this contested matter is sufficient for standing purposes.

41. The Phase 1 issues present a case and controversy which the Court should decide.

42. New GM will be prejudiced if it is unable to participate in the Phase 1 proceedings.

43. New GM's coordinated participation during discovery in Phase 1 provides a further justification to allow it to participate in the Phase 1 trial.

Dated: New York, New York
       December 5, 2017

                                                  Respectfully submitted,

                                                  By:     /s/ JAMES C. TECCE
Arthur J. Steinberg                                       Susheel Kirpalani
Scott Davidson                                            James C. Tecce
KING & SPALDING LLP                                       Julia M. Beskin
1185 Avenue of the Americas                               Jordan Harap
New York, New York  10036                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
Tel:  212-556-2158                                51 Madison Avenue
                                                  New York, New York  10010
                                                  (212) 849 7199

                                                  *Counsel to General Motors LLC*

13