**Presentment Date and Time: January 24, 2018 at 4:00 p.m. (Eastern Time)**
**Objection Deadline: January 25, 2018 at 4:00 p.m. (Eastern Time)**
**Hearing Date and Time (Only if Objection Filed): January 29, 2018 at 2:00 p.m. (Eastern Time)**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David N. Griffiths
Candice M. Carson

*Attorneys for Motors Liquidation*
*Company DIP Lenders Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
| | : | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **MOTORS LIQUIDATION COMPANY**, *et al.*, | : | **09-50026 (REG)** |
| f/k/a General Motors Corp., *et al.* | : | |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------x

### NOTICE OF PRESENTMENT
### OF AGREEMENT AMONG MOTORS
### LIQUIDATION COMPANY DIP LENDERS TRUST, GENERAL
### MOTORS COMPANY, ARROWOOD INDEMNITY COMPANY,
### ROYAL & SUN ALLIANCE INSURANCE PLC, AND RSA INSURANCE
### <u>GROUP PLC AND APPLICATION FOR ORDER APPROVING AGREEMENT</u>

**WHEREAS**, on January 5, 2018, Motors Liquidation Company DIP Lenders

Trust ("**MLC DIP TRUST**"), formed in furtherance of the Second Amended Joint Chapter 11

Plan (the "**Plan**") (ECF No. 9836) by the above-captioned debtors, entered into an Agreement

(the "**Agreement**"), annexed hereto as **<u>Exhibit A</u>**, with General Motors Company ("**New GM**"),

Arrowood Indemnity Company ("**Arrowood**"), Royal & Sun Alliance Insurance plc ("**RSAI**"),

and RSA Insurance Group plc (f/k/a Royal & Sun Alliance Insurance Group plc) ("**RSA**

**Group**") concerning the disbursement of the remaining proceeds (the "**LOC Proceeds**") from

the drawdown of a $14.5 million Letter of Credit (the "**LOC**") delivered by General Motors

Corporation ("**Old GM**") to Arrowood pursuant to a Settlement Agreement dated, July 16, 2008,

and a Collateral Reimbursement Agreement, dated July 16, 2008 (collectively, the "**Old GM**

**Contracts**");

        **WHEREAS**, the Trust Administrator for the MLC DIP Trust has authority to

enter into the Agreement in the ordinary course pursuant to section 8.1(a) of the Motors

Liquidation Company DIP Lenders Trust Agreement, dated December 15, 2011 (as amended by

(i) that certain Amendment to Motors Liquidation Company DIP Lenders Trust Agreement,

dated as of December 1, 2014, (ii) that certain Second Amendment to Motors Liquidation

Company DIP Lenders Trust Agreement, dated as of August 24, 2016, (iii) and that certain Third

Amendment to Motors Liquidation Company DIP Lenders Trust Agreement, dated as of

September 29, 2017), annexed hereto as **Exhibit B**;

        **WHEREAS**, the MLC DIP Trust received the rights of Old GM under the

Collateral Reimbursement Agreement to receive any LOC Proceeds remaining after all

obligations for which Arrowood, RSAI, and RSA Group were or are permitted to draw on the

LOC are paid in full;

        **WHEREAS,** the Agreement does not provide for the forfeiture of any of the

MLC DIP Trust's rights under the Old GM Contracts or require the provision of any additional

collateral by the MLC DIP Trust;

        **WHEREAS**, pursuant to the Agreement, the MLC DIP Trust shall receive for the

benefit of its beneficiaries the balance of the LOC Proceeds twenty years earlier than anticipated;

WEIL:\96320798\2\64323.0004

**WHEREAS**, pursuant to the Agreement, Arrowood, RSAI, and RSA Group shall continue to seek reimbursement and/or payment from Motors Insurance Corporation and MIC Property and Casualty Insurance Corporation for those Secured Obligations which constitute MIC Obligations (as such terms are defined in the Agreement);

**WHEREAS**, pursuant to the Agreement, New GM has agreed to pay Arrowood, RSAI, and RSA Group the amount, by which the amount of the Secured Obligation exceeds the reimbursement and/or payment, if any, received by such Arrowood, RSAI, and RSA Group from Motors Insurance Corporation and MIC Property and Casualty Insurance Corporation (the "**New GM Reimbursement**");

**WHEREAS**, the MLC DIP Trust has agreed to share 5% of the LOC Proceeds (excepting that portion of the LOC Proceeds payable to Arrowood under Section IV of the Agreement) with New GM in return for New GM's agreement to provide the New GM Reimbursement, which amount, absent approval of the Agreement (including the New GM Reimbursement), would otherwise be retained by Arrowood, RSAI, and RSA Group to secure any shortfall;

**WHEREAS**, under the Agreement the parties require entry of an order approving the Agreement in these chapter 11 cases;

**PLEASE TAKE NOTICE** that pursuant to 11 U.S.C. §§ 105(a) and 363(c) the MLC DIP Trust will present the Proposed Order, annexed hereto as **Exhibit C**, to the Honorable Martin Glenn, United States Bankruptcy Judge, for approval and signature at Room 523 of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy**

Court"), One Bowling Green, New York, New York 10004 on **January 25, 2018 at 4:00 p.m. (Eastern Time)**;

   **PLEASE TAKE FURTHER NOTICE** that any responses or objections to entry into the Agreement as set forth in the Proposed Order must be made in writing and shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (i) by attorneys practicing in the Bankruptcy Court, including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (ii) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399, and on (i) Weil, Gotshal & Manges LLP, attorneys for the MLC DIP Trust, 767 Fifth Avenue, New York, New York 10153 (Attn: David N. Griffiths, Esq. and Candice M. Carson, Esq.); (ii) General Motors LLC, 400 GM Renaissance Center, Detroit, Michigan 48243 (Attn: L. Joseph Lines, Esq.); (iii) Dentons US LLP, attorneys for Arrowood Indemnity Company, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Michael Barr, Esq. and Richard Zuckerman, Esq.); and (iv) RSA Insurance Group plc and Royal & Sun Alliance Insurance plc, Group Corporate Centre, 17th Floor, 20 Fenchurch Street, London EC3M 3AU, United Kingdom (Attn: Group General Counsel), so as to be received no later than **January 24, 2018 at 4:00 p.m. (Eastern Time)** ( the "**Objection Deadline**").

   PLEASE TAKE FURTHER NOTICE that if no objections are timely filed and served with respect to the Proposed Order, the MLC DIP Trust may, on or after the Objection

Deadline, submit to the Bankruptcy Court the Proposed Order, which may be entered with no

further notice or opportunity to be heard offered to any party.


Dated:  January 10, 2018
        New York, New York

/s/ David N. Griffiths
David N. Griffiths
Candice Carson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Motors Liquidation
Company DIP Lenders Trust*

WEIL:\96320798\2\64323.0004

## EXHIBIT A

**Agreement**

AGREEMENT (the "Agreement") made as of January 5, 2018, by and among:

(a)    Motors Liquidation Company DIP Lenders Trust, a statutory trust established pursuant to the laws of Delaware ("DIPLT");

(b)    General Motors Company, a Delaware corporation ("New GM"); and

(c)    Arrowood Indemnity Company, a Delaware corporation ("Arrowood"), Royal & Sun Alliance Insurance plc, a company incorporated in England and Wales with registered number 93792 ("RSAI"), and RSA Insurance Group plc, a company incorporated in England and Wales with registered number 2339826 (f/k/a Royal & Sun Alliance Insurance Group plc) ("RSA Group") (Arrowood, RSAI and RSA Group are, collectively, the "Royal/Arrowood Parties").

## RECITALS

WHEREAS:

## I.    The Settlement Agreement, the C&R Agreement, and the LOC Proceeds

A.    On or about July 16, 2008, General Motors Corporation ("Old GM") entered into a Settlement Agreement (the "Settlement Agreement") with the Royal/Arrowood Parties, Arrowood Capital Corp., and Arrowpoint Group, Inc.

B.    On or about July 16, 2008, contemporaneously with the execution of the Settlement Agreement, Old GM and the Royal/Arrowood Parties entered into a Collateral and Reimbursement Agreement (the "C&R Agreement") to, among other things, provide security for certain obligations described in the Settlement Agreement and the C&R Agreement (the "Secured Obligations"). The Secured Obligations are all obligations for which the Royal/Arrowood Parties were or are

1

permitted to draw on the LOC (as defined below) or the proceeds thereof, including, without limitation,

1.    all obligations of Motors Insurance Corporation and MIC Property and Casualty Insurance Corporation (collectively, the "MIC Insurers") owed to the Royal/Arrowood Parties (the "MIC Obligations"), and

2.    those obligations for which the MIC Insurers were or are not liable but for which the Royal/Arrowood Parties were permitted to draw on the LOC, including, without limitation, a percentage of the Statutory Workers' Compensation Claims-Related Obligations (as defined in the C&R Agreement) and a percentage of the Foreign Insurer-Related Obligations (as defined in the C&R Agreement) (the "Other Obligations").

C.    In accordance with the C&R Agreement, Old GM delivered a Letter of Credit, in the face amount of $14.5 million (the "LOC"), to Arrowood.

D.    In accordance with the C&R Agreement, Arrowood effected a draw down upon the LOC.

E.    The proceeds from the drawdown of the LOC were deposited in an account (the "LOC Account") with JPMorgan Chase Bank, National Association, as account agent (the "Account Agent") pursuant to an Account Agreement among the Royal/Arrowood Parties and the Account Agent (the "Account Agreement").

F.    From time to time, the amount in the LOC Account has been reduced (and, from time to time, will continue to be reduced) by amounts paid in accordance with the C&R Agreement, has been increased (and, from time to time, will continue to be increased) by income earned on investments of the funds in the LOC Account,

2

and has been increased and/or decreased (and, from time to time, may continue to

be increased and/or decreased) by the fluctuation in market value of the

investments of the funds in the LOC Account.  The amount in the LOC Account,

as so reduced and increased from time to time, is the "LOC Proceeds."

G.    As of July 31, 2017, the LOC Proceeds were approximately $16,310,468.

H.    Pursuant to the Settlement Agreement and the C&R Agreement, the

Royal/Arrowood Parties are entitled to continue to hold the LOC Proceeds, and to

continue to use the LOC Proceeds to pay amounts in accordance with the C&R

Agreement.

## II.    The GM/MIC Agreement

A.    On or about April 2, 2006, Old GM and the MIC Insurers entered into a

Termination and Release Agreement (the "GM/MIC Agreement").

B.    Under the GM/MIC Agreement, among other things, Old GM agreed to

indemnify and reimburse the MIC Insurers for certain obligations owed to the

Royal/Arrowood Parties.

## III.    The Bankruptcy Proceedings

A.    On or about June 1, 2009, Old GM filed a petition in bankruptcy in the United

States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"). Old GM later changed its name to Motors Liquidation Company. The

bankruptcy proceedings are captioned *In re Motors Liquidation Company*, Case

No. 09-50026 (Bankr. S.D.N.Y.) (Jointly Administered) (the "Bankruptcy

Proceedings").

B.    As part of the Bankruptcy Proceedings, DIPLT was granted the rights of Old GM,

3

under the C&R Agreement, to receive the amount, if any, of the LOC Proceeds which remains after all of the Secured Obligations have been paid.

C.    As part of the Bankruptcy Proceedings, New GM agreed to assume and did assume the obligations of Old GM to indemnify and reimburse the MIC Insurers under the GM/MIC Agreement, to the extent set forth in the GM/MIC Agreement.

IV.    **Reasons for this Agreement.**

A.    Absent this Agreement, DIPLT would not be able to receive the LOC Proceeds until all Secured Obligations had been liquidated, which is not likely to occur within the next twenty years.

B.    Under this Agreement, after payment of certain amounts described below to Arrowood, the remainder of the LOC Proceeds will be paid to DIPLT upon the date set forth below, which is earlier than the LOC Proceeds would otherwise be paid to DIPLT.

C.    Under this Agreement, in return for giving up their right to retain the LOC Proceeds, the Royal/Arrowood Parties will receive (1) security comparable to that which they would have if they retained the LOC Proceeds in the LOC Account pursuant to the C&R Agreement and (2) the full financial benefits which they have under the Settlement Agreement and the C&R Agreement, after taking into account insurance regulatory requirements.

AGREEMENT

NOW, THEREFORE, IT IS HEREBY AGREED, in consideration of the foregoing and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, by and among DIPLT, New GM, Arrowood, RSAI and RSA Group (each a "Party," and, collectively, the

4

105906056\V-4

"Parties") as follows:

**I.    Recitals**

    A.    Each of the recitals set forth above is true and correct and incorporated by reference as if restated fully herein.

**II.    Approval and Effective Date**

    A.    Within five (5) days of the execution of this Agreement, DIPLT will file a notice of presentment with the Bankruptcy Court, upon notice to all parties in interest, for an order, in form and substance acceptable to the Royal/Arrowood Parties, approving this Agreement (the "Approval Order").

    B.    It is a condition precedent to this Agreement's becoming effective that the Approval Order shall: (a) have been entered by the Bankruptcy Court or by the District Court exercising bankruptcy jurisdiction, (b) not be subject to a pending appeal, and the time to have appealed the Approval Order shall have expired, and (c) on such date (when there is no pending appeal and the time to have appealed having expired) not have been reversed, modified, amended, supplemented, vacated or stayed; *provided, however, that, this condition precedent shall be deemed satisfied* if the Bankruptcy Court or the District Court exercising bankruptcy jurisdiction, having been requested to enter an Approval Order, has instead entered an order declining jurisdiction (the "Declined Jurisdiction Order"), and such Declined Jurisdiction Order shall: (a) not be subject to a pending appeal, and the time to have appealed the Declined Jurisdiction Order shall have expired, and (b) on such date (when there is no pending appeal and the time to have appealed having expired) not have been reversed, modified, amended,

5

supplemented, vacated or stayed.

C.    In the event that the condition precedent to the effectiveness of this Agreement set forth in Section II.B has not been satisfied or deemed satisfied on or prior to February 28, 2018 (which date may be extended by the written consent of the Parties), this Agreement shall be null, void, and of no further force or effect.

D.    This Agreement shall be effective on the date when the condition precedent has been satisfied or deemed satisfied (the "Effective Date").

## III.   The LOC Account and the LOC Proceeds

A.    Each of the DIPLT and the Royal/Arrowood Parties acknowledges and agrees that LOC Account has been properly maintained, that the funds therein have been reasonably and prudently invested, that all amounts drawn from the LOC Account were duly drawn in accordance with the Settlement Agreement and the C&R Agreement, that the amount of the LOC Proceeds is the correct and proper balance remaining in the LOC Account, and that no Party has any claim against any other Party with respect to the establishment, maintenance, investment, and use of the LOC Account to the date of this Agreement.

B.    New GM waives any claim with respect to the establishment, maintenance, investment, and use of the LOC Account to the date of this Agreement including, without limitation, whether or not the LOC Account has been properly maintained, whether or not the funds therein have been reasonably and prudently invested, whether or not all amounts drawn from the LOC Account were duly drawn in accordance with the Settlement Agreement and the C&R Agreement, and whether

6

or not the amount of the LOC Proceeds is the correct and proper balance remaining in the LOC Account.

C.    From the date of execution of this Agreement until the Payment Date, each of the Royal/Arrowood Parties shall continue to have the right to instruct the Payment Agent to make payments to each of them which become due in accordance with the Settlement Agreement and the C&R Agreement, and to receive such payments.

## IV.    Payment of LOC Proceeds

A.    The payment date (the "Payment Date") shall be that date that is three (3) days after the Effective Date. The Parties shall designate the Effective Date of the Agreement in writing based on the condition precedent in Article II.

B.    On the Payment Date, the Royal/Arrowood Parties shall instruct the Account Agent to pay the LOC Proceeds as follows:

1.    To each of the Royal/Arrowood Parties, those amounts, if any, due in accordance with Section III.C hereof.

2.    To DIPLT, the balance of the LOC Proceeds (the "DIPLT Payment").

C.    Payments of the LOC Proceeds shall be made in the following manner:

1.    Any payment to Arrowood shall be made by wire transfer to:

Bank of America, 901 Main Street, Dallas, TX
Account Name:      Arrowood Indemnity Company
ABA:                      026 009 593
Account Number:    375 035 4867

2.    Any payment to DIPLT shall be made by wire transfer to:

Texas Capital Bank
ABA No.: 111017979
Acct. Name: Motors Liquidation Company DIP Lenders Trust-Distributable Trust Cash
Acct. No.: 1113028888

7

105906056\V-4

## V.    Secured Obligations

A.    For those Secured Obligations which constitute MIC Obligations, the
Royal/Arrowood Parties shall continue to submit requests for reimbursement
and/or payment to the MIC Insurers, in the same manner in which such requests
for reimbursement and/or payment have been submitted under the insurance and
reinsurance agreements with the MIC Insurers.

B.    For all Secured Obligations, upon notice from any Royal/Arrowood Party, New
GM shall pay, to the applicable Royal/Arrowood Party within sixty (60) days, the
amount by which the amount of such Secured Obligation exceeds the
reimbursement and/or payment, if any, received by such Royal/Arrowood Party
from the MIC Insurers.

C.    The definition of "Foreign Policy," as set forth in the Settlement Agreement,
includes a requirement that the policy "was reinsured by Royal U.S. through a
pre-existing contract [(a "pre-existing contract")] as evidenced by an agreement or
secondary evidence of such agreement." Such evidentiary requirement (1) is
conclusively satisfied if claims have heretofore been paid under such policy, and
treated by a Royal/Arrowood Party as having been reinsured, and (2) is presumed
satisfied absent clear and convincing evidence that (a) it was the intent of all
parties (including, without limitation, Royal U.S. and Royal U.K. (each as defined
in the Settlement Agreement), as well as Old GM (as identified herein)) to treat
such policy independently of the Old GM / Royal U.S. relationship, (b) such
policy was placed by the local Old GM entity with the local Royal entity/affiliate,
and (c) there is no recourse to Royal U.S. through insurance, reinsurance or

8

otherwise. In light of the passage of time, the inability to locate a copy of such a pre-existing contract is not evidence of the absence of such a pre-existing contract.

D.  If the Royal/Arrowood Parties receive notice that either or both of the MIC Insurers is placed into administrative supervision, conservation, rehabilitation, receivership, and/or liquidation by the Michigan Department of Insurance (or other insurance administrative or regulatory agency) (each a "Formal Insolvency"), then the Royal/Arrowood Parties shall not thereafter request payment or reimbursement from the MIC Insurers, and instead shall submit all claims for payment or reimbursement of all Secured Obligations directly to New GM.  New GM shall pay such amounts to the Royal/Arrowood Parties within sixty (60) days of the written submission.

E.  In the event that, after the Royal/Arrowood Parties receive notice that either or both of the MIC Insurers is placed into Formal Insolvency, the Royal/Arrowood Parties request payment or reimbursement from the MIC Insurers and their doing so causes the MIC Insurers to make a claim against New GM based on that request, the amount which New GM would be obliged to pay to the Royal/Arrowood Parties had such request been made directly to New GM will be reduced by any amount which New GM is obliged to pay to the MIC Insurers as a result of the Royal/Arrowood Parties' having submitted that request to the MIC Insurers. New GM acknowledges that, after the Royal/Arrowood Parties receive notice that either or both of the MIC Insurers is placed into Formal Insolvency, the Royal/Arrowood Parties have no obligation to request payment or reimbursement from the MIC Insurers.

9

F.    If reserves ceded by the Royal/Arrowood Parties (the "Reserves") to the MIC Insurers shall fail to qualify for full credit for ceded reinsurance for statutory accounting purposes with any insurance regulatory authority having jurisdiction over Arrowood, then New GM agrees to collateralize such Reserves by funds held by Arrowood in trust (the "New Collateral"). The New Collateral may be funded: 1) with a new clean, unconditional, irrevocable, evergreen letter of credit (the "New LOC"); or 2) cash, cash equivalents, or United States Government backed securities. The Reserves shall include: a) known outstanding losses that have been reported to the MIC Insurers and allocated loss adjustment expense relating thereto; b) losses and allocated loss adjustment expense paid by Arrowood , but not recovered from the MIC Insurers; and c) reserves for losses incurred but not reported, as shown in a statement prepared by Arrowood. The amount of the New Collateral shall be adjusted as contemplated in Article 2, Section B of the C&R Agreement. New GM may use any one of the methods of funding noted above as long as the method is acceptable to the insurance regulatory authorities having jurisdiction over Arrowood's reserves. The Royal/Arrowood Parties shall have the right to draw on the New Collateral for the purposes set forth in the C&R Agreement.

G.    If, in their sole and absolute discretion, the Royal/Arrowood Parties determine that a risk has arisen that they will not receive timely payment of any amount due or to become due to them from New GM under this agreement, then, upon thirty (30) days' notice, New GM shall, at its option, either (a) establish, maintain, and renew a new clean, unconditional, irrevocable, evergreen letter of credit (the

10

"New LOC"), in an amount equal to 100% of the Aggregate Collateral Obligation, as defined in Article 2, Section B of the C&R Agreement, for the benefit of the Royal/Arrowood Parties, pursuant to the same terms and conditions of the LOC required by the C&R Agreement, or (b) deposit a sum equal to 100% of the Aggregate Collateral Obligation into an account (the "New Account") to be maintained by the Payment Agent (or such other payment agent as is designated by the Royal/Arrowood Parties) in the same manner as, and for the same purposes for which, the LOC Account has been maintained, *provided that* if New GM has posted and is maintaining New Collateral in accordance with Section V(F) hereof, the amount of the New LOC or New Account established under this Section V(G) shall be equal to 100% of the Aggregate Collateral Obligation less the amount then being maintained as the New Collateral.

1.      If a New LOC is established, each of the Royal/Arrowood Parties shall have the same rights with respect to the New LOC that it had with respect to the LOC.

2.      If a New Account is established, each of the Royal/Arrowood Parties shall have the same rights with respect to the New Account that it had with respect to the LOC Account.

3.      Neither the establishment of a New LOC, nor the establishment of a New Account shall diminish the obligations of the MIC Insurers and of New GM including, without limitation, the payment obligations under Section V.A and Section V.B.

11

105906056\V-4

4.      The amount of the New LOC or the New Account shall be adjusted, as

contemplated in Article 2, Section B of the C&R Agreement, so that upon

any required adjustment the aggregate amounts of (a) the New LOC or the

New Account established under Section V(G), and (b) the New Collateral

remain equal to 100% of the Aggregate Collateral Obligation, as defined

in the C&R Agreement.

## VI.    Reinsurance; MIC Insurers.

A.      <u>No Impact on Reinsurance</u>. Nothing in this Agreement shall prevent or impair the

right of any of the Royal/Arrowood Parties, or any of its or their direct or indirect

parent, subsidiary or affiliate entities from pursuing and receiving any reinsurance

recoveries or from acting in its capacity as reinsurer or reinsured.

B.      <u>No Impact on Obligations of MIC Insurers</u>. Nothing in this Agreement shall

reduce or impair the obligations of the MIC Insurers to any Party.

## VII.   General Provisions

A.      <u>Governing Law</u>. This Agreement, and any contractual or non-contractual dispute

or claim arising out of, related to, or in connection with this Agreement, shall be

governed by the internal laws of the State of Delaware without regards to

conflicts of laws.

B.      <u>Representation.</u>  DIPLT represents and warrants that, as part of the Bankruptcy

Proceedings, DIPLT was granted the rights of Old GM, under the C&R

Agreement, to receive the amount, if any, of the LOC Proceeds which remains

after all of the Secured Obligations have been paid.

C.      <u>Authority</u>. Each Party represents that the person who executes this Agreement on

12

behalf of that Party is duly authorized to execute this Agreement on behalf of, and to bind, that Party for whom he or she executes this Agreement.

D.    <u>Assignment; Benefit</u>. Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned without the prior written consent of all Parties. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, including any trustee or estate representative appointed in the Bankruptcy Proceedings, and no other person or entity shall have any right, benefit or obligation under this Agreement.

E.    <u>Notice</u>. Any notice, request, instruction or other document to be given under this Agreement by any of the Parties shall be in writing and delivered personally or by certified mail, postage prepaid, return receipt requested, with such notice being effective on the date receipt is acknowledged, as follows:

1.    If to DIPLT, addressed to:

> Thomas Morrow
> Evanto Group LLC
> c/o AlixPartners LLC
> 2101 Cedar Springs Road, Suite 1100
> Dallas, TX 75201

2.    If to New GM, addressed to:

> L. Joseph Lines
> Counsel, Litigation
> General Motors LLC
> 400 GM Renaissance Center - Mail Code:  482-026-601
> Detroit, MI  48243

> With a copy to:

13

Alan G. Gier
Director, Global Risk Management and Insurance
General Motors LLC
Mail Code 482-C27-B14
PO Box 300
Detroit MI 48265

3.    If to Arrowood, addressed to:

Arrowood Indemnity Company
3600 Arco Corporate Drive
Charlotte, North Carolina 28273
Attention:    James F. Meehan

with a copy to:

Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:    Michael Barr
              Richard Zuckerman

4.    If to RSAI or RSA Group, addressed to:

RSA Insurance Group plc
Royal & Sun Alliance Insurance plc
Group Corporate Centre
17th Floor
20 Fenchurch Street
London EC3M 3AU
United Kingdom
Attention:    Group General Counsel

or to such other place and with such other copies as any of the Parties may

designate as to itself by written notice to the other Parties.

F.    Entire Agreement; Amendments; Waivers.

14

1.      This Agreement embodies arms'-length negotiations and compromises between the Parties, was drafted jointly thereby and shall not be construed against any Party by reason of their drafting or preparation.

2.      This Agreement constitutes the entire agreement among the Parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter of this Agreement, *provided that* except as specifically set forth herein, this Agreement is not intended to alter or affect the rights and obligations of the Parties under the Settlement Agreement, the C&R Agreement, the GM/MIC Agreement, the Account Agreement, and those Orders and agreements in the Bankruptcy Proceedings under which New GM assumed obligations of Old GM to indemnify and reimburse the MIC Insurers under the GM/MIC Agreement.

3.      No vacatur, supplement, amendment, modification or waiver of this Agreement, or any provision of this Agreement, shall be binding unless expressly provided in a writing executed by the Party or Parties against whom it is to be enforced.

4.      No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided in a writing executed by the Party or Parties against whom it is to be enforced.

G.  <u>Multiple Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties may execute facsimile or .pdf copies of this Agreement and the facsimile or .pdf signature of each Party shall be deemed an original and fully binding.

H.  <u>Invalidity</u>. In the event that any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such provision or provisions shall be reformed (judicially or by agreement of the Parties) consistent with the Parties' intentions so as to be valid, legal and enforceable to the maximum extent possible and such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

105906056\V-4

I.    <u>Titles</u>. The titles, captions or headings in this Agreement are inserted for

convenience of reference only and are not intended to be a part of or to affect the

meaning or interpretation of this Agreement.


MOTORS LIQUIDATION COMPANY           ARROWOOD INDEMNITY COMPANY
DIP LENDERS TRUST

By: Evanto Group, LLC,
a Michigan limited liability company,            By: _____
Trust Administrator                              Name:
                                                 Title:

By: _____
Thomas Morrow,
its Authorized Representative

GENERAL MOTORS COMPANY                ROYAL & SUN ALLIANCE INSURANCE
                                      PLC

By: _____
Name:                                            By: _____
Title:                                           Name:
                                                 Title:


                                      RSA INSURANCE GROUP PLC


                                                 By: _____
                                                 Name:
                                                 Title:

105906056\V-4

I.    <u>Titles</u>. The titles, captions or headings in this Agreement are inserted for

convenience of reference only and are not intended to be a part of or to affect the

meaning or interpretation of this Agreement.

MOTORS LIQUIDATION COMPANY
DIP LENDERS TRUST

By: Evanto Group, LLC,
a Michigan limited liability company,
Trust Administrator

By: _____
Thomas Morrow,
its Authorized Representative

GENERAL MOTORS COMPANY

By: _____
Name: Alan G. Gier
Title: Global Director,
       Corporate Risk &
       Insurance

ARROWOOD INDEMNITY COMPANY

By: _____
Name:
Title:

ROYAL & SUN ALLIANCE INSURANCE
PLC

By: _____
Name:
Title:

RSA INSURANCE GROUP PLC

By: _____
Name:
Title:

17

105906056\V-4

I.     Titles. The titles, captions or headings in this Agreement are inserted for

convenience of reference only and are not intended to be a part of or to affect the

meaning or interpretation of this Agreement.

MOTORS LIQUIDATION COMPANY
DIP LENDERS TRUST

By: Evanto Group, LLC,
a Michigan limited liability company,
Trust Administrator

By: _____
Thomas Morrow,
its Authorized Representative

GENERAL MOTORS COMPANY

By: _____
Name:
Title:

ARROWOOD INDEMNITY COMPANY

By: _____
Name:  Dennis W Cahill
Title:  Sr. V P and COO.

ROYAL & SUN ALLIANCE INSURANCE
PLC

By: _____
Name:
Title:

RSA INSURANCE GROUP PLC

By: _____
Name:
Title:

17

I.  Titles. The titles, captions or headings in this Agreement are inserted for

convenience of reference only and are not intended to be a part of or to affect the

meaning or interpretation of this Agreement.

MOTORS LIQUIDATION COMPANY
DIP LENDERS TRUST

ARROWOOD INDEMNITY COMPANY

By: Evanto Group, LLC,
a Michigan limited liability company,
Trust Administrator

By: _____
Name:
Title:

By: _____
Thomas Morrow,
its Authorized Representative

GENERAL MOTORS COMPANY

ROYAL & SUN ALLIANCE INSURANCE
PLC .

By: _____
Name:
Title:

By: _____
Name: VESPER WILLIAM
Title: DIRECTOR

RSA INSURANCE GROUP PLC

By: _____
Name: CHARLOTTE HEISS
Title: COMPANY SECRETARY

17

## **EXHIBIT B**

**MLC DIP Trust Agreement**

**EXECUTION VERSION**

## MOTORS LIQUIDATION COMPANY
## DIP LENDERS TRUST

      This MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST AGREEMENT, is made as of December 15, 2011 (as it may be amended from time to time, this "Trust Agreement"), by and among Motors Liquidation Company (f/k/a General Motors Corporation) ("MLC"), as post-effective date debtor (the "MLC Debtor"), CSC Trust Company of Delaware as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms hereof, the "Resident Trustee"), and AP Services, LLC ("APS"), as trust administrator and trustee (together with any successor appointed under the terms hereof, the "Trust Administrator") of the Motors Liquidation Company DIP Lenders Trust (the "Trust") for the benefit of the DIP Lenders.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Second Amended Joint Chapter 11 Plan pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"), dated March 18, 2011, as confirmed by the Bankruptcy Court on March 29, 2011 (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

### Background

      A.    Beginning on June 1, 2009, MLC; MLC of Harlem, Inc. (f/k/a Chevrolet-Saturn of Harlem, Inc.); MLCS, LLC (f/k/a Saturn, LLC); MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation); Remediation and Liability Management Company, Inc.; and Environmental Corporate Remediation Company, Inc. (collectively, the "Debtors") each commenced voluntary cases under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

      B.    On March 29, 2011, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Plan.

      C.    The Trust is being established (i) to avoid abandonment of certain assets of the MLC Debtor and facilitate the recovery of certain causes of actions that will not be able to be monetized before MLC Debtor's dissolution as required by the Plan; and (ii) to hold and administer the assets and any corresponding liabilities of the Trust listed on Schedule A, Schedule B and Schedule C attached hereto (the "Trust Assets") for the benefit of the DIP Lenders under the DIP Credit Agreement and to distribute the Trust Assets to the DIP Lenders in accordance with the terms of this Trust Agreement.  The MLC Debtor and the DIP Lenders each believe that the value of the Trust Assets is immaterial in relation to the overall consideration to be distributed under the Plan and the MLC Debtor represents that, absent the creation of the Trust, it is likely that at least some of the Trust Assets would have been abandoned under the Plan.

      D.    The MLC Debtor and the DIP Lenders have each agreed to designate APS as the Trust Administrator under this Trust.

E.    The MLC Debtor and its legal counsel have concluded that creation of the Trust is not inconsistent with the Plan and requires no further consent or approval of any party or the Bankruptcy Court.

F.    The Trust Administrator shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Trust for the benefit of the DIP Lenders, including the power to: (i) prosecute through counsel and other professionals selected by the Trust Administrator any causes of action that may from time to time be held by the Trust, and (ii) preserve, maintain, convert to Cash and distribute the Trust Assets in accordance with this Trust Agreement.

G.    The Trust Administrator shall otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order, or in any other agreement executed pursuant to the Plan.

H.    The Trust is intended to qualify as a liquidating trust under Treasury Regulation section 301.7701-4(d) that is treated as a "grantor trust" for federal and applicable state and local income tax purposes.

## Agreement

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants contained herein, the MLC Debtor and the Trust Administrator agree as follows:

## ARTICLE I
## DEFINED TERMS

1.1.    <u>Definitions</u>.  Whenever used in this Trust Agreement, unless the context otherwise requires, the following words and phrases shall have the respective meanings ascribed to them as follows:

(a)    "<u>Bankruptcy Code</u>" has the meaning set forth in the preamble to this Trust Agreement.

(b)    "<u>Bankruptcy Court</u>" means the United States District Court for the Southern District of New York, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

(c)    "<u>Budget</u>" has the meaning set forth in <u>Section 6.1</u>.

(d)    "<u>Business Day</u>" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

(e)    "<u>calendar quarter</u>" means the relevant three-month period ending on the last day of March, June, September or December, as applicable, of each calendar year;

2

*provided, however*, that the calendar quarter that contains the Transfer Date shall be the period commencing on the Transfer Date and concluding on the date on which the relevant calendar quarter would naturally end in accordance with the foregoing.

(f)    "Certificate of Trust" means the certificate of trust of the Trust as required by Section 3810 of the Delaware Act.

(g)    "Chapter 11 Cases" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and currently styled *In re Motors Liquidation Company, et al. f/k/a General Motors Corp. et al*, Ch. 11 Case No. 09-50026 (REG) (Jointly Administered).

(h)    "Confidential Party" has the meaning set forth in Section 11.12.

(i)    "Confirmation Order" has the meaning set forth in Background paragraph B.

(j)    "Commencement Date" means (i) June 1, 2009 with respect to MLC; MLC of Harlem, Inc.; MLCS, LLC; and MLCS Distribution Corporation and (ii) October 9, 2009 with respect to Remediation and Liability Management Company, Inc. and Environmental Corporate Remediation Company, Inc.

(k)    "Debtors" has the meaning set forth in Background paragraph A.

(l)    "Delaware Act" means the Delaware Statutory Trust Act, 12 Del. C. § 3801 *et seq.*

(m)    "Disputed Amount" has the meaning set forth in Exhibit A.

(n)    "Distributable Trust Cash" means any Cash or cash equivalents included in the Trust Assets.

(o)    "Distribution Date" means the date of any distribution made by the Trust Administrator to the DIP Lenders pursuant to this Trust Agreement.

(p)    "Holdback" has the meaning set forth in Section 6.1(b).

(q)    "Incompetency" means, with respect to any Person, the incompetency of such Person if such Person is a natural person.

(r)    "IRS" means the Internal Revenue Service.

(s)    "MLC" has the meaning set forth in the preamble to this Trust Agreement.

(t)    "MLC Debtor" has the meaning set forth in the preamble to this Trust Agreement.

(u)    "Permissible Investments" means investments in any of the following:

3

(i)      Marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States;

(ii)     Marketable debt securities, rated Aaa by Moody's and/ or AAA by S&P, issued by U.S. Government-sponsored enterprises, U.S. Federal agencies, U.S. Federal financing banks, and international institutions whose capital stock has been subscribed for by the United States;

(iii)    Certificates of deposit, time deposits, and bankers acceptances of any bank or trust company incorporated under the laws of the United States or any state, provided that, at the date of acquisition, such investment, and/or the commercial paper or other short-term debt obligation of such bank or trust company has a short-term credit rating or ratings from Moody's and/or S&P, each at least P-1 or A-1;

(iv)    Commercial paper of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition is rated by Moody's and/or S&P, provided each such credit rating is least P-1 and/or A-1;

(v)     Money market mutual funds that are registered with the Securities and Exchange Commission under the Investment Company Act of 1940, as amended, and operated in accordance with Rule 2a-7 and that at the time of such investment are rated Aaa by Moody's and/or AAA by S&P; and

(vi)    Tax-exempt variable rate commercial paper, tax-exempt adjustable rate option tender bonds, and other tax-exempt bonds or notes issued by municipalities in the United States, having a short-term rating of "MIG-1" or "VMIG-1" or a long term rating of "AA" (Moody's), or a short-term rating of "A-1" or a long term rating of "AA" (S&P).

(v)     "Plan" has the meaning set forth in the preamble to this Trust Agreement.

(w)    "Resident Trustee" has the meaning set forth in the preamble to this Trust Agreement.

(x)     "Secretary of State" means the Office of the Secretary of State of the State of Delaware.

(y)     "Tax Returns" means all tax returns, reports, certificates, forms or similar statements or documents.

(z)     "Transfer Date" means the date on which the Trust Assets are transferred to the Trust by the MLC Debtor, which transfer shall occur on or before December 15, 2011.

(aa)    "Treasury Regulations" means the income tax regulations promulgated under the Tax Code, including any amended or successor income tax regulations thereto.

4

(bb)    "Trust" has the meaning set forth in the preamble to this Trust Agreement.

(cc)    "Trust Act" means the Delaware Statutory Trust Act, 12 Del. C. § 3801 et seq.

(dd)    "Trust Administrator" has the meaning set forth in the preamble to this Trust Agreement.

(ee)    "Trust Administrator Parties" means the Trust Administrator, the Resident Trustee and any of their principals, directors, officers, employees, agents, representatives, attorneys, accountants, advisors, affiliates and other professionals (including the Trust Professionals).

(ff)    "Trust Administrative Cash" means the Cash held and maintained by the Trust Administrator for the purpose of paying the fees and expenses incurred by the Trust Administrator (including fees and expenses of Trust Professionals) in connection with the Trust and any obligations imposed on the Trust Administrator or the Trust, including fees and expenses relating to the performance of the Trust Administrator's obligations under this Trust Agreement.

(gg)    "Trust Agreement" has the meaning set forth in the preamble to this Trust Agreement.

(hh)    "Trust Assets" has the meaning set forth in Background paragraph C.

(ii)    "Trust Professionals" means, collectively, independent contractors, including attorneys, accountants, financial advisors, appraisers, disbursing agents or other parties deemed by the Trust Administrator to have the qualifications necessary or desirable to assist in the proper administration of the Trust and that are employed or retained by the Trust in such capacities.

## ARTICLE II
## DECLARATION OF TRUST

2.1.    Creation of Trust.  The MLC Debtor hereby constitutes and creates the Trust, in the form of a statutory trust under the Delaware Act, which shall bear the name "Motors Liquidation Company DIP Lenders Trust."  In connection with the exercise of the Trust Administrator's power hereunder, the Trust Administrator may use this name or such variation thereof as the Trust Administrator sees fit.  The Resident Trustee, as trustee of the Trust, is hereby authorized and directed to execute and file a Certificate of Trust with the Secretary of State contemporaneously with the execution of this Trust Agreement.

2.2.    Purpose of Trust.  The sole purpose of the Trust is to liquidate and distribute the Trust Assets in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

2.3.    Transfer of Trust Assets to the Trust.  Effective upon the Transfer Date, the MLC Debtor hereby transfers to the Trust, in furtherance of the Plan, the Trust Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other persons to the maximum extent contemplated by and permissible under Bankruptcy Code Section 1141(c).  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to Bankruptcy Code Section 1146.  The MLC Debtor and its successors and assigns shall be released from any and all liability with respect to the transfer of the Trust Assets to the Trust as aforesaid.  Nothing in this Trust Agreement is intended to, or shall be construed to, effect a release, extinguishment or compromise of any claim or cause of action transferred to the Trust pursuant to this Trust Agreement.  The Trust Assets and all other property held from time to time by the Trust under this Trust Agreement and any earnings (including interest) thereon are to be managed, applied and disposed of by the Trust Administrator in accordance with the terms hereof, for the benefit of the DIP Lenders, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth, including the provisions of Section 2.6.

2.4.    Appointment and Acceptance of Trust Administrator.  The Trust Administrator is hereby appointed trustee of the Trust under the Delaware Act.  The Trust Administrator hereby accepts such appointments, including trusteeship of the Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery by the MLC Debtor to the Trust Administrator on behalf of the Trust, and for the benefit of the DIP Lenders, of all of its respective right, title and interest in the Trust Assets.  The Trust Administrator's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Trust and not otherwise, and in accordance with applicable law, including the Delaware Act.  The Trust Administrator shall have the authority to bind the Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trust Administrator, and not individually.

2.5.    Relevant Disclosure.  The Parties hereto acknowledge that Albert A. Koch, an authorized representative of APS, is serving as a member of the Board of Directors of the MLC Debtor as of the date hereof.  Mr. Koch recused himself from the Board's decision to create the Trust, and to appoint APS as the Trust Administrator.

2.6.    Distribution of Trust Assets.  The Trust Administrator shall, in an expeditious but orderly manner, seek to convert the Trust Assets to Cash and make timely distributions of any Distributable Trust Cash in accordance with the terms hereof and not unduly prolong the existence of the Trust.  The Trust Administrator may incur and pay any reasonable and necessary expenses in connection with the administration of the Trust, including the fees and expenses of the Trust Professionals and costs to administer the Trust, including insurance costs, provided such fees, expenses and costs are consistent with the then current Budget.

2.7.    No Reversion to the MLC Debtor.  In no event shall any part of the Trust Assets revert to or be distributed to or for the benefit of the MLC Debtor.  All Trust Assets shall be applied as provided in Section 5.1.

## ARTICLE III
## DIP LENDERS

3.1.    Rights of DIP Lenders.

(a)    The DIP Lenders shall be the sole beneficiaries of the Trust and the Trust Administrator shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this Trust Agreement, including those powers set forth in Articles VI and VIII hereof.

(b)    Subject to Article VII, the beneficial interest of each DIP Lender is hereby declared and shall be in all respects and for all purposes intangible personal property.

(c)    Except as expressly provided herein, a DIP Lender shall have no title or right to, or possession, management or control of, the Trust or the Trust Assets, or any right to demand a partition or division of such assets or to require an accounting of the Trust Administrator.  The whole legal title to the Trust Assets shall be vested in the Trust as a separate legal entity under the Delaware Act or, if necessary, in the Trust Administrator on behalf of the Trust and the sole beneficial interest of the DIP Lenders shall be as set forth in this Trust Agreement.  Notwithstanding the foregoing, the DIP Lenders may direct the Trust Administrator to abandon a specific Trust Asset provided the DIP Lenders provide the Trust Administrator with at least 90 days prior written notice.

3.2.    Limited Liability.  No provision of this Trust Agreement, and no mere enumeration herein of the rights or privileges of any DIP Lender, shall give rise to any liability of such DIP Lender solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors or employees of any Debtor, or by any other Person.

3.3.    No Control by DIP Lenders.  A DIP Lender shall have no title to, or any right to possess, manage or control, the Trust Assets, or any portion thereof or interest therein, except as expressly provided herein.  The whole title to all the Trust Assets shall be vested in the Trust and the sole interest of the DIP Lenders shall be the rights and benefits provided to such persons under this Trust Agreement.

## ARTICLE IV
## DURATION AND TERMINATION OF THE TRUST

4.1.    Duration.  The Trust shall become effective upon the earlier to occur of (a) the Transfer Date and (b) the execution of this Trust Agreement and the filing of the Certificate of Trust with the Secretary of State, and shall remain and continue in full force and effect until (x) all of the Trust Assets, if any, have been distributed pursuant this Trust Agreement and (y) the Trust Administrator determines, in its discretion, that the administration of the Trust Assets is not likely to yield sufficient additional Distributable Trust Cash to justify further pursuit, and all other distributions required to be made by the

7

Trust Administrator under this Trust Agreement have been made, but in no event shall the Trust be dissolved later than December 15, 2014. If at any time the Trust Administrator determines that the expense of administering the Trust and converting any remaining Trust Assets to Cash is such that making a final distribution to the DIP Lenders is likely to exceed the value of the Trust Assets remaining in the Trust, the Trust Administrator may, with the prior unanimous written consent of the DIP Lenders (i) reserve such portion of the Trust Administrative Cash as is necessary to dissolve the Trust, and Transfer any remaining portion of the Trust Administrative Cash to the DIP Lenders, (ii) (A) transfer the remainder of the Trust Assets to the DIP Lenders or (B) donate the remainder of the Trust Assets to a charitable organization described in section 501(c)(3) of the Tax Code and exempt from U.S. federal income tax under section 501(a) of the Tax Code that is unrelated to the MLC Debtor, the Trust or any Trust Administrator Parties, or otherwise abandon the Trust Assets in any commercially reasonable manner, and (iii) dissolve the Trust.

4.2.    Dissolution of the Trust.  Notwithstanding anything to the contrary in this Trust Agreement, in no event shall the Trust Administrator unduly prolong the duration of the Trust, and the Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all DIP Lenders, at all times endeavor to terminate the Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement.  Upon final dissolution and wind-up of the Trust and upon the written direction of the Trust Administrator, the Resident Trustee shall file a certificate of cancellation for the Trust with the Secretary of State at which time the Resident Trustee shall be released from any further duties herein.

4.3.    Continuance of Trust for Purposes of Winding Up.  After the dissolution of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trust Administrator shall continue to act in such capacity until its duties hereunder have been fully performed.  The Trust Administrator shall retain the books, records and files that shall have been delivered to or created by the Trust Administrator until distribution or resolution of all the Trust Assets, if any.  At the Trust Administrator's discretion, all of such books, records and files may be destroyed at any time following the later of (x) final distribution of the Trust Assets, if any, unless such books, records and files are necessary to fulfill the Trust Administrator's obligations pursuant to Articles VI and VIII hereof and subject to any joint prosecution and common interests agreement(s) to which the Trust Administrator may be party, and (y) the date until which the Trust Administrator is required by applicable law to retain such books, records and files.

## ARTICLE V
## DISTRIBUTIONS TO DIP LENDERS

5.1.    General.

(a)    The Trust Administrator shall establish Distribution Dates no less frequently than once each calendar year and no more frequently than once a calendar quarter for the distribution of any Distributable Trust Cash as provided in this Article V; provided that distributions need not be made in any calendar year to the extent (A) there is no Distributable

Trust Cash held by the Trust or (B) the Trust Administrator determines (i) that it is reasonably necessary to retain the Distributable Trust Cash to meet contingent liabilities and maintain the value of the Trust Assets (such as, for example, in the event that the Trust Administrator determines that the Distributable Trust Cash is so small in amount as not to justify making a distribution, taking into account the costs that would be incurred in making the distribution, the anticipated total amount of Distributable Trust Cash expected to be available for distribution over time and the timing of the distribution or distributions thereof), or (ii) that it is necessary to retain the Distributable Trust Cash to pay reasonable incurred or anticipated expenses (including any taxes imposed on the Trust or in respect of the Trust Assets) or to satisfy liabilities incurred and anticipated by the Trust in accordance with this Trust Agreement.

(b)    The Trust Assets (including any Distributable Trust Cash) shall be distributed to the DIP Lenders, each in their relative proportion pursuant to the terms of the DIP Credit Agreement.

5.2.    <u>Retention of Trust Assets and Distributable Trust Cash</u>.  Notwithstanding anything in this Trust Agreement to the contrary, the Trust Administrator shall at all times, to the extent practicable, retain sufficient Trust Administrative Cash as the Trust Administrator shall determine is necessary (x) to pay the reasonable incurred or anticipated fees and expenses of the Trust (including any taxes imposed on the Trust or in respect of the Trust Assets) and (y) to satisfy other liabilities incurred or anticipated by the Trust in accordance with this Trust Agreement.

5.3.    <u>No Accounting</u>.    Except as otherwise provided in this Trust Agreement, nothing shall require the Trust Administrator to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition for making any payment or distribution out of the Trust Assets.

**ARTICLE VI**
**ADMINISTRATION OF THE TRUST**

6.1.    <u>Budget</u>.  The Trust Administrator shall prepare and submit to the DIP Lenders for approval a reasonably detailed annual budget (the "<u>Budget</u>") at least thirty (30) days prior to the commencement of each calendar year; <u>provided</u>, <u>however</u>, that the first such Budget shall be agreed to on or prior to the date hereof.  The Budget shall set forth (on a quarterly basis) in reasonable detail: (i) the Trust Administrator's anticipated actions to administer the Trust Assets; and (ii) the anticipated fees and expenses, including professional fees, associated with the administration of the Trust.  All actions by the Trust Administrator shall be consistent with the Budget.  The Trust Administrator may revise the Budget as required during the course of each calendar year with the prior approval of the DIP Lenders, such approval not be unreasonably withheld.

6.2.    <u>Payment of Costs, Expenses and Liabilities</u>.

(a)    The Trust Administrator shall use the Trust Administrative Cash in a manner that is consistent with the then current Budget to:

9

(i)    pay reasonable costs and expenses of the Trust that are incurred in connection with the administration thereof (including the fees and expenses of the Trust Administrator pursuant to Section 9.7 hereof, any taxes imposed on the Trust, actual reasonable fees and out-of-pocket expenses incurred by Trust Professionals retained by the Trust Administrator in connection with the administration of the Trust Assets, insurance costs, and costs associated with the preservation of books and records);

(ii)    satisfy other obligations or other liabilities incurred or assumed by the Trust (or to which the Trust Assets are otherwise subject) in accordance with this Trust Agreement, including fees and expenses incurred and in connection with the protection, preservation and distribution of the Trust Assets; and

(iii)    satisfy any other obligations of the Trust expressly set forth in this Trust Agreement to be satisfied out of the Trust Administrative Cash.

(b)    (i) If, at any time, the Trust Administrator determines that the Trust Administrative Cash is not reasonably likely to be adequate to satisfy the current and projected future fees, costs and expenses of the Trust, the Trust Administrator may, with the approval of the DIP Lenders (such approval not to be unreasonably withheld), reserve an amount, or increase the amount previously reserved, of Distributable Trust Cash to satisfy such fees, costs and expenses (the "Holdback").

(ii)    To the extent necessary to satisfy the fees, costs and expenses on account of which the Holdback may be reserved, the Trust Administrator may apply all or a portion of the Holdback to the satisfaction of such fees, costs and expenses.

6.3.    Compliance with Laws. Any and all distributions of Distributable Trust Cash shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.4.    Fiscal Year. Except for the first and last years of the Trust, the fiscal year of the Trust shall be the calendar year. For the first and last years of the Trust, the fiscal year of the Trust shall be such portion of the calendar year that the Trust is in existence.

6.5.    Books and Records. The Trust Administrator shall maintain books and records relating to the assets, liabilities, income and expense of the Trust, all distributions made by the Trust and the payment of fees and expenses of, and satisfaction of claims against or assumed by, the Trust and the Trust Administrator, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and otherwise to comply with applicable provisions of law, including tax law.

6.6.    Cash Payments. All distributions of Distributable Trust Cash required to be made by the Trust Administrator may be made by checks drawn on a United States domestic bank selected by the Trust Administrator or, at the option of the Trust Administrator, by wire transfer from a United States domestic bank selected by the Trust Administrator or as otherwise required or provided in applicable agreements; *provided*, *however*, that payments to foreign persons may be made, at the option of the Trust

Administrator, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.7.    <u>Insurance</u>.  The Trust shall maintain customary insurance coverage for the protection of the Trust Administrator and any such other persons serving as administrators and overseers of the Trust, on and after the Transfer Date.  The Trust Administrator may also obtain such insurance coverage as it deems necessary and appropriate with respect to real and personal property which may become Trust Assets.  The foregoing insurance can be in the form of an errors and omissions policy, general liability, directors' and officers' insurance ("D&O") or otherwise.  Any D&O coverage shall remain in effect for the period through which claims can be made against any covered persons.  The D&O insurance must have first dollar coverage, acceptable to the Trust Administrator, in effect for at least $3 million.  The cost of any insurance shall be paid from the Trust Administrative Cash.

## ARTICLE VII
## TAX MATTERS

7.1.    <u>Tax Treatment</u>.

(a)    For all U.S. federal and applicable state and local income tax purposes, all parties (including the MLC Debtor and the Trust Administrator) and the DIP Lenders shall treat the Trust and the transfer of the Trust Assets to the Trust in a manner consistent with the remainder of this <u>Section 7.1</u>.

(b)    For U.S. federal income tax purposes, the Trust shall be treated as a liquidating trust that is treated as a grantor trust and the Trust Assets shall be treated as (i) being transferred directly to the DIP Lenders followed by (ii) the transfer by such DIP Lenders of the Trust Assets to the Trust in exchange for beneficial interests in the Trust.  Accordingly, the DIP Lenders shall be treated as the grantors and owners of their respective share of the Trust Assets.

(c)    To the extent permitted by applicable law, all parties and the DIP Lenders shall report consistently with the U.S. federal income tax treatment of the Trust by the Trust Administrator for state and local income tax purposes.

7.2.    <u>Valuation of Assets</u>.  As soon as practicable after the Transfer Date, the Trust Administrator shall make a good-faith valuation of the Trust Assets, and such valuation shall be made available to and shall be used consistently by all parties (including the MLC Debtor and the Trust Administrator) and the DIP Lenders for all U.S. federal and applicable state and local income tax purposes.

7.3.    <u>Payment of Taxes</u>.  The Trust Administrator shall be responsible for payment, out of the Trust Assets, of any taxes imposed on the Trust or the Trust Assets.

7.4.    <u>Tax Reporting</u>.

(a)    The Trust Administrator shall file (or cause to be filed) Tax Returns for the Trust treating the Trust as a grantor trust pursuant to Treasury Regulation section 1.671-

11

4(a) and in accordance with the applicable provisions of this <u>Section 7.4</u>. The Trust Administrator also shall annually send to each DIP Lender a separate statement setting forth such DIP Lender's share of items of income, gain, loss, deduction, or credit of the Trust (including, for the avoidance of doubt, earnings on the Trust Administrative Cash) and shall instruct all DIP Lenders to report such items on their respective U.S. federal income Tax Returns. The Trust Administrator also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Trust that are required by any governmental unit.

(b)    All items of income, gain, loss, deduction and credit shall be allocated among the DIP Lenders proportionately in accordance with their relative beneficial interests in the Trust.

7.5.    <u>Tax Withholdings</u>. The Trust Administrator shall withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code, Treasury Regulations or other applicable requirements, including any provision of any foreign, state or local tax law, with respect to any payment or distribution to the DIP Lenders. All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such DIP Lenders for all purposes of this Trust Agreement. The Trust Administrator shall be authorized to collect such tax information from the DIP Lenders (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate this Trust Agreement, or to comply with any applicable withholding or reporting requirement. The Trust Administrator may refuse to make a distribution to any DIP Lender that fails to furnish such information in a timely fashion, until such information is furnished; *provided*, *however*, that upon a DIP Lender furnishing such information, the Trust Administrator shall make such distribution to which such DIP Lender is entitled, without interest.

7.6.    <u>Expedited Determination of Taxes</u>. The Trust Administrator may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for any or all Tax Returns filed for, or on behalf of, the Trust for any or all taxable periods (or part thereof) through the dissolution of the Trust.

**ARTICLE VIII**
**POWERS OF AND LIMITATIONS ON THE TRUST ADMINISTRATOR AND THE RESIDENT TRUSTEE**

8.1.    <u>Powers of the Trust Administrator</u>.

(a)    The Trust Administrator shall have only such rights, powers and privileges expressly set forth in this Trust Agreement and as otherwise provided by applicable law. Subject to any other provisions herein, the Trust Administrator shall be expressly authorized to undertake the following actions, in the Trust Administrator's good faith judgment, in the best interests of the DIP Lenders, in furtherance of the purpose of the Trust, and in a manner that is consistent with the then current Budget:

(i)    receive, hold and manage the Trust Assets, and exercise all rights with respect thereto, for the benefit of the DIP Lenders;

12

(ii)    execute all agreements, instruments and other documents, and effect all other actions necessary or appropriate to dispose of the Trust Assets;

(iii)    execute all documents and take such other actions as are necessary to complete the transfer to the Environmental Response Trust of any real estate and remaining Environmental Response Trust Assets as required by the Plan;

(iv)    calculate and implement distributions of the Trust Assets obtained through the exercise of its power and authority as contemplated by this Trust Agreement;

(v)    retain, pay, oversee and direct the services of, and terminate Trust Professionals in accordance with Section 8.3 hereof to carry out its duties and obligations hereunder;

(vi)    pay the fees and expenses of the Trust Administrator;

(vii)    incur and pay all reasonable expenses, satisfy ordinary course liabilities and make all other payments reasonable and necessary to administer, dispose of and convert to Cash, the Trust Assets;

(viii)    invest monies received by the Trust, the Trust Administrator or otherwise held by the Trust or the Trust Administrator in accordance with Section 8.4 hereof;

(ix)    protect and enforce the rights to the Trust Assets vested in the Trust Administrator by this Trust Agreement (including the Disputed Amount) by any method deemed reasonably appropriate, including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(x)    prosecute, resolve, compromise and/or settle any litigation, including with respect to the Disputed Amount;

(xi)    vote any claim or interest held by the Trust in a case under the Bankruptcy Code and receive any distribution therefrom for the benefit of the Trust;

(xii)    make all necessary filings in accordance with any applicable law, statute or regulation;

(xiii)    purchase customary insurance coverage in accordance with Section 6.6 hereof;

(xiv)    assert and/or waive any applicable privileges (legal or otherwise) on behalf of the Trust, or with respect to the Trust Assets held by the MLC Debtor at any time (prepetition or postpetition);

(xv)    maintain the books and records of the Trust;

(xvi)    open, maintain and close any bank, securities or other accounts that are necessary and appropriate to manage the Trust Assets; and

13

(xvii)  perform such functions and take such actions as are provided for or permitted this Trust and take any other actions as the Trust Administrator may deem to be reasonably necessary or appropriate to realize, preserve, dispose and convert to Cash, the Trust Assets or to carry out the purposes and intent of the Plan.

(b)  In all circumstances, the Trust Administrator shall act in a manner that it believes is in the best interests of all DIP Lenders, is in furtherance of the purpose of the Trust, and is consistent with the then current Budget.  The Trust Administrator shall not take any action inconsistent with the purpose of the Trust, or take (or fail to take) any action that would cause the Trust to fail to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust.

(c)  Notwithstanding any provision herein to the contrary, the Trust Administrator shall not serve on the board of directors, management committee or any similar governing body of any non-Debtor subsidiary of the MLC Debtor, where the charter, limited liability company agreement, partnership agreement or other similar constituent document of such subsidiary does not provide for a liquidating purpose for such subsidiary.  Except as otherwise provided in this Trust Agreement, the Trust Administrator will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trust Administrator will have the right to submit to the Bankruptcy Court or any other court of competent jurisdiction any question or questions regarding any specific action proposed to be taken by the Trust Administrator with respect to this Trust Agreement, the Trust, or the Trust Assets, including the administration and distribution of the Trust Assets and the termination of the Trust.

8.2.    <u>Limitations on the Trust Administrator</u>.  The Trust Administrator shall not be authorized to engage, in its capacity as Trust Administrator, in any trade or business with respect to the Trust Assets or to take (or fail to take) any action that would cause the Trust to fail to qualify as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust.  The Trust Administrator shall take such actions consistent with the prompt orderly disposition of the Trust Assets, if any, as required by applicable law and consistent with the treatment of the Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) that is treated as a grantor trust, to the extent such actions are permitted by this Trust Agreement.  The Trust Administrator shall, in its capacity as Trust Administrator, be restricted to the liquidation of the Trust on behalf, and for the benefit, of the DIP Lenders and the distribution and application of Trust Assets for the purposes set forth in, and the conservation and protection of the Trust Assets and the administration thereof, in each case in accordance with, the provisions of this Trust Agreement.

8.3.    <u>Agents and Professionals</u>.

(a)  The Trust Administrator and the Resident Trustee (upon written direction of the Trust Administrator), on behalf of the Trust may, but shall not be required to, from time

to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the Trust Administrator or Resident Trustee deems appropriate in accordance with the terms hereof; provided, however, that prior to retaining any Trust Professionals after the date hereof, the Trust Administrator and the Resident Trustee shall obtain the prior approval of each DIP Lender, such approval not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, the Trust Administrator intends to engage AlixPartners, LLP on or around the date hereof to assist the Trust Administrator with the administration of the Trust and the DIP Lenders have approved such engagement. AlixPartners, LLP shall be compensated on an hourly basis, plus expenses, and shall be engaged pursuant to such other reasonable and customary terms to be further specified in an engagement letter to be agreed by and among the Trust Administrator and AlixPartners, LLP. None of the professionals that represented parties-in-interest in the Chapter 11 Cases shall be precluded from being engaged by the Trust Administrator or Resident Trustee solely on account of their service as a professional for such parties-in-interest prior to the Transfer Date.

(b)    After the Transfer Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trust Administrator, including in such invoices a description of the work performed, the individuals who performed such work, and, if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. The Trust Administrator shall timely pay all such invoices that are not disputed by the Trust Administrator provided such invoices (i) are consistent with the then current Budget, or (ii) are approved by the DIP Lenders. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trust Administrator or the affected Trust Professional may petition the Bankruptcy Court to resolve the dispute.

(c)    Except as permitted by Section 6.1(b) hereof, all payments to Trust Professionals shall be paid out of the Trust Administrative Cash.

8.4.    Investment of Trust Cash.

(a)    The Trust Administrator shall establish separate accounts for Cash as follows: (i) Distributable Trust Cash which shall be held in trust for the benefit of the DIP Lenders and (ii) Trust Administrative Cash which shall be used to pay the administrative expenses of the Trust.

(b)    The Trust Administrator shall invest any Cash (including any earnings thereon or proceeds thereof) in the manner set forth in this Section 8.4, but shall otherwise be under no liability for interest or income on any monies received by the Trust hereunder and held for distribution or payment to the DIP Lenders, except as such interest shall actually be received. Investment of any Cash shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Trust Administrator to invest any Cash and the proceeds thereof, or any income earned by the Trust, shall be limited to investing such Cash (pending distribution or disbursement in accordance with this Trust Agreement) in Permissible Investments; provided, however, that such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to the

15

Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

(c)    For the avoidance of doubt, the Trust is not, and will not hold itself out as, an "investment company" as such term is understood under the Investment Company Act of 1940, and is prohibited from investing, reinvesting or trading in securities (other than making any Permissible Investments as contemplated by this Trust Agreement) or conducting any trade or business other than distributing Trust Assets under this Trust Agreement.

8.5.    Termination.    The duties, responsibilities and powers of the Trust Administrator will terminate when the Trust is dissolved and terminated pursuant to Article IV hereof and the Trust Administrator has performed all of its obligations under Section 4.3, by an order of the Bankruptcy Court or by entry of a final decree closing the Debtors' cases before the Bankruptcy Court; *provided*, *however*, that Sections 9.4, 9.5 and 9.6 hereof shall survive such termination, dissolution and entry.

8.6.    The Resident Trustee.

(a)    The Resident Trustee has been appointed and hereby agrees to serve as a trustee of the Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware.  The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement.  Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Trust, the Trust Administrator or the DIP Lenders.  Contemporaneously with the execution of this Trust Agreement, the Resident Trustee is hereby authorized and directed to file a Certificate of Trust with the Secretary of State pursuant to Section 2.1 of this Trust Agreement.

(b)    By its execution hereof, the Resident Trustee accepts the Trust created herein.  Except as otherwise expressly required by Section 8.6(a), the Resident Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Assets or the distribution of the Trust Assets to the DIP Lenders, and no such duties shall be implied.  The Resident Trustee shall not be liable for the acts or omissions of the Trust Administrator, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the Trust Administrator under this Trust Agreement, except as expressly required by Section 8.6(a).  The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.  The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence.  Without limiting the foregoing:

(i)      the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes willful misconduct, bad faith or gross negligence;

(ii)     no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii)    the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution hereof by the other parties hereto;

(iv)     the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

(v)      the Resident Trustee may request the Trust Administrator to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi)     in the exercise or administration of the Trust hereunder, the Resident Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and (b) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

(vii)    the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(c)    The Resident Trustee shall be entitled to receive compensation from the Trust for the services that the Resident Trustee performs in accordance with this Trust Agreement in accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee and the Trust Administrator. The Resident Trustee may also consult with counsel (who may be counsel for the Trust Administrator or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Trust, and the reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Resident Trustee pursuant to this Section 8.6(c) provided such fees are approved by the Trust Administrator and provided further that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

17

(d)    The Resident Trustee shall serve for the duration of the Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee.  The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the Trust Administrator, provided, however, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment.  The Resident Trustee may be removed at any time by the Trust Administrator, by providing thirty (30) days' written notice to the Resident Trustee; provided, however, such removal shall not be effective until such time as a successor Resident Trustee has accepted appointment.  Upon the resignation or removal of the Resident Trustee, the Trust Administrator shall appoint a successor Resident Trustee.  Any successor Resident Trustee appointed pursuant to this Section 8.6(d) shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 8.6(d), shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee.  Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

## ARTICLE IX
## ADDITIONAL MATTERS CONCERNING THE TRUST ADMINISTRATOR

9.1.    Reliance by Trust Administrator.  Except as otherwise provided in this Trust Agreement, the Trust Administrator Parties may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the Trust Administrator to be genuine and to have been signed or presented by the proper party or parties.

9.2.    Liability to Third Persons.  To the fullest extent permitted by applicable law, the Trust Administrator Parties shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the Trust Administrator, to any Trust Professionals retained by the Trust Administrator in accordance with this Trust Agreement) in connection with the Trust Assets or the affairs of the Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a Final Order of the Bankruptcy Court to be the direct result of their respective willful misconduct, gross negligence, fraud, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts, and all such persons shall look solely to the Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Trust.  The Trust Administrator Parties' aggregate liability, whether in tort, contract, or otherwise, is limited to the amount of fees paid to APS for services on this engagement.

9.3.    Non-liability of Trust Administrator for Acts of Others.  Except as provided herein, nothing contained in this Trust Agreement shall be deemed to be an assumption by the Trust Administrator of any of the liabilities, obligations or duties of the MLC Debtor or shall be deemed to be or contain a covenant or agreement by the Trust Administrator to assume or accept any such liability, obligation or duty.  The Trust Administrator and any successor Trust Administrator may accept and rely upon any

18

accounting made by or on behalf of the MLC Debtor or any predecessor Trust Administrator hereunder, and any statement or representation made as to the assets comprising the Trust Assets, or as to any other fact bearing upon the prior administration of the Trust or the MLC Debtor's estate, so long as it has a good faith basis to do so. The Trust Administrator shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. Neither the Trust Administrator nor any successor Trust Administrator shall be liable for any act or omission of any predecessor Trust Administrator, nor have a duty to enforce any claims against any predecessor Trust Administrator on account of any such act or omission.

9.4.    Exculpation. As of the earlier of the Transfer Date, to the fullest extent permitted by applicable law, the Trust Administrator Parties shall be and hereby are exculpated by all Persons, from any and all claims, causes of action and other assertions of liability arising out of the discharge of their respective powers and duties conferred by this Trust Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by Final Order of the Bankruptcy Court to be the direct result of such Trust Administrator Party's own respective willful misconduct, gross negligence, fraud, criminal conduct, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts. No party-in-interest will have or be permitted to pursue any claim or cause of action against the Trust Administrator Parties or the Trust, for making payments and distributions in accordance with this Trust Agreement or for implementing the provisions thereof. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty, or *ultra vires* acts.

9.5.    Limitation of Liability. In no event shall the Trust Administrator Parties be liable for punitive, exemplary, consequential, special or other damages for a breach of, or otherwise in connection with, this Trust Agreement under any circumstances.

9.6.    Indemnity.

(a)    To the fullest extent permitted by applicable law, the Trust Administrator Parties shall be indemnified by the Trust from the Trust Assets for any losses, claims, damages, liabilities and expenses occurring after the earlier of the Transfer Date, including reasonable attorneys' fees, disbursements and related expenses which the Trust Administrator Parties may incur or to which the Trust Administrator Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against one or more of the Trust Administrator Parties on account of the acts or omissions in their capacity as, or on behalf of, the Trust Administrator; *provided*, *however*, that the Trust shall not be liable to indemnify any Trust Administrator Party for any act or omission directly arising out of such Trust Administrator Party's respective actions that are determined by a Final Order of the Bankruptcy Court to be the direct result of such party's willful misconduct, gross negligence, fraud, criminal conduct, breach of fiduciary duty (to the extent applicable), or *ultra vires* acts. Notwithstanding any provision herein to the contrary, the Trust

19

Administrator Parties shall be entitled to obtain advances from the Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Trust Administrator Party in its capacity as such; *provided, however*, that the Trust Administrator Parties receiving such advances shall repay the amounts so advanced to the Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Trust Administrator Parties were not entitled to any indemnity under the provisions of this Section 9.6. Any amounts payable to any Trust Administrator Party pursuant to this Section 9.6 shall be satisfied as follows: (i) first from the Trust Administrative Cash, and (ii) second from the Distributable Trust Cash.

(b)    Anything to the contrary in this Trust Agreement or in any other agreement notwithstanding, to the extent that the Trust Administrative Cash or Distributable Trust Cash, as the case may be, shall be insufficient to fully indemnify the Trust Administrator Parties or to provide advances to the Trust Administrator Parties in accordance with Section 9.6(a), the Trust Administrator Parties shall be indemnified and shall be entitled to obtain advances, from the Trust Assets.

(c)    The foregoing indemnities in respect of any Trust Administrator Party shall survive the termination of such Trust Administrator Party from the capacity for which they are indemnified.

9.7.    Compensation and Expenses. The Trust Administrator shall receive $10,000.00 per calendar month during the term of the Trust for its services, to be paid out of the Trust Administrative Cash. The Trust Administrator shall be entitled, without the need for approval of the Bankruptcy Court, to reimburse itself on a monthly basis from the Trust Administrative Cash for such compensation and all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement. The Trust Administrator shall promptly pay the Resident Trustee upon receipt of invoices for compensation and any reasonable out of pocket expenses.

9.8.    No Personal Financial Liability. No provision of this Trust Agreement shall be construed as requiring the Trust Administrator Parties to expend or risk their own funds or otherwise to incur any personal financial liability (x) in the performance of any of their duties thereunder or hereunder, including any situation where the Trust Assets are insufficient to permit the administration of the Trust or distributions as contemplated herein or the payment of fees and expenses of the Trust Professionals, or (y) in the exercise of any of their rights or powers afforded hereunder or thereunder.

**ARTICLE X**
**SUCCESSOR TRUST ADMINISTRATORS**

10.1.    Resignation. The Trust Administrator may resign from the Trust by giving at least sixty (60) days' prior written notice thereof to the DIP Lenders. Such resignation shall become effective on the later to occur of (x) the date specified in such written notice and (y) the effective date of the appointment of a successor Trust Administrator in accordance with Section 10.4 hereof and such successor's acceptance of such appointment in accordance with Section 10.5 hereof.

10.2.    <u>Removal</u>. The DIP Lenders may, by unanimous written resolution, remove the Trust Administrator, but only for good cause. Such removal shall become effective on the date specified in such unanimous written resolution, provided that such removal shall not become effective until the appointment of a successor Trust Administrator in accordance with <u>Section 10.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 10.5</u> hereof. The services of the Trust Administrator shall also terminate upon its bankruptcy, provided that such termination shall not become effective until the appointment of a successor Trust Administrator in accordance with <u>Section 10.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 10.5</u> hereof.

10.3.    <u>Effect of Resignation or Removal</u>. The resignation, removal or bankruptcy of the Trust Administrator shall not operate to terminate the Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement or invalidate any action theretofore taken by the Trust Administrator. The exculpation, indemnity and limitation of liability provisions of this Trust Agreement shall survive the resignation, removal or bankruptcy of the Trust Administrator. All fees and expenses properly incurred by the Trust Administrator prior to the resignation, Incompetency, removal or bankruptcy of the Trust Administrator shall be paid from the Trust Administrative Cash, unless such fees and expenses are disputed by the successor Trust Administrator, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trust Administrator that are subsequently allowed by the Bankruptcy Court shall be paid from the Trust Administrative Cash. In the event of the resignation, removal or bankruptcy of the Trust Administrator, such Trust Administrator shall:

(a)    promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trust Administrator or directed by the Bankruptcy Court to effect the termination of such Trust Administrator's capacity under this Trust Agreement;

(b)    promptly deliver to the successor Trust Administrator all documents, instruments, records and other writings related to the Trust as may be in the possession of such Trust Administrator; and

(c)    otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trust Administrator.

10.4.    <u>Appointment of Successor</u>. In the event of the resignation, removal, Incompetency or bankruptcy of the Trust Administrator, the DIP Lenders shall, by unanimous written resolution, promptly appoint a successor Trust Administrator, *__provided that__* such appointment shall not take effect unless and until the successor Trust Administrator shall have delivered written acceptance of its appointment as described <u>Section 10.5</u> below. If a successor Trust Administrator does not take office within thirty (30) days after the resignation, removal, Incompetency or bankruptcy of the retiring Trust Administrator, the Bankruptcy Court, upon its own motion or the motion of the retiring Trust Administrator or any DIP Lender, shall appoint a successor Trust Administrator.

21

10.5.    Acceptance of Appointment by Successor Trust Administrator.  Any successor Trust Administrator appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to each DIP Lender and, in case of the Trust Administrator's resignation, to the resigning Trust Administrator.  Thereupon, such successor Trust Administrator shall, without any further act, become vested with all the duties, powers, rights, obligations, title, discretion and privileges of its predecessor in the Trust with like effect as if originally named Trust Administrator and shall be deemed appointed pursuant to the Bankruptcy Code; *provided*, *however*, such successor Trust Administrator shall, or shall provide evidence of such succession and instruct in writing the Resident Trustee to file, an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.  The predecessor Trust Administrator shall duly assign, transfer and deliver to such successor Trust Administrator all Trust Assets held by such predecessor Trust Administrator hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Trust Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Trust Administrator upon the trusts herein expressed, all the duties, powers, rights, obligations, title, discretion and privileges of the predecessor Trust Administrator.

10.6.    Successor Entity to Trust Administrator. Any business entity into which the Trust Administrator may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trust Administrator shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trust Administrator, shall be the successor of the Trust Administrator hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided*, *however*, such successor Trust Administrator shall file, or shall instruct in writing the Resident Trustee to file, an amendment to the Certificate of Trust with the Secretary of State as required by the Delaware Act.

## ARTICLE XI
### MISCELLANEOUS PROVISIONS

11.1.    Actions Taken on Other Than a Business Day.  In the event that any payment or act under this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

11.2.    Governing Law.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to rules governing conflicts of law.

11.3.    Jurisdiction.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive and continuing jurisdiction over the Trust and the Trust Administrator, including the administration and activities of the Trust and the Trust Administrator; *provided*, *however*, that notwithstanding the foregoing, the Trust Administrator shall have power and authority to bring any action in any court of competent

jurisdiction to prosecute any claims or Causes of Action assigned to the Trust, including the Delaware Chancery Court, the Delaware Superior Court and the Delaware Supreme Court.

      11.4.    <u>Third Party Beneficiary</u>.  The DIP Lenders are third party beneficiaries of this Trust Agreement to the extent of their rights of approval and direction contained herein and their residual interest in the Trust Assets and shall have standing and authority to enforce the terms, conditions, provisions and articles of this Trust Agreement with respect to the foregoing.  The Trust Administrator Parties (other than the Trust Administrator) are third party beneficiaries of the provisions of <u>Section 9.2</u>, <u>Section 9.4</u> and <u>Section 9.6</u> of this Trust Agreement.  Except as aforesaid, there are no other third party beneficiaries of this Trust Agreement.

      11.5.    <u>Severability</u>.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the fullest extent permitted by law.

      11.6.    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(A)    if to the Trust Administrator, to:

      AP Services, LLC
      2101 Cedar Springs Road, Suite 1100
      Dallas, TX 75201
      Phone: 214-647-7632
      Fax: 214-647-7501
      Attn: Bryan Porter

With a copy to:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY 10153
      Phone 212 310 8000
      Fax 212 310 8007
      Attn: Stephen Karotkin

(B)    if to the Resident Trustee, to:

      CSC Trust Company of Delaware
      2711 Centerville Road, Suite 400
      Wilmington, DE 19808
      Attention: Trust Administration
      Fax: 302-636-8666
      Email: csctrust@cscinfo.com

with a copy to:

      Weil, Gotshal & Manges LLP
      767 Fifth Avenue
      New York, NY 10153
      Phone 212 310 8000
      Fax 212 310 8007
      Attn: Stephen Karotkin

(C)    if to the U.S. Department of Treasury, to:

      United States Department of the Treasury
      1500 Pennsylvania Avenue, NW
      Washington, D.C. 20220
      Attn: Chief Counsel, Office of Financial Stability
      Telecopier: (202) 927-9225

(D)    if to Export Development Canada, to:

24

>           Export Development Canada
>           151 O'Connor Street
>           Ottawa, Ontario
>           Canada K1A 1K3
>           Attention: Loans Services
>           Telecopy: 613-598-2514;

with a copy to:

>           Export Development Canada
>           151 O'Connor Street
>           Ottawa, Ontario
>           Canada K1A 1K3
>           Attention: Asset Management/Covenants Officer
>           Telecopy: 613-598-316

   11.7.    Headings.  The headings 8 contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

   11.8.    Plan.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order.  To the extent that the terms of sections 5.2(b) and 6.10 of the Plan are inconsistent with the terms set forth in this Trust Agreement with respect to the Trust, then the terms of the Trust Agreement shall govern. All other provisions of the Plan shall supersede the provisions of this Trust Agreement, including section 6.15 of the Plan, which provides that the restrictions set forth in paragraph 25 of the Final Order approving the DIP Credit Agreement (ECF No. 2529) shall continue to apply.

   11.9.    Ambiguities and Construction.

      (a)    The Trust created by this Trust Agreement is intended to qualify as a liquidating trust under Treasury Regulation section 301.7701-4(d) for U.S. federal and applicable state and local income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such U.S. federal and applicable state and local income tax laws, which amendments may apply retroactively.

      (b)    Unless the context otherwise requires:

         (i)    a term has the meaning assigned to it;

         (ii)    "or" is not exclusive;

         (iii)    words in the singular include the plural, and in the plural include the singular;

(iv)    all references herein to Articles, Sections and other subsections, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subsections of this Trust Agreement;

(v)    the words "hereof," "herein," "hereunder" and similar words refer to this Trust Agreement as a whole and not to any particular provision, Article, Section or subsection of this Trust Agreement unless otherwise specified;

(vi)    words importing persons shall include firms, associations, corporations and other entities;

(vii)    any pronoun shall include the corresponding masculine, feminine and neuter forms; and

(viii)    "including" means including without limitation.

11.10.    _Entire Trust Agreement_.  This Trust Agreement, together with the written consent of the DIP Lenders dated December 15, 2011, contains the entire agreement between the parties and the DIP Lenders with respect to the Trust Assets and supersedes all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.11.    _Cooperation_.  The MLC Debtor shall turn over or otherwise make available to the Trust Administrator at no cost to the Trust or the Trust Administrator, all books and records reasonably required by the Trust Administrator to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Trust Administrator in carrying out its duties hereunder, subject to the obligation to preserve the confidential nature of the Debtors' books and records, as provided in Section 11.12.

11.12.    _Confidentiality_.  The Trust Administrator, the Resident Trustee, and their respective employees, members, agents, professionals and advisors, including the Trust Professionals (each a "Confidential Party" and collectively the "Confidential Parties") shall hold confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the Trust Assets relates or which is otherwise received from the MLC Debtor by the Trust; _provided_, _however_, that such information may be disclosed if

(i)    it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or

(ii)    such disclosure is required of the Confidential Parties pursuant to legal process, including subpoena or other court order or other applicable laws or regulations.

In the event that any Confidential Party is requested to divulge confidential information pursuant to clause (ii), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trust Administrator to allow

26

sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trust Administrator in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

    11.13.   Amendment and Waiver.

    (a)   The Trust Administrator, may amend or supplement this Trust Agreement without notice to or consent of the Bankruptcy Court or any DIP Lender for the purpose of (x) curing any ambiguity, omission, inconsistency or correcting or supplementing any defective provision; (y) evidencing and providing for the acceptance of the appointment of a successor Trust Administrator; or (z) making any other changes to this Trust Agreement that do not adversely affect the interests of the DIP Lenders in any material respect or alter the status of the Trust as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4 (d) that is treated as a grantor trust.

    (b)   The Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only (i) with the unanimous written consent of the DIP Lenders or (ii) on petition to, and with the approval of, the Bankruptcy Court; *provided* that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the Trust to dispose of in an expeditious but orderly manner the Trust Assets in accordance with the terms of this Trust Agreement; *provided* that any such amendment which alters the duties or liabilities of the Resident Trustee shall require the consent of the Resident Trustee.

    (c)   The Trust Administrator shall file any amendment to the Certificate of Trust with the Secretary of State as may be required or permitted by the Delaware Act and shall provide a copy of the evidence of any such amendment to the Resident Trustee.

    11.14.   Counterparts.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

**[Remainder of Page Blank — Signature Pages Follows]**

27

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

MOTORS LIQUIDATION COMPANY

By: _____
Name: A.A. KOCH
Title: PRESIDENT

AP SERVICES, LLC, AS TRUST ADMINISTRATOR
AND TRUSTEE

By: _____
Name: A.A. KOCH
Title: AUTHORIZED REPRESENTATIVE

CSC TRUST COMPANY OF DELAWARE, AS
DELAWARE RESIDENT TRUSTEE

By: _____
Name:
Title:

[SIGNATURE PAGE TO MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST AGREEMENT]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

MOTORS LIQUIDATION COMPANY

By:_____
Name:
Title:

AP SERVICES, LLC, AS TRUST ADMINISTRATOR AND TRUSTEE

By:_____
Name:
Title:

CSC TRUST COMPANY OF DELAWARE, AS DELAWARE RESIDENT TRUSTEE

By:_____
Name:
Title:           Alan R. Halpern
                 Vice President

[SIGNATURE PAGE TO MOTORS LIQUIDATION COMPANY DIP LENDERS TRUST AGREEMENT]

**<u>EXHIBIT C</u>**
**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
                                                :
In re                                           :          **Chapter 11 Case No.**
                                                :
**MOTORS LIQUIDATION COMPANY,** *et al.*,       :          **09-50026 (REG)**
         **f/k/a General Motors Corp.,** *et al.* :
                                                :
                    **Debtors.**                :          **(Jointly Administered)**
                                                :
--------------------------------------------------------------x

### ORDER APPROVING
### AGREEMENT AMONG MOTORS LIQUIDATION
### COMPANY DIP LENDERS TRUST, GENERAL MOTORS
### COMPANY, ARROWOOD INDEMNITY COMPANY, ROYAL &
### SUN ALLIANCE INSURANCE PLC, AND RSA INSURANCE GROUP PLC

Upon the notice of presentment of agreement among Motors Liquidation

Company DIP Lenders Trust, General Motors Company, Arrowood Indemnity Company, Royal

& Sun Alliance Insurance plc, and RSA Insurance Group plc (collectively, the "**Parties**") and

application for an order (the "**Proposed Order**") approving the Agreement, dated

January 5, 2018; and due and proper notice of the application and the Proposed Order having

been provided, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the Motors Liquidation Company DIP Lenders Trust has

authority to enter into the Agreement under the Motors Liquidation Company DIP Lenders Trust

Agreement, dated December 15, 2011 (as amended by (i) that certain Amendment to Motors

Liquidation Company DIP Lenders Trust Agreement, dated as of December 1, 2014, (ii) that

certain Second Amendment to Motors Liquidation Company DIP Lenders Trust Agreement,

dated as of August 24, 2016, (iii) and that certain Third Amendment to Motors Liquidation

Company DIP Lenders Trust Agreement, dated as of September 29, 2017) and that the relief

sought is in the best interests of the beneficiaries of the Motors Liquidation Company DIP

Lenders Trust and all parties in interest and after due deliberation and sufficient cause appearing

therefor, it is:

**ORDERED** that, pursuant to sections 105 (a) and 363(c) title 11 of the United

States Code the Motors Liquidation Company DIP Lenders Trust is authorized to enter into and

perform under the Agreement; and it is further

**ORDERED** that the Motors Liquidation Company DIP Lenders Trust is

authorized take all actions necessary actions to carry out this Order; and it is further

**ORDERED** that the Order shall be effective immediately upon entry; and it is

further

**ORDERED** that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2018
     New York, New York

        _____
             MARTIN GLENN
          United States Bankruptcy Judge

10