# Exhibit C

# *The* **GUY LAW FIRM** *PLLC*

December 19, 2017

NYS Department of Motor Vehicles
Division of Safety and Business Hearings
6 Empire State Plaza
Albany, NY  12228

Re: Request of Pat Bombard for an Adjudicatory Hearing

Dear Commissioner,

Enclosed please find NYS Form AA-71 comprising a Statement of Facts supporting Mr. Pat Bombard's claim against General Motors Corporation for having repeatedly violating the provisions of Article 17-A of the NYS Franchised Motor Vehicle Dealer Act, together with the required documentation supporting his claim.  The $2,000.00 fee is also enclosed.

We are requesting an adjudicatory hearing so his claim and witnesses in support of it may me be heard by the Commissioner as soon as practicable.

Please do not hesitate to contact me if any further information is required.

Sincerely,

Frederick R. Guy, Esq.

enc.
cc:  GM Counsel Deb Collins

**3596 PLEASANT VALLEY RD, SYRACUSE, NEW YORK 13215**
*Phone:* 315.314.7461 * *Fax:* 315.254.2126 * rickguy7@gmail.com * www.rickguy.com



**Department of Motor Vehicles**

**Franchised Motor Vehicle Dealer**
**REQUEST FOR ADJUDICATORY PROCEEDING**
Division of Safety & Business Hearings
Telephone: (518) 474-1509
Fax: (518) 473-8505

**COMPLETE THE INFORMATION REQUESTED BELOW. PLEASE PRINT.**

Name: __Pat J. Bombard__    AKA/DBA __Bombard Car Company, Inc.__

Address *(include number & Street)* __5 Wheeler Ave.__

City __Fayetteville__    State __NY__    Zip Code __13066__    Telephone # __( 315 ) 382-9464__

Dealer Certificate of Registration No.: __7058987__    Represented by: __Frederick R. Guy, Esq__

*Requests a New York State Department of Motor Vehicles Adjudicatory proceeding with:*

Franchisor __General Motors Corporation - Chevrolet__

Address *(include number & Street)* __General Motors Global Headquarters__

City __Detroit__    State __MI__    Zip Code __48625__    Telephone # __( 313 ) 667-9844__

Represented by *(if known):* __Deborah F. Collins, Esq.__

Address *(include number & Street)* __300 Renaissance Center__

City __Detroit__    State __MI__    Zip Code __48625__    Telephone # __( 313 ) 667-9844__

**INSTRUCTIONS FOR REQUEST**

1) All documents relevant to the claim(s) made in this request, including all correspondence between the dealer and franchisor, must accompany this request when it is filed with the Commissioner. Include a copy of the current franchise agreement that exists between the dealer and the franchisor, and a copy of the certificate of service (see Instruction #2). Submit to:

   NYS Department of Motor Vehicles
   Div. Safety and Business Hearings, Room 424A
   6 Empire State Plaza
   Albany, NY  12228

2) At the time this request is filed with the Commissioner, a true copy of this request, with copies of all documents filed with it, must be served upon the franchisor in any manner specifically permitted under the terms of the franchise agreement or, if no such manner is specified, then via certified mail, return receipt requested, addressed to the officer or employee of the franchisor from whom the dealer has received correspondence relevant to the claims made in this request.

3) This request must be accompanied by a non-refundable filing fee of two thousand dollars ($2,000). Attach a certified check or money order payable to the Commissioner of Motor Vehicles.

4) In a short, plain statement present the facts that support your claim that the franchisor has violated one or more specific provisions of Article 17-A Franchised Motor Vehicle Dealer Act. Also, describe your request for a specific remedy other than damages. *(Use additional sheets as necessary.)*

   Please See Attached Statement of Facts and Supporting Documentation

Your attention is directed to the automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1) and 465(7).

_Please Sign Here_    __12/19/2017__
_Date_

AA-71 (2/15)

**STATE OF NEW YORK**
**Department of Motor Vehicles**

---

**Pat J. Bombard, Franchisee**

Claimant

Dealer Certificate
Registration No. 7058987
Dealer Code 15-044
BAC Code 115292

**General Motors, Franchisor**

Respondent

---

## Statement of Facts

Pat J. Bombard (Bombard) is a long-time automobile dealership with a GM Chevrolet Franchise Agreement dating back to 1992. General Motors (GM) filed Bankruptcy in 2008 and initially decided to maintain Bombard's Dealership because of his excellence in meeting performance standards.

On March 19, 2009 Bombard received a proposal to purchase his dealership for $800,000.00, in the midst of the GM Bankruptcy, from Mr. Graziano Zazzara. That proposal was summarily denied. (Ex. A.). Afterwards, GM reneged on the decision to maintain Bombard's Dealership at all and compelled Bombard to enter a Wind-Down agreement to terminate his dealership assets by the end of the then existing Dealer Agreement Term (Dealer Code #15-044) on October 31, 2010 (Ex. B). General Motors then, within days rescinded the Wind-Down Agreement and entered a Participation Agreement with Bombard on June 1, 2009 (Ex. C.) The Participation Agreement included certain performance standards; all were met or exceeded by Bombard.

On June 11, 2009 Bombard requested approval of the sale of the Dealership pursuant to the Purchase Agreement date March 19, 2009. That request was refused by GM on June 11, 2009 (Ex. D Purchase Agreement and Rejection). It was rejected summarily without any discussion or due diligence. Bombard received an additional four offers thereafter in 2010-2012 to purchase his dealership. All of those offers were presented for approval to GM and likewise summarily and unreasonably rejected by GM without cause and in bad faith. The five additional offers are attached as Ex. E.

The initial Participation Agreement ended October 31, 2010 and a new Dealership and

Sales Agreement (Ex. F) was entered by the parties, with an automatic 5-year renewal term. On October 8, 2014 Bombard requested the Dealership Renewal Package for the 2015-2020 period by fax and letter (Ex. G).

On October 31, 2014, Bombard was falsely accused of Grand Larceny by the Onondaga County District Attorney and tried. He was found Not Guilty in July 2015 (Ex. H Exoneration Letter from Attorney).

Afterwards GM responded to more requests for renewal by phone requesting proof of NYS licensing and other documentation showing Bombard's financial ability. All requested information was immediately and timely provided to GM by fax (Ex. I). Acting in bad faith, GM refused to respond to Bombard's requests to renew the franchise and, ignoring previous responses by Bombard, GM required him to again send the same information he had already sent by fax (Ex. J).

GM Counsel Deb Collins and GM Director of Dealer Network, Lynn Howard, had assured Bombard at that time that upon receipt of the repeatedly requested and supplied verifications that his Dealership would be renewed. Bombard provided all repeatedly requested verifications by fax yet again again on October 11, 2016 (Ex.K). Bombard was told GM would schedule his renewal signing shortly thereafter in Danbury, Ct.. GM never did and no explanation was offered.

Among other sections, GM violated section 463 (2) (ff) (1) et seq. which prohibit modifications that substantially and adversely affect the dealer's rights, obligations, investment or return on investment. Bombard alleges that the Participation Agreement was not undertaken in good faith and adversely and substantially altered the his rights, obligations, investment or return on investment under his existing franchise agreement. In particular, among other items in the Participation Agreement, Bombard was required to build a brand new facility without any showing that his then existing one was in any way insufficient and without any inspection having been conducted. This was a new requirement added with several others set out in the PA that modified the existing dealer agreement in bad faith and without cause to the detriment and demise of Bombard's investment in the dealership. In spite of this unfair additional requirement, Bombard pursued the design and approval of a new facility fully, having procured all zoning approvals and architectural design elements at significant financial expense.

Section 463.2 (e)(2) of Article 17-A Franchised Motor Vehicle Dealer Act provides (The Act) that a Franchisor, here GM, may not terminate, cancel or refuse, to renew the franchise of any franchised motor vehicle dealer, here Bombard, except for "due cause" and in "good faith".  GM's refusal to renew was in bad faith and without due cause in fact

and under the Dealer Agreement then in force and which was to have been renewed as Bombard was repeatedly assured. Moreover, The Act provides at Section 463.2 (d) (1) that a Franchisor shall not cancel or refuse to renew the franchise of any motor vehicle dealer except for due cause, regardless of the terms of the franchise. It further provides that a "Franchisor shall notify a franchised motor vehicle dealer, in writing of its intention to terminate, cancel, or refuse to renew the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such termination, cancelation, or refusal to renew. In no event shall the term of any such franchise expire without the written consent of the franchised motor vehicle dealer involved prior to the expiration of at least ninety days following shut written notice except as hereinafter provided." Additionally, GM's failure to renew Bombard's Dealership and failure to approve the sale of the Dealership pursuant to the agreement set out in Ex. A, violated Sections 466.1 of the Act as GM directly imposed unreasonable restrictions on the sale and on Bombards right to renew the Dealership as demonstrated above. Moreover, the repeated willful refusals of GM to consider or even engage in discussion about the several offers Bombard received to purchase his dealership during the term of his agreement demonstrates the Bad Faith of GM in regard to his affairs.

Further miscellaneous communications and documentation are included in Ex. L which includes among other items notice to GM dated October 16, 2017 requesting that they cooperate in appointing a mediator pursuant to NYS Vehicle and Traffic Law 471-a. GM ignored the notice and after some weeks indicated by a phone message that they would not be participating in mediation with Mr. Bombard.

### Request for Remedy

Mr. Bombard requests that the Franchisor fulfill the renewal of his Franchise so that he can elect to either operate it or sell it in accordance with the terms of the Franchise Agreement. He further requests that the Franchisor be directed to give due consideration and approval to any sale of the Franchise that Mr. Bombard may agree to with a capable and otherwise qualified purchaser.

Signed: _Pat J Bombard_

Pat J. Bombard

Dated: _12/2017/19_

# List of Exhibits

Exhibit A - Letter from GM Zone Manager Tamara Jackson disapproving without due diligence or negotiation a proposal received by Mr. Bombard to sell the dealership while GM was still in Bankruptcy.

Exhibit B – Wind Down Agreement that Mr. Bombard was compelled to enter even when GM had received proposal to purchase the dealership from Mr. Zazzara as demonstrated by Ex. A.

Exhibit C – Participation Agreement entered after GM rescinded the Wind Down Agreement.

Exhibit D – Rejection of Purchase Proposal (Also Ex. A – the actual proposal to purchase in in the custody of GM)

Exhibit E – Additional Offers to purchase the Bombard Dealership between 2010 and 2012. All were summarily refused by GM without due diligence investigation or discussion.

Exhibit F – Modified New Dealership and Sales Agreement dated June of 2009 which renewed in October of 2010.

Exhibit G – Request by Bombard for the Dealership Renewal Package dated October 31, 2014.

Exhibit H – Letter from Attorney Baska demonstrating acquittal of Mr. Bombard on all charges brought against him.

Exhibit I – Information requested by (and repeatedly supplied to) GM in response to Bombard repeated request for renewal of Dealership and Sales Agreement.

Exhibit J – GM's duplicated and repeated request for information provided previously in response to Bombard's requests for renewal of his dealership.

Exhibit K – Third repeated provision of duplicated requested information purportedly needed to finalize the renewal package for Mr. Bombard's Dealership.

Exhibit L – Request for mediation, Architectural Drawings for new dealership, GM financial statement demonstrating excellence of Bombard dealership, letters of recommendation, et al..

A



General Motors Corporation
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

FED EX:  7976 7417 3877
RETURN RECEIPT REQUESTED

PERSONAL & CONFIDENTIAL

June 11, 2009

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152-8868

Attention: Mr. Pat J. Bombard, Dealer Operator

This letter responds to the proposal submitted by Mr. Graziano Zazzara. ("Applicant" or "Buyer") and Mr. Pat Bombard, Bombard Car Co., Inc. ("Dealer Company" or "Seller"), to General Motors Corporation ("GM") relating to the Asset Purchase Agreement dated March 19, 2009, between Buyer and Seller for the sale of certain assets of Seller (the "Purchase Agreement"). The proposal further calls for the issuance of a Chevrolet Dealer Sales and Service Agreement with Applicant and for Mr. Graziano Zazzara to be named Dealer Operator.   All of the above shall be referred to as the "Proposal".  GM is declining this Proposal for the reasons explained below.

Based on GM's review of the Proposal and recent dealer network developments, GM believes that the objectives of the Proposal, as submitted, are not consistent with GM's long term plans for Chevrolet in the subject marketing area. GM's plans in this regard are reflected in a Wind-Down Agreement dated June 1, 2009 (the "Wind-Down Agreement") for Chevrolet pursuant to which Seller was advised that the Chevrolet Dealer Agreements between it and GM (the "Dealer Agreement") will not be continued, by GM on a long-term basis.  Consequently, GM is not approving the Proposal.

Please note that GM is contemporaneously notifying the Applicant of GM's decision to not approve the Proposal.

In the meantime, GM will continue to conduct business with your dealership according to the Dealer Agreement and the Wind-Down Agreement, if executed, and will expect your dealership to likewise fulfill its responsibilities and obligations under such agreements, if Dealer Company elects to sign the latter agreement.

Very truly yours,

Tamera Jackson
Zone Manager
General Motors Corporation

c:    Sabin Blake, Regional Dealer Support Manager
      Paul Bottiglieri, DNPI – Regional Manager

B





# FACSIMILE TRANSMISSION

## DEALER NETWORK PLANNING & INVESTMENT
GENERAL MOTORS GLOBAL HEADQUARTERS
TOWER 100 – 6TH FLOOR
MAIL CODE: 482-A06-C66
DETROIT, MICHIGAN 48265 - 1000

DATE: 6/11/09                          # OF PAGES

TO: Pat J. Bombard                      2

FAX NUMBER                              PHONE NUMBER:
   315-685-5508

FROM: GM

FAX NUMBER:                             PHONE NUMBER:

MESSAGE/COMMENTS:

Confidential



# General Motors Corporation

June 1, 2009

VIA Federal Express

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152

Attention: Pat J Bombard

This letter is to advise you that the Chevrolet Dealer Agreement between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Chevrolet dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before June 12, 2009.

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

- For the termination of the Dealer Agreement no earlier than January 1, 2010 and no later than October 31, 2010

- For the assignment and assumption of the Dealer Agreement, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "363 Acquirer")

- For the payment of financial assistance in installments in connection with the orderly winding down of your Chevrolet operations

- For the waiver of any other termination assistance of any kind

- For a release of claims against GM, the 363 Acquirer and their related parties

- For dealership operations to continue pursuant to the Dealer Agreement, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreement, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down the Chevrolet dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before June 12, 2009. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreement (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before June 12, 2009, GM will apply to the bankruptcy court to reject your Dealer Agreement. If we reject the Dealer Agreement, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreement.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Chevrolet dealership business and to sell your Chevrolet new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION





# General Motors Corporation

June 1, 2009

VIA Federal Express

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152

Attention: Pat J Bombard

This letter is to advise you that the Chevrolet Dealer Agreement between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Chevrolet dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before **June 12, 2009.**

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

- For the termination of the Dealer Agreement no earlier than January 1, 2010 and no later than October 31, 2010
- For the assignment and assumption of the Dealer Agreement, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "363 Acquirer")
- For the payment of financial assistance in installments in connection with the orderly winding down of your Chevrolet operations
- For the waiver of any other termination assistance of any kind
- For a release of claims against GM, the 363 Acquirer and their related parties
- For dealership operations to continue pursuant to the Dealer Agreement, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreement, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down the Chevrolet dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before **June 12, 2009.** If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreement (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before **June 12, 2009,** GM will apply to the bankruptcy court to reject your Dealer Agreement. If we reject the Dealer Agreement, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreement.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Chevrolet dealership business and to sell your Chevrolet new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION

03
4805_03_115292



## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between Bombard Car Co., Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

### RECITALS

A.    Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer Agreement") for Chevrolet motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale. Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer. If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

2.  <u>Termination of Dealer Agreement.</u>  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement.  Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010.  Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party.  In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records.  Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  <u>Payment to Dealer.</u>

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $128,163 (the "<u>Wind-Down Payment Amount</u>"), subject to the terms herein.  This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "<u>Initial Payment Amount</u>") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "<u>Open Account</u>"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement.  GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "<u>Final Payment Amount</u>") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of

12 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals.  GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)  In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "<u>Competing Claim</u>"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.  <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)  Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)  Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations.  Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations.  Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

3

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5. Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

4

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292



(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. <u>Subject Dealership Operations</u>.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("<u>RIM</u>") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section

5

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d) In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e) Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7. No Protest.

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b)    Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in

6

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before <u>June 12, 2009</u>.

13. <u>Continuing Jurisdiction</u>.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. <u>Other Agreements</u>.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable. In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase."

7

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts.  This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach.  In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties.  This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292



## General Motors Company

Date:  August 7, 2009

To:  All General Motors Dealers with Wind-Down Agreements

From:  General Motors Company

Subject  Wind-Down Agreements

This communication contains direction once you are ready to terminate your Dealer Agreement.
Termination will only occur once all new Motor Vehicle inventory has been sold as required in Section
2(a) of the Wind-Down Agreement(s).

Please keep in mind that GM is counting on you to fulfill your obligations per the Wind-Down
Agreement.  However, if you have sold all of your New Vehicle Inventory prior to that date, GM will not
unreasonably withold its consent to a termination request.

When your vehicles have been sold and you are ready to request termination, please submit the attached
Sample Termination Letter, written on dealership letterhead, to the Dealer Business Planning Group
("DBPG") by fax to (313) 667-5461 or (313) 667-5462, by mail or overnight carrier to the address below,
or to your Zone Manager.

<u>DBPG Contact Information - Address & Fax Number:</u>

Dealer Business Planning Group
100 Renaissance Center
Mail Code: 482-A06-C66
Detroit, MI 48265-1000

Upon receipt of your Termination Letter, GM will respond with a Termination Response Letter which
will include the termination effective date (30 days from GM's receipt of your Termination Letter),
information relative to the termination, as well as a list of additional information necessary to demonstrate
Dealer has satisfied all conditions identified in the Wind-Down Agreement prior to the payment of the
Final Payment.

Please contact your Zone Manager if you have any questions.

Sincerely,

**GENERAL MOTORS COMPANY**

# SAMPLE TERMINATION LETTER

## *(PREPARE ON DEALERSHIP LETTERHEAD)*

### *(DATE)*

General Motors Company
Dealer Business Planning Group
100 Renaissance Center
MC 482-A06-C66
Detroit, MI 48265

Dear Sir or Madam:

Please take notice that *(Insert Dealer Company's Name)* elects to, and does hereby, terminate the current General Motors Dealer Sales and Service Agreement(s) for *(Insert Applicable Linemake(s))* in accordance with Section 2(a) of the Wind-Down Agreement.  *(Insert Dealer Company's Name)* agrees that this termination will be effective 30 days from GM's receipt of this letter.

In case GM needs to contact me after termination, listed below is a phone number and the address to be used for future mailings, after termination, such as open account activity:

Very truly yours,

*(Insert Dealer Company's Name)*
*Future: Address, City, State, Zip, Phone number*

*(Dealer Operator's Name)*

C



General Motors Corporation

June 1, 2009

Via Federal Express

BOMBARD CAR COMPANY
PO BOX 8
SKANEATELES, NY 13152

Re:    *GM Dealer Sales and Service Agreements/Participation Agreement*

Attention:  PAT BOMBARD

[  BOMBARD CAR COMPANY            ) and General Motors Corporation
("GM") are parties to Dealer Sales and Service Agreements (the "Dealer Agreements") for [
CHEVROLET motor vehicles (the "Existing Model Lines"). Capitalized terms not otherwise defined in
this letter agreement have the definitions set forth for such terms in the Dealer Agreements.

GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending
in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"),
having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"),
to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"),
subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case
involves, among other things, the restructuring of its current dealer network. Part of that restructuring
includes focus on and retention of those dealers who, based on a number of factors, GM believes have an
opportunity to be successful dealers selling and servicing GM's products.

Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the
same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers
representing the Existing Model Lines, the retained dealers, including Dealer, will have the opportunity to
increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement
additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's
dealer network and for Dealer's performance to be in line with such increased opportunity.

In consideration for Dealer's execution and delivery of, and performance under, this letter
agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer
Agreements in the Bankruptcy Case, and (ii) shall assign the Dealer Agreements to the 363 Acquirer as
part of the 363 Sale, provided such sale closes.

1

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreements[s] and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Lines, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before June 12, 2009, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreements, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before June 12, 2009, GM may, in its sole discretion, move to reject the Dealer Agreements[s] in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. Defined Terms. All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreements[s].

2. Sales Performance. Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreements. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreements alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreements, as supplemented by this letter agreement.

3. New Vehicle Inventory. Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Lines and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Lines to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in Section 2 above. In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

4. Exclusivity. During the remaining term of the Dealer Agreements[s] (the "Exclusivity Period"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing

2

Model Lines[s] at the premises authorized for the conduct of Dealership Operations under the Dealer Agreements (the "Dealership Premises"). During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Lines[s] (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreements[s], other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreements, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days of written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of its remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreements.

5. No Protest. In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a)    GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Lines at a site located in the vicinity of the Dealership Premises (the "Proposed Site"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "No Protest Commencement Date"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for any of the Existing Model Lines at or in the vicinity of the Proposed Site.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

3

(c)     Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "GM Parties"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of any of the Existing Model Lines described in Section 5(a) above.

(d)     Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(e)     Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.  Release; Covenant Not to Sue; Indemnity. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale:

(a) Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreements or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2ⁿᵈ) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to

4

Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due or to become due to either or any of their Affiliates.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreements and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreements by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited

5

liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

      (f)   The terms of this Section 6 shall survive the termination of this letter agreement.

7.   Compliance.  In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale, from and after the Effective Date:

      (a)   Dealer shall continue to comply with all of its obligations under the Dealer Agreements[s], as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreements[s] and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein;

      (b)   Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer.  In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control.  The term "Channel Agreements" shall mean agreements (other than the Dealer Agreements) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreements, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreements, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreements," "Agreements and Business Plan," "Exclusive Use Agreements," "Performance Agreements," "No-Protest Agreements," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case.  By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

      (c)   Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8.   Breach and Remedies.  In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreements[s], as supplemented by this letter agreement, GM and the 363

6

11   THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

Acquirer shall have all of its rights and remedies under the Dealer Agreements[s], as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreements[s], as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement[s] upon the termination by its terms of the Dealer Agreements, as supplemented by this letter agreement. In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreements[s], as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement[s] as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreements[s] (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreements[s]), and (y) Dealer waives all other rights under the Dealer Agreements[s], as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9.  Miscellaneous.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b) This letter agreement shall supplement the Dealer Agreements[s] as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreements[s], which shall expire no later than October 31, 2010.

(c) Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreements[s] shall remain in full force and effect as written. Additionally, the Dealer Agreements[s], as referenced in any other document that the parties have executed, shall mean the Dealer Agreements[s] as supplemented by this letter agreement.

(d) This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e) The Dealer Agreements, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreements, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f) The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law. In executing this letter agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g) The Dealer Agreement[s], as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

11   THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(h) By executing this letter agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto. The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i) Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j) If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

(k) This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreements as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

*[Signature Page Follows]*

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

**GENERAL MOTORS CORPORATION**

By:_____
      Authorized Representative

APPROVED AND AGREED TO THIS
_10_ DAY OF JUNE, 2009

[DEALER ENTITY CORPORATE NAME]

By: _Paty Borland_____
Name: _PAT J BOMBARD_____
Title: _PRESIDENT_____

# THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.

9

D



General Motors Corporation
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

<u>FED EX: 7976 7417 3877</u>
<u>RETURN RECEIPT REQUESTED</u>

<u>PERSONAL & CONFIDENTIAL</u>

June 11, 2009

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152-8868

Attention: Mr. Pat J. Bombard, Dealer Operator

This letter responds to the proposal submitted by Mr. Graziano Zazzara, ("Applicant" or "Buyer") and Mr. Pat Bombard, Bombard Car Co., Inc. ("Dealer Company" or "Seller"), to General Motors Corporation ("GM") relating to the Asset Purchase Agreement dated March 19, 2009, between Buyer and Seller for the sale of certain assets of Seller (the "Purchase Agreement"). The proposal further calls for the issuance of a Chevrolet Dealer Sales and Service Agreement with Applicant and for Mr. Graziano Zazzara to be named Dealer Operator.   All of the above shall be referred to as the "Proposal". GM is declining this Proposal for the reasons explained below.

Based on GM's review of the Proposal and recent dealer network developments, GM believes that the objectives of the Proposal, as submitted, are not consistent with GM's long term plans for Chevrolet in the subject marketing area. GM's plans in this regard are reflected in a Wind-Down Agreement dated June 1, 2009 (the "<u>Wind-Down Agreement</u>") for Chevrolet pursuant to which Seller was advised that the Chevrolet Dealer Agreements between it and GM (the "<u>Dealer Agreement</u>") will not be continued, by GM on a long-term basis.  Consequently, GM is not approving the Proposal.

Please note that GM is contemporaneously notifying the Applicant of GM's decision to not approve the Proposal.

In the meantime, GM will continue to conduct business with your dealership according to the Dealer Agreement and the Wind-Down Agreement, if executed, and will expect your dealership to likewise fulfill its responsibilities and obligations under such agreements, if Dealer Company elects to sign the latter agreement.

Very truly yours,

Tamera Jackson
Zone Manager
General Motors Corporation

c:    Sabin Blake, Regional Dealer Support Manager
      Paul Bottiglieri, DNPI – Regional Manager

E



**Best Price · Best Service · Best Choice**

P.O. Box 8, Rt 20, 1351 E. Genesee St., Skaneateles, NY 13152
Phone: (315) 685-5797  Fax (315) 685-5508
Email: bombardhasit@yahoo.com

*4/31/10*

## Fax Cover Sheet

**TO:** *Joey Romano*

**FROM:** *Pat Borland*

**FAX NUMBER:** *561-638-3562*

**PAGES SENT:** *9*     **(INCLUDING COVER)**

**COMMENTS:** *Joey, thanks for your help*
*I am ready to make this deal*
*So please review and make it happen*
*Want to close*
*The deal*

*Thanks,*
*Pat 4/30/10*

1. Bombard would sell the assets of the Dealership including the franchise right to General Motors ("GM") Chevrolet brand (together the "Assets") which is subject to approval of Buyer by GM;

2. Buyer would pay Bombard seven hundred thousand ($700,000) dollars in certified funds on the day of closing for the Assets. The closing would not occur until Bombard and Buyer have received GM's approval of Buyer as a franchisee for Chevrolet;

3. Buyer and Bombard would enter into a lease agreement which provides land sufficient for the Dealership in the Town of Skaneateles (the "Land") in accordance with GM's mini facility requirements ("Facility Requirements") for a twenty year period in an annual amount of $96,000 paid in monthly installments;

4. Buyer and Bombard would enter into a lease agreement for the current building being used by the Dealership on the Land for the shorter of the completion of a new building in accordance with the Facility Requirements (the "Facility") or twenty years in an annual amount of $1.

5. Bombard would offer the option to Buyer that Bombard would build the facility for Buyer in accordance with the Facility Requirements with an annual rent in the range of $15 to $20 per square foot.

6. Further, If Buyer does not elect the option to have Bombard build the Facility, Bombard would allow Buyer the right to build the Facility subject to Bombard's approval.

7. All other terms of the sale of the Assets, the lease for the Land and the Lease for current building with the option to build the Facility would be negotiated in good faith and would contain customary terms and conditions for agreements of these types.

## Section 4.    Definitive Agreement

Once the Parties have executed this MOU, the Parties would commence the negotiation of a definitive, legally binding agreement setting forth the terms and conditions of the sale of the Assets, lease of the Land and the lease of the Facility ("Definitive Agreements"). The Definitive Agreements would contain terms consistent with the terms set froth above in Section 3 above as well as other terms and conditions that customary to agreements of these types.

## Section 5.    General Provisions

5.1    The Parties understand that the only binding legal obligations hereunder are those set forth in Section 1 and Section 6 of this MOU. Neither Party intends any other legal binding obligations to arise out of this MOU unless and until the Parties enter into a Definitive Agreement.

5.2    Bombard and Other Party anticipate that it will be beneficial to the evaluation of a potential agreement between the Parties to exchange certain information of a confidential nature. This exchanged information will be governed pursuant to the Non-Disclosure Agreement dated May ___, 2010 ("NDA") which is attached hereto as Exhibit 1. The NDA is in no way superseded or otherwise affected by the terms of this MOU and will continue to govern the confidentiality obligations associated with any confidential information or documentation delivered by either Party to the other.

5.3    The points of contact for this MOU are:

**For Bombard:**                              **For Other Party:**

Attention: Pat J. Bombard
Bombard Car Companies
1351 Cherry Valley Turnpike
Skaneateles, New York 13152

**Section 6.    Agreement**

The Parties intend the provisions of this Section 6 of the MOU to be a binding legal agreement and signify their acceptance by the signature of their duly authorized representatives below.

6.1    Each Party represents and warrants that it has not taken and will not take any action that would constitute a violation of the U.S. Foreign Corrupt Practices Act ("FCPA"). Each Party agrees to indemnify and hold harmless the other Party from and against any and all loss, cost, expense, claims, damage, or liability arising out of or resulting from or occurring in connection with a breach of this Section 6.1.

6.2    Each Party will retain exclusive right, title and interest to its individual underlying property, and no licenses are granted by this MOU.

6.3    Neither Party warrants that any information disclosed to the other Party under this MOU will be accurate, complete or free from defects.

6.4    Unless extended in writing, this MOU expires and terminates one (1) year from the Effective Date; provided, however, should either Party determine at any time that further cooperative efforts are not likely to be productive or likely to result in Definitive Agreements, such Party may terminate this MOU upon giving the other Party thirty (30) days prior written notice.  Upon any termination or expiration of this MOU and upon request of either Party, all confidential or proprietary information, papers or reports furnished by either Party under this MOU will be returned by the recipient except to the extent otherwise permitted under the NDA.

6.5    By signing this MOU, each Party indicates that the foregoing is an accurate statement of the arrangement contemplated by the Parties.  This MOU will be used as the basis for discussions and the drafting of the Definitive Agreement which will contain other terms and conditions, including, but not limited to warranties, representations, conditions precedent, confidentiality, reports, ownership provisions and indemnifications.

6.6    This MOU is not intended to constitute nor does it create a joint venture, partnership, teaming or similar enforceable arrangement between the Parties.  Neither Party has the right or authority to make or undertake any promise or to make any representation for the other Party, nor to execute any document or to otherwise assume any obligation or responsibility in the name of or on behalf of the other Party.

6.7    IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSS OF REVENUE, LOSS OF PROFITS OR LOSS OF BUSINESS OPPORTUNITY RESULTING FROM OR ARISING OUT OF THIS AGREEMENT, EVEN IF INFORMED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES AGREE THAT ANY LIABILITIES

UNDER THIS AGREEMENT WILL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED FIFTY THOUSAND DOLLARS ($50,000) IN THE AGGREGATE.   TO THE EXTENT PERMITTED BY LAW, THESE LIMITATION AND EXCLUSIONS APPLY REGARDLESS OF HOW THE LOSS OR DAMAGE MAY HAVE OCCURRED AND REGARDLESS OF THE THEORY OF LIABILITY. THIS EXCLUSION OF DAMAGES AND CAP ON LIABILITY DOES NOT APPLY TO ANY LIABILITY ARISING OUT OF SECTION 6.1.

6.8    Before the Parties initiate any dispute resolution process other than injunctive relief, the Parties will schedule a mandatory executive mediation in a mutually agreeable neutral location to be held within ten (10) business days of receipt of the other Party's written request.  The mediation will be attended by at least one executive from each Party.  Bombard's lead mediator is Pat Bomabrd and Other Party's lead mediator is _____.  At the mediation, each Party will present its view of the dispute in detail and the executives will enter into good faith negotiations in an attempt to resolve the dispute.  If the dispute is not resolved within thirty (30) days from the date that the mediation commenced, then either Party may pursue resolution of the dispute consistent with the other terms of this Agreement.

6.9    This MOU will be governed by and interpreted solely in accordance with the procedural and substantive law of the State of New York and the United States of America, without giving effect to any conflict of laws provisions thereof. The federal and state courts located in New York City, New York, will have exclusive jurisdiction to adjudicate any dispute arising out of or related to this MOU.  The Parties expressly agree to exclude from this MOU the United Nation Convention on Contract for the International Sale of Good, 1980, and any successor thereto.

6.10   This MOU embodies all of the understandings between the Parties, and merges all prior or contemporaneous understanding, agreements, discussions or commitments, verbal or written, with respect to the subject matter of this MOU.

6.11   This MOU may be executed in one or more original counterparts, each of which will be deemed to be an original and all of which will be deemed to be one and the same instrument.   Facsimile versions of this MOU that contain telecopy facsimiles of signatures will be deemed duplicate, executed originals of this MOU.

AGREED TO:                              AGREED TO:
Bombard Car Companies

                                        Other Party


By: _____            By: _____

    _____                _____
        (Printed Name)                          (Printed Name)

Title: _____            Title: _____

Date: _____            Date: _____

May. 14. 2010  4:00PM    HONEYWELL Legal Dept.                    NO. 0012   P. 5

Via Hand Delivery

May 15, 2010                                               [Deleted: 7]

Pat Bombard
Bombard Chevrolet
1351 U.S. 20
Skaneateles, NY 13152

    RE:   Bombard Chevrolet                                [Formatted: French (France)]

Dear Pat,

        I wanted to get back with you, and outline some of the key terms that John is proposing
for the purchase of Bombard Chevrolet and lease of the building as follows:

1.    As you know, for John to make a go of a dealership, he is going to need as much up-front   [Deleted: that is essentially starting from scratch]
capital as possible, so that he could continue to make a go of the business, make your payments.
Obviously, you have a vested interested in seeing him succeed.

2.    He is willing to agree to a purchase price of $650,000.00, with $250,000.00 down at         [Deleted: 600]
closing, and $80,000.00 per year plus interest in the amount of prime rate plus 2% as set forth in  [Deleted: 100]
the Wall Street Journal in May of the current year to be paid on June 1 of each year until the      [Deleted: 25]
remaining $400,000.00 is paid. This will be an extreme advantage to you, since it will minimize     [Deleted: 5]
your capital gain / taxes, depending on how we set it up. This offer also would include the
equipment, special tools, parts, furniture, fixtures, etc. I will need a list of this equipment as soon   [Deleted: that you valued at approximately $377,000.00.]
as possible. Furthermore, the offer will also have to be contingent upon GM agreeing to the
transfer, and GM not pulling the dealership over the 5-year life of the note, through no fault of    [Deleted: , and if there is a significant difference in your evaluation, and the evaluation that John comes up with, this will have to be renegotiated]
John's.
                                                                                                    [Deleted: 20]
3.    He is willing to pay you an annual rent of $66,000 payable in monthly installments of         [Deleted: 4]
$5,500.00 a month rent triple net, for a 5-year lease, with the requisite options throughout the    [Deleted: 6]
term of the five-year note.                                                                         [Deleted: twenty]

4.    It is my understanding that GM will insist upon a new building or a facility, and that the
lease agreement will also contain an option for space in a building that you will construct, and     [Deleted: it back]
enter into a triple net lease to John at approximately $15-20 per square foot for a Class A          [Deleted: $7,400.00 a month]
building or $12-14 per square foot for a Class B building. The building would be approximately       [Deleted: for]
12,000 square feet with display area and requisite parking. John will also have an option to

May. 14. 2010  4:00PM    HONEYWELL Legal Dept    NO. 0072    P. 2

May 14, 2010
Page 2

construct the building subject to Bombard's approval. If John constructs the building, Bombard would lease the requisite land to John at an annual rent of $60,000 triple net payable in monthly installments of $5,000 for a twenty-year period. At the end of the lease term if John has constructed the building, Bombard would sell the leased land to John for $650,000.

5.     He would also agree that in the event of a default, you would also get the dealership back. John will agree to secure the note with a personal guarantee (including his wife and brother). Further the note will be secured by first mortgages on real property owned by John that is equal to or exceeds the value of the note.

6.     John is very serious about the above, and I feel that this offer is very close to the numbers that we have discussed in the past.  This offer is more than reasonable, since I have now spoken to both a broker that specializes in the sale of dealerships, and also to the principals of H&L Ford and other car dealerships in the area.

7.     During the term of the note, John will provide Pat with the use of an insured automobile and health insurance.

Sincerely,

Joseph A. Camardo, Jr.

Acknowledged:

_____
Patrick J. Bombard

Deleted: May 11, 2010

Deleted: purchase

Deleted: that

Deleted: .

Deleted: Pat, I think that this is a great deal for you, in that you will be getting approximately $73,000 a year ($30,000.00 plus if the new building is constructed) for the next 20 years, plus your initial $100,000.00 down payment. Just think of the number of trips you could take to Italy!



# *Romeo & Romeo, p.c.*

—————— ATTORNEYS & COUNSELORS AT LAW ——————

314 E. Fayette Street
Syracuse, NY 13202
315.422.4163 Tel.
315.476.4781 Fax

## FACSIMILE COVER SHEET

| To: | Pat Bombard | Fax # | 685-5508 |
|---|---|---|---|
| Business: | | Tel. # | |
| From: | James N. Romeo, Esq. | Date: | November 5, 2010 |
| Re: | Contract | Pages to Follow: | -10- |

IN THE EVENT THAT TRANSMISSION IS UNCLEAR OR INCOMPLETE,
PLEASE CONTACT US AT (315) 422-4163

COMMENTS:

*Nice
essay
dest
10/25/2016*

This message is intended only for the use of
information that is privileged, confidential a
this message is not the intended recipient o
intended recipient, you are hereby notified t
communication is strictly prohibited. If you
immediately by telephone and return the ori
Service. Thank you.

individual or entity to which it is addressed and may contain
exempt from disclosure under applicable law. If the reader of
employee or agent responsible for delivering the message to the
any dissemination, distribution or copying of this
received this communication in error, please notify us
l message to us at the above address via the U.S. Postal

<u>REAL ESTATE PURCHASE AGREEMENT</u>

THIS REAL ESTATE PURCHASE AGREEMENT is made effective as of the 3 day of November 2010, between Michael Fantacone, as trustee of The Randy Trust, a New York revocable trust which maintains an office at 5197 Forest Edge Drive, Syracuse, New York 13215 being the owner of the "Property" as defined in paragraph 1 below (hereafter referred to as "Seller") and Nice N Easy Properties, Inc., a New York corporation which maintains its principal office at 7840 Oxbow Road, Canastota, New York 13032 (hereinafter the "Buyer").

<u>W I T N E S S E T H :</u>

<u>Sale and Purchase: Description of Property</u>

Upon and subject to the terms and conditions hereinafter contained, and for value received, Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller:

1.   <u>Property.</u>  This purchase shall include the following three (3) parcels of land in fee simple title, situated in the Town of Skaneateles, County of Onondaga: (i) 032.-03-30-30.1, (ii) 032.-03-30-30.1/1, Schedule "A" (Landlord's Tract") collectively being 13.2 +/- acres of property which address is commonly identified as 1351 U.S. Route 20 (a/k/a 1351 Cherry Valley Turnpike), Skaneateles, New York,

TOGETHER ALSO with the appurtenances thereto and all right, title and interest, if any, of the Seller in and to any land lying in the bed of any public street, road or avenue opened or proposed, in front of or adjoining said parcels of land, to the center line thereof, and

TOGETHER ALSO with all right, title and interest of Seller, if any in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to said parcels by reason of change of grade of any street, road or avenue (collectively as the "Property").

2.   <u>Purchase Price</u>

The purchase price to be paid by Buyer to Seller for the aforesaid Property shall be the sum of Eight Hundred and Thirty Thousand Dollars ($830,000) (the "Purchase Price").   NINE WJG   $930.000   MJF

3.   <u>Payment of Purchase Price</u>

The Purchase Price shall be paid in the following manner:

11/02/2010   23:44    3155624552

(a)    Within five (5) days following full execution of this contract, Buyer shall deposit with Seller's attorney, the sum of Two Thousand Five Hundred Dollars ($2,500) (the "Deposit") as assurance that Buyer shall fulfill the terms and conditions of this contract, said Deposit to be applied to the Purchase Price due upon transfer of title to the Premises ("Closing"). In the event that a breach of this contract by Purchaser shall continue without diligent attempt by Buyer to cure such default for a period of ten (10) days after written notice by Seller to Buyer then the Deposit shall become the property of Seller, not as a penalty, but as total liquidated damages, in lieu of law and equity, and as Seller's sole remedy hereunder, and this contract and any other remedies shall be without effect. In the event of breach of this contract by Seller, then Seller shall upon written notice from Buyer promptly cause the Deposit to be returned to Buyer without offset or delay and Buyer may at its option declare this contract to be null and void.

(b)    The balance of the Purchase Price (as adjusted pursuant to the terms of this contract) shall be paid by Purchaser to Seller by certified check, bank check or wire transfer upon transfer of title to the Real Property at the closing ("Closing")

4.    Representations and Warranties of the Seller

To induce Buyer to enter into this Agreement, Seller represents and warrants to Buyer as follows:

4.1    Seller owns the Property described in Paragraph 1, in fee simple absolute and Seller has the power to convey title to the Property in accordance with the terms and conditions of this Agreement.

4.2    Seller has complete authority to execute this Agreement and to deliver any and all documents and title set forth herein.

4.3    Neither Seller nor prior owner Patrick Bombard (hereafter as "Prior Owner") have been served with documents indicating that there are actions, suits, claims, citations, proceedings, arbitrations, investigations, or inquiries, governmental or otherwise, seeking money damages, injunctive relief, remedial action or any other remedy pending or threatened against or affecting the Property relating to a violation or non-compliance with, or any matter otherwise arising under, any federal, state or local law.

4.4    There are no agreements, consent orders, decrees, judgments, licenses or permit conditions, or other directives of government which adversely affect the future use of the Property as a convenience style grocery store with retail sale of gasoline or require any change in the present condition of the Property.

4.5    At the time the Property is conveyed to Buyer there shall be no existing maintenance or other contracts affecting the Property which cannot be terminated by will without penalty or additional expense by reason of termination.

2

4.6    The Property complies with all applicable environmental laws including without limitation those relating to the presence of hazardous materials on or beneath the Property.

4.7    At the time the Property is conveyed to Buyer it shall be free and clear of leases.

4.8    Seller is not a foreign person within the meaning of Section 1445, et. seq., of the Internal Revenue Code of 1986, as amended, or any regulations promulgated there under.

4.9    The representations and warranties contained in this paragraph are made on the date of this Agreement, shall be deemed made again at the Closing, and shall survive Closing.

4.10    Trustee Michael Fantacone represents that he has made these representations after discussing with Prior Owner the accuracy and truth regarding each subparagraph 4.3 through 4.7 above.

5.    Property Inspection

5.1    Buyer shall have the right to cause a physical inspection of the Property to be made by its agents, employees, engineers and architects, and Seller shall permit and facilitate such inspection. Without limiting the generality of this subparagraph it is agreed that Buyer and its agents may inspect the soil of and under the Property to determine the presence of any contamination and the presence of rock and bedrock. In addition, Buyer may make boring, percolation, and other soil tests to determine the physical characteristics of the Property. Seller hereby grants to Buyer, its agents or contractors, the right to enter upon the Property to make said investigations and soil tests and surveys; provided, however, Buyer shall replace and restore the earth to its prior condition. If, after the examination of the Property by Buyer, the environmental or physical condition of the Property is not satisfactory to Buyer, then Buyer may in writing so notify Seller and terminate the Agreement, and, if this Agreement is terminated, neither party shall have any further right or obligation hereunder, except that Seller shall cause the Deposit to be promptly returned to Buyer without offset or delay.

5.2.    Within ten (10) days from the execution of this contract Seller shall provide Buyer's attorney with all drawings, maps, plans, specifications, studies, tests, reports and environmental audits in the possession or control of Seller whenever prepared relating to the Property, including but not limited to environmental studies or certificates, and studies.

5.3.    Buyer shall indemnify and hold harmless Seller from any and all damages, costs, expenses including reasonable attorneys' fees, and liabilities for bodily injury, death or property damage arising from any negligence by Buyer, its agents or servants, in

3

connection with the investigations, and this indemnification shall survive the full execution or termination of this Agreement.

6.    Title Evidence

Except as provided in paragraph 6.4 and 6.5, Seller shall use good faith reasonable efforts to deliver to Buyer's attorney on or about ten (10) days following the execution of this Agreement, the following documents and evidence of title to the Property. The documents referred to in this Paragraph 6 or as may be redated prior to Closing by Buyer shall show that the Seller holds good, marketable and insurable title to the Property free and clear of all liens and encumbrances, except provisions of existing easements (provided such easement does not in Buyer's opinion impairs Buyer's ability to operate a business on the Property in the manner Buyer desires); building and zoning laws; that do not in Buyer's opinion impair its use of the Property, and taxes and assessments which are a lien but which are not yet due and payable.

6.1    A current abstract or abstracts of title prepared by an abstract company duly qualified to do business in the State of New York, covering the Property described in Exhibit "A", for a period of at least prior to the year 1945 and beginning with a warranty deed or other source of title acceptable to Buyer's attorney.

6.2    A survey of the Property. Seller shall also provide a current survey, certified as reasonably requested by Buyer, prior to Closing.

6.3    Tax searches and other municipal searches as are customary in county where the Property is located.

6.4    A copy of the proposed deed, RP-5217, TP-584 and current tax receipts prior to the Closing Date.

6.5    At least three (3) business days prior to the Closing Date, a proposed statement of sale.

6.6    Such further and additional documents, affidavits and searches as Buyer may reasonably request.

7.    Title Documentation

At the Closing marketable title to the Property shall be conveyed to Buyer by the following instruments, which instruments shall be in sufficient form to convey the quality of title hereinafter described, and delivery of these instruments and the documents described in Paragraph 15.2 shall be a condition of Closing.

7.1    A Warranty Deed with Covenant Against Grantor's Acts and Section 13 lien covenant, in recordable form, said deed shall convey good, marketable and insurable

title, to the Property together with searches, forms or affidavits which Buyer's attorney may reasonably request.

8.   Adjustments

All real estate taxes, special assessments shall be prorated and adjusted as of the Closing Date. All water charges and other costs customarily prorated in the county where the Property is located shall be prorated by the parties as of the Closing Date, and all utilities shall be paid and placed in the name of Buyer at Closing.

9.   Closing Expenses

9.1   Buyer shall pay the recording fees for the deed, filing fee for RP-5217 and mortgage financing expenses.

9.2   Seller shall pay the transfer tax under New York Tax Law '1402, the filing fee for TP-584 and mortgage discharge, if any.

9.3   Unless otherwise stated to the contrary in this contract it is agreed that all Closing expenses customarily paid by a seller or purchaser in the county where Property is located shall be paid by Seller and Buyer herein.

10.   Delivery of Possession

Sole and exclusive possession of the Property shall be delivered to Buyer on the Closing Date free of all liens, tenants and leases.

11.   Damage or Destruction/Condemnation

11.1   Seller shall give Buyer prompt notice of any fire or other casualty occurring at or to the Property between the date hereof and Closing Date, or of any actual, threatened, or rumored condemnation of all or any part of the Property of which Seller shall have knowledge.

11.2   If, prior to the Closing, there shall occur (i) material damage to the Property caused by fire or other casualty, or (ii) a taking by condemnation of all or any material (as hereinafter defined) part of the Property, then, and in either such event, Buyer may terminate its obligations under this Agreement by written notice given to Seller, and this Agreement shall be void and of no effect, and unless otherwise expressly agreed herein, neither Seller nor Buyer shall thereafter have any further obligation to the other except for the prompt return of the Deposit to Buyer without offset or delay. If Buyer does not so elect to terminate its obligation under this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, Seller shall assign or transfer to Buyer at Closing, by written instrument, all of Seller's right, title and

5

interest in any insurance proceeds or condemnation awards paid or payable to Seller on account of any such fire, casualty or condemnation.

11.3   If, prior to the Closing, there shall occur:  (i) damage to the Property caused by fire or other casualty which would cost less than ten thousand and 00/100 dollars ($10,000.00) to repair, or (ii) a taking by condemnation of any part of the Property which does not include a material (as hereinafter defined) portion thereof, then, and in either of such events, neither party shall have the right to terminate its obligations under this Agreement by reason thereof, and Seller shall (a) in the event of a condemnation, assign and transfer to Buyer at Closing, by written instrument, all of Seller's right, title and interest in any condemnation awards paid or payable to Seller on account of such taking or (b) in the event of damage to the Property caused by fire or other casualty, restore the Property to it  condition immediately prior to the loss and the Closing Date shall be adjourned for a reasonable period of time to allow for such restoration.

11.4   For purposes of this Paragraph 11, a taking of a material part of the Property shall mean any casualty to or taking of (i) any of the structures, or (ii) any portion of the real property which causes a reduction in the area available by 5% or more, or (ii) which significantly impedes access to and from the real property or impedes Buyer's intended use of the Property.

12.   Seller's Failure to Fulfill this Agreement

If after using good faith reasonable efforts Seller shall be unable to convey title in accordance with the provisions of this Agreement, then both Buyer and Seller shall be released from their respective obligations in accordance with this Agreement, and neither party shall have any further rights or obligations under this Agreement except that Seller shall remain liable for the prompt return of the Deposit to Buyer without offset or delay. Notwithstanding the foregoing: if the Property shall be subject to any lien or charge in a fixed or ascertainable amount, Seller may at its election, pay or discharge the same, or at Seller's option, a sum sufficient to pay or discharge the same shall be deducted from the balance due Seller upon Closing;

13.   Broker

Seller and Buyer represent and warrant to each other that no real estate broker is involved in this transaction or has brought about this sale. .  This material representation and warranty shall survive the Closing, and the parties agree to indemnify and hold harmless each other from all costs and expenses, including reasonable attorney's fees, incurred by the other party as a result of the breach of this representation and warranty.

14.   The Closing

14.1   The Closing shall be held at the office of the attorney for the Buyer or the attorney for Buyer's lender.  The date on which the transactions contemplated by this Agreement shall close hereunder is sometimes referred to herein as the "Closing Date".

6

11/02/2018  23:44   3156024552

|  |  |
|---|---|
| As to Buyer or: | Nice N Easy Properties, Inc.<br>7840 Oxbow Road<br>Canastota, New York 13032 |
| With a copy to: | Robert P. O'Leary, Esq.<br>104 Pleasant Street<br>P.O. Box 57<br>Manlius, New York 13104 |
| As to Sellers: | Michael Fantacone<br>as Trustee of The Randy Trust,<br>5197 Forest Edge Drive<br>Syracuse, New York 13215 |
| With a copy to: | Robert Romeo, Esq.<br>Romeo and Romeo<br>314 East Fayette Street<br>Syracuse, New York 13202 |

## 17. Counterparts; Captions

This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

## 18. Governing Law

This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the laws of the State of New York. In order to induce the parties to execute this Agreement, and as a material part of the consideration therefore the parties hereto agree that all actions or proceedings arising out of this Agreement shall be litigated in state or federal courts located within Onondaga County, State of New York

## 19. Successor and Assigns

This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the respective parties

## 20. Entire Agreement

This Agreement (including all Exhibits annexed hereto, all of which are expressly made a part hereof) contains the entire agreement between the parties with respect to the subject matter hereof. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument

8

signed by the party to be changed or by its agent duly authorized in writing or as otherwise expressly permitted.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

Buyer: Nice N Easy Properties, Inc.

Seller: Michael Fantacone as Trustee
of the Randy Trust

_____
John MacDougall, its President

_____
Michael Fantacone, Trustee

9

Schedule A

Map depicting Property

10



STORAGE FACILITY
TAX MAP 31.1/2
1.6 ACRES (70,038 SF)

CAR DEALERSHIP
TAX MAP 31.1
11.6 ACRES (505,199 SF)

HOUSE
TX 31.1/1
.14 ACRE

NEW YORK STATE ROUTE No. 20

**a r c h i t e c t**

ROBERT O. EGGLESTON
4361 JORDAN ROAD
SKANEATELES, NY 13152
(315) 685-8144

DATE:

PROJ: 07075

**TAX MAP LAYOUT**
PAT BOMBARD
ROUTE 20
TN OF SKANEATELES, NY



STORAGE FACILITY
TAX MAP  31.1/2
1.6 ACRES (70,038 SF)

CAR DEALERSHIP
TAX MAP  31.1
11.6 ACRES  (505,199 SF)

HOUSE
TX  31.1/1
.14 ACRE

NEW YORK STATE ROUTE No. 20

DATE:

PROJ.: 07075

**a r c h i t e c t**
ROBERT O. EGGLESTON
4361 JORDAN ROAD
SKANEATELES, NY 13152
(315) 685-8144

**TAX MAP LAYOUT**
PAT BOMBARD
ROUTE 20
TN OF SKANEATELES, NY

## OFFER TO PURCHASE

TO THE OWNER OR PERSON ("SELLER") WHO HAS THE RIGHT TO SELL THE PROPERTY DESCRIBED BELOW:

Purchasers agree to purchase the following properties situated in the Town of Skaneateles, County of Onondaga, State of New York collectively known as 1351 Cherry Valley Turnpike (for a more detailed description of the property reference is hereby made to the deed thereof), owned by Seller (the "Premises" or "Property") on approximately 13.94 acres and known as tax map parcel 032.-03-30.1, 032.-03-30.1/1 and 032.-03-30.1/2.

1. **PRICE.** At the price of <u>Two Million Nine Hundred Ninety Thousand and 00/100</u>  ($2,990,000.00) Dollars, payable as follows:

**Deposit.**  $    5,000.00 in the form of a check to be held by Purchasers' attorney until closing at which time it shall be applied to the purchase price. In the event that closing on the Premises does not occur or in the event that the Contingencies as set forth in Paragraph 3 are not satisfied to Purchasers' sole satisfaction, then this Deposit shall be returned to the Purchasers.

**Balance.**  $ 2,985,000.00  cash on passing of deed in the form of a cashier=s or certified check.

2. **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller, in order to induce Purchasers to enter into this Agreement and to purchase the Premises, represents and warrants to Purchaser as follows:

(a) At the Closing, Seller will have, and will convey and transfer to Purchasers, good and marketable title to the Premises free and clear of any liens, encumbrances, tenancies, licenses, security interests, covenants, conditions, restrictions, judgments, rights of way, easements, encroachments and any other matters affecting title, except as otherwise noted herein.

(b) There is not any pending condemnation or similar proceeding affecting the Premises or any portion thereof and Seller has not heretofore received any notice, and has no knowledge, that any such proceeding is contemplated.

(c) No person, firm, corporation or entity other than Purchasers has, or as of the Closing will have, any right or option to acquire the Premises or any portion thereof or any interest therein.

(d) This contract may be assigned by the Purchasers.

(e) There are not, and as of the Closing there will not be, any violations of any federal, state or municipal laws, ordinances, orders, regulations or requirements affecting any portion of the Premises, and no notice of any such violation has been issued by any governmental authority having jurisdiction.

(f) As of Closing, to the best knowledge of the Seller, the area above and below the surface of the Premises, including ground water is free from contamination and/or hazardous wastes or substances (as those terms are defined under any federal, state or local laws, rules or regulations pertaining to environmental regulations, contamination or cleanup) paints, cleaning products, gasoline and/or used oil (hereinafter, individually and collectively AHazardous Materials@) regardless of its source, that can serve as a basis of a claim or liability of any kind under any federal, state or local law, ordinance or regulation.

(i) To the best knowledge of the Seller, there are no actions, suits, claims or proceedings relating to a violation of non-compliance with any environmental law or with respect to the disposal, discharge or release of Hazardous Materials at or from the Premises.

(ii) To the best knowledge of the Seller, Seller covenants that it will not, prior to closing, make any change in the present use of the Premises and will not generate, store or dispose of Hazardous Materials on or from the Premises nor allow others to do so.

(g) As of the Closing, no work will have been performed or will be in progress at, and no materials will have been furnished to, the Premises which, though not then the subject of, might provide the basis for, mechanics, materialmen or other liens against the Premises or any portion thereof.

(h) No portion of the Premises is, or as of the Closing will be, subject to or affected by any special

assessments, whether or not a lien thereon. There is no proceeding pending for the reduction of the assessed valuation or taxes of any portion of the Premises and no such proceeding will be instituted by Seller, prior to the closing without the prior written consent of Purchasers.

(i) No portion of the Premises are listed on the Historical Register or any other historical lists.

(j) Seller has full power, in accordance with law, to enter into this Agreement and upon the Closing to consummate the sale provided for herein.

3. **CONTINGENCIES.** This Offer is contingent upon, within one hundred twenty (120) days of acceptance of this Offer ("Due Diligence Period"), Purchasers conducting a full and satisfactory review that the Premises are acceptable for Purchasers' intended use, including but not limited to: acceptable title to the Premises; the Premises are free from all Environmental Contaminants; public utilities are available and the Premises may be developed using conventional construction techniques for footings, foundations, renovations, etc.; and federal, state, local, and tenant approvals, permits, etc., necessary for the development of the Property and Purchasers are able to obtain suitable financing. In the event that Purchasers determine, in their sole discretion, that the Premises are not satisfactory or that satisfactory financing cannot be obtained, Purchasers shall have the right up until the last day of the Due Diligence Period to cancel this Offer upon written notice to Seller and the deposit shall be returned to Purchasers.

Seller agrees to provide Purchasers and Purchasers' representatives access to the Premises in order to perform the above noted inspections. Seller agrees to deliver to Purchasers, within five (5) days of the acceptance of this Offer, any and all copies of reports or information concerning survey, environmental, geotechnical, wetland mitigation, engineering, traffic engineering, architectural and any other information that Seller has in its possession relating to the Premises. If Purchasers cancel this Offer, all such materials will be returned to Seller.

4. **TITLE.** Seller is to deliver to Purchasers or its attorney, at least forty-five (45) days before closing, current survey, abstract of title commencing with a Warranty Deed no later than 1945 and 10 year tax search and current tax receipts showing the Property free and clear of all liens and encumbrances. Notwithstanding the foregoing, Purchasers acknowledge and agree to the existence of a life estate in favor of Erma Jerva on parcels ___ of the Premises. Such life estate shall remain in place following transfer of title to the Purchasers and Purchasers agree that such life estate shall not be an objection to title, and that the Premises shall remain in all effects subject to such life estate following the transfer of title hereunder.

5. **CLOSING.** Transfer is to be completed at the office of Purchasers' attorney or where otherwise mutually agreed on or about thirty (30) days after the expiration of the Due Diligence Period. At that time Seller is to convey to Purchasers by Warranty Deed, good title to the Property free of all liens and encumbrances, except as otherwise provided herein. Notwithstanding the foregoing, Purchasers agree that Seller may satisfy any existing liens or encumbrances from proceeds at Closing.

6. **ADJUSTMENTS.** Interest, insurance premiums, rents and taxes shall be pro-rated and adjusted as of closing.
City, State and County Taxes shall be adjusted and apportioned on a calendar year beginning Jan. 1, and ending Dec. 31. School Taxes outside the city shall be adjusted and apportioned for the fiscal year beginning July 1st and ending the following June 30th, and Village Taxes shall be adjusted and apportioned for the fiscal year beginning June 1st and ending the last day of May following or as otherwise provided by law.

7. **POSSESSION.** Possession of Premises shall be delivered on or before closing, subject as aforesaid to the life estate of Erma Jerva.

8. **DEFAULTS.** If Purchasers willfully fail to perform as required under this Offer beyond any applicable notice and cure periods, the Seller shall have the right to retain any and all Deposits paid by Purchasers. If Seller fails to perform as required under this Offer beyond any applicable notice and cure periods, or if any of Sellers warranties, representations, or covenants are not true and accurate, Purchasers may: (a) terminate this Agreement by notice to Seller and Seller shall reimburse Purchasers all Deposits paid under this Agreement and Purchasers shall have the right to evoke any additional right or remedy allowed at law or in equity by statute or otherwise; or (b) at Purchasers' option cure any Seller default and waive such rights and proceed toward Closing and receive an abatement against the Purchase Price equal to the costs and damages incurred by Purchasers on account of curing any Seller default.

9. **NOTICES.** All notices, requests, consents, etc., provided for in this Agreement shall be in writing and delivered by personal service, registered or certified mail-return receipt requested, recognized overnight courier, or receipted telefacsimile and shall be deemed given on the date of receipt (including telefacsimile transmission confirmation) or refusal of delivery.

Address for Purchasers:

Patrick M. McCracken
Robin Casper
c/o Keller Williams
6872 East Genesee Street
Fayetteville, NY  13066

With a copy to:
Mannion Copani
224 Harrison Street
Suite 306
Syracuse, NY  13202
Attn: Terence A.J. Mannion, Esq.
Fax: 315-478-0204

Address for Seller:
Pat J. Bombard
P.O. Box 8
Skaneateles, NY  13152

With a copy to:
Badami & Connolly P.C.
P.O. Box 131
Skaneateles, NY 13152
Att: David Badami, Esq.
Fax: 866-702-9343

10. **MORTGAGE TAX.** Upon any purchase money mortgage given, Purchasers agree to pay the usual mortgage tax and recording fee and Revenue stamps on bond where required.

11. **ASSIGNMENT.** This offer may be assigned to an individual or corporation for the purpose of holding title thereto. However, Purchasers shall remain responsible for the faithful performance of the contract.

12. **RISK OF LOSS.** The risk of loss or damage to the Property by fire or other causes until the delivery of the deed is assumed by Seller.

13. **BINDING CONTRACT.** This offer, when accepted shall be a binding contract. It shall bind the parties hereto and their respective executors, administrators, distributees, successors and assigns.

14. **BROKER.** Keller Williams Realty Syracuse is the only broker in this transaction and no other real estate broker or agent has been instrumental in bringing about this sale, and as such, all brokerage fees due will be paid by Seller. Seller acknowledges that Purchasers are licensed real estate agents with Keller Williams Realty Syracuse.

Dated: December ___, 2012

_____
Patrick M. McCracken

Witness _Robert W. Bedworth_

_____
Robin Casper

Witness _Robert W. Bedworth_

## ACCEPTANCE

The undersigned hereby accepts this offer and agrees to sell and convey said Premises on the terms and conditions set forth above.

Dated: December 3, 2012

Pat J. Bombard

Witness _Robert W. Bedworth_

F



General Motors Corporation

June 1, 2009

Via Federal Express

BOMBARD CAR COMPANY
PO BOX 8
SKANEATELES, NY 13152

Re:   *GM Dealer Sales and Service Agreements/Participation Agreement*

Attention:  PAT BOMBARD

[      BOMBARD CAR COMPANY                    ) and General Motors Corporation
("GM") are parties to Dealer Sales and Service Agreements (the "Dealer Agreements") for [
CHEVROLET motor vehicles (the "Existing Model Lines"). Capitalized terms not otherwise defined in
this letter agreement have the definitions set forth for such terms in the Dealer Agreements.

GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending
in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"),
having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"),
to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"),
subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case
involves, among other things, the restructuring of its current dealer network. Part of that restructuring
includes focus on and retention of those dealers who, based on a number of factors, GM believes have an
opportunity to be successful dealers selling and servicing GM's products.

Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the
same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers
representing the Existing Model Lines, the retained dealers, including Dealer, will have the opportunity to
increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement
additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's
dealer network and for Dealer's performance to be in line with such increased opportunity.

In consideration for Dealer's execution and delivery of, and performance under, this letter
agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer
Agreements in the Bankruptcy Case, and (ii) shall assign the Dealer Agreements to the 363 Acquirer as
part of the 363 Sale, provided such sale closes.

1

1]      THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreements[s] and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Lines, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before June 12, 2009, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreements, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before June 12, 2009, GM may, in its sole discretion, move to reject the Dealer Agreements[s] in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. **Defined Terms.** All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreements[s].

2. **Sales Performance.** Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer .has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreements. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreements alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreements, as supplemented by this letter agreement.

3. **New Vehicle Inventory.** Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Lines and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Lines to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in Section 2 above. In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

4. **Exclusivity.** During the remaining term of the Dealer Agreements[s] (the "Exclusivity Period"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing

2

Model Lines[s] at the premises authorized for the conduct of Dealership Operations under the Dealer Agreements (the "Dealership Premises"). During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Lines[s] (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreements[s], other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreements, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days of written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of its remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreements.

5. No Protest. In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a)    GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Lines at a site located in the vicinity of the Dealership Premises (the "Proposed Site"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "No Protest Commencement Date"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for any of the Existing Model Lines at or in the vicinity of the Proposed Site.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

3

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c)    Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "GM Parties"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of any of the Existing Model Lines described in Section 5(a) above.

(d)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(e)    Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.    Release; Covenant Not to Sue; Indemnity. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale:

(a) Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreements or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2nd) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to

4

Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due or to become due to either or any of their Affiliates.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreements and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreements by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited

5

liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(f)  The terms of this Section 6 shall survive the termination of this letter agreement.

7.  <u>Compliance</u>.  In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale, from and after the Effective Date:

(a)  Dealer shall continue to comply with all of its obligations under the Dealer Agreements[s], as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreements[s] and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein;

(b)  Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer. In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control. The term "<u>Channel Agreements</u>" shall mean agreements (other than the Dealer Agreements) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreements, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreements, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreements," "Agreements and Business Plan," "Exclusive Use Agreements," "Performance Agreements," "No-Protest Agreements," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "<u>Termination Agreement</u>"), (ii) any performance agreement of any kind between Dealer and GM (each a "<u>Performance Agreement</u>"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("<u>AHI</u>"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c)  Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8.  <u>Breach and Remedies</u>.  In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreements[s], as supplemented by this letter agreement, GM and the 363

6

Acquirer shall have all of its rights and remedies under the Dealer Agreements[s], as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreements[s], as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement[s] upon the termination by its terms of the Dealer Agreements, as supplemented by this letter agreement. In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreements[s], as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement[s] as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreements[s] (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreements[s]), and (y) Dealer waives all other rights under the Dealer Agreements[s], as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9. Miscellaneous.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b) This letter agreement shall supplement the Dealer Agreements[s] as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreements[s], which shall expire no later than October 31, 2010.

(c) Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreements[s] shall remain in full force and effect as written. Additionally, the Dealer Agreements[s], as referenced in any other document that the parties have executed, shall mean the Dealer Agreements[s] as supplemented by this letter agreement.

(d) This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e) The Dealer Agreements, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreements, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f) The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law. In executing this letter agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g) The Dealer Agreement[s], as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

7

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(h)  By executing this letter agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto. The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i)  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j)  If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

(k)  This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreements as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

*[Signature Page Follows]*

8

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

**GENERAL MOTORS CORPORATION**

By:_____
          Authorized Representative

APPROVED AND AGREED TO THIS
*10* DAY OF JUNE, 2009

[DEALER ENTITY CORPORATE NAME]

By: *Paty Borland*
Name: *PAT J BOMBARD*
Title: *PRESIDENT*

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
        BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

G

Bombard Car Co
P.o. Box 8 RT 20
Skaneateles N.Y. 13152          10/8/2014

DBPG Contact Inf. - Address + Fax

Dealer Business Planning Group
100 Renaissance Center                    Fax
Mail - Code - 482-A06-C66          313-667-5461
Detroit, MI 48265 - 1000           10/8/2014

Please Contact Me on
my Personal cell 315-506-5797
Dealer Name PAT Bombard
   BAC 115292
   Chev - 15-044

I AM giving you my E-Mail Address
   Summerwinds LLC @ g.mail.com

Please Forward To MY Email
ALL Dealership New Contract For
5 year Renewal Per your agreement
on MY Chevrolet STORE.
I AM excited About MY New Store
And Chevrolet New Product
AND Breaking More Sales Records

                              Pat Bombard

CC. GSE 0910 Ass.
CC dBadami Lawyer dBadami@uclclin.net
CC M. Ashley Lawyer Mitchell Ashley Law@ the Ashley Law Firm.com

**HP Officejet Pro 8600 N911a Series**

Fax Log for
American Group I, P.C.
3156852289
Oct 08 2014 12:49PM

Last Transaction

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| | | | | Digital Fax | | |
| Oct 8 | 12:48PM | Fax Sent | 13136675461 | 1:01 N/A | 1 | OK |

10/11/2016

To Lynn Howard    fax
313-667-
5461

from Pat Borland

per our understanding
for my Chevrolet Start

Thank you Pat
10/11/2016

Please review and hand
deliver to Deb Collins

Cover ltter

45 pages

American Group I, P.C.
3156852289
Oct 08 2014 12:53PM

## Last Transaction

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| | | | | Digital Fax | | |
| Oct 8 | 12:52PM | Fax Sent | 13136675461 | 0:42 N/A | 1 | OK |

H

# ROBERT S. BASKA, M.D., ESQ.
## MADEEHA S. SYED, ESQ.
## UZMA A. GULAMALI, ESQ.

The Galleries of Syracuse, 441 S. Salina, Suite 700 ~ Syracuse, NY  13202

O: (315) 399-0696          bobbaska@aol.com          F: (315) 362-9065

August 22nd, 2015

Lynn M. Howard
Regional Manager, Dealer Organization for Northeast Region
General Motors
100 Renaissance Center
Mail Code 482-A16-C41
Detroit, MI 48265-1000

### Re:     *People v. Pat Bombard*

Dear Lynn Howard:

I was the attorney for Pat Bombard, who faced three felony charges of Grand Larceny in the 3rd Degree, Grand Larceny in the 4th Degree, and Grand Larceny in the 4th Degree in Onondaga County, New York. We took the case to trial and Mr. Bombard was found not guilty of all charges by his jury on July 23rd, 2015.  This closes out his criminal case.  See the attached.  The file has been sealed pursuant to New York law.

Thank you again for your courtesies.  Please feel free to call with any questions.

Sincerely,

Robert Baska, Esq.

STATE OF NEW YORK
COUNTY OF ONONDAGA
COUNTY COURT

Indictment # 2015-0329-1
Index # 2015-347

THE PEOPLE OF THE STATE OF NEW YORK

VS

PAT BOMBARD, DEFENDANT
  DOB: 03/28/1956

CERTIFICATE OF

CONVICTION

THE ABOVE NAMED DEFENDANT WAS SENTENCED IN THIS COURT FOR THE OFFENSE OF

SEE BELOW

JUDGEMENT WAS ENTERED ON THE 23RD DAY OF JULY, 2015, BEFORE
JUDGE ANTHONY F ALOI  THE HONORABLE JUDGE OF THIS COURT.

THE DEFENDANT WAS SENTENCED TO A TERM OF:

ACQUITTED OF ALL COUNTS AFTER TRIAL BY JURY. SEALED PURSUANT CPL 160.50

I HEREBY CERTIFY THE ABOVE IS A TRUE ABSTRACT OF THE MINUTES OF THIS
PROCEEDING FILED IN THIS OFFICE OF THE ONONDAGA COUNTY CLERK.

_____
COUNTY CLERK

DATED AT SYRACUSE, NEW YORK
THIS 20TH DAY OF AUGUST, 2015

THE PEOPLE OF THE STATE OF NEW YORK

VS.

_Pat Bombard_
Defendant

_8-20-15_
Date

I, _Pat Bombard_ hereby make application to the Honorable _Anthony Aloi_

Judge of the Onondaga County Court for release of information referring to the above-entitled

action. Information requested is _Sealed 2015-0329-1 hello 156347_

Reason for request _Business_

_Pat Bombard_   _8/20/15_
Signature        Date

Witnessed by _____

_8-20-15_
Date

_____
Signature of Judge
Granting Release

_8/20/2015_
Date

**NADA** Retirement Trust
P.O. BOX 9200
McLEAN, VIRGINIA 22102-0200

PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

PREMATURE DISTRIBUTION
| | |
|---|---|
| CHECK: | 818147 |
| DATE: | 03/18/2010 |
| AMOUNT: | $31,093.04 |
| PLAN ID: | 304766 |
| SSN: | 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 |

IN ADDITI...
YOU MAY ...
FOR "EARI...

SEE THE F...
FOR ADD'...

...BLE PORTION OF THIS DISTRIBUTION,
...(10) PERCENT FEDERAL EXCISE TAX
...CLUDED IN THIS PAYMENT.

...PORT AND 1099R INSTRUCTIONS



32 Jordan St
Skaneateles, ...
Tel: 1-800-...

03/30 2010     09:52 AM
Teller: PERNIJE
Deposit Checking/Money Market
Acct # ****5 2439
Checks          $   31,093.04
                $   31,093.04

CC #0001422
Seq #0014

Welcome to KeyBank!

---

**Form 1099-R**

1 Gross distribution
38,866.3...

2b Taxable amount
not determined

Account number (optional)

PAYER'S name, street a...
NATIONAL A...
RETIREMEN...
PO BOX 920...
McLEAN, VA

PAYER'S Federal Id...
51-0210613...

RECIPIENT'S name...
PAT J BOM...
PO BOX 8
SKANEAT...

3 Capital gain (incl...
in box 2a)

6 Net unrealized...
in employer's s...

8a Your percentage of total distribution
100.00

9b Total emplo...

10 State tax withheld

11 State/Payer's state no.

12 State distribution

13 Local tax withheld

14 Name of locality

15 Local distribution

**Copy C For Recipient's Records**
(keep for your records)
This information is being furnished to the Internal Revenue Service.

Department of the Treasury
Internal Revenue Service

---

...rm 1099-R   ☐ CORRECTED (if checked)   OMB No. 1545-0119   **2010**

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

1 Gross distribution
38,866.30

2a Taxable amount
38,866.30

2b Taxable amount not determined ☐    Total distribution ☒

1st year of desig. Roth contrib.

Account number (optional)

PAYER'S name, street address, city, state, and ZIP code
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
RETIREMENT TRUST / CARDINAL BANK AS TRUSTEE
PO BOX 9200
McLEAN, VA 22102-0200

PAYER'S Federal identification number
51-0210613

RECIPIENT'S identification number
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

RECIPIENT'S name, street address, city, state, and ZIP code
PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

3 Capital gain (included in box 2a)

4 Federal income tax withheld
7,773.26

5 Employee contributions or insurance premiums

6 Net unrealized appreciation in employer's securities

7 Distribution code
1

IRA/SEP/SIMPLE

8 Other        %

8a Your percentage of total distribution
100.00

9b Total employee contributions

10 State tax withheld

11 State/Payer's state no.

12 State distribution

13 Local tax withheld

14 Name of locality

15 Local distribution

**Copy B**  If this form shows Federal income tax withheld in Box 4, attach this copy to your Federal tax return.

Department of the Treasury
Internal Revenue Service

From:Christi Quesada-Berry FaxID:                                                           Date:

## NEW YORK STATE INSURANCE IDENTIFICATION CARD

275  UTICA NATIONAL ASSURANCE CO.

Name & Address of Issuer    **DELMONICO INSURANCE AGENCY**
**1391 EAST GENESEE STREET**
**SKANEATELES  NY  13152**

An authorized NEW YORK insurer has issued an Owner's Policy of
Liability Insurance complying with Article 6 (Motor Vehicle Financial
Security Act) of the NEW YORK Vehicle and Traffic Law to:

**BOMBARD;CAR**
**COMPANIES;INC**
**1351 E GENESEE ST**
**SKANEATELES  NY 13152**

Policy Number
**CPP4093638**

| Effective Date | Expiration Date |
|---|---|
| **01/01/2009** | **01/01/2010** |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration
after 45 days from effective date.)
Applicable with respect to the following
Motor Vehicle:

| Year | Make |
|---|---|
| | **DEALER GARAGE AUTO LIABIL** |

Vehicle Identification Number

THIS ID CARD MUST BE CARRIED
IN THE INSURED VEHICLE FOR
PRODUCTION UPON DEMAND

WARNING: Any person who issues
or produces an ID card knowing that
an Owner's Policy of insurance is not in
effect may be committing a misdemeanor.
In addition, a person who presents
an ID card if insurance is not in
effect may be committing a
misdemeanor.

The name of the registrant and the
name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION:
DMV WILL ONLY PROCESS A VEHICLE
CHANGE (RE-REGISTRATION) USING
THE REPLACED VEHICLE'S CURRENT
REGISTRATION.

FS-20



## NEW YORK STATE INSURANCE IDENTIFICATION CARD

275  UTICA NATIONAL ASSURANCE CO.

Name & Address of Issuer    **DELMONICO INSURANCE AGENCY**
**1391 EAST GENESEE STREET**
**SKANEATELES  NY  13152**

An authorized NEW YORK insurer has issued an Owner's Policy of
Liability Insurance complying with Article 6 (Motor Vehicle Financial
Security Act) of the NEW YORK Vehicle and Traffic Law to:

**BOMBARD;CAR**
**COMPANIES;INC**
**1351 E GENESEE ST**
**SKANEATELES  NY 13152**

Policy Number
**CPP4093638**

| Effective Date | Expiration Date |
|---|---|
| **01/01/2009** | **01/01/2010** |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration
after 45 days from effective date.)
Applicable with respect to the following
Motor Vehicle:

| Year | Make |
|---|---|
| | **DEALER GARAGE AUTO LIABIL** |

Vehicle Identification Number

THIS ID CARD MUST BE CARRIED
IN THE INSURED VEHICLE FOR
PRODUCTION UPON DEMAND

WARNING: Any person who issues
or produces an ID card knowing that
an Owner's Policy of insurance is not in
effect may be committing a misdemeanor.
In addition, a person who presents
an ID card if insurance is not in
effect may be committing a
misdemeanor.

The name of the registrant and the
name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION:
DMV WILL ONLY PROCESS A VEHICLE
CHANGE (RE-REGISTRATION) USING
THE REPLACED VEHICLE'S CURRENT
REGISTRATION.

FS-20



**FAX: Scanable Bar Code**



FAX INSTRUCTIONS:

1. The entire page must be faxed.

2. If submitted to DMV, either the entire page or the second
ID card and large scanable bar code will be retained.

3. A faxed ID card must be replaced with a scanable
ID card within 14 days of the effective date.

4. DMV will not accept a faxed ID card without a
scanable barcode




# DEALER BOND UNDER NEW YORK STATE
# VEHICLE AND TRAFFIC LAW SECTION 415(6-B)

FACILITY NUMBER: _____

BOND NUMBER: 1194

**KNOW ALL PERSONS BY THESE PRESENTS:**

Whereas, the undersigned **Bombard Car Companies**
(Dealer Name), of **PO Box 8 Skaneateles, NY 13152**
(Full Dealer Address)

hereinafter referred to as Principal) has applied or is about to make application for a registration certificate as a dealer, qualified dealer or new motor vehicle dealer pursuant to New York Vehicle and Traffic Law Section 415; and

Whereas, the undersigned **Universal Underwriters Ins.Co.**
(Surety Name), of **7045 College Blvd. Overland Park, KS 66211** (hereinafter
(Surety Address)

referred to as Surety) a corporation organized and existing under the laws of the state of **KANSAS** and authorized to transact business as a surety insurer in the State of New York, is willing to act as surety on this Bond to comply with the requirement of Vehicle and Traffic Law Section 415(6-b); and

Whereas, Vehicle and Traffic Law Section 415(6-b) requires that every dealer, qualified dealer, and new motor vehicle dealer obtain and continue in effect a surety bond as a condition to obtaining a registration certificate;

Now therefore, Principal, as principal, and Surety, as surety, do hereby bind themselves and their heirs, executors, successors and assigns to the State of New York in a sum not to exceed the amount below, the payment for which the Principal and Surety bind themselves and their legal representatives, firmly by these presents, pursuant to Vehicle and Traffic Law Section 415(6-b) and subject to the following conditions.

**BOND AMOUNT:**
**Fifty Thousand***********\*\*\*** (Dollars)
**($50,000*********************)**

1.  The term of this Bond shall commence **February 28, 2000** and shall continue in full force and effect until terminated by sixty (60) days written notice of cancellation delivered to the New York State Commissioner of Motor Vehicles by the Surety.
2.  The Surety shall be required to provide sixty (60) days written notice to the New York State Commissioner of Motor Vehicles prior to the effective date of cancellation of the Bond by first class mail.
3.  The conditions of this Bond are that the Principal shall:
    (a) pay all valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles;
    (b) transfer good title to each motor vehicle which the Principal sells;
    (c) maintain and keep safe all customer deposits related to the sale of a motor vehicle from the time of receipt of such customer deposit until good title has been transferred to the customer;
    (d) pay all fines imposed upon the Principal by the Commissioner of Motor Vehicles pursuant to the provisions of the Vehicle and Traffic Law; and
    (e) repay any overcharges of a customer for vehicle registration and titling charges payable to the Commissioner of Motor Vehicles for registering and titling the sold vehicle.
4.  Recovery against this Bond may be made by a person, including the State, who obtains a judgment against the Principal for an act or omission on which the Bond is conditioned if the act or omission occurred during the term of the Bond. The total liability imposed on the Surety for all breaches of the Bond condition is limited to the face amount of the Bond. Such liability may include, but is not limited to, the amount of the valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles or the amount of the overcharge by the Principal or the deposit, as the case may be, for the motor vehicle for which good title was not delivered. In no event shall the Surety on a Bond be liable for total claims in excess of the bond amount, regardless of the number or nature of claims made against the bond or the number of years the bond remained in force.

In witness whereof, the Principal and Surety have hereunto set their hands and seals on this **7th** day of **February**
in the year of **2000**.

**Bombard Car Companies**, Princi
Print Name

By: _____
Signature

**Universal Underwriters Insurance Co.**, Surety
Print Name

By: _____
Signature

V5-3P (12/99)

New York State Department of Motor Vehicles

# OFFICIAL BUSINESS CERTIFICATE

THIS CERTIFICATE EXPIRES 04/30/10

FACILITY/IDENTIFICATION NO. 7058987

BOMBARD CAR CO INC
POBX8 1351 E GNSE RD
SKANEATEELES NY    13152

Validation Date and Number:    04/15/08    02339

This person is    REGISTERED AS A
NEW MOTOR VEHICLE DEALER
pursuant to the provisions of the Vehicle and Traffic Law.

This document does _not_ certify that this business complies with zoning and other local laws

POST IN A CONSPICUOUS PLACE

MV-61P (11/05)



N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS

162 WASHINGTON AVENU
ALBANY, NY 12231

### FILING RECEIPT

CORPORATION NAME: BOMBARD CAR CO., INC.

DOCUMENT TYPE   : INCORPORATION (DOM. BUSINESS)

COUNTY: ONON

SERVICE COMPANY : SERVICO

FILED: 04/30/1992   DURATION: PERPETUAL    CASH #: 920430000029   FILM #: 9204300000

ADDRESS FOR PROCESS
-------------------
THE CORPORATION
P.O. BOX 70
SYRACUSE, NY 13215

REGISTERED AGENT
----------------



STOCK:      200 NPV

| FILER | FEES | | PAYMENTS | 160.0 |
|---|---|---|---|---|
| PELLIGRA LAW FIRM | | 160.00 | | |
| 205 S. TOWNSEND STREET | FILING  : | 125.00 | CASH  : | 0.0 |
| | TAX     : | 10.00 | CHECK : | 0.0 |
| SYRACUSE, NY 13202 | CERT    : | 0.00 | BILLED: | 160.0 |
| | COPIES  : | 0.00 | | |
| | HANDLING: | 25.00 | | |
| | | | REFUND: | 0.0 |

DS-1025 (11/89)

## REVOLVING LINE OF CREDIT AGREEMENT

### I.

### THE PARTIES

This Revolving Line of Credit Agreement (the "Agreement") is made effective the _____ 2/11 day of _____ 2 _____, 2007, by and between GMAC, an entity organized under the laws of Delaware, with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265, and Bombard Car Co., Inc., a New York Corporation, with its principal place of business located at 1351 E.geneseo Street, Skaneateles, NY 13152 ("Borrower").

### II.

### THE RECITALS

A.    **WHEREAS, GMAC** is in the business of providing, among other things, various credit accommodations for use in assisting periodic cash flow needs and capital requirements; and

B.    **WHEREAS,** Borrower has requested, and GMAC is willing to provide credit and finance accommodations in the form of a discretionary revolving line of credit to assist Borrower with cash flow needs and capital requirements (the "Line of Credit"), but only in accordance with the terms and conditions of this Agreement.

### III.

### THE AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein contained, the sufficiency of which is hereby acknowledged, GMAC and Borrower hereby agree as follows:

1.    **The Line of Credit.**  Subject to all the terms and conditions of this Agreement, GMAC hereby establishes a discretionary revolving Line of Credit for the Borrower.  The limits and availability of the revolving Line of Credit may be determined by GMAC from time to time in its discretion and will be based upon, among other things, Borrower's financial condition and status, value of collateral pledged as security for the Line of Credit, and Borrower's performance of its obligations hereunder and under other agreements with GMAC.

(a)    **The Purpose.**  The Line of Credit may be used by the Borrower to assist Borrower in the periodic cash flow needs of its dealership or cash or capital needs of its related dealerships or its related business entities.

(b)    **Limitation and Availability.**  GMAC will notify Borrower at least monthly of the amounts available to Borrower hereunder.  Notification will be made by way of a monthly billing statement (the "Billing Statement"), although GMAC may in its discretion notify Borrower of changes in availability by e-mail or fax or verbally, in person or by phone, with a courtesy confirmation in writing.  Borrower may also obtain information regarding the amount of Borrower's account balance and the amount available to Borrower at GMAC's dealer loan

website located at the following URL: *www.gmacdealerloans.com* ("Website"). Borrower will not rely or cause a third party to rely on information contained in the Website or GMAC's telephonic access system. Borrower agrees that at no time will advances taken by Borrower under paragraph (c) below exceed the availability; provided, however, that if advances exceed availability for any reason, the excess amount will be deemed to be part of the Line of Credit for all intents and purposes under this Agreement. Unless Borrower notifies GMAC in writing of any objection to any monthly Billing Statement (specifically describing the basis of such objection) within thirty (30) days after the date thereof, the Billing Statement will (absent manifest error) be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein. Only those items expressly objected to in that notice will be deemed to be disputed by Borrower.

(c)    **Advances**.    Borrower may obtain advances (the "Credit Line Advances") available hereunder by:

   (i)    making a request in writing to the GMAC office that does business with Borrower; or,

   (ii)    using GMAC's electronic access systems. The procedures, restrictions and instructions regarding Borrower's use of the electronic access system, as modified from time to time, are posted on the Website (the "Account Terms of Access"). The procedures, restrictions and instructions regarding Borrower's use of GMAC's telephonic access system will be presented in separate instructional materials to Borrower before or contemporaneously with the availability of the system for the Borrower's use. If Borrower uses the electronic access systems, Borrower will be bound by and must comply with those Account Terms of Access and the terms, conditions and instructions set forth in the separate materials.

Credit Line Advances will be transferred by GMAC to Borrower's pre-designated account via Automated Clearing House ("ACH") deposit. Upon GMAC's request, Borrower will provide written confirmation to GMAC of any on-line request for a Credit Line Advance within five (5) calendar days.

(d)    **Repayment**.    In addition to any other amounts Borrower is obligated to pay GMAC as herein set forth, Borrower will promptly repay to GMAC the Credit Line Advances plus any accrued interest, as follows:

   (i)    **Mandatory Repayment of Credit Line Advances**. The following amounts must be paid at the time indicated:

      (A)    The principal and interest amounts, if any, indicated on a Billing Statement as may be sent to Borrower by GMAC, payable by the due date shown on such statement.

      (B)    That amount of the total Credit Line Advances which exceeds the availability set forth in the most current Billing Statement, or other means of notification provided by GMAC, payable immediately upon notice.

      (C)    If demanded, the full amount of the Credit Line Advances plus accrued interest must be paid immediately upon demand by GMAC.

    (ii)   **Permissive Payment**. The Credit Line Advances may be prepaid in whole or in part at the option of the Borrower and without premium or penalty.

    (iii)   **Principal Repayments Via ACH Withdrawal**. Principal repayments must be made by Borrower designating the amount to be repaid at the Website or GMAC's telephonic access system. The repayments will be withdrawn from Borrower's pre-designated account via Automated Clearing House ("ACH") withdrawal.

(e)   **Credit Line Availability Fee**. None.

(f)   **Interest**. The Credit Line Advances will bear interest on the principal amount of and from the date of each advance to the date of repayment in full of the Credit Line Advances. Only one interest rate will apply to the Credit Line Advances at any given time. The rate of interest on the Credit Line Advances will be 325 basis points (one basis point equals one hundredth of one percent) above the previous month's average of the 30-Day LIBOR rate (as hereinafter defined). Such previous month's average of the 30-Day LIBOR rate as of the date of this Agreement is Five and 35/100 percent (5.35%). Upon each subsequent increase or decrease in the previous month's average of the 30-Day LIBOR rate, the rate of interest will be increased or decreased by the same amount as the increase or decrease in the previous month's average of the 30-Day LIBOR rate, effective on the first day of the next monthly interest billing period. In no event will the applicable interest rate exceed the maximum permitted by law.

The rate of interest in effect as of the date of this Agreement and applicable to the first monthly billing hereunder is Eight and 60/100 percent (8.60%). The rate of interest applicable to any successive monthly billing period will be 325 basis points above the previous month's average of the 30-Day LIBOR rate applicable as of the billing date.

Interest is calculated on the basis of a 360-day year for the number of actual days outstanding. Interest will be billed by GMAC monthly as part of the Billing Statement and will be due and payable as instructed therein. In no event will the interest provided for herein exceed the maximum permitted by law, which the parties recognize may change from time to time. If acceleration or other events cause the interest contracted for, charged or received to be in excess of the lawful maximum, Borrower will receive credits so that the interest will comply with the law and in no event will the interest contracted for, charged or received exceed the legal maximum.

This rate will not be subject to any Wholesale Incentive Plan reductions, which may be currently applicable to other outstanding loans.

The 30-Day LIBOR rate is defined as follows: The per annum rate of interest offered for 30-day deposits in U.S. Dollars for each day of a billing period that appears on the Bloomberg Screen US0001M Index (British Banker's Association LIBOR setting) at approximately 11:00 a.m. London time, or a similar commercially reasonable source. The 30-day LIBOR rate applicable to any day on which no rate is published will be the rate last quoted prior to such day. The previous month's average LIBOR rate will be based on the 30-day LIBOR quotes for the calendar days beginning on the 26th of the month prior to the previous month and ending with the 25th of the previous month.

Notwithstanding the foregoing, for purposes of determining the previous month's average of the 30-Day LIBOR rate of interest under this Agreement, such rate will be considered 2.00% per annum if at any time during the previous month such rate was less than 2.00% per annum.

If the wholesale floorplan account(s) of Bombard Car Co., Inc. is (are) transferred to another financing source, GMAC may, at its option:

(i)    declare the loan balance due and payable,

(ii)   increase the rate of this loan to 400 basis points above the then current previous month's average of the 30-day LIBOR rate (as defined herein), or

(iii)  increase the rate of this loan to 400 basis points above the existing loan rate.

(g)    **Interest Payments**. Interest as shown on the monthly Billing Statement will be withdrawn by GMAC from Borrower's pre-designated account on the due date designated in the monthly Billing Statement or within five (5) days after the due date (at GMAC's discretion) via Automated Clearing House ("ACH") withdrawal. Borrower will maintain sufficient funds in the account to cover the ACH withdrawals for interest.

2.    **Security Interest and Collateral Assignment**. To secure:

(a)    the prompt and complete payment of the Credit Line Advances and

(b)    the payment and performance of any and all obligations and duties of Borrower of any and all other debts, obligations or duties of Borrower to GMAC now existing or hereafter arising, whether direct or indirect, absolute or contingent, or otherwise,

Borrower hereby pledges, assigns and grants to GMAC a security interest in the following property and assets (the "Collateral"):

inventory, equipment, fixtures, accounts receivable, contract rights, securities, cash, general intangibles, documents, instruments, chattel paper, investment property and commercial tort claims.

3.    **Handling of Collateral**. With respect to the Collateral, Borrower will:

(a)    maintain, secure and protect it from diminution in value; and

(b)    keep it free and clear of the claims, liens, mortgage, pledge, encumbrances, security interests and rights of all others; and

(c)    permit GMAC full and complete access to it in order to inventory, inspect and audit it, including review of Borrower's books and records pertaining thereto; and

(d) insure it against all risks in such amounts and with a carrier and deductibles acceptable to GMAC. Such insurance policy must name GMAC as loss payee, to the extent of its interests therein and must contain a cancellation provision conditioned upon thirty (30) days prior written notice to GMAC.

(e) have good and marketable title to all of it.

4. **Default**.

(a) **Terms of Default**. Occurrence of any of the following constitutes a default under this Agreement:

(i) a default by Borrower in the payment, performance or observance of any obligation or covenant under this Agreement, or under any other agreement now or hereafter entered into with GMAC;

(ii) the institution of a proceeding in bankruptcy, receivership or insolvency by or against Borrower or its property;

(iii) GMAC deems itself insecure based on knowledge of any event, occurrence, circumstance or fact not directly caused by GMAC, which in the reasonable judgment of GMAC will have a material adverse effect on the Collateral, or on the collection by GMAC under any guaranty of the obligations of Borrower hereunder or if any substantial portion of Collateral is in danger of misuse, loss, seizure or confiscation.

(b) **Borrower's Duties Upon Default**. Upon Borrower's default, Borrower must, if GMAC so requests, assemble Collateral and make it available to GMAC at a reasonable, convenient place designated by GMAC.

(c) **Rights and Remedies of GMAC**. Upon Borrower's default, GMAC has the right to exercise one or more of the following remedies:

(i) GMAC may take immediate possession of Collateral without demand or further notice and without legal process, and in so doing may enter upon the premises wherever Collateral may be and remove the same;

(ii) GMAC may institute proceedings to collect all or a portion of the Credit Line Advances, and any accrued or unpaid interest, and to recover a judgment for the same and to collect upon such judgment out of any property of the Borrower wherever situated;

(iii) GMAC may offset and apply any monies, credits or other proceeds of property of Borrower that has or may come into possession or under the control of GMAC against any amount owing by Borrower to GMAC;

(iv) GMAC may sell or lease the Collateral, or any portion thereof, after five days' written notice at public or private sale for the account of the Borrower;

(v) GMAC may demand return of all checks issued to Borrower.

5. **Rights and Remedies Not Waived**. No course of dealing between the Borrower and GMAC or any failure or delay on the part of GMAC in exercising any rights or remedies under this Agreement, or as provided by law, will operate as a waiver of any rights or remedies of GMAC and no single or partial exercise of any rights or remedies will operate as a waiver or preclude the exercise of any other rights or remedies.

6. **Limit of Liability**. GMAC will use its best efforts in handling the Automated Clearing House ("ACH") Credit Line Advance and ACH principal repayment and interest payment processes, but will not be liable to Borrower, except for acts or omissions by GMAC which constitute gross negligence or willful neglect. In no event will GMAC be liable for any delay in transmitting ACH Credit Line Advances or ACH principal repayments or interest payments due to equipment, communication or electronic failures or any other cause beyond GMAC's reasonable control. In any and all events, the liability of GMAC will not exceed an amount equal to the actual dollar amount of the processing entries which are the subject of the claim and there is no liability of GMAC for incidental, consequential or punitive damages.

7. **Termination**. This Agreement is effective until terminated upon the earlier of any event described in subparagraph 4(a) or thirty days after receipt of written notice of termination sent by either party to the other. All rights and remedies of GMAC or duties and obligations of Borrower extant upon termination of this Agreement continue in full force and effect until all obligations are paid in full.

8. **Suspension**. GMAC may, in its sole and absolute discretion, increase, decrease, change, or suspend its obligation to make Advances under the Line of Credit.

9. **Notice and Waivers**. The Borrower agrees, if this Agreement is placed in the hands of an attorney for collection, to pay all actual and reasonable legal fees whether incurred as a result of out-of-court resolution or a court action (including pre-trial, trial, and all appellate expenses), and to pay all costs of collection as permitted by law. The Borrower hereby waives notice of presentment, presentment, notice of dishonor, and demand. **The Borrower further waives the right to trial by jury as to any and all matters relating in any way to this Agreement to the extent permitted by law. The Borrower acknowledges that Borrower has consulted with counsel regarding this section and each and every other section of this Agreement.**

10. **Complete Agreement**. Except as otherwise provided or referred to herein, there are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement. No agreement between GMAC and Borrower which relates to matters covered herein, and no change in, addition to (except the filling in of blank lines), or erasure of any printed portion of this Agreement will be binding unless it is approved in a written agreement executed by a duly authorized representative of each party.

11. **Severability**. Any provision hereof prohibited by law will be ineffective to the extent of such prohibitions without invalidating the remaining provisions hereof.

12. **Governing Law**. This Agreement will be construed in accordance with and governed by the laws of the location of Borrower's principal place of business.

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by its duly authorized representative effective the date first above written.

| GMAC | Bombard Car Co., Inc. |
|---|---|
| | **("BORROWER")** |
| By: | By: |
| Its: | Its: |

CORPORATE RESOLUTION OF
Bombard Car Co., Inc.
_____2/1_____, 2007

I, the undersigned Secretary of Bombard Car Co., Inc., a Corporation organized and existing under the laws of the State of New York, do hereby certify that at a meeting of the Board of Directors of said Corporation, duly held on ___2/1___, 2007, a quorum being present, the following resolutions, affirmations and ratifications are made in accordance with the by-laws, and have been entered upon the regular minute book of said Corporation and are now in full force and effect to-wit:

WHEREAS, this Corporation has entered into and/or desires to enter into one or more commercial and/or retail finance agreements with GMAC whereby GMAC agrees, at its sole discretion, to extend credit and/or grant loans and other financial accommodations to this Corporation, (the "Loan Documents"); and

WHEREAS, in accordance with these Loan Documents, this Corporation assumes certain obligations to GMAC;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors affirms and ratifies the terms and provisions of said Loan Documents and further affirms that _Pat Bombard_ is authorized to sign any and all Loan Documents and other documents necessary or required by GMAC in connection with any extension of credit and/or grant of loans and other financial accommodations.

RESOLVED FURTHER, that _Pat Bombard_ is authorized and empowered from time to time to do and perform all such other acts and things deemed by him/her necessary, convenient, or proper to carry out, modify or supplement any such agreements and arrangements made with GMAC pursuant to said Loan Documents and other documents.

0
0
0
0
0
0
0
1
5

_____
Secretary

_____2/1_____, 2007

10/11/2016

To Lynn Howard    fax
[ 313-667-
5461

from Pat Borland

per our understanding
for my Chevrolet Start

Thank you Pat    10/11/2016

Please review and hand
deliv to Det Colbar
Cover sheet
45 pages

10/11/2016

**NADA Retirement Trust**
P.O. BOX 9200
McLEAN, VIRGINIA 22102-0200

PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

PREMATURE DISTRIBUTION
CHECK:      818147
DATE:       03/18/2010
AMOUNT:     $31,093.04
PLAN ID:    304766
SSN:        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

KeyBank

IN ADDITIC...                          ...BLE PORTION OF THIS DISTRIBUTION,
YOU MAY ...                            ...(10) PERCENT FEDERAL EXCISE TAX
FOR "EARI...                           ...CLUDED IN THIS PAYMENT.

SEE THE F...                           ...PORT AND 1099R INSTRUCTIONS
FOR ADD'...

32 Jordan St
Skaneateles, N...
Tel: 1-800-...

03/30/2010                09:52 AM
Teller: PERNIJE                CC #000157...
                               Seq #00...

Deposit Checking/Money Market
Acct # ***** 2439
Checks              $
                    $            31,093.04
                                 31,093.04

The proceeds for which this receipt is issued is
subject to the rules, regulations and practices of...
...force at the time of this transaction. Please...
...this receipt until verified with your statement
of account.

Welcome to KeyBank!

## Form 1099-R

| | |
|---|---|
| 1 Gross distribution | 38,866.30 |
| 2b Taxable amount not determined | |
| Account number (optional) | |

PAYER'S name, street...
NATIONAL A...
RETIREMEN...
PO BOX 920...
McLEAN, VA

PAYER'S Federal Iden...
51-0210613

RECIPIENT'S name...
PAT J BON...
PO BOX 8
SKANEAT...

| 3 Capital gain (incl... in box 2a) | |
|---|---|
| 6 Net unrealized a... in employer's s... | |

| 9a Your percentage of total distribution | 9b Total employe... |
|---|---|
| 100.00 | |

| 10 State tax withheld | 11 State/Payer's state no. | 12 State distribution |
|---|---|---|
| | | |
| 13 Local tax withheld | 14 Name of locality | 15 Local distribution |
| | | |

**Copy C For Recipient's Records**
(keep for your records)
This information is being furnished to the Internal Revenue Service.

Department of the Treasury
Internal Revenue Service

## Form 1099-R    CORRECTED (if checked)   OMB No. 1545-0119    2010

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

| 1 Gross distribution | 2a Taxable amount |
|---|---|
| 38,866.30 | 38,866.30 |
| 2b Taxable amount not determined | Total distribution X |
| Account number (optional) | 1st year of desig. Roth contrib. |

PAYER'S name, street address, city, state, and ZIP code
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
RETIREMENT TRUST / CARDINAL BANK AS TRUSTEE
PO BOX 9200
McLEAN, VA 22102-0200

| PAYER'S Federal identification number | RECIPIENT'S identification number |
|---|---|
| 51-0210613 | 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 |

RECIPIENT'S name, street address, city, state, and ZIP code
PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

| 3 Capital gain (included in box 2a) | 4 Federal income tax withheld | 5 Employee contributions or insurance premiums |
|---|---|---|
| | 7,773.26 | |
| 6 Net unrealized appreciation in employer's securities | 7 Distribution code | IRA/SEP/SIMPLE | 8 Other | % |
| | 1 | | | |

| 9a Your percentage of total distribution | 9b Total employee contributions |
|---|---|
| 100.00 | |

| 10 State tax withheld | 11 State/Payer's state no. | 12 State distribution |
|---|---|---|
| | | |
| 13 Local tax withheld | 14 Name of locality | 15 Local distribution |
| | | |

**Copy B** If this form shows Federal income tax withheld in Box 4, attach this copy to your Federal tax return.

Department of the Treasury
Internal Revenue Service

From:Christi Quesada-Berry  FaxID:

## NEW YORK STATE INSURANCE IDENTIFICATION CARD

375  UTICA NATIONAL ASSURANCE CO.

Name & Address of Issuer  **DELMONICO INSURANCE AGENCY**
**1391 EAST GENESEE STREET**
**SKANEATELES  NY  13152**

An authorized NEW YORK insurer has issued an Owner's Policy of
Liability insurance complying with Article 6 (Motor Vehicle Financial
Security Act) of the NEW YORK Vehicle and Traffic Law to:

BOMBARD;CAR
COMPANIES;INC
1351 E GENESEE ST
SKANEATELES  NY 13152

**Policy Number**
**CPP4093638**

| Effective Date | Expiration Date |
|---|---|
| **01/01/2009** | **01/01/2010** |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration
after 45 days from effective date.)
Applicable with respect to the following
Motor Vehicle:

| Year | Make |
|---|---|
| | DEALER GARAGE AUTO LIABIL |

Vehicle Identification Number

THIS ID CARD MUST BE CARRIED
IN THE INSURED VEHICLE FOR
PRODUCTION UPON DEMAND

WARNING: Any person who issues
or produces an ID card knowing that
an Owner's Policy of insurance is not in
effect may be committing a misdemeanor.
In addition, a person who presents
an ID card if insurance is not in
effect may be committing a
misdemeanor.

The name of the registrant and the
name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION:
DMV WILL ONLY PROCESS A VEHICLE
CHANGE (RE-REGISTRATION) USING
THE REPLACED VEHICLE'S CURRENT
REGISTRATION.

FS-20



## NEW YORK STATE INSURANCE IDENTIFICATION CARD

375  UTICA NATIONAL ASSURANCE CO.

Name & Address of Issuer  **DELMONICO INSURANCE AGENCY**
**1391 EAST GENESEE STREET**
**SKANEATELES  NY  13152**

An authorized NEW YORK insurer has issued an Owner's Policy of
Liability insurance complying with Article 6 (Motor Vehicle Financial
Security Act) of the NEW YORK Vehicle and Traffic Law to:

BOMBARD;CAR
COMPANIES;INC
1351 E GENESEE ST
SKANEATELES  NY 13152

**Policy Number**
**CPP4093638**

| Effective Date | Expiration Date |
|---|---|
| **01/01/2009** | **01/01/2010** |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration
after 45 days from effective date.)
Applicable with respect to the following
Motor Vehicle:

| Year | Make |
|---|---|
| | DEALER GARAGE AUTO LIABIL |

Vehicle Identification Number

THIS ID CARD MUST BE CARRIED
IN THE INSURED VEHICLE FOR
PRODUCTION UPON DEMAND

WARNING: Any person who issues
or produces an ID card knowing that
an Owner's Policy of insurance is not in
effect may be committing a misdemeanor.
In addition, a person who presents
an ID card if insurance is not in
effect may be committing a
misdemeanor.

The name of the registrant and the
name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION:
DMV WILL ONLY PROCESS A VEHICLE
CHANGE (RE-REGISTRATION) USING
THE REPLACED VEHICLE'S CURRENT
REGISTRATION.

FS-20



FAX: Scanable Bar Code



FAX INSTRUCTIONS:

1. The entire page must be faxed.

2. If submitted to DMV, either the entire page or the second
ID card and large scanable bar code will be retained

3. A faxed ID card must be replaced with a scanable
ID card within 14 days of the effective date.

4. DMV will not accept a faxed ID card without a
scanable barcode




# DEALER BOND UNDER NEW YORK STATE
# VEHICLE AND TRAFFIC LAW SECTION 415(6-B)

FACILITY NUMBER:_____

BOND NUMBER: 1194

**KNOW ALL PERSONS BY THESE PRESENTS:**

Whereas, the undersigned **Bombard Car Companies** PO Box 8 ,of **Skaneateles, NY 13152**
(Dealer Name)                                          (Full Dealer Address)

hereinafter referred to as Principal) has applied or is about to make application for a registration certificate as a dealer, qualified dealer or new
motor vehicle dealer pursuant to New York Vehicle and Traffic Law Section 415; and

Whereas, the undersigned **Universal Underwriters Ins.Co.** 7045 College Blvd. Overland Park, KS 66211 (hereinafter
(Surety Name)               of          (Surety Address)

referred to as Surety) a corporation organized and existing under the laws of the state of ____**KANSAS**_____ and authorized to
transact business as a surety insurer in the State of New York, is willing to act as surety on this Bond to comply with the requirement of
Vehicle and Traffic Law Section 415(6-b); and

Whereas, Vehicle and Traffic Law Section 415(6-b) requires that every dealer, qualified dealer, and new motor vehicle dealer obtain and
continue in effect a surety bond as a condition to obtaining a registration certificate;

Now therefore, Principal, as principal, and Surety, as surety, do hereby bind themselves and their heirs, executors, successors and assigns to
the State of New York in a sum not to exceed the amount below, the payment for which the Principal and Surety bind themselves and their
legal representatives, firmly by these presents, pursuant to Vehicle and Traffic Law Section 415(6-b) and subject to the following conditions.

> **BOND AMOUNT:**
> **Fifty Thousand**\*\*\*\*\*\*\*\*\*\*(Dollars)
> (\$ 50,000\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* )

1.  The term of this Bond shall commence **February 28, 2000** and shall continue in full force and effect until terminated by sixty (60) days
written notice of cancellation delivered to the New York State Commissioner of Motor Vehicles by the Surety.
2.  The Surety shall be required to provide sixty (60) days written notice to the New York State Commissioner of Motor Vehicles prior to the
effective date of cancellation of the Bond by first class mail.
3.  The conditions of this Bond are that the Principal shall:
    (a) pay all valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles;
    (b) transfer good title to each motor vehicle which the Principal sells;
    (c) maintain and keep safe all customer deposits related to the sale of a motor vehicle from the time of receipt of such customer deposit
    until good title has been transferred to the customer;
    (d) pay all fines imposed upon the Principal by the Commissioner of Motor Vehicles pursuant to the provisions of the Vehicle and Traffic
    Law; and
    (e) repay any overcharges of a customer for vehicle registration and titling charges payable to the Commissioner of Motor Vehicles for
    registering and titling the sold vehicle.
4.  Recovery against this Bond may be made by a person, including the State, who obtains a judgment against the Principal for an act or
omission on which the Bond is conditioned if the act or omission occurred during the term of the Bond. The total liability imposed on the
Surety for all breaches of the Bond condition is limited to the face amount of the Bond. Such liability may include, but is not limited to the
amount of the valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles or the amount of the overcharge
by the Principal or the deposit, as the case may be, for the motor vehicle for which good title was not delivered. In no event shall the Surety on
a Bond be liable for total claims in excess of the bond amount, regardless of the number or nature of claims made against the bond or the
number of years the bond remained in force.

In witness whereof, the Principal and Surety have hereunto set their hands and seals on this ___7th___ day of __February__
in the year of __2000__ .

**Bombard Car Companies** , Principal
Print Name

By:_____
Signature

**Universal Underwriters Insurance Co.** , Surety
Print Name

By:_____
Signature

V5-3P (12/99)





New York State Department of Motor Vehicles

# OFFICIAL BUSINESS CERTIFICATE

THIS CERTIFICATE EXPIRES 04/30/10

FACILITY/IDENTIFICATION NO.    7058987

BOMBARD CAR CO INC
POBX8 1351 E GNSE RD
SKANEATELES NY     13152

Validation Date and Number:    04/15/08     02339

This person is  REGISTERED AS A
NEW MOTOR VEHICLE DEALER
pursuant to the provisions of the Vehicle and Traffic Law.

This document does not certify that this business complies with zoning and other local laws

**POST IN A CONSPICUOUS PLACE**

MV-01P (11/97)



N. Y. S. DEPARTMENT OF STATE
DIVISION OF CORPORATIONS AND STATE RECORDS

162 WASHINGTON AVENU
ALBANY, NY 12231

## FILING RECEIPT

CORPORATION NAME: BOMBARD CAR CO., INC.

DOCUMENT TYPE   : INCORPORATION (DOM. BUSINESS)

COUNTY: ONON

SERVICE COMPANY : SERVICO

FILED: 04/30/1992  DURATION: PERPETUAL   CASH #: 920430000029   FILM #: 92043000002

ADDRESS FOR PROCESS
-------------------
THE CORPORATION
P.O. BOX 70
SYRACUSE, NY 13215

REGISTERED AGENT
-------------------



STOCK:      200 NPV

| FILER | | FEES | 160.00 | PAYMENTS | 160.0 |
|---|---|---|---|---|---|
| PELLIGRA LAW FIRM | | | | | |
| 205 S. TOWNSEND STREET | | FILING : | 125.00 | CASH : | 0.0 |
| | | TAX : | 10.00 | CHECK : | 0.0 |
| SYRACUSE, NY 13202 | | CERT : | 0.00 | BILLED: | 160.0 |
| | | COPIES : | 0.00 | | |
| | | HANDLING: | 25.00 | | |
| | | | | REFUND: | 0.0 |

JS-1025 (11/89)

## REVOLVING LINE OF CREDIT AGREEMENT

### I.

### THE PARTIES

This Revolving Line of Credit Agreement (the "Agreement") is made effective the _2/1_ day of ___2___, 2007, by and between GMAC, an entity organized under the laws of Delaware, with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265, and Bombard Car Co., Inc., a New York Corporation, with its principal place of business located at 1351 E.genesee Street, Skaneateles, NY 13152 ("Borrower").

### II.

### THE RECITALS

A.    **WHEREAS, GMAC** is in the business of providing, among other things, various credit accommodations for use in assisting periodic cash flow needs and capital requirements; and

B.    **WHEREAS,** Borrower has requested, and GMAC is willing to provide credit and finance accommodations in the form of a discretionary revolving line of credit to assist Borrower with cash flow needs and capital requirements (the "Line of Credit"), but only in accordance with the terms and conditions of this Agreement.

### III.

### THE AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein contained, the sufficiency of which is hereby acknowledged, GMAC and Borrower hereby agree as follows:

1.    **The Line of Credit.**    Subject to all the terms and conditions of this Agreement, GMAC hereby establishes a discretionary revolving Line of Credit for the Borrower. The limits and availability of the revolving Line of Credit may be determined by GMAC from time to time in its discretion and will be based upon, among other things, Borrower's financial condition and status, value of collateral pledged as security for the Line of Credit, and Borrower's performance of its obligations hereunder and under other agreements with GMAC.

    (a)    **The Purpose.**    The Line of Credit may be used by the Borrower to assist Borrower in the periodic cash flow needs of its dealership or cash or capital needs of its related dealerships or its related business entities.

    (b)    **Limitation and Availability.**    GMAC will notify Borrower at least monthly of the amounts available to Borrower hereunder. Notification will be made by way of a monthly billing statement (the "Billing Statement"), although GMAC may in its discretion notify Borrower of changes in availability by e-mail or fax or verbally, in person or by phone, with a courtesy confirmation in writing. Borrower may also obtain information regarding the amount of Borrower's account balance and the amount available to Borrower at GMAC's dealer loan

website located at the following URL: *www.gmacdealerloans.com* ("Website"). Borrower will not rely or cause a third party to rely on information contained in the Website or GMAC's telephonic access system. Borrower agrees that at no time will advances taken by Borrower under paragraph (c) below exceed the availability; provided, however, that if advances exceed availability for any reason, the excess amount will be deemed to be part of the Line of Credit for all intents and purposes under this Agreement. Unless Borrower notifies GMAC in writing of any objection to any monthly Billing Statement (specifically describing the basis of such objection) within thirty (30) days after the date thereof, the Billing Statement will (absent manifest error) be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein. Only those items expressly objected to in that notice will be deemed to be disputed by Borrower.

(c) **Advances**. Borrower may obtain advances (the "Credit Line Advances") available hereunder by:

(i) making a request in writing to the GMAC office that does business with Borrower; or,

(ii) using GMAC's electronic access systems. The procedures, restrictions and instructions regarding Borrower's use of the electronic access system, as modified from time to time, are posted on the Website (the "Account Terms of Access"). The procedures, restrictions and instructions regarding Borrower's use of GMAC's telephonic access system will be presented in separate instructional materials to Borrower before or contemporaneously with the availability of the system for the Borrower's use. If Borrower uses the electronic access systems, Borrower will be bound by and must comply with those Account Terms of Access and the terms, conditions and instructions set forth in the separate materials.

Credit Line Advances will be transferred by GMAC to Borrower's pre-designated account via Automated Clearing House ("ACH") deposit. Upon GMAC's request, Borrower will provide written confirmation to GMAC of any on-line request for a Credit Line Advance within five (5) calendar days.

(d) **Repayment**. In addition to any other amounts Borrower is obligated to pay GMAC as herein set forth, Borrower will promptly repay to GMAC the Credit Line Advances plus any accrued interest, as follows:

(i) **Mandatory Repayment of Credit Line Advances**. The following amounts must be paid at the time indicated:

(A) The principal and interest amounts, if any, indicated on a Billing Statement as may be sent to Borrower by GMAC, payable by the due date shown on such statement.

(B) That amount of the total Credit Line Advances which exceeds the availability set forth in the most current Billing Statement, or other means of notification provided by GMAC, payable immediately upon notice.

(C) If demanded, the full amount of the Credit Line Advances plus accrued interest must be paid immediately upon demand by GMAC.

GMAC Form ERLC-L1
(5/06)                              -2-

(ii) **Permissive Payment**. The Credit Line Advances may be prepaid in whole or in part at the option of the Borrower and without premium or penalty.

(iii) **Principal Repayments Via ACH Withdrawal**. Principal repayments must be made by Borrower designating the amount to be repaid at the Website or GMAC's telephonic access system. The repayments will be withdrawn from Borrower's pre-designated account via Automated Clearing House ("ACH") withdrawal.

(e) **Credit Line Availability Fee**. None.

(f) **Interest**. The Credit Line Advances will bear interest on the principal amount of and from the date of each advance to the date of repayment in full of the Credit Line Advances. Only one interest rate will apply to the Credit Line Advances at any given time. The rate of interest on the Credit Line Advances will be 325 basis points (one basis point equals one hundredth of one percent) above the previous month's average of the 30-Day LIBOR rate (as hereinafter defined). Such previous month's average of the 30-Day LIBOR rate as of the date of this Agreement is Five and 35/100 percent (5.35%). Upon each subsequent increase or decrease in the previous month's average of the 30-Day LIBOR rate, the rate of interest will be increased or decreased by the same amount as the increase or decrease in the previous month's average of the 30-Day LIBOR rate, effective on the first day of the next monthly interest billing period. In no event will the applicable interest rate exceed the maximum permitted by law.

The rate of interest in effect as of the date of this Agreement and applicable to the first monthly billing hereunder is Eight and 60/100 percent (8.60%). The rate of interest applicable to any successive monthly billing period will be 325 basis points above the previous month's average of the 30-Day LIBOR rate applicable as of the billing date.

Interest is calculated on the basis of a 360-day year for the number of actual days outstanding. Interest will be billed by GMAC monthly as part of the Billing Statement and will be due and payable as instructed therein. In no event will the interest provided for herein exceed the maximum permitted by law, which the parties recognize may change from time to time. If acceleration or other events cause the interest contracted for, charged or received to be in excess of the lawful maximum, Borrower will receive credits so that the interest will comply with the law and in no event will the interest contracted for, charged or received exceed the legal maximum.

This rate will not be subject to any Wholesale Incentive Plan reductions, which may be currently applicable to other outstanding loans.

The 30-Day LIBOR rate is defined as follows: The per annum rate of interest offered for 30-day deposits in U.S. Dollars for each day of a billing period that appears on the Bloomberg Screen US0001M Index (British Banker's Association LIBOR setting) at approximately 11:00 a.m. London time, or a similar commercially reasonable source. The 30-day LIBOR rate applicable to any day on which no rate is published will be the rate last quoted prior to such day. The previous month's average LIBOR rate will be based on the 30-day LIBOR quotes for the calendar days beginning on the 26th of the month prior to the previous month and ending with the 25th of the previous month.

Notwithstanding the foregoing, for purposes of determining the previous month's average of the 30-Day LIBOR rate of interest under this Agreement, such rate will be considered 2.00% per annum if at any time during the previous month such rate was less than 2.00% per annum.

If the wholesale floorplan account(s) of Bombard Car Co., Inc. is (are) transferred to another financing source, GMAC may, at its option:

(i)    declare the loan balance due and payable,

(ii)    increase the rate of this loan to 400 basis points above the then current previous month's average of the 30-day LIBOR rate (as defined herein), or

(iii)    increase the rate of this loan to 400 basis points above the existing loan rate.

(g)    **Interest Payments**.  Interest as shown on the monthly Billing Statement will be withdrawn by GMAC from Borrower's pre-designated account on the due date designated in the monthly Billing Statement or within five (5) days after the due date (at GMAC's discretion) via Automated Clearing House ("ACH") withdrawal.  Borrower will maintain sufficient funds in the account to cover the ACH withdrawals for interest.

2.    **Security Interest and Collateral Assignment**.  To secure:

(a)    the prompt and complete payment of the Credit Line Advances and

(b)    the payment and performance of any and all obligations and duties of Borrower of any and all other debts, obligations or duties of Borrower to GMAC now existing or hereafter arising, whether direct or indirect, absolute or contingent, or otherwise,

Borrower hereby pledges, assigns and grants to GMAC a security interest in the following property and assets (the "Collateral"):

inventory, equipment, fixtures, accounts receivable, contract rights, securities, cash, general intangibles, documents, instruments, chattel paper, investment property and commercial tort claims.

3.    **Handling of Collateral**.  With respect to the Collateral, Borrower will:

(a)    maintain, secure and protect it from diminution in value; and

(b)    keep it free and clear of the claims, liens, mortgage, pledge, encumbrances, security interests and rights of all others; and

(c)    permit GMAC full and complete access to it in order to inventory, inspect and audit it, including review of Borrower's books and records pertaining thereto; and

(d) insure it against all risks in such amounts and with a carrier and deductibles acceptable to GMAC. Such insurance policy must name GMAC as loss payee, to the extent of its interests therein and must contain a cancellation provision conditioned upon thirty (30) days prior written notice to GMAC.

(e) have good and marketable title to all of it.

4. **Default**.

(a) **Terms of Default**. Occurrence of any of the following constitutes a default under this Agreement:

(i) a default by Borrower in the payment, performance or observance of any obligation or covenant under this Agreement, or under any other agreement now or hereafter entered into with GMAC;

(ii) the institution of a proceeding in bankruptcy, receivership or insolvency by or against Borrower or its property;

(iii) GMAC deems itself insecure based on knowledge of any event, occurrence, circumstance or fact not directly caused by GMAC, which in the reasonable judgment of GMAC will have a material adverse effect on the Collateral, or on the collection by GMAC under any guaranty of the obligations of Borrower hereunder or if any substantial portion of Collateral is in danger of misuse, loss, seizure or confiscation.

(b) **Borrower's Duties Upon Default**. Upon Borrower's default, Borrower must, if GMAC so requests, assemble Collateral and make it available to GMAC at a reasonable, convenient place designated by GMAC.

(c) **Rights and Remedies of GMAC**. Upon Borrower's default, GMAC has the right to exercise one or more of the following remedies:

(i) GMAC may take immediate possession of Collateral without demand or further notice and without legal process, and in so doing may enter upon the premises wherever Collateral may be and remove the same;

(ii) GMAC may institute proceedings to collect all or a portion of the Credit Line Advances, and any accrued or unpaid interest, and to recover a judgment for the same and to collect upon such judgment out of any property of the Borrower wherever situated;

(iii) GMAC may offset and apply any monies, credits or other proceeds of property of Borrower that has or may come into possession or under the control of GMAC against any amount owing by Borrower to GMAC;

(iv) GMAC may sell or lease the Collateral, or any portion thereof, after five days' written notice at public or private sale for the account of the Borrower;

(v) GMAC may demand return of all checks issued to Borrower.

5. **Rights and Remedies Not Waived**. No course of dealing between the Borrower and GMAC or any failure or delay on the part of GMAC in exercising any rights or remedies under this Agreement, or as provided by law, will operate as a waiver of any rights or remedies of GMAC and no single or partial exercise of any rights or remedies will operate as a waiver or preclude the exercise of any other rights or remedies.

6. **Limit of Liability**. GMAC will use its best efforts in handling the Automated Clearing House ("ACH") Credit Line Advance and ACH principal repayment and interest payment processes, but will not be liable to Borrower, except for acts or omissions by GMAC which constitute gross negligence or willful neglect. In no event will GMAC be liable for any delay in transmitting ACH Credit Line Advances or ACH principal repayments or interest payments due to equipment, communication or electronic failures or any other cause beyond GMAC's reasonable control. In any and all events, the liability of GMAC will not exceed an amount equal to the actual dollar amount of the processing entries which are the subject of the claim and there is no liability of GMAC for incidental, consequential or punitive damages.

7. **Termination**. This Agreement is effective until terminated upon the earlier of any event described in subparagraph 4(a) or thirty days after receipt of written notice of termination sent by either party to the other. All rights and remedies of GMAC or duties and obligations of Borrower extant upon termination of this Agreement continue in full force and effect until all obligations are paid in full.

8. **Suspension**. GMAC may, in its sole and absolute discretion, increase, decrease, change, or suspend its obligation to make Advances under the Line of Credit.

9. **Notice and Waivers**. The Borrower agrees, if this Agreement is placed in the hands of an attorney for collection, to pay all actual and reasonable legal fees whether incurred as a result of out-of-court resolution or a court action (including pre-trial, trial, and all appellate expenses), and to pay all costs of collection as permitted by law. The Borrower hereby waives notice of presentment, presentment, notice of dishonor, and demand. **The Borrower further waives the right to trial by jury as to any and all matters relating in any way to this Agreement to the extent permitted by law. The Borrower acknowledges that Borrower has consulted with counsel regarding this section and each and every other section of this Agreement.**

10. **Complete Agreement**. Except as otherwise provided or referred to herein, there are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement. No agreement between GMAC and Borrower which relates to matters covered herein, and no change in, addition to (except the filling in of blank lines), or erasure of any printed portion of this Agreement will be binding unless it is approved in a written agreement executed by a duly authorized representative of each party.

11. **Severability**. Any provision hereof prohibited by law will be ineffective to the extent of such prohibitions without invalidating the remaining provisions hereof.

12. **Governing Law**. This Agreement will be construed in accordance with and governed by the laws of the location of Borrower's principal place of business.

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by its duly authorized representative effective the date first above written.

**GMAC**

By: _____

Its: _____

**Bombard Car Co., Inc.**
**("BORROWER")**

By: _____

Its: _____

-7-

000000013

J

CORPORATE RESOLUTION OF
Bombard Car Co., Inc.
_____2/1_____, 2007

I, the undersigned Secretary of Bombard Car Co., Inc., a Corporation organized and existing under the laws of the State of New York, do hereby certify that at a meeting of the Board of Directors of said Corporation, duly held on _____2/1_____, 2007, a quorum being present, the following resolutions, affirmations and ratifications are made in accordance with the by-laws, and have been entered upon the regular minute book of said Corporation and are now in full force and effect to-wit:

WHEREAS, this Corporation has entered into and/or desires to enter into one or more commercial and/or retail finance agreements with GMAC whereby GMAC agrees, at its sole discretion, to extend credit and/or grant loans and other financial accommodations to this Corporation, (the "Loan Documents"); and

WHEREAS, in accordance with these Loan Documents, this Corporation assumes certain obligations to GMAC;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors affirms and ratifies the terms and provisions of said Loan Documents and further affirms that *Pat Bombard* is authorized to sign any and all Loan Documents and other documents necessary or required by GMAC in connection with any extension of credit and/or grant of loans and other financial accommodations.

RESOLVED FURTHER, that *Pat Bombard* is authorized and empowered from time to time to do and perform all such other acts and things deemed by him/her necessary, convenient, or proper to carry out, modify or supplement any such agreements and arrangements made with GMAC pursuant to said Loan Documents and other documents.

_____          _____2/1_____, 2007
              Secretary

K

10/11/2016

To Lynn Howard      for
313-667-
5461

from Pat Bonturi

per our understanding.
for My Chevrolet Start

Thank you Pat
10/11/2016

Please review and hand
deling to Sed Collmi
Cover ploo
45 pages

Thanks
10/11/2016

L

*The*
# GUY LAW FIRM *PLLC*

October 16, 2017

Deborah F. Collins, Esq.
Counsel GM Legal Staff
300 Renaissance Center
Detroit, Michigan 48265

**Re: Notice Pursuant to NYS Vehicle and Traffic Law 471-a**

Dear Deb

Pursuant to Section 471-a of the NYS Vehicle and Traffic Law, I am writing on behalf of my client, Pat Bombard, to formally request mediation of the dispute that you have maintained against his demand for renewal of his Franchise Agreement with GM.

As you have not responded to my repeated requests that you agree to terms for mediation, I will rely on the procedure set in Section 471-a to request your response within seven days.

Thereafter, we will proceed with a request under Section 471-b of the NYS Vehicle and Traffic Law to have the Commissioner of the Department of Motor Vehicles adjudicate your dispute of our franchise rights.

Sincerely,

Frederick R. Guy, Esq.

**3596 PLEASANT VALLEY RD, SYRACUSE, NEW YORK 13215**
*Phone:* 315.314.7461 * *Fax:* 315.254.2126 * rickguy7@gmail.com * www.rickguy.com

## VSSM - TRIAL BALANCE EDIT APPLICATION v149r1

115202 - 200010 - PAGE I

| LN NO | Input Method / Dealer System Provider | | | LN NO |
|---|---|---|---|---|
| 1 | Reynolds & Reynolds - ERA | GM FACTS | The information in this report is supplied by Dealer and Dealer is solely responsible for the accuracy of the data contained in this report. GM disclaims responsibility for the accuracy of data. | 1 |
| 2 | DEALER "BAC" CODE | | | 2 |
| 3 | 115202 | DEALER NAME  BOMBARD CAR CO., INC. | | 3 |
| 4 | FROM  January  1  2008 | ADDRESS  1351 EAST GENESEE STREET | | 4 |
| 5 | THRU  October  31  2008 | CITY & STATE  SKANEATELES  NY  13152-8888 | | 5 |

| LN | ASSETS | NO. | AMOUNT | | LIABILITIES | NO. | AMOUNT | LN |
|---|---|---|---|---|---|---|---|---|
| 6 | | | | | | | | 6 |
| 7 | C  CASH ON HAND | 200 | 310 | | CASH IN BANK CREDIT BALANCE | 202 | 0 | 7 |
| 8 | A  CASH IN BANK | 202 | 23,055 | C | ACCTS PAYABLE-TRADE CREDITORS | 300 | 134,200 | 8 |
| 9 | S  CONTRACTS IN TRANSIT | 205 | 0 | | ACC. RECEIVABLE CREDIT BAL. | 220 | 937 | 9 |
| 10 | H  SECURITIES | 280 | 0 | | CUSTOMER DEPOSITS | 220 | 25,823 | 10 |
| 11 | C | | | | WARRANTY CLAIMS ADVANCE | 305 | 0 | 11 |
| 12 | TOTAL CASH AND CONTRACTS | | 24,265 | | NOTES PAYABLE-NEW VEH.&DEMOS | 310 | 1,335,781 | 12 |
| 13 | U  NET CUSTOMER RECEIVABLES | FACM PGT | 900,666 | | MEMO: DELAYED PAYMENT-ACCT. 310 | | | 13 |
| 14 | R  FACTORY RECEIVABLES | 281 | 7,740 | | $ 0 | | | 14 |
| 15 | E  DUE FROM FINANCE COMPANIES | 282 | 1,053 | N | NOTES PAYABLE-USED VEHICLES | 311 | 333,758 | 15 |
| 16 | C  WARRANTY CLAIMS | 283 | 3,313 | O | NOTES PAYABLE-LEASE & RENTAL UNITS | 312 | 0 | 16 |
| 17 | E  INS. COMMISSIONS RECEIVABLE | 284 | 0 | T | NOTES PAYABLE-OTHER | 314 | 140,013 | 17 |
| 18 | | | | E | | | | 18 |
| 19 | TOTAL RECEIVABLES | | 912,772 | | INTEREST PAYABLE | 320 | 0 | 19 |
| 20 | DEMONSTRATORS | 0 | 230 | 0 | SALARIES, WAGES & COMM. PAYABLE | 321 | 4,173 | 20 |
| 21 | N  I  NEW CARS | 31 | 241 | 689,661 | INSURANCE PAYABLE | 322 | 0 | 21 |
| 22 | N  NEW TRUCKS | 20 | 237 | 605,033 | PAYROLL TAXES PAYABLE | 323 | 0 | 22 |
| 23 | T  V  NEW MD TRUCKS | 0 | 235 | 0 | SALES TAXES PAYABLE | 324 | 14,419 | 23 |
| 24 | E  OTHER AUTOMOTIVE | | 238 | 0 | OTHER TAXES PAYABLE | 325 | 0 | 24 |
| 25 | N  USED CARS | 20 | 240 | 204,006 | INCOME TAXES PAYABLE | 327 | 0 | 25 |
| 26 | T  USED TRUCKS | 24 | 241 | 301,926 | EMPLOYEE'S INCENTIVES/BONUSES PAYABLE | 328 | 0 | 26 |
| 27 | O  PARTS AND ACCESSORIES | | 242 | 60,000 | OWNER'S BONUSES PAYABLE | 329 | 0 | 27 |
| 28 | R  TIRES | | 243 | 0 | RETIREMENT BENEFITS PAYABLE | 330 | 0 | 28 |
| 29 | S  I  GAS, OIL AND GREASE | | 244 | 1,835 | OTHER PAYABLES | 331 | 39,431 | 29 |
| 30 | E  PAINT AND BODY SHOP MATERIALS | | 245 | 0 | | | | 30 |
| 31 | S  SUBLET REPAIRS | | 246 | 0 | TOTAL CURRENT LIABILITIES | | 2,037,025 | 31 |
| 32 | WORK IN PROCESS-LABOR | | 247 | 1,310 | OTHER RESERVES | 332 | 50,089 | 32 |
| 33 | E  OTHER | | 252 | 0 | | | | 33 |
| 34 | N  MISC. ASSETS RECEIVED IN TRADE | | 256 | 0 | LONG TERM DEBT | 334 | 0 | 34 |
| 35 | LIFO RESERVE | | | 0 | | | | 35 |
| 36 | TOTAL INVENTORIES | | | 1,863,771 | DEFERRED TAXES | 333 | 0 | 36 |
| 37 | O  PREPAID EXPENSES:  TAXES | 110 | 9,450 | | TOTAL  Ln 31 to 36 | | 2,088,614 | 37 |
| 38 | T  INSURANCE | 110 | 0 | | | | | 38 |
| 39 | H  OTHER | 110 | 11,438 | | MORTGAGES PAYABLE-REAL ESTATE | 335 | 0 | 39 |
| 40 | TOTAL CURRENT ASSETS | | 2,821,696 | | | | | 40 |
| 41 | A  DRIVER TRAINING - C+T | 0 | 275 | 0 | TOTAL  Ln 37 to 41 | | | 41 |
| 42 | S  L&R C+T | 0 | | 0 | TOTAL LIABILITIES  Ln 37 to 41 | | 2,088,614 | 42 |
| 43 | T  L&R  ACCUMULATED DEP. | 0 | | 0 | QUALIFIED L.T.D.  $ | | 0 | 43 |
| 44 | TOTAL CURRENT AND WORKING ASSETS | | 2,821,696 | | DEALER | | 733,082 | 44 |
| 45 | FIXED ASSETS | | | | STANDARD | | 332,000 | 45 |
| 46 | ACCOUNT | COST | ACCUM DEP | | CORPORATION TYPE: | | | 46 |
| 47 | LAND | 0 | | 0 | PROFIT OR LOSS SUMMARY | C-Corp | | 47 |
| 48 | BLDGS & IMP. | 0 | 0 | 0 | RTL  RTL  PROFIT/ | NET WORTH | NO. | 48 |
| 49 | LEASE HOLDS | 133,653 | (62,265) | 71,388 | NEW  USED  LOSS | CAPL STOCKS | 360 | 0 | 49 |
| 50 | IT-HARDWARE | 0 | 0 | 0 | 11  0  8,567 | C  ADL PD IN CAP | 360 | 150,731 | 50 |
| 51 | IT-SOFTWARE | 0 | 0 | 0 | 2  13  1,570 | R | | | 51 |
| 52 | M&S EQUIP | 201,065 | (151,025) | 50,040 | 10  17  35,781 | RET. EARNINGS | 370 | 541,488 | 52 |
| 53 | R&A EQUIP | 0 | 0 | 0 | 12  12  31,594 | R | | | 53 |
| 54 | FURN & FIXTRS | 35,505 | (34,344) | 1,161 | 8  3  4,699 | DIVIDENDS | 375 | 0 | 54 |
| 55 | CO. VEHICLES | 0 | 0 | 0 | 7  17  25,351 | P | | | 55 |
| 56 | OTHER | 0 | 0 | 0 | 14  5  15,808 | INVESTMENTS | 380 | 0 | 56 |
| 57 | TOTAL (49-52) | 370,224 | (247,665) | 122,589 | 13  12  17,320 | O | | | 57 |
| 58 | CONTRACTS - CARS  TRIALS | | | | 13  4,075 | P | | | 58 |
| 59 | A  LIFE INSURANCE-CASH VALUE | | | 0 | 2  1  510 | R | | | 59 |
| 60 | S  NOTES & ACCNT RECEIVABLE-OFFICERS | | | 0 | | DRAWINGS | 390 | 0 | 60 |
| 61 | S  NOTES & ACCOUNTS RECEIVABLE-OTHER | | | 0 | | TO BALANCE | | (1) | 61 |
| 62 | E  OTHER INVESTMENTS & MISC. ASSETS | | | 0 | 80  80  140,903 | Y | | | 62 |
| 63 | T | | | | PROFIT OR LOSS | 399 | 154,455 | 63 |
| 64 | S  TOTAL OTHER ASSETS | | | 0 | NET WORTH | | 855,671 | 64 |
| 65 | TOTAL ASSETS | | 2,944,285 | | TOTAL LIABILITIES & NET WORTH | | 2,944,285 | 65 |

## TOTAL OPERATION EXPENSE ANALYSIS

| | TOTAL INCOME AND EXPENSE | | TOTAL DEALERSHIP | | | | | VARIABLE OPERATIONS | | | | FIXED OPERATIONS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MONTH | | % OF SALES | YEAR-TO-DATE | | % DEALS | MONTH | | % YEAR-TO-DATE | | MONTH | | YEAR-TO-DATE | |
| 1 | NET SALES | | 184,057 | | | 5,009,402 | | | 140,827 | 1% | 4,308,858 | 1% | 53,230 | % Sls | 670,544 | % Sls |
| 2 | GROSS PROFIT/INCOME | | 41,765 | | 21.52% | 805,813 | | 15.90% | 4,425 | 0% | 470,681 | 11% | 37,340 | 70% | 395,132 | 60% |
| | EXPENSES | | | % Gross Profit | | | | PVR | | % Gm | | % Gm | | % Gm | | % Gm |
| 4 | MTH. SUPPLE. COMPENSATION & OTHER | | 2,279 | 5.5% | | 29,503 | | 3.7% | 2,279 | 51% | 29,503 | 6% | | | | |
| 5 | DELIVERY EXPENSE | | 668 | 1.6% | | 723 | | 0.09% | 668 | 15% | | | | | | |
| 6 | POLICY WORK-VEHICLES | | 0 | 0.0% | | 13,402 | | 1.1% | 0 | 0% | 13,402 | 1% | | | | |
| 7 | TOTAL VARIABLE | | 2,947 | 7.1% | 682 | 41,139 | | 5.1% | 225 | | 2,947 | 61% | 41,139 | 8% | | | | |
| 8 | SALARIES-OWNERS / EXECUTIVE MANAGEMENT | | 0 | 0.0% | | 0 | | 0.00% | 0 | 0% | | | 0 | 0% | 0 | 0% |
| 9 | SALARIES-SUPERVISION | | 15,370 | 36.8% | 7.02% | 155,496 | | 19.3% | 3.53% | 6,858 | 155% | 88,858 | 18% | 5,560 | 16% | 55,980 | 17% |
| 10 | SALARIES-CLERICAL | | 5,193 | 13.4% | 2.88% | 80,503 | | 7.1% | 1.10% | 3,356 | 76% | 38,302 | 7% | 2,237 | 6% | 24,201 | 7% |
| 11 | OTHER SALARIES AND WAGES | | 1,403 | 3.4% | 0.72% | 15,890 | | 1.9% | 0.31% | 926 | 21% | 10,050 | 2% | 477 | 1% | 5,540 | 1% |
| 12 | ABSENTEE COMPENSATION | | 647 | 1.5% | 0.33% | 9,626 | | 1.2% | 0.19% | 50 | 1% | 600 | 0% | 597 | 2% | 9,026 | 3% |
| 13 | INCENTIVES-SUPERVISION | | 861 | 2.1% | 0.44% | 32,883 | | 4.1% | 0.65% | (800) | -18% | 12,757 | 3% | 1,161 | 3% | 13,278 | 4% |
| 14 | TOTAL PAYROLL | | 3,031 | 7.3% | 1.55% | 55,272 | | 4.4% | 1.10% | 1,230 | 28% | 14,258 | 3% | 1,383 | 4% | 16,040 | 5% |
| 15 | EMPLOYEE BENEFITS | | 2,784 | 8.7% | 1.43% | 25,570 | | 2.7% | 0.76% | 1,434 | 32% | 12,812 | 2% | 435 | 1% | 5,096 | 2% |
| 16 | RETIREMENT BENEFITS | | 300 | 0.7% | 0.15% | 3,351 | | 0.4% | 0.07% | 120 | 3% | 1,840 | 0% | 195 | 0% | 1,508 | 0% |
| 17 | TOTAL PERSONNEL | | 29,995 | 71.8% | 15.46% | 338,250 | | 47.0% | 6.67% | 13,172 | | 156,863 | 33% | 12,005 | 32% | 130,649 | 37% |
| 18 | COMPANY VEHICLE EXPENSE | | 1,398 | 3.3% | 0.72% | 13,039 | | 1.7% | 0.26% | 1,098 | 25% | 9,624 | 2% | 0 | 0% | 1,200 | 0% |
| 19 | OFFICE SUPPLIES AND EXPENSE | | 59 | 0.1% | 0.03% | 1,584 | | 0.2% | 0.03% | 0 | 0% | 2,066 | 0% | 0 | 0% | 1,584 | 1% |
| 20 | DATA SUPPLIES | | 1,306 | 3.1% | 0.67% | 15,673 | | 1.9% | 0.31% | 405 | 9% | 4,238 | 1% | 817 | 2% | 10,604 | 3% |
| 21 | ADVERTISING | | 35 | 0.1% | 0.02% | 810 | | 0.1% | 0.03% | 14 | 0% | 580 | 0% | 16 | 0% | 16 | 0% |
| 22 | ADVERTISING REBATES | | (12,401) | -29.7% | -6.39% | 17,753 | | 2.2% | 0.35% | (13,273) | -300% | 37,410 | 8% | 872 | 2% | 8,948 | 3% |
| 23 | CONTRIBUTIONS | | 0 | 0.0% | 0.00% | 1,200 | | 0.1% | 0.02% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 24 | POLICY WORK-PARTS AND SERVICE | | 69 | 0.2% | 0.04% | 2,511 | | 0.3% | 0.05% | 0 | 0% | 2,438 | 0% | 0 | 0% | 403 | 0% |
| 25 | INFORMATION TECHNOLOGY SERVICES | | 1,253 | 3.0% | 0.65% | 10,755 | | 1.3% | 0.21% | 180 | 4% | 3,854 | 1% | 89 | 0% | 2,511 | 1% |
| 26 | OUTSIDE SERVICES (OTHER) | | 546 | 1.3% | 0.28% | 15,423 | | 1.9% | 0.31% | 140 | 3% | 12,450 | 2% | 1,008 | 3% | 10,764 | 3% |
| 27 | TRAVEL AND ENTERTAINMENT | | 0 | 0.0% | 0.00% | 3,223 | | 0.4% | 0.05% | 0 | 0% | 0 | 0% | 354 | 1% | 3,223 | 1% |
| 28 | MEMBERSHIP DUES AND PUBLICATIONS | | 0 | 0.0% | 0.00% | 1,147 | | 0.1% | 0.02% | 0 | 0% | 628 | 0% | 0 | 0% | 448 | 0% |
| 29 | LEGAL AND AUDITING EXPENSE | | 500 | 1.2% | 0.26% | 6,271 | | 0.8% | 0.12% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 30 | TELEPHONE | | 601 | 2.2% | 0.46% | 18,791 | | 1.0% | 0.15% | 300 | 0% | 3,088 | 1% | 406 | 1% | 4,160 | 1% |
| 31 | TRAINING EXPENSE | | 564 | 1.4% | 0.29% | 8,051 | | 1.0% | 0.15% | 243 | 5% | 2,381 | 0% | 321 | 1% | 5,675 | 2% |
| 32 | INTEREST-FLOOR PLAN | | 8,136 | 19.5% | 4.19% | 83,277 | | 10.5% | 1.64% | 8,136 | 184% | 83,277 | 16% | | | | |
| 33 | INTEREST-FLOOR PLAN CREDIT | | (8,619) | -20.6% | -4.44% | (60,700) | | -7.5% | -1.21% | (8,619) | -195% | (60,716) | -12% | | | | |
| 34 | INTEREST-NOTES PAYABLE (OTHER) | | 492 | 1.2% | 0.25% | 8,172 | | 1.0% | 0.16% | 0 | 0% | 672 | 0% | 0 | 0% | 0 | 0% |
| 35 | INSURANCE - INVENTORY | | 481 | 1.1% | 0.24% | 4,116 | | 0.5% | 0.08% | 481 | 10% | 4,116 | 1% | | | | |
| 36 | BAD DEBT EXPENSE | | 0 | 0.0% | 0.00% | 0 | | 0.0% | 0.00% | 0 | 0% | | | 0 | 0% | 0 | 0% |
| 37 | FREIGHT, POSTAGE & SHIPPING | | 115 | 0.3% | 0.06% | 1,553 | | 0.2% | 0.04% | 0 | 0% | | | 115 | 0% | 1,553 | 0% |
| 38 | MISCELLANEOUS EXPENSE | | 179 | 0.4% | 0.09% | 492 | | 0.1% | 0.01% | 0 | 0% | 600 | 0% | 179 | 0% | 492 | 0% |
| 39 | TOTAL SEMI-FIXED | | (5,014) | -12.0% | -2.58% | 145,207 | | 18.0% | 2.87% | (10,863) | -245% | 73,671 | 15% | 4,155 | 11% | 51,771 | 15% |
| 40 | RENT | | 7,560 | 18.0% | 3.86% | 78,296 | | 9.7% | 1.54% | 3,060 | 69% | 31,286 | 6% | 3,375 | 9% | 35,199 | 10% |
| 41 | AMORTIZATION LEASEHOLDS | | 0 | 0.0% | 0.00% | 0 | | 0.0% | 0.00% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 42 | REPAIRS-REAL ESTATE | | 0 | 0.0% | 0.00% | 1,327 | | 0.1% | 0.02% | 0 | 0% | 1,327 | 0% | 0 | 0% | 148 | 0% |
| 43 | TAXES-REAL ESTATE | | 650 | 7.6% | 0.44% | 8,050 | | 1.1% | 0.17% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 44 | INSURANCE-BLDGS. & IMPROVEMENTS | | 0 | 0.0% | 0.00% | 0 | | 0.0% | 0.00% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 45 | INTEREST - MORTGAGES | | 0 | 0.0% | 0.00% | 0 | | 0.0% | 0.00% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 46 | UTILITIES | | 806 | 1.9% | 0.42% | 9,748 | | 1.2% | 0.03% | 322 | 7% | 8,098 | 2% | 363 | 1% | 7,536 | 2% |
| 47 | SUB-TOTAL RENT & RENT EQUIVALENT | | 9,156 | 21.9% | 4.72% | 103,766 | | 12.9% | 2.04% | 3,322 | 75% | 38,118 | 8% | 3,736 | 10% | 42,863 | 12% |
| 48 | INSURANCE-OTHER | | 2,274 | 5.4% | 1.17% | 12,719 | | 1.6% | 0.25% | 918 | 21% | 7,938 | 2% | 1,023 | 3% | 8,031 | 2% |
| 49 | TAXES-OTHER | | 0 | 0.0% | 0.00% | 602 | | 0.1% | 0.01% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 50 | REPAIRS-EQUIPMENT | | 51 | 0.1% | 0.03% | 1,057 | | 0.1% | 0.02% | 0 | 0% | 751 | 0% | 0 | 0% | 276 | 0% |
| 51 | DEPRECIATION-EQUIPMENT | | 0 | 0.0% | 0.00% | 0 | | 0.0% | 0.00% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| 52 | EQUIPMENT RENTAL | | 146 | 0.3% | 0.08% | 866 | | 0.1% | 0.02% | 0 | 0% | 762 | 0% | 86 | 0% | 846 | 0% |
| 53 | TOTAL FIXED | | 11,627 | 27.8% | 5.99% | 126,003 | | 15.7% | 2.49% | 4,200 | 97% | 46,883 | 10% | 4,627 | 13% | 52,035 | 16% |
| 54 | TOTAL FIXED OVERHEAD | | 38,018 | 87.1% | 18.87% | 610,010 | | 80.6% | 12.01% | 6,599 | 149% | 277,637 | 58% | 20,907 | 56% | 235,355 | 67% |
| 55 | OPERATING PROFIT (LOSS) | | 39,585 | 94.7% | 20.39% | 651,589 | | | | 14,513 | 328% | 372,378 | 79% | 25,052 | 67% | 279,211 | 83% |
| 56 | NET ADDITIONS & DEDUCTIONS | | 2,200 | 5.3% | 1.13% | 154,459 | | | | (10,088) | -228% | 98,303 | 21% | 12,288 | 33% | 55,921 | 17% |
| 57 | OPERATING PROFIT (LOSS) BEFORE BONUS & INC. TAX | | (1,690) | -4.0% | 0.26% | 154,459 | | | | | | | | | | | |
| 61 | BONUSES & OWNERS | | 510 | 1.2% | 0.26% | 154,459 | | | | | | | | | | | |
| 62 | BONUSES-OWNERS | | 0 | 0.0% | 0.00% | 0 | | | | | | | | | | | |
| 63 | NET PROFIT (LOSS) BEFORE INCOME TAXES | | 510 | 1.2% | 0.26% | 154,459 | | | | | | | | | | | |
| 64 | INCOME TAXES | | 0 | 0.0% | 0.00% | 0 | | | | | | | | | | | |
| 65 | NET PROFIT (LOSS) AFTER INCOME TAXES | | 510 | 1.2% | 0.26% | 154,459 | | | | | | | | | | | |

## VARIABLE OPERATIONS - DEPARTMENT PROFITABILITY

| LN | | NEW VEHICLE DEPT. (01) | | | | USED VEHICLE DEPT. (02) | | | | LEASE AND RNTL DEPT. (03) | | | | FIN.INS & PROT. PLANS INC. (04) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MONTH | | YEAR-TO-DATE | | MONTH | | YEAR-TO-DATE | | MONTH | | YEAR-TO-DATE | | MONTH | | YEAR-TO-DATE |
| 1 | NET SALES | 56,125 | | 2,825,747 | | 82,851 | | 4,495,440 | | 0 | | 0 | | 1,821 | | 771,671 |
| 2 | GROSS PROFIT/INCOME | 805 | | 193,285 | | 3,524 | | 213,654 | | 0 | | 0 | | (304) | | 63,762 |
| 3 | EXPENSES | | | | | | | | | | | | | NEW - SLSPEOPLE COMP PVN1 | | |
| 4 | VEH. SLSPLE COMPENSATION & OTHER | 1,439 | | 39,046 | | 840 | | 15,959 | | 0 | | 0 | | 720 | | (134) |
| 5 | DELIVERY EXPENSE | 260 | | 2,497 | | 400 | | 5,730 | | 0 | | 0 | | USED - SLSPEOPLE COMP PVN1 | | |
| 6 | POLICY WORK-VEHICLES | 0 | | 0 | | 0 | | 3,402 | | 0 | | 0 | | 840 | | (497) |
| 7 | TOTAL VARIABLE | 1,707 | | 18,040 | | 1,240 | | 25,090 | | 0 | | 0 | | USED - VEH POLICY PVN1 | | |
| 8 | SALARIES-OWNERS / EXECUTIVE MANAGERS | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 542 |
| 9 | SALARIES-SUPERVISION | 3,429 | | 34,286 | | 3,429 | | 34,429 | | 0 | | 0 | | | | |
| 10 | SALARIES-CLERICAL | 1,678 | | 18,751 | | 1,678 | | 18,681 | | 0 | | 0 | | | | |
| 11 | OTHER SALARIES AND WAGES | 469 | | 5,079 | | 469 | | 5,079 | | 0 | | 0 | | | | |
| 12 | ABSENTEE COMPENSATION | 25 | | 250 | | 25 | | 250 | | 0 | | 0 | | | | |
| 13 | INCENTIVES-SUPERVISION | (400) | | 6,189 | | (400) | | 6,572 | | 0 | | 0 | | | | |
| 14 | TAXES-PAYROLL | 616 | | 7,729 | | 615 | | 7,137 | | 0 | | 0 | | | | |
| 15 | EMPLOYEE BENEFITS | 717 | | 8,406 | | 717 | | 8,406 | | 0 | | 0 | | | | |
| 16 | RETIREMENT | 60 | | 670 | | 63 | | 670 | | 0 | | 0 | | | | |
| 17 | TOTAL PERSONNEL | 6,586 | | 78,248 | | 6,586 | | 78,635 | | 0 | | 0 | | | | |
| 18 | COMPANY VEHICLE EXPENSE | 300 | | 1,600 | | 760 | | 1,600 | | 0 | | 0 | | | | |
| 19 | OFFICE SUPPLIES EXPENSES | 0 | | 1,037 | | 0 | | 1,037 | | 0 | | 0 | | | | |
| 20 | OTHER SUPPLIES | 293 | | 2,953 | | 117 | | 2,953 | | 0 | | 0 | | | | |
| 21 | E-COMMERCE ADVERTISING FEES | 0 | | 582 | | 7 | | 582 | | 0 | | 0 | | | | |
| 22 | ADVERTISING | (3,273) | | 16,591 | | 0 | | 23,201 | | 0 | | 0 | | NEW - NET TO ADVERTISING PVN1 | | |
| 23 | ADVERTISING REBATES | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | (6,633) | | (155) |
| 24 | CONTRIBUTIONS | 0 | | 219 | | 0 | | 219 | | 0 | | 0 | | | | |
| 25 | POLICY WORK-PARTS AND SERVICE | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 26 | INFORMATION TECHNOLOGY SERVICES | 90 | | 1,027 | | 90 | | 1,027 | | 0 | | 0 | | | | |
| 27 | OUTSIDE SERVICES (OTHER) | 70 | | 3,472 | | 70 | | 3,009 | | 0 | | 0 | | | | |
| 28 | TRAVEL AND ENTERTAINMENT | 0 | | 913 | | 0 | | 913 | | 0 | | 0 | | | | |
| 29 | MEMBERSHIP DUES / SUBSCRIPTIONS | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 30 | LEGAL AND AUDITING EXPENSE | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 31 | TELEPHONE | 180 | | 1,604 | | 180 | | 1,604 | | 0 | | 0 | | | | |
| 32 | TRAINING EXPENSE | 243 | | 2,309 | | 0 | | 0 | | 0 | | 0 | | | | |
| 33 | INTEREST-FLOORPLAN | 8,434 | | 88,846 | | 1,760 | | 24 | | 0 | | 0 | | NEW - NET INTEREST FLRPLN PVN1 | | |
| 34 | INTEREST-FLOORPLAN CREDIT | (8,610) | | (60,718) | | 0 | | 0 | | 0 | | 0 | | (1,004) | | (18) |
| 35 | INTEREST-NOTES PAYABLE (OTHER) | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 36 | INSURANCE - INVENTORY | 321 | | 2,826 | | 143 | | 0 | | 0 | | 0 | | | | |
| 37 | BAD DEBT EXPENSE | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 38 | FREIGHT, POSTAGE & SHIPPING | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 39 | MISCELLANEOUS EXPENSE | 0 | | 3,003 | | 0 | | 0 | | 0 | | 0 | | | | |
| 40 | TOTAL SEMI-FIXED | (13,950) | | (3,083) | | 3,064 | | | | 0 | | 0 | | | | |
| 41 | RENT | 1,900 | | 19,644 | | 1,900 | | | | 0 | | 0 | | | | |
| 42 | AMORTIZATION-LEASEHOLDS | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 43 | REPAIRS-REAL ESTATE | 0 | | 464 | | 0 | | 0 | | 0 | | 0 | | | | |
| 44 | DEPRECIATION-BLDGS & IMPROVEMENTS | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 45 | TAXES-REAL ESTATE | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 46 | INSURANCE-BLDGS. & IMPROVEMENTS | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 47 | INTEREST-MORTGAGES | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 48 | UTILITIES | 161 | | 3,949 | | 13 | | 0 | | 0 | | 0 | | | | |
| 49 | SUBTOTAL RENT & RNT EQUIVALENT | 1,861 | | 19,059 | | 1,861 | | 19,059 | | 0 | | 0 | | | | |
| 50 | INSURANCE OTHER | 455 | | 3,990 | | 455 | | 3,599 | | 0 | | 0 | | | | |
| 51 | TAXES-OTHER | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 52 | REPAIRS-EQUIPMENT | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 53 | DEPRECIATION-EQUIPMENT | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | |
| 54 | EQUIPMENT RENTAL | 22 | | 276 | | 0 | | 0 | | 0 | | 0 | | | | |
| 55 | TOTAL FIXED | 2,141 | | 20,479 | | 2,141 | | 20,041 | | 0 | | 0 | | | | |
| 56 | TOTAL FIXED OVERHEAD | 15,226 | | 86,684 | | 11,202 | | 20,041 | | 0 | | 0 | | | | |
| 57 | TOTAL EXPENSES | (3,519) | | 114,713 | | 13,001 | | 27,041 | | 0 | | 0 | | | | |
| 58 | DEPARTMENT PROFIT OR LOSS | 4,324 | | 78,552 | | (9,477) | | 8,563 | | 0 | | 0 | | | | |
| 59 | F&I PROT. PLN INCOME TRANSFER | 150 | | 38,908 | | (480) | | 28,454 | | 0 | | 0 | | 304 | | (63,762) |
| 60 | PRORATION OF G&A | (2,705) | | (3,237) | | (2,245) | | (4,341) | | 0 | | 0 | | | | |
| 61 | NET PROFIT OR LOSS BEFORE TAXES | 1,771 | | 79,623 | | 11,529 | | 33,600 | | 0 | | 0 | | | | |
| 62 | ADDITIONS TO MODEL | MONTH | | Y-T-D | | MONTH | | Y-T-D | | MONTH | | Y-T-D | | | | |
| 63 | BAD DEBTS RECOVERED | 0 | | | | 0 | | | | 0 | | | | | | |
| 64 | CASH DISCOUNTS EARNED | (3) | | (219) | | 0 | | | | 0 | | | | | | |
| 65 | OTHER INCOME | 450 | | 10,690 | | 0 | | | | 2,147 | | 10,254 | | | | |
| 66 | AMOUNT TO BALANCE | 1 | | | | 0 | | | | 0 | | | | | | |
| 67 | | | | | | | | | | (1,690) | | 229 | | | | |

## FIXED OPERATIONS - DEPARTMENT PROFITABILITY

| | MECHANICAL DEPT. (31) | | BODY SHOP DEPT. (34) | | PARTS & ACCESSORIES DEPT. (41) | | GENERAL & ADMINISTRATIVE (05) | |
|---|---|---|---|---|---|---|---|---|
| | MONTH | YEAR-TO-DATE | MONTH | YEAR-TO-DATE | MONTH | YEAR-TO-DATE | MONTH | YEAR-TO-DATE |

CHEVROLET    NEW VEHICLE SALES AND GROSS PROFIT ANALYSIS                    115792 - 200810 - PAGE 5.

| LN NO. | VARIABLE OPERATIONS | ACC | MONTH UNITS SOLD | SALES | COST-OF-SALES | GROSS PROF. | PER UNIT SLD | YEAR-TO-DATE UNITS SOLD | SALES | COST-OF-SALES | GROSS PROF. | PER UNIT SLD | LN NO. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | IMPALA | 400A | 0 | 0 | 0 | 0 | 0 | 13 | 321,204 | 291,885 | 29,319 | 2,255 | 1 |
| 2 | DO NOT USE | 401A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 3 | IMCARLO | 402A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| 4 | DO NOT USE | 423A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 5 | MALIBU | 404A | 0 | 0 | 0 | 0 | 0 | 15 | 366,816 | 339,452 | 27,366 | 1,824 | 5 |
| 6 | CAMARO | 405A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 |
| 7 | DO NOT USE | 406A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| 8 | CORVETTE | 407A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 |
| 9 | DO NOT USE | 408A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| 10 | AVEO | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| 11 | COBALT | | 0 | 0 | 0 | 0 | 0 | 9 | 143,778 | 131,885 | 11,893 | 1,321 | 11 |
| 12 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| 13 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| 14 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| 15 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| 16 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| 17 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| 18 | OTHER CHEVY CAR | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| 19 | OTHER CHEVY CAR | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| 20 | TOTAL NEW CARS RETAIL | | 0 | 0 | 0 | 0 | 0 | 37 | 821,800 | 753,222 | 68,578 | 1,853 | 20 |
| 21 | MEMO: CAR SLS fleet | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21 |
| 22 | TOTAL CAR FLEET fleet | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| 23 | TOTA CAR INTERNAL | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 23 |
| 24 | TOTAL NEW CARS | | 0 | 0 | 0 | 0 | 0 | 37 | 821,800 | 753,222 | 68,578 | 1,853 | 24 |
| 25 | UPLANDER | | 0 | 0 | 0 | 0 | 0 | 2 | 49,300 | 46,086 | 3,214 | 1,607 | 25 |
| 26 | SSR | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 |
| 27 | EXPRESS | | 0 | 0 | 0 | 0 | 0 | 1 | 22,510 | 21,688 | 822 | 822 | 27 |
| 28 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| 29 | TRAIL BLAZER | | 1 | 29,515 | 29,169 | 346 | 346 | 6 | 187,315 | 175,124 | 12,191 | 2,032 | 29 |
| 30 | COLORADO | | 0 | 0 | 0 | 0 | 0 | 2 | 35,792 | 31,392 | 4,400 | 2,200 | 30 |
| 31 | SILVERADO/C4500 HD | | 1 | 26,610 | 26,151 | 459 | 459 | 32 | 997,929 | 941,153 | 56,776 | 1,774 | 31 |
| 32 | AVALANCH | | 0 | 0 | 0 | 0 | 0 | 2 | 85,981 | 81,693 | 4,288 | 2,144 | 32 |
| 33 | TAHOE | | 0 | 0 | 0 | 0 | 0 | 4 | 173,220 | 162,555 | 10,665 | 2,666 | 33 |
| 34 | SUBURBAN | | 0 | 0 | 0 | 0 | 0 | 4 | 140,347 | 131,598 | 8,749 | 2,250 | 34 |
| 35 | DO NOT USE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 |
| 36 | EQUINOX | | 0 | 0 | 0 | 0 | 0 | 9 | 242,079 | 221,011 | 21,068 | 2,341 | 36 |
| 37 | HHR | | 0 | 0 | 0 | 0 | 0 | 4 | 71,474 | 66,960 | 4,514 | 1,129 | 37 |
| 38 | TRAVERSE | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 38 |
| 39 | MED C-T-W SERIES | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 |
| 40 | OTHER CHEVY TRUCK | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| 41 | TOTAL NEW TRKS RET | | 2 | 56,125 | 55,320 | 805 | 403 | 65 | 2,003,947 | 1,879,260 | 124,687 | 1,918 | 41 |
| 42 | MEMO: TRK SLS fltg | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 |
| 43 | TOTAL TRK FLEET fltg | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 43 |
| 44 | TOTA TRK INTERNAL | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 44 |
| 45 | TOTAL NEW TRUCKS | | 2 | 56,125 | 55,320 | 805 | 403 | 65 | 2,003,947 | 1,879,260 | 124,687 | 1,918 | 45 |
| 46 | | | | | | | | | | | | | 46 |
| 47 | ACCESSORIES this pag | | 0 | 0 | 0 | 0 | 0 | | | | | | 47 |
| 48 | TOTAL NEW VEHICLES | | 2 | 56,125 | 55,320 | 805 | 403 | 102 | 2,825,747 | 2,632,482 | 193,265 | 1,895 | 48 |

View 16% Audit Range and mapped   and Commercial Page 5k.                  PNUS                                    PNUS

## DEPARTMENTAL SALES AND GROSS PROFIT ANALYSIS

| | | | MONTH | | | | | YEAR-TO-DATE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | VARIABLE OPERATIONS | | UNITS SOLD | SALES | COST-OF-SALES | GR\$ PROF. | P.U.\$. | UNITS SOLD | SALES | COST-OF-SALES | GR\$ PROF. | P.U.\$. |
| 1 | USED CARS RTL – GM CERTIFIED | | 0 | 0 | 0 | 0 | | 37 | 1,082,922 | 992,345 | 90,878 | 2,840 |
| 2 | USED CARS RTL – OTHER | | 0 | 0 | 0 | 0 | | | | | | |
| 3 | 3 NEW/USED PER CAR RTL | | GM CERTIFIED → | ←–047A / 047B → | | OTHER → | | 44 | ←–047A / 047B → | | OTHER → | 597 |
| 4 | USED TRUCKS RTL – GM CERTIFIED | | 0 | 0 | 0 | 0 | | | | | | |
| 5 | USED TRUCKS RTL – OTHER | | 5 | 30,621 | 28,789 | 1,832 | 1,832 | | 117,762 | 107,790 | 2,290 | |
| 6 | NEW/USED RECON PER – TRK RTL | | GM CERTIFIED → | ←–031A / 031B → | | OTHER → | 789 | | ←–031A / 031B → | | OTHER → | -430 |
| 7 | TOTAL USED RETAIL | | 1 | 30,621 | 28,789 | 1,832 | 1,832 | 81 | 1,201,015 | 1,002,338 | 198,677 | 2,453 |
| 8 | USED CARS WHOLESALE | | 0 | 0 | 0 | 0 | | 127 | 1,465,440 | 1,281,786 | 213,654 | 1,882 |
| 9 | USED 10 NEW – CAR RTL RATIO | | | ADJ USED CAR INV | 0 | | | | ADJ USED CAR INV | | | |
| 10 | USED TRUCKS WHOLESALE | | 8 | 12,260 | 50,168 | 2,092 | 262 | | 175,710 | 10,481 | 388 | |
| 11 | USED 10 NEW – TRK RTL RATIO | | 0.5 : 1 | ADJ USED TRK INV | 0 | | | | ADJ USED TRK INV | | | |
| 12 | USED OTHER | | 0 | 52,260 | 50,168 | 2,092 | | 48 | 294,425 | 279,448 | 14,977 | |
| 13 | | | 0 | | | | | | | | | |
| 14 | TOTAL USED VEHICLE | | 0 | 82,891 | 78,957 | 3,924 | 436 | | 1,405,440 | 1,281,786 | 213,654 | 1,882 |
| 15 | TOTAL NEW VEHICLE | | 11 | 139,006 | 134,277 | 4,723 | 430 | 228 | 4,321,187 | 3,914,288 | 406,916 | 1,777 |
| 16 | TOTAL F&I AND PROFIT PLANS | | 1,821 | 2,125 | (304) | (101) | | 73,671 | 13,909 | 63,762 | 348 | |
| 17 | TOTAL VARIABLE LER | | 0 | | | | PVR | | | | PVR | |
| 18 | TOTAL VARIABLE | | 140,827 | 136,402 | 4,425 | 1,475 | | 4,398,858 | 3,928,177 | 470,681 | 2,572 |

| | | | MONTH | | | | | YEAR-TO-DATE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FIXED OPERATIONS | | R.O. COUNTS | SALES | COST-OF-SALES | GR\$ PROF. | % SALES | R.O. COUNTS | SALES | COST-OF-SALES | GR\$ PROF. | % SALES |
| 21 | CUST LAB CARS & LD TRKS | | 145 | 16,069 | 5,304 | 10,765 | 66.99% | 1,490 | 170,562 | 51,618 | 119,144 | 69.81% |
| 22 | RENTAL LAB CARS/LD TRKS | | 0 | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 23 | SERV LAB CARS/LD TRKS | | 0 | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 25 | CUST LAB CARS & MD TRKS | | 0 | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 26 | | | 0 | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 27 | | | 57 | 3,378 | 1,224 | 2,154 | 63.77% | | 62,465 | 18,357 | 44,821 | 68.83% |
| 28 | | | 49 | 2,533 | 985 | 1,548 | 61.11% | | 51,530 | 17,447 | 34,383 | 66.77% |
| 29 | NEW/OTHER REPAIR | | 0 | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 30 | ADJ COST OF LABOR F.S. | | | 2,760 | (2,760) | | | | | | (16,100) | |
| 31 | SUB-TOTAL | | 21,960 | 10,273 | 11,707 | 53.59% | | | 286,381 | 103,142 | 183,239 | 63.98% |
| 32 | SHOP SUPPLIES | | 0 | 0 | 0 | 0.00% | | | | | | 0.00% |
| 33 | | | 1,279 | 892 | 387 | 30.28% | | | 32,780 | 29,700 | 2,970 | 9.07% |
| 34 | TOTAL MECHANICAL | | 251 | 23,259 | 11,165 | 12,094 | 52.00% | 3,044 | 319,131 | 132,922 | 186,209 | 58.35% |
| 35 | CUST PAINT & LABOR | | 0 | 0 | 0 | 0.00% | | | | | | 0.00% |
| 36 | CUST BODY LABOR | | 0 | 0 | 0 | 0.00% | | | | | | 0.00% |
| 37 | INSURANCE BP LABOR | | 0 | 0 | 0 | 0.00% | | | | | | 0.00% |
| 38 | INTERNAL LABOR | | 0 | 0 | 0 | 0.00% | | | | | | 0.00% |
| 39 | ADJ COST OF LABOR | | | | | | | | | | | |
| 40 | SUB-TOTAL | | 0 | 0 | 0.00% | | | | 0 | 0 | 0.00% | |
| 41 | SUBLET REPAIRS | | 0 | 0 | 0.00% | | | | 0 | 0 | 0.00% | |
| 42 | PNT & SHOP MATERIAL | | 0 | 0 | 0.00% | | | | 0 | 0 | 0.00% | |
| 43 | TOTAL BODY SHOP | | 0 | 0 | 0.00% | | | | 0 | 0 | 0.00% | |
| 44 | TOTAL SERVICE | | 251 | 23,259 | 11,165 | 12,094 | 52.00% | 3,044 | 319,131 | 132,922 | 186,209 | 58.35% |
| 45 | WARRANTY CLAIMS | | | -7,747 | 6,581 | 7,166 | 27.59% | | 257,009 | 27,556 | 28,85% | |
| 46 | MECHANICAL PARTS L | | (49CA & 49CH) | 16,541 | 8,537 | 8,004 | 48.39% | | 187,715 | 107,634 | 80,021 | 41.61% |
| 47 | MECHANICAL LAB & TRKS R/D | | (49CA & 49CH) | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 48 | MECHANICAL REPAIRS | | (49CC & 49CF) | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 49 | BODY CARS, L/C | | (47CE & 47F) | 0 | 0 | 0 | 0.00% | | 19,200 | 14,131 | 1770% | |
| 50 | INTERNAL | | | 1,801 | 1,453 | 348 | 19.32% | | | | | |
| 51 | COUNTER RETAIL | | | 803 | 546 | 257 | 32.00% | | 14,830 | 10,205 | 4,625 | 31.19% |
| 52 | WHOLESALE | | | 2,287 | 1,780 | 507 | 22.17% | | 26,673 | 22,760 | 3,913 | 14.67% |
| 53 | GROSS SOLD R | | | 0 | 0 | 0.00% | | | | | | 0.00% |
| 60 | PURCHASE ALLOWANCES | | | (1,249) | 1,249 | | | | (14,742) | 14,742 | | |
| 61 | ADJ. P&A INVENTORY | | | (12,502) | 12,592 | | | | (12,055) | 12,055 | | |
| 66 | | | | 29,179 | 4,065 | 25,113 | 86.07% | | 342,000 | 104,977 | 147,023 | 42.99% |
| 67 | GAS, OIL & GREASE | | | 792 | 659 | 133 | 16.29% | | 8,413 | 7,513 | 1,900 | 20.18% |
| 68 | MISCELLANEOUS | | | 0 | 0 | 0 | 0.00% | | | | | 0.00% |
| 61 | | | TOTAL FIXED | 701 | 659 | 133 | 16.80% | TOTAL FIXED | 9,413 | 7,513 | 1,900 | 20.18% |
| 62 | | | COVERAGE | 29,971 | 4,725 | 25,246 | 84.00% | COVERAGE | 351,413 | 203,490 | 148,923 | 42.38% |
| 63 | TOTAL ALL DEPTS | | 100.0% | 53,230 | 15,890 | 37,347 | 70.00% | | 670,544 | 335,412 | 335,132 | 49.95% |
| | | | | 194,057 | 152,292 | 41,755 | 71.00% | | 5,084,402 | 4,263,589 | 805,813 | 15.00% |

115332 - 2(0610) - PAGE 6

# ADDITIONAL DATA

| LN NO | FINANCE, INSURANCE & PROT. PLAN ACTIVITY | MONTH | | | | | YEAR-TO-DATE | | | | | LN NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CNTRS | SALES | COST-OF-SALES | REVGROSS | PER CNTR | CNTRS | SALES | COST-OF-SALES | REVGROSS | PER CNTR | |
| 1 | FINANCE INCOME-NEW | 1 | 256 | | 256 | 256 | 59 | 29,007 | | 29,007 | 492 | 1 |
| 2 | INS. COMM. EARNED-NEW | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | 0 | 2 |
| 3 | F&I & INS CHARGEBACKS | | | 300 | (300) | | | 1,072 | | (1,072) | 0 | 3 |
| 4 | ACCESSORIES | 0 | 0 | 0 | 0 | 0 | | | | | | 4 |
| 5 | GM PROT. PLANS | 0 | 1,565 | 1,365 | 200 | 0 | 2 | 2,550 | 2,076 | | 768 | 5 |
| 6 | OTHER PROT. PLANS | 0 | 0 | 0 | 0 | 0 | 1 | 1,895 | 665 | 1,230 | 1,230 | 6 |
| 7 | REPO. LOSSES-NEW | 0 | 0 | | | | | | | | | 7 |
| 8 | F&I COMP | | 0 | 0 | PVR | | | 392 | | (392) | PVR | 8 |
| 9 | NEW F&I & PROT. PLN INCOME | | 1,821 | 1,665 | 156 | 78 | | 34,452 | 4,144 | 30,308 | 297 | 9 |
| 10 | FINANCE INCOME-USED | 0 | 0 | | 0 | 0 | 59 | 26,271 | | 26,271 | 523 | 10 |
| 11 | INS. COMM. EARNED-USED | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | 0 | 11 |
| 12 | F&I & INS CHARGEBACKS | | | 460 | (460) | | | 1,716 | | (1,716) | 0 | 12 |
| 13 | ACCESSORIES | 0 | 0 | 0 | 0 | 0 | | | | | | 13 |
| 14 | GM PROT. PLANS | 0 | 0 | 0 | 0 | 0 | 5 | 7,760 | 3,915 | 3,845 | 769 | 14 |
| 15 | OTHER PROT. PLANS | 0 | 0 | 0 | 0 | 0 | 4 | 6,188 | 3,742 | 2,446 | 612 | 15 |
| 16 | REPO. LOSSES-USED | | | 0 | 0 | | | | | | | 16 |
| 17 | F&I COMP | | | 0 | 0 | PVR | | 392 | | (392) | PVR | 17 |
| 18 | USED F&I & PROT. PLN INCOME | CHK TOTAL | 0 | 460 | (460) | (460) | | 43,219 | 9,765 | 33,454 | 413 | 18 |
| 19 | F&I INC (Lns 9 + 18) | 1 | 1,821 | 2,125 | (304) | (101) | 127 | 77,671 | 13,909 | 63,762 | 348 | 19 |

(Remainder of page illegible due to image degradation)



# Success - Past, Present and Future

- Bombard Chevrolet is a Genuine Leader Winner
- Bombard Chevrolet is a key dealer in the Western Region Sales and Service Service
- Bombard Chevrolet leads in Parts sales and Service
- Bombard Chevrolet is a AAA warranty dealer
- 2009 Bombard Chevrolet will continue to maintain our state of the art dealership leadership

# Retail Sales Potential

## Skaneateles / Marcellus / Auburn

| | | |
|---|---|---|
| Auto Dealers | Auto | |
| Auto Parts | Auto Parts | |
| Building Materials | Building Materials Etc. | |
| Clothing | Clothing | |
| Department Stores | | |
| Eating Places | | 4,140,589 |
| GAFO | GAFO | 7,591,065 |
| General Merchandise | General | |
| Grocery Stores | Grocery Stores | |
| Accommodation/Food | Food | |







Mark LaNeve:

Your letter of June 2 to Bombard Chevrolet has been met with shock and dismay not only by me but by Congressman Dan Maffei, Onondaga County Executive Joanie Mahoney, Assemblyman Al Stirpe, Assemblywoman Joan Christensen, Assemblyman Will Barclay, and Onondaga County Legislator Jim Rhinehart. These New York State leaders believe an individual dealership is a powerful economic engine, one which the area cannot afford to lose. Small businesses provide vital economic growth in rural markets where Chevrolet dominates the competition. The continuation of Bombard Chevrolet in the Town of Skaneateles, County of Onondaga, State of New York is critical to the economy and those employed by the dealership..

Currently in the state there are more than 230,000 auto industry related jobs. The majority of these jobs are in Upstate New York, generating good paying jobs, providing investment in local economy, and increased tax revenue for local governments. The extraordinary local, state and national economic power comes from Bombard Chevrolet's investment of private capital to operate effectively and without its presence; the local community is at risk

Bombard Chevrolet has proudly represented General Motors for over 20 years via proven profitability, outstanding customer service, effective training programs and community leadership. We maintain an RSI score above 90, above standard working capital and are positioned in an unsurpassed location across from a Ford store. With these attributes in place; the dealership invested over $300,000 and has been approved to break ground on a new facility in 2010.

Bombard Chevrolet continues to capture the market and has identified potential for growth as can be seen in pages 6-8 of the attached power point presentation. This presentation will provide incite on the market, and our strong, viable community focused dealership.

Bombard Chevrolet exemplifies General Motor's slogans; Baseball, Apple Pie and Chevrolet, Like a Rock, The Longest, Most Dependable Trucks on the Road, and See the USA in your Chevrolet. The philosophy we believe in is that the rural dealership continues to provide increased growth, customer service, profitability and brand recognition. We are positioned to be the dealer of choice now and into the future.

After the passing the first round of cuts I am stunned to have received the letter of June 2. It is senseless. I am formally requesting a review. I look forward to a positive review for Bombard Chevrolet as well as General Motors future.

Pat Bombard
Winning is everything!

1351 East Genesee Street
Skaneateles, NY 13152
DEALER CODE 15044
BAC 115292

Mark LaNeve;

Your letter of June 2 to Bombard Chevrolet has been met with shock and dismay not only by me but by Congressman Dan Maffei, Onondaga County Executive Joanie Mahoney, Assemblyman Al Stirpe, Assemblywoman Joan Christensen, Assemblyman Will Barclay, and Onondaga County Legislator Jim Rhinehart. These New York State leaders believe an individual dealership is a powerful economic engine, one which the area cannot afford to lose. Small businesses provide vital economic growth in rural markets where Chevrolet dominates the competition. The continuation of Bombard Chevrolet in the Town of Skaneateles, County of Onondaga, State of New York is critical to the economy and those employed by the dealership..

Currently in the state there are more than 230,000 auto industry related jobs. The majority of these jobs are in Upstate New York, generating good paying jobs, providing investment in local economy, and increased tax revenue for local governments. The extraordinary local, state and national economic power comes from Bombard Chevrolet's investment of private capital to operate effectively and without its presence; the local community is at risk

Bombard Chevrolet has proudly represented General Motors for over 20 years via proven profitability, outstanding customer service, effective training programs and community leadership. We maintain an RSI score above 90, above standard working capital and are positioned in an unsurpassed location across from a Ford store. With these attributes in place; the dealership invested over $300,000 and has been approved to break ground on a new facility in 2010.

Bombard Chevrolet continues to capture the market and has identified potential for growth as can be seen in pages 6-8 of the attached power point presentation. This presentation will provide incite on the market, and our strong, viable community focused dealership.

Bombard Chevrolet exemplifies General Motor's slogans; Baseball, Apple Pie and Chevrolet, Like a Rock, The Longest, Most Dependable Trucks on the Road, and See the USA in your Chevrolet. The philosophy we believe in is that the rural dealership continues to provide increased growth, customer service, profitability and brand recognition. We are positioned to be the dealer of choice now and into the future.

After the passing the first round of cuts I am stunned to have received the letter of June 2. It is senseless. I am formally requesting a review. I look forward to a positive review for Bombard Chevrolet as well as General Motors future.

Pat Bombard
Winning is everything!

1351 East Genesee Street
Skaneateles, NY 13152
DEALER CODE 15044
BAC 115292

Mark LaNeve;

Your letter of June 2 to Bombard Chevrolet has been met with shock and dismay not only
by me but by Congressman Dan Maffei, Onondaga County Executive Joanie Mahoney,
Assemblyman Al Stirpe, Assemblywoman Joan Christensen, Assemblyman Will Barclay,
and Onondaga County Legislator Jim Rhinehart. These New York State leaders believe
an individual dealership is a powerful economic engine, one which the area cannot afford
to lose. Small businesses provide vital economic growth in rural markets where
Chevrolet dominates the competition. The continuation of Bombard Chevrolet in the
Town of Skaneateles, County of Onondaga, State of New York is critical to the economy
and those employed by the dealership..

Currently in the state there are more than 230,000 auto industry related jobs. The
majority of these jobs are in Upstate New York, generating good paying jobs, providing
investment in local economy, and increased tax revenue for local governments. The
extraordinary local, state and national economic power comes from Bombard Chevrolet's
investment of private capital to operate effectively and without its presence; the local
community is at risk

Bombard Chevrolet has proudly represented General Motors for over 20 years via proven
profitability, outstanding customer service, effective training programs and community
leadership. We maintain an RSI score above 90, above standard working capital and are
positioned in an unsurpassed location across from a Ford store. With these attributes in
place; the dealership invested over $300,000 and has been approved to break ground on a
new facility in 2010.

Bombard Chevrolet continues to capture the market and has identified potential for
growth as can be seen in pages 6-8 of the attached power point presentation.  This
presentation will provide incite on the market, and our strong, viable community focused
dealership.

Bombard Chevrolet exemplifies General Motor's slogans; Baseball, Apple Pie and
Chevrolet, Like a Rock, The Longest, Most Dependable Trucks on the Road,  and See the
USA in your Chevrolet.  The philosophy we believe in is that the rural dealership
continues to provide increased growth, customer service, profitability and brand
recognition.  We are positioned to be the dealer of choice now and into the future.

After the passing the first round of cuts I am stunned to have received the letter of June 2.
It is senseless.  I am formally requesting a review.  I look forward to a positive review for
Bombard Chevrolet as well as General Motors future.

Pat Bombard
Winning is everything!

1351 East Genesee Street
Skaneateles, NY 13152
DEALER CODE 15044
BAC 115292



THE ASSEMBLY
STATE OF NEW YORK
ALBANY

ASSISTANT MINORITY LEADER

RANKING MINORITY MEMBER
Insurance Committee
Ethics and Guidance Committee

COMMITTEES
Ways and Means
Corporations, Authorities
and Commissions
Judiciary

WILLIAM A. BARCLAY
Assemblyman 124TH District
Oswego and Onondaga
Counties

April 3, 2009

President Barack Obama
The White House
1600 Pennsylvania Ave, NW
Washington, DC 20500

Dear Mr. President:

    The purpose of this letter is to express my support for two policy initiatives which will assist the auto industry in establishing a foundation towards economic recovery.

    In an effort to stabilize the auto industries and prevent further layoffs and closures, the American International Automobile Dealers, the National Automobile Dealers Association, and National Association of Minority Automobile Dealers have proposed two policy initiatives that will directly help finance local dealerships. The three automobile dealer associations have proposed: (i) reforming the eligibility requirements of the Term Asset-backed Securities Loan Facility to include wholesale and retail auto loans; and (ii) expanding the Small Business Administrative loan guarantee program to provide floorplan financing and working capital for auto dealers. These initiatives will expand already successful programs to include auto dealers. By doing so, additional floorplan financing will become available and restore their ability to purchase their wholesale inventory of vehicles from automakers.

    Currently, in New York State there are more than 230,000 auto industry related jobs. Further, the majority of these jobs are in Upstate New York, which incorporates my district. Main Street dealerships generate these good paying jobs, provide investments in local economies and increase tax revenue for local governments. For example, one local dealership, Bombard Chevrolet, has been a fixture in the Skaneateles community for twenty years. The company stimulates the local economy by hiring employees from the local workforce, paying taxes, and giving back by contributing to local charities. When dealerships falter, there is a domino effect that ripples through the community.

    It is my hope that your administration will be receptive to a meeting with these auto associations, in light of the fact that these policy initiatives will positively impact the nation as well as my local district. Thank you for consideration of this matter.

                    Very truly yours,

                    William A. Barclay
                    Member of the Assembly

WAB/lb
CC: Mr. Patrick Bombard



THE ASSEMBLY
STATE OF NEW YORK
ALBANY

CHAIR
Legislative Commission on
Skills Development and
Career Education

COMMITTEES
Housing
Labor
Insurance
Small Business
Real Property Taxation

JOAN K. CHRISTENSEN
Assemblywoman 119th District

April 7, 2009

Mr. Steven Walters
GMAC Zone Manager
Northeast Region
PO BOX 535160
Pittsburgh, PA 15253

Dear Mr. Walters,

I am writing on behalf of Pat Bombard who has an opportunity to sell his Skaneateles dealership, Bombard Chevrolet, to the Paradise Companies of North Syracuse. The transition from one local business to another is important to the community in order to sustain employees and revenue which cannot be overlooked in these challenging economic times.

In light of the current economic conditions, Bombard Chevrolet has been extremely fortunate to secure a signed offer to purchase the dealership. It would be greatly appreciated if you could aid Mr. Bombard and all of the employees who count on their jobs at the dealership by expediting the transition. In doing so, you will help maintain Central New York's economy and keep much needed jobs within the Skaneateles community intact.

An individual dealership is a powerful economic engine, one which we cannot afford to lose in any community. Few businesses in America generate as many direct jobs, investments in the local economy, increases in payroll tax revenue for local government and state sales tax revenue.

Bombard Chevrolet has been an integral part of the community, volunteering with local not-for-profit organizations such as Christian Brothers Academy, little league, Rotary, the volunteer fire department, SAVES ambulance services, and the SPCA Pet Walk. Bombard Chevrolet takes pride in helping to enhance the Skaneateles community.

It is clear that without Bombard Chevrolet the Skaneateles community is at risk. With these facts in mind, I urge you to expedite this transition so that much needed jobs and community support are able to maintain the security that they need and deserve.

Sincerely,

Joan K. Christensen
Member of Assembly

JKC/enb/kt



THE ASSEMBLY

STATE OF NEW YORK

ALBANY

JOAN K. CHRISTENSEN
Assemblywoman 119ᵗʰ District

CHAIR
Legislative Commission on
Skills Development and
Career Education

COMMITTEES
Housing
Labor
Insurance
Small Business
Real Property Taxation

April 7, 2009

Ms. Tamera Jackson
General Motors Zone Manager
2600 Westchester Avenue
Purchase, New York 10577

Dear Ms. Jackson,

I am writing on behalf of Pat Bombard who has an opportunity to sell his Skaneateles dealership, Bombard Chevrolet, to the Paradise Companies of North Syracuse. The transition from one local business to another is important to the community in order to sustain employees and revenue which cannot be overlooked in these challenging economic times.

In light of the current economic conditions, Bombard Chevrolet has been extremely fortunate to secure a signed offer to purchase the dealership. It would be greatly appreciated if you could aid Mr. Bombard and all of the employees who count on their jobs at the dealership by expediting the transition. In doing so, you will help maintain Central New York's economy and keep much needed jobs within the Skaneateles community intact.

An individual dealership is a powerful economic engine, one which we cannot afford to lose in any community. Few businesses in America generate as many direct jobs, investments in the local economy, increases in payroll tax revenue for local government and state sales tax revenue.

Bombard Chevrolet has been an integral part of the community, volunteering with local not-for-profit organizations and schools such as Christian Brothers Academy, Little League, Rotary, the volunteer fire department, SAVES ambulance services, and the SPCA Pet Walk. Bombard Chevrolet takes pride in helping to enhance the Skaneateles community.

It is clear that without Bombard Chevrolet the Skaneateles community is at risk. With these facts in mind, I urge you to expedite this transition so that much needed jobs and community support are able to maintain the security that they need and deserve.

Sincerely,

Joan K. Christensen
Member of Assembly

JKC/cnb/kl

□  Room 502, Legislative Office Building, Albany, New York 12248, (518) 455-5383, FAX (518) 455-5417
□  454 E. Genesee Street, Room 103, Syracuse, New York 13214, (315) 449-9536, FAX (315) 449-0712



THE ASSEMBLY
STATE OF NEW YORK
ALBANY

COMMITTEES
Aging
Agriculture
Economic Development, Job Creation,
Commerce and Industry
Higher Education
Small Business
Veterans Affairs

ALBERT A. STIRPE, JR.
Assemblyman 121st District

April 9, 2009

Frederick A. Henderson
GM President and
Chief Executive Officer
General Motors Corporation
P. O. Box 33170
Detroit, MI 48232-5170

Alvaro G. De Molina
Chief Executive Officer
GMAC Financial Services
200 Renaissance Center
P. O. Box 200
Detroit, MI 48265-2000

Dear Mr. Henderson & Mr. de Molina:

I am writing to both of you on behalf of Mr. Pat Bombard, of Bombard Chevrolet, located in Skaneateles, New York.  Mr. Bombard contacted me because he has received an offer from Paradise Companies for the purchase of this dealership and would like to have this sale approved as soon as possible so that it continues to be an integral part of our community.

Mr. Bombard has apprised me of the many economic benefits that Bombard Chevrolet provides to our Central New York community both directly by providing jobs and tax revenues, and indirectly, by providing jobs and business to other local employers.  This sale will allow those benefits to continue.  As in most areas throughout our nation, the economic downturn has created unprecedented results.  I'm sure you'll agree that keeping our Central New York business community intact is a top priority and allowing a dealership to remain and continue to provide their service to the community will be beneficial.

Thank you in advance for your attention to this matter and please don't hesitate to contact me at my Cicero district office at (315) 452-1115 for any additional information.

Best regards,

Albert A. Stirpe, Jr.
Member of Assembly, 121st A. D.

cc:    Mr. Pat Bombard

Apr 16 09 04:02p    Nannette M Krenitsky    315.445.9683    p.1

County of Onondaga

Joanne M. Mahoney
*County Executive*

## Office of the County Executive

John H. Mulroy Civic Center, 14th Floor
421 Montgomery Street, Syracuse, New York 13202

Phone: 315.435.3516  Fax: 315.435.8582

Edward Kochian
*Deputy County Executive*

April 13, 2009

Tamera Jackson
General Motors Corporate Zone Manager
One Pepsi Way, Box 8500
Somers, New York 10589

Dear Tamara:

This letter is written in support of Pat Bombard, Bombard Chevrolet, Skaneateles, New York and his request to expedite the sale of his Skaneateles Chevrolet dealership to the Paradise Companies of North Syracuse, New York. In these difficult economic times, Bombard Chevrolet has been fortunate to secure a signed offer for the purchase of the dealership.

I cannot tell you how important the continuation of this business is to the Town of Skaneateles and Onondaga County. While several companies have recently closed their doors to in our part of Central New York, I am heartened that Bombard Chevrolet's business and the services that they have provided for many years will be continued locally.

I urge you to accept the proposed transition and expedite the sale of this dealership. Those employed by the dealership and the entire county will benefit from a seamless transition of this property.

Thank you in advance for considering this request.

Sincerely,

Joanne M. Mahoney
County Executive

JMM/ll



## Onondaga County Legislature

### James M. Rhinehart
**County Legislator - 6th District**
93 East Lake Road
Skaneateles, New York 13152
Legislature 315.435.2070
Fax 315.435.8434
EMail rhinehartjr@aol.com

National Automobile Dealers Association
Small Business Administration
General Motors Corporation
General Motors Acceptance Corporation

To whom it may concern:

I am writing this letter with regards to Bombard Chevrolet, and more specifically Pat Bombard, the owner/operator.  I have known Pat personally for over 30 years.  We attended the same High School together.  More recently, Mr. Bombard and I have become associated through community efforts, and also through my business and personal choice to trade at Bombard Chevrolet, here in our home town, Skaneateles, New York.

Since coming to Skaneateles, Pat Bombard has been a most positive impact on our local community.  Personal involvement at the local Government level, is just the start.  Pat has also made tremendous contributions to the community with donations and involvement in many local organizations, some that would not have survived without his support.  Little league baseball, our local Skaneateles Ski hill, the community docks, Rotary club, Volunteer Fire department, and SAVES, our local volunteer Ambulence corps, are just a few of the "not for profit" that both Pat, and Bombard Chevrolet has supported...

Our local community needs to have business like Bombard Chevrolet and also community leaders like Pat Bombard to survive and maintain a quality of life for our residents. As an elected official, I urge that anything that can be done to help our main street local businesses, that we rely on so much, be considered immediately and implemented. If I can help in any way, please feel free to contact me at the above information.

Sincerely:

James M. Rhinehart
Onondaga County Legislator/ District 6