# Exhibit F

### STATE OF MICHIGAN
### IN THE CIRCUIT COURT FOR INGHAM COUNTY

GENERAL MOTORS CORPORATION, a Delaware
Corporation,

       Plaintiff,

v.

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY, a governmental
department of the State of Michigan,

       Defendant.

COPY

Case No. 00-92551 -AA

Hon.

---

John D. Pirich (P23204)
Joseph M. Polito (P25313)
Mark R. Werder (P27453)
HONIGMAN MILLER SCHWARTZ AND COHN
2290 First National Building
Detroit, Michigan 48226
(313) 465-7000
Attorneys for Plaintiff

Thomas L. Arnett (P27902)
Artis M. Noel (P26022)
GENERAL MOTORS
CORPORATION
300 Renaissance Center
MC 482-C24-D24
Detroit, Michigan 48265
(313) 665-4870
Attorneys for Plaintiff

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF OR, IN THE ALTERNATIVE, FOR AN APPEAL OF STATE AGENCY ACTION UNDER MICHIGAN CONST. ART 6, §28, MCL §.600.631, AND MCR 7.104

Plaintiff General Motors Corporation ("GM"), a Delaware corporation, by its

attorneys, Honigman Miller Schwartz and Cohn, for its Complaint states as follows:

### JURISDICTION AND VENUE

1.    GM seeks declaratory and injunctive relief pursuant to MCR 2.605 to resolve

an actual controversy between the parties as described below.  The amount in controversy,

exclusive of interest and costs, exceeds $25,000.  This Court has jurisdiction over the claims

herein pursuant to MCL §§ 600.601 and 600.605 and MCR 2.605 or, in the alternative,

$100.
Rec #279

pursuant to MCL § 600.631 and MCR 7.104. Venue is proper pursuant to MCL § 600.1615 in

that the Defendant Michigan Department of Environmental Quality ("MDEQ") exercises

governmental authority in Ingham County, Michigan.

## GENERAL ALLEGATIONS

2.    MDEQ is a governmental entity and department of the State of Michigan.

MDEQ administers and enforces Part 201 (Environmental Response) of the Michigan Natural

Resources and Environmental Protection Act ("NREPA"), MCL § 324.20101 *et seq.*, and the

regulations promulgated thereunder.

3.    GM owns the over 4,000-acre Milford Proving Ground ("MPG") located in the

Township of Milford, Counties of Oakland and Livingston, Michigan. Among other things,

GM conducts year-round, 24-hours per day road testing of automobiles and other vehicles at

the MPG under all weather conditions.

4.    GM uses salt (also known by its chemical name, sodium chloride) at the MPG

for a number of purposes. During the winter, road salt must be applied for deicing purposes to

an estimated 102.4 equivalent miles of roads, test tracks, and parking areas located within the

MPG requiring deicing for driver safety. Salt is also used by GM in the winter for deicing

purposes at the MPG on sidewalks, doorways, steps, ramps, etc. Salt is used year-round to

regenerate water softeners and water softener regenerant resulting therefrom is discharged

pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit issued by

MDEQ. Corrosion testing of vehicles is performed using, for example, naturally present salty

water pumped from a brine well at the MPG. Until approximately August 1996, GM also

used calcium chloride for dust suppression on dirt roads located within the MPG.

5.    Both Oakland and Livingston Counties apply road salt to the road systems surrounding the MPG for driver safety in the winter.

6.    When sodium chloride (salt) dissolves in water, such as when it is used to melt snow and ice (i.e., "deicing"), it dissociates into sodium ions ("ionic sodium") and chloride ions ("chloride").

7.    In cooperation with MDEQ, GM has been voluntarily investigating groundwater sodium and chloride conditions at the MPG for several years and has submitted multiple reports to MDEQ on the results of GM's investigations.

8.    On September 27, 2000, GM received a letter dated September 22, 2000, from MDEQ (a copy of which is attached as Exhibit A), in which MDEQ asserts that the MPG and adjacent properties are a "facility" under Part 201 due to the presence of sodium and chloride in groundwater and that GM is responsible for an activity causing a release or threat of release of a "hazardous substance" that MDEQ identifies as sodium chloride (i.e., salt) and GM is, therefore, liable under Section 20126 of Part 201.

9.    More specifically, in the September 22, 2000, letter, MDEQ asserts:

> Staff of the [MDEQ] has obtained information that indicates that *sodium chloride*, a hazardous substance, was released, deposited, or became located at the Proving Grounds. The concentrations of sodium and chloride released to the groundwater exceed the residential cleanup requirements of Section 20120a(1)(a) or (17) of Part 201, Environmental Remediation, of the Natural Resources and Environmental Protection Act, 1994 PA 451 as amended (NREPA), for these chemicals. Any area, place, or property where hazardous substances exceed this threshold constitutes a "facility" which is regulated under Part 201 of the NREPA.

(Emphasis added).

3

10.    Part 201 defines a "facility" as follows:

> "*Facility*" means any area, place, or property where a *hazardous substance* in excess of the concentrations which satisfy the requirements of *section 20120a(1)(a) or (17)* or the cleanup criteria for unrestricted residential use under part 213 has been *released*,[1] deposited, disposed of, or otherwise comes to be located. ...

MCL § 324.20101(1)(o) (emphasis added).

11.    The term "hazardous substance" used in the definition of "facility" is a term of art, statutorily defined as follows and must be based upon one of four statutory criteria, to the exclusion of all other criteria:

> "Hazardous substance" means 1 or more of the following ...:
>
> (i) Any substance that the department demonstrates, on a case by case basis, poses an unacceptable risk to the public health, safety, or welfare, or the environment, considering the fate of the material, dose-response, toxicity, or adverse impact on natural resources.
>
> (ii) Hazardous substance as defined in the comprehensive environmental response, compensation, and liability act of 1980, Public Law 96-510, 94 Stat. 2767 ["CERCLA"].
>
> (iii) Hazardous waste as defined in part 111.
>
> (iv) Petroleum as described in part 213.

MCL § 324.20101(1)(t).

12.    Sodium chloride (salt) and ionic sodium and chloride (dissolved salt) are neither "[h]azardous waste as defined in part 111" nor "[p]etroleum as described in part 213." MCL § 324.20101(1)(t)(iii), (iv). Therefore, in order to be a "hazardous substance," sodium chloride (salt) and ionic sodium and chloride (dissolved salt) must either be CERCLA "hazardous substances" or demonstrated on a case-by-case basis to "[pose] an unacceptable

---

[1] "'Release' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a hazardous substance into the environment, or the abandonment or discarding of barrels, containers, and other closed receptacles containing a hazardous substance. ..." MCL § 324.20101(1)(bb).

4

risk to the public health, safety, or welfare, or the environment, considering the fate of the material, dose-response, toxicity, or adverse impact on natural resources." MCL § 324.20101(1)(t)(i), (ii).

13.    Section 20120a(1)(a) of Part 201, cross referenced in the definition of "facility," above, directs MDEQ to establish hazardous substance cleanup criteria for the "residential" land use category, while § 324.20120a(17) provides that a remedial action plan relying on one of the categorical cleanup criteria, such as residential land use, "shall also consider other factors necessary to protect the public health, safety, and welfare, and the environment . . . if [MDEQ] determines based on data and existing information that such considerations are relevant to a specific facility." MCL § 324.20120a(17).

14.    Consequently, a "facility" under Part 201 is any property where a: (i) "hazardous substance"; (ii) has been "released" into the environment; (iii) at levels exceeding a "residential" cleanup criterion for that "hazardous substance." Because a "hazardous substance" must have been "released" into the environment in order for a property to be a "facility," a property cannot be a "facility" on the basis of hazardous substances naturally present in the environment at background levels exceeding the "residential" cleanup criteria.

15.    The Environmental Response Division ("ERD") of MDEQ has published the residential (and other) cleanup criteria for substances that MDEQ has deemed to be "hazardous substances" under Part 201 in Attachment A to a document entitled "Operational Memorandum No. 18" ("Op. Memo 18"), the most current version of which is dated June 7, 2000. In Op. Memo 18, MDEQ set the residential groundwater cleanup criteria for sodium and chloride at 120 milligrams/liter ("mg/l") and 250 mg/l, respectively. MDEQ has never

5

promulgated Op. Memo 18 as either a regulation or a guideline under the Administrative Procedures Act ("APA"), MCL § 24.201 *et seq.*

16.   MDEQ has unlawfully declared the MPG and adjacent properties to be a "facility" because allegedly "hazardous substances" (salt and its dissolution products) are allegedly present above the residential cleanup criteria.

17.   MDEQ's determination that GM is liable under Part 201 for the release of a hazardous substance, salt, to the environment at the MPG causing the MPG to be a "facility" under Part 201 exposes GM to liability for over Fifty Million Dollars to investigate the releases alleged by MDEQ and perform remedial action for such alleged releases, and exposes GM to penalties under Section 201137(1)(e) of Part 201 of up to $1,000 per day for failure to implement the "requests" by MDEQ in the September 22, 2000, letter, which, among other things, require GM to cease the use of road salt for deicing, necessitating periodic cessation of winter vehicle testing at the MPG, and to cease corrosion testing of vehicles.

18.   Independent of any "requests" MDEQ is authorized to make of a "facility" owner under Part 201, Part 201 imposes certain mandatory requirements upon the owner of property that the owner knows is a "facility." For example, even non-liable "facility" owners are required to comply with Part 201's "due care" obligations, which include, but are not limited to:  (i) undertaking measures to prevent exacerbation of existing contamination; (ii) exercising due care to prevent unacceptable exposures to hazardous substances; and (iii) taking reasonable precautions against the reasonably foreseeable acts of third parties.  MCL § 324.20107a(1)(a) – (c).  In addition, Part 201 requires a person liable under Part 201 to "[d]etermine the nature and extent of a release at the facility" and to "[d]iligently pursue

response activities necessary to achieve the cleanup criteria specified in this part and the rules promulgated under this part." MCL § 324.20114(1)(a), (g).

19.   For the reasons set forth herein, an existing controversy and dispute between GM and MDEQ requires judicial resolution – i.e., the Court must determine the validity of MDEQ's determination that the MPG is a "facility" in order to define GM's rights and obligations under Part 201 and with respect to its continuing operations utilizing salt at the MPG.

## COUNT I
## DECLARATORY AND INJUNCTIVE RELIEF
## MDEQ HAS UNLAWFULLY DETERMINED
## SALT TO BE A HAZARDOUS SUBSTANCE

20.   The allegations of paragraphs 1 through 19 are incorporated herein by reference.

21.   As quoted above, in the September 22, 2000, letter MDEQ declares that a "hazardous substance," sodium chloride (salt) has been "released" at the MPG, causing the MPG to be a "facility" regulated under Part 201.

22.   Op. Memo 18 does not list sodium chloride (salt) as a hazardous substance.

23.   Sodium chloride is neither: (i) a CERCLA hazardous substance; (ii) a Part 111 hazardous waste; nor (iii) petroleum under Part 213.

24.   Therefore, MDEQ has unlawfully determined that the MPG is a "facility" on the basis of the alleged presence of a substance that is not a "hazardous substance" under Part 201.

WHEREFORE, GM respectfully requests that the Court declare that:

a.   MDEQ has unlawfully declared sodium chloride (salt) to be a "hazardous substance" under Part 201;

b.   MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based upon the presence of sodium chloride (salt);

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of sodium chloride (salt) at the MPG.

## COUNT II
## DECLARATORY AND INJUNCTIVE RELIEF
## MDEQ HAS UNLAWFULLY LISTED
## SODIUM AS A HAZARDOUS SUBSTANCE

25.   The allegations of paragraphs 1 through 24 are incorporated herein by reference.

26.   Ionic sodium (dissolved salt) is not a "hazardous substance" because it is neither a Part 111 hazardous waste nor petroleum under Part 213.

27.   The definition of "hazardous substance" under Part 201, quoted above in paragraph 11, provides that CERCLA-listed hazardous substances are hazardous substances under Part 201; however, only elemental/metallic sodium is listed as a hazardous substance under CERCLA, not sodium chloride (salt) or ionic sodium (dissolved salt).

28.   Through a request under the Freedom of Information Act ("FOIA"), MCL § 15.231 *et seq.*, GM obtained from MDEQ a document entitled "Part 201 Chemical Criteria Worksheet" prepared by the MDEQ, ERD, regarding sodium (the "Sodium Worksheet"), attached hereto as Exhibit B.   The Sodium Worksheet indicates that the basis for "Sec 20101(1)(t) Hazardous Substance Determination" is "CERCLA Table 302.4." That is, MDEQ has listed sodium as a hazardous substance in Op. Memo 18 because MDEQ erroneously believes that ionic sodium was listed as a hazardous substance under CERCLA by the United States Environmental Protection Agency ("EPA").

29.    EPA, in fact, listed in 40 CFR Table 302.4 only elemental/metallic sodium as a hazardous substance. *See* Exhibit C. Elemental/metallic sodium is indeed hazardous and is a non-naturally occurring, highly reactive --- explosive --- substance which will react violently with water and will ignite if merely exposed to moist air. EPA did NOT list sodium chloride (salt) or ionic sodium (dissolved salt) as a CERCLA hazardous substance.

30.    This is clear because the CERCLA sodium hazardous substance listing shows Chemical Abstract Service Registry Number ("CASRN") 7440-23-5, which is the CASRN for elemental/metallic sodium, not sodium chloride (salt). 40 CFR Table 302.4 (*see also* Exhibit D). Sodium chloride (salt) has been assigned CASRN 7647-14-5. *See* Exhibit E. No CASRN has been assigned to ionic sodium, i.e., dissolved salt. Therefore, EPA clearly has not listed sodium chloride (salt) or ionic sodium (dissolved salt) as a hazardous substance under CERCLA. Notably, MDEQ listed the CASRN for elemental/metallic sodium on the Sodium Worksheet, not the CASRN for sodium chloride (salt).

31.    Therefore, MDEQ has improperly listed sodium (dissolved salt) as a hazardous substance and improperly set a groundwater residential cleanup criterion for ionic sodium caused by the dissolution of sodium chloride (salt) in groundwater on the basis of EPA's listing of elemental/metallic sodium as a CERCLA hazardous substance. That is, as a matter of law and basic science, it would be clear error and arbitrary and capricious for MDEQ to rely upon the listing of elemental/metallic sodium in 40 CFR Table 302.4 as a basis for listing ionic sodium in groundwater resulting from the dissolution of sodium chloride (salt).

32.    Consequently, the listing of sodium by MDEQ as a hazardous substance and the residential groundwater sodium cleanup criterion in Op. Memo 18 are unlawful and may not serve as a basis to characterize the MPG as a "facility" under Part 201.

9

WHEREFORE, GM respectfully requests that the Court declare that:

a.    MDEQ has unlawfully listed ionic sodium (dissolved salt) as a hazardous substance under Part 201 and any cleanup criteria established by MDEQ under Part 201 for sodium are, therefore, unlawful and unenforceable;

b.    MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based upon the presence of ionic sodium (dissolved salt) in the groundwater under and adjacent to the MPG;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT III
## DECLARATORY AND INJUNCTIVE RELIEF
## MDEQ HAS UNLAWFULLY ESTABLISHED THE
## CLEANUP CRITERION FOR SODIUM

33.    The allegations of paragraphs 1 through 32 are incorporated herein by reference.

34.    In the June 2000 version of Op. Memo 18, MDEQ changed the sodium residential groundwater cleanup criterion from 160 mg/l in the May 1999 version of Op. Memo 18 to 120 mg/l. MDEQ did not follow APA rule or guideline promulgation procedures in doing so.

35.    In response to a FOIA request for documents supporting MDEQ's revision of the sodium residential groundwater cleanup criterion, MDEQ simply supplied a printout of an American Heart Association ("AHA") World Wide Web page (http://www.americanherat.org - /Heart_and_Stroke_A_Z_Guide/sodium.html, printed June 12, 1999) listing AHA's recommended daily sodium (salt) intake of no more than 2,400 mg/day, and a Part 201 Chemical Criteria Worksheet for sodium. As stated above, the Sodium Worksheet lists the CASRN for elemental/metallic sodium. The Sodium Worksheet merely recites the AHA's

10

recommended daily sodium (salt) intake, but does not explain how MDEQ derived the Part 201 residential groundwater cleanup criterion for sodium from that number.

36.    In fact, the new Part 201 residential groundwater cleanup criterion for sodium is lower than the concentration of sodium that is allowed to be discharged directly to the groundwater under the rules recently promulgated by MDEQ under Part 31 (Water Resources Protection) of NREPA, MCL § 324.3101 *et seq.*, which became effective on August 26, 1999, and provide that a discharge to groundwater containing sodium shall be at a concentration of less than 150 mg/l.  Michigan Administrative Code ("MAC") R 323.2222(3)(c).  It is arbitrary and capricious to set a groundwater cleanup criterion at a level that is lower than the level allowed by MDEQ to be discharged to the groundwater.

37.    MDEQ's identified bases for the Part 201 residential groundwater cleanup criterion for sodium are vague and without adequate foundation in law or fact, and MDEQ has acted arbitrarily and capriciously in setting the Part 201 residential groundwater cleanup criterion for sodium.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    The Part 201 residential groundwater cleanup criterion set by MDEQ for sodium is unlawful;

b.    MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based on the presence of ionic sodium (dissolved salt) in the groundwater under and adjacent to the MPG;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF
## MDEQ HAS UNLAWFULLY LISTED
## CHLORIDE AS A HAZARDOUS SUBSTANCE

38.     The allegations of paragraphs 1 through 37 are incorporated herein by reference.

39.     Chloride (dissolved salt) is neither listed as a hazardous substance under CERCLA, as a Part 111 hazardous waste, nor is it petroleum under Part 213 of NREPA and, therefore, does not fall within the statutory "hazardous substances" incorporated by reference under Part 201. Therefore, Section 20101(t)(i) of Part 201 remains as the only possible basis for listing chloride (dissolved salt) as a "hazardous substance" under Part 201.

40.     Through a request under FOIA, GM obtained from MDEQ a document entitled "Part 201 Chemical Criteria Worksheet" prepared by the MDEQ, ERD, regarding chloride (the "Chloride Worksheet"), attached hereto as Exhibit F. The Chloride Worksheet states in the "Notes" section: "Basis: Agricultural impacts (Dow Chem. & MDNR, 87, 88)" and in the "Sec. 20101(1)(t)" portion of the document states "MDEQ-State DWS."

41.     The reference to "agricultural impacts" as the basis for listing chloride indicates that MDEQ believes that chloride falls within the Part 201 "hazardous substance" definition under MCL § 324.20101(1)(t)(i), cited above: "[a]ny substance that the department demonstrates, on a case by case basis, poses an unacceptable risk to the public health, safety, or welfare, or the environment, considering the fate of the material, dose-response, toxicity, or adverse impact on natural resources."

42.     The documents in the FOIA response, including a number of scientific journal articles, indicate that the "agricultural impacts" relied upon by MDEQ solely relate to the

12

effects of chloride soil contamination in the root zone of plants, not contamination of groundwater in a subterranean aquifer.

43.    The reference to "MDEQ-State DWS" on the Chloride Worksheet indicates that MDEQ believes that chloride in groundwater also falls within the Part 201 definition of "hazardous substance" because a "State Drinking Water Standard" allegedly exists for chloride.

44.    This is clear legal error because:

a.    The existence of a state drinking water standard is not listed in MCL § 324.20101(1)(t) as a basis for including a substance within the Part 201 definition of "hazardous substance."

b.    Even if the existence of a state drinking water standard was a basis for concluding that a substance fell within the definition of "hazardous substance" under MCL § 324.20101(1)(t)(i), there is no Michigan drinking water standard for chloride.

c.    EPA has established a Secondary Maximum Contaminant Level ("SMCL") for chloride under the federal Safe Drinking Water Act, 42 USC § 300f *et seq.*; however, SMCLs "control contaminants in drinking water that primarily affect the aesthetic qualities relating to the public acceptance of drinking water. ... The regulations are not Federally enforceable but are intended as guidelines for the States." 40 CFR § 143.1. **Michigan has never adopted any of the SMCLs.** Aesthetic considerations are not among those listed in MCL § 324.20101(1)(t)(i) for demonstration of a substance as hazardous. Consequently, MDEQ may not list a substance as "hazardous" merely because it might impact the taste of drinking water – unless MDEQ "demonstrates on a case by case basis [the substance], poses an

13

unacceptable risk to the public health, safety, or welfare, or the environment, considering the fate of the material, dose-response, toxicity, or adverse impact on natural resources." MCL § 324.20101(1)(t)(i).

45.    Therefore, MDEQ has improperly listed chloride (dissolved salt) as a hazardous substance and improperly set a groundwater residential cleanup criterion for chloride caused by the dissolution of sodium chloride (salt) in groundwater.

46.    Consequently, the listing of chloride (dissolved salt) by MDEQ as a hazardous substance and the residential groundwater chloride cleanup criterion in Op. Memo 18 are unlawful and may not serve as a basis to characterize the MPG as a "facility" under Part 201.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    MDEQ has unlawfully listed chloride (dissolved salt) as a hazardous substance under Part 201 and any cleanup criteria established by MDEQ under Part 201 for chloride are, therefore, unlawful and unenforceable;

b.    MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based upon the presence of chloride (dissolved salt) in the groundwater under and adjacent to the MPG;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of chloride (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF
## MDEQ HAS UNLAWFULLY ESTABLISHED THE
## CLEANUP CRITERION FOR CHLORIDE

47.    The allegations of paragraphs 1 through 46 are incorporated herein by reference.

48.    The residential groundwater cleanup criterion for chloride listed in Op. Memo 18 is identical to the SMCL for chloride promulgated by EPA at 40 CFR § 143.3.

14

49.   As detailed in paragraph 44, above, SMCLs are not federally enforceable and Michigan has never adopted SMCLs, including the SMCL for chloride.

50.   Section 20120a(5) of Part 201 provides the following regarding determination of the cleanup criteria for non-toxic hazardous substances in an aquifer:

> If a cleanup criterion derived under subsection (4) for groundwater in an aquifer differs from either: (a) the *state drinking water standard* established pursuant to section 5 of the safe drinking water act, Act No. 399 of the Public Acts of 1976, being section 325.1005 of the Michigan Compiled Laws; or (b) criteria for *adverse aesthetic characteristics* derived pursuant to R 299.5709 of the Michigan administrative code, the cleanup criterion shall be the more stringent of (a) or (b) unless the department determines that compliance with this rule is not necessary because the use of the aquifer is reliably restricted pursuant to section 20120b(4) or (5).

MCL § 324.20120a(5) (emphasis added).

51.   MAC R 299.5709, referenced in the above statutory provision, improperly incorporates by reference EPA methods for determining "adverse aesthetic characteristics" and provides, in part:

> For a hazardous substance which, singly or in combination with other hazardous substances present at the site, imparts *adverse aesthetic characteristics* to groundwater, the concentration which is documented as the taste or odor threshold or the concentration below which appearance or other aesthetic characteristics are not adversely affected. The criteria of this subdivision shall apply only when the level required by this subdivision is less than the level required by subdivision (a) or (b) of this subrule. *A taste or odor threshold concentration or a concentration adversely affecting appearance shall be determined according to methods approved by the United States environmental protection agency.*[2]

MAC R 299.5709(2)(d) (emphasis added).

---

[2] Subdivisions (a) and (b) referenced in this rule provide for the calculation of cleanup criteria for hazardous substances that are carcinogens (subdivision (a)) or that are not a carcinogen, genotoxic teratogen, or germ line mutagen (subdivision (b)). MAC R 299.5709(2)(a), (b). Subdivision (c) provides that the cleanup criterion for a hazardous substance with an SMCL be set at the SMCL. MAC R 299.5709(2)(c).

52.   The use of the phrase "adverse aesthetic characteristics" by the Legislature in MCL § 324.20120a(5)(b) ("criteria for *adverse aesthetic characteristics* derived pursuant to R299.5709") employs exactly the same phrase as MAC R 299.5709(2)(d).

53.   MDEQ has interpreted the phrase to refer to the direction in MAC R 299.5709(2)(c) to set the cleanup criterion for a "hazardous substance" at its SMCL, if one exists. That is not what the statute directs, however. The statute clearly refers to only the improperly incorporated by reference EPA methods recited in MAC R 299.5709(2)(d) for determining an applicable aesthetics-based cleanup criterion.

54.   The APA sets forth the following explicit procedures that a state agency must follow in order to incorporate by reference methods adopted by another agency, such as the EPA, in a rule:

> An agency may adopt, by reference in its rules and without publishing the adopted matter in full, all or any part of a code, standard or regulation which has been adopted by an agency of the United States or by a nationally recognized organization or association. *The reference shall fully identify the adopted matter by date and otherwise.* The reference shall not cover any later amendments and editions of the adopted matter, but if the agency wishes to incorporate them in its rule it shall amend the rule or promulgate a new rule therefor. ....

MCL § 24.232(4) (emphasis added).

55.   MAC R 299.5709(2)(d) directs MDEQ to employ "methods approved by the United States environmental protection agency" in order to set a groundwater cleanup criterion addressing "adverse aesthetic characteristics." Nowhere in Part 201 or its rules is any EPA method for addressing "adverse aesthetic characteristics" fully identified by date or otherwise for incorporation by reference.

56.   The generic reference in MAC R 299.5709(2)(d) to "methods approved by the United States environmental protection agency" clearly does not comply with the explicit,

16

mandatory requirement under the APA that an incorporation by reference "shall fully identify the adopted matter by date and otherwise." MCL § 24.232(4).

57.    Therefore, the incorporation by reference in MCL § 324.20120a(5)(b) and MAC R 299.5709(2)(d) is invalid and any cleanup criterion established by MDEQ pursuant to those provisions is accordingly unlawful and unenforceable.

58.    Therefore, MDEQ has unlawfully established a chloride (dissolved salt) cleanup criterion of 250 mg/l because the Part 201 rules have not properly incorporated by reference any "methods approved by the United States environmental protection agency" for the determination of a "taste or odor threshold concentration" nor were any such methods used or relied upon by MDEQ in setting the chloride (dissolved salt) cleanup criterion.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    MDEQ has unlawfully established the Part 201 cleanup criterion for chloride (dissolved salt) in groundwater;

b.    MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based upon the presence of chloride (dissolved salt) in the groundwater under and adjacent to the MPG in excess of the Part 201 cleanup criterion;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of chloride (dissolved salt) in the groundwater under and adjacent to the MPG in excess of the unlawfully established Part 201 cleanup criterion for chloride.

<u>COUNT VI</u>
<u>DECLARATORY AND INJUNCTIVE RELIEF</u>
<u>THE PART 201 CLEANUP CRITERIA ARE NOT ENFORCEABLE</u>
<u>AGAINST THIRD PARTIES BECAUSE MDEQ HAS FAILED TO FOLLOW</u>
<u>APA PROCEDURES IN LISTING SODIUM AND CHLORIDE AS</u>
<u>HAZARDOUS SUBSTANCES AND SETTING THE CLEANUP CRITERIA</u>

59.    The allegations of paragraphs 1 through 58 are incorporated herein by reference.

60.    Part 201 directs MDEQ to establish "cleanup criteria" for specified categories of land use, including residential, commercial, recreational, industrial, and other categories established by MDEQ.  MCL § 324.20120a(1)(a) – (e).

61.    MDEQ is also directed under Part 201 to promulgate rules "to implement the powers and duties of the department under this part, and as otherwise necessary to carry out the requirements of this part."  MCL § 324.20104(1).

62.    MDEQ has promulgated a number of rules under Part 201, including rules which direct how to calculate certain cleanup criteria, but has never promulgated any rules which list "hazardous substances" in addition to those statutory "hazardous substances" incorporated by reference in MCL § 324.20101(1)(t)(ii) – (iv), nor have the cleanup criteria published in Op. Memo 18 ever been officially incorporated into the promulgated Part 201 rules.

63.    The Legislature amended Part 201 in 1995 to specifically provide that the existing Part 201 rules for determining health-based groundwater cleanup levels  (MAC RR 299.5723 and .5725) shall not apply for calculations of residential cleanup criteria, the exceeding of which determines Part 201 "facility" status.  MCL § 324.20120a(8).

64.    MDEQ has not yet promulgated replacement rules, and now calculates the health-based generic residential groundwater cleanup criteria using the algorithms set forth in

18

the August 31, 1998, MDEQ document entitled "Part 201 Generic Drinking Water Criteria Technical Support Document," which has never been promulgated as a rule or a guideline under the APA. This document constitutes a rule requiring promulgation under the APA because it is "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency . . . ." MCL § 24.207.

65.    The Drinking Water and Radiological Protection Division of MDEQ, which is responsible for regulating drinking water, **has not adopted drinking water standards for sodium chloride, sodium, or chloride.** *See, e.g.*, MAC R 325.10604c.

66.    Therefore, the MDEQ, ERD, has acted arbitrarily and capriciously by establishing drinking water-based groundwater cleanup criteria when its sister division actually responsible for the regulation of drinking water has specifically declined to regulate sodium chloride, sodium, and chloride in drinking water itself, much less in groundwater.

67.    As discussed above, MDEQ published its Part 201 cleanup criteria in Op. Memo 18; however, MDEQ did not follow the procedures set forth in the APA for promulgating either rules or guidelines in doing so.

68.    Under the APA, a "rule" is "an agency regulation, statement, standard, policy, ruling, or instruction *of general applicability* that *implements or applies law enforced or administered by the agency*, or that prescribes the organization, procedure, or practice of the agency . . . ." MCL § 24.207 (emphasis added).

69.    A rule must be promulgated according to the procedures set forth in Chapter 3 of the APA, MCL §§ 24.231 - .264, in order to be effective. For example: (i) the agency must give notice of, and hold, a public hearing (MCL § 24.241); and (ii) such notice must be

HONIGMAN MILLER SCHWARTZ AND COHN LLP

published in newspapers meeting the standards set forth in the APA and also in the Michigan Register (MCL § 24.242). A rule is invalid and not binding on those outside of the agency if the agency fails to comply with these requirements. MCL § 24.243(1). In contrast, a "guideline" is not binding on those outside of the agency even when properly promulgated under the APA. A "guideline" is "an agency statement or declaration of policy which the agency intends to follow, which *does not have the force or effect of law, and which binds the agency but does not bind any other person.*" MCL § 24.203(6) (emphasis added). Before adopting a guideline, an agency must provide notice of the proposed guideline and an opportunity to comment on it to, among others, the office of the Governor and each person who requested advance notice from the agency of such actions. MCL § 24.224. Notice of proposed and adopted agency guidelines must also be published in the Michigan Register. MCL § 24.208(1)(i).

70.    The listing of hazardous substances and their cleanup criteria in Op. Memo 18 is clearly intended by MDEQ to be of general applicability and to implement Part 201 -- a law enforced and implemented by MDEQ. **MDEQ, however, has not followed any of the APA rule or guideline promulgation procedures in setting the cleanup criteria in Op. Memo 18.** None of the exceptions to the definition of "rule" under the APA applies here so as to excuse MDEQ from complying with its obligations under the APA. MCL § 24.207(a) – (p).

71.    Therefore, the Part 201 cleanup criteria are not enforceable against third parties as a formally promulgated rule. That is precisely what MDEQ did here when it improperly declared the MPG to be a "facility" based upon the residential groundwater cleanup criteria for ionic sodium and chloride (dissolved salt) in Op. Memo 18, which were adopted with complete disregard for the APA's requirements.

72.    To the extent that MDEQ believes it has made a case-by-case demonstration that ionic sodium and chloride (dissolved salt) are "hazardous substances," MDEQ is required to follow the same APA rule promulgation procedures in order to make a case-by-case demonstration under MCL § 324.20101(1)(t)(i) that a substance not statutorily incorporated by reference in the definition of "hazardous substance," such as sodium chloride (salt), ionic sodium or chloride (dissolved salt), is nonetheless a "hazardous substance."

73.    Therefore, MDEQ may not lawfully determine that the MPG is a "facility" under Part 201 on the basis of the presence of sodium chloride (salt) or ionic sodium and chloride (dissolved salt) in the groundwater beneath the MPG and adjacent properties because MDEQ has failed to promulgate rules both: (i) listing sodium chloride (salt) or ionic sodium and chloride (dissolved salt) as "hazardous substances" under MCL § 324.20101(1)(t)(i); and (ii) establishing the cleanup criteria for each substance.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    MDEQ has unlawfully listed ionic sodium and chloride (dissolved salt) as hazardous substances under Part 201 and any cleanup criteria established by MDEQ under Part 201 for ionic sodium and chloride are, therefore, unlawful and unenforceable;

b.    MDEQ has unlawfully determined that the MPG and adjacent properties are a "facility" under Part 201 based upon the presence of ionic sodium and chloride (dissolved salt) in the groundwater under and adjacent to the MPG;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium and chloride (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT VII
### DECLARATORY AND INJUNCTIVE RELIEF
### THE PART 201 "PERMITTED RELEASE" EXEMPTION
### APPLIES TO WATER SOFTENER REGENERANT DISCHARGES,
### ROAD SALTING, AND DUST SUPPRESSING ACTIVITIES AT THE MPG

74.    The allegations of paragraphs 1 through 73 are incorporated herein by reference.

75.    Assuming, arguendo, that the MPG and adjacent properties could be characterized as a "facility" under Part 201, (i) the application of road salt to de-ice the roads, parking lots, and other areas at the MPG, (ii) the discharge of "water softener regenerant," which contains sodium and chloride, to a seepage lagoon at the MPG pursuant to NPDES Permit No. MI0001911 issued by MDEQ, and (iii) the use of chloride dust suppressants at the MPG all fall within the "permitted release" exemption under Section 20114(4) of Part 201 and, therefore, any alleged contamination resulting from these activities is not subject to the remedial and other obligations imposed under Part 201.

76.    In addition to the "requests" in MDEQ's September 22, 2000, letter, Section 324.20114 of Part 201 independently requires a person liable under Part 201 to "[d]etermine the nature and extent of a release at the facility" and to "[d]iligently pursue response activities necessary to achieve the cleanup criteria specified in this part and the rules promulgated under this part." MCL § 324.20114(1)(a), (g). These mandatory requirements, however, "*do not apply to a permitted release* or a release in compliance with applicable federal, state, and local air pollution control laws." MCL § 324.20114(4) (emphasis added).

77.    Therefore, the remediation requirements of MCL § 324.20114(1) are not applicable to a site (or a portion thereof) that has become a "facility" due to a "permitted release."

HONIGMAN MILLER SCHWARTZ AND COHN LLP

78.    Further, Section 20126a(5) of Part 201 provides:   "A person shall not be required under this part to undertake response activity for a permitted release."

79.    A "permitted release" is defined under Part 201 as one or more of the following:

> (i) *A release in compliance with an applicable, legally enforceable permit issued under state law.*
>
> (ii) *A lawful and authorized discharge into a permitted waste treatment facility.*
>
> (iii) *A federally permitted release as defined in the comprehensive environmental response, compensation, and liability act of 1980, Public Law 96-510, 94 Stat. 2767.*

MCL § 324.20101(1)(aa) (emphasis added).

80.    Since July 22, 1981, NPDES Permit No. MI0001911 has authorized GM to discharge a maximum of 10,000 gallons per day of, among other things, "water softener regenerant," which contains ionic sodium and chloride (dissolved salt), through a seepage lagoon (a permitted waste treatment facility) designated as "Outfall 003" in the permit. *See* Exhibit G.  This discharge was discontinued in 1997 when it was rerouted to the MPG wastewater treatment plant and the discharges prior to 1997 were always in compliance with the NPDES permit.

81.    Therefore, any ionic sodium or chloride (dissolved salt) groundwater contamination resulting from the NPDES-permitted discharge falls within the Part 201 permitted release exemption and is not subject to the Part 201 investigation, remediation, and other requirements.

82.    Part 22 of the rules promulgated under the former Water Resources Commission Act, now codified as Part 31 of NREPA, sets forth requirements for the issuance of permits for discharges to groundwater, among other things.  Prior to August 26, 1999,

certain activities were specifically exempted from the requirement to obtain a permit – such activities were granted a "permit by rule" – including the "[c]ontrolled application of de-icing chemicals used with normally accepted or regulated practices." MAC R 323.2209(1)(c) (superseded as of August 26, 1999).

83.   Former MAC R 323.2209(1)(b) also grants a permit by rule for the "controlled application of dust-suppressant chemicals used with normally accepted or regulated practices." (Emphasis added.)

84.   The term "controlled application" was defined as "the proper application of a chemical for its intended purpose." MAC R 323.2202(f) (superseded August 26, 1999). The rules, however, do not elaborate further on the meaning of the phrase "normally accepted or regulated practices."

85.   There were no other regulations regarding the application of road salt to private property for deicing purposes during the effective period of superseded MAC R 323.2202(f). Nor were there any other regulations regarding the application of dust suppressants on private property.

86.   GM properly applied deicing road salt at the MPG for its intended purposes, that is, melting snow and ice on road and other surfaces, in a manner consistent with normally accepted practices.

87.   Therefore, GM fell within the former Part 31 permit by rule for the application of deicing chemicals.

88.   Calcium chloride was utilized at the MPG on unpaved roads for dust suppression until August 1996, when water from the MPG's potable water system was substituted.

89.    GM properly applied calcium chloride to unpaved roads at the MPG for its intended purposes, that is, dust control, in a manner consistent with normally accepted practices.

90.    Any chloride released though dust suppression activities, both before and after August 1996, therefore, also falls within the Part 201 permitted release exemption.

91.    Therefore, GM is not liable under Part 201 to take any action with respect to the presence of sodium chloride (salt) and its dissolution products, ionic sodium and chloride (dissolved salt), in the groundwater under the MPG and adjacent properties due to (i) the application of road salt to de-ice the roads, parking lots, and other areas at the MPG, (ii) the discharge of "water softener regenerant" pursuant to NPDES Permit No. MI0001911, and (iii) the use of dust suppressants at the MPG.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    The Part 201 "permitted release" exemption applies to GM's discharge of water softener regenerant to the seepage lagoon pursuant to the NPDES permit;

b.    The Part 201 "permitted release" exemption applies to GM's use of road salt for deicing the roads, parking lots, and other areas at the MPG;

c.    The Part 201 "permitted release" exemption applies to GM's use of calcium chloride as a dust suppressant at the MPG;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium and chloride (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT VIII
## THE MPG IS NOT A "FACILITY" BECAUSE THE SODIUM AND CHLORIDE IN THE GROUNDWATER REPRESENT BACKGROUND CONDITIONS

92.    The allegations of paragraphs 1 through 91 are incorporated herein by reference.

93.     If the ionic sodium and chloride (dissolved salt) found at the MPG and adjacent properties are naturally-occurring, the MPG would not be a "facility" even if the concentrations exceed the generic residential cleanup criteria because those concentrations represent "background" conditions. Section 20120a(11) of Part 201 provides:

> If the cleanup criterion for a hazardous substance determined by R 299.5707 of the Michigan administrative code is greater than a cleanup criterion developed for a category pursuant to subsection (1), the criterion determined pursuant to R 299.5707 of the Michigan administrative code shall be the cleanup criterion for that hazardous substance in that category.

MCL § 324.20120a(11).

94.     MAC R 299.5707, cited in the above quote, provides for cleanup to "background" levels of a hazardous substance. Footnote B of Attachment A to Op. Memo 18 indicates that the "background" value, as defined in MAC R 299.5701(c), may be substituted for the calculated cleanup criteria for both ionic sodium and chloride (dissolved salt) if the "background" level exceeds the calculated cleanup criteria. MAC R 299.5701(c) defines "background" as "the concentration or level of a hazardous substance which *exists in the environment at or regionally proximate to a site* that is *not attributable to any release* at or regionally proximate to the site." (Emphasis added.)

95.     MCL § 324.20120a(11) essentially provides that "background" concentrations at a site will override the residential cleanup criteria calculated under MCL § 324.20120a(1)(a) with respect to determining whether a property is a "facility" and whether remediation is necessary.

96.     Chloride concentrations in excess of the Part 201 residential cleanup criterion have been documented by the United States Geological Service throughout Livingston and Oakland Counties. *See, e.g.*, Exhibit H.

26

97.    The ionic sodium and chloride (dissolved salt) levels detected in the bedrock aquifer under the MPG and where groundwater from the bedrock aquifer migrates into the overburden aquifer also represent "background" and, therefore, cannot be a basis for a "facility" determination.  The induction of brine from the bedrock aquifer into the overburden aquifer by the pumping of water production wells located in the overburden aquifer does not cause the MPG to fall within the meaning of "facility" because a hazardous substance has not "been released, deposited, disposed of, or otherwise [come] to be located" in the environment as required by Part 201's definition of "facility" in MCL § 324.20101(1)(o), and the ionic sodium and chloride (dissolved salt) levels represent concentrations which exist "in the environment at or regionally proximate to" the MPG as referenced in MAC R 299.5701(c)'s definition of "background."  That is, the pumping does not cause a contaminant to be released to the environment and the levels observed are reflective of local background conditions.

98.    Therefore, because the ionic sodium and chloride (dissolved salt) concentrations detected at the MPG represent "background" levels, the MPG is not a "facility" even if those levels are greater than the residential cleanup criteria, and GM would have no liability under Part 201 to perform remediation or engage in other activities.

WHEREFORE, GM respectfully requests that the Court declare that:

a.    The ionic sodium (dissolved salt) concentrations in the groundwater under the MPG and adjacent properties represent "background" under Part 201;

b.    The chloride (dissolved salt) concentrations in the groundwater under the MPG and adjacent properties represent "background" under Part 201;

and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium and chloride (dissolved salt) in the groundwater under and adjacent to the MPG.

## COUNT IX
## MICHIGAN CONSTITUTION OF 1963, ARTICLE 6, §28, RJA 631, AND MCR 7.104 REVIEW

99.    The allegations of paragraphs 1 through 98 are incorporated herein by reference.

100.    In the alternative, should this Court conclude that the September 22, 2000, letter is an order, decision, or opinion of a state board, commission, or agency reviewable under MCL § 600.631 and MCR 7.104, or a final decision, finding, ruling, or order of an administrative officer or agency reviewable under the Michigan Constitution of 1963, Article 6, §28, then this Court should review the determinations made in the September 22, 2000, letter and find that the determinations therein were not authorized by law, for, among other reasons, the following:

a.    MDEQ based its determinations on an application of incorrect legal principles;

b.    The determinations are not supported by competent, material, and substantial evidence on a properly constituted record;

c.    The determinations are arbitrary, capricious, and an abuse of discretion or an unwarranted exercise of discretion;

d.    The determinations are in excess of the statutory authority and jurisdiction of MDEQ; and

e.    The determinations are in violation of the Michigan Constitution, the United States Constitution, and applicable statutory law.

WHEREFORE, the Court should vacate the determinations by MDEQ in the September 22, 2000, letter and grant such other relief as may be appropriate, including enjoining MDEQ from seeking to enforce inapplicable requirements on GM based upon the presence of ionic sodium and chloride (dissolved salt) in the groundwater under and adjacent to the MPG.

Respectfully submitted,

Attorneys for Plaintiff GENERAL MOTORS
CORPORATION

HONIGMAN MILLER SCHWARTZ AND COHN LLP

By: _____

John D. Pirich (P23204)
Joseph M. Polito (P25313)
Mark R. Werder (P27453)
2290 First National Building
Detroit, Michigan 48226
(313) 465-7000

Thomas L. Arnett (P27902)
Artis M. Noel (P260220)
GENERAL MOTORS CORPORATION
300 Renaissance Center
MC 482-C24-D24
Detroit, Michigan 48265
(313) 665-4870

DATED: October 13, 2000

DET_B\246201.4

29