# Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

In re:                                                    :        Chapter 11
                                                          :
MOTORS LIQUIDATION COMPANY, *et al.*,                     :        Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., *et al.*              :
                                                          :        (Jointly Administered)
                Debtors.                                  :

-------------------------------------------------------------- x

### DECLARATION OF MARLIN E. GILLIAM IN SUPPORT OF THE MOTION BY GENERAL MOTORS LLC TO ENFORCE THE BANKRUPTCY COURT'S SALE ORDER AND COURT-APPROVED DEFERRED TERMINATION (WIND-DOWN) AGREEMENT WITH RESPECT TO PAT BOMBARD

I, Marlin E. Gilliam, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am an employee of General Motors LLC ("**New GM**").  I am currently an Analyst in New GM's Dealer Business Management, Planning & Performance group.  I have held my current position for the past six months.  Immediately before my current position, I supported New GM's Dealer Network Planning and Investment group for several years, where my responsibilities included monitoring the progress of wind-down dealers like Bombard Car. Co, Inc.

2.      I make this declaration based upon my personal knowledge and my review of New GM's business records concerning Bombard Car Co.  I am competent to testify regarding these facts if called upon to do so.

3.      As part of the General Motors Corporation ("**Old GM**") bankruptcy, Mr. Bombard and Bombard Car Co. were presented with a Wind-Down Agreement, which Mr. Bombard and Old GM executed in June 2009 ("**Bombard WD Agreement**").  A copy of the Bombard WD Agreement is attached as **Exhibit "A."**

4.      Under Section 3 of the Bombard WD Agreement, Bombard Car Co. was to be paid $128,163.00 (“**WD Payment**”).  The first 25% of the WD Payment was to be paid 10 business days following the 363 Sale; the 75% balance was to be paid after all of the conditions set forth in Section 3(b) of the Bombard WD Agreement were satisfied.

5.      Mr. Bombard was paid $32,040.75, which was the first installment of the WD Payment.  A spreadsheet reflecting New GM's payment is attached as **Exhibit "B."**

6.      On or about March 11, 2010, New GM sent Mr. Bombard a letter of intent, which Mr. Bombard executed on March 17, 2010 (the "**Bombard LOI**").  A copy of the Bombard LOI is attached as **Exhibit "C."**

7.      The Bombard LOI included a series of requirements that Mr. Bombard and/or Bombard Car Co. had to satisfy within 60 days—or by May 16, 2010 (the "**Compliance Deadline**")—to remain a New GM dealer.

8.      Mr. Bombard did not comply with at least two of the Bombard LOI requirements:

   A.      Under Paragraph 7 of the Bombard LOI, Mr. Bombard and Bombard Car Co. had to provide evidence of Wholesale Floorplan financing; and

   B.      Under Paragraph 10 of the Bombard LOI, Mr. Bombard and Bombard Car Co. had to return the $32,040.75 that they received as the first installment of the WD Payment.

9.      According to New GM's records, Mr. Bombard has never returned the $32,040.75.  A screenshot reflecting New GM's records documenting the non-repayment of the $32,040.75 is attached as **Exhibit "D."**

10.     According to New GM's business records, Mr. Bombard did not obtain Wholesale Floorplan financing.  Documents reflecting Mr. Bombard and Bombard Car Co.'s failure to provide evidence of Wholesale Floorplan financing are attached as **Exhibit "E."**

DMSLIBRARY01\32048409.v1

11.     On July 16, 2019, two months after the Compliance Deadline expired, New GM sent Mr. Bombard a letter ("**July 2010 Letter**") advising him that the Bombard LOI had expired for failure to satisfy its conditions, and that the terms of the Bombard WD Agreement would govern the termination of the Bombard dealership.  A copy of the July 2010 Letter is attached hereto as **Exhibit "F."**

12.     On November 3, 2010, New GM sent Mr. Bombard a letter ("**November 2010 Letter**") stating that the Bombard dealership terminated on October 31, 2010 pursuant to the Bombard WD Agreement.  A copy of the November 2010 Letter is attached hereto as **Exhibit "G."**

13.     According to New GM's records, Mr. Bombard has not complied with all of the conditions in the Bombard WD Agreement; therefore, New GM has continued to hold the balance of the WD Payment.  Screenshots reflecting New GM's records documenting both the amount of that balance (*i.e.*, $96,122.25) and what Mr. Bombard must do to receive it are attached as **Exhibit "H."**

14.     Upon his satisfaction of these required conditions, Mr. Bombard would be entitled to the balance of the WD Payment in the amount of $96,122.25.


Dated: April 5, 2018                                              _____/s/ Marlin E. Gilliam____
                                                                              Marlin E. Gilliam

DMSLIBRARY01\32048409.v1

# Exhibit A

Skaneateles, NY

# WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between Bombard Car Co., Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

## RECITALS

A.      Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer Agreement") for Chevrolet motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.      GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").   No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.      GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.      GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.      In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.      Assignment-363 Sale.   Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer.  As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer.  If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

2.  Termination of Dealer Agreement.  Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Dealer has sold of all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  Payment to Dealer.

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $128,163 (the "Wind-Down Payment Amount"), subject to the terms herein. This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as Exhibit A (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals. GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "Competing Claim"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.    Complete Waiver of All Termination Assistance Rights.   In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)   Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations. Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations. Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

3

4805_12_115292

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5. Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

4

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6.  Subject Dealership Operations.    From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section

5

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, ~~subject to the terms of this Agreement.  Accordingly, neither GM nor the 363 Acquirer, as~~ applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d)  In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e)  Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7.  No Protest.

(a)      GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b)      Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c)      Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7.  Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7.  Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)      Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach.  As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in

6

violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. <u>Binding Effect</u>. This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. <u>Effectiveness</u>. This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before <u>June 12, 2009</u>.

13. <u>Continuing Jurisdiction</u>.    By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. <u>Other Agreements</u>.

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.    In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "<u>Channel Agreements</u>" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase."

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. <u>Breach</u>. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. <u>Complete Agreement of the Parties</u>. This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

Bombard Car Co., Inc.

By: _Patg Bonbard_

Name: _PAT J. BOMBARD_

Title: _President_

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

**THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.**

9

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

# Exhibit B

| BAC | Dealer | City | ST | Current Brands | Future Brands | CBPGK Payment | HUMMER Payment | Saab Payment | Saturn Payment | CM Payment | GM Payment | Total Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 115292 | BOMBARD CAR CO. | INSKANEATE | NY | C | | $ 128,163.00 | $ - | $ - | $ - | $ - | $ - | $ 128,163.00 |

| 25% CBPGK | 25% Saab | 25% CM | 25% GM | Total 25% |
|---|---|---|---|---|
| $ 32,040.75 | $ - | $ - | $ - | $ 32,040.75 |

# Exhibit C

GM

General Motors LLC

VIA OVERNIGHT MAIL

PERSONAL & CONFIDENTIAL

March 11, 2010

Mr Pat J Bombard
BOMBARD CAR CO., INC.
1351 EAST GENESEE STREET
SKANEATELES, NY 13152

Dear Mr Pat J Bombard:

Your dealership filed for arbitration under Section 747 of the Consolidated Appropriations Act, 2010 (H.R. 3288, as signed by President Obama on December 16, 2009) ("the Arbitration Statute"). General Motors LLC ("GM") has carefully reviewed your dealership's situation in light of the provisions of the Arbitration Statute to determine if we wish to proceed with the arbitration process. We are pleased to offer your dealer company this letter of intent, as provided for in the Arbitration Statute ("the Letter of Intent") concerning the Chevrolet brand(s) ("the Reinstated Brand(s)"). Upon compliance with the terms and conditions of this Letter of Intent, BOMBARD CAR CO., INC. ("Dealer Company" or "Applicant")'s Reinstated Brands, will be reinstated into GM's dealer network with Mr Pat J Bombard, as the Dealer Operator.

This will be accomplished by amending the existing Wind-Down Agreement in place between Dealer Company and GM for the Reinstated Brand(s) vehicles. Within 15 days of Dealer Company's completion of the conditions and requirements of this Letter of Intent, GM will execute and deliver to Dealer Company an amendment to the Wind-Down Agreement in substantially the form attached as Exhibit A (the "Wind-Down Amendment"), which will allow Dealer Company to resume normal dealership operations for Reinstated Brand(s).

Please note that the term of this Letter of Intent is sixty (60) days. If Dealer Company does not provide GM with satisfactory evidence of compliance with all of the terms and conditions of this Letter of Intent within 60 days from your execution of this letter, then this Letter of Intent will expire and GM shall have no obligation to execute the Wind-Down Amendment.

The following are the terms, conditions, and requirements for reinstatement:

1.  **Arbitration Claim:**   Dealer Company must withdraw its Arbitration claim, as previously filed with American Arbitration Association (AAA), with prejudice by April 30, 2010.

2.  **Facility (Space/Premises) Requirements:**   Dealer Company must establish and maintain facilities in accordance with GM's facilities requirements as set forth in GM Dealer Bulletin GM 01-18 (copy attached as Exhibit B). To comply with this facility requirement and space guideline for the purposes of this Letter of Intent, Dealer Company must provide dealership facilities which meet the space and facility requirements outlined in the Dealer Company's Location and Premises Addendum ("GMMS 1016") executed with the Dealer Company's most recent GM Dealer Sales and Service Agreement ("Dealer Agreement(s)").

3.   **Approved Location:** The Dealer Company must confirm that the location specified in Dealer Company's most recent Dealer Agreement(s) will be the same location for the resumed Dealer Company operations for the Reinstated Brand(s). If that location is no longer available or Dealer Company wishes to propose another location, Dealer Company must provide a location acceptable to GM within the 60-day timeframe specified in this Letter of Intent. The Dealer Company must submit documentation to GM within the 60 day timeframe confirming dealership location.

4.   **Non-GM Dual Policy:** Dealer Company will be allowed to use the same facility arrangement previously identified in the Dealer Company's most recent GMMS 1016; however, the GM policy prohibiting non-GM products from being sold and serviced from approved GM dealer premises remains in place. If Dealer Company wishes to participate in the voluntary Essential Brand Elements (EBE) program, then Dealer Company must separate all non-GM dealership operations from the approved GM showroom facilities by October 31, 2010 to be eligible for the EBE facility element. In addition, to continue to be compliant with the EBE program, Dealer Company must separate all non-GM dealership operations from the service write-up and waiting areas located at the approved GM facilities by September 30, 2011. If Dealer Company subsequently complies with the EBE program guidelines, then Dealer Company will be eligible for EBE payouts in accord with the EBE program. For complete details for your Dealer Company go to the EBE website at www.gmexcellence.com.

5.   **Facility Image:** Dealer Company will be allowed to use the same facility arrangement previously identified in the Dealer Company's most recent GMMS 1016; however, GM expects Dealer Company to comply with applicable facility image requirements. Please refer to gmfacilityimage.com for image requirements. Dealer Company agrees that to be eligible for the EBE program, with respect to facility image, it must comply with the applicable EBE Program requirements.

6.   **Technology Infrastructure Standards:**   The Dealer Company must comply with GM's information technology infrastructure standards for dealerships as described on the following GM website at www.gmdit.com   .

7.   **Line of Credit:** The Dealer Company must obtain a separate line of credit from a creditworthy financial institution approved by GM, to enable the Dealer Company to finance the purchase of a sufficient number of new GM motor vehicles, for all GM vehicle lines, including the Reinstated Brand(s) which GM is offering to reinstate pursuant to this Letter of Intent, to meet its obligations under the Dealer Agreement(s). The Dealer Company must submit documentation to GM within the 60-day time frame to demonstrate that it has obtained a sufficient line of credit (see Exhibit C).

8.   **Net Working Capital:** The Dealer Company shall establish and maintain for use in its GM sales and service business unencumbered net working capital in the amount of $204,000. Dealer Company must provide GM with documentation that Dealer Company has satisfied this Net Working Capital Standard by October 31, 2010 when the current Dealer Agreement(s) expires. If Dealer Company fails to meet this requirement, dealer agrees GM shall have no obligation to offer a replacement dealer agreement to dealer upon the expiration of the current Dealer Agreement(s).

9.   **Licenses:** Dealer Company must obtain all necessary licenses under applicable statutes and regulations to conduct the Reinstated Brand(s) dealership operations at the approved location. GM shall not be responsible for any costs, expenses, damages or delays incurred as a result of Dealer Company's efforts to obtain such licenses. The Dealer Company must submit documentation to GM within the 60-day timeframe that it has obtained all necessary licenses.

10. **Return of Wind-Down Payments:** Upon Dealer Company's compliance with all of the terms and conditions of this Letter of Intent and GM's execution of the Wind-Down Amendment, Dealer Company hereby expressly authorizes GM to debit Dealer Company's open account maintained on the General Motors Dealer Payment System for all amounts previously paid by GM to Dealer Company under the Wind-Down Agreement for Reinstated Brand(s). This amount is $32,040.75. The Dealer Company shall not be able to order new vehicles from GM until all wind down amounts received by Dealer Company related to the Reinstated Brands have been repaid.

11. **Completeness and Accuracy:** Dealer Company and Dealer Operator represent that all documents submitted to GM under this Letter of Intent, are complete, true and accurate.

12. **Term:** This Letter of Intent shall expire sixty (60) days after execution by Dealer Company unless an extension is agreed to in writing by the Parties.

13. **No Assignment or Transfer:** This Letter of Intent may not be transferred or assigned, in whole or in part, without the express written consent of GM.

Dealer Company acknowledges and represents that (i) the decision to enter into this Letter of Intent is based upon an independent analysis of the business opportunity, costs, and risks associated with re-instatement, (ii) they are not relying on any representations, promises, guaranties, or information provided by GM or any employee, agent or representative of GM, except as expressly set forth in this Letter of Intent, and (iii) there are no other agreements or understandings written or verbal between the parties concerning the matters covered by this Letter of Intent, its references, and its Attachments.

Please indicate your agreement to terms and conditions of this Letter of Intent by signing the two attached originals. Retain one signed original for your records and return the other signed original to Madonna Wenner, whose telephone number is (313) 667-0068, at General Motors LLC, 100 Renaissance Center, MC: 482-A06-C66, Detroit, Michigan 48265, within ten days (10) days of receipt by Dealer Company of this Letter of Intent. Once executed, this Letter of Intent cannot be modified except in writing by the parties. If Dealer Company does not execute and return an unaltered counterpart of this Letter of Intent to the undersigned within the ten (10) day period, then this Letter of Intent shall be deemed rescinded and this Letter of Intent shall be null and void and GM shall have no further obligations.

We look forward to your completion of the requirements and to the subsequent reinstatement of your dealership in the GM dealer network.

Very truly yours,

**GENERAL MOTORS LLC**

Attachments:  Sample Wind-Down Amendment Agreement – Exhibit A
GM Bulletin 01-18 – Exhibit B
Wholesale Floorplan Package – Exhibit C

Acknowledged and agreed this _17_ day of _March_, 2010.

BOMBARD CAR CO., INC.                              Mr Pat J Bombard

By: _____                       _____

Title: _____                    Individually

4805_Arbloi_031110_NEMW.pdf                                        115292

# **Exhibit D**



This shows the remaining payments as of 9/26/2013. This is only for use to double check the amount that was sent on to the dealership for the final payment.

Update to date as of: 9/26/2013

| BAC | Saturn Mkt Area | Dealer | City | ST | Current Bran... | VD Repaymen t | Comple te VP... | Cmplt VD $$ | Revise d Future Bran | CBPGK | Settlement | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 185282 | 1 | BOMBARD CAR CO, INC. | SKANEATELES | NY | C | | 1 | $  96,122.25 | | $96,122.25 | | $96,122.25 |

Still Owed As Of 9/25/2013

Remaining Payments Owed

# Exhibit E

# GM Dealer Scanning Information Sheet

|  | New Dealership<br>(New BAC) | Existing Dealership<br>(Same BAC,<br>Realignments) |
|---|---|---|
| Current Date:  October 21, 2010 | ☐ | ☒ |

| DEALER CHANGE PROPOSAL<br>EFFECTIVE DATE:* | |
|---|---|
| BAC#: | 115292 |
| LOC PT: | 4805 |
| BMD: | Chev |
| INC NAME: | Bombard Car Co., Inc. |
| DBA NAME: | |
| CITY: | Skaneateles |
| STATE: | NY |
| REGION #: | 40 |
| REGION DESC: | Northeast |
| AREA #: | |
| MKT AREA DESC (Optional): | |
| PARA 3rd LAST NAME: | Bombard |
| PARA 3rd FIRST NAME: | Pat |
| Special Letter Section | |
| Correspondence Section | 4805_arbloi_102110 |

Requested By:  Madonna Wenner_____

Phone Number:  7-0068_____

**\*ATTENTION CM's:**

- Use this field for Dealer Change Proposals only.
- Date = Contract effective date.

Rev. 3/12/07



```
DIDTI505          SITE DIVISIONAL ORGANIZATION INQUIRY        03/16/10  08:50:26
                                                              PAGE NO    1
  SELLG SCE NO: 13       SITE CD:  15044      SITE NO 000122233  BAC      115292
  LOC PT: 000004805      PLAN NBR: 000127151  LINK STATUS: A    DBC LVL     2
  NAME    BOMBARD CAR CO., INC.
  CITY    SKANEATELES                         STATE/PROV  NY    CNTRY CD  US

  ORG TYP(#): 001  SALES        DIV SELLG SCE"S  13
  MKTG SELLG SCE NO: NA         ORG TYP"S  001 002
  EFCTV DT   10/03/2009         TERM DT
  SEQ                           DIV ORG  DIV ORG                   DIV ORG
  NO  LVL NO  LVL DESC          GRP      GRP DESC                  SITE NO
   1    40    AREA              6622     6622 RCC UPPER NY         000663292
   2    30    ZONE              4662     4662 RCC 40 NE            000417547
   3    20    SECTION           46       RCC REGION 40            000417514
   4    10    REGION            40       NORTHEAST REGION         000270100


  SELECT:  __                                            NO MORE RECORDS
  COMMAND: _____   A= DLR NAME B= ADDR INQ C= LOCPT UP
  PF01 HELP   PF02 MAIN   PF03 PRV SCRN PF04         PF05 CANCEL   PF06 ADD SCRN
  PF07 PG UP  PF08 PG DN  PF09         PF10          PF11          ENTR CMD/INQ
  INQUIRY COMPLETE                                                 P/W:
```

*Handwritten annotations:*

Skinny atlas (with arrows pointing to SKANEATELES)

Pat Bombard 315-685-5797
x308

C 315-506-5797

LOI 3/17 Shauport 3-22

3/17/2010 - returned call - to Pat Bombard.

facility unchanged - advised not to propose relocation.

# Exhibit F

**GM**

General Motors LLC

<u>**VIA FEDEX - 798858552670**</u>

<u>**PERSONAL & CONFIDENTIAL**</u>

July 16, 2010

BOMBARD CAR CO., INC.
1351 EAST GENESEE STREET
SKANEATELES, NY 13152

Dear Pat J Bombard:

Your dealership executed a Letter of Intent in connection with the arbitration filing under Section 747 of the Consolidated Appropriations Act, 2010 (H.R. 3288). As provided for in the Arbitration Statute, the Letter of Intent allowed your dealership the opportunity for reinstatement of the Chevrolet brand(s) if your dealership complied with all the requirements of the Letter of Intent.

The Letter of Intent required compliance with all the terms and conditions within sixty (60) days of the date of execution. The letter was executed by your dealership on 3/17/2010, meaning compliance was due by 5/16/2010. Your dealership has not provided GM with satisfactory evidence of compliance with all of the terms and conditions of the Letter of Intent. As a result, pursuant to its terms, the Letter of Intent is now expired.

Accordingly, the terms of Wind-Down agreement executed between your dealership and GM will govern the termination of the Chevrolet dealer agreement(s) on, or before, October 31, 2010, pursuant to the terms of the Wind-Down agreement. GM is committed to working with your dealership through this process.

Very truly yours,

**GENERAL MOTORS LLC**

# Exhibit G



General Motors LLC

<u>**VIA FEDEX 7941-0021-5438**</u>

<u>**PERSONAL & CONFIDENTIAL**</u>

November 3, 2010

Mr. Pat J Bombard
Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY  13152

Dear Pat J Bombard:

This is in response to your fax received October 31, 2010 relative to your request for GM to consider reinstatement of the Chevrolet brand in Skaneateles, New York.

Your dealership executed a Letter of Intent in connection with the arbitration filing under Section 747 of the Consolidated Appropriations Act, 2010 (H.R. 3288).  As provided for in the Arbitration Statute, the Letter of Intent allowed your dealership the opportunity for reinstatement of the Chevrolet brand if your dealership complied with all the requirements of the Letter of Intent.

The Letter of Intent required compliance with all the terms and conditions within sixty (60) days of the date of execution.  The letter was executed by your dealership on March 17, 2010, meaning compliance was due by May 16, 2010.  Your dealership has never provided GM with satisfactory evidence of compliance with all of the terms and conditions of the Letter of Intent, specifically, Wholesale Floorplan Financing or return of the Wind-down payment.  As a result, pursuant to its terms, the Letter of Intent expired months ago.

Accordingly, under the terms of the Wind-Down agreement executed between your dealership and GM, the Chevrolet dealer agreement terminated on October 31, 2010.

Very truly yours,

Troy D. Ifer
Manager, Strategic Network Analysis

cc: DCG

# Exhibit H

## Wind Down Agreement Tracking - Active as of 10/31/2013

| | Wind Down Requirements Tracking | | | | | | | |
|---|---|---|---|---|---|---|---|---|

| Wind Down Letter | Dealership Name | City | State | Region | Final Wind Down Brands (by Letter) | Final Wind Down Category (Rooftop) | 1. Termination request on file | 2. Dealer has zero units in New Vehicle inventory | 2a. Confirmed that no bank repurchases have taken place | 3. Termination letter sent to Dealer | 4. Received Supplemental Wind-Down Agreement from Dealer | 5. Received GMDI request for signage change form from Dealer | 6. Received Post Termination Notification Form | 7. Received customer list and service records from Dealer | 8. Termination of Dealer Sales and Service Agreement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
| 115292-12-C | BOMBARD CAR CO. INC. | SKANEATELES | NY | NE | C | Complete Wind Down | 11/3/2009 | 08/24/10 | 08/24/10 | 12/03/09 | | | | | 11/01/10 |

### Wind Down Payment Info

**Ready for Payment:** 1

**Owed as of 11/11/2013**

| 9. Compliance with Bulk Transfer, Sales Tax Transfer, or similar laws | 10. Compliance with Sales Tax Clearance requirement | 11. Removal of dealer-owned signs | 12. Approve for payment | 13. Payment to Dealer has occurred | Requirements 1 - 11 are Completed (Check for Payment Approval) | CBPGK | Hummer | Saturn | Chev MD | GMC MD | Owed > $0 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q | R | S | T | U | V | W | X | Y | Z | AA | AB | AC |
| 01/23/10 | | | | | REQ(S) NOT COMPLETED | $96,122.25 | | | | | 1 | |