TO:   Chamber of the Honorable Martin Glenn
      United States Bankruptcy Court
      1 Bowling Green
      NY, NY 10004

FROM: Pat J Bombard
      5 Wheeler Ave
      Fayetteville, NY 13066



DATE: April 3, 2018

Purpose: To present facts, exhibits, and proof outlining Chevrolet franchise owner by Pat J. Bombard per
the March 29, 2018 request of the court.

Facts: First, the venue and the jurisdiction are not correct for this motion. The old General
Motors is venue shopping to cause delays and financial harm to Pat J. Bombard personally and to
his Chevrolet franchise. Secondly, the jurisdiction of Bankruptcy Court does not have any
standing in the matter of the Motor Vehicle hearing. Once again the old General Motors is
wasting the judge and court's time, causing delays and harm to his franchise. The correct court
for the hearing is the New York State Franchise Motor Vehicle Department.

I am providing the court statements of facts, documents and proof of ownership of Pat J.
Bombard Chevrolet franchise. Attached are Exhibits 1 – 25.

Notice Pursuant to NYS Vehicle and Traffic Law 471-a. The defendant hereby moves the court
to dismiss the Motors Liquidation Company, ET AL.,F/K/A/ General Motors, ET AL, complaint
with prejudice. Your attention is directed to the stay provisions, without bond, under the Vehicle
and Traffic Law Sections 463(2)(e)(1), 465(7) and CPLR 3211 (a)(2)(4)(5). The basis for the
Motion are set forth in this Memorandum.

I am providing the court copies of the following: Case No.: 09-50026 (MG)

- A letter written to Deborah F. Collins, Esq., October 16. 2017
- The NYS Department of Motor Vehicles, Request for Adjudicatory Proceeding,
  December 19, 2017
- State of New York – Department of Motor Vehicles, Safety and Business Hearing
  Bureau, Notice of Hearing, in the matter of Pat J. Bombard DBA Bombard Car
  Company, Inc. Date of hearing: April 23, Time of Hearing: 9 a.m.

- CPLR 3211 (a)(2)(4)(5) other action pending
- The United States Court of Appeals for the Second Circuit has ruled in the dealer franchise favor. Included is a copy of the decision, Decided: December 29, 2016, Docket Nos. 13-4066, 13-4310.

I am asking the court to dismiss the motion for the reasons stated above. The defendant's Motion to Dismiss should be granted. And the defendant should be awarded damages and awards. A Proof of Claim has been filed.

Sincerely,

Pat J. Bombard    Pro Se

1   Pat J. Bombard
    5 Wheeler Ave
2   Fayetteville, NY  13066
    (315) 382-9464
3

4

5   UNITED STATES BANKRUPTCY COURT

6   SOUTHERN DISTRICT OF NEW YORK

7

8   MOTORS LIQUIDATION COMPANY           | Chapter 11

9   ET AL.,F/K/A GENERAL MOTORS.,ET AL,

10  DEBTORS.                              | Case No.: 09-50026 (MG)

11  PLANTIFF

12  vs.                                   | (Jointly Administered)

13  PAT  J. BOMBARD,

              Defendant                   | MOTION TO DISMISS

              Re: Notice Pursuant to NYS Vehicle and Traffic Law 471-a.  The defendant hereby

17  moves the court to dismiss Plaintiff's Complaint with prejudice.  Your attention is directed to the

18  automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1),

19
    465(7) and CPLR 3211(a) (2) (4) (5).  The basis  for this Motion are set forth in the accompanied
20
21  Memorandum.

22

23                                         DaтЕ ApriL 3, 2018

24                                         Dated this 13th of March, 2018.

25                                         *Pat J Bombard* (signature)

26

27                                         Pro Se
                                           Pat  J. Bombard
28                                         *Pat J Bombard* (signature)
                                           4/03/2018
    1 – MOTION TO DISMISS                   Pro SE

Pat J. Bombard
5 Wheeler Ave
Fayetteville, NY  13066
(315) 382-9464

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOTORS LIQUIDATION COMPANY | Chapter 11 |
| ET AL.,F/K/A GENERAL MOTORS.,ET AL, | |
| DEBTORS. | Case No.: 09-50026 (MG) |
| PLAINTIFF | |
| vs. | (Jointly Administered) |
| PAT  J. BOMBARD, | |
| Defendant | MOTION TO DISMISS |

### FACTS

I am providing the court copies of the following:

- A letter written to Deborah F. Collins, Esq., October 16, 2017.

- The NYS Department of Motor Vehicles, Request for Adjudicatory Proceeding, December 19, 2017.

- State of New York – Department of Motor Vehicles, Safety and Business Hearing Bureau, Notice of Hearing, in the matter of Pat J. Bombard DBA Bombard Car Company, Inc. Date of Hearing: April 23, 2018, Time of Hearing: 9:00 a.m.

- CPLR 3211 (a)(2) (4)(5) other action pending

2 - MOTION TO DISMISS

3 - MOTION TO DISMISS

- The United States Court of Appeals for the Second Circuit has ruled in the dealer franchise favor. I am providing a copy of the decision, Decided: December 29, 2016, Docket Nos. 13-4066, 13-4310.

## ARGUMENT

Plaintiff's claim must be dismissed because it is without merit based upon all documents provided to the court. They are clearly trying to hurt the defendant by using bankruptcy court as a way to delay and cause financial and personal damage.

The United States Court of Appeals for the Second Circuit has ruled in the dealer franchise favor. I am providing a copy of the decision, Decided: December 29, 2016, Docket Nos. 13-4066, 13-4310.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss should be granted.

*Defendant shall be award damage and claim of proof by The Court*

*Date April 3, 2018*

Dated this 13th of March, 2018.

*Pat J Bombard*

Pro Se
Pat J. Bombard

*Pat J Bombard*
*4/03/2018*
*Pro SE*

3 - MOTION TO DISMISS

**STATE OF NEW YORK**
**Department of Motor Vehicles**

---

**Pat J. Bombard, Franchisee**

Claimant

Dealer Certificate
Registration No. 7058987
Dealer Code 15-044
BAC Code 115292

**General Motors, Franchisor**

Respondent

---

### Statement of Facts

Pat J. Bombard (Bombard) is a long-time automobile dealership with a GM Chevrolet Franchise Agreement dating back to 1992. General Motors (GM) filed Bankruptcy in 2008 and initially decided to maintain Bombard's Dealership because of his excellence in meeting performance standards.

On March 19, 2009 Bombard received a proposal to purchase his dealership for $800,000.00, in the midst of the GM Bankruptcy, from Mr. Graziano Zazzara. That proposal was summarily denied. (Ex. A.). Afterwards, GM reneged on the decision to maintain Bombard's Dealership at all and compelled Bombard to enter a Wind-Down agreement to terminate his dealership assets by the end of the then existing Dealer Agreement Term (Dealer Code #15-044) on October 31, 2010 (Ex. B). General Motors then, within days rescinded the Wind-Down Agreement and entered a Participation Agreement with Bombard on June 1, 2009 (Ex. C.) The Participation Agreement included certain performance standards; all were met or exceeded by Bombard.

On June 11, 2009 Bombard requested approval of the sale of the Dealership pursuant to the Purchase Agreement date March 19, 2009. That request was refused by GM on June 11, 2009 (Ex. D Purchase Agreement and Rejection). It was rejected summarily without any discussion or due diligence. Bombard received an additional four offers thereafter in 2010-2012 to purchase his dealership. All of those offers were presented for approval to GM and likewise summarily and unreasonably rejected by GM without cause and in bad faith. The five additional offers are attached as Ex. E.

The initial Participation Agreement ended October 31, 2010 and a new Dealership and

Sales Agreement (Ex. F) was entered by the parties, with an automatic 5-year renewal term. On October 8, 2014 Bombard requested the Dealership Renewal Package for the 2015-2020 period by fax and letter (Ex. G).

On October 31, 2014, Bombard was falsely accused of Grand Larceny by the Onondaga County District Attorney and tried. He was found Not Guilty in July 2015 (Ex. H Exoneration Letter from Attorney).

Afterwards GM responded to more requests for renewal by phone requesting proof of NYS licensing and other documentation showing Bombard's financial ability. All requested information was immediately and timely provided to GM by fax (Ex. I). Acting in bad faith, GM refused to respond to Bombard's requests to renew the franchise and, ignoring previous responses by Bombard, GM required him to again send the same information he had already sent by fax (Ex. J).

GM Counsel Deb Collins and GM Director of Dealer Network, Lynn Howard, had assured Bombard at that time that upon receipt of the repeatedly requested and supplied verifications that his Dealership would be renewed. Bombard provided all repeatedly requested verifications by fax yet again again on October 11, 2016 (Ex.K). Bombard was told GM would schedule his renewal signing shortly thereafter in Danbury, Ct.. GM never did and no explanation was offered.

Among other sections, GM violated section 463 (2) (ff) (1) et seq. which prohibit modifications that substantially and adversely affect the dealer's rights, obligations, investment or return on investment. Bombard alleges that the Participation Agreement was not undertaken in good faith and adversely and substantially altered the his rights, obligations, investment or return on investment under his existing franchise agreement. In particular, among other items in the Participation Agreement, Bombard was required to build a brand new facility without any showing that his then existing one was in any way insufficient and without any inspection having been conducted. This was a new requirement added with several others set out in the PA that modified the existing dealer agreement in bad faith and without cause to the detriment and demise of Bombard's investment in the dealership. In spite of this unfair additional requirement, Bombard pursued the design and approval of a new facility fully, having procured all zoning approvals and architectural design elements at significant financial expense.

Section 463.2 (e)(2) of Article 17-A Franchised Motor Vehicle Dealer Act provides (The Act) that a Franchisor, here GM, may not terminate, cancel or refuse, to renew the franchise of any franchised motor vehicle dealer, here Bombard, except for "due cause" and in "good faith". GM's refusal to renew was in bad faith and without due cause in fact

and under the Dealer Agreement then in force and which was to have been renewed as Bombard was repeatedly assured. Moreover, The Act provides at Section 463.2 (d) (1) that a Franchisor shall not cancel or refuse to renew the franchise of any motor vehicle dealer except for due cause, regardless of the terms of the franchise. It further provides that a "Franchisor shall notify a franchised motor vehicle dealer, in writing of its intention to terminate, cancel, or refuse to renew the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such termination, cancelation, or refusal to renew. In no event shall the term of any such franchise expire without the written consent of the franchised motor vehicle dealer involved prior to the expiration of at least ninety days following shut written notice except as hereinafter provided." Additionally, GM's failure to renew Bombard's Dealership and failure to approve the sale of the Dealership pursuant to the agreement set out in Ex. A, violated Sections 466.1 of the Act as GM directly imposed unreasonable restrictions on the sale and on Bombards right to renew the Dealership as demonstrated above. Moreover, the repeated willful refusals of GM to consider or even engage in discussion about the several offers Bombard received to purchase his dealership during the term of his agreement demonstrates the Bad Faith of GM in regard to his affairs.

Further miscellaneous communications and documentation are included in Ex. L which includes among other items notice to GM dated October 16, 2017 requesting that they cooperate in appointing a mediator pursuant to NYS Vehicle and Traffic Law 471-a. GM ignored the notice and after some weeks indicated by a phone message that they would not be participating in mediation with Mr. Bombard.

## Request for Remedy

Mr. Bombard requests that the Franchisor fulfill the renewal of his Franchise so that he can elect to either operate it or sell it in accordance with the terms of the Franchise Agreement. He further requests that the Franchisor be directed to give due consideration and approval to any sale of the Franchise that Mr. Bombard may agree to with a capable and otherwise qualified purchaser.

Signed: _Pat J Bombard_

Pat J. Bombard

Dated: _12 -19-2017_

# The GUY LAW FIRM *PLLC*

October 16, 2017

Deborah F. Collins, Esq.
Counsel GM Legal Staff
300 Renaissance Center
Detroit, Michigan 48265

**Re: Notice Pursuant to NYS Vehicle and Traffic Law 471-a**

Dear Deb

Pursuant to Section 471-a of the NYS Vehicle and Traffic Law, I am writing on behalf of my client, Pat Bombard, to formally request mediation of the dispute that you have maintained against his demand for renewal of his Franchise Agreement with GM.

As you have not responded to my repeated requests that you agree to terms for mediation, I will rely on the procedure set in Section 471-a to request your response within seven days.

Thereafter, we will proceed with a request under Section 471-b of the NYS Vehicle and Traffic Law to have the Commissioner of the Department of Motor Vehicles adjudicate your dispute of our franchise rights.

Sincerely,

Frederick R. Guy, Esq.

*The*
# GUY LAW FIRM *PLLC*

December 19, 2017

NYS Department of Motor Vehicles
Division of Safety and Business Hearings
6 Empire State Plaza
Albany, NY  12228

Re: Request of Pat Bombard for an Adjudicatory Hearing

Dear Commissioner,

Enclosed please find NYS Form AA-71 comprising a Statement of Facts supporting Mr. Pat Bombard's claim against General Motors Corporation for having repeatedly violating the provisions of Article 17-A of the NYS Franchised Motor Vehicle Dealer Act, together with the required documentation supporting his claim.  The $2,000.00 fee is also enclosed.

We are requesting an adjudicatory hearing so his claim and witnesses in support of it may me be heard by the Commissioner as soon as practicable.

Please do not hesitate to contact me if any further information is required.

Sincerely,

Frederick R. Guy, Esq.

enc.
cc:  GM Counsel Deb Collins

 **Department of Motor Vehicles**

**Franchised Motor Vehicle Dealer**
**REQUEST FOR ADJUDICATORY PROCEEDING**
Division of Safety & Business Hearings
Telephone: (518) 474-1509
Fax: (518) 473-8505

## COMPLETE THE INFORMATION REQUESTED BELOW. PLEASE PRINT.

Name: **Pat J. Bombard**          AKA/DBA **Bombard Car Company, Inc.**

Address *(include number & Street)* **5 Wheeler Ave.**

City **Fayetteville**          State **NY**   Zip Code **13066**   Telephone # **( 315 ) 382-9464**

Dealer Certificate of Registration No.: **7058987**          Represented by: **Frederick R. Guy, Esq**

*Requests a New York State Department of Motor Vehicles Adjudicatory proceeding with:*

Franchisor **General Motors Corporation - Chevrolet**

Address *(include number & Street)* **General Motors Global Headquarters**

City **Detroit**          State **MI**   Zip Code **48625**   Telephone # **( 313 ) 667-9844**

Represented by *(if known):* **Deborah F. Collins, Esq.**

Address *(include number & Street)* **300 Renaissance Center**

City **Detroit**          State **MI**   Zip Code **48625**   Telephone # **( 313 ) 667-9844**

### INSTRUCTIONS FOR REQUEST

1) All documents relevant to the claim(s) made in this request, including all correspondence between the dealer and franchisor, must accompany this request when it is filed with the Commissioner. Include a copy of the current franchise agreement that exists between the dealer and the franchisor, and a copy of the certificate of service (see Instruction #2). Submit to:

   NYS Department of Motor Vehicles
   Div. Safety and Business Hearings, Room 424A
   6 Empire State Plaza
   Albany, NY  12228

2) At the time this request is filed with the Commissioner, a true copy of this request, with copies of all documents filed with it, must be served upon the franchisor in any manner specifically permitted under the terms of the franchise agreement or, if no such manner is specified, then via certified mail, return receipt requested, addressed to the officer or employee of the franchisor from whom the dealer has received correspondence relevant to the claims made in this request.

3) This request must be accompanied by a non-refundable filing fee of two thousand dollars ($2,000). Attach a certified check or money order payable to the Commissioner of Motor Vehicles.

4) In a short, plain statement present the facts that support your claim that the franchisor has violated one or more specific provisions of Article 17-A Franchised Motor Vehicle Dealer Act. Also, describe your request for a specific remedy other than damages. *(Use additional sheets as necessary.)*

   **Please See Attached Statement of Facts and Supporting Documentation**

Your attention is directed to the automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1) and 465(7).

*Please Sign Here*          **12/19/2017**
                              *Date*

AA-71 (2/15)

## STATE OF NEW YORK - DEPARTMENT OF MOTOR VEHICLES
### 6 Empire State Plaza, Albany, New York 12228

**Division of Safety and Business Hearings    Tel: (518) 474-1509    Fax: (518) 473-8505**

|  |  |  |
|---|---|---|
| SAFETY AND BUSINESS HEARING BUREAU<br>NOTICE OF HEARING<br><br>in the matter of<br>**Pat J. Bombard DBA  Bombard Car Company, Inc.**<br><br>Dealer/Franchisee<br><br>**and**<br><br>**General Motors Corporation-Chevrolet**<br><br>Franchisor<br><br>RESPONDENT | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.    **FMD201801**<br><br>Date of Hearing: April 23, 2018<br>Time of Hearing:        9:00 AM<br>Place of Hearing:<br>  NYS Dept. of Motor Vehicles<br>  Western Lights Plaza<br>  4671 Onondaga Blvd Suite #100B<br>  Syracuse, NY 13219<br><br>Presiding Officer: Jeffrey Leibo |

YOU ARE HEREBY GIVEN NOTICE that an Adjudicatory Hearing, conducted by the New York State Department of Motor Vehicles, in accordance with Vehicle and Traffic Law Section 471-a, and 15 N.Y.C.R.R., part 127.13, has been scheduled between the above parties before the assigned presiding officer.

This hearing is a result of a *Request for Adjudicatory Proceeding*, filed by the franchised motor vehicle dealer with the Commissioner of the Department of Motor Vehicles. The matters asserted by the dealer are as per the attached sheet. If you are hearing impaired, an interpreter will be available to you if you notify the Safety and Business Hearing Bureau in advance. An interpreter for the hearing impaired will be provided at no charge. It is your responsibility to bring an English translator if needed. You are permitted to appear with counsel. You should be prepared to present all evidence and witnesses at the hearing.

Adjournments are not granted except for good cause based on all the circumstances. Requests for adjournments should be made to the Safety and Business Hearing Bureau, Department of Motor Vehicles, 6 Empire State Plaza, Albany, NY 12228. Contact the bureau promptly. Do not assume an adjournment has been granted without specific confirmation. **In case of inclement weather such as a snow/ice storm please call Safety Hearing at (518) 474-1509 on the morning of hearing to see if hearing is still on.**

**Franchisor:** You have **20 Days** from receipt of this Hearing notice to deliver to the assigned presiding officer at the above address, and to the Dealer-Franchisee, a short and concise answering statement in response to the Dealer-Franchisee's allegations, and of the facts on which you rely upon in defense of such allegations, along with any supporting documents. **Your attention is directed to the automatic stay provisions, without bond, under Vehicle and Traffic Law Sections 463(2)(e)(1) and 465(7).**

**Dealer-Franchisee:** You have **20 Days** from receipt of the Franchisor's answering statement, to submit to the presiding officer at the above address, an additional statement of facts and documentary material but only to the extent of answering any new matter raised by the franchisor.
Date:    1/31/18

### THE HEARING WILL START PROMPTLY

| | | | |
|---|---|---|---|
| Dealer/Franchisee:<br><br>Address:<br><br>Telephone #:<br>Represented By:<br>Address:<br><br><br>Telephone #:<br>AA-70 (6/10) | Pat J. Bombard DBA  Bombard Car Company, Inc.<br>5 Wheeler Avenue<br>Fayetteville, NY 13066<br>315-382-9464<br>Fredrick R. Guy, ESQ<br>The Guy Law Firm PLLC<br>3596 Pleasant Valley Road<br>Syracuse, NY 13215<br>315-314-7461 | Franchisor:<br>Address :<br><br>Telephone #:<br>Represented By:<br>Address: | General Motors Corporation-Chevrolet<br>General Motors Global Headquarters<br>Detroit, MI 48625<br>313-667-9844<br>Deborah F. Collins, Esq<br>300 Renaissance Center<br>Detroit, MI 48625<br>313-667-9844 |

5

P.O. BOX 8    RT 20

SKANEATELES N.Y. 13152        10/8/2014

DBPG CONTACT INF. - ADDRESS + FAX

Dealer Business Planning Group
100 Renaissance Center                    FAX
MAIL - CODE - 482 - AO6 - C66            313 - 667 - 5461
Detroit, MI 48265 - 1000                 10/8/2014

              Please Contact ME on
        my Personal cell 315-506-5797
        Dealer name  PAT BONBARD
            BAC 115292

         Chev - 15-044


        I AM giving you my E.MAIL ADDRESS
          SUMMERWINDS LLC @ g.MAIL. COM


        PLEASE FORWARD TO MY EMAIL
     ALL Dealership New CONTRACT FOR
       5 YEAR RENEWAL Per YOUR aggament
     ON MY Chevrolet STORE.
       I AM EXCITED ABOUT MY New STORE
     AND Chevrolet New PRODUCT
       AND  BREAKING MORE SALES RECORDS

                        Pat Bonbard

CC. GSR 0410 ASS.
CC dBADAMi  LAWYER  dBADAMi@VERIZIN. NET
CC  M. Ashley   LAWYER  Mitchell Ashley Law @ the Ashley MWFirm. com

**HP Officejet Pro 8600 N911a Series**

**Fax Log for**
American Group I, P.C.
3156852289
Oct 08 2014 12:49PM

## Last Transaction

| Date | Time | Type | Station ID | Duration | Pages | Result |
|------|------|------|-----------|----------|-------|--------|
| | | | | Digital Fax | | |
| Oct 8 | 12:48PM | Fax Sent | 13136675461 | 1:01 N/A | 1 | OK |

6

10/11/2016

To Lynn Howard    313-
661-
5461

From Pat Bombard    313-667-
9844

Papers for Bombard    313- ③
432-2914
fax 3.57p

Chevolet franchise

and Store please provide
me with my Dealer salary
Service agreement asap. I am
in Ahweatten NY 13152
Now and can drive to
Danbuy CT. asap to sign
and Stat selling New Chev.
and Ship + Lease
Bank deposit and flp.

cover plus
16 pages.

Pat Bombard
10/11/2016

## ROBERT S. BASKA, M.D., ESQ.
## MADEEHA S. SYED, ESQ.
## UZMA A. GULAMALI, ESQ.

The Galleries of Syracuse, 441 S. Salina, Suite 700 ~ Syracuse, NY 13202

O: (315) 399-0696                 bobbaska@aol.com                 F: (315) 362-9065

August 22nd, 2015

Lynn M. Howard
Regional Manager, Dealer Organization for Northeast Region
General Motors
100 Renaissance Center
Mail Code 482-A16-C41
Detroit, MI 48265-1000

          Re:     *People v. Pat Bombard*

Dear Lynn Howard:

I was the attorney for Pat Bombard, who faced three felony charges of Grand Larceny in the 3rd Degree, Grand Larceny in the 4th Degree, and Grand Larceny in the 4th Degree in Onondaga County, New York. We took the case to trial and Mr. Bombard was found not guilty of all charges by his jury on July 23rd, 2015. This closes out his criminal case. See the attached. The file has been sealed pursuant to New York law.

Thank you again for your courtesies. Please feel free to call with any questions.

Sincerely,

Robert Baska, Esq.

STATE OF NEW YORK
COUNTY OF ONONDAGA
COUNTY COURT

Indictment # 2015-0329-1
Index # 2015-347

---

THE PEOPLE OF THE STATE OF NEW YORK

VS

PAT BOMBARD, DEFENDANT
DOB: 03/28/1956

CERTIFICATE OF

CONVICTION

---

THE ABOVE NAMED DEFENDANT WAS SENTENCED IN THIS COURT FOR THE OFFENSE OF

SEE BELOW

JUDGEMENT WAS ENTERED ON THE 23RD DAY OF JULY, 2015, BEFORE
JUDGE ANTHONY F ALOI  THE HONORABLE JUDGE OF THIS COURT.

THE DEFENDANT WAS SENTENCED TO A TERM OF:

ACQUITTED OF ALL COUNTS AFTER TRIAL BY JURY. SEALED PURSUANT CPL 160.50

I HEREBY CERTIFY THE ABOVE IS A TRUE ABSTRACT OF THE MINUTES OF THIS
PROCEEDING FILED IN THIS OFFICE OF THE ONONDAGA COUNTY CLERK.

COUNTY CLERK

DATED AT SYRACUSE, NEW YORK
THIS 20TH DAY OF AUGUST, 2015

THE PEOPLE OF THE STATE OF NEW YORK

vs.

_Pat Bombard_              _8-20-15_
Defendant                          Date

I, _Pat Bombard_ hereby make application to the Honorable _Anthony Aloi_

Judge of the Onondaga County Court for release of information referring to the above-entitled

action. Information requested is _Sealed 2015-6329-1 bla 156347_

Reason for request _Business_

_Pat Bombard_    _8/20/15_
Signature           Date

Witnessed by _____

                      _8-20-15_
                      Date

_____    _8/20/2015_
Signature of Judge        Date
Granting Release





**NADA Retirement Trust**
P.O. BOX 9200
McLEAN, VIRGINIA 22102-0200

PAT J BOMBARD SR
PO BOX 8

SKANEATELES, NY 13152-0008

**PREMATURE DISTRIBUTION**

CHECK: 818147
DATE: 03/18/2010
AMOUNT: $31,093.04
PLAN ID: 304766
SSN: 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

IN ADDITION TO THE FEDERAL INCOME TAX ON THE TAXABLE PORTION OF THIS DISTRIBUTION,
YOU MAY ALSO BE REQUIRED TO REPORT AND PAY A TEN (10) PERCENT FEDERAL EXCISE TAX
FOR "EARLY WITHDRAWAL" ON THE TAXABLE INCOME INCLUDED IN THIS PAYMENT.

SEE THE ENCLOSED NADART BENEFIT CALCULATION REPORT AND 1099R INSTRUCTIONS
FOR ADDITIONAL INFORMATION.

---

**Form 1099-R** — CORRECTED (if checked) — OMB No. 1545-0119 — **2010**

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

1 Gross distribution: 38,866.30
2a Taxable amount: 38,866.30
2b Taxable amount not determined: ☐ | Total distribution: ☒

PAYER'S name, street address, city, state, and ZIP code
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
RETIREMENT TRUST / CARDINAL BANK AS TRUSTEE
PO BOX 9200
McLEAN, VA 22102-0200

PAYER'S Federal identification number: 51-0210613
RECIPIENT'S Identification number: 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

RECIPIENT'S name, street address, city, state, and ZIP code
PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

4 Federal income tax withheld: 7,773.26
7 Distribution code: 1
9a Your percentage of total distribution: 100.00

Department of the Treasury - Internal Revenue Service

**Copy C For Recipient's Records**
(keep for your records)
This information is being furnished to the Internal Revenue Service.

---

**Form 1099-R** — CORRECTED (if checked) — OMB No. 1545-0119 — **2010**

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

1 Gross distribution: 38,866.30
2a Taxable amount: 38,866.30
2b Taxable amount not determined: ☐ | Total distribution: ☒

PAYER'S name, street address, city, state, and ZIP code
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
RETIREMENT TRUST / CARDINAL BANK AS TRUSTEE
PO BOX 9200
McLEAN, VA 22102-0200

PAYER'S Federal identification number: 51-0210613
RECIPIENT'S Identification number: 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

RECIPIENT'S name, street address, city, state, and ZIP code
PAT J BOMBARD SR
PO BOX 8
SKANEATELES, NY 13152-0008

4 Federal income tax withheld: 7,773.26
7 Distribution code: 1
9a Your percentage of total distribution: 100.00

Department of the Treasury - Internal Revenue Service

**Copy B** If this form shows Federal income tax withheld in Box 4, attach this copy to your Federal tax return.



Welcome to KeyBank!

KeyBank
32 Jordan St.
Skaneateles, NY 13152
Tel: 1-800-KEY2YOU

## NEW YORK STATE INSURANCE IDENTIFICATION CARD

375  UTICA NATIONAL ASSURANCE CO.

**Policy Number**
CPP4093638

THIS ID CARD MUST BE CARRIED IN THE INSURED VEHICLE FOR PRODUCTION UPON DEMAND

Name & Address of Issuer   **DELMONICO INSURANCE AGENCY**
1391 EAST GENESEE STREET
SKANEATELES  NY  13152

| Effective Date | Expiration Date |
|---|---|
| 01/01/2009 | 01/01/2010 |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration after 45 days from effective date.)
Applicable with respect to the following Motor Vehicle:

WARNING: Any person who issues or produces an ID card knowing that an Owner's Policy of insurance is not in effect may be committing a misdemeanor. In addition, a person who presents an ID card if insurance is not in effect may be committing a misdemeanor.

An authorized NEW YORK insurer has issued an Owner's Policy of Liability Insurance complying with Article 6 (Motor Vehicle Financial Security Act) of the NEW YORK Vehicle and Traffic Law to:

BOMBARD;CAR
COMPANIES;INC
1351 E GENESEE ST
SKANEATELES  NY 13152

| Year | Make |
|---|---|
| | DEALER GARAGE AUTO LIABIL |

Vehicle Identification Number

The name of the registrant and the name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION: DMV WILL ONLY PROCESS A VEHICLE CHANGE (RE-REGISTRATION) USING THE REPLACED VEHICLE'S CURRENT REGISTRATION.

FS-20

## NEW YORK STATE INSURANCE IDENTIFICATION CARD

375  UTICA NATIONAL ASSURANCE CO.

**Policy Number**
CPP4093638

THIS ID CARD MUST BE CARRIED IN THE INSURED VEHICLE FOR PRODUCTION UPON DEMAND

Name & Address of Issuer   **DELMONICO INSURANCE AGENCY**
1391 EAST GENESEE STREET
SKANEATELES  NY  13152

| Effective Date | Expiration Date |
|---|---|
| 01/01/2009 | 01/01/2010 |
| 12:01 a.m. | 12:01 a.m. |

(Not acceptable to obtain registration after 45 days from effective date.)
Applicable with respect to the following Motor Vehicle:

WARNING: Any person who issues or produces an ID card knowing that an Owner's Policy of insurance is not in effect may be committing a misdemeanor. In addition, a person who presents an ID card if insurance is not in effect may be committing a misdemeanor.

An authorized NEW YORK insurer has issued an Owner's Policy of Liability Insurance complying with Article 6 (Motor Vehicle Financial Security Act) of the NEW YORK Vehicle and Traffic Law to:

BOMBARD;CAR
COMPANIES;INC
1351 E GENESEE ST
SKANEATELES  NY 13152

| Year | Make |
|---|---|
| | DEALER GARAGE AUTO LIABIL |

Vehicle Identification Number

The name of the registrant and the name of the insured must coincide.

REPLACEMENT VEHICLE NOTATION: DMV WILL ONLY PROCESS A VEHICLE CHANGE (RE-REGISTRATION) USING THE REPLACED VEHICLE'S CURRENT REGISTRATION.

FS-20

FAX: Scanable Bar Code



FAX INSTRUCTIONS:

1. The entire page must be faxed.

2. If submitted to DMV, either the entire page or the second ID card and large scanable bar code will be retained

3. A faxed ID card must be replaced with a scanable ID card within 14 days of the effective date.

4. DMV will not accept a faxed ID card without a scanable barcode




# DEALER BOND UNDER NEW YORK STATE
## VEHICLE AND TRAFFIC LAW SECTION 415(6-B)

FACILITY NUMBER: _____

BOND NUMBER: __1194__

**KNOW ALL PERSONS BY THESE PRESENTS:**

Whereas, the undersigned __Bombard Car Companies__ , of
PO Box 8

(Dealer Name)

__Skaneateles, NY  13152__

(Full Dealer Address)

(hereinafter referred to as Principal) has applied or is about to make application for a registration certificate as a dealer, qualified dealer or new motor vehicle dealer pursuant to New York Vehicle and Traffic Law Section 415; and

Whereas, the undersigned __Universal Underwriters Ins.Co.__ , of

7045 College Blvd.
Overland Park, KS 66211 (hereinafter

(Surety Name)    (Surety Address)

referred to as Surety) a corporation organized and existing under the laws of the state of __KANSAS__ and authorized to transact business as a surety insurer in the State of New York, is willing to act as surety on this Bond to comply with the requirements of Vehicle and Traffic Law Section 415(6-b); and

Whereas, Vehicle and Traffic Law Section 415(6-b) requires that every dealer, qualified dealer, and new motor vehicle dealer obtain and continue in effect a surety bond as a condition to obtaining a registration certificate;

Now therefore, Principal, as principal, and Surety, as surety, do hereby bind themselves and their heirs, executors, successors and assigns to the State of New York in a sum not to exceed the amount below, the payment for which the Principal and Surety bind themselves and their legal representatives, firmly by these presents, pursuant to Vehicle and Traffic Law Section 415(6-b) and subject to the following conditions.

**BOND AMOUNT:**
__Fifty Thousand**********__ (Dollars)

(**$50,000********************__**

1. The term of this Bond shall commence **February 28, 2000** and shall continue in full force and effect until terminated by sixty (60) days written notice of cancellation delivered to the New York State Commissioner of Motor Vehicles by the Surety.

2. The Surety shall be required to provide sixty (60) days written notice to the New York State Commissioner of Motor Vehicles prior to the effective date of cancellation of the Bond by first class mail.

3. The conditions of this Bond are that the Principal shall:
   (a) pay all valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles;
   (b) transfer good title to each motor vehicle which the Principal sells;
   (c) maintain and keep safe all customer deposits related to the sale of a motor vehicle from the time of receipt of such customer deposit until good title has been transferred to the customer;
   (d) pay all fines imposed upon the Principal by the Commissioner of Motor Vehicles pursuant to the provisions of the Vehicle and Traffic Law; and
   (e) repay any overcharges of a customer for vehicle registration and titling charges payable to the Commissioner of Motor Vehicles for registering and titling the sold vehicle.

4. Recovery against this Bond may be made by a person, including the State, who obtains a judgment against the Principal for an act or omission on which the Bond is conditioned if the act or omission occurred during the term of the Bond. The total liability imposed on the Surety for all breaches of the Bond condition is limited to the face amount of the Bond. Such liability may include, but is not limited to, the amount of the valid bank drafts, including checks, drawn by the Principal for the purchase of motor vehicles or the amount of the overcharge by the Principal or the deposit, as the case may be, for the motor vehicle for which good title was not delivered. In no event shall the Surety or a Bond be liable for total claims in excess of the bond amount, regardless of the number or nature of claims made against the bond or the number of years the bond remained in force.

In witness whereof, the Principal and Surety have hereunto set their hands and seals on this __7th__ day of __February__ in the year of __2000__.

__Bombard Car Companies__ , Principal

Print Name

By: _____
Signature

__Universal Underwriters Insurance Co.__ , Surety

Print Name

By: _____
Signature

V3-3P (12/99)



12

**New York State Department of Motor Vehicles**

# OFFICIAL BUSINESS CERTIFICATE

THIS CERTIFICATE EXPIRES 04/30/10

FACILITY IDENTIFICATION NO.    7058987

BOMBARD CAR CO INC
POBX8 1351 E GNSE RD
SKANEATELES NY        13152

Validation Date and Number:        04/15/08        02339

This person is    REGISTERED AS A
NEW MOTOR VEHICLE DEALER
pursuant to the provisions of the Vehicle and Traffic Law.

This document does not certify that this business complies with zoning and other local laws

POST IN A CONSPICUOUS PLACE

MV-61P (11/95)

N. Y. S. DEPARTMENT OF STATE                              162 WASHINGTON AVEN
DIVISION OF CORPORATIONS AND STATE RECORDS               ALBANY, NY 12231

FILING RECEIPT
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

CORPORATION NAME: BOMBARD CAR CO., INC.


DOCUMENT TYPE   : INCORPORATION (DOM. BUSINESS)          COUNTY: ONON

SERVICE COMPANY : SERVICO

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
FILED: 04/30/1992   DURATION: PERPETUAL   CASH #: 920430000029   FILM #: 9204300000

ADDRESS FOR PROCESS
-------------------
THE CORPORATION
P.O. BOX 70
SYRACUSE, NY 13215

REGISTERED AGENT
----------------



     STOCK:     200 NPV


::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

  FILER                    FEES          160.00  PAYMENTS   160.
  -----                    ----          ------  --------
PELLIGRA LAW FIRM         FILING  :      125.00  CASH  :      0.
205 S. TOWNSEND STREET    TAX     :       10.00  CHECK :      0.
                          CERT    :        0.00  BILLED:    160.
SYRACUSE, NY 13202        COPIES  :        0.00
                          HANDLING:       25.00
                                                 REFUND:      0.
                                                 ------
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
DOS-1025 (11/89)

# REVOLVING LINE OF CREDIT AGREEMENT

## I.

## THE PARTIES

This Revolving Line of Credit Agreement (the "Agreement") is made effective the ___2/11___ day of ___2___, 2007, by and between GMAC, an entity organized under the laws of Delaware, with its principal place of business at 200 Renaissance Center, Detroit, Michigan 48265, and Bombard Car Co., Inc., a New York Corporation, with its principal place of business located at 1351 E.genesee Street, Skaneateles, NY 13152 ("Borrower").

## II.

## THE RECITALS

A.   **WHEREAS, GMAC** is in the business of providing, among other things, various credit accommodations for use in assisting periodic cash flow needs and capital requirements; and

B.   **WHEREAS,** Borrower has requested, and GMAC is willing to provide credit and finance accommodations in the form of a discretionary revolving line of credit to assist Borrower with cash flow needs and capital requirements (the "Line of Credit"), but only in accordance with the terms and conditions of this Agreement.

## III.

## THE AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein contained, the sufficiency of which is hereby acknowledged, GMAC and Borrower hereby agree as follows:

1.   **The Line of Credit.**  Subject to all the terms and conditions of this Agreement, GMAC hereby establishes a discretionary revolving Line of Credit for the Borrower. The limits and availability of the revolving Line of Credit may be determined by GMAC from time to time in its discretion and will be based upon, among other things, Borrower's financial condition and status, value of collateral pledged as security for the Line of Credit, and Borrower's performance of its obligations hereunder and under other agreements with GMAC.

   (a)   **The Purpose.**  The Line of Credit may be used by the Borrower to assist Borrower in the periodic cash flow needs of its dealership or cash or capital needs of its related dealerships or its related business entities.

   (b)   **Limitation and Availability.**  GMAC will notify Borrower at least monthly of the amounts available to Borrower hereunder. Notification will be made by way of a monthly billing statement (the "Billing Statement"), although GMAC may in its discretion notify Borrower of changes in availability by e-mail or fax or verbally, in person or by phone, with a courtesy confirmation in writing. Borrower may also obtain information regarding the amount of Borrower's account balance and the amount available to Borrower at GMAC's dealer loan

website located at the following URL: *www.gmacdealerloans.com* ("Website"). Borrower will not rely or cause a third party to rely on information contained in the Website or GMAC's telephonic access system. Borrower agrees that at no time will advances taken by Borrower under paragraph (c) below exceed the availability; provided, however, that if advances exceed availability for any reason, the excess amount will be deemed to be part of the Line of Credit for all intents and purposes under this Agreement. Unless Borrower notifies GMAC in writing of any objection to any monthly Billing Statement (specifically describing the basis of such objection) within thirty (30) days after the date thereof, the Billing Statement will (absent manifest error) be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein. Only those items expressly objected to in that notice will be deemed to be disputed by Borrower.

(c) **Advances**. Borrower may obtain advances (the "Credit Line Advances") available hereunder by:

   (i) making a request in writing to the GMAC office that does business with Borrower; or,

   (ii) using GMAC's electronic access systems. The procedures, restrictions and instructions regarding Borrower's use of the electronic access system, as modified from time to time, are posted on the Website (the "Account Terms of Access"). The procedures, restrictions and instructions regarding Borrower's use of GMAC's telephonic access system will be presented in separate instructional materials to Borrower before or contemporaneously with the availability of the system for the Borrower's use. If Borrower uses the electronic access systems, Borrower will be bound by and must comply with those Account Terms of Access and the terms, conditions and instructions set forth in the separate materials.

Credit Line Advances will be transferred by GMAC to Borrower's pre-designated account via Automated Clearing House ("ACH") deposit. Upon GMAC's request, Borrower will provide written confirmation to GMAC of any on-line request for a Credit Line Advance within five (5) calendar days.

(d) **Repayment**. In addition to any other amounts Borrower is obligated to pay GMAC as herein set forth, Borrower will promptly repay to GMAC the Credit Line Advances plus any accrued interest, as follows:

   (i) **Mandatory Repayment of Credit Line Advances**. The following amounts must be paid at the time indicated:

      (A) The principal and interest amounts, if any, indicated on a Billing Statement as may be sent to Borrower by GMAC, payable by the due date shown on such statement.

      (B) That amount of the total Credit Line Advances which exceeds the availability set forth in the most current Billing Statement, or other means of notification provided by GMAC, payable immediately upon notice.

      (C) If demanded, the full amount of the Credit Line Advances plus accrued interest must be paid immediately upon demand by GMAC.

(ii) **Permissive Payment**. The Credit Line Advances may be prepaid in whole or in part at the option of the Borrower and without premium or penalty.

(iii) **Principal Repayments Via ACH Withdrawal**. Principal repayments must be made by Borrower designating the amount to be repaid at the Website or GMAC's telephonic access system. The repayments will be withdrawn from Borrower's pre-designated account via Automated Clearing House ("ACH") withdrawal.

(e) **Credit Line Availability Fee**. None.

(f) **Interest**. The Credit Line Advances will bear interest on the principal amount of and from the date of each advance to the date of repayment in full of the Credit Line Advances. Only one interest rate will apply to the Credit Line Advances at any given time. The rate of interest on the Credit Line Advances will be 325 basis points (one basis point equals one hundredth of one percent) above the previous month's average of the 30-Day LIBOR rate (as hereinafter defined). Such previous month's average of the 30-Day LIBOR rate as of the date of this Agreement is Five and 35/100 percent (5.35%). Upon each subsequent increase or decrease in the previous month's average of the 30-Day LIBOR rate, the rate of interest will be increased or decreased by the same amount as the increase or decrease in the previous month's average of the 30-Day LIBOR rate, effective on the first day of the next monthly interest billing period. In no event will the applicable interest rate exceed the maximum permitted by law.

The rate of interest in effect as of the date of this Agreement and applicable to the first monthly billing hereunder is Eight and 60/100 percent (8.60%). The rate of interest applicable to any successive monthly billing period will be 325 basis points above the previous month's average of the 30-Day LIBOR rate applicable as of the billing date.

Interest is calculated on the basis of a 360-day year for the number of actual days outstanding. Interest will be billed by GMAC monthly as part of the Billing Statement and will be due and payable as instructed therein. In no event will the interest provided for herein exceed the maximum permitted by law, which the parties recognize may change from time to time. If acceleration or other events cause the interest contracted for, charged or received to be in excess of the lawful maximum, Borrower will receive credits so that the interest will comply with the law and in no event will the interest contracted for, charged or received exceed the legal maximum.

This rate will not be subject to any Wholesale Incentive Plan reductions, which may be currently applicable to other outstanding loans.

The 30-Day LIBOR rate is defined as follows: The per annum rate of interest offered for 30-day deposits in U.S. Dollars for each day of a billing period that appears on the Bloomberg Screen US0001M Index (British Banker's Association LIBOR setting) at approximately 11:00 a.m. London time, or a similar commercially reasonable source. The 30-day LIBOR rate applicable to any day on which no rate is published will be the rate last quoted prior to such day. The previous month's average LIBOR rate will be based on the 30-day LIBOR quotes for the calendar days beginning on the 26th of the month prior to the previous month and ending with the 25th of the previous month.

Notwithstanding the foregoing, for purposes of determining the previous month's average of the 30-Day LIBOR rate of interest under this Agreement, such rate will be considered 2.00% per annum if at any time during the previous month such rate was less than 2.00% per annum.

If the wholesale floorplan account(s) of Bombard Car Co., Inc. is (are) transferred to another financing source, GMAC may, at its option:

(i)    declare the loan balance due and payable,

(ii)   increase the rate of this loan to 400 basis points above the then current previous month's average of the 30-day LIBOR rate (as defined herein), or

(iii)  increase the rate of this loan to 400 basis points above the existing loan rate.

(g)    **Interest Payments**.  Interest as shown on the monthly Billing Statement will be withdrawn by GMAC from Borrower's pre-designated account on the due date designated in the monthly Billing Statement or within five (5) days after the due date (at GMAC's discretion) via Automated Clearing House ("ACH") withdrawal.  Borrower will maintain sufficient funds in the account to cover the ACH withdrawals for interest.

2.    **Security Interest and Collateral Assignment.**  To secure:

(a)    the prompt and complete payment of the Credit Line Advances and

(b)    the payment and performance of any and all obligations and duties of Borrower of any and all other debts, obligations or duties of Borrower to GMAC now existing or hereafter arising, whether direct or indirect, absolute or contingent, or otherwise,

Borrower hereby pledges, assigns and grants to GMAC a security interest in the following property and assets (the "Collateral"):

inventory, equipment, fixtures, accounts receivable, contract rights, securities, cash, general intangibles, documents, instruments, chattel paper, investment property and commercial tort claims.

3.    **Handling of Collateral.**  With respect to the Collateral, Borrower will:

(a)    maintain, secure and protect it from diminution in value; and

(b)    keep it free and clear of the claims, liens, mortgage, pledge, encumbrances, security interests and rights of all others; and

(c)    permit GMAC full and complete access to it in order to inventory, inspect and audit it, including review of Borrower's books and records pertaining thereto; and

(d) insure it against all risks in such amounts and with a carrier and deductibles acceptable to GMAC. Such insurance policy must name GMAC as loss payee, to the extent of its interests therein and must contain a cancellation provision conditioned upon thirty (30) days prior written notice to GMAC.

(e) have good and marketable title to all of it.

4. **Default**.

(a) **Terms of Default**. Occurrence of any of the following constitutes a default under this Agreement:

(i) a default by Borrower in the payment, performance or observance of any obligation or covenant under this Agreement, or under any other agreement now or hereafter entered into with GMAC;

(ii) the institution of a proceeding in bankruptcy, receivership or insolvency by or against Borrower or its property;

(iii) GMAC deems itself insecure based on knowledge of any event, occurrence, circumstance or fact not directly caused by GMAC, which in the reasonable judgment of GMAC will have a material adverse effect on the Collateral, or on the collection by GMAC under any guaranty of the obligations of Borrower hereunder or if any substantial portion of Collateral is in danger of misuse, loss, seizure or confiscation.

(b) **Borrower's Duties Upon Default**. Upon Borrower's default, Borrower must, if GMAC so requests, assemble Collateral and make it available to GMAC at a reasonable, convenient place designated by GMAC.

(c) **Rights and Remedies of GMAC**. Upon Borrower's default, GMAC has the right to exercise one or more of the following remedies:

(i) GMAC may take immediate possession of Collateral without demand or further notice and without legal process, and in so doing may enter upon the premises wherever Collateral may be and remove the same;

(ii) GMAC may institute proceedings to collect all or a portion of the Credit Line Advances, and any accrued or unpaid interest, and to recover a judgment for the same and to collect upon such judgment out of any property of the Borrower wherever situated;

(iii) GMAC may offset and apply any monies, credits or other proceeds of property of Borrower that has or may come into possession or under the control of GMAC against any amount owing by Borrower to GMAC;

(iv) GMAC may sell or lease the Collateral, or any portion thereof, after five days' written notice at public or private sale for the account of the Borrower;

(v) GMAC may demand return of all checks issued to Borrower.

5. **Rights and Remedies Not Waived**. No course of dealing between the Borrower and GMAC or any failure or delay on the part of GMAC in exercising any rights or remedies under this Agreement, or as provided by law, will operate as a waiver of any rights or remedies of GMAC and no single or partial exercise of any rights or remedies will operate as a waiver or preclude the exercise of any other rights or remedies.

6. **Limit of Liability**. GMAC will use its best efforts in handling the Automated Clearing House ("ACH") Credit Line Advance and ACH principal repayment and interest payment processes, but will not be liable to Borrower, except for acts or omissions by GMAC which constitute gross negligence or willful neglect. In no event will GMAC be liable for any delay in transmitting ACH Credit Line Advances or ACH principal repayments or interest payments due to equipment, communication or electronic failures or any other cause beyond GMAC's reasonable control. In any and all events, the liability of GMAC will not exceed an amount equal to the actual dollar amount of the processing entries which are the subject of the claim and there is no liability of GMAC for incidental, consequential or punitive damages.

7. **Termination**. This Agreement is effective until terminated upon the earlier of any event described in subparagraph 4(a) or thirty days after receipt of written notice of termination sent by either party to the other. All rights and remedies of GMAC or duties and obligations of Borrower extant upon termination of this Agreement continue in full force and effect until all obligations are paid in full.

8. **Suspension**. GMAC may, in its sole and absolute discretion, increase, decrease, change, or suspend its obligation to make Advances under the Line of Credit.

9. **Notice and Waivers**. The Borrower agrees, if this Agreement is placed in the hands of an attorney for collection, to pay all actual and reasonable legal fees whether incurred as a result of out-of-court resolution or a court action (including pre-trial, trial, and all appellate expenses), and to pay all costs of collection as permitted by law. The Borrower hereby waives notice of presentment, presentment, notice of dishonor, and demand. **The Borrower further waives the right to trial by jury as to any and all matters relating in any way to this Agreement to the extent permitted by law. The Borrower acknowledges that Borrower has consulted with counsel regarding this section and each and every other section of this Agreement.**

10. **Complete Agreement**. Except as otherwise provided or referred to herein, there are no other agreements or understandings, either oral or in writing, between the parties affecting this Agreement or relating to any of the subject matters covered by this Agreement. No agreement between GMAC and Borrower which relates to matters covered herein, and no change in, addition to (except the filling in of blank lines), or erasure of any printed portion of this Agreement will be binding unless it is approved in a written agreement executed by a duly authorized representative of each party.

11. **Severability**. Any provision hereof prohibited by law will be ineffective to the extent of such prohibitions without invalidating the remaining provisions hereof.

12. **Governing Law**. This Agreement will be construed in accordance with and governed by the laws of the location of Borrower's principal place of business.

## CORPORATE RESOLUTION OF
Bombard Car Co., Inc.

_____2/1_____, 2007

I, the undersigned Secretary of Bombard Car Co., Inc., a Corporation organized and existing under the laws of the State of New York, do hereby certify that at a meeting of the Board of Directors of said Corporation, duly held on ____2/1____, 2007, a quorum being present, the following resolutions, affirmations and ratifications are made in accordance with the by-laws, and have been entered upon the regular minute book of said Corporation and are now in full force and effect to-wit:

WHEREAS, this Corporation has entered into and/or desires to enter into one or more commercial and/or retail finance agreements with GMAC whereby GMAC agrees, at its sole discretion, to extend credit and/or grant loans and other financial accommodations to this Corporation, (the "Loan Documents"); and

WHEREAS, in accordance with these Loan Documents, this Corporation assumes certain obligations to GMAC;

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors affirms and ratifies the terms and provisions of said Loan Documents and further affirms that _Pat Bombard_____ is authorized to sign any and all Loan Documents and other documents necessary or required by GMAC in connection with any extension of credit and/or grant of loans and other financial accommodations.

RESOLVED FURTHER, that _Pat Bombard___ is authorized and empowered from time to time to do and perform all such other acts and things deemed by him/her necessary, convenient, or proper to carry out, modify or supplement any such agreements and arrangements made with GMAC pursuant to said Loan Documents and other documents.

_____          _____2/1_____, 2007
             Secretary

0
0
0
0
0
0
0
0
1
5

**IN WITNESS WHEREOF,** each of the parties has caused this Agreement to be executed by its duly authorized representative effective the date first above written.

**GMAC**

By: _____

Its: _____

**Bombard Car Co., Inc.**

**("BORROWER")**

By: _____

Its: _____

# ROBERT S. BASKA, M.D., ESQ.
## MADEEHA S. SYED, ESQ.
## UZMA A. GULAMALI, ESQ.

The Galleries of Syracuse, 441 S. Salina, Suite 700 ~ Syracuse, NY 13202

O: (315) 399-0696                bobbaska@aol.com                F: (315) 362-9065

August 22nd, 2015

Lynn M. Howard
Regional Manager, Dealer Organization for Northeast Region
General Motors
100 Renaissance Center
Mail Code 482-A16-C41
Detroit, MI 48265-1000

Re:    *People v. Pat Bombard*

Dear Lynn Howard:

I was the attorney for Pat Bombard, who faced three felony charges of Grand Larceny in the 3rd Degree, Grand Larceny in the 4th Degree, and Grand Larceny in the 4th Degree in Onondaga County, New York. We took the case to trial and Mr. Bombard was found not guilty of all charges by his jury on July 23rd, 2015. This closes out his criminal case. See the attached. The file has been sealed pursuant to New York law.

Thank you again for your courtesies. Please feel free to call with any questions.

Sincerely,

Robert Baska, Esq.

STATE OF NEW YORK
COUNTY OF ONONDAGA
COUNTY COURT

Indictment # 2015-0329-1
Index # 2015-347

THE PEOPLE OF THE STATE OF NEW YORK

VS

PAT BOMBARD, DEFENDANT
DOB: 03/28/1956

CERTIFICATE OF

CONVICTION

THE ABOVE NAMED DEFENDANT WAS SENTENCED IN THIS COURT FOR THE OFFENSE OF

SEE BELOW

JUDGEMENT WAS ENTERED ON THE 23RD DAY OF JULY, 2015, BEFORE
JUDGE ANTHONY F ALOI THE HONORABLE JUDGE OF THIS COURT.

THE DEFENDANT WAS SENTENCED TO A TERM OF:

ACQUITTED OF ALL COUNTS AFTER TRIAL BY JURY. SEALED PURSUANT CPL 160.50

I HEREBY CERTIFY THE ABOVE IS A TRUE ABSTRACT OF THE MINUTES OF THIS
PROCEEDING FILED IN THIS OFFICE OF THE ONONDAGA COUNTY CLERK.

COUNTY CLERK

DATED AT SYRACUSE, NEW YORK
THIS 20TH DAY OF AUGUST, 2015

THE PEOPLE OF THE STATE OF NEW YORK

VS.

_Pat Bombard_
_____
Defendant

_8-20-15_
_____
Date

I, _Pat Bombard_ hereby make application to the Honorable _Anthony Aloi_

Judge of the Onondaga County Court for release of information referring to the above-entitled

action. Information requested is _Sealed 2015-0329-1 Indx 156347_

Reason for request _Business_

_Pat Bombard_          _8/20/15_
_____     _____
Signature                                            Date

Witnessed by _____

_8-20-15_
_____
Date

_____
Signature of Judge
Granting Release

_8/20/2015_
_____
Date

# GMAC FINANCIAL SERVICES

3104 Unionville Rd Suite 200
Cranberry Township, PA 16066

BRANCHES THROUGHOUT
THE WORLD

EXECUTIVE OFFICES
DETROIT

October 23, 2008

Mr. Pat Bombard
Bombard Car Co., Inc.
PO Box 8
Skaneateles, NY 13152

Re: Bombard Car Co., Inc. ("Borrower") Revolving Line of Credit Agreement

Dear Mr. Bombard:

Bombard Car Co., Inc., is the Borrower under the Revolving Line of Credit Agreement dated February 1, 2007 ("Agreement"). Due to current market conditions:

- GMAC can no longer make this credit line available to the Borrower and hereby suspends its obligation to make Credit Line Advances to the Borrower as of the date of this letter; and
- GMAC needs to raise the rate of interest on any outstanding Credit Line Advances to 600 basis points above the previous month's average of the 30-day LIBOR rate.

This rate increase requires an amendment of the Agreement that must be signed by the Borrower and GMAC. As such, GMAC proposes to amend Section 1(f) of the Agreement, which is captioned "Interest", to read as follows:

1. Strike the first paragraph in its entirety and replace it with the following:

   "The Credit Line Advances will bear interest on the principal amount of and from the date of each advance to the date of repayment in full of the Credit Line Advances. Only one interest rate will apply to the Credit Line Advances at any given time. The rate of interest on the Credit Line Advances will be 600 basis points (one basis point equals one hundredth of one percent) above the previous month's average of the 30-Day LIBOR rate (as hereinafter defined). Such previous month's average of the 30-Day LIBOR rate as of October 1, 2008 is Two and 72/100 percent (2.72%). Upon each subsequent increase or decrease in the previous month's average of the 30-Day LIBOR rate, the rate of interest will be increased or decreased by the same amount as the increase or decrease in the previous month's average of the 30-Day LIBOR rate, effective on the first day of the next monthly interest billing period. In no event will the applicable interest rate exceed the maximum permitted by law.

2. Strike the second paragraph in its entirety.

The foregoing amendments would be effective on December 1, 2008, and all other paragraphs of Section 1(f) and all other terms and conditions of the Agreement will remain unchanged and in full force and effect as written.

Please indicate the Borrower's agreement to this amendment, effective December 1, 2008, by signing below where indicated and **return a signed copy of this letter to GMAC at the address indicated above by October 31, 2008.**

If GMAC does not receive the Borrower's signed agreement by October 31, 2008, then:

- GMAC will deem the ERLC Agreement terminated effective November 30, 2008.

- The Borrower must pay the full amount of the Credit Line Advances plus accrued interest by November 30, 2008.

In the interim, the ERLC Agreement remains unchanged and in full force and effect as written.

If you have any questions about this matter, please contact me at telephone number 724-742-4013.

Capitalized terms used in this letter and not otherwise defined in it have the meanings ascribed to them in the Agreement.

Sincerely,

Christine Woodworth
Portfolio Manager

**Acknowledged and Agreed**

Bombard Car Co., Inc.

Signature: _Paty Borland_

By (print name): _PAT J BOMBARD_

Title: _PRESIDENT_

Date: _11/5/08_

# General Motors Corporation

June 1, 2009

VIA Federal Express

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152

Attention: Pat J Bombard

This letter is to advise you that the Chevrolet Dealer Agreement between GM and your dealer company will not be continued by GM on a long-term basis. This is a difficult step, but one that is part of GM's court supervised restructuring efforts. Subject to bankruptcy court approval, we are willing to assist you in winding down your Chevrolet dealership operations to allow for the sale of new vehicle and other inventories in an orderly fashion. In order for us to provide you with this assistance, you must execute, and GM must receive, the enclosed agreement on or before **June 12, 2009**.

In summary and subject to bankruptcy court approval, the enclosed agreement, which you should carefully read, provides:

- For the termination of the Dealer Agreement no earlier than January 1, 2010 and no later than October 31, 2010

- For the assignment and assumption of the Dealer Agreement, as supplemented by the enclosed agreement, by a purchaser of certain assets of GM in the bankruptcy (the "<u>363 Acquirer</u>")

- For the payment of financial assistance in installments in connection with the orderly winding down of your Chevrolet operations

- For the waiver of any other termination assistance of any kind

- For a release of claims against GM, the 363 Acquirer and their related parties

- For dealership operations to continue pursuant to the Dealer Agreement, as supplemented by the enclosed agreement, through the effective date of termination of the Dealer Agreement, except that you shall not be entitled to order any new vehicles from GM or the 363 Acquirer

Given that the enclosed agreement provides your dealership with the ability to wind-down the Chevrolet dealership operations on an orderly basis, we recommend you carefully consider executing the agreement. We have enclosed a return Federal Express envelope, addressed to GM, for your convenience. Due to extremely short court deadlines in the bankruptcy process, we must receive the enclosed agreement on or before **June 12, 2009**. If we receive the executed agreement by that date, we will not move to reject your Dealer Agreement in the bankruptcy and plan to assign your Dealer Agreement (as supplemented by the enclosed agreement) to the 363 Acquirer as part of the court supervised restructuring of our dealer network. If we do not receive the enclosed agreement executed by you on or before **June 12, 2009**, GM will apply to the bankruptcy court to reject your Dealer Agreement. If we reject the Dealer Agreement, we cannot offer any wind-down or termination assistance in connection with such Dealer Agreement.

While these are challenging and unprecedented economic circumstances in the industry, we are pleased that we are able to offer you the enclosed agreement to allow you to wind down your Chevrolet dealership business and to sell your Chevrolet new Motor Vehicle inventory in an orderly fashion.

If you have any questions, please direct them to the Dealer Call Center at 877.868.8071.

Sincerely,

GENERAL MOTORS CORPORATION

03
4805_03_115292



## WIND-DOWN AGREEMENT

THIS WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the 1st day of June, 2009, by and between Bombard Car Co., Inc. ("Dealer"), and GENERAL MOTORS CORPORATION ("GM").

## RECITALS

A.    Dealer and GM are the parties to Dealer Sales and Service Agreement (the "Dealer Agreement") for Chevrolet motor vehicles (the "Existing Model Line"). Capitalized terms not otherwise defined in this Agreement shall have the definitions set forth for such terms in the Dealer Agreement.

B.    GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

C.    GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets") to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"), subject to approval by and order of the Bankruptcy Court.

D.    GM has considered moving and may, at its option, move to reject the Dealer Agreement in the Bankruptcy Case, as permitted under the Bankruptcy Code, unless Dealer executes and delivers this Agreement to GM on or before June 12, 2009.

E.    In return for the payments set forth herein and GM's willingness not to pursue the immediate rejection of the Dealer Agreement in the Bankruptcy Case, Dealer desires to enter into this Agreement, (i) to allow Dealer, among other things, to wind down its Dealership Operations in an orderly fashion (specifically including the sale of all Dealer's new Motor Vehicles), (ii) to provide for Dealer's voluntary termination of the Dealer Agreement, GM's payment of certain monetary consideration to Dealer, and Dealer's covenants regarding its continuing Dealership Operations under the Dealer Agreement, as supplemented by the terms of this Agreement (the "Subject Dealership Operations"), and (iii) to provide for Dealer's release of GM, the 363 Acquirer and their related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between GM and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, all on the terms and conditions set forth herein.

## COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer and GM hereby agree (subject to any required Bankruptcy Court approvals) as follows:

1.    Assignment-363 Sale.  Dealer acknowledges and agrees that GM has the right, but not the obligation, to seek to assign the Dealer Agreement and this Agreement in the Bankruptcy Case to the 363 Acquirer. As part of the 363 Sale, provided such sale closes, GM may, in its sole discretion, assign the Dealer Agreement and this Agreement to the 363 Acquirer. If GM elects to exercise its option to assign the Dealer Agreement and this Agreement, Dealer specifically agrees to such assignment and agrees not to object to or protest any such assignment.

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

2.  Termination of Dealer Agreement. Subject to the terms of Section 1 above:

(a)  Dealer hereby covenants and agrees to conduct the Subject Dealership Operations until the effective date of termination of the Dealer Agreement, which shall not occur earlier than January 1, 2010 or later than October 31, 2010, under and in accordance with the terms of the Dealer Agreement, as supplemented by the terms of this Agreement. Accordingly, Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof, such termination to be effective on October 31, 2010. Notwithstanding the foregoing, either party may, at its option, elect to cause the effective date of termination of the Dealer Agreement to occur (if not terminated earlier as provided herein) on any date after December 31, 2009, and prior to October 31, 2010, upon thirty (30) days written notice to the other party. In addition, and notwithstanding the foregoing, if Dealer has sold all of its new Motor Vehicle inventory on or before December 31, 2009 and wishes to terminate the Dealer Agreement prior to January 1, 2010, Dealer may request that GM or the 363 Acquirer, as applicable, approve such termination and, absent other limiting circumstances, GM or the 363 Acquirer, as applicable, shall not unreasonably withhold its consent to such termination request, subject to the terms of this Agreement.

(b)  Concurrently with its termination of the Dealer Agreement, Dealer hereby conveys to GM or the 363 Acquirer, as applicable, a non-exclusive right to use Dealer's customer lists and service records for the Subject Dealership Operations, and within ten (10) days following GM's or the 363 Acquirer's, as applicable, written request, Dealer shall deliver to GM or the 363 Acquirer, as applicable, digital computer files containing copies of such lists and records. Such right of use shall include without limitation the right to communicate with and solicit business and information from customers identified in such lists and records and to assign such non-exclusive right to third parties without thereby relinquishing its own right of use.

3.  Payment to Dealer.

(a)  Subject to Sections 1 and 2 above, in consideration of (i) Dealer's execution and delivery to GM of this Agreement, (ii) Dealer's agreement to sell its new Motor Vehicle inventory as set forth below, and (iii) the termination of the Dealer Agreement by written agreement in accordance with Section 14.2 thereof (as set forth in Section 2 of this Agreement), GM or the 363 Acquirer, as applicable, shall pay, or cause to be paid, to Dealer the sum of $128,163 (the "Wind-Down Payment Amount"), subject to the terms herein. This payment is consideration solely for Dealer's covenants, releases and waivers set forth herein, and Dealer's transfer to GM or the 363 Acquirer, as applicable, of a non-exclusive right to use the customer lists and service records.

(b)  GM shall pay twenty-five percent (25%) of the Wind-Down Payment Amount (the "Initial Payment Amount") to Dealer by crediting Dealer's open account maintained by GM on the GM Dealer Payment System (the "Open Account"), in accordance with GM's standard practices, within ten (10) business days following the later of (i) GM's receipt of any required Bankruptcy Court approvals, or (ii) full execution and delivery of this Agreement. GM or the 363 Acquirer, as applicable, shall pay the balance of the Wind-Down Payment Amount (the "Final Payment Amount") to Dealer, subject to the terms of this Agreement, by crediting Dealer's Open Account in accordance with its standard practices, within ten (10) business days after all of the following have occurred: (i) Dealer has sold all of its new Motor Vehicle inventory for the Existing Model Line prior to the termination of the Dealer Agreement, (ii) Dealer's compliance with all applicable bulk transfer, sales tax transfer or similar laws and the expiration of all time periods provided therein, (iii) Dealer's delivery to GM or the 363 Acquirer, as applicable, of

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

certificates of applicable taxing authorities that Dealer has paid all sales, use, and other taxes or evidence reasonably satisfactory to GM or the 363 Acquirer, as applicable, that GM or the 363 Acquirer, as applicable, will have no liability or obligation to pay any such taxes that may remain unpaid, (iv) the effective date of termination of the Dealer Agreement in accordance with Section 2(a) above, (v) Dealer's compliance with the terms of Section 4(c) below, (vi) GM's or the 363 Acquirer's receipt of the fully executed Supplemental Wind-Down Agreement in substantially the form attached hereto as <u>Exhibit A</u> (subject to inclusion of information specific to Dealer's Dealership Operations), and (vii) GM's or the 363 Acquirer's, as applicable, receipt of any required Bankruptcy Court approvals.  GM or the 363 Acquirer, as applicable, may, in its sole discretion, waive in writing any of the conditions for payment set forth in the preceding sentence.

(c)   In addition to any other setoff rights under the Dealer Agreement, payment of all or any part of the Wind-Down Payment Amount may, in GM's or the 363 Acquirer's reasonable discretion, be (i) reduced by any amount owed by Dealer to GM or the 363 Acquirer, as applicable, or their Affiliates (as defined below), and/or (ii) delayed in the event GM or the 363 Acquirer, as applicable, has a reasonable basis to believe that any party has or claims any interest in the assets or properties of Dealer relating to the Subject Dealership Operations including, but not limited to, all or any part of the Wind-Down Payment Amount (each, a "<u>Competing Claim</u>"), in which event GM or the 363 Acquirer, as applicable, may delay payment of all or any part of the Wind-Down Payment Amount until GM or the 363 Acquirer, as applicable, has received evidence in form and substance reasonably acceptable to it that all Competing Claims have been fully and finally resolved.

4.   <u>Complete Waiver of All Termination Assistance Rights</u>.  In consideration of the agreements by GM hereunder, upon the termination of the Dealer Agreement, as provided in this Agreement, and cessation of the Subject Dealership Operations, the following terms shall apply in lieu of Dealer's rights to receive termination assistance, whether under the Dealer Agreement or applicable laws, all of which rights Dealer hereby waives:

(a)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Motor Vehicles whatsoever.

(b)   Neither GM nor the 363 Acquirer, as applicable, shall have any obligation to repurchase from Dealer any Parts or Accessories or Special Tools whatsoever.

(c)   Dealer shall eliminate or remove from the Dealership Premises all Dealer-owned signs (freestanding or not) for the Subject Dealership Operations within thirty (30) days following the effective date of termination at no cost to either GM or the 363 Acquirer, as applicable. Dealer understands and agrees that neither GM nor the 363 Acquirer, as applicable, will purchase any Dealer-owned signs used in connection with the Subject Dealership Operations.  Dealer hereby waives any rights it may have to require either GM or the 363 Acquirer, as applicable, to purchase any signs used or useful in connection with the Subject Dealership Operations.  Dealer shall provide, or shall cause the owner of the Dealership Premises to provide, GMDI access to the Dealership Premises in order for GMDI to remove all GM signs leased to Dealer by GMDI. Dealer understands and agrees that the Wind-Down Payment Amount was determined by GM in part based on Dealer's agreement that it will timely remove all signs for the Subject Dealership Operations and will not require or attempt to require GM or the 363 Acquirer, as applicable, to purchase any or all of such signs pursuant to the provisions of the Dealer Agreement or any applicable statutes, regulations, or other laws.

3

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

(d) Dealer expressly agrees that the provisions of Article 15 of the Dealer Agreement do not, by their terms, apply to this termination.

(e) Dealer expressly agrees that all termination rights of Dealer are set forth herein and expressly agrees that any termination assistance otherwise available to Dealer as set forth in the Dealer Agreement or any state statute or regulation shall not apply to Dealer's termination of the Dealer Agreement.

(f) The terms of this Section 4 shall survive the termination of this Agreement.

5.    Release; Covenant Not to Sue; Indemnity.

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "GM Parties"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and neither GM nor the 363 Acquirer, as applicable, shall collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer, as applicable, of any amounts due or to become due to either or any of its Affiliates. GM or the 363 Acquirer, as applicable, shall not charge back to Dealer any warranty claims approved and paid by GM or the 363 Acquirer, as applicable, prior to the effective date of termination, as described in Section 2 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM or the 363 Acquirer, as applicable, may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) As set forth above, GM reaffirms the indemnification provisions of Section 17.4 of the Dealer Agreement and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

4

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or this Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

(d) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, costs, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Party's) breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(e) The terms of this Section 5 shall survive the termination of this Agreement.

6. **Subject Dealership Operations.** From the effective date of this Agreement until the effective date of termination of the Dealer Agreement (which shall not occur prior to January 1, 2010, subject to Section 2(a) above):

(a) Dealer shall not, and shall have no right to, purchase Motor Vehicles from GM or the 363 Acquirer, as applicable, which rights Dealer hereby waives.

(b) Dealer shall have the right to purchase service parts from GM or the 363 Acquirer, as applicable, to perform warranty service and other normal service operations at the Dealership Premises during the term of this Agreement. Dealer shall have no obligation, however, to follow the recommendations of GM's service parts operations' retail inventory management ("RIM") process, which recommendations are provided for guidance purposes only. Dealer's future orders of service parts of any kind (as well as service parts currently on hand and those acquired in the future from a source other than GM or the 363 Acquirer, as applicable), including but not limited to RIM-recommended orders, shall not be eligible for return.

(c) Dealer shall not, and shall have no right to, propose to GM or the 363 Acquirer, as applicable, (under Section 12.2 of the Dealer Agreement or otherwise) or consummate a change in Dealer Operator, a change in ownership, or, subject to GM's or the 363 Acquirer's, as applicable, option, a transfer of the dealership business or its principal assets to any Person; provided, however, that GM or the 363 Acquirer, as applicable, shall honor the terms of Section

5

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

12.1 of the Dealer Agreement upon the death or incapacity of the Dealer Operator, except that the term of any new dealer agreement under Subsection 12.1.5 shall expire on October 31, 2010, subject to the terms of this Agreement. Accordingly, neither GM nor the 363 Acquirer, as applicable, shall have any obligation (under Section 12.2 of the Dealer Agreement or otherwise) to review, process, respond to, or approve any application or proposal to accomplish any such change, except as expressly otherwise provided in the preceding sentence.

(d)    In addition to all other matters set forth herein, the following portions of the Dealer Agreement shall not apply; Sections 6.1 and 6.3.1 (concerning ordering of new Motor Vehicles), Article 8 (Training), Article 9 (Review of Dealer's Performance), Sections 12.2 and 12.3 (Changes in Management and Ownership), Article 15 (Termination Assistance), and Article 16 (Dispute Resolution).

(e)    Except as expressly otherwise set forth herein, the terms of the Dealer Agreement, shall remain unmodified and in full force and effect.

7.    <u>No Protest.</u>

(a)    GM or the 363 Acquirer, as applicable, may desire to relocate or establish representation for the sale and service of the Existing Model Line in the vicinity of Dealer's Dealership Premises identified in the Dealer Agreement. In consideration of GM's and the 363 Acquirer's, as applicable, covenants and obligations herein, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or other tribunal or dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, any establishment or relocation whatsoever of a motor vehicle dealership for the Existing Model Line.

(b)    Dealer, for itself and for each and all of the other Dealer Parties, hereby releases and forever discharges the GM Parties, from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including, without limitation, attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of such Existing Model Line.

(c)    Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 7. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 7. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(d)    Dealer acknowledges that, upon a breach of this Section 7 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer, as applicable, to the same position it would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM or the 363 Acquirer, as applicable, to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's, as applicable, application for injunctive relief and prohibiting any further act by Dealer in

6

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

violation of this Section 7. In addition, GM or the 363 Acquirer, as applicable, shall have all other equitable rights in connection with a breach of this Section 7 by Dealer, including, without limitation, the right to specific performance.

8. _Due Authority._  Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

9. _Confidentiality._  Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, as applicable, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

10. _Informed and Voluntary Acts._  Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

11. _Binding Effect._  This Agreement shall benefit and be binding upon the parties hereto and their respective successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs and provided that GM assigns the Dealer Agreement and this Agreement to the 363 Acquirer, this Agreement shall benefit and bind the 363 Acquirer.

12. _Effectiveness._  This Agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this Agreement is executed fully and properly by Dealer and is received by GM on or before **June 12, 2009**.

13. _Continuing Jurisdiction._   By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 13 shall survive the termination of this Agreement.

14. _Other Agreements._

(a) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer, as applicable, and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer, as applicable.  In the event of any conflict between the terms of the Channel Agreements and this Agreement, the terms and conditions of this Agreement shall control.

(b) The term "Channel Agreements" shall mean any agreement (other than the Dealer Agreement) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreement, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other dealerships, to conduct exclusive Dealership Operations under the Dealer Agreement, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or the 363 Acquirer, as applicable, or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreement," "Agreement and Business Plan," "Exclusive Use Agreement," "Performance Agreement," "No-Protest Agreement," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase."

7

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "Termination Agreement"), (ii) any performance agreement of any kind between Dealer and GM (each a "Performance Agreement"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("AHI"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) All of the Channel Agreements shall automatically terminate and be of no further force or effect on the effective date of termination of the Dealer Agreement, except that those provisions that, by their terms, expressly survive termination of the Channel Agreements shall survive the termination contemplated under this Agreement. Following the effective date of termination of the Dealer Agreement, Dealer and GM shall execute and deliver documents in recordable form reasonably satisfactory to GM or the 363 Acquirer, as applicable, confirming the termination of any Channel Agreements affecting title to real property owned or leased by Dealer or Dealer's Affiliates.

15. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

16. Counterparts. This Agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

17. Breach. In the event of a breach of this Agreement by Dealer, GM and the 363 Acquirer shall each have all of its remedies at law and in equity, including, without limitation, the right to specific performance.

18. Complete Agreement of the Parties. This Agreement, the Dealer Agreement, and the schedules, exhibits, and attachments to such agreements (i) contain the entire understanding of the parties relating to the subject matter of this Agreement, and (ii) supersede all prior statements, representations and agreements relating to the subject matter of this Agreement. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

8

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

IN WITNESS WHEREOF, Dealer and GM have executed this Agreement as of the day and year first above written.

Bombard Car Co., Inc.

By: _Paty Bombard_____

Name: _PAT J. BOMBARD_____

Title: _President_____

**GENERAL MOTORS CORPORATION**

By _____

Authorized Representative

# THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292



General Motors Corporation

June 1, 2009

Via Federal Express

BOMBARD CAR COMPANY
PO BOX 8
SKANEATELES, NY 13152

Re:    *GM Dealer Sales and Service Agreements/Participation Agreement*

Attention:    PAT BOMBARD

I    BOMBARD CAR COMPANY                    ) and General Motors Corporation
("GM") are parties to Dealer Sales and Service Agreements (the "Dealer Agreements") for [
CHEVROLET motor vehicles (the "Existing Model Lines"). Capitalized terms not otherwise defined in
this letter agreement have the definitions set forth for such terms in the Dealer Agreements.

GM is the debtor and debtor-in-possession in a bankruptcy case (the "Bankruptcy Case") pending
in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"),
having filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code"). No trustee has been appointed and GM is operating its business as debtor-in-possession.

GM intends to sell, convey, assign and otherwise transfer certain of its assets (the "363 Assets"),
to a purchaser (the "363 Acquirer") pursuant to Section 363 of the Bankruptcy Code (the "363 Sale"),
subject to approval by and order of the Bankruptcy Court. GM's restructuring in the Bankruptcy Case
involves, among other things, the restructuring of its current dealer network. Part of that restructuring
includes focus on and retention of those dealers who, based on a number of factors, GM believes have an
opportunity to be successful dealers selling and servicing GM's products.

Dealer recognizes that as part of GM's restructuring efforts, a significant number of dealers of the
same line make as Dealer will be consolidated. Because this consolidation will result in fewer dealers
representing the Existing Model Lines, the retained dealers, including Dealer, will have the opportunity to
increase sales significantly. It is therefore vital to Dealer and GM that Dealer agree to implement
additional sales and inventory requirements necessary for Dealer to be retained in the 363 Acquirer's
dealer network and for Dealer's performance to be in line with such increased opportunity.

In consideration for Dealer's execution and delivery of, and performance under, this letter
agreement and subject to Bankruptcy Court approval, GM (i) shall not move to reject the Dealer
Agreements in the Bankruptcy Case, and (ii) shall assign the Dealer Agreements to the 363 Acquirer as
part of the 363 Sale, provided such sale closes.

1

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR
BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

As a condition of its participation in the 363 Acquirer's dealer network and in consideration of GM's agreements set forth herein, Dealer shall execute and deliver this letter agreement to GM. This letter agreement contains terms that supplement the Dealer Agreements[s] and incorporates requirements that GM believes will enhance Dealer's and the 363 Acquirer's opportunities for success. In addition, GM expects that GM or the 363 Acquirer will from time to time, subject to modification in its sole discretion, publish essential brand element guidelines for dealership operations, including Dealer's operations. The essential brand elements are GM's and the 363 Acquirer's minimum standards for dealership operations and include, among other things, facility image requirements and/or relocation requirements, dedicated sales and service requirements for the Existing Model Lines, and participation in customer information programs.

This letter agreement will become effective upon the date of Dealer's due execution and delivery of this letter agreement to GM (the "Effective Date"). If Dealer executes and delivers this letter agreement to GM on or before June 12, 2009, subject to Bankruptcy Court approval, the 363 Assets will include, without limitation, the Dealer Agreements, as supplemented by this letter agreement. If Dealer does not sign and deliver to GM this letter agreement on or before June 12, 2009, GM may, in its sole discretion, move to reject the Dealer Agreements[s] in the Bankruptcy Case. If the 363 Sale does not occur on or before August 31, 2009 (or such later date as GM or the 363 Acquirer may select in their sole discretion), GM or the 363 Acquirer may, at their sole option and at any time thereafter, terminate this letter agreement by written notice to Dealer.

## SUPPLEMENTAL TERMS

1. Defined Terms. All initially capitalized terms used and not otherwise expressly defined herein shall have the meanings set forth for such terms in the Dealer Agreements[s].

2. Sales Performance. Dealer recognizes that, as a result of the consolidation of GM dealers undertaken by GM to strengthen the dealer network and increase dealer through-put, Dealer has substantially more sales opportunities and Dealer must substantially increase its sales of new Motor Vehicles. The 363 Acquirer will provide to Dealer an annual number of new Motor Vehicles that Dealer must sell to meet the 363 Acquirer's increased sales expectations and will update such annual sales number on a periodic basis throughout each year. Dealer's requirements to meet the 363 Acquirer's sales targets are in addition to the sales effectiveness requirements of the current Dealer Agreements. Dealer acknowledges and agrees that compliance with the sales effectiveness requirements of the Dealer Agreements alone will not be sufficient to meet the requirements of this Section 2 and Dealer must meet the sales effectiveness requirements of the Dealer Agreements, as supplemented by this letter agreement.

3. New Vehicle Inventory. Dealer recognizes that, due to the consolidation of GM dealers representing the Existing Model Lines and the expected sales increases contemplated in Section 2 above, Dealer will need to stock additional Motor Vehicles. Dealer shall use its best efforts to stock sufficient additional new Motor Vehicles to meet the increased sales expectations. To facilitate its expected increased sales, Dealer shall, upon the written request from the 363 Acquirer, order and accept from the 363 Acquirer additional new Motor Vehicles of the Existing Model Lines to meet or exceed the sales guidelines provided by the 363 Acquirer relating to Dealer's increased sales expectations contemplated in Section 2 above. In addition, upon Dealer's written request, the 363 Acquirer shall coordinate with, and provide to, GMAC (or such other floor plan provider designated by Dealer), updated sales expectations and other information necessary for GMAC (or such other floor plan provider designated by Dealer) to act upon Dealer's request for additional floor plan funding.

4. Exclusivity. During the remaining term of the Dealer Agreements[s] (the "Exclusivity Period"), Dealer shall actively and continuously conduct Dealership Operations only for the Existing

2

Model Lines[s] at the premises authorized for the conduct of Dealership Operations under the Dealer Agreements (the "Dealership Premises"). During the Exclusivity Period, the Dealership Premises may not be used for any purpose other than Dealership Operations for the Existing Model Lines[s] (including, but not limited to, the sale, display, storage and/or service of vehicles not approved by the Dealer Agreements[s], other than as specifically contemplated by the term "Dealership Operations") without the express prior written consent of GM or the 363 Acquirer, which consent may be granted or withheld in GM's or the 363 Acquirer's sole discretion. In the event that Dealer currently operates any non-GM dealership on the Dealership Premises, Dealer shall cease all non-GM Dealership Operations at the Dealership Premises on or before December 31, 2009. Notwithstanding anything to the contrary in the Dealer Agreements, state law or otherwise, if Dealer fails to cure any default under this Section 4 within thirty (30) days of written notice of default from GM or the 363 Acquirer, GM or the 363 Acquirer shall be entitled to all of its remedies as set forth in Section 8 below, including without limitation, the right to terminate the Dealer Agreements.

5. No Protest. In connection with GM's restructuring plan and consolidation of the dealer network, GM intends that GM and the 363 Acquirer have a dealer network consisting of fewer, stronger and more properly located dealers allowing for higher through-put and enhanced business potential.

(a)    GM or the 363 Acquirer may desire to relocate or establish representation for the sale and service of motor vehicles for the Existing Model Lines at a site located in the vicinity of the Dealership Premises (the "Proposed Site"). In consideration of GM's and the 363 Acquirer's covenants and obligations herein, and provided that (i) GM or the 363 Acquirer notifies Dealer of any such relocation or establishment within two (2) years after the later of (x) the date of the 363 Sale or (y) the Effective Date (the "No Protest Commencement Date"), (ii) such relocation or establishment is substantially completed on or before the date which is four (4) years after the No Protest Commencement Date, and (iii) the Proposed Site is, measured by straight line distance, at least six (6) miles from the then current location of the Dealership Premises, Dealer covenants and agrees that it will not commence, maintain, or prosecute, or cause, encourage, or advise to be commenced, maintained, or prosecuted, or assist in the prosecution of any action, arbitration, mediation, suit, proceeding, or claim of any kind, before any court, administrative agency, or tribunal or in any dispute resolution process, whether federal, state, or otherwise, to challenge, protest, prevent, impede, or delay, directly or indirectly, establishment or relocation of a motor vehicle dealership for any of the Existing Model Lines at or in the vicinity of the Proposed Site.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

3

11    THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

(c)     Dealer, for itself, its Affiliates (as defined below) and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "Dealer Parties"), hereby releases and forever discharges GM, the 363 Acquirer, their Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, agents, spouses, legal representatives, successors and assigns (collectively, the "GM Parties"), from any and all past, present, and future claims, demands, rights, causes of action, judgments, executions, damages, liabilities, costs, or expenses (including attorneys' fees) which they or any of them have or might have or acquire, whether known or unknown, actual or contingent, which arise from, are related to, or are associated in any way with, directly or indirectly, the establishment or relocation of any of the Existing Model Lines described in Section 5(a) above.

(d)     Dealer recognizes that it may have some claim, demand, or cause of action of which it is unaware and unsuspecting which it is giving up pursuant to this Section 5. Dealer further recognizes that it may have some loss or damage now known that could have consequences or results not now known or suspected, which it is giving up pursuant to this Section 5. Dealer expressly intends that it shall be forever deprived of any such claim, demand, cause of action, loss, or damage and understands that it shall be prevented and precluded from asserting any such claim, demand, cause of action, loss, or damage.

(e)     Dealer acknowledges that, upon a breach of this Section 5 by Dealer, the determination of the exact amount of damages would be difficult or impossible and would not restore GM or the 363 Acquirer to the same position they would occupy in the absence of breach. As a result of the foregoing, any such breach shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 5. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 5 by Dealer, including, without limitation, the right to specific performance.

6.  Release; Covenant Not to Sue; Indemnity. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale:

(a) Dealer, for itself, the other Dealer Parties, hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreements), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("Claims"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this letter agreement against the GM Parties, arising out of or relating to (i) the Dealer Agreements or this letter agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Lines, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("SFE") related payments or bonuses (except that GM or the 363 Acquirer shall pay any SFE funds due the Dealer for the second (2nd) quarter of 2009), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreements, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this letter agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to

4

Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior to the date of this letter agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Article 17.4 of the Dealer Agreements, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM or the 363 Acquirer of any amounts due or to become due to either or any of their Affiliates.

(b) Dealer hereby acknowledges, understands and agrees that the foregoing release extends to, and is expressly intended by Dealer to extend to, all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected. In this regard, Dealer hereby expressly waives the benefit, if any, to Dealer of Section 1542 of the California Civil Code, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Dealer expressly assumes the risk that after the execution and delivery of this letter agreement by Dealer, Dealer may discover facts which are different from those facts which Dealer believed to be in existence on the date hereof. Any such discovery by Dealer shall not affect the validity or effectiveness of the release contained herein.

(c) As set forth above, GM reaffirms the indemnification provisions of Article 17.4 of the Dealer Agreements and specifically agrees that such provisions apply to all new Motor Vehicles sold by Dealer.

(d) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert (i) any Claim that is covered by the release provision in subparagraph (a) above, or (ii) any Claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreements by GM to the 363 Acquirer in the 363 Sale or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement. Any breach of the foregoing shall absolutely entitle GM and the 363 Acquirer to an immediate and permanent injunction to be issued by any court of competent jurisdiction, precluding Dealer from contesting GM's or the 363 Acquirer's application for injunctive relief and prohibiting any further act by Dealer in violation of this Section 6. In addition, GM and the 363 Acquirer shall have all other equitable rights in connection with a breach of this Section 6 by Dealer, including, without limitation, the right to specific performance.

(e) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this letter agreement or Dealer's execution or delivery of or performance under this letter agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited

5

liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

(f) The terms of this Section 6 shall survive the termination of this letter agreement.

7. <u>Compliance</u>. In consideration for GM's covenants and agreements set forth herein, including, without limitation, the assignment of the Dealer Agreements in the 363 Sale, from and after the Effective Date:

(a) Dealer shall continue to comply with all of its obligations under the Dealer Agreements[s], as supplemented by the terms of this letter agreement. In the event of any conflict between the Dealer Agreements[s] and this letter agreement, the terms and conditions of this letter agreement shall control, unless otherwise set forth herein;

(b) Dealer shall continue to comply with all of its obligations under Channel Agreements (as defined below) between GM and Dealer, provided that GM or the 363 Acquirer and Dealer shall enter into any amendment or modification to the Channel Agreements required as a result of GM's restructuring plan, in a form reasonably satisfactory to GM or the 363 Acquirer. In the event of any conflict between the terms of the Channel Agreements and this letter agreement, the terms and conditions of this letter agreement shall control. The term "<u>Channel Agreements</u>" shall mean agreements (other than the Dealer Agreements) between GM and Dealer imposing on Dealer obligations with respect to its Dealership Operations under the Dealer Agreements, including, without limitation, obligations to relocate Dealership Operations, to construct or renovate facilities, not to protest establishment or relocation of other GM dealerships, to conduct exclusive Dealership Operations under the Dealer Agreements, or to meet certain sales performance standards (as a condition of receiving or retaining payments from GM or otherwise). Channel Agreements may be entitled, without limitation, "Summary Agreements," "Agreements and Business Plan," "Exclusive Use Agreements," "Performance Agreements," "No-Protest Agreements," or "Declaration of Use Restriction, Right of First Refusal, and Option to Purchase." Notwithstanding the foregoing, the term "Channel Agreement" shall not mean or refer to (i) any termination agreement of any kind with respect to the Dealer Agreement between Dealer and GM (each a "<u>Termination Agreement</u>"), (ii) any performance agreement of any kind between Dealer and GM (each a "<u>Performance Agreement</u>"), or (iii) any agreement between Dealer (or any Affiliate of Dealer) and Argonaut Holdings, Inc., a Delaware corporation and wholly-owned subsidiary of GM ("<u>AHI</u>"), including, without limitation, any agreement entitled "Master Lease Agreement," "Prime Lease," or "Dealership Sublease" (and Dealer shall comply with all of the terms of such agreements with AHI). Dealer acknowledges that GM shall be entitled, at its option, to move to reject any currently outstanding Termination Agreements or Performance Agreements in the Bankruptcy Case. By executing this letter agreement, Dealer agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert any objection or protest of any kind with respect to GM's rejection of such Termination Agreements or Performance Agreements.

(c) Dealer shall (i) comply with the essential brand elements set forth in any subsequently published guidelines from GM or the 363 Acquirer, and (ii) increase its floor plan capability to accommodate the increased sales and inventory expectations contemplated in Sections 2 and 3 above.

8. <u>Breach and Remedies</u>. In return for the consideration provided by GM herein, in the event of Dealer's breach of the Dealer Agreements[s], as supplemented by this letter agreement, GM and the 363

6

Acquirer shall have all of its rights and remedies under the Dealer Agreements[s], as supplemented by this letter agreement, and in addition, (i) GM or the 363 Acquirer may terminate the Dealer Agreements[s], as supplemented by this letter agreement, upon written notice to Dealer of not less than thirty (30) days, and/or (ii) the 363 Acquirer shall not be obligated to offer Dealer a replacement dealer sales and service agreement[s] upon the termination by its terms of the Dealer Agreements, as supplemented by this letter agreement. In the event that either Dealer or the 363 Acquirer terminates the Dealer Agreements[s], as supplemented by this letter agreement, after the 363 Sale or the 363 Acquirer does not offer Dealer a replacement dealer sales and service agreement[s] as set forth above, then (x) GM or the 363 Acquirer shall provide Dealer with termination assistance solely as set forth in Section 15.2 of the Dealer Agreements[s] (excluding any facility assistance pursuant to Section 15.3 of the Dealer Agreements[s]), and (y) Dealer waives all other rights under the Dealer Agreements[s], as supplemented by this letter agreement, and any applicable state laws, rules or regulations regarding termination notice, termination rights, termination assistance, facility assistance or other termination rights.

9.  Miscellaneous.

(a) Dealer and the individual(s) executing this letter agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this letter agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this letter agreement.

(b) This letter agreement shall supplement the Dealer Agreements[s] as of the Effective Date and shall be effective through the remainder of the term of the Dealer Agreements[s], which shall expire no later than October 31, 2010.

(c) Except as supplemented by this letter agreement (including all exhibits, schedules and addendums to this letter agreement), the Dealer Agreements[s] shall remain in full force and effect as written. Additionally, the Dealer Agreements[s], as referenced in any other document that the parties have executed, shall mean the Dealer Agreements[s] as supplemented by this letter agreement.

(d) This letter agreement may be executed in counterparts, each of which when signed by all of the parties hereto shall be deemed an original, but all of which when taken together shall constitute one agreement.

(e) The Dealer Agreements, as supplemented by this letter agreement, shall benefit and be binding upon (i) to the extent permitted by this letter agreement, any replacement or successor dealer as referred to in the Dealer Agreements, as supplemented by this letter agreement, and any successors or assigns, and (ii) any of GM's or the 363 Acquirer's successors or assigns. Without limiting the generality of the foregoing, after the 363 Sale occurs, this letter agreement shall benefit and bind the 363 Acquirer.

(f) The parties to this letter agreement have been represented, or have had the opportunity to be represented, by counsel and have been advised, or have had the opportunity to be advised, by counsel as to their rights, duties and relinquishments hereunder and under applicable law. In executing this letter agreement, Retailer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

(g) The Dealer Agreement[s], as supplemented hereby, shall be governed by and construed in accordance with the laws of the state of Michigan.

7

(h) By executing this letter agreement, Dealer herby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this letter agreement and any other matter related thereto. The terms of this Section 9(h) shall survive the termination of this letter agreement.

(i) Dealer hereby agrees that, without the prior written consent of GM or the 363 Acquirer, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this letter agreement or any facts relating hereto or to the underlying transactions.

(j) If any part, term or provision of this letter agreement is invalid, unenforceable, or illegal, such part, term or provision shall be considered severable from the rest of this letter agreement and the remaining portions of this letter agreement shall be enforceable as if the letter agreement did not contain such part, term or provision.

(k) This letter agreement shall constitute an agreement, executed by authorized representatives of the parties, supplementing the Dealer Agreements as contemplated by Section 17.11 thereof. This letter agreement shall be deemed withdrawn and shall be null and void and of no further force or effect unless this letter agreement is executed fully and properly by Dealer and is received by GM on or before June 12, 2009.

*[Signature Page Follows]*

8

Please indicate your approval of, and agreement with respect to, the matters set forth in this letter agreement by signing where provided below and returning it to GM for execution in the enclosed, self-addressed Federal Express envelope.

GENERAL MOTORS CORPORATION

By:_____
          Authorized Representative

APPROVED AND AGREED TO THIS
*10* DAY OF JUNE, 2009

[DEALER ENTITY CORPORATE NAME]

By: _Paty Borland_

Name: _PAT J BOMBARD_
Title: _PRESIDENT_

# THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009, OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN.

9

GMMS 09    
USA 11/2004

# GENERAL MOTORS CORPORATION
## Dealer Sales And Service Agreement(s)

Effective <u>November 1, 2005</u>, General Motors Corporation, a Delaware Corporation, separately on behalf of its Division(s) identified in the specific Motor Vehicle Addendum(s) for ☒ Chevrolet Passenger Vehicles and Light Duty Trucks, ☐ Chevrolet Medium Duty Trucks, ☐ Pontiac Motor Vehicles, ☐ GMC Light Duty Trucks, ☐ GMC Medium Duty Trucks, ☐ Buick Motor Vehicles, ☐ Cadillac Motor Vehicles, and ☐ HUMMER Motor Vehicles, ("General Motors") and <u>BOMBARD CAR CO., INC.,</u> ☐ a proprietorship, ☐ a partnership, or ☒ a <u>NEW YORK</u> corporation, ☐ a limited liability company, or ☐ other business entity, doing business as <u>Not Applicable</u> and located at <u>E GENESEE ST, SKANEATELES, NEW YORK, 13152,</u> ("Dealer"), hereby enter into separate Agreement(s) for each Motor Vehicle Line-Make(s) included in the Motor Vehicle Addendum(s) incorporated into this Agreement, and only for the Line-Make(s) included in the Motor Vehicle Addendum(s). The Agreement for each Line-Make is independent and separately enforceable by each party, and the use of this common form is intended solely to simplify execution of the Agreement(s). The parties agree as follows:

## FIRST: TERM OF AGREEMENT(S)

This Agreement(s) shall expire on <u>October 31, 2010</u> unless earlier terminated. Dealer is assured of an opportunity to enter into a new Agreement(s) at the expiration date if General Motors determines that Dealer has fulfilled its obligations under this Agreement(s).

## SECOND: STANDARD PROVISIONS AND RELATED ADDENDA

The Standard Provisions and all of the related Addenda are hereby incorporated as part of this Agreement. The Dealer acknowledges that these documents have been brought to its attention, and Dealer accepts their form, content and amendments thereto, in the prescribed manner, from time to time.

## THIRD: DEALER OPERATOR AND DEALER OWNER

Dealer agrees that the following Dealer Operator will provide personal services in accordance with Article 2 of the Standard Provisions:

<u>PAT J. BOMBARD</u>
—
—

The following Dealer Owner(s) agree that they will comply in all respects with Article 3 of the Standard Provisions:
<u>N/A</u>
—

—

## FOURTH: EXECUTION OF AGREEMENT(S) AND RELATED DOCUMENT(S)

This Agreement(s) and related agreement(s) are valid only if signed:

   (a)  on behalf of Dealer by its duly authorized representative, and in the case of this Agreement(s), by its Dealer Operator; and

   (b)  this Agreement(s) as set forth below on behalf of General Motors by the Regional General Manager and his authorized representative. All related agreements will be signed by the Regional General Manager or his authorized representative.

## FIFTH: ADDITIONAL AGREEMENTS AND UNDERSTANDINGS

The following agreement(s) are hereby incorporated by reference into this Agreement(s):
<u>NEW DEALER FACILITY LETTER AGREEMENT - C</u>

<u>BOMBARD CAR CO., INC.</u>
Dealer Firm Name

By: _____
Dealer Operator and Date

**GENERAL MOTORS CORPORATION**

By: _____
Regional General Manager

By: _____    9/x/05
Authorized Representative and Date

GM000224



## FACSIMILE TRANSMISSION

### DEALER NETWORK PLANNING & INVESTMENT
GENERAL MOTORS GLOBAL HEADQUARTERS
TOWER 100 – 6TH FLOOR
MAIL CODE: 482-A06-C66
DETROIT, MICHIGAN 48265 - 1000

**DATE:** 6/11/09

**TO:** Pat J. Bombard

**FAX NUMBER**
315 · 685 · 5508

**FROM:** GM

**FAX NUMBER:**

**# OF PAGES**
2

**PHONE NUMBER:**

**PHONE NUMBER:**

**MESSAGE/COMMENTS;**

Confidential



General Motors Corporation
Dealer Business Planning Group
Mail Code 482-A06-C66
100 GM Renaissance Center
Detroit, MI 48265-1000

FED EX:  7976 7417 3877
RETURN RECEIPT REQUESTED

PERSONAL & CONFIDENTIAL

June 11, 2009

Bombard Car Co., Inc.
1351 East Genesee Street
Skaneateles, NY 13152-8868

Attention: Mr. Pat J. Bombard, Dealer Operator

This letter responds to the proposal submitted by Mr. Graziano Zazzara, ("Applicant" or "Buyer") and Mr. Pat Bombard, Bombard Car Co., Inc. ("Dealer Company" or "Seller"), to General Motors Corporation ("GM") relating to the Asset Purchase Agreement dated March 19, 2009, between Buyer and Seller for the sale of certain assets of Seller (the "Purchase Agreement"). The proposal further calls for the issuance of a Chevrolet Dealer Sales and Service Agreement with Applicant and for Mr. Graziano Zazzara to be named Dealer Operator.    All of the above shall be referred to as the "Proposal". GM is declining this Proposal for the reasons explained below.

Based on GM's review of the Proposal and recent dealer network developments, GM believes that the objectives of the Proposal, as submitted, are not consistent with GM's long term plans for Chevrolet in the subject marketing area. GM's plans in this regard are reflected in a Wind-Down Agreement dated June 1, 2009 (the "Wind-Down Agreement") for Chevrolet pursuant to which Seller was advised that the Chevrolet Dealer Agreements between it and GM (the "Dealer Agreement") will not be continued, by GM on a long-term basis. Consequently, GM is not approving the Proposal.

Please note that GM is contemporaneously notifying the Applicant of GM's decision to not approve the Proposal.

In the meantime, GM will continue to conduct business with your dealership according to the Dealer Agreement and the Wind-Down Agreement, if executed, and will expect your dealership to likewise fulfill its responsibilities and obligations under such agreements, if Dealer Company elects to sign the latter agreement.

Very truly yours,

Tamera Jackson
Zone Manager
General Motors Corporation

c:    Sabin Blake, Regional Dealer Support Manager
      Paul Bottiglieri, DNPI – Regional Manager



# General Motors Company

Date:  August 7, 2009

To:  All General Motors Dealers with Wind-Down Agreements

From:  General Motors Company

Subject  Wind-Down Agreements

This communication contains direction once you are ready to terminate your Dealer Agreement. Termination will only occur once all new Motor Vehicle inventory has been sold as required in Section 2(a) of the Wind-Down Agreement(s).

Please keep in mind that GM is counting on you to fulfill your obligations per the Wind-Down Agreement.  However, if you have sold all of your New Vehicle Inventory prior to that date, GM will not unreasonably withold its consent to a termination request.

When your vehicles have been sold and you are ready to request termination, please submit the attached Sample Termination Letter, written on dealership letterhead, to the Dealer Business Planning Group ("DBPG") by fax to (313) 667-5461 or (313) 667-5462, by mail or overnight carrier to the address below, or to your Zone Manager.

<u>DBPG Contact Information - Address & Fax Number:</u>

Dealer Business Planning Group
100 Renaissance Center
Mail Code: 482-A06-C66
Detroit, MI 48265-1000

Upon receipt of your Termination Letter, GM will respond with a Termination Response Letter which will include the termination effective date (30 days from GM's receipt of your Termination Letter), information relative to the termination, as well as a list of additional information necessary to demonstrate Dealer has satisfied all conditions identified in the Wind-Down Agreement prior to the payment of the Final Payment.

Please contact your Zone Manager if you have any questions.

Sincerely,

**GENERAL MOTORS COMPANY**

## SAMPLE TERMINATION LETTER

### *(PREPARE ON DEALERSHIP LETTERHEAD)*

### *(DATE)*

General Motors Company
Dealer Business Planning Group
100 Renaissance Center
MC 482-A06-C66
Detroit, MI 48265

Dear Sir or Madam:

Please take notice that *(Insert Dealer Company's Name)* elects to, and does hereby, terminate the current General Motors Dealer Sales and Service Agreement(s) for *(Insert Applicable Linemake(s))* in accordance with Section 2(a) of the Wind-Down Agreement.  *(Insert Dealer Company's Name)* agrees that this termination will be effective 30 days from GM's receipt of this letter.

In case GM needs to contact me after termination, listed below is a phone number and the address to be used for future mailings, after termination, such as open account activity:

Very truly yours,

*(Insert Dealer Company's Name)*
*Future: Address, City, State, Zip, Phone number*

*(Dealer Operator's Name)*

*20*

## EXHIBIT A

## SAMPLE SUPPLEMENTAL WIND-DOWN AGREEMENT

THIS SUPPLEMENTAL WIND-DOWN AGREEMENT (this "Agreement") is made and entered into as of the _____ day of _____, 20__, by _____, a _____ ("Dealer"), for the use and benefit of _____, a _____ ("GM") and _____, a _____ corporation ("363 Acquirer").

### RECITALS

A.     Dealer and GM are parties to a Dealer Sales and Service Agreement for *Chev*_____ motor vehicles (the "Dealer Agreement").

B.     Dealer and GM are parties to that certain Wind-Down Agreement dated June __, 2009 (the "Original Wind-Down Agreement"). All initially capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Original Wind-Down Agreement.

C.     [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ [GM assigned all of its right, title and interest in the Dealer Agreement and the Original Wind-Down Agreement to the 363 Acquirer.]

D.     Pursuant to the Original Wind-Down Agreement, Dealer agreed to terminate and cancel the Dealer Agreement and all rights and continuing interests therein by written agreement and to release GM and its related parties from any and all liability arising out of or connected with the Dealer Agreement, any predecessor agreement(s) thereto, and the relationship between [GM or the 363 Acquirer] and Dealer relating to the Dealer Agreement, and any predecessor agreement(s) thereto, on the terms and conditions set forth herein, intending to be bound by the terms and conditions of this Agreement.

E.     Dealer executes this Agreement in accordance with Section 3 of the Original Wind-Down Agreement.

### COVENANTS

NOW, THEREFORE, in consideration of the foregoing recitals and the premises and covenants contained herein, Dealer hereby agrees as follows:

1.     Termination of Dealer Agreement.

(a) Dealer hereby terminates the Dealer Agreement by written agreement in accordance with Section 14.2 thereof. The effective date of such termination shall be *OCT 31*, 201*8*.

(b) Dealer shall timely pay all sales taxes, other taxes and any other amounts due to creditors, arising out of the operations of Dealer.

(c) Dealer shall be entitled to receive the Final Payment Amount in accordance with the terms of the Original Wind-Down Agreement.

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

2. <u>Release; Covenant Not to Sue; Indemnity.</u>

(a) Dealer, for itself, its Affiliates and any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors, and assigns (collectively, the "<u>Dealer Parties</u>"), hereby releases, settles, cancels, discharges, and acknowledges to be fully satisfied any and all claims, demands, damages, debts, liabilities, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever (specifically including any claims which are pending in any court, administrative agency or board or under the mediation process of the Dealer Agreement), whether known or unknown, foreseen or unforeseen, suspected or unsuspected ("<u>Claims</u>"), which Dealer or anyone claiming through or under Dealer may have as of the date of the execution of this Agreement against GM, the 363 Acquirer, their Affiliates or any of their respective members, partners, venturers, stockholders, officers, directors, employees, agents, spouses, legal representatives, successors or assigns (collectively, the "<u>GM Parties</u>"), arising out of or relating to (i) the Dealer Agreement or this Agreement, (ii) any predecessor agreement(s), (iii) the operation of the dealership for the Existing Model Line, (iv) any facilities agreements, including without limitation, any claims related to or arising out of dealership facilities, locations or requirements, Standards for Excellence ("<u>SFE</u>") related payments or bonuses (except that the 363 Acquirer shall pay any SFE payments due Dealer for the second (2nd) quarter of 2009 and the 363 Acquirer shall not collect any further SFE related payments from Dealer for the third (3rd) quarter of 2009 or thereafter), and any representations regarding motor vehicle sales or profits associated with Dealership Operations under the Dealer Agreement, or (v) any other events, transactions, claims, discussions or circumstances of any kind arising in whole or in part prior to the effective date of this Agreement, provided, however, that the foregoing release shall not extend to (x) reimbursement to Dealer of unpaid warranty claims if the transactions giving rise to such claims occurred within ninety (90) days prior the date of this Agreement, (y) the payment to Dealer of any incentives currently owing to Dealer or any amounts currently owing to Dealer in its Open Account, or (z) any claims of Dealer pursuant to Section 17.4 of the Dealer Agreement,, all of which amounts described in (x) - (z) above of this sentence shall be subject to setoff by GM of any amounts due or to become due to GM or any of its Affiliates. GM shall not charge back to Dealer any warranty claims approved and paid by GM prior to the effective date of termination, as described in Section 1 above, after the later to occur of (A) the date six (6) months following payment, or (B) the effective date of termination, except that GM may make charge-backs for false, fraudulent or unsubstantiated claims within two (2) years of payment.

(b) Dealer, for itself, and the other Dealer Parties, hereby agrees not to, at any time, sue, protest, institute or assist in instituting any proceeding in any court or administrative proceeding, or otherwise assert [(i)] any Claim that is covered by the release provision in subparagraph (a) above [IF DEALER AGREEMENT ASSIGNED TO THE 363 ACQUIRER][ or (ii) any claim that is based upon, related to, arising from, or otherwise connected with the assignment of the Dealer Agreement or the Original Wind-Down Agreement by GM to the 363 Acquirer in the 363 Sale, if any, or an allegation that such assignment is void, voidable, otherwise unenforceable, violates any applicable law or contravenes any agreement.] Notwithstanding anything to the contrary, Dealer acknowledges and agrees that GM will suffer irreparable harm from the breach by any Dealer Party of this covenant not to sue and therefore agrees that GM shall be entitled to any equitable remedies available to them, including, without limitation, injunctive relief, upon the breach of such covenant not to sue by any Dealer Party.

(c) Dealer shall indemnify, defend and hold the GM Parties harmless, from and against any and all claims, demands, fines, penalties, suits, causes of action, liabilities, losses, damages,

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE
JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

costs of settlement, and expenses (including, without limitation, reasonable attorneys' fees and costs) which may be imposed upon or incurred by the GM Parties, or any of them, arising from, relating to, or caused by Dealer's (or any other Dealer Parties') breach of this Agreement or Dealer's execution or delivery of or performance under this Agreement. "Affiliate" means, with respect to any Person (as defined below), any Person that controls, is controlled by or is under common control with such Person, together with its and their respective partners, venturers, directors, officers, stockholders, agents, employees and spouses. "Person" means an individual, partnership, limited liability company, association, corporation or other entity. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise.

3. <u>Due Authority</u>. Dealer and the individual(s) executing this Agreement on behalf of Dealer hereby jointly and severally represent and warrant to GM that this Agreement has been duly authorized by Dealer and that all necessary corporate action has been taken and all necessary corporate approvals have been obtained in connection with the execution and delivery of and performance under this Agreement.

4. <u>Confidentiality</u>. Dealer hereby agrees that, without the prior written consent of GM, it shall not, except as required by law, disclose to any person (other than its agents or employees having a need to know such information in the conduct of their duties for Dealer, which agents or employees shall be bound by a similar undertaking of confidentiality) the terms or conditions of this Agreement or any facts relating hereto or to the underlying transactions.

5. <u>Informed and Voluntary Acts</u>. Dealer has reviewed this Agreement with its legal, tax, or other advisors, and is fully aware of all of its rights and alternatives. In executing this Agreement, Dealer acknowledges that its decisions and actions are entirely voluntary and free from any duress.

6. <u>Binding Effect</u>. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns. This Agreement shall be binding upon any replacement or successor dealer as referred to in the Dealer Agreement and any successors or assigns, and shall benefit any of GM's successors or assigns.

7. <u>Continuing Jurisdiction</u>. By executing this Agreement, Dealer hereby consents and agrees that the Bankruptcy Court shall retain full, complete and exclusive jurisdiction to interpret, enforce, and adjudicate disputes concerning the terms of this Agreement and any other matter related thereto. The terms of this Section 7 shall survive the termination of this Agreement.

8. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan.

9. <u>No Reliance</u>. The parties represent and agree that, in entering into this Agreement, they have not relied upon any oral or written agreements, representations, statements, or promises, express or implied, not specifically set forth in this Agreement. No waiver, modification, amendment or addition to this Agreement is effective unless evidenced by a written instrument signed by an authorized representative of the parties, and each party acknowledges that no individual will be authorized to orally waive, modify, amend or expand this Agreement. The parties hereto expressly waive application of any law, statute, or judicial decision allowing oral modifications, amendments, or additions to this Agreement notwithstanding this express provision requiring a writing signed by the parties.

*[Signature Page Follows]*

12 **THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN**

**IN WITNESS WHEREOF,** Dealer has executed this Agreement through its duly authorized officer as of the day and year first above written.

_____

By:_____

Name:_____

Title:_____

12 THIS DOCUMENT SHALL BE NULL AND VOID IF NOT EXECUTED BY DEALER AND RECEIVED BY GM ON OR BEFORE JUNE 12, 2009 OR IF DEALER CHANGES ANY TERM OR PROVISION HEREIN

4805_12_115292

## Onondaga County Legislature

### James M. Rhinehart
County Legislator - 6th District
93 East Lake Road
Skaneateles, New York 13152
Legislature 315.435.2070
Fax 315.435.8434
EMail rhinehartjim@aol.com

National Automobile Dealers Association
Small Business Administratiom
General Motors Corporation
General Motors Acceptance Corporation

To whom it may concern:

 I am writing this letter with regards to Bombard Chevrolet, and more specifically Pat Bombard, the owner/operator. I have known Pat personally for over 30 years. We attended the same High School together. More recently, Mr. Bombard and I have become associated through community efforts, and also through my business and personal choice to trade at Bombard Chevrolet, here in our home town, Skaneateles, New York.

 Since coming to Skaneateles, Pat Bombard has been a most positive impact on our local community. Personal involvement at the local Government level, is just the start. Pat has also made tremendous contributions to the community with donations and involvement in many local organizations, some that would not have survived without his support. Little league baseball, our local Skaneateles Ski hill, the community docks, Rotary club, Volunteer Fire department, and SAVES, our local volunteer Ambulence corps. are just a few of the "not for profits" that both Pat, and Bombard Chevrolet has supported...

 Our local community needs to have business like Bombard Chevrolet and also community leaders like Pat Bombard to survive and maintain a quality of life for our residents. As an elected official, I urge that anything that can be dome to help our main street local businesses, that we rely on so much, be considered immediately and implemented. If I can help in any way, please feel free to contact me at the above information..

Sincerely: 

James M. Rhinehart
Onondaga County Legislator/ District 6

2ν



**WILLIAM A. BARCLAY**
Assemblyman 124ᵀᴴ District
Oswego and Onondaga
Counties

# THE ASSEMBLY
# STATE OF NEW YORK
## ALBANY

ASSISTANT MINORITY LEADER

RANKING MINORITY MEMBER
Insurance Committee
Ethics and Guidance Committee

COMMITTEES
Ways and Means
Corporations, Authorities
and Commissions
Judiciary

April 3, 2009

President Barack Obama
The White House
1600 Pennsylvania Ave, NW
Washington, DC 20500

Dear Mr. President:

The purpose of this letter is to express my support for two policy initiatives which will assist the auto industry in establishing a foundation towards economic recovery.

In an effort to stabilize the auto industries and prevent further layoffs and closures, the American International Automobile Dealers, the National Automobile Dealers Association, and National Association of Minority Automobile Dealers have proposed two policy initiatives that will directly help finance local dealerships. The three automobile dealer associations have proposed: (i) reforming the eligibility requirements of the Term Asset-backed Securities Loan Facility to include wholesale and retail auto loans; and (ii) expanding the Small Business Administrative loan guarantee program to provide floorplan financing and working capital for auto dealers. These initiatives will expand already successful programs to include auto dealers. By doing so, additional floorplan financing will become available and restore their ability to purchase their wholesale inventory of vehicles from automakers.

Currently, in New York State there are more then 230,000 auto industry related jobs. Further, the majority of these jobs are in Upstate New York, which incorporates my district. Main Street dealerships generate these good paying jobs, provide investments in local economies and increase tax revenue for local governments. For example, one local dealership, Bombard Chevrolet, has been a fixture in the Skaneateles community for twenty years. The company stimulates the local economy by hiring employees from the local workforce, paying taxes, and giving back by contributing to local charities. When dealerships falter, there is a domino effect that ripples through the community.

It is my hope that your administration will be receptive to a meeting with these auto associations, in light of the fact that these policy initiatives will positively impact the nation as well as my local district. Thank you for consideration of this matter.

Very truly yours,

William A. Barclay
Member of the Assembly

WAB/lb
CC: Mr. Patrick Bombard

ALBANY OFFICE: Room 546, Legislative Office Building, Albany, New York 12248 • 518-455-5841, FAX: 518-455-5362
DISTRICT OFFICE: 200 North Second Street, Fulton, New York 13069 • 315-598-5185, FAX: 315-592-2359
EMAIL: barclaw@assembly.state.ny.us

23



2009 and Beyond. . .

# Success - Past, Present and Future

- Bombard Chevrolet is a Genuine Lead Winner

- Bombard Chevrolet is #1 in Customer Satisfaction in Sales and Service

- Bombard Chevrolet is a Mark of Excellence Dealer

- Bombard Chevrolet is a AAA Award Winner

- 2009 Bombard Chevrolet will open a new state of the art dealership

## SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT, dated as of July 5, 2009 (this "Amendment"), is made by and among General Motors Corporation, a Delaware corporation ("Parent"), Saturn LLC, a Delaware limited liability company ("S LLC"), Saturn Distribution Corporation, a Delaware corporation ("S Distribution"), Chevrolet-Saturn of Harlem, Inc., a Delaware corporation ("Harlem," and collectively with Parent, S LLC and S Distribution, "Sellers," and each a "Seller"), and NGMCO, Inc., a Delaware corporation and successor-in-interest to Vehicle Acquisition Holdings LLC, a Delaware limited liability company ("Purchaser").

WHEREAS, Sellers and Purchaser have entered into that certain Amended and Restated Master Sale and Purchase Agreement, dated as of June 26, 2009 (as amended, the "Purchase Agreement");

WHEREAS, Sellers and Purchaser have entered into that certain First Amendment to Amended and Restated Master and Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained in this Agreement, and for other good and valuable consideration, the value, receipt and sufficiency of which are acknowledged, the Parties hereby agree as follows:

Section 1.    *Capitalized Terms.*  All capitalized terms used but not defined herein shall have the meanings specified in the Purchase Agreement.

Section 2.    *Amendments to Purchase Agreement.*

(a)    The following new definition of "Advanced Technology Credits" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Credits" has the meaning set forth in **Section 6.36**.

(b)    The following new definition of "Advanced Technology Projects" is hereby included in **Section 1.1** of the Purchase Agreement:

"Advanced Technology Projects" means development, design, engineering and production of advanced technology vehicles and components, including the vehicles known as "the Volt", "the Cruze" and components, transmissions and systems for vehicles employing hybrid technologies.

(c)    The definition of "Ancillary Agreements" is hereby amended and restated in its entirety to read as follows:

GM000210

09-50026-mg    Doc 14269    Filed 04/05/18    Entered 04/06/18 15:50:09    Main Document
09-50026-mg    Doc 14253-2    Filed 03/26/18    Entered 03/26/18 10:02:47    Exhibit B
Pg 72 of 78
Pg 232 of 406

JUN-30-2009  00:07                                                              P.21

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:  Vice President and Treasurer

GM000209

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
    Name: Frederick A. Henderson
    Title:  President and Chief Executive
           Officer

SATURN LLC

By: _____
    Name: Jill Lajdziak
    Title:  President

SATURN DISTRIBUTION CORPORATION

By: _____
    Name: Jill Lajdziak
    Title:  President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
    Name: Michael Garrick
    Title:  President

NGMCO, INC.

By: _____
    Name: Sadiq Malik
    Title:  Vice President and Treasurer

IN WITNESS WHEREOF, each of the Parties hereto has caused this amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____
   Name:  Frederick A. Henderson
   Title:  President and Chief Executive
         Officer

SATURN LLC

By: _____
   Name:  Jill Lajdziak
   Title:  President

SATURN DISTRIBUTION CORPORATION

By: _____
   Name:  Jill Lajdziak
   Title:  President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____
   Name:  Michael Garrick
   Title:  President

NGM CO, INC.

By: _____
   Name:  Sadiq Malik
   Title:  Vice President and Treasurer

GM000207

IN WITNESS WHEREOF, each of the Parties hereto has caused this Amendment to be executed by its duly authorized officer, in each case as of the date first written above.

GENERAL MOTORS CORPORATION

By: _____

    Name:  Frederick A. Henderson
    Title:   President and Chief Executive
            Officer

SATURN LLC

By: _____

    Name:  Jill Lajdziak
    Title:   President

SATURN DISTRIBUTION CORPORATION

By: _____

    Name:  Jill Lajdziak
    Title:   President

CHEVROLET-SATURN OF HARLEM, INC.

By: _____

    Name:  Michael Garrick
    Title:   President

NGMCO, INC.

By: _____

    Name:  Sadiq Malik
    Title:   Vice President and Treasurer

GM000206

*Section 5.*     *Counterparts.* This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement. All signatures of the Parties may be transmitted by facsimile or electronic delivery, and each such facsimile signature or electronic delivery signature (including a pdf signature) will, for all purposes, be deemed to be the original signature of the Party whose signature it reproduces and be binding upon such Party.

[Remainder of page intentionally left blank]

GM000205

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |

**Name of Debtor:**
*MOTORS LIQUIDATION COMPANY, eTal.*
*F/K/A General MoTors Corp., eTal.*

**Case Number:**
*09-50026*
*(MG)*

**NOTE:** *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
*PAT BOMBARD*

**COURT USE ONLY**

**Name and address where notices should be sent:**
*5 wheeler Ave*
*Fayetteville NY 13066*

**Telephone number:** *315-382-9464*    **email:** *summerwinds llc jntlk.com*

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
    *(If known)*

**Filed on:**_____

**Name and address where payment should be sent** (if different from above):

**Telephone number:**    **email:**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**    $ *10 MILLION*

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** *FRANCHISE AWARD Chevrolet*
    (See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** *9191*

**3a. Debtor may have scheduled account as:**
    (See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
    (See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☑ Other
**Describe:**

**Value of Property:** $ *10 MILLION*

**Annual Interest Rate**_____% ☑ Fixed  or  ☐ Variable
(when case was filed)

**Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:**
$ *10 MILLION*

**Basis for perfection:** *FRANCHISE*

**Amount of Secured Claim:** $ *10 MILLION*

**Amount Unsecured:** $ *0*

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(___).

**Amount entitled to priority:**
$_____

*\*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)                                                                                           2

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

---

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor.     ☐ I am the creditor's authorized agent.     ☐ I am the trustee, or the debtor,     ☐ I am a guarantor, surety, indorser, or other codebtor.
                                                                          or their authorized agent.                      (See Bankruptcy Rule 3005.)
                                                                          (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: _PAT BOMBARD_

Title: _PRESIDENT_

Company: _BOMBARD CABLE_                    (Signature)   _Pat J Bombard_            _3/13/2018_

Address and telephone number (if different from notice address above):                                (Date)

Telephone number:                      email:

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law.  In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case.  A separate space is provided for the payment address if it differs from the notice address.  The creditor has a continuing obligation to keep the court informed of its current address.  See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing.  Follow the instructions concerning whether to complete items 4 and 5.  Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred.  Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.  If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.  You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here.  A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured.  Skip this section if the claim is entirely unsecured.  (See Definitions.)  If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority.  (See Definitions.)  A claim may be partly priority and partly non-priority.  For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt.  You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence.  You may also attach a summary in addition to the documents themselves.  FRBP 3001(c) and (d).  If the claim is based on delivering health care goods or services, limit disclosing confidential health care information.  Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it.  FRBP 9011.  If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature.  If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief.  Your signature is also a certification that the claim meets the requirements of FRBP 9011(b).  Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration.  Print the name and title, if any, of the creditor or other person authorized to file this claim.  State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices.  If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent.  If the authorized agent is a servicer, identify the corporate servicer as the *company*.  Criminal penalties apply for making a false statement on a proof of claim.