UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| Et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Thursday, March 29, 2018 |
| . . . . . . . . . . . . . . . . | . | 10:05 a.m. |

TRANSCRIPT OF HEARING RE: MOTION TO AUTHORIZE BY GENERAL
MOTORS LLC TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2009
SALE ORDER AND THE RULINGS IN CONNECTION THEREWITH,
WITH RESPECT TO THE MOORE, ET AL. PLAINTIFFS [14241, 14242];
MOTION TO AUTHORIZE BY GENERAL MOTORS LLC TO ENFORCE
THE BANKRUPTCY COURT'S SALE ORDER AND COURT-APPROVED
DEFERRED TERMINATION (WIND-DOWN)
AGREEMENT WITH RESPECT TO PAT BOMBARD [14243]
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For General Motors, LLC:        King & Spalding
                                By:  ARTHUR STEINBERG, ESQ.
                                     SCOTT DAVIDSON, ESQ.
                                1185 Avenue of the Americas
                                New York, NY  10036-4003
                                (212) 556-2100


For The Moore Plaintiffs:       The Memmen Law Firm
                                By:  ALEXANDER MEMMEN, ESQ.
                                505 N. LaSalle Drive, #500
                                Chicago, IL  60654
                                (312) 878-2357


APPEARANCES CONTINUED.

Audio Operator:                 Shea, ECR

Transcription Company:          Access Transcripts, LLC
                                517 Dell Road
                                Landing, NJ  07850
                                (855) 873-2223
                                www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES:

For Pat Bombard:              Pat Bombard, Pro Se
                             (315) 382-9464

For General Motors, LLC:     Zausmer August & Caldwell, P.C.
                             By:  MICHAEL L. CALDWELL, ESQ.
                             32255 Northwestern Highway
                             Suite 225
                             Farmington Hills, MI  48334
                             (248) 851-4111

3

1        (Proceedings commence at 10:05 a.m.)

2              THE CLERK:  All rise.

3              THE COURT:  All right.  Please be seated.  We're here

4    in Motors Liquidation Company, 09-50026.  All right.  The first

5    matter we're going to hear is the General Motors, LLC motion to

6    enforce the sale order with respect to Pat Bombard.  May I have

7    the appearances, please?

8              MR. STEINBERG:  Good morning, Your Honor.  Arthur

9    Steinberg and Scott Davidson from King & Spalding on behalf of

10   New General Motors.

11             THE COURT:  Okay.  Mr. Bombard, you're on the phone?

12             MR. BOMBARD:  Yes, Your Honor, I am here.

13             THE COURT:  All right.  I had given Mr. Bombard

14   permission to appear by telephone today.  Let me just make a

15   couple of notes here.

16             MR. STEINBERG:  Your Honor, would you mind if I take

17   the lectern or do you want to say something --

18             THE COURT:  No.  Please do.  I'll be with you in just

19   a second.

20             All right.  Mr. Bombard, I'm going to allow

21   Mr. Steinberg to -- since it's his motion, to argue first.  And

22   then after he's finished, I'll give you an opportunity to

23   respond.  So if you would wait until he's done, I would

24   appreciate it.  Okay?

25             MR. BOMBARD:  Yes, Your Honor.

4

1           THE COURT:  Go ahead, Mr. Steinberg.

2           MR. STEINBERG:  Your Honor, as you would appreciate,

3   New General Motors doesn't like to come back to the Court

4   asking to enforce the sale order unless there are no other

5   alternatives to try to deal with the situation.  Here, the

6   situation with Bombard & Company is fairly well-explained by

7   just looking at the time line of events that occurred.

8           The bottom line is that we feel that Bombard &

9   Companies and their rights vis-a-vis being a dealer were

10  governed by a court-approved wind-down agreement.  And the

11  wind-down agreement clearly provided for this Court's

12  jurisdiction in both the wind-down agreement itself and in the

13  sale agreement itself.  But Bombard & Company has not been a GM

14  dealer for the last eight years.  The Court approved the

15  wind-down agreement and the wind-down agreement was offered to

16  dealers as an alternative to an outright rejection of their

17  dealership agreement.

18          The wind-down agreement was assigned to New General

19  Motors and the wind-down agreement provided for a payment of

20  $128,000 to Bombard & Company and allowed them to wind down

21  their inventory so that the dealership would not terminate

22  until October 21, 2010, which was approximately 15 or 16 months

23  after the sale agreement.  Under the wind-down agreement, in

24  exchange for that consideration, Bombard & Company agreed to

25  release Old GM and New GM and coveted not to sue New GM as well

5

1  with regard to the dealership arrangement.  In 2010, there was

2  an opportunity for Bombard & Company to, in effect, get back

3  the dealership and there was a letter of intent that was

4  submitted to Bombard & Company on March 17.  The conditions for

5  reinstatement included returning the $128,000 that had been

6  paid to Bombard & Company, obtaining financing, and maintaining

7  the facilities requirements that New GM requires of its

8  dealers.  And they had 60 days to comply with the letter of

9  intent.

10         When Bombard & Company did not comply, New GM sent

11  them a letter on July 16, 2010, which is attached to our

12  papers, which terminated the letter of intent, thus leaving the

13  wind-down agreement as the operative agreement.  By then,

14  Bombard & Company had let its official business certificate

15  lapse as of April 30, 2010.  And by November 3, 2010, after the

16  expiration of the dealership pursuant to the wind-down

17  agreement, New GM sent a further letter to Bombard & Company

18  confirming the termination of the dealership as of October 31,

19  2010.

20         Our papers refer to the fact that Pat Bombard himself

21  filed for bankruptcy in the Northern District of New York in

22  August of 2013.  In the sworn-to schedules that were filed, the

23  information that referred to Bombard & Company said that it was

24  an inactive franchise, it was closed, no longer operating.  It

25  was not listed as an executory contract.  No income was

6

 1  associated with Bombard Company.  And in the affidavit filed by

 2  Pat Bombard, he said the car dealership was no longer

 3  operational and that the closing of the dealership had

 4  substantially strained his personal and business obligations,

 5  thus necessitating the filing for bankruptcy in 2013.

 6          The Bombard papers referred to a participation

 7  agreement.

 8          THE COURT:  That's what my main questions relate to.

 9  I know you say there never was a participation agreement.

10  Address what a participation agreement is, was intended to do,

11  and whether there were drafts that were circulated with --

12          MR. STEINBERG:  The participation agreement was

13  basically given to the dealers that were going to stay in the

14  network.  The wind-down agreement were going to be given to the

15  dealers who were out of the network.  That's why the terms of

16  the participation agreement provided that the agreement would

17  need to be assigned to New GM and the document needed to be

18  approved by the bankruptcy court.

19          The agreement that is attached to the Bombard papers

20  that Bombard relies on is unsigned by all General Motors and it

21  was a form where someone typed in Bombard's name, not even on

22  the signature line.  The signature line just says dealer.

23  That's not the way that GM dealt -- Old GM dealt with dealing

24  with the participation agreement.  They didn't have

25  separately-looking font.  It was an integrated document.  So

7

1  our position is that it was clear that this participation

2  agreement was doctored.

3        And there are two other extrinsic pieces of evidence

4  that would support that as well, too, other than -- I'm not

5  trying to be a forensic expert to try to do this.  One is that

6  Mr. Bombard was trying -- in 2009 was trying to sell his

7  franchise and he had to ask GM for permission to sell his

8  franchise.  And GM in a letter dated June 11, 2009, refers

9  to -- says that they are turning down his prospective buyer but

10 refers to the wind-down agreement, not this June -- this June 1

11 unsigned participation agreement, as the basis for the rights

12 of the parties based on the turndown.

13       Also the letter of intent that was signed -- that was

14 submitted in 2010 saying that this is an offer that I'm

15 providing to you in March of 2010, but it is being done in the

16 context of the rights that you presently have under the

17 wind-down agreement, not the participation agreement.

18       THE COURT:  Let me just --

19       MR. STEINBERG:  So --

20       THE COURT:  You indicated -- did the participation

21 agreement have to be -- each one have to be specifically

22 approved by the bankruptcy court?

23       MR. STEINBERG:  I think probably not, Your Honor.

24       THE COURT:  Okay.

25       MR. STEINBERG:  I think it was in the same way that

8

1  each wind-down agreement wasn't specifically.  But they did

2  need to be signed.  They did need to be signed by Old GM.

3  There did need to be an acknowledgment by New GM.  And the

4  books and records needed to acknowledge the assignment of these

5  executory contracts, none of which was done.

6         Your Honor, I think that is what I would have to say

7  about this matter, other than that as a technical matter,

8  Bombard & Company as a corporation can't be represented pro se

9  by individuals.  But I don't have any objection to listening to

10 Pat Bombard and whatever he wants to say.

11        THE COURT:  Okay.  All right.  Thank you very much,

12 Mr. Steinberg.

13        Mr. Bombard, do you want to go ahead and address the

14 issues?

15        MR. BOMBARD:  Yes, I do, Your Honor.  Thank you for

16 allowing me to call in today, too.  With my -- with the Court's

17 understanding, I am asking the Court to dismiss the Old GM's

18 motion here.  My case is not with the Old GM.  It's with the

19 New GM for my Chevrolet franchise and sales and service

20 agreement.  Old GM is just trying to use bankruptcy court to

21 delay and cause me personal and financial harm.  They have been

22 aware of my conversation and negotiations with General Motors

23 since 2010 through faxes as well as phone call conversations.

24        In regards to the letter of intent and regards to the

25 participation agreement, all those documents were provided to

1  Old GM when they were in bankruptcy and they would fax you the

2  information.  You had one or two days or ten days or 60 days,

3  depending on what was necessary, to send back to them.  I have

4  sent back them all the necessary information and documents back

5  to them and as well as of 2013, '14, '15, '16, and in '17.

6          As of this money that they're talking about, the

7  $128,000 that they were supposedly giving to me, they,

8  according to the bankruptcy court, gave 25 percent to each

9  dealer that was originally a wind-down dealer.  I was -- the

10  first time I passed the test and I was not a wind dealer --

11  wind-down dealer.

12          The second test, unfortunately, I was part of the

13  wind down.  And then the third test, I was called and said,

14  listen, we changed our mind, you are going to be a

15  participating dealer and your Chevrolet franchise is back, this

16  is what you need to do.  I still today do not have the $128,000

17  that they're talking about.  GM has had that money since their

18  bankruptcy started in 2009.

19          I also recognize that I had to build a new

20  dealership.  I was in the process of breaking ground and spent

21  thousands of -- hundreds of thousands of dollars with a new

22  facility with their approval.  And the letter of intent says

23  that I'll have a new Chevrolet franchise.  And I've done all

24  the things that are necessary.

25          My case is with the Department of Motor Vehicle and

10

1  they -- and the hearing that is supposed to take place on April

2  23rd.  We tried under the motor vehicle law Section 471 to talk

3  to them on October 16th with a letter to Doug Pallins

4  (phonetic) requesting mediation.  They ignored the letter.  On

5  December 19th of 2017, we filed the papers according to the

6  Department of Motor Vehicles for our franchise for a hearing.

7  We waited the necessary time and just in the last few weeks we

8  received the letter that I provided to the Court that we are

9  going to have the hearing on April 23rd.

10       In the interim, General Motors, as one of their

11  tactics, came out and reached out to my attorney and said that

12  if we didn't do something by February 18th or 19th of 2018,

13  they were going to take legal recourse and go back to

14  bankruptcy court and use that as a weapon to try and delay and

15  cause me more problems.  And that's why we're here today,

16  because this is a tactic of theirs to hurt me.

17       I've been a Chevrolet dealer since 1992.  I've won

18  every Chevrolet award that's possible.  And I was in the

19  process of building this state-of-art facility.  When General

20  Motors went bankrupt, they caused financial harm to myself and

21  7,000 dealers across America that are no longer with us.  I

22  provided and didn't file personal bankruptcy until 2013 because

23  of the harm that they were causing me and there was financial

24  crisis in our business.  At that time, I had $8.9 million worth

25  of assets, property, buildings, and other holdings.

11

1           I only owed about a million dollars in debt.  My

2   Chapter 13 approval was done through bankruptcy court.  I was

3   going to be done with that in 12 to 18 months.  It was an

4   aggressive, fast time because we were moving forward with our

5   new facility, with business, with a storage business, with a

6   U-Haul franchise and many other properties and interests going

7   on.

8           So I'm asking the Court today to dismiss this motion

9   with the Old GM.  I don't have any problem with the Old GM.  My

10  case is with the New GM and my Chevrolet franchise with the

11  State of New York, Department of (indiscernible) is coming up

12  this April 23rd.  And according to the motor vehicle, there is

13  an automatic stay provision on this and I would like that to be

14  honored today.  And that's all I have, Your Honor.

15          THE COURT:  Let me ask you a few questions,

16  Mr. Bombard.

17          MR. BOMBARD:  Sure.

18          THE COURT:  Did you sign the wind-down agreement?

19          MR. BOMBARD:  I did.

20          THE COURT:  Did New GM sign the participation --

21          MR. BOMBARD:  I can address that, Your --

22          THE COURT:  Stop just -- did New GM sign a

23  participation agreement?

24          MR. BOMBARD:  Your Honor, on the wind-down agreement

25  there is a scribble where it has General Motors' signature.

1  And that was done after I signed it and faxed it back to them.

2          THE COURT:  Sure.

3          MR. BOMBARD:  On the participation agreement, I

4  signed it and faxed it back to them and that's -- that was done

5  in the time necessary to be done.

6          THE COURT:  Yeah.  But my --

7          MR. BOMBARD:  I did.

8          THE COURT:  -- my question to you is whether you have

9  a copy of the participation agreement signed by or on behalf of

10 New GM.

11         MR. BOMBARD:  I do not, Your Honor.  I never received

12 one back during this -- the time they were faxing back things

13 back all -- between June and -- of 2009 and March of 2010.

14 There were other requirements that we had to fax them, Your

15 Honor: your license, your insurance, your -- all that, which I

16 provided to them.  And if you look at the original wind-down

17 agreement, there's a scribbled signature.  I cannot tell you

18 who signed that or when it was signed or if it was ever signed

19 by them.  And the second time either.

20         THE COURT:  All right.  Mr. Steinberg, Mr. Bombard

21 says he never received the $128,000.  Do you have any evidence

22 that he did?

23         MR. STEINBERG:  Your Honor, when I sat down,

24 Mr. Davidson corrected me.  The wind-down payments were paid in

25 installments so there -- Mr. Bombard did receive $32,000.  And

13

1  the evidence that I would have is that the letter of intent

2  agreement that was sent references the $32,000 that he's been

3  received -- that he received.

4          THE COURT:  Was he supposed to receive 32,000 or

5  128,000?

6          MR. STEINBERG:  They were supposed to receive

7  128,000; 32- was the first installment.  And then he was

8  supposed to receive more as and when he performed the wind-down

9  agreement.  And that wasn't fully performed.  So but he did

10  receive 32,000.

11          MR. BOMBARD:  Your Honor, if I may interject?

12          THE COURT:  Just stop, Mr. Bombard.

13          MR. BOMBARD:  With the new --

14          THE COURT:  Mr. Bombard?  Mr. Bombard, stop.  I'll

15  give you a chance to respond.  I have some more questions for

16  Mr. Steinberg first.  Okay?  I'll --

17          MR. BOMBARD:  Thank you.  I'm sorry.

18          THE COURT:  I do want to hear your response, but I

19  want to -- I have some questions for Mr. Steinberg.

20          Where do I look to see that he was to receive an

21  initial payment of 32,000 and that the remaining payments

22  totaling 128,000 were contingent on Mr. Bombard doing certain

23  steps?

24      (Counsel confer)

25          MR. STEINBERG:  It's in the wind-down agreement

14

1  itself, Your Honor.  They're staged payments.

2         THE COURT:  And what is it that he failed to do that

3  you believe meant that he wasn't going to receive the further

4  payments?

5         MR. STEINBERG:  I would have to ask Mr. Davidson.  I

6  don't know the answer offhand.

7         THE COURT:  Okay.

8     (Counsel confer)

9         MR. STEINBERG:  Your Honor, Mr. Davidson says that he

10  doesn't know the answer.  And it may be that he did receive

11  more money, but neither one of us know at this point in time.

12         THE COURT:  Okay.  Mr. Bombard, go ahead.  What else

13  do you want to tell me?

14         MR. BOMBARD:  Your Honor, as part of the moving

15  forward participation agreement, there were approximately 13

16  things that we had to provide to the New GM.  One of those was

17  insurance, DMV license, and all that.  And also, it was to give

18  back the $32,000 to General Motors, and which I did.  They

19  never, ever paid me $128,000.  They did advance me the 32-.  We

20  paid it back as part of the 13 requirements that General Motors

21  had to do.  And they still have my money today with the Old GM

22  and we provided everything that was necessary to participate

23  with the franchise with Chevrolet and move forward.

24         THE COURT:  Let me ask you, when did you return the

25  $32,000 and do you have any documents that show you did that?

15

1  If you did it by check, do you have a canceled check back,

2  anything --

3          MR. BOMBARD:  It was an electric transfer that was

4  provided to GM and to the Court.

5          THE COURT:  I haven't -- when you say provided to the

6  Court, I certainly haven't seen that.  What is the --

7          MR. BOMBARD:  Well, it was --

8          THE COURT:  Stop, stop.  No, let me finish my

9  question.  Okay?

10          MR. BOMBARD:  Uh-huh.

11          THE COURT:  Tell me what it is you have that shows

12  that you repaid the $32,000.

13          MR. BOMBARD:  I have a deposit slip that was done

14  with the bank that we were using at that time.  And everything

15  done with General Motors was electronically transferred, so we

16  have a copy of that receipt.

17          THE COURT:  And when did you do that?

18          MR. BOMBARD:  It would have been -- it was --

19          THE COURT:  When did you repay the 32,000?

20          MR. BOMBARD:  It was in March of 2010, I believe

21  around the 17th or 18th.  I apologize, Your Honor.  I don't

22  have it in front of me.  But there was 13 other things at that

23  time that --

24          THE COURT:  Sure.

25          MR. BOMBARD:  -- we had to provide through fax to

16

1 them, which we did.  And I can provide the 13 things, if you'd

2 like.

3          THE COURT:  And to whom did you electronically

4 transfer the $32,000?  To which entity?

5          MR. BOMBARD:  To the Old GM.

6          THE COURT:  All right.  Mr. Steinberg, we need to get

7 to the bottom of this.  I need the -- you represented that he

8 received $128,000 and he didn't pay it back.  And now you've

9 said, no, you received 32,000 and you never repaid it.  And he

10 says he did repay it.

11          MR. STEINBERG:  Your Honor, we're prepared to submit

12 an affidavit to Your Honor and to supplement this record as to

13 what was paid and not paid.  What I think Mr. Bombard is

14 referring to when he says the participation agreement, he's

15 really talking about performance of the letter of intent.

16          THE COURT:  I'm focused right now, Mr. Steinberg --

17 you had indicated that one of the conditions under the letter

18 of intent was his return of $128,000.  Now you acknowledge that

19 he didn't receive $128,000.  And he said he did pay back the

20 28,000 (sic).  There's a material --

21          MR. STEINBERG:  We'll --

22          THE COURT:  Stop.  There is a material difference

23 that -- what you're arguing now from what you represented

24 before.

25          MR. STEINBERG:  Your Honor, that's correct.  And the

17

1  answer is I don't know whether he received the full 128- or

2  whether he received only 32-.  The letter of intent that was

3  sent in March of 2010 acknowledges $32,000 that was paid.

4          THE COURT:  Acknowledges what, that he was paid

5  32,000?

6          MR. STEINBERG:  That he was paid $32,000.

7          THE COURT:  Okay.  And he says he paid it back.

8          MR. STEINBERG:  I'm not aware of him paying back.  I

9  would have to check with the client.  I don't have the client

10  here.

11          THE COURT:  All right.  I can't decide this until

12  I -- this is a material issue of fact with respect to, you

13  know, first you tell me he was paid 128- and now you tell me he

14  was paid 32-.  He says he paid it back.  You don't know whether

15  it was paid back.  He indicated he thinks he paid it back

16  around March 17th or 18th, 2010.  That may not be the precise

17  date, but when is the hearing before the Motor Vehicle Board?

18          MR. STEINBERG:  I think it's the third week of April,

19  but we would be able to submit an affidavit by Tuesday of next

20  week.

21          THE COURT:  Mr. Bombard, when can you submit the

22  additional papers to me?

23          MR. BOMBARD:  Your Honor, I can put all that

24  together.  Today is Thursday.  I could have it to your court no

25  later -- by Monday.  I could FedEx it or deliver it mail-wise

1  that way.

2          THE COURT:  Just bear with me.  When you returned the

3  payment, why -- tell me why you returned the payment,

4  Mr. Bombard.

5          MR. BOMBARD:  Because by being awarded my franchise

6  back -- because part of the participation agreement, you had to

7  provide them 13 things: a DMV license, your driver's license, a

8  surety bond, a garage liability, a payment back on the amount

9  of money that they advanced of the 31,000 or 32,000 back.  That

10  was all part of the -- and continued to be in the New GM or the

11  Chevrolet dealer.  I never received $128,000 from them.  They

12  still have the money today.  They've never paid me.

13          THE COURT:  Let me ask you, did you --

14          MR. BOMBARD:  I've not --

15          THE COURT:  Let me just --

16          MR. BOMBARD:  Sure.

17          THE COURT:  Did you do the other 12 things that

18  were -- that you say were required of you?  You know, they say

19  there were --

20          MR. BOMBARD:  I did.

21          THE COURT:  -- 13 things, one of which was the

22  $32,000.  Did you do the other things?

23          MR. BOMBARD:  Yes, I did, Your Honor.

24          THE COURT:  Do you have any evidence of that, the --

25  you know, the copies of what you --

1            MR. BOMBARD:  Yes, I -- I have --

2            THE COURT:  Let me -- Mr. Bombard, just stop for a

3  minute.  Let me finish my question.  Okay?

4            MR. BOMBARD:  Uh-huh.

5            THE COURT:  Was there a transmittal or something --

6  letter in which you submitted the other items that you were

7  required to submit?

8            MR. BOMBARD:  They were faxed to General Motors, Your

9  Honor, and that probably would have been --

10           THE COURT:  Okay.  Do you have --

11           MR. BOMBARD:  And they were faxed to them, and I have

12  the faxes --

13           THE COURT:  Okay.

14           MR. BOMBARD:  -- and the proof.

15           THE COURT:  Include that with the materials that you

16  send to the Court.  Okay?  And copy Mr. Steinberg --

17           MR. BOMBARD:  Okay.

18           THE COURT:  -- as well with it.

19           MR. BOMBARD:  Okay.

20           THE COURT:  All right?

21           MR. BOMBARD:  Yes.

22           THE COURT:  Here's what I'm going to do.  I'm going

23  to continue this hearing because I want to make sure I'm ruling

24  on a full record.  Let me ask, are both sides available for

25  hearing -- and, Mr. Bombard, you can again participate on

20

1  telephone -- on Thursday, April 12th --

2          MR. STEINBERG:  I am, Your Honor.

3          THE COURT:  -- at 10 a.m.?

4          MR. STEINBERG:  Your Honor, would it be all right --

5          THE COURT:  No.  Let me hear from Mr. Bombard first.

6          MR. STEINBERG:  Sure.

7          MR. BOMBARD:  Yes, Your Honor, I am available.

8          THE COURT:  Okay.  So I'm going to adjourn this

9  hearing to Thursday, April 12th at 10 a.m.  Mr. Steinberg,

10 arrange a CourtCall call-in number so that Mr. Bombard can call

11 in rather than appear in person and advise Mr. Bombard of the

12 call-in instructions.

13         I would like the -- any additional documents that

14 either side is going to provide.  Mr. Bombard, you're going to

15 provide me with whatever evidence you have of the 13 items that

16 you believe that you did to satisfy the participation

17 agreement.  I'm going to set Thursday, April 5th as the

18 deadline.  I know you said --

19         MR. STEINBERG:  Thank you.

20         THE COURT:  -- you thought you could get it done more

21 quickly than that, but I want to be sure that you have enough

22 time to get the materials together, Mr. Bombard.  And what I

23 would ask you to do is FedEx it to the -- or, you know, some

24 fast delivery service to the Court so that we get it with a

25 copy to Mr. Steinberg.  Okay?  So I want all of -- both sides'

21

1  additional submissions by Thursday, April 5th at 5 p.m.  Okay?

2  That's the deadline.  Okay?

3          MR. BOMBARD:  Yes.

4          THE COURT:  And we'll do the telephone hearing --

5  telephone for you -- Mr. Steinberg, if you would be here, or

6  Mr. Davidson, whoever is going to cover it -- for Thursday,

7  April 12th at 10 a.m.

8          MR. STEINBERG:  Your Honor, just to be clear here so

9  that the terminology is correct, there is a participation

10  agreement that is unsigned dated June -- that appears to have a

11  date of June 1, 2009, and then there's a letter of intent that

12  is the March 2010 document.  I think that the questions that

13  you're asking was the -- whether the letter of intent was

14  performed or not performed and the conditions for the letter of

15  intent.  I know we've used the term "participation

16  agreement" --

17          THE COURT:  Right.

18          MR. STEINBERG:  -- but I want to make sure that we do

19  that.  And obviously the letter of intent had, as Mr. Bombard

20  has acknowledged, assigned from the return of the payment

21  another set of conditions as well, too.  So what we will be

22  submitting is documents related to the performance or not

23  performance of that letter of intent.  And we will include in

24  that the letters of termination of the letters of intent and

25  the termination of the wind-down agreement so that Your --

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

22

 1  which is already in the record, but Your Honor will have it at

 2  one point in time.

 3          THE COURT:  All right.  By that deadline, I will

 4  allow each side to submit an additional memorandum if they wish

 5  to explain what it is that's being submitted and how it bears

 6  on the issue before me.  Okay?  Do you understand, Mr. Bombard?

 7          MR. BOMBARD:  I do.

 8          THE COURT:  Okay.  Mr. Steinberg?

 9          MR. STEINBERG:  Thank you.

10          THE COURT:  Okay.  I just want to be sure I have a

11  full record because there's --

12          MR. STEINBERG:  I appreciate that.  And --

13          THE COURT:  -- there's obviously a disconnect to --

14          MR. STEINBERG:  No.  I apologize.  Obviously, I wish

15  I had a client here to ask the questions that Your Honor has.

16  I just don't know the answer.

17          THE COURT:  That's fine.  I want to try and resolve

18  this quickly.  I understand there's a hearing date on the motor

19  vehicle board and I'm definitely going to rule in advance of

20  that, but I want to make sure I have a full accurate record.

21  Okay?

22          MR. STEINBERG:  Appreciate that.

23          THE COURT:  All right.  Mr. Bombard, you're excused.

24          MR. BOMBARD:  Your Honor?

25          THE COURT:  Yes?  Go ahead, Mr. Bombard.

23

1          MR. BOMBARD:  I have two questions.  I would like to

2    make sure that they provide me New GM paperwork for Chevrolet

3    dealers moving forward.  That is critical in what they ask me

4    to provide so that you understand that the Old GM is gone and

5    I'm dealing with the New GM.  And I don't understand the

6    reasons that -- excuse me -- that, you know, I'm -- the time

7    essence is so critical because of my hearing with the

8    Department of Motor Vehicles.  And I don't want to miss that.

9    And that's why I'm asking the Court, you know, for its help in

10   that matter.

11         THE COURT:  Okay.  I think I'm going to have to --

12   just bear with me.  My courtroom deputy handed me a note that

13   on April 12th at 10 a.m. I do have a scheduling conflict.  So

14   we're going to -- are you each able to do it on April 12th at

15   3:00 p.m. rather than at 10:00 a.m.?

16         MR. STEINBERG:  I am, Your Honor.

17         THE COURT:  Mr. Bombard?

18         MR. BOMBARD:  I am, Your Honor.

19         THE COURT:  All right.  So Thursday, April 12th at

20   3:00 p.m.  I have a meeting at the -- my courtroom deputy has

21   reminded me I have a meeting at the circuit in the morning.

22   Okay?

23         MR. STEINBERG:  Your Honor, just --

24         THE COURT:  Go ahead.

25         MR. STEINBERG:  Just one other thing.  And certainly

24

1  Your Honor gets what he wanted to get, clarity on this.  There

2  are rights that Mr. Bombard may be asserting under this June 1,

3  2009 agreement, and we're not trying to supplement that.  We

4  are focused on the letter of intent of March of 2010, and

5  whether there was performance and a proper termination of that

6  letter of intent.  I don't know whether Mr. Bombard is talking

7  about activity after the termination of that letter of intent

8  based on what he believes were understandings that he had with

9  New General Motors pursuant to something.  I mean, the reality

10 is that he has not been a dealer for GM since 2009.  He hasn't

11 sold GM cars since 2010 when the wind-down agreement was over.

12         So I don't know what he's talking about.  His papers

13 did refer to some kind of new agreement that was going to be

14 renewed, but there was no document that was attached to that

15 other than the June 1, 2009 participation agreement.  We, in

16 our papers, have just addressed the letter of intent issue with

17 Your Honor.  I don't know what Mr. Bombard is going to do, but

18 I do hear from his comments that there may be something more or

19 something different than just the focus on that letter of

20 intent.

21         THE COURT:  Okay.  The thing that threw me for the

22 loop today, Mr. Steinberg, is you said he got paid, and he said

23 he sent it -- first you told me 128,000.  Then you changed it

24 to 32,000.  And he says he has evidence that he paid it back.

25 You haven't had a chance to respond to that, but, you know, I'm

25

obviously somewhat perplexed about if Old GM or New GM got the

$32,000 back and never -- so he doesn't -- he's got nothing.

He doesn't have the money he was -- he says, and you'll have a

chance to respond to it.

It raises a question about why.  What did he think he

was doing when he sent the money back?  If he sent the money

back, if it was in connection with the letter of intent, and he

says he complied with the other requirements of it, and did --

was he told, no, you didn't comply, and so here's your $32,000

back, or was the 32,000 accepted, and what's the consequences

of that.

MR. STEINBERG:  We'll address that another time.

THE COURT:  Okay.  And so, Mr. Bombard, I want to

give you a -- I want to be sure -- I want to see the documents

that you have.  But I want to see -- if you have some further

explanation you want to provide, I want to be sure you have a

chance to do that.  You'll have a chance to appear by telephone

again and tell me, but -- okay?

MR. BOMBARD:  Yes, Your Honor.

THE COURT:  All right.  Thank you very much.  All

right.  So you're excused, Mr. Bombard.  We're going to

continue on with our hearing on another New GM Matter.  Okay.

So --

MR. BOMBARD:  Thank you.

THE COURT:  Thank you very much, Mr. Bombard.  We're

26

1  going to move forward now with the motion by General Motors,

2  LLC to enforce the sale order with respect to the Moore case in

3  Michigan.

4          MR. STEINBERG:  Again, good morning, Your Honor.

5          THE COURT:  Let me get the appearances from both

6  sides of this.

7          MR. STEINBERG:  Arthur Steinberg and Scott Davidson

8  on behalf of New General Motors.

9          MR. MEMMEN:  Good morning, Your Honor.  Alex Memmen,

10  M-E-M-M-E-N, here on behalf of the Moore plaintiffs.

11          THE COURT:  Thank you.  Just give me a second,

12  Mr. Steinberg.  Go ahead, Mr. Steinberg.

13          MR. STEINBERG:  All right.  Your Honor, I'd like to

14  sort of focus in as to the areas of the dispute because there

15  are areas of agreement that we have.  They're -- New GM, under

16  the sale agreement and pursuant to the sale order of 2009,

17  agreed to assume liabilities relating to environmental laws.

18  So contained in the Moore complaint, there are counts that we

19  believe are covered by the assumed liabilities, and therefore

20  that the litigation at some point will go forward in the

21  District Court of the Eastern District of Michigan on Counts 1,

22  2, 8, and 9 of the Moore amended complaint.

23          THE COURT:  Let me stop you there and ask you some

24  questions.  Okay?  When you say that New GM assumed liability

25  under environmental laws, I want to probe that further to make

27

1  sure I understand.  So let's assume that Old GM poured benzene

2  into the ground, and it went down into the groundwater and

3  migrated to adjacent properties.  And environmental regulators

4  don't impose a cleanup obligation until after -- post sale.  Is

5  New GM obligated to remediate the environmental contamination

6  from benzene that migrated off the property?

7          MR. STEINBERG:  I assume the property was transferred

8  to New GM pursuant to the sale.

9          THE COURT:  Yes, it was.

10         MR. STEINBERG:  The answer's yes.

11         THE COURT:  Okay.  And what's the reason for that?

12         MR. STEINBERG:  Because New GM agreed to comply with

13 environmental laws as the owner of the property.  It has the

14 responsibilities of an owner having had the property

15 transferred over to it.  And I think the sale agreement does

16 provide for that.  There was -- this issue did come up

17 specifically at the sale hearing.  The Michigan Department of

18 Environmental Quality were one of the people who had

19 objections.  The State's Attorney Generals had objections.

20 They wanted to clarify that New GM would be a good citizen and

21 comply with the environmental laws going forward.

22         THE COURT:  But that's -- I just wanted to be clear

23 that it included -- the assumed liability includes remediation

24 for environmental contamination that occurred on Old GM's

25 watch.

28

1          MR. STEINBERG:  Correct.

2          THE COURT:  Okay.

3          MR. STEINBERG:  And it would also, I think, cover the

4   cost incurred by, in this case, the plaintiff, if they had any

5   things to remediate the environmental situation.

6          THE COURT:  So if they're -- if any of the plaintiffs

7   were obtaining their water from a well on their property, and

8   the well was contaminated in some fashion attributable to Old

9   GM, New GM assumes liability for remediation of the

10  environmental harm?

11         MR. STEINBERG:  Yes.  I think they -- I think that's

12  correct, Your Honor, but I'm not a practicing environmental

13  lawyer.  The term that was used to me was "response cost,"

14  which is a defined term under environment law, and it's

15  supposed to cover cost incurred to remediate the contamination.

16  So that's what we agreed to.

17         If Your Honor was trying to sort of understand why

18  we're fighting over what's an assumed liability -- and what

19  they've admitted was a retained liability, but believe they

20  should be able to assert it because of an alleged due process

21  violation.  Is that on the causes --

22         THE COURT:  I'm not focusing on a due process

23  violation.  I'm focusing on -- what I'm -- my questions now are

24  -- I want to be sure I understand what are assumed liabilities

25  under the sale agreement.  That's -- for now, that's where my

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

29

1  focus is.  I may have some questions later about due process,

2  but I'm not sure whether I do.  Okay.

3         MR. STEINBERG:  And, you know, the sale agreement was

4  written in a tight timeframe, and then there was negotiations

5  over it.  But the relevant provision as to why we believe that

6  certain counts of the Moore amended complaint are retained

7  liabilities is found in section 2.3(b)(4)(C) of the sale

8  agreement.  And I actually don't think that they disagree with

9  the -- that there are counts that are technically retained

10 liabilities.

11        And the section that I just referred to says that New

12 GM is not assuming liabilities, quote, "Arising out of, or

13 relating to, or in respect of, or in connection with

14 third-party claims relating to hazardous materials that were or

15 are located or that were released into the environment from

16 transferred real property prior to the closing, except as

17 required under applicable environmental laws."  So --

18        THE COURT:  Except as otherwise required under

19 applicable --

20        MR. STEINBERG:  Under applicable --

21        THE COURT:  -- environmental laws.

22        MR. STEINBERG:  -- environment laws, right.  So what

23 the parties were trying to do there was that -- to the extent

24 that there was claims for fraud that they said Old GM committed

25 by not disclosing a contamination --

30

1           THE COURT:  That's not where my questions are right

2    now.  Okay?  I'm -- specifically, my focus is on claims for

3    personal injury or property damage resulting from contamination

4    when this property -- you know, that migrated off the proving

5    ground when it was owned by Old GM.  And I've been struggling

6    to reconcile various provisions of the sale order.

7           So I have open in front of me all of Section 2.3, and

8    I see in 2.3(a)(viii), assumed liabilities are all liability --

9    quote, "All liabilities arising under any Environmental Law; A,

10   relating to conditions present on the transferred property,

11   other than those liabilities described in Section 2.3(b)(iv)."

12   Its goes on from there, but I'll stop there.

13          Okay.  So then I looked at 2.3(b)(iv), and, let's

14   see, what does that carve out?  What's the "retain liabilities"

15   that 2.3(b)(iv) carves out?  It's all liabilities associated

16   with non-compliances with environmental laws including fines,

17   penalties, damages, remedies.  And then (C), arising out of,

18   relating to, in respect of, or in connection with third-party

19   claims related to hazardous materials that were or are located

20   at, or that migrated or may migrate from, any transferred real

21   property, except as otherwise required under applicable

22   environmental laws.

23          So if one of Mr. Memmen's clients owned property --

24   owns property, and their well is contaminated by salt -- and

25   let's assume it was -- I know that, at least for a long time,

1  Old GM/New GM denied that it was from salt that was spread on

2  the roads or wherever, and said it was somehow in the ground.

3  Let's assume it was because a lot of salt was used and it got

4  into the groundwater and migrated.  I'm trying to -- so you're

5  -- you've acknowledged that New GM assumed liability for

6  response costs to remediate the harm.  Okay.  But you're now

7  telling me it didn't assume liability for personal injury or

8  property damage, although I would think that the contaminated

9  well, isn't that property damage?

10         MR. STEINBERG:  Property damage in the way that they

11  argued that their overall real property was reduced in value

12  because of the aura of --

13         THE COURT:  So where do I -- how do I parse these

14  sections to say, yes, assume liability or remediation; no,

15  assume liability or personal injured?  Let me stop at personal

16  injuries.

17         MR. STEINBERG:  Yeah.  There is -- Mr. Davidson

18  pointed out to me there was a generic provision in the retained

19  liabilities in Subdivision 11, which is not specifically tied

20  to environmental laws, but says all liabilities to third

21  parties for claims based upon contract, tort, or any other

22  basis, but --

23         THE COURT:  Well, I would've thought that somebody

24  whose well had been contaminated would have a tort claim.

25         MR. STEINBERG:  That's --

32

1           THE COURT:  Look, let me drill down further, okay.

2    I've been poring over definitions and -- so on page 4 of your

3    memorandum of law, you quote section -- you quote the retained

4    liabilities, 2.3(b)(iv), which we've just been looking at.  And

5    actually the carryover sentence from page 3 of the memorandum

6    of law, you have footnote 6 that's on the bottom of page 4.

7    And you say environmental law -- I won't read the whole thing.

8    You define -- you quote what environmental law is.  And then

9    you quote the definition of law.  So defined terms in the

10   agreement are capitalized, right?

11          MR. STEINBERG:  Right.

12          THE COURT:  And you define law, and this has me

13   really curious and confused.  The term Law is defined in the

14   sale agreement as, quote, "Any and all applicable United States

15   or non-United States federal, national, provincial, state, or

16   local laws, rules, regulations, directive, decrees, treaties,

17   statutes, provisions of any constitution, and principles,

18   including principles of common law, of any Governmental

19   Authority, as well as any applicable Final Order," referring to

20   sale agreement page 11.

21          Okay.  So I look at -- you've got the definition of

22   environmental law, and I look at page 7 of the sale agreement,

23   the definitions -- it's ECF 2968-2, page 12 of 132.  And I see,

24   okay, there's the definition of environmental laws, and that in

25   turn has hazardous materials as a defined term.  Okay.  And,

33

1  you know, you have this, what I thought was a curious sentence,

2  going back to page 4.  After defining law, you said, "The

3  common law claims asserted by the Moore plaintiffs are not

4  principals of a governmental authority.  There are third-party

5  non-governmental authority claims."  No citation.  What is

6  that?

7        So I go look at the definition of governmental

8  authority on page 9 of the definition, 14 of 132 of the sale

9  agreement.  Governmental authority means any United States or

10 non-United States federal, national, provincial, state or local

11 government, or other political subdivision thereof; any entity,

12 authority, agency, or body exercising executive, legislative,

13 judicial regulatory or administrative functions.  It goes on.

14       So I guess my question is, is New GM liable for

15 violation of Michigan common law?  Has it assumed liability for

16 Michigan common law with respect to environmental claims?  So,

17 you know, it sent me off to read Michigan Supreme Court cases.

18 In Michigan, for -- a lot of the cases are common law nuisance.

19 The Michigan Supreme Court has dealt with liability for common

20 law nuisance because of environmental contamination.  And

21 what's not clear to me, Mr. Steinberg, is your last sentence in

22 footnote 6.

23       MR. STEINBERG:  I think the --

24       THE COURT:  The last two sentences.  You know,

25 governmental authority includes a court, and courts -- the

34

1  Michigan Supreme Court spells out Michigan common law.  And

2  whether it's trespass or common law nuisance, those are two

3  common law claims typically, in many states, applied to

4  environmental -- to personal injury and property damage

5  resulting from environmental contamination.

6          MR. STEINBERG:  I think, Your Honor, what was meant

7  to -- said, and hopefully we had said it, was that the common

8  law principles have to be asserted by the governmental

9  authority itself.

10         THE COURT:  I don't see that.  That's what you need

11 to be able to -- it doesn't say the common law principles have

12 to be asserted by a governmental authority.

13         MR. STEINBERG:  Well, the common law principles in

14 the definition of law is the -- in the parenthetical is

15 describing principles.  But then you go outside of the

16 parenthetical and it -- the overall covering is of any

17 governmental authority.

18         THE COURT:  No.  Well, that -- and that -- and

19 governmental -- that's what sent me to look -- you didn't

20 define governmental -- you didn't give me the definition of

21 governmental authority, so I went and found it.

22         MR. STEINBERG:  Right.

23         THE COURT:  That's on page 9, 14 of 132.

24         MR. STEINBERG:  Right.

25         THE COURT:  And coming through that language means --

35

 1  governmental authority means any state body that carries out

 2  judicial functions.  That's what courts do.  They define common

 3  law.  The Michigan Supreme Court has, you know, cases that deal

 4  with the application of Michigan common law for environmental

 5  harm, personal injury, property damage, based on the cases I

 6  read.  I didn't go further -- nuisance.  Okay.

 7          MR. STEINBERG:  Well, Your Honor --

 8          THE COURT:  And so I'm having problems,

 9  Mr. Steinberg.  I don't -- you know, and I'll tell you, look,

10  this is the first time I've had to delve quite so deeply into

11  Michigan law, but there's a reported decision of mine in In re

12  Oldco M Corp., 438 B.R. 775 (Bankr. S.D.N.Y. 2010).  It's --

13  you know, it's different.  It was -- the Michigan Department of

14  Natural Resources and Environment appeared in the Metaldyne --

15  Oldco M was Metaldyne.  This is in the same time period that

16  the auto companies were going to go bust.

17          Metaldyne was a big tier-one auto parts supplier.  It

18  had factories in Michigan.  And the MDNRE had claims.  The

19  purchase agreement -- the site that was involved in this claim

20  was acquired by the buyer, 363 buyer, and on page -- at 448

21  B.R. 779, note 5, I quote the definition of environmental

22  liabilities in that purchase agreement.  A little different

23  than here, but in that same footnote, I quote from the purchase

24  agreement what environment law means.  They used the same term,

25  "environmental law."  And it included -- including common law.

1      It didn't have the language that the GM sale

2   agreement has at the end about governmental authority, but I'm

3   reading it in the context -- it looks to me that governmental

4   -- the reason it has governmental authority, because you

5   assumed liability, whether it's Canada or the U.S. or some

6   other country.  If New GM acquired a plant on the border -- in

7   Michigan on the border with Canada, and it contaminated

8   property in Canada, and Canada law, either statute or common

9   law, provided remedies, it looked to me that that's what you

10  were -- that's why you didn't just -- that's why you used

11  governmental authority, because it means United States or

12  non-United States, and that includes judicial.

13      So I don't know.  I'm  -- I don't know whether this

14  issue has come up in GM before, so I'm struggling in that.  But

15  I'm trying to reconcile that with what are the retained

16  liabilities.  And so another question.  You know, in

17  2.3(b)(iv)(C), which you quoted and which I've read, I started

18  asking about what's the "Except as otherwise required under

19  applicable environmental law."  I don't know whether

20  environmental law is limited solely to statute or whether it

21  includes common law.  Because environmental law means any law.

22  That said, okay, what's a law?  Okay.  So I went to the

23  definition of a law.

24      MR. STEINBERG:  Your Honor, I think that -- I

25  appreciate the struggle that you're having.  I think the clear

37

1  intent of the parties was that with respect to third-party

2  claims, that they would not be able to be asserted against New

3  GM for essentially Old GM conduct, unless it fell within the

4  general category of remediating the property or paying for

5  response costs.

6          THE COURT:  Where do I find that?

7          MR. STEINBERG:  Well, I --

8          THE COURT:  You've acknowledged that it includes the

9  cost of remediating the property, and that's what -- one of the

10 things I struggle to see.  How do you -- what is it that

11 separates out -- you assume liability for remediating property,

12 whether the contamination was post sale because salt continued

13 to migrate through the groundwater or not.  I don't know.

14 That's what I -- I'm -- I've been -- I'm struggling with this.

15         MR. STEINBERG:  The -- obviously, the -- if the

16 broader interpretation that environmental law would cover

17 anything judicial, which would pick up anything common law,

18 then that would totally swallow the exception that was created.

19         THE COURT:  I didn't draft this agreement.

20         MR. STEINBERG:  I understand.

21         THE COURT:  You didn't either.  I understand.

22         MR. STEINBERG:  I actually didn't draft it, either,

23 but --

24         THE COURT:  I know.  I know that.

25         MR. STEINBERG:  -- but the argument is that the --

38

1 that there was clearly an intention to carve out something.

2 And frankly, in the context of this case, they haven't

3 quarreled with the notion that these are retained liabilities.

4 They just don't think they have to comply with them, so they

5 haven't contested and struggled.  Maybe they will now, but they

6 hadn't up to this point struggled with it the way Your Honor

7 has.

8    On this here, it is a little consistent with -- if

9 you had to think of an analogy area about how this agreement

10 worked, assume liabilities for accidents that take place after

11 the sale relating to Old GM vehicles.  Judge Gerber wrote a

12 decision as to what was actually assumed and what wasn't

13 assumed.  And one of the things that he determined in his

14 November 2015 decision/December 2015 judgment was that fraud

15 claims, Old GM fraud claims, those aren't covered by the

16 assumed liabilities because there was clearly an intent for New

17 GM to pay, in effect, compensatory damages for a post-sale

18 accident, but not to pick up some ancillary stuff.

19    THE COURT:  I -- let's assume that I agree.  I don't

20 know whether I do or not, but let's assume I agree that fraud

21 claims are not covered.  My -- I'm focusing on persona injury

22 or property damage to adjacent property owners resulting from

23 migration of contaminants before -- migration before the sale

24 to New GM.

25    Let me ask you a different question.  What's your

39

1  position with respect to whether New GM would have liability to

2  third parties, adjacent property owners, or injury -- personal

3  injury claims resulting from the post-sale migration of

4  contaminants that were dumped when Old GM owned the property?

5         Let's assume -- I mean, they allege that New GM

6  continued to use salt and continued to contaminate, but so for

7  this question I'm asking you to assume New GM stopped.  There

8  was no further dumping of salt or it was reduced, or what have

9  you.

10        Groundwater -- once the problem -- groundwater

11 contamination is insidious.  It tends to move from high

12 gradient to low gradient in -- I've actually litigated these

13 cases.  You contract the plume -- and I know there's a dispute

14 about what direction the plume was going off the proving

15 ground.  That's not for me to decide.  The allegation is it did

16 migrate.

17        What's your view as to whether New GM assumed

18 liability -- well, not assumed, whether New GM, as the property

19 owner, is liable for personal injury or property damage

20 resulting from the continued migration of contaminants from the

21 proving ground property post-closing, post-sale?

22        MR. STEINBERG:  Your Honor, I want to give you an

23 answer, but I want to make sure I understand the question,

24 because I thought two minutes before the final words you were

25 talking about that it stopped totally.

40

1           THE COURT:  No.  I want you to assume that they

2   stopped dumping.

3           MR. STEINBERG:  Stopped dumping.

4           THE COURT:  Okay?  The problem is, and once it gets

5   into the groundwater, the groundwater keeps migrating.  It goes

6   from high gradient to low gradient.  Okay?  Do you follow me so

7   far in my assumption?

8           In your papers, you agree if New GM continued dumping

9   -- it's not dumping.  Continued using salts that got into the

10  groundwater that migrated, you're not asserting that New GM

11  wouldn't be liable for that, right?

12          MR. STEINBERG:  Right.

13          THE COURT:  Okay.  That's why I said assume that New

14  GM wasn't dumping more, wasn't putting out more contaminants.

15          MR. STEINBERG:  I mean, I think, Your Honor, if there

16  is personal injury that was caused by an Old GM conduct review,

17  GM hadn't done anything, and it's a third-party claim, our

18  position is that it is not GM's liability.

19          THE COURT:  Okay.  I think you're wrong, but that's,

20  you know --

21          MR. STEINBERG:  But to say something further is that

22  if the migration took place after the sale, not caused by New

23  GM but just because of the rate and water flow, that under the

24  sale agreement you did have an obligation to rectify that

25  issue, rectify the problem, comply with the environmental law,

41

1  and to pay for any expense that the homeowner had in trying

2  itself to rectify the problem.

3          THE COURT:  But let's assume that the guy next door

4  gets sick and can show that it resulted from post-sale

5  migration of contaminants into his well.  He drank the water.

6  He got sick.  The contaminants were dumped by Old GM, but New

7  GM owns the property.  In your view --

8          MR. STEINBERG:  It's a good question.  I do have my

9  -- the environmental lawyer, Mike Caldwell, who is on this

10 phone call.  I have never discussed it with him.  It looks to

11 me like this is somewhat analogous to, in the product area

12 where I've had more discussions with more lawyers about, you

13 know, sort of a duty to warn post-sale.  You didn't do

14 anything, but you became aware of an issue, and do you have a

15 responsibility or not?  And --

16         THE COURT:  Mr. Caldwell, are you on the phone?

17         MR. CALDWELL:  I am, Your Honor.

18         THE COURT:  All right.  What is your -- and just

19 identify yourself a little further than your last name.

20         MR. CALDWELL:  Again, Michael Caldwell from the law

21 firm of Zausmer August & Caldwell.  I practice here in Michigan

22 primarily as an environmental attorney.

23         And I think one of the issues that the Court is

24 focused on and perhaps could use some clarification, under

25 Michigan and also federal and, to my knowledge, the

42

1   environmental statutes of other states, you can't recover

2   personal injury damages, emotional distress damages, or

3   property value diminution, or damage to property under the

4   environmental statutes, including the --

5          THE COURT:  I have looked at your -- I have some

6   familiarity with it and looked again at the Michigan

7   Environmental Protection Act, which I think was one of the

8   first state --

9          MR. CALDWELL:  Yeah.

10         THE COURT:  -- acts that did that.  And I understand

11  it creates remedies for injunctive or other equitable relief.

12  I don't know anything in the statute that provides for personal

13  injury or property damage.  But as I understand it, most of

14  those claims for personal injury and property damage arise from

15  the common law claims, nuisance, for example.  True?

16         MR. CALDWELL:  Correct.  That's where if you want to

17  recover property value diminution or personal injury, those

18  types of monetary damages are only recoverable under common law

19  claims.

20         THE COURT:  All right.  So my question is, did GM --

21  in the hypothetical I give, if the contaminants were -- if the

22  groundwater was contaminated by Old GM, and the contamination

23  migrated off the property after New GM owned it, and adjacent

24  property owners suffered personal injury, is New GM liable for

25  those personal injury claims?

1          MR. CALDWELL:  They would not be under any of the

2     environmental statutes.

3          THE COURT:  Well, I understand environmental

4     statutes, but my question is broader.  You have acknowledged

5     that claims for nuisance, personal injury, or property damage

6     is recoverable on claims for nuisance.  And so would a -- would

7     someone who became ill from post-sale migration of contaminants

8     be able to recover from the property owner, New GM, for

9     personal injuries resulting from the migration of contaminants

10    post-sale?

11         MR. CALDWELL:  Typically, migration of groundwater

12    contamination that the release has occurred before the current

13    owner who owns the property, under nuisance there is -- you

14    typically don't have liability.  For instance, under nuisance

15    there's lack of control.  You know, the release has already

16    occurred, and the continuing migration does not constitute a

17    new release.

18         And in the various other -- and then under trespass,

19    there is -- in Michigan there is no cause of action for

20    trespass with regard to groundwater contamination.  And --

21         THE COURT:  So let's just talk about nuisance then.

22    Are there any cases that support what you've just told me?

23         MR. CALDWELL:  Yes.  I can't -- I'm not sure I could

24    pull them off the top of my head, but dealing with the lack of

25    control, I believe there are.

44

1             THE COURT:  Well, you control the property after you

2      buy it.  And if the migration of contaminants occurs after you

3      buy it, don't you control it?

4             MR. CALDWELL:  If there is an ability to stop

5      migration off your property, there could be, subject to

6      technical and practical limitations.

7             THE COURT:  So when I litigated these cases before I

8      became a judge, the typical way that you dealt with it was you

9      -- first, you drilled monitoring wells to track the plume, and

10     you drilled pumping wells to remove the contaminated

11     groundwater, so that it wouldn't continue to migrate.  Is that

12     generally correct?

13            MR. CALDWELL:  Yeah.  Pump and treat is one of the

14     tools in your toolbox, yes.

15            THE COURT:  All right.  And so has that -- either

16     Mr. Steinberg or your colleague, what has happened since New GM

17     bought the property?  I mean, is the groundwater being treated?

18     Is pump and treat being done?  Is there other steps being done

19     to prevent continued migration of contaminated groundwater?  On

20     this site.

21            MR. STEINBERG:  Mike, do you want to start with that?

22     I can answer part of the question, but you may have a more

23     complete response.

24            MR. CALDWELL:  Your Honor, I have not been involved

25     in the remediation efforts and the investigation efforts that

1  took place prior to the lawsuit being filed.  That was, you

2  know, the start date for my involvement.  I know bottled water

3  has been offered.  I mean, all -- sodium and chloride is -- you

4  know, these are naturally occurring substances, and it would

5  be, in my experience, somewhat unusual for this type of

6  situation to be solved by pump-and-treat type remediation.

7          Typically, point of service treatment system,

8  alternative water that has been supplied to the plaintiffs and

9  others in that neighborhood, is the more typical remedy.  But

10  I'm not sure, beyond those types of alternative water supplies,

11  what affirmative remedial efforts.  I think it's still in the

12  investigation stage.

13          THE COURT:  I guess, Mr. Steinberg, the issue of

14  whether New GM would be liable for personal injury or property

15  damage for post-sale migration would be for the District Court

16  in Michigan where the case is pending.  That wouldn't be --

17  would you agree that wouldn't be a Bankruptcy Court issue under

18  the sale order?

19          MR. STEINBERG:  I think that that's correct.

20          THE COURT:  Okay.  So we can --

21          MR. STEINBERG:  I will say, Your Honor, that this has

22  obviously been a challenging and interesting dialogue that you

23  have on this question.  The one variable that I would just

24  overlay on your conversation with Mr. Caldwell was that the law

25  of a new property owner taking over the property and its

46

1   responsibility does have the overlap of this bankruptcy sale

2   order and the attempt to try to cabin some of these liabilities

3   as being retained liabilities.

4           I know you're struggling with exactly what was

5   cabined, and the example that you gave is an example that under

6   the construct of how we've thought about retain liabilities,

7   assume liabilities, and independent claims.  You have raised

8   the issue as to whether where New GM was not responsible for

9   any further problems relating to --

10          THE COURT:  Well, when you say not responsible, you

11  may be responsible for --

12          MR. STEINBERG:  I'm just saying --

13          THE COURT:  -- for contamination migrating off the

14  property, whether you dumped it.  You obviously --

15          MR. STEINBERG:  I'm was trying to say that part, that

16  New GM didn't dump anything, didn't have an obligation as the

17  property owner.  That would be an independent obligation, an

18  independent claim.  And I think Your Honor has been fairly

19  consistent that, if properly pled, the issue of whether

20  something is an independent claim or not is something for the

21  other Court to determine.

22          THE COURT:  So here, look, there are things in their

23  amended complaint that I think kind of foul up the sale order.

24  Pleading the conduct of Old GM in conduct that resulted in --

25  if it did, in salt contamination -- I know it's not for me to

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

47

1  decide.  It's disputed whether it was naturally occurring salt

2  or whether it's the result of the amount of salt that they put

3  on the roads in surrounding areas.

4         That all seems to me to be proper from the standpoint

5  of, well, is New GM -- if contamination continued to migrate

6  up, if the contamination resulted from Old GM's conduct, you've

7  got to say, what did Old GM do?  It dumped a lot of salt.  And

8  a Court -- not this Court I think -- is going to have to decide

9  whether if there was continued migration of salt and it caused

10  injury, personal injury or property damage, whether that

11  post-sale -- that gives rise to liability for New GM.

12         So I'm not troubled by allegations, detailed

13  allegations about, here's what Old GM did.  New GM bought the

14  property.  They do say there has been this continued migration

15  of contaminated groundwater.

16         So to understand, how did it become contaminated,

17  when did it become contaminated, is it still migrating, has the

18  continued migration caused personal injury, property damage,

19  and it may be essential to assert independent claims against

20  New GM.  It may raise the issue, well, is New GM supposed to do

21  something about it?  It owns the property.  According to their

22  allegations, there is continued migration of contaminated

23  groundwater.

24         So I'm not bothered by those allegations.  There are

25  punitive damage allegations, other things, you know, is a

48

1   non-starter as far as I'm concerned.  But the fact that they've

2   pled a lot about Old GM and conduct, and the consequences of

3   Old GM conduct, you know, at some point I have to go through

4   and parse, okay, this paragraph is okay, this paragraph is not.

5          But generally speaking, if you're trying to excise

6   all allegations about Old GM, I don't think that's going to

7   work.

8          MR. STEINBERG:  I don't think we were, Your Honor.

9   And, in fact, if this was just a pleading exercise of how to

10  property plead an independent claim, I'm somewhat confident

11  that I could have probably talked through those issues with my

12  adversary.

13         The reason why I think we're in Court today is that

14  which we think are retained liabilities, which I think that

15  they acknowledge are retained liabilities, whether they have to

16  comply with that, whether we're allowed to, in effect, exercise

17  sort of a self-help remedy and decide that there was a

18  violation.  And that's what really --

19         THE COURT:  I agree with you on that.  Okay?

20         MR. STEINBERG:  And that's what brought us to Court.

21         THE COURT:  Mr. Menli (phonetic) is going to have a

22  problem with me on that score.  He can't use self-help, go to

23  another Court in another place, and simply do something

24  contrary to the sale order.  Okay?  I enforce the sale order.

25         MR. STEINBERG:  And while Your Honor has identified

49

1  an interesting hypothetical about assume New GM totally stopped

2  doing anything, that's actually not what they have alleged.

3  They have alleged the --

4          THE COURT:  You continue to do it.

5          MR. STEINBERG:  -- that we continue to do it.  We had

6  said that, you know, as a technical matter, when you repeat and

7  re-allege, for purposes of the independent claim, some of it is

8  background.  You have to put in the background.  But some of it

9  is the actual averment.  And when you have a fraud count, and

10  the only thing that you're alleging is the fraud count, is a

11  2007 statement about the water flow, that seems to be relying

12  on Old GM conduct.

13          The issue really was is that once someone takes the

14  position that they don't have to comply with the sale order,

15  it's hard to have a discussion with them on the pleading

16  because they don't really care about whether they're pleading

17  in accordance with the sale order or not anymore.

18          THE COURT:  I am going to want a supplemental brief

19  regarding common law liability under Michigan law.  Okay.

20          Generally, the environmental -- my familiarity with

21  the environmental statutes is they don't create personal --

22  they don't create liability for personal injury/property

23  damage.  Michigan allows -- provides broad standing for

24  equitable relief under the Michigan Environmental Protection

25  Act.  But that's -- the real issue here are the personal

50

1  injury/property damage claims.

2          Go ahead and address the due process issues, if you

3  would.

4          MR. STEINBERG:  I'm sorry?

5          THE COURT:  The due process issues.

6          MR. STEINBERG:  Due process.  Your Honor, on the due

7  process issues, I take it I can skip over the seller tax and

8  compliance with the seller?

9          THE COURT:  You can.

10         MR. STEINBERG:  So on the due process issue, there

11 are three parties that are relevant to look at, besides Old GM,

12 when looking at the due process issue.  What did the developer

13 of the property know about the issue relating to salt at the

14 property prior to the sale?  What did the environmental agency

15 know about the issue about salt prior to the sale?  And what

16 did the homeowners know about the issue of salt related to the

17 sale?

18         And then overlaying on top of that is the issue that

19 the Second Circuit didn't really deal with on the appeal by the

20 ignition switch defect plaintiffs about whether due process

21 requires prejudice as well, too.  And there are two elements

22 about prejudice which I want to address as well.

23         So let me just sort of focus in that everybody knew

24 Old GM's position with regard to its responsibility for salt

25 migration prior to the sale.  It was well-known and it was

51

 1  subject to a litigation.  Back 10 years, more than 10 years

 2  before the sale, the developer had -- of the plaintiff's

 3  property had filed a complaint with the Michigan Department of

 4  Environmental Quality saying that there was migration coming

 5  from the Milford Proving Ground.

 6          And Old GM -- so, in 1998, the MDEQ wrote the

 7  developer regarding a potential salt issue and reaction to the

 8  complaint that the development had made.  So the developer knew

 9  about the problem, and the deeds that went to the homeowners

10  had their identification of the sodium chloride issue that --

11          THE COURT:  Say that again?

12          MR. STEINBERG:  The deeds, the homeowner deeds --

13          THE COURT:  Yes.

14          MR. STEINBERG:  -- had a disclosure of sodium

15  chloride issues that relate --

16          THE COURT:  So are you saying that -- does that cover

17  all putative class members, the deeds of their homes, include a

18  disclosure of the salt levels?  Do I have that -- do I have one

19  of those --

20          MR. STEINBERG:  Let me ask Mr. Caldwell to confirm

21  that.  My --

22          THE COURT:  Do I have one of those documents?

23          MR. STEINBERG:  Yes, we do.  It's in our reply.

24          MR. CALDWELL:  Yes, Your Honor.  That declaration of

25  restrictions applied to the entire subdivision that the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

52

 1  developer was putting together.

 2          THE COURT:  This is in the reply?

 3          MR. CALDWELL:  Yes.

 4          MR. STEINBERG:  Yes.  It's an exhibit to the reply.

 5          Scott, do you know the exhibit?

 6          THE COURT:  I don't have these.  Are the exhibits

 7  still --

 8          MR. STEINBERG:  It's just one exhibit to the reply.

 9  So it's the only exhibit to the reply.

10          THE COURT:  Okay.

11          MR. STEINBERG:  So --

12          THE COURT:  Just point to me -- okay.  I see the --

13  all right.  Go ahead.

14          MR. STEINBERG:  All right.  So that's the developer.

15  The MDEQ has known about this continuing issue, and Old GM and

16  New GM have both been working with the DEQ about this issue.

17  mean, they know about it, they're on top of it.

18          THE COURT:  Yes.  This seemed just to -- this memo

19  can deal with -- this seems so fundamentally different than the

20  ignition switch defect, which had not been disclosed.  That was

21  the whole -- and I'm not getting into whether -- I live with

22  the Second Circuit decision.

23          MR. STEINBERG:  Okay.

24          THE COURT:  And --

25          MR. STEINBERG:  So do I.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

53

```
 1          THE COURT:  Yes.  Okay?  And, you know, I mean, it
 2  all started with stipulated facts before Judge Gerber.  But
 3  this does seem fundamentally different.  And I have to confess,
 4  I read a lot of this stuff, but I didn't look at this deed, the
 5  disclosure in the deed.
 6          I don't know where the due process violation is in
 7  your -- if people have been told it's fine for GM to deny that
 8  they're responsible for it.  But the issue was flagged, was
 9  known.  They do seem to fit into the category of unknown
10  claimants as to which direct mail notice is not required.
11          Go ahead.
12          MR. STEINBERG:  The DEQ obviously was aware of this
13  entire situation.  There was actually a litigation brought by
14  Old GM against the DEQ.
15          THE COURT:  I know.  I'm familiar with that.
16          MR. STEINBERG:  And so you have --
17          THE COURT:  And they reached a settlement, they
18  withdraw their --
19          MR. STEINBERG:  That's correct.  So the DEQ is aware
20  of it, and the DEQ gets notice of a sale hearing, files a
21  limited objection to the sale hearing, appears for all three
22  days of the sale hearing.  And in junction with --
23          THE COURT:  They appeared in my Metaldyne case.  You
24  know, that was -- they were very aggressive in enforcing their
25  environmental -- making sure that any sale had appropriate
```

54

1  protection.

2          MR. STEINBERG:  So I think Your Honor understands the

3  DEQ aspect.  Let me deal with the homeowners, besides the deed

4  issue.  The homeowners, according to the complaint, on Exhibit

5  H, they got a letter from the MDEQ relating to the sodium

6  chloride of their property in June of 2007.  So they also got

7  notice from the DEQ.

8          This is not in their complaint.  I'll just say it

9  because Mr. Caldwell told me that -- it sounds to me like it's

10 right -- that if you have salt in your water, you probably

11 could taste it.  That's an easy way of understanding there's a

12 problem.  But it's more than that, and it's not in the record

13 that is before you.  It is something that I did see on the

14 internet.

15         There is an article that when this lawsuit was

16 started the local newspaper got quotes from Mr. Moore.  And

17 Mr. Moore said in those quotes in the newspaper article, and we

18 could --

19         THE COURT:  I think we ought to stick to the record.

20         MR. STEINBERG:  No, no, but I -- but it is a fact

21 that I don't think counsel will deny.  So I --

22         THE COURT:  I'm only deciding it on the record I have

23 before me, Mr. Steinberg.

24         MR. STEINBERG:  I understand that.  If we do

25 supplement --

55

1           THE COURT:  I don't want to know what he has said in

2   -- what a newspaper quoted him as having said.

3           MR. STEINBERG:  Okay.  But the point that I'm trying

4   to make -- and I know you -- the point I'm just trying to make

5   is that the bottled water situation that you asked about what

6   has New GM done after the notice of migration that all the

7   homeowners are getting or being offered at least bottled water,

8   the bottled water issue about what the homeowners were getting

9   actually preceded the sale, and that the DEQ was offering these

10  homeowners more bottled water.

11          And the thing that I was trying to say is that Mr.

12  Moore has acknowledged that they were -- he was getting bottled

13  water since 2005.  I know it's not part of the record, but --

14          THE COURT:  I only want -- Mr. Steinberg, I don't

15  know how many times I have to say this.  I only want to hear

16  what's in the record.

17          MR. STEINBERG:  The other thing, which is part of the

18  record, which is, you know, did -- unlike the people who may be

19  driving a car in Iowa or Idaho, Milford, Michigan, the largest

20  employer in Milford, Michigan -- I'll take that back.  It's not

21  in the record, but it's the largest employer.

22          But paragraph 9 of the amended complaint says the

23  General Motors Milford Proving Ground was industry's first

24  dedicated automobile testing facility when it opened in 1924.

25  It is located in Milford, Michigan, and covers approximately

56

1  4,000 acres.  It is over 115 buildings.  It covers 100 miles of

2  road.

3          And the thing that I'm asking you to connect is that

4  when Old GM files for bankruptcy, the people in Milford,

5  Michigan, know that there was a bankruptcy.

6          THE COURT:  Maybe I'm wrong.  If they are known

7  claimants, they are entitled to actual notice by mail.  If they

8  are unknown, notice by publication is sufficient.  I think you

9  quote -- I can't remember which Circuit.  There is -- this

10 issue of notice in environmental cases has come up before,

11 right?  What's the case you -- I think -- I can't remember

12 which case you cited and put in your reply.  I'm sorry.

13         MR. STEINBERG:  Envirodyne, wasn't it?  Third

14 Circuit?  Mr. Davidson will look that up.

15         THE COURT:  Maybe I'm misremembering.  I know I read

16 a Circuit Court case involving notice of environmental cases

17 recently.

18         MR. STEINBERG:  Yeah.  But the reason why I go

19 through this provision, Your Honor, because it dovetails to the

20 prejudice argument, which, you know, is highlighted.  You know,

21 it's the same issue that came up on an analogous basis in Queen

22 Elizabeth Realty, which is cited in our paper, which a Judge

23 Bernstein decision.

24         THE COURT:  It's the Chemetron case.  Chemetron.

25         MR. STEINBERG:  Chemetron.

57

1              THE COURT:  From the Third Circuit.

2              MR. STEINBERG:  That's right.

3              THE COURT:  That was the case I'm thinking of.

4              MR. STEINBERG:  But the argument about that the

5    people of Milford knew about the bankruptcy and the sale is

6    that even if you should have given them notice by mail, and you

7    gave it to them by publication, if they otherwise were aware of

8    the sale hearing and that there was a bankruptcy because they

9    got it through other means, and here I'm suggesting that the

10   Milford Census has a certain level of population, the people

11   who work at the Milford Proving Grounds have a certain level of

12   population, people in Milford knew about this, and they knew

13   about that -- and even if there was improper notice, if you

14   became aware of the hearing date, then you don't have a due

15   process violation.  That's the essence of the prejudice --

16             THE COURT:  All right.  Any other points you want to

17   cover?

18             MR. STEINBERG:  The only -- I think we've talked

19   about the allegations and the independent claim issue or the

20   exemplary damages issue.  Not for --

21             THE COURT:  Do you agree that New GM, on independent

22   claims -- and I dealt with -- you brief it, I dealt with what's

23   an independent claim -- I don't think this makes it here.  I

24   think it needs to be revised.  But New GM, on independent

25   claims, if state law provided the remedy, punitive damages

58

1  might be available.

2        MR. STEINBERG:  Correct.

3        THE COURT:  Okay.

4        MR. STEINBERG:  All right.  Your Honor, I think

5  you've probably heard enough from me for now.

6        THE COURT:  Okay.  Mr. Memmen?

7        MR. MEMMEN:  Thank you, Judge.  Good morning, Your

8  Honor.  Alex Memmen here on behalf of the Moore plaintiffs,

9  M-E-M-M-E-N.  I came to Court today ready to talk about due

10 process, but I think Your Honor is maybe more interested in

11 some other topics.  I am going to start --

12       THE COURT:  You can talk about due process if you

13 want.  I'm skeptical of your due process claim because this is

14 very different than the ignition switch defect.  There has been

15 no -- you went to state court, then were moved to district

16 court, didn't come here, and you're -- you know, you have to

17 abide by the sale order.  You didn't.

18       MR. MEMMEN:  Your Honor, we don't disagree that we

19 have to abide by the sale order.  We were coming up to a

20 statute of limitations on this case and we wanted to get a case

21 filed in a timely manner on behalf of our plaintiffs.

22       THE COURT:  Okay.

23       MR. MEMMEN:  We served General Motors.  We intended

24 to come before the Court.  Counsel are better bankruptcy

25 counsel than I am and they got something filed before I was

59

1    able to file something requesting leave from the sale order.

2              THE COURT:  You filed this case when in Michigan?

3              MR. MEMMEN:  We filed it in November.  It was served

4    on General Motors, I want to say, in early to mid-December of

5    '17.

6              THE COURT:  Okay.

7              MR. MEMMEN:  So it was not an attempt to evade the

8    sale order.  We absolutely respect the sale order.  We're not

9    saying the sale order doesn't apply to this case.

10             There are certain counts I think in this case, Your

11   Honor, that it doesn't apply to, but we'd certainly agree that

12   the sale order applies regarding claims that are relating to

13   old General Motors.  Specifically, Judge -- and I apologize --

14   I think everybody agrees, and after hearing counsel's

15   discussion with Your Honor, Counts 1 and 2 and 8 and 9 are both

16   counts for violations of Michigan environmental law, those four

17   counts.  What we attempted to do when we amended our complaint

18   was we attempted to split up the counts between counts that

19   impute or refer to or are talking about the conduct of Old

20   General Motors from the counts that are against New General

21   Motors.

22             Part of what has made this tricky, Judge, is that

23   what we allege is a continuing course of conduct.  Your Honor

24   talked a little bit about plumes and migrating plumes and salt

25   contamination and environmental contamination in general.  It's

60

1 not something that we alleged happened once and then stopped or

2 happened a couple times and then stopped.  It's something that

3 continued onwards since, at least as early we say is 1985, and

4 we think long before that.  So that's one of the reasons I

5 think that this is a little different.

6          Judge, the only thing I would say, you were talking a

7 little bit earlier about the construction of the sale

8 agreement, and the only thing I would add to that -- I don't

9 have very much to add about that -- I think Your Honor went

10 over that pretty well -- is that in the case of a sale

11 agreement like that, it's I think, to the extent that GM

12 drafted the sale agreement, to the extent that the plaintiffs

13 had no hand in drafting the sale agreement, and to the extent

14 that there are vague or inconsistent clauses, those should be

15 interpreted in favor of the non-drafting party.

16          THE COURT:  What's the meaning of -- you tell me your

17 interpretation of 2.3(b)(iv), the retained liabilities?

18          MR. MEMMEN:  I've looked at it at Judge, and Your

19 Honor talked about the end of (4)(c), except as otherwise

20 required  under applicable environmental laws.  I have a hard

21 time parsing this out as well.

22          THE COURT:  Well if environmental laws means

23 statutes, the Michigan statutes, CERCLA the federal statute,

24 RECLA, they don't create liability for personal injury or

25 property damage; is that correct?

61

1          MR. MEMMEN:  Well I actually do think that the

2    portion of our complaint, specifically, count 1 and I believe

3    it's count 8, Judge, that references the NREPA part 201, does

4    contain portions of that statute that do allow for, you know,

5    damages for the value of injury to destruction of or loss of

6    natural resources.

7          THE COURT:  Which section?  Give it to me again.

8          MR. MEMMEN:  It's specifically section, it's

9    M.C.L. 324.20126(a), sub -- and I just found it, Judge, while

10   we were -- (a)(1)(c).

11         THE COURT:  And I'll look at that.  But hang on

12   because I did print some of those Michigan statutes.  Just bear

13   with me, okay.

14         I didn't print that subsection.  I looked at more

15   than this, but I had printed M.C.L. 324.1701 and its

16   subsections.  And tell me what .20126a(1)(c), what does that

17   do?

18         MR. MEMMEN:  That calls for damages for the value of

19   injury to destruction of or loss of natural resources,

20   including the reasonable cost of assessing those injuries and

21   destruction and losses.

22         THE COURT:  Yeah, I did see.  That has to do with

23   remediation doesn't it?

24         MR. MEMMEN:  That's not my reading of the statute,

25   Judge.

62

1              THE COURT:  Okay.

2              MR. MEMMEN:  And I don't have any case law to cite to

3    you right now as it relates to that reading, but my reading of

4    it I thought was that it was pretty clear that it included

5    damages for destruction to the property.

6              THE COURT:  And which count do you have that pled in?

7              MR. MEMMEN:  That's in counts 1 and 8.  Again,

8    count 1 is as it pertains to the actions of Old General Motors

9    and count 8 as it pertains to the actions of new.

10             THE COURT:  Mr. Steinberg, you're agreeing that

11   counts 1 and 8 can properly be asserted against New GM?

12             MR. STEINBERG:  Yes.

13             THE COURT:  Okay.  So that'll be for a judge in

14   Michigan to decide.

15             MR. MEMMEN:  Sure.

16             THE COURT:  Okay.  Let me just make sure.

17   Mr. Steinberg, do you have a position on whether under Michigan

18   law, New GM can be liable for damages for injury or destruction

19   of property under the Michigan environmental law?  Mr. Memmen

20   has cited to Section 324.20126a(1)(c).  I think maybe it's

21   unfair for me to ask that question unless you've looked at

22   that.

23             MR. STEINBERG:  I would be asking Mr. Caldwell.  But

24   the counts that we think are the retain liabilities are

25   counts 3 through 7.  Those are the ones that we say --

63

1              THE COURT:  Mr. Caldwell, do you want to be heard

2  about this section that Mr. Memmen has referred to?

3              MR. CALDWELL:  Well, and I do think we can parse that

4  out in the Eastern District, but those are natural resource

5  damages, Your Honor, which are more akin to remediation as

6  you've suggested.  They're not property value diminution type

7  claims at all.

8              THE COURT:  But you both agree --

9              MR. CALDWELL:  You know if you had a fish kill, the

10  Department of Environmental Quality could assert damages for

11  the damage to that natural resource.

12              THE COURT:  Well, but if the water in a well was

13  contaminated and was no longer potable, could a homeowner

14  recover damages for not being able to use their well anymore?

15  Isn't that natural resources?  Let me withdraw the question.

16              Both sides agree that counts 1 and 8 can properly be

17  asserted and the issues resolved by the district court in

18  Michigan.  Am I correct in that Mr. Memmen?

19              MR. MEMMEN:  I agree with that Judge.

20              THE COURT:  Mr. Steinberg?

21              MR. STEINBERG:  That's correct.

22              THE COURT:  Then you don't need to know anymore about

23  that.

24              MR. CALDWELL:  And I would only add, Your Honor,

25  there are statutory defenses that would be applicable, but as

1  far as whether they can bring those claims, that's my

2  understanding.

3          THE COURT:  Okay.  The district court in Michigan

4  will deal with that.  Go ahead Mr. Memmen.

5          MR. CALDWELL:  Yeah.

6          MR. MEMMEN:  So Your Honor, I did just want to deal

7  then with the due process arguments under the Elliott case.

8  And I understand the distinctions that Your Honor discussed

9  earlier, but I think that these cases are more analogous than

10  maybe it appears on the surface.

11          In the Elliott case, there was no question that there

12  were people other than General Motors who knew that the

13  ignition switch defects were a problem.  The National Highway

14  Safety Board was aware of it.  Various police agencies were

15  aware of it.  There was questions about whether or not General

16  Motors was going to inform their dealers of the issue.  I don't

17  remember if that's particularly clear, if it actually happened

18  in that case.

19          There were people who knew about this issue other

20  than General Motors.  It wasn't as though General Motors was

21  just sitting on it and no one else had figured out that this

22  was an issue.  It had been an issue for a long time before the

23  July 2009 bankruptcy, and it continued to be an issue

24  afterwards.

25          THE COURT:  Did the putative plaintiff property

65

1 owners had the disclosure that Mr. Steinberg has pointed to in

2 their deeds with respect to salt content of the wells?

3 　　　　MR. MEMMEN:  I believe they had disclosure that there

4 was salt content in the wells.  I do not believe they had any

5 disclosure that the salt content came from General Motors.  And

6 this is an important point because General Motors, up until

7 2014, continued to state adamantly that they did not cause this

8 problem.  This was not an issue that they had created.  This

9 was either a natural issue or was due to road salt or was due

10 to something else.

11 　　　　THE COURT:  But it may be due to road salt.  There's

12 a lot of road salt.

13 　　　　MR. MEMMEN:  And that may be the case, Judge.  That,

14 I think, would be an issue for a judge or jury in Michigan to

15 decide.  The question is, how did the plaintiffs in this case

16 have an opportunity to make an objection to the sale at the

17 time of the sale order.  And the point is that everybody knew

18 there was a bankruptcy -- that General Motors was in

19 bankruptcy.  Anybody in the United States, and certainly

20 anybody in Michigan, knew that there was a bankruptcy

21 proceeding and that General Motors was in bankruptcy.  That's

22 not a question.

23 　　　　The question is, did the plaintiffs in this case,

24 like the plaintiffs in <u>Elliott</u>, know that they were supposed to

25 show up for that proceeding and make an objection based on

66

1  general notice.  I think the answer from the Elliott court is,

2  no, they didn't know, they didn't have adequate notice and that

3  due process requires that they be given adequate notice.

4        The real question, I think, in addition to that is

5  not just what did the plaintiffs know, but what did General

6  Motors know, and did General Motors have adequate knowledge or

7  that they knew or should have known that they had potential

8  claimants nearby the Milford facility.  It's in the record that

9  for a very long time General Motors knew that the MDEQ believed

10 that they were the source of this contamination to the

11 southwest of the Milford proving grounds.  There's an email, I

12 think it's Exhibit G in our response, it's an internal MDEQ

13 memo saying that they're going to tell or that they told

14 General Motors that the developer's upset and that the

15 developer has salt in the ground.

16       General Motors knew there was a development being

17 built there.  They knew that there were problems with salt in

18 the ground there.  And they knew that there was reason to

19 believe that they might be responsible for the salt in the

20 ground, even if they weren't taking responsibility for it at

21 that time.  And so, again, very similar, I think, to the

22 Elliott case where General Motors, you know, knew or should

23 have known that there was a linkage between the ignition switch

24 defects --

25       THE COURT:  But where did the Second Circuit in

1  Elliott establish a knew or should have known standard?

2          MR. MEMMEN:   Elliott at 160, Judge.  Even if the

3  precise linkage between the ignition switch defect and moving

4  stalls and air bag non-deployments was unclear, Old General

5  Motors had enough knowledge.

6          At a minimum, Old GM knew about the moving stalls and

7  air bag non-deployments in certain models and should have

8  revealed those facts in bankruptcy.  Those defects would still

9  be the basis of claims even if the root cause, the ignition

10 switch, was not clear.

11         So I think that's analogous to this case, Judge.

12 Where General Motors knew or should have known that there were

13 problems.  And I would allege, Judge, by the way that they did

14 know.  I think we allege that they did know and I think there

15 are facts in the record that show that they had reasons to know

16 these things.  So much so that in 2000, they did file a lawsuit

17 against MDEQ seeking relief from the court to stop MDEQ from

18 proceeding with their claims against General Motors.

19         They knew that this was a problem to the southwest of

20 the Milford proving grounds.  They knew that there were homes

21 being built there.  They knew all these things.  So I think

22 these are reasonably ascertainable claims that General Motors

23 should have provided specific notice about and when they didn't

24 provide specific notice, violated due process.

25         As it relates then to the prejudice argument which is

68

1  the second part of this, and I think the Second Circuit said,

2  you know, basically passed on whether or not prejudice was

3  required.  But even if prejudice is required in this case,

4  Judge, the Second Circuit made, I think, quite clear that the

5  question as it relates to prejudice is whether or not you had a

6  seat at the table.  And can the court say with any certainty

7  that by not having a seat at the table, things would have been

8  the same?  And the court pointed to, I think, the lemon law

9  litigants who --

10        THE COURT:  They assumed liability for lemon law

11  claims.

12        MR. MEMMEN:  Correct.  And that's the point that the

13  court makes in the Second Circuit in the Elliott case is that

14  even though --

15        THE COURT:  Can they assume liability here for --

16        MR. MEMMEN:  Yes.  But the point being, Judge, that

17  even though those claimants didn't necessarily have a legal

18  reason to have those claims be assumed, it wasn't necessarily

19  based on a law.  It wasn't necessarily saying well there's this

20  part of the Bankruptcy Code that allows us to keep those

21  claims.

22        THE COURT:  But here, the Michigan Environmental

23  Agency appeared before Judge Gerber, actively participated,

24  satisfied itself that the provisions of the sale order with

25  respect to assumed liabilities protected the environmental

69

1  interests of Michigan.  There wasn't a comparable provision in

2  GM.  The sale agreement is part of the rub that while New GM

3  assumed liability for post-sale accidents, even for vehicles

4  manufactured before the sale, it did not assume liability for

5  presale accidents.  That's one of the issues that Judge Furman

6  is wrestling with and has wrestled with.  Okay.  Here, GM did

7  assume liabilities for environmental law violations.

8           MR. MEMMEN:  And I agree with that, Your Honor.  I

9  think the difference is I don't think the MDEQ --

10           THE COURT:  And it's because the Michigan

11  environmental regulators essentially insisted on it.  They

12  appeared, you know, from my own experience in <u>Metaldyne</u>.  They

13  appeared before me.  They were active and they wanted to assure

14  that the environmental interests of Michigan and its citizens

15  were protected.

16           MR. MEMMEN:  And I agree with that and I understand

17  that, Your Honor.  But I don't think MDEQ could stand in the

18  shoes of the Moore plaintiffs in this case.  The MDEQ is

19  looking out for the entire State of Michigan.  They had

20  priorities.  I don't know what those priorities were at the

21  time of the sale.  Those priorities were not necessarily the

22  Moore plaintiffs.  In fact, MDEQ eventually agreed to

23  essentially back off.

24           THE COURT:  The unknown Moore plaintiffs, as opposed

25  to the Michigan environmental regulator that's looking out for

70

the public interest trying to assure that the interests of its

citizens, known or unknown, has been protected.  That's where

I'm having a lot of trouble, Mr. Memmen, with respect to the

due process argument.  This is fundamentally different.

NHTSA didn't appear before Judge Gerber and say, you

know, we're not sure exactly why but there have been ignition

switch problems that have led to stalls, non-inflation of air

bags during accidents, the sale agreement needs to be written

in such a way as to protect those interests.  That didn't

happen in GM.  Here, it did happen.

MR. MEMMEN:  And I appreciate that, Your Honor.  But

I think that the constitutional concept of due process requires

specific notice to known --

THE COURT:  To known creditors.

MR. MEMMEN:  Correct.

THE COURT:  Agreed?

MR. MEMMEN:  Correct.  Yes.  Known or reasonably

ascertainable creditors.

THE COURT:  GM couldn't have looked in its books and

records to ascertain who owned the adjacent properties, could

it?  You agree with that?

MR. MEMMEN:  It wouldn't have been -- that specific

information would not have been in their books and records.

What information would have been in their books and records

were claims by --

71

1            THE COURT:  The claimant has to be known or

2  reasonably ascertainable from -- well, let me ask you a

3  question.

4            MR. MEMMEN:  Yes.

5            THE COURT:  Do you agree that the claimant has to be

6  known or reasonably ascertainable from the books and records of

7  the debtor?

8            MR. MEMMEN:  Yes.

9            THE COURT:  Okay.  I wrote on that issue in <u>Borders</u>

10 <u>Books</u>.  Okay.  I could be wrong, but that was what I

11 determined.  That the standard for known creditors is known or

12 reasonably ascertainable, not from research of public records,

13 go to the land records to see who might be adjacent, who not,

14 known or reasonably ascertainable from the books and records of

15 the debtor.  So with respect to a purchaser of a GM vehicle

16 with a defective ignition switch, they have books and records

17 that show who bought the cars.

18            If it's a vehicle of a particular year and model,

19 they have that in their books and records.  That's part of what

20 the Second Circuit focused on.  They were known or reasonably

21 ascertainable from the books and records of GM.  You would

22 agree that your named plaintiffs and putative class members are

23 not known or reasonably ascertainable from the books and

24 records of GM, correct?

25            MR. MEMMEN:  I don't agree to that, Judge, because I

72

1  haven't had an opportunity to see those books and records.  In

2  other words, I think it's very likely that Old General Motors

3  did know about these potential claimants and I obviously

4  can't --

5          THE COURT:  You think nine years after a bankruptcy,

6  you can come into this Court and say, we think that GM knew

7  about it?  We don't have any evidence of that.

8          MR. MEMMEN:  Well, no.  I do have evidence.

9          THE COURT:  Not knew of the problem, knew about the

10 claimants that they were known or reasonably ascertainable from

11 the books and records.  How many years after a bankruptcy do

12 you think you can come back and try and reopen it, a very

13 different set of allegations than occurred with respect to the

14 ignition switch defect?

15         MR. MEMMEN:  Right, Your Honor.  Although the

16 ignition switch defect was made known to those plaintiffs at

17 about the same time that this was made to our plaintiffs.

18         THE COURT:  Buy who bought the cars was known to Old

19 GM.  They could go to their books and records, they could

20 identify -- if the car had been sold in a used car sale, they

21 may not have known.  But they knew who bought cars.  They may

22 have had records of who had the car serviced if the car had

23 been sold.

24         But that was part of the point of the Elliott case.

25 The known creditors were reasonably ascertainable from the

73

1  books and records of GM.  These are the vehicles in which it

2  had been identified a problem that wasn't disclosed, okay.

3  That's not your case, right?

4         MR. MEMMEN:  I agree that that's not our case.

5         THE COURT:  All right.  Go ahead.

6         MR. MEMMEN:  Okay.  The only thing I would say about

7  it, Judge, is that there's a five-year delay from the time of

8  the bankruptcy until the time that General Motors files their

9  notice with MDEQ saying the salt contamination is potentially

10 our responsibility.  It's our fault.  So during that time

11 period, I understand we're along way away from the 2009 sale

12 order.  But five of those years are during a time when the

13 Moore plaintiffs have no reason to know that General Motors is

14 responsible for the contamination.  And General Motors is

15 actively denying responsibility for the contamination during

16 that time.

17        THE COURT:  They probably still don't think they're

18 responsible, but that's you know.

19        MR. MEMMEN:  Yeah.  And I understand that.  Although

20 now they are providing water, they're doing certain things.

21 They have not taken any remediatory action, by the way.

22        But the point that I'm making, Your Honor, is that,

23 and I don't know that there's a statutory or a legal time limit

24 on how long we're allowed to come in, but I do think it would

25 be appropriate to --

74

1          THE COURT:  There's a statute of limitation in

2  Michigan.  I read a lot of statute of limitations cases in

3  Michigan --

4          MR. MEMMEN:  Right.

5          THE COURT:  -- dealing with environmental

6  liabilities.

7          MR. MEMMEN:  Yeah.  And that's why we filed when we

8  filed was to get this case.  We had a tolling agreement with

9  General Motors.  We wanted to file before the tolling agreement

10  expired.  So that's why we filed when we filed.

11          THE COURT:  Okay.  Any other points you want to

12  cover?

13          MR. MEMMEN:  Just, Judge, that we think that the

14  Court can reasonably read from the record that Old General

15  Motors knew of the (indiscernible) claims, or should have been

16  able to reasonably ascertain who the claimants were.

17          THE COURT:  How?  How are they supposed to -- but

18  it's not.  I asked you and you agreed with me.  The standard is

19  known or reasonably ascertainable from the books and records of

20  the debtor, not to go off and do property search records in a

21  public record to see who may own the house that year as opposed

22  to the year before or the year after.  It's -- my -- because

23  I've written on this, there's no duty to go beyond the debtor's

24  books and records to identify the known or reasonably

25  ascertainable creditors.  You believe that -- is that a correct

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  statement of the standard?

2           MR. MEMMEN:  I agree with Your Honor on that point.

3           THE COURT:  Okay.

4           MR. MEMMEN:  The only thing I would say is that, if

5  that's the case, we'd like the opportunity to see what General

6  Motors has in their possession as it relates to their books and

7  records on these claims.  I think that that's where we're at on

8  this.

9           As far as what we are then asking the Court for is

10 for us to move forward with our independent claims, whether or

11 not to --

12          THE COURT:  I have problem with it -- I don't mean to

13 interrupt you there -- because one of the jobs I least like is

14 have to fly spec these complaints, say, well, this clause has

15 got to come out, this one come -- you know, is okay.  But

16 that's what this -- in some ways it comes down to.  You've

17 included things in your so-called independent claims that don't

18 meet the standard -- whether you agree with me or disagree with

19 me, I've ruled on this previously -- what satisfies.  I have

20 the gate-keeping function.  I allow independent claims to go

21 forward.  And it seemed to me that your amended complaint runs

22 afoul of the standard for independent claims.  I wish you could

23 work that out with Mr. Steinberg.

24          MR. MEMMEN:  I think counsel was right, Your Honor,

25 that we could -- if that were the issue here, and I think that

76

1  we can work out those issues.  I do think that counsel and I

2  can work those issues out.

3         THE COURT:  Because I don't want to have to sit down

4  and redline a complaint, this paragraph's in, that paragraph's

5  out.  I expect what I'll do -- I don't know what my ruling's

6  going to be yet.  But with respect to those independent claims,

7  it is pretty clear to me that you've run afoul of the standards

8  I've set forth and that Judge Gerber did for what's an

9  independent claim.  And you ought to sit down with

10 Mr. Steinberg sooner rather than later and see whether you can

11 iron that out.  I don't think it's going to make a big

12 difference to how you're going to proceed.  But the language

13 you have in there now runs afoul of what I've ruled before.

14        There are some other bigger issues that I do have to

15 decide.  They're important to you and I appreciate that.  I'm

16 sensitive to these environmental claims.

17        MR. MEMMEN:  Sure.  And I agree with Your Honor.  I

18 think counsel and I can work those issues out.  But we are

19 asking you to move forward with independent claims perhaps with

20 an amended complaint, move forward with assumed liabilities

21 that the parties agree to, and we are asking to move forward

22 with claims relating to Old GM based on our due process

23 arguments, or --

24        THE COURT:  That's the successor liability?

25        MR. MEMMEN:  Correct, Judge.  We think the Michigan

77

1  judge would make the determination as to successful liability

2  under the laws of Michigan.  Worst case scenario, we're asking

3  for the Court to allow us some limited discovery to be able to

4  understand what it is that General Motors had in their books

5  and records at the time of the 2009 Chapter 11 proceedings.

6  And that's about all I have to say for Your Honor, unless you

7  have any questions for me.

8          THE COURT:  Okay.  No, I don't.  Thank you, very

9  much, Mr. Memmen.  I take the issues here very seriously.  I

10 hope you understand that.

11         MR. MEMMEN:  And I take that from Your Honor.  I

12 appreciate that.  Thank you.

13         MR. STEINBERG:  Your Honor, I'll be very brief and I

14 appreciate the time that you've given to this matter already.

15         Mr. Memmen is a nice person.

16         THE COURT:  That's not the issue.

17         MR. STEINBERG:  I know.  But just so you understand

18 the timeline.  He said that he filed a complaint because he was

19 running out of time in November of 2017.  We wrote, as we

20 reflect in our papers, a demand letter saying that you're

21 running afoul of the sale order in January of 2018.

22         We actually had a phone call which we reflect in our

23 papers as well in February of 2018 in response to it.  Well we

24 didn't get a real response to the demand letter, citing to him

25 the Celotex case, and saying that your job is to come to the

78

1  Court and not to exercise remedies.

2          The response to that was to file an amended complaint

3  in the Eastern District of Michigan.  So the notion that he was

4  waiting and about to file a complaint here, I don't think

5  carries water.

6          THE COURT:  Can I ask both of you this?  Do you agree

7  about the assumed liabilities?

8          MR. STEINBERG:  Correct.

9          THE COURT:  Do you agree that properly pleaded

10 independent claims can be asserted?

11         MR. STEINBERG:  Correct.

12         THE COURT:  And the real area, the strongest area of

13 disagreement is over the claims that assert successor

14 liability.  Is that a fair statement?

15         MR. STEINBERG:  We agree on retained liabilities.  He

16 thinks he doesn't have to comply because of the due process

17 issue.

18         THE COURT:  Okay.  What I would ask the two of you to

19 do -- I'm not going to rule instantly, okay.  I want the two of

20 you to see if you could come to agreement on the independent

21 claims.  I'm telling you, Mr. Memmen, you've got allegations in

22 there that don't satisfy my prior decisions and Judge Gerber's

23 decisions about what would truly be an independent claim.

24         Mr. Steinberg said he thinks you could work this out

25 with you.  You know, I'd like you to try and work that out now

1  because I think where I need to focus my attention is on the

2  successor liability claims.  Do you both agree with that?

3          MR. STEINBERG:  Correct.

4          MR. MEMMEN:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. STEINBERG:  We will try.

7          If you want to give a time frame of when we should be

8  trying --

9          THE COURT:  Yeah.

10          MR. STEINBERG:  -- I'm happy to listen to whatever

11  your time frame is and say yes after you tell me.

12          THE COURT:  Give me a time frame.  Talk to each

13  other.

14          MR. STEINBERG:  Two weeks?

15          MR. MEMMEN:  Yeah, that's fine.

16          THE COURT:  Fine.

17          MR. STEINBERG:  Two weeks?

18          MR. MEMMEN:  I was going to say 21 days, but that's

19  fine.

20          THE COURT:  Two weeks.

21          MR. STEINBERG:  Two weeks from today.

22          THE COURT:  Okay.  It will simplify my life if I

23  don't have to go through with a red pen and mark -- you can

24  agree or disagree, but I think the law is pretty settled

25  between Judge Gerber and myself as to what you have to do.

80

1  Okay.  You want to be able to iron that out.  Okay.

2          MR. STEINBERG:  Your Honor, I just have a few more

3  quick points that I'd --

4          THE COURT:  Go ahead.

5          MR. STEINBERG:  -- just like to be able to give you.

6          One is that the due process issue that is being

7  raised in this case, at least on the papers that they filed, is

8  that they should have gotten direct mail notice of the sale

9  notice.  The sale notice was approved by Judge Gerber prior to

10 the sale hearing in a separate order.  The sale notice itself

11 doesn't say anything about claims or -- it just says, there's

12 going to be a hearing on a certain day to sell these assets.

13 This is the time to make a bid.  It's your official form sale

14 notice.

15         Once counsel admits that his clients were aware of

16 the sale and knew about the sale agreement, they knew the

17 timing of the sale agreement, they've essentially conceded the

18 prejudice issue because they knew they could have come to court

19 and they could have said whatever they wanted to say at a time

20 when they had notice of sodium chloride issues relating to

21 their water.  And it's not -- I'll just leave it there -- at a

22 time that they knew that there was issues, and there was a

23 public record of a lawsuit that Old GM had denied liability and

24 where the DEQ had withdrawn their lawsuit that was there.

25         Mr. Memmen referred to water flow issues.  That was

in 1997 prior to the lawsuit where the lawsuit was addressing

those issues.  And finally, I did have in my outline, it is in

our papers, I'll just tick off the other things.

Mr. Memmen referred to the reason why they didn't

take action.  The notice of migration was October of 2014.  I

think the tolling agreement that he referred to was a 2016

event.  So there was at least like a year and a half before

they did anything at all.  And then they brought their lawsuit

in November of 2017.

And we do have in our papers, and it's an argument

we've made to Your Honor before in other context, Your Honor

has never ruled on it.  We have said that for parties who want

to enforce the sale agreement, and here the assumption of

liability is in the sale agreement, they're required to take to

the burdens as well as the benefits.  And the burdens here

would be that retained liabilities stay behind.  And we cited

some cases on that as well.

So I think, Your Honor, I think you've asked for some

additional papers.  I'm not sure if you've set the time of how

you want to do it.

THE COURT:  I didn't.  And I do understand you didn't

draft the sale agreement, Judge Gerber didn't draft the sale

agreement.  I have this question whether Michigan common law

claims for damages for personal injury or property damage from

environmental contamination are among the assumed liabilities.

82

1          MR. STEINBERG:  If there's anything in the sale

2   hearing record or the sale objections record, we will include

3   it in whatever papers --

4          THE COURT:  Okay.  How much time do you want

5   Mr. Steinberg?  I want simultaneous briefs from both of you, so

6   not seriatim.

7          MR. STEINBERG:  I think two weeks from tomorrow is

8   fine with us.

9          THE COURT:  That's fine.

10         MR. STEINBERG:  Is that all right with you?

11         MR. MEMMEN:  Can we get 21 days on that issue, Judge?

12         MR. STEINBERG:  I'm happy to do whatever you --

13         MR. MEMMEN:  Is that okay?

14         THE COURT:  Yeah.  Let's just do it with one.  So

15  three weeks from tomorrow, you'll both brief on assumed

16  liabilities and the two of you trying to hammer out an

17  acceptable pleading on independent claims.  So rather than do

18  it seriatim, three weeks.

19         MR. STEINBERG:  That's fine.  And Your Honor, just

20  for your convenience, and assuming counsel will be agreeing, to

21  whatever extent we haven't agreed, we will give you in effect

22  the paragraphs that we didn't agree so you don't have to

23  read --

24         THE COURT:  Narrow it.

25         MR. STEINBERG:  -- everything.  But we will have

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

83

1  narrowed it down.

2          THE COURT:  Okay.

3          MR. MEMMEN:  Fair enough, Judge.

4          THE COURT:  That would be very helpful to me, and I

5  would appreciate it.  Thank you very much.  Go ahead

6  Mr. Steinberg.

7          MR. STEINBERG:  I think that that's all I have for

8  today.  We will submit to you whatever we think will be helpful

9  to you.

10          THE COURT:  Okay.  Mr. Memmen, anything else that you

11  want to raise?

12          MR. MEMMEN:  No, nothing further, Judge.

13          THE COURT:  Okay.  Thank you both, very much.

14          MR. STEINBERG:  Thank you, Judge.

15          MR. MEMMEN:  Thanks Your Honor.

16      (Proceedings concluded at 12:10 p.m.)

17                      * * * * *

18

19

20

21

22

23

24

25

84

**C E R T I F I C A T I O N**

       I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

ILENE WATSON, AAERT NO. 447    DATE:  March 30, 2018

ACCESS TRANSCRIPTS, LLC

**C E R T I F I C A T I O N**

       I, Lisa Luciano, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

LISA LUCIANO, AAERT NO. 327    DATE:  March 30, 2018

ACCESS TRANSCRIPTS, LLC