UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Thursday, March 8, 2018 |
| . . . . . . . . . . . . . . . | . | 3:05 p.m. |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For General Motors LLC: | King & Spalding, LLP |
| | By:  ARTHUR J. STEINBERG, ESQ. |
| | 1185 Avenue of the Americas |
| | New York, NY 10036 |
| | (212) 556-2158 |
| | |
| For the GUC Trust: | Drinker, Biddle & Reath LLP |
| | By:  KRISTIN K. GOING, ESQ. |
| | 1177 Avenue of the Americas |
| | 41st Floor |
| | New York, New York 10036-2714 |
| | (212) 248-3140 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Court ECRO Personnel |
| | |
| Transcription Company: | Access Transcripts, LLC |
| | 10110 Youngwood Lane |
| | Fishers, IN 46038 |
| | (855) 873-2223 |
| | www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):


| | |
|---|---|
| For the Ignition Switch plaintiffs and certain non-Ignition Switch plaintiffs: | Brown Rudnick LLP<br>By: EDWARD S. WEISFELNER, ESQ.<br>7 Times Square<br>New York, New York 10036<br>(212) 209-4917 |
| | Stutzman Bromberg Esserman & Plifka<br>By: SANDER L. ESSERMAN, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX 75201-2689<br>(214) 969-4910 |
| For Personal Injury Accident Plaintiffs: | Goodwin Procter LLP<br>By: WILLIAM P. WEINTRAUB, ESQ.<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY 10018-1405<br>(212) 813-8839 |
| For Participating Unitholders: | Akin Gump Strauss Hauer & Feld LLP<br>By: DANIEL GOLDEN, ESQ.<br>One Bryant Park<br>New York, NY 10036-6745<br>(212) 872-1000 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Certain Personal Injury/Death Plaintiffs: | Hilliard Munoz & Gonzales LLP<br>By: ROBERT HILLIARD, ESQ.<br>719 South Shoreline Boulevard #500<br>Corpus Christi, Texas  78401<br>(361) 882-1612 |
| For Creditor, Additional Ignition Switch Pre-Closing Accident Plaintiffs: | Andrews Myers, P.C.<br>By: LISA M. NORMAN, ESQ.<br>1885 Saint James Place, 15th Floor<br>Houston, TX 77056<br>(713) 850-4245 |

3

1          (Proceedings commenced at 3:05 p.m.)

2                  THE CLERK:  All rise.

3                  THE COURT:  All right.  Please be seated.  We're here

4    in Motors Liquidation, 09-50026.  Have you all made your

5    appearances?  I don't have a -- nobody gave me a pad with your

6    -- with all of your names.  Has everybody made an appearance?

7    Yes.  People are shaking their head, yes.

8                  MS. GOING:  Yes, Your Honor.  And I think I'm the new

9    player, so --

10                 THE COURT:  Okay.

11                 MS. GOING:  Kristin Going, Drinker, Biddle & Reath,

12   on behalf of Wilmington Trust as the GUC Trust administrator.

13                 THE COURT:  Late to the party, but here you are.

14                 MS. GOING:  Yes, yes.

15                 THE COURT:  You're standing, so do you want to start?

16                 MS. GOING:  I was going to start, Your Honor.  I

17   thought since I --

18                 THE COURT:  Tell me your name one more time.  Okay.

19                 MS. GOING:  Kristin Going.

20                 THE COURT:  Okay.  Thank you.  Go ahead, Ms. Going.

21                 MS. GOING:  Good afternoon, Your Honor.

22          So first and foremost, Your Honor, Wilmington Trust

23   and the GUC Trust want you to be aware that they took Your

24   Honor's January opinion very seriously, and they've made

25   several changes as a result of that opinion, the most obvious

4

1  change being a change of counsel, which results in my

2  appearance before you today, Your Honor.

3          I also thought it would be helpful if I took a

4  moment, since I am the new player, to update the Court

5  regarding what's transpired over the last month or so and then

6  told you what we believe we need to do, and then finally tell

7  you what we would like in terms of scheduling, if that's all

8  right.

9          THE COURT:  Okay.

10          MS. GOING:  So Drinker Biddle replaced Gibson Dunn as

11  counsel to the GUC Trust on February 2nd.  At that time, as

12  Your Honor is aware, the GUC Trust was a party to what was

13  known as the forbearance agreement with New GM.  So our first

14  order of business was to evaluate the forbearance agreement,

15  which contained a provision whereby it would terminate pursuant

16  to its terms on February 28th should the agreement not be

17  extended by the parties.

18          So we first undertook to assess whether or not

19  Wilmington Trust, as the GUC Trust administrator, should, in

20  fact, extend that agreement.  And in doing so, we met with New

21  GM's counsel, both King & Spalding and Kirkland & Ellis, and

22  they shared their views with us regarding the benefits of the

23  forbearance agreement and the perceived deficiencies that they

24  saw in the previous settlement agreement that was proposed by

25  the plaintiffs.  New GM also detailed the many legal arguments

5

that they would make in response to any proposed settlement by

the plaintiffs.

      Ultimately, the GUC Trust, on advice of Drinker

Biddle, determined not to agree to a further extension of the

forbearance agreement.  And the GUC Trust certainly understands

that bankruptcy promotes settlement, and we did not believe

that the forbearance agreement created a path towards a

settlement.  In fact, pursuant to its terms, it restricted the

parties' abilities to work towards a settlement.

      So after the forbearance agreement terminated, the

GUC Trust administrator's counsel then met with counsel for

both the plaintiffs and the unitholders, and we received their

views regarding the previously proposed settlement and stated

the MDL proceedings generally.  These meetings have been

particularly helpful to us.  Both parties have provided us with

significant documents.  In fact, New GM has provided us with 15

expert witness reports that they have recently, I believe,

exchanged in the MDL proceeding.

      And the other reason why these meetings have been

particularly helpful is because Gibson Dunn originally took the

position that their files were property of Gibson Dunn, and

they refused to turn them over to Drinker Biddle.  So it was

only on March 5th that we received any files from Gibson Dunn.

So we are working fast and expeditiously, but we've --

      THE COURT:  I'm sorry, the date that you received

1  them was when?

2          MS. GOING:  March 5th.  We received a document dump

3  of 40 gigabytes of information.

4          THE COURT:  Did you receive all of their files?

5          MS. GOING:  I don't know that.  That was -- March 5th

6  was Monday, so we're working through it to see what we have.

7          THE COURT:  Okay.

8          MS. GOING:  So unless you have any questions, I think

9  I'd like to talk to you now about what we see in terms of the

10 schedule.

11          THE COURT:  Sure, go ahead.

12          MS. GOING:  I've read the transcripts from Your

13 Honor's proceedings, and I understand that in January of 2017,

14 Your Honor was concerned about the late claims motions not

15 being resolved in 2017, and it turned out you were prescient.

16 We are working as fast as we can to get up to speed, but we

17 would actually ask that Your Honor not set a hearing or oral

18 argument or any further proceedings on the motions for late

19 claims.  We'd like at least 30 days to pursue settlement

20 discussions, and I think setting an oral argument right now

21 would perhaps waste the Court's time and our time as we

22 continue to get up to speed, and hopefully, such oral argument

23 and any preparation for that oral argument would prove to be

24 unnecessary.

25          I'd also note for the Court, as I was just telling

7

1  New GM's counsel, that in the event that we were going to move

2  forward with the late claims, we believe that there is actually

3  a Southern District -- well, not precedent, but there was a

4  decision by Judge Bernstein last March, and I have the cite,

5  which is directly on point, and it was not raised by any of the

6  parties in the briefing.  It's In re Queen Elizabeth Realty

7  Corp., 2017 LEXIS 793, and it is -- he addresses whether or not

8  the Pioneer factors apply.  So that's something that we would

9  like to address.

10         THE COURT:  And what did Judge Bernstein decide?

11         MS. GOING:  Judge Bernstein decided that Pioneer

12  would, in fact, apply, but that when you've got a due process

13  violation, then excusable neglect is obviously already met.

14  But -- and it's a very low threshold.

15         THE COURT:  Okay.  I'll read it.

16         MS. GOING:  Okay.  So with that, Your Honor, I

17  conclude by saying we're just asking for some additional time,

18  and I believe I understand that the plaintiffs, who are the

19  movants, don't object to our request for additional time, but

20  Mr. Weisfelner can obviously speak for himself.

21         THE COURT:  Let me -- one thing you ought to consider

22  in -- if you all go forward with the late claims motion, it was

23  not clear to me whether an evidentiary hearing is required.

24  And so you need -- when this -- assuming I give you the more

25  time, which I'm going to do, you need to tell me whether --

1   what the proceedings on the late claims motion are going to

2   look like.  Is it going to be an evidentiary hearing?  Is it

3   just going to be the briefs?  If it's evidentiary, will direct

4   testimony be submitted in writing with in-court

5   cross-examination, we frequently do in trials?  But you'll have

6   time to get to that, okay?

7           MS. GOING:  Understood, Your Honor.

8           THE COURT:  All right.  Thank you.

9           MS. GOING:  Thank you.

10          THE COURT:  Mr. Weisfelner.

11          MR. WEISFELNER:  Judge, I think -- Ed Weisfelner of

12  Brown Rudnick, designated counsel for the economic loss

13  plaintiffs.  In court today is also Sandy Esserman.

14          Your Honor, I think you know from our February 8th

15  status letter to you that in our view, our primary focus, as a

16  consequence of Your Honor's January ruling, was to focus on

17  putting this settlement back together again, for lack of a

18  better term.  And in that regard, we share the desire of the

19  unitholders, represented by Mr. Golden to focus on that as

20  opposed to litigating late claims.

21          So we endorse the request by Drinker Biddle for an

22  additional period of time.  We are obviously concerned that

23  it's going to take that much time, and I'll comment that one of

24  the things I think is important for you to know, not only is

25  there new counsel for Wilmington Trust, but there are new

1  people in charge at Wilmington Trust.  In particular, our

2  understanding is that Beth Andrews, who appeared as a witness

3  at the last trial, no longer functions with regard to the GUC

4  Trust.  We are particularly concerned about the amount of time

5  it's taken for Drinker Biddle, despite what we understood to be

6  diligent efforts, to get files from Gibson Dunn.

7          THE COURT:  Somebody should have come to me.

8          MR. WEISFELNER:  Well, Your Honor, it's interesting

9  because there was a motion that was made before Your Honor from

10  Gibson Dunn to withdraw, and there was a companion motion that

11  was filed before Judge Furman to withdraw.  The difference

12  between the two motions, as I understand it, and I haven't

13  looked at the files in detail, is that Mr. Karlan from Gibson

14  Dunn filed an affidavit in support of the application in front

15  of Judge Furman where he made the representation that Gibson

16  Dunn is not asserting any liens on any of the files because of

17  unpaid invoices.  It's my understanding, and we only garnered

18  this recently from Drinker Biddle, that the delay in the

19  turnover of the files was based on Gibson Dunn's assertion that

20  the files belonged not to a client, but to Gibson Dunn.

21          So, look, given the fact that they got a dump -- and

22  I think "dump" is a correct term -- from Gibson Dunn only

23  Monday of this week, I'm hard pressed to see how new counsel

24  with, in effect, a new client can very well get up to speed any

25  quicker than they've indicated.  They know that we will supply

1  them with as much background information, documents, reports

2  that they need.  We've met with them once in person and a

3  couple times telephonically, and we're at their disposal.  They

4  have raised questions.  Frankly, they're not new.  All of the

5  issues that we understand have been raised by New GM were

6  raised by New GM once upon a time, and they were overcome by

7  all of us, meaning the GUC Trust, the unitholders, and the

8  plaintiffs, by the time we thought we were ready to move

9  forward with the settlement agreement.  We'll go through those

10 same issues again for the benefit of new counsel and new

11 personnel of W-2C.  We assume we'll come to the same

12 conclusions.  And we will move diligently forward on, first and

13 foremost, trying to get the settlement resurrected.

14        Your Honor, I will tell you that once we hear from

15 Mr. Golden and were Your Honor so inclined to hear from

16 Mr. Steinberg, the one thing that we wanted to avoid today

17 because we've been through it before -- I don't know that Your

18 Honor benefits from it -- is arguments on the merits of the

19 settlement.  There will be plenty of time for that, and rather

20 than take up your time to rebut each and every one of the

21 arguments, which again are stale, we've heard them before, I

22 think it's better -- we're all better served to hear them, if

23 Your Honor's inclined to hear them at all based on standing

24 issues, when the time's right.

25        THE COURT:  Yeah, I did rule on standing.

11

1          MR. WEISFELNER:  You did rule on standing with regard

2     to whether the settlement agreement was enforceable.

3     Mr. Steinberg will be quick to remind you, least you need

4     reminding, that you haven't ruled on standing with regard to

5     their participation in any aspect of the settlement agreement,

6     either the notice procedures, getting names and addresses from

7     New GM as part of the noticing procedures, or the merits either

8     of part one of the settlement or part two of the settlement.

9          If Your Honor has any other questions, concerns, or

10    comments, you know where to find me.

11         THE COURT:  Well, let me -- I haven't sat idly by,

12    waiting to see what you would all do.  My law clerks and I have

13    spent considerable time on the assumption that we are moving

14    forward with late claims motions to review a group of decisions

15    by Judge Furman, where he dealt with choice of law issues and

16    he was fairly carefully going through, on summary judgment

17    motions, the law of various states, and, you know, there's sort

18    of an array of law with respect to the claims that were

19    asserted in the complaints before him.

20         It certainly adds a level of complication.  And

21    whether -- if, in an effort to reach a settlement, you all can

22    find a way to cut through or simplify what those choice of law

23    issues would be, you know, Judge Furman found on certain causes

24    of action, the law differed.  Some states -- on economic loss

25    claims, for example, some states recognized, you know, without

1  evidence of an actual defect, you know, a claim could exist.

2  In other states, no.  I didn't come out with my notes, but, you

3  know, I know he went through pretty carefully.  I don't know

4  what he -- what the status -- maybe somebody here can enlighten

5  me what the status of the matters before Judge Furman are.  I

6  don't know whether the class certification issues have been

7  briefed before Judge Furman, whether he set any hearing dates

8  with respect to that.  You know --

9          Sit down Mr. Steinberg.

10          -- there -- Judge Furman has had to grapple with the

11  successor liability claims, which doesn't exist in terms of

12  whether there are claims that can be asserted against the GUC

13  Trust as the, in effect, the stand-in for Old GM.  So some of

14  the issues that Judge Furman has had to work very hard on

15  dealing with, I'm not deciding anything, but it seemed to me

16  those -- that isn't really relevant to what the issues will be

17  before me.  I -- you know, my focus in the work that we've done

18  was on the assumption that we'd go forward on the late claims

19  motion.

20          If you're able to reach a settlement with the GUC

21  Trust, perhaps trying to obviate some of the objections that

22  New GM had, you may be able to do -- find ways to cut those

23  arguments out of the case going forward.  I'm sure you're

24  thinking about that.

25          MR. WEISFELNER:  We are.  And, Your Honor, just to

1  respond to your inquiry because I think it's important, and I'm

2  sure that Mr. Steinberg is anxious to put this in his own

3  words, but I'll do my best to sort of articulate one of GM's

4  arguments and theories because it relates directly to what Your

5  Honor was talking about.

6          There are any number of theories, and it depends

7  sometimes on a state-by-state analysis, over how to measure

8  economic loss damages.  And some of the damages rely, according

9  to New GM, on the manifestation of a defect.  And absent the

10 manifestation of a defect, certain elements of economic loss

11 don't apply.  And the fact of the matter is that Judge Furman

12 has considered economic loss in the absence of manifestation

13 for -- I think it's 13 jurisdictions and is in the process of

14 briefing another -- I think it's 35 or 36 jurisdictions.

15         There are questions regarding lost time as an element

16 of damage, and likewise, those have been briefed and, I think,

17 even determined in a handful of jurisdictions.  And --

18         THE COURT:  But he didn't determine whether you could

19 certify classes with this type of loss.

20         MR. WEISFELNER:  And I'm going to get to that.  But

21 my point is that there are five or six different theories under

22 which the plaintiffs would prove economic loss as an element of

23 their overall damages, some of which have been partially

24 considered by Judge Furman, by the way, subject to appeal

25 because all of those decisions are interlocutory, and some of

14

1  them remain to be briefed and decided by Judge Furman.

2          In addition, separate and apart from the elements of

3  damages, it is the case that Judge Furman is considering class

4  certification issues within the MDL.  And since Your Honor

5  asked, I will tell you that briefing on class certification, it

6  is my understanding, is not going to be completed until the

7  20th of July of this year, and that's assuming Judge Furman

8  accepts the joint proposal by GM and the plaintiffs.  I don't

9  presume he'll have much problems with it, but that's the

10  proposal.  And a class certification summary judgment hearing

11  has been requested by both parties to occur sometime in

12  September or October or as soon thereafter as is reasonable

13  practicable.

14          Now, Your Honor will see, as when and if we have a

15  settlement agreement and it's presented to Your Honor for

16  consideration, a couple of issues.  We intend to chart out for

17  you all of the issues that the settlement will resolve, and

18  among the issues that the settlement will resolve is all

19  matters that are otherwise pending before Judge Furman that

20  relate to the elements of economic losses, both the ones that

21  have been preliminarily determined based on summary judgment

22  motions or are scheduled sometime in late summer or early fall

23  to be determined, again based on motions for summary judgment,

24  all of which, win or lose, are subject to appeal by the side

25  that lost and maybe even by the side that won and could be

15

1  pending for years to come.

2           Our view is that if Your Honor were to accept the

3  settlement and the claims estimation, that that would resolved,

4  once and for all, all of those issues as they relate to

5  plaintiffs' claims against Old GM.  They may be instructive for

6  Judge Furman, although in the settlement context, you're not

7  really sure how instructive they'd be, for a consideration --

8           THE COURT:  I found his decisions very instructive

9  for me.

10          MR. WEISFELNER:  Okay.  And, Your Honor -- so that's

11 what we'll lay out for you.  The other --

12          THE COURT:  May be binding.  I don't -- you know, I

13 said instructive, but may well be binding.

14          MR. WEISFELNER:  And, Your Honor, again, to the

15 extent that you resolved those issues as a matter of summary

16 judgment subject to appeal, and only some of those issues were

17 resolved, you know, we understand where the balance is, but one

18 of the things we're going to stress in our briefs and in our

19 presentation is that we are taught that under Rule 9019, the

20 Court is, for lack of a better term, instructed not to try the

21 issues on the merits, but merely to canvass the circumstances

22 and make a determination that the proposed resolution is beyond

23 the lowest rung in the range of reasonableness.  So it's going

24 to be our position that unlike Judge Furman, who has the

25 obligation, in the absence of some shortcut, but has the

16

1  obligation to otherwise try these issues on the merits, Your

2  Honor only has the obligation to determine whether the

3  settlement is reasonable, and we think that's a major

4  distinction.

5          So, Your Honor, again, we are very cognizant of not

6  only what's gone on in front of Judge Furman to date, but

7  what's scheduled to go in front of him.  GM will take the

8  position that you've got to be crazy to step on Judge Furman's

9  toes by going forward with this claims estimate because so many

10  of the issues that impact the appropriate estimation of the

11  claims either are partially being considered by Judge Furman or

12  are going to be considered by Judge Furman, and -- I'm sure

13  they won't phrase it this way -- you have no business getting

14  involved.

15          Well, Your Honor, we understand that argument, we

16  understand it well, and we will, I think, be able to convince

17  Your Honor that in the rubric of the settlement we presented,

18  of course, you're entitled to consider those issues, and they

19  impact your ultimate decision as to what the right estimate of

20  damages would be, but it doesn't, in any way, shape, or form,

21  preclude you from going forward.

22          Your Honor, again, if you have any other questions,

23  I'm here.

24          THE COURT:  What -- what would you envision as the

25  timeframe -- so I've heard Ms. Going indicate that she wants

17

1  time.  She's just gotten Gibson Dunn files.  I wish she had

2  been able to get them earlier.  I think I said something about

3  this in the opinion.  I may have focused more on the personal

4  injury/wrongful death plaintiffs.  It's true for the economic

5  loss plaintiffs, as well, but I'm very concerned about the

6  amount of time that's passed and that particularly for the

7  pre-closing personal injury/wrongful death claimants, economic

8  loss claims, they're real, they're serious, but the amounts per

9  claimant pale compared to what the personal injury/wrongful

10 death.

11      I want to get this resolved.  I don't -- I'm sure

12 whatever I do is not going to be the final word, but, you know,

13 GM filed for bankruptcy in June 2009, and we're in 2018.

14      MR. WEISFELNER:  And, Your Honor, I think,

15 representing the plaintiff side of the equation, we're

16 painfully aware of how long this has been taking.  Remember

17 that the knowledge of our claims didn't arise until 2014, when

18 the recalls occurred.  And yes, four years from then until now

19 is still a very long period of time, but Your Honor, if we look

20 at the choices that all the parties are facing -- settle or

21 start litigating late claims -- in our view, neither of them

22 are happening tomorrow or as fast as the plaintiffs or the

23 Court may otherwise like.  But of one thing we're certain.

24 Getting to a settlement and getting Your Honor to determine

25 whether or not the settlement's appropriate under Rule 9019 is

18

1   going to be a lot faster than trying the late claims and all of

2   its constituent issues.  Your Honor will recall --

3           THE COURT:  I agree.

4           MR. WEISFELNER:  Okay.

5           THE COURT:  Let me ask you a question.  Correct me if

6   I'm wrong.  Judge Gerber, in the Second Circuit, decided that

7   there was a due process violation with respect to the defined

8   ignition switch plaintiffs.  It mystified me that this category

9   of defined non-ignition switch plaintiffs really are ignition

10  switch -- it's really an ignition switch problem, just a

11  different ignition switch problem.  But I didn't see where

12  either Judge Gerber or the Second Circuit decided whether there

13  was a due process violation with respect to non-ignition switch

14  plaintiffs.  Am I wrong?

15          MR. WEISFELNER:  No, Your Honor is not wrong, but

16  what might give you some comfort is that among the documents

17  that we had prepared in connection with the first round of

18  settlement -- I think it was filed, maybe it wasn't.  I know it

19  was provided to Wilmington Trust -- was an 80-page brief, the

20  vast majority of which is dedicated to the proposition that

21  like the initial cap ignition switch defect vehicle owners, the

22  non-ignition switch vehicle owners suffered an identical due

23  process violation, and it is replete with references to

24  discovery, congressional testimony, Valukas reports, primarily

25  discovery in related litigation, where we can identify that the

1  ignition switch defect is similar to every other ignition

2  switch defect and New GM's -- I'm sorry, Old GM's knowledge of

3  the defect is the equivalent of Old GM's knowledge of the

4  similar defects, and New GM's knowledge of what Old GM knew,

5  although it only relates to independent claims, is similar.

6        But as to the claims against the Old GM estate, which

7  is what this proceeding is all about, Your Honor, we think that

8  we will provide -- I won't say uncontested, but evidence that

9  Your Honor ought to accept, especially on a 9019 standing, that

10  stands for the proposition that if you had a due process

11  violation with regard to the first two million cars, you've got

12  an identical due process violation with regard to the remaining

13  -- and I think it's some 10 or 14 million cars.

14        THE COURT:  And does the power steering defect fall

15  in the non-ignition switch plaintiffs?

16        MR. WEISFELNER:  It does.  And, Your Honor, the brief

17  does have a whole section on power steering, and it has a whole

18  provision on side air bags.  Some of it, by the way, is tied to

19  the ignition switch, to the extent --

20        THE COURT:  Right.

21        MR. WEISFELNER:  -- that the rotation --

22        THE COURT:  If it rotates, then the --

23        MR. WEISFELNER:  -- happens, you don't get --

24        THE COURT:  -- power steering goes out and the side

25  air bag doesn't --

20

1    MR. WEISFELNER:  Correct.

2    THE COURT:  -- doesn't deploy.

3    MR. WEISFELNER:  But, Your Honor, we understand that

4 as part of what I'll call the proof of the reasonableness of

5 the settlement, one of the questions that Your Honor would have

6 is the extent to which the victims of the subsequent recall

7 could likewise establish a due process violation, as did the

8 victims of the first set of recalls.

9    New GM will tell you you have to try every one of

10 them on the merits, full-blown evidentiary hearing.  We think

11 it's sufficient for -- Your Honor, for us to give you the

12 citations of the record, the discovery.  If necessary, Your

13 Honor will ask for whatever witnesses you think you may need,

14 but we think you'll have a sufficient record upon which to

15 judge that to the extent the settlement relies on a resolution

16 that assumes due process violation, that that is, in effect,

17 reasonable.

18    The only other point that I wanted to make, and I

19 don't want to overstay my welcome or get off onto a tangent,

20 again, we think 30 days ought to be enough time to get

21 Wilmington Trust re-comfortable with the settlement that they,

22 once upon a time, touted as being in the best interest of their

23 beneficiaries based on the advice of counsel.  That changed

24 after a short meeting.  We think their new counsel can work

25 quickly, call it 30 days, that brings us to the middle of

21

1   April.  Another 30 days for notice, that brings us to the

2   middle of May, or the end of May if we extend the notice period

3   beyond 30 days.  That means we're in court, talking about the

4   settlement, which as Your Honor knows is in three parts,

5   approve the notice, approve part one, which is the 15 million

6   bucks and $6 million for notice costs in exchange for the

7   release, in relatively short notice.  And then, depending on

8   how vociferous GM's objections are, and they will be

9   vociferous, I can't yet predict how long it will take to get

10  through phase two, which is the estimate proceeding.

11          So again, Your Honor, I'm available to try and answer

12  any questions you may have.

13          THE COURT:  All right.  Anybody else on the

14  plaintiffs' side want to be heard?

15          MR. HILLIARD:  Judge Glenn, this is Bob Hilliard on

16  the phone.  I'm in Texas, so I don't want to overstep if it's

17  not the appropriate time to speak on behalf of the injury and

18  death plaintiffs.

19          THE COURT:  Go ahead, Mr. HIlliard.

20          MR. HILLIARD:  Thank you, Judge, and thank you for

21  letting us appear by phone.  It really helped with the travel.

22          THE COURT:  You could have been here for the snow if

23  you wanted, but --

24          MR. HILLIARD:  Yeah, I've had about enough of this

25  South Texas sunshine.

22

 1        Your Honor, just briefly, and I -- you know, and I

 2 really do, on behalf of my clients, appreciate the Court has

 3 kept in the forefront of its mind the fact that these injury

 4 and death plaintiffs are real and have waited a long time, and

 5 part of our responsibility, every time there's a change in the

 6 settlement status in regards to GUC, is to speak with them,

 7 communicate and get their permission that they still want to

 8 pursue the settlement, and every time we speak to our clients,

 9 it's the same, and that is, will this ever end, this is -- you

10 know, we've lost a loved one or we were injured, you know,

11 before '09.

12        And Ms. Going, during our meeting, I think is aware

13 of the fact that, you know, we would either prefer to begin the

14 process in front of Your Honor or know one way or the other in

15 the next few weeks if this deal is going to be resurrected.

16 And if not, you know, we would almost prefer, instead of

17 continuing to tell our clients that, you know, there's no end

18 in sight, we would prefer to begin the process in front of Your

19 Honor.  But right now, we do support the very short extension

20 of time in order to see if the agreement can, you know, if we

21 can breathe life into it and if it's still acceptable to

22 everybody and move forward.

23        THE COURT:  Thank you, Mr. Hilliard.

24        MR. WEINTRAUB:  Good afternoon, Your Honor.  William

25 Weintraub for the Hilliard Henry personal injury plaintiffs.  I

1  apologize to Mr. HIlliard.  I was not looking at my phone if he

2  was trying to email me, but I would echo what Mr. Weisfelner

3  said and will add a few words that we are committed to moving

4  head with the settlement.  As Mr. Hilliard said, it has been a

5  long road, and we frankly don't see any way to make it a whole

6  lot shorter, no matter which path we go down, but we do believe

7  that the settlement path is ultimately going to be probably a

8  faster resolution for us and probably return a better -- return

9  or recovery for these individual personal injury claimants than

10  not doing the settlement because we think that the accordion is

11  an important component of recovery for our clients.

12          In terms of the due process issues that Your Honor

13  mentioned, you are correct.  As Mr. Weisfelner said, the due

14  process issues have not been adjudicated with respect to

15  anything other than the, quote, "ignition switch defect."  Part

16  of the reason for that was there was never really a time and a

17  place and a platform in this court for that to occur.  We were

18  very much put on a narrow path by Judge Gerber, and then there

19  was all of the ancillary litigation that resulted from that.  I

20  know there's been commentary before Your Honor as to whether or

21  not there was a time back in 2015, because of the scheduling

22  order where people should have assumed that this was an issue,

23  but our position always was that was unclear.  So that's why

24  that remains an open issue.

25          In terms --

24

1          THE COURT:  I opened the Queen Elizabeth decision

2    after Ms. Going pointed it out.  I guess Judge Bernstein talks

3    about when does excusable neglect apply, when does laches

4    apply, so I guess the issue could be even if excusable neglect

5    isn't the appropriate standard, when is laches applicable and

6    what would have to be shown.  I just -- I only glanced at the

7    decision on my computer screen.

8          MR. WEINTRAUB:  Right.  And again, not to get into

9    the issues, but we don't think that the excusable neglect

10   standard would be applicable here because this was not a

11   situation where our clients received constitutionally

12   sufficient notice.  Therefore, our view is there's no operative

13   bar date order with respect to us.  In terms of how quickly

14   after 2014 people reacted, not until there was an adjudication

15   of due process violation and a vacating of the equitable

16   mootness was there any opportunity for people to file a claim

17   that wouldn't be summarily dismissed as being untimely.  So we

18   think that the people in this courtroom have acted with

19   alacrity, and there is not a --

20         THE COURT:  When I first got the case, you know, one

21   of the early things was after the Second Circuit decided, was

22   the order to show cause with respect to the 2016 threshold

23   issues, the last one of which was the late claims issue.

24         MR. WEINTRAUB:  Exactly, Your Honor.  So we believe

25   that we were not late to the party with our claims.

1          I know you had asked Ms. Going about what we

2   perceived or what anyone perceived the late claims hearing

3   would be like if and when it occurs.  I don't know if today is

4   the day you want that answer or if that's something you want

5   people to think about and report back on later.

6          THE COURT:  I think you can all think about it.  I

7   think concentrating the mind on a possible settlement would

8   probably be better -- your time would be better spent.

9          MR. WEINTRAUB:  Thank you, Your Honor.

10         My last point would be in General Motors's letter to

11  Your Honor in advance of this hearing, I think the letter was

12  -- sometime in February, they mentioned --

13         THE COURT:  This is when they objected to moving the

14  hearing from February 22nd or a different letter?

15         MR. WEINTRAUB:  There was a lot in their very long

16  letter.  I focused on the footnote which stated that there may

17  have been some claimants in our group who previously paid --

18         THE COURT:  That was the same letter.

19         MR. WEINTRAUB:  Same letter.  And I'm prepared to

20  address that today, claim by claim.  I'd prefer not to.

21         THE COURT:  Don't do it claim by claim.  Just give me

22  the high points on this.

23         MR. WEINTRAUB:  The highest points are that there are

24  some people who we have learned settled with Ken Feinberg and

25  executed a release, and we will get the consent to withdraw

26

1  those claims.  If those consents are not forthcoming, we will

2  withdraw, and then those individuals would either need new

3  counsel or pro se come into --

4        THE COURT:  How many do you think you still have?

5  How many claims do you think you still have?

6        MR. WEINTRAUB:  Well over 200, Your Honor.  We

7  withdraw for 30 in the first wave.  We are going to withdraw

8  for another, I think, eight who were recently dismissed from

9  the MDL and who withdrew their claims, and we're looking to get

10 consent from those eight to not just drop the motion, but

11 really drop the claim for them.  If we don't get that consent,

12 Goodwin will withdraw as counsel, and then we will not

13 prosecute the motion for them.  And those were not in -- listed

14 in the GM letter.  That's just sort of an update, Your Honor.

15       There were two people listed in the GM letter that

16 they think may have been paid.  We have researched that.  We

17 think that they are two people with similar names, and we spoke

18 to the law firm that filed the claim for them.  We are told

19 those were asbestos claims, not accident claims, so we think

20 they're different people.  The date of birth and the driver's

21 license numbers for our clients and that law firm's clients are

22 different, so we just think it's a mistaken identity, Your

23 Honor.

24       There were, I think, four additional claims.  I

25 mentioned two that have settled with Ken Feinberg.  There were

1  two that it appeared were paid on claims and have agreed to

2  withdraw their claims, so we're just going to get the express

3  consent.  And there's a fifth claim, Callie Sorbeck (phonetic),

4  who there may be some issues that she has that are unique, and

5  we're trying to run those down, and we haven't decided whether

6  or not we would withdraw for those yet or not.

7          So in sum, there's about a dozen claims, eight that

8  were withdrawn in the MDL that we will withdraw here, and then

9  I think it's another six raised in that footnote, two of which

10 we think are the wrong people, three of which we will withdraw

11 for, and one of which we're looking into.

12         THE COURT:  Okay.  Thank you very much.

13         MR. WEINTRAUB:  Thank you, Your Honor.

14         THE COURT:  Anybody else on the plaintiffs' side?

15         MS. NORMAN:  Your Honor, Lisa Norman from Andrews

16 Myers is on the phone, also on behalf of certain personal

17 injury plaintiffs.  I would just like to make my appearance and

18 let the Court know that I'm in agreement with Mr. Hilliard's

19 comments regarding our expectations and the anticipated

20 timeline that we hope will occur with regard to our clients'

21 claims.

22         THE COURT:  Thank you.

23         MR. WEINTRAUB:  Your Honor, I did make one mistake

24 that my colleague, Mr. Fox, who often serves as my peripheral

25 memory, told me that the number is not well over 200.  It's

1  probably slightly under 200.

2         THE COURT:  Okay.  Thank you.  All right.

3         Mr. Golden.

4         MR. GOLDEN:  Thank you, Your Honor.  Daniel Golden,

5  Akin Gump, counsel for the participating unitholders, so not a

6  part of the plaintiffs' team, but in agreement with the

7  positions advocated by them.

8         Your Honor, as it relates to this status conference

9  and what we believe New GM's position will be in terms of how

10 to proceed forward, as evidenced by the letter that they

11 submitted on February 8, we think that one of the more cogent

12 observations made by Your Honor in your January 18 memorandum

13 opinion and order was -- is as follows, quote:

14         "In the lead-up to these events, New GM's counsel has

15         made it clear in open court for months that New GM

16         would do whatever it could to prevent additional

17         ignition switch defect claims to be filed and allowed

18         in the bankruptcy case, so it is no real surprise

19         that New GM aggressively sought to torpedo any deal

20         between the signatory plaintiffs and the GUC Trust,"

21 found at page 5, and continuing at page 9, quote:

22         "New GM has demonstrated that it would like to force

23         individual adjudications of millions of separate

24         ignition switch defect claims."

25         Well, Your Honor, unfortunately, not much has changed

1  since you issued that decision, in terms of New GM's

2  determination to avoid any consensual resolution of these

3  claims, both economic loss and personal injury.  One thing that

4  is -- that has changed, and I'm optimistic that it will

5  continue to change and has been reported this afternoon to you

6  is the GUC Trust and the GUC Trust's new counsel's willingness

7  to work with the signatory plaintiffs and Akin Gump, as counsel

8  to the participating noteholders, to resurrect the settlement

9  agreement, which obviously, if approved, would render the

10  pending late claims motions moot and would avoid the millions

11  of litigations that could follow the late claims motions should

12  they be allowed.

13           Your Honor, you are well aware with the

14  well-established principle that bankruptcy favors settlement,

15  and I can't think of a case that would make that axiom more

16  apartment.

17           It was our very fervent hope that when we appeared

18  before you today, we would be able to announce that we had

19  already resurrected the settlement.  Unfortunately, that hasn't

20  happened yet, but I remain confident that it will.  Drinker

21  Biddle, as successor counsel to the GUC Trust, continues to get

22  up to sleep, and as you've heard, that unfortunately has been

23  hampered by prior counsel's reluctance to turn over the files

24  to help Drinker Biddle to get up to speed.

25           Given the circumstances of these cases and Your

1 Honor's opinion, Drinker Biddle is acting and operating

2 methodically.  It has met with all the parties in interest.  It

3 has met with New GM.  It has met with the various plaintiffs'

4 counsel.  It has met with Akin Gump, as counsel for the

5 participating holders, on numerous occasions.  And one thing I

6 was very happy to hear from Ms. Going is that Wilmington Trust,

7 as the GUC Trust trustee and administrator, recognizes to whom

8 they owe their fiduciary duties to, and that is the

9 participating holders.

10          I think it's probably fair to say that everybody in

11 this courtroom recognizes that New GM will continue to use

12 everything in their arsenal to block a settlement, and despite

13 that fact, the plaintiffs, the participating unitholders and

14 what we will -- and what we expect, the GUC Trust will continue

15 to press forward to resurrect the settlement and to be able to

16 present that settlement to Your Honor, we would expect, within

17 the next 30 days.

18          We also are aware that to the extent that New GM is

19 determined to have standing with respect to the settlement, it

20 will do everything in its power to throw up the roadblocks, the

21 obstacles, the objections to the settlement, and yet we

22 continue to believe that this proposed settlement is clearly in

23 the best interest of the GUC Trust, clearly in the best

24 interest of the participating unitholders, and obviously will

25 have a tremendous, significant benefit for the universe of

1  economic loss and personal injury claimants.

2          One other thing that I think would probably be

3  helpful to this Court -- for the Court to be aware is that the

4  -- in many conversations between the participating unitholders

5  and the signatory plaintiffs, both sides are committed to be

6  flexible in their approach to the settlement agreement.  Your

7  Honor touched on this a few minutes ago, to try to predict and

8  deal with, in advance, the likely objections that New GM will

9  interpose to the settlement, in order to make the settlement

10  hearing go as efficiently and as effectively as possible.

11          Having said that, having heard from plaintiffs'

12  counsel and from the GUC Trust, and I think it's pretty much

13  the opinion now of the Court, we ask the Court not to schedule

14  a hearing with respect to the late claims motion.  Allow the

15  settlement process to proceed.  I'd like to believe we can be

16  in front of your court within the next 30 days with a

17  full-blown, executed, fully executed settlement agreement.

18  Mr. Weisfelner has laid out the timetable that will ensue

19  should we be able to file that settlement and the corresponding

20  notice motion, and for all of the reasons that I think Your

21  Honor is probably painfully aware, we believe that a

22  settlement, as opposed to years of litigation, certainly

23  advances the interest of justice in this case, and we, as the

24  counsel for the participating unitholders, support that

25  proposition.

32

1          THE COURT:  Thank you very much, Mr. Golden.

2          MR. GOLDEN:  Thank you.

3          THE COURT:  Okay.  Mr. Steinberg.

4          MR. STEINBERG:  Good afternoon, Your Honor.  In your

5   January 18th opinion, you directed the parties to propose a

6   schedule for how to litigate the late claims motions, including

7   whatever discovery might be needed, whatever briefing might be

8   needed, but asked the parties to do that and to report back to

9   the Court by a specific date.

10          Shortly after Your Honor had issued this opinion in

11  January, there was a order entered in the MDL.  It was order

12  number 140.  And in that opinion, Judge Furman said,

13  essentially, that he wasn't going to rule any further on the

14  successor liability issues until the bankruptcy court has ruled

15  on whether to permit late claims.  So as Your Honor had wanted

16  to move swiftly in trying to push the late claims motions

17  forward, as reflected in your opinion, so did Judge Furman

18  reflect that these issues are important to him to --

19          THE COURT:  I didn't preclude the GUC Trust and the

20  plaintiffs and the participating unitholders to endeavor to

21  settle.  I found that the settlement agreement presented to me,

22  I couldn't enforce.  I said "reluctantly."

23          MR. STEINBERG:  I understood that, Your Honor.

24          THE COURT:  And the fact that they have -- you know,

25  there has been a change.  Gibson Dunn's been replaced.  Drinker

33

Biddle has replaced them.  I'm distressed to hear they didn't

get the files until this week, but they have a place -- they've

been replaced.  There's new counsel.

        The fact that there's an effort -- it may not come to

fruition.  The fact that there's an effort to try and reach a

new settlement on the same terms, modified terms, we'll see.  I

clearly said I wanted a status report on the schedule, and what

I've heard is that the parties, in good faith, are trying to

reach a settlement.  That is the -- you know, that is the best

result in a bankruptcy case, probably in a district court case,

too, but certainly in a bankruptcy case.

        So what I'm hearing, I think that they've acted in

good faith and constructively and they're moving forward.  So

if your whole complaint is that they didn't reach a schedule

for proceeding with the late claims motion, it's an objection

not well taken.

        MR. STEINBERG:  Your Honor, I didn't, in any way,

mean to insinuate they couldn't approach at any point in time

how to try to resolve this case or settle this case.  The only

thing that I was pointing out, which Your Honor well knows

because it's your opinion, is that you directed the parties to

do something with regard to the late claims motion.  And on

February 8th, the only letter that was submitted that tried to

address Your Honor's particular directive was from New GM.

        THE COURT:  Okay.

34

1        MR. STEINBERG:  So that's all I wanted to say.

2        THE COURT:  You've made your point.  Go ahead.

3   What's next?

4        MR. STEINBERG:  The -- at this point in time, if we

5   were going to go forward on the late claims motion, the obvious

6   first step, which is --

7        THE COURT:  Well, we're not going forward on it now.

8   We're going forward to give the GUC Trust and the unitholders

9   and the plaintiffs a chance to try and resolve the matter by

10  settlement, so I'm deferring a schedule or going forward on the

11  late claims motion.

12       MR. STEINBERG:  Your Honor, I understand that and

13  that it seems clear that to the extent that the GUC Trust has

14  asked for 30 days to have another status conference, to do

15  something, that Your Honor has indicated now that you're

16  prepared to do that.  I would like to be able to address a

17  couple of the things that were said.  There were a lot of

18  things that were said that I --

19       THE COURT:  Go ahead.

20       MR. STEINBERG:  -- I actually don't think are true,

21  but I want to be able to address them.

22       THE COURT:  Go ahead.

23       MR. STEINBERG:  First, on a straight number basis,

24  the presale accident plaintiffs filed by the Goodwin Proctor

25  firm were originally 175.  They moved to withdraw 30 of them,

1   so that takes the number down to 145, not north of 200 or

2   slightly less than 200.  There have been a number of motions

3   that were filed in the MDL by the Hilliard firm seeking to

4   further withdraw from certain claims, certain litigations that

5   are in the MDL.  There's a substantial overlap of litigations

6   that are in the MDL that are also of the same MDL -- same

7   litigations that are part of the late claims.  So I think

8   Mr. Weintraub indicated that the number probably will drop

9   below 145, and without regard to the people that he filed

10  claims for, which had already settled, released, or whatever.

11  So the number will be not slightly less than 200, but

12  substantially less than 200.

13          THE COURT:  If there were 100 people who were

14  involved in personal injury and wrongful death cases as a

15  result -- or claims as a result of ignition switch or

16  non-ignition switch defects -- we'll put the non-ignition

17  switch defects as a defined term aside -- that's still a

18  substantial number of people who assert -- they may be able to

19  establish it, maybe not -- that they're entitled to recover.

20  The issue for me is only whether they can assert their late

21  claims against the GUC Trust, standing in for Old GM.  A

22  hundred is still a lot.  Whether it's a hundred or 200, I

23  consider it a lot of people.

24          Some of them may not be good claims.  You've done

25  very well before Judge Furman in, you know, in those matters

1  you've tried.  You've settled a lot.  I'm not making any

2  judgment at all with respect to the merits of those claims.

3          MR. STEINBERG:  Your Honor --

4          THE COURT:  But it's still a lot of people.

5          MR. STEINBERG:  I do not argue with you at all about

6  that a hundred claims are a lot of claims, and a hundred

7  personal injury claims, as contrasted to the economic loss

8  claims where people have actually gotten injured, is an

9  important issue that needs to be addressed by the courts.

10          The thing that Your Honor may or may not be aware of,

11  which is alluded to in our February 8th letter, was that when

12  the ignition switch recalls were announced in 2014, New GM

13  instituted a program to compensate these presale accident

14  plaintiffs which had the ignition switch defect.  They hired

15  Kenneth Feinberg to be able to administer that program.

16  Mr. Feinberg was given carte blanch to decide whatever he

17  thought should be the level of compensation for presale

18  accident plaintiffs.  Mr. Feinberg administered that program

19  over a year.  A substantial portion of the Hilliard clients who

20  had presale claims were made -- were given offers in the

21  Feinberg program and accepted the Feinberg program.  A very,

22  very high percentage of anybody who got the offer from

23  Mr. Feinberg accepted Mr. Feinberg's offering.  GM tried in

24  2014 to try to do the right thing to address these issues, even

25  though they had, under the sale order, been deemed to be

1  barred, but they wanted to address those issues as, in effect,

2  a voluntary contribution to try to address the wrong that had

3  been visited on these people.

4         THE COURT:  I would --

5         MR. STEINBERG:  And I'm not sure if Your -- we have

6  specific details of the level of compensation that we paid, but

7  we tried to address the most serious accident victims that are

8  there.  A hundred and ninety-eight of the late-filed claims are

9  people who had their claims rejected by Mr. Feinberg.

10  Mr. Feinberg, when he did the program, was not -- he said he

11  was not going to take into account any type of contributory

12  negligence-type claim defense that would normally be involved.

13  If you had an injury, he was going to compensate that.  He had

14  a formula.  He worked with the plaintiffs bar as to what would

15  be an appropriate formula because they wanted to get a very,

16  very high acceptance rate.

17         I'm not here, Your Honor, to advocate for the fact

18  that presale accident plaintiffs shouldn't have their claims

19  adjudicated and dealt with promptly.  All I meant to tell you,

20  Your Honor, to the extent that this happened on Judge Gerber's

21  watch and not your watch, that there was a extensive program

22  that GM had done at the beginning to try to deal with personal

23  injury-type cases.

24         THE COURT:  Mr. Steinberg, I would hope that New GM

25  would sit down with the plaintiffs' counsel and see whether you

38

1  can consensually resolve the issues with respect to personal

2  injury/wrongful death cases.  I'm not -- yeah, there are

3  potentially millions of economic loss claims, more complicated.

4  I'm not -- you know, I'm not going to get into what Ken

5  Feinberg did, what claims he rejected, why he rejected them.

6  You know, if late -- if a settlement is reached and I have to

7  estimate claims, we'll have procedures as to how that happens,

8  but I would hope just the way New GM has settled many of the

9  post-sale accident cases that are before Judge Furman.

10       You've been very effective in settling them.  You've

11  done well with those that have been on summary judgment motions

12  or other contested issues, but nothing about what is being

13  discussed today prevents New GM from engaging with the

14  plaintiffs' counsel to try and resolve more of them.  If it's

15  150 today, if you can solve another 50 of them, then it's 100

16  that we have to deal with, okay.  And if you think that you've

17  solved the ones that you have the greatest risk in -- that's

18  risk over the accordion is more, you know -- I understand that.

19  But I would encourage you to do that.

20       MR. STEINBERG:  Your Honor, there are two different

21  buckets of these accident -- presale accident claims.  They are

22  the claims filed by the Goodwin Proctor firm on behalf of

23  Hilliard Munoz law firm, and then there is the claims that were

24  filed by Andrews Myers, which are approximately 350 presale

25  accident claims.

1          There is a argument -- there is something that we

2    will ultimately tee up for Your Honor to resolve is that those

3    claims were filed well after any of the deadlines that were set

4    in Your Honor's scheduling order.  Your Honor said that if you

5    had a late claim motion, you needed to file it by December 22.

6    If you wanted to join in any late claim motions, you had to

7    file your joinder by January 6th.  The first Andrews -- bless

8    you -- the first --

9          THE COURT:  That was a cough, but anyway, you're

10   welcome.

11         MR. STEINBERG:  I didn't know the word for a cough,

12   so I gave you the word for a sneeze.

13         THE COURT:  You can bless me.  That's fine.

14         MR. STEINBERG:  But "bless you" works for both, I

15   think.  Andrews and Myers filed their first supplement, first

16   motion, at the end of July --

17         THE COURT:  Mr. Steinberg, it sounds like you're

18   going to have plenty of arguments that are premature for today.

19         MR. STEINBERG:  I understand, but, Your Honor, I hope

20   you can appreciate that Mr. Weisfelner castigated me before I

21   stood up to say I should not talk about any type of proposed

22   settlement.  It would all be stale.  They would all be able to

23   overcome.  And then, I had to listen to everybody talk about a

24   potential settlement, which the GUC Trust has not agreed to

25   anything about, about how it could be resurrected and the

40

1  issues that they would anticipate defeating New GM for.  And so

2  there's a natural inclination, and I don't mean to belabor the

3  record longer.

4       THE COURT:  You know, Mr. Steinberg, when I said in

5  the opinion that for months, New GM has made it clear that it

6  would do everything it could to torpedo any settlement, I

7  didn't make it up.  That's the position that you consistently

8  -- you were very open about it, okay.  That's the reality of

9  it.  I -- it's in my opinion.  I stick by it.

10      I will evaluate if you have standing to oppose the

11 settlement.  I will evaluate the arguments that you make.  I've

12 already ruled with respect to your standing with respect to the

13 initial settlement agreement.  I will consider any arguments

14 that are made.  If that's not the law of the case, I'm not sure

15 what is, but -- what would be, but if you've got standing, I

16 will hear your arguments.  Okay?  I'm not prejudging things

17 today.

18      I did have a lengthy -- I permitted -- you know, the

19 plaintiffs argued that I should prevent New GM from arguing in

20 the first phase trial as to whether the initial settlement was

21 enforceable.  I permitted New GM to do that.  I listened to the

22 evidence and the arguments, and I ruled.  That ruling may or

23 may not be binding on whether -- if they reach a new settlement

24 and seek approval of it from the Court, separate from the

25 estimation issue, and they seek approval from the Court,

41

1  whether New GM has standing will have to be briefed and argued.

2  I'll certainly permit you to brief and argue it.  I addressed

3  it once before.

4         Anything else that's pertinent to what we're doing

5  today?

6         MR. STEINBERG:  Yes.  Just with respect to that

7  specific comment that Your Honor made, Your Honor was clear

8  that you were deciding standing only in connection with phase

9  one and had not made any rulings with regard to phase two,

10 which included everything about whether the settlement would --

11 if deemed to be binding, would be presented to Your Honor.  So

12 that was my understanding of Your Honor's ruling.

13        I did have a couple other things that I wanted to

14 just say briefly.  One is that there's been a lot of discussion

15 about settlement, Rule 9019 and the standard for settlement.

16 Just so there's no confusion -- and this is not meant to

17 torpedo, this is New GM's stated legal position, which is that

18 if someone is going to move to estimate claims under a contract

19 in order to trigger our requirement to contribute additional

20 consideration, that is an estimation proceeding.  That is

21 actually not a settlement.  You actually have to have a

22 specific ruling as to what the estimated aggregate claims would

23 be.  That's not a 9019 standard.  That's actually the standard

24 you would have in estimating claims.  And so to the extent that

25 Mr. Weisfelner wanted to argue that, just so Your Honor knows,

42

1  we will be saying a different -- we're asserting a different

2  position.

3          THE COURT:  I think I -- I know I said in the opinion

4  before that there was nothing in the existing settlement that

5  was before me that required any specific determination in the

6  estimation proceeding.

7          MR. STEINBERG:  That's correct.

8          THE COURT:  I didn't read the agreement.  I asked

9  questions during the trial about it, and I believe that the

10 parties -- Mr. Weisfelner wasn't one of the trial counsel, but

11 the counsel who argued the case, they agreed that there was

12 nothing that bound -- it didn't require the Court to reach the

13 particular estimation if I have a estimation proceeding.

14         The settlement gets approved, and there's going to be

15 an estimation proceeding.  I'll consider the evidence and the

16 arguments on estimation.  They had a bunch of expert reports

17 that they were submitting in support of the estimation.  That

18 was one side's evidence.

19         MR. STEINBERG:  Okay.  Your Honor is absolutely

20 correct.  The one nuance that I would add is that the

21 settlement provided that the GUC Trust was required to present

22 an estimation for $10 billion worth of claims.  So you couldn't

23 divorce the contractual requirement imposed on the GUC Trust.

24         THE COURT:  They can present anything they want.

25 They could have presented $100 billion, but there was --

43

1  everybody acknowledged, and I read the agreement, as not to

2  require any specific amount in estimating the claims.  I said

3  it in the opinion.  I asked the questions during the trial

4  about it.  I don't think there was any dispute about that

5  point.

6          MR. STEINBERG:  I agree with Your Honor.

7          The final point that I would make is that

8  Mr. Weisfelner alluded to the fact that -- and Your Honor has

9  actually said that there were a number of rulings made in the

10 MDL, and there were rulings that will be coming down the pike

11 that the MDL will be making that we believe will have a

12 substantial impact on mostly the economic loss claims, but also

13 to the extent, the presale accident claims.  And part of the

14 reason why the --

15         THE COURT:  I take it you would agree that there is

16 no successor liability issue for this Court to determine

17 whether the GUC Trust should be liable for economic loss

18 claims.  That's a big part of what Judge Furman has had to deal

19 with.  Do you agree with that?

20         MR. STEINBERG:  That the GUC Trust should be --

21         THE COURT:  There is no successor liability issue

22 that I have to address in deciding whether late claims should

23 be allowed or estimated for economic loss claims, for example.

24         MR. STEINBERG:  Your Honor, I think that the answer

25 to your direct question is that I agree with you because

44

1  successor liability is a claim against the purchaser, being New

2  GM.  Those claims are in the bankruptcy court.

3         But where I think that there's a point that Your

4  Honor must realize is that a major portion of the ignition

5  switch economic loss claims are the same claims that are being

6  asserted before Judge Furman under a successor liability

7  theory, and so therefore two courts have the same claim I'm

8  being asked to adjudicate.

9         THE COURT:  It's not the same claim.  It's not the

10  same claim, Mr. Steinberg.  Whether an economic loss claim can

11  be asserted against Old GM, the GUC Trust, and whether an

12  economic loss claim can be asserted against New GM are not the

13  same issue.

14         MR. STEINBERG:  Your Honor, the reason why --

15         THE COURT:  I'm mindful of -- I don't -- you know,

16  somebody's going to have a really hard time convincing me that

17  if Judge Furman has decided an issue, that I'm not going to

18  follow his decision.  I don't know whether it's binding or

19  whether it's persuasive, but you're going to have a really hard

20  -- his decisions have been very carefully thought out and

21  articulated, and so people -- anybody who's coming to me and

22  say, well, we think that Judge Furman didn't quite get that

23  right, you should do it a little differently, is going to have

24  a very hard time with that.

25         MR. STEINBERG:  Your Honor, I think that on this

45

1  particular issue, there's a nuance there that I'm not sure that

2  I'm articulating --

3          THE COURT:  Let's save it for another day,

4  Mr. Steinberg.  It's not today's issue.

5          MR. STEINBERG:  Okay.  One sentence?

6          THE COURT:  Go ahead.

7          MR. STEINBERG:  May I just the one sentence?  When

8  the claim that's being asserted in the MDL is a successor

9  liability claim that's derivative of the liability that Old GM

10 had, which is what's presented before you.  So on those claims,

11 which are the exact same plaintiffs for the exact same injury,

12 where New GM was only liable on the successor liability that

13 Old GM had, New GM could potentially defeat the claim that it's

14 not liable for successor liability, but if you had to get to

15 the merits of the claim, it is exactly the same claim.

16         THE COURT:  And I know I commented at prior hearings,

17 there was a letter from Kirkland to Judge Furman, and I could

18 only smile when I read the letter.  This -- that was obviously

19 before the late claims  motions were here, where Kirkland

20 argued to Judge Furman in a letter -- it wasn't a full brief --

21 that if the economic loss claimants had the ability to assert a

22 claim against Old GM, they couldn't assert a successor

23 liability claim against New GM.  I commented at that -- about

24 that very briefly at some prior hearing.

25         MR. STEINBERG:  I do remember that.

1           THE COURT:  So, you know, you keep going around in

2   circles about it.  I'm sure if late economic loss claims are

3   allowed or settled, you're going to be arguing to Judge Furman

4   that, see, they have an opportunity to recover from Old GM,

5   they shouldn't be able to recover on successor liability.  All

6   very interesting issues, none of which are pertinent to today.

7           MR. STEINBERG:  I agree with Your Honor.

8           THE COURT:  Any last points you want to make?

9           MR. STEINBERG:  I think the only other thing -- and

10  this will truly be my last point -- is that -- and Your Honor

11  has inherited this case, but in 2014 when the MDL started, the

12  litigations that were brought on account of presale accidents

13  and economic loss were asserted against New GM in an MDL

14  complaint.  And they admitted to Judge Gerber that there were

15  strategic reasons why they never wanted to pursue late claims

16  in the bankruptcy case, and Judge Gerber -- and in prior

17  briefing certainly before Judge Gerber, we commented about

18  that.  We also commented about the due process issue and when

19  they had to deal with it.  Judge Gerber, we believe, actually

20  ruled on the due process issue for non-ignition switch

21  plaintiffs in his November 2015 decision, which was never

22  appealed.

23          THE COURT:  I think I addressed that in one of my

24  opinions.  I think I did.

25          MR. STEINBERG:  I know you alluded to it, but I don't

1  think it was ever teed up for it.

2          THE COURT:  No, but it was raised.  The issue was

3  raised with me before.  We'll get to all these issues.

4          MR. STEINBERG:  Okay.

5          THE COURT:  The first thing is to see --

6          MR. STEINBERG:  I thank -- Your Honor, I thank you

7  for giving me the opportunity to at least counterbalance some

8  of the arguments, and I know none of it was relevant for a

9  30-day extension request, but I thank you for allowing me to go

10 through some of it.

11         THE COURT:  You're trying to influence the Court

12 already, just as Mr. Weisfelner and the other plaintiffs'

13 lawyers are.  Fine.

14         Mr. Weisfelner, last comments?

15         MR. WEISFELNER:  Yes, three quick things.  First of

16 all, I would like to thank Your Honor for accommodating the

17 personal schedules of some of us, including me, in setting

18 today's hearing.  So I didn't want the day to go by without

19 again thanking you.

20         Number two, you talked about circles, just to make

21 the circle go all the way around.  What Your Honor talked about

22 was the potential for credits available to New GM on successor

23 liability, to the extent that there was a recovery against Old

24 GM.

25         THE COURT:  Well, they argued there was -- it's not a

48

1  question of credits.  They argued in that Kirkland Ellis letter

2  there are no claims for successor liability.

3          MR. WEISFELNER:  I know exactly what they argued, but

4  like Judge Gerber before you used to comment, there's such a

5  thing as baby bankruptcy dollars and real dollars.  And to the

6  extent that you recover against the GUC Trust --

7          THE COURT:  I understand fully well about this issue.

8          MR. WEISFELNER:  even by -- okay.  And the last thing

9  is, my good friend, Mr. Steinberg, misspoke when he said that

10  there was commentary about strategic decisions not to pursue

11  late claims.  That's Weisfelner being quoted, and Mr. Steinberg

12  will recall that what I was criticized for by Judge Gerber was,

13  quote, "strategic decisions not to hold up GUC Trust

14  distributions in the past," not for failure to pursue late

15  claims.  I think I recall that he was wrong.

16          I'm done.  Thank you very much.

17          THE COURT:  Okay.  I would like a written status

18  letter by 5 p.m., April 9th.

19          MS. GOING:  Your Honor, could you repeat the date.

20          THE COURT:  April 9th.  5 p.m., April 9th.  You

21  wanted a month.  I'm giving you the month.  And if you -- you

22  know, the status letter will be a moot issue if what you file

23  is a motion for approval of a settlement.  Then there's -- you

24  know, if you're ready to move on, but I do -- otherwise, I want

25  a written status letter by April 9th.  Okay?

1          UNIDENTIFIED:  Thank you, Your Honor.

2          THE COURT:  Anything else?  All right.  We're

3    adjourned.

4          UNIDENTIFIED:  Thank you, Judge.

5       (Proceedings concluded at 4:18 p.m.)

6                    *  *  *  *  *

7

8

9

10

11

12

13

14

15              **C E R T I F I C A T I O N**

16

17       I, Alicia Jarrett, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE:  March 9, 2018

25   ACCESS TRANSCRIPTS, LLC