# Exhibit A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF LIVINGSTON

TERRY MOORE, ELLEN MOORE,
DAVID O'NIONS, DIANE O'NIONS
JOELLEN PISARCZYK,
MARVIN PISARCZYK, and all others similarly
situated,                                                Case No. 2017-      - CE

        Plaintiffs,                                    Hon.

v.

GENERAL MOTORS LLC, a Delaware limited
liability company,

        Defendant.

---

*There is no other pending or resolved civil action arising from
the transaction or occurrence alleged in the complaint.*

---

### PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Terry Moore, Ellen Moore, David O'Nions, Diane O'Nions, Joellen Pisarczyk and Marvin Pisarczyk, on behalf of themselves and all others similarly situated, state the following as their class action complaint against Defendant, General Motors LLC:

### SYNOPSIS OF CLAIMS

1.     This action arises from contamination of Plaintiffs' groundwater by Defendant and Motors Liquidation Company (f/k/a General Motors Corporation) ("Old GM") **its predecessor** at the Milford Proving Grounds, and Defendant's denial and concealment of claims arising from its contamination. Plaintiffs seek compensation for property damage and personal

injury caused by Defendant's pollution, and for the cost of obtaining potable water.

2

<u>PARTIES AND JURISDICTION</u>

2.      Plaintiffs, Terry Moore, Ellen Moore, David O'Nions, Diane O'Nions, Joellen

Pisarczyk and Marvin Pisarczyk are residents of the City of Milford, Michigan.  Plaintiffs own or

in the recent past have owned real property that draws on ground water polluted by Defendant's

and Old GM's release of hazardous substances from the Milford Proving Grounds facility in

Milford, Michigan ("MPG").

3.      Plaintiffs bring this action individually and as representatives of a class of persons

defined as:

> All persons who reside or have resided in the past 10 years in any
> home to which Defendant sent a Notice of Migration in or about
> October 2014, and who claim to have suffered damages as a result
> of Defendant's contamination of groundwater.

4.      Defendant General Motors LLC ("New GM") is a Delaware limited liability

company with its principal place of business in Detroit, Michigan.  Defendant conducts business

in Livingston County, Michigan.

**5.      Plaintiffs allege that, under Michigan law, New GM is the successor
corporation to Old GM.**

**6.**      5. Plaintiffs bring this action to recover compensation for damages caused by

Defendant's tortious conduct and violations of Michigan environmental statutes.

**7.**      6. The amount in controversy of each class member exceeds the sum of $25,000,

exclusive of interest, costs and attorney fees.

**8.**      7. The Court has subject matter jurisdiction over this cause pursuant to MCL

600.601 and 600.605.

**9.**      8. Venue is proper in Livingston County, pursuant to MCL 600.1629.

COMMON FACT ALLEGATIONS

THE MPG

**10.** ~~9.~~ The MPG is an approximately 4,011-acre vehicle testing and development

facility located near the border of Livingston and Oakland Counties.  Old GM owned and

operated the MPG from 1924 to July 9, 2009, and tested vehicles on the site 24 hours per day,

seven days per week.  Starting on July 10, 2009 and until the present day New GM has owned

and operated the MPG.  New GM tests vehicles on the site 24 hours per day, seven days per

week.  The MPG contains over 100 miles of paved and dirt roads, numerous parking lots, over

115 commercial and industrial buildings, several salt storage buildings, a wastewater treatment

plant, landfills (for debris, compacted cars, pesticides, scrap tires etc.), and hundreds of

aboveground and underground storage tanks containing petroleum products, sodium chloride,

and numerous other hazardous materials.

**11.** ~~10.~~ Substantial amounts of the following hazardous materials are being used or

have been used at the MPG:  fuel oil, antifreeze, transmission fluid, chlorine, denatured alcohol,

diesel fuel, heating oil, Dowtherm J and SR-1, ferric chloride, gasoline, lubricants and greases,

methanol, MTBE, motor oil, nitrogen, propane, road deicer or potassium acetate, salt, brine,

sodium chloride, sulfuric acid, windshield washer solvent, Freon, sodium hydroxide, car

batteries, Syltherm HF, corrosion inhibitor, lean acid batteries, calcium chloride with boost,

lithium chloride, photographic materials, paint thinners, water treatment chemicals, mineral

spirits, chlorinated and non-chlorinated solvents, PCBs, hydrochloric acid, herbicides,

insecticides, lithium batteries, lacquer thinner, naphtha, adhesives, Stoddard solvent, mercury

batteries, mercury, hydraulic oil, and gear oil. The majority of these materials are stored in the Main Building Area on the southern portion of the MPG.

**12.** ~~11.~~ There are several small lakes on the MPG premises, including Mott Lake, Sloan Lake, and Pickett Lake.  Mann Creek bisects the property from northeast to southwest and drains a supermajority of the site ultimately flowing into Moraine Lake.  Most of the Main Building Area (located on the southern portion of the property) drains to Mott Lake and then to Mann Creek.   Groundwater flow from these areas is predominantly to the southwest.   Water samples in 2000 taken from Mann Creek where the creek enters the MPG contain 42 mg/l chloride; water samples taken from where the creek exits the MPG contain up to 400 mg/l of chloride.

**13.** ~~12.~~ Defendant, since July 10, 2009 and Old GM, until July 9, 2009, released hundreds of thousands of tons of salt at the MPG over the last several decades (the "Releases"), leading to extremely high concentrations of sodium and chloride in surface and groundwater at the MPG.

**14.** ~~13.~~ The Releases migrated from the MPG into groundwater beneath Plaintiffs' property, causing extremely high concentrations of sodium and chloride in water used by Plaintiffs (the "Contamination").

**15.** ~~14.~~ The Contamination has caused and will cause the chemical extraction from the earth, and transport into the water used by Plaintiffs, of existing but otherwise dormant hazardous substances including, but not limited to, arsenic.

<u>DEFENDANT AND OLD GM'S KNOWLEDGE OF THE RELEASES AND CONTAMINATION</u>

**16.** ~~15.~~ From 1985 to July 9, 2009 Old GM was well-aware of the Releases and the Contamination.

5

**17.** 16. Since July 10, 2009, Defendant has been well aware of the Releases and the Contamination.

**18.** 17. In 1985, Old GM engaged McNamee, Porter and Seeley ("MPS") to conduct a Water Supply Study (the "MPS Study"). The purposes of the MPS Study included evaluation of the source and extent of chloride contamination, existing water consumption and future demands, and possible locations for new water supply wells.

**19.** 18. The MPS Study found:

    a.    The then-existing water supply system at MPG as consisted of two production wells located near the military building (southern portion of the property). "Another production well (Well 3), drilled in 1953, was a major supply source, but because of high chloride concentrations, is now only used for emergency supply." The 1985 chloride concentration at Well 3 was 600 mg/l compared to the USEPA's National Secondary Drinking Water Regulations of 250 mg/l.

    b.    The subsurface conditions at the MPG are variable (containing unsorted clay, silt, sand and gravel), and Mann Creek drains the majority of the MPG, exiting near the southwest corner.

    c.    Chloride in surface water at Mann Creek exiting the property was 300 mg/l in 1984; both Mott Lake and Pickett Lake had chloride concentrations of 404 mg/l and 480 mg/l, respectively.

    d.    There were four possible sources of chlorides in the MPG groundwater: (1) road salt used as ice control on paved roads; (2) calcium chloride used for dust control on dirt roads; (3) wastewater effluent (OLD GM used water softeners at its industrial facilities and wastewater discharge was 543 mg/l in 1980); and (4) salt contained in geologic deposits. *Id.* at 11. However, the study stated that **"[r]oad salt appears to be a major source of chloride at the proving grounds**" where approximately 10,000 tons of salt was used each year on the 120 miles of paved roads and parking lots. *Id.*

**20.** 19. MPS recommended that Old GM monitor chloride levels in wells and surface waters, examine salt usage to determine if lesser amounts could be used, and check any new

6

wells drilled at the site for contamination.  MPS further noted that "[w]ater quality consistent with Federal Primary and Secondary Drinking Water Standards is considered essential."

**21.**  ~~20.~~ After receiving the MPS Study, Old GM did not disclose the Contamination to regulatory authorities or local residents, reduce salt usage, or monitor the groundwater and surface water contamination.

**22.**  ~~21.~~ Because of its Contamination, Old GM discontinued use of its own existing domestic water supply wells.

7

MDEQ TESTING AND NOTICE TO OLD GM OF THE CONTAMINATION

**23.** ~~22.~~ In 1997, the Michigan Department of Environmental Quality ("MDEQ") learned of the Contamination after a developer reportedly found high chlorides in the shallow aquifer when it started drilling wells for homes to be built to the southwest of the MPG.  MDEQ immediately advised Old GM that it was evaluating the source of this contamination and requested that Old GM furnish information relating to its salt usage.

**24.** ~~23.~~ In May and June of 1997, the Livingston County Health Department ("LCHD") conducted a series of chloride sampling results taken from portions of Mann Creek located within the MPG. The test results showed elevated levels of chloride exceeding 300 mg/l.

**25.** ~~24.~~ On October 2, 1997, MDEQ provided Old GM with results of groundwater sampling at The Oaks, a residential neighborhood to the southwest of the MPG.  MDEQ advised Old GM that groundwater flow in this area was to the southwest, and stated that "it appears that a source of sodium and chlorides may therefore emanate from the [Old] GM Proving Grounds facility."

**26.** ~~25.~~ In May 1998, MDEQ wrote letters to the developer of The Oaks that stated, *inter alia*:

> a.    "Sodium levels are above residential health based drinking water criteria and chlorides are present above residential aesthetic criteria in water samples taken from some homes and test wells in the area of Kensington/Jacoby/Stobart"

> b.    "Due to regional groundwater flow, which is to the southwest, and the pattern of distribution of those wells that are affected, the MDEQ believes that the sodium and chloride are not naturally occurring and are from a source northeast of your development"

> c.    "This contamination is migrating onto the Kensington/Jacoby/Stobart and Oaks on Beach Lake properties."

8

**27.**    26. Old GM became aware of MDEQ's letters to the developer of The Oaks and,

during a meeting with MDEQ on May 29, 1998, denied liability for the Contamination and

demanded that MDEQ retract the letters.

**28.**    27. Beginning in 1998, Old GM commissioned a series of reports from

Conestoga-Rovers Associates ("CRA") designed to refute or at least obfuscate MDEQ's

hypothesis that Old GM's prodigious use of salt at the MPG was the source of the

Contamination.   This series of reports contended, *inter alia*, that groundwater flow from the

MPG was to the south-southeast, and CRA's (very limited) testing indicated that groundwater

quality at a downgradient monitoring well did not exceed the Act 451, part 201 Generic

Residential Groundwater Criteria of 160 mg/l (or the Generic Industrial Groundwater Criteria of

450 mg/l) for sodium, and marginally exceeded the 250 mg/l aesthetic criteria for total chloride.

**29.**    28. In a 1999 Salt Usage Report, CRA identified the following uses of salt at the

MPG:

> **Grit Trough Near Building 83**: Consists of a paved road, paved shoulder, and grit
> containment area in the middle of the MPG that has been in operation for 15 years.
> The Grit Trough is filled with approximately 7,200 gallons of salt grit solution per
> day. Test vehicles drive through at 40 mph. "During the testing procedure, a small
> amount of the grit solution may be splashed out of the grit trough containment area
> and onto adjacent grassed areas." A nearby well reported chloride contamination at
> 750 mg/l.
> **Corrosion Test At Building 83**: Vehicles drive through the building (which is
> located near the middle of the MPG) and are sprayed with a 10,000 mg/l brine
> solution which drains inside and outside of the building. This building was
> constructed in 1980s.
> **Several Salt Storage Buildings**: These include a salt dome at Building 74, former
> salt storage structure near Building 11, and sidewalk salt storage near Building 11; all
> of which are located on the southern portion of the MPG.
> **Salt Splash Road Facility Near Building 74**: The salt splash is an outside testing
> area in which a 5 percent salt solution is used to flood a paved area that vehicles drive
> through. Approximately, 2 to 4 tons of salt is used per week. OLD GM claimed most
> of the water is recycled except for periodic runoff. The Salt Splash Road Facility is
> located on the southern portion of the MPG.

9

**Brine Storage Tank Near Building 10**: 7,600 gallon tank used for water softener located on the southern portion of the property.

**Water Softeners**: Old GM used approximately 200 tons of salt per year for water softening which presently drains to Mott Lake (southern portion of the property). Prior to 1997, backwash from the water softening at Building 12 discharged at Outfall 003 to the ground.

**Military Testing Area**: This area contains 5 earthen pits (on the southern portion of the property) filled with salt water in the winter and driven through by military vehicles. Old GM estimated 20 to 40 tons of salt were deposited in the pits per year.

**Road Salting and Dust Suppression**: Old GM estimates that it used approximately 7,800 tons of salt per year for pave roads, 7 tons per year of calcium chloride for dirt roads, and 160 tons per year for sidewalks.

**30.** ~~29.~~ In June 2000, in response to MDEQ's criticisms of OLD GM's unwillingness to take responsibility for the Contamination, Old GM represented to MDEQ:

Groundwater flow in the southwest portion of the Proving Grounds is to the south and southeast not the southwest;

Groundwater contamination on the MPG could be a result of bedrock brine intrusion caused by local overburden production and local gas wells;

Groundwater contamination at adjacent properties could be the result of county road salting, residential water softener and septic tank usage;

Concentrations of sodium and chloride at MPG are similar to those occurring at other areas of Oakland and Livingston Counties and thus could be naturally occurring;

The contamination levels at The Oaks are higher than those at Mann Creek and therefore Mann Creek cannot be the cause of increased contamination at The Oaks;

The MPG was not a "facility" under NREPA;

Old GM's permitted releases of salt from its wastewater treatment plant were exempt;

MDEQ has not made the requisite case-by-case determination that sodium and chloride are "hazardous substances"; and

The 1985 study's conclusion that road salting caused contamination at the MPG was wrong.

**31.** ~~30.~~ On September 22, 2000, MDEQ advised Old GM in writing of MDEQ's final decision to classify the MPG as a contaminated "facility" and to reject Old GM's request that MDEQ not take any action regarding the sodium and chloride contamination until MDEQ had reviewed Old GM's "Salt Use Reduction Monitoring Plan."

**32.** ~~31.~~ MDEQ's September 22, 2000 correspondence also stated, in relevant part:

a.    "[S]odium Chloride, a hazardous substance, was released, deposited, or became located at the [MPG]" and "[t]he concentrations of sodium and

10

chloride release to the groundwater exceed the residential cleanup requirements" established under Michigan law.

b.    Old GM's Salt Use Reduction Monitoring Plan does not, as required by Michigan law, "evaluate and address past releases of salt on the property and the impact those releases have had and continue to have on the environment," nor does it "evaluate locations outside the [MPG] that are, or potentially are, impacted by release of salt at the [MPG]."

c.    "[Old GM] uses large quantities of sodium chloride (salt) at the [MPG]. Salt is used as a deicing agent, in water softeners, and as a corrosive agent for vehicle corrosion testing."

d.    During the 1990s, the [MPG] used approximately 7,430 tons of salt per year on the equivalent of approximately 102.4 miles of road, test track, and parking areas. This equates to 72.6 tons of salt per mile of road annually. By comparison, Livingston County uses an average of 24 tons of salt per mile of road. [Old] GM uses three times as much salt per mile of road . . . Moreover, this comparatively high per mile salt application rate is concentrated in an area of six square miles at the [MPG] compared to an areas of 576 square miles for the county."

e.    "Salt Splash Road is an outside vehicle testing area in which 5 percent sodium chloride solution is used for vehicle corrosion testing. Vehicles continuously drive through a 12-foot wide paved area that is flooded with the aqueous salt solution that is maintained in two concrete tanks. The salt solution is supposed to be captured on the paved area and recycled back into the contaminant tanks. However, during a visit to the [MPG], staff of the Environmental Response Division (ERD), MDEQ observed what appeared to be gullies cut into the unpaved area next to the paved area. These gullies promote the drainage of water with high concentrations of salt into unpaved areas, posing a greater potential for impact on the soil and groundwater. Erosion gullies also seem to appear in the same area in historical air photos of the [MPG]. Further, according to witness testimony, [Old GM] used Salt Splash Road for many years without any recovery or recycling of the salt solution."

f.    "A military vehicle testing area in the northeastern portion of the site, which is no longer in use, consisted of five earthen pits that contained water. Military and other four-wheel drive test vehicles were driven through the pits. [Old GM] added approximately 20-40 tons of salt per year to these pits during the winter months to prevent the water in the pits from freezing. There was no method to recover the brine solution in these pits."

g.    "The grit trough is an outside corrosion testing area . . . Test vehicles move through the trough to undercoat the car with a salty grit and water mixture. A shallow (or 'drift') well located near the grit trough has supplied water to the trough since November 1998. A sample from this drift well had a reported chloride concentration of 595 mg/l."

h.    "[Old GM] discharges approximately 200 tons of salt per year from water softeners at the [MPG]. . . [Old GM] discharged water softener backwash

11

to a wetland via Outfall 003 for 30 years. Samples from Outfall 003 tested as high as 2,200 mg/l of chloride."

i.   "[Old GM] now discharges all water softener backwash water to their sanitary sewer system, which goes to an on-site wastewater treatment plant. The discharge from the wastewater treatment plant at the [MPG] discharges to an unlined impoundment (Mott Lake) on the [Old GM] property . . . Concentration of chloride in water samples collected from Mott Lake ranged from 443 to 555 mg/l of chloride . . . Mott Lake, because it is unlined, is likely providing recharge to, and potentially contaminating, groundwater."

j.   "Mann Creek enters the [MPG] from the northeast and exits the property at the southwest corner . . . MDEQ has estimated that Mott Lake discharges 826 pounds of salt per day to Mann Creek . . . Mott Lake, Outfall 001, and the majority of the overland runoff from the [MPG] property drain to Mann Creek. Water samples taken from Mann Creek where the creek enters [Old] GM property contain 42 mg/l chloride. Water samples taken from where the creek exits GM property contain up to 400 mg/l of chloride."

k.   "Overland runoff and stormwater also drains to Pickett lake, located on the [MPG] property. Water samples from Pickett Lake have contained chloride concentrations as high as 13,000 mg/l. Pickett Lake, with its high concentrations of chloride, is also likely providing recharge to, and potentially contaminating, the groundwater."

l.   "Water Samples from several widely spaced monitoring wells across the [MPG] indicate elevated levels of chloride are widespread. The concentrations of chloride in these wells ranged from 200 mg/l to 900 mg/l. This compares to a typical background concentration in groundwater of 10 mg/l."

m.   "Groundwater flow direction varies across the [MPG], but generally ranges from southeasterly to southwesterly. Water samples from residential wells located southwest, south, and southeast of the [MPG] contain sodium and chloride at concentrations that are approaching or exceed Part 201 residential drinking water criteria. Documented increases of chloride concentrations in private wells south of the [MPG] indicates groundwater contaminated with chlorides is migrating through the area."

n.   "The [LCHD] is monitoring the drinking water at 24 homes southwest of the [MPG]. The concentration of chloride in 13 of these 24 private wells ranges from 261 mg/l to 651 mg/l. The average concentration of chloride in these affected homes is 393 mg/l. The MDEQ drinking water criterion for chloride is 250 mg/l. The concentration of sodium in 10 of these wells ranges from 186 mg/l to 371 mg/l with an average concentration of 242 mg/l. The MDEQ drinking water criterion for sodium is 120 mg/l."

**33.**   32. On October 13, 2000, Old GM initiated a civil action against MDEQ alleging

that: (1) sodium chloride, ionic sodium, and chloride are not "hazardous substances" under state

12

or federal law; (2) MDEQ's residential groundwater criterion for sodium and chloride are arbitrary and capricious; (3) the "permitted release" exemption applies to water softener regenerant discharges, road salting, and dust surpassing activities at the MPG; (4) the MPG is not a "facility" because the sodium and chloride contaminants on the site represent background levels; and (5) MDEQ's September 22, 2000 letter constituted a final agency action which was not supported by law or fact, in excess of statutory authority and arbitrary and capricious.

**34.** 33. Pursuant to an April 26, 2001 Pollution Minimization Agreement ("PMA") Old GM and MDEQ agreed that: (1) Old GM would dismiss its complaint without prejudice; (2) MDEQ would withdraw its September 22, 2000 facility letter; (3) MDEQ would not issue another determination that the MPG is a "facility" without providing Old GM 30-days' notice; and (4) Old GM would implement a number of best management practices with respect to the use, management, are storage of road salt and monitor the effects of such measures. The PMA further provided that if a final five-year summary report to be prepared by Old GM did not document a statistically significant trend of decreasing ionic sodium and chloride concentrations in groundwater at the MPG, OLD GM must conduct a hydrological study to determine the known sources of salt in the groundwater and the impact on uses of groundwater at the MPG.

**35.** 34. In May 2007, Old GM submitted to MDEQ a Five Year Summary Report that stated that Old GM could not document a statistically significant trend of decreasing ionic sodium and chloride concentrations in ground water at the MPG. CRA, on Old GM's behalf, also asserted that groundwater flows vary and that the bedrock beneath the MPG "contains naturally occurring brines, which could be a source of sodium and chloride in the overburden groundwater due to the natural upward gradient, groundwater extraction from the overburden, or bedrock drilling activities (*i.e.*, installation of oil and gas production wells)." In addition, CRA,

13

on behalf of Old GM, steadfastly denied that Old GM was responsible for the Contamination at The Oaks.  Instead, CRA attributed salt contamination at The Oaks, at least in part, to offsite sources including (1) individual septic systems, (2) residential water softeners, (3) county road salting practices, and (4) naturally occurring brines.

**36.**   35.  In subsequent communications with MDEQ and others, Old GM continued to maintain that the MPG was not the source of the Contamination in Plaintiffs' groundwater.

### DEFENDANT'S ACQUISITION OF THE MPG AND FAILURE TO OBTAIN A BASELINE ENVIRONMENTAL ASSESSMENT

**37.**   36.  On June 1, 2009, Old GM filed a petition in bankruptcy.

**38.**   37.  Old GM failed to give Plaintiffs notice of claims against Old GM arising from the Releases and Contamination.

**39.**   38.  During the time of Old GM's bankruptcy filing, Old GM had never given notice of any groundwater contamination emanating from the MPG to any Plaintiff

**40.**   39.  On July 10, 2009 (the "Sale Date"), Defendant purchased the MPG, along with all buildings, roads, facilities, wells, and other structures from the Old GM bankruptcy estate.

**41.**   40.  After purchasing the MPG, Defendant continued to use the MPG in essentially the same fashion as Old GM had used it since the 1920's.

**42.**   **After purchasing the MPG, Defendant operated as a continuing enterprise of Old GM:**

> a.   After purchasing the MPG, Defendant Retained  substantially the same employees as Old GM;
>
> b.   Retained substantially the same supervisory personnel as Old GM;

14

c.      Retained the same production facilities in the same location, specifically the MPG location;

d.      Continued to test the same products;

e.      Retained a substantially similar name – **General Motors Corporation became General Motors, LLC**;

f.      Retained most of Old GM's assets;

g.      Continued Old GM's business operations – designing, building, testing and selling automobiles;

h.      held itself out as General Motors, using similar branding and marketing.

**43.** 41. After the Sale , Defendant was in possession of all information and data collected by Old GM prior to the bankruptcy regarding the Contamination.

**44.** 42. In connection with its acquisition of the MPG, Defendant failed to obtain a Baseline Environmental Assessment within the meaning of MCL 324.20101(f).

**45.** 43. After its acquisition of the MPG, Defendant perpetuated the Releases.

**46.** 44. On March 7, 2014, CRA submitted to MDEQ Defendant's 2013 Annual Salt Usage and Monitoring Report which stated that over the course of the previous six years, Old GM, until July 9, 2009, and New GM after July 10, 2009 had released into the environment: 16,671 tons of road salt; 226 tons of sidewalk salt; and 1,517 tons of water softening salt. New GM, however, did not fully disclose the amount of salt released into the environment from vehicle testing.

**47.** **Defendant has acted as a mere continuation of Old GM, after Old GM's 2009 bankruptcy. To wit:**

DMSLIBRARY01\32095996.v332096351.v1

    a.    **After its acquisition of the MPG, Defendant has continued to operate the business of Old GM, including the MPG, with substantially identical personnel, including management of the MPG;**

    b.    **After its acquisition of the MPG, Defendant has continued to operate the business of the MPG, in substantially the same fashion;**

**After its acquisition of the MPG, Defendant has had all data, documentation and relevant information regarding the Contamination, which were available to Old GM.**

### FRAUDULENT CONCEALMENT

**48.** ~~45.~~ Old GM had actual knowledge of the Releases and the Contamination from 1985 to July 9, 2009.

**49.** ~~46.~~ Defendant had actual knowledge of the Releases and the Contamination from July 10, 2009.

**50.** ~~47.~~ Until July 9, 2009, Old GM knew that its usage of salt at the MPG was the predominant source of the Contamination at the MPG and at nearby locations, including Plaintiffs' neighborhoods.

**51.** ~~48.~~ From July 10, 2009, Defendant knew that its usage of salt at the MPG was the predominant source of the Contamination at the MPG and at nearby locations, including Plaintiffs' neighborhoods.

**52.** ~~49.~~ Despite its knowledge of the Releases and Contamination, Old GM took no action to remediate the Contamination or stop it from spreading.

**53.** ~~50.~~ Despite its knowledge of the Releases and Contamination, Defendant took no action to remediate the Contamination or stop it from spreading.

**54.** ~~51.~~ Despite its knowledge of the Releases and Contamination, until July 9, 2009, Old GM made affirmative misrepresentations that were designed to prevent discovery that their

16

Releases from the MPG were the predominant causes of the Contamination. Such false representations included statements that groundwater flowed in a south-southeasterly direction, rather than southwesterly, and that the sodium and chloride Contamination was due to "naturally occurring brines."

## DEFENDANT FINALLY COMES CLEAN

**55.** 52. In October of 2014, Defendant abandoned previous denials and notified MDEQ, local residents, including Plaintiffs, and the public that Defendant had caused the Contamination (the "Notice of Migration").

**56.** 53. Defendant's Notice of Migration stated, in part:

    a.    At the request of MDEQ [Defendant] installed three monitoring wells near the southwest boundary of the Milford Proving Grounds;

    b.    Groundwater sampling from those wells show groundwater with elevated levels of sodium and chloride likely have migrated off the Proving Grounds;

    c.    The recent sodium and chloride concentrations in the furthest downgradient well were 630 mg/l and 1,300 mg/l respectively; and

    d.    Groundwater potentiometric contours indicate groundwater flow in the southwest corner of the Proving Grounds is to the south and southwest.

**57.** 54. The Notice of Migration was the first time Defendant or Old GM had ever acknowledged off-site migration of the Contamination.

## CLASS ALLEGATIONS

**58.** 55. The class is so numerous that joinder of all members is impracticable.

**59.** 56. There are questions of law or fact common to the members of the class that predominate over questions affecting only individual members.

17

**60.** 57. The claims or defenses of the representative parties are typical of the claims or defenses of the class.

**61.** 58. The representative parties will fairly and adequately assert and protect the interests of the class.

**62.** 59. The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

COUNT I – VIOLATION OF NREPA PART 201
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)

**63.** 60. Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to Old GM conduct.

**64.** 61. From 1924 to July 9, 2009, Old GM owned and operated the MPG.

**65.** 62. During said time and place, Old GM caused the Releases and the Contamination without a permit to do so. On October 13, 2014, Defendant communicated the Notice of Migration in which Defendant expressly or implicitly acknowledged:

    a.    Defendant is the current owner and operator of the MPG.

    b.    The MPG is a "facility" within the meaning of MCL 324.20101(s).

    c.    Sodium and chloride are hazardous substances.

    d.    The sodium and chloride Contamination is migrating in a south and southwesterly direction, towards the Plaintiffs' residences.

**66.** 63. As the owner and operator of the MPG facility from 1924 to July 9, 2009, Old GM was required to notify MDEQ and Plaintiffs within 30 days after obtaining knowledge that the release has migrated and "immediately stop or prevent an ongoing release at the source."

18

**67.** ~~64.~~ Furthermore, MCL 324.20107a required Old GM to exercise due care with respect to the contamination emanating from the MPG by undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances.

**68.** ~~65.~~ Old GM failed to fulfill its obligations under Part 201 of the Michigan Natural Resources and Environmental Protection Act ("NREPA").

**69.** ~~66.~~ **Due to Old GM's failure to notify Plaintiffs of the contamination prior to the bankruptcy and succession liability**, Defendant is liable for costs and damages caused by Old GM pursuant to MCL 324.20126 and 20126a for the Plaintiffs' costs of response activities and damages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release.

**70.** ~~67.~~ Defendant is strictly liable for cleanup costs prior to the Sale Date, under MCL 324.20126 due to its failure to obtain a Baseline Environmental Assessment within the meaning of MCL 324.20101(f).

**71.** ~~68.~~ As a direct and proximate result of Old GM's Releases and Contamination **for which Defendant is liable through succession theory and lack of notice**, Plaintiffs have suffered irreparable harm inasmuch as the groundwater used by Plaintiffs has been polluted, impaired and rendered unusable.

**72.** ~~69.~~ Plaintiffs have incurred, and will incur, response activity costs for which Defendant is responsible for reimbursement.

**73.** ~~70.~~ On November 29, 2017, pursuant to MCL 324.20135(3), Plaintiffs notified Defendant, the MDEQ, and the Michigan Attorney General, that they would be seeking relief under Part 201.

<u>COUNT II – VIOLATION OF MICHIGAN ENVIRONMENTAL PROTECTION ACT
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)</u>

19

**74.** ~~71.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to Old GM conduct.

**75.** ~~72.~~ Plaintiffs assert this cause of action under the Michigan Environmental Protection Act ("MEPA") for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

**76.** ~~73.~~ Old GM's Releases during said time polluted and threatened the usability of the groundwater beneath Plaintiffs' property.

**77.**    **Equity requires that Defendant be enjoined from further Releases into the environment that would pollute, impair and/or destroy the groundwater beneath Plaintiffs' property.**

COUNT III – FRAUD
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)

**78.** ~~74.~~ Plaintiffs incorporate by reference the foregoing allegations.

**79.** ~~75.~~ Old GM had actual knowledge that the Contamination was migrating off-site from 1985 through the Sale Date.

**80.** ~~76.~~ Despite its actual knowledge of the Contamination migration, Old GM failed to ever notify Plaintiffs and those similarly situated of the Contamination from 1985 to though the Sale Date.

**81.** ~~77.~~ Old GM concealed its knowledge of the Contamination migration by knowingly and affirmatively making spurious assertions that the MPG was not the source of the Contamination and that groundwater flowed in a south to southeast direction from the MPG.

**82.** ~~78.~~ Old GM made its representations to MDEQ and others with actual intent to defraud, or at least with reckless disregard for the truth and as positive assertions.

20

**83.** ~~79.~~ As a direct and proximate result of Old GM's fraud, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

    a.    Diminution in value of real property;

    b.    Damage to vegetation and landscaping;

    c.    Damage to personal property and premature obsolescence due to corrosion;

    d.    Adverse health effects caused by increased sodium and chloride intake;

    e.    Emotional distress and mental anguish.

**84.** ~~80.~~ Under the circumstances, exemplary damages are appropriate to rectify Old GM's wrongful conduct. Old GM and its assets must not be allowed to hide behind the curtain of bankruptcy when it fraudulently withheld information of damages it was causing to Plaintiffs.

COUNT IV – NEGLIGENCE
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)

**85.** ~~81.~~ Plaintiffs incorporate by reference the foregoing allegations.

**86.** ~~82.~~ Old GM had duties to:

    a.    Refrain from polluting the environment and, specifically, from discharging into the waters of the State of Michigan a substance that is or may become injurious to the public health, safety or welfare, or domestic use of such waters.

    b.    Report ongoing releases to MDEQ and notify Plaintiffs and those similarly situated that the Contamination impaired the public health, safety or welfare, or domestic use of such waters, and that the Releases had migrated from the MPG to groundwater beneath Plaintiffs' property.

    c.    Prevent ongoing releases of hazardous substances into the groundwater and/or diligently pursue remediation of same.

    d.    Take action to mitigate Plaintiffs' unacceptable exposure to hazardous substances.

**87.** ~~83.~~ Old GM breached its duties by:

a.       Causing the Releases and the Contamination.

b.       Failing to report the Releases and Contamination to MDEQ, and to notify Plaintiffs and those similarly situated.

c.       Failing to prevent ongoing releases of hazardous substances into the groundwater and/or diligently pursue remediation of same.

d.       Failing to take action to mitigate Plaintiffs' unacceptable exposure to hazardous substances.

**88.** ~~84.~~ As a direct and proximate result of Old GM's breaches of duties, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

a.       Diminution in value of real property;

b.       Damage to vegetation and landscaping;

c.       Damage to personal property and premature obsolescence due to corrosion;

d.       Adverse health effects caused by increased sodium and chloride intake;

e.       Emotional distress and mental anguish.

<u>COUNT V – TRESPASS</u>
<u>NEW GM (FOR CLAIMS *RELATING TO* OLD GM)</u>

**89.** ~~85.~~ Plaintiffs incorporate by reference the foregoing allegations.

**90.** ~~86.~~ The Releases prior to the Sale Date constituted an unauthorized direct and immediate invasion of land over which Plaintiffs and those similarly situated at all relevant times had a right of exclusive possession.

**91.** ~~87.~~ As a direct and proximate result of Defendant's invasion of Plaintiffs' land, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

a.       Diminution in value of real property;

b.       Damage to vegetation and landscaping;

22

09-50026-mg   Doc 14277-1   Filed 04/20/18   Entered 04/20/18 16:33:16   Exhibit A
Pg 24 of 33


    c.      Damage to personal property including, but not limited to, household appliances and plumbing;

    d.      Adverse health effects caused by increased sodium and chloride intake;

    e.      Emotional distress and mental anguish.

COUNT VI – PRIVATE NUISANCE
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)

**92.**    88. Plaintiffs incorporate by reference the foregoing allegations.

**93.**    89. Old GM's intentional Releases and Contamination prior to the Sale Date unreasonably interfered with Plaintiffs' use and enjoyment of their property.

**94.**    90. As a direct and proximate result of Old GM's interference with Plaintiffs' use and enjoyment of property, Plaintiffs and those similarly situated have suffered substantial damages.

COUNT VII – PUBLIC NUISANCE
NEW GM (FOR CLAIMS *RELATING TO* OLD GM)

**95.**    91. Plaintiffs incorporate by reference the foregoing allegations.

**96.**    92. The Releases and Contamination by Old GM prior to the Sale Date, significantly interfered with the public's health, safety, peace, comfort, and/or convenience.

**97.**    93. The Releases and Contamination were proscribed by law.

**98.**    94. The Releases and Contamination were known, or should have been known, by Old GM to be of a continuing nature which produced permanent or long-lasting significant effect on the public's rights.

23

**99.** ~~95.~~ Plaintiffs were uniquely harmed by the public nuisance, because their groundwater sources had been polluted, they sustained real and personal property damage as a result of the corrosive nature of the water, and they suffered adverse health effects.

**100.** ~~96.~~ Plaintiffs have incurred legal expenses as a result of Old GM's fraudulent and unlawful conduct.

COUNT VIII – VIOLATION OF NREPA PART 201
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)

**101.** ~~97.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

**102.** ~~98.~~ As of the Sale Date, Defendant owns and operates the MPG.

**103.** ~~99.~~ As of said time and place, Defendant has caused the Releases and the Contamination without a permit to do so.

**104.** ~~100.~~ On October 13, 2014, Defendant communicated the Notice of Migration in which Defendant expressly or implicitly acknowledged:

  e. Defendant is the owner and operator of the MPG.

  f. The MPG is a "facility" within the meaning of MCL 324.20101(s).

  g. Sodium and chloride are hazardous substances.

  h. The sodium and chloride Contamination is migrating in a south and southwesterly direction, towards the Plaintiffs' residences.

**105.** ~~101.~~ As the owner and operator of the MPG facility since July 10, 2009, Defendant was required to notify MDEQ and Plaintiffs within 30 days after obtaining knowledge that the release has migrated and "immediately stop or prevent an ongoing release at the source."

**106.** ~~102.~~ Furthermore, MCL 324.20107a required Defendant, from on and after July 10, 2009 to exercise due care with respect to the contamination emanating from the MPG by

24

undertaking response activity necessary to mitigate unacceptable exposure to hazardous substances.

**107.** ~~103.~~ Defendant failed to fulfill its obligations under Part 201 of the Michigan Natural Resources and Environmental Protection Act ("NREPA") since July 10, 2009.

**108.** ~~104.~~ From on and after July 10, 2009, Defendant is liable for costs and damages pursuant to MCL 324.20126 and 20126a for the Plaintiffs' costs of response activities and damages for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release.

**109.** ~~105.~~ Defendant is strictly liable for cleanup costs after the Sale Date, under MCL 324.20126 due to its failure to obtain a Baseline Environmental Assessment within the meaning of MCL 324.20101(f).

**110.** ~~106.~~ As a direct and proximate result of Defendant's Releases and Contamination since July 10, 2009, Plaintiffs have suffered irreparable harm inasmuch as the groundwater used by Plaintiffs has been polluted, impaired and rendered unusable.

**111.** ~~107.~~ From on or after July 10, 2009, Plaintiffs have incurred, and will incur, response activity costs for which Defendant is responsible for reimbursement.

**112.** ~~108.~~ On November 29, 2017, pursuant to MCL 324.20135(3), Plaintiffs notified Defendant, the MDEQ, and the Michigan Attorney General, that they would be seeking relief under Part 201.

<u>COUNT IX – VIOLATION OF MICHIGAN ENVIRONMENTAL PROTECTION ACT
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)</u>

**113.** ~~109.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

25

**114.** ~~110.~~ Plaintiffs assert this cause of action under the Michigan Environmental Protection Act ("MEPA") for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

**115.** ~~111.~~ Through the Releases and Contamination from the Sale Date through the present, Defendant has polluted, impaired and, for all practical purposes, destroyed, the groundwater beneath Plaintiffs' property.

**116.** ~~112.~~ Defendant's ongoing Releases continue to pollute and threaten the usability of the groundwater beneath Plaintiffs' property.

**117.** ~~113.~~ Equity requires that Defendant be enjoined from further Releases into the environment that would pollute, impair and/or destroy the groundwater beneath Plaintiffs' property.

COUNT X – FRAUD
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)

**118.** ~~114.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

**119.** ~~115.~~ Defendant had actual knowledge that the Contamination was migrating off-site since the day it took possession of the MPG on the Sale Date **because the previous owner, Old GM, had actual knowledge that the Contamination was migrating off-site since 1985 at the latest**.

**120.** ~~116.~~ Despite its actual knowledge of the Contamination migration, Defendant failed to notify Plaintiffs and those similarly situated of the Contamination from the Sale Date to October of 2014 when Defendant issued the Notice of Migration.

**121.** **Defendant concealed its knowledge of the Contamination migration by knowingly and affirmatively making spurious assertions that the MPG was not the source**

26

**of the Contamination and that groundwater flowed in a south to southeast direction from the MPG.**

**122.    Defendant made its representations to MDEQ and others with actual intent to defraud, or at least with reckless disregard for the truth and as positive assertions.**

123.    117. As a direct and proximate result of Defendant's fraud, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

  f.  Diminution in value of real property;

  g.  Damage to vegetation and landscaping;

  h.  Damage to personal property and premature obsolescence due to corrosion;

  i.  Adverse health effects caused by increased sodium and chloride intake;

  j.  Emotional distress and mental anguish.

124.    118. Under the circumstances, exemplary damages are appropriate to rectify Defendant's wrongful conduct.

COUNT XI – NEGLIGENCE
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)

125.    119. Plaintiffs incorporate by reference the foregoing allegations but only to the extent they related to New GM conduct.

126.    120. Since July 10, 2009, Defendant had duties to:

  e.  Refrain from polluting the environment and, specifically, from discharging into the waters of the State of Michigan a substance that is or may become injurious to the public health, safety or welfare, or domestic use of such waters.

  f.  Report ongoing releases to MDEQ and notify Plaintiffs and those similarly situated that the Contamination impaired the public health, safety or welfare, or domestic use of such waters, and that the Releases had migrated from the MPG to groundwater beneath Plaintiffs' property.

27

g.      Prevent ongoing releases of hazardous substances into the groundwater and/or diligently pursue remediation of same.

h.      Take action to mitigate Plaintiffs' unacceptable exposure to hazardous substances.

**127.**    ~~121.~~ From on and after July 10, 2009, Defendant breached its duties by:

e.      Causing the Releases and the Contamination.

f.      Failing to report the Releases and Contamination to MDEQ, and to notify Plaintiffs and those similarly situated.

g.      Failing to prevent ongoing releases of hazardous substances into the groundwater and/or diligently pursue remediation of same.

h.      Failing to take action to mitigate Plaintiffs' unacceptable exposure to hazardous substances.

**128.**    ~~122.~~ As a direct and proximate result of Defendant's breaches of duties from the Sale Date through the present, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

f.      Diminution in value of real property;

g.      Damage to vegetation and landscaping;

h.      Damage to personal property and premature obsolescence due to corrosion;

i.      Adverse health effects caused by increased sodium and chloride intake;

j.      Emotional distress and mental anguish.

<u>COUNT XII – TRESPASS</u>
<u>NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)</u>

**129.**    ~~123.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

28

**130.** ~~124.~~ The Releases by the Defendant from the Sale Date through the present constitute an unauthorized direct and immediate invasion of land over which Plaintiffs and those similarly situated at all relevant times had a right of exclusive possession.

**131.** ~~125.~~ As a direct and proximate result of Defendant's invasion of Plaintiffs' land from the Sale Date through the present, Plaintiffs and those similarly situated have suffered damages including, but not limited to:

f.      Diminution in value of real property;

g.      Damage to vegetation and landscaping;

h.      Damage to personal property including, but not limited to, household appliances and plumbing;

i.      Adverse health effects caused by increased sodium and chloride intake;

j.      Emotional distress and mental anguish.

COUNT XIII – PRIVATE NUISANCE
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)

**132.** ~~126.~~ Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

**133.** ~~127.~~ Defendant's intentional Releases and Contamination from the Sale Date through the present have unreasonably interfered with Plaintiffs' use and enjoyment of their property.

**134.** ~~128.~~ As a direct and proximate result of Defendant's interference with Plaintiffs' use and enjoyment of property from the Sale Date through the present, Plaintiffs and those similarly situated have suffered substantial damages.

COUNT XIV – PUBLIC NUISANCE
NEW GM (FOR CLAIMS *INDEPENDENT OF* OLD GM)

29

135.    129. Plaintiffs incorporate by reference the foregoing allegations but only to the extent they relate to New GM conduct.

136.    130. The Releases and Contamination by Defendant from the Sale Date through the present significantly interferes with the public's health, safety, peace, comfort, and/or convenience.

137.    131. The Releases and Contamination from the Sale Date through the present are proscribed by law.

138.    132. The Releases and Contamination from the Sale Date through the present are known, or should be known, by Defendant to be of a continuing nature which produced permanent or long-lasting significant effect on the public's rights.

139.    133. Plaintiffs are uniquely harmed by the public nuisance, because their groundwater sources have been polluted from the Sale Date through the present, they have sustained real and personal property damage as a result of the corrosive nature of the water, and they have suffered and continue to suffer adverse health effects.

140.    134. Pursuant to MCL 600.3805, equity requires that Defendant's activities from the Sale Date through the present causing further Releases and Contamination be preliminarily and permanently enjoined.

141.    135. Plaintiffs have incurred legal expenses as a result of Defendant's fraudulent and unlawful conduct from the Sale Date through the present.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Certify a plaintiffs-class of persons pursuant to MCR 3.305 consisting of:

> All persons who reside or have resided in the past 10 years in any home to which Defendant sent a Notice of Migration in or about October 2014, and who claim to have suffered damages as a result of Defendant's contamination of groundwater.

DMSLIBRARY01\32095996.v332096351.v1

B.      Enter judgment on a jury verdict for each class member in whatever amount in excess of $25,000 to which the trier of fact determines each class member is entitled.

C.      Order and adjudge that the Defendant is liable for any and all cleanup costs necessary to remediate the MPG.

D.      Order and adjudge that Defendant must reimburse Plaintiffs for any and all response activity costs.

E.      Enter preliminary and permanent injunctions prohibiting Defendant from causing further Releases and/or Contamination at the MPG.

F.      Award Plaintiffs their reasonable costs and attorney and expert fees.

G.      Grant Plaintiffs such additional relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.


Respectfully Submitted,



By:_____

Edward J. Hood (P42953)
Stephen A. Campbell (P76684)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, MI  48226
(313) 965-8300

and

Alexander McH. Memmen
The Memmen Law Firm, LLC
505 North LaSalle Street, Suite 500
Chicago, Illinois 60654

31

P. 312.878.2357
F. 312.794.1813
(*pro hac vice* pending)

Attorneys for Plaintiffs

Date:  February 16, 2018

DMSLIBRARY01\32095996.v332096351.v1