# **Exhibit A**

(Amended Ex. A to Motion For An Order Granting Authority To File
Late Class Proofs Of Claim, Dkt. No. 13806)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor** (Check Only One):    Case No. **09-50026**

☒ Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.)    09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE: *This form should not be used to make a claim for an administrative expense arising* **after** *the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property) Patricia Barker, et al. on behalf of Proposed Class (see attached for add'l claimants).

☒ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
c/o Steve W. Berman, Hagens Berman Sobol Shapiro, LLP,
1918 8th Avenue, Suite 3300, Seattle, WA  98101

**Court Claim Number:** Dkt. No. 13806
(*If known*)

Filed on: December 22, 2016

Telephone number: (206) 623-7292
Email Address: steve@hbsslaw.com

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:** $ See attached.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** See attached.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe:

**Value of Property:** $_____  **Annual Interest Rate** ___%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case – 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

Date: 4/24/18

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

FOR COURT USE ONLY

/s/ Steve W. Berman, on behalf of Claimants and the Proposed Class

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Modified B10 (GCG) (12/08)**

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: **IF BY MAIL**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, P.O. BOX 9386, DUBLIN, OH 43017-4286. **IF BY HAND OR OVERNIGHT COURIER**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. **ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.**

### THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES IS NOVEMBER 30, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)

**Court, Name of Debtor, and Case Number:**
These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009. You should select the debtor against which you are asserting your claim.

**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.**

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a):**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

For claims pursuant to 11 U.S.C. § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1 2009, the date of commencement of these cases (See DEFINITIONS, below). Attach documentation supporting such claim.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
The Debtors in these Chapter 11 cases are:

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc. | |
| (f/k/a Chevrolet Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group, Inc. as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Section 503(b)(9) Claim**
A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's

### INFORMATION

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing from The Garden City Group, Inc., please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**Additional Information**
If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation.com.

**ATTACHMENT TO PROOF OF CLAIM UNDER B.R. 7023 ON BEHALF OF PURCHASERS OF DELTA IGNITION SWITCH VEHICLES BY:**

**PATRICIA BARKER, MARION SMOKE, CAMILLE BURNS, GRACE BELFORD, RAY WIETERS, MICHAEL AND SYLVIA BENTON, CRYSTAL HARDIN, ESPERANZA RAMIREZ, ANNET TIVIN, MICHAEL PESCE, LISA TEICHER, MARIA E. SANTIAGO, NEYSA WILLIAMS, JENNIFER DUNN, DENNIS WALTHER, HEATHER HOLLEMAN, JAMES DOOLEY, PHILIP ZIVNUSKA, D.D.S., ROBERT WYMAN, COLIN ELLIOTT, DIANA CNOSSEN, JACQUELINE SMITH, DAVID CLELAND, FRANCES HOWARD, KENNETH ROBINSON, PATRICE WITHERSPOON, LAURIE HOLZWARTH, WAYNE WITTENBERG, MICHAEL AMEZQUITA, LORRAINE DE VARGAS, BERNADETTE ROMERO, SANDRA LEVINE, MICHAEL ROONEY, BONNIE TAYLOR, PAULETTE HAND, WILLIAM BERNICK, GEORGE MATHIS, MARY DIAS, CATHERINE SENKLE, SHENYESA HENRY, LISA SIMMONS, BLAIR TOMLINSON, D.D.S., AND STEPHANIE RENEE CARDEN**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.    CLAIMANTS ...........................................................................................................2

    A.    Patricia Barker—California ..........................................................................2

    B.    Marion Smoke—Alabama .............................................................................3

    C.    Camille Burns—Arkansas .............................................................................3

    D.    Grace Belford—Arizona ...............................................................................4

    E.    Ray Wieters—Arizona ..................................................................................4

    F.    Michael and Sylvia Benton—California ........................................................4

    G.    Crystal Hardin—California ...........................................................................5

    H.    Esperanza Ramirez—California ....................................................................5

    I.    Annet Tivin—Colorado .................................................................................6

    J.    Michael Pesce—Connecticut ........................................................................6

    K.    Lisa Teicher—Connecticut ...........................................................................6

    L.    Maria E. Santiago—Florida ..........................................................................7

    M.    Neysa Williams—Florida .............................................................................7

    N.    Jennifer Dunn—Georgia ...............................................................................7

    O.    Dennis Walther—Hawaii ..............................................................................8

    P.    Heather Holleman—Indiana ..........................................................................8

    Q.    James Dooley—Iowa .....................................................................................8

    R.    Philip Zivnuska, D.D.S.—Kansas .................................................................9

    S.    Robert Wyman—Maryland ...........................................................................9

    T.    Colin Elliott—Massachusetts ........................................................................9

    U.    Diana Cnossen—Michigan .........................................................................10

    V.    Jacqueline Smith—Michigan ......................................................................10

    W.    David Cleland—Minnesota .........................................................................10

X.      Frances Howard—Mississippi ...................................................................11

Y.      Kenneth Robinson—Missouri ..................................................................11

Z.      Patrice Witherspoon—Missouri................................................................11

AA.     Laurie Holzwarth—Montana ....................................................................12

BB.     Wayne Wittenberg—Nevada ....................................................................12

CC.     Michael Amezquita—New Jersey .............................................................13

DD.     Lorraine De Vargas—New Mexico ...........................................................13

EE.     Bernadette Romero—New Mexico............................................................13

FF.     Sandra Levine—New York........................................................................14

GG.     Michael Rooney—New York .....................................................................14

HH.     Bonnie Taylor—Ohio ...............................................................................14

II.     Paulette Hand—Oklahoma .......................................................................15

JJ.     William Bernick—Oregon ........................................................................15

KK.     George Mathis—Pennsylvania ..................................................................15

LL.     Mary Dias—Rhode Island ........................................................................16

MM.     Catherine Senkle—South Dakota .............................................................16

NN.     Shenyesa Henry—Texas ...........................................................................17

OO.     Lisa Simmons—Texas ..............................................................................17

PP.     Blair Tomlinson, D.D.S.—Utah ...............................................................17

QQ.     Stephanie Renee Carden—West Virginia..................................................18

III.    THE DELTA IGNITION SWITCH DEFECT ......................................................18

A.      Before It Sold Any Of The Delta Ignition Switch Vehicles, GM
        Knew The Ignition Switch Design Was Defective, But Approved
        The Substandard Switches Anyway, And Concealed These
        Material Facts From The Class. ................................................................20

B.      GM Received Many Complaints And Reports Of Vehicles Stalling
        Due To The Delta Ignition Switch Defect, And Concealed That
        Material Information From The Class. .......................................................22

C.      By 2004, GM Engineers Understood The Need To Correct The
        Delta Ignition Switch Defect But Failed To Act To Disclose Or
        Correct The Defect....................................................................................23

D.      GM Closes Its First Internal Investigation Of The Delta Ignition
        Switch Defect, Deciding To Take No Action Because Of Cost. ...........................27

E.      Complaints Continued And Serious Accidents Came To GM's
        Attention In 2005. ...............................................................................................28

F.      GM Engineers Proposed Design Modifications To The Delta
        Ignition Switch In 2005, But GM Management Rejected The
        Proposed Changes Because Of Cost. ....................................................................32

G.      Rather Than Implementing A Safety Recall And Fixing The
        Known Delta Ignition Switch Defect, GM Sent An Inadequate
        Technical Service Bulletin To GM Dealers In Late 2005 That
        Advocated The Removal Of Heavy Items From Key Rings. ................................36

H.      GM Authorized A Design Change To The Delta Ignition Switch In
        2006, But Masked The Existence Of The Change By Keeping The
        Same Part Number. ..............................................................................................38

I.      The Fatalities Resulting From The Ignition Switch Defect And The
        Cover-Up Came To GM's Attention As Early As 2004. .......................................40

J.      GM Responded To Growing Evidence Of Fatalities By Updating
        The Technical Service Bulletin To Dealers About Heavy Key
        Chains. .................................................................................................................42

K.      GM Knew Of And Tracked Multiple Accidents Involving The
        Delta Ignition Switch Defect But Avoided Scrutiny By Misleading
        The Class, The Public, And Regulators. ..............................................................43

L.      In 2009, As Injuries And Deaths Continued To Mount, GM
        Opened Yet Another Internal Investigation Of The Ignition Switch
        Defect, But Continued To Conceal Information About The Defect
        From Its Customers And The Class. .....................................................................46

M.      Right Up Until Its Bankruptcy Filing, GM Concealed Its
        Knowledge Of The Ignition Switch Defect And Its Devastating
        Consequences. ......................................................................................................47

IV.    OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM
       VEHICLES. ....................................................................................................................49

A.      Ignition Lock Cylinder Defect In Vehicles Also Affected By The
        Delta Ignition Switch Defect. ..............................................................................49

B.      Ignition Lock Cylinder Defect Affecting Over 200,000 Additional
        GM Vehicles. .......................................................................................................53

C.      "Second Wave" Ignition Switch Defects In Millions Of GM
        Vehicles. ..............................................................................................................53

        1.      The Defective Ignition Switch Vehicles that were
                eventually subject to the June 20, 2014 recall for the
                "ignition key slot defect." ........................................................................54

2. The Defective Ignition Switch Vehicles giving rise to the July 2 and 3 recalls for so-called "unintended ignition rotation" defects. ..................................................................58

3. The Defective Ignition Switch Vehicles which gave rise to the September 4, 2014 recall.......................................................71

D. Safety Defects Of The Airbag Systems Of GM Vehicles....................................72

1. Wiring harness defect. ..............................................................72

2. Front passenger airbag defect. ...................................................74

E. Safety Defects Of The Seat Belt Systems In GM Vehicles. .................................74

1. Seat belt connector cable defect.................................................74

2. Seat belt retractor defect. ..........................................................75

F. Safety Defects Affecting The Brakes In GM Vehicles........................................75

1. Brake light defect. .....................................................................75

2. Reduced brake performance defect.............................................77

G. Safety Defects Affecting The Steering In GM Vehicles. ....................................78

1. Sudden power-steering failure defect. ........................................78

2. Loss of electric power steering assist defect................................79

H. Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac Vehicles.......................................................................79

I. Light Control Module Defect................................................................80

J. Electrical Short In Driver's Door Module Defect...................................80

K. Low-Beam Headlight Defect. ...............................................................80

L. Fuel Pump Module Defect. ...................................................................81

M. Overloaded Feed Defect. .......................................................................81

N. Headlamp Driver Module Failure.........................................................82

O. Valve Cover Gasket Defect. ..................................................................82

V. GM'S PRODUCTION OF DEFECTIVE DELTA IGNITION SWITCH VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES. ...................................................................................82

VI.    GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DELTA IGNITION SWITCH VEHICLES. ...........................................................................................86

VII.   CLASS ALLEGATIONS. ............................................................101

    A.    The Class....................................................................................101

    B.    The Delta Ignition Switch Implied Warranty Subclass. ......................102

    C.    The Delta Ignition Switch Negligence Subclass....................................102

    D.    The Class And The Subclasses Meet The Requirements For Class Certification. ...........................................................................103

VIII.  THE CLASS' AND SUBCLASSES' CLAIMS ..........................................105

    A.    Class Claims................................................................................105

        1.    Fraudulent concealment. ..................................................105

        2.    Unjust enrichment. .........................................................109

        3.    Consumer Protection Claims ............................................110

            a.    Alabama-Violations of Alabama Deceptive Trade Practices Act (ALA. CODE § 8-19-1, *et seq.*) ...............................110

            b.    Alaska-Violations of the Alaska Unfair Trade Practices and Consumer Protection Act (ALASKA STAT. § 45.50.471, *et seq.*)...........................114

            c.    Arizona-Violations of the Consumer Fraud Act (ARIZ. REV. STAT. § 44-1521, *et seq.*) .......................118

            d.    Arkansas-Violations of the Deceptive Trade Practice Act (ARK. CODE § 4-88-101, *et seq.*)...........................120

            e.    California ...............................................................123

                (1)    Violations of the California Consumer Legal Remedies Act (CAL. CIV. CODE § 1750, *et seq.*) ...........................................123

                (2)    Violations of the California Unfair Competition Law ("UCL") (CAL. BUS. & PROF. CODE § 17200, *et seq.*) ...............127

            f.    Colorado-Violations of the Colorado Consumer Protection Act (COL. REV. STAT. § 6-1-101, *et seq.*)...................130

            g.    Connecticut-Violations of Connecticut Unlawful Trade Practices Act (CONN. GEN. STAT. § 42-110a, *et seq.*) ...........................................................133

h.      Delaware-Violations of the Delaware Consumer
        Fraud Act (6 DEL. CODE § 2513, *et seq.*)....................................136

i.      District of Columbia-Violations of the Consumer
        Protection Procedures Act (D.C. CODE § 28-3901,
        *et seq.*) ........................................................................139

j.      Florida-Violations of the Florida Unfair &
        Deceptive Trade Practices Act (FLA. STAT.
        § 501.201, *et seq.*) ........................................................142

k.      Georgia-Violations of Georgia's Fair Business
        Practices Act (GA. CODE § 10-1-390, *et seq.*) ............145

l.      Hawaii-Unfair and Deceptive Acts in violation of
        Hawaii Law (HAW. REV. STAT. § 480, *et seq.*)............148

m.      Idaho-Violations of the Idaho Consumer Protection
        Act (IDAHO CIV. CODE § 48-601, *et seq.*)...................151

n.      Illinois-Violations of Illinois Consumer Fraud and
        Deceptive Business Practices Act (815 ILCS 505/1,
        *et seq.* and 720 ILCS 295/1a).......................................154

o.      Indiana-Violations of the Indiana Deceptive
        Consumer Sales Act (IND. CODE § 24-5-0.5-3,
        *et seq.*) ........................................................................157

p.      Iowa-Violations of the Private Right of Action for
        Consumer Frauds Act (IOWA CODE § 714H.1,
        *et seq.*) ........................................................................160

q.      Kansas-Violations of the Kansas Consumer
        Protection Act (KAN. STAT. § 50-623, *et seq.*) ............163

r.      Kentucky-Violations of the Kentucky Consumer
        Protection Act (KY REV. STAT. § 367.110, *et seq.*)....167

s.      Louisiana-Violations of the Louisiana Unfair Trade
        Practices and Consumer Protection Law
        (LA. REV. STAT. § 51:1401, *et seq.*)...........................169

t.      Maine-Violations of Maine Unfair Trade Practices
        Act (ME. REV. STAT. TIT. 5 § 205-A, *et seq.*)..............173

u.      Maryland-Violations of the Maryland Consumer
        Protection Act (MD. CODE COM. LAW § 13-101,
        *et seq.*) ........................................................................175

v.      Massachusetts-Deceptive acts or practices
        prohibited by Massachusetts law
        (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)...................178

w.      Michigan-Violations of the Michigan Consumer
        Protection Act (MICH. COMP. LAWS § 445.903,
        *et seq.*) .........................................................................................181

x.      Minnesota...............................................................................184

        (1)     Violations of Minnesota Prevention of
                Consumer Fraud Act (MINN. STAT
                § 325F.68, *et seq.*)............................................184

        (2)     Violations of Minnesota Uniform Deceptive
                Trade Practices Act (MINN. STAT.
                § 325D.43-48, *et seq.*)......................................187

y.      Mississippi-Violations of Mississippi Consumer
        Protection Act (MISS. CODE § 75-24-1, *et seq.*) ..........................190

z.      Missouri-Violations of Missouri Merchandising
        Practices Act (MO. REV. STAT. § 407.010, *et seq.*) ...................192

aa.     Montana-Violations of the Montana Consumer
        Protection Act (MONT. CODE § 30-14-101, *et seq.*)....................196

bb.     Nebraska-Violations of the Nebraska Consumer
        Protection Act (NEB. REV. STAT. § 59-1601, *et seq.*).................198

cc.     Nevada-Violations of the Nevada Deceptive Trade
        Practices Act (NEV. REV. STAT. § 598.0903, *et seq.*).................201

dd.     New Hampshire-Violations of N.H. Consumer
        Protection Act (N.H. REV. STAT. § 358-A:1, *et seq.*).................204

ee.     New Jersey-Violations of the New Jersey Consumer
        Fraud Act (N.J. STAT. § 56:8-1, *et seq.*) ......................................207

ff.     New Mexico-Violations of the New Mexico Unfair
        Trade Practices Act (N.M. STAT. §§ 57-12-1,
        *et seq.*) ......................................................................................210

gg.     New York ................................................................................213

        (1)     Violations of the New York General
                Business Law (N.Y. GEN. BUS. LAW §§ 349
                and 350) .........................................................................213

        (2)     Violations of New York's False Advertising
                Act (N.Y. GEN. BUS. LAW § 350)....................................216

hh.     North Carolina-Violations of North Carolina's
        Unfair and Deceptive Practices Act
        (N.C. GEN. STAT. § 75-1.1, *et seq.*) ............................................217

ii.     North Dakota-Violations of the North Dakota
        Consumer Fraud Act (N.D. CENT. CODE § 51-15-
        02, *et seq.*) ................................................................................220

jj.     Ohio-Violations of Ohio Consumer Sales Practices
        Act (OHIO REV. CODE § 1345.01, *et seq.*) ...................................222

kk.     Oklahoma-Violations of the Oklahoma Consumer
        Protection Act (OKLA. STAT. TIT. 15 § 751, *et seq.*)....................227

ll.     Oregon-Violations of the Oregon Unlawful Trade
        Practices Act (OR. REV. STAT. § 646.605, *et seq.*) ......................231

mm.     Pennsylvania-Violations of the Pennsylvania Unfair
        Trade Practices and Consumer Protection Law
        (73 P.S. § 201-1, *et seq.*)..............................................................234

nn.     Rhode Island-Violations of the Rhode Island Unfair
        Trade Practices and Consumer Protection Act
        (R.I. GEN. LAWS § 6-13.1, *et seq.*)...............................................237

oo.     South Carolina ...........................................................................240

        (1)     Violations of the South Carolina Unfair
                Trade Practices Act (S.C. CODE § 39-5-10,
                *et seq.*) ........................................................................240

        (2)     Violations of the South Carolina Regulation
                of Manufacturers, Distributors, and Dealers
                Act (S.C. CODE § 56-15-10, *et seq.*) ................................243

pp.     South Dakota-Violations of the Deceptive Trade
        Practices and Consumer Protection Law
        (S.D. CODIFIED LAWS § 37-24-6, *et seq.*) ....................................244

qq.     Tennessee—Violations of Tennessee Consumer
        Protection Act (TENN. CODE § 47-18-101, *et seq.*)......................247

rr.     Texas-Violations of the Texas Deceptive Trade
        Practices-Consumer Protection Act
        (TEX. BUS. & COM. CODE § 17.41, *et seq.*) .................................250

ss.     Utah-Violations of Utah Consumer Protection Act
        (UTAH CODE § 13-11-1, *et seq.*) ..................................................254

tt.     Vermont-Violations of Vermont Consumer Fraud
        Act (VT. STAT. TIT. 9, § 2451, *et seq.*).........................................257

uu.     Virginia-Violations of Virginia Consumer
        Protection Act (VA. CODE § 59.1-196, *et seq.*)............................260

vv.     Washington-Violations of the Washington
        Consumer Protection Act
        (REV. CODE WASH. § 19.86.010, *et seq.*) ....................................263

ww.     West Virginia-Violations of the Consumer Credit
and Protection Act (W. Va. Code § 46A-1-101,
*et seq.*) ............................................................................265

xx.     Wisconsin-Violations of the Wisconsin Deceptive
Trade Practices Act (Wis. Stat. § 100.18, *et seq.*) ....................270

yy.     Wyoming-Violations of the Wyoming Consumer
Protection Act (Wyo. Stat. § 40-12-105, *et seq.*) ......................272

B.     Subclass Claims. ............................................................................275

1.     Breach of the Implied Warranty of Merchantability................................275

a.     Alaska ............................................................................276

b.     Arkansas..........................................................................277

c.     California ........................................................................278

d.     Colorado..........................................................................280

e.     Delaware ........................................................................281

f.     District of Columbia ........................................................282

g.     Hawaii ............................................................................283

h.     Indiana............................................................................283

i.     Kansas ............................................................................284

j.     Louisiana........................................................................285

k.     Maine ............................................................................286

l.     Maryland ........................................................................287

m.     Massachusetts ................................................................288

n.     Michigan ........................................................................289

o.     Minnesota........................................................................290

p.     Mississippi ....................................................................291

q.     Missouri ........................................................................292

r.     Montana ........................................................................293

s.     Nebraska ........................................................................293

t.     Nevada ............................................................................294

u.      New Hampshire ...................................................................................295

v.      New Jersey...........................................................................................296

w.      New Mexico.........................................................................................297

x.      New York ............................................................................................298

y.      North Carolina ....................................................................................299

z.      North Dakota .......................................................................................300

aa.     Ohio.....................................................................................................300

bb.     Oklahoma ............................................................................................301

cc.     Pennsylvania .......................................................................................302

dd.     Rhode Island .......................................................................................303

ee.     South Carolina ....................................................................................304

ff.     South Dakota.......................................................................................305

gg.     Texas ...................................................................................................306

hh.     Utah.....................................................................................................306

ii.     Virginia ...............................................................................................307

jj.     West Virginia ......................................................................................308

kk.     Wyoming.............................................................................................309

2.      Negligence ..........................................................................................310

## I.    PRELIMINARY STATEMENT

1.      By this Proof of Claim, Claimants, on behalf of a proposed Nationwide Class under B.R. 7023, of owners and lessees of Delta Ignition Switch Vehicles, as defined herein (collectively, the "Class"), assert unliquidated claims against the debtor, Motors Liquidation Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.      More specifically, Claimants allege claims of fraudulent concealment, unjust enrichment and consumer protection violations on behalf of the following proposed Class pursuant to B.R. 7023:

> All persons in the United States who either bought or leased a
> Delta Ignition Switch Vehicle prior to July 10, 2009.

Claimants also allege claims of breach of the implied warranty of merchantability and negligence on behalf of proposed Subclasses of persons who bought or leased a Delta Ignition Switch Vehicle prior to July 10, 2009, and who reside in jurisdictions that recognize such claims as set forth herein.

3.      As defined more specifically herein, "Delta Ignition Switch Vehicles" include each of the following model/years of GM Vehicles ultimately subject to NHTSA Recall No. 14-V-047, provided they were sold or leased prior to July 10, 2009: (i) 2005-2010 Chevrolet Cobalt; (ii) 2006-2010 Chevrolet HHR; (iii) 2007-2010 Pontiac G5; (iv) 2007-2010 Saturn Sky; (v) 2003-2007 Saturn ION; and (vi) 2006-2010 Pontiac Solstice.

4.      All told, there are approximately 1.6 million Delta Ignition Switch Vehicles at issue in this Proof of Claim.

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors LLC, is referred to herein as "New GM."

5.      GM was aware of the defects in the Delta Ignition Switch Vehicles, and the
defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

6.      GM induced Claimants and the Class to purchase and retain the Delta Ignition
Switch Vehicles under false pretenses, and thus deprived Class members of the benefit of their
bargain and saddled them with dangerously defective cars that were worth less than they would
have been in the absence of the defects.  Many Class members also incurred repair costs and
other expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at
Class members' expense.

7.      Claimants therefore file this Proof of Claim on behalf of the Class to recover the
damages caused by GM's conduct under consumer protection statutes, the law of fraudulent
concealment and unjust enrichment, which is essentially the same under the laws of each of the
50 states and the District of Columbia.  Claimants also bring claims for breach of the implied
warranty of merchantability on behalf of a Subclass of persons living in other states where the
law provides a similar claim (the "Implied Warranty Subclass.")  Finally, Claimants bring a
claim for negligence on behalf of residents of states where the law provides for such a claim (the
"Negligence Subclass.")

## II.     CLAIMANTS

### A.     Patricia Barker—California

8.      Patricia Barker, a resident of Wilmington, California, purchased a new 2005
Saturn Ion in Torrance, California in March 2005, and she still owns it today.  She chose this
vehicle because she had an excellent experience with her first Saturn and because safety and
reliability were important factors to her.  She recalls the GM dealership had several awards
pertaining to the safety and reliability of GM vehicles displayed prominently in the waiting
room.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously

defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Barker did not learn about the Delta Ignition Switch Defect until 2014.

**B.      Marion Smoke—Alabama**

9.      Marion Smoke, a resident of Elmore, Alabama, purchased a new 2005 Chevrolet Cobalt in Montgomery, Alabama in May 2005, and she still owns it today. She chose this vehicle, in part, because the vehicle's safety and reliability were important to her. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Smoke did not learn about the Delta Ignition Switch Defect until 2014.

**C.      Camille Burns—Arkansas**

10.      Camille Burns, a resident of Pine Bluff, Arkansas, purchased a used 2006 Chevrolet Cobalt in White Hall, Arkansas on November 1, 2006. She chose this vehicle, in part, because the vehicle's safety and reliability were important to her. She saw GM television advertisements touting the safety and reliability of GM vehicles. The GM sales representative at the dealership also told Ms. Burns about the Cobalt's safety and reliability and gas savings before her purchase. She relied on these representations in buying the car. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Burns did not learn about the Delta Ignition Switch Defect until 2014. Ms. Burns traded in her vehicle on July 14, 2014.

D.    **Grace Belford—Arizona**

11.    Grace Belford, a resident of Phoenix, Arizona, purchased a new 2005 Chevrolet Cobalt in Phoenix, Arizona in October 2005.  She chose this vehicle, in part, because the vehicle's safety and reliability were important to her.  Ms. Belford recalls the GM sales representative at the dealership telling her the car was reliable.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Belford did not learn about the Delta Ignition Switch Defect until 2014. Ms. Belford traded in her vehicle in August 2015.

E.    **Ray Wieters—Arizona**

12.    Ray Wieters, a resident of Glendale, Arizona, purchased a new 2008 Chevrolet Cobalt in Glendale, Arizona on July 13, 2008, and he still owns it today.  He chose this vehicle, in part, based on its posted safety ratings and the GM sales representative's comments highlighting the vehicle's full airbags and positive crash test ratings.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Wieters did not learn about the Delta Ignition Switch Defect until 2014.

F.    **Michael and Sylvia Benton—California**

13.    Michael and Sylvia Benton, residents of Barstow, California, purchased a used 2005 Chevrolet Cobalt in Barstow, California on January 10, 2009, and they still own it today. They chose the Cobalt because the sales representative at the dealership recommended it as a very good car that was safe, reliable, and a gas saver.  The vehicle's safety was important to the couple because they planned to give the car to their daughter to drive while she was in high school.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  The Bentons did not learn about the Delta Ignition Switch Defect until 2014.

## G.    Crystal Hardin—California

14.    Crystal Hardin, a resident of Cupertino, California, purchased a new 2005 Chevrolet Cobalt in Stockton, California on May 17, 2005.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Hardin did not learn about the Delta Ignition Switch Defect until 2014.  Ms. Hardin sold her vehicle in December 2016.

## H.    Esperanza Ramirez—California

15.    Esperanza Ramirez, a resident of Los Angeles, California, purchased a new 2007 Saturn Ion in Torrance, California on March 13, 2007, and she still owns it today.  The vehicle's safety and reliability were very important to her because she is a single parent to two children.  Ms. Ramirez purchased the Ion because she had previously owned a Saturn and was satisfied with it.  She also saw television commercials about the Saturn, some of which depicted families driving the car, and this signified the brand's safety and trustworthiness to her.  When Ms. Ramirez purchased her car, the sales people at Saturn of Torrance assured her that she would be satisfied with her vehicle.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Ramirez did not learn about the Delta Ignition Switch Defect until 2014.

I.    **Annet Tivin—Colorado**

16.    Annet Tivin, a resident of Margate, Florida, purchased a new 2008 Chevrolet Cobalt in Broomfield, Colorado on July 28, 2008. She chose this vehicle, in part, because its safety and reliability were important to her. The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Tivin did not learn about the Delta Ignition Switch Defect until 2014. Ms. Tivin's vehicle was totaled in August 2009.

J.    **Michael Pesce—Connecticut**

17.    Michael Pesce, a resident of Waterbury, Connecticut, purchased a used 2006 Chevrolet Cobalt in Waterbury, Connecticut on May 29, 2008. He chose the Cobalt in part because of the vehicle's safety and reliability. Mr. Pesce remembers seeing television and print ads from Chevrolet stating that the Cobalt was one of the safest and most reliable cars on the market. The dealership, Loehman's Chevrolet, also had an ad regarding the safety and reliability of the Cobalt. The Pesces had previously purchased a Cavalier and a Malibu from Loehman's Chevrolet and they believed GM was a good, reputable brand. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Mr. Pesce did not learn about the Delta Ignition Switch Defect until 2014. Mr. Pesce sold the vehicle in April 2018.

K.    **Lisa Teicher—Connecticut**

18.    Lisa Teicher, a resident of Manchester, Connecticut, purchased a used 2005 Chevrolet Cobalt in Hartford, Connecticut on January 24, 2008. She chose this vehicle, in part, because the vehicle's safety and reliability were important to her. The ignition switch that GM

used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone

to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable

airbag.  Ms. Teicher did not learn about the Delta Ignition Switch Defect until 2014.  Ms.

Teicher's vehicle was totaled in a collision on September 29, 2015.

**L.**     **Maria E. Santiago—Florida**

19.     Maria Santiago, a resident of Cutler Bay, Florida, purchased a new 2007 Saturn

Ion coupe in Miami, Florida in late 2006.  The ignition switch that GM used in the Ion (the Delta

Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling,

the loss of power steering and power brakes, and an inoperable airbag.  Ms. Santiago did not

learn about the Delta Ignition Switch Defect until 2014.  The vehicle was totaled in a collision on

July 3, 2015.

**M.**     **Neysa Williams—Florida**

20.     Neysa Williams, a resident of Miami, Florida, purchased a used 2007 Chevrolet

Cobalt in Miami, Florida on March 23, 2009, and she still owns it today.  Safety and reliability

were important to her when she purchased this vehicle.  The ignition switch that GM used in the

Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden

unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms.

Williams did not learn about the Delta Ignition Switch Defect until 2014.

**N.**     **Jennifer Dunn—Georgia**

21.     Jennifer Dunn, a resident of Cleveland, Georgia, purchased a new 2006 Chevrolet

Cobalt in Gainesville, Georgia in 2006, and she still owns it today.  Ms. Dunn specifically asked

the GM sales representative for the most dependable, safest, and most affordable car on the lot.

He introduced her to the Cobalt and told her it had the highest safety rating.  The ignition switch

that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the

car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Dunn did not learn about the Delta Ignition Switch Defect until 2014.

**O.    Dennis Walther—Hawaii**

22.    Dennis Walther, a resident of Honolulu, Hawaii, purchased a new 2006 Saturn Ion in Honolulu in 2006.  Mr. Walther purchased the Saturn Ion because he trusted GM's reputation for the safety and reliability of its vehicles.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Walther did not learn about the Delta Ignition Switch Defect until 2014.  Mr. Walther sold his vehicle in June 2017.

**P.    Heather Holleman—Indiana**

23.    Heather Holleman, a resident of South Bend, Indiana, purchased a new 2007 Pontiac G5 in South Bend in May 2007.  She chose the Pontiac G5, in part, because of its safety features like the side airbags, and its reliability.  Ms. Holleman recalls the sales representative stressing the safety features of the vehicle before her purchase because Ms. Holleman was concerned about the vehicle's size.  The ignition switch that GM used in the G5 (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Holleman did not learn about the Delta Ignition Switch Defect until 2014.  She sold her vehicle around November 2014.

**Q.    James Dooley—Iowa**

24.    James Dooley, a resident of Waterloo, Iowa, purchased a new 2006 Pontiac Solstice in Cedar Falls, Iowa, in June 2006, and he still owns it today.  He chose the car because he believed that GM made reliable, safe cars.  The ignition switch that GM used in the Solstice

(the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Dooley did not learn about the Delta Ignition Switch Defect until 2014.

**R.**    **Philip Zivnuska, D.D.S.—Kansas**

25.    Philip Zivnuska, D.D.S., a resident of Valley Center, Kansas, purchased a new 2006 Chevrolet Cobalt in Newton, Kansas in 2006.  He had seen websites featuring and/or discussing the car, and the promise of good handling was important to him.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Dr. Zivnuska did not learn about the Delta Ignition Switch Defect until 2014. Dr. Zivnuska's vehicle was totaled in an accident in 2010.

**S.**    **Robert Wyman—Maryland**

26.    Robert Wyman, a resident and citizen of Baltimore, Maryland, purchased a new 2007 Saturn Sky in Owings Mills, Maryland in 2007.  He believed GM cars were reliable and safe.  He saw some of the safety features in an advertisement on television and the GM sales representative told him that the Sky was a reliable car.  The ignition switch that GM used in the Sky (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Wyman did not learn about the Delta Ignition Switch Defect until 2014.  Mr. Wyman traded in the vehicle in 2015.

**T.**    **Colin Elliott—Massachusetts**

27.    Colin Elliott, a resident of Buzzards Bay, Massachusetts, purchased a new 2008 Saturn Sky in Hyannis, Massachusetts in July 2007.  He owned several Saturn vehicles before this one and—up until the Delta Ignition Switch recall—he believed these cars were safe and

reliable.  The ignition switch that GM used in the Sky (the Delta Ignition Switch) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power

steering and power brakes, and an inoperable airbag.  Mr. Elliott did not learn about the Delta

Ignition Switch Defect until 2014.  Mr. Elliott sold the vehicle in April 2016.

**U.    Diana Cnossen—Michigan**

28.    Diana Cnossen, a resident of Grand Rapids, Michigan, purchased a new 2007

Saturn Ion in Michigan on November 27, 2006, and she still owns it today.  The ignition switch

that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car

prone to sudden unintended stalling, the loss of power steering and power brakes, and an

inoperable airbag.  Ms. Cnossen did not learn about the Delta Ignition Switch Defect until 2014.

**V.    Jacqueline Smith—Michigan**

29.    Jacqueline Smith, a resident of Detroit, Michigan, purchased a new 2007 Saturn

Ion in Southfield, Michigan on June 30, 2007, and she still owns it today.  She purchased the

vehicle because reliability and safety were important to her and she had heard from friends that

the Ion was a good vehicle.  The ignition switch that GM used in the Ion (the Delta Ignition

Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss

of power steering and power brakes, and an inoperable airbag.  Ms. Smith did not learn about the

Delta Ignition Switch Defect until 2014.

**W.    David Cleland—Minnesota**

30.    David Cleland, a resident of Northfield, Minnesota, purchased a used 2004 Saturn

Ion in Northfield, Minnesota, in 2005.  He chose this vehicle, in part, because the vehicle's

safety and reliability were important to him.  The ignition switch that GM used in the Ion (the

Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended

stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Cleland did

not learn about the Delta Ignition Switch Defect until 2014.  Mr. Cleland sold the vehicle for
scrap in 2014 after it was involved in an accident.

## X.    Frances Howard—Mississippi

31.    Frances Howard, a resident of Jackson, Mississippi, leased and then purchased a
new 2006 Saturn Ion in Jackson in April 2006, and she still owns it today.  She chose this
vehicle, in part, because the vehicle's safety and reliability were important to her.  She recalls
seeing Saturn television commercials touting the brand's reliability.  The ignition switch that GM
used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to
sudden unintended stalling, the loss of power steering and power brakes, and an inoperable
airbag.  Ms. Howard did not learn about the Delta Ignition Switch Defect until 2014.

## Y.    Kenneth Robinson—Missouri

32.    Kenneth Robinson, a resident of Urich, Missouri, purchased a new 2008 Pontiac
G5 in Missouri on September 7, 2008.  He chose this vehicle, in part, because the vehicle's
safety and reliability were important to him.  He remembers the sales representative talking
about the vehicle's safety.  The ignition switch that GM used in the G5 (the Delta Ignition
Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss
of power steering and power brakes, and an inoperable airbag.  Mr. Robinson traded in the car in
2013.  Mr. Robinson did not learn about the Delta Ignition Switch Defect until 2014.

## Z.    Patrice Witherspoon—Missouri

33.    Patrice Witherspoon, a resident of Lee's Summit, Missouri, purchased a new 2006
Saturn Ion in Blue Springs, Missouri in 2005, and she still owns it today.  She chose this vehicle,
in part, because its safety and reliability were important to her, as she would be transporting
herself and her minor daughter.  She remembers seeing Saturn television advertisements stating
that Saturn vehicles were safe.  The Saturn sales representative also assured her that the car was

safe after she told him she must have a car with dual airbags in the front seats.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Witherspoon did not learn about the Delta Ignition Switch Defect until 2014.

## AA.    Laurie Holzwarth—Montana

34.     Laurie Holzwarth, a resident of Billings, Montana, purchased a used 2005 Chevrolet Cobalt in Billings, Montana in 2008.  Ms. Holzwarth purchased this vehicle for her daughter to drive because safety and reliability were important to her.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Holzwarth did not learn about the Delta Ignition Switch Defect until 2014.  Ms. Holzwarth sold her vehicle in September 2017.

## BB.    Wayne Wittenberg—Nevada

35.     Wayne Wittenberg, a resident of Las Vegas, Nevada, purchased a new 2006 Chevrolet HHR in Las Vegas in September 2005.  He chose this vehicle, in part, because the vehicle's safety and reliability were important to him.  He recalls seeing television ads about the safety features of the HHR.  The ignition switch that GM used in the HHR (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Wittenberg traded in the vehicle in September 2012.  Mr. Wittenberg did not learn about the Delta Ignition Switch Defect until 2014.

### CC.    Michael Amezquita—New Jersey

36.    Michael Amezquita, a resident of Hamilton, New Jersey, purchased a new 2006 Chevrolet Cobalt in Hightstown, New Jersey on June 30, 2006, and he still owns it today. He chose to purchase a GM vehicle because safety and reliability were both important to him and his family. He truly believed that he was buying a safe car. He also remembers the sales representative saying that GM was a very reliable brand. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Mr. Amezquita did not learn about the Delta Ignition Switch Defect until 2014.

### DD.    Lorraine De Vargas—New Mexico

37.    Lorraine De Vargas, a resident of Rio Rancho, New Mexico, purchased a used 2005 Saturn Ion in Santa Fe, New Mexico in October 2007. She chose this vehicle, in part, because the vehicle's safety and reliability were important to her. The ignition switch that GM used in the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. De Vargas did not learn about the Delta Ignition Switch Defect until 2014. She sold the vehicle to a junk yard in 2017.

### EE.    Bernadette Romero—New Mexico

38.    Bernadette Romero, a resident of Santa Fe, New Mexico, purchased a new 2007 Chevrolet Cobalt in Albuquerque, New Mexico on July 3, 2007. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Romero did not learn about the Delta Ignition Switch Defect until 2014. Ms. Romero traded in her vehicle on June 20, 2014.

**FF.    Sandra Levine—New York**

39.    Sandra Levine, a resident of Babylon, New York, purchased a used 2005 Chevrolet Cobalt in Babylon, New York on May 27, 2006, and she still owns it today.  Ms. Levine purchased her Cobalt because she believed it would be a safe and reliable vehicle.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Levine did not learn about the Delta Ignition Switch Defect until 2014.

**GG.    Michael Rooney—New York**

40.    Michael Rooney, a resident of Ronkonkoma, New York, purchased a used 2005 Chevrolet Cobalt in Port Jefferson Station, New York on September 13, 2007, and she still owns it today.  She chose this vehicle because safety and reliability were important to her.  She recalls seeing advertisements for the Cobalt in Newsday and in the New York Daily News touting the vehicle's safety and reliability, and she sought out the vehicle because of these advertisements.  Ms. Rooney also recalls asking the sales representative about whether the Cobalt was safe, and he told her the vehicle had a good safety rating.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Rooney did not learn about the Delta Ignition Switch Defect until 2014.

**HH.    Bonnie Taylor—Ohio**

41.    Bonnie Taylor, a resident of Laura, Ohio, purchased a new 2007 Chevrolet Cobalt in Troy, Ohio on December 23, 2006, and she still owns it today.  She chose the Cobalt, in part, because the vehicle's safety and reliability were important to her.  The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone

to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Taylor did not learn about the Delta Ignition Switch Defect until 2014.

## II.     Paulette Hand—Oklahoma

42.     Paulette Hand, a resident of Blanchard, Oklahoma, purchased a new 2006 Chevrolet HHR in Hennessy, Oklahoma in 2006, and she still owns it today. She purchased the vehicle, in part, because of the vehicle's reputation for safety and reliability. Indeed, several members of Ms. Hand's family worked for GM, and she was repeatedly told that GM vehicles were safe and reliable. The sales representative that sold Ms. Hand her HHR specifically told her that the vehicle was known for its safety. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Hand did not learn about the Delta Ignition Switch Defect until 2014.

## JJ.     William Bernick—Oregon

43.     William Bernick, a resident of Grants Pass, Oregon, purchased a used 2005 Chevrolet Cobalt in Oregon on December 29, 2006, and he still owns it today. He purchased the Cobalt, in part, because of family health issues necessitated trips to medical appointments (and underscored the need for a safe and reliable car). Indeed, Mr.Bernick believed the vehicle was safe and reliable when he bought it. The ignition switch that GM used in the Cobalt (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Mr. Bernick did not learn about the Delta Ignition Switch Defect until 2014.

## KK.   George Mathis—Pennsylvania

44.     George Mathis, a resident of Dundalk, Maryland, purchased a new 2007 Chevrolet Cobalt in York, Pennsylvania on April 1, 2007. He chose this vehicle, in part, because

the vehicle's safety and reliability were important to him.  Mr. Mathis recalls the sales

representative saying the Cobalt was the replacement for the Chevy Cavalier but was much more

reliable and had additional safety features.  The ignition switch that GM used in the Cobalt (the

Delta Ignition Switch) was dangerously defective, and left the car prone to sudden unintended

stalling, the loss of power steering and power brakes, and an inoperable airbag.  Mr. Mathis did

not learn about the Delta Ignition Switch Defect until 2014.  Mr. Mathis traded in the vehicle in

September 2015.

**LL.    Mary Dias—Rhode Island**

45.    Mary Dias, a resident of Taunton, Massachusetts, purchased a used 2007

Chevrolet HHR in Woonsocket, Rhode Island on February 28, 2008, and she still owns it today.

She chose this vehicle, in part, because safety and reliability were important to her.  She recalls

her husband looked up the vehicle and saw that it had a five-star rating.  The ignition switch that

GM used in the HHR (the Delta Ignition Switch) was dangerously defective, and left the car

prone to sudden unintended stalling, the loss of power steering and power brakes, and an

inoperable airbag.  Ms. Dias did not learn about the Delta Ignition Switch Defect until 2014.

**MM.    Catherine Senkle—South Dakota**

46.    Catherine Senkle, a resident of Sioux Falls, South Dakota, purchased a new 2007

Saturn Ion in Sioux Falls, South Dakota on March 14, 2006, and she still owns it today.  Safety

was a huge factor in Ms. Senkle's decision to purchase that car.  She wanted a car that had

exceptional safety features without a huge price tag.  The ignition switch that GM used in the Ion

(the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden

unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms.

Senkle did not learn about the Delta Ignition Switch Defect until 2014.

**NN.    Shenyesa Henry—Texas**

47.    Shenyesa Henry, a resident of Aubrey, Texas, purchased a new 2004 Saturn Ion in

Plano, Texas in 2003.  She chose this vehicle, in part, because safety and reliability were

important to her.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power

steering and power brakes, and an inoperable airbag.  Ms. Henry did not learn about the Delta

Ignition Switch Defect until 2014.  Ms. Henry donated her vehicle in 2016.

**OO.    Lisa Simmons—Texas**

48.    Lisa Simmons, a resident of Amarillo, Texas, purchased a new 2007 Saturn Ion in

Amarillo, Texas in 2007, and she still owns it today.  She purchased the Ion because she believed

that it was a safe and reliable vehicle.  Indeed, at the time of purchase, the sales representative

told Ms. Simmons that the vehicle was safe and reliable.  The ignition switch that GM used in

the Ion (the Delta Ignition Switch) was dangerously defective, and left the car prone to sudden

unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms.

Simmons did not learn about the Delta Ignition Switch Defect until 2014.

**PP.    Blair Tomlinson, D.D.S.—Utah**

49.    Blair Tomlinson, D.D.S., a resident of Kaysville, Utah, purchased a new 2005

Chevrolet Cobalt in Bountiful, Utah in August 2005.  Safety was an important factor to him in

choosing this vehicle.  The ignition switch that GM used in the Cobalt (the Delta Ignition

Switch) was dangerously defective, and left the car prone to sudden unintended stalling, the loss

of power steering and power brakes, and an inoperable airbag.  Dr. Tomlinson did not learn

about the Delta Ignition Switch Defect until 2014.  Dr. Tomlinson's vehicle was totaled in an

accident in January 2018.

**QQ.    Stephanie Renee Carden—West Virginia**

50.    Stephanie Renee Carden, a resident of Huntington, West Virginia, purchased a

new 2004 Saturn Ion 2 in Hurricane, West Virginia on July 22, 2004.  Safety and reliability were

important to Ms. Carden when she purchased her Ion, and GM's advertising regarding its

vehicles' safety and reliability was one of the reasons Ms. Carden purchased the Ion.  In addition

to the national advertising campaigns concerning the safety of GM cars, at the time of purchase a

GM sales representative told Ms. Carden about a previous Ion owner who was involved in a

major crash that would have resulted in the driver's death had it not been for the Ion's safety

features.  The ignition switch that GM used in the Ion (the Delta Ignition Switch) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power

steering and power brakes, and an inoperable airbag.  Ms. Carden did not learn about the Delta

Ignition Switch Defect until 2014.  She sold the car in 2016.

.

## III.    THE DELTA IGNITION SWITCH DEFECT

51.    Approximately 1.6 million vehicles manufactured and sold by GM contained a

defective ignition switch and cylinder. The ignition switch in these vehicles, the Delta Ignition

Switch Vehicles, is prone to fail during ordinary and foreseeable driving situations.

52.    In each of the Delta Ignition Switch Vehicles, GM installed the same defective

ignition switch in an unreasonable position on the steering cylinder that can cause the vehicle to

stall, disable the power steering and power brakes, and disable the airbag system in normal and

foreseeable driving circumstances.

53.    More specifically, the ignition switches can inadvertently move from the "run" to

the "accessory" or "off" position at any time during normal and proper operation of the Delta

Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle is jarred or

travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the

ignition key with his or her knee; or for a host of additional reasons. When the ignition switch

inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses

engine power, power steering, and power brakes, and certain safety features are disabled,

including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and

death.

54.     The Delta Ignition Switch system is defective in at least three major respects.

First, the switches are simply weak and consequently can inadvertently move from the "run" to

the "accessory" or "off" position.  Second, because the ignition switches are placed low on the

steering column, the driver's knee can easily bump the key (or the hanging fob below the key)

and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position.

Third, when the ignition switches move from the "run" to the "accessory" or "off" position, the

vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost

during ordinary operation of the vehicle, a driver is left without the protection of the airbag

system even if he or she is traveling at high speeds. GM was aware of safer alternative designs

that would have prevented the non-deployment of airbags caused by the Delta Ignition Switch

Defects, but chose not to employ them, in part to avoid disclosure of the Delta Ignition Switch

Defect and its tragic consequences.

55.     Vehicles with the Delta Ignition Switch Defect are therefore unreasonably prone

to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily

harm or death to the drivers and passengers of the vehicles.

56.     For the purposes of this Proof of Claim, the Delta Ignition Switch Vehicles

include the following vehicles, provided that they were sold or leased prior to July 10, 2009:

| DELTA IGNTION SWITCH VEHICLES |
| :--- |
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

57.     Alarmingly, GM knew of the Delta Ignition Switch Defect and its tragic

consequences for many years, but concealed its knowledge from consumers and regulators.  As

the Bankruptcy Court found, "at least 24 … GM personnel…, including engineers, senior

managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior

to the Sale Motion, as early as 2003."  *In re Motors Liquidation Co*., 529 B.R. 510, 538 (Bankr.

S.D.N.Y. 2015).  On appeal, the Second Circuit Court of Appeals affirmed this finding.  *Elliot v.*

*General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 161 (2d Cir. 2016).

58.     GM chose not to disclose and remedy the Delta Ignition Switch Defect as it was

legally obligated to do under the Safety Act, state consumer protection laws, and the law of

fraudulent concealment, unjust enrichment, implied warranty and negligence, among other laws.

59.     Instead, GM concealed the defects from the early 2000's through the end of its

corporate existence—and continued to tout the safety and reliability of its vehicles—including

the Delta Ignition Switch Vehicles.

**A.      Before It Sold Any Of The Delta Ignition Switch Vehicles, GM Knew The Ignition
      Switch Design Was Defective, But Approved The Substandard Switches Anyway,
      And Concealed These Material Facts From The Class.**

60.     Well before the first Delta Ignition Switch Vehicles eventually subject to Recall

No. 14-V-047 were sold, GM knew the ignition switches were defective.  In the late 1990's and

early 2000's, GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for

the ignition switch for the Saturn Ion—the first of the Delta Ignition Switch Vehicles eventually

subject to Recall No. 14-V-047, introduced in model year 2003. Eaton Corporation sold its

Vehicle Switch/Electronic Division to Delphi Automotive Systems ("Delphi") on March 31,

2001. Delphi went on to manufacture the defective ignition switch for GM.

61.    In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers

learned that the vehicle's ignition switch could unintentionally move from the "run" to the

"accessory" or "off" position. GM also knew that when the ignition switch moved from "run" to

"accessory" or "off," the vehicle's engine would stall and/or lose power. GM engineers

identified two "causes of failure," namely, "[l]ow contact force and low detent plunger force."

The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating

from one setting to another unless the driver turns the key.

62.    The GM Design Release Engineer assigned to the Delta Ignition Switch, Ray

DeGiorgio, noticed problems with the prototype switches provided by Delphi during early

testing of the switch. In correspondence in September 2001, DeGiorgio stated that 10 of 12

prototype switches from Delphi failed to meet engineering requirements, and the "failure is

significant." DeGiorgio noted that GM "must ensure this new design meets engineering

requirements."

63.    But GM did not correct this significant failure. Instead, DeGiorgio approved the

use of ignition switches that he knew did not meet GM's required specifications.

64.    In fact, validation testing conducted by Delphi in late 2001 showed that the Delta

Ignition Switch consistently failed to meet the torque values in GM's required specifications.

These tests included a test to determine whether the torque required to rotate the switch from

"run" to "accessory" complied with the specification.  The January 2002 test report denoted the design failure by stating "Not OK" next to each result.

65.    In February 2002, Delphi asked GM to approve production for the substandard Delta Ignition Switch and submitted a Production Part Approval Process ("PPAP") request. Even though testing of the ignition switch revealed that it did not meet the original specifications set by GM and that the switch would fail, GM approved it anyway.  The defective ignition switch was then used in the Delta Ignition Switch Vehicles, unbeknownst to Claimants and the Class.

**B.     GM Received Many Complaints And Reports Of Vehicles Stalling Due To The Delta Ignition Switch Defect, And Concealed That Material Information From The Class.**

66.    In 2003, almost immediately after it sold the first of the Delta Ignition Switch Vehicles that eventually led to Recall No. 14-V-047, the 2003 Saturn Ion, GM began receiving complaints of vehicles stalling while driving due to the Delta Ignition Switch Defect.

67.    In 2003, an internal report documented an instance in which the service technician observed a stall while driving.  The service technician stated that the weight of several keys on the key ring had worn out the ignition switch.  GM replaced the switch and closed the matter.

68.    GM employees were also having problems with their own model year 2003 and 2004 Ions that used the Delta Ignition Switch.  A January 9, 2004 report from GM employee Gerald A. Young concerning his 2003 Ion informed GM that "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee.  The switch should be raised at least one inch toward the wiper stalk."  The report characterized the problem as "a basic design flaw [that] should be corrected if we want repeat sales."

69.    In a February 19, 2004 report concerning his 2004 Saturn Ion, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my

knee would rest (I am 6'3" tall, not many places to put my knee).  On several occasions, I inadvertently turn[ed] the ignition key off with my knee while *driving down the road.*  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

70.     In an April 15, 2004 report concerning his 2004 Saturn Ion, GM employee Raymond P. Smith reported experiencing an inadvertent shut-off:  "I thought that my knee had inadvertently turned the key to the off position."

71.     On July 4, 2004, a vehicle occupant died after her 2004 Saturn Ion (which contained the Delta Ignition Switch) left the road at a high speed and struck a utility pole head on.  The airbag did not deploy.  GM was aware of this incident.

72.     GM concealed these and other similar manifestations of the Delta Ignition Switch Defect.

**C.     By 2004, GM Engineers Understood The Need To Correct The Delta Ignition Switch Defect But Failed To Act To Disclose Or Correct The Defect.**

73.     By 2004, GM knew that the Delta Ignition Switch Defect posed a safety concern, and that remedial action was necessary.  For example, in October 2004, GM internally documented incidents in which GM engineers verified that the ignition switch inadvertently turned out of the "run" position.  The cause of the problem was found to be "low key cylinder torque/effort."

74.     In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt.  GM installed the same Delta Ignition Switch in the 2005 Cobalt as it did in the Saturn Ion. As the Cobalt moved into production, it too—like its Saturn Ion predecessor—sustained inadvertent ignition switch shut-offs that resulted in moving stalls.  Instead of implementing a solution to this

safety problem, GM engineers and higher-ups debated partial solutions, short-term fixes, and cost.

75.    GM engineers independently encountered the Delta Ignition Switch Defect in early test drives of the Cobalt, before it went to market.  The GM engineers pinpointed the problem of engine shut-off in the Cobalt and were "able to replicate this phenomenon during test drives."  Despite this knowledge, GM told no one.

76.    According to GM, its engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  But after considering the cost and amount of time it would take to develop a fix, GM did not implement a fix, and the vehicles went to market with the Delta Ignition Switch Defect.

77.    During testing of the Cobalt, GM Program Engineering Manager Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

78.    Around the time of the Cobalt launch, more reports surfaced of moving stalls caused by a driver bumping the key fob or chain with his knee.  At a 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain. GM's Doug Parks asked Gary Altman, the GM Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.

79.    DeGiorgio learned about the Cobalt press event discussion of the moving stall issue and was approached by a GM engineer who suggested that DeGiorgio should "beef up" the ignition switch and increase the torque.  He did not do so.

80.     As soon as the Chevrolet Cobalt hit the market in late 2004, GM immediately started getting similar complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."  GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch … [and a] low position of the lock module [on] the [steering] column."

81.     On November 22, 2004, engineers in GM's High Performance Vehicle Operations group wrote  DeGiorgio and informed him that their group had repeatedly experienced moving stalls during a track test of the Cobalt SS (the high-performance version of the Cobalt) when the driver's knee "slightly graze[d]" the key fob.  A GM engineer forwarded this complaint to DeGiorgio, and explicitly asked DeGiorgio whether there was "a specification on the force/torque required to keep that switch in the RUN position."  He also asked DeGiorgio: "If so, is the switch meeting that spec? If not, what are the options for implementing a stronger spring?"  Once again, DeGiorgio did not act, and neither did GM.

82.     When driving the Cobalt, GM employees, customers, and members of the automotive press found repeatedly that they would hit the key fob or keychain with their knee, and the car would turn off.  As noted, GM received some of these reports before the Cobalt's launch, and others afterwards.  Despite the many complaints describing the moving stalls and customers' safety concerns, GM covered up the fact of the defect and made safety assurances to

the driving public, its customers, and the Class, upon which they reasonably relied. GM received

reports from dealers documenting this problem and advised dealers to tell customers to modify

their key chains.

83.    On February 28, 2005, GM issued a bulletin to its dealers regarding engine-

stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac

G5).

84.    In the February 28, 2005 bulletin, GM provided the following recommendations

and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the
> ignition due to low key ignition cylinder torque/effort.  The
> concern is more likely to occur if the driver is short and has a large
> heavy key chain.
>
> In the cases in which this condition was documented, the driver's
> knee would contact the key chain while the vehicle was turning.
> The steering column was adjusted all the way down.  This is more
> likely to happen to a person that is short as they will have the seat
> positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to
> determine if this may be the cause.  The customer should be
> advised of this potential and to take steps, such as removing
> unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each
> step.  If the condition exhibited is resolved without completing
> every step, the remaining steps do not need to be performed.

85.    This bulletin was issued by GM as an effort to assuage disgruntled Delta Ignition

Switch Vehicle owners who actually complained to GM Dealers, and further GM's fraudulent

scheme to conceal the Delta Ignition Switch Defect from, regulators, and consumers – including

the Class.

**D.    GM Closes Its First Internal Investigation Of The Delta Ignition Switch Defect, Deciding To Take No Action Because Of Cost.**

86.    Despite the serious safety issues posed by the Delta Ignition Switch Defect, GM took no action to correct the defect and instead covered it up.

87.    On November 19, 2004, GM opened an engineering inquiry known as a Problem Resolution Tracking System ("PRTS") to evaluate a number of potential solutions to address the Delta Ignition Switch Defect in the Chevrolet Cobalt.  At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("CPIT").  The CPIT that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman, Chief Cobalt Engineer Doug Parks, and Lori Queen, Vehicle Line Executive on the case.

88.    In early 2005, and as part of the PRTS, Parks sent an email with the subject, "Inadvertent Ign turn-off."  In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot?  This appears to me to be the only real, quick solution."

89.    After considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing.  Indeed, by March 2005, the GM Cobalt Program Engineering Manager ("PEM") issued a "directive" to close the 2004 PRTS "with no action."[2]  According to GM's internal documents, the design change was refused because of time, i.e., because the "lead-time for all solutions is too long," and money, i.e., because the "tooling cost and piece price are too high…."[3]

---

[2] GMHEC000001735 (Nov. 19, 2004).

[3] GMHEC000001735.

90.     The 2004 PRTS was closed because "none of the solutions represents an acceptable business case"—a standard phrase used by GM personnel for closing a PRTS without action because of cost.[4]  In deciding to do nothing to correct the serious safety defect that existed in its vehicles, GM simply shrugged off the issue entirely.  What is more, GM downplayed the severity of the safety threat, rating the specter of a moving stall (even at highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe).  GM did not explain what, if any, criteria existed for an "acceptable business case" or otherwise justify its decision to do nothing.   David Trush, the DRE for the ignition cylinder, explained that to present an "acceptable business case," a solution should solve the issue, be cost effective, and have an acceptable lead time to implement the change. [5]  But one of the very solutions proposed by Trush—changing the key from a slot to a hole configuration—would have cost less than one dollar per vehicle.

91.     Here, as elsewhere in the story of the Delta Ignition Switch Defect, the corporate culture within GM was one in which no one was held responsible and no one took responsibility.[6]

**E.     Complaints Continued And Serious Accidents Came To GM's Attention In 2005.**

92.     After the Cobalt program team closed the November 19, 2004, PRTS with no action taken, additional complaints of Cobalt stalls and inadvertent ignition switch shut-offs continued to come into GM's Brand Quality Group.[7]

---

[4] GMNA PRTS+ Closure Codes (Close w/out Action) (Effective Dec. 2007) [DOC ID GMCB-000000977300]. Valukas Report at 69, fn. 271.

[5] Valukas Report at 69.

[6] Valukas Report at 71.

[7] Valukas Report at 75.

93.     In March 2005, Jack Weber, a GM engineer, reported that during "heel-toe downshifting" in a Cobalt SS with a manual transmission (a high-performance Cobalt model), his knee contacted the key fob and key ring, which caused "pulling on the key to move it to the 'Off' position."[8]

94.     In May 2005, a customer demanded that GM repurchase his Cobalt. The complaint was that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and the key chain or fob.[9] GM Brand Quality Manager Steven Oakley forwarded this information internally at GM, stating that the ignition switch "goes to the off position too easily shutting the car off."[10] DeGiorgio was one of the GM personnel who received this email chain, which effectively stated that the customer's car, as well as others at the dealership, had ignition switches with insufficient torque and cause the car to shut off while driving.[11] This email chain specifically included a request for an ignition switch "at the high end of the tolerance spec."[12]

95.     By May 2005, GM personnel thus had multiple reports of moving stalls and were receiving buyback requests for Cobalts following complaints that consumers made to dealers.[13]

96.     The problem of moving stalls and the ignition switch turning off in Delta Ignition Switch Vehicles continued throughout 2005, and was discussed within GM and in the media. In

---

[8] Email from Jonathan L. Weber, GM, to Rajiv Mehta, GM, et al. (March 9, 2005), at 22 (attached to FPR0793/2005/US) [DOC ID GMHEC000019677]. Valukas Report at 76, fn. 303.

[9] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, fn. 308.

[10] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, fn. 309.

[11] Email from Joseph Joshua, GM, to Joseph Manson, GM, Raymond DeGiorgio, GM, et al. (May 4, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 77, fn. 312.

[12] Email from Joseph Joshua, GM, to Steven Oakley, GM, et al. (May 4, 2005) (noting "[w]e have asked the ign switch DRE for a switch at the high end of the tolerance spec") [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76-77, fn. 310.

[13] J&B Interview of Steven Oakley, May 23, 2014. Valukas Report at 78, fn. 315.

May and June 2005, reviewers from two newspapers, including the New York Times, wrote

about how they or a family member had inadvertently turned a Cobalt off with their knees.[14]  On

May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and

reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last

week. . . . I never encountered anything like this in 37 years of driving and I hope I never do

again."  In furtherance of covering up the material safety hazard posed by the Ignition Switch

Defect, one of GM's in-house vehicle safety lawyers emailed a colleague to marshal evidence for

the press that the risk of moving stalls was "remote" and "inconsequential."  He wrote that he did

not want to be criticized for failing to "defend a brand new launch."[15]

97.    In June 2005, a Senior Delphi Project Engineer stated in an email that the

"Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's

knee."[16]

98.    A GM customer filed the following complaint about a 2005 Cobalt prone to

moving stalls on June 29, 2005:

> Dear Customer Service:
>
> This is a safety/recall issue if ever there was one.  … The problem
> is the ignition turn switch is poorly installed.  Even with the
> slightest touch, the car will shut off while in motion.  I don't have
> to list to you the safety problems that may happen, besides an
> accident or death, a car turning off while doing a high speed ….[17]

---

[14] Jeff Sabatini, "Making a Case for Ignitions That Don't Need Keys," *New York Times*, June 19, 2005; *see also* Christopher Jensen, "Salamis, Key Rings and GM's Ongoing Sense of Humor," *Plain Dealer (Cleveland)*, June 26, 2005.

[15] Valukas Report at 86.

[16] SC-000084.

[17] Customer complaint (June 29, 2005) [DOC ID 000014669078; GMNHTSA000540683].  Valukas Report at 89, fn. 379.

99.     In July 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the teenage driver.[18]  Calspan Crash Data Research Center was assigned by the NHTSA Special Crash Investigation Program to conduct a Special Crash Investigation (or "SCI"), which found "that the frontal airbag system did not deploy" and the "[Sensing Diagnostic Module (or "SDM")] data indicated that the 'vehicle power mode status' was in 'Accessory.'"[19]  The August 15, 2005, SCI report found that the vehicles SDM data recorded the "vehicle power mode status" of the ignition switch had shifted from "run" to "accessory."  NHTSA continued the SCI and GM failed to report the crash to NHTSA until the third quarter of 2005.[20]  Upon information and belief, GM subsequently entered into a confidential settlement agreement with the victim's mother.

100.     Inside GM, the defect was raised with the Product Investigations ("PI") unit.  The PI group was charged with solving significant engineering problems, including safety problems; it was the primary unit charged with investigating and resolving potential safety defects.[21]  GM Product Investigations Manager Doug Wachtel assigned PI employee Elizabeth Kiihr to investigate the Cobalt ignition switch shut-off.  Wachtel's team looked at early data from the field and found 14 incidents related to the Delta Ignition Switch Defect.

101.     The PI group also tried to recreate the problem themselves.  Doug Wachtel and Gay Kent drove a Cobalt around GM's property in Warren.  Kent had a long and heavy key chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so

---

[18] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[19] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[20] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), (GMHEC 00198137-198210); (GMHEC00197893).

[21] Valukas Report at 86.

that her jeans caused friction against the fob.[22]  Wachtel also reproduced the stall in the Cobalt

test drive by contact with the key chain.[23]

102.    Notwithstanding the media reporting, the customer complaints, and its replication

of moving stalls in the field, the PI team did not recommend a safety recall on vehicles with the

Delta Ignition Switch Defect.[24]  GM knew that a defect existed in its vehicles, but did nothing to

disclose the truth or warn consumers or the Class, nor did GM correct the defect in vehicles that

it had already sold, or in vehicles it continued to manufacture, sell, warrant, and represent as

safe.

**F.    GM Engineers Proposed Design Modifications To The Delta Ignition Switch In
       2005, But GM Management Rejected The Proposed Changes Because Of Cost.**

103.    GM's knowledge of the serious safety problem grew, but still the Company made

no disclosure.  In February 2005, GM engineers met to analyze how to address the Delta Ignition

Switch Defect.[25]  Indeed, between February 2005 and December 2005, GM opened multiple

PRTS inquiries concerning reports of power failure and/or engine shutdown in the Delta Ignition

Switch Vehicles.

104.    GM engineers internally recognized that there was a need to do something in

order to address the Delta Ignition Switch Defect.  For example, GM engineers investigated a

possible key slot change as "containment" of the defect, and generated development cost and

time estimates.[26]

---

[22] TREAD Search Results (June 28, 2005) [DOC ID 000005586004; DOC ID 000005586005; DOC ID
000005586006]. Valukas Report at 86-87, fn. 367.

[23] Valukas Report at 87.

[24] Valukas Report at 87.

[25] GMHEC000001733 (Nov. 19, 2004).

[26] GMHEC000001734 (Nov. 19, 2004).

105.    In May 2005, GM opened PRTS N182276 (the "2005 PRTS") to analyze the ignition switch in the 2005 Chevrolet Cobalt following continued customer complaints that the "vehicle ignition will turn off while driving."[27]  GM acknowledged in the 2005 PRTS that it had previously considered the same issue in the 2004 PRTS and "[d]ue to the level of buyback activity that is developing in the field, Brand Quality requests that the issue be reopened."[28]  In other words, customers were asking GM to take back the defective cars, yet GM said nothing to customers or the Class about the safety risks.  Instead, GM continued to market and warrant the Delta Ignition Switch Vehicles as safe.  The 2005 PRTS proposed that GM re-design the key head from a "slotted" to a "hole" configuration.  After initially approving the proposed fix, GM reversed course and again declined to implement it.[29]

106.    As part of one of the many PRTS inquiries opened in 2005, quality brand manager Steve Oakley asked William Chase, a GM warranty engineer, to estimate the warranty impact of the Delta Ignition Switch Defect in the Cobalt and Pontiac G5 vehicles.  Chase estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1000 vehicles would experience inadvertent power failure while driving.  Still, GM did nothing.

107.    At a June 7, 2005 Vehicle and Process Integration Review ("VAPIR") meeting at GM, the Cobalt VAPIR team discussed potential solutions to the inadvertent shut-off issue.  Around this same time, GM asked DeGiorgio to propose a change to the ignition switch that would double the torque required to turn the switch.[30]  DeGiorgio identified two alternatives.

---

[27] 2005 PRTS, originated May 17, 2005, GMHEC000001742-54.

[28] GMHEC000001743.

[29] February 24, 2014 GM Submission to NHTSA – Chronology Re:  Recall of 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 Vehicles (or "February GM Chronology"), at 1; March 11, 2014 GM Submission to NHTSA – Chronology Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles (or "March GM Chronology") at 1; April Chronology at 2.

[30] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

The first was to use a switch under development for the Saturn Vue and the Chevrolet Equinox (the "GMT 191").  Because the GMT 191 switch was superior to the current ignition switch both electrically and mechanically, DeGiorgio referred to it as the "gold standard of ignition switches."[31]  Alternatively, DeGiorgio proposed redesigning the ignition switch already in Delta platform vehicles.  Part of DeGiorgio's plan included adding a second detent plunger.[32]

108.    At the June 14, 2005 VAPIR meeting, additional proposed fixes were presented—categorized as either "short-term" or "long-term" solutions.  The short-term solution was to use a smaller key ring and to change the key going forward with a new key head design that used a hole instead of a slot.[33]  The "long-term" solutions included DeGiorgio's idea of replacing the Delta Ignition Switch with the GMT 191, or "gold standard" switch, which would double the torque needed to shut off the ignition.  The implementation of the new switch was targeted for MY 2007 or MY 2008 vehicles, at a cost of just $1.00/vehicle, plus tooling costs which were not known at that time.[34]

109.    The presentation for this VAPIR meeting also included discussion of press coverage describing the Delta Ignition Switch Defect that GM engineers experienced earlier in 2005:  inadvertent shut-off of the ignition switch and moving stalls.  The presentation included GM's official public relations statement regarding the issue reassuring the public and the Class that the vehicle was "still controllable."[35]

---

[31] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[32] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[33] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80, fn. 331.

[34] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 333.

[35] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 334.

110.    Also on June 14, 2005, similar complaints surfaced of "inadvertent ignition shut-offs" in the Solstice, which used the same defective Delta Ignition Switch as the Cobalt and the Ion. A GM engineer emailed DeGiorgio and other GM personnel involved in evaluating short-term and long-term fixes for the ignition switch, informing them that Solstice testing showed the "ignition inadvertently turns off when hit."  The engineer noted that the complaint was "very similar to the ones on the Cobalt" and suggested that the same "preventative measures" under discussion for the Cobalt should be taken for the Solstice.[36]

111.    On June 17, 2005, GM engineer Al Manzor conducted testing on the defective Delta Ignition Switch, and the proposed GMT 191 ignition switch, at GM's Milford Proving Ground[37] to evaluate how the switches performed in the Cobalt using a key with a slotted key head versus a key head with a hole.[38]

112.    They also demonstrated that the rotational torque required to move the key out of "run" was 10 N-cm, below the Specification of 15 to 25 N-cm.  However, neither Manzor, nor anyone else interviewed, compared the test results to the actual specification.[39]

113.    Later in June 2005, the VAPIR approved a fix for existing customers—a plug that could be inserted into keys when customers came to the dealer reporting problems—and a change to the key for production in the future (a change that was not implemented).  On July 12, 2005, GM also issued another Preliminary Information to dealers, this time explaining (only for

[36] Email from Devin Newell, GM, to Raymond DeGiorgio, GM, et al. (June 14, 2005) [DOC ID 000001748037; GMNHTSA000218756]. Valukas Report at 81, fn. 336.

[37] The Milford Proving Ground is a GM engineering facility designed for vehicle research, development, and testing in Milford, Michigan.  It has extensive test tracks for vehicle testing under a range of road conditions. Valukas Report at 81, fn. 337.

[38] X001 Ignition Cylinder Effort … Next Actions" (June 19, 2005) [DOC ID 000012140574; GMNHTSA000218793]; J&B Interview of Alberto Manzor, May 1, 2014; e mail from Gay Kent, GM, to Deb Nowak-Vanderhoef, GM, *et al.*(June 14, 2005) [DOC ID S006878_000038279].  Valukas Report at 81, fn. 338.

[39] J&B Interview of Doug Parks, May 1-2, 2014; J&B Interview of Alberto Manzor, May 1, 2014.  Valukas Report at 82, fn. 341.

the 2005 Cobalt and 2005 Pontiac Pursuit) that a fix was available (the key insert).  The key change (and the insert) did not, however, address the core problem of the low torque of the ignition switch or the placement of the ignition switch on the steering cylinder; indeed, the engineers still regarded the key head design change as only a temporary solution—or, as one GM engineer described it, a "band-aid."[40]

114.    Manzor said he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Parks, Altman, and a safety engineer, Naveen Ramachandrappa Nagapola.[41]

115.    Ignoring the Delta Ignition Switch Defect did not make the problem or reported incidents go away.

## G.    Rather Than Implementing A Safety Recall And Fixing The Known Delta Ignition Switch Defect, GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005 That Advocated The Removal Of Heavy Items From Key Rings.

116.    Throughout 2005, various committees within GM considered proposed fixes, but rejected them as too costly.  In December 2005, rather than issuing a safety recall on the Delta Ignition Switch Defect, GM sent Technical Service Bulletin ("TSB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontiac Solstice vehicles.[42]  The TSB explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder/torque."

---

[40] Valukas Report at 82-83.

[41] J&B Interview of Alberto Manzor, May 1, 2014.  Valukas Report at 83, fn. 347.

[42] TSB 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000329773.

117.    When GM issued this TSB, it removed from the dealer database the July 12, 2005 Preliminary Information (which had accurately used the word "stall"). The TSB also did not accurately describe the danger posed by the Delta Ignition Switch Defect and went only to GM dealers, not to the public or the Class.[43]  In the TSB, GM did not mention the possibility of airbag non-deployment, engine stalls, and loss of power steering or power brakes.

118.    Evidencing GM's fraudulent concealment, multiple GM employees confirmed that GM intentionally avoided using the word "stall" in the TSB to dealers.[44]

119.    GM Quality Service Manager, Steve Oakley, who drafted the December 2005 TSB, stated the term "stall" is a "hot" word that GM did not use in TSBs because *it may raise a concern about vehicle safety*, which *"suggests GM should recall the vehicle*, *not issue a bulletin."*[45]  In addition, GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."[46]  The December 2005 TSB was intentionally misleading and incomplete.

120.    GM chose not to disclose the true nature of the Delta Ignition Switch Defect and remedy the problem.  Instead, in the December 2005 TSB, GM instructed its dealers to give customers who brought in their vehicle complaining about stalling "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change was intended to keep the keys from hanging as low as they had in the past.[47]  GM created over

---

[43] March 2014 GM chronology; GMHEC000329773.

[44] Valukas Report at 91-93; (citing GMHEC000329773).

[45] Valukas Report at 92, fn. 390, emphasis added.

[46] Valukas Report at 93, fn. 392.

[47] Valukas Report at 1-2; March GM Chronology at 2; April GM Chronology at 2.

10,000 key plug inserts as a purported cheap fix for the defect.[48]  According to GM's records, its

dealers provided key inserts to only 474 customers who brought their vehicles into dealers for

service.[49]  But the band-aid failed because GM abandoned the key redesign effort.[50]

Furthermore, while GM made the key insert available to consumers of previously purchased

vehicles, it did not, at the same time, change the key for cars that were rolling off the assembly

line and those yet to be produced.  Thus, GM denied new car purchasers even the "band-aid" its

engineers proposed.[51]

121.    Still there was no recall though GM was squarely on notice of the Delta Ignition

Switch Defect, as it continued to receive complaints of fatalities and injuries.  Rather than issue

the necessary safety recall, GM chose to continue the cover-up.

**H.    GM Authorized A Design Change To The Delta Ignition Switch In 2006, But
Masked The Existence Of The Change By Keeping The Same Part Number.**

122.    GM covertly authorized a design change for the defective ignition switch in 2006.

123.    In late 2005 and early 2006, DeGiorgio discussed with Delphi a proposal to put a

stronger spring and plunger into the ignition switch.[52]  An internal Delphi document indicates

that this switch design—with a longer detent spring-plunger—was the same as the longer detent

spring-plunger design originally drafted by Delphi in 2001.[53]  In other words, GM had this

option available before the defective Delta Ignition Switches were ever approved.[54]

---

[48] Valukas Report at 93-94.

[49] February GM Chronology at 2.

[50] Valukas Report at 94.

[51] Valukas Report at 94.

[52] Email from Arturo Alcala, Delphi to Raymond DeGiorgio, GM, John B. Coniff, Delphi, et al. (Jan. 6, 2006) [DOC ID 000051786002; GMNHTSA000257777]. Valukas Report at 97, fn. 401.

[53] Drawing 741-76307-T [DOC ID GMHEC000003206]; 2001 Long Detent Spring Drawing, Drawing 741-79378 (2001) [Ex. A.3.a(2) 2001 Long Detent Spring Drawing]; 2001 Short Detent Spring Drawing, Drawing 741-75259 (2001) [Ex. A.3.a (1) 2001 Short Detent Spring Drawing]; email from Antero Cuervo, Delphi, to Lyle Miller, Delphi (Oct. 29, 2013) [DOC ID 000004253527; GMNHTSA000223906]. Valukas Report at 97, fn. 402.

[54] Valukas Report at 97.

124.    In April 2006, DeGiorgio authorized Delphi to implement changes to fix the Delta Ignition Switch Defect.[55]  The design change "was implemented to increase torque performance in the switch."[56]  On April 26, 2006, DeGiorgio approved an ignition switch with a longer detent plunger by signing what is called a Form 3660, giving Delphi permission to begin manufacturing the longer parts for the switch.[57]  The Form 3660 stated, "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in switch."[58]  Each Form 3660 has to link back to a master work order, and this one did as well.  But the work order to which it linked was only for the electrical improvements to the ignition switch; the work order did not mention the change to the spring and plunger.[59]  GM fraudulently concealed and acted to suppress and cover up this material fact.

125.    Delphi documents suggest that the new ignition switch went into production sometime after June 26, 2006.[60]  Although the design of the ignition switch changed, *the part number remained the same*.[61]

126.    Consumers, NHTSA, the driving public, and the Class were unaware of the change, because GM "*concealed the fact*" of the design change and "*failed to disclose this critical information*," with devastating consequences.[62]

---

[55] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[56] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[57] General Motors Commodity Validation Sign Off (April 26, 2006) GMHEC000003201.

[58] Form 3660 (April 26, 2006), at 3 [DOC ID 000004253529; GMNHTSA000223924].  Valukas Report at 98, fn. 406.

[59] EWO 302726 (Feb. 19, 2004) [DOC ID 000000000080; GMNHTSA000220667]. Valukas Report at 98, fn. 407.

[60] Valukas Report at 99.

[61] Valukas Report at 100 (emphasis added).

[62] Valukas Report at 34 (emphasis added).

127.     In congressional testimony in 2014, GM CEO Mary Barra acknowledged that GM should have changed the part number when it redesigned the Delta Ignition Switch, and that its failure to do so did not meet industry standard behavior.  Former New GM engineers term GM's failure to change the part number a "cardinal sin" and "an extraordinary violation of internal processes."

## I.    The Fatalities Resulting From The Ignition Switch Defect And The Cover-Up Came To GM's Attention As Early As 2004.

128.     GM's legal department received notice of the first Ion airbag non-deployment claim in January 2004 involving a 2004 Saturn Ion.  The first Cobalt crash came to GM's attention in September 2005.[63]

129.     On November 17, 2005—immediately before GM issued the December Technical Service Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front airbags did not deploy in this accident.  GM received notice of the accident, opened a file, and referred to it as the "Colbert incident."

130.     In January 2006, a 2005 Chevy Cobalt struck several trees as a result of the Delta Ignition Switch Defect.  The driver died in route to the hospital.[64]  The vehicle's power mode status was in "accessory" at the time of the crash and the airbag did not deploy when it should have.[65]

131.     On February 10, 2006, in Lanexa, Virginia—shortly after GM issued the TSB—a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident, *supra*, the

---

[63] Valukas Report at 103, fn. 419.

[64] Calspan Corporation, Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049, Dec. 12, 2006 [DOC ID GMCB-000000073786; GMHEC100026303]; GM, Activity Notes form, File No. 501661, Jan. 31, 2006 [DOC ID 000001660023; GMNHTSA000200717].  Valukas Report at 110, fn. 453.

[65] Crash Data Retrieval System, [redacted] SDM Data, Sept. 14, 2005 [DOC ID 000001660011; GMNHTSA000200688].  Valukas Report at 110, fn. 454.

frontal airbags failed to deploy.  The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this accident, opened a file, and referred to it as the "Carroll incident."

132.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of the SDM showed the key was in the "accessory/off" position at the time of the crash.  GM received notice of this incident, opened a file, and referred to it as the "Oakley incident."

133.    In September 2006, GM became aware of an incident in which a 2004 Saturn Ion left the road and struck a utility pole head on.  The airbag did not deploy and the driver was wearing her seatbelt, but was pronounced dead at the scene.  GM identified this crash as one in which the airbag should have deployed, and internally acknowledged that the airbag likely would have saved the driver's life.[66]  GM engineers agreed that "1) the airbags … should have deployed; 2) the SDM did not record the crash event, for unknown reasons;… and 4) it is reasonably likely that deployment of the driver airbag would have prevented [] death in this accident."[67]  Still, GM admitted nothing and represented that its cars were safe.

134.    On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and struck a telephone box and two trees.  There were fatalities and severe injuries, and the airbag did not deploy.  GM's Alan Adler emailed Dwayne Davidson, Senior Manager for TREAD Reporting at GM, and others, copying Gay Kent, Jaclyn Palmer, Brian Everest, and Doug Wachtel, with the subject line "2005 Cobalt Air Bags—Fatal Crash; Alleged Non-Deployment."[68]

---

[66] Valukas Report at 112, fn. 463, 464.

[67] Valukas Report at 113, fn. 474.

[68] Valukas Report at 113-114.

135.    In October 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin which resulted in the deaths of the front right and rear right passengers.  NHTSA assigned Indiana University Transportation Research Center to investigate the crash.  The vehicle was inspected on November 6, 2006.[69]  GM reported the crash later in 2006 in an Early Warning Reporting ("EWR") filing with NHTSA.[70]  NHTSA requested additional information from GM in May of 2007, and GM responded a month later.[71]

136.    In 2007, two analyses of the fatalities in the Wisconsin Cobalt crash—one by Wisconsin State Trooper Keith Young and another by the Indiana University researchers discussed above—both independently concluded that the movement of the ignition switch from "run" to "accessory" caused the 2006 accident, the airbag non-deployment, and the tragic deaths. Trooper Young was able to reach this accurate conclusion examining GM's own engineering documents.

137.    Internal GM documents show that the company received at least 248 reports of airbag non-deployment in MY 2005 vehicles.[72]  Internal documents also showed that GM received at least 134 reports of air bag non-deployment in MY 2006 vehicles.[73]

## J.    GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains.

138.    In October 2006, GM updated the December 2005 Service Bulletin to include additional make and MY vehicles, namely:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR,

---

[69] Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report").

[70] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007); Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414).

[71] GMHEC00197898.

[72] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[73] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

and 2007 Pontiac Solstice and G5.  As it had previously done, GM avoided acknowledging the

Delta Ignition Switch Defect and this time blamed the problem on short people and heavy key

rings, stating:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column.  In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain.[74]

139.    Despite the TSB to dealers, the Delta Ignition Switch Vehicles remained on the

road endangering the lives and livelihoods of the Class and the public.

**K.    GM Knew Of And Tracked Multiple Accidents Involving The Delta Ignition Switch Defect But Avoided Scrutiny By Misleading The Class, The Public, And Regulators.**

140.    GM knew that people were being killed and seriously injured because of the Delta

Ignition Switch Defect in its vehicles and the resulting loss of power and airbag non-deployment.

141.    In March 2007, GM met with NHTSA and discussed the July 29, 2005 fatal crash

involving Amber Rose.[75]  At this meeting, NHTSA informed GM that the airbags in Ms. Rose's

Cobalt did not deploy, causing Ms. Rose' death, and that data retrieved from the crashed

vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  This was

no surprise to GM; it had been secretly tracking ignition switch related accidents for some time.

By the end of 2007, GM identified 10 other accidents, including 4 where the ignition switch had

moved into the "accessory" position.[76]

---

[74] GMHEC000143093; GM Technical Service Bulletin, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and no DTCs," (Oct. 25, 2006), at GMHEC000138614.

[75] GM Feb. 24, 2014, Letter to NHTSA, GM February Chronology.

[76] GM Feb. 24, 2014, Letter to NHTSA, GM February chronology.

142.    Thus, by the end of 2007, GM knew of at least 10 frontal collisions involving the Delta Ignition Switch Vehicles in which the airbag did not deploy.[77]

143.    For the next two years, GM continued to receive complaints and continued to investigate frontal crashes in which the airbags did not deploy in Delta Ignition Switch Vehicles, but did not disclose the crucial safety information to the Class of unsuspecting drivers of the vehicles.

144.    In April 2007, as part of its investigation into the July 2005 Maryland Cobalt crash that killed Amber Rose, NHTSA received a 2006 SCI report stating that the "crash is of special interest because the vehicle was equipped with … dual stage air bags that did not deploy."[78]  The SCI Report concluded that the air bags did not deploy "as a result of the impact with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due to the movement of the ignition switch just prior to impact."[79]  The Electronic Data Recorder for the vehicle indicated that the ignition switch was in "accessory" mode at the time of impact.[80] The SCI Report also found that the investigation demonstrated that contact with the ignition switch could result in "engine shut down and loss of power."[81]

145.    In August 2007, GM met with its airbag supplier, Continental, to review SDM data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.[82]

---

[77] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis, Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at* http://democrats.energycommerce.house.gov/sites/default/files/ documents/Letter-Benavides-Lewis-2014-02-24.pdf (or "Benavides Letter").

[78] 2006 NTHSA SCI Report.

[79] 2006 NTHSA SCI Report at ii.

[80] 2006 NTHSA SCI Report at 7.

[81] 2006 NTHSA SCI Report at 7.

[82] Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153, GM Mar. 11, 2014 Letter to NHTSA, GM March chronology at 2.

146.    The next month, in September of 2007, the Chief of the Defects Assessment

Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an

investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion"

vehicles.[83]  In an email, the Chief of DAD within ODI noted that the "issue was prompted by a

pattern of reported non-deployments in VOQ [("Vehicle Owner Questionnaire")] complaints that

was first observed in early 2005."[84]  The email stated that NHTSA had "discussed the matter

with GM," but that GM had assured NHTSA that "they see no specific problem pattern."[85]

NHTSA's Greg Magno stated:

> Notwithstanding GM's indications that they see no specific
> problem, DAD perceives a pattern of non-deployment in these
> vehicles that does not exist in their peers and that their
> circumstances are such that, in our engineering judgment, merited
> a deployment, and that such a deployment would have reduced
> injury levels or saved lives.[86]

147.    In November 2007, NHTSA's ODI considered a proposal to investigate the non-

deployment of airbags in 2003-2006 Chevy Cobalt and Saturn Ion vehicles.[87]  The review was

prompted by 29 complaints, 4 fatal crashes, and 14 field reports that NHTSA knew about.[88]

Again, GM not only failed to act, but it worked to thwart the agency's efforts, in furtherance of

its fraud and concealment to the detriment of the Class.

148.    As part of the cover-up, GM tried to avoid full regulatory investigation and

disclosure by claiming that it was unaware of any problem in its vehicles.  Furthermore, GM

knew that the airbag system in the Delta Ignition Switch Vehicles would be disabled when the

---

[83] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[84] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[85] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[86] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[87] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

[88] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

ignition switch moved from the "run" to the "accessory" position.  The airbag system, in other

words, was disabled when the vehicle lost power.  GM knew, however, that NHTSA believed

that in most, if not all, vehicles, the airbag systems were operable for several seconds following a

power loss.  Although GM knew that NHTSA was mistaken, it did not correct NHTSA's

mistaken belief.

149.    From 2001 until July 9, 2009, GM was repeatedly put on notice of the Delta

Ignition Switch Defect and received reports of deaths and injuries in Chevy Cobalts and other

GM vehicles involving airbag failures and/or steering failures, yet acted at every turn to

fraudulently conceal the danger from the Class.  Examples include, but are not limited to the

following:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."[89]

**L.    In 2009, As Injuries And Deaths Continued To Mount, GM Opened Yet Another Internal Investigation Of The Ignition Switch Defect, But Continued To Conceal Information About The Defect From Its Customers And The Class.**

150.    In February 2009, GM initiated yet another internal investigation of the Delta

Ignition Switch Defect which resulted in a redesign of the ignition key for the 2010 model/year

---

[89] NHTSA Cobalt Chronology prepared by the Center for Auto Safety, February 27, 2014.

Cobalt.[90]  However, GM took no remedial action in response to the investigation and continued

to conceal the facts. Consequently, deaths, injuries, and incidents continued to occur related to

the Delta Ignition Switch Defect.  As one GM employee put it when the Delta Ignition Switch

Defect was raised again internally at GM:

> "Gentleman!  This issue has been around since man first lumbered
> out of sea and stood on two feet.  In fact, I think Darwin wrote the
> first PRTS on this and included as an attachment as part of his
> Theory of Evolution."[91]

151.    Some within GM were not mincing words.  Yet GM chose to conceal the truth

from the Class, and the death and injury toll mounted.

152.    Again, in April 2009, a 2005 Chevy Cobalt was involved in a crash in

Pennsylvania which resulted in the deaths of the driver and front passenger.[92]  The crash was

investigated by NHTSA.[93]  The 2009 SCI Report noted that data from the Cobalt's SDM

indicated that the ignition switch was in "accessory" mode at the time of the crash.[94]  Still, GM

refused to issue a recall or notify the Class of the danger.

**M.    Right Up Until Its Bankruptcy Filing, GM Concealed Its Knowledge Of The
Ignition Switch Defect And Its Devastating Consequences.**

153.    Beginning in 2007, GM Field Performance Assessment engineer John Sprague

maintained a spreadsheet of accidents involving the Cobalt airbag non-deployment, along with

the vehicle power mode status.  To gather the data for the spreadsheet, Sprague sent SDMs from

---

[90] GM Feb. 24, 2014 Letter To NHSTA, GM Feb. chronology at 2; Valukas Report at 132-133; GM PRTS Complete Report (1078137)—GMNHTSA000018925.

[91] Memo, Joseph R. Manson, Feb. 18, 2009, GMHEC000282093.

[92] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[93] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[94] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").  SDM Data Report, attached to 2009 SCI Report.

crash vehicles to Continental (the SDM manufacturer) so that it could access information that GM could not.[95]  After receiving the data from Continental, Sprague collected information regarding the Cobalt crashes and power mode status, added it to the spreadsheet, and discovered that, in fact, the power mode status was recorded as "off" or "accessory" in many accidents.[96]

154.    Sprague continued to maintain his spreadsheet through and beyond the end of GM's corporate existence.  In doing so, Sprague noticed a pattern—the problem of non-deployment of airbags did not appear to be present in MY 2008 and later Cobalts.  That led him to question whether there had been some change in the Cobalt from MY 2007 to MY 2008.[97]

155.    Sprague brought his spreadsheet on the ignition switches and vehicles losing power while driving to a meeting with DeGiorgio in 2009 and the two of them reviewed it together.[98]  Still no action was taken.  Instead there were more non-productive meetings.

156.    In May 2009, GM again met with its SDM supplier, Continental, and asked for data in connection with another crash involving a 2006 Chevy Cobalt where the airbags failed to deploy.[99]  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the state changed from "run" to "off" during the accident.  According to Continental, this, in turn, disabled the airbags.  GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in non-deployment incidents in Chevrolet Cobalt vehicles.  Yet again, in the face of mounting death tolls, GM did not correct the Delta Ignition Switch Defect, take the Delta Ignition Switch Vehicles off the road, or warn its consumers or the Class.  Sprague's secret spreadsheet of accidents simply grew.

---

[95] Valukas Report at 134.

[96] J&B Interview of John Sprague, May 27, 2014.  Valukas Report at 135, fn. 596.

[97] Valukas Report at 137.

[98] Valukas Report at 138, fn. 616.

[99] Continental Automotive Sys. US, Inc., Field Event Analysis Report GMHEC00003129-3142.

157.     The next month, in June 2009, GM filed a Chapter 11 petition.  The bankruptcy

sale to "New GM" became effective on July 10, 2009, and the Bar Date for filing proofs of claim

was set for November 30, 2009.

## IV.     OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES.

158.     In addition to the Delta Ignition Switch Defect summarized above, GM sold

vehicles with dozens of other defects—many of which were known to and concealed by GM, and

remained concealed until New GM conducted a parade of recalls in 2014.

159.     In many cases, the available evidence suggests that GM was aware of the defects.

In any event, the defects are the product of GM's systemic valuation of cost-cutting and

devaluation of safety, making it likely that GM was aware of each of the following defects

summarized below.

**A.     Ignition Lock Cylinder Defect In Vehicles Also Affected By The Delta Ignition
Switch Defect.**

160.     On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[100]  Though the

vehicles are the same as those affected by the Delta Ignition Switch Defect,[101] the lock cylinder

defect is distinct.

161.     In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

key while the engine is not in the "off" position.  If the ignition key is removed when the ignition

is not in the "off" position, unintended vehicle motion may occur.  That motion could cause a

crash and injury to the vehicle's occupants or pedestrians.  Some of the vehicles with faulty

---

[100] New GM Letter to NHTSA dated April 9, 2014.

[101] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number 114, "*Theft Prevention and Rollaway Prevention*."[102]

162.    According to New GM's Chronology that it submitted to NHTSA on April 23, 2014, the ignition lock cylinder defect recall arose out of the notorious recalls for the Ignition Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn ION, and Saturn Sky vehicles.[103]

163.    New GM noted several hundred instances of potential key pullout issues in vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances identified from records relating to customer and dealer reports to GM call centers, 479 instances identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA VOQ information.  New GM investigators also identified 16 roll-away instances associated with the key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

164.    New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured by GM, based on information that included the following:  (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key

---

[102] New GM Notice to NHTSA dated April 9, 2014, at 1.

[103] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

165.    A majority of the key pullout instances identified involved 2003-2004 model year Saturn Ion and 2005 model year Chevrolet Cobalt vehicles.  An April 3, 2014 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

166.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the MY 2003 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the MY 2004 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the MY 2005 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the MY 2006 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date."  The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

167.    The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836).  According to PRTS N 183836:  "Tolerance stack up condition permits key to be removed from lock cylinder while driving."  The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder."  According to a "Summary," "A

tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed."  The Problem Resolution identified the following "Solution":  "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

168.    In response to PRTS N 183836, GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

169.    According to the work order:  "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes.  Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

170.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution made on March 2, 2007 stated:  "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles…." A "Summary" in Problem Resolution stated:  "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3, 2014, Decision Committee meeting, although it is not the only engineering or field report relating to potential key pullout issues.

171.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to Federal Motor Vehicle Safety Standards and Regulations ("FMVSS") 114.  In addition, the Decision Committee concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the Ignition Switch Defect recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or

pedestrian injuries.  For vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**B.    Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

172.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[104]  In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[105]  If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[106]

173.    Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition cylinders that permit the operator to remove the ignition key when the key is not in the "off" position in other vehicles outside of those already recalled.[107]  New GM identified 152 reports of vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the MY 2002-2004 Saturn Vue vehicles.[108]

174.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and July 24, 2014, New GM instituted a safety recall on July 31, 2014.[109]

**C.    "Second Wave" Ignition Switch Defects In Millions Of GM Vehicles.**

175.    In addition to the vehicles subject to the Delta Ignition Switch Defect, GM manufactured millions of other vehicles subject to the same or substantially similar ignition

---

[104] *See* August 7, 2014 Letter from New GM to NHTSA.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

switch defects (collectively, "Defective Ignition Switch Vehicles").  In each case, the ignition switch defects caused unintended stalling with the attendant shut-down of critical systems, including power steering, power brakes, seatbelt pretensioners, and airbags.

176.    While these millions of vehicles with defective ignition switches were not recalled until 2014, the evidence suggests that GM was long aware of the defects, well prior to the bankruptcy Sale.

### 1.    The Defective Ignition Switch Vehicles that were eventually subject to the June 20, 2014 recall for the "ignition key slot defect."

177.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for ignition switch, or ignition key slot, defects (NHTSA Recall No. 14-V-355).  New GM announced to NHTSA and the public that the recall concerns an ignition key slot defect.

178.    Approximately 2,349,095 of the vehicles subject to this recall were made by GM and sold prior to July 10, 2009, and are therefore at issue in this Proof of Claim.

179.    The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

180.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."

181.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."

182.    The vehicles included in this recall were built on the same platform and their defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other Delta Ignition Switch Vehicles recalled in February and March of 2014 in Recall No. 14-V-047.

183.    GM was long aware of the ignition switch defect in these vehicles, as demonstrated by the following facts, all of which were known to GM:

a.    On or about August 25, 2005, Laura Andres, a GM design engineer, wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.    GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on August 25, 2005 to four other GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

c.    On August 29, 2005, GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

d.    Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

e.    On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito and copied ten other GM employees, including Ray DeGiorgio.  Ms. Andres, in her email, stated, "I picked up the vehicle from repair.  No repairs were done. . . . The technician said there is

nothing they can do to repair it. He said it is just <u>the design of the switch</u>. He said other

switches, like on the trucks, have a stronger detent and don't experience this."

      f.     Ms. Andres' email continued:

> I think this is a serious safety problem, especially if this switch is on
> multiple programs. I'm thinking big recall. I was driving 45 mph when I
> hit the pothole and the car shut off and I had a car driving behind me that
> swerved around me. I don't like to imagine a customer driving with their
> kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic. I
> think you should seriously consider changing this part to a switch with a
> stronger detent.

184.    New GM has tried to characterize the recall of these 3.14 million vehicles as

being different than the recall for the ignition switch defect in the Delta Ignition Switch Vehicles

when in reality, and for all practical purposes it is for exactly the same defect that creates exactly

the same safety risks.

185.    From 2001 to the end of its corporate existence in July of 2009, GM received

numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to

this safety defect. The following are examples of just a few of the many reports and complaints

regarding the defect that GM received and/or knew about:

186.    A January 23, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

187.    A June 12, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP

IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
HAS NOT BEEN CORRECTED. MANUFACTURER HAS
BEEN NOTIFIED.*AK NHTSA ID Number: 890227.

188.    A January 27, 2003 complaint filed with NHTSA involving a MY 2001 Cadillac

Deville and an incident that occurred on January 27, 2003, in which the following was reported:

WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
ADDITIONAL INFORMATION.*AK NHTSA ID Number:
10004759.

189.    A September 18, 2007 complaint filed with NHTSA involving a MY 2006

Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was reported

that:

TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
SIDE DOOR AND NEITHER THE DRIVER NOR THE
PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
SUSTAINED MINOR INJURIES TO HIS WRIST. THE
VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
DEALER WAS NOTIFIED AND STATED THAT THE CRASH
HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
CURRENT AND FAILURE MILEAGES WERE 21,600. THE
CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

190.    An April 2, 2009 complaint filed with NHTSA involving a MY 2005 Buick

LaCrosse and an incident that occurred on April 2, 2009, in which the following was reported:

POWER STEERING WENT OUT COMPLETELY, NO
WARNING JUST OUT. HAD A VERY HARD TIME
STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
NHTSA ID Number: 10263976.

191.    The approval and implementation of the defective ignition switches resulted in part from GM's systemic valuation of cost-cutting over safety, and the many disincentives to flagging or taking responsibility for safety issues at GM.

192.    GM was aware of the so-called "ignition key slot" defect for years yet continued to sell these Defective Ignition Switch Vehicles, and did nothing to either warn the public or correct the defect in these vehicles.

**2.      The Defective Ignition Switch Vehicles giving rise to the July 2 and 3 recalls for so-called "unintended ignition rotation" defects.**

193.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall No. 14-V-394).  The July 2 recall applied to MY 2003-2014 Cadillac CTS vehicles and MY 2004-2006 Cadillac SRX vehicles.

194.    The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.

195.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United States for ignition switch defects (Recall No. 14-V-400).

196.    The following vehicles were included in Recall No. 14-V-400:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.

197.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off

the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.

198.    In both of these recalls, New GM notified NHTSA and the public that the recall was intended to address a defect involving unintended or "inadvertent key rotation" within the ignition switch of the vehicles.  As with the ignition key defect announced June 20, 2014, however, the defects for which these vehicles have been recalled is directly related to the Delta Ignition Switch Defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same safety risks and dangers.

199.    All of the vehicles involved in Recall No. 14-V-400 were manufactured by GM and sold or leased prior to July 10, 2009, as were approximately 400,000 of the vehicles involved in Recall No. 14-V-394.

200.    Once again, the unintended ignition rotation defect is substantially similar to and relates directly to the other ignition switch defects, including the defects that gave rise to the initial recall of the Delta Ignition Switch Vehicles in February and March of 2014.  Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

201.    The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the Delta Ignition Switch Vehicles and the other Defective

Ignition Switch Vehicles:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

202.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to GM, and was the basis for a change that was made to a use stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

203.    GM was long aware of the defects in these vehicles, as the following facts indicate, as well as others not pled herein:

a.    In January of 2003, GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his MY 2003 Pontiac Grand Am.

b.    During the investigation, GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c.    The customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.    In May 2003, GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  GM identified the relevant population of affected vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e.      GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.      On July 24, 2003, GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  GM engineers allegedly increased the detent plunger force and changed the part number of the ignition switch.  The new parts were installed beginning in MY 2004 Malibu, Alero, and Grand Am vehicles.

g.      GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix.  GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

h.      GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch.

204.    From 2002 to the end of its corporate existence, GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect. The following are just a handful of examples of some of the reports known to GM.

205.    A September 16, 2002 complaint filed with NHTSA regarding a MY 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK NHTSA ID Number: 8018687.

206.    A November 22, 2002 complaint filed with NHTSA involving a MY 2003 Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURRENCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

207.    A January 21, 2003 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED, THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

208.    A June 30, 2003 complaint filed with NHTSA regarding a MY 2001 Oldsmobile

Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK NHTSA ID
> Number: 10026252.

209.    A March 11, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK NHTSA ID Number: 10062993.

210.    A March 11, 2004 complaint with NHTSA regarding a MY 2003 Oldsmobile

Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCCURRENCE, THEN STALL 4

TIMES A DAY FOR 5 DAYS, ETC., ETC. IN EVERY
OCCURRENCE, IT TAKES APPROXIMATELY 10 MINUTES
BEFORE IT WILL START BACK UP. AT HIGH SPEEDS, IT IS
EXTREMELY TOO DANGEROUS TO DRIVE. WE'VE
TAKEN IT TO THE DEALER, UNDER EXTENDED
WARRANTY, THE REQUIRED 4 TIMES UNDER THE
LEMON LAW PROCESS. THE DEALER CANNOT
ASCERTAIN, NOR FIX THE PROBLEM. IT HAPPENED TO
THE DEALER AT LEAST ONCE WHEN WE TOOK IT IN. I
DOUBT THEY WILL ADMIT IT, HOWEVER, MY WIFE WAS
WITNESS. THE CAR IS A 2003. EVEN THOUGH I BOUGHT
IT IN JULY 2003, IT WAS CONSIDERED A USED CAR. GM
HAS DENIED OUR CLAIM SINCE THE LEMON LAW DOES
NOT APPLY TO USED CARS. THE CAR HAS BEEN
PERMANENTLY PARKED SINCE NOVEMBER 2003. WE
WERE FORCED TO BUY ANOTHER CAR. THE DEALER
WOULD NOT TRADE. THIS HAS RESULTED IN A BAD
LUCK SITUATION FOR US. WE CANNOT AFFORD 2 CAR
PAYMENTS / 2 INSURANCE PREMIUMS, NOR CAN WE
AFFORD $300.00 PER HOUR TO SUE GM. I STOPPED
MAKING PAYMENTS IN DECEMBER 2003. I HAVE KEPT
THE FINANCE COMPANY ABREAST OF THE SITUATION.
THEY HAVE NOT REPOSSESSED AS OF YET. THEY WANT
ME TO TRY TO SELL IT. CAN YOU HELP?*AK NHTSA ID
Number: 10061898.

211.    A July 20, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, involving an incident that occurred on July 9, 2004, in which the following was reported:

THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
THIS CAR IS A DEATH TRAP. *LA NHTSA ID Number:
10082289.

212.    An August 2004 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on June 30, 2004, in which it was reported that:

WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF

BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
Number:  10089418.

213.    A report in August of 2004 involving a MY 2004 Chevrolet Malibu incident that

occurred on August 3, 2004, in which it was reported that:

WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
Number: 10087966.

214.    An October 23, 2004 complaint with NHTSA regarding a MY 2003 Chevrolet

Monte Carlo, in which the following was reported:

VEHICLE CONTINUOUSLY EXPERIENCED AN
ELECTRICAL SYSTEM FAILURE. AS A RESULT, THERE
WAS AN ELECTRICAL SHUT DOWN WHICH RESULTED IN
THE ENGINE DYING/ STEERING WHEEL LOCKING UP,
AND LOSS OF BRAKE POWER.*AK  NHTSA ID
Number: 10044624.

215.    An April 26, 2005 complaint filed with NHTSA involving a MY 2005 Pontiac

Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
WHILE DRIVING NORMALLY WITHOUT TRYING TO
ACCELERATE AND ALSO WHILE TRYING TO
ACCELERATE. THE CAR HAS LOST POWER WHILE
TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
HAS LOST POWER WHILE JUST DRIVING DOWN THE
ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
MODULE, POWERTRAIN CONTROL-ENGINE
REPROGRAMMING. 01/24/2005 [XXX]-SOLENOID,
PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-

MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-PEDAL,
ACCELERATOR-REPLACED. DEALERSHIP PURCHASED
FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500.
DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW
WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD
THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE
PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC
SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE
GOING TO RESEARCH THE PROBLEM AND SEE IF ANY
OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS.
SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY
WANT US TO COME IN AND TAKE ANOTHER GRAND
PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR
TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
*AK *JS INFORMATION REDACTED PURSUANT TO THE
FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
552(B)(6) NHTSA ID Number: 10118501.

216.    A May 2005 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on July 18, 2004, in which it was reported that:

THE CAR CUT OFF WHILE I WAS DRIVING AND IN
HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
SERVICED BEFORE FOR THIS PROBLEM BUT IT
CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
HORN FUSE HAS BEEN REPLACED TWICE, AND THE
BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
TO BE A NEW CAR.  NHTSA ID Number: 10123684.

217.    A June 2, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand Am

incident that occurred on February 18, 2005, in which the following was reported:

2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
DRIVING AND THE POWER STEERING AND BRAKING
ABILITY ARE LOST.*MR *NM.  NHTSA ID
Number: 10124713.

218.    An August 12, 2005 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, regarding an incident that occurred on January 3, 2005, in which it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB NHTSA ID Number: 10127580.

219.    An August 26, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand

Am incident that occurred on August 26, 2005, in which the following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB NHTSA ID Number: 10134303.

220.    A September 22, 2005 complaint filed with NHTSA involving a MY 2005

Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

> DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY.  TWO INJURED WERE
> INJURED IN THIS CRASH.  A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK NHTSA ID Number:
> 10137348.

221.    A September 29, 2006 complaint filed with NHTSA involving a MY 2004

Cadillac CTS and an incident that occurred on September 29, 2006, in which the following was

reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006 – *NM NHTSA ID
> Number: 10169594.

222.    An April 18, 2007 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, regarding an incident that occurred on April 13, 2007, in which it was reported that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

223.    A September 20, 2007 complaint filed with NHTSA involving a MY 2007

Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it was

reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
> HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
> WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
> CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
> 10203516.

224.    A September 24, 2007 complaint filed with NHTSA involving a MY 2004

Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the following

was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

225.    A June 18, 2008 complaint filed with NHTSA involving a MY 2006 Cadillac

CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE

OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
WERE IN NEUTRAL. THERE WERE NO WARNING
INDICATORS PRIOR TO THE FAILURE. THE CONTACT
FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
COULD HAVE RESULTED IN A SERIOUS CRASH. THE
VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
REPAIR FOR THE SAME FAILURE IN FEBRUARY OF 2008
AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
COMPUTER SWITCH THAT CONTROLS THE
TRANSMISSION. AT THE SECOND VISIT, THE SHOP
EXPLAINED THAT THEY COULD NOT IDENTIFY THE
FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
CURRENT AND FAILURE MILEAGES WERE 43,000.
NHTSA ID Number: 10231507.

226.    An October 14, 2008 complaint filed with NHTSA involving a MY 2008 Cadillac

CTS and an incident that occurred on April 5, 2008, in which it was reported that:

WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
*TR NHTSA ID Number: 10245423.

227.    A November 13, 2008 complaint with NHTSA regarding a MY 2001 Oldsmobile

Intrigue, in which the following was reported:

L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
STALLS AND HESITATES. IN ADDITION, THE
INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
AT RANDOM. THE VEHICLE FAILED INSPECTION AND
THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
HELPED WITH THE STALLING AND HESITATION;
HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR

WAS REPLACED, THE VEHICLE FAILED TO START.
HOWEVER, ALL OF THE INSTRUMENT PANEL
INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
ATTEMPTS TO START THE VEHICLE, HE HAD IT
JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
START. WHILE DRIVING HOME, ALL OF THE LIGHTING
FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
VEHICLE LOST ALL ELECTRICAL POWER AND POWER
STEERING ABILITY. THE CONTACT MANAGED TO PARK
THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
SHOULD ALSO BE RECALLED IN THE UNITED STATES.
THE FAILURE MILEAGE WAS UNKNOWN AND THE
CURRENT MILEAGE WAS 106,000.  NHTSA ID
Number: 10248694.

228.    A December 10, 2008 complaint filed with NHTSA regarding a MY 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
COULD HAVE BEEN ON THE HIGHWAY AND BEEN
KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
WAS RANDOM. *TR NHTSA ID Number: 10251280.

229.    A March 31, 2009 complaint filed with NHTSA regarding a MY 2005 Chevrolet

Malibu incident that occurred on May 30, 2008, in which it was reported that:

TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
THE CONTACT STATED THAT THE POWER WINDOWS,
LOCKS, LINKAGES, AND IGNITION SWITCH
SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
VEHICLE TO THE DEALER AND THEY REPLACED THE
IGNITION SWITCH AT THE COST OF $495. THE
MANUFACTURER STATED THAT THEY WOULD NOT

ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
CORRECTING THE FAILURES. THE FAILURE MILEAGE
WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
ID Number: 10263716.

230.    New GM has publicly admitted that at least 7 crashes, 8 injuries, and 3 deaths are

linked to this serious safety defect.  However, in reality, the number of reports and complaints is

much higher.

231.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of

numerous complaints and reports from consumers, including reports of crashes, injuries, and

deaths, GM continued to sell these Defective Ignition Switch Vehicles and neither warned the

public nor implemented a recall.

**3.      The Defective Ignition Switch Vehicles which gave rise to the September 4,
2014 recall.**

232.    On September 4, 2014, New GM recalled, *inter alia,* 2008-2009 Pontiac G8

vehicles for yet another ignition switch defect (NHTSA Recall No. 14-V-540).  New GM's letter

to NHTSA stated the total number of affected vehicles as 46,783—but that includes an

indeterminate number of 2011-2013 Chevrolet Caprices manufactured and sold by New GM.

233.    New GM explains that, in these Defective Ignition Switch Vehicles, "there is a

risk, under certain conditions, that some drivers may bump the ignition key with their knee and

unintentionally move the key away from the 'run' position."  New GM admits that, when this

happens, "engine power, and power braking will be affected, increasing the risk of a crash."

Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation

of the sending algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[110]

234.    This recall is directly related to the other ignition switch recalls and involves the same safety risks and dangers.  The defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to the "off" or "accessory" position, which causes the loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increases the risk of a crash.  Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags may not deploy.

235.    The recall occurred after New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA Vehicle Owner Questionnaires, and other data."[111]

236.    Once again, the production of these Defective Ignition Switch Vehicles was a product of GM's systemic devaluation of safety issues, and GM knew or should have known of this defect.

**D.    Safety Defects Of The Airbag Systems Of GM Vehicles.**

**1.    Wiring harness defect.**

237.    On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles for a dangerous defect involving airbags and seatbelt pretensioners.

238.    The affected vehicles were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in

---

[110] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

[111] *Id.*

the affected vehicles may prevent the side impact airbags, front center airbags, and seat belt

pretensioners from deploying in a crash.  The vehicles' failure to deploy airbags and

pretensioners in a crash increases the risk of injury and death to the drivers and front-seat

passengers.

239.    Once again, the available evidence suggests that GM knew of the dangerous

airbag defect but failed to take the requisite remedial action.

240.    As the wiring harness connectors in the side impact airbags corrode or loosen

over time, resistance will increase.  The airbag sensing system will interpret this increase in

resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on

the vehicle's dashboard.  This message may be intermittent at first and the airbags and

pretensioners will still deploy.  But over time, the resistance can build to the point where the

SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[112]  The

problem relates to the use of tin, rather than a more solid material, to connect wire harnesses.

241.    GM knew that in 2008 there was an increase in warranty claims for airbag service

on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  A

September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors

was causing the increased resistance in the airbag wiring.  GM issued  a technical service bulletin

on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC

Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using

Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM began the

---

[112] *See* New GM Notice to NHTSA dated March 17, 2014, at 1.

transition back to gold-plated terminals in certain vehicles and suspended all investigation into the defective airbag wiring without taking further action.[113]

242.    Thus, through the remainder of its corporate history, GM failed to remedy the known hazards caused by the wiring harness defect.

### 2.    Front passenger airbag defect.

243.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY 2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an indeterminate number of which were manufactured and sold by GM.[114]

244.    In the affected vehicles, in certain frontal impact collisions below the airbag deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of the collision (especially given the passenger-side airbag housing is plastic).[115]  These vehicles therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior Impact."[116]

### E.    Safety Defects Of The Seat Belt Systems In GM Vehicles.

### 1.    Seat belt connector cable defect.

245.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY 2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-2010 Saturn Outlook vehicles with a dangerous safety belt defect.

246.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outboard seating positions can fatigue and separate over

---

[113] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[114] *See* March 31, 2014 Letter from New GM to NHTSA.

[115] *Id.*

[116] *Id.*

time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[117]

### 2.  Seat belt retractor defect.

247.   On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seat belt retractor defect.

248.   In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[118]  In the event of a crash, a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[119]

### F.  Safety Defects Affecting The Brakes In GM Vehicles.

### 1.  Brake light defect.

249.   On May 14, 2014, New GM issued a safety recall of approximately 2.4 million MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

250.   In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[120]

251.   Once again, GM knew of the dangerous brake light defect for years but did not take anything approaching the requisite remedial action.

---

[117] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[118] *See* New GM's June 11, 2013 Letter to NHTSA.

[119] *See id.*

[120] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

252.     According to New GM, the brake defect originates in the Body Control Module connection system.  "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[121]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[122]

253.     The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[123]

254.     New GM now acknowledges that the brake light defect "may increase the risk of a crash."[124]

255.     As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may ***not*** turn on when the driver ***does*** depress the brake pedal.[125]

256.     During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[126]  GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector would be "an effective countermeasure to the fretting

---

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.* at 2.

[126] *Id.*

corrosion."[127]  Beginning in November 2008, the Company began applying dielectric grease in its vehicle assembly plants.[128]

257.    On December 4, 2008, GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[129]  One month later, in January 2009, GM recalled only a small subset of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[130]

258.    Not surprisingly, the brake light problem was far from resolved.

259.    GM sat on and concealed its knowledge of the brake light defect for the remainder of its corporate existence, and did not even consider available countermeasures (other than the application of grease that proved ineffective).

**2.    Reduced brake performance defect.**

260.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and 2009 Pontiac G3 vehicles.[131]  Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system module, affecting the closing motion of the valves.[132] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[133]

---

[127] *Id.*

[128] *Id* at 3.

[129] *Id.* at 2.

[130] *Id.*

[131] *See* July 28, 2014 Letter from New GM to NHTSA.

[132] *Id.*

[133] *Id.*

G.      **Safety Defects Affecting The Steering In GM Vehicles.**

1.      **Sudden power-steering failure defect.**

261.    Between 2003 and 2010, over 1.3 million GM vehicles in the United States were

sold with a safety defect that caused the vehicle's electric power steering to suddenly fail during

ordinary driving conditions and revert back to manual steering, requiring greater effort by the

driver to steer the vehicle and increasing the risk of collisions and injuries.

262.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-

2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006

and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles—almost

all of which were manufactured by and sold by GM.

263.    As with the ignition switch defects and many of the other defects, GM was long

aware of the power steering defect but refused to take proper remedial action.

264.    When the power steering fails, a message appears on the vehicle's dashboard, and

a chime sounds to inform the driver.  Although steering control can be maintained through

manual steering, greater driver effort is required, and the risk of an accident is increased.

265.    Documents released by NHTSA show that GM (and then New GM) waited years

to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4800

consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a

complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.

By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per

100,000 vehicles.[134]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

---

[134] *See Search Safety Problems,* NHTSA, https://www-odi.nhtsa.dot.gov/cars/problems/defect/-
results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true (last visited Dec. 8, 2016).

266.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

267.    NHTSA has linked approximately 12 crashes and 2 injuries to the power-steering defect in the Ions.

**2.    Loss of electric power steering assist defect.**

268.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 for a steering defect that may result in a sudden loss of electric power steering assist.[135]

269.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

**H.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac Vehicles.**

270.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

271.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[136]

---

[135] *See* NHTSA Campaign Number 15V064000.

[136] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

I.    **Light Control Module Defect.**

272.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[137]  New GM later updated the number of affected vehicles to 218,000.

273.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[138]

J.    **Electrical Short In Driver's Door Module Defect.**

274.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[139]

275.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

K.    **Low-Beam Headlight Defect.**

276.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

277.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of

---

[137] *See* May 30, 2014 Letter from New GM to NHTSA.

[138] *Id.*

[139] *See* July 2, 2014 Letter from New GM to NHTSA.

illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**L.    Fuel Pump Module Defect.**

278.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

279.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**M.    Overloaded Feed Defect.**

280.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

281.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

**N.      Headlamp Driver Module Failure.**

282.      On October 25, 2014, New GM announced a recall of 273,182 vehicles, including
the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC
Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab
9-7x for headlamp driver module failure.[140]  The number of affected vehicles was later modified
to 269,586.

283.      In the affected vehicles, the headlamp driver module can overheat and fail,
causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the
roadway and reducing visibility of the vehicle to oncoming traffic.

**O.      Valve Cover Gasket Defect.**

284.      On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal,
2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket
defect.[141]  New GM later increased the number of affected vehicles to 50,948, and noted that this
also includes 2004 Pontiac Grand Prix vehicles.

285.      In these vehicles the valve cover gasket may leak causing engine oil to drip onto
the exhaust manifold increasing the risk of fire.

**V.      GM'S PRODUCTION OF DEFECTIVE DELTA IGNITION SWITCH VEHICLES
AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS
STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY
ISSUES IN ITS VEHICLES.**

286.      In a 2008 internal presentation, GM instructed its employees to avoid using the
following judgment words:[142]

Always                        detonate                        Maniacal

---

[140] *See* NHTSA Campaign Number 14V755000.

[141] *See* NHTSA Campaign Number 15V201000.

[142] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

| | | |
|---|---|---|
| Annihilate | disemboweling | Mutilating |
| Apocalyptic | enfeebling | Never |
| Asphyxiating | evil | potentially-disfiguring |
| Bad | eviscerated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | Problem |
| big time | failed | Safety |
| brakes like an "X" car | flawed | safety related |
| Cataclysmic | genocide | Serious |
| Catastrophic | ghastly | spontaneous combustion |
| Challenger | grenade-like | Startling |
| chaotic | grisly | Suffocating |
| Cobain | gruesome | Suicidal |
| condemns | Hindenburg | Terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | Tomblike |
| critical | impaling | Unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

287.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in place of accurate descriptions of material safety defects such as the ignition switch defects and the other defects discussed herein.  To avoid disclosure of the material safety risks, and furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[143]

---

[143] NHTSA Consent Order at Exhibit B (emphasis added).

288.    GM knew its Delta Ignition Switch Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in the Delta Ignition Switch Vehicles, and the other defective GM Vehicles, GM repeatedly blamed accidents on driver error.

289.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety.  Additional examples of GM's cavalier approach to safety follow.

290.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

291.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[144]  As a result, "GM personnel failed to raise significant issues to key decision-makers."[145]

292.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

---

[144] *Id*. at 252.

[145] *Id*. at 253.

293.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[146]

294.    The focus of GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

295.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[147]  TREAD was the principal database used by GM to track incidents related to its vehicles.[148]  Generally, the TREAD Reporting team consisted of employees who conducted monthly searches and prepared scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[149]

296.    GM severely understaffed the TREAD Reporting team and did not provide it with the resources to obtain the advanced data mining software to better identify and understand potential defects, thereby making it far less likely that safety defects would be remediated.[150]

297.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[151]

---

[146] Valukas Report at 251.

[147] *Id*. at 306.

[148] *Id*.

[149] *Id*. at 307.

[150] *Id*. at 307-308.

[151] Valukas Report at 255.

298.    Similarly, GM had a siloed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

299.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[152]

300.    According to the Valukas Report, part of the failure to properly correct the Delta Ignition Switch Defect was due to problems with GM's organizational structure[153] and a corporate culture that did not care enough about safety.[154]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[155] and the improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[156]

## VI.    GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DELTA IGNITION SWITCH VEHICLES.

301.    Throughout its history, GM regularly used print media, press releases, and television and video media to represent its vehicles as safe, reliable, quality products that provide great value to purchasers, and retain their value over time better than other manufacturers' vehicles.  GM also used these media to present itself as an honest, above-board, values-oriented company with integrity. In truth, however, GM was concealing serious safety hazards and endangering its own customers.

302.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding quality and great value…  That's leadership, that's GM."[157]

---

[152] Valukas Report at 256.

[153] Id. at 259-260.

[154] Id. at 260-61.

[155] Id. at 263.

[156] Id. at 264.

[157] https://www.youtube.com/watch?v=h19lFAwGDwU.

303.    In 1989, a GM commercial represented:

"Fact:  GM cars have held their resale value better than any other U.S. make."[158]



304.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[159]



305.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and

safe:

We are fans and nothing keeps us from the game.  We need cars and trucks as reliable as we are.  Season after season.  And when

---

[158] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

[159] https://www.youtube.com/watch?v=_hR7-7eKufQ.

the game is over, we need to know that what got us there will also
get us safely home. Delivering cars and trucks that fans count on
is what makes us General Motors.[160]

306.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the

car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn

ION sets itself apart from competitors with innovative features, unique personalization

opportunities and surprising levels of safety, sophistication and fun."[161]

307.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala

"offers a comprehensive safety package, solid body structure, room for five passengers, plenty of

cargo space, a surprising number of amenities for the price, and a track record of outstanding

quality, reliability and durability."[162]

308.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and

acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and

comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's

history."[163]

309.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo

that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[164]

310.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix

that explained that "[s]afety is always a high priority for Grand Prix."[165]

311.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

---

[160] https://www.youtube.com/watch?v=Dt12Gti12iA.

[161] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[162] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

[163] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[164] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

[165] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

> [S]ince 1997, the new Malibu has offered buyers excellent
> performance, safety and comfort in a trim, stylish package.  For
> 2003, Chevrolet Malibu remains a smart buy for those who want a
> well-equipped midsize sedan at an attractive price.  …  Designed
> for individuals or families with high expectations of quality,
> reliability, safety, driving pleasure, and affordability, the Malibu
> appeals to domestic and import owners.[166]

312.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining

that, "[t]he ION sedan and quad coupe are designed to carry on the Saturn tradition of being at

the top of the class when it comes to safety and security.  The world-class structural design

provides the foundation for this focus on safety.  The steel spaceframe's front and rear crush

zones help absorb the energy of a crash while protecting the integrity of the safety cage."[167]

313.    On October 4, 2003, GM's website stated that "[m]otor vehicle safety is important

to GM and to our customers.  It is at the top of mind in many of the thousands of decisions that

are made every day in engineering and manufacturing today's cars, trucks, and SUVs/ Motor

vehicle safety is a significant public health concern in the U.S., and GM is proud to partner with

government agencies, emergency responders and health care workers in addressing that

challenge."[168]

---

[166] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[167] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

[168] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle
_shopping/suv_facts/100_safety/index.html.



314.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"
which highlighted safety features such as electronic stability control.  GM stated:  "We want to
bring this kind of safety, security and peace-of-mind to all of our customers because it's the right
thing to do, and because only GM can do it."

**Only GM**

For example, we recently launched a new corporate adver-
tising campaign under the theme, "Only GM." It's part of
an effort to use the GM brand more aggressively and with
more purpose, to show that we're leading the industry in
ways that only GM can.

The "Only GM" campaign began by highlighting our plans to
equip all our cars and trucks sold to retail customers in the
United States and Canada with OnStar and StabiliTrak, GM's
electronic stability control system. We want to bring this kind
of safety, security and peace-of-mind to all of our customers
because it's the right thing to do, and because only GM can
do it. We also want potential customers to know that GM
offers them great value, and that buying GM matters. (For
more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

315.    And in the same Report, under the banner "Peace of mind," GM represented that
"[o]nly GM can offer its customers the assurance that someone is looking out for them and their
families when they're on the road," and that  "[t]his commitment to safety makes GM the only
automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety
protection before, during and after vehicle collisions."



(GM's 2004 Annual Report, p. 22.)

316.    On May 10, 2004, GM's website announced that its "aim is to improve motor vehicle safety for customers, passengers, and other motorists.  Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these expectations and to protect customers and their families while they are on the road."  The website continued, "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles, and we support many programs aimed at encouraging safer motor vehicle use…."[169]

317.    On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM, and we constantly strive to make our cars and trucks safe.  We also continue our support for groups such as the National SAFE KIDS Campaign, and a number of programs aimed at encouraging safer motor vehicle use."[170]

318.    GM's June 4, 2004, website published a message from its CEO, Rick Wagoner, on corporate responsibility.  Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance of corporate responsibility and the value of sustainable development, we at General Motors are fortunate to have inherited a legacy of doing business the right way.  It's a great asset.  And, it's a huge obligation … one we take very seriously.  What we call "winning with integrity" is not an optional or occasional behavior at GM.  Integrity is one of our core values, and a way of doing business that helps us realize our company's full potential….In short, "winning with integrity" is much more than a one-time exercise at GM. It's how we work every day.  It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[171]

---

[169] http://web.archive.org/web/20040510221647/http://www.gm.com/company/gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[170] http://web.archive.org/web/20040604055658/http://www.gm.com/company/gmability/sustainability/reports/03/safety.html.

[171] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability/sustainability/reports/03/wagoner_message.html.

319.    In its 2005 Annual Report, GM stated:  "We are driving quality and productivity even further."  "Lasting quality—That is why restoring confidence in quality is just as important as design in rebuilding our brands….  We are focused on providing our customers with the best quality experience over the lifetime of GM ownership."



320.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly designed packages that lead the segment in performance, safety, efficiency and capability."[172]

321.    On September 9, 2005, GM's website described its safety technology as "Helping You Avoid a Crash" and "Giving the driver information never possible before."[173]

---

[172] GM's 2005 Annual Report, p. 23.

[173] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/
safety/avoid_crash/index.html.



322.    At the same time GM announced what it called the next big step in safety:[174]

> No matter what vehicle you drive, your safety is vital.  GM is
> looking out for you—you deserve that peace of mind on the road.
> Which is why at GM, we've taken the next big step in our
> commitment to provide more customers with more safety and
> security.



323.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM

stated:

---

[174] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

From an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year— stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market.[175]

324.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[176]

325.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[177]

326.    GM's website on August 9, 2006, stated:[178]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

BEFORE:  Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called 'active safety' technologies),

DURING:  Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called 'passive safety'), and

AFTER:  Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

…

---

[175] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[176] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[177] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[178] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

327.    GM's website on September 6, 2006, stated:[179]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

\* \* \*

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well.  GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash.  GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

328.    GM stated on its website in October 29, 2006 it is a leader in automotive safety

and that its safety leadership extends as far back as the birth of GM.[180]

---

[179] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.

[180] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/ safety/safety_firsts/index.html.



329.    In a video published on January 2, 2007, GM's Vice Chairman of Product Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has predominately been known for customer service, fair dealers, honest dealers and having happy buyers."[181]

330.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure and Safety Integration, stated "[o]ur aim is to improve motor vehicle safety for customers, passengers and other motorists.  Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these expectations and to protect customers and their families while they are on the road."  Further, Lange stated, "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles…."[182]

331.    In its 2007 Annual Report, GM stated:

> In 2007, we continued to implement major improvements to our
> U.S. sales and marketing strategy.  Over the past two years, we've

---

[181] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[182] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

re-focused our marketing efforts to emphasize the strength and
value of our products and brands….

We also continued to make progress in our long-term effort to
improve quality….

We've also witnessed, since 2005, an 89 percent reduction in
vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

332.    Moreover, GM represented that it "actively studies trends of claims" to take

action to improve vehicle quality:

> **POLICY, WARRANTY AND RECALLS**
> Provisions for estimated expenses related to policy and product warranties
> are made at the time products are sold. These estimates are established using
> historical information on the nature, frequency, and average cost of claims. We
> actively study trends of claims and take action to improve vehicle quality and
> minimize claims. Actual experience could differ from the amounts estimated
> requiring adjustments to these liabilities in future periods.

(GM 2007 Annual Report, p. 74.)

333.    In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve,

GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's

transformation is being driven by high-quality cars and trucks that look great, drive great, are

fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated, "[n]o other

automaker provides such a diverse lineup of cars and trucks that meets the needs of customers

that range from college studies to contactors.  And our five-year, 100,000-mile powertrain

warranty—the most comprehensive in the industry—adds even more value to the bottom line,

demonstrating that we are putting our money where our mouth is on vehicle quality."[183]

334.    On August 1, 2007, GM represented that:

The Cobalt enters the 2008 model year on the heels of a successful
'07 model year, which introduced several significant
enhancements, including more powerful Ecotec engines.  For '08,

---

[183] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

the Cobalt builds on that powerful foundation with a streamlined model lineup and more standard safety and convenience equipment…."[184]

335.    On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's value story with new features and revisions that add to its safety and efficiency, including the addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models…."[185]

336.    In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and side curtain airbags are standard on all models."[186]

337.    In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM represented that the "Lucerne's body structure is designed to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions.  Active safety and handling features offered on Lucerne include a four-channel anti-lock braking system and traction control; an auto-level rear suspension that automatically adjusts the vehicle height for heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which senses emergency braking situations and boosts power as needed."[187]

338.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM represented that the "Grand Prix's convenience and safety features are perfect for drivers who enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand

---

[184] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

[185] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

[186] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[187] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

Prix remains a driver's car inside and out.  The active and passive safety features on the Grand

Prix include standard four-wheel disc brakes, traction control and daytime running lamps."[188]

339.    GM's website on January 15, 2008, stated "GM incorporates a total safety

philosophy into each of its designs to help protect you in a collision—and keep one from

occurring in the first place."[189]

340.    In February 2008, GM aired a Chevy Malibu commercial during The Grammy's

which stated the Chevy Malibu was "built to last" "because safety should last a lifetime."  The

commercial used images of a child being raised to adulthood, in order to convey protection and

safety.[190]

341.    On its website in March of 2008, GM stated it was delivering the best cars and

trucks in its 100-year history, and that it was "Obsessed with Quality."  The website also spoke

of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into

each of its designs to help protect you in a collision—and keep one from occurring in the first

place."[191]

---

[188] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

[189] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[190] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[191] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/;
http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and
http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



## VII.    CLASS ALLEGATIONS.

342.    Under B.R. 7023, Claimants files this Proof of Claim on behalf of themselves and a proposed Class and Subclasses initially defined below.

343.    Excluded from the Class and the Subclasses are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

### A.    The Class.

344.    Claimants allege claims, under the consumer protection, fraudulent concealment and unjust enrichment laws of each state and the District of Columbia (all of which are the same or substantially similar):

> All persons in the United States who either bought or leased a
> Delta Ignition Switch Vehicle prior to July 10, 2009.

345.    "Delta Ignition Switch Vehicles" include the following, provided they were purchased or leased prior to July 10, 2009:

| DELTA IGNTION SWITCH VEHICLES |
| --- |
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

**B.    The Delta Ignition Switch Implied Warranty Subclass.**

346.    Claimants also allege implied warranty claims under the substantially similar laws of the following jurisdictions for the Delta Ignition Switch Implied Warranty Subclass on behalf of persons with vehicles sold or leased as new or certified pre-owned prior to July 10, 2009: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

**C.    The Delta Ignition Switch Negligence Subclass**

347.    Claimants also allege negligence claims under the substantially similar laws of the following jurisdictions for the Delta Ignition Switch Negligence Subclass on behalf of persons with vehicles sold or leased as new or certified pre-owned prior to July 10, 2009:  Arkansas, California, Maryland, Louisiana and Ohio.

**D.     The Class And The Subclasses Meet The Requirements For Class Certification.**

348.     Individual joinder of all Class or Subclass members is impracticable, given that

GM manufactured and sold approximately 1.6 million Delta Ignition Switch Vehicles in the

United States.

349.     The Class disclaims recovery, in this Proof of Claim, for physical injury resulting

from the safety defects alleged herein.  But the increased risk of injury from the defects serves as

an independent justification for the relief sought by Claimants and the Class.

350.     The Class can be readily identified using registration records, sales records,

production records, and other information kept by GM's successor, New GM, or third parties in

the usual course of business and within their control.

351.     Questions of law and fact are common to the Class and predominate over

questions affecting only individual members, including the following:

> 1.     Whether the Delta Ignition Switch Vehicles suffer from safety
>        defects;
>
> 2.     Whether GM fraudulently concealed the defect;
>
> 3.     Whether GM misrepresented that the Delta Ignition Switch
>        Vehicles were safe;
>
> 4.     Whether GM engaged in fraudulent, deceptive or unfair acts or
>        practices by failing to disclose that the Delta Ignition Switch
>        Vehicles were designed, manufactured, and sold with safety
>        defects and that GM systematically valued cost-cutting over safety;
>
> 5.     Whether GM was unjustly enriched at the expense of Claimants
>        and the Class;
>
> 6.     Whether GM breached the implied warranty of merchantability in
>        connection with the Delta Ignition Switch Vehicles;
>
> 7.     Whether GM was negligent in its design and manufacture of the
>        Delta Ignition Switch Vehicles, and/or in failing to warn of the
>        known defect and failing to recall the vehicles; and

8.      Whether Claimants and the Class are entitled to a remedy as a
result of GM's fraudulent, inequitable and/or negligent conduct.

352.    Claimants' claims are typical of the claims of the Class and Subclass members, and arise from the same course of conduct by GM.  The relief Claimants seeks is typical of the relief sought for the absent Class and Subclass members.

353.    Claimants will fairly and adequately represent and protect the interests of all absent Class and Subclass members.  Claimants are represented by counsel competent and experienced in product liability, consumer protection, and class action litigation, as well as counsel experienced in bankruptcy litigation.

354.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual Class and Subclass members is impracticable.  Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.   B.R. 7023 provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce any management challenges that may arise.

355.    The prosecution of separate actions by the individual Class and Subclass members would create a risk of inconsistent or varying adjudications for individual Class and Subclass members.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

356.    Claimants are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Claimants

anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class and Subclasses.

357.    Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for GM's misconduct.

## VIII.   THE CLASS' AND SUBCLASSES' CLAIMS

**A.    Class Claims**

**1.    Fraudulent concealment.**

358.    Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

359.    This claim is brought on behalf of the Class.

360.    The law of fraudulent concealment is essentially identical in each state, as virtually every state generally follows the principles of §§ 550 and 551 of the RESTATEMENT (SECOND) OF Torts.

361.    Under Section 550, "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."

362.    Under Section 551:

> (1)  One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2)  One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a)  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b)  matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c)  subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d)  the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

363.    As alleged above and discussed below, GM's fraudulent concealment of the safety defects and other material information concerning the Delta Ignition Switch Vehicles renders GM liable to Claimants and the Class under the law of fraudulent concealment of each state and the District of Columbia.

364.    GM concealed and suppressed material facts concerning the quality and safety of GM vehicles in general and in the Delta Ignition Switch Vehicles in particular.

365.    GM concealed and suppressed material facts concerning the culture of GM – a culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

366.    GM concealed and suppressed material facts concerning the safety defects alleged herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did

not reveal known safety defects, including the Delta Ignition Switch Defect, to regulators or consumers.

367.    GM did so in order to boost confidence in its vehicles, including the Delta Ignition Switch Vehicles, and falsely assure owners, purchasers and lessees of the Delta Ignition Switch Vehicles that GM was a reputable manufacturer that stood behind its vehicles after they were sold and ensured that its vehicles were safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Delta Ignition Switch Vehicles and because they played a significant role in the value of the vehicles.

368.    GM had a duty to disclose the Delta Ignition Switch Defect because it was known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew the facts were not known to or reasonably discoverable by Claimants and the Class.  These omitted and concealed facts were material because they directly impact the value of the Delta Ignition Switch Vehicles purchased or leased by Claimants and the Class.  Whether a product is safe and reliable, and whether the manufacturer stands behind the product, is a material concern to a consumer.

369.    GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition Switch Vehicles.  Having provided information to the Class, GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the TREAD Act.

370.    GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and it did so at the expense of Claimants and the Class.

371.    GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Claimants and the Class.

372.    Claimants and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Claimants' and the Class' actions were justified.  GM was in exclusive control of the material facts and such facts were not known to the public, Claimants, or the Class.

373.    Because of the concealment and/or suppression of the facts, Claimants and the Class sustained damage.  Had they been aware of the safety defects in their Delta Ignition Switch Vehicles and GM's disregard for safety, Claimants and the Class either would have paid less for their vehicles or would not have purchased them at all.   Claimants and the Class did not receive the benefit of their bargain as a result of GM's fraudulent concealment.

374.    More specifically, Claimants and the Class were damaged by GM's fraudulent concealment in at least the following ways:

a.    Class members were fraudulently induced into purchasing their Delta Ignition Switch Vehicles and/or paying more than they otherwise would have had the defect been revealed.

b.    Class members remained in possession of vehicles of diminished value which GM would otherwise have been compelled to fix or replace.

c.    Class members incurred expense and loss in connection with their efforts to repair the defective Delta Ignition Switches and/or eliminate or reduce

the risks and costs to which they were exposed by the Delta Ignition Switch

Vehicles.

> d. Class members incurred the inconvenience and expense of having

a recall repair done.

375. Without limitation, Claimants and the Class therefore seek a full refund of the

purchase price paid for their Delta Ignition Switch Vehicles (or the overpayments they made for

the vehicles) together with any and all other available compensatory, incidental and

consequential damages (save for personal injury damages) they may have suffered as a result of

their leasing and/or ownership of a Delta Ignition Switch Vehicle, and punitive damages given

the extremely outrageous and reprehensible conduct perpetrated by GM to keep and increase the

numbers of highly-dangerous Delta Ignition Switch Vehicles on the road in order to avoid the

expense and adverse publicity of the requisite safety recall.

## 2. Unjust enrichment.

376. Claimants reallege and incorporate by reference all paragraphs as though fully set

forth herein.

377. This claim is brought on behalf of the Class.

378. The law of unjust enrichment is essentially identical in each state.

379. GM received and retained a benefit from Claimants and the Class and inequity

resulted.

380. GM benefitted from selling and leasing the Delta Ignition Switch Vehicles, whose

value was artificially inflated by GM's concealment of the defect as well as systemic safety

issues that plagued the GM brand, for more than they were worth, at a profit, and Claimants and

the Class overpaid for their defective Delta Ignition Switch Vehicles and were forced to pay

other costs.

381.    In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

382.    Thus, Claimants and all Class members conferred a benefit on GM.

383.    It was inequitable for GM to retain these benefits.

384.    Claimants and the Class were not aware of the true facts about their Delta Ignition Switch Vehicles, and did not benefit from GM's conduct.

385.    GM knowingly accepted the benefits of its unjust conduct.

386.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**3.    Consumer Protection Claims**

387.    Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

388.    This claim is brought on behalf of the Class.

389.    The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting commerce…."  15 U.S.C. § 45.

390.    390.    As set forth below, the Class states claims under the consumer protection statutes of every U.S. jurisdiction.

**a.    Alabama-Violations of Alabama Deceptive Trade Practices Act (ALA. CODE § 8-19-1, *et seq.*)**

391.    Claimants, on behalf of themselves and all Class members who are Alabama residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

392.     Claimants are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

393.     Claimants and GM are "persons" within the meaning of ALA. CODE § 8-19-3(5).

394.     The Delta Ignition Switch Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

395.     GM was engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

396.     The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.  By concealing the defects in the Delta Ignition Switch Vehicles and promoting the safety of GM vehicles, GM engaged in deceptive business practices prohibited by the Alabama DTPA, including:  representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; advertising Delta Ignition Switch Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving a Delta Ignition Switch Vehicle has been supplied in accordance with a previous representation when it has not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.  The defects in each vehicle include not only the specific defect (*i.e.*, the Delta Ignition Switch), but also include the defective process through which GM built cars, a process

that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of

resources devoted to recognizing and studying safety issues, the failure to follow acceptable

engineering and inventory processes concerning parts management, and the failure to follow a

proper FMEA process.  All of these defects would be material to a reasonable consumer.

397.    GM also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of Delta Ignition Switch Vehicles.

398.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Alabama DTPA.

399.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

400.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

401.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

402.    GM knew or should have known that its conduct violated the Alabama DTPA.

403.    As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles and the GM brand that were either false or misleading.

404.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

>           a.    Possessed exclusive knowledge about the defects in the
>                 Delta Ignition Switch Vehicles;

  b.  Intentionally concealed the foregoing from Claimants;

  c.  Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

  d.  Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

405. Because GM fraudulently concealed the defects in GM vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further, Claimants had to spend their time and money to bring their Delta Ignition Switch Vehicles in for repair.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

406. GM's concealment of the defects in Claimants' vehicles was material to Claimants.

407. Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they known of the defect in their vehicles, Claimants who purchased or leased Delta Ignition Switch Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

408. GM's unlawful acts and practices complained of herein affected the public interest.

409. As a direct and proximate result of GM's violations of the Alabama DTPA, Claimants have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of GM's misconduct, all Claimants incurred damages in at least the form of lost time required to repair their vehicles.

410.    Pursuant to ALA. CODE § 8-19-10, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Claimant.

411.    Claimants also seek an order of attorneys' fees, and any other just and proper relief available under ALA. CODE § 8-19-1, *et seq.*

> **b.    Alaska-Violations of the Alaska Unfair Trade Practices and Consumer Protection Act (ALASKA STAT. § 45.50.471, *et seq.*)**

412.    Claimants, on behalf of themselves and all Class members who are Alaska residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

413.    The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or  "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."  ALASKA STAT. § 45.50.471.

414.    GM participated in misleading, false, or deceptive acts that violated the Alaska CPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Alaska CPA.  GM also engaged in unlawful trade practices by representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Delta Ignition Switch Vehicles.  The defects in each vehicle include not only the specific defect (*i.e.*, the Delta Ignition Switch), but also include the defective process through which GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defects would be material to a reasonable consumer.

415.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

416.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

417.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Alaska CPA.

418.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

419.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

420.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

421.    GM knew or should have known that its conduct violated the Alaska CPA.

422.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles and the GM brand that were either false or misleading.

423.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

424.    Because GM fraudulently concealed the defects in GM vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further,

Claimants had to spend their time and money to bring their Delta Ignition Switch Vehicles in for repair. Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

425.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

426.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they known about the defect in their vehicles, Claimants would have paid less for their vehicles or would not have purchased or leased them at all.

427.    GM's violations presented a continuing risk to Claimants as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

428.    As a direct and proximate result of GM's violations of the Alaska CPA, Claimants have suffered injury-in-fact and/or actual damage as alleged above. As a direct result of GM's misconduct, all Claimants incurred damages in at least the form of lost time required to repair their vehicles.

429.    Pursuant to ALASKA STAT. § 45.50.531, Claimants seek monetary relief against GM measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Claimant.

430.    Claimants also seek attorneys' fees, and any other just and proper relief available under the Alaska CPA.

c.    **Arizona-Violations of the Consumer Fraud Act (ARIZ. REV. STAT. § 44-1521, *et seq.*)**

431.    Claimants, on behalf of themselves and all Class members who are Arizona residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

432.    GM and Claimants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

433.    The Delta Ignition Switch Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

434.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Arizona CFA.

435.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

436.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

437.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

438.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the Arizona CFA.

439.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

440.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

441.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

442.    GM knew or should have known that its conduct violated the Arizona CFA.

443.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

444.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

445.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

446.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

447.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

448.    As a direct and proximate result of GM's violations of the Arizona CFA, Claimants have suffered injury-in-fact and/or actual damage.

449.    Claimants seek monetary relief against GM, as well as attorneys' fees, and any other just and proper relief available under the Arizona CFA.

> **d.      Arkansas-Violations of the Deceptive Trade Practice Act
> (ARK. CODE § 4-88-101, *et seq.*)**

450.    Claimants, on behalf of themselves and all Class members who are Arkansas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

451.    GM and Claimants are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE § 4-88-102(5).

452.     The Delta Ignition Switch Vehicles are "goods" within the meaning of ARK. CODE § 4-88-102(4).

453.     The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  ARK. CODE § 4-88-108.  GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, concealing the defects in the Delta Ignition Switch Vehicles and otherwise engaging in activities with a tendency or capacity to deceive.

454.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

455.     In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

456.     GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

457.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Arkansas DTPA.

458.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

459.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

460.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

461.    GM knew or should have known that its conduct violated the Arkansas DTPA.

462.    As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

463.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
reliability of the Delta Ignition Switch Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

464.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

465.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

466.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

467.    As a direct and proximate result of GM's violations of the Arkansas DTPA,

Claimants have suffered injury-in-fact and/or actual damage.

468.    Claimants seek monetary relief against GM.  Claimants also seek attorneys' fees,

and any other just and proper relief available under the Arkansas DTPA.

        **e.**      **California**

        **(1)**      **Violations of the California Consumer Legal Remedies Act
(CAL. CIV. CODE § 1750, *et seq.*)**

469.    Claimants, on behalf of themselves and all Class members who are California

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

470.    GM was a "person" under CAL. CIV. CODE § 1761(c).

471.    Claimants and the Class are "consumers," as defined by CAL. CIV. CODE

§ 1761(d), who purchased or leased one or more Delta Ignition Switch Vehicles.

472.    The California Consumer Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a). GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*, as described above and below, by, among other things, concealing the known defects in the Delta Ignition Switch Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles are of a particular standard, quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving a Delta Ignition Switch Vehicle has been supplied in accordance with a previous representation when it has not.

473.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

474.    In the course of its business, GM concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

475.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants and the Class.

476.    By failing to disclose and by actively concealing the defects in the Delta Ignition Switch Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the CLRA.

477.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class' vehicles.

478.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class, about the true safety and reliability of their vehicles.

479.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead the Class.

480.    GM knew or should have known that its conduct violated the CLRA.

481.    GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

482.    GM owed the Class a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from the Class;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from the Class that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

483.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, the vehicle owners and lessees were deprived of the benefit of their bargain since the vehicles they purchased or leased were worth less than they would have been if they were free from the defects.  Had the Class been aware of the defects in their vehicles, they would have either not bought or leased their Delta Ignition Switch Vehicles or would have paid less for them.

484.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

485.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Vehicles, Class members either would have paid less for their vehicles or would not have purchased or leased them at all.  The Class also incurred repair and recall costs, as alleged above.

486.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

487.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

488.    Under CAL. CIV. CODE § 1780(b), the Class seeks an additional award of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  GM knew or should have known that its conduct was directed to one or more Class members who are senior citizens or disabled persons.   GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Class members who are senior citizens or disabled persons were substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

489.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

### (2)    Violations of the California Unfair Competition Law ("UCL") (CAL. BUS. & PROF. CODE § 17200, *et seq.*)

490.    Claimants, on behalf of themselves and all Class members who are California residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

491.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." GM engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

492.    GM violated the unlawful prong of § 17200 by the following:

    a.    violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set forth above.

    b.    violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations. FMVSS number 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that the defect is safety related. *See* 49 C.F.R. § 573.6. GM violated these reporting requirements by failing to report the defects in the Delta Ignition Switch Vehicles within the required time, and failing to timely recall all impacted vehicles.

493.    GM also violated the "fraudulent" prong of § 17200 by concealing the defects in the Delta Ignition Switch Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of the vehicles.

494.    GM also violated the unfair prong of § 17200 because the acts and practices set forth above, including devaluing safety and concealing the defects in the Delta Ignition Switch Vehicles, offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices. GM's conduct also impaired

competition within the automotive vehicles market and prevented the Class from making fully informed decisions about whether to lease, purchase and/or retain their vehicles.

495.     In the course of its business, GM concealed the defects in Class members' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and lease of the Delta Ignition Switch Vehicles.

496.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

497.     GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by the Class.

498.     By failing to disclose and by actively concealing the defects in Class members' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the UCL.

499.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Class members' vehicles.

500.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Class members, about the true safety and reliability of their vehicles.

501.      GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead the Class.

502.     GM knew or should have known that its conduct violated the UCL.

503.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

504.    GM owed the Class a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from the Class;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from the Class that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

505.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, the vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Class members been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

506.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

507.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Vehicles, Class members either would have paid less for their vehicles or would not have purchased or leased them at all.

508.    As a direct and proximate result of GM's violations of the UCL, Class members have suffered injury-in-fact and/or actual damage.

509.    Claimants request that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Class members any money lost as the result of GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. CODE § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

### f.      Colorado-Violations of the Colorado Consumer Protection Act (COL. REV. STAT. § 6-1-101, *et seq.*)

510.    Claimants, on behalf of themselves and all Class members who are Colorado residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

511.    GM was a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq.*

512.    Claimants are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

513.    The Colorado CPA prohibits deceptive trade practices in the course of a person's business.  GM engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Delta Ignition Switch Vehicles that had the capacity or tendency to deceive Claimants; (2) representing that the Delta Ignition Switch were of a particular standard, quality, and grade even though GM knew or should have known they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Delta Ignition Switch that was known to GM at the time of advertisement or sale with the intent to induce Claimants to purchase, lease or retain the Delta Ignition Switch Vehicles.

514.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

515.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

516.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

517.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Colorado CPA.

518.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

519.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

520.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

521.    GM knew or should have known that its conduct violated the Colorado CPA.

522.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

523.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

524.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

525.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

526.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.

527.    As a direct and proximate result of GM's violations of the Colorado CPA, Claimants have suffered injury-in-fact and/or actual damage.

528.    Pursuant to COLO. REV. STAT. § 6-1-113, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial

and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for

each Claimant.

529.    Claimants also seek attorneys' fees, and any other just and proper relief available

under the Colorado CPA.

   **g.**  **Connecticut-Violations of Connecticut Unlawful Trade Practices Act (CONN. GEN. STAT. § 42-110a,** *et seq.***)**

530.    Claimants, on behalf of themselves and all Class members who are Connecticut

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

531.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides:

"No person shall engage in unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

532.    GM was a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

GM's challenged acts occurred in "trade" or "commerce" within the meaning of CONN. GEN.

STAT. § 42-110a(4).

533.    GM participated in deceptive trade practices that violated the Connecticut UTPA

as described herein.  In the course of its business, GM concealed the defects in the Delta Ignition

Switch Vehicles as described herein and otherwise engaged in activities with a tendency or

capacity to deceive.  GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

of any material fact with intent that others rely upon such concealment, suppression or omission,

in connection with the sale of Delta Ignition Switch Vehicles.  In the course of its business, GM

concealed the defects in Claimants' vehicles as described herein and otherwise engaged in

activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices

by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

534.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

535.     In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

536.     GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

537.     By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

538.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

539.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

540.     GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

541.     GM knew or should have known that its conduct violated the Connecticut UTPA.

542.     As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

543.     GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

   a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

   b.     Intentionally concealed the foregoing from Claimants;

   c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

   d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

544.     Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

545.     GM's concealment of the defects in Claimants' vehicles was material to Claimants.

546.     Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

547.    As a direct and proximate result of GM's violations of the Connecticut UTPA, Claimants have suffered injury-in-fact and/or actual damage.

548.    Claimants are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

### h.    Delaware-Violations of the Delaware Consumer Fraud Act (6 DEL. CODE § 2513, *et seq.*)

549.    Claimants, on behalf of themselves and all Class members who are Delaware residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

550.    GM was a "person" within the meaning of 6 DEL. CODE § 2511(7).

551.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

552.    GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, GM concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

553.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

554.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

555.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

556.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Delaware CFA.

557.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

558.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

559.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

560.    GM knew or should have known that its conduct violated the Delaware CFA.

561.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

562.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

     a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

563.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

564.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

565.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

566.    As a direct and proximate result of GM's violations of the Delaware CFA, Claimants have suffered injury-in-fact and/or actual damages.

567.    Claimants seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of GM's unlawful conduct.  *See*, *e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983).  Claimants also seek an order for declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

568.    GM engaged in gross, oppressive, or aggravated conduct justifying the imposition

of punitive damages.

> i.    **District of Columbia-Violations of the Consumer Protection
> Procedures Act (D.C. CODE § 28-3901, *et seq.*)**

569.    Claimants, on behalf of themselves and all Class members who are District of

Columbia residents (for the purposes of this Count, the "Class"), reallege and incorporate by

reference all paragraphs as though fully set forth herein.

570.    GM was a "person" under the District of Columbia Consumer Protection

Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

571.    Claimants are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who

purchased or leased one or more Delta Ignition Switch Vehicles.

572.    GM's actions as set forth herein constitute "trade practices" under D.C. CODE

§ 28-3901.

573.    GM participated in unfair or deceptive acts or practices that violated the District

of Columbia CPPA.  By systematically concealing the defects in the Delta Ignition Switch

Vehicles, GM engaged in unfair or deceptive practices prohibited by the District of Columbia

CPPA, D.C. CODE § 28-3901, *et seq.*, including:  (1) representing that the Delta Ignition Switch

Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2)

representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and

grade when they are not; (3) advertising the  Delta Ignition Switch Vehicles with the intent not to

sell them as advertised; (4) representing that the subject of a transaction involving the Delta

Ignition Switch Vehicles has been supplied in accordance with a previous representation when it

has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing

to state a material fact when such failure tends to mislead.

574.    In the course of its business in trade or commerce, GM systematically concealed the defects in the Delta Ignition Switch Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

575.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

576.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

577.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

578.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the District of Columbia CPPA.

579.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

580.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

581.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

582.    GM knew or should have known that its conduct violated the District of Columbia CPPA.

583.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

584.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

585.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

586.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

587.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above

588.    As a direct and proximate result of GM's violations of the District of Columbia CPPA, Claimants have suffered injury-in-fact and/or actual damage.

589.    Claimants are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

590.    Claimants seek punitive damages against GM because its conduct evidences malice and/or egregious conduct.  GM maliciously and egregiously misrepresented the safety and reliability of the Delta Ignition Switch Vehicles, deceived Claimants on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Claimants that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting deadly flaws in the Delta Ignition Switch Vehicles.  This unlawful conduct constitutes malice warranting punitive damages.

####    j.    Florida-Violations of the Florida Unfair & Deceptive Trade Practices Act (FLA. STAT. § 501.201, *et seq.*)

591.    Claimants, on behalf of themselves and all Class members who are Florida residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

592.    Claimants are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

593.    GM engaged in "trade or commerce" within the meaning of FLA. STAT.
§ 501.203(8).

594.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." FLA. STAT. § 501.204(1).  By concealing the known defects in Claimants' vehicles, GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.  The defects in each vehicle include not only the specific defect (*i.e.*, the Delta Ignition Switch), but also include the defective process through which GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defects would be material to a reasonable consumer.

595.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

596.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

597.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the FUDTPA.

598.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

599.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

600.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

601.    GM knew or should have known that its conduct violated the FUDTPA.

602.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles and the GM brand that were either false or misleading.

603.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

604.    Because GM fraudulently concealed the defects, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further, Claimants had to spend their time and money to bring their Delta Ignition Switch Vehicles in for repair.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would

have either not have bought their Delta Ignition Switch Vehicles or would have paid less for them.

605.     GM's concealment of the defects in Claimants' vehicles was material to Claimants.

606.     Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they known the truth about the defects, Claimants either would have paid less for their Delta Ignition Switch Vehicles or would not have purchased or leased them at all.

607.     GM's violations presented a continuing risk to Claimants as well as to the general public.   GM's unlawful acts and practices complained of herein affected the public interest.

608.     As a direct and proximate result of GM's violations of the FUDTPA, Claimants have suffered injury-in-fact and/or actual damage as alleged above.

609.     Claimants are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

> **k.     Georgia-Violations of Georgia's Fair Business Practices Act (GA. CODE § 10-1-390, *et seq.*)**

610.     Claimants, on behalf of themselves and all Class members who are Georgia residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

611.     The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or

services are of a particular standard, quality, or grade … if they are of another," and

"[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN.

§ 10-1-393(b).

612.    By systematically concealing the defects in the Delta Ignition Switch Vehicles,

GM engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including:  (1)

representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and

qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a

particular standard, quality, and grade when they are not; and (3) advertising the Delta Ignition

Switch Vehicles with the intent not to sell them as advertised.  GM participated in unfair or

deceptive acts or practices that violated the Georgia FBPA.

613.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

614.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

615.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

616.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Georgia FBPA.

617.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

618.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

619.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

620.    GM knew or should have known that its conduct violated the Georgia FBPA.

621.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

622.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

623.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.  Claimants also incurred repair costs, as alleged above.

624.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

625.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.

626.    As a direct and proximate result of GM's violations of the Georgia FBPA, Claimants have suffered injury-in-fact and/or actual damage.

627.    Claimants are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

628.    Claimants also seek attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

      **l.**      **Hawaii-Unfair and Deceptive Acts in violation of Hawaii Law
(HAW. REV. STAT. § 480, *et seq.*)**

629.    Claimants, on behalf of themselves and all Class members who are Hawaii residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

630.    GM was a "person" under HAW. REV. STAT. § 480-1.

631.    Claimants are "consumer[s]" as defined by HAW. REV. STAT. § 480-1.

632.    GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

633.    The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically

concealing the defects in the Delta Ignition Switch Vehicles, GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

634.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

635.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

636.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Hawaii Act.

637.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

638.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

639.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

640.    GM knew or should have known that its conduct violated the Hawaii Act.

641.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

642.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

643.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

644.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

645.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

646.    As a direct and proximate result of GM's violations of the Hawaii Act, Claimants have suffered injury-in-fact and/or actual damage.

647.    Pursuant to HAW. REV. STAT. § 480-13, Claimants seek monetary relief against GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

648.    Under HAW. REV. STAT. § 480-13.5, Claimants seek an additional award against GM of up to $10,000 for each violation directed at a Hawaiian elder.  GM knew or should have known that its conduct was directed to one or more Claimants who are elders.  GM's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Elders are substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each Claimant-elder suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

> **m.    Idaho-Violations of the Idaho Consumer Protection Act
> (IDAHO CIV. CODE § 48-601, *et seq.*)**

649.    Claimants, on behalf of themselves and all Class members who are Idaho residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

650.    GM was a "person" under the Idaho Consumer Protection Act ("Idaho CPA"), IDAHO CIV. CODE § 48-602(1).

651.    GM's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CIV. CODE § 48-602(2).

652.    GM participated in misleading, false, or deceptive acts that violated the Idaho CPA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, GM engaged in deceptive business practices prohibited by the Idaho CPA, including:

(1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CIV. CODE § 48-603.

653.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

654.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

655.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

656.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Idaho CPA.

657.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

658.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

659.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

660.    GM knew or should have known that its conduct violated the Idaho CPA.

661.    As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

662.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

      a.    Possessed exclusive knowledge about the defects in the
Delta Ignition Switch Vehicles;

      b.    Intentionally concealed the foregoing from Claimants;

      c.    Made incomplete representations about the safety and
reliability of the Delta Ignition Switch Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

663.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

664.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

665.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

666.    As a direct and proximate result of GM's violations of the Idaho CPA, Claimants have suffered injury-in-fact and/or actual damage.

667.    Pursuant to IDAHO CODE § 48-608, Claimants seek monetary relief against GM measured as the greater of (a) actual damages and (b) statutory damages in the amount of $1,000 for each Claimant.

668.    Claimants also seek attorneys' fees, and any other just and proper relief available under the Idaho CPA.

   **n.    Illinois-Violations of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a)**

669.    Claimants, on behalf of themselves and all Class members who are Illinois residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

670.    GM was a "person" as that term is defined in 815 ILCS 505/1(c).

671.    Claimants are "consumers" as that term is defined in 815 ILCS 505/1(e).

672.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

673.    GM participated in misleading, false, or deceptive acts that violated the Illinois CFA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Illinois CFA.

674.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

675.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

676.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

677.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Illinois CFA.

678.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

679.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

680.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

681.    GM knew or should have known that its conduct violated the Illinois CFA.

682.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

683.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

684.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

685.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

686.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

687.    As a direct and proximate result of GM's violations of the Illinois CFA, Claimants have suffered injury-in-fact and/or actual damage.

688.    Pursuant to 815 ILCS 505/10a(a), Claimants seek monetary relief from GM in the amount of actual damages, as well as punitive damages because GM acted with fraud and/or malice and/or was grossly negligent, attorneys' fees, and such other relief as may be just and proper under the Illinois CFA.

o.    **Indiana-Violations of the Indiana Deceptive Consumer Sales Act (IND. CODE § 24-5-0.5-3, *et seq.*)**

689.    Claimants, on behalf of themselves and all Class members who are Indiana residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

690.    GM was a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-.05-2(a)(3).

691.    Claimants' purchases of the Delta Ignition Switch Vehicles were "consumer transactions" within the meaning of IND. CODE § 24-5-.05-2(a)(1).

692.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … [and] (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have."  IND. CODE § 24-5-.05-3 (a)-

(b).  "Any representations on or within a product or its packaging or in advertising or

promotional materials which would constitute a deceptive act shall be the deceptive act both of

the supplier who places such a representation thereon or therein, or who authored such materials,

and such suppliers who shall state orally or in writing that such representation is true if such

other supplier shall know or have reason to know that such representation was false."  IND. CODE

§ 24-5-.05-3 (c).

693.    GM participated in misleading, false, or deceptive acts that violated the Indiana

DCSA.  By systematically concealing the defects in the Delta Ignition Switch Vehicles, GM

engaged in deceptive business practices prohibited by the Indiana DCSA.  GM also engaged in

unlawful trade practices by:  (1) representing that the Delta Ignition Switch Vehicles have

characteristics, uses, benefits, and qualities which they do not have; (2) representing that the

Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; (3)

advertising the Delta Ignition Switch e Vehicles with the intent not to sell them as advertised;

and (4) otherwise engaging in conduct likely to deceive.

694.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

695.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

696.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

697.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Indiana DCSA.

698.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

699.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

700.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

701.    GM knew or should have known that its conduct violated the Indiana DCSA.

702.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

703.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

704.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

705.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

706.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

707.    As a direct and proximate result of GM's violations of the Indiana DCSA,

Claimants have suffered injury-in-fact and/or actual damage.

708.    Pursuant to IND. CODE § 24-5-0.5-4, Claimants seek monetary relief against GM

measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

statutory damages in the amount of $500 for each Claimant, including treble damages up to

$1,000 for GM's willfully deceptive acts.

 

 

       **p.    Iowa-Violations of the Private Right of Action for Consumer Frauds
            Act (IOWA CODE § 714H.1, *et seq.*)**

709.    Claimants, on behalf of themselves and all Class members who are Iowa residents

(for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs

as though fully set forth herein.

710.    GM was a "person" under IOWA CODE § 714H.2(7).

711.    Claimants are "consumers," as defined by IOWA CODE § 714H.2(3), who purchased or leased one or more Delta Ignition Switch Vehicles from GM.

712.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3. GM participated in misleading, false, or deceptive acts that violated the Iowa CFA. By systematically concealing the defects in the Delta Ignition Switch Vehicles, GM engaged in deceptive business practices prohibited by the Iowa CFA.

713.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

714.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

715.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

716.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

717.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

718.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

719.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

720.    GM knew or should have known that its conduct violated the Iowa CFA.

721.    As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

722.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

     a.     Possessed exclusive knowledge about the defects in the
            Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Claimants;

     c.     Made incomplete representations about the safety and
            reliability of the Delta Ignition Switch Vehicles, while
            purposefully withholding material facts from Claimants
            that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to
            disclose and remedy the defects.

723.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

724.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

725.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

726.    As a direct and proximate result of GM's violations of the Iowa CFA, Claimants have suffered injury-in-fact and/or actual damage.

727.    Pursuant to IOWA CODE § 714H.5, Claimants seek actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other relief as the Court deems necessary under the Iowa CFA.

   q.    **Kansas-Violations of the Kansas Consumer Protection Act
(KAN. STAT. § 50-623, *et seq.*)**

728.    Claimants, on behalf of themselves and all Class members who are Kansas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

729.    GM was a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. § 50-624(l).

730.    Claimants are "consumers," within the meaning of KAN. STAT. § 50-624(b), who purchased or leased one or more Delta Ignition Switch Vehicles.

731.    Each sale of a Delta Ignition Switch Vehicle to Claimants was a "consumer transaction" within the meaning of KAN. STAT. § 50-624(c).

732.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or
practice in connection with a consumer transaction," KAN. STAT. § 50-626(a), and that deceptive
acts or practices include:  (1) knowingly making representations or with reason to know that "(A)
Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses,
benefits or quantities that they do not have;" and "(D) property or services are of particular
standard, quality, grade, style or model, if they are of another which differs materially from the
representation;" "(2) the willful use, in any oral or written representation, of exaggeration,
falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a
material fact, or the willful concealment, suppression or omission of a material fact."  The
Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice
in connection with a consumer transaction." KAN. STAT. § 50-627(a).

733.    GM participated in misleading, false, or deceptive acts that violated the Kansas
CPA.  By systematically concealing the defects in Delta Ignition Switch Vehicles, GM engaged
in deceptive business practices prohibited by the Kansas CPA.  GM also engaged in unlawful
trade practices by:  (1) representing that the Delta Ignition Switch Vehicles have characteristics,
uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition
Switch Vehicles are of a particular standard and quality when they are not; (3) advertising the
Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) willfully using,
in any oral or written representation, an exaggeration, falsehood, innuendo or ambiguity as to a
material fact; (5) willfully failing to state a material fact, or willfully concealing, suppressing or
omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in
connection with a consumer transaction.

734.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

735.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

736.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

737.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Kansas CPA.

738.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

739.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

740.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

741.    GM knew or should have known that its conduct violated the Kansas CPA.

742.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

743.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.      Intentionally concealed the foregoing from Claimants;

     c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

     d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

744.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

745.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

746.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

747.    As a direct and proximate result of GM's violations of the Kansas CPA, Claimants have suffered injury-in-fact and/or actual damage.

748.    Pursuant to KAN. STAT. § 50-634, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Claimant.

749.    Claimants also seek attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623, *et seq.*

> **r.    Kentucky-Violations of the Kentucky Consumer Protection Act (KY REV. STAT. § 367.110, *et seq.*)**

750.    Claimants, on behalf of themselves and all Class members who are Kentucky residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

751.    GM and Claimants are "persons" within the meaning of KY. REV. STAT. § 367.110(1).

752.    GM engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

753.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …." KY. REV. STAT. § 367.170(1). GM participated in misleading, false, or deceptive acts that violated the Kentucky CPA. By systematically concealing the defects in the Delta Ignition Switch Vehicles, GM engaged in deceptive business practices prohibited by the Kentucky CPA.

754.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

755.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

756.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

757.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Kentucky CPA.

758.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

759.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

760.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

761.    GM knew or should have known that its conduct violated the Kentucky CPA.

762.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

763.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

764.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

765.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

766.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

767.    As a direct and proximate result of GM's violations of the Kentucky CPA, Claimants have suffered injury-in-fact and/or actual damage.

768.    Pursuant to KY. REV. STAT. § 367.220, Claimants seek to recover actual damages in an amount to be determined at trial; attorneys' fees; and any other just and proper relief available under KY. REV. STAT. § 367.220.

s.    **Louisiana-Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (LA. REV. STAT. § 51:1401, *et seq.*)**

769.    Claimants, on behalf of themselves and all Class members who are Louisiana residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

770.    GM and Claimants are "persons" within the meaning of the LA. REV. STAT. § 51:1402(8).

771.    Claimants are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

772.    GM engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

773.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).  GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By systematically concealing the defects in Delta Ignition Switch Vehicles, GM engaged in deceptive business practices prohibited by the Louisiana CPL.

774.    GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Louisiana CPL.

775.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

776.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

777.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

778.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

779.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

780.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

781.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

782.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

783.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

784.    GM knew or should have known that its conduct violated the Louisiana CPL.

785.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

786.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

     a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

787.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

788.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

789.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

790.    As a direct and proximate result of GM's violations of the Louisiana CPL, Claimants have suffered injury-in-fact and/or actual damage.

791.    Pursuant to La. Rev. Stat. § 51:1409, Claimants seek to recover actual damages in an amount to be determined at trial; treble damages for GM's knowing violations of the Louisiana CPL; attorneys' fees; and any other just and proper relief.

### t.    Maine-Violations of Maine Unfair Trade Practices Act
### (ME. REV. STAT. TIT. 5 § 205-A, *et seq.*)

792.    Claimants, on behalf of themselves and all Class members who are Maine residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

793.    GM and Claimants are "persons" within the meaning of ME. REV. STAT. TIT. § 206(2).

794.    GM was engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. TIT. § 206(3).

795.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." ME. REV. STAT. TIT. 5 § 207.  GM participated in misleading, false, or deceptive acts that violated the Maine UTPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Maine UTPA.

796.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

797.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

798.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

799.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Maine UTPA.

800.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

801.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

802.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

803.    GM knew or should have known that its conduct violated the Maine UTPA.

804.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

805.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

806.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

807.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

808.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

809.    As a direct and proximate result of GM's violations of the Maine UTPA,

Claimants have suffered injury-in-fact and/or actual damage.

810.    Pursuant to ME. REV. STAT. TIT. 5 § 213, Claimants seek damages, punitive

damages, and attorneys' fees, costs, and any other just and proper relief available under the

Maine UTPA.

> **u.    Maryland-Violations of the Maryland Consumer Protection Act
> (MD. CODE COM. LAW § 13-101, *et seq.*)**

811.    Claimants, on behalf of themselves and all Class members who are Maryland

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

812.    GM and Claimants are "persons" within the meaning of MD. CODE COM. LAW

§ 13-101(h).

813.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a

person may not engage in any unfair or deceptive trade practice in the sale or lease of any

consumer good.  MD. COM. LAW CODE § 13-303.  GM engaged in misleading, false, or deceptive acts that violated the Maryland CPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Maryland CPA.

814.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

815.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

816.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

817.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Maryland CPA.

818.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

819.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

820.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

821.    GM knew or should have known that its conduct violated the Maryland CPA.

822.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

823.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

824.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

825.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

826.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

827.     As a direct and proximate result of GM's violations of the Maryland CPA,

Claimants have suffered injury-in-fact and/or actual damage.

828.     Pursuant to MD. CODE COM. LAW § 13-408, Claimants seek actual damages,

attorneys' fees, and any other just and proper relief available under the Maryland CPA.

> **v.     Massachusetts-Deceptive acts or practices prohibited by
> Massachusetts law (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)**

829.     Claimants, on behalf of themselves and all Class members who are Massachusetts

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

830.     GM and Claimants are "persons" within the meaning of MASS. GEN. LAWS ch.

93A, § 1(a).

831.     GM engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS

ch. 93A, § 1(b).

832.     Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts

or practices in the conduct of any trade or commerce." MASS. GEN. LAWS ch. 93A, § 2.  GM

participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By

concealing the known defects in Claimants' vehicles, GM engaged in deceptive business

practices prohibited by the Massachusetts Act.

833.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

834.     In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

835.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

836.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

837.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

838.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

839.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

840.    GM knew or should have known that its conduct violated the Massachusetts Act.

841.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

842.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

843.   Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

844.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

845.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

846.   As a direct and proximate result of GM's violations of the Massachusetts Act,

Claimants have suffered injury-in-fact and/or actual damage.

847.   Pursuant to MASS. GEN. LAWS ch. 93A, § 9, Claimants seek monetary relief

against GM measured as the greater of (a) actual damages in an amount to be determined at trial

and (b) statutory damages in the amount of $25 for each Claimant.  Because GM's conduct was

committed willfully and knowingly, Claimants are entitled to recover, for each Claimant, up to

three times the actual damages, but no less than two times the actual damages.

848.   Claimants also seek punitive damages, and attorneys' fees, costs, and any other

just and proper relief available under the Massachusetts Act.

### w.    Michigan-Violations of the Michigan Consumer Protection Act
### (MICH. COMP. LAWS § 445.903, *et seq.*)

849.    Claimants, on behalf of themselves and all Class members who are Michigan

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

850.    At all relevant times hereto, GM was a "person" engaged in "trade or commerce"

within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

851.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair,

unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce

…." MICH. COMP. LAWS § 445.903(1).  GM engaged in unfair, unconscionable, or deceptive

methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that

goods or services have … characteristics … that they do not have ….;" "(e) Representing that

goods or services are of a particular standard … if they are of another;" "(i) Making false or

misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or

deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb)

Making a representation of fact or statement of fact material to the transaction such that a person

reasonably believes the represented or suggested state of affairs to be other than it actually is;"

and "(cc) Failing to reveal facts that are material to the transaction in light of representations of

fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).  By concealing the known

defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the

Michigan CPA.

852.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

853.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

854.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

855.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Michigan CPA.

856.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

857.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

858.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

859.    GM knew or should have known that its conduct violated the Michigan CPA.

860.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

861.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and
        reliability of the Delta Ignition Switch Vehicles, while
        purposefully withholding material facts from Claimants
        that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
        disclose and remedy the defects.

862.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

863.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

864.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

865.    As a direct and proximate result of GM's violations of the Michigan CPA,

Claimants have suffered injury-in-fact and/or actual damage.

866.    Claimants seek monetary relief against GM measured as the greater of (a) actual

damages in an amount to be determined at trial and (b) statutory damages in the amount of $250

for each Claimant; reasonable attorneys' fees; and any other just and proper relief available

under MICH. COMP. LAWS § 445.911.

x.    **Minnesota**

(1)    **Violations of Minnesota Prevention of Consumer Fraud Act
(MINN. STAT § 325F.68,** *et seq.***)**

867.    Claimants, on behalf of themselves and all Class members who are Minnesota

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

868.    The Delta Ignition Switch Vehicles constitute "merchandise" within the meaning

of MINN. STAT. § 325F.68(2).

869.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby."  MINN. STAT. § 325F.69(1).  GM participated in

misleading, false, or deceptive acts that violated the Minnesota CFA.  By concealing the known

defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the

Minnesota CFA.

870.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

871.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

872.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

873.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Minnesota CFA.

874.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

875.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

876.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

877.    GM knew or should have known that its conduct violated the Minnesota CFA.

878.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

879.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

880.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

881.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

882.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

883.    As a direct and proximate result of GM's violations of the Minnesota CFA, Claimants have suffered injury-in-fact and/or actual damage.

884.    Pursuant to MINN. STAT. § 8.31(3a), Claimants seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

885.    Claimants also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that GM's acts showed deliberate disregard for the rights or safety of others.

(2)    **Violations of Minnesota Uniform Deceptive Trade Practices Act (MINN. STAT. § 325D.43-48, *et seq.*)**

886.    Claimants, on behalf of themselves and all Class members who are Minnesota residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

887.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." MINN. STAT. § 325D.44. In the course of GM's business, it systematically concealed the defects in Delta Ignition Switch Vehicles and engaged in deceptive practices by representing that Delta Ignition Switch Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised. GM participated in misleading, false, or deceptive acts that violated the Minnesota DTPA. By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Minnesota DTPA.

888.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

889.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

890.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

891.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Minnesota DTPA.

892.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

893.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

894.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

895.    GM knew or should have known that its conduct violated the Minnesota DTPA.

896.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

897.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

     a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

     b.     Intentionally concealed the foregoing from Claimants;

     c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while

purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

898.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

899.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

900.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

901.    As a direct and proximate result of GM's violations of the Minnesota DTPA,

Claimants have suffered injury-in-fact and/or actual damage.

902.    Pursuant to MINN. STAT. §§ 8.31(3a) and 325D.45, Claimants seek actual

damages, attorneys' fees, and any other just and proper relief available under the Minnesota

DTPA.

903.    Claimants also seek punitive damages under MINN. STAT. § 549.20(1)(a) given

the clear and convincing evidence that GM's acts showed deliberate disregard for the rights or

safety of others.

**y.     Mississippi-Violations of Mississippi Consumer Protection Act
(MISS. CODE § 75-24-1, *et seq.*)**

904.     Claimants, on behalf of themselves and all Class members who are Mississippi

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

905.     The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair

or deceptive trade practices in or affecting commerce." MISS. CODE. ANN. § 75-24-5(1).  Unfair

or deceptive practices include, but are not limited to, "(e) Representing that goods or services

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do

not have or that a person has a sponsorship, approval, status, affiliation, or connection that he

does not have;" "(g) Representing that goods or services are of a particular standard, quality, or

grade, or that goods are of a particular style or model, if they are of another;" and "(i)

Advertising goods or services with intent not to sell them as advertised."

906.     GM participated in deceptive trade practices that violated the Mississippi CPA as

described herein, including representing that Delta Ignition Switch Vehicles have characteristics,

uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch

Vehicles are of a particular standard and quality when they are not; and advertising Delta

Ignition Switch Vehicles with the intent not to sell them as advertised.

907.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

908.     In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

909.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

910.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Mississippi CPA.

911.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

912.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

913.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

914.    GM knew or should have known that its conduct violated the Mississippi CPA.

915.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

916.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

917.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

918.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

919.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

920.    As a direct and proximate result of GM's violations of the Mississippi CPA, Claimants have suffered injury-in-fact and/or actual damage.

921.    Claimants' seek actual damages in an amount to be determined at trial and any other just and proper relief available under the Mississippi CPA.

      **z.     Missouri-Violations of Missouri Merchandising Practices Act (MO. REV. STAT. § 407.010, *et seq.*)**

922.    Claimants, on behalf of themselves and all Class members who are Missouri residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

923.    GM and Claimants are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

924.    GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

925.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

926.    In the course of its business, GM systematically omitted, suppressed, and concealed the defects in the Delta Ignition Switch Vehicles as described herein. By failing to disclose these defects or facts about the defects described herein known to it or that were available to GM upon reasonable inquiry, GM deprived consumers of material facts about the safety and functionality of their vehicles. By failing to release material facts about the defects, GM curtailed or reduced the ability of consumers to take notice of material facts about their vehicles, and/or it affirmatively operated to hide or keep those facts from consumers. 15 MO. CODE OF SERV. REG. § 60-9.110. Moreover, GM otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

927.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

928.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

929.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

930.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Missouri MPA.

931.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

932.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

933.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

934.    GM knew or should have known that its conduct violated the Missouri MPA.

935.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

936.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.       Intentionally concealed the foregoing from Claimants;

    c.       Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

937.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

938.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

939.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

940.    As a direct and proximate result of GM's violations of the Missouri MPA, Claimants have suffered injury-in-fact and/or actual damage.

941.     GM has liability to Claimants for damages, attorneys' fees, costs, and punitive damages, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

aa.    **Montana-Violations of the Montana Consumer Protection Act**
(MONT. CODE § 30-14-101, *et seq.*)

942.    Claimants, on behalf of themselves and all Class members who are Montana residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

943.    GM and Claimants are "persons" within the meaning of MONT. CODE § 30-14-102(6).

944.    Claimants are "consumer[s]" under MONT. CODE § 30-14-102(1).

945.    The sale or lease of the Delta Ignition Switch Vehicles to Claimants occurred within "trade and commerce" within the meaning of MONT. CODE § 30-14-102(8), and GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

946.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE § 30-14-103.  By systematically devaluing safety and concealing a plethora of defects in Claimants' vehicles, GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.

947.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

948.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

949.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Montana CPA.

950.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

951.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

952.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

953.    GM knew or should have known that its conduct violated the Montana CPA.

954.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

955.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

956.     Because GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain
since the vehicles they purchased were worth less than they would have been if they were free
from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their
vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have
paid less for them.

957.     GM's concealment of the defects in Claimants' vehicles was material to
Claimants.

958.     Claimants suffered ascertainable loss caused by GM's misrepresentations and its
concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the
truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their
vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,
as alleged above.

959.     As a direct and proximate result of GM's violations of the Montana CPA,
Claimants have suffered injury-in-fact and/or actual damages.

960.     Because GM's unlawful methods, acts, and practices have caused Claimants to
suffer an ascertainable loss of money and property, Claimants seek actual damages or $500 per
Class member, whichever is greater, discretionary treble damages, reasonable attorneys' fees,
and any other relief the Court considers necessary or proper, under MONT. CODE § 30-14-133.

      **bb.**    **Nebraska-Violations of the Nebraska Consumer Protection Act
(NEB. REV. STAT. § 59-1601, *et seq.*)**

961.     Claimants, on behalf of themselves and all Class members who are Nebraska
residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all
paragraphs as though fully set forth herein.

962.    GM and Claimants are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

963.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

964.    The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602. GM engaged in misleading, false, or deceptive acts that violated the Nebraska CPA. By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Nebraska CPA.

965.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

966.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

967.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

968.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Nebraska CPA.

969.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

970.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

971.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

972.    GM knew or should have known that its conduct violated the Nebraska CPA.

973.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

974.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

975.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

976.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

977.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

978.    As a direct and proximate result of GM's violations of the Nebraska CPA, Claimants have suffered injury-in-fact and/or actual damage.

979.    Because GM's conduct caused damage to Claimants' property through violations of the Nebraska CPA, Claimants seek recovery of actual damages, as well as enhanced damages up to $1,000 per Claimant, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

### cc.    Nevada-Violations of the Nevada Deceptive Trade Practices Act (NEV. REV. STAT. § 598.0903, *et seq.*)

980.    Claimants, on behalf of themselves and all Class members who are Nevada residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

981.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.* prohibits deceptive trade practices.  NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "5.  Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7.  Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or

should know that they are of another standard, quality, grade, style or model"; "9. Advertises

goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes

any other false representation in a transaction."

982.    GM engaged in deceptive trade practices that violated the Nevada DTPA,

including:  knowingly representing that Delta Ignition Switch Vehicles have uses and benefits

which they do not have; representing that Delta Ignition Switch Vehicles are of a particular

standard, quality, and grade when they are not; advertising Delta Ignition Switch Vehicles with

the intent not to sell or lease them as advertised; representing that the subject of a transaction

involving Delta Ignition Switch Vehicles has been supplied in accordance with a previous

representation when it has not; and knowingly making other false representations in a

transaction.

983.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

984.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

985.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

986.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Nevada DTPA.

987.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

988.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

989.     GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

990.     GM knew or should have known that its conduct violated the Nevada DTPA.

991.     As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

992.     GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.     Intentionally concealed the foregoing from Claimants;

c.     Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

993.     Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

994.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

995.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

996.    As a direct and proximate result of GM's violations of the Nevada DTPA, Claimants have suffered injury-in-fact and/or actual damage.

997.    Accordingly, Claimants seek their actual damages, punitive damages, and all other appropriate and available remedies under the Nevada DTPA.  NEV. REV. STAT. § 41.600.

### dd. New Hampshire-Violations of N.H. Consumer Protection Act (N.H. REV. STAT. § 358-A:1, *et seq.*)

998.    Claimants, on behalf of themselves and all Class members who are New Hampshire residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

999.    GM and Claimants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

1000.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

1001.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a

particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. REV. STAT. § 358-A:2.

1002.  GM participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below.  By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in deceptive business practices prohibited by the CPA, including representing that Defective Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they did not; representing that Defective Ignition Switch Vehicles are of a particular standard, quality, and grade when they were not; advertising Defective Ignition Switch Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Ignition Switch Vehicles had been supplied in accordance with a previous representation when it had not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

1003.  GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1004.  In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1005.  GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1006.   By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the New Hampshire CPA.

1007.   In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1008.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1009.   GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1010.   GM knew or should have known that its conduct violated the New Hampshire

CPA.

1011.   As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

1012.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

   a. Possessed exclusive knowledge about the defects in the
    Delta Ignition Switch Vehicles;

   b. Intentionally concealed the foregoing from Claimants;

   c. Made incomplete representations about the safety and
    reliability of the Delta Ignition Switch Vehicles, while
    purposefully withholding material facts from Claimants
    that contradicted these representations; and/or

   d. Had duties under the TREAD Act and related regulations to
    disclose and remedy the defects.

1013.   Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1014.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1015.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1016.   As a direct and proximate result of GM's violations of the New Hampshire CPA,

Claimants have suffered injury-in-fact and/or actual damage.

1017.   Because GM's willful conduct caused injury to Claimants' property through

violations of the New Hampshire CPA, Claimants seek recovery of actual damages or $1,000,

whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and

proper relief under N.H. REV. STAT. § 358-A:10.

> **ee.    New Jersey-Violations of the New Jersey Consumer Fraud Act
> (N.J. STAT. § 56:8-1, *et seq.*)**

1018.   Claimants, on behalf of themselves and all Class members who are New Jersey

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1019.   GM and Claimants are or were "persons" within the meaning of N.J. STAT.

§ 56:8-1(d).

1020.   GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT.

§ 56:8-1(c), (d).

1021.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he

act, use or employment by any person of any unconscionable commercial practice, deception,

fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression

or omission of any material fact with the intent that others rely upon such concealment,

suppression or omission, in connection with the sale or advertisement of any merchandise or real

estate, or with the subsequent performance of such person as aforesaid, whether or not any

person has in fact been misled, deceived or damaged thereby …." N.J. STAT. § 56:8-2. GM

engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as

described above and below, and did so with the intent that Claimants rely upon their acts,

concealment, suppression or omissions.

1022.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1023.   In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1024.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

1025.  By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

1026.  In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1027.  GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1028.  GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1029.  GM knew or should have known that its conduct violated the New Jersey CFA.

1030.  As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1031.  GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1032.  Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free

from the defects. Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1033. GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1034. Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

1035. As a direct and proximate result of GM's violations of the New Jersey CFA, Claimants have suffered injury-in-fact and/or actual damage.

1036. Claimants are entitled to recover legal and/or equitable relief including treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. § 56:8-19, and any other just and appropriate relief.

> **ff.    New Mexico-Violations of the New Mexico Unfair Trade Practices Act (N.M. STAT. §§ 57-12-1, *et seq.*)**

1037. Claimants, on behalf of themselves and all Class members who are New Mexico residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1038. GM and Claimants are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. § 57-12-2.

1039. GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. § 57-12-2.

1040.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. § 57-12-2(D).  GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. § 57-12-2(D).  In addition, GM's actions constitute unconscionable actions under N.M. STAT. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Claimants to a grossly unfair degree.

1041.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1042.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1043.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1044.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New Mexico UTPA.

1045.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1046.  GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1047.  GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1048.  GM knew or should have known that its conduct violated the New Mexico UTPA.

1049.  As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1050.  GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1051.  Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1052.  GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1053.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1054.   As a direct and proximate result of GM's violations of the New Mexico UTPA, Claimants have suffered injury-in-fact and/or actual damage.

1055.   Because GM's unconscionable, willful conduct caused actual harm to Claimants, Claimants seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. § 57-12-10.

      **gg.**    **New York**

      **(1)**    **Violations of the New York General Business Law (N.Y. GEN. BUS. LAW §§ 349 and 350)**

1056.   Claimants, on behalf of themselves and all Class members who are New York residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1057.   Claimants are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

1058.   GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

1059.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. GEN. BUS. LAW § 349.  GM's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York

GBL.  Furthermore, GM's deceptive acts and practices, which were intended to mislead

consumers who were in the process of purchasing and/or leasing the Delta Ignition Switch

Vehicles, was conduct directed at consumers.

1060.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1061.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1062.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

1063.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the New York GBL.

1064.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1065.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1066.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1067.    GM knew or should have known that its conduct violated the New York GBL.

1068.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1069.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1070.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1071.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1072.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1073.   As a direct and proximate result of GM's violations of the New York GBL, Claimants have suffered injury-in-fact and/or actual damage.

1074.   Because GM's willful and knowing conduct caused injury to Claimants, Claimants seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

### (2)   Violations of New York's False Advertising Act (N.Y. GEN. BUS. LAW § 350)

1075.   Claimants, on behalf of themselves and all Class members who are New York residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1076.   GM was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

1077.   N.Y. GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …."  N.Y. GEN. BUS. LAW § 350-a.

1078.   GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers and Claimants.

1079.   GM violated § 350 because the misrepresentations and omissions regarding the

defects, and GM's systemic devaluation of safety, as set forth above, were material and likely to

deceive a reasonable consumer.

1080.   Claimants have suffered an injury, including the loss of money or property, as a

result of GM's false advertising.  In purchasing or leasing their vehicles, Claimants relied on the

misrepresentations and/or omissions of GM with respect to the safety and reliability of the Delta

Ignition Switch Vehicles.  GM's representations were false and/or misleading because the

concealed defects and safety issues seriously undermined the value of the Delta Ignition Switch

Vehicles.  Had Claimants known this, they would not have purchased or leased their Delta

Ignition Switch Vehicles and/or paid as much for them.

1081.   Pursuant to N.Y. GEN. BUS. LAW § 350e, Claimants seek monetary relief against

GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

statutory damages in the amount of $500 for each Claimant.  Because GM's conduct was

committed willfully and knowingly, Claimants are entitled to recover three times actual

damages, up to $10,000 per Claimant, attorneys' fees, and any other just and proper relief

available under General Business Law §§ 349–350.

> **hh.    North Carolina-Violations of North Carolina's Unfair and Deceptive
> Practices Act (N.C. GEN. STAT. § 75-1.1, *et seq.*)**

1082.   Claimants, on behalf of themselves and all Class members who are North

Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by

reference all paragraphs as though fully set forth herein.

1083.   GM engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

1084.   The North Carolina Unfair and Deceptive Practices Act (the "North Carolina

Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C.

GEN. STAT. § 75-1.1(a).  As alleged above and below, GM willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

1085.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1086.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1087.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1088.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the North Carolina Act.

1089.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1090.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1091.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1092.   GM knew or should have known that its conduct violated the North Carolina Act.

1093.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1094.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1095.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1096.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1097.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1098.   As a direct and proximate result of GM's violations of the North Carolina Act, Claimants have suffered injury-in-fact and/or actual damage.

1099.   Claimants seek an order for treble their actual damages, costs of Court, attorney's

fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN.

STAT. § 75-16

### ii.    North Dakota-Violations of the North Dakota Consumer Fraud Act (N.D. CENT. CODE § 51-15-02, *et seq.*)

1100.   Claimants, on behalf of themselves and all Class members who are North Dakota

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1101.   GM and Claimants are "persons" within the meaning of N.D. CENT. CODE § 51-

15-02(4).

1102.   GM engaged in the "sale" of "merchandise" within the meaning of N.D. CENT.

CODE § 51-15-02(3), (5).

1103.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful

"[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false

pretense, false promise, or misrepresentation, with the intent that others rely thereon in

connection with the sale or advertisement of any merchandise...." N.D. CENT. CODE § 51-15-02.

As set forth above and below, GM committed deceptive acts or practices, with the intent that

Claimants rely thereon in connection with their purchase or lease of the Delta Ignition Switch

Vehicles.

1104.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1105.   In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1106.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1107.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the North Dakota CFA.

1108.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1109.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1110.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1111.   GM knew or should have known that its conduct violated the North Dakota CFA.

1112.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1113.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1114.   Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1115.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1116.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1117.   As a direct and proximate result of GM's violations of the North Dakota CFA,

Claimants have suffered injury-in-fact and/or actual damage.

1118.   Further, GM knowingly committed the conduct described above, and thus, under

N.D. CENT. CODE § 51-15-09, GM is liable to Claimants for treble damages in amounts to be

proven at trial, as well as attorneys' fees, costs, and disbursements.

### jj.      Ohio–Violations of Ohio Consumer Sales Practices Act
(OHIO REV. CODE § 1345.01, *et seq.*)

1119.   Claimants, on behalf of themselves and all Class members who are Ohio residents

(for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs

as though fully set forth herein.

1120.    GM is a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

1121.    Claimants are "consumers" as that term is defined in OHIO REV. CODE § 1345.01(D), and their purchases and leases of the Delta Ignition Switch Vehicles are "consumer transactions" within the meaning of OHIO REV. CODE § 1345.01(A).

1122.    The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  GM's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE § 1345.02.

1123.    By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

1124.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1125.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1126.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

1127.   By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Ohio CSPA.

1128.   In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1129.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1130.   GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1131.   GM knew or should have known that its conduct violated the Ohio CSPA.

1132.   As alleged above, GM made material statements about the safety and reliability of

the Delta Ignition Switch Vehicles that were either false or misleading.

1133.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta

Ignition Switch Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
              Delta Ignition Switch Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
              reliability of the Delta Ignition Switch Vehicles, while
              purposefully withholding material facts from Claimants
              that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1134.    Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1135.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1136.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1137.    As a direct and proximate result of GM's violations of the Ohio CSPA, Claimants

have suffered injury-in-fact and/or actual damages.

1138.    Claimants seek punitive damages against GM because its conduct was egregious.

GM misrepresented the safety and reliability of millions of vehicles, concealed myriad defects in

millions of GM vehicles and the systemic safety issues plaguing GM, deceived Claimants on

life-or-death matters, and concealed material facts that only GM knew, all to avoid the expense

and public relations nightmare of correcting the serious flaw in its culture and in millions of

vehicles.  GM's egregious conduct warrants punitive damages.

1139.   Claimants specifically do not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

1140.   GM was on notice pursuant to OHIO REV. CODE § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, GM's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's CSPA and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of OHIO REV. CODE § 1345.05. The applicable rule and Ohio court opinions include, but are not limited to:  OHIO ADMIN. CODE 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098 (2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017, unreported (PIF #10001874).

1141.   As a result of the foregoing wrongful conduct of GM, Claimants have been damaged, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, court costs and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09, *et seq.*

### kk.    Oklahoma-Violations of the Oklahoma Consumer Protection Act (OKLA. STAT. TIT. 15 § 751, *et seq.*)

1142.    Claimants, on behalf of themselves and all Class members who are Oklahoma residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1143.    Claimants are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

1144.    GM is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15 § 15-751(1).

1145.    The sale or lease of the Delta Ignition Switch Vehicles to Claimants was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and GM's actions as set forth herein occurred in the conduct of trade or commerce.

1146.    The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another," or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

1147.    By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in unfair and deceptive business practices prohibited by the Oklahoma CPA, including:  representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles

are of a particular standard, quality, and grade when they are not; advertising Delta Ignition

Switch Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting

and engaging in other practices that have deceived or could reasonably be expected to deceive or

mislead; and engaging in practices which offend established public policy or are immoral,

unethical, oppressive, unscrupulous or substantially injurious to consumers.

1148.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1149.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned

or leased by Claimants.

1150.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Oklahoma CPA.

1151.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1152.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1153.    GM intentionally and knowingly misrepresented material facts regarding the

Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1154.    GM knew or should have known that its conduct violated the Oklahoma CPA.

1155.    GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1156.    GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1157.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1158.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1159.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1160.   As a direct and proximate result of GM's violations of the Oklahoma CPA, Claimants have suffered injury-in-fact and/or actual damage.

1161.   Claimants seek punitive damages because GM's conduct was egregious.  GM misrepresented the safety and reliability of millions of GM vehicles, concealed myriad defects in millions of GM vehicles and the systemic safety issues plaguing GM, deceived Claimants on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of GM vehicles.  GM's egregious conduct warrants punitive damages.

1162.   GM's conduct as alleged herein was unconscionable because (1) GM, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, GM knew or had reason to know that the price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) GM knew or had reason to know that the transaction GM induced the consumer to enter into was excessively one-sided in favor of GM.

1163.   Because GM's unconscionable conduct caused injury to Claimants, Claimants seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1, and any other just and proper relief available under the Oklahoma CPA.

### ll.    Oregon-Violations of the Oregon Unlawful Trade Practices Act
### (OR. REV. STAT. § 646.605, *et seq.*)

1164.    Claimants, on behalf of themselves and all Class members who are Oregon residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1165.    GM is a person within the meaning of OR. REV. STAT. § 646.605(4).

1166.    The Delta Ignition Switch Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

1167.    The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce."  OR. REV. STAT. § 646.608(1).

1168.    GM engaged in unlawful trade practices, including representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; advertising Delta Ignition Switch with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

1169.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1170.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1171.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1172.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1173.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

1174.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1175.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1176.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1177.   GM knew or should have known that its conduct violated the Oregon UTPA.

1178.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1179.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.          Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.          Intentionally concealed the foregoing from Claimants;

    c.          Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.          Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1180.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1181.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1182.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

1183.   As a direct and proximate result of GM's violations of the Oregon UTPA, Claimants have suffered injury-in-fact and/or actual damages.

1184.   Claimants are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1). Claimants are also entitled to punitive damages because GM

engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

> ### mm. Pennsylvania-Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-1, *et seq.*)

1185.   Claimants, on behalf of themselves and all Class members who are Pennsylvania residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1186.   Claimants purchased or leased their Delta Ignition Switch Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

1187.   All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

1188.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  (i) "Representing that goods or services have … characteristics, ….  Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

1189.   GM engaged in unlawful trade practices, including representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; advertising Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

1190.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1191.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1192.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

1193.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1194.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1195.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1196.   GM knew or should have known that its conduct violated the Pennsylvania CPL.

1197.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1198.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

>    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1199.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1200.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1201.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1202.   As a direct and proximate result of GM's violations of the Pennsylvania CPL, Claimants have suffered injury-in-fact and/or actual damage.

1203.   GM is liable to Claimants for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Claimants are also entitled to an award of punitive damages given that GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### nn.    Rhode Island-Violations of the Rhode Island Unfair Trade Practices and Consumer Protection Act (R.I. GEN. LAWS § 6-13.1, *et seq.*)

1204.    Claimants, on behalf of themselves and all Class members who are Rhode Island residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1205.    Claimants are persons who purchased or leased one or more Delta Ignition Switch Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

1206.    Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including:  "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

1207.    GM engaged in unlawful trade practices, including:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch Vehicles are of a particular standard and quality when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

1208.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1209.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1210.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1211.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Rhode Island CPA.

1212.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1213.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1214.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1215.   GM knew or should have known that its conduct violated the Rhode Island CPA.

1216.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1217.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.      Possessed exclusive knowledge about the defects in the
Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and
reliability of the Delta Ignition Switch Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1218.  Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1219.  GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1220.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1221.  As a direct and proximate result of GM's violations of the Rhode Island CPA,

Claimants have suffered injury-in-fact and/or actual damage.

1222.  Claimants are entitled to recover the greater of actual damages or $200 pursuant

to R.I. GEN. LAWS § 6-13.1-5.2(a).  Claimants also seek punitive damages in the discretion of the

Court because of GM's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

### oo.    South Carolina

#### (1)    Violations of the South Carolina Unfair Trade Practices Act (S.C. CODE § 39-5-10, *et seq.*)

1223.   Claimants, on behalf of themselves and all Class members who are South Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1224.   GM is a "person" under S.C. CODE § 39-5-10.

1225.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." S.C. CODE § 39-5-20(a).  GM engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by systematically devaluing safety and concealing defects in Delta Ignition Switch Vehicles.

1226.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1227.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1228.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1229.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the South Carolina UTPA.

1230.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1231.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1232.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1233.   GM knew or should have known that its conduct violated the South Carolina UTPA.

1234.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1235.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
          Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
          reliability of the Delta Ignition Switch Vehicles, while
          purposefully withholding material facts from Claimants
          that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
          disclose and remedy the defects.

1236.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1237.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1238.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1239.   As a direct and proximate result of GM's violations of the South Carolina UTPA,

Claimants have suffered injury-in-fact and/or actual damage.

1240.   Pursuant to S.C. CODE § 39-5-140(a), Claimants seek monetary relief against GM

to recover for their economic losses.  Because GM's actions were willful and knowing,

Claimants' damages should be trebled.  *Id.*

1241.   Claimants further allege that GM's malicious and deliberate conduct warrants an

assessment of punitive damages because GM carried out despicable conduct with willful and

conscious disregard of the rights and safety of others, subjecting Claimants to cruel and unjust

hardship as a result.  GM intentionally and willfully misrepresented the safety and reliability of

the Delta Ignition Switch Vehicles, deceived Claimants on life-or-death matters, concealed

material facts that only GM knew, and repeatedly promised Claimants that all vehicles were

safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in the

Delta Ignition Switch Vehicles.  GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### (2)    Violations of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (S.C. CODE § 56-15-10, *et seq.*)

1242.   Claimants, on behalf of themselves and all Class members who are South Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1243.   GM was a "manufacturer" as set forth in S.C. CODE § 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

1244.   GM committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE § 56-15-30.

1245.   GM engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Claimants and to the public.

1246.   GM's bad faith and unconscionable actions include, but are not limited to: (1) representing that Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Delta Ignition Switch Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Delta Ignition Switch Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Delta Ignition Switch Vehicles has been supplied in accordance with a previous representation when it has not.

1247.   GM resorted to and used false and misleading advertisements in connection with its business.  As alleged above, GM made numerous material statements about the safety and

reliability of the Delta Ignition Switch Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

1248.   Claimants bring this action pursuant to S.C. CODE § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1249.   Claimants are entitled to double their actual damages, the cost of the suit, and attorney's fees pursuant to S.C. CODE § 56-15-110.  Claimants also seek treble damages because GM acted maliciously.

   **pp.    South Dakota-Violations of the Deceptive Trade Practices and Consumer Protection Law (S.D. CODIFIED LAWS § 37-24-6, *et seq.*)**

1250.   Claimants, on behalf of themselves and all Class members who are South Dakota residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1251.   The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]" S.D. CODIFIED LAWS § 37-24-6(1).  The conduct of GM as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of S.D. Codified Laws § 37-24-6 and 37-24-31, including, but not limited to, GM's misrepresentations and omissions regarding the safety and reliability of

the Delta Ignition Switch Vehicles, and GM's misrepresentations concerning a host of other defects and safety issues.

1252.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1253.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1254.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1255.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the South Dakota CPL.

1256.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1257.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1258.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1259.    GM knew or should have known that its conduct violated the South Dakota CPL.

1260.    As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1261.  GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1262.  Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1263.  GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1264.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1265.  As a direct and proximate result of GM's violations of the South Dakota CPL, Claimants have suffered injury-in-fact and/or actual damage.

1266.   Under S.D. CODIFIED LAWS § 37-24-31, Claimants are entitled to a recovery of their actual damages suffered as a result of GM's acts and practices.

### qq.    Tennessee—Violations of Tennessee Consumer Protection Act (TENN. CODE § 47-18-101, *et seq.*)

1267.   Claimants, on behalf of themselves and all Class members who are Tennessee residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1268.   Claimants are "natural persons" and "consumers" within the meaning of TENN. CODE § 47-18-103(2).

1269.   GM is a "person" within the meaning of TENN. CODE § 47-18-103(2).

1270.   GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE § 47-18-103(19).

1271.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised."  TENN. CODE § 47-18-104.  GM violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Delta Ignition Switch Vehicles have characteristics or benefits that they did not have; representing that Delta Ignition Switch Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised.

1272.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1273.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1274.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1275.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

1276.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1277.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1278.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1279.   GM knew or should have known that its conduct violated the Tennessee CPA.

1280.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1281.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

      a.     Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.   Intentionally concealed the foregoing from Claimants;

c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1282.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1283.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1284.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1285.   As a direct and proximate result of GM's violations of the Tennessee CPA, Claimants have suffered injury-in-fact and/or actual damage.

1286.   Pursuant to TENN. CODE § 47-18-109(a), Claimants seek monetary relief against GM measured as actual damages in an amount to be determined at trial, treble damages as a result of GM's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

rr.  **Texas–Violations of the Texas Deceptive Trade Practices–Consumer Protection Act (TEX. BUS. & COM. CODE § 17.41, *et seq.*)**

1287.  Claimants, on behalf of themselves and all Class members who are Texas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1288.  Claimants are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

1289.  The Texas Deceptive Trade Practices–Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); (ii) "breach of an express or implied warranty"; or (iii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3).

1290.  An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, GM has engaged in an unconscionable action or course of action and thereby caused economic damages to Claimants.

1291.  GM also breached the implied warranty of merchantability with respect to Claimants, as set forth below.

1292.  GM has also violated the specifically enumerated provisions of TEX. BUS. & COM. CODE § 17.46(b) by, at a minimum:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that

the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and (4) failing to disclose information concerning the Delta Ignition Switch Vehicles with the intent to induce consumers to purchase or lease the Delta Ignition Switch Vehicles.

1293.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1294.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1295.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1296.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Texas DTPA.

1297.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1298.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1299.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1300.    GM knew or should have known that its conduct violated the Texas DTPA.

1301.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1302.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

        a.        Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

        b.        Intentionally concealed the foregoing from Claimants;

        c.        Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

        d.        Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1303.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1304.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1305.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1306.   As a direct and proximate result of GM's violations of the Texas DTPA,

Claimants have suffered injury-in-fact and/or actual damage.

1307.   As the foregoing allegations demonstrate, GM's misrepresentations and failure to

disclose material facts about the safety and quality of the Delta Ignition Switch Vehicles resulted

in the deaths and injuries of hundreds, and economically injured millions more.  GM thereby

engaged in acts or practices which, to the detriment of Claimants, took advantage of their lack of

knowledge, ability, experience, and capacity to a grossly unfair degree.  In other words, GM

engaged in unconscionable actions or an unconscionable course of action as to Claimants.

1308.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose material information.  As the result of GM's performance

of deceptive practices, and of unconscionable actions and an unconscionable course of action, as

set forth in detail above, Claimants who purchased Delta Ignition Switch Vehicles either would

have paid less for their vehicles or would not have purchased or leased them at all.  Under TEX.

BUS. & COM. CODE § 17.50(b)(1), Claimants are entitled to recover such economic damages.

1309.   As set forth above and in Texas Count VIII below, GM breached the implied

warranty of merchantability with respect to Claimants, and engaged in unconscionable actions

and an unconscionable course of action "knowingly," which means it did so with "actual

awareness of the fact of the act, practice, condition, defect or failure constituting the breach of

warranty" and with "actual awareness, at the time of the act or practice complained of, of the

falsity, deception or unfairness of the act or practice giving rise to the consumer's claim…."

TEX. BUS. & COM. CODE § 17.45(9).  Accordingly, pursuant to TEX. BUS. COM. CODE

§ 17.50(b)(1), Claimants are entitled to additional damages in an amount up to three times the

amount of economic damages.

1310.   GM's violations presented a continuing risk to Claimants as well as to the general public.  GM's unlawful acts and practices complained of herein affected the public interest.

1311.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Claimants seek monetary relief against GM measured as actual damages in an amount to be determined at trial, treble damages for GM's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1312.   Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Claimants are entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

1313.   Claimants are also entitled to recover court costs and reasonable and necessary attorneys' fees under § 17.50(d) of the Texas DTPA.

> **ss.    Utah-Violations of Utah Consumer Protection Act (UTAH CODE § 13-11-1, *et seq.*)**

1314.   Claimants, on behalf of themselves and all Class members who are Utah residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1315.   GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE § 13-11-3.

1316.   Claimants are "persons" under UTAH CODE § 13-11-3.

1317.   The sale of the Delta Ignition Switch Vehicles to Claimants was a "consumer transaction" within the meaning of UTAH CODE § 13-11-3.

1318.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE § 13-11-4.  Specifically, "a supplier

commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  UTAH CODE § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE § 13-11-5.

1319.   GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Delta Ignition Switch Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Delta Ignition Switch Vehicles are of a particular standard, quality, and grade when they are not.

1320.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1321.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1322.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

1323.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1324.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1325.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1326.   GM knew or should have known that its conduct violated the Utah CSPA.

1327.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1328.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

  a.   Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

  b.   Intentionally concealed the foregoing from Claimants;

  c.   Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

  d.   Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1329.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1330.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1331.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1332.   As a direct and proximate result of GM's violations of the Utah CSPA, Claimants have suffered injury-in-fact and/or actual damage.

1333.   Pursuant to UTAH CODE § 13-11-4, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Claimant, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

### tt.   Vermont-Violations of Vermont Consumer Fraud Act (VT. STAT. TIT. 9, § 2451, *et seq.*)

1334.   Claimants, on behalf of themselves and all Class members who are Vermont residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1335.   GM was a seller within the meaning of VT. STAT. TIT. 9, § 2451(a).

1336.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" VT. STAT. TIT. 9, § 2453(a).  GM engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by systematically devaluing safety and concealing a plethora of defects in Delta Ignition Switch Vehicles.

1337.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1338.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1339.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1340.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Vermont CFA.

1341.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1342.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1343.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1344.   GM knew or should have known that its conduct violated the Vermont CFA.

1345.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1346.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1347.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1348.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1349.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1350.    As a direct and proximate result of GM's violations of the Vermont CFA, Claimants have suffered injury-in-fact and/or actual damage.

1351.    Claimants are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them],

reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]" pursuant to VT. STAT. TIT. 9, § 2461(b).

> **uu.    Virginia-Violations of Virginia Consumer Protection Act
> (VA. CODE § 59.1-196,** *et seq.***)**

1352.    Claimants, on behalf of themselves and all Class members who are Virginia residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1353.    GM was a "supplier" under VA. CODE § 59.1-198.

1354.    The sale of the Delta Ignition Switch Vehicles to Claimants was a "consumer transaction" within the meaning of VA. CODE § 59.1-198.

1355.    The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that goods or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." VA. CODE § 59.1-200. GM violated the Virginia CPA by misrepresenting that Delta Ignition Switch Vehicles had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that Delta Ignition Switch Vehicles were of a particular standard, quality, grade, style, or model when they were another; advertising Delta Ignition Switch Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

1356.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1357.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1358.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1359.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Virginia CPA.

1360.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1361.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1362.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1363.   GM knew or should have known that its conduct violated the Virginia CPA.

1364.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1365.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

a.      Possessed exclusive knowledge about the defects in the
Delta Ignition Switch Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and
reliability of the Delta Ignition Switch Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1366.   Because GM fraudulently concealed the defects in the Delta Ignition Switch

Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain

since the vehicles they purchased were worth less than they would have been if they were free

from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have

paid less for them.

1367.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1368.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their

vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,

as alleged above.

1369.   As a direct and proximate result of GM's violations of the Virginia CPA,

Claimants have suffered injury-in-fact and/or actual damage.

1370.   Pursuant to VA. CODE § 59.1-204, Claimants seek monetary relief against GM

measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

statutory damages in the amount of $500 for each Claimant. Because GM's conduct was

committed willfully and knowingly, Claimants are entitled to recover, for each Claimant, the

greater of (a) three times actual damages or (b) $1,000.

1371. Claimants also seek punitive damages, and attorneys' fees, and any other just and

proper relief available under General Business Law § 59.1-204, *et seq.*

**vv.    Washington-Violations of the Washington Consumer Protection Act
(REV. CODE WASH. § 19.86.010, *et seq.*)**

1372. Claimants, on behalf of themselves and all Class members who are Washington

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1373. GM committed the acts complained of herein in the course of "trade" or

"commerce" within the meaning of WASH. REV. CODE. WASH. § 19.96.010.

1374. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits

"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce." WASH. REV. CODE. WASH. § 19.96.010. GM engaged in unfair and

deceptive acts and practices and violated the Washington CPA by systematically devaluing

safety and concealing a plethora of defects in the Delta Ignition Switch Vehicles and other GM

vehicles.

1375. In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1376.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1377.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Washington CPA.

1378.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1379.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1380.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1381.   GM knew or should have known that its conduct violated the Washington CPA.

1382.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1383.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1384.   Because GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain
since the vehicles they purchased were worth less than they would have been if they were free
from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their
vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have
paid less for them.

1385.   GM's concealment of the defects in Claimants' vehicles was material to
Claimants.

1386.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its
concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the
truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their
vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs,
as alleged above.

1387.   As a direct and proximate result of GM's violations of the Washington CPA,
Claimants have suffered injury-in-fact and/or actual damage.

1388.   GM is liable to Claimants for damages in amounts to be proven at trial, including
attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem
appropriate under REV. CODE. WASH. § 19.86.090.

      **ww.**    **West Virginia-Violations of the Consumer Credit and Protection Act
(W. VA. CODE § 46A-1-101, *et seq.*)**

1389.   Claimants, on behalf of themselves and all Class members who are West Virginia
residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all
paragraphs as though fully set forth herein.

1390.   GM was a "person" under W. VA. CODE § 46A-1-102(31).

1391.   Claimants are "consumers," as defined by W. VA. CODE §§ and 46A-1-102(12)

and 46A-6-102(2), who purchased or leased one or more Delta Ignition Switch Vehicles.

1392.   GM engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

1393.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA")

prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …."

W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

> (I)    Advertising goods or services with intent not to sell
>        them as advertised;
>
> (K)    Making false or misleading statements of fact
>        concerning the reasons for, existence of or amounts
>        of price reductions;
>
> (L)    Engaging in any other conduct which similarly
>        creates a likelihood of confusion or of
>        misunderstanding;
>
> (M)    The act, use or employment by any person of any
>        deception, fraud, false pretense, false promise or
>        misrepresentation, or the concealment, suppression
>        or omission of any material fact with intent that
>        others rely upon such concealment, suppression or
>        omission, in connection with the sale or
>        advertisement of any goods or services, whether or
>        not any person has in fact been misled, deceived or
>        damaged thereby;
>
> (N)    Advertising, printing, displaying, publishing,
>        distributing or broadcasting, or causing to be
>        advertised, printed, displayed, published, distributed
>        or broadcast in any manner, any statement or
>        representation with regard to the sale of goods or
>        the extension of consumer credit including the rates,
>        terms or conditions for the sale of such goods or the
>        extension of such credit, which is false, misleading
>        or deceptive or which omits to state material
>        information which is necessary to make the
>        statements therein not false, misleading or
>        deceptive;

W. VA. CODE § 46A-6-102(7).

1394.   By systematically devaluing safety and concealing a plethora of defects in GM
vehicles, GM engaged in deceptive business practices prohibited by the West Virginia CCPA,
including:  (1) representing that the Delta Ignition Switch Vehicles have characteristics, uses,
benefits, and qualities which they do not have; (2) representing that the Delta Ignition Switch
Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the
Delta Ignition Switch Vehicles with the intent not to sell them as advertised; (4) representing that
a transaction involving the Delta Ignition Switch Vehicles confers or involves rights, remedies,
and obligations which it does not; and (5) representing that the subject of a transaction involving
the Delta Ignition Switch Vehicles has been supplied in accordance with a previous
representation when it has not.

1395.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1396.   In the course of its business, GM concealed the defects in Claimants' vehicles as
described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM
also engaged in unlawful trade practices by employing deception, deceptive acts or practices,
fraud, misrepresentations, or concealment, suppression or omission of any material fact with
intent that others rely upon such concealment, suppression or omission, in connection with the
sale of Delta Ignition Switch Vehicles.

1397.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned
or leased by Claimants.

1398.   By failing to disclose and by actively concealing the defects in Claimants'
vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and
deceptive business practices in violation of the West Virginia CCPA.

1399.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1400.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1401.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1402.   GM knew or should have known that its conduct violated the West Virginia CCPA.

1403.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1404.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1405.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their

vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1406.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1407.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1408.   As a direct and proximate result of GM's violations of the West Virginia CCPA, Claimants have suffered injury-in-fact and/or actual damage.

1409.   Pursuant to W. VA. CODE § 46A-6-106, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Claimant.

1410.   Claimants also seek punitive damages against GM because GM carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Claimants to cruel and unjust hardship as a result.  GM intentionally and willfully misrepresented the safety and reliability of the Delta Ignition Switch Vehicles, deceived Claimants on life-or-death matters, concealed material facts that only GM knew, and repeatedly promised Claimants that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in GM vehicles.  GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1411.   Claimants further seek restitution, punitive damages, costs of Court, attorney's

fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available

under the West Virginia CCPA.

> **xx.    Wisconsin-Violations of the Wisconsin Deceptive Trade Practices Act
> (WIS. STAT. § 100.18, *et seq.*)**

1412.   Claimants, on behalf of themselves and all Class members who are Wisconsin

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1413.   GM is a "person, firm, corporation or association" within the meaning of WIS.

STAT. § 100.18(1).

1414.   Claimants are members of "the public" within the meaning of WIS. STAT.

§ 100.18(1).  Claimants purchased or leased one or more Delta Ignition Switch Vehicles.

1415.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a

"representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT.

§ 100.18(1).  By systematically devaluing safety and concealing a plethora of defects in GM

vehicles, GM engaged in unfair and deceptive acts and practices and violated the Wisconsin

DTPA.

1416.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1417.   In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Delta Ignition Switch Vehicles.

1418.   GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1419.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

1420.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1421.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1422.   GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1423.   GM knew or should have known that its conduct violated the Wisconsin DTPA.

1424.   As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1425.   GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1426.   Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1427.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1428.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1429.   Claimants are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2).  Because GM's conduct was committed knowingly and/or intentionally, Claimants are entitled to treble damages.

1430.   Claimants also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

### yy.   Wyoming-Violations of the Wyoming Consumer Protection Act (WYO. STAT. § 40-12-105, *et seq.*)

1431.   Claimants, on behalf of themselves and all Class members who are Wyoming residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1432.    GM and Claimants are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

1433.    The sales of the Delta Ignition Switch Vehicles to Claimants were "consumer transactions" within the meaning of WYO. STAT. § 40-12-105.

1434.    Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and in connection with a consumer transaction it knowingly:  "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; or  "(xv) Engages in unfair or deceptive acts or practices." WYO. STAT. § 45-12-105.

1435.    By systematically devaluing safety and concealing a plethora of defects in GM vehicles as described above, GM violated the Wyoming CPA.  GM engaged in deceptive trade practices, including (among other things) representing that the Delta Ignition Switch Vehicles are of a particular standard and grade, which they are not; advertising the Delta Ignition Switch Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.

1436.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1437.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

1438.  GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimants.

1439.  By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Wyoming CPA.

1440.  In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1441.  GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1442.  GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead Claimants.

1443.  GM knew or should have known that its conduct violated the Wyoming CPA.

1444.  As alleged above, GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

1445.  GM owed Claimants a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1446.  Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had Delta Ignition Switch Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

1447.  GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1448.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1449.  As a direct and proximate result of GM's violations of the Wyoming CPA, Claimants have suffered injury-in-fact and/or actual damage.

1450.  Pursuant to WYO. STAT. § 40-12-108(a), Claimants seek monetary relief against GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

**B.    Subclass Claims.**

    **1.    Breach of the Implied Warranty of Merchantability.**

1451.  Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

1452.   This claim is brought on behalf of the Delta Ignition Switch Vehicle Implied Warranty Subclass.

1453.   The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Delta Ignition Switch Vehicle Implied Warranty Subclass state claims.

1454.   As set forth below, the Class states claims under the U.C.C. statutes of every jurisdiction included in the Delta Ignition Switch Vehicle Implied Warranty Subclass.

    a.    **Alaska**

1455.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Alaska residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1456.   GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

1457.   Under ALASKA STAT. § 45.02.314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Delta Ignition Switch Vehicles.

1458.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.

1459.   The Delta Ignition Switch Vehicles are inherently defective in that there are defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1460.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1461.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### b.    Arkansas

1462.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Arkansas residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1463.   GM was a merchant with respect to motor vehicles within the meaning of ARK. CODE § 4-2-104(1).

1464.   Under ARK. CODE § 4-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1465.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1466.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1467.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### c.      California

1468.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are California residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1469.   Claimants, on behalf of themselves and the Subclass, bring this claim for violations of the Song-Beverly Warranty Act (Cal. Civ. Code §§1791.1 & 1792).

1470.   Claimants and the Subclass members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1471.   The Delta Ignition Switch Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

1472.   GM was the "manufacturer" of the Delta Ignition Switch Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

1473.   GM impliedly warranted to Claimants and the Subclass that Delta Ignition Switch Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Delta Ignition Switch Vehicles did not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1474.   CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

  (3)  Are adequately contained, packaged, and labeled.

  (4)  Conform to the promises or affirmations of fact made on the container or label.

1475. The Delta Ignition Switch Vehicles would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accident, and an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1476. Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death, the Delta Ignition Switch Vehicles were not safe to drive and thus not fit for ordinary purposes.

1477. The Delta Ignition Switch Vehicles were not adequately labeled because the labeling failed to disclose the Delta Ignition Switch Defect and did not advise Claimants and the Subclass to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Delta Ignition Switch Vehicles.

1478. GM breached the implied warranty of merchantability by selling Delta Ignition Switch Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1479. Notice of breach is not required because Claimants and Subclass members did not purchase their automobiles directly from GM.  In any event, GM was provided notice of these

issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1480.   As a direct and proximate result of GM's breach of its duties under California's Lemon Law, Claimants and the Subclass members received goods whose dangerous condition substantially impaired their value.

1481.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimants and Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

1482.   Under CAL. CIV. CODE § 1794, Claimants and the Subclass are entitled to costs and attorneys' fees.

### d.    Colorado

1483.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Colorado residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1484.   GM was a merchant with respect to motor vehicles.

1485.   Under COL REV. STAT. § 4-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1486.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1487.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1488.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### e.    Delaware

1489.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Delaware residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1490.   GM was a merchant with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

1491.   Under 6 DEL. CODE § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1492.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1493.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1494.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### f.      District of Columbia

1495.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are District of Columbia residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1496.   GM was a merchant with respect to motor vehicles within the meaning of D.C. Code § 28:2-104(1).

1497.   Under D.C. Code § 28:2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1498.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1499.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1500.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### g.    Hawaii

1501.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Hawaii residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1502.    GM was a merchant with respect to motor vehicles within the meaning of HAW. REV. STAT. § 490-2-104(1).

1503.    Under HAW. REV. STAT. § 490-§ 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1504.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1505.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1506.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### h.    Indiana

1507.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Indiana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1508.   GM was a merchant with respect to motor vehicles within the meaning of IND. CODE § 26-1-2-104(1).

1509.   Under IND. CODE § 26-1-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1510.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1511.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1512.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### i.    Kansas

1513.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Kansas residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1514.   GM was a merchant with respect to motor vehicles within the meaning of KAN. STAT. § 84-2-104(1).

1515.   Under KAN. STAT. § 84-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1516.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1517.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1518.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### j.    Louisiana

1519.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Louisiana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1520.   At the time Claimants acquired their Delta Ignition Switch Vehicles, those vehicles had a redhibitory defect within the meaning of LA. CIV. CODE ART. 2520, in that (a) the defects rendered the use of the Delta Ignition Switch Vehicles so inconvenient that Claimants either would not have purchased the Delta Ignition Switch Vehicles had they known of the defects, or (b) the defects so diminished the usefulness and/or value of the Delta Ignition Switch

Vehicles that it must be presumed that the Claimants would have purchased the Delta Ignition

Switch Vehicles for a lesser price.

1521.   No notice of the defect is required under LA. CIV. CODE ART. 2520, since GM had

knowledge of a redhibitory defect in the Delta Ignition Switch Vehicles at the time they were

sold to Claimants.

1522.   Under LA. CIV. CODE ART. 2524, a warranty that the Delta Ignition Switch

Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the

transactions when Claimants purchased or leased their Delta Ignition Switch Vehicles from GM.

1523.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were

not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition

switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

power steering and power brakes and the nondeployment of airbags in the event of a collision,

thereby causing an increased likelihood of serious injury or death.

1524.   GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1525.   As a direct and proximate result of GM's sale of vehicles with redhibitory defects,

and in violation of the implied warranty that the Delta Ignition Switch Vehicles were fit for

ordinary use, Claimants are entitled to either rescission or damages.

### k.    Maine

1526.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied

Warranty Subclass members who are Maine residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1527.    GM was a merchant with respect to motor vehicles within the meaning of ME. REV. STAT. TIT. II § 2-104(1).

1528.    Under ME. REV. STAT. TIT. II § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1529.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1530.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1531.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### l.    Maryland

1532.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Maryland residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1533.    GM was a merchant with respect to motor vehicles within the meaning of MD. COM. LAW § 2-104(1).

1534.   Under MD. COM. LAW § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1535.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1536.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1537.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### m.    Massachusetts

1538.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Massachusetts residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1539.   GM was a merchant with respect to motor vehicles within the meaning of ALM. GL CH. 106, § 2-104(1).

1540.   Under ALM. GL CH. 106, § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1541.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1542.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1543.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### n.    Michigan

1544.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Michigan residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1545.   GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

1546.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1547.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1548.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1549.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### o.    Minnesota

1550.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Minnesota residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1551.   GM was a merchant with respect to motor vehicles within the meaning of MINN. STAT. § 336.2-104(1).

1552.   Under MINN. STAT. § 336.2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1553.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1554.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1555.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### p.    Mississippi

1556.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Mississippi residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1557.   GM was a merchant with respect to motor vehicles within the meaning of MISS. CODE § 75-2-104(1).

1558.   Under MISS. CODE § 75-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1559.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1560.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1561.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### q.   Missouri

1562.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Missouri residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1563.   GM was a merchant with respect to motor vehicles within the meaning of Mo. Rev. Stat § 400.2-104(1).

1564.   Under Mo. Rev. Stat § 400.2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1565.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1566.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1567.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### r.    Montana

1568.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Montana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1569.    GM was a merchant with respect to motor vehicles within the meaning of MONT. CODE § 30-2-104(1).

1570.    Under MONT. CODE § 30-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Defective Ignition Switch Vehicles from GM.

1571.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1572.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1573.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### s.    Nebraska

1574.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Nebraska residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1574.   GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

1575.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Delta Ignition Switch Vehicles from GM.

1576.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1577.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1578.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**t.      Nevada**

1579.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Nevada residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1580.   GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

1581.  A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Delta Ignition Switch Vehicles from GM.

1582.  The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1583.  GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1584.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### u.    New Hampshire

1585.  Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are New Hampshire residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1586.  GM was a merchant with respect to motor vehicles within the meaning of N.H. REV. STAT. § 382-A:2-104(1).

1587.  A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law under N.H. REV. STAT. § 382-A:2-314 in the transactions when Claimants purchased their vehicles on or before July 9, 2009.

1588.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1589.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1590.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### v.    New Jersey

1591.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are New Jersey residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1592.    GM was a merchant with respect to motor vehicles within the meaning of N.J. STAT. § 12A:2-104(1).

1593.    Under N.J. STAT. § 12A:2-104(1), a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1594.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1595.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1596.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

## w.   New Mexico

1597.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are New Mexico residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1598.   GM was a merchant with respect to motor vehicles within the meaning of N.M. STAT. § 55-2-104(1).

1599.   Under N.M. STAT. § 55-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1600.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1601.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1602.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### x.    New York

1603.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are New York residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1604.    GM was a merchant with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

1605.    Under N.Y. U.C.C. § 2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1606.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1607.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1608.   As a direct and proximate result of GM's breach of the implied warranty of
merchantability, Claimants have been damaged.

### y.    North Carolina

1609.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied
Warranty Subclass members who are North Carolina residents (for the purposes of this Count,
the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth
herein.

1610.   GM was a merchant with respect to motor vehicles within the meaning of N.C.
GEN. STAT. § 25-2-104(1).

1611.   Under N.C. GEN. STAT. § 25-2-314, a warranty that the Delta Ignition Switch
Vehicles were in merchantable condition was implied by law in the transactions when Claimants
purchased or leased their vehicles from GM.

1612.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were
not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the
Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition
switch systems that cause sudden unintended stalling to occur, with the attendant shut down of
power steering and power brakes and the nondeployment of airbags in the event of a collision,
thereby causing an increased likelihood of serious injury or death.

1613.   GM was provided notice of these issues by numerous complaints filed against it,
internal investigations, and by numerous individual letters and communications sent by
Claimants and others.

1614.   As a direct and proximate result of GM's breach of the implied warranty of
merchantability, Claimants have been damaged.

### z.    North Dakota

1615.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are North Dakota residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1616.    GM was a merchant with respect to motor vehicles.

1617.    A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1618.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1619.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1620.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### aa.    Ohio

1621.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Ohio residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1622.    Claimants and the Subclass allege GM breached its implied warranty in tort.

1623.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1624.   Based upon the dangerous product defects, GM failed to meet the expectations of a reasonable consumer.  The Delta Ignition Switch Vehicles failed their ordinary, intended use because the ignition systems in the vehicles did not function as a reasonable consumer would expect.  Moreover, the defect presented a serious danger to Claimants that could not be eliminated without significant cost.

1625.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1626.   As a direct and proximate result of GM's tortious breach of its implied warranty, Claimants have been damaged.

### bb.   Oklahoma

1627.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Oklahoma residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1628.   GM was a merchant with respect to motor vehicles.

1629.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1630.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1631.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1632.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### cc.    Pennsylvania

1633.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Pennsylvania residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1634.   GM was a merchant with respect to motor vehicles.

1635.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1636.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of

power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1637.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1638.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### dd.    Rhode Island

1639.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Rhode Island residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1640.    GM was a merchant with respect to motor vehicles.

1641.    A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1642.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1643.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1644.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ee.    South Carolina

1645.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are South Carolina residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1646.   GM was a merchant with respect to motor vehicles under S.C. CODE § 36-2-314.

1647.   Under S.C. CODE § 36-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1648.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1649.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1650.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ff.    South Dakota

1651.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are South Dakota residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1652.   GM was a merchant with respect to motor vehicles.

1653.   A warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1654.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1655.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1656.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### gg.    Texas

1657.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Texas residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1658.    GM was a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104.

1659.    Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1660.    The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1661.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1662.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### hh.    Utah

1663.    Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Utah residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1664.   GM was at all relevant times a merchant with respect to motor vehicles.

1665.   GM impliedly warranted that its vehicles were of good and merchantable quality, fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public. This warranty was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1666.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1667.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1668.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ii.    Virginia

1669.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Virginia residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1670.   GM was at all relevant times a merchant with respect to motor vehicles.

1671.   GM impliedly warranted that the Delta Ignition Switch Vehicles were of good and merchantable quality, fit, and safe for their ordinary intended use—transporting the driver and

passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.  This warranty was implied by law in the transactions when Claimants purchased or leased their Delta Ignition Switch Vehicles from GM.

1672.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1673.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1674.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### jj.    West Virginia

1675.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are West Virginia residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1676.   GM was at all relevant times a seller of motor vehicles under W. VA. CODE § 46-2-314, and was also a "merchant" as the term is used in W. VA. CODE § 46A-6-107 and § 46-2-314.

1677.   Under W. VA. CODE § 46-2-314, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1678.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1679.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1680.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### kk.     Wyoming

1681.   Claimants, on behalf of themselves and all Delta Ignition Switch Vehicle Implied Warranty Subclass members who are Wyoming residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1682.   GM was at all relevant times a merchant with respect to motor vehicles.

1683.   Under Wyoming law, a warranty that the Delta Ignition Switch Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1684.   The Delta Ignition Switch Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the Delta Ignition Switch Vehicles were inherently defective in that there were defects in the ignition switch systems that permit sudden unintended shutdown to occur, with the attendant shut down

of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1685.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1686.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**2.    Negligence**

1687.   Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

1688.   This claim is brought on behalf of the Delta Ignition Switch Negligence Subclass.

1689.   The law of negligence is substantially similar under the laws of all the jurisdictions whose residents are included in the Delta Ignition Switch Negligence Subclass.

1690.   GM designed, manufactured and sold or otherwise placed in the stream of commerce Delta Ignition Switch Vehicles, as set forth above.

1691.   GM had a duty to design, manufacture, and sell only a product that would be safe for its intended and foreseeable uses and users, including the use to which its products were put by Claimants and the Delta Ignition Switch Negligence Subclass.  GM breached its duties to the Delta Ignition Switch Negligence Subclass because it was negligent in the design, development, manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold.

1692.   GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles equipped with defective ignition systems pose an unreasonable risk of death or serious bodily injury to Delta Ignition Switch Negligence

Subclass members, passengers, other motorists, pedestrians, and the public at large, because they are susceptible to incidents in which the vehicles suddenly stall, and the brakes, power steering, seatbelt pretensioners, and airbags are rendered inoperable.

1693.   GM thus "failed to exercise reasonable care in the manufacture of [its Delta Ignition Switch Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

1694.   GM further breached its duties to Delta Ignition Switch Negligence Subclass by supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used by such foreseeable persons as Delta Ignition Switch Negligence Subclass when:

a.     GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b.     GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

1695.   GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Delta Ignition Switch Negligence Subclass members were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

1696.   GM knew or should have known of the defects described herein.  GM breached its duty to Delta Ignition Switch Negligence Subclass members because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the vehicles when ordinary care and reasonable prudence so demanded.

1697.   As a direct and proximate result of GM's negligence, the Delta Ignition Switch Negligence Subclass suffered damages.  The damages include overpayment for the Delta Ignition Switch Vehicles and repair and recall costs, as discussed above.

*      *      *      *

1698.   The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver of Claimants' rights against any person, entity or property; (b) a consent by Claimants to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any objection or other proceeding commenced in this case or any related case; (c) a waiver of the right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court.