# **Exhibit B**

(Amended Ex. B to Motion For An Order Granting Authority To File
Late Class Proofs Of Claim, Dkt. No. 13806)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

**Name of Debtor** (Check Only One):                    Case No.  **09-50026**

Your Claim is Scheduled As Follows:

☒ Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.)    09-13558 (REG)

NOTE: *This form should not be used to make a claim for an administrative expense arising **after** the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
Yvonne James-Bivens, et al. on behalf of the Proposed Class (see attached for add'l claimants).

Name and address where notices should be sent:
c/o Steve W. Berman, Hagens Berman Sobol Shapiro, LLP,
1918 8th Avenue, Suite 3300, Seattle, WA  98101

Telephone number:  (206) 623-7292
Email Address:  steve@hbsslaw.com

☒ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** Dkt. No. 13806
(*If known*)

Filed on:  December 22, 2016

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:**    $ See attached.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** See attached.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:**  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
Describe:

**Value of Property:** $_____  **Annual Interest Rate** ____%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____    **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2)).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

*\*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

| Date: 4/24/18 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|

/s/ Steve W. Berman, on behalf of Claimants and the Proposed Class

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Modified B10 (GCG) (12/08)

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules. The attorneys for the Debtors and their court-appointed claims agent, The Garden City Group, Inc., are not authorized and are not providing you with any legal advice.*

### A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR

PLEASE SEND YOUR ORIGINAL, COMPLETED CLAIM FORM AS FOLLOWS: **IF BY MAIL**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, P.O. BOX 9386, DUBLIN, OH 43017-4286. **IF BY HAND OR OVERNIGHT COURIER**: THE GARDEN CITY GROUP, INC., ATTN: MOTORS LIQUIDATION COMPANY CLAIMS PROCESSING, 5151 BLAZER PARKWAY, SUITE A, DUBLIN, OH 43017. **ANY PROOF OF CLAIM SUBMITTED BY FACSIMILE OR E-MAIL WILL NOT BE ACCEPTED.**

### THE GENERAL BAR DATE IN THESE CHAPTER 11 CASES IS NOVEMBER 30, 2009 AT 5:00 P.M. (PREVAILING EASTERN TIME)

**Court, Name of Debtor, and Case Number:**

These chapter 11 cases were commenced in the United States Bankruptcy Court for the Southern District of New York on June 1, 2009. You should select the debtor against which you are asserting your claim.

**A SEPARATE PROOF OF CLAIM FORM MUST BE FILED AGAINST EACH DEBTOR.**

**Creditor's Name and Address:**

Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. Please provide us with a valid email address. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**

State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**

State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the debtor, trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**

State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor, if any.

**3a. Debtor May Have Scheduled Account As:**

Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**

Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507(a):**

If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

For claims pursuant to 11 U.S.C. § 503(b)(9), indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before June 1 2009, the date of commencement of these cases (See DEFINITIONS, below). Attach documentation supporting such claim.

**6. Credits:**

An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the Debtor credit for any payments received toward the debt.

**7. Documents:**

Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**

The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**

A debtor is the person, corporation, or other entity that has filed a bankruptcy case.
The Debtors in these Chapter 11 cases are:

| | |
|---|---|
| Motors Liquidation Company | |
| (f/k/a General Motors Corporation) | 09-50026 (REG) |
| MLCS, LLC | |
| (f/k/a Saturn, LLC) | 09-50027 (REG) |
| MLCS Distribution Corporation | |
| (f/k/a Saturn Distribution Corporation) | 09-50028 (REG) |
| MLC of Harlem, Inc. | |
| (f/k/a Chevrolet Saturn of Harlem, Inc.) | 09-13558 (REG) |

**Creditor**

A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**

A claim is the creditor's right to receive payment on a debt that was owed by the Debtor on the date of the bankruptcy filing. See 11 U.S.C. § 101(5). A claim may be secured or unsecured.

**Proof of Claim**

A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with The Garden City Group, Inc. as described in the instructions above and in the Bar Date Notice.

**Secured Claim Under 11 U.S.C. § 506(a)**

A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Section 503(b)(9) Claim**

A Section 503(b)(9) claim is a claim for the value of any goods received by the debtor within 20 days before the date of commencement of a bankruptcy case in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**Unsecured Claim**

An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507(a)**

Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's

## INFORMATION

tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**

Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**

To receive acknowledgment of your filing from The Garden City Group, Inc., please provide a self-addressed, stamped envelope and a copy of this proof of claim when you submit the original claim to The Garden City Group, Inc.

**Offers to Purchase a Claim**

Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

**Additional Information**

If you have any questions with respect to this claim form, please contact Alix Partners at 1 (800) 414-9607 or by e-mail at claims@motorsliquidation.com.

**ATTACHMENT TO PROOF OF CLAIM ON BEHALF OF
PURCHASERS OF DEFECTIVE GM VEHICLES BY:**

**YVONNE JAMES-BIVINS, GERALD SMITH, PATRICIA BARKER, ESPERANZA
RAMIREZ, WANDELL LITTLES BEAZER, STACEY BOWENS, MARIA E.
SANTIAGO, VERLENA WALKER, DENNIS WALTHER, KEITH NATHAN, LYLE
WIRTJES, MELODY LOMBARDO, SUSAN VIENS, DIANA CNOSSEN, SOPHIA
MARKS, DAVID PRICE, JACQUELINE SMITH, BRYAN WALLACE, DAVID
CLELAND, FRANCES HOWARD, PATRICE WITHERSPOON, LORRAINE DE
VARGAS, LISA AXELROD, GEORGIANNA PARISI, ANNETTE HOPKINS,
CATHERINE SENKLE, SHENYESA HENRY, LISA SIMMONS, MALINDA
STAFFORD, AND STEPHANIE RENEE CARDEN**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ..................................................................................1

II.  CLAIMANTS ............................................................................................................2

    A.  Yvonne James-Bivins—California ...............................................................2

    B.  Gerald Smith—Alabama ...............................................................................3

    C.  Patricia Barker—California ...........................................................................3

    D.  Esperanza Ramirez—California ....................................................................4

    E.  Wandell Littles Beazer—Connecticut ..........................................................4

    F.  Stacey Bowens—Connecticut .......................................................................4

    G.  Maria E. Santiago—Florida ..........................................................................5

    H.  Verlena Walker—Florida ..............................................................................5

    I.  Dennis Walther—Hawaii ...............................................................................6

    J.  Keith Nathan—Illinois ..................................................................................6

    K.  Lyle Wirtjes—Iowa .......................................................................................6

    L.  Melody Lombardo—Maryland ......................................................................7

    M.  Susan Viens—Massachusetts ........................................................................7

    N.  Diana Cnossen—Michigan ...........................................................................8

    O.  Sophia Marks—Michigan .............................................................................8

    P.  David Price—Michigan .................................................................................8

    Q.  Jacqueline Smith—Michigan ........................................................................9

    R.  Bryan Wallace—Michigan ............................................................................9

    S.  David Cleland—Minnesota .........................................................................10

    T.  Frances Howard—Mississippi ....................................................................10

    U.  Patrice Witherspoon—Missouri ..................................................................10

    V.  Lorraine De Vargas—New Mexico .............................................................11

    W.  Lisa Axelrod—Ohio ....................................................................................11

    X.  Georgianna Parisi—Ohio .............................................................................12

Y. Annette Hopkins—South Carolina ........................................................12

Z. Catherine Senkle—South Dakota ......................................................13

AA. Shenyesa Henry—Texas ....................................................................13

BB. Lisa Simmons—Texas .......................................................................13

CC. Malinda Stafford—Texas ..................................................................14

DD. Stephanie Renee Carden—West Virginia .........................................14

III. THE DEFECTS AT ISSUE ...........................................................................15

A. The Low-Torque Ignition Switch Defects .........................................15

 1. Low Torque Safety Recall No. 14-V-355. .............................16

 2. Low Torque Safety Recalls No. 14-V-394 and 14-V-400. ......21

B. Side-Impact Airbag Wiring Harness Defect .....................................38

C. The Power Steering Defect ................................................................41

IV. OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM
VEHICLES ...................................................................................................43

A. Ignition Lock Cylinder Defect in Vehicles Also Affected By the
Delta Ignition Switch Defect. ...........................................................44

B. Ignition Lock Cylinder Defect Affecting Over 200,000 Additional
GM Vehicles. ....................................................................................47

C. Front Passenger Airbag Defect. ........................................................48

D. Safety Defects of the Seat Belt Systems in GM Vehicles. ..................48

 1. Seat belt connector cable defect. ..........................................48

 2. Seat belt retractor defect. .....................................................49

E. Safety Defects Affecting the Brakes in GM Vehicles. ........................49

 1. Brake light defect. ................................................................49

 2. Reduced brake performance defect. .......................................51

F. Electric Power Steering Assist Defect. ..............................................52

G. Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet
and Pontiac Vehicles. ........................................................................52

H. Light Control Module Defect. ...........................................................53

010440-11  1022312 V1

I.      Electrical Short in Driver's Door Module Defect..................................................53

J.      Low-Beam Headlight Defect. ...............................................................................53

K.      Fuel Pump Module Defect.....................................................................................54

L.      Overloaded Feed Defect. .......................................................................................54

M.      Headlamp Driver Module Failure. ........................................................................55

N.      Valve Cover Gasket Defect. ..................................................................................55

V.      GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS
        SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS
        STEMMED FROM ITS SYSTEMIC DEVALUATION AND
        DISREGARD OF SAFETY ISSUES IN ITS VEHICLES ................................55

VI.     GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND
        HIGH QUALITY—INCLUDING THE DEFECTIVE GM VEHICLES ........59

VII.    CLASS ALLEGATIONS ....................................................................................77

A.      The Class...............................................................................................................77

B.      The Defective GM Vehicle Implied Warranty Subclass. .....................................78

C.      The Defective GM Vehicle Negligence Subclass..................................................79

D.      The Class And The Subclasses Meet The Requirements For Class
        Certification. .........................................................................................................79

VIII.   THE CLASS' AND SUBCLASSES' CLAIMS ................................................81

A.      Class Claims..........................................................................................................81

        1.      Fraudulent concealment. ...............................................................................81

        2.      Unjust enrichment. ........................................................................................85

        3.      Consumer Protection Claims. .......................................................................86

                a.      Alabama-Violations of Alabama Deceptive Trade
                        Practices Act (ALA. CODE § 8-19-1, *et seq.*)...................................87

                b.      Alaska-Violations of the Alaska Unfair Trade
                        Practices and Consumer Protection Act (ALASKA
                        STAT. § 45.50.471, *et seq.*)................................................................90

                c.      Arizona-Violations of the Consumer Fraud Act
                        (ARIZ. REV. STAT. § 44-1521, *et seq.*) ............................................94

                d.      Arkansas-Violations of the Deceptive Trade
                        Practice Act (ARK. CODE § 4-88-101, *et seq.*)...............................96

- iii -

e.      California ...................................................................99

        (1)     Violations of the California Consumer Legal
                Remedies Act (CAL. CIV. CODE § 1750
                *et seq.*) ...............................................................99

        (2)     Violations of the California Unfair
                Competition Law ("UCL")
                (CAL. BUS. & PROF. CODE § 17200, *et seq.*) ..................103

f.      Colorado-Violations of the Colorado Consumer
        Protection Act (COL. REV. STAT. § 6-1-101, *et seq.*) ...................106

g.      Connecticut-Violations of Connecticut Unlawful
        Trade Practices Act (CONN. GEN. STAT. § 42-110a,
        *et seq.*) ........................................................................109

h.      Delaware-Violations of the Delaware Consumer
        Fraud Act (6 DEL. CODE § 2513, *et seq.*) ....................................112

i.      District of Columbia-Violations of the Consumer
        Protection Procedures Act (D.C. CODE § 28-3901,
        *et seq.*) ........................................................................115

j.      Florida-Violations of the Florida Unfair &
        Deceptive Trade Practices Act (FLA. STAT.
        § 501.201, *et seq.*) ........................................................118

k.      Georgia-Violations of Georgia's Fair Business
        Practices Act (GA. CODE § 10-1-390, *et seq.*)............................121

l.      Hawaii-Unfair and Deceptive Acts in violation of
        Hawaii Law (HAW. REV. STAT. § 480, *et seq.*) ...........................124

m.      Idaho-Violations of the Idaho Consumer Protection
        Act (IDAHO CIV. CODE § 48-601, *et seq.*) ...................................127

n.      Illinois-Violations of Illinois Consumer Fraud and
        Deceptive Business Practices Act (815 ILCS 505/1,
        *et seq.* and 720 ILCS 295/1a)......................................................130

o.      Indiana-Violations of the Indiana Deceptive
        Consumer Sales Act (IND. CODE § 24-5-0.5-3,
        *et seq.*) ........................................................................132

p.      Iowa-Violations of the Private Right of Action for
        Consumer Frauds Act (IOWA CODE § 714H.1,
        *et seq.*) ........................................................................136

q.      Kansas-Violations of the Kansas Consumer
        Protection Act (KAN. STAT. § 50-623, *et seq.*) ...........................139

r.      Kentucky-Violations of the Kentucky Consumer
        Protection Act (KY. REV. STAT. § 367.110, *et seq.*) ...................142

s.      Louisiana-Violations of the Louisiana Unfair Trade
        Practices and Consumer Protection Law (LA. REV.
        STAT. § 51:1401, *et seq.*) ............................................................145

t.      Maine-Violations of Maine Unfair Trade Practices
        Act (ME. REV. STAT. TIT. 5 § 205-A, *et seq.*)...............................148

u.      Maryland-Violations of the Maryland Consumer
        Protection Act (MD. CODE COM. LAW § 13-101,
        *et seq.*) ......................................................................................151

v.      Massachusetts-Deceptive acts or practices
        prohibited by Massachusetts law (MASS. GEN.
        LAWS CH. 93A, § 1, *et seq.*) .........................................................153

w.      Michigan-Violations of the Michigan Consumer
        Protection Act (MICH. COMP. LAWS § 445.903,
        *et seq.*) ......................................................................................156

x.      Minnesota.................................................................................159

        (1)     Violations of Minnesota Prevention of
                Consumer Fraud Act
                (MINN. STAT § 325F.68, *et seq.*)......................................159

        (2)     Violations of Minnesota Uniform Deceptive
                Trade Practices Act
                (MINN. STAT. § 325D.43-48, *et seq.*)...............................162

y.      Mississippi-Violations of Mississippi Consumer
        Protection Act (MISS. CODE § 75-24-1, *et seq.*)...........................165

z.      Missouri-Violations of Missouri Merchandising
        Practices Act (MO. REV. STAT. § 407.010, *et seq.*).....................167

aa.     Montana-Violations of the Montana Consumer
        Protection Act (MONT. CODE § 30-14-101, *et seq.*)....................170

bb.     Nebraska-Violations of the Nebraska Consumer
        Protection Act (NEB. REV. STAT. § 59-1601, *et seq.*) .................173

cc.     Nevada-Violations of the Nevada Deceptive Trade
        Practices Act (NEV. REV. STAT. § 598.0903, *et seq.*) .................176

dd.     New Hampshire-Violations of N.H. Consumer
        Protection Act (N.H. REV. STAT. § 358-A:1, *et seq.*) .................179

ee.     New Jersey-Violations of the New Jersey Consumer
        Fraud Act (N.J. STAT. § 56:8-1, *et seq.*) ......................................182

ff.     New Mexico-Violations of the New Mexico Unfair
        Trade Practices Act (N.M. STAT. §§ 57-12-1,
        *et seq.*) ...........................................................................185

gg.     New York .........................................................................188

        (1)     Violations of the New York General
                Business Law (N.Y. GEN. BUS. LAW §§ 349
                and 350) .............................................................188

        (2)     Violations of New York's False Advertising
                Act (N.Y. GEN. BUS. LAW § 350) ....................190

hh.     North Carolina-Violations of North Carolina's
        Unfair and Deceptive Practices Act (N.C. GEN.
        STAT. § 75-1.1, *et seq.*) .................................................192

ii.     North Dakota-Violations of the North Dakota
        Consumer Fraud Act (N.D. CENT. CODE § 51-15-02,
        *et seq.*) ...........................................................................194

jj.     Ohio-Violations of Ohio Consumer Sales Practices
        Act (OHIO REV. CODE § 1345.01, *et seq.*) .....................197

kk.     Oklahoma-Violations of the Oklahoma Consumer
        Protection Act (OKLA. STAT. TIT. 15 § 751, *et seq.*) ...................201

ll.     Oregon-Violations of the Oregon Unlawful Trade
        Practices Act (OR. REV. STAT. § 646.605, *et seq.*) ......................205

mm.     Pennsylvania-Violations of the Pennsylvania Unfair
        Trade Practices and Consumer Protection Law (73
        P.S. § 201-1, *et seq.*) .....................................................208

nn.     Rhode Island-Violations of the Rhode Island Unfair
        Trade Practices and Consumer Protection Act (R.I.
        GEN. LAWS § 6-13.1, *et seq.*) ........................................211

oo.     South Carolina .................................................................214

        (1)     Violations of the South Carolina Unfair
                Trade Practices Act (S.C. CODE § 39-5-10,
                *et seq.*) ...........................................................214

        (2)     Violations of the South Carolina Regulation
                of Manufacturers, Distributors, and Dealers
                Act (S.C. CODE § 56-15-10, *et seq.*) ................217

pp.     South Dakota-Violations of the Deceptive Trade
        Practices and Consumer Protection Law
        (S.D. CODIFIED LAWS § 37-24-6, *et seq.*) ....................218

010440-11  1022312 V1

qq.  Tennessee—Violations of Tennessee Consumer
Protection Act (TENN. CODE § 47-18-101, *et seq.*).....................221

rr.  Texas-Violations of the Texas Deceptive Trade
Practices-Consumer Protection Act (TEX. BUS. &
COM. CODE § 17.41, *et seq.*) ........................................224

ss.  Utah-Violations of Utah Consumer Protection Act
(UTAH CODE § 13-11-1, *et seq.*) ...................................228

tt.  Vermont-Violations of Vermont Consumer Fraud
Act (VT. STAT. TIT. 9, § 2451, *et seq.*).........................231

uu.  Virginia-Violations of Virginia Consumer
Protection Act (VA. CODE § 59.1-196, *et seq.*)...........................234

vv.  Washington-Violations of the Washington
Consumer Protection Act
(REV. CODE WASH. § 19.86.010, *et seq.*) ...................................237

ww.  West Virginia-Violations of the Consumer Credit
and Protection Act (W. VA. CODE § 46A-1-101,
*et seq.*)...........................................................240

xx.  Wisconsin-Violations of the Wisconsin Deceptive
Trade Practices Act (WIS. STAT. § 100.18, *et seq.*) ....................244

yy.  Wyoming-Violations of the Wyoming Consumer
Protection Act (WYO. STAT. § 40-12-105, *et seq.*) ....................246

B.  Subclass Claims. .....................................................249

1.  Breach of the Implied Warranty of Merchantability...............................249

a.  Alaska .......................................................250

b.  Arkansas.....................................................252

c.  California ...................................................253

d.  Colorado.....................................................256

e.  Delaware ....................................................258

f.  District of Columbia ........................................259

g.  Hawaii ......................................................261

h.  Indiana......................................................263

i.  Kansas ......................................................264

j.  Louisiana....................................................266

010440-11  1022312 V1

k.    Maine ....................................................................................................267

l.    Maryland ..............................................................................................269

m.    Massachusetts .......................................................................................270

n.    Michigan ..............................................................................................272

o.    Minnesota .............................................................................................274

p.    Mississippi ...........................................................................................275

q.    Missouri ...............................................................................................277

r.    Montana ...............................................................................................279

s.    Nebraska ..............................................................................................280

t.    Nevada .................................................................................................282

u.    New Hampshire ....................................................................................283

v.    New Jersey ...........................................................................................285

w.    New Mexico .........................................................................................287

x.    New York .............................................................................................288

y.    North Carolina ......................................................................................290

z.    North Dakota ........................................................................................292

aa.    Ohio.....................................................................................................293

bb.    Oklahoma .............................................................................................295

cc.    Pennsylvania ........................................................................................296

dd.    Rhode Island ........................................................................................298

ee.    South Carolina ......................................................................................299

ff.    South Dakota.........................................................................................301

gg.    Texas ...................................................................................................303

hh.    Utah.....................................................................................................304

ii.    Virginia ...............................................................................................306

jj.    West Virginia .......................................................................................308

kk.    Wyoming..............................................................................................309

010440-11  1022312 V1

2.    Negligence. ...........................................................................................311

010440-11  1022312 V1

# I.    PRELIMINARY STATEMENT

1.      By this Proof of Claim, Claimants, on behalf of a proposed Nationwide Class

under B.R. 7023, of owners and lessees of Defective GM Vehicles, as defined herein

(collectively, the "Class"), assert unliquidated claims against the debtor, Motors Liquidation

Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.      More specifically, Claimants allege claims of fraudulent concealment, unjust

enrichment and consumer protection violations on behalf of the following proposed Class

pursuant to B.R. 7023:

> All persons in the United States who either bought or leased a
> Defective GM Vehicle prior to July 10, 2009.

Claimants also allege claims of breach of the implied warranty of merchantability and negligence

on behalf of proposed Subclasses of persons who bought or leased a Defective GM Vehicle prior

to July 10, 2009, and resided in jurisdictions that recognize such claims as set forth herein.

3.      As detailed more specifically herein, "Defective GM Vehicles" include each of

the following vehicles provided they were sold or leased prior to July 10, 2009:

(i)     Low-Torque Ignition Switch Defect Vehicles (the vehicles included in Recall
        Nos. 14-V-355, 14-V-394, and 14-V-400:  2005-2009 Buick Lacrosse, 2006-2014
        Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2010 Cadillac DTS, 2006-
        2010 Buick Lucerne, 2006-2008, and Chevrolet Monte Carlo; 2003-2010 Cadillac
        CTS and 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005
        Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand
        Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-
        2004 Oldsmobile Alero);

(ii)    Side Airbag Defect Vehicles (the vehicles included in Recall No. 14-V-118:
        2008-2010 Buick Enclave, 2009-2010 Chevrolet Traverse, 2008-2010 GMC
        Acadia, and 2008-2010 Saturn Outlook); and

(iii)   Power Steering Defect Vehicles (the vehicles included in Recall No. 14-V-153:
        2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx,

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors
LLC, is referred to herein as "New GM."

2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura).

4.    All told, there are approximately 9.8 million Defective GM Vehicles at issue in this Proof of Claim.

5.    GM was aware of the defects in the Defective GM Vehicles, and the defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

6.    GM induced Claimants and the Class to purchase and retain the Defective GM Vehicles under false pretenses, and thus deprived Class members of the benefit of their bargain and saddled them with dangerously defective cars that were worth less than they would have been in the absence of the defects.  Many Class members also incurred repair costs and other expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at Class members' expense.

7.    Claimants therefore file this Proof of Claim on behalf of the Class to recover the damages caused by GM's conduct under consumer protection statutes, the law of fraudulent concealment and unjust enrichment, which is essentially the same under the laws of each of the 50 states and the District of Columbia.  Claimants also bring claims for breach of the implied warranty of merchantability on behalf of a Subclass of persons living in states where the law supports such a claim (the "Defective GM Vehicle Implied Warranty Subclass").  Finally, Claimants bring a claim for negligence on behalf of residents of states where the law provides for such a clam (the "Defective GM Vehicle Negligence Subclass").

## II.    CLAIMANTS

### A.    Yvonne James-Bivins—California

8.    Yvonne James-Bivins, a resident of Altadena, California, purchased a new 2006 Cadillac CTS in Alhambra, California on January 9, 2006, and she still owns it today.  Ms.

James-Bivins chose this vehicle, in part, because the vehicle's safety and reliability were important to her. The GM sales representative told her this was a superior vehicle with safety enhancements. The ignition switch that GM used in the CTS (a "Low-Torque Ignition Switch" subject to Recall No. 14-V-394) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. James-Bivins did not learn about the Low-Torque Ignition Switch Defect until 2014.

**B.      Gerald Smith—Alabama**

9.      Gerald Smith, a resident of Montgomery, Alabama, purchased a used 2006 Chevrolet Impala in Prattville, Alabama in January 2007, and he still owns it today. He chose this vehicle, in part, because the vehicle's safety and reliability were important to him. The ignition switch that GM used in the Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-355) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Mr. Smith did not learn about the Low-Torque Ignition Switch Defect until 2014.

**C.      Patricia Barker—California**

10.      Ms. Barker, a resident of Wilmington, California, purchased a new 2005 Saturn Ion in Torrance, California in March 2005, and she still owns it today. She chose this vehicle because she had an excellent experience with her first Saturn and because safety and reliability were important factors to her. She recalls the GM dealership had several awards pertaining to the safety and reliability of GM vehicles displayed prominently in the waiting room. The vehicle's electric power steering was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "Power Steering Defect"). Ms. Barker did not learn about the Power Steering Defect until 2011 or 2012.

- 3 -

### D.    Esperanza Ramirez—California

11.    Esperanza Ramirez, a resident of Los Angeles, California, purchased a new 2007 Saturn Ion in Torrance, California on March 13, 2007, and she still owns it today.  The vehicle's safety and reliability were very important to her because she is a single parent to two children. Ms. Ramirez previously owned a Saturn and was satisfied with it, and that prompted her to purchase the Ion.  She also saw television commercials about the Saturn, some of which depicted families driving the car, and this signified the brand's safety and trustworthiness to her. When Ms. Ramirez purchased her car, the sales people at Saturn of Torrance assured her that she would be satisfied with her vehicle.  The vehicle's electric power steering was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the Power Steering Defect).  Ms. Ramirez did not learn about the Power Steering Defect until 2014.

### E.    Wandell Littles Beazer—Connecticut

12.    Wandell Littles Beazer, a resident of New York, New York, purchased a used 2004 Cadillac SRX in Waterbury, Connecticut on July 5, 2007.  Ms. Beazer purchased the vehicle because she believed it was safe and reliable.  The ignition switch that GM used in the SRX (the Low-Torque Ignition Switch subject to Recall No. 14-V-394) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag.  Ms. Beazer sold the vehicle in November 2011.  Ms. Beazer did not learn about the Low-Torque Ignition Switch Defect until 2014.

### F.    Stacey Bowens—Connecticut

13.    Stacey Bowens, a resident of Springfield, Massachusetts, purchased a used 2004 Chevrolet Impala in East Bridgewater, Connecticut in February 2009.  She chose this vehicle

- 4 -

because its safety, reliability, and size were perfect for her family.  The ignition switch that GM

used in the Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-400) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power

steering and power brakes, and an inoperable airbag.  Ms. Bowens decided to junk the vehicle in

April 2015, and received the recall notice about six weeks later.  Ms. Bowens did not learn about

the Low-Torque Ignition Switch Defect until 2015.

**G.    Maria E. Santiago—Florida**

14.    Maria Santiago, a resident of Cutler Bay, Florida, purchased a new 2007 Saturn

Ion coupe in Miami, Florida in late 2006.  The vehicle's electric power steering was dangerously

defective in that it could suddenly fail during ordinary driving conditions and revert to manual

steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of

collisions and injuries (the Power Steering Defect).  Ms. Santiago did not learn about the Power

Steering Defect until 2011.  The vehicle was totaled in a collision on July 3, 2015.

**H.    Verlena Walker—Florida**

15.    Verlena Walker, a resident of Detroit, Michigan, purchased a new 2006 Chevrolet

Impala in Orlando, Florida on October 31, 2006, and she still owns it today. She chose this

vehicle, in part, because the vehicle's safety and reliability were important to her. She recalls the

GM sales representative saying this car was highly favored, very reliable, and safe.  The ignition

switch that GM used in the Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-

355) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of

power steering and power brakes, and an inoperable airbag.  Ms. Walker did not learn about the

Low-Torque Ignition Switch Defect until 2014 or 2015.

010440-11  1028180 V1

## I.      Dennis Walther—Hawaii

16.      Dennis Walther, a resident of Honolulu, Hawaii, purchased a new 2006 Saturn

Ion in Honolulu in 2006.  Mr. Walther purchased the Saturn Ion because he trusted GM's

reputation for the safety and reliability of its vehicles.  The vehicle's electric power steering was

dangerously defective in that it could suddenly fail during ordinary driving conditions and revert

to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the

risk of collisions and injuries (the Power Steering Defect).  Mr. Walther did not learn about the

Power Steering Defect until 2014.  Mr. Walther sold his vehicle in June 2017.

## J.      Keith Nathan—Illinois

17.      Keith Nathan, a resident of Vernon Hills, Illinois, purchased a new 2002

Chevrolet Malibu in Antioch, Illinois on November 14, 2001.  He chose the vehicle, in part,

because of the vehicle's safety and reliability, which were important to him.  Mr. Nathan had

always owned Chevrolets, and, at the time he bought the Malibu, he trusted the brand.  The

ratings for his car were excellent compared to other brands and ranked higher in safety, fuel

economy, and reliability.  The ignition switch that GM used in the Malibu (the Low-Torque

Ignition Switch subject to Recall No. 14-V-400) was dangerously defective, and left the car

prone to sudden unintended stalling, the loss of power steering and power brakes, and an

inoperable airbag.  Mr. Nathan did not learn about the Low-Torque Ignition Switch Defect until

2014.  Mr. Nathan traded his Malibu for a Subaru in May 2017, and will never buy another GM

vehicle.

## K.      Lyle Wirtjes—Iowa

18.      Lyle Wirtjes, a resident of Thompson, Iowa, purchased a used 2009 Chevrolet

Impala in Buffalo Center, Iowa around March 2009, and he still owns it today.  He purchased the

vehicle, in part, because reliability and safety were important to him.  He had a lot of trust in the

- 6 -

Chevrolet brand because he had previously owned Chevrolet products.  The ignition switch that

GM used in the Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-355) was

dangerously defective, and left the car prone to sudden unintended stalling, the loss of power

steering and power brakes, and an inoperable airbag.  Mr. Wirtjes did not learn about the Low-

Torque Ignition Switch Defect until 2014.

**L.     Melody Lombardo—Maryland**

19.     Melody Lombardo, a resident of Catonsville, Baltimore County, Maryland,

purchased a new 2006 Chevrolet Malibu in Clarksville, Maryland on December 5, 2005, and she

still owns it today.  She chose the Malibu because it was on the Consumer Reports list as one of

the safest vehicles that year.  The vehicle's electric power steering was dangerously defective in

that it could suddenly fail during ordinary driving conditions and revert to manual steering,

requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and

injuries (the Power Steering Defect).  Ms. Lombardo did not learn about the Power Steering

Defect until 2013.

**M.     Susan Viens—Massachusetts**

20.     Susan Viens, a resident of Monson, Massachusetts, purchased a new 2005

Chevrolet Malibu in Springfield, Massachusetts on September 15, 2005.  She has owned at least

four or five GM products and trusted the brand.  She chose the Malibu, in part, because safety

and reliability were important to her.  The ignition switch that GM used in the Malibu (the Low-

Torque Ignition Switch subject to Recall No. 14-V-400) was dangerously defective, and left the

car prone to sudden unintended stalling, the loss of power steering and power brakes, and an

inoperable airbag.  The vehicle's electric power steering was also dangerously defective in that it

could suddenly fail during ordinary driving conditions and revert to manual steering, requiring

greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries

- 7 -

(the Power Steering Defect).  She sold the vehicle in 2012.  Ms. Viens did not learn about the

Low-Torque Ignition Switch Defect until after she sold her vehicle in 2012.

## N.    Diana Cnossen—Michigan

21.    Diana Cnossen, a resident of Grand Rapids, Michigan, purchased a new 2007

Saturn Ion in Michigan on November 27, 2006, and she still owns it today.  The vehicle's

electric power steering was dangerously defective in that it could suddenly fail during ordinary

driving conditions and revert to manual steering, requiring greater effort by the driver to steer the

vehicle and increasing the risk of collisions and injuries (the Power Steering Defect).  Ms.

Cnossen did not learn about the Power Steering Defect until 2014.

## O.    Sophia Marks—Michigan

22.    Sophia Marks, a resident of Southfield, Michigan, purchased a used 2009

Chevrolet Impala in Ypsilanti, Michigan in April 2009.  She purchased this car for safety and

reliability purposes.  She did online research on the car and safety was her number one priority

because she has an autistic son who would be riding in the car.  She also saw print

advertisements about the car's safety and reliability.  The ignition switch that GM used in the

Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-355) was dangerously

defective, and left the car prone to sudden unintended stalling, the loss of power steering and

power brakes, and an inoperable airbag.  Ms. Marks did not learn about the Low-Torque Ignition

Switch Defect until around 2014.  Ms. Marks sold her vehicle in 2017.

## P.    David Price—Michigan

23.    David Price, a resident of Chesterfield, Michigan, purchased a used 2001 Cadillac

Deville in Chesterfield, Michigan, on May 15, 2003.  He chose the vehicle, in part, because

safety and reliability were important to him.  Before purchasing the Deville, Mr. Price visited his

local GM dealership to gather literature about GM vehicles.  He also saw television

- 8 -

advertisements concerning GM vehicles.  The ignition switch that GM used in the Deville (the

Low-Torque Ignition Switch subject to Recall No. 14-V-355) was dangerously defective, and left

the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an

inoperable airbag.  Mr. Price did not learn about the Low-Torque Ignition Switch Defect until

2014.  Mr. Price sold his vehicle in January 2018.

**Q.     Jacqueline Smith—Michigan**

24.     Jacqueline Smith, a resident of Detroit, Michigan, purchased a new 2007 Saturn

Ion in Southfield, Michigan on June 30, 2007, and she still owns it today.  She purchased the Ion

because reliability and safety were important to her and friends had told her that the Ion was a

good vehicle.  The vehicle's electric power steering was dangerously defective in that it could

suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater

effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the

Power Steering Defect).  Ms. Smith did not learn about the Power Steering Defect until 2014.

**R.     Bryan Wallace—Michigan**

25.     Bryan Wallace, a resident of Fenton, Michigan, purchased a new 2009 Chevy

Traverse in Grand Blanc, Michigan on January 6, 2009, and he still owns it today.  He chose this

vehicle, in part, because the vehicle's safety and reliability were important to him.  He and his

family had purchased Chevrolets in the past, and Mr. Wallace's father-in-law had worked for

GM, so he always bought Chevrolets because of their reputation for reliability and safety.

Because they had younger children at the time, Mr. Wallace and his wife did a lot of research on

the Traverse to make sure it was a good fit for their family.  The GM sales representative told

Mr. Wallace how safe the car was in crash tests.  In reality, the vehicle's airbags were

dangerously defective in that corrosion and/or loose crimps in the driver and passenger seat

mounted side impact airbag wiring harness connectors could cause an increase in resistance; over

- 9 -

time this resistance could cause the airbags and pretensioners not to deploy in a crash, thereby increasing the risk of injury or death (the "Side Airbag Defect"). Mr. Wallace did not learn about the Side Airbag Defect until 2014.

**S.    David Cleland—Minnesota**

26.    David Cleland, a resident of Northfield, Minnesota, purchased a used 2004 Saturn Ion in Northfield, Minnesota, in 2005. He chose this vehicle, in part, because the vehicle's safety and reliability were important to him. The vehicle's electric power steering was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the Power Steering Defect). Mr. Cleland did not learn about the Power Steering Defect until 2014. Mr. Cleland sold the vehicle for scrap in 2014 after it was involved in an accident.

**T.    Frances Howard—Mississippi**

27.    Frances Howard, a resident of Jackson, Mississippi, leased a new 2006 Saturn Ion in Jackson in April 2006; she then purchased the vehicle and she still owns it today. She chose the Ion, in part, because the vehicle's safety and reliability were important to her. She recalls seeing Saturn television commercials touting the brand's reliability. The vehicle's electric power steering was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the Power Steering Defect). Ms. Howard did not learn about the Power Steering Defect until 2014.

**U.    Patrice Witherspoon—Missouri**

28.    Patrice Witherspoon, a resident of Lee's Summit, Missouri, purchased a new 2006 Saturn Ion in Blue Springs, Missouri in 2005, and she still owns it today. She chose this vehicle,

- 10 -

in part, because safety and reliability were important to her because she would be driving herself

and her minor daughter.  She remembers seeing Saturn television advertisements stating that the

vehicles were safe.  The Saturn sales representative also assured Ms. Witherspoon that the car

was safe after she told the representative that she must have a car with dual airbags in the front

seats.  The vehicle's electric power steering was dangerously defective in that it could suddenly

fail during ordinary driving conditions and revert to manual steering, requiring greater effort by

the driver to steer the vehicle and increasing the risk of collisions and injuries (the Power

Steering Defect).  Ms. Witherspoon did not learn about the Power Steering Defect until 2014.

## V.     Lorraine De Vargas—New Mexico

29.     Lorraine De Vargas, a resident of Rio Rancho, New Mexico, purchased a used

2005 Saturn Ion in Santa Fe, New Mexico in October 2007.  She chose this vehicle, in part,

because the vehicle's safety and reliability were important to her.  The vehicle's electric power

steering was dangerously defective in that it could suddenly fail during ordinary driving

conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle

and increasing the risk of collisions and injuries (the Power Steering Defect).  Ms. De Vargas did

not learn about the Power Steering Defect until 2014.  Ms. De Vargas sold the vehicle to a junk

yard in 2017.

## W.     Lisa Axelrod—Ohio

30.     Lisa Axelrod, a resident of Hillsboro Beach, Florida, purchased a new 2004

Pontiac Grand Am GT in Willoughby, Ohio on January 21, 2005, and she still owns it today.

She chose this vehicle, in part, because safety and reliability were important to her.  Ms. Axelrod

had previously owned a Grand Am; that had been a good, safe car that held up well.  She also

saw print ads for GM vehicles in a local news magazine, and in the Cleveland newspaper, *The

Plain Dealer*.  The ignition switch that GM used in the Grand Am (the Low-Torque Ignition

- 11 -

Switch subject to Recall No. 14-V-400) was dangerously defective, and left the car prone to

sudden unintended stalling, the loss of power steering and power brakes, and an inoperable

airbag.  Ms. Axelrod did not learn about the Low-Torque Ignition Switch Defect until 2014.

**X.    Georgianna Parisi—Ohio**

31.    Georgianna Parisi, a resident of Kettering, Ohio, purchased a used 2004 Cadillac

Deville in Dayton, Ohio on July 27, 2006, and she still owns it today.  Safety and reliability were

extremely important to Ms. Parisi in choosing to purchase this vehicle.  The sales representative

told Ms. Parisi and her husband that the car was safe and reliable.  Because her son was still

riding in a car seat at the time, it was very important to Ms. Parisi that the vehicle could safely

accommodate the car seat.  She also asked about other safety features, such as airbags.  The

ignition switch that GM used in the Deville (the Low-Torque Ignition Switch subject to Recall

No. 14-V-355) was dangerously defective, and left the car prone to sudden unintended stalling,

the loss of power steering and power brakes, and an inoperable airbag.  Ms. Parisi did not learn

about the Low-Torque Ignition Switch Defect until 2015.

**Y.    Annette Hopkins—South Carolina**

32.    Annette Hopkins, a resident of Bishopville, South Carolina, purchased a used

2003 Chevrolet Impala LS in Florence, South Carolina on December 31, 2004, and she still owns

it today.  She purchased this vehicle, in part, because safety and reliability were important to her.

Ms. Hopkins recalls seeing advertisements touting the safety and reliability of GM vehicles on

television and in magazines.  The sales representative at Newsome Automotive also told Ms.

Hopkins that the Impala was a good, reliable car.  The ignition switch that GM used in the

Impala (the Low-Torque Ignition Switch subject to Recall No. 14-V-400) was dangerously

defective, and left the car prone to sudden unintended stalling, the loss of power steering and

power brakes, and an inoperable airbag.  Ms. Hopkins did not learn about the Low-Torque

Ignition Switch Defect until 2014.

## Z.    Catherine Senkle—South Dakota

33.    Catherine Senkle, a resident of Sioux Falls, South Dakota, purchased a new 2007

Saturn Ion in Sioux Falls, South Dakota on March 14, 2006, and she still owns it today.  Safety

was a huge factor in Ms. Senkle's decision to purchase that car.  She wanted a car that had

exceptional safety features without a huge price tag.  The Ion's electric power steering was

dangerously defective in that it could suddenly fail during ordinary driving conditions and revert

to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the

risk of collisions and injuries (the Power Steering Defect).  Ms. Senkle did not learn about the

Power Steering Defect until 2014.

## AA.    Shenyesa Henry—Texas

34.    Shenyesa Henry, a resident of Aubrey, Texas, purchased a new 2004 Saturn Ion in

Plano, Texas in 2003.  She chose this vehicle, in part, because safety and reliability were

important to her.  The vehicle's electric power steering was dangerously defective in that it could

suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater

effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the

Power Steering Defect).  Ms. Henry did not learn about the Power Steering Defect until 2016.

Ms. Henry donated her vehicle in 2016.

## BB.    Lisa Simmons—Texas

35.    Lisa Simmons, a resident of Amarillo, Texas, purchased a new 2007 Saturn Ion in

Amarillo, Texas in 2007, and she still owns it today.  She purchased the Ion because she believed

that it was a safe and reliable vehicle.  Indeed, at the time of purchase, the sales representative

told Ms. Simmons that the vehicle was safe and reliable.  The vehicle's electric power steering

- 13 -

was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the Power Steering Defect). Ms. Simmons did not learn about the Power Steering Defect until 2014.

**CC.    Malinda Stafford—Texas**

36.    Malinda Stafford, a resident of Vacaville, California, purchased a new 2008 Buick Lucerne in Arlington, Texas on January 19, 2008. She chose this vehicle, in part, because safety and reliability were of the utmost importance to her. She also selected this vehicle because of Buick's perceived history of reliability. The ignition switch that GM used in the Lucerne (the Low-Torque Ignition Switch subject to Recall No. 14-V-355) was dangerously defective, and left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and an inoperable airbag. Ms. Stafford did not learn about the Low-Torque Ignition Switch Defect until 2014. Ms. Stafford sold the vehicle in March 2017.

**DD.    Stephanie Renee Carden—West Virginia**

37.    Stephanie Renee Carden, a resident of Huntington, West Virginia, purchased a new 2004 Saturn Ion 2 in Hurricane, West Virginia on July 22, 2004. Safety and reliability were important to Ms. Carden when she purchased her Ion, and GM advertisements regarding the vehicles' safety and reliability were one of the reasons Ms. Carden purchased an Ion. In addition to the national advertising campaigns, at the time of purchase, a GM sales representative told Ms. Carden about a previous Ion owner who was involved in a major crash that would have resulted in the driver's death had it not been for the Ion's safety features. The vehicle's electric power steering was dangerously defective in that it could suddenly fail during ordinary driving conditions and revert to manual steering, requiring greater effort by the driver to steer the vehicle

- 14 -

and increasing the risk of collisions and injuries (the Power Steering Defect). Ms. Carden did

not learn about the Power Steering Defect until 2014. Ms. Carden sold her vehicle in 2016.

.

### III.    THE DEFECTS AT ISSUE

**A.    The Low-Torque Ignition Switch Defects**

38.    New GM's belated recall of the Defective GM Vehicles occurred in 2014 in the

wake of the stunning revelation that GM and New GM had manufactured and sold some 2.1

million vehicles with a dangerous ignition switch defect (the "Delta Ignition Switch Defect").

The Delta Ignition Switch Vehicles were recalled beginning in February 2014 in NHTSA Recall

No. 14-V-047.

39.    The Delta Ignition Switch Vehicles contained ignition switches that can

inadvertently move from the "run" to the "accessory" or "off" position at any time during normal

and proper operation of the vehicles. The ignition switch is most likely to move when the

vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver

inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.

When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and

unexpectedly loses engine power, power steering, and power brakes, and certain safety features

are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes,

serious injuries, and death.

40.    The Delta Ignition Switch System is defective in at least three major respects.

First, the switches are simply weak; because of a faulty "detent plunger," the switch can

inadvertently move from the "run" to the "accessory" position. Second, because the ignition

switches are placed low on the steering column, the driver's knee can easily bump the key (or the

hanging fob below the key) and cause the switch to inadvertently move from the "run" to the

- 15 -

"accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the

"accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables

the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left

without the protection of the airbag system even if he or she is traveling at high speeds.

41.     GM was aware of safer alternative designs for airbag systems that would have

prevented the non-deployment of airbags caused by the Delta Ignition Switch Defect as well as

the "Low-Torque Ignition Switch Defects" detailed herein, but chose not to employ them—

whether by way of recall of GM vehicles on the road or a design change for GM vehicles it

continued to manufacture—in part to avoid disclosure of the defective ignition switches and their

tragic consequences.

42.     In June and July 2014, New GM conducted three additional recalls of more than

10.4 million vehicles for ignition switches with low torque ("Low-Torque Ignition Switch

Defects"):  Safety Recalls No. 14-V-355, 14-V-394, and 14-V-400.  Approximately 8.7 million

of these Low-Torque Ignition Switch Defect Vehicles were manufactured and sold by GM.

43.     Each of these three recalls involves the same defect (low-torque switches that

inadvertently move out of the "run" position on rough roads or due to a weight hanging from the

key or knee interaction with the switch) with the same adverse effect (loss of power to steering,

brakes, and airbag).

44.     The defects that gave rise to each of these recalls were well-known to GM long

before it filed for bankruptcy in June 2009.

**1.      Low Torque Safety Recall No. 14-V-355.**

45.     On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for

ignition switch, or ignition key slot, defects (Recall No. 14-V-355).

- 16 -

46.     Approximately 2,349,095 of the vehicles subject to this recall were made and sold by GM.

47.     The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

48.     The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  New GM's internal description of the defect was similar:  "The ignition switch may inadvertently move out of the 'run' position if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event."  Thus, all models involved in Safety Recall No. 14-V-355 have a common defect.

49.     The recall notice also explains that, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."  This is similar to how New GM internally described the *effect* of the defect:  "If the ignition switch moves out of the 'run' position, there is an effect on power steering and power braking."  In addition, the timing of the key movement out of the "run position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-355.

50.     The root cause of the defect was as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

51.    The vehicles included in this recall were built on the same platform and their defective ignition switches have weak detent plungers, just like the Cobalt and other Delta Ignition Switch Vehicles recalled in February and March of 2014.

52.    GM was aware of the ignition switch defect well before it filed for bankruptcy. The information known to GM included the following facts:

a.    On or about August 25, 2005, GM design engineer Laura Andres wrote a description of ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

b.    GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on August 25, 2005, to four other GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

c.    On August 29, 2005, GM employee Jim Zito forwarded the messages to Ray DeGiorgio (the GM Design Research Engineer for the notorious Delta Ignition Switch) and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

d.    Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

e.    On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito and copied ten other GM employees, including Mr. DeGiorgio.  Ms. Andres, in her email, stated,

- 18 -

"I picked up the vehicle from repair.  No repairs were done. . . .  The technician said there is nothing they can do to repair it.  He said it is just the design of the switch.  He said other switches, like on the trucks, have a stronger detent and don't experience this."

       f.     Ms. Andres' email continued:  "I think this is a serious safety problem, especially if this switch is on multiple programs.  I'm thinking big recall.  I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a switch with a stronger detent."

    53.    Senior executives and engineers at GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate.  For example, Mr. DeGiorgio knew that there had been "issues with detents being too light."  Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

    54.    From 2001 until the bankruptcy Sale in 2009, GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect. The following are examples of just a few of the many reports and complaints regarding the defect that GM knew before the bankruptcy Sale:

    55.    GM knew of a January 23, 2001 complaint filed with NHTSA involving a 2000 Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE SHUTDOWN WHILE DRIVING. HAPPENED THREE DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO DETERMINE CAUSE OF FAILURE. THIS CONDITION DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER. NHTSA ID Number: 739850.

- 19 -

56.    GM knew of a June 12, 2001 complaint filed with NHTSA involving a 2000

Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was

reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK NHTSA ID Number: 890227.

57.    GM knew of a January 27, 2003 complaint filed with NHTSA involving a 2001

Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was

reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK NHTSA ID Number:
> 10004759.

58.    GM knew of a September 18, 2007 complaint filed with NHTSA involving a

2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was

reported that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

59.      GM knew of an April 2, 2009 complaint filed with NHTSA involving a 2005 Buick LaCrosse and an incident that occurred on April 2, 2009, in which the following was reported:

> POWER STEERING WENT OUT COMPLETELY, NO WARNING JUST OUT. HAD A VERY HARD TIME STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR NHTSA ID Number: 10263976.

**2.      Low Torque Safety Recalls No. 14-V-394 and 14-V-400.**

60.      On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall No. 14-V-394).

61.      The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX. Approximately 450,000 of the vehicles involved in Recall No. 14-V-394 were manufactured and sold by GM.

62.      The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine. Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury. Internally, New GM characterized the defect as "The ignition switch may move from RUN to ACCESSORY or OFF due to driver interaction with the key or due to the weight of objects on the key ring." Thus, all vehicles subject to Safety Recall No. 14-V-394 have the same defect.

63.      New GM internally described the effect of the defect as follows: "This will result in a partial loss of electrical power and turn off the engine. Power steering/braking will be affected and the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury or fatality." Thus the effect of the defect is the same for all models involved in Safety Recall No. 14-V-394.

64.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United States for ignition switch defects (Recall No. 14-V-400).

65.    The following vehicles were included in Recall No. 14-V-400:  1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero.  All of the vehicles involved in Recall No. 14-V-400 were manufactured and sold by GM.

66.    The recall notice states that the weight on the key and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is involved in a collision, increasing the risk of injury.  Thus, all vehicles subject to Safety Recall No.14-V-400 have the same defect.

67.    New GM described the effect of the defect as follows:  "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position.  If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash.  The timing of the key movement out of the 'run' position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-400.

68.    The root cause of the defect is as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

69.     Once again, the unintended ignition rotation defect is substantially similar to and relates directly to ignition switch defects, including the Delta Ignition Switch Vehicles and the other Low-Torque Ignition Switch Defects.  Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to the "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

70.     The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other GM vehicles with defective switches:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

71.     The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to GM, and was the basis for a change that was made to a stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

72.     GM was aware of the defects in these vehicles well before it filed for bankruptcy in 2009.  GM's knowledge is evidenced by the following non-exclusive list of incidents:

a.      In January 2003, GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his 2003 Pontiac Grand Am.

010440-11  1028180 V1

b.      During the investigation, GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30 to 35 mph.

c.      GM knew that the customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.      In May 2003, GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  GM identified the relevant population of defective vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am:

> This information goes out to Chevrolet, Oldsmobile and Pontiac dealers and concerns the 1999 through 2003 Chevrolet Malibu, Oldsmobile Alero and Pontiac Grand Am. This voicemail provides information about a condition that may be driving no trouble found claims on customer vehicles on part replacements such as BCMs, ignition lock cylinders, ignition switches and also some PCMs, ABS modules, door lock modules, restraint control system and theft security system replacements.  We were able to capture a customer's vehicle for the complaint of intermittent vehicle shuts off while driving.  At times this vehicle would start up and then shut off for no apparent reason.  Sometimes no codes would set and sometimes multiple codes would set.  In both instances the vehicle would immediately restart.  The customer had brought the vehicle in to the dealership four times.  On the first three trips the condition could not be duplicated.  On the fourth trip back the dealership service manager noticed the customer's excess size key ring and mass.  The condition was duplicated using the customer's full key ring, which was not left at the dealership on prior visits. The actual cause of this customer's condition was that over bumps the mass and weight of the customer's key ring forces the dash mounted key lock cylinder switch out of its switch detent and allows the key to rotate back one sixteenth of an inch from the on position towards the accessory position.  This amount of key movement will shut the vehicle off and create this customer's complaint. Also, when the vehicle is started and the key is quickly released between the ignition lock spring and weight and mass of

- 24 -

the key chain, the key can snap back just past the on position detent and allow the engine to shut off.  Noting the size of the customer's key ring, replacing the ignition lock cylinder with another one of the same would not have corrected this issue.  Additionally, when the ignition is turned off in this type of manner, depending on which module is communicating on the data line at the time, is dependent on whether or not DTC codes will set and which codes will set.  The DTCs that set most consistently during this condition was usually the communication or serial data codes DTC U1040, U1088, U1255, C1298, B, as in boy, 2958 and/or B, as in boy, 2960.  As we investigated this condition further we also found that it was not uncommon for customers to have a number of items attached to their key rings.  In many instances, especially when the vehicle was in for service overnight, the customer usually left only the vehicle key and key fob.  Large key rings with multiple items attached can also be responsible for customer complaints of the vehicle shuts off while shifting into park on column mounted ignition lock cylinders.  This is caused when the customer is shifting from a drive gear upward into park and an item on the key ring hits the ignition lock cylinder key tabs on the way up and moves the switch back out of the on detent position.  Please be aware that these conditions can be caused by excessive key size and mass from the customer's key ring, and attention to this detail should be paid to allow you to better and more properly diagnose the customer's complaint.  I also wanted to thank Rob Maziac, the service manager at Art Moran, in Michigan, for his efforts here in assisting General Motors with this issue.  And many of you others who have taken the time out of your busy schedules and assisted us in the identification on many other issues.  I appreciate your time.  Thanks.  [GM-MDL2543-300732518]

e.    GM did not recall these vehicles.  Nor did it provide owners and/or lessees with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f.    GM engineers had "recommended a higher spring rate from day one," as "this would be the least costly fastest fix."

g.    On July 24, 2003, GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles.  GM engineers allegedly increased the detent plunger

force and changed the part number of the ignition switch.  The new parts were installed

beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.  No recall was done at

the time to increase detent plunger force in prior models.

> h.    GM issued a separate engineering work order in March 2004 to increase

the detent plunger force on the ignition switch in the Pontiac Grand Prix, ostensibly to "maintain

commonality" between the Grand Prix and the Malibu, Grand Am, and the Alero.  This change

was made only in production vehicles beginning in 2005, and no recall was done at the time to

increase detent plunger force in prior models.  GM engineers did not change the part number for

the new Pontiac Grand Prix ignition switch.

> i.    GM design engineer Ray DeGiorgio signed the work order in March 2004

authorizing the part change for the Grand Prix ignition switch without changing the part number.

An Engineering Group Manager approved the design change "w/o part number change."  GM's

decision not to change the part number is a violation of generally accepted engineering

standards.  For example, the American Society of Mechanical Engineers ("ASME") issued

ASME Y14.100-2004, Engineering Drawing Practices, which sets forth essential minimum

requirements for engineering drawings and related documentation practices.  Such standards are

generally relied upon by automotive engineers (indeed, a GM engineer was on the ASME Y14

Standards Committee at the time ASME Y14.100-2004 was approved).  ASME Y14.100-2004,

Section 6.8.1 governs "Change Requiring New Identification" and provides that "New PINs [part

identification numbers] shall be assigned when a part or item is changed in such a manner that

any of the following conditions occur:  (a) When performance or durability is affected to such an

extent that the previous versions must be discarded or modified for reasons of safety or

malfunction."  GM redesigned the switch "for reasons of safety or malfunction."  ASME

- 26 -

Y14.100-2004, Section 6.8.1, applies here and mandates that GM should have changed the part

number.  GM's decision not to change the part number is also a violation of generally accepted

inventory management standards and practices, which dictate that a modification that is

necessary to meet product safety specifications requires a part number change.

j.      On or around August 25, 2005, Laura Andres, a GM design engineer, sent

an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet

Impala on the highway.  Ms. Andres' email stated:

> While driving home from work on my usual route, I was driving
> about 45 mph, where the road changes from paved to gravel &
> then back to paved, some of the gravel had worn away, and the
> pavement acted as a speed bump when I went over it.  The car shut
> off.  I took the car in for repairs.  The technician thinks it might be
> the ignition detent, because in a road test in the parking lot it also
> shut off.

k.      GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on

August 25, 2005 to four GM employees.  Mr. Dickinson asked, "Is this a condition we would

expect to occur under some impacts?"

l.      On August 29, 2005, GM employee Jim Zito forwarded the messages to

Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being

sensitive to road bumps?"

m.      Mr. DeGiorgio responded the same day, stating, "To date there has never

been any issues with the detents being too light."

73.      From 2002 to the time of the bankruptcy Sale, GM received numerous reports

from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.

The following are just a handful of examples of some of the reports known to GM.

74.     GM knew of a September 16, 2002 complaint filed with NHTSA regarding a

2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the

following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK NHTSA ID Number: 8018687.

75.     GM knew of a November 22, 2002 complaint filed with NHTSA involving a 2003

Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURRENCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

76.     GM knew of a January 21, 2003 complaint filed with NHTSA involving a 2003

Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED, THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> IT'S VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

77.     GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001

Oldsmobile Intrigue, which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK NHTSA ID
> Number: 10026252.

78.     GM knew of a March 11, 2004 complaint filed with NHTSA involving a 2004

Cadillac CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

- 28 -

CONSUMER STATED WHILE DRIVING AT 55-MPH
VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
PROBLEM. *AK NHTSA ID Number: 10062993.

79.     GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003

Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
THE ENGINE DYING. THERE IS NO SET PATTERN, IT
MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
NEXT DAY. THEN GO 4 DAYS WITH NO OCCURRENCE,
THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
GO A WEEK WITH NO OCCURRENCE, THEN STALL 4
TIMES A DAY FOR 5 DAYS, ETC., ETC. IN EVERY
OCCURRENCE, IT TAKES APPROXIMATELY 10 MINUTES
BEFORE IT WILL START BACK UP. AT HIGH SPEEDS, IT IS
EXTREMELY TOO DANGEROUS TO DRIVE. WE'VE
TAKEN IT TO THE DEALER, UNDER EXTENDED
WARRANTY, THE REQUIRED 4 TIMES UNDER THE
LEMON LAW PROCESS. THE DEALER CANNOT
ASCERTAIN, NOR FIX THE PROBLEM. IT HAPPENED TO
THE DEALER AT LEAST ONCE WHEN WE TOOK IT IN. I
DOUBT THEY WILL ADMIT IT, HOWEVER, MY WIFE WAS
WITNESS. THE CAR IS A 2003. EVEN THOUGH I BOUGHT
IT IN JULY 2003, IT WAS CONSIDERED A USED CAR. GM
HAS DENIED OUR CLAIM SINCE THE LEMON LAW DOES
NOT APPLY TO USED CARS. THE CAR HAS BEEN
PERMANENTLY PARKED SINCE NOVEMBER 2003. WE
WERE FORCED TO BUY ANOTHER CAR. THE DEALER
WOULD NOT TRADE. THIS HAS RESULTED IN A BAD
LUCK SITUATION FOR US. WE CANNOT AFFORD 2 CAR
PAYMENTS / 2 INSURANCE PREMIUMS, NOR CAN WE
AFFORD $300.00 PER HOUR TO SUE GM. I STOPPED
MAKING PAYMENTS IN DECEMBER 2003. I HAVE KEPT
THE FINANCE COMPANY ABREAST OF THE SITUATION.
THEY HAVE NOT REPOSSESSED AS OF YET. THEY WANT
ME TO TRY TO SELL IT. CAN YOU HELP?*AK NHTSA ID
Number: 10061898.

80.     GM knew of a July 20, 2004 complaint filed with NHTSA involving a 2004

Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the following was

reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA NHTSA ID Number:
> 10082289.

81.     GM knew of an August 23, 2004 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.    NHTSA ID
> Number:  10089418.

82.     GM knew of a report in August of 2004 involving a 2004 Chevrolet Malibu

incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.    NHTSA ID
> Number: 10087966.

83.     GM knew of an October 23, 2004 complaint filed with NHTSA regarding a 2003

Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE    CONTINUOUSLY    EXPERIENCED    AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT, THERE
> WAS AN ELECTRICAL SHUT DOWN WHICH RESULTED IN
> THE ENGINE DYING/ STEERING WHEEL LOCKING UP,
> AND LOSS OF BRAKE POWER.*AK    NHTSA ID
> Number: 10044624.

84.    GM knew of an April 26, 2005 complaint filed with NHTSA involving a 2005

Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN # [XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-SOLENOID,
> PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-
> MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-PEDAL,
> ACCELERATOR-REPLACED. DEALERSHIP PURCHASED
> FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500.
> DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW
> WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD
> THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE
> PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC
> SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE
> GOING TO RESEARCH THE PROBLEM AND SEE IF ANY
> OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS.
> SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY
> WANT US TO COME IN AND TAKE ANOTHER GRAND
> PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR
> TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6) NHTSA ID Number: 10118501.

85.     GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR.  NHTSA ID Number: 10123684.

86.     GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was

reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY   ARE   LOST.*MR   *NM.      NHTSA   ID
> Number: 10124713.

87.     GM knew of an August 12, 2005 complaint filed with NHTSA involving a 2003

Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which it was reported

that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES   SINCE   JANUARY.   THE   DEALER   TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB NHTSA ID Number: 10127580.

88.     GM knew of an August 26, 2005 complaint with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was

reported:

- 32 -

WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
ME WITH NO POWER STEERING AND NO WAY TO
REGAIN CONTROL OF THE CAR UNTIL COMING TO A
COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
THE CAR FAILED TO START AT ALL NOT EVEN TURNING
OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
CONTROL MODULE" IN THE CAR. AT THIS TIME THE
PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
THE CAR CONTINUED TO START AND SHUT OFF ALL
THE WAY TO THE SERVICE GARAGE WHERE IT WAS
AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
POSSIBLE THE "POWER CONTROL MODULE". AT THIS
TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
FOR TRAVEL. *JB NHTSA ID Number: 10134303.

89.    GM knew of a September 22, 2005 complaint filed with NHTSA involving a

2005 Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

DT: 2005 CADILLAC CTS—THE CALLER'S VEHICLE WAS
INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
VEHICLE HAS NOT BEEN INSPECTED BY THE
DEALERSHIP, AND INSURANCE COMPANY TOTALED
THE VEHICLE. THE CALLER SAW NO REASON FOR THE
AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
INJURED IN THIS CRASH. T A POLICE REPORT WAS
TAKEN. THERE WAS NO FIRE. *AK NHTSA ID Number:
10137348.

90.    GM knew of a September 29, 2006 complaint filed with NHTSA involving a

2004 Cadillac CTS and an incident that occurred on September 29, 2006, in which the following

was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006—*NM NHTSA ID
> Number: 10169594.

91.    GM knew of an April 18, 2007 complaint filed with NHTSA involving a 2004

Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which it was reported

that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000. NHTSA ID Number: 10188245.

92.    GM knew of a September 20, 2007 complaint filed with NHTSA involving a

2007 Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it

was reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER

- 34 -

HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND CURRENT MILEAGE WAS 11,998. NHTSA ID Number: 10203516.

93.    GM knew of a September 24, 2007 complaint filed with NHTSA involving a

2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the

following was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD SHUT OFF WITHOUT WARNING. THE DEALER STATED THAT THE BATTERY CAUSED THE FAILURE AND THEY REPLACED THE BATTERY. APPROXIMATELY EIGHT MONTHS LATER, THE FAILURE RECURRED. THE DEALER STATED THAT THE BATTERY CAUSED THE FAILURE AND REPLACED IT A SECOND TIME. APPROXIMATELY THREE MONTHS LATER, THE FAILURE OCCURRED AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE DEALER WAS UNABLE TO DUPLICATE THE FAILURE, HOWEVER, THEY REPLACED THE CRANK SHAFT SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE WAS 70,580. NHTSA ID Number: 10203943.

94.    GM knew of a June 18, 2008 complaint filed with NHTSA involving a 2006

Cadillac CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF AND LOST TOTAL POWER. WHEN THE FAILURE OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT WERE IN NEUTRAL. THERE WERE NO WARNING INDICATORS PRIOR TO THE FAILURE. THE CONTACT FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT COULD HAVE RESULTED IN A SERIOUS CRASH. THE VEHICLE WAS TAKEN TO THE DEALER TWICE FOR REPAIR FOR THE SAME FAILURE IN FEBRUARY OF 2008 AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE FAILURE WAS IDENTIFIED AS A GLITCH WITH THE COMPUTER SWITCH THAT CONTROLS THE TRANSMISSION. AT THE SECOND VISIT, THE SHOP

- 35 -

> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

95.    GM knew of an October 14, 2008 complaint filed with NHTSA involving a 2008

Cadillac CTS and an incident that occurred on April 5, 2008, in which it was reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR NHTSA ID Number: 10245423.

96.    GM knew of a November 13, 2008 complaint with NHTSA regarding a 2001

Oldsmobile Intrigue, and an incident that occurred on July 1, 2004, in which the following was

reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS AND HESITATES. IN ADDITION, THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK

- 36 -

THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
SHOULD ALSO BE RECALLED IN THE UNITED STATES.
THE FAILURE MILEAGE WAS UNKNOWN AND THE
CURRENT MILEAGE WAS 106,000.    NHTSA ID
Number: 10248694.

97.    GM knew of a December 10, 2008 complaint filed with NHTSA regarding a 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
COULD HAVE BEEN ON THE HIGHWAY AND BEEN
KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
WAS RANDOM. *TR NHTSA ID Number: 10251280.

98.    GM knew of a March 31, 2009 complaint filed with NHTSA regarding a 2005

Chevrolet Malibu incident that occurred on May 30, 2008, in which it was reported that:

TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
THE CONTACT STATED THAT THE POWER WINDOWS,
LOCKS,    LINKAGES,    AND    IGNITION    SWITCH
SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
VEHICLE TO THE DEALER AND THEY REPLACED THE
IGNITION    SWITCH    AT    THE    COST    OF    $495.    THE
MANUFACTURER STATED THAT THEY WOULD NOT
ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
CORRECTING THE FAILURES. THE FAILURE MILEAGE
WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
ID Number: 10263716.

- 37 -

99.     New GM has publicly admitted that it was aware of at least 7 crashes, 8 injuries, and 3 deaths linked to this serious safety defect before deciding to finally implement a recall. However, in reality, the number of reports and complaints is much higher.

100.     Notwithstanding years of notice and knowledge of the defect, on top of numerous complaints and reports from consumers, including reports of crashes, injuries, and deaths, GM did not implement a recall involving this defect at any time before the bankruptcy Sale.

**B.     Side-Impact Airbag Wiring Harness Defect**

101.     On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles in Safety Recall No. 14-V-118 for a dangerous defect involving airbags and seatbelt pretensioners (the "Side Airbag Defect").  More than 275,000 of these vehicles were manufactured and sold by GM.

102.     In a March 31, 2014 letter to NHTSA, New GM described the defect as follows:

> Corrosion and/or loose crimps in the driver and passenger seat mounted side impact airbag (SIAB) wiring harness connectors can cause an increase in resistance.  The airbag sensing system will interpret an increase in resistance as a fault.  A fault will illuminate the airbag readiness light on the instrument cluster and a 'SERVICE AIR BAG' message in the Driver Information Center (DIC), and set a Diagnostic Trouble Code (DTC).  At first, at lower levels of resistance, the light and DIC message may be intermittent and the airbags and pretensioners will still deploy. Over time, the resistance may reach a level where the SIABs, front center side airbag, if equipped, and pretensioners will not deploy in a crash.

Thus, all models involved in Safety Recall No. 14-V-118 have a common defect.

103.     Internally, New GM described the *effect* of the defect as follows:  "If the resistance reaches a high enough level, the SIABs, driver's center side airbag, or pretensioners

- 38 -

may not deploy in a crash." Thus, the effect of the defect is the same for all models involved in

Safety Recall No. 14-V-118.

104.     Once again, GM knew of the dangerous airbag defect but never took the requisite

remedial action at any time prior to the bankruptcy Sale.

105.     The SIAB module is mounted to the seat back structure and has a direct electrical

connection to the inflator.  The wiring harness routes from the airbag, attaches to the seat

suspension, secures to the seat structure, and mounts to the front edge of the seat.  The mating

socket side of the connector is on a breakout from the body harness that exits through an opening

in the carpet.[2]



**Fig. 1 Connecter location and setup**[3]

106.     In 2007, GM launched the GMC Acadia and Saturn Outlook using a Delphi

Metropak 150 connector for the driver and passenger SIABs.  Personnel at GM's plant in

Lansing Delta Township ("LDT") expressed concern with respect to using that connector

because the orientation required the operator to reach in and behind the connector to install the

---

[2] GM-MDL2543-000698574, sheet 2, row 1686.

[3] GM-MDL2543-402353770.

connector position assurance clip.[4]  The blind installation and limited hand clearance prompted LDT to issue Problem Resolution Tracking System ("PRTS") N208096 so that it could meet production requirements.[5]  To meet these requirements, GM replaced the Delphi Metropak connecter with a two way connector that was easier to connect—it could be locked with a one-handed single motion.[6]

107.    But in June 2008, GM found that even after corrections had been made to prevent claims related to wire routing and terminal crimping, there were still significant SIAB warranty claims for May 2008-built vehicles.[7]

108.    GM knew that, from September 2, 2008 through September 16, 2008, three pairs of failed parts were analyzed by supplier JST,[8] which concluded that the issue was fretting corrosion.[9]  A GM current production PRTS opened in October 2008 confirmed that the issue was indeed fretting corrosion.[10]  GM Problem Resolution Process Engineer Vinod Katothia found that fretting corrosion of non-noble metals (tin in this case) is the result of the continual rupture of oxide films on the contact surfaces caused by motion of the contact interface.[11]

109.    In November 2008, GM released a field service "rework" for MY 2008 vehicles.[12]  GM dealers were advised to clear the terminal of debris and apply Nyogel 760G, a

---

[4] GM-MDL2543-000698574, sheet 2, row 1686.

[5] GM-MDL2543-402353770.

[6] GM-MDL2543-000698574, sheet 2, row 1686; GM-MDL2543-303352291 (EWO CSXTJ); GM-MDL2543-303352291 (Supply Contract).

[7] GM-MDL2543-402353770.

[8] GM-MDL2543-304666870.

[9] *Id.*

[10] GM-MDL2543-300128031.

[11] *Id.* at p.11.

[12] GM-MDL2543-302802992 (TSB 08-09-41-011).

010440-11  1028180 V1

grease that seals electrical contacts from oxygen, moisture, aggressive gasses and other hostile elements.  No action was taken for MY 2009 vehicles.

110.    Thus, before the bankruptcy Sale, GM knew that in 2008 there had been an increase in warranty claims for airbag service on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  GM further knew that a September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring.  GM knew that  a technical service bulletin had been issued on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM had also begun the transition back to gold-plated terminals in certain vehicles and suspended all investigation into the defective airbag wiring without taking further action.[13]

111.    Despite this clear knowledge of the defect, GM failed to take appropriate remedial action at any time prior to the bankruptcy Sale.

## C.    The Power Steering Defect

112.    Between 2003 and 2010, over 1.3 million GM and New GM vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "Power Steering Defect").   Approximately 1 million of these vehicles were manufactured and sold by GM.

---

[13] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

- 41 -

113.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.  All of these recalls were subject to Safety Recall No. 14-V-153.

114.    In a March 28, 2014 letter to NHTSA, New GM described the Power Steering Defect as follows:  "The subject vehicles equipped with electric power steering (EPS) may experience a sudden loss of power steering assist that could occur at any time while driving."  Thus, all models involved in Safety Recall No. 14-V-153 have a common defect.

115.    New GM internally described the *effect* of the defect as follows:

The Driver Information Center (DIC) displays "PWR STRG", a diagnostic trouble code is set, and the power steering assist is lost.  A chime is momentarily activated to alert the driver to the DIC message.  Steering control is maintained, although greater driver effort is required at low vehicle speeds.  Typically, at the next ignition cycle, power assist is regained and the DIC message is off.

In its March 28, 2014 letter to NHTSA, New GM acknowledged that steering that requires greater driver effort at low vehicle speeds "could result in an increased risk of a crash."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-153.

116.    As with the ignition switch defects and many of the other defects that led to recalls in 2014, GM was aware of the Power Steering Defect but never took anything approaching full remedial action at any time prior to the bankruptcy Sale.

117.    In 2003, GM began receiving customer complaints regarding loss of power steering in Ions, and in 2004, GM instituted a "Customer Satisfaction program" for 2004 Malibus in which dealers were instructed to replace the steering column if a customer complained.  Despite acknowledging the problem, GM did not initiate any recall.

118.    In response to a NHTSA Preliminary Investigation into potential Power Steering

Defect in the 2005-2006 Pontiac G6, GM extended warranty coverage for the 2005-06 G6 and

2005 Malibu and Malibu Maxx to replace the steering column assembly.  But GM initiated no

recall.

119.    NHTSA has linked approximately 12 crashes and 2 injuries to the Power Steering

Defect in the Ions.  The first injury was reported in May 2007, and was known to GM.

120.    In September 2011, after NHTSA began to make inquiries about the safety of the

Saturn Ion, New GM acknowledged that it had received almost 3,500 customer reports claiming

a sudden loss of power steering in 2004-2007 Ion vehicles.  Many of those were received by GM

prior to the bankruptcy Sale.

121.    By the time New GM finally recalled the Saturn Ion in March 2014, NHTSA had

received more than 1,200 complaints about the vehicle's power steering—many of them during

the time of GM.

122.    Despite its knowledge of this defect, GM failed to initiate a recall or take other

necessary remedial measures at any time prior to the bankruptcy Sale.

**IV.    OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES**

123.    In addition to the Defective GM Vehicles at issue in this Proof of Claim, and the

Delta Ignition Switch Vehicles at issue in the Proof of Claim field by Patricia Barker and many

others, GM sold vehicles with dozens of other defects—many of which were known to and

concealed by GM, and remained concealed until New GM conducted a parade of recalls in 2014.

124.    In many cases, the available evidence suggests that GM was aware of the defects.

In any event, the defects are the product of GM's systemic valuation of cost-cutting and

devaluation of safety, making it likely that GM was aware of each of the following defects

summarized below.

**A.    Ignition Lock Cylinder Defect in Vehicles Also Affected By the Delta Ignition Switch Defect.**

125.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[14]  Though the

vehicles are the same as those affected by the Delta Ignition Switch Defect,[15] the lock cylinder

defect is distinct.

126.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

key while the engine is not in the "off" position (the "Ignition Lock Cylinder Defect").  If the

ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion

may occur.  That motion could cause a crash and injury to the vehicle's occupants or pedestrians.

Some of the vehicles with faulty ignition lock cylinders may fail to conform to FMVSS number

114, "*Theft Prevention and Rollaway Prevention*."[16]

127.    According to New GM's Chronology that it submitted to NHTSA on April 23,

2014, the Ignition Lock Cylinder Defect recall arose out of the notorious recalls for the Delta

Ignition Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice,

Saturn ION, and Saturn Sky vehicles.[17]

128.    New GM noted several hundred instances of potential key pullout issues in

vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances

identified from records relating to customer and dealer reports to GM call centers, 479 instances

---

[14] New GM Letter to NHTSA dated April 9, 2014.

[15] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[16] New GM Notice to NHTSA dated April 9, 2014, at 1.

[17] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

- 44 -

identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA

vehicle owner questionnaire information.  New GM investigators also identified 16 roll-away

instances associated with the key pullout issue from records relating to customer and dealer

reports to GM call centers and legal claims information.

129.    New GM also considered the possibility that some vehicles may have experienced

key pullout issues at the time they were manufactured by GM, based on information that

included the following:  (a) a majority of instances of key pullouts that had been identified in the

recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition,

repair order data indicated vehicles within that population had experienced a repair potentially

related to key pullout issues as early as 47 days from the date on which the vehicle was put into

service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key

pullout issues was initiated in June 2005, which resulted in an engineering work order to modify

the ignition cylinder going forward.

130.    A majority of the key pullout instances identified involved MY 2003-2004 Saturn

Ion and MY 2005 Chevrolet Cobalt vehicles.  An April 3, 2014 New GM PowerPoint identified

358 instances of key pullouts involving those vehicles.

131.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles,

the April 3 2014 Decision Committee meeting PowerPoint materials discussed the number of

days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road)

and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the MY 2003 Saturn

Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days

from its "In Service Date;" with respect to the MY 2004 Saturn Ion, a vehicle was reported as

experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with

- 45 -

respect to the MY 2005 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the MY 2006 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date." The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

132. The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836). According to PRTS N 183836: "Tolerance stack up condition permits key to be removed from lock cylinder while driving." The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder." According to a "Summary," "A tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed." The Problem Resolution identified the following "Solution": "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

133. In response to PRTS N 183836, GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

134. According to the work order: "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes. Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

135. According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution made on March 2, 2007 stated: "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles. . . ."

- 46 -

A "Summary" in Problem Resolution stated:  "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3, 2014, Decision Committee meeting, although it is not the only engineering or field report relating to potential key pullout issues.

136.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to FMVSS number 114.  In addition, the Decision Committee concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the Ignition Switch Defect recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or pedestrian injuries.  For vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**B.      Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

137.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[18]  In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[19]  If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[20]

138.    Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition

---

[18] *See* August 7, 2014 Letter from New GM to NHTSA.

[19] *Id.*

[20] *Id.*

cylinders that permit the operator to remove the ignition key when the key is not in the "off"
position in other vehicles outside of those already recalled.[21]  New GM identified 152 reports of
vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in
the MY 2002-2004 Saturn Vue vehicles.[22]

139.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and
July 24, 2014, New GM instituted a safety recall on July 31, 2014.[23]

## C.    Front Passenger Airbag Defect.

140.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY
2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an
indeterminate number of which were manufactured and sold by GM.[24]

141.    In the affected vehicles, in certain frontal impact collisions below the airbag
deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of
the collision (especially given the passenger-side airbag housing is plastic).[25]  These vehicles
therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior
Impact."[26]

## D.    Safety Defects of the Seat Belt Systems in GM Vehicles.

### 1.    Seat belt connector cable defect.

142.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY
2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-
2010 Saturn Outlook vehicles with a dangerous safety belt defect.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See* March 31, 2014 Letter from New GM to NHTSA.

[25] *Id.*

[26] *Id.*

143.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to the vehicle at the outside of the front outboard seating positions can fatigue and separate over time as a result of occupant movement into the seat.  In a crash, a separated cable could increase the risk of injury to the occupant."[27]

### 2.    Seat belt retractor defect.

144.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible vehicles with a seat belt retractor defect.

145.    In the affected vehicles, the driver's side front seat belt retractor may break, causing the seat belt webbing spooled out by the user not to retract.[28]  In the event of a crash, a seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of injury to the driver.[29]

## E.    Safety Defects Affecting the Brakes in GM Vehicles.

### 1.    Brake light defect.

146.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura vehicles with a dangerous brake light defect.

147.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; the same defect can disable cruise control, traction control, electronic stability control, and panic brake assist operation, thereby increasing the risk of collisions and injuries.[30]

---

[27] See New GM Notice to NHTSA dated May 19, 2014, at 1.

[28] See New GM's June 11, 2013 Letter to NHTSA.

[29] See id.

[30] See New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

148.    Once again, GM knew of the dangerous brake light defect for years but did not take anything approaching the requisite remedial action.

149.    According to New GM, the brake defect originates in the Body Control Module connection system. "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[31]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[32]

150.    The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[33]

151.    New GM now acknowledges that the brake light defect "may increase the risk of a crash."[34]

152.    As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may ***not*** turn on when the driver ***does*** depress the brake pedal.[35]

153.    During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 2.

the problem.[36]  GM and its part supplier Delphi decided that applying dielectric grease to the

[Body Control Module] C2 connector would be "an effective countermeasure to the fretting

corrosion."[37]  Beginning in November 2008, the Company began applying dielectric grease in its

vehicle assembly plants.[38]

154.    On December 4, 2008, GM issued a Technical Service Bulletin recommending

the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-

2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-

2009 Saturn Aura vehicles.[39]  One month later, in January 2009, GM recalled only a small subset

of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built

during the month of January 2005.[40]

155.    Not surprisingly, the brake light problem was far from resolved.

156.    GM sat on and concealed its knowledge of the brake light defect for the remainder

of its corporate existence, and did not even consider available countermeasures (other than the

application of grease that proved ineffective).

**2.    Reduced brake performance defect.**

157.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and

2009 Pontiac G3 vehicles.[41]  Affected vehicles may contain brake fluid which does not protect

against corrosion of the valves inside the anti-lock brake system module, affecting the closing

---

[36] *Id.*

[37] *Id.*

[38] *Id* at 3.

[39] *Id.* at 2.

[40] *Id.*

[41] *See* July 28, 2014 Letter from New GM to NHTSA.

motion of the valves.[42] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[43]

**F.    Electric Power Steering Assist Defect.**

158.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 vehicles for a steering defect that may result in a sudden loss of electric power steering assist.[44]

159.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

**G.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet and Pontiac Vehicles.**

160.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

161.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[45]

---

[42] *Id.*

[43] *Id.*

[44] *See* NHTSA Campaign Number 15V064000.

[45] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

## H.    Light Control Module Defect.

162.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008 Chevrolet Aveo vehicles with a light control module defect.[46]  New GM later updated the number of affected vehicles to 218,000.

163.    In the vehicles, heat generated within the daytime running lamp module in the center console in the instrument panel may melt the module and cause a vehicle fire.[47]

## I.    Electrical Short in Driver's Door Module Defect.

164.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module.[48]

165.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

## J.    Low-Beam Headlight Defect.

166.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

167.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of

---

[46] *See* May 30, 2014 Letter from New GM to NHTSA.

[47] *Id.*

[48] *See* July 2, 2014 Letter from New GM to NHTSA.

illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**K.    Fuel Pump Module Defect.**

168.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

169.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**L.    Overloaded Feed Defect.**

170.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

171.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

010440-11  1028180 V1

**M.      Headlamp Driver Module Failure.**

172.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x vehicles for headlamp driver module failure.[49]  The number of affected vehicles was later modified to 269,586.

173.    In the affected vehicles, the headlamp driver module can overheat and fail, causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the roadway and reducing visibility of the vehicle to oncoming traffic.

**N.      Valve Cover Gasket Defect.**

174.    On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[50]  New GM later increased the number of affected vehicles to 50,948, and noted that this also includes 2004 Pontiac Grand Prix vehicles.

175.    In these vehicles the valve cover gasket may leak causing engine oil to drip onto the exhaust manifold increasing the risk of fire.

**V.      GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES**

176.    In a 2008 internal presentation, GM instructed its employees to avoid using the following judgment words:[51]

Always                    detonate                  maniacal

---

[49] *See* NHTSA Campaign Number 14V755000.

[50] *See* NHTSA Campaign Number 15V201000.

[51] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

- 55 -

| | | |
|---|---|---|
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | eviscerated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenade-like | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

177.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in place of accurate descriptions of material safety defects such as the ignition switch defects and the other defects discussed herein.  To avoid disclosure of the material safety risks, and furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[52]

---

[52] NHTSA Consent Order at Exhibit B (emphasis added).

178.    GM knew its Delta Ignition Switch Vehicles and other Defective GM Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety."  Instead of publicly admitting the dangerous safety defects in the Defective GM Vehicles, GM repeatedly blamed accidents on driver error.

179.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety.  Additional examples of GM's cavalier approach to safety follow.

180.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

181.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[53]  As a result, "GM personnel failed to raise significant issues to key decision-makers."[54]

182.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

---

[53] *Id*. at 252.

[54] *Id*. at 253.

183.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[55]

184.    The focus of GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

185.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[56]  TREAD was the principal database used by GM to track incidents related to its vehicles.[57]  Generally, the TREAD Reporting team consisted of employees who conducted monthly searches and prepared scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[58]

186.    GM severely understaffed the TREAD Reporting team and did not provide it with the resources to obtain the advanced data mining software to better identify and understand potential defects, thereby making it far less likely that safety defects would be remediated.[59]

187.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[60]

---

[55] Valukas Report at 251.

[56] *Id*. at 306.

[57] *Id*.

[58] *Id*. at 307.

[59] *Id*. at 307-308.

[60] Valukas Report at 255.

188.    Similarly, GM had a siloed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

189.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[61]

190.    According to the Valukas Report, part of the failure to properly correct the Delta Ignition Switch Defect was due to problems with GM's organizational structure[62] and a corporate culture that did not care enough about safety.[63]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[64] and the improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[65]  Claimants believe and thereupon allege that this same systematic denigration of safety issues fostered the manufacture and failure to recall the Defective GM Vehicles.

## VI.    GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DEFECTIVE GM VEHICLES

191.    Throughout its history, GM regularly used print media, press releases, and television and video media to represent its vehicles as safe, reliable, quality products that provide great value to purchasers, and retain their value over time better than other manufacturers' vehicles.  GM also used these media to present itself as an honest, above-board, values-oriented company with integrity. In truth, however, GM was concealing serious safety hazards and endangering its own customers.

---

[61] Valukas Report at 256.

[62] Id. at 259-260.

[63] Id. at 260-61.

[64] Id. at 263.

[65] Id. at 264.

192.    A GM print advertisement exclaimed in bold print:  **"At GM, Safety Isn't One Thing, It's Everything**."[66]

193.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding quality and great value . . . .  That's leadership, that's GM."[67]

194.    In 1989, a GM commercial represented "Fact:  GM cars have held their resale value better than any other U.S. make."[68]



195.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[69]

[66] GM-MDL2543-301025786.

[67] https://www.youtube.com/watch?v=h19lFAwGDwU.

[68] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

[69] https://www.youtube.com/watch?v=_hR7-7eKufQ.

010440-11  1028180 V1



196.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and safe:

> We are fans and nothing keeps us from the game.  We need cars and trucks as reliable as we are.  Season after season.  And when the game is over, we need to know that what got us there will also get us safely home.  Delivering cars and trucks that fans count on is what makes us General Motors.[70]

197.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn ION sets itself apart from competitors with innovative features, unique personalization opportunities and surprising levels of safety, sophistication and fun."[71]

198.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala "offers a comprehensive safety package, solid body structure, room for five passengers, plenty of cargo space, a surprising number of amenities for the price, and a track record of outstanding quality, reliability and durability."[72]

---

[70] https://www.youtube.com/watch?v=Dt12Gti12iA.

[71] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[72] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

199.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's history."[73]

200.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[74]

201.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix that explained that "[s]afety is always a high priority for Grand Prix."[75]

202.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

> [S]ince 1997, the new Malibu has offered buyers excellent performance, safety and comfort in a trim, stylish package.  For 2003, Chevrolet Malibu remains a smart buy for those who want a well-equipped midsize sedan at an attractive price.…  Designed for individuals or families with high expectations of quality, reliability, safety, driving pleasure, and affordability, the Malibu appeals to domestic and import owners.[76]

203.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining that:

> The ION sedan and quad coupe are designed to carry on the Saturn tradition of being at the top of the class when it comes to safety and security.  The world-class structural design provides the foundation for this focus on safety.  The steel spaceframe's front and rear crush zones help absorb the energy of a crash while protecting the integrity of the safety cage.[77]

204.    On October 4, 2003, GM's website stated that:

---

[73] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[74] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

[75] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

[76] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[77] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

Motor vehicle safety is important to GM and to our customers.  It
is at the top of mind in many of the thousands of decisions that are
made every day in engineering and manufacturing today's cars,
trucks, and SUVs/ Motor vehicle safety is a significant public
health concern in the U.S., and GM is proud to partner with
government agencies, emergency responders and health care
workers in addressing that challenge."[78]



205.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"

which highlighted safety features such as electronic stability control.  GM stated:  "We want to

bring this kind of safety, security and peace-of-mind to all of our customers because it's the right

thing to do, and because only GM can do it."

---

[78] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle
_shopping/suv_facts/100_safety/index.html.

**Only GM**

For example, we recently launched a new corporate adver-
tising campaign under the theme, "Only GM." It's part of
an effort to use the GM brand more aggressively and with
more purpose, to show that we're leading the industry in
ways that only GM can.

The "Only GM" campaign began by highlighting our plans to
equip all our cars and trucks sold to retail customers in the
United States and Canada with OnStar and StabiliTrak, GM's
electronic stability control system. We want to bring this kind
of safety, security and peace-of-mind to all of our customers
because it's the right thing to do, and because only GM can
do it. We also want potential customers to know that GM
offers them great value, and that buying GM matters. (For
more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

206.    And in the same Report, under the banner "Peace of mind," GM represented that
"[o]nly GM can offer its customers the assurance that someone is looking out for them and their
families when they're on the road," and that "[t]his commitment to safety makes GM the only
automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety
protection before, during and after vehicle collisions."



(GM's 2004 Annual Report, p. 22.)

207.    On May 10, 2004, GM's website announced that its

> aim is to improve motor vehicle safety for customers, passengers,
> and other motorists.  Our customers expect and demand vehicles
> that help them to avoid crashes and reduce the risk of injury in case
> of a crash.  We strive to exceed these expectations and to protect
> customers and their families while they are on the road.

The website continued, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles, and we support many programs aimed at encouraging safer

motor vehicle use…."[79]

208.    On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM,

and we constantly strive to make our cars and trucks safe.  We also continue our support for

groups such as the National SAFE KIDS Campaign, and a number of programs aimed at

encouraging safer motor vehicle use."[80]

209.    GM touted safety for the Malibu and Malibu Maxx, stating in a brochure that

"Safety is built into the heart of the all-new 2004 Chevrolet Malibu sedan and Malibu Maxx

extended sedan," specifically highlighting the airbags.[81]

210.    GM's June 4, 2004, website published a message from its CEO, Rick Wagoner,

on corporate responsibility.  Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance
> of corporate responsibility and the value of sustainable
> development, we at General Motors are fortunate to have inherited
> a legacy of doing business the right way.  It's a great asset.  And,
> it's a huge obligation … one we take very seriously.  What we call
> "winning with integrity" is not an optional or occasional behavior
> at GM.  Integrity is one of our core values, and a way of doing
> business that helps us realize our company's full potential….In
> short, "winning with integrity" is much more than a one-time

---

[79] http://web.archive.org/web/20040510221647/http://www.gm.com/company/
gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[80] http://web.archive.org/web/20040604055658/http://www.gm.com/company/
gmability/sustainability/reports/03/safety.html.

[81] GM-MDL2543-302128438.

exercise at GM. It's how we work every day.  It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[82]

211.    In its 2005 Annual Report, GM stated:  "We are driving quality and productivity even further."  "Lasting quality—That is why restoring confidence in quality is just as important as design in rebuilding our brands….  We are focused on providing our customers with the best quality experience over the lifetime of GM ownership."



212.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly designed packages that lead the segment in performance, safety, efficiency and capability."[83]

213.    On September 9, 2005, GM's website described its safety technology as "Helping You Avoid a Crash" and "Giving the driver information never possible before."[84]

---

[82] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability /sustainability/reports/03/wagoner_message.html.

[83] GM's 2005 Annual Report, p. 23.



214.    At the same time GM announced what it called the next big step in safety:[85]

> No matter what vehicle you drive, your safety is vital.  GM is looking out for you—you deserve that peace of mind on the road. Which is why at GM, we've taken the next big step in our commitment to provide more customers with more safety and security.



---

[84] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/safety/avoid_crash/index.html.

[85] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

215.    A 2005 Pontiac G6 brochure makes "**SAFETY ASSURANCES**," including standard "dual-stage front airbags."[86]  A brochure for the 2008 Pontiac G6 promised that "safety is all around you.  Standard equipment includes dual-stage frontal driver and front passenger air bags," that would—presumably—actually work.[87]

216.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM stated:

> From an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year— stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market.[88]

217.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[89]

218.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[90]

219.    GM's website on August 9, 2006, stated:[91]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

---

[86] GM-MDL2543-301463441.

[87] GM-MDL2543-302131852.

[88] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[89] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[90] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[91] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

BEFORE:  Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called "active safety" technologies),

DURING:  Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called "passive safety"), and

AFTER:  Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

\* \* \*

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

220.    GM's website on September 6, 2006, stated:[92]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

\* \* \*

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well.   GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles.   GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash.   GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

221.    GM stated on its website in October 29, 2006 that it was a leader in automotive

safety and that its safety leadership extends as far back as the birth of GM.[93]

---

[92] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.

010440-11  1028180 V1



222.    A 2006 GM brand-wide marketing brochure contained a page dedicated to safety. The page was titled:  "YOUR SAFETY AND SECURITY.  IT'S OUR PRIORITY."  GM then promised:  "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[94]

223.    This theme was repeated in another marketing brochure for the GM brand, touting:  "OUR PRIORITY—YOUR SAFETY AND SECURITY."  GM again promised:  "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[95]

---

[93] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/ safety/safety_firsts/index.html.

[94] GM-MDL2543 -301443177.

[95] GM-MDL2543-301463604; *see also* GM-MDL2543-302767597.

224.    A 2006 GMC *The Magazine* article titled "Not Just HOT AIR" discussed the importance of a vehicle's air bags.  It advised that "Your vehicle's air bags are poised to help protect you in a moment's notice."  Further: "When appropriate conditions arise, your vehicle's air bags inflate rapidly and powerfully to work with your safety belt system to help protect you in the event of a collision."[96]

225.    Safety was an express selling point in a 2006 HHR brochure touting the "HHR Selling Advantage" of "Added Safety and Security," including "enhanced airbag protection."[97] A 2006 GM press release for the HHR added that that "HHR is designed to protect occupants in the event of a crash" through such "safety features" such as "dual-stage frontal air bags."[98]  A 2007 HHR marketing brochure reiterated the GM "WE'VE GOT YOUR BACK" promise, explaining that "Chevrolet is committed to keeping you and your family safe."[99]  Marketing copy for the HHR promised that the "HHR is designed to protect occupants in the event of a crash" in ad copy from 2008 and 2009.[100]

226.    In a print ad for the 2006 Buick LaCrosse, GM represented: "Occupant safety received high priority in the design of LaCrosse—with the goal of providing excellent protection in the event of a collision."[101]

227.    The promise of "Safety" was central to a GM press release for the 2006 Saturn Outlook: "Saturn Outlook is designed to protect passengers before, during and after a crash."[102]

---

[96] GM-MDL2543-100223694.

[97] GM-MDL2543-301464481-82.

[98] GM-MDL2543-301452586.

[99] GM-MDL2543-3023158819.

[100] GM-MDL2543-301452598; GM-MDL2543-301458742.

[101] GM-MDL2543-006787272.

[102] GM-MDL2543-301451107.

228.    A marketing brochure for the 2007 Buick Lucerne promised "PROTECTION

BEYOND PROTECTION:"

> Lucerne was designed with safety and protection as top priorities.
> Helping occupants avoid serious injury in the event of a crash was
> a given. But our engineers were committed to doing much more.
> Like helping the driver avoid crashes…. If a crash is unavoidable,
> Lucerne's six air bags and industry leading technology will be
> there to help protect.

229.    In a video published on January 2, 2007, GM's Vice Chairman of Product

Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has

predominately been known for customer service, fair dealers, honest dealers and having happy

buyers."[103]

230.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure

and Safety Integration, stated:

> Our aim is to improve motor vehicle safety for customers,
> passengers and other motorists. Our customers expect and demand
> vehicles that help them to avoid crashes and reduce the risk of
> injury in case of a crash. We strive to exceed these expectations
> and to protect customers and their families while they are on the
> road."

Further, Lange stated, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles."[104]

231.    In its 2007 Annual Report, GM stated:

> In 2007, we continued to implement major improvements to our
> U.S. sales and marketing strategy. Over the past two years, we've
> re-focused our marketing efforts to emphasize the strength and
> value of our products and brands….
>
> We also continued to make progress in our long-term effort to
> improve quality….

---

[103] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[104] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

> We've also witnessed, since 2005, an 89 percent reduction in vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

232. Moreover, GM represented that it "actively studies trends of claims" to take action to improve vehicle quality:



> **POLICY, WARRANTY AND RECALLS**
> Provisions for estimated expenses related to policy and product warranties are made at the time products are sold. These estimates are established using historical information on the nature, frequency, and average cost of claims. We actively study trends of claims and take action to improve vehicle quality and minimize claims. Actual experience could differ from the amounts estimated requiring adjustments to these liabilities in future periods.

(GM 2007 Annual Report, p. 74.)

233. In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve, GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's transformation is being driven by high-quality cars and trucks that look great, drive great, are fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated,

> No other automaker provides such a diverse lineup of cars and trucks that meets the needs of customers that range from college studies to contactors.  And our five-year, 100,000-mile powertrain warranty—the most comprehensive in the industry—adds even more value to the bottom line, demonstrating that we are putting our money where our mouth is on vehicle quality.[105]

234. On August 1, 2007, GM represented that:

> The Cobalt enters the 2008 model year on the heels of a successful '07 model year, which introduced several significant enhancements, including more powerful Ecotec engines.  For '08, the Cobalt builds on that powerful foundation with a streamlined model lineup and more standard safety and convenience equipment…."[106]

---

[105] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

[106] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

- 73 -

235.   On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's value story with new features and revisions that add to its safety and efficiency, including the addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models …."[107]

236.   In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and side curtain airbags are standard on all models."[108]

237.   In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM represented that the

> Lucerne's body structure is designed to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions.  Active safety and handling features offered on Lucerne include a four-channel anti-lock braking system and traction control; an auto-level rear suspension that automatically adjusts the vehicle height for heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which senses emergency braking situations and boosts power as needed.[109]

238.   In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM represented that the

> Grand Prix's convenience and safety features are perfect for drivers who enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand Prix remains a driver's car inside and out.  The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps.[110]

---

[107] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

[108] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[109] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

[110] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

239.    A 2008 Buick Enclave brochure said, "From the outset, safety and protection were top priorities in the design of the Enclave. . . .  If a crash is unavoidable, Enclave's advanced safety technology will be there to help protect." [111]

240.    GM's website on January 15, 2008, stated "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[112]

241.    In February 2008, GM aired a Chevy Malibu commercial during The Grammy's which stated the Chevy Malibu was "built to last" "because safety should last a lifetime."  The commercial used images of a child being raised to adulthood, in order to convey protection and safety.[113]

242.    On its website in March of 2008, GM stated it was delivering the best cars and trucks in its 100-year history, and that it was "Obsessed with Quality."  The website also spoke of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[114]

---

[111] GM-MDL2543-303150775.

[112] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[113] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[114] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/;
http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and
http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



243.    In early 2009 owner loyalty mailings, GM touted the quality and reliability of its

vehicles as well as safety:

**Safe**.
- 37 of our 2009 models have five-star frontal crash safety ratings.
- We offer the safety and security of OnStar, including Automatic Crash Response, OnStar Vehicle Diagnostics, and Turn-By-Turn Navigation.  Nobody else offers these services.  Not Honda.  Not Toyota.  Not Ford.  Not Chrysler.  Not Nissan.  Not Dodge.[115]

244.    Brochures for the 2009 and 2010 Cadillac CTS contain the tagline, "**THE ONLY**

**PLACE WHERE WE PLAY IT SAFE**," claiming that "Passenger safety is one of the first and

most important considerations throughout the engineering process" and that "[o]f course, the

---

[115] GM-MDL2543-100182783 (footnotes omitted).

010440-11  1028180 V1

ultimate luxury is passenger safety.  So it's needless to say that this aspect of the CTS has been scrutinized with utmost care."[116]

245.    A marketing brochure for the 2009 Saturn VUE asked, "Can good looks keep you Safe?"  The answer:  "The Saturn VUE Compact SUV.  Six air bags.  StabiliTrak vehicle stability control system.  OnStar.  Now safety isn't a luxury."[117]

## VII.    CLASS ALLEGATIONS

246.    Under B.R. 7023, Claimants file this Proof of Claim on behalf of themselves and a proposed Class and Subclasses initially defined below.

247.    Excluded from the Class and the Subclasses are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

## A.    The Class.

248.    Claimants allege claims, under the consumer protection, fraudulent concealment and unjust enrichment laws of each state and the District of Columbia (all of which are the same or substantially similar):

> All persons in the United States who either bought or leased a
> Defective GM Vehicle prior to July 10, 2009.

249.    "Defective GM Vehicles" include the following, provided they were bought or leased prior to July 10, 2009:

---

[116] GM-MDL2543-302127737; GM-MDL2543-301626861.

[117] GM-MDL2543-100222943.

| DEFECTIVE GM VEHICLES |
|---|
| · 2005-2009 Buick Lacrosse |
| · 2000-2010 Chevrolet Impala |
| · 2000-2005 Cadillac Deville |
| · 2006-2010 Cadillac DTS |
| · 2006-2010 Buick Lucerne |
| · 2000-2008 Chevrolet Monte Carlo |
| · 2003-2010 Cadillac CTS |
| · 2004-2006 Cadillac SRX |
| · 1997-2005 Chevrolet Malibu |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2008-2010 Buick Enclave |
| · 2009-2010 Chevrolet Traverse |
| · 2008-2010 Acadia |
| · 2008-2010 Saturn Outlook |
| · 2004-2009 Chevrolet Malibu |
| · 2004-2006 Chevrolet Malibu Maxx |
| · 2009-2010 Chevrolet HHR |
| · 2010 Chevrolet Cobalt |
| · 2005-2006 and 2008-2009 Pontiac G6 |

**B.      The Defective GM Vehicle Implied Warranty Subclass.**

250.    Claimants also allege implied warranty claims under the substantially similar laws

of the following jurisdictions for the Defective GM Vehicle Implied Warranty Subclass on

behalf of persons with Defective GM Vehicles sold or leased as new or certified pre-owned prior

to July 10, 2009:  Alaska, Arkansas, California, Colorado, Delaware, District of Columbia,

Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South

Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

- 78 -

C.    **The Defective GM Vehicle Negligence Subclass.**

251.    Claimants also allege negligence claims under the substantially similar laws of the following jurisdictions for the Defective GM Negligence Subclass on behalf of persons with Defective GM Vehicles sold or leased as new or certified pre-owned prior to July 10, 2009: Arkansas, California, Maryland, Louisiana and Ohio.

D.    **The Class And The Subclasses Meet The Requirements For Class Certification.**

252.    Individual joinder of all Class or Subclass members is impracticable, given that GM manufactured and sold approximately 9.8 million Defective GM Vehicles in the United States.

253.    The Class disclaims recovery, in this Proof of Claim, for physical injury resulting from the safety defects alleged herein.  But the increased risk of injury from the defects serves as an independent justification for the relief sought by Claimants and the Class.

254.    The Class can be readily identified using registration records, sales records, production records, and other information kept by GM's successor, New GM, or third parties in the usual course of business and within their control.

255.    Questions of law and fact are common to the Class and predominate over questions affecting only individual members, including the following:

1.    Whether the Defective GM Vehicles suffer from safety defects;

2.    Whether GM fraudulently concealed the defects;

3.    Whether GM misrepresented that the Defective GM Vehicles were safe;

4.    Whether GM engaged in fraudulent, deceptive or unfair acts or practices by failing to disclose that the Defective GM Vehicles were designed, manufactured, and sold with safety defects and that GM systematically valued cost-cutting over safety;

- 79 -

5.      Whether GM was unjustly enriched at the expense of Claimants
        and the Class;

6.      Whether GM breached the implied warranty of merchantability in
        connection with the Defective GM Vehicles;

7.      Whether GM was negligent in its design and manufacture of the
        Defective GM Vehicles, and/or in failing to warn of the known
        defects and failing to recall the vehicles; and

8.      Whether Claimants and the Class are entitled to a remedy as a
        result of GM's fraudulent, inequitable and/or negligent conduct.

256.    Claimants' claims are typical of the claims of the Class and Subclass members,
and arise from the same course of conduct by GM.  The relief Claimants seek is typical of the
relief sought for the absent Class and Subclass members.

257.    Claimants will fairly and adequately represent and protect the interests of all
absent Class and Subclass members.  Claimants are represented by counsel competent and
experienced in product liability, consumer protection, and class action litigation, as well as
counsel experienced in bankruptcy litigation.

258.    A class action is superior to other available methods for the fair and efficient
adjudication of this controversy, since joinder of all the individual Class and Subclass members
is impracticable.  Because the damages suffered by each individual Class member may be
relatively small, the expense and burden of individual litigation would make it very difficult or
impossible for individual Class members to redress the wrongs done to each of them
individually, and the burden imposed on the judicial system would be enormous.   B.R. 7023
provides the Court with authority and flexibility to maximize the benefits of the class mechanism
and reduce any management challenges that may arise.

259.    The prosecution of separate actions by the individual Class and Subclass members
would create a risk of inconsistent or varying adjudications for individual Class and Subclass

- 80 -

members.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

260.    Claimants are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Claimants anticipate providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class and Subclasses.

261.    Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for GM's misconduct.

## VIII.   THE CLASS' AND SUBCLASSES' CLAIMS

A.    **Class Claims.**

1.    **Fraudulent concealment.**

262.    Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

263.    This claim is brought on behalf of the Class.

264.    The law of fraudulent concealment is essentially identical in each state, as virtually every state generally follows the principles of Sections 550 and 551 of the Restatement (Second) of Torts.

265.    Under Section 550, "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."

- 81 -

266.     Under Section 551:

(1)   One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2)   One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a)  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b)  matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c)  subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d)  the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

267.     As alleged above and discussed below, GM's fraudulent concealment of the safety defects and other material information concerning the Defective GM Vehicles renders GM liable to Claimants and the Class under the law of fraudulent concealment of each state and the District of Columbia.

268.     GM concealed and suppressed material facts concerning the quality and safety of GM vehicles in general and in the Defective GM Vehicles in particular.

- 82 -

269.    GM concealed and suppressed material facts concerning the culture of GM—a culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

270.    GM concealed and suppressed material facts concerning the safety defects alleged herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects, including the defects in the Defective GM Vehicles, to regulators or consumers.

271.    GM did so in order to boost confidence in its vehicles, including the Defective GM Vehicles, and falsely assure owners, purchasers and lessees of the Defective GM Vehicles that GM was a reputable manufacturer that stood behind its vehicles after they were sold and ensured that its vehicles were safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Defective GM Vehicles and because they played a significant role in the value of the vehicles.

272.    GM had a duty to disclose the defects in the Defective GM Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew the facts were not known to or reasonably discoverable by Claimants and the Class.  These omitted and concealed facts were material because they directly impact the value and safety of the Defective GM Vehicles purchased or leased by Claimants and the Class. Whether a product is safe and reliable, and whether the manufacturer stands behind the product, is a material concern to a consumer.

273.    GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective GM

Vehicles.  Having provided information to the Class, GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the TREAD Act.

274.    GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and it did so at the expense of Claimants and the Class.

275.    GM concealed and suppressed the defects in the Defective GM Vehicles with the intent to deceive Claimants and the Class.

276.    Claimants and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Claimants' and the Class's actions were justified.  GM was in exclusive control of the material facts and such facts were not known to the public, Claimants, or the Class.

277.    Because of the concealment and/or suppression of the facts, Claimants and the Class sustained damage.  Had they been aware of the safety defects in their Defective GM Vehicles and GM's disregard for safety, Claimants and the Class either would have paid less for their vehicles or would not have purchased them at all.  Claimants and the Class did not receive the benefit of their bargain as a result of GM's fraudulent concealment.

278.    More specifically, Claimants and the Class were damaged by GM's fraudulent concealment in at least the following ways:

a.    Class members were fraudulently induced into purchasing their Defective GM Vehicles and/or paying more than they otherwise would have had the defect been revealed.

b.      Class members remained in possession of vehicles of diminished

value which GM would otherwise have been compelled to fix or replace.

c.      Class members incurred expense and loss in connection with their

efforts to repair the Defective GM Vehicles and/or eliminate or reduce the risks

and costs to which they were exposed by the vehicles.

d.      Class members incurred the inconvenience and expense of having

a recall repair done.

279.    Without limitation, Claimants and the Class therefore seek a full refund of the

purchase price paid for their Defective GM Vehicles (or the overpayments they made for the

vehicles) together with any and all other available compensatory, incidental and consequential

damages (save for personal injury damages) they may have suffered as a result of their leasing

and/or ownership of a Defective GM Vehicle, and punitive damages given the extremely

outrageous and reprehensible conduct perpetrated by GM to keep and increase the numbers of

highly-dangerous Defective GM Vehicles on the road in order to avoid the expense and adverse

publicity of the requisite safety recall.

**2.      Unjust enrichment.**

280.    Claimants reallege and incorporate by reference all paragraphs as though fully set

forth herein.

281.    This claim is brought on behalf of the Class.

282.    The law of unjust enrichment is essentially identical in each state.

283.    GM received and retained a benefit from Claimants and the Class and inequity

resulted.

- 85 -

284.    GM benefitted from selling and leasing the Defective GM Vehicles, whose value was artificially inflated by GM's concealment of the defects as well as systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Claimants and the Class overpaid for their Defective GM Vehicles and were forced to pay other costs.

285.    In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

286.    Thus, Claimants and all Class members conferred a benefit on GM.

287.    It was inequitable for GM to retain these benefits.

288.    Claimants and the Class were not aware of the true facts about their Defective GM Vehicles, and did not benefit from GM's conduct.

289.    GM knowingly accepted the benefits of its unjust conduct.

290.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### 3.    Consumer Protection Claims.

291.    Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

292.    This claim is brought on behalf of the Class.

293.    The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting commerce…." 15 U.S.C. § 45.

294.    As set forth below, the Class states claims under the consumer protection statutes of every U.S. jurisdiction.

a. **Alabama-Violations of Alabama Deceptive Trade Practices Act (ALA. CODE § 8-19-1, *et seq.*)**

295.    Claimants, on behalf of themselves and all Class members who are Alabama residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

296.    Claimants are "consumers" within the meaning of ALA. CODE § 8-19-3(2).

297.    Claimants and GM are "persons" within the meaning of ALA. CODE § 8-19-3(5).

298.    The Defective GM Vehicles are "goods" within the meaning of ALA. CODE § 8-19-3(3).

299.    GM was engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

300.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:  "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  ALA. CODE § 8-19-5.  By concealing the defects in the Defective GM Vehicles and promoting the safety of GM vehicles, GM engaged in deceptive business practices prohibited by the Alabama DTPA, including:  representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective GM Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective GM Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving a Defective GM Vehicle has been supplied in accordance with a previous

- 87 -

representation when it has not; and engaging in other unconscionable, false, misleading, or

deceptive acts or practices in the conduct of trade or commerce.  The defects in each vehicle

include not only the specific defect (*e.g.*, the Power Steering Defect), but also include the

defective process through which GM built cars, a process that included cost-cutting, minimizing

the importance of safety issues, siloing, the depletion of resources devoted to recognizing and

studying safety issues, the failure to follow acceptable engineering and inventory processes

concerning parts management, and the failure to follow a proper FMEA process.  All of these

defects would be material to a reasonable consumer.

301.    GM also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of Defective GM Vehicles.

302.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Alabama DTPA.

303.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

304.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

305.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

306.    GM knew or should have known that its conduct violated the Alabama DTPA.

010440-11  1028180 V1

307.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles and the GM brand that were either false or misleading.

308.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

309.    Because GM fraudulently concealed the defects in GM vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further, Claimants had to spend their time and money to bring their Defective GM Vehicles in for repair.  Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

310.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

311.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they known of the defect in their vehicles, Claimants who purchased or leased Defective GM Vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

312.     GM's unlawful acts and practices complained of herein affected the public interest.

313.     As a direct and proximate result of GM's violations of the Alabama DTPA, Claimants have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of GM's misconduct, all Claimants incurred damages in at least the form of lost time required to repair their vehicles.

314.     Pursuant to ALA. CODE § 8-19-10, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Claimant.

315.     Claimants also seek an order of attorneys' fees, and any other just and proper relief available under ALA. CODE § 8-19-1, *et seq.*

   **b.     Alaska-Violations of the Alaska Unfair Trade Practices and Consumer Protection Act (ALASKA STAT. § 45.50.471, *et seq.*)**

316.     Claimants, on behalf of themselves and all Class members who are Alaska residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

317.     The Alaska Unfair Trade Practices And Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including:  "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" and  "(12) using or employing

- 90 -

deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing,

suppressing, or omitting a material fact with intent that others rely upon the concealment,

suppression or omission in connection with the sale or advertisement of goods or services

whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT.

§ 45.50.471.

318.    GM participated in misleading, false, or deceptive acts that violated the Alaska

CPA. By concealing the known defects in Claimants' vehicles, GM engaged in deceptive

business practices prohibited by the Alaska CPA. GM also engaged in unlawful trade practices

by representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that the Defective GM Vehicles are of a particular standard

and quality when they are not; advertising the Defective GM Vehicles with the intent not to sell

them as advertised; and omitting material facts in describing the Defective GM Vehicles. The

defects in each vehicle include not only the specific defect (*e.g.*, the Power Steering Defect), but

also include the defective process through which GM built cars, a process that included cost-

cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to

recognizing and studying safety issues, the failure to follow acceptable engineering and

inventory processes concerning parts management, and the failure to follow a proper FMEA

process. All of these defects would be material to a reasonable consumer.

319.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

320.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective GM Vehicles.

321.     By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Alaska CPA.

322.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

323.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

324.     GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

325.     GM knew or should have known that its conduct violated the Alaska CPA.

326.     As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles and the GM brand that were either false or misleading.

327.     GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.     Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.     Intentionally concealed the foregoing from Claimants;

c.     Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

328.    Because GM fraudulently concealed the defects in GM vehicles, Defective GM

Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased

were worth less than they would have been if they were free from defects.  Further, Claimants

had to spend their time and money to bring their Defective GM Vehicles in for repair.  Had

Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either

not have bought their vehicles or would have paid less for them.

329.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

330.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they known about the

defect in their vehicles, Claimants would have paid less for their vehicles or would not have

purchased or leased them at all.

331.    GM's violations presented a continuing risk to Claimants as well as to the general

public.  GM's unlawful acts and practices complained of herein affect the public interest.

332.    As a direct and proximate result of GM's violations of the Alaska CPA, Claimants

have suffered injury-in-fact and/or actual damage as alleged above.  As a direct result of GM's

misconduct, all Claimants incurred damages in at least the form of lost time required to repair

their vehicles.

333.    Pursuant to ALASKA STAT. § 45.50.531, Claimants seek monetary relief against

GM measured as the greater of (a) three times the actual damages in an amount to be determined

at trial or (b) $500 for each Claimant.

334.    Claimants also seek attorneys' fees, and any other just and proper relief available

under the Alaska CPA.

- 93 -

### c.    Arizona-Violations of the Consumer Fraud Act (ARIZ. REV. STAT. § 44-1521, *et seq.*)

335.    Claimants, on behalf of themselves and all Class members who are Arizona residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

336.    GM and Claimants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

337.    The Defective GM Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

338.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Arizona CFA.

339.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

340.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

341.     GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

342.     By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the Arizona CFA.

343.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

344.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

345.     GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

346.     GM knew or should have known that its conduct violated the Arizona CFA.

347.     As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

348.     GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.     Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.     Intentionally concealed the foregoing from Claimants;

      c.     Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

010440-11  1028180 V1

349.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

350.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

351.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about their Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

352.    As a direct and proximate result of GM's violations of the Arizona CFA, Claimants have suffered injury-in-fact and/or actual damage.

353.    Claimants seek monetary relief against GM, as well as attorneys' fees, and any other just and proper relief available under the Arizona CFA.

> **d.    Arkansas-Violations of the Deceptive Trade Practice Act (ARK. CODE § 4-88-101, *et seq.*)**

354.    Claimants, on behalf of themselves and all Class members who are Arkansas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

355.    GM and Claimants are "persons" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), ARK. CODE § 4-88-102(5).

010440-11  1028180 V1

356.    The Defective GM Vehicles are "goods" within the meaning of ARK. CODE § 4-88-102(4).

357.    The Arkansas DTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" ARK. CODE § 4-88-107(a)(10).  The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods:  "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  ARK. CODE § 4-88-108.  GM violated the Arkansas DTPA and engaged in deceptive and unconscionable trade practices by, among other things, concealing the defects in the Defective GM Vehicles and otherwise engaging in activities with a tendency or capacity to deceive.

358.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

359.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

360.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

361.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Arkansas DTPA.

362.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

363.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

364.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

365.    GM knew or should have known that its conduct violated the Arkansas DTPA.

366.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

367.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

   a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

   b.    Intentionally concealed the foregoing from Claimants;

   c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

368.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

369.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

370.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about their Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

371.    As a direct and proximate result of GM's violations of the Arkansas DTPA, Claimants have suffered injury-in-fact and/or actual damage.

372.    Claimants seek monetary relief against GM.  Claimants also seek attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

     **e.**    **California**

     **(1)**    **Violations of the California Consumer Legal Remedies Act (CAL. CIV. CODE § 1750 *et seq.*)**

373.    Claimants, on behalf of themselves and all Class members who are California residents (for the purposes of this Count, the "Class") reallege and incorporate by reference all paragraphs as though fully set forth herein.

374.    GM was a "person" under CAL. CIV. CODE § 1761(c).

375.    Claimants and the Class are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Defective GM Vehicles.

376.    The California Consumer Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which

results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a).

GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq.*,

as described above and below, by, among other things, concealing the known defects in the

Defective GM Vehicles, representing that the vehicles have characteristics, uses, benefits, and

qualities which they do not have; representing that the vehicles are of a particular standard,

quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease

them as advertised; and representing that the subject of a transaction involving a Defective GM

Vehicle has been supplied in accordance with a previous representation when it has not.

377.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

378.    In the course of its business, GM concealed the defects in the Defective GM

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to

deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts

or practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of Defective GM Vehicles.

379.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants and the Class.

380.    By failing to disclose and by actively concealing the defects in the Defective GM

Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and

deceptive business practices in violation of the CLRA.

381.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in the Class' vehicles.

382.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class, about the true safety and reliability of their vehicles.

383.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead the Class.

384.    GM knew or should have known that its conduct violated the CLRA.

385.    GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

386.    GM owed the Class a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

   a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

   b.    Intentionally concealed the foregoing from the Class;

   c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from the Class that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

387.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, the vehicle owners and lessees were deprived of the benefit of their bargain since the vehicles they purchased or leased were worth less than they would have been if they were free from the defects.  Had the Class been aware of the defects in their vehicles, they would have either not bought or leased their Defective GM Vehicles or would have paid less for them.

388.    GM's concealment of the defects in the Defective GM Vehicles was material to the Class.

389.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Class members either would have paid less for their vehicles or would not have purchased or leased them at all.  The Class also incurred repair and recall costs, as alleged above.

390.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

391.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

392.    Under CAL. CIV. CODE § 1780(b), the Class seeks an additional award of up to $5,000 for each Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  GM knew or should have known that its conduct was directed to one or more Class members who are senior citizens or disabled persons.   GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Class members who are senior citizens or disabled persons were substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

393.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

(2)    **Violations of the California Unfair Competition Law ("UCL")**
(CAL. BUS. & PROF. CODE § 17200, *et seq.*)

394.    Claimants, on behalf of themselves and all Class members who are California

residents (for the purposes of this Count, the "Class") reallege and incorporate by reference all

paragraphs as though fully set forth herein.

395.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent

business act or practices."  GM engaged in unlawful, fraudulent, and unfair business acts and

practices in violation of the UCL.

396.     GM violated the unlawful prong of § 17200 by the following:

a.        violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*, as set
forth above.

b.        violation of the National Traffic and Motor Vehicle Safety Act of
1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations.
FMVSS number 573 governs a motor vehicle manufacturer's
responsibility to notify NHTSA of a motor vehicle defect within
five days of determining that the defect is safety related. *See* 49
C.F.R. § 573.6.  GM violated these reporting requirements by
failing to report the defects in the Defective GM Vehicles within
the required time, and failing to timely recall all impacted vehicles.

397.    GM also violated the "fraudulent" prong of § 17200 by concealing the defects in

the Defective GM Vehicles, information that was material to a reasonable consumer, while it

touted the safety and reliability of the vehicles.

398.    GM also violated the unfair prong of § 17200 because the acts and practices set

forth above, including devaluing safety and concealing the defects in the Defective GM

Vehicles, offend established public policy, and also because the harm GM caused consumers

greatly outweighs any benefits associated with those practices.  GM's conduct also impaired

competition within the automotive vehicles market and prevented the Class from making fully

informed decisions about whether to lease, purchase and/or retain their vehicles.

399.    In the course of its business, GM concealed the defects in Class members'
vehicles as described herein and otherwise engaged in activities with a tendency or capacity to
deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or
practices, fraud, misrepresentations, or concealment, suppression or omission of any material
fact with intent that others rely upon such concealment, suppression or omission, in connection
with the sale and lease of the Defective GM Vehicles.

400.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

401.    GM knew of serious defects affecting the Defective GM Vehicles owned or
leased by the Class.

402.    By failing to disclose and by actively concealing the defects in Class members'
vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and
deceptive business practices in violation of the UCL.

403.    In the course of GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Class members' vehicles.

404.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive
reasonable consumers, including Class members, about the true safety and reliability of their
vehicles.

405.    GM intentionally and knowingly misrepresented material facts regarding the
Defective GM Vehicles with the intent to mislead the Class.

406.    GM knew or should have known that its conduct violated the UCL.

407.    As alleged above, GM made material statements about the safety and reliability of
the Defective GM Vehicles that were either false or misleading.

408.    GM owed the Class a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective
GM Vehicles;

    b.    Intentionally concealed the foregoing from the Class;

    c.    Made incomplete representations about the safety and reliability of
the Defective GM Vehicles, while purposefully withholding
material facts from the Class that contradicted these
representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

409.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

the vehicle owners were deprived of the benefit of their bargain since the vehicles they

purchased were worth less than they would have been if they were free from the defects.  Had

Class members been aware of the defects in their vehicles, they would have either not bought

their Defective GM Vehicles or would have paid less for them.

410.    GM's concealment of the defects in the Defective GM Vehicles was material to

the Class.

411.    The Class suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Class members either would have paid less for their

vehicles or would not have purchased or leased them at all.

412.    As a direct and proximate result of GM's violations of the UCL, Class members

have suffered injury-in-fact and/or actual damage.

413.    Claimants request that this Court enter such orders or judgments as may be

necessary, including an order and judgment restoring to the Class members any money lost as the

result of GM's unfair, unlawful, and deceptive trade practices, including restitution and

disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive

practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. CODE § 384 and

CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

      **f.**    **Colorado-Violations of the Colorado Consumer Protection Act (COL.
REV. STAT. § 6-1-101,** *et seq.***)**

414.    Claimants, on behalf of themselves and all Class members who are Colorado

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

415.    GM was a "person" under § 6-1-102(6) of the Colorado Consumer Protection Act

("Colorado CPA"), COL. REV. STAT. § 6-1-101, *et seq.*

416.    Claimants are "consumers" for purposes of COL. REV. STAT § 6-1-113(1)(a).

417.    The Colorado CPA prohibits deceptive trade practices in the course of a person's

business.  GM engaged in deceptive trade practices prohibited by the Colorado CPA, including:

(1) knowingly making a false representation as to the characteristics, uses, and benefits of the

Defective GM Vehicles that had the capacity or tendency to deceive Claimants; (2) representing

that the Defective GM Vehicles were of a particular standard, quality, and grade even though

GM knew or should have known they are not; (3) advertising the Defective GM Vehicles with

the intent not to sell them as advertised; and (4) failing to disclose material information

concerning the Defective GM Vehicles that was known to GM at the time of advertisement or

sale with the intent to induce Claimants to purchase, lease or retain the Defective GM Vehicles.

418.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

419.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

420.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

421.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Colorado CPA.

422.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

423.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

424.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

425.    GM knew or should have known that its conduct violated the Colorado CPA.

426.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

427.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while

- 107 -

purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

428.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

429.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

430.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.

431.    As a direct and proximate result of GM's violations of the Colorado CPA,

Claimants have suffered injury-in-fact and/or actual damage.

432.    Pursuant to COLO. REV. STAT. § 6-1-113, Claimants seek monetary relief

against GM measured as the greater of (a) actual damages in an amount to be determined at trial

and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for

each Claimant.

433.    Claimants also seek attorneys' fees, and any other just and proper relief available

under the Colorado CPA.

010440-11  1028180 V1

g.    **Connecticut-Violations of Connecticut Unlawful Trade Practices Act
(CONN. GEN. STAT. § 42-110a, *et seq.*)**

434.    Claimants, on behalf of themselves and all Class members who are Connecticut

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

435.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides:

"No person shall engage in unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  CONN. GEN. STAT. § 42-110b(a).

436.    GM was a "person" within the meaning of CONN. GEN. STAT. § 42-110a(3).

GM's challenged acts occurred in "trade" or "commerce" within the meaning of CONN. GEN.

STAT. § 42-110a(4).

437.    GM participated in deceptive trade practices that violated the Connecticut UTPA

as described herein.  In the course of its business, GM concealed the defects in the Defective GM

Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to

deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale of Defective GM Vehicles.  In the course of its business, GM concealed the defects

in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or

capacity to deceive.  GM also engaged in unlawful trade practices by employing deception,

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

of any material fact with intent that others rely upon such concealment, suppression or omission,

in connection with the sale of Defective GM Vehicles.

438.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

- 109 -

439.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

440.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

441.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

442.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

443.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

444.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

445.    GM knew or should have known that its conduct violated the Connecticut UTPA.

446.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

447.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

- 110 -

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

448.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

449.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

450.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

451.    As a direct and proximate result of GM's violations of the Connecticut UTPA,

Claimants have suffered injury-in-fact and/or actual damage.

452.    Claimants are entitled to recover their actual damages, punitive damages, and

attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

010440-11  1028180 V1

h.    **Delaware-Violations of the Delaware Consumer Fraud Act (6 DEL. CODE § 2513, et seq.)**

453.    Claimants, on behalf of themselves and all Class members who are Delaware residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

454.    GM was a "person" within the meaning of 6 DEL. CODE § 2511(7).

455.    The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."  6 DEL. CODE § 2513(a).

456.    GM participated in deceptive trade practices that violated the Delaware CFA as described herein.  In the course of its business, GM concealed the defects in the Defective GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

457.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

458.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with

- 112 -

intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

459.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

460.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Delaware CFA.

461.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

462.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

463.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

464.    GM knew or should have known that its conduct violated the Delaware CFA.

465.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

466.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

  a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

  b.    Intentionally concealed the foregoing from Claimants;

  c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

467.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

468.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

469.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

470.    As a direct and proximate result of GM's violations of the Delaware CFA, Claimants have suffered injury-in-fact and/or actual damages.

471.    Claimants seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of GM's unlawful conduct. *See*, *e.g*., *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983). Claimants also seek an order for declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

472.    GM engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

010440-11  1028180 V1

i.    **District of Columbia-Violations of the Consumer Protection Procedures Act (D.C. CODE § 28-3901, *et seq.*)**

473.    Claimants, on behalf of themselves and all Class members who are District of Columbia residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

474.    GM was a "person" under the District of Columbia Consumer Protection Procedures Act ("District of Columbia CPPA"), D.C. CODE § 28-3901(a)(1).

475.    Claimants are "consumers," as defined by D.C. CODE § 28-3901(1)(2), who purchased or leased one or more Defective GM Vehicles.

476.    GM's actions as set forth herein constitute "trade practices" under D.C. CODE § 28-3901.

477.    GM participated in unfair or deceptive acts or practices that violated the District of Columbia CPPA.  By systematically concealing the defects in the Defective GM Vehicles, GM engaged in unfair or deceptive practices prohibited by the District of Columbia CPPA, D.C. CODE § 28-3901, *et seq.*, including:  (1) representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective GM Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the  Defective GM Vehicles with the intent not to sell them as advertised; (4) representing that the subject of a transaction involving the Defective GM Vehicles has been supplied in accordance with a previous representation when it has not; (5) misrepresenting as to a material fact which has a tendency to mislead; and (6) failing to state a material fact when such failure tends to mislead.

478.    In the course of its business in trade or commerce, GM systematically concealed the defects in the Defective GM Vehicles as described herein and otherwise engaged in activities

- 115 -

with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective GM Vehicles.

479.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

480.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

481.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

482.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the District of Columbia CPPA.

483.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

484.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

485.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

- 116 -

486.    GM knew or should have known that its conduct violated the District of Columbia CPPA.

487.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

488.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

   a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

   b.    Intentionally concealed the foregoing from Claimants;

   c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

489.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

490.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

491.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above

492.    As a direct and proximate result of GM's violations of the District of Columbia CPPA, Claimants have suffered injury-in-fact and/or actual damage.

493.    Claimants are entitled to recover treble damages or $1,500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the Court deems proper, under D.C. CODE § 28-3901.

494.    Claimants seek punitive damages against GM because its conduct evidences malice and/or egregious conduct.  GM maliciously and egregiously misrepresented the safety and reliability of the Defective GM Vehicles, deceived Claimants on life-or-death matters, concealed material facts that only it knew, and repeatedly promised Claimants that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting deadly flaws in the Defective GM Vehicles.  This unlawful conduct constitutes malice warranting punitive damages.

     **j.**    **Florida-Violations of the Florida Unfair & Deceptive Trade Practices Act (FLA. STAT. § 501.201, *et seq.*)**

495.    Claimants, on behalf of themselves and all Class members who are Florida residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

496.    Claimants are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

497.    GM engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

498.    The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …." FLA. STAT. § 501.204(1).  By concealing the known defects in Claimants' vehicles, GM participated in unfair and deceptive trade practices that violated the FUDTPA as described herein.  The defects in each vehicle include not only the specific defect (*e.g.*, the Power Steering Defect), but also include the defective process through which GM built cars, a process that included cost-cutting, minimizing the importance of safety issues, siloing, the depletion of resources devoted to recognizing and studying safety issues, the failure to follow acceptable engineering and inventory processes concerning parts management, and the failure to follow a proper FMEA process.  All of these defects would be material to a reasonable consumer.

499.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

500.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective GM Vehicles.

501.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the FUDTPA.

502.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

010440-11  1028180 V1

503.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

504.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

505.    GM knew or should have known that its conduct violated the FUDTPA.

506.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles and the GM brand that were either false or misleading.

507.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles because GM:

      a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.    Intentionally concealed the foregoing from Claimants;

      c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

508.    Because GM fraudulently concealed the defects, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects.  Further, Claimants had to spend their time and money to bring their Defective GM Vehicles in for repair.  Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their Defective GM Vehicles or would have paid less for them.

509.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

510.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they known the truth about the defects, Claimants either would have paid less for their Defective GM Vehicles or would not have purchased or leased them at all.

511.    GM's violations presented a continuing risk to Claimants as well as to the general public.   GM's unlawful acts and practices complained of herein affected the public interest.

512.    As a direct and proximate result of GM's violations of the FUDTPA, Claimants have suffered injury-in-fact and/or actual damage as alleged above.

513.    Claimants are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

      **k.    Georgia-Violations of Georgia's Fair Business Practices Act (GA. CODE § 10-1-390, *et seq.*)**

514.    Claimants, on behalf of themselves and all Class members who are Georgia residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

515.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b).

- 121 -

516.    By systematically concealing the defects in the Defective GM Vehicles, GM engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including: (1) representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective GM Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Defective GM Vehicles with the intent not to sell them as advertised. GM participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

517.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

518.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

519.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

520.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

521.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

522.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

010440-11  1028180 V1

523.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

524.    GM knew or should have known that its conduct violated the Georgia FBPA.

525.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

526.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
          Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
          reliability of the Defective GM Vehicles, while
          purposefully withholding material facts from Claimants
          that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
          disclose and remedy the defects.

527.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.  Claimants also

incurred repair costs, as alleged above.

528.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

529.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

- 123 -

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.

530.     As a direct and proximate result of GM's violations of the Georgia FBPA, Claimants have suffered injury-in-fact and/or actual damage.

531.     Claimants are entitled to recover damages and exemplary damages (for intentional violations) per GA. CODE. ANN § 10-1-399(a).

532.     Claimants also seek attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE. ANN § 10-1-399.

     **l.**     **Hawaii-Unfair and Deceptive Acts in violation of Hawaii Law (HAW. REV. STAT. § 480,** *et seq.***)**

533.     Claimants, on behalf of themselves and all Class members who are Hawaii residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

534.     GM was a "person" under HAW. REV. STAT. § 480-1.

535.     Claimants are "consumer[s]" as defined by HAW. REV. STAT. § 480-1.

536.     GM's acts or practices as set forth above occurred in the conduct of trade or commerce.

537.     The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…"  By systematically concealing the defects in the Defective GM Vehicles, GM engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

538.     In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

- 124 -

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

539.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

540.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Hawaii Act.

541.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

542.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

543.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

544.    GM knew or should have known that its conduct violated the Hawaii Act.

545.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

546.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
           Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
           reliability of the Defective GM Vehicles, while
           purposefully withholding material facts from Claimants
           that contradicted these representations; and/or

- 125 -

     d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

547.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

548.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

549.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

550.    As a direct and proximate result of GM's violations of the Hawaii Act, Claimants

have suffered injury-in-fact and/or actual damage.

551.    Pursuant to HAW. REV. STAT. § 480-13, Claimants seek monetary relief against

GM measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be

determined at trial.

552.    Under HAW. REV. STAT. § 480-13.5, Claimants seek an additional award

against GM of up to $10,000 for each violation directed at a Hawaiian elder.  GM knew or

should have known that its conduct was directed to one or more Claimants who are elders.  GM's

conduct caused one or more of these elders to suffer a substantial loss of property set aside for

retirement or for personal or family care and maintenance, or assets essential to the health or

welfare of the elder.  Elders are substantially more vulnerable to GM's conduct because of age,

poor health or infirmity, impaired understanding, restricted mobility, or disability, and each

Claimant-elder suffered substantial physical, emotional, or economic damage resulting from

GM's conduct.

> **m.**     **Idaho-Violations of the Idaho Consumer Protection Act (IDAHO CIV.
> CODE § 48-601, *et seq.*)**

553.     Claimants, on behalf of themselves and all Class members who are Idaho

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

554.     GM was a "person" under the Idaho Consumer Protection Act ("Idaho CPA"),

IDAHO CIV. CODE § 48-602(1).

555.     GM's acts or practices as set forth above occurred in the conduct of "trade" or

"commerce" under IDAHO CIV. CODE § 48-602(2).

556.     GM participated in misleading, false, or deceptive acts that violated the Idaho

CPA.  By systematically concealing the defects in the Defective GM Vehicles, GM engaged in

deceptive business practices prohibited by the Idaho CPA, including:  (1) representing that the

Defective GM Vehicles have characteristics, uses, and benefits which they do not have;

(2) representing that the Defective GM Vehicles are of a particular standard, quality, and grade

when they are not; (3) advertising the Defective GM Vehicles with the intent not to sell them as

advertised; (4) engaging in acts or practices which are otherwise misleading, false, or deceptive

to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct

of trade or commerce.  *See* IDAHO CIV. CODE § 48-603.

557.     GM's actions, as set forth above, occurred in the conduct of trade or commerce.

558.     In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

559.     GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

560.     By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Idaho CPA.

561.     In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

562.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

563.     GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

564.     GM knew or should have known that its conduct violated the Idaho CPA.

565.     As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

566.     GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

        a.     Possessed exclusive knowledge about the defects in the
               Defective GM Vehicles;

- 128 -

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

567.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

568.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

569.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

570.    As a direct and proximate result of GM's violations of the Idaho CPA, Claimants have suffered injury-in-fact and/or actual damage.

571.    Pursuant to IDAHO CODE § 48-608, Claimants seek monetary relief against GM measured as the greater of (a) actual damages and (b) statutory damages in the amount of $1,000 for each Claimant.

572.    Claimants also seek attorneys' fees, and any other just and proper relief available under the Idaho CPA.

010440-11  1028180 V1

### n.     Illinois-Violations of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, *et seq.* and 720 ILCS 295/1a)

573.    Claimants, on behalf of themselves and all Class members who are Illinois residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

574.    GM was a "person" as that term is defined in 815 ILCS 505/1(c).

575.    Claimants are "consumers" as that term is defined in 815 ILCS 505/1(e).

576.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

577.    GM participated in misleading, false, or deceptive acts that violated the Illinois CFA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Illinois CFA.

578.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

579.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

580.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

581.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Illinois CFA.

582.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

583.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

584.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

585.    GM knew or should have known that its conduct violated the Illinois CFA.

586.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

587.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.    Intentionally concealed the foregoing from Claimants;

      c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

010440-11  1028180 V1

588.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

589.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

590.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

591.    As a direct and proximate result of GM's violations of the Illinois CFA, Claimants have suffered injury-in-fact and/or actual damage.

592.    Pursuant to 815 ILCS 505/10a(a), Claimants seek monetary relief in the amount of actual damages, as well as punitive damages because GM acted with fraud and/or malice and/or was grossly negligent, attorneys' fees, and such other relief as may be just and proper under the Illinois CFA.

> **o.**    **Indiana-Violations of the Indiana Deceptive Consumer Sales Act (IND. CODE § 24-5-0.5-3, *et seq.*)**

593.    Claimants, on behalf of themselves and all Class members who are Indiana residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

594.    GM was a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a
"supplier" within the meaning of IND. CODE § 24-5-.05-2(a)(3).

595.    Claimants' purchases of the Defective GM Vehicles were "consumer
transactions" within the meaning of IND. CODE § 24-5-.05-2(a)(1).

596.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person
from engaging in a "deceptive trade practice," which includes representing:  "(1) That such
subject of a consumer transaction has sponsorship, approval, performance, characteristics,
accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval,
status, affiliation, or connection it does not have[;] (2) That such subject of a consumer
transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier
knows or should reasonably know that it is not[;] …[and] (7) That the supplier has a sponsorship,
approval or affiliation in such consumer transaction that the supplier does not have, and which
the supplier knows or should reasonably know that the supplier does not have…." IND. CODE
§ 24-5-.05-3(a)-(b).  Under the Indiana DCSA, "Any representations on or within a product or its
packaging or in advertising or promotional materials which would constitute a deceptive act shall
be the deceptive act both of the supplier who places such a representation thereon or therein, or
who authored such materials, and such suppliers who shall state orally or in writing that such
representation is true if such other supplier shall know or have reason to know that such
representation was false."  IND. CODE § 24-5-.05-3(c).

597.    GM participated in misleading, false, or deceptive acts that violated the Indiana
DCSA.  By systematically concealing the defects in the Defective GM Vehicles, GM engaged in
deceptive business practices prohibited by the Indiana DCSA.  GM also engaged in unlawful
trade practices by:  (1) representing that the Defective GM Vehicles have characteristics, uses,

benefits, and qualities which they do not have; (2) representing that the Defective GM Vehicles

are of a particular standard and quality when they are not; (3) advertising the Defective GM

Vehicles with the intent not to sell them as advertised; and (4) otherwise engaging in conduct

likely to deceive.

598.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

599.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

600.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

601.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Indiana DCSA.

602.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

603.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

604.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

605.    GM knew or should have known that its conduct violated the Indiana DCSA.

606.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

607.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

   a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

   b.    Intentionally concealed the foregoing from Claimants;

   c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

   d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

608.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

609.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

610.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

010440-11  1028180 V1

611.    As a direct and proximate result of GM's violations of the Indiana DCSA,

Claimants have suffered injury-in-fact and/or actual damage.

612.    Pursuant to IND. CODE § 24-5-0.5-4, Claimants seek monetary relief against GM

measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

statutory damages in the amount of $500 for each Claimant, including treble damages up to

$1,000 for GM's willfully deceptive acts.

### p.    Iowa-Violations of the Private Right of Action for Consumer Frauds Act (IOWA CODE § 714H.1, *et seq.*)

613.    Claimants, on behalf of themselves and all Class members who are Iowa residents

(for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs

as though fully set forth herein.

614.    GM was a "person" under IOWA CODE § 714H.2(7).

615.    Claimants are "consumers," as defined by IOWA CODE § 714H.2(3), who

purchased or leased one or more Defective GM Vehicles from GM.

616.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA")

prohibits any "practice or act the person knows or reasonably should know is an unfair practice,

deception, fraud, false pretense, or false promise, or the misrepresentation, concealment,

suppression, or omission of a material fact, with the intent that others rely upon the unfair

practice, deception, fraud, false pretense, false promise, misrepresentation, concealment,

suppression, or omission in connection with the advertisement, sale, or lease of consumer

merchandise."  IOWA CODE § 714H.3.  GM participated in misleading, false, or deceptive acts

that violated the Iowa CFA.  By systematically concealing the defects in the Defective GM

Vehicles, GM engaged in deceptive business practices prohibited by the Iowa CFA.

617.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

- 136 -

618.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

619.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

620.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Iowa CFA.

621.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

622.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

623.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

624.    GM knew or should have known that its conduct violated the Iowa CFA.

625.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

626.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

        a.    Possessed exclusive knowledge about the defects in the
              Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

627.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

628.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

629.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

630.    As a direct and proximate result of GM's violations of the Iowa CFA, Claimants have suffered injury-in-fact and/or actual damage.

631.    Pursuant to IOWA CODE § 714H.5, Claimants seek actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of GM's willful and wanton disregard for the rights or safety of others; attorneys' fees; and such other relief as the Court deems necessary under the Iowa CFA.

- 138 -

q.    **Kansas-Violations of the Kansas Consumer Protection Act (KAN. STAT. § 50-623, *et seq.*)**

632.    Claimants, on behalf of themselves and all Class members who are Kansas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

633.    GM was a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. § 50-624(l).

634.    Claimants are "consumers," within the meaning of KAN. STAT. § 50-624(b), who purchased or leased one or more Defective GM Vehicles.

635.    Each sale of a Defective GM Vehicle to Claimants was a "consumer transaction" within the meaning of KAN. STAT. § 50-624(c).

636.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. § 50-626(a), and that deceptive acts or practices include:  (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."  The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."  KAN. STAT. § 50-627(a).

637.    GM participated in misleading, false, or deceptive acts that violated the Kansas CPA.  By systematically concealing the defects in Defective GM Vehicles, GM engaged in

- 139 -

deceptive business practices prohibited by the Kansas CPA.  GM also engaged in unlawful trade practices by:  (1) representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective GM Vehicles are of a particular standard and quality when they are not; (3) advertising the Defective GM Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

638.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

639.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

640.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

641.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Kansas CPA.

642.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

010440-11  1028180 V1

643.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

644.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

645.    GM knew or should have known that its conduct violated the Kansas CPA.

646.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

647.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

648.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

649.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

010440-11  1028180 V1

650.     Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

651.     As a direct and proximate result of GM's violations of the Kansas CPA, Claimants have suffered injury-in-fact and/or actual damage.

652.     Pursuant to KAN. STAT. § 50-634, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Claimant.

653.     Claimants also seek attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN § 50-623, *et seq.*

**r.     Kentucky-Violations of the Kentucky Consumer Protection Act (KY. REV. STAT. § 367.110, *et seq.*)**

654.     Claimants, on behalf of themselves and all Class members who are Kentucky residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

655.     GM and Claimants are "persons" within the meaning of KY. REV. STAT. § 367.110(1).

656.     GM engaged in "trade" or "commerce" within the meaning of KY. REV. STAT. § 367.110(2).

657.     The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce …."  KY. REV. STAT. § 367.170(1).  GM participated in misleading, false, or

deceptive acts that violated the Kentucky CPA.  By systematically concealing the defects in the

Defective GM Vehicles, GM engaged in deceptive business practices prohibited by the Kentucky

CPA.

658.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

659.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

660.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

661.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Kentucky CPA.

662.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

663.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

664.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

665.    GM knew or should have known that its conduct violated the Kentucky CPA.

666.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

667.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

668.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

669.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

670.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

671.    As a direct and proximate result of GM's violations of the Kentucky CPA,

Claimants have suffered injury-in-fact and/or actual damage.

672.    Pursuant to KY. REV. STAT. § 367.220, Claimants seek to recover actual damages

in an amount to be determined at trial; attorneys' fees; and any other just and proper relief

available under KY. REV. STAT. § 367.220.

> s.    **Louisiana-Violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (LA. REV. STAT. § 51:1401, *et seq.*)**

673.    Claimants, on behalf of themselves and all Class members who are Louisiana

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

674.    GM and Claimants are "persons" within the meaning of the LA. REV. STAT.

§ 51:1402(8).

675.    Claimants are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

676.    GM engaged in "trade" or "commerce" within the meaning of LA. REV. STAT.

§ 51:1402(9).

677.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana

CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce."

LA. REV. STAT. § 51:1405(A).  GM participated in misleading, false, or deceptive acts that

violated the Louisiana CPL.  By systematically concealing the defects in Defective GM Vehicles,

GM engaged in deceptive business practices prohibited by the Louisiana CPL.

678.    GM participated in misleading, false, or deceptive acts that violated the Louisiana

CPL.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive

business practices prohibited by the Louisiana CPL.

679.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

- 145 -

680.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Defective GM Vehicles.

681.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

682.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

683.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

684.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Louisiana CPL.

685.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

010440-11  1028180 V1

686.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

687.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

688.    GM knew or should have known that its conduct violated the Louisiana CPL.

689.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

690.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.    Intentionally concealed the foregoing from Claimants;

      c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

691.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

692.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

- 147 -

693.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

694.    As a direct and proximate result of GM's violations of the Louisiana CPL, Claimants have suffered injury-in-fact and/or actual damage.

695.    Pursuant to LA. REV. STAT. § 51:1409, Claimants seek to recover actual damages in an amount to be determined at trial; treble damages for GM's knowing violations of the Louisiana CPL; attorneys' fees; and any other just and proper relief.

> **t.    Maine-Violations of Maine Unfair Trade Practices Act (ME. REV. STAT. TIT. 5 § 205-A,** *et seq.***)**

696.    Claimants, on behalf of themselves and all Class members who are Maine residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

697.    GM and Claimants are "persons" within the meaning of ME. REV. STAT. TIT. § 206(2).

698.    GM was engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. TIT. § 206(3).

699.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."  ME. REV. STAT. TIT. 5 § 207.  GM participated in misleading, false, or deceptive acts that violated the Maine UTPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Maine UTPA.

700.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

701.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

702.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

703.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Maine UTPA.

704.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

705.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

706.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

707.    GM knew or should have known that its conduct violated the Maine UTPA.

708.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

709.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

710.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

711.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

712.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

713.    As a direct and proximate result of GM's violations of the Maine UTPA, Claimants have suffered injury-in-fact and/or actual damage.

714.    Pursuant to ME. REV. STAT. TIT. 5 § 213, Claimants seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Maine UTPA.

- 150 -

u.    **Maryland-Violations of the Maryland Consumer Protection Act (M**D. **C**ODE **C**OM. **L**AW § 13-101, *et seq.***)**

715.    Claimants, on behalf of themselves and all Class members who are Maryland residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

716.    GM and Claimants are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

717.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good.  MD. COM. LAW CODE § 13-303.  GM engaged in misleading, false, or deceptive acts that violated the Maryland CPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Maryland CPA.

718.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

719.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

720.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

721.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Maryland CPA.

- 151 -

722.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

723.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

724.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

725.    GM knew or should have known that its conduct violated the Maryland CPA.

726.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

727.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

728.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

- 152 -

729.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

730.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

731.    As a direct and proximate result of GM's violations of the Maryland CPA, Claimants have suffered injury-in-fact and/or actual damage.

732.    Pursuant to MD. CODE COM. LAW § 13-408, Claimants seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

v.    **Massachusetts-Deceptive acts or practices prohibited by Massachusetts law (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)**

733.    Claimants, on behalf of themselves and all Class members who are Massachusetts residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

734.    GM and Claimants are "persons" within the meaning of MASS. GEN. LAWS Ch. 93A, § 1(a).

735.    GM engaged in "trade" or "commerce" within the meaning of MASS. GEN. LAWS Ch. 93A, § 1(b).

736.    Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  MASS. GEN. LAWS Ch. 93A, § 2.  GM participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By

concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Massachusetts Act.

737.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

738.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

739.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

740.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

741.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

742.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

743.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

744.    GM knew or should have known that its conduct violated the Massachusetts Act.

745.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

010440-11  1028180 V1

746.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

747.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

748.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

749.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

750.    As a direct and proximate result of GM's violations of the Massachusetts Act,

Claimants have suffered injury-in-fact and/or actual damage.

- 155 -

751.    Pursuant to MASS. GEN. LAWS Ch. 93A, § 9, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Claimant.  Because GM's conduct was committed willfully and knowingly, Claimants are entitled to recover, for each Claimant, up to three times the actual damages, but no less than two times the actual damages.

752.    Claimants also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

> **w.    Michigan-Violations of the Michigan Consumer Protection Act
> (MICH. COMP. LAWS § 445.903, *et seq.*)**

753.    Claimants, on behalf of themselves and all Class members who are Michigan residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

754.    At all relevant times hereto, GM was a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

755.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …."  MICH. COMP. LAWS § 445.903(1).  GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that goods or services have … characteristics … that they do not have ….;" "(e) Representing that goods or services are of a particular standard … if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person

reasonably believes the represented or suggested state of affairs to be other than it actually is;"
and "(cc) Failing to reveal facts that are material to the transaction in light of representations of
fact made in a positive manner." MICH. COMP. LAWS § 445.903(1). By concealing the known
defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the
Michigan CPA.

756. GM's actions, as set forth above, occurred in the conduct of trade or commerce.

757. In the course of its business, GM concealed the defects in Claimants' vehicles as
described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM
also engaged in unlawful trade practices by employing deception, deceptive acts or practices,
fraud, misrepresentations, or concealment, suppression or omission of any material fact with
intent that others rely upon such concealment, suppression or omission, in connection with the
sale of Defective GM Vehicles.

758. GM knew of serious defects affecting the Defective GM Vehicles owned or
leased by Claimants.

759. By failing to disclose and by actively concealing the defects in Claimants'
vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and
deceptive business practices in violation of the Michigan CPA.

760. In the course of GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Claimants' vehicles.

761. GM's unfair or deceptive acts or practices were likely to and did in fact deceive
reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

762. GM intentionally and knowingly misrepresented material facts regarding the
Defective GM Vehicles with the intent to mislead Claimants.

763.    GM knew or should have known that its conduct violated the Michigan CPA.

764.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

765.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.     Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.     Intentionally concealed the foregoing from Claimants;

      c.     Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

766.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

767.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

768.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

010440-11  1028180 V1

769.    As a direct and proximate result of GM's violations of the Michigan CPA,

Claimants have suffered injury-in-fact and/or actual damage.

770.    Claimants seek monetary relief against GM measured as the greater of (a) actual

damages in an amount to be determined at trial and (b) statutory damages in the amount of $250

for each Claimant; reasonable attorneys' fees; and any other just and proper relief available

under MICH. COMP. LAWS § 445.911.

> **x.    Minnesota**
>
> **(1)    Violations of Minnesota Prevention of Consumer Fraud Act
> (MINN. STAT § 325F.68, *et seq.*)**

771.    Claimants, on behalf of themselves and all Class members who are Minnesota

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

772.    The Defective GM Vehicles constitute "merchandise" within the meaning of

MINN. STAT. § 325F.68(2).

773.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

"[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

misrepresentation, misleading statement or deceptive practice, with the intent that others rely

thereon in connection with the sale of any merchandise, whether or not any person has in fact

been misled, deceived, or damaged thereby."  MINN. STAT. § 325F.69(1).  GM participated in

misleading, false, or deceptive acts that violated the Minnesota CFA.  By concealing the known

defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the

Minnesota CFA.

774.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

775.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

776.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

777.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Minnesota CFA.

778.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

779.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

780.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

781.    GM knew or should have known that its conduct violated the Minnesota CFA.

782.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

783.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

- 160 -

b.  Intentionally concealed the foregoing from Claimants;

c.  Made incomplete representations about the safety and
    reliability of the Defective GM Vehicles, while
    purposefully withholding material facts from Claimants
    that contradicted these representations; and/or

d.  Had duties under the TREAD Act and related regulations to
    disclose and remedy the defects.

784.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

785.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

786.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

787.    As a direct and proximate result of GM's violations of the Minnesota CFA,

Claimants have suffered injury-in-fact and/or actual damage.

788.    Pursuant to MINN. STAT. § 8.31(3a), Claimants seek actual damages, attorneys'

fees, and any other just and proper relief available under the Minnesota CFA.

789.    Claimants also seek punitive damages under MINN. STAT. § 549.20(1)(a) given

the clear and convincing evidence that GM's acts showed deliberate disregard for the rights or

safety of others.

- 161 -

(2)    **Violations of Minnesota Uniform Deceptive Trade Practices Act (MINN. STAT. § 325D.43-48, *et seq.*)**

790.    Claimants, on behalf of themselves and all Class members who are Minnesota residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

791.    The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."  MINN. STAT. § 325D.44.  In the course of GM's business, it systematically concealed the defects in Defective GM Vehicles and engaged in deceptive practices by representing that Defective GM Vehicles have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that Defective GM Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising Defective GM Vehicles with intent not to sell them as advertised.  GM participated in misleading, false, or deceptive acts that violated the Minnesota DTPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Minnesota DTPA.

792.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

793.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

794.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

795.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Minnesota DTPA.

796.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

797.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

798.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

799.    GM knew or should have known that its conduct violated the Minnesota DTPA.

800.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

801.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while

- 163 -

purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

802.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

803.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

804.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

805.    As a direct and proximate result of GM's violations of the Minnesota DTPA,

Claimants have suffered injury-in-fact and/or actual damage.

806.    Pursuant to MINN. STAT. §§ 8.31(3a) and 325D.45, Claimants seek actual

damages, attorneys' fees, and any other just and proper relief available under the Minnesota

DTPA.

807.    Claimants also seek punitive damages under MINN. STAT. § 549.20(1)(a) given

the clear and convincing evidence that GM's acts showed deliberate disregard for the rights or

safety of others.

y.    **Mississippi-Violations of Mississippi Consumer Protection Act (MISS. CODE § 75-24-1,** *et seq.***)**

808.    Claimants, on behalf of themselves and all Class members who are Mississippi residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

809.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE. ANN. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(i) Advertising goods or services with intent not to sell them as advertised."

810.    GM participated in deceptive trade practices that violated the Mississippi CPA as described herein, including representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective GM Vehicles are of a particular standard and quality when they are not; and advertising Defective GM Vehicles with the intent not to sell them as advertised.

811.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

812.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with

- 165 -

intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

813.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

814.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Mississippi CPA.

815.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

816.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

817.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

818.    GM knew or should have known that its conduct violated the Mississippi CPA.

819.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

820.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

821.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

822.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

823.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

824.    As a direct and proximate result of GM's violations of the Mississippi CPA, Claimants have suffered injury-in-fact and/or actual damage.

825.    Claimants seek actual damages in an amount to be determined at trial and any other just and proper relief available under the Mississippi CPA.

      z.     **Missouri-Violations of Missouri Merchandising Practices Act (MO. REV. STAT. § 407.010, *et seq.*)**

826.    Claimants, on behalf of themselves and all Class members who are Missouri residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

827.    GM and Claimants are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

- 167 -

828.    GM engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

829.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  MO. REV. STAT. § 407.020.

830.    In the course of its business, GM systematically omitted, suppressed, and concealed the defects in the Defective GM Vehicles as described herein.  By failing to disclose these defects or facts about the defects described herein known to it or that were available to GM upon reasonable inquiry, GM deprived consumers of material facts about the safety and functionality of their vehicles.  By failing to release material facts about the defects, GM curtailed or reduced the ability of consumers to take notice of material facts about their vehicles, and/or it affirmatively operated to hide or keep those facts from consumers.  15 MO. CODE OF SERV. REG. § 60-9.110.  Moreover, GM otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

831.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

832.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

- 168 -

fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

833.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

834.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Missouri MPA.

835.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

836.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

837.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

838.   GM knew or should have known that its conduct violated the Missouri MPA.

839.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

840.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

> a.   Possessed exclusive knowledge about the defects in the Defective GM Vehicles;
>
> b.   Intentionally concealed the foregoing from Claimants;
>
> c.   Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

841.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

842.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

843.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

844.    As a direct and proximate result of GM's violations of the Missouri MPA, Claimants have suffered injury-in-fact and/or actual damage.

845.    GM has liability to Claimants for damages, attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

    **aa.    Montana-Violations of the Montana Consumer Protection Act (MONT. CODE § 30-14-101, *et seq.*)**

846.    Claimants, on behalf of themselves and all Class members who are Montana residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

847.    GM and Claimants are "persons" within the meaning of MONT. CODE § 30-14-102(6).

010440-11  1028180 V1

848.    Claimants are "consumer[s]" under MONT. CODE § 30-14-102(1).

849.    The sale or lease of the Defective GM Vehicles to Claimants occurred within "trade and commerce" within the meaning of MONT. CODE § 30-14-102(8), and GM committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

850.    The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE § 30-14-103. By systematically devaluing safety and concealing a plethora of defects in Claimants' vehicles, GM engaged in unfair and deceptive acts or practices in violation of the Montana CPA.

851.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

852.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

853.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Montana CPA.

854.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

855.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

856.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

857.    GM knew or should have known that its conduct violated the Montana CPA.

858.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

859.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

     a.     Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

     b.     Intentionally concealed the foregoing from Claimants;

     c.     Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

860.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

861.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

862.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

863.    As a direct and proximate result of GM's violations of the Montana CPA, Claimants have suffered injury-in-fact and/or actual damages.

864.    Because GM's unlawful methods, acts, and practices have caused Claimants to suffer an ascertainable loss of money and property, Claimants seek actual damages or $500 per Class member, whichever is greater, discretionary treble damages, reasonable attorneys' fees, and any other relief the Court considers necessary or proper, under MONT. CODE § 30-14-133.

### bb.    Nebraska-Violations of the Nebraska Consumer Protection Act (NEB. REV. STAT. § 59-1601, *et seq.*)

865.    Claimants, on behalf of themselves and all Class members who are Nebraska residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

866.    GM and Claimants are "person[s]" under the Nebraska Consumer Protection Act ("Nebraska CPA"), NEB. REV. STAT. § 59-1601(1).

867.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

868.    The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  NEB. REV. STAT. § 59-1602.  GM engaged in misleading, false, or deceptive acts that violated the Nebraska CPA.  By concealing the known defects in Claimants' vehicles, GM engaged in deceptive business practices prohibited by the Nebraska CPA.

869.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

870.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

871.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

872.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Nebraska CPA.

873.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

874.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

875.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

876.   GM knew or should have known that its conduct violated the Nebraska CPA.

877.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

878.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.      Possessed exclusive knowledge about the defects in the
        Defective GM Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and
        reliability of the Defective GM Vehicles, while
        purposefully withholding material facts from Claimants
        that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to
        disclose and remedy the defects.

879.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

880.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

881.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

882.    As a direct and proximate result of GM's violations of the Nebraska CPA,

Claimants have suffered injury-in-fact and/or actual damage.

883.    Because GM's conduct caused damage to Claimants' property through violations

of the Nebraska CPA, Claimants seek recovery of actual damages, as well as enhanced damages

up to $1,000 per Claimant, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

        **cc.**    **Nevada-Violations of the Nevada Deceptive Trade Practices Act (NEV. REV. STAT. § 598.0903, *et seq.*)**

884.    Claimants, on behalf of themselves and all Class members who are Nevada residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

885.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.* prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

886.    GM engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Defective GM Vehicles have uses and benefits which they do not have; representing that Defective GM Vehicles are of a particular standard, quality, and grade when they are not; advertising Defective GM Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective GM

Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

887.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

888.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

889.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

890.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Nevada DTPA.

891.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

892.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

893.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

894.    GM knew or should have known that its conduct violated the Nevada DTPA.

895.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

010440-11  1028180 V1

896.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
              Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
              reliability of the Defective GM Vehicles, while
              purposefully withholding material facts from Claimants
              that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
              disclose and remedy the defects.

897.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

898.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

899.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

900.    As a direct and proximate result of GM's violations of the Nevada DTPA,

Claimants have suffered injury-in-fact and/or actual damage.

010440-11  1028180 V1

901.    Accordingly, Claimants seek their actual damages, punitive damages, and all other appropriate and available remedies under the the Nevada DTPA.  NEV. REV. STAT. § 41.600.

  **dd. New Hampshire-Violations of N.H. Consumer Protection Act (N.H. REV. STAT. § 358-A:1, *et seq.*)**

902.    Claimants, on behalf of themselves and all Class members who are New Hampshire residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

903.    GM and Claimants are "persons" under the New Hampshire Consumer Protection Act ("New Hampshire CPA"), N.H. REV. STAT. § 358-A:1.

904.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. § 358-A:1.

905.    The New Hampshire CPA prohibits a person, in the conduct of any trade or commerce, from using "any unfair or deceptive act or practice," including "but … not limited to, the following: … (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have;" "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another;" and "(IX) Advertising goods or services with intent not to sell them as advertised."  N.H. REV. STAT. § 358-A:2.

906.    GM participated in unfair or deceptive acts or practices that violated the New Hampshire CPA as described above and below.  By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in deceptive business practices prohibited by the CPA, including representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they did not; representing that Defective Ignition Switch Vehicles are of a particular standard, quality, and grade when they were not; advertising

- 179 -

Defective Ignition Switch Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Defective Ignition Switch Vehicles had been supplied in accordance with a previous representation when it had not; and engaging in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

907.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

908.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

909.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

910.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New Hampshire CPA.

911.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

912.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

913.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

- 180 -

914.    GM knew or should have known that its conduct violated the New Hampshire

CPA.

915.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

916.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
          Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
          reliability of the Defective GM Vehicles, while
          purposefully withholding material facts from Claimants
          that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to
          disclose and remedy the defects.

917.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

918.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

919.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

920.    As a direct and proximate result of GM's violations of the New Hampshire CPA, Claimants have suffered injury-in-fact and/or actual damage.

921.    Because GM's willful conduct caused injury to Claimants' property through violations of the New Hampshire CPA, Claimants seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and proper relief under N.H. REV. STAT. § 358-A:10.

ee.    **New Jersey-Violations of the New Jersey Consumer Fraud Act (N.J. STAT. § 56:8-1, *et seq.*)**

922.    Claimants, on behalf of themselves and all Class members who are New Jersey residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

923.    GM and Claimants are or were "persons" within the meaning of N.J. STAT. § 56:8-1(d).

924.    GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT. § 56:8-1(c), (d).

925.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby ...." N.J. STAT. § 56:8-2.  GM

- 182 -

engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Claimants rely upon their acts, concealment, suppression or omissions.

926.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

927.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

928.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

929.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New Jersey CFA.

930.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

931.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

932.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

933.    GM knew or should have known that its conduct violated the New Jersey CFA.

- 183 -

934.    As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

935.    GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

936.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

937.    GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

938.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

939.    As a direct and proximate result of GM's violations of the New Jersey CFA, Claimants have suffered injury-in-fact and/or actual damage.

940.    Claimants are entitled to recover legal and/or equitable relief including treble damages, costs and reasonable attorneys' fees pursuant to N.J. STAT. § 56:8-19, and any other just and appropriate relief.

**ff.    New Mexico-Violations of the New Mexico Unfair Trade Practices Act (N.M. STAT. §§ 57-12-1, *et seq.*)**

941.    Claimants, on behalf of themselves and all Class members who are New Mexico residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

942.    GM and Claimants are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. STAT. § 57-12-2.

943.    GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. § 57-12-2.

944.    The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive."  N.M. STAT. § 57-12-2(D).  GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. STAT. § 57-12-2(D).  In addition, GM's actions constitute unconscionable actions under N.M. STAT. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of Claimants to a grossly unfair degree.

945.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

- 185 -

946.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

947.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

948.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New Mexico UTPA.

949.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

950.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

951.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

952.    GM knew or should have known that its conduct violated the New Mexico UTPA.

953.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

954.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
          Defective GM Vehicles;

- 186 -

b.        Intentionally concealed the foregoing from Claimants;

c.        Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.        Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

955.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

956.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

957.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

958.    As a direct and proximate result of GM's violations of the New Mexico UTPA, Claimants have suffered injury-in-fact and/or actual damage.

959.    Because GM's unconscionable, willful conduct caused actual harm to Claimants, Claimants seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. § 57-12-10.

- 187 -

gg.    **New York**

(1)    **Violations of the New York General Business Law
(N.Y. GEN. BUS. LAW §§ 349 and 350)**

960.    Claimants, on behalf of themselves and all Class members who are New York residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

961.    Claimants are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. GEN. BUS. LAW § 349(h).

962.    GM is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

963.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. GM's conduct, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL. Furthermore, GM's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Defective GM Vehicles, was conduct directed at consumers.

964.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

965.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

966.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

967.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the New York GBL.

968.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

969.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

970.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

971.    GM knew or should have known that its conduct violated the New York GBL.

972.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

973.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

974.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

975.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

976.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

977.    As a direct and proximate result of GM's violations of the New York GBL, Claimants have suffered injury-in-fact and/or actual damage.

978.    Because GM's willful and knowing conduct caused injury to Claimants, Claimants seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

### (2)    Violations of New York's False Advertising Act (N.Y. GEN. BUS. LAW § 350)

979.    Claimants, on behalf of themselves and all Class members who are New York residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

010440-11  1028180 V1

980.    GM was engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

981.    N.Y. GEN. BUS. LAW § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …."  N.Y. GEN. BUS. LAW § 350-a.

982.    GM caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers and Claimants.

983.    GM violated § 350 because the misrepresentations and omissions regarding the defects, and GM's systemic devaluation of safety, as set forth above, were material and likely to deceive a reasonable consumer.

984.    Claimants have suffered an injury, including the loss of money or property, as a result of GM's false advertising.  In purchasing or leasing their vehicles, Claimants relied on the misrepresentations and/or omissions of GM with respect to the safety and reliability of the Defective GM Vehicles.  GM's representations were false and/or misleading because the concealed defects and safety issues seriously undermined the value of the Defective GM Vehicles.  Had Claimants known this, they would not have purchased or leased their Defective GM Vehicles and/or paid as much for them.

985.    Pursuant to N.Y. GEN. BUS. LAW § 350e, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b)

statutory damages in the amount of $500 for each Claimant.  Because GM's conduct was committed willfully and knowingly, Claimants are entitled to recover three times actual damages, up to $10,000 per Claimant, attorneys' fees, and any other just and proper relief available under General Business Law §§ 349–350.

### hh.    North Carolina-Violations of North Carolina's Unfair and Deceptive Practices Act (N.C. Gen. Stat. § 75-1.1, *et seq.*)

986.    Claimants, on behalf of themselves and all Class members who are North Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

987.    GM engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

988.    The North Carolina Unfair and Deceptive Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(a).  As alleged above and below, GM willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

989.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

990.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

991.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

010440-11  1028180 V1

992.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the North Carolina Act.

993.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

994.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

995.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

996.    GM knew or should have known that its conduct violated the North Carolina Act.

997.    As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

998.    GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

999.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1000.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1001.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1002.   As a direct and proximate result of GM's violations of the North Carolina Act, Claimants have suffered injury-in-fact and/or actual damage.

1003.   Claimants seek an order for treble their actual damages, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16

> ii.     **North Dakota-Violations of the North Dakota Consumer Fraud Act (N.D. CENT. CODE § 51-15-02, *et seq.*)**

1004.   Claimants, on behalf of themselves and all Class members who are North Dakota residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1005.   GM and Claimants are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

1006.   GM engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

1007.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…." N.D. CENT. CODE § 51-15-02. As set forth above and below, GM committed deceptive acts or practices, with the intent that Claimants rely thereon in connection with their purchase or lease of the Defective GM Vehicles.

1008.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1009.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1010.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1011.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the North Dakota CFA.

1012.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1013.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

- 195 -

1014.   GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1015.   GM knew or should have known that its conduct violated the North Dakota CFA.

1016.   As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

1017.   GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

   a.      Possessed exclusive knowledge about the defects in the
           Defective GM Vehicles;

   b.      Intentionally concealed the foregoing from Claimants;

   c.      Made incomplete representations about the safety and
           reliability of the Defective GM Vehicles, while
           purposefully withholding material facts from Claimants
           that contradicted these representations; and/or

   d.      Had duties under the TREAD Act and related regulations to
           disclose and remedy the defects.

1018.   Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1019.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1020.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

- 196 -

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1021.   As a direct and proximate result of GM's violations of the North Dakota CFA, Claimants have suffered injury-in-fact and/or actual damage.

1022.   Further, GM knowingly committed the conduct described above, and thus, under N.D. CENT. CODE § 51-15-09, GM is liable to Claimants for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.

>    **jj.**    **Ohio-Violations of Ohio Consumer Sales Practices Act (OHIO REV. CODE § 1345.01, *et seq.*)**

1023.   Claimants, on behalf of themselves and all Class members who are Ohio residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1024.   GM is a "supplier" as that term is defined in OHIO REV. CODE § 1345.01(C).

1025.   Claimants are "consumers" as that term is defined in OHIO REV. CODE § 1345.01(D), and their purchases and leases of the Defective GM Vehicles are "consumer transactions" within the meaning of OHIO REV. CODE § 1345.01(A).

1026.   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), OHIO REV. CODE § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  GM's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of OHIO REV. CODE § 1345.02.

1027.   By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective GM Vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Defective GM Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

1028.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1029.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1030.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1031.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

1032.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1033.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1034.   GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1035.   GM knew or should have known that its conduct violated the Ohio CSPA.

1036.   As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

1037.   GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1038.   Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1039.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1040.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1041.   As a direct and proximate result of GM's violations of the Ohio CSPA, Claimants have suffered injury-in-fact and/or actual damages.

1042.   Claimants seek punitive damages against GM because its conduct was egregious. GM misrepresented the safety and reliability of millions of vehicles, concealed myriad defects in millions of GM vehicles and the systemic safety issues plaguing GM, deceived Claimants on life-or-death matters, and concealed material facts that only GM knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of vehicles.  GM's egregious conduct warrants punitive damages.

1043.   Claimants specifically do not allege herein a claim for violation of OHIO REV. CODE § 1345.72.

1044.   GM was on notice pursuant to OHIO REV. CODE § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at *33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, GM's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate the Ohio CSPA and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of OHIO REV. CODE § 1345.05.  The applicable rule and Ohio court opinions include, but are not limited to:  OHIO ADMIN. CODE 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No.

342098 (2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085

(2000); and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017,

unreported (PIF #10001874).

1045.   As a result of the foregoing wrongful conduct of GM, Claimants have been

damaged, and seek all just and proper remedies, including, but not limited to, actual and statutory

damages, court costs and reasonable attorneys' fees, pursuant to OHIO REV. CODE § 1345.09,

*et seq.*

      **kk.**    **Oklahoma-Violations of the Oklahoma Consumer Protection Act
(OKLA. STAT. TIT. 15 § 751, *et seq.*)**

1046.   Claimants, on behalf of themselves and all Class members who are Oklahoma

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1047.   Claimants are "persons" under the Oklahoma Consumer Protection Act

("Oklahoma CPA"), OKLA. STAT. TIT. 15 § 752.

1048.   GM is a "person," "corporation," or "association" within the meaning of OKLA.

STAT. TIT. 15 § 15-751(1).

1049.   The sale or lease of the Defective GM Vehicles to Claimants was a "consumer

transaction" within the meaning of OKLA. STAT. TIT. 15 § 752, and GM's actions as set forth

herein occurred in the conduct of trade or commerce.

1050.   The Oklahoma CPA declares unlawful, *inter alia*, the following acts or practices

when committed in the course of business:  "mak[ing] a false or misleading representation,

knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject

of a consumer transaction," or making a false representation, "knowingly or with reason to

know, that the subject of a consumer transaction is of a particular standard, style or model, if it is

- 201 -

of another," or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer

transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or

deceptive trade practice." *See* OKLA. STAT. TIT. 15, § 753.

1051.    By systematically devaluing safety and concealing a plethora of defects in GM

vehicles, GM engaged in unfair and deceptive business practices prohibited by the Oklahoma

CPA, including:  representing that Defective GM Vehicles have characteristics, uses, benefits,

and qualities which they do not have; representing that Defective GM Vehicles are of a particular

standard, quality, and grade when they are not; advertising Defective GM Vehicles with the

intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other

practices that have deceived or could reasonably be expected to deceive or mislead; and

engaging in practices which offend established public policy or are immoral, unethical,

oppressive, unscrupulous or substantially injurious to consumers.

1052.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

1053.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

1054.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Oklahoma CPA.

010440-11  1028180 V1

1055.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1056.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1057.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1058.   GM knew or should have known that its conduct violated the Oklahoma CPA.

1059.   GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1060.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

     a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

     b.      Intentionally concealed the foregoing from Claimants;

     c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

     d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1061.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

010440-11  1028180 V1

1062.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1063.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1064.   As a direct and proximate result of GM's violations of the Oklahoma CPA, Claimants have suffered injury-in-fact and/or actual damage.

1065.   Claimants seek punitive damages because GM's conduct was egregious.  GM misrepresented the safety and reliability of millions of GM vehicles, concealed myriad defects in millions of GM vehicles and the systemic safety issues plaguing GM, deceived Claimants on life-or-death matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in its culture and in millions of GM vehicles.  GM's egregious conduct warrants punitive damages.

1066.   GM's conduct as alleged herein was unconscionable because (1) GM, knowingly or with reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, GM knew or had reason to know that the price grossly exceeded the price at which similar vehicles were readily obtainable in similar transactions by like consumers; and (3) GM knew or had reason to know that the transaction GM induced the consumer to enter into was excessively one-sided in favor of GM.

1067.   Because GM's unconscionable conduct caused injury to Claimants, Claimants seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15 § 761.1, and any other just and proper relief available under the Oklahoma CPA.

### ll.    Oregon-Violations of the Oregon Unlawful Trade Practices Act (OR. REV. STAT. § 646.605, *et seq.*)

1068.   Claimants, on behalf of themselves and all Class members who are Oregon residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1069.   GM is a person within the meaning of OR. REV. STAT. § 646.605(4).

1070.   The Defective GM Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

1071.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from doing any of the following, in the course of the person's business:  "Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have;" "Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another;" "Advertis[ing] … goods or services with intent not to provide them as advertised;" and "engag[ing] in any other unfair or deceptive conduct in trade or commerce."  OR. REV. STAT. § 646.608(1).

1072.   GM engaged in unlawful trade practices, including representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Defective GM Vehicles are of a particular standard and quality when they are not; advertising Defective GM Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

- 205 -

1073.    GM also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the sale of Defective GM Vehicles.

1074.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1075.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

1076.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

1077.    By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Oregon UTPA.

1078.    In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1079.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1080.    GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1081.    GM knew or should have known that its conduct violated the Oregon UTPA.

010440-11  1028180 V1

1082.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1083.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1084.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1085.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1086.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1087.   As a direct and proximate result of GM's violations of the Oregon UTPA, Claimants have suffered injury-in-fact and/or actual damages.

1088.   Claimants are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1).  Claimants are also entitled to punitive damages because GM engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

> **mm.    Pennsylvania-Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-1, *et seq.*)**

1089.   Claimants, on behalf of themselves and all Class members who are Pennsylvania residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1090.   Claimants purchased or leased their Defective GM Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

1091.   All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

1092.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  (i) "Representing that goods or services have … characteristics, ….  Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

1093.   GM engaged in unlawful trade practices, including representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have;

representing that Defective GM Vehicles are of a particular standard and quality when they are not; advertising Defective GM Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

1094.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1095.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1096.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Pennsylvania CPL.

1097.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1098.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1099.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1100.    GM knew or should have known that its conduct violated the Pennsylvania CPL.

1101.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1102.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1103.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1104.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1105.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1106.   As a direct and proximate result of GM's violations of the Pennsylvania CPL, Claimants have suffered injury-in-fact and/or actual damage.

1107.   GM is liable to Claimants for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 P.S. § 201-9.2(a).  Claimants are also entitled to an award of punitive damages given that GM's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

   **nn.    Rhode Island-Violations of the Rhode Island Unfair Trade Practices and Consumer Protection Act (R.I. GEN. LAWS § 6-13.1, *et seq.*)**

1108.   Claimants, on behalf of themselves and all Class members who are Rhode Island residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1109.   Claimants are persons who purchased or leased one or more Defective GM Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

1110.   Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including:  "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. GEN. LAWS § 6-13.1-1(6).

1111.   GM engaged in unlawful trade practices, including:  (1) representing that the

Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have;

(2) representing that the Defective GM Vehicles are of a particular standard and quality when

they are not; (3) advertising the Defective GM Vehicles with the intent not to sell them as

advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to

deceive.

1112.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1113.   In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

1114.   GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

1115.   By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the Rhode Island CPA.

1116.   In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1117.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1118.   GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1119.   GM knew or should have known that its conduct violated the Rhode Island CPA.

1120.   As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

1121.   GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

> a.      Possessed exclusive knowledge about the defects in the
>          Defective GM Vehicles;
>
> b.      Intentionally concealed the foregoing from Claimants;
>
> c.      Made incomplete representations about the safety and
>          reliability of the Defective GM Vehicles, while
>          purposefully withholding material facts from Claimants
>          that contradicted these representations; and/or
>
> d.      Had duties under the TREAD Act and related regulations to
>          disclose and remedy the defects.

1122.   Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1123.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1124.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

- 213 -

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1125.   As a direct and proximate result of GM's violations of the Rhode Island CPA, Claimants have suffered injury-in-fact and/or actual damage.

1126.   Claimants are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a).  Claimants also seek punitive damages in the discretion of the Court because of GM's egregious disregard of consumer and public safety and its long-running concealment of the serious safety defects and their tragic consequences.

      **oo.**    **South Carolina**

          **(1)**    **Violations of the South Carolina Unfair Trade Practices Act (S.C. CODE § 39-5-10, *et seq.*)**

1127.   Claimants, on behalf of themselves and all Class members who are South Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1128.   GM is a "person" under S.C. CODE § 39-5-10.

1129.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." S.C. CODE § 39-5-20(a).  GM engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by systematically devaluing safety and concealing defects in Defective GM Vehicles.

1130.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1131.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

1132.   GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by Claimants.

1133.   By failing to disclose and by actively concealing the defects in Claimants'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the South Carolina UTPA.

1134.   In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Claimants' vehicles.

1135.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1136.   GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1137.   GM knew or should have known that its conduct violated the South Carolina

UTPA.

1138.   As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

1139.   GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

    a.      Possessed exclusive knowledge about the defects in the
            Defective GM Vehicles;

    b.      Intentionally concealed the foregoing from Claimants;

    c.      Made incomplete representations about the safety and
            reliability of the Defective GM Vehicles, while

- 215 -

purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1140.   Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1141.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1142.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

1143.   As a direct and proximate result of GM's violations of the South Carolina UTPA,

Claimants have suffered injury-in-fact and/or actual damage.

1144.   Pursuant to S.C. CODE § 39-5-140(a), Claimants seek monetary relief against GM

to recover for their economic losses.  Because GM's actions were willful and knowing,

Claimants' damages should be trebled.  *Id.*

1145.   Claimants further allege that GM's malicious and deliberate conduct warrants an

assessment of punitive damages because GM carried out despicable conduct with willful and

conscious disregard of the rights and safety of others, subjecting Claimants to cruel and unjust

hardship as a result.  GM intentionally and willfully misrepresented the safety and reliability of

- 216 -

the Defective GM Vehicles, deceived Claimants on life-or-death matters, concealed material

facts that only GM knew, and repeatedly promised Claimants that all vehicles were safe—all to

avoid the expense and public relations nightmare of correcting deadly flaws in the Defective GM

Vehicles.  GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive

damages.

### (2)    Violations of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (S.C. CODE § 56-15-10, *et seq.*)

1146.   Claimants, on behalf of themselves and all Class members who are South

Carolina residents (for the purposes of this Count, the "Class"), reallege and incorporate by

reference all paragraphs as though fully set forth herein.

1147.   GM was a "manufacturer" as set forth in S.C. CODE § 56-15-10, as it was engaged

in the business of manufacturing or assembling new and unused motor vehicles.

1148.   GM committed unfair or deceptive acts or practices that violated the South

Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. CODE

§ 56-15-30.

1149.   GM engaged in actions which were arbitrary, in bad faith, unconscionable, and

which caused damage to Claimants and to the public.

1150.   GM's bad faith and unconscionable actions include, but are not limited to:

(1) representing that Defective GM Vehicles have characteristics, uses, benefits, and qualities

which they do not have, (2) representing that Defective GM Vehicles are of a particular standard,

quality, and grade when they are not, (3) advertising Defective GM Vehicles with the intent not

to sell them as advertised, (4) representing that a transaction involving Defective GM Vehicles

confers or involves rights, remedies, and obligations which it does not, and (5) representing that

010440-11  1028180 V1

the subject of a transaction involving Defective GM Vehicles has been supplied in accordance with a previous representation when it has not.

1151.   GM resorted to and used false and misleading advertisements in connection with its business.  As alleged above, GM made numerous material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.  Each of these statements contributed to the deceptive context of GM's unlawful advertising and representations as a whole.

1152.   Claimants bring this action pursuant to S.C. CODE § 56-15-110(2), as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1153.   Claimants are entitled to double their actual damages, the cost of the suit, and attorney's fees pursuant to S.C. CODE § 56-15-110.  Claimants also seek treble damages because GM acted maliciously.

> **pp.    South Dakota-Violations of the Deceptive Trade Practices and Consumer Protection Law (S.D. CODIFIED LAWS § 37-24-6, *et seq.*)**

1154.   Claimants, on behalf of themselves and all Class members who are South Dakota residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1155.   The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which are defined for relevant purposes to include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby [.]"

010440-11  1028180 V1

S.D. CODIFIED LAWS § 37-24-6(1). The conduct of GM as set forth herein constitutes deceptive acts or practices, fraud, false promises, misrepresentation, concealment, suppression and omission of material facts in violation of S.D. CODIFIED LAWS § 37-24-6 and 37-24-31, including, but not limited to, GM's misrepresentations and omissions regarding the safety and reliability of the Defective GM Vehicles, and GM's misrepresentations concerning a host of other defects and safety issues.

1156.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1157.    In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1158.    GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1159.    By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the South Dakota CPL.

1160.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1161.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1162.  GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead Claimants.

1163.  GM knew or should have known that its conduct violated the South Dakota CPL.

1164.  As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

1165.  GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the
Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and
reliability of the Defective GM Vehicles, while
purposefully withholding material facts from Claimants
that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1166.  Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1167.  GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1168.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1169.   As a direct and proximate result of GM's violations of the South Dakota CPL, Claimants have suffered injury-in-fact and/or actual damage.

1170.   Under S.D. CODIFIED LAWS § 37-24-31, Claimants are entitled to a recovery of their actual damages suffered as a result of GM's acts and practices.

**qq.    Tennessee—Violations of Tennessee Consumer Protection Act (TENN. CODE § 47-18-101, *et seq.*)**

1171.   Claimants, on behalf of themselves and all Class members who are Tennessee residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1172.   Claimants are "natural persons" and "consumers" within the meaning of TENN. CODE § 47-18-103(2).

1173.   GM is a "person" within the meaning of TENN. CODE § 47-18-103(2).

1174.   GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE § 47-18-103(19).

1175.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to:  "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised."  TENN. CODE § 47-18-104.  GM violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Defective GM Vehicles have characteristics or benefits that they did not have; representing that Defective GM Vehicles are of a particular

standard, quality, or grade when they are of another; and advertising Defective GM Vehicles with intent not to sell them as advertised.

1176.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1177.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1178.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1179.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

1180.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1181.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1182.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1183.   GM knew or should have known that its conduct violated the Tennessee CPA.

1184.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1185.   GM owed Claimants a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

  a.  Possessed exclusive knowledge about the defects in the
    Defective GM Vehicles;

  b.  Intentionally concealed the foregoing from Claimants;

  c.  Made incomplete representations about the safety and
    reliability of the Defective GM Vehicles, while
    purposefully withholding material facts from Claimants
    that contradicted these representations; and/or

  d.  Had duties under the TREAD Act and related regulations to
    disclose and remedy the defects.

1186.   Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1187.   GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1188.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

1189.   As a direct and proximate result of GM's violations of the Tennessee CPA,

Claimants have suffered injury-in-fact and/or actual damage.

010440-11  1028180 V1

1190.   Pursuant to TENN. CODE § 47-18-109(a), Claimants seek monetary relief against GM measured as actual damages in an amount to be determined at trial, treble damages as a result of GM's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

### rr.    Texas-Violations of the Texas Deceptive Trade Practices-Consumer Protection Act (TEX. BUS. & COM. CODE § 17.41, *et seq.*)

1191.   Claimants, on behalf of themselves and all Class members who are Texas residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1192.   Claimants are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

1193.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); (ii) "breach of an express or implied warranty"; or (iii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3).

1194.   An "unconscionable action or course of action," means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5).   As detailed herein, GM has engaged in an unconscionable action or course of action and thereby caused economic damages to Claimants.

1195.   GM also breached the implied warranty of merchantability with respect to Claimants, as set forth below.

1196.   GM has also violated the specifically enumerated provisions of TEX. BUS. & COM. CODE § 17.46(b) by, at a minimum:  (1) representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective GM Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Defective GM Vehicles with the intent not to sell them as advertised; and(4) failing to disclose information concerning the Defective GM Vehicles with the intent to induce consumers to purchase or lease the Defective GM Vehicles.

1197.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1198.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1199.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1200.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Texas DTPA.

1201.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

010440-11  1028180 V1

1202.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1203.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1204.   GM knew or should have known that its conduct violated the Texas DTPA.

1205.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1206.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.       Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.       Intentionally concealed the foregoing from Claimants;

    c.       Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1207.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1208.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

010440-11  1028180 V1

1209.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1210.   As a direct and proximate result of GM's violations of the Texas DTPA, Claimants have suffered injury-in-fact and/or actual damage.

1211.   As the foregoing allegations demonstrate, GM's misrepresentations and failure to disclose material facts about the safety and quality of the Defective GM Vehicles resulted in the deaths and injuries of hundreds, and economically injured millions more.  GM thereby engaged in acts or practices which, to the detriment of Claimants, took advantage of their lack of knowledge, ability, experience, and capacity to a grossly unfair degree.  In other words, GM engaged in unconscionable actions or an unconscionable course of action as to Claimants.

1212.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose material information.  As the result of GM's performance of deceptive practices, and of unconscionable actions and an unconscionable course of action, as set forth in detail above, Claimants who purchased Defective GM Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.  Under TEX. BUS. & COM. CODE § 17.50(b)(1), Claimants are entitled to recover such economic damages.

1213.   As set forth above and in Texas Count VIII below, GM breached the implied warranty of merchantability with respect to Claimants, and engaged in unconscionable actions and an unconscionable course of action "knowingly," which means it did so with "actual awareness of the fact of the act, practice, condition, defect or failure constituting the breach of

warranty" and with "actual awareness, at the time of the act or practice complained of, of the

falsity, deception or unfairness of the act or practice giving rise to the consumer's claim…."

TEX. BUS. & COM. CODE § 17.45(9).  Accordingly, pursuant to TEX. BUS. COM. CODE

§ 17.50(b)(1), Claimants are entitled to additional damages in an amount up to three times the

amount of economic damages.

1214.   GM's violations presented a continuing risk to Claimants as well as to the general

public.  GM's unlawful acts and practices complained of herein affected the public interest.

1215.   Pursuant to TEX. BUS. & COM. CODE § 17.50(a)(1) and (b), Claimants seek

monetary relief against GM measured as actual damages in an amount to be determined at trial,

treble damages for GM's knowing violations of the Texas DTPA, and any other just and proper

relief available under the Texas DTPA.

1216.   Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3)

& (4), Claimants are entitled to disgorgement or to rescission or to any other relief necessary to

restore any money or property that was acquired from them based on violations of the Texas

DTPA or which the Court deems proper.

1217.   Claimants are also entitled to recover court costs and reasonable and necessary

attorneys' fees under § 17.50(d) of the Texas DTPA.

 **ss.    Utah-Violations of Utah Consumer Protection Act (UTAH CODE § 13-
 11-1, *et seq.*)**

1218.   Claimants, on behalf of themselves and all Class members who are Utah residents

(for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs

as though fully set forth herein.

1219.   GM is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"),

UTAH CODE § 13-11-3.

1220.   Claimants are "persons" under UTAH CODE § 13-11-3.

1221.   The sale of the Defective GM Vehicles to Claimants was a "consumer transaction" within the meaning of UTAH CODE § 13-11-3.

1222.   The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE § 13-11-4.  Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:  (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not."  UTAH CODE § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  UTAH CODE § 13-11-5.

1223.   GM committed deceptive acts or practices in the conduct of trade or commerce, by, among other things, engaging in unconscionable acts, representing that the Defective GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; and representing that the Defective GM Vehicles are of a particular standard, quality, and grade when they are not.

1224.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1225.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1226.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Utah CSPA.

1227.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1228.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1229.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1230.   GM knew or should have known that its conduct violated the Utah CSPA.

1231.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1232.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

      a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

      b.      Intentionally concealed the foregoing from Claimants;

      c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

      d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1233.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1234.    GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1235.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1236.    As a direct and proximate result of GM's violations of the Utah CSPA, Claimants have suffered injury-in-fact and/or actual damage.

1237.    Pursuant to UTAH CODE § 13-11-4, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Claimant, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

### tt.    Vermont-Violations of Vermont Consumer Fraud Act (VT. STAT. TIT. 9, § 2451, *et seq.*)

1238.    Claimants, on behalf of themselves and all Class members who are Vermont residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1239.    GM was a seller within the meaning of VT. STAT. TIT. 9, § 2451(a).

010440-11  1028180 V1

1240.   The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce…." VT. STAT. TIT. 9, § 2453(a).  GM engaged in unfair and deceptive acts or practices in trade or commerce in violation of the Vermont CFA by systematically devaluing safety and concealing a plethora of defects in Defective GM Vehicles.

1241.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1242.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1243.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1244.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Vermont CFA.

1245.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1246.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1247.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1248.   GM knew or should have known that its conduct violated the Vermont CFA.

1249.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1250.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

     a.     Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

     b.     Intentionally concealed the foregoing from Claimants;

     c.     Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

     d.     Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1251.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1252.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1253.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

010440-11  1028180 V1

1254.   As a direct and proximate result of GM's violations of the Vermont CFA,

Claimants have suffered injury-in-fact and/or actual damage.

1255.   Claimants are entitled to recover "appropriate equitable relief" and "the amount of

[their] damages, or the consideration or the value of the consideration given by [them],

reasonable attorney's fees, and exemplary damages not exceeding three times the value of the

consideration given by [them]" pursuant to VT. STAT. TIT. 9, § 2461(b).

**uu.     Virginia-Violations of Virginia Consumer Protection Act
(VA. CODE § 59.1-196, *et seq.*)**

1256.   Claimants, on behalf of themselves and all Class members who are Virginia

residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all

paragraphs as though fully set forth herein.

1257.   GM was a "supplier" under VA. CODE § 59.1-198.

1258.   The sale of the Defective GM Vehicles to Claimants was a "consumer

transaction" within the meaning of VA. CODE § 59.1-198.

1259.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited

"practices" which include:  "5. Misrepresenting that goods or services have certain

characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality,

grade style, or model;" "8. Advertising goods or services with intent not to sell them as

advertised, or with intent not to sell at the price or upon the terms advertised;" "9.  Making false

or misleading statements of fact concerning the reasons for, existence of, or amounts of price

reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a

consumer transaction."  VA. CODE § 59.1-200.  GM violated the Virginia CPA by

misrepresenting that Defective GM Vehicles had certain quantities, characteristics, ingredients,

uses, or benefits; misrepresenting that Defective GM Vehicles were of a particular standard,

quality, grade, style, or model when they were another; advertising Defective GM Vehicles with intent not to sell them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

1260.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1261.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1262.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1263.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Virginia CPA.

1264.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1265.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1266.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1267.   GM knew or should have known that its conduct violated the Virginia CPA.

1268.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1269.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.    Intentionally concealed the foregoing from Claimants;

c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1270.   Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1271.   GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1272.   Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1273.   As a direct and proximate result of GM's violations of the Virginia CPA, Claimants have suffered injury-in-fact and/or actual damage.

1274.   Pursuant to VA. CODE § 59.1-204, Claimants seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Claimant.  Because GM's unlawful conduct was committed willfully and knowingly, Claimants are entitled to recover, for each Claimant, the greater of (a) three times actual damages or (b) $1,000.

1275.   Claimants also seek punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

### vv.   Washington-Violations of the Washington Consumer Protection Act (REV. CODE WASH. § 19.86.010, *et seq.*)

1276.   Claimants, on behalf of themselves and all Class members who are Washington residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1277.   GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. WASH. § 19.96.010.

1278.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  WASH. REV. CODE. WASH. § 19.96.010.  GM engaged in unfair and deceptive acts and practices and violated the Washington CPA by systematically devaluing safety and concealing a plethora of defects in Defective GM Vehicles, in the course of the person's business.

1279.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1280.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1281.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Washington CPA.

1282.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1283.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1284.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1285.   GM knew or should have known that its conduct violated the Washington CPA.

1286.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1287.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the
          Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and
          reliability of the Defective GM Vehicles, while

- 238 -

purposefully withholding material facts from Claimants
that contradicted these representations; and/or

d.    Had duties under the TREAD Act and related regulations to
disclose and remedy the defects.

1288.  Because GM fraudulently concealed the defects in the Defective GM Vehicles,

Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles

they purchased were worth less than they would have been if they were free from the defects.

Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have

either not bought their Defective GM Vehicles or would have paid less for them.

1289.  GM's concealment of the defects in Claimants' vehicles was material to

Claimants.

1290.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its

concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the

truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles

or would not have purchased or leased them at all.  Claimants also incurred repair costs, as

alleged above.

1291.  As a direct and proximate result of GM's violations of the Washington CPA,

Claimants have suffered injury-in-fact and/or actual damage.

1292.  GM is liable to Claimants for damages in amounts to be proven at trial, including

attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem

appropriate under REV. CODE. WASH. § 19.86.090.

- 239 -

### ww.    West Virginia-Violations of the Consumer Credit and Protection Act (W. VA. CODE § 46A-1-101, *et seq.*)

1293.   Claimants, on behalf of themselves and all Class members who are West Virginia residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1294.   GM was a "person" under W. VA. CODE § 46A-1-102(31).

1295.   Claimants are "consumers," as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Defective GM Vehicles.

1296.   GM engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

1297.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. VA. CODE § 46A-6-104.  Without limitation, "unfair or deceptive" acts or practices include:

(I)     Advertising goods or services with intent not to sell them as advertised;

(K)     Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions;

(L)     Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M)     The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby;

(N)     Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed

- 240 -

or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive;

W. Va. Code § 46A-6-102(7).

1298.    By systematically devaluing safety and concealing a plethora of defects in GM

vehicles, GM engaged in deceptive business practices prohibited by the West Virginia CCPA,

including:  (1) representing that the Defective GM Vehicles have characteristics, uses, benefits,

and qualities which they do not have; (2) representing that the Defective GM Vehicles are of a

particular standard, quality, and grade when they are not; (3) advertising the Defective GM

Vehicles with the intent not to sell them as advertised; (4) representing that a transaction

involving the Defective GM Vehicles confers or involves rights, remedies, and obligations which

it does not; and (5) representing that the subject of a transaction involving the Defective GM

Vehicles has been supplied in accordance with a previous representation when it has not.

1299.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1300.    In the course of its business, GM concealed the defects in Claimants' vehicles as

described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM

also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with

intent that others rely upon such concealment, suppression or omission, in connection with the

sale of Defective GM Vehicles.

010440-11  1028180 V1

1301.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1302.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the West Virginia CCPA.

1303.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1304.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1305.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1306.   GM knew or should have known that its conduct violated the West Virginia CCPA.

1307.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1308.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1309.    Because GM fraudulently concealed the defects in the Defective GM Vehicles,
Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles
they purchased were worth less than they would have been if they were free from the defects.
Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have
either not bought their Defective GM Vehicles or would have paid less for them.

1310.    GM's concealment of the defects in Claimants' vehicles was material to
Claimants.

1311.    Claimants suffered ascertainable loss caused by GM's misrepresentations and its
concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the
truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles
or would not have purchased or leased them at all.  Claimants also incurred repair costs, as
alleged above.

1312.    As a direct and proximate result of GM's violations of the West Virginia CCPA,
Claimants have suffered injury-in-fact and/or actual damage.

1313.    Pursuant to W. VA. CODE § 46A-6-106, Claimants seek monetary relief against
GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b)
statutory damages in the amount of $200 per violation of the West Virginia CCPA for each
Claimant.

1314.    Claimants also seek punitive damages against GM because GM carried out
despicable conduct with willful and conscious disregard of the rights and safety of others,
subjecting Claimants to cruel and unjust hardship as a result.  GM intentionally and willfully
misrepresented the safety and reliability of the Defective GM Vehicles, deceived Claimants on
life-or-death matters, concealed material facts that only GM knew, and repeatedly promised

Claimants that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a deadly flaw in GM vehicles.  GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1315.   Claimants further seek restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

      **xx.    Wisconsin-Violations of the Wisconsin Deceptive Trade Practices Act (WIS. STAT. § 100.18, *et seq.*)**

1316.   Claimants, on behalf of themselves and all Class members who are Wisconsin residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1317.   GM is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

1318.   Claimants are members of "the public" within the meaning of WIS. STAT. § 100.18(1).  Claimants purchased or leased one or more Defective GM Vehicles.

1319.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  WIS. STAT. § 100.18(1).  By systematically devaluing safety and concealing a plethora of defects in GM vehicles, GM engaged in unfair and deceptive acts and practices and violated the Wisconsin DTPA.

1320.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1321.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1322.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1323.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Wisconsin DTPA.

1324.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1325.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1326.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1327.   GM knew or should have known that its conduct violated the Wisconsin DTPA.

1328.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1329.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

    a.    Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.    Intentionally concealed the foregoing from Claimants;

    c.    Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

- 245 -

d.  Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1330.  Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1331.  GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1332.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all. Claimants also incurred repair costs, as alleged above.

1333.  Claimants are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2). Because GM's conduct was committed knowingly and/or intentionally, Claimants are entitled to treble damages.

1334.  Claimants also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

**yy. Wyoming-Violations of the Wyoming Consumer Protection Act (WYO. STAT. § 40-12-105, *et seq.*)**

1335.  Claimants, on behalf of themselves and all Class members who are Wyoming residents (for the purposes of this Count, the "Class"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

010440-11  1028180 V1

1336.   GM and Claimants are "persons" within the meaning of WYO. STAT. § 40-12-102(a)(i).

1337.   The sales of the Defective GM Vehicles to Claimants were "consumer transactions" within the meaning of WYO. STAT. § 40-12-105.

1338.   Under the Wyoming Consumer Protection Act ("Wyoming CPA"), a person engages in a deceptive trade practice when, in the course of its business and in connection with a consumer transaction it knowingly:  "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not"; "(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not…"; "(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false"; "(x) Advertises merchandise with intent not to sell it as advertised"; or  "(xv) Engages in unfair or deceptive acts or practices." WYO. STAT. § 45-12-105.

1339.   By systematically devaluing safety and concealing a plethora of defects in GM vehicles as described above, GM violated the Wyoming CPA.  GM engaged in deceptive trade practices, including (among other things) representing that the Defective GM Vehicles are of a particular standard and grade, which they are not; advertising the Defective GM Vehicles with the intent not to sell them as advertised; and overall engaging in unfair and deceptive acts or practices.

1340.   GM's actions, as set forth above, occurred in the conduct of trade or commerce.

1341.   In the course of its business, GM concealed the defects in Claimants' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices,

fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

1342.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimants.

1343.   By failing to disclose and by actively concealing the defects in Claimants' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the Wyoming CPA.

1344.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Claimants' vehicles.

1345.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Claimants, about the true safety and reliability of their vehicles.

1346.   GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead Claimants.

1347.   GM knew or should have known that its conduct violated the Wyoming CPA.

1348.   As alleged above, GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

1349.   GM owed Claimants a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

b.      Intentionally concealed the foregoing from Claimants;

c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from Claimants that contradicted these representations; and/or

- 248 -

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

1350.  Because GM fraudulently concealed the defects in the Defective GM Vehicles, Defective GM Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects. Had Defective GM Vehicle owners been aware of the defects in their vehicles, they would have either not bought their Defective GM Vehicles or would have paid less for them.

1351.  GM's concealment of the defects in Claimants' vehicles was material to Claimants.

1352.  Claimants suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Claimants either would have paid less for their vehicles or would not have purchased or leased them at all.  Claimants also incurred repair costs, as alleged above.

1353.  As a direct and proximate result of GM's violations of the Wyoming CPA, Claimants have suffered injury-in-fact and/or actual damage.

1354.  Pursuant to WYO. STAT. § 40-12-108(a), Claimants seek monetary relief against GM measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

**B.  Subclass Claims.**

**1.  Breach of the Implied Warranty of Merchantability.**

1355.  Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

1356.   This claim is brought on behalf of the Defective GM Vehicle Implied Warranty Subclass.

1357.   The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Defective GM Vehicle Implied Warranty Subclass state claims.

1358.   As set forth below, the Class states claims under the U.C.C. statutes of every jurisdiction included in the Defective GM Vehicle Implied Warranty Subclass.

   **a.**  **Alaska**

1359.   Claimants, on behalf of themselves and all Class members who are Alaska residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1360.   GM was a merchant with respect to motor vehicles within the meaning of ALASKA STAT. § 45.02.104(a).

1361.   Under ALASKA STAT. § 45.02.314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Defective GM Vehicles.

1362.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1363.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1364.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1365.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1366.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1367.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1368.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

- 251 -

b.       Arkansas

1369.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are Arkansas residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1370.   GM was a merchant with respect to motor vehicles within the meaning of ARK.

CODE § 4-2-104(1).

1371.   Under ARK. CODE § 4-2-314, a warranty that the Defective GM Vehicles were in

merchantable condition was implied by law in the transactions when Claimants purchased or

leased their vehicles from GM.

1372.   The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1373.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1374.   The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

- 252 -

1375.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1376.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1377.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1378.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### c.    California

1379.   Claimants, on behalf of themselves and all Class members who are California residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1380.   Claimants, on behalf of themselves and the Subclass, bring this claim for violations of the Song-Beverly Warranty Act (Cal.  Civ. Code §§1791.1 & 1792).

1381.   Claimants and the Subclass members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

1382.   The Defective GM Vehicles are "consumer goods" within the meaning of CAL.
CIV. CODE § 1791(a).

1383.   GM was the "manufacturer" of the Defective GM Vehicles within the meaning of
CAL. CIV. CODE § 1791(j).

1384.   GM impliedly warranted to Claimants and the Subclass that Defective GM
Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792;
however, the Defective GM Vehicles did not have the quality that a buyer would reasonably
expect, and were therefore not merchantable.

1385.   CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that
goods are merchantable" means that the consumer goods meet
each of the following:

(1)    Pass without objection in the trade under the contract
description.

(2)    Are fit for the ordinary purposes for which such goods are
used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on
the container or label.

1386.   The Defective GM Vehicles would not pass without objection in the automotive
trade and were not fit for the ordinary purposes for which vehicles are used because of the
dangerous defects that created an unreasonable likelihood of accident, and/or an unreasonable
likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1387.   Because of the ignition switch defects that cause sudden unintended stalling to
occur, with the attendant shut down of power steering and power brakes and the nondeployment
of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

- 254 -

death, the Low-Torque Ignition Switch Defect Vehicles were not safe to drive and thus not fit for ordinary purposes.

1388.    The Power Steering Defect Vehicles were inherently defective and not fit for ordinary purposes in that there were defects in the vehicles that could cause the loss of power steering, resulting in an increased risk of accident.

1389.    The Side Airbag Defect Vehicles were inherently defective and not fit for ordinary purposes in that there were defects in the wiring harness connectors that could cause the side impact airbags and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1390.    The Low-Torque Ignition Switch Defect Vehicles were not adequately labeled because the labeling failed to disclose the ignition switch defects and did not advise Claimants and the Subclass to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Defective GM Vehicles.

1391.    GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1392.    Notice of breach is not required because Claimants and Subclass members did not purchase their automobiles directly from GM.  In any event, GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

- 255 -

1393.   As a direct and proximate result of GM's breach of its duties under California's Lemon Law, Claimants and the Subclass members received goods whose dangerous condition substantially impaired their value.

1394.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimants and Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

1395.   Under CAL. CIV. CODE § 1794, Claimants and the Subclass are entitled to costs and attorneys' fees.

### d.    Colorado

1396.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Colorado residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1397.   GM was a merchant with respect to motor vehicles.

1398.   Under COL REV. STAT. § 4-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1399.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents wo cause serious bodily harm or death to vehicle occupants.

1400.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1401.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1402.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1403.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1404.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1405.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

010440-11  1028180 V1

e.    **Delaware**

1406.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Delaware residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1407.    GM was a merchant with respect to motor vehicles within the meaning of 6 DEL. CODE § 2-104(1).

1408.    Under 6 DEL. CODE § 2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1409.    The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1410.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1411.    The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

- 258 -

1412.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1413.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1414.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1415.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### f.     District of Columbia

1416.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are District of Columbia residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1417.   GM was a merchant with respect to motor vehicles within the meaning of D.C. Code § 28:2-104(1).

1418.   Under D.C. Code § 28:2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1419.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1420.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1421.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1422.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1423.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1424.   GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1425.   As a direct and proximate result of GM's breach of the implied warranty of

merchantability, Claimants have been damaged.

### g.    Hawaii

1426.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are Hawaii residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1427.   GM was a merchant with respect to motor vehicles within the meaning of HAW.

REV. STAT. § 490-2-104(1).

1428.   Under HAW. REV. STAT. § 490-§ 2-314, a warranty that the Defective GM

Vehicles were in merchantable condition was implied by law in the transactions when Claimants

purchased or leased their vehicles from GM.

1429.   The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1430.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1431.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1432.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1433.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1434.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1435.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

010440-11  1028180 V1

h.    **Indiana**

1436.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Indiana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1437.    GM was a merchant with respect to motor vehicles within the meaning of IND. CODE § 26-1-2-104(1).

1438.    Under IND. CODE § 26-1-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1439.    The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1440.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1441.    The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1442.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1443.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1444.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1445.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### i.    Kansas

1446.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Kansas residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1447.   GM was a merchant with respect to motor vehicles within the meaning of KAN. STAT. § 84-2-104(1).

1448.   Under KAN. STAT. § 84-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1449.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1450.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1451.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1452.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1453.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

010440-11  1028180 V1

1454.  GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1455.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### j.  Louisiana

1456.  Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Louisiana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1457.  At the time Claimants acquired their Defective GM Vehicles, those vehicles had a redhibitory defect within the meaning of LA. CIV. CODE ART. 2520, in that (a) the defects rendered the use of the Defective GM Vehicles so inconvenient that Claimants either would not have purchased the Defective GM Vehicles had they known of the defects, or, (b) the defects so diminished the usefulness and/or value of the Defective GM Vehicles that it must be presumed that the Claimants would have purchased the Defective GM Vehicles, but for a lesser price.

1458.  No notice of the defect is required under LA. CIV. CODE ART. 2520, since GM had knowledge of a redhibitory defect in the Defective GM Vehicles at the time they were sold to Claimants.

1459.  Under LA. CIV. CODE ART. 2524, a warranty that the Defective GM Vehicles were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Claimants purchased or leased their Defective GM Vehicles.

1460.  The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used.  Specifically, the

Defective GM Vehicles created an unreasonable likelihood of serious injury or death for vehicle occupants.

1461.    GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1462.    GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1463.    As a direct and proximate result of GM's sale of vehicles with redhibitory defects, and in violation of the implied warranty that the Defective GM Vehicles were fit for ordinary use, Claimants are entitled to either rescission or damages.

### k.    Maine

1464.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Maine residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1465.    GM was a merchant with respect to motor vehicles within the meaning of ME. REV. STAT. TIT. II § 2-104(1).

1466.    Under ME. REV. STAT. TIT. II § 2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

- 267 -

1467.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1468.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1469.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1470.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1471.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

010440-11  1028180 V1

1472.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1473.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### l.    Maryland

1474.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Maryland residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1475.   GM was a merchant with respect to motor vehicles within the meaning of MD. COM. LAW § 2-104(1).

1476.   Under MD. COM. LAW § 2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1477.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1478.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1479.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1480.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1481.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1482.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1483.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### m.    Massachusetts

1484.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Massachusetts residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1485.   GM was a merchant with respect to motor vehicles within the meaning of ALM. GL CH. 106, § 2-104(1).

1486.   Under ALM. GL CH. 106, § 2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1487.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1488.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1489.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1490.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1491.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1492.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1493.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### n.    Michigan

1494.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Michigan residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1495.   GM was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

1496.   Under MICH. COMP. LAWS § 440.2314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1497.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an

010440-11  1028180 V1

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1498.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1499.  The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1500.  The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1501.  GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1502.  GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1503.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**o.    Minnesota**

1504.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Minnesota residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1505.   GM was a merchant with respect to motor vehicles within the meaning of MINN. STAT. § 336.2-104(1).

1506.   Under MINN. STAT. § 336.2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1507.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1508.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

010440-11  1028180 V1

1509.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1510.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1511.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1512.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1513.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### p.    Mississippi

1514.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Mississippi residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1515.   GM was a merchant with respect to motor vehicles within the meaning of MISS. CODE § 75-2-104(1).

- 275 -

1516.   Under MISS. CODE § 75-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1517.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1518.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1519.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1520.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1521.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners. The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1522.  GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1523.  As a direct and proximate result of GM's breach of the implied warranty of

merchantability, Claimants have been damaged.

### q.      Missouri

1524.  Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are Missouri residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1525.  GM was a merchant with respect to motor vehicles within the meaning of MO.

REV. STAT § 400.2-104(1).

1526.  Under MO. REV. STAT § 400.2-314, a warranty that the Defective GM Vehicles

were in merchantable condition was implied by law in the transactions when Claimants

purchased or leased their vehicles from GM.

1527.  The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1528.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1529.    The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

1530.    The Side Airbag Defect Vehicles were inherently defective in that there were

defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and

seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased

likelihood of serious injury or death.

1531.    GM breached the implied warranty of merchantability by selling Defective GM

Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles

during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1532.    GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1533.    As a direct and proximate result of GM's breach of the implied warranty of

merchantability, Claimants have been damaged.

### r.    Montana

1534.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Montana residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1535.    GM was a merchant with respect to motor vehicles within the meaning of MONT. CODE § 30-2-104(1).

1536.    Under MONT. CODE § 30-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Defective Ignition Switch Vehicles from GM.

1537.    The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1538.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1539.    The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

010440-11  1028180 V1

1540.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1541.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1542.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1543.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**s.    Nebraska**

1544.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Nebraska residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1545.   GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

1546.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Defective GM Vehicles from GM.

1547.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1548.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1549.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1550.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1551.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

010440-11  1028180 V1

1552.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1553.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### t.    Nevada

1554.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Nevada residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1555.   GM was a merchant with respect to motor vehicles within the meaning of NEV. REV. STAT. § 104.2104(1).

1556.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their Defective GM Vehicles from GM.

1557.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1558.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1559.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1560.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1561.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1562.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1563.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### u.    New Hampshire

1564.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are New Hampshire residents (for the purposes of this Count,

the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1565.   GM was a merchant with respect to motor vehicles within the meaning of N.H. REV. STAT. § 382-A:2-104(1).

1566.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law under N.H. REV. STAT. § 382-A:2-314 in the transactions when Claimants purchased their vehicles on or before July 9, 2009.

1567.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1568.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1569.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1570.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and

- 284 -

seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1571.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1572.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1573.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### v.    New Jersey

1574.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are New Jersey residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1575.   GM was a merchant with respect to motor vehicles within the meaning of N.J. STAT. § 12A:2-104(1).

1576.   Under N.J. STAT. § 12A:2-104(1), a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1577.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

- 285 -

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1578.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1579.   The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

1580.   The Side Airbag Defect Vehicles were inherently defective in that there were

defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and

seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased

likelihood of serious injury or death.

1581.   GM breached the implied warranty of merchantability by selling Defective GM

Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles

during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1582.   GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1583.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### w.    New Mexico

1584.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are New Mexico residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1585.   GM was a merchant with respect to motor vehicles within the meaning of N.M. STAT. § 55-2-104(1).

1586.   Under N.M. STAT. § 55-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1587.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1588.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

010440-11  1028180 V1

1589.  The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1590.  The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1591.  GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1592.  GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1593.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### x.    New York

1594.  Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are New York residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1595.  GM was a merchant with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

1596.   Under N.Y. U.C.C. § 2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1597.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1598.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1599.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1600.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1601.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1602.   GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1603.   As a direct and proximate result of GM's breach of the implied warranty of

merchantability, Claimants have been damaged.

### y.    North Carolina

1604.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are North Carolina residents (for the purposes of this Count,

the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth

herein.

1605.   GM was a merchant with respect to motor vehicles within the meaning of N.C.

GEN. STAT. § 25-2-104(1).

1606.   Under N.C. GEN. STAT. § 25-2-314, a warranty that the Defective GM Vehicles

were in merchantable condition was implied by law in the transactions when Claimants

purchased or leased their vehicles from GM.

1607.   The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

- 290 -

1608.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1609.  The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1610.  The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1611.  GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1612.  GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1613.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

010440-11  1028180 V1

z.    **North Dakota**

1614.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are North Dakota residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1615.    GM was a merchant with respect to motor vehicles.

1616.    A warranty that the Defective GM Vehicles were in merchantable condition was

implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1617.    The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1618.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1619.    The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

1620.    The Side Airbag Defect Vehicles were inherently defective in that there were

defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and

seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1621.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1622.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1623.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### aa.   Ohio

1624.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Ohio residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1625.   Claimants and the Subclass allege GM breached its implied warranty in tort.

1626.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

010440-11  1028180 V1

1627.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1628.  The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1629.  The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1630.  GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1631.  Based upon the dangerous product defects, GM failed to meet the expectations of a reasonable consumer.  The Defective GM Vehicles failed their ordinary because they do not function as a reasonable consumer would expect.  Moreover, the defects present a serious danger to Claimants that cannot be eliminated without significant cost.

1632.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1633.   As a direct and proximate result of GM's tortious breach of its implied warranty, Claimants have been damaged.

### bb.    Oklahoma

1634.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Oklahoma residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1635.   GM was a merchant with respect to motor vehicles.

1636.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1637.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1638.  The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

010440-11  1028180 V1

1639.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1640.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1641.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1642.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants.

1643.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### cc.    Pennsylvania

1644.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Pennsylvania residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1645.   GM was a merchant with respect to motor vehicles.

1646.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1647.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1648.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1649.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1650.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1651.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived

Claimants and the Subclass members of the benefit of their bargain.

1652.   GM was provided notice of these issues by numerous complaints filed against it,

internal investigations, and by numerous individual letters and communications sent by

Claimants and others.

1653.   As a direct and proximate result of GM's breach of the implied warranty of

merchantability, Claimants have been damaged.

### dd.    Rhode Island

1654.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are Rhode Island residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1655.   GM was a merchant with respect to motor vehicles.

1656.   A warranty that the Defective GM Vehicles were in merchantable condition was

implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1657.   The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1658.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1659.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1660.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1661.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1662.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1663.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ee.    South Carolina

1664.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are South Carolina residents (for the purposes of this Count,

the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1665.   GM was a merchant with respect to motor vehicles under S.C. CODE § 36-2-314.

1666.   Under S.C. CODE § 36-2-314, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1667.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1668.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1669.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1670.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1671.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1672.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1673.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ff.    South Dakota

1674.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are South Dakota residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1675.   GM was a merchant with respect to motor vehicles.

1676.   A warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1677.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

010440-11  1028180 V1

1678.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1679.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1680.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1681.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1682.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1683.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### gg.    Texas

1684.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are Texas residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1685.    GM was a merchant with respect to motor vehicles under TEX. BUS. & COM.

CODE § 2.104.

1686.    Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Defective GM

Vehicles were in merchantable condition was implied by law in the transactions when Claimants

purchased or leased their vehicles from GM.

1687.    The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1688.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1689.    The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

- 303 -

1690.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1691.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1692.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1693.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**hh.    Utah**

1694.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Utah residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1695.   GM was at all relevant times a merchant with respect to motor vehicles.

1696.   GM impliedly warranted that its vehicles were of good and merchantable quality, and fit and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of

010440-11  1028180 V1

the public.  This warranty was implied by law in the transactions when Claimants purchased or

leased their vehicles from GM.

1697.   The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1698.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1699.   The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

1700.   The Side Airbag Defect Vehicles were inherently defective in that there were

defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and

seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased

likelihood of serious injury or death.

1701.   GM breached the implied warranty of merchantability by selling Defective GM

Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles

during ordinary driving conditions, and/or the failure of power brakes and/or power steering,

010440-11  1028180 V1

and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1702.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1703.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### ii.    Virginia

1704.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Virginia residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1705.   GM was at all relevant times a merchant with respect to motor vehicles.

1706.   GM impliedly warranted that the Defective GM Vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.  This warranty was implied by law in the transactions when Claimants purchased or leased their Defective GM Vehicles from GM.

1707.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1708.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1709.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1710.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1711.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1712.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1713.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

010440-11  1028180 V1

### jj.    West Virginia

1714.    Claimants, on behalf of themselves and all Defective GM Vehicle Implied

Warranty Subclass members who are West Virginia residents (for the purposes of this Count, the

"Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1715.    GM was at all relevant times a seller of motor vehicles under W. Va. Code § 46-

2-314, and was also a "merchant" as the term is used in W. Va. Code § 46A-6-107 and § 46-2-

314.

1716.    Under W. Va. Code § 46-2-314, a warranty that the Defective GM Vehicles were

in merchantable condition was implied by law in the transactions when Claimants purchased or

leased their vehicles from GM.

1717.    The Defective GM Vehicles, when sold and at all times thereafter, were not

merchantable and not fit for the ordinary purpose for which cars are used, and would not pass

without objection in the automotive trade because of the dangerous defects that created an

unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents

would cause serious bodily harm or death to vehicle occupants.

1718.    The Low-Torque Ignition Switch Defect Vehicles were inherently defective in

that there were defects in the ignition switch systems that caused sudden unintended stalling to

occur, with the attendant shut down of power steering and power brakes and the nondeployment

of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or

death.

1719.    The Power Steering Defect Vehicles were inherently defective in that there were

defects in the vehicles that could cause the loss of power steering assist, resulting in an increased

risk of accident.

1720.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1721.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

1722.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1723.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

### kk.    Wyoming

1724.   Claimants, on behalf of themselves and all Defective GM Vehicle Implied Warranty Subclass members who are Wyoming residents (for the purposes of this Count, the "Subclass"), reallege and incorporate by reference all paragraphs as though fully set forth herein.

1725.   GM was at all relevant times a merchant with respect to motor vehicles.

1726.   Under Wyoming law, a warranty that the Defective GM Vehicles were in merchantable condition was implied by law in the transactions when Claimants purchased or leased their vehicles from GM.

1727.   The Defective GM Vehicles, when sold and at all times thereafter, were not merchantable and not fit for the ordinary purpose for which cars are used, and would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accidents, and/or an unreasonable likelihood that such accidents would cause serious bodily harm or death to vehicle occupants.

1728.   The Low-Torque Ignition Switch Defect Vehicles were inherently defective in that there were defects in the ignition switch systems that caused sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1729.   The Power Steering Defect Vehicles were inherently defective in that there were defects in the vehicles that could cause the loss of power steering assist, resulting in an increased risk of accident.

1730.   The Side Airbag Defect Vehicles were inherently defective in that there were defects in the wiring harness connectors that could cause the side impact airbags (SIABs) and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

1731.   GM breached the implied warranty of merchantability by selling Defective GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners.  The defects deprived Claimants and the Subclass members of the benefit of their bargain.

010440-11  1028180 V1

1732.   GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by Claimants and others.

1733.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Claimants have been damaged.

**2.      Negligence.**

1734.   Claimants reallege and incorporate by reference all paragraphs as though fully set forth herein.

1735.   This claim is brought on behalf of the Defective GM Vehicle Negligence Subclass.

1736.   The law of negligence is substantially similar under the laws of all the jurisdictions whose residents are included in the Defective GM Vehicle Negligence Subclass.

1737.   GM designed, manufactured and sold or otherwise placed in the stream of commerce Defective GM Vehicles, as set forth above.

1738.   GM had a duty to design, manufacture, and sell only products that would be safe for their intended and foreseeable uses and users, including the use to which the Defective GM Vehicles products were put by Claimants and the Defective GM Vehicle Negligence Subclass. GM breached its duties to the Defective GM Vehicle Negligence Subclass because it was negligent in the design, development, manufacture, and testing of the Defective GM Vehicles it manufactured and sold.

1739.   GM was negligent in the design, development, manufacture, testing, and/or "certification" of the Defective GM Vehicles because it knew, or in the exercise of reasonable care should have known, that the vehicles posed an unreasonable risk of death or serious bodily

injury to Defective GM Vehicle Negligence Subclass members, passengers, other motorists, pedestrians, and the public at large, because they were susceptible to incidents in which the vehicles suddenly stall, and/or the brakes and/or power steering, and/or airbags and seatbelt pretensioners were rendered inoperable.

1740.   GM thus "failed to exercise reasonable care in the manufacture of [its Defective Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

1741.   GM further breached its duties to the Defective GM Vehicle Negligence Subclass by supplying directly or through a third person defective vehicles to be used by such foreseeable persons as the Defective GM Vehicle Negligence Subclass members when:

a.      GM knew or had reason to know that the vehicles were dangerous or likely to be dangerous for the use for which they were supplied; and

b.      GM failed to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicles are likely to be dangerous.

1742.   GM had a continuing duty to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles. Defective GM Vehicle Negligence Subclass members were entitled to know that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

010440-11  1028180 V1

1743.   GM knew or should have known of the defects described herein.  GM breached its duty to Defective GM Vehicle Negligence Subclass members because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the vehicles when ordinary care and reasonable prudence so demanded.

1744.   As a direct and proximate result of GM's negligence, the Defective GM Vehicle Negligence Subclass members suffered damages.  The damages include overpayment for the Defective GM Vehicles and repair and recall costs, as discussed above.

*       *       *       *

1745.   The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver of Claimants' rights against any person, entity or property; (b) a consent by Claimants to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any objection or other proceeding commenced in this case or any related case; (c) a waiver of the right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court.

- 313 -