**DRINKER BIDDLE & REATH LLP**

1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Telephone:  (212) 248-3140
Facsimile:  (212) 248-3141
E-mail: kristin.going@dbr.com
      clay.pierce@dbr.com
      marita.erbeck@dbr.com
Kristin K. Going
Clay J. Pierce
Marita S. Erbeck

**HEARING DATE AND TIME: [ ], 2018 @ [ ] (EST)**
**OBJECTION DEADLINE: [ ], 2018 @ _:00 p.m.**
**(EST)**

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (MG) |
|     f/k/a General Motors Corp., et al., | : |  |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------X

**MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST TO
APPROVE (I) THE GUC TRUST ADMINISTRATOR'S ACTIONS AND (II) THE
SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS
AND THE GUC TRUST PURSUANT TO BANKRUPTCY CODE SECTIONS 105,
363, AND 1142 AND BANKRUPTCY RULES 3002 AND 9019
AND TO (III) AUTHORIZE THE REALLOCATION OF GUC TRUST ASSETS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

RELIEF REQUESTED ...................................................................................................... 1

JURISDICTION ................................................................................................................. 7

BACKGROUND ............................................................................................................... 7

    I.    Old GM's Bankruptcy and the Creation of the GUC Trust ................................. 7

    II.    The Recalls and Subsequent Proceedings  In the Bankruptcy Court and Second Circuit ................................................................................................. 9

    III.    Developments in the Bankruptcy Court Following the Second Circuit Opinion ................................................................................................. 13

    IV.    Plaintiffs' Alleged Claims Against Old GM ...................................................... 15

    V.    The Settlement Agreement ................................................................................. 18

RELIEF REQUESTED ...................................................................................................... 20

BASIS FOR RELIEF REQUESTED ................................................................................. 21

    I.    The Court Should Find that Entry into the Settlement is an Appropriate Exercise of the GUC Trust Administrator's Authority and Approve Actions Taken by the GUC Trust Administrator in Connection Therewith Pursuant to Section 8.1(e) of the GUC Trust Agreement ................................... 21

    II.    The Court Should Authorize the Reallocation of $15 Million of GUC Trust Funds ................................................................................................. 24

    III.    The Court Should Approve the Settlement Agreement Pursuant to Bankruptcy Rule 9019 ................................................................................................. 24

        A.    The Settlement's Benefits Outweigh the Likelihood of  Success in Protracted Litigation over Numerous, Complex Issues .......................... 26

        B.    The Settlement Agreement Is Beneficial to  Creditors and Supported by Interested Parties .............................................................. 32

        C.    The Settlement Agreement Satisfies the Remaining Iridium Factors ...... 33

NOTICE ............................................................................................................................ 34

NO PRIOR REQUEST ..................................................................................................... 35

CONCLUSION ................................................................................................................. 35

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

In re Adelphia Commn's Corp.,
  327 B.R. 143 (Bankr. S.D.N.Y. 2005) .......................................................................28

Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs,
  Inc.),
  156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) .........................28

In re Am. Home Mort. Inv. Trust
  2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867 ......................24

In the Matter of the Application of U.S. Bank Nat'l Ass'n,
  No. 651625/2018 .....................................................................................................24

In re Arts de Provinces de France, Inc.,
  153 B.R. 144 (Bankr. S.D.N.Y. 1993) ...................................................................31

In re Chateaugay Corp.,
  10 F.3d 944 (2d Cir. 1993) ...............................................................................31, 32

Elliott v. General Motors LLC (In re Motors Liquidation Co.),
  Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16,
  2015), 49-52 ................................................................................................... passim

In re Hibbard Brown & Co., Inc.,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998) ................................................................27, 28

Mosser v. Darrow,
  341 U.S. 267 (1951) ................................................................................................24

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
  LLC),
  478 F.3d 452 (2d Cir. 2007) .............................................................28, 29, 35, 36

In re Motors Liquidation Co.,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in
  part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.),
  829 F.3d 135 (2d Cir. 2016) ................................................................................ passim

Nellis v. Shugrue,
  165 B.R. 115 (S.D.N.Y. 1994) ................................................................................28

Newman v. Stein,
  464 F.2d 689 (2d Cir. 1972) ...................................................................................27

In re Peierls Family Inter Vivos Trusts,
    59 A.3d 471 (Del. Ch. 2012)...........................................................................................24

Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.,
    507 U.S. 380 (1993)...........................................................................6, 17, 30, 33

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson,
    390 U.S. 414 (1968)...........................................................................................28

In re PT-1 Commc'ns, Inc.,
    292 B.R. 482 (Bankr. E.D.N.Y. 2003)...............................................................31

In re Purofied Down Prods. Corp.,
    150 B.R. 519 (S.D.N.Y. 1993)............................................................................28

In re Residential Capital, LLC,
    Case No. 12-12020 (MG), 2015 WL 515387 (Bankr. S.D.N.Y. Feb. 6, 2015)......................30

In re Tronox Inc.,
    No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17,
    2015) ..............................................................................................24, 25, 26

In re W.T. Grant, Co.,
    699 F.2d 599 (2d Cir. 1983)...............................................................................28

**STATUTES, RULES & REGULATIONS**

28 U.S.C. §§ 157 and 1334 ..............................................................................................10

28 U.S.C. § 157(b)(2)(A) .................................................................................................10

28 U.S.C. §§ 1408 and 1409 ............................................................................................10

11 U.S.C. § 105(a) .............................................................................................10, 12, 27, 37

11 U.S.C. § 363 .................................................................................................................10

11 U.S.C. § 502(c) ............................................................................................................10

11 U.S.C. § 502(h) ............................................................................................................34

11 U.S.C. § 1142 ...............................................................................................................10

Fed. R. Bankr. P. 3002 ...............................................................................................4, 10

Fed. R. Bankr. P. 3003 .....................................................................................................12

Fed. R. Bankr. P. 9019 .......................................................................................... 27, *passim*

By and through its undersigned counsel, the GUC Trust Administrator[1] of the Motors Liquidation Company GUC Trust (the "GUC Trust"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 [ECF No. 9836] (as confirmed, the "Plan") of the above-captioned post-effective date debtors (the "Debtors"), respectfully submits this *Motion to Approve (I) the GUC Trust Administrator's Actions and (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002 and 9019 and (III) Authorize the Reallocation of GUC Trust Assets* (the "**Motion**"), seeking entry of an order (the "**Settlement Order**") approving the Settlement Agreement (as defined herein).  In support of this Motion, the GUC Trust Administrator respectfully represents as follows:

## RELIEF REQUESTED

1.      By this Motion, the GUC Trust asks this Court to approve the actions the GUC Trust Administrator proposes to undertake pursuant to the terms of the Settlement Agreement, approve the Settlement between and among it and certain Ignition Switch Plaintiffs,[2] certain Non-Ignition Switch Plaintiffs,[3] and certain Pre-Closing Accident Plaintiffs[4] (collectively, the

---

[1]   Capitalized terms not defined herein shall have the meaning ascribed to them in the Settlement Agreement, the Plan or the GUC Trust Agreement, as applicable. Any description herein of the terms of the Plan or the GUC Trust Agreement is qualified in its entirety by the terms of the Plan or the GUC Trust Agreement, as applicable.

[2]   The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[3]   The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

[4]   The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident that occurred prior to the Closing Date involving an Old GM vehicle that was later subject to the Recalls.  The Pre-Closing Accident Plaintiffs are comprised of a subset asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"), and a subset asserting claims or who suffered an injury or death involving vehicles with other defects (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**").

92514240.7

"**Signatory Plaintiffs,**" and together with the GUC Trust, the "**Parties**") and authorize the GUC Trust to reallocate $15 million in GUC Trust Assets. As set forth more fully below, among other things, the Settlement resolves all issues arising from the Late Claims Motions in a global fashion, correcting the historic pattern of piecemeal litigation of Plaintiffs' claims.

2.     On April 21, 2014, New GM filed its first of three motions with this Court seeking a ruling that owners of Old GM vehicles that were the subject of recalls conducted by New GM were barred from asserting claims against New GM.[5]  New GM's request precipitated years of litigation in this Court involving numerous parties and a host of complex issues, including, but not limited to, whether the Signatory Plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds), whether the Plaintiffs' asserted claims are equitably moot, whether additional grounds exist to object to the Plaintiffs' asserted claims, and the amount of said claims in the event that they are allowed.

3.     Litigation of these issues has been ongoing for several years, and has consumed significant time, money and resources from the parties and the Bankruptcy Court. Nevertheless, key disputes between the Parties remain unresolved. For example, in the April 2015 Decision, the Bankruptcy Court ruled that Old GM failed to provide Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs with constitutionally proper notice of the Bar Date.[6]  While the Bankruptcy Court ruled that assets of the GUC Trust could not be tapped to pay any late claims

---

[5]     See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, dated April 21, 2014* [ECF No. 12620], *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in* Pre-Closing Accident Lawsuits, dated Aug. 1, 2014 [ECF No. 12807] and *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions), dated Aug. 1, 2014* [ECF No. 12808].

[6]     See In re Motors Liquidation Co., 529 B.R. 510, 573-74, 583 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016) (the "**April 2015 Decision**").

92514240.7

that might be allowed as a result of the doctrine of equitable mootness, the Second Circuit vacated this holding as an advisory opinion—leaving open the question of the applicability of equitable mootness.[7]  In addition, there is an on-going dispute as to whether an additional showing under the factors articulated in Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380 (1993) is required for Plaintiffs to obtain leave to file late claims.  In the event Plaintiffs are granted leave to file late claims, the allowance and amount of such claims would also have to be litigated, a process that could take years.

4.    Certain Pre-Closing Accident Plaintiffs injured or killed before July 10, 2009, involving vehicles subject to Recall Nos. 14V-355, 14V-394, 14V-400, or 14V-540 (and who are identified by name and Recall Number in Schedule 1 to the Settlement Agreement) have informed the GUC Trust Administrator that they intend to file a Supplemental Late Claims Motion on or before May 31, 2018, seeking allowance of their late claims based on due process violations relating to the foregoing recalls.  As part of the Settlement, the GUC Trust will settle these late claims along with the late claims of the other Signatory Plaintiffs.

5.    Continuation of protracted litigation on the foregoing and related issues will deplete remaining GUC Trust Assets, delay any further GUC Trust distributions, and subject the Parties to uncertain results.  In an effort to avoid these risks, the GUC Trust, Designated and Lead Counsel for Ignition Switch and certain Non-Ignition Switch Plaintiffs, counsel for certain Pre-Closing Accident Plaintiffs and the Participating Unitholders engaged in good faith, arms'-length negotiations concerning a potential settlement (the "**Initial Settlement**") that would resolve the many disputes surrounding the Signatory Plaintiffs' ability to file late proposed class claims that seek relief for: (i) economic losses related to Old GM's alleged concealment of safety defects in

---

[7]    See In re Motors Liquidation Co., 529 B.R. at 529; Elliott, 829 F.3d at 168-69.

92514240.7

ignition switches (including the Ignition Switch Defect and similarly defective ignition switches), side airbags, and power steering and (ii) personal injury and wrongful death claims against the GUC Trust related to Old GM vehicles subject to the Recalls.

6.      As discussed in the Court's *Memorandum Opinion and Order Regarding Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, dated Jan.18, 2018 [ECF No. 14212] (the "**Settlement Decision**"), the GUC Trust determined ultimately not to execute the Initial Settlement.  Following the Court's issuance of the Settlement Decision, the GUC Trust retained new counsel, and after termination of a forbearance agreement with New GM; the GUC Trust, the Participating Unitholders, the Designated and Lead Counsel for the Ignition Switch and certain Non-Ignition Switch Plaintiffs, and counsel for certain Pre-Closing Accident Plaintiffs resumed their good faith, arms'-length negotiations.    These negotiations have culminated in the Parties' agreement to the settlement that is the subject of the Motion (the "**Settlement**," and the agreement documenting it, the "**Settlement Agreement**").

7.      The Settlement consists of the following three components, all subject to Bankruptcy Court approval:  (i) establishing noticing procedures; (ii) approving the Settlement and (iii) estimating Plaintiffs' claims.  The Settlement Agreement contemplates that the forgoing components of the Settlement will be considered in successive stages.  First, pursuant to the separate motion (the "**Notice Procedures Motion**") filed contemporaneously herewith, the Parties request that the Court approve proposed notice procedures with respect to the Settlement and the estimation process.  Second, and contingent upon the entry of an order approving the Notice Procedures Motion (the "**Notice Procedures Order**"), the Parties will serve notice of this Motion and the Claims Estimation Motion (as defined below) in accordance with the procedures established by the Court and pursue the relief sought thereunder.

4

8.      Through this Motion, the Parties seek entry of the Settlement Order approving the terms of the Settlement Agreement.  Upon entry of the Settlement Order, the GUC Trust will pay Plaintiffs $15 million (the "**Settlement Amount**").

9.      Pursuant to the terms of the Settlement Agreement, the GUC Trust has also filed a motion (the "**Estimation Motion**") seeking entry of an order (the "**Claims Estimate Order**") that would estimate the amount of Plaintiffs' claims, in an amount that may (depending on the amount of the Court's estimate) trigger New GM's obligation to issue additional shares of New GM common stock (the "**Adjustment Shares**")[8] pursuant to the terms of the Sale Agreement.[9]

10.     Upon entry of the Settlement Order, in exchange for the foregoing consideration from the GUC Trust, and following compliance with extensive noticing procedures designed to provide notice to every potentially affected Plaintiff and an opportunity to object and be heard as set forth in the Notice Procedures Motion and/or contemplated by the Notice Procedures Order, all Plaintiffs will be deemed to have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), the Trust Monitor, the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interests in the GUC Trust (the "**Unitholders**").  By its terms, the waiver and release applies to Plaintiffs' claims or rights,

---

[8]     Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently propose the allocation of the value of the Settlement Amount and the Adjustment Shares between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, which shall be subject to an order of this Court after notice and an opportunity to be heard by Plaintiffs.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.  The GUC Trust, Unitholders, and defendants in the Term Loan Avoidance Action, waive any rights to the Settlement Amount and the Adjustment Shares.

[9]     See concurrently-filed *Motion of Motors Liquidation Company GUC Trust to Estimate Vehicle Recall Economic Loss and Personal Injury Claims for Allowance Purposes and to Establish a Schedule for the Claims Estimation Proceeding*, dated May 2, 2018.

5

including any rights to any assets that are presently in the GUC Trust and any distributions that have previously been made to Unitholders (collectively, "**GUC Trust Assets**") and to distributions that have or will be made by the Avoidance Action Trust (the "**Release**").  In so doing, the waiver and release provides finality and certainty to the GUC Trust and Unitholders (regardless of whether or in what amount, the Claims Estimate Order may ultimately be entered), protects against the risk of claw-back or recapture of prior distributions of GUC Trust Assets and eliminates delay in the GUC Trust wind-down process and distribution of assets.

11.     The final component of the Settlement contemplates an estimation proceeding with respect to Plaintiffs' claims.  Pursuant to the Settlement Agreement, the GUC Trust has agreed to seek entry of a claims estimate order estimating the aggregate Allowed General Unsecured Claims against the GUC Trust.  Entry of the Claims Estimate Order, as sought through the Estimation Motion, may trigger New GM's obligation to provide the Adjustment Shares as additional consideration under the Sale Agreement.  Pursuant to the terms of the Settlement, any Adjustment Shares would be set aside for the exclusive benefit of the Plaintiffs.

12.     The Settlement Agreement resulted from extensive, good faith negotiations between experienced counsel to reasonably resolve the many issues arising out of the Late Claims Motions.  This Court should approve the Settlement because it will substantially reduce costs and the expenditure of resources, eliminate the risk of uncertain litigation outcomes, and prevent further delay in distributions of remaining GUC Trust Assets, without disturbing the recovery expectations of other creditors and Unitholders.  Moreover, the Settlement Agreement establishes a streamlined process for allowing Plaintiffs' claims and providing Plaintiffs a source of recovery from the Settlement Amount and the Adjustment Shares.  Again, regardless of whether the Claims Estimate Order is ultimately entered, the waivers and releases by Plaintiffs that are set forth in the

92514240.7

Settlement will be binding on all Parties, subject only to approval of the Settlement Order and payment of the Settlement Amount. In light of the inherent risks and costs associated with litigation, the Settlement Agreement is fair and clearly falls above the lowest rung in the range of reasonableness. Accordingly, the Court should enter the Settlement Order approving the Settlement Agreement pursuant to Bankruptcy Rule 9019 as a fair and equitable resolution of the on-going litigation between the Parties.

## JURISDICTION

13.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

14.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

15.    The statutory predicates for the relief sought in this Motion are Bankruptcy Code sections 105(a), 363, 502(c) and 1142 and Bankruptcy Rules 3002 and 9019.

## BACKGROUND

**I.    Old GM's Bankruptcy and the Creation of the GUC Trust.**

16.    On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, the "**Debtors**") filed for chapter 11 bankruptcy protection in this Court and entered into an agreement (the "**Sale Agreement**") to sell substantially all of its assets to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants. See In re Motors Liquidation Co., 529 B.R. at 535.

17.    The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount (the

7

"**Purchase Price Adjustment**").  See AMSPA § 3.2(c).[10]  Specifically, the Purchase Price Adjustment provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  See id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares that may be required under the AMSPA.  See id.

18.    On July 5, 2009, the sale was approved by the Bankruptcy Court.  See Elliott, 829 F.3d at 146-47.

19.     In September 2009, the Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529 B.R. at 535.

20.    On March 29, 2011, the Court entered an order confirming the Plan, which, among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in the GUC Trust Agreement.  See id. at 536.

21.    Pursuant to the Plan, the GUC Trust Agreement, and a side letter by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011 (the "**Side Letter**"), the GUC Trust was granted exclusive authority to object to the allowance of general unsecured claims, seek estimation of the amount of allowed general unsecured claims, and seek Adjustment Shares from New GM.  See Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.

---

[10]    See Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009 (the "**AMSPA**").

92514240.7

22.     In February 2012, the Court entered an order providing that any claims filed after entry of the order would be deemed disallowed unless, *inter alia*, the claimant obtained leave of the Court or written consent of the GUC Trust.[11]

23.     As of March 31, 2018, the total amount of Allowed General Unsecured Claims against the Debtors' estate was $31,855,431,837.00, approximately $3.14 billion below the threshold for triggering the issuance of Adjustment Shares under the AMSPA.[12]

## II.     The Recalls and Subsequent Proceedings In the Bankruptcy Court and Second Circuit.

24.     In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047, impacting approximately 2.1 million vehicles. After this first wave of recalls, New GM issued additional recalls in June, July and September of 2014 concerning defective ignition switches affecting approximately 10 million additional vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, and 14V-540.

25.     New GM issued a multitude of other recalls for safety defects throughout 2014. These included a recall issued in March pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14V-153.

---

[11]     See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[12]     See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of March 31, 2018, dated Apr. 30, 2018* [ECF No. 14290].

9

26.    After the issuance of these recalls (collectively, the "**Recalls**"), owners and lessees of defective Old GM and New GM vehicles filed lawsuits against New GM.  New GM sought to enjoin that litigation by filing motions to enforce the Sale Order in the Bankruptcy Court. Specifically, New GM filed the following motions:

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated Apr. 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**");

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 [ECF No. 12807] (the "**Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce**")[13];

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-Ignition Switch Plaintiffs Motion to Enforce**" and together with the Ignition Switch Plaintiffs Motion to Enforce and the Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce, the "**Motions to Enforce**").

27.    The Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce was also filed in conjunction with the launch of the Feinberg Protocol which "provided eligible Plaintiffs with an alternative (*i.e.*, a source of recovery under the Fienberg Protocol) to the enforcement of the Sale Order and Injunction against them."   According to the Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce, the Feinberg Protocol was developed and designed "for the

---

[13]    The claims sought to be enjoined in that motion were limited to personal injury and wrongful death claims resulting from vehicles with the Ignition Switch Defect (i.e. Recall No. 14V-047).

submission, evaluation, and settlement of death or physical injury claims resulting from accidents allegedly caused by defective ignition switches in certain vehicles." *Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce* [ECF No. 12807] at 2.

28.    In large part, the prosecution of the Motions to Enforce set in motion litigation over Plaintiffs' late claims that was piecemeal and disjointed. In furtherance of resolution of the Ignition Switch Plaintiffs Motion to Enforce, on or about July 11, 2014, the Bankruptcy Court entered a *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929* [ECF No. 12770] (the "**Supplemental Scheduling Order**")[14].    The Supplemental Scheduling Order identified four threshold issues (the "**2014 Threshold Issues**") to be determined, including whether any of the claims in these actions were claims against Old GM and, if so, whether such claims should "nevertheless be disallowed/dismissed on grounds of equitable mootness . . . ." Id.[15]  The Supplemental Scheduling Order also required the parties to submit to the Bankruptcy Court on or before August 8, 2014 agreed upon stipulations of fact and to jointly identify any facts that could not be stipulated to with respect to the Four Threshold Issues[16], and established a briefing schedule for the Four Threshold Issues.

---

[14]    The Supplemental Scheduling Order superseded the *Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929* entered on May 16, 2014 [ECF No. 12697] (the "**May 2014 Scheduling Order**").  Among other things, the May 2014 Scheduling Order identified five (5) threshold issues to be resolved and required the submission of agreed-upon stipulations of fact to the Bankruptcy Court by July 1, 2014.

[15]    Notably, the only vehicles covered by the 2014 Threshold Issues briefing were those with the Ignition Switch Defect.

[16]    On August 8, 2014, New GM, certain Plaintiffs by and through Designated Counsel, the Groman Plaintiffs, the GUC Trust, and the Unitholders filed the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014* [ECF No. 12826] (the "**August 8, 2014 Stipulations of Fact**").

11

29.    This schedule was later applied to the Ignition Switch Pre-Closing Accident Plaintiffs Motion to Enforce, which was limited to accidents involving vehicles with the Ignition Switch Defect.   See *Scheduling Order Regarding Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [ECF No. 12897].

30.    On April 15, 2015, the Bankruptcy Court issued its *Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., 529 B.R. 510 (the "Enforcement Decision") [ECF No. 13109].  The Bankruptcy Court held that the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs were known creditors who did not receive constitutionally adequate notice of the Sale or Bar Date.  See In re Motors Liquidation Co., 529 at 574.

31.    The Bankruptcy Court further held that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them" under the doctrine of equitable mootness.  In re Motors Liquidation Co., 529 B.R. at 529; see also June 2015 Judgment ¶ 6.  On direct appeal, the Second Circuit vacated this equitable mootness ruling as an advisory opinion.  See Elliott, 829 F.3d at 168-69.

32.    The Non-Ignition Switch Plaintiffs Motion to Enforce, which was limited to plaintiffs asserting economic loss claims and did not cover accident plaintiffs, was deferred pending resolution of the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs Motions to Enforce.  See In re Motors Liquidation Co., 529 B.R. at 523.  No motion to enforce was filed against Non-Ignition Switch Pre-Closing Accident Plaintiffs.  It has not yet been determined whether any Non-Ignition Switch Plaintiffs or Non-Ignition Switch Pre-Closing Accident Plaintiffs suffered a due process violation in connection with the entry of the Sale Order or the Bar Date Order.

III.  **Developments in the Bankruptcy Court Following the Second Circuit Opinion.**

33.    On or about December 13, 2016, on remand from the Second Circuit's opinion

vacating the equitable mootness ruling and making clear the due process violation, the Bankruptcy

Court issued the *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with*

*Claims Asserted Against General Motors LLC That Involve Vehicles Manufactured by General*

*Motors Corporation* [ECF No. 13802] (the "**Order to Show Cause**").  The Order to Show Cause

identified five (5) threshhold issues (the "**2016 Threshold Issues**") for resolution in light of the

Second Circuit decision.  Relevant here is the issue of whether "the Ignition Switch Plaintiffs

and/or Non-Ignition Switch Plaintiffs [defined in the Order to include plaintiffs asserting both

economic loss and personal injury or wrongful death claims] satisfy the requirements for

authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably

moot (the "**Late Proof of Claim Issue**")."[17]

34.    The Order to Show Cause also established a December 22, 2016 deadline to file

motions seeking authority to file late claims ("**Late Claims Motions**").  See Order to Show Cause

at 5 ¶ 1.  No additional issues (such as class certification, discovery, or the merits of a late proof

of claim) would be addressed in these motions.  See id.  In addition, the procedures provided that

briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs and

Pre-Closing Accident Plaintiffs would be stayed pending resolution of the other 2016 Threshold

Issues.  See id. at 5 ¶ 2.

35.    In accordance with the Order to Show Cause, on December 22, 2016, the Ignition

Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Ignition Switch Pre-Closing

---

[17]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3.

92514240.7

Accident Plaintiffs filed Late Claims Motions.[18]  The motions attached proposed proofs of claim,

including proposed class proofs of claim asserted on behalf of purported class representatives for

Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim

on behalf of certain Ignition Switch Pre-Closing Accident Plaintiffs.  See id.[19]  Certain other

Plaintiffs subsequently filed joinders to the Late Claims Motions pursuant to the terms of the Order

to Show Cause.

36.    Thereafter, in connection with the Ignition Switch Plaintiffs' and Ignition Switch

Pre-Closing Accident Plaintiffs' Late Claims Motions, the Parties participated in two status

conferences before the Bankruptcy Court, engaged in preliminary rounds of discovery, and filed

briefs addressing two preliminary issues raised in the Late Claims Motions: (i) whether relief can

be granted absent a showing of excusable neglect under the Pioneer factors; and (ii) the

applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll

timeliness objections (the "**Initial Late Claims Motions Issues**").[20]  Subsequent to such briefing,

certain Plaintiffs who had not previously appeared before the Bankruptcy Court filed motions

seeking authority to file late proofs of claim.

---

[18]    See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[19]    On April 24, 2018, the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed amended proposed class proofs of claim.  See *Notice of Filing of Amended Exhibits to Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Apr. 25, 2018 [ECF No. 14280].

[20]    See *Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869]; *Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13871]; *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

14

92514240.7

IV.    **Plaintiffs' Alleged Claims Against Old GM.**

37.    The proposed class claims addressed in the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' Late Claims Motions (the "**Proposed Class Claims**") allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[21] The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[22]

38.    Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[23]

39.    The Ignition Switch Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by the Ignition Switch Defect (the "**Personal Injury Claims**," and together with the Proposed Class Claims, the "**Claims**").[24]

40.    Additionally, certain Pre-Closing Accident Plaintiffs asserting personal injury and wrongful death claims arising from accidents they assert were caused by vehicles subject to Recall Nos. 14V-355, 14V-394, 14V-400, 14V-540 (and who are identified by name and Recall Number on Schedule 1 to the Settlement Agreement, and are Signatory Plaintiffs to such agreement) have

---

[21]    See Amended Exhibit A to the Economic Loss Late Claim Motion (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 57-285; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**") ¶¶ 38-175.

[22]    See, e.g., Proposed Ignition Switch Class Claim ¶ 374; Proposed Non-Ignition Switch Class Claim ¶ 278.

[23]    See Proposed Ignition Switch Class Claim ¶¶ 358-1697; Proposed Non-Ignition Switch Class Claim ¶¶ 262-1744.

[24]    See, e.g., *Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

15

92514240.7

informed the GUC Trust that they intend to file a Supplemental Late Claims Motion on or before

May 31, 2018.  The Supplemental Late Claims Motions will be settled under the Settlement

Agreement.

41.    New GM has consistently taken the position that any such claims are properly

asserted against the GUC Trust and not against New GM.[25]

42.    Subsequent to filing the Late Claims Motions, counsel for the proposed class

representatives for the Ignition Switch Plaintiffs, the proposed class representatives for certain

Non-Ignition Switch Plaintiffs, and counsel for certain Pre-Closing Accident Plaintiffs provided

the GUC Trust with materials and expert reports describing in detail the factual background for

their claims, the alleged viability of the asserted claims and the alleged amount of damages (the

"**Proffered Evidence**").

43.    In addition, they provided a report by Stefan Boedeker, an expert on surveys and

statistical sampling, analyzing the amount of alleged damages for the Ignition Switch Plaintiffs'

and certain Non-Ignition Switch Plaintiffs' claims based on a conjoint analysis conducted by Mr.

Boedeker and Berkeley Research Group.

44.    Conjoint analysis is a set of econometric and statistical techniques developed to

study consumer preferences and is widely used as a market research tool.  In a conjoint analysis,

study participants review a set of products with different attributes (such as a vehicle shown in

different colors) and choose which product they would prefer to purchase.  The collected data can

---

[25]    The record is replete with attempts by New GM to saddle the Old GM estate with these potentially massive claims. "To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate."  Dkt. 12981 (New GM's 2014 Threshold Issues Br.) at 53; "To the extent they had any claim, it was against Old GM and they retained that claim after the 363 Sale."  Id. at 36; "Every one of their claims, the economic loss plaintiffs' claims, is a claim that's assertable against Old GM as it relates to an Old GM vehicle."  Hr'g Tr. Feb. 17, 2015 at 59:17-19 (New GM counsel Arthur Steinberg).

92514240.7

be used to determine market preferences and the value consumers place on particular attributes of a product. Here, the alleged amount of damages for economic loss claims was determined by using a conjoint analysis to evaluate the difference in value that consumers placed on an Old GM vehicle without a defect as compared to an identical vehicle with a defect.

45.    Certain Pre-Closing Accident Plaintiffs provided materials describing the personal injury and wrongful death claims of certain plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts. The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.

46.    The valuation of these plaintiffs' asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the Adjustment Shares under the AMSPA. While the GUC Trust disputes that Plaintiffs are entitled to this (or any) level of damages, it recognizes that there is no guarantee that it would be able to defeat or reduce such damages claims if the issues were litigated.

47.    Likewise, New GM has presented the GUC Trust Administrator with expert reports and other evidence attempting to discredit the Proffered Evidence and also support its position in these bankruptcy cases and other related litigation ("**New GM Evidence**"). New GM does not challenge the damage valuation method, rather New GM alleges that there is simply no basis for economic loss or personal injury damages.

48.    While the GUC Trust believes there are legal and factual arguments that refute the damages asserted in the Proffered Evidence, it recognizes that there is no guarantee that it would be able to defeat or reduce such damages claims if the issues were litigated. At a minimum, the GUC Trust believes that such litigation would be expensive and time consuming. Thus, after reviewing the Proffered Evidence, the New GM Evidence, and in consultation with the GUC Trust

17

Monitor, and considering the benefits of the Settlement as a whole to the Unitholders to whom it owes its fiduciary duty, the GUC Trust has concluded that the Settlement falls well within the range of reasonableness.

## V.    The Settlement Agreement.

49.    Following the filing of the Late Claims Motions, the Parties engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old GM estate and the assets held and previously distributed by the GUC Trust.   These include negotiations held before and after the Settlement Decision, which denied Plaintiffs' motion to enforce the terms of a prior, unsigned draft of a settlement with Plaintiffs.   After the Court issued the Settlement Decision, and after the expiration of the forbearance agreement between the GUC Trust and New GM, the GUC Trust conducted extensive additional negotiations with both the Plaintiffs and New GM.   The Trust also reviewed voluminous materials regarding the merits and potential value of Plaintiffs' claims that were provided by each side of the dispute (i.e., Plaintiffs and New GM).   As a result of these additional negotiations, and after securing Plaintiffs' consent to changes addressing concerns of the Trust regarding the terms of the prior proposed agreement, the GUC Trust and Plaintiffs executed the Settlement Agreement.

50.    The Settlement Agreement resolves the Late Claims Motions (including the Initial Late Claim Motions Issues), the Late Proof of Claim Issue, the allowance of Plaintiffs' claims, and Plaintiffs' rights to GUC Trust Assets.   The Settlement Agreement also places the asserted claims of all Plaintiffs on the same track, correcting the disjointed approach introduced by New GM.

51.    The key terms of the Settlement Agreement are as follows:[26]

---

[26]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the Settlement Agreement.   To the extent that there are any inconsistencies between the description of the Settlement Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement Agreement shall control.   A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

92514240.7

a.      The GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Motion and the Claims Estimation Motion in an amount not to exceed $6 million.  The Signatory Plaintiffs agree to pay any required noticing costs in excess of $6 million.

b.      The Settlement Agreement becomes effective on the date the Settlement Order becomes a Final Order (the "**Settlement Effective Date**"), provided, however, that from and after the date the Settlement Order is entered by the Bankruptcy Court, the GUC Trust may waive the requirement that the Settlement Order be a Final Order.

c.      Within five (5) business days of the Settlement Effective Date, the GUC Trust will irrevocably pay $15,000,000 (the "**Settlement Amount**") into a trust, fund or other vehicle (the "**Settlement Fund**") for the exclusive benefit of Plaintiffs.  All Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Settlement Amount (the "**GUC Waiver Provision**").

d.      Contemporaneously with payment of the Settlement Amount, the Plaintiffs will be deemed to irrevocably waive and release all claims against the GUC Trust, including a release of any rights to prior distributions of or current GUC Trust Assets and any rights to distributions by the Motors Liquidation Company Avoidance Action Trust (the "**Waiver Provision**").  For the avoidance of doubt, the Settlement Agreement and Settlement Order define "Plaintiffs" to include all persons who now have, or in the future could have, claims against the Old GM estate related to any of the Recalls, such that the Waiver Provision shall be applicable to all such parties whether or not they have asserted any claims against the Old GM estate or the GUC Trust to date.  However, being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Settlement Amount, the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.

e.      In light of the benefits of the Settlement, the GUC Trust agrees that, subject to the entry of the Settlement Order, it will seek the entry of a Claims Estimate Order that (i) estimates the aggregate allowed General Unsecured Claims of Plaintiffs against Sellers and/or the GUC Trust pursuant to Section 5.1 of the GUC Trust Agreement, Section 7.3 of the Plan, Section 3.2(c) of the AMSPA and the Side Letter in an amount that, as of the date of the Estimation Order, could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares, and (ii) directs that, subject to Section 2.13 of the Settlement Agreement, any such Adjustment Shares issued as a result of an Estimation Order, or the value of such Adjustment Shares be promptly delivered by New GM to the Settlement Fund.  Certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining the aggregate Allowed General Unsecured Claims for a Claims Estimate Order.

92514240.7

f.    Contemporaneously with payment of the Settlement Amount, all Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, will be deemed to irrevocably waive and release any and all rights to the Adjustment Shares.

g.    Subject to notice, an opportunity for Plaintiffs to object and approval by the Bankruptcy Court, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, and the eligibility and criteria for payment. Notice of the proposed allocation and proposed eligibility and criteria for payment will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

h.    Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Settlement Amount and the Adjustment Shares. Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither the Settlement Amount nor the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

## **RELIEF REQUESTED**

52.    By this Motion, the Parties respectfully request that this Court approve the actions taken by the GUC Trust Administrator set forth in the Settlement Agreement, and enter the Settlement Order substantially in the form attached to this Motion as **Exhibit B**.

92514240.7

## BASIS FOR RELIEF REQUESTED

**I.    The Court Should Find that Entry into the Settlement is an Appropriate Exercise of the GUC Trust Administrator's Authority and Approve Actions Taken by the GUC Trust Administrator in Connection Therewith Pursuant to Section 8.1(e) of the GUC Trust Agreement.**

53.    The GUC Trust Administrator seeks a determination by the Court that entry into the Settlement and estimation of Allowed General Unsecured Claims as described in the Settlement Agreement is an appropriate exercise of the GUC Trust Administrator's rights, powers, and/or privileges.

54.    "The practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment." Mosser v. Darrow, 341 U.S. 267, 274 (1951); see also In the Matter of the Application of U.S. Bank Nat'l Ass'n, No. 651625/2018, NYSCEF No. 1 (N.Y. Sup. Ct. April 4, 2018) (petition seeking an order, following an estimation proceeding, that instructs and authorizes trustees to make distributions pursuant to method proposed); In re Am. Home Mort. Inv. Trust 2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867, at *29-30 (explaining that "[t]rust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents"), In re Peierls Family Inter Vivos Trusts, 59 A.3d 471, 477 (Del. Ch. 2012) (noting that a "request for judicial relief involving a trust can be appropriate in many circumstances").

55.    Judge Wiles recently considered a similar request for instruction in In re Tronox Inc., No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17, 2015). In that matter, the trustee of the Tronox Incorporated Tort Claims Trust (established under the Tronox debtors' plan of reorganization, and governed by a trust agreement and a set of trust distribution

21

procedures) filed a motion seeking instruction regarding whether the trustee was correct with respect to certain past action.  See id. at *1-2.  The court noted that because the trustee was seeking "'comfort' as to actions already taken rather than … 'instructions' as to what the [t]rustee should do going forward in administering the [t]rust," it had "some skepticism as to whether the motion … [was] an appropriate request for instructions."  Id. at *21.  The court based its skepticism on the notion that "[o]rdinarily a [t]rustee seeks instructions when it has not yet taken action and where the [t]rustee is unsure as to what to do, and may even face liability for an incorrect choice." Id. (citations omitted).  The court further noted that the request before it was "not really a request for 'instructions' as to how to interpret the existing [t]rust documents[,]" but "more of a request for an advisory opinion as to whether a proposed change to the" trust distribution procedures "would be consistent (or inconsistent) with the terms of the [debtors' plan] and the vested rights of claimants."  Id. at *22.  Noting, however, that it was "plain that further litigation – and thereby further delays in distributions to the beneficiaries of the [t]rust, who [had] already been waiting for many years – [were] inevitable unless some binding clarification of these issues is provided[,]" and based upon the conclusion that the court, under the plan, had "continuing jurisdiction over any issue relating to the interpretation and application of the [t]rust [a]greement" and the trust distribution procedures, the court found that it was "appropriate" to exercise its jurisdiction and issue the ruling as requested.  Id. at *23.

56.    Here, the GUC Trust Administrator is specifically authorized to seek guidance from the Court in this matter pursuant to § 8.1(e) of the GUC Trust Agreement, which provides, in relevant part, that

> where the GUC Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate, or desirable, the GUC Trust Administrator will have the right to submit to the Bankruptcy Court … any question or questions regarding any specific action

> proposed to be taken by the GUC Trust Administrator with respect to the [GUC Trust Agreement], the GUC Trust, or the GUC Trust Assets …. Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the GUC Trust Administrator.

GUC Trust Agreement § 8.1(e).

57.     The GUC Trust Administrator has determined that, given the import of both the Settlement and the estimation of allowed General Unsecured Claims in the manner described in the Estimation Motion on the forward trajectory of this matter, it is necessary, appropriate, and desirable to ask the Court at this time whether the actions the GUC Trust Administrator proposes to take in connection therewith are permissible and appropriate. As noted, the GUC Trust Administrator has the exclusive right to object to General Unsecured Claims, seek estimation of the amount of allowed General Unsecured Claims, and seek Adjustment Shares from New GM. Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1. Moreover, similar to the circumstances extant in Tronox, the Court has continuing jurisdiction to interpret, implement, or enforce the GUC Trust Agreement. Plan § 11.1(i); see also GUC Trust Agreement § 8.1(e). Unlike the Tronox trustee, however, the GUC Trust Administrator is seeking instruction regarding actions it proposes to take based on its interpretation of the relevant documents. Based on the foregoing, it is well within the Court's authority to issue a ruling "approv[ing] … [the described] proposed action" by the GUC Trust Administrator. GUC Trust Agreement § 8.1(e).

92514240.7

## II.   The Court Should Authorize the Reallocation of $15 Million of GUC Trust Funds.

58.     As noted above, under the terms of the Settlement, the GUC Trust is obligated to pay $15 million to the Settlement Fund.  Pursuant to Section 5.5 of the GUC Trust Agreement, the GUC Trust Administrator is afforded the flexibility to "hold back" from distributions (with the approval of the GUC Trust Monitor)[27] assets that would otherwise be distributed to GUC Trust Beneficiaries to reserve for unresolved disputed claims.  *See* GUC Trust Agreement § 5.5.  The GUC Trust has historically held back an amount sufficient to pay $50 million in disputed claims, which totals approximately $14.8 million.  Since the only remaining dispute is with the Plaintiffs, the GUC Trust seeks authority to use the disputed claims holdback to pay the amount required under the Settlement Agreement.  Section 6.1 of the GUC Trust Agreement specifically provides the GUC Trust Administrator with the ability to seek Bankruptcy Court approval (after consultation with the GUC Trust Monitor) to redesignate GUC Trust Distributable Assets.

59.     Accordingly, the GUC Trust submits that, pursuant to Sections 5.5 and 6.1 of the GUC Trust Agreement, the request to reallocate $15 million of otherwise distributable assets for the purposes of funding the Settlement should be approved pursuant to the terms of the GUC Trust Agreement.

## III.   The Court Should Approve the Settlement Agreement Pursuant to Bankruptcy Rule 9019.

60.     Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve a settlement under Bankruptcy Code section

---

[27] As required by Section 6.1 of the GUC Trust Agreement, the GUC Trust Administrator has consulted with the GUC Trust Monitor with respect to the proposed reallocation and use of distributable cash.  GUC Trust Agreement § 6.1.  The GUC Trust Monitor has indicated that it supports the relief requested herein.

92514240.7

105(a), which empowers it to issue any order that is "necessary or appropriate." 11 U.S.C. §
105(a).

61.     The authority to approve a compromise or settlement is within the sound discretion
of the Court. See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972). The Court should exercise
its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown &
Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue,
165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in
fact, encouraged . . . ." (citation omitted)).

62.     When exercising its discretion, the Court must determine whether the settlement is
fair and equitable, reasonable, and in the best interests of the estate. See, e.g., Airline Pilots Ass'n,
Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y.
1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R. 519, 523
(S.D.N.Y. 1993). Where "the integrity of the negotiation process is preserved, a strong initial
presumption of fairness attaches to the proposed settlement . . . ." In re Hibbard, 217 B.R. at 46.

63.     The Court need not decide the numerous issues of law and fact raised in the
underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below
the lowest point in the range of reasonableness.'" In re Adelphia Commn'cs Corp., 327 B.R. 143,
159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir. 1983));
see also Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the
merits of the underlying [dispute] . . . .").

64.     The Court evaluates whether the Settlement Agreement is fair and equitable based
on "the probabilities of ultimate success should the claim be litigated," and "an educated estimate
of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of

92514240.7

collecting on any judgment which might be obtained, and all other factors relevant to a full and

fair assessment of the wisdom of the proposed compromise." Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

65.    Courts in this jurisdiction consider the following Iridium factors in determining

whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in collecting
> on the judgment; (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement"; (4) whether other
> parties in interest support the settlement; (5) the "competency and experience of
> counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court
> judge" reviewing, the settlement; (6) "the nature and breadth of releases to be
> obtained by officers and directors"; and (7) "the extent to which the settlement is
> the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d

452, 462 (2d Cir. 2007) (citations omitted).

66.    The Settlement Agreement falls well within the range of reasonableness and

satisfies each of the Iridium factors as set forth below.  Thus, the Settlement Agreement should be

approved under Bankruptcy Rule 9019.

**A.    The Settlement's Benefits Outweigh the Likelihood of
Success in Protracted Litigation over Numerous, Complex Issues.**

67.    The first two Iridium factors—(1) the balance between the litigation's likelihood of

success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—

are easily met.  As detailed below, continued litigation over Plaintiffs' claims raises significant,

complex issues, has an uncertain outcome, and would be costly and time consuming.  Conversely,

the benefits of near-term, certain resolution are clear.

92514240.7

1.     **Litigation over Plaintiffs' Claims Raises Numerous Complex Issues**.

68.     One complex, contentious issue raised by the litigation over Plaintiffs' claims is whether the Court should grant Plaintiffs authority to file late claims and class claims under the Late Filed Claims Order.  See Late Filed Claims Order at 1-2.

69.     As an initial matter, there is a strong dispute over the standard for obtaining leave to file late claims.  Certain Plaintiffs have argued that creditors may assert late claims based solely on a showing that they have suffered a due process violation related to the Bar Date.[28]  The GUC Trust has taken the position that Plaintiffs are precluded from asserting late claims because of Plaintiffs' strategic delay in pursuing claims against the GUC Trust after the Recalls.[29]

70.     The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs have also asserted that they can meet the Pioneer factors for demonstrating excusable neglect.  Of the four Pioneer factors, the one given the most weight is the reason for the delay in filing claims, including whether the delay was in the reasonable control of the movant.  See In re Residential Capital, LLC, Case No. 12-12020 (MG), 2015 WL 515387, at *5 (Bankr. S.D.N.Y. Feb. 6, 2015). The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs have argued that a debtor's failure to provide actual notice to a known creditor is evidence that any delay was not in control of the creditor.  The GUC Trust, in turn, has argued that the delay here is attributable to Plaintiffs' voluntary strategic decision, made after the Recalls, to pursue New GM and not the GUC Trust.  In response, the Plaintiffs have argued that, among other things, the February 2012

---

[28]    See, e.g., *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

[29]    See *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873].

92514240.7

order effectively precluded the filing of late claims until the Second Circuit vacated the equitable mootness ruling.

71.    Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, many of these plaintiffs have alleged that their claims arise out of defects that are substantially similar to the Ignition Switch Defect—defects that involve the same condition (low torque switches that move out of the "run" position) and have the same effects (loss of power to steering, brakes, and airbags). The Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have also argued that they can demonstrate a violation of their due process rights in connection with the Bar Date.

72.    Further, the Plaintiffs have argued, and the GUC Trust disputes, that excusable neglect can exist in the absence of a due process violation. For example, Plaintiffs have asserted that excusable neglect can be found where the debtors failed to comply with bankruptcy procedures in providing notice of a bar date and where a claimant, through no fault of its own, was unaware of its claim prior to the bar date. See In re Arts de Provinces de France, Inc., 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993); In re PT-1 Commc'ns, Inc., 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003). This issue, too, would have to be litigated.

73.    Another complex issue is whether the doctrine of equitable mootness is applicable to bar Plaintiffs' claims. See In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993).

74.    In the April 2015 Decision, the Bankruptcy Court applied the five Chateaugay factors[30] and determined that if the Ignition Switch Plaintiffs' or Ignition Switch Pre-Closing

---

[30]    These five factors are: (i) the court can still order some effective relief; (ii) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be adversely

92514240.7

Accident Plaintiffs' late claims were allowed, GUC Trust Assets could not be tapped to pay them under the doctrine of equitable mootness. See In re Motors Liquidation Co., 529 B.R. at 598. The Bankruptcy Court found, *inter alia*, that any relief would "knock the props out" from the transactions in which Unitholders acquired their units. See id. at 587-88, 592. Allowing billions of dollars in additional claims against the GUC Trust, in Judge Gerber's view, would be "extraordinarily unjust" given the Unitholders' expectation that the universe of claims against the GUC Trust would decrease, and not increase, over time following the Bar Date. Id. at 88. The Bankruptcy Court's determination was also based, in part, on its acknowledgment that purchasers of GUC Trust units could not foresee that future distributions would be delayed while additional claims were filed and litigated. Id. at 88-89.

75.     On appeal, the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs argued that the Bankruptcy Court erred because, *inter alia*, effective relief could be fashioned without disturbing any transactions or having an adverse impact on Unitholders by providing Plaintiffs with exclusive access to any Adjustment Shares that may be issued under the AMSPA.[31] These Plaintiffs argued that where any relief, including partial relief, is available, equitable mootness should not be applied. See, e.g., Chateaugay, 10 F.3d at 954. In addition, they argued that equitable mootness was only applicable in the context of bankruptcy appeals.[32]

---

affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." In re Chateaugay Corp., 10 F.3d at 952-53.

[31]     See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) [ECF No. 235], 49-52; Br. for Ignition Switch Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) [ECF No. 183], 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

[32]     See Response and Reply Br. for Appellant-Cross-Appellee Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Feb. 1, 2016) [ECF No. 315], at 40-43.

29

76.    The Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory, neither affirming nor reversing that decision.

77.    Additional complex issues would certainly arise from continued litigation of Plaintiffs' claims.  The Bankruptcy Court would need to decide whether class certification for the economic loss Plaintiffs' proposed class proofs of claims would be appropriate.  In addition, the GUC Trust could raise objections to allowance of these class claims, as well as to the separate proofs of claim filed by Ignition Switch Pre-Closing Accident Plaintiffs.  This could lead to the need to resolve issues under the varied laws of the fifty states and the District of Columbia.

78.    In sum, while the GUC Trust believes that it has meritorious defenses to the claims of all Plaintiffs, the resolution of the numerous, complex issues raised by the litigation over Plaintiffs' claims is uncertain, and, as set forth below, would result in significant expense and delay.

### 2.    The Terms of the Settlement Agreement Outweigh the Risks of Continued Litigation.

79.    Litigation of these complex issues has been ongoing for years, consuming large sums of money and countless hours of labor for the Parties and this Court.  In the absence of settlement, there is a high likelihood of even more expensive, protracted and contentious litigation that will consume significant estate funds and expose the estate to risk and uncertainty.  In addition, resolution of these issues may require the added time and expense of discovery.  For example, the Pioneer analysis is fact intensive and, to date, only limited discovery, restricted to a proposed class representative of the Ignition Switch Plaintiffs and certain Ignition Switch Pre-Closing Accident Plaintiffs, has occurred on this issue.

92514240.7

80.     By comparison, settling the litigation provides the Parties with greater certainty and eliminates the significant cost and delay of litigation.   In addition, the Settlement Agreement provides several benefits beyond avoiding continued litigation.

81.     First, the Parties' determination to seek a Claims Estimate Order allowing and estimating Plaintiffs' claims in an amount, when combined with all of the other Allowed General Unsecured Claims against the Old GM estate, that may equal or exceed $42 billion, provides an efficient and reasonable resolution of the allowable amount of Plaintiffs' claims.

82.     Under the Settlement, any Adjustment Shares issued by New GM under this Claims Estimate Order would be for the exclusive benefit of Plaintiffs.   Based on the amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these shares would not be triggered absent allowance of Plaintiffs' claims.[33]   Thus, the GUC Trust determined that it was reasonable to forgo any potential future recovery from the Adjustment Shares in consideration for the Release.   This provision potentially paves the way for Plaintiffs to obtain a recovery on their claims without disturbing other creditors' past or future recoveries.

83.     Further, the Settlement removes a major impediment to winding down the Old GM estate.  The resolution of Plaintiffs' claims and waiver of certain rights and claims eliminates the likelihood of complex and protracted litigation, including with respect to Plaintiffs' attempts to enjoin further GUC Trust distributions, thus preventing delay in distributing remaining GUC Trust Assets and protects Unitholders from the risk of claw-back or recapture of prior distributions.

84.     Finally, given that nearly all the GUC Trust's funds have been distributed or reserved for the Bankruptcy Code section 502(h) claim emanating from the Avoidance Action

---

[33]   See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of March 30, 2018*, dated Apr. 30, 2018 [ECF No. 14290].

31

Litigation, it is likely that the GUC Trust would run out of funds prior to completing the litigation of these claims.

85.    The terms of the Settlement Agreement reflect a reasonable assessment of the substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more near-term, efficient and certain resolution of the allowable amount of Plaintiffs' claims and sources of recovery.  The benefits of the Settlement in the near term outweigh the benefit of potential long-term success through the protracted litigation of complex issues.

### B.    The Settlement Agreement Is Beneficial to Creditors and Supported by Interested Parties.

86.    With respect to the third and fourth <u>Iridium</u> factors—the paramount interests of creditors and whether other interested parties support the settlement—prolonging the litigation will increase costs and decrease the amount of GUC Trust Assets available to satisfy creditors. Approving the Settlement Agreement, on the other hand, avoids the significant expense and uncertainty associated with continued litigation, and maximizes and expedites distributions to current GUC Trust beneficiaries.  The release of Plaintiffs' rights and claims with respect to the GUC Trust's prior distributions and current GUC Trust Assets allows the GUC Trust to complete the orderly wind-down of the Old GM estate.

87.    Moreover, providing Plaintiffs with the exclusive right to proceed against a settlement fund containing the Settlement Amount and the Adjustment Shares potentially opens an avenue for Plaintiffs to recover on their claims against the GUC Trust without disturbing recovery expectations of other creditors or Unitholders.  Plaintiffs' rights concerning the Adjustment Shares are protected because notice of any agreement by the Signatory Plaintiffs on proposed criteria to assert a claim against the Settlement Fund and a proposed methodology of

allocation of the Settlement Fund between economic loss claims and personal injury/wrongful death claims will be provided to Plaintiffs, who will be given an opportunity to object.

88.     Not surprisingly, the key interested parties—the GUC Trust (who has sole authority under the Late Filed Claims Order to consent to late filed claims and is the only party under the Plan provided with standing to object to the allowance of claims), Signatory Plaintiffs and the Participating Unitholders—all support the Settlement Agreement.   Accordingly, for all of the reasons set forth above, the Settlement easily meets the <u>Iridium</u> factors and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement.   GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

**C.     The Settlement Agreement Satisfies the Remaining *Iridium* Factors.**

89.     With respect to the sixth factor, "the nature and breadth of releases to be obtained by officers and directors," in exchange for the payment of $15 million, the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, the Avoidance Action Trust and Unitholders.   Importantly, the notice procedures set forth in the Notice Procedures Motion contemplate a comprehensive individualized mailing program whereby Plaintiffs receive a concise summary of the Settlement Agreement and instructions for accessing a website dedicated

92514240.7

specifically to the Settlement. Each recipient, therefore, will have the opportunity and right to be heard by the Court in connection with the Settlement.

90.    With respect to the fifth and seventh <u>Iridium</u> factors, competent and experienced counsel to the Parties who have been litigating these issues for years actively engaged in arms'-length, good faith negotiations to formulate the Settlement Agreement. The Parties, having considered the uncertainties, delay and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable and appropriate, and in the best interests of the Parties.

91.    Based on the foregoing, the Settlement Agreement is in the best interests of the estate and its creditors and falls well within the range of reasonableness. Therefore, entry into and approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted and the Settlement Agreement should be approved.[34]

## <u>NOTICE</u>

92.    Notice of this Motion has been provided in accordance with the Court-approved notice procedures. <u>See</u> *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [ECF No. 10183]. Notice of this Motion has also been provided to any other required notice parties under Section 6.1(b)(iv) of the GUC Trust Agreement. The Parties submit that no other or further notice need be provided.

---

[34] In the event that the Settlement Agreement is not approved by the Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all their rights and nothing herein shall be deemed or construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made in furtherance of settlement discussions.

92514240.7

## **NO PRIOR REQUEST**

No previous application for the relief sought in this Motion has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE, the Parties respectfully request that the Court: (i) enter an order substantially in the form attached hereto as **Exhibit B** approving the actions to be undertaken by the GUC Trust Administrator under the terms of the Settlement and approving the Settlement Agreement, attached hereto as **Exhibit A**, pursuant to Bankruptcy Rule 9019; (ii) authorize the reallocation of $15 million of GUC Trust Assets; and (iii) grant such other relief as is just and equitable.

*[Remainder of the page intentionally left blank]*

92514240.7

Dated:  New York, New York
        May 3, 2018

                            Respectfully submitted,

                            By:    /s/   *Kristin K. Going*
                                   Kristin K. Going
                                   Clay J. Pierce
                                   Marita S. Erbeck
                                   DRINKER BIDDLE & REATH LLP
                                   1177 Avenue of the Americas
                                   41st Floor
                                   New York, NY 10036-2714
                                   Tel: (212) 248-3140
                                   E-mail: kristin.going@dbr.com
                                           clay.pierce@dbr.com
                                           marita.erbeck@dbr.com

                                   *Attorneys for the Motors Liquidation*
                                   *Company GUC Trust Administrator*

36