```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
In re:                                                      :
                                                            :   Chapter 11 Case No.
MOTORS LIQUIDATION COMPANY, et al.,                         :
f/k/a General Motors Corp., et al.                          :   09-50026 (MG)
                                                            :
                         Debtors.                           :   (Jointly Administered)
                                                            :
                                                            :
------------------------------------------------------------x
```

**DECLARATION OF DAVID A. VANASKEY JR. IN SUPPORT OF: (1) THE MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST TO APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE GUC TRUST PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363, AND 1142 AND BANKRUPTCY RULES 3020 AND 9019; AND (2) THE MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST TO ESTIMATE VEHICLE RECALL ECONOMIC LOSS AND PERSONAL INJURY CLAIMS FOR ALLOWANCE PURPOSES AND TO ESTABLISH A SCHEDULE FOR THE CLAIMS ESTIMATION PROCEEDING**

I, David A. Vanaskey Jr. declare:

1. I am a Vice President of Wilmington Trust Company ("**WTC**"), located at Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity as trustee for and administrator (the "**Administrator**") of the Motors Liquidation Company GUC Trust (the "**GUC Trust**").[1]

2. I submit this Declaration in support of: (i) *Motion Of Motors Liquidation Company GUC Trust To Approve The Settlement Agreement By And Among The Signatory Plaintiffs And The GUC Trust Pursuant To Bankruptcy Code Sections 105, 363, And 1142 And Bankruptcy Rules 3002 And 9019* (the "<u>Settlement Motion</u>"); and (ii) Motion of Motors

---

[1] Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Settlement Agreement dated April 25, 2018 or the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015 (the "**GUC Trust Agreement**") [ECF No. 13332].

92547214.3

*Liquidation Company GUC Trust To Estimate Vehicle Recall Economic Loss And Personal Injury Claims For Allowance Purposes And To Establish A Schedule For The Claims Estimation Proceeding* each dated May 2, 2018, and filed concurrently with this declaration.

3. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

**Background**

4. I am a Vice President of WTC with over 30 years of experience in its financial services group, including 25 years specializing in capital markets, defaults and corporate restructuring. In such capacity, I and the WTC teams overseen by me have directed multiple accounts and products in varying contexts, including chapter 11 reorganizations. Specifically, I have provided services in connection with the following major bankruptcy cases: (a) *In re UAL Corp.*; (b) *In re US Airways Group, Inc.*; (c) *In re Baldwin*; (d) *In re Delta Air Lines, Inc.*; (e) *In re Solutia Inc.*; (f) *In re Mesa Air Group, Inc.*; (g) *In re Circuit City Stores, Inc.*; and (h) *In re General Motors Corporation.*

5. WTC's initial role in the Old GM bankruptcy was serving as the successor Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation. During the bankruptcy, WTC served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

6. On March 29, 2011, the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered a Confirmation Order confirming the Debtors' liquidating Plan, and appointing WTC as the Administrator. The GUC Trust is governed by a trust agreement, which has been modified in accordance with its terms several times since the entry of the Confirmation Order.

2

92547214.3

7. Prior to the Effective Date of the Plan, I served as the lead representative of WTC in its capacities as Indenture Trustee and chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company. From and after the Effective Date, I served, and continue to serve, as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust. Through such experiences, I have developed an intimate understanding of the Debtors, the Plan, the GUC Trust Agreement, and the other facts and circumstances that form the basis of this Declaration.

### The Sale Order and the Bar Date

8. On July 5, 2009, the Bankruptcy Court entered the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief* (Dkt. 2968) (the "**Sale Order**"). Under the Amended and Restated Master Sale and Purchase Agreement (the "**MSPA**"), the Purchaser, New GM, agreed to pay approximately $45 billion in consideration for substantially all of the assets of the Sellers, primarily Old GM.

9. Under the MSPA, New GM agreed that if "the estimated allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will . . . issue" up to 30,000,000 of additional shares of New GM common stock (the "**Adjustment Shares**"). MSPA (Dkt. 2968-2) § 3.2(c)(i).

10. Under the MSPA, the Debtors had authority to seek an order of the Bankruptcy Court estimating the aggregate allowed general unsecured claims against Old GM's estate (the "**Claims Estimate Order**").

92547214.3

11. A September 23, 2011 letter agreement between the GUC Trust, the GUC Trust Monitor, Motors Liquidation Corporation, and New GM confirms that the GUC Trust has the sole and exclusive authority to "at any time . . . seek . . . the Claims Estimate Order" that Sellers previously had authority to seek.

12. The Bankruptcy Court set November 30, 2009 as the bar date for filing claims against Old GM (the "**Bar Date**").

### The GUC Trust's Creation and Current State

13. The GUC Trust was formed to implement the Plan. The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust Assets and GUC Trust Units to the GUC Trust's defined beneficiaries (**"GUC Trust Beneficiaries,"** or **"Beneficiaries"**). GUC Trust Beneficiaries include holders of Allowed General Unsecured Claims as of March 31, 2011, holders of disputed claims as of March 31, 2011 that were later allowed, and holders of freely transferable Units in the GUC Trust.

14. The GUC Trust operates for the benefit of GUC Trust Beneficiaries and has a fiduciary duty to maximize the recoveries of the GUC Trust Beneficiaries.

15. Under the GUC Trust Agreement, the GUC Trust "shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims." Dkt. 13332 § 5.1(d). If the amount to be Allowed exceeds $10 million, then the GUC Trust Monitor must review and approve "[a]ny decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors." *Id.* § 11.3(a)(i).

16. To date, putative creditors have filed over $40 billion in general unsecured claims, of which $31.854 billion are Allowed General Unsecured Claims. The GUC Trust has resolved over 4,000 unsecured claims filed against Old GM.

92547214.3

17. As of November 2016, the GUC Trust had distributed approximately 94% of its initial assets in the form of New GM stock, warrants, and cash, to holders of allowed claims and to holders of Units. Aside from a general disputed claim contingency totaling $14.8M, there are no remaining assets in the GUC Trust that have not already been allocated.

18. Furthermore, other than the proposed claims related to the Recalls and the contingent claim that may result from the Avoidance Action Litigation, I am not aware of any other potential claims against Old GM or the GUC Trust.

### New GM's Recalls and Resulting Litigation

19. In 2014, New GM recalled more than 30 million vehicles, including some that had been on the road for more than a decade. In particular, New GM recalled millions of vehicles due to a defective ignition switch as part of NHTSA Recall Number 14V-047 (the "**Ignition Switch Defect**"), millions of additional vehicles due to other defects related to similar ignition switch defects, and millions of vehicles due to defective side airbags, power steering, and other defects.

20. Hundreds of plaintiffs responded to the revelations by filing individual and putative class actions against New GM seeking damages, under various theories, for alleged economic loss, personal injury, and wrongful death.

21. In response, New GM filed motions to enforce the Sale Order's injunction on successor liability (the "**Motions to Enforce**"). In addition, New GM suggested that plaintiffs look to the GUC Trust for recovery.

22. On a stipulated record related to the Ignition Switch Defect, the Bankruptcy Court found, *inter alia*, that Old GM knew or should have known about the Ignition Switch Defect and therefore gave inadequate notice to plaintiffs, but that any claims against the GUC Trust were

5

92547214.3

nonetheless barred because of a lack of prejudice. The Bankruptcy Court also found that claims against the GUC Trust were barred by the doctrine of equitable mootness.

23. On appeal, the Second Circuit affirmed in part, reversed in part, and vacated in part. Most relevant for purposes of the settlement motion, the Second Circuit held that plaintiffs had suffered a due process violation causing prejudice and that the issue of equitable mootness was not ripe because no plaintiff had filed for permission to file late claims.

### The Late Claims Motions

24. Upon remand, the parties began addressing whether Recall plaintiffs could satisfy the requirements for authorization to file late proofs of claim against the GUC Trust, and whether such claims are equitably moot.

25. On December 22, 2016, counsel for certain Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 175 plaintiffs alleging personal injury and wrongful death claims arising from the Ignition Switch Defect. Separately, Designated Counsel for Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed a motion for authority to file one late putative class proof of claim for economic losses on behalf of Ignition Switch Plaintiffs, and another for economic losses on behalf of Non-Ignition Switch Plaintiffs.

26. On January 4, 2017 counsel for the *Groman* Plaintiffs and counsel for the Peller Plaintiffs filed a joinder to the late claims motions filed by Designated Counsel. On July 28, 2017 counsel for Additional Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 171 plaintiffs alleging personal injury and wrongful death claims arising from the Ignition Switch Defect (together the "**Late Claims Motions**").

92547214.3

27. Further, certain Pre-Closing Accident Plaintiffs injured or killed in crashes that occurred before July 10, 2009, involving vehicles subject to Recall Nos. 14V-355, 14V-394, 14V-400, or 14V-540 (and who are identified by name and Recall Number in Schedule 1 to the Settlement Agreement as among the Signatory Plaintiffs) have informed the GUC Trust that they intend to file a Supplemental Late Claims Motion on or before May 31, 2018, seeking allowance of their late claims based on due process violations relating to the foregoing Recalls.

28. Per the Bankruptcy Court's order, the GUC Trust received limited discovery from certain putative late claimants regarding when they knew or reasonably could have known that they potentially had claims against the GUC Trust. In addition, the parties briefed disputed questions about whether the plaintiffs would be required to show excusable neglect under *Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1992), in order to obtain permission to file late claims, and the applicability of any agreements with the GUC Trust to toll the time to file late claims (the "***Pioneer* Briefing**").

29. To date, the Court has not set a schedule for hearing argument or deciding the disputed issues raised in the *Pioneer* Briefing. The Court also has not set a schedule for briefing, arguing, or deciding the merits of the Late Claims Motions.

## The Settlement

30. The principal terms of the Settlement are as follows: 1) the GUC Trust agrees to pay $15 million (the "**Settlement Amount**") to a settlement fund and up to another $6 million for providing notice; 2) the GUC Trust agrees to file a motion seeking entry of a Claims Estimate Order estimating the aggregate allowed General Unsecured Claims of Plaintiffs in an amount that could equal or exceed $10 billion; 3) the GUC Trust Beneficiaries agree to waive any claim to the Settlement Amount and, if the Claims Estimate Order is entered, the Adjustment Shares

(or the value thereof), and any Adjustment Shares issued (or the value thereof) will be deposited into the settlement fund for the sole benefit of Plaintiffs; and 4) all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the GUC Trust beneficiaries, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims from the settlement fund.

31.    Based on consultation with counsel, the GUC Trust Monitor, a review of the voluminous materials provided to the GUC Trust by both Plaintiffs and New GM, and my experience with other complex—and often protracted—litigations related to the Recalls, I believe the GUC Trust's decision to enter into the Settlement to be a prudent and reasonable exercise of the Administrator's business judgment. The Settlement will maximize recovery for the benefit of the GUC Trust Beneficiaries, while minimizing the substantial risks posed by the Late Claims Motions. In reaching this conclusion, the Administrator considered the following significant factors:

32.    First, absent a Settlement, the GUC Trust would likely be required to litigate issues relating to the Recalls into the foreseeable future. None of the Late Claims Motions has been decided at this point, and the litigation of those Motions will likely require at least several months. Regardless of who prevails on those Motions, the Court's ruling(s) will almost certainly be appealed, a process that will consume many additional months. If any part of the Court's decisions are reversed, the parties may be required to relitigate the Motions. Taken together, the process could require several years.

33.    Second, litigating the Late Claims Motions to their conclusion would require the GUC Trust to incur significant litigation and administrative costs. Together, litigation of the Late Claims Motions and any subsequent allowance proceedings could consume a substantial

8

92547214.3

portion of the GUC Trust's remaining assets—assets that otherwise would be available for distribution to the GUC Trust Beneficiaries. Because continued litigation would endanger the remaining Trust Assets, it would necessarily delay any further distributions of Trust Assets to its current beneficiaries.

34. Third, the outcome of the Late Claims Motions and any subsequent allowance proceedings is uncertain. The GUC Trust believes its prior opposition to the Late Claims Motions and its analysis of the *Pioneer* factors are based on principled legal arguments. That said, litigation of the Motions would be fact-intensive and would involve complex legal questions, with uncertain ultimate resolution.

35. The GUC Trust has expended substantial resources in considering the merits and valuation of Plaintiffs' claims—including, among other things, a review of the materials provided to the Trust by Plaintiffs and New GM, numerous in-person and telephonic conferences the Trust conducted with each side of the dispute and extensive legal analysis conducted by the GUC Trust's counsel. The GUC Trust has legal and factual arguments that may refute some or all of those claims. However, the Trust recognizes that Plaintiffs nevertheless may succeed in having the Late Claims valued at billions of dollars. If Plaintiffs succeeded on their Late Claims, then absent the proposed Settlement the current GUC Trust Beneficiaries could be forced to surrender rights to future distributions of GUC Trust Assets, and could even be required to return previously distributed funds (as plaintiffs have reserved the right to seek to claw back previously distributed funds).

36. Fourth, and finally, counsel to the Participating Unitholders (representing approximately sixty-six percent (66%) of the Trust's outstanding Units) has expressly informed the Trust that the Participating Unitholders support and agree with the Trust's decision to enter

9

into the Settlement. The Trust owes a fiduciary duty to its Unitholders, and is required to act in their best interests under the terms of the GUC Trust Agreement. The Participating Unitholders' support for the Settlement is another factor considered by the GUC Trust in determining that entry into the Settlement is in the best interests of those parties for whose benefit the Trust was created.

37. The terms of the proposed Settlement were negotiated at arms-length and in good faith. Due to the significant risks that the Late Claims Motions present to the GUC Trust Beneficiaries, the GUC Trust first entered into settlement negotiations with plaintiffs beginning in May 2017. All parties to the negotiations were represented and advised by experienced counsel, and negotiations involved intensive communications over a period of several months. During this period, the parties' representatives engaged in multiple in-person and telephonic meetings, and exchanged numerous drafts of the Settlement Agreement and ancillary documents.

38. I believe that the Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides those parties with substantial concrete benefits. The Settlement will resolve the long-standing dispute regarding the timeliness of the Late Claims, preserve the distributable assets for the GUC Trust Beneficiaries, and eliminate the risk of claw-backs of previously distributed assets. The Settlement will also clear the way for future distributions to GUC Trust Beneficiaries, and allow the GUC Trust to wind-down the affairs of the Debtors in accordance with the Plan in the near term. Because it maximizes recoveries for GUC Trust Beneficiaries, the Settlement clearly is in accord with the duties of the GUC Trust and the GUC Trust Administrator under the Plan and the GUC Trust Agreement.

92547214.3

39.     To be sure, the Settlement comes at a cost to the Trust's Beneficiaries. As noted above, the GUC Trust has agreed in the Settlement to pay $6 million to distribute notice of the Settlement and $15 million to establish the Settlement Fund. The funds would otherwise potentially be available to Beneficiaries if the GUC Trust ultimately prevailed in the Late Claim Motion litigation. However, given the substantial benefits of the Settlement, these costs are reasonable and prudent. Indeed, for that reason and others, the Settlement is supported by the Participating Unitholders, who have represented that they hold a substantial proportion of the outstanding GUC Trust Units.

40.     In consideration of all the above issues, it is my opinion that the Settlement falls within the range of reasonableness—well above the lowest point in the range of reasonableness—and provides the best outcome for the GUC Trust Beneficiaries. My opinion is buttressed by the advice of the GUC Trust Monitor and the opinion of multiple experienced bankruptcy counsel—those representing the GUC Trust and Participating Unitholders—who have been intimately involved in the ignition switch litigations since they began in 2014 and who negotiated and support the Settlement.

41.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Wilmington, Delaware
       May 2, 2018

_____
David A. Vanaskey Jr.