**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

MOTORS LIQUIDATION COMPANY, *et al.,*

f/k/a General Motors Corp*., et al.*,

Debtors.

**FOR PUBLICATION**

Case No. 09-50026 (MG)

(Jointly Administered)

**MEMORANDUM OPINION AND ORDER ENFORCING PROVISIONS OF SALE**
**ORDER WITH RESPECT TO THE MOORE, *ET AL.* PLAINTIFFS**

*A P P E A R A N C E S:*

KING & SPALDING LLP
Attorneys for General Motors LLC
1185 Avenue of the Americas
New York, NY 10036
By:    Arthur Steinberg, Esq.
          Scott Davidson, Esq.

THE MEMMEN LAW FIRM, LLC
Attorneys for Moore, *et al.*
505 North LaSalle Drive, Suite 500
Chicago, IL 60654
By:    Alexander McH. Memmen, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

This dispute involves allegedly contaminated groundwater that migrated from property

previously owned until July 2009 by **General Motors Corporation** ("Old GM") and now owned

by **General Motors LLC** ("New GM") into the water wells of nearby properties that were used by

homeowners for drinking water and other normal household uses.  The alleged contaminant is

sodium chloride ("road salt"), allegedly used in excessive quantities by Old GM and then by

New GM to treat the roads on the Milford Proving Grounds ("MPG") in Michigan during winter

months.  The plaintiffs in an action pending in U.S. District Court for the Eastern District of

Michigan allege that the contaminated groundwater caused personal injury and property damages. New GM asks this Court to enforce the Sale Order (explained below) entered by the bankruptcy court to accomplish the bankruptcy sale of most of Old GM assets, including the MPG, to New GM, and to enjoin plaintiffs from proceeding with some but not all of the claims asserted in the pending action.

Groundwater is the water found underground in the cracks and spaces in soil, sand and rock. Groundwater contamination can be insidious. It can and often does migrate slowly in a "plume" from the property where the contamination originated to nearby properties. In areas where the earth and material above groundwater is permeable, pollutants can seep into groundwater supplies. If contaminated groundwater invades water wells used for drinking, showering, and other normal household uses, it may no longer be safe to drink or for other uses, depending on the specific contaminants and concentrations, and it can cause personal injury and property damage, although proof can be challenging. Even if dumping additional contaminants stops, it can be years or even decades for contaminated groundwater to stop migrating to nearby properties. In this matter, the plaintiffs allege Old GM contaminated the groundwater with road salt *and* New GM continued contaminating the groundwater by using excessive amounts of road salt after it acquired the property in 2009.

Plaintiffs in the pending Michigan federal court action assert that New GM is liable for *all* personal injury and property damages caused by the road salt contamination, whether traced to Old GM's conduct or to New GM's conduct. New GM acknowledged during argument that it assumed liability for any required environmental response costs, whether Old GM or New GM contaminated the groundwater, although, at this stage at least, no government agencies charged

with enforcing environmental laws has required remediation.[1]  New GM also agrees that

plaintiffs can assert claims against New GM based solely on New GM's conduct, but New GM

argues that any liabilities for personal injury or property damages caused by Old GM's pre-sale

conduct were "Retained Liabilities," for which New GM bears no liability.

As explained below, this Court exercises its role as a "gatekeeper," determining whether

claims asserted against New GM are barred by the Sale Order and prior decisions of this Court.

The merits of any claims that pass through the gate are not for this Court to pass upon.  The

Court concludes below that many but not all of plaintiffs' claims may be asserted against New

GM, some because they raise claims for which New GM contractually assumed liability and

others because the claims may be asserted against New GM based on its own conduct.  Some of

plaintiffs' claims and allegations are barred by the Sale Order, and as to those matters, the

plaintiffs are enjoined from proceeding.

The Motion is therefore **GRANTED** in part, to the extent described herein.

## I.     BACKGROUND

### A.     Motion to Enforce the Sale Order

Pending before the Court is the *Motion to Enforce the Bankruptcy Court's July 5, 2009,*

*Sale Order and the Rulings in Connection Therewith, With Respect to the Moore, et al. Plaintiffs*

(the "Motion," ECF Doc. # 14241), filed on February 27, 2018, by New GM.  New GM seeks to

enjoin the plaintiffs (the "Moore Plaintiffs," or the "Plaintiffs") in a lawsuit captioned *Terry*

*Moore, et al. v. General Motors LLC*, Case No. 2:17-cv-14226 (the "Moore Litigation"), pending

in the United States District Court for the Eastern District of Michigan (the "Michigan District

---

[1]      *See* March 29, 2018 Hearing Transcript, at 27–28 (ECF Doc. # 14274).

Court"), from proceeding with personal injury and property damage claims against New GM

based on alleged groundwater contamination by Old GM.  The Moore Plaintiffs filed an

objection to the Motion (the "Objection," ECF Doc. # 14251), and New GM filed a reply (the

"Reply," ECF Doc. # 14254).  On March 29, 2018, the Court heard argument on the Motion (the

"Hearing").[2]

The Moore Litigation is a putative class action filed on behalf of homeowners who live

near the MPG, an automobile testing facility previously owned by Old GM and transferred to

New GM pursuant to the Sale Agreement.[3]  The Moore Plaintiffs seek to recover for personal

injury and property damage based on the alleged contamination of groundwater caused by Old

GM's *and* New GM's release of large amounts of road salt into the MPG.  (*See* ECF Doc. #

14242-3, the "Moore Amended Complaint," or the "MAC."[4])

In many respects there is common ground between the parties as to which claims against

New GM can properly be asserted (subject, of course, to any motions challenging the pleadings

before the Michigan District Court).  New GM believes some aspects of the Moore Amended

Complaint are barred by the Sale Order and this Court's previous decisions and judgments, and

seeks an order enforcing the Sale Order and enjoining the litigation to the extent the MAC is

improper.  (Mot. ¶¶ 1, 5.)  The Sale Order and Sale Agreement provide that certain liabilities

were assumed by New GM ("Assumed Liabilities") and certain liabilities were retained by Old

GM ("Retained Liabilities").  The Sale Order provides that, with respect to property Old GM

---

[2]      *See* March 29, 2018 Hearing Transcript (ECF Doc. # 14274).

[3]      Capitalized terms not defined herein are defined below.

[4]      On December 4, 2017, New GM was served with the Moore Original Complaint (the "MOC").  (Mot. ¶ 20.)  Upon receiving a January 8, 2018 letter from New GM stating that the MOC violated the Sale Order, on February 16, 2018, the Moore Plaintiffs filed the Moore Amended Complaint.  (*Id.* at ¶ 22–23.)

transferred to New GM, New GM assumed certain liabilities under Environmental Laws (as that

term is defined in the Sale Order).  New GM argues that the Moore Amended Complaint

improperly asserts claims against New GM that do *not* arise under Environmental Laws—

specifically, common law claims for negligence, public and private nuisance, trespass and

fraud—that were Retained Liabilities of Old GM.  (*Id.* ¶¶ 1, 2, 23.)  New GM also objects to the

Moore Litigation going forward to the extent that the Moore Plaintiffs (1) fail to properly assert

independent claims against New GM because they do not specifically identify New GM conduct

that would support their claims (*id.* ¶ 24), (2) improperly seek exemplary damages in connection

with their improper fraud claims (*id.* ¶ 25), and (3) advance successor liability allegations that

impermissibly lump Old GM and New GM conduct together (*id.* ¶ 26).

Complicating matters, the plain language of the Sale Order and Sale Agreement are not a

model of clarity regarding the contours of New GM's liability for common law claims for

personal injury and property damage due to environmental contamination.  While the Court has

dealt with issues of Michigan environmental law in the past,[5] this is the first instance in which

the Court is required to parse the complicated provisions of the Sale Agreement to determine the

scope of New GM's Assumed Liabilities regarding environmental law.  The Court therefore

ordered the parties to submit supplemental briefs on the issue whether Michigan common law

claims for damages for personal injury or property damage from environmental contamination

are among "Assumed Liabilities" that may be alleged against New GM.  On April 20, 2018, both

parties submitted supplemental memoranda of law (the "New GM Supplemental Brief," ECF

Doc. # 14276; the "Moore Plaintiffs' Supplemental Brief," ECF Doc. # 14278).

---

[5]     *See In re Oldco M Corp.*, 438 B.R. 775 (Bankr. S.D.N.Y. 2010).

Finally, the Court is not writing on a blank slate.  Judge Gerber previously construed the provisions of the Sale Order and Sale Agreement concerning environmental law in *In re Gen. Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009), *aff'd in part, vacated in part, reversed in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir.), *cert. denied*, 137 S. Ct. 1813 (2017) (the "*Sale Decision*").  To the extent Judge Gerber did so, the Court considers that construction settled law of the case, and will not second guess such interpretation nine years after the bankruptcy.  In the *Sale Decision*, Judge Gerber interpreted the environmental provisions of the Sale Agreement to require New GM to comply with the Environmental Laws relating to the Transferred Real Property.[6]  But, Judge Gerber explained, New GM did not assume liability for claims relating to the property based on Old GM's conduct.  Accordingly, the Court holds that the Moore Plaintiffs are precluded from proceeding with their common law claims against New GM related to Old GM's conduct (Counts III through VII), because they are not claims arising under Environmental Laws and, therefore, are not Assumed Liabilities.

As explained below, the Court concludes as follows:

1.  Plaintiffs may not assert common law claims against New GM for personal injury or property damage based on  groundwater contamination that migrated from the MPG *before* the sale of the Property to New GM was completed.

2.  For personal injury or property damage claims based on groundwater contamination from Old GM's dumping of road salt *before* the Property sale to New GM, but which migrated from the Property *after* the Property was owned by

---

[6]    The term "Transferred Real Property" is defined at Section 2.2(a)(vi) of the Sale Agreement.

New GM, the Sale Order does *not* bar such claims. But whether Michigan law recognizes claims for personal injury or property damage against a property owner (and, in this regard, New GM stands in no different position than any other Michigan property owner) is an issue for the Michigan District Court, not for this Court.

3.   New GM does not dispute that Plaintiffs may assert common law claims against New GM for personal injury or property damage caused by groundwater contamination resulting from New GM's dumping of road salt.

4.   The Court agrees with New GM that many of the allegations in the MAC purporting to allege independent claims are improper and may not proceed as pleaded. During the Hearing on the Motion, the Court directed the parties' counsel to meet and confer to try to narrow their disagreements regarding Plaintiffs' proposed amended complaint. On April 20, 2018, New GM's counsel submitted a letter to the Court (ECF Doc. # 14277-1) explaining that the parties had resolved some but not all of their disagreements. They provided the Court with a redlined version of the MAC indicating the parties' remaining disputes (ECF Doc. # 14277-2, the "Mark-Up"). A separate order will be entered ruling on New GM's outstanding objections in the Mark-Up, the Court's basis for which is described in this Opinion.

5.   In addition, the Moore Plaintiffs are permitted to proceed with their common law claims against New GM related to New GM's conduct (Counts X through XIV), as they have sufficiently identified New GM conduct that would

support such claims.  However, the Moore Plaintiffs must remove their claim for exemplary damages based on conduct of Old GM.

6.  The Court also rejects the Moore Plaintiffs' argument that they should be permitted to assert common law claims against New GM based on Old GM's conduct because Plaintiffs were denied due process as they were not provided with actual notice of Old GM's bankruptcy.  (Obj. at 10.)  As explained below, the Court holds that the Moore Plaintiffs' due process rights were not violated. The Plaintiffs were not known creditors entitled to actual notice of the bankruptcy; notice by publication, which they received, sufficed.  The Moore Plaintiffs are thus are bound by the Sale Order.

**B.      The Sale Order, Sale Agreement and Sale Decision**

On June 1, 2009, Old GM commenced a case under chapter 11 of the Bankruptcy Code, and on the same day, filed a motion to sell substantially all of its assets to New GM, including the MPG through a sale agreement (the "Sale Agreement," ECF Doc. # 14242-2).  (*See Sale Decision*, 407 B.R. at 473; Obj. at 6.)  The Sale Order (ECF Doc. # 2968) was entered on July 5, 2009, and the sale (the "363 Sale") closed on July 10, 2009.

The Sale Agreement provides that, pursuant to the 363 Sale, New GM assumed certain categories of liabilities (the "Assumed Liabilities") related to the real property Old GM transferred to New GM.  (Mot. ¶ 7.)  These liabilities include "all Liabilities arising under any Environmental Law[7] (A) relating to the Transferred Real Property, other than those Liabilities

---

[7]      "Environmental Law" is defined in the Sale Agreement as "any Law in existence on the date of the Original Agreement relating to the management or Release of, or exposure of humans to, any Hazardous Materials; or pollution; or the protection of human health and welfare and the Environment."  (Sale Agreement at 7.)

(Footnote continued on next page)

described in Section 2.3(b)(iv), (B) resulting from Purchaser's ownership or operations of the

Transferred Real Property after the Closing or (C) Relating to Purchaser's failure to comply with

Environmental Laws after the Closing[.]"  (Sale Agreement § 2.3(a)(viii).)

Certain liabilities were expressly carved out of the category of Assumed Liabilities.

Specifically, Section 2.3(b)(iv) of the Sale Agreement provides that the following are liabilities

*retained* by Old GM (the "Retained Liabilities"):

> [A]ll Liabilities (A) associated with noncompliance with Environmental Laws (including for fines, penalties, damages and remedies); (B) arising out of, relating to, in respect of or in connection with the transportation, off-site storage or off-site disposal of any Hazardous Materials generated or located at any Transferred Real Property; (C) ***arising out of, relating to, in respect of or in connection with third party Claims related to Hazardous Materials that were or are located at or that were Released into the Environment from Transferred Real Property prior to the Closing, except as otherwise required under applicable environmental laws***[8]; (D) arising under Environmental Laws related to the Excluded Real Property, except as provided under Section 18.2(E) of the Master Lease Agreement or as provided under the "Facility Idling Process" section of Schedule A of the Transition Services Agreement; or (E) for Environmental Liabilities with respect to real property formerly owned, operated, or leased by Sellers (as of the Closing), which, in the case of clauses (A), (B), or (C), arose prior to or at the Closing, and which, in the case of clause (D) and (E), arise prior to, at, or after the Closing[.]

---

(Footnote continued from prior page)

"Law" is defined in the Sale Agreement as "any and all applicable United States or non-United States federal, national, provincial, state or local laws, rules, regulations, directives, decrees, treatises, statutes, provisions of any constitution and principles (including principles of common law) of any Governmental Authority, as well as any applicable final order."  (*Id.* at 11.)

"Governmental Authority" is defined in the Sale Agreement as "any United States or non-United States federal, national, provision, state or local government or other political subdivision thereof, any entity, authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions or any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such foreign states."  (*Id.* at 9.)

[8]        Emphasis added.

Retained Liabilities also include "[l]iabilities to third parties for Claims based on Contract, tort

or any other basis[.]" (*Id.* § 2.3(b)(xi).)  The assets were therefore sold free and clear of all

claims (except Assumed Liabilities), including claims based on successor or transferee liability.

The Sale Order echoes this principle, stating that except for Assumed Liabilities, New GM is not

liable for any claims arising from Old GM's acts, or failures to act, whether known or unknown,

contingent or otherwise, whether arising before or after Old GM's bankruptcy, including claims

arising under doctrines of successor or transferee liabilities.  (Sale Order ¶ AA.)

In the *Sale Decision*, Judge Gerber addressed the provisions of the Sale Order regarding

environmental liability, and held that New GM has no successor liability with respect to

environmental claims.  In addressing parties' objections with respect to environmental issues,

Judge Gerber noted:

> Certain objectors—most notably, New York's attorney General
> (the "New York AG"), who enforces New York's environmental
> laws, and the St. Regis Mohawk Tribe (the "Tribe") . . . have
> voiced their concerns as to whether any approval order would too
> broadly release either Old GM or New GM from their respective
> duties to comply with environmental laws and cleanup obligations.
> Objections of this character were a matter of concern to this Court
> as well, but they were addressed—very well, in the Court's view—
> by amendments to the proposed order that were made after
> objections were due.

*Sale Decision*, 407 B.R. at 507.

The additional amended language that was added to the Sale Order to which Judge

Gerber refers appears in paragraphs 61 and 62 of the Sale Order:

> **Paragraph 61:** Nothing in this Order or the MPA releases,
> nullifies, or enjoins the enforcement of any Liability to a
> governmental unit under Environmental Laws or regulations . . .
> that any entity would be subject to as the owner, lessor, or operator
> of property after the date of entry of this Order.  Notwithstanding
> the foregoing sentence, nothing in this Order shall be interpreted to
> deem the Purchaser as the successor to the Debtors under any state

law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to the entry of this Order . . .

**Paragraph 62:** Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtor to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code . . .

Judge Gerber overruled certain objections to the Sale Agreement, explaining that:

The Environmental Matter Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For the reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view . . . is this Court's decision, seven years ago, in *Mag. Corp.* There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue—to what extent could that property be sold free and clear of environmental claims under section 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation at that time, any such remediation would be the buyer's responsibility: When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.

Those same principles apply here. Any Old GM properties to be transferred will be transferred free and clear of successor liability, but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward.

*Id.* at 508 (footnotes and quotation marks omitted).

C.    **The Court's Subsequent Judgments and Decisions Interpreting the Sale Order and Sale Agreement**

    *1.    The November 2015 Opinion and December 2015 Judgment*

On August 19, 2015, the Court entered a Case Management Order directing the parties in interest to submit their views on how best to address various issues relating to the Sale Order. (ECF Doc. # 13383.)  The Court entered a Scheduling Order on September 3, 2015 (the "September 3 Scheduling Order," ECF Doc. # 13416) setting forth a briefing schedule to address, among other things, whether New GM assumed punitive damages for Old GM's conduct, and whether certain causes of action or allegations in complaints filed against New GM were barred by the Sale Order.

On November 9, 2015, the Court entered its Decision (the "*November 2015 Decision*") with respect to matters identified in the September 3 Scheduling Order.  *See In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015).  On December 4, 2015, the Court entered a judgment (the "December 2015 Judgment," ECF Doc. # 13563) memorializing the rulings set forth in the November 2015 Decision.  Specifically, the December 2015 Judgment described the types of allegations that cannot be asserted by plaintiffs in pleadings against New GM.  (Mot. ¶ 14.)  Most pertinent to the current Motion, under the December 2015 Judgment, plaintiffs are prohibited from making allegations that (i) speak of New GM as the successor of Old GM (*i.e.*, allegations that refer to New GM as the 'successor of,' a 'mere continuation of,' or a 'de facto successor of' Old GM)" (December 2015 Judgment ¶ 16), and (ii) "do not distinguish between Old GM and New GM . . . ."  (*Id.* ¶ 17.)  Such pleadings "are and remain stayed, unless and until they are amended, consistent with the [November 2015] Decision and this Judgment." (*Id.* ¶ 16.)

2.    *The June 2017 and July 2017 Opinions*

On June 7, 2017, the Court issued an opinion deciding whether Non-Ignition Switch

Plaintiffs may assert Independent Claims against New GM.  *See In re Motors Liquidation Co.*,

568 B.R. 217 (Bankr. S.D.N.Y. 2017) (the "*June 2017 Opinion*").  The Court ruled that claims

based on post-closing wrongful conduct of New GM could go forward as Independent Claims,

but such claims must clearly distinguish between actions of Old GM and New GM.  *June 2017*

*Opinion*, 568 B.R. at 220 n.1.

Thereafter, on July 12, 2017, this Court entered another Opinion regarding the types of

claims that may be asserted against New GM.  *See In re Motors Liquidation Co*., 571 B.R. 565

(Bankr. S.D.N.Y.) (the "*July 2017 Opinion*").  In the *July 2017 Opinion*, the Court affirmed that

"truly Independent Claims" are "claims based solely on wrongful post-closing conduct of New

GM . . . ."  *Id.* at 569 n.2.  The Court also held that "Post- Closing Accident Plaintiffs may not

assert claims against New GM for punitive damages based on conduct of Old GM."  *Id*. at 580;

*see also* December 2015 Judgment ¶ 6.  In addition, the Court ruled that "Judge Gerber's

[December 2015] ruling . . . remains law of the case and New GM cannot be held liable for

punitive damages on a contractual basis."  *July 2017 Opinion*, 571 B.R. at 576 (citation omitted).

**D.    The Moore Litigation**

On December 4, 2017, New GM was served with a complaint in the Moore Litigation.

(Mot. ¶ 20.)  The Moore Litigation is a putative class action pending in the Michigan District

Court, initiated on behalf of owners who live in close proximity to the MPG and who claim

damages from contamination of their groundwater due to New GM and Old GM conduct.  (*Id.* ¶

21; *see also* MAC ¶¶ 2, 3.)  The Moore Plaintiffs allege a course of conduct by both Old GM and

New GM, that is summarized below.[9]

The MPG, an automobile testing facility, has been in operation since 1924.  (MAC ¶ 9.)

In 1985, Old GM commissioned engineering firm McNamee, Porter and Seeley to conduct a

water supply study at the MPG.  (Obj. at 9.)  The study revealed concentrations of sodium

chloride in the MPG wells above USEPA standards and stated that "[r]oad salts appear to be a

major source of chloride at the proving grounds."  (*Id.*)  In 1997, the Michigan Department of

Environmental Quality (the "MDEQ") learned of the sodium chloride contamination after a

developer found high levels of chloride in the shallow aquifer when it started drilling wells for

homes to be built to the southwest of the MPG.  (*Id.*)  The MDEQ conducted its own testing and

found high levels of sodium chloride in the MPG at "The Oaks," a residential neighborhood to

the southwest of the MPG and the location of the Moore Plaintiffs' homes.  (*Id.*)  In May 1998,

the MDEQ wrote letters to the developer of The Oaks advising of the high levels of sodium

chloride and that the levels were above residential health-based drinking water criteria.  (*Id.*)

Old GM was made aware of the MDEQ's letters to the developer of The Oaks and during

a meeting with the MDEQ on May 29, 1998, denied liability for the sodium chloride

contamination and demanded that the MDEQ retract the letters.  (*Id.* at 9–10.)  Plaintiffs allege

that at the time, Old GM knew or should reasonably have known that (1) the sodium chloride

contamination existed; (2) the MDEQ believed Old GM was responsible; and (3) the

contamination had likely "migrated" into The Oaks development.  (*Id.* at 10.)  Old GM did not

---

[9]    To be clear, the following paragraphs of this section are based on the Plaintiffs' allegations.  No findings of
fact are made by the Court.

provide notice to the residents of The Oaks, including the Moore Plaintiffs, that the MPG was the likely source of the sodium chloride contamination. (*Id.*)

Based on these claims, the Moore Plaintiffs seek, *inter alia*, compensation for personal injury and property damage for (i) a violation of Part 201 of the Michigan Natural Resources and Environmental Protection Act, (ii) a violation of the Michigan Environmental Protection Act, (iii) fraud, (iv) negligence, (v) trespass, (vi) private nuisance, and (vii) public nuisance. (*See generally* MAC.) The MAC includes counts against New GM for (1) the independent actions of New GM after the Sale Order, and (2) the actions of Old GM based on successor liability. (Obj. at 10.) The Moore Plaintiffs claim that the MAC separates the claims between those relating to Old GM (counts I through VII) and those independent of Old GM (counts VIII through XIV). (*Id.*) The Moore Plaintiffs also argue that the independent claims allege actions by New GM after the Sale Order, and since these claims are independent of actions by Old GM, they do not implicate the Sale Order. (*Id.*)

On January 8, 2018, counsel for New GM sent counsel for the Moore Plaintiffs a letter (the "January 8 Letter," ECF Doc. # 14242-3), explaining that the Moore Original Complaint violated the Sale Order and other Bankruptcy Court rulings, and requesting that the Plaintiffs amend their complaint to address those issues. (Mot. ¶ 22.) Counsel for New GM and counsel for the Moore Plaintiffs had a conference call on February 14, 2018, to discuss the bankruptcy issues with the Moore Litigation, and shortly thereafter, on February 16, 2018, the Plaintiffs filed the Moore Amended Complaint in the Michigan District Court, attempting to address these issues. On the same day, the Moore Plaintiffs filed in the Michigan District Court a motion to sever, requesting that the court "sever all independent claims of damages caused by or relating to New GM from the present until July 5, 2009 . . . from all claims against New GM for damages

caused by or relating to Old GM prior to the Sale Date," reasoning that severing the claims "will

allow claims against New GM, independent of Old GM, to immediately move forward in the

Circuit Court of Michigan while all remaining claims against New GM will remain in this Court

or be transferred to the Bankruptcy Court . . . ."  (ECF Doc. # 14242-5 (the "Motion to Sever") at

2–3.)  New GM believes that the MAC and the Motion to Sever do not adequately address the

issues raised in New GM's January 8 Letter, and thus filed the Motion presently before the

Court.

## II.    <u>LEGAL STANDARD</u>

### A.    Jurisdiction

The Sale Order conferred exclusive jurisdiction on this Court to enforce the provisions of

the Sale Order and the Sale Agreement.  Paragraph 71 of the Sale Order provides, in relevant

part:

> This Court retains exclusive jurisdiction to enforce and implement
> the terms of this Order, the [Sale Agreement], . . . and each of the
> agreements executed in connection therewith . . . , in all respects,
> including, but not limited to, retaining jurisdiction to . . . (c)
> resolve any disputes arising under or related to the [Sale
> Agreement], except as otherwise provided therein, (d) interpret,
> implement, and enforce the provisions of this Order, (e) protect the
> Purchaser against any of the Retained Liabilities or the assertion of
> any lien, claim, encumbrance, or other interest, of any kind or
> nature whatsoever, against the Purchased Assets . . . .

(Sale Order ¶ 71.)  Indeed, the Court very recently upheld this principle in *In re Motors

Liquidation Company*, 2018 WL 1801234, at *6 (Bankr. S.D.N.Y. Apr. 13, 2018) (stating that

the Sale Order "granted exclusive jurisdiction to this Court to enforce and implement the

provisions of the Sale Order").

**B.      The Scope and Effect of the Sale Order Regarding Successor Liability**

Section 363(f) of the Bankruptcy Code authorizes the debtor in certain circumstances to

sell the estate's interest in property "free and clear of any interest in such property of an entity

other than the estate."  11 U.S.C. § 363(f).  "The Bankruptcy Code does not define 'any interest,'

and in the course of applying section 363(f) to a wide variety of rights and obligations related to

estate property, courts have been unable to formulate a precise definition."  *Precision Indus., Inc.*

*v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) (citing *Folger Adam Security,*

*Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000)).

"Interests in property," as used in section 363(f), include "claims" that arise from the

assets being sold.  *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) (citing *In re Trans*

*World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003)), *granting cert. & vacating judgment sub*

*nom. Indiana State Police Pension Trust v. Chrysler LLC,* 558 U.S. 1087 (2009).  Although

section 363(f) is not limited to *in rem* interests in property, it affords only *in rem* relief similar

to 11 U.S.C. § 1141(c).  *See Chrysler*, 576 F.3d at 125–26.  "By its terms, § 363(f) cleanses the

transferred assets of any attendant liabilities, and allows the buyer to acquire them without fear

that an estate creditor can enforce its claim against those assets."  *Morgan Olson Indus., LLC v.*

*Frederico (In re Grumman Olson Industries, Inc.)*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011).

In addition, section 363(f) has been interpreted to authorize the bankruptcy court to grant

*in personam* relief, similar to the discharge under Bankruptcy Code § 1141(d), that exonerates

the buyer from successor liability, including liability for tort claims.  *Campbell v. Motors*

*Liquidation Co. (In re Motors Liquidation Co.)*, 428 B.R. 43, 57–59 (S.D.N.Y. 2010).

The Sale Order in this case expressly provides that, with the exception of certain limited

liabilities expressly assumed by New GM (the Assumed Liabilities) under the Sale Order, the

assets acquired by New GM were transferred "free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever . . . including rights or claims based on any successor liability . . . ." (Sale Order § 7.)  Similarly, the Sale Order provides the following:

> [A]ll persons and entities . . . holding liens, claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in [Old GM] or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to [Old GM], the Purchased Assets, the operation of the Purchased Assets prior to the Closing . . . are forever barred, estopped, and permanently enjoined . . . from asserting against [New GM] . . . such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

(*Id.* § 8.)

Further, the Sale Order states that "[t]his Order (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities, will be assertable against [New GM] . . . (ii) the Purchased Assets shall have been transferred to [New GM] free and clear of all claims (other than Permitted Encumbrances) . . . ." (*Id.* § 9.)  The Sale Order also provides:

> Except for the Assumed Liabilities expressly set forth in the [Sale Agreement] . . . [New GM] . . . shall have [no] liability for any claim that arose prior to the Closing Date . . . or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing Date.  [New GM] shall not be deemed . . . to: (i) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Purchased Assets from and after the Closing); (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the foregoing, [New GM] shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, but not limited to, under any theory of successor or transferee liability, de facto merger or continuity . . . whether

> known or unknown as of the Closing, now existing or hereafter
> arising, asserted, or unasserted, fixed or contingent, liquidated or
> unliquidated.

(*Id*. § 46.)

"Effective upon the Closing . . . all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action . . . against [New GM] . . . with respect to any (i) claim against [Old GM] other than the Assumed Liabilities." (*Id*. § 47.) The Sale Order further provides that New GM did not assume any liabilities "arising in any way in connection with any agreements, acts, or failure to act, of any of [Old GM] or any of [Old GM's] predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these chapter 11 cases . . . including but not limited to, claims otherwise arising under doctrines of successor or transferee liability." (*Id*. § AA.)

As described in greater detail above (*see supra* at section I.B.), the Sale Agreement expressly defines the types of environmental liabilities retained by Old GM (the Retained Liabilities) and those assumed by New GM (the Assumed Liabilities). (Sale Agreement §§ 2.3(a)(viii); 2.3(b)(iv).)

## C.    Independent Claims

In light of the Sale Order, in the *June 2017 Opinion*, the Court specified requirements for pleading independent claims against New GM, holding that only "truly independent claims based solely on New GM's wrongful conduct" may pass through the bankruptcy gate as "Independent Claims." *June 2017 Opinion*, 568 B.R. at 231. The Court noted that its role is as a "gatekeeper," not to decide issues of state law. *Id*. at 222 (stating that the "Court's role, then, is a 'gatekeeper' role. It should be the court to decide what claims and allegations should get through the 'gate,' under the Sale Order and this Court's prior decisions") (citation omitted).

19

Deciding similar questions in the *June 2017 Opinion*, the Court wrote:

> The Court emphasizes that its analysis here applies only to claims based solely on *New GM's alleged wrongful conduct*. It is not acceptable, as the Pitterman Complaint does in several paragraphs, to base allegations on generalized knowledge of both Old GM and New GM. To pass the bankruptcy gate, a complaint must clearly allege that its causes of action are based solely on New GM's post-closing wrongful conduct. The Pitterman Plaintiffs' counsel acknowledged during oral argument that the current complaint crosses the line, basing the purported independent claims on conduct of both Old GM and New GM.  Such allegations are not permissible.

*Id.* at 231.

### D.    Punitive Damages

The Court's July 2017 Opinion clearly holds that (i) New GM did not contractually assume liability for punitive damages arising from Old GM's conduct in connection with Post-Closing Accidents; and (ii) such punitive damages are not available against New GM on a successor liability theory.  *July 2017 Opinion*, 571 B.R. at 579–80.  Additionally, the *July 2017 Opinion* concluded that imposing punitive damages liability on New GM based on Old GM conduct was inconsistent with the claims priority scheme set forth in the Bankruptcy Code.  *Id.* at 580 (explaining that "[w]hile an insolvent debtor may pay general unsecured claims on a *pro rata* basis, the Bankruptcy Code dictates that an insolvent debtor would never pay punitive damages until higher priority claims are paid in full," and it is therefore "inconsistent with the Bankruptcy Code to hold a purchaser in a section 363 sale liable for damages that would be categorically barred as a matter of priority had the sale never occurred").

### E.    Adequacy of Notice

The Due Process Clause states that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law."  U.S. Const. amend. V.  "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice

reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections." *Mullane v. Central*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The due process requirement applies in

the bankruptcy context, as an essential goal of a bankruptcy is to discharge and restructure claims

against the debtor in an efficient manner. *See Elliott v. General Motors LLC (In re Motors*

*Liquidation Company)*, 829 F.3d 135, 159 (2d Cir. 2016) (citing *Lines v. Frederick*, 400 U.S. 18,

19 (1970)). "Inadequate notice is a defect which precludes discharge of a claim in bankruptcy."

*Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995); *see also Grant v. U.S. Home Corp.*

*(In re U.S.H. Corp. of N.Y.)*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998) (stating that "[d]ischarge

under the Bankruptcy Code, however, presumes that all creditors bound by the plan have been

given notice sufficient to satisfy due process").

   The level of notice required as reasonable or adequate to fulfill the due process

requirement depends on whether the creditor is "known" or "unknown." If a creditor is "known"

to a debtor, actual notice of a debtor's bankruptcy filing and bar date must be given to the

creditor to achieve a legally effective discharge of the creditor's claim. *See Chemetron*, 72 F.3d

at 346 (explaining that "[k]nown creditors must be provided with actual written notice of a

debtor's bankruptcy filing and bar claims date") (citation omitted); *In re BGI, Inc.*, 476 B.R. 812,

820 (Bankr. S.D.N.Y. 2012) ("It is long-held that known creditors must be afforded notice

'reasonably calculated, under all the circumstances to apprise' them of the pendency of the Bar

Date. Adequate notice entails actual written notice of the bankruptcy filing and the bar date.").

For unknown creditors, constructive notice, such as notice by publication, will suffice. *Id.*

(citation omitted); *Grant*, 223 B.R. at 658. Constructive notice can be satisfied through

publication notice, since "in the case of persons missing or unknown, employment of an indirect

and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane*, 339 U.S. at 317.

An "unknown" creditor is a creditor whose identity or claim is not "reasonably ascertainable" or is merely "conceivable, conjectural or speculative." *In re Thomson McKinnon Sec., Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (citation omitted); *see also Mullane*, 339 U.S. at 317 (noting that it was reasonable to dispense with more certain notice to claimants "whose interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to the knowledge [of the debtor in possession]"). A "known" creditor includes both a claimant whose identity is actually known to the debtor and a claimant whose identity is "reasonably ascertainable" by the debtor. *Chemetron*, 72 F.3d at 346 (explaining that claimants must be reasonably ascertainable, not "reasonably foreseeable").

A creditor is "reasonably ascertainable" if the debtor can uncover the identity of that creditor through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 804 (1983). But reasonable diligence does not require "impracticable and extended searches . . . in the name of due process." *Mullane*, 339 U.S. at 317–18. A debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *Brooks Fashion Stores, Inc. v. Michigan Employment Sec. Comm'n (In re Brooks Fashion Stores, Inc.)*, 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991) (citation omitted). "[W]hat is required is not a vast, open-ended investigation." *Chemetron,* 72 F.3d at 346. Instead, "[t]he requisite search . . . focuses on the debtor's own books and records. Efforts beyond a careful examination of these documents are generally not required. Only those claimants who are identifiable through a diligent search are 'reasonably ascertainable' and hence

'known' creditors." *Id.* at 347; *see also In re BGI, Inc.*, 476 B.R at 823 ("In determining its

creditors, a debtor is not obligated to try to find and serve notice on any individual who could

potentially be a creditor.  It is generally sufficient for the debtors to scrutinize their own

records.") (citation omitted); *In re Best Prods. Co.*, 140 B.R. 353, 358 (Bankr. S.D.N.Y. 1992)

(citing *In re Waterman Steamship Corp.*, 59 B.R. 724, 727 (Bankr. S.D.N.Y. 1986)) (stating that

"[w]hereas a debtor must review its own books and records to ascertain the identity of creditors,

a debtor is not required to search elsewhere for those who might have been injured").  This Court

in *In re Drexel Burnham Lambert Grp. Inc.*, 151 B.R. 674, 680–81 (Bankr. S.D.N.Y. 1993),

*aff'd, In re Drexel Bernham Lambert Grp. Inc.*, 157 B.R. 532 (S.D.N.Y. 1993), further explained

as follows:

> Reasonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor.  Applying *Mullane's* "reasonable under the circumstances" standard, due process requires a reasonable search for contingent or unmatured claims so that ascertainable creditors can receive adequate notice of the bar date.  What is reasonable depends on the particular facts of each case.  A debtor need not be omnipotent or clairvoyant.  A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.

> Known creditors are defined as creditors that a debtor knew of, or should have known of, when serving notice of the bar date.  Among known creditors may be parties who have made a demand for payment against a debtor in one form or another before the compilation of a debtor's schedules.  Typically, a known creditor may have engaged in some communication with a debtor concerning the existence of the creditor's claim.  This communication by itself does not necessarily make the creditor known.  Direct knowledge based on a demand for payment is not, however, required for a claim to be considered "known."  A known claim arises from facts that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it.

### F.     Law of the Case

"[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  Where *res judicata* bars parties in subsequent actions from relitigating what has already been decided, law of the case "holds that a court should adhere to its earlier decisions in subsequent stages of litigation unless compelling reasons counsel otherwise."  *Tomasino v. Estee Lauder Companies, Inc.*, 2015 WL 1470177, at *1 (E.D.N.Y. March 31, 2015).  Compelling reasons may include an intervening change in the law, new evidence, or the need to correct a clear error or law or to prevent manifest injustice.  *Carr*, 557 F.3d at 102.  By maintaining consistency in a court's rulings, the law of the case doctrine promotes "fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

## III.     DISCUSSION

### A.     Claims Against New GM for New GM's Post-363 Sale Conduct are Permitted to go Forward, but the Moore Plaintiffs Must Amend the MAC to Remove Impermissible Allegations

The issue whether New GM will be liable for claims for personal injury and property damage based on New GM's alleged post-363 Sale contamination of the Plaintiffs' groundwater should be assessed by the Michigan District Court where the Moore Litigation is pending, but it is well within this Court's role to analyze to what extent the allegations in the MAC may pass through the bankruptcy gate as complying with the Sale Order and as including truly independent claims.  *See June 2017 Opinion*, 568 B.R. at 222 (explaining that the Bankruptcy Court serves a "gatekeeper role," but does not determine whether any particular claim should prevail on its merits under state law).

New GM argues that several claims in the MAC should not pass through the bankruptcy

gate because they do not meet the Court's requirement that a truly independent claim against

New GM clearly allege specific wrongful conduct of New GM upon which it is based.    New

GM argues that many of the Plaintiffs' supposedly "independent claims" are either based on both

alleged New GM conduct and Old GM conduct together, or do not identify with particularity

New GM conduct that would have contributed to the alleged contamination of the Plaintiffs'

groundwater.  (Mot. ¶¶ 34–35.)  The Moore Plaintiffs counter that since they allege a continuing

course of conduct beginning as early as 1985 by Old GM and continuing to the present through

New GM, the Moore Plaintiffs' claims against New GM for the conduct of New GM should be

permitted to continue as independent claims.  (Obj. at 15.)  The Moore Plaintiffs argue that the

MAC separates claims against Old GM and those against New GM: Counts I through VII allege

claims against Old GM, while Counts VIII through XIV allege claims against New GM.  Since

these independent claims are against New GM for the actions of New GM, and have nothing to

do with Old GM, they do not implicate the Sale Order and should be permitted to proceed.  (*Id.*

15–16.)

As New GM admits in its Reply (*see* Reply ¶ 1), the Moore Plaintiffs may assert

independent claims against New GM based solely on New GM's post-closing wrongful conduct.

After all, under the Sale Agreement, New GM assumed liability for its own violations of

environmental laws occurring after the closing.  *See Sale Decision*, 407 B.R. at 508 (explaining

that New GM does not have successor liability for Old GM's environmental liabilities, but

"[New GM] would have to comply with its environmental responsibilities starting with the day it

got the property, and if the property required remediation as of that time, any such remediation

would be [New GM's] responsibility"); *see also In re OldCo M Corp.*, 438, B.R. 775,787

25

(Bankr. S.D.N.Y. 2010) (discussing alleged violations of Michigan environmental laws and explaining that the Sale Order provided that New GM assumed post-closing environmental liabilities). The Court agrees with the Plaintiffs that they have sufficiently supported their independent claims against New GM with allegations that hinge on New GM conduct. For example, allegations such as those in Count XI that New GM continued contaminating the groundwater by causing releases of salt after it acquired the MPG in 2009, are not problematic, as they are claims independent of Old GM and that could support New GM's independent liability, regardless of Old GM's actions before the 363 Sale. Similarly, as the Court explained above, for personal injury or property damage claims based on groundwater contamination from Old GM's dumping of road salt *before* the 363 Sale, but which migrated from the Property *after* the Property was owned by New GM, the Sale Order does *not* bar such claims. Whether Michigan law recognizes claims for personal injury or property damage against a property owner (and, in this regard, New GM stands in no different position than any other Michigan property owner) is an issue for the Michigan District Court, not for this Court.[10]

Certain of the allegations in the MAC do not, however, sufficiently distinguish between the conduct of Old GM and New GM and improperly describe New GM as the successor of Old GM. For instance, certain paragraphs of the complaint simply add the word "Defendant" concerning the conduct of Old GM. For example, the Plaintiffs allege: "Despite its knowledge of the Releases and Contamination, before 2014 Defendant and Old GM made affirmative misrepresentations that were designed to prevent discovery that their Releases from the MPG

---

[10]    Similarly, whether the Plaintiffs have satisfied Federal Rule of Procedure 9(b) with respect to their fraud claim in Count X, is an issue properly before the Michigan District Court, and the Court here will not reach beyond its role as a gatekeeper in deciding whether such allegations are "too generalized" or fail to set forth allegations that "describe [New GM conduct] with particularity." (Mot. ¶ 35.)

were the predominant causes of the Contamination." (MAC ¶ 49.) While the parties' proposed

second amended complaint as embodied in the parties' Mark-Up rectifies many of the improper

allegations originally pleaded, the Mark-Up still includes claims that may not proceed as drafted.

Such impermissible language includes:

- "Plaintiffs allege that, under Michigan law, New GM is the successor corporation to Old GM" (Mark-Up ¶ 5);

- "Defendant has acted as a mere continuation of Old GM, after Old GM's bankruptcy . . ." (*Id.* ¶ 47); and

- "As a direct and proximate result of Old GM's Releases and Contamination for which Defendant is liable through successor theory and lack of notice, Plaintiffs have suffered irreparable harm . . ." (*Id.* ¶ 71.)

These allegations flout the December 2015 Judgment's clear direction that plaintiffs are

prohibited from making allegations that speak of New GM as the "successor of" or a "mere

continuation of" Old GM. *See December 2015 Judgment* ¶ 16. The Court has reviewed the

Mark-Up, and a separate order will be entered ruling on New GM's outstanding objections.

Finally, the Plaintiffs must amend the MAC to remove claims for exemplary damages in

their claim for fraud against New GM for claims relating to Old GM. *See July 2017 Opinion*,

571 B.R. at 579–80 (explaining that plaintiffs may not assert claims against New GM for

punitive damages based on the conduct of Old GM).

**B.      Claims that are Precluded by the Sale Order and Sale Agreement May Not Proceed**

*1.      The Moore Plaintiffs' Right to Due Process was Not Violated*

As an initial matter, the Court rejects the Moore Plaintiffs' argument that their claims

should be permitted to proceed because their due process right was violated by Old GM's failure

to provide the Plaintiffs with actual notice of the bankruptcy. The Moore Plaintiffs argue that

they are analogous to the plaintiffs in *Elliott v. General Motors LLC (In re Motors Liquidation*

*Company)*, 829 F.3d 135 (2d Cir. 2016) ("*Elliott*"), who were victims of faulty ignition switches

produced by Old GM, and whose injuries occurred before and after the 363 Sale was completed.

(Obj. at 11.)  In *Elliott*, the Second Circuit concluded that Old GM knew who had purchased its

cars and knew about the ignition switch defect, but never gave actual notice to potential

claimants.  (*Id.* at 12.)  Because Old GM knew or with reasonable diligence should have known

about the ignition switch claims, the Court held that the plaintiffs were entitled to actual or direct

mail notice, and received only publication notice in violation of their right to due process.  (*Id.* at

11–12.)

The Moore Plaintiffs reason that here, "Old GM knew or should have known about the

sodium chloride contamination and migration prior to the 2009 bankruptcy" so, as in *Elliott*, due

process required that they receive actual notice of the bankruptcy.  (*Id.* at 13.)  The Moore

Plaintiffs claim they first learned about their possible claim against New GM in October 2014

when New GM abandoned previous denials and notified the MDEQ and local residents that the

sodium chloride contamination had been coming from the MPG.  The Plaintiffs explain that

meanwhile, Old GM knew about the sodium contaminations since at least 1985 and knew it had

migrated to the neighboring properties since at least 1997 when the MDEQ informed them of the

contamination.  (*Id.*)  In addition, the Plaintiffs contend that the knowledge of Old GM can be

imputed to New GM based on Old GM's files.  (*Id.*)  The Moore Plaintiffs further argue that they

were prejudiced by their lack of notice because they "missed a chance to sit at the negotiating

table with other potential creditors," and it "cannot be known whether New GM would have

made concessions for the Moore Plaintiffs in the same way concessions were made for other

claimants, including claimants who lacked legal grounds to avoid the protections of the § 363

sale."  (*Id.* at 14.)

The Moore Plaintiffs' reliance on *Elliott* is misplaced. It is well-settled that to be a "known" creditor, a claimant must be known or reasonably ascertainable from the debtor's own books and records (*see, e.g.*, *In re BGI, Inc.*, 476 B.R. at 823), and in stark contrast to the circumstances in *Elliott*, where Old GM both knew about the defect and could have ascertained the identities of the plaintiffs by determining the purchasers of GM cars, here (as Counsel for the Moore Plaintiffs acknowledged at the Hearing (Hearing Tr. at 70:19–23)), Old GM could not have looked at its books and records to ascertain who owned the properties nearby the MPG.

Indeed, this case is far more similar to *Chemetron* where, in the context of tort claims for damages arising out of exposure to toxic substances, the court found that the plaintiffs were unknown creditors because their identities were not reasonably ascertainable to the debtor based on an examination of the debtor's own books and records. There, during the period of 1965 and 1972, Chemetron Corporation ("Chemetron") used depleted uranium at its manufacturing facility and then sold the facility before filing for bankruptcy. *Chemetron*, 72 F.3d at 344. Before the bankruptcy, Chemetron conducted clean-up efforts at the facility because increased radiation levels were detected at the site. *Id.* The plaintiffs, including those who had visited or who had lived in the vicinity of the facility, sued claiming injuries for exposure to toxic chemicals, and claimed they did not receive actual notice of the claim-bar date in Chemetron's bankruptcy. *Id.* at 345. The Third Circuit affirmed the district court's finding that publication notice to the plaintiffs was sufficient because the plaintiffs were not known creditors and emphasized, "[w]here a debtor has sought the protection of bankruptcy law . . . procedural protections such as the bar claims date apply" and these provisions "cannot be circumvented by forcing debtors to

anticipate speculative suits based on lengthy chains of causation." *Id.* at 348.[11]  The court flatly

rejected the argument that "Chemetron could have conducted a title search on all the properties

surrounding the sites to determine all persons who might have lived in the area during the twenty

years between Chemetron's operation of the sites and the Chapter 11 proceeding" (*id.* at 347),

instead holding that "Debtors cannot be required to provide actual notice to anyone who

potentially could have been affected by their actions; such a requirement would completely

vitiate the important goal of prompt and effectual administration and settlement of debtors'

estates." *Id.*

The same principles apply here.  At the time it filed for bankruptcy, Old GM was merely

required to conduct a search "reasonable under the circumstances" of its own books and files for

known creditors, and was not required to be "omnipotent or clairvoyant" and conduct a title

search of the land surrounding the MPG to determine the Moore Plaintiffs' identities.  *See In re*

*Drexel Burnham Lambert Grp. Inc.*, 151 B.R. at 680–81 (explaining that reasonably-diligent

searches for known creditors depends on the circumstances of a case, and while a debtor must

undertake "more than a cursory review of its records and files," a debtor "need not be

omnipotent or clairvoyant").  Since the Moore Plaintiffs have not advanced any evidence that a

review of Old GM's own books and records would have revealed the identities of the Moore

Plaintiffs, the Court holds that the Moore Plaintiffs are not known creditors who were entitled to

actual notice, but unknown creditors entitled to publication notice, which they received.

While the Court need not determine the issue whether the Moore Plaintiffs were

prejudiced by the notice they received, the Court finds unconvincing the Moore Plaintiffs'

---

[11]        Similarly, applying the "reasonably ascertainable" test, the Eighth Circuit recently held that a commercial
truck driver, whose widow allegedly died due to the driver's benzene exposure from a petrochemical facility where
he loaded his truck with benzene-containing pyrolysis gasoline, was an unknown creditor.  *Dahlin v. Lyondell*
*Chem. Co. et al.*, 881 F.3d 599, 602, 607 (8th Cir. 2018).

argument that their interests were not represented during the 363 Sale because they "missed a chance to sit at the negotiating table with other potential creditors," and it "cannot be known whether New GM would have made concessions for the Moore Plaintiffs in the same way concessions were made for other claimants, including claimants who lacked legal grounds to avoid the protections of the § 363 sale." (Obj. at 14.)  At the Hearing, counsel for the Moore Plaintiffs asserted that "the question is how did the plaintiffs in this case have an opportunity to make an objection to the sale at the time of the Sale Order." (Hearing Tr. at 65:15–17.)  In fact, unlike in the context of the ignition switch defect where there was no party specifically tasked with advocating on behalf of ignition switch plaintiffs, here, the Moore Plaintiffs' interests *were* represented during the 363 Sale.  The MDEQ was provided mail notice of the 363 Sale and actively participated in the all phases of the sale. *See Certificate of Service*, dated June 15, 2009 (ECF Doc. # 073-49), at 540.  The MDEQ filed a limited objection (the "MDEQ Objection," ECF Doc. # 1847) raising issues of environmental liability and successor liability provisions of the Sale Agreement in order to "protect its interests in seeing that the environmental laws are complied with, environmental contamination is addressed, and any restrictions protective of public health, safety or welfare, or the environment at the Transferred Real Property are maintained." (MDEQ Objection ¶ 14.)  Moreover, counsel for the MDEQ, Assistant Attorney General in Michigan, appeared before Judge Gerber at the hearings concerning the 363 Sale, and ultimately supported the approval of the 363 Sale. *See* July 2, 2009 Hearing Tr. at 198:14–199:15.  The facts here are thus fundamentally different from the facts in *Elliott*.  The law regarding who is entitled to actual notice of a bankruptcy strikes a reasonable compromise in both affording interested parties an opportunity to protect their interests by presenting objections, and providing finality and a fresh start to honest debtors.  Thus, while the Court is sympathetic to

the Plaintiffs' claims in the MAC, under these circumstances the Court will not disturb this

careful balance by permitting the Moore Plaintiffs to attempt to evade the Sale Order nine years

after the bankruptcy, based on what "could have been" had they individually participated in the

363 Sale.

> 2.    *Counts III through VII of the MAC are Retained Liabilities Barred by the Sale Agreement and Sale Order*

The Court turns now to the parties' dispute over the Sale Order and the Sale Agreement's

provisions related to environmental liabilities.  The parties agree that claims arising under

Environmental Laws (Counts I, II VIII and IX of the MAC) may proceed against New GM as

Assumed Liabilities, but disagree whether Counts III through VII are Retained Liabilities barred

by the Sale Agreement.  (Reply ¶ 1; Hearing Tr. at 59:10–17, 62:23–25.)  The plain language of

the Sale Agreement is unclear regarding the scope of New GM's Assumed Liabilities, and at the

Hearing the Court asked the parties several questions to better parse the relevant provisions.

Specifically, it is unclear on the face of the Sale Agreement whether New GM could be liable

under Michigan common law for damages for personal injury or property damage arising out of

environmental contamination.  The parties' supplemental briefs clarify the relevant provisions of

the Sale Agreement and Sale Order.  The Court concludes that, when read in the context of the

*Sale Decision* and contract construction principles, New GM did not assume liability for third-

party common law claims relating to the Transferred Real Property based on Old GM conduct.

The Sale Agreement provides that New GM's Assumed Liabilities exclude Old GM

liabilities for non-compliance of environmental laws "*except as required under applicable*

*environmental laws.*" (Sale Agreement 2.3(b)(iv) (emphasis added).)  Since the term "Law" is

defined in Section 1.1 of the Sale Agreement broadly to include "principles of common law, of

any Governmental Authority" (Sale Agreement at 11), and "Governmental Authority" is defined

to include "any entity, agency, or body exercising executive, legislative, judicial regulatory or administrative functions" (*id.* at 9), which would include a court, the Sale Agreement could arguably be construed as permitting common law claims against New GM based on Old GM's conduct if such common law claims were recognized under Michigan law.  This interpretation would greatly expand the scope of New GM's liabilities, and would in essence cause the exception to swallow the rule in Sale Agreement section 2.3(b)(xi) that Old GM retains liabilities "to third parties for Claims based upon Contract, tort or any other basis."

Adopting this expansive interpretation of the Sale Agreement, the Moore Plaintiffs argue in their supplemental brief that the Sale Agreement's unambiguous language states that New GM assumed liability for the tort of negligently failing to comply with environmental laws.  (Moore Plaintiffs' Supp. Br. at 7–8.)  The Moore Plaintiffs emphasize that the "definitions contained in the plain wording of the Sale Agreement state that New GM assumed liability for Michigan common law with respect to claims under Environmental Law" because "New GM assumes liability for violations of Environmental Law under principles of common law as set by the judiciary of the state of Michigan (a 'Governmental Authority' under the Sale Agreement)" and "New GM's assumption of liability for Michigan common law claims under Environmental Law includes claims like the Moore Plaintiffs' allegations of negligence."  (*Id.* at 8.)

The Court concludes that the more reasonable interpretation of the Sale Agreement, considering contract principles and reading the agreement in the context of the Sale Order and *Sale Decision*, is that (i) Old GM retained liabilities for third-party common law damages claims based on its own conduct, and (ii) New GM assumed liability for compliance with *statutory-based* Environmental Laws after the 363 Sale, including for remediation or clean-up for contamination caused by Old GM.

33

This interpretation is supported by basic tents of contract interpretation. "The objective of contract interpretation is to give effect to the expressed intentions of the parties," *see In re Lehman Brothers Holdings, Inc.*, 530 B.R. 601, 608 (Bankr. S.D.N.Y. 2016) (citation omitted), and Section 2.3(b)(xi) of the Sale Agreement unambiguously includes as a Retained Liability "all Liabilities to third parties for Claims based upon Contract, tort or any other basis." The Moore Plaintiffs argue that "this more general definition should not be favored over the specific language relating to claims stemming from Environmental Law," (Moore Plaintiffs' Supp. Br. at 9), but such construction would contravene the parties' expressed intent in Section 2.3(b)(xi) and throughout the Sale Agreement and Sale Order. It clear from the structure of the Sale Agreement that liabilities are "Retained Liabilities" unless specifically carved out as New GM's assumed liabilities, underscoring that a fundamental basis for New GM's agreement to purchase Old GM's assets was that New GM would agree to assume only specifically-identified liabilities of Old GM, and the 363 Sale was "free and clear" of all liens and claims against Old GM, including successor liability claims, except for the contractually-defined Assumed Liabilities. The principle applicable here is the doctrine of *expressio unius est exclusio alterius*, or, the expression of one thing is the exclusion of another. *See IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F. Supp. 769, 773 n.19 (S.D.N.Y. 1984) (explaining that "[u]nder the doctrine of *expressio unius est exclusion alterius*, when certain persons or categories are specified in a contract an intention to exclude all others may be inferred"). "[U]nder this drafting structure, unless a liability was covered as an Assumed Liability under Section [2.3(a)], New GM did *not* assume it" (emphasis in original). *November 2015 Decision*, 541 B.R. at 108.

New GM also rightly notes that while the term "Law" appears to be broadly defined to include common law principles, which would seem to sweep into "Assumed Liabilities" third-

party claims against New GM for Old GM conduct under applicable Michigan common law, the

relevant term in section 2.3(b)(iv) is the more precise phrase, "Environmental Law," which is

defined as any Law "relating to the management or Release of, or exposure of humans to, any

Hazardous Materials; or pollution; or the protection of human health and welfare and the

environment."  (Sale Agreement at 7.)  Accordingly, "Law" as used in the definition of

"Environmental Law" must relate to the Release of Hazardous Materials, and common law

claims such as the Moore Plaintiffs' may be contrasted with statutory-based Environmental

Laws.  (New GM Supp. Br. at 13.)

Most importantly, the Court need not revisit Judge Gerber's interpretation of the Sale

Agreement and Sale Order, which remains the law of this case and which supports New GM's

construction of the relevant provisions.  *See July 2017 Opinion*, 571 B.R. at 576.  In the *Sale

Decision*, Judge Gerber addressed the provisions of the Sale Order regarding environmental

liability, and held that New GM has no successor liability with respect to environmental claims.

In addressing parties' objections with respect to environmental issues, Judge Gerber noted:

> Certain objectors—most notably, New York's attorney General
> (the "New York AG"), who enforces New York's environmental
> laws, and the St. Regis Mohawk Tribe (the "Tribe") . . . have
> voiced their concerns as to whether any approval order would too
> broadly release either Old GM or New GM from their respective
> duties to comply with environmental laws and cleanup obligations.
> Objections of this character were a matter of concern to this Court
> as well, but they were addressed—very well, in the Court's view—
> by amendments to the proposed order that were made after
> objections were due.

*Sale Decision*, 407 B.R. at 507.

The additional amended language that was added to the Sale Order to which Judge

Gerber refers appears in paragraphs 61 and 62 of the Sale Order:

> **Paragraph 61:** Nothing in this Order or the MPA releases,
> nullifies, or enjoins the enforcement of any Liability to a

35

governmental unit under Environmental Laws or regulations . . . that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to the entry of this Order . . .

**Paragraph 62:** Nothing contained in this Order or the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtor to comply with Environmental Laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code . . .

Judge Gerber overruled certain objections to the Sale Agreement, explaining that:

The Environmental Matter Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For the reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view . . . is this Court's decision, seven years ago, in *Mag. Corp.* There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue—to what extent could that property be sold free and clear of environmental claims under section 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs or any other obligations that were obligations of the seller. But the purchase would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation at that time, any such remediation would be the buyer's responsibility: When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward.

Those same principles apply here. Any Old GM properties to be transferred will be transferred free and clear of successor liability, but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward.

*Id.* at 508 (footnotes and quotation marks omitted).

Reading the provisions of the Sale Agreement in conjunction with the principles articulated in Judge Gerber's *Sale Decision*, the Court interprets Section 2.3(b)(iv)(C) to mean that third-party common law claims for personal injury or property damage based on pre-363 Sale releases or migration of hazardous materials from the Transferred Real Property (and not based on New GM's post-363 Sale conduct) are Retained Liabilities, and therefore Counts III through VII are precluded by the Sale Agreement.[12]  Such claims are essentially successor liability claims which this Court has repeatedly held were *not* assumed by New GM.  *See, e.g.*, *In re Motors Liquidation Co.*, 549 B.R. 607, 613 (Bankr. S.D.N.Y. 2016) (explaining that "the record in this bankruptcy case and the prior decisions of this Court make it abundantly clear that New GM is *not* a successor in interest to Old GM").

## IV.    CONCLUSION

For the reasons explained above, New GM's Motion is **GRANTED** to the extent provided herein.  The decision whether any proposed amended complaint ultimately approved by this Court states causes of action and otherwise meets pleading standards under applicable nonbankruptcy law is for the Michigan District Court to decide.

**IT IS SO ORDERED.**

Dated:    May 4, 2018
          New York, New York

                              *Martin Glenn*
                              MARTIN GLENN
                              United States Bankruptcy Judge

---

[12]     As explained earlier, the issue whether Michigan law recognizes common law liability of a property owner for post-sale migration of contaminated groundwater based on pre-sale contamination is left to the Michigan District Court to determine.  The Sale Agreement and the Sale Order do not bar such claims, if such claims exist under state law.