Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corp., *et al.*, | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OF LAW OF GENERAL MOTORS LLC WITH RESPECT
TO APPLICATION OF RULE 23 TO THE PROPOSED SETTLEMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................ 5

I.     The Court Should Not Estimate Hypothetical and Unfiled Claims. .................................. 5

       a.     The Court May Only Estimate "Aggregate Allowed General Unsecured Claims" And Not Hypothetical Unfiled "Claims." .................................. 5

       b.     No Claim May Be Allowed, Whether by Estimation or Otherwise, Unless It Is First Filed. ................................................................................. 7

       c.     The GUC Trust Administrator's Suggestion that 502(c) Permits Estimation of Unfiled Claims Refutes Itself. .................................. 10

       d.     Cases Where Estimation Is Done for Purposes Other Than Claims Allowance Are Irrelevant. .................................. 11

       e.     Other Cases Cited by Movants in the Estimation Motion Are Inapplicable Because They Involve *Filed* Claims. .................................. 14

II.    A Court Should Determine Whether The Proposed Classes Can Be Certified Before Estimating the Allowed Amount of Claims Asserted by Putative Class Members. .................................. 15

       a.     The Proposed Class Claims Must Meet the Requirements of Rule 23. ................ 15

       b.     Movants Cannot Circumvent Rule 23 By Settling the Proposed Class Claims. .................................. 18

       c.     Movants Cannot Circumvent Rule 23 By Estimating Proposed Class Claims. .................................. 23

       d.     Movants' Arguments—If Accepted—Would Nullify Rule 23. ........................... 24

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*In re A.H. Robins Co., Inc.*,
    880 F.2d 694 (4th Cir. 1988) ..................................................................14

*In re Adelphia Commc'ns Corp.*,
    364 B.R. 518 (Bankr. S.D.N.Y. 2007) ...........................................22, 23

*In re Am. Reserve Corp.*,
    840 F.2d 487 (7th Cir. 1988) ..................................................................17

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988) ....................................................11

*Amchem Prods., Inc.* v. *Windsor*,
    521 U.S. 591 (1997) ........................................................5, 19, 20, 21, 24

*In re Anderson*,
    357 B.R. 473 (Bankr. W.D. Mich. 2006) ................................................22

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006) ...................................................................13

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    402 B.R. 616 (Bankr. S.D.N.Y. 2009) ....................................................15

*In re BGI, Inc.*,
    465 B.R. 365 (Bankr. S.D.N.Y. 2012) ....................................................21

*In re Blockbuster, Inc.*,
    441 B.R. 239 (Bankr. S.D.N.Y. 2011) ...............................................4, 15

*In re Chaparral Energy, Inc.*,
    571 B.R. 642 (Bankr. D. Del. 2017) .......................................................16

*In re Chemtura Corp.*,
    448 B.R. 635 (Bankr. S.D.N.Y. 2011) ....................................................12

*In re Connaught Grp., Ltd.*,
    491 B.R. 88 (Bankr. S.D.N.Y. 2013) ......................................................17

*In re Continental Airlines, Inc.*,
    57 B.R. 842 (Bankr. S.D. Tex. 1985) .....................................................14

*In re Craft*,
    321 B.R. 189 (Bankr. N.D. Tex. 2002) ...................................................16

*In re Dow Corning Corp.*,
211 B.R. 545 (Bank. E.D. Mich. 1997) .................................................................9

*In re Eagle-Picher Indus., Inc.*,
189 B.R. 681 (Bankr. S.D. Ohio 1995)................................................................13

*In re EOS Airlines, Inc.*,
2008 WL 8820257 (Bankr. S.D.N.Y. Sept. 4, 2008) .............................................21

*In re Ephedra Prods. Liab. Litig.*,
231 F.R.D. 167 (S.D.N.Y. 2005) .........................................................................20

*In re Ephedra Prods. Liability Litig.*,
329 B.R. 1 (S.D.N.Y. 2005)................................................................................15

*In re Fed.–Mogul Global, Inc.*,
330 B.R. 133 (D. Del. 2005)...............................................................................13

*In re Flores*,
2013 WL 6186262 (Bankr. C.D. Cal. Nov. 25, 2013)............................................22

*Fulco* v. *Continental Cablevision, Inc.*,
789 F. Supp. 45 (D. Mass. 1992) ........................................................................17

*In re G-I Holdings, Inc.*,
323 B.R. 583 (Bankr. D.N.J. 2005) .....................................................................13

*In re Garlock Sealing Techs. LLC*,
504 B.R. 71 (Bankr. W.D.N.C. 2014)..................................................................13

*In re Gen. Motors Corp. Engine Interchange Litig.*,
594 F.2d 1106 (7th Cir. 1979) ............................................................................17

*Gentry* v. *Siegel*,
668 F.3d 83 (4th Cir. 2012) ................................................................................16

*In re Greenwich Sentry, L.P.*,
471 B.R. 800 (Bankr. S.D.N.Y. 2012)...................................................................9

*In re Hyundai and Kia Fuel Econ. Litig.*,
881 F.3d 679 (9th Cir. 2018) ..............................................................................25

*In re Initial Pub. Offering Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) .........................................................................20

*Johnson* v. *Nextel Commc'ns*,
780 F.3d 128 (2d Cir. 2015)................................................................................25

iii

*In re Lahman Mfg. Co., Inc.*,
  31 B.R. 195 (Bankr. D.S.D. 1983) ........................................................................ 11

*In re Lehman Bros. Holdings, Inc.*,
  Case No. 08-13555, ECF No. 57785 ...................................................................... 15

*In re Lichtin/Wade, LLC*,
  2012 WL 6629682 (Bankr. E.D.N.C. Dec. 19, 2012) ............................................. 9

*In re Literary Works in Electronic Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ................................................................................. 21

*Litty* v. *Merrill Lynch & Co., Inc.*,
  2015 WL 4698475 (C.D. Cal. Apr. 27, 2015) ...................................................... 21

*In re MarketXT Holdings Corp.*,
  336 B.R. 67 (Bankr. S.D.N.Y. 2006) ...................................................................... 8

*Maywalt* v. *Parker & Parsley Petrol. Co.*,
  67 F.3d 1072 (2d Cir. 1995) ................................................................................. 17

*In re Meadowbrook Estates*,
  246 B.R. 898 (Bankr. E.D. Cal. 2000) .................................................................... 8

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ................................................................................. 22

*Motorola, Inc.* v. *Official Comm. of Unsecured Creditors
  (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) ................................................................................. 18

*In re Motors Liquidation Co.*,
  447 B.R. 150 (Bankr. S.D.N.Y. 2011) .......................................................... 4, 15, 23

*In re Musicland Holding Corp.*,
  362 B.R. 644 (Bankr. S.D.N.Y. 2007) ............................................................ 16, 17

*In re Nutri*Bevco, Inc.*,
  117 B.R. 771 (Bankr. S.D.N.Y. 1990) .................................................................. 10

*In re Old Carco LLC*,
  2013 WL 1856299 (Bankr. S.D.N.Y. May 2, 2013) ................................................ 8

*Owens Corning* v. *Credit Suisse First Bos.*,
  322 B.R. 719 (D. Del. 2005) ................................................................................. 13

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016) ................................................................................. 21

iv

*In re Partsearch Techs., Inc.*,
   453 B.R. 84 (Bankr. S.D.N.Y. 2011) .................................................................21

*In re Ralph Lauren Womenswear, Inc.*,
   197 B.R. 771 (Bankr. S.D.N.Y. 1994) ...............................................................23

*Reid* v. *White Motor Corp.*,
   886 F.2d 1462 (6th Cir. 1989) ..........................................................................16

*Republic of Rwanda* v. *Ferone*,
   307 Fed. Appx. 600 (2d Cir. 2009) .....................................................................6

*Riedel* v. *Acqua Ancien Bath N.Y. LLC*,
   2016 WL 3144375 (S.D.N.Y. May 19, 2016) ...................................................20

*Schoenbaum* v. *E.I. DuPont De Nemours and Co.*,
   2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ....................................................20

*In re Specialty Prods. Holding Corp.*,
   2013 WL 2177694 (Bankr. D. Del. May 20, 2013) ..........................................13

*In re SportStuff, Inc.*,
   430 B.R. 170 (8th Cir. B.A.P. 2010) ................................................................22

*In re The 1031 Tax Group, LLC*,
   397 B.R. 670 (Bankr. S.D.N.Y. 2008) ..............................................................22

*In re USG Corp.*,
   290 B.R. 223 (Bankr. D. Del. 2003) .................................................................13

*In re W.R. Grace & Co.*,
   2009 WL 230138 (Bankr. D. Del. Jan. 16, 2009) .............................................21

*In re Wallace's Bookstores, Inc.*,
   317 B.R. 720 (Bankr. E.D. Ky. 2004) ..............................................................12

*In re White*,
   352 B.R. 633 (Bankr. E.D. La. 2006) ................................................................8

*In re WorldCom, Inc.*,
   347 B.R. 123 (Bankr. S.D.N.Y. 2006) ..............................................................21

**STATUTES**

11 U.S.C. § 502(a) ...........................................................................................7

11 U.S.C. § 502(c) ....................................................................................*passim*

11 U.S.C. § 502(j) ..........................................................................................11

11 U.S.C. § 507(a) ...................................................................................................11

11 U.S.C. § 521 ...................................................................................................8, 24

11 U.S.C. § 524(g) .................................................................................................14

11 U.S.C. § 1111(a) ..................................................................................................8

11 U.S.C. § 1129(a) ................................................................................................11

11 U.S.C. § 1129(b) ................................................................................................11

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3001 .........................................................................................3, 16

Fed. R. Bankr. P. 3002(a) ......................................................................................3, 7

Fed. R. Bankr. P. 3003 .......................................................................................3, 8, 9

Fed. R. Bankr. P. 3004 ............................................................................................8

Fed. R. Bankr. P. 3005 ............................................................................................8

Fed. R. Bankr. P. 3006 ...........................................................................................11

Fed. R. Bankr. P. 3007 ...........................................................................................11

Fed. R. Bankr. P. 3021 ...........................................................................................11

Fed. R. Bankr. P. 7023 .............................................................................................1

Fed. R. Bankr. P. 9014 ...........................................................................................16

Fed. R. Bankr. P. 9019 ..................................................................................... *passim*

Fed. R. Civ. P. 23 ........................................................................................... *passim*

General Motors LLC ("**New GM**") submits this Memorandum of Law in response to the Court's request for briefing regarding application of Rule 23 to the Proposed Settlement.[1]

## PRELIMINARY STATEMENT

1.      The fundamental question posed by the Proposed Settlement is which claims may properly be settled, estimated, and ultimately allowed.

2.      New GM believes, consistent with the Sale Agreement and applicable law, that Movants may only settle, estimate, and allow claims that have actually been filed against the GUC Trust.  Currently, the only late-filed claims consist of those filed by approximately 500 personal injury plaintiffs and several dozen individual plaintiffs seeking economic loss damages; a group of claims that, even if allowed at face value (without class certification), could not reach the threshold necessary to require New GM to issue any Adjustment Shares.  If, however, a court were to certify under Rule 23 of the Federal Rules of Civil Procedure (as incorporated by Bankruptcy Rule 7023, "**Rule 23**"), the nationwide classes alleged by Co-Lead Counsel in the Proposed Class Claims, then the scope of the filed claims would change, and could include up to 11.4 million individuals.[2]

3.      Movants, on the other hand, believe they may settle, estimate, and ultimately allow any claim, including hypothetical claims, regardless of whether a proof of claim has actually been filed against the GUC Trust.  According to Movants, estimation need "not be applied to proofs of

---

[1]    Capitalized terms not defined herein shall have the meanings given to them in New GM's Notice Procedures Objection (ECF No. 14314).  For purposes of this Memorandum of Law, New GM assumes, consistent with Movants' statements to date, that they do not intend to seek Rule 23 certification.  If Movants change course and seek Rule 23 certification at any point in time, New GM reserves its right to supplement this response accordingly.

[2]    The Proposed Class Claims state that they could potentially cover up to 11.4 million individuals.  At the May 25, 2018 Status Conference (the transcript of which is attached hereto as **Exhibit A**), however, Co-Lead Counsel stated that the number was now no greater than 9.5 million based on a recent ruling by the MDL Court.  (*See* 5/25/2018 Hr'g Tr. 29:20-22.)  Other rulings from the MDL Court should, and future rulings may, further reduce the scope of the Proposed Class Claims.

claim, but . . . to claims generally, whether or not a proof of claim has actually been filed." (5/25/2018 Hr'g Tr. 9-10.)  The Proposed Settlement expressly seeks to settle, estimate, and allow the purported claims of any person "suffering economic losses who, prior to July 10, 2009, owned or leased" an Old GM vehicle subject to the Recalls (Settlement Motion ¶ 1),  and therefore covers the same 11.4 million individuals included in the Proposed Class Claims while avoiding the requirement that a court certify a class under Rule 23.

4.      The difference in the parties' respective positions reduces to two key questions. First, can or should the Court estimate and allow hypothetical and unfiled claims under the Proposed Settlement?  Second, if the answer to that question is no, can or should the Court estimate and allow the claims of putative class members without deciding whether the proposed nationwide classes may be certified under Rule 23?  The answer to both questions is "no."

5.      The Court should not estimate and allow unfiled potential claims because, in addition to violating Rule 23 and Supreme Court precedent, doing so would violate bankruptcy law and New GM's contractual rights under the Sale Agreement, Side Letter, and the Plan.  The Sale Agreement requires that, in determining whether New GM is obligated to issue Adjustment Shares, the Court must estimate "***aggregate allowed general unsecured claims***"—not simply "claims."  This language is no accident and must be accorded its plain meaning:  the purpose of the Adjustment Shares is to protect general unsecured creditors entitled to distributions from dilution, and the only way such creditors could be diluted is if other claims are filed, ultimately allowed, and entitled to receive distributions.  Accordingly, in any estimation proceeding, the Court must consider whether the "claims" Movants ask the Court to settle and estimate are even capable of being allowed.  That this is the proper interpretation of the Sale Agreement is confirmed by Movants' own conduct and statements:  their papers expressly state that the Proposed

Settlement "resolves . . . the ***allowance*** of Plaintiffs' claims," and they ask the Court to estimate Plaintiffs' claims "***for allowance and distribution purposes***."    (Settlement Motion ¶ 50; Estimation Motion ¶ 52 (emphasis added).)

6.      The Bankruptcy Code and Bankruptcy Rules unequivocally require that, as a prerequisite to having an allowed claim, a creditor ***must*** file a proof of claim.  *See* F.R.B.P. 3002(a) (unsecured creditor "***must file a proof of claim . . . for the claim . . . to be allowed***").  Courts routinely find that the failure to file a proof of claim precludes a creditor from having an allowed claim and receiving a distribution.  Indeed, the very reason that Co-Lead Counsel filed the Late Claims Motion (and have since sought to add and amend proofs of claim) was their recognition that they must file a proof of claim—even a late claim—in order to receive distributions from the GUC Trust.  Similarly, even if the "claims" had been scheduled (which they were not), they necessarily would have been scheduled as disputed and unliquidated since the Proposed Settlement seeks to compromise a dispute and estimate unliquidated claims.  The Bankruptcy Code and Bankruptcy Rules provide that a creditor whose claim is scheduled as disputed or unliquidated "***shall*** file a proof of claim," and "any creditor who fails to do so ***shall not be treated as a creditor***."  *See* F.R.B.P. 3003(c)(2).  In sum, claims that are not filed can never be allowed, and therefore are not considered for purposes of determining whether Adjustment Shares should be issued under the Sale Agreement.

7.      Given the necessary focus on estimation of the Proposed Class Claims that were actually filed against the GUC Trust, these putative Proposed Class Claims can only be allowed on behalf of persons other than the individual plaintiffs if a court first certifies the alleged classes under Rule 23.  The Bankruptcy Code and Bankruptcy Rules again are dispositive:  a proof of claim must be signed by the creditor or an authorized agent of the creditor, F.R.B.P. 3001(b), and

an individual is not an authorized agent of putative class members unless and until the proposed

classes are certified and the agents are appointed class representatives.  For this reason, bankruptcy

courts consistently hold that a proposed class claim cannot be asserted—and therefore cannot be

allowed—unless a court first certifies the proposed class.  *See, e.g.*, *In re Motors Liquidation Co.*,

447 B.R. 150, 157 (Bankr. S.D.N.Y. 2011) ("[T]he claim can be asserted as a class claim ***if, but***

***only if,*** . . . the class claim proponent has shown compliance with the requirements of Civil Rule

23."); *In re Blockbuster, Inc.*, 441 B.R. 239, 240-41 (Bankr. S.D.N.Y. 2011) ("[I]n determining

whether to permit the filing of a class claim, bankruptcy courts must determine . . . that the claims

sought to be certified fulfill the requirements of Rule 23 . . . .").

8.      Movants' own conduct and statements confirms the need to certify a class under

Rule 23.  Co-Lead Counsel represented to the Court that they would "seek application of [Rule

23] to the Proposed Class Claims and to certify the proposed classes . . . ."  (Late Claims Motion

¶ 16.)  They also represented to the Court that "a class action is superior to other available methods

for the fair and efficient adjudication of this controversy," and that Rule 23 "provides the Court

with authority and flexibility" to resolve the claims of the individual class members.[3]  Movants

cannot disown these statements now.  Absent Rule 23 compliance, the Proposed Class Claims

constitute only the claims of the individually named plaintiffs.

9.      Further, it makes no difference that Movants are "settling" or "estimating" the

Proposed Class Claims.  As a settlement that on its face seeks to resolve class claims (Settlement

Agreement ¶ MM), applicable case law unequivocally requires Movants to comply with Rule 23,

including ***heightened scrutiny*** under the certification requirements of Rule 23(a) and (b).

---

[3]    *See Notice of Filing of Amended Exhibits to Motion for an Order Granting Authority to File Late Class Proofs of Claim*, ECF No. 14280 ¶ 354 (Bankr. S.D.N.Y. Apr. 24, 2018) (the "**Amended Proposed Class Claims**").

*See Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 621-22 (1997).

10.     For Movants to settle, estimate, or allow the unfiled economic loss claims of 11.4 million individuals, Movants must pick up where they began and "seek application of [Rule 23] to the Proposed Class Claims and to certify the proposed classes."  (Late Claims Motion ¶ 16.)

## ARGUMENT

## I.     The Court Should Not Estimate Hypothetical and Unfiled Claims.

### a.     The Court May Only Estimate "Aggregate Allowed General Unsecured Claims" and Not Hypothetical Unfiled "Claims."

11.     New GM's obligation to issue any Adjustment Shares—the key objective of the Proposed Settlement—is defined and determined by the Sale Agreement, not section 502(c) of the Bankruptcy Code.  It provides that Old GM (now the GUC Trust Administrator) may seek an order "estimating the ***aggregate allowed general unsecured claims***" against Old GM, and if the Court enters an order "finding that the estimated ***aggregate allowed general unsecured claims*** against Sellers' estates exceed $35,000,000,000" then New GM will issue Adjustment Shares.  (Sale Agreement § 3.2(c)(i) (emphasis added).)  To trigger that obligation, the Court must estimate the aggregate amount of ***allowed claims—not*** hypothetical claims that were never asserted.

12.     The purpose of section 3.2(c) of the Sale Agreement is to protect allowed general unsecured creditors from dilution in the event that "aggregate allowed general unsecured claims" are ultimately higher than anticipated in July 2009.  (*See* Disclosure Statement § III.C ("[I]f General Unsecured Claims range from $35 billion to $42 billion, New GM will issue up to an additional 2% of New GM Stock ***to protect against dilution***.") (emphasis added).)  The only way a creditor's recovery could be diluted is if other creditors ***file claims*** that are capable of being ***allowed***, and therefore capable of receiving ***distributions***.  Creditors with unfiled claims, on the

other hand, get no distribution and cannot dilute other creditors. As this court put it: "Claims in bankruptcy get paid to people who filed claims." (*See* 10/3/17 Hr'g Tr. at 28:12-13.)

13.    This is why the Sale Agreement, the Plan, and the GUC Trust Agreement each repeatedly refer to the estimation of "Allowed General Unsecured Claims" and not—as Movants would rewrite it—to the estimation of possible "claims" when referring to the Adjustment Shares.[4] Similarly, it is the reason that the Side Letter provides that the GUC Trust Administrator would request a Claims Estimate Order if it determines that "***allowed eligible claims*** are ***likely to exceed*** $35 billion in the aggregate." (Side Letter p. 2 (emphasis added).)[5] Movants now take the position that ***any claim***, whether filed or not (or even entirely speculative or facially invalid), constitutes an "allowed eligible" claim, an interpretation that renders the contractual words "allowed" and "eligible" meaningless. *See, e.g.*, *Republic of Rwanda* v. *Ferone*, 307 Fed. Appx. 600, 602 (2d Cir. 2009) ("Courts should construe a contract so as to give meaning to all of its language and avoid an interpretation that effectively renders meaningless a part of the contract.") (citations and internal quotation marks omitted). [6]

---

[4]    *See* Disclosure Statement § II.C (Adjustment Shares to be distributed to "holders of Allowed General Unsecured Claims"); Plan § 1.99 (Adjustment Shares issued if the "estimated or actual amount . . . of (i) Allowed General Unsecured Claims . . . exceed[ing] $35 billion"); Plan § 6.2(b) (GUC Trust has responsibility to "determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro Rata Share of New GM Securities under the Plan"); GUC Trust Agreement § 2.3(d) (Adjustment Shares issued if the "aggregate amount of Allowed General Unsecured Claims exceeding $35 billion").

[5]    Neither the Side Letter nor the GUC Trust Agreement modify the standards set forth in section 3.2(c) of the Sale Agreement requiring the Court to estimate "aggregate allowed general unsecured claims." (*See* Side Letter p. 2 ("For avoidance of doubt, this letter agreement is not intended to amend the MSPA; rather it is intended to clarify the parties' rights and responsibilities thereunder."); Plan § 1.99 (requiring issuance of Adjustment Shares "as provided in the MSPA"); GUC Trust Agreement § 2.3(d) (permitting GUC Trust Administrator to seek Adjustment Shares "pursuant to the MSPA" and "as described in the MSPA").)

[6]    Tellingly, the GUC Trust previously argued that GUC Trust Beneficiaries (*i.e.*, creditors potentially entitled to Adjustment Shares) only included creditors that ***filed*** claims as of the Effective Date. (GUC Trust Administrator Letter, December 13, 2016, MDL ECF No. 3588 p. 2 (S.D.N.Y. Dec. 13, 2016) ("GUC Trust Beneficiaries . . . do[] not include the holders of claims filed after the effective date."); *see* GUC Trust Agreement ¶ F.)

14.     Movants' own conduct and statements corroborate this contractual interpretation. Movants acknowledge that the Proposed Settlement "resolves . . . the *allowance* of Plaintiffs' claims," and provides for the "efficient and certain resolution of the *allowable amount* of Plaintiffs' claims." (Settlement Motion ¶¶ 50, 85 (emphasis added); *see also* Estimation Motion ¶ 52 ("The facts and circumstances of this case strongly support estimation of the Claims for *allowance* and distribution purposes.") (emphasis added); Proposed Estimation Order (titled "Order Estimating . . . Claims For Allowance Purposes" and providing that "Plaintiffs' aggregate allowed General Unsecured Claims are hereby estimated in an amount not less than $_____").) Movants confirmed on May 22, 2018 (ECF No. 14312) that they are requesting this Court to "estimate economic loss and personal injury claims for both allowance and distribution purposes."

15.     Section 3.2(c) of the Sale Agreement is not conditioned on the estimated amount of potential "claims;" rather, it requires the estimation of "aggregate allowed general unsecured claims." This distinction cannot be ignored because, as set forth below, the difference between estimating "claims" and "aggregate allowed general unsecured claims" is significant under the plain language of the Bankruptcy Code, the Bankruptcy Rules, and the Plan.[7]

**b.     No Claim May Be Allowed, Whether by Estimation or Otherwise, Unless It Is First Filed.**

16.     It is axiomatic that a creditor must generally file a proof of claim to have an allowed claim. Bankruptcy Rule 3002(a)—titled "*Necessity for Filing*"—provides as follows:

> A[n] . . . *unsecured creditor* or an equity security holder *must file a proof of claim* or interest *for the claim* or interest *to be allowed,* except as provided in Rules 1019(3), 3003, 3004, and 3005.

(emphasis added); *accord* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is *filed* under

---

[7]     Movants mischaracterize New GM's position as requiring millions of full-blown trials for claims to be allowed. New GM makes no such argument; rather, New GM's position is that putative nationwide class claims cannot be settled and allowed without complying with Rule 23.

section 501 of this title, is deemed allowed . . . .").[8]  Accordingly, "[t]he general rule in chapter 11, as in other chapters, is that a creditor must file a proof of claim to participate in any distribution from the bankruptcy estate."  Collier on Bankruptcy ¶ 1111.02[1]; *see, e.g.*, *In re Old Carco LLC*, 2013 WL 1856299, at *3 (Bankr. S.D.N.Y. May 2, 2013) (failure to file a proof of claim means a creditor "is not entitled to any distribution from the estate"); *In re MarketXT Holdings Corp.*, 336 B.R. 67, 72 (Bankr. S.D.N.Y. 2006) ("EIF's failure to file a claim is fatal to its pretensions to have a continuing participation in the existing Claims.").[9]  Unfiled claims are not capable of becoming allowed claims, and therefore cannot be estimated for purposes of the Sale Agreement.

17.    Scheduling "Plaintiffs' claims" under section 521 does not satisfy the basic requirements of the claims allowance process.  Section 1111(a) of the Bankruptcy Code provides that a "proof of claim . . . is ***deemed filed*** under section 501 . . . for any claim . . . that appears in the schedules . . . ***except*** a claim . . . that is scheduled as disputed, contingent, or unliquidated."  11 U.S.C. § 1111(a) (emphasis added).  Therefore, section 1111(a) does not obviate the need for an unsecured creditor to file a proof of claim, but instead provides that a proof of claim is "deemed filed" ***only*** when the scheduled claim is liquidated, non-contingent, and undisputed.  *See In re Greenwich Sentry, L.P.*, 471 B.R. 800, 804 (Bankr. S.D.N.Y. 2012) ("Section 1111(a) is premised on procedural efficiency, and if the amount of a claim or interest is clear to all parties, filing proof of that claim or interest is unnecessary and wasteful.").

---

[8]    The exceptions provided in Rule 3002(a) are not applicable here:  Rule 1019(3) (claims filed before conversion to chapter 7), Rule 3003 (indenture trustee may file a claim on behalf of bondholders), Rule 3004 (debtor or trustee may file a proof of claim within 30 days of the bar date), and Rule 3005 (guarantor, surety, indorse, or co-debtor may file a proof of claim).

[9]    *See also In re White*, 352 B.R. 633, 643 (Bankr. E.D. La. 2006) ("In order to hold an allowed claim, the claimant must file a proof under § 501.  Section 502 then provides for its allowance."); *In re Meadowbrook Estates*, 246 B.R. 898, 905 (Bankr. E.D. Cal. 2000) ("The defendant's claim was scheduled as disputed and no proof of claim has been filed.  Thus, there is nothing to subordinate.").

18.    When a claim is disputed or unliquidated (or not scheduled), the creditor **must** file

a proof of claim.  Rule 3003(c)(2)—titled "***Who Must File***"—provides:

> ***Any creditor*** or equity security holder ***whose claim*** or interests ***is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim*** or interest within the time prescribed by subdivision (c)(3) of this rule; ***any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purpose of voting and distribution***.

(emphasis added).  Section 1.54 of the Plan is also dispositive:

> [I]f no proof of Claim has been filed by the applicable deadline and the Claim . . . has been or hereafter is listed on the Schedules as disputed, contingent, or unliquidated, such Claim ***shall not be valid and shall be disregarded***.

(emphasis added).  Bankruptcy courts routinely enforce this rule.  *See, e.g.*, *In re Lichtin/Wade,

LLC*, 2012 WL 6629682, at *2 (Bankr. E.D.N.C. Dec. 19, 2012) ("If the claim had not been listed

on the Debtor's schedules, or was listed as contingent, disputed, or unliquidated, AMG would have

been required to file a proof of claim."); *In re Dow Corning Corp.*, 211 B.R. 545, 560 (Bank. E.D.

Mich. 1997) ("In this case, the Debtor scheduled virtually all personal injury claims against it as

either 'disputed, contingent, or unliquidated.'  As a result, personal injury claimants wishing to

share in the Debtor's bankruptcy estate were required to file a proof of claim . . . .").

19.    Here, there is no question that "Plaintiffs' claims" were not scheduled and are both

disputed and unliquidated.  Thus, individual Plaintiffs are required to file proofs of claim if they

seek allowance and distributions.  The GUC Trust has already conceded that "Plaintiffs' claims"

are disputed and unliquidated:  if they were not, there would be no reason for the GUC Trust to

seek approval of a settlement and estimation of the claims.  (*See* Settlement Motion ¶ 78 ("[T]he

GUC Trust believes it has ***meritorious defenses*** to the claims of ***all*** Plaintiffs . . . .") (emphasis

added); Estimation Motion ¶ 49 ("[T]he bankruptcy court must determine the ***number and amount***

of claims that have validity under applicable law.") (emphasis added).)

9

20.    Movants' conduct confirms the need to file proofs of claim.  If, as Movants now suggest, the Court could allow or estimate "claims," including hypothetical unfiled claims, and trigger the Adjustment Shares, then there would have been no reason for Co-Lead Counsel to file the Late Claims Motion.[10]  Co-Lead Counsel filed the Late Claims Motion (and personal injury plaintiffs recently filed additional proofs of claim) because they recognize that one must actually file a claim to be entitled to a distribution.  For the same reason, the Settlement Agreement provides that the GUC Trust shall "consent to the late filing of the Proofs of Claim," a provision that would be unnecessary if Movants' position was accepted.  (Settlement Agreement § 2.5.)

21.    Because unfiled claims cannot be allowed, any holder of such hypothetical claims would not be entitled to distributions from the GUC Trust.  *See* F.R.B.P. 3021 (noting that "distribution shall be made to creditor whose claims ***have been allowed***") (emphasis added); *accord In re Nutri*Bevco, Inc.*, 117 B.R. 771, 778 (Bankr. S.D.N.Y. 1990) (those who do not have "***allowed*** claims against the Chapter 11 estate . . . are not entitled to receive a distribution under the reorganization plan") (emphasis added).  As it must, the Plan only permits distributions to holders of "Allowed General Unsecured Claims."  (Plan § 4.3(a).)

22.    Potential claims that have not been filed cannot be allowed, cannot receive distributions, and cannot dilute other creditors.  The Court does not have to guess which claims could be allowed for purposes of the Sale Agreement; it need only consider the proofs of claim that have actually been filed and are subject to the Late Claims Motion.

c.    **The GUC Trust Administrator's Suggestion that Section 502(c) Permits Estimation of Unfiled Claims Refutes Itself.**

23.    As set forth above, it is the Sale Agreement, not section 502(c) of the Bankruptcy

---

[10]    Indeed, the purpose of the December 2016 Order to Show Cause was to establish "a deadline to file motions seeking authority to file late claims."  (Settlement Motion ¶ 34.)  This exercise would have been pointless if it was not in fact necessary for purported creditors to file proofs of claim.

Code, that dictates the form of estimation contemplated under the Proposed Settlement.   But

Movants' arguments under section 502(c) are equally misguided.   If an unfiled claim cannot be

allowed, it also cannot be estimated for the "purpose of allowance" under section 502(c).   The

cases that have considered the issue hold that such estimation is improper.   *See In re Lahman Mfg.*

*Co., Inc.*, 31 B.R. 195, 200 (Bankr. D.S.D. 1983) ("Farmhand has not filed a proof of claim. . . .

The Court does not have an unliquidated or disputed proof of claim before it.   Without the claim,

the Court cannot consider an objection or a question of estimation under § 502(c)."); *In re Am.*

*Solar King Corp.*, 90 B.R. 808, 830 (Bankr. W.D. Tex. 1988) ("It is quite another matter to assume

that subsection (c) *alone* can operate to render a contingent or unliquidated claim allowable when

there is no proof of claim on file and the claim is not scheduled.") (emphasis added).

24.      Further, Movants' textual interpretation of section 502(c) is wrong and proves too

much.  The Bankruptcy Code routinely refers to "claims," not "proofs of claim," in myriad contexts

in which it is obvious that a proof of claim must be filed.   For example, section 1129(b) requires

that the plan provide "each **holder** of a claim" value "equal to the **allowed** amount of such claim,"

or prohibit junior claims from receiving any value.  11 U.S.C. § 1129(b) (emphasis added).[11]

### d.      Cases Where Estimation Is Done for Purposes Other Than Claims Allowance Are Irrelevant.

25.      Bankruptcy courts may estimate claims for many purposes, including estimation

for voting, plan feasibility, section 524(g), establishment of a reserve, or "(though this is less

commonly wise) allowing claims."  *See In re Chemtura Corp.*, 448 B.R. 635, 649 n.46 (Bankr.

---

[11]      *See also* 11.U.S.C. § 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause."); *id.* § 507(a)(1)-(10) (listing priorities of "allowed unsecured claims"); *id.* § 1129(a)(7) (applying best interests test to "each holder of a claim"); *id.* § 1129(a)(9) (requiring that the holder of particular kinds of "claims" be paid in cash on effective date); F.R.B.P. 3006 (permitting creditor to "withdraw a claim"); *id.* 3007 (providing procedures for "objections to claims"); *id.* § 3021 (distributions shall be made "to creditors whose claims have been allowed.").

S.D.N.Y. 2011).  Regardless of the theoretical applications of estimation under section 502(c), the Plan and GUC Trust Agreement limit estimation to **only** two purposes:  "the Bankruptcy Court [may] estimate[] any contingent, unliquidated, or Disputed Claim, [and] the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court."  (Plan § 7.3; GUC Trust Agreement § 5.1(e).)  The Plan does not permit estimation for any other purpose.[12]  Estimating the "maximum limitation" of a claim—as opposed to the "Allowed amount"—is irrelevant under the Sale Agreement because "[i]f the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the GUC Trust Administrator, as applicable, may pursue supplementary proceedings **to object to the allowance of such Claim**."  (Plan § 7.3 (emphasis added).)  The only permissible form of estimation under the Plan that can trigger the Adjustment Shares, therefore, is estimation of the allowed amount of Plaintiffs' claims.

26.    In the Estimation Motion, Movants argue that this Court's prior authorization for estimation of asbestos personal injury claims is a blueprint for the estimation Movants seek in the Proposed Settlement.  (Estimation Motion ¶¶ 44, 46; *see also Order Authorizing Estimation of Debtors' Aggregate Liability for Asbestos Personal Injury Claims*, ECF No. 8121 (Bankr. S.D.N.Y. Dec. 15, 2010).)  Although such an estimation never occurred because the parties settled, the contemplated estimation (in that motion as well as other asbestos cases) is irrelevant for several reasons.  Initially, the Debtors noted that they sought estimation "[i]n view of the approximately 28,500 Asbestos Personal Injury Claims **filed** and the delay that would be occasioned in the absence of estimation . . . ."  (*Motion of Debtors to Estimate Aggregate Liability for Asbestos*

---

[12]    *See In re Wallace's Bookstores, Inc.*, 317 B.R. 720, 724 (Bankr. E.D. Ky. 2004) (holding that estimation provision of confirmed plan controls, not section 502(c)).

*Personal Injury Claims*, ECF No. 7782 ¶ 15 (Bankr. S.D.N.Y. Nov. 15, 2010).)  Next, the Court

was not estimating the allowed amounts of asbestos claims as would be required under the Sale

Agreement; rather, the Debtors sought estimation "to facilitate confirmation and consummation of

a plan" and provided that, notwithstanding such estimation, "each such holder will be free to

liquidate the ultimate allowance of his or her claim following confirmation . . . ."  (*Id.* ¶ 16.)

Further, estimation of Old GM's asbestos liabilities was "crucial for the Plan confirmation and

consummation process" and "is exactly what occurred in several other chapter 11 cases in order to

facilitate confirmation and consummation of a plan."  (*Id.*  ¶¶ 14, 17.)  Indeed, courts in other

asbestos cases used estimation solely as necessary in the context of plan confirmation, to determine

plan feasibility or voting rights, ***not*** for the purpose of estimating the allowed amount of claims.[13]

     27.     In contrast to Plaintiffs' alleged claims, asbestos cases generally estimate claims of

"future" claimants, who by definition cannot file proofs of claims because their injuries may not

manifest until after a plan of reorganization is confirmed.  Thus, courts estimate potential aggregate

future asbestos liabilities pre-confirmation to establish a reserve and set up a channeling injunction

pursuant to a plan of reorganization.  Those cases also involve official asbestos claims committees

and/or appointed future representatives expressly appointed and authorized by the court to act on

---

[13]    *See, e.g.*, *In re Garlock Sealing Techs. LLC*, 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014) (estimating personal injury claims for present and future claimants for purposes of determining plan feasibility); *In re Specialty Prods. Holding Corp.*, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013) (estimating personal injury claims for present and future claimants for purposes of voting on a plan of reorganization); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 124 (D. Del. 2006) (estimating personal injury claims for present and future claimants for purposes of resolving objection asserting unfair discrimination); *In re Fed.–Mogul Global, Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (estimating personal injury claims for present and future claimants "for the limited purposes of plan formulation"); *Owens Corning* v. *Credit Suisse First Bos.*, 322 B.R. 719, 720-21 (D. Del. 2005) (estimating personal injury claims for present and future claimants for purposes of determining "voting power and . . . relative participation in the fruits of the reorganization proceeding"); *In re G-I Holdings, Inc.*, 323 B.R. 583, 587 (Bankr. D.N.J. 2005) (estimating personal injury claims for present and future claimants for purposes of voting under a plan of reorganization); *In re USG Corp.*, 290 B.R. 223, 224 (Bankr. D. Del. 2003) (estimating personal injury claims for present and future claimants for plan formulation); *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 683 (Bankr. S.D. Ohio 1995) (estimating personal injury claims for present and future claimants for purposes of determining the "proper allocation of plan funding assets").

behalf of all asbestos claimants. 11 U.S.C. § 524(g)(4)(B)(i).  In contrast, Co-Lead Counsel has

not been appointed by any court to represent 11.4 million individuals.  In addition, section 524(g)

of the Bankruptcy Code provides additional protection for asbestos claimants by, among other

things, requiring that 75% of holders of asbestos claims who vote on the plan vote to accept the

plan.  11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

28.     The asbestos cases do not estimate claims for purposes of allowance; rather, they

invoke specialized provisions of the Bankruptcy Code designed to protect future and unknown

asbestos claimants in establishing a reserve when necessary to confirm a plan.  These cases do not

provide a blueprint for estimating the Proposed Class Claims filed by Co-Lead Counsel.  Instead,

only Rule 23—if satisfied—could provide that blueprint, as Co-Lead Counsel have asserted in

their proofs of claim.  (Amended Proposed Class Claim ¶¶ 353-55.)

### e.     Other Cases Cited by Movants in the Estimation Motion Are Inapplicable Because They Involve *Filed* Claims.

29.     Other cases cited by Movants for the proposition that this Court "has broad

discretion to estimate groups of claims" simply reinforce the basic proposition that only filed

claims are allowable.  (Estimation Motion ¶ 45.)  For instance, Movants make much of *In re

Continental Airlines, Inc.*, 57 B.R. 842 (Bankr. S.D. Tex. 1985), but *Continental* involved the

estimation of a group (or subgroups) of 13,000 *filed* claims.  *See id.* at 843.  Similarly, *In re A.H.

Robins Co., Inc.*, 880 F.2d 694 (4th Cir. 1988), involved the estimation of approximately 195,000

*filed* "Court questionnaires," and such estimation was for plan feasibility and establishment of a

trust.  *See id.* 699.  The same is true of *Lehman Brothers*, in which "certain RMBS trustees,

representing approximately 400 trusts, . . . *filed proofs of claims* asserting approximately $37

billion . . . relating to approximately 1.8 million mortgage loans in the aggregate."  (*In re Lehman

Bros. Holdings, Inc.*, Case No. 08-13555, ECF No. 57785 p. 4 (Bankr. S.D.N.Y. Mar. 15, 2018)

14

(emphasis added).)   These cases do not support Movants' untenable proposition that they can estimate for allowance hypothetical, unfiled (and therefore unallowable) claims.

**II.    A Court Should Determine Whether the Proposed Classes Can Be Certified Before Estimating the Allowed Amount of Claims Asserted by Putative Class Members.**

30.    Because Movants can only ask the Court to estimate filed claims consistent with the applicable contractual provisions and bankruptcy law, the Proposed Class Claims that were actually filed must satisfy the certification requirements of Rule 23 to be settled, estimated or allowed. The Bankruptcy Code and Bankruptcy Rules again provide the answer:   without certification of a class claim under Rule 23, the class claims are not properly filed and cannot be allowed.   It makes no difference that Movants are seeking to settle or estimate the Proposed Class Claims.  Federal law is unequivocal that the classes must first be certified pursuant to Rule 23.

**a.    The Proposed Class Claims Must Meet the Requirements of Rule 23.**

31.    For a class proof of claim to be asserted—and thus capable of settlement, estimation, or allowance—a court must determine whether the proposed class meets the requirements of Rule 23 and, if so, enter an order certifying the proposed class. *See, e.g.*, *In re Motors Liquidation Co.*, 447 B.R. 150, 157 (Bankr. S.D.N.Y. 2011) ("[T]he claim can be asserted as a class claim *if, but only if,* (1) the class claim proponent has shown compliance with the requirements of Civil Rule 23, and (2) . . . the bankruptcy court directs that Rule 23 should apply.") (emphasis added); *In re Blockbuster, Inc.*, 441 B.R. 239, 240-41 (Bankr. S.D.N.Y. 2011) ("[I]n determining whether to permit the filing of a class claim, bankruptcy courts must determine . . . that the claims sought to be certified fulfill the requirements of Rule 23 . . . ."); *In re Bally Total Fitness of Greater N.Y., Inc.*, 402 B.R. 616, 620 (Bankr. S.D.N.Y. 2009) (noting that request for a class proof of claim must "satisfy the Rule 23 requirements"); *In re Ephedra Prods. Liability Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005) ("Rule 23 may be invoked against the debtor *only if* the bankruptcy

15

court first makes a discretionary ruling under Rule 9014 to apply Rule 23 to the proof of claim.")
(emphasis added).[14]  As these cases demonstrate, compliance with Rule 23 is a prerequisite to the
claim being filed or asserted.  These requirements are rooted in the text of Rule 23:  "[A]t an early
practicable time after a person sues or is sued as a class representative, the court *must determine
by order* whether to certify the action as a class action."  F.R.C.P. 23(c)(1)(A) (emphasis added).[15]

32.     Critically, if a court does not certify a class, then the proposed class claim does *not*
assert claims on behalf of anyone other than the named claimants.  Bankruptcy Rule 3001(b)
requires that a proof of claim "be executed by the creditor or the creditor's authorized agent," but
until a class is certified, the proposed class representative is not authorized under Rule 3001(b) to
file claims on behalf of the proposed class.  "By certifying the class, a court effectively ratifies the
agent's authority *nunc pro tunc*.  Conversely, if the court declines to apply Rule 23 to the proof of
claim, the putative agent never obtains the requisite authority.  Until certification, the claim is in
limbo."  *In re Musicland Holding Corp.*, 362 B.R. 644, 652 (Bankr. S.D.N.Y. 2007) (internal
citations omitted).  Without certification, a proposed class claim "may not even be a 'filed' claim
within the meaning of [section 502(a) of the Bankruptcy Code]," and "in that case, no objection
[to the proposed class claim] would be necessary" because the proposed class claim is itself not
valid.  *Id*.  As the Seventh Circuit Court of Appeals noted in *American Reserve*, "if the court

---

[14]    *See also Gentry* v. *Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) ("[S]uch class proofs of claim serve their function only
on a conditional basis.  If the court approves class representation, the approval will function retroactively to
legitimize the class proof of claim . . . ."); *Reid* v. *White Motor Corp.*, 886 F.2d 1462, 1470-71 (6th Cir. 1989)
(obligation to "timely petition the bankruptcy court to apply . . . [Rule] 7023" is a "mandatory requirement
essential to filing a class proof of claim with the bankruptcy court"); *In re Chaparral Energy, Inc.*, 571 B.R. 642,
646 (Bankr. D. Del. 2017) ("[T]he court must determine whether the requirements of Federal Rule 23 have been
satisfied, such that a class proof of claim may properly be filed."); *In re Craft*, 321 B.R. 189, 198 (Bankr. N.D.
Tex. 2002) ("In those cases in which a Rule 23 determination is not made timely in another court, the bankruptcy
court must, first . . . decide whether or not . . . a class should be certified and whether the putative representatives
are appropriate to act as fiduciaries for their class.").

[15]    Rule 23 also requires that the court enter an order that defines "the class claims, issues, or defenses," and appoints
class counsel to "fairly and adequately represent the interests of the class."  F.R.C.P. 23(c)(1)(B), (g).

certifies the class . . . the self-appointed agent has become 'authorized', and the original filing is

effective for the whole class," including "the missing." *In re Am. Reserve Corp.*, 840 F.2d 487,

493 (7th Cir. 1988). But, when a court does not certify a proposed class, "***each creditor must file***

***an individual proof of claim***." *Id.* (emphasis added); *In re Connaught Grp., Ltd.*, 491 B.R. 88, 93

(Bankr. S.D.N.Y. 2013) (stating that a "class cannot participate in a distribution unless it has filed

and holds an allowed proof of claim").

33.    If a court does not certify the proposed nationwide classes, then Co-Lead Counsel

will have no authority to assert, settle, mediate, or estimate the claims of 11.4 million individuals

who never filed proofs of claim. Such authority can only exist if a court certifies a class and

appoints class counsel to represent that class. *See Maywalt* v. *Parker & Parsley Petrol. Co.*, 67

F.3d 1072, 1078 (2d Cir. 1995) ("The attorneys themselves have an obligation to ***all*** of the class

members . . . .") (emphasis added); *Fulco* v. *Continental Cablevision, Inc.*, 789 F. Supp. 45, 47 (D.

Mass. 1992) ("[O]nce the court enters an order certifying a class, an attorney-client relationship

arises between all members of the class and class counsel."). Indeed, "adequate representation is

the foundation of all representative actions." *In re Gen. Motors Corp. Engine Interchange Litig.*,

594 F.2d 1106, 1121 (7th Cir. 1979) (*citing Hansberry* v. *Lee*, 311 U.S. 32 (1940)).[16]

34.    Again, Movants' own conduct and statements confirm the need for Rule 23

compliance. When Co-Lead Counsel filed the Proposed Class Claims, they stated that "the

Plaintiffs intend to seek application of [Rule] 23 . . . ***and to certify the proposed classes***." (Late

Claims Motion ¶ 16 (emphasis added).) The Proposed Class Claims included dozens of pages

arguing why the Proposed Class Claims meet "the requirements for class certification," and the

---

[16]    *See also* Restatement (Third) of the Law Governing Lawyers § 22 (2000) (lawyer has no right or authority to
represent or settle a case on behalf of a person who has not retained him or her); N.Y. Comp. Codes. R. & Regs.
tit. 22, § 1200.0, Rule 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter."); Rule 1.4(a)
of the Rules of Professional Responsibility (a lawyer shall promptly inform client of settlement).

Amended Proposed Class Claims included hundreds of pages of additional allegations to support their "class claims." (*See id.* Ex. A ¶¶ 87-105.) The Amended Proposed Class Claims—filed the day before the Proposed Settlement Agreement was signed—argue that "***a class action is superior to other available methods*** for the fair and efficient adjudication of this controversy," and that "***B.R. 7023 provides the Court with authority*** and flexibility to maximize the benefits of the class mechanism and reduce any management challenges that may arise." (Amended Proposed Class Claims ¶¶ 353-55 (emphasis added).) Likewise, the Proposed Settlement authorizes Co-Lead Counsel to file "class claims" and then purports to resolve such class claims and bind all putative class members. (Settlement Motion ¶¶ 50-51; Proposed Settlement Agreement § 2.5.) Most recently, Co-Lead Counsel told the Court that: "remembering that this is certification for settlement purposes and not for trial purposes, the issues, the criteria, quite frankly, the standards are easily met here." (5/25/2018 Hr'g Tr. 15:20-24.)

### b.    Movants Cannot Circumvent Rule 23 By Settling the Proposed Class Claims.

35.    Consistent with Movants' prior statements to the Court,[17] the Proposed Settlement purports to "settle" Rule 23's certification requirements via Bankruptcy Rule 9019. In fact, the Settlement Motion expressly states that class certification is being settled under Rule 9019. (Settlement Motion ¶ 77.) In arguing that the Proposed Settlement meets the Rule 9019 standards set forth in *Motorola, Inc.* v. *Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007), Movants argue:

> Additional complex issues would certainly arise from continued litigation of Plaintiffs' claims. The Bankruptcy Court would need to decide whether class certification for the economic loss Plaintiffs' proposed class proofs of claims would

---

[17]    At the December 18, 2017 hearing in this Court, Co-Lead Counsel argued that "there were a lot of reasons to pick 9019 over a Rule 23 class settlement." (12/18/2017 Hr'g Tr. 151:18-21.) More recently, Co-Lead Counsel referred to "the Rule 23 9019 debate" (5/25/2018 Hr'g Tr. 25:10-11), and argued that "in terms of whether the settlement reaches or meets or exceeds the criteria of 9019, within the issues being settled, the GUC Trust takes the position that you can satisfy the criteria for certification of a class for settlement purposes." (*Id.* 15:1-4.)

> be appropriate. In addition, the GUC Trust could raise objections to allowance of these class claims, as well as to the separate proofs of claim filed by Ignition Switch Pre-Closing Accident Plaintiffs. This could lead to the need to resolve issues under the varied laws of the fifty states and the District of Columbia.

(Settlement Motion ¶¶ 68-77.) Further, the "Settlement Agreement resolves . . . whether Plaintiffs asserting claims for economic loss should be granted authority to file late class proofs of claim." (Notice Procedures Motion p. 5; Settlement Motion ¶¶ 1, 50 ("the Settlement resolves all issues arising from the Late Claims Motions," including "the allowance of Plaintiffs' claims").) To implement the Proposed Settlement, the GUC Trust will consent to the "late filing of the Proofs of Claim," a term that that is defined to include "late *class* proofs of claim." (Settlement Agreement § 2.5.) Movants incorrectly assert that a different, less rigorous, standard of class certification applies in the settlement context. (5/25/2018 Hr'g Tr. 15:20-24.)

36.     The Supreme Court has squarely rejected Movants' argument. In *Amchem Prods., Inc.* v. *Windsor*, the Supreme Court considered "the role settlement may play, under existing Rule 23, in determining the propriety of class certification." 521 U.S. 591, 619 (1997). Resolving a circuit split over whether Rule 23's certification requirements must be strictly adhered to in class settlements, the Supreme Court held that Rule 23 "*demand[s] undiluted, even heightened, attention* in the settlement context," because such attention is "of vital importance" to "protect absentees by blocking unwarranted or overbroad class definitions." *Id*. at 620 (emphasis added). The certification requirements in Rule 23(a) and (b), the Supreme Court held, "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives," and noted that such concern "persists when settlement, rather than trial, is proposed." *Id.* at 621. The "safeguards" provided by the "class-qualifying criteria, *we emphasize, are not impractical impediments—checks shorn of utility—in the settlement-class context*," but rather protect absent class members from "the court's gestalt

19

judgment or overarching impression of the settlement's fairness." *Id.* (emphasis added). The Supreme Court concluded that "[*f*]*ederal courts . . . lack authority* to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper." *Id.* at 622 (emphasis added).

37. Movants nonetheless assert that this Court can approve the Proposed Settlement—which undeniably settles the Proposed Class Claims and purports to bind millions of putative members of the proposed nationwide classes—without satisfying the requirements of Rule 23. "[T]he *Amchem* decision was expressly intended to *curb 'judicial inventiveness'* of the kind requested here . . . and to *restrict district judges' discretion to do equity under the guise of Rule 23*." *In re Ephedra Prods. Liab. Litig.*, 231 F.R.D. 167, 169-70 (S.D.N.Y. 2005) (denying certification to proposed settlement class) (emphasis added). Further, *Amchem* rejects Movants' assertions at the May 25th Status Conference that the certification standards are relaxed in the settlement context. *See Amchem*, 521 U.S. at 620; *Schoenbaum* v. *E.I. DuPont De Nemours and Co.*, 2009 WL 4782082, at *11 (E.D. Mo. Dec. 8, 2009) ("These arguments seem to presuppose that settlement class certification is less rigorous than litigation class certification . . . a position that the Supreme Court has clearly refuted."); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("A settlement-only class must meet all the requirements of Rule 23 . . . [except] the court need not consider the manageability of . . . [a hypothetical] trial.").

38. Courts have an "independent responsibility to make a determination that every Rule 23 requirement is met," and therefore parties may not settle or stipulate that a certifiable class exists outside of Rule 23. *Riedel* v. *Acqua Ancien Bath N.Y. LLC*, 2016 WL 3144375, at *3 (S.D.N.Y. May 19, 2016); *see also Litty* v. *Merrill Lynch & Co., Inc.*, 2015 WL 4698475, at *3 (C.D. Cal. Apr. 27, 2015) ("[T]he court cannot blindly rely on the fact that the parties have

stipulated that a class exists for purposes of settlement."). Accordingly, a court must reject a putative class settlement if there is noncompliance with Rule 23's requirements.[18]

39. Bankruptcy Rule 9019 does not provide a "work-around" of Rule 23. Indeed, bankruptcy courts—including this Court—routinely make clear that application of Rule 9019 does not immunize a settlement of a class proof of claim from scrutiny under Rule 23. *See, e.g.*, *In re BGI, Inc.*, 465 B.R. 365, 378 (Bankr. S.D.N.Y. 2012) ("For the Settlement to be approved in bankruptcy court, the Settlement must be both procedurally and substantively fair under Rule 23 *and* Federal Rule of Bankruptcy Procedure 9019.") (emphasis added). Numerous other decisions confirm that, to settle a class claim in bankruptcy, the court must first consider whether the proposed class is appropriate under Rule 23. *See, e.g.*, *In re Partsearch Techs., Inc.*, 453 B.R. 84 (Bankr. S.D.N.Y. 2011); *In re W.R. Grace & Co.*, 2009 WL 230138 (Bankr. D. Del. Jan. 16, 2009); *In re EOS Airlines, Inc.*, 2008 WL 8820257 (Bankr. S.D.N.Y. Sept. 4, 2008); *In re WorldCom, Inc.*, 347 B.R. 123 (Bankr. S.D.N.Y. 2006).

40. Further, any suggestion that Rule 9019 may substitute for Rule 23 is foreclosed by the Supreme Court's ruling in *Amchem*. The Supreme Court held that "federal courts . . . lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair' then certification is proper." 521 U.S. at 622. That, however, is precisely what Movants propose. In relying on Rule 9019 and not Rule 23, Movants argue that the Court "must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate." (Settlement Motion ¶ 62.) If the Proposed Settlement satisfies these standards of fairness,

---

[18] *See, e.g.*, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016) (overturning class settlement where "class members of the [Rule 23(b)(2)] class were inadequately represented in violation of . . . Rule 23(a)(4)"); *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 254-55 (2d Cir. 2011) (vacating class settlement because "the district court abused its discretion in certifying the class based on its finding that class representation was adequate.").

Movants argue that the Court should make the Proposed Settlement binding on all putative members of the classes set forth in the Proposed Class Claims—precisely what *Amchem* rejected.

41.    Moreover, Bankruptcy Rule 9019 cannot be used affirmatively to "bind" individuals not party to the settlement agreement.  In *In re SportStuff, Inc.*, for example, the bankruptcy appellate panel reversed the bankruptcy court's approval of a settlement and held, among other things, that Bankruptcy Rule 9019 "cannot be used to impose an injunction on the non-settling parties."  430 B.R. 170, 181 (8th Cir. B.A.P. 2010) ("The opportunity to object to a settlement does not take the place of a trial on the merits.").[19]  Here, Movants propose to use Rule 9019 to impose broad, non-consensual releases on all 11.4 million putative class members that would waive claims, not just against the GUC Trust and Old GM, but also against numerous third parties such as all past and present GUC Trust Beneficiaries.  These broad releases, which form a critical element of the Proposed Settlement, cannot be approved outside of plan confirmation.  *See In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 529 (Bankr. S.D.N.Y. 2007) ("[T]he applicable law authorizing the approval of channeling injunctions and third party releases has become increasingly restrictive, and now permits such relief only under limited circumstances—most significantly, where they are critical to the reorganization of the debtor.").[20]  Where, as here, the debtor "has already reorganized and distributed the overwhelming bulk of its value," the Court cannot conclude that "issuance of a channeling injunction is essential (or even important) to a

---

[19]    *See also In re Flores*, 2013 WL 6186262, at *7 (Bankr. C.D. Cal. Nov. 25, 2013) (noting that it would violate due process to use "Rule 9019 . . . [to] impos[e] results on parties who were not party to the [settlement] agreement"); *In re Anderson*, 357 B.R. 473, 476 (Bankr. W.D. Mich. 2006) (Bankruptcy Rule 9019 "cannot be used to countenance . . . an ultra vires activity regardless of how advantageous the proposed settlement might otherwise be to the bankruptcy estate").

[20]    *See also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) ("[I]t is clear that [a nondebtor] release is proper only in rare cases" where "a nondebtor release is important to a debtor's plan . . . ") (internal quotation marks omitted); *In re The 1031 Tax Group, LLC*, 397 B.R. 670, 687 (Bankr. S.D.N.Y. 2008) ("Cases make clear that the bankruptcy courts in this Circuit have very limited power to approve settlements or chapter 11 plans containing permanent or channeling injunctions in favor of non-debtors.").

successful reorganization." *Id*. Rule 23—not Rule 9019—provides the necessary (and only) means for Movants to bind Plaintiffs in the manner sought under the Proposed Settlement.

### c.   Movants Cannot Circumvent Rule 23 By Estimating Proposed Class Claims.

42.   Although not stated in the Settlement Motion or Estimation Motion, Movants may argue that the Court can estimate the probability of class certification under Rule 23 in determining the allowed amount of "Plaintiffs' claims." This too would be wrong.

43.   First, such an argument places the cart before the horse: as set forth above, a court must certify a class ***before*** the claim "can be ***asserted*** as a class claim." *In re Motors Liquidation Co.*, 447 B.R. at 157 (emphasis added). Accordingly, there is no claim for the Court to estimate— much less allow—***until*** a court first certifies the proposed nationwide classes under Rule 23 and grants the named individuals *nunc pro tunc* authority pursuant to Bankruptcy Rule 3001 to file the Proposed Class Claims on behalf of millions of individuals. Estimation may be employed to quantify the amount of unliquidated proofs of claim, but it cannot be used to estimate whether a claim was actually filed. *See, e.g.*, *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1994) ("[T]he parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law."). For example, the Court could not "estimate" whether "Plaintiffs' claims" were timely filed; that is a threshold issue that must be determined for its "correctness as a matter of governing law" and decided before the Court estimates the amount of such purported claims.

44.   Second, an estimation argument like this would be a red herring. Here, the Proposed Settlement Agreement—***not*** the subsequent Estimation Motion—"authorizes" Co-Lead Counsel to file the Proposed Class Claims without certification of the proposed nationwide classes in violation of Rule 23. (*See* Notice Procedures Motion p. 5 (noting that the "Settlement Agreement resolves . . . whether Plaintiffs asserting claims for economic loss should be granted

23

authority to file late class proofs of claim").)[21]  Further, Movants state that estimation is merely a "component[] of the Settlement," and approval of the Proposed Settlement is a condition precedent to seeking estimation.  (Settlement Motion  ¶ 7.)  Thus, if Movants' multiple-step settlement process is followed, by the time the Court would be asked to estimate "Plaintiffs' claims," the Movants will have already "settled" whether the Proposed Class Claims could be filed, and presumed that there are "millions of claims against the estate."  (Estimation Motion ¶ 4.)  By creatively staging the settlement process, Movants are improperly trying to circumvent Rule 23.

45.    Third, using estimation to end-run Rule 23 would violate the rationale and holding of *Amchem*—that federal courts lack authority to replace the strict requirements of Rule 23(a) and (b) with general notions of fairness.  521 U.S. at 622.  While Movants' contention that the Court has "wide discretion" in making a "speedy and rough" estimation of claims, so long as such estimate is "a reasonable estimate of the claim" and within a "range" of damages (Estimation Motion ¶¶ 47-51) may have general merit in estimating non-class claims, it does not square with *Amchem*'s holding that Rule 23 takes precedence over claimed principles of equity.  *Id.*

### d.    Movants' Arguments—If Accepted—Would Nullify Rule 23.

46.    If Movants' arguments were accepted, then Rule 23 would be a nullity.  Rather than apply Rule 23, bankruptcy courts could achieve the exact same result by using settlement of class claims under Rule 9019, estimation of unfiled claims under section 502(c) and/or scheduling (and then allowing) disputed and unliquidated class "claims" under section 521.  There are at least 100 reported bankruptcy decisions analyzing the applicability of Rule 23 in bankruptcy, and there is

---

[21]    *See also* Settlement Motion ¶ 68 (Proposed Settlement resolves "whether the Court should grant Plaintiffs authority to file late claims and class claims under the Late Filed Claims Order."); Settlement Agreement § 2.5 (GUC Trust consents to the late filing of Proposed Class Claims); Proposed Settlement Order ¶ 6 (payment of $15 million is "in full settlement of the Parties' disputes as contemplated in the Settlement Agreement").

no support for Movants' argument that Rule 23 can be circumvented by using some combination

of sections 502(c) and 521 of the Bankruptcy Code and Bankruptcy Rule 9019.

47.     Rule 23 is the only method by which the Proposed Class Claims can be settled,

estimated or allowed.   Co-Lead Counsel's assertion that the standards for certifying two

nationwide classes in this Court "are easily met here" only begs the question:  why are Co-Lead

Counsel inappropriately relying on other provisions to accomplish what Rule 23 plainly could on

its own?  Co-Lead Counsel provided the answer at an earlier hearing:  "we understood that the

MDL had as an open issue class certification and we didn't want to start confusing class

certification for the purposes of the MDL and class certifications for the purpose of the bankruptcy

settlement."  (12/18/2017 Hr'g Tr. 150-52.)  While Movants may want to avoid "confusion" with

the MDL, what they are really trying to accomplish is an end run around the MDL Court, given

that the notion of a *de facto* "nationwide class" as urged in this Court has been already foreclosed

in the MDL Court and has been rejected in recent federal cases, given the myriad of state laws that

are necessary to consider.[22]

## CONCLUSION

48.     For the reasons stated above, the Court should find that Movants must comply with

Rule 23 before moving forward with any of the phases of the Proposed Settlement.

---

[22]     If Plaintiffs were to seek a nationwide class, variations in state law would "swamp any common issues and defeat
predominance."  *Johnson* v. *Nextel Commc'ns*, 780 F.3d 128, 141 (2d Cir. 2015) (*quoting Castano* v. *Am.
Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)); *see also id.* at 141 ("Courts must exercise care in conducting a
choice-of-law analysis in a putative Rule 23(b)(3) class action, however, in order to determine whether any
conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation
through classwide proof."); *In re Hyundai and Kia Fuel Econ. Litig.*, 881 F.3d 679, 702, 707 (9th Cir. 2018)
(holding that district court abused its discretion by not conducting choice-of-law analysis or rigorously analyzing
potential differences in state consumer protection laws before certifying single nationwide settlement class).

Dated: June 12, 2018
     New York, New York

*/s/ Paul M. Basta*  _____
Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*and*

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

## EXHIBIT A

**TRANSCRIPT OF MAY 25, 2018
STATUS CONFERENCE**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | . | Case No. 09-50026-mg |
| IN RE: | . | Chapter 11 |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . | |
| MOTORS CORP., et al, | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Friday, May 25, 2018 |
| . . . . . . . . . . . . . . | . | 10:05 a.m. |


TRANSCRIPT OF CASE MANAGEMENT CONFERENCE REGARDING PROPOSED
SETTLEMENT BETWEEN THE GUC TRUST AND SIGNATORY PLAINTIFFS
(RELATED DOCUMENT(S) 14292, 14294, 14293, 14298)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For General Motors LLC:   King & Spalding, LLP
                          By:  ARTHUR J. STEINBERG, ESQ.
                               SCOTT DAVIDSON, ESQ.
                          1185 Avenue of the Americas
                          New York, NY 10036
                          (212) 556-2158


For the GUC Trust:        Drinker, Biddle & Reath LLP
                          By:  KRISTIN K. GOING, ESQ.
                          1177 Avenue of the Americas
                          41st Floor
                          New York, New York 10036-2714
                          (212) 248-3140

APPEARANCES CONTINUED.


Audio Operator:           F. Ferguson, ECR


Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):

For the Ignition Switch    Brown Rudnick LLP
Plaintiffs and Certain     By:  EDWARD S. WEISFELNER, ESQ.
Non-Ignition Switch             JILL FORSTER, ESQ.
Plaintiffs:                7 Times Square
                           New York, New York 10036
                           (212) 209-4917

                           Lieff, Cabraser, Heimann & Bernstein
                           By:  ELIZABETH J. CABRASER, ESQ.
                           275 Battery Street, 29th Floor
                           San Francisco, CA 94111-3339
                           (415) 956-1000


For Personal Injury        Goodwin Procter LLP
Accident Plaintiffs:       By:  WILLIAM P. WEINTRAUB, ESQ.
                           The New York Times Building
                           620 Eighth Avenue
                           New York, NY 10018-1405
                           (212) 813-8839


For Participating          Akin Gump Strauss Hauer & Feld LLP
Unitholders:               By:  DANIEL GOLDEN, ESQ.
                           One Bryant Park
                           New York, NY 10036-6745
                           (212) 872-1000


For JPMorgan Chase         Wachtell, Lipton, Rosen & Katz
Bank, N.A.:                By:  HAROLD S. NOVIKOFF, ESQ.
                           51 West 52nd Street
                           New York, NY 10019-6150
                           (212) 403-1000


For Certain Personal       Hilliard Munoz & Gonzales LLP
Injury/Death Plaintiffs:   By:  ROBERT HILLIARD, ESQ.
                           719 South Shoreline Boulevard #500
                           Corpus Christi, Texas  78401
                           (361) 882-1612
```

3

APPEARANCES (Continued):

For New GM:                    Paul, Weiss, Rifkind, Wharton &
                               Garrison LLP
                               By:  KYLE J. KIMPLER, ESQ.
                                    AIDAN SYNNOTT, ESQ.
                                    PAUL M. BASTA, ESQ.
                               1285 Avenue of the Americas
                               New York, NY 10019-6064
                               (212) 373-3023


TELEPHONIC APPEARANCES:

For the Ignition
Switch Plaintiffs:             Hagens Berman Sobol Shapiro LLP
                               By: STEVE W. BERMAN, ESQ.
                               1918 8th Avenue, Suite 3300
                               Seattle, Washington 98101
                               (206) 623-7292


For the Ignition Switch       Stutzman Bromberg Esserman & Plifka
plaintiffs and certain        By:  SANDER L. ESSERMAN, ESQ.
non-Ignition Switch           2323 Bryan Street, Suite 2200
plaintiffs:                   Dallas, TX 75201-2689
                              (214) 969-4910

                              Brown Rudnick LLP
                              By:  HOWARD S. STEEL, ESQ.
                              7 Times Square
                              New York, New York 10036
                              (212) 209-4800


For Creditor, Additional      Andrews Myers, P.C.
Ignition Switch               By:  LISA M. NORMAN, ESQ.
Pre-Closing Accident          1885 Saint James Place, 15th Floor
Plaintiffs:                   Houston, TX 77056
                              (713) 850-4245

4

1          (Proceedings commenced at 10:05 a.m.)

2          THE COURT:  -- 09-50026.  We're here in connection

3   with the order I entered scheduling the case management

4   conference regarding proposed settlement between the GUC Trust

5   and the signatory plaintiffs.  The scheduling order is ECF

6   Docket Number 14298.  I have the list of appearances in front

7   of me.

8          Obviously, in addition to entering the order

9   scheduling the case management conference, I entered a separate

10  order regarding the proposed settlement.  And that was entered

11  -- raising some questions, that was entered on May 10th.  In

12  response to that order, I received the May 22, 2018 letter from

13  Mr. Weisfelner, attaching a proposed amended settlement

14  agreement and notice procedures, and I've obviously received

15  several letters from New GM's counsel.

16         Mr. Basta, I guess this is your first appearance in

17  the case.  Is that right?

18         MR. BASTA:  Happy to be here, Your Honor.

19         THE COURT:  Were you involved at Weil when the case

20  was first filed?  Were you involved in GM?

21         MR. BASTA:  At Weil?

22         THE COURT:  Weren't you at Weil at some point?

23         MR. BASTA:  I was at Weil, and then I was at

24  Kirkland.  I think my involvement with GM at Weil had to do

25  with the spinoff --

5

1              THE COURT:  Were you there when GM filed?

2              MR. BASTA:  No, I was not.  I was at Kirkland at that

3    time.

4              THE COURT:  Okay.  All right.  Thank you.  Well,

5    welcome.

6              Before we get into the conference, I have some more

7    comments just generally I wanted to raise and maybe frame some

8    of the discussion today.  So obviously I scheduled today's

9    conference because it appeared likely to me that there are

10   fundamental disputes between the plaintiff and the GUC Trust on

11   the one hand and New GM on the other hand, whether the proposed

12   settlement construct is workable.  And I didn't want -- I do

13   not want to approve the notice procedure and have $6 million

14   spent on giving notice if the proposed settlement could not be

15   approved as a matter of law.

16             I entered the May 10, 2018 order raising questions

17   about the proposed settlement in part because of concerns

18   whether the settlement was illusory, and I will listen to what

19   counsel has to say today to address those concerns.  But it

20   does seem to me that the changes made in the proposed

21   settlement go a long way to addressing the concerns I expressed

22   in raising those questions.  And I want to explore today

23   whether there are any gating issues that the parties and the

24   Court should address before proceeding with notice.

25             So New GM, in its various filings so far, raises

6

1 important questions whether a settlement can be approved

2 without utilizing Rule 23.  And I'm not going to decide that

3 issue today, but I would like to hear the parties' views on

4 that issue.  I am inclined to order briefing on that issue

5 before approving a schedule for all three motions.

6       I also have questions about how many personal

7 injury/wrongful death claims have been filed and whether more

8 such claims are anticipated before the end of May.  If more

9 claims are filed, will those plaintiffs agree to proceed under

10 the terms of the proposed settlement?  I read in one of the

11 papers, and I don't remember whose paper it was, that more late

12 claims are expected to be filed by May 31.

13       So in thinking about the issue, whether the proposed

14 settlement construct can work without using Rule 23, let me ask

15 the following question:  Is what the settlement proposes any

16 different than a debtor scheduling claims of all purchasers of

17 vehicles that were subject to recalls and listing the amounts

18 of the claims as unliquidated?  If that was done, wouldn't that

19 avoid the Rule 23 issue?  There would be many millions of

20 unliquidated claims for which estimation under Section 502(c)

21 would appear to be a perfectly appropriate method for trying to

22 resolve the claims.

23       If -- I'll refer to them as the "recall claims."  If

24 the recall claims were scheduled as unliquidated and actual

25 notice was given to the claimants, wouldn't the claimants be

1  bound by the Court's estimation whether or not the claimants

2  appeared in the bankruptcy cases?  This issue of being able to

3  bind people who aren't here today, I don't see how that's any

4  different.  If proper notice is given, people are bound by what

5  happens in a bankruptcy case.

6        And I have a few other questions.  Well, I'll just

7  put them out there now.  They're sort of unrelated to what I've

8  asked so far, but first, with respect to the personal

9  injury/wrongful death claims.  What, if any, proof of causation

10  and damages would be required to estimate those claims?  Could

11  the Court estimate those claims without evidence of causation

12  and damages?  As part of a settlement, could the plaintiffs and

13  the GUC Trust agree on simplified criteria for the Court to

14  apply in determining causation and damages and estimating the

15  personal injury/wrongful death claims?  Would New GM have

16  standing to object to those criteria?  These are claims against

17  Old GM in the former GUC Trust, not against New GM.

18        Then, switching to the economic loss claims, in order

19  to estimate the economic loss claims in the aggregate, must the

20  parties and the Court apply the law of each state in which the

21  owners purchased cars?  For settlement purposes, can the

22  parties agree on one state's law or legal principles to apply

23  in an estimation proceeding?  With respect to determining

24  choice of law or applicable law, parties often stipulate to the

25  applicable law to apply.  Can the plaintiffs and the GUC Trust

8

1  agree on the principles on governing law by settlement?  Would

2  New GM have standing to object?

3          So those are the -- you know, in thinking some more

4  before today's hearing, those are some additional questions I

5  have.  It's my hope we're wrapping up no later than noon, so

6  this is not going to be a particularly -- I'm not -- we're not

7  going to go beyond then.  But I'd like to come out of today

8  with either directing briefing on gating issues, if I conclude

9  after listening to people that's the appropriate thing to do.

10         I also -- Mr. Basta, in your latest letter, you

11  complain about the schedule that the moving parties have

12  proposed for various things, discovery and other things, and my

13  reaction to that is you need to go and try and work out an

14  agreed schedule for all of those things.  I'm not going to pose

15  that schedule today.  The only question in my mind is, is the

16  start of that schedule going to await me getting some briefs on

17  gating issues or not.  But, you know, quibbling whether it's 10

18  or 20 days or 30 days for this, that, or the other thing, you

19  ought to be able to work that out, and maybe you've already sat

20  down and tried to hammer it out.  I'm not going, today, to go

21  through and throw darts and pick the number of days for the

22  various steps along the way.

23         Now, I know you also filed the stay motion, and the

24  plaintiffs and GUC Trust certainly can respond to that when or

25  if that motion is going to be heard.  And when I say "if," I

9

 1  may decide it without a hearing, but if I have a hearing, when

 2  that will be remains to be seen, as well.  I guess you did file

 3  your objection to the notice -- the motion for the form of

 4  notice.  I have that, so that's done.  I did want to see that.

 5  I went -- I didn't read it.  I read it through very quickly.  I

 6  didn't study it.  I think it's likely we're not going to go

 7  forward with that notice procedure motion on the date that it's

 8  been scheduled for, I think, but we'll come to that.  I do want

 9  to hear the parties.

10          So, Ms. Going, do you want to start?

11          MS. GOING:  Sure.  Thank you, Your Honor.  Kristen

12  Going, Drinker, Biddle & Reath, on behalf of the GUC Trust.

13          Your Honor, I -- in light of your questions, I

14  thought I would dive right in, and I feel that I at least can

15  answer the first question that you posed.

16          THE COURT:  I'd better look at my questions again and

17  make sure I see which was first because I said a lot.

18          MS. GOING:  And this is something that we wanted to

19  raise with Your Honor anyway, and that is that nothing in

20  502(c) provides that the Court must estimate a proof of claim.

21  It actually contemplates that the Court estimate a claim, and

22  as you know, that is simply a right to payment.  I think if

23  you, in fact, look at 502(a) and contrast that language against

24  502(c), you will see that Congress, in fact, intended that

25  estimation would not be applied to proofs of claim, but it

1  would be applied to claims generally, whether or not a proof of

2  claim had actually been filed because you can see 502(a) says:

3  A claim or interest, proof of which has been filed under

4  Section 501 of this title.  So in 502(c), if the Congress had

5  intended that estimation -- that the Court's were obligated to

6  only estimate proofs of claim, it would have utilized that same

7  language.  And it's for that reason, Your Honor, we are asking

8  this Court to estimate the claims -- not the proofs of claims,

9  but the claims -- of the economic loss and the personal injury

10 plaintiffs.

11            THE COURT:  Okay.

12            MS. GOING:  I'm looking at your questions now.

13            And so picking up on that, that the settlement as you

14 know contemplates that notice is given to all possible personal

15 injury and economic loss plaintiffs because it's contemplated

16 that the notice would be given to all individuals that were

17 subject to the recalls that are part and parcel of the

18 settlement.  So they would receive notice.  They would have an

19 opportunity to come in and object to the settlement.  And then,

20 those claims are what we would be asking this Court to

21 estimate.  And we do believe that that would bind all of the

22 parties because of the broad notice that's being provided.

23            Unless you have any questions about that, I think I'm

24 going to cede the podium on your questions about causation and

25 damages.

1        THE COURT:  Well, let me just -- address specifically
2   why you believe it's unnecessary to certify classes under Rule
3   23 in order to proceed with this settlement.
4        MS. GOING:  Well, I think --
5        THE COURT:  Or if you want one of the other counsel
6   to address it, that's fine with me, too.  I don't know how you
7   decided to divide things up, but --
8        MS. GOING:  Sure.  Mr. Weisfelner's going to address
9   Rule 23 class certification specifically, but on that point,
10  the GUC Trust would just want to point out that we're a little
11  surprised that this issue is being raised now, and --
12       THE COURT:  But they raised it at the -- before you
13  came into the case, when I had the trial about whether the
14  original proposed settlement was binding or not, that certainly
15  was one of the main arguments that New GM made, that this
16  settlement could not be -- that settlement -- little different
17  -- couldn't be approved anyway because it didn't follow Rule --
18  didn't provide for class certification, essentially.
19       MS. GOING:  Right.
20       THE COURT:  So that's not a new issue in the case.
21       MS. GOING:  Well, Your Honor, I'm actually going back
22  farther.  And this is in the context of -- I think we can all
23  agree that New GM's goal here is delay.  And so my point is
24  when you entered your order to show cause back in December of
25  2016 and you identified the late claims process and

12

1   specifically said that issues regarding class certification

2   would be addressed at a later time and you asked parties to

3   object or raise issues with the schedule, they didn't raise it

4   then.  And so they've allowed this process to play out for 18

5   months.

6          THE COURT:  Well, we didn't go forward with that

7   threshold issue about late claims.  That got put on the back

8   burner, so it's not as if -- the Court has not resolved that

9   issue.

10         MS. GOING:  Okay.

11         THE COURT:  I mean, do you disagree?

12         MS. GOING:  I don't, but I think that if New GM's

13  position was always going to be you had to have a certified

14  class before you filed the proofs of claim, which seems to be

15  what they're saying today, they should have articulated that to

16  Your Honor.

17         THE COURT:  So why isn't it necessary -- or is Mr.

18  Weisfelner's the one --

19         MS. GOING:  Yes.

20         THE COURT:  -- who's going to -- I'll leave this to

21  Mr. Weisfelner.  Thank you very much, Ms. Going.

22         MS. GOING:  All right, thank you.

23         MR. WEISFELNER:  Good morning, Judge.

24         THE COURT:  Good morning.

25         MR. WEISFELNER:  I do want to take an opportunity to

13

1   address each and every one of the concerns that Your Honor

2   raised at the outset of this status conference.  If Your Honor

3   will permit me a point of personal overview, I don't know if

4   Your Honor shares the sense of irony we, on this side of the

5   courtroom, feel about New GM placing itself in the position of

6   being the champion of the rights of the plaintiffs, their

7   victims.  They're stepping into the shoes to make sure that

8   Your Honor is aware of what their rights are and how to best

9   protect those rights.  And frankly, Your Honor, I find that

10  just a bit ironic.

11          Getting to your specific points, we're all familiar

12  with Your Honor's decisions in -- I think it was both MFG and

13  in the BCI case, where Your Honor, in a different context, had

14  settlements of class claims.  And I think, if I remember both

15  decisions, the classes there were certified for settlement

16  purposes, and the class certification was approved

17  preliminarily and then finally simultaneously with the

18  consideration of the settlement.  And we can see any number of

19  cases that predate and postdate Your Honor's own decisions,

20  WorldCom included, where the process is sort of in a two-step

21  stage.

22          I think Your Honor may be familiar with the

23  modifications to Rule 23, which now provide that, once adopted,

24  will provide that courts no longer need to go through this

25  two-step process of, first, preliminarily certifying a class in

1  order to give them notice, and then finally certifying a class

2  in connection with the ultimate settlement.  It's now pretty

3  clear that it's contemplated that to the extent that a class

4  needs to be certified at all for settlement purposes, it can be

5  done at the same time as the settlement and notice, so long as

6  it comports with the necessary notice -- best notice in a class

7  context -- can go forward.  So it's a couple of important

8  things, I think, to note.  And whether Your Honor wants this

9  briefed or not, we're --

10            THE COURT:  That part, I don't need briefed.

11            MR. WEISFELNER:  Okay.  So what we have here is a

12  situation where --

13            THE COURT:  Well, let me ask.  Even with the proposed

14  amendments, the Court -- I would be very reluctant to order

15  $6 million to be spent for notice if what was being -- the

16  settlement that was being proposed, on its face, could not be

17  approved.  Okay.  I'm not making -- I don't contemplate making

18  ultimate determination until notice has been given to everybody

19  whether I can approve what you do.  But as a threshold issue,

20  it does seem to me, I don't want to see $6 million spent for

21  something that, you know, isn't going to work.

22            MR. WEISFELNER:  Understood.  And, Your Honor, again,

23  from the perspective of, quote, "whether a settlement works,"

24  putting aside some of the jurisdictional concerns and the due

25  process concerns, on the face of it, in terms of whether the

15

1  settlement reaches or meets or exceeds the criteria of 9019,

2  within the issues that are being settled, the GUC Trust takes

3  the position that you can satisfy the criteria for

4  certification of a class for settlement purposes.  Plaintiffs

5  take the position -- economic loss plaintiffs take the

6  position, of course, we can.  And we all know what the four

7  criteria are.

8        And, Your Honor, intended, as part of the settlement,

9  to brief you on why it is that if Rule 23 is applicable -- you

10  just heard Ms. Going indicate that from the perspective of the

11  GUC Trust, and we share her perspective, the analogy that Your

12  Honor gave was to, you know, schedule claims, small C, in an

13  unliquidated disputed amount that then get estimated, and

14  there's nothing about the constitutional documentation that

15  formed the GUC Trust that requires them to ask for an

16  estimation of claims only if they're part of a proof of claim

17  and only if that proof of claim -- if it's a class claim, first

18  get certified.  They're entitled to ask for estimation of

19  claims, lowercase C.

20        But more importantly, again, if you look at what the

21  standards are that the Court would be required to apply in a

22  Rule 23 setting, remembering that this is certification for

23  settlement purposes and not for trial purposes, the issues, the

24  criteria, quite frankly, the standards are easily met here.

25  And we intend to brief that and have Your Honor satisfy that to

16

1  the extent there are any open issues regarding certification

2  for settlement purposes, they've been more than met and as part

3  of your approval of the settlement could find that coextensive

4  with compliance with Rule 9019, we've got compliance to the

5  extent it's applicable with Rule 23 class certification for

6  settlement purposes.

7          THE COURT:  I didn't articulate this before, but the

8  Rule 23 issue raised the question in my mind about, you know,

9  in a (b)(3) class, there's a right to opt out, okay.   In

10  bankruptcy, there's no opt out on claims, and the court,

11  whether you show up or -- if you've gotten notice, the court

12  resolves it and it's binding.

13          MR. WEISFELNER:  Well, two things --

14          THE COURT:  There's no opt out.

15          MR. WEISFELNER:  -- two things to say about that.  I

16  agree completely that the bankruptcy context doesn't permit for

17  or deal with opt outs, but it does permit for people to show up

18  and respond to the notice and state their objections and have

19  their objections dealt with in whatever way is ultimately

20  appropriate.

21          THE COURT:  Let me just say, I mean, it's one of the

22  -- like what I've just said about the collective nature of a

23  bankruptcy proceeding and the preclusive binding effect of a

24  bankruptcy court order.  That's fundamentally different than

25  what Judge Furman is being asked to do in certifying a Rule 23

17

1  class.

2            MR. WEISFELNER:  For trial purposes.

3            THE COURT:  Yes.

4            MR. WEISFELNER:  Your Honor, more to the point, even

5  if one were to be boxed in to a narrow interpretation or the

6  procedural posture that this settlement is put in and view it

7  from the perspective of Rule 23 and the opt-out issue, let's

8  remember that this is the paradigm of a limited fund.  At the

9  end of the day, Your Honor could determine that the claims of

10 the plaintiffs, writ large, is worth $40 billion.  It doesn't

11 ultimately lead to any more than 30 million shares of New GM

12 stock being proffered as a true up to their purchase price.  So

13 it is a limited fund, and we think on application, if we were

14 required to comply with all of Rule 23 criteria and avoid the

15 opt out, it's because we have a limited fund.

16           THE COURT:  But the notice would look different,

17 though, Mr. Weisfelner.

18           MR. WEISFELNER:  The notice may very well look

19 different.  The other thing I want to emphasize here is that --

20 and as Your Honor may imagine, we had many, many, many hours of

21 discussion -- I won't say debate, but discussion among the

22 plaintiffs, the GUC Trust, both before they were adequately

23 represented and now that they're adequately represented, and

24 most importantly with the unitholders about Rule 23.  And the

25 concern we all had was a practical concern, that in a typical

18

1  Rule 23 context, even for settlement purposes, what you are

2  telling the beneficiaries of your activities, the members of

3  the classes, what this settlement means to you in dollars and

4  cents.  That, we can't do.  We don't have a res to point to and

5  say, this is the res that you're going to get to share, and

6  here's what we think your pro rata participation in that res is

7  going to mean by way of a check that gets cut in your name.

8           So for all those reasons --

9           THE COURT:  Wouldn't that be true in any limited fund

10  case, though?

11          MR. WEISFELNER:  Well, yes and no.  I mean, if we had

12  a limited fund and there was X numbers of dollars, there are Y

13  number of potential participants, and dividing it up, at a

14  minimum, you could say X over Y, subject to whatever criteria

15  gets you into the Y category.  Here, we have no idea what the X

16  is.  And as a consequence, it is virtually impossible to let

17  anybody know what it is you're going to receive but for the

18  following, which we think the notice has made clear.

19          In giving the waiver and the release, that's your

20  cause.  You get the benefit, if any, associated with an

21  estimation proceeding that results in the accordion being

22  triggered and some adjustment shares being available.  There

23  will then be a process, subject to court approval, where

24  everyone has a clear understanding of what they're going to get

25  out of that process.

19

1          So you have to waive.  You have to balance, rather.

2    On the one hand, you've got a little over $400 million worth of

3    GUC assets that are currently available.  You can make a claim

4    against the GUC assets.  You can attempt to overcome the

5    Pioneer factors, the waiver, the laches, whatever other

6    arguments the GUC Trust could and historically did raise with

7    regard to your entitlement to any portion of those funds.

8    Beyond that, you may have an ability, on your own dime, to go

9    chase the unitholder beneficiaries and seek a clawback of prior

10   distributions.

11         Or you can give a waiver under all these for the

12   opportunity to be part of an estimation procedure that gives

13   rise to adjustment shares that then potentially is a

14   billion-dollar recovery that's reserved for you and your

15   cohorts, as opposed to take a shot at 400 million, maybe have

16   to share it with the unitholders, maybe you get first dibs at

17   it, maybe you get the clawback.

18         And I think the notices in this case clearly point

19   out to everyone what their options are and afford them an

20   opportunity to show up, not once but twice.  Show up in

21   connection with the settlement -- three times.  Show up in

22   connection with the estimation, show up in connection with the

23   approval of what we refer to as the David Trott distribution

24   procedures by analogy to what some of us are more familiar with

25   in the asbestos arena.

20

1      The other thing I want to say about Rule 23, and I'll

2 do it quickly, and I think it bears emphasizing.  Throughout

3 GM's paperwork, in its effort to be the champion of the

4 victims, their own victims, we keep hearing that, judge, don't

5 knock yourself out.  Judge Furman is geared up to and is about

6 to make rulings on class certification.

7      THE COURT:  So I understand that the briefing isn't

8 even done until --

9      MR. WEISFELNER:  Well --

10      THE COURT:  -- October sometime.

11      MR. WEISFELNER:  Not only that, Your Honor, but let's

12 get real and let's be forthright and let's be transparent.

13 What's going on in front of Judge Furman is GM perfectly well

14 noticed its consideration of class certification on a

15 bellwether basis.  Unless I'm mistaken, there are three

16 jurisdictions that the Court is giving consideration to as part

17 of the bellwether briefing and the bellwether hearing that

18 takes place.  Frankly, we don't think they could possibly take

19 place before April of next year, forget about November of this

20 year.

21      Whatever determination the Court makes is, A, subject

22 to appeal by other party up to the Second Circuit.  Whether the

23 Second Circuit takes cert on those issues or not, those appeals

24 will take a long time.  But let's assume that everyone's

25 perfectly happy with the Court's decision on certification.  It

1  only applies to three bellwether cases.  We then have the

2  second part of the exercise, which by the way, we've seen this

3  movie before, where the parties then attempt to agree on

4  whether or not those determinations impact anything other than

5  those three bellwether jurisdictions, or whether or not you've

6  got to then consider the law of other jurisdictions for

7  certification purposes.

8         And when I say we've seen this movie before, we saw

9  this movie before in connection with the damages theory that

10  was being proffered by the plaintiffs that went to the economic

11  loss theory benefit of the bargain.  There were bellwether

12  cases.  The Court made its determination that in some

13  jurisdictions, manifestation is a pre-condition to benefit of

14  the bargain theory, said to the parties, now, go ahead and meet

15  and confer and see whether or not my ruling applies to any

16  other jurisdictions.

17        The plaintiffs, in good faith, said, you know what,

18  we think it does apply to at least another five, six, or seven

19  jurisdictions.  I can't remember.  GM said, doesn't apply to

20  any other jurisdiction, manifestation is a requirement in every

21  single jurisdiction.  And now, Judge Furman's going to have to

22  try that beyond the bellwether cases he established, my point

23  being that GM is disingenuous when it suggested --

24        THE COURT:  Mr. Weisfelner, your motions that I have

25  before me proceed with a construct for settlement that does not

22

1 require Rule 23 class certification.  That's what's pending

2 before me, and that's what I contemplate going ahead and

3 deciding.  And when I said at the outset that I contemplated

4 getting -- because I think that's -- it's raised as a gating

5 issue to at least preliminarily decide that issue before $6

6 million is spent giving notice.

7       If the issue was whether classes should be certified,

8 economic loss classes should be certified, and that issue is in

9 the process of being briefed in discovery or whatever before

10 Judge Furman, I'm strongly disinclined to try and jump the gun

11 and decide the issue before Judge Furman does.

12       New GM argues that those issues are before Judge

13 Furman, he's going to decide them.  Judge Furman and I had a

14 brief telephone conversation this week.  We did not discuss the

15 merits of any -- and we have -- in any of the prior discussions

16 we've had, we have not discussed the merits.  He knows that

17 this hearing is going forward today.  I believe one of his law

18 clerks was going to have the opportunity to listen in.  Whether

19 she's there or not, I don't know.  He decides what he has to

20 decide.  I'll decide what I have to decide.  I want to be

21 careful not to take and decide any issues that he has before

22 him.  You may not like the schedule by which it's being done.

23 He's got massive cases, and he's been proceeding in a very

24 orderly fashion.

25       But when I took your -- the three motions, say, as we

23

1   don't believe that Rule 23 class certification is required.

2   That's not the construct by which -- you may be able -- if you

3   had to, you may be able to satisfy the Rule 23 requirements

4   through -- this will be for settlement purposes, not for trial.

5   Those issues would be different than what Judge Furman is being

6   asked to decide; class certification for trial.  Okay.  But at

7   least on the pleadings that I have before me, that's not the

8   direction -- that's not the structure of the settlement that's

9   been negotiated.  Okay.

10          So in terms of will I go ahead and decide these

11  issues that are raised by your motions, I want to see -- you

12  know, with respect to the form of the notice, I started to read

13  New GM's brief, but it fundamentally raised the Rule 23 issue.

14  You know, in terms of who are you going to give notice to, the

15  postcard procedure, all that, I don't have a problem with that.

16  You know, I'm not deciding it today, but fundamentally, with

17  11.4 million people or something, I don't have a problem with

18  it.  Okay.

19          MR. WEISFELNER:  Let me move on and address -- I'm

20  going to skip over your question about causation of damages

21  because I think that's more directed towards personal injury.

22          THE COURT:  Sure.

23          MR. WEISFELNER:  But I do want to address your

24  concern about whether or not, in performing an estimate, Your

25  Honor has to give consideration to state-by-state analysis,

24

1  choice of law issues, that sort of thing.

2        THE COURT:  And I've read Judge Furman's decisions,

3  you know, deciding on -- for those states that he has decided.

4  One, I read the -- his decision on reconsideration as to New

5  York.  And so, you know, I'm generally familiar with it.

6        MR. WEISFELNER:  Sure.

7        THE COURT:  But for settlement purposes, I don't

8  know.  What is it you're contemplating?

9        MR. WEISFELNER:  Well, I'll tell you -- I'll give you

10 an example of where, you know, I would suspect it might be

11 relevant to Your Honor.  So we've got, a rough estimate,

12 11.4 million cars at issue.  Now, if one were to back out of

13 11.4 million cars, cars that were sold in jurisdictions where

14 manifestation is a precondition -- don't hold me to the exact

15 numbers, but I think we're down to -- instead of 11.4 million

16 cars, we're down to nine-and-a-half-million cars.  Well, I can

17 imagine that as part of the trial on what an appropriate

18 estimation would be, it would be overreach for the plaintiffs

19 to ask you to apply an estimation to 11.4 million cars as

20 opposed to nine and a half million cars.

21        Likewise, any other rulings that have been issued by

22 Judge Furman that has an impact on damages or damage theories,

23 state by state or otherwise, are going to be built into the

24 estimation proffer that we give you.  And if we're stupid

25 enough not to do that, I would assume someone withstanding is

1    going to point out those defects.

2          So generally speaking, we don't think that an

3    estimation hearing, given the law of estimation, which is very

4    much akin to the standards of the courts to apply in a 9019 --

5    you're estimating, you're not trying these cases -- that we

6    will gear ourselves towards an appropriate presentation on the

7    appropriate estimation with consideration -- due consideration

8    given to everything that Judge Furman has done to date.

9          The other thing I want to point out, because I think

10   it's reflective, going back again for a second to the Rule 23

11   9019 debate.  We need to understand, as I'm sure Your Honor

12   does, the difference between the case that's pending in front

13   of Judge Furman and the bankruptcy issues that are presented to

14   Your Honor through the three pending motions.  The three

15   pending motions deal with claims that could've been asserted

16   against the debtor in possession.

17         By and large, with one exception, the claims that are

18   pending in front of Judge Furman are so-called "independent

19   claims" asserting independent liability of New GM relating to

20   cars that were sold after the sale date in this case.  Now, the

21   one exception is successor liability, and successor liability

22   is, for lack of a better term, up in the air in front of the

23   district court.  Some preliminary rulings, whether they apply

24   across the board, whether they're going to be reconsidered is

25   up for grabs

1              THE COURT:  That's not an issue for me.

2              MR. WEISFELNER:  Okay.  Because I think, again, it's

3      an issue, if any, as to what, if any, credit New GM may be

4      entitled to in front of the district court.

5              THE COURT:  And that's for Judge Furman to decide.

6      Not for me.

7              MR. WEISFELNER:  As far as the scheduling of

8      discovery, Your Honor, we are more than happy to sit down with

9      General Motors and the other parties on the plaintiffs' side

10     and try and work out discovery.

11             But I think in that context, Your Honor ought to be

12     aware of just a couple of salient facts.  It's not as if

13     there's been no discovery.  In fact, there's been fulsome

14     discovery, albeit at the MDL level.  As of mid-March, the

15     parties have conducted 643 depositions:  There have been 361

16     depositions of plaintiffs and other case-specific witnesses,

17     especially in the injury and wrongful death actions; 102

18     depositions of current or former GM employees; 84 expert

19     depositions; 96 depositions of named plaintiffs in the economic

20     loss aspect of the case.

21             GM has produced about four million documents,

22     23 million pages.  And I don't have a figure for how much

23     documents and pages we've submitted.  But all plaintiffs have

24     likewise completed and turned over to GM fact sheets and

25     produced documents.  So I think that's going to be relevant

27

1  when the parties sit down and attempt to work out a schedule

2  for discovery and depositions and fact discovery and expert

3  discovery.

4       THE COURT:  I'm assuming that the parties will agree

5  that any depositions that have been taken in the MDL can be

6  used here.

7       MR. WEISFELNER:  The other, and I think final comment

8  unless Your Honor has any other questions for me, is with

9  regard to the -- that aspect of the notice motion that asked

10 New GM to turn over information.  And I'm not sure --

11      THE COURT:  Their latest objection was to how many

12 days you were giving them to turn it over.

13      MR. WEISFELNER:  And again --

14      THE COURT:  You're going to work that out.

15      MR. WEISFELNER:  We will do our best to work that

16 out.

17      THE COURT:  You're going to work it out.

18      MR. WEISFELNER:  It seems to me that there are -- it

19 seems to me that there are three areas of information that

20 we're looking for.  On either end of the spectrum, give us the

21 names, addresses, and identifying information with regard to

22 original vehicle purchases.  As far as I can tell from review

23 of the applicable federal law in this area, that's a

24 "push-a-button exercise."  You're obligated to maintain those

25 records.

28

1          THE COURT:  I read the briefs on that.

2          MR. WEISFELNER:  Okay.

3          THE COURT:  So I understand that.

4          MR. WEISFELNER:  The only --

5          THE COURT:  I didn't see any argument from New GM

6   that they don't have the information.  What about used car

7   purchases?

8          MR. WEISFELNER:  Well, that was the middle part of

9   the two ends of the spectrum.  So they have to have the

10  information regarding car purchasers.  They have to have the

11  information regarding who they send their recall notices to.

12  The only thing that's left is, in the middle, to the extent the

13  car's changed hands, which information, we understand from our

14  experts, is available, although potentially at a price through

15  services such as Polk, and how long it would take to get that

16  information and de-duplicate the stuff so people aren't getting

17  massive numbers of the same notice.

18         THE COURT:  I'm assuming that with pre-2009 cars,

19  most of them have been sold, have been turned over.

20         MR. WEISFELNER:  Yeah.  But again, we're talking

21  about 2014 being the recall.

22         THE COURT:  Yeah.  I don't know what happens when,

23  you know, somebody trades a car, whether GM -- and if they

24  trade it for a new GM car, whether the dealer who took the

25  trade would have the records, and whether -- therefore GM --

29

1  New GM would have the records of who traded their vehicle and

2  purchased a new --

3       MR. WEISFELNER:  What I'm advised is those records

4  are, in fact, maintained.  They're maintained for a purpose.

5  And that is, should there ever be a subsequent recall you have

6  to know where the car is today as opposed to who originally

7  sold it.  You have to know where the car is today.

8       The automobile manufacturers, unlike with regard to

9  original purchases or who you gave recall notices to, don't

10  necessarily have to maintain the records of the stuff that

11  transpired in between.  But it is available through a service.

12  GM, you know, uses that vendor, has used that vendor in the

13  past to do the recall notices.  But in any event, we will

14  attempt to work it out as best we can with the parties.

15       But I just want to make sure that Your Honor doesn't

16  get sidetracked on this used car issue.  Understand that the

17  theory of liability that we will attempt to establish in

18  connection with the estimation is with regard to the number of

19  vehicles at issue, regardless of the number of owners, so that

20  if the 11.4 million cars has now been reduced to nine and a

21  half million cars by virtue of the manifestation rulings, it's

22  those nine million cars that the damage experts, you know, will

23  attempt to convince Your Honor is equal to X number of dollars

24  of claims.

25       THE COURT:  Are there still additional states as to

1  which Judge Furman has motions still pending or scheduled to be

2  filed dealing with the manifestation issue?

3       MR. WEISFELNER:  Absolutely.  Again, the current

4  state of affairs is -- I think the parties have only agreed and

5  -- again I apologize, and I don't want to be held to these

6  numbers.  I think the parties have -- we have conceded, and/or

7  the judge has ruled that there's a grand total of, I think it's

8  seven jurisdictions where manifestation is a prerequisite to

9  benefit-of-the-bargain damages.  The parties have been unable

10  to agree on the application of manifestation as a prerequisite

11  in anything other than those seven jurisdictions.  And the

12  party keeps on going.

13       THE COURT:  Well, let me ask -- can the parties here

14  in bankruptcy court, in the context of the 9019 and an

15  estimation procedure, agree as to what rules should apply as to

16  -- that should be applied to determine economic loss claims,

17  where the car -- whatever state the car is.  I don't know.

18       MR. WEISFELNER:  Well, Your Honor, we can certainly

19  put forward, and do intend to put forward as part of our

20  briefing on the estimation itself, just what it is Your Honor's

21  being asked to estimate, and what elements of our claims we

22  think have survived Judge Furman's rulings to date, and

23  therefore ought to be part of your calculation on estimation.

24       I'll give you one bad example because, again, I'm not

25  the expert on damages on our side.  But let's take a

1  jurisdiction where Judge Furman has ruled that manifestation's

2  a prerequisite to finding economic loss.  Okay.  That's the law

3  as determined by Judge Furman, subject to any appeals that

4  economic loss side may tend to take.  Let's say that state was

5  Michigan, just to pick a state.  Well, that still doesn't

6  prevent a calculation or an estimation of damages that includes

7  a Michigan resident who in point of fact does have

8  manifestation.

9          So all of these factors will be taken into

10  consideration when it comes time for our side to prove up just

11  how high of an estimate we think Your Honor ought to be giving

12  us.  And, Your Honor, unless you have any other questions --

13          THE COURT:  I'm looking back to see whether I have

14  any questions for you, Mr. Weisfelner.  No, that's fine.  Let

15  me hear from -- Mr. Hilliard, are you going to -- who's going

16  to address the personal injury/wrongful death?

17          MR. WEISFELNER:  Thank you, Judge.

18          THE COURT:  Thank you very much.

19          MR. HILLIARD:  Good morning, Your Honor.

20  Bob Hilliard.  With the Court's permission, just --

21          THE COURT:  I was going to allow you to appear by

22  telephone so you didn't have to come from Memorial Day weekend

23  here, but, you know --

24          MR. HILLIARD:  I appreciate that, but I'll tell you

25  why I'm here in just a minute.  It's not for Mr. Weisfelner's

1  wedding.  But on a personal note, I want to just congratulate

2  him on the record.  We've become friends since we've started

3  this process, and I know the bankruptcy community's tightly

4  knit.  And it's quite remarkable to me that he's spending the

5  morning with you and then the evening with his new bride.

6          Judge, I think I want to address what you've asked.

7  But first, when you sent your order out asking for

8  clarification, we took it very seriously because as you know,

9  and as I've tried to make clear, and I think the Court

10  appreciates and respects, this could be the only mechanism by

11  which people who were hurt or killed ever get value for their

12  loss.

13          And so you said I could appear by phone, but because

14  of the Court's order, we met last night.  Because we had no

15  hard line in the sand about how to do this.  We just want to

16  make it non-illusory.  We want to make sure that this

17  settlement works.

18          THE COURT:  Look, I'm all in favor of settlement.  I

19  ask the questions because when I read -- several times I read

20  the proposed settlement.  I obviously had questions.  I was

21  concerned that, well, what are you really accomplishing if

22  you've got to wait five or six, seven years before anybody gets

23  anything?

24          MR. HILLIARD:  Absolutely.  And your questions were

25  taken to heart, and we've hopefully addressed as many as we

33

1  can, and we're still willing to continue to make sure that this

2  settlement does --

3         THE COURT:  Are there going to be more personal

4  injury/wrongful death claims this week?

5         MR. HILLIARD:  So I have a bet with Mr. Golden about

6  that.  I don't think so, Judge.  I think that you have the

7  universe of personal injury/wrongful death, and here's why.  So

8  the earliest an accident could've happened is June '09, the

9  earliest.  And then it goes back another 14 or 15 years, and

10  they've yet to appear in any related action because General

11  Motors reports to Judge Furman about all state court related

12  actions.  They have yet to appear in front of Your Honor.

13         And perhaps if notice does go out to every customer

14  that had a vehicle, they might remember that there was an

15  accident.  And GUC's intent is to buy its full peace, which I

16  appreciate, but I'm not sure that there is much more peace to

17  buy, except for those that are here.

18         THE COURT:  How many personal injury/wrongful death

19  claims, late claims are now filed here, or believed to file

20  late claims?

21         MR. HILLIARD:  Right.  We have approximately 200.

22  One is the core recall group, and the other is the second

23  recall group that GUC is going to include in the settlement

24  that Mr. Weintraub's going to address in particular in just a

25  minute.  There's a group out -- another group out of Texas, I

1  think, that has 400.

2          So I believe -- unless for strategic reasons some

3  other law firm has been holding onto their cases and have never

4  made an appearance despite the Court's notice of deadline for

5  late filing, I don't think we're going to see many more.

6          But to one of the questions you asked in regards to

7  damages and causation, I was trying to, as a practical matter,

8  go through in my head, how will that hearing occur.  If we have

9  families who were killed, does the Court expect -- and I hope

10  I'm not presumptive, but I don't believe the Court would expect

11  that we would have testimony every single -- in every single

12  case.  But I believe that there would be a way to develop a

13  protocol of the injury or death, the medical costs, the loss,

14  the beneficiaries, some comments about, you know, the mental

15  anguish and the soft side of the damages, and present those to

16  the Court for every case on the damage side.

17          THE COURT:  Is it 200 or 600 cases?  You said --

18          MR. HILLIARD:  So my firm and my co-counsel's firm

19  has approximately 200.

20          THE COURT:  Okay.

21          MR. HILLIARD:  There's another firm that I do not

22  represent, I think that's on the line, that has approximately

23  400.

24          THE COURT:  Okay.

25          MR. HILLIARD:  And -- but that firm represents the

35

1    universe --

2            THE COURT:  So let me ask this.  And they can speak

3    for themselves, but I have this new proposed settlement.  I say

4    new because you modified it after I issued your questions.  And

5    so are the lawyers on behalf of 600 plaintiffs in agreement

6    with the proposed settlement that I now have before me?

7            MR. HILLIARD:  And I believe that every one of the

8    particular and individual clients have signed off on it as

9    well, yes.

10           THE COURT:  Okay.  So -- because -- you know, they're

11   arguably consenting to give up very substantial rights to a

12   jury trial and -- substantial rights.  And they're expressing

13   their willingness to throw in their lot with what this court

14   decides, subject to appeal.  I'm not -- you know, no -- I'm not

15   suggesting that anybody should give that up, okay.  But that's

16   -- you know, it's substantial rights, and I just wanted to be

17   reasonably clear that -- I didn't realize it was 600.  In the

18   back of my head was the 200.  But -- so it's 600.  There are

19   600 plaintiffs with personal injury/wrongful death claims who

20   are in agreement to go forward on the basis set forth in the

21   most recent draft of the proposed settlement?

22           MR. HILLIARD:  I will speak specifically to

23   Bob Hilliard and Tom Henry's docket of the 200.  Each one of

24   the clients has agreed in writing to go forward, understanding

25   both the risk and what they're giving up.  I believe Ms. Lisa

36

1  Norman, who's on the phone, and who has participated with his

2  in this process, I believe what she will tell the Court is the

3  same thing, but I'll let her speak for herself if the Court --

4          THE COURT:  Ms. Norman, go ahead and identify

5  yourself for the record, and then let me hear from you.

6          MS. NORMAN:  Yes.  Thank you, Your Honor.

7  Lisa Norman.  I represent approximately -- well, exactly 352

8  personal injury and wrongful death plaintiffs that have late

9  claims and motions pending because the Court, and who have

10  agreed to and are part of the settlement -- proposed settlement

11  agreement that's been submitted.  The list of all of our

12  plaintiffs is attached thereto.

13          THE COURT:  All right.  Thank you.  Anything else you

14  want to tell me, Ms. Norman, while you're speaking?

15          MS. NORMAN:  Nothing further at this time, unless you

16  have any questions for me, Your Honor.

17          THE COURT:  So on this issue of the agreement -- so

18  there's an agreement, as I understand it, between the personal

19  injury/wrongful death plaintiffs and the GUC Trust that -- to

20  consent to the Court estimating their claims for approval and

21  allowance and distribution.

22          MR. HILLIARD:  Correct.

23          THE COURT:  Okay.  And -- give me a second.  So 28

24  U.S.C. 157(b)(2)(B), which has the language about estimation,

25  not personal injured/wrongful death claims, the -- one of the

1  things that I'm trying to reconcile, 157(b)(5), which provides

2  that the district court shall order that personal injury, tort,

3  and wrongful death claims shall be tried in the district court,

4  et cetera -- so one of the little-observed aspects of Stern v.

5  Marshall is the statement by the chief justice that 157(b)(5)

6  is not jurisdictional.  In <u>Stern v. Marshall</u>, it arose in the

7  context of the defamation claim asserted by Marshall.  Then the

8  Court said, we don't have to decide whether it's personal

9  injury or wrongful death because he -- through his conduct in

10 the bankruptcy court, he consented, and 157(b)(5) is not

11 jurisdictional.

12      So I take from that, that if the personal

13 injury/wrongful death plaintiffs and the GUC Trust consent to

14 the procedure, if the Court approves the settlement and the

15 estimation procedure, that I have the authority to do that.  If

16 you disagree, tell me, but --

17      MR. HILLIARD:  It seems that would be the

18 distinction, Judge.  As you were reading that, though, I

19 confess, I'm not specifically familiar with the rule you found,

20 but I will tell you that by agreement -- and my response was

21 going to be, by agreement we have decided to come to you an

22 deliver these plaintiffs and their claims to be estimated.

23      THE COURT:  Okay.  So if any of the bankruptcy

24 lawyers want to be heard on that point, I'm certainly prepared

25 to hear them on it.  But that was -- you know, I was concerned

38

1 about this issue of what the Court's authority was, and that

2 was one of the concerns I had in reading the original

3 settlement, because they were -- all the plaintiffs were

4 reserving their right to go to the district court, which they

5 had the right.

6          Go ahead, Ms. Going.

7          MS. GOING: And so just to --

8          THE COURT: Just identify yourself for the record.

9          MS. GOING: Kristen Going, Drinker, Biddle & Reath,

10 on behalf of the GUC Trust. And just to clarify, Your Honor,

11 so between Mr. Hilliard and Ms. Norman, they're both

12 signatories to the amended settlement agreement. And one of

13 the things that the GUC Trust required from the signatory

14 personal injury plaintiff firms was an affidavit from counsel

15 delineating that their clients had, in fact, affirmatively

16 consented to the terms of the settlement agreement, and that

17 affidavit included a list of all of the personal injury

18 plaintiffs.

19          So I can tell you that we have, you know, that full

20 volume of -- and universe of numbers. And so we do believe

21 that that is the universe of personal injury/wrongful death

22 plaintiffs, and that they have, in fact, consented to give up

23 their jury trial rights.

24          THE COURT: Okay. Not only have they consented to

25 give up their jury trial rights, but to have the bankruptcy

39

1  court, as opposed to a district --

2         MS. GOING:  Estimate.

3         THE COURT:  -- court make the determination.

4         MS. GOING:  That's correct.

5         THE COURT:  Okay.

6         MR. WEISFELNER:  Your Honor, it occurs to me -- and I

7  don't want to take up too much more of your time.  There were

8  two other issues --

9         THE COURT:  Just identify yourself for the record.

10        MR. WEISFELNER:  Certainly.  I apologize.  It's

11 Ed Weisfelner, Brown Rudnick, for the economic loss plaintiffs.

12        Your Honor, there were two other questions that were

13 raised, one of which was raised in your May 10th letter, that I

14 thought important to address.  And Your Honor asked the

15 question as to whether or not mediation would be appropriate.

16        THE COURT:  Because in one of my conversations with

17 Judge Furman, he gave me the two order numbers where mediation

18 had been --

19        MR. WEISFELNER:  Sure.  And, Your Honor, we did get

20 what I perceived to be New GM's position on this in one of the

21 letters Mr. Basta sent to you.  And that is that -- and it's

22 consistent with the position New GM has taken in mediation

23 under Judge Furman's auspices that New GM takes the position

24 that mediation with economic loss plaintiffs would be -- I

25 forgot the terminology -- un-useful, unwarranted, they're not

40

1  prepared to do it until and unless three things happen:  Their

2  final determinations of class certification, which we think

3  would take until June of next year, if not longer.  There are

4  final determinations with regard to <u>Daubert</u> challenges, which

5  could take quite a while, especially since Judge Furman

6  indicated in his last status conference in March that he may

7  want to hire his own expert; and then there was a third

8  condition.  I don't know that I'm -- oh, their summary judgment

9  they're eventually going to file.

10         So what GM is saying is mediation, sure.  Not now.

11 And what we've said with regard to mediation is we've always

12 been happy to mediate in the district court level, at this

13 court's level.  Don't see how we're going to get anywhere given

14 New GM's position that they're not prepared to mediate with us.

15         THE COURT:  Well, let me put it this -- and I'll hear

16 what Mr. Basta has to say about mediation.  A couple of general

17 comments.  I would've thought that New GM would frankly be

18 enthusiastic about resolving all claims or potential claims for

19 pre-closing accident plaintiffs and economic loss plaintiffs,

20 and would probably, no doubt, negotiate very hard about the

21 terms of -- you know, this term of the settlement, that term of

22 the settlement, what the criteria are for estimation versus

23 what the plaintiffs want.  I would fully expect that.

24 But from the day you presented the first proposed settlement,

25 the approach of New GM is not now, never, never with

1    exclamation marks at each point in the process.  If it takes

2    ten years, so it takes ten years.  We'll see whether the

3    Plaintiffs can last that long.

4           So, you know, they're entitled to that position if

5    they want to take it.  But I'm surprised by it, that the

6    bankruptcy is a collective proceeding.  This is not of New GM's

7    making.  It was -- you know, Judge Gerber found a due process

8    violation and the Second Circuit found a due process violation.

9    The consequences of it were established by the Second Circuit.

10   Yes, there are recalls that are a part of -- that here has been

11   acknowledged and was going acknowledged at the last hearing,

12   that there has never been a determination, and it's being

13   proposed to be settled as to whether there was a due process

14   violation as to certain of the recall, subsequent -- very soon

15   thereafter recalls.

16          Okay.  All right.  Settlement, that's what

17   settlement, you know, to resolve those issues.  So yeah, I'm

18   surprised, okay?  But if -- and I'll say this, if -- I would

19   urge New GM, as we go forward with this process here, to

20   discuss mediation sooner rather than later.  I can tell you, if

21   I approve the 9019, they're going to mediate.  Okay?  The

22   question is are they going to mediate before then?  I won't

23   order it before then.  I will order it -- if I approve the

24   notice and the 9019, they will mediate.

25          MR. WEISFELNER:  Your Honor, the last --

42

1          THE COURT:  And they'll mediate in good faith.  I

2   don't have any doubt about that.  If they go to mediation, but

3   why they want to wait for that -- okay.  That's -- I'm not

4   going to force mediation before that.  I will force mediation

5   if we get -- if notice goes out, and I approve the 9019 before

6   we get to an estimation proceeding.  They've settled so many

7   claims in the District Court, I guess some without mediation,

8   some with mediation, okay, those may be the personal

9   injury/wrongful death claims, okay, and here we're dealing with

10  the alleged millions of recalls, economic loss claims.

11          Okay.  I understand, different -- presents different

12  issues.  That's my little speech on this point.  It's not going

13  to affect how I decide on any of the issues, Mr. Basta, but

14  that's, you know -- go ahead, Mr. Weisfelner.

15          MR. WEISFELNER:  The last thing I wanted to comment

16  on was the question of New GM's standing.  And, you know, it

17  can be viewed at very many different stages with, you know,

18  some slicing and dicing within those stages.  I am ultimately

19  struck by the way the standing issues were handled by this

20  Court when we were dealing with the enforceability of the prior

21  settlement agreement, and frankly Your Honor handled it the way

22  we were hoping you would handle it.  We didn't want to just --

23          THE COURT:  You mean I got something right here?

24          MR. WEISFELNER:  You got more than something right.

25  We didn't want to hand New GM another appellate issue that

43

1   would hold up the ultimate determination on the merits, nor did

2   we want standing to serve in the same capacity.  So ultimately,

3   you know, we're sitting here with the realization that standing

4   issues ought to be resolved at the end and afford the people

5   the opportunity to participate.  And I guess the operative word

6   would be "up to a point."

7            Again the irony of having New GM step into the shoes

8   of the champion of the unwashed masses and making sure that the

9   rights of the Plaintiffs are properly protected both

10  procedurally and substantively makes those of us on this side

11  of the equation a little sick.  Nevertheless, I offer Your

12  Honor whatever briefing Your Honor thinks is necessary or

13  appropriate on standing, and we can take it from the ridiculous

14  to the sublime as --

15           THE COURT:  Well, let me say, it -- so there's -- I

16  pondered what's the effect of the side letter between the GUC

17  Trust and New GM.  Okay.  In light of that side letter, does

18  New GM have standing to object to the allowance of claims?

19  Look, they're -- it's their money you want, and so I'm not

20  saying -- only if we get to the estimation, but certainly an

21  estimation -- you know, they're the ones with the dog in this

22  hunt, right?  As to how much the GUC Trust -- I'm not

23  suggesting the GUC Trust was just -- be just willing to roll

24  over and have the billion dollars, but they have the economic

25  stake in this, and at that stage I have no question about it.

44

1           I do have a question as to, you know, earlier stages,

2    as to -- particularly because of the side letter.  In the

3    absence of the side letter, I think it might -- the issues

4    might be different, but what did they agree in that side

5    letter?  I think I'm clear about what I'm talking about.

6           MR. WEISFELNER:  Well, I think I -- well, I know

7    exactly what you're talking about, and I think the GUC Trust

8    has a definitive response to it.  And putting aside the side

9    letter in terms of when it is that the GUC Trust may properly

10   trigger the call for an estimation, which the GUC can respond

11   to the contentions that GM has raised.  I think of issues like,

12   you know, this whole deal where you're allocating all of the

13   adjustment shares just to the Plaintiffs and you're leaving all

14   of the remaining GUC Trust assets to the beneficiaries

15   constitutes --

16          THE COURT:  I was waiting for Mr. Golden to have a

17   position --

18          MR. WEISFELNER:  Well, you can rarely motivate him to

19   stand up and take a position on anything in open court as

20   opposed to in a conference room.

21          THE COURT:  He wasn't hesitant to express his

22   position at the earlier trial, but go ahead.

23          MR. WEISFELNER:  And he knows I'm only kidding.

24          THE COURT:  Well --

25          MR. WEISFELNER:  My point is this:  When GM complains

1 that embedded in the settlement is an impermissible plan

2 modification because we are improperly discriminating against

3 creditors, what -- where do they have standing to raise that

4 issue?  And that's just an example.  So, Your Honor, we will

5 abide by whatever direction you give us.  Understand that with

6 the exception of participation in the estimation, we could take

7 a very formalistic view that GM has zero standing across the

8 board, save maybe for the side letter issue.  I'm not sure that

9 it behooves us, more importantly, Your Honor, to debate that

10 issue, as I think I know how Your Honor is likely to deal with

11 it, but we're at your disposal.

12            THE COURT:  All right.  Mr. Basta?

13            MR. BASTA:  Your Honor --

14            THE COURT:  Oh, I'm sorry, Mr. Weintraub.  Way to

15 have spent -- Mr. Basta, let Mr. Weintraub -- I'm sorry.

16            MR. WEINTRAUB:  May I cross in front of Your Honor?

17 It would save some --

18            MR. BASTA:  Anybody but Mr. Weintraub, Your Honor.

19 Anybody.

20            MR. WEINTRAUB:  I get no respect, Your Honor.  Good

21 morning, Your Honor.  I just wanted to clarify two things, and

22 I'll be brief.  There will be a supplemental late claims

23 motions filed, probably later today.  We'll be going to trial

24 before May 31st, but I think I can accelerate that to just

25 enhance everyone's weekend.  So we will get that done today.

46

1              THE COURT:  How many more claimants?

2              MR. WEINTRAUB:  That will be for 69 claimants who

3   are, in fact, signatory Plaintiffs to the original settlement

4   agreement, so these are not people that are just

5   materializing --

6              THE COURT:  And they've agreed to the modifications?

7              MR. WEINTRAUB:  Yes, they have, Your Honor.  And the

8   other point I just wanted to revisit shortly is, you know, Your

9   Honor's reference to 157(b)(5).  That was referenced in the

10  original settlement agreement, and that was taken out in

11  response to one of Your Honor's concerns as to whether or not

12  people are trying to preserve jury trial rights in district

13  court.  In connection with the settlement, all of the

14  Plaintiffs are prepared to have their claims estimated in this

15  court, and have waived any rights to a jury trial in connection

16  with the settlement and any procedures relating to the

17  settlement.

18             THE COURT:  Thank you.

19             MR. WEINTRAUB:  Thank you.

20             THE COURT:  Thank you very much.

21             All right.  Mr. Basta?

22             MR. BASTA:  Your Honor, I was joking with

23  Mr. Weintraub.  We go way back.

24             Paul Basta from Paul, Weiss, representing New GM.

25  What I thought I would handle today is to maybe do a little

47

1  reverse order, and start with mediation and then move to this,

2  whether they've consented, the mechanism for consenting to have

3  their claims estimated in Bankruptcy Court, and then I wanted

4  to give the Court our overview of how we see the settlement,

5  and how we see how the three parts of the settlement work

6  together, and what our concerns are, and then I'm going to

7  caucus with my colleagues and make sure I've answered and given

8  you our perspective.

9          To start, you know, I don't think Mr. Weisfelner --

10  and by the way, congratulations on your wedding.

11          MR. WEISFELNER:  Thanks, Paul.

12          MR. BASTA:  I don't think his characterization of our

13  motivation to just delay, delay, delay and never settle is the

14  correct description.  We want to settle, and we're prepared to

15  mediate, and we're prepared to mediate all of the issues.  And

16  we would like to get this resolved.  I think when you say,

17  well, what are we mediating?  If we mediated tomorrow, what are

18  we mediating?  And there could be three things that we're

19  mediating.  We could mediate how to figure out how to move the

20  whole case forward and settle, and even if you can't settle

21  actual claims, maybe we could settle a process that we would

22  all agree on.  We could settle wrongful death and personal

23  injury claims, and we're prepared to do that.  As Your Honor

24  noted in past success in doing that in the NDL, and the key to

25  that is that we would like to mediate the specifics of actual

48

1  claims, for which there needs to be information.  And that

2  information is rolling, and we're expecting it very soon, but

3  we're prepared to sit down and mediate those things.

4        And when it comes to economic loss, the way that I

5  understand it is that there was a mediation session in the NDL,

6  and no, it wasn't GM alone who said that we don't want to

7  mediate.  Both parties said that Judge Furman is addressing

8  gating items that are going to inform where the parties are

9  going to settle, and there should be more progress on those

10 gating items.  We are prepared to sit down and try to mediate

11 it again, but the idea that we're just going to not be

12 constructive and just be obstructionists, in my experience,

13 since I've been working with this client, is not the direction

14 that we've received.

15       THE COURT:  When did you get retained?

16       MR. BASTA:  We would like to clear -- I got retained

17 the first of April.

18       THE COURT:  All right.  So since the first of April,

19 there's been no effort of obstruction.

20       MR. BASTA:  Not since I've been involved, Your Honor.

21       THE COURT:  Okay.

22       MR. BASTA:  What is our motivation for the big

23 picture, Your Honor?  We're under a -- we have a sale

24 agreement, and the sale agreement says we have to issue

25 adjustment shares, if the Court estimates allowed general

49

1  unsecured claims at above the threshold.  And we have a

2  fiduciary duty to our own constituencies to make sure that that

3  standard, if it's going to be triggered, is the right rules

4  apply to triggering that standard.  And we have a very strong

5  interest to use whatever arguments that we have, and that we

6  have proper standing to assert to make sure that we get the

7  best outcome that we can for our organization that complies

8  with the rules.

9           And, you know, I've been in many cases with

10 Mr. Weisfelner to expect shock and awe that we would actually

11 assert arguments that help us -- you know, that we are under

12 some duty to not assert argument --

13          THE COURT:  Mr. Basta, Mr. Weisfelner has been before

14 me enough that I have sometimes heard his --

15          MR. BASTA:  I love it when he does --

16          THE COURT: -- righteous indignation in what --

17          MR. BASTA:  I love -- I love it -- I don't think the

18 righteous indignation is appropriate where our constituency,

19 that we're just trying to get the best outcome --

20          THE COURT:  Mr. Basta -- excuse me, Mr. Weisfelner --

21 the righteous indignation is not what's having an effect on --

22          MR. BASTA:  All right.  But I wanted to --

23          THE COURT:  -- on me.

24          MR. BASTA:  So on mediation --

25          THE COURT:  But at every step of the process before

50

1   me, New GM has done what it's entitled to do, assert every

2   conceivable argument and right that it could possibly assert.

3            MR. BASTA:  Okay.  But I think -- let me --

4            THE COURT:  If they continue doing that, that's New

5   GM's right to do that, but --

6            MR. BASTA:  But, Your Honor, I think that what New GM

7   feels, I'm going to get to this in my comments, I want to cover

8   the consent to jurisdiction for a minute, but what New GM is

9   looking at is seeing what the movants are doing is to set up a

10  process where the estimation of the claims isn't going to be

11  based on actual claims, which we think under the contract we're

12  entitled to make sure that the estimate covers actual claims.

13  And faced with that threat, I think New GM is reacting to the

14  threat that the other side is taking an action that's not

15  consistent with the agreement, and I'll explain why we think --

16           THE COURT:  Let me just --

17           MR. BASTA:  -- it's inconsistent --

18           THE COURT:  Let me just say -- let's take, for

19  example, the personal injury/wrongful death claims.

20           MR. BASTA:  Yes, sir.

21           THE COURT:  If -- let's assume for a minute that the

22  Court approves the 9019 and we go forward with an estimation.

23  And as you well know, the Court has great flexibility in

24  setting the ground rules for an estimation proceeding.

25           MR. BASTA:  Right.

51

1          THE COURT:  And what I -- with dealing with those

2    claims alone, I would fully expect that you or other counsel on

3    behalf of New GM would negotiate with Mr. Hilliard, Mr. Norman

4    -- Ms. Norman, and any other lawyers for the personal injury

5    plaintiffs.  What are the criteria that should be applied in

6    estimating personal injury/wrongful death claims?  And that was

7    why I asked specific questions about it before because it seems

8    to me, you know, causation and damages are going to be an issue

9    with respect to every one of them.

10          I don't know how many of those accidents happened in

11   comparative fault states, whether that is an issue as to some

12   of them, or contributory negligence states, as a complete

13   defense.  The rules, you know, are going to differ by the state

14   where the accident occurred, and what I would -- if we get to

15   that stage, I'm not saying we will, but if we get to that

16   stage, and there's no reason to wait to get to that stage, is

17   that you begin the process promptly of trying to reach an

18   agreement with the lawyers for the personal injury/wrongful

19   death plaintiffs as to what criteria -- assuming the Court

20   proceeds to estimate the claims, what criteria the Court should

21   apply.

22          You know, I'm now being told that there are likely to

23   be 660 personal injury/wrong -- pre-closing personal

24   injury/wrongful death claims; 200 from Mr. Hilliard, 400 from

25   Ms. Normal, and Mr. Weintraub tells me there's going to be

52

1    another 60 or so, and so, you know, 660.  There's not going to
2    be full-blown trials, and I don't think -- and estimation
3    doesn't require full-blown trials, but New GM is entitled to
4    propose procedures that ought to apply to that estimation.
5            MR. BASTA:  Your Honor, I understand, and this
6    process is going to go forward, and we're going to assert our
7    rights.  We're going to try to convince the Court we think the
8    settlement should not go forward for Rule 23 reasons, but as
9    this progresses and we need -- if it's --
10            THE COURT:  What's your position on the consent
11   issue?
12            MR. BASTA:  Sorry.  Sorry, Your Honor.  So the way
13   the estimation order works and the settlement order works is --
14   on the personal injury/wrongful death, is that even if someone
15   is not represented here, that if they suffered an injury, that
16   claim is going to be allowed under the settlement.
17            THE COURT:  No, I don't think so.
18            MR. BASTA:  I believe that's the way it works, Your
19   Honor, is if Your Honor looks -- and let me tell you why I
20   think that's the way it works is that, if you look in their
21   letter, they say that in order to receive a distribution, that
22   someone will be deemed to consent under 157(b)(5).  And that
23   dovetails with the definition of plaintiff in the settlement
24   agreement, which includes all plaintiffs, whether named or
25   unnamed, and it goes on to include them.

53

1          So there's two pieces here.  To the extent they

2    actually have a written consent from someone that says I

3    consent under 157, I understand that.

4          THE COURT:  Well, let me ask, do you -- what is your

5    position if the order of the Court says that the only personal

6    injury/wrongful death claims that the Court will estimate are

7    on behalf of those plaintiffs who have filed a motion to allow

8    a late claim?  Because that's -- I have 600, and will have 660.

9    So that -- because I wasn't sure -- it seemed to me that I was

10   being told -- we'll see whether anybody comes out of the

11   woodwork before the end of the day, but as of now I'm being

12   told there is nobody else.  Okay?  They're all represented by

13   the Plaintiffs' lawyers that we know.  Does -- would -- does

14   that obviate your concern as to people -- anybody else coming

15   in and having a right?

16         MR. BASTA:  Well, Your Honor, if Your Honor orders

17   that, the way they proposed the settlement agreement is not the

18   way it's going to work, and it's only people that are

19   represented in here, obviously, that fixes the issue.  And it

20   would remove the provision in their letter where there's a

21   deemed consent in exchange for getting a distribution.  So that

22   would take that away, but I -- when I read Your Honor's order

23   to show cause, and Your Honor questioned the illusory nature, I

24   thought one of the things that Your Honor was asking in the

25   numerical examples was, well, what happens if I allow a claim

54

1  for $10, and then there's subsequently a jury trial, and in

2  that subsequent jury trial it comes in at $17.  How do I do

3  that?

4           THE COURT:  That's exactly -- yeah --

5           MR. BASTA:  Okay.  And so I don't know that they've

6  addressed that --

7           THE COURT:  I think they did.  The issue -- and I

8  thought they addressed it very clearly that by consenting to

9  this Court estimating the claims for distribution, they've

10  agreed if I -- in the aggregate estimate personal

11  injury/wrongful death claims at $50 million, they can't say we

12  think we're entitled to $50 million and $10, that they're --

13           MR. BASTA:  May I try to explain my point, Your

14  Honor?

15           THE COURT:  Sure.

16           MR. BASTA:  The -- this is all getting into what it

17  means when the Court enters an order allowing it because -- for

18  distribution purposes because the way the settlement structure

19  works is that we get to an estimation hearing, Your Honor

20  enters an order, it allows for estimation, it estimates for

21  allowance and distribution, and then there is a subsequent

22  process that's the real allowance process.

23           And in that subsequent process, a claimant -- the way

24  we read it, a personal injury claimant who has filed a claim

25  against New GM and has a jury trial against New GM, there's

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

55

1   nothing that -- they're not waiving the right to a jury trial

2   against New GM and there's nothing that says that that

3   plaintiff can't take what comes from New GM and come in and ask

4   the Court to say, Judge, that previous allowance of my claim

5   that you had?  That's not what I should get.  I should get --

6            THE COURT:  Well, look, I can't decide --

7            MR. BASTA:  -- that other --

8            THE COURT:  -- and I don't intend to decide whether

9   plaintiffs are permitted to assert claims against New GM if

10  claims are estimated and provided for distribution here.

11  Before you came into the case --

12           MR. BASTA:  Yes, Your Honor.

13           THE COURT:  -- I recall reading a filing by Kirkland

14  & Ellis where they took the position before Judge Furman that

15  if late claims are allowed in the Bankruptcy Court, they don't

16  -- they're not entitled to assert claims against New GM.  I

17  don't have a -- that's not for me to decide.  I fully -- so

18  yes, the -- this settlement preserves their rights to argue

19  before Judge Furman --

20           MR. BASTA:  Right.

21           THE COURT:  -- that whatever this Court -- whatever

22  the Bankruptcy Court decides doesn't effect what they can

23  assert against New GM.  I have nothing to say about that, and

24  I'm -- you know, because I already saw the argument made by

25  New GM many, many months ago that if they get claims allowed in

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

56

1   the Bankruptcy Court against Old GM, they have no claims

2   against New GM, and I fully expect -- and Judge Furman will

3   decide those issues.

4           MR. BASTA:  And, Your Honor, that is going to be our

5   position.

6           THE COURT:  I --

7           MR. BASTA:  Because I think that's what the law

8   provides, but what --

9           THE COURT:  But I can't --

10          MR. BASTA:  -- that -- what you --

11          THE COURT:  You're not arguing that I can have any

12  say in that, do you?

13          MR. BASTA:  I'm not arguing that --

14          THE COURT:  And their reservation of rights doesn't

15  do anything to do --

16          MR. BASTA:  Well, Your Honor, I'm trying to make a

17  more narrow point.  And the point that I'm making is, if you

18  look at the settlement construct, this is what happens.  Their

19  proposed order on the estimation says you're allowing -- you're

20  entering an order allowing for distribution purposes,

21  estimating for allowance and distribution, and in that you're

22  estimating based upon summary process that's been articulated

23  here.

24          When the actual distribution is made, all the work as

25  to whether or not the claim is what I'm going to call a real

57

1  claim, for example, if you look at the criteria on the

2  allocation methodology, which will define your actual

3  distribution, that -- it could be very different than what

4  happens in the --

5          THE COURT:  It's not likely though.  With personal

6  injury/wrongful death claims, I find it extremely unlikely that

7  that would occur because, like it or not, I think I'm forced to

8  go through whatever the summary criteria that are applied, you

9  know, determined to be applicable, what each personal

10 injury/wrongful death claim is worth.  It isn't going to be 660

11 full trials, but in a sense there are going to be summary --

12 you know, Mr. Basta, when I'm speaking, and you're up --

13         MR. BASTA:  I'm sorry --

14         THE COURT:  -- you shouldn't be conferring with your

15 co-counsel.

16         MR. BASTA:  I apologize, Your Honor.

17         THE COURT:  What's your next point?  You weren't

18 interested in what I had to say so I'm going to stop.

19         MR. BASTA:  Your Honor, I was listening to what

20 you've said.  I was trying --

21         THE COURT:  No, you did not.  You were -- it's rude

22 to the Court to do that.  Counsel do not do that in my

23 courtroom.  For future reference, be aware of that.

24         MR. BASTA:  Sorry, Your Honor.

25         THE COURT:  What's your next point?

58

1        MR. BASTA:  Your Honor, what I was trying to point

2  out is that in the criteria that they have in this later

3  allocation methodology --

4        THE COURT:  I haven't decided on an allocation

5  methodology.

6        MR. BASTA:  Okay.

7        MR. WEISFELNER:  Your Honor --

8        THE COURT:  You will be heard on that.

9        MR. WEISFELNER:  -- it occurs to me --

10       THE COURT:  No, Mr. Weisfelner, let me hear from

11  Mr. Basta.  Go ahead.

12       MR. BASTA:  So, Your Honor, let me outline a few

13  points that we -- the way we see the different elements of the

14  settlement working and why we don't think it should be

15  approved.  And I'm going to start with Rule 23, which Your

16  Honor again --

17       THE COURT:  And I think with respect to that, I'm

18  going to ask -- I'll let you make some summary comments on it,

19  but I am going to ask both sides to brief this issue because I

20  do view it as a gating issue, and I'm going to ask for

21  simultaneous briefs, and when we stop, you can agree on what's

22  a date for submitting those.  So -- but go ahead, if you want

23  to make some summary comments on it.  I understand -- I read

24  your -- I read that much of your papers to know, and it's been

25  an issue before you came into the case.  I understand that.

59

1  And, you know, I don't want to see $6 million spent on notice

2  without deciding that issue.

3          MR. BASTA:  Your Honor, this is why we think the

4  Rule 23 issue is so pervasive.  And for -- the first is it ties

5  to the contract, because the contract refers to the allowance

6  of claims --

7          THE COURT:  And provides for estimation of claims.

8          MR. BASTA:  Estimation of claims, and then the

9  question becomes, if you're going to estimate, what are you

10 estimating?  For it to estimate, it actually has to be a claim,

11 and a claim is not some amorphous concept.  And for a class

12 claim --

13         THE COURT:  If GM had given due process notice to

14 everybody whose vehicle was recalled, they could have scheduled

15 unliquidated claims for everybody who bought a vehicle with --

16 that was subject to a recall, and there would be no Rule 23.

17         MR. BASTA:  But they --

18         THE COURT:  The Court would be -- and they could ask

19 for an -- there's 11 million of those, or 9 and a half million

20 of those, and the Court should estimate the claims, and it

21 would take forever to resolve 11 million claims.  There would

22 be no Rule 23.

23         MR. BASTA:  Your Honor, if GM had -- if Old GM had

24 done that, and under penalty of perjury they had taken a

25 position on all of these claims and had a specific view as to

60

1    all of these claims, and then we had an ability to come in and

2    test the schedules and look at the person who scheduled the

3    claim and saw what was the basis for that claim, then that

4    could happen.  But in this case, and in many Rule 23 cases,

5    they haven't been scheduled by the debtor, and then the

6    question becomes you have this amorphous class of potential

7    claimants, and how are you going to --

8            THE COURT:  It's not amorphous.  There are 11 and a

9    half million people who bought cars that were subject to recall

10   where there was no disclosure of the defect.

11           MR. BASTA:  And how do we know which of those claims

12   have a commonality among them so that, with the purposes of

13   estimation, you can figure out what exactly you're estimating?

14   And Rule 23 is the constitutional way to figure out --

15           THE COURT:  Not in --

16           MR. BASTA:  -- the groupings.

17           THE COURT:  -- Bankruptcy Court.  Not in Bankruptcy

18   Court.  Because in a collective proceeding in bankruptcy, there

19   are other -- estimation is not an -- only single individual

20   claim, as when I've read the estimation of asbestos claims, for

21   example, it's not done necessarily on a claim-by-claim basis.

22           MR. BASTA:  And let me explain, I've been involved in

23   many of those cases, and why I think that's different than what

24   you have here.  There are cases where I'm trying to get a

25   company out of bankruptcy that's got a mass tort problem.  And

61

1  I need to create a plan, and I need to figure out how much I'm

2  going to reserve in the plan for those claims.  And in that

3  context, we can have competing experts and we can figure out,

4  in order to get that company out of bankruptcy, how much we're

5  going to put in that reserve.  And that would be an estimation

6  for reserve purposes.  But the contract doesn't provide for

7  that.  The contract provides that we need --

8          THE COURT:  I don't see the word, capital C, "Claims"

9  in the contract, only where proofs of claim have been filed.

10 Are those words a defined term in the contract?

11         MR. BASTA:  The word "claim," like only where proof

12 of claim --

13         THE COURT:  Yes.

14         MR. BASTA:  -- has been filed?

15         THE COURT:  Yes.  Is that in the contract?

16         MR. BASTA:  The word "claim" has before it the word

17 "allow," and before that --

18         THE COURT:  So if --

19         MR. BASTA:  -- an estimate.

20         THE COURT:  So if a claim had been scheduled --

21         MR. BASTA:  But it had not been --

22         THE COURT:  -- and no objection was made to it, it

23 would be deemed allowed.  It wouldn't -- no proof of claim

24 would be required.

25         MR. BASTA:  Unless it was scheduled as disputed.

62

1   But, Your Honor, I don't believe that in a case in which no

2   schedules have been filed and no proof of claim has been filed,

3   that Your Honor can treat it as a claim for the purposes of

4   estimation.

5           THE COURT:  Mr. Basta, let's -- here's what we're

6   going to do, because I'm going to order -- I want briefs on the

7   Rule 23 issue, whether that's required.

8           MR. BASTA:  We will comply with that.

9           THE COURT:  So go on to your next point.

10          MR. BASTA:  Mr. Weisfelner pointed out all the

11  discovery that's already occurred in the MDL.  A lot of the

12  discovery still has not occurred.  There have been no fact

13  sheets on pre-sale.  There's been no discovery on pre-sale

14  personal injury claimants.  And so Your Honor suggested that if

15  we get to that stage, we're going to have to work out the

16  estimation procedures.  We think that the estimation procedures

17  that they're proposing are so summary that what they reveal to

18  us is that they're trying to have the Court estimate claims

19  based upon really inadequate information and inadequate process

20  and then backfill all the really diligent work to determine

21  whether the claims really exist.

22          And we believe that if Your Honor is going to trigger

23  the adjustment shares, that the process that the Court has to

24  undertake to decide whether those thresholds have met need all

25  the work that's in the backfill part of what they're doing --

63

1  not all of it, but it really needs to be a detailed basis so

2  we're not in a situation where not -- where we're estimating

3  based upon what we believe to be unreal claims.  And so we will

4  get to that part.

5          Mr. Weisfelner talked about standing.  We think that

6  one ramification of this construct is that there's no adversary

7  if the standing rulings are sustained.

8          THE COURT:  I'm mindful of that, Mr. Basta, and --

9          MR. BASTA:  Yeah.

10         THE COURT:  Let me just -- I'll just stop there.  I'm

11  mindful of that.  I think -- I do have a question whether under

12  the side letter -- the effect that that has on -- at least as

13  to the GUC Trust decision, enter into a settlement to allow

14  claims not in a specific amount.  Because your -- because New

15  GM's economic interests are at stake on the additional

16  allocation shares, I agree that it will have standing -- full

17  standing at any estimation proceeding, subject to whatever

18  ground rules are set forth for the estimation.  I fully

19  contemplate you have the greatest interest in opposing the

20  estimation.

21         MR. BASTA:  I appreciate that, Your Honor.  And

22  just -- you know, just to -- I know you probably don't want to

23  hear more of this, but just one part about the construct I

24  wanted to point out, because it goes to when in the sequence

25  you're really allowing claims, is that at the settlement phase,

64

1   the GUC Trust is released.  It gets a full release.

2   Mr. Golden's clients go off into the sunset.  They no longer

3   have any beneficiaries to who they report.  There's no

4   obligation on them.  So whatever interest they have to actually

5   perform the function of saying this is a real claim and this is

6   not a real claim, they don't -- they're gone.  They don't have

7   any incentive, so -- and then --

8                THE COURT:  I'm not questioning --

9                MR. BASTA:  But then what --

10               THE COURT:  -- that new GM is the one to say this is

11  a --

12               MR. BASTA:  But --

13               THE COURT:  -- real claim, this isn't a real claim.

14               MR. BASTA:  But -- and just -- this is the point I'm

15  trying to get to in an inartful way.  When that's all done and

16  Your Honor has now issued the adjustment shares, there's a

17  switchback.  Because now that the asset is in the estate, all

18  of a sudden they spring to life and they've got a very

19  significant interest in which of them get the recovery and --

20               THE COURT:  Who's the "them"?

21               MR. BASTA:  Which of the signatory plaintiffs, the --

22               THE COURT:  Oh, sure.

23               MR. BASTA:  And so they have this whole process.

24  They say, for example, we're going to factor in whether a claim

25  is late filed in figuring out whether somebody gets a

65

distribution or not.  And so what's happening is if you have
like different phases -- we have the notice procedure phase and
then you have the settlement phase and then you have the
estimation.  And then this -- in this estimation, we like put
our blinders on.  There's nobody really incented to drill down
from the due process perspective as to what the actual claims
are.  Once Your Honor issues the share, then everybody's
economic interest comes up and says, well, your claim is not so
good, you're not going to get the full amount, and your claim
is late and you should have known, you got the recall, and you
have all of this.

          So what is happening is Your Honor's get -- being
given a snapshot at the estimation phase that is incomplete.
It's incomplete, and the reason --

          THE COURT:  Mr. Basta, there aren't going to be
11.5 million trials.  Okay?  Get real.

          MR. BASTA:  Yeah.  But I'm not suggesting that.

          THE COURT:  Get real.

          MR. BASTA:  What I'm suggesting is that --

          THE COURT:  Yes, you are.

          MR. BASTA:  I'm not --

          THE COURT:  You know, this is the same tune that New
GM has been singing throughout litigation since 2014 when
recalls were first disclosed.  Okay?  Change the tune.

          MR. BASTA:  The tune you're --

66

1          THE COURT:  I am determined that New GM will get due

2     process in any estimation proceeding.  It has the financial

3     stake in determining which are real claims, which are not.

4     I've encouraged not waiting and begin discussing and

5     negotiating what criteria will apply to economic loss claims,

6     what criteria will apply to personal injury/wrongful death

7     claims.  New GM will be very happy to have 660 personal injury

8     trials that take ten years.  That is not -- if the settlement

9     is approved, which I'm not assuring it will be, if the

10    settlement is approved, that's not what's going to happen,

11    Mr. Basta.  That's not what's required in an estimation

12    proceeding.

13          I will be sure, if it's approved, that the estimation

14    proceedings provide due process to New GM and an ability to

15    filter out claims that aren't real.  Okay?  But there aren't

16    going to be 660 personal injury trials.  There aren't going to

17    be 11 and a half million economic loss trials, and so that 20

18    years from now, several of successors of mine will have the

19    opportunity to go back and review it.  It has already been nine

20    years since the bankruptcy.  Okay?

21          MR. BASTA:  Your Honor, I'm not --

22          THE COURT:  Regrettably, the claims have gotten

23    pretty stale.  And for the personal injury and wrongful death

24    claimants, to the extent they do have valid claims for

25    pre-closing injuries and deaths, nine years have gone by and

67

1  they're not going to have to -- if the settlement's approved,

2  they're not going to wait another nine years to see what

3  happens.  So what you ought to be doing is trying to work out

4  criteria that protect New GM in the way it should be protected

5  and not in insisting on 11 and a half million economic loss

6  trials and 660 personal injury trials.

7         Any other points you want to raise?

8         MR. BASTA:  Yes, Your Honor.

9         THE COURT:  Go ahead.

10       MR. BASTA:  I was not intending to suggest that

11  11.4 million -- we were only intending to suggest that Rule 23

12  is the way to cull it.

13       THE COURT:  You didn't brief that.  Okay?

14       MR. BASTA:  Yeah.

15       THE COURT:  And I have --

16       MR. BASTA:  And we will do that.

17       THE COURT:  I have my questions about whether the

18  Rule 23 construct is the only one that can be applied in a

19  collective proceeding in bankruptcy.  But go ahead.  That's --

20  don't address that any further now.

21       MR. BASTA:  Okay.  Thank you, Your Honor.  One

22  second, Your Honor.  Can I consult with my colleagues?

23       THE COURT:  Go ahead.

24       MR. BASTA:  Yeah.

25    (Counsel confer)

68

1          MR. BASTA:  Your Honor, the sequence of events, the

2  way I understand it, is that Rule 23 will be a gating issue

3  before the notice goes out.  And then if the notice goes out,

4  then there will be a settlement hearing.

5          THE COURT:  That's correct.

6          MR. BASTA:  And there are other arguments in addition

7  to Rule 23 that we respectfully suggest are also gating items.

8  And so the question I have --

9          THE COURT:  Tell me what they are.

10          MR. BASTA:  Well, Your Honor, what I'd like to do

11  if --

12          THE COURT:  No.  Tell me what they are.  You say

13  there are other gating issues.  Tell me what they are.

14          MR. BASTA:  I think another big gating issue is

15  issuing releases pursuant to a 9019 that blocks people who

16  are -- from going after and enjoining them from going against

17  other assets.

18          THE COURT:  What's your standing to raise that issue?

19          MR. BASTA:  Your Honor, if --

20          THE COURT:  That's not a New GM issue, is it?

21          MR. BASTA:  I believe it is, Your Honor.

22          THE COURT:  Why?

23          MR. BASTA:  Well, we're the economic interest holder

24  and we're the one funding the plan.

25          THE COURT:  That's not a gating issue.  Next?  You

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

69

1  can take it up with -- you can -- if we get to the 9019

2  hearing, you'll take that one up then.  Okay?  I don't view it

3  as a gating issue.

4          Go ahead.  What's next?  What are the other gating

5  issues?

6          MR. BASTA:  Your Honor, we believe that the way --

7  without Rule 23 and the way this --

8          THE COURT:  You've raised Rule 23.

9          MR. BASTA:  No.

10         THE COURT:  How many times do I have to tell you no

11 more Rule 23 today?  You're going to brief it.  What other

12 gating issues other than the Rule 23 issue are there?

13         MR. BASTA:  There's a representational authority

14 issue, and the representational --

15         THE COURT:  You'll raise it at the 9019.  I don't

16 view it as a gating issue.

17         MR. BASTA:  All right.

18         THE COURT:  Not with -- if their construct works --

19         MR. BASTA:  Right.

20         THE COURT:  -- it's not an issue in my view.  If the

21 construct doesn't work, it's a different question.  Okay?

22         MR. BASTA:  Right.

23         THE COURT:  What's next?  Any other gating issues?

24         MR. BASTA:  Give me one second.

25     (Counsel confer)

70

 1              MR. BASTA:  No further -- nothing further, Your

 2    Honor.

 3              THE COURT:  Okay.  Ms. Going, briefly?

 4              MS. GOING:  Thank you, Your Honor.  Kristin Going on

 5    behalf of the GUC Trust.  Your Honor, I apologize, but you

 6    started speaking about the side letter after I had --

 7              THE COURT:  Yes.

 8              MS. GOING:  -- taken my turn, and so I wanted to

 9    raise something associated with that as one thing that we

10    believe is a gating issue.  And I know we've been talking about

11    it in terms of New GM's standing, and perhaps we should think

12    about it slightly different.  And I would maybe even

13    characterize it almost as a motion in limine to address, I

14    think, the issue that you were identifying, which is the impact

15    of the side letter and whether or not New GM has already agreed

16    that the GUC Trust has every right to seek an estimation of

17    claims whenever it wants.  And that's --

18              THE COURT:  It read that way.

19              MS. GOING:  I'm sorry?

20              THE COURT:  I said it read that way.

21              MS. GOING:  Yes.  That's right, Your Honor.  So that

22    is the gating issue that --

23              THE COURT:  It's not a gating issue.  Raise it at the

24    9019 stage.  Okay?

25              MS. GOING:  All right.  Thank you, Your Honor.

71

1          THE COURT:  All right.  Any other gating -- anything

2    else that you think is a gating issue?  I don't view that as a

3    gating issue.  You know, I pondered the side letter, and it

4    really reads like New GM has already appeared -- it left it in

5    the hands of the GUC Trust.

6          MS. GOING:  And, Your Honor, the only reason we

7    thought it was a gating issue was, because of the discovery

8    that they have intimated that they would be seeking of the GUC

9    Trust with regard to the settlement and, you know, whether or

10   not we exercised our obligations under the side letter.  But

11   they're obviously reading the side letter very selectively, so

12   we were trying to avoid getting into a discovery dispute,

13   but --

14         THE COURT:  Well, if there's a discovery dispute,

15   you'll raise it with me.

16         MS. GOING:  Okay.

17         THE COURT:  And I think everybody is aware with

18   respect to discovery disputes, the parties meet and confer and

19   try and resolve the issues.  If they can't, they arrange a

20   conference call with the Court -- very rarely people come in --

21   and I try and resolve it.  Usually it's a day or two -- within

22   a day or two after the discovery dispute, and I don't have

23   motions to compel or anything like that, I'll try and resolve

24   it very promptly.  At most I ask for letter briefs on it.  So

25   that's the cart before the horse.  Okay?

72

1          MS. GOING:  Absolutely.

2          THE COURT:  All right.

3          MS. GOING:  Thank you, Your Honor.

4          THE COURT:  Mr. Weisfelner, very briefly?

5          MR. WEISFELNER:  Judge, yeah, very quickly because I

6   wanted to address procedures.  While I'm not often inclined to

7   do this, I thought it might help the New GM side think through

8   these issues and help Your Honor --

9          THE COURT:  They may be skeptical that you're trying

10  to help them, but --

11         MR. WEISFELNER:  Your Honor, we all appreciate the

12  fact that there's a number somewhere between zero and 30

13  million shares that are at issue.  You can't get beyond

14  30 million shares.  As a consequence, it may behoove the

15  Plaintiffs, for example, to focus their attention first and

16  foremost on those claims that, to the extent possible, are not

17  susceptible of individuality or individual proof like, for

18  example, economic loss versus personal injury.  And we could

19  certainly sit down with New GM, if they were inclined, and talk

20  about what is it about anything Judge Furman's done, is about

21  to do, may do in the future, that ought to impact an estimation

22  of economic loss claims.

23         Your Honor, if and only if we haven't hit the

24  bull's-eye, you know, where you're in the carnival and you hit

25  it and the thing goes up and hits the bell, if you haven't hit

1  30 million shares by then, then you have to consider trotting

2  in personal injury/wrongful death claims and figure out a

3  methodology for how you start estimating those claims.

4          THE COURT:  Okay.  I think we're -- you know, your

5  suggestions are -- I'll use the word "intriguing" to me, but I

6  think what -- I come back to what I said before with respect to

7  the mediation issue.  I would strongly urge, first try and see

8  what you can agree on in terms of procedures, the order in

9  which things will go forward here -- you don't even need

10  mediation for that -- and then try and move forward with

11  mediation to the extent that makes sense and not wait for a

12  9019 approval hearing because it may change the dynamics of it.

13          In a lot of ways, it's what I said before.  I think

14  New GM fundamentally ought to be pleased that this provides a

15  mechanism, if it's approved by the Court, to resolve lots of

16  claims that would take years of litigation in two different

17  courts at least -- actually, a lot more courts than that -- to

18  resolve.  So really you really ought to be trying to do it

19  sooner rather than later.

20          Let me ask this so we can send you off to your

21  wedding, and with congratulations from the Court as well.

22          MR. WEISFELNER:  Thank you, sir.

23          THE COURT:  How much time do you all want?  I want

24  simultaneous briefs on this gating issue of whether Rule 23 has

25  to be applied to any proposed settlement presented to the Court

74

1  or whether the construct that the plaintiffs -- I'm not

2  articulating it very well, but I think you all get the clear

3  picture.  New GM's position is very clear.  At least the

4  written motions I think are clear as to what's being presented.

5  And so tell me how much time you want.

6          MR. WEISFELNER:  Your Honor, I would think, given

7  that we've --

8          THE COURT:  I saw somebody raising three fingers, but

9  I --

10         MR. WEISFELNER:  Yeah.  But, you know, those

11 people those people were wrong.  We think two weeks is more

12 than enough time.

13         THE COURT:  Don't you want to go on a honeymoon?

14         MR. WEISFELNER:  Not that.  It's just that, as Your

15 Honor indicated before, we've had a lot of people waiting a

16 long time.

17         THE COURT:  Yeah.

18         MR. WEISFELNER:  So I think two weeks to get briefing

19 on this since I think we've heard New GM's position.  This is

20 the fourth law firm that's articulated it, so I think we're

21 pretty clear on what their position is.

22         THE COURT:  How much time do you want, Mr. Basta?  Is

23 two weeks okay?  Two weeks and three days.  I don't want to

24 interfere with anybody's Memorial Day weekend.  Mr. Basta?

25         MR. BASTA:  That's fine.

75

1          THE COURT:  Okay.  All right.

2          MR. WEISFELNER:  The other thing I think we need to

3 work out -- not now, because I assume this means that the

4 June 4th hearing is going to be put off --

5          THE COURT:  Is going to be put off.  That's correct.

6          MR. WEISFELNER:  Right.  But I do want an

7 opportunity --

8          THE COURT:  That's why I wanted -- I apologize we had

9 to do this on the Friday of Memorial Day weekend, but I

10 couldn't do it earlier this week and I wanted to make sure we

11 got it before the --

12          MR. WEISFELNER:  I would like to work with Mr. Basta

13 and Mr. Steinberg, whoever needs to be part of the

14 conversation, to work out -- well, maybe we'll wait to get to

15 the 2004 -- the motion on notice, but I want to understand, you

16 know, what the timing issues are were Your Honor to direct them

17 to turn over the information we want --

18          THE COURT:  Yeah.

19          MR. WEISFELNER:  -- that isn't the subject of just

20 push a button and deliver it takes any time, and how much time

21 are we talking about.

22          THE COURT:  Okay.  For the briefs, I am adding three

23 days, so Tuesday, June 12th.

24          MR. BASTA:  Your Honor, one round of briefing, right?

25 No replies, right?

76

 1              THE COURT:  Correct.

 2              MR. BASTA:  Okay.  And then with respect to

 3  Mr. Weisfelner's comment about the timing, if the notice were

 4  to go out, we'll work with him --

 5              THE COURT:  Could you work --

 6              MR. BASTA:  -- and convey -- and compare notes.

 7              THE COURT:  I don't doubt that you'll be able to --

 8              MR. BASTA:  Right.

 9              THE COURT:  You may disagree, but I think you're

10  going to be able to come to --

11              MR. BASTA:  Right.

12              THE COURT:  -- an agreement about it.  Okay.  When I

13  see the briefs on the 12th, I'll decide whether I need to have

14  another hearing or not.  I probably won't set a hearing, but I

15  want to see the briefs first.  Okay.

16              Anything else for today?  All right.  So the hearing

17  on the notice motion is adjourned.  Everybody enjoy the holiday

18  weekend, but really then -- as soon as that's over, could you

19  really try and work out a schedule for things and really talk

20  about whether it's the personal injury/wrongful death -- those

21  classically work for medication.  I mean, you know -- and, yes,

22  and whether it's formal or informal, there's certain

23  information you're going to want to see.  You've got a lot of

24  experience with those cases before Judge Furman, and the

25  Plaintiffs have got a lot of experience with it as well.  You

77

1  want to be able to work out an agreement on what information

2  will be exchanged and when it will be exchanged and go forward.

3          And I'm going to write -- you know, whether you want

4  to use the mediator that Judge Furman has already approved -- I

5  guess he's a former district judge, I can't remember his

6  name -- or someone else, that's fine with me, but, you know,

7  I'll leave it to you to try and work it out.  Please let's try

8  and get these worked out.  And if it starts out with 660, if

9  you could settle half of them, that would be great.  Okay?  But

10 we're not going to -- there's not going to be 660 full-blown

11 trials here.  Okay?

12          Anything else for today?  All right.  We're

13 adjourned.  Everybody have a good holiday weekend.

14          MR. WEISFELNER:  Thank you, Judge.

15          MR. BASTA:  Thank you, Judge.

16      (Proceedings concluded at 11:56 a.m.)

17                          *  *  *  *  *

18

19

20

21

22

23

24

25

78

1          **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10 _____

11 ALICIA JARRETT, AAERT NO. 428     DATE:  May 29, 2018

12 ACCESS TRANSCRIPTS, LLC

13

14

15         **C E R T I F I C A T I O N**

16

17         I, Ilene Watson, court-approved transcriber, hereby

18 certify that the foregoing is a correct transcript from the

19 official electronic sound recording of the proceedings in the

20 above-entitled matter.

21

22

23 _____

24 ILENE WATSON, AAERT NO. 447     DATE:  May 29, 2018

25 ACCESS TRANSCRIPTS, LLC