UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
|  | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | (Jointly administered) |
| et al., f/k/a GENERAL | . |  |
| MOTORS CORP., et al, | . | One Bowling Green |
|  | . | New York, NY 10004 |
| Debtors. | . |  |
|  | . | Friday, May 25, 2018 |
| . . . . . . . . . . . . . . . | . | 10:05 a.m. |

TRANSCRIPT OF CASE MANAGEMENT CONFERENCE REGARDING PROPOSED
SETTLEMENT BETWEEN THE GUC TRUST AND SIGNATORY PLAINTIFFS
(RELATED DOCUMENT(S) 14292, 14294, 14293, 14298)
BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For General Motors LLC:    King & Spalding, LLP
                           By:  ARTHUR J. STEINBERG, ESQ.
                                SCOTT DAVIDSON, ESQ.
                           1185 Avenue of the Americas
                           New York, NY 10036
                           (212) 556-2158


For the GUC Trust:         Drinker, Biddle & Reath LLP
                           By:  KRISTIN K. GOING, ESQ.
                           1177 Avenue of the Americas
                           41st Floor
                           New York, New York 10036-2714
                           (212) 248-3140

APPEARANCES CONTINUED.


Audio Operator:            F. Ferguson, ECR


Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46038
                           (855) 873-2223
                           www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

For the Ignition Switch        Brown Rudnick LLP
Plaintiffs and Certain         By:  EDWARD S. WEISFELNER, ESQ.
Non-Ignition Switch                 JILL FORSTER, ESQ.
Plaintiffs:                    7 Times Square
                               New York, New York 10036
                               (212) 209-4917

                               Lieff, Cabraser, Heimann & Bernstein
                               By:  ELIZABETH J. CABRASER, ESQ.
                               275 Battery Street, 29th Floor
                               San Francisco, CA 94111-3339
                               (415) 956-1000


For Personal Injury            Goodwin Procter LLP
Accident Plaintiffs:           By:  WILLIAM P. WEINTRAUB, ESQ.
                               The New York Times Building
                               620 Eighth Avenue
                               New York, NY 10018-1405
                               (212) 813-8839


For Participating              Akin Gump Strauss Hauer & Feld LLP
Unitholders:                   By:  DANIEL GOLDEN, ESQ.
                               One Bryant Park
                               New York, NY 10036-6745
                               (212) 872-1000


For JPMorgan Chase             Wachtell, Lipton, Rosen & Katz
Bank, N.A.:                    By:  HAROLD S. NOVIKOFF, ESQ.
                               51 West 52nd Street
                               New York, NY 10019-6150
                               (212) 403-1000


For Certain Personal           Hilliard Munoz & Gonzales LLP
Injury/Death Plaintiffs:       By:  ROBERT HILLIARD, ESQ.
                               719 South Shoreline Boulevard #500
                               Corpus Christi, Texas  78401
                               (361) 882-1612


ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

3

```
APPEARANCES (Continued):

For New GM:                Paul, Weiss, Rifkind, Wharton &
                           Garrison LLP
                           By:  KYLE J. KIMPLER, ESQ.
                                AIDAN SYNNOTT, ESQ.
                                PAUL M. BASTA, ESQ.
                           1285 Avenue of the Americas
                           New York, NY 10019-6064
                           (212) 373-3023


TELEPHONIC APPEARANCES:

For the Ignition
Switch Plaintiffs:         Hagens Berman Sobol Shapiro LLP
                           By: STEVE W. BERMAN, ESQ.
                           1918 8th Avenue, Suite 3300
                           Seattle, Washington 98101
                           (206) 623-7292


For the Ignition Switch    Stutzman Bromberg Esserman & Plifka
plaintiffs and certain     By:  SANDER L. ESSERMAN, ESQ.
non-Ignition Switch        2323 Bryan Street, Suite 2200
plaintiffs:                Dallas, TX 75201-2689
                           (214) 969-4910

                           Brown Rudnick LLP
                           By:  HOWARD S. STEEL, ESQ.
                           7 Times Square
                           New York, New York 10036
                           (212) 209-4800


For Creditor, Additional   Andrews Myers, P.C.
Ignition Switch            By:  LISA M. NORMAN, ESQ.
Pre-Closing Accident       1885 Saint James Place, 15th Floor
Plaintiffs:                Houston, TX 77056
                           (713) 850-4245
```

4

1          (Proceedings commenced at 10:05 a.m.)

2          THE COURT:   -- 09-50026.  We're here in connection

3  with the order I entered scheduling the case management

4  conference regarding proposed settlement between the GUC Trust

5  and the signatory plaintiffs.  The scheduling order is ECF

6  Docket Number 14298.  I have the list of appearances in front

7  of me.

8          Obviously, in addition to entering the order

9  scheduling the case management conference, I entered a separate

10 order regarding the proposed settlement.  And that was entered

11 -- raising some questions, that was entered on May 10th.  In

12 response to that order, I received the May 22, 2018 letter from

13 Mr. Weisfelner, attaching a proposed amended settlement

14 agreement and notice procedures, and I've obviously received

15 several letters from New GM's counsel.

16         Mr. Basta, I guess this is your first appearance in

17 the case.  Is that right?

18         MR. BASTA:  Happy to be here, Your Honor.

19         THE COURT:  Were you involved at Weil when the case

20 was first filed?  Were you involved in GM?

21         MR. BASTA:  At Weil?

22         THE COURT:  Weren't you at Weil at some point?

23         MR. BASTA:  I was at Weil, and then I was at

24 Kirkland.  I think my involvement with GM at Weil had to do

25 with the spinoff --

1           THE COURT:  Were you there when GM filed?

2           MR. BASTA:  No, I was not.  I was at Kirkland at that

3  time.

4           THE COURT:  Okay.  All right.  Thank you.  Well,

5  welcome.

6           Before we get into the conference, I have some more

7  comments just generally I wanted to raise and maybe frame some

8  of the discussion today.  So obviously I scheduled today's

9  conference because it appeared likely to me that there are

10  fundamental disputes between the plaintiff and the GUC Trust on

11  the one hand and New GM on the other hand, whether the proposed

12  settlement construct is workable.  And I didn't want -- I do

13  not want to approve the notice procedure and have $6 million

14  spent on giving notice if the proposed settlement could not be

15  approved as a matter of law.

16          I entered the May 10, 2018 order raising questions

17  about the proposed settlement in part because of concerns

18  whether the settlement was illusory, and I will listen to what

19  counsel has to say today to address those concerns.  But it

20  does seem to me that the changes made in the proposed

21  settlement go a long way to addressing the concerns I expressed

22  in raising those questions.  And I want to explore today

23  whether there are any gating issues that the parties and the

24  Court should address before proceeding with notice.

25          So New GM, in its various filings so far, raises

1  important questions whether a settlement can be approved

2  without utilizing Rule 23.  And I'm not going to decide that

3  issue today, but I would like to hear the parties' views on

4  that issue.  I am inclined to order briefing on that issue

5  before approving a schedule for all three motions.

6          I also have questions about how many personal

7  injury/wrongful death claims have been filed and whether more

8  such claims are anticipated before the end of May.  If more

9  claims are filed, will those plaintiffs agree to proceed under

10 the terms of the proposed settlement?  I read in one of the

11 papers, and I don't remember whose paper it was, that more late

12 claims are expected to be filed by May 31.

13         So in thinking about the issue, whether the proposed

14 settlement construct can work without using Rule 23, let me ask

15 the following question:  Is what the settlement proposes any

16 different than a debtor scheduling claims of all purchasers of

17 vehicles that were subject to recalls and listing the amounts

18 of the claims as unliquidated?  If that was done, wouldn't that

19 avoid the Rule 23 issue?  There would be many millions of

20 unliquidated claims for which estimation under Section 502(c)

21 would appear to be a perfectly appropriate method for trying to

22 resolve the claims.

23         If -- I'll refer to them as the "recall claims."  If

24 the recall claims were scheduled as unliquidated and actual

25 notice was given to the claimants, wouldn't the claimants be

1    bound by the Court's estimation whether or not the claimants

2    appeared in the bankruptcy cases?  This issue of being able to

3    bind people who aren't here today, I don't see how that's any

4    different.  If proper notice is given, people are bound by what

5    happens in a bankruptcy case.

6            And I have a few other questions.  Well, I'll just

7    put them out there now.  They're sort of unrelated to what I've

8    asked so far, but first, with respect to the personal

9    injury/wrongful death claims.  What, if any, proof of causation

10   and damages would be required to estimate those claims?  Could

11   the Court estimate those claims without evidence of causation

12   and damages?  As part of a settlement, could the plaintiffs and

13   the GUC Trust agree on simplified criteria for the Court to

14   apply in determining causation and damages and estimating the

15   personal injury/wrongful death claims?  Would New GM have

16   standing to object to those criteria?  These are claims against

17   Old GM in the former GUC Trust, not against New GM.

18           Then, switching to the economic loss claims, in order

19   to estimate the economic loss claims in the aggregate, must the

20   parties and the Court apply the law of each state in which the

21   owners purchased cars?  For settlement purposes, can the

22   parties agree on one state's law or legal principles to apply

23   in an estimation proceeding?  With respect to determining

24   choice of law or applicable law, parties often stipulate to the

25   applicable law to apply.  Can the plaintiffs and the GUC Trust

1  agree on the principles on governing law by settlement?  Would

2  New GM have standing to object?

3        So those are the -- you know, in thinking some more

4  before today's hearing, those are some additional questions I

5  have.  It's my hope we're wrapping up no later than noon, so

6  this is not going to be a particularly -- I'm not -- we're not

7  going to go beyond then.  But I'd like to come out of today

8  with either directing briefing on gating issues, if I conclude

9  after listening to people that's the appropriate thing to do.

10       I also -- Mr. Basta, in your latest letter, you

11  complain about the schedule that the moving parties have

12  proposed for various things, discovery and other things, and my

13  reaction to that is you need to go and try and work out an

14  agreed schedule for all of those things.  I'm not going to pose

15  that schedule today.  The only question in my mind is, is the

16  start of that schedule going to await me getting some briefs on

17  gating issues or not.  But, you know, quibbling whether it's 10

18  or 20 days or 30 days for this, that, or the other thing, you

19  ought to be able to work that out, and maybe you've already sat

20  down and tried to hammer it out.  I'm not going, today, to go

21  through and throw darts and pick the number of days for the

22  various steps along the way.

23       Now, I know you also filed the stay motion, and the

24  plaintiffs and GUC Trust certainly can respond to that when or

25  if that motion is going to be heard.  And when I say "if," I

1  may decide it without a hearing, but if I have a hearing, when

2  that will be remains to be seen, as well.  I guess you did file

3  your objection to the notice -- the motion for the form of

4  notice.  I have that, so that's done.  I did want to see that.

5  I went -- I didn't read it.  I read it through very quickly.  I

6  didn't study it.  I think it's likely we're not going to go

7  forward with that notice procedure motion on the date that it's

8  been scheduled for, I think, but we'll come to that.  I do want

9  to hear the parties.

10          So, Ms. Going, do you want to start?

11          MS. GOING:  Sure.  Thank you, Your Honor.  Kristen

12  Going, Drinker, Biddle & Reath, on behalf of the GUC Trust.

13          Your Honor, I -- in light of your questions, I

14  thought I would dive right in, and I feel that I at least can

15  answer the first question that you posed.

16          THE COURT:  I'd better look at my questions again and

17  make sure I see which was first because I said a lot.

18          MS. GOING:  And this is something that we wanted to

19  raise with Your Honor anyway, and that is that nothing in

20  502(c) provides that the Court must estimate a proof of claim.

21  It actually contemplates that the Court estimate a claim, and

22  as you know, that is simply a right to payment.  I think if

23  you, in fact, look at 502(a) and contrast that language against

24  502(c), you will see that Congress, in fact, intended that

25  estimation would not be applied to proofs of claim, but it

1  would be applied to claims generally, whether or not a proof of

2  claim had actually been filed because you can see 502(a) says:

3  A claim or interest, proof of which has been filed under

4  Section 501 of this title.  So in 502(c), if the Congress had

5  intended that estimation -- that the Court's were obligated to

6  only estimate proofs of claim, it would have utilized that same

7  language.  And it's for that reason, Your Honor, we are asking

8  this Court to estimate the claims -- not the proofs of claims,

9  but the claims -- of the economic loss and the personal injury

10 plaintiffs.

11          THE COURT:  Okay.

12          MS. GOING:  I'm looking at your questions now.

13          And so picking up on that, that the settlement as you

14 know contemplates that notice is given to all possible personal

15 injury and economic loss plaintiffs because it's contemplated

16 that the notice would be given to all individuals that were

17 subject to the recalls that are part and parcel of the

18 settlement.  So they would receive notice.  They would have an

19 opportunity to come in and object to the settlement.  And then,

20 those claims are what we would be asking this Court to

21 estimate.  And we do believe that that would bind all of the

22 parties because of the broad notice that's being provided.

23          Unless you have any questions about that, I think I'm

24 going to cede the podium on your questions about causation and

25 damages.

11

1            THE COURT:  Well, let me just -- address specifically

2    why you believe it's unnecessary to certify classes under Rule

3    23 in order to proceed with this settlement.

4            MS. GOING:  Well, I think --

5            THE COURT:  Or if you want one of the other counsel

6    to address it, that's fine with me, too.  I don't know how you

7    decided to divide things up, but --

8            MS. GOING:  Sure.  Mr. Weisfelner's going to address

9    Rule 23 class certification specifically, but on that point,

10   the GUC Trust would just want to point out that we're a little

11   surprised that this issue is being raised now, and --

12           THE COURT:  But they raised it at the -- before you

13   came into the case, when I had the trial about whether the

14   original proposed settlement was binding or not, that certainly

15   was one of the main arguments that New GM made, that this

16   settlement could not be -- that settlement -- little different

17   -- couldn't be approved anyway because it didn't follow Rule --

18   didn't provide for class certification, essentially.

19           MS. GOING:  Right.

20           THE COURT:  So that's not a new issue in the case.

21           MS. GOING:  Well, Your Honor, I'm actually going back

22   farther.  And this is in the context of -- I think we can all

23   agree that New GM's goal here is delay.  And so my point is

24   when you entered your order to show cause back in December of

25   2016 and you identified the late claims process and

12

1    specifically said that issues regarding class certification

2    would be addressed at a later time and you asked parties to

3    object or raise issues with the schedule, they didn't raise it

4    then.  And so they've allowed this process to play out for 18

5    months.

6         THE COURT:  Well, we didn't go forward with that

7    threshold issue about late claims.  That got put on the back

8    burner, so it's not as if -- the Court has not resolved that

9    issue.

10        MS. GOING:  Okay.

11        THE COURT:  I mean, do you disagree?

12        MS. GOING:  I don't, but I think that if New GM's

13   position was always going to be you had to have a certified

14   class before you filed the proofs of claim, which seems to be

15   what they're saying today, they should have articulated that to

16   Your Honor.

17        THE COURT:  So why isn't it necessary -- or is Mr.

18   Weisfelner's the one --

19        MS. GOING:  Yes.

20        THE COURT:  -- who's going to -- I'll leave this to

21   Mr. Weisfelner.  Thank you very much, Ms. Going.

22        MS. GOING:  All right, thank you.

23        MR. WEISFELNER:  Good morning, Judge.

24        THE COURT:  Good morning.

25        MR. WEISFELNER:  I do want to take an opportunity to

13

 1   address each and every one of the concerns that Your Honor

 2   raised at the outset of this status conference.  If Your Honor

 3   will permit me a point of personal overview, I don't know if

 4   Your Honor shares the sense of irony we, on this side of the

 5   courtroom, feel about New GM placing itself in the position of

 6   being the champion of the rights of the plaintiffs, their

 7   victims.  They're stepping into the shoes to make sure that

 8   Your Honor is aware of what their rights are and how to best

 9   protect those rights.  And frankly, Your Honor, I find that

10   just a bit ironic.

11         Getting to your specific points, we're all familiar

12   with Your Honor's decisions in -- I think it was both MFG and

13   in the BCI case, where Your Honor, in a different context, had

14   settlements of class claims.  And I think, if I remember both

15   decisions, the classes there were certified for settlement

16   purposes, and the class certification was approved

17   preliminarily and then finally simultaneously with the

18   consideration of the settlement.  And we can see any number of

19   cases that predate and postdate Your Honor's own decisions,

20   WorldCom included, where the process is sort of in a two-step

21   stage.

22         I think Your Honor may be familiar with the

23   modifications to Rule 23, which now provide that, once adopted,

24   will provide that courts no longer need to go through this

25   two-step process of, first, preliminarily certifying a class in

14

 1  order to give them notice, and then finally certifying a class

 2  in connection with the ultimate settlement.  It's now pretty

 3  clear that it's contemplated that to the extent that a class

 4  needs to be certified at all for settlement purposes, it can be

 5  done at the same time as the settlement and notice, so long as

 6  it comports with the necessary notice -- best notice in a class

 7  context -- can go forward.  So it's a couple of important

 8  things, I think, to note.  And whether Your Honor wants this

 9  briefed or not, we're --

10          THE COURT:  That part, I don't need briefed.

11          MR. WEISFELNER:  Okay.  So what we have here is a

12  situation where --

13          THE COURT:  Well, let me ask.  Even with the proposed

14  amendments, the Court -- I would be very reluctant to order

15  $6 million to be spent for notice if what was being -- the

16  settlement that was being proposed, on its face, could not be

17  approved.  Okay.  I'm not making -- I don't contemplate making

18  ultimate determination until notice has been given to everybody

19  whether I can approve what you do.  But as a threshold issue,

20  it does seem to me, I don't want to see $6 million spent for

21  something that, you know, isn't going to work.

22          MR. WEISFELNER:  Understood.  And, Your Honor, again,

23  from the perspective of, quote, "whether a settlement works,"

24  putting aside some of the jurisdictional concerns and the due

25  process concerns, on the face of it, in terms of whether the

15

1  settlement reaches or meets or exceeds the criteria of 9019,

2  within the issues that are being settled, the GUC Trust takes

3  the position that you can satisfy the criteria for

4  certification of a class for settlement purposes.  Plaintiffs

5  take the position -- economic loss plaintiffs take the

6  position, of course, we can.  And we all know what the four

7  criteria are.

8         And, Your Honor, intended, as part of the settlement,

9  to brief you on why it is that if Rule 23 is applicable -- you

10  just heard Ms. Going indicate that from the perspective of the

11  GUC Trust, and we share her perspective, the analogy that Your

12  Honor gave was to, you know, schedule claims, small C, in an

13  unliquidated disputed amount that then get estimated, and

14  there's nothing about the constitutional documentation that

15  formed the GUC Trust that requires them to ask for an

16  estimation of claims only if they're part of a proof of claim

17  and only if that proof of claim -- if it's a class claim, first

18  get certified.  They're entitled to ask for estimation of

19  claims, lowercase C.

20         But more importantly, again, if you look at what the

21  standards are that the Court would be required to apply in a

22  Rule 23 setting, remembering that this is certification for

23  settlement purposes and not for trial purposes, the issues, the

24  criteria, quite frankly, the standards are easily met here.

25  And we intend to brief that and have Your Honor satisfy that to

16

1  the extent there are any open issues regarding certification

2  for settlement purposes, they've been more than met and as part

3  of your approval of the settlement could find that coextensive

4  with compliance with Rule 9019, we've got compliance to the

5  extent it's applicable with Rule 23 class certification for

6  settlement purposes.

7      THE COURT:  I didn't articulate this before, but the

8  Rule 23 issue raised the question in my mind about, you know,

9  in a (b)(3) class, there's a right to opt out, okay.  In

10 bankruptcy, there's no opt out on claims, and the court,

11 whether you show up or -- if you've gotten notice, the court

12 resolves it and it's binding.

13     MR. WEISFELNER:  Well, two things --

14     THE COURT:  There's no opt out.

15     MR. WEISFELNER:  -- two things to say about that.  I

16 agree completely that the bankruptcy context doesn't permit for

17 or deal with opt outs, but it does permit for people to show up

18 and respond to the notice and state their objections and have

19 their objections dealt with in whatever way is ultimately

20 appropriate.

21     THE COURT:  Let me just say, I mean, it's one of the

22 -- like what I've just said about the collective nature of a

23 bankruptcy proceeding and the preclusive binding effect of a

24 bankruptcy court order.  That's fundamentally different than

25 what Judge Furman is being asked to do in certifying a Rule 23

17

1    class.

2              MR. WEISFELNER:  For trial purposes.

3              THE COURT:  Yes.

4              MR. WEISFELNER:  Your Honor, more to the point, even

5    if one were to be boxed in to a narrow interpretation or the

6    procedural posture that this settlement is put in and view it

7    from the perspective of Rule 23 and the opt-out issue, let's

8    remember that this is the paradigm of a limited fund.  At the

9    end of the day, Your Honor could determine that the claims of

10   the plaintiffs, writ large, is worth $40 billion.  It doesn't

11   ultimately lead to any more than 30 million shares of New GM

12   stock being proffered as a true up to their purchase price.  So

13   it is a limited fund, and we think on application, if we were

14   required to comply with all of Rule 23 criteria and avoid the

15   opt out, it's because we have a limited fund.

16             THE COURT:  But the notice would look different,

17   though, Mr. Weisfelner.

18             MR. WEISFELNER:  The notice may very well look

19   different.  The other thing I want to emphasize here is that --

20   and as Your Honor may imagine, we had many, many, many hours of

21   discussion -- I won't say debate, but discussion among the

22   plaintiffs, the GUC Trust, both before they were adequately

23   represented and now that they're adequately represented, and

24   most importantly with the unitholders about Rule 23.  And the

25   concern we all had was a practical concern, that in a typical

18

1  Rule 23 context, even for settlement purposes, what you are

2  telling the beneficiaries of your activities, the members of

3  the classes, what this settlement means to you in dollars and

4  cents.  That, we can't do.  We don't have a res to point to and

5  say, this is the res that you're going to get to share, and

6  here's what we think your pro rata participation in that res is

7  going to mean by way of a check that gets cut in your name.

8          So for all those reasons --

9          THE COURT:  Wouldn't that be true in any limited fund

10 case, though?

11         MR. WEISFELNER:  Well, yes and no.  I mean, if we had

12 a limited fund and there was X numbers of dollars, there are Y

13 number of potential participants, and dividing it up, at a

14 minimum, you could say X over Y, subject to whatever criteria

15 gets you into the Y category.  Here, we have no idea what the X

16 is.  And as a consequence, it is virtually impossible to let

17 anybody know what it is you're going to receive but for the

18 following, which we think the notice has made clear.

19         In giving the waiver and the release, that's your

20 cause.  You get the benefit, if any, associated with an

21 estimation proceeding that results in the accordion being

22 triggered and some adjustment shares being available.  There

23 will then be a process, subject to court approval, where

24 everyone has a clear understanding of what they're going to get

25 out of that process.

19

1              So you have to waive.  You have to balance, rather.

2    On the one hand, you've got a little over $400 million worth of

3    GUC assets that are currently available.  You can make a claim

4    against the GUC assets.  You can attempt to overcome the

5    Pioneer factors, the waiver, the laches, whatever other

6    arguments the GUC Trust could and historically did raise with

7    regard to your entitlement to any portion of those funds.

8    Beyond that, you may have an ability, on your own dime, to go

9    chase the unitholder beneficiaries and seek a clawback of prior

10   distributions.

11             Or you can give a waiver under all these for the

12   opportunity to be part of an estimation procedure that gives

13   rise to adjustment shares that then potentially is a

14   billion-dollar recovery that's reserved for you and your

15   cohorts, as opposed to take a shot at 400 million, maybe have

16   to share it with the unitholders, maybe you get first dibs at

17   it, maybe you get the clawback.

18             And I think the notices in this case clearly point

19   out to everyone what their options are and afford them an

20   opportunity to show up, not once but twice.  Show up in

21   connection with the settlement -- three times.  Show up in

22   connection with the estimation, show up in connection with the

23   approval of what we refer to as the David Trott distribution

24   procedures by analogy to what some of us are more familiar with

25   in the asbestos arena.

20

1         The other thing I want to say about Rule 23, and I'll

2  do it quickly, and I think it bears emphasizing.  Throughout

3  GM's paperwork, in its effort to be the champion of the

4  victims, their own victims, we keep hearing that, judge, don't

5  knock yourself out.  Judge Furman is geared up to and is about

6  to make rulings on class certification.

7         THE COURT:  So I understand that the briefing isn't

8  even done until --

9         MR. WEISFELNER:  Well --

10        THE COURT:  -- October sometime.

11        MR. WEISFELNER:  Not only that, Your Honor, but let's

12 get real and let's be forthright and let's be transparent.

13 What's going on in front of Judge Furman is GM perfectly well

14 noticed its consideration of class certification on a

15 bellwether basis.  Unless I'm mistaken, there are three

16 jurisdictions that the Court is giving consideration to as part

17 of the bellwether briefing and the bellwether hearing that

18 takes place.  Frankly, we don't think they could possibly take

19 place before April of next year, forget about November of this

20 year.

21        Whatever determination the Court makes is, A, subject

22 to appeal by other party up to the Second Circuit.  Whether the

23 Second Circuit takes cert on those issues or not, those appeals

24 will take a long time.  But let's assume that everyone's

25 perfectly happy with the Court's decision on certification.  It

1  only applies to three bellwether cases.  We then have the

2  second part of the exercise, which by the way, we've seen this

3  movie before, where the parties then attempt to agree on

4  whether or not those determinations impact anything other than

5  those three bellwether jurisdictions, or whether or not you've

6  got to then consider the law of other jurisdictions for

7  certification purposes.

8         And when I say we've seen this movie before, we saw

9  this movie before in connection with the damages theory that

10  was being proffered by the plaintiffs that went to the economic

11  loss theory benefit of the bargain.  There were bellwether

12  cases.  The Court made its determination that in some

13  jurisdictions, manifestation is a pre-condition to benefit of

14  the bargain theory, said to the parties, now, go ahead and meet

15  and confer and see whether or not my ruling applies to any

16  other jurisdictions.

17         The plaintiffs, in good faith, said, you know what,

18  we think it does apply to at least another five, six, or seven

19  jurisdictions.  I can't remember.  GM said, doesn't apply to

20  any other jurisdiction, manifestation is a requirement in every

21  single jurisdiction.  And now, Judge Furman's going to have to

22  try that beyond the bellwether cases he established, my point

23  being that GM is disingenuous when it suggested --

24         THE COURT:  Mr. Weisfelner, your motions that I have

25  before me proceed with a construct for settlement that does not

22

1  require Rule 23 class certification.  That's what's pending

2  before me, and that's what I contemplate going ahead and

3  deciding.  And when I said at the outset that I contemplated

4  getting -- because I think that's -- it's raised as a gating

5  issue to at least preliminarily decide that issue before $6

6  million is spent giving notice.

7          If the issue was whether classes should be certified,

8  economic loss classes should be certified, and that issue is in

9  the process of being briefed in discovery or whatever before

10 Judge Furman, I'm strongly disinclined to try and jump the gun

11 and decide the issue before Judge Furman does.

12         New GM argues that those issues are before Judge

13 Furman, he's going to decide them.  Judge Furman and I had a

14 brief telephone conversation this week.  We did not discuss the

15 merits of any -- and we have -- in any of the prior discussions

16 we've had, we have not discussed the merits.  He knows that

17 this hearing is going forward today.  I believe one of his law

18 clerks was going to have the opportunity to listen in.  Whether

19 she's there or not, I don't know.  He decides what he has to

20 decide.  I'll decide what I have to decide.  I want to be

21 careful not to take and decide any issues that he has before

22 him.  You may not like the schedule by which it's being done.

23 He's got massive cases, and he's been proceeding in a very

24 orderly fashion.

25         But when I took your -- the three motions, say, as we

23

1 don't believe that Rule 23 class certification is required.

2 That's not the construct by which -- you may be able -- if you

3 had to, you may be able to satisfy the Rule 23 requirements

4 through -- this will be for settlement purposes, not for trial.

5 Those issues would be different than what Judge Furman is being

6 asked to decide; class certification for trial.  Okay.  But at

7 least on the pleadings that I have before me, that's not the

8 direction -- that's not the structure of the settlement that's

9 been negotiated.  Okay.

10          So in terms of will I go ahead and decide these

11 issues that are raised by your motions, I want to see -- you

12 know, with respect to the form of the notice, I started to read

13 New GM's brief, but it fundamentally raised the Rule 23 issue.

14 You know, in terms of who are you going to give notice to, the

15 postcard procedure, all that, I don't have a problem with that.

16 You know, I'm not deciding it today, but fundamentally, with

17 11.4 million people or something, I don't have a problem with

18 it.  Okay.

19          MR. WEISFELNER:  Let me move on and address -- I'm

20 going to skip over your question about causation of damages

21 because I think that's more directed towards personal injury.

22          THE COURT:  Sure.

23          MR. WEISFELNER:  But I do want to address your

24 concern about whether or not, in performing an estimate, Your

25 Honor has to give consideration to state-by-state analysis,

24

 1  choice of law issues, that sort of thing.

 2          THE COURT:  And I've read Judge Furman's decisions,

 3  you know, deciding on -- for those states that he has decided.

 4  One, I read the -- his decision on reconsideration as to New

 5  York.  And so, you know, I'm generally familiar with it.

 6          MR. WEISFELNER:  Sure.

 7          THE COURT:  But for settlement purposes, I don't

 8  know.  What is it you're contemplating?

 9          MR. WEISFELNER:  Well, I'll tell you -- I'll give you

10  an example of where, you know, I would suspect it might be

11  relevant to Your Honor.  So we've got, a rough estimate,

12  11.4 million cars at issue.  Now, if one were to back out of

13  11.4 million cars, cars that were sold in jurisdictions where

14  manifestation is a precondition -- don't hold me to the exact

15  numbers, but I think we're down to -- instead of 11.4 million

16  cars, we're down to nine-and-a-half-million cars.  Well, I can

17  imagine that as part of the trial on what an appropriate

18  estimation would be, it would be overreach for the plaintiffs

19  to ask you to apply an estimation to 11.4 million cars as

20  opposed to nine and a half million cars.

21          Likewise, any other rulings that have been issued by

22  Judge Furman that has an impact on damages or damage theories,

23  state by state or otherwise, are going to be built into the

24  estimation proffer that we give you.  And if we're stupid

25  enough not to do that, I would assume someone withstanding is

1  going to point out those defects.

2          So generally speaking, we don't think that an

3  estimation hearing, given the law of estimation, which is very

4  much akin to the standards of the courts to apply in a 9019 --

5  you're estimating, you're not trying these cases -- that we

6  will gear ourselves towards an appropriate presentation on the

7  appropriate estimation with consideration -- due consideration

8  given to everything that Judge Furman has done to date.

9          The other thing I want to point out, because I think

10  it's reflective, going back again for a second to the Rule 23

11  9019 debate.  We need to understand, as I'm sure Your Honor

12  does, the difference between the case that's pending in front

13  of Judge Furman and the bankruptcy issues that are presented to

14  Your Honor through the three pending motions.  The three

15  pending motions deal with claims that could've been asserted

16  against the debtor in possession.

17          By and large, with one exception, the claims that are

18  pending in front of Judge Furman are so-called "independent

19  claims" asserting independent liability of New GM relating to

20  cars that were sold after the sale date in this case.  Now, the

21  one exception is successor liability, and successor liability

22  is, for lack of a better term, up in the air in front of the

23  district court.  Some preliminary rulings, whether they apply

24  across the board, whether they're going to be reconsidered is

25  up for grabs

26

1          THE COURT:  That's not an issue for me.

2          MR. WEISFELNER:  Okay.  Because I think, again, it's

3  an issue, if any, as to what, if any, credit New GM may be

4  entitled to in front of the district court.

5          THE COURT:  And that's for Judge Furman to decide.

6  Not for me.

7          MR. WEISFELNER:  As far as the scheduling of

8  discovery, Your Honor, we are more than happy to sit down with

9  General Motors and the other parties on the plaintiffs' side

10  and try and work out discovery.

11          But I think in that context, Your Honor ought to be

12  aware of just a couple of salient facts.  It's not as if

13  there's been no discovery.  In fact, there's been fulsome

14  discovery, albeit at the MDL level.  As of mid-March, the

15  parties have conducted 643 depositions:  There have been 361

16  depositions of plaintiffs and other case-specific witnesses,

17  especially in the injury and wrongful death actions; 102

18  depositions of current or former GM employees; 84 expert

19  depositions; 96 depositions of named plaintiffs in the economic

20  loss aspect of the case.

21          GM has produced about four million documents,

22  23 million pages.  And I don't have a figure for how much

23  documents and pages we've submitted.  But all plaintiffs have

24  likewise completed and turned over to GM fact sheets and

25  produced documents.  So I think that's going to be relevant

1  when the parties sit down and attempt to work out a schedule

2  for discovery and depositions and fact discovery and expert

3  discovery.

4           THE COURT:  I'm assuming that the parties will agree

5  that any depositions that have been taken in the MDL can be

6  used here.

7           MR. WEISFELNER:  The other, and I think final comment

8  unless Your Honor has any other questions for me, is with

9  regard to the -- that aspect of the notice motion that asked

10 New GM to turn over information.  And I'm not sure --

11          THE COURT:  Their latest objection was to how many

12 days you were giving them to turn it over.

13          MR. WEISFELNER:  And again --

14          THE COURT:  You're going to work that out.

15          MR. WEISFELNER:  We will do our best to work that

16 out.

17          THE COURT:  You're going to work it out.

18          MR. WEISFELNER:  It seems to me that there are -- it

19 seems to me that there are three areas of information that

20 we're looking for.  On either end of the spectrum, give us the

21 names, addresses, and identifying information with regard to

22 original vehicle purchases.  As far as I can tell from review

23 of the applicable federal law in this area, that's a

24 "push-a-button exercise."  You're obligated to maintain those

25 records.

28

1          THE COURT:  I read the briefs on that.

2          MR. WEISFELNER:  Okay.

3          THE COURT:  So I understand that.

4          MR. WEISFELNER:  The only --

5          THE COURT:  I didn't see any argument from New GM

6    that they don't have the information.  What about used car

7    purchases?

8          MR. WEISFELNER:  Well, that was the middle part of

9    the two ends of the spectrum.  So they have to have the

10   information regarding car purchasers.  They have to have the

11   information regarding who they send their recall notices to.

12   The only thing that's left is, in the middle, to the extent the

13   car's changed hands, which information, we understand from our

14   experts, is available, although potentially at a price through

15   services such as Polk, and how long it would take to get that

16   information and de-duplicate the stuff so people aren't getting

17   massive numbers of the same notice.

18         THE COURT:  I'm assuming that with pre-2009 cars,

19   most of them have been sold, have been turned over.

20         MR. WEISFELNER:  Yeah.  But again, we're talking

21   about 2014 being the recall.

22         THE COURT:  Yeah.  I don't know what happens when,

23   you know, somebody trades a car, whether GM -- and if they

24   trade it for a new GM car, whether the dealer who took the

25   trade would have the records, and whether -- therefore GM --

1  New GM would have the records of who traded their vehicle and

2  purchased a new --

3        MR. WEISFELNER:  What I'm advised is those records

4  are, in fact, maintained.  They're maintained for a purpose.

5  And that is, should there ever be a subsequent recall you have

6  to know where the car is today as opposed to who originally

7  sold it.  You have to know where the car is today.

8        The automobile manufacturers, unlike with regard to

9  original purchases or who you gave recall notices to, don't

10 necessarily have to maintain the records of the stuff that

11 transpired in between.  But it is available through a service.

12 GM, you know, uses that vendor, has used that vendor in the

13 past to do the recall notices.  But in any event, we will

14 attempt to work it out as best we can with the parties.

15       But I just want to make sure that Your Honor doesn't

16 get sidetracked on this used car issue.  Understand that the

17 theory of liability that we will attempt to establish in

18 connection with the estimation is with regard to the number of

19 vehicles at issue, regardless of the number of owners, so that

20 if the 11.4 million cars has now been reduced to nine and a

21 half million cars by virtue of the manifestation rulings, it's

22 those nine million cars that the damage experts, you know, will

23 attempt to convince Your Honor is equal to X number of dollars

24 of claims.

25       THE COURT:  Are there still additional states as to

30

1    which Judge Furman has motions still pending or scheduled to be

2    filed dealing with the manifestation issue?

3            MR. WEISFELNER:  Absolutely.  Again, the current

4    state of affairs is -- I think the parties have only agreed and

5    -- again I apologize, and I don't want to be held to these

6    numbers.  I think the parties have -- we have conceded, and/or

7    the judge has ruled that there's a grand total of, I think it's

8    seven jurisdictions where manifestation is a prerequisite to

9    benefit-of-the-bargain damages.  The parties have been unable

10   to agree on the application of manifestation as a prerequisite

11   in anything other than those seven jurisdictions.  And the

12   party keeps on going.

13           THE COURT:  Well, let me ask -- can the parties here

14   in bankruptcy court, in the context of the 9019 and an

15   estimation procedure, agree as to what rules should apply as to

16   -- that should be applied to determine economic loss claims,

17   where the car -- whatever state the car is.  I don't know.

18           MR. WEISFELNER:  Well, Your Honor, we can certainly

19   put forward, and do intend to put forward as part of our

20   briefing on the estimation itself, just what it is Your Honor's

21   being asked to estimate, and what elements of our claims we

22   think have survived Judge Furman's rulings to date, and

23   therefore ought to be part of your calculation on estimation.

24           I'll give you one bad example because, again, I'm not

25   the expert on damages on our side.  But let's take a

31

1  jurisdiction where Judge Furman has ruled that manifestation's

2  a prerequisite to finding economic loss.  Okay.  That's the law

3  as determined by Judge Furman, subject to any appeals that

4  economic loss side may tend to take.  Let's say that state was

5  Michigan, just to pick a state.  Well, that still doesn't

6  prevent a calculation or an estimation of damages that includes

7  a Michigan resident who in point of fact does have

8  manifestation.

9        So all of these factors will be taken into

10 consideration when it comes time for our side to prove up just

11 how high of an estimate we think Your Honor ought to be giving

12 us.  And, Your Honor, unless you have any other questions --

13       THE COURT:  I'm looking back to see whether I have

14 any questions for you, Mr. Weisfelner.  No, that's fine.  Let

15 me hear from -- Mr. Hilliard, are you going to -- who's going

16 to address the personal injury/wrongful death?

17       MR. WEISFELNER:  Thank you, Judge.

18       THE COURT:  Thank you very much.

19       MR. HILLIARD:  Good morning, Your Honor.

20 Bob Hilliard.  With the Court's permission, just --

21       THE COURT:  I was going to allow you to appear by

22 telephone so you didn't have to come from Memorial Day weekend

23 here, but, you know --

24       MR. HILLIARD:  I appreciate that, but I'll tell you

25 why I'm here in just a minute.  It's not for Mr. Weisfelner's

1  wedding.  But on a personal note, I want to just congratulate

2  him on the record.  We've become friends since we've started

3  this process, and I know the bankruptcy community's tightly

4  knit.  And it's quite remarkable to me that he's spending the

5  morning with you and then the evening with his new bride.

6          Judge, I think I want to address what you've asked.

7  But first, when you sent your order out asking for

8  clarification, we took it very seriously because as you know,

9  and as I've tried to make clear, and I think the Court

10  appreciates and respects, this could be the only mechanism by

11  which people who were hurt or killed ever get value for their

12  loss.

13          And so you said I could appear by phone, but because

14  of the Court's order, we met last night.  Because we had no

15  hard line in the sand about how to do this.  We just want to

16  make it non-illusory.  We want to make sure that this

17  settlement works.

18          THE COURT:  Look, I'm all in favor of settlement.  I

19  ask the questions because when I read -- several times I read

20  the proposed settlement.  I obviously had questions.  I was

21  concerned that, well, what are you really accomplishing if

22  you've got to wait five or six, seven years before anybody gets

23  anything?

24          MR. HILLIARD:  Absolutely.  And your questions were

25  taken to heart, and we've hopefully addressed as many as we

33

1  can, and we're still willing to continue to make sure that this

2  settlement does --

3       THE COURT:  Are there going to be more personal

4  injury/wrongful death claims this week?

5       MR. HILLIARD:  So I have a bet with Mr. Golden about

6  that.  I don't think so, Judge.  I think that you have the

7  universe of personal injury/wrongful death, and here's why.  So

8  the earliest an accident could've happened is June '09, the

9  earliest.  And then it goes back another 14 or 15 years, and

10 they've yet to appear in any related action because General

11 Motors reports to Judge Furman about all state court related

12 actions.  They have yet to appear in front of Your Honor.

13      And perhaps if notice does go out to every customer

14 that had a vehicle, they might remember that there was an

15 accident.  And GUC's intent is to buy its full peace, which I

16 appreciate, but I'm not sure that there is much more peace to

17 buy, except for those that are here.

18      THE COURT:  How many personal injury/wrongful death

19 claims, late claims are now filed here, or believed to file

20 late claims?

21      MR. HILLIARD:  Right.  We have approximately 200.

22 One is the core recall group, and the other is the second

23 recall group that GUC is going to include in the settlement

24 that Mr. Weintraub's going to address in particular in just a

25 minute.  There's a group out -- another group out of Texas, I

34

1  think, that has 400.

2         So I believe -- unless for strategic reasons some

3  other law firm has been holding onto their cases and have never

4  made an appearance despite the Court's notice of deadline for

5  late filing, I don't think we're going to see many more.

6         But to one of the questions you asked in regards to

7  damages and causation, I was trying to, as a practical matter,

8  go through in my head, how will that hearing occur.  If we have

9  families who were killed, does the Court expect -- and I hope

10 I'm not presumptive, but I don't believe the Court would expect

11 that we would have testimony every single -- in every single

12 case.  But I believe that there would be a way to develop a

13 protocol of the injury or death, the medical costs, the loss,

14 the beneficiaries, some comments about, you know, the mental

15 anguish and the soft side of the damages, and present those to

16 the Court for every case on the damage side.

17         THE COURT:  Is it 200 or 600 cases?  You said --

18         MR. HILLIARD:  So my firm and my co-counsel's firm

19 has approximately 200.

20         THE COURT:  Okay.

21         MR. HILLIARD:  There's another firm that I do not

22 represent, I think that's on the line, that has approximately

23 400.

24         THE COURT:  Okay.

25         MR. HILLIARD:  And -- but that firm represents the

 1  universe --

 2          THE COURT:  So let me ask this.  And they can speak

 3  for themselves, but I have this new proposed settlement.  I say

 4  new because you modified it after I issued your questions.  And

 5  so are the lawyers on behalf of 600 plaintiffs in agreement

 6  with the proposed settlement that I now have before me?

 7          MR. HILLIARD:  And I believe that every one of the

 8  particular and individual clients have signed off on it as

 9  well, yes.

10          THE COURT:  Okay.  So -- because -- you know, they're

11  arguably consenting to give up very substantial rights to a

12  jury trial and -- substantial rights.  And they're expressing

13  their willingness to throw in their lot with what this court

14  decides, subject to appeal.  I'm not -- you know, no -- I'm not

15  suggesting that anybody should give that up, okay.  But that's

16  -- you know, it's substantial rights, and I just wanted to be

17  reasonably clear that -- I didn't realize it was 600.  In the

18  back of my head was the 200.  But -- so it's 600.  There are

19  600 plaintiffs with personal injury/wrongful death claims who

20  are in agreement to go forward on the basis set forth in the

21  most recent draft of the proposed settlement?

22          MR. HILLIARD:  I will speak specifically to

23  Bob Hilliard and Tom Henry's docket of the 200.  Each one of

24  the clients has agreed in writing to go forward, understanding

25  both the risk and what they're giving up.  I believe Ms. Lisa

36

1  Norman, who's on the phone, and who has participated with his

2  in this process, I believe what she will tell the Court is the

3  same thing, but I'll let her speak for herself if the Court --

4          THE COURT:  Ms. Norman, go ahead and identify

5  yourself for the record, and then let me hear from you.

6          MS. NORMAN:  Yes.  Thank you, Your Honor.

7  Lisa Norman.  I represent approximately -- well, exactly 352

8  personal injury and wrongful death plaintiffs that have late

9  claims and motions pending because the Court, and who have

10  agreed to and are part of the settlement -- proposed settlement

11  agreement that's been submitted.  The list of all of our

12  plaintiffs is attached thereto.

13          THE COURT:  All right.  Thank you.  Anything else you

14  want to tell me, Ms. Norman, while you're speaking?

15          MS. NORMAN:  Nothing further at this time, unless you

16  have any questions for me, Your Honor.

17          THE COURT:  So on this issue of the agreement -- so

18  there's an agreement, as I understand it, between the personal

19  injury/wrongful death plaintiffs and the GUC Trust that -- to

20  consent to the Court estimating their claims for approval and

21  allowance and distribution.

22          MR. HILLIARD:  Correct.

23          THE COURT:  Okay.  And -- give me a second.  So 28

24  U.S.C. 157(b)(2)(B), which has the language about estimation,

25  not personal injured/wrongful death claims, the -- one of the

37

1   things that I'm trying to reconcile, 157(b)(5), which provides

2   that the district court shall order that personal injury, tort,

3   and wrongful death claims shall be tried in the district court,

4   et cetera -- so one of the little-observed aspects of Stern v.

5   Marshall is the statement by the chief justice that 157(b)(5)

6   is not jurisdictional.  In Stern v. Marshall, it arose in the

7   context of the defamation claim asserted by Marshall.  Then the

8   Court said, we don't have to decide whether it's personal

9   injury or wrongful death because he -- through his conduct in

10  the bankruptcy court, he consented, and 157(b)(5) is not

11  jurisdictional.

12          So I take from that, that if the personal

13  injury/wrongful death plaintiffs and the GUC Trust consent to

14  the procedure, if the Court approves the settlement and the

15  estimation procedure, that I have the authority to do that.  If

16  you disagree, tell me, but --

17          MR. HILLIARD:  It seems that would be the

18  distinction, Judge.  As you were reading that, though, I

19  confess, I'm not specifically familiar with the rule you found,

20  but I will tell you that by agreement -- and my response was

21  going to be, by agreement we have decided to come to you an

22  deliver these plaintiffs and their claims to be estimated.

23          THE COURT:  Okay.  So if any of the bankruptcy

24  lawyers want to be heard on that point, I'm certainly prepared

25  to hear them on it.  But that was -- you know, I was concerned

1    about this issue of what the Court's authority was, and that

2    was one of the concerns I had in reading the original

3    settlement, because they were -- all the plaintiffs were

4    reserving their right to go to the district court, which they

5    had the right.

6              Go ahead, Ms. Going.

7              MS. GOING:  And so just to --

8              THE COURT:  Just identify yourself for the record.

9              MS. GOING:  Kristen Going, Drinker, Biddle & Reath,

10   on behalf of the GUC Trust.  And just to clarify, Your Honor,

11   so between Mr. Hilliard and Ms. Norman, they're both

12   signatories to the amended settlement agreement.  And one of

13   the things that the GUC Trust required from the signatory

14   personal injury plaintiff firms was an affidavit from counsel

15   delineating that their clients had, in fact, affirmatively

16   consented to the terms of the settlement agreement, and that

17   affidavit included a list of all of the personal injury

18   plaintiffs.

19             So I can tell you that we have, you know, that full

20   volume of -- and universe of numbers.  And so we do believe

21   that that is the universe of personal injury/wrongful death

22   plaintiffs, and that they have, in fact, consented to give up

23   their jury trial rights.

24             THE COURT:  Okay.  Not only have they consented to

25   give up their jury trial rights, but to have the bankruptcy

39

 1  court, as opposed to a district --

 2          MS. GOING:   Estimate.

 3          THE COURT:   -- court make the determination.

 4          MS. GOING:   That's correct.

 5          THE COURT:   Okay.

 6          MR. WEISFELNER:   Your Honor, it occurs to me -- and I

 7  don't want to take up too much more of your time.   There were

 8  two other issues --

 9          THE COURT:   Just identify yourself for the record.

10          MR. WEISFELNER:   Certainly.   I apologize.   It's

11  Ed Weisfelner, Brown Rudnick, for the economic loss plaintiffs.

12          Your Honor, there were two other questions that were

13  raised, one of which was raised in your May 10th letter, that I

14  thought important to address.   And Your Honor asked the

15  question as to whether or not mediation would be appropriate.

16          THE COURT:   Because in one of my conversations with

17  Judge Furman, he gave me the two order numbers where mediation

18  had been --

19          MR. WEISFELNER:   Sure.   And, Your Honor, we did get

20  what I perceived to be New GM's position on this in one of the

21  letters Mr. Basta sent to you.   And that is that -- and it's

22  consistent with the position New GM has taken in mediation

23  under Judge Furman's auspices that New GM takes the position

24  that mediation with economic loss plaintiffs would be -- I

25  forgot the terminology -- un-useful, unwarranted, they're not

40

1  prepared to do it until and unless three things happen:  Their

2  final determinations of class certification, which we think

3  would take until June of next year, if not longer.  There are

4  final determinations with regard to <u>Daubert</u> challenges, which

5  could take quite a while, especially since Judge Furman

6  indicated in his last status conference in March that he may

7  want to hire his own expert; and then there was a third

8  condition.  I don't know that I'm -- oh, their summary judgment

9  they're eventually going to file.

10        So what GM is saying is mediation, sure.  Not now.

11 And what we've said with regard to mediation is we've always

12 been happy to mediate in the district court level, at this

13 court's level.  Don't see how we're going to get anywhere given

14 New GM's position that they're not prepared to mediate with us.

15        THE COURT:  Well, let me put it this -- and I'll hear

16 what Mr. Basta has to say about mediation.  A couple of general

17 comments.  I would've thought that New GM would frankly be

18 enthusiastic about resolving all claims or potential claims for

19 pre-closing accident plaintiffs and economic loss plaintiffs,

20 and would probably, no doubt, negotiate very hard about the

21 terms of -- you know, this term of the settlement, that term of

22 the settlement, what the criteria are for estimation versus

23 what the plaintiffs want.  I would fully expect that.

24 But from the day you presented the first proposed settlement,

25 the approach of New GM is not now, never, never with

41

1  exclamation marks at each point in the process.  If it takes

2  ten years, so it takes ten years.  We'll see whether the

3  Plaintiffs can last that long.

4        So, you know, they're entitled to that position if

5  they want to take it.  But I'm surprised by it, that the

6  bankruptcy is a collective proceeding.  This is not of New GM's

7  making.  It was -- you know, Judge Gerber found a due process

8  violation and the Second Circuit found a due process violation.

9  The consequences of it were established by the Second Circuit.

10  Yes, there are recalls that are a part of -- that here has been

11  acknowledged and was going acknowledged at the last hearing,

12  that there has never been a determination, and it's being

13  proposed to be settled as to whether there was a due process

14  violation as to certain of the recall, subsequent -- very soon

15  thereafter recalls.

16        Okay.  All right.  Settlement, that's what

17  settlement, you know, to resolve those issues.  So yeah, I'm

18  surprised, okay?  But if -- and I'll say this, if -- I would

19  urge New GM, as we go forward with this process here, to

20  discuss mediation sooner rather than later.  I can tell you, if

21  I approve the 9019, they're going to mediate.  Okay?  The

22  question is are they going to mediate before then?  I won't

23  order it before then.  I will order it -- if I approve the

24  notice and the 9019, they will mediate.

25        MR. WEISFELNER:  Your Honor, the last --

42

```
 1          THE COURT:  And they'll mediate in good faith.  I
 2   don't have any doubt about that.  If they go to mediation, but
 3   why they want to wait for that -- okay.  That's -- I'm not
 4   going to force mediation before that.  I will force mediation
 5   if we get -- if notice goes out, and I approve the 9019 before
 6   we get to an estimation proceeding.  They've settled so many
 7   claims in the District Court, I guess some without mediation,
 8   some with mediation, okay, those may be the personal
 9   injury/wrongful death claims, okay, and here we're dealing with
10   the alleged millions of recalls, economic loss claims.
11          Okay.  I understand, different -- presents different
12   issues.  That's my little speech on this point.  It's not going
13   to affect how I decide on any of the issues, Mr. Basta, but
14   that's, you know -- go ahead, Mr. Weisfelner.
15          MR. WEISFELNER:  The last thing I wanted to comment
16   on was the question of New GM's standing.  And, you know, it
17   can be viewed at very many different stages with, you know,
18   some slicing and dicing within those stages.  I am ultimately
19   struck by the way the standing issues were handled by this
20   Court when we were dealing with the enforceability of the prior
21   settlement agreement, and frankly Your Honor handled it the way
22   we were hoping you would handle it.  We didn't want to just --
23          THE COURT:  You mean I got something right here?
24          MR. WEISFELNER:  You got more than something right.
25   We didn't want to hand New GM another appellate issue that
```

43

1  would hold up the ultimate determination on the merits, nor did

2  we want standing to serve in the same capacity.  So ultimately,

3  you know, we're sitting here with the realization that standing

4  issues ought to be resolved at the end and afford the people

5  the opportunity to participate.  And I guess the operative word

6  would be "up to a point."

7           Again the irony of having New GM step into the shoes

8  of the champion of the unwashed masses and making sure that the

9  rights of the Plaintiffs are properly protected both

10 procedurally and substantively makes those of us on this side

11 of the equation a little sick.  Nevertheless, I offer Your

12 Honor whatever briefing Your Honor thinks is necessary or

13 appropriate on standing, and we can take it from the ridiculous

14 to the sublime as --

15          THE COURT:  Well, let me say, it -- so there's -- I

16 pondered what's the effect of the side letter between the GUC

17 Trust and New GM.  Okay.  In light of that side letter, does

18 New GM have standing to object to the allowance of claims?

19 Look, they're -- it's their money you want, and so I'm not

20 saying -- only if we get to the estimation, but certainly an

21 estimation -- you know, they're the ones with the dog in this

22 hunt, right?  As to how much the GUC Trust -- I'm not

23 suggesting the GUC Trust was just -- be just willing to roll

24 over and have the billion dollars, but they have the economic

25 stake in this, and at that stage I have no question about it.

44

1            I do have a question as to, you know, earlier stages,

2    as to -- particularly because of the side letter.  In the

3    absence of the side letter, I think it might -- the issues

4    might be different, but what did they agree in that side

5    letter?  I think I'm clear about what I'm talking about.

6            MR. WEISFELNER:  Well, I think I -- well, I know

7    exactly what you're talking about, and I think the GUC Trust

8    has a definitive response to it.  And putting aside the side

9    letter in terms of when it is that the GUC Trust may properly

10   trigger the call for an estimation, which the GUC can respond

11   to the contentions that GM has raised.  I think of issues like,

12   you know, this whole deal where you're allocating all of the

13   adjustment shares just to the Plaintiffs and you're leaving all

14   of the remaining GUC Trust assets to the beneficiaries

15   constitutes --

16           THE COURT:  I was waiting for Mr. Golden to have a

17   position --

18           MR. WEISFELNER:  Well, you can rarely motivate him to

19   stand up and take a position on anything in open court as

20   opposed to in a conference room.

21           THE COURT:  He wasn't hesitant to express his

22   position at the earlier trial, but go ahead.

23           MR. WEISFELNER:  And he knows I'm only kidding.

24           THE COURT:  Well --

25           MR. WEISFELNER:  My point is this:  When GM complains

45

1    that embedded in the settlement is an impermissible plan

2    modification because we are improperly discriminating against

3    creditors, what -- where do they have standing to raise that

4    issue?  And that's just an example.  So, Your Honor, we will

5    abide by whatever direction you give us.  Understand that with

6    the exception of participation in the estimation, we could take

7    a very formalistic view that GM has zero standing across the

8    board, save maybe for the side letter issue.  I'm not sure that

9    it behooves us, more importantly, Your Honor, to debate that

10   issue, as I think I know how Your Honor is likely to deal with

11   it, but we're at your disposal.

12              THE COURT:  All right.  Mr. Basta?

13              MR. BASTA:  Your Honor --

14              THE COURT:  Oh, I'm sorry, Mr. Weintraub.  Way to

15   have spent -- Mr. Basta, let Mr. Weintraub -- I'm sorry.

16              MR. WEINTRAUB:  May I cross in front of Your Honor?

17   It would save some --

18              MR. BASTA:  Anybody but Mr. Weintraub, Your Honor.

19   Anybody.

20              MR. WEINTRAUB:  I get no respect, Your Honor.  Good

21   morning, Your Honor.  I just wanted to clarify two things, and

22   I'll be brief.  There will be a supplemental late claims

23   motions filed, probably later today.  We'll be going to trial

24   before May 31st, but I think I can accelerate that to just

25   enhance everyone's weekend.  So we will get that done today.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

46

1             THE COURT:  How many more claimants?

2             MR. WEINTRAUB:  That will be for 69 claimants who

3    are, in fact, signatory Plaintiffs to the original settlement

4    agreement, so these are not people that are just

5    materializing --

6             THE COURT:  And they've agreed to the modifications?

7             MR. WEINTRAUB:  Yes, they have, Your Honor.  And the

8    other point I just wanted to revisit shortly is, you know, Your

9    Honor's reference to 157(b)(5).  That was referenced in the

10   original settlement agreement, and that was taken out in

11   response to one of Your Honor's concerns as to whether or not

12   people are trying to preserve jury trial rights in district

13   court.  In connection with the settlement, all of the

14   Plaintiffs are prepared to have their claims estimated in this

15   court, and have waived any rights to a jury trial in connection

16   with the settlement and any procedures relating to the

17   settlement.

18            THE COURT:  Thank you.

19            MR. WEINTRAUB:  Thank you.

20            THE COURT:  Thank you very much.

21            All right.  Mr. Basta?

22            MR. BASTA:  Your Honor, I was joking with

23   Mr. Weintraub.  We go way back.

24            Paul Basta from Paul, Weiss, representing New GM.

25   What I thought I would handle today is to maybe do a little

1  reverse order, and start with mediation and then move to this,

2  whether they've consented, the mechanism for consenting to have

3  their claims estimated in Bankruptcy Court, and then I wanted

4  to give the Court our overview of how we see the settlement,

5  and how we see how the three parts of the settlement work

6  together, and what our concerns are, and then I'm going to

7  caucus with my colleagues and make sure I've answered and given

8  you our perspective.

9          To start, you know, I don't think Mr. Weisfelner --

10  and by the way, congratulations on your wedding.

11          MR. WEISFELNER:  Thanks, Paul.

12          MR. BASTA:  I don't think his characterization of our

13  motivation to just delay, delay, delay and never settle is the

14  correct description.  We want to settle, and we're prepared to

15  mediate, and we're prepared to mediate all of the issues.  And

16  we would like to get this resolved.  I think when you say,

17  well, what are we mediating?  If we mediated tomorrow, what are

18  we mediating?  And there could be three things that we're

19  mediating.  We could mediate how to figure out how to move the

20  whole case forward and settle, and even if you can't settle

21  actual claims, maybe we could settle a process that we would

22  all agree on.  We could settle wrongful death and personal

23  injury claims, and we're prepared to do that.  As Your Honor

24  noted in past success in doing that in the NDL, and the key to

25  that is that we would like to mediate the specifics of actual

48

1  claims, for which there needs to be information.  And that

2  information is rolling, and we're expecting it very soon, but

3  we're prepared to sit down and mediate those things.

4         And when it comes to economic loss, the way that I

5  understand it is that there was a mediation session in the NDL,

6  and no, it wasn't GM alone who said that we don't want to

7  mediate.  Both parties said that Judge Furman is addressing

8  gating items that are going to inform where the parties are

9  going to settle, and there should be more progress on those

10 gating items.  We are prepared to sit down and try to mediate

11 it again, but the idea that we're just going to not be

12 constructive and just be obstructionists, in my experience,

13 since I've been working with this client, is not the direction

14 that we've received.

15         THE COURT:  When did you get retained?

16         MR. BASTA:  We would like to clear -- I got retained

17 the first of April.

18         THE COURT:  All right.  So since the first of April,

19 there's been no effort of obstruction.

20         MR. BASTA:  Not since I've been involved, Your Honor.

21         THE COURT:  Okay.

22         MR. BASTA:  What is our motivation for the big

23 picture, Your Honor?  We're under a -- we have a sale

24 agreement, and the sale agreement says we have to issue

25 adjustment shares, if the Court estimates allowed general

49

1  unsecured claims at above the threshold.  And we have a

2  fiduciary duty to our own constituencies to make sure that that

3  standard, if it's going to be triggered, is the right rules

4  apply to triggering that standard.  And we have a very strong

5  interest to use whatever arguments that we have, and that we

6  have proper standing to assert to make sure that we get the

7  best outcome that we can for our organization that complies

8  with the rules.

9          And, you know, I've been in many cases with

10  Mr. Weisfelner to expect shock and awe that we would actually

11  assert arguments that help us -- you know, that we are under

12  some duty to not assert argument --

13          THE COURT:  Mr. Basta, Mr. Weisfelner has been before

14  me enough that I have sometimes heard his --

15          MR. BASTA:  I love it when he does --

16          THE COURT: -- righteous indignation in what --

17          MR. BASTA:  I love -- I love it -- I don't think the

18  righteous indignation is appropriate where our constituency,

19  that we're just trying to get the best outcome --

20          THE COURT:  Mr. Basta -- excuse me, Mr. Weisfelner --

21  the righteous indignation is not what's having an effect on --

22          MR. BASTA:  All right.  But I wanted to --

23          THE COURT:  -- on me.

24          MR. BASTA:  So on mediation --

25          THE COURT:  But at every step of the process before

50

1  me, New GM has done what it's entitled to do, assert every

2  conceivable argument and right that it could possibly assert.

3          MR. BASTA:  Okay.  But I think -- let me --

4          THE COURT:  If they continue doing that, that's New

5  GM's right to do that, but --

6          MR. BASTA:  But, Your Honor, I think that what New GM

7  feels, I'm going to get to this in my comments, I want to cover

8  the consent to jurisdiction for a minute, but what New GM is

9  looking at is seeing what the movants are doing is to set up a

10 process where the estimation of the claims isn't going to be

11 based on actual claims, which we think under the contract we're

12 entitled to make sure that the estimate covers actual claims.

13 And faced with that threat, I think New GM is reacting to the

14 threat that the other side is taking an action that's not

15 consistent with the agreement, and I'll explain why we think --

16         THE COURT:  Let me just --

17         MR. BASTA:  -- it's inconsistent --

18         THE COURT:  Let me just say -- let's take, for

19 example, the personal injury/wrongful death claims.

20         MR. BASTA:  Yes, sir.

21         THE COURT:  If -- let's assume for a minute that the

22 Court approves the 9019 and we go forward with an estimation.

23 And as you well know, the Court has great flexibility in

24 setting the ground rules for an estimation proceeding.

25         MR. BASTA:  Right.

51

1          THE COURT:  And what I -- with dealing with those

2   claims alone, I would fully expect that you or other counsel on

3   behalf of New GM would negotiate with Mr. Hilliard, Mr. Norman

4   -- Ms. Norman, and any other lawyers for the personal injury

5   plaintiffs.  What are the criteria that should be applied in

6   estimating personal injury/wrongful death claims?  And that was

7   why I asked specific questions about it before because it seems

8   to me, you know, causation and damages are going to be an issue

9   with respect to every one of them.

10         I don't know how many of those accidents happened in

11  comparative fault states, whether that is an issue as to some

12  of them, or contributory negligence states, as a complete

13  defense.  The rules, you know, are going to differ by the state

14  where the accident occurred, and what I would -- if we get to

15  that stage, I'm not saying we will, but if we get to that

16  stage, and there's no reason to wait to get to that stage, is

17  that you begin the process promptly of trying to reach an

18  agreement with the lawyers for the personal injury/wrongful

19  death plaintiffs as to what criteria -- assuming the Court

20  proceeds to estimate the claims, what criteria the Court should

21  apply.

22         You know, I'm now being told that there are likely to

23  be 660 personal injury/wrong -- pre-closing personal

24  injury/wrongful death claims; 200 from Mr. Hilliard, 400 from

25  Ms. Normal, and Mr. Weintraub tells me there's going to be

52

1  another 60 or so, and so, you know, 660.  There's not going to

2  be full-blown trials, and I don't think -- and estimation

3  doesn't require full-blown trials, but New GM is entitled to

4  propose procedures that ought to apply to that estimation.

5          MR. BASTA:  Your Honor, I understand, and this

6  process is going to go forward, and we're going to assert our

7  rights.  We're going to try to convince the Court we think the

8  settlement should not go forward for Rule 23 reasons, but as

9  this progresses and we need -- if it's --

10         THE COURT:  What's your position on the consent

11 issue?

12         MR. BASTA:  Sorry.  Sorry, Your Honor.  So the way

13 the estimation order works and the settlement order works is --

14 on the personal injury/wrongful death, is that even if someone

15 is not represented here, that if they suffered an injury, that

16 claim is going to be allowed under the settlement.

17         THE COURT:  No, I don't think so.

18         MR. BASTA:  I believe that's the way it works, Your

19 Honor, is if Your Honor looks -- and let me tell you why I

20 think that's the way it works is that, if you look in their

21 letter, they say that in order to receive a distribution, that

22 someone will be deemed to consent under 157(b)(5).  And that

23 dovetails with the definition of plaintiff in the settlement

24 agreement, which includes all plaintiffs, whether named or

25 unnamed, and it goes on to include them.

53

1          So there's two pieces here.  To the extent they

2     actually have a written consent from someone that says I

3     consent under 157, I understand that.

4          THE COURT:  Well, let me ask, do you -- what is your

5     position if the order of the Court says that the only personal

6     injury/wrongful death claims that the Court will estimate are

7     on behalf of those plaintiffs who have filed a motion to allow

8     a late claim?  Because that's -- I have 600, and will have 660.

9     So that -- because I wasn't sure -- it seemed to me that I was

10    being told -- we'll see whether anybody comes out of the

11    woodwork before the end of the day, but as of now I'm being

12    told there is nobody else.  Okay?  They're all represented by

13    the Plaintiffs' lawyers that we know.  Does -- would -- does

14    that obviate your concern as to people -- anybody else coming

15    in and having a right?

16         MR. BASTA:  Well, Your Honor, if Your Honor orders

17    that, the way they proposed the settlement agreement is not the

18    way it's going to work, and it's only people that are

19    represented in here, obviously, that fixes the issue.  And it

20    would remove the provision in their letter where there's a

21    deemed consent in exchange for getting a distribution.  So that

22    would take that away, but I -- when I read Your Honor's order

23    to show cause, and Your Honor questioned the illusory nature, I

24    thought one of the things that Your Honor was asking in the

25    numerical examples was, well, what happens if I allow a claim

54

1  for $10, and then there's subsequently a jury trial, and in

2  that subsequent jury trial it comes in at $17.  How do I do

3  that?

4           THE COURT:  That's exactly -- yeah --

5           MR. BASTA:  Okay.  And so I don't know that they've

6  addressed that --

7           THE COURT:  I think they did.  The issue -- and I

8  thought they addressed it very clearly that by consenting to

9  this Court estimating the claims for distribution, they've

10 agreed if I -- in the aggregate estimate personal

11 injury/wrongful death claims at $50 million, they can't say we

12 think we're entitled to $50 million and $10, that they're --

13          MR. BASTA:  May I try to explain my point, Your

14 Honor?

15          THE COURT:  Sure.

16          MR. BASTA:  The -- this is all getting into what it

17 means when the Court enters an order allowing it because -- for

18 distribution purposes because the way the settlement structure

19 works is that we get to an estimation hearing, Your Honor

20 enters an order, it allows for estimation, it estimates for

21 allowance and distribution, and then there is a subsequent

22 process that's the real allowance process.

23          And in that subsequent process, a claimant -- the way

24 we read it, a personal injury claimant who has filed a claim

25 against New GM and has a jury trial against New GM, there's

55

1  nothing that -- they're not waiving the right to a jury trial

2  against New GM and there's nothing that says that that

3  plaintiff can't take what comes from New GM and come in and ask

4  the Court to say, Judge, that previous allowance of my claim

5  that you had?  That's not what I should get.  I should get --

6          THE COURT:  Well, look, I can't decide --

7          MR. BASTA:  -- that other --

8          THE COURT:  -- and I don't intend to decide whether

9  plaintiffs are permitted to assert claims against New GM if

10 claims are estimated and provided for distribution here.

11 Before you came into the case --

12         MR. BASTA:  Yes, Your Honor.

13         THE COURT:  -- I recall reading a filing by Kirkland

14 & Ellis where they took the position before Judge Furman that

15 if late claims are allowed in the Bankruptcy Court, they don't

16 -- they're not entitled to assert claims against New GM.  I

17 don't have a -- that's not for me to decide.  I fully -- so

18 yes, the -- this settlement preserves their rights to argue

19 before Judge Furman --

20         MR. BASTA:  Right.

21         THE COURT:  -- that whatever this Court -- whatever

22 the Bankruptcy Court decides doesn't effect what they can

23 assert against New GM.  I have nothing to say about that, and

24 I'm -- you know, because I already saw the argument made by

25 New GM many, many months ago that if they get claims allowed in

56

1  the Bankruptcy Court against Old GM, they have no claims

2  against New GM, and I fully expect -- and Judge Furman will

3  decide those issues.

4          MR. BASTA:  And, Your Honor, that is going to be our

5  position.

6          THE COURT:  I --

7          MR. BASTA:  Because I think that's what the law

8  provides, but what --

9          THE COURT:  But I can't --

10         MR. BASTA:  -- that -- what you --

11         THE COURT:  You're not arguing that I can have any

12  say in that, do you?

13         MR. BASTA:  I'm not arguing that --

14         THE COURT:  And their reservation of rights doesn't

15  do anything to do --

16         MR. BASTA:  Well, Your Honor, I'm trying to make a

17  more narrow point.  And the point that I'm making is, if you

18  look at the settlement construct, this is what happens.  Their

19  proposed order on the estimation says you're allowing -- you're

20  entering an order allowing for distribution purposes,

21  estimating for allowance and distribution, and in that you're

22  estimating based upon summary process that's been articulated

23  here.

24         When the actual distribution is made, all the work as

25  to whether or not the claim is what I'm going to call a real

57

1 claim, for example, if you look at the criteria on the

2 allocation methodology, which will define your actual

3 distribution, that -- it could be very different than what

4 happens in the --

5          THE COURT:  It's not likely though.  With personal

6 injury/wrongful death claims, I find it extremely unlikely that

7 that would occur because, like it or not, I think I'm forced to

8 go through whatever the summary criteria that are applied, you

9 know, determined to be applicable, what each personal

10 injury/wrongful death claim is worth.  It isn't going to be 660

11 full trials, but in a sense there are going to be summary --

12 you know, Mr. Basta, when I'm speaking, and you're up --

13          MR. BASTA:  I'm sorry --

14          THE COURT:  -- you shouldn't be conferring with your

15 co-counsel.

16          MR. BASTA:  I apologize, Your Honor.

17          THE COURT:  What's your next point?  You weren't

18 interested in what I had to say so I'm going to stop.

19          MR. BASTA:  Your Honor, I was listening to what

20 you've said.  I was trying --

21          THE COURT:  No, you did not.  You were -- it's rude

22 to the Court to do that.  Counsel do not do that in my

23 courtroom.  For future reference, be aware of that.

24          MR. BASTA:  Sorry, Your Honor.

25          THE COURT:  What's your next point?

58

1          MR. BASTA:  Your Honor, what I was trying to point

2    out is that in the criteria that they have in this later

3    allocation methodology --

4          THE COURT:  I haven't decided on an allocation

5    methodology.

6          MR. BASTA:  Okay.

7          MR. WEISFELNER:  Your Honor --

8          THE COURT:  You will be heard on that.

9          MR. WEISFELNER:  -- it occurs to me --

10          THE COURT:  No, Mr. Weisfelner, let me hear from

11   Mr. Basta.  Go ahead.

12          MR. BASTA:  So, Your Honor, let me outline a few

13   points that we -- the way we see the different elements of the

14   settlement working and why we don't think it should be

15   approved.  And I'm going to start with Rule 23, which Your

16   Honor again --

17          THE COURT:  And I think with respect to that, I'm

18   going to ask -- I'll let you make some summary comments on it,

19   but I am going to ask both sides to brief this issue because I

20   do view it as a gating issue, and I'm going to ask for

21   simultaneous briefs, and when we stop, you can agree on what's

22   a date for submitting those.  So -- but go ahead, if you want

23   to make some summary comments on it.  I understand -- I read

24   your -- I read that much of your papers to know, and it's been

25   an issue before you came into the case.  I understand that.

59

1  And, you know, I don't want to see $6 million spent on notice

2  without deciding that issue.

3        MR. BASTA:  Your Honor, this is why we think the

4  Rule 23 issue is so pervasive.  And for -- the first is it ties

5  to the contract, because the contract refers to the allowance

6  of claims --

7        THE COURT:  And provides for estimation of claims.

8        MR. BASTA:  Estimation of claims, and then the

9  question becomes, if you're going to estimate, what are you

10 estimating?  For it to estimate, it actually has to be a claim,

11 and a claim is not some amorphous concept.  And for a class

12 claim --

13       THE COURT:  If GM had given due process notice to

14 everybody whose vehicle was recalled, they could have scheduled

15 unliquidated claims for everybody who bought a vehicle with --

16 that was subject to a recall, and there would be no Rule 23.

17       MR. BASTA:  But they --

18       THE COURT:  The Court would be -- and they could ask

19 for an -- there's 11 million of those, or 9 and a half million

20 of those, and the Court should estimate the claims, and it

21 would take forever to resolve 11 million claims.  There would

22 be no Rule 23.

23       MR. BASTA:  Your Honor, if GM had -- if Old GM had

24 done that, and under penalty of perjury they had taken a

25 position on all of these claims and had a specific view as to

1  all of these claims, and then we had an ability to come in and

2  test the schedules and look at the person who scheduled the

3  claim and saw what was the basis for that claim, then that

4  could happen.  But in this case, and in many Rule 23 cases,

5  they haven't been scheduled by the debtor, and then the

6  question becomes you have this amorphous class of potential

7  claimants, and how are you going to --

8           THE COURT:  It's not amorphous.  There are 11 and a

9  half million people who bought cars that were subject to recall

10 where there was no disclosure of the defect.

11          MR. BASTA:  And how do we know which of those claims

12 have a commonality among them so that, with the purposes of

13 estimation, you can figure out what exactly you're estimating?

14 And Rule 23 is the constitutional way to figure out --

15          THE COURT:  Not in --

16          MR. BASTA:  -- the groupings.

17          THE COURT:  -- Bankruptcy Court.  Not in Bankruptcy

18 Court.  Because in a collective proceeding in bankruptcy, there

19 are other -- estimation is not an -- only single individual

20 claim, as when I've read the estimation of asbestos claims, for

21 example, it's not done necessarily on a claim-by-claim basis.

22          MR. BASTA:  And let me explain, I've been involved in

23 many of those cases, and why I think that's different than what

24 you have here.  There are cases where I'm trying to get a

25 company out of bankruptcy that's got a mass tort problem.  And

61

1  I need to create a plan, and I need to figure out how much I'm

2  going to reserve in the plan for those claims.  And in that

3  context, we can have competing experts and we can figure out,

4  in order to get that company out of bankruptcy, how much we're

5  going to put in that reserve.  And that would be an estimation

6  for reserve purposes.  But the contract doesn't provide for

7  that.  The contract provides that we need --

8            THE COURT:  I don't see the word, capital C, "Claims"

9  in the contract, only where proofs of claim have been filed.

10 Are those words a defined term in the contract?

11           MR. BASTA:  The word "claim," like only where proof

12 of claim --

13           THE COURT:  Yes.

14           MR. BASTA:  -- has been filed?

15           THE COURT:  Yes.  Is that in the contract?

16           MR. BASTA:  The word "claim" has before it the word

17 "allow," and before that --

18           THE COURT:  So if --

19           MR. BASTA:  -- an estimate.

20           THE COURT:  So if a claim had been scheduled --

21           MR. BASTA:  But it had not been --

22           THE COURT:  -- and no objection was made to it, it

23 would be deemed allowed.  It wouldn't -- no proof of claim

24 would be required.

25           MR. BASTA:  Unless it was scheduled as disputed.

62

1   But, Your Honor, I don't believe that in a case in which no

2   schedules have been filed and no proof of claim has been filed,

3   that Your Honor can treat it as a claim for the purposes of

4   estimation.

5           THE COURT:  Mr. Basta, let's -- here's what we're

6   going to do, because I'm going to order -- I want briefs on the

7   Rule 23 issue, whether that's required.

8           MR. BASTA:  We will comply with that.

9           THE COURT:  So go on to your next point.

10          MR. BASTA:  Mr. Weisfelner pointed out all the

11  discovery that's already occurred in the MDL.  A lot of the

12  discovery still has not occurred.  There have been no fact

13  sheets on pre-sale.  There's been no discovery on pre-sale

14  personal injury claimants.  And so Your Honor suggested that if

15  we get to that stage, we're going to have to work out the

16  estimation procedures.  We think that the estimation procedures

17  that they're proposing are so summary that what they reveal to

18  us is that they're trying to have the Court estimate claims

19  based upon really inadequate information and inadequate process

20  and then backfill all the really diligent work to determine

21  whether the claims really exist.

22          And we believe that if Your Honor is going to trigger

23  the adjustment shares, that the process that the Court has to

24  undertake to decide whether those thresholds have met need all

25  the work that's in the backfill part of what they're doing --

63

1  not all of it, but it really needs to be a detailed basis so

2  we're not in a situation where not -- where we're estimating

3  based upon what we believe to be unreal claims.  And so we will

4  get to that part.

5          Mr. Weisfelner talked about standing.  We think that

6  one ramification of this construct is that there's no adversary

7  if the standing rulings are sustained.

8          THE COURT:  I'm mindful of that, Mr. Basta, and --

9          MR. BASTA:  Yeah.

10         THE COURT:  Let me just -- I'll just stop there.  I'm

11 mindful of that.  I think -- I do have a question whether under

12 the side letter -- the effect that that has on -- at least as

13 to the GUC Trust decision, enter into a settlement to allow

14 claims not in a specific amount.  Because your -- because New

15 GM's economic interests are at stake on the additional

16 allocation shares, I agree that it will have standing -- full

17 standing at any estimation proceeding, subject to whatever

18 ground rules are set forth for the estimation.  I fully

19 contemplate you have the greatest interest in opposing the

20 estimation.

21         MR. BASTA:  I appreciate that, Your Honor.  And

22 just -- you know, just to -- I know you probably don't want to

23 hear more of this, but just one part about the construct I

24 wanted to point out, because it goes to when in the sequence

25 you're really allowing claims, is that at the settlement phase,

64

1  the GUC Trust is released.  It gets a full release.

2  Mr. Golden's clients go off into the sunset.  They no longer

3  have any beneficiaries to who they report.  There's no

4  obligation on them.  So whatever interest they have to actually

5  perform the function of saying this is a real claim and this is

6  not a real claim, they don't -- they're gone.  They don't have

7  any incentive, so -- and then --

8          THE COURT:  I'm not questioning --

9          MR. BASTA:  But then what --

10         THE COURT:  -- that new GM is the one to say this is

11  a --

12         MR. BASTA:  But --

13         THE COURT:  -- real claim, this isn't a real claim.

14         MR. BASTA:  But -- and just -- this is the point I'm

15  trying to get to in an inartful way.  When that's all done and

16  Your Honor has now issued the adjustment shares, there's a

17  switchback.  Because now that the asset is in the estate, all

18  of a sudden they spring to life and they've got a very

19  significant interest in which of them get the recovery and --

20         THE COURT:  Who's the "them"?

21         MR. BASTA:  Which of the signatory plaintiffs, the --

22         THE COURT:  Oh, sure.

23         MR. BASTA:  And so they have this whole process.

24  They say, for example, we're going to factor in whether a claim

25  is late filed in figuring out whether somebody gets a

65

1  distribution or not.  And so what's happening is if you have

2  like different phases -- we have the notice procedure phase and

3  then you have the settlement phase and then you have the

4  estimation.  And then this -- in this estimation, we like put

5  our blinders on.  There's nobody really incented to drill down

6  from the due process perspective as to what the actual claims

7  are.  Once Your Honor issues the share, then everybody's

8  economic interest comes up and says, well, your claim is not so

9  good, you're not going to get the full amount, and your claim

10  is late and you should have known, you got the recall, and you

11  have all of this.

12          So what is happening is Your Honor's get -- being

13  given a snapshot at the estimation phase that is incomplete.

14  It's incomplete, and the reason --

15          THE COURT:  Mr. Basta, there aren't going to be

16  11.5 million trials.  Okay?  Get real.

17          MR. BASTA:  Yeah.  But I'm not suggesting that.

18          THE COURT:  Get real.

19          MR. BASTA:  What I'm suggesting is that --

20          THE COURT:  Yes, you are.

21          MR. BASTA:  I'm not --

22          THE COURT:  You know, this is the same tune that New

23  GM has been singing throughout litigation since 2014 when

24  recalls were first disclosed.  Okay?  Change the tune.

25          MR. BASTA:  The tune you're --

66

1          THE COURT:  I am determined that New GM will get due

2    process in any estimation proceeding.  It has the financial

3    stake in determining which are real claims, which are not.

4    I've encouraged not waiting and begin discussing and

5    negotiating what criteria will apply to economic loss claims,

6    what criteria will apply to personal injury/wrongful death

7    claims.  New GM will be very happy to have 660 personal injury

8    trials that take ten years.  That is not -- if the settlement

9    is approved, which I'm not assuring it will be, if the

10   settlement is approved, that's not what's going to happen,

11   Mr. Basta.  That's not what's required in an estimation

12   proceeding.

13          I will be sure, if it's approved, that the estimation

14   proceedings provide due process to New GM and an ability to

15   filter out claims that aren't real.  Okay?  But there aren't

16   going to be 660 personal injury trials.  There aren't going to

17   be 11 and a half million economic loss trials, and so that 20

18   years from now, several of successors of mine will have the

19   opportunity to go back and review it.  It has already been nine

20   years since the bankruptcy.  Okay?

21          MR. BASTA:  Your Honor, I'm not --

22          THE COURT:  Regrettably, the claims have gotten

23   pretty stale.  And for the personal injury and wrongful death

24   claimants, to the extent they do have valid claims for

25   pre-closing injuries and deaths, nine years have gone by and

67

 1  they're not going to have to -- if the settlement's approved,

 2  they're not going to wait another nine years to see what

 3  happens.  So what you ought to be doing is trying to work out

 4  criteria that protect New GM in the way it should be protected

 5  and not in insisting on 11 and a half million economic loss

 6  trials and 660 personal injury trials.

 7          Any other points you want to raise?

 8          MR. BASTA:  Yes, Your Honor.

 9          THE COURT:  Go ahead.

10          MR. BASTA:  I was not intending to suggest that

11  11.4 million -- we were only intending to suggest that Rule 23

12  is the way to cull it.

13          THE COURT:  You didn't brief that.  Okay?

14          MR. BASTA:  Yeah.

15          THE COURT:  And I have --

16          MR. BASTA:  And we will do that.

17          THE COURT:  I have my questions about whether the

18  Rule 23 construct is the only one that can be applied in a

19  collective proceeding in bankruptcy.  But go ahead.  That's --

20  don't address that any further now.

21          MR. BASTA:  Okay.  Thank you, Your Honor.  One

22  second, Your Honor.  Can I consult with my colleagues?

23          THE COURT:  Go ahead.

24          MR. BASTA:  Yeah.

25      (Counsel confer)

68

1          MR. BASTA:  Your Honor, the sequence of events, the

2     way I understand it, is that Rule 23 will be a gating issue

3     before the notice goes out.  And then if the notice goes out,

4     then there will be a settlement hearing.

5          THE COURT:  That's correct.

6          MR. BASTA:  And there are other arguments in addition

7     to Rule 23 that we respectfully suggest are also gating items.

8     And so the question I have --

9          THE COURT:  Tell me what they are.

10         MR. BASTA:  Well, Your Honor, what I'd like to do

11    if --

12         THE COURT:  No.  Tell me what they are.  You say

13    there are other gating issues.  Tell me what they are.

14         MR. BASTA:  I think another big gating issue is

15    issuing releases pursuant to a 9019 that blocks people who

16    are -- from going after and enjoining them from going against

17    other assets.

18         THE COURT:  What's your standing to raise that issue?

19         MR. BASTA:  Your Honor, if --

20         THE COURT:  That's not a New GM issue, is it?

21         MR. BASTA:  I believe it is, Your Honor.

22         THE COURT:  Why?

23         MR. BASTA:  Well, we're the economic interest holder

24    and we're the one funding the plan.

25         THE COURT:  That's not a gating issue.  Next?  You

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

69

 1    can take it up with -- you can -- if we get to the 9019

 2    hearing, you'll take that one up then.  Okay?  I don't view it

 3    as a gating issue.

 4              Go ahead.  What's next?  What are the other gating

 5    issues?

 6              MR. BASTA:  Your Honor, we believe that the way --

 7    without Rule 23 and the way this --

 8              THE COURT:  You've raised Rule 23.

 9              MR. BASTA:  No.

10              THE COURT:  How many times do I have to tell you no

11    more Rule 23 today?  You're going to brief it.  What other

12    gating issues other than the Rule 23 issue are there?

13              MR. BASTA:  There's a representational authority

14    issue, and the representational --

15              THE COURT:  You'll raise it at the 9019.  I don't

16    view it as a gating issue.

17              MR. BASTA:  All right.

18              THE COURT:  Not with -- if their construct works --

19              MR. BASTA:  Right.

20              THE COURT:  -- it's not an issue in my view.  If the

21    construct doesn't work, it's a different question.  Okay?

22              MR. BASTA:  Right.

23              THE COURT:  What's next?  Any other gating issues?

24              MR. BASTA:  Give me one second.

25         (Counsel confer)

1            MR. BASTA:  No further -- nothing further, Your
2  Honor.
3            THE COURT:  Okay.  Ms. Going, briefly?
4            MS. GOING:  Thank you, Your Honor.  Kristin Going on
5  behalf of the GUC Trust.  Your Honor, I apologize, but you
6  started speaking about the side letter after I had --
7            THE COURT:  Yes.
8            MS. GOING:  -- taken my turn, and so I wanted to
9  raise something associated with that as one thing that we
10 believe is a gating issue.  And I know we've been talking about
11 it in terms of New GM's standing, and perhaps we should think
12 about it slightly different.  And I would maybe even
13 characterize it almost as a motion in limine to address, I
14 think, the issue that you were identifying, which is the impact
15 of the side letter and whether or not New GM has already agreed
16 that the GUC Trust has every right to seek an estimation of
17 claims whenever it wants.  And that's --
18            THE COURT:  It read that way.
19            MS. GOING:  I'm sorry?
20            THE COURT:  I said it read that way.
21            MS. GOING:  Yes.  That's right, Your Honor.  So that
22 is the gating issue that --
23            THE COURT:  It's not a gating issue.  Raise it at the
24 9019 stage.  Okay?
25            MS. GOING:  All right.  Thank you, Your Honor.

1          THE COURT:  All right.  Any other gating -- anything

2  else that you think is a gating issue?  I don't view that as a

3  gating issue.  You know, I pondered the side letter, and it

4  really reads like New GM has already appeared -- it left it in

5  the hands of the GUC Trust.

6          MS. GOING:  And, Your Honor, the only reason we

7  thought it was a gating issue was, because of the discovery

8  that they have intimated that they would be seeking of the GUC

9  Trust with regard to the settlement and, you know, whether or

10  not we exercised our obligations under the side letter.  But

11  they're obviously reading the side letter very selectively, so

12  we were trying to avoid getting into a discovery dispute,

13  but --

14          THE COURT:  Well, if there's a discovery dispute,

15  you'll raise it with me.

16          MS. GOING:  Okay.

17          THE COURT:  And I think everybody is aware with

18  respect to discovery disputes, the parties meet and confer and

19  try and resolve the issues.  If they can't, they arrange a

20  conference call with the Court -- very rarely people come in --

21  and I try and resolve it.  Usually it's a day or two -- within

22  a day or two after the discovery dispute, and I don't have

23  motions to compel or anything like that, I'll try and resolve

24  it very promptly.  At most I ask for letter briefs on it.  So

25  that's the cart before the horse.  Okay?

72

1            MS. GOING:  Absolutely.

2            THE COURT:  All right.

3            MS. GOING:  Thank you, Your Honor.

4            THE COURT:  Mr. Weisfelner, very briefly?

5            MR. WEISFELNER:  Judge, yeah, very quickly because I

6    wanted to address procedures.  While I'm not often inclined to

7    do this, I thought it might help the New GM side think through

8    these issues and help Your Honor --

9            THE COURT:  They may be skeptical that you're trying

10   to help them, but --

11           MR. WEISFELNER:  Your Honor, we all appreciate the

12   fact that there's a number somewhere between zero and 30

13   million shares that are at issue.  You can't get beyond

14   30 million shares.  As a consequence, it may behoove the

15   Plaintiffs, for example, to focus their attention first and

16   foremost on those claims that, to the extent possible, are not

17   susceptible of individuality or individual proof like, for

18   example, economic loss versus personal injury.  And we could

19   certainly sit down with New GM, if they were inclined, and talk

20   about what is it about anything Judge Furman's done, is about

21   to do, may do in the future, that ought to impact an estimation

22   of economic loss claims.

23           Your Honor, if and only if we haven't hit the

24   bull's-eye, you know, where you're in the carnival and you hit

25   it and the thing goes up and hits the bell, if you haven't hit

1   30 million shares by then, then you have to consider trotting

2   in personal injury/wrongful death claims and figure out a

3   methodology for how you start estimating those claims.

4           THE COURT:  Okay.  I think we're -- you know, your

5   suggestions are -- I'll use the word "intriguing" to me, but I

6   think what -- I come back to what I said before with respect to

7   the mediation issue.  I would strongly urge, first try and see

8   what you can agree on in terms of procedures, the order in

9   which things will go forward here -- you don't even need

10  mediation for that -- and then try and move forward with

11  mediation to the extent that makes sense and not wait for a

12  9019 approval hearing because it may change the dynamics of it.

13          In a lot of ways, it's what I said before.  I think

14  New GM fundamentally ought to be pleased that this provides a

15  mechanism, if it's approved by the Court, to resolve lots of

16  claims that would take years of litigation in two different

17  courts at least -- actually, a lot more courts than that -- to

18  resolve.  So really you really ought to be trying to do it

19  sooner rather than later.

20          Let me ask this so we can send you off to your

21  wedding, and with congratulations from the Court as well.

22          MR. WEISFELNER:  Thank you, sir.

23          THE COURT:  How much time do you all want?  I want

24  simultaneous briefs on this gating issue of whether Rule 23 has

25  to be applied to any proposed settlement presented to the Court

74

1  or whether the construct that the plaintiffs -- I'm not

2  articulating it very well, but I think you all get the clear

3  picture.  New GM's position is very clear.  At least the

4  written motions I think are clear as to what's being presented.

5  And so tell me how much time you want.

6          MR. WEISFELNER:  Your Honor, I would think, given

7  that we've --

8          THE COURT:  I saw somebody raising three fingers, but

9  I --

10          MR. WEISFELNER:  Yeah.  But, you know, those

11  people those people were wrong.  We think two weeks is more

12  than enough time.

13          THE COURT:  Don't you want to go on a honeymoon?

14          MR. WEISFELNER:  Not that.  It's just that, as Your

15  Honor indicated before, we've had a lot of people waiting a

16  long time.

17          THE COURT:  Yeah.

18          MR. WEISFELNER:  So I think two weeks to get briefing

19  on this since I think we've heard New GM's position.  This is

20  the fourth law firm that's articulated it, so I think we're

21  pretty clear on what their position is.

22          THE COURT:  How much time do you want, Mr. Basta?  Is

23  two weeks okay?  Two weeks and three days.  I don't want to

24  interfere with anybody's Memorial Day weekend.  Mr. Basta?

25          MR. BASTA:  That's fine.

75

1            THE COURT:  Okay.  All right.

2            MR. WEISFELNER:  The other thing I think we need to

3   work out -- not now, because I assume this means that the

4   June 4th hearing is going to be put off --

5            THE COURT:  Is going to be put off.  That's correct.

6            MR. WEISFELNER:  Right.  But I do want an

7   opportunity --

8            THE COURT:  That's why I wanted -- I apologize we had

9   to do this on the Friday of Memorial Day weekend, but I

10  couldn't do it earlier this week and I wanted to make sure we

11  got it before the --

12           MR. WEISFELNER:  I would like to work with Mr. Basta

13  and Mr. Steinberg, whoever needs to be part of the

14  conversation, to work out -- well, maybe we'll wait to get to

15  the 2004 -- the motion on notice, but I want to understand, you

16  know, what the timing issues are were Your Honor to direct them

17  to turn over the information we want --

18           THE COURT:  Yeah.

19           MR. WEISFELNER:  -- that isn't the subject of just

20  push a button and deliver it takes any time, and how much time

21  are we talking about.

22           THE COURT:  Okay.  For the briefs, I am adding three

23  days, so Tuesday, June 12th.

24           MR. BASTA:  Your Honor, one round of briefing, right?

25  No replies, right?

76

1          THE COURT:  Correct.

2          MR. BASTA:  Okay.  And then with respect to

3 Mr. Weisfelner's comment about the timing, if the notice were

4 to go out, we'll work with him --

5          THE COURT:  Could you work --

6          MR. BASTA:  -- and convey -- and compare notes.

7          THE COURT:  I don't doubt that you'll be able to --

8          MR. BASTA:  Right.

9          THE COURT:  You may disagree, but I think you're

10 going to be able to come to --

11          MR. BASTA:  Right.

12          THE COURT:  -- an agreement about it.  Okay.  When I

13 see the briefs on the 12th, I'll decide whether I need to have

14 another hearing or not.  I probably won't set a hearing, but I

15 want to see the briefs first.  Okay.

16          Anything else for today?  All right.  So the hearing

17 on the notice motion is adjourned.  Everybody enjoy the holiday

18 weekend, but really then -- as soon as that's over, could you

19 really try and work out a schedule for things and really talk

20 about whether it's the personal injury/wrongful death -- those

21 classically work for medication.  I mean, you know -- and, yes,

22 and whether it's formal or informal, there's certain

23 information you're going to want to see.  You've got a lot of

24 experience with those cases before Judge Furman, and the

25 Plaintiffs have got a lot of experience with it as well.  You

1  want to be able to work out an agreement on what information

2  will be exchanged and when it will be exchanged and go forward.

3        And I'm going to write -- you know, whether you want

4  to use the mediator that Judge Furman has already approved -- I

5  guess he's a former district judge, I can't remember his

6  name -- or someone else, that's fine with me, but, you know,

7  I'll leave it to you to try and work it out.  Please let's try

8  and get these worked out.  And if it starts out with 660, if

9  you could settle half of them, that would be great.  Okay?  But

10  we're not going to -- there's not going to be 660 full-blown

11  trials here.  Okay?

12        Anything else for today?  All right.  We're

13  adjourned.  Everybody have a good holiday weekend.

14        MR. WEISFELNER:  Thank you, Judge.

15        MR. BASTA:  Thank you, Judge.

16     (Proceedings concluded at 11:56 a.m.)

17                    * * * * *

18

19

20

21

22

23

24

25

78

1                    **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9

10

11  ALICIA JARRETT, AAERT NO. 428      DATE:  May 29, 2018

12  ACCESS TRANSCRIPTS, LLC

13

14

15                    **C E R T I F I C A T I O N**

16

17          I, Ilene Watson, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23

24  ILENE WATSON, AAERT NO. 447      DATE:  May 29, 2018

25  ACCESS TRANSCRIPTS, LLC