KING & SPALDING LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

————————

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019

July 25, 2018

**VIA E-MAIL**
<u>**AND ECF FILING**</u>
The Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

> Re:  **In re Motors Liquidation Company,** *et al.*
> **Case No. 09-50026 (MG)**
>
> **Summary Judgment Materials Filed by New GM in the MDL Court**
> <u>**(In re Gen. Motors LLC Ignition Switch Litig., 14-MD-2543 (JMF))**</u>

Dear Judge Glenn:

General Motors LLC ("<u>New GM</u>") attaches for the Court's reference the following materials that were filed in the MDL Court on July 20, 2018:

- New GM's *Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs*, as <u>**Exhibit A-1**</u>;
- New GM's *Memorandum in Support of its Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs*, as <u>**Exhibit A-2**</u>;
- New GM's *Motion to Exclude Expert Opinions Under Daubert and Federal Rule of Evidence 702*, as <u>**Exhibit B-1**</u>;
- New GM's *Memorandum of Law in Support of General Motors LLC's Motion to Exclude Plaintiffs' Expert Opinions Under Daubert and Federal Rule of Evidence 702*, as <u>**Exhibit B-2**</u>;
- The Economic Loss Plaintiffs' *Motion to Certify Bellwether Classes in California, Missouri, and Texas*, as <u>**Exhibit C-1**</u>; and
- The Economic Loss Plaintiffs' *Memorandum in Support of Motion to Certify Bellwether Classes in California, Missouri, and Texas*, as <u>**Exhibit C-2**</u>.

Honorable Martin Glenn
July 25, 2018
Page 2

New GM respectfully submits that the attached materials are relevant to the issues addressed in its *Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Certain Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* [ECF No. 14315].

Respectfully submitted,

*/s/ Paul M. Basta*
Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*and*

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

## EXHIBIT A-1

**NEW GM'S *MOTION FOR SUMMARY JUDGMENT AGAINST THE BELLWETHER ECONOMIC LOSS PLAINTIFFS***

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
|  | ) No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC | ) No. 14-MC-2543 (JMF) |
| IGNITION SWITCH LITIGATION | ) |
|  | ) Hon. Jesse M. Furman |
| *This Document Relates To All Actions* | ) |
|  | ) |

## DEFENDANT GENERAL MOTORS LLC'S MOTION FOR SUMMARY JUDGMENT AGAINST THE BELLWETHER ECONOMIC LOSS PLAINTIFFS

Defendant General Motors LLC ("New GM") respectfully requests that the Court grant summary judgment against the claims of the named plaintiffs from the economic loss bellwether states of California, Missouri, and Texas.  There are 29 plaintiffs in these three states, who are identified in Exhibits 2-4 to the accompanying Memorandum.  These 29 plaintiffs are divided into three categories based on the claims they are asserting against New GM:  (A) the full range of claims (16 plaintiffs) alleged in the Fifth Amended Consolidated Complaint ("5ACC"); (B) only successor liability claims (2 plaintiffs) alleged in the 5ACC; and (C) only a claim for fraud by concealment of the right to file a claim against Old GM in bankruptcy (11 "Bankruptcy Claim Fraud" plaintiffs) alleged in the 5ACC.  Summary judgment should be granted against all named plaintiffs' claims for the following reasons:

*First*, damages are an essential element of each named plaintiff's claims under the laws of all three bellwether states.  Each plaintiff here cannot prove damages for multiple reasons, and therefore summary judgment should be granted against their claims:

- New GM conducted recalls that fixed all of the defects at issue.  Plaintiffs' putative expert opinions to the contrary are both inadmissible under *Daubert* and could not create a disputed issue of fact even if considered.  New GM's recall repairs preclude the benefit-of-the-bargain damages claims of all plaintiffs.

- Named plaintiffs have no evidence of benefit-of-the-bargain damages. The individual plaintiffs themselves admit they have no proof of such damages and defer to plaintiffs' putative economic experts. But those experts have expressly admitted that they did not calculate damages for any named plaintiff.

- The Court has previously held that Texas law requires a manifest defect for all claims, and Missouri requires a manifest defect for breach of implied warranty claims. Because they lack evidence of a manifest defect, summary judgment should be granted against all claims of named plaintiffs Al-ghamdi, Fuller, McClellan, and Graciano, and against the implied warranty claims of named plaintiffs Akers, Hamilton, K. Robinson, Stefano, and Witherspoon.

- The Court has previously held that plaintiffs who disposed of their vehicles before the recalls could not have realized any diminished value. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017) ("*FACC MTD Opinion*"). Nor could such plaintiffs have spent time having their vehicles repaired under the recalls. Named plaintiffs K. Robinson, Tinen, and McClellan each sold or returned his or her vehicle before 2014, and thus could not have any benefit-of-the-bargain or "lost time" damages.

- Under the laws of the three bellwether states, a plaintiff cannot recover for "lost time" without, at a minimum, proving the loss of income directly caused by that lost time. The only named plaintiff that alleges lost income from having his vehicle repaired is Akers. Besides Akers, summary judgment should be granted against the "lost time" claims of all named plaintiffs.

*Second*, the model year ("MY") 2008-2010 Pontiac Solstice and G5, MY 2008-2010 Saturn Sky, MY 2008-2010 Chevrolet Cobalt, and MY 2008-2011 Chevrolet HHR vehicles covered under Recall No. 14v047 ("the Service Parts Vehicles") were manufactured with an ignition switch that had a longer detent plunger and higher torque resistance. As the Court has previously held, such vehicles could be defective only if they had been repaired using a faulty ignition switch. *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, *20 n.15 (S.D.N.Y. July 15, 2016) ("*TACC MTD Opinion*"). No plaintiff who owns a Service Parts Vehicle has evidence that his or her vehicle was repaired with a defective switch, and thus summary judgment should be granted against all claims of named plaintiffs Chimen Basseri, Kenneth Robinson, David Padilla, Brad Akers, and Cynthia Hawkins.

*Third*, various named plaintiffs' claims fail because they cannot establish New GM's liability. Because they cannot prove the required element of reliance, summary judgment should be granted against:

- the California consumer protection and common law fraud claims of named plaintiffs Basseri, Orosco, and Padilla;

- the Missouri common law fraud claims of named plaintiffs R. Robinson and Stefano; and

- the Texas consumer protection claims of named plaintiffs Al-ghamdi and McClellan.

No plaintiff can prove an actionable misrepresentation, and thus summary judgment should be granted against the following named plaintiffs' consumer protection claims to the extent based on misrepresentations because:

- Orosco, Padilla, Hamilton, Hawkins, K. Robinson, Stefano, Al-ghamdi, Fuller, Graciano, and McClellan testified that they did not see or did not rely on New GM advertisements or materials before buying their vehicles.

- Akers, Basseri, Cereceres, and Tinen do not have evidence of what representations they saw, and for the last three admit they could not identify any untrue representations.

- The representations that R. Robinson, Witherspoon, Bacon, and Thomas allege they saw are non-actionable puffery.

Plaintiffs' implied warranty claims and the damages they seek are barred because:

- For all Missouri and Texas named plaintiffs, the plain language of New GM's written warranties is binding under Missouri and Texas law, and bars these plaintiffs' benefit-of-the-bargain and "lost time" damages.

- Named plaintiffs Akers, K. Robinson, Tinen, Witherspoon, and Al-ghamdi all bought their vehicles more than 4 years before this litigation began, and thus each of their implied warranty claims is time-barred by the Missouri and Texas UCC.

- New GM's express warranties have time and mileage limits that are enforced by Texas and Missouri courts, barring the implied warranty claims of named plaintiffs Akers, Hamilton, K, Robinson, Tinen, Witherspoon, Al-ghamdi, Bacon, Fuller, Graciano, and McClellan.

- All three bellwether states hold that there is no breach of implied warranty where plaintiffs drove their vehicles for years or tens of thousands of miles, barring the implied

3

warranty claims of named plaintiffs Basseri, Cerceres, Orosco, Padilla, Thomas, Akers, Hamilton, Stefano, Witherspoon, Fuller, and Graciano.

Plaintiffs' remaining unjust enrichment claims are barred. The Court already dismissed all Texas named plaintiffs' unjust enrichment claims because those plaintiffs have an adequate remedy at law, and the same rule applies in California and Missouri. Thus, summary judgment should be granted against the unjust enrichment claims of all California and Missouri named plaintiffs. The Court also held plaintiffs in California and Missouri could not bring claims if their vehicles were covered by warranties, which bars the claims of named plaintiffs Basseri, Cereceres, Orosco, Akers, K. Robinson, Stefano, Tinen, and Witherspoon.

Summary judgment should also be granted against plaintiffs who purchased Old GM or used vehicles for multiple reasons:

- California, Missouri, and Texas all hold that there is no duty to disclose without a transaction between the parties. Here, New GM did not engage in any transaction with those who purchased Old GM vehicles. Therefore, summary judgment should be granted against the omissions-based claims of all named plaintiffs who own Old GM vehicles, specifically Thomas, Hamilton, Al-ghamdi, Bacon, Fuller, Graciano, and McClellan.

- Independently, for an asset purchaser to potentially be liable to the asset seller's customers, a jurisdiction must impose a duty to warn. Neither California nor Texas impose a duty to warn on asset purchasers, and thus the claims of Old GM vehicle owners are barred, specifically named plaintiffs Thomas, Al-ghamdi, Bacon, Fuller, Graciano, and McClellan.

- New GM was not the seller or manufacturer of any Old GM vehicle, and thus cannot be liable for any breach of implied warranty claims under the UCC or the California Song-Beverly Act brought by plaintiffs who purchased an Old GM vehicle, specifically named plaintiffs Santiago, Thomas, Akers, Hamilton, Al-ghamdi, Bacon, Fuller, Graciano, and McClellan.

- The California Song-Beverly Act that provides the basis for California plaintiffs' implied warranty claims does not apply to used vehicle purchasers such as named plaintiffs Basseri and Thomas.

- Used vehicle purchasers did not provide New GM with the benefit required to state an unjust enrichment claim. Thus, summary judgment should be granted against the unjust enrichment claims of used car purchaser named plaintiffs Basseri, Thomas, Hamilton, Hawkins, K. Robinson, R. Robinson, Stefano, and Witherspoon.

Texas plaintiffs' consumer protections claims are barred to the extent they are based on unconscionability. Unconscionability requires that a defendant's acts be unmitigated. Here, New GM mitigated its acts by recalling all the vehicles at issue and repairing them at its own expense, which bars all Texas consumer protection unconscionability claims. In addition, unconscionability requires that the plaintiff lack sophistication, and named plaintiffs Graciano and Al-ghamdi were both sophisticated purchasers.

The Bankruptcy-Claim-Fraud counts (the only counts brought by 11 plaintiffs) are barred for multiple reasons:

- New GM had no duty to these plaintiffs because (1) New GM did not have a duty to disclose because it did not engage in any transaction with the Bankruptcy-Claim-Fraud plaintiffs, who all purchased Old GM vehicles; (2) New GM did not have any direct transaction with the Old GM vehicle owners as required for a fraudulent concealment claim under Texas law; and (3) under California and Texas law, New GM as an asset purchaser does not have any duty to warn Old GM vehicle owners.

- In addition to the lack of duty, the Bankruptcy-Claim-Fraud counts fail for the following reasons:

- The Bankruptcy-Claim-Fraud plaintiffs "purchased cars from Old GM" and thus "suffered an injury before New GM even existed and cannot now recover from New GM for those injuries." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 401 (S.D.N.Y. 2017).

- Fraud claims require damages, and the Bankruptcy-Claim-Fraud plaintiffs' alleged damages depend on the benefit-of-the-bargain theory which fails because (1) New GM has offered to repair the vehicles free of charge, thus providing plaintiffs with the benefit of their bargain and (2) no named plaintiff has evidence of their alleged benefit-of-the-bargain loss. Nor can plaintiffs recover "lost time" for recall repairs, as the recalls occurred after the time for filing a claim against Old GM.

- Fraud claims—including the Bankruptcy-Claim-Fraud counts—require proof of reliance and causation, which named plaintiffs Barker, Ramirez, Brown, Mattos, Michael & Sylvia Benton, and Malaga cannot show.

- Named plaintiffs Rukeyser (who owned a Service Parts Vehicles whose switch was not replaced) and Simmons and Henry (Texas plaintiffs who cannot prove a manifest defect) had no meritorious counts against Old GM, and so could not have recovered on any bankruptcy claim.

Case 1:14-md-02543-JMF   Document 5656   Filed 07/20/18   Page 6 of 7

*Fourth*, plaintiffs cannot obtain injunctive relief because they have not alleged or provided evidence that legal remedies are inadequate to prevent any irreparable future harm. Plaintiffs' requested relief of having the Court monitor the effectiveness of New GM's recalls is both impractical and unprecedented. Plaintiffs' requested injunctive relief also is vague and overbroad, and thus impermissible under federal rules and traditional equitable requirements.

New GM's Motion is further supported by its accompanying Memorandum, including Exhibit 1, which identifies the claims asserted by each named plaintiff and summarizes why those claims fail.

WHEREFORE, for the reasons set forth in this Motion and the accompanying Memorandum, New GM respectfully requests that the Court grant summary judgment against all the claims of each of the named plaintiffs at issue in this motion.

Respectfully submitted,

Dated: July 20, 2018          */s/ Richard C. Godfrey, P.C.*

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant General Motors LLC*

### CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing Brief using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

By: /s/ *Andrew B. Bloomer, P.C.*
Andrew B. Bloomer, P.C.

# EXHIBIT A-2

**NEW GM'S *MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST THE BELLWETHER ECONOMIC LOSS PLAINTIFFS***

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC | ) | No. 14-MC-2543 (JMF) |
| IGNITION SWITCH LITIGATION | ) | |
| | ) | Hon. Jesse M. Furman |
| *This Document Relates To All Actions* | ) | |
| | ) | |

# DEFENDANT GENERAL MOTORS LLC'S MEMORANDUM
# IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST
# THE BELLWETHER ECONOMIC LOSS PLAINTIFFS

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant General Motors LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 3

    A.    New GM Conducted Recalls To Repair Vehicles Free-of-Charge ........................ 3

        1.    Recall No. 14v047 ("Delta Ignition Switch") ............................................ 3

        2.    Recall Nos. 14v355, 14v394, 14v400 ("Key Rotation") ........................... 4

        3.    Recall No. 14v346 ("Camaro Knee-Key Rotation") ................................ 6

        4.    Recall No. 14v118 ("SIAB Wiring Harness") ........................................... 7

        5.    Recall No. 14v153 ("EPS Assist") ............................................................ 8

    B.    The Court's Prior Rulings Narrowed Plaintiffs' Claims And Alleged Damages ........................................................................................................ 9

    C.    The Named Plaintiffs At Issue ....................................................................... 11

ARGUMENT ........................................................................................................ 12

I.    PLAINTIFFS HAVE NO LEGALLY RECOVERABLE DAMAGES. .......................... 12

    A.    New GM's Recall Repairs Preclude Plaintiffs' Alleged Benefit-Of-The-Bargain Damages. ...................................................................................... 13

        1.    The Undisputed Evidence Establishes That The Recall Repairs Were Effective And Remedied The Defects ........................................... 14

        2.    Plaintiffs Have No Relevant Or Admissible Evidence That New GM's Recalls Did Not Fix The Defects ................................................... 16

    B.    Named Plaintiffs Have No Legally Cognizable Benefit-Of-The-Bargain Evidence ....................................................................................................... 19

        1.    The Named Plaintiffs Have No Evidence Of Benefit-Of-The-Bargain Damages And Deferred To Their Experts ................................. 20

        2.    The Named Plaintiffs' Putative Experts Did Not Determine Damages For Any Named Plaintiff ............................................................ 22

    C.    Various Plaintiffs' Claims Fail Because They Cannot Show A Manifest Defect ........................................................................................................... 24

i

## TABLE OF CONTENTS (CONT'D)

**Page**

D.    Plaintiffs Who Disposed Of Their Vehicles Before The Recalls Do Not
Have Legally Cognizable Or Recoverable Damages............................................ 26

E.    Plaintiffs Cannot Recover Lost Time Damages................................................... 27

1.    Lost Time Damages Require Proof Of Lost Earnings, Which No
Plaintiff (With One Exception) Provides............................................ 27

2.    No Plaintiffs Have Relevant Expert Testimony To Support Their
Lost Time Claims............................................................................. 30

F.    Plaintiffs Cannot Recover On Their Claims Without Damages. ........................ 31

II.    PLAINTIFFS WHOSE VEHICLES ARE SUBJECT TO SERVICE PARTS
VEHICLE RECALL HAVE NO CLAIMS......................................................... 32

III.    AS A MATTER OF LAW AND UNDISPUTED FACT, VARIOUS NAMED
PLAINTIFFS CANNOT ESTABLISH NEW GM'S LIABILITY. ................................. 34

A.    Certain Plaintiffs Cannot Show Reliance As Required For Consumer
Protection And Fraudulent Concealment Claims. .................................. 34

1.    Various Texas Plaintiffs Cannot Prove Reliance...................................... 35

2.    Various California Plaintiffs Likewise Cannot Show Reliance............... 37

3.    Various Missouri Plaintiffs Cannot Show Reliance. ............................... 40

B.    Plaintiffs Have Not Pled Any Actionable Misrepresentations. .......................... 40

1.    Alleged Statements That A Plaintiff Never Saw Or Heard Cannot
Have Caused Plaintiff Harm. ............................................................ 40

2.    New GM Cannot Be Liable For The Statements Of Third Parties,
Including Independent Dealers. ........................................................ 42

3.    The Alleged Misrepresentations Are Non-actionable Puffery................. 43

C.    Plaintiffs' Implied Warranty Claims Are Barred In Whole Or In Part............... 46

1.    New GM Warranties Exclude Benefit-of-the-Bargain, Lost Time,
and Other Consequential Damages................................................... 46

2.    Various Plaintiffs' Implied Warranty Claims Are Barred By The
Statutory Limitations Period............................................................ 48

3.    Various Plaintiffs' Implied Warranty Claims Are Barred By The
Time And Mileage Limits In The Vehicles' Warranties. ......................... 49

**TABLE OF CONTENTS (CONT'D)**

|  |  | **Page** |
|---|---|---|

4.   Numerous Plaintiffs' Substantial Use Of Their Vehicles Precludes Their Implied Warranty Claims. ................................ 50

D.   All Plaintiffs' Unjust Enrichment Claims Are Barred. ........................................ 54

    1.   California Law Precludes Plaintiffs' Unjust Enrichment Claims. ............ 54

    2.   Missouri Law Precludes Plaintiffs' Unjust Enrichment Claims. .............. 55

E.   Summary Judgment Should Be Granted Against Claims Of Plaintiffs Who Purchased Old GM Or Used Vehicles. ................................ 56

    1.   New GM Had No Duty To Disclose To Old GM Vehicle Purchasers. ................................ 56

        a.   New GM Did Not Have A Duty Under California Law. .............. 56

        b.   New GM Did Not Have A Duty Under Texas Law. ..................... 57

        c.   New GM Did Not Have A Duty Under Missouri Law. ................ 58

    2.   California And Texas Do Not Recognize An Asset Purchaser's Duty to Warn. ................................ 59

        a.   California Does Not Recognize An Asset Purchaser's Duty To Warn. ................................ 59

        b.   Texas Does Not Recognize An Asset Purchaser's Duty To Warn. ................................ 60

    3.   Used Old GM Purchasers Cannot Bring Implied Warranty Claims Against New GM, Which Was Not A "Seller" Of The Vehicles. ............ 61

    4.   The California Song-Beverly Act Does Not Apply To The Purchase Of Any Used Vehicle. ................................ 62

    5.   Used Vehicle Purchasers Cannot Recover On Their Unjust Enrichment Claims Because They Did Not Provide Any Benefit To New GM. ................................ 62

F.   Texas Plaintiffs Cannot Prove Unconscionability Under the Texas DTPA. ........ 63

    1.   New GM's Mitigation By Recalling And Repairing The Vehicles Precludes DTPA Unconscionability Claims. ................................ 63

    2.   Various Plaintiffs Cannot Show The Lack Of Sophistication Required To Assert A DTPA Unconscionability Claims. ................................ 65

Case 1:14-md-02543-JMF    Document 5869    Filed 07/20/18    Page 3 of 99

## TABLE OF CONTENTS (CONT'D)

**Page**

    G.    Multiple Grounds Bar Plaintiffs' Bankruptcy-Claim-Fraud Counts. ................... 66

        1.    New GM Had No Duty To Purchasers Of Old GM Vehicles................... 66

        2.    The Bankruptcy-Claim-Fraud Plaintiffs' Count Fails For Additional Reasons. ...................................................................... 68

IV.    PLAINTIFFS CANNOT OBTAIN INJUNCTIVE RELIEF............................................ 70

    A.    Plaintiffs' Have Not Alleged And Cannot Establish Irreparable Harm................ 71

    B.    The Extraordinary Relief Plaintiffs Request Is Not In The Public Interest. ......... 72

    C.    The Requested Future Relief Is Overbroad And Impermissibly Reaches Conduct Unrelated To The Alleged Violations. ................................................... 74

CONCLUSION...................................................................................................... 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abraham v. Volkswagen of Am., Inc.,*
795 F.2d 238 (2d Cir. 1986) ................................................................................. 10

*Adams v. Am. Suzuki Motor Corp.,*
2011 WL 1304766 (N.J. Super. Ct. App. Div. 2011) ........................................... 52

*Algarin v. Maybelline, LLC,*
300 F.R.D. 444 (S.D. Cal. 2014) .......................................................................... 38

*Allgood v. R.J. Reynolds Tobacco Co.,*
80 F.3d 168 (5th Cir. 196) .................................................................................... 61

*Am. Pipe & Constr. Co. v. Utah,*
414 U.S. 538 (1974) .............................................................................................. 48

*Am. Suzuki Motor Corp. v. Superior Court,*
44 Cal. Rptr. 2d 526 (Cal. App. Ct. 1995) ........................................................... 51

*Amburgy v. Express Scripts, Inc.,*
671 F. Supp. 2d 1046 (E.D. Mo. 2009) ................................................................ 28

*Arceneaux v. Lykes Bros. S.S. Co., Inc.,*
890 S.W.2d 191 (Tex. App. 1994) ........................................................................ 61

*Arnson v. Gen. Motors Corp.,*
377 F. Supp. 209 (N.D. Ohio 1974) ..................................................................... 43

*Astiana v. Ben & Jerry's Homemade, Inc.,*
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ............................................................ 20

*Astiana v. Hain Celestial Grp., Inc.,*
783 F.3d 753 (9th Cir. 2015) ................................................................................ 63

*Atari Corp. v. The 3DO Co.,*
1994 WL 723601 (N.D. Cal. May 16, 1994) ....................................................... 43

*Atchison, Topeka & Santa Fe Ry. Co. v. Acosta,*
435 S.W.2d 539 (Tex. Civ. App. 1968) ............................................................... 29

*Autohaus, Inc. v. Aguilar,*
794 S.W.2d 459 (Tex. App. 1990) ........................................................................ 43

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Avedisian v. Mercedes-Benz USA, LLC,*
  43 F. Supp. 3d 1071 (C.D. Cal. 2014)...................................................................... 51

*Azoulai v. BMW of N. Am., LLC,*
  2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ......................................................... 44

*Backhaut v. Apple, Inc.,*
  74 F. Supp. 3d 1033 (N.D. Cal. 2014) ..................................................................... 34

*Badame v. J.P. Morgan Chase Bank, N.A.,*
  641 F. App'x 707 (9th Cir. 2016).............................................................................. 28

*Bagdasarian v. Gragnon,*
  192 P.2d 935 (Cal. 1948) .......................................................................................... 20

*BaySystems N. Am. LLC v. Rosebud-Lott Indep. Sch. Dist.,*
  2011 WL 6989898 (Tex. App. Dec. 21, 2011) ........................................................ 46

*Bennett v. Crane,*
  289 S.W. 26 (Mo. Ct. App. 1926) ............................................................................ 55

*Berger v. Home Depot USA, Inc.,*
  741 F.3d 1061 (9th Cir. 2014)................................................................................... 31

*Bill & Joe Deane Bradford Invs., Inc. v. Cutter Aviation San Antonio, Inc.,*
  2005 WL 3161083 (Tex. App. Nov. 23, 2005) ........................................................ 45

*Block v. Wyeth, Inc.,*
  2003 WL 203067 (N.D. Tex. Jan. 28, 2003)............................................................ 61

*Bohac v. Walsh,*
  223 S.W.3d 858 (Mo. Ct. App. 2007) ................................................................. 59, 67

*Bossier Chrysler Dodge II, Inc. v. Rauschenberg,*
  201 S.W. 3d 787 (Tex. App. 2006) ........................................................................... 29

*Bowles v. Mars, Inc.,*
  2015 WL 3629717 (S.D. Tex. June 10, 2015) ......................................................... 36

*Brandt v. Gen. Motors, LLC,*
  Case No. 2:14-cv-00079, Docket No. 1, Original Class Action Complaint
  (S.D. Tex. Mar. 14, 2014) ......................................................................................... 48

*Briehl v. Gen. Motors Corp.,*
  172 F.3d 623 (8th Cir. 1999)..................................................................................... 45

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Brisson v. Ford Motor Co.*,
349 F. App'x 433 (11th Cir. 2009) ........................................................... 49

*Buffington v. Lewis*,
834 S.W.2d 601 (Tex. App. 1992) ........................................................... 48

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
769 F.2d 919 (2d Cir. 1985) ................................................................... 25

*Burns v. Bank of Am.*,
655 F. Supp. 2d 240 (S.D.N.Y. 2008) ..................................................... 13

*Burroughs v. Precision Airmotive Corp.*,
93 Cal. Rptr. 2d 124 (Cal. App. Ct. 2000) ......................................... 59, 68

*Bushendorf v. Freightliners Corp.*,
13 F.3d .1024 (7th Cir. 1993) ................................................................. 42

*Bussian v. DaimlerChrysler Corp.*,
411 F. Supp. 2d 614 (M.D.N.C. 2006) ................................................... 52

*Butler v. Adoption Media, LLC*,
486 F. Supp. 2d 1022 (C.D. Cal. 2007) ................................................. 27

*Butler v. Porsche Cars N. Am., Inc.*,
2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ........................................ 39

*Capital Ford Truck Sales, Inc. v. Ford Motor Co.*,
819 F. Supp. 1555 (N.D. Ga. 1992) ....................................................... 43

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) ................................................................. 42

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ......................................................................... 12, 33

*Chandler v. Gener Messer Ford, Inc.*,
81 S.W.3d 493 (Tex. App. 2002) ........................................................... 45

*Chapman v. Pacificare of Tex., Inc.*,
2005 WL 1155108 (S.D. Tex. Apr. 18, 2005) ........................................ 41

*Chicago Bd. of Educ.* v. *Substance, Inc.*,
354 F.3d 624 (7th Cir. 2003) ................................................................. 74

*Chin v. Chrysler Corp.*,
182 F.R.D. 448 (D.N.J. 1998) ............................................................... 72

<u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

*Chularee v. Cookson Co.*,
  2014 WL 726778 (Cal. App. Ct. Feb. 26, 2014) ........................................... 59

*Chuong Cam Ha v. W. Houston Infiniti, Inc.*,
  1995 WL 516993 (Tex. App. Aug. 31, 1995) ............................................. 17

*Cirulli v. Hyundai Motor Co.*,
  2009 WL 5788762 (C.D. Cal. June 12, 2009) ............................................. 44

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ...................................................................................... 71

*Coleman-Anacieto v. Samsung Elecs. Am., Inc.*,
  2016 WL 4729302 (N.D. Cal. Sept. 12, 2016) ........................................... 35

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal. App. 4th 663 (Cal. App. 2006) .................................................... 20

*Collins v. eMachines, Inc.*,
  202 Cal. App. 4th 249 (2011) ..................................................................... 54

*Combined Am. Ins. Co. v. Morgan*,
  214 S.W.2d 145 (Tex. Civ. App. 1948) ..................................................... 29

*Consumer Advocates v. Echostar Satellite Corp.*,
  113 Cal. App. 4th 1351 (2d Dist. 2003) ..................................................... 43

*Contech Casting, LLC v. ZF Steering Sys., LLC*,
  931 F. Supp. 2d 809 (E.D. Mich. 2013) ..................................................... 72

*Cortinas v. Behr Process Corp.*,
  2017 WL 2418012 (E.D. Mo. June 5, 2017) ............................................. 43

*Cruz v. Andrews Restoration, Inc.*,
  364 S.W.3d 817 (Tex. 2012) ................................................................. 31, 34

*Dagher v. Ford Motor Co.*,
  238 Cal. App. 4th 905 (2015) ..................................................................... 62

*Daigle v. Ford Motor Co.*,
  2012 WL 3113854 (D. Minn. July 31, 2012) ........................................ 45, 63

*Deburro v. Apple, Inc.*,
  2013 WL 5917665 (W.D. Tex. Oct. 31, 2013) ...................................... 41, 49

*DePeralta v. Dlorah, Inc.*,
  2012 WL 4092191 (W.D. Mo. Sept. 17, 2012) .......................................... 58

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Detroit Newsp. Publishers Ass'n v. Detroit Typographical Union No. 18,*
 *Intern. Typographical Union*, 471 F.2d 872 (6th Cir. 1972) ................................ 73

*Diais v. Land Rover Dallas, L.P.,*
 2016 WL 1298392 (Tex. App. Apr. 4, 2016) ................................ 43, 65

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
 907 S.W.2d 472 (Tex. 1995) ................................ 31

*Doll v. Ford Motor Co.,*
 814 F. Supp. 2d 526 (D. Md. 2011) ................................ 63

*Dugas v. Starwood Hotels & Resorts Worldwide, Inc.,*
 2016 WL 6523428 (S.D. Cal. Nov. 3, 2016) ................................ 27

*Dunlap v. Gayle,*
 2013 WL 1500377 (Tex. App. Apr. 11, 2013) ................................ 45

*Durell v. Sharp Healthcare,*
 183 Cal. App. 4th 1350 (2010) ................................ 34

*Durrell v. Sharp Healthcare,*
 183 Cal. App. 4th 1350 (2010) ................................ 41

*eBay Inc. v. MercExchange, L.L.C.,*
 547 U.S. 388 (2006) ................................ 71, 72

*Ehret v. Uber Tech., Inc.,*
 148 F. Supp. 3d 884 (N.D. Cal. 2015) ................................ 41

*Emmons v. Durable Mobile Homes, Inc.,*
 521 S.W.2d 153 (Tex. App. 1974) ................................ 47

*English v. Apple Inc.,*
 2016 WL 1188200 (N.D. Cal. Jan. 5, 2016) ................................ 35, 39

*Everett v. TK-Taito, L.L.C.,*
 178 S.W.3d 844 (Tex. App. 2005) ................................ 32

*Exec. Taxi/Golden Cab v. Abdelillah,*
 2004 WL 1663980 (Tex. App. July 19, 2004) ................................ 17

*Fed. Exp. Corp. v. Fed. Espresso, Inc.,*
 201 F.3d 168 (2d Cir. 2000) ................................ 72

*Fernandes v. Havkin,*
 731 F. Supp. 2d 103 (D. Mass. 2010) ................................ 55

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Fidelity & Guar. Life Ins. Co. v. Pina,*
    165 S.W.3d 416 (Tex. App. 2005) ........................................................... 35

*Firestone Steel Prods. Co. v. Barajas,*
    927 S.W.2d 608 (Tex. 1996) .......................................................... 60, 61

*Ford Motor Co. v. Fairley,*
    398 So.2d 216 (Miss. 1981) .......................................................... 51

*Ford Motor Co. v. Ocanas,*
    136 S.W.3d 447 (Tex. App. 2004) ........................................................... 35

*Ford v. Reynolds,*
    316 F.3d 351 (2d Cir. 2003) .......................................................... 71

*Ford v. St. Louis Metro. Towing, L.C.,*
    2010 WL 618491 (E.D. Mo. Feb. 18, 2010) ........................................... 28

*Fort v. Am. Fed'n of State, County and Mun. Emps.,*
    375 Fed. App'x 109 (2d Cir. 2010) .......................................................... 71

*Frank v. DaimlerChrysler Corp.,*
    292 A.D.2d 118 (N.Y. App. Div. 1st Dept. 2002) ............................. 72, 73

*Fulford v. Logitech,*
    2009 WL 837639 (N.D. Cal. Mar. 26, 2009) ......................................... 57

*Ganz v. Metro. St. R. Co.,*
    220 S.W. 490 (Mo. 1920) .......................................................... 29

*Garcia v. Asphalt Equip. & Serv. Co.,*
    2005 WL 488569 (Cal. App. Ct. Mar. 3, 2005) ................................... 59

*Gaulding v. Celotex Corp.,*
    772 S.W.2d 66 (Tex. 1989) .......................................................... 60

*Gee v. Tenneco, Inc.,*
    615 F.2d 857 (9th Cir. 1980) .......................................................... 59, 60

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) .......................................................... 18

*Gen. Motors Corp. v. Halco Instruments, Inc.,*
    185 S.E.2d 619 (Ga. Ct. App. 1971) .......................................................... 47

*Gerard v. Wells Fargo Bank, N.A.,*
    2015 WL 12791416 (C.D. Cal. 2015) .......................................................... 28

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*GJP, Inc. v. Ghosh*,
    251 S.W.3d 854 (Tex. App. 2008) ........................................................ 20

*Glass v. BMW of N. Am., LLC*,
    2011 WL 6887721 (D.N.J. Dec. 29, 2011) ......................................... 52

*Goodrich & Pennington Mortgage Fund, Inc. v. Chase Home Fin., LLC*,
    2008 WL 11338041 (S.D. Cal. Apr. 22, 2008) ................................... 55

*Grasshopper House v. Bosworth*,
    2015 WL 7354822 (Cal. Ct. App. Nov. 20, 2015), .............................. 17

*Grassi v. Int'l Comfort Prods., LLC*,
    2015 WL 4879410 (E.D. Cal. Aug. 14, 2015) ..................................... 43

*Greater Houston Transp. Co. v. Uber Techs., Inc.*,
    155 F. Supp. 3d 670 (S.D. Tex. Dec. 2015) ....................................... 45

*Grossoeheme v. Cordell*,
    904 S.W.2d 392 (Mo. Ct. App. 1995) ................................................. 40

*Hall v. Time Inc.*,
    158 Cal. App. 4th 847 (2008) .............................................................. 34

*Hangarter v. Provident Life and Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ............................................................... 71

*Harris v. Penninger*,
    613 S.W.2d 211 (Mo. Ct. App. 1981) ................................................. 29

*Hauter v. Zogarts*,
    14 Cal. 3d 104 (1975) .......................................................................... 44

*Heberer v. Shell Oil Co.*,
    744 S.W.2d 441 (Mo. 1988) ................................................................ 32

*Henderson v. Ford Motor Co.*,
    547 S.W.2d 663 (Tex. App. 1977) ...................................................... 47

*Henry Schein, Inc. v. Stromboe*,
    102 S.W.3d 675 (Tex. 2002) .......................................................... 34, 35

*Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp.*,
    774 N.W.2d 332 (Mich. Ct. App. 2009) ............................................. 47

*Hoffman v. 162 North Wolfe LLC*,
    175 Cal Rptr. 3d 820 (Cal. Ct. App. 2014) ........................................ 57

Case 1:14-md-02543-JMF    Document 5869    Filed 07/20/18    Page 23 of 99

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Hoffman v. A. B. Chance Co.,*
339 F. Supp. 1385 (M.D. Pa. 1972) ............................................................... 45

*Hoffmeister v. Kranawetter,*
407 S.W.3d 59 (Mo. Ct. App. 2013) ............................................................... 63

*In re Accutane Prods. Liab.,*
511 F. Supp. 2d 1288 (M.D. Fla. 2007) ......................................................... 18

*In re C.R. Bard, Inc.,*
948 F. Supp. 2d 589 (S.D. W. Va. 2013) ....................................................... 17

*In re Chateaugay Corp.,*
53 F.3d 478 (2d Cir. 1995) ............................................................................. 68

*In re Clorox Consumer Litig.,*
301 F.R.D. 436 (N.D. Cal. 2014) ................................................................... 35

*In re Davenport,*
491 B.R. 911 (Bankr. W.D. Mo. 2013) .......................................................... 20

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II),*
2010 WL 2813788 (D.N.J. July 9, 2010) ....................................................... 45

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.,*
2011 WL 601279 (D.N.J. Feb. 16, 2011) ...................................................... 63

*In re Ford Motor Co. Sec. Litig., Class Action,*
381 F.3d 563 (6th Cir. 2004) ......................................................................... 45

*In re Gen. Motors Anti-Lock Brake Prods. Liab. Litig.,*
966 F. Supp. 1525 (E.D. Mo. 1997) .............................................................. 45

*In re Gen. Motors Ignition Switch Litig.,*
2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018) ............................................. passim

*In re Gen. Motors LLC Ignition Switch Litig.,*
2016 WL 874778 (S.D.N.Y. Mar. 3, 2016) .................................................... 62

*In re Gen. Motors LLC Ignition Switch Litig.,*
2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017) ................................................. 11

*In re Gen. Motors LLC Ignition Switch Litig.,*
2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ..................................... 10, 26, 31

*In re Gen. Motors LLC Ignition Switch Litig.,*
2017 WL 6509256 (S.D.N.Y. Dec. 19, 2017) ............................................... 10

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Gen. Motors LLC Ignition Switch Litig.,*
  2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018) ........................................................ 11

*In re Gen. Motors LLC Ignition Switch Litig.,*
  202 F. Supp. 3d 362 (S.D.N.Y. 2016) ................................................................ 50

*In re Gen. Motors LLC Ignition Switch Litig.,*
  257 F. Supp. 3d 372 (S.D.N.Y. 2017) .......................................................... passim

*In re Gen. Motors LLC Ignition Switch Litig.,*
  2016 WL 3920353 (S.D.N.Y. July 15, 2016) ................................................ passim

*In re General Motors LLC Ignition Switch Litig.,*
  2017 WL 6729295 (S.D.N.Y. Dec, 28, 2017) .................................................. 16, 18

*In re iPhone Application Litig.,*
  6 F. Supp. 3d 1004 (N.D. Cal. 2013) ................................................................ 41

*In re LinkedIn User Privacy Litig.,*
  932 F. Supp. 2d 1089 (N.D. Cal. 2013) ............................................................. 41

*In re Mirena,*
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................... 17, 18

*In re Motors Liquidation Co.,*
  829 F.3d 135 (2d Cir. 2016) ............................................................................. 68

*In re NJOY, Inc. Consumer Class Action Litig.,*
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ............................................................ 20

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.,*
  903 F. Supp. 2d 942 (S.D. Cal. 2012) .............................................................. 27

*In re Vioxx Class Cases,*
  180 Cal. App. 4th 116 (2009) .......................................................................... 38

*In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.,*
  127 F. Supp. 3d 1306 (N.D. Ga. 2015) ............................................................. 19

*Isip v. Mecedes-Benz USA,*
  65 Cal. Rptr. 3d 695 (Cal. App. Ct. 2007) ........................................................ 51

*Jones v. SIG Arms, Inc.,*
  2001 WL 1617187 (Tex. App. Dec. 19, 2001) ............................................... 60, 68

*Kuhns v. Scotttrade, Inc.,*
  868 F.3d 711 (8th Cir. 2017) ........................................................................... 28

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Kwikset Corp. v. Super. Ct.*,
  246 P.3d 877 (Cal. 2011) ........................................................................... 31

*Larabee v. Eichler*,
  271 S.W.3d 542 (Mo. 2008) ....................................................................... 20

*Larsen v. Nissan N. Am.*,
  2009 WL 1766797 (Cal. Ct. App. June 23, 2009) ..................................... 51

*LeCates v. Hertrich Pontiac Buick Co.*,
  515 A.2d 163 (Del. Super. Ct. 1986) ......................................................... 47

*Lee v. Gen. Motors Corp.*,
  950 F.Supp. 170 (S.D. Miss. 1996) ........................................................... 52

*Lesser v. St. Louis & S. Ry. Co.*,
  85 Mo. App. 331 (Mo. App. Ct. 1900) ...................................................... 29

*LiMandri v. Judkins*,
  60 Cal. Rptr. 2d 539 (Cal. Ct. App. 1997) ................................... 56, 60, 67

*Lueras v. BAC Home Loans Servicing, LP*,
  163 Cal. Rptr. 3d 804 (Cal. Ct. App. 2013) .............................................. 27

*Marshall v. Kusch*,
  84 S.W.3d 781 (Tex. App. 2002) ........................................................ 58, 67

*Martin v. Ford Motor Co.*,
  292 F.R.D. 252 (E.D. Pa. July 2, 2013) .................................................... 56

*Matthews v. Ford Motor Co.*,
  479 F.2d 399 (4th Cir. 1973) ..................................................................... 42

*May v. AC & S, Inc.*,
  812 F. Supp. 934 (E.D. Mo. 1993) ............................................................ 48

*McLaughlin v. Northstar Drillings Techs., Inc.*,
  138 S.W.3d 24 (Tex. App. 2004) ............................................................... 36

*McManus v. Fleetwood Enters., Inc.*,
  320 F.3d 545 (5th Cir. 2003) ..................................................................... 35

*McNeely v. Salado Crossing Holding, L.P.*,
  2017 WL 2561551 (Tex. App. June 14, 2017) .......................................... 43

*Meserole v. Sony Corp. of Am., Inc.*,
  2009 WL 1403933 (S.D.N.Y. May 19, 2009) ........................................... 49

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Messina v. Prather*,
   42 S.W.3d 753 (Mo. Ct. App. 2001) ..................................................... 28

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) ................................................. 74

*Mexia v. Rinker Boat Co., Inc.*,
   95 Cal. Rptr. 3d 285 (Cal. App. Ct. 2009) ............................................ 51

*Microsoft Corp v. Baker*,
   137 S. Ct. 1702 (2017) ........................................................................ 31

*Minkin v. State Farm Gen. Ins. Co.*,
   2014 WL 117481 (Cal. Ct. App. Jan. 14, 2014) ................................... 17

*Mirkin v. Wasserman*,
   858 P.2d 568 (Cal. 1993) ............................................................... 35, 37

*Mitchell v. Gen. Motors LLC*,
   2014 WL 1319519 (W.D. Ky. Mar. 31, 2014) ..................................... 45

*Moore v. Panini Am.*,
   2016 WL 7163899 (Tex App. Nov. 7, 2016) ....................................... 34

*Mostek Corp. v. Chemetron Corp.*,
   642 S.W.2d 20 (Tex. App. 1982) ......................................................... 47

*Muehlbauer v. Gen. Motors Corp.*,
   2009 WL 874511 (N.D. Ill. Mar. 31, 2009) ........................................ 55

*Muss v. Mercedes-Benz of N. Am.*,
   734 S.W.2d 155 (Tex. App. 1987) ....................................................... 48

*Myre v. Meletio*,
   307 S.W.3d 839 (Tex. App. 2010) ....................................................... 58

*N.L.R.B. v. Express Pub. Co.*,
   312 U.S. 426 (1941) ............................................................................ 74

*N.Y. State Nat. Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989) .............................................................. 71

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ........................................................ 43, 44

*Newton v. City of New York*,
   640 F. Supp. 2d 426 (S.D.N.Y. 2009) ................................................. 37

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*O'Keefe v. Mercedes-Benz USA, LLC,*
2002 WL 377122 (E.D. Pa. Jan. 31, 2002) ............................................................ 73

*Olivas v. Am. Home Prods. Corp.,*
2002 WL 32620351 (W.D. Tex. Oct. 18, 2002) ..................................................... 60

*Ortega v. Gen. Motors Corp.,*
392 So.2d 40 (Fla. Dist. Ct. App. 1980).................................................................. 43

*Peltier Enters. v. Hilton,*
51 S.W.3d 616 (Tex. App. 2000) ................................................................ 34, 35, 65

*Perkins v. LinkedIn Corp.,*
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ..................................................................... 41

*Peterson v. Cont'l Boiler Works, Inc.,*
783 S.W.2d 896 (Mo. 1990)..................................................................................... 20

*Philips v. Ford Motor Co.,*
2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ........................................................ 37

*Pleasant v. Noble Fin. Corp.,*
54 F. Supp. 3d 1071 (W.D. Mo. 2014)..................................................................... 28

*Priebe v. Autobarn, Ltd.,*
240 F.3d 584 (7th Cir. 2001).................................................................................... 52

*Princess Cruise Lines, Ltd. v. Superior Court,*
179 Cal. App. 4th 36 (2009)..................................................................................... 34

*Pro Serv. Auto., L.L.C. v. Lenan Corp.,*
469 F.3d 1210 (8th Cir. 2006).................................................................................. 17

*R. D. Reeder Lathing Co. v. Cypress Ins. Co.,*
84 Cal. Rptr. 98 (Cal. Ct. App. 1970) ..................................................................... 28

*Ramona Manor Convalescent Hosp. v. Care Enters.,*
177 Cal. App. 3d 1120 (1986)................................................................................... 54

*Rauscher v. Gen. Motors Corp.,*
905 S.W.2d 158 (Mo. Ct. App. 1995) ...................................................................... 17

*Resnick v. Hyundai Motor Am., Inc.,*
2016 WL 9455016 (C.D. Cal. Nov. 14, 2016) ........................................................ 41

*Roach v. Morse,*
440 F.3d 53 (2d Cir. 2006)....................................................................................... 71

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Rogozienski v. Allen,*
2007 WL 867773 (Cal. Ct. App. Mar. 23, 2007) ..................................................... 57

*Rojas-Lozano v. Google, Inc.,*
159 F. Supp. 3d 1101 (N.D. Cal. 2016) .................................................................. 37

*Russo v. Hilltop Lincoln-Mercury, Inc.,*
479 S.W.2d 211 (Mo. Ct. App. 1972) .................................................................... 47

*Rylott-Rooney v. Alitalita-Linee Aeree Italiane SpA,*
2009 WL 37817 (S.D.N.Y. Jan. 6, 2009) ............................................................... 37

*S & J, Inc. v. McLoud & Co., L.L.C.,*
108 S.W.3d 765 (Mo. Ct. App. 2003) .................................................................... 32

*Saavedra v. Eli Lilly & Co.,*
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........................................................ 20

*Sabol v. Ford Motor Co.,*
2015 WL 4378504 (E.D. Pa. July 16, 2015) .......................................................... 45

*Sadat v. Am. Motors Corp.,*
470 N.E.2d 997 (Ill. 1984) ..................................................................................... 71

*Safeway Stores, Inc. v. Certainteed Corp.,*
710 S.W.2d 544 (Tex. 1986) ................................................................................... 48

*Salazar v. Buono,*
559 U.S. 700 (2010) ................................................................................................ 72

*Samms v. Abrams,*
198 F. Supp. 3d 311 (S.D.N.Y. 2016) .................................................................... 71

*Sanders v. Air Line Pilots Ass'n Int'l.,*
473 F.2d 244 (2d Cir. 1972) .............................................................................. 74, 75

*Schmidt v. Ford Motor Co.,*
972 F. Supp. 2d 712 (E.D. Pa. 2013) ..................................................................... 63

*Schneider v. G. Guilliams, Inc.,*
976 S.W.2d 522 (Mo. Ct. App. 1998) .................................................................... 48

*Schoenlein v. Routt Homes, Inc.,*
260 S.W.3d 852 (Mo. Ct. App. 2008) .................................................................... 28

*Scholl v. Grayson,*
127 S.W. 415 (Mo. Ct. App. 1910) ........................................................................ 29

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Season Comfort Corp. v. Ben A. Borenstein Co.*,
  655 N.E.2d 1065 (Ill. App. Ct. 1995) ........................................................................ 55

*Sellify Inc. v. Amazon.com, Inc.*,
  2010 WL 4455830 (S.D.N.Y. 2010) ........................................................................ 13

*Sharp v. Tom Wood East, Inc.*,
  822 N.E.2d 173 (Ind. Ct. App. 2004) ..................................................................... 52

*Silvas v. Gen. Motors, LLC*,
  2014 WL 1572590 (S.D. Tex. Apr. 17, 2014) ........................................................ 73

*Sims v. Kia Motors Am., Inc.*,
  2014 WL 12558249 (C.D. Cal. Mar. 31, 2014) ...................................................... 44

*Skeen v. BMW of N. Am., LLC*,
  2014 WL 283628 (D.N.J. Jan. 24, 2014) ................................................................ 51

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*,
  230 F. Supp. 3d 290 (S.D.N.Y. 2017) .................................................................... 12

*Smith v. Tracy*,
  372 S.W.2d 925 (Mo. 1963) .................................................................................... 20

*Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*,
  2008 WL 5115294 (Tex. App. Dec. 4, 2008) ........................................................ 41

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) ......................................................... 55

*State ex rel. Bunting v. Koehr*,
  865 S.W.2d 351 (Mo. 1993) .................................................................................... 42

*State Farm Lloyds v. Nicolau*,
  951 S.W.2d 444 (Tex. 1997) ................................................................................... 64

*Steele v. Goddard*,
  2013 WL 3013671 (Tex. App. June 13, 2013) ................................................. 57, 58

*Stein v. Novus Equities Co.*,
  284 S.W.3d 597 (Mo. Ct. App. 2009) ..................................................................... 40

*Stevenson v. Mazda Motor of Am., Inc.*,
  2015 WL 3487756 (D.N.J. June 2, 2015) ............................................................... 49

*Stickrath v. Globalstar, Inc.*,
  527 F. Supp. 2d 992 (N.D. Cal. 2007) .................................................................... 43

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Stout v. Turney,*
586 P.2d 1228 (Cal. 1978) ................................................................. 20

*Sud v. Costco Wholesale Corp.,*
229 F. Supp. 3d 1075 (N.D. Cal. 2017) ................................... 34, 37, 39

*Suddreth v. Mercedes-Benz, LLC,*
2011 WL 5240965 (D.N.J. Oct. 31, 2011) ........................................ 52

*Suminski v. Maine Appliance Warehouse, Inc.,*
602 A.2d 1173 (Me. 1992) ................................................................. 52

*Szymczak v. Nissan N. Am., Inc.,*
2011 WL 7095432 (S.D.N.Y. Dec. 16, 2011) .................................... 51

*Tague v. Autobarn Motors, Ltd.,*
914 N.E.2d 710 (Ill. App. Ct. 2009) ................................................. 52

*Tellinghuisen v. Chrysler Group, LLC,*
84 U.C.C. Rep. Serv. 2d 564 (Minn. Ct. App. 2014) ........................ 52

*Terry v. Mercedes-Benz, USA, LLC,*
2007 WL 2045231 (Tex. App. 2007) .......................................... 57, 66

*Tex. S. Rentals, Inc. v. Gomez,*
267 S.W.3d 228 (Tex. App. 2008) ..................................................... 35

*Theos & Sons, Inc. v. Mack Trucks, Inc.,*
1999 WL 38393 (Mass. App. Ct. 1999) ............................................ 47

*Thompson v. Bayer Corp.,*
2009 WL 362982 (E.D. Ark. 2009) ................................................... 56

*Town E. Ford Sales, Inc. v. Gray,*
730 S.W.2d 796 (Tex. App. 1987) .................................................... 20

*Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.,*
549 U.S. 443, 450 .............................................................................. 69

*Triggs v. Risinger,*
772 S.W.2d 381 (Mo. Ct. App. 1989) .............................................. 35

*Trudeau v. Bockstein,*
2008 WL 541158 (N.D.N.Y. Feb. 25, 2008) .................................... 71

*Tudor Dev. Group, Inc. v. U.S. Fidelity & Guar. Co.,*
968 F.2d 357 (3d Cir. 1992) ............................................................. 55

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*,
   213 F.3d 627 (2d Cir. 2000) ............................................................. 13

*Valley Nissan, Inc. v. Davila*,
   133 S.W.3d 702 (Tex. App. 2003) .................................................... 29

*Vista Chevrolet, Inc. v. Barron*,
   698 S.W.2d 435 (Tex. App. 1985) .................................................... 29

*Walsh v. Al West Chrysler, Inc.*,
   211 S.W. 3d 673 (Mo. Ct. App. 2007) ............................................. 28

*Walsh v. Ford Motor Co.*,
   807 F.2d 1000 (D.C. Cir. 1986) ....................................................... 10

*Walsh v. Ingersoll-Rand Co.*,
   656 F.2d 367 (8th Cir. 1981) ........................................................... 29

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011) ........................................... 37, 38, 39

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ........................................................................ 71

*Welwood v. Cypress Creek Estates, Inc.*,
   205 S.W.3d 722 (Tex. App. 2006) .................................................... 47

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 2191901 (N.D. Cal. May 23, 2014) ................................... 20

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ................................... 20

*Williams v. HSBC Bank USA, N.A.*,
   467 S.W.3d 836 (Mo. Ct. App. 2015) ............................................... 41

*Williams v. Kia Motors Am., Inc.*,
   2005 WL 2649152 (E.D. Mich. Oct. 14, 2005) ................................. 52

*Williams v. United Techs. Corp.*,
   2015 WL 7738370 (W.D. Mo. Nov. 30, 2015) .............................. 43, 45

*Williams v. Yamaha Motor Corp., U.S.A.*,
   2015 WL 13626022 (C.D. Cal. Jan. 7, 2015) .................................... 42

*Wilson v. John Daugherty Realtors, Inc.*,
   981 S.W.2d 723 (Tex. App. 1998) .................................................... 57

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Wortham Bros. v. Haffner,*
   347 S.W.3d 356 (Tex. App. 2011) ........................................................................ 17

*Wright v. Bath & Body Works Direct, Inc.,*
   2012 WL 12088132 (W.D. Mo. Oct. 17, 2012) .................................................... 43

*Zaccagnino v. Nissan N. Am., Inc.,*
   2015 WL 3929620 (S.D.N.Y. June 17, 2015) ...................................................... 45

*Zapata Fonseca v. Goya Foods Inc.,*
   2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) ...................................................... 55

**Statutes**

11 U.S.C. § 502(b)(1) ............................................................................................. 69

Cal. Civ. Code § 1780(a) ........................................................................................ 31

Cal. Civ. Code § 1792 ....................................................................................... 61, 62

Cal. Civ. Code § 1794(a) ........................................................................................ 31

Cal. Civ. Code. § 1791(a) ....................................................................................... 62

Mo. Ann. Stat. § 407.025(1) ................................................................................... 28

Mo. Rev. Stat. § 400.2-314(1) ................................................................................ 61

Mo. Rev. Stat. § 400.2-316 ..................................................................................... 49

Mo. Rev. Stat. § 400.2-316(2) ................................................................................ 49

Mo. Rev. Stat. § 400.2-719(1)(a) ........................................................................... 46

Mo. Rev. Stat. § 400.2-719(3) ................................................................................ 46

Mo. Rev. Stat. § 400.2-725(1) ................................................................................ 48

Mo. Rev. Stat. § 400.2-725(2) ................................................................................ 48

Mo. Rev. Stat. § 407.020 ........................................................................................ 59

Tex. Bus. & Com. Code § 17.45(5) ........................................................................ 65

Tex. Bus. & Com. Code § 17.50(a) ........................................................................ 29

Tex. Bus. & Com. Code § 2.314(1) ........................................................................ 61

Case 1:14-md-02543-JMF Document 5859 Filed 05/18/18 Page 23 of 99

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

Tex. Bus. & Com. Code § 2.316 .................................................................................... 49

Tex. Bus. & Com. Code § 2.316(b) .............................................................................. 49

Tex. Bus. & Com. Code § 2.719(a)(1) .......................................................................... 46

Tex. Bus. & Com. Code § 2.719(c) ............................................................................... 47

Tex. Bus. & Com. Code § 2.725(1) ............................................................................... 48

Tex. Bus. & Com. Code § 2.725(2) ............................................................................... 48

**Other Authorities**

22 AM. JUR. 2D DAMAGES § 155 .................................................................................. 27

25 C.J.S. DAMAGES § 52 .............................................................................................. 27

**Rules**

Fed. R. Civ. P. 56 ......................................................................................................... 33

Fed. R. Civ. P. 65(d)(1) ................................................................................................ 74

Fed. R. Evid. 611(c) ..................................................................................................... 37

## INTRODUCTION

The undisputed facts and law establish that the named plaintiffs from the bellwether states of California, Missouri, and Texas cannot prove either damages or liability, and thus do not have any valid claims.

*First*, damages are an essential element of all claims in the bellwether states and plaintiffs cannot prove any such damages, whether in the form of benefit of the bargain, lost time, or otherwise. Named plaintiffs allege they did not receive the benefit of the bargain at the time of purchase, but ignore New GM's recall repairs, which the Court has concluded are relevant to benefit-of-the-bargain damages. *In re Gen. Motors Ignition Switch Litig.*, 2018 WL 1638096, at *2 (S.D.N.Y. Apr. 3, 2018) ("*BotB Opinion*"). Plaintiffs attempt to dispute whether New GM's recall repairs cured their defects, but the putative expert opinions they offer are inadmissible under *Daubert* and, even if considered, do not raise a genuine issue of material fact as to whether New GM's repairs were effective. Independently, each named plaintiff must prove benefit-of-the-bargain damages by measuring the difference between the purchase price and the market value of their vehicle with the alleged defects. Despite their burden, plaintiffs themselves offer no evidence on this issue and their putative experts admit that they did not, and were not even asked to, calculate benefit-of-the-bargain damages for any named plaintiff. Likewise, named plaintiffs' request for "lost free time" damages is legally and factually invalid because each bellwether state holds that lost time is not recoverable without proof of lost income, and none of the named plaintiffs (with one exception) have any such evidence. Certain named plaintiffs lack damages for additional reasons, such as that they sold, traded-in, or otherwise disposed of their vehicles before the recalls were announced.

*Second*, starting with model year 2008, Cobalts, Ions, and other vehicles covered by the Delta Ignition Switch recall (Recall No. 14v047) were built using an ignition switch that was not

Case 1:14-md-02543-JMF    Document 5859    Filed 07/20/18    Page 23 of 99

defective. Such "Service Parts Vehicles" were recalled because they "could have been repaired at some point using the faulty ignition switch." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, *20 n.15 (S.D.N.Y. July 15, 2016) ("*TACC MTD Opinion*"). If such plaintiffs "are ultimately to succeed on their claims with respect to the ignition switch, they will have to show that their cars in fact contained that defect." *TACC MTD Opinion*, at *20 n.15. None of the named plaintiffs owning the Service Parts Vehicles can satisfy this factual predicate.

*Third*, individual named plaintiffs' claims fail for a variety of additional reasons:

- Most named plaintiffs did not see *any* New GM advertising, much less the specific advertisements the Fifth Amended Consolidated Complaint ("5ACC") claims are false, and thus have no evidence that these alleged misrepresentations caused them injury.

- Other named plaintiffs' claims are legally impermissible because the advertisements they allegedly saw constitute non-actionable puffery.

- Various named plaintiffs cannot prove reliance on New GM's alleged misrepresentations or omissions.

- Many named plaintiffs' implied warranty claims fail because the written warranties bar recovery of consequential damages, the limitations period has expired, or plaintiffs drove their vehicles for many tens of thousands of miles without a problem.

- Named plaintiffs' unjust enrichment claims are barred because they have an adequate remedy at law, and because many plaintiffs received a written vehicle warranty.

- Named plaintiffs who purchased Old GM or used vehicles face additional bars, including that New GM had no duty to disclose to or warn these plaintiffs, New GM did not sell the vehicles as required for an implied warranty claim, and plaintiffs did not provide any benefits to New GM as required for an unjust enrichment claim.

- The counts of plaintiffs who allege that New GM concealed their right to file a bankruptcy claim fail for numerous reasons, including that (i) New GM had no duty to disclose to or warn such plaintiffs and (ii) such plaintiffs have no damages for the reasons discussed previously.

*Fourth*, plaintiffs cannot obtain injunctive relief because they have not alleged or provided evidence that legal remedies are inadequate to prevent any irreparable future harm. Plaintiffs' requested relief of having the Court monitor the effectiveness of New GM's recalls is

2

both impractical and unprecedented.  Finally, plaintiffs' requested injunctive relief is vague and overbroad, and thus impermissible under federal rules and traditional equitable requirements.

Accordingly, the Court should grant summary judgment against each named plaintiff's claims for each of these reasons, which are summarized in Exhibit 1.

## BACKGROUND

### A.    New GM Conducted Recalls To Repair Vehicles Free-of-Charge.

#### 1.    Recall No. 14v047 ("Delta Ignition Switch")

New GM issued a recall in February 2014 under NHTSA Recall No. 14v047 to remedy the "Delta Ignition Switch" defect.  SUF ¶ 1.  That initial recall covered model year ("MY") 2005-2007 Chevrolet Cobalt, MY 2007 Pontiac G5, MY 2003-2007 Saturn Ion, MY 2006-2007 Chevrolet HHR, MY 2005-2006 Pontiac Pursuit (Canada), MY 2006-2007 Pontiac Solstice, and MY 2007 Saturn Sky vehicles.  SUF ¶ 1.  These vehicles were manufactured with an ignition switch known as "the '423 switch" and were recalled because under certain conditions that switch could unintentionally move from the "run" position to "accessory" or "off" with a corresponding loss of power.  *Id.* ¶¶ 2-3.

In March 2014, New GM extended Recall No. 14v047 to MY 2008-2010 Pontiac Solstice and G5, MY 2008-2010 Saturn Sky, MY 2008-2010 Chevrolet Cobalt, and MY 2008-2011 Chevrolet HHR vehicles (the "Service Parts Vehicles").  SUF ¶ 4.  Service Parts Vehicles were not considered defective as manufactured, as they were built with an ignition switch ("the '190 switch") that had a longer detent plunger and higher torque resistance than the '423 switch.  *Id.* ¶¶ 6-8.  New GM's testing in 2014 concluded that vehicles equipped with the '190 switch did not have susceptibility to inadvertent key rotation, and so were not included in the initial Delta Ignition Switch recall.  SUF ¶¶ 7-9.  In March 2014, however, New GM, received information that a limited number of vehicles originally manufactured with the '190 switch might have been

3

repaired with the '423 switch, and "out of an abundance of caution" New GM extended the recall

to all Service Parts Vehicles. *Id.* ¶¶ 10-11; *see also TACC MTD Opinion*, at *20 n.15.

New GM remedied the original No. 14v047 recall vehicles and the Service Parts Vehicles

with a recall kit comprising an ignition switch, an ignition lock cylinder, two keys, and a key

ring. SUF ¶ 13. With the recall remedy implemented, the vehicle is resistant to unintended key

rotation because the moment arm[1] is minimized. *Id.* ¶ 16. The remedy also decouples the rigid

interaction between the ignition key and the key fob or other items attached to it, making the

ignition system resistant to unintended key rotation due to knee-key contact. *Id.* ¶ 17. New GM

validated the remedy through a variety of extreme driving condition and surrogate-driver tests.

*Id.* ¶¶ 18; 33-35. The ignition key did not rotate from "run" to "accessory" during any of the

extreme driving condition tests or any of the surrogate driver tests when the driver's knee was in

a normal driving position. *Id.* ¶¶ 32-40. The Virginia Tech Transportation Institute

independently evaluated New GM's testing, concluding that the tests were valid and robust to

assess the risk of inadvertent key rotation. *Id.* ¶¶ 41-44. New GM recalled the vehicles, made

the remedy available free of charge to all consumers, and sent out notices informing customers

and dealers. *Id.* ¶ 51.

### 2.     Recall Nos. 14v355, 14v394, 14v400 ("Key Rotation")

In June 2014, New GM recalled under NHTSA Recall No. 14v355 MY 2005-2009 Buick

Lacrosse, MY 2006-2014 Chevrolet Impala, MY 2000-2005 Cadillac Deville, MY 2006-2011

Cadillac DTS, MY 2006-2011 Buick Lucerne, and MY 2006-2007 Chevrolet Monte Carlo

vehicles ("Impala Key Rotation"). *Id*. ¶ 52. The ignition key for these vehicles was originally

---

[1] The moment arm distance is the distance from where the force is being applied to the axis of rotation. Torque is the product of the moment arm distance and the applied force. Thus, reducing the moment arm distance reduces the torque. SUF ¶ 16 n.1.

designed with a slot for attaching the key ring to the key. *Id.* ¶ 54. New GM's inadvertent key rotation testing showed that "[i]f the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position." *Id.* ¶ 53.

In July 2014, New GM recalled under NHTSA Recall No. 14v394 certain MY 2003-2014 Cadillac CTS and MY 2004-2006 Cadillac SRX vehicles ("Cadillac CTS / SRX Key Rotation"). *Id.* ¶ 64. The ignition key for the 2003-2007 MY Cadillac CTS vehicles and 2004-2006 MY Cadillac SRX vehicles was originally designed with a slot for attaching the key ring to the key. *Id.* ¶ 66. The ignition key for the 2008-2014 MY Cadillac CTS vehicles was also originally designed with a slot, but that slot was changed to a hole in December 2010. *Id.* ¶ 67. New GM's inadvertent key rotation testing showed that "[i]f the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, or if the driver unintentionally bumps the key ring or items attached to the key ring with their knee, the key may unintentionally move away from the 'run' position." *Id.* ¶ 65.

In July 2014, New GM recalled under NHTSA Recall No. 14v400 MY 2000-2005 Chevrolet Impala and Monte Carlo, MY 1997-2005 Chevrolet Malibu, MY 1999-2004 Oldsmobile Alero, MY 1998-2002 Oldsmobile Intrigue, MY 1999-2005 Pontiac Grand Am, and MY 2004-2008 Pontiac Grand Prix vehicles ("Malibu Key Rotation"). *Id.* ¶ 79. The ignition key for these vehicles was originally designed with a slot for attaching the key ring to the key. *Id.* ¶ 81. New GM's inadvertent key rotation testing showed that "[i]f the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position." *Id.* ¶ 80.

Differences exist among the vehicles, ignition system, and ignition switches subject to

5

Case 1:14-md-02543-JMF   Document 5869   Filed 05/4/20/18   Page 23 of 99

these three key rotation recalls that materially impact the circumstances under which the key may unintentionally rotate and the specific remedy implemented. SUF ¶ 55 n.2. New GM remedied the defects in Recall Nos. 14v355, 14v394, 14v400 by having dealers change the design of the ignition key and key rings to provide a key with a small diameter hole and two small (16-mm) diameter key rings and, depending on the vehicle's ignition key, a key insert in the key slot or a cover over the key head of all ignition keys. *Id.* ¶¶ 55, 68, 82. For the CTS vehicles manufactured after December 2010 in Recall No. 14v394, dealers provided drivers with two small (one 16 mm and one 18 mm) diameter key rings. *Id.* ¶ 70.

With the recall remedy for Recall Nos. 14v355, 14v394, 14v400, even if the ignition key is weighted with other items and the vehicle experiences a jarring event, the key does not rotate out of "run" because the moment arm is minimized such that the input torque to the ignition key due to a jarring event is negligible. *Id.* ¶¶ 16, 56-58, 71-73, 83-85. The remedy also decouples the rigid interaction between the ignition key and the key fob or other items attached to it, making the ignition system resistant to unintended key rotation due to knee-key contact. *Id.* ¶¶ 17, 59-60, 74-75, 86-87. To validate the remedy, New GM used the same peer-reviewed testing as conducted for the Delta Ignition Switch recall. *Id.* ¶¶ 56-60, 71-75, 83-87. No unintentional rotations occurred on any vehicle with the remedy during any of the extreme driving condition tests or any of the surrogate driver tests when the driver's knee was in a normal driving position. *Id.* ¶¶ 58, 60, 73, 75, 85, 87. New GM recalled the vehicles, made the remedy available free of charge to all consumers, and sent out notices informing customers and dealers. *Id.* ¶¶ 63, 78, 90.

### 3.    Recall No. 14v346 ("Camaro Knee-Key Rotation")

In June 2014, New GM recalled MY 2010-2014 Chevrolet Camaros. *Id*. ¶ 91. New GM determined there "is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position." *Id.* ¶ 92.

Case 1:14-md-02543-JMF    Document 5869    Filed 07/20/18    Page 36 of 99

New GM remedied this defect by having dealers remove the key blade from the original flip key/RKE transmitter assemblies provided with the vehicle and provide two new keys and two key rings per key. *Id.* ¶ 96. The key head of the new key was thinner than the original flip key head, presenting less surface area for the driver's knee to contact the key, and also was re-oriented approximately 90 degrees from the original flip key design, creating less opportunity for rotation from "run" to "accessory." *Id.* ¶ 98.

New GM validated the remedy's effectiveness using the same extreme driving condition tests and surrogate driver tests as the Delta Ignition Switch recall. *Id.* ¶¶ 99-103. No unintentional rotations occurred on any vehicle with the remedy during any of the extreme driving condition tests or any surrogate driver tests when the driver's knee was in a normal driving position. *Id.* ¶¶ 101, 103. New GM recalled the vehicles, made the remedy available free of charge to all consumers, and sent out notices informing customers and dealers. *Id.* ¶ 106.

### 4.    Recall No. 14v118 ("SIAB Wiring Harness")

In March 2014, New GM recalled MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles. *Id.* ¶ 107. In these vehicles, "[c]orrosion and/or loose crimps in the driver and passenger seat mounted side impact airbag wiring (SIAB) harness connectors could cause an increase in resistance." *Id.* ¶ 108. The airbag sensing system would interpret the increase in resistance as a fault, illuminating the airbag light on the dashboard and sending a "service air bag" message to the driver. *Id.* "Over time, the resistance may reach a level where the SIABs, front center side airbag, if equipped, and pretensioners will not deploy in a crash." *Id.*

New GM remedied this issue by having dealers remove the SIAB wiring harness connectors and solder the wires directly together. *Id.* ¶ 109. New GM recalled the vehicles, made the remedy available free of charge to all consumers, and sent out notices informing

customers and dealers.  *Id.* ¶ 119.

     **5.**       **Recall No. 14v153 ("EPS Assist")**

     In March 2014, New GM recalled the following vehicles if they were equipped with electric power steering:  all MY 2004-2005 and certain MY 2006, 2008-2009 Chevrolet Malibu, all MY 2004-05 and certain MY 2006 Chevrolet Malibu Maxx, certain MY 2009-2010 Chevrolet HHR (non-turbo), certain MY 2010 Chevrolet Cobalt, certain MY 2008-2009 Saturn Aura, all MY 2004-2007 Saturn Ion, and all MY 2005 and certain MY 2006, 2008-2009 Pontiac G6 vehicles.  *Id.* ¶ 120.  These "vehicles equipped with electric power steering (EPS) may experience a sudden loss of power steering assist . . . ."  *Id.* ¶ 121.  The cause of EPS assist loss varied among models.  *Id.* ¶¶ 122-23.  EPS assist loss in Delta platform vehicles (*e.g.,* the Cobalt, HHR, and Ion) was caused by oil contamination or intrusion within the electric power steering motor case.  *Id.* ¶ 122.  The cause of the EPS assist loss in Epsilon platform vehicles—*e.g.*, the Pontiac G6, Saturn Aura, and Malibu/Malibu Maxx—was supplier manufacturing issues concerning the torque sensor and power steering motor controller unit.  *Id.* ¶ 123.

     New GM remedied the EPS assist defect, with the repair depending on the particular cause.  *Id.* ¶¶ 126-30.  For the oil intrusion issue in Delta platform vehicles, New GM and its supplier designed, tested, validated and produced a new motor.  *Id.* ¶ 124.  For the supplier manufacturing issues in Epsilon platform vehicles, New GM and its suppliers implemented manufacturing and process improvements or replaced the affected steering components with different components manufactured by other suppliers.  *Id.* ¶ 125.  Plaintiffs "do not dispute that New GM's recall 'cured' the 'Power Steering Defect.'"  *BotB Opinion*, 2018 WL 1638096, at *2 n.1.  New GM issued recall notices that provided for the repair free of charge to all consumers.  *Id.* ¶ 135.

**B.     The Court's Prior Rulings Narrowed Plaintiffs' Claims And Alleged Damages.**

Named plaintiffs allege economic loss based on the "benefit-of-the-bargain defect theory," which "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle." *TACC MTD Opinion*, 2016 WL 3920353, at *7, 10; *see also*, *e.g.*, 5ACC ¶¶ 17, 861, 1596, 1623, 1643, 1658.  Plaintiffs also allege that they "incurred damages in at least the form of lost time required to repair their vehicles."  *E.g.*, 5ACC ¶¶ 1602, 4300, 6545.

The Court previously concluded that New GM's recall repairs affect whether plaintiffs can recover benefit-of-the-bargain damages.  "The Court has not exhausted its research on the question of whether and to what extent evidence of post-sale mitigation would affect the availability or calculation of damages in the sixteen jurisdictions at issue.  But it has done enough research to conclude that many, if not most (or even all), states would factor such evidence into the analysis." *BotB Opinion*, 2018 WL 1638096, at *2.  The "Court surmises (though, to be clear, does not yet hold) that the viability of Plaintiffs' claims for benefit-of-the-bargain damages is likely to turn on the question of whether New GM actually fixed the recalls at issue in its many recalls." *Id.*

Plaintiffs' claims also were the subject of New GM's motions to dismiss, with the Court rejecting many of the claims.  At this stage of the litigation, for the states of California, Missouri, and Texas, the following plaintiff claims remain pending:

- **Consumer Protection:**  Consumers Legal Remedies Act ("CLRA") and Unfair Competition Law ("UCL") for California plaintiffs; Missouri Merchandising Practices Act ("MMPA") for Missouri plaintiffs; and Deceptive Trade Practices Consumer Protection Act ("DTPA") for Texas plaintiffs who allege a manifest defect.

- **Fraudulent Concealment:**  California and Missouri plaintiffs.

- **Breach of Implied Warranty of Merchantability / Magnuson-Moss Warranty Act ("MMWA"):**  Under the Song-Beverly Consumer Warranty Act ("SBA") for California

9

plaintiffs; and under the Uniform Commercial Code for Missouri and Texas plaintiffs who allege a manifest defect.[2]

- **Unjust Enrichment:** California and Missouri plaintiffs who did not purchase a vehicle subject to the manufacturer's warranty.

- **Successor Liability:** Missouri plaintiffs who purchased a Delta Ignition Switch vehicle on or before July 9, 2009 allege successor liability versions of the previous claims, seeking to hold New GM liable for Old GM's conduct.[3]

- **Fraud By Concealment of the Right to File A Claim Against Old GM in Bankruptcy ("Bankruptcy Claim Fraud"):** California, Missouri, and Texas plaintiffs who owned a Delta Ignition Switch vehicle between July 10, 2009 and November 30, 2009.

*See TACC MTD Opinion*, 2016 WL 3920353, at *19-24 (California claims); *id.* at *32-35 (Missouri claims); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 445-55 (S.D.N.Y. 2017) ("*FACC MTD Opinion*") (Texas claims); *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 6509256, at *5-6 (S.D.N.Y. Dec. 19, 2017) (Missouri successor liability); Docket No. 5618 at 28-29 (Bankruptcy Claim Fraud counts).

The Court has dismissed categories of plaintiffs and alleged damages. Other than successor liability claims, the "claims of all Plaintiffs who bought their vehicles prior to entry of the Sale Order on [July 2009] must be dismissed." *FACC MTD Opinion*, 257 F. Supp. 3d at 400-03. Plaintiffs who sold, traded in, or returned their vehicles before the recalls "could not have realized any 'diminished value' because they did not own the defective vehicles when the recalls were announced." *FACC MTD Opinion*, 257 F. Supp. 3d at 403; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. Aug. 9, 2017) (on reconsideration, stating that some claims might not require proof of damages, and that "Plaintiffs do not articulate

---

[2] The arguments in this memorandum against each named plaintiff's state law implied warranty claim apply equally to that named plaintiff's MMWA claim. *E.g.*, *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 247 (2d Cir. 1986); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1011 (D.C. Cir. 1986).

[3] Because the successor liability claims are the same as the claims pled directly against New GM, New GM's summary judgment arguments apply equally to the successor liability claims.

Case 1:14-md-02543-JMF    Document 5859    Filed 07/20/18    Page 54 of 99

a coherent theory of how a plaintiff who bought a vehicle with a concealed defect and sold the same vehicle before the defect was revealed can logically, if not legally, prove that he or she suffered damages."). The Court also dismissed the successor liability claims of California and Texas plaintiffs. *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3382071, at *19 (S.D.N.Y. Aug. 3, 2017) (California); *In re Gen. Motors LLC Ignition Switch Litig.*, 2018 WL 1989572, at *3 (S.D.N.Y. Apr. 25, 2018) (Texas). Finally, the Court dismissed all Texas plaintiffs' fraudulent concealment and unjust enrichment claims. *FACC MTD Opinion*, 257 F. Supp. 3d at 453-55.

### C.    The Named Plaintiffs At Issue.

The number of economic loss named plaintiffs has fallen substantially over the course of this litigation. A total of 273 plaintiffs have joined at least one of the various consolidated complaints, but only 213 plaintiffs were named in the 5ACC, with 22 included "solely for the purpose of preserving their claims on appeal." *E.g.*, 5ACC ¶¶ 64, 249. Fifty plaintiffs from the three bellwether states have joined at least one consolidated complaint, but 21 (42%) have dropped out or been dismissed.

Of the remaining 29 named plaintiffs, only 16 plaintiffs (32% of the total) are asserting the full range of claims against New GM. These 16 plaintiffs, described in Exhibit 2, are:

- **California:**  Chimen Basseri, Kellie Cereceres, Santiago Orosco, David Padilla, and Michelle Thomas

- **Missouri:**  Brad Akers, Deloris Hamilton, Cynthia Hawkins, Ronald Robinson, Mario Stefano, and Christopher Tinen

- **Texas:**  Gareebah Al-ghamdi, Dawn Bacon, Dawn Fuller, Michael Graciano, Lisa McClellan

Two additional plaintiffs—Kenneth Robinson and Patrice Witherspoon—are from Missouri, the only bellwether state where the Court has not rejected successor liability claims.

Case 1:14-md-02543-JMF   Document 5859   Filed 07/20/18   Page 53 of 99

These two plaintiffs can allege only successor liability, as they purchased their vehicles before July 10, 2009 and thus do not have direct claims against New GM.  *FACC MTD Opinion*, 257 F. Supp. 3d at 400-03.  Exhibit 3 describes these two successor liability plaintiffs.

The remaining 11 named plaintiffs are from California and Texas, purchased Delta Ignition Switch vehicles before July 10, 2009 and can bring only Bankruptcy Claim Fraud counts against New GM.  *See* 5ACC ¶ 959 (defining Bankruptcy Claim Fraud class as "All persons who owned or leased a Delta Ignition Switch Vehicle between July 10, 2009, and November 30, 2009."); *FACC MTD Opinion*, 257 F. Supp. 3d at. 401-03 & n.5.  Missouri plaintiffs Akers, K. Robinson, and Witherspoon also bring Bankruptcy Claim Fraud counts.  These California and Texas Bankruptcy-Claim-Fraud plaintiffs, described in Exhibit 4, are:

- **California:** Patricia Barker, Michael & Sylvia Benton, Kimberly Brown, Crystal Hardin, Javier Malaga, Winifred Mattos, Esperanza Ramirez, and William Rukeyser

- **Texas:** Shenyesa Henry and Lisa Simmons

Because these 11 plaintiffs are limited to their Bankruptcy Claim Fraud count, unless otherwise specified, they are not included in the discussion of "plaintiffs" in the argument sections until Section III.G, which addresses their count.

## ARGUMENT

## I.   PLAINTIFFS HAVE NO LEGALLY RECOVERABLE DAMAGES.

"Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  As described in Section I.F, damages are an essential element of each of plaintiff's claims.  Because plaintiffs cannot offer sufficient proof of damages for multiple, independent reasons, summary judgment should be granted against their claims.  *Small Bus.*

12

Case 1:14-md-02543-JMF   Document 5853   Filed 05/24/18   Page 56 of 99

*Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 303 (S.D.N.Y. 2017) ("On a motion for summary judgment, [plaintiff] must offer actual evidence that it suffered damages, not mere speculation. In other words, a summary judgment motion is 'put up or shut up' time for litigants. [Defendant] is, therefore, entitled to summary judgment . . . ."); *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 213 F.3d 627 (2d Cir. 2000); *Sellify Inc. v. Amazon.com, Inc.*, 2010 WL 4455830, at *5 (S.D.N.Y. 2010); *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 250 (S.D.N.Y. 2008).

### A.  New GM's Recall Repairs Preclude Plaintiffs' Alleged Benefit-Of-The-Bargain Damages.

Under the laws of all states, including the three bellwethers, plaintiffs cannot recover benefit-of-the-bargain damages. New GM incorporates and relies on the authorities and arguments previously made in its Motion for Summary Judgment Against Plaintiffs' Claims For Benefit-Of-The-Bargain Damages (Docket No. 4679), the Supporting Memorandum to that Motion (Docket No. 4681), the Statement of Undisputed Facts (Docket No. 4682), and the Reply (Docket No. 4868). *First*, plaintiffs received the benefit of their bargain because New GM repaired or offered to repair their vehicles for free. *Second*, plaintiffs are limited to cost-of-repair as the measure of recoverable damages for property. Because of New GM's recalls, plaintiffs' repair costs are zero. *Third*, plaintiffs seek both (i) the costs of fully repairing vehicles, which New GM has paid through its recalls, as well as (ii) damages for an allegedly defective vehicle, which is an impermissible double recovery. *Id.*

The Court previously explained that "most (or even all) states would factor such evidence [of post-sale mitigation] into the analysis" of benefit-of-the-bargain damages and surmised "that the viability of Plaintiffs' claims for benefit-of-the-bargain damages is likely to turn on the question of whether New GM actually fixed the recalls at issue in its many recalls." *BotB*

13

*Opinion*, 2018 WL 1638096, at \*2.  "That, in turn, would require a determination of whether each side's expert testimony is admissible," which had not been briefed at the time.  *Id.* Plaintiffs' purported expert evidence must create a genuine issue of material fact that each of the vehicles subject to all seven recalls (about 11 million vehicles) continue to have the safety defect that prompted each recall.  *See* 5ACC ¶ 683 ("the vehicle continues to have unintended stalls while driving, the very safety defect the Defective Ignition Switch Vehicle recalls are intended to correct); *see also id.* ¶¶ 699, 702.  Plaintiffs do not and cannot satisfy their substantial burden on this issue.

New GM accordingly renews its benefit-of-the-bargain summary judgment motion previously filed at Docket Nos. 4679, 4681, 4682, 4868.  In this regard and to further expose the failure of plaintiffs' proofs, New GM is simultaneously filing *Daubert* motions to exclude the opinions of plaintiffs' putative experts.  New GM's expert and factual evidence together with the failure of plaintiffs' putative experts to satisfy *Daubert* establish that New GM's recalls fixed the identified safety defects, precluding alleged benefit-of-the-bargain damages.

### 1.    The Undisputed Evidence Establishes That The Recall Repairs Were Effective And Remedied The Defects.

For the Delta Ignition Switch, Key Rotation, and Camaro Knee-Key Rotation recalls, New GM applied fundamental physics principles and design assessment tools to develop and verify that the remedies fixed the safety defects.  SUF ¶¶ 14, 56, 71, 83, 99.  While the remedies differ among the recalls, a basic principle is to reduce the moment arm[4] of any weight hanging from the ignition key by reducing the size of the hole in the key head and to decouple the rigid interaction between the ignition key and items hanging from it through use of newly designed key rings.  *Id.* ¶¶ 15-17.  Plaintiffs' experts concede the scientific principles behind the

---

[4]  *See* footnote 1 for the definition of "moment arm."

14

effectiveness of these key rotation remedies, characterizing them as "sound." *Id.* ¶ 137.

New GM also validated the remedies using a peer-reviewed testing regime designed for evaluating inadvertent key rotation. *Id.* ¶¶ 19, 33-35, 56-60, 71-75, 83-87, 99-103. For example, New GM subjected the recalled vehicles to 8 extreme driving condition tests, such as once-in-a-vehicle-life potholes and abusive roads, with 0.7 lbs of key weight[5] hanging from the newly designed key and key rings. *Id.* ¶¶ 18-32, 56-58, 71-73, 83-85, 99-101. Additionally, New GM had surrogate drivers, representing the standing height of a 5th percentile female, a 50th percentile male and a 99th percentile male, evaluate whether they could rotate the key with their knee during normal driving moves, such as moving a foot between pedals, slamming on the brakes, or twisting to look over both shoulders. *Id.* ¶¶ 33-40, 59-60, 74-75, 86-87, 102-103. Plaintiffs' experts concede that "there is nothing wrong with" New GM's testing and that New GM was "reasonable" to rely on it. *Id.* ¶ 39.

Virginia Tech Transportation Institute ("VTTI"), an independent engineering organization which plaintiffs' expert Glen Stevick admits is "well-respected in the automotive industry" (*id.* ¶ 42), conducted a peer review evaluation of New GM's inadvertent key rotation tests. VTTI, concluded that New GM's testing was "robust" and "acceptable" for assessing inadvertent key rotation in existing vehicles. SUF ¶ 43.

For the SIAB Wiring Harness recall, New GM eliminated the possibility of corrosion affecting the interface and increasing the circuit resistance by removing the connector from the system. SUF ¶¶ 109-10. For the EPS Assist recall, New GM and suppliers designed, tested, validated, and implemented effective remedies to address the issues specific to the different vehicles. *Id.* ¶¶ 124-29. Plaintiffs' experts do not dispute the adequacy of the EPS recall

---

[5] A key weight of 0.7 lb is abnormally high and exceeds the heaviest weight New GM encountered during a key chain weight study. SUF ¶ 18.

Case 1:14-md-02543-JMF   Document 5859   Filed 05/24/18   Page 59 of 99

remedies, and plaintiffs have conceded that the EPS Assist remedy repaired the defect. *Id.* ¶ 131; *BotB Opinion*, 2018 WL 1638096, at *2 n.1.

## 2.     Plaintiffs Have No Relevant Or Admissible Evidence That New GM's Recalls Did Not Fix The Defects.

Plaintiffs have no evidence that New GM's recall remedies did not fix the defects. The overwhelming majority of named plaintiffs did not experience any power losses or other problems after the repairs were performed. SUF ¶¶ 145-146 (Basseri), 154 (Cereceres), 180 (Thomas), 184-185 (Barker), 192 (Benton), 211-212 (Malaga), 218-219 (Mattos), 224-225 (Ramirez), 231-232 (Rukeyser), 240 (Akers), 255-256 (Hawkins), 271-272 (R. Robinson), 280-281 (Stefano), 301-302 (Witherspoon), 322-323 (Fuller), 354-344 (Simmons).[6]

Moreover, as the Court has indicated, expert evidence is necessary to prove that the recall did not fix the relevant defect, and plaintiffs do not proffer sufficient admissible or relevant expert evidence that each vehicle remains defective even after the recalls. *BotB Opinion*, 2018 WL 1638096, at *2; *see also In re General Motors LLC Ignition Switch Litig.*, 2017 WL 6729295, at *8-9 (S.D.N.Y. Dec, 28, 2017) ("*Garza/Greenroad Daubert Opinion*") ("In the absence of admissible expert evidence, Plaintiffs concededly cannot prove that the Airbag

---

[6]  The only plaintiffs who allege incidents after the recalls repairs were performed have no evidence to support their assertions. David Padilla claims that post-repair the key would not turn on two occasions when he tried to start his vehicle, but not that the ignition key inadvertently rotated and his vehicle stalled. He took the vehicle to the dealership a second time for repairs, for which he was not charged anything. SUF ¶¶ 170-172. Bankruptcy Claim Fraud plaintiff Kimberly Brown alleges that her vehicle shut off after the repairs but she does not know the position of the switch for any of these incidents and thus has no evidence that the defects at issue were the cause, no one has told her that the ignition switch was causing her vehicle to turn off, and her vehicle had problems with its transmission, gearshift, and floor shifter that could cause the shut offs. SUF ¶¶ 198. Bankruptcy Claim Fraud plaintiff Crystal Hardin alleges that in a single instance after the repair her vehicle shut down, but has no idea why this happened or any evidence it was caused by a defect. SUF ¶¶ 204. Moreover, plaintiffs who own their vehicles can still contact their dealerships to have their vehicles inspected. Any recall-related repairs will continue to be performed free of charge. SUF ¶¶ 47, 61, 76, 88, 104, 117, 133.

Case 1:14-md-02543-JMF    Document 5859    Filed 07/20/18    Page 40 of 99

Deployment RAR Sequence occurred.").[7]

      To contest New GM's recall remedies for the Delta Ignition Switch, Key Rotation, and Camaro Knee-Key Rotation vehicles, plaintiffs proffer one expert, Glen Stevick.[8]  Stevick, however, has conducted *no testing or scientific analysis* to support his speculative opinion that the remedies are ineffective.  He relies only on his own idiosyncratic "logical deduction" and a misreading of the testing that validates New GM's remedies fixed the defects.  Indeed, plaintiffs' putative expert Ernest Manuel states ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████  SUF ¶ 377.

If the repairs did not cure the defects, then more than .02-.03% of the vehicles would have required multiple dealer visits.  Stevick also admitted that NHTSA was aware of New GM's testing and remedies, and raised no concern.  *Id*. ¶ 139.  Stevick's unsupported speculation that the remedies did not fix the defects is inconsistent with the repeatable, scientific testing New GM performed and fails to satisfy *Daubert*, as discussed in New GM's *Daubert* motion.  *See In re Mirena*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016); *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 604-605 (S.D. W. Va. 2013); *see also Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210,

---

[7]  Each bellwether state requires expert evidence.  *See Minkin v. State Farm Gen. Ins. Co*., 2014 WL 117481, at *6 (Cal. Ct. App. Jan. 14, 2014) (holding "expert testimony was required to establish the scope and cost of repairs"); *Grasshopper House v. Bosworth*, 2015 WL 7354822, at *12 (Cal. Ct. App. Nov. 20, 2015), *as modified on denial of reh'g* (Dec. 15, 2015) (holding expert testimony required on estimated cost of repairs). *Rauscher v. Gen. Motors Corp.*, 905 S.W.2d 158, 162 (Mo. Ct. App. 1995) ("In claims for negligent repair, expert testimony is almost always required because the jurors are unfamiliar with the business of repairing automobiles."); *Wortham Bros. v. Haffner*, 347 S.W.3d 356, 361 (Tex. App. 2011) (holding necessity and reasonableness of repairs and repair costs requires expert testimony); *Chuong Cam Ha v. W. Houston Infiniti, Inc.*, 1995 WL 516993, at *2 (Tex. App. Aug. 31, 1995) (same); *Exec. Taxi/Golden Cab v. Abdelillah*, 2004 WL 1663980, at *1 (Tex. App. July 19, 2004) (holding repair estimate unsupported by expert testimony is no evidence of reasonableness or necessity of repair).

[8]  Plaintiffs' only other technical expert, Steven Loudon, did not investigate the effectiveness of any of the recall remedies to address inadvertent key rotation and testified that he is not offering any opinions on that topic or about the EPS or SIAB wiring harness recalls.  SUF ¶ 138.

17

1216 (8th Cir. 2006). Stevick's opinions should be excluded for the same reasons that they were excluded in the *Garza/Greenroad* case. *See In re General Motors LLC Ignition Switch Litig.*, 2017 WL 6729295, at *8-9 (S.D.N.Y. Dec, 28, 2017) ("*Garza/Greenroad Daubert Opinion*") (excluding Stevick's opinions because his "logical deduction" method did not satisfy *Daubert*: "such pure speculation, untethered to the facts in the record, is not a proper basis for reliable scientific testimony.").

For the SIAB Wiring Harness recall, Stevick is the only expert who offers any opinion on the remedy. Stevick concedes that the remedy of splicing the wires directly "should be pretty good" (SUF ¶ 115), and that "it's certainly doable" for a dealer technician to implement the remedy *(id)*. Stevick's only opinion is that dealers *might* make a mistake in implementing the remedy. He did not conduct any testing or scientific analysis to support his opinion, and he has no evidence of a specific instance where a dealer improperly implemented the remedy. *Id.* ¶ 113. In fact, plaintiffs' putative expert Manuel's exhibits state ███████████████████████ ████████████████████████████████████████████ *Id.* ¶ 378. Manuel's data supports that dealers are splicing correctly. Without any real-world proof, Stevick's opinion is nothing more than inadmissible speculation. *See Garza/Greenroad Daubert Opinion*, 2017 WL 6729295, at *8 ("[M]ere possibility is not proof …") (citing *In re Mirena*, 169 F. Supp. 3d at 430; *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

For the EPS Assist recall, neither plaintiffs' nor their technical experts dispute the remedy's effectiveness. SUF ¶¶ 131-32; *see also BotB Opinion*, 2018 WL 1638096, at *2 n.1 (Plaintiffs "do not dispute that New GM's recall 'cured' the 'Power Steering Defect.'").

Overall, plaintiffs have no admissible expert opinions or other evidence to show that the

recall remedies did not fix the defects. *See In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*, 127 F. Supp. 3d 1306, 1347 (N.D. Ga. 2015) (holding that an expert's extrapolation unsupported by evidence or data was unreliable, even if the expert's opinion might be logical). The undisputed facts, particularly the comprehensive testing, demonstrate that New GM's recalls addressed and remedied the defects. Under governing law plaintiffs cannot recover any benefit-of-the-bargain damages.

### B. Named Plaintiffs Have No Legally Cognizable Benefit-Of-The-Bargain Evidence.

Under the "benefit-of-the-bargain" damages theory, "a plaintiff is compensated 'for the fact that he or she overpaid, at the time of the sale, for a defective vehicle.'" *See TACC MTD Opinion*, 2016 WL 3920353, at *7-10. The named plaintiffs have no evidence, whether fact or expert, to show support that they overpaid.

Each named plaintiff's benefit-of-the-bargain damages claim must be based on the difference between what each plaintiff paid and the allegedly defective vehicle's market value, as plaintiffs have alleged and argued. 5ACC ¶ 41.[9] The Court's description of such damages relied on a market value or worth: "Plaintiffs who purchased defective cars were injured when they purchased for x dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than x dollars for the car (or not bought the car at all),

---

[9] *See also* 5ACC ¶ 41 ("The defects that New GM concealed throughout the Class Period related to the safety and reliability of the Defective Vehicles, and affected the brand perception and **market value** of all Defective Vehicles.") (emphasis added); Pl. Memo. in Opp. to MTD TACC (Docket No. 2761) at 1 ("[a]ll Plaintiffs allege 'manifest' damages in the decreased market value of their cars"; "[t]he revelation of the fraudulent scheme and the magnitude of concealed defects substantially reduced the fair market value of Plaintiffs' property."); Pl. Ltr. to Judge re Supp. Auth. in Support of Opp. to MTD TACC (Docket No. 2871) at 3 ("damages for all Plaintiffs and Class members here should reflect the difference between the market value of their vehicles if made by a reputable manufacturer…and the market value of their vehicles as actually made by a disreputable manufacturer."); Pl. Hearing Slides, Hearing on New GM's Motion to Dismiss the Economic Loss Allegations, at 3 (June 17, 2016) (asserting plaintiffs paid a "premium on the sales price" where "the size of that premium [is] the difference in the market value of the vehicle as delivered and its market value on the condition it should have been delivered.").

because a car with a safety defect is worth less than a car without a safety defect." *TACC MTD Opinion*, 2016 WL 3920353, at \*7. California,[10] Missouri,[11] and Texas[12] require that such damages compare the purchase price to the allegedly defective vehicle's market price.

> 1. **The Named Plaintiffs Have No Evidence Of Benefit-Of-The-Bargain Damages And Deferred To Their Experts.**

Plaintiffs have no admissible fact evidence on the market value of their vehicles at the time of purchase or the amount of the benefit-of-the-bargain damages. When asked about such damages in their plaintiff fact sheets, all named plaintiffs (except Padilla) deferred to their

---

[10] Overpayment damages under the California UCL and CLRA are "determined by taking the 'difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices'" reflecting "the prices at which … [manufacturers] are willing to sell their products." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118, 1120-22 (C.D. Cal. 2015); *see also Saavedra v. Eli Lilly & Co*., 2014 WL 7338930, at \*3-7 (C.D. Cal. Dec. 18, 2014) ("[T]he typical benefit-of-the-bargain claim relies on a difference in fair market value (i.e. the amount that a willing buyer and willing seller would both accept) between the product as represented and the product actually received."); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at \*8 (N.D. Cal. Dec. 15, 2014) ("Restitution is then determined by taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices.") (citing *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at \*22 (N.D. Cal. May 23, 2014); *Bagdasarian v. Gragnon*, 192 P.2d 935, 940-41 (Cal. 1948) ("[C]ases and texts clearly show that 'value,' in connection with legal problems, ordinarily means market value."); *Stout v. Turney*, 586 P.2d 1228, 1231-32 (Cal. 1978); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 675 (Cal. App. 2006); *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at \*12 (N.D. Cal. Jan. 7, 2014).

[11] To prove an ascertainable loss and benefit-of-the-bargain damages under Missouri law, including the MMPA, named plaintiffs must establish the difference between the price paid and the "fair market value" of the allegedly defective product. *Larabee v. Eichler*, 271 S.W.3d 542, 548 (Mo. 2008) (benefit-of-the-bargain damages are measured as "the difference between the fair market value of the property received and the value if the property had been as represented . . . at the time of the transaction"); *Smith v. Tracy*, 372 S.W.2d 925, 938-39 (Mo. 1963) (same); *In re Davenport*, 491 B.R. 911, 921 (Bankr. W.D. Mo. 2013) (same); *see also Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 900 (Mo. 1990).

[12] Under the Texas DTPA, "in order to sustain such a finding of damages, there must be evidence of both the actual amount paid by the buyer ***and the actual market value*** of the car as received in its defective condition." *Town E. Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 801-03 (Tex. App. 1987) (emphasis added) (reversing damages award under the DTPA where evidence of "market value" was determined at the time of trial rather than "the time it was received in its defective condition"); *see also GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 888-89 (Tex. App. 2008) (measuring benefit-of-the-bargain damages for a defective vehicle as the difference in price paid and the market value of a vehicle).

20

experts, claiming an "[i]nflated purchase price and/or the diminution in value of the Subject
Vehicle in an amount subject to expert opinion and to be proven at trial." SUF ¶¶ 148 (Basseri),
156 (Cereceres), 165 (Orosco), 181 (Thomas), 188 (Barker), 194 (Benton), 201 (Brown), 208
(Hardin), 214 (Malaga), 221 (Mattos), 228 (Ramirez), 234 (Rukeyser), 243 (Akers), 251
(Hamilton), 258 (Hawkins), 265 (K. Robinson), 274 (R. Robinson), 284 (Stefano), 294 (Tinen),
303 (Witherspoon), 311 (Al-ghamdi), 318 (Bacon), 325 (Fuller), 335 (Graciano), 345
(McClellan), 350 (Henry), 358 (Simmons). At deposition, almost all named plaintiffs (including
Padilla) confirmed that they did not know by how much the value of their vehicles had
diminished because of the alleged defects, and generally deferred to their lawyer or putative
experts. *E.g.*, SUF ¶ 265 (K. Robinson testifying that "I'm not a -- that's my lawyer's job.");
SUF ¶ 284 (Stefano testifying that "I couldn't tell you. I'm not an expert. … I don't know
anything about the actual value on it."); SUF ¶ 303 (Witherspoon testifying that "I'm not an
expert in the value, but I've left that to my attorneys and their experts."); *see also* SUF ¶ 156
(Cereceres), ¶ 173 (Padilla), ¶ 181 (Thomas), ¶ 243 (Akers), ¶ 251 (Hamilton), ¶ 274 (R.
Robinson), ¶ 294 (Tinen), ¶ 311 (Al-ghamdi), ¶ 318 (Bacon), ¶ 325 (Fuller).

Some plaintiffs who attempted to quantify their losses admitted that their claims were not
based on market value or any other foundation. For example, Chimen Basseri claims she would
have paid $3,000 less for the vehicle, but when asked the basis for that number admitted that
"I'm just giving you a round figure. I'm not basing it on anything." SUF ¶ 148; *see also* SUF ¶
165 (Orosco claiming decrease of five-to-six thousand dollars based "[j]ust on my personal
belief" without any other basis), ¶ 258 (Hawkins claiming her vehicle had lost all value, but
admitting she had not attempted to sell or trade in the car, had no valuation of her vehicle, had
not checked Kelley Blue Book or any valuation sites to see what the vehicle was worth, and no

21

one besides her counsel had told her the vehicle was worth less because of the recalls).

> **2.    The Named Plaintiffs' Putative Experts Did Not Determine Damages For Any Named Plaintiff.**

As plaintiffs have no admissible evidence of benefit-of-the-bargain damages, they defer to their putative economic loss experts.  Plaintiffs retained two putative economic loss experts, Stefan Boedeker and Joshua Gans, to opine about the amount of alleged ***classwide*** overpayment damages.  New GM will be filing a *Daubert* motion to exclude their economic loss opinions in connection with class certification briefing.  Without regard to *Daubert* considerations, and whether assessed individually or in combination the classwide damage opinions of Boedeker and Gans are legally insufficient to establish each named plaintiff's damages.

Plaintiffs' putative economic loss damages experts have no opinions regarding, and have not been asked to establish, market value or benefit-of-the-bargain damages for any named plaintiff.  When asked, ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[13]

As this Court recognized, measuring benefit-of-the-bargain damages is difficult "given how many variables (such as age, mileage, technical features, consumer preference, and even

---

[13] *See also* SUF ¶ 368 (Boedeker Dep. Testimony) ██████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

paint color) affect the value and price of cars." *TACC MTD Opinion,* 2016 WL 3920353, at *7.

Plaintiffs' experts, including Dr. Weisberg,[14] agree 

SUF ¶ 371.

*Id.* ¶ 372. The prices paid by named plaintiffs demonstrate this variety. For example, Deloris Hamilton bought a used 12-year-old 2000 Oldsmobile Alero for $3,500; Gareebah Al-ghamdi bought a used 2004 Impala for $12,999; Orosco Santiago bought a new 2010 Camaro for $28,000; and Christopher Tinen bought a new 2010 GMC Acadia for $32,080.27. SUF ¶¶ 245, 305, 158, 287; *see also id.* ¶ 373

Accordingly, plaintiffs lack any basis to determine whether, or by how much, any individual named plaintiff's purchase price exceeded the market price of the particular allegedly defective vehicle he or she bought. Indeed, plaintiffs' own expert Weisberg agreed that "

*Id.* ¶ 374.

Individual evidence and comparison of the price each individual named plaintiff paid to the market value of the particular vehicle that plaintiff bought is necessary to establish damages.

---

[14] Plaintiffs hired Weisberg to review results concerning the presence or absence of changes in prices in used recalled Old GM and New GM vehicles following their recalls in 2014. SUF ¶ 370.

As no named plaintiff has such evidence—fact, expert, or otherwise—no named plaintiff can carry their burden of providing benefit-of-the-bargain damages.    Accordingly, summary judgment should be awarded against each plaintiff's claims for benefit-of-the-bargain damages.

### C.    Various Plaintiffs' Claims Fail Because They Cannot Show A Manifest Defect.

Plaintiffs cannot recover for any Texas claims, or for Missouri implied warranty claims, without a manifest defect.  *FACC MTD Opinion*, 257 F. Supp. 3d at 450-51, 462; *TACC MTD Opinion*, 2016 WL 3920353, at *35.  The Court dismissed the implied warranty claims of Missouri plaintiffs Cynthia Hawkins and Ronald Robinson for lack of a manifest defect.  *TACC MTD Opinion*, 2016 WL 3920353, at *35, 42 (Exhibit A).  Summary judgment should be awarded against additional claims because (1) new plaintiffs that do not allege manifestation have joined the 5ACC; (2) plaintiffs who alleged a manifest defect have no evidence to support their contention; or (3) the alleged manifestation is not of a defect at issue in this litigation.

For the ignition switch-related recalls, named plaintiffs allege that the ignition switch may inadvertently rotate out of the "on" or "run" position, causing the vehicle to lose power and disabling the airbags.  *E.g.*, 5ACC ¶ 10.  Importantly, a vehicle simply stalling cannot show manifestation of an ignition switch-related defect.   As plaintiff's putative expert Stevick concedes, "moving stalls are something that can happen in all vehicles," and occur for a "variety of reasons," such as "running out of gas," "[b]ad spark plugs," a "[b]ad ignition cable," or a "[c]logged EGR valve."  SUF ¶ 140.  Accordingly, plaintiffs must have evidence that the ignition switch in their vehicles inadvertently rotated and caused a loss of power.

Of the Texas plaintiffs, Dawn Fuller does not claim that her 2008 Impala experienced a moving stall, loss of power steering, or any other manifestation caused by the defects at issue. SUF ¶ 322.  Other Texas plaintiffs have no evidence that the defects at issue manifested:

24

- Gareebah Al-ghamdi alleges that she experienced moving stalls in her 2004 Impala, but admits that during the first stall the ignition switch was in the "on" position and she does not know the position for the other stalls. SUF ¶ 308.

- Lisa McClellan's vehicle was recalled only for EPS Assist, not a key rotation recall. SUF ¶¶ 336-37. She does not allege loss of power steering assist. *Id.* ¶ 341. The only times she had issues with her steering was when the vehicle shut off, but not only was her vehicle not subject to a key rotation recall, she also does not know the position of the ignition for any of those occasions. *Id.* ¶ 341.

- Michael Graciano does not claim that he experienced or witnessed any incidents with his 2007 Cobalt, but instead that his then-fiancee's daughter told him that she lost power steering and the brakes did not work. SUF ¶ 329. Such hearsay cannot defeat summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985). Moreover, Graciano testified that the daughter does not recall details about the incidents, and thus he has no evidence that the ignition switch rotated. *Id.*

For the Missouri plaintiffs, Deloris Hamilton admits that her 2000 Alero never experienced an inadvertent ignition rotation or other potential manifestation. SUF ¶ 248. Other Missouri plaintiffs likewise admit they have no evidence that a defect manifested:

- Mario Stefano claims that his Camaro lost power once, but does not claim his knee hit the key or that the ignition rotated. SUF ¶ 281. Instead, he believes there was a faulty battery in the vehicle's fob which was later replaced, a condition separate from and unrelated to the claimed defects at issue in the 5ACC. *Id.*

- Brad Akers alleges a single incident in which his 2009 HHR lost engine power. SUF ¶ 240. Akers admits that he does not know whether his key rotated when his vehicle lost power, and thus has no evidence that his vehicle manifested the defect at issue. *Id.*

- Patrice Witherspoon claims her 2006 Ion shut off on multiple occasions, but each time the ignition key was in the "run" position, establishing that these shut offs were not related to the recall condition. SUF ¶ 299.

- Kenneth Robinson claims that his 2008 Pontiac G5 shut down multiple times, but does not recall the ignition switch's position on any of those occasions. SUF ¶ 262.

Accordingly, summary judgment should be granted against all claims of Al-ghamdi, Fuller, McClellan, and Graciano, and against the implied warranty claims of Akers, Hamilton, K. Robinson, Stefano, and Witherspoon for lack of a manifest defect.

25

**D. Plaintiffs Who Disposed Of Their Vehicles Before The Recalls Do Not Have Legally Cognizable Or Recoverable Damages.**

Plaintiffs "who disposed of their vehicles before the recall could not have realized any 'diminished value' because they did not own the defective vehicles when the recalls were announced," and could not have benefit-of-the-bargain damages. *FACC MTD Opinion*, 257 F. Supp. 3d at 403; *see also In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. August 9, 2017) (on reconsideration, confirming that "even now, Plaintiffs do not articulate a coherent theory of how a plaintiff who bought a vehicle with a concealed defect and sold the same vehicle before the defect was revealed can logically, if not legally, prove that he or she suffered damages."). Nor could such plaintiffs have "lost time" by taking their vehicles for recalls, since repairs were not available until after plaintiffs disposed of their vehicles.

Three of the named plaintiffs disposed of their vehicles before the 2014 recalls. Kenneth Robinson sold his 2008 G5 in May 2013. SUF ¶ 263. Christopher Tinen traded-in his 2010 Acadia in April 2012. SUF ¶ 292. Lisa McClellan returned her vehicle to the dealership in April 2012. SUF ¶ 342. Summary judgment should be granted against the benefit-of-the-bargain and lost time damages claims of these three plaintiffs.

Moreover, because these three plaintiffs lack damages, summary judgment should be granted against all their claims. The Court previously declined to dismiss such plaintiffs because certain claims might allow some form of recovery without damages. *See In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2-3. But as explained in Section I.F, all claims at issue require damages, which these three plaintiffs lack.[15]

---

[15] The *FACC MTD Opinion* notes that McClellan alleged "out-of-pocket expenses and lost time," but she has no evidence to support any such damages. *FACC MTD Opinion*, 257 F. Supp. 3d at 403. McClellan admitted the defect did not cause her to lose income, and thus she cannot recover for "lost time." SUF ¶¶ 343; Section I.E. McClellan also claimed that after she returned the car to the dealership, an amount of $4,716 was left owing on her credit report, but at deposition admitted that "I'm not even sure where I got

### E.    Plaintiffs Cannot Recover Lost Time Damages.

#### 1.    Lost Time Damages Require Proof Of Lost Earnings, Which No Plaintiff (With One Exception) Provides.

No jurisdiction recognizes a claim for "lost time" without proof of lost income. *See* New GM's briefs at Docket No. 5098 at 30-49; Docket No. 5191 at 16-21. "[L]oss of time, per se, is not compensable unless it is directly connected with some loss of" wages or other revenue. 25 C.J.S. DAMAGES § 52; *see also* 22 AM. JUR. 2D DAMAGES § 155 (unless the plaintiff is prevented from earning wages, "no allowance can be made for loss of time"). California, Missouri, and Texas follow this rule.

Lost time is not cognizable under the California's consumer protection laws, including the CLRA and UCL. *E.g.*, *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 2016 WL 6523428, at *11 (S.D. Cal. Nov. 3, 2016) (time spent responding to credit card charges could not "demonstrate that Plaintiff has suffered a loss of money or property" for a UCL claim); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 966 (S.D. Cal. 2012) ("Plaintiffs' allegations that the heightened risk of identity theft, time and money spent on mitigation of that risk . . . do not suffice as injury under the UCL, FAL, and/or the CLRA."); *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1062 (C.D. Cal. 2007).

California also rejects lost time damages for fraud and other claims. *E.g.*, *Lueras v. BAC Home Loans Servicing, LP*, 163 Cal. Rptr. 3d 804, 829 (Cal. Ct. App. 2013) (holding for fraud that "[t]ime and effort spent assembling materials for an application to modify a loan is the sort of nominal damage subject to the maxim de minimis non curat lex—i.e., the law does not

---

the $4,716," that she did not know where the number came from, and that she did not have a credit report listing that any debt was owed to the dealership. *Id.* Similarly, McClellan alleges she spent $1,500 at different shops to correct problems with the vehicle and $200 in rental charges, but admitted she does not have any receipts or documentation to prove these alleged amounts. *Id.*

concern itself with trifles").[16]  This rule is consistent with California law holding that fraud plaintiffs can recover only for pecuniary losses.  *E.g.*, *R. D. Reeder Lathing Co. v. Cypress Ins. Co.*, 84 Cal. Rptr. 98, 100 (Cal. Ct. App. 1970).

Similarly, Missouri holds that lost time is not recoverable under the MMPA.  *Ford v. St. Louis Metro. Towing, L.C.*, 2010 WL 618491, at *13 (E.D. Mo. Feb. 18, 2010) (dismissing plaintiffs' claims for "loss of time" damages); *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1057 (E.D. Mo. 2009) ("A claim of damages for time expended is not sufficiently definite or certain to support a monetary award for an 'ascertainable loss' under the MMPA.").[17] The MMPA's ascertainable loss "requirement is not satisfied where plaintiff claims speculative, non-pecuniary harm or where he alleges no out-of-pocket costs."  *Pleasant v. Noble Fin. Corp.*, 54 F. Supp. 3d 1071, 1079 (W.D. Mo. 2014) (internal quotation marks omitted); *see also Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 719 (8th Cir. 2017) (under the MMPA, damages are limited to "ascertainable pecuniary loss[es]."); Mo. Ann. Stat. § 407.025(1) (plaintiff must prove an "ascertainable loss of money or property" to recover under consumer protection law).  Claims for lost "free time" are neither pecuniary nor an out-of-pocket loss, and thus not recoverable.

Missouri follows the same rule for other claims.  *E.g.*, *Messina v. Prather*, 42 S.W.3d

---

[16]    *See also Badame v. J.P. Morgan Chase Bank, N.A.*, 641 F. App'x 707, 710 (9th Cir. 2016) ("Furthermore, Plaintiffs' contention that they are entitled to damages for the loss of time and energy they spent through the loan modification process also fails because the time and effort spent assembling materials for an application to modify a loan is the sort of nominal damage subject to the maxim de minimis non curat lex-i.e., the law does not concern itself with trifles."); *Gerard v. Wells Fargo Bank, N.A.*, 2015 WL 12791416, at *10 (C.D. Cal. 2015) ("Any damages associated with the time and effort spent assembling materials for an application to modify a loan are insufficient to support an intentional misrepresentation claim under California law.").

[17]    *See also Walsh v. Al West Chrysler, Inc.*, 211 S.W. 3d 673, 675 (Mo. Ct. App. 2007) (rejecting claim for "lost or wasted time" damages under the MMPA as insufficiently definite or certain); *Schoenlein v. Routt Homes, Inc.*, 260 S.W.3d 852, 855 (Mo. Ct. App. 2008) (reversing, in an MMPA case arising out of the defendant's failure to provide a warranty, a damages award that was based on evidence of telephone calls made by the plaintiffs to the defendant and evidence of "the significant time [the plaintiffs] spent attempting to obtain the warranty").

753, 764 (Mo. Ct. App. 2001) ("A personal injury plaintiff may prove a resulting loss of time, and a consequent loss of personal earnings or wages as an item of special damages and may recover for loss of future earnings due to impairment of the plaintiff's earning capacity."). Common law fraud requires proof of pecuniary loss, same as the MMPA. *E.g.*, *Harris v. Penninger*, 613 S.W.2d 211, 214 (Mo. Ct. App. 1981); *Walsh v. Ingersoll-Rand Co.*, 656 F.2d 367, 371 (8th Cir. 1981) (applying Missouri law). Indeed, "[l]oss of 'time' and loss of 'earnings' for that time mean the same thing." *Ganz v. Metro. St. R. Co.*, 220 S.W. 490, 496 (Mo. 1920).[18]

For Texas, lost "free time" is not recoverable under the DTPA, which is limited to "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a); *see Valley Nissan, Inc. v. Davila*, 133 S.W.3d 702, 713 (Tex. App. 2003) (holding that "damages based on loss of time" are not within scope of Texas consumer protection law). This exclusion of lost "free time" is a general principle of Texas law. *E.g.*, *Vista Chevrolet, Inc. v. Barron*, 698 S.W.2d 435, 441 (Tex. App. 1985) (holding that "damages for loss of time in and of itself are not recoverable" and "that loss of time means loss of earnings").[19] Texas holds that time spent on vehicle repairs cannot be recovered without proof of lost earnings. *Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W. 3d 787, 810 (Tex. App. 2006) (holding that plaintiff could not recover time spent visiting a repair shop on Saturday, when he did not work and thus did not lose any compensation), *rev'd in part on other grounds*, 238 S.W. 3d 376 (Tex. 2007).

---

[18]  *See also Scholl v. Grayson*, 127 S.W. 415, 417 (Mo. Ct. App. 1910) ("loss of time is averred, which is the same, in legal effect, as averring loss of earnings"); *Lesser v. St. Louis & S. Ry. Co.*, 85 Mo. App. 331 (Mo. App. Ct. 1900) ("loss of time or of earnings (which is the same thing)").

[19]  *See also Combined Am. Ins. Co. v. Morgan*, 214 S.W.2d 145, 148 (Tex. Civ. App. 1948) ("Loss of time as used in connection with damages recoverable for personal injuries means loss of earnings."); *Atchison, Topeka & Santa Fe Ry. Co. v. Acosta*, 435 S.W.2d 539 (Tex. Civ. App. 1968) (rejecting alleged lost time damages where there "is no testimony that he hired someone to do the work he had previously done, or that his net profits had been reduced").

With the exception of Brad Akers, the other named plaintiffs have no evidence of lost income from having the recall repairs performed. Indeed, plaintiffs Santiago Orosco, Deloris Hamilton, Kenneth Robinson, Gareebah Al-ghamdi, Dawn Bacon, and Lisa McClellan did not have the recall repairs performed when they owned their vehicles, SUF ¶¶ 163, 249, 263, 309, 316, 342, and thus even under plaintiffs' theory have no claim for lost time. Similarly, Kellie Cereceres' vehicle was remedied during a standard maintenance visit, and thus she did not spend additional time having her vehicle repaired pursuant to the recall. SUF ¶ 154. Summary judgment should be awarded against the lost time claims of all plaintiffs except Akers.

### 2. No Plaintiffs Have Relevant Expert Testimony To Support Their Lost Time Claims.

Even if named plaintiffs' lost-time claims were not barred as a matter of law, they are barred for lack of evidence. Most plaintiffs who obtained recall repairs depend on the opinion of Ernest Manuel, who was retained by Lead Counsel to estimate "the monetary value of time lost to Class Members who obtained recall repairs." *Id*. ¶ 375. His analysis suffers from numerous deficiencies, and New GM intends to file, in connection with the class certification briefing, a *Daubert* motion detailing why Manuel's opinion is inadmissible.

But even if Manuel's opinion were admissible, it could not establish any plaintiff's claim for lost-time damages because Manuel admittedly ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████ *Id*. ¶ 376. Accordingly, plaintiffs who provided no individual evidence of their alleged damages (that is, all named plaintiffs besides Akers) cannot rely on Manuel's opinion to establish lost income from the time they spent having their vehicles repaired, and their "lost-time" damages claim should be rejected as a matter of fact as well as law.

30

### F.        Plaintiffs Cannot Recover On Their Claims Without Damages.

Under the laws of the three bellwether states, plaintiffs have no claims unless they have damages.  While the Court previously suggested that "some claims in some states" might not "require a plaintiff to allege damages in order to survive a motion," *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3443623, at *2-3 (S.D.N.Y. Aug. 8, 2017), that possible exception is not available to any of the named plaintiffs:

- **California UCL:**  "To satisfy the narrower standing requirements imposed by [the amended UCL], a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury* … ."  *TACC MTD Opinion*, 2016 WL 3920353, at *19 (emphasis in original) (quoting *Kwikset Corp. v. Super. Ct.*, 246 P.3d 877, 885 (Cal. 2011).)

- **California CLRA:**  "Notably, the language of the CLRA is even broader than that of the UCL: It provides a remedy to '[a]ny consumer who suffers *any damage* as a result' of an unfair trade practice …"  *TACC MTD Opinion*, 2016 WL 3920353, at *21 (emphasis in original) (quoting Cal. Civ. Code § 1780(a)).

- **California Fraudulent Concealment:**    "Under California law, a plaintiff bringing a claim for fraudulent concealment must allege … (5) resulting damage."  *TACC MTD Opinion*, 2016 WL 3920353, at *22.

- **California Song-Beverly Act:**  "Any buyer of consumer goods *who is damaged* by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief."  Cal. Civ. Code § 1794(a) (emphasis added).

- **California Restitution:**  "The elements of unjust enrichment are receipt of a benefit and unjust retention of the benefit *at the expense of another*."  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (emphasis added), *abrogated on other grounds by Microsoft Corp v. Baker*, 137 S. Ct. 1702 (2017).  This Court relied on *Berger* in finding that California would recognize an action for unjust enrichment or restitution. *TACC MTD Opinion*, 2016 WL 3920353, at *23.

- **Texas DTPA:**  The DTPA's "clear language provides a cause of action only to consumers who have sustained damages."  *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823-24 (Tex. 2012); *see also FACC MTD Opinion*, 257 F. Supp. 3d at 448-49 ("'To prove a violation of the Act, a plaintiffs must show that … (3) these acts constituted a producing cause of the consumer's damages.'") (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995).)

31

- **Texas Implied Warranty:** "The statutory elements of the Everetts' breach of implied warranty of merchantability are … (3) that the alleged defect proximately caused the injuries for which the Everetts seek damages." *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 853 (Tex. App. 2005).

- **Missouri Merchandising Practices Act:** "To pursue a claim under the MMPA, a plaintiff must show: … (2) an ascertainable loss of money or property … ." *TACC MTD Opinion*, 2016 WL 3920353, at *33.

- **Missouri Fraudulent Concealment:** Fraud elements include "the hearer's consequent and proximately caused injury" and plaintiffs can use the benefit-of-the-bargain measure to calculate "damages." *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988).

- **Missouri Implied Warranty:** "A plaintiff bringing a breach of implied claim in Missouri must show … injury and damages to the plaintiff or his property." *TACC MTD Opinion* at *35.

- **Missouri Unjust Enrichment:** "The right to restitution for unjust enrichment presupposes: … (2) that the enrichment was at the expense of the plaintiff . . . ." *S & J, Inc. v. McLoud & Co., L.L.C.*, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003) (internal citations omitted).

Summary judgment should be entered in New GM's favor and awarded against each named plaintiff's claims for lack of any legally recoverable damages.

## II.  PLAINTIFFS WHOSE VEHICLES ARE SUBJECT TO SERVICE PARTS VEHICLE RECALL HAVE NO CLAIMS.

The MY 2008-2010 Pontiac Solstice and G5, MY 2008-2010 Saturn Sky, MY 2008-2010 Chevrolet Cobalt, and MY 2008-2011 Chevrolet HHR vehicles covered under Recall No. 14v047—the Service Parts Vehicles—were not defective as manufactured with the '190 switch. *See* Background.A.1.  Instead, New GM recalled those vehicles because some of them might have been repaired with the earlier, faulty '423 switch.  But unless the switch in a Service Parts Vehicle had been replaced with a '423 switch, they are not defective.

Consistent with these facts, the Court previously held that Service Parts Vehicles are automobiles that "were not manufactured with the faulty ignition switch, but which could have been repaired at some point using the faulty ignition switch.  Accordingly, if they [Service Parts

32

Vehicle plaintiffs] are ultimately to succeed on their claims with respect to the ignition switch, they will have to show that their cars in fact contained that defect." *TACC MTD Opinion*, 2016 WL 3920353, at *20 n.15.

None of the named plaintiffs with Service Parts Vehicles has any proof that his or her ignition switch was replaced prior to the recalls, let alone replaced with the defective '423 switch. SUF ¶¶ 146 (Basseri), 263 (K. Robinson), 171 (Padilla), 241 (Akers), 255 (Hawkins). As a result, none of the named plaintiffs can prove the elements of their claim as required by the Court's *TACC MTD Opinion*. Without evidence of an ignition switch repair, any allegation that a vehicle subject to the Service Parts Vehicle recall had a defective ignition switch contradicts the undisputed facts and this Court's prior opinion.

Additionally, plaintiffs have conducted no testing or analysis showing that the ignition switches in the Service Parts Vehicle recall are defective. In the *Ward* case, the plaintiffs claimed that such vehicles are defective if the ignition switch has a torque resistance from "Run" that falls below 15 N.cm. Although New GM disputes this position as applied to ignition switches in the Service Parts Vehicle recall population, plaintiffs have no evidence that any of named plaintiffs' vehicles met plaintiffs' own standard. Glen Stevick, the only plaintiffs' expert who offers an opinion on inadvertent key rotation, has admitted that he has conducted no analysis of the named plaintiffs' vehicles. SUF ¶ 140.

As a result, summary judgment should be granted against all claims of Chimen Basseri, David Padilla, Kenneth Robinson, Brad Akers, and Cynthia Hawkins the to the extent based on the Service Parts Vehicle recall.[20] See Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 322.

---

[20] Padilla, Akers, and Hawkins allege claims based on both the Service Parts Vehicle recall and the EPS Assist recall. The argument in Section II bars their claims based on the Service Parts Vehicle recall.

Case 1:14-md-02543-JMF    Document 5852    Filed 05/14/18    Page 67 of 99

## III.    AS A MATTER OF LAW AND UNDISPUTED FACT, VARIOUS NAMED PLAINTIFFS CANNOT ESTABLISH NEW GM'S LIABILITY.

### A.    Certain Plaintiffs Cannot Show Reliance As Required For Consumer Protection And Fraudulent Concealment Claims.

Plaintiffs' consumer protection and fraudulent concealment claims (other than claims under the MMPA) require proof of reliance.[21]   Under Texas law, "[g]enerally, to prevail on a DTPA claim, a plaintiff must establish that: . . . the defendant engaged in false, misleading, deceptive, or unconscionable acts upon which the plaintiff relied to his detriment."   *Moore v. Panini Am.*, 2016 WL 7163899, at *3 (Tex App. Nov. 7, 2016).[22]   Similarly, under current California law,[23] proof of each plaintiff's reliance is required for the CLRA and UCL.   *E.g.*, *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1362-63, 1366-67 (2010) (reliance is required for UCL claims based on fraud as well as CLRA claims); *Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1047-48 (N.D. Cal. 2014) (where "CLRA claims and UCL claims are based on alleged misrepresentations, omissions, and fraudulent conduct . . . those claims are therefore subject to the actual reliance requirement").[24]   California and Missouri also require reliance for

---

[21]   Each named plaintiff had a variety of different reasons as to why they purchased their vehicles.  In this section, New GM is moving for summary judgment against the named plaintiffs where the undisputed facts—including their own testimony—show that they did not rely on safety or reliability.

[22]   *See also Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 823-24 (Tex. 2012) (under DTPA, a "consumer loses without proof that he relied to his detriment on the deceptive act"); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675 (Tex. 2002); *Peltier Enters. v. Hilton*, 51 S.W.3d 616, 623-24 (Tex. App. 2000) (under unconscionability prong of DTPA that there "must be a showing of what the consumer could have or would have done if he had known about the information").

[23]   Before November 2, 2004, UCL claims did not require individualized proof of reliance, injury, or damages.  *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 852 (2008).  On that date, Proposition 64 changed the UCL to require plaintiffs to prove they have "suffered injury in fact" and "lost money or property as a result of such unfair competition."  *Id.*  Earlier case law that did not require reliance, as well as decisions that mistakenly continue to rely on such case law, have been superseded by Proposition 64.

[24]   *Princess Cruise Lines, Ltd. v. Superior Court*, 179 Cal. App. 4th 36, 46 (2009) (holding that "reliance is required for CLRA actions"); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1082-83 (N.D. Cal. 2017) ("Plaintiffs must allege reliance to show they have statutory standing to pursue each of their

Case 1:14-md-02543-JMF Document 5852 Filed 05/4/20/18 Page 58 of 99

common law fraudulent concealment. *See*, *e.g.*, *Mirkin v. Wasserman*, 858 P.2d 568, 573-74 (Cal. 1993); *Triggs v. Risinger*, 772 S.W.2d 381, 384 (Mo. Ct. App. 1989).

### 1. Various Texas Plaintiffs Cannot Prove Reliance.

Under Texas law, reliance cannot be presumed, but must be proven for each consumer. *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 549 (5th Cir. 2003). Reliance cannot be inferred from a consumer purchasing a product, even if it has an undisclosed problem or inflated price. *See Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 237-38 (Tex. App. 2008); *Fidelity & Guar. Life Ins. Co. v. Pina*, 165 S.W.3d 416, 424-25 (Tex. App. 2005); *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 446 (N.D. Cal. 2014); *see also Ford Motor Co. v. Ocanas*, 136 S.W.3d 447, 453 (Tex. App. 2004) (even if defendant wanted plaintiff to rely on its statements, there is no DTPA violation unless the plaintiff actually did rely). Texas courts recognize that a plaintiff might proceed with the transaction for various different reasons. *See Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App. 2000) (differences in loan interest rates and thus monthly payments for a vehicle may not be material to a buyer, such as if the buyer cannot acquire financing elsewhere); *Tex. S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 238 (Tex. App. 2008) (a consumer might pay an inflated fee for a product for various reasons). A plaintiff cannot prove reliance without showing "what the consumer could have or would have done if he had known about the information." *Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623-24 (Tex. App. 2000).

Texas courts regularly reject DTPA and fraud claims where a plaintiff relies on statements from sources other than the defendant in buying the product. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 694 (Tex. 2002) (plaintiffs could not show reliance on defendant's

---

claims" under the CLRA and UCL); *Coleman-Anacieto v. Samsung Elecs. Am., Inc.*, 2016 WL 4729302, at *10-11, 17 (N.D. Cal. Sept. 12, 2016); *English v. Apple Inc.*, 2016 WL 1188200, at *12 (N.D. Cal. Jan. 5, 2016) ("Courts require a showing of reliance from named plaintiffs asserting UCL claims based on alleged misrepresentations irrespective of which of the UCL's prongs the claims are bought under.").

statements regarding software where plaintiffs "relied on recommendations from colleagues and others"); *McLaughlin v. Northstar Drillings Techs., Inc.*, 138 S.W.3d 24 (Tex. App. 2004) (rejecting DTPA claims where the "record in this case establishes that McLaughlin did not rely on Northstar's promotional literature to hire McLaughlin, but rather on a friend's recommendation"); *Bowles v. Mars, Inc.*, 2015 WL 3629717, at *4 (S.D. Tex. June 10, 2015) (plaintiff could not show reliance on manufacturer's label when plaintiff relied on the recommendation of the retailer that sold him the product).

Under Texas law, neither plaintiff Gareebah Al-ghamdi nor Lisa McClellan can prove reliance on New GM's alleged omission of information about vehicle defects. Al-ghamdi relied on her family in buying her 2004 Chevrolet Impala, testifying that she was influenced by her mother and cousins owning Chevrolets and being happy with those vehicles. SUF ¶ 306. Al-ghamdi's stepfather accompanied her on trips to the dealerships, test drove the Impala, and negotiated its price with the dealership. *Id*. Al-ghamdi did not mention safety as a reason for buying the vehicle and, while she said she wanted a reliable car, she relied on her stepfather to determine this, as he discussed "status of the vehicles, maintenance, and things of that sort" with the dealerships. *Id*. Indeed, despite receiving several recall notices, Al-ghamdi chose to not have the recall repair performed. *Id.* ¶ 309.

Lisa McClellan bought her used vehicle because it had low mileage, she liked the vehicle's look and liked Chevrolets in general, and that she preferred an American car over foreign competitors. *Id*. ¶ 330. McClellan did not mention safety as a reason for buying the vehicles, and mentioned reliability only in general. *Id*. The undisputed evidence establishes that Al-ghamdi and McClellan did not rely on New GM's alleged representations or omissions, and

36

judgment should be granted against their DTPA claims.[25]

**2.    Various California Plaintiffs Likewise Cannot Show Reliance.**

Under California law "to show actual reliance, whether based on an affirmative misrepresentation or a material omission, Plaintiffs must demonstrate that the misrepresentation or omission was an immediate cause of the injury-causing conduct."  *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017) (collecting and summarizing cases). Plaintiffs must "show that the misrepresentation or omission was a substantial factor in their decision making process."  *Id.*; *see also Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101 (N.D. Cal. 2016).  "If an omission is material, … that one would have behaved different can be presumed, or at least inferred."  *Sud*, 229 F. Supp. 3d at 1083.  "However, a plaintiff cannot use that presumption if the evidence establishes an actual lack of reliance."  *Id.*; *see also Philips v. Ford Motor Co.*, 2016 WL 7428810, at *15-16 (N.D. Cal. Dec. 22, 2016) (presumption or inference does not apply where plaintiffs are exposed to disparate information).

To show reliance on omissions, each plaintiff must prove that (1) "had the omitted information been disclosed one would have been aware of it" and (2) he or she would have "behaved differently."  *Mirkin v. Wasserman*, 858 P.2d 568, 574 (Cal. 1993); *see also Webb v. Carter's Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011); *Sud*, 229 F. Supp. at 1083.  California courts have rejected claims where plaintiffs cannot show reliance, even where those claims were

---

[25]  For the plaintiffs discussed in Section III.A., plaintiffs' counsel used leading questions to have plaintiffs answer that they would not have purchased the vehicle if they had known of the alleged defects. These improper questions cannot change that when these plaintiffs were asked why they purchased each vehicle, they did not rely on safety or reliability. *See, e.g.*, Fed. R. Evid. 611(c) ("Leading question should not be used on direct examination except as necessary to develop the witness's testimony."); *Rylott-Rooney v. Alitalia-Linee Aeree Italiane SpA*, 2009 WL 37817, at *2-3 (S.D.N.Y. Jan. 6, 2009) (the "assertions in plaintiff's counsel's leading question are, however, not evidence in themselves" and were not sufficient to prevent summary judgment, especially where the witness himself did not offer such testimony); *Newton v. City of New York*, 640 F. Supp. 2d 426, 444-45 (S.D.N.Y. 2009) (striking witness's responses to plaintiffs leading questions and granting summary judgment to defendant).

37

based on alleged omissions that could cause physical injury.  *E.g.*, *Webb v. Carter's Inc.*, 272 F.R.D. 489, 502-03 (C.D. Cal. 2011) (disclosing that children's clothes had toxic chemical may not change consumer behavior depending on perceptions of likelihood of injury and whether disclosure conflicted with consumer's experience); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 134 (2009) (consumers who took allegedly harmful drug could not show reliance or materiality if they would still take the drug today or if their physicians would have distrusted statements by the pharmaceutical industry); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 457 (S.D. Cal. 2014) (consumers would not be able to prove reliance on claim that makeup would last 24 hours based on their expectations, reasons for purchase, and consumer satisfaction).

According to plaintiffs themselves, New GM's alleged representations or omissions were not a substantial factor for various California plaintiffs.  Chimen Basseri testified that she bought her car based on its appearance and because she and her fiancé liked the car:

> Q:  How did you decide to buy a 2011 HHR from Valencia of Nissan of Valencia? Sorry.
>
> A. I was looking through the cars.com, you know, locally, but that's the only place that there was a 2011 white HHR, and we wanted to buy that car because we wanted to buy the car. You know, me and my fiancé, we liked the car.

SUF ¶¶ 143.

David Padilla relied on statements by an independent dealer's salesperson that the vehicle was a good buy and because he believed the salesperson was honest:

> Q. When you purchased the 2010 Chevy Cobalt why did you pick that car over the other two or three?
>
> A. Told me it is a good buy.  He says, "It is in good shape."  It wasn't.  Later I found out, but he told me it was and I believed him.  But he was honest.  He said, "Get it in here."  He says, "There is something wrong with it." . . .
>
> Q. Do you recall specifically what [the dealer's salesperson] told you about the Chevy Cobalt when you spoke with him on the day that you purchased it?
>
> A. No. I really -- I liked it and I bought it.  I didn't ask no questions on it. . . .

38

Case 1:14-md-02543-JMF  Document 5855  Filed 05/04/18  Page 82 of 99

A. I didn't do no shopping for that one.  I -- I purchased it when he suggested it.
SUF ¶¶ 168.  That Padilla did not mention safety when asked about why he purchased the Cobalt
shows that it was not a "substantial factor" in his decision-making.

Various plaintiffs also are unable to prove that they would have been aware of the
allegedly omitted information if it had been disclosed pre-purchase.  Santiago Orosco and David
Padilla did not view any New GM materials before purchasing their vehicles.  SUF ¶¶ 161, 169.
Their lack of exposure to New GM's alleged statements establishes that they would not have
received information disclosed by New GM.  *See*, *e.g.*, *Webb v. Carter's Inc.*, 272 F.R.D. 489,
502 (C.D. Cal. 2011) (plaintiff could not show she would have been aware of disclosures
regarding children's clothing where she did not research children's clothes before buying them);
*English*, 2016 WL 1188200, at *12 (plaintiff could not show reliance on omissions where she did
not read or rely on documents where disclosures would have been made); *Sud*, 229 F. Supp. 3d at
1083-84 (plaintiff could not show reliance on omitted information by arguing it should have been
revealed in disclosure where plaintiffs did not read disclosure before making purchase).  Basseri
bought her vehicle used from a Nissan dealer.  SUF ¶ 142.  Dealers are unlikely to provide
information about another manufacturer's vehicles and thus a buyer will not learn of supposedly
omitted information.  *See Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *11 (N.D.
Cal. Apr. 19, 2017) (noting that "a class member who purchased a used Class Vehicle from a
third party may not have interacted with a Porsche representative *at all* prior to purchase, and
indeed may not have viewed *any* material or advertisements from Porsche") (emphases in
original).

Basseri, Orosco, and Padilla did not rely on New GM's alleged representations or
omissions.  Judgment should be granted against their consumer and common law fraud claims.

### 3. Various Missouri Plaintiffs Cannot Show Reliance.

Under Missouri law, the "test of whether a plaintiff relied upon a misrepresentation is simply whether the representation was a material factor influencing final action." *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009); *Grossoeheme v. Cordell*, 904 S.W.2d 392, 397 (Mo. Ct. App. 1995).

Ronald Robinson and Mario Stefano did not rely upon New GM's alleged misrepresentations or omissions. When asked about the reasons for his vehicle purchase, Robinson testified that he "was looking for low mileage and what I would consider a decent price." SUF ¶ 268. Robinson also relied on the opinion of his brother-in-law, who was in the auto repair business. SUF ¶ 270.

Stefano testified he bought his 2011 Camaro "[b]ecause it is a vehicle that my wife and I enjoy. We've always enjoyed Camaros." *Id.* ¶ 277; *see also Id.* (Stefano bought his 2011 Camaro because "it's a love my wife has for these cars that she loves Camaros. She's had them for so long, and she's driven them for many years. ... [W]e try and support each other by getting vehicles that we like."). Given the couple's shared enjoyment of Camaros, Stefano testified that he did no research before buying and that the purchase was "completely impulse." *Id.* Summary judgment should be granted against R. Robinson and Stefano's fraudulent concealment claims.

### B. Plaintiffs Have Not Pled Any Actionable Misrepresentations.[26]

#### 1. Alleged Statements That A Plaintiff Never Saw Or Heard Cannot Have Caused Plaintiff Harm.

In California,[27] Texas,[28] and Missouri,[29] if a plaintiff never saw or heard a statement, that

---

[26] Plaintiffs plead misrepresentations only in their consumer fraud counts. *E.g.*, 5ACC ¶¶ 1585, 1592, 1594, 1614, 1620, 1622. The arguments in this section apply equally to any other claims to the extent that plaintiffs base those claims on alleged misrepresentations.

representation cannot have caused plaintiff any harm, nor can plaintiff have relied on it. Each plaintiff's misrepresentation claims can be based only on alleged statements he or she actually saw or heard. Santiago Orosco, David Padilla, Deloris Hamilton, Cynthia Hawkins, Kenneth Robinson, Mario Stefano, Gareebah Al-ghamdi, Dawn Fuller, Michael Graciano, and Lisa McClellan testified that they did not see or did not rely on New GM advertisements or materials before buying their vehicles. SUF ¶¶ 161 (Orosco), 169 (Padilla), 247 (Hamilton), 254 (Hawkins), 261 (K. Robinson), 279 (Stefano), 307 (Al-ghamdi), 321 (Fuller), 328 (Graciano), 340 (McClellan). Therefore, they have no valid claims for misrepresentation.

Other plaintiffs vaguely recalled having seen what they believed were advertisements, but cannot recall what these said. Chimen Basseri and Kellie Cereceres claim to have seen New GM advertisements, but do not remember any content and do not know whether they saw any of the statements the 5ACC alleges are inaccurate. *Id.* ¶¶ 144, 151. Brad Akers believes he may have seen one advertisement about his vehicle, but was not sure if it was an advertisement or article, or if it was written by New GM or someone else. *Id.* ¶ 239. Because none of these plaintiffs remember the content of any representations, they cannot have a misrepresentation claim.

---

[27] *E.g.*, *Durrell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010) (plaintiff could not show reliance for UCL claim where he did not read agreement at issue); *Resnick v. Hyundai Motor Am., Inc.*, 2016 WL 9455016, at *15 (C.D. Cal. Nov. 14, 2016) ("Plaintiffs have failed to establish that they were aware of the alleged misrepresentations at the time they purchased their vehicles. Thus, they have failed to sufficiently plead reliance."); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1220 (N.D. Cal. 2014); *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1018 (N.D. Cal. 2013); *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013); *Ehret v. Uber Tech., Inc.*, 148 F. Supp. 3d 884, 901 (N.D. Cal. 2015).

[28] *E.g.*, *Solano v. Landamerica Commonwealth Title of Fort Worth, Inc.*, 2008 WL 5115294, at *9-10 (Tex. App. Dec. 4, 2008) (plaintiff could not show reliance without evidence he saw incorrect description in document); *Chapman v. Pacificare of Tex., Inc.*, 2005 WL 1155108, at *6 (S.D. Tex. Apr. 18, 2005); *Deburro v. Apple, Inc.*, 2013 WL 5917665, at *1 (W.D. Tex. Oct. 31, 2013).

[29] *E.g.*, *Williams v. HSBC Bank USA, N.A.*, 467 S.W.3d 836, 845 (Mo. Ct. App. 2015) (there can be no reliance "where the plaintiff took the action which caused the damage before hearing the alleged misrepresentation").

Christopher Tinen claims to have seen advertising with general themes of dependability and performance, but did not identify whether that advertising was Old GM or New GM, could not recall if these advertisements were about the vehicle he purchased, and could not recall whether he relied on any such themes or statements. *Id.* ¶ 288. As he cannot testify whether these alleged statements caused him to purchase the vehicle, he has no misrepresentation claims.

Moreover, three of the named plaintiffs who cannot recall or did not rely on the content of advertisements they saw testified that the representations in those advertisements were not false or misleading. Basseri and Cereceres admitted that they were not claiming that any of the New GM advertisements were false or misleading. *Id.* ¶¶ 144, 151. Tinen could not identify any representations he believed were untrue. *Id.* ¶ 288. These plaintiffs have no basis for a misrepresentation claim.

## 2. New GM Cannot Be Liable For The Statements Of Third Parties, Including Independent Dealers.

Plaintiffs cannot maintain misrepresentation claims based on statements made by dealership representatives. Dealerships are separate entities from, and not agents of, New GM. The "relationship between automobile manufacturers and their dealers has been examined by a host of courts throughout the country, all of which have agreed that dealers are not 'agents' of manufacturers." *Williams v. Yamaha Motor Corp., U.S.A.*, 2015 WL 13626022, at *6 & n.9 (C.D. Cal. Jan. 7, 2015) (collecting cases); *State ex rel. Bunting v. Koehr*, 865 S.W.2d 351, 354 (Mo. 1993) ("The relationship between the dealers and [manufacturer] for the sale of [manufacturer's] products is, therefore, that of buyer and seller, not agent and principal."); *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 290 (5th Cir. 2004).[30] New GM's

---

[30] *See also Bushendorf v. Freightliners Corp.*, 13 F.3d .1024, 1026 (7th Cir. 1993) (An "automobile dealer or other similar type of dealer, who like [defendant dealer] merely buys goods from manufacturers or other suppliers for resale to the consuming public, is not his supplier's agent."); *Matthews v. Ford*

Dealer Sales and Service Agreements expressly confirm that dealers are not New GM's agents. SUF ¶¶ 379-81.

Santiago Orosco, David Padilla, Michelle Thomas, Brad Akers, Deloris Hamilton, Cynthia Hawkins, Kenneth Robinson, Christopher Tinen, Patrice Witherspoon, Michael Graciano all claim to have relied on statements made by dealership employees, not New GM. SUF ¶¶ 160 (Orosco), 168 (Padilla), 176 (Thomas), 239 (Akers), 246 (Hamilton), 254 (Hawkins), 261 (K. Robinson), 289 (Tinen), 297 (Witherspoon), 328 (Graciano). Such statements cannot be the basis for liability against New GM.

### 3. The Alleged Misrepresentations Are Non-actionable Puffery.

California,[31] Texas,[32] and Missouri[33] hold that puffery is not actionable under statutory or common law fraud. "Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Office Solution*,

---

*Motor Co.*, 479 F.2d 399, 403 & n.13 (4th Cir. 1973) (noting that authorized dealer was not an agent of automobile manufacturer); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1580 (N.D. Ga. 1992); *Ortega v. Gen. Motors Corp.*, 392 So.2d 40, 43 (Fla. Dist. Ct. App. 1980); *Arnson v. Gen. Motors Corp.*, 377 F. Supp. 209, 213 (N.D. Ohio 1974).

[31] *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1353 (2d Dist. 2003) (holding that statements such as "crystal clear" and CD quality" were not factual representations and thus could not be the basis of liability under the UCL or CLRA); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007); *Atari Corp. v. The 3DO Co.*, 1994 WL 723601, at *2-3 (N.D. Cal. May 16, 1994); *Grassi v. Int'l Comfort Prods., LLC*, 2015 WL 4879410, at *6 (E.D. Cal. Aug. 14, 2015).

[32] *Autohaus, Inc. v. Aguilar*, 794 S.W.2d 459, 462 (Tex. App. 1990) ("[W]e hold that if the statements alleged to be misrepresentations are, in fact, only puffing or opinion, they cannot be actionable representations under the DTPA."); *id.* at 463 ("The Texas courts have routinely discussed puffing and opinion in breach of warranty and fraud cases."); *id.* at 464 (holding that representations that car "was the best engineered car in the world" and "probably would not have mechanical difficulties" were inactionable puffery); *McNeely v. Salado Crossing Holding, L.P.*, 2017 WL 2561551, at *3 (Tex. App. June 14, 2017); *Diais v. Land Rover Dallas, L.P.*, 2016 WL 1298392, at *4 (Tex. App. Apr. 4, 2016).

[33] *Williams v. United Techs. Corp.*, 2015 WL 7738370, at *8 (W.D. Mo. Nov. 30, 2015) ("Defendants' claims that its products were 'reliable' and 'built to last,' constitute non-actionable puffery" under the MMPA); *Wright v. Bath & Body Works Direct, Inc.*, 2012 WL 12088132, at *2 (W.D. Mo. Oct. 17, 2012); *Cortinas v. Behr Process Corp.*, 2017 WL 2418012, at *2 (E.D. Mo. June 5, 2017).

43

513 F.3d 1038, 1053 (9th Cir. 2008) (California law). "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions." *Id.* (internal citations omitted). "Thus, a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery." *Id.*

"[C]ourts have repeatedly held that general statements about a brand's quality, or a product's safety, are too vague or lacking in factual content to be actionable." *TACC MTD Opinion*, 2016 WL 3920353 at *10. Consistent with the Court's ruling, California, Texas, and Missouri hold that general statements concerning safety or reliability are inactionable puffery.

The California Supreme Court has recognized that if "defendants' assertion of safety is merely a statement of opinion—mere 'puffing'—they cannot be held liable for its falsity." *Hauter v. Zogarts*, 14 Cal. 3d 104, 111 (1975);[34] *see also Sims v. Kia Motors Am., Inc.*, 2014 WL 12558249, at *1, 7 (C.D. Cal. Mar. 31, 2014) (advertisements where "safety and quality were consistent themes" including that the vehicles "are engineered to help ensure everyone's well-being" were puffery under the UCL and FAL) (internal citation omitted); *Azoulai v. BMW of N. Am., LLC*, 2017 WL 1354781, at *1, 8 (N.D. Cal. Apr. 13, 2017) (representation that vehicle soft close door system operated "safely" was puffery despite door crushing plaintiff's fingers: "Contrary to what Plaintiffs contend, there is nothing 'specific and measurable' about the word 'safely.'"); *Cirulli v. Hyundai Motor Co.*, 2009 WL 5788762, at *3 (C.D. Cal. June 12, 2009).

In Texas, statements that an airplane's engine was "'good, safe and reliable' … amount to

---

[34]  After holding that puffing about safety was not actionable, *Hauter* ultimately concluded that the statements at issue in that case were sufficiently specific and measurable to be factual. Specifically, *Hauter* concerned a golfing training device where the defendant represented that "Completely Safe Ball Will Not Hit Player," when, in fact, the plaintiff was struck in the head by the golf ball. *Id.* at 109, 112.

mere opinion or puffing." *Bill & Joe Deane Bradford Invs., Inc. v. Cutter Aviation San Antonio, Inc.*, 2005 WL 3161083, at *2 (Tex. App. Nov. 23, 2005); *Chandler v. Gener Messer Ford, Inc.*, 81 S.W.3d 493, 501 (Tex. App. 2002) (dealership salesman's statement that one car would be "safer" than another was "'sales talk' or 'puffing' which are not actionable under the DTPA"); *Dunlap v. Gayle*, 2013 WL 1500377, at *4 (Tex. App. Apr. 11, 2013); *Greater Houston Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670 (S.D. Tex. Dec. 2015).

Missouri has explained that allegations that "GM has through its national advertisements, press releases and promotions created a false impression that the ABS system is 'safe and reliable'" were "statements of puffery." *In re Gen. Motors Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1534 (E.D. Mo. 1997), *aff'd*, *Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999); *Williams v. United Techs. Corp.*, 2015 WL 7738370, at *8 (W.D. Mo. Nov. 30, 2015) ("Defendants' claims that its products were 'reliable' and 'built to last,' constitute non-actionable puffery" under the MMPA).[35] Beyond the bellwether states, decisions across the nation hold that automotive companies' general statements of safety or reliability are not actionable.[36]

The handful of plaintiffs in the three bellwether states who claim to have seen New GM

---

[35] In denying New GM's motion to dismiss plaintiffs' Wisconsin consumer fraud, the Court found that some of plaintiffs' statements were actionable, but that conclusion does not apply here. *FACC MTD Opinion*, 257 F. Supp. at 457-58. The Court's prior opinion dealt with the particularities of Wisconsin law, while California, Texas, and Missouri law all make clear that general statements regarding safety are puffery. Moreover, the prior opinion concerned a motion to dismiss where the complaints alleged, and the Court was required to assume, that each plaintiff viewed a range of statements. By contrast, on summary judgment each plaintiff must produce evidence of each specific representation of which he or she relies. The evidence shows that the New GM representations plaintiffs heard or saw, if any, are not actionable.

[36] *E.g.*, *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004); *Zaccagnino v. Nissan N. Am., Inc.*, 2015 WL 3929620, *4 (S.D.N.Y. June 17, 2015); *Mitchell v. Gen. Motors LLC*, 2014 WL 1319519, at *8 (W.D. Ky. Mar. 31, 2014); *Sabol v. Ford Motor Co.*, 2015 WL 4378504, *5 (E.D. Pa. July 16, 2015); *Daigle v. Ford Motor Co.*, 2012 WL 3113854, *9 (D. Minn. July 31, 2012); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2010 WL 2813788, at *8-9 (D.N.J. July 9, 2010); *Hoffman v. A. B. Chance Co.*, 339 F. Supp. 1385, 1388 (M.D. Pa. 1972).

45

statements and recalled their content cite only puffery. Ronald Robinson claims he saw advertising about the vehicle's "quality." SUF ¶ 269. Patrice Witherspoon does not claim the advertisements made any statements, but rather depicted vehicles being hit with a baseball bat or shopping cart, which she asserts gave the impression of safety. *Id.* ¶ 297. Dawn Bacon claims she saw an advertisement describing a vehicle as being "first in its class in safety." *Id.* ¶ 314. Michelle Thomas alleges that she saw advertisements talking generally about "safety" and "reliability," though she does not recall what the advertisements specifically said about any vehicle. *Id.* ¶ 176. These general references are classic puffery; summary judgment should be granted against these plaintiffs' misrepresentation claims.

### C.   Plaintiffs' Implied Warranty Claims Are Barred In Whole Or In Part.[37]

#### 1.   New GM Warranties Exclude Benefit-of-the-Bargain, Lost Time, and Other Consequential Damages.

Texas and Missouri allow a manufacturer to limit the remedy for breach of implied warranty to repair and replacement of nonconforming parts, and also to exclude all consequential damages. Both states' UCC provisions on implied warranties state that "the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to … repair and replacement of nonconforming goods or parts." Mo. Rev. Stat. § 400.2-719(1)(a); Tex. Bus. & Com. Code § 2.719(a)(1). "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." Mo. Rev. Stat. §

---

[37]   If Texas plaintiffs' implied warranty claims are barred, their DTPA claims also are barred to the extent they are based on implied warranty. *See BaySystems N. Am. LLC v. Rosebud-Lott Indep. Sch. Dist.*, 2011 WL 6989898, at *3-4 (Tex. App. Dec. 21, 2011).

400.2-719(3); Tex. Bus. & Com. Code § 2.719(c).

All of New GM's (and Old GM's) express warranties for the named plaintiffs' vehicles limit implied warranties in accord with these UCC provisions.  SUF ¶ 362.  Those warranties provide in bold, conspicuous language that **"Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty.  GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty."**  *Id.*  Texas[38] and Missouri[39] courts have enforced similar warranties limiting remedies to repair and replacement where plaintiffs sought economic losses and manufacturers agreed to repair the product.

Therefore, for implied warranty, Texas and Missouri plaintiffs are limited to "repair and replacement of nonconforming goods or parts," which New GM has already provided through the 2014 recalls.  Plaintiffs' alleged economic loss damages are barred by the warranties' terms.  No Texas or Missouri plaintiff[40] can obtain benefit-of-the-bargain, lost time, or other

---

[38] *Henderson v. Ford Motor Co.*, 547 S.W.2d 663, 669 (Tex. App. 1977) (explaining that warranty satisfied its purpose where a "limited warranty to repair defects within the limitation prescribed without expense to the purchaser was given in lieu of any implied warranty of merchantability or fitness"); *Emmons v. Durable Mobile Homes, Inc.*, 521 S.W.2d 153, 154 (Tex. App. 1974) (holding that warranty limiting remedy to replacement of parts in a mobile home was reasonable, conscionable, and conspicuous, despite plaintiff's assertions that home was unfit for its intended purpose); *Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20, 25 (Tex. App. 1982).

[39] *Russo v. Hilltop Lincoln-Mercury, Inc.*, 479 S.W.2d 211, 213 (Mo. Ct. App. 1972) (enforcing warranty's limitation of remedies to replacement or repair of defective parts to exclude plaintiff's damages for renting an alternative vehicle and for interest paid on car loan).

[40] These limitations on damages apply regardless of whether a plaintiff bought a vehicle new or used. *E.g.*, *Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 729 (Tex. App. 2006) ("Other cases indicate that disclaimers may apply to subsequent purchasers."); *Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp.*, 774 N.W.2d 332, 345 (Mich. Ct. App. 2009); *Theos & Sons, Inc. v. Mack Trucks, Inc.*, 1999 WL 38393 (Mass. App. Ct. 1999); *LeCates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 166 (Del. Super. Ct. 1986); *Gen. Motors Corp. v. Halco Instruments, Inc.*, 185 S.E.2d 619, 622 (Ga. Ct. App. 1971).

consequential damages under an implied warranty theory and, therefore, summary judgment should be granted against such claims.

> ### 2. Various Plaintiffs' Implied Warranty Claims Are Barred By The Statutory Limitations Period.

Both Texas and Missouri apply a four-year statute of limitations to implied warranty claims. Mo. Rev. Stat. § 400.2-725(1); Tex. Bus. & Com. Code § 2.725(1). The "cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach" and a "breach of warranty occurs when tender of delivery is made . . . ." Mo. Rev. Stat. § 400.2-725(2); Tex. Bus. & Com. Code § 2.725(2). Thus, the limitations period for implied warranty claims begins to run whether the vehicle is delivered to the plaintiff, and cannot be extended by any discovery period.[41]

In general, Texas and Missouri plaintiffs' implied warranty claims are time-barred if they purchased their vehicles before March 14, 2010. While filing a class action can, in certain circumstances, toll the limitations periods for absent class members, *see Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the first nationwide class action relating to the Delta Ignition Switch was filed on March 14, 2014. *See Brandt v. Gen. Motors, LLC*, Case No. 2:14-cv-00079, Docket No. 1, Original Class Action Complaint (S.D. Tex. Mar. 14, 2014). If a plaintiff purchased a vehicle before March 14, 2010, the four-year limitations period expired before that plaintiff could benefit from class action tolling.

Named plaintiffs Brad Akers, Kenneth Robinson, Christopher Tinen, Patrice

---

[41] *Buffington v. Lewis*, 834 S.W.2d 601, 603 (Tex. App. 1992) ("actions based on breach of warranty are not subject to the discovery rule" and "a warranty action accrues when delivery occurs and must be brought within four years after accrual"); *Muss v. Mercedes-Benz of N. Am.*, 734 S.W.2d 155, 158 (Tex. App. 1987) (claim of plaintiff alleging latent defects in his vehicle accrued on the date of delivery); *Safeway Stores, Inc. v. Certainteed Corp.*, 710 S.W.2d 544, 546-48 (Tex. 1986); *Schneider v. G. Guilliams, Inc.*, 976 S.W.2d 522, 529 (Mo. Ct. App. 1998); *May v. AC & S, Inc.*, 812 F. Supp. 934, 944-45 (E.D. Mo. 1993).

Witherspoon, and Gareebah Al-ghamdi all purchased their vehicles before March 14, 2010. SUF ¶ 237 (Akers bought his 2009 HHR in 2009), ¶ 260 (K. Robinson purchased his 2008 Pontiac G5 on September 7, 2008), ¶ 286 (Tinen purchased his 2010 Acadia on February 22, 2010), ¶ 296 (Witherspoon purchased her 2006 Ion in 2005), ¶ 305 (Al-ghamdi purchased her 2004 Impala on September 7, 2009). Each of their implied warranty claims is time-barred.

### 3. Various Plaintiffs' Implied Warranty Claims Are Barred By The Time And Mileage Limits In The Vehicles' Warranties.

Texas and Missouri have adopted UCC § 2-316 permitting the "Exclusion or Modification of Warranties." Mo. Rev. Stat. § 400.2-316; Tex. Bus. & Com. Code § 2.316. To "exclude or modify the implied warranty of merchantability of any part of it the language must mention merchantability and in case of a writing must be conspicuous." Mo. Rev. Stat. § 400.2-316(2); Tex. Bus. & Com. Code § 2.316(b). The warranties here contain such conspicuous language, stating in bolded text that, "**Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty.**" SUF ¶ 362. In accord with the UCC, courts across the country have enforced similar limitations of implied warranties for vehicles and other products.[42]

Nearly all the written warranties of the vehicles at issue provide that "[c]overage is for

---

[42]  *Deburro v. Apple, Inc.*, 2013 WL 5917665, at *7 (W.D. Tex. 2013) (enforcing one-year limit on implied warranties); *Brisson v. Ford Motor Co.*, 349 F. App'x 433, 434-35 (11th Cir. 2009) ("We also agree with the district court's ruling that plaintiffs' failure to allege that they experienced a defect within the warranty period of the three years or 36,000 miles is fatal. … Ford limited the implied warranty to the period of the express warranty, as expressly permitted by the MMWA, and plaintiffs failed to allege that a defect manifested itself or a breach occurred within that period."); *Meserole v. Sony Corp. of Am., Inc.*, 2009 WL 1403933, at *9 (S.D.N.Y. May 19, 2009) (enforcing disclaimer that stated that any implied warranty of merchantability or fitness for a particular purpose was limited to the duration of an express warranty); *Stevenson v. Mazda Motor of Am., Inc.*, 2015 WL 3487756, at *12 (D.N.J. June 2, 2015) (collecting cases).

the first 3 years or 36,000 miles, whichever comes first." *Id.* ¶ 363.[43]  The sole exception is Dawn Bacon's Cadillac CTS, which states that "[c]overage is for the first 4 years or 50,000 miles, whichever comes first." *Id.* ¶ 364.  As the first class action relating to the Delta Ignition Switch was filed on March 14, 2014, plaintiffs' implied warranty claims are barred if they purchased their vehicles before March 14, 2011 (or in Bacon's case, 2010), or if the vehicle had more than 36,000 miles (or in Bacon's case, 50,000 miles) before March 14, 2014.

The vehicles of Brad Akers, Deloris Hamilton, Kenneth Robinson, Christopher Tinen, Patrice Witherspoon, Gareebah Al-ghamdi, Dawn Bacon, Dawn Fuller, Michael Graciano, and Lisa McClellan each was either more than three years old or had more than 36,000 miles in March 2014.[44]  These plaintiffs' implied warranty claims are barred.

### 4. Numerous Plaintiffs' Substantial Use Of Their Vehicles Precludes Their Implied Warranty Claims.

For California plaintiffs to recover under the Song-Beverly Act, or Texas or Missouri plaintiffs to recover under the UCC, for breach of implied warranty, they must prove that their

---

[43]  In the *Cockram* summary judgment decision, the Court suggested that the 5-year powertrain warranty might cover the ignition system.  *In re Gen. Motors LLC Ignition Switch Litig.*, 202 F. Supp. 3d 362, 370 (S.D.N.Y. 2016).  The warranties define what is included in powertrain coverage—which is various parts of the engine, transmission, transaxle, transfer case, and drive systems (subject to various exclusions)—and do not include the ignition switch as part of the powertrain.  SUF ¶ 365.  Accordingly, the ignition switch is subject to the bumper-to-bumper warranty.

[44]  *See* SUF ¶ 242 (Akers' vehicle was originally bought in 2009; it also had 133,781 miles when repairs were conducted in mid-2014), ¶ 244 (Hamilton's vehicle was originally bought in 2000 or 2001), ¶ 257 (Hawkins' 2010 Cobalt had approximately 52,000 miles when she purchased it in July 2013), ¶ 260 (K. Robinson's 2008 Pontiac G5 was originally sold on September 7, 2008), ¶¶ 267, 273 (R. Robinson's 2010 Impala was bought used in June 2011; it had 25,000 miles at that time and over 77,000 when the recall was conducted), ¶ 286 (Tinen bought his 2010 Acadia on February 22, 2010), ¶ 296 (Witherspoon purchased her 2006 Ion in 2005), ¶¶ 304, 310 (Al-ghamdi purchased a used 2004 Impala; it had 80,000 miles in September 2009), ¶¶ 312, 317 (Bacon purchased a used 2006 Cadillac CTS; it had approximately 160,000 miles in January 2013), ¶ 328 (Fuller bought a 2008 Impala; it had over 79,000 miles in December 2011), ¶ 331 (Graciano's vehicle is a 2007 Cobalt; it had 43,991 miles in October 2011), ¶ 344 (McClellan's vehicle is a 2005 Malibu Maxx, which had approximately 60,000 to 70,000 miles in November 2010).

vehicles were not merchantable.  Courts "have consistently held that an automobile that was
driven for years without problems was merchantable and fit for its ordinary use at the time of
sale." *Szymczak v. Nissan N. Am., Inc.*, 2011 WL 7095432, at *11 (S.D.N.Y. Dec. 16, 2011); *see
also Skeen v. BMW of N. Am., LLC*, 2014 WL 283628, at *16 (D.N.J. Jan. 24, 2014) ("A claim
for breach of implied warranty must ordinarily arise shortly after purchase—there will typically
be no claim for breach of implied warranty where plaintiffs have driven their cars without
problems for years.").  This rule applies where plaintiffs allege that the vehicle has a latent,
safety-related defect.  In *Am. Suzuki Motor Corp. v. Superior Court*, plaintiffs alleged that the
Suzuki Samurai had "an unacceptable risk of a deadly roll-over accident."  44 Cal. Rptr. 2d 526,
528 (Cal. App. Ct. 1995).  But because "the vast majority of the Samurais sold to the putative
class did what they were supposed to do for as long as they were supposed to do it, we conclude
that these vehicles remained fit for their ordinary purpose."  *Id.* at 531 (internal citations and
quotations omitted).  California courts have rejected Song-Beverly Act claims where "Plaintiffs'
car operated for four years without apparent problem, easily satisfying any implied warranty that
might attach as a matter of law."  *Larsen v. Nissan N. Am.*, 2009 WL 1766797, at *6 (Cal. Ct.
App. June 23, 2009); *see also Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1079
(C.D. Cal. 2014) (vehicle was merchantable where plaintiff drove it for approximately 4.5 years
and over 65,000 miles, despite peeling chrome cutting plaintiffs' hands).[45]

Courts nationwide have reached similar conclusions, rejecting implied warranty claims
where vehicles operated for years or tens of thousands of miles without incident.  *See*, *e.g.*, *Ford
Motor Co. v. Fairley*, 398 So.2d 216, 219 (Miss. 1981) ("As to the breach of any implied

---

[45]  Contrast these cases with *Isip v. Mecedes-Benz USA*, 65 Cal. Rptr. 3d 695, 696 (Cal. App. Ct. 2007),
where a new vehicle began exhibiting numerous problems in its first year after being driven only 3,900
miles and *Mexia v. Rinker Boat Co., Inc.*, 95 Cal. Rptr. 3d 285, 288 (Cal. App. Ct. 2009), where a boat
exhibited defects after only 27 months of use.

warranty of merchantability, the car had been driven over two years and 26,649 miles before Fairley experienced any difficulty with it.  Such service as a matter of law negates a breach of an implied warranty of merchantability of this car."); *Tellinghuisen v. Chrysler Group, LLC*, 84 U.C.C. Rep. Serv. 2d 564 (Minn. Ct. App. 2014) (vehicle was merchantable when plaintiff "drove the car for nearly 31,000 miles over the course of more than a year before the alleged defect first manifested itself"); *Suddreth v. Mercedes-Benz, LLC*, 2011 WL 5240965, at *4 (D.N.J. Oct. 31, 2011) ("It is simply not plausible that a motor vehicle could be classified as not merchantable when it has been used for its intended purpose for 4 years and 50,000 miles").[46]

Court also reject implied warranty claims where owners continue to drive their vehicles even after learning of alleged defects.  *See, e.g.*, *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 588 (7th Cir. 2001) ("Although Priebe maintains that he 'lost faith' in the Acura and believed it was 'dangerous to drive,' his actions belie these vague claims.  Priebe continued to drive the car; indeed, at the time of trial, Priebe had driven the Acura more than 30,000 miles.  Priebe's claim for breach of warranty fails."); *Glass v. BMW of N. Am., LLC*, 2011 WL 6887721, at *15 (D.N.J. Dec. 29, 2011); *Adams v. Am. Suzuki Motor Corp.*, 2011 WL 1304766, at *1, 5 (N.J. Super. Ct. App. Div. 2011).

Many named plaintiffs drove their vehicles for years and tens of thousands of miles without incident:

- Chimen Basseri bought her used 2011 HHR in March 2013 and had driven it over 13,000 miles prior to its recall repair.  SUF ¶¶ 142, 147.  She had driven another 13,000 miles by

---

[46]  *See also Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614 (M.D.N.C. 2006) (vehicle was merchantable despite ball joints needing to be replaced five years after vehicles original sale); *Lee v. Gen. Motors Corp.*, 950 F.Supp. 170, 174 (S.D. Miss. 1996) (no merchantability claim where vehicles had been driven for five years and 90,000 miles without manifesting their alleged defects); *Williams v. Kia Motors Am., Inc.*, 2005 WL 2649152, at *4 (E.D. Mich. Oct. 14, 2005); *Tague v. Autobarn Motors, Ltd.*, 914 N.E.2d 710, 722 (Ill. App. Ct. 2009); *Sharp v. Tom Wood East, Inc.*, 822 N.E.2d 173, 175 (Ind. Ct. App. 2004); *see also Suminski v. Maine Appliance Warehouse, Inc.*, 602 A.2d 1173 (Me. 1992).

52

November 2017, operating her vehicle for over four years. *Id.* ¶ 147. She has never experienced a shut off, loss of power steering, or other similar incident. *Id.* ¶ 145.

- Kellie Cereceres bought a new 2012 Traverse that had over 32,000 miles when the recall repair was performed. *Id.* ¶ 155. She continues to drive the vehicle, which had over 80,000 miles in December 2017. *Id.* She claims that on a single occasion the airbag light briefly illuminated before turning off again, but she did not take her vehicle to be serviced afterwards and has no evidence that this illumination was related to any defect. *Id.* ¶ 153.

- Santiago Orosco bought a new 2010 Camaro in August 2009. *Id.* ¶ 158. He drove the vehicle 145,000 miles and used it for seven years before selling it in August 2016. *Id.* ¶ 164. While he claims his daughter told him she experienced a single shut off-incident in the vehicle, this is inadmissible hearsay and there is no evidence that any defect caused this single shutoff. *Id.* ¶ 162. Orosco himself never experienced an incident in the 2010 Camaro. *Id.*

- David Padilla purchased a new 2010 Cobalt in April 2010, which he drove over 20,000 miles and used for years before he gave the vehicle to his son to trade in. *Id.* ¶¶ 167, 173. While Padilla claims that sometimes he had difficulty turning the key to start the vehicle, the Cobalt did not shut off while moving. *Id.* ¶ 170.

- Michelle Thomas purchased a used 2005 Lacrosse in December 2010. *Id.* ¶ 175. She drove the vehicle approximately 100,000 miles over the course of four-and-a-half years before she claimed that the ignition switch rotated out of position. *Id.* ¶¶ 177-79.

- Brad Akers bought his 2009 HHR in 2009, continues to drive it, and had put 177,777 miles on the vehicles as of November 2016. *Id.* ¶¶ 237, 242. He claims that a single time in 2013 the vehicle lost power, but does not know the key's position and has no evidence that the power loss was caused by any defect. *Id.* ¶ 240.

- Deloris Hamilton bought a 2000 Alero in February 2012, which she drove for approximately 12,000 to 13,000 miles over a two-and-a-half year period before giving it to her daughter. *Id.* ¶¶ 245, 250. She never experienced a moving stall, loss of power steering, or other similar incident. *Id.* ¶ 248.

- Mario Stefano bought a used 2011 Camaro in May 2013, which he drove more than 25,000 miles as of November 2016 and continues to use. *Id.* ¶ 276, 282. He experienced only a single event where he lost power, and believes this was caused by a faulty battery in the key fob rather than being related to the ignition. *Id.* ¶ 281. Stefano continues to drive his Camaro and regularly displays it at cars shows. *Id.* ¶ 283.

- Patrice Witherspoon bought a new 2006 Ion in 2005, and had driven it approximately 175,000 to 180,000 miles as of May 2017. *Id.* ¶¶ 296, 300. She claims to have experienced shut offs while driving, but on each occasion the ignition was in the "run" position, and thus the incidents were not related to the recall condition. *Id.* ¶ 299.

53

Case 1:14-md-02543-JMF    Document 5852    Filed 05/14/20 18    Page 7 of 99

- Dawn Fuller purchased a used 2008 Impala in December 2011, which she has driven over 95,000 miles and continues to drive of September 2017. *Id.* ¶¶ 320, 324. She had never experienced a moving stall, loss of power steering, or similar incident. *Id.* ¶ 322.

- Michael Graciano bought a used 2007 Cobalt in October 2011, which he and his family drove for almost 60,000 miles as of December 2016 and which they used regularly until April 2017. *Id.* ¶¶ 327, 331, 330. While his then-fiancee's daughter alleged she experienced incidents, such claims are inadmissible hearsay, and Graciano himself does not claim to have had problems with the vehicle. *Id.* ¶ 329.

Summary judgment should be granted against the California Song-Beverly Act or UCC breach of implied warranty made by each of these plaintiffs.

### D.    All Plaintiffs' Unjust Enrichment Claims Are Barred.

None of the named plaintiffs has a valid unjust enrichment claim. The Court already held that "the unjust enrichment claims of all the Texas Plaintiffs fall short because they have an adequate remedy at law." *FACC MTD Opinion*, 257 F. Supp. 3d at 455. Judgment should be entered on that ground against all Texas plaintiffs' unjust enrichment claims in the 5ACC. All of the California and Missouri plaintiffs' unjust enrichment claims fail for the same reason, and various plaintiff's claims also fail because their vehicles were covered by warranties.

### 1.    California Law Precludes Plaintiffs' Unjust Enrichment Claims.

As with Texas, California holds that an unjust enrichment or restitution claim cannot be brought where a plaintiff has adequate legal remedies:

> Because we have found that plaintiffs' remedies at law are adequate (counts alleged under the CLRA, the UCL, and common law fraud), a claim for restitution, alleging that [the defendant] has been unjustly enriched by its fraud, is unnecessary. This conclusion follows from the general principle of equity that equitable relief (such as restitution) will not be given when the plaintiff's remedies at law are adequate.

*Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 260 (2011); *see also Ramona Manor Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1140 (1986) (explaining that there is "no action for restitution . . . in cases of wrongful dispossession of land because the remedy in

tort damages is adequate").[47]  All named California plaintiffs seek damages as a legal remedy under the CLRA, fraudulent concealment, and the Song-Beverly Act, and thus their unjust enrichment claims are barred.[48]

Independently, the Court previously held that California plaintiffs could not bring claims where "their cars were covered by warranties at the time of purchase."  *TACC MTD Opinion*, 2016 WL 3920353, at *23.  The Court previously dismissed David Padilla's unjust enrichment claim on this ground.  *Id.* at *23, 42 (Exhibit A).  Chimen Basseri, Kellie Cereceres, and Santiago Orosco also purchased vehicles covered by warranties, and summary judgment should be granted against each of their unjust enrichment claims.  SUF ¶¶ 142, 150, 158.

### 2.    Missouri Law Precludes Plaintiffs' Unjust Enrichment Claims.

Like Texas and California, Missouri bars the equitable remedy of unjust enrichment where an adequate remedy at law exists.  *Bennett v. Crane* rejected unjust enrichment claims because of "the unmistakable barrier that an adequate remedy at law exists . . . .  If equity alone were left to impose a remedy because there is no remedy at law, then we would be on safe ground, and only then."  289 S.W. 26, 28 (Mo. Ct. App. 1926).  Courts follow *Bennett* in holding that Missouri does not allow recovery for unjust enrichment where a plaintiff has an adequate legal remedy.  *E.g.*, *Muehlbauer v. Gen. Motors Corp.*, 2009 WL 874511, at *6 (N.D. Ill. Mar.

---

[47]  *See also Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *32 (E.D. Cal. Sept. 3, 2010) (dismissing unjust enrichment claim where plaintiff "alleges numerous statutory violations which protect it from the same alleged harm as contained in plaintiff's unjust enrichment claim"); *Goodrich & Pennington Mortgage Fund, Inc. v. Chase Home Fin., LLC*, 2008 WL 11338041, at *4 (S.D. Cal. Apr. 22, 2008) ("However, unjust enrichment is an equitable rather than a legal claim, and it is a basic doctrine of equity jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law.") (internal quotation marks and modifications omitted); *Zapata Fonseca v. Goya Foods Inc.*, 2016 WL 4698942, at *7 (N.D. Cal. Sept. 8, 2016).

[48]  Whether plaintiffs can prevail on any of these claims is irrelevant; the existence of adequate remedies at law bars any unjust enrichment claims.  *See, e.g., Tudor Dev. Group, Inc. v. U.S. Fidelity & Guar. Co.*, 968 F.2d 357, 364 (3d Cir. 1992); *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010); *Season Comfort Corp. v. Ben A. Borenstein Co.*, 655 N.E.2d 1065, 1071 (Ill. App. Ct. 1995).

Case 1:14-md-02543-JMF    Document 5859    Filed 07/20/18    Page 73 of 99

31, 2009); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 280 (E.D. Pa. July 2, 2013); *Thompson v. Bayer Corp.*, 2009 WL 362982, at *6 (E.D. Ark. 2009).  Because all of the Missouri plaintiffs have adequate legal remedies, their unjust enrichment claims are barred.

Separately, the Court previously held that Missouri plaintiffs' claims are barred where they "allege[] the existence of an express warranty . . ., and [their] unjust enrichment claims arise out of the same allegations."  *TACC MTD Opinion*, 2016 WL 3920353, at *35.  Because Brad Akers, Kenneth Robinson, Mario Stefano, Christopher Tinen, and Patrice Witherspoon all received express warranties with their vehicles, summary judgment should be granted against their unjust enrichment claims.  SUF ¶¶ 237 (Akers), 260 (K. Robinson), 276 (Stefano), 287 (Tinen), 296 (Witherspoon).

> **E.    Summary Judgment Should Be Granted Against Claims Of Plaintiffs Who Purchased Old GM Or Used Vehicles.**

> **1.    New GM Had No Duty To Disclose To Old GM Vehicle Purchasers.**

> **a.    New GM Did Not Have A Duty Under California Law.**

New GM can be liable for an omission under the UCL, CLA, or fraudulent concealment only if New GM had a duty to disclose.  *TACC MTD Opinion*, 2016 WL 3920353, at *20-22. Under California law, unless the parties are in a fiduciary relationship, the "circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise."  *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997).   "As a matter of common sense, such a relationship can only come into being as a result of some sort of *transaction* between the parties."  *Id.* (emphasis in original) (holding that because there was no transaction giving rise to a

relationship, defendant could not be liable for nondisclosure).[49]

Under California law, New GM did not have a duty to disclose to Michelle Thomas, who bought a used 2005 Lacrosse in December 2010. Thomas has no argument that New GM owed her a fiduciary duty. Nor was there any transaction between Thomas and New GM that could create a relationship giving rise to a duty to disclose. Thomas bought her used Old GM vehicle from an independent dealership, and did not enter into any transaction with New GM. SUF ¶ 175. Without any transactional relationship, New GM had no duty to disclose information to Thomas and her omission claims fail.

### b.    New GM Did Not Have A Duty Under Texas Law.

The lack of any transaction between New GM and plaintiffs who purchased Old GM vehicles similarly dooms Texas plaintiffs' omission-based claims under the Texas DTPA. Such claims require a duty to disclose.[50] Like California, Texas holds that a duty to disclose arises only if the parties transact. For example, in *Steele v. Goddard*, a jury found Robert, an advisor to a home seller, liable under the DTPA for failing to disclose that the home had termites. 2013

---

[49]  *See also Hoffman v. 162 North Wolfe LLC*, 175 Cal Rptr. 3d 820, 827-30 (Cal. Ct. App. 2014) (defendant could not be liable for omission in absence of "circumstances that constitute a transactional relationship between the parties" and collecting "several cases [that] have rejected fraud claims founded on nondisclosure where there was an absence of a relationship between the plaintiff and the defendant"); *Rogozienski v. Allen*, 2007 WL 867773, at *9 (Cal. Ct. App. Mar. 23, 2007) ("There was no transaction between [plaintiff] and [defendant] that established a relationship such that [defendant] had a duty to disclose the fact of the gift" that defendant made to a temporary judge presiding over plaintiff's divorce); *Fulford v. Logitech*, 2009 WL 837639, at *1 (N.D. Cal. Mar. 26, 2009) (dismissing fraud claims where plaintiff "has neither argued nor alleged that [defendant] owed him any fiduciary duty, nor has [plaintiff] argued or alleged that he entered into any transaction with [defendant]" but instead purchased plaintiff's product from a friend).

[50]  *E.g.*, *Terry v. Mercedes-Benz, USA, LLC*, 2007 WL 2045231, at *5 (Tex. App. 2007) ("Because we conclude as a matter of law that appellees had no duty to disclose the information regarding the bumper, the trial court did not err in granting the no-evidence summary judgment on appellants' common-law fraud, DTPA nondisclosure, and civil theft claims."); *Wilson v. John Daugherty Realtors, Inc.*, 981 S.W.2d 723, 726 (Tex. App. 1998) (affirming summary judgment for defendant because it did not have "a duty to tell [plaintiff] about the [defective] water heater").

Case 1:14-md-02543-JMF    Document 5885    Filed 05/14/18    Page 92 of 99

WL 3013671, at *3-4 (Tex. App. June 13, 2013).  The Texas appellate court reversed, holding

that "with respect to section 17.46(b)(24), the nondisclosure portion of the DTPA, we fail to see

how Robert had any duty to disclose any information to the Goddards considering he was not the

seller of the house."  *Id.* at *7; *see also Marshall v. Kusch*, 84 S.W.3d 781, 786 (Tex. App. 2002)

("Marshall sold the ranch to Gilmore-Barclay.  Any duty to disclose he had was to Gilmore-

Barclay.  Marshall was not the seller nor was he involved in the sales transaction with Kusch.

Accordingly, Marshall had no duty to disclose anything to Kusch."); *Myre v. Meletio*, 307

S.W.3d 839, 844 (Tex. App. 2010) ("As for 8 of the 9 Homeowners, Myre not only had no

relationship with them, he had no contact at all.  Therefore, there is no basis for the imposition of

a duty to disclose as between Myre and these 8 Homeowners.  Because there is no duty to

disclose, Myre cannot be liable for fraud.").

      This rule bars the omissions-based DTPA claims of the Texas plaintiffs, each of whom

purchased used Old GM vehicles.  Gareebah Al-ghamdi bought a used 2004 Impala from an

Auto Expo used car lot; Dawn Bacon bought a used 2006 Cadillac CTS from her former

stepfather; Dawn Fuller bought a used 2008 Impala from a Kia dealership; Michael Graciano

bought a used 2007 Cobalt from a Chrysler dealership; and Lisa McClellan bought a used 2005

Malibu Maxx from La Fiesta Auto Sales.  SUF ¶¶ 305 (Al-ghamdi), 313 (Bacon), 320 (Fuller),

327 (Graciano), 338 (McClellan).  None of these plaintiffs engaged in any transaction with New

GM, and thus New GM had no duty to disclose information to them.

            c.      **New GM Did Not Have A Duty Under Missouri Law.**

      Like California and Texas, Missouri fraudulent concealment and MMPA claims based on

omissions require a duty to disclose.  *See DePeralta v. Dlorah, Inc.*, 2012 WL 4092191, at *7

(W.D. Mo. Sept. 17, 2012) (MMPA omission claims); *TACC MTD Opinion*, 2016 WL 3920353,

at *34 (fraudulent concealment).  And similar to those two states, Missouri law also holds that

Case 1:14-md-02543-JMF    Document 5853    Filed 05/12/08    Page 62 of 99

only parties to a transaction have a duty to disclose.  *E.g.*, *Bohac v. Walsh*, 223 S.W.3d 858, 865

(Mo. Ct. App. 2007) (explaining that "one party to a business transaction has a duty to disclose"

under certain circumstances); *see also* Mo. Rev. Stat. § 407.020 (under MMPA, only omissions

made "in connection with the sale or advertisement of any merchandise" are actionable).

Deloris Hamilton bought a used 2000 Oldsmobile Alero from 94 Auto in 2012.  SUF ¶

245.  As she did not engage in any transaction with New GM, summary judgment should be

granted against her omissions claims.

### 2.    California And Texas Do Not Recognize An Asset Purchaser's Duty to Warn.

As described in Section III.E.1, there can be a duty to disclose under the bellwether states

only if the parties engaged in a transaction giving rise to a relationship, which does not exist

between New GM and purchasers of Old GM vehicles.  Independently, the claims of California

and Texas Old GM vehicle purchasers also fail because neither state imposes a duty at all on

asset purchasers such as New GM to warn consumers who purchased products of the asset seller.

### a.    California Does Not Recognize An Asset Purchaser's Duty To Warn.

California courts have repeatedly declined to hold that an asset purchaser has a duty to

warn the asset seller's customers of defects.  *E.g.*, *Burroughs v. Precision Airmotive Corp.*, 93

Cal. Rptr. 2d 124, 136 (Cal. App. Ct. 2000) ("California has not adopted an independent duty to

warn theory of liability."); *Chularee v. Cookson Co.*, 2014 WL 726778, at *7 (Cal. App. Ct. Feb.

26, 2014) ("California has not adopted an independent duty of a successor to warn of defects in

products manufactured by a predecessor."); *Garcia v. Asphalt Equip. & Serv. Co.*, 2005 WL

488569, at *5 (Cal. App. Ct. Mar. 3, 2005) ("Although some other jurisdictions have recognized

such an independent duty to warn, California has not adopted it.  We decline the opportunity to

do so here.") (citations omitted).  Notably, all these cases were decided after *Gee v. Tenneco,*

*Inc.*, which in dicta suggested that California might recognize such a duty but which held that none existed on that case's facts. 615 F.2d 857, 865-66 (9th Cir. 1980). That multiple California appellate cases have refused to adopt an asset purchaser's duty to warn confirms that *Gee's* dicta incorrectly predicted California law. Finally, even if California were to recognize such a duty, *LiMandri* and its progeny hold that an asset purchaser would not have any duty to disclose in the absence of a transaction with the particular customer of the asset seller. *See* Section III.E.1.a.

Therefore, New GM did not have a duty to disclose to Michelle Thomas, who bought a used Old GM 2005 Lacrosse in December 2010, and summary judgment should be granted against her omissions-based consumer protection and fraudulent concealment claims.

**b.    Texas Does Not Recognize An Asset Purchaser's Duty To Warn.**

Texas does not recognize post-sale duty claims against an asset purchaser like New GM that did not manufacture the vehicle. *Jones v. SIG Arms, Inc.*, 2001 WL 1617187, at *3-4 (Tex. App. Dec. 19, 2001) (granting summary judgment on "post sale duty to warn" claims against alleged successor corporation where the defendant "was not even in existence at the time the [product] was manufactured and distributed" and thus "did not manufacture, design, market, sell or distribute the [product]"). Under Texas law, a non-manufacturer "owe[s] no duty" at all to consumers of a product "it did not design, manufacture or sell," and cannot be liable because it "was not involved in the production, marketing or distribution" of the allegedly defective product. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 615-16 (Tex. 1996); *see also Gaulding v. Celotex Corp.*, 772 S.W.2d 66, 68 (Tex. 1989) ("A fundamental principle of traditional products liability law is that the plaintiff must prove that the defendants supplied the product which caused the injury."); *Olivas v. Am. Home Prods. Corp.*, 2002 WL 32620351, at *3 (W.D. Tex. Oct. 18, 2002) (plaintiffs are "barred from asserting a claim of negligence and strict

60

liability against a defendant who did not supply the injury-producing product") (citing *Barajas*, 927 S.W.2d at 616); *Block v. Wyeth, Inc.*, 2003 WL 203067, at *1-2 (N.D. Tex. Jan. 28, 2003) (conducting "a brief Texas two-step analysis: (1) because [the defendant] did not design, manufacture, or sell the product, it owed no legal duty to plaintiff; and (2) because it owed no legal duty, plaintiff's tort claim fail[s].").

As Texas does not impose any duty to warn on an asset purchaser like New GM that was not involved in designing, manufacturing, or selling Old GM vehicles, summary judgment should be granted against the omissions-based DTPA claims of the Texas plaintiffs, each of whom is basing claims on an Old GM vehicle. *See* Section III.E.1.b.

### 3.    Used Old GM Purchasers Cannot Bring Implied Warranty Claims Against New GM, Which Was Not A "Seller" Of The Vehicles.

New GM cannot be liable for breach of implied warranty for Old GM vehicles because it was not the "seller" of those automobiles.  Under the Missouri and Texas UCC, an implied warranty applies only to "the seller."  Mo. Rev. Stat. § 400.2-314(1); Tex. Bus. & Com. Code § 2.314(1).  Similarly, the Song-Beverly Act provides that goods "shall be accompanied by the manufacturer's and the retail seller's implied warranty."  Cal. Civ. Code § 1792.  As case law confirms, "[i]mplied warranties are given only by the actual sellers of products, not by others who have played some other role in the distribution of the product." *Arceneaux v. Lykes Bros. S.S. Co., Inc.*, 890 S.W.2d 191 n. 2 (Tex. App. 1994); *Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 170-71 (5th Cir. 196) ("Even where a party has promoted a product, and made promises regarding that product, if the party is not the actual seller a claim for breach of warranty will not lie.  Plaintiffs have provided no evidence of manufacture or sale on the part of" defendants, and thus summary judgment was properly granted to them.).

New GM did not sell, manufacture, or distribute Old GM vehicles.  As New GM was not

the "seller" or "manufacturer" of Old GM vehicles, the implied warranty claims of all plaintiffs who purchased Old GM vehicles are barred. Indeed, such claims are not "Independent Claims" and thus are precluded under the Sale Order. Independent claims "against New GM must [be] 'based solely on New GM's own, independent, post-Closing acts or conduct.'" *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 874778, at *4 (S.D.N.Y. Mar. 3, 2016). Any implied warranty for an Old GM vehicle is based on Old GM selling and manufacturing the vehicle and thus is not based solely on New GM's conduct.

Summary judgment should be awarded against the implied warranty claims of Old GM vehicle purchasers Orosco Santiago, Michelle Thomas, Brad Akers, Deloris Hamilton, Gareebah Al-ghamdi, Dawn Bacon, Dawn Fuller, Michael Graciano, and Lisa McClellan.

### 4.    The California Song-Beverly Act Does Not Apply To The Purchase Of Any Used Vehicle.

The Song-Beverly Act does not impose an implied warranty of merchantability on a manufacturer for the sale of used goods. The Act provides that "every sale of consumer goods … shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable." Cal. Civ. Code § 1792. "Consumer goods" are defined as "any *new* product or part that is used, bought, or leased for use primarily for personal, family, or household purposes." Cal. Civ. Code. § 1791(a) (emphasis added). Thus, "unless new consumer goods were bought, the Act does not protect a consumer." *Dagher v. Ford Motor Co.*, 238 Cal. App. 4th 905, 918 (2015). Summary judgment should be granted against the Song-Beverly Act claims of Chimen Basseri and Michelle Thomas, who purchased used vehicles.

### 5.    Used Vehicle Purchasers Cannot Recover On Their Unjust Enrichment Claims Because They Did Not Provide Any Benefit To New GM.

Unjust enrichment under California and Missouri law requires that the suing plaintiff

Case 1:14-md-02543-JMF    Document 5852    Filed 07/20/18    Page 66 of 99

have benefitted the defendant. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir.

2015); *Hoffmeister v. Kranawetter*, 407 S.W.3d 59, 61 (Mo. Ct. App. 2013).   Used vehicle

purchasers have not provided any benefit to New GM.   Instead, any price they paid went to the

seller, and New GM did not receive any direct or indirect benefit from the purchase of a used

vehicle.   The Court previously declined to dismiss such claims "because it may be proved at a

later stage that purchasing a used New GM car conferred a sufficient benefit on New GM," but

plaintiffs have no such proof. *TACC MTD Opinion*, 2016 WL 3920353, at \*35.   Other courts

have rejected unjust enrichment claims brought by used vehicle purchasers for lack of any

benefit to the manufacturer.   *E.g.*, *Daigle v. Ford Motor Co.*, 2012 WL 3113854, at \*5 (D.

Minn. July 31, 2012) (if "the Class Vehicle had been purchased used, no benefit would have

been conferred to Ford"); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2011 WL 601279,

at \*6 (D.N.J. Feb. 16, 2011) (entering summary judgment against plaintiff where "[p]laintiffs

have not presented evidence or explained how [a plaintiff's] purchase of a used vehicle conferred

a benefit upon Ford.").[51]   This Court should reach the same conclusion and grant summary

judgment against the unjust enrichment claims of used car purchasers Chimen Basseri, Michelle

Thomas, Deloris Hamilton, Cynthia Hawkins, Ronald Robinson, and Mario Stefano.

>    **F.    Texas Plaintiffs Cannot Prove Unconscionability Under the Texas DTPA.**

>       **1.    New GM's Mitigation By Recalling And Repairing The Vehicles**
>          **Precludes DTPA Unconscionability Claims.**

Acts cannot be unconscionable under the Texas DTPA if a defendant mitigates the acts'

harm.   As this Court has previously held, to "prove an unconscionable action or course of action

---

[51]   *See also Schmidt v. Ford Motor Co.*, 972 F. Supp. 2d 712, 721-22 (E.D. Pa. 2013) (rejecting unjust
enrichment claims where plaintiffs "fail to show any way in which their money transferred from their own
pockets to Defendant's"); *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 551-52 (D. Md. 2011) ("Ford
points out that these three Plaintiffs [who purchased used vehicles] have not provided any evidence that
suggests Ford received a benefit when they bought their vehicles.").

[under the Texas DTPA], a plaintiff must show that the defendant took advantage of his lack of knowledge and the resulting unfairness was glaringly noticeable, flagrant, complete ***and unmitigated***." *FACC MTD Opinion*, 257 F. Supp. 3d at 449 (emphasis added).

*State Farm Lloyds v. Nicolau* illustrates how mitigation defeats a DTPA claim based on unconscionability.  951 S.W.2d 444 (Tex. 1997).  In *Nicolau*, a water leak damaged the plaintiff's home.  951 S.W.2d 444, 446-47 (Tex. 1997).  The plaintiff filed a claim with the defendant home insurer for $102,200.  *Id.* at 447.  The insurer denied the claim and offered to pay only $1,820.05 for expenses incurred in locating and repairing the leak.  *Id.* at 447.  Plaintiff prevailed at trial on DTPA unconscionability and other claims.  *Id.* at 447-48.  On appeal the Texas Supreme Court found that "there is some evidence that State Farm denied the claim without a reasonable basis or without attempting to objectively determine whether its liability had become reasonably clear."  *Id.* at 448.  Nevertheless, the Texas Supreme Court reversed the DTPA unconscionability jury verdict, relying on the fact that "[a]lthough State Farm refused to pay the Nicolaus' claim for foundation repairs, it did pay for the plumbing repairs and investigative costs after the leak was discovered."  *Id.* at 451.

New GM did not just mitigate plaintiffs' claimed injuries here; it paid to eliminate them at no cost to plaintiffs.  New GM's affirmative conduct to address the defects is far greater than the insurer's in *Nicolau*, and that decision's rejection of the DTPA unconscionability claim applies all the more.  In *Nicolau*, the insurer offered to pay less than 2% of the plaintiff's cost to repair his house, and refused to pay for the foundation repairs until found liable after a jury verdict, yet the Texas Supreme Court still held that the insurer's actions were not unconscionable.  By contrast, here New GM announced recalls before litigation began that paid 100% of the costs of repairs.  New GM's conduct cannot be unconscionable under Texas DTPA

64

law, and all the Texas plaintiffs' unconscionability DTPA claims should be rejected.

> ### 2.     Various Plaintiffs Cannot Show The Lack Of Sophistication Required To Assert A DTPA Unconscionability Claims.

The DTPA's unconscionability prong requires proof that the defendant took "advantage of the [plaintiff's] lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5); *see also Peltier Enters., Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App. 2000). Texas courts reject unconscionability DTPA claims where the plaintiff is sophisticated. For example, in *Diais v. Land Rover Dallas, L.P.*, the plaintiff bought a vehicle with a defective engine that would cause the vehicle not to move, make knocking noises, and not accelerate over 30 miles per hour. 2016 WL 1298392, at *1-2 (Tex. App. Apr. 4, 2016). When the dealership would not refund his purchase price, the plaintiff sued alleging DTPA unconscionability. *Id.* at *2. The Texas appellate court rejected this claim based on plaintiff being a "sophisticated businessman" who had negotiated and purchased several new cars in the past and had talked with family members in the car business about the vehicle. *Id.* at *5. "[T]here is no evidence supporting Diais's claim that he lacked knowledge, ability, or experience to which Land Rover took advantage of to a grossly unfair degree." *Id.* at *5; *see also Peltier*, 51 S.W.3d at 624 (in case involving claims based on dealerships charging buyers higher interest rates for loans than what the dealership pays, holding that a "plaintiff with knowledge about indirect lending or with years of experience in the car-selling business would not be able to show that Peltier did anything that was 'unconscionable.'").

As in *Diais*, plaintiffs Michael Graciano and Gareebah Al-ghamdi cannot show the lack of sophistication necessary for an unconscionability claim. Graciano took courses in automotive maintenance, performs automotive work on his own vehicle, and can work on "[a]nything from brakes to power steering pump, alternatives to serpentine valve, heater core, radiator, head

gasket." SUF ¶ 332.  He owned several vehicles before buying his 2007 Cobalt, including a MY 05 Jeep Cherokee, a MY 62 Chevy Impala Super Sport, a MY 07 Ford Expedition, a Mazda MX-6, and "a couple Chevy trucks."  *Id*. ¶ 333.  He also understood that vehicles could be recalled for defects and that this was not a rare occurrence.  *Id*. ¶ 334.

When Al-ghamdi shopped for her 2004 Impala, she had her stepfather with her who "is very knowledgeable on vehicles, and he can fix anything."  *Id*. ¶ 306.  Her stepfather test drove the Impala and negotiated its price.  *Id*.  Thus, similar to Diais, Al-ghamdi relied on relatives with knowledge about vehicles in making her purchase.  Moreover, Al-ghamdi understood—and believes it is common knowledge—that vehicles can be recalled for defects.  SUF ¶ 309.  Accordingly, summary judgment should be awarded against the DTPA unconscionability claims of Graciano and Al-ghamdi.

### G. Multiple Grounds Bar Plaintiffs' Bankruptcy-Claim-Fraud Counts.

Plaintiffs' attempts to avoid the Sale Order and successor liability restrictions by alleging New GM had a duty to disclose to allow them to file bankruptcy claims against Old GM is both unprecedented and meritless.  New GM has not located any case law holding that a non-debtor such as New GM has any duty to disclose information that a potential creditor might use to file a claim against a separate company such as Old GM.  Moreover, the authorities and legal principles previously described bar the Bankruptcy-Claim-Fraud counts.

### 1. New GM Had No Duty To Purchasers Of Old GM Vehicles.

New GM had no duty to Old GM purchasers for three separate reasons, each of which is sufficient to defeat the Bankruptcy-Claim-Fraud plaintiffs' counts.  *First*, plaintiffs' fraudulent concealment requires a duty to disclose under the law of each bellwether state.  *See* Section III.E; *TACC MTD Opinion*, 2016 WL 3920353, at *20-22, 34 (California and Missouri law); *Terry v. Mercedes-Benz, USA, LLC*, 2007 WL 2045231, at *5 (Tex. App. 2007).  That duty to disclose

66

can arise only where the plaintiff and defendant have engaged in a transaction.  *See* Section III.E; *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 543 (Cal. Ct. App. 1997); *Marshall v. Kusch*, 84 S.W.3d 781, 786 (Tex. App. 2002); *Bohac v. Walsh*, 223 S.W.3d 858, 865 (Mo. Ct. App. 2007).

New GM did not engage in any transaction with the Bankruptcy-Claim-Fraud plaintiffs, and thus did not have a duty to disclose as required for a fraudulent omissions claim.  Each of the Bankruptcy-Claim-Fraud plaintiffs had purchased vehicles manufactured by Old GM before New GM existed.[52]  New GM did not sell those Old GM vehicles either to the plaintiffs or dealers, did not manufacture those vehicles, and was in no other way involved in the transactions by which the Bankruptcy-Claim-Fraud plaintiffs bought their Old GM vehicles.  Without a transaction, New GM had no duty to disclose to those plaintiffs.

*Second*, Texas requires proof not only of a transaction, but a *direct* transaction between the parties.  The Court has held that fraudulent concealment claims under Texas law require "proof of a transaction between the parties of some sort (even arm's length) before a duty to disclose will arise" and dismissed all Texas fraudulent concealment claims because "none of the Texas Plaintiffs interacted with New GM directly."  *FACC MTD Opinion*, 257 F. Supp. at 453-54.  That same rationale applies to the Texas Bankruptcy-Claim-Fraud plaintiffs, who likewise had no transaction with New GM, much less a direct transaction or interaction, and thus cannot bring any fraudulent concealment counts, including those based on bankruptcy claims.

*Third*, a plaintiff can recover on a fraudulent concealment claim from an asset purchaser such as New GM (rather than the original manufacturer Old GM) only if the asset purchaser also had a duty to warn, in addition to a duty to disclose.  *See* Section III.E.2.  Neither California nor

---

[52]  Brad Akers alleges that he is a Bankruptcy-Claim-Fraud plaintiff even though he purchased his vehicle in November 2009, after July 10, 2009 Sale Date.  5ACC ¶ 163; SUF ¶ 237.  Accordingly, as explained in Section III.G.2, Akers would not have been able to file a claim in Old GM's bankruptcy.

Case 1:14-md-02543-JMF   Document 5869   Filed 07/20/18   Page 91 of 99

Texas recognizes an asset purchaser's duty to warn. *See* Section III.E.2; *Burroughs v. Precision Airmotive Corp.*, 93 Cal. Rptr. 2d 124, 136 (Cal. App. Ct. 2000); *Jones v. SIG Arms, Inc.*, 2001 WL 1617187, at *3-4 (Tex. App. Dec. 19, 2001). Thus, the California and Texas Bankruptcy-Claim-Fraud plaintiffs' count is barred as a matter of law.

###### 2.      The Bankruptcy-Claim-Fraud Plaintiffs' Count Fails For Additional Reasons.

Independently, judgment should be granted against the Bankruptcy-Claim-Fraud plaintiffs for reasons other than lack of duty. *First*, "Plaintiffs who purchased cars from Old GM suffered an injury before New GM even existed and cannot now recover from New GM for those injuries." *FACC MTD Opinion*, 257 F. Supp. at 401. This holding applies equally to the Bankruptcy-Claim-Fraud plaintiffs, who all purchased Old GM vehicles before New GM existed. SUF ¶¶ 183 (Barker), 190 (Benton), 196 (Brown), 203 (Hardin), 210 (Malaga), 216 (Mattos), 223 (Ramirez), 230 (Rukeyser), 347 (Henry), 352 (Simmons).

Bankruptcy law confirms that New GM could not have caused these plaintiffs' injuries. "A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation— 'a right to payment'—under the relevant non-bankruptcy law." *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995); *see also In re Motors Liquidation Co.*, 829 F.3d 135, 156 (2d Cir. 2016) ("A claim is (1) a right to payment (2) that arose before the filing of the petition."). As fraud requires injury and damages, plaintiffs could only have had a bankruptcy claim for fraud if they were injured and damaged *before* Old GM filed its Chapter 11 petition, which was before New GM purchased any of Old GM's assets. New GM could not have caused the supposed economic losses forming the basis of plaintiffs' Bankruptcy-Claim-Fraud counts.

*Second*, fraud claims require damages. *See* Section I.F. The Bankruptcy-Claim-Fraud

plaintiffs' damages are based on the same benefit-of-the-bargain theory other plaintiffs use. *TACC MTD Opinion*, 2016 WL 3920353, at *7, 10. Plaintiffs cannot recover such benefit-of-the-bargain losses because (1) New GM has offered to repair the vehicles free of charge, thus providing plaintiffs with the benefit of their bargain and (2) no named plaintiff can prove their alleged benefit-of-the-bargain loss. *See* Sections I.A-B. Nor can plaintiffs recover "lost time" for recall repairs, as the recalls occurred after the time for filing a claim.

*Third*, fraud claims—including the Bankruptcy-Claim-Fraud counts—require proof of reliance and causation, which various plaintiffs cannot show. *See* Section III.A. Patricia Barker and Esperanza Ramirez were not even aware that Old GM had filed for Chapter 11 in 2009, and thus would not have known to file claims in Old GM's bankruptcy even if the defects had been disclosed. SUF ¶¶ 187, 227. Kim Brown and Winifred Mattos did not see or rely on any advertisements or materials related to their vehicles before purchasing them, and thus have no evidence that they would have learned of the defects even if they had been disclosed. SUF ¶¶ 197, 217; *see* Section III.A.2. Michael and Sylvia Benton and Javier Malaga purchased from used car dealers unaffiliated with Old GM or New GM, who likely would not have disclosed information from the manufacturer. SUF ¶¶ 190, 210; *see* Section III.A.2.

*Fourth*, without a meritorious underlying claim, the Bankruptcy-Claim-Fraud plaintiffs would not not have been able to recover on any bankruptcy claim against Old GM.[53] *See* 11 U.S.C. § 502(b)(1) (bankruptcy claims are not allowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law …"); *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (Section 502(b)(1) "is

---

[53]  Missouri Bankruptcy-Fraud-Claim plaintiffs Akers, K. Robinson, and Witherspoon also would not have been able to recover on a bankruptcy claim against Old GM because their underlying counts fail for the reasons discussed throughout this brief.

69

most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy.").

This rule bars the claims of the two Texas Bankruptcy-Claim-Fraud plaintiffs for lack of a manifest defect.  Plaintiff Lisa Simmons does not allege a manifest defect as required to state any counts under Texas law.  *Id*. ¶ 354.  Similarly, while Shenyesa Henry alleged that her key got stuck in the ignition and that one time her steering and brakes locked up, she is not aware of any incidents of inadvertent key rotation, a prerequisite for any bankruptcy claim against Old GM.  *Id*. ¶ 348; *see also* Section I.C.  As they could not recover on a bankruptcy claim against Old GM, summary judgment should be granted against their fraudulent concealment claims for lack of injury.  *FACC MTD Opinion*, 257 F. Supp. 3d at 452 (Texas fraudulent concealment claims require injury).

The lack of meritorious underlying claims also bars the Bankruptcy-Claim-Fraud count of Service Parts Vehicle owner William Rukeyser.  As explained in Section II, the Service Parts Vehicles are not defective unless repaired with an older switch, and Rukeyser does not claim that his switch was replaced and thus cannot recover.  SUF ¶ 231.

## IV.    PLAINTIFFS CANNOT OBTAIN INJUNCTIVE RELIEF.

Plaintiffs allege that this Court should oversee New GM's implementation of the 2014 recalls at issue, covering millions of vehicles.  5ACC ¶¶ 1077, 1094.  Plaintiffs further ask the Court to establish and administer a fund to pay claims for vehicle owners' out-of-pocket expenses and, more generally, to "monitor New GM's efforts to improve its safety processes." *Id*. ¶ 1688.  Plaintiffs cannot prove the factual or bases legal prerequisites for such an extraordinary injunction.

To obtain a permanent injunction, a "'plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction.'"  *Samms v. Abrams*, 198 F. Supp. 3d 311,

315 (S.D.N.Y. 2016) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Moreover, "imminent and irreparable harm is essential for a claim for a permanent injunction."

*See Fort v. Am. Fed'n of State, County and Mun. Emps.*, 375 Fed. App'x 109, 112 (2d Cir.

2010); *see also Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).[54]

### A.    Plaintiffs' Have Not Alleged And Cannot Establish Irreparable Harm.

A "showing of irreparable harm is required for the imposition of any injunctive relief,

preliminary or permanent."  *See Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003) (internal

quotation marks omitted).  To establish irreparable harm, the injury alleged "must be one

requiring a remedy of more than mere money damages."  *Id.*; *see also N.Y. State Nat. Org. for

Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989).  The claimed irreparable harm must also

be real and immediate, not speculative.  *Trudeau v. Bockstein*, 2008 WL 541158, at *6

(N.D.N.Y. Feb. 25, 2008) ("[i]njunctive relief is inappropriate 'where there is no showing of any

real or immediate threat that the plaintiff will be wronged again.'") (*quoting City of Los Angeles

v. Lyons,* 461 U.S. 95, 111 (1983)); *see also Hangarter v. Provident Life and Acc. Ins. Co.*, 373

F.3d 998, 1021-22 (9th Cir. 2004).

---

[54]  Plaintiffs must meet the traditional requirements for equitable relief even when Congress has explicitly
authorized equitable remedies, such as under the Magnuson-Moss Warranty Act.  A "major departure
from the long tradition of equity practice should not be lightly implied," *Weinberger v. Romero-Barcelo*,
456 U.S. 305, 320 (1982), and unless Congress clearly intended such a departure, the ordinary
requirements for injunctive relief apply.  *See eBay Inc*, 547 U.S. at 391-92 (lower court erred by applying
a presumption that an injunction would issue if plaintiffs met the requirements of a statute); *see also
Sadat v. Am. Motors Corp.*, 470 N.E.2d 997, 1002 (Ill. 1984) ("[W]hile we conclude that the plain
language of the Magnuson-Moss Warranty Act extends the full range of equitable remedies to private
litigants in appropriate situations, we do not find that the Act's general grant of equitable relief evinces
congressional intent to dispense with the traditional equitable pleading requirements.").

Here, no plaintiff has even alleged that he or she will suffer irreparable future harm
absent an injunction or that there is no adequate legal remedy.  Nor do plaintiffs provide
evidence to establish that the recall remedy was inadequate, *see* Section I.A, let alone that they
will suffer real and immediate irreparable harm absent an injunction.  Plaintiffs' failure to move
for injunctive relief in the four years since the recalls were announced, but instead to pursue
damages claims, precludes any argument that an injunction is necessary to prevent irreparable
harm, that the repairs have not worked, or that the public is at risk.  *Cf. Fed. Exp. Corp. v. Fed.
Espresso, Inc.*, 201 F.3d 168, 178 (2d Cir. 2000) ("The seeming lack of urgency on the part of a
plaintiff who has been denied interim relief tends to confirm the view that irreparable harm was
not imminent."); *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 821 (E.D.
Mich. 2013) (The "glaring failure of Plaintiff to pursue other reasonable alternatives to avoid the
harm it claims is imminent fundamentally undermines its contention of irreparable injury.");
*Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 127 (N.Y. App. Div. 1st Dept. 2002) (in case
without allegations of manifest defect, NHTSA remedy was preferable; plaintiffs' lawsuit would
benefit no one except "the lawyers handling the case and perhaps the few consumers directly
involved in the litigation." ).

**B.    The Extraordinary Relief Plaintiffs Request Is Not In The Public Interest.**

The public interest factor is of great importance in a case of this magnitude involving
millions of New GM vehicle owners.  No federal court has ever granted such broad injunctive or
equitable relief over automobile recalls, *see, e.g., Chin v. Chrysler Corp.*, 182 F.R.D. 448, 464
n.6 (D.N.J. 1998), and for good reason.  Such an extraordinary remedy—requiring the court to
manage and supervise a recall and a defendant's future business conduct—is contrary to the
public interest and unavailable where, as here, plaintiffs cannot establish a non-speculative risk
of future irreparable harm.  *See Salazar v. Buono*, 559 U.S. 700, 714 (2010) ("Equitable relief is

72

not granted as a matter of course, . . . and a court should be particularly cautious when
contemplating relief that implicates public interests"); *Detroit Newsp. Publishers Ass'n v. Detroit
Typographical Union No. 18, Intern. Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972)
("The right must be clear, the injury impending or threatened, so as to be averted only by the
protecting preventive process of injunction: but that will not be awarded in doubtful cases, or
new ones, not coming within well-established principles.").

In addition, given that New GM's recall obligations arise from the Safety Act's
regulatory framework, an injunction requiring New GM to implement, and this Court to
supervise, plaintiffs' version of an adequate recall remedy is not the proper legal mechanism for
addressing plaintiffs' alleged harms.  No public interest is served by ignoring Congressional
mandates and inviting conflicting judicial decisions.  *Cf. Frank*, 292 A.D.2d at 128 (holding that,
where there was no manifest defect, "the remedy which will not only best promote consumer
safety, but will also address the parties' concerns regarding the possible consequences of a rear-
end collision if the purported defect is not remedied, is to petition the NHTSA for a defect
investigation."); *O'Keefe v. Mercedes-Benz USA, LLC*, 2002 WL 377122, at *4 (E.D. Pa. Jan.
31, 2002) (holding that, given reporting required by NHTSA, "there is no public interest in
ordering the corrective notice ... without a showing that the recipients of the notice will be
harmed irreparably without it."); *Silvas v. Gen. Motors, LLC*, 2014 WL 1572590, at *3 (S.D.
Tex. Apr. 17, 2014) (rejecting request for "park-it-now" injunction where NHTSA "has
proceeded substantially into the recall process": "The Court is of the opinion that NHTSA is far
better equipped than this Court to address the broad and complex issues of automotive safety and
the regulation of automotive companies in connection with a nationwide recall.").  Plaintiffs
cannot explain how the public would benefit from their requested injunction, or why this case is

different from all previous vehicle recall cases that reject the injunctive relief plaintiffs seek.

### C. The Requested Future Relief Is Overbroad And Impermissibly Reaches Conduct Unrelated To The Alleged Violations.

Finally, New GM cannot be held responsible for unknown potential violations in connection with possible future, unrelated recalls, defects, or advertising. *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435-36 (1941) ("[T]he mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged."); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) ("[A] district court should only include injunctive terms that have a common sense relationship to the needs of the specific case, and the conduct for which a defendant has been held liable.").

Any injunction regarding, for example, New GM's "response to problems," 5ACC Prayer for Relief ¶ B, would contravene to Fed. R. Civ. P. 65(d)(1), which requires that "every order granting [an] injunction shall be specific in terms and shall describe in reasonable detail the act or acts sought to be restrained." *See Sanders v. Air Line Pilots Ass'n Int'l.*, 473 F.2d 244 (2d Cir. 1972); *see also Chicago Bd. of Educ.* v. *Substance, Inc.*, 354 F.3d 624, 631-32 (7th Cir. 2003) (Posner, J.) (noting court's "independent duty" under Rule 65(d)(1) to scrutinize and limit scope of injunctions).

Rule 65(d)(1) proscribes unduly broad injunctions. As the Second Circuit has observed, an injunction like the one plaintiff requests is plainly impermissible:

> [The injunction] would be "so broad as to place the entire conduct of [defendant's] business under the jeopardy of punishment for contempt for violating" the injunction . . . [Even if] the proposed injunction [would not] 'invariably paralyze' [defendant] . . ., we do see a danger that [defendant] would be exposed to contempt prosecution for the

74

performance of acts not properly within the scope of the injunction. . . . Any number of normal business actions, not even remotely concerned with the Grandfathers' seniority rights and having only a limited and tangential effect thereon, might be in violation of the order.

*See Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 248 (2d Cir. 1972).  Plaintiffs have not even alleged the traditional equitable requirements, much less "the specific acts sought to be restrained."

In short, plaintiffs cannot establish any risk of future irreparable harm, that an injunction would serve the public interest, or that the substantial money damages they seek (in addition to the recall repairs provided by New GM) are inadequate to remedy any claimed harm. Accordingly, plaintiffs' claims for injunctive relief should be rejected.

## CONCLUSION

The undisputed evidence establishes that the bellwether named plaintiffs cannot, as a matter of law and undisputed fact, prove the fundamental prerequisites of their claims, such as damages, defect, causation, or reliance.  Accordingly, summary judgement should be granted against each plaintiff's claims.

Respectfully submitted,

Dated:  July 20, 2018                            */s/ Richard C. Godfrey, P.C.*

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL  60654-3406
Phone:  312-862-2000
Fax:  312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

*Attorneys for Defendant General Motors LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

By: /s/ *Andrew B. Bloomer, P.C.*

Andrew B. Bloomer, P.C.

# Exhibit 1

Case 1:14-md-02543-JMF    Document 5869-9    Filed 03/26/18    Page 2 of 12

## EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH PLAINTIFF WITH ALL CLAIMS

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| **California** | | | | | |
| 1. Basseri, Chimen SUF ¶¶ 141-48 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Owned Service Parts Vehicle that was not defective 5. Cannot obtain injunctive relief | 1. Cannot prove reliance 2. Would not have been aware of defect if disclosed 3. No misrepresentation claim because no evidence re advertisements 4. No misrepresentation claim because does not claim advertisements were untrue | 1. Cannot prove reliance 2. Would not have been aware of defect if disclosed | 1. Barred by substantial use of vehicle 2. Used car purchaser to whom Song-Beverly Act does not apply | 1. Barred by adequate remedy at law 2. Barred by warranty 3. Used car purchaser who did not provide benefit to New GM |
| 2. Cereceres, Kellie SUF ¶¶ 149-56 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because no evidence re advertisements 2. No misrepresentation claim because does not claim advertisements were untrue | | 1. Barred by substantial use of vehicle | 1. Barred by adequate remedy at law 2. Barred by warranty |
| 3. Orosco, Santiago SUF ¶¶ 157-65 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. Would not have been aware of defect if disclosed 2. No misrepresentation claim because did not view advertisements 3. No misrepresentation claim because New GM not liable for dealer statements | 1. Would not have been aware of defect if disclosed | 1.  Barred by substantial use of vehicle 2. Barred because New GM was not "seller" of Old GM vehicle | 1. Barred by adequate remedy at law 2. Barred by warranty |

**EXHIBIT 1: REASONS FOR SUMMARY JUDGMENT AGAINST**
**EACH PLAINTIFF WITH ALL CLAIMS**

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| 4. Padilla, David SUF ¶¶ 166-73 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Owned Service Parts Vehicle that was not defective 5. Cannot obtain injunctive relief | 1. Cannot prove reliance 2. Would not have been aware of defect if disclosed 3. No misrepresentation claim because did not view advertisements 4. No misrepresentation claim because New GM not liable for dealer statements | 1. Cannot prove reliance 2. Would not have been aware of defect if disclosed | 1. Barred by substantial use of vehicle | Dismissed because barred by warranty in *TACC MTD Opinion* |
| 5. Thomas, Michelle SUF ¶¶ 174-81 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because New GM not liable for dealer statements 2. No misrepresentation claim because statements are puffery 3. Old GM car purchaser so New GM did not have duty to disclose 4. Old GM car purchaser so New GM did not have post-sale duty to warn | 1. Old GM car purchaser so New GM did not have duty to disclose 2. Old GM car purchaser so New GM did not have post-sale duty to warn | 1. Barred by substantial use of vehicle 2. Barred because New GM was not "seller" of Old GM vehicle 3. Used car purchaser to whom Song-Beverly Act does not apply | 1. Barred by adequate remedy at law 2. Used car purchaser who did not provide benefit to New GM |

2

## EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH PLAINTIFF WITH ALL CLAIMS

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| **Missouri** | | | | | |
| 6. Akers, Brad SUF ¶¶ 236-43 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. Owned Service Parts Vehicle that was not defective 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because no evidence re advertisements 2.  No misrepresentation claim because New GM not liable for dealer statements | | 1. No manifest defect 2. Damages barred by express warranty 3. Time-barred by statute 4. Time-barred by express warranty 5. Barred by substantial use of vehicle 6. Barred because New GM was not "seller" of Old GM vehicle | 1. Barred by adequate remedy at law 2. Barred by warranty |
| 7. Hamilton, Deloris SUF ¶¶ 244-51 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements 2. No misrepresentation claim because New GM not liable for dealer statements 3. Old GM car purchaser so New GM did not have duty to disclose | 1. Old GM car purchaser so New GM did not have duty to disclose | 1. No manifest defect 2. Damages barred by express warranty 3. Time-barred by express warranty 4. Barred by substantial use of vehicle 5. Barred because New GM was not "seller" of Old GM vehicle | 1. Barred by adequate remedy at law 2. Used car purchaser who did not provide benefit to New GM |

## EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH PLAINTIFF WITH ALL CLAIMS

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| 8. Hawkins, Cynthia SUF ¶¶ 252-58 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Owned Service Parts Vehicle that was not defective 5. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements 2. No misrepresentation claim because New GM not liable for dealer statements | | Dismissed for no manifest defect by *TACC MTD Opinion* | 1. Barred by adequate remedy at law 2. Used car purchaser who did not provide benefit to New GM |
| 9. Robinson, Ronald SUF ¶¶ 266-74 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because statements are puffery | 1. Cannot prove reliance | Dismissed for no manifest defect by *TACC MTD Opinion* | 1. Barred by adequate remedy at law 2. Used car purchaser who did not provide benefit to New GM |
| 10. Stefano, Mario SUF ¶¶ 275-84 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements | 1. Cannot prove reliance | 1. No manifest defect 2. Damages barred by express warranty 3. Barred by substantial use of vehicle | 1. Barred by adequate remedy at law 2. Barred by warranty 3. Used car purchaser who did not provide benefit to New GM |
| 11. Tinen, Christopher SUF ¶¶ 285-94 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. Sold vehicle before recalls 4. No recoverable lost time damages 5. Cannot obtain injunctive relief | 1. No misrepresentation claim because lack of evidence re advertisements 2. No misrepresentation claim because does not claim advertisements were untrue 3. No misrepresentation claim because New GM not liable for dealer statements | | 1. Damages barred by express warranty 2. Time-barred by statute 3. Time-barred by express warranty | 1. Barred by adequate remedy at law 2. Barred by warranty |

**EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST**
**EACH PLAINTIFF WITH ALL CLAIMS**

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| **Texas** | | | | | |
| 12. Al-ghamdi, Gareebah SUF ¶¶ 304-311 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No manifest defect 4. No recoverable lost time damages 5. Cannot obtain injunctive relief | 1. Cannot prove reliance 2. No misrepresentation claim because did not view advertisements 3. Old GM car purchaser so New GM did not have duty to disclose 4. Old GM car purchaser so New GM did not have post-sale duty to warn 5. Cannot prove unconscionability because New GM mitigated by recalls 6. Cannot prove unconscionability because does not lack sophistication | Dismissed by *FACC MTD Opinion* | 1. Damages barred by express warranty 2. Time-barred by statute 3. Time-barred by express warranty 4. Barred because New GM was not "seller" of Old GM vehicle | Dismissed by *FACC MTD Opinion* |
| 13. Bacon, Dawn SUF ¶¶ 312-18 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No recoverable lost time damages 4. Cannot obtain injunctive relief | 1. No misrepresentation claim because statements are puffery 2. Old GM car purchaser so New GM did not have duty to disclose 3. Old GM car purchaser so New GM did not have post-sale duty to warn 4. Cannot prove unconscionability because New GM mitigated by recalls | Dismissed by *FACC MTD Opinion* | 1. Damages barred by express warranty 2. Time-barred by express warranty 3. Barred because New GM was not "seller" of Old GM vehicle | Dismissed by *FACC MTD Opinion* |

Case 1:14-md-02543-JMF   Document 5889-9   Filed 07/20/18   Page 1 of 12

# EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
# EACH PLAINTIFF WITH ALL CLAIMS

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| 14. Fuller, Dawn SUF ¶¶ 319-25 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No manifest defect 4. No recoverable lost time damages 5. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements 2. Old GM car purchaser so New GM did not have duty to disclose 3. Old GM car purchaser so New GM did not have post-sale duty to warn 4. Cannot prove unconscionability because New GM mitigated by recalls | Barred under *FACC MTD Opinion* | 1. Damages barred by express warranty 2. Time-barred by express warranty 3. Barred by substantial use of vehicle 4. Barred because New GM was not "seller" of Old GM vehicle | Barred under *FACC MTD Opinion* |
| 15. Graciano, Michael SUF ¶¶ 326-35 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No manifest defect 4. No recoverable lost time damages 5. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements 2. No misrepresentation claim because New GM not liable for dealer statements 3. Old GM car purchaser so New GM did not have duty to disclose 4. Old GM car purchaser so New GM did not have post-sale duty to warn 5. Cannot prove unconscionability because New GM mitigated by recalls 6. Cannot prove unconscionability because does not lack sophistication | Dismissed by *FACC MTD Opinion* | 1. Damages barred by express warranty 2. Time-barred by express warranty 3. Barred by substantial use of vehicle 4. Barred because New GM was not "seller" of Old GM vehicle | Dismissed by *FACC MTD Opinion* |

6

**EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
EACH PLAINTIFF WITH ALL CLAIMS**

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| 16. McClellan, Lisa SUF ¶¶ 336-45 | 1. Recall repairs provide benefit of the bargain 2. No evidence of benefit-of-the-bargain damages 3. No manifest defect 4. Returned vehicle before recalls 5. No recoverable lost time damages 6. Cannot obtain injunctive relief | 1. Cannot prove reliance 2. No misrepresentation claim because did not view advertisements 3. Old GM car purchaser so New GM did not have duty to disclose 4. Old GM car purchaser so New GM did not have post-sale duty to warn 5. Cannot prove unconscionability because New GM mitigated by recalls | Dismissed by *FACC MTD Opinion* | 1. Damages barred by express warranty 2. Time-barred by express warranty 3. Barred because New GM was not "seller" of Old GM vehicle | Dismissed by *FACC MTD Opinion* |

7

**EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST**
**EACH SUCCESSOR LIABILITY PLAINTIFF**

| Plaintiff | All Claims | Consumer Protection | Fraudulent Concealment | Implied Warranty | Unjust Enrichment |
|---|---|---|---|---|---|
| **Missouri** | | | | | |
| 17. Robinson, Kenneth SUF ¶¶ 259-65 | 1. No direct claims against New GM because purchased before July 10, 2009<br>2. Recall repairs provide benefit of the bargain<br>3. No evidence of benefit-of-the-bargain damages<br>4. Sold vehicle before recalls<br>5. No recoverable lost time damages<br>6. Owned Service Parts Vehicle that was not defective<br>7. Cannot obtain injunctive relief | 1. No misrepresentation claim because did not view advertisements<br>2. No misrepresentation claim because New GM not liable for dealer statements | | 1. No manifest defect<br>2. Damages barred by express warranty<br>3. Time-barred by statute<br>4. Time-barred by express warranty | 1. Barred by adequate remedy at law<br>2. Barred by warranty |
| 18. Witherspoon, Patrice SUF ¶¶ 295-303 | 1. No direct claims against New GM because purchased before July 10, 2009<br>2. Recall repairs provide benefit of the bargain<br>3. No evidence of benefit-of-the-bargain damages<br>4. No recoverable lost time damages<br>5. Cannot obtain injunctive relief | 1. No misrepresentation claim because New GM not liable for dealer statements<br>2. No misrepresentation claim because statements are puffery | | 1. No manifest defect<br>2. Damages barred by express warranty<br>3. Time-barred by statute<br>4. Time-barred by express warranty<br>5. Barred by substantial use of vehicle | 1. Barred by adequate remedy at law<br>2. Barred by warranty |

## EXHIBIT 1:  REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH BANKRUPTCY CLAIM FRAUD PLAINTIFF

| Plaintiff | Fraudulent Concealment of the Right to File A Claim Against Old GM in Bankruptcy |
|---|---|
| **California** ||
| 19. Barker, Patricia<br>SUF ¶¶ 182-88 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. No reliance because not aware of Old GM bankruptcy in 2009<br>8. Cannot obtain injunctive relief |
| 20-21. Benton, Michael &<br>Sylvia<br>SUF ¶¶ 189-94 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. Purchased from unaffiliated used car dealer unlikely to disclose information about defects<br>8. Cannot obtain injunctive relief |
| 22. Brown, Kimberly<br>SUF ¶¶ 195-201 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. No reliance because did not see or rely on New GM advertisements or other materials that could have disclosed defects<br>8. Cannot obtain injunctive relief |
| 23. Hardin, Crystal<br>SUF ¶¶ 202-08 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. Cannot obtain injunctive relief |

## SUMMARY OF REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH BANKRUPTCY CLAIM FRAUD PLAINTIFF

| Plaintiff | Fraudulent Concealment of the Right to File A Claim Against Old GM in Bankruptcy |
|---|---|
| 24. Malaga, Javier<br>SUF ¶¶ 209-14 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. Purchased from unaffiliated used car dealer unlikely to disclose information about defects<br>8. Cannot obtain injunctive relief |
| 25. Mattos, Winifred<br>SUF ¶¶ 215-21 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. No reliance because did not see or rely on New GM advertisements or other materials that could have disclosed defects<br>8. Cannot obtain injunctive relief |
| 26. Ramirez, Esperanza<br>SUF ¶¶ 222-28 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. No reliance because not aware of Old GM bankruptcy in 2009<br>8. Cannot obtain injunctive relief |
| 27. Rukeyser, William<br>SUF ¶¶ 229-34 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Owned Service Parts Vehicle that was not defective<br>7. Old GM car purchaser so New GM did not have duty to warn<br>8. Cannot obtain injunctive relief |

## SUMMARY OF REASONS FOR SUMMARY JUDGMENT AGAINST
## EACH BANKRUPTCY CLAIM FRAUD PLAINTIFF

| Plaintiff | Fraudulent Concealment of the Right to File A Claim Against Old GM in Bankruptcy |
|---|---|
| **Texas** ||
| 28. Henry, Shenyesa<br>SUF ¶¶ 346-50 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. Because no direct transaction with New GM, cannot bring any fraudulent concealment claim<br>8. No manifest defect and so no basis on which to file bankruptcy claim<br>9. Cannot obtain injunctive relief |
| 29. Simmons, Lisa<br>SUF ¶¶ 351-58 | 1. Old GM car purchaser so New GM did not have duty to disclose<br>2. Purchased before Sale Order so New GM could not have caused injury<br>3. Cannot recover damages because recall repairs provide benefit of the bargain<br>4. Cannot recover damages because no evidence of benefit-of-the-bargain damages<br>5. Cannot recover lost time damages because recalls occurred after time for filing a bankruptcy claim<br>6. Old GM car purchaser so New GM did not have duty to warn<br>7. Because no direct transaction with New GM, cannot bring any fraudulent concealment claim<br>8. No manifest defect and so no basis on which to file bankruptcy claim<br>9. Cannot obtain injunctive relief |

# Exhibit 2

## EXHIBIT 2:  PLAINTIFFS WITH ALL CLAIMS

| Name | Vehicle | Recall(s) | Purchase Info | Warr-anty | Still Own | Miles Driven | Claims Manifest Defect | Claims Lost Earnings |
|---|---|---|---|---|---|---|---|---|
| California | | | | | | | | |
| Basseri, Chimen | 2011 Chevrolet HHR | 14v047 (Cobalt/Ion Ignition Switch) | 3/5/2013 (Used) | Y | Y | 26,000 (37,000 at purchase) | N | N |
| Cereceres, Kellie | 2012 Chevrolet Traverse | 14v118 (SIAB) | 6/18/2012 (New) | Y | Y | 80,000 | Y | N |
| Orosco, Santiago | 2010 Chevrolet Camaro (Old GM) | 14v346 (Camaro Key Rotation) | 8/1/2009 (New) | Y | N - Sold August 2016 | 145,000 | Y | N/A (No recall repair) |
| Padilla, David | 2010 Chevrolet Cobalt (New GM) | 14v047 (Cobalt/Ion Ignition Switch) 14v153 (EPS) | April 2010 (New) | Y | N - Sale date unknown | 20,000 | Y | N |
| Thomas, Michelle | 2005 Buick Lacrosse | 14v355 (Key Rotation) | 12/9/2010 (Used) | N | Y | 121,000 (72,000 at purchase) | Y | N |
| Missouri | | | | | | | | |
| Akers, Brad | 2009 Chevrolet HHR (Old GM) | 14v047 (Cobalt/Ion Ignition Switch) 14v153 (EPS) | Nov 2009 (New) | Y | Y | 177,777 | Y | Y |
| Hamilton, Deloris | 2000 Oldsmobile Alero | 14v400 (Key Rotation) | 2/24/2012 (Used) | N | N - Gifted 4/1/2016 | 165,000 total (including prior owner) | N | N/A (No recall repair) |
| Hawkins, Cynthia | 2010 Chevrolet Cobalt (New GM) | 14v047 (Cobalt/Ion Ignition Switch) 14v153 (EPS) | 7/23/2013 (Used) | N | Y | 48,000 (52,000 at purchase) | N | N |

| Name | Vehicle | Recall(s) | Purchase Info | Warr-anty | Still Own | Miles Driven | Claims Manifest Defect | Claims Lost Earnings |
|---|---|---|---|---|---|---|---|---|
| Robinson, Ronald | 2010 Chevrolet Impala | 14v355 (Key Rotation) | June 2011 (Used) | N | Y | 80,000 (25,000 at purchase) | N | N |
| Stefano, Mario | 2011 Chevrolet Camaro | 14v346 (Camaro Key Rotation) | 5/14/2013 (Used) | Y | Y | 25,000 (32,000 at purchase) | Y | N |
| Tinen, Christopher | 2010 GMC Acadia (New GM) | 14v118 (SIAB) | 2/22/2010 (New) | Y | N - Sold April 2012 | 52,000 | Y | N/A (No recall repair) |
| **Texas** | | | | | | | | |
| Al-ghamdi, Gareebah | 2004 Chevrolet Impala | 14v400 (Key Rotation) | 9/7/2009 (Used) | N | N - Sold April 2017 | 100,000 (80,000 at purchase) | Y | N/A (No recall repair) |
| Bacon, Dawn | 2006 Cadillac CTS | 14v394 (Cadillac Key Rotation) | Sept 2012 (Used) | N | Y | 40,000 (160,000 at purchase) | Y | N/A (No recall repair) |
| Fuller, Dawn | 2008 Chevrolet Impala | 14v355 (Key Rotation) | 12/17/2011 (Used) | Y | Y | 95,000 (79,630 at purchase) | N | N |
| Graciano, Michael | 2007 Chevrolet Cobalt | 14v047 (Cobalt/Ion Ignition Switch) | 10/17/2011 (Used) | N | Y | 58,000 (44,000 at purchase) | Y | N |
| McClellan, Lisa | 2005 Chevrolet Malibu Maxx | 14v153 (EPS) | 11/22/2010 (Used) | N | N - Sold April 2012 | Under 10,000 (60,000 at purchase) | Y | N/A (No recall repair) |

# Exhibit 3

Case 1:12-md-02543-JMF    Document 5859-9    Filed 07/20/18    Page 2 of 2

**EXHIBIT 3:  SUCCESSOR LIABILITY PLAINTIFFS**

| Name | Vehicle | Recall(s) | Purchase Info | Warr-anty | Still Own | Miles Driven | Claims Manifest Defect | Claims Lost Earnings |
|---|---|---|---|---|---|---|---|---|
| **Missouri** | | | | | | | | |
| Robinson, Kenneth | 2008 Pontiac G5 | 14v047 (Cobalt/Ion Ignition Switch) | 9/7/2008 (New) | Y | N - Sold May 2013 | 88,000 | Y | N/A (No recall repair) |
| Witherspoon, Patrice | 2006 Saturn Ion | 14v047 (Cobalt/Ion Ignition Switch) | 2005 (New) | Y | Y | 165,000 | Y | N |

# Exhibit 4

## EXHIBIT 4:  BANKRUPTCY-CLAIM-FRAUD PLAINTIFFS

| Name | Vehicle | Recall(s) | Purchase Info | Warranty | Still Own | Claims Manifest Defect |
|------|---------|-----------|---------------|----------|-----------|------------------------|
| California | | | | | | |
| Patricia Barker | 2005 Saturn Ion | 14v047 (Cobalt/Ion Ignition Switch) | March, 2005 (New) | Y | Y | Y |
| Michael & Sylvia Benton | 2005 Chevrolet Cobalt | 14v047 (Cobalt/Ion Ignition Switch) | 1/10/2009 (Used) | N | Y | Y |
| Kimberly Brown | 2006 Chevrolet HHR | 14v047 (Cobalt/Ion Ignition Switch) | 1/7/2007 (New) | Y | Y | Y |
| Crystal Hardin | 2005 Chevrolet Cobalt | 14v047 (Cobalt/Ion Ignition Switch) 14v153 (EPS) | 5/17/05 (New) | Y | Y | Y |
| Javier Malaga | 2006 Chevrolet Cobalt | 14v047 (Cobalt/Ion Ignition Switch) | 12/8/06 (Used) | Y | N - Sold July 30, 2016 | N |
| Winifred Mattos | 2007 Pontiac G5 | 14v047 (Cobalt/Ion Ignition Switch) | April 2007 (New) | Y | Y | N |
| Esperanza Ramirez | 2007 Saturn Ion | 14v047 (Cobalt/Ion Ignition Switch) | 3/13/07 (New) | Y | Y | N |
| William Rukeyser | 2008 Chevrolet Cobalt | 14v047 (Cobalt/Ion Ignition Switch) | 9/4/08 (New) | Y | Y | N |

| Name | Vehicle | Recall(s) | Purchase Info | Warranty | Still Own | Claims Manifest Defect |
|------|---------|-----------|---------------|----------|-----------|------------------------|
| Texas | | | | | | |
| Shenyesa Henry | 2004 Saturn Ion | 14v047 (Cobalt/Ion Ignition Switch) | 2003 (New) | Y | N - Donated 2016 | Y |
| Lisa Simmons | 2007 Saturn Ion | 14v047 (Cobalt/Ion Ignition Switch)[1] | 2007 (New) | Y | Y | N |

---

[1]    The Barker, Henry, and Simmons plaintiffs' vehicles also were subject to the EPS Assist recall, but those recalls are not part of their Bankruptcy Claim Fraud counts, which are limited to claims based on the Delta Ignition Switch recall.  5ACC ¶ 959.

## **EXHIBIT B-1**

**NEW GM'S *MOTION TO EXCLUDE EXPERT OPINIONS UNDER
DAUBERT AND FEDERAL RULE OF EVIDENCE 702***

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
|  | )    No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC | )    No. 14-MC-2543 (JMF) |
| IGNITION SWITCH LITIGATION | ) |
|  | )    Hon. Jesse M. Furman |
| *This Document Relates To All Actions* | ) |
|  | ) |

## GENERAL MOTORS LLC'S MOTION TO EXCLUDE EXPERT OPINIONS UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702

General Motors LLC ("New GM") respectfully moves for an order excluding in part expert opinions from Glen Stevick and Steven Loudon pursuant to Federal Rule of Evidence 702, the Supreme Court's holding in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and related case law. New GM's Motion is supported by the accompanying Memorandum of Law, which New GM hereby incorporates by reference.

Dated:  July 20, 2018

Respectfully submitted,

 */s/ Richard C. Godfrey, P.C.*

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL  60654-3406
Phone:  312-862-2000
Fax:  312-862-2200
andrew.bloomer@kirkland.com
richard.godfrey@kirkland.com

Attorneys for Defendant General Motors LLC

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing Motion using

the CM/ECF system which will serve notification of such filing to the email of all counsel of

record in this action.

By: */s/ Andrew B. Bloomer, P.C.*
Andrew B. Bloomer, P.C.

## **EXHIBIT B-2**

**NEW GM'S *MEMORANDUM OF LAW IN SUPPORT OF GENERAL MOTORS LLC'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINIONS UNDER DAUBERT AND FEDERAL RULE OF EVIDENCE 702***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH
LITIGATION

*This Document Relates To All Actions*

--------------------------------------------------------------------------------

14-MD-2543 (JMF)
14-MC-2543 (JMF)

Hon. Jesse M. Furman

## MEMORANDUM OF LAW IN SUPPORT OF GENERAL MOTORS LLC'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT OPINIONS UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654-3406
Phone:    312-862-2000
Fax:         312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

***Attorneys for Defendant***
***General Motors LLC***

Date: July 20, 2018

# TABLE OF CONTENTS

                                                                              **Page**

INTRODUCTION...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

I.      **New GM Provided An Effective Remedy for the Delta Ignition Switch and
        Key Rotation Recalls**................................................................................... 3

        A.      The Delta Ignition Switch Recall................................................... 3

        B.      The Key Rotation Recalls. ............................................................. 3

        C.      New GM Developed Repeatable, Peer-Reviewed Tests To Assess
                Inadvertent Key Rotation And To Validate The Recall Remedies........ 5

        D.      Plaintiffs' Theories Regarding Effectiveness Of The Delta Ignition Switch
                And Key Rotation Remedies. ......................................................... 6

II.     **New GM Provided An Effective Remedy For The Side Impact Airbag
        ("SIAB") Wiring Harness Recall**............................................................ 13

LEGAL STANDARD .............................................................................................. 14

ARGUMENT ............................................................................................................ 16

I.      **THE COURT SHOULD EXCLUDE STEVICK'S OPINIONS THAT THE
        RECALL REMEDIES FOR THE DELTA AND KEY ROTATION
        RECALLS ARE INADEQUATE.** ............................................................ 16

        A.      The Only Reliable Data Shows That The Recall Remedies Have
                Effectively Addressed Inadvertent Key Rotation. .............................. 16

        B.      Stevick's Opinion That The Recalled Vehicles Are Susceptible to Knee-
                Key Rotation Is Unreliable. .......................................................... 17

        C.      Stevick's Opinion That Only 25% Of Vehicle Owners Will Use The
                Remedy Is Based Solely On "Logical Deduction" And Lacks Any
                Scientific Support........................................................................ 20

        D.      Stevick's "Single Point of Failure" Opinion Is Unreliable And Irrelevant. ......... 21

        E.      Stevick's Opinion That The Key Rotation Recall Remedies Are
                Inadequate Because They Do Not Replace The Ignition Switch Is
                Unreliable and Irrelevant. ............................................................ 22

i

## TABLE OF CONTENTS (CONT'D)

**Page**

II.   **THE COURT SHOULD EXCLUDE STEVICK'S OPINION THAT THE
REMEDY FOR THE SIAB RECALL IS INADEQUATE.** ........................................ 23

III.  **THE COURT SHOULD EXCLUDE LOUDON'S AND STEVICK'S
OPINIONS ABOUT SDM PROLONGATION BECAUSE THEY ARE
IRRELEVANT.** ................................................................................................ 24

**CONCLUSION** .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prods. Liab.*,
    511 F. Supp. 2d 1288 (M.D. Fla. 2007) ...............................................................18

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ...............................................................................14

*Borsack v. Ford Motor Co.*,
    2009 WL 5604383 (S.D.N.Y. Feb. 3, 2009) ......................................................24

*In re C.R. Bard, Inc.*,
    948 F.Supp.2d 589 (S.D. W. Va. 2013) ...............................................................19

*Cacciola v. Selco Balers, Inc.*,
    127 F. Supp. 2d 175 (E.D.N.Y. 2001) .................................................................15

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................................. *passim*

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
    367 F. Supp. 2d 413 (W.D.N.Y. 2005) ...............................................................23

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...........................................................................15, 18, 22

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2015 WL 9480448 (S.D.N.Y. Dec. 29, 2015) ....................................................20

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2017 WL 2664199 (S.D.N.Y. June 20, 2017) ....................................................20

*In re General Motors LLC Ignition Switch Litig.*,
    2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ......................................... *passim*

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ...........................................................................................14

*In re Mirena IUD Prod. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) .................................................................18

*Pro Serv. Auto., L.L.C. v. Lenan Corp.*,
    469 F.3d 1210 (8th Cir. 2006) .............................................................................19

## TABLE OF AUTHORITIES (CONT'D)

<strong><u>Page(s)</u></strong>

*R.F.M.A.S., Inc. v. Mimi So*,
　748 F. Supp. 2d 244 (S.D.N.Y. 2010)..........................................................................15

*Rider v. Sandoz Pharm. Corp.*,
　295 F.3d 1194 (11th Cir. 2002) ..................................................................................15

*Tamraz v. Lincoln Elec. Co.*,
　620 F. 3d. 665 (6th Cir. 2010) ....................................................................................15

*In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*,
　127 F. Supp. 3d 1306 (N.D. Ga. 2015) ......................................................................18

**Rules**

Fed. R. Evid. 702(a)..............................................................................................15, 24, 25

Case 1:14-md-02543-JMF   Document 5665   Filed 07/20/18   Page 6 of 32

## INTRODUCTION

In 2014, New GM provided millions of vehicle owners with effective remedies that fixed the safety defects identified in the recalls at issue. New GM engineers developed these remedies using sound science and engineering judgment and confirmed the effectiveness of the remedies through robust and peer reviewed test procedures. Notwithstanding this overwhelming evidence, plaintiffs contend that each remedy, except the remedy for NHTSA Recall No. 14v153 (loss of EPS), is "insufficient to make the [subject vehicles] safe." (*See* Dkt. 4838, Fifth Am. Complaint, ¶ 684.) To support their claim, plaintiffs rely on two technical experts, Glen Stevick and Steven Loudon. Neither expert, however, offers scientific, reliable or relevant opinions with regard to effectiveness of the recall remedies and both experts' opinions fail to satisfy the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

***First***, the Court should exclude the testimony of Glen Stevick as to the effectiveness of the recall remedies. The record shows that these opinions are (i) unsupported by a reliable methodology, data or testing, (ii) based at best on a mistaken interpretation of New GM's tests, and (iii) contradicted by the results of the only rigorous tests that have been conducted. For the inadvertent key rotation recalls,[1] Stevick offers four theories: (1) the repaired vehicles continue to be susceptible to knee-key rotation; (2) only 25% of vehicle owners will use the remedy they received from New GM; (3) the ignition system with the recall remedy is a single point of failure; and (4) the remedies are inadequate if New GM does not provide a new ignition switch with increased torque resistance. These are nothing more than theories unsupported by any meaningful

---

[1]   For the subject recalls, there are 5 recalls that at their broadest level relate to inadvertent key rotation: NHTSA Recall No. 14v047 (the Delta Ignition Switch recall), NHTSA Recall No. 14v355 (the Impala Key Rotation recall), NHTSA Recall No. 14v394 (the Cadillac CTS/SRX Key Rotation recall), NHTSA Recall No. 14v346 (the Camaro Knee-Key Rotation recall), and NHTSA Recall No. 14v400 (the Malibu Key Rotation recall). Each of these recalls involve different vehicle platforms, vehicles, ignition systems and ignition switches, and therefore the conditions for inadvertent key rotation, and remedies to address it, differ among them.

measurements, scientifically reliable testing or analysis, or field performance evaluation. Stevick's offers only one theory as to why the recall remedy for NHTSA Recall No. 14v118 (the Side-Impact Airbag Wiring Harness recall) is ineffective: that dealer technicians may not correctly perform the remedy. But, similar to his rotation theories, Stevick only speculates this is possible and provides no evidence this has occurred. Stevick's speculative theories have no basis in the real world. That was not good enough in the *Garza* and *Greenroad* cases, and it is not good enough here. *See In re General Motors LLC Ignition Switch Litig.*, 2017 WL 6729295 (S.D.N.Y. Dec. 28, 2017) ("*Garza/Greenroad*") at *8 (finding that plaintiffs' lack of evidence that their rotation theory "has occurred, or could occur, in real life" rendered the experts' opinions inadmissible and noting that the "lack of foundation is starkest in the case of Stevick"); *see also id.* at *11 (holding that Stevick's testimony "is unreliable and, thus, inadmissible under *Daubert*.").

**Second**, the Court should exclude the testimony of Steven Loudon regarding SDM prolongation as irrelevant where the subject vehicles have received New GM's recall repairs. Loudon opines that New GM should retrofit all its vehicles with new technology to prolong airbag deployment if there is an inadvertent key rotation. Loudon admits that this concept, known as SDM prolongation, "does not address the issue of inadvertent key rotation," and that he has no opinions on whether the remedies that New GM has provided effectively address key rotation. (Ex. 1, 12/7/2017 Loudon Dep. Tr. at 76:2-8; 80:7-10; 97:11-16; 117:7-18; 131:24-132:10.) Loudon's SDM prolongation simply is not relevant to whether the remedies effectively address inadvertent key rotation, and goes to a "different" issue. (*Id.* at 80:7-15.) Thus, because his expert

testimony is not "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute," the Court should exclude it.[2]   *Daubert*, 509 U.S. at 591.

## BACKGROUND

Plaintiffs' claims are premised on seven New GM recalls initiated in 2014.  For each recall, New GM used sound engineering judgment and validated testing to provide an effective remedy free of charge to the plaintiffs.  Plaintiffs allege that the remedies for six of the seven subject recalls are ineffective for addressing the recall condition do not satisfy *Daubert*.

### I.   New GM Provided An Effective Remedy for the Delta Ignition Switch and Key Rotation Recalls.

#### A.   The Delta Ignition Switch Recall.

The first of the subject recalls occurred in February and March 2014 under NHTSA Recall No. 14v047, resulting from the Delta Ignition Switch defect ("the Delta Ignition Switch Recall"). New GM remedied this issue with a recall kit that comprised an ignition switch, an ignition lock cylinder, newly designed keys, and an additional key ring.   New GM engineers applied fundamental physics principles and design assessment tools, such as Design for Six Sigma (DFSS), to develop and verify the new remedy.  (*See* Ex. 2, Fedullo Rpt. at 5-21.)  Stevick admits that the principles behind the remedy's effectiveness for mitigating inadvertent key rotation are "sound." (Ex. 3, 9/28/2015 Stevick Dep. Tr. at 145:3-25.)

#### B.   The Key Rotation Recalls.

After initiating the Delta Ignition Switch recall, New GM assessed whether other New GM vehicles could have susceptibility to inadvertent key rotation.  Through a series of investigations, New GM concluded that in certain vehicles the ignition key under certain circumstances may

---

[2]   Stevick offers a SDM prolongation opinion that is essentially identical to Loudon's opinion.  (Ex. 1, 12/7/2017 Loudon Dep. Tr. at 20:18-23.)  Putting aside their duplication, Stevick's SDM prolongation opinion is also irrelevant and should be excluded under *Daubert* for the same reasons as explained in detail herein.

unintentionally move away from run position. These vehicles showed material differences in the circumstances under which the key may unintentionally rotate and, consequently, the specific remedy implemented also differed due to mechanical design differences such as chassis and interior compartment design, suspension, and ignition switch and system design,. (Ex 2, Fedullo Rpt. at 25-26.) Nevertheless, for briefing efficiency purposes, New GM refers to these recalls collectively as the "Key Rotation" recalls.

In 2014, New GM initiated the following Key Rotation recalls with the following remedies:

| NHTSA Recall No. | Subject Vehicles | Remedy |
|---|---|---|
| 14v355 (Impala Key Rotation) | 2006-2014 Chevrolet Impala; 2005-2009 Buick Lacrosse; 2006-2011 Buick Lucerne; 2000-2005 Cadillac Deville; 2006-2011 Cadillac DTS; 2006-2007 Chevrolet Monte Carlo | Two 16-mm key rings and a cover over the key head or insert in the key slot |
| 14v400 (Malibu Key Rotation) | 1997-2005 Chevrolet Malibu; 2000-2005 Chevrolet Impala; 2000-2005 Monte Carlo; 1999-2004 Oldsmobile Alero; 1998-2002 Oldsmobile Intrigue; 1999-2005 Pontiac Grand Am; 2004-2008 Pontiac Grand Prix | Two 16-mm key rings and a cover over the key head or insert in the key slot |
| 14v394 (Cadillac CTS/SRX Key Rotation) | 2003-2014 Cadillac CTS; 2004-2006 Cadillac SRX | Two 16-mm key rings and a cover over the key head or insert in the key slot[3] |
| 14v346 (Camaro Knee-Key Rotation) | 2010-14 Camaro | Remove key blade and provide two new keys and 16-mm and 18-mm key rings for each new key |

---

[3]    For Cadillac CTS vehicles manufactured after December 12, 2010, dealers provided drivers with one 16-mm key ring attached to the key, and also attached one 18-mm key ring connected to the key fob, to replace a single larger diameter key ring.

C.  **New GM Developed Repeatable, Peer-Reviewed Tests To Assess Inadvertent Key Rotation And To Validate The Recall Remedies.**

In 2014, New GM engineer, Joe Fedullo, led a multi-disciplinary team that developed new, repeatable tests to assess inadvertent key rotation. (Ex. 2, Fedullo Rpt. at 5-21.) These repeatable tests comprised two major components: driving tests and stationary tests. The driving tests encompassed eight extreme driving events that "were selected to encompass the breadth of accelerations a vehicle would experience in both on and off road events." (*Id.* at 8.) For these eight driving events, the vehicles were equipped with heavy key weights, up to 0.7 lbs.,[4] and any unintended rotations through inertial or knee-key forces were documented. (*Id.* at 8-21.) The stationary testing used driver surrogates (5% female, 50% male and 95% male) who attempted to rotate the key in a stationary vehicle. (*Id.* at 21.) This stationary testing augmented the driving tests by "eliminating the distraction of the driving task" and allowing the surrogates to "concentrate all of their efforts on trying to rotate the ignition key with their knee." (*Id.*) In the stationary test, the surrogates first attempted to deliberately rotate the key in "any normal driving motions while in a vehicle," including panic brake stops, feet pulled back in a relaxed position, twisting to look backwards over each shoulder, sitting with knees pulled up, crossing their legs, reaching for a wallet, and reaching in the backseat. (*Id.* at 22; Ex. 4, 5/18/2017 Fedullo Dep. Tr. at 108:13-109:10.) After the "normal" test, the surrogates were asked to deliberately rotate the key "through any means," including "motions that would not occur in a normal driving scenario," including "put[ting] [their] leg anywhere," and "do[ing] yoga in the car." (Ex. 2, Fedullo Rpt. at 22; Ex. 4, 5/18/2017 Fedullo Dep. Tr. at 109:11-18.) This testing, known as the "abnormal" test, was "not

---

[4]  New GM conducted a key chain study and found the maximum observed key weight was 0.61 lbs. (Ex. 2, Fedullo Rpt. at 19.)

intended to duplicate an actual event," but intended to assess "what extreme position an occupant would need to assume in order to rotate the key with their knee." (Ex. 2, Fedullo Rpt. at 22.)

New GM also had an independent engineering organization, Virginia Tech Transportation Institute (VTTI), conduct a peer review of the inadvertent key rotation tests New GM developed. VTTI, an organization that Stevick admits is "well-respected in the automotive industry" (Ex. 3, 9/28/2015 Stevick Dep. Tr. at 191:16-192:5), concluded in a 220-page report that New GM's testing was "robust" and "acceptable" for assessing inadvertent key rotation in existing vehicles. (Ex. 5, VTTI Rpt., at GM-MDL2543-301432451-52.) Stevick likewise agrees "there's nothing wrong with" New GM's testing. (Ex. 3, 9/28/15 Stevick Dep. Tr. at 192:6-192:24; 193:9-12.)

New GM used these tests to assess whether vehicles had susceptibility to inadvertent key rotation and to assess the effectiveness of the remedy for addressing that susceptibility. (Ex 2, Fedullo Rpt. at 23-27.) Through these peer-reviewed tests, New GM validated that the remedies for each of the Delta Ignition Switch and Key Rotation recalls were robust to inadvertent key rotation. (*Id.* at 24; Ex. 6, Final Evaluation Rpt., App'x D.)

### D. Plaintiffs' Theories Regarding Effectiveness Of The Delta Ignition Switch And Key Rotation Remedies.

Plaintiffs offer two experts with technical backgrounds to provide opinions about the recalls. Only one of those experts, Glen Stevick, offers any opinions about whether the remedies that New GM implemented for the Delta Ignition Switch recall and the Key Rotation recalls are effective. Specifically, Stevick offers four theories:

- The recalled vehicles continue to be susceptible to knee-key rotation because New GM has not moved the location of the ignition switch or provided a shroud to protect against knee-key contact;

- According to the "persuasion technique," "[o]nly 25%" of vehicle owners will use the remedy that they received from New GM;

- The recalled vehicles are defective even with the remedy implemented because the ignition system continues to be a single point of failure; and

- For the Key Rotation recalls, New GM did not provide a new ignition switch with increased torque resistance.

Stevick offers no testing or scientific analysis to show his speculative theories have any connection to the real world.  Instead, he relies on "logical deduction" and a distortion of the very testing that validates the remedy's effectiveness.  Stevick also agrees that NHTSA was aware of New GM's testing and the remedies that it implemented and that he was not aware of any "criticisms or concerns that NHTSA has raised."  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 96:22-98:23.)

The other technical expert, Steven Loudon, did not investigate the effectiveness of any of the recall remedies to address inadvertent key rotation and testified that he is not offering any opinions on that topic. (Ex. 1, 12/7/2017 Loudon Dep. Tr. at 76:2-77:16.)  Loudon admits that his opinion that New GM should retrofit all its vehicles with new SDM logic to prolong the time the airbags could be deployed addresses a different condition than inadvertent key rotation.  (*Id.* at 80:7-15.)  Thus, his testimony will not aid the trier of fact on this issue and should be excluded.

### 1.    Stevick Has No Scientifically Reliable Evidence To Conclude That The Remedies Do Not Effectively Address Knee-Key Rotation.

Stevick unequivocally agrees that the remedies for the Delta Ignition Switch and Key Rotation recalls effectively address inadvertent rotation due to inertial forces:

> Q: Based on the testing that GM has conducted in assessing the effectiveness of the recall remedy, is it your opinion that the recall remedy effectively mitigates the potential for inertial rotation?
>
> A: Yes.

(Ex. 7, 1/8/2018 Stevick Dep. Tr. at 66:10-14; *see also id.* at 65:24-66:4; 185:23-186:5.) Stevick's only contention with respect to inadvertent key rotation is that the repaired vehicles are still susceptible to inadvertent key rotation due to forces applied by the driver's knee (*i.e.*, knee-key

rotation). Stevick, however, has conducted no field performance assessment to identify any real-world incidents of inadvertent key rotation for the recall repaired vehicles and is not aware of any such incident. (*Id.* at 116:11-23; 135:9-14; 136:9-19; 137:3-24; 166:8-18.) Further, Stevick has not conducted knee-key rotation testing himself, except "anecdotally," and instead has relied on his own "interpretation" of New GM's surrogate testing. (*Id.* at 15:21-16:5 (testifying New GM has "done a significant amount of testing. And it doesn't need to be reproduced; it just needs to be interpreted"); 40:15-24; 69:22-70:18; 129:13-23; 130:2-23; 132:17-24; 133:11-21; 185:14-22 ("[W]e're relying on [New GM's] tests.").)

### a. Stevick Improperly Relies On New GM's "Abnormal" Surrogate Testing.

While admitting that he has done no rotation testing himself and that he is relying almost exclusively on New GM's tests, Stevick points to only one element of New GM's testing to support his conclusion. (*Id.* at 40:15-41:8.) Specifically, Stevick relies on results that New GM obtained from the "abnormal" test, a test where New GM requested that surrogate drivers in a stationary vehicle deliberately attempt to rotate the key with their knee in positions not normally encountered during driving. (*Id.*) Mr. Fedullo, who devised this test, explains the "abnormal" test was not a pass/fail test for inadvertent key rotation, but an extreme test where surrogates were asked, "if we gave you a million dollars, can you turn this key off," and were instructed to "put [their] leg anywhere," and to go as far as "do[ing] yoga in the car." (Ex. 4, 5/18/2017 Fedullo Dep. Tr. at 109:11-18; Ex. 2, Fedullo Rpt. at 23.) This test was neither intended nor designed to replicate real world events, but to understand the lengths to which an occupant must contort their body position to deliberately rotate the key with their knee. (Ex. 2, Fedullo Rpt. at 23.) In virtually all "abnormal" tests of GM vehicles and non-GM vehicles, one or more surrogates were able to rotate the key deliberately with their knee. (*Id.*)

8

Stevick distorts the intent of this testing to conclude that if a driver could rotate the key with his/her knee in an abnormal position while deliberately trying to do so, the vehicle is unsafe. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 41:3-8; 78:18-23; 149:11-150:20.)  Stevick, however, has neither conducted any engineering testing, nor performed any field performance evaluation, to assess whether those "abnormal positions" have any connection to the real world.  To the contrary, Stevick admits his opinion is based on his allegation that "it can be done," albeit deliberately and in an abnormal position, and "logical deduction." (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 185:2-12.)  Stevick's distorted interpretation of the "abnormal" test also ignores the results of the "normal" test that showed drivers could not rotate the key in the repaired vehicles when conducting normal driving maneuvers, such as moving their foot while in cruise control and from accelerator to brake, looking over their shoulder, reaching in the back seat, or reaching for a wallet.  (Ex. 4, 5/18/2017 Fedullo Dep. Tr. at 108:13-109:10; Ex. 2, Fedullo Rpt. at 23; Ex. 8, 7/11/2018 Stevick Dep. Tr. at 246:22-247:22 (admitting that all these maneuvers were part of the normal testing).)

> **b.    Stevick's Limited Vehicle Measurements Have No Relevance To Knee-Key Rotation.**

Stevick also attempts to support his "knee key" opinion with a limited number of measurements of ignition switch location in a handful of vehicles—Saturn Ion,[5] 2004MY Cadillac CTS, 2012MY Cadillac CTS and 2010MY Camaro, and possibly the Chevy HHR and Chevy Impala. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 31:14-22; 36:18-37:11.)  Although he admits that these measurements are "observational," he concludes that "if [the ignition switch is] within 22 inches of the floor, or 24 if it has a ledge over which your knee can trap a key chain, it's on the

---

[5]    Stevick does not identify what model year vehicle is the Saturn Ion from which he took measurements.  In his deposition, he claimed that measurements were taken for a Chevy HHR and Impala, but no such measurements were identified in his expert report.  (*See generally* Ex. 9, Stevick Rpt.)

lower side of the column and if it's not recessed, odds are very strong that it has a knee-key issue."
(*Id.* at 26:20-27:3; 27:4-16, 28:17-23.)  Stevick's "22 inch standard," however, is pulled from thin
air and is based on nothing more than his own *ipse dixit*.  Stevick points to no scientific data or
industry standards showing that ignition switch height from the floorboard predicts knee-key
rotation and agrees applying this criteria to all vehicles renders many other manufacturers'
vehicles, including the Honda Civic and Ford Focus, defective. (*Id.* at 80:22-81:18.)

Stevick's reliance on these interior measurements also improperly conflates the concepts
of knee-key **contact** and knee-key **rotation**, and ignores their fundamental differences.  For knee-
key rotation, the knee must not only contact the key, but must also apply a force in a specific
direction and orientation to cause rotation.  (Ex. 10, 12/9/2016 Stevick Dep. Tr. at 118:22-119:12.)
Stevick's "22 inch" theory does not even mention, much less account for, the differences between
knee-key **contact** and knee-key **rotation**.

## 2. Stevick Conducted No Testing Or Studies To Conclude That "Only 25%" Of Vehicle Owners Will Use The Remedies.

Stevick further contends that the remedies for the Delta Ignition Switch and Key Rotation
Recalls are ineffective because after a vehicle owner completes the recall repair, receives the newly
designed keys and key rings, and gives the dealer their old keys, "only 25%" of those vehicle
owners will use the newly designed keys and key rings.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 63:6-
21.)  To be clear, Stevick is not offering any opinion about the percentage of vehicle owners that
will obtain the remedy, but only opines that 25% of those owners who *do* receive the remedy will
not actually use it.  In other words, Stevick believes that 75% of vehicle owners will simply discard
the remedy those same owners sought out and received.  (*Id.* at 162:11-17.)  He admits that he has
no scientific support for this contention, that he conducted no surveys of how vehicle owners are

Case 1:14-md-02543-JMF    Document 5852    Filed 05/14/2018    Page 16 of 32

using the remedies in the real world, and is not aware of any studies as to the percentage of vehicle owners who are using them.  (*Id.* at 63:22-61:4; 95:19-96:5; 117:18-23.)

Stevick's sole basis for his opinion is a statement in the VTTI report that states, "the persuasion technique used alone often see compliance rates no greater than 20 or 25 percent." (Ex. 5, VTTI Rpt. at GM-MDL2543-301432608.)  Putting aside that Stevick is unaware of how VTTI arrived at that number,[6] Stevick admits that this 25% number that VTTI cites is based on using "consumer persuasion" *alone* as a remedy technique. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 95:10-18.)   But, as Stevick admits, the recall remedies here are ***design changes***.  (*Id.* at 74:4-7.) In fact, VTTI states that a design change, such as New GM's new key and key rings, is the most effective type of remedy, and believes New GM's remedy "will be successful:"

> ***Another design solution*** that will mitigate inertial issues is the use of a hole in the center of the ignition key head instead of a slot.  The center hole design eliminates a moment arm, that, in combination with the key chain mass or a force exerted from a contact with the key chain, can move the ignition key out of the 'RUN' position.  ***The VTTI project team believes this mitigation strategy will be successful.***

(Ex. 5, VTTI Report at GM-MDL2543-301432606 (emphasis added).)

VTTI's generic statement about how consumer persuasion works in isolation does not apply to New GM's design change remedies and does not support Stevick's conclusion about how many vehicles owners will use the new keys and key rings provided in the Delta Ignition Switch and Key Rotation recalls.  Stevick is relying on nothing more than "logical deduction," or mere guess work, to opine on the percentage of vehicle owners who will use the newly designed keys provided in the subject recalls at issue here. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 163:14-164:3.)

---

[6]    Stevick testified that "some human factors books" may support his conclusion, but he could not identify those books and admitted they are unrelated to the automotive industry.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 96:6-21.)

3.      **Stevick Has No Scientific Data To Support His Conclusion That The Recalled Vehicles With The Remedy Implemented Are Defective Because The Ignition System Is A "Single Point of Failure."**

Stevick opines that the ignition system in the repaired vehicles contain a "single point of failure defect" that "remains in [New GM] vehicles today." (Ex. 9, Stevick Rpt. at 60.) Stevick, however, agrees that every automotive vehicle has many single points of failure and that a component is not defective simply because it is a single point of failure. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 158:2-24.) He also admits that a "single point of failure" component only becomes defective if it has a high failure rate, but he has no data about the failure rate of the recall remedy. (*Id.* at 97:1-11; 158:2-24.)

4.      **Stevick Has Conducted No Testing Or Analysis To Conclude That The Key Rotation Recall Vehicles Are Susceptible To Inadvertent Key Rotation Because New GM Did Not Replace The Ignition Switch**

Stevick opines that the remedies for the Key Rotation recalls are inadequate because New GM did not replace the ignition switch in those recalls as it did with the Delta Ignition Switch recall. (Ex. 9, Stevick Rpt. at 22, 39, 57.) For this opinion, Stevick focuses on one component of the ignition system—the ignition switch—and ignores the fact that New GM's remedy changed other components of the ignition system that influence key rotation, *i.e.* the keys and key rings. Stevick has neither conducted any engineering testing nor any field performance evaluation to show there is a real-world difference if the ignition switch were to be replaced in the Key Rotation recalls. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 116:11-23; 135:9-14; 136:9-19; 137:3-24; 166:8-18.) Stevick simply speculates about the hypothetical impact of replacing the ignition switch.

Stevick's conjecture that a new ignition switch is *necessary* to render the remedies for the Key Rotation recalls "safe" runs contrary to the fundamental physics principles and peer-reviewed validation testing that supports their effectiveness. (Ex. 2, Fedullo Rpt. at 5-27.) Stevick admits that the principles behind New GM's remedies—reducing the moment arm and adding key

12

Case 1:14-md-02543-JMF   Document 5865   Filed 07/20/18   Page 13 of 32

ring(s)—address the issue of inadvertent key rotation.  (Ex. 8, 7/11/2018 Stevick Dep. Tr. at 250:20-25; 251:13-252:4.)   Once again, Stevick relies on speculation couched as "logical deduction" for concluding that the vehicles subject to the Key Rotation recalls are susceptible to inadvertent key rotation without a new ignition switch, and ignores New GM's uncontroverted real-world testing.

###     5.     Loudon Agrees His SDM Prolongation Concept Does Not Address Inadvertent Key Rotation.

Loudon offers no opinion on inadvertent key rotation, but opines that New GM could have retrofitted the recalled vehicles with new technology that prolongs the time for airbag deployment capability if the ignition switch moves out of the RUN position ("SDM prolongation").  (Ex. 11, Loudon Rpt. at 47.)  Yet this opinion is only relevant *if* the ignition system inadvertently rotates out of RUN.  (*Id.* ("GM should have designed its SDMs to remain active and allow the airbags to deploy for a reasonable period of time *after the ignition switch has moved from RUN to ACC or OFF* where the vehicle is still in motion.") (emphasis added).  If a vehicle containing the recall remedy is not susceptible to unintended rotation, the ignition switch will not inadvertently move out of run, and thus SDM prolongation is irrelevant.  As a result, Loudon candidly admits that his opinions regarding SDM prolongation do not address the issue of inadvertent key rotation:

> Q. Now, you agree [t]hat the concept of SDM prolongation does not address the issue of inadvertent key rotation, correct?
>
> A. Yes. I understand that.

(Ex. 1, 12/7/2017 Loudon Dep. Tr. at 80:7-10.)

## II.     New GM Provided An Effective Remedy For The Side Impact Airbag ("SIAB") Wiring Harness Recall.

In 2014, New GM initiated NHTSA Recall No. 14v118 for the Lamba platform vehicles that related to a concern with the wiring harness in the side impact airbag ("SIAB") deployment

Case 1:14-md-02543-JMF   Document 5885   Filed 07/20/18   Page 153 of 32

circuit.  For this recall, New GM informed dealers to remove the existing wiring harness connector and to solder the wires directly together.  Plaintiffs do not dispute that the prescribed remedy for the SIAB recall is effective:

> Q.  Do you have an opinion as to the effectiveness of that remedy of splicing the wires directly?
>
> A.  Should be pretty good, the splice itself, as long as it's done correctly, right wires to right wires."

(Ex. 7, 1/8/2018 Stevick Dep. Tr. at 187:6-16; Ex. 12, 5/2/2017 Stevick Dep Tr. at 301:7-11.) Stevick also agrees that "it's certainly doable" for a dealer to conduct the SIAB recall repair.  (Ex. 12, 5/2/2017 Stevick Dep. Tr. at 301:17-21.)  Stevick's only dispute is that some dealers **may** not follow the instructions that New GM provided and **may** incorrectly attach the wrong wires. Stevick, however, has no evidence, no surveys, and no analysis to show that this has actually occurred in the real world.

## <u>LEGAL STANDARD</u>

Under Rule 702 and *Daubert*, federal trial courts serve as gatekeepers to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  The burden is on the proponent of expert testimony to show by a "preponderance of proof" that the expert satisfies each of the *Daubert* admissibility requirements.  *Daubert*, 509 U.S. at 592 n.10.

To be reliable, the testimony must be based upon "sufficient facts or data," and be "the product of reliable principles and methods" that have been "reliably" applied to the "facts of the case."  Fed. R. Evid. 702 Advisory Committee's Notes (2000 Amendment); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  In other words, expert opinions must be

Case 1:14-md-02543-JMF  Document 5852  Filed 07/20/18  Page 20 of 32

"derived by the scientific method," "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known," scientifically reliable, and based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also R.F.M.A.S., Inc. v. Mimi So*, 748 F. Supp. 2d 244, 248–49 (S.D.N.Y. 2010).  Opinions premised on possibilities, speculation, or hypotheses do not satisfy *Daubert*.  509 U.S. at 589–90 ("The subject of an expert's testimony must be 'scientific… knowledge'. . . .  The word 'knowledge' connotes more than subjective belief or unsupported speculation.") (internal citation and quotation omitted); *Cacciola v. Selco Balers, Inc.,* 127 F. Supp. 2d 175, 183 (E.D.N.Y. 2001) (excluding opinion evidence based on "unsubstantiated generalizations, speculative hypotheses and subjective evaluation"); *Tamraz v. Lincoln Elec. Co.*, 620 F. 3d. 665, 670 (6th Cir. 2010) (a "working hypothesis" is not "admissible scientific 'knowledge.'") (internal citation omitted); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles.  The courtroom is not the place for scientific guesswork, even of the inspired sort." (internal citation and quotation omitted).)

An expert's opinion must also be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citations omitted); *see also id.* at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").  That is, to be relevant, the testimony must "help the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702(a).  To be clear, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ARGUMENT

I.    **THE COURT SHOULD EXCLUDE STEVICK'S OPINIONS THAT THE RECALL REMEDIES FOR THE DELTA AND KEY ROTATION RECALLS ARE INADEQUATE.**

Stevick agrees that the recall remedies for the Delta Ignition Switch and Key Rotation recalls effectively address the potential for inadvertent rotation due to inertial forces. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 65:24-66:4; 66:10-14; 185:23-186:5.)  Stevick's remaining theories about a vehicle with the recall remedy being susceptible to knee-key rotation are unsupported by any scientific analysis and should be excluded.

A.    **The Only Reliable Data Shows That The Recall Remedies Have Effectively Addressed Inadvertent Key Rotation.**

New GM conducted a battery of repeatable, scientific tests to assess the effectiveness of the recall remedy to address inadvertent key rotation.  (Ex. 2, Fedullo Rpt. at 25-26.)  New GM used those tests to assess whether certain GM vehicles were susceptible to inadvertent key rotation, and then used those same tests to assess the effectiveness of the remedy for addressing that susceptibility.  (*Id.* at 23-27.)  Stevick concedes there was "nothing wrong with" New GM's testing.  (Ex. 3, 9/28/2018 Stevick Dep. Tr. at 192:6-192:11.)  Similarly, VTTI, an independent automotive industry group, concluded that New GM's testing was "robust" and "acceptable" for assessing inadvertent key rotation in existing vehicles.  (Ex. 5, VTTI Rpt. at GM-MDL2543-301432451-52.)  Even Stevick agrees that there is "nothing wrong with" this testing. (Ex. 3, 9/28/2015 Stevick Dep. Tr. at 192:6-192:11.)

New GM conducted these peer-reviewed tests on the recalled vehicles both with and without the relevant recall remedy.  (Ex. 2, Fedullo Rpt. at 25-26.)  The vehicles with the recall remedy universally passed these tests, while many of the recalled vehicles without the remedies did not.  (*Id.*)  In short, the ***only*** real-world, peer-reviewed testing of the recall remedies establish

16

that they are effective.  In the face of this overwhelming evidence that the recall remedies are effective, Stevick cannot identify a confirmed incident in which a repaired vehicle experienced an inadvertent rotation in the real world.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 136:15-19.)[7]

**B.**   **Stevick's Opinion That The Recalled Vehicles Are Susceptible to Knee-Key Rotation Is Unreliable.**

Despite the overwhelming evidence to the contrary, Stevick contends that repaired vehicles are susceptible to inadvertent key rotation due to forces applied by the driver's knee (*i.e.*, knee-key rotation).  Stevick arrives at this contrary conclusion without conducting any reliable testing of his own and without performing any field performance evaluation of whether there is any evidence that repaired vehicles show any susceptibility to knee-key rotation. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 69:22-70:18; 129:13-23; 130:2-23; 132:17-24; 133:11-21.)  Highlighting his lack of analysis, Stevick has never inspected, tested, or analyzed the named plaintiffs' vehicles. (Ex. 8, Stevick 7/11/2018 Dep. Tr. at 213:10-214:15.)

Without key rotation testing of his own or any field performance data, Stevick resorts to "logical deduction" derived from a distortion of New GM's tests and his own "observational" data to conclude that the vehicles with the recall remedy are still susceptible to knee-key rotation. Specifically, he relies on one element of New GM's extensive testing, the "abnormal" test where surrogates were told to do whatever they can to deliberately rotate the key with their knee.  If a driver is able to rotate the key with the knee while ***deliberately*** trying to do so, Stevick concludes that the vehicle poses a safety risk, regardless of the extremes to which an individual must contort

---

[7]   While Stevick tries to point to a handful of verbatim complaints submitted to NHTSA, as the Court already pointed out twice before, "such complaints are not the kind of materials upon which an expert would reasonably rely."  (Dkt. 4065 at 15; *Scheuer* Trial Tr. at 718.)  Regardless, these complaints are hearsay and were never analyzed or verified.  (*Id.*)  And when previously confronted with the specifics of certain of these complaints, Stevick was unable to assess whether the complaints related to a vehicle with the recall remedy installed due to lack of information.  (Ex. 12, 5/2/2017 Stevick Dep. Tr. at 251:23-252:3.)

their body to achieve such rotation and regardless of whether such a position would ever occur in the real world.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 41:3-8; 78:18-23; 149:11-150:20.)  Thus, Stevick's theory is that if it is ***possible*** to cause knee-key rotation in ***certain*** situations where a ***subset*** of drivers could contort their bodies in an ***abnormal*** position, it is proof that the remedy is ineffective.  But as this Court already held, "mere possibility is not proof."  *See Garza/Greenroad*, 2017 WL 6729295 at *8 (citing *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016); *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007); *Joiner*, 522 U.S. at 146) (internal quotations omitted); *In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig.*, 127 F. Supp. 3d 1306, 1347 (N.D. Ga. 2015) (holding an expert's extrapolation unsupported by evidence or data was unreliable, even if the opinion may be logical).

Stevick's "observational" data—some interior compartment measurements for a handful of recalled vehicles and torque measurements of some ignition switches—similarly does not support a conclusion that the repaired vehicles are unsafe.  Stevick has conducted no scientific tests or engineering analysis that show a direct correlation between this data and the possibility of inadvertent key rotation occurring in the real world. For example, Stevick has no scientific testing or industry standards that would support his "22-inch standard" as predictive of knee-key rotation, and if it were predictive, he admits it would result in many non-GM vehicles having the same issue.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 80:22-81:18.)  Stevick is simply speculating based on "logical deduction" that his "observational" data predicts susceptibility to knee-key rotation, but once more, this is not enough.  *Garza/Greenroad*, 2017 WL 6729295 at *7-8.

In sum, Stevick resorts to the same tactics he deployed in *Garza*/*Greenroad*: using "logical deduction" as a cover for his speculation about possibilities.  Possibilities, though, are insufficient to satisfy *Daubert*.  *Id.* at *7-9 (finding Stevick's "logical deduction" method failed to satisfy

*Daubert* because "such pure speculation, untethered to the facts in the record, is not a proper basis for reliable scientific testimony."). Stevick's inability to identify any real-world instances of his hypothetical scenarios about the possibility of a key rotation in a repaired vehicle confirms that, like his opinions about the possibility of a "double rotation" in *Garza/Greenroad*, his "possibilities" are untethered to the real world and fail to meet the *Daubert* standard. *Id.* at *7 (holding Stevick's opinions as unreliable because, in part, he was unable to identify any "real-world instances" to show his hypothetical scenarios actually occurred).

In *Garza/Greenroad*, the Court found that Stevick did no reliable scientific testing to confirm plaintiffs' double rotation theory, discounting as unreliable the "limited" physical testing that he did perform of "sitting in his own parked car." *Id.* at *9, n.5. Here, Stevick does even less, performing no tests at all to assess whether all repaired vehicles are susceptible to inadvertent key rotation. In fact, the only "tests" that Stevick did conduct—"observational" measurements of certain interior dimensions of a few recalled vehicles and torque measurements of certain ignition switches—have no direct correlation as to whether the recall remedies effectively address key rotation. Stevick cannot buttress his opinions with testing only tenuously related to the relevant inquiry. *Id.* at *7 (holding that Stevick's double rotation opinion is scientifically unreliable despite noting Stevick had conducted limited torque testing). Stevick again has no reliable expert testing directed to the recall remedies, and therefore, like in *Garza/Greenroad*, his methodology is speculative and unscientific. *In re C.R. Bard, Inc.*, 948 F.Supp.2d 589, 604-605 (S.D. W. Va. 2013); *see also Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006) (affirming exclusion of expert testimony as unreliable where expert did not conduct testing or analysis and "offered only vague theorizing based upon general principle.")

19

The Court's rulings regarding Stevick's knee-key opinions in the *Ward* and *Scheuer* bellwether trials do not apply or change the result here. In those cases, the Court denied exclusion based on "case-specific analysis and testing" or examinations of "extensive data" applied to case-specific observations. *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 2664199, at *3 (S.D.N.Y. June 20, 2017); *In re Gen. Motors LLC Ignition Switch Litig.*, , 2015 WL 9480448, at *3 (S.D.N.Y. Dec. 29, 2015). Moreover, neither case involved a vehicle repaired with the recall remedy. Stevick's opinions here are thus akin to *Garza/Greenroad*, and his opinions are based on no reliable scientific testing or analysis and directly contradicts the robust testing that New GM conducted. As in *Garza/Greenroad*, Stevick's knee-key opinion should be excluded.

### C. Stevick's Opinion That Only 25% Of Vehicle Owners Will Use The Remedy Is Based Solely On "Logical Deduction" And Lacks Any Scientific Support.

Stevick's next attempt to conjure a basis for plaintiffs' claims by opining that after receiving the recall remedy, only 25% of vehicle owners will actually use the new key or key rings of the recall remedies. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 63:6-21.) In Stevick's view, 75% of vehicle owners who specifically seek out the remedy, bring his/her vehicle to a dealer, and receive the remedy, will—after all that work—promptly toss away the remedy. Stevick admits that this opinion is solely based on "logical deduction," and he has no scientific or empirical support to show this has actually occurred. (*Id.* at 163:14-164:3.) Stevick has not attempted to identify any real-world instances where a vehicle owner obtained the new key and key rings and then failed to use them. (*Id.* at 162:11-17.) Further, Stevick has conducted no surveys to assess whether customers are using the supplied remedy (*id.* at 63:22-64:1), and is not aware of any studies as to the percentage of customers who are using the remedies. (*Id.* at 95:19-96:5; 117:18-23.) Stevick also has not talked with any of the named plaintiffs about how they have used the remedies, and,

indeed, "knows nothing of the named plaintiffs." (Ex. 8, 7/11/2018 Stevick Dep. Tr. at 213:10-214:15.)

Stevick's only support for his theory is a generic statement from the VTTI Report that has no relevance to the recall remedies.[8] VTTI states generally in its report that a remedy that relies on persuasion, such as a warning, may have a compliance rate of only 25% when "used alone." (Ex. 5, VTTI Report at GM-MDL2543-301432605.) Thus, VTTI limited its application for circumstances where a remedy relies exclusively on a warning. But Stevick admits New GM's recall remedies are design changes involving new keys and key rings—not a standalone warning. (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 95:10-15.) As Stevick's only support for his "25% opinion" is a statement that is entirely unrelated to New GM's recall remedy, Stevick's opinion does not "fit the facts" of this case and will only serve to confuse the jury that this unsupported theory has any merit. Without any scientific support, Stevick's opinion rests solely on "logical deduction," (*id.* at 163:14-164:3), which is an insufficient basis for admissibility. *Garza/Greenroad*, 2017 WL 6729295 at *8-9.

### D.   Stevick's "Single Point of Failure" Opinion Is Unreliable And Irrelevant.

Stevick also posits that the ignition switch of the recalled vehicles is a "single point of failure" and the vehicles with the recall remedy are defective because they continue to have this "single point of failure." (Ex. 9, Stevick Rpt. at 60.) Stevick, however, agrees that it is possible for well-designed and well-developed products to have a single point of failure. (Ex. 13, 9/29/2015 Stevick Dep. Tr. at 487:8-11.) He also agrees there are designs in which a single point of failure

---

[8]   Stevick has no understanding as to how VTTI reached the compliance rate, (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 95:16-18), and cannot cite any other support for it beyond a vague reference to "some human factors books" that (i) he cannot identify with specificity and (ii) he admits do not address or relate to the automotive industry. (*See id.* at 96:6-21.)

Case 1:14-md-02543-JMF    Document 5855    Filed 05/14/2018    Page 27 of 32

does not present a defect, (*id.* at 487:19-22), and that a component is not defective for being a single point of failure unless that component is not "robust" or has a "high failure rate." (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 158:2-24.) Thus, for the repaired vehicles to be defective due to the ignition system allegedly being a "single point of failure," Stevick (and the plaintiffs) must present admissible evidence that repaired vehicles have a high failure rate or continue to be unsafe.

Stevick fails to present any such evidence. He cannot point to a single incident in which a vehicle with the recall remedy experienced inadvertent key rotation. (*Id.* at 116:11-23; 135:9-14; 136:9-19; 137:3-24; 166:8-18.) There is no evidence, scientific or otherwise, that repaired vehicles have any failure rate at all, let alone the requisite "high failure rate" that Stevick admits is necessary to support his opinion. Without any scientific support, Stevick's opinion that the recall remedies are defective because the ignition system is a "single point of failure" is *ipse dixit* and should be excluded. *Gen. Elec.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### E.    Stevick's Opinion That The Key Rotation Recall Remedies Are Inadequate Because They Do Not Replace The Ignition Switch Is Unreliable and Irrelevant.

Stevick next opines that one component of the ignition system—the ignition switch—must be replaced for all the Key Rotation recall remedies to be effective. According to Stevick, an ignition switch that does not meet the torque specification is, *ipso facto*, defective. Stevick, however, concedes that a component may fall outside an engineering specification without posing a safety risk, and that he has no evidence that the ignition switch torque specifications were created for safety reasons. (Ex. 12, 5/2/2017 Stevick Dep. Tr. at 123:2-4; Ex. 8, 7/11/2018 Stevick Dep. Tr. at 242:23-243:3.) He further agrees that the relevant consideration for assessing inadvertent key rotation is not performance of the ignition ***switch***, but performance of the ignition ***system*** as a

whole.  (Ex. 12, 5/2/2017 Stevick Dep. Tr. at 122:11-16.)  Stevick focuses on one aspect of one component of the ignition system—the torque of the ignition switch—without providing *any* scientific basis to conclude that aspect of that component alone renders vehicles with the recall remedy implemented susceptible to inadvertent key rotation.

Stevick should have analyzed the real-world performance of the ignition *system* of the recalled vehicles with the remedies implemented and come forth with facts, data and a reliable methodology on which to support his opinion that these vehicles are unsafe. But Stevick failed to do so and, as a result, Stevick has no basis to conclude that the recalled vehicles present an unreasonable risk of safety without replacing the ignition switch, especially in light of New GM's uncontroverted testing showing that the recall remedies effectively address inadvertent key rotation. (Ex. 2, Fedullo Rpt. at 5-23.)  In stark contrast to New GM's robust and peer-reviewed testing, Stevick offers nothing but speculation.  Without evidence that a recalled vehicle is susceptible to inadvertent key rotation unless the ignition switch is replaced, Stevick's opinion has no scientific support and is inadmissible.  *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416-417 (W.D.N.Y. 2005) (holding an expert's opinion inadmissible if "he fails to employ investigative techniques or cannot explain the technical basis for his opinion.")

## II. THE COURT SHOULD EXCLUDE STEVICK'S OPINION THAT THE REMEDY FOR THE SIAB RECALL IS INADEQUATE.

Stevick's opinion contesting the effectiveness of the SIAB recall remedy is without scientific support and is purely speculative.  Stevick agrees that the SIAB recall remedy of removing the wiring harness connector and soldering the wires directly "should be pretty good." (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 187:11-16.)  Stevick similarly offers no criticism as to the instructions that New GM provides to dealers (*see, e.g.,* Ex. 14, Recall Bulletin No. 14030, GM-

23

MDL2543-302803038), and concedes, "it's certainly doable" for a dealer to properly conduct the repair.  (Ex. 12, 5/2/2017 Stevick Dep. Tr. at 301:17-21.)

Stevick's only concern with the remedy is that some dealer technicians may not solder the correct wires together.  He admits, though, that he has no evidence of a specific instance where that has occurred, and that he has conducted no studies or experiments that would indicate that this is likely to occur.  (Ex. 7, 1/8/2018 Stevick Dep. Tr. at 188:2-6.)  Without more, Stevick's concern is purely conjecture.  This is insufficient to survive *Daubert* and his opinion should be excluded. *Garza/Greenroad*, 2017 WL 6729295 at *7-9.

## III.    THE COURT SHOULD EXCLUDE LOUDON'S AND STEVICK'S OPINIONS ABOUT SDM PROLONGATION BECAUSE THEY ARE IRRELEVANT.

Both Loudon and Stevick opine that the recalled vehicles are defective because they should be retrofitted with new SDM logic that prolongs airbag deployment for an extended time after the ignition switch has rotated from RUN.  These SDM prolongation opinions, which are materially the same, should be excluded because they are irrelevant to the issues to be tried.  Expert testimony must not only be firmly grounded in scientific knowledge, it must also "help the trier of fact . . . to determine a fact in issue."  Fed. R. Evid. 702(a).  Thus, an expert's opinion must be "sufficiently tied to the facts of the case [such] that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591; *Borsack v. Ford Motor Co.*, 2009 WL 5604383, at *2 (S.D.N.Y. Feb. 3, 2009) ("[T]he Court's duty under *Daubert* is to examine the 'fit' between the expert's proposed testimony and the relevance to the jury in deciding the issue.")

Both experts begin with the assumption that a vehicle is susceptible to unintended rotation and, working backwards, opine that SDM prolongation is necessary in such a vehicle to prolong airbag deployment capability in the event of an inadvertent key rotation.  (Ex. 11, Loudon Rpt. at 47 ("GM should have designed its SDMs to remain active and allow the airbags to deploy for a

Case 1:14-md-02543-JMF Document 5835 Filed 07/20/18 Page 30 of 32

reasonable period of time *after the ignition switch has moved from RUN to ACC or OFF* where the vehicle is still in motion."); Ex. 9, Stevick Rpt. at 60 ("Alternative designs were available to GM and New GM to ensure that safety systems remained active *in the event the ignition switch moved out of RUN*—a concept called 'airbag prolongation.'").) But if New GM implemented remedies that effectively address inadvertent key rotation in the recalled vehicles, which the admissible evidence confirms to be true, then there would be no need for SDM prolongation and thus any SDM prolongation opinions are irrelevant. The relevant issue is whether the remedies have effectively addressed inadvertent key rotation, and Loudon admits that SDM prolongation does not address that issue. (Ex. 1, 12/7/2017 Loudon Dep. Tr. at 80:7-10 ("Q. Now, you agree that the concept of SDM prolongation does not address the issue of inadvertent key rotation, correct? A. Yes. I understand that."); *see also id.* at 28:21-29:2; 61:7-14; 76:2-8; 76:23-77:2; 79:14-18; 94:19-95:14; 97:11-16; 117:7-18; 125:12-21; 131:24-132:10.) These SDM prolongation opinions are not directed towards the effectiveness of the remedies but to an issue that this case does not present. Consequently, the Court should exclude Loudon's and Stevick's SDM prolongation opinions because they are irrelevant. Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 591.

## CONCLUSION

For the foregoing reasons, New GM respectfully requests the Court grant New GM's motion to exclude the above described opinions under *Daubert* and Federal Rule of Evidence 702.

Case 1:14-md-02543-JMF    Document 5853    Filed 07/20/18    Page 31 of 32

DATED:  July 20, 2018                              Respectfully submitted,


                                                   */s/ Richard C. Godfrey P.C.*
                                                   Richard C. Godfrey, P.C.
                                                   Andrew B. Bloomer, P.C.
                                                   KIRKLAND & ELLIS LLP
                                                   300 North LaSalle Street
                                                   Chicago, IL  60654
                                                   Tel: (312) 862-2000
                                                   Fax: (312) 862-2200
                                                   rgodfrey@kirkland.com
                                                   abloomer@kirkland.com

                                                   Attorneys for General Motors LLC

Case 1:14-md-02543-JMF    Document 5855    Filed 07/20/18    Page 32 of 32

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing Memorandum Of Law In support of General Motors LLC's Motion To Exclude Opinions Under *Daubert* And Federal Rule Of Evidence 702 using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.

*/s/ Andrew B. Bloomer*
Andrew B. Bloomer

## **EXHIBIT C-1**

**THE ECONOMIC LOSS PLAINTIFFS'** *MOTION TO CERTIFY*
*BELLWETHER CLASSES IN CALIFORNIA, MISSOURI, AND TEXAS*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | |
| This Document Relates to: | |
| ALL ACTIONS | |

## ECONOMIC LOSS PLAINTIFFS' MOTION TO CERTIFY BELLWETHER CLASSES IN CALIFORNIA, MISSOURI, AND TEXAS

Case 1:14-md-02543-JMF    Document 5835    Filed 07/20/18    Page 2 of 18

# TABLE OF CONTENTS

A.     The California Bellwether Classes and Subclasses .........................................1

    1.    The California Delta Ignition Switch Defect Class and Subclass...........................1

    2.    The California Recall 14v355 Low Torque Ignition Switch Defect Class .............2

    3.    The California Knee-to-Key Camaro Defect Class and Subclass ..........................3

    4.    The California Side Airbag Defect Class and Subclass...........................................3

    5.    The California Power Steering Defect Class and Subclass ....................................4

    6.    The Delta Ignition Switch Defect Bankruptcy Class ................................................5

B.     The Missouri Bellwether Classes.....................................................................5

    1.    The Missouri Delta Ignition Switch Defect Class ...................................................6

    2.    The Missouri Delta Ignition Switch Defect Successor Liability Class...................6

    3.    The Missouri Recall 14v355 Low Torque Ignition Switch Defect Class...............7

    4.    The Missouri Recall 14v400 Low Torque Ignition Switch Defect Class...............7

    5.    The Missouri Knee-to-Key Camaro Defect Class ...................................................8

    6.    The Missouri Side Airbag Defect Class....................................................................8

    7.    The Missouri Power Steering Defect Class ..............................................................9

    8.    The Missouri Delta Ignition Switch Defect Bankruptcy Class...............................9

C.     The Texas Bellwether Classes .......................................................................10

    1.    The Texas Delta Ignition Switch Defect Class.....................................................10

    2.    The Texas Recall 14v355 Low Torque Ignition Switch Defect Class..................10

    3.    The Texas Recall 14v394 Low Torque Ignition Switch Defect Class..................11

    4.    The Texas Recall 14v400 Low Torque Ignition Switch Defect Class..................11

    5.    The Texas Power Steering Defect Class................................................................12

010440-11 1012563 V1

The Economic Loss Plaintiffs move for an order under Fed. R. Civ. P. 23(b)(3) certifying the California, Missouri, and Texas bellwether Classes and Subclasses identified below.  This Motion is based on the concurrently filed Economic Loss Plaintiffs' Memorandum in Support of Motion to Certify Bellwether Classes in California, Missouri, and Texas and its associated Economic Loss Plaintiffs' Offer of Proof, in addition to the record on file herein.

Excluded from the Classes and Subclasses identified below are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of New GM; New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated Court staff assigned to this case.

## A.      The California Bellwether Classes and Subclasses

Each California Class and Subclass brings claims for violations of the California Consumer Legal Remedies Act, violations of the California Unfair Competition Law, and fraud by concealment, with the following exceptions:[1]  (i) the Magnuson-Moss/Song-Beverly Implied Warranty Subclasses bring claims for violations of the Magnuson-Moss Warranty Act and the California Song-Beverly Consumer Warranty Act, and (ii) the California Delta Ignition Switch Defect Bankruptcy Class brings claims for fraud by concealment of the right to file a claim against Old GM in bankruptcy.

### 1.      The California Delta Ignition Switch Defect Class and Subclass

*The California Delta Ignition Switch Defect Class*:  All persons who bought or leased in the State of California a Delta Ignition Switch Vehicle at some point during the time period July 10, 2009 through February 13, 2014.

---

[1] The Court has dismissed the California Plaintiffs' claims for negligent failure to recall and, for when warranties are in place, unjust enrichment.  The Court has also dismissed the California Plaintiffs' successor liability claims.

010440-11 1012563 V1

The following Delta Ignition Switch Vehicles are included in the California Delta Ignition Switch Defect Class:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2011 Chevrolet HHR |
| 2007-2010 Pontiac G5 |
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

The proposed representatives for the California Delta Ignition Switch Defect Class are Chimen Basseri and David Padilla.

***The California Delta Ignition Switch Defect Magnuson-Moss/Song-Beverly and Implied Warranty Subclass***:  All persons whose Delta Ignition Switch Vehicle was bought or leased as a new or Certified Pre-Owned vehicle.

The proposed representative for the California Delta Ignition Switch Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass is David Padilla.

**2.    The California Recall 14v355 Low Torque Ignition Switch Defect Class**

All persons who bought or leased in the State of California a Recall 14v355 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through June 19, 2014.

The following Recall 14v355 Low Torque Ignition Switch Vehicles are included in the California Recall 14v355 Low Torque Ignition Switch Defect Class:

| VEHICLES |
| --- |
| 2005-2009 Buick Lacrosse |
| 2006-2014 Chevrolet Impala |
| 2000-2005 Cadillac Deville |
| 2006-2011 Cadillac DTS |

| VEHICLES |
|---|
| 2006-2011 Buick Lucerne |
| 2006-2007 Chevrolet Monte Carlo |

The proposed representative for the California Recall 14v355 Low Torque Ignition Switch Defect Class is Michelle Thomas.

### 3.    The California Knee-to-Key Camaro Defect Class and Subclass

*The California Knee-to-Key Camaro Defect Class*:  All persons who bought or leased in the State of California a 2010-2014 Chevrolet Camaro at some point during the time period July 10, 2009 through June 18, 2014.

The proposed representative for the California Knee-to-Key Camaro Defect Class is Santiago Orosco.

*The California Knee-to-Key Camaro Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass*:  All persons whose Camaro vehicle was bought or leased as a new or Certified Pre-Owned vehicle.

The proposed representative for the California Knee-to-Key Camaro Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass is Santiago Orosco.

### 4.    The California Side Airbag Defect Class and Subclass

*The California Side Airbag Defect Class*:  All persons who bought or leased in the State of California a Side Airbag Defect Vehicle at some point during the time period July 10, 2009 through March 16, 2014.

The following Side Airbag Defect Vehicles are included in the California Side Airbag Defect Class:

| VEHICLES |
|---|
| 2008-2013 Buick Enclave |
| 2009-2013 Chevrolet Traverse |

- 3 -

Case 1:14-md-02543-JMF    Document 5805    Filed 07/20/18    Page 6 of 16

| VEHICLES |
|---|
| 2008-2013 GMC Acadia |
| 2008-2010 Saturn Outlook |

The proposed representative for the California Side Airbag Defect Class is Kellie Cereceres.

**The California Side Airbag Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass**:  All persons whose Side Airbag Defect Vehicle was bought or leased as a new or Certified Pre-Owned vehicle.

The proposed representative for the California Side Airbag Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass is Kellie Cereceres.

5.    **The California Power Steering Defect Class and Subclass**

**The California Power Steering Defect Class**:  All persons who bought or leased in the State of California a Power Steering Defect Vehicle at some point during the time period July 10, 2009 through March 30, 2014.

The following Power Steering Defect Vehicles are included in the California Power Steering Defect Class:

| VEHICLES |
|---|
| 2004-2006 and 2008-2009 Chevrolet Malibu |
| 2004-2006 Chevrolet Malibu Maxx |
| 2009-2010 Chevrolet HHR |
| 2008-2010 Saturn Outlook |
| 2010 Chevrolet Cobalt |
| 2005-2006 and 2008-2009 Pontiac G6 |
| 2004-2007 Saturn ION |
| 2008-2009 Saturn Aura |

The proposed representative for the California Power Steering Defect Class is David Padilla.

*The California Power Steering Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass*:  All persons whose Power Steering Defect Vehicle was bought or leased as a new or Certified Pre-Owned vehicle.

The proposed representative for the California Power Steering Defect Magnuson-Moss/Song-Beverly Implied Warranty Subclass is David Padilla.

### 6.    The Delta Ignition Switch Defect Bankruptcy Class

All persons who resided in the State of California and owned or leased a Delta Ignition Switch Vehicle at some point during the time period July 10, 2009 through November 30, 2009.

The following Delta Ignition Switch Vehicles are included in the California Delta Ignition Switch Defect Bankruptcy Class:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2011 Chevrolet HHR |
| 2007-2010 Pontiac G5 |
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

The proposed representatives for the California Delta Ignition Switch Defect Bankruptcy Class are Patricia Barker, Michael and Sylvia Benton, Kimberly Brown-Shipley, Crystal Hardin, Javier Malaga, Winifred Mattos, Esperanza Ramirez, and William Rukeyser.

## B.    The Missouri Bellwether Classes

Each Missouri Class brings claims for violations of the Missouri Merchandising Practices Act and fraud by concealment, except that the Missouri Delta Ignition Switch Defect Bankruptcy

010440-11 1012563 V1

Class brings claims for fraud by concealment of the right to file a claim against Old GM in bankruptcy.[2]

### 1.    The Missouri Delta Ignition Switch Defect Class

All persons who bought or leased in the State of Missouri a Delta Ignition Switch Vehicle at some point during the time period July 10, 2009 through February 13, 2014.

The following Delta Ignition Switch Vehicles are included in the Missouri Delta Ignition Switch Defect Class:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2011 Chevrolet HHR |
| 2007-2010 Pontiac G5 |
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

The proposed representatives for the Missouri Delta Ignition Switch Defect Class are Brad Akers and Cynthia Hawkins.

### 2.    The Missouri Delta Ignition Switch Defect Successor Liability Class

All persons who bought or leased in the State of Missouri a Delta Ignition Switch Vehicle at some point before July 10, 2009.

The following Delta Ignition Switch Vehicles are included in the Missouri Delta Ignition Switch Defect Successor Liability Class if bought or leased before to July 10, 2009:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2010 Chevrolet HHR |
| 2007-2010 Pontiac G5 |

---

[2] The Court has dismissed the Missouri Plaintiffs' claim for unjust enrichment to the extent that express warranties were in place.

010440-11 1012563 V1

| VEHICLES |
|---|
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

The proposed representatives for the Missouri Delta Ignition Switch Defect Successor Liability Class are Patrice Witherspoon and Kenneth Robinson.

### 3. The Missouri Recall 14v355 Low Torque Ignition Switch Defect Class

All persons who bought or leased in the State of Missouri a Recall 14v355 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through June 19, 2014.

The following Recall 14v355 Low Torque Ignition Switch Vehicles are included in the Missouri Recall 14v355 Low Torque Ignition Switch Defect Class:

| VEHICLES |
|---|
| 2005-2009 Buick Lacrosse |
| 2006-2014 Chevrolet Impala |
| 2000-2005 Cadillac Deville |
| 2006-2011 Cadillac DTS |
| 2006-2011 Buick Lucerne |
| 2006-2007 Chevrolet Monte Carlo |

The proposed representative for the Missouri Recall 14v355 Low Torque Ignition Switch Defect Class is Ronald Robinson.

### 4. The Missouri Recall 14v400 Low Torque Ignition Switch Defect Class

All persons who bought or leased in the State of Missouri a Recall 14v400 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through July 2, 2014.

The following Recall 14v400 Low Torque Ignition Switch Vehicles are included in the Missouri Recall 14v400 Low Torque Ignition Switch Defect Class:

010440-11 1012563 V1

| VEHICLES |
|---|
| 2000-2005 Chevrolet Impala |
| 1997-2003 Chevrolet Malibu |
| 2004-2005 Chevrolet Malibu Classic |
| 2000-2005 Chevrolet Monte Carlo |
| 1999-2004 Oldsmobile Alero |
| 1998-2002 Oldsmobile Intrigue |
| 1999-2005 Pontiac Grand Am |
| 2004-2008 Pontiac Grand Prix |

The proposed representative for the Missouri Recall 14v400 Low Torque Ignition Switch Defect Class is Deloris Hamilton.

**5.     The Missouri Knee-to-Key Camaro Defect Class**

All persons who bought or leased in the State of Missouri a 2010-2014 Chevrolet Camaro at some point during the time period July 10, 2009 through June 18, 2014.

The proposed representative for the Missouri Knee-to-Key Camaro Defect Class is Mario Stefano.

**6.     The Missouri Side Airbag Defect Class**

All persons who bought or leased in the State of Missouri a Side Airbag Defect Vehicle at some point during the time period July 10, 2009 through March 16, 2014.

The following Side Airbag Defect Vehicles are included in the Missouri Side Airbag Defect Class:

| VEHICLES |
|---|
| 2008-2013 Buick Enclave |
| 2009-2013 Chevrolet Traverse |
| 2008-2013 GMC Acadia |
| 2008-2010 Saturn Outlook |

The proposed representative for the Missouri Side Airbag Defect Class is Christopher Tinen.

010440-11 1012563 V1

Case 1:14-md-02543-JMF    Document 5849    Filed 04/20/18    Page 21 of 29

7.      **The Missouri Power Steering Defect Class**

All persons who bought or leased in the State of Missouri a Power Steering Defect Vehicle at some point during the time period July 10, 2009 through March 30, 2014.

The following Power Steering Defect Vehicles are included in the Missouri Power Steering Defect Class:

| VEHICLES |
| --- |
| 2004-2006 and 2008-2009 Chevrolet Malibu |
| 2004-2006 Chevrolet Malibu Maxx |
| 2009-2010 Chevrolet HHR |
| 2008-2010 Saturn Outlook |
| 2010 Chevrolet Cobalt |
| 2005-2006 and 2008-2009 Pontiac G6 |
| 2004-2007 Saturn ION |
| 2008-2009 Saturn Aura |

The proposed representatives for the Missouri Power Steering Defect Class are Brad Akers and Cynthia Hawkins.

8.      **The Missouri Delta Ignition Switch Defect Bankruptcy Class**

All persons who resided in the State of Missouri and owned or leased a Delta Ignition Switch Vehicle at some point during the time period July 10, 2009 through November 30, 2009.

The following Delta Ignition Switch Vehicles are included in the Missouri Delta Ignition Switch Defect Bankruptcy Class:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2011 Chevrolet HHR |
| 2007-2010 Pontiac G5 |
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

- 9 -

Case 1:14-md-02543-JMF   Document 5845   Filed 07/20/18   Page 12 of 26

The proposed representatives for the Missouri Delta Ignition Switch Defect Bankruptcy Class are Brad Akers, Kenneth Robinson, and Patrice Witherspoon.

## C.     The Texas Bellwether Classes

Each Texas Class brings claims for violations of the Texas Deceptive Trade Practices—Consumer Protection Act.[3]

### 1.     The Texas Delta Ignition Switch Defect Class

All persons who bought or leased in the State of Texas a Delta Ignition Switch Vehicle at some point during the time period July 10, 2009 through February 13, 2014 and whose vehicle had an ignition switch related malfunction.

The following Delta Ignition Switch Vehicles are included in the Texas Delta Ignition Switch Defect Class:

| VEHICLES |
| --- |
| 2005-2010 Chevrolet Cobalt |
| 2006-2011 Chevrolet HHR |
| 2007-2010 Pontiac G5 |
| 2007-2010 Saturn Sky |
| 2003-2007 Saturn ION |
| 2006-2010 Pontiac Solstice |

The proposed representative for the Texas Delta Ignition Switch Defect Class is Michael Graciano.

### 2.     The Texas Recall 14v355 Low Torque Ignition Switch Defect Class

All persons who bought or leased in the State of Texas a Recall 14v355 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through June 19, 2014 and whose vehicle had an ignition switch related malfunction.

---

[3] The Court has dismissed the Texas Plaintiffs' claims for fraud by concealment and unjust enrichment.

Case 1:14-md-02543-JMF    Document 5869    Filed 05/12/18    Page 13 of 29

The following Recall 14v355 Low Torque Ignition Switch Vehicles are included in the Texas Recall 14v355 Low Torque Ignition Switch Defect Class:

| VEHICLES |
| --- |
| · 2005-2009 Buick Lacrosse |
| · 2006-2014 Chevrolet Impala |
| · 2000-2005 Cadillac Deville |
| · 2006-2011 Cadillac DTS |
| · 2006-2011 Buick Lucerne |
| · 2006-2007 Chevrolet Monte Carlo |

The proposed representative for the Texas Recall 14v355 Low Torque Ignition Switch Defect Class is Dawn Fuller.

**3.     The Texas Recall 14v394 Low Torque Ignition Switch Defect Class**

All persons who bought or leased in the State of Texas a Recall 14v394 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through July 2, 2014 and whose vehicle had an ignition switch related malfunction.

The following Recall 14v394 Low Torque Ignition Switch Vehicles are included in the Texas Recall 14v394 Low Torque Ignition Switch Defect Class:

| VEHICLES |
| --- |
| 2003-2014 Cadillac CTS |
| 2004-2006 Cadillac SRX |

The proposed representative for the Texas Recall 14v394 Low Torque Ignition Switch Defect Class is Dawn Bacon.

**4.     The Texas Recall 14v400 Low Torque Ignition Switch Defect Class**

All persons who bought or leased in the State of Texas a Recall 14v400 Low Torque Ignition Switch Vehicle at some point during the time period July 10, 2009 through July 2, 2014, and whose vehicle had an ignition switch related malfunction.

- 11 -

Case 1:14-md-02543-JMF   Document 5845-1   Filed 07/20/18   Page 24 of 29

The following Recall 14v400 Low Torque Ignition Switch Vehicles are included in the
Texas Recall 14v400 Low Torque Ignition Switch Defect Class:

| VEHICLES |
|---|
| 2000-2005 Chevrolet Impala |
| 1997-2003 Chevrolet Malibu |
| 2004-2005 Chevrolet Malibu Classic |
| 2000-2005 Chevrolet Monte Carlo |
| 1999-2004 Oldsmobile Alero |
| 1998-2002 Oldsmobile Intrigue |
| 1999-2005 Pontiac Grand Am |
| 2004-2008 Pontiac Grand Prix |

The proposed representative for the Texas Recall 14v400 Low Torque Ignition Switch
Defect Class is Gareebah Al-Ghamdi.

**5.      The Texas Power Steering Defect Class**

All persons who bought or leased in the State of Texas a Power Steering Defect Vehicle
at some point during the time period July 10, 2009 through March 30, 2014 and whose vehicle
had a power steering related malfunction.

The following Power Steering Defect Vehicles are included in the Texas Power Steering
Defect Class:

| VEHICLES |
|---|
| 2004-2006 and 2008-2009 Chevrolet Malibu |
| 2004-2006 Chevrolet Malibu Maxx |
| 2009-2010 Chevrolet HHR |
| 2008-2010 Saturn Outlook |
| 2010 Chevrolet Cobalt |
| 2005-2006 and 2008-2009 Pontiac G6 |
| 2004-2007 Saturn ION |
| 2008-2009 Saturn Aura |

010440-11 1012563 V1

Case 1:14-md-02543-JMF    Document 5864    Filed 07/20/18    Page 25 of 29

The proposed representative for the Texas Power Steering Defect Class is Lisa McClellan.

DATED: July 20, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

                                       By: _____*/s/ Steve W. Berman*_____
                                             Steve W. Berman
                                       *steve@hbsslaw.com*
                                       Sean R. Matt
                                       *sean@hbsslaw.com*
                                       Andrew M. Volk
                                       *andrew@hbsslaw.com*
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       1918 Eighth Avenue, Suite 3300
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594


DATED: July 20, 2018                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                       By: _____*/s/ Elizabeth J. Cabraser*_____
                                             Elizabeth J. Cabraser
                                       *ecabraser@lchb.com*
                                       Rachel Geman
                                       *rgeman@lchb.com*
                                       275 Battery St., 29th Floor
                                       San Francisco, CA 94111
                                       Telephone: (415) 956-1000
                                       Facsimile: (415) 956-1008

                                       *Co-Lead Counsel with Primary Focus on Economic
                                       Loss Cases*

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on July 20, 2018, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steve W. Berman*
Steve W. Berman

## <u>EXHIBIT C-2</u>

**THE ECONOMIC LOSS PLAINTIFFS'** *MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY BELLWETHER CLASSES IN CALIFORNIA, MISSOURI, AND TEXAS*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | No. 14-MD-2543 (JMF) |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | |
| This Document Relates to: | |
| ALL ACTIONS | |

**ECONOMIC LOSS PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
TO CERTIFY BELLWETHER CLASSES IN CALIFORNIA, MISSOURI, AND TEXAS**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF FACTS .................................................................................... 3

      A.      Recall 14v047 (Delta Ignition Switch Defect)...................................... 3

      B.      Recall 14v355. ........................................................................................ 4

      C.      Recall 14v394. ........................................................................................ 4

      D.      Recall 14v400. ........................................................................................ 5

      E.      Recall 14v346 (Knee-to-Key Defect). .................................................. 5

      F.      Recall 14v118 (Side Airbag Defect)...................................................... 5

      G.      Recall 14v153 (Power Steering Defect). .............................................. 6

III.    APPLICABLE LEGAL STANDARDS .............................................................. 6

IV.     THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF
      RULE 23(A)...................................................................................................... 7

      A.      The members of the Classes are so numerous that joinder is
            impracticable........................................................................................... 7

      B.      Numerous common issues exist because the focus is on GM's
            common course of conduct. ................................................................... 10

      C.      Plaintiffs' claims are typical of those of other members of the
            Classes because the claims arise from a common course of conduct
            and are pled under common legal theories. ......................................... 11

      D.      Plaintiffs and their counsel will adequately represent the interests
            of the Classes. ....................................................................................... 13

V.      THE COURT SHOULD CERTIFY THE BELLWETHER CLASSES
      UNDER RULE 23(B)(3) ............................................................................... 14

      A.      Common issues of fact and law predominate because legal and
            factual questions will be resolved with proof common to all
            Plaintiffs and Class members............................................................... 14

            1.      Plaintiffs will prove with common evidence that GM
                  violated California, Missouri, and Texas consumer
                  protection statutes. ................................................................. 16

010440-11 1014023 V1

a.    Common issues predominate for the California
consumer statute claims. ............................................ 16

b.    Common issues predominate for the Missouri
Merchandising Practices Act claim. ........................... 20

c.    Common issues predominate for the Texas
Deceptive Trade Practices—Consumer Protection
Act claim. .................................................................... 23

2.    Plaintiffs will prove with common evidence that GM
fraudulently concealed the defects from the Classes, and
common issues will predominate for Plaintiffs' fraudulent
concealment claims. ................................................................. 24

3.    Plaintiffs will prove with common evidence that GM
fraudulently concealed the right to file a claim against Old
GM in bankruptcy, and common issues will predominate
for this claim. ........................................................................... 25

4.    Plaintiffs will prove with common evidence that GM
breached implied warranties and violated the Magnuson-
Moss Warranty Act, and common issues will predominate
for Plaintiffs' implied warranty claims. .................................. 26

5.    Plaintiffs will use common evidence to prove causation and
the amount of damages, and Plaintiffs' damages models
satisfy the *Comcast* standard. ................................................. 27

a.    Plaintiffs will prove Class-wide benefit-of-the-
bargain loss using common evidence. ......................... 28

b.    Plaintiffs will prove Class-wide consequential
damages using common evidence. ............................... 32

B.    A Class action is a superior method of adjudicating this dispute. ....................... 33

VI.    PROPOSED TRIAL PROCEDURE .................................................................... 36

VII.    CONCLUSION ................................................................................................... 36

CERTIFICATE OF SERVICE .......................................................................................... 38

010440-11 1014023 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allen v. Hyland's Inc.*,
    300 F.R.D. 643 (C.D. Cal. 2014) ............................................................. 9

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................... 6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ............................................................................... 7

*In re Amla Litig.*,
    282 F. Supp. 3d 751 (S.D.N.Y. 2017) ..................................................... 28

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) .............................................................. 30

*Arnold v. Alton R. Co.*,
    154 S.W.2d 58 (Mo. 1941) ..................................................................... 32

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
    945 S.W.2d 812 (Tex. 1997) .................................................................. 29

*Banks v. Nissan N. Am., Inc.*,
    301 F.R.D. 327 (N.D. Cal. 2013) ........................................................... 19

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011) ................................................................... 33

*Belfiore v. Proctor & Gamble Co.*,
    311 F.R.D. 29 (E.D.N.Y. 2015) ............................................................... 9

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ................................................................. 36

*Boundas v. Abercrombie & Fitch Stores, Inc.*,
    280 F.R.D. 408 (N.D. Ill. 2012) ......................................................... 9, 10

*Brazil v. Dell Inc.*,
    585 F. Supp. 2d 1158 (N.D. Cal. 2008) ................................................. 23

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
    290 F.R.D. 409 (S.D.N.Y. 2012) ........................................................ 8, 10

010440-11 1014023 V1

*Carnegie v. Household Int'l, Inc.*,
    376 F3d 656 (7th Cir. 2004) ....................................................36

*Carriuolo v. Gen. Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ..........................................10, 16

*Chamberlan v. Ford Motor Co.*,
    223 F.R.D. 524 (N.D. Cal. 2004) ......................................10, 16

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ....................................................11

*In re Chatterley*,
    2005 WL 6960176 (B.A.P. 9th Cir. May 23, 2005) ..................32

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .......................................................27, 32

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................23, 30

*Cross v. 21st Century Holding Co.*,
    2004 WL 307306 (S.D.N.Y. Feb. 18, 2004) .............................7

*Daffin v. Ford Motor Co.*,
    458 F.3d 549 (6th Cir. 2006) ....................................................13

*Dandong v. Pinnacle Performance Ltd.*,
    2013 U.S. Dist. LEXIS 150259 (S.D.N.Y. Oct. 17, 2013) ........... *passim*

*Danzig v. Grynberg & Assocs.*,
    161 Cal. App. 3d 1128 (1984) ..................................................25

*Daugherty v. Am. Honda Motor Co.*,
    144 Cal. App. 4th 824 (2006) ...................................................16

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    320 F.R.D. 326 (D.N.H. 2017) .................................................29

*Doyle v. Chrysler Grp. LLC*,
    2014 WL 7690155 (C.D. Cal. Oct. 9, 2014) ............................12

*Dzielak v. Whirlpool Corp.*,
    2017 U.S. Dist. LEXIS 39232 (D.N.J. Mar. 17, 2017) ............31

*Ebin v. Kangadis Food, Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ................................................9

010440-11 1014023 V1

*Edwards v. Ford Motor Co.*,
  603 F. App'x 538 (9th Cir. 2015) .........................................................19

*Ehret v. Uber Techs., Inc.*,
  148 F. Supp. 3d 884 (N.D. Cal. 2015) ...................................................19

*Falco v. Nissan N. Am., Inc.*,
  2016 U.S. Dist. LEXIS 46115 (C.D. Cal. Apr. 5, 2016) .......................19

*Fazio v. Cypress/GR Houston I, L.P.*,
  403 S.W.3d 390 (Tex. App. 2013)...........................................................29

*Flynn v. FCA US LLC*,
  2018 U.S. Dist. LEXIS 111963 (S.D. Ill. July 5, 2018) .......................22

*In re Folding Carton Antitrust Litig.*,
  75 F.R.D. 727 (N.D. Ill. 1977).................................................................6

*Galvan v. KDI Distrib.*,
  2011 U.S. Dist. LEXIS 127602 (C.D. Cal. Oct. 25, 2011)....................19

*Gen. Motors Corp. v. Bryant*,
  285 S.W.3d 634 (Ark. 2008)............................................................16, 34

*In re GM LLC Ignition Switch Litig.*,
  2016 U.S. Dist. LEXIS 92499 (S.D.N.Y. July 15, 2016) .............. *passim*

*In re GM LLC Ignition Switch Litig.*,
  257 F. Supp. 3d 372 (S.D.N.Y. 2017)................................................23, 32

*Guido v. L'Oreal USA, Inc.*,
  2013 WL 3353857 (C.D. Cal. July 1, 2013)...........................................18

*Guido v. L'Oreal, USA, Inc.*,
  2014 U.S. Dist. LEXIS 165777 (C.D. Cal. July 24, 2014)....................30

*Hartless v. Clorox Co.*,
  273 F.R.D. 630 (S.D. Cal. 2011) ............................................................34

*Heberer v. Shell Oil Co.*,
  744 S.W.2d 441 (Mo. 1988) ...................................................................29

*Hope v. Nissan N. Am., Inc.*,
  353 S.W.3d 68 (Mo. Ct. App. 2011).................................................20, 22

*Isip v. Mercedes-Benz USA, LLC*,
  155 Cal. App. 4th 19 (2007) ...................................................................26

010440-11 1014023 V1

*Isip v. Mercedes-Benz USA, LLC,*
    65 Cal. Rptr. 3d 695 (Cal. App. 2007) ....................................................................29

*Keegan v. Am. Honda Motor Co.,*
    284 F.R.D. 504 (C.D. Cal. 2012) ..................................................................... *passim*

*Khoday v. Symantec Corp.,*
    93 F. Supp. 3d 1067 (D. Minn. 2015) .....................................................................30

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. 2004) ...............................................................................35

*Little v. Kia Motors of Am., Inc.,*
    2018 WL 3446734 (N.J. Sup. Ct. July 18, 2018) ....................................................28

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012) ....................................................................................12

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ....................................................................................12

*McKell v. Wash. Mut., Inc.,*
    142 Cal. 4th 1457 (2006) .........................................................................................17

*McKenzie v. Fed. Express Corp.,*
    275 F.R.D. 290 (C.D. Cal. 2011) .............................................................................35

*Medrazo v. Honda of N. Hollywood,*
    205 Cal. App. 4th 1 (2012) ......................................................................................19

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) .....................................................................................7

*Microsoft Corp. v. Motorola Mobility, Inc.,*
    904 F. Supp. 2d 1109 (W.D. Wash. 2012) ..............................................................31

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002) .............................................................................15, 25

*Motley v. Jaguar Land Rover N. Am., LLC,*
    2012 Conn. Super. LEXIS 2701 (Conn. Super. Ct. Nov. 1, 2012) ...................11, 12

*In re Motors Liquidation Co.,*
    529 B.R. 510 (Bankr. S.D.N.Y. 2015) .....................................................................26

*In re Motors Liquidation Co.,*
    541 B.R. 104 (Bankr. S.D.N.Y. 2015) .......................................................................4

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016)..................................................................................25

*In re MTBE Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ..........................................................................10

*In re Myford Touch Consumer Litig.*,
    291 F. Supp. 3d 936 (N.D. Cal. 2018) ...................................................................29

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................................7

*Occidental Land, Inc. v. Superior Court*,
    18 Cal. 3d 355 (1976) ..........................................................................................24

*Parkinson v. Hyundai Motor Am.*,
    258 F.R.D. 580 (C.D. Cal. 2008)................................................................16, 18, 34

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017).............................................................................8, 15

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)................................................................................................6

*Plubell v. Merck & Co.*,
    289 S.W.3d 707 (Mo. Ct. App. 2009)....................................................................22

*In re POM Wonderful LLC Mktg. & Sales Practices Litig.*,
    2012 U.S. Dist. LEXIS 141150 (C.D. Cal. Sept. 28, 2012)...................................18

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ................................................................................29

*Ries v. Ariz. Beverages USA LLC*,
    287 F.R.D. 523 (N.D. Cal. 2012)......................................................................10, 11

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)..................................................................................12

*Rosen v. J.M. Auto Inc.*,
    270 F.R.D. 675 (S.D. Fla. 2009) ...........................................................................16

*Sanchez-Knutson v. Ford Motor Co.*,
    310 F.R.D. 529 (S.D. Fla. 2015) ...........................................................................30

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994) .................................................................................17

*Schoenlein v. Routt Homes, Inc.*,
260 S.W.3d 852 (Mo. Ct. App. 2008) ........................................................29

*Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*,
199 S.W.3d 228 (Mo. Ct. App. 2006) ........................................................21

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) ..........................................................9, 30

*Seymour v. House*,
305 S.W.2d 1 (Mo. 1957) ......................................................................32

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
659 F.3d 234 (2d Cir. 2011) ..................................................................28

*Spradling v. Williams*,
566 S.W.2d 561 (Tex. 1978) ..................................................................23

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) ...........................................................17, 18

*Sykes v. Mel Harris & Assocs., LLC*,
285 F.R.D. 279 (S.D.N.Y. 2012) .........................................................33, 34

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ................................................................27, 28

*Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*,
219 S.W.3d 563 (Tex. App. 2007) ............................................................32

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ..........................................................................25

*In re Toyota Motor Corp.*,
790 F. Supp. 2d 1152 (C.D. Cal. 2011) ....................................................28

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab.
Litig.*,
2012 WL 4904412 (C.D. Cal. Sep. 20, 2012) ..........................................31

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &
Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...............................................17, 20

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013) ...............................................30, 31

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................14

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ...........................................................................7, 36

*Vaccarino v. Midland Nat'l Life Ins. Co.*,
    2014 WL 572365 (C.D. Cal. Feb. 3, 2014) ........................................................32

*Vasquez v. Superior Court*,
    4 Cal. 3d 800 (1971) ...........................................................................................24

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................................12

*In re Visa Check/Master Money Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ...............................................................................35

*Von Brimer v. Whirlpool Corp.*,
    536 F.2d 838 (9th Cir. 1976) ..............................................................................32

*Wilner v. Sunset Life Ins. Co.*,
    78 Cal. App. 4th 952 (2000) ..........................................................................24, 25

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) .................................................................. *passim*

*Yamada v. Nobel Biocare Holding AG*,
    275 F.R.D. 573 (C.D. Cal. 2011) .......................................................................20

## STATUTES

CAL. BUS. & PROF. CODE § 17200 ..........................................................................16, 17

CAL. CIV. CODE § 1770(a) ............................................................................................16

CAL. CIV. CODE § 1791.1 ..............................................................................................26

CAL. CIV. CODE § 1750 ..................................................................................................16

MO. CODE REGS. tit. 15, § 60-8.020 .............................................................................21

MO. CODE REGS. tit. 15, § 60-9.010 .............................................................................22

MO. CODE REGS. tit. 15, § 60-9.020 .............................................................................21

MO. CODE REGS. tit. 15, § 60-9.040 .............................................................................21

MO. CODE REGS. tit. 15, § 60-9.110 .............................................................................21

- ix -

Mo. Rev. Stat. § 400.2-714(2) ................................................................29

Mo. Rev. Stat. § 407.020(1) .............................................................20, 21

Mo. Rev. Stat. § 407.025.2 ..................................................................22

Tex. Bus. & Com. Code § 17.45(5) ........................................................23

Tex. Bus. & Com. Code § 17.50(a)(3) ....................................................23

## Other Authorities

3 Conte & Newberg, Newberg on Class Actions, § 9:53 (4th ed. 2002) ..............36

7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal
    Practice and Procedure § 1781 (2d ed. 1986) ..................................36

Fed. R. Civ. P. 23(b)(3) .......................................................... *passim*

## I.     INTRODUCTION

Under Fed. R. Civ. P. 23(b)(3), the Economic Loss Plaintiffs seek certification of six bellwether Classes under California law, eight Classes under Missouri law, and five Classes under Texas law.  Because all elements of Rule 23(a) and (b)(3) are satisfied, the Court should certify the proposed Classes.

Rule 23(a)(1) numerosity is present because each proposed Class is comprised of thousands of owners or lessees of Class Vehicles, making joinder impracticable.  *See infra* at 7-10.  There are many common questions of law and fact arising from the uniform defects, GM's knowledge thereof, and GM's uniform omissions, thus satisfying Rule 23(a)(2) commonality.  The uniform defects demonstrated by GM's documents and Plaintiffs' experts, and the defects' impact on each Class, give rise to common questions for all Plaintiffs and Class members.  *See infra* at 10-11.

Rule 23(a)(3)'s typicality requirement is also satisfied.  Plaintiffs' claims are typical of the claims of all Class members because GM subjected each Class member to the same common omissions and uniform defects.  Plaintiffs and the Classes thus seek redress via common legal claims and remedial theories arising out of the same course of GM conduct.  *See infra* at 11-12. And Rule 23(a)(4)'s adequacy of representation requirement is fulfilled because Plaintiffs' interests are fully aligned with the Classes they seek to represent, and Plaintiffs are represented by well-qualified counsel who meet the requirements of Rule 23(g) and are diligently prosecuting the claims on behalf of each Class.  The interests of Plaintiffs and Class members are co-extensive given that each Plaintiff, like each Class member, has a strong interest in proving GM's liability and obtaining redress.  *See infra* at 13-14.

Plaintiffs are entitled to certification under Rule 23(b)(3) because common issues of law or fact predominate over questions affecting individual Class members, and class treatment is

superior to other methods of adjudication.  Common issues predominate because the salient legal and factual questions in this case will be resolved with proof common to all Plaintiffs and members of each Class.  Within each Class, Class Vehicles suffer unifying defects subject to common recall notices; GM was aware of the alleged defects at the time the vehicles were sold; GM had a duty to disclose its knowledge but failed to do so; and the facts that GM failed to disclose were material.  This evidence is essential to every Class member's effort to establish liability and every Class member's entitlement to relief.  *See infra* at 14-27.

Predominance is buttressed by the nature of the common proof required to calculate Class loss and restitution.  Benefit-of-the-bargain losses for the Classes will be calculated based on a widely-accepted conjoint analysis that reliably estimates the lesser amount that consumers would have paid for their GM vehicles had the consumers known of the defect.  Lost time damages will also be calculated using a common formula expertly applied to reliably quantify such damages on a class-wide basis.  *See infra* at 27-33.

Class treatment is superior under Rule 23(b)(3) because nearly all Class members have claims that are too small to litigate individually, and, indeed, the courthouse doors will be closed to almost all of these consumers unless a Class is certified.  GM has spared no expense in defending Plaintiffs' claims, leaving no stone unturned and fighting every issue, no matter how inconsequential.  No consumer can prove this case without the pooling of resources offered by the class mechanism.  Further, adjudicating claims in a single proceeding before this Court, which is already intimately familiar with the subject matter of this case, is much more efficient than a multiplicity of suits here and elsewhere that would unduly burden the judicial system.  A class action is a superior method of adjudicating Plaintiffs' claims.  *See infra* at 33-35.

Plaintiffs' case will rise or fall on common proof, that is, on facts common to most if not all members of each proposed Class. Each recall has its own Class, and the glue that binds all Class members together is GM's conduct towards each Class as a whole. Each recall involved the same GM internal investigation; the same presentation to the GM committee responsible for initiating a recall; the same description of the defect condition, root cause, and the effect of the defect; the same recall notice; and the same purported remedy. Given this common evidentiary focus, and because all required elements of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied, the Court should certify the proposed Classes and Subclasses.

## II.        SUMMARY OF FACTS

As the Court is aware, the record in this case is lengthy. For years, GM sold cars that it knew contained serious safety defects. It endangered its customers and shielded the truth from the public and the government until finally issuing in 2014 historic recalls of millions of affected vehicles. The recalls are themselves admissions that the affected vehicles were defective when sold—a unifying theme that binds all members of a given Class together. Rather than provide a detailed recitation of the facts here, Plaintiffs respectfully refer the Court to the concurrently filed Offer of Proof. We briefly summarize the facts, by recall, below.

### A.        Recall 14v047 (Delta Ignition Switch Defect).

In February and March 2014, GM recalled more than two million cars containing the defect known as the Delta Ignition Switch Defect. The nature of the defect was such that the ignition switch would unexpectedly move from the "run" position to the "accessory" or "off" position, thereby resulting in a "loss of electrical system," including power brakes, power steering, and airbags. General Motors Company (Old GM) knew about this defect as early as 1999,[1] as did GM

---

[1] Regarding whether GM can be liable based on knowledge it inherited from Old GM and Old GM employees, the Bankruptcy Court has ruled that "[a]ny acts by New GM personnel, or knowledge of New GM personnel (including

from day one of its existence, yet both companies continued to sell cars containing the defective switch.  *See* Offer of Proof §§ II.B, II.G.

**B.    Recall 14v355.**

In June 2014, GM issued Recall No. 14v355 for cars containing another ignition-switch defect.  Like the ignition switches included in Recall No. 14v047, the ignition switch in the 14v355 vehicles would unexpectedly move from the "run" position to the "accessory" or "off" position, thereby resulting in a loss of engine power, power braking and steering, and airbags.  Although Old GM had knowledge of this defect in 2002 given Old GM's cross-platform knowledge, Old GM certainly knew about this defect and its dangerous consequences no later than early 2005. Accordingly, GM knew of this defect from the very first day of its existence on July 10, 2009. Despite that knowledge, GM knowingly sold cars containing the defect and allowed them to remain on the road until the 2014 recall.  Offer of Proof §§ II.C, II.G.

**C.    Recall 14v394.**

GM issued yet another recall (14v394) for an ignition switch defect.  Like the switches giving rise to the other ignition switch recalls, the switch would unexpectedly move from the "run" position to the "accessory" or "off" position, thereby resulting in a loss of engine power, power braking and steering, and airbags.  Although Plaintiffs submit that Old GM had knowledge of this defect in 2002 given Old GM's cross-platform knowledge, there can be no question that Old GM knew about this defect and its dangerous consequences by no later than 2007, and GM knew about

---

knowledge that any of them might have acquired while previously working at Old GM) may … be imputed to New GM ….  Likewise, to the extent, as a matter of nonbankruptcy law, knowledge may be imputed as a consequence of documents in a company's files, documents in New GM's files may be utilized as a predicate for such knowledge, even if they first came into existence before the sale from Old GM to New GM."  *In re Motors Liquidation Co.*, 541 B.R. 104, 143 (Bankr. S.D.N.Y. 2015).  As set forth in the Offer of Proof and the exhibits cited therein, GM's knowledge is based in part on its post-bankruptcy knowledge and in part on knowledge and documents it inherited from Old GM.

- 4 -

the defect from its inception on July 10, 2009.  But despite that knowledge, GM knowingly sold cars containing the defects until it recalled those cars in June 2014.  *See* Offer of Proof §§ II.D, II.G.

**D.      Recall 14v400.**

In June 2014, GM issued Recall No. 14v400 and recalled millions of cars containing yet another ignition switch defect where the ignition switch would unexpectedly move from the "run" position to the "accessory" or "off" position, thereby resulting in a loss of engine power, power braking and steering, and airbags.  Although Old GM had knowledge of this defect in 2002 given Old GM's cross-platform knowledge, Old GM certainly knew about this defect and its dangerous consequences no later than January 2003, and GM knew about the defect from its inception on July 10, 2009.  But despite that knowledge, GM did not recall the vehicles until 2014.  *See* Offer of Proof §§ II.E, II.G.

**E.      Recall 14v346 (Knee-to-Key Defect).**

In June 2014, GM recalled Camaros containing the defect known as the Knee-to-Key Defect, with effects identical to those in the other ignition switch recalls:  the ignition switch would unexpectedly move from the "run" position to the "accessory" or "off" position, thereby resulting in a loss of engine power, power braking and steering, and airbags.  GM knew about this defect and its dangerous consequences no later than January 2010.  But despite that knowledge, GM knowingly sold cars containing the defect until it recalled those cars in 2014.  *See* Offer of Proof §§ II.F, II.G.

**F.      Recall 14v118 (Side Airbag Defect).**

In March 2014, GM recalled cars containing the defect known as the Side Airbag Defect. This defect involved corrosion and wear in the wiring harness connectors on a car's side airbags, which could cause a dashboard light to illuminate indicating a problem with the airbag, and, over

time, deteriorate so that the airbags would not function in a collision. Old GM was aware of this problem by 2007 at the latest. But despite possessing that knowledge from the first day of its existence on July 10, 2009, GM knowingly sold cars containing the Side Air Bag Defect and did not recall them until 2014. *See* Offer of Proof § II.I.

**G.    Recall 14v153 (Power Steering Defect).**

In 2014, GM recalled cars that had a Power Steering Defect, which caused vehicles to suddenly lose power steering while driving, thus increasing the risk of a crash. *Id.* Old GM knew about this defect as early as 2004, and GM knew about it from its inception on July 10, 2009. But despite that knowledge, GM knowingly sold cars containing the defect and did not recall them until 2014. *See* Offer of Proof § II.J.

## III.    APPLICABLE LEGAL STANDARDS

Class actions are an essential tool for adjudicating cases involving multiple claims that involve similar factual and/or legal inquiries and that are too modest to warrant prosecuting individually. In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Class actions thus give voice to plaintiffs who "would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Class actions also serve an important deterrent function: "The public at large . . . benefit[s] from a class action and expeditious adjudication of the issues involved, since class actions reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement." *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations omitted).

010440-11 1014023 V1

The party seeking certification must provide evidentiary proof that Rule 23's requirements
are satisfied. *Dandong v. Pinnacle Performance Ltd.*, 2013 U.S. Dist. LEXIS 150259, at *11
(S.D.N.Y. Oct. 17, 2013) (Furman, J.).[2]  In assessing a motion for class certification, the Court
conducts a "rigorous analysis" and may consider merits questions, but only to the extent that those
questions are relevant in determining whether all of the requirements of Rule 23 are satisfied. *Id.*
(quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)).  "[T]he office of a Rule
23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the metho[d] best
suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans &
Tr. Funds*, 568 U.S. 455, 460 (2013).

## IV.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.   The members of the Classes are so numerous that joinder is impracticable.

Rule 23(a) requires that the members of the Class be so numerous that joinder of all
members is impracticable.  "[I]mpracticable" does not mean impossible, and "Plaintiffs are not
obligated to prove the exact class size to satisfy numerosity." *Cross v. 21st Century Holding Co.*,
2004 WL 307306, at *1 (S.D.N.Y. Feb. 18, 2004).  Instead, the courts "may rely on reasonable
inferences drawn from the available facts in order to estimate the size of the class." *In re NASDAQ
Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996).  "[C]ourts are instructed to
consider all the circumstances surrounding the case, not merely the number of potential class
members," and "'[r]elevant considerations include judicial economy arising from the avoidance of
a multiplicity of actions, geographic dispersion of class members, financial resources of class

---

[2] *See also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (party seeking class
"bear[s] the burden of showing that a proposed class satisfies the Rule 23 requirements . . . but they need not make
that showing to a degree of absolute certainty"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir.
2013) (Rule 23 requirements satisfied where each is shown by a preponderance of the evidence).

Case 1:14-md-02543-JMF    Document 5845    Filed 05/4/20/18    Page 13 of 49

members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members.'" *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012) (Furman, J.) (quoting *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993)).  Courts often presume numerosity where it is reasonably inferred that the class contains 40 members or more.  *Bloomberg*, 290 F.R.D. at 417-18 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  The Second Circuit does not have a so-called "administrative feasibility" requirement and only requires "that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017).[3]

The numerosity requirement is satisfied.  The Classes are defined with objective criteria and definite boundaries: each Class simply requires ownership or lease during a specified time period of a vehicle covered by the relevant recall (with an added manifestation requirement in Texas), and subclasses, where they exist, are defined around a specific legal claim.[4]  Registration data obtained by GM demonstrates that each Class has thousands of members.  More specifically, reliable estimates of the number of registrations by recall and bellwether state, taken from industry standard registration data, are:[5]

---

[3] The Second Circuit calls this a "modest threshold requirement" that "will only preclude certification if a proposed class definition is indeterminate in some fundamental way."  *Id.* at 269.

[4] Subclasses are proposed, where Class representation exists, for implied warranty because the law generally requires the vehicle be purchased or leased as a new vehicle.  *See generally* Motion.

[5] *See* Offer of Proof § II.M (citing Mr. Boedeker's Damages Estimates Based on Currently Available Data).

Case 1:14-md-02543-JMF   Document 5845   Filed 05/17/2018   Page 206 of 49

| Recall | Registrations | | |
|--------|------------|----------|---------|
|        | California | Missouri | Texas   |
| 14v047 | 79,782     | 39,680   | 119,956 |
| 14v346 | 40,976     | 7,859    | 58,127  |
| 14v355 | 84,582     | 55,186   | 145,098 |
| 14v394 | 33,904     | 8,786    | 48,458  |
| 14v400 | 124,162    | 84,045   | 187,540 |
| 14v118 | 53,065     | 27,266   | 97,872  |
| 14v153 | 37,732     | 25,036   | 69,794  |
| **Totals** | **454,203** | **248,258** | **726,845** |

If the Court certifies any classes, GM has agreed to provide information that will precisely identify the members of the certified class(es), and this data will also be used to provide Class members with direct mail notice and to refine damages calculations.[6]

The Texas Classes have the added requirement that a vehicle malfunction related to the defect at issue manifested. Class members can self-identify by submitting sworn declarations that a manifestation has occurred consistent with the objectively described class, that is, an ignition switch-related malfunction for the ignition switch classes and a power steering-related malfunction for the power steering class. Consistent with the rationale of *Petrobas*, courts have allowed class membership to be determined by self-identification. *See, e.g.*, *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. 2015) (certifying class of consumers who purchased a particular product that had uniform packaging); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (certifying class of consumers who purchased seeds with "50% thicker" claim because requiring proof-of-purchase in all cases would effectively result in no consumer class actions for low-cost products); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (certifying class of purchasers of bottles of olive oil that had the same label); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658-59, 672 (C.D. Cal. 2014) (class of purchasers of homeopathic products); *Boundas v.*

---

[6] The Parties' agreement is triggered upon termination of any Rule 23(f) appeal of a class-certification decision.

*Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012) (certifying class of gift

card purchasers even though some would have to self-identify); *In re MTBE Prods. Liab. Litig.*,

209 F.R.D. 323, 337 (S.D.N.Y. 2002) (certifying class of all individuals in particular states who

had a contaminated well because the "class definition refers only to objective criteria").

**B.    Numerous common issues exist because the focus is on GM's common course of conduct.**

The commonality inquiry asks whether "there are questions of law or fact common to the

class." Fed. R. Civ. P. 23(a)(2).  Commonality exists when the claims are "'capable of classwide

resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke.'"  *Bloomberg*, 290 F.R.D. at 418

(quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  Commonality is "not

demanding" and is met if at least one issue is common to the class.  *Id.*  In automobile defect cases,

commonality is often found based upon a common question concerning the existence of a defect.

For instance, proposed representatives of a class of purchasers of vehicles with alleged alignment

defects "easily satisf[ied] the commonality requirement" because all of their claims "involve[d],"

among other things, "the same alleged defect," which was "found in vehicles of the same make

and model."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010).[7]

Importantly, "variation among class members in their motivation for purchasing the product, the

factual circumstances behind their purchase, or the price that they paid does not defeat the

relatively 'minimal' showing required to establish commonality."  *Ries v. Ariz. Beverages USA*

---

[7] *See also, e.g.*, *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 524 (C.D. Cal. 2012) (finding commonality relating to uniform rear suspension defect, noting that "[t]he fact that some vehicles have not yet manifested premature or excessive tire wear is not sufficient, standing alone, to defeat commonality"); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 526 (N.D. Cal. 2004) (finding commonality when Ford knew but concealed the risk that intake manifolds would prematurely crack); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016) (commonality satisfied where plaintiffs alleged "consistent" theories of liability and damages for all class members, and where GM inaccurately communicated vehicle safety ratings "allow[ing] it to command a price premium").

*LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

The relatively low commonality hurdle is satisfied here.  Within each Class, the claims of all members involve the *same* common defect that was the subject of a unifying recall notice. Additional common issues include:  whether GM was aware of and concealed the defects; whether GM's omissions were material; whether GM engaged in fraudulent concealment, violated consumer protection statutes, and breached implied warranties; whether GM's law violations harmed Plaintiffs and the members of the Classes; and what relief, if any, are Plaintiffs and the Classes entitled to.  Proof of GM's knowledge of the defects, for example, will focus solely on GM's conduct and will necessarily be common—indeed, identical—for each member of each Class.  "These issues, which can be resolved on a class-wide basis, are indeed central to the validity of the claims in this litigation," *Dandong*, 2013 U.S. Dist. LEXIS 150259, at *13, and the commonality requirement is thus met.[8]

## C.   Plaintiffs' claims are typical of those of other members of the Classes because the claims arise from a common course of conduct and are pled under common legal theories.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The commonality and typicality requirements of Rule 23(a)

---

[8] *See also Wolin*, 617 F.3d at 1172 (commonality threshold "easily satisfied" based on several core, common issues, including: "1) whether the [vehicles'] alignment geometry was defective; 2) whether Land Rover was aware of this defect; 3) whether Land Rover concealed the nature of the defect; 4) whether Land Rover's conduct violated the Michigan Consumer Protection Act or the Florida Deceptive and Unfair Trade Practices Act; and 5) whether Land Rover was obligated to pay for or repair the alleged defect pursuant to the express or implied terms of its warranties."); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (examples of common issues included "(1) whether the design of the plastic intake manifold was defective; (2) whether Ford was aware of alleged design defects; (3) whether Ford had a duty to disclose its knowledge; (4) whether it failed to do so; (5) whether the facts that Ford allegedly failed to disclose were material; and (6) whether the alleged failure to disclose violated the CLRA"); *Motley v. Jaguar Land Rover N. Am., LLC*, 2012 Conn. Super. LEXIS 2701, at *11 (Conn. Super. Ct. Nov. 1, 2012) ("[T]he claims of the plaintiffs here all have the same 'glue' holding the questions and answers together for the class claims. All prospective class members own or lease the same vehicle models, allege the same factory defect, allege the same policy by Land Rover, and allege the same warranty at issue.").

tend to merge, and "typicality 'is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Dandong*, 2013 U.S. Dist. LEXIS 150259, at *13-14 (quoting *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012)). Typicality does not require "that the situations of the named representatives and the class members be identical," *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) (citation omitted), and typicality is usually satisfied "irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 367-77 (2d Cir. 1997) (affirming typicality finding where plaintiffs alleging deprivation of child welfare services suffered "broad range of injuries").

Typicality is readily satisfied in cases like this one, where "all class members are alleged to have suffered injury as a result of the same conduct by [GM]." *Doyle v. Chrysler Grp. LLC*, 2014 WL 7690155, at *7 (C.D. Cal. Oct. 9, 2014). Plaintiffs' claims here arise from a common course of conduct and common legal theories: GM engaged in unfair and deceptive conduct in violation of consumer protection laws, committed fraudulent concealment, and breached implied warranties by selling vehicles with known, concealed defects. Further, Plaintiffs' vehicles have the same defect as all other vehicles in the particular Class for which Plaintiffs are proposed representatives. Because each Class member's claims arise from the same course of GM's conduct, and each Class member makes similar (if not identical) legal arguments to prove GM's liability, the typicality requirement is satisfied.[9]

_____

[9] *See, e.g.*, *Wolin*, 617 F.3d at 1175 (typicality satisfied because plaintiffs alleged that they, like all class members, were injured by the vehicles' common alignment defect, and plaintiffs sought recovery under the same legal theories as the class); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012) ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types."); *Motley*, 2012 Conn. Super. LEXIS 2701, at *15 (plaintiffs' claims are typical because they "arise from the same conduct and alleged factory defect, and each class member would present similar legal arguments to prove Land

### D. Plaintiffs and their counsel will adequately represent the interests of the Classes.

Rule 23(a)(4) requires the class representatives to "fairly and adequately protect the interests of the class." The Court "must inquire as to whether '(1) the plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Dandong*, 2013 U.S. Dist. LEXIS 150259, at *21 (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons*, *Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)). The named Plaintiffs need not have expert knowledge of the details of the case and are entitled to rely on the expertise of their counsel. *Id.* (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 31963 (S.D.N.Y. Apr. 30, 2007)).

*First*, there are no potential intra-class conflicts here and no hint of antagonism between the claims of the proposed Class representatives and the members of the proposed Classes. Plaintiffs are members of the Classes they seek to represent, and have suffered economic loss from the same defects as members of the proposed Classes. All of them seek to hold GM responsible for the legal violations that GM has committed.

*Second*, Plaintiffs' testimony and the record establish their adequacy. All Plaintiffs have actively participated in the litigation by producing Fact Sheets and documents, providing written discovery responses, providing testimony in a deposition, and communicating with their counsel.[10] Plaintiffs have demonstrated a basic understanding of the nature of their claims and their duties as

---

Rover's liability; namely that they suffered damages as a result of a common factory defect of which Land Rover was aware of . . . ."); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (Daffin's claim is typical "because the class members' theory is that Ford breached its express warranty by providing vehicles with defectively designed throttle body assemblies, causing Daffin and other class members to receive vehicles worth less than vehicles that conform to the promises allegedly contained in the warranty agreement. Daffin is typical because her car has the same defective throttle body assembly as the other class members.").

[10] *See* Declaration of Steve W. Berman in Support of Bellwether Class Certification Motion (Berman Decl.), Exs. 552-78 (excerpts of Plaintiff deposition testimony).

- 13 -

class representatives and have remained "at least somewhat active in monitoring the litigation." *Dandong*, 2013 U.S. Dist. LEXIS 150259, at \*22.

*Third*, in retaining Mr. Berman and Ms. Cabraser, Plaintiffs have employed counsel with the qualifications, experience, and resources necessary to prosecute this case to a successful resolution. Both attorneys have recovered billions of dollars in class litigation on behalf of consumers and specific experience in pursuing auto defect-related class claims.[11]  Each participated in a competitive leadership application process during which they established, and this Court recognized, their qualifications, experience, and commitment to this litigation. And, based on the litigation history of this case, it is evident that Mr. Berman, Ms. Cabraser, and their respective firms have conducted this litigation vigorously and effectively and have demonstrated their willingness to devote ample and substantial resources to prosecute the Class claims. Rule 23(a)(4) is satisfied.

## V.    THE COURT SHOULD CERTIFY THE BELLWETHER CLASSES UNDER RULE 23(b)(3)

Certification is warranted under Rule 23(b)(3) because "the questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.    Common issues of fact and law predominate because legal and factual questions will be resolved with proof common to all Plaintiffs and Class members.

A common question "is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 WILLIAM B. RUBENSTEIN,

---

[11]Berman Decl., ¶¶ 3-20 & Exs. A-B; Declaration of Elizabeth J. Cabraser in Support of Bellwether Class Certification Motion (Cabraser Decl.), ¶¶ 2-6.

NEWBERG ON CLASS ACTIONS § 4:50, at 196-97 (5th ed. 2012) ("NEWBERG")).  In contrast, an individual question "is one where 'members of a proposed class will need to present evidence that varies from member to member.'"  *Id.*  The predominance inquiry asks "whether the common, aggregation-enabling issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues."  *In re Petrobas Sec. Litig.*, 862 F.3d at 270 (quoting *Tyson Foods*, 136 S. Ct. at 1045)).  The "analysis is 'more [] qualitative than quantitative,'" *id.* at 271 (quoting NEWBERG at 197), and "[c]lass-wide issues predominate if resolution of some of the legal or factual questions . . . can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Common issues will predominate the trial of Plaintiffs' claims.  As the Offer of Proof demonstrates, the key evidence necessary to establish Plaintiffs' claims is common to Plaintiffs and all members of each Class—they all seek to prove, among other things, that GM's vehicles within each Class have a common defect and that GM's conduct was uniformly wrongful.  The evidence changes little if there are 100 Class members or millions: either way, Plaintiffs would, for instance, present the *same* evidence that GM was aware of the defects and concealed them and that GM caused economic loss to Plaintiffs and the members of the Classes.  In the words of the Second Circuit, these common issues—and more—"'are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *In re Petrobas Sec. Litig.*, 862 F.3d at 270

(quoting *Tyson Foods*, 136 S. Ct. at 1045).  Courts often find that such issues predominate in auto

defect class actions,[12] as the following count-by-count analysis highlights.[13]

### 1.   Plaintiffs will prove with common evidence that GM violated California, Missouri, and Texas consumer protection statutes.

#### a.   Common issues predominate for the California consumer statute claims.

Plaintiffs seek to certify claims under the California Consumer Legal Remedies Act, CAL.

CIV. CODE § 1750 (CLRA), and the California Unfair Competition Law, CAL. BUS. & PROF. CODE

§ 17200 (UCL).  The CLRA forbids "unfair methods of competition and unfair or deceptive acts

or practices undertaken by any person in a transaction intended to result or that results in the sale

or lease of goods or services to any consumer."  CAL. CIV. CODE § 1770(a).  An omission is

actionable under the CLRA where it is either "contrary to a representation actually made by the

defendant, or an omission of a fact the defendant was obliged to disclose."  *Daugherty v. Am.*

*Honda Motor Co.*, 144 Cal. App. 4th 824, 835 (2006).   An obligation to disclose arises "'when

the defendant had exclusive knowledge of material facts not known to the plaintiff; … when the

---

[12] *See, e.g., Wolin*, 617 F.3d at 1173 (common issues predominate such as whether Land Rover was aware of and had a duty to disclose the defect and violated consumer protection laws); *Keegan*, 284 F.R.D. at 532-34 (predominance found under UCL and CLRA based on common evidence of the nature of the defect, the defect's impact on vehicle safety, Honda's knowledge, and what Honda disclosed to consumers); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 596-97 (C.D. Cal. 2008) (predominating common issues under the CLRA and UCL include defendant's knowledge of the alleged defect, whether it had a duty to disclose and did so, whether the alleged failure to disclose was material to a reasonable consumer; and whether the conduct violated the CLRA and UCL); *Chamberlan v. Ford Motor Co.*, 223 F.R.D. at 526-27 (common questions predominate such as "whether the design of the plastic intake manifold was defective, whether Ford was aware of the alleged design defects, whether Ford had a duty to disclose its knowledge, whether it failed to do so, whether the facts that Ford allegedly failed to disclose were material, and whether the alleged failure to disclose violated the CLRA"), *petition denied*, 402 F.3d 952 (9th Cir. 2005); *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 681-82 (S.D. Fla. 2009)  (the "critical issue of whether the [airbag system] was defective is common to all putative class members" and "predominates over the individual issues"); *Carriuolo*, 823 F.3d at 989 (predominance satisfied where plaintiffs alleged "consistent" theories of liability and damages for all class members, including whether GM inaccurately communicated vehicle safety ratings "allow[ing] it to command a price premium"); *Gen. Motors Corp. v. Bryant*, 285 S.W.3d 634, 639 (Ark. 2008) (whether defect existed in class vehicles and "whether or not General Motors concealed that defect are predominating questions.").

[13] For purposes of discussing the predominance of common issues, Plaintiffs group their claims into five categories below: (i) statutory consumer fraud claims; (ii) fraudulent concealment claims; (iii) claims for fraudulent concealment of the right to file a bankruptcy claim; (iv) implied warranty claims; and (v) causation and damages.

defendant actively conceals a material fact from the plaintiff; and … when the defendant makes partial representations but also suppresses some material fact.'" *In re GM LLC Ignition Switch Litig.*, 2016 U.S. Dist. LEXIS 92499, at *169 (S.D.N.Y. July 15, 2016) ("*GM Ignition Switch Litig. I*") (quoting *Falk v. GMC*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007)).[14]

The UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." CAL. BUS. & PROF. CODE § 17200; *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *158-59. The "unlawful" prong prohibits practices that are forbidden by any law, and borrows violations of other laws and treats them as actionable. *Id.* at *158; *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838 (1994). "Unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1175 (C.D. Cal. 2010) ("*Toyota I*") (quoting *Cel-Tech Commc'ns v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)). A "fraudulent" business practice is "one that is likely to deceive the public and may be based on representations that are untrue," *id.* (citing *McKell v. Wash. Mut., Inc.*, 142 Cal. 4th 1457, 1471 (2006)); *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *158, as well as those that "may be accurate on some level, but will nonetheless tend to mislead or deceive." *McKell*, 142 Cal. 4th at 1471. The inquiry is objective, and turns on whether a "reasonable consumer" is likely to be deceived. *Id.* Because the UCL focuses on defendant's conduct, rather than the plaintiff's damages, "'relief under the UCL is available without individualized proof of deception, reliance, and injury.'" *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021 (9th Cir. 2011) (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009));

---

[14] The test for actionable omissions under the UCL is the same. *Id.* at *163.

Case 1:14-md-02543-JMF    Document 5864-2    Filed 05/14/18    Page 23 of 49

*see also Keegan*, 284 F.R.D. at 533-34; *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 596-97 (C.D. Cal. 2008).

Common issues predominate for Plaintiffs' California consumer protection statute claims. Using evidence common to all Class members within each proposed Class, Plaintiffs will prove a violation of the CLRA by demonstrating:  (i) Class Vehicles suffer from a unifying defect subject to a common recall notice (*see, e.g.*, Offer of Proof §§ II.B-J); (ii) GM was aware, or should have been aware, of the alleged defects (Offer of Proof §§ II.B-K); (iii) GM had a duty to disclose its knowledge but failed to do so; and (iv) the facts that GM allegedly failed to disclose were material (*see, e.g.*, Offer of Proof § II.L).   Similarly, the same common proof will predominate for Plaintiffs' UCL claims, which Plaintiffs will establish by showing that GM committed unlawful practices (violations of the CLRA and the National Highway Transportation Safety Act), engaged in practices that are likely to deceive (failing to disclose known defects), and committed unfair acts (distributing vehicles with known safety defects offends established public policy).

The CLRA and UCL claims are also suitable for class-wide resolution because causation and materiality are considered under an objective standard.  Under the CLRA, causation can be established class-wide by demonstrating the materiality of an omission, which gives rise to an inference of reliance.  *See, e.g.*, *Keegan*, 284 F.R.D. at 530-31; *Stearns*, 655 F.3d at 1022-23; *In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, 2012 U.S. Dist. LEXIS 141150, at *17 (C.D. Cal. Sept. 28, 2012); *Guido v. L'Oreal USA, Inc.*, 2013 WL 3353857, at *11 (C.D. Cal. July 1, 2013) ("Since materiality concerns objective features of allegedly deceptive advertising, not subjective questions of how it was perceived by each individual consumer, whether an omission is material presents a common question of fact suitable for class litigation.")  (citing *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1294 (2002)).  Materiality "is judged by an

Case 1:14-md-02543-JMF   Document 5845   Filed 05/24/18   Page 36 of 49

objective reasonable person standard," focusing on the defendant's conduct, which "can be determined relative to the class as a whole." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 920 (N.D. Cal. 2015).

Likewise, reliance and causation are not required for a UCL claim not based on misrepresentations and false advertising, *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at *28 (C.D. Cal. Oct. 25, 2011); *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012), moreover, a presumption of reliance arises, as here, when the misrepresentation is material. Once the class representative's reliance is established, "the UCL does not require individualized proof of causation and injury for absent class members." *Galvan*, 2011 U.S. Dist. LEXIS 127602, at *31.

In considering class certification of CLRA and UCL claims in an auto defect case, the Ninth Circuit held that the district court had erred in its predominance analysis by "concluding that individualized proof was required on the question of the existence of a defect and on the question of materiality." *Edwards v. Ford Motor Co.*, 603 F. App'x 538, 540 (9th Cir. 2015). Because materiality is governed by an objective "reasonable person" standard, the same inquiry is made for every class member. *Id.* at 541. It follows, the Court reasoned, that "a finding that the defendant has failed to disclose information that would have been material to a reasonable person who purchased the defendant's product gives rise to a rebuttable inference of reliance as to the class." *Id.* (citing *Mass. Mut.*, 97 Cal. App. 4th at 1292-93).[15]

---

[15] *See also Falco v. Nissan N. Am., Inc.*, 2016 U.S. Dist. LEXIS 46115, at *24 (C.D. Cal. Apr. 5, 2016) ("Common proof can be used to establish the elements of the CLRA claim, such as whether Nissan had a duty to disclose the alleged defect, whether there was an unreasonable safety risk, and whether consumers would find such omission material in their transaction."); *Banks v. Nissan N. Am., Inc.*, 301 F.R.D. 327, 335 (N.D. Cal. 2013) ("[W]hile it is true that some vehicles' defects may have manifested in different ways, the issues of (1) whether Nissan was aware of the alleged defect, (2) whether Nissan had a duty to disclose its knowledge, and (3) whether Nissan violated consumer protection laws when it failed to do so, are common to the class and predominate over any individual issues.").

Under both the UCL and the CLRA, pure omissions about safety are necessarily uniform.[16]
The record here justifies an inference of common reliance. The Court has already held that a safety
defect is "material" for purposes of alleged UCL and CLRA violations, *GM Ignition Switch Litig.
I*, 2016 U.S. Dist. LEXIS 92499, at *169,[17] making a finding of class-wide causation and reliance
appropriate. *See also Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 578 (C.D. Cal. 2011)
(finding that no reasonable class member would have purchased and used the product had he been
aware of the alleged defect); Offer of Proof § II.L (outlining substantial proof of materiality).
Accordingly, the related issues of whether GM had a duty to disclose the existence of the defects,
whether GM failed to disclose them, and whether the information was material to a reasonable
consumer are all common to each California Class as a whole, and predominate over any individual
issue any California Class member may face.

Plaintiffs' proposed Special Verdict Forms for the California consumer statute claims are
attached as **Exhibit A**.

> **b.    Common issues predominate for the Missouri Merchandising
> Practices Act claim.**

To show a violation of the Missouri Merchandising Practices Act (MMPA), Plaintiffs must
establish that they purchased or leased a vehicle for personal, family, or household purposes and
suffered an ascertainable loss of money or property as a result of an act declared unlawful by Mo.
Rev. Stat. § 407.020(1). *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 82 (Mo. Ct. App. 2011).

---

[16] *See, e.g., Keegan*, 284 F.R.D. at 531, 533 (for the CLRA claim, "Defendants allegedly provided the same
information to the entire class, i.e., no information, concerning the possibility of the [defect]"; regarding the UCL
claim, "all class members received the same information from defendants regarding the purported defect—which is
to say, no information concerning the possibility of premature and excessive tire wear").

[17] *See also id.* at *165 ("And the concealed defect unquestionably implicated a safety issue and would have
affected a reasonable person's decision to purchase a car—making the omission material."); *id.* at *171 ("And a defect
that can cause a car to suddenly switch off plainly implicates safety, and thus constitutes a 'material' fact that would
cause a consumer to behave differently if she knew of it."); *Toyota I*, 754 F. Supp. 2d at 1173-74.

Case 1:12-md-02543-JMF    Document 5846-1    Filed 05/12/18    Page 52 of 49

Section 407.020(1) prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." MO. REV. STAT. § 407.020(1).[18] "Concealment" of a material fact is "any method, act, use or practice which operates to hide or keep material facts from consumers." MO. CODE REGS. tit. 15, § 60-9.110(1). "Suppression" of a material fact is "any method, act, use or practice which is likely to curtail or reduce the ability of consumers to take notice of material facts which are stated." MO. CODE REGS. tit. 15, § 60-9.110(2). "Omission" of a material fact is "any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her." MO. CODE REGS. tit. 15, § 60-9.110(3). "Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission." MO. CODE REGS. tit. 15, § 60-9.110(4).

A "material fact" is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond

---

[18] A practice is "unfair" if it: "(1) offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions *or* (2) is unethical, oppressive, or unscrupulous; *and* (3) presents a risk of, or causes, substantial injury to consumers." *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo. Ct. App. 2006) (emphasis in original); MO. CODE REGS. tit. 15, § 60-8.020(1). Proof of deception fraud, or misrepresentation is not required to prove unfair practices. MO. CODE REGS. tit. 15, § 60-8.020(2).

"Deception" is "any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." MO. CODE REGS. tit. 15, § 60-9.020(1). "Reliance, actual deception, knowledge of deception, intent to mislead or deceive, or any other culpable mental state such as recklessness or negligence, are not elements of deception . . . ." MO. CODE REGS. tit. 15, § 60-9.020(2).

"Fraud" includes "any acts, omissions or artifices which involve falsehood, deception, trickery, breach of legal or equitable duty, trust, or confidence, and are injurious to another or by which an undue or unconscientious advantage over another is obtained." MO. CODE REGS. tit. 15, § 60-9.040(1). It is not limited to common law fraud or deceit or even finite rules, "but extends to the infinite variations of human invention." MO. CODE REGS. tit. 15, § 60-9.040(2).

or change his/her behavior in any substantial manner." MO. CODE REGS. tit. 15, § 60-9.010(1)(C).

The Court has recognized that, where a plaintiff alleges omission of material fact, "he or she must

show that the defendant knew or reasonably should have known the material fact, and failed to

disclose it to consumers." *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *210

(citing *Hope*, 353 S.W.3d at 82). Proof of defendant's knowledge, however, is not required for

concealment or suppression claims. *Plubell v. Merck & Co.*, 289 S.W.3d 707, 713 n.4 (Mo. Ct.

App. 2009). The MMPA specifically authorizes class actions where an unlawful practice "has

caused similar injury to numerous other persons." MO. REV. STAT. § 407.025.2.

Plaintiffs will prove violations of the MMPA by using the same common evidence used to

prove violations of the California consumer statutes. *See*, *supra*, at Section V.A.1.a. Courts have

found that common issues predominate in product defect class actions involving MMPA claims.

*See, e.g.*, *Hope*, 353 S.W.3d at 84-85 (upholding certification of MMPA omission claims because

evidence focused on Nissan's conduct in failing to disclose defect and noting that the class period

could be revised or subclasses used if the court later found that Nissan's knowledge of the defect

evolved over time); *Plubell*, 289 S.W.3d at 713 (common issues predominated because the central

issue was whether Merck failed to disclose and concealed Vioxx's safety risks, an issue "at the

core of the case" and common to all class members); *Flynn v. FCA US LLC*, 2018 U.S. Dist.

LEXIS 111963, at *39 (S.D. Ill. July 5, 2018) ("For omission-based consumer protection claims

[including the MMPA], whether Defendants knew the vehicles were defective and engaged in

unlawful practices poses a common question that predominates over individual questions that may

arise."). Plaintiffs' proposed Special Verdict Forms for the MMPA claims are attached as **Exhibit**

**B**.

Case 1:14-md-02543-JMF   Document 5845-1   Filed 04/20/18   Page 84 of 49

### c.   Common issues predominate for the Texas Deceptive Trade Practices—Consumer Protection Act claim.

The Texas Deceptive Trade Practices-Consumer Protection Act (DTPCPA) prohibits an "unconscionable action or course of action," TEX. BUS. & COM. CODE § 17.50(a)(3), defined as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  TEX. BUS. & COM. CODE § 17.45(5).  As the Court has recognized, "'a plaintiff must show that the defendant took advantage of his lack of knowledge and the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.'"  *In re GM LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 449 (S.D.N.Y. 2017) ("*GM Ignition Switch Litig. II*") (quoting *Washburn v. Ford*, 521 S.W.3d 871 (Tex. App. 2017)).  Further, as the Court held, a violation of the Texas DTPCPA is proven by showing that "the defendant engaged in false, misleading or deceptive acts" and "these acts constituted a producing cause of the [plaintiff's] damages."  *Id.* at 448-49 (citation omitted).  Deceptiveness is subject to common proof.  *See Spradling v. Williams*, 566 S.W.2d 561, 562-63 (Tex. 1978) (upholding jury instruction that "[f]alse, misleading or deceptive" act or practice means "an act or series of acts which has the capacity or tendency to deceive an average or ordinary person, even though that person may have been ignorant, unthinking or credulous").  The Texas DTPCPA's causation requirement is also susceptible to class-wide proof.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1016-17 (C.D. Cal. 2015) (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002)).  Like other state consumer fraud statutes, the Texas DTPCPA allows class-wide inference of reliance or causation where the omitted information would have affected consumers' purchasing decisions.  *See Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1164-65 (N.D. Cal. 2008) (explaining that reliance and materiality are treated similarly under both the Texas DTPCPA and California CLRA).

By using the same common evidence used to prove violations of the California consumer statutes, Plaintiffs will prove that GM's omission of material fact and knowledge of the numerous defects was unconscionable in violation of the Texas DTPCPA.  *See*, *supra*, at Section V.A.1.a.  Plaintiffs' proposed Special Verdict Forms for the Texas DTPCPA claims are attached as **Exhibit C**.

### 2. Plaintiffs will prove with common evidence that GM fraudulently concealed the defects from the Classes, and common issues will predominate for Plaintiffs' fraudulent concealment claims.

In California, fraudulent concealment occurs when there is "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *172 (quoting *Toyota I*, 754 F. Supp. 2d at 1189). A duty to disclose must exist, "which arises under the same circumstances as in the UCL and CLRA contexts," *id.*, as discussed above.  Under Missouri law, "'[t]o recover for fraudulent concealment, plaintiffs must prove that defendants had a duty to disclose the concealed information,'" and such a duty arises "'when one party has superior knowledge of information not within the fair and reasonable reach of the other party.'"  *Id.* at *215 (quoting *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997)).

Plaintiffs will prove fraudulent concealment with the same common evidence used to prove GM's violations of consumer statutes, namely (i) Class Vehicles within each Class suffer from a unifying defect subject to the same recall; (ii) GM was aware, or should have been aware, of the alleged defects; (iii) GM had a duty to disclose its knowledge but failed to do so; and (iv) the facts that GM failed to disclose were material.  As with the California CLRA claim, reliance is presumed or inferred based on the materiality of the concealment, *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 n.9 (1971); *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 363 (1976); *Wilner v.*

*Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 962-963 (2000); *Danzig v. Grynberg & Assocs.*, 161 Cal. App. 3d 1128, 1138-1139 (1984), and a concealed fact is material if it would influence a reasonable person's judgment or conduct. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009). And this Court has recognized that courts in the Second Circuit "have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform . . . omissions about that product," including where—like here—the omissions were "so fundamental" that it is "hard to imagine" that they would not have influenced the purchase decision. *Dandong*, 2013 U.S. Dist. LEXIS 150259, at *28, *30 (certifying common law fraud claim); *see also Moore*, 306 F.3d at 1253 ("fraud claims based on uniform misrepresentations . . . are appropriate for class certification because the standardized misrepresentations may be established by generalized proof"). In addition, Plaintiffs will use common evidence to establish that GM intended to deceive consumers by failing to disclose material information regarding the defects.

Plaintiffs' proposed Special Verdict Forms for their fraudulent concealment claims are attached as **Exhibit D**.

> **3.** **Plaintiffs will prove with common evidence that GM fraudulently concealed the right to file a claim against Old GM in bankruptcy, and common issues will predominate for this claim.**

In September 2009, the Bankruptcy Court entered a Bar Date Order, establishing November 30, 2009, as the deadline for proof of claims to be filed against Old GM (the Bar Date). *In re Motors Liquidation Co.*, 829 F.3d 135, 147 (2d Cir. 2016). From the day GM came into existence on July 10, 2009, it was well aware of the Delta Ignition Switch Defect, yet it concealed its knowledge and, consequently, members of the Delta Ignition Switch Defect Bankruptcy Classes did not know of their right to file bankruptcy claims before the Bar Date. GM's "Day One" awareness, resulting from the transfer of knowledge and personnel from Old GM to GM, will be

proved using evidence common to all Class members.[19]  As the Bankruptcy Court found, "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the [Delta Ignition Switch] Defect prior to the Sale Motion, as early as 2003." *In re Motors Liquidation Co.*, 529 B.R. 510, 538 (Bankr. S.D.N.Y. 2015).[20]  This common evidence will be used to establish the elements of fraudulent concealment under California and Missouri law, as outlined above in Section V.A.2.

Plaintiffs' proposed Special Verdict Forms for their claims of fraudulent concealment of the right to file a claim against Old GM in bankruptcy are attached as **Exhibit E**.

### 4. Plaintiffs will prove with common evidence that GM breached implied warranties and violated the Magnuson-Moss Warranty Act, and common issues will predominate for Plaintiffs' implied warranty claims.

The elements of breach of implied warranty under the California Song-Beverly Consumer Warranty Act are:  (i) plaintiff bought/leased consumer goods manufactured by defendant; and (ii) the consumer goods were not of the same quality as those generally acceptable in the trade or were not fit for the ordinary purposes for which such goods are used.  *See* CAL. CIV. CODE § 1791.1(a)(1), (2); *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26 (2007).[21] "Significantly, the relevant inquiry focuses on whether the product was defective at the time it was sold." *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *177 (citing *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1243 (C.D. Cal. 2011)).

---

[19] This same common evidence will be used in support of Plaintiffs' successor liability claims on behalf of the Missouri Delta Ignition Switch Defect Successor Liability Class.

[20] The Bankruptcy Court also found that, "[a]s of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required . . . to send out mailed recall notices to owners of affected Old GM vehicles." *Id.* at 524.  GM necessarily had this same knowledge from day one of its existence.

[21] Plaintiffs only seek certification of implied warranty-based claims under California law.

Selling vehicles with defects constitutes a breach of implied warranty, and Plaintiffs will prove with evidence common to the California implied warranty-related Subclasses that the relevant vehicles within each recall were defective.  The breach of implied warranty claim thus rises or falls predominantly on common proof.  *See, e.g.*, *Wolin*, 617 F.3d at 1173 ("Common issues predominate such as whether [defendant] was aware of the existence of the alleged defect, [and] whether [defendant] had a duty to disclose its knowledge….") (citing *Chamberlan*, 402 F.3d at 962)).[22]  And because the Court has already recognized that the claims for violations of the Magnuson-Moss Warranty-Federal Trade Commission Act (MMA) rely on the claims for implied warranty under state law, *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS 92499, at *154, Plaintiffs will offer the same common proof in support of the MMA claims.

Plaintiffs' proposed Special Verdict Forms for the MMA and implied warranty claims are attached as **Exhibit F**.

### 5.   Plaintiffs will use common evidence to prove causation and the amount of damages, and Plaintiffs' damages models satisfy the *Comcast* standard.

At the class certification stage, Plaintiffs "'must be able to show that their damages stemmed from the defendant's actions that created the legal liability,'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)), and that damages are capable of measurement on a class-wide basis.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *see id*. at 1435 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.").   The existence of some individualized damage issues does not defeat

---

[22] *See also Keegan*, 284 F.R.D. at 537 (in California, "if defendants can demonstrate that the design specification requiring 1.5 degrees of negative camber is not 'substantially certain' to result in the excessive and premature tire wear about which plaintiffs complain, they will prevail.  If plaintiffs, on the other hand, can demonstrate that the specification is substantially certain to result in premature and excessive tire wear that renders the vehicles unfit for driving, they will prevail.  The breach of implied warranty claim is therefore susceptible of common proof[.]").

010440-11 1014023 V1

predominance when damages can be modeled based on a measure of common proof.  *Sykes*, 780

F.3d at 88; *see also Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir.

2011) (common issues predominate when liability can be determined class-wide despite the

existence of individualized damage issues); *Little v. Kia Motors of Am., Inc.*, 2018 WL 3446734,

at *7-9 (N.J. Sup. Ct. July 18, 2018) (jury properly estimated class damages using common

evidence; precise calculations not required).  Plaintiffs' experts present two models for measuring

class-wide damages—one for loss of the benefit-of-the-bargain, and another for consequential

damages in the form of lost time.

### a. Plaintiffs will prove Class-wide benefit-of-the-bargain loss using common evidence.

The Court has found that Plaintiffs adequately pled economic loss in the form of loss of

the benefit-of-the-bargain, explaining:  "The gravamen of the benefit-of-the-bargain defect theory

is that Plaintiffs who purchased defective cars were injured when they purchased for *x* dollars a

New GM car that contained a latent defect; had they known about the defect, they would have paid

fewer than *x* dollars for the car (or not bought the car at all), because a car with a safety defect is

worth less than a car without a safety defect."  *GM Ignition Switch Litig. I*, 2016 U.S. Dist. LEXIS

92499, at *113.[23]  In other words, the "theory compensates a plaintiff for the fact that he or she

overpaid, *at the time of sale*, for a defective vehicle."  *GM Ignition Switch Litig. I*, 2016 U.S. Dist.

---

[23] *See also In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011) ("Plaintiffs bargained for safe, defect-free vehicles, but instead received unsafe, defective vehicles.  A vehicle with a defect is worth less than one without a defect.  The overpayment for the defective, unsafe vehicle constitutes the economic-loss injury . . . ."); *id.* at 1165 ("[A]ll Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle. The fact that Plaintiffs discovered this defect after the time of purchase is of no moment.  The economic loss was present from the beginning.").

LEXIS 92499, at *126 (emphasis added).[24]  The law in each bellwether state recognizes benefit-of-the-bargain damages and measures those damages at the time of sale.[25]

    On behalf of the Classes and Subclasses seeking restitution and damages, Plaintiffs will prove loss of benefit-of-the-bargain at the time of sale using common evidence in the form of a choice-based conjoint analysis conducted by Plaintiffs' expert, Stefan Boedeker.  Mr. Boedeker is an economist with extensive experience conducting conjoint analysis, and similar conjoint studies that he has conducted have been accepted and relied on by federal courts in similar consumer litigation.  *See, e.g.*, *In re Myford Touch Consumer Litig.*, 291 F. Supp. 3d 936, 968-73, 978 (N.D. Cal. 2018) (denying summary judgment based on alleged failure of class-wide damages and denying *Daubert* challenge to Boedeker's choice-based conjoint analysis measuring how consumers valued the vehicle component under four scenarios in which they were provided varying levels of information about the defect and Ford's knowledge thereof); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 331-33 (D.N.H. 2017) (certifying class and rejecting *Daubert* challenge to Boedeker conjoint analysis establishing market-determined price premium associated with purported germ killing properties of soap).

    Conjoint analysis is one of the most widely-used quantitative methods of market research. The analysis involves asking a group of consumers to complete surveys concerning particular qualities of products, and the values they assign to those particular qualities, and then analyzing

---

    [24] As to whether a malfunction resulting from the defect later occurred, "several circuit courts have held that an economic, point-of-sale injury is not erased just because the purchaser was lucky enough to avoid the effects of the alleged misrepresentations or omissions."  *In re Amla Litig.*, 282 F. Supp. 3d 751, 767 (S.D.N.Y. 2017) (citing *Wolin*, 617 F.3d at 1173)).

    [25] *See, e.g.*, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (California UCL and CLRA claims); *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 698, 700 (Cal. App. 2007) (breach of warranty); *Schoenlein v. Routt Homes, Inc.*, 260 S.W.3d 852, 854 (Mo. Ct. App. 2008) (Missouri MMPA claims); *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988) (fraud-based claims); Mo. REV. STAT. § 400.2-714(2) (warranty damages); *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 396 (Tex. App. 2013); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).

the survey results to create an approximation of how the market values a particular aspect of a product.  *See* Offer of Proof § II.M; *see also TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020 (N.D. Cal. 2013) (Conjoint analysis is "a type of survey or market research, which, at the most general level, conceptualizes products as bundles of attributes, treating price as an attribute. . . .  Conjoint analysis uses customer surveys to determine 'values' for each attribute.  By choosing among multiple bundles of attributes, survey participants make implicit tradeoffs one would make in real-world purchasing decisions.").

Numerous courts across the country, including this Court, have accepted choice-based conjoint analysis as a reliable methodology for calculating price premiums on a class-wide basis in consumer class actions.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013) (finding abuse of discretion in district court's failure to consider plaintiff's expert's conjoint analysis, explaining that "there may be a variety of ways to show that a feature drives demand, including with evidence that a feature significantly increases the desirability of a product incorporating that feature"); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) (relying on conjoint analysis damage model to certify class); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413-15 (accepting testimony that expert "will isolate the premium associated with the 50% thicker claim using one of three statistical methods: hedonic regression, a contingent valuation study, or a conjoint analysis"); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) (certifying class and accepting conjoint model that valued specific product feature); *In re ConAgra*, 90 F. Supp. 3d at 1022-32 (proposed conjoint analysis was "sufficiently reliable to be used in calculating class-wide damages," and, therefore, satisfied *Comcast* as part of a hybrid damages methodology); *Guido v. L'Oreal, USA, Inc*., 2014 U.S. Dist. LEXIS 165777 (C.D. Cal. July 24, 2014) (admitting conjoint analysis of price premium in mislabeled cosmetics

Case 1:14-md-02543-JMF    Document 5884    Filed 07/20/18    Page 42 of 49

case); *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Prods. Liab. Litig.*, 2012 WL 4904412, at *3-4 (C.D. Cal. Sep. 20, 2012) ("hedonic regression, contingent valuation, and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies"); *see also Dzielak v. Whirlpool Corp.*, 2017 U.S. Dist. LEXIS 39232, at *77 (D.N.J. Mar. 17, 2017) (denying *Daubert* challenge to conjoint analysis determining the value of washing machine's "Energy Star" feature); *TV Interactive Data Corp.*, 929 F. Supp. 2d at 1019-20 (admitting conjoint analysis to determine reasonable royalty rate in patent dispute); *Microsoft Corp. v. Motorola Mobility, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012) (admitting conjoint analysis survey in patent dispute and finding that criticisms of the conjoint analysis went "to issues of methodology, survey design, reliability, . . . [and] critique of conclusions, and therefore go to the weight of the survey rather than admissibility") (citation omitted).

Consistent with this precedent, Mr. Boedeker surveyed consumers in order to estimate how their willingness to pay for a GM car would have changed if they had known, at the point of sale, about the defects at issue in this case. *See* Offer of Proof § II.M. Based on responses from consumers and his analysis of those responses, Mr. Boedeker concluded that the "non-disclosure of defects caused class members to overpay for their vehicles, leading to class-wide damages." *Id.* He found that consumers would have paid less for a GM vehicle that they knew contained a defect *even if there was already a recall in place and the repairs would be immediate*, and the impact is greater the longer the time to recall. *Id.* The amount by which consumers "overpaid" for their vehicles because of their lack of knowledge of the particular concealed defect in their vehicles constitutes their damages, and Mr. Boedeker has calculated median economic loss per vehicle for each defect under a variety of scenarios considering time-to-recall and the possibility of personal injury and death (not surprisingly, economic losses are highly correlated with the chance of

- 31 -

specific injury or death, as well as the time elapsed between the manufacturer's knowledge of the defect and the recall). *Id.* Class-wide economic losses can be calculated by applying the median economic loss per vehicle to the number of vehicles at issue in each recall. *Id.* (citing Ex. 215 at ¶¶ 177-78; Ex. 216).[26]

Mr. Boedeker's model translates Plaintiffs' "legal theory of the harmful event into an analysis of the economic impact of that event," which is all that is required at class certification. *Comcast*, 133 S. Ct. at 1435; *see also Vaccarino v. Midland Nat'l Life Ins. Co.*, 2014 WL 572365, at *10-13 (C.D. Cal. Feb. 3, 2014) (*Comcast* requires only that Plaintiffs' damages model "not measure damages 'unrelated' to [P]laintiffs' claim").

### b. Plaintiffs will prove Class-wide consequential damages using common evidence.

In addition to suffering damages by overpaying for their vehicle, Class members have also suffered consequential damages in the form of the time and expense of taking the vehicles to GM dealerships for the relevant recall repairs. The Court has recognized that some states recognize "lost time" as a valid theory of consequential damages. *In re GM LLC Ignition Switch Litig. II*, 257 F. Supp. 3d at 398. California, Missouri, and Texas are such states.[27]

---

[26] For the Delta Ignition Switch Bankruptcy Classes in California and Missouri, which pursue claims for fraud by concealment of the right to file a claim against Old GM in bankruptcy, the damages are the amounts that the Class members would have recovered had they timely filed a claim in Old GM's Bankruptcy. This amount will be calculated on a class-wide basis from Mr. Boedeker's findings, which set forth the amount of the Class members' overpayment for their defective vehicles. They will then recover the same percentage of that amount that they would have recovered had they been paid out of the General Unsecured Creditors' Trust Fund.

[27] *See, e.g.*, *In re Chatterley*, 2005 WL 6960176, at *4 (B.A.P. 9th Cir. May 23, 2005) (citing Cal. Civ. Code § 3343 as an example of California law "codif[ying] existing case law relating to damages arising from lost time" as "'additional' or 'consequential' damages"); *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 847 (9th Cir. 1976) (California law allows lost time damages for malicious prosecution claims); *Seymour v. House*, 305 S.W.2d 1, 3 (Mo. 1957) (Missouri law recognizes loss-of-time damages in personal injury actions); *Arnold v. Alton R. Co.*, 154 S.W.2d 58, 62 (Mo. 1941) (affirming award of damages including "special damages for 'loss of time and earnings'"); *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 n.19 (Tex. App. 2007) (under Texas law, special damages include "lost time value").

The time and costs associated with obtaining recall repairs made necessary by GM's concealment of known defects include scheduling an appointment; driving to the dealership (in some instances multiple times); meeting with the dealer's service writer to discuss the repair; arranging and engaging in transportation when the vehicle was left at the dealership during the repair or spending time waiting at the dealership during the repair; and driving the vehicle back home or to work after the recall was performed.  *See* Offer of Proof § II.N (citing Ex. 218, Manuel Report at 6-7).  On an interim basis subject to GM producing vehicle-level data if relevant classes are certified, Plaintiffs' expert, Dr. Ernest Manuel, has estimated these damages on a vehicle-by-vehicle basis using, among other data points, GM data identifying each vehicle that received a recall repair; vehicle registration Zip Code data and dealership addresses to estimate drive-times; GM's own recall bulletins that estimate repair times; and average local hourly wages.  *See* Offer of Proof § II.N (citing Ex. 218, Manuel Report at 7-15).  The consequential damages estimate is a vehicle-by-vehicle "ground up" calculation providing "a common methodology to measure and quantify damages on a class-wide basis."  *Behrend v. Comcast Corp.*, 655 F.3d 182, 207 (3d Cir. 2011).  Therefore, the methodology yields a highly reliable measurement of lost time.

**B.    A Class action is a superior method of adjudicating this dispute.**

A class action must be superior to other available methods of fair and efficient adjudication. Fed. R. Civ. P. 23(b)(3).  "'[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy.'"  *Wolin*, 617 F.3d at 1175 (quoting 7AA CHARLES WRIGHT, ARTHUR MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1779, at 174 (3d ed. 2005)).  Rule 23(b)(3)'s non-exclusive factors are: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or

against class members; (C) the desirability or undesirability of concentrating the litigation of the
claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R.
Civ. P. 23(b)(3). Each factor is satisfied here.

With respect to factors (A) and (C), the value of the claims is simply too low to incentivize
many Class members to litigate their claims individually, particularly in light of GM's resources,
and weighs in favor of concentrating the claims in a single forum. *Sykes v. Mel Harris & Assocs.
LLC*, 285 F.R.D. 279, 294 (S.D.N.Y. 2012) ("the class members' interests in litigating separate
actions is likely minimal given their potentially limited means with which to do so and the prospect
of relatively small recovery in individual actions"). This is especially true here given the high cost
of marshalling the evidence necessary to litigate the claims at issue, the disparity in resources
between the typical class member and a well-funded, litigation-savvy defendant like GM, and the
scorched-earth litigation strategy that GM is employing.[28] Not only will individual resources be
spared with class certification, but already-strapped judicial resources will also be conserved.[29]

Co-Lead Counsel for the Economic Loss Plaintiffs have already devoted significant
resources to this class litigation, engaged in multiple rounds of briefing on motions to dismiss,
summary judgment and discovery issues; taken depositions of hundreds of GM witnesses and
experts and defended hundreds of depositions of Plaintiffs and experts; orchestrated a labor-

---

[28] *See also Wolin*, 617 F.3d at 1176 (finding that the amount of damages suffered by each class member is not
large and that forcing individual vehicle owners to litigate their cases is an inferior method of adjudication); *see also
Keegan*, 284 F.R.D. at 549 ("The funds required to marshal the type of evidence, including expert testimony, that will
be necessary to pursue these claims against well-represented corporate defendants would discourage individual class
members from filing suit when the expected return is so small."); *Hartless v. Clorox Co*., 273 F.R.D. 630, 639 (S.D.
Cal. 2011) (observing that cost of securing expert testimony would render individual lawsuits cost prohibitive);
*Bryant*, 285 S.W.3d at 644 (number of proposed class members whose "meritorious claims might go unaddressed"
absent class certification is "a factor in determining superiority).

[29] *See Wolin*, 617 F.3d at 1176 ("It is far more efficient to litigate this . . . on a classwide basis rather than in
thousands of individual and overlapping lawsuits."); *Parkinson*, 258 F.R.D. at 597 (finding a class action superior
when the burden on the judiciary would be significant and unnecessary, given the existence of multiple common
questions); *Hartless*, 273 F.R.D. at 639 (observing that "multiple individual claims could overburden the judiciary").

intensive written-discovery and document-review effort; presented Plaintiffs' vehicles to GM for inspection; retained experts; and engaged in significant motion practice on other issues.  No individual litigant pursuing a purely economic loss case could invest the same resources.

Factor (B)—the extent and nature of any similar litigation—also favors class certification. Numerous class action lawsuits based on the same facts at issue here have been filed against GM. Through the MDL process, those cases were transferred to this Court and are part of this consolidated litigation (in addition to the personal injury cases).  That the MDL Panel chose this Court to be the transferee court is one indication that having a single case—as opposed to multiple cases—makes sense.

The final superiority factor—manageability—focuses on whether '"the complexities of class action treatment outweigh the benefits of considering common issues in one trial. . . .'" *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 302 (C.D. Cal. 2011) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001)).  The question is whether multiple individual lawsuits would be more manageable than a class action, and not whether trying the class claims is easy.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004).  Indeed, this fourth factor "will rarely, if ever, be in itself sufficient to prevent certification."  *Id.* at 1272; *see also In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule").  Here, Plaintiffs do not foresee any serious manageability problems and certainly none that make thousands of individual actions a better alternative.  As discussed in more detail above, and in Plaintiffs' accompanying Offer of Proof and the proposed Special Verdict Forms, the salient issues in this case will be resolved based upon common proof.  Simply put, this case can be tried in an efficient manner.  "Here, substituting a single class action for numerous trials in a matter

involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 130 (quoting Fed. R. Civ. P. 23 Advisory Committee's Notes); *see also Keegan*, 284 F.R.D. at 550-51 (finding that certifying three separate state subclasses under the laws of California, Florida and New York was manageable).

## VI.    PROPOSED TRIAL PROCEDURE

Plaintiffs envision a single trial.  Plaintiffs will first present their case-in-chief, submitting common evidence of GM's wrongdoing, class-wide injury, and total damages, then GM may present whatever defenses it wishes to advance.  Plaintiffs will then present their rebuttal case. The Court will enter a verdict based on Special Verdict Forms that take into account the elements of Plaintiffs' claims under California, Missouri, and Texas law.  The attached proposed Special Verdict Forms demonstrate that trial of this action will be manageable.

If a verdict is returned for GM, judgment dismissing the bellwether claims with prejudice would enter.  If a verdict for the Bellwether Classes results, judgment decreeing the appropriate relief would enter, in addition to a judgment in a total, single monetary sum to be entered on behalf of each Class and Subclass for damage.  A post-judgment administrative proceeding will follow, in which checks to each individual Class member will be distributed.[30]

## VII.    CONCLUSION

Plaintiffs have demonstrated that they satisfy all of the elements of Rule 23(a) and (b)(3). The class action mechanism is not only the best and most efficient way to adjudicate the Class

---

[30] If is common for courts to have follow-on proceedings regarding damages allocation, even if they involve individualized damage proceedings.  *See, e.g.*, *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); 3 CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS, § 9:53 at 429-30 (4th ed. 2002) (collecting cases); 7B CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1781 (2d ed. 1986).

members' claims in this case, it is also the only viable method of doing so.  For all of the foregoing

reasons, Plaintiffs respectfully request that the Court grant their motion to certify the Bellwether

Classes.[31]

DATED:  July 20, 2018                   HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By:      */s/ Steve W. Berman*
                                             Steve W. Berman
*steve@hbsslaw.com*
Sean R. Matt
*sean@hbsslaw.com*
Andrew M. Volk
*andrew@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

DATED:  July 20, 2018                   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

                                         By:      */s/ Elizabeth J. Cabraser*
                                             Elizabeth J. Cabraser
*ecabraser@lchb.com*
Rachel Geman
*rgeman@lchb.com*
275 Battery St., 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Co-Lead Counsel with Primary Focus on Economic
Loss Cases*

---

[31] Plaintiffs will file with their reply papers a Proposed Order Granting Plaintiffs' Motion for Class Certification, Appointing Class Representatives and Appointing Class Counsel.

Case 1:14-md-02543-JMF   Document 5845   Filed 07/20/18   Page 49 of 49

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on July 20, 2018, which will send notification of such filing to the e-mail addresses registered.

*/s/ Steve W. Berman*
Steve W. Berman

010440-11 1014023 V1

**EXHIBIT A**

**PLAINTIFFS′ PROPOSED SPECIAL VERDICT FORMS**

**CALIFORNIA CONSUMER PROTECTION STATUTES**

Case 1:14-md-02543-JMF    Document 5946-3    Filed 07/20/18    Page 2 of 19

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial. This form is meant to be illustrative only, and not comprehensive. Plaintiffs may suggest changes to the special interrogatories herein. Moreover, the absence of any claim or state from the classes and subclasses suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

A.    LIABILITY

Plaintiffs claim that GM violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750.

Do you find by a preponderance of the evidence the following:

(i)    Were Plaintiffs' vehicles sold with characteristics, uses, benefits, or qualities that a reasonable consumer would not believe they had, in the form of a safety defect about which GM knew or should have known?

Yes ☐        No ☐

(ii)    Were Plaintiffs' vehicles, when sold, of a particular standard, quality, or grade that a reasonable consumer would not believe they were, in that they contained a safety defect about which GM knew or should have known?

Yes ☐        No ☐

*If you answered "Yes" to (i) and/or (ii), above, go to "iii." If you answered "No" to **both** (i) and (ii), **Stop**.*

(iii)    Would the information mentioned in (i) and/or (ii), above have been material to a reasonable consumer?

Yes ☐        No ☐

*If you answered "Yes" to (iii), above, go to "iv." If you answered "No" to (iii), **Stop**.*

(iv)    Did Plaintiffs suffer damages as a result of GM's conduct?

Yes ☐        No ☐

B.    DAMAGES

Have Plaintiffs proved by a preponderance of the evidence the amount of damages suffered by Plaintiffs and the California Classes and Subclasses?

Yes ☐        No ☐

- 1 -

If "yes," complete the following blank: The [Court/Jury] finds actual damages for Plaintiffs and the California Classes and Subclasses in the amount of $_____.  (If you answered "no," do not complete the blank.).

## CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL")

**C.   LIABILITY**

Plaintiffs claim that GM violated California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200.

Do you find by a preponderance of the evidence the following:

(i)      Did GM engage in an unlawful business act or practice?

Yes ☐                No ☐

(ii)     Did GM engage in an unfair business act or practice?

Yes ☐                No ☐

(iii)    (a)    Did GM engage in a fraudulent business act or practice by concealing or failing to disclose safety defects in Plaintiffs' vehicles which GM knew about or should have known about?

Yes ☐                No ☐

*If you answered "Yes," go to (iii)(b).  If you answered "No," skip (iii)(b) and (iii)(c).*

(b)    Did GM have a duty to disclose material information to potential purchasers of its vehicles?

Yes ☐                No ☐

*If you answered "Yes," go to (iii)(c).  If you answered "No," skip (iii)(c).*

(c)    Would the information concealed or not disclosed by GM have been material to a reasonable consumer?

Yes ☐                No ☐

*If you answered "Yes" to (i), (ii) or **all** of (iii)(a)-(iii)(c), above, go to (iv). If you answered "No" to (i), (ii), and **any** of (iii)(a)-(iii)(c), then you should **Stop**.*

(iv)    As a result of GM's conduct, did Plaintiffs lose money or property?

- 2 -

Yes ☐         No ☐

**D.    RESTITUTION**

Have Plaintiffs proved by a preponderance of the evidence the amount of restitution necessary to restore Plaintiffs and the California Classes and Subclasses' lost money or property?

Yes ☐         No ☐

If "yes," complete the following blank: The Court awards restitution to Plaintiffs and the California Classes and Subclasses in the amount of $_____.  (If you answered "no," do not complete the blank.)

- 3 -

**EXHIBIT B**

**PLAINTIFFS' PROPOSED SPECIAL VERDICT FORM**

**MISSOURI MERCHANDISING PRACTICES ACT CLAIM**

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial.  This form is meant to be illustrative only, and not comprehensive.  Plaintiffs may suggest changes to the special interrogatories herein.  Moreover, the absence of any claim or state from the classes suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

A.    LIABILITY

Plaintiffs claim that GM violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407.020(1).

Do you find by a preponderance of the evidence the following:

(i)    Did GM engage in deception or fraud in connection with the sale or advertisement of Plaintiffs' vehicles by concealing or failing to disclose safety defects in Plaintiffs' vehicles which GM knew about or should have known about?

Yes ☐        No ☐

(ii)    Did GM engage in any false pretense or misrepresentation in connection with the sale or advertisement of Plaintiffs' vehicles by concealing or failing to disclose safety defects in Plaintiffs' vehicles which GM knew about or should have known about?

Yes ☐        No ☐

(iii)    Did GM engage in any unfair practice in connection with the sale or advertisement of Plaintiffs' vehicles by failing to disclose safety defects in Plaintiffs' vehicles when GM knew or should have known of the defects?

Yes ☐        No ☐

(iv)    Did GM conceal any material fact in connection with the sale or advertisement of Plaintiffs' vehicles?

Yes ☐        No ☐

(v)    Did GM suppress any material fact in connection with the sale or advertisement of Plaintiffs' vehicles?

Yes ☐        No ☐

- 1 -

    (vi)    Did GM omit any material fact in connection with the sale or advertisement of Plaintiffs' vehicles?

        Yes ☐        No ☐

*If you answered "Yes" to **any** of (i)-(vi) above, go to (vii).  If you answered "No" to **all** of (i)-(vi) above, then you should **Stop.***

    (vii)    As a result of GM's conduct, did Plaintiffs suffer an ascertainable loss?

        Yes ☐        No ☐

**B.**    **DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of the money necessary to restore Plaintiffs' and the Missouri Classes' ascertainable losses?

        Yes ☐        No ☐

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the Missouri Classes in the amount of \$_____.  (If you answered "no," do not complete the blank.).

- 2 -

Case 1:14-md-02543-JMF    Document 5940-3    Filed 07/20/18    Page 8 of 19

**EXHIBIT C**

<u>**PLAINTIFFS' PROPOSED SPECIAL VERDICT FORM**</u>

**TEXAS DECEPTIVE TRADE PRACTICES
CONSUMER PROTECTION ACT CLAIM**

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial. This form is meant to be illustrative only, and not comprehensive. Plaintiffs may suggest changes to the special interrogatories herein. Moreover, the absence of any claim or state from the classes suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

A.   **LIABILITY**

Plaintiffs claim that GM violated the Texas Deceptive Trade Practices—Consumer Protection Act, TEX. BUS. & COM. CODE §§ 17.46(b), 17.50(a)(3).

Do you find by a preponderance of the evidence the following:

(i)   Did GM engage in an unconscionable course of action in connection with the sale of Plaintiffs' vehicles by concealing or failing to disclose safety defects in Plaintiffs' vehicles which GM knew about or should have known about at the time of the sale of Plaintiffs' vehicles?

Yes ☐        No ☐

(ii)   Did GM fail to disclose information concerning Plaintiffs' vehicles with the intent to induce consumers to purchase or lease the vehicles?

Yes ☐        No ☐

(iii)   Apart from (i) or (ii), above, did GM engage in false, misleading or deceptive acts by concealing or failing to disclose safety defects in Plaintiffs' vehicles which GM knew about or should have known about at the time of the sale of Plaintiffs' vehicles?

Yes ☐        No ☐

*If you have answered "Yes" to **any** of (i)-(iii) above, proceed to (iv). If you have answered "No" to **all** of (i)-(iii) above, **Stop**.*

(iv)   As a result of GM's conduct, did Plaintiffs suffer economic damage?

Yes ☐        No ☐

B.   **DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of economic damages suffered by Plaintiffs and the Texas Classes?

Yes ☐        No ☐

- 1 -

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the Texas Classes in the amount of $_____.  (If you answered "no," do not complete the blank.)

# EXHIBIT D

## PLAINTIFFS' PROPOSED SPECIAL VERDICT FORM

### FRAUDULENT CONCEALMENT CLAIMS

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial.  This form is meant to be illustrative only, and not comprehensive.  Plaintiffs may suggest changes to the special interrogatories herein.  Moreover, the absence of any claim or state from the classes and subclasses suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

<u>**CALIFORNIA AND MISSOURI**</u>

**A.    LIABILITY**

Plaintiffs claim that GM has violated the law of fraudulent concealment.

Do you find by a preponderance of the evidence the following:

(i)    Did GM have a duty to disclose material facts in connection with the sale or lease of Plaintiffs' vehicles?

Yes ☐          No ☐

(ii)    Did GM knowingly make a false representation concerning material information in connection with the sale or lease of Plaintiffs' vehicles?

Yes ☐          No ☐

(iii)    Did GM knowingly conceal material information in connection with the sale or lease of Plaintiffs' vehicles?

Yes ☐          No ☐

(iv)    Did GM knowingly fail to disclose material information in connection with the sale or lease of Plaintiffs' vehicles?

Yes ☐          No ☐

*If you answered "Yes" to **any or all** of (ii)-(iv), above, continue on to (v), below.  If you answered "No" to **all** of (ii)-(iv), above, **Stop.***

(v)    Did GM act with the intent to defraud Plaintiffs (i.e., did GM intend that Plaintiffs act in reliance on GM's false representation, concealment or nondisclosure?)

Yes ☐          No ☐

- 1 -

(vi)    As a result of GM's conduct, did Plaintiffs suffer economic damage?

Yes ☐           No ☐

**B. DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of economic damages suffered by Plaintiffs, the California Classes and Subclasses [Missouri Classes]?

Yes ☐           No ☐

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the California Classes and Subclasses [Missouri Classes] in the amount of $_____.  (If you answered "no," do not complete the blank.)

- 2 -

**EXHIBIT E**

<u>**PLAINTIFFS' PROPOSED SPECIAL VERDICT FORM**</u>

**CLAIMS FOR FRAUDULENT CONCEALMENT OF THE RIGHT TO
FILE A CLAIM AGAINST OLD GM IN BANKRUPTCY**

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial.  This form is meant to be illustrative only, and not comprehensive.  Plaintiffs may suggest changes to the special interrogatories herein.  Moreover, the absence of any claim or state from the classes suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

## CALIFORNIA AND MISSOURI

A.    LIABILITY

Plaintiffs claim that GM has violated the law by fraudulently concealing the Plaintiffs' right to file a claim in Old GM's bankruptcy.

Do you find by a preponderance of the evidence the following:

(i)    Did GM have a duty to disclose material facts concerning Plaintiffs' vehicles?

Yes ☐            No ☐

(ii)    Did GM knowingly conceal material information concerning Plaintiffs' vehicles at any time during the period from July 10, 2009-November 30, 2009 (the deadline for filing proof of claims in Old GM's bankruptcy)?

Yes ☐            No ☐

(iii)    Did GM knowingly fail to disclose material information concerning Plaintiffs' vehicles at any time during the period from July 10, 2009-November 30, 2009 (the deadline for filing proof of claims in Old GM's bankruptcy)?

Yes ☐            No ☐

*If you answered "Yes" to **either** (ii) or (iii), above, continue on to (iv), below.  If you answered "No" to **both** (ii) and (iii), above, **Stop**.*

(iv)    Did GM act with the intent to defraud Plaintiffs (*i.e.*, did GM intend that Plaintiffs act or fail to act in reliance on GM's concealment or nondisclosure?)

Yes ☐            No ☐

(v)    Did GM's conduct prevent Plaintiffs from filing a proof of claim in GM's bankruptcy before the November 30, 2009 deadline?

Yes ☐            No ☐

- 1 -

010440-11 1047046 V1

    (vi)      As a result of GM's conduct, did Plaintiffs suffer economic damage?

Yes ☐          No ☐

**B.**    **DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of economic damages suffered by Plaintiffs, the California and Missouri Delta Ignition Switch Defect Bankruptcy Classes?

Yes ☐          No ☐

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the California and Missouri Delta Ignition Switch Defect Classes in the amount of $_____.  (If you answered "no," do not complete the blank.)

- 2 -

EXHIBIT F

**PLAINTIFFS' PROPOSED SPECIAL VERDICT FORM**

**CLAIMS FOR BREACH OF IMPLIED WARRANTY AND VIOLATIONS
OF THE MAGNUSON-MOSS WARRANTY ACT**

*Set forth below are suggested interrogatories that would be presented on Special Verdict Forms at Trial. This form is meant to be illustrative only, and not comprehensive. Plaintiffs may suggest changes to the special interrogatories herein. Moreover, the absence of any claim or state from the subclasses suggested below is not intended to constitute a waiver of any claims currently, or in the future, brought in this action.*

## <u>CALIFORNIA</u>

**A.    LIABILITY**

Plaintiffs claim that GM has violated California's Song-Beverly Consumer Warranty Act, CAL. CIV. CODE §§ 1791.1 and 1792 by selling or leasing them vehicles that did not have the quality that a buyer would reasonably expect.

Do you find by a preponderance of the evidence the following:

(i)    Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, would not pass without objection in the automotive trade?

Yes ☐                    No ☐

(ii)    Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, were not fit for the ordinary purpose for which vehicles are used?

Yes ☐                    No ☐

(iii)    Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, were not adequately labeled?

Yes ☐                    No ☐

*If you answered "Yes" to **any or all** of (i)-(iii), above, continue on to (iv), below. If you answered "No" to **all** of (i)-(iii), below, **Stop**.*

(iv)    As a result of GM's conduct, did Plaintiffs suffer economic damage?

Yes ☐                    No ☐

**B. DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of economic damages suffered by the California Subclasses?

Yes ☐          No ☐

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the California Subclasses in the amount of $_____.  (If you answered "no," do not complete the blank.)

## CALIFORNIA: MAGNUSON-MOSS WARRANTY ACT

**A.** **LIABILITY**

Plaintiffs claim that GM violated the Magnuson-Moss-Warranty Act, 15 U.S.C. § 2301 by breaching its implied warranty that accompanied Plaintiffs' vehicles when they bought or leased them.

Do you find by a preponderance of the evidence the following:

(i) Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, would not pass without objection in the automotive trade?

Yes ☐          No ☐

(ii) Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, were not fit for the ordinary purpose for which vehicles are used?

Yes ☐          No ☐

(iii) Did GM sell or lease Plaintiffs' vehicles that, at the time of purchase or lease, were not adequately labeled?

Yes ☐          No ☐

*If you answered "Yes" to **any or all** of (i)-(iii), above, continue on to (v), below.  If you answered "No" to **all** of (i)-(iii), above, **Stop.***

(iv) As a result of GM's conduct, did Plaintiffs suffer economic damage?

Yes ☐          No ☐

**B.** **DAMAGES**

Have Plaintiffs proved by a preponderance of the evidence the amount of economic damages suffered by Plaintiffs and the California Subclasses?

Yes ☐          No ☐

If "yes," complete the following blank: The Court awards damages to Plaintiffs and the California Subclasses in the amount of $_____.  (If you answered "no," do not complete the blank.)