# Exhibit C

ELECTRONICALLY FILED
8/31/2018 12:06 PM
09-CV-2017-900053.80
CIRCUIT COURT OF
BULLOCK COUNTY, ALABAMA
RASHAWN HARRIS, CLERK

IN THE CIRCUIT COURT
FOR BULLOCK COUNTY, ALABAMA

| | |
|---|---|
| **KRUUZ FINCH, as the Guardian and Representative of LAMAR HOUGH,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| v. ) ) | **CIVIL ACTION NO. CV-2017-900053.80** |
| **GENERAL MOTORS, LLC; RONALD GOSHAY d/b/a RON'S AUTOMOTIVE, et al.,** ) ) ) ) | |
| **Defendants.** ) | |

**PLAINTIFFS' OPPOSITION TO GM'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs respond and respectfully oppose Defendant GM's motion for summary judgment. As will be shown, there is substantial evidence supporting the Plaintiffs' claims that the Defendant designed and manufactured a defective firewall/ bulkhead that allowed an engine fire, fueled by leaking oil, to reach the passenger compartment and seriously burning and ultimately killing Lamar Hough. The Defendant's motion is meritless and should be denied.

**I.     FACTS**

On May 6, 2017, in Bullock County, Alabama, Lamar Hough was driving his 1998 Chevrolet Blazer on Alabama 223. The Blazer started backfiring and running very rough. Unbeknownst to Mr. Hough, the vehicle had developed an oil leak. (Ex. 1 -C. Miller Aff. at 3). The Blazer shut off in the road and started rolling backwards. (Id.) The vehicle's engine compartment caught fire and the vehicle rolled back into a ditch. (Id.) Mr. Hough was unable to

get out before the engine fire came through the Blazer's firewall and into the passenger compartment causing him severe burns.

The Plaintiffs sued Defendant General Motors, LLC ("GM") as the manufacturer of the Blazer alleging claims of defective design and manufacture under AEMLD. The Plaintiff further asserted negligence and wantonness claims against GM in its design and manufacture of the Blazer. (Second Amended Complaint).

The fire began in the engine compartment. (Ex. 2- R. Dyer depo. at 77-78, 95-96). Most likely, the fire started when oil vapors reached a hot pipe directly below the engine exhaust manifold and ignited. (Id. at 94-96; 108). The oil vapors emanated from liquid oil that came out of the oil filter. (Id. at 94; 108-109). Plaintiffs' expert Charlie Miller opined that the oil leak that caused the fire was the result of the failure to properly install the oil filter. (Ex. 1-Miller Aff. at 8). The oil leak was the fuel source for the fire. (Id.)

Once the engine fire began, it propagated through the bulkhead or fire wall on the driver's side. (Ex. 2-Dyer at 58, 110-11). The design of the fire wall lacked any fire barrier to stop fires from passing through the firewall to the passenger compartment. (Id. at 110-112). The firewall was instead designed with rubber grommets that covered openings in the firewall. (Id.) However, the fire simply melted the rubber grommets away that was covering the large holes in the firewall, leaving a free and open path for an engine fire to reach the passenger compartment. (Id.) There were numerous alternative designs available at the time of the manufacture of the subject Blazer that would have prevented or substantially slowed the propagation of the engine fire into the passenger compartment, such as using metal to cover the holes in the firewalls, using better fire-resistant material for the hole covers, making the holes smaller and/or creating a secondary fire barrier within the engine compartment. (Ex. 3- B. Herbst depo. at 68-70).

Mr. Hough was trapped in his vehicle, unable to remove his seatbelt in time before the fire reached the compartment. Bishop Ivey, an eyewitness who tried to get Mr. Hough out of the vehicle before the fire reached him, testified that both he and Hough were desperately trying to get the seatbelt off but could not until it was too late. (Ex. 4- B. Ivey at 28-29. 53-54, 60). The time between when Ivey first saw the fire burning in the engine compartment and when Hough was finally able to get out of the vehicle was less than two minutes. (Id. at 31, 60-61). Unfortunately, by that time, Hough was severely burned and ultimately succumbed to his injuries four months later in the hospital.

## II.   SUMMARY JUDGMENT STANDARD

A summary judgment is only proper when the court concludes that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Ala.R.Civ.P. Rule 56. On a motion for a summary judgment, when the movant makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Rule 56(e); § 12–21–12, *Ala. Code* 1975. The court views the evidence most favorably to the nonmovant and resolves all reasonable doubts concerning the existence of a genuine issue of material fact against the movant. *Specialty Container Mfg., Inc. v. Rusken Packaging, Inc.,* 572 So.2d 403, 404 (Ala.1990).

## III.   ARGUMENT

### A. Overview of Alabama Law on Substantial Modification Under AEMLD.

In an AEMLD claim, plaintiff must show that the product reached the consumer without substantial change in the condition in which it was sold. *Sears, Roebuck & Co. v. Harris*, 630 So.2d 1018, 1027 (Ala.1993); *see also Clarke Indus., Inc. v. Home Indem. Co.*, 591 So.2d 458, 462

3

(Ala.1991). However, "the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability." *Tanksley v. ProSoft Automation, Inc.*, 982 So. 2d 1046, 1055 (Ala. 2007) (citing *Harris*, 630 So.2d at 1027); *see also Johnson v. Niagara Machine & Tool Works*, 555 So.2d 88, 91 (Ala. 1989). Instead, the question of a seller's liability under the AEMLD turns on two things: (1) whether the substantial alteration created the defect and (2) if it created the defect, was the substantial alteration foreseeable.

> When **a defect created by an alteration** to a product after it left the seller's control is the factual and proximate cause of an injury, **and the alteration was not foreseeable**, the alteration amounts to an intervening or superseding cause of the injury and relieves the seller from liability under the AEMLD. See *Burkett v. Loma Machine Manufacturing, Inc.,* 552 So.2d 134, 136 (Ala.1989) (modifying the blade guard on a billet saw to expose an additional 15 inches of the blade was a substantial change that relieved the manufacturer of liability); *Fenley v. Rouselle Corp.,* 531 So.2d 304, 306 (Ala.1988) (removing the safety devices from a machine press constituted a superseding cause of an employee's accident and relieved the press's manufacturer of liability).

*McDaniel v. French Oil Mill Mach. Co.*, 623 So. 2d 1146, 1148–49 (Ala. 1993) (emphasis added).

### B.     There Was No Substantial Alteration of the Defective Bulkhead/Firewall.

The gist of GM's argument is as follows: (1) that the Blazer was substantially altered since the co-Defendant improperly torqued oil filter and (2) it is possible that somewhere in the 20- year history of the Blazer that someone somewhere may have altered the bulkhead/firewall somehow, even though there is no evidence that any modification occurred. The Plaintiffs may be stating the obvious to this Court when we say that each of GM's arguments are meritless under Alabama law.

First, the improperly torqued oil filter is not a "design defect". It is a negligent service and maintenance issue against the co-Defendant. The design defect is the bulkhead/firewall that separates the engine compartment from the passenger compartment. The bulkhead/firewall is defective because it failed to prevent an engine fire from rapidly progressing into the passenger

4

compartment in the Blazer. (Ex. 5- Plaintiff's Expert Disclosures at 3). As shown above, for the substantial alteration element of an AEMLD claim to apply, the at issue design defect must have been created by the alleged substantial alteration - - "When a defect created by an alteration . . ." *McDaniel v. French Oil Mill Mach. Co.*, 623 So. 2d at 1148–49 (Ala. 1993). An improperly torqued oil filter may have started the engine fire, but it is not the design defect alleged in this case. Because the oil filter did not create the design defect in the firewall, GM's argument fails.[1] Further, it is well known the automobile industry that oil filters may be improperly torqued and that leaks can occur in the oil filters. "It is well known in the mechanical field that if the oil filter is either tightened too much or too little oil can leak from the filter seal." (Ex. 1-Miller aff. at 6). GM cannot honestly and with a straight-face say that it could not foresee an oil leak or an improperly torqued oil filter. Thus, even if the improperly torqued oil filter was a substantial alteration, it is one that was clearly foreseeable to GM.

GM next argues that, because the Blazer is almost 20 years old and modifications occurred overtime to certain parts of the vehicle, it cannot be ruled out that there may have been modifications to the bulkhead/firewall. The problem with GM's argument is that there is no proof that modifications did in fact occur to the firewall. In fact, all of the evidence produced in this case thus far indicates that no modification was done to the bulkhead/firewall. GM wants this Court to speculate and assume that firewall modifications occurred and existed at the time of the accident. Yet, no one can point to any modification in the firewall/bulkhead. Not an eyewitness. Not GM's experts. Not Mr. Hough's family. The only modifications to the Blazer itself that GM can point to involve a door hinge, the exhaust system, running boards, and some wiring. (Doc. 181 at 5). That's

---

[1] GM seems to tacitly agree since it cites no case law in support of its argument that the improperly torqued oil filter is a substantial alteration. (See Doc. 181 at 4).

5

it. Nothing about the bulkhead/firewall.

On the other hand, there is substantial evidence that no alterations were made to the firewall of the Blazer. Plaintiff's expert, Charlie Miller, not only inspected the vehicle but also reviewed extensive maintenance records throughout the life of the vehicle. The maintenance records on the vehicle date back to when the car had almost 38,000 miles on it. (Ex. 6- C. Miller depo. at 21). Prior to that, the Blazer would have been under warranty and no warranty records have been produced by GM regarding this vehicle. (Id.) The Blazer only had three owners in its lifetime. The first owner bought it in March 1998 and sold it in November 1999. The Carfax on the vehicle reveals its service history and none of it indicate an alteration was made to the firewall. (Ex. 7- Carfax). The next owner, Mr. and Mrs. Farley, purchased the vehicle in November 1999 when the Blazer had almost 38,000 miles on it. (Id.) The Farleys' maintenance records were "pretty darn detailed". (Ex. 6- Miller at 20). Charlie Miller, Plaintiff's expert, reviewed the detailed and extensive maintenance records that the Farleys kept on the vehicle. (Miller at 57-58) None of those records show any modification being done to the firewall. (Ex. 8- Maintenance Records) The final owner was Mr. Hough. The maintenance records from Mr. Hough's ownership shows no change to or modification to the firewall. Charlie Miller confirmed during his inspection of the subject Blazer that he saw no evidence that the firewall had been modified or altered in any way.

> Q. It says you will testify about modifications, if any, to the vehicle and how they would not have affected the outcome in this case. What modifications is that referring to?
>
> A. What we were talking about earlier, I didn't see any evidence that the wiring harness had been replaced or the steering column or anything in that firewall area had been serviced in the records that I saw.
>
> Q. Yeah. And that's really strictly from a rec -- looking at the records themselves?

6

> A. Well, that, yes, and I didn't see any defamation [sic], for instance, in that firewall where someone had gone in within [sic] snips and opened up a hole or anything like that.
>
> Q. Okay. But can we agree that there could have been modifications made to the vehicle because of the fire damage? And I'm not talking about taking tin snips and cutting a hole, but could there have been other modifications made to the vehicle where the evidence is burned away?
>
> A. **I haven't seen any records of that**, but it's a possibility because it's not there anymore for me to look at.

(Miller depo. at 57 – 58)

Additionally, Richard Dyer, Plaintiff's expert, compared the bulkhead of the subject vehicle to exemplar Blazer and found that there was no indication of any modification or repair to the subject bulkhead.

> Q. When you inspected the subject Blazer, did you see any impact damage or evidence of prior damage from before this fire?
>
> A. When I was present at the second inspection with Brian Hertz [sic], we discussed something that may have been an indicator of a repair. I can't recall what it was, what was important to me. **There was no indication to me that there had been any repair of the bulkhead separating the engine compartment from the passenger compartment.** I did note that there was -- during my first inspection, I noted that there was a change in shape involving the cowl at the right side of the vehicle and I was concerned if that was indicative of collision damage; and then upon examining the exemplar vehicle, the same type of bend in the cowl was present.

(Ex.2- Dyer depo. at 56-57).

GM also contends that there is a possibility that a grommet/bushing may not have been replaced in the vehicle during its lifetime. A grommet is made up of a rubber material that fills in the holes around the wiring that pass through the bulkhead holes. (Dyer at 77-79) Because the rubber grommets do not contain any fire- resistant additive, they typically burn away during a fire. (Id.) Yet, here, GM's own expert stated that "some of the grommet insert for the body harness

7

passthrough [were] still in place unconsumed by fire." (Ex. 9- Santrock's Expert. Depo. at 80) Thus, there is physical evidence that grommets were still on the Blazer at the time of the accident. Further, Jeff Santrock, GM's corporate representative, testified that, if a vehicle was having any problems with a grommet, then the occupant might hear increased engine noise, get water intrusion and get "engine smells." (Ex. 10- Santrock's Corp. Rep. depo. at 188) Kruuz Finch, Mr. Hough's son, rode in the Blazer with his dad. Mr. Finch testified that the Blazer worked okay and that his dad never had any problems with it. (Ex. 11- K. Finch depo. at 28) Mr. Finch never heard any increased engine noises, never heard any wind noise, never saw any water intrusion or dirt build-up and there were no engine smells. (Ex. 12- Finch Aff.) Finch has worked on cars for most of his life. He would have noticed these sounds and signs if they had existed. (Id.) There simply is no evidence that any grommets were missing prior to the accident.

In *Hicks v. Commercial Union Ins. Co.*, 652 So.2d 211, 217 (Ala. 1994), a worker was killed after a pipe stopper was discharged and struck him during the pressure testing of a container. The administrator of the estate filed an AEMLD against the manufacturer of the pipe stopper and the inspection company. The manufacturer contended that the pipe stopper was misused and/or substantially altered either by one or more employees of Taylor–Wharton, who altered the pipe stopper by mismatching its jaws. The Court held that a jury could find that the mismatching of the jaws was reasonably foreseeable to the manufacturer since "the pipe stopper could easily be mismatched during the productive life of the product" and because the manufacturer markets "O-ring kits" for the purpose of replacing the pipe stopper's O-rings. *Id.* at 218. Thus, the Court held that the alteration of the stopper was foreseeable because once part of the stopper deteriorates, there is nothing to keep the jaws from becoming mismatched. *Id.*

In *Hannah v. Gregg, Bland & Berry, Inc.,* 840 So. 2d 839, 862 (Ala. 2002), the plaintiff

8

was crushed by two machines after the control panel failed due to an action on behalf of a coworker. *Id* at 846. The coworker pushed the wrong button on the control panel which controlled the machines and when that coworker went to hit the retract button, the machines did not respond. *See id.* Defendant Westinghouse manufactured and supplied the control panel for the machines. Westinghouse argued that, because the employer had altered or modified the control panel, it should not be held liable because the alterations were a substantial modification that was not foreseeable. The Court held that it was a jury question whether the alterations were foreseeable because Westinghouse had manufactured the control panel with extra space on it knowing that alterations or modifications could take place in the future. *Id.* at 855-856. The testimony demonstrated that it was a "common thing" that the control panel would be altered. *Id.* The Court reasoned that because the design was created in such a way that alterations could take place and it was common for the product to be altered, the alterations to the control panel was reasonably foreseeable by Westinghouse. *Id.*

Here, just as in *Hicks* and *Hannah*, Plaintiff has presented substantial evidence, including expert testimony and extensive detailed maintenance records, demonstrating that there were no modifications or alterations to the bulkhead/firewall of the subject vehicle and/or, even if there were, those alterations were foreseeable to GM. As such, GM's motion should be denied.

### C.   Plaintiffs' Failure to Warn and Negligence Per Se Claims Related to GM's Failure to Recall Are Viable Under Alabama Law.

Alabama law imposes a duty to warn end users of the dangers of its products on all manufacturers. This duty to warn arises, in a pure negligence context, from § 388, *Restatement (Second) of Torts,* as adopted by the Alabama Supreme Court in *Purvis v. PPG Industries, Inc.,*

9

502 So.2d 714, 719 (Ala.1987). *See Ex parte Chevron Chem. Co.*, 720 So. 2d 922, 924–25 (Ala. 1998). Section 388 states:

> § 388. Chattel Known to be Dangerous for Intended Use
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise **reasonable care to inform** them of its dangerous condition or of the facts which make it likely to be dangerous.

(emphasis added).

In a negligence action, the existence of a duty and the standard of conduct is determined by the nature of the defendant's activity, the relationship between the parties and the type of injury and harm threatened. *Morgan v. South Central Bell Tel. Co.*, 466 So. 2d 107, 114 (Ala. 1985). The key factor is the foreseeability of harm. *Key V. Compass Bank*, 826 So. 2d 159, 170 (Ala. Civ. App. 2001). Because of the complexity of the issues, "it is seldom possible to reduce negligence to any definite rules; it is 'relative to the need and occasion.'" *Stanford v. Wal-Mart Stores, Inc.*, 600 So. 2d 234, 237 (Ala. 1992) (citation omitted).

GM in essence argues that a manufacturer's duty to warn ends when the product is sold. This limitation has never been recognized by Alabama law. Instead, Alabama law emphasizes that a manufacturer's duty to warn arises due to the manufacturer's superior knowledge that the product is dangerous. For instance, the Alabama Pattern Jury Instruction on warnings do not mention that the duty to warn ceases to exist after the product is sold.

10

APJI 32.09 AEMLD — Warning — Elements [PL]

Plaintiff (name of plaintiff) says that the (name the product) was dangerous when used as intended and that Defendant (name of defendant) did not give (him/her/name of deceased) an adequate warning about the danger. To recover damages on this claim, (name of plaintiff) must prove to your reasonable satisfaction all of the following elements:

1. (Name of defendant) was a (manufacturer/supplier/distributor/seller) of the (name the product);

2. (Name of defendant) did (manufacture/supply/distribute/sell) the (name the product);

3. The (name the product) was dangerous when used as intended;

4. **(Name of defendant) knew or should have known that the (name the product) could create danger when used as intended in its customary manner;**

5. **(Name of defendant) did not give an adequate warning about the danger to persons likely to be injured by the product; and**

6. (Name of plaintiff/name of deceased) was caused (harm/death) as a result.[2]

Numbers 4 and 5 are of particular importance. If Alabama limited the duty to warn only to the time of sale, then number 4 and 5 would read as follows:

4. (Name of defendant) knew or should have known**, at the time of sale,** that the (name the product) could create danger when used as intended in its customary manner;

5. (Name of defendant) did not give an adequate warning about the danger**, at the time of sale,** to persons likely to be injured by the product; and

Alabama has not limited a manufacturer's knowledge of the danger or duty to give an adequate warning to the time of sale. Instead, a manufacturer's duty to warn can arise at any time the manufacturer knows or should have known about dangers associated with the product's use.

---

[2] *See also* APJI 32.17 Negligence-Failure to Warn, which does not limit the duty to warn to the time of sale.

11

> The manufacturer of a product which may be reasonably anticipated to be dangerous if used in a way which he should reasonably foresee it would be used is under a duty to exercise reasonable care to give reasonable and adequate warnings of any dangers known to him, or which in the exercise of reasonable care he should have known and which the user of the product obviously could not discover. **Reasonable care means that degree of care which a reasonably prudent person would exercise under the same circumstances.**

*Bean v. BIC Corp.*, 597 So. 2d 1350, 1353 (Ala. 1992) (emphasis added).

As recently as 2014, the Alabama Supreme Court confirmed that a manufacturer or supplier of a product would owe a duty to warn expected users of safety issues relative to the product's use even **after** the sale. *See Yanmar America Corp. v. Nichols*, 166 So.3d 70 (2014). In *Yanmar America* Corp., Autrey Nichols purchased a "gray-market"[3] Yanmar tractor manufactured in Japan in 1979 from a local tractor supplier in 2005. *Id.* at 74. The Yanmar tractor was intended to primarily be used in the rice paddies of Japan and was designed and manufactured to comply with Japanese standards. *Id.* "Significant design differences existed between those Yanmar brand tractors manufactured for use in the Japanese market and those Yanmar brand tractors manufactured for use in the United States market . . . Because of the significant differences in the design and performance of the tractors, the tractors intended for the Japanese market were never intended to be sold or used in the United States market." *Id.*

---

[3] The Alabama Supreme Court explained what the term "gray market" means as follows:

> "Gray market" has been defined as a "'market in which the seller uses legal but sometimes unethical methods to avoid a manufacturer's distribution chain and thereby sell (esp. imported goods) at prices lower than those envisioned by the manufacturer.'" *Rife v. Hitachi Constr. Mach. Co.,* 363 S.C. 209, 217, 609 S.E.2d 565, 570 (S.C.Ct.App.2005) (quoting *Black's Law Dictionary* 989 (8th ed.2004)). "Gray-market" products include products that have been produced abroad with authorization and payment and have been imported into unauthorized markets. *Id.*

12

In 1981, Yanmar Japan established Yanmar America to distribute parts for Yanmar tractors authorized for sale in the United States. *Yanmar America Corp.*, 166 So.3d at 74. By the early 1990s, Yanmar America became aware of the influx of gray-market tractors into the U.S. market. *Id.* at 77. In 1992, Yanmar America began warning about the safety issues associated with using gray-market tractors in the U.S. and continued its efforts to prevent the sale of gray-market tractors in the U.S. into the 2000s. *Id.* at 77-80.

On May 1, 2008, Randy Nichols, the owner's brother, fell from the tractor while bush hogging a neighbor's property and was severely injured. *Yanmar America Corp.*, 166 So.3d at 73. He sued Yanmar America, alleging in relevant part to this case, a claim for post-sale failure to warn. *Id.* at 80-81. In discussing Yanmar America's post-sale duty to warn, the Alabama Supreme Court noted that if Yanmar American had been the manufacturer of the tractor, it would have had the duty to warn any "expected users of the gray-market tractor of the safety issues relative to its use." *Id.* at 82. Since Yanmar America did not manufacture the tractor, it could possess the duty to warn post-sale only if it assumed the duty. *Id.*

If a manufacturer discovers a hazard after the sale of the product, and it is obvious that the user of the product could not discover this same hazard, it makes legal and logical sense that the manufacturer should have a duty to warn of the hazard. In other words, a reasonable and prudent manufacturer would warn potential users of such hazards. Plaintiffs cannot locate any Alabama case, and GM has failed to cite one, that restricts the duty to inform users of hazards only to the time of sale. This Court should deny GM's motion for summary judgment on Plaintiffs' warnings claims.

Although GM is correct that Alabama does not recognize a common law post-sale duty to recall, the Motor Vehicle Safety Act 49 U.S.C. § 30118, 30120 places an affirmative duty on a

13

manufacturer that knows its vehicles contain a defect related to motor vehicle safety to warn about and remedy the defect.

> A manufacturer of a motor vehicle or replacement equipment shall notify the Secretary by certified mail or electronic mail, and the owners, purchasers, and dealers of the vehicle or equipment as provided in section 30119(d) of this section, if the manufacturer . . . learns the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety . . ..

49 U.S.C. § 30118 (c).

> (a) Ways to remedy. — (1) Subject to subsections (f) and (g) of this section, when notification of a defect or noncompliance is required under section 30118(b) or (c) of this title, the manufacturer of the defective or noncomplying motor vehicle or replacement equipment shall remedy the defect or noncompliance without charge when the vehicle or equipment is presented for remedy. Subject to subsections (b) and (c) of this section, the manufacturer shall remedy the defect or noncompliance in any of the following ways the manufacturer chooses:
>    (A) if a vehicle--
>       (i) by repairing the vehicle;
>       (ii) by replacing the vehicle with an identical or reasonably equivalent vehicle; or
>       (iii) by refunding the purchase price, less a reasonable allowance for depreciation.

49 U.S.C. § 30120.

While the MVSA does not create a private right of action, "violation of the MVSA is evidence of negligence per se in Alabama." *Lowe v. Gen. Motors Corp.*, 624 F.2d 1373, 1380 (5th Cir. 1980). In addition, "evidence of a failure to recall may have relevance to a failure to warn claim." *See Lampley v. Bridgestone Firestone, Inc.*, No. CIV.A. 90-A-907-N, 1992 WL 12666661, at *1 (M.D. Ala. Mar. 31, 1992). Plaintiffs do not allege a separate "Failure to Recall" cause of action. Instead, Plaintiffs group failure to warn and recall together under their AEMLD, negligence, and wantonness claims.

## IV.  CONCLUSION

For the reasons stated above, GM's motion should be denied. Plaintiffs have presented

14

substantial evidence that the conduct of the co-defendant in improperly torqueing the oil filter was not a substantial alteration to the product because the conduct did not create the defective bulkhead/firewall and, even if so, improper torqueing of an oil filter is foreseeable to GM. Additionally, the Plaintiffs have presented substantial evidence that there were no substantial alterations to the bulkhead or its grommets. Finally, Alabama law supports the Plaintiffs' negligence claims based upon GM's failure to warn about the defect in this Blazer. As a result, GM's motion for summary judgment should be DENIED.

/s/ Jere L. Beasley
JERE L. BEASLEY (BEA020)

/s/ J. Greg Allen
J. GREG ALLEN (ALL021)

/s/ D. Michael Andrews
D. MICHAEL ANDREWS (AND076)

/s/ L. Shane Seaborn
L. SHANE SEABORN (SEA027)

/s/ Myron C. Penn
Myron C. Penn (PEN020)
Attorneys for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW,
 METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160

15

Montgomery, AL 36104
(334) 269-2343
jere.beasley@beasleyallen.com
greg.allen@beasleyallen.com
michael.andrews@beasleyallen.com

PENN AND SEABORN, L.L.C.
P.O. Box 688
Clayton, AL 36016
(334) 775-9778
sseaborn1@yahoo.com
myronpenn28@hotmail.com

## CERTIFICATE OF SERVICE

      I hereby certify that I have this date served the foregoing upon the following counsel by electronically filing same and/or by placing a copy of same in the U.S. Mail, postage prepaid, and properly addressed this **31st** day of **August, 2018**.

                                            /s/   J. Greg Allen
                                            OF COUNSEL

**Attys. for Defendant General Motors, LLC**
Paul V. Cassisa, Jr.
*(admitted pro hac vice)*
BUTLER SNOW LLP
P.O. Box 1138
Oxford, MS  38655
paul.cassisa@butlersnow.com

Robert R. Baugh
Alyse N. Gillman
Thomas A. Woodall
SIROTE & PERMUTT, PC
2311 Highland Avenue South
Birmingham, AL  35205
rbaugh@sirote.com
agillman@sirote.com
twoodall@sirote.com

Ronald Goshay d/b/a Ron's Automotive
120-A Blackmon Avenue
Union Springs, AL  36089