09-50026-mg    Doc 14393-4    Filed 12/21/18    Entered 12/21/18 18:20:40    Exhibit
Exhibit B to Declaration of Mark Williams    Pg 1 of 9

# EXHIBIT B

**NEW YORK STATE OF OPPORTUNITY** | **Department of Environmental Conservation**

# GM Powertrain - Report, March 27, 2003

## Report, March 27, 2003

STATE OF NEW YORK : DEPARTMENT OF ENVIRONMENTAL CONSERVATION
625 Broadway
Albany, New York 12233-1550

In the Matter

of

the Disputed Regulatory Program Fees of

**GM POWERTRAIN - TONAWANDA ENGINE PLANT**
**AMERICAN AXLE & MANUFACTURING, INC.**
2390 Kenmore Avenue
Tonawanda, NY 14150-7847

**REPORT**

by

_____/s/_____
P. Nicholas Garlick
Administrative Law Judge

March 27, 2003

## Introduction

This report summarizes a dispute between Staff of the Department of Environmental Conservation ("DEC Staff") and two companies, the General Motors Corporation ("GM") and American Axle and Manufacturing, Inc. ("AAM") over the amount of regulatory program fees for the years 1996 through 1999. The disputed amount totals $167,000 and was paid in full by GM who now seeks reimbursement. These fees were billed as a result of the generation of hazardous waste while cleaning up at two sites in Tonawanda, NY. The first site, known as GM's foundry complex, involved the removal of sand and concrete contaminated with PCBs. The second site, the AAM site, involved the removal of soils contaminated with PCBs and debris from sewers. There is no dispute regarding the amount of hazardous waste generated, rather the dispute centers on whether these hazardous wastes were exempt or not from the calculation of the appropriate regulatory fees under Article 72 of the Environmental Conservation Law ("ECL").

The ALJ has determined, following the pre-hearing conference that there were no disputed issues of fact but only issues involving the interpretation of Article 72 and its enacting regulations. Accordingly, this report summarizes the material facts and disputed issues and refers this matter to the General Counsel of DEC for a declaratory ruling, in accordance with 6 NYCRR 619.

## Proceedings

This matter was referred to the Office of Hearings and Mediation Services on April 11, 2002 and assigned to Administrative Law Judge ("ALJ") P. Nicholas Garlick on April 19, 2002. The pre-hearing conference in this matter occurred over several months through a series of teleconferences. The first call was held on April 25, 2002, during which a schedule was set for the exchange of documents and for the parties to negotiate a "Summary of Facts" in this matter. Copies of relevant documents and drafts of the proposed "Summary of Facts" were exchanged. The pre-hearing conference ended on August 23, 2002 without an agreement between the parties on a "Summary of Facts" but with an

agreement that there were no disputes to a hearing and the parties agreed that only drafting disputes prevented agreement on a "Summary." Accordingly, no adjudicatory hearing in this matter was held. The ALJ, upon review of the submissions of the parties, determined the facts as set forth below.

The remaining dispute is a legal one, a question of statutory interpretation, which pursuant to 6 NYCRR 481.10(f)(4), must be referred to the Department's General Counsel for a declaratory ruling. This report summarizes the material facts, briefly states the positions of the parties, identifies the legal disputes, and sets forth a briefing schedule. As part of the petition for declaratory ruling, I submit to the General Counsel this report and copies of all documents provided by the parties. These documents include invoices, correspondence, statements of positions by the parties and all other materials submitted.

## Summary of Facts

1. This report addresses the application of two exclusions from regulatory fees on generators of hazardous waste established by ECL §72-0402.

2. ECL §72-0402 imposes regulatory fees on generators of hazardous waste using a tiered fee schedule based on the annual total of hazardous waste generated. In the period 1996 through 1999, the annual fees were:

| Annual Hazardous Waste Generation | Regulatory Fee |
|---|---|
| Less than 15 tons | No Fee |
| 15 to 100 tons | $1,000 |
| More than 100 tons to 500 tons | $6,000 |
| More than 500 tons to 1,000 tons | $20,000 |
| More than 1,000 tons | $40,000 |

3. ECL §72-0402(f) excludes certain wastes from the calculation of the annual hazardous waste generation total and reads:

> f. No fee shall be payable for waste resulting from services which are provided
>
> (i) under a contract with the department, or with the department's approval and in compliance with department regulations, or pursuant to an order of the department, the United States environmental protection agency or a court, related to the cleanup or remediation of a hazardous materials or hazardous waste spill, discharge, or surficial cleanup, pursuant to this chapter, other than section 27-1313 or a removal action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ( 42 U.S.C. 9601 et seq.); or
>
> (ii) under a contract for, or with the department's approval and in compliance with department regulations for, the cleanup and removal of a petroleum spill or discharge, pursuant to subdivision seven or section one hundred seventy-six of the navigation law; or
>
> (iii) under the order of a court, the department or the department of health, or the United States environmental protection agency related to an inactive hazardous waste disposal site pursuant to section 27-1313 of this chapter, section thirteen hundred eighty-nine-b of the public health law, or the Comprehensive Environmental Response, Compensation and Liability Act ( 42 U.S.C. 9601 et seq.); or
>
> (iv) voluntarily and without expectation of monetary compensation in accordance with subdivision one of section 17-1321 of this chapter; or
>
> (v) under permit or order requiring corrective action pursuant to title nine of article twenty-seven of this chapter or the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.).

4. GM contends that wastes generated from the cleanup of hazardous waste during a project on a portion of its Tonawanda, NY Facility known as the former Foundry Complex should be excluded in calculating the regulatory fee because they are covered by the exclusions in both ECL §72-0402(1)(f)(i) and (iv). DEC Staff disagrees.

5. AAM contends that wastes generated on its Tonawanda, NY facility in 1998 and 1999 should be excluded in calculating the regulatory fee because they are covered by the exclusion found in ECL §72-0402(1)(f)(i). Specifically,

these wastes were generated during (1) contaminated soil removal at a portion of its Tonawanda, NY facility known as the Berm Area, and (2) contaminated sediment removal from the facility sewer system. DEC Staff disagrees.

6. The AAM facility formerly was owned by GM and was a part of GM's Tonawanda, NY facility until it was transferred to AAM in 1994. GM had a SPDES permit which defined the terms and conditions for discharge of storm water, cooling water, and industrial process wastewater to the waters of New York State, in this case, the Niagara River.

7. By agreement between GM and AAM, GM conducted the work that generated the hazardous wastes in dispute from the AAM facility, and GM paid the regulatory fees that DEC Staff alleges were due from AAM.

8. The amounts of regulatory fees in dispute in this hearing total $167,000 as detailed below:

| Facility | Year | GM/AAM Calculated Fee | DEC Calculated Fee | Fee in Dispute |
|---|---|---|---|---|
| GM | 1996 | $6,000 | $40,000 | $34,000 |
| GM | 1997 | $6,000 | $40,000 | $34,000 |
| GM | 1998 | $1,000 | $40,000 | $39,000 |
| AAM | 1998 | $0 | $40,000 | $40,000 |
| AAM | 1999 | $0 | $20,000 | $20,000 |

9. GM made timely submissions, as specified in DEC regulations, of the regulatory fee recalculation request forms, continuing disagreement forms and an opposing summary statement explaining its disagreement with the DEC's calculation of the regulatory fees.

10. AAM made timely submissions, as specified in DEC regulations, of the regulatory fee recalculation request forms, continuing disagreement forms and an opposing summary statement explaining its disagreement with the DEC's calculation of the regulatory fees.

11. GM, on behalf of itself and AAM, has paid all regulatory fees invoiced by the DEC, and in this hearing seeks refund of the overpayments in the amount of $167,000.

## Factual Background

12. Since the 1950s, GM operated the Tonawanda facility consisting of three major operations: the engine plant, the forge facility and the foundry complex.

13. GM continues to operate the engine plant at the Tonawanda facility, and has expanded it over the last decade.

14. The forge facility was sold to AAM in 1994, and AAM continues to operate it.

15. The foundry complex consisted of the foundry building, plus satellite structures including a dedicated wastewater treatment facility with settling tanks, clarifiers, a waste sludge building and a thickener building. The foundry complex ceased operation and was closed in 1984, and was demolished during the period of 1996 through 1998.

16. Historically, GM used PCBs in the foundry complex and the forge.

## GM Foundry Complex Project

17. The foundry complex was closed in 1984. The foundry sand was left in place throughout the structures. Much of the foundry sand in the foundry complex was present in the basement areas. Once the foundry complex closed, it was fenced off, and the basements of the structures filled with water.

18. GM began the demolition of the foundry complex in January of 1996 prompted by a plan to expand the existing engine plant into a portion of the site occupied by the abandoned foundry complex.

19. As part of the proposal to develop the site, GM planned to demolish the structure of the foundry complex, remove and dispose of excess debris, and fill the basement with a concrete material referred to as "flowable fill," so that it could be used as a stable foundation for future development.

20. GM proposed to use foundry sand and possibly concrete decks as part of the mixture to fill the basement, and developed and submitted an application for a beneficial use determination (BUD) to DEC's Region 9 office, requesting authorization to reuse the foundry sand in producing the flowable fill.

21. In 1996, GM performed testing of the foundry sand and visibly impacted areas of the concrete structures. These testing results showed that some of the foundry sand and portions of the structure contained PCBs in excess of 50 ppm subjecting them to regulation as hazardous waste when disposed.

22. On July 19, 1996, GM notified Mr. Jeffrey Schmitt of the DEC Solid Waste Program by telephone of the detection of PCBs. On August 2, 1996, GM, through its consultant EMCON, followed up with a letter (a copy of this letter is provided with the petition). A true copy of the August 2, 1996 letter was provided by GM counsel on May 16, 2002.

23. Subsequently, the DEC Solid Waste Staff advised GM that the contaminated foundry sand could not be used onsite, and GM informed the DEC that it would instead ship all of the foundry sand offsite as hazardous waste.

24. As it developed, the foundry complex project in 1996 and 1997 consisted of four major elements: (a) collection, treatment and discharge of PCB contaminated wastewaters that had been in contact with the foundry sand and concrete; (b) handling and disposal of foundry sand; (c) characterization and handling of PCB-contaminated concrete; and (d) completion of the project by filling the basement with the flowable fill.

25. GM consulted with DEC Region 9 Water Staff concerning control of runoff from the foundry complex and treatment and characterization of the accumulated water in the basement and other areas prior to discharge. Regulatory fees did not apply to this water.

26. GM and its consultants submitted proposals, work plans and reports to DEC regarding the handling of the accumulated water and stormwater runoff on August 16, 1996, September 27, 1996, October 1, 1996, November 1, 1996, January 16, 1997, March 11, 1997, June 26, 1997 and January 28, 1999. Regulatory fees did not apply to this water. True copies of these letters/reports were provided by GM counsel on May 16, 2002.

27. In letters dated October 4, 1996, November 4, 1996, and December 18, 1996, DEC Region 9 Staff approved GM's proposals for treating and discharging the wastewaters, which were not considered hazardous wastes from the foundry complex project (other letters dated September 10, 1996 and September 23, 1996 relate to this paragraph and copies are included in the petition). True copies of these letters were provided by GM counsel on May 16, 2002.

28. GM treated and discharged the wastewaters, which are not considered hazardous wastes (so regulatory fees do not apply), from the foundry complex project in compliance with its proposals and the DEC's approvals.

29. GM addressed the PCB-contaminated foundry sand by gathering it, moving it to a staging area and shipping it offsite as hazardous waste in rail cars. The first shipments of hazardous waste foundry sand were manifested offsite in September 1996. The wastes were not generated pursuant to an Order of the Department, USEPA or a court, or as part of a CERCLA cleanup or RCRA Corrective Action or Voluntary Cleanup Agreement.

30. During a routine inspection of the site in January 1997, a member of DEC Region 9 RCRA Staff observed that the hazardous waste GM was generating was being handled in a manner that he believed required a RCRA permit. GM did not have such a permit.

31. In response, GM, in a February 14, 1997, letter to DEC, explained how it believed that no RCRA permit was necessary and that the procedures followed at the site were consistent with interpretations recognized by DEC and the United States Environmental Protection Agency (EPA). A true copy of the February 14, 1997 letter was provided by GM counsel on May 16, 2002.

32. A meeting was held on March 13, 1997 between representatives of DEC and GM to discuss the application of the area of contamination (AOC) concept.

33. On March 19, 1997, GM provided a letter to DEC describing the procedure to be used for characterizing, moving and staging foundry sand and other PCB-contaminated materials for offsite transport. A true copy of the March 19, 1997 letter was provided by GM counsel on May 16, 2002.

34. On March 26, 1997, DEC stated that the proposal set forth in the March 19, 1997 letter were "in conformance with existing federal guidance." The letter continued "Please note that this determination applies only to the management methods as described in your March 19 letter. Any alternative or differing management methods will require prior NYSDEC review and approval. Failure to obtain prior approval may result in a violation of the State's hazardous waste regulations; any violation of the State's hazardous waste regulations will result in an enforcement action."

35. In letters dated March 27, 1997, March 28, 1997 and April 2, 1997, GM and DEC clarified the conditions in the March 26, 1997 letter, and ultimately GM went forward with the work outlined (the moving and staging of foundry sands) and the remaining PCB-contaminated materials were transported offsite. True copies of these letters were provided by GM counsel on May 16, 2002.

36. On October 2, 1996, GM's representatives sought confirmation from DEC that GM could decontaminate the foundry complex slab and any residual PCB contamination would not be subject to regulation as hazardous waste. A true copy of the October 2, 1996 letter was provided by GM counsel on May 16, 2002.

37. On October 3, 1996, DEC Staff member Lawrence Nadler confirmed that the intact slab would not be regulated as hazardous waste, but indicated that EPA and DEC solid waste officials should be contacted to confirm that the proposed approach complied with EPA PCB regulations and DEC solid waste regulations. Since the slab was not considered hazardous waste, no hazardous waste fees applied. However, concrete debris and other materials were removed from the slab and were manifested off-site as hazardous waste; DEC alleges that the materials removed from the slab are subject to regulatory fees. A true copy of the October 3, 1996 letter was provided by GM counsel on May 16, 2002. GM did not seek or request to enter into a Superfund Cleanup Order or a Responsible Party Order.

38. In letters dated October 10, 1996, October 22, 1996, November 8, 1996, June 18, 1997 and July 3, 1997, GM representatives described to EPA's David Greenlaw the proposed approach for characterizing and addressing areas of PCB-contaminated concrete in the slab and EPA approved the proposed approach. True copies of the October 10, 1996, October 22, 1996, November 8, 1996, June 18, 1997 and July 3, 1997 letters were provided by GM counsel on May 16, 2002.

39. In a letter dated October 10, 1996, DEC Region 9 Solid Waste Program confirmed that uncontaminated concrete debris could be used together with flowable fill in the basement, that the basement could be filled provided sampling indicated PCB concentrations in the slab were less than 50 ppm, and that concrete debris with PCB concentrations of less than 50 ppm could be handled as non-hazardous waste. Non-hazardous waste is not subject to hazardous waste fees. A true copy of the October 10, 1996 letter was provided by GM counsel on May 16, 2002.

40. In a February 21, 1997 letter, GM requested clarification that any concrete containing less than 1 ppm PCBs would be considered uncontaminated, and, in response, DEC Solid Waste Program in a February 28, 1997 letter requested a report on the sampling carried out on the concrete. True copies of these letters were provided by GM counsel on May 16, 2002.

41. On June 12, 1997, GM submitted to the DEC Solid Waste Program a "Foundry Area Concrete Characterization Status Report" describing the testing which was already conducted of the concrete slab in the former foundry complex. A true copy of this letter and attached report was provided by GM counsel on May 16, 2002.

42. On July 2, 1997, DEC Solid Waste Program approved the "Foundry Area Concrete Characterization Status Report" and the use of 1 ppm as the threshold for identifying concrete that "can be considered uncontaminated." This report pertained to the use of non-hazardous waste as backfill material. A true copy of the July 2, 1997 letter was provided by GM counsel on May 16, 2002. DEC does not consider the approval of a non-hazardous waste issue to be approval of the remediation or cleanup of hazardous waste.

43. After GM received the DEC Solid Waste Program's approval of the "Foundry Area Concrete Characterization Status Report," it filled the basement with flowable fill concrete material and construction of the engine plant expansion proceeded.

44. DEC staff repeatedly visited and inspected the foundry complex project area and attended meetings with GM and its consultants.

45. In letters dated March 31, 1998 and April 29, 1998, GM notified DEC of its intention to demolish the wastewater treatment plant of the former foundry complex and of the need to dispose of lead contaminated wastewater treatment sludge as hazardous waste. The DEC did not state an objection to this course of action, nor did it provide any formal or written approval of this course of action. True copies of the March 31, 1998 and April 29, 1998 letters were provided by GM counsel on May 16, 2002.

46. DEC does not allege that GM committed any violations regarding the characterization and removal of hazardous wastes from the former foundry complex. DEC was not present nor involved during the entire characterization and removal process.

47. GM was not required by law to demolish the former foundry complex, but chose to carry out the project to allow redevelopment of the site.

48. GM asserts it received no monetary compensation for the foundry complex demolition and removal of PCB-contaminated materials.

49. GM asserts (and DEC has no evidence to the contrary) that it conducted the foundry complex project utilizing persons professionally trained and experienced in the treatment, storage, disposal and transport of hazardous materials to properly clean up and dispose of the contaminated materials.

50. The foundry complex project undertaken by GM was not done pursuant to: (a) an order issued by a court, EPA or DEC, (b) the hazardous waste corrective action program, or (c) a voluntary cleanup agreement with DEC.

## American Axle & Manufacturing

51. Investigation of the AAM site by GM identified the presence of PCBs in an area known as the Berm Area in which it was reported that metal grindings, swarf and other scrap metal historically had been staged on the ground prior to transport offsite.

52. Under its SPDES permit, GM was required to monitor for PCBs on a monthly schedule, and if PCBs were detected above 0.065 µg/l, GM was required to notify the DEC of the detection, any known or probable cause, and any short term steps to reduce, eliminate and prevent any recurrence of the detection.

53. Under GM's SPDES permit, GM was required after three consecutive PCB detections above 0.065 µg/l to "evaluate the treatment system and/or the wastewater source to determine if there is an identifiable and/or controllable cause of the detectable level of PCBs in the discharge" and to prepare a report to DEC.

54. The wastewater samples from GM's Outfall 001 analyzed in April, May and June 1998 contained PCBs at concentrations greater than 0.065 µg/l.

55. Some of the wastewater discharged through GM's Outfall 001 came from the AAM facility.

56. On June 26, 1998, GM faxed to Robert Smythe of the DEC's Division of Water in Region 9 a Soil Removal Plan for the Berm Area at the AAM facility that proposed the excavation and offsite disposal of PCB-contaminated concrete and soil. Mr. Smythe had been informed of the proposed work in a conference call a few days earlier. A hard copy of the work plan was delivered to DEC on June 29, 1998. The plan notified DEC that GM expected to begin the work on July 1 and complete it on July 12, and invited Mr. Smythe to a "kickoff meeting" on July 1. A true copy of the June 26, 1998 letter and soil removal plan was provided by GM counsel on May 16, 2002.

57. GM considered the Berm Area a likely source of the PCBs detected in the wastewater discharge.

58. Mr Smythe reviewed the Soil Removal Plan, attended a meeting at the site, asked questions regarding the proposed project, and did not object to the project going forward based on GM's response to his questions. DEC asserts that Mr. Smythe did not have the authority to approve soil remediation plans; GM asserts that he did.

59. The soil removal project began on July 2, 1998. Manifests show shipments of hazardous waste started on July 3, 1998. By August over 6,000 tons of soil and other debris had been excavated and subsequently was shipped offsite as hazardous waste.

60. Following the soil removal project, GM investigated additional sources of PCBs in its wastewater discharge, and during the next six months, cleaned out sediments in sewers on the AAM facility contaminated with PCBs. GM also conducted additional smaller soil excavations in contaminated areas on the AAM facility.

61. These follow-up projects in 1999 generated approximately an additional 464 tons of PCB-contaminated soil/sediment that was shipped offsite for disposal as hazardous waste.

62. The total hazardous waste generation on the AAM facility was less than 500 tons in 1999.

63. GM submitted additional reports to DEC concerning the soil and sediment removal work being carried out on the AAM facility in compliance with the requirements of its SPDES permit on August 26, 1998, September 22, 1998, December 17, 1998 and June 15, 1999. True copies of these reports were provided by GM counsel on May 16, 2002.

64. DEC Staff reviewed these reports and the work carried out by GM.

65. GM and AAM were not required to remediate the AAM facility pursuant to: (a) an order issued by a court, EPA or DEC, (b) the hazardous waste corrective action program, or (c) a voluntary cleanup agreement with DEC. GM was required to address the discharge of PCBs under the terms of its SPDES permit.

# Positions of the Parties

## GM's and AAM's Position

GM and AAM contend that the hazardous wastes generated are specifically exempt from regulatory fees. Specifically, the companies argue that the hazardous wastes generated at the two sites should be excluded from regulatory fees because the projects at both sites were carried out with the approval of DEC staff, in compliance with DEC regulations, and involved the remediation or cleanup of a hazardous waste/hazardous material spill, discharge or surficial cleanup (ECL §72-0402(1)(f)(i) and 6 NYCRR §483.4(a)). GM and AAM argue that while no order or contract existed between DEC and GM, DEC staff were kept informed of progress at the sites and approved the work done and thus the hazardous waste generated should be exempt from regulatory fees. In addition, fees should not be imposed on hazardous waste generated from the foundry site because the cleanup was carried out voluntarily by GM with no expectation of monetary compensation (ECL §72-0402(1)(f)(iv) and 6 NYCRR § 483(d)).

## DEC Staff's Position

DEC Staff does not dispute the quantity or source of the hazardous waste, rather, it argues that the exceptions to regulatory fees cited by GM and AAM do not apply in this case. Specifically, DEC staff argues that the correct interpretation of the term "approval" in law means a formal document (such as a consent order, contract, permit, or voluntary cleanup agreement) that has been executed by either the Commissioner or a designated representative. The informal reviews and approvals that GM and AAM may have received during the cleanup of these two sites do not rise to the level of "approval" envisioned in the law. Regarding the companies' claim under the voluntary cleanup program, DEC Staff asserts that GM is not entitled to make this claim because it was responsible for the contamination at the site. Finally, DEC Staff assert that the positions asserted by the companies are inconsistent with past agency practice and agency interpretation of the law.

# Issues for Declaratory Ruling

There are two issues to be resolved by the General Counsel in his declaratory ruling:

1. Does ECL §72-0402(1)(f)(i) which exempts hazardous waste from regulatory fees for wastes generated with the "department's approval and in compliance with the department's regulations" apply to the facts of this dispute?

2. Does ECL §72-0402(f)(1)(iv) which exempts hazardous waste from regulatory fees for wastes generated "voluntarily and without expectation of monetary compensation" apply to the facts of this dispute?

# Briefing Schedule

Parties shall submit initial briefs on this dispute to the General Counsel by April 18, 2003 and replies no later than May 9, 2002. Unless the General Counsel directs, otherwise, the parties' briefs and replies, this report and the documents forwarded will constitute the petition for a declaratory ruling.

Brief must be filed with James F.X. Ferriera, Esq., General Counsel, NYS Department of Environmental Conservation, 625 Broadway, Albany, NY 12233-1500. Each party must also send a copy of its respective brief to the opposing party at the addresses provided below.

To: Margaret A. Sheen, Esq.
Senior Attorney
NYSDEC Region 7
Division of Legal Affairs
615 Erie Blvd. West
Syracuse, NY 13204-2400

Robert S. McLaughlin, Esq.
Bond, Schoeneck & King, LLP
One Lincoln Center
Syracuse, NY 13202-1355