# EXHIBIT C

**NEW YORK STATE OF OPPORTUNITY | Department of Environmental Conservation**

# Declaratory Ruling 72-14: GM-Powertrain - Tonawanda Engine Plant, American Axle & Manufacturing, Inc.

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION

In the Matter of the Petition of

**GM-Powertrain - Tonawanda Engine Plant, American Axle & Manufacturing, Inc.**

for a Declaratory Ruling

## Introduction and Issues for Ruling

This matter has been referred by the New York State Department of Environmental Conservation ("Department" or "DEC") Office of Hearings and Mediation Services to the Department's Office of General Counsel pursuant to 6 NYCRR §481.10(f)(4) for the issuance of a declaratory ruling pursuant to State Administrative Procedures Act §204 and 6 NYCRR Part 619. GM-Powertrain-Tonawanda Engine Plant ("GM") and American Axle & Manufacturing, Inc. ("AAM") (collectively "Petitioner") dispute the assessment of hazardous waste regulatory fees ("fees") for the years 1996 through 1999, for cleanup of two sites: the GM foundry site and the AAM site. The disputed amount of $167,000 has been paid in full by GM, and GM now seeks to be reimbursed. The two issues that need to be resolved by this declaratory ruling, as stated in Administrative Law Judge (ALJ) P. Nicholas Garlick's March 27, 2003 hearing report, are as follows:

1. Whether ECL §72-0402(1)(f)(i), which exempts hazardous waste from regulatory fees for wastes generated with the "department's approval and in compliance with the department's regulations", applies to the facts of this dispute; and

2. Whether ECL §72-0402(1)(f)(iv), which exempts hazardous waste from regulatory fees for wastes generated "voluntarily and without expectation of monetary compensation", applies to the facts of this dispute.

## Summary of Ruling

Since the Department was not involved with the GM foundry complex site or AAM project at the outset and before any hazardous waste was generated, the GM foundry complex site and the AAM project are not exempt from regulatory fees pursuant to ECL §72-0402(1)(f)(i). As a matter of procedure, the Department has historically required some type of written agreement between the generator and the proper program within the Department. This is to ensure the project is performed properly and that the Department has reviewed remediation plans and approved those plans before any work commences.

In addition, ECL §72-0402(1)(f)(iv) does not apply to the GM foundry complex site. The provisions in ECL §72-0402(1)(f)(iv) and ECL §27-1321(1) & (2) apply to a response effort for an accidental or threatened discharge of hazardous materials or hazardous waste. Although GM "voluntarily" conducted the cleanup project, and was not mandated to do so through a consent order or other type of enforcement action, it does not relieve GM of it's legal duty to perform the cleanup, as both an owner of the site and generator of the hazardous waste.

## Statement of Facts

The following relevant facts, as set forth in ALJ P. Nicholas Garlick's March 27, 2003 hearing report, have been accepted by both parties.[1] They are as follows:

1. ECL §72-0402 imposes regulatory fees on generators of hazardous waste using a tiered fee schedule based on the annual total of hazardous waste generated. In the period 1996 through 1999, the annual fees were:

| Generation | Regulatory Fees |
|---|---|
| Less than 15 tons | No Fee |
| 15 to 100 tons | $1,000 |
| More than 100 tons to 500 tons | $6,000 |
| More than 500 tons to 1,000 tons | $20,000 |
| More than 1,000 tons | $40,000 |

2. GM contends that wastes generated from the cleanup of hazardous waste during a project on a portion of its Tonawanda, NY Facility known as the former Foundry Complex should be excluded in calculating the regulatory fee because they are covered by the exclusions in both ECL §72-0402(1)(f)(i) and (iv). DEC Staff disagrees.
3. AAM contends that wastes generated on its Tonawanda, NY facility in 1998 and 1999 should be excluded in calculating the regulatory fee because they are covered by the exclusion found in ECL §72-0402(1)(f)(i). Specifically, these wastes were generated during (1) contaminated soil removal at a portion of its Tonawanda, NY facility known as the Berm Area, and (2) contaminated sediment removal from the facility sewer system. DEC Staff disagrees.
4. The AAM facility formerly was owned by GM and was part of GM's Tonawanda, NY facility until it was transferred to AAM in 1994. GM had a SPDES permit which defined the terms and conditions for discharge of storm water, cooling water, and industrial process wastewater to the waters of New York State, in this case, the Niagara River.
5. By agreement between GM and AAM, GM conducted the work that generated the hazardous waste in dispute from the AAM facility, and GM paid the regulatory fees that DEC Staff alleges were due from AAM.
6. The amounts of regulatory fees in dispute in this hearing total $167,000 as detailed below:

**Regulatory Fees in Dispute**

| Facility | Year | GM/AAM Calculated Fees | DEC Calculated Fees | Fee in Dispute |
|---|---|---|---|---|
| GM | 1996 | $6,000 | $40,000 | $34,000 |
| GM | 1997 | $6,000 | $40,000 | $34,000 |
| GM | 1998 | $1,000 | $40,000 | $39,000 |
| AAM | 1998 | $0 | $40,000 | $40,000 |
| AAM | 1999 | $0 | $20,000 | $20,000 |

7. GM and AAM made timely submissions, as specified in DEC regulations, of the regulatory fee recalculation request forms, continuing disagreement forms on an opposing summary statement explaining its disagreement with the DEC's calculation of the regulatory fees.
8. GM, on behalf of itself and AAM, has paid all regulatory fees invoiced by the DEC, and in this hearing seeks refund of the overpayment in the amount of $167,000.

## GM Foundry Site

1. Since the 1950's, GM operated the Tonawanda facility consisting of three major operations: the engine plant, the forge facility and the foundry complex.
2. GM continues to operate the engine plant at the Tonawanda facility, and has expanded it over the last decade.
3. The forge facility was sold to AAM in 1994, and is still operated by AAM.
4. The foundry complex ceased operation and was closed in 1984, and was demolished during the period of 1996 through 1998.
5. GM began demolition of the foundry complex in 1996 prompted by a plan to expand the existing engine plant into a portion of the site occupied by the abandoned foundry complex.

6. GM planned to demolish the structure of the foundry complex, remove and dispose of excess debris, and fill the basement with a concrete material, so that it could be used as a stable foundation for future development.
7. As it developed, the foundry complex project in 1996 and 1997 consisted of four major elements: (a) collection, treatment and discharge of PCB contaminated wastewaters that had been in contact with the foundry sand and concrete; (b) handling and disposal of foundry sand; (c) characterization and handling of PCB-contaminated concrete; and (d) completion of the project by filling the basement with the flowable fill.
8. GM addressed the PCB-contaminated foundry sand by gathering it, moving it to a staging area and shipping it offsite as hazardous waste in rail cars.
9. DEC staff repeatedly visited and inspected the foundry complex project area and attended meetings with GM and its consultants.
10. The foundry complex project undertaken by GM was not done pursuant to: (a) an order issued by the court, EPA or DEC; (b)the hazardous waste corrective action program; or (c) a voluntary cleanup agreement with DEC.

**AAM Site**

1. Investigation of the AAM site by GM identified the presence of PCBs in the Berm Area.
2. Under its SPDES permit, GM was required to monitor for PCBs on a monthly schedule.
3. GM faxed a Soil Removal Plan for the Berm Area at the AAM facility, to DEC, that proposed the excavation and offsite disposal of PCB-contaminated concrete and soil.
4. The soil removal project began on July 2, 1998. Manifests show shipments of hazardous waste started on July 3, 1998. By August over 6,000 tons of soil and other debris had been excavated and subsequently shipped offsite as hazardous waste.
5. Following the soil removal project, GM investigated additional sources of PCBs in its wastewater discharge, and during the next six months, cleaned out sediments in sewers on the AAM facility contaminated with PCBs. GM also conducted additional smaller soil excavations in contaminated areas on the AAM facility.
6. These follow-up projects in 1999 generated approximately an additional 464 tons of PCB-contaminated soil/sediment that was shipped offsite for disposal as hazardous waste.
7. The total hazardous waste generation at the AAM facility was less than 500 tons in 1999.
8. GM and AAM were not required to remediate the AAM facility pursuant to: (a) an order issued by a court, EPA or DEC; (b) the hazardous waste corrective action program; or (c) a voluntary cleanup agreement with DEC. GM was required to address the discharge of PCBs under the terms of its SPDES permit.
9. GM made timely submissions, as specified in DEC regulations, of the regulatory fee recalculation request forms, continuing disagreement forms and an opposing summary statement explaining its disagreement with the DEC's calculation of the regulatory fees.
10. AAM made timely submissions, as specified in DEC regulations, of the regulatory fee recalculation request forms, continuing disagreement forms and an opposing summary statement explaining its disagreement with the DEC's calculation of the regulatory fees.
11. GM, on behalf of itself and AAM, has paid all regulatory fees invoiced by the DEC, and in the hearing sought refund of the overpayments in the amount of $167,000.

**Discussion**

1.Whether ECL §72-0402(1)(f)(i), which exempts hazardous waste from regulatory fees for wastes generated with the "department's approval and in compliance with the department's regulations", applies to the facts of this dispute?

ECL §72-0402(1)(f)(i) states: No fee shall be payable for waste resulting from services which are provided (i) under a contract with the department, or with the department's approval and in compliance with department regulations, or pursuant to an order of the department, the United States environmental protection agency or a court, related to the cleanup or remediation of a hazardous materials or hazardous waste spill, discharge, or surficial cleanup, pursuant to this chapter, other than section 27-1313 or a removal action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. 9601 et seq.).

**GM's Argument**

**GM Foundry Site**

GM contends the only criteria in dispute, within the exemption, is whether services were provided with the department's approval. It is agreed that the cleanup was in compliance with department regulations, the remediation wastes were generated during the cleanup or remediation of hazardous materials or hazardous waste, and the services were not required by ECL 27-1313. GM contends it involved DEC staff in the foundry complex demolition project from its onset. GM submitted a Beneficial Use Determination ("BUD") application to the Department, to use the foundry sand as fill material. At such time, PCBs were discovered and the Department informed GM that the PCB-containing foundry sand could not be used onsite. Thereafter, GM informed the Department that all the foundry sand would be shipped offsite as a hazardous waste. GM views the Foundry Complex Project as having five major elements and stated that the Department was involved in the review and approval of each.

The first element was water management, due to the accumulation of storm water with low concentrations of PCB levels in the project area. GM states it repeatedly consulted with DEC Region 9 staff concerning the control, collection, characterization, treatment and ultimate discharge of the storm water. There was oral communication, submitted proposals, work plans and reports regarding the stormwater runoff. GM contends the Department approved the proposals in five separate letters. GM believes that although the storm water was not regulated as hazardous waste, the collection, handling, treatment and discharge of the storm water was an essential part of the project approved by DEC.

The second element was site characterization of various concrete structures, to determine what needed to be remediated. GM sought confirmation of the regulatory requirements from the Department. GM was informed that the intact concrete structure was not regulated as a hazardous waste, but that the debris may need to be handled as such. GM stated it contacted the Department's solid waste staff on a number of occasions, to discuss the approach for characterizing PCB-contaminated concrete and the permissible use of the material.

The third element was the procedure for handling hazardous remediation wastes, due to the generation of substantial quantities of PCB-contaminated foundry sand and concrete debris. The foundry sand and concrete debris were moved within the project area to a staging area, and then loaded into railroad cars for offsite transport. GM claims that DEC staff regularly inspected the site and were aware of how the materials were being handled. In a letter dated March 19, 1997 and addressed to the Department, GM submitted a description of the work that had been performed, future work that would occur and an explanation for why all regulations were being complied with. Based on a letter from the Department to GM, dated March 26, 1997, GM stated the DEC formally approved GM's procedure, and cautioned that the approval "applies only to the management methods described" by GM and that any change in the procedures "will require prior NYSDEC review and approval and that failure to obtain prior approval may result in a violation of the State's hazardous waste regulations." Further correspondence was exchanged and after further clarification, GM continued with the project.

The fourth element was the foundry remediation project. Once all the material in the basement had been characterized, the material identified as hazardous waste was removed. GM states the area was then cleaned, in accordance with standards required by DEC, and was then filled with flowable fill. Before being filled, GM states that DEC required it to submit for approval a report of its work identified as the "Foundry Area Concrete Characterization Status Report." GM thereafter filled the basement with soil containing less than 1 ppm PCB as a component in the fill material.

The fifth element was the closure of the foundry complex wastewater treatment plant. Waste water treatment sludge was generated and GM informed DEC of the discovery and it's intent to remove the hazardous waste material and demolish the abandoned wastewater treatment plant. DEC did not provide formal written approval, which was not required, so GM went ahead with the project.

GM summarizes its argument by stating that DEC staff was involved in the review of plans for collecting, treating and discharging PCB-contaminated water, reviewing and approving how PCB-contaminated material was handled, and reviewing and approving standards for clean-up. In addition, based on the degree of oversight and involvement, the DEC's acceptance of the course of action proposed by GM was sufficient to constitute the required "department approval" for the Department Approved Cleanup Exclusion from regulatory fees. GM Initial Brief p.6.

**AAM Project**

The AAM facility consisted of two phases to cleanup of the available cleanup of PCB-contaminated sediments out of the sewers. GM argues that both phases were conducted with the knowledge and approval of the DEC. Under the SPDES permit, GM was required to notify DEC if PCBs were detected. GM devised a soil removal plan after PCBs were detected three consecutive months and submitted it to DEC. The plan proposed the excavation and offsite disposal of PCB-contaminated soil. The Plan was reviewed by DEC Region 9 and questions were posed to GM, but there were no objections to the work. GM thereafter began work and contends that it submitted reports to DEC describing the remediation work performed and planned.

GM believes the reasonable conclusion should be that it carried out the remediation work required by the SPDES permit with the knowledge and approval of the DEC. The soil removal plan was submitted to the Department before work began and additional reports were submitted as the work progressed. GM contends that Department staff reviewed the reports, asked for additional information, expressly approved or did not outwardly object to the proposed work going forward, and therefore GM received "the department's approval" for purposes of the exclusion.

## Department's Argument

### GM Foundry Site

Department staff argues that the generation of hazardous waste occurred prior to any DEC involvement, which was at the time the demolition of the foundry complex began. The dates of correspondence indicate that there was no prior written approval or review of any site remediation plans regarding the generation of hazardous waste. Department staff contends that the earliest correspondence was dated August 2, 1996, which was six months after the generation of hazardous waste through demolition of the foundry complex building. The correspondence was regarding the BUD approval, which relates only to solid waste and not hazardous waste. Once it was determined that the contaminated sand could not be used onsite, Department staff stated they neither approved nor disapproved shipments of the waste off-site. In fact, such approvals/disapprovals were not requested and it is not within the DEC's jurisdiction whether or not GM decides to manifest everything as hazardous waste, as long as it was legally disposed of and manifested correctly.

It is argued by Department staff that there was never any approval of the remediation project and that the services which generated the hazardous waste had already been performed before the Department was contacted. Upon review of the manifest, it is clear that a large percentage of the hazardous waste from the demolition project had already been shipped off-site by 1996. There was never any type of order, contract, or approval by DEC or EPA.

### AAM Project

Department staff notes that GM had a SPDES permit for the AAM facility and due to the detection of PCB's for three consecutive months, GM had to evaluate the treatment system. The Department's Division of Water received an implementation plan by fax on June 26, 1998. GM stated in the letter that the contractor would mobilize on June 29 and 30 and would initiate work on July 1, 1998. The letter went on to state that the project would need to be completed by July 12, 1998. Department staff contends that there was never any request for approvals from the Division of Water regarding the generation of hazardous waste. The Department argues that if a company will begin mobilizing, the job at hand has already been planned in great detail. In this case, the contractor was ready to mobilize without GM having obtained any prior approval from the Department. Since Department staff believes it would have taken a good deal of time to review the plan, DEC believed the faxed workplan was sent for post-project informational purposes only.

A letter from GM on July 28, 1998, stated that it was in the process of completing the remediation of an area at the AAM facility and that it had already shipped some of the excavated soil off-site. Department staff again argues that the services which resulted in hazardous waste being generated had already been provided, clearly without the request or even the possibility of DEC approval. Furthermore, Department staff states the Water Program did not participate in the development of the workplan, did not have the authority to approve or reject the workplan, and was not asked by GM to give approval. The Division of Water was only involved in water issues so that PCB's were not discharged into any State waters. Water staff did not have any involvement or approval authority relating to the remediation plan or removal of contaminated soil. Based on the implementation and documentation of GM, Department staff argues that GM did not generate the hazardous waste by services under a contract, order or approval with the DEC. The regulatory fee statutory exemption does not apply in this case.

## Discussion and Ruling

The statutory language at ECL §72-0402(1)(f), delineates means by which a generator can be exempt from regulatory fees related to the cleanup or remediation of a hazardous materials or hazardous waste spill, discharge, or surficial cleanup. The three means are: under contract with the Department; with the Department's approval and in compliance with the Department's regulations; or pursuant to an order of the Department, USEPA or a court. Although the statute lists three different mechanisms to exempt a generator, they are similar in regards to the extent of regulatory control necessary to fulfill the intent of the statute and ensure the work is being carried out in a safe and proper manner.

As a matter of procedure, the Department has historically required some type of written agreement between the generator and the proper program within the Department, even if the work is not performed under a contract or consent order. GM argues the remediation work was done with the Department's approval and in compliance with the Department's regulations. In order to have Department approval, the Department would need to be involved at the outset, during the planning stages, well before any work commenced. In addition, adequate time would be required to review work plans and make necessary adjustments to the plans. The Department would be aware of the pending work schedule and be available to monitor the work being performed. It is not enough that a generator submit periodic reports on the progress of the project.

At the GM Foundry site, GM contacted the Department's water staff about PCB's in the storm water and the Department's solid waste staff about a beneficial use determination ("BUD") and the characterization of PCB contaminated concrete. GM submitted documents listing work that had been performed. Department staff asked to be apprised of any changes in the removal procedures, to ensure compliance with applicable regulations. GM also carried out remediation work required under the SPDES permit, which it concluded was done with Department's approval.

According to documentation submitted to the Department, the generation of hazardous waste occurred prior to any DEC involvement. There was no effort made on the part of GM to involve the Department during the planning stages of the cleanup; site remediation plans were not reviewed or approved by the Department. GM submitted letters describing work that had been completed and although the Department did not have any objections, it does not rise to the level of approval of the cleanup.

Since the Department was not involved in the GM Foundry site or AAM project at the outset and before any hazardous waste was generated, GM is not exempt from regulatory fees pursuant to ECL §72-0402(1)(f)(i). The documentation that GM sent to the Department summarized the work that had been completed. Some of the letters were not sent to the appropriate staff and the staff did not have the authority to approve hazardous waste remediation activities. If the remediation was done with the Department's approval, the appropriate staff would have been involved with the project from the planning stages. Department staff would have worked closely with GM to devise remediation plans and would have been present during various stages of the project. No hazardous waste would have been generated without prior knowledge and approval from the Department.

In other words, it is the Department's practice to engage with entities undertaking remedial activities prior to the commencement of remediation. This is done through the review and approval, in advance, of remedial action plans, workplans, interim remedial measures and other instruments. Absent these indications of Department approval, hazardous waste cannot be said to have been generated in this instance with "the Department's approval." For the reasons set out above, GM is not exempt from the regulatory fees under ECL §72-0402(1)(f)(i).

2. Whether ECL §72-0402(1)(f)(iv), which exempts hazardous waste from regulatory fees for wastes generated "voluntarily and without expectation of monetary compensation", apply to the facts of this dispute?

ECL §72-0402(1)(f)(iv) states:
No fee shall be payable for waste resulting from services which are provided (iv) voluntarily and without expectation of monetary compensation in accordance with subdivision one of section 27-1321 of this chapter; ...

ECL §27-1321 states in part:
1. Notwithstanding any other provision of law to the contrary, any person who is, by professional training or experience and attainment, qualified to analyze and interpret matters pertaining to the treatment, storage, disposal, or transport of hazardous materials or hazardous wastes, and who voluntarily and without expectation of monetary compensation provides assistance or advice in mitigating the effects of an accidental or threatened discharge of any

hazardous materials or hazardous wastes, or in preventing, cleaning up, or disposing of any such discharge, shall not be subject to a penalty or to civil liability for damages or injuries alleged to have been sustained by any person or entity by reason of an act or omission in the giving of such assistance or advice ... . 2. Nothing in subdivision one of this section shall be deemed or construed to relieve from liability for damages or injuries any person who: (a) is alleged to have caused said damages or injuries as the result of gross negligence, or reckless, wanton or intentional misconduct, or (b) is under a legal duty to respond to the incident, or (c) receives compensation other than reimbursement for out-of-pocket expenses for services in rendering assistance or advice.

GM began operation of the Tonawanda facility in the 1950's, which consisted of three major operations. The engine plant is still operated by GM, the forge facility was sold to AAM in 1994 and is currently operated by AAM, and the foundry complex was demolished during the years of 1996 and 1998. GM contends that the exclusion, pursuant to ECL §72-0402(1)(f)(iv), only applies to the GM Foundry Complex project, and not the AAM project. GM claims it chose to conduct the remediation work voluntarily and dispose of the wastes as hazardous wastes. In addition, GM chose to spend large amounts of money to clean the site, to ensure it could be used productively in the future. GM contends it is a "Good Samaritan" under the statute and believes it should therefore be entitled to the exclusion for the above-mentioned reasons. GM/AAM Reply Brief at p.6.

Department staff concurs that the statute is a type of "Good Samaritan" law. Department Initial Brief at p.17. Nevertheless, Department staff does not believe the statute covers GM, being the generator of the waste and the responsible party, or the contractors who were monetarily compensated for the work. Indeed, Department staff contend that GM has a legal duty to respond as a discharger and should not be considered a "Good Samaritan" under the statute. Department Initial Brief at p. 17. Department staff further believe GM has a legal duty to respond to the waste produced in the demolition: anything less would be against the legislative intent, and award parties with clear legal liability an exemption intended for innocent helpers. Department Initial Brief at pp.17-18.

## Discussion and Ruling

For all intents and purposes, I conclude that ECL §72-0402(1)(f)(iv) does not apply to the GM Foundry Complex project. The provisions in ECL §72-0402(1)(f)(iv) and ECL §27-1321(1) & (2) apply to a response effort for an accidental or threatened discharge of hazardous materials or hazardous waste. The Good Samaritan provision encourages trained individuals (who also meet the requirements in ECL §27-1321(2)) to respond to an emergency situation without being held liable, as long as ordinary prudence is used. The provision does not apply to an entity who: is alleged to have caused said damage through gross negligence, or reckless, wanton or intentional misconduct; is under a legal duty to respond to the incident; or received compensation other than reimbursement for out-of-pocket expenses.

The discovery of the PCB contaminated foundry sand was not an accidental or threatened discharge of any hazardous materials or hazardous waste. When GM demolished the complex, test results from the foundry sand showed that some of the sand had PCB levels in excess of 50 ppm. As stated in the ALJ's record, GM historically used PCBs in the foundry complex and the forge facility. Whereby such contamination was most likely caused by GM's use of PCB's at the complex.

As both the owner of the complex and generator of the hazardous waste, it was GM's responsibility to remove the waste and ensure the waste was disposed of properly. The exemption at ECL §72-0402(1)(f)(iv) applies to individuals responding to an emergency situation, who have no legal duty to respond to the incident: services are merely offered, without any compensation, for the benefit of the environment and the people. Although GM "voluntarily" conducted the cleanup project, and was not mandated to do so through a consent order or other type of enforcement action, it does not relieve GM of it's legal duty to perform the cleanup, as both an owner and generator. GM's remediation of the foundry complex fails to fit within the intended purpose of the statute and GM is not exempt from the regulatory fees pursuant to ECL §72-0402(1)(f)(iv).

## Conclusion

For the above-stated reasons, Petitioners do not meet the requirements of ECL §§72-0402(1)(f)(i) or 72-0402(1)(f)(iv), which exempts hazardous wastes generated under certain conditions from regulatory fees. Accordingly, petitioners' request for reimbursement of the disputed amount of $167,000 paid by GM is denied.

Dated: May 12, 2006
Albany, New York

***James H. Ferreira***
James H. Ferreira
Deputy Commissioner and General Counsel

1. For purposes of this declaratory ruling only, the Department will assume that the facts alleged in this petition are true. The Department may take official notice of any fact not subject to reasonable dispute if it is generally known or can be accurately and readily verified. 6 NYCRR §619.2(b). The Department will engage in no fact finding for purposes of this declaratory ruling and the binding effect of the ruling is limited by the assumed fact predicate. *Power Authority v. N.Y. State Dept. Of Environmental Conservation*, 58 N.Y. 2d 427, 434 (1983).