```
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK


                                  .   Case No. 09-50026-mg
IN RE:                            .   Chapter 11
                                  .
MOTORS LIQUIDATION COMPANY,  .   (Jointly administered)
et al., f/k/a GENERAL         .
MOTORS CORP., et al,          .   One Bowling Green
                                  .   New York, NY 10004
                Debtors.        .
                                  .   Thursday, December 20, 2018
. . . . . . . . . . . . . .   2:00 p.m.


            TRANSCRIPT OF CASE MANAGEMENT CONFERENCE
            BEFORE THE HONORABLE MARTIN GLENN
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For General Motors LLC:   King & Spalding, LLP
                          By:  ARTHUR J. STEINBERG, ESQ.
                          1185 Avenue of the Americas
                          New York, NY 10036
                          (212) 556-2158

                          Paul, Weiss, Rifkind, Wharton &
                           Garrison, LLP
                          By:  PAUL BASTA, ESQ.
                               KYLE J. KIMPLER, ESQ.
                          1285 Avenue of the Americas
                          New York, NY  10019-6064
                          (212) 373-3253

For Hilliard Munoz        Goodwin Procter LLP
Gonzales LLP and          By:  WILLIAM WEINTRAUB, ESQ.
Thomas J. Henry           The New York Times Building
Injury Attorney:          620 Eighth Avenue
                          New York, NY  10018
                          (212) 813-8839


APPEARANCES CONTINUED.

Audio Operator:           TL, ECRO

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

```
APPEARANCES:   (Continued)

For Ignition Switch        Brown Rudnick
Plaintiffs and             By:  EDWARD WEISFELNER, ESQ.
Non-Ignition Switch        HOWARD S. STEEL, ESQ.
Plaintiffs:                Times Square Tower, #47
                           New York, NY  10036
                           (212) 209-4917

For Wilmington Trust,      Drinker Biddle & Reath
as GUC Trust               By:  KRISTIN K. GOING, ESQ.
Administrator:             1177 Avenue of the Americas, 41st Fl.
                           New York, NY  10036-2714
                           (202) 230-5177

For Participating          Akin Gump Strauss Hauer & Feld LLP
Unitholders:               By:  SEAMUS DUFFY, ESQ.
                           One Bryant Park
                           New York, NY  10036-6745
                           (212) 872-1000

Also present:              Kirkland & Ellis, LLP
                           By:  MARK NOMELLINI, ESQ.
                           601 Lexington Avenue
                           New York, NY  10022
                           (212) 446-4800


TELEPHONIC APPEARANCES:

For Ignition Switch        Hagens Berman Sobol Shapiro LLP
Plaintiffs and             By:  STEVE W. BERMAN, ESQ.
Certain Non-Ignition       555 5th Avenue, #1700
Switch Plaintiffs:         New York, NY  10017
                           (212) 752-5455

For Additional             Andrews Myers, P.C.
Ignition Switch            By:  LISA M. NORMAN, ESQ.
Pre-Closing Accident       1885 Saint James Place, 15th Floor
Plaintiffs:                Houston, TX  77056
                           (713) 850-4200

For Lawrence Elliott,      GARY PELLER, ESQ.
Et al:                     600 New Jersey Avenue N.W.
                           Washington, D.C.  20001
                           (240) 463-7400
```

3

1          (Proceedings commenced at 2:00 p.m.)

2          THE COURT:  Please be seated.  We're here in Motors

3   Liquidation Company, 09-50026.  I have the list of appearances

4   in front of me.

5          Mr. Weisfelner, do you want to start?

6          MR. WEISFELNER:  Yes, Your Honor.  Thank you.  First

7   of all, on behalf of all of the combatants, I want to thank

8   Your Honor for the flexibility that you've shown in

9   rescheduling this conference.  My colleagues have asked me to

10  avoid saying things like "here we go again" or "the third

11  time's the charm," but frankly I couldn't help myself.

12          I want to divide my comments into two parts.

13          THE COURT:  That's a comment that's been made by a

14  lot of people about you, Mr. Weisfelner, but --

15          MR. WEISFELNER:  That I couldn't help myself.

16          THE COURT:  Right.

17          MR. WEISFELNER:  I accept it.

18          I want to divide my comments in two parts, starting

19  with the question of timing.  And in particular, so as to avoid

20  Your Honor having to ask the question, I want to deal with why

21  is it taking us so long, and then what do we see as to the

22  timing generally going forward.

23          As we spelled out in our December 12th letter, "we"

24  meaning the plaintiffs, the GUC Trust, and the Unitholders, are

25  all working very hard on a revised proposed settlement

4

1  consistent with Your Honor's September 25th decision.  The

2  parties are very cautious that, charging up the hill for the

3  third time, this time we need to get it right.

4          And just to give Your Honor a sense of what the delay

5  has been, first and foremost, we had to get a thorough handle

6  on the path forward, as was outlined in Your Honor's September

7  25th opinion, understanding through all of the various class

8  action gurus employed by each of our respective firms what the

9  rulings in <u>Manville</u> and the subsequent <u>Ortiz</u> decision means for

10 our path forward and ultimately what the support was for a

11 limited-fund, non-opt-out class or classes.

12          To complicate matters, as I'm sure Your Honor is

13 aware, there are brand new amendments to Rule 23.

14          THE COURT:  I referenced them in the opinion.

15          MR. WEISFELNER:  And in particular, amendment to Rule

16 23(e)(2)(B), which requires that the first step is to seek a

17 finding from this Court, that this Court will likely be able to

18 approve the settlement and our settlement purposes class

19 certification.

20          Which brings us to the next issue, which is notice

21 and notice costs.  And, Your Honor, to fully appreciate that,

22 there are two potential universes of class members.  In

23 universe one, we are looking at all Old GM registration holders

24 up to the bar date.  Our best estimate is that's over

25 26 million registrants.  Not cars, because the cars may have

1  been owned or leased by multiple parties, but 26 million

2  registrants.  And the cost of updating those registrations and

3  getting enough information to be able to do mail notices and

4  subsequent email notices or just the mail notices, our best

5  estimate is $13 million.

6         Conversely, there's an alternative universe, and that

7  is one where you would take out or subtract anyone who sold

8  their car before the bar date on the theory that you, by

9  definition, therefore sold the car before the recall notices.

10  That's a universe that shrinks down to some 12 million

11  registrants, and the cost of updating all those registrations

12  from the original loan or through as many successive purchasers

13  up until the person who owned the car as of the bar date is

14  estimated at some $7 million.

15         And again, Your Honor, that's just the cost of

16  updating the registrations.  There's additional cost for

17  mailing, additional cost for establishing and maintaining a

18  website.

19         The other factor is the timing of updating the

20  registration materials.  For most states, we are told by the

21  vendor involved that it's a four-to-six-week process.  There

22  are, however, a handful of states where you can add yet another

23  six weeks to the time frame because there are a lot more hoops

24  to jump through in those jurisdictions in order to obtain

25  updated registrations.

1          The other thing that impacts all of us in terms of

2    timing is, as I'm sure Your Honor is aware or will become

3    aware, Judge Furman has in front of him certain summary

4    judgment decisions that are currently pending that will impact

5    the size of the two universes.  And without getting into the

6    complexity, it's not just a binary call, but we expect that

7    Judge Furman's summary judgment ruling could very well

8    implicate whether we're talking about 26 million registrations

9    or 11- or 12 million registrations; a cost would be the

10   13 million or 7 million.

11         We expect that ruling fairly soon.  And by fairly

12   soon, I can't give you a definitive date.  The judge did have

13   on his agenda bellwether trials, which are now off of his

14   plate, if you will, because of a settlement.  And at least the

15   lead plaintiffs believe and hope that the summary judgment

16   ruling will now take its place in terms of order of priority.

17         THE COURT:  Has he heard argument on this summary

18   judgment?

19         MR. WEISFELNER:  Your Honor, I don't know.  I think

20   it's fully submitted, but no oral argument.  And I'm not sure

21   that he's going to request oral argument.  But in any event,

22   but for any argument he may seek, the matter is fully briefed

23   by all the parties.

24         So discretion being the better part of valor, it

25   seems to us that the determination of what notice to proceed

7

1  with, because of the significant difference in cost, might very

2  well wait for an ultimate ruling by Judge Furman on the pending

3  summary judgment motions.  That's not to say that an awful lot

4  of work can't and shouldn't be done in the interim.

5         THE COURT:  How do you anticipate proposed class

6  definitions here to differ from the class definitions in the

7  district court?

8         MR. WEISFELNER:  They will differ significantly for a

9  whole host of reasons, not the least of which is the two

10 classes don't overlap.  There is a much different plaintiff

11 class in front of Judge Furman in his MDL.  By definition, our

12 class are holders as of the bar date, and whether they include

13 prior owners of the same vehicles or prior lessees of the same

14 vehicles is the issue that, among others, is up for

15 determination by Judge Furman.

16        Just Furman, conversely, is looking at owners of the

17 cars post-sale, except for the issue of I guess successor

18 liability, which applies to presale owners as well.  But

19 they're two different classes.  Not only that, but Judge Furman

20 is working towards certification of a class for trial purposes,

21 which, as Your Honor knows, is a lot different a standard than

22 certification for settlement purpose.

23        Your Honor, going back to the notice and the cost of

24 notice, some of us on the plaintiff, GUC, beneficial holder's

25 side believe that in a settlement context, the defendant picks

8

1  up the cost of notice, the defendant in this case being the GUC

2  Trust.  Some of us have expressed the view that the cost of

3  notice should be shared, and still other of us believe that GM,

4  both contractually and as a matter of equity, ought to be,

5  pardon me, picking up some or all of the notice costs.  After

6  all, as I'm reminded, we wouldn't be here today but for the

7  fact that GM did not give notice of the barred date to people

8  that were impacted by these defective vehicles.

9        In any event, as Your Honor may recall from prior

10 iterations of our settlement agreement, it was originally

11 contemplated that the GUC Trust would "front," for lack of a

12 better word, $6 million worth of notice costs, plus $15 million

13 worth of a settlement payment, for a grand total of 21 million.

14 But remember that the GUC Trust was only going out of pocket

15 and taking a risk as to the notice costs before Your Honor were

16 -- would have been in a position to approve the settlement.

17       Now we may have to go back to the GUC Trust and ask

18 them to put a lot more money on the line before there is a

19 final determination of the merits of the settlement and the

20 certification of the class for settlement purpose.

21       That's why, Your Honor, we think we'll be done with

22 all the paperwork and done with the outstanding issues that

23 need to be resolved, and I think we're very close to a final

24 resolution, and we need until the end of January to get

25 started.

9

1        THE COURT:  I think you're right.  It said January

2   3rd.  I think you've now pushed that further.

3        MR. WEISFELNER:  Yeah.  I'm not sure the letter ever

4   said the 3rd.  I think the letter clearly said the end of -- I

5   think it said 31, actually.

6        THE COURT:  Okay.  I misremember then.  Go ahead.

7        MR. WEISFELNER:  So here's the process as we envision

8   it and when we think we get on file.  By the end of January, if

9   not sooner, we will embark on what we refer to as "stage one."

10  In stage one, we will be asking the Court to approve our form

11  of notice, which will be state-of-the-art notice under Rule

12  23(e)(1); in other words, direct-mail notice.  And there will

13  be one of two universes of people who are going to get the

14  notice, depending on what Judge Furman ultimately rules.

15        We'll ask Your Honor, in stage one, to make a

16  determination that you are likely to approve the settlement

17  under both Rule 9019 and Rule 7023.  And once that's

18  accomplished, and we have all the information we need to

19  conduct the notice, the notice will begin.

20        Now, it will take us, as I indicated before, a period

21  of time to collect the registration data from the vendor and to

22  do the notice itself.  So it may very well be that if we're in

23  and out of court in the month of January, early February, we're

24  not back in court probably until May seeking final approval of

25  both the settlement and the certification.

1        Stage three is the estimation proceeding itself.  And

2   it seems to me that between now and May when we ask the Court

3   for final approval of the settlement and certification for

4   settlement purposes, we can get a lot of work done in terms of

5   ginning up the estimation proceeding.  Although I do recall

6   Your Honor saying that if Your Honor were to approve the

7   settlement, you intended to direct the parties to mediation

8   before moving to estimation.  And if that's still Your

9   Honor's --

10        THE COURT:  It was so long ago that I said that,

11  Mr. Weisfelner, that I don't even remember it.

12        MR. WEISFELNER:  Okay.  But one way or the other, we

13  should be ready with estimation motion and hopefully some

14  semblance of agreement with GM on the procedure for estimation.

15        I should stop here and divert a bit to let you know

16  that consistent with Your Honor's order establishing today's

17  status conference, we did reach out to New GM and we did have a

18  meet and confer, at which time we asked New GM what its views

19  were with regard to discovery.  We asked New GM what its views

20  were with regard to motions to withdraw the reference.  We

21  asked New GM what its views were with regard to continuing or

22  revising its motion to stay proceedings.

23        And in fairness to New GM, their response should have

24  been anticipated, and it was, can't really tell you until we

25  see your pleadings.  So we will be pressing them yet again,

1  sometime after we file our stage-one pleadings, for their view

2  on those three topics:  discovery, which we think there ought

3  not be any until we get the estimation; withdraw the reference;

4  continue motion to stay.

5          The fourth and final stage, once the estimation is

6  completed, and assuming that there is any trigger of the

7  accordion feature, would be for the plaintiff's side, working

8  together with a mediator or judicial monitor, to come up with

9  what I refer to as "trust distribution procedures," and to

10  present all of that to the Court on notice to affected parties.

11          There is a possibility, at that stage, that the class

12  could be decertified, re-jiggered, you know, if any party in

13  interest felt that their interests weren't being adequately

14  protected in terms of the allocation methodology that the

15  parties ultimately put forward that Your Honor will be asked to

16  approve.

17          THE COURT:  Come back to stage one.

18          MR. WEISFELNER:  Yes, sir.

19          THE COURT:  Do you contemplate one or more classes or

20  subclasses?

21          MR. WEISFELNER:  We contemplate one or more.  And not

22  to be cute about it, the current contemplation is that there

23  will be a class consisting of people who owned or leased the

24  initial defect cars.  I'm forgetting my recall numbers, but I

25  think it was 047.  And the other class will be all of those

12

owners or lessees of the non-initial-ignition-switch cars.  So

those are the two classes that we currently contemplate.

THE COURT:  So Judge Furman's various decisions

identify differences in the law of various states.  And does

that compel subclasses?

MR. WEISFELNER:  It does not, Your Honor, and let me

tell you why.

THE COURT:  Go ahead.

MR. WEISFELNER:  We contemplate that all of Judge

Furman's rulings with regard to underlying merits -- and Your

Honor may recall that one of the ones that we all seem to point

to, first and foremost, is manifestation versus

non-manifestation.  And as Judge Furman has previously

indicated, there are some states where you can't make out a

claim for economic loss on a theory of "benefit of the bargain"

unless your vehicle demonstrated or manifested a defect.

And, Your Honor, when it comes to the estimation

procedure, that ruling and every other ruling that may impact

the damages calculation on an overall basis to determine how

much of any of the accordion gets triggered is something that

the plaintiffs will have the burden of culling, for fear that

New GM will hand our heads to us if we were to attempt to

demonstrate damages that in any way conflict with any of the

merits rulings that we've gotten from Judge Furman to date.

But they will not require separate classifications or

13

1  certification at the settlement phase.

2       It is possible that once the accordion is triggered,

3  based on the evidence that we intend to proceed with, in full

4  contemplation of Judge Furman's prior rulings, that that may

5  affect people's entitlement to all or any portion of the

6  accordion when it comes time to allocation.  And it's possible

7  at that stage of the proceeding, depending on parties' views,

8  that we may very well have to -- and I don't know the exact

9  methodology -- decertify the original settlement class,

10  re-certify subclasses to take into account people's different

11  expectation levels.  It gets a little complicated, because even

12  in those states that require manifestation, there may very well

13  be people whose cars manifested the defect.  And, Your Honor, I

14  would think all of that needs to be accounted for in the class

15  context, albeit at the allocation stage and not before that.

16  I'd be surprised if GM didn't have a different perspective, but

17  we'll deal with it when they raise it, as I'm sure they will.

18       THE COURT:  Obviously, motions to withdraw the

19  reference are decided by the district court, not by this Court.

20  But what is your view -- you recognize that Judge Furman is

21  going to be deciding a fairly large number of issues that

22  impact on class certification.  He's already decided many, I'll

23  refer to them as "merits issues," that deal with economic loss.

24  Why shouldn't the reference be withdrawn and Judge Furman

25  decide all of the class issues?

1          MR. WEISFELNER:  For the same exact reason that the

2    last time GM sought to withdraw the reference from the

3    bankruptcy court, the district court denied the withdraw.  And

4    those are breaking them down to their two respective groupings.

5    The only summary judgment issue that could at all impact

6    proceedings before this Court is the one that speaks to the

7    size of the universe.

8          As to the merits decisions that he's made, and is not

9    likely to make any more before we get to estimation, but if he

10   were, all of those merits determinations will be -- will impact

11   our trial preparation.  So there's not a decision that Judge

12   Furman has made that won't be reflected in how we try the

13   estimation case.

14         THE COURT:  From your letter, I take it you agree

15   that to the extent proceedings continue in this Court, and

16   Judge Furman has issued decisions and may issue additional

17   decisions that I'll refer to as "merits," those would -- you

18   would agree those would apply in further proceedings here?

19         MR. WEISFELNER:  Absolutely.  Either in connection

20   with -- as we plotted out, his near-term decisions are likely

21   to involve summary judgment on the pending papers, which could

22   dramatically impact the size of the universe, therefore who

23   gets noticed, therefore the cost of notice.  It makes sense to

24   most of us that we ought to be awaiting that determination

25   before we blow X number of millions of dollars on costs of

1  notice for people that Judge Furman has decided are entitled to

2  notice.  There are some countervailing concerns among some of

3  the folks within the beneficiary and GUC class about just how

4  ironclad a series of protections they want, but I think it'll

5  resolve itself that way.

6         Any merits-based issues that the judge has previously

7  made or will make in the future will be reflected by necessity

8  as part of the estimation proceedings.  Your Honor is not

9  likely to put in the column of adding up to hopefully

10  $10 billion, any dollar amount that reflects damages that Judge

11  Furman has already said, sorry, doesn't fly.  So we will be

12  careful, and GM will hold us to our promise to be careful not

13  to try anything that's already been determined.  And in that

14  fashion, I think all of Judge Furman's past and future

15  determinations will be reflected in all of the proceedings that

16  Your Honor will be asked to engage in.

17         THE COURT:  New GM's letter, which is ECF 14384, very

18  briefly addressed, because I requested it be addressed, the

19  issue of mediation.  And my takeaway from that portion of the

20  letter is that they've been reasonably successful in resolving

21  personal injury/wrongful death -- presale personal

22  injury/wrongful death cases.  How, if at all, does that affect

23  the -- your achieving the threshold to trigger the accordion?

24         MR. WEISFELNER:  Your Honor, our co-leads, together

25  with all of our experts, have assured me that we easily get to

16

1  the $10 billion threshold if you were to assume zero value for

2  personal injury/wrongful death.

3         Now, having said that, I read the letter.  I've been

4  reading submissions to Judge Furman.  I know approximately how

5  many personal injury/wrongful death plaintiffs actually signed

6  on to the last version of the settlement agreement.  I'm led to

7  believe that not very many of them have settled, so we still

8  have the same grouping off personal injury/wrongful death.

9         I think it's great that other personal

10 injury/wrongful death claimants against New GM, primarily folks

11 that had their injury or loss after the sale date, you know,

12 are being resolved.  But I don't think it's going to have a

13 dramatic impact on us, A, because I think we hit the threshold

14 without personal injury/wrongful death.  But I believe that

15 we'll still have lots of company when it comes to the

16 estimation trial.

17        THE COURT:  Since you're up here, I'll ask you this

18 now.  Mr. Peller, I see, is on the phone list, that he's

19 appearing by telephone.  His letter, which is at ECF 14382,

20 expresses his view that some or all of his clients should be

21 able to participate and agreed that they want to participate in

22 the settlement.  They certainly left that open.  Do you want to

23 address the issues raised by Mr. Peller's letter?

24        MR. WEISFELNER:  Sure.  As I view it, Mr. Peller

25 really has two concerns.  One is to the extent that he has

1  clients that have accident claims relating to Delta ignition

2  switch related cars.  He'll be given the same opportunity as

3  the people represented by Mr. Weintraub and his cohorts to sign

4  onto the settlement agreement, or alternatively to file

5  whatever objections he thinks are necessary.  But it's our

6  intent to include his clients as part of the settlement.

7  That's sort of up to him.

8          He was invited to our meet and confer.  He will be

9  shown the settlement agreement in advance.  We will walk him

10  through any questions, concerns, or comments that he may have.

11          But in addition --

12          THE COURT:  What about the other recalls?

13          MR. WEISFELNER:  Mr. Peller has a client or clients

14  that are claiming damages on account of different

15  non-ignition-switch related claims.  I guess that's Mr. and

16  Mrs. Elliott.  And this is a -- an injury or a claimed defect

17  that's outside the scope of the MDL or what it is that the co

18  leads have been doing.  But I understand that the GUC Trust has

19  been coordinating with Mr. Peller.

20          THE COURT:  I'm going to ask Ms. Going about what the

21  GUC Trust

22          MR. WEISFELNER:  But she's really in a much better

23  position to address it than I am.

24          THE COURT:  Okay.  That's fine.  All right.  Anything

25  else you want to add at this point?

18

1          MR. WEISFELNER:  No, Your Honor.

2          THE COURT:  Let me hear from Ms. Going, then.

3          MR. WEISFELNER:  Thank you.

4          MS. GOING:  Good afternoon, Your Honor.  Kristin

5   Going, Drinker Biddle Reath, on behalf of Wilmington Trust as

6   the GUC Trust administrator.

7          So why don't I just start right where Mr. Weisfelner

8   let off.  So with regard to the Elliotts and the 2006

9   Trailblazer, which I believe they are alleging a door handle

10  defect, Mr. Peller did file a joinder to the motion to file a

11  late claim on behalf of the Elliotts and their Trailblazer.

12  But as we've discussed with Mr. Peller, that the Trailblazer

13  and this door handle defect, I'm not even sure if the recall

14  for this door handle was actually issued prior to the bar date

15  or after the bar date.

16         This is completely separate and apart from the

17  ignition switch, both defined term and undefined term "ignition

18  switch defects."  And so we view this as no different than,

19  say, the Gillespie matter that was before you previously on a

20  motion to file a late claim.  And so we're prepared to proceed

21  on adjudicating the motion to file a late claim.

22         But procedurally here, all we have is Mr. Peller

23  joining the late-claimed motion that was filed by the economic

24  loss plaintiffs, and it attached, you know, their proof of

25  claim that was for ignition switch defects.  So we've asked

1  Mr. Peller to actually file something on behalf of the Elliotts

2  specifically addressing the Trailblazer and the door handle and

3  their allegations for why they would be entitled to file a late

4  claim.  And he has agreed to do that, and then we would

5  respond.

6           THE COURT:  Okay.  Anything else you want to add at

7  this point?  A lot of what Mr. Weisfelner said really directly

8  impacts on the GUC Trust, so --

9           MS. GOING:  It does.  And it's -- what he said is

10  consistent.  There are a lot of discussions that are continuing

11  regarding settlement, so I'm not going to get into those here.

12          THE COURT:  Does your crystal ball suggest that you

13  are going to successfully reach and agreement that will be

14  reflected in a new settlement agreement and motion for class

15  certification?

16          MS. GOING:  That is certainly our hope and intent

17  right now, and that's what we're working towards.

18          THE COURT:  Okay.

19          MS. GOING:  I guess the only -- while I'm here, I do

20  have one other issue that is related to the settlement, and it

21  involves, which you mentioned, the letter from New GM and their

22  description of the settlements that they've entered into with

23  some personal injury presale plaintiffs.  So the GUC Trust's

24  intent in the revised settlement -- it was the same in the

25  former versions of the settlement -- would be to settle with

1  any and all presale personal injury plaintiffs that are willing

2  to settle with us and come forward.  I think this letter, and

3  the description of the settlements that they reached, we found

4  to be very positive.

5         But at the same time, we'd like -- we need some

6  assistance, hopefully from New GM, on getting a better handle

7  of the universe of plaintiffs that they are settling with.  And

8  I really view this as a -- simply, you know, an Excel

9  spreadsheet game.

10        THE COURT:  May I ask you this?  Have you talked to

11  Mr. Steinberg or Mr. Best about what it is you want?

12        MS. GOING:  We have reached out to them this week,

13  and we're going to continue to engage with them.  Just because

14  these are individuals, so we should easily be able to, you

15  know, keep track of who's settled and who is in and out of the

16  settlement.

17        THE COURT:  Okay.

18        MS. GOING:  And before I cede the podium, I just want

19  to make sure that the schedule that we've proposed vis-à-vis

20  Mr. Peller's client on the Trailblazer is acceptable to Your

21  Honor.

22        THE COURT:  Well, tell me what the schedule is.  I

23  mean, you -- I don't think you put dates on it.  You indicated

24  -- well, tell me what you -- have you agreed on a schedule with

25  Mr. Peller?  I'm going to hear from Mr. Peller in a few

21

1  minutes, so --

2          MS. GOING:  Yes, I believe we have.

3          THE COURT:  Okay.  And what are you -- what's the

4  schedule?

5          MS. GOING:   That Mr. Peller has committed to filing

6  his late claim by the end of January and --

7      (Counsel confer)

8          MS. GOING:  He will file it by January 21st and we

9  will file a response by February 11th.

10          THE COURT:  Okay.  Perfect.

11          MS. GOING:  And the last matter I just want to raise

12  with Your Honor, and I think Mr. Weisfelner alluded to it, I

13  think during this time period that we have between now and a

14  settlement getting on file, we anticipate reaching out to New

15  GM on the issue of obtaining from them the names and addresses

16  of the individuals that they sent the recall notices to in

17  2014.  We believe that pursuant to the master sale purchase

18  agreement, that they do have an obligation to provide us with

19  access to books and records, and we're not looking -- we're

20  just looking for literally the names and addresses of everyone

21  that they sent recall notices to for our ignition switch

22  defined term and undefined term recalls.

23          THE COURT:  And have you already made that request,

24  or are they hearing it for the first time as you're --

25          MS. GOING:  They're --

22

1          THE COURT:  -- standing there?

2          MS. GOING:  Well, they've heard rumblings of it, but

3     we will be sending them a letter this week.

4          THE COURT:  Okay.  All right.  Yeah, then I won't

5     even ask them what their response is.

6          MS. GOING:  Okay.

7          THE COURT:  When they get your letter, they'll

8     respond.

9          MS. GOING:  Absolutely.

10         THE COURT:  Okay.  Anything else you want to --

11         MS. GOING:  That's all, Your Honor.

12         MR. WEISFELNER:  Your Honor, in fairness --

13         THE COURT:  Mr. Weisfelner?

14         MR. WEISFELNER:  -- months ago we went to GM to talk

15    about what information they had available with regard to

16    identification of vehicle owners.  Your Honor may recall that

17    under certain federal regulations, vehicle manufacturers are

18    required to maintain records as to who they sold the car to.

19    Furthermore, one would anticipate that GM had records of who

20    they sent the recall notices to.  Somewhere in between those

21    two universes is what we're looking for, and that's the owners

22    of lessees of the cars as of the bar date.

23         We got a lot of different information from New GM,

24    some of which made sense, a lot of which didn't.  There appears

25    to be a vendor that everyone in the country uses to get this

23

1   information.

2          THE COURT:  I think you told me quite some time ago

3   it was very expensive to get it from them.

4          MR. WEISFELNER:  Very expensive.  And furthermore,

5   we're told that the information they got is pursuant to a

6   license agreement with GM, and that this vendor won't give us

7   the information because we're not their licensed parties.  And

8   not to make things too difficult, but I didn't want Your Honor

9   to be left with the impression that we haven't spoken to GM

10  about this topic --

11         THE COURT:  You had --

12         MR. WEISFELNER:  -- in the past.

13         THE COURT:  I do remember from prior hearings that

14  this issue came up.  You raised it about the vendor and what

15  the potential cost was.  Today is not the time to really get

16  into that issue, so neither side really needs to argue this

17  issue.  I understand it's going -- it may well be an issue.

18  We'll first take it up if you -- if you haven't, you will with

19  New GM's counsel, and at an appropriate time, if I have to deal

20  with it, I'll deal with it.  Okay?

21         MS. GOING:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Mr. Weintraub, do you want me to hear --

24         MR. WEINTRAUB:  Yes, Your Honor.

25         THE COURT:  Your beard's getting longer.

24

1          MR. WEINTRAUB:  Yes, Your Honor.  My wife keeps

2  reminding me of that every morning.

3          Your Honor, there's been some --

4          THE COURT:  And grayer, but, you know.

5          MR. WEINTRAUB:  And grayer.  I can't help that, Your

6  Honor, it's this case.

7          MR. WEISFELNER:  He was clean shaven when we first

8  filed the motions.

9          MR. WEINTRAUB:  That's true.  William Weintraub,

10 Goodwin Proctor, for the Hilliard/Henry docket of pre-closing

11 action and plaintiffs.

12         Your Honor, there's been some discussion about

13 mediation and settlement, so in case Your Honor was wondering,

14 there was a mediation session between -- my clients, Mr. Henry

15 and Mr. Hilliard, met with New GM this week, and the matter did

16 not settle.

17         THE COURT:  Do you anticipate additional mediation

18 sessions or is the matter -- or is it an impasse and no further

19 sessions are going to --

20         MR. WEINTRAUB:  I don't really know how to answer

21 that, Your Honor.

22         THE COURT:  Then don't.

23         MR. WEINTRAUB:  I was told --

24         THE COURT:  Yeah, I don't want to get into --

25         MR. WEINTRAUB:  -- discussions terminated, but I

1  don't think anything is every really over --

2          THE COURT:  Nothing's --

3          MR. WEINTRAUB:  -- if people want to resume.

4          THE COURT:  It's not over until it's over.

5          MR. WEINTRAUB:  Exactly, Your Honor.

6          THE COURT:  Okay.

7          MR. WEINTRAUB:  Thank you.

8          THE COURT:  All right.

9          Mr. Peller, do you want to be heard?

10          MR. PELLER:  I don't have anything to add, Your

11  Honor.

12          THE COURT:  Do you agree with Ms. Goings with respect

13  to the schedule by when you'll file your papers and that the

14  GUC Trust will respond, I think she said you were -- your

15  date --

16          MR. PELLER:  Yes, Your Honor.

17          THE COURT:  -- is January 21?

18          MR. PELLER:  The only issue that may pose --

19          THE COURT:  Just let me finish.

20          MR. PELLER:  The only issue that may pose a future

21  scheduling issue is whether there needs to be discovery with

22  respect to Old GM's knowledge of the Elliotts' non-ignition

23  switch door module defect.  But my understanding is by the 21st

24  we'll file a proposed late proof of claim and that that issue

25  can be addressed later.

26

1          THE COURT:  Okay.  Thank you.  All right.

2          Mr. Steinberg or Mr. Basta, whoever is going to

3  address on behalf of New GM.  Mr. Basta?

4          MR. BASTA:  Good afternoon, Your Honor.  Paul Basta

5  from Paul Weiss.  My order got a little bit jumbled up by

6  Mr. Weisfelner's presentation, so let me just cover a few

7  points.  Let me start with the pre-sale settlement.  We have

8  settled --

9          THE COURT:  Pre-sale accident --

10          MR. BASTA:  Yes.

11          THE COURT:  -- settlement.

12          MR. BASTA:  Yes, personal injury accident settlement.

13  We've settled 156.  The way that those settlements are

14  structured is they're done by docket.  And so there's a

15  settlement, and then the lawyer for the plaintiffs goes through

16  a period of allocating that among its -- their clients.

17          THE COURT:  But 156 --

18          MR. BASTA:  Cases have been --

19          THE COURT:  -- cases.

20          MR. BASTA:  Cases have been settled.

21          THE COURT:  And those are -- does that correspond to

22  156 individuals or --

23          MR. BASTA:  Yes.

24          THE COURT:  Yes.

25          MR. BASTA:  Yes, and we're expecting -- those

27

1  settlements are confidential.  And so we're expecting that

2  process to resolve, and when that -- the follow-on process for

3  the allocation resolves, then the claims will be resolved.  I

4  understand what the GUC Trust is asking, which is they asked us

5  for the information so they know what's out of their

6  settlement, and we're sympathetic to that.  But I just -- I'm

7  not counsel on those mediations and I need to figure the

8  confidentiality rules to be able to deal with the GUC Trust

9  request, but we'll pay attention to that.

10         THE COURT:  Okay.

11         MR. BASTA:  Your Honor, we have -- Mr. Weisfelner was

12  kind enough to hold a meet and confer where he largely went

13  through with us and gave us advanced notice of what he has

14  presented to the Court, and we took it all in.  I don't think

15  it will be surprising to the Court to know that we have a

16  disagreement about the -- their path forward and whether it

17  really works.  But what we suggested is that they give us their

18  settlement agreement when it's ready and their proposed path,

19  and that we would have another meet and confer and suggest the

20  right path forward to get this resolved.

21         There are two things, maybe three things I'd like to

22  point out as to what's likely to come back before the Court

23  when the issues get joined.  One is I don't -- under Ortiz,

24  which post-dated the Manville decision and Your Honor's ruling,

25  you know, we really don't believe that a limited class applies

1  in this circumstance, and we will be putting in briefing

2  explaining why that's the case.

3       We also don't know the extent to which the settlement

4  agreement -- it hasn't been described to us how -- in <u>Manville</u>

5  they had to deal with the plan modification issues.  It's

6  unclear to us how that is going to be addressed, and we'd like

7  to review that and reserve on that, as well.

8       I think there's going to be a debate as to what has

9  to happen at that notice hearing.  And the last time that we

10 did this, what got approved at the notice hearing was the

11 sending of the notice, and then we determined there was a --

12 Your Honor determined there was a predicate issue as to whether

13 Rule 23 applied.

14      Here at that notice hearing, you know, under <u>Ortiz</u>,

15 there are very specific requirements of factual findings that

16 have to happen at that first hearing, including findings

17 regarding the amounts of the claims and the -- that they're

18 liquidated, and the amount of the limited funds which could

19 impact the JPMorgan litigation.  There are going to be issues

20 regarding the adequacy of class representatives and all the

21 23(a) issues that are being decided by Judge Furman present are

22 also going to be -- need to be findings of that done at that

23 notice hearing.

24      What I heard Mr. Weisfelner say is he wants to get

25 the preliminary approvals and then kind of backfill into it as

29

1   the rulings come down from the District Court, but I think

2   there's going to be a debate about that, whether that would

3   work.

4          Mr. Weisfelner was also correct that we were

5   non-committal on whether to seek a stay or withdrawal of the

6   reference or to do nothing, and we weren't trying to be coy

7   about it.  The issue -- and Your Honor alluded to it -- is

8   there's overlap.  The last time around, there were real

9   bankruptcy issues that had to be resolved here that were

10  dissectable away from the class certification issues that are

11  going on before Judge Furman.

12         Here, it's harder to navigate, and we have a

13  consistent view that we don't think there should be

14  inconsistent rulings.

15         THE COURT:  Explain a little further what you see as

16  those issues.

17         MR. BASTA:  Well, for example, at the notice hearing,

18  you're going to have to -- the Court would have to consider

19  factual findings regarding the amount of the claims and that

20  they're liquidated.  There's briefing occurring for Judge

21  Furman regarding experts and Boettcher --

22         THE COURT:  Why do I have to decide at that stage

23  that that could be liquidated?  I mean, that sounds wrong to

24  me.  But go ahead and explain.

25         MR. BASTA:  Your Honor, it is a -- we've done the

1  research.  We haven't found a case since <u>Ortiz</u> that has found a

2  limited fund to apply where the claims are unliquidated.

3  That's the big change of <u>Ortiz</u>, one of the big changes or

4  <u>Ortiz</u>.  And so we believe that -- and we think the case is very

5  clear that it only applies to liquidated claims, and there has

6  to be findings that the amount of the claims are greater than

7  the limited fund, which all requires -- in <u>Ortiz</u>, it was an

8  eight-day evidentiary trial on, you know, on those factual

9  issues.  And we think that that overlaps with things that are

10 coming down from Judge Furman.

11          We also think that before Judge Furman are the

12 typicality, commonality, and adequate representation issues,

13 and we disagree with the GUC Trust.  All of these, the

14 viability of all of these claims, are state by state, based

15 upon state law.  That's what's being worked through in the

16 district court, and that's because differences in state law

17 drive differences in the plaintiffs' rights.  And I think what

18 Mr. Weisfelner described is a process where Your Honor approves

19 the fairness of the settlement preliminarily and approves a

20 nationwide class, but then fills in the subclasses based upon

21 what comes down from Judge Furman.  And what we believe <u>Ortiz</u>

22 is going to require is that that be done at the settlement --

23 at the initial notice hearing.

24          THE COURT:  As part of a settlement, can the

25 plaintiffs and the GUC Trust agree that -- as to the law that

1  will govern claims for settlement purposes rather than -- in

2  other words, could they agree or propose to agree as part of

3  the settlement that the following legal principles will --

4  substantive legal principles will apply to claims of each class

5  member, whatever states they're located in?  I understand if

6  the case were litigated to judgment --

7          MR. BASTA:  Right.

8          THE COURT:  -- the law of each state would apply.

9  But in the settlement, is that true?

10          MR. BASTA:  Your Honor, I'm a little bit out of my

11 league on this.  I have to refer -- defer to my co-counsel, but

12 my understanding is that AmChem, which we went through over the

13 last hearing, says that the class certification rules in the

14 settlement context are equally stringent --

15          THE COURT:  Oh, I knew that.

16          MR. BASTA:  -- if not more stringent.

17          THE COURT:  No question about that.  But I didn't

18 think that the stringency of -- for class certification

19 dictated the substantive rules that would -- if you litigated a

20 case would have to be -- every issue would have to -- you know,

21 might have to be decided.  But for settlement purposes, the

22 parties can agree that the following rule will apply to all

23 class members, whatever states they're located in.  People

24 could come in and object to that settlement, but -- am I wrong

25 in that?

32

1          MR. BASTA:  Your Honor, honestly, I'd like to see

2    what they propose, and I really don't want to misstep as to

3    whether that would work or not work.  It's my understanding

4    that they need to have that set up up front, but what I'd like

5    to do is to see what they do and then brief it.  I don't know

6    for sure whether that work-around would work, but it's my

7    understanding is that it does --

8          THE COURT:  I wouldn't necessarily --

9          MR. BASTA:  -- have to be done up front.

10         THE COURT:  -- a work-around.  That's -- settlements

11   can do that.  I mean, I've had -- in bankruptcy cases,

12   Mr. Basta, where there are choice of law issues, it's quite

13   common for lawyers to agree that the law of X state will be

14   applied no matter -- even though there are arguments that six

15   different states should apply, the parties agree that the law

16   of New York will apply to all claims.  And I've had trials with

17   that and that's not an uncommon stipulation.  I -- it's always

18   dangerous to think back more than the 12 years I've been

19   sitting here, but I seem to recall being involved as a

20   litigator in settlements where, for settlement purposes, the

21   parties agreed as to the legal principles that would control

22   for determining damages, for -- you know, or in fixing amounts

23   of claims, et cetera.  That's a long time ago.  I haven't gone

24   back to the books myself to see if I could find that.

25         MR. BASTA:  Not sure I'm answering the question, but

33

1  we're going to brief it.  It's my understanding, under Ortiz,

2  that in the preliminary approval of the fairness of the

3  settlement, what you're doing is you're assessing what the

4  ultimate class members are actually going to receive

5  quantitatively.  And so --

6          THE COURT:  So could they agree in what's presented

7  to me as the proposed settlement that the following six rules

8  will apply for -- you know, it may be that they conclude that

9  maybe there's ten causes of action that have been asserted,

10 five of them would create real difficulty if you had to

11 litigate them, five are pretty clear cut.  And so for

12 settlement purposes, all -- we settle on the basis of the five

13 and the claims under the other five will be barred if the

14 settlement's approved.

15         MR. BASTA:  Your Honor, we will brief it.  I think

16 that there's going to be complexity as to how the subclasses

17 are defined and how what entitlements -- like, who's actually

18 in the subclasses and what they're going to receive.  But

19 really, I think at this point, without having seen --

20         THE COURT:  You're assuming that there have to be

21 subclasses.  Mr. Weisfelner had suggested that until you get to

22 an estimation stage as to if different law applies in different

23 states, it -- we'll get there at some point.

24         MR. BASTA:  Yeah, okay.

25         THE COURT:  All right.

34

1          MR. BASTA:  I don't want to confuse things, Your

2   Honor, by not being crisp in my responses to you.  I'm just

3   giving you what my understanding is of what the rules are that

4   apply.

5          And so the withdrawal of the reference in the stay is

6   really just because we want to see and assess, once we read

7   what they have done, where we think overlap is and really try

8   to prevent that overlap.

9          THE COURT:  From what Mr. Weisfelner suggested, the

10  notion of the stay seems almost moot because he's suggesting

11  that the class certification doesn't go forward here until

12  Judge Furman has decided the summary judgment motions.

13         MR. BASTA:  The thing I -- and I could speak to that

14  separately, that I didn't really understand is that at the

15  notice stage in this court, the Court would be certifying

16  classes; yet, the details of then those classes would await

17  Judge Furman.  It just seems to me that that's -- either there

18  are state classes or there's a nationwide class.  How those two

19  things interact, I have not figured out.

20         THE COURT:  Well, that might -- and I'm going to have

21  Mr. Weisfelner come back up after you've finished talking

22  because I didn't ask him this question.  I didn't go back today

23  to read -- I've got a stack of Judge Furman's decisions.  Are

24  there causes of action that Judge Furman has recognized as

25  existing in each of the states in which he has rendered a

35

1  decision?  And so I guess what I'm asking, in effect, is

2  whether -- can a settlement be proposed with a nationwide class

3  that will settle one, two, or three causes of action, and

4  provided that pursuant to the settlement, other claims, causes

5  of action will be dismissed?

6           MR. BASTA:  Could you give me one moment --

7           THE COURT:  Yeah.

8           MR. BASTA:  -- to confer with my co-counsel, Your

9  Honor?

10          THE COURT:  Yes, absolutely.

11      (Counsel confer)

12          MR. BASTA:  Mr. Weisfelner might have a different

13 view, but my understanding that what's pending before Judge

14 Furman is class certification issues, summary judgment issues,

15 and Daubert issues, and that the determination of those issues

16 preclude nationwide class on any of the causes of action.

17          THE COURT:  The Daubert issues, I'm not -- I -- you

18 know, once upon a time, I think I saw one of the briefs before

19 Judge Furman on it, but I really haven't gone back to look.

20 But if we get to the estimation stage, the rules, as I

21 understand it, as to what the Court may consider in an

22 estimation proceeding are not the same as the Daubert trial

23 issues.  And so the parties and the Court ultimately have much

24 broader discretion in terms of what evidence is presented and

25 what evidence will be considered.  The rules of -- the strict

36

1  rules of evidence, as I understand them, do not apply in an

2  estimation proceeding.

3           MR. BASTA:  Yes, Your Honor, I think we're going to

4  unfortunately get into a chicken and an egg problem again

5  because in order to estimate, we need claims to estimate.  In

6  order to need claims to estimate, we need class certification.

7  And so the question is going to come back to, I believe, Your

8  Honor, is to whether Your Honor's going to be comfortable

9  certifying a class based on Ortiz on that basis, understanding

10 that those issues are going to follow on from Judge Furman.

11          THE COURT:  Okay.  All right.

12          MR. BASTA:  And then the last point I wanted to make,

13 Your Honor, just has to do with timing, which is that

14 Mr. Weisfelner proposed filing the settlement motion I think at

15 the end of January.

16          THE COURT:  Yes.

17          MR. BASTA:  And then said that there would be a

18 hearing in February.  And our view is there's a lot of wood to

19 chop at this first hearing and that that's tight.  But when the

20 -- there's evidence that's going to be required at that first

21 hearing, and so we will sit down when it's filed with a meet

22 and confer and come up with a schedule that we think makes

23 sense.

24          THE COURT:  Okay.  Does anybody else which to be

25 heard before Mr. Weisfelner gets back up?  Okay.

1          Mr. Weisfelner, let me ask you the questions that I

2    asked Mr. Basta, not really -- with respect to a settlement,

3    can -- is there authority as part of the settlement to agree

4    that certain claims will be settled, and others ultimately will

5    be dismissed if -- assuming the settlement is approved?

6          MR. WEISFELNER:  With all due respect, the question's

7    irrelevant, and let me tell you why.

8          THE COURT:  Okay.

9          MR. WEISFELNER:  There was a path down which we could

10   have gone where we viewed all of the merits-based issues either

11   resolved by Judge Furman, pending before Judge Furman, or,

12   frankly, on appeal from Judge Furman.  And what we could have

13   done was in a settlement agreement settle all that stuff as

14   between us and the GUC Trust; say, you know, we heard what

15   Judge Furman said and it's up on appeal, so we're going to

16   presume the plaintiffs win; we heard what Judge Furman is

17   planning on ruling, let's obviate it, we'll just give you the

18   benefit of a positive ruling.  Let me tell why I don't think

19   that's the direction that we ought to be going, and that's not

20   the direction we plan on going.

21         THE COURT:  Okay.

22         MR. WEISFELNER:  And a lot of it has to do with

23   Ortiz, which I think is a critical case.  But what Mr. Basta

24   failed to mention is that Ortiz was determined before the

25   amendments to Rule 23.  And let me tell you how I think those

1  two things coincide because they talk a lot about needing to

2  determine liability by dollar amount before you can get to

3  class certification, all of which is nonsense.

4        The way we read <u>Ortiz</u> and the amendments to Rule 23,

5  what you're being asked to do at the very first substantive

6  hearing is to determine whether or not certification of the

7  class is likely to happen after notice, and whether the

8  settlement agreement is likely to be approved after notice and

9  the hearing.

10        What <u>Ortiz</u> teaches us, I believe, before or after the

11  amendment, is a court of competent needs to make a

12  determination that what the class is being offered is as good

13  or better than what the class could have realized had their

14  litigated their brains out.  That's the economic analysis that

15  needs to be done, and let me tell you how we view it.  It's

16  really pretty simple.

17        The most that this class is ever able to accomplish

18  is round numbers, $1 billion.  That's if you trigger the entire

19  accordion, which requires round numbers again, a determination

20  and an estimation proceeding of $10 billion worth of damages.

21  And I wish I had these numbers better memorized.  I don't, so

22  I'm guaranteed to make a mistake.  But Mr. Steele --

23        THE COURT:  And that's why you --

24        MR. WEISFELNER:  Mr. Steele --

25        THE COURT:  That's also why you think the limited

1  fund concept works because --

2       MR. WEISFELNER:  Of course.  And this is the only

3  liability calculation Your Honor has to go through.  First

4  issue, if we didn't all collectively, every class member, have

5  an interest in triggering the accordion, that's the

6  commonality.  We all want to trigger the accordion, and we want

7  to trigger it to the maximum extent possible.  So it's the shot

8  at a billion dollars versus -- what is it versus?  It versus us

9  saying to heck with triggering the accordion feature, we're

10  going to go after the remaining value in the GUC Trust and

11  we're going to seek to claw back every dime that the GUC Trust

12  ever distributed to any GUC beneficiary on the theory that we

13  were as good as the -- I don't remember the numbers, $8 billion

14  worth of allowed claims in the General Motors case other than

15  ours.

16       That -- those $8 billion worth of claims got an

17  original GUC Trust that was at one point valued at -- how much

18  money went into the GUC Trust at the sale?  Do you know?  Do

19  you remember?  At any event, when you do that --

20       THE COURT:  Your people are letting you down,

21  Mr. Weisfelner.

22       MR. WEISFELNER:  Well, they are because we've gone

23  through this math a million times.  If one were to take a look

24  at all of the money that the GUC Trust ever had and figured out

25  what the distribution was, it was about 20 cents on the dollar,

1  you then add the amount of plaintiff claims on top of that.

2  And for purposes of this exercise, figure it's 10 billion.  And

3  then figure there's another billion dollars' worth of value

4  that comes into the trust.

5       So you claw back everything, you have the billion,

6  you now have a much bigger plaintiff unsecured creditor class,

7  and do the math.  And compare that to $10 billion worth of

8  claims getting the billion dollar according feature

9  exclusively, not having to share it with the other general

10  unsecured creditors.  And Your Honor will the numbers are such

11  that we satisfy Ortiz's test, that we did as well as we could

12  ever do through a litigation or better.  That's the economic,

13  quote, "liability" test, not that you had to sit there and

14  determine what the entire class' claims are worth with

15  application to every ruling that Judge Furman did or could have

16  made, and then make an economic determination as to what that

17  claim is worth.  That's not the exercise.

18       That's why we don't have to, in my judgment, pull a

19  fast one and try and settle claims as part of a settlement.

20  That would be -- someone's going to kill me for having said

21  this -- unfair to GM.  Like I care.  But it's not that it would

22  be unfair to GM, it's that Mr. Basta, as part of --

23            THE COURT:  Don't you feel better, Mr. Basta?

24            MR. BASTA:  My work is done here, Your Honor.

25            MR. WEISFELNER:  It's that Mr. Basta and

1  Mr. Steinberg, on behalf of the their client, continuing their

2  scorched-earth litigation policy, would call us to task and say

3  the determination of liability, okay, in connection with and in

4  full anticipation and credence to Judge Furman's decisions get

5  made at the estimation hearing.  You can't settle them.

6        THE COURT:  All I can say is, life -- if you ever get

7  to the -- if you get to the point of an estimation proceeding,

8  life would be much easier if there was a settlement on the

9  legal principles that were going to be applied and not have to

10 do it on 50 states and to just --

11       MR. WEISFELNER:  Yeah.  And, Your Honor, I do think

12 that --

13       THE COURT:  I'm not suggesting that -- I'm just --

14 that's an observation, that's all.

15       MR. WEISFELNER:  Well, it's interesting because

16 that's what Judge Furman asked, as I understand it.  And I'm no

17 expert on the MDL, but I what I understand is Judge Furman had,

18 for lack of a better term, bellwether determinations on, for

19 example, manifestation.  I think it involved three, four, maybe

20 five jurisdictions.  And then the court said, please sit down

21 GM and co-leads, and tell me the extent to which this ruling

22 applies to every other state.  And the parties were unable, as

23 far as I can recall, to agree on a single state where the rule

24 either applied or it didn't apply, except plaintiffs

25 acknowledge that there were a handful of states where the

1  ruling would apply as against their economic interest.

2         All I'm saying is we will try.  We will try hard.  I

3  don't think it's impossible on a lot of these rulings, but I

4  think the hard work to gear up for the estimation hearing,

5  which, again, is an estimation under the Bankruptcy Code --

6  because we started this whole dialogue with Mr. Basta trying to

7  explain to you why prior determinations by Judge Furman on

8  withdrawal of the reference are going to be different now

9  because we've stripped away all the bankruptcy-related issues

10 and all we're left with is class certification stuff.  He's

11 wrong.  The meat of this case is going to be a claims

12 estimation under 502 of the Bankruptcy Code.  And with all due

13 respect to Judge Furman, you're the man whether you like it or

14 not.

15         THE COURT:  Unless he withdraws the reference.

16         MR. WEISFELNER:  And -- well, but my point is he

17 ought not because you are the man.

18         THE COURT:  Let me ask this question, Ms. Weisfelner.

19         MR. WEISFELNER:  Yes, sir.

20         THE COURT:  The last paragraph of Mr. Basta's letter

21 says, quote:

22              "Finally, in late October 2018, New GM conducted two

23              mediation sessions with counsel for certain economic

24              lost lead claimants with Judge Layn Phillips as the

25              mediator, but the mediation did not result in a

43

1                      settlement agreement."

2                Are there going to be any -- are any future mediation

3    sessions with Judge Phillips or anyone else contemplated at

4    this point?

5                MR. WEISFELNER:  Not currently, Your Honor.  That's,

6    again, not to say that hope doesn't spring eternal --

7                THE COURT:  That's why I only asked whether it was

8    contemplated.

9                MR. WEISFELNER:  But listen, after all the lay-offs

10   this poor company has been required to go through because of

11   the poor economic circumstances there they're forced to face, I

12   don't know that we ever get back on track again.  But again,

13   we're optimistic.

14               THE COURT:  Sometimes there's an advantage to putting

15   all this bad stuff behind you.

16               MR. WEISFELNER:  One would think.

17               THE COURT:  Okay.  Mr. Basta, do you have anything to

18   add on the mediation front just to this economic loss?  I

19   appreciate -- I take it as to the personal injury wrongful

20   death, there are still efforts to see whether you can resolve

21   additional cases, and maybe Mr. Steinberg or someone else is

22   dealing with that.

23               MR. BASTA:  Your Honor, Kirkland is the one dealing

24   with that.

25               THE COURT:  Okay.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

44

1          MR. BASTA:  The -- on the personal injury wrongful

2   death, there are additional sessions scheduled through the

3   first quarter of 2019, and we are committed to keeping at it.

4   As to the global, the economic loss mediation, we're not

5   involved in that.  I understand the same thing as

6   Mr. Weisfelner, which is that there's nothing currently

7   scheduled.  But I agree that hope springs eternal.

8          THE COURT:  Okay.

9          MR. BASTA:  And as to Mr. Weisfelner's last point,

10  I'm not going to respond, I'm just going to wait to see that

11  their -- their motion and we'll file our response.

12          THE COURT:  Okay.  I would request that someone order

13  the transcript.  I plan to send a copy of the transcript to

14  Judge Furman.  Okay?

15          MR. BASTA:  Yes.  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you very much for

17  coming.  Everybody have a nice holiday, and Happy New Year.

18          MR. BASTA:  You, too, Your Honor.  And thank you.

19      (Proceedings concluded at 3:08 p.m.)

20                    *  *  *  *  *

21

22

23

24

25

# C E R T I F I C A T I O N

I, Lisa Luciano, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.



_____
LISA LUCIANO, AAERT NO. 327     DATE:  December 21, 2018

ACCESS TRANSCRIPTS, LLC