**Opposition Deadline: February 11, 2019**
**Hearing:  TBD**

Gary Peller
600 New Jersey Avenue, N.W.
Washington, DC 20001
(202) 662-9122
peller@georgetown.edu
*Counsel for Celestine Elliott and*
*Lawrence Elliott*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | ) | Case No.: 09-50026 (MG) |
| f/k/a General Motors Corp., et al., | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

-------------------------------------------------

# ELLIOTTS' MOTION TO LIFT BAR DATE
# AND PROPOSED [LATE] PROOF OF CLAIMS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………………………………….….. ii

BACKGROUND ......................................................................................................................1

BASES FOR REQUEST FOR THE COURT TO LIFT THE BAR DATE AND PERMIT SUBMISSION OF THE ELLIOTTS' TRAILBLAZER CLAIMS .......................................................................7

    1.    Non-Ignition Switch Plaintiffs Such as the Elliotts Who Owned Cars With Latent Defects Unknown to Themselves or to Old GM When GM Filed its Petition Were Future Creditors Whose Claims Could Not Constitutionally be Precluded by the Bar Date Order. ................................8

    2.    If Old GM Knew or Should Have Known of the Non-Ignition Switch Defect, Then Non-Ignition Switch Plaintiffs Such as the Elliotts Were Known Creditors Whose Claims Could Not Have Bern Precluded Without Individual Mail Notice of the Bar Date Order, Which They Did Not Receive. .......11

    3.    If Non-Ignition Switch Plaintiffs Such as the Elliotts are Deemed to Have Been Unknown Creditors in  June 2009, Their Claims Could Not be Precluded Without Publication Notice Reasonable Calculated to Reach Them and to Apprise Them of Their Interests in the Litigation. ............................12

        a.    The scope and intensity of publication were not reasonably calculated to reach gm consumers in the District of Columbia. ..............................................................................................................13

        b.    The content and form of notice approved for publication did not adequately convey to Plaintiffs that their rights to sue for a danger that may not become known until years later would be affected by GM's bankruptcy. .......................................................................................................................15

    4.    The Pioneer Factors are Satisfied Here. ...................................................................................19

CONCLUSION.......................................................................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                              **Page**

*Bledsoe et al. v. General Motors LLC*, 1:14-cv-7631 (S.D.N.Y) (JMF), *consolidated* in *In re General Motos LLC Ignition Switch Litigation,*14-md-2543 (JMF)...........................................9

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886 (1961)........16

*City of New York v. New York, N.H. & H.R. Co.,* 344 U.S. 293 (1953) ................................15, 19

*Elliott et al v. General Motors LLC*, 14-cv- 14-cv-8382 (JMF) ......................................................7

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),* 829 F.3d 135 (2d Cir. 2016) ..........10

*Elliott v. General Motors LLC*, 829 F.3d 135 (2d Cir. 2016) ................................................13, 15

*First Assembly of God of Naples, Fla., Inc. v. Collier Cty., Fla.,* 20 F.3d 419 (11th Cir. 1994) . 21

*Hecht v United Collection Bur., Inc.,* 691 F3d 218 (2d Cir 2012)................................................16

*In re Chateaugay Corp. ("Chateaugay I"),*  944 F. 2d 997 (2d Cir. 1991)..................................13

*In re Chemtura Corp.*, 505 B.R. 427 (S.D.N.Y. 2014)..................................................................19

*In re Dana Corp.,* 2007 WL 1577763 (Bankr. S.D.N.Y. 2007) ....................................................22

*In re Enron Creditors Recovery Corp.*, 370 B.R. 90 (Bankr. S.D.N.Y. 2007)............................22

*In re General Motors LLC Ignition Switch Litigation*, 14-md- 2543 (JMF) ..................................7

*In re Greenwich Sentry, L.P.,* 471 B.R. 800 (Bankr. S.D.N.Y.), *aff'd,* 484 B.R. 567 (S.D.N.Y. 2012), *aff'd,* 534 F. App'x 77 (2d Cir. 2013) ..............................................................................21

*In re Grumman Olsen Indus.*, 467 B.R. 694 (S.D.N.Y. 2012).............................................12, 15

*In re Grumman Olson Indus., Inc.*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011), *aff'd,* 467 B.R. 694 (S.D.N.Y. 2012) ..........................................................................................................................14

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040 (S.D. Tex. 2012)..........................................................................................................................20

*In re Hexcel Corp.,* 239 B.R. 564 (N.D. Cal. 1999) ....................................................................13

*In re Johns-Manville Corp.*, 551 B.R. 104 (S.D.N.Y. 2016)........................................................14

*In re Johns-Manville Corp.*, 600 F.3d 135 (2d Cir. 2010)....................................................19, 23

*In re Lehman Bros. Holdings Inc.*, 433 B.R. 113 (Bankr. S.D.N.Y. 2010) ................................22

*In re Motors Liquidation Co.*, 513 B.R. 467 (Bankr.S.D.N.Y.2014) (*Phaneuf*) ...........................9

*In re Motors Liquidation Co.*, 514 B.R. 377 (Bankr. S.D.N.Y. 2014), *rev'd and vacated in part, Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016).........7

In re Motors Liquidation Co., 514 B.R. 377 (Bankr. S.D.N.Y 2014).............................................. 9

*In re Motors Liquidation Co.*, 529 B.R. 510, 583 (Bankr. S.D.N.Y. 2015) ................................. 23

In re Motors Liquidation Co., 534 B.R. 538 (Bankr. S.D.N.Y. 2014) ........................................... 9

*In re Motors Liquidation Co.*, 591 B.R. 501 (Bankr. S.D.N.Y. September 24, 2018) .................. 4

*In re New Century TRS Holdings, Inc.,* 528 B.R. 251 (D. Del. 2014).................................... 17, 18

*In re Pettibone,* 162 B.R. 791 (Bankr. N.D. Ill.1994) .................................................................. 13

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450 (D. N.J. 1997) .......... 21

*In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.,* 471 B.R. 331 (Bankr. S.D.N.Y. 2012).............................................................................................................................................. 19

*In re Waterman S.S. Corp.,* 157 B.R. 220 (S.D.N.Y. 1993) ......................................................... 12

*In re XO Commc'ns, Inc.*, 301 B.R. 782 (Bankr. S.D.N.Y. 2003) ................................................ 13

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) .................................... 15, 16, 20

*Pioneer Invest. Services v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380 (1993) ........................ 22

*Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478 (1988)..................................... 16

*Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411 (2d Cir. 2004)................................................. 22

*Wright v. Corning*, 679 F.3d 101 (3d Cir. 2012) .................................................................. 17, 18

Celestine Elliott and Lawrence Elliott ("Non-Ignition Switch Plaintiffs," or "Plaintiffs"), hereby submit their proposed proof of individual, class and representative claims (attached hereto as Exhibit 1)[1] for economic loss relating to a dangerous and defective driver's power door switch installed in their jointly owned 2006 Chevrolet Trailblazer and in thousands of other vehicles manufactured by Old GM, subject to NHTSA Recall No. 14-404000 (July 2, 2014), and owned by residents of the District of Columbia.

## BACKGROUND

Mr. and Mrs. Elliott are 83 and 78 years of age, respectively. They have been married for fifty-four years. They are lifelong residents of the District of Columbia. They are each retired commercial drivers with over twenty-five years of on-the-road experience. While Mr. Elliott's physical condition makes walking difficult and prevents him from driving for extended periods of time, Mrs. Elliott has continued to drive part-time since her retirement, first as a "Ride-On" bus driver for the Washington D.C. transit authority, and more recently as a driver for Uber and Lyft. The Elliotts own a home in the District in which they reside with their adult children and grandchildren, as well with as their two young greatgrandchildren, for whom Mr. and Mrs. Elliott provide care, and whom they regularly help transport to and from school, medical appointments, and elsewhere. Exhibit 1, Rider at ¶3.

In 2006, at a now-defunct Chevrolet dealership in the District of Columbia, Mr. and Mrs. Elliott paid full sticker price for a new 2006 Chevrolet Trailblazer. A year later, they paid full sticker price at the same dealership for a new 2007 Chevrolet Cobalt. *Id*. at ¶4.

---

[1] The Elliotts recognize that permission to file proof of claim on behalf of absent class members depends on the Court granting a timely motion for class certification. *See In re Motors Liquidation Co.*, 591 B.R. 501 (September 24, 2018) and intend to so move expeditiously.

1

After GM's public admissions, beginning in February 2014, that New and Old GM had failed to disclose and/or concealed from Plaintiffs and others a myriad of safety related defects in GM vehicles, the Elliotts became extremely hesitant to drive either of their GM vehicles. They feared for their own safety and, in particular, for the safety of their family members. *Id.*

On April 1, 2014, the Elliotts filed a four-page letter as a *pro se* complaint in the Superior Court for the District of Columbia, alleging that each of their two General Motors vehicles had been defective in various respects, that the company had concealed the defects, and that they were entitled to compensation for GM's wrongdoing. New GM removed the action to the United States District Court for the District of Columbia, moved for dismissal for failure to state a claim, petitioned the Judicial Panel on Multidistrict Litigation to consolidate the Elliotts' case with other ignition switch cases in federal courts,[2] and filed their Motion to Enforce in this Court, listing the Elliotts' lawsuit as one of the scores of "Ignition Switch Actions" that New GM alleged had been filed in violation of the 2009 Sale Order and that New GM sought to enjoin. [ECF No. 18620, Schedule 1]

In its May 16, 2014 Scheduling Order, this Court imposed a case management plan in which each of the lawsuits identified by New GM (including the Elliotts' lawsuit) was stayed while the proceedings focused on identified "Threshold Issues" regarding the enforceability of the Sale Order against economic loss Plaintiffs asserting ignition switch claims against New GM based exclusively on a single GM recall, NHTSA Recall No. 14-04700. The Court explicitly stated that it would not treat the issue of whether late claims may be filed against the GUC Trust

---

[2] The JPML transferred and consolidated the Elliot's lawsuit with the multidistrict ignition switch litigation it had earlier established, over the Elliotts' objection that their non-ignition switch claims should not be consolidated. The Panel stated that, "while our initial intent was to limit MDL No. 2543 to cases alleging only an ignition switch defect," because non-ignition switch lawsuits such as the Elliotts allege a similar pattern of corporate misconduct regarding safety risks in GM vehicles, efficiency would be served by consolidating non-ignition switch claims against New GM with the ignition switch litigation. Transfer Order, *In re General Motors LLC Ignition Switch Litigation*, 14-md- 2543 (JMF) [ECF 356, October 17, 2014]

2

as a threshold issue: "For the avoidance of doubt, the issue of whether a claim asserted in the Ignition Switch Actions is timely and/or meritorious against the Old GM bankruptcy estate (and/or the GUC Trust) is not a Threshold Issue." [ECF 12697 at 4, n. 4]

To protect the interests of Plaintiffs such as the Elliotts--who were enjoined from taking any action with respect to late claims they may have wished to assert against the GUC Trust-- Court provided that:

> [T]he GUC Trust agrees that it shall not assert a timeliness objection to any claims that the Plaintiffs may attempt to assert against the Old GM bankruptcy estate and/or the GUC Trust, based directly or indirectly on the ignition switch issue, as a result of the Plaintiffs' delay in asserting such claims during the "Interval." For purposes hereof, (a) the "Interval" shall commence on the date of this Order and shall end 30 days after a Final Order is entered with respect to an adjudication of the Threshold Issues (as defined in this Order), and (b) "Final Order" shall mean the entry of an order by a court of competent jurisdiction, and there are no pending appeals, and the time period to file an appeal of such order has expired.

*Id*. at 3.[3]

The Elliotts' *pro se* lawsuit operative at the time the May 16th Scheduling Order was entered alleged both ignition switch and non-ignition switch defects in their Cobalt and non-ignition switch defects in the Elliotts' Trailblazer. Their entire lawsuit was stayed pursuant to the Order, having been classified as one of the "Ignition Switch Actions" in New GM's papers and then enjoined as such (over the Elliotts' objections) under the Court's May 16th, 2014 Scheduling Order.[4]

---

[3] On July 11, 2014, the Court modified the Scheduling Order *inter alia* to revise the list of 2014 Threshold Issues. *See* Supplemental Scheduling Order [ECF No. 12770]

[4] After the Elliotts' retained counsel in June 2014, they successfully moved in the District Court for the District of Columbia to amend their complaint to remove breach of warranty and other derivative claims, to remove claims related to their Trailblazer, and instead to assert only non-successor liability claims related to ignition switch and other defects in their Cobalt. Their claims were exclusively based on alleged breaches of New GM's independent duties to them, that is, on New GM's own wrongdoing. That action, alleging claims about defects in their Chevrolet Cobalt, *Elliot et al v. General Motors LLC*, 14-cv- 14-cv-8382 (JMF), was eventually consolidated with other actions in *In re General Motors LLC Ignition Switch Litigation*, 14-md- 2543 (JMF). *See* n. 2, *supra*.

3

On July 2, 2014, New GM recalled the Elliotts' 2006 Trailblazer, along with other vehicles, to replace a defective driver's power door switch that posed a fire danger. *See* NHTSA Recall No. 14-404000. Exhibit 1, Rider at ¶38.

On August 1, 2014, New GM filed two additional Motions to Enforce the Sale Order, one directed against Plaintiffs in "Pre-Closing Accident Lawsuits" [ECF No. 12807], and another against Plaintiffs asserting "Monetary Relief Actions Other Than Ignition Switch Actions." [ECF No. 12808] On September 2, 2014, at New GM's request, the Court entered scheduling orders regarding the claims of Plaintiffs in "Pre-Closing Accident Lawsuits" [ECF No. 12897] and those of Plaintiffs asserting "Monetary Relief Actions Other Than Ignition Switch Actions." [ECF No. 18898]. The Orders were virtually identical. The Non-Ignition Switch economic loss Order provided that

> Until further order of the Court, the schedule governing New GM's Ignition Switch Motion to Enforce (which is subject to various Orders previously entered by the Court, copies of which shall be provided by New GM to Plaintiffs upon written request) shall govern the schedule for the Monetary Relief Motion to Enforce.

Id. at 2,¶1.

The effect of the three Scheduling Orders, taken together, was to impose a case management plan in which the identified "Threshold Issues" presented by New GM's Motion to Enforce against Ignition Switch economic claims related to NHTSA Recall No. 14-047 would be litigated to finality before this Court would begin consideration of the claims of pre-closing

---

In this Court, the Elliotts declined to enter stay stipulations that other parties had executed, and instead submitted a "No Stay Pleading," pursuant to procedures outlined in the May 16th Scheduling Order for parties unwilling to "voluntarily" stay their lawsuits, and with leave of the Court to submit such pleadings out of time upon counsel's appearance in the matter. The Elliotts also moved for dismissal for lack of subject matter jurisdiction, arguing *inter alia* that the Court had no statutory or constitutional authority to enjoin independent, non-derivative claims against New GM for its own wrongdoing. The Court denied the Elliott Plaintiffs' Motion and No Stay Pleading on August 8, 2014. *See In re Motors Liquidation Co.*, 514 B.R. 377 (Bankr. S.D.N.Y. 2014), *aff'd in part, rev'd in part, and vacated in part, Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 159-61 (2d Cir. 2016).

4

accident victims or the claims of Plaintiffs asserting economic loss based on non-ignition switch hazards—such as those presented by the Elliotts' Trailblazer allegations.

On any fair reading, the provisions estopping the GUC Trust from claiming delay during the "Interval" that appeared in the extensive May 16, 2014 Scheduling Order were intended to be incorporated with the rest of the May 16th schedule that the summary September 2, 2014 Scheduling Orders incorporated by reference—the protection of Plaintiffs from being accused of delay while they complied with the Court's case management Orders was part of the "schedule" under which Pre-Closing Accident Plaintiffs and Non-Ignition Switch economic loss Plaintiffs were to refrain from prosecuting their claims pending resolution of the 2014 Threshold Issues. In fact, without such protection, the Court's Scheduling Orders would have produced the very piecemeal and chaotic litigation that Judge Gerber was explicitly trying to avoid, as Plaintiffs asserting a myriad of Non-Ignition Switch and Personal Injury claims would have sought to litigate their ability to pursue late claims in order to protect their rights and to avoid later accusations of delay by the GUC Trust. Judge Gerber had made clear that "jumping the line" by trying to litigate such claims before litigation of the "threshold issues" would not be tolerated.[5]

On September 19, 2014, the Elliotts joined the *Bledsoe* lawsuit to assert independent and non-derivative claims for economic loss against New GM regarding the Trailblazer's defective power door module switch on behalf of themselves and similarly situated residents of the District of Columbia.[6] The lawsuit was listed as a "Monetary Action Other Than An Ignition Switch

---

[5] *See, e.g., In re Motors Liquidation Co.*, 513 B.R. 467, 470 (Bankr.S.D.N.Y.2014) (*Phaneuf*); 514 B.R. 377, 380 (2014) (*Elliott*); 534 B.R. 538, 540-41 (2014) (*Sesay*).

[6] *See Bledsoe et al. v. General Motors LLC*, 1:14-cv-7631 (S.D.N.Y) (JMF), *consolidated* in *In re General Motos LLC Ignition Switch Litigation,*14-md-2543 (JMF).

Action" on a supplement to New GM's third motion to enforce the sale order, [ECF No.12938 at 4], and accordingly stayed.[7]

Following this Court's April 15, 2015 decision, its June 1, 2015 Order disposing *inter alia* of the 2014 Threshold Issues, and its certification of those rulings for direct review to the Circuit Court, the Elliotts successfully petitioned the Second Circuit Court of Appeals for direct review. The Court of Appeals affirmed this Court's finding of a due process violation with respect to the ignition switch plaintiffs, reversed its finding that ignition switch plaintiffs suffered no prejudice from the violation with respect to successor liability claims, reversed this Court's construction of the Sale Order to encompass the Elliotts' and other plaintiffs' independent, non-derivative claims against New GM for its own wrongdoing, reversed this Court's ruling with respect to the rights of post-closing used vehicle purchasers, and vacated this Court's injunction of the claims of non-ignition switch plaintiffs and remanded for further proceedings in this Court. *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),* 829 F.3d 135, 157-59, 166 (2d Cir. 2016).

Following the Court of Appeals decision, this Court entertained the parties' proposals on how to proceed. Pursuant to the Court's Order to Show Cause entered on December 13, 2016 (No. 13802), Plaintiffs joined the Omnibus Motions to File Late Claims submitted by Designated and Lead Counsel representing other parties. [ECF No. 13811]. Plaintiffs were not then required to submit proposed proofs of their claim. Order at 4, ¶1. While briefing regarding whether the Court should permit submission of late claims of behalf of *Ignition Switch Plaintiffs*[8] has been

---

[7] Like the *Elliott* Plaintiffs, the *Bledsoe* Plaintiffs declined to enter into a stay stipulation and instead submitted a No Stay Pleading contending that the 2009 Sale Order injunction did not apply to them because they were not notified and accorded an opportunity to be heard prior to its entry, and that this Court lacked authority to enjoin independent, non-derivative claims against Non-Debtor New GM. This Court rejected their contentions. Endorsed Order, November 10, 2014 [ECF No. 12991].

[8] Ignition Switch Plaintiffs refers to the 1.8 million or so parties claiming economic loss, personal injury or property damage in connection with the ignition switch defect that was the subject of NHTSA Recall No. 14-047.

completed (Nos. 13869-13874; 13879; 13881-13884), the Court stayed consideration of the relief sought by Non-Ignition Switch Plaintiffs, including the Elliotts, pending resolution of the 2016 Threshold Issues.[9] Following the final resolution of the 2016 Threshold Issues, and pursuant to the Court's *Order Scheduling Case Management Conference*, dated Nov. 6, 2018 [ECF No. 14377],  the parties conferred and reported to the Court that the Ignition Switch and Certain Non-Ignition Switch Plaintiffs were pursuing a settlement with the GUC Trust of their late claims, but that the Non-Ignition Switch claims regarding the Elliotts' 2006 Trailblazer would not be encompassed by the anticipated proposed settlement. The Court adopted the parties' proposed schedule requiring that the Elliotts submit their proposed claim by January 21, 2019, that the GUC Trust file any objection by February 11, 2019. [ECF Nos. 13882-83)].

## BASES FOR REQUEST FOR THE COURT TO LIFT THE BAR DATE AND PERMIT SUBMISSION OF THE ELLIOTTS' TRAILBLAZER CLAIMS

As more fully discussed below, Non-Ignition Switch Plaintiffs including the Elliotts are entitled to file their claims against the GUC Trust because their constitutional and statutory due process rights to notice and to a reasonable opportunity to be heard before their valuable property interests are extinguished preclude the application of the Bar Date Order or the Late Claims Order to them on one or more of the following grounds:

1) If, on June 1, 2009, when Old GM filed its Petition in this Court, neither Old GM nor Plaintiffs knew or should have known about the safety hazard in the driver's power door module switch that was later recalled by New GM, then Plaintiffs who owned vehicles with latent safety defects were unidentifiable "future claimants" for whom no notice could be effective, and who therefore could not constitutionally be subject

---

[9] The Court directed that

> [W]hile the briefing and adjudication of the Late Claim Motions filed by Brown Rudnick LLP and/or Goodwin Procter LLP on behalf of Ignition Switch Plaintiffs is intended to go forward, the relief sought by Non-Ignition Switch Plaintiffs shall be stayed pending the Court's resolution of the other 2016 Threshold Issues and no briefing with respect to the Late Claim Motions filed on behalf of Non-Ignition Switch Plaintiffs shall take place pending such stay.

*Id*. at 5, ¶2.

to the Bar Date Order or the Late Claims Order (or to the Sale Order and Injunction, for that matter), without the necessity of further consideration of the *Pioneer* factors;

2) If Old GM knew or had reason to know of the driver's power door module switch defect--as Old GM has been found to have known and suppressed information about the ignition switch defect--then Non-Ignition Switch Plaintiffs would have been "known creditors" who were entitled to and did not receive actual notice, and whose claims should proceed to the same extent and in the same fashion as the claims of the ignition switch plaintiffs according to the ruling of the Court of Appeals, again without further consideration of the *Pioneer* factors;

3) If Non-Ignition Switch Plaintiffs are found to have been neither future claimants nor known creditors, but instead unknown creditors, the Bar Date and Late Claims Orders nevertheless cannot preclude the Elliotts and the District of Columbia consumers whom they seek to represent because:

   a. the scope and intensity of the publication campaign was not reasonably calculated to reach and alert ordinary consumers in the District of Columbia. The handful of national and international newspapers for which the Court approved *one-time* publication, to occur merely thirty-days before the Bar Date, primarily served the business and financial communities, and publication in those newspapers was not reasonably calculated to reach the Elliotts and other GM vehicle owners of the District of Columbia, to say nothing of the tens of millions of consumers who owned GM vehicles across the nation; and/or

   b. the form and content of the Notice approved for publication were not reasonably calculated to alert the Elliotts and other consumers that their valuable rights might be extinguished. The Notice did not fairly advise GM vehicle owners that their rights to sue for latent defects in their vehicles would be forever extinguished if they filed to file a proof of claim. The Notice was a virtually illegible "Legal Notice," written in confusing and legalistic language incomprehensible to ordinary consumers such as the Elliotts and other owners of GM vehicles.

Alternatively, if the *Pioneer* factors are deemed relevant, Non-Ignition Switch Plaintiffs

should be permitted to file the late claims, as discussed below.

1. *Non-Ignition Switch Plaintiffs Such as the Elliotts Who Owned Cars With Latent Defects Unknown to Themselves or to Old GM When GM Filed its Petition Were Future Creditors Whose Claims Could Not Constitutionally be Precluded by the Bar Date Order.*

If, when Old GM published notice of the Bar Date in November 2009, Old GM did not know or have reason to know of the power door switch hazard, then the Elliotts were then "future claimants" with respect to the claims that would manifest in a "right to payment" years later when the defects in GM vehicles like theirs became known. Because future claimants "cannot possibly be identified" at the time notice of the Bar Date is issued, "and thus cannot be provided notice of the bankruptcy," their claims cannot be adversely affected by the bankruptcy proceedings. *See In re Grumman Olsen Indus.*, 467 B.R. 694, 707 (S.D.N.Y. 2012). Future claims "cannot be extinguished without due process for the future claimants." *Id.* at 708.

Although known creditors are entitled to actual notice of the Bar Date, and unknown creditors may be provided constructive publication notice, no notice provided would have satisfactorily informed the Elliotts of their rights in a claim they did not yet know they held. *See In re Waterman S.S. Corp.,* 157 B.R. 220, 222 (S.D.N.Y. 1993) ("The Bankruptcy Court correctly held that the potential future claims of those who had not manifested any detectable signs of disease when notice of the bar date was given were not discharged in the bankruptcy proceeding."); *In re Hexcel Corp.,* 239 B.R. 564, 571 (N.D. Cal. 1999) (holding publication notice sufficient for "creditors who could contemplate that they might have a claim " but not creditors with "no way of knowing that it may have a claim against the debtor some time in the future"). *In re Pettibone*, 162 B.R. 791, 808 (Bankr. N.D. Ill.1994) ("The Bankruptcy Code does not require a party. . . with no known interest in a bankruptcy proceeding to monitor national financial papers and read notices about businesses against which they have no known claims to guard against the possibility they might later be held on notice of claim bar."). Due process requires that all "creditors receive notice of the debtor's bankruptcy case and applicable bar date so that [they] have an opportunity to make

any claims they may have against the debtor's estate." *In re XO Commc'ns, Inc.*, 301 B.R. 782,

792 (Bankr. S.D.N.Y. 2003).[10]

While the appointment of a future claims representative may have protected the interests

of future claimants such as the Elliotts, none was appointed here to represent owners of GM

vehicles with latent defects that would not become known until years after the closing. "Without

the appointment of ... [a future claims representative] to provide adequate representation to the

absent future claim holders, it is doubtful that the injunction provisions binding them would be

found to comply with the due process clause." *In re Johns-Manville Corp.*, 551 B.R. 104, 114

(S.D.N.Y. 2016); *see also In re Grumman Olson Indus., Inc.*, 445 B.R. 243, 254 (Bankr.

S.D.N.Y. 2011), *aff'd,* 467 B.R. 694 (S.D.N.Y. 2012):

> [Plaintiffs'] rights were not protected through the appointment of
> a future claims representative and the creation of a trust to pay their claims. …
> Every case that we have found addressing this issue has concluded that for reasons of
> practicality or due process, or both, that a person injured after the sale (or
> confirmation) by a defective product manufactured and sold prior to
> the bankruptcy does not hold a "claim" in the bankruptcy case and is not affected
> by either the § 363(f) sale order or the discharge under 11 U.S.C. § 1141(d).

Because the Elliotts and those they seek to represent were future claimants unidentifiable

at the time that the Bar Order was entered, and because their interests were not protected by the

---

[10] The Court of Appeals has not yet definitively ruled on the "future claims" question presented here:

> This Court has not decided, however, "the difficult case of pre-petition conduct that has not yet resulted in
> detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any
> tortious consequence to a victim."

*Elliott v. General Motors LLC*, 829 F.3d 135, 156 (2d Cir. 2016), *quoting "In re Chateaugay Corp. ("Chateaugay
I "),* 944 F. 2d 997, 1004 (2d Cir. 1991). The Court suggested that, at the very least, for a "future claim" to
constitute a "claim" extinguishable in bankruptcy proceedings, there must be  pre-petition contact or relationship
between the debtor and the future claimant "that makes identifiable the individual with whom the claim does or
would rest." *Id.* Notably, Plaintiffs owning vehicles with latent defects, unknown either to themselves or to GM,
were not under this standard "identifiable" and thus did not hold a claims that could be barred.

appointment of a future claims representative, their due process rights preclude application of the

Bar Date or Late Claims Orders to them.

> 2. *If Old GM Knew or Should Have Known of the Non-Ignition Switch Defect, Then Non-Ignition Switch Plaintiffs Such as the Elliotts Were Known Creditors Whose Claims Could Not Have Been Precluded Without Actual Notice of the Bar Date Order, Which They Did Not Receive.*

Plaintiffs have grounds to believe that, consistent with its corporate culture at the time,

Old GM very well might have known of and concealed the hazards of the power door module

switch in the Elliotts' Trailblazer and similar vehicles, just as it did with the ignition switch

defect. Exhibit 1, Rider at  ¶¶5-27, 30-40 . Plaintiffs have learned that NHTSA's Office of

Defect Investigations (ODI) received a complaint about a fire starting in the driver's door of a

2006 Trailblazer as early as November 6, 2008, and that ODI received some 170 reports alleging

a thermal event in the driver door switch between November 2008 and November 2012 in

vehicles  including the Elliotts' Trailblazer ultimately recalled by New GM. ¶¶30, 39. New GM

has acknowledged the receipt of 619 unique consumer complaints related to the driver door

switch, 77 of which led to fire with flame. *Id*. at 40.  Plaintiffs have not yet had the benefit of

discovery, either in this Court or in the MDL Court, with respect to Old GM's knowledge of the

power door switch hazard.

If discovery reveals that Old GM knew about the driver's power door module switch

defect, then the Elliotts and those they seek to represent would have been known creditors

entitled to actual notice of the Bar Date Order. Because they did not receive such notice, they are

not bound by the Bar Date Order and should be free to file their claims against the GUC Trust

now. If Old GM knew about but concealed the defects about which they complain, then the

11

Elliotts would be in the same position as the ignition switch Plaintiffs.[11] Creditors are not bound

by orders issued during bankruptcy proceedings prior to the time they receive adequate notice of

the bankruptcy. *See In re Grumman Olson Indus.*, 467 BR at 706. This principle prevents courts

from barring a creditor's claim as untimely when that creditor never received adequate notice of

the bankruptcy. *See In re Residential Capital, LLC,* No. 12-12020 (MG), 2015 WL 2256683, at

*6 (Bankr. S.D.N.Y. May 11, 2015).

> 3. *If Non-Ignition Switch Plaintiffs Such as the Elliotts are Deemed to Have Been*
>    *Unknown Creditors in  June 2009, Their Claims Could Not be Precluded Without*
>    *Publication Notice Reasonable Calculated to Reach Them and to Apprise Them of*
>    *Their Interests in the Litigation.*

In some circumstances, notice by publication may satisfy due process for unknown

creditors, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950); *City of New*

*York v. New York, N.H. & H.R. Co.,* 344 U.S. 293, 296 (1953), but the publication notice

campaign must be "reasonably calculated, under all the circumstances, to apprise [creditors] of

the pendency of the action and afford them an opportunity to present their objections," *Mullane*,

339 U.S. at 314. Whether notice procedures are reasonably calculated to reach unknown

claimants "depends upon the circumstances of each particular case." *Tulsa Professional*

*Collection Serv., Inc. v. Pope*, 485 U.S. 478, 484 (1988); *see also Cafeteria & Rest. Workers*

*Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) ("The very nature of due

process negates any concept of inflexible procedures universally applicable to every imaginable

situation."). The mere fact that notice was published in a newspaper of general circulation is not,

---

[11] The Court of Appeals recognized the need for a fuller record on which to determine whether Old GM knew or
should have known of Non-Ignition Switch defects such as those asserted by the Elliotts. This Court

> left as an open question whether Old GM knew of the Non–Ignition Switch Plaintiffs' claims based on other
> defects. …Without factual findings relevant to determining knowledge, we have no basis for deciding
> whether notice was adequate let alone whether enforcement of the Sale Order would violate procedural due
> process as to these claims.

829 F.3d at 166.

by itself, sufficient to demonstrate that due process was satisfied. *Hecht v United Collection Bur., Inc.,* 691 F3d 218, 225 (2d Cir 2012) (a more extensive campaign of notification beyond limited publication in a national periodical, including local publications and electronic media, was necessary to satisfy due process).

"[W]hen notice is a person's due, *process which is a mere gesture is not due process*. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* 339 U.S. at 315, 70 S.Ct. 652 (*emphasis added*)

    a. *The scope and intensity of publication were not reasonably calculated to reach GM consumers in the District of Columbia.*

The Notice Order proposed by Old GM and entered by this Court limited publication notice of the Bar Date to a one-time publication at least thirty days prior to the Bar Date in following newspapers: the global edition of *The Wall Street Journal*, the national edition of *The New York Times,* the global edition of *The Financial Times*, the national edition of *USA Today*, *Detroit Free Press/Detroit News*, *Le Journal de Montreal*, *Montreal Gazette*, *The Globe and Mail*, and *The National Post*. [ECF No. 4079 at 7] This selection was perhaps aimed at the financial and business community but it was not targeted to reach the consumers who owned GM vehicles. Of the newspapers, only *USA Today* might have potentially reached some small number of GM consumers across the country, but the one-time publication thirty days before the Bar Date in a single outlet potentially reaching only a small fraction of GM consumers was not a "means employed …by one desirous of actually informing" the tens of millions of GM vehicle owners, but rather, at best, "a mere gesture."

Considering the size of the GM Bankruptcy, and the tens of millions of GM consumers scattered across the United States, a more far-reaching effort to provide notice was essential to ensuring due process was satisfied. Notably, the record is devoid of any rationale for the choice

13

of publications or to support the reasonableness of the notice campaign in general, much less the

kind of evidence-based expert testimony that could have demonstrated the necessary scope and

intensity of publication beyond the mere conjecture that seemed to rule the day here.

GM knew it had tens of millions of consumers residing across the United States. GM

expanded its business operations to reach the entire country and influence millions of potential

customers. Yet it did not treat the publication of the Bar Date notice in this Case with the same

dedication to  reaching consumers. When there is such a wide disparity between the size of a

debtor's business and the reach and diversity of the publications it uses for notifying its own

consumers of its bankruptcy, "[d]ue process affords a re-do." *In re New Century TRS Holdings,*

*Inc.,* 528 B.R. 251, 260 (D. Del. 2014) (*quoting Wright v. Corning*, 679 F.3d 101, 107 (3d Cir.

2012)). GM included local publication in Detroit in its notice plan but failed to publish the notice

in local or regional papers throughout the United States, in the diverse areas in which its

customers resided. GM was in the business of manufacturing and selling vehicles. GM

categorically failed to design a publication campaign reasonably calculated to reach GM

customers. GM customers' particular identities might have been unknown, but surely the

likelihood that the group of  then unknown GM vehicle owners would constitute a major

proportion of "unknown creditors" once their vehicles' latent defects became manofest was not

unknowable—and the failure to target a publication campaign reasonably designed to reach

them violated GM's customers' due process rights.  *See In re New Century TRS Holdings, Inc*.,

*id*. at 260 (publication notice violated due process when debtor, a lender, published one-time in

the national edition of *USA* Today, and another notice in an area with a large concentration of

debtors' employees, but had no publication plan to reach its million or so borrower-customers).

14

The narrow time window between the Bar Date and the publication notice (45 days) exacerbated the problems with the limited scope and intensity of the GM publication program. In circumstances such as this, with the debtor rushing through the bankruptcy process and leaving such little time to file claims for consumers who did receive notice, the debtor should "have a heavier burden to ensure that notice is widespread." *Id.*

When courts find that publication of notice in newspapers of general circulation satisfies due process, it is often also supplemented with publication in local papers. *See, e.g., Wright v. Corning*, *supra*. In this case, no effort was made to supplement the Debtor's notice regime with local publications that would be more accessible to the Plaintiffs at the time the Bar Date Order was entered. Significantly, the record is utterly devoid of evidence that any attention whatsoever was paid to the need to reach the tens of millions of owners of Old GM vehicles. Accordingly, Plaintiffs rights to notice and an opportunity to be heard were violated and the Bar Date Order may not be constitutionally applied to prevent them from filing their claims against the GUC Trust now.

> b.  *The content and form of notice approved for publication did not adequately convey to Plaintiffs that their rights to sue for a danger that may not become known until years later would be affected by GM's bankruptcy.*

To satisfy due process, all published notices must "convey the required information" necessary for a creditor to understand that its rights may be adversely affected by the bankruptcy. *In re Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, 471 B.R. 331, 338 (Bankr. S.D.N.Y. 2012). But even if a consumer found and read the published notice, the notice could not have informed them of their future claim. This 2009 notice did not mention the existence of the door module defect that was the subject of Recall No. 14V-404 in July 2014. No information provided

in the 2009 notice would have adequately informed the Elliotts and others of a claim that would not arise until years later.

Even apart from the failure to specify theparticular power door switch defect, the content of the Notice published by GM contained insufficient information generally to inform a reasonable GM vehicle owner that his or her rights would be adversely affected by the Bankruptcy in the event that vehicles that were performing properly at the time of the Notice came to develop hazards later. *Cf. In re Chemtura Corp.*, 505 B.R. 427, 431 (S.D.N.Y. 2014) (due process satisfied if *inter alia* the bar date notice made explicit that those who may develop injuries later from pre-bankruptcy exposure may have their rights affected). Even if the Elliotts and other GM consumers had sufficient knowledge of GM's bankruptcy, this alone is insufficient to bar their claims unless they were properly and adequately notified of the Bar Date and its effect on their right to sue. *See City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953). The notice issued could not have informed them that their future claims, which were "abstract, unimaginable, and inchoate at the time," would later be barred in this Case. *In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010).

Moreover, as this Court itself observed at the time, the Notice was laden with legal jargon that would have prevented any reasonable consumer from understanding its terms and import in any event.[12] The purpose of disseminating notice in bankruptcy is to ensure interested parties

---

[12] The Court stated:

> I agreed with the point that the notice was kind of verbose and legalese….One point that was made in the papers did hit a responsive chord with me. I'm not going to direct that the notice be rewritten, but I think that the objection that it was wordy and lawyeresque and legalesesque was well taken. I think as a matter of best practices, the debtors' community should start working on preparing its bar date notices in something closer to plain English. But I am not going to, today, order that something that would be a matter of best practices will be turned into a requirement, at least not in this case.

Transcript of the September 14, 2009, Hearing on the Debtors' Motion for Order Pursuant to Section502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim Including Claims Under Section 503(b)(9) of the Bankruptcy Code and Procedures Relating Thereto and Approving

have enough information to fully understand how their rights could be affected by the case and what actions are necessary to preserve those rights. As the Court stated in *Mullane*, "[t]he notice must be of such nature as reasonably to convey the required information." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). If the notice is written in any way other than plain English, there is a risk interested parties may not understand what the notice is required to convey. Accordingly, when a debtor's notice includes an inordinate amount of legal jargon concealing the essential information in the notice, due process cannot be satisfied for those parties without the knowledge of legal terminology needed to decipher the notice. *See In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (ruling notice satisfied due process because "written in easy-to-understand plain English.").

The notices that GM published in this case are a textbook example of obscurantism.[13] GM vehicle owners are never mentioned, lists of statutory definitions and exclusions with formal citations are included, those having "claims" are purportedly alerted, but the Notice defines "claims" to include a "right to payment," and later the Notice, in larger bold font, instructs those who do not hold "claims" that they should *not* file a proof of claim. *Id.* Only bankruptcy law experts schooled in the split among courts interpreting the core concept of "claim" under the Bankruptcy Code could begin to understand the otherwise convoluted and apparently contradictory messages—at least when read by those, like the Elliotts, who owned GM vehicles for which no defects were known and who then had no "right of payment"—and therefore who

---

the Form and Manner of Notice Thereof at 37 [ECF 4081]. The Court did not provide further explanation why it approved the content of the Notice despite these observations.
[13] Certificate of Publication [ECF 4290], attached hereto as Exhibit 2.

could be not reasonably be expected to understand that their rights were to be affected, even had they seen and attempted to parse the publication notice that GM provided.

GM published its notice using a font size that made it nearly illegible for anyone without a magnifying glass, with its text so crammed together that virtually no space whatsoever is visible around it or between apparent sections and subsections. *Id*. To satisfy the demands of due process, a debtor's published notice must be readable. When the notice is written in a fine print that prevents interested parties from reading it, courts have regularly ruled that due process would be violated if unknown claimants were deemed to have read it. *See In re Greenwich Sentry, L.P.*, 471 B.R. 800, 806–07 (Bankr. S.D.N.Y.), *aff'd*, 484 B.R. 567 (S.D.N.Y. 2012), *aff'd*, 534 F. App'x 77 (2d Cir. 2013) (upholding bar date notice written in "bold font and capital letters"); *First Assembly of God of Naples, Fla., Inc. v. Collier Cty., Fla.*, 20 F.3d 419, 422 (11th Cir.) (noting that notice "less than ¼ page in size" and without "a headline in 18 point type" was a "deficiency" in the notice*); In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 528 (D.N.J. 1997) (explaining that "notice must be readable" to satisfy due process).

Notably, no notices were published in Spanish, or placed in Spanish language publications.

The Elliotts invite the Court to review the copies of the actual published Notices that GM provided. *See* Exhibit 2. Even a cursory review of the combination of legalistic jargon, a virtually illegible and tiny font, provisions densely packed together, placement amid other "Legal Notices," confusing terminology, and the omission of any mention of GM vehicle owners, confirms that the Notice was not reasonably calculated to give GM vehicle owners notice that any claims they might hold might be affected in the GM bankrupty, much less notice that their

18

ability to sue for defects that may arise later in the course of their use of GM vehicles would be barred.

The GM Bankruptcy was the largest industrial bankruptcy in American history. GM had tens of millions of customers across the nation. Plaintiffs submit that even a cursory review of the Notice in its published form confirms that Plaintiffs were not accorded the due process that the Constitution required in the circumstances.

### 4. The Pioneer Factors are Satisfied Here.

The Supreme Court in *Pioneer Invest. Services v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993), set out the authoritative test for determining whether a court may exempt a party's failure to meet a bar date for filing a proof of claim under "excusable neglect." Whether neglect is excusable is based on four equitable considerations including: "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* However, "not all factors need to favor the moving party" for a court to accept a late proof of claim. *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 101 (Bankr. S.D.N.Y. 2007). The Second Circuit places considerable weight on the reason for delay and weighs less equally the other factors. *See Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415-16 (2d Cir. 2004) ("[I]t is the third factor-the reason for delay-that predominates, and the other three are significant only in close cases."); *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010) (explaining the Second Circuit's "hard line" approach to Pioneer, which "focuses primarily on the reason for the delay, and specifically whether the delay was in the reasonable control of the movant."); *In re Dana Corp.*, 2007 WL 1577763, at *4

(Bankr. S.D.N.Y. 2007) ([T]he Second Circuit . . . focus[es] on the reason for delay as the predominate factor.").

Evaluating these factors in light of the facts of this case, the Court should find that the Elliots' late filing qualifies as excusable neglect and that the late-filed proof of claim should be allowed. The Elliotts were fully entitled to receive notice of the Bar Date, and thus the opportunity to participate in the bankruptcy, before their claims could be barred. GM's publication notice was insufficient to adequately notify the Elliotts of the adverse effect on their rights that GM's bankruptcy could create. The Bar Date notice was posted in publications that were not reasonably calculated to reach them, and it did not contain the requisite information to put the Elliotts on notice that their future claims would be extinguished. The Movants were unable to file timely proofs of claim due to these inadequacies in the notice that were entirely out of their control. Permitting the Movants to file late proofs of claim is the only remedy that will protect their rights in this case. *See In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010); *In re Motors Liquidation Co.*, 529 B.R. 510, 583 (Bankr. S.D.N.Y. 2015).

The GUC Trust will not be prejudiced by permitting the Elliotts to assert their claims, and the inability of the Elliotts to pursue their claims against the GUC Trust has been due to factors entirely beyond the Elliotts' control, namely the concealment of the true nature of the defect from the Elliotts until July 2, 2014, and the Scheduling Orders of this Court which precluded Non-Ignition Switch Plaintiffs from pursuing their late claims until now. When New GM finally recalled the Elliotts' dangerous door module for replacement on July 2, 2014, the Elliotts had already been enjoined by this Court from proceeding with their claims in any way, and had already been assured that their inability to file proofs of claims against the GUC Trust would not be used against them by the Trust later. The Elliotts have acted reasonably and with dispatch to

20

press their claims against the Trust here after awaiting the resolution of the 2014 and 2016 Threshold Issues.

## CONCLUSION

For the foregoing reasons, the Elliotts should be permitted to file their proposed proof of claim, attached as Exhibit 1, with respect to the defects in their 2006 Chevrolet Trailblazer. Alternatively, the Elliotts should be permitted to develop a factual record through discovery with respect to the factual issues presented by their proposed proof of claim, including discovery related to the whether Old GM knew or should have known of the driver's power door module switch, and whether the publication notice of the bar date was reasonably calculated to reach the Elliotts and other GM vehicles owner and to apprise them of the relevance of the bankruptcy proceedings to their potential claims.

Dated: January 21, 2019                    Respectfully submitted,

                                           */s/ Gary Peller*
                                           Gary Peller
                                           600 New Jersey Avenue, N.W.
                                           Washington, DC 20001
                                           (202) 662-9122
                                           peller@georgetown.edu
                                           *Counsel for Celestine Elliott and*
                                           *Lawrence Elliott*