# EXHIBIT 1

*In re Motors Liquidation Company, et al. f/k/a General Motors Corp., et al.*
Case No. 09-50026 (MG) **(Jointly Administered)**

### RIDER TO PROOF OF CLAIM OF LAWRENCE & CELESTINE ELLIOTT

**Names of Claimants:** Lawrence Elliott and Celestine Elliott.

**Nature and Basis of Claim:**

1. Pursuant to this Proof of Claim, the Elliotts assert an economic loss claim against the bankruptcy estate of Motors Liquidation Company f/k/a General Motors Corporation and its affiliated debtors and the Motors Liquidation Company General Unsecured Creditors Trust. More specifically, the Elliotts allege claims of consumer protection violations, fraudulent concealment, implied warranty of merchantability, and unjust enrichment.

2. The Elliotts assert these claims on behalf of themselves and the following proposed Class:

    All residents of the District of Columbia who, prior to June 2009, either owned or leased a GM vehicle subject to Recall No. 14V-404.

3. Mr. and Mrs. Elliott are 83 and 78 years of age, respectively. They have been married for fifty-four years. They are lifelong residents of the District of Columbia. They are each retired commercial drivers with over twenty-five years of on-the-road experience. While Mr. Elliott's physical condition makes walking difficult and prevents him from driving for extended periods of time, Mrs. Elliott has continued to drive part-time since her retirement, first as a "Ride-On" bus driver for the Washington D.C. transit authority, and more recently as a driver for Uber and Lyft. The Elliotts own a home in the District in which they reside with their adult children and grandchildren, as well with as their two young greatgrandchildren, for whom Mr. and Mrs. Elliott provide care, and whom they regularly help transport to and from school, medical appointments, and elsewhere.

1

4. In 2006, the Elliotts paid the full manufacturer's suggested retail price for a new 2006 Chevrolet Trailblazer at a now-defunct GM dealership in Washington, D.C. In 2007, the Elliotts paid the full manufacturer's suggested retail price for a new 2007 Chevrolet Cobalt at the same GM dealership. After GM's public admissions, beginning in February 2014, that New and Old GM had failed to disclose and/or concealed from Plaintiffs and others a myriad of safety related defects in GM vehicles, the Elliotts became extremely hesitant to drive either of their GM vehicles. They feared for their own safety and, in particular, for the safety of their family members.

**GM's Practice of Concealing and Minimizing Safety Risks**

5. GM instituted policies and practices intended to conceal and minimize safety related risks in GM products from the Elliotts, Class members, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product risks.

6. Through their deception, GM recklessly endangered the safety of the Elliotts, Class members, their families, and members of the public.

7. GM's Chief Executive Officer Mary Barra admitted on behalf of the company that GM employees knew about safety-related defects in millions of vehicles and that GM did not disclose those defects as it was required to do by law. Ms. Barra attributed GM's "failure to disclose critical pieces of information," in her words, to GM's policies and practices that mandated and rewarded the unreasonable elevation of cost concerns over safety risks.

8. This case arises from GM's concerted and systematic practice and policy of denying, diminishing, and failing to remediate safety related hazards that GM vehicles pose.

2

9. GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that GM would take with respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

10. GM directed its engineers and other employees to falsely characterize safety-related risks – including the risks described in this complaint – in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires, and/or to issue narrower recalls than the circumstances warranted.

11. GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in GM products.

12. GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with GM products, and force GM to incur the costs of a recall. A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

13. GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving the Elliotts, Class members, and the public.

14. GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

15. GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

3

16. GM's managerial practices were designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public.

17. In a practice GM management labeled "the GM nod," GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that they company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

18. GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related risks and GM's refusal to respond to and/or GM's continuing concealment of those risks. GM employees understood that no notes should be taken during meetings about safety related issues, and existing employees instructed new employees in this policy. GM did not describe the "no-notes policy" in writing to evade detection of their campaign of concealment.

19. GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for GM, the Elliotts, Class members, law enforcement officials, the NHTSA, and other governmental officials to identify. GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. GM followed this practice with respect to the dangerous ignition switched.

20. GM directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks in GM products. These actions included settling cases raising safety

4

issues, demanding that GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation, and settling cases for amounts of money that did not require GM managerial approval, so that management officials could maintain their veneer of ignorance concerning the safety related risks.

21. The systematic concealment of known defects was deliberate, as GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect. GM routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

22. Under the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. § 30101, et seq. ("TREAD Act"), and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must properly disclose the defect. If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.

23. When a manufacturer with TREAD Act responsibilities is aware of safety defects and fails to disclose them as GM has done, the manufacturer's vehicles are not safe.

24. The array of defects in GM vehicles that GM and New GM failed to disclose until New GM began issuing recalls for the defects in February 2014 includes: (1) ignition switch defect, (2) power steering defect, (3) airbag defect (4) brake light defect, (5) shift cable defect, (6) safety belt defect, (7) ignition lock cylinder defect, (8) key design defect, (9) ignition key defect, (10) transmission oil cooler line defect, (11) power management mode software defect, (12) substandard front passenger airbags, (13) light control module defect, (14) front axle shaft defect, (15) brake boost defect, (16) low-beam headlight defect, (17) vacuum line

5

brake booster defect, (18) fuel gauge defect, (19) acceleration defect, (20) flexible flat cable airbag defect, (21) windshield wiper defect, (22) brake rotor defect, (23) passenger-side airbag defect, (24) electronic stability control defect, (25) steering tie-rod defect, (26) automatic transmission shift cable adjuster, (27) fuse block defect, (28) diesel transfer pump defect, (29) base radio defect, (30) shorting bar defect, (31) front passenger airbag end cap defect, (32) sensing and diagnostic module ("SDM") defect, (33) sonic turbine shaft, (34) electrical system defect, (35) seatbelt tensioning system defect, and (36) master power door switch defect.

25. GM has received reports of crashes and injuries that put GM on notice of the serious safety issues presented by many of these defects. GM advanced its culture of concealment by actively denying liability for fatal accidents.

26. In 2005, Defunct GM customer Adam Powledge lost control of his vehicle, slamming into a highway median and killing himself and his four children. In the ensuing suit GM nefariously framed the incident as a suicide, disavowing any connection between the accident and an electrical failure, despite GM's knowledge that the Malibu Mr. Powledge drove had a steering defect that likely was the real cause of the tragedy. Then, in April 2014, GM finally admitted that Adam Powledge's Chevrolet Malibu had a steering defect that was consistent with the loss of control over the vehicle that led to his death and that of his four children. The Powledge saga is but one dramatic example of the lengths that GM, its attorneys, risk personnel, and others went to further the GM campaign of denial and deceit.

27. Despite the dangerous nature of many of the defects and their effects on critical safety systems, GM concealed the existence of the defects and failed to remedy the problems in an appropriate or timely manner.

6

*Failure to Disclose and Concealment of Master Power Door Switch Defect (Elliotts' vehicle); NHTSA Campaign 14V404000).*

28. Lawrence and Celestine Elliott own a 2006 Chevrolet Trailblazer for which they paid full sticker price when they purchased it from a now defunct dealership in the District. The vehicles has had a host of problems, including two dangerous and frightening "moving stalls," in which the Trailblazer's electrical system turned off while Ms. Elliott was driving, resulting in loss of control over steering, braking, and the loss of power to the airbag system

29. The Trailblazer was installed with a Master Power Door Module Switch that became so dangerous that, in NHTSA Recall No. 14-404000, New GM advised owners that the vehicles must be parked outdoors to avoid unreasonable risks of fire. GM's treatment of the Trailblazer dangers has been consistent with the corporate culture that has engulfed GM's cost-containment approach to risk issues presented by GM vehicles: deny any hazard exists; if forced to concede the hazard, minimize its significance; and if nevertheless forced to act, insist on cheap rather than appropriate remediation.

30. NHTSA's Office of Defect Investigations (ODI) received a complaint about a fire starting in the driver's door of a 2006 Trailblazer as early as November 6, 2008.

31. This is the third recall New GM has conducted for this very same hazard, a process of denial and avoidance going back at least to 2012. In the previous two recalls, GM convinced governmental officials and assured vehicles owners that minor remediation—consisting of spraying the part with silicate rather than removing and replacing the dangerous part to eliminate the fire risk--would render the vehicles safe. GM failed to disclose the true nature of the ris, however. After years of denial, GM finally admitted in July 2014 that the Elliotts' 2006 Chevrolet Trailblazer was and may remain dangerous because of the risk that its electrical components will short and start a fire inside the driver's door.

7

32. After years of denial, then false claims that it had repaired the vehicles and rendered them safe to drive, GM has admitted to the NHTSA that its prior two recalls and purported repairs—when it tried to take the cheap way out, and spay the switch with a chemical coating rather than actually replace and repair the faulty switch—were failures.

33. On August 16, 2012, GM notified the NHTSA that it was recalling "certain model year 2006 Chevrolet Trailblazer EXT and GMC Envoy XL and 2006-2007 Chevrolet Trailblazer, GMC Envoy, Buick Rainier, SAAB 9-7x, and Isuzu Ascender vehicles, originally sold or currently registered in Connecticut, Delaware, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, Wisconsin, and the District of Columbia" (NHTSA Report Campaign No. 12V406000). The reason for the recall was that "[f]luid may enter the driver's door module, causing corrosion that could result in a short in the circuit board." The consequence of this defect was listed in the report as follows: "A short may cause the power door lock and power window switches to function intermittently or become inoperative. The short may also cause overheating, which could melt components of the door module, producing odor, smoke, or a fire."

34. The August 16, 2012 recall was limited to vehicles in the twenty aforementioned states and the District of Columbia. To owners outside of the aforementioned states, GM sent an Owner Notification Letter to owners of the affected vehicles instructing them to bring their vehicle to a GM service center only if they noticed switches that functioned "uncommanded, intermittently or become inoperative" or they noticed "an odor or overheated/hot switches." The letter stated that owners should seek not repairs unless they observed these symptoms their vehicle.

8

35. The NHTSA was not satisfied with GM's geographic limitation of the August 16, 2012 driver door switch recall (NHTSA Action No. EA12004), and on June 13, 2013 GM notified the NHTSA that they were expanding the recall to cover the aforementioned vehicles in all states (NHTSA Report Campaign No. 13V248000). As part of the expanded recall GM notified consumers that unattended vehicle fire may occur in rare instances, yet also stated that the affected vehicles remained safe to drive.

36. On September 18, 2013, the Elliotts' 2006 Trailblazer was serviced pursuant to the previously issued recalls and a "protective coating" was applied as an attempt to address the defective driver door switch. The Elliotts' relied upon GM's assurance that the protective coating would address the defect and eliminate the risk of personal injury or property damage.

37. On April 1, 2014, the Elliotts filed a pro se complaint notifying GM that critical electrical components of the car had continued to operate ineffectively and presented risk of personal injury and property damage.

38. On July 2, 2014, GM issued a third recall concerning the defective driver door switch in the same vehicle models for the same defect and fire risk (NHTSA Campaign No. 14V404000). This new recall required additional remedy for vehicles "whose modules were modified but not replaced" under the previous two recalls. GM conceded that "[v]ehicles that were repaired by having a protective coating applied to the driver's door module may continue to have a safety related defect." This recall encompasses the following models: BUICK RAINIER 2006-2007; CHEVROLET TRAILBLAZER 2006-2007; CHEVROLET TRAILBLAZER EXT 2006; GMC ENVOY 2006-2007; GMC ENVOY XL 2006; ISUZU ASCENDER 2006-2007; SAAB 9-7X 2005-2007.

39. NHTSA's Office of Defect Investigations (ODI) has received 170 reports alleging a thermal event in the driver door switch in vehicles identified by GM's August 2012 recall. GM acknowledged the receipt of 619 unique consumer complaints related to the driver door switch, 77 of which led to fire with flame.

40. On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007 Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007 GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x vehicles with a defect that can cause an electrical short in the driver's door module. In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module. The overheated module can then cause a fire in the affected vehicles.

### CLASS ACTION ALLEGATIONS

41. The Elliotts assert a class action for themselves and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. The Elliotts bring this claim on behalf of a proposed class defined as follows: residents of the District of Columbia who, since the inception of GM in October 2009, hold or have held a legal or equitable interest in a GM vehicle with a master power door switch hazard, as described in the recalls for these conditions above.

42. Excluded from the Class are: (1) GM, any entity or division in which GM has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.

*NUMEROSITY AND ASCERTAINABILITY*

10

43. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder for each Class or Subclass is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, and/or from public vehicular registration records.

*TYPICALITY*

44. The claims of the Elliotts are typical of the claims of each member of the class and subclasses in that the representative Plaintiffs, like all class members, legally or equitably own or owned a dangerous GM vehicle during the time period noted above. The Elliotts, like all class and subclass members, have been damaged by GM's misconduct, namely, in being wrongfully exposed to an increased risk of death or serious bodily injury, in suffering diminished use and enjoyment of their vehicles, and in suffering the diminished market value of their vehicles. Furthermore, the factual bases of GM's misconduct are common to all class and subclass members.

*ADEQUATE REPRESENTATION*

45. The Elliotts will fairly and adequately represent and protect the interests of the class and subclasses. The Elliotts have retained counsel with substantial experience in prosecuting consumer class actions and in prosecuting complex federal litigation. The Elliotts and their counsel are committed to vigorously prosecuting this action on behalf of the class and subclasses, and have the financial resources to do so. Neither the Elliotts nor their counsel have interests adverse to those of the class of subclasses.

*PREDOMINANCE OF COMMON ISSUES*

46. There are numerous questions of law and fact common to the Elliotts and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

11

    a. Whether the vehicles owned by class or subclass members during the class periods suffer from the dangerous hazards described herein.
    b. Whether the hazards posed an unreasonable danger of death or serious bodily injury.
    c. Whether GM imposed an increased risk of death or serious bodily injury on the Elliotts and class and subclass members during the Class period.
    d. Whether GM caused the Elliotts and class and subclass members to suffer economic loss during the Class period.
    e. Whether GM caused the Elliotts and class and subclass members to suffer the loss of the use and enjoyment of their vehicles during the class period.
    f. Whether GM had a legal duty to disclose the dangers described above to class and subclass members.
    g. Whether GM had a legal duty to disclose the dangers described above to the NHTSA.
    h. Whether class and subclass members suffered legally compensable harm.
    i. Whether GM violated the District of Columbia's consumer protection statute by concealing safety related hazards from the Elliotts and governmental officials.
    j. Whether the safety related hazards were material.
    k. Whether the Elliotts and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction.

*SUPERIORITY*

47. The Elliotts and class and subclass members have all suffered and will continue to suffer harm and damages as a result of GMs' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most class and subclass members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual class and subclass member's claims, it is likely that few could afford to seek legal redress for GMs' misconduct. Absent a class action, class and subclass members will continue to incur damages, and GMs' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication. The class action is also superior for defendants, who could be forced to litigate thousands of separate actions.

48. GM has acted in a uniform manner with respect to the Elliotts and class and subclass members. Class and subclass wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because GM has acted on grounds that apply generally to the class, and inconsistent

12

adjudications with respect to GM's liability would establish incompatible standards and substantially impair or impede the ability of class and subclass members to protect their interests.

## COUNT I
### The District of Columbia Consumer Protection Procedures Act

49. The Elliotts bring this claim on behalf of themselves and the Proposed Class and as Representatives for similarly situated District of Columbia residents.

50. GM violated the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904 et seq., by representing that its vehicles were safe and adequately engineered when in fact GM failed to disclose and actively concealed an unprecedented number of safety defeats due in large part to GM's focus on cost- cutting over safety. The Elliotts and the Class members had no reason to believe that their vehicles possessed distinctive shortcomings; they relied on GM to identify latent features that distinguished their vehicles from similar vehicles without the safety related defects, and GM's failure to do so tended to mislead consumers into believing their vehicles were safe to drive.

51. Upon information and belief, GM was aware of the defects in the Elliotts' and Class members' vehicles, and the defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

52. GM induced the Elliotts and members of the Class to purchase and retain their 2006 Trailblazer under false pretenses, and thus deprived them of the benefit of their bargain and saddled them with dangerously defective cars that were worth less than they would have been in the absence of the defects. The Elliotts and Class members also incurred repair costs and other expenses as a direct result of GM's fraud, and GM was unjustly enriched at the Elliotts' and Class members' expense.

13

53. GM sold the Trailblazer to the Elliotts in violation of the warranty of merchantability and fitness implied under the District's Commercial Code, §§28:2-314, 315. Violations of the Commercial Code constitute violations of the Consumer Protection Procedures Act.

54. Plaintiffs are entitled to the greater of actual damages or the statutory damages of $1500 for each violation of the Consumer Protection Procedure Act, as well as costs and attorneys fees.

55. Plaintiffs are empowered by the Consumer Protection Act to proceed as representatives of the Public to protect the interests of District residents.

## COUNT II
## Fraudulent Concealment

56. The Elliotts bring this claim on behalf of themselves and the Proposed Class.

57. GM knew since August 2012 about the master power door switch hazard described above. The facts that their vehicles presented the above described safety hazards was material to the Elliotts and Class members. The Elliotts and Class members had no reasonable way of learning of the hazards that GM knew about but failed to disclose.

58. GM's failure to disclose the risks, and its affirmative misrepresentations regarding the safety of the Elliotts' and Class members' vehicles, were intentional.

59. The Elliotts and the Class members reasonably relied on GM's communications and material omissions to their detriment. As a result of the concealment and/or suppression of facts, the Elliotts and the Class members have sustained and will continue to sustain injuries, consisting of the diminished value of their GM vehicles and the lost use and enjoyment of the vehicles that GM's actions have caused, and exposure to increased risk of death or serious bodily injury. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and with reckless disregard to the Elliotts' and Class members' rights and well-being, in order to enrich GM.

14

## COUNT III
### Implied Warranty of Merchantability

60. The Elliotts bring this claim on behalf of themselves and the Proposed Class.

61. The Elliotts and all Class members purchased their vehicle under an implied warranty that the vehicle would be merchantable. DC Commercial Code §§28:2-314. Because of the door module defect, their vehicles are not fit for ordinary purposes for which such vehicles are generally used and are therefore not merchantable.

62. GM sold goods that were not merchantable, because those goods are not fit for the ordinary purposes for which such goods are used – the vehicles were marketed and intended to be driven, but become unsafe under ordinary driving conditions.

63. The Elliotts and all Class members did not receive the full benefit of their bargain with GM and seek to recover an amount to make them whole, or seek to exercise their contractual rights of rescission and return to the status quo ante by allowing them to return their vehicles to GM for a full refund, and to seek any other rights and remedies afforded them as buyers injured by the total breach of the seller in failing to tender a merchantable product as promised.

## COUNT IV
### Unjust Enrichment

64. The Elliotts bring this claim on behalf of themselves and the Proposed Class.

65. GM has benefitted from selling and leasing the Defective Vehicles, for more than they were worth as a result of their concealed defects, at a profit, and the Elliotts and all Class members have overpaid for the cars and been forced to pay other costs.

66. The Elliotts and all Class members conferred a benefit on GM, and it is inequitable for GM to retain that benefit. GM knowingly accepted the benefits of its unjust conduct. As a result

15

of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**Amount of Claim:** The Claim is asserted in an amount to be proven at trial (or via estimation proceeding in the bankruptcy court).

**Related Litigation:** The Elliotts are plaintiffs in actions against General Motors LLC pending and consolidated in the *In re General Motors LLC Ignition Switch Litigation*, 14-md-2543 (JMF), *Elliott et al v. General Motors LLC*, 14-cv-8382 (JMF) (Cobalt), and *Bledsoe et al. v. General Motors LLC*, 1:14-cv-7631 (JMF) (Trailblazer).

**Notice:**      Gary Peller, Esq., 600 New Jersey Avenue, N.W., Washington, D.C. 20001

**Payment:**   Gary Peller, Esq., 600 New Jersey Avenue, N.W., Washington, D.C. 20001