**Hearing Date and Time: March 11, 2019 at 10:00 a.m. (EST)**
**Objection Deadline: March 4, 2019 at 4:00 p.m. (EST)**

**BROWN RUDNICK LLP**
Edward S. Weisfelner
Howard S. Steel
7 Times Square
New York, NY  10036
Telephone:  (212) 209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

**STUTZMAN, BROMBERG, ESSERMAN**
**& PLIFKA, A PROFESSIONAL**
**CORPORATION**
Sander L. Esserman
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the Bankruptcy Court*

**HAGENS BERMAN SOBOL SHAPIRO**
**LLP**
Steve W. Berman (admitted pro hac vice)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the MDL Court*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------X
                                         :
In re:                                   :    Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,      :    Case No.: 09-50026 (MG)
         f/k/a General Motors Corp., et al.,  :
                                         :
                          Debtors.       :    (Jointly Administered)
-----------------------------------------------------------X
```

**NOTICE OF HEARING ON THE ECONOMIC LOSS PLAINTIFFS' MOTION TO:**
**(1) EXTEND BANKRUPTCY RULE 7023 TO THESE PROCEEDINGS; (2) APPROVE**
**THE FORM AND MANNER OF NOTICE; (3) GRANT CLASS CERTIFICATION FOR**
**SETTLEMENT PURPOSES UPON FINAL SETTLEMENT APPROVAL; (4) APPOINT**
**CLASS REPRESENTATIVES AND CLASS COUNSEL FOR SETTLEMENT URPOSES;**
**AND (5) APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG**
**THE SIGNATORY PLAINTIFFS AND THE GUC TRUST PURSUANT TO RULE 23**

**PLEASE TAKE NOTICE** that upon the annexed *The Economic Loss Plaintiffs' Motion to: (1) Extend Bankruptcy Rule 7023 to these Proceedings; (2) Approve the Form and Manner of Notice; (3) Grant Class Certification for Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel For Settlement Purposes; and (5) Approve the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Rule 23* (the "**Motion**"), a hearing will be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on **March 11, 2019 at 10:00 a.m. (EST)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** .that any responses or objections to this Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on (i) Drinker Biddle & Reath LLP, attorneys for Wilmington Trust Company as GUC Trust Administrator, 1177 Avenue of the Americas, 41st Floor, New York, New York 10166 (Attn: Kristin K. Going, Esq. & Marita S. Erbeck, Esq.); (ii) FTI Consulting, as the GUC Trust Monitor, 3 Times Square, 9th Floor New York, NY 10036 (Attn: Conor Tully); (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for the United States Department of the Treasury, 1285 Avenue of the Americas, New York, New York 10019

2

(Attn: Douglas R. Davis, Esq.); (iv) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Erik Rosenfeld); (v) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 31th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vi) Brown Rudnick LLP, designated counsel in the Bankruptcy Court for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, Seven Times Square, New York, New York 10036 (Attn: Edward S. Weisfelner, Esq. & Howard S. Steel, Esq.); (vii) Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation, designated counsel in the Bankruptcy Court for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq.); (viii) Hagens Berman Sobol Shapiro LLC, co-lead counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court, 1301 2nd Ave., Suite 2000, Seattle, WA 98101 (Attn: Steve W. Berman, Esq.); (ix) Lieff Cabraser Heimann & Bernstein, LLP, co-lead counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court, 275 Battery Street, 29th Floor, San Francisco, California 94111 (Attn: Elizabeth J. Cabraser, Esq.); (x) Andrews Myers, P.C., counsel to certain Pre-Closing Accident Plaintiffs, 1885 St. James Place, 15th Floor, Houston, Texas 77056 (Attn: Lisa M. Norman, Esq. & T. Joshua Judd, Esq.); (xi) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: William K. Harrington, Esq.); and (xii) Cole Schotz, P.C., counsel for Certain Ignition Switch Pre-Closing Accident Plaintiffs Represented by The Cooper Firm and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019 (Attn:

3

Mark Tsukerman, Esq.) so as to be received no later than March 4, 2019 at 4:00 p.m. (Eastern

Time) (the "**Objection Deadline**")

      **PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served

with respect to the Motion, the movants may, on or before the Objection Deadline, submit to the

Court an order substantially in the form of the proposed order attached to the Motion, which

order may be entered with no further notice or opportunity to be heard.

Dated: February 1, 2019
     New York, New York

                Respectfully submitted,

                */s/ Edward S. Weisfelner*
                Edward S. Weisfelner
                Howard S. Steel
                BROWN RUDNICK LLP
                Seven Times Square
                New York, New York 10036
                Tel: 212-209-4800
                eweisfelner@brownrudnick.com
                hsteel@brownrudnick.com

                Sander L. Esserman
                STUTZMAN, BROMBERG, ESSERMAN &
                PLIFKA, A PROFESSIONAL CORPORATION
                2323 Bryan Street, Ste 2200
                Dallas, Texas 75201
                Tel: 214-969-4900
                esserman@sbep-law.com

                *Designated Counsel for the Ignition Switch*
                *Plaintiffs and Certain Non-Ignition Switch*
                *Plaintiffs in the Bankruptcy Court*

                Steve W. Berman (admitted pro hac vice)
                HAGENS BERMAN SOBOL SHAPIRO LLP
                1301 Second Avenue, Suite 2000
                Seattle, WA 98101
                Tel: 206-623-7292
                steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch Plaintiffs
and Certain Non-Ignition Switch Plaintiffs in the
MDL Court*

**HEARING DATE AND TIME: March 11, 2019 at 10:00 a.m. (EST)**
**OBJECTION DEADLINE: March 4, 2019 at 4:00 p.m. (EST)**

**BROWN RUDNICK LLP**
Edward S. Weisfelner
Howard S. Steel
7 Times Square
New York, NY  10036
Telephone:  (212) 209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

**STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, A PROFESSIONAL CORPORATION**
Sander L. Esserman
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (admitted pro hac vice)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs in the MDL Court*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------X
                                        :
In re:                                  :        Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,     :        Case No.: 09-50026 (MG)
        f/k/a General Motors Corp., et al., :
                                        :
                        Debtors.        :        (Jointly Administered)
------------------------------------------------------------X
```

**THE ECONOMIC LOSS PLAINTIFFS' MOTION TO:  (1) EXTEND BANKRUPTCY RULE 7023 TO THESE PROCEEDINGS; (2) APPROVE THE FORM AND MANNER OF NOTICE; (3) GRANT CLASS CERTIFICATION FOR SETTLEMENT PURPOSES UPON FINAL SETTLEMENT APPROVAL; (4) APPOINT CLASS REPRESENTATIVES AND CLASS COUNSEL FOR SETTLEMENT PURPOSES; AND (5) APPROVE THE SETTLEMENT AGREEMENT BY AND AMONG <u>THE SIGNATORY PLAINTIFFS AND THE GUC TRUST PURSUANT TO RULE 23</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION ........................................................................................................9

BACKGROUND ......................................................................................................9

    I.    Old GM's Bankruptcy And The Creation Of The GUC Trust. ..............................9

    II.    Plaintiffs' Claims Against Old GM. ....................................................... 11

    III.    The Settlement Classes. ........................................................................ 14

RELIEF REQUESTED...........................................................................................14

BASIS FOR RELIEF REQUESTED.......................................................................14

    I.    To The Extent The Court Has Not Already Done So In The Rule 23 Decision, The Court Should Exercise Its Discretion To Apply Federal Rule Of Bankruptcy Procedure 7023 To These Proceedings. ........................................... 15

    II.    The Court Should Approve The Form And Manner Of The Proposed Notice Of The Settlement Agreement To The Classes And Pre-Closing Accident Plaintiffs.................................................................................................... 17

        A.    The Court Should Direct Notice To The Classes Pursuant To Rule 23.... 17

        B.    The Court Should Approve The Form And Manner Of The Proposed Notice Of The Settlement Agreement To The Classes And Pre-Closing Accident Plaintiffs. .................................................................................. 20

    III.    The Court Should Certify The Classes For Settlement Purposes And Appoint Class Counsel And Class Representatives Pursuant to Rule 23 .......................... 24

        A.    The Rule 23(a) Requirements Are Satisfied. ........................................... 25

            1.    The Classes Are Sufficiently Numerous That Joinder Is Impracticable............................................................................. 25

            2.    Questions Of Law And Fact Are Common To The Classes......... 26

            3.    The Claims Of The Economic Loss Plaintiffs As Class Representatives Are Typical Of The Claims Of The Classes....... 28

            4.    The Economic Loss Plaintiffs As Class Representatives And Co-Lead Counsel As Class Counsel Will Fairly And Adequately Protect The Interests Of The Classes. .......................................... 29

i

B.    The Rule 23(b) Requirements Are Satisfied. ........................................... 31

1.    The Rule 23(b)(1)(B) Requirements Are Met. ............................ 32

2.    Alternatively, The Requirements Of Rule 23(b)(1)(A) Are Met. . 41

IV.    The Court Should Approve The Settlement Agreement On A Final Basis
Pursuant To Rule 23(e). ....................................................................................... 43

A.    The Class Representatives And Class Counsel Adequately Represent
The Classes, And The Settlement Was Negotiated At Arm's-Length...... 44

B.    The Relief Provided For The Classes Under The Settlement Is
Adequate. ................................................................................................. 46

C.    The Settlement Treats Class Members Equitably Relative To Each
Other. ....................................................................................................... 50

MEMORANDUM OF LAW ...........................................................................................51

NOTICE .........................................................................................................................51

CONCLUSION ...............................................................................................................51

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Amchem v. Windsor,
    521 U.S. 591 (1997)...............................................................24, 41

Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
    568 U.S. 455 (2013)....................................................................24

Aramburu v. Healthcare Fin. Servs., Inc.,
    No. 02-cv-6535 (MDG), 2009 WL 1086938 (E.D.N.Y. Apr. 22, 2009)................48

In re Austrian & German Bank Holocaust Litig.,
    80 F. Supp. 2d 164 (S.D.N.Y. 2010)...................................................45

In re BGI, Inc.,
    465 B.R. 365 (S.D.N.Y. 2012).................................................. *passim*

Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,
    290 F.R.D. 409 (S.D.N.Y. 2012) ................................................25, 26

In re Chaparral Energy, Inc.,
    571 B.R. 642 (Bankr. D. Del. 2017) ..................................................15

In re Chattanooga Wholesale Antiques, Inc.,
    930 F.2d 458 (6th Cir. 1991) .........................................................38

City of Detroit v. Grinnell Corp.,
    495 F.2d 448 (2d Cir. 1974), abrogated on other grounds by Goldberger v.
    Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000) ......................44, 45, 46

In re Corrugated Container Antitrust Litig.,
    643 F.2d 195 (5th Cir. 1981) .........................................................30

Cross v. 21st Century Holding Co.,
    2004 WL 307306 (S.D.N.Y. Feb. 18, 2004).........................................25

Doe v. Karadzic,
    192 F.R.D. 133 (S.D.N.Y. 2000) .............................................33, 35, 37

In re Drexel Burnham Lambert Grp., Inc.,
    960 F.2d 285 (2d Cir. 1992)................................................28, 29, 35

Eisen v. Carlisle & Jaquelin,
    417 U.S. 156 (1974)....................................................................24

Elliott v. General Motors LLC (In re Motors Liquidation Co.),
    829 F.3d 135 (2d Cir. 2016)......................................................................... *passim*

In re Ephedra Prods. Liab. Litig.,
    329 B.R. 1 (S.D.N.Y. 2005)................................................................14, 15

Fletcher v. Davis (In re Fletcher Int'l, Ltd.),
    536 B.R. 551 (S.D.N.Y. 2015), aff'd, 661 F. App'x 124 (2d Cir. 2016)................................20

Matter of Ford,
    61 B.R. 913 (Bankr. W.D. Wis. 1986)...................................................................38

Great Neck Capital Appreciation Inv. P'ship, L.P. v. PriceWaterhouseCoopers,
    LLP (In re Harnischfeger Indus., Inc.),
    212 F.R.D. 400 (E.D. Wis. 2002) .......................................................................49

Hans v. Tharaldson,
    No. 3:05-cv-115, 2010 WL 1856267 (D.N.D. May 7, 2010) ................................................42

In re IKON Office Solutions, Inc. Sec. Litig.,
    194 F.R.D. 166 (E.D. Pa. 2000)........................................................................47

In re Initial Pub. Offering, Sec. Litig.,
    243 F.R.D. 79 (S.D.N.Y. 2007) ....................................................................17, 18

Jane Doe 30's Mother v. Bradley,
    64 A.3d 379 (Del. Super. Ct. 2012) ...................................................................37

In re Joint E. and S. Dist. Asbestos Litig.,
    982 F.2d 721 (2d Cir. 1992), opinion modified on reh'g, 993 F.2d 7 (2d Cir.
    1993) ............................................................................................32, 33

In re Katrina Canal Breaches Litig.,
    628 F.3d 185 (2010).....................................................................................41

Keegan v. Am. Honda Motor Co.,
    284 F.R.D. 504 (C.D. Cal. 2012) ......................................................................26

Maywalt v. Parker & Parsley Petroleum Co.,
    67 F.3d 1072 (2d Cir. 1995).........................................................................23, 43

Mba v. Wold Airways, Inc.,
    369 F. App'x 194 (2d Cir. 2010) ......................................................................44

In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,
    241 F.R.D. 185 (S.D.N.Y. 2007) .......................................................................43

*In re MF Global Inc.*,
  512 B.R. 757 (Bankr. S.D.N.Y. 2014) ............................................................15, 16

*In re Michael Milken & Assocs. Sec. Litig.*,
  150 F.R.D. 57 (S.D.N.Y. 1993) .............................................................................23

*In re Motors Liquidation Co.*,
  447 B.R. 150 (Bankr. S.D.N.Y. 2011) ...................................................................15

*In re Motors Liquidation Co.*,
  529 B.R. 510 (Bankr. S.D.N.Y. 2015) ............................................................ *passim*

*In re Motors Liquidation Co.*,
  580 B.R. 319 (Bankr. S.D.N.Y. 2018) .....................................................................3

*In re Motors Liquidation Co.*,
  591 B.R. 501 (Bankr. S.D.N.Y. 2018) ...........................................................3, 6, 15

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ...........................................................................25

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ................................................................................... *passim*

*In re Partsearch Techs., Inc.*,
  453 B.R. 84 (Bankr. S.D.N.Y. 2011) .....................................................................28

*In re Penthouse Exec. Club Comp. Litig.*,
  Master File No. 10 Civ. 1145 (KMW), 2013 WL 1828598 (S.D.N.Y. Apr. 30,
  2013) .....................................................................................................................17

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*,
  507 U.S. 380 (1993) ...........................................................................................8, 47

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993) ..................................................................................28

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*,
  No. 2:97-CV-11441-RDP, 2010 WL 11506713 (N.D. Ala. May 19, 2010) .........34, 36, 37, 41

*Stott v. Capital Fin. Servs., Inc.*,
  277 F.R.D. 316 (N.D. Tex. Sept. 12, 2011) ................................................. *passim*

*Tiro v. Public House Invs., LLC*,
  288 F.R.D. 272 (S.D.N.Y. 2012) ...........................................................................29

Tiro v. Public House Invs., LLC,
    Nos. 11 Civ. 7679(CM), 11 Civ. 8249(CM), 2013 WL 2254551 (S.D.N.Y.
    May 22, 2013) .................................................................................................................. 18

Turner v. Bernstein,
    768 A.2d 24 (Del. Ch. 2000) ........................................................................................ 42

U.S. Trust Co. of N.Y. v. Alpert,
    163 F.R.D. 409 (S.D.N.Y. 1995) ................................................................................. 32

Van Gemert v. Boeing Co.,
    590 F.2d 433 (2d Cir. 1978), aff'd, 444 U.S. 472 (1980) ........................................... 32

Vigil v. Finesod,
    779 F. Supp. 522 (D.N.M. 1990) .................................................................................. 49

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ................................................................................................ 26, 31

Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,
    396 F.3d 96 (2d Cir. 2005) ........................................................................................... 43

Wolin v. Jaguar Land Rover N. Am., LLC,
    617 F.3d 1168 (9th Cir. 2010) .......................................................................... 26, 27, 28

In re Worldcom, Inc.,
    343 B.R. 412 (Bankr. S.D.N.Y. 2006) .......................................................................... 24

**Statutes**

11 U.S.C. § 105 .................................................................................................... 9, 20, 23

11 U.S.C. § 549 .............................................................................................................. 38

28 U.S.C. § 157 ................................................................................................................ 9

28 U.S.C. § 1334 .............................................................................................................. 9

28 U.S.C. § 1408 .............................................................................................................. 9

28 U.S.C. § 1409 .............................................................................................................. 9

**Other Authorities**

2 Newberg on Class Actions (5th Ed.) ..................................................................... 32, 41

Fed. R. Bankr. P. 7023 ............................................................................................ passim

Fed. R. Bankr. P. 9014 ................................................................................................ 9, 14

Fed. R. Bankr. P. 9019 ...........................................................................................................7, 17

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

274 Injures, CAR AND DRIVER (Aug. 3, 2015),
      https://www.caranddriver.com/news/a15353429/gm-ignition-switch-review-
      complete-124-fatalities-274-injuries/ .......................................................................2

Local Rule 9013-1(a) ...............................................................................................................51

By and through their undersigned counsel, prospective class representatives for the Ignition Switch Plaintiffs (the "**Ignition Switch Class Representatives**")[1] and prospective class representatives for the Non-Ignition Switch Plaintiffs (the "**Non-Ignition Switch Class Representatives**,"[2] and together with the Ignition Switch Class Representatives, the "**Economic Loss Plaintiffs**") respectfully submit *The Economic Loss Plaintiffs' Motion to: (1) Extend Bankruptcy Rule 7023 to These Proceedings; (2) Approve the Form and Manner of Notice; (3) Grant Class Certification for Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel for Settlement Purposes; and (5) Approve the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Rule 23* (the "**Motion**").[3]  In support thereof, the Economic Loss Plaintiffs respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    Almost ten years ago, Old GM filed for chapter 11 bankruptcy in this Court, having knowledge of the Ignition Switch Defect, yet failing to disclose it.[4]  Shortly after the filing, on July 5, 2009, the Court approved the 363 Sale, and both Old and New GM kept the Ignition Switch Defect hidden.[5]  A few months later, the Court established November 30, 2009

---

[1]    The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[2]    The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

[3]    Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Bankr. Case No. 09-50026 (MG).  Capitalized terms not defined herein shall have the meanings ascribed to them in the Settlement Agreement, attached hereto as **Exhibit A**.

[4]    See In re Motors Liquidation Co., 529 B.R. 510, 557 (Bankr. S.D.N.Y. 2015) (the "**April 2015 Decision**").

[5]    See Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135, 149-50 (2d Cir. 2016).

as the deadline for filing proofs of claim against Old GM (the "**Bar Date**"), and the cover-up of the Ignition Switch Defect by Old and New GM continued.[6]

2.      It was not until 2014 that New GM issued a multitude of recalls for safety defects in millions of Old GM vehicles, including the Ignition Switch Defect and other defects in ignition switches, side airbags, and power steering—defects that have caused death, personal injury, and billions of dollars in economic losses.[7]

3.      Old GM's failure to provide owners and lessees of these defective vehicles with actual notice of the Bar Date despite Old GM's knowledge of the defects was a grave violation of due process.[8]  As this Court succinctly stated:

> Old GM failed to provide the [Ignition Switch and Ignition Switch Pre-Closing Accident] Plaintiffs with the notice that due process requires.  And because that failure prejudiced them in filing timely claims, the Plaintiffs were prejudiced as a result. . . . [T]he remedy with respect to the denial of notice sufficient to enable the filing of claims before the Bar Date is obvious.  That is leave to file late claims.

In re Motors Liquidation Co., 529 B.R. at 574, 583.

4.      On December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs filed motions seeking authority to

---

[6]    See In re Motors Liquidation Co., 529 B.R. at 535.

[7]    The Ignition Switch Defect has caused at least 124 deaths and 274 injuries.  See Clifford Atiyeh, GM Ignition Switch Review Complete: 124 Fatalities, 274 Injures, CAR AND DRIVER (Aug. 3, 2015), https://www.caranddriver.com/news/a15353429/gm-ignition-switch-review-complete-124-fatalities-274-injuries/.

[8]    See In re Motors Liquidation Co., 529 B.R. at 574, 583 (holding that the failure to provide actual notice of the Bar Date to Ignition Switch and Ignition Switch Pre-Closing Accident Plaintiffs violated due process); Elliott, 829 F.3d at 159-60 ("The facts paint a picture that Old GM did nothing, even as it knew that the ignition switch defect impacted consumers. . . . Old GM knew that the defect caused stalls and had linked airbag non-deployments to the defect by May 2009."); id. at 148-50 (detailing Old GM's knowledge of the Ignition Switch Defect relying on, inter alia, the Valukas Report, a report detailing the results of an investigation by an attorney hired by New GM).  Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, they have argued that they can demonstrate a violation of their due process rights in connection with the Bar Date.

file late claims against the Old GM estate (the "**Late Claims Motions**").[9]  Thereafter, certain

Plaintiffs filed joinders to these Late Claims Motions and other Plaintiffs filed additional Late

Claims Motions.

5.    Following the filing of the Late Claims Motions, counsel for the Economic Loss

Plaintiffs, certain Pre-Closing Accident Plaintiffs, the GUC Trust, and the Participating

Unitholders engaged in good faith, arm's-length negotiations concerning a potential settlement

that would resolve the many disputes related to the Late Claims Motions.  However, the GUC

Trust abruptly decided not to execute the agreement and, after conducting a trial, the Court

determined that the unexecuted settlement agreement was unenforceable.[10]  Subsequently, after

the GUC Trust retained new counsel and enacted management changes, a new settlement

agreement was entered into by certain Plaintiffs and the GUC Trust on April 24, 2018 (and

amended on May 22, 2018) (the "**Prior Settlement**").[11]  The Court held that the Prior Settlement

as drafted could not be approved unless the Ignition Switch and Non-Ignition Switch Plaintiffs

can certify one or more classes for settlement under Rule 23 and denied the Prior Settlement

Motion without prejudice.[12]

---

[9]    The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident that occurred prior to the Closing Date involving an Old GM vehicle that was later subject to the Recalls.  The Pre-Closing Accident Plaintiffs are comprised of a subset asserting claims or who suffered an injury or death involving an Old GM vehicle with an Ignition Switch Defect (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"), and a subset asserting claims or who suffered an injury or death involving vehicles with other defects (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**").  Collectively, the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs who have signed the Settlement Agreement are "**Plaintiffs**."

[10]    See In re Motors Liquidation Co., 580 B.R. 319 (Bankr. S.D.N.Y. 2018).

[11]    See *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions and (II) the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002 and 9019 and to (III) Authorize the Reallocation of GUC Trust Assets*, dated May 3, 2018 [ECF No. 14293] (the "**Prior Settlement Motion**").

[12]    See In re Motors Liquidation Co., 591 B.R. 501 (Bankr. S.D.N.Y. 2018) (the "**Rule 23 Decision**").

6.      Further negotiations between counsel for the Economic Loss Plaintiffs, certain Pre-Closing Accident Plaintiffs (together, the "**Signatory Plaintiffs**"), the GUC Trust (together with the Signatory Plaintiffs, the "**Parties**"), and the Participating Unitholders following this decision culminated in the Parties' agreement to the settlement that is the subject of the 9019 Motion and this Motion (the "**Settlement**," and the agreement documenting it, the "**Settlement Agreement**").[13]

7.      The key terms of the Settlement are as follows.  After notice and an opportunity to object and following entry of the Final Approval Order, all Plaintiffs will be deemed to have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), FTI Consulting, Inc., as monitor of the GUC Trust (in such capacity, the "**GUC Trust Monitor**"), the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interests in the GUC Trust (the "**Unitholders**").  The waiver and release (the "**Release**") applies to Plaintiffs' claims or rights, including any rights to any assets that are presently in the GUC Trust and any distributions that have previously been made to Unitholders (collectively, "**GUC Trust Assets**") and to distributions that have or will be made by the Avoidance Action Trust.

8.      In exchange, under the Settlement Agreement, the GUC Trust agrees to pay up to $13.72 million for notice costs, and file a motion (the "**Estimation Motion**") seeking entry of an order (the "**Claims Estimate Order**") that would estimate the amount of Plaintiffs' claims, in an amount that may (depending on the amount of the Court's estimate) trigger New GM's

---

[13]    *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions, (II) the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019, and (III) Authorize the Reallocation of GUC Trust Assets* (the "**9019 Motion**"), filed contemporaneously herewith.

obligation to issue additional shares of New GM common stock (the "**Adjustment Shares**")
pursuant to the terms of the Sale Agreement.[14]

9.    The Settlement Agreement includes a class settlement of the Ignition Switch
Plaintiffs' and Non-Ignition Switch Plaintiffs' claims, and settlement on an individual basis of
certain Pre-Closing Accident Plaintiffs' claims.

10.    The Settlement establishes a framework for potentially righting the wrongs of Old
GM's bankruptcy that have prejudiced the owners and lessees of the approximately 1.6 million
vehicles with the Ignition Switch Defect manufactured and sold by Old GM in the United States
(the "**Delta Ignition Switch Vehicles**"), the owners and lessees of the approximately 9.8 million
vehicles subject to Recall Nos. 14v-355, 14v-394, 14v-400, 14v-118, and 14v-153 manufactured
and sold by Old GM in the United States (the "**Defective GM Vehicles**"), and the Pre-Closing
Accident Plaintiffs asserting claims or who suffered an injury or death involving an Old GM
vehicle subject to Recall No. 14v-540.

11.    Ensuring that the Economic Loss and Pre-Closing Accident Plaintiffs receive the
right to seek to obtain a recovery on their claims against Old GM provides them, finally, with
nearly the same opportunity as was afforded other creditors who did receive timely actual notice
of the Bar Date.

12.    By this Motion, the Economic Loss Plaintiffs seek the following relief.  First, as
part of the Preliminary Approval Order, attached hereto as **Exhibit B**, the Economic Loss

---

[14]    Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive
benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently propose the allocation of the value of the
Adjustment Shares between economic loss claims and personal injury/wrongful death claims, the eligibility and
criteria for payment, and the procedures for payment of attorneys' fees, which shall be subject to an order of
this Court after notice and an opportunity to be heard.  Being defined as a Plaintiff does not assure any party
that he, she, or it will receive a distribution from the Adjustment Shares (or their value), if any, or any other
consideration contained in the Settlement Fund.  Under the Final Approval Order, the GUC Trust, Unitholders,
and defendants in the Term Loan Avoidance Action, via agreement or notice and bar order, shall be deemed to
have waived any rights to the Adjustment Shares.

Plaintiffs request that the Court exercise its discretion to apply Bankruptcy Rule 7023 to these proceedings and approve the form and manner of notice to Plaintiffs, including notice to the proposed Classes upon finding that this Court will likely be able to approve the Settlement under Federal Rule of Civil Procedure 23(e)(2) and certify the settlement-purpose classes.[15]

13.    Second, following notice and an opportunity to be heard at a final fairness hearing, as part of the Final Approval Order, attached hereto as **Exhibit C**, the Economic Loss Plaintiffs request that the Court grant settlement class certification with respect to the Ignition Switch and Non-Ignition Switch Plaintiffs, appoint class representatives and class counsel for Rule 23(a) and (g) settlement certification purposes, and approve the Settlement Agreement on a final basis pursuant to Rule 23(e).

14.    The Court should authorize notice of the Settlement Agreement because, as detailed herein and the 9019 Motion, the Court will likely be able to approve the Settlement under Rule 23(e)(2) and certify the Classes for settlement purposes. Further, the form and manner of notice should be approved. The proposed notices appropriately apprise members of the Classes and the Pre-Closing Accident Plaintiffs of the terms of the Settlement and options open to them in connection with this Motion and the 9019 Motion. The proposed notice ensures that members of the Classes, the Pre-Closing Accident Plaintiffs, and all parties-in-interest receive notice in accordance with due process and Rule 23.[16]

15.    Certification of the Classes is warranted under Rule 23. Each Class satisfies the class certification requirements of Rule 23(a). Each Class contains millions of Class members

---

[15]    The Court has already concluded that Bankruptcy Rule 7023 should apply here, stating that "[n]ow faced with more than 11 million potential economic loss claims seven years after the Chapter 11 Plan was confirmed, the Court has no difficulty concluding that Rule 7023 should be applied." In re Motors Liquidation Co., 591 B.R. at 518.

[16]    Under the Settlement Agreement, the GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Settlement to the Classes and Pre-Closing Accident Plaintiffs in an amount not to exceed $13.72 million.

asserting common claims arising from the same unlawful conduct of Old GM with respect to the same defects, which caused the same type of injury. Each Class also satisfies the class certification requirements of Rule 23(b)(1)(B). This proceeding, which resolves a major issue in a bankruptcy that has spanned a decade, concerns a "classic" limited fund class action, where the available funds—the Adjustment Shares—are undeniably insufficient to satisfy Class members' claims, which will reach into the billions. Alternatively, each Class satisfies the class certification requirements of Rule 23(b)(1)(A) because multiple adjudications of the Proposed Class Claims (defined below) could lead to inconsistent and contradictory orders. Accordingly, the Court should enter the Preliminary Approval Order and Final Approval Order.

16.    Finally, approval of the Settlement is warranted under Rule 23 as set forth herein and under Bankruptcy Rule 9019 as set forth in the 9019 Motion.[17] The Settlement resolves all issues arising from the Late Claims Motions in a global fashion. This includes a host of complex issues, including, but not limited to, whether the Economic Loss Plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds), whether the Plaintiffs' claims are equitably moot, whether additional grounds exist to object to the Plaintiffs' claims, and the amount of said claims in the event that they are allowed.

17.    Litigation of these issues has been ongoing for several years, and has consumed significant time, money, and resources from the Parties and the Court. Key disputes between the Parties have, subject to Court approval, been resolved. For example, in the April 2015 Decision, the Court ruled that Old GM failed to provide Ignition Switch Plaintiffs and Ignition Switch Pre-

---

[17]    The Economic Loss Plaintiffs hereby join in the arguments made in the 9019 Motion.

Closing Accident Plaintiffs with constitutionally proper notice of the Bar Date.[18]  While the
Court ruled that assets of the GUC Trust could not be tapped to pay any late claims that might be
allowed as a result of the doctrine of equitable mootness, the Second Circuit vacated this holding
as an advisory opinion—leaving open the question of the applicability of the equitable mootness
doctrine.[19]  In addition, there is an on-going dispute as to whether an additional showing under
the factors articulated in Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380 (1993)
is required for Plaintiffs to obtain leave to file late claims.  In the event Plaintiffs are granted
leave to file late claims, the allowance and amount of such claims would also have to be
litigated, a process that could take years.

18.    Continuation of protracted litigation on the foregoing and related issues will
deplete remaining GUC Trust Assets, delay any further GUC Trust distributions, and subject the
Parties to uncertain results.  The Settlement, on the other hand, will substantially reduce costs
and the expenditure of resources and eliminate the risk of uncertain litigation outcomes.
Moreover, the Settlement Agreement establishes a streamlined process for allowing Plaintiffs'
claims and providing Plaintiffs a source of recovery from the Adjustment Shares.

19.    In light of the inherent risks and costs associated with litigation, the Settlement
Agreement provides adequate relief.  Moreover, the Settlement Agreement treats Class members
equitably and was the result of good faith, arm's length negotiations by class counsel, who
adequately represented the Classes.  Accordingly, the Settlement Agreement is fair, reasonable,
and adequate, and should be approved under Rule 23.

---

[18]    See In re Motors Liquidation Co., 529 B.R. at 573-74, 583.

[19]    See id. at 529; Elliott, 829 F.3d at 168-69.

## JURISDICTION

20.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

21.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

22.      The statutory predicates for the relief sought in this Motion are Bankruptcy Code Section 105(d) and Bankruptcy Rules 7023 and 9014.

## BACKGROUND[20]

### I.      Old GM's Bankruptcy And The Creation Of The GUC Trust.

23.      On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, the "**Debtors**") filed for chapter 11 bankruptcy in this Court and entered into an agreement (the "**Sale Agreement**") to sell substantially all of its assets to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants.  See In re Motors Liquidation Co., 529 B.R. at 535.

24.      The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount (the "**Purchase Price Adjustment**").  See AMSPA § 3.2(c).[21]  Specifically, the Purchase Price Adjustment provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof, New GM will issue Adjustment Shares to the GUC Trust.  See

---

[20]   The bulk of the relevant factual background is set forth in the 9019 Motion and, for the sake of brevity, not restated herein.

[21]   See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42

billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment

Shares that may be required under the AMSPA.  See id.

25.    On July 5, 2009, the 363 Sale was approved by the Bankruptcy Court.  See Elliott,

829 F.3d at 146.

26.    In September 2009, the Court established November 30, 2009 as the Bar Date for

filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529 B.R. at 535.

27.    On March 29, 2011, the Court entered an Order confirming the Plan, which,

among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in

the GUC Trust Agreement.  See id. at 535-36.

28.    Pursuant to the Plan, the GUC Trust Agreement, and a side letter by and between

the GUC Trust, the Debtors, New GM, and the GUC Trust Monitor, dated September 23, 2011

(the "**Side Letter**"), the GUC Trust was granted exclusive authority to object to the allowance of

general unsecured claims, seek estimation of the amount of allowed general unsecured claims,

and seek Adjustment Shares from New GM.  See Side Letter; Plan §§ 7.1(b), 7.3; GUC Trust

Agreement § 5.1.

29.    In February 2012, the Court entered the Late Filed Claims Order providing that

any claims filed after entry of the Late Filed Claims Order would be deemed disallowed unless,

inter alia, the claimant obtained leave of the Court or written consent of the GUC Trust.[22]

30.    As of December 31, 2018, the total amount of Allowed General Unsecured

Claims against Old GM's estate was $31,855,431,837, approximately $3.15 billion below the

threshold for triggering the issuance of Adjustment Shares under the AMSPA.[23]

---

[22]    See Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for
an Order Disallowing Certain Late Filed Claims, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed
Claims Order**").

## II.    Plaintiffs' Claims Against Old GM.

31.    In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14v-047, impacting approximately 2.1 million vehicles (including the approximately 1.6 million Delta Ignition Switch Vehicles).

32.    After this first wave of recalls, New GM issued additional recalls in June, July and September of 2014 concerning defective ignition switches affecting approximately 10 million additional vehicles, NHTSA Recall Numbers 14v-355, 14v-394, 14v-400, and 14v-540.

33.    New GM issued a multitude of other recalls for safety defects throughout 2014. These included a recall issued in March 2014 pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14v-118, and another recall issued in March 2014 pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14v-153.[24]

34.    The proposed class claims of the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs (the "**Proposed Class Claims**") allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[25]  The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and

---

[23]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of December 31, 2018*, dated Jan. 24, 2019 [ECF No. 14402].

[24]    These recalls include the approximately 9.8 million Defective GM Vehicles subject to Recall Nos. 14v-355, 14v-394, 14v-400, 14v-118, and 14v-153 manufactured and sold by Old GM.

[25]    See Amended Exhibit A to the Economic Loss Late Claim Motion (ECF No. 14280-1) (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 57-285; Exhibit B to the Economic Loss Late Claim Motion (ECF No. 14280-2) (the "**Proposed Non-Ignition Switch Class Claim**") ¶¶ 38-175.

bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[26]

35.    Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[27]

36.    The Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by defects (including the Ignition Switch Defect, and other defects in ignition switches, side airbags, and power steering) in vehicles manufactured by Old GM that were later subject to the Recalls (the "**Personal Injury Claims**," and together with the Proposed Class Claims, the "**Claims**").[28]

37.    Subsequent to filing the Late Claims Motions, counsel for the Economic Loss Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the factual background for their Claims, the alleged viability of the asserted Claims and the alleged amount of damages (the "**Proffered Evidence**").

---

[26]    See, e.g., Proposed Ignition Switch Class Claim ¶ 374; Proposed Non-Ignition Switch Class Claim ¶ 278.

[27]    See Proposed Ignition Switch Class Claim ¶¶ 358-1697; Proposed Non-Ignition Switch Class Claim ¶¶ 262-1744.

[28]    See, e.g., *Motion by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated July 28, 2017 [ECF No. 14018]; *Supplement to Motion [ECF No. 14018] by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Aug. 10, 2017 [ECF No. 14046]; *Second Supplement to Motion [ECF No. 14018] by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Sept. 19, 2017 [ECF No. 14112]; *Third Supplement to Motion [ECF No. 14018] by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 12, 2017 [ECF No. 14195]; *Fourth Supplement to Motion [ECF No. 14018] by Additional Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated July 19, 2018 [ECF No. 14346]; *Motion by Certain Ignition Switch Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths in Connection with Settlement with the Motors Liquidation Company GUC Trust*, dated July 27, 2018 [ECF No. 14350].

38.    In addition, counsel for the Economic Loss Plaintiffs provided a report by Stefan

Boedeker, an expert on surveys and statistical sampling, analyzing the amount of alleged

damages for the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' claims

based on a conjoint analysis conducted by Mr. Boedeker and the Berkeley Research Group.

39.    Conjoint analysis is a set of econometric and statistical techniques developed to

study consumer preferences and is widely used as a market research tool.  In a conjoint analysis,

study participants review a set of products with different attributes (such as a vehicle shown in

different colors) and choose which product they would prefer to purchase.  The collected data

can be used to determine market preferences and the value consumers place on particular

attributes of a product.  Here, the alleged amount of damages for economic loss claims was

determined by using a conjoint analysis to evaluate the difference in value that consumers placed

on an Old GM vehicle without a defect as compared to an identical vehicle with a defect.

Conjoint studies were conducted where the defect was described as causing physical harm and

death, as well as where the defect was described as involving no physical harm or death.

40.    Following rulings by Judge Furman in the MDL Action regarding the viability of

claims in certain states, counsel for the Economic Loss Plaintiffs provided the GUC Trust with

refined estimates of the amount of damages.  Counsel started with median estimates of damages

per vehicle based on the conjoint analysis, and multiplied that by the number of defective Old

GM vehicles in each state without a manifestation requirement.  Depending on which estimate

was used (*i.e.*, the estimate based on a defect causing physical harm and death, or the estimate

based on time-to-recall), the estimated damages could equal or exceed $77 billion.[29]

---

[29]    Likewise, New GM has presented the GUC Trust Administrator with expert reports and other evidence attempting to discredit the Proffered Evidence and also support its position in these bankruptcy cases and other related litigation.  New GM does not challenge the valuation method, rather New GM alleges that there is simply no basis for economic loss or personal injury damages.

### III.    **The Settlement Classes.**

41.     Under the Settlement Agreement, the "**Ignition Switch Class**" is defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.   The "**Non-Ignition Switch Class**" (together with the Ignition Switch Class, the "**Classes**") is defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

### RELIEF REQUESTED

42.     By this Motion, the Economic Loss Plaintiffs request, as part of the Preliminary Approval Order, that the Court exercise its discretion to apply Bankruptcy Rule 7023 to these proceedings and approve the form and manner of notice to Plaintiffs.   The Economic Loss Plaintiffs also request, as part of the Final Approval Order and following the final fairness hearing, that the Court grant settlement class certification for settlement purposes, appoint class representatives and class counsel for settlement purposes, and approve the Settlement Agreement.

### BASIS FOR RELIEF REQUESTED

### I.    **To The Extent The Court Has Not Already Done So In The Rule 23 Decision, The Court Should Exercise Its Discretion To Apply Federal Rule Of Bankruptcy Procedure 7023 To These Proceedings.**

43.     Pursuant to Bankruptcy Rule 9014, the Court has discretion to make Bankruptcy Rule 7023, and thus Rule 23, applicable to "contested matters."   In re Ephedra Prods. Liab. Litig., 329 B.R. 1, 5-6 (S.D.N.Y. 2005); see also Fed. R. Bankr. P. 9014(c) (providing that the "court may at any stage in a particular matter direct that" Bankruptcy Rule 7023 "shall apply").

In exercising its discretion to apply Bankruptcy Rule 7023, a court's primary consideration is whether class certification will adversely affect the administration of the case and "'gum up the works' of distributing the estate." See In re Motors Liquidation Co., 447 B.R. 150, 164 (Bankr. S.D.N.Y. 2011); In re Ephedra Prods. Liab. Litig., 329 B.R. at 5. Additional factors that courts consider include "whether the members of the putative class received notice of the bar date" and "whether the class was certified pre-petition." In re MF Global Inc., 512 B.R. 757, 763 (Bankr. S.D.N.Y. 2014) (Glenn, J.).

44.    The Court has already concluded that Bankruptcy Rule 7023 should apply here, stating in the Rule 23 Decision that "[n]ow faced with more than 11 million potential economic loss claims seven years after the Chapter 11 Plan was confirmed, the Court has no difficulty concluding that Rule 7023 should be applied." In re Motors Liquidation Co., 591 B.R. at 518. This result is supported by a review of the relevant factors and should not be disturbed.

45.    Here, application of Bankruptcy Rule 7023 will be beneficial to administration of the estate because it will facilitate the resolution of the Proposed Class Claims and has no impact on the administration of other claims against the estate. See In re MF Global, Inc., 512 B.R. at 765 (granting class certification where it would not "threaten[] to halt or delay the . . . substantial progress in resolving general estate claims").

46.    Moreover, the failure to provide notice of the Bar Date weighs heavily in favor of applying Bankruptcy Rule 7023. See id. at 763 ("The filing of a class proof of claim is consistent with the Bankruptcy Code generally . . . where there has been no actual or constructive notice to the class members of the bankruptcy case and Bar Date."). This is true even if some members of the class received notice. See In re Chaparral Energy, Inc., 571 B.R. 642, 648 (Bankr. D. Del. 2017) (holding that this factor weighed in favor of permitting class

claim, where the debtor failed to notify putative class members whose claims preceded the bankruptcy by more than three years, recognizing that "[t]o find otherwise would condone the Debtors' failure . . . to provide actual notice to its known creditors").

47.    The Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs, as known creditors of Old GM, were entitled to, but did not receive, direct notice of the Bar Date.  See In re Motors Liquidation Co., 529 B.R. at 574.  Although Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, many of these Plaintiffs have alleged that their claims arise out of defects that are substantially similar to the Ignition Switch Defect—defects that involve the same condition (low torque switches that move out of the "run" position) and have the same life-threatening safety effects (loss of power to steering, brakes, and airbags).  The Non-Ignition Switch Plaintiffs and Non-Ignition Switch Pre-Closing Accident Plaintiffs have also argued that they can demonstrate a violation of their due process rights in connection with the Bar Date.  Settlement of these issues as part of the Settlement Agreement is appropriate under the circumstances of this case.

48.    Finally, while a class was not certified pre-petition, that is because the Economic Loss Plaintiffs were not aware of their claims as a direct result of Old GM's concealment of the defects.  Thus, this factor is irrelevant.  See In re MF Global, Inc., 512 B.R. at 763 (lack of pre-petition certification of class of claimants who lost their jobs for the same reasons that precipitated the debtor's bankruptcy was not relevant to inquiry because claimants did not have "time to file a class action complaint and certify a class before the petition date").

49.    Accordingly, to the extent necessary in light of the Rule 23 Decision, the Court should exercise its discretion to extend Bankruptcy Rule 7023 to these proceedings.

## II.    The Court Should Approve The Form And Manner Of The Proposed Notice Of The Settlement Agreement To The Classes And Pre-Closing Accident Plaintiffs.

### A.    The Court Should Direct Notice To The Classes Pursuant To Rule 23.

50.    "Court review of a proposed class action settlement is subject to a two-step procedure," a preliminary approval stage and a final approval stage. In re BGI, Inc., 465 B.R. 365, 378 (S.D.N.Y. 2012) (citing In re Initial Pub. Offering, Sec. Litig., 243 F.R.D. 79, 87 (S.D.N.Y. 2007)). The role of the court at the preliminary approval stage is to determine whether it is appropriate to send notice of a proposed settlement to the class. See In re Initial Pub. Offering, Sec. Litig., 243 F.R.D. at 87. Thereafter, following notice, the court will hold a final fairness hearing to determine whether to approve the settlement and certify a class on a final basis. See id.

51.    Rule 23(e)(1)(B), as amended, provides that "[t]he court must direct notice . . . if giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B).[30]

52.    For the reasons more fully set forth in Section IV, *infra*, and in the 9019 Motion, the Court will likely be able to approve the Settlement Agreement under Rule 23 and Bankruptcy Rule 9019. Rule 23 provides that a proposed settlement may only be approved upon finding that the Settlement Agreement is "fair, reasonable, and adequate," taking into account whether the class was adequately represented and whether the settlement is the product of arm's-length

---

[30]    Likewise, in the past, courts ordered that notice of the settlement be sent to the settlement classes upon determining that a proposed settlement agreement was within the range of possible final settlement approval, and that provisional certification of a class was warranted. See In re Penthouse Exec. Club Comp. Litig., Master File No. 10 Civ. 1145 (KMW), 2013 WL 1828598, at *1-*4 (S.D.N.Y. Apr. 30, 2013).

negotiations, provides adequate relief, and treats class members equitably. See Fed. R. Civ. P. 23(e)(2).[31]

53. The Settlement Agreement is presumptively fair, adequate, and reasonable because it is the result of months of intensive, good-faith, arm's-length negotiations between experienced and specialized complex litigation and bankruptcy counsel.[32] Extensive discovery regarding the Plaintiffs' claims has been completed in the MDL Action and counsel for the GUC Trust was provided with the Proffered Evidence, including factual and expert reports regarding claims and damages, valuation reports, market research analytics tools, and data collections, as well as updated and refined analyses regarding damages taking into account rulings by Judge Furman in the MDL Action. Thus, the Parties had adequate information through which to measure the strengths and weaknesses of each Party's positions.

54. Further, the Settlement Agreement benefits all Parties. It will resolve years of contentious litigation, provide Plaintiffs (Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs) with a potential source of recovery in the near-term, and eliminate any delay in the distribution of assets from the GUC Trust and its subsequent wind-down process without granting preferential treatment to any party or segment of the Classes. And, as detailed in Section III(B)(1)(b), *infra*, it is virtually impossible that Plaintiffs would be able to obtain a better recovery through continued litigation against the GUC Trust.

55. In addition, as more fully set forth in Section III, *infra*, the Court will likely be able to certify the Classes for settlement purposes. Each factor of Rule 23(a) is plainly met.

---

[31]    Similarly, in the past, courts granted preliminary approval when the settlement proposal "appear[ed] to be the product of serious, informed, non-collusive negotiations, ha[d] no obvious deficiencies, d[id] not improperly grant preferential treatment to class representatives or segments of the class and f[ell] within the range of possible approval." In re Initial Pub. Offering, Sec. Litig., 243 F.R.D. at 87.

[32]    See Tiro v. Public House Invs., LLC, Nos. 11 Civ. 7679(CM), 11 Civ. 8249(CM), 2013 WL 2254551, at *2 (S.D.N.Y. May 22, 2013) (holding under prior Rule 23 that "[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement").

Numerosity is met because there are millions of members of each Class.  Commonality is met because there are questions of law and fact common to every member of the Classes, such as the existence of a defect and whether Class members' due process rights were violated.  Typicality is met because all of the members of each Class were subject to the same unlawful conduct of Old GM, suffered the same type of injury, and rely on the same legal theories.  Finally, adequate representation is met because proposed Class Counsel are eminently qualified and experienced, and the Economic Loss Plaintiffs share the same interest as members of the Classes in obtaining the maximum amount of Adjustment Shares.

56.    The final factor for certification—that the action be maintainable as one of the types of class actions described in Rule 23(b)—is met because this is a "classic" Rule 23(b)(1)(B) limited fund class action.  The maximum funds available under the Purchase Price Adjustment are undeniably insufficient to satisfy Plaintiffs' claims; the fund will be devoted entirely to Plaintiffs' claims, no amount is reserved to benefit the GUC Trust, and the fund provides a better outcome for Plaintiffs than *seriatim* litigation; and claimants are treated equitably among themselves.  Alternatively, the action is maintainable under Rule 23(b)(1)(A) because multiple adjudications of the Class members' claims could lead to inconsistent and contradictory orders.

57.    Accordingly, the Court should grant the Economic Loss Plaintiffs' request to direct that notice of the Settlement Agreement to the members of the Classes and Pre-Closing Accident Plaintiffs be issued.

**B.**    **The Court Should Approve The Form And**
**Manner Of The Proposed Notice Of The Settlement**
**Agreement To The Classes And Pre-Closing Accident Plaintiffs.**

58.    Pursuant to Rule 23(e), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." See Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2)(A) further provides that the court may direct appropriate notice to the class certified under 23(b)(1). See Fed. R. Civ. P. 23(c)(2)(A).

59.    The Court may direct notice to individual Pre-Closing Accident Plaintiffs under Bankruptcy Code Section 105(d), which grants the Court the authority and discretion to issue and prescribe procedures and conditions as the Court deems appropriate to ensure that matters before it are handled expeditiously and economically. See 11 U.S.C. § 105(d); Fletcher v. Davis (In re Fletcher Int'l, Ltd.), 536 B.R. 551, 560 (S.D.N.Y. 2015), aff'd, 661 F. App'x 124 (2d Cir. 2016).

60.    Here, the Economic Loss Plaintiffs propose notice to members of the Classes and Pre-Closing Accident Plaintiffs pursuant to the below "**Notice Procedures**:"

- notice by postcard in the form attached hereto as **Exhibit D** (the "**Direct Mail Notice**") to: (A) all persons in the United States who, prior to July 10, 2009, purchased or leased a defective vehicle manufactured by Old GM included in the Recalls; and (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM or filed or joined a motion for authority to file late claims against the GUC Trust, as of the date of the Settlement Agreement;

- notice via DTC's LENSNOTICE system to Unitholders in the form attached hereto as **Exhibit E** (the "**DTC Notice**");

- notice via ECF to all entities, including New GM and the defendants in the Term Loan Avoidance Action, that receive electronic notice from the Court's ECF system; and

- paid media, including: (1) digital banner advertisements targeted specifically to owners or lessees of the defective vehicles manufactured by Old GM included in the Recalls; (2) pre-roll video ads placed on YouTube and other sites with YouTube embedded videos; (3) sponsored search listings on the three most highly-visited

20

Internet search engines, Google, *Yahoo!*, and *Bing*; (4) a party-neutral informational press release issued to online press outlets throughout the United States; and (5) a settlement website where individuals will be able to obtain detailed information about the case and review documents including the Long Form Notices (in English and Spanish), the Settlement Agreement, and the Final Approval Order, and answers to frequently asked questions (FAQs) and any other documents the Court may require.

61.    To ensure that the Notice Procedures are sufficient, Epiq/Hilsoft, a firm that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans, was engaged.  Epiq/Hilsoft analyzed the individual notice options and the media audience data to determine the most effective and cost-efficient mixture of media required to reach the greatest practicable number of parties.[33]

62.    Rather than incurring the prohibitive cost and expense of mailing a long form of notice to Plaintiffs, the Parties will serve the Direct Mail Notice, which clearly and concisely summarizes the Settlement and Release.  The Direct Mail Notice will direct the recipients to a website dedicated specifically to the Settlement where they can access additional information. The Direct Mail Notices will be sent by United States Postal Service first class mail.[34]

63.    The comprehensive Direct Mail Notice effort will be supplemented by paid media selected to both notify persons who may not see the Direct Mail Notice and remind persons to act if they so choose.  Paid media will include digital banner advertisements targeted specifically to owners and lessees of the vehicles subject to the Recalls, along with online video advertisements targeted to adults aged 18 and over.[35]

---

[33]    See *Declaration of Cameron R. Azari, Esq., on Implementation and Adequacy of General Motors Bankruptcy Settlement Class Notice Program* ("**Azari Decl.**"), annexed hereto as **Exhibit F**, ¶ 8.

[34]    Id. ¶ 14.

[35]    Id. ¶¶ 21-25.

64.    To build additional reach and extend exposures, a party-neutral informational release will be issued to approximately 5,000 general media (print and broadcast) outlets and 5,400 online databases and websites throughout the United States.[36]

65.    A dedicated website will be created for the Settlement.  Plaintiffs will be able to obtain detailed information about the case and review documents, including the long form notice attached hereto as **Exhibit G** (the "**Long Form Notice**") (in English and Spanish), Settlement Agreement, Final Approval Order, and answers to frequently asked questions, and any other documents the Court may require.[37]  To facilitate locating the case website, sponsored search listings will be acquired on the three most highly-visited internet search engines:  Google, Yahoo!, and Bing.[38]

66.    The Notice Procedures presented here are substantially similar to the notice procedures approved by Judge Shannon in In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bank. D. Del. July 7, 2017), attached hereto as **Exhibit H**, to provide notice to individuals who own, or may have owned, vehicles equipped with recalled airbag inflators (*i.e.*, serving a postcard via first-class mail, utilizing digital banner advertising and paid internet search listings, distributing an informational release, and creating a dedicated website).[39]

---

[36]    Id. ¶ 28.

[37]    Once the Estimation Motion is filed, it will be posted prominently on the Settlement website.  In addition, once the plan for allocation between economic loss claims and personal injury/wrongful death claims is determined, it will be posted prominently on the Settlement website.  Any criteria on eligibility to recover from the Settlement Fund will also be posted prominently on the Settlement website.

[38]    Id. ¶¶ 26-27.

[39]    See *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(b)(9) and 105(a), Fed. R. Bankr. P. 2002, 3003(c)(3), 5005, and 9007, and Local Rules 2002-1(e), 3001-1, and 3003-1 for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, and (III) Approve Procedures for Providing Notice of Bar Date and Other Important Deadlines and Information to Potential PSAN Inflator Claimants* ¶¶ 24-28, In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. July 7, 2017) [ECF No. 171].

67.    Rules 23(c)(2)(A) and 23(e) do not contain specific instructions regarding the content of notice.  However, "[d]ue process requires that the notice to class members 'fairly apprise the . . . members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.'"  <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 67 F.3d 1072, 1079 (2d Cir. 1995).  "Normally, settlement notices need only describe the terms of the settlement generally."  <u>In re Michael Milken & Assocs. Sec. Litig.</u>, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (citing <u>Handschu v. Special Servs. Div.</u>, 787 F.2d 828, 833 (2d Cir. 1986)).

68.    The Direct Mail Notice and Long Form Notice (together, the "**<u>Notices</u>**") collectively set forth the nature of the action, define the Classes, identify the claims, issues, and defenses, and set forth the rights of Class members.  Specifically, the Notices collectively provide the date, time, and location of the fairness hearing, inform the Class members and Pre-Closing Accident Plaintiffs that they may retain their own counsel who may enter an appearance on the class member's behalf, and set forth the procedure for objecting to the Settlement Agreement, including the relevant deadlines for doing so.  Additionally, the Notices unequivocally state that the Settlement Agreement, once approved, will be binding on all Class members.

69.    Approval of the form and manner of notice is appropriate under Rule 23(c)(2)(A), Rule 23(e) and Bankruptcy Code Section 105(d) because it will allow the Parties to implement a process in which appropriate notice, in accordance with due process, will be given to all Plaintiffs and parties-in-interest so that this Court can consider the Settlement Agreement and the relief sought under the Motion, including the Release.

### III.   The Court Should Certify The Classes For Settlement Purposes
#### And Appoint Class Counsel And Class Representatives Pursuant to Rule 23.

70.     Before approving a class settlement, the Court must determine whether the proposed settlement class satisfies the certification requirements of Rule 23.  See Amchem v. Windsor, 521 U.S. 591, 620 (1997).

71.     The Court may certify a class for settlement purposes only.  See id. at 619-22; In re BGI, Inc., 465 B.R. 365, 375 (Bankr. S.D.N.Y. 2012); Rule 23(e).  The class certification process in the settlement-only context is streamlined because, unlike a typical class certification for trial purposes, settlement-only class certification does not require a court to analyze the litany of potential management problems that may occur were the case to go to trial.  See Amchem Prods., 521 U.S. at 620 ("Confronted with a request for settlement-only certification, a district court need not inquire whether the case, if tried would present intractable management problems."); In re Worldcom, Inc., 343 B.R. 412, 428 (Bankr. S.D.N.Y. 2006) ("Settlement-only cases do not require a court to analyze the management problems.").

72.     To grant certification, courts must determine whether the settlement class satisfies the four criteria enunciated in Rule 23(a) and whether certification for settlement is appropriate under at least one of the conditions set forth in the subparts of Rule 23(b).  See Fed. R. Civ. P. 23(b).  In making this determination, a court should assume that the substantive allegations forming the basis of the claims are generally true and not inquire into the merits of the claims. See Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013) (explaining that the merits of plaintiffs' claims may be considered "to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"); Eisen v. Carlisle & Jaquelin, 417 U.S. 156, 178 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but

24

rather whether the requirements of Rule 23 are met.").  Here, the Classes meet each element required for certification under Rule 23(a) and (b).

**A.    The Rule 23(a) Requirements Are Satisfied.**

73.    Under Rule 23(a), one or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if:

    a.  the class is so numerous that joinder of all members is impracticable;

    b.  there are questions of law or fact common to the class;

    c.  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    d.  the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

74.    The proposed Classes meet each of these requirements as follows:

**1.    The Classes Are Sufficiently Numerous That Joinder Is Impracticable.**

75.    The numerosity requirement is met because the Classes are each so numerous that joinder would be impracticable.  Numerosity is presumed at forty (40) class members.  See In re BGI, Inc., 465 B.R. at 375 ("In the Second Circuit, courts presume that joinder is impracticable when the prospective class consists of forty or more members."); Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg, 290 F.R.D. 409, 417-18 (S.D.N.Y. 2012) (Furman, J.).  Moreover, "Plaintiffs are not obligated to prove the exact class size to satisfy numerosity."  Cross v. 21st Century Holding Co., 2004 WL 307306, at *1 (S.D.N.Y. Feb. 18, 2004).  Instead, courts "may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class."  In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 509 (S.D.N.Y. 1996).

76.    Old GM manufactured and sold approximately 1.6 million Delta Ignition Switch Vehicles and 9.8 million Defective GM Vehicles.  Given that there are millions of members of

each Class, joinder is clearly impracticable and the numerosity requirement under Rule 23(a)(1) is satisfied.

## 2.      Questions Of Law And Fact Are Common To The Classes.

77.     The commonality factor is met because there are questions of law and fact common to every member of the respective Classes.  Rule 23(a)(2) "does not require that all of the questions of law and fact raised by the dispute must be completely common."  In re BGI, Inc., 465 B.R. at 375.  Rather, to establish commonality under Rule 23(a)(2), "[e]ven a single [common] question will do."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50, 359 (2011) (explaining that commonality is determined not by the number of common questions, but by the significance of those questions with common answers and even a single liability question with a common answer that advances the proceeding toward resolution will suffice); see also Bloomberg, 290 F.R.D. at 418 ("The test for commonality, however, 'is not demanding and is met so long as there is at least one issue common to the class.'").

78.     In vehicle defect cases, commonality is often found based upon a common question concerning the existence of a defect.  See, e.g., Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (holding that the commonality requirement was met where the claims of proposed class representatives all involved, inter alia, "the same alleged defect"); Keegan v. Am. Honda Motor Co., 284 F.R.D. 504, 524 (C.D. Cal. 2012) (finding commonality relating to vehicle defect, noting that "[t]he fact that some vehicles have not yet manifested [the defect] is not sufficient, standing alone, to defeat commonality").

79.     The questions pivotal to the Classes' claims have common answers, easily satisfying the commonality requirement.  Proof of Old GM's knowledge of defects and failure to disclose defects, for example, focuses solely on Old GM's conduct and will necessarily be

common for each member of each Class.[40]  Likewise, each member of each Class has a common

interest in triggering the maximum number of Adjustment Shares.

80.    Within the Ignition Switch Class, common questions of law and fact include, but

are not limited to, whether:  (i) members of the Class have the right to file late proofs of claim,

including whether filing late proofs of claim is the appropriate remedy for the violation of Class

members' due process rights in failing to provide constitutionally adequate notice of the Bar

Date; (ii) members of the Class have the right to seek to maximize the Adjustment Shares; (iii)

the vehicles suffer from the common Ignition Switch Defect; (iv) Old GM was aware of and

concealed the Ignition Switch Defect; (v) Old GM misrepresented that the vehicles were safe;

(vi) Old GM engaged in fraudulent, deceptive, or unfair acts or practices by failing to disclose

that the vehicles were designed, manufactured, and sold with the Ignition Switch Defect and that

Old GM systemically valued cost-cutting over safety; (vii) Old GM was unjustly enriched at the

expense of the Class; (viii) Old GM breached the implied warranty of merchantability; and (ix)

Old GM was negligent in its design and manufacture of the vehicles, and or in failing to warn of

the Ignition Switch Defect and failing to recall the vehicles.

81.    Within the Non-Ignition Switch Class, common questions of law and fact include,

but are not limited to, whether:  (i) members of the Class received constitutionally adequate

notice of the Bar Date; (ii) members of the Class have the right to file late proofs of claim; (iii)

members of the Class have the right to seek to maximize the Adjustment Shares; (iv) the vehicles

suffer from common safety defects; (v) Old GM was aware of and concealed the defects; (vi)

---

[40]    See Wolin, 617 F.3d at 1172 (commonality threshold "easily satisf[ied]" based on several core, common issues, including: "1) whether the [vehicles'] alignment geometry was defective; 2) whether Land Rover was aware of this defect; 3) whether Land Rover concealed the nature of the defect; 4) whether Land Rover's conduct violated the Michigan Consumer Protection Act or the Florida Deceptive and Unfair Trade Practices Act; and 5) whether Land Rover was obligated to pay for or repair the alleged defect pursuant to the express or implied terms of its warranties").

Old GM misrepresented that the vehicles were safe; (vii) Old GM engaged in fraudulent, deceptive, or unfair acts or practices by failing to disclose that the vehicles were designed, manufactured, and sold with safety defects and that Old GM systemically valued cost-cutting over safety; (viii) Old GM was unjustly enriched at the expense of the Class; (ix) Old GM breached the implied warranty of merchantability; and (x) Old GM was negligent in its design and manufacture of the vehicles, and or in failing to warn of the known defects and failing to recall the vehicles.

### 3.    The Claims Of The Economic Loss Plaintiffs As Class Representatives Are Typical Of The Claims Of The Classes.

82.    Typicality is satisfied because the claims and defenses of the proposed class representatives are typical of the claims or defenses of the Class members. "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes the same legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993).

83.    All of the members of each Class were subject to the same unlawful conduct of Old GM, "suffered the same type of injury as the rest of the class," namely a violation of their due process rights in connection with the Bar Date and the incurrence of economic losses caused by the concealment of dangerous safety defects, and "rely on the same legal theory" to prove Old GM's liability and seek recovery for their claims. See In re Partsearch Techs., Inc., 453 B.R. 84, 95 (Bankr. S.D.N.Y. 2011); see also Wolin, 617 F.3d at 1175 (typicality satisfied because

plaintiffs alleged that they, like all class members, were injured by the vehicles' common alignment defect, and plaintiffs sought recovery under the same legal theories as the class). Thus, the typicality requirement under Rule 23(a)(3) is satisfied.

> **4.      The Economic Loss Plaintiffs As Class
> Representatives And Co-Lead Counsel As Class Counsel
> Will Fairly And Adequately Protect The Interests Of The Classes.**

84.     Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Rule 23(a)(4) entails a two-part finding:  "First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation.  Second, the class members must not have interests that are 'antagonistic' to one another."  In re Drexel Burnham Lambert Grp., Inc., 960 F.2d at 291.  Rule 23(g)(4) also states that "[c]lass counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

85.     The Court should appoint the Economic Loss Plaintiffs as class representatives and find that they will fairly and adequately protect the interests of the Classes.   "[C]lass representatives cannot hold an interest in conflict with the class" and "must be of the character to assure the vigorous prosecution of the action so that the members' rights will be protected . . . ." In re BGI, Inc., 465 B.R. at 376.

86.     The Economic Loss Plaintiffs have and will continue to diligently prosecute the Proposed Class Claims and protect the interests of the Classes.  The Economic Loss Plaintiffs' claims are typical of the claims of Class members, which is strong evidence that their "interests are not antagonistic to those of the class" and they will adequately protect the interests of each Class.  See Tiro v. Public House Invs., LLC, 288 F.R.D. 272, 280 (S.D.N.Y. 2012).  Moreover, the Economic Loss Plaintiffs and Class members are united in seeking to obtain the maximum

value possible from the Adjustment Shares, which further demonstrates that the Economic Loss Plaintiffs will adequately protect the interests of each Class. See In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981) (certifying settlement class and holding that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes").

87.     In addition, the Court should appoint Co-Lead Counsel as class counsel and find that they will fairly and adequately protect the interests of the Classes. Rule 23(g) requires that, in appointing required class counsel, a court must consider:  (i) "the work counsel has done in identifying or investigating potential claims in the action;" (ii) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (iii) "counsel's knowledge of the applicable law;" and (iv) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).  A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).  Once appointed, class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).  This appointment may be made on an interim basis pending final certification of the settlement classes, as provided in Fed. R. Civ. P. 23(g)(3).

88.     Co-Lead Counsel satisfy these requirements and will undoubtedly continue to represent the interests of the classes both fairly and adequately as class counsel in regard to the Classes and Settlement Agreement.  Co-Lead Counsel have represented the interests of Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs in this Court and in the MDL Court for over

four years.[41]  To this end, Co-Lead Counsel has undertaken to identify, investigate, and prosecute claims against Old GM on behalf of these Plaintiffs.

89.    Further, Co-Lead Counsel has extensive experience as specialists in class actions and complex litigation involving defective vehicles.[42]  Co-Lead Counsel have already committed vast resources to the representation of Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs before both this Court and the MDL Court, demonstrating their dedication to these Plaintiffs and achieving the most beneficial resolution of their claims.[43]

90.    Accordingly, it is in the best interests of the Classes to appoint Co-Lead Counsel, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein LLP, as class counsel and the Economic Loss Plaintiffs as class representatives.  Co-Lead Counsel and the Economic Loss Plaintiffs will fairly and adequately represent the interests of the Classes and, accordingly, the requirement of Rule 23(a)(4) is satisfied.

## B.    The Rule 23(b) Requirements Are Satisfied.

91.    Certification of a class requires, in addition to satisfaction of the four Rule 23(a) prerequisites, that the action be maintainable as one of the "types" of class actions described in Rule 23(b).  See Fed. R. Civ. P. 23(b).  In this case, Plaintiffs seek certification of the Classes under Rule 23(b)(1)(B) or, in the alternative, under Rule 23(b)(1)(A).

92.    Rule 23(b)(1) provides no rights to opt out.  See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 362 (2011) ("[Rule 23] provides no opportunity for (b)(1) or (b)(2) class members

---

[41]    See Order No. 8, In re Gen. Motors LLC Ignition Switch. Litig., Case No. 14-MD-2543 (JMF) (S.D.N.Y. Aug. 8, 2014) [ECF No. 249] (appointing Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein LLP as Co-Lead Counsel with a focus on economic loss claims).

[42]    See Declarations of Mr. Berman and Ms. Cabraser are attached hereto as **Exhibits I and J**.

[43]    See Berman and Cabraser Declarations at **Exhibits I and J**.

to opt out."); <u>Van Gemert v. Boeing Co.</u>, 590 F.2d 433, 439 n.11 (2d Cir. 1978) (en banc) ("The plaintiffs in the suit before us were certified as a 23(b)(1) class under the Federal Rules. No class member could have opted out of such a suit even if he had desired to do so . . ."), <u>aff'd</u>, 444 U.S. 472 (1980). Accordingly, the Classes will be mandatory, non-opt out Classes.

### 1.  <u>The Rule 23(b)(1)(B) Requirements Are Met.</u>

93.     Rule 23(b)(1)(B) provides that a class may be maintained if the prosecution of separate actions by individual class members would create the risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. <u>See</u> Fed. R. Civ. P. 23(b)(1)(B).

94.     Rule 23(b)(1)(B) is traditionally utilized in cases involving recovery of a "limited fund" that could be exhausted by individual actions. <u>See, e.g.</u>, <u>U.S. Trust Co. of N.Y. v. Alpert</u>, 163 F.R.D. 409, 419 (S.D.N.Y. 1995). "In a limited fund situation, many litigants have claims against a single asset, and the asset's total value is unlikely to satisfy all of the claims. If the claims are adjudicated one by one, the fund will run out before the claimants do. Early claimants' suits are therefore 'dispositive of the interests' of the other claimants . . . ." 2 Newberg on Class Actions (5th Ed.) § 4:16.

95.     "Classic" limited fund class actions "include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, and proceeds of a ship sale in a maritime accident suit." <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815, 834 (1999).

96.     A limited fund class action "may be used to accomplish some readjustment of creditors' rights against an insolvent entity, without observing the protections of bankruptcy law." <u>In re Joint E. and S. Dist. Asbestos Litig.</u>, 982 F.2d 721, 738 (2d Cir. 1992), <u>opinion</u>

modified on reh'g, 993 F.2d 7 (2d Cir. 1993). In In re Joint E. and S. Dist. Asbestos Litig., the

Second Circuit permitted the use of a Rule 23(b)(1)(B) class in connection with a settlement that

adjusted the rights of creditors to distributions from a trust created in Manville's bankruptcy

proceeding following the substantial depletion of trust assets after only a couple of years of

operation. See id. at 738-39. Similarly, here, the Economic Loss Plaintiffs are seeking to use a

Rule 23(b)(1)(B) class in connection with a settlement that will adjust their rights as creditors to

distributions from the GUC Trust.

97.     Following the In re Joint E. and S. Dist. Asbestos Litig. decision, the United

States Supreme Court in Ortiz articulated three characteristics of a "limited fund" class action

under Rule 23(b)(1)(B) which it described as presumptively necessary:

(1)     "the totals of the aggregated liquidated claims and the fund available for
        satisfying them, set at their maximums, demonstrates the inadequacy of the fund
        to pay all claims;"

(2)     "the whole of the inadequate fund [is] to be devoted to the overwhelming claims;"
        and

(3)     "the claimants identified by a common theory of recovery [are] treated equitably
        among themselves."

Ortiz, 527 U.S. at 838-39. As set forth below, this action bears each of these characteristics.

### a.   The Fund Is Inadequate.

98.     The first prong of Ortiz is satisfied because the total amount of the Class

members' aggregated claims far exceeds the fund available for satisfying them, set at their

maximums.

99.     To evaluate this factor, the Court must first ascertain the parameters of the fund at

issue. See Doe v. Karadzic, 192 F.R.D. 133, 141 (S.D.N.Y. 2000). The "maximum" amount of

the fund at issue need not include every asset available to the defendant. See Stott v. Capital Fin.

Servs., Inc., 277 F.R.D. 316, 329-30 (N.D. Tex. Sept. 12, 2011) (citing Ortiz, 527 U.S. at 851)

(finding a settlement fund was a limited fund set at its maximum, as required by Ortiz's first prong, notwithstanding the fact that the defendant retained some assets and there was potentially additional insurance coverage that could have applied to the settled claims).

100.    While this Settlement's emergence from within long-running bankruptcy proceedings exemplifies a classic limited fund scenario, courts have also affirmed Rule 23(b)(1)(B) class settlements as an alternative to bankruptcy, as Ortiz itself suggested, and as illustrated by In re Silicone Gel Breast Implant Prods. Liab. Litig. See Ortiz, 527 U.S. at 861 & nn. 34-35 (leaving unresolved "how close to insolvency a limited fund defendant must be brought as a condition of class certification" and whether "a credit" for saving "transaction costs that would never have gone into a class member's pocket in the absence of settlement" may "be recognized in a mandatory class action as an incentive to settlement"); In re Silicone Gel Breast Implant Prods. Liab. Litig., No. 2:97-CV-11441-RDP, 2010 WL 11506713, at *26 (N.D. Ala. May 19, 2010) (finding that a settlement fund contributed by defendant's senior secured noteholders was the "maximum" value available for settling a class of tort claims because the defendant's other assets existed only nominally when compared to its rapidly increasing commercial debts and priority interests of the senior secured noteholders and defendant did not have any products liability insurance coverage or means of obtaining alternative lending to supplement the settlement fund).

101.    For example, in Stott, the court considered whether a proposed settlement fund satisfied Ortiz's requirement that the "limited fund" be "set definitely at its maximum." See Stott, 277 F.R.D. at 329 (citing Ortiz, 527 U.S. at 838-39). The settlement fund was comprised of: (i) a $120,000 contribution from the defendant, which was the absolute maximum amount that FINRA determined the defendant could contribute while maintaining sufficient assets to

maintain operations; and (ii) $1.4 million of insurance coverage.  See id. at 329.  Certain class

members objected to the proposed settlement on the basis that: (i) the $120,000 contribution did

not include all of the defendant's assets; and (ii) a higher $5 million aggregate insurance policy

applied to the claims being settled.  See id. at 329-31.   The court rejected both arguments and

approved the proposed settlement, finding that the "limited" settlement fund was set definitively

at its maximum, as required by Ortiz.  Id. at 330-34.

102.    With respect to the objection that the defendant retained some assets, the court

concluded that the proposed settlement was nonetheless a "proper 'limited fund' under Rule

23(b)(1)(B)," observing that multiple courts have approved Rule 23(b)(1)(B) settlements that did

not encompass a defendant's entire net worth and that the amount the defendant was contributing

to the settlement fund was "not some arbitrary number that was randomly chosen, but was

determined by FINRA as the maximum amount that [defendant] could contribute without

violating" regulatory capital requirements.  See id.  at 331-32.

103.    With respect to the objection regarding the insurance contribution, the court found

that "the 'limited fund' in this case can properly be based upon the $2 million [policy] sublimit,"

of which the $1.4 million contribution was the remainder, because portions of the $5 million

aggregate insurance policy needed to be devoted to other classes of claims and reliance on the $2

million policy sublimit was an appropriate value discount for the risks associated with litigating

the applicability of the $5 million policy to the claims being settled.  Id. at 329-30.

104.    Here, the defendant is the GUC Trust, which, as "a fixed and limited fund" that

will be depleted, fits the model of a "traditional limited fund class action . . . ."  See Doe, 192

F.R.D. at 141; see also In re Drexel Burnham Lambert Grp., 960 F.2d 285, 292 (2d Cir. 1992)

(holding that certification of a limited fund class action against a defendant in bankruptcy was

"necessary . . . to prevent claimants" from maintaining costly individual actions and "unfairly diminishing the eventual recovery of other class members"); In re Silicone Gel Breast Implant Prods. Liab. Litig., 2010 WL 11506713, at *28-29 (holding that limited fund class certification was appropriate where defendant was not a going concern at the time of settlement). The GUC Trust will be contributing to the Settlement Fund any and all Adjustment Shares issued following the estimation proceedings.

105.    The Adjustment Shares, like the settlement fund in Stott, constitutes a limited fund, set at its maximum, within the meaning of Ortiz's first prong, notwithstanding the fact that the GUC Trust Distributable Assets currently held by the GUC Trust (the "**Remaining GUC Trust Assets**") will be retained for distribution to other GUC Trust Beneficiaries (potentially including the defendants in the Term Loan Avoidance Action). Like the $5 million insurance policy in Stott, the Remaining GUC Trust Assets are arguably required to satisfy other claims - i.e., those of other GUC Trust Beneficiaries - and the exclusion of such assets from the "limited fund" is a commensurate discount for the costs and risks associated with litigating Class members' entitlement to such funds. Likewise, as set forth below, it is highly unlikely that the Plaintiffs would be able to successfully clawback prior distributions of GUC Trust Assets to supplement the value from the Adjustment Shares, both as a practical and legal matter, and the pursuit of the same would likely involve significant costs and delay. See infra n.45.

106.    Accordingly, the upper limit of the Settlement Fund available to satisfy Plaintiffs' claims is 30 million Adjustment Shares (the maximum amount that may be required under the AMSPA). At the current share price of $38.47 for New GM common stock, the value of those Adjustment Shares is approximately $1.15 billion.

107.   By comparison, according to the conjoint analysis conducted by Plaintiffs' experts, the total amount of the Class members' aggregated claims could equal or exceed $76.69 billion.  See Doe, 192 F.R.D. at 140, n.11 (explaining that where there is a "reasonable method by which to calculate, or even estimate with comfortable certainty, [defendant's] potential liability' to the class members," class members' claims need not be liquidated in order to assess whether a fund is limited); see also Stott, 277 F.R.D. at 328 (determining that, based on the evidence regarding class members' damages presented to the court, "the amount contemplated is a 'sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages'" to determine that a limited fund exists).  The $1.15 billion fund is wholly inadequate to satisfy these claims.

108.   Accordingly, the first Ortiz prong is met.

### b.  The Whole Of The Inadequate Fund Is Devoted To Plaintiffs' Claims.

109.   The second prong of Ortiz, that "the whole of the inadequate fund . . . be devoted to the overwhelming claims," is also met.  See Ortiz, 527 U.S. at 839.  This prong ensures that "the defendant . . . with the inadequate assets ha[s] no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class" and "the class as a whole [is] given the best deal . . . ."  See id.

110.   This prong is met because, under the Settlement Agreement, the Adjustment Shares are for the exclusive benefit of Plaintiffs.  See Silicone, 2010 WL 11506713, at *31 (finding that the second prong of Ortiz was satisfied where the entirety of a settlement fund, which reflected the maximum available payout to claimants, was devoted to the class claims); Jane Doe 30's Mother v. Bradley, 64 A.3d 379 (Del. Super. Ct. 2012) (finding the second prong of Ortiz satisfied where all of a limited settlement fund, which was the result of intensive

37

mediation between a defendant and the class members, would be devoted to compensating eligible class members).

111.    Moreover, the Settlement does not permit the GUC Trust "to benefit [itself] or claimants of lower priority by holding back on the amount distributed to the class . . . ." Ortiz, 527 U.S. at 839.  The only amount "held back" is the Remaining GUC Trust Assets, which will be distributed to other GUC Trust Beneficiaries, not retained by the GUC Trust or distributed to claimants of lower priority.  In any event, the Remaining GUC Trust Assets would be subject to the billions of claims of other GUC Trust Beneficiaries, including potentially the defendants in the Term Loan Avoidance Action.[44]  Likewise, Plaintiffs' agreement to forsake seeking to clawback prior distributions of GUC Trust Assets provides no benefit to the GUC Trust or claimants of lower priority, particularly in light of the substantial practical and legal impediments and attendant costs and delay.

112.    Further, the Classes are receiving "the best deal."  See Ortiz, 527 U.S. at 839. Obtaining exclusive access to the Adjustment Shares provides Class members with a better deal than they would receive if they successfully prosecuted the Proposed Class Claims and ultimately shared in Remaining GUC Trust Assets and Adjustment Shares on a *pro rata* basis with other GUC Trust Beneficiaries, and pursued clawback actions for prior distributions of GUC Trust Assets.[45]

---

[44]    This is in marked contrast to Ortiz, where the court held that the limited fund standards were not met because, *inter alia*, the defendant "was allowed to retain virtually its entire net worth."  Ortiz, 527 U.S. at 859-60 & n.34.

[45]    It is highly unlikely that the Plaintiffs would be able to successfully clawback prior distributions of GUC Trust Assets, both as a practical and legal matter.  75% of the GUC Trust Assets were distributed in the initial distribution to holders of Allowed General Unsecured Claims, which was completed on or around May 26, 2011.  See *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014* [ECF No. 12826], Exhibit D, ¶ 34.  Bankruptcy Code Section 549 only authorizes avoidance of post-petition transfers within two years after the transfer date and cannot be used to avoid plan distributions.  See 11 U.S.C. § 549; In re Chattanooga Wholesale Antiques, Inc., 930 F.2d 458, 462 (6th Cir. 1991); Matter of Ford, 61 B.R. 913 (Bankr. W.D. Wis. 1986).  Indeed, the Confirmation Order provides that "the GUC Trust Administrator may dispose of the GUC Trust Assets free of any restrictions of the Bankruptcy

113.    By way of example, assume that the Proposed Class Claims are allowed at approximately $10.15 billion (the minimum amount necessary to trigger the issuance of the maximum amount of Adjustment Shares).   Currently, there are approximately $31.85 billion Allowed General Unsecured Claims, so the aggregate Allowed General Unsecured Claims would increase to approximately $42 billion.[46]  Following successful completion of *seriatim* litigation, the assets available to satisfy those claims would be:  (i) the value of 30 million Adjustment Shares (approximately $1.15 billion); and (ii) the Remaining GUC Trust Assets (currently $457.9 million) still available following the depletion that would occur to pay for the costs of litigation and operating the GUC Trust.[47]  Together, that amounts to approximately $1.6 billion. That amount would be distributed on a *pro rata* basis to satisfy the aggregate Allowed General Unsecured Claims of $42 billion, providing each Plaintiff with a recovery of less than 4 cents on the dollar.

114.    On the other hand, under the proposed Settlement, Plaintiffs would receive exclusive access to the Adjustment Shares.  Distributing approximately $1.15 billion to satisfy the Plaintiffs' aggregate claims of $10.15 billion would provide each Plaintiff with

---

Code, but in accordance with the provisions of the Plan and the GUC Trust Agreement."  Confirmation Order ¶ 6.  Further, the GUC Trust Agreement provides that "GUC Trust Beneficiaries are deemed to receive the GUC Trust Distributable Assets in accordance with the provisions of the Plan, the Confirmation Order, the Liquidation Order and this Trust Agreement . . . without further obligation or liability of any kind . . . ."  GUC Trust Agreement § 3.2.  As a practical matter, it would be nearly impossible to trace and collect distributions made nearly eight years ago.  Ortiz does not require a Court to consider speculative assets contingent on success in challenging litigation and collection.  See Stott, 277 F.R.D. at 330 (holding that it was appropriate for settling parties to rely on an insurance policy sublimit as a source of settlement funds, as opposed to the higher aggregate policy limit, where insurer "would have a substantial chance of success in confirming its position [that only the sublimit was applicable to the claims at issue] through litigation").

[46]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of December 31, 2018*, dated Jan. 24, 2019 [ECF No. 14402].

[47]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of December 31, 2018*, dated Jan. 24, 2019 [ECF No. 14402]; n.45 *supra*.

approximately 11 cents on the dollar.[48]  The Classes are, thus, clearly getting a better deal under

the proposed Settlement than could be achieved through successful *seriatim* litigation.  See Ortiz,

527 U.S. at 840-41.

<strong>c.      Class Members Are Treated Equitably.</strong>

115.    The third prong of Ortiz—"the claimants identified by a common theory of

recovery [are] treated equitably among themselves"—is met because the Classes include all

potential owners and lessees of the Delta Ignition Switch Vehicles and Defective GM Vehicles

"who might state a claim" for economic loss "invoking a common theory of recovery."  See id.

at 839.  In addition, the Settlement Agreement has been structured to avoid intra-class conflicts,

which addresses the critical question for the third prong—whether procedures are implemented

"to resolve the difficult issues of treating . . . differently situated claimants with fairness as

among themselves."  Ortiz, 527 at 856.

116.    Here, the Settlement proceeds in three stages.  In the first stage (approval of the

Settlement Agreement) and the second stage (estimation of Plaintiffs' claims), Class members

have a common interest in maximizing the number of Adjustment Shares through Plaintiffs'

claims for damages against Old GM, which they are permitted to bring because Plaintiffs have

suffered a common due process violation.  The Court held that the Ignition Switch Plaintiffs

suffered a due process violation and that the obvious remedy would be leave to file late proofs of

claim.  See In re Motors Liquidation Co., 529 B.R. at 574, 583.  Although the Non-Ignition

Switch Plaintiffs (many of whom have alleged that their claims arise out of defects that are

substantially similar to the Ignition Switch Defect) have not established a due process violation

yet, they have argued that they can do so.

---

[48]    The same result obtains if Plaintiffs' claims are estimated in an amount sufficient to trigger the Adjustment
Shares, albeit insufficient to trigger the maximum amount of Adjustment Shares.

117.    While Class members may be differently situated in the third stage (approval of allocation and distribution procedures), additional or different subclasses can be created at that time, if necessary.    See Silicone, 2010 WL 11506713 (supporting a proceeding with a multi-phase settlement that first certifies a settlement class for claims estimation purposes and subsequently and separately proceeds to an equitable allocation and distribution of the fund to eligible class members).[49]    Further, the allocation and distribution procedures to be created will be guided by, and flow from, the Court's determinations in the estimation proceedings, further ensuring equitable treatment among class members.[50]

118.    Accordingly, certification of a limited fund class under Rule 23(b)(1)(B) is warranted because the three prongs of Ortiz are met.

## 2.    Alternatively, The Requirements Of Rule 23(b)(1)(A) Are Met.

119.    Rule 23(b)(1)(A) provides that a class may be maintained if the prosecution of separate actions by individual class members would create the risk of "inconsistent or varying adjudications . . . that would establish incompatible standards of conduct for the" defendant.    See Fed. R. Civ. P. 23(b)(1)(A).

120.    Under Rule 23(b)(1)(A), courts look to whether the party opposing the class has a practical or legal requirement to treat individual class members alike.    See 2 Newberg on Class Actions (5th Ed.) § 4:7; Amchem Prods., Inc., 521 U.S. at 614 ("Rule 23(b)(1)(A) 'takes in cases

---

[49]    Here, the members of the Classes all suffered economic losses and seek recovery from the same source. Accordingly, none of the intra-class inequity issues present in In re Katrina Canal Breaches Litig. or Ortiz are present.    See Ortiz, 527 at 856 (finding intra-class conflicts between present and future claimants, and between claimants whose claims accrued before the lapse of an insurance policy (and, thus, had more valuable rights to insurance proceeds) and those whose claims accrued after the policy lapsed); In re Katrina Canal Breaches Litig., 628 F.3d 185, 193-94 (2010) (holding that the third Ortiz factor was not met where settlement failed to include procedures for differentiating among class members based on whether they suffered death, personal injury, or property damage).

[50]    For instance, if, during the estimation proceedings, the Court determines that some claims are valued higher than others, that determination will necessarily be taken into account at the allocation and distribution phase and guide the formation of subclasses, if necessary, with adequate representatives—thereby ensuring an equitable distribution.

where the party is obliged by law to treat the members of the class alike . . . or where the party

must treat all alike as a matter of practical necessity . . .'").

121.    Certification under Rule 23(b)(1)(A) is appropriate where claims arise from "one

set of actions by defendants creating a uniform type of impact" upon class members in light of

the "real possibility of inconsistent adjudications" if separate actions were pursued.  See Hans v.

Tharaldson, No. 3:05-cv-115, 2010 WL 1856267, at *10 (D.N.D. May 7, 2010) (certifying class

under Rule 23(b)(1)(A) in action alleging breaches of fiduciary duty due to "real possibility of

inconsistent results" if the claims were not aggregated); cf. Turner v. Bernstein, 768 A.2d 24, 31-

34 (Del. Ch. 2000) (certifying class of stockholders under Del. Ch. Ct. R. 23(b)(1)(A) in case

arising from directors' alleged failure to disclose material information regarding merger, which

"creat[ed] a uniform type of impact upon the class").

122.    The requirements of Rule 23(b)(1)(A) are met because the GUC Trust must treat

the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs alike as a practical matter.

Under the Plan and the GUC Trust Agreement, the GUC Trust must treat each Ignition Switch

Plaintiff and Non-Ignition Switch Plaintiff alike as contingent GUC Trust Beneficiaries holding

disputed general unsecured claims that are subject to resolution per the Settlement Agreement.[51]

123.    In addition, multiple adjudications of Class members' claims could lead to

inconsistent and contradictory orders.   Class members, as known creditors of Old GM, suffered

common due process violations arising from a uniform set of facts—Old GM's failure to provide

constitutionally adequate notice of the Bar Date—and are seeking collectively to trigger the

---

[51]    See Plan § 6.2 (explaining, inter alia, that the GUC Trust shall be established "for the benefit of the holders of
Allowed General Unsecured Claims" and to "resolv[e] outstanding Disputed General Unsecured Claims to
determine the amount of Allowed General Unsecured Claims that will be eligible for distribution of their Pro
Rata Share of New GM Securities under the Plan"); GUC Trust Agreement Preamble § F (explaining that the
GUC Trust is created for the benefit of holders of Initial Allowed General Unsecured Claims, Disputed General
Unsecured Claims, and holders of the Term Loan Avoidance Action Claims).

issuance of Adjustment Shares.  They also raise common economic loss claims arising from a

uniform set of facts—Old GM's knowledge and concealment of defects in their vehicles—and

raise common questions regarding Old GM's duties to similarly situated vehicle owners and

lessees.  Multiple adjudications of these common issues could result in orders establishing

different standards of conduct towards Class members by the GUC Trust.

124.    Accordingly, the Classes can be certified under Rule 23(b)(1)(A).  See In re

Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 241 F.R.D. 185, 199-200 (S.D.N.Y.

2007) (certifying Rule 23(b)(1)(A) class of homeowners asserting claims that property was

harmed by seepage of harmful substance where, inter alia, individual adjudication of negligence

claims could lead to different conclusions on the issue of whether defendants breached a duty of

reasonable care).

**IV.    The Court Should Approve The Settlement
Agreement On A Final Basis Pursuant To Rule 23(e).**

125.    Pursuant to Rule 23(e), "[t]he claims, issues, or defenses of . . . a class proposed

to be certified for purposes of settlement—may be settled . . . only with the court's approval."

Fed. R. Civ. R. 23(e).  Courts have discretion regarding whether to approve a class action

settlement.  See Maywalt, 67 F.3d at 1078-79.  In exercising that discretion, courts should be

"mindful of the 'strong judicial policy in favor of settlements, particularly in the class action

context.'"  See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116-17 (2d Cir. 2005).

126.    The court may approve a class settlement "only after a hearing and only on

finding that it is fair, reasonable, and adequate after considering" the following factors:

whether: (A) the class representatives and class counsel have adequately
represented the class; (B) the proposal was negotiated at arm's length; (C) the
relief provided for the class is adequate . . .; and (D) the proposal treats class
members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

127.    These factors were added as part of the recent (2018) amendments to Rule 23. The Advisory Committee Notes on the 2018 amendments to Rule 23 recognize that, in the past, "[c]ourts have generated lists of factors to shed light on" the "central concern in reviewing a proposed class-action settlement"—that the settlement is "fair, reasonable, and adequate." Advisory Committee's Notes on Fed. R. Civ. P. 23 (2018) (hereinafter, "**Committee Notes**").[52] While the amendment is not intended "to displace any factor" previously identified by courts, it does "direct[] the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal." Id.

128.    A review of this "shorter list of core concerns" shows that the Settlement is fair, reasonable, and adequate, and should be approved pursuant to Rule 23(e).

### A.    The Class Representatives And Class Counsel Adequately Represent The Classes, And The Settlement Was Negotiated At Arm's-Length.

129.    The first two factors set forth in Rule 23(e)(2)—whether the class representatives and class counsel adequately represented the Classes and whether the Settlement was negotiated at arm's-length—identify "procedural" concerns looking to "the actual performance of counsel acting on behalf of the class." Committee Notes. Relevant information may include "the nature

---

[52]    In the Second Circuit, courts evaluating whether to approve a class settlement under Rule 23 considered whether the settlement was procedurally fair, meaning "free from collusion and inadequate representation," and whether the settlement was substantively fair by weighing the nine Grinnell factors. See Mba v. Wold Airways, Inc., 369 F. App'x 194, 197 (2d Cir. 2010) (quoting City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000)); In re BGI, Inc., 465 B.R. at 378.  The Grinnell factors are: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery contemplated; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund to a possible recovery in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Grinnell, 495 F.2d at 463.

and amount of discovery in this or other cases," which "may indicate whether counsel negotiating on behalf of the class had an adequate information base." Id.; see also In re BGI, Inc., 465 B.R. at 380 (explaining that "[t]he progression of discovery is a useful proxy through which to measure" "the parties' knowledge and awareness of the relative strength or weakness of each party's respective arguments and positions"); In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2010) ("[I]t is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal of the Settlement.'").[53]

130.    Indeed, a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached between experienced, capable counsel after meaningful discovery." In re BGI, Inc., 465 B.R. at 378 (quoting Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d at 116).

131.    Competent and experienced counsel to the Parties who have been litigating these issues for years in the MDL Action and this Court actively engaged in arm's-length negotiations to formulate the Settlement Agreement.  Extensive discovery regarding the relevant defects has taken place in the MDL Action.[54]  The Economic Loss Plaintiffs provided the GUC Trust with the Proffered Evidence, which describes in detail the alleged viability of the Ignition Switch and Non-Ignition Switch Plaintiffs' claims, the alleged violation of due process rights in connection with the Bar Date, and the alleged amount of damages suffered by the Ignition Switch and Non-

---

[53]    This inquiry corresponds with the inquiry into procedural fairness under prior Rule 23 and the third Grinnell factor—"the stage of the proceedings and the amount of discovery contemplated."  Grinnell, 495 F.2d at 463.

[54]    Discovery in the MDL Action includes information on Old GM's knowledge of the various defects and is not limited to information in the post-Sale period.  New GM has produced more than 4.7 million documents (totaling more than 23.4 million pages) and the parties have conducted 746 depositions, including 447 depositions of case-specific witnesses, 102 depositions of current or former General Motors' employees, 120 depositions of experts related to bellwether cases, and 96 depositions of named plaintiffs in the Fifth Amended Consolidated Complaint.  See Joint Letter, In re Gen. Motors LLC Ignition Switch Litig., Case No. 14-md-02543-JMF (S.D.N.Y. Oct. 26, 2018), ECF No. 6220.

Ignition Switch Plaintiffs, and the Parties engaged in several meetings to discuss the Proffered

Evidence.   Thus, by the time the Settlement Agreement was formulated, counsel for the

Economic Loss Plaintiffs and the GUC Trust had access to all the material facts and had the

opportunity to undertake their own analyses of the merits of Plaintiffs' claims based on those

facts and existing law, allowing for informed negotiations among the Parties.

132.    Accordingly, the first two factors of Rule 23(e)(2) are met.

**B.    <u>The Relief Provided For The Classes Under The Settlement Is Adequate</u>.**

133.    The third factor set forth in Rule 23(e)(2)—whether the relief provided for the

class is adequate—evaluates the substantive fairness of the proposed settlement.   <u>See</u> Fed. R.

Civ. P. 23(e)(2); Committee Notes.   This inquiry must take into account the following four sub-

factors:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any
> proposed method of distributing relief to the class, including the method of
> processing class-member claims; (iii) the terms of any proposed award of
> attorney's fees, including timing of payment; and (iv) any agreement required to
> be identified under Rule 23(e)(3) . . . .

Fed. R. Civ. P. 23(e)(2).[55]   Rule 23(e)(3) also requires disclosure of "any agreement made in

connection with the proposal."   Fed. R. Civ. P. 23(e)(3).

134.    Here, there is no doubt that the relief provided for the Classes under the

Settlement is adequate in light of "the costs, risks, and delay of trial and appeal," a factor

identified by the Advisory Committee as a "central concern" in evaluating a proposed settlement.

<u>See</u> Committee Notes.

---

[55]   Nearly all of the <u>Grinnell</u> factors address similar issues, specifically factor one—"the complexity, expense and likely duration of the litigation;" factors four through six—the risks of establishing liability, establishing damages, and maintaining the class action through the trial; factor seven—"the ability of the defendants to withstand a greater judgment;" and factors eight and nine—"the range of reasonableness of the settlement fund to a possible recovery" in light of the best possible recovery and all the attendant risks of litigation.   <u>Grinnell</u>, 495 F.2d at 463.

135.    The Advisory Committee Notes explain that, in evaluating this factor, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results," taking into account, *inter alia*, "whether certification for litigation would be granted were the settlement not approved." Id.  Nevertheless, "the court should avoid conducting a mini-trial and must, 'to a certain extent, give credence to the estimation of the probability of success proffered by class counsel.'"  In re IKON Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 181 (E.D. Pa. 2000).

136.    The litigation of the Proposed Class Claims raises numerous complex legal issues which, if litigated to conclusion, would require extensive expenditures of time and resources with no certain benefit to the Plaintiffs.

137.    As described in greater detail in the 9019 Motion, the Court explicitly stated, in the April 2015 Decision, that Ignition Switch Plaintiffs suffered a due process violation and that the obvious remedy would be leave to file late proofs of claim.  See In re Motors Liquidation Co., 529 B.R. at 573-74, 583.  Even if this statement is binding authority, which the GUC Trust asserts it is not, the Ignition Switch Plaintiffs may still need to establish that they can meet the Pioneer factors.  The Non-Ignition Switch Plaintiffs, on the other hand, have not yet established a due process violation.

138.    There also remains the issue of whether the equitable mootness doctrine is applicable to Plaintiffs' claims—an issue left unresolved after the Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory.  See Elliott, 829 F.3d at 168-69.[56]

---

[56]    On appeal, the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs argued that the Bankruptcy Court erred by, *inter alia*, failing to consider that effective relief could be fashioned by providing Plaintiffs with exclusive access to any Adjustment Shares that may be issued under the AMSPA.  See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 235), 49-52; Br. for Ignition Switch Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal

Additional complex issues would necessarily arise from continued litigation of Plaintiffs' claims, including class certification for litigation and issues regarding the viability and amount of Plaintiffs' claims.

139.    Thus, continued litigation of Plaintiffs' claims would require substantial expenditures of time and resources from both the Plaintiffs and the GUC Trust, the resources of which would be depleted to the detriment of the Parties and GUC Trust Beneficiaries.

140.    The Settlement Agreement, on the other hand, provides a tangible source of recovery for the Plaintiffs from the Adjustment Shares, in the short term, avoiding the uncertain results of expensive and protracted litigation and appeals.  See Aramburu v. Healthcare Fin. Servs., Inc., No. 02-cv-6535 (MDG), 2009 WL 1086938, at *3 (E.D.N.Y. Apr. 22, 2009) ("[T]he settlement provides certain compensation to the class members now rather than awaiting an eventual resolution that would result in further expense without any definite benefit."); In re BGI, Inc., 465 B.R. at 379 ("On the other hand, the Class Members would have received nothing if they were not successful.  Therefore, it is reasonable for the Class Members 'to take the bird in the hand instead of the prospective flock in the bush.'").

141.    As described in further detail in Section III.B.1 *supra*, Plaintiffs would almost certainly not receive a larger recovery through continued litigation than what they receive under the Settlement.  In any event, "[d]ollar amounts [in class action settlement agreements] are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  In re BGI, Inc., 465 B.R. at 381.

142.    The substantial relief provided for the Classes under the Settlement, when balanced against the delay, cost, expense, and risk of trial, particularly in light of the complex

Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) (ECF No. 183), 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

legal issues at play, demonstrates that the Settlement is fair, reasonable, and adequate for the Plaintiffs.  See Vigil v. Finesod, 779 F. Supp. 522, 526 (D.N.M. 1990) (explaining that if the result of rejecting the proposed settlement would be a complicated and expensive course of litigation that is unlikely to be superior to the proposed settlement, the settlement should be approved); Great Neck Capital Appreciation Inv. P'ship, L.P. v. PriceWaterhouseCoopers, LLP (In re Harnischfeger Indus., Inc.), 212 F.R.D. 400, 409-10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

143.    The remaining sub-factors set forth in Rule 23(e)(2)(C) do not change the result. The second sub-factor—the effectiveness of any proposed method of distributing relief—is aimed at "ensur[ing] that [the claim processing method] facilitates filing legitimate claims." Committee Notes.  Here, the proposed claim processing method will be determined following Court-approval of the Settlement and the estimation proceedings.  Any proposal will be subject to Court approval following notice and an opportunity for Plaintiffs to object.

144.    With respect to the third sub-factor—the terms of any proposed award of attorney's fees—the Advisory Committee explains that "the relief actually delivered to the class can be a significant factor in determining the appropriate fee award."  Id.  Here, procedures for payment of attorneys' fees will be determined following Court-approval of the Settlement and the estimation proceedings, when the relief actually delivered to the Classes will be known. These procedures will be subject to Court approval following notice and an opportunity for Plaintiffs to object.

145.    The final sub-factor—any agreement made in connection with the proposal—is irrelevant as no such agreement exists here.

146.    Accordingly, the relief provided for the Class weighs in favor of approving the Settlement Agreement.

## C.    The Settlement Treats Class Members Equitably Relative To Each Other.

147.    The fourth factor under Rule 23(e)(1)—whether the proposal treats class members equitably relative to each other—also concerns the substantive fairness of the proposal.  See Fed. R. Civ. P. 23(e)(1); Committee Notes.   "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways." Committee Notes.

148.    Here, the Settlement proceeds in three stages.  In the first stage (approval of the Settlement Agreement) and the second stage (estimation of Plaintiffs' claim), Class members have a common interest in maximizing the accordion through Plaintiffs' claims for damages against Old GM, which they are permitted to bring because Plaintiffs have suffered a common due process violation.  Apportionment of relief will be dealt with in the third stage, when the Signatory Plaintiffs (with the assistance of Magistrate Judge Cott as mediator in the MDL Action) will devise the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims and the eligibility and criteria for payment, subject to Court-approval following notice and an opportunity for Plaintiffs to object. Further, the scope of the Release affects all Class members in the same way.  Thus, the proposal treats Class members equitably.

149.    Accordingly, the considerations set forth in Rule 23(e) demonstrate that the Settlement is fair, reasonable, and adequate and should be approved by the Court

50

## **MEMORANDUM OF LAW**

150.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.  Accordingly, this Motion satisfies Local Rule 9013-1(a).  The Economic Loss Plaintiffs reserve all rights to file a memorandum of law in reply to any objection to this Motion.

## **NOTICE**

151.    Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [ECF No. 10183].  The Economic Loss Plaintiffs submit that no other or further notice need be provided.

## **CONCLUSION**

WHEREFORE, the Economic Loss Plaintiffs respectfully request that the Court enter the Preliminary Approval Order substantially in the form attached hereto as **Exhibit B**:  (i) extending Bankruptcy Rule 7023 to these proceedings; and (iii) approving the form and manner of notice; and, following the final fairness hearing, the Final Approval Order substantially in the form attached hereto as **Exhibit C**:  (i) granting class certification for settlement purposes; (ii) appointing class representatives and class counsel for settlement purposes; and (iii) approving the Settlement Agreement.

Dated: February 1, 2019
     New York, New York

                  Respectfully submitted,

                  */s/ Edward S. Weisfelner*
                  Edward S. Weisfelner
                  Howard S. Steel
                  BROWN RUDNICK LLP

Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted pro hac vice)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch Plaintiffs
and Certain Non-Ignition Switch Plaintiffs in the
MDL Court*