**HEARING DATE AND TIME: March 11, 2019 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: March 4, 2019 at 4:00 p.m. (Eastern Time)**

**DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas, 41st Floor
New York, New York  10036-2714
Telephone:  (212) 248-3140
Facsimile:  (212) 248-3141
E-mail: kristin.going@dbr.com;
        marita.erbeck@dbr.com;
Kristin K. Going
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| | : | |
| | : | **09-50026 (MG)** |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : | |
| **f/k/a General Motors Corp.,** *et al.* | : | **(Jointly Administered)** |
| | : | |
| **Debtors.** | : | |

------------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION OF MOTORS LIQUIDATION COMPANY**
**GUC TRUST TO APPROVE (I) THE GUC TRUST ADMINISTRATOR'S ACTIONS,**
**(II) THE SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY**
**PLAINTIFFS AND THE GUC TRUST PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105, 363, AND 1142 AND BANKRUPTCY RULES 3002, 9014 AND 9019**
**AND (III) AUTHORIZE THE REALLOCATION OF GUC TRUST ASSETS**

PLEASE TAKE NOTICE that on February 1, 2019, Wilmington Trust

Company, solely in its capacity as trust administrator and trustee (in such capacity, the "**GUC**

**Trust Administrator**"), of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"),

formed by the above-captioned debtors (collectively, the "**Debtors**") in connection with the

Debtors' Second Amended Joint Chapter 11 Plan dated March 18, 2011, (the "**Movant**") filed

a motion (the "**Motion**") for an order (1) approving the actions to be undertaken by the GUC

Trust Administrator under the terms of the Settlement Agreement[1] between and among the Signatory Plaintiffs and the GUC Trust; (ii) authorizing the reallocation of $13.72 million of GUC Trust Assets for notice costs; and (iii) approving, pursuant to Bankruptcy Rule 9019, the Settlement documented in the Settlement Agreement, which, *inter alia*, includes a class settlement of the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' claims, and settlement on an individual basis of certain Pre-Closing Accident Plaintiffs' claims, all as more fully described in the Motion, and that a hearing will be held before the Honorable Judge Martin Glenn, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on **March 11, 2019 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to this Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on (i) Drinker Biddle & Reath LLP, attorneys for Wilmington Trust Company as GUC Trust Administrator, 1177 Avenue of the Americas, 41st Floor, New York, New York 10166 (Attn: Kristin K. Going, Esq. & Marita S. Erbeck, Esq.); (ii) FTI Consulting, as the GUC Trust Monitor, 3 Times Square, 11th Floor New York, NY 10036 (Attn: Conor Tully); (iii) Paul, Weiss, Rifkind,

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion (defined herein).

Wharton & Garrison LLP, attorneys for the United States Department of the Treasury, 1285 Avenue of the Americas, New York, New York (Attn: Douglas R. Davis, Esq. and Lauren Shumejda, Esq.); (iv) the United States Department of the Treasury, 1500 Pennsylvania Avenue NW, Room 2312, Washington, D.C. 20220 (Attn: Erik Rosenfeld); (v) Vedder Price, P.C., attorneys for Export Development Canada, 1633 Broadway, 47th Floor, New York, New York 10019 (Attn: Michael J. Edelman, Esq. and Michael L. Schein, Esq.); (vi) Brown Rudnick LLP, designated counsel in the Bankruptcy Court for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, Seven Times Square, New York, New York 10036 (Attn: Edward S. Weisfelner, Esq. & Howard S. Steel, Esq.); (vii) Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation, designated counsel in the Bankruptcy Court for the Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs, 2323 Bryan Street, Suite 2200, Dallas, Texas 75201 (Attn: Sander L. Esserman, Esq.); (viii) Hagens Berman Sobol Shapiro LLC, co-lead counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court, 1301 2nd Avenue, Suite 2000, Seattle, Washington 98101 (Attn: Steve W. Berman, Esq.); (ix) Lieff Cabraser Heimann & Bernstein, LLP, co-lead counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court, 275 Battery Street, 29th Floor, San Francisco, California 94111 (Attn: Elizabeth J. Cabraser, Esq.); (x) Andrews Myers, P.C., counsel to certain Pre-Closing Accident Plaintiffs, 1885 St. James Place, 15th Floor, Houston, Texas 77056 (Attn: Lisa M. Norman, Esq. & T. Joshua Judd, Esq.); (xi) Cole Schotz, P.C., counsel for Certain Ignition Switch Pre-Closing Accident Plaintiffs Represented by The Cooper Firm and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019 (Attn:  Mark Tsukerman, Esq.) and (xii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York

96989552.2

10014 (Attn: William K. Harrington, Esq.), so as to be received no later than **March 4, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, Movant may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
         February 1, 2019

DRINKER BIDDLE & REATH LLP

By:   /s/   Kristin K. Going
         Kristin K. Going
         Marita S. Erbeck
         1177 Avenue of the Americas
         41st Floor
         New York, NY 10036-2714
         Tel: (212) 248-3140
         E-mail: kristin.going@dbr.com;
                 marita.erbeck@dbr.com;

         *Attorneys for the Motors Liquidation
         Company GUC Trust Administrator*

96989552.2

**DRINKER BIDDLE & REATH LLP**

1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Telephone:  (212) 248-3140
Facsimile:  (212) 248-3141
E-mail: kristin.going@dbr.com
       clay.pierce@dbr.com
       marita.erbeck@dbr.com
Kristin K. Going
Clay J. Pierce
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**HEARING DATE AND TIME: March 11, 2019**
**@ 10:00 a.m. (EDT)**
**OBJECTION DEADLINE: March 4, 2019**
**@ 4:00 p.m. (EST)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                          :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., | : | Case No.: 09-50026 (MG) |
|     f/k/a General Motors Corp., et al., | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------X

**MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST TO APPROVE**
**(I) THE GUC TRUST ADMINISTRATOR'S ACTIONS, (II) THE SETTLEMENT**
**AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS**
**AND THE GUC TRUST PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363,**
**AND 1142 AND BANKRUPTCY RULES 3002, 9014, AND 9019, AND (III) AUTHORIZE**
**THE REALLOCATION OF GUC TRUST ASSETS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION ........................................................................................................ 7

BACKGROUND ....................................................................................................... 7

I.  Old GM's Bankruptcy and the Creation of the GUC Trust ................................. 7

II.  The Recalls and Subsequent Proceedings In the Bankruptcy Court and Second Circuit ................................................................................................. 9

III.  Developments in the Bankruptcy Court Following the Second Circuit Opinion ........................................................................................................... 12

IV.  Plaintiffs' Alleged Claims Against Old GM ........................................... 15

V.  The Settlement Agreement ..................................................................... 18

RELIEF REQUESTED ........................................................................................... 21

BASIS FOR RELIEF REQUESTED ...................................................................... 22

I.  The Court Should Find that Entry into the Settlement is an Appropriate Exercise of the GUC Trust Administrator's Authority and Approve Actions Taken by the GUC Trust Administrator in Connection Therewith Pursuant to Section 8.1(e) of the GUC Trust Agreement ................................. 22

II.  The Bankruptcy Court Should Approve and Authorize the Reallocation of $13,720,000 of GUC Trust Assets ....................................................... 25

III.  The Settlement Will Confer Benefits Greater than Those that Would be Obtained Through Further Litigation ............................................................ 26

A.  Plaintiffs' Claims Raise Numerous Complex Litigation Issues ............. 28

1.  Litigation over Plaintiffs' Claims Raises Numerous Complex Issues ........................................................................... 28

2.  The Terms of the Settlement Agreement Outweigh the Risks of Continued Litigation ..................................................... 32

B.  The Benefits of Settling Exceed the Potential Benefits of Continued Litigation ................................................................. 34

C.  The Settlement Agreement Satisfies the Remaining *Iridium* Factors ...... 35

NOTICE .................................................................................................................. 36

CONCLUSION ....................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Ad Hoc Comm. Of Personal Injury Asbestos Claimants v. Dana Corp. (In re
    Dana Corp.)
    412 B.R. 53 (S.D.N.Y. 2008)...................................................................34

In re Adelphia Commc'ns Corp.,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005)...................................................27

Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.),
    156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994)........26

In re Am. Home Mort. Inv. Trust
    2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867 .......22

In the Matter of the Application of U.S. Bank Nat'l Ass'n,
    No. 651625/2018.....................................................................................22

In re Arts de Provinces de France, Inc.,
    153 B.R. 144 (Bankr. S.D.N.Y. 1993)...................................................30

In re Chateaugay Corp.,
    10 F.3d 944 (2d Cir. 1993)................................................................30, 31

In re Hibbard Brown & Co., Inc.,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998).................................................26, 27

Mosser v. Darrow,
    341 U.S. 267 (1951)................................................................................22

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
    478 F.3d 452 (2d Cir. 2007)........................................................... passim

In re Motors Liquidation Co.,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub
    nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d
    Cir. 2016) ...................................................................................... passim

Nellis v. Shugrue,
    165 B.R. 115 (S.D.N.Y. 1994)...............................................................26

Newman v. Stein,
    464 F.2d 689 (2d Cir. 1972)...................................................................26

In re Peierls Family Inter Vivos Trusts,
    59 A.3d 471 (Del. Ch. 2012)..................................................................22

Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.,
    507 U.S. 380 (1993).................................................................................................... *passim*

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
    390 U.S. 414 (1968)..............................................................................................................27

In re PT-1 Commc'ns, Inc.,
    292 B.R. 482 (Bankr. E.D.N.Y. 2003)...............................................................................30

In re Purofied Down Prods. Corp.,
    150 B.R. 519 (S.D.N.Y. 1993)............................................................................................26

In re Residential Capital, LLC,
    Case No. 12-12020 (MG), 2015 WL 515387 (Bankr. S.D.N.Y. Feb. 6, 2015).......................29

In re Tronox Inc.,
    No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17, 2015) .22, 23, 24

In re W.T. Grant, Co.,
    699 F.2d 599 (2d Cir. 1983)...............................................................................................27

**STATUTES, RULES & REGULATIONS**

11 U.S.C. § 105(a) ......................................................................................................... *passim*

11 U.S.C. § 363..............................................................................................................1, 7, 21

11 U.S.C. § 502(h) ................................................................................................................33

11 U.S.C. § 1142..........................................................................................................1, 7, 21

28 U.S.C. § 157......................................................................................................................7

28 U.S.C. § 157(b)(2)(A)........................................................................................................7

28 U.S.C. § 1334....................................................................................................................7

28 U.S.C. § 1408....................................................................................................................7

28 U.S.C. § 1409....................................................................................................................7

Fed. R. Bankr. P. 3002..................................................................................................1, 7, 21

Fed. R. Bankr. P. 9014..................................................................................................1,7, 21

Fed. R. Bankr. P. 9019 ................................................................................................. *passim*

By and through its undersigned counsel, the GUC Trust Administrator[1] of the Motors Liquidation Company GUC Trust (the "GUC Trust"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 [ECF No. 9836] (as confirmed, the "Plan") of the above-captioned post-effective date debtors (the "Debtors"), respectfully submits this *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions, (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019, and (III) Authorize the Reallocation of GUC Trust Assets* (the "**Motion**"), seeking entry of an order approving the Settlement Agreement and the actions taken by the GUC Trust in furtherance of the Settlement Agreement (as defined herein).  In support of this Motion, the GUC Trust Administrator respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      By this Motion, the GUC Trust asks this Court to approve the actions the GUC Trust Administrator proposes to undertake pursuant to the terms of the Settlement Agreement, approve the Settlement between and among it and certain Ignition Switch Plaintiffs,[2] certain Non-Ignition Switch Plaintiffs,[3] and certain Pre-Closing Accident Plaintiffs[4] (collectively, the

---

[1]  Capitalized terms not defined herein shall have the meaning ascribed to them in the Settlement Agreement, the Plan or the GUC Trust Agreement, as applicable. Any description herein of the terms of the Plan or the GUC Trust Agreement is qualified in its entirety by the terms of the Plan or the GUC Trust Agreement, as applicable.

[2]  The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[3]  The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

[4]  The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident that occurred prior to the Closing Date involving an Old GM vehicle that was later subject to Recall Nos. 14V-118, 14V-153, 14V-355, 14V-394, 14V-400,  and 14V-540 and who have signed the Settlement Agreement. Collectively, the

1

"**Signatory Plaintiffs,**" and together with the GUC Trust, the "**Parties**") and authorize the GUC Trust to reallocate $13,720,000 in GUC Trust Assets for the cost of notice more fully described herein.  As set forth more fully below, among other things, the Settlement resolves many of the issues arising from the Late Claims Motions (defined below) in a global fashion, correcting the historic pattern of piecemeal litigation of Plaintiffs' claims.

2.      On April 21, 2014, New GM filed its first of three motions with this Court seeking a ruling that owners of Old GM vehicles that were the subject of recalls conducted by New GM were barred from asserting claims against New GM.[5]  New GM's request precipitated years of litigation in this Court involving numerous parties and a host of complex issues, including, but not limited to, whether the Signatory Plaintiffs and other plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds), whether the Plaintiffs' asserted claims are equitably moot, whether additional grounds exist to object to the Plaintiffs' asserted claims, and the amount of said claims in the event that they are allowed.

3.      Litigation of these issues has been ongoing for several years, and has consumed significant time, money and resources from the parties and the Bankruptcy Court.  Nevertheless, key disputes between the Parties remain unresolved.  For example, in the April 2015 Decision, the Bankruptcy Court ruled that Old GM failed to provide Ignition Switch Plaintiffs with

---

Pre-Closing Accident Plaintiffs who have signed the Settlement Agreement, the Ignition Switch Plaintiffs, and the Non-Ignition Switch Plaintiffs are "**Plaintiffs**."

[5]     See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, dated April 21, 2014* [ECF No. 12620], *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in* Pre-Closing Accident Lawsuits, dated Aug. 1, 2014 [ECF No. 12807] and *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions), dated Aug. 1, 2014* [ECF No. 12808].

constitutionally proper notice of the Bar Date.[6]  While the Bankruptcy Court ruled that assets of

the GUC Trust could not be tapped to pay any late claims that might be allowed as a result of the

doctrine of equitable mootness, the Second Circuit vacated this holding as an advisory opinion—

leaving open the question of the applicability of equitable mootness.[7]  In addition, there is an on-

going dispute as to whether an additional showing under the factors articulated in Pioneer

Investment Services Co. v. Brunswick Associates Ltd., 507 U.S. 380 (1993) is required for

Plaintiffs to obtain leave to file late claims.  In the event Plaintiffs are granted leave to file late

claims, the allowance and amount of such claims would also have to be litigated, a process that

could take years.

4.        Continuation of protracted litigation on the foregoing and related issues will deplete

remaining GUC Trust Assets, delay any further GUC Trust distributions, and subject the Parties

to uncertain results.  In an effort to avoid these risks, the GUC Trust, Co-Lead Counsel for Ignition

Switch and certain Non-Ignition Switch Plaintiffs, counsel for certain Pre-Closing Accident

Plaintiffs and the Participating Unitholders engaged in good faith, arms'-length negotiations

concerning a potential settlement (the "**Initial Settlement**") that would resolve the many disputes

surrounding those  plaintiffs' ability to file late proposed class claims that seek relief for: (i)

economic losses related to Old GM's alleged concealment of safety defects in ignition switches

(including the Ignition Switch Defect and similarly defective ignition switches), side airbags, and

power steering and (ii) personal injury and wrongful death claims against the GUC Trust related

to Old GM vehicles subject to the Recalls.

---

[6]    See In re Motors Liquidation Co., 529 B.R. 510, 573-74, 583 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016) (the "**April 2015 Decision**").

[7]    See In re Motors Liquidation Co., 529 B.R. at 529; Elliott, 829 F.3d at 168-69.

5.    As discussed in the Court's *Memorandum Opinion and Order Regarding Motion to Enforce the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust*, dated January 18, 2018 [ECF No. 14212] (the "**Settlement Decision**"), the GUC Trust determined ultimately not to execute the Initial Settlement.  Following the Court's issuance of the Settlement Decision, the GUC Trust retained new counsel, and after termination of a forbearance agreement with New GM; the GUC Trust, the Participating Unitholders, the Co-Lead Counsel for the Ignition Switch and certain Non-Ignition Switch Plaintiffs, and counsel for certain Pre-Closing Accident Plaintiffs resumed their good faith, arms'-length negotiations and entered into a settlement agreement on April 24, 2018 (and amended on May 22, 2018) (the "**Prior Settlement**").[8]  The Court held that the Prior Settlement as drafted could not be approved unless the Ignition Switch and certain Non-Ignition Switch Plaintiffs could certify one or more classes under Rule 23 and denied the Initial 9019 Motion without prejudice.[9]

6.    Further good faith, arms'-length negotiations between the Signatory Plaintiffs, the GUC Trust, and the Participating Unitholders following this decision culminated in the Parties' agreement to the settlement that is the subject of this Motion (the "**Settlement**," and the agreement documenting it, the "**Settlement Agreement**").  The Settlement Agreement includes a class settlement of the Ignition Switch Plaintiffs' and Non-Ignition Switch Plaintiffs' claims, and settlement on an individual basis of certain Pre-Closing Accident Plaintiffs' claims.

7.    Following entry of the Preliminary Approval Order (as defined in the Settlement Agreement), the Parties request that this Court enter an order:  (i) approving the actions of the

---

[8]    See *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions and (II) the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002 and 9019 and to (III) Authorize the Reallocation of GUC Trust Assets*, dated May 3, 2018 [ECF No. 14293] (the "**Initial 9019 Motion**").

[9]    See In re Motors Liquidation Co., 591 B.R. 501 (Bankr. S.D.N.Y. 2018) (the "**Rule 23 Decision**").

GUC Trust Administrator in entering into the Settlement; (ii) authorizing the GUC Trust to reallocate up to $13.72 million in GUC Trust Assets to pay for noticing costs.

8.    Further, simultaneous with the entry of an order (the "**Final Approval Order**"), which shall (i) grant class certification for settlement purposes with respect to the Ignition Switch and Non-Ignition Switch Plaintiffs; and (ii) appoint class representatives and class counsel for Rule 23(a) and (g) settlement certification purposes, following notice and an opportunity to be heard at a final fairness hearing, the GUC Trust requests this Court approve the Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and order that all Plaintiffs have waived and released any rights or claims against the GUC Trust, Wilmington Trust Company as trust administrator and trustee of the GUC Trust (the "**GUC Trust Administrator**"), FTI Consulting, Inc., as monitor of the GUC Trust (the "**GUC Trust Monitor**"), the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**") and holders of beneficial interests in the GUC Trust (the "**Unitholders**").  By its terms, the waiver and release applies to those Plaintiffs' claims or rights, including any rights to any assets that are presently in the GUC Trust and any distributions that have previously been made to Unitholders (collectively, "**GUC Trust Assets**") and to distributions that have or will be made by the Avoidance Action Trust (the "**Release**").  In so doing, the waiver and release provides finality and certainty to the GUC Trust and Unitholders (regardless of whether or in what amount, the Claims Estimate Order (defined below) may ultimately be entered), protects against the risk of claw-back or recapture of prior distributions of GUC Trust Assets and eliminates delay in the GUC Trust wind-down process and distribution of assets.

9.    In exchange, under the Settlement Agreement, the GUC Trust agrees to pay up to $13,720,000 for the cost of notice to the putative class, and, after entry of the Final Approval

Order, to file a motion (the "**Estimation Motion**") seeking entry of an order (the "**Claims Estimate Order**") that would estimate the amount of Plaintiffs' claims, in an amount that may (depending on the amount of the Court's estimate) trigger New GM's obligation to issue additional shares of New GM common stock (the "**Adjustment Shares**") pursuant to the terms of the Sale Agreement.[10]  Pursuant to the terms of the Settlement Agreement, any Adjustment Shares would be set aside for the exclusive benefit of the Plaintiffs.

10.     Approval of the Settlement Agreement is appropriate under Bankruptcy Rule 9019. The Settlement resolves all issues arising from the Late Claims Motions in a global fashion, correcting the historic pattern of piecemeal litigation of Plaintiffs' claims.  This includes a host of complex issues, including, but not limited to, whether the Signatory Plaintiffs should be granted authority to file late proofs of claim (and whether such authority can be granted solely on due process grounds), whether the Plaintiffs' claims are equitably moot, whether additional grounds exist to object to the Plaintiffs' claims, and the amount of said claims in the event that they are allowed.

11.     The Settlement Agreement resulted from extensive, good faith negotiations between experienced counsel to reasonably resolve the many issues arising out of the Late Claims Motions.  This Court should approve the Settlement because it will substantially reduce costs and the expenditure of resources, eliminate the risk of uncertain litigation outcomes, and prevent

---

[10]     Upon entry of the Claims Estimate Order, all Adjustment Shares will be placed in a fund for the exclusive benefit of Plaintiffs.  The Signatory Plaintiffs will subsequently propose the allocation of the value of the Adjustment Shares between economic loss claims and personal injury/wrongful death claims, the eligibility and criteria for payment, and the procedures for payment of attorneys' fees, which shall be subject to an order of this Court after notice and an opportunity to be heard.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.  Under the Final Approval Order, the GUC Trust, Unitholders, and defendants in the Term Loan Avoidance Action, via agreement and/or notice and an opportunity to be heard, shall be found to have waived any rights to the Adjustment Shares.

further delay in distributions of remaining GUC Trust Assets, without disturbing the recovery expectations of other creditors and Unitholders. Moreover, the Settlement Agreement establishes a streamlined process for allowing Plaintiffs' claims and providing Plaintiffs a source of recovery from the Adjustment Shares. Again, regardless of whether the Claims Estimate Order is ultimately entered, the waivers and releases by Plaintiffs that are set forth in the Settlement will be binding on all Parties, subject only to approval of the Final Approval Order. In light of the inherent risks and costs associated with litigation, the Settlement Agreement is fair, reasonable, and adequate, and clearly falls above the lowest rung in the range of reasonableness and should be approved under Bankruptcy Rule 9019. Moreover, the Settlement Agreement was the result of good faith, arms'-length negotiations by counsel. Accordingly, the Court should approve the Settlement Agreement pursuant to Bankruptcy Rule 9019 as a fair, reasonable, adequate, and equitable resolution of the ongoing litigation between the Parties.

## **JURISDICTION**

12.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

13.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The statutory predicates for the relief sought in this Motion are Bankruptcy Code sections 105(a), 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019.

## **BACKGROUND**

### I.     **Old GM's Bankruptcy and the Creation of the GUC Trust.**

15.     On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, the "**Debtors**") filed for chapter 11 bankruptcy protection in this Court and entered into an agreement (the "**Sale Agreement**") to sell substantially all of its assets to NGMCO,

Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants.  See In re Motors Liquidation Co., 529 B.R. at 535.

16.    The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount (the "**Purchase Price Adjustment**").  See AMSPA § 3.2(c).[11]  Specifically, the Purchase Price Adjustment provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  See id.  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares that may be required under the AMSPA.  See id.

17.    On July 5, 2009, the sale was approved by the Bankruptcy Court.  See Elliott, 829 F.3d at 146-47.

18.     In September 2009, the Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529 B.R. at 535.

19.    On March 29, 2011, the Court entered an order confirming the Plan, which, among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in the GUC Trust Agreement.  See id. at 535-36.

---

[11]    See *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

20.     Pursuant to the Plan, the GUC Trust Agreement, and a side letter by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011 (the "**Side Letter**"), the GUC Trust was granted exclusive authority to object to the allowance of general unsecured claims, seek estimation of the amount of allowed general unsecured claims, and seek Adjustment Shares from New GM.  See Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.

21.     In February 2012, the Court entered an order providing that any claims filed after entry of the order would be deemed disallowed unless, *inter alia*, the claimant obtained leave of the Court or written consent of the GUC Trust.[12]

22.     As of December 31, 2018, the total amount of Allowed General Unsecured Claims against the Debtors' estate was $31,855,431,837.00 approximately $3.1 billion below the threshold for triggering the issuance of Adjustment Shares under the AMSPA.[13]

## II.     The Recalls and Subsequent Proceedings
##         In the Bankruptcy Court and Second Circuit.

23.     In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047, impacting approximately 2.1 million vehicles. After this first wave of recalls, New GM issued additional recalls in June, July and September of 2014 concerning defective ignition switches affecting approximately 10 million additional vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, and 14V-540.

---

[12]    See *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**").

[13]    See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of Dec. 31, 2018, dated Jan. 24, 2019* [ECF No. 14402].

24.     New GM issued a multitude of other recalls for safety defects throughout 2014. These included a recall issued in March 2014 pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March 2014 pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14V-153.

25.     After the issuance of these recalls (collectively, the "**Recalls**"), many owners and lessees of defective Old GM and New GM vehicles filed lawsuits against New GM.  New GM sought to enjoin that litigation by filing motions to enforce the Sale Order in the Bankruptcy Court. Specifically, New GM filed the following motions:

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated Apr. 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**");

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 [ECF No. 12807] (the "**Pre-Closing Accident Plaintiffs Motion to Enforce**")[14];

- *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-**

---

[14]     The claims sought to be enjoined in that motion were limited to personal injury and wrongful death claims resulting from vehicles with the Ignition Switch Defect (*i.e.*, Recall No. 14V-047).  The Pre-Closing Accident Plaintiffs Motion to Enforce was also filed in conjunction with the launch of the Feinberg Protocol which "provided eligible Plaintiffs with an alternative (*i.e.*, a source of recovery under the Feinberg Protocol) to the enforcement of the Sale Order and Injunction against them."  According to the Pre-Closing Accident Plaintiffs Motion to Enforce, the Feinberg Protocol was developed and designed "for the submission, evaluation, and settlement of death or physical injury claims resulting from accidents allegedly caused by defective ignition switches in certain vehicles."  *Pre-Closing Accident Plaintiffs Motion to Enforce* [ECF No. 12807] at 2.

**Ignition Switch Plaintiffs Motion to Enforce**" and together with the Ignition Switch Plaintiffs Motion to Enforce and the Pre-Closing Accident Plaintiffs Motion to Enforce, the "**Motions to Enforce**").

26.    In large part, the prosecution of the Motions to Enforce set in motion litigation over Plaintiffs' late claims that was piecemeal and disjointed.  In furtherance of resolution of the Ignition Switch Plaintiffs Motion to Enforce, on or about July 11, 2014, the Bankruptcy Court entered a *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929* [ECF No. 12770] (the "**Supplemental Scheduling Order**").[15]   The Supplemental Scheduling Order identified four threshold issues (the "**2014 Threshold Issues**") to be determined, including whether any of the claims in these actions were claims against Old GM and, if so, whether such claims should "nevertheless be disallowed/dismissed on grounds of equitable mootness . . . ." Id.[16]  The Supplemental Scheduling Order also required the parties to submit to the Bankruptcy Court on or before August 8, 2014 agreed upon stipulations of fact and to jointly identify any facts that could not be stipulated to with respect to the Four Threshold Issues,[17] and established a briefing schedule for the Four Threshold Issues.

---

[15]    The Supplemental Scheduling Order superseded the *Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929* entered on May 16, 2014 [ECF No. 12697] (the "**May 2014 Scheduling Order**").  Among other things, the May 2014 Scheduling Order identified five (5) threshold issues to be resolved and required the submission of agreed-upon stipulations of fact to the Bankruptcy Court by July 1, 2014.

[16]    Notably, the only vehicles covered by the 2014 Threshold Issues briefing were those with the Ignition Switch Defect.

[17]    On August 8, 2014, New GM, certain Plaintiffs by and through Designated Counsel, the Groman Plaintiffs, the GUC Trust, and the Unitholders filed the *Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014* [ECF No. 12826] (the "**August 8, 2014 Stipulations of Fact**").

27.     This schedule was later applied to the Pre-Closing Accident Plaintiffs Motion to Enforce, which was limited to accidents involving vehicles with the Ignition Switch Defect.  *See Scheduling Order Regarding Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits* [ECF No. 12897].

28.     On April 15, 2015, the Bankruptcy Court issued its *Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., 529 B.R. 510 (the "Enforcement Decision") [ECF No. 13109].  The Bankruptcy Court held that the Ignition Switch Plaintiffs were known creditors who did not receive constitutionally adequate notice of the Sale or Bar Date.  See id. at 574.

29.     The Bankruptcy Court further held that while "late claims filed by the Plaintiffs might still be allowed, assets transferred to the GUC Trust under the Plan could not now be tapped to pay them" under the doctrine of equitable mootness.  Id. at 529; see also June 2015 Judgment ¶ 6.  On direct appeal, the Second Circuit vacated this equitable mootness ruling as an advisory opinion.  See Elliott, 829 F.3d at 168-69.

30.     The Non-Ignition Switch Plaintiffs Motion to Enforce, which was limited to plaintiffs asserting economic loss claims and did not cover accident plaintiffs, was deferred pending resolution of the Ignition Switch Plaintiffs Motion to Enforce.  See In re Motors Liquidation Co., 529 B.R. at 523.  It has not yet been determined whether any non-ignition switch plaintiffs suffered a due process violation in connection with the entry of the Sale Order or the Bar Date Order.

### III.     Developments in the Bankruptcy Court Following the Second Circuit Opinion.

31.     On or about December 13, 2016, on remand from the Second Circuit's opinion vacating the equitable mootness ruling and making clear the due process violation, the Bankruptcy Court issued the *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with*

*Claims Asserted Against General Motors LLC That Involve Vehicles Manufactured by General Motors Corporation* [ECF No. 13802] (the "**Order to Show Cause**"). The Order to Show Cause identified five (5) threshold issues (the "**2016 Threshold Issues**") for resolution in light of the Second Circuit decision. Relevant here is the issue of whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs [defined in the Order to include plaintiffs asserting both economic loss and personal injury or wrongful death claims] satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot (the "**Late Proof of Claim Issue**")."[18]

32.    The Order to Show Cause also established a December 22, 2016 deadline to file motions seeking authority to file late claims ("**Late Claims Motions**").[19]  See Order to Show Cause at 5 ¶ 1. No additional issues (such as class certification, discovery, or the merits of a late proof of claim) would be addressed in these motions. See id. In addition, the procedures provided that briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues. See id. at 5 ¶ 2.

33.    In accordance with the Order to Show Cause, on December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident

---

[18]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3.

[19]    Pursuant to an Order to Show Cause, on December 22, 2016, the Economic Loss Plaintiffs and certain Pre-Closing Accident Plaintiffs who had not received notice of the Order to Show Cause, filed motions for authority to file late proofs of claim [ECF Nos. 13806, 13807], including late class proofs of claim; on July 28, 2017, certain Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14018], as supplemented on August 10, 2017, September 19, 2017, December 12, 2017 and July 19, 2018 [ECF Nos. 14046, 14112, 14195, 14346]; and on July 27, 2018, certain Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14350]. Pursuant to the Order to Show Cause, certain other Plaintiffs have filed joinders to these motions [ECF Nos. 13811, 13818]. On May 25, 2018, certain Pre-Closing Accident Plaintiffs filed a supplemental Late Claims Motion [ECF No. 14325]. The term "Late Claims Motions" as defined in this Motion encompasses all of these filings.

Plaintiffs filed Late Claims Motions.[20]  The motions attached proposed proofs of claim, including proposed class proofs of claim asserted on behalf of purported class representatives for Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf of certain Pre-Closing Accident Plaintiffs.  See id.[21]  Certain other Plaintiffs subsequently filed joinders to the Late Claims Motions pursuant to the terms of the Order to Show Cause.

34.    Thereafter, in connection with the Ignition Switch Plaintiffs' and certain Pre-Closing Accident Plaintiffs' Late Claims Motions, the parties participated in two status conferences before the Bankruptcy Court, engaged in preliminary rounds of discovery, and filed briefs addressing two preliminary issues raised in the Late Claims Motions: (i) whether relief can be granted absent a showing of excusable neglect under the Pioneer factors; and (ii) the applicability of any purported agreements with the GUC Trust or other tolling arrangements to toll timeliness objections (the "**Initial Late Claims Motions Issues**").[22]  Subsequent to such briefing, certain Plaintiffs who had not previously appeared before the Bankruptcy Court filed motions seeking authority to file late proofs of claim.

---

[20]    See *Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[21]    On April 24, 2018, the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed amended proposed class proofs of claim.  See *Notice of Filing of Amended Exhibits to Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Apr. 25, 2018 [ECF No. 14280].

[22]    See *Order Establishing, Inter Alia, Briefing Schedule for Certain issues Arising from Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Pre-Closing Accident Plaintiffs*, dated Mar. 2, 2017 [ECF No. 13869]; *Opening Brief by General Motors LLC with Respect to Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13871]; *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872]; *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873]; *Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Mar. 6, 2017 [ECF No. 13874].

IV.    **Plaintiffs' Alleged Claims Against Old GM.**

35.    The proposed class claims addressed in the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' Late Claims Motions (the "**Proposed Class Claims**") allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.[23] The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices and avoiding the costs of a recall.[24]

36.    Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[25]

37.    Certain Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by vehicles subject to Recall No.14V-047. Certain other Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising from accidents they assert were caused by vehicles subject to Recall Nos. 14V-118, 14V-153, 14V-355, 14V-394, 14V-400,  and 14V-540 (collectively, the "**Personal Injury Claims**," and together with the Proposed Class Claims, the "**Claims**").

---

[23]    See Amended Exhibit A to the Economic Loss Late Claim Motion (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 57-285; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**") ¶¶ 38-175.

[24]    See, e.g., Proposed Ignition Switch Class Claim ¶ 374; Proposed Non-Ignition Switch Class Claim ¶ 278.

[25]    See Proposed Ignition Switch Class Claim ¶¶ 358-1697; Proposed Non-Ignition Switch Class Claim ¶¶ 262-1744.

38.     New GM has consistently taken the position that the Claims are properly asserted against the GUC Trust and not against New GM.[26]

39.     Subsequent to filing the Late Claims Motions, counsel for the proposed class representatives for the Ignition Switch Plaintiffs, the proposed class representatives for certain Non-Ignition Switch Plaintiffs, and counsel for certain Pre-Closing Accident Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the factual background for their Claims, the alleged viability of the asserted Claims and the alleged amount of damages (the "**Proffered Evidence**").

40.     In addition, they provided a report by Stefan Boedeker, an expert on surveys and statistical sampling, analyzing the amount of alleged damages for the Ignition Switch Plaintiffs' and certain Non-Ignition Switch Plaintiffs' claims based on a conjoint analysis conducted by Mr. Boedeker and the Berkeley Research Group.

41.     Conjoint analysis is a set of econometric and statistical techniques developed to study consumer preferences and is widely used as a market research tool.  In a conjoint analysis, study participants review a set of products with different attributes (such as a vehicle shown in different colors) and choose which product they would prefer to purchase.  The collected data can be used to determine market preferences and the value consumers place on particular attributes of a product.  Here, the alleged amount of damages for economic loss claims was determined by using a conjoint analysis to evaluate the difference in value that consumers placed on an Old GM vehicle

---

[26]     The record is replete with attempts by New GM to saddle the Old GM estate with these potentially massive claims. "To the extent Plaintiffs can prove that they are entitled to any relief, the appropriate remedy is to permit them to seek allowance of an unsecured claim against the Old GM bankruptcy estate."  Dkt. 12981 (New GM's 2014 Threshold Issues Br.) at 53; "To the extent they had any claim, it was against Old GM and they retained that claim after the 363 Sale." Id. at 36; "Every one of their claims, the economic loss plaintiffs' claims, is a claim that's assertable against Old GM as it relates to an Old GM vehicle."  Hr'g Tr. Feb. 17, 2015 at 59:17-19 (New GM counsel Arthur Steinberg).

without a defect as compared to an identical vehicle with a defect. Conjoint studies were conducted where the defect was described as causing physical harm and death, as well as where the defect was described as involving no physical harm or death.

42.    Following rulings by Judge Furman in the multi-district proceeding pending in the United States District Court for the Southern District of New York regarding the viability of claims in certain states, counsel for the Named Plaintiffs provided the GUC Trust with refined estimates of the amount of damages. Counsel started with median estimates of damages per vehicle based on the conjoint analysis, and multiplied that by the number of defective Old GM vehicles in each state without a manifestation requirement. Depending on which estimate was used (*i.e.*, the estimate based on a defect causing physical harm and death, or the estimate based on time-to-recall), the estimated damages could equal or exceed $77 billion.

43.    Certain Pre-Closing Accident Plaintiffs provided materials describing the personal injury and wrongful death claims of certain plaintiffs and demonstrating the alleged value of these claims based on exemplar verdict amounts. The valuation of damages was assessed and approved by W. Mark Lanier, an experienced trial attorney recognized as a leader in the field.

44.    The valuation of these plaintiffs' asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA. While the GUC Trust disputes that Plaintiffs are entitled to this (or any) level of damages, it recognizes that there is no guarantee that it would be able to defeat or reduce such damages claims if the issues were litigated.

45.    Likewise, New GM has presented the GUC Trust Administrator with expert reports and other evidence attempting to discredit the Proffered Evidence and also support its position in these bankruptcy cases and other related litigation ("**New GM Evidence**"). New GM offers no

alternative damage valuation method. Rather, New GM alleges that there is simply no basis for economic loss or personal injury damages.

46.      While the GUC Trust believes there are legal and factual arguments that refute the damages asserted in the Proffered Evidence, it recognizes that there is no guarantee that it would be able to defeat or reduce such damages claims if the issues were litigated. At a minimum, the GUC Trust believes that such litigation would be expensive and time consuming. Thus, after reviewing the Proffered Evidence, the New GM Evidence, and in consultation with the GUC Trust Monitor, and considering the benefits of the Settlement as a whole to the Unitholders to whom it owes its fiduciary duty, the GUC Trust has concluded that the Settlement falls well within the range of reasonableness.

## V.     **The Settlement Agreement.**

47.      Following the filing of the Late Claims Motions, the Parties engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old GM estate and the assets held and previously distributed by the GUC Trust. After the Court issued the Settlement Decision, and after the expiration of the forbearance agreement between the GUC Trust and New GM, the GUC Trust conducted extensive additional negotiations with the Plaintiffs and New GM. The GUC Trust also reviewed voluminous materials regarding the merits and potential value of Plaintiffs' claims that were provided by each side of the dispute (*i.e.*, Plaintiffs and New GM). As a result of these additional negotiations, the GUC Trust, Co-Lead Counsel for Ignition Switch and certain Non-Ignition Switch Plaintiffs, counsel for certain Pre-Closing Accident Plaintiffs and the Participating Unitholders entered into the Prior Settlement. The Court held in the Rule 23 Decisions that the Prior Settlement as drafted could not be approved unless the Ignition Switch and certain Non-Ignition Switch Plaintiffs could certify one or more classes under

Rule 23, and denied the Initial 9019 Motion without prejudice.

48.    Following the Rule 23 Decisions, the Signatory Plaintiffs, the GUC Trust, and the

Participating Unitholders engaged in further good faith, arms'-length negotiations.  As a result of

these further negotiations, the Parties executed the Settlement Agreement that is the subject of this

Motion.

49.    The Settlement Agreement resolves the Late Claims Motions (including the Initial

Late Claim Motions Issues) filed by the Signatory Plaintiffs, and provides a mechanism

(estimation) for the determination of the allowance of the Signatory Plaintiffs' claims, and the

Signatory Plaintiffs' rights to GUC Trust Assets.  The Settlement Agreement also places the

asserted claims of all Signatory Plaintiffs on the same track, correcting, for the most part, the

disjointed approach introduced by New GM.

50.    The key terms of the Settlement Agreement are as follows:[27]

**Notice Costs:**

   a.    The GUC Trust agrees to pay the reasonable costs and expense for Court-approved
         notice of the Settlement to the Classes and Pre-Closing Accident Plaintiffs in an amount
         not to exceed $13.72 million.[28]

**Condition Precedent to the Settlement Agreement:**

   b.    The Settlement set forth in the Settlement Agreement becomes effective on the date the
         Final Approval Order is entered (the "**Settlement Effective Date**").

**Plaintiffs' Release:**

---

[27]    This summary of the Settlement Agreement is qualified in its entirety by the terms and provisions of the
Settlement Agreement.  To the extent that there are any inconsistencies between the description of the Settlement
Agreement contained in the Motion and the terms and provisions of the Settlement Agreement, the Settlement
Agreement shall control.  A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

[28]    The GUC Trust's agreement to pay up to $13.72 million of notice costs under the Settlement Agreement is an
increase from the $6 million notice cost cap amount under the Prior Settlement Agreement.  In exchange for this
increase in notice funding, and the practical reality that these amounts must now be paid prior to receiving any
release from the Plaintiffs, under the Settlement Agreement, the GUC Trust is not making the $15 million
settlement amount payment to the Plaintiffs that was contemplated under the Prior Settlement Agreement.

   c.   Upon the Settlement Effective Date, the Plaintiffs will be deemed to irrevocably waive and release all claims against the GUC Trust, including a release of any rights to prior distributions of or current GUC Trust Assets and any rights to distributions by the Avoidance Action Trust, and waive jury trial rights with regard to fixing the amount of individual claims that are estimated for allowance purposes and entitlement to any value from the Adjustment Shares (the "**Waiver Provision**").

**Settlement Fund:**

   d.   In light of the benefits of the Settlement, the GUC Trust agrees that, subject to the entry of the Final Approval Order, it will seek the entry of a Claims Estimate Order that: (i) estimates the aggregate allowed General Unsecured Claims of Plaintiffs against Sellers and/or the GUC Trust pursuant to Section 5.1 of the GUC Trust Agreement, Section 7.3 of the Plan, Section 3.2(c) of the AMSPA, and the Side Letter, in an amount that, as of the date of the Estimation Order, could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares; and (ii) directs that, subject to Section 7 of the Settlement Agreement, any such Adjustment Shares issued as a result of an Estimation Order, or the value of such Adjustment Shares be promptly delivered by New GM to a trust, fund or other vehicle (the "**Settlement Fund**") established and designated by the Signatory Plaintiffs for the exclusive benefit of Plaintiffs.

   e.   Certain Pre-Closing Accident Plaintiffs consent to estimation of their personal injury and wrongful death claims by this Court solely for the purposes of determining the aggregate Allowed General Unsecured Claims for a Claims Estimate Order, and waive any related jury trial rights.

   f.   Under the Final Approval Order, all Unitholders, all defendants in the Term Loan Avoidance Action, and all holders of Allowed General Unsecured Claims, other than the Plaintiffs, via notice and bar order, will be deemed to irrevocably waive and release any and all rights to the Adjustment Shares.

**Settlement Payments And Attorneys' Fees:**

   g.   Subject to notice, an opportunity for Plaintiffs to object, and approval by the Bankruptcy Court, the Signatory Plaintiffs will determine the overall allocation of the value of the Settlement Fund between economic loss claims and personal injury/wrongful death claims, the eligibility and criteria for payment, and procedures for payment of attorneys' fees.

   h.   Notice of the proposed allocation, proposed eligibility and criteria for payment, and proposed procedures for payment of attorneys' fees will be posted on a settlement website, along with information about the hearing date and how and when to assert any objections.

   i.   **Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from the Adjustment Shares (or their value), if any, or any other consideration contained in the Settlement Fund.**

**No Waiver Of Claims Against New GM:**

j. Nothing in the Settlement Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Settlement Agreement or any payments made in connection therewith represent full satisfaction of any claims against Old GM, unless and until such claims are, in fact, paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the GUC Trust in respect of their claims or otherwise, other than the Adjustment Shares.

k. Except as mandated otherwise under applicable law, nothing in the Settlement Agreement shall waive any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff, and neither Adjustment Shares nor any distribution thereof to any Plaintiff shall represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved.

l. The Bankruptcy Court's estimate of the aggregate Allowed General Unsecured Claims in the Claims Estimate Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

51. Under the Settlement Agreement, the "**Ignition Switch Class**" is defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047. The "**Non-Ignition Switch Class**" (together with the Ignition Switch Class, the "**Classes**") is defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-118, 14V-153, 14V-355, 14V-394, and 14V-400.

## RELIEF REQUESTED

52. By this Motion, the GUC Trust respectfully requests that this Court, pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019: (i) approve the actions of the GUC Trust Administrator in entering into the Settlement and seeking estimation of the claims at the appropriate time as provided by the Settlement Agreement; and (ii) authorize the reallocation of GUC Trust Assets. The GUC Trust further requests that this Court approve the Settlement pursuant to Rule 9019 at the time of the Final Approval Hearing.

## BASIS FOR RELIEF REQUESTED

I.    **The Court Should Find that Entry into the Settlement is an Appropriate Exercise of the GUC Trust Administrator's Authority and Approve Actions Taken by the GUC Trust Administrator in Connection Therewith Pursuant to Section 8.1(e) of the GUC Trust Agreement.**

53.    The GUC Trust Administrator seeks a determination by the Court that entry into the Settlement and a motion seeking estimation of Allowed General Unsecured Claims, at the time and in the manner described in the Settlement Agreement, is an appropriate exercise of the GUC Trust Administrator's rights, powers, and/or privileges.

54.    "The practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment." Mosser v. Darrow, 341 U.S. 267, 274 (1951); see also In the Matter of the Application of U.S. Bank Nat'l Ass'n, No. 651625/2018, NYSCEF No. 1 (N.Y. Sup. Ct. April 4, 2018) (petition seeking an order, following an estimation proceeding, that instructs and authorizes trustees to make distributions pursuant to method proposed); In re Am. Home Mort. Inv. Trust 2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867, at *29-30 (explaining that "[t]rust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents"), In re Peierls Family Inter Vivos Trusts, 59 A.3d 471, 477 (Del. Ch. 2012) (noting that a "request for judicial relief involving a trust can be appropriate in many circumstances").

55.    Judge Wiles recently considered a similar request for instruction in In re Tronox Inc., No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17, 2015). In that matter, the trustee of the Tronox Incorporated Tort Claims Trust (established under the Tronox debtors' plan of reorganization, and governed by a trust agreement and a set of trust distribution

procedures) filed a motion seeking instruction regarding whether the trustee was correct with respect to certain past action.  See id. at *1-2.  The court noted that because the trustee was seeking "'comfort' as to actions already taken rather than . . . 'instructions' as to what the [t]rustee should do going forward in administering the [t]rust," it had "some skepticism as to whether the motion . . . [was] an appropriate request for instructions."  Id. at *21.  The court based its skepticism on the notion that "[o]rdinarily a [t]rustee seeks instructions when it has not yet taken action and where the [t]rustee is unsure as to what to do, and may even face liability for an incorrect choice."  Id. (citations omitted).  The court further noted that the request before it was "not really a request for 'instructions' as to how to interpret the existing [t]rust documents[,]" but "more of a request for an advisory opinion as to whether a proposed change to the" trust distribution procedures "would be consistent (or inconsistent) with the terms of the [debtors' plan] and the vested rights of claimants."  Id. at *22.  Noting, however, that it was "plain that further litigation – and thereby further delays in distributions to the beneficiaries of the [t]rust, who [had] already been waiting for many years – [were] inevitable unless some binding clarification of these issues is provided[,]" and based upon the conclusion that the court, under the plan, had "continuing jurisdiction over any issue relating to the interpretation and application of the [t]rust [a]greement" and the trust distribution procedures, the court found that it was "appropriate" to exercise its jurisdiction and issue the ruling as requested.  Id. at *23.

56.    Here, the GUC Trust Administrator is specifically authorized to seek guidance from the Court in this matter pursuant to § 8.1(e) of the GUC Trust Agreement, which provides, in relevant part, that

> where the GUC Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate, or desirable, the GUC Trust Administrator will have the right to submit to the Bankruptcy Court . . . any question or questions regarding any specific action

> proposed to be taken by the GUC Trust Administrator with respect
> to the [GUC Trust Agreement], the GUC Trust, or the GUC Trust
> Assets . . . . Pursuant to the Plan, the Bankruptcy Court has retained
> jurisdiction for such purposes and may approve or disapprove any
> such proposed action upon motion by the GUC Trust Administrator.

GUC Trust Agreement § 8.1(e).

57.    The GUC Trust Administrator has determined that, given the import of both the

Settlement and the estimation of allowed General Unsecured Claims, it is necessary, appropriate,

and desirable to ask the Court at this time whether the actions the GUC Trust Administrator

proposes to take in connection therewith are permissible and appropriate.  As noted, the GUC Trust

Administrator has the exclusive right to object to General Unsecured Claims, seek estimation of

the amount of allowed General Unsecured Claims, and seek Adjustment Shares from New GM.

Plan §§ 7.1(b), 7.3; GUC Trust Agreement § 5.1.  Moreover, similar to the circumstances extant

in Tronox, the Court has continuing jurisdiction to interpret, implement, or enforce the GUC Trust

Agreement.  Plan § 11.1(i); see also GUC Trust Agreement § 8.1(e).  Unlike the Tronox trustee,

however, the GUC Trust Administrator is seeking instruction regarding actions it proposes to take

based on its interpretation of the relevant documents.  Based on the foregoing, it is well within the

Court's authority to issue a ruling "approv[ing] . . . [the described] proposed action" by the GUC

Trust Administrator.  GUC Trust Agreement § 8.1(e).

58.    Accordingly, the Court should find that entry into the Settlement Agreement is an

appropriate exercise of the GUC Trust Administrator's authority and approve the actions to be

taken pursuant therewith, including seeking entry of a Claims Estimate Order after entry of the

Final Approval Order.

## II.     The Bankruptcy Court Should Approve and Authorize the Reallocation of $13,720,000 of GUC Trust Assets.

53.     Pursuant to the Settlement Agreement, the GUC Trust is responsible for funding the cost of notice contemplated herein, up to an amount of $13.72 million (the "**Notice Cost Cap Amount**").  The Notice Cost Cap Amount is based on an estimate by the Plaintiffs' notice expert Epiq/Hilsoft for the costs of direct mail notice of the Settlement Agreement to the Classes.  The projected costs are "all in" amounts that provide for a "state of the art" notice program including costs for mailing and social media.  The GUC Trust respectfully requests authority to reallocate $13.72 million from otherwise distributable assets of the GUC Trust for use in funding the notice.

58.     As noted above, under the terms of the Settlement, the GUC Trust is obligated to pay up to $13.72 million to fund the cost of notice.  Pursuant to Section 5.5 of the GUC Trust Agreement, the GUC Trust Administrator is afforded the flexibility to "hold back" from distributions (with the approval of the GUC Trust Monitor)[29] assets that would otherwise be distributed to GUC Trust Beneficiaries to reserve for unresolved disputed claims.  *See* GUC Trust Agreement § 5.5.  The GUC Trust has historically held back an amount sufficient to pay $50 million in disputed claims, which totals approximately $14.8 million.  Since the only remaining dispute is with the Plaintiffs, the GUC Trust seeks authority to use the disputed claims holdback to pay the amount required under the Settlement Agreement.  Section 6.1 of the GUC Trust Agreement specifically provides the GUC Trust Administrator with the ability to seek Bankruptcy Court approval (after consultation with the GUC Trust Monitor) to redesignate GUC Trust Distributable Assets.

---

[29]   As required by Section 6.1 of the GUC Trust Agreement, the GUC Trust Administrator has consulted with the GUC Trust Monitor with respect to the proposed reallocation and use of distributable cash.  GUC Trust Agreement § 6.1.  The GUC Trust Monitor supports the relief requested herein.

59.    The GUC Trust's agreement to pay up to $13.72 million for notice falls well within the types of "expenses, costs, liabilities, obligations or fees" that may be "held back" and reallocated for use by the GUC Trust pursuant to Section 6.1 of the GUC Trust Agreement.

60.    Accordingly, the GUC Trust submits that, pursuant to Sections 5.5 and 6.1(b) of the GUC Trust Agreement, the request to reallocate $13.72 million of otherwise distributable assets for the purposes of funding notice is warranted and the Settlement should be approved pursuant to the terms of the GUC Trust Agreement.

## III.    The Settlement Will Confer Benefits Greater than Those that Would be Obtained Through Further Litigation.

61.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve a settlement under Bankruptcy Code section 105(a), which empowers it to issue any order that is "necessary or appropriate."  11 U.S.C. § 105(a).

62.    The authority to approve a compromise or settlement is within the sound discretion of the Court.  See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972).  The Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . ." (citation omitted)).

63.    When exercising its discretion, the Court must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate.  See, e.g., Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R. 519, 523

(S.D.N.Y. 1993).  Where "the integrity of the negotiation process is preserved, a strong initial

presumption of fairness attaches to the proposed settlement . . . ."  In re Hibbard, 217 B.R. at 46.

64.    The Court need not decide the numerous issues of law and fact raised in the

underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below

the lowest point in the range of reasonableness.'"  In re Adelphia Commc'ns Corp., 327 B.R. 143,

159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir. 1983));

see also In re Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine

the merits of the underlying [dispute] . . . .").

65.    The Court evaluates whether the Settlement Agreement is fair and equitable based

on "the probabilities of ultimate success should the claim be litigated," and "an educated estimate

of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of

collecting on any judgment which might be obtained, and all other factors relevant to a full and

fair assessment of the wisdom of the proposed compromise."  Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

66.    Courts in this jurisdiction consider the following Iridium factors in determining

whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in collecting
> on the judgment; (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement"; (4) whether other
> parties in interest support the settlement; (5) the "competency and experience of
> counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court
> judge" reviewing, the settlement; (6) "the nature and breadth of releases to be
> obtained by officers and directors"; and (7) "the extent to which the settlement is
> the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d

452, 462 (2d Cir. 2007) (citations omitted).

67.     The Settlement Agreement falls well within the range of reasonableness and

satisfies each of the Iridium factors as set forth below.  Thus, the Settlement Agreement should be

approved under Bankruptcy Rule 9019.

### A.    Plaintiffs' Claims Raise Numerous Complex Litigation Issues.

68.     The first two Iridium factors—(1) the balance between the litigation's likelihood of

success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—

are easily met.  As detailed below, continued litigation over Plaintiffs' claims raises significant,

complex issues, has an uncertain outcome, and would be costly and time consuming.  Conversely,

the benefits of near-term, certain resolution are clear.

### 1.    Litigation over Plaintiffs' Claims Raises Numerous Complex Issues.

69.     One complex, contentious issue raised by the litigation over Plaintiffs' claims is

whether the Court should grant Plaintiffs authority to file late claims and class claims under the

Late Filed Claims Order.  See Late Filed Claims Order at 1-2.

70.     As an initial matter, there is a dispute over the standard for obtaining leave to file

late claims.  Certain Plaintiffs have argued that creditors may assert late claims based solely on a

showing that they have suffered a due process violation related to the Bar Date.[30]  The GUC Trust

has taken the position that Plaintiffs are precluded from asserting late claims because of Plaintiffs'

strategic delay in pursuing claims against the GUC Trust after the Recalls.[31]

---

[30]    See, e.g., The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues, dated Mar. 6, 2017 [ECF
No. 13872]; Brief on Applicability of Pioneer and Tolling Issues in Connection with Omnibus Motion by Certain
Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful
Deaths, dated Mar. 6, 2017 [ECF No. 13874].

[31]    See Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer
and Tolling to Plaintiffs' Motions to File Late Claims, dated Mar. 6, 2017 [ECF No. 13873].

71.     The Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have also asserted that they can meet the Pioneer factors for demonstrating excusable neglect.  Of the four Pioneer factors, the one given the most weight is the reason for the delay in filing claims, including whether the delay was in the reasonable control of the movant.  See In re Residential Capital, LLC, Case No. 12-12020 (MG), 2015 WL 515387, at *5 (Bankr. S.D.N.Y. Feb. 6, 2015).  The Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have argued that a debtor's failure to provide actual notice to a known creditor is evidence that any delay was not in the control of the creditor.  The GUC Trust, in turn, has argued that the delay here is attributable to Plaintiffs' voluntary strategic decision, made after the Recalls, to pursue New GM and not the GUC Trust.  In response, the Plaintiffs have argued that, among other things, the Late Filed Claims Order effectively precluded the filing of late claims until the Second Circuit vacated the equitable mootness ruling.

72.     Although Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have not yet demonstrated a due process violation, many of these plaintiffs have alleged that their claims arise out of defects that are substantially similar to the Ignition Switch Defect— defects that involve the same condition (low torque switches that move out of the "run" position) and have the same effects (loss of power to steering, brakes, and airbags).  The Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs have also argued that they can demonstrate a violation of their due process rights in connection with the Bar Date.

73.     Further, the Plaintiffs have argued, and the GUC Trust disputes, that excusable neglect can exist in the absence of a due process violation.  For example, Plaintiffs have asserted that excusable neglect can be found where the debtors failed to comply with bankruptcy procedures in providing notice of a bar date and where a claimant, through no fault of its own, was unaware

of its claim prior to the bar date.  See In re Arts de Provinces de France, Inc., 153 B.R. 144, 147

(Bankr. S.D.N.Y. 1993); In re PT-1 Commc'ns, Inc., 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003).

This issue, too, would have to be litigated.

74.    Another complex issue is whether the doctrine of equitable mootness is applicable

to bar Plaintiffs' claims.  See In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993).

75.    In the April 2015 Decision, the Bankruptcy Court applied the five Chateaugay

factors[32] and determined that if the Ignition Switch Plaintiffs' or certain Pre-Closing Accident

Plaintiffs' late claims were allowed, GUC Trust Assets could not be tapped to pay them under the

doctrine of equitable mootness.  See In re Motors Liquidation Co., 529 B.R. at 598.   The

Bankruptcy Court found, *inter alia*, that any relief would "knock the props out" from the

transactions in which Unitholders acquired their units.  See id. at 587-88, 592. Allowing billions

of dollars in additional claims against the GUC Trust, in Judge Gerber's view, would be

"extraordinarily unjust" given the Unitholders' expectation that the universe of claims against the

GUC Trust would decrease, and not increase, over time following the Bar Date. Id. at 88.  The

Bankruptcy Court's determination was also based, in part, on its acknowledgment that purchasers

of GUC Trust units could not foresee that future distributions would be delayed while additional

claims were filed and litigated. Id. at 88-89.

76.    On appeal, the Ignition Switch Plaintiffs and certain Pre-Closing Accident

Plaintiffs argued that the Bankruptcy Court erred because, *inter alia*, effective relief could be

---

[32]    These five factors are: (i) the court can still order some effective relief; (ii) such relief will not affect "the re-
emergence of the debtor as a revitalized corporate entity"; (iii) such relief will not unravel intricate transactions
so as to "knock the props out from under the authorization for every transaction that has taken place" and "create
an unmanageable, uncontrollable situation for the Bankruptcy Court"; (iv) the "parties who would be adversely
affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and
(v) the appellant "pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable
order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from."
In re Chateaugay Corp., 10 F.3d at 952-53 (citations omitted).

fashioned without disturbing any transactions or having an adverse impact on Unitholders by providing Plaintiffs with exclusive access to any Adjustment Shares that may be issued under the AMSPA.[33]  These Plaintiffs argued that where any relief, including partial relief, is available, equitable mootness should not be applied.  See, e.g., Chateaugay, 10 F.3d at 954.  In addition, they argued that equitable mootness was only applicable in the context of bankruptcy appeals.[34]

77.    The Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory, neither affirming nor reversing that decision.  See Elliott, 829 F.3d at 168-69.

78.    Additional complex issues would certainly arise from continued litigation of Plaintiffs' claims.  The Bankruptcy Court would still need to decide whether class certification for the Ignition Switch and Non-Ignition Switch Plaintiffs' Proposed Class Claims would be appropriate.  In addition, the GUC Trust could raise objections to allowance of these class claims, as well as to the separate proofs of claim filed by Pre-Closing Accident Plaintiffs.  This could lead to extensive additional litigation and delay.

79.    In sum, while the GUC Trust believes that it has meritorious defenses to the claims of all Plaintiffs, the resolution of the numerous, complex issues raised by the litigation over Plaintiffs' claims is uncertain, and, as set forth below, would result in significant expense and delay.

---

[33]   See Br. for Appellant Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) [ECF No. 235], 49-52; Br. for certain Pre-Closing Accident Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Nov. 16, 2015) [ECF No. 183], 4, 52 n.18 (incorporating the arguments on the application of equitable mootness in the Ignition Switch Plaintiffs' brief).

[34]   See Response and Reply Br. for Appellant-Cross-Appellee Ignition Switch Plaintiffs, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Appeal Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir. Feb. 1, 2016) [ECF No. 315], at 40-43.

### 2.    The Terms of the Settlement Agreement
### Outweigh the Risks of Continued Litigation.

80.    Litigation of these complex issues has been ongoing for years, consuming large sums of money and countless hours of labor for the Parties and this Court.  In the absence of settlement, there is a high likelihood of even more expensive, protracted and contentious litigation that will consume significant estate funds and expose the estate to risk and uncertainty.  In addition, resolution of these issues may require the added time and expense of discovery.  For example, the Pioneer analysis is fact intensive and, to date, only limited discovery, restricted to a proposed class representative of the Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs, has occurred on this issue.

81.    By comparison, settling the litigation provides the Parties with greater certainty and eliminates the significant cost and delay of litigation.

82.    Likewise, the Settlement avoids the likely substantial costs and expenses, significant risk, and practical difficulties for the Plaintiffs, the GUC Trust and potential defendants surrounding litigation relating to the clawback of prior distributions of GUC Trust Assets.  On a similar score, the waiver under the Settlement Agreement of certain Pre-Closing Accident Plaintiffs' jury trial rights with regard to fixing the amount of individual claims that are estimated for allowance purposes and entitlement to any value from the Adjustment Shares obviates potentially prolonged litigation across several forums.

83.    In addition, the Settlement Agreement provides several benefits beyond avoiding continued litigation.

84.    First, the Parties' determination to seek a Claims Estimate Order allowing and estimating Plaintiffs' claims in an amount, when combined with all of the other Allowed General Unsecured Claims against the Old GM estate, that may equal or exceed $42 billion, provides an

efficient and reasonable resolution of the allowable amount of Plaintiffs' claims.  This will provide a potential source of recovery in the near-term for Plaintiffs who have been waiting years for any recovery, including Plaintiffs who have suffered personal injury or wrongful death.

85.     Under the Settlement, any Adjustment Shares issued by New GM under this Claims Estimate Order would be for the exclusive benefit of Plaintiffs.  Based on the amount of allowed and disputed unsecured claims against Old GM, New GM's obligation to issue these shares would not be triggered absent allowance of Plaintiffs' claims.[35]  Thus, the GUC Trust determined that it was reasonable to forgo any potential future recovery from the Adjustment Shares in consideration for the Release.   This provision potentially paves the way for Plaintiffs to obtain a recovery on their claims without disturbing other creditors' past or future recoveries.

86.     Further, the Settlement removes a major impediment to winding down the Old GM estate.  The resolution of Plaintiffs' claims and waiver of certain rights and claims eliminates the likelihood of complex and protracted litigation, including with respect to Plaintiffs' attempts to enjoin further GUC Trust distributions, thus preventing delay in distributing remaining GUC Trust Assets and protects Unitholders from the risk of claw-back or recapture of prior distributions.

87.     Finally, given that nearly all the GUC Trust's Assets have been distributed or reserved for the Bankruptcy Code section 502(h) claim emanating from the Avoidance Action Litigation, it is likely that the GUC Trust would run out of funds prior to completing the litigation of Plaintiffs' Claims.

88.     The terms of the Settlement Agreement reflect a reasonable assessment of the substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more

---

[35]   See *Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of December 31, 2018*, dated Jan. 24. 2019 [ECF No. 144402].

near-term, efficient and certain resolution of the allowable amount of Plaintiffs' claims and sources

of recovery.  The benefits of the Settlement in the near term outweigh the benefit of potential long-

term success through the protracted litigation of complex issues.

> **B.    The Benefits of Settling Exceed the Potential Benefits of
> Continued Litigation.**

89.    With respect to the third and fourth _Iridium_ factors—the paramount interests of

creditors and whether other interested parties support the settlement—prolonging the litigation will

increase costs and decrease the amount of GUC Trust Assets available to satisfy creditors.

Approving the Settlement Agreement, on the other hand, avoids the significant expense and

uncertainty associated with continued litigation, and maximizes and expedites distributions to

current GUC Trust beneficiaries.  The release of Plaintiffs' rights and claims with respect to the

GUC Trust's prior distributions and current GUC Trust Assets allows the GUC Trust to complete

the orderly wind-down of the Old GM estate.

90.    Moreover, providing Plaintiffs with the exclusive right to proceed against the

Adjustment Shares potentially opens an avenue for Plaintiffs to recover on their claims against the

GUC Trust without disturbing the recovery expectations of other creditors or Unitholders.

Plaintiffs' rights concerning the Adjustment Shares are protected because notice of any agreement

by the Signatory Plaintiffs on proposed criteria to assert a claim against the Settlement Fund and

a proposed methodology of allocation of the Settlement Fund between economic loss claims and

personal injury/wrongful death claims will be provided to Plaintiffs, who will be given an

opportunity to object.

91.    The fourth _Iridium_ factor—whether other interested parties support the

settlement—is also met.  Not surprisingly, the key interested parties—the GUC Trust, Signatory

Plaintiffs and the Participating Unitholders—all support the Settlement Agreement.  See _Ad Hoc_

34

Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 61 (S.D.N.Y. 2008) (affirming approval of settlement of claims of 7,500 asbestos personal injury claimants where, *inter alia*, the creditors' committee and ad hoc bondholders' committee supported the settlement).  The only anticipated opposition is from New GM.

92.    Accordingly, for all of the reasons set forth above, the Settlement Agreement easily meets the fourth Iridium factor and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement.  GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

C.    **The Settlement Agreement Satisfies the Remaining *Iridium* Factors.**

93.    With respect to the sixth Iridium factor, "the nature and breadth of releases to be obtained by officers and directors," the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, the Avoidance Action Trust and Unitholders.  Importantly, the notice procedures set forth in Plaintiffs' class certification motion contemplate a comprehensive individualized mailing program whereby Plaintiffs receive a concise summary of the Settlement Agreement and instructions for accessing a website dedicated specifically to the Settlement.  Each recipient, therefore, will have the opportunity and right to be heard by the Court in connection with the Settlement.

94.    With respect to the fifth and seventh <u>Iridium</u> factors, competent and experienced counsel to the Parties who have been litigating these issues for years actively engaged in arms'-length, good faith negotiations to formulate the Settlement Agreement.  The Parties, having considered the uncertainties, delay and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable and appropriate, and in the best interests of the Parties.

95.    Based on the foregoing, the Settlement Agreement is in the best interests of the estate and its creditors and falls well within the range of reasonableness.  Therefore, entry into and approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted and the Settlement Agreement should be approved.[36]

## NOTICE

96.    Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  <u>See</u> *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [ECF No. 10183].  Notice of this Motion has also been provided to any other required notice parties under Section 6.1(b)(iv) of the GUC Trust Agreement.  The Parties submit that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Parties respectfully request that the Court: (i) enter an order substantially in the form attached hereto as **Exhibit B** approving the actions to be undertaken by the GUC Trust Administrator under the terms of the Settlement Agreement, attached hereto as

---

[36]    In the event that the Settlement Agreement is not approved by the Court or the Settlement Agreement does not become binding and enforceable for any reason, the Parties reserve all their rights and nothing herein shall be deemed or construed as an admission of any fact, liability, stipulation, or waiver, but rather as a statement made in furtherance of settlement discussions.

**Exhibit A**, and authorizing the reallocation of $13.72 million of GUC Trust Assets for notice costs; and (ii) approve the Settlement pursuant to Bankruptcy Rule 9019; and (iii) grant such other relief as is just and equitable.

[*Remainder of the page intentionally left blank*]

Dated:  New York, New York
February 1, 2019

Respectfully submitted,

By:   /s/  *Kristin K. Going*

Kristin K. Going

Clay J. Pierce

Marita S. Erbeck

DRINKER BIDDLE & REATH LLP

1177 Avenue of the Americas

41st Floor

New York, NY 10036-2714
Tel: (212) 248-3140
E-mail: kristin.going@dbr.com
clay.pierce@dbr.com
marita.erbeck@dbr.com

*Attorneys for the Motors Liquidation*
*Company GUC Trust Administrator*