UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                             :

In re:                        :           Chapter 11 Case No.
                             :

MOTORS LIQUIDATION COMPANY, *et al.*,  :          09-50026 (MG)
f/k/a General Motors Corp., *et al.*     :

                             :          (Jointly Administered)
              Debtors.     :

                             :
------------------------------------------------------------------x

**DECLARATION OF DAVID A. VANASKEY JR. IN SUPPORT OF THE
MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST
TO APPROVE (I) THE GUC TRUST ADMINISTRATOR'S ACTIONS, (II) THE
SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS
AND THE GUC TRUST PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363,
AND 1142 AND BANKRUPTCY RULES 3002 AND 9019, AND
(III) TO AUTHORIZE THE REALLOCATION OF GUC TRUST ASSETS**

I, David A. Vanaskey Jr. declare:

1.      I am a Vice President of Wilmington Trust Company ("**WTC**"), located at Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity as trustee for and administrator (the "**Administrator**") of the Motors Liquidation Company GUC Trust (the "**GUC Trust**").[1]

2.      I submit this Declaration in support of the *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions, (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002 and 9019, and (III) to Authorize the Reallocation*

---

[1]    Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Settlement Agreement dated April 25, 2018 or the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015 (the "**GUC Trust Agreement**") [ECF No. 13332].

of *GUC Trust Assets* (the "**Settlement Motion**") dated January 31, 2019, and filed contemporaneously herewith.

3.        Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

4.        Attached hereto as **Exhibit A** is a true and correct copy of the *Declaration of David A. Vanaskey Jr. in Support of: (1) the Motion of Motors Liquidation Company GUC Trust to Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363 and 142 and Bankruptcy Rules 3020 and 9019; and (2) the Motion of Motors Liquidation Company GUC Trust to Estimate Vehicle Recall Economic Loss and Personal Injury Claims for Allowance Purposes and to Establish a Schedule for the Claims Estimation Proceeding* [ECF No. 14293-3] (the "**2018 Vanaskey Declaration**"). As its title suggests, the 2018 Vanaskey Declaration was filed in connection with a prior settlement between the GUC Trust and Signatory Plaintiffs[2].

5.        My background, both with WTC and the GUC Trust, is set forth more fully in the 2018 Vanaskey Declaration.  However, in summary, I am a Vice President of WTC with over 30 years of experience in its financial services group, including 25 years specializing in capital markets, defaults and corporate restructuring. I served as the lead representative of WTC in its capacities as Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation, and chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.  From and after the Effective Date, I served, and continue to serve, as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust.

---

[2] Capitalized terms not otherwise defined herein bear the meaning given in the Settlement Motion.

## <u>The Settlement</u>

6.      Attached hereto as Exhibit B is a true and correct copy of the Settlement Agreement.

7.      The principal terms of the Settlement are as follows:

(a)      the GUC Trust agrees to pay the reasonable costs and expense for Court-approved notice of the Settlement to the Classes and Pre-Closing Accident Plaintiffs in an amount not to exceed $13.72 million;

(b)      the Economic Loss Plaintiffs agree to prepare and file the Class Certification Motion seeking certification of the Economic Loss Class pursuant to Rule 23 on a preliminary and final basis, approval of the Notice Provisions, and appointment of class representatives and class counsel for Rule 23(a) and (g) settlement certification purposes;

(c)      the GUC Trust agrees to file a motion seeking entry of a Claims Estimate Order estimating the aggregate allowed General Unsecured Claims of Plaintiffs, including the Pre-Closing Accident Plaintiffs, in an amount that, as of the date of the Estimation Order, could equal or exceed $10 billion;

(d)      the GUC Trust, the GUC Trust Beneficiaries, the Motors Liquidation Company Avoidance Action Trust, and all defendants in the Term Loan Avoidance Action, irrevocable waive and release Plaintiffs with respect to any rights to the Settlement Fund or the Adjustment Shares; and

(e)      upon entry of the Final Approval Order, all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the GUC Trust Beneficiaries, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims exclusively from the Settlement Fund.

8.      Through the Settlement Motion, the GUC Trust and Signatory Plaintiffs also
request that this Court enter an order (i) approving the actions of the GUC Trust Administrator in
entering into the Settlement; (ii) authorizing the GUC Trust to reallocate up to $13.72 million in
GUC Trust Assets to pay for noticing costs.

9.      The facts known to the GUC Trust as of May 2, 2018 that supported my opinion on
settlement as of that date have not materially changed.  Accordingly, through this Declaration, I
ratify and adopt the 2018 Vanaskey Declaration, and confirm that the facts contained therein also
support entry into the Settlement at this time.  I still believe, as I did on May 2, 2018, that the
Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust
Beneficiaries because it provides those parties with the substantial concrete benefits described
more fully in the 2018 Vanaskey Declaration.  Those benefits support the current Settlement.

10.     In consideration of all the above and the issues addressed in the 2018 Vanaskey
Declaration, it is my opinion that the Settlement falls within the range of reasonableness – well
above the lowest point in the range of reasonableness – and provides the best outcome for the GUC
Trust Beneficiaries.  As was the case on May 2, 2018, my opinion is buttressed by the advice of
the GUC Trust Monitor and the opinion of multiple experienced bankruptcy counsel – those
representing the GUC Trust and Participating Unitholders – who have been intimately involved in
the ignition switch litigations since they began in 2014 and who negotiated and support the
Settlement.

11.     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing
is true and correct to the best of my knowledge, information, and belief.

Dated: Wilmington, Delaware
      January 31, 2019

David A. Vanaskey Jr.

96989122.2

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                    :

In re:                                         :           Chapter 11 Case No.

MOTORS LIQUIDATION COMPANY, *et al.*,   :
f/k/a General Motors Corp., *et al.*        :           09-50026 (MG)
                                           :

               Debtors.              :           (Jointly Administered)
                                           :

-----------------------------------------------------------------x

**DECLARATION OF DAVID A. VANASKEY JR. IN SUPPORT OF: (1) THE
MOTION OF MOTORS LIQUIDATION COMPANY GUC TRUST TO APPROVE THE
SETTLEMENT AGREEMENT BY AND AMONG THE SIGNATORY PLAINTIFFS AND THE
GUC TRUST PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363,
AND 1142 AND BANKRUPTCY RULES 3020 AND 9019; AND (2) THE MOTION OF
MOTORS LIQUIDATION COMPANY GUC TRUST TO ESTIMATE VEHICLE RECALL
ECONOMIC LOSS AND PERSONAL INJURY CLAIMS FOR ALLOWANCE PURPOSES
AND TO ESTABLISH A SCHEDULE FOR THE CLAIMS ESTIMATION PROCEEDING**

        I, David A. Vanaskey Jr. declare:

        1.      I am a Vice President of Wilmington Trust Company ("**WTC**"), located at

Rodney Square North, 1110 North Market Street, Wilmington, Delaware, 19890-1615, and am

duly authorized to submit this declaration (the "**Declaration**") on behalf of WTC in its capacity

as trustee for and administrator (the "**Administrator**") of the Motors Liquidation Company GUC

Trust (the "**GUC Trust**").[1]

        2.      I submit this Declaration in support of: (i)*Motion Of Motors Liquidation
Company GUC Trust To Approve The Settlement Agreement By And Among The Signatory
Plaintiffs And The GUC Trust Pursuant To Bankruptcy Code Sections 105, 363, And 1142 And
Bankruptcy Rules 3002 And 9019 (the "*<u>Settlement Motion</u>*"); and (ii) Motion of Motors*

---

[1]   Unless otherwise defined in this declaration, capitalized terms shall have the meanings noted in the Settlement
Agreement dated April 25, 2018 or the Second Amended and Restated Motors Liquidation Company GUC
Trust Agreement, dated as of July 30, 2015 (the "**GUC Trust Agreement**") [ECF No. 13332].

*Liquidation Company GUC Trust To Estimate Vehicle Recall Economic Loss And Personal Injury Claims For Allowance Purposes And To Establish A Schedule For The Claims Estimation Proceeding* each dated May 2, 2018, and filed concurrently with this declaration.

3.       Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

## Background

4.       I am a Vice President of WTC with over 30 years of experience in its financial services group, including 25 years specializing in capital markets, defaults and corporate restructuring. In such capacity, I and the WTC teams overseen by me have directed multiple accounts and products in varying contexts, including chapter 11 reorganizations.  Specifically, I have provided services in connection with the following major bankruptcy cases: (a) *In re UAL Corp.*; (b) *In re US Airways Group, Inc.*; (c) *In re Baldwin*; (d) *In re Delta Air Lines, Inc.*; (e) *In re Solutia Inc.*; (f) *In re Mesa Air Group, Inc.*; (g) *In re Circuit City Stores, Inc.*; and (h) *In re General Motors Corporation.*

5.       WTC's initial role in the Old GM bankruptcy was serving as the successor Indenture Trustee for approximately $23 billion in U.S. dollar denominated unsecured notes, bonds and debentures issued by Motors Liquidation Company, formerly known as General Motors Corporation.  During the bankruptcy, WTC served as chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.

6.       On March 29, 2011, the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered a Confirmation Order confirming the Debtors' liquidating Plan, and appointing WTC as the Administrator.  The GUC Trust is governed by a trust agreement, which has been modified in accordance with its terms several times since the entry of the Confirmation Order.

2

92547214.3

7.      Prior to the Effective Date of the Plan, I served as the lead representative of WTC in its capacities as Indenture Trustee and chair of the Official Committee of Unsecured Creditors of Motors Liquidation Company.  From and after the Effective Date, I served, and continue to serve, as the lead representative of WTC in its capacity as trustee for and administrator of the GUC Trust.  Through such experiences, I have developed an intimate understanding of the Debtors, the Plan, the GUC Trust Agreement, and the other facts and circumstances that form the basis of this Declaration.

### The Sale Order and the Bar Date

8.      On July 5, 2009, the Bankruptcy Court entered the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., a U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief* (Dkt. 2968) (the "**Sale Order**").  Under the Amended and Restated Master Sale and Purchase Agreement (the "**MSPA**"), the Purchaser, New GM, agreed to pay approximately $45 billion in consideration for substantially all of the assets of the Sellers, primarily Old GM.

9.      Under the MSPA, New GM agreed that if "the estimated allowed general unsecured claims against Sellers' estates exceed $35,000,000,000, then Purchaser will . . . issue" up to 30,000,000 of additional shares of New GM common stock (the "**Adjustment Shares**").  MSPA (Dkt. 2968-2) § 3.2(c)(i).

10.      Under the MSPA, the Debtors had authority to seek an order of the Bankruptcy Court estimating the aggregate allowed general unsecured claims against Old GM's estate (the "**Claims Estimate Order**").

11.     A September 23, 2011 letter agreement between the GUC Trust, the GUC Trust Monitor, Motors Liquidation Corporation, and New GM confirms that the GUC Trust has the sole and exclusive authority to "at any time . . . seek . . . the Claims Estimate Order" that Sellers previously had authority to seek.

12.     The Bankruptcy Court set November 30, 2009 as the bar date for filing claims against Old GM (the "**Bar Date**").

### The GUC Trust's Creation and Current State

13.     The GUC Trust was formed to implement the Plan.  The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust Assets and GUC Trust Units to the GUC Trust's defined beneficiaries (**"GUC Trust Beneficiaries,"** or **"Beneficiaries")**.  GUC Trust Beneficiaries include holders of Allowed General Unsecured Claims as of March 31, 2011, holders of disputed claims as of March 31, 2011 that were later allowed, and holders of freely transferable Units in the GUC Trust.

14.     The GUC Trust operates for the benefit of GUC Trust Beneficiaries and has a fiduciary duty to maximize the recoveries of the GUC Trust Beneficiaries.

15.     Under the GUC Trust Agreement, the GUC Trust "shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Disputed General Unsecured Claims."  Dkt. 13332 § 5.1(d).  If the amount to be Allowed exceeds $10 million, then the GUC Trust Monitor must review and approve "[a]ny decision to settle or otherwise resolve any objections to Disputed General Unsecured Claims against the Debtors."  *Id.* § 11.3(a)(i).

16.     To date, putative creditors have filed over $40 billion in general unsecured claims, of which $31.854 billion are Allowed General Unsecured Claims.  The GUC Trust has resolved over 4,000 unsecured claims filed against Old GM.

92547214.3

17.     As of November 2016, the GUC Trust had distributed approximately 94% of its initial assets in the form of New GM stock, warrants, and cash, to holders of allowed claims and to holders of Units. Aside from a general disputed claim contingency totaling $14.8M, there are no remaining assets in the GUC Trust that have not already been allocated.

18.     Furthermore, other than the proposed claims related to the Recalls and the contingent claim that may result from the Avoidance Action Litigation, I am not aware of any other potential claims against Old GM or the GUC Trust.

### New GM's Recalls and Resulting Litigation

19.     In 2014, New GM recalled more than 30 million vehicles, including some that had been on the road for more than a decade. In particular, New GM recalled millions of vehicles due to a defective ignition switch as part of NHTSA Recall Number 14V-047 (the "**Ignition Switch Defect**"), millions of additional vehicles due to other defects related to similar ignition switch defects, and millions of vehicles due to defective side airbags, power steering, and other defects.

20.     Hundreds of plaintiffs responded to the revelations by filing individual and putative class actions against New GM seeking damages, under various theories, for alleged economic loss, personal injury, and wrongful death.

21.     In response, New GM filed motions to enforce the Sale Order's injunction on successor liability (the "**Motions to Enforce**").  In addition, New GM suggested that plaintiffs look to the GUC Trust for recovery.

22.     On a stipulated record related to the Ignition Switch Defect, the Bankruptcy Court found, *inter alia*, that Old GM knew or should have known about the Ignition Switch Defect and therefore gave inadequate notice to plaintiffs, but that any claims against the GUC Trust were

92547214.3

nonetheless barred because of a lack of prejudice.  The Bankruptcy Court also found that claims

against the GUC Trust were barred by the doctrine of equitable mootness.

23.    On appeal, the Second Circuit affirmed in part, reversed in part, and vacated in

part.  Most relevant for purposes of the settlement motion, the Second Circuit held that plaintiffs

had suffered a due process violation causing prejudice and that the issue of equitable mootness

was not ripe because no plaintiff had filed for permission to file late claims.

**The Late Claims Motions**

24.    Upon remand, the parties began addressing whether Recall plaintiffs could satisfy

the requirements for authorization to file late proofs of claim against the GUC Trust, and whether

such claims are equitably moot.

25.    On December 22, 2016, counsel for certain Ignition Switch Pre-Closing Accident

Plaintiffs filed a motion for authority to file late proofs of claim on behalf of 175 plaintiffs

alleging personal injury and wrongful death claims arising from the Ignition Switch Defect.

Separately, Designated Counsel for Ignition Switch Plaintiffs and certain Non-Ignition Switch

Plaintiffs filed a motion for authority to file one late putative class proof of claim for economic

losses on behalf of Ignition Switch Plaintiffs, and another for economic losses on behalf of Non-

Ignition Switch Plaintiffs.

26.    On January 4, 2017 counsel for the *Groman* Plaintiffs and counsel for the Peller

Plaintiffs filed a joinder to the late claims motions filed by Designated Counsel.  On July 28,

2017 counsel for Additional Ignition Switch Pre-Closing Accident Plaintiffs filed a motion for

authority to file late proofs of claim on behalf of 171 plaintiffs alleging personal injury and

wrongful death claims arising from the Ignition Switch Defect (together the "**Late Claims**

**Motions**").

92547214.3

27.    Further, certain Pre-Closing Accident Plaintiffs injured or killed in crashes that

occurred before July 10, 2009, involving vehicles subject to Recall Nos. 14V-355, 14V-394,

14V-400, or  14V-540 (and who are identified by name and Recall Number in Schedule 1 to the

Settlement Agreement as among the Signatory Plaintiffs) have informed the GUC Trust that they

intend to file a Supplemental Late Claims Motion on or before May 31, 2018, seeking allowance

of their late claims based on due process violations relating to the foregoing Recalls.

28.    Per the Bankruptcy Court's order, the GUC Trust received limited discovery from

certain putative late claimants regarding when they knew or reasonably could have known that

they potentially had claims against the GUC Trust.  In addition, the parties briefed disputed

questions about whether the plaintiffs would be required to show excusable neglect under

*Pioneer Investment Services Co. v. Brunswick Associates Ltd.*, 507 U.S. 380 (1992), in order to

obtain permission to file late claims, and the applicability of any agreements with the GUC Trust

to toll the time to file late claims (the "***Pioneer* Briefing**").

29.    To date, the Court has not set a schedule for hearing argument or deciding the

disputed issues raised in the *Pioneer* Briefing.  The Court also has not set a schedule for briefing,

arguing, or deciding the merits of the Late Claims Motions.

### The Settlement

30.    The principal terms of the Settlement are as follows: 1) the GUC Trust agrees to

pay $15 million (the "**Settlement Amount**") to a settlement fund and up to another $6 million

for providing notice; 2) the GUC Trust agrees to file a motion seeking entry of a Claims Estimate

Order estimating the aggregate allowed General Unsecured Claims of Plaintiffs in an amount

that could equal or exceed $10 billion; 3) the GUC Trust Beneficiaries agree to waive any claim

to the Settlement Amount and, if the Claims Estimate Order is entered, the Adjustment Shares

92547214.3

(or the value thereof), and any Adjustment Shares issued (or the value thereof) will be deposited into the settlement fund for the sole benefit of Plaintiffs; and 4) all Plaintiffs agree (or will be deemed to agree) to waive all current and future claims against the GUC Trust, the GUC Trust beneficiaries, the Avoidance Action Trust and certain other parties, and instead seek satisfaction of such claims from the settlement fund.

31.    Based on consultation with counsel, the GUC Trust Monitor, a review of the voluminous materials provided to the GUC Trust by both Plaintiffs and New GM, and my experience with other complex—and often protracted—litigations related to the Recalls, I believe the GUC Trust's decision to enter into the Settlement to be a prudent and reasonable exercise of the Administrator's business judgment.  The Settlement will maximize recovery for the benefit of the GUC Trust Beneficiaries, while minimizing the substantial risks posed by the Late Claims Motions.  In reaching this conclusion, the Administrator considered the following significant factors:

32.    First, absent a Settlement, the GUC Trust would likely be required to litigate issues relating to the Recalls into the foreseeable future.  None of the Late Claims Motions has been decided at this point, and the litigation of those Motions will likely require at least several months.  Regardless of who prevails on those Motions, the Court's ruling(s) will almost certainly be appealed, a process that will consume many additional months.  If any part of the Court's decisions are reversed, the parties may be required to relitigate the Motions.  Taken together, the process could require several years.

33.    Second, litigating the Late Claims Motions to their conclusion would require the GUC Trust to incur significant litigation and administrative costs.  Together, litigation of the Late Claims Motions and any subsequent allowance proceedings could consume a substantial

portion of the GUC Trust's remaining assets—assets that otherwise would be available for distribution to the GUC Trust Beneficiaries. Because continued litigation would endanger the remaining Trust Assets, it would necessarily delay any further distributions of Trust Assets to its current beneficiaries.

34.    Third, the outcome of the Late Claims Motions and any subsequent allowance proceedings is uncertain. The GUC Trust believes its prior opposition to the Late Claims Motions and its analysis of the *Pioneer* factors are based on principled legal arguments. That said, litigation of the Motions would be fact-intensive and would involve complex legal questions, with uncertain ultimate resolution.

35.    The GUC Trust has expended substantial resources in considering the merits and valuation of Plaintiffs' claims—including, among other things, a review of the materials provided to the Trust by Plaintiffs and New GM, numerous in-person and telephonic conferences the Trust conducted with each side of the dispute and extensive legal analysis conducted by the GUC Trust's counsel. The GUC Trust has legal and factual arguments that may refute some or all of those claims. However, the Trust recognizes that Plaintiffs nevertheless may succeed in having the Late Claims valued at billions of dollars. If Plaintiffs succeeded on their Late Claims, then absent the proposed Settlement the current GUC Trust Beneficiaries could be forced to surrender rights to future distributions of GUC Trust Assets, and could even be required to return previously distributed funds (as plaintiffs have reserved the right to seek to claw back previously distributed funds).

36.    Fourth, and finally, counsel to the Participating Unitholders (representing approximately sixty-six percent (66%) of the Trust's outstanding Units) has expressly informed the Trust that the Participating Unitholders support and agree with the Trust's decision to enter

92547214.3

into the Settlement.  The Trust owes a fiduciary duty to its Unitholders, and is required to act in their best interests under the terms of the GUC Trust Agreement.  The Participating Unitholders' support for the Settlement is another factor considered by the GUC Trust in determining that entry into the Settlement is in the best interests of those parties for whose benefit the Trust was created.

37.    The terms of the proposed Settlement were negotiated at arms-length and in good faith.  Due to the significant risks that the Late Claims Motions present to the GUC Trust Beneficiaries, the GUC Trust first entered into settlement negotiations with plaintiffs beginning in May 2017.  All parties to the negotiations were represented and advised by experienced counsel, and negotiations involved intensive communications over a period of several months. During this period, the parties' representatives engaged in multiple in-person and telephonic meetings, and exchanged numerous drafts of the Settlement Agreement and ancillary documents.

38.    I believe that the Settlement is in the best interests of the GUC Trust, the Old GM estates and the GUC Trust Beneficiaries because it provides those parties with substantial concrete benefits.  The Settlement will resolve the long-standing dispute regarding the timeliness of the Late Claims, preserve the distributable assets for the GUC Trust Beneficiaries, and eliminate the risk of claw-backs of previously distributed assets.  The Settlement will also clear the way for future distributions to GUC Trust Beneficiaries, and allow the GUC Trust to wind-down the affairs of the Debtors in accordance with the Plan in the near term.  Because it maximizes recoveries for GUC Trust Beneficiaries, the Settlement clearly is in accord with the duties of the GUC Trust and the GUC Trust Administrator under the Plan and the GUC Trust Agreement.

92547214.3

39.    To be sure, the Settlement comes at a cost to the Trust's Beneficiaries.  As noted

above, the GUC Trust has agreed in the Settlement to pay $6 million to distribute notice of the

Settlement and $15 million to establish the Settlement Fund.  The funds would otherwise

potentially be available to Beneficiaries if the GUC Trust ultimately prevailed in the Late Claim

Motion litigation.  However, given the substantial benefits of the Settlement, these costs are

reasonable and prudent.  Indeed, for that reason and others, the Settlement is supported by the

Participating Unitholders, who have represented that they hold a substantial proportion of the

outstanding GUC Trust Units.

40.    In consideration of all the above issues, it is my opinion that the Settlement falls

within the range of reasonableness—well above the lowest point in the range of

reasonableness—and provides the best outcome for the GUC Trust Beneficiaries.  My opinion is

buttressed by the advice of the GUC Trust Monitor and the opinion of multiple experienced

bankruptcy counsel—those representing the GUC Trust and Participating Unitholders—who

have been intimately involved in the ignition switch litigations since they began in 2014 and who

negotiated and support the Settlement.

41.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated: Wilmington, Delaware
       May 2, 2018

       David A. Vanaskey Jr.

92547214.3

# <u>EXHIBIT B</u>

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**"), dated as of February 1, 2019, is entered into between:

Wilmington Trust Company, (the "**GUC Trust Administrator**") solely in its capacity as trustee for and administrator of the Motors Liquidation Company General Unsecured Creditors Trust (and as defined in Section 2.25 herein, the "**GUC Trust**")

-and-

The Signatory Plaintiffs, as hereinafter defined (the Signatory Plaintiffs and the GUC Trust, the "**Parties**").

## PREAMBLE[1]

### Background: The Old GM Bankruptcy.

A.     Beginning on the Petition Date, Motors Liquidation Company f/k/a General Motors Corporation, a Delaware Corporation ("**Old GM**"), and certain of its affiliated companies (together with Old GM, the "**Debtors**") commenced the Old GM Bankruptcy Case under chapter 11 of the Bankruptcy Code;

B.     Also on the Petition Date, the Sellers entered into an agreement pursuant to which certain assets of the Sellers, including the brand "General Motors," were to be sold to NGMCO, Inc., n/k/a General Motors LLC, a Delaware corporation ("**New GM**");

C.     As of July 5, 2009, the AMSPA was further and finally amended pursuant to a Second Amendment to the Amended and Restated Master Sale Purchase Agreement to, among other things, modify provisions in the original sale agreement relating to the issuance by New GM of a purchase price adjustment consisting of shares (the "**Adjustment Shares**") of New GM Common Stock in respect of Allowed General Unsecured Claims;

D.     Pursuant to the AMSPA, if the Bankruptcy Court issues an order estimating the aggregate allowed General Unsecured Claims against the Sellers at an amount exceeding thirty-five billion dollars ($35,000,000,000), then New GM must, within five (5) business days of entry of such order, issue the Adjustment Shares;

E.      If the Bankruptcy Court issues an Estimation Order estimating the aggregate allowed General Unsecured Claims against the Sellers at an amount at or exceeding forty-two billion dollars ($42,000,000,000), New GM must issue the maximum amount of Adjustment Shares (30,000,000 shares);

---

[1] Capitalized terms used, but not otherwise defined in the Preamble shall have the meanings ascribed to such terms in the Definitions section of this Agreement.

96909476.11

F.      On July 5, 2009, the AMSPA was approved pursuant to a Bankruptcy Code section 363 order (the "**Sale Order**");

G.      Pursuant to the Sale Order, New GM became vested in substantially all of the material assets of the Sellers;

H.      On July 10, 2009 (the "**Closing Date**"), the 363 Sale was consummated;

I.      On September 16, 2009, the Bar Date Order was entered establishing November 30, 2009 (the "**Bar Date**") as the deadline to file proofs of claim against the Debtors;

J.      On March 29, 2011, the Bankruptcy Court issued an order (the "**Confirmation Order**") confirming the Plan;

K.      The Plan created the GUC Trust pursuant to the GUC Trust Agreement, as a post-confirmation successor to the Debtors pursuant to Section 1145 of the Bankruptcy Code, to, *inter alia*, administer the GUC Trust Assets;

L.      The Plan, GUC Trust Agreement, MSPA and Side Letter provided the GUC Trust with the sole, exclusive right to object to and settle General Unsecured Claims, pursue an Estimation Order, and request and receive the Adjustment Shares;

M.      On March 31, 2011 (the "**Effective Date**"), the Plan was declared effective;

N.      As of December 31, 2018, the total allowed General Unsecured Claims are $31,855,431,837;

**The Recalls and the Multi-District Litigation.**

O.      In or around February and March of 2014, New GM issued a recall, NHTSA Recall Number 14V-047, pertaining to 2,191,525 vehicles with an ignition switch defect (the "**Ignition Switch Defect**");

P.      In or around June, July and September of 2014, New GM issued four additional recalls pertaining to approximately 10 million vehicles with defective ignition switches, NHTSA Recall Numbers 14V-355, 14V-394, 14V-540 and 14V-400;

Q.      In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-118, pertaining to approximately 1.2 million vehicles with defective side airbags;

R.      In or around March of 2014, New GM issued a recall, NHTSA Recall Number 14V-153, pertaining to over 1.3 million vehicles with defective power steering;

S.      Commencing after the issuance of the recalls, numerous lawsuits were filed against New GM, individually or on behalf of putative classes of persons, by, *inter alia*,:

a.  plaintiffs asserting economic loss claims who, prior to the Closing Date, owned or leased a vehicle with an ignition switch defect included in NHTSA Recall No. 14V-047 (the "**Ignition Switch Plaintiffs**");

b.  plaintiffs asserting economic loss claims who, prior to the Closing Date, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153 (the "**Non-Ignition Switch Plaintiffs**" and, together with the Ignition Switch Plaintiffs, the "**Economic Loss Plaintiffs**");

c.  plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident that occurred before the Closing Date involving an Old GM vehicle that was later subject to an ignition switch defect included in NHTSA Recall No. 14V-047 (the "**Ignition Switch Pre-Closing Accident Plaintiffs**"); and

d.  plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident that occurred before the Closing Date involving an Old GM vehicle that was later subject to NHTSA Recall Nos. 14V-355, 14V-540, 14V-394 or 14V-400 due to defects in ignition switches, side airbags, or power steering (the "**Non-Ignition Switch Pre-Closing Accident Plaintiffs**" and together with the Ignition Switch Pre-Closing Accident Plaintiffs, the "**Pre-Closing Accident Plaintiffs**"),

T.      Many of the cases commenced against New GM were consolidated in a multi-district litigation (the "**GM MDL**") pending in the United States District Court for the Southern District of New York before the Hon. Jesse M. Furman (the "**District Court**");

**The Motions to Enforce Litigation.**

U.      In or around April and August of 2014, New GM sought to enjoin such lawsuits against New GM by filing motions to enforce the Sale Order with respect to: (i) Ignition Switch Plaintiffs; (ii) Ignition Switch Pre-Closing Accident Plaintiffs; and (iii) Non-Ignition Switch Plaintiffs (the "**Motions to Enforce**");

V.      Following the filing of the Motions to Enforce, the Bankruptcy Court identified initial issues to be addressed on the Motions to Enforce with respect to the Ignition Switch Plaintiffs and Ignition Switch Pre-Closing Accident Plaintiffs;

W.      Following briefing and argument, the Bankruptcy Court issued a Decision on April 15, 2015, and a Judgment implementing the Decision on June 1, 2015;

X.      In the Decision and the Judgment, the Bankruptcy Court ruled that "based on the doctrine of equitable mootness, in no event shall assets of the GUC Trust held at any time in the past, now or in the future (collectively, the 'GUC Trust Assets') (as defined in the Plan) be used to satisfy any claims of the Plaintiffs";

Y.      On July 13, 2016, the Second Circuit issued an opinion on direct appeal of the Decision and Judgment, vacating the Bankruptcy Court's equitable mootness ruling as an advisory opinion and further determining that (i) there was no clear error in the Bankruptcy Court's factual

3

finding that Old GM knew or reasonably should have known about the ignition switch defect prior to bankruptcy, (ii) Old GM should have provided direct mail notice to vehicle owners, and (iii) individuals with claims arising out of the ignition switch defect were entitled to notice by direct mail or some equivalent, as required by procedural due process;

Z.    Following the issuance of the Second Circuit's mandate, the Bankruptcy Court identified initial issues to be addressed on remand, including whether the Economic Loss Plaintiffs or Pre-Closing Accident Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or whether such claims are equitably moot;

AA.    Pursuant to an Order to Show Cause, on December 22, 2016, the Economic Loss Plaintiffs and certain Pre-Closing Accident Plaintiffs who had not received notice of the Order to Show Cause, filed motions [ECF Nos. 13806, 13807] for authority to file late proofs of claim, including late class proofs of claim; on July 28, 2017, certain Pre-Closing Accident Plaintiffs filed a motion [ECF No. 14018] for authority to file late proofs of claim, as supplemented on August 10, 2017, September 19, 2017, December 12, 2017 and July 19, 2018 [ECF Nos. 14046, 14112, 14195, 14346]; and on July 27, 2018, certain Pre-Closing Accident Plaintiffs filed a motion [ECF No. 14350] for authority to file late proofs of claim  (collectively, the "**Late Claims Motions**");

BB.    Pursuant to the Order to Show Cause, certain other Plaintiffs have filed joinders to the Late Claims Motions [ECF Nos. 13811, 13818];

CC.    In or around March 2017, additional briefs were filed by Ignition Switch Plaintiffs, certain Ignition Switch Pre-Closing Accident Plaintiffs, New GM, and jointly by the GUC Trust and the Participating Unitholders on the Applicability of the *Pioneer* Issue and the Tolling Issue (as those terms are defined in the *Order Establishing, Inter Alia, Briefing Schedule for Certain Issues Arising From Late Claim Motions Filed by Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs and Certain Ignition Switch Pre-Closing Accident Plaintiffs* [ECF No. 13869]);

DD.    On July 15, 2016 and June 30, 2017, Judge Furman issued opinions in the GM MDL explaining that the "benefit-of-the-bargain defect theory" of economic loss damages "compensates a plaintiff for the fact that he or she overpaid, at the time of sale, for a defective vehicle.  That form of injury has been recognized by many jurisdictions."  See In re Gen. Motors LLC Ignition Switch Litig., 14-MD-2543 (JMF) (S.D.N.Y. June 30, 2017) [ECF Nos. 3119, 4175]. On April 3, 2018, Judge Furman denied without prejudice, New GM's motion for summary judgment with respect to Plaintiffs' claims for "benefit-of-the-bargain" damages [ECF No. 5310];

EE.    On April 24, 2018, the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed amended Proofs of Claim in connection with the Late Claims Motions [ECF No. 14280];

FF.    On May 25, 2018, certain Pre-Closing Accident Plaintiffs filed a supplemental Late Claims Motion (the "**Supplemental Late Claims Motion**") [ECF No. 14325];

GG.    Based upon the complexity of the issues in dispute, including, but not limited to the remaining 2016 Threshold Issues (the "**Disputed Issues**"), the potential for extensive, time consuming and expensive litigation regarding the Disputed Issues, the inherent uncertainty that would be attendant to litigating them, and the impact that an adverse judgment would have on the

4

GUC Trust, coupled with the desire to resolve the final potential claims against the GUC Trust, address any due process violations and attendant issues relating to the Recalls, and after review of the expert reports and proffer of evidence from the Ignition Switch Plaintiffs, Non-Ignition Switch Plaintiffs, and Ignition Switch Pre-Closing Accident Plaintiffs, as well as expert reports and other materials from New GM, the GUC Trust agrees, as part of the settlement of the Disputed Issues, to seek the issuance of the Estimation Order as provided for pursuant to Section 3.2(c) of the AMSPA, Section 7.3 of the Plan, the Side Letter and Section 5.1 of the GUC Trust Agreement.

## **AGREEMENT**

In settlement of the Disputed Issues between the GUC Trust and the Plaintiffs, the Parties agree to the following:

**1.      Preamble.**   The Preamble constitutes an essential part of the Agreement and is incorporated herein.

**2.      Definitions.**   The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**2.1      Adjustment Shares** shall have the meaning ascribed to such term in the Preamble. Solely in the event that the Bankruptcy Court enters the Estimation Order, the term "Adjustment Shares" as used herein shall be deemed to exclude any amounts due and payable on account of taxes or withholding.

**2.2      Adjustment Shares Waiver Provision** shall have the meaning ascribed to such term in Section 5.4 hereto.

**2.3      AMPSA** means that certain Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation and its debtor subsidiaries, as Sellers, and NGMCO, Inc., as successor in interest to Vehicle Acquisition Holdings LLC, a purchaser sponsored by the U.S. Treasury, as Purchaser, dated as of June 26, 2009, together with all related documents and agreements as well as all exhibits, schedules, and addenda thereto, as amended, restated, modified, or supplemented from time to time.

**2.4      Bar Date Order** means that *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim (Including Claims Under Bankruptcy Code Section 503(B)(9)) and Procedures Relating Thereto and Approving the Form and Manner of Notice Thereof,* dated Sept. 16, 2009 [ECF No. 4079] entered by the Bankruptcy Court establishing the Bar Date.

**2.5      Bar Date** shall have the meaning ascribed to such term in the Preamble.

**2.6      Bankruptcy Code** means title 11 of the United States Code.

**2.7      Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York.

**2.8      Closing Date** shall have the meaning ascribed to such term in the Preamble.

**2.9    Co-Lead Counsel** means, for purposes of this Agreement, Steve W. Berman of Hagens Berman Sobol Shapiro LLP and Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein, LLP, who were individually and collectively appointed to represent all economic loss plaintiffs in the GM MDL by Order No. 8, In re Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (S.D.N.Y. Aug. 15, 2014) [ECF No. 249], or any other or replacement counsel appointed to represent any Ignition Switch or Non-Ignition Switch Plaintiffs in the GM MDL.

**2.10    Communication** shall have the meaning ascribed to such term in Section 3.15.

**2.11    Confirmation Order** shall have the meaning ascribed to such term in the Preamble.

**2.12    Debtors** shall have the meaning ascribed to such term in the Preamble.

**2.13    Decision** means the *Decision on Motion to Enforce Sale Order*, entered April 15, 2015 [ECF No. 13109] by Judge Robert E. Gerber in the Bankruptcy Court, published as In re Motors Liquidation Company, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), as corrected in *Errata Order RE: Decision on Motion to Enforce Sale Order*, In re Motors Liquidation Co., No. 09-50026, dated July 13, 2015 [ECF No. 13290].

**2.14    Disputed Issues** shall have the meaning ascribed to such term in the Preamble.

**2.15    District Court** shall have the meaning ascribed to such term in the Preamble.

**2.16    Economic Loss Classes** shall mean the putative class of Ignition Switch Plaintiffs and the putative class of Non-Ignition Switch Plaintiffs seeking certification under Rule 23.

**2.17    Economic Loss Plaintiff** shall mean any individual who, prior to the Closing Date, owned or leased a vehicle subject to a Recall other than NHTSA Recall No. 14v-540.

**2.18    Effective Date** shall have the meaning ascribed to such term in the Preamble.

**2.19    Estimation Motion** shall mean a motion filed in the Bankruptcy Court by the GUC Trust seeking a determination of Plaintiffs' aggregate Allowed General Unsecured Claims against the Sellers.

**2.20    Estimation Order** shall mean an order of the Bankruptcy Court estimating Plaintiffs' aggregate Allowed General Unsecured Claims against the Sellers, as contemplated by Section 3.2(c) of the AMSPA, substantially in the form to be agreed upon by the Parties.

**2.21    Final Approval Order** shall have the meaning ascribed to such term in Section 5.2.2.

**2.22    Final Order** shall have the meaning ascribed to such term in the Plan.

**2.23    General Unsecured Claim** shall have the meaning ascribed to such term in the Plan.

**2.24    GM MDL** shall have the meaning ascribed to such term in the Preamble.

6

**2.25    GUC Trust** means the trust created by the GUC Trust Agreement in the form approved as Exhibit D to the Plan, as the same has been and may further be amended from time to time.

**2.26    GUC Trust Agreement** means the *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement*, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust, and FTI Consulting, as trust monitor of the GUC Trust, dated July 30, 2015, as it may be amended from time to time.

**2.27    GUC Trust Assets** means assets that have been held, are held, or may be held in the future by the GUC Trust.  Solely in the event that the Bankruptcy Court enters the Estimation Order, the term "GUC Trust Assets" as used herein shall be deemed to exclude the Adjustment Shares.

**2.28    GUC Trust Beneficiaries** means, in accordance with Section F of the GUC Trust Agreement, holders of allowed General Unsecured Claims as of the date of this Agreement, and, for the avoidance of doubt, does not include Plaintiffs.

**2.29    Ignition Switch Defect** shall have the meaning ascribed to such term in the Preamble.

**2.30    Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**2.31    Ignition Switch Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**2.32    Judgment** means the Judgment, entered June 1, 2015 [ECF No. 13177] by Judge Robert E. Gerber in the Old GM Bankruptcy Case.

**2.33    Late Claims Motions** shall have the meaning ascribed to such term in the Preamble.

**2.34    Motors Liquidation Company Avoidance Action Trust** means the trust established under the Plan in connection with recovery of proceeds of the Term Loan Avoidance Action.

**2.35    Motions to Enforce** means, collectively, the (i) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620]; (ii) *Motion of General Motors LLC Pursuant to 11 U.S.C §§ 105 and 363 to Enforce this Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated August 1, 2014 [ECF No. 12807]; and (iii) *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808].

**2.36    New GM** shall have the meaning ascribed to such term in the Preamble.

7

**2.37    New GM Common Stock** means the common stock of New GM (NYSE: GM).

**2.38    NHTSA** means the National Highway Traffic Safety Administration.

**2.39    Non-Ignition Switch Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**2.40    Notice Cost Cap Amount** shall have the meaning ascribed to such term in Section 4.4.

**2.41    Notice Provisions** shall have the meaning ascribed to such term in Section 4.2.

**2.42    Old GM** shall have the meaning ascribed to such term in the Preamble.

**2.43    Old GM Bankruptcy Case** means those proceedings commenced on June 1, 2009 in the Bankruptcy Court captioned *In re Motors Liquidation Company, et al., f/k/a General Motors Corp.*, Bankr. No. 09-50026.

**2.44    Order to Show Cause** means the order entered by the Bankruptcy Court on December 13, 2016, which identified five threshold issues.

**2.45    Participating Unitholders** means certain unaffiliated holders of 67% of the beneficial units of the GUC Trust, as of the date of this Agreement, represented by Akin Gump Strauss Hauer & Feld LLP.

**2.46    Parties** means the Signatory Plaintiffs and the GUC Trust.

**2.47    Petition Date** means June 1, 2009, when Motors Liquidation Company, f/k/a General Motors Corporation, a Delaware Corporation, and certain of its affiliated companies commenced cases under chapter 11 of the Bankruptcy Code.

**2.48    PIWD** means claims for personal injury and wrongful death.

**2.49    PIWD Counsel** means (i) Lisa M. Norman of Andrews Myers, P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm with respect to a Late Claims Motion and identified on Schedule 2; and (ii) Mark Tsukerman of Cole Schotz P.C., but solely for the Pre-Closing Accident Plaintiffs represented by that law firm with respect to a Late Claims Motion and identified on Schedule 3.

**2.50    PIWD Plaintiffs** means those certain Pre-Closing Accident Plaintiffs represented by PIWD Counsel with respect to a Late Claims Motion or a Supplemental Late Claims Motion who have not entered into a settlement agreement with New GM and are identified on Schedules 2 and 3.

**2.51    Plaintiffs** means the Ignition Switch Plaintiffs, the Non-Ignition Switch Plaintiffs, and the Pre-Closing Accident Plaintiffs, including all plaintiffs (whether named or unnamed, including unnamed members of the putative classes) covered by any of the Late Claims Motions, all plaintiffs represented by counsel that is signatory hereto and any other party who (i) prior to

8

July 10, 2009, suffered an economic loss claim by reason of his, her or its ownership or lease of an Old GM vehicle with an Ignition Switch Defect included in Recall No. 14V-047; (ii) prior to July 10, 2009 suffered an economic loss claim by reason of their ownership or lease of an Old GM vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 or 14V-153, it being understood however that the covenants and agreements to be performed by the Signatory Plaintiffs are to be performed by Co-Lead Counsel and PIWD Counsel and that no action or failure to act by any Plaintiff (other than the Signatory Plaintiffs) shall constitute a breach of this Agreement or shall excuse the performance of any other Party.

**2.52    Plan** means the Debtors' Second Amended Joint Chapter 11 Plan, filed March 18, 2011 [ECF No. 9836] by Motors Liquidation Company in the Old GM Bankruptcy Case.

**2.53    Pre-Closing** means any time before July 10, 2009, the date on which the 363 Sale between the Sellers and New GM closed.

**2.54    Pre-Closing Accident Plaintiffs** shall have the meaning ascribed to such term in the Preamble.

**2.55    Preliminary Approval Order** means an Order of the Bankruptcy Court (i) extending its discretion to apply Rule 23 to these proceedings, and (ii) approving the form and manner of notice to the Plaintiffs, including notice to the proposed Classes upon finding that this Court will likely be able to approve the Settlement under Federal Rule of Civil Procedure 23(e)(2) and certify the settlement-purpose classes.

**2.56    Proofs of Claim** means the late proofs of claim, including late class proofs of claim, that the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs sought authority to file pursuant to the Late Claims Motions and the Supplemental Late Claims Motion, and any amendments thereto filed prior to the execution of this Agreement. For the avoidance of doubt, the Proofs of Claim do not include any proofs of claim filed by any client of Hilliard Martinez Gonzalez LLP or The Law Offices of Thomas J. Henry, including any parties who sought to file late claims pursuant to ECF No. 13807 and any related supplemental late claim motion (the "Hilliard Plaintiffs"). The Hilliard Plaintiffs shall not be entitled to any of the rights or benefits conferred under this Agreement.

**2.57    Release** shall have the meaning ascribed to such term in Section 5.3.

**2.58    Recalls** means NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-540, 14V-400, 14V-118 and 14V-153.

**2.59    Rule 23** means Rule 23 of the Federal Rules of Civil Procedure in effect on the date of this Agreement.

**2.60    Sale Order** means the *Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief,* dated July 5, 2009 [ECF No. 2968] and the supporting *Decision on Debtors' Motion for Approval of (1) Sale of Assets to Vehicle Acquisition Holdings, LLC; (2)*

*Assumption and Assignment of Related Executory Contracts; and (3) Entry into UAW Retiree Settlement Agreement*, dated July 5, 2009 [ECF No. 2967].

**2.61    Sellers** means Motors Liquidation Company, formerly known as General Motors Corporation, together with three of its debtor subsidiaries, Chevrolet-Saturn of Harlem, Inc.; Saturn, LLC; and Saturn Distribution Corporation.

**2.62    Settlement** means the settlement of the Parties' disputes as provided for by this Agreement.

**2.63    Settlement Effective Date** shall have the meaning ascribed to such term in Section 3.1.

**2.64    Settlement Fund** means that trust, fund or other vehicle established and designated by the Signatory Plaintiffs for purposes of administration of Plaintiffs' claims reconciliation and/or distributions to Plaintiffs under a subsequent allocation methodology.

**2.65    Settlement Motion** shall have the meaning ascribed to such term in Section 2.2.

**2.66    Side Letter** shall mean the document attached hereto as <u>Exhibit A</u>, by and between the GUC Trust, the Debtors, New GM, and FTI Consulting (as trust monitor of the GUC Trust) dated September 23, 2011.

**2.67    Signatory Plaintiffs** means PIWD Counsel on behalf of the PIWD Plaintiffs identified on Schedule 2, and Co-Lead Counsel on behalf of the proposed class representatives for Ignition Switch Plaintiffs and proposed class representatives for certain Non-Ignition Switch Plaintiffs identified on Schedule 3.

**2.68    Supplemental Late Claims Motion** shall have the meaning ascribed to such term in the Preamble.

**2.69    Term Loan Avoidance Action** means the action captioned *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (Bankr. S.D.N.Y. July 31, 2009).

**2.70    Term Loan Avoidance Action Claims** shall have the meaning ascribed to such term in the GUC Trust Agreement.

**2.71    2016 Threshold Issues** means the five threshold issues identified in the Bankruptcy Court's Order to Show Cause of December 13, 2016.

**2.72    363 Sale** means the consummation of transactions that were approved on July 10, 2009 pursuant to the Sale Order.

**3.    Consent to Filing of Late Claims.**  The GUC Trust consents to the filing of the Proofs of Claim, as amended.  For the avoidance of doubt, (i) the GUC Trust does not consent to the filing of any proofs of claim submitted by the Hilliard Plaintiffs or any other parties who are not

Signatory Plaintiffs and (ii) nothing in this Agreement shall constitute an agreement regarding the allowance of any Proofs of Claim.

**4.    Class Certification.**

4.1    As soon as practicable following the execution of this agreement, the Economic Loss Plaintiffs shall prepare a motion ("**Class Certification Motion**") substantially in the form agreed upon by the GUC Trust, seeking certification of the Economic Loss Class pursuant to Rule 23 on a preliminary and final basis, approval of the form and manner of notice, and appointment of class representatives and class counsel for Rule 23(a) and (g) settlement certification purposes.

4.2    As part of the Preliminary Approval Order, the Economic Loss Plaintiffs shall seek Bankruptcy Court approval of the form and manner of notice to the proposed members of the Economic Loss Classes and certain Pre-Closing Accident Plaintiffs (the "**Notice Provisions**"), substantially in the form to be agreed upon by the Parties and approved by the Bankruptcy Court.

4.3    The requested Notice Provisions shall include (i) publication notice by multimedia channels that may include social media, e-mail, online car and consumer publications, and a settlement website (which, for the avoidance of doubt, may be the GUC Trust's website at www.mlcguctrust.com) where all relevant documents and long form notice will be posted; (ii) notice by postcard to: (A) all persons in the United States who, prior to July 10, 2009, owned or leased a vehicle manufactured by Old GM that was subject to the Recalls and whose claim has not been settled or adjudicated finally; (B) all Pre-Closing Accident Plaintiffs who have filed a lawsuit against New GM as of the date of this Agreement and whose claim has not been settled or adjudicated finally; and (C) all Pre-Closing Accident Plaintiffs who have filed or joined a motion for authorization to file late claims against the GUC Trust and whose claim has not been settled or adjudicated finally; (iii) notice to all defendants in the Term Loan Avoidance Action via the Bankruptcy Court's ECF system and, to the extent a defendant is not registered to receive notice via the ECF system, via postcard, and (iv) notice via DTC's LENSNOTICE system to holders of beneficial units of the GUC Trust.

4.4    The GUC Trust agrees to pay the reasonable costs and expenses for notice in an amount up to $13,720,000 (the "**Notice Cost Cap Amount**"), to be paid directly to the Plaintiffs' noticing agent upon presentment of an invoice and only after the Bankruptcy Court enters the Preliminary Approval Order, consistent with the terms of this Agreement. For the avoidance of doubt, the GUC Trust shall not be obligated to fund or otherwise be committed to fund any amount in excess of the Notice Cost Cap Amount.

4.5    The Parties agree that, in the event that the District Court issues an Opinion or Order on the *Defendant General Motors LLC's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs* [GM MDL ECF No. 5859] ("**Summary Judgment Decision**") that impacts the size, scope or composition of the classes of

11

Economic Loss Plaintiffs, the Parties shall, within five (5) business days from entry of the applicable Opinion or Order, engage in good faith negotiations regarding the applicable provisions of this Settlement Agreement impacted by said decision.

**4.6**    In furtherance of the Plaintiffs' Class Certification Motion, the GUC Trust shall file a motion seeking approval of an Order from the Bankruptcy Court directing the production of information held by General Motors LLC concerning the identity of any members of the Economic Loss Classes pursuant to Federal Rule of Bankruptcy Procedure 2004 and the applicable provisions of the MSPA.

**5.    Motion for Approval of Settlement.**

**5.1**    As soon as practicable following the execution of this Agreement, the GUC Trust shall prepare and file a motion in the Bankruptcy Court (the "**Settlement Motion**") seeking approval of this Settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.  The Settlement Motion shall be in a form to be agreed upon by the Parties, and otherwise on terms acceptable to the GUC Trust, Co-Lead Counsel and PIWD Counsel, each in their sole and absolute discretion.

**5.2**    The Settlement Motion will ask the Bankruptcy Court to issue:

**5.2.1**    An order approving the reallocation up to the Notice Cost Cap Amount from GUC Trust Assets and authorizing (i) the payment of the noticing costs and (ii) the GUC Trust to enter into the Settlement Agreement and seek estimation pursuant to the terms of the GUC Trust Agreement.

**5.2.2**    An order granting approval of the Settlement Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, which order may be the same order that provides final approval of the Settlement and Class Certification Motion pursuant to Rule 23 (the "**Final Approval Order**").

**5.3**    The Final Approval Order will include a provision that imposes a complete and irrevocable waiver and release on the part of all Signatory Plaintiffs with respect to any and all rights, claims and causes of action (including but not limited to any claims and causes of action arising as a result of the Recalls or with respect to General Unsecured Claims of the Plaintiffs arising under, or that may arise under, an Estimation Order), now existing or arising in the future, that any Signatory Plaintiff might directly or indirectly assert against the Debtors, their estates, the GUC Trust, the trust administrator of the GUC Trust, the GUC Trust Monitor, the GUC Trust Assets, the Motors Liquidation Company Avoidance Action Trust, the trustee for the Motors Liquidation Company Avoidance Action and the GUC Trust Beneficiaries, and channels all such claims or potential claims to the Settlement Fund for administration and satisfaction (the "**Release Provision**," and the waiver and release contemplated thereby, the "**Release**").

**5.4**    The Final Approval Order will include a provision that imposes a complete and irrevocable waiver and release from the GUC Trust, the GUC Trust Beneficiaries, the Motors Liquidation Company Avoidance Action Trust, and all defendants in

the Term Loan Avoidance Action, with respect to any rights to the Settlement Fund or the Adjustment Shares (the "**Adjustment Shares Waiver Provision**").

5.5    Immediately upon the entry of the Final Approval Order, the Release Provision and Adjustment Shares Waiver Provision shall become effective and binding on all affected parties.

5.6    The Signatory Plaintiffs agree that they will not object to any and all injunctions sought by the GUC Trust pursuant to Bankruptcy Code Section 105 to further effectuate the Release Provision.

6.    **Estimation.**

6.1    The GUC Trust shall file the Estimation Motion within three (3) business days of entry of the Final Approval Order.  The Estimation Motion shall seek entry of the Estimation Order, which order shall:

6.1.1    estimate the aggregate allowed General Unsecured Claims of Economic Loss Plaintiffs and certain Pre-Closing Accident Plaintiffs against Sellers and/or the GUC Trust pursuant to Bankruptcy Code Section 502(c), Section 5.1 of the GUC Trust Agreement, Section 7.3 of the Plan, Section 3.2(c) of the AMSPA and the Side Letter in an amount that, as of the date of the Estimation Order, could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares;

6.1.2    direct that, subject to Section 7 hereof, any such Adjustment Shares issued as a result of an Estimation Order, or the value of such Adjustment Shares, be promptly delivered by New GM to the Settlement Fund; and

6.1.3    schedule a hearing in the Bankruptcy Court to consider the Estimation Motion and entry of the Estimation Order.

6.2    Notwithstanding Sections 157(b)(2)(B) and (b)(2)(O) of Title 28 of the United States Code, in connection with the Settlement Motion, to the extent (if any) consent is required, the Pre-Closing Accident Plaintiffs represented by PIWD Counsel consent to the Bankruptcy Court estimating their personal injury and wrongful death claims against the Sellers and/or the GUC Trust in connection with the settlement contemplated under this Agreement.  The Pre-Closing Accident Plaintiffs represented by PIWD Counsel do not consent to estimation of their personal injury and wrongful death claims by the Bankruptcy Court for any other purpose other than implementation of the settlement contemplated under this Agreement or in connection with any other proceeding other than proceedings necessary to implement the settlement contemplated under this Agreement.

6.3    For the avoidance of doubt, each Signatory Plaintiff that is a Pre-Closing Accident Plaintiff settling a Late Claims Motion or a Supplemental Late Claims Motion against the GUC Trust relating to an accident that occurred before the Closing Date in a vehicle that was later subject to one of the Recalls waives any right to a jury

trial in connection with the following: (1) the estimation of his or her individual claim as a Pre-Closing Accident Plaintiff by the Bankruptcy Court, (2) the estimation of all late claims of PIWD Plaintiffs taken as a whole by the Bankruptcy Court, (3) the fixing of the amount to be distributed to such Pre-Closing Accident Plaintiff on account of his or her late claim, (4) the development and approval of the allocation of the Adjustment Shares and any other property or proceeds in the Settlement Fund between economic loss plaintiffs and Pre-Closing Accident Plaintiffs, (5) the development and approval of the criteria and eligibility for such PIWD Plaintiff to receive distributions from the Settlement Fund on account of his or her late claim, and (6) the fixing of the amount of such Signatory Plaintiff's claim for purposes of receiving distributions (if any) from the Settlement Fund pursuant to the terms of this Agreement.

**7.    Required Withholdings from Distributions.**    Notwithstanding anything in this Agreement to the contrary, and although not anticipated to be required to do so, the GUC Trust, the GUC Trust Administrator, and any applicable withholding agent shall be entitled to deduct and withhold from the distribution of the Adjustment Shares otherwise payable to the Settlement Fund pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under the United States Internal Revenue Code of 1986, as amended (the "**Code**"), or any other provision of tax law.  The GUC Trust and the GUC Trust Administrator agree to provide the Settlement Fund with reasonable notice of its intent to deduct and withhold if required to do so, and to the extent practicable, consider in good faith any position that the Settlement Fund raises as to why withholding is not required or alternative arrangements proposed by the Settlement Fund that may avoid the need for withholding.  To the extent that amounts are so withheld or deducted by the GUC Trust, the GUC Trust Administrator, or other applicable withholding agent, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Settlement Fund.  In addition, in accordance with Section 6.1(e) of the GUC Trust Agreement and taking into account Section 7.3 of the GUC Trust Agreement, the GUC Trust Administrator may hold back from the distributions of Adjustment Shares contemplated by this Agreement sufficient Adjustment Shares or amounts in order to settle the tax liabilities of the GUC Trust incurred as a result of the transactions contemplated by this Agreement.  To the extent such hold back of Adjustment Shares is necessary, the GUC Trust Administrator shall monetize such held back Adjustment Shares on the same date as the distribution of Adjustment Shares is provided to the Settlement Fund.  Furthermore, the GUC Trust Administrator will request an expedited determination of taxes of the GUC Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for any and all tax periods that include transactions contemplated by this Agreement.  Upon such determination (or, in the event a court of competent jurisdiction decides that such a determination is unavailable, as soon as reasonably practicable but no later than the expiration of the applicable statute of limitations), the GUC Trust Administrator will distribute in accordance with provisions of this Agreement any amounts held back in excess of any tax liabilities incurred by the GUC Trust as a result of the transactions contemplated by this Agreement.  The GUC Trust and the GUC Trust Administrator agree to provide the Settlement Fund with reasonable notice of (a) any intent to hold back Adjustment Shares and (b) the amount to be withheld, with the intent that such withheld amount would not exceed what could be the final tax liability of the GUC Trust as a result of the transactions contemplated by this Agreement.

14

**8.     The Settlement Fund.**  The Signatory Plaintiffs or, in the alternative, an administrator appointed by the Signatory Plaintiffs, shall establish the Settlement Fund (at the sole cost of the Signatory Plaintiffs) and the procedures for the administration and allocation to Plaintiffs of the Settlement Fund, including the criteria for Plaintiffs to assert a claim against the Settlement Fund, the methodology for allocating the Settlement Fund to Plaintiffs, and procedures for payment of Plaintiffs' attorneys' fees.

(a) Allocation of any Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund between the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs shall be determined and approved by the Bankruptcy Court.  Notice of any agreement as to the proposed allocation of any Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund as between the Economic Loss Plaintiffs and Pre-Closing Accident Plaintiffs, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by such allocation, and such Plaintiffs shall have an opportunity to object to the proposed allocation at a hearing, as when and if such agreement is reached.

(b) Approval of the qualifications and criteria for Plaintiffs to be eligible to receive distributions from any Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund shall be done by the Bankruptcy Court.  Notice of any proposed criteria for determining the right or ability of each Plaintiff to receive a distribution from any Adjustment Shares (or their value), and any other consideration contained in the Settlement Fund on account of a claim against Debtors based upon economic loss or for PIWD arising or occurring before the Closing Date, along with information about the hearing date and how and when to assert any objections, will be provided by, and at the sole cost of, Signatory Plaintiffs (and not the GUC Trust) via a settlement website to all known Plaintiffs whose rights might be affected by the establishment of criteria for the payment of such claims and such Plaintiffs shall have an opportunity to object to the proposed criteria at a hearing, as when and if such criteria is developed.  Being defined as a Plaintiff does not assure any party that he, she, or it will receive a distribution from any Adjustment Shares (or their value), or any other consideration contained in the Settlement Fund.

**9.     Settlement Effective Date.**  This Agreement shall become effective and binding on the Parties on the date on which this Agreement is fully executed by each of the Parties.

**10.    Termination.**

   **10.1    Automatic Termination.**  This Agreement shall immediately terminate as to all Parties in the event (a) the Bankruptcy Court does not approve any aspect of the relief sought in the Settlement Motion, (b) the Bankruptcy Court does not enter either the Preliminary Approval Order or Final Approval Order, (c) the Bankruptcy Court denies class certification, or (d) the Bankruptcy Court requires notice or other procedures materially different from those set forth herein that are not otherwise reasonably acceptable to the Parties.  For the avoidance of doubt, this Agreement shall not immediately terminate if the Bankruptcy Court denies approval of the Estimation Order.  In the event of such automatic termination, this Agreement shall

96909476.11

be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 11, 12, 13, 21, 23 and 27) had never existed and the Parties shall be returned to their respective positions *status quo ante*.

10.2    **Termination by the GUC Trust.** This Agreement shall be terminable at the option of the GUC Trust in the event (a) the Preliminary Approval Order is not entered on or before September 15, 2019; or (b) an appeal of the Summary Judgment Decision is filed by Co-Lead Counsel. In the event of such termination, this Agreement shall be null and void, and each of the Parties' respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement (except as set forth in Sections 11, 12, 13, 21, 23 and 27) had never existed and the Parties shall be returned to their respective positions *status quo ante*.

10.3    **Termination by Any Party for Cause.** In the event of any material breach of the terms of this Agreement, the non-breaching Party may elect (in addition to any other remedies available to the non-breaching party hereunder or under applicable law) to terminate this Agreement by (i) providing a Communication to the breaching party as set forth in Section 23 below, and affording the breaching party a five (5) business day period in which to cure the purported breach, and (ii) absent such cure or the commencement of an action in the Bankruptcy Court with respect to the existence of any such breach, by providing a follow-up Communication to the breaching Party as set forth in Section 23 below, that declares the Agreement to be terminated. Following such termination for cause, the terms of the Agreement shall no longer be binding on the non-breaching Party (except as set forth in Sections 11, 12, 13, 21, 23 and 27).

**11.    Attorneys' Fees.** Except as otherwise provided for herein, each of the Parties shall pay its own court costs, attorneys' fees, and all other expenses, costs, and fees incurred relating to this Agreement and any related litigation, including but not limited to the GM MDL and Motions to Enforce litigation. If any lawsuit or proceeding is required to enforce the terms of this Agreement, the prevailing party in any such lawsuit or proceeding shall be entitled to reasonable attorney's fees and costs.

**12.    No Admission.** Nothing in this Agreement shall be deemed an admission of any kind. To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding.

**13.    Remedies.** Each of the Parties retain all remedies available in law or equity for breach of this Agreement by any Party, including, without limitation, the right of a non-breaching Party to seek specific performance and injunctive or other equitable relief as a remedy for any such breach. For the avoidance of doubt, nothing in the Agreement is intended to waive any claims against New GM or to be an election of remedies against New GM; nor does the Agreement or any payments made in connection therewith represent full satisfaction of any claims against the Debtors, unless and until such claims are in fact paid in full from every available source; provided, however, that in no event shall any Plaintiff be permitted to seek any further payment or compensation from the

16

GUC Trust in respect of its claims or otherwise, other than the Adjustment Shares. Except as mandated otherwise under applicable law, (i) nothing in the Settlement Agreement shall be construed to waive (nor is anything in the Settlement Agreement intended by the Parties to waive) any claims that any Plaintiff may have against New GM or constitute an election of remedies by any Plaintiff; (ii) the Adjustment Shares (nor any distribution thereof to any Plaintiff) shall not represent full and final satisfaction of any claim that any Plaintiff may have against New GM, all of which are expressly reserved; and (iii) the Bankruptcy Court's estimate of the Plaintiffs' Allowed General Unsecured Claims in an Estimation Order shall not operate as a cap on any of the claims of any of the Plaintiffs against New GM.

14.     **No Litigation.**  Except as may be necessary to enforce the terms of this Agreement, the Parties and any other person who is an intended beneficiary hereunder, agree that she or he shall not commence or proceed with any action, claim, suit, proceeding or litigation against any other Party, directly or indirectly, regarding or relating to the matters described in this Agreement, or take any action inconsistent with the terms of the Agreement.

15.     **Further Assurances.**  Each of the Parties covenant to, from time to time, execute and deliver such further documents and instruments and take such other actions as may be reasonably required or appropriate to evidence, effectuate, or carry out the intent and purposes of this Agreement or to perform its obligations under this Agreement and the transactions contemplated thereby.

16.     **Cooperation.**  The Parties agree to reasonably cooperate with one another to effectuate an efficient and equitable implementation of this Agreement.

17.     **Counterparts; Facsimile; Signatures.**  This Agreement may be executed in any number of counterparts and by different Parties to this Agreement on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by any of the Parties by facsimile or .pdf electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement, shall be deemed to be an original signature hereto, and shall be admissible as such in any legal proceeding to enforce this Agreement.

18.     **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective agents, partners, attorneys, employees, representatives, officers, directors, shareholders, divisions, subsidiaries, affiliates, transferees, heirs, executors, administrators, personal representatives, legal representatives, successors, and assigns.

19.     **Integration.**  This Agreement constitutes the entire agreement and understanding among the Parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements, representations and understandings between or among any of the Parties hereto relating to such subject matter.  In entering into this Agreement, the Parties and each of them acknowledge that they are not relying on any statement, representation, warranty, covenant or agreement of any kind made by any other party hereto or any employee or agent of any other party hereto, except for the representations, warranties, covenants and agreements of the Parties expressly set forth herein.

17

20.    **Amendment.**    Except as otherwise specifically provided in this Agreement, no amendment, modification, rescission, waiver or release of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Parties.

21.    **Interpretation.**    Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, and the Parties agree to take any and all steps which are necessary in order to enforce the provisions hereof.

22.    **Severability.**    The terms and conditions of this Agreement are not severable.  However, if any provision or part of any provision of this Agreement is for any reason declared or determined by a court of competent jurisdiction to be invalid, unenforceable, or contrary to public policy, law, statute, or ordinance, the validity of the remaining parts, terms, or provisions of this Agreement shall not be affected thereby and shall remain valid and fully enforceable, and such invalid, unenforceable, or illegal part or provision shall not be deemed to be part of this Agreement.

23.    **Notices.**    Any notice, demand, request, consent, approval, declaration or other communication (a "**Communication**") under this Agreement shall be in writing and shall be given or delivered (i) by a nationally recognized private overnight courier service addressed as indicated in Schedule 1 annexed hereto or to such other address as such party may indicate by a notice delivered to the other Parties hereto in accordance with the provisions hereof; or (ii) to the extent that such Communication has been filed with the Bankruptcy Court, via the electronic distribution means used by the Bankruptcy Court.  Any Communication shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the first business day following the date upon which it is delivered for overnight delivery to such courier service.

24.    **Choice of Law and Forum; Consent to Jurisdiction.**    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to its conflict of laws principles.  The Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute arising out of, related to or in connection with this Agreement to the exclusion of any other court, and the Parties hereby consent to the jurisdiction of the Bankruptcy Court for resolution of such disputes and agree that they shall not attempt to litigate any such dispute in any other court.

25.    **Advice of Counsel.**    Each Party represents and acknowledges that it has been represented by an attorney with respect to this Agreement and any and all matters covered by or related to such Agreement.  Each Party further represents and warrants to each other that the execution and delivery of this Agreement has been duly authorized by each of the Parties after consultation with counsel, that the persons signing this Agreement on their behalf below have been fully authorized by their respective Parties to do so, and that the undersigned do fully understand the terms of this Agreement and have the express authority to enter into this Agreement.

26.    **Assignment.**    No assignment of this Agreement or of any rights or obligations hereunder may be made by any party hereto without the prior written consent of the other Parties hereto, and any attempted assignment without such prior consent shall be null and void.

96909476.11

27.    **Waiver.**  Except as otherwise specifically provided in this Agreement, any provision of this Agreement may be waived only by a written instrument signed by the Party against whom enforcement of such waiver is sought.

28.    **Headings, Number, and Gender.**  The descriptive headings of the sections of this Agreement are included for convenience of reference only and shall have no force or effect in the interpretation or construction of this Agreement.  As used in this Agreement, the singular shall include the plural, and the masculine shall include the feminine and neutral genders, and vice versa.

29.    **Waiver of Jury Trial.**  Each of the Parties hereby irrevocably waives its rights, if any, to a jury trial for any claim or cause of action based upon or arising out of this Agreement.

30.    **Authority**.  Each of the Parties represents and warrants that (i) it has the requisite power and authority to execute and deliver this Agreement and any ancillary agreements connected hereto which it may be a party; (ii) the execution and delivery by it of this Agreement, and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and (iii) this Agreement constitutes a legal, valid and binding obligation of such Party.

31.    **GUC Trust Fiduciary Duties**.  Nothing in this Agreement shall otherwise require the GUC Trust or the GUC Trust Administrator to take any action, or to refrain from taking any action, to the extent inconsistent with its fiduciary obligations under applicable law (as reasonably determined by them in good faith after consultation with legal counsel).

96909476.11

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

Wilmington Trust National Association, Not individually, but solely in its capacity as GUC Trust Administrator and Trustee of the GUC Trust

By: _____
Name:  David A. Vanaskey, Jr.

Title:  Vice President, Wilmington Trust Company

BROWN RUDNICK LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

On behalf of Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

ANDREWS MYERS, P.C.

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to certain PIWD Plaintiffs

COLE SCHOTZ, P.C.

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Mark Tsukerman

Title: Counsel to certain PIWD Plaintiffs

96909476.10

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

Wilmington Trust National Association,
Not individually, but solely in its capacity
as GUC Trust Administrator and Trustee of
the GUC Trust

By: _____
Name:  David A. Vanaskey, Jr.

Title:  Vice President, Wilmington Trust
Company

**BROWN RUDNICK LLP**

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court

STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.

On behalf of Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court

**HAGENS BERMAN SOBOL SHAPIRO LLP**

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

**ANDREWS MYERS, P.C.**

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to certain PIWD Plaintiffs

**COLE SCHOTZ, P.C.**

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Mark Tsukerman

Title: Counsel to certain PIWD Plaintiffs

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

Wilmington Trust National Association, Not individually, but solely in its capacity as GUC Trust Administrator and Trustee of the GUC Trust

By: _____
Name:  David A. Vanaskey, Jr.

Title:  Vice President, Wilmington Trust Company

BROWN RUDNICK LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, P.C.

On behalf of Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the Bankruptcy Court

HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs in the MDL Court

ANDREWS MYERS, P.C.

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to certain PIWD Plaintiffs

COLE SCHOTZ, P.C.

On behalf of certain PIWD Plaintiffs

By: _____

96909476.11

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

Wilmington Trust National Association,
Not individually, but solely in its capacity
as GUC Trust Administrator and Trustee of
the GUC Trust

By: _____
Name:  David A. Vanaskey, Jr.

Title:  Vice President, Wilmington Trust
Company

BROWN RUDNICK LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Edward S. Weisfelner
Name:  Howard S. Steel

Title:  Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-
Switch Plaintiffs in the Bankruptcy Court

STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.

On behalf of Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Sander L. Esserman

Title: Designated Counsel for the Ignition
Switch Plaintiffs and certain Non-Ignition
Switch Plaintiffs in the Bankruptcy Court

HAGENS BERMAN SOBOL SHAPIRO LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Steve W. Berman

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

On behalf of the Ignition Switch Plaintiffs and
certain Non-Ignition Switch Plaintiffs

By: _____
Name:  Elizabeth J. Cabraser

Title: Co-Lead Counsel for the Ignition Switch
Plaintiffs and certain Non-Ignition Switch
Plaintiffs in the MDL Court

ANDREWS MYERS, P.C.

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Lisa M. Norman

Title: Counsel to certain PIWD Plaintiffs

COLE SCHOTZ, P.C.

On behalf of certain PIWD Plaintiffs

By: _____
Name:  Mark Tsukerman

Title: Counsel to certain PIWD Plaintiffs

20

# EXHIBIT A

**Execution Version**

**MOTORS LIQUIDATION COMPANY GUC TRUST**

c/o Wilmington Trust Company
Rodney Square North
1100 North Market Street
Wilmington, Delaware, 19890-1615

September 23, 2011

Motors Liquidation Company
401 S. Old Woodward, Suite 370
Birmingham, Michigan 48009
Attn: Ted Stenger

Remediation And Liability Management Company, Inc.
c/o Motors Liquidation Company
401 S. Old Woodward, Suite 370
Birmingham, Michigan 48009
Attn: Ted Stenger

General Motors  LLC
300 Renaissance Center]
Detroit Michigan 48265-3000
Attn: Lawrence Buonomo

FTI Consulting, Inc.
1201 W. Peachtree St., Suite 600
Atlanta, GA 30309
Attn: Anna Phillips

      **Re:**    **Adjustment Shares**

Ladies and Gentlemen,

Reference is made to the (i) Amended and Restated Master Sale and Purchase Agreement, dated as of July 5, 2009 (as amended, the "MSPA"), by and among General Motors Corporation (now known as Motors Liquidation Company) ("MLC"), certain of MLC's affiliated debtor entities listed therein (the "MSPA Affiliated Debtors") and NGMCO, Inc. (now known as General Motors LLC) ("GM"), (ii) Motors Liquidation Company GUC Trust Agreement, dated as of March 30, 2011 (as amended, the "GUC Trust Agreement"), by and among MLC, the MSPA Affiliated Debtors and certain other MLC affiliates (the "Debtors"), Wilmington Trust Company, solely in its capacity as GUC Trust Administrator and trustee of the Motors Liquidation Company GUC Trust (the "GUC Trust Administrator"), and FTI Consulting, Inc., solely in its capacity as GUC Trust Monitor of the Motors Liquidation Company GUC Trust, and (iii) Debtors' Second Amended Joint Chapter 11 Plan (the "Plan"), as confirmed by order of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on March 29, 2011.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the GUC Trust Agreement.

Pursuant to the GUC Trust Agreement and the Plan, the Debtors are the parties designated to pursue and receive any Adjustment Shares (as such term is defined in the MSPA) prior to the GUC Trust Funding Date and the Motors Liquidation Company GUC Trust is the party designated to pursue and receive any Adjustment Shares on and after the GUC Trust Funding Date.  In order to address any ambiguity under the MSPA or the GUC Trust Agreement regarding the timing and conditions precedent to the issuance of

any Adjustment Shares and in order to eliminate the potential burden on the Bankruptcy Court of estimating claims in order to calculate whether Adjustment Shares should be issued, the parties hereto enter into this letter agreement to fix procedures with respect thereto.

Notwithstanding Section 5.1 of the GUC Trust Agreement or otherwise, and in accordance with Sections 2.3(d) and 6.12 of the GUC Trust Agreement, the undersigned parties agree that the GUC Trust Administrator may, at any time (which for the avoidance of doubt shall not be restricted to on or before the 180th day following the Effective Time), seek (or require the Debtors to seek, as applicable) the Claims Estimate Order (as such term is defined in the MSPA).  In the event that the GUC Trust Administrator determines to seek the Claims Estimate Order prior to the GUC Trust Funding Date, the Debtors agree to file and pursue the Claims Estimate Order (in accordance with Sections 2.3(d) and 6.12 of the GUC Trust Agreement) until the GUC Trust Funding Date, at which time the entitlement to pursue the Claims Estimate Order shall be transferred to the GUC Trust Administrator.  Notwithstanding anything to the contrary in this letter agreement, in the event that any Adjustment Shares are required to be issued prior to the GUC Trust Funding Date, such Adjustment Shares shall be issued to MLC in accordance with section 3.2(c) of the MSPA.

The parties acknowledge that the GUC Trust Administrator's current intention is to delay a request for a Claims Estimate Order (which may be one or multiple orders) to such time, if any, that the GUC Trust Administrator determines, in its sole and absolute discretion, that the allowed eligible claims are likely to exceed $35 billion in the aggregate.  This delay is intended to eliminate the risk and uncertainty to all parties of estimating at this time the outcome of ongoing litigation with respect to Disputed Claims (as such term is defined in the Plan).

By executing the acknowledgment below, the parties further agree that at any time on or following the GUC Trust Funding Date, the GUC Trust Administrator (as successor to MLC) (i) may seek the Claims Estimate Order (or continue the prosecution of any Claims Estimate Order previously sought by the Debtors), and (ii) shall be entitled to receive the Adjustment Shares, in each case in accordance with Section 3.2(c) of the MSPA as if it were MLC.

For avoidance of doubt, this letter agreement is not intended to amend the MSPA; rather it is intended to clarify the parties' rights and responsibilities thereunder.

This letter agreement may be executed in multiple counterparts (including by means of telecopied or PDF signature pages), each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.  Each party represents and warrants that (i) it has all requisite power and authority to execute and deliver this letter agreement, (ii) this letter agreement constitutes the legal, valid and binding obligation of such party (assuming the due authorization, execution and delivery of this letter agreement by the other parties), and (iii) no further consent, approval or authorization is required on the part of any such party. This letter agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

*[Signature Page Follows]*

Very truly yours,

MOTORS LIQUIDATION COMPANY GUC TRUST

By: WILMINGTON TRUST COMPANY, solely in its
capacity as GUC Trust Administrator

By: _____
    Name:
    Title:    **David A. Vanaskey, Jr.**
                **Vice President**

Acknowledged and agreed to on
this _____ day of September, 2011 by:

MOTORS LIQUIDATION COMPANY

By: _____
Name:
Title:

REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC:

By: _____
Name:
Title:

GENERAL MOTORS LLC

By: _____
    Name:
    Title:

FTI CONSULTING, INC.,
solely in its capacity as GUC Trust Monitor

By: _____
    Name:
    Title:

Very truly yours,

MOTORS LIQUIDATION COMPANY GUC TRUST

By: WILMINGTON TRUST COMPANY, solely in its
capacity as GUC Trust Administrator

By:_____
   Name:
   Title:

Acknowledged and agreed to on
this _____ day of September, 2011 by:

MOTORS LIQUIDATION COMPANY

By:_____
Name: _Steven_
Title: _EVA_

REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC:

By: _____
Name: _Steven_
Title: _EVA_

GENERAL MOTORS LLC

By:_____
   Name:
   Title:

FTI CONSULTING, INC.,
solely in its capacity as GUC Trust Monitor

By:_____
   Name:
   Title:

Very truly yours,


MOTORS LIQUIDATION COMPANY GUC TRUST

By: WILMINGTON TRUST COMPANY, solely in its
capacity as GUC Trust Administrator


By:_____
   Name:
   Title:


Acknowledged and agreed to on
this _____ day of September, 2011 by:


MOTORS LIQUIDATION COMPANY


By:_____
Name:
Title:



REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC:


By:_____
Name:
Title:



GENERAL MOTORS LLC

By:_____ *[signature]* _____
   Name: Michael P. Millikin
   Title: Senior Vice President and General Counsel



FTI CONSULTING, INC.,
solely in its capacity as GUC Trust Monitor


By:_____
   Name:
   Title:

Very truly yours,

MOTORS LIQUIDATION COMPANY GUC TRUST

By: WILMINGTON TRUST COMPANY, solely in its
capacity as GUC Trust Administrator

By:_____
   Name:
   Title:

Acknowledged and agreed to on
this ____ day of September, 2011 by:

MOTORS LIQUIDATION COMPANY

By:_____
Name:
Title:

REMEDIATION AND LIABILITY MANAGEMENT COMPANY, INC:

By:_____
Name:
Title:

GENERAL MOTORS LLC

By:_____
   Name:
   Title:

FTI CONSULTING, INC.,
solely in its capacity as GUC Trust Monitor

By: _M. Phill_____
   Name: _Anna Phillips_
   Title: _Senior Managing Director._

<u>Schedule 1</u>

<u>If to the GUC Trust</u>:

c/o Drinker Biddle & Reath LLP
1177 Ave. of the Americas
41st Floor
New York, NY 10036
Attn:   Kristin K. Going
        Clay Pierce


<u>If to the PIWD Plaintiffs represented by Andrews Myers, P.C.</u>:

c/o Andrews Myers, P.C.
1885 St. James Place, 15th Floor
Houston, Texas 77056
Attn:  Lisa M. Norman

<u>If to the Ignition Switch Plaintiffs and/or certain Non-Ignition Switch Plaintiffs (or Co-Lead
Counsel on their behalf)</u>:

c/o Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Attn:  Steve W. Berman, Esq.

c/o Brown Rudnick LLP
Seven Times Square
New York, New York 10036
Attn:  Edward S. Weisfelner
        Howard S. Steel

c/o Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Attn:  Elizabeth J. Cabraser, Esq.

c/o Stutzman, Bromberg, Esserman & Plifka,
a Professional Corporation
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Attn:  Sander L. Esserman


<u>If to the PIWD Plaintiffs represented by Cole
Schotz P.C.</u>:

c/o Cole Schotz, P.C.
1325 Avenue of the Americas, 19th Floor
New York, NY  10019
Attn:  Mark Tsukerman

c/o The Cooper Firm
531 Roselane Street, Suite 200
Marietta, GA 30060
Attn:  Lance Cooper

c/o Beasley, Allen, Crow, Methvin, Portis &
Miles P.C.
218 Commerce Street
Montgomery, AL 36104
Attn:  J. Cole Portis

Schedule 2

**ANDREWS MYERS, PC - Pre-Closing Accident Plaintiffs**

|     | Last name | First name | Actual Date of Injury |
|-----|-----------|------------|-----------------------|
| 1.  | Aguilar | Angel | 02/28-29/2008 |
| 2.  | Allen | Carl | 02/01/2008 |
| 3.  | Alvarado | Angelica | 04/07/2007 |
| 4.  | Amaya | Anthony | 06/28/2009 |
| 5.  | Amaya | Brandon | 06/28/2009 |
| 6.  | Amaya | Rosalie | 06/28/2009 |
| 7.  | Anderson | Cindy | 02/14/2003 |
| 8.  | Anderson | Jeanne | 03/25/2003 |
| 9.  | Anderson Wheeler | Vickie K. | 06/14/2007 |
| 10. | Andrew | Curtis | 03/15/2009 |
| 11. | Applewhite | Allen | 12/12/2007 |
| 12. | Ashford | Karl | 07/26/2006 |
| 13. | Ator | Carole | 05/09/2008 |
| 14. | Bachelder | Jeannine | 07/23/2007 |
| 15. | Badalucco | Anthony | 07/22/2004 |
| 16. | Ball | Sarah K. | 01/24/2006 |
| 17. | Barnett | Parnell R. | 09/20/2008 |
| 18. | Barrera | Rafael | 06/11/2007 |
| 19. | Barton | James | 08/19/2008 |
| 20. | Baylous | Marquessia | 08/25/2007 |
| 21. | Bazinette | Carolyn | 08/15/2005 |
| 22. | Beaty | Robert | 05/01/2009 |
| 23. | Bednar | Jared | 01/09/2008 |
| 24. | Benard | Mary J. | 03/01/2005 |
| 25. | Bennett | Erick | 07/04/2008 |
| 26. | Bennett | Mary | 02/26/2006 |
| 27. | Bernard | Sylvia M. | 06/24/2006 |
| 28. | Bhandari | Sunita | 07/03/2008 |
| 29. | Bingle | Bonnie J. | 02/13/2009 |
| 30. | Birkheimer | LeAnn | 07/09/2006 |
| 31. | Bittner | Vickey A. | 04/24/2008 |
| 32. | Black | Benita | 06/21/2007 |
| 33. | Bleicken | Eric | 04/26/2008 |
| 34. | Bloedow | Barbara | 07/14/2007 |
| 35. | Boggs | Alvin | 01/14/2007 |
| 36. | Bonds | Ashanti | 02/28/2009 |
| 37. | Booth | Cody | 06/02/2009 |
| 38. | Botello | David | 04/07/2007 |
| 39. | Bovanizer | Brian K. | 01/16/2009 |
| 40. | Bovanizer | Karen A. | 01/16/2009 |
| 41. | Boyle | James | 05/12/2009 |

| 42. | Bradfield | Annette | 12/25/2006 |
|---|---|---|---|
| 43. | Bradley | Cynthia | 11/23/2006 |
| 44. | Brown | Bertha | 04/17/2009 |
| 45. | Brown | Chante | 12/19/2007 |
| 46. | Brown | Joshua | 12/31/2008 |
| 47. | Brown | Jovan | 10/03/2007 |
| 48. | Brown | Samantha | 02/01/2009 |
| 49. | Browning | Stephani | 01/21/2008 |
| 50. | Brown-Washington | Patricia | 09/05/2008 |
| 51. | Brzozowski | Diane M. | 02/28/2009 |
| 52. | Brzozowski | Jennifer A. | 02/28/2009 |
| 53. | Burke | Christina | 03/09/2009 |
| 54. | Burley | William | 12/19/2008 |
| 55. | Campbell | Frankie L. | 04/15/2009 |
| 56. | Cantu | Kristopher | 09/10/2008 |
| 57. | Carrisales | Patrick | 11/25/2003 |
| 58. | Celestine | Glory | 12/31/2005 |
| 59. | Champagne (Decd.) | Dustin | 5/25/2007 |
| 60. | Charly | Sallie | 03/25/2009 |
| 61. | Childs | Jewell | 07/01/2008 |
| 62. | Clapper | James G. | 04/20/2007 |
| 63. | Clark | Teresse | 10/17/2005 |
| 64. | Clem | Paul | 05/08/2006 |
| 65. | Cochran | Kim | 02/11/2005 |
| 66. | Coleman | Anthony | 07/11/2009 |
| 67. | Collins | Daryl | 12/09/2007 |
| 68. | Comens | Pamela | Dec-07 |
| 69. | Cook | Julie R. | 12/31/2006 |
| 70. | Cook | Reina | 12/29/2006 |
| 71. | Coviello | Rebecca | 04/09/2008 |
| 72. | Cuesta | James | 03/13/2005 |
| 73. | Curry | Derek | 08/05/2005 |
| 74. | Cyr | Elizabeth | 05/03/2007 |
| 75. | Dalsass | Donna | 02/11/2007 |
| 76. | Dardano | Joanne | 12/12/2008 |
| 77. | Davidson | Betty J. | 09/23/2007 |
| 78. | Davis | Tajanae | 04/27/2007 |
| 79. | Davis | Terry | 08/19/2003 |
| 80. | Davis | Tiffaney | 08/15/2004 |
| 81. | Delasso | Seiarra | 01/23/2009 |
| 82. | Delp | Amanda | 05/27/2008 |
| 83. | Dent | Anthony | 12/11/2008 |
| 84. | Dent | Nell | 12/30/2005 |

| 85. | Dinar | Joseph | 10/24/2003 |
|---|---|---|---|
| 86. | DiSchiavi | Mario | 12/10/2008 |
| 87. | Dixon | Ashley | 01/10/2007 |
| 88. | Doll | Lyndsey | 11/30/2008 |
| 89. | Donato | Joann | 07/18/2005 |
| 90. | Dorsey | Alonda | 07/06/2009 |
| 91. | Dorsey-Foster | Amanda | 07/06/2009 |
| 92. | Doyle | Lisa M. | 02/05/2008 |
| 93. | Dullen | Ryan | 2004 |
| 94. | Dziedzic | Tommy | 12/21/2005 |
| 95. | Earnest | Crystal | 04/22/2005 |
| 96. | Earnest | Gregory | 04/22/2005 |
| 97. | Earnest | Jessie | 04/22/2005 |
| 98. | Earnest | Tyler | 04/22/2005 |
| 99. | Eaton | Mark L. | 06/02/2006 |
| 100. | Edwards | Andre | 03/07/2007 |
| 101. | Edwards | Franklin | 09/16/2005 |
| 102. | El-cheikh | Sheryl | 09/10/2001 |
| 103. | Enders | Kathryn | 09/25/2008 |
| 104. | Eubank | Betty | 08/09/2007 |
| 105. | Evans | Daniel | 10/04/2002 |
| 106. | Fallon | Patrick | 10/30/2001 |
| 107. | Farley | Wanda | 02/02/2009 |
| 108. | Farrar | Julius | 03/09/2004 |
| 109. | Faugno | Nicole | Jul-06 |
| 110. | Fedoris | Joe | 09/15/2007 |
| 111. | Fettig | Austin | 07/15/2003 |
| 112. | Fettig | Howard J. | 07/15/2003 |
| 113. | Fettig | Jamie | 07/15/2003 |
| 114. | Fischer | Darrin | 05/26/2003 |
| 115. | Fitzpatrick | Aliza | 10/30/2004 |
| 116. | Floyd | Rayland | 02/02/2009 |
| 117. | Foerster | Wilson I. | 04/18/2000 |
| 118. | Fonseca | Nina | 02/07/2006 |
| 119. | Forbes | Andre | 05/23/2004 |
| 120. | Forrest | Janice | 06/07/2007 |
| 121. | Frazier | Brenda | 06/25/2007 |
| 122. | Frimel | Carol | 08/27/2007 |
| 123. | Fritze (Decd.) | Dean | 01/04/2009 |
| 124. | Fritze (Decd.) | Minerva | 01/04/2009 |
| 125. | Geisleman | Laura | 10/15/2007 |
| 126. | Gentry | Rodney | 01/31/2008 |
| 127. | George | Nancy R. | 10/14/2007 |

| 128. | Gibson | Demetria | 02/25/2008 |
|------|--------|----------|------------|
| 129. | Gilliam | Edward | 11/24/2008 |
| 130. | Gillis | Michael | 10/23/2007 |
| 131. | Glasper | Dandra | 02/12/2006 |
| 132. | Glenn | Rodney | 05/30/2009 |
| 133. | Gless | Todd | 07/07/2006 |
| 134. | Godwin, Jr. | James | 07/17/2009 |
| 135. | Gonzalez | Jesus | 03/04/2005 |
| 136. | Goodman | Nancy | 07/01/2009 |
| 137. | Gottshall | Sonia | 09/21/2007 |
| 138. | Grant | Chas | 08/26/2006 |
| 139. | Green | Chasity | 04/09/2006 |
| 140. | Green | Sederick | 05/27/2008 |
| 141. | Green | Thomas | 06/05/2006 |
| 142. | Hackbarth | Brant | 12/14/2003 |
| 143. | Hadley | Melissa | 01/29/2009 |
| 144. | Hair | Danischa | 05/27/2007 |
| 145. | Hale | Howard | 02/13/2009 |
| 146. | Hamm | Loretta | 06/09/2001 |
| 147. | Hamrick | Sharlie | 03/11/2006 |
| 148. | Harl | Kenneth J., Sr. | 11/21/2008 |
| 149. | Harrington | Bill | 12/23/2006 |
| 150. | Harrington | Richard J. | 12/27/2007 |
| 151. | Harris | Vickie C. | 12/04/2004 |
| 152. | Harvey | Steven | 05/28/2008 |
| 153. | Hauser | Ryan | 01/28/2009 |
| 154. | Hayes | Nathan W. | 01/25/2007 |
| 155. | Haynes | Robin | 2008 |
| 156. | Healy | William | 05/16/2009 |
| 157. | Henderson | Bonnie | 02/05/2009 |
| 158. | Hendron | Robin | 03/28/2006 |
| 159. | Henzel | Jessica | 10/09/2005 |
| 160. | Hernandez | Aida | 06/08/2007 |
| 161. | Hernandez | Rosalia | 06/16/2009 |
| 162. | Hester | Reginald | 05/22/2005 |
| 163. | Hester | Rosie | 05/22/2005 |
| 164. | Hester | Terri | 05/22/2005 |
| 165. | Higgins | Shatora | 03/05/2005 |
| 166. | Hightower | Tracy | 11/24/2008 |
| 167. | Hill | Adam | 10/13/2005 |
| 168. | Hill | David | 07/20/2008 |
| 169. | Hillin | Misty | 08/08/2008 |
| 170. | Hiney | Christine | 09/11/2007 |

| | | | |
|---|---|---|---|
| 171. | Hlavac | Janice | 05/15/2007 |
| 172. | Holcomb | Supreina | 05/27/2007 |
| 173. | Holub | Jessica | 2009 |
| 174. | Hopkins | Gary R. | 04/02/2008 |
| 175. | Hosfelt | Helene | 04/28/1999 |
| 176. | Hutchings | Kevin | 01/05/2006 |
| 177. | Hvizda | Paulette | 06/10/2009 |
| 178. | Isley | Randy J., Sr. | 12/23/2003 |
| 179. | Jackson | Christine | 09/01/2005 |
| 180. | James | Amber | 08/10/2007 |
| 181. | Jankauskas | Roseanne | 02/02/2009 |
| 182. | Jaskula | Joseph | 11/21/2007 |
| 183. | Jimenez (Decd.) | Jordan | 01/23/2007 |
| 184. | Johnson | Ennis | 08/15/2008 |
| 185. | Johnson | Kevin | 01/22/2008 |
| 186. | Johnson | LaShauna | 04/27/2007 |
| 187. | Johnson | Miguel | 10/18/2007 |
| 188. | Johnson | Shanga | 07/06/2009 |
| 189. | Jones | Antoinette | 06/15/2008 |
| 190. | Jones | Jimmy | 11/12/2007 |
| 191. | Jones | Madeline S. | 01/23/2008 |
| 192. | Jones | Precila | 06/28/2000 |
| 193. | Joseph | Kevin | 03/01/2005 |
| 194. | Josey | Barbara | 02/27/2008 |
| 195. | Kasey | Dallas | 11/06/2004 |
| 196. | Kearney | LaToya | 05/27/2008 |
| 197. | Keyes | Ronnie N. | 11/23/2006 |
| 198. | Kilbourne | Mary Ann | 07/06/2007 |
| 199. | King | Dominque | 08/17/2001 |
| 200. | King | Jeanette | 08/17/2001 |
| 201. | King | Keith | 11/12/1999 |
| 202. | Kiziah | Sandra K. | 04/11/2008 |
| 203. | Kletzien | Emily | 03/04/2005 |
| 204. | Knight | Justin | 10/07/2006 |
| 205. | Konz | Susan (for dec. David Konz) | 05/20/2002 |
| 206. | LaDow | Charles | 01/01/2004 |
| 207. | LaFevor | Kimberly | 10/23/2008 |
| 208. | Lambert | Jennifer H. | 08/30/2008 |
| 209. | Lamon | Eric A. | 01/24/2007 |
| 210. | Landry | Eugene | 04/10/2006 |
| 211. | Lasley | Julie | 08/29/2006 |
| 212. | Lavergne | Keisha | 08/18/2007 |
| 213. | Lawkin | Lyndon | 07/14/2007 |

| 214. | Lawrimore | Gina | 09/13/2012 |
|---|---|---|---|
| 215. | Lefever | Troy | 08/15/2005 |
| 216. | Lehman | Sylvia | 08/04/2006 |
| 217. | Lewis | Gloria | 02/01/2002 |
| 218. | Likens | Thurman P., III | 03/13/2009 |
| 219. | Limon | Juan Carlos | 05/04/2008 |
| 220. | Linden | Michael | 05/09/2006 |
| 221. | Little | Amelia | 12/05/2006 |
| 222. | Little | Leawaiia | 08/12/2008 |
| 223. | Lloyd | Robert J. | 02/15/2003 |
| 224. | Lonzo | Calvin | 08/02/2005 |
| 225. | Lynch | Melinda | 11/24/2002 |
| 226. | MacLaren | Nathan | 05/15/2009 |
| 227. | Magee | Juahem | 08/25/2007 |
| 228. | Manuel-Collins | Yolanda | 12/09/2007 |
| 229. | Marquiss | Amy | 05/24/2008 |
| 230. | Martinez | Louella | 03/15/2008 |
| 231. | Masternak | Becky | 10/12/2004 |
| 232. | Mastrich | Debra | 12/01/2001 |
| 233. | Mathis | Steve | 11/14/2007 |
| 234. | Mayr | Mark | 03/08/2009 |
| 235. | Mayrant | Tyisha | 01/16/2009 |
| 236. | Mays | Joshua | 01/04/2007 |
| 237. | McBrayer | Anthony | 11/11/2006 |
| 238. | McCarthy | Shawn | 06/07/2009 |
| 239. | McCarthy (Decd.) | Cory | 10/07/2008 |
| 240. | McClain | Wendy | 05/07/2007 |
| 241. | McCluney | Demetria | 03/20/2007 |
| 242. | McClure | Katrina | 11/15/2008 |
| 243. | McDonough | John | 03/03/1998 |
| 244. | McGhee | Gina | 01/03/2009 |
| 245. | McLeod | Jacoby | 01/20/2000 |
| 246. | McLeod | Scott | 01/20/2000 |
| 247. | McMillin | Juliet | 11/14/2007 |
| 248. | Merritt | Ruby | 03/19/2008 |
| 249. | Mikeska | Christopher | 12/17/2007 |
| 250. | Milam | Mark | 02/27/2008 |
| 251. | Miles | Lisa | 02/28/2009 |
| 252. | Miller | Ariel | 09/06/2008 |
| 253. | Miller | Grace | 03/29/2008 |
| 254. | Miller | Jennifer L. | 05/18/2008 |
| 255. | Miller | Jessie | 08/26/2006 |
| 256. | Miller | Star | 10/21/2007 |

| 257. | Monroe | Jerry | 09/20/2001 |
|------|--------|-------|------------|
| 258. | Moore | Wilbur | 11/12/2007 |
| 259. | Morales | Jason | 09/29/2006 |
| 260. | Morgan | Glenda | 12/11/2008 |
| 261. | Morris | Lillian | 06/10/2009 |
| 262. | Morris | Sonya | 06/20/2001 |
| 263. | Morrison | Sheryl | 05/07/2008 |
| 264. | Morrison | Thomas | 05/07/2008 |
| 265. | Mortin | Phillip | 07/16/2008 |
| 266. | Morton | Philip G. | 07/16/2008 |
| 267. | Mull | Bruce  W. | 09/21/2008 |
| 268. | Mungo | Ernest | 12/07/2007 |
| 269. | Murray | Shirley | 07/02/2004 |
| 270. | Murrell | Tiffany L. | 02/15/2006 |
| 271. | Murry | Kienda | 05/20/2009 |
| 272. | Myers | Rachel | 07/23/2005 |
| 273. | Nash | Jenifer | 04/01/2007 |
| 274. | Nelson | Richard L. | 10/01/2007 |
| 275. | New | Michael | 01/29/2009 |
| 276. | Nichols | Michael | 06/12/2006 |
| 277. | Niemisto | Diane | 06/12/2009 |
| 278. | Norwood | Dijionay | 08/25/2007 |
| 279. | Norwood | Sumer | 08/25/2007 |
| 280. | O'Bryan | Brandon | 01/01/2007 |
| 281. | Olufs | Courtney | 09/25/2008 |
| 282. | Olufs | Joshua | 09/25/2008 |
| 283. | Owens | Evelyn L. | 09/13/2004 |
| 284. | Owens | Jerome | 01/14/2009 |
| 285. | Owens, Sr. | Perry | 08/17/2001 |
| 286. | Parker | Andy | 05/21/2004 |
| 287. | Parker | Randy | Fall 2008 |
| 288. | Patrick | Mary | 12/11/2004 |
| 289. | Patterson | Richard | 06/10/2009 |
| 290. | Perkins | Crystal | 09/16/2008 |
| 291. | Perlstone | Paul | 03/30/2007 |
| 292. | Perrino | Alyssa | 02/16/2007 |
| 293. | Perrino | Joseph | 02/16/2007 |
| 294. | Perrino | Kathleen | 02/16/2007 |
| 295. | Perymon | Sinator | 09/01/2000 |
| 296. | Peters | Merle | 01/06/2009 |
| 297. | Phillips | Ami | 05/24/2009 |
| 298. | Phillips | Okeshia | 01/15/2008 |
| 299. | Pier | David | 01/16/2005 |

| | | | |
|---|---|---|---|
| 300. | Pierce | Donald E. | 09/07/2005 |
| 301. | Polanowski | Jennifer | 03/08/2009 |
| 302. | Polanowski | Mark | 03/08/2009 |
| 303. | Pope | Lloyd A. | 11/04/2004 |
| 304. | Pope | Twanna | 10/25/2001 |
| 305. | Portale | Phil | 08/20/2007 |
| 306. | Prayleau | Priscella | 01/16/2009 |
| 307. | Pritchett | John L. | 02/10/2004 |
| 308. | Pruski | Alexander | 10/13/2007 |
| 309. | Rahman | Minimiah W. | 05/06/2008 |
| 310. | Ramirez | Melissa | 12/20/2007 |
| 311. | Ramsden | Jerry D. | 05/04/2008 |
| 312. | Randolph | Annie | 08/09/2007 |
| 313. | Ray | Kristi | 10/10/2008 |
| 314. | Reed | Joy | 09/23/2008 |
| 315. | Reeves | Curtis | 06/09/2002 |
| 316. | Renckert | Michael | 10/27/2006 |
| 317. | Rhoades | Brigette | 03/14/2007 |
| 318. | Rhodes | Marian | 11/14/2007 |
| 319. | Rhyner | Allen | 03/04/2005 |
| 320. | Richardson | Jerry | 07/08/2009 |
| 321. | Richardson | Steve | 07/02/2004 |
| 322. | Ricketts | Byron | 03/01/2006 |
| 323. | Riley | Jibreel | 06/18/2007 |
| 324. | Rivers | Antonio | 03/28/2005 |
| 325. | Roberts | Valare | 03/23/2007 |
| 326. | Robinson | Diane | 06/19/2008 |
| 327. | Robinson | Laquinda | 06/28/2009 |
| 328. | Rodman | Casey D. | 01/05/2009 |
| 329. | Rodney | Van | 02/05/2009 |
| 330. | Rogers | Kevin | 02/13/2008 |
| 331. | Rolfes | Todd | 02/28/2009 |
| 332. | Roy | Blake K. | 03/05/2006 |
| 333. | Rozier | Kevin | 02/24/2008 |
| 334. | Rubino | Gary | 06/04/2009 |
| 335. | Rutledge | Raeann | 01/18/2005 |
| 336. | Sachs | Andrea | 08/01/2008 |
| 337. | Salazar | Ontonio | 03/05/2008 |
| 338. | Samuels | Sandra | 03/19/2008 |
| 339. | Sanchez | Alejandro | 10/13/2007 |
| 340. | Sandel | Kelly | 04/25/2009 |
| 341. | Sanders | Felicia | 01/14/2009 |
| 342. | Sanderson | Sheila | 04/14/2005 |

| 343. | Sasser | Stephanie | 11/02/2008 |
| 344. | Sauseda | Michael | 12/08/2008 |
| 345. | Scherer | Claudette | 05/14/2006 |
| 346. | Schnieter | Marianne | 11/26/2007 |
| 347. | Schultz | Lisa | 04/16/2008 |
| 348. | Selby | Mathew | 05/13/2009 |
| 349. | Shaffer | Maurice | 02/14/2009 |
| 350. | Shaffer (Decd.) | Lloyd | 02/14/2009 |
| 351. | Sharon | Debra | 08/16/2008 |
| 352. | Shaw | Tony | 01/28/2006 |
| 353. | Sheldon | Connie M. | 07/11/2007 |
| 354. | Sherman | Chelsea | 05/21/2006 |
| 355. | Sherman | Emily | 05/21/2006 |
| 356. | Silk-Miller | Colleen | 07/04/2007 |
| 357. | Sills | Jerome | 11/22/2004 |
| 358. | Simecek | Dawn | 11/02/2007 |
| 359. | Simmonds | Alner | 07/02/2004 |
| 360. | Simmons | David | 03/07/2006 |
| 361. | Simpson | Lynette | 01/02/2009 |
| 362. | Sims | Charles Arthur | 05/08/2005 |
| 363. | Sims | Janice | 06/01/2001 |
| 364. | Singleton | Beulah | 01/13/2007 |
| 365. | Singleton | Billy | 01/13/2007 |
| 366. | Sinnett | Kasie | 03/28/2004 |
| 367. | Sinnokrot | Mamoon | 12/02/2005 |
| 368. | Skelton | Mark | 12/31/2005 |
| 369. | Slade | Austin | 03/29/2006 |
| 370. | Smart | Kayla | 10/01/2005 |
| 371. | Smith | Denise | 07/21/2007 |
| 372. | Smith | Mark | 02/13/2009 |
| 373. | Smith | Mildred | 04/05/2008 |
| 374. | Smith | Monica | 07/20/2002 |
| 375. | Smith | Ruth | 08/16/2006 |
| 376. | Smith | Steve | 04/23/2005 |
| 377. | Speed | Kimberly | 06/18/2009 |
| 378. | Stafford (Decd.) | Theodore | 02/25/2007 |
| 379. | Starlin | Marvella | 01/18/2006 |
| 380. | Stephenson | Shakiria | 2007 |
| 381. | Stevenson | Kim M. | 07/28/2004 |
| 382. | Stewart | Annette | 08/20/2007 |
| 383. | Stiens | Karen | 03/01/2008 |
| 384. | Tate | Rasheed | 07/12/2002 |
| 385. | Taylor | Cynthia L. | 02/01/2006 |

| 386. | Taylor | Mike | 12/27/2000 |
| 387. | Tenner | Tiffany | 04/11/2008 |
| 388. | Theakos | Jeannine E. | 02/14/2009 |
| 389. | Thomas | Ashley | 04/13/2009 |
| 390. | Thomas | Mary | 02/11/2009 |
| 391. | Thompson-Warren | Kesha | 06/02/2007 |
| 392. | Tilley | Joan | 07/08/2008 |
| 393. | Tipton | Kristina | 09/12/2007 |
| 394. | Tittle | James | 05/29/2009 |
| 395. | Tollefson | Mary Ann | 10/15/2007 |
| 396. | Tooley | Camille | 01/10/2009 |
| 397. | Tousoulis | Denise | 05/25/2009 |
| 398. | Tousoulis | John | 05/25/2009 |
| 399. | Trice | Matthew J. | 09/05/2005 |
| 400. | Tyler | Lora | 09/15/2004 |
| 401. | Tyler | Theresa | Summer 2008 |
| 402. | Valcarce-Stuart | Rosaura | 05/20/2008 |
| 403. | Vallee | Candus M. | 02/14/2008 |
| 404. | Vines | Sarah | 10/19/2003 |
| 405. | Wagley | Kelly | 02/26/2008 |
| 406. | Walker | Thomas | 07/05/2009 |
| 407. | Washington | George | 02/08/2008 |
| 408. | Washington-Hardy | Eloise | 05/08/2008 |
| 409. | Watson | Marcus B. | 11/20/2006 |
| 410. | Wells | Fredrick | 03/18/2008 |
| 411. | Werth | Regina | 04/18/2007 |
| 412. | Whalen | Pam | 02/13/2006 |
| 413. | Whatley | Susan | 05/29/2009 |
| 414. | Wheeler | Meghan | 03/13/2009 |
| 415. | Wheeler | Vickie | 06/14/2007 |
| 416. | Whitfield | Rose | 12/25/2007 |
| 417. | Wiesjahn (Decd.) | Rachel | 08/28/2008 |
| 418. | Wilkins | Damion | 12/05/2006 |
| 419. | Wilkins | Rolando | 12/05/2006 |
| 420. | Williams | Brittany | 06/07/2009 |
| 421. | Williams | Claudia | 06/07/2009 |
| 422. | Williams | Linda P. | 11/17/2007 |
| 423. | Wilson | Candis M. | 10/07/2005 |
| 424. | Wilson | Jazmin | 030/3/2009 |
| 425. | Wilson | Patrick C. | 01/15/2001 |
| 426. | Wisdom | Sharon L. | 09/07/2008 |
| 427. | Wisniewski | Edward | 10/22/2007 |
| 428. | Wooten | William | 05/19/2009 |

| | | | |
|---|---|---|---|
| 429. | Worsham | John | 08/25/2005 |
| 430. | Wrigley | Joyce | 07/31/2008 |
| 431. | Writt | James | 03/28/2009 |
| 432. | Wyatt | Lisa | 12/19/2008 |
| 433. | Young | Ashley | 04/03/2008 |
| 434. | Youngbear | James | 07/29/2007 |
| 435. | Youngbear | Robert | 07/27/2007 |
| 436. | Zayas | Ricardo | 05/26/2007 |
| 437. | Zayas | Victor | 05/26/2007 |
| 438. | Zenon | Shericia T. | 06/27/2005 |
| 439. | Zimmer | Katherine | 08/06/2005 |

<u>Schedule 3</u>

**The Cooper Firm and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. –**
**<u>Pre-Closing Accident Plaintiffs</u>**

(1) Vickey Meyers, as personal representative of the estate of Karen King (deceased);

(2) Larry A. King, as personal representative of the estate of Hannah King; and

(3) Rose Thompson, as personal representative of the estate of Ter'iel Thompson (deceased)