**HEARING DATE AND TIME: February 27, 2019 at 10:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: February 20, 2019 at 4:00 p.m. (Eastern Time)**

**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008

*Attorneys for the Motors Liquidation Company*
*Avoidance Action Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                            Debtors.

------------------------------------------------------------------------x

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

**MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST
FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105 AND 1142 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 3020(d) (I) APPROVING
AMENDMENTS TO THE THIRD AMENDED AND RESTATED AVOIDANCE
ACTION TRUST AGREEMENT AND AUTHORIZING THE AVOIDANCE ACTION
TRUST TO ENTER INTO THE FOURTH AMENDED AND RESTATED AVOIDANCE
ACTION TRUST AGREEMENT (II) AUTHORIZING THE AVOIDANCE ACTION
TRUST TO ENTER INTO THE LW CAPITAL PROVISION AGREEMENT AND TO
GRANT A LIEN TO THE LW CAPITAL PROVIDER**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

JURISDICTION AND VENUE ........................................................................................... 2

PRELIMINARY STATEMENT........................................................................................... 2

BACKGROUND ................................................................................................................. 4

    A.    Old GM Files for Bankruptcy, the Term Loan Is Paid Off, and
        the Committee Commences the Term Loan Avoidance Action ..................................... 4

    B.    The Plan Is Confirmed, and the Committee Transfers Prosecution
        of the Term Loan Avoidance Action to the Avoidance Action Trust........................... 6

    C.    The Avoidance Action Trust Would Require Additional Funding to Prosecute the
        Litigation to Completion ............................................................................................ 6

    D.    The Avoidance Action Trust Sought Additional Funding............................................ 12

    E.    The LW Capital Provision Agreement ....................................................................... 14

BASIS FOR REQUESTED RELIEF .................................................................................. 17

    A.    The Avoidance Action Trust Amendment Should Be Approved ................................. 18

    B.    The LW Capital Provision Agreement and Other LW Transaction Documents
        Provide Necessary Funding to the Avoidance Action Trust and Should Be
        Approved ................................................................................................................... 20

NOTICE............................................................................................................................. 23

CONCLUSION................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    7 F.3d 32 (2d Cir. 1993) ..................................................................................... 17

*In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*,
    272 B.R 396 (Bankr. S.D.N.Y. 2002) .................................................................. 18

*LTV Corp. v. Back* (*In re Chateaugay Corp.*),
    201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................................... 18

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,
    N.A. (In re Motors Liquidation Co.)*,
    755 F.3d 78 (2d Cir. 2014) .................................................................................... 7

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,
    N.A. (In re Motors Liquidation Co.)*,
    777 F.3d 100 (2d Cir. 2015) .................................................................................. 4

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,
    N.A.*,
    103 A.3d 1010 (Del. 2014) .................................................................................... 8

*Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*,
    335 B.R. 66 (Bankr. S.D.N.Y. 2005) .................................................................... 18

**Statutes**

11 U.S.C. § 1142(b) ................................................................................................. 17, 18

**Rules**

Fed. R. Bankr. P. 3020(d) ......................................................................................... 18

TO:    **THE HONORABLE MARTIN GLENN**
       **UNITED STATES BANKRUPTCY JUDGE**

Wilmington Trust Company, solely in its capacity as trust administrator and trustee (the "**Avoidance Action Trust Administrator**") of the Motors Liquidation Company Avoidance Action Trust (the "**Avoidance Action Trust**" or the "**AAT**"), as established under the Debtors' Second Amended Joint Chapter 11 Plan dated as of March 18, 2011 [Bankr. Dkt. No. 9836] (as confirmed, the "**Plan**") of the above-captioned post-effective date debtors (the "**Debtors**"), submits this motion (the "**Motion**"), pursuant to sections 105 and 1142 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking entry of an order, substantially in the form attached hereto as Exhibit A (the "**Approval Order**"), (i) approving the capital provision agreement attached hereto as Exhibit B (the "**LW Capital Provision Agreement**") between the Avoidance Action Trust and the private litigation funder LW Holdco VI LLC ( the "**LW Capital Provider**"); (ii) authorizing the Avoidance Action Trust and the Avoidance Action Trust Administrator to enter into the Fourth Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement (the "**Fourth Amended Avoidance Action Trust Agreement**") substantially in the form attached hereto as Exhibit C, which amends the Third Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, dated as of June 29, 2017 and attached hereto as Exhibit D (the "**Third Amended Avoidance Action Trust Agreement**"); [1] (iii) authorizing the Avoidance Action Trust to take all actions necessary or appropriate to effectuate the LW Capital Provision Agreement, including the granting of a third-priority lien in favor of the LW Capital Provider on specified property of the Avoidance Action Trust; and

---

[1] A redline comparing the proposed Fourth Amended Avoidance Action Trust Agreement to the Third Amended Avoidance Action Trust Agreement is attached hereto as Exhibit E.

(iv) granting such other and further relief as may be necessary. In support of the foregoing, the Avoidance Action Trust Administrator respectfully states as follows:

## JURISDICTION AND VENUE

1.    The Bankruptcy Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334, paragraph II of the order of the Bankruptcy Court dated as of March 29, 2011, confirming the Plan [Bankr. Dkt. No. 9941], Article XI of the Plan, and Sections 6.1(b), 8.1 and 13.13 of the Third Amended Avoidance Action Trust Agreement. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. § 1409. The statutory predicates for the relief requested are sections 105 and 1142 of the Bankruptcy Code and Bankruptcy Rule 3020.

## PRELIMINARY STATEMENT

2.    The Avoidance Action Trust seeks approval of the LW Capital Provision Agreement that would provide it with up to $10 million in additional funding to cover litigation costs and other trust administrative expenses. The AAT chose the terms of the LW Capital Provision Agreement after soliciting and receiving indicative terms from other potential third-party capital providers. As the Court was advised on February 1, 2019, the parties have reached an agreement in principle to fully resolve the Avoidance Action Trust's action (the "**Term Loan Avoidance Action**") against JPMorgan Bank, N.A. ("**JPMorgan**") and hundreds of other defendants (collectively, the "**Term Loan Defendants**" or "**Term Loan Lenders**"). The AAT entered into the LW Capital Provision Agreement before the settlement in principle was reached to ensure that it would have sufficient funds to prosecute to resolution the Term Loan Avoidance Action. Although the AAT and the Term Loan Defendants were continuing to mediate this dispute, the likelihood of reaching a settlement was uncertain at the time the funding was sought.

2

The funding commitment eliminated the risk to the AAT that it would run out of funds to prosecute this action before an acceptable settlement was reached.

3.      Moreover, even though a settlement in principle has been reached, the need for the LW Capital Provision Agreement remains.  Although the Avoidance Action Trust expects that the parties will succeed in negotiating a definitive settlement agreement and securing the Court's approval of that settlement agreement, significant work is still required before a settlement can be finalized and presented for approval.  In addition, there always remains the possibility, however unlikely and undesirable, that a settlement will not be effectuated, in which case the Avoidance Action Trust would be faced with the possibility of not having sufficient funds to cover the fees and costs associated with continued prosecution of the Term Loan Avoidance Action.

4.      Further, the terms of the funding contained in the LW Capital Provision Agreement take into account the fact that the parties were in active mediation and, though uncertain, there existed a reasonable likelihood of settlement.  In a scenario where the settlement is finalized and then approved by the Court, the Avoidance Action Trust will not be obligated to draw more than $1.5 million of the $10 million facility and will owe a return only on the drawn amount.  Should the settlement not be effectuated, there is no guarantee that the AAT could obtain funding on equally favorable terms.  The LW Capital Provision Agreement ensures that in the event that the settlement is not effectuated, there will be no delay in the Avoidance Action Trust's ability to proceed with the litigation.

5.      After careful consideration, the Trustee, in consultation with the Trust Monitor, has determined that it is in the AAT's interest to have the LW Capital Provision Agreement approved and respectfully requests that the LW Capital Provision Agreement be approved no later than March 7, 2019, to ensure that the Avoidance Action Trust will have the

financial means to fully and finally reach a resolution of the Term Loan Avoidance Action and maximize the value of the Avoidance Action Trust's assets for its beneficiaries.

## BACKGROUND

A.     **Old GM Files for Bankruptcy, the Term Loan Is Paid Off, and
       the Committee Commences the Term Loan Avoidance Action**

6.     The history of this litigation is well known to this Court and will be summarized briefly. General Motors Corporation ("**Old GM**") obtained a syndicated secured term loan (the "**Term Loan**") of approximately $1.5 billion pursuant to a term loan agreement, dated as of November 29, 2006, as amended on March 4, 2009 (the "**Term Loan Agreement**"). *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 101 (2d Cir. 2015) ("**Second Circuit 2015 Decision**").[2] To secure repayment of the Term Loan, the Term Loan Lenders were granted a security interest in a large number of Old GM's assets located at forty-two Old GM facilities (the "**Collateral**"). *Id.* Among other filings to perfect the Term Loan Lenders' security interest in the Collateral, JPMorgan caused the filing of a UCC-1 financing statement with the Delaware Secretary of State that covered all of the equipment and fixtures constituting Collateral at the forty-two Old GM facilities (the "**Main Lien**"). *Id.*

7.     In connection with its bankruptcy filing, Old GM sought authority from the Court to use a portion of the $33 billion in post-petition financing (the "**DIP Financing**") from the DIP Lenders to repay the Term Loan in full. Bankr. Dkt. No. 64 ¶¶ 75-78. Old GM repaid the

---

[2] All references to the Bankruptcy Docket are to *In re Motors Liquidation Company f/k/a General Motors Corporation*, Case No. 09-50026. All references to the Adversary Docket are to *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 09-00504.

4

Term Loan Lenders in full, ahead of other creditors of Old GM, on the assumption that their claims arising under the Term Loan Agreement were fully secured. Bankr. Dkt. No. 2529 ¶ 19.

8.      However, shortly before entry of the Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties (the "**DIP Order**") [Bankr. Dkt. No. 2529], which provided for the final approval of the DIP Financing, the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Committee**") learned that the Term Loan Lenders' security interests, in fact, may not all have been perfected as of the date that Old GM filed for bankruptcy on June 1, 2009 (the "**Petition Date**") due to the filing of a termination statement relating to the Main Lien (the "**2008 Termination Statement**") months before the Petition Date. *Second Circuit 2015 Decision*, 777 F.3d at 102. Therefore, the DIP Order, while conditionally approving Old GM's repayment of the Term Loan, expressly preserved the right of the Committee to investigate and bring actions based upon the purported perfection of the security interests related to the Term Loan. Bankr. Dkt. No. 2529 ¶ 19(d).

9.      In order to recover amounts alleged to have been improperly paid by Old GM to the Term Loan Lenders (the "**Transfers**"), based on the erroneous assumption that the Term Loan Lenders' security interests were perfected and the loan fully secured, the Committee commenced the Term Loan Avoidance Action on July 31, 2009. Adv. Pro. Dkt. No. 1.

**B.    The Plan Is Confirmed, and the Committee Transfers Prosecution
of the Term Loan Avoidance Action to the Avoidance Action Trust**

10.    JPMorgan and the Committee agreed to litigate the issue of whether the 2008 Termination Statement terminated the security interest in the Collateral covered by the Main Lien ("**Phase I**"), before litigating any other issues in the case, and the Bankruptcy Court approved this bifurcation of the case. *See, e.g.*, Adv. Pro. Dkt. Nos. 10, 17, and 82.

11.    By August 2010, approximately one year after commencement of the Term Loan Avoidance Action, the Avoidance Action Trust and JPMorgan had completed discovery, and fully briefed cross-motions for summary judgment, in connection with Phase I of the Avoidance Action. *See* Adv. Pro. Dkt. Nos. 17, 20, and 23.

12.    On March 29, 2011, the Bankruptcy Court entered an order (the "**Confirmation Order**") confirming the Plan. Bankr. Dkt. No. 9941. The Plan provided for, among other things, the creation of the Avoidance Action Trust, which was established to liquidate and distribute its non-administrative assets, which consist entirely of the proceeds, if any, of the Term Loan Avoidance Action. Bankr. Dkt. No. 9836 § 6.5 (Plan). Thereafter the Committee was dissolved, and on December 15, 2011, while the cross-motions for summary judgment relating to Phase I were pending, prosecution of the Term Loan Avoidance Action was transferred to the Avoidance Action Trust. *See id.* § 6.5 (Plan); Ex. D (Third Amended Avoidance Action Trust Agreement).

**C.    The Avoidance Action Trust Would Require Additional Funding to Prosecute the
Litigation to Completion**

13.    The initial administrative assets of the Avoidance Action Trust consisted of approximately $1.6 million in cash to be held and maintained by the Avoidance Action Trust Administrator for fees and expenses in connection with trust administration and prosecution of the

6

Term Loan Avoidance Action (the "**Avoidance Action Trust Administrative Cash**").  Bankr. Dkt No. 11330 ¶ 18.[3]

14.    The $1.6 million of Avoidance Action Trust Administrative Cash set aside under the Plan quickly proved to be insufficient, and on January 20, 2012, the GUC Trust filed a motion seeking, *inter alia*, to liquidate securities to fund additional Avoidance Action Trust fees, costs, and expenses primarily related to the prosecution of the Term Loan Avoidance Action.  *See generally id* ¶¶ 18-21.  The Court granted the GUC Trust's motion and entered an Order, which, among other things, allocated an additional $13,714,000 to the Avoidance Action Trust to satisfy the Avoidance Action Trust's estimated fees, costs and expenses for 2012, 2013, and 2014 (the "**GUC Trust Supplemental Cash**").  Bankr. Dkt. No. 11507.

15.    On March 1, 2013, the Bankruptcy Court denied the Committee's motion for partial summary judgment and granted summary judgment in favor of JPMorgan, ruling that the filing of the 2008 Termination Statement was not effective and that the security interest covered by the Main Lien was therefore perfected as of the Petition Date.  Adv. Pro. Dkt. No. 71.  The Committee appealed to the Second Circuit.  Adv. Pro. Dkt. No. 74.

16.    A little less than two years later, on January 21, 2015, after receiving an answer to a Delaware UCC question that the Second Circuit had certified to the Delaware Supreme Court, *see Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d Cir. 2014) and *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010

---

[3] The Avoidance Action Trust also received $500,000 of Avoidance Action Trust SEC Reporting Cash to be used solely for SEC Reporting Costs to the extent there is no other available source of funds to pay such costs.  Bankr. Dkt. No. 11330 ¶ 18.  Any unused portion of the Avoidance Action Trust SEC Reporting Cash will be returned to the GUC Trust.  Ex. C § 2.3(e) (Third Amended Avoidance Action Trust Agreement).

(Del. 2014), the Second Circuit reversed the Bankruptcy Court's grant of summary judgment and remanded the matter to the Bankruptcy Court with instructions to enter partial summary judgment in favor of plaintiff, the Avoidance Action Trust. *Second Circuit 2015 Decision*, 777 F.3d at 101.

17.    On June 12, 2015, following issuance of the Second Circuit's mandate, the Bankruptcy Court entered partial summary judgment in favor of the Avoidance Action Trust as to the termination of the Main Lien. Adv. Pro. Dkt. No. 96. Thereafter, the Avoidance Action Trust filed an amended complaint and proceeded to serve it upon all the Term Loan Lenders. Adv. Pro. Dkt. Nos. 91, 94, 95, 163, 164. The Term Loan Lenders moved to dismiss the complaint on various grounds but the Court ruled on June 30, 2016, that the Term Loan Avoidance Action could proceed. Adv. Pro. Dkt. No. 643.

18.    At the heart of the next phase ("**Phase II**") of the Term Loan Avoidance Action was the Avoidance Action Trust's contention that because the perfected security interest with respect to the Main Lien was terminated, the Term Loan Lenders should not have been paid as fully secured creditors, and the value of the Transfers in excess of the value of any surviving perfected collateral should be avoided and recovered for the benefit of the estate under Bankruptcy Code section 549 and 550. *See, e.g.*, Adv. Pro. Dkt. No. 903. The Court decided in an attempt to streamline the Phase II proceedings and promote a global settlement between the parties, to hold an initial trial to determine the collateral classification and valuation issues of forty "Representative Assets" to be selected by the parties (the "**Representative Assets Trial**"). Adv. Pro. Dkt. No. 547.

19.    In the spring of 2016, it became clear that the GUC Trust Supplemental Cash would be insufficient to fund the Avoidance Action Trust's fees, costs, and expenses related to the prosecution of Phase II of the litigation. The Avoidance Action Trust entered into a

financing agreement with the United States Department of the Treasury ("**Treasury**") and Export Development Canada ("**EDC**" and together with Treasury, the "**DIP Lenders**") pursuant to which the DIP Lenders provided $15 million in financing (the "**DIP Lenders Litigation Financing**"), which was approved by the Court on August 30, 2016.  Bankr. Dkt. No. 13748.

20.     At the same time the Avoidance Action Trust was seeking funding, the parties began extensive discovery and preparations in the lead up to the Representative Assets Trial.  In the fall of 2016, depositions were taken of 37 fact witnesses and more than 200,000 documents were produced for review.  Both sides retained large expert teams to review the voluminous and technical discovery and assist in litigation strategy.  The parties deposed 18 experts, and 22 expert reports, including rebuttal reports, were submitted.  The parties went on four site visits to GM facilities, including the judicial site visit with the Court.

21.     After discovery ended, there was extensive pre-trial briefing in the months immediately before the Representative Assets Trial, including nine motions in limine and briefs to the Court laying out the issues to be addressed at trial.  Additionally, the opening statements of the Representative Assets Trial and the direct testimony of the experts were submitted in writing before trial.  The live testimony portion of the Representative Assets Trial lasted two weeks, from April 24, 2017 to May 5, 2017, and three fact witnesses and 15 expert witnesses testified.  Hundreds of pages of post-trial briefing were submitted on May 25, 2017, and closing arguments were heard by the Court on June 5, 2017.

22.     By June 2017, the Avoidance Action Trust had exhausted the DIP Lenders Litigation Financing.  The Avoidance Action Trust sought a second round of litigation funding and on June 23, 2017, entered into a second financing agreement (the "**CE Capital Providers Agreement**") with the private litigation funders Cynthiana LLC and Earlham LLC (collectively,

9

the "**CE Capital Providers**") pursuant to which the CE Capital Providers provided up to $15 million in financing (the "**CE Capital Providers Litigation Financing**").  Bankr. Dkt. No. 13957. The Court approved the CE Capital Providers Agreement on June 29, 2017, Bankr. Dkt. No. 13980.

23.    On September 26, 2017, the Court issued its decision on the Representative Assets Trial with the expectation that the parties would use the decision to reach a global settlement of the entire case.  Adv. Pro. Dkt. No. 1015 at 2-3.

24.    From the date of the decision to the summer of 2018, the parties engaged in extensive mediation, conducting five days of mediation aimed at global resolution as well as five days of mediation aimed at reaching consensus on individual asset line items.  As part of the mediation process, the Avoidance Action Trust, among other preparations, shared with the Term Loan Defendants a mediation statement as well as additional memoranda and presentations on discrete topics; engaged in high-level strategizing and legal analysis; and worked with their expert team to analyze the impact of the Court's decision on the remaining thousands of assets in dispute and model different outcome scenarios.

25.    On July 3, 2018, the parties informed the Bankruptcy Court that a global settlement was not at that time possible.  Adv. Pro. Dkt. No. 1055 at 2.  In their communication with the Court, the parties identified issues that were ripe for summary judgment briefing and additional issues that, if resolved at trial, would materially facilitate reaching a global settlement (the "**Initial Discovery and Trial Issues**").  Adv. Pro. Dkt. No. 1075 at 3-6.  On September 14, 2018, the Court entered the *Order Amending and Superseding Certain Prior Orders Regarding Discovery and Scheduling*, establishing a briefing schedule for a number of summary judgment issues, and a discovery and trial schedule for the Initial Discovery and Trial Issues (the "**Phase III**

10

**Trial**").  Adv. Pro. Dkt. No. 1080 at 6-8.  The Court-ordered schedule contemplated an additional trial on the Initial Discovery and Trial Issues and prescribed that (i) after the Court's decision on the Initial Discovery and Trial Issues, the parties would have 30 days to reach a global settlement; and (ii) if no resolution after this second trial were reached, there would be an expedited schedule for a third trial by the Court for all remaining assets in dispute.  *Id*. at 8-9.

26.     A settlement was not reached at that time, and the parties began discovery on issues for the Phase III Trial.  In accordance with the scheduling order, the parties fully briefed four summary judgment motions and an estoppel motion.  At the same time, the parties engaged in discovery, serving more than 20 document subpoenas which resulted in the production of approximately 36,000 documents.  In preparation for the Phase III Trial, the parties have also conducted eight additional fact depositions and conducted an additional five site visits to current and former GM facilities.

27.     In preparing for the Phase III Trial, the Avoidance Action Trust retained additional experts and also continued to work with its experts from Phase II of the case.  The Avoidance Action Trust has been working with its team of experts to analyze the additional discovery and prepare initial expert reports, which, prior to the settlement in principle, were to be served by February 12, 2019.

28.     In addition, the Trust continues to incur expenses in connection with trust administration.

29.     The Avoidance Action Trust estimates that as of January 31, 2019, the Trust had $2 million in undrawn funds remaining on the current litigation finance facility plus approximately $2.5 million of cash in its accounts.  Thus after accounting for billed and estimated unbilled fees and expenses in excess of approximately $1.2 million, the Trust has less than $3.3

11

million available to fund the fees and costs associated with prosecution of the Term Loan

Avoidance Action, the administrative expenses of the Avoidance Action Trust, and the fees of the

Administrator of the Avoidance Action Trust (the "**Trust Administrator**") and trust monitor (the

"**Avoidance Action Trust Monitor**").  Declaration of Arthur J. Gonzalez, dated February 4, 2019

(the "**Gonzalez Declaration**") ¶ 4.

30.    As the Court is aware, the parties have now reached an agreement in

principle to fully resolve the Term Loan Avoidance Action.  Adv. Pro. Dkt. No. 1168 (E. Fisher

letter to Court).  However, the parties have yet to enter into a definitive settlement agreement for

which the parties will seek Court approval.  In the unexpected event that a final settlement is not

entered into and approved, the Trust's remaining cash holdings are insufficient to fund the Term

Loan Avoidance Action to its conclusion.  Gonzalez Decl. ¶ 4.

**D.    The Avoidance Action Trust Sought Additional Funding**

31.    Pursuant to the Avoidance Action Trust Agreement, the Avoidance Action

Trust Administrator "shall at all times, to the extent practicable, retain … sufficient Avoidance

Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash as the Trust

Administrator shall determine, with the approval of the Trust Monitor and subject to the Budget,

is necessary (x) to pay the reasonable incurred or anticipated fees and expenses of the Trust . . .

and (y) to satisfy other liabilities incurred or anticipated by the Trust in accordance with the Plan,

the Confirmation Order and this Trust Agreement."  Ex. D § 5.5(b) (Third Amended Avoidance

Action Trust Agreement).

32.    The Avoidance Action Trust Agreement sets forth a mechanism for the

Avoidance Action Trust to seek additional funding in the event that the Avoidance Action Trust

Administrative Cash and the GUC Trust Supplemental Cash "is not reasonably likely to be

12

adequate to satisfy the current and projected future fees, costs and expenses" of the Avoidance Action Trust. *Id.* § 6.1(d).

33.     Specifically, the Avoidance Action Trust Agreement permits, upon approval of the Bankruptcy Court, the granting of a lien on the Term Loan Avoidance Action or other property of the Avoidance Action Trust in exchange for proceeds that may be used to satisfy the fees, costs and expenses of the Avoidance Action Trust (the "**Other Supplemental Cash**"). *Id.*

34.     In accordance with its obligations under the Avoidance Action Trust Agreement, the Avoidance Action Trust Administrator, in consultation with the Avoidance Action Trust Monitor, made a determination that the cash available to the Avoidance Action Trust was not sufficient to meet its projected fees and expenses. *See* Gonzalez Decl. ¶ 4. The Avoidance Action Trust Administrator, through counsel, solicited and received indicative terms from potential third-party capital providers in order to obtain Other Supplemental Cash for the Avoidance Action Trust. *See id.* ¶ 8. The LW Capital Provider's proposed terms were competitive with those offered by other potential funders. *See id.* ¶ 9.

35.     The Avoidance Action Trust engaged in negotiations with the LW Capital Provider in order to obtain an agreement on terms that would ensure adequate litigation funding for the Avoidance Action Trust on the best economic terms. *Id.* ¶¶ 7-9. Ultimately, after these negotiations, the parties arrived at the LW Capital Provision Agreement that is the subject of this Motion.

E.      **The LW Capital Provision Agreement**[4]

36.    The LW Capital Provision Agreement provides that the LW Capital Provider will provide up to $10 million to the Avoidance Action Trust to cover all costs, which include the costs of litigation as well as the costs and expenses of the Avoidance Action Trust. The AAT is required to draw $1,500,000 upon Court approval of the LW Capital Provider Agreement. In the event that a settlement is not effectuated within a year or this case proceeds to a Phase III Trial, the AAT would be required to draw the remaining $8,500,000. The full terms of the litigation funding are set out in the LW Capital Provision Agreement attached hereto as Exhibit B.

37.    Critically, the LW Capital Provision Agreement provides that the LW Capital Provider has no rights with respect to oversight of the Avoidance Action Trust's prosecution of the Term Loan Avoidance or any other action, nor does the LW Capital Provider have any rights with respect to any decision whether or not to settle any action. Ex. B § 5.2(b) (LW Capital Provision Agreement).

38.    The key terms of the LW Capital Provision Agreement, all of which are consistent with Section 6.1(d) of the Avoidance Action Trust Agreement, are as follows:

- Following, *inter alia*, this Court's approval of the LW Capital Provision Agreement (the "**Initial Funding Date**"), the LW Capital Provider shall provide the first $1,500,000 (the "**Initial Funding**") to the Avoidance Action Trust (*id.* § 2.1(a)(ii));

- The Avoidance Action Trust agrees to accept the Initial Funding (*id.* § 2.1(a)(i));

- Thereafter, the Avoidance Action Trust may make further draws in tranches of not less than $1 million in its sole discretion (all funds actually paid by the LW Capital Provider to the Avoidance Action Trust are collectively referred to as the "**Invested Amount**") (*id.* § 2.1(a)(ii), (iii));

---

[4] To the extent there is any conflict between this summary and the LW Capital Provision Agreement, the LW Capital Provision Agreement will govern in all respects.

- The LW Capital Provider shall provide the Avoidance Action Trust with up to $10,000,000 in financing until the earlier of (a) the one year anniversary of the Initial Funding Date, and (b) the commencement of the Phase III Trial (*id.* § 2.1(a)(i); and

- The LW Capital Provider shall be entitled (the "**LW Capital Provider's Entitlement**") to a return calculated as (a) the product of the Invested Amount multiplied by two plus (b) after twelve months, an annual interest rate of 15%, compounded annually, accruing on the amounts outstanding under clause (a) above until the LW Capital Provider's Entitlement is paid in full to the LW Capital Provider; such fee shall be payable from the Proceeds of the Avoidance Action Trust ahead of all other obligations and beneficiaries of, or investors in, the Avoidance Action Trust other than the DIP Lenders and the CE Capital Providers (*id.* § 2.2(a)).

39.    Effectively, under the LW Capital Provision Agreement, if the settlement that has in principle been reached by the parties is effectuated prior to a year from when the LW Capital Provider provided the AAT the Initial Funding, the cost to the AAT will be $1,500,000. If the settlement does not become effective and it is necessary to continue litigation, the AAT will draw the full $10,000,000, and the LW Capital Provider will be entitled to a $20,000,000 payment (plus applicable interest) from litigation proceeds of the Avoidance Action Trust (as defined in the LW Capital Provision Agreement) after payment to the DIP Lenders and the CE Capital Providers.

40.    In addition to the key terms summarized above, the LW Capital Provision Agreement contains other provisions, including but not limited to, those concerning conditions to

consummating the LW Capital Provision Agreement, and termination events, rights, and procedures.[5]

41.    To secure the Avoidance Action Trust's obligations under the LW Capital Provision Agreement, the Avoidance Action Trust and the LW Capital Provider also executed a Security Agreement attached hereto as <u>Exhibit F</u> (the "**LW Security Agreement**") pursuant to which the Avoidance Action Trust granted a third-priority security interest and lien to the LW Capital Provider on (i) the Avoidance Action Proceeds and (ii) the LW Capital Provider Funding Account and all Supplemental Capital therein (all terms in this paragraph shall retain the meanings ascribed thereto in the LW Security Agreement) (the "**LW Capital Provision Agreement Collateral**").  Ex. F §§ 2.1 and 6.3 (LW Security Agreement).

42.    The Avoidance Action Trust has advised and consulted with the DIP Lenders throughout the process of obtaining additional funding and shared with the DIP Lenders the initial term sheet outlining the terms of the LW Capital Provision Agreement and drafts of the LW Capital Provision Agreement.  The DIP Lenders have consented to the AAT entering into this agreement for additional funding.

43.    In addition, the DIP Lenders and the CE Capital Providers have both approved, and are parties to, a subordination agreement (the "**LW Subordination Agreement**,"

---

[5] For example, in exchange for the LW Capital Provider reserving the funding for the Avoidance Action Trust notwithstanding the ongoing mediation, the Avoidance Action Trust has entered into a Termination Fee Agreement with the LW Capital Provider (the "**Termination Fee Agreement**").  Ex. B § 27 (LW Capital Provider Agreement).  Under the Termination Fee Agreement, the Avoidance Action Trust agreed that if for any reason the LW Capital Provider Agreement was not approved within 45 days after the agreement was executed—for example, because the AAT terminated the agreement prior to Court approval or because such approval was denied—the AAT would, subject to Court approval, pay the LW Capital Provider a fee of $200,000 from Distributable Trust Assets (as that term is defined in the Third Amended Avoidance Action Trust Agreement).  *Id.*

and together with the LW Capital Provision Agreement and the LW Security Agreement, the "**LW Transaction Documents**"), attached hereto as Exhibit G.

44.    As required by Section 6.1(d)(ii) of the Third Amended Avoidance Action Trust Agreement, the Avoidance Action Trust Monitor has submitted a Declaration herewith setting forth his approval of the LW Capital Provision Agreement and the other LW Transaction Documents.  *See* Gonzalez Decl. ¶¶ 6-10.

## BASIS FOR REQUESTED RELIEF

45.    This Court has the authority to enter the proposed order (a) authorizing the amendments to the Third Amended Avoidance Action Trust Agreement (the "**Avoidance Action Trust Amendment**") and execution of the Fourth Amended Avoidance Action Trust Agreement; and (b) approving the LW Capital Provision Agreement and the other LW Transaction Documents under the terms of the Plan and under section 1142(b) of the Bankruptcy Code.

46.    The Plan specifies that the Bankruptcy Court retains exclusive jurisdiction "of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code" and for, *inter alia*, the following purposes: (1) to "ensure that distributions to holders of Allowed Claims are accomplished as provided herein"; (2) to "hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, . . . the Avoidance Action Trust, . . . and the Avoidance Action Trust Agreement . . . ."; and (3) to "take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan to maintain the integrity of the Plan following consummation."  Bankr. Dkt. No. 9836 §§ 11.1(c), (i), (j) (Plan).

17

47.     Further, section 1142(b) of the Bankruptcy Code authorizes the Court to "direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b); *see also Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993) (finding that bankruptcy courts retain postconfirmation jurisdiction in chapter 11 proceedings to the extent provided by the plan); *Penthouse Media Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (finding that bankruptcy courts retain post-confirmation jurisdiction to matters related to the implementation of a plan); *In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 272 B.R 396, 407 n.11 (Bankr. S.D.N.Y. 2002) ("[T]he Court may direct parties to perform any act necessary to consummate the plan.") (citing 11 U.S.C. § 1142(b)); *LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996), *aff'd in part,* 213 B.R. 633 (S.D.N.Y. 1997) ("The clear intent of Section 1142(b) of the Bankruptcy Code is to assure that the terms and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the final decree is entered closing the case."). In addition, Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Fed. R. Bankr. P. 3020(d).

A.     <u>The Avoidance Action Trust Amendment Should Be Approved</u>

48.     The Avoidance Action Trust Amendment is intended to implement the terms of the LW Capital Provision Agreement. While the Third Amended Avoidance Action Trust Agreement provided a mechanism for the Avoidance Action Trust to obtain additional funding from private litigation funders, it now needs to be revised to implement the terms of the LW Capital

18

Provision Agreement.  In addition, the Third Amended Avoidance Action Trust Agreement needs to be amended to reflect the priority of payments to the LW Capital Provider and the other creditors and beneficiaries of the Avoidance Action Trust.

49. The Third Amended Avoidance Action Trust Agreement permits that:

> The Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court; _provided_ that (x) no amendment or supplement to this Trust Agreement shall be inconsistent with the purpose and intent of the Trust to dispose of in an expeditious but orderly manner the Avoidance Action Trust Assets in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement, and (y) this Trust Agreement shall not be amended in a manner that is inconsistent with the Plan in the form confirmed by the Bankruptcy Court, subject to any post confirmation modifications to the Plan pursuant to Section 1127 of the Bankruptcy Code.

Ex. D § 13.13(b) (Third Amended Avoidance Action Trust Agreement).

50.    Pursuant to the Plan, the Avoidance Action Trust was established to liquidate and distribute its assets, which consist entirely of the proceeds, if any, of the Avoidance Action.  Bankr. Dkt. No. 9836 § 6.5 (Plan).  The additional funding provided to the Avoidance Action Trust through the LW Capital Provision Agreement is necessary to ensure the AAT's ability to continue to meet its responsibility to seek the recovery and liquidation of the "Avoidance Action Trust Assets" – the Term Loan Avoidance Action.  As discussed in greater detail below, although the parties have recently reached an agreement in principle to fully resolve the Term Loan Avoidance Action, the LW Capital Provision Agreement provides necessary funding in the event the settlement in principle reached by the parties is not effectuated and the Avoidance Action Trust must restart the prosecution of the Term Loan Avoidance Action.  Accordingly, the Avoidance Action Trust Amendment is consistent with the purpose and intent of the Avoidance Action Trust, as well as the Plan.

19

51.    The Avoidance Action Trust Amendment has been narrowly tailored to implement only the terms of the LW Capital Provision Agreement and the other LW Transaction Documents and, for all the reasons stated above, should be approved.

**B.    The LW Capital Provision Agreement and Other LW Transaction Documents Provide Necessary Funding to the Avoidance Action Trust and Should Be Approved**

52.    Here, the LW Capital Provision Agreement allows the Avoidance Action Trust to fulfill its basic purpose under the Plan.  The Plan specifies that the "sole purpose" of the Avoidance Action Trust is to liquidate and distribute its assets, which consist of the Term Loan Avoidance Action.   Bankr. Dkt. No. 9836 §§ 1.23, 6.5 (Plan).   The LW Capital Provision Agreement promotes this goal.

53.    This case has been vigorously and intensively defended by well-resourced Term Loan Defendants, requiring the Trust's counsel, in conjunction with a team of experts, to mount a tremendous effort as part of the Trust's continuing duty to attempt to realize value from this litigation for the benefit of the Trust's beneficiaries, which include the unsecured creditors of this bankruptcy estate, United States Treasury, and Export Development Canada.  As this litigation progressed during 2018, building towards a potential second trial before the Court later this year, the Trust Administrator, in consultation with the Trust Monitor and the Trust's counsel, determined that the Trust's available cash would be insufficient to meet the needs of the Trust if this case were to continue to a litigated resolution.  Specifically, the Trust Administrator determined that the Trust would run out of funds by the spring of this year.

54.    The Avoidance Action Trust entered into the LW Capital Provision Agreement because, at the time the agreement was executed by the Trust, it was uncertain that the parties would be able to find a way to resolve this case, and the Trust had to ensure that it would have the financial wherewithal to see the case through to completion.  Further, the Avoidance

20

Action Trust's ability to demonstrate to the Term Loan Defendants the Trust's financial capability to meet the demands of the case was necessary to negotiate for the best possible settlement for the Trust.

55.     Although the parties have now succeeded in reaching an agreement in principle to settle this case, a settlement is still subject to the negotiation of definitive settlement documents and the Court's approval.  The LW Capital Provision Agreement remains critical because it provides a source of funding to the Trust in the event that the settlement in principle that has been reached does not ultimately come to fruition.  Should no settlement be reached, the Avoidance Action Trust would be required to restart the prosecution of the Term Loan Avoidance Action, which would not be possible with the cash currently available to the Avoidance Action Trust.

56.     Further, the terms of the LW Capital Provision Agreement take into account the fact that the parties were in active mediation, and though uncertain, there existed a reasonable likelihood of settlement at the time the agreement was reached.  In a scenario where the settlement is finalized and then approved by the Court, the Avoidance Action Trust will not be obligated to draw more than $1.5 million of the $10 million facility and will owe a return only on the drawn amount.  Should the settlement not be effectuated, there is no guarantee that the AAT could obtain funding on equally favorable terms.  Further, the process of obtaining and negotiating additional funding would take time and result in additional costs to the AAT.[6]  Though the AAT has every hope that a final settlement will be effectuated, the Trustee, in consultation with the Trust Monitor,

---

[6] In addition to costs associated with soliciting and finalizing other funding, the Avoidance Action Trust is already obligated to reimburse the LW Capital Provider up to $65,000 for its costs incurred in connection with the Transaction Documents.  Ex. B § 22 (LW Capital Provision Agreement).

has determined that it is in the best interest of the Trust to enter into the LW Capital Provision Agreement.

57.    In sum, the LW Capital Provision Agreement, which was the result of the solicitation of bids from private funders and good faith, arm's-length negotiations, resolved and continues to resolve significant funding issues of the Avoidance Action Trust, fulfills the goals of the Plan, and benefits all affected parties.

58.    In addition, the Avoidance Action Trust's entry into the LW Subordination Agreement is necessary in order for the Avoidance Action Trust to meet the requirement that any additional funding be junior and subordinate to the funding provided by the DIP Lenders and the CE Capital Providers.  The LW Subordination Agreement should have no material impact on the Avoidance Action Trust or its assets, as the LW Subordination Agreement merely documents and gives effect to the subordination of the claims and interests of the LW Capital Provider to the claims and interests of the DIP Lenders and the CE Capital Providers as provided in the Settlement Agreement and Third Amended Avoidance Action Trust Agreement.  Because the Avoidance Action Trust's entry into the LW Subordination Agreement is necessary in order for the Avoidance Action Trust to obtain funding under the LW Capital Provision Agreement, the LW Subordination Agreement should be approved.

59.    Finally, the LW Capital Provision Agreement provides that the LW Capital Provider may terminate the agreement if the Court's approval is not obtained by March 7, 2019, which is 45 days after the execution of the agreement.  This requirement was an essential part of the agreement.  The AAT wanted (and received) the benefit of committed funding in advance of what it expected would be the last chance to reach a settlement before the Phase III Trial, and, in exchange, the LW Capital Provider did not want to provide the AAT with an open-ended option

to fund up to $10 million in funding.  Although the AAT does have the right to terminate the LW

Capital Provision Agreement at this point, in light of the risk associated with a failure to effectuate

a settlement, the Trustee in consultation with the Trust Monitor has determined that such funding

remains in the best interest of the AAT.  Accordingly, the Avoidance Action Trust respectfully

requests that by no later than March 7, 2019, the Court enter the proposed order (a) authorizing

the amendments to the Third Amended Avoidance Action Trust Agreement and execution of the

Fourth Amended Avoidance Action Trust Agreement; and (b) approving the LW Capital Provision

Agreement and the other LW Transaction Documents under the terms of the Plan and under section

1142(b) of the Bankruptcy Code.

## NOTICE

60.    The Avoidance Action Trust has provided notice of this Motion to (a) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

21st Floor, New York, New York 10004; (b) the DIP Lenders; (c) the other parties in interest in

accordance with the *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P.

1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011

[Docket No. 10183]; (d) JPMorgan and each of the Term Loan Defendants, and (e) any other

required notice parties under Section 6.1(b)(ii) of the Avoidance Action Trust Agreement.[7]  The

---

[7] The Avoidance Action Trust Agreement requires notice to "the Trust Monitor, the holders of Units and
the holders of Disputed General Unsecured Claims." Ex. C § 6.1(d)(ii) (Third Amended Avoidance Action
Trust Agreement).  However, because of the now-resolved dispute over who is entitled to the proceeds of
the Term Loan Avoidance Action (*see supra* p. 6, n.2), no Units have been issued, and there are no holders
of Units.  Accordingly, notice has been provided to all potential Unit holders and/or beneficiaries of the
Avoidance Action Trust and other interested parties, including the DIP Lenders; the Committee; the holders
of Motors Liquidation Company (f/k/a General Motors Company) debentures and notes with the following
CUSIP Nos.: 370ESCAN5; 370ESCAJ4; 370ESCAR6; 370ESCAG3; 370ESCAS7; 370ESCAT2;
370ESCAU9; 370ESCAV7; 370ESCAZ8; 370ESCBB0; 370ESCBQ7; 370ESCBT1; 370ESCBW4;
370ESCBS3; 370ESC816; 370ESC774; 370ESC766; 370ESC758; 370ESC741; 370ESC733; 370ESC725;
370ESC717; 370ESC121; 370ESC691; 616ESC AA2; 616ESC AB0; 349ESC AT1; 677ESC AU2;
677ESC BC2; 455ESC AB8; 594ESC AQ6; XS0171942757; XS0171943649; CH0008769264 (served

Avoidance Action Trust submits that such notice is sufficient and no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Avoidance Action Trust respectfully requests that the Court enter an Order: (i) approving the LW Transaction Documents; (ii) authorizing the Avoidance Action Trust and the Avoidance Action Trust Administrator to enter into the Fourth Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement; (iii) authorizing the Avoidance Action Trust to take all actions necessary or appropriate to effectuate the LW Transaction Documents, including the granting of a third-priority lien (subject to the DIP Lenders' and the CE Capital Providers' liens, interests and rights) on the LW Capital Provision Agreement Collateral; and (iv) granting such other and further relief as may be necessary.

Dated:  February 4, 2019
      New York, New York

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008

*Attorneys for the Motors Liquidation*
*Company Avoidance Action Trust*

---

through the Depository Trust Company (DTC)); the non-bondholder holders of Allowed General Unsecured Claims (as defined in the Third Amended Avoidance Action Trust Agreement); and any holders of disputed General Unsecured Claims.