# Exhibit B

*EXECUTION VERSION*

**Dated as of January 21, 2019**

---

**Capital Provision Agreement**

---

**between**

**The Counterparty named in Annex I hereto**

**and**

**The LW Capital Provider, as defined in the introductory paragraph hereof**

# CONTENTS

**SECTION**                                                                 **PAGE**

1.  Definitions ........................................................................................ 2

2.  Capital Provision Obligations and LW Capital Provider's Entitlement ................ 3

    2.1  Capital Amounts ......................................................................... 3

    2.2  LW Capital Provider's Entitlement ................................................ 5

3.  Payment Obligations of the Counterparty ................................................. 6

4.  Payments Generally ............................................................................ 7

    4.1  Place and Account for Payment ..................................................... 7

    4.2  Interest on Overdue Amounts ....................................................... 7

    4.3  Waiver of Right of Set-Off ........................................................... 7

5.  Covenants ........................................................................................ 7

    5.1  Covenants of Each Party .............................................................. 7

    5.2  Covenants of the LW Capital Provider ............................................ 8

    5.3  Covenants of the Counterparty ..................................................... 8

6.  Representations and Warranties ........................................................... 11

    6.1  Representations and Warranties of Each Party ................................ 11

    6.2  Representations and Warranties of the Counterparty ........................ 12

    6.3  Representation and Warranty of the LW Capital Provider .................. 14

7.  Confidentiality ................................................................................. 14

    7.1  Exclusive Ownership of Information by Disclosing Party .................... 14

    7.2  Non-Disclosure of Information ..................................................... 15

    7.3  Confidentiality Procedures .......................................................... 15

    7.4  Judicial and Official Disclosure Requests ...................................... 15

8.  Legal Privilege ................................................................................. 16

    8.1  Common Interest Privilege Applies ............................................... 16

    8.2  Information Subject to Privilege Protection .................................... 16

    8.3  Information Subject to Work Product Protection .............................. 16

    8.4  No Obligation to Provide Privileged Information ............................. 17

9.  Indemnification of the LW Capital Provider ............................................ 17

| 10. | Exculpation; Reinstatement | 18 |
|---|---|---|
| 11. | Remedy Events | 19 |
| | 11.1 Failure to Pay or Deliver | 19 |
| | 11.2 Failure to Discharge Claim Costs | 19 |
| | 11.3 Breach or Repudiation | 19 |
| | 11.4 Misrepresentation | 19 |
| 12. | Remedies | 19 |
| | 12.1 Available Remedies Generally | 19 |
| | 12.2 Remedies Cumulative | 20 |
| 13. | Limitations on Transfer, Successors and Assigns; Third Party Beneficiaries | 20 |
| 14. | Tax Withholding | 20 |
| 15. | Notices | 21 |
| | 15.1 Effectiveness of Notices | 21 |
| | 15.2 Change of Details | 21 |
| 16. | Amendments | 22 |
| 17. | Entire Agreement | 22 |
| 18. | Counterparts | 22 |
| 19. | Survival of Obligations | 22 |
| 20. | No Waiver | 22 |
| 21. | Severability | 22 |
| 22. | Expenses | 23 |
| 23. | Relationship of Parties | 23 |
| 24. | Governing Law | 23 |
| 25. | Dispute Resolution | 24 |
| 26. | Rules of Construction | 26 |
| 27. | Termination of Agreement | 26 |
| 28. | Subordination Agreement | 27 |

This CAPITAL PROVISION AGREEMENT, dated as of January 21, 2019 (this "*Agreement*"), is by and between Motors Liquidation Company Avoidance Action Trust, an entity organized or formed under the laws of the jurisdiction identified in <u>Annex I</u> (the "*Counterparty*"), and LW Holdco VI LLC, a limited liability company formed under the laws of the State of Delaware ("*LW Capital Provider*").

WHEREAS, prior to August 2016, there was a dispute between the Official Committee of Unsecured Creditors of Motors Liquidation Company (the "*Committee*") and the DIP Lenders as to entitlements to Avoidance Action Proceeds, which dispute was resolved by mutual agreement (the "*Litigation Settlement*") pursuant to which, among other things, (i) the DIP Lenders provided the Litigation Cost Advance and (ii) the DIP Lenders are entitled to be repaid the Litigation Cost Advance out of Distributable Trust Assets; and

WHEREAS, the Trust Administrator and the Trust Monitor determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash held by the Counterparty at the time of the Litigation Settlement were insufficient to satisfy projected fees, costs and expenses of the Counterparty, and, as an integral part of the Litigation Settlement, the DIP Lenders agreed to provide the Litigation Cost Advance to the Counterparty to fund the prosecution of the Term Loan Avoidance Action, on the terms set forth in the Litigation Cost Advance Agreement;

WHEREAS, on August 24, 2016, the Bankruptcy Court entered an order approving the Settlement Agreement and the Litigation Cost Advance Agreement; and

WHEREAS, subsequent to the entering into of the Litigation Cost Advance Agreement, the Trust Administrator and the Trust Monitor determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash held by the Counterparty was insufficient to satisfy projected fees, costs and expenses of the Counterparty, for which reason the Counterparty sought additional funding by entering into the CE Capital Provision Agreement (as defined below) with the CE Capital Providers (as defined below); and

WHEREAS, one of the preconditions to the DIP Lenders' provision of the Litigation Cost Advance was the Counterparty's agreement, as reflected in Section 6.1(d)(i) of the Trust Agreement, that any additional litigation funding provided to the Counterparty would be (i) junior and subordinate to the Litigation Cost Advance and any other amounts owed to the DIP Lenders on account of prior funding of the Counterparty and (ii) subject to a form of subordination acceptable to the DIP Lenders in all respects; and

WHEREAS, the Trust Administrator and the Trust Monitor have determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash currently held by the Counterparty remain insufficient to satisfy projected fees, costs and expenses of the Counterparty, for which reason the Counterparty has determined to seek additional funding from the LW Capital Provider; and

WHEREAS, the Counterparty, before interacting with the LW Capital Provider in regard to the matters described herein and without any influence from the LW Capital Provider, decided to pursue one or more legal claims identified on Annex II to this Agreement; and

WHEREAS, the Counterparty has provided confidential materials protected by the attorney-client privilege and/or the attorney work product doctrine to the LW Capital Provider and its Affiliates, subject to a non-disclosure agreement and in reliance on the common interest privilege, the work product doctrine and other existing law protecting such materials from disclosure; and

WHEREAS, the LW Capital Provider and its Affiliates have conducted research and analysis and communicated views and opinions both internally and to the Counterparty, all in reliance on that same common interest privilege, work product doctrine and other existing law protecting such research, analysis and communications from disclosure; and

WHEREAS, the LW Capital Provider is a passive provider of external capital and has not become owner of, partner in or party to the Claim or any part thereof or acquired any rights as to their control or resolution, and the Counterparty remains in full control of the assertion and resolution of the Claim; and

WHEREAS, the Counterparty is sophisticated and is entering into this Agreement freely and entirely of its own volition following independent legal advice from experienced counsel, and does not believe that this Agreement or the transactions it contemplates are inconsistent with any relevant law or public policy; and

WHEREAS, pursuant to Section 6.1(d)(i) of the Trust Agreement, the entry into the Subordination Agreement (as defined herein), by and among the DIP Lenders, the LW Capital Provider, and the Counterparty, is a precondition of the DIP Lenders' consent to the LW Capital Provider's provision of the Supplemental Capital to the Counterparty pursuant to this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **DEFINITIONS**

Certain capitalized terms used herein have the meanings assigned thereto in Exhibit A. Capitalized terms used but not otherwise defined in Exhibit A have the respective meanings assigned to such terms elsewhere in this Agreement or in the Trust Agreement.

**2.    CAPITAL PROVISION OBLIGATIONS AND LW CAPITAL PROVIDER'S ENTITLEMENT**

**2.1    Capital Amounts**

The LW Capital Provider shall provide capital to the Counterparty as set forth below.

(a)    Capital Amounts:

    (i)    Subject to satisfaction of conditions set forth in clause (e) of this Section 2.1 and as otherwise set forth in this Agreement, the LW Capital Provider shall provide to the Counterparty up to Ten Million United States Dollars (US$10,000,000), until the earlier of (A) the one year anniversary of the Initial Funding Date (as defined below) and (B) the commencement of the Phase III Trial.  The Counterparty agrees to accept, at a minimum, Capital Amounts in the aggregate amount of One Million Five Hundred Thousand United States Dollars (US$1,500,000).

    (ii)    The LW Capital Provider shall provide the first $1,500,000 to the Counterparty upon receipt of the Approvals (as defined below) (the date of such initial funding, the "***Initial Funding Date***").  The remaining committed Capital Amounts shall be paid to the Counterparty, in tranches of no less than One Million Dollars ($1,000,000) each, at such times as the Counterparty may determine in its sole discretion; *provided*, *that*, if the amount available for the final tranche is less than $1,000,000, such tranche shall be for such lesser amount.

    (iii)    The sum of all amounts actually paid by the LW Capital Provider to the Counterparty hereunder constitutes the "***Invested Amount***".

(b)    The LW Capital Provider shall make each payment of a Capital Amount owing to the Counterparty hereunder by the tenth (10th) Business Day following the relevant due date.

(c)    The LW Capital Provider shall make each such payment of a Capital Amount to a segregated capital provider funding account established at Wilmington Trust Company (the "***LW Capital Provider Funding Account***").

(d)    Subject to the requirements of Section 5.3(c)(iii) hereof and the Trust Agreement, the Trust shall be entitled to make withdrawals from the LW Capital Provider Funding Account at any time and in any amount determined by the

Trust Administrator to be reasonable and appropriate to meet the needs of the Trust.

(e)     The LW Capital Provider's obligation to provide the Capital Amounts shall be subject to satisfaction of the following conditions:

(i)     the Trust Administrator shall have made an application to the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") seeking approval of the transactions contemplated hereby, in accordance with Section 6.1(d) of the Trust Agreement, including a statement of the Trust Monitor's position in respect thereof and proposed amendments to the Trust Agreement, in form and substance approved in writing by the LW Capital Provider, to implement the terms of this Agreement (the "***Bankruptcy Court Application***");

(ii)    the Trust Administrator shall have given proper notices to the parties entitled to receive the same, pursuant to Section 6.1(d)(ii) of the Trust Agreement, of any hearing on the matter of selling or granting liens;

(iii)   the Bankruptcy Court shall have issued an order: (A) (1) approving the transactions contemplated hereby, in such form as is necessary to ensure the LW Capital Provider of the validity, perfection and second priority status of its lien, granted pursuant to the Security Agreement described on Annex II to this Agreement, (2) authorizing the payment to the LW Capital Provider of the LW Capital Provider's Entitlement as and when due pursuant to the terms of this Agreement and the Trust Agreement, and (3) providing that the Counterparty shall not otherwise distribute Proceeds in contravention of the Trust Agreement, and (B) approving the amendments to the Trust Agreement described in the preceding clause 2.1(e)(i) hereof;

(iv)    the Trust Administrator shall have delivered to the LW Capital Provider a certificate signed by an authorized officer thereof stating without qualification that the Trust has fully complied with the DIP Lenders' right of first refusal pursuant to Section 6.1(d)(i) of the Trust Agreement and Section 12 of the Litigation Cost Advance Agreement; and

(v)     the DIP Lenders shall have provided their consent to the transactions contemplated hereby, pursuant to Section 6.1(d)(i) of the Trust Agreement and Section 12 of the Litigation Cost Advance Agreement, and the DIP Lenders and the CE Capital Providers shall have provided their consent that the Subordination Agreement is acceptable, or, with respect to the CE Capital Providers, the Trust Administrator and the Trust Monitor have determined that the CE Capital Providers have unreasonably withheld consent to the Subordination Agreement, pursuant to Section 6.1(d)(i) of the Trust Agreement, is acceptable (all

consents, approvals and other documents required pursuant to this Section 2.1(e), collectively, the "**Approvals**").

## 2.2    LW Capital Provider's Entitlement

In consideration of their agreement to provide the Capital Amounts, the LW Capital Provider shall be entitled to receive the amounts set forth below.

(a)    LW Capital Provider's Entitlement:

    (i)    *Amount*. The LW Capital Provider's Entitlement shall be:

        (A)    the product of the Invested Amount <u>multiplied by 2 (two)</u> <u>plus</u>

        (B)    beginning on the 12-month anniversary of the Initial Funding Date, an annual interest rate of fifteen percent (15.0%), compounded annually, accruing on the amounts outstanding under clause (A) above until the LW Capital Provider's Entitlement is paid in full to the LW Capital Provider.

    (ii)    *Timing and Priority*. Subject to and in accordance with the terms of the Trust Agreement, the Counterparty shall pay the LW Capital Provider's Entitlement as a distribution of Distributable Trust Assets, on applicable Distribution Dates, in the order of priority set forth in Section 5.1(d) of the Trust Agreement, which priority for the distribution of Distributable Trust Assets shall be: (A) first, to the DIP Lenders, each in their relative proportion pursuant to the terms of the DIP Credit Agreement, in the amount of the DIP Lender Advances, until such obligation is satisfied; (B) second, to the CE Capital Providers, to pay the CE Capital Providers' Entitlement, until such obligation is satisfied; (C) third, to the LW Capital Provider, to pay the LW Capital Provider's Entitlement, until such obligation is satisfied; (D) fourth, to the Segregated Account (as defined in the Trust Agreement) in the amount of the GUC Trust Advances to be distributed to the holders of Allowed General Unsecured Claims, until such obligation is satisfied; and (E) fifth, to the DIP Lenders, each in their relative proportion pursuant to the terms of the DIP Credit Agreement, and to the holders of Allowed General Unsecured Claims.

(iii) *Obligation Absolute*.  The payment obligation to the LW Capital Provider, to the extent not subject to a reasonable dispute among the parties, shall be absolute and unconditional and shall not under any circumstances, except pursuant to Section 25(c) of this Agreement, be delayed, suspended or avoided.

3.   **PAYMENT OBLIGATIONS OF THE COUNTERPARTY**

(a)   *Non-Recourse Agreement; Circumstances of All Payment Obligations.*  The Capital Amounts are provided to the Counterparty on a non-recourse basis, and the LW Capital Provider's Entitlement is derived from, computed on the basis of and paid solely from Proceeds recovered on or after the first Capital Amounts are provided. If the amount of Proceeds is not sufficient to pay the DIP Lenders pursuant to Section 5.1(d) of the Trust Agreement and Section 2.2(a)(ii)(A) of this Agreement, or the CE Capital Providers pursuant to Section 5.1(d) of the Trust Agreement and Section 2.2(a)(ii)(B) of this Agreement, then the Counterparty shall not have any obligation to pay the LW Capital Provider's Entitlement (including any repayment of the Invested Amount).  Other than any payment obligation that arises under Section 2.2 of this Agreement, the only other circumstances under which the Counterparty may be obligated to make a payment to the LW Capital Provider hereunder are set forth in Sections 4.2, 9, 10(d), 12, 22 and 27 of this Agreement.

(b)   *Notice*.  If at any time Proceeds arise, the Counterparty shall as soon as practicable notify the LW Capital Provider of the amount of such Proceeds.  Upon the request of the LW Capital Provider, the Counterparty shall promptly provide to the LW Capital Provider in writing a calculation of the portion of the LW Capital Provider's Entitlement payable to the LW Capital Provider from the Proceeds.

(c)   *Application of Payments*.  The Counterparty's payment of any and all portions of the LW Capital Provider's Entitlement shall be applied as follows: (i) first, towards payment of the returns on the applicable Capital Amounts, as specified in Section 2 of this Agreement, and (ii) second, towards the repayment of Capital Amounts paid by the LW Capital Provider to the Counterparty.

(d)   *Termination Fee*. In exchange for the LW Capital Provider reserving the Capital Amounts as necessary to satisfy its obligations hereunder, in the event that (i) the Counterparty terminates the LW Capital Provision Agreement pursuant to Section 27(b) of this Agreement; or (ii) the Counterparty fails to secure the Approvals within forty-five (45) days of this Agreement for any reason and the LW Capital Provider terminates this Agreement pursuant to Section 27(c) of this Agreement, the Counterparty shall be obligated to pay to the LW Capital Provider the Termination Fee pursuant to the terms of the Termination Fee Agreement included as Exhibit A to this Agreement (the "***Termination Fee Agreement***").

4.   **PAYMENTS GENERALLY**

**4.1   Place and Account for Payment**

Each payment to a party required under this Agreement shall be made (<u>a</u>) to the payment account for such party specified on <u>Annex II</u> to this Agreement; (<u>b</u>) in the currency specified in Section 2 of this Agreement; (<u>c</u>) in the place where such account is located; (<u>d</u>) unless otherwise agreed to in writing by the LW Capital Provider, by wire transfer of freely transferable and immediately available funds; and (e) otherwise in the manner customary for payments in the specified currency.

**4.2   Interest on Overdue Amounts**

If the Counterparty defaults in the performance of any payment obligation under this Agreement, the Counterparty shall on demand pay interest (before as well as after judgment, if applicable) at the Default Rate on the overdue amount to the LW Capital Provider for the period from (and including) the original due date for payment to (but excluding) the date of actual payment.

**4.3   Waiver of Right of Set-Off**

Each amount that the Counterparty is obligated to pay under this Agreement shall be paid without Set-off or other deduction.

5.   **COVENANTS**

**5.1   Covenants of Each Party**

The Counterparty, on the one hand, and the LW Capital Provider, on the other hand, agrees that, so long as such party has or may have any obligation under this Agreement or any other Transaction Document to the other:

(a)   It shall preserve and maintain its corporate existence, except to the extent that the failure to do so would not have a Material Adverse Effect.

(b)   It shall use all reasonable efforts to maintain in full force and effect all consents, approvals, actions, authorizations, exceptions, notices, filings and registrations of or with any Governmental Authority that are required to be obtained by it with respect to this Agreement or any other Transaction Document and shall use all reasonable efforts to obtain any that may become necessary in the future.

(c)   It shall comply with all applicable laws and orders of any Governmental Authority to which it may be subject if failure so to comply could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

**5.2    Covenants of the LW Capital Provider**

With respect to each Claim, the LW Capital Provider agrees with the Counterparty that:

(a)    the LW Capital Provider is not, and shall not by virtue of entering into this Agreement or any other Transaction Document become, a party to such Claim; and

(b)    the LW Capital Provider shall have no authority to control any litigation affecting the Counterparty, including but not limited to the Claim, and the decisions of the Counterparty, the Trust Administrator and the Trust Monitor regarding the conduct of any such litigation, including but not limited to a settlement of all or a portion of the Claim, shall be conclusive and binding upon the LW Capital Provider.

**5.3    Covenants of the Counterparty**

The Counterparty agrees with the LW Capital Provider that:

(a)    Subject to Section 8 of the Trust Agreement, the Counterparty shall use its best efforts and exercise good faith and reasonable commercial judgment, but at all times within the bounds of any applicable law and rules of professional responsibility, to (i) pursue the Claim; (ii) bring about the reasonable monetization thereof through a Claim Resolution; (iii) collect and enforce any settlement, final judgment or award (all costs of doing the foregoing, plus Trust Administration Expenses, collectively, "***Claim Costs***"); (iv) manage Claim Costs incurred in doing the foregoing and promptly discharge the same.

(b)    The Counterparty shall use its best efforts to obtain the Approvals as soon as practicable, and shall file the Bankruptcy Court Application as soon as reasonably practicable, but within ten (10) Business Days in any event, after the full execution of this Agreement.

(c)    So long as the Counterparty has or may have any obligation under this Agreement or any other Transaction Document, the Counterparty shall:

   (i)    comply in all material respects with the terms and conditions of the Trust Agreement, the Litigation Cost Advance Agreement and the Settlement Agreement;

   (ii)    provide annual Budgets and quarterly updates in accordance with Section 6.3 of the Trust Agreement.  The quarterly updates shall reconcile actual expenditures with projections that had been included in the relevant Budget, and, if and when the Trust identifies a need for or the occurrence of actual expenditures that materially differ from the relevant Budget, they will notify the LW Capital Provider as promptly as practicable, and no later than 15 days after identifying the issue;

   (iii)    provide in the Trust Agreement that Professionals and any other persons

entitled to payment from the Trust (other than the Trust Administrator and the Trust Monitor) shall be required to submit reasonably detailed invoices on a monthly basis to the Trust Administrator, the Trust Monitor and the LW Capital Provider, including in such invoices a description of the work performed, the individuals who performed such work, and the hourly rate of such Person, plus an itemized statement of expenses for which payment is sought. Invoices submitted to the LW Capital Provider may be in a form reasonably necessary to protect the attorney-client privilege. For the avoidance of doubt, any and all payments by the Trust from funds that originated from the Capital Amounts shall be subject to this invoice disclosure requirement. No payment on account of such invoices shall be made until 15 days after presentation of the invoices to the LW Capital Provider. The Trust Administrator shall timely pay all such invoices that are not disputed by the Trust Administrator or the Trust Monitor. If the LW Capital Provider has questions or concerns about any invoice submitted to the Trust, or about any other issue relating to the Trust's finances or administration, it shall be entitled to discuss the matter with the Trust Monitor, as well as with the Trust Administrator and/or counsel for the Trust, as appropriate, and the Trust Monitor shall consult with the LW Capital Provider and give good faith consideration to any objection of the LW Capital Provider before approval of payment by the Trust Administrator or non-objection by the Trust Monitor;

(iv)   open the LW Capital Provider Funding Account and provide the LW Capital Provider with monthly account statements for the LW Capital Provider Funding Account, and provide immediate access to any or all LW Capital Provider Funding Account records upon request by the LW Capital Provider;

(v)   subject to Section 8.4 of this Agreement, (A) shall itself, and cause the applicable Nominated Lawyers to, keep the LW Capital Provider fully and promptly apprised of each material development in relation to the Claim and the Trust and respond fully and promptly to any request by the LW Capital Provider and its Affiliates or Representatives for any information regarding such Claim and (B) provide to the LW Capital Provider copies of all reports provided by it to Trust Beneficiaries pursuant to the Trust Agreement contemporaneously with delivery to such Trust Beneficiaries;

(vi)   provide notice by email as soon as practicable to the LW Capital Provider of a Claim Resolution or any receipt of any Proceeds, or of any event that is expected to generate a Claim Resolution or the receipt of any Proceeds;

(vii)   other than pursuant to the Litigation Cost Advance Agreement, the Settlement Agreement, Section 6.1(d) of the Trust Agreement, any Security Agreement or any Engagement Agreement(s), and with the prior written consent of the LW Capital Provider, (A) not dispose of, transfer, encumber

or assign, nor otherwise create, incur, assume or permit to exist any Adverse Claim with respect to, all or any portion of such Claim (or any interest therein) or any Proceeds thereof (or any right to such Proceeds); or (B) not increase the amount of existing indebtedness that is secured by the collateral under any Security Agreement, if, in the case of either (A) or (B), doing so would either  (x) create a lien senior to or *pari passu* with the lien securing the LW Capital Provider's Entitlement or, (y) except as set forth in Section 2.7 of the Subordination Agreement, result in the subordination of any portion of the payment of the LW Capital Provider's Entitlement pursuant to Section 5.1(d) of the Trust Agreement;

(viii) not permit or apply any Set-off or agree to permit or apply any Set-off against such Claim;

(ix) not use Capital Amounts to fund distributions to other creditors (including the DIP Lenders and the CE Capital Providers) or, after a Claim Resolution, to pay Trust Professionals (as defined in the Trust Agreement) without the prior written consent of the LW Capital Provider; and

(x) not amend or seek to amend the Trust Agreement without the prior written consent of the LW Capital Provider if such amendment(s) would negatively impact the amount or payment priority of the LW Capital Provider's Entitlement or modify the treatment of Capital Amounts as Other Supplemental Cash, as such term is defined in the Trust Agreement.

(d) Within five (5) Business Days after the Counterparty knows or has reason to believe that any of the following has occurred or is likely to occur, the Counterparty shall deliver to the LW Capital Provider a notice describing the same in reasonable detail and, together with such notice or as soon thereafter as possible, a description of any action that the Counterparty has taken or proposes to take with respect thereto:

(i) any Potential Remedy Event or Remedy Event;

(ii) any action, suit or proceeding of the kind described in Section 6.2(b) of this Agreement has been or shall be brought; and

(iii) a material failure by the Counterparty, or the Nominated Lawyers on the Counterparty's behalf, to pay when due any undisputed amounts owing to any litigation services providers (e.g., experts) retained in connection with a Claim (after giving effect to any applicable notice requirement or grace period).

(e) If the Counterparty replaces the Nominated Lawyers for any reason or retains additional legal counsel for the Claim, the Counterparty shall promptly deliver to the LW Capital Provider copies of any Engagement Agreements with any successor or new attorneys, and all references to the "Nominated Lawyers" herein shall be

deemed to refer to and include such successor or new counsel.

(f)     The Counterparty shall not, without the LW Capital Provider's prior written consent, (x) amend the economic terms of any Engagement Agreement if such amendment(s) would, directly or indirectly, negatively impact the amount or payment priority of the LW Capital Provider's Entitlement or (y) enter into any new Engagement Agreements that would have such an effect.

## 6.    REPRESENTATIONS AND WARRANTIES

## 6.1    Representations and Warranties of Each Party

On each Representation Date, the Counterparty, on the one hand, and the LW Capital Provider, on the other hand, represents and warrants to the other as follows:

(a)     It (i) is duly organized or formed and validly existing under the laws of the jurisdiction of its organization or formation and, if relevant under such laws, in good standing, (ii) is qualified to do business in each jurisdiction in which the nature of its business so requires, and (iii) has not filed any certificates of dissolution or liquidation, or any certificates of domestication, transfer or continuance in any jurisdiction.

(b)     It has the power to execute this Agreement and the other Transaction Documents to which it is a party, to deliver this Agreement and the other Transaction Documents it is required by this Agreement to deliver, and to perform its obligations under this Agreement and the other Transaction Documents; and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not and shall not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other Governmental Authority applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets (including, with respect to the Counterparty, the Engagement Agreement(s) and any provisions therein).

(d)     All consents, approvals, actions, authorizations, exceptions, notices, filings and registrations that are required to have been obtained by it with respect to this Agreement or any other Transaction Document, other than the Approvals, have been obtained and are in full force and effect, and all conditions of any such consents, approvals, actions, authorizations, exceptions, notices, filings and registrations have been complied with.

(e)     This Agreement and the other Transaction Documents constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization or similar laws and to general equitable principles).

(f)     It is acting for its own account, and it has made its own independent decisions to enter into this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, and as to whether this Agreement and the other Transaction Documents and such transactions are appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.

(g)     No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby.

(h)     It is capable of assessing the merits of and understanding (on its own behalf or through independent professional legal advice), and understands and accepts, the terms, conditions and risks of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby.

## 6.2     Representations and Warranties of the Counterparty

On each Representation Date, the Counterparty represents and warrants to the LW Capital Provider as follows:

(a)     No Remedy Event or Potential Remedy Event has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any other Transaction Document.

(b)     No litigation or other proceedings before any court or other Governmental Authority, official, tribunal or arbitrator that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, have been commenced by or against the Counterparty or, to the best of the Counterparty's knowledge, are threatened against, the Counterparty, any other Person or any collateral under any Security Agreement.

(c)     It has provided the most recent financial reporting for the Trust, which financial reporting accurately reflects the present financial condition and budget of the Trust. As of the date of this Agreement, such financial reporting includes the Q3 2018 balance sheet and income statement and the 2019 budget.

(d)     It is not materially overdue in the filing of any Tax return nor overdue in the payment of any amount in respect of Tax.

(e)     It has, and reasonably expects to continue to have, sufficient assets (taking into account the Capital Amounts) available to it with which to discharge such Claim Costs as may be necessary to comply with its covenants under this Agreement.

(f)     As of the date of this Agreement, it has entered into the Engagement Agreements in respect to the Claim as described on <u>Annex II</u> to this Agreement.

(g)     With respect to the Claim:

    (i)     it is the sole legal and beneficial owner of, has good title to, and possesses sole control of, the Claim, free and clear of any Adverse Claim, other than pursuant to Article V of the Trust Agreement, the Litigation Cost Advance Agreement, the Settlement Agreement, any CE Security Agreement or any Security Agreement;

    (ii)     it has full power and authority to bring such Claim and has obtained all necessary corporate, contractual and other authorizations to do so;

    (iii)     other than pursuant to this Agreement, the CE Capital Provision Agreement, the Litigation Cost Advance Agreement, the Settlement Agreement, any CE Security Agreement, any Security Agreement or any Engagement Agreement or as described in Section 6.1(d) of the Trust Agreement, it has not disposed of, transferred, encumbered or assigned all or any portion of such Claim (or any interest therein) or any Proceeds thereof, whether by way of security, subrogation, assignment to an insurer or otherwise;

    (iv)     to the extent that the Counterparty purports to grant to the LW Capital Provider any security interest in such Claim, any proceeds thereof and/or related collateral pursuant to any Security Agreement (without limiting any representation or warranty made by the Counterparty in such Security Agreement), such security interest is a legal, validly created, perfected security interest, with priority over all other secured parties other than the DIP Lenders and the CE Capital Providers;

    (v)     it has not permitted or applied any Set-off nor agreed to permit or apply any Set-off against such Claim, and there exist no rights of Set-off or similar rights against the Counterparty that could permit any Set-off against such Claim;

    (vi)     it has not taken any steps or executed any documents, nor is it aware of any asserted or unasserted claim, lien or judgment against it, which could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, and it is not aware of anyone else doing or purporting to do so;

    (vii)     the Counterparty believes (and does not have, and has not been informed by any of its Representatives of, any belief to the contrary) that such Claim is meritorious and likely to succeed; and

(viii) any proceeds arising directly or indirectly from the Reconstitution Claims shall constitute Avoidance Action Proceeds, as defined in the Trust Agreement.

(h) It is not relying on any communication (written or oral) of the LW Capital Provider or any of the LW Capital Provider's Affiliates as legal advice or as a recommendation to enter into this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby, it being understood that information and explanations related to the terms and conditions of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, shall not be considered legal advice or as such a recommendation.

(i) Schedule 6.2(i) sets forth, as of January 15, 2019, the amounts which, if recovered, would be due pursuant to the Trust Agreement from Distributable Trust Assets: (i) to the DIP Lenders pursuant to the Litigation Cost Advance Agreement; (ii) to the CE Capital Providers pursuant to the CE Capital Provision Agreement; and (iii) to the GUC Trust for DIP Lender Advances. The amounts set forth in Schedule 6.2(i) are a representation by the Counterparty and are not binding on the DIP Lenders or CE Capital Providers.

## 6.3 Representation and Warranty of the LW Capital Provider

On each Representation Date, the LW Capital Provider represents and warrants to the Counterparty that it has sufficient access to capital to enable it to fulfill its funding commitment to the Counterparty under this Agreement.

## 7. CONFIDENTIALITY

## 7.1 Exclusive Ownership of Information by Disclosing Party

Each recipient of Confidential Information hereunder (the "***Recipient***") agrees that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the disclosing party (the "***Disclosing Party***"), or any of its Affiliates or contract counterparties, as the case may be, and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such information, or any aspect or embodiment thereof. Neither the execution of this Agreement or any other Transaction Document, nor the furnishing of any Confidential Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel or otherwise, any license to distribute or title to any patent, trademark, copyright, service mark, business and trade secret or other proprietary right, title or interest in or to such Confidential Information, or to use such Confidential Information for any purpose other than as specified in this Agreement or any other Transaction Document, or to constitute a waiver of any attorney-client privilege or work product protection.

**7.2     Non-Disclosure of Information**

The Recipient shall not for any reason, (a) until the later of (i) the seventh (7th) anniversary of the date of this Agreement, or (ii) the second (2nd) anniversary of a Claim Resolution, disclose, reveal, report, publish, transfer or make available, directly or indirectly, to any Person other than its Representatives authorized pursuant to Section 7.3 of this Agreement, nor use for any purpose other than the fulfillment of its obligations hereunder (collectively, "***Disclose***"), any Confidential Information provided to it; nor (b) in perpetuity, Disclose any Common Interest Material provided to it.  Moreover, notwithstanding any other provision of this Agreement, at no time shall the Recipient knowingly disclose any Confidential Information or Common Interest Material to the Opponent or any other adversary, potential adversary or conduit to an adversary of the Counterparty, and the Recipient shall treat such materials in a manner that does not substantially increase the likelihood that any of the foregoing shall come into possession of it.  Notwithstanding the foregoing, the LW Capital Provider shall be free (A) following a Claim Resolution, to disclose publicly its involvement in the Claim and (B) at any time, to make disclosures as part of any public reporting obligations.

**7.3     Confidentiality Procedures**

The Recipient shall ensure that the Confidential Information it receives is not divulged or disclosed to any Person except its Representatives who have a "need to know" such information in order to perform their job responsibilities. The Recipient shall procure its Representatives' compliance with Section 7.2 of this Agreement and all other provisions of this Agreement and shall be responsible for its or its Representatives' failure to so comply.

**7.4     Judicial and Official Disclosure Requests**

If a Recipient receives a request, including in any judicial, arbitral or administrative proceeding or by any Governmental Authority, to disclose any Confidential Information, then such Recipient, before complying with such request, shall, unless prohibited from doing so by applicable law or court order, promptly provide written notice of such request, including a copy of such request, to the Disclosing Party, sufficiently in advance, so that the Disclosing Party may contest the requested disclosure.  If, upon such notice, the Disclosing Party elects to contest the requested disclosure (all such contests being at the Disclosing Party's expense and under its control; provided that where the Counterparty is the Disclosing Party, the Counterparty shall consult with the LW Capital Provider about such contests), the Recipient shall not disclose any Confidential Information until such time as an order has been entered compelling such disclosure, and the Recipient shall cooperate with the Disclosing Party in its contest.  Moreover, if any such request for the disclosure of Confidential Information seeks disclosure of this Agreement or any other Transaction Document, any terms hereof or thereof, the identities of the LW Capital Provider or any communications between the Counterparty and the LW Capital Provider, then the Recipient shall promptly notify the LW Capital Provider and shall object to such disclosure on all applicable bases, including work product doctrine, common interest

privilege and relevance, as applicable, and shall abide by the instructions of the LW Capital Provider with respect to the management of such objections, including using counsel nominated by the LW Capital Provider with experience in addressing such objections for that narrow purpose. Should the Disclosing Party not contest the requested disclosure, the Recipient shall not have any obligation to do so; the Recipient may, however, contest the requested disclosure even if the Disclosing Party elects not to do so. Notwithstanding anything herein to the contrary, (i) any disclosure in connection with the Claim ordered by the United States Bankruptcy Court for the Southern District of New York or any other court of competent jurisdiction is permitted upon notice to the other party; and (ii) the obligations of the Recipient in connection with requests for the disclosure of Confidential Information described in this Section 7.4 shall not apply with respect to requests made by a regulatory or self-regulatory body having jurisdiction over the Recipient when such disclosures are required by law as a matter of general or routine examinations in which no specific request is made for Confidential Information relating to the Disclosing Party or the Claim(s).

## 8.    LEGAL PRIVILEGE

### 8.1    Common Interest Privilege Applies

The parties agree that the Counterparty, the LW Capital Provider and the LW Capital Provider's Affiliates have a "common legal interest" in each Claim and its successful prosecution, this Agreement and the other Transaction Documents, and any discussion, evaluation and negotiation and other communications and exchanges of information relating thereto.

### 8.2    Information Subject to Privilege Protection

Notwithstanding any contrary provision of this Agreement, the parties agree that any Common Interest Material shall at all times remain subject to all applicable Privileges, it being the express intent of the parties and their Affiliates to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all Privileges to which Common Interest Material, or any part of it, is, may be or may in the future become subject. It is the good faith belief of the Disclosing Party that Privileges, including the common interest privilege, attach to the Common Interest Material and disclosure of Common Interest Material is made in reliance on that good faith belief.

### 8.3    Information Subject to Work Product Protection

The parties agree that without limiting the foregoing, any materials prepared in anticipation of litigation by or for the Counterparty, the LW Capital Provider, any of their respective Affiliates or any of their respective Representatives shall remain subject to work product protection. The LW Capital Provider and its Affiliates shall be considered "representatives" of the Counterparty given that the Counterparty requested assistance and advice from them regarding the plausibility of the Counterparty's obtaining external capital

to finance its legal claims.  Moreover, the parties agree that information shared between the Counterparty and the LW Capital Provider is shared pursuant to a common interest and non-disclosure agreement, and the exchange of such information does not increase the risk of disclosure, inadvertent or otherwise, to the Opponent or any other adversary and does not lessen or waive the protection secured under work product doctrine.  Disclosure of work product is made in reliance on that good faith belief.

## 8.4    No Obligation to Provide Privileged Information

Notwithstanding other provisions of this Agreement, the Counterparty is not obliged to provide to the LW Capital Provider any information that is subject to attorney-client privilege; provided that if the Counterparty withholds from the LW Capital Provider information otherwise required by this Agreement on the basis of attorney-client privilege, any other Privilege or any similar doctrine of confidentiality, it shall provide prompt notice thereof to the LW Capital Provider.

## 9.    INDEMNIFICATION OF THE LW CAPITAL PROVIDER

The Counterparty agrees to indemnify, defend and hold the LW Capital Provider and its Representatives ("*Indemnitees*") free and harmless from and against any and all losses, costs, charges, damages and expenses (including reasonable attorneys' fees and costs of experts and advisors) which any Indemnitee sustains at any time by reason of one or more of:

(a)    any costs, sanctions, awards or penalties assessed or awarded against the LW Capital Provider in connection with any Claim (other than in connection with any dispute with the Counterparty), in each case which results from any act committed by the Counterparty; and

(b)    any claim by any agent or broker claiming to represent the Counterparty for compensation on account of the transactions contemplated by this Agreement.

Any amounts owed as a result of the indemnification obligations set forth in this Section 9 are independent of the Counterparty's obligation to pay the LW Capital Provider's Entitlement.  Any party who receives notice of a claim for which it shall seek indemnification hereunder (the "*Indemnified Party*") shall promptly notify the party from which the Indemnified Party shall seek indemnification (the "*Indemnifying Party*") of such claim in writing.  The Indemnifying Party shall have the right to assume the defense of such action at its cost with counsel approved by the Indemnified Party but shall not have the right to settle or compromise any claim or action without the written consent of the Indemnified Party.  The Indemnified Party shall have the right to participate in such defense with its own counsel at its cost.  Any failure by the Indemnified Party to give prompt notice of a claim hereunder shall not relieve the Indemnifying Party of its indemnification obligation except to the extent the Indemnifying Party is actually prejudiced by such failure.

## 10.    EXCULPATION; REINSTATEMENT

(a)    Other than its obligations to provide the Capital Amounts to the Counterparty, the LW Capital Provider shall not have any obligation to fund any fees, expenses or other sums in relation to any Claim, and all such fees, expenses or other sums shall be the sole responsibility of the Counterparty.  Without limiting the generality of the foregoing, the LW Capital Provider shall not have any obligation to pay any sums awarded against, or penalties incurred by, the Counterparty, including any costs orders, awards, interest, damages, expenses or penalties against the Counterparty, nor to fund any legal fees or any other costs whatsoever incurred as a result of defending any counterclaim brought against the Counterparty in relation to any Claim or defending any enforcement or other proceedings against the Counterparty.

(b)    Subject to Section 10(c) of this Agreement, the liability of the LW Capital Provider to the Counterparty under this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, in relation to any Claim is equal to the aggregate of the Capital Amounts committed by the LW Capital Provider in relation to such Claim.

(c)    There shall be no other liability of either LW Capital Provider to the Counterparty hereunder or otherwise in connection with the transactions contemplated hereby or any of the activities of the parties related thereto, except in the event of fraud of the LW Capital Provider or reckless activity of the LW Capital Provider amounting to fraud.  This limitation of liability is absolute and applies to liability for (without limitation) breach of contract, negligence and gross negligence, and for any damages that may constitute compensatory damages, lost profit, expenses, costs, losses or charges, or consequential, exemplary or punitive damages or otherwise.  This limitation of liability extends to the LW Capital Provider and its Representatives.

(d)    To the extent any payment received by the LW Capital Provider, or obligation incurred by the Counterparty pursuant to any of the Transaction Documents, is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid in whole or in part by the LW Capital Provider or paid over to a trustee, receiver or any other entity, whether under any bankruptcy law, insolvency, fraudulent transfer law or otherwise (any such payment or obligation being hereinafter referred to as a "***Challenged Item***"), then the obligations of the Counterparty pursuant to this Agreement with respect to such Challenged Item shall (i) be fully reinstated and revived, as the case may be, notwithstanding such payment or incurrence, and (ii) to the extent of each such Challenged Item, remain effective and continue in full force and effect as if said Challenged Item had not occurred or been made.  The Counterparty shall indemnify the LW Capital Provider on demand for all reasonable third party costs and expenses (including the reasonable fees and disbursements of outside counsel) incurred by the LW Capital Provider in connection with such rescission or revival, if caused by a wrongful act

committed by the Counterparty, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment.

## 11.   REMEDY EVENTS

The occurrence at any time with respect to the Counterparty of any of the following events constitutes a "***Remedy Event***":

### 11.1   Failure to Pay or Deliver

The Counterparty fails to make, when and where due, any payment under Section 3 of this Agreement.

### 11.2   Failure to Discharge Claim Costs

The Counterparty fails to comply with, or perform any of its obligations to discharge Claim Costs under, Section 5.3(a) of this Agreement.

### 11.3   Breach or Repudiation

The Counterparty fails to comply with or perform any of its obligations in accordance with this Agreement, any Security Agreement or any other Transaction Document if (a) such failure, if remediable, is not remedied within five (5) Business Days after written notice thereof is given to the Counterparty and (b) (i) such failure could reasonably be expected to have a Material Adverse Effect; (ii) such failure could reasonably be expected to cause the expiration or termination of any Security Agreement or the failing or ceasing of any Security Agreement to be in full force and effect, in each case (A) other than in accordance with its terms and (B) without the written consent of the LW Capital Provider; or (iii) the Counterparty or any of its Representatives disaffirms, disclaims, repudiates or rejects in writing, in whole or in part, or challenges the validity of, this Agreement, any Security Agreement or any other Transaction Document.

### 11.4   Misrepresentation

A representation by the Counterparty in this Agreement or any other Transaction Document proves to have been incorrect or misleading in any material respect when made or deemed to have been made.

## 12.   REMEDIES

### 12.1   Available Remedies Generally

If at any time a Remedy Event has occurred with respect to one or more Claims, the LW Capital Provider shall be entitled to exercise one or more of the following remedies (in each case without thereby relieving the Counterparty of any of its obligations under Section 3 of this Agreement):

(a)     the LW Capital Provider may by notice to the Counterparty suspend or terminate all or any portion of the obligations of the LW Capital Provider hereunder to pay Capital Amounts due and payable on or after the date such Remedy Event occurred, regardless of which Claim(s) such Capital Amounts may relate to or be used for;

(b)     with respect to those Claim(s) to which the Remedy Event relates, the LW Capital Provider may exercise any rights and remedies available to the LW Capital Provider under any Security Agreement; and

(c)     the LW Capital Provider may pursue all other legal and equitable remedies available to the LW Capital Provider under applicable law in connection with the enforcement of their rights under this Agreement and the other Transaction Documents.

## 12.2    Remedies Cumulative

Except as provided otherwise in this Agreement, the rights, powers, remedies and privileges provided in this Agreement and the other Transaction Documents are cumulative; may be exercised singularly, concurrently or successively at the LW Capital Provider's option; and may be exercised or enforced without constituting a bar to the exercise or enforcement of any other such rights, powers, remedies and privileges.

## 13.    LIMITATIONS ON TRANSFER, SUCCESSORS AND ASSIGNS; THIRD PARTY BENEFICIARIES

(a)     Neither this Agreement nor any other Transaction Document, nor any right or obligation in or under this Agreement or any other Transaction Document, may be transferred (whether by way of security or otherwise) or delegated by the Counterparty without the prior written consent of the LW Capital Provider, which consent shall not be unreasonably withheld.  The LW Capital Provider may assign its rights and obligations under this Agreement and the other Transaction Documents, in whole or in part, to another Person without the consent of the Counterparty.  Any purported transfer that is not in compliance with this provision shall be void.

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c)     No Person other than the parties hereto (and the Indemnitees and any permitted transferee hereunder) shall have any rights under this Agreement.

## 14.    TAX WITHHOLDING

The Counterparty shall make all payments under or in connection with this Agreement without any deduction or withholding for or on account of any Tax, save only as may be required by applicable law. If any such deduction or withholding is required by law to be

made, the Counterparty shall (<u>a</u>) promptly notify the LW Capital Provider upon becoming aware that it must make such a deduction or withholding; (<u>b</u>) pay to the relevant authorities (within the time allowed) the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by the Counterparty to the LW Capital Provider under clause (<u>d</u>) of this Section 15 of this Agreement); (<u>c</u>) promptly provide an official receipt (or a certified copy or such other evidence reasonably acceptable to the LW Capital Provider) evidencing the relevant withholding and payment to such authorities; and (<u>d</u>) pay to the LW Capital Provider such additional amounts as are necessary to ensure that (after making any such withholdings or deductions) the net amount actually received by the LW Capital Provider in respect of the payment due from the Counterparty equals the amount which the LW Capital Provider would have received if no such withholdings or deductions had been required.

## 15. NOTICES

### 15.1 Effectiveness of Notices

Any notice or other communication in respect of this Agreement shall be in writing and may be given in any manner described below to the address or number provided for the recipient in <u>Annex I</u> to this Agreement and shall be deemed effective as indicated:

(a)     if delivered in person or by courier, on the date it is received;

(b)     if sent by certified or registered mail or the equivalent (return receipt requested), on the date it is received; or

(c)     if sent by email, on the date sent in the absence of any immediate automated response indicating the message was not received or would not be timely read, and if such an immediate automated response is received by the sender, on the date the sender receives an acknowledgement from the recipient,

unless the date of receipt is not a Business Day or the communication is received after the close of business on a Business Day, in which case such communication shall be deemed given and effective on the first following day that is a Business Day.  Notices to the Counterparty shall be copied to the Nominated Lawyers, and the time of effectiveness of each such notice shall be the effective time of receipt by either the Counterparty or the Nominated Lawyers, whichever occurs earlier.

### 15.2 Change of Details

Either party may by notice to the other in accordance with Section 15.1 of this Agreement change the address or email details at which notices or other communications are to be given to it.

16.    **AMENDMENTS**

No amendment, modification or waiver in respect of this Agreement shall be effective unless in writing and executed by the Counterparty and the LW Capital Provider.

17.    **ENTIRE AGREEMENT**

This Agreement and the other Transaction Documents collectively constitute the entire agreement between the parties relating to the subject matter hereof and are the final and complete expression of their intent.  The parties represent and warrant that no prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing, have been made or relied upon by them, whether in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained in the Transaction Documents, or which have not become merged and finally integrated therein; it being the intention of the parties that in the event of any subsequent litigation, controversy, or dispute concerning the terms and provisions of the Transaction Documents, no party shall be permitted to offer or introduce oral or extrinsic evidence concerning the terms and conditions thereof that are not included or referred to therein and not reflected in writing.

18.    **COUNTERPARTS**

This Agreement and the other Transaction Documents (and each amendment, modification and waiver in respect thereof) may be executed and delivered in counterparts (including by facsimile or digital transmission), each of which shall be deemed an original.

19.    **SURVIVAL OF OBLIGATIONS**

With respect to each Claim, the rights and obligations of the parties under Sections 3, 4, 6, 7, 8, 9, 10 and 12 through 27 of this Agreement in relation to such Claim shall survive any Claim Resolution or the exercise by the LW Capital Provider of any remedies with respect to such Claim pursuant to Section 12 of this Agreement.  In the event of a termination of this Agreement pursuant to Section 27, the following provisions shall survive to the extent applicable: Sections 2, 3, 4, 6, 7, 8, 9, 10, 13, 17 and 19 - 26.

20.    **NO WAIVER**

A failure or delay in exercising any right, power or privilege in respect of this Agreement or any other Transaction Document shall not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege shall not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

21.    **SEVERABILITY**

If any term of this Agreement or any other Transaction Document, or the application thereof to either party or any circumstance, is held to be unenforceable, invalid or illegal

(in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms, modified by the deletion of the unenforceable, invalid or illegal portion, shall continue in full force and effect, and such unenforceability, invalidity, or illegality shall not otherwise affect that of the remaining terms, so long as this Agreement and the other Transaction Documents as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement or any other Transaction Document shall not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties shall endeavour in good faith negotiations to replace any prohibited or unenforceable provision with a valid provision the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

## 22.   EXPENSES

The Counterparty shall reimburse the LW Capital Provider for its expenses as set forth in such invoice and for all other expenses incurred in connection with this Agreement and the other Transaction Documents, up to an aggregate reimbursement under this Section 22 of US$65,000. Such reimbursement shall be payable regardless of whether the Approvals are obtained and regardless of whether any Capital Amounts are provided by the LW Capital Provider pursuant to this Agreement. The parties acknowledge and agree that such reimbursement obligation may, at the LW Capital Provider's option, be satisfied by netting such amount against the amount to be funded by the LW Capital Provider pursuant to Section 2.1(a)(ii).

## 23.   RELATIONSHIP OF PARTIES

(a)     The LW Capital Provider and its Affiliates are not law firms and are not engaged in the practice of law with respect to any Claim or the Counterparty.  The Counterparty may not, and shall not, rely on any of the LW Capital Provider or its Affiliates for legal advice.

(b)     Nothing in this Agreement or any other Transaction Document shall give rise to or be construed to create a fiduciary, lawyer-client, lender-borrower, agency or other non-contractual relationship between the parties.

(c)     Neither this Agreement nor any other Transaction Document creates any joint venture, partnership or any other type of affiliation between the parties, nor does this Agreement or any other Transaction Document create a joint interest in any Claim for any purpose, including for U.S. federal, state and local income tax purposes.

## 24.   GOVERNING LAW

This Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract,

tort or otherwise) shall be governed by, the law of the State of New York (without reference to any conflict of law principles or choice of law doctrine that would have the effect of causing this Agreement to be construed in accordance with or governed by the law of any other jurisdiction).

## 25. DISPUTE RESOLUTION

(a)    Any dispute, controversy or claim arising out of, under or in connection with this Agreement or any other Transaction Document, or any amendment or supplementation thereof, including any question regarding formation, existence, validity, interpretation, amendment, supplementation, performance, breach or termination and any application for interim, preliminary, equitable or injunctive relief, shall (to the exclusion of any other forum) be resolved by an action or judicial proceeding pursuant to the remainder of this Section 25. If and to the extent an action or judicial proceeding is commenced, then, subject to clause (v) of the following sentence, it shall be brought exclusively in the Bankruptcy Court (as defined herein). If the Bankruptcy Court declines jurisdiction, the action or judicial proceeding may be brought in another court of competent jurisdiction in the State of New York, City of New York, Borough of Manhattan. By executing and delivering this Agreement, each party irrevocably (i) accepts generally and unconditionally the exclusive jurisdiction and venue of such courts; (ii) waives any defense of forum non conveniens or improper venue; (iii) agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to such party at its address provided in accordance with this Agreement; (iv) agrees that service as provided in clause (iii) above is sufficient to confer personal jurisdiction over the applicable party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect; and (v) agrees that the other party retains the right to serve process in any other manner permitted by law.

(b)    **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER HEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS**

**REVIEWED THIS WAIVER WITH COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH COMPETENT COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION AND EXECUTED BY EACH OF THE PARTIES HERETO, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS PROVISION MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

(c)     The commencement of an action or proceeding in connection herewith shall not suspend or interfere with the Counterparty's obligation to make payment to the LW Capital Provider pursuant to this Agreement; provided, however, that if the Counterparty commences an action or proceeding contemplated by this Section 25 the Nominated Lawyers and/or the Counterparty, as applicable, shall immediately deposit any Proceeds in a dedicated account with the Bankruptcy Court, which Proceeds shall be released, including any interest thereon, as directed by any applicable order of the Bankruptcy Court, unless the parties expressly agree otherwise in writing.

(d)     Any attempt by the Counterparty or the LW Capital Provider to seek relief or remedies in any forum that contravenes this Section 25 shall constitute a breach of this Agreement and entitle the other party to damages, equitable relief and full indemnification against all costs and expenses incurred in connection therewith. No claim by any third party, including the Nominated Lawyers, shall interfere with the operation of this Section 25.

(e)     The Counterparty, being a sophisticated commercial entity with access to counsel, irrevocably waives and forever and unconditionally releases, discharges and quitclaims any claims, counterclaims, defenses, causes of action, remedies and/or rights that it has or may have in the future arising from any doctrine, rule or principle of law or equity that this Agreement or any other Transaction Document, or any of the relationships and transactions contemplated hereby or thereby, (i) are against the public policy of any relevant jurisdiction; (ii) are unconscionable or contravene any laws relating to consumer protection; (iii) are usurious or call for payment of interest at a usurious rate; (iv) were entered into under duress; (v) were entered into as a result of actions by the LW Capital Provider that violated its obligations of good faith and/or fair dealing; (vi) constitute illegal gambling or the sale of unregistered securities; (vii) constitute malicious prosecution, abuse of process or wrongful initiation of litigation; or (viii) constitute champerty, maintenance, barratry or any impermissible transfer or assignment of property or choses in action. The parties specifically agree that any issues concerning the scope or validity of the foregoing waiver shall be within the exclusive jurisdiction of the Tribunal.

### 26.    RULES OF CONSTRUCTION

Unless the context otherwise clearly requires: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (d) the word "shall" shall be construed to have the same meaning and effect as the word "will"; (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein); (f) any reference herein to any Person shall be construed to include such Person's successors and assigns; (g) the phrase "to its knowledge" and phrases of similar import shall be construed to mean the best knowledge, after due inquiry, of any director, officer, manager, member, partner, principal or employee of the entity to which the phrase refers; (h) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; (i) all references herein to Sections, Annexes, Exhibits and Schedules, as applicable, shall be construed to refer to Sections of, and Annexes, Exhibits and Schedules to, this Agreement, and the same are incorporated herein as part of this Agreement; and (j) the headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

### 27.    TERMINATION OF AGREEMENT

(a)    The Counterparty, at its option, by notice pursuant to Section 15 of this Agreement stating that it is terminating this Agreement, shall have the right to terminate this Agreement upon its receipt of written confirmation from the LW Capital Provider that payment of the LW Capital Provider's Entitlement has been received by it in full, such confirmation, if requested by the Counterparty, not to be unreasonably withheld.  Upon the LW Capital Provider's receipt of a termination notice from the Counterparty in accordance herewith, this Agreement shall be terminated, subject to Section 19 of this Agreement.

(b)    At any time prior to the Bankruptcy Court's issuance of an order approving the LW Capital Provision Agreement, the Counterparty may terminate this Agreement by sending a notice, pursuant to Section 15 of this Agreement, representing to the LW Capital Provider in good faith that a settlement of the Claim has been reached in principle and informing the LW Capital Provider that the LW Capital Provision Agreement has been terminated.  Upon such termination of the LW Capital Provision Agreement pursuant to this subsection, the LW Capital Provider is entitled to the Termination Fee under the terms of the Termination Fee Agreement.

(c)    The LW Capital Provider, at its option, by notice pursuant to Section 15 of this Agreement stating that it is terminating this Agreement, shall have the right to terminate this Agreement if (i) LW Capital Provider is in compliance with this

Agreement and (ii) the Counterparty fails to secure the Approvals for any reason within forty-five (45) days of this Agreement. Upon the Counterparty's receipt of a termination notice from the LW Capital Provider in accordance herewith, this Agreement shall be terminated, subject to Section 19 of this Agreement.  Upon termination of the LW Capital Provision Agreement pursuant to this subsection, the LW Capital Provider is entitled to the Termination Fee under the terms of the Termination Fee Agreement, and to any unreimbursed expenses payable pursuant to Section 22.

## 28.    SUBORDINATION AGREEMENT

The terms and conditions of this Agreement are expressly subject to the terms and conditions of the Subordination Agreement.

*[Remainder of this page intentionally left blank.]*

<u>Signature page to Capital Provision Agreement</u>

IN WITNESS WHEREOF, the parties have executed and delivered this Capital Provision Agreement as of the date first written above.

**Counterparty**:

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST

By: Wilmington Trust Company, as Trust Administrator and Trustee

By: _____

Name: _Beth Andrews_

Title: _Vice President_

**LW Capital Provider**:

LW HOLDCO VI LLC

By:_____

    Name: Boaz Weinstein

    Title: Authorized Signatory

**Acknowledged and approved**:

_____

ARTHUR J. GONZALEZ, as Trust Monitor

<u>Signature page to Capital Provision Agreement</u>

IN WITNESS WHEREOF, the parties have executed and delivered this Capital Provision Agreement as of the date first written above.

**Counterparty**:

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST

By: Wilmington Trust Company, as Trust Administrator and Trustee

By:_____
Name:
Title:

**LW Capital Provider**:

LW HOLDCO VI LLC

By:_____
       Name: Boaz Weinstein
       Title: Authorized Signatory

**Acknowledged and approved**:

_____
ARTHUR J. GONZALEZ, as Trust Monitor

# EXHIBIT A

## Defined Terms

"***Adverse Claim***" means, with respect to any Claim or any interest therein or any Proceeds thereof, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or affecting such Claim or any interest therein or any Proceeds thereof, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Claim or any interest therein or any Proceeds thereof, (iii) any purchase option, call or similar right of a third party with respect to such Claim or any interest therein or any Proceeds thereof and (iv) any other claim that a claimant has an interest in such Claim or any interest therein or any Proceeds thereof or that it is a violation of the rights of the claimant for another person to hold, transfer or deal with such Claim or any interest therein or any Proceeds thereof.

"***Affiliate***" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For this purpose, "***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "***Controlling***" and "***Controlled***" have meanings correlative thereto.

 "***Allowed General Unsecured Claims***" has the meaning given thereto in the Trust Agreement.

"***Approvals***" has the meaning set forth in Section 2.1 of this Agreement.

"***Bankruptcy Court***" has the meaning set forth in Section 2.1 of this Agreement.

"***Bankruptcy Court Application***" has the meaning set forth in Section 2.1 of this Agreement.

"***Budget***" has the meaning given thereto in the Trust Agreement.

"***Business Day***" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in New York.

"***Capital Amounts***" means the amounts set forth as such in Section 2.1 of this Agreement.

"***CE Capital Providers***" means Earlham LLC, a limited liability company formed under the laws of the State of Delaware, and Cynthiana LLC, a limited liability company formed under the laws of the State of Delaware.

"***CE Capital Providers' Entitlement***" means the amounts set forth in Section 2.2(a)(i) of the CE Capital Provision Agreement.

"***CE Capital Provision Agreement***" means that certain Capital Provision Agreement, dated as of June 2, 2017 between the Counterparty and the CE Capital Providers.

"***CE Security Agreement***" means any security agreement, pledge agreement or similar agreement pursuant to which the Counterparty provides to the CE Capital Providers a security interest in certain collateral to secure the obligations of the Counterparty under the CE Capital Provision Agreement.

"***Claim***" means the claim(s) described on <u>Annex II</u> to this Agreement.  If two or more claims are set forth on <u>Annex II</u>, all such claims together shall be referred to collectively as "***the Claim***".

"***Claim Costs***" has the meaning set forth in Section 5.3(a) of this Agreement.

"***Claim Resolution***" means either full and final settlement of the Claim or the entry of a final, non-appealable and enforceable judgment, in either case resolving with prejudice all aspects and elements of the Claim.  In circumstances where a final, non-appealable and enforceable judgment does not automatically come into being upon the rendering of a dispositive decision, a Claim Resolution shall be deemed to have occurred on the date that is sixty (60) days following such dispositive decision in the absence of any subsequent challenge thereto.

"***Committee***" has the meaning set forth in the Recitals of this Agreement.

"***Common Interest Material***" means any Confidential Information that is the work product of qualified legal advisers and/or attorney work product, protected by the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege and/or litigation or arbitral privilege, or that is protected by any rules of professional secrecy in any jurisdiction (collectively, "***Privileges***"), including: (i) information prepared by a party to a Claim or any of its Affiliates or their counsel, advisors, consultants or agents; or (ii) information prepared by the LW Capital Provider or any of its Representatives in connection with the review of a Claim, including legal and factual memoranda, case analyses and evaluations.

"***Confidential Information***" means any non-public, confidential or proprietary information relating to:  (i) the LW Capital Provider and its Affiliates and Representatives, information provided by them about their business and operations or the structures and economic arrangements they use in their business, including the nature, terms and existence of this Agreement and the other Transaction Documents, the existence of any relationship between the Counterparty and the LW Capital Provider or any of its Affiliates or Representatives, and the discussions and negotiations related thereto; (ii) any Claim, including the names of the parties and potential other parties to such Claim; the factual, legal, technical, economic and financial background of such Claim; and the procedural status, theories, strategies and

tactics for the prosecution or defense of such Claim; (iii) billing arrangements, rates, financial or fee arrangements; (iv) any financial statements, accounts or other similar information or materials; (v) business or financial information, business plans and relationships, marketing or product data; (vi) algorithms, computer databases, computer programs, computer software and systems, intellectual property, trade secrets and trademarks; (vii) research, scientific data, specifications, technical data, techniques and technology; and (viii) other proprietary or non-public information, data or material; in all cases regardless of whether such information is (A) written or oral, irrespective of the form or storage medium, or (B) specifically identified as "Confidential".  Notwithstanding the foregoing, Confidential Information does not include information that (x) was or becomes generally available to the public other than as a result of a disclosure by the Recipient; (y) was available to the Recipient on a non-confidential basis prior to its disclosure; or (z) was developed independent of the information derived from the Confidential Information.

"**_Counterparty_**" has the meaning set forth in the introductory paragraph of this Agreement.

"**_Default Rate_**" means a rate per year of 17%.

"**_DIP Lender Advances_**" has the meaning given thereto in the Trust Agreement.

"**_DIP Lenders_**" has the meaning given thereto in the Trust Agreement.

"**_Disclosing Party_**" has the meaning set forth in Section 7.1 of this Agreement.

"**_Distributable Trust Assets_**" has the meaning given thereto in the Trust Agreement.

"**_Distribution Date_**" has the meaning given thereto in the Trust Agreement.

"**_Engagement Agreement_**" means any engagement, retainer or similar agreement between the Counterparty and the Nominated Lawyers (including any successor or new Nominated Lawyers designated in accordance with Section 5.3(e) of this Agreement) governing or purporting to govern the terms of the representation of the Counterparty by such legal counsel with respect to the Claim, in each case as set forth on Annex II to this Agreement and as provided to the LW Capital Provider.  In the case of any Engagement Agreements entered into after the date hereof, Annex II shall be deemed amended to include such agreements.

"**_Governmental Authority_**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**_GUC Trust Advances_**" has the meaning given thereto in the Trust Agreement.

"**_Invested Amount_**" has the meaning set forth in Section 2.1 of this Agreement.

"*Litigation Settlement*" has the meaning set forth in the Recitals of this Agreement.

"*Litigation Cost Advance*" has the meaning given thereto in the Trust Agreement.

"*Litigation Cost Advance Agreement*" has the meaning given thereto in the Trust Agreement.

"*LW Capital Provider*" has the meaning set forth in the introductory paragraph of this Agreement.

"*LW Capital Provider Funding Account*" has the meaning set forth in Section 2.1(c) of this Agreement.

"*LW Capital Provider's Entitlement*" means the amounts set forth as such in Section 2.2(a) of this Agreement.

"*Material Adverse Effect*" means, with respect to any event or circumstance and either party, one or more of (i) the impairment of its ability to perform any of its obligations under this Agreement or any other Transaction Document, (ii) the impairment of the rights or remedies available under this Agreement or any other Transaction Document to the other party and (iii) solely in the case of the Counterparty, an adverse effect on any Claim or the value or collectability thereof.

"*Nominated Lawyers*" means, with respect to any Claim, the Person or Persons identified as such on <u>Annex II</u> to this Agreement.

"*Opponent*" means, with respect to any Claim, individually and collectively, the Person(s) named as defendants or counterclaim defendants in such Claim, as set forth on <u>Annex II</u> to this Agreement, and any other Person added or joined to the Claim from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened even if such Person is not named or served, and in each case their respective Affiliates and successors.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership or other entity or Governmental Authority.

"*Phase III Trial*" means the trial on the Initial Discovery and Trial Issues as defined in the Bankruptcy Court's order of September 14, 2018 in case number 09-00504-mg (docket number 1080).

"*Potential Remedy Event*" means any event which, with the giving of notice or the lapse of time or both, would constitute a "Remedy Event".

"*Privileges*" has the meaning set forth in the definition of "Common Interest Material".

"*Proceeds*" means Distributable Trust Assets as defined in the Trust Agreement, to wit: Avoidance Action Proceeds, as defined in the Trust Agreement, together with earnings (including interest) thereon.

"*Recipient*" has the meaning set forth in Section 7.1 of this Agreement.

"*Reconstitution Claims*" has the meaning set forth in Annex II to this Agreement.

"*Remedy Event*" has the meaning set forth in Section 11 of this Agreement.

"*Representation Date*" means (i) the date hereof, (ii) each date on which the parties agree to cause any Claim to become subject to this Agreement, (iii) each date on which the LW Capital Provider is obligated to or do make any payment of Capital Amounts and (iv) in the case of the Counterparty, each date on which a Monthly Report is delivered (provided that, in the event of a failure to deliver any Monthly Report by its due date, the Representation Date shall instead be such due date); provided that, for the avoidance of doubt, even though an agreement or payment referred to in clause (ii) or (iii) above relates to a specific Claim, a "Representation Date" shall be deemed to occur with respect to each Claim that is then subject to this Agreement.

"*Representatives*" means, with respect to any person or entity, as applicable, its directors, officers, managers, members, partners, principals, employees, shareholders and participants (or potential shareholders and participants), Affiliates, related entities, agents, assignees (or potential assignees), reinsurers, lawyers, accountants, consultants, advisors and independent contractors.

"*Security Agreement*" means, if required by the LW Capital Provider in connection with the transactions contemplated hereby, any security agreement, pledge agreement or similar agreement pursuant to which the Counterparty provides to the LW Capital Provider a security interest in certain collateral to secure the obligations of the Counterparty hereunder, as set forth on Annex I and in the form required by the LW Capital Provider.

"*Set-off*" means a direct or indirect right of one party (Party A) to deduct from a debt owed by it to another party (Party B) the amount of a different debt that Party B owes to Party A, including but not limited to a counterclaim in a legal proceeding, but excluding a substantive defense successfully asserted in a legal proceeding.

"*Settlement Agreement*" has the meaning given thereto in the Trust Agreement.

"*Subordination Agreement*" means the subordination agreement to be entered into by and among the LW Capital Provider, the Counterparty and the DIP Lenders promptly after the date hereof, in a form acceptable to the DIP Lenders and the CE Capital Providers pursuant to Section 6.1(d)(i) of the Trust Agreement, which acceptance shall not be unreasonably withheld.

"**Tax**" means any tax, duty, contribution, impost, withholding, levy or other charge or withholding of a similar nature (including use, sales and value added taxes), whether domestic or foreign, and any fine, penalty, surcharge or interest in connection therewith.

"**Termination Fee**" means US$200,000 payable by the Counterparty to the LW Capital Provider pursuant to the Termination Fee Agreement.

"**Term Loan Avoidance Action**" has the meaning set forth in Annex II.

"**Transaction Documents**" means, collectively, this Agreement, any Security Agreement, the Subordination Agreement, and any other agreements, documents, instruments or certificates entered into or delivered in connection with this Agreement.

"**Tribunal**" has the meaning set forth in Section 26 of this Agreement.

"**Trust Administration Expenses**" means reasonable costs and expenses of the Trust incurred in connection with the administration thereof, as described in Section 6.1(a)(i) of the Trust Agreement, in accordance with the Budget.

"**Trust Administrator**" has the meaning given thereto in the Trust Agreement.

"**Trust Agreement**" means the Third Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement, as the same shall be amended pursuant to this Agreement.

"**Trust Beneficiaries**" has the meaning given thereto in the Trust Agreement.

"**Trust Monitor**" has the meaning given thereto in the Trust Agreement.

# EXHIBIT B

## Termination Fee Agreement

## [Attached]

*EXECUTION VERSION*

**Dated as of January 21, 2019**

---

**Termination Fee Agreement**

---

**between**

**Motors Liquidation Company Avoidance Action Trust**

**and**

**The LW Capital Provider, as defined in the introductory paragraph hereof**

This TERMINATION FEE AGREEMENT, dated as of January 21, 2019 (this "***Agreement***"), is by and between Motors Liquidation Company Avoidance Action Trust, an entity organized or formed under the laws of the State of Delaware (the "***Counterparty***"), and LW Holdco VI LLC, a limited liability company formed under the laws of the State of Delaware ("***LW Capital Provider***").

WHEREAS, prior to August 2016, there was a dispute between the Official Committee of Unsecured Creditors of Motors Liquidation Company (the "***Committee***") and the DIP Lenders as to entitlements to Avoidance Action Proceeds, which dispute was resolved by mutual agreement (the "***Litigation Settlement***") pursuant to which, among other things, (i) the DIP Lenders provided the Litigation Cost Advance and (ii) the DIP Lenders are entitled to be repaid the Litigation Cost Advance out of Distributable Trust Assets; and

WHEREAS, the Trust Administrator and the Trust Monitor determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash held by the Counterparty at the time of the Litigation Settlement were insufficient to satisfy projected fees, costs and expenses of the Counterparty, and, as an integral part of the Litigation Settlement, the DIP Lenders agreed to provide the Litigation Cost Advance to the Counterparty to fund the prosecution of the Term Loan Avoidance Action, on the terms set forth in the Litigation Cost Advance Agreement;

WHEREAS, on August 24, 2016, the Bankruptcy Court entered an order approving the Settlement Agreement and the Litigation Cost Advance Agreement; and

WHEREAS, subsequent to the entering into of the Litigation Cost Advance Agreement, the Trust Administrator and the Trust Monitor determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash held by the Counterparty was insufficient to satisfy projected fees, costs and expenses of the Counterparty, for which reason the Counterparty sought additional funding by entering into a Capital Provision Agreement with Cynthiana LLC and Earlham LLC (the "***CE Capital Provision Agreement***"); and

WHEREAS, on June 20, 2017, the Bankruptcy Court entered an order approving the CE Capital Provision Agreement;

WHEREAS, subsequently, the Trust Administrator and the Trust Monitor determined that the Avoidance Action Trust Administrative Cash and Supplemental Avoidance Action Trust Cash currently held by the Counterparty remained insufficient to satisfy projected fees, costs and expenses of the Counterparty, for which reason the Counterparty determined to seek additional funding from the LW Capital Provider; and

WHEREAS, the LW Capital Provider and the Counterparty entered into the LW Capital Provision Agreement, dated as of January 21, 2019 (the "LW Capital Provision Agreement"), for the purpose of the LW Capital Provider providing additional funding to the Counterparty; and

WHEREAS, the LW Capital Provision Agreement provides that the LW Capital Provider's obligation to provide additional funding is subject to, among other conditions, the obtaining of certain Approvals, as defined at Section 2.1(e) of the LW Capital Provision Agreement; and

WHEREAS, the LW Capital Provision Agreement provides, at Section 3(d), that:

*Termination Fee.* In exchange for the LW Capital Provider reserving the Capital Amounts as necessary to satisfy its obligations hereunder, in the event that (i) the Counterparty terminates the LW Capital Provision Agreement pursuant to Section 27(b) of this Agreement; or (ii) the Counterparty fails to secure the Approvals within forty-five (45) days of this Agreement for any reason and the LW Capital Provider terminates this Agreement pursuant to Section 27(c) of this Agreement, the Counterparty shall be obligated to pay to the LW Capital Provider the Termination Fee pursuant to the terms of the Termination Fee Agreement included as <u>Exhibit A</u> to this Agreement (the *"**Termination Fee Agreement**"*).

WHEREAS, the present Termination Fee Agreement is Exhibit A to the LW Capital Provision Agreement, referred to in Section 3(d) of the LW Capital Provision Agreement; and

WHEREAS, the LW Capital Provision Agreement defined the term Termination Fee as "US$200,000 payable by the Counterparty to the LW Capital Provider";

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ENTITLEMENT TO TERMINATION FEE

(a)    In the event that (i) the Counterparty terminates the LW Capital Provision Agreement pursuant to Section 27(b) of the LW Capital Provision Agreement, or (ii) the LW Capital Provider terminates the LW Capital Provision Agreement pursuant to Section 27(c) of the LW Capital Provision Agreement, in the next motion filed by the Counterparty with the Bankruptcy Court seeking authorization to distribute Distributable Trust Assets, whether based upon the settlement of the Claims or otherwise, or any other appropriate motion or process, the Counterparty shall seek approval to pay, and shall use its best efforts to take all other actions necessary for such approval and payment of, the Termination Fee to the LW Capital Provider.

(b)    The Counterparty's obligation to pay the Termination Fee is contingent upon the Bankruptcy Court's approval of the payment of the Termination Fee.

(c)     Payment of the Termination Fee is contingent upon the availability of Distributable Trust Assets after full payment to the DIP Lenders of the DIP Lender Advances and full payment to the CE Capital Providers of the CE Capital Providers' Entitlement.

[Signature Page Follows.]

IN WITNESS WHEREOF, the parties have executed and delivered this Termination Fee Agreement as of the date first written above.

**Counterparty**:

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST

By: Wilmington Trust Company, as Trust Administrator and Trustee

By:
Name: Beth Andrews
Title: Vice President

**LW Capital Provider**:

LW HOLDCO VI LLC

By:
   Name: Boaz Weinstein
   Title: Authorized Signatory

**Acknowledged and approved**:

ARTHUR J. GONZALEZ, as Trust Monitor

IN WITNESS WHEREOF, the parties have executed and delivered this Termination Fee Agreement as of the date first written above.

**Counterparty**:

MOTORS LIQUIDATION COMPANY AVOIDANCE ACTION TRUST

By: Wilmington Trust Company, as Trust Administrator and Trustee

By:_____
Name:
Title:

**LW Capital Provider**:

LW HOLDCO VI LLC

By:_____
      Name: Boaz Weinstein
      Title: Authorized Signatory

**Acknowledged and approved**:

_____
ARTHUR J. GONZALEZ, as Trust Monitor

## ANNEX I

**Counterparty: Motors Liquidation Company Avoidance Action Trust**

| | | |
|---|---|---|
| 1. | Type of Entity: | Statutory trust |
| 2. | Jurisdiction of Organization or Formation: | State of Delaware |
| 3. | Security Agreement(s): | Security Agreement between the Counterparty, as grantor, and the LW Capital Provider, as secured parties, dated the date hereof. |
| 4. | Notice Information: | Address:<br><br>Wilmington Trust Company<br>Rodney Square North<br>1100 North Market Street<br>Wilmington, Delaware, 19890-1615<br><br>Fax Number: (302) 636-4145<br><br>Email Address: bandrews@WilmingtonTrust.com<br><br>Attn: Corporate Trust Administration |
| 5. | Notice Information for Nominated Lawyers: | Address:<br><br>Binder & Schwartz LLP<br>366 Madison Avenue<br>6th Floor<br>New York, NY 10017<br><br>Fax Number: (212) 510-7299<br><br>Email Address: nbinder@binderschwartz.com<br><br>Attn: Neil Binder |

**LW Capital Provider: LW Holdco VI LLC**

| 6. | Type of Entity: | limited liability company |
|---|---|---|
| 7. | Jurisdiction of Organization or Formation: | State of Delaware |
| 8. | Notice Information: | Address:  1350  Avenue  of  the  Americas,  2nd Floor<br>New York, New York 10019<br><br>Fax Number: (646) 389-1032<br><br>Email Address: weinstein@lakewhillans.com<br><br>Attn:   Boaz Weinstein |

## ANNEX II

| | |
|---|---|
| 1. Description of the Claim: | Any litigation commenced by the Counterparty, including *In re: Motors Liquidation Company, et al.*, Chapter 11 Case No. 09-50026 (REG) (Jointly Administered), including but not limited to (i) *Motors Liquidation Co. Avoidance Action Trust, by and through the Wilmington Trust Company, solely in its capacity as Trust Administrator and Trustee v. J.P. Morgan Chase Bank, N.A., individually and as administrative Agent for various lenders party to the Term Loan Agreement, et al.*, Adversary Proceeding Case No. 09-00504 (REG), U.S.B.C. S.D.N.Y. (the "***Term Loan Avoidance Action***"); (ii)  the action commenced in the Court of Chancery of the State of Delaware against Oaktree Loan Fund, LP, including any related actions; (iii)  the action commenced in the Court of Chancery of the State of Delaware against SSS Funding II, LLC (the two actions described in the preceding clauses (ii) and (iii), the "***Reconstitution Claims***"); and (iv) any other actions or proceedings brought by the Counterparty. |
| | The Claim also includes any variations or expansions of the above claims by the addition of any claims and/or parties from time to time, as well as the following:<br><br>(i)      any and all related pre- and post-trial proceedings or processes (or pre- and post-hearing proceedings or processes, where applicable) in or in connection with such claim(s), including the pursuit of costs or post-judgment or post-arbitral award remedies;<br><br>(ii)      all proceedings seeking to appeal, challenge, confirm, enforce, modify, correct, vacate or annul a judgment or award, as well as proceedings on remand or retrial or rehearing;<br><br>(iii)      all ancillary, parallel or alternative dispute resolution proceedings and processes arising out of or related to the acts or occurrences alleged in such claim(s) (including conciliation or mediation |

|  | | |
|---|---|---|
|  |  | or court filings seeking discovery for or filed in aid of a contemplated or pending arbitration); |
|  | (iv) | re-filings or parallel filings of such claim(s) and any other legal, diplomatic or administrative proceedings or processes founded on the underlying facts giving rise to or forming a basis for such claim(s); |
|  | (v) | ancillary or enforcement proceedings related to the facts or claims alleged from time to time or that could have been alleged in such claim(s) at any time; |
|  | (vi) | all arrangements, settlements, negotiations, or compromises made between the Counterparty and any adverse party having the effect of resolving any of the Counterparty's claims against any adverse party that are or could be or could have been brought in such claim(s); and |
|  | (vii) | all rights of the Counterparty to collect any damages or awards or otherwise exercise remedies in connection with any of the foregoing. |
| 2. | Payment account of the Counterparty: | Bank: Wilmington Trust Company<br>ACCT Name: LW Capital Provider Funding Account<br>Address: 1100 N. Market Street<br>　　　　Wilmington, DE 19890-0100<br>Wire Routing: ABA# 031100092<br>Account Number: To be provided prior to Initial Funding Date |
| 3. | Payment account of LW Capital Provider: | To be provided. |
| 4. | Identity of the Opponent: | Defendants in the Term Loan Avoidance Action<br>Oaktree Loan Fund, LP<br>SSS Funding II, LLC |
| 5. | Identity of the Nominated Lawyers: | Binder & Schwartz LLP |
| 6. | Engagement Agreement(s): | Agreement between Binder & Schwartz LLP and the Counterparty, dated January 5, 2016, as amended by letter dated August 8, 2016 |

**Schedule 6.2(i)**

As of January 15, 2019, the amounts which, if recovered, would be due pursuant to the Trust Agreement from Distributable Trust Assets:

| | | **Amount in US Dollars** |
|---|---|---|
| (i.) | to the DIP Lenders pursuant to the Litigation Cost Advance Agreement | $16,600,000.00 |
| (ii.) | to the CE Capital Providers pursuant to the CE Capital Provision Agreement | $24,870,531.00 |
| (iii.) | to the GUC Trust for DIP Lender Advances | $31,575,574.00 |