DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140
Facsimile:  (212) 248-3141
E-mail:  kristin.going@dbr.com;
        marita.erbeck@dbr.com
Kristin K. Going
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
                                                               :
**In re:**                                                     :  **Chapter 11 Case No.**
                                                               :
**MOTORS LIQUIDATION COMPANY**, *et al.*,                      :  **09-50026 (MG)**
**f/k/a General Motors Corp.**, *et al.*                       :
                                                               :  **(Jointly Administered)**
**Debtors.**                                                   :
                                                               :
---------------------------------------------------------------x

## OBJECTION OF WILMINGTON TRUST COMPANY, AS
## GUC TRUST ADMINISTRATOR, TO ELLIOTTS' MOTION TO
## LIFT BAR DATE AND FILE PROPOSED LATE PROOF OF CLAIM

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.    The Old GM Bankruptcy ....................................................................................... 3

    B.    The Elliotts Fail to File a Proof of Claim Prior to the November 2009 Bar Date ................................................................................................................... 3

    C.    The Elliotts' Purchase of the Vehicle and Subsequent Driver Door Module Recalls ............................................................................................................... 4

    D.    Relevant Procedural History ................................................................................ 5

LEGAL ARGUMENT ............................................................................................................ 10

    A.    The Elliotts Had a Contingent Claim Within the Meaning of Section 101(5)(A) of the Bankruptcy Code .................................................................... 10

    B.    The Elliotts Were "Unknown" Creditors of Old GM and, as such, Received Adequate Notice of the Bankruptcy and Bar Date............................... 14

        1.    The Elliotts' Claim Was Not Known to Old GM ................................... 16

        2.    This Court Should Reject the Elliotts' Efforts to Disturb the Bar Date Notice ........................................................................................ 18

    C.    The Elliotts Cannot Demonstrate Their Failure to Timely File a Proof of Claim Was the Result of Excusable Neglect ...................................................... 26

        1.    The Reason for the Elliotts' Delay Precludes a Finding of Excusable Neglect................................................................................. 27

        2.    The Remaining Pioneer Factors Also Preclude a Finding of Excusable Neglect................................................................................. 29

CONCLUSION...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AMR Corp.*,
    492 B.R. 660 (Bankr. S.D.N.Y. 2013) .................................................................31

*Aramony v. United Way of Am.*,
    254 F.3d 403 (2d Cir. 2001) ......................................................................19, 21

*Atlas v. Chrysler, LLC (In re TALT)*,
    No. 10–02902, 2010 WL 2771841 (Bankr. S.D.N.Y. July 13, 2010) ....................26

*In re Caldor, Inc.-NY*,
    240 B.R. 180 (Bankr. S.D.N.Y. 1999) .................................................................10

*Canfield v. Van Atta Buick/GMC Truck*,
    127 F.3d 248 (2d Cir. 1997) (per curiam) ............................................................28

*In re Chateaugay Corp.*,
    944 F.2d 997 (2d Cir. 1991) ....................................................................12, 14

*Chemetron Corp. v. Jones*,
    72 F.3d 341 (3d Cir. 1995) ......................................................................15, 17

*City of New York v. New York, N. H. & H.R. Co.*,
    344 U.S. 293 (1953) ...........................................................................................15

*In re Dana Corp.*,
    No. 06–10354, 2008 WL 2885901 (Bankr. S.D.N.Y. 2008) .................................31

*In re Drexel Burnham Lambert Grp. Inc.*,
    148 B.R. 982 (Bankr. S.D.N.Y. 1992) .................................................................11

*In re Enron Corp.*,
    419 F.3d 115 (2d Cir. 2005) ....................................................................26, 31

*In re Enron Creditors Recovery Corp.*,
    370 B.R. 90 (Bankr. S.D.N.Y. 2007) ..............................................................11, 31

*Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft
Corp.*,
    58 F.3d 1573 (11th Cir. 1995) ...........................................................................12

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ...........................................................................................10

# TABLE OF AUTHORITIES

(continued)

**Page**

*First Assembly of God of Naples, Florida, Inc. v. Collier County, Fla.*,
  20 F.3d 419 (11th Cir. 1994) ............................................................................24, 25

*In re General Motors Corp.*,
  407 B.R. 463 (Bankr. S.D.N.Y. 2009)......................................................................3

*In re Greenwich Sentry, L.P.*,
  471 B.R. 800 (Bankr. S.D.N.Y. 2012)....................................................................24

*In re Grossman's Inc.*,
  607 F.3d 114 (3d Cir. 2010)....................................................................................10

*In re Grumman Olson Indus., Inc.*,
  467 B.R. 694 (S.D.N.Y. 2012).................................................................................12

*Hecht v. United Collection Bureau*,
  691 F.3d 218 (2d Cir. 2012).....................................................................................22

*In re Johns-Manville Corp.*,
  552 B.R. 221 (Bankr. S.D.N.Y. 2016)...............................................................11, 13

*In re Keene Corp.*,
  188 B.R. 903 (Bankr. S.D.N.Y. 1995).....................................................................30

*In re Lehman Bros. Holdings Inc.*,
  433 B.R. 113 (Bankr. S.D.N.Y. 2010).....................................................................29

*In re Manville Forest Prod. Corp.*,
  209 F.3d 125 (2d Cir. 2000).....................................................................................11

*In re Mazzeo*,
  131 F.3d 295 (2d Cir. 1997).....................................................................................10

*McGee v. Dunn*,
  940 F.Supp.2d 93 (S.D.N.Y. 2013)..........................................................................19

*Meadows v. AMR Corp.*,
  539 B.R. 246 (S.D.N.Y. 2015)..................................................................................29

*Mennonite Bd. of Missions v. Adams*,
  462 U.S. 791 (1983)..................................................................................................15

*In Matter of Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016)............................................................................. *passim*

## TABLE OF AUTHORITIES

(continued)

**Page**

*In re Motors Liquidation Co.*,
    462 B.R. 494 (Bankr. S.D.N.Y. 2012)........................................................26

*In re Motors Liquidation Co.*,
    576 B.R. 313 (Bankr. S.D.N.Y. 2017)........................................................19

*In re Motors Liquidation Co.*,
    576 B.R. 761 (Bankr. S.D.N.Y. 2017).............................................21, 27, 28, 29

*In re Motors Liquidation Co.*,
    591 B.R. 501 (2018).................................................................................1

*In re Motors Liquidation Company*,
    590 B.R. 39 (S.D.N.Y. 2018)....................................................................21

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)...........................................................................15, 17

*In re New Century TRS Holdings, Inc.*,
    528 B.R. 251 (D. Del. 2014)....................................................................22

*In re New Century TRS Holdings, Inc.*,
    612 Fed. Appx. 147 (3d Cir. 2015)............................................................22

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991)....................................................................19

*Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*,
    507 U.S. 380 (1993).......................................................................26, 29, 31

*In re Prudential Ins. Co. of America Sales Practices Litigation*,
    962 F.Supp. 450 (D.N.J. 1997) ................................................................25

*Silivanch v. Celebrity Cruises, Inc.*,
    333 F.3d 355 (2d Cir. 2003)................................................................26, 31

*In re U.S.H. Corp. of New York*,
    223 B.R. 654 (Bankr. S.D.N.Y. 1998).............................................14, 15, 16, 18

*Wright v. Corning*,
    679 F.3d 101 (3d Cir. 2012)....................................................................23

## Statutes

11 U.S.C. § 101(5) ....................................................................... *passim*

# TABLE OF AUTHORITIES

(continued)

**Page**

11 U.S.C. § 363 ..................................................................................................................3

**Other Authorities**

Fed. R. Bankr. P. 3003 ...............................................................................................11. 28

Fed. R. Bankr. P. 9006 .........................................................................................26, 27, 28

Black's Law Dictionary (10th ed. 2014)..........................................................................11

## PRELIMINARY STATEMENT

The present motion (the "**Motion**") concerns whether individuals with a contingent claim against Old GM who received adequate notice of the bar date but failed to timely file a proof of claim should be granted leave to file a post-bar date proof of claim. Celestine Elliott and Lawrence Elliott (the "**Elliotts**") are the owners of a 2006 Chevrolet Trailblazer that was purchased prior to the Old GM[1] bankruptcy and subject to multiple recalls beginning in 2012 because of an issue with the driver door module, or window switch. In 2014, the Elliotts commenced a lawsuit against New GM and they now seek to assert a claim against the GUC Trust, not only on behalf of themselves, but on behalf of all residents of the District of Columbia who, prior to June 2009, owned or lease a vehicle subject to the driver door module recall that was first initiated in August 2012.[2] To be clear, despite the Elliotts' best efforts to conflate the two, the driver door module issue has *nothing* to do with the now notorious Ignition Switch Defect, which involves different vehicles and has a separate and complex factual record and procedural history which is well known to this Court.

The Elliotts offer a number of explanations in hopes of justifying their assertion of a claim nearly ten years after the Bar Date, all of which are unavailing. First, the Elliotts argue that they were "future" creditors as of the Bar Date. This argument ignores Second Circuit law as to when a prepetition claim arises under Section 101(5)(A) of the Bankruptcy Code. Consideration of the applicable case law makes clear that the Elliotts had a bankruptcy claim at the Bar Date, albeit a contingent or unmatured one. Nevertheless, contingent creditors are required to file claims by the applicable bar date if they received adequate notice.

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement bear the meaning given elsewhere in this Objection.

[2] The Elliotts' attempted assertion of a class claim before such class has been certified is improper pursuant to this Court's ruling in *In re Motors Liquidation Co.*, 591 B.R. 501 (2018). The Motion should be denied on that basis alone.

The Elliotts next argue that they were "known" creditors of Old GM and thus entitled to actual notice of the Bar Date. The Elliotts' argument is based entirely on speculation and conjecture and asks this Court to conclude, without any evidentiary support, that because one particular defect was known to Old GM yet concealed from consumers—the Ignition Switch Defect—*all* other defects must have been similarly concealed. There is no basis for this Court to make such a finding or to accede to the Elliotts' request for a "fishing expedition."

Third, the Elliotts concede that, if they were contingent "unknown" creditors, they were only entitled to constructive notice through publication, which was provided in this case. Notwithstanding, the Elliotts contend that the notice was insufficient, despite being published in the three largest newspapers in the United States, including *USA Today*, and six other leading newspapers, because it was not published in every local and regional paper and because the notice was allegedly imperfectly worded and formatted. The Court should reject the Elliotts' effort to relitigate the adequacy of the notice, which consistent with Local Rule, was approved by this Court nearly ten years ago and has since provided the basis for innumerable rulings.

Finally, the Elliotts argue that their delay in filing a proof of claim should be excused. However, it appears as if the Elliotts' failure to file a timely proof of claim was based upon their own misunderstanding as to when a claim arises, and this mistake of law cannot qualify as excusable neglect. Furthermore, the Elliotts offer no explanation for the delay of over four years between the announcement of the first recall concerning the 2006 Chevrolet Trailblazer and their first filing with this Court indicating an intention to assert a claim against Old GM (*i.e.*, their joinder filed in January 2017).

For all of these reasons, and as detailed herein, the Motion should be denied it its entirety.

# BACKGROUND

## A.    The Old GM Bankruptcy.

The circumstances surrounding the General Motors bankruptcy are well documented, so this Objection offers only an abbreviated summary.  On June 1, 2009, General Motors Corporation ("**Old GM**") and affiliated entities (collectively, the "**Debtors**") petitioned for Chapter 11 bankruptcy protection in this Court.  *In re General Motors Corp*., 407 B.R. 463, 479–80 (Bankr. S.D.N.Y. 2009).  The same day, Old GM filed a sale motion seeking approval to sell substantially all of its assets pursuant to 11 U.S.C. § 363 (the "**Sale**") to the entity now known as General Motors, LLC ("**New GM**").  *Id*.  On July 5, 2009, after addressing and dismissing numerous objections to the sale, the Court approved the Sale (the "**Sale Order**").  *Id*.  On July 10, 2009, the Sale officially closed, and New GM began operating in the automaker business.

## B.    The Elliotts Fail to File a Proof of Claim Prior to the November 2009 Bar Date.

On September 2, 2009, Old GM filed a motion requesting that the Court set a deadline (the "**Bar Date**") for all proofs of claim relating to prepetition claims against Old GM or any of its affiliated debtors that did not appear on schedules of assets and liabilities [ECF No. 3940] (the "**Bar Date Motion**").[3]  The Bar Date motion contained a proposed form of notice of the Bar Date, the proposed procedures for delivering such notice, and a proposed model proof of claim.  *Id*.  On September 16, 2009, the Court issued an order approving the motion, the form of bar date notice, and establishing November 30, 2009 at 5:00 p.m. (Eastern Time) as the Bar Date. [ECF No. 4079] (the "**Bar Date Order**").  The Bar Date Order further stated:

> [A]ny holder of a Claim against the Debtors that is required but fails to file a Proof of Claim in accordance with this Bar Date Order . . . shall be forever barred,

---

[3] On September 15, 2009, Old GM and its affiliated debtors filed their schedules of assets and liabilities.  [ECF No. 4061-4077].  The schedules did not list a claim by the Elliotts.  Amendments to the schedules were filed on October 4, 2009.  [ECF No. 4161].  Like the original schedules filed on September 15, the amendments did not list a claim by the Elliotts.

estopped and enjoined from asserting such Claim against each of the Debtors and their respective estates (or filing a Proof of Claim with respect thereto), and each of the Debtors and their respective chapter 11 estates, successors, and property shall be forever discharged from any and all indebtedness or liability with respect to such Claim.

*Id.* at 5.

The Bar Date Order also required Old GM to publish notice of the Bar Date in a number of global, national, and local newspapers (the "**Bar Date Notice**"). *See id.* at 7. Specifically, the Bar Date Order provided that:

> [T]he Debtors shall publish the Bar Date Notice, with any necessary modifications for ease of publication, once in each of <u>Financial Times</u>, <u>The Wall Street Journal</u> (Global Edition—North America, Europe, and Asia), <u>The New York Times</u> (National), <u>USA Today</u> (Monday through Thursday, National), <u>Detroit Free Press/Detroit News</u>, <u>Le Journal de Montreal</u> (French), <u>Montreal Gazette</u> (English), <u>The Globe and Mail</u> (National), and <u>The National Post</u> at least **thirty days** prior to the General Bar Date, *which publication is hereby approved and shall be deemed good, adequate, and sufficient publication notice of the Bar Date and the procedures for filing Proofs of Claim in these cases . . . .*

*Id.* (emphasis added).

The Elliotts did not file a Proof of Claim prior to the Bar Date.

### C.    The Elliotts' Purchase of the Vehicle and Subsequent Driver Door Module Recalls.

The Elliotts allege that, in 2006, they purchased a new 2006 Chevrolet Trailblazer (the "**Chevy Trailblazer**") at a now defunct Chevrolet dealership in the District of Columbia. Motion at 1.

On August 16, 2012, New GM recalled certain vehicles, including the Chevy Trailblazer, that were "originally sold or currently registered in Connecticut, Delaware, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, West Virginia, Wisconsin, and the District of Columbia." *See* NHTSA Campaign No. 12V406000 ("**Recall 12V-406**"),

-4-

https://www.nhtsa.gov/vehicle/2006/CHEVROLET/TRAILBLAZER/4%252520DR/RWD%252 52F4WD#recalls. The reason for the recall was because fluids, such as rain water, entering the driver's door module could subsequently cause corrosion and result in an electrical short in the circuit board (the "**DDM Issue**"). *See id.* A short could cause the power door locks and power window switches to malfunction, or cause overheating, which is a potential fire hazard. *See id.*

On June 13, 2013, New GM expanded Recall 12V-406 to include vehicles sold or currently registered in any state, not simply the states and federal district identified in Recall 12V-406. NHTSA Campaign No. 13V248000 ("**Recall 13V-248**"), https://www.nhtsa.gov/vehicle/2006/CHEVROLET/TRAILBLAZER/4%252520DR/RWD%252 52F4WD#recalls.

The Elliotts allege that their Chevy Trailblazer was serviced on September 18, 2013, and that a "protective coating" was applied in an attempt to remedy the DDM Issue. Motion, Ex. 1, Rider at ¶ 36.

On July 2, 2014, New GM issued a third recall concerning the Chevy Trailblazer and other models arising from the DDM Issue. NHTSA Campaign No. 14V404000 ("**Recall 14V-404**" and together with (collectively, Recall 12V-406 and Recall 13V-248, the "**DDM Recalls**"). https://www.nhtsa.gov/vehicle/2006/CHEVROLET/TRAILBLAZER/4%252520DR/RWD%252 52F4WD#recalls. As part of the DDM Recalls, New GM dealers inspected owners' DDM and, if necessary, installed a new DDM free of charge. *See id.*

### D.    Relevant Procedural History.

On April 1, 2014, the Elliotts filed a Complaint against New GM (and not Old GM) in the Superior Court of the District of Columbia, which was docketed as Civil Action No. 14-0001980 (the "**DC Action**"). The Complaint is a four-page letter comprised of a series of complaints

primarily stemming from their alleged ownership of a Chevrolet Cobalt (not the Chevy Trailblazer, which is the subject of this Motion). The Elliotts alleged, among other things, that "under many conditions" the Cobalt's key caused the car's ignition switch to turn off, disabling the car's steering and deactivating the airbags. The Elliotts' allegations with respect to this issue echoed those of thousands of other GM owners regarding the Delta ignition switch (the "**Ignition Switch Defect**"). With respect to the Chevy Trailblazer, the Elliotts did not raise any complaints regarding the Ignition Switch Defect. Rather, the Elliotts complained of "excessive rust." New GM subsequently removed the DC Action to the United States District Court for the District of Columbia (the "**DC District Court**").

On April 24, 2014, New GM filed the *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction* [ECF No. 12620] ("**Motion to Enforce**") in this Court asserting, *inter alia*, that (i) the DC Action, among other "Ignition Switch Actions," violates the Sale Order and the injunction contained therein, and (ii) this Court has exclusive jurisdiction to interpret and enforce the Sale Order. By way of Order dated May 16, 2014 [ECF No. 12697] ("**Scheduling Order**"), this Court established certain procedures to address certain issues raised in the Motion to Enforce and the objections thereto (the "**2014 Threshold Issues**"). Contrary to the Elliotts' claim, the Scheduling Order *did not* enjoin the Elliotts or other plaintiffs from filing late claims against the Old GM bankruptcy estate and/or the GUC Trust. The Scheduling Order did provide that:

> [T]he GUC Trust agrees that it shall not assert a timeliness objection to any claims that the Plaintiffs may attempt to assert against the Old GM bankruptcy estate and/or the GUC Trust, *based directly or indirectly on the ignition switch issue*, as a result of the Plaintiffs' delay in asserting such claims during the 'Interval.'[4]

---

[4] "Interval" is defined as the period "commec[ing] on the date of this Order and shall end 30 days after a Final Order is entered with respect to an adjudication of the Threshold Issues (as defined in this Order)." *Id.* at 3.

*Id.* at 3 (emphasis added). Thus, under the Scheduling Order, the GUC Trust agreed that, with respect to claims arising from the Ignition Switch Defect, it would not further object to such claims' untimeliness as a result of any delay in filing between the entry of the Scheduling Order and the resolution of the Threshold Issues. With respect to the DDM issue and other claims unrelated to the Ignition Switch Defect, the GUC Trust made no such promise.

On June 28, 2014, the Elliotts filed a motion to amend their Complaint in the DC Action to, *inter alia*, remove all claims relating to the Chevy Trailblazer. [Case No. 14-691, ECF No. 15]. The DC District Court granted the motion to amend on July 16, 2014. [Case No. 14-691, ECF No. 20]. On September 19, 2014, the Elliotts and others initiated a putative class action against New GM (and not Old GM) in the United States District Court for the Southern District of New York, asserting economic losses arising from the Ignition Switch Defect and other alleged defects, including the DDM Issue. *See Bledsoe et al. v. General Motors LLC*, 1:14-cv-7631 (S.D.N.Y) (JMF), consolidated in *In re General Motors LLC Ignition Switch Litigation*, 14-md-2543 (JMF) (the "**Bledsoe Action**"). New GM had previously filed an additional motion to enforce the Sale Order [ECF No. 12808] (the "**Monetary Relief Motion to Enforce**") with respect to monetary relief actions, other than Ignition Switch Actions ("**Monetary Relief Actions**"). Pursuant to this Court's Order dated September 15, 2014 [ECF No. 12898] (the "**Monetary Relief Scheduling Order**"), the briefing schedule set forth in the Scheduling Order governing the initial Motion to Enforce also applied to the Monetary Relief Motion to Enforce. Like the Scheduling Order, the Monetary Relief Scheduling Order *did not* enjoin the Elliotts or other plaintiffs from filing late claims against the Old GM Bankruptcy Estate and/or the GUC Trust. Further, unlike the Scheduling Order, the Monetary Relief Scheduling Order does not prohibit the GUC Trust from

raising a claim's lack of timeliness based on a delay in filing between the entry of the Monetary Relief Scheduling Order and the resolution of the 2014 Threshold Issues.

Following this Court's resolution of the 2014 Threshold Issues and the Second Circuit's decision in *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), by way of Order to Show Cause dated December 13, 2016 [ECF No. 13802] (the "**Order to Show Cause**"), this Court established a briefing schedule for additional threshold issues (the "**2016 Threshold Issues**"), including whether potential claimants can "satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or such claims equitably moot" (the "**Late Proof of Claim Issue**"). With respect to the Late Proof of Claim Issue, the Order to Show Cause provided that Brown Rudnick LLP and Goodwin Procter LLP shall file motions seeking authority to file late proofs of claims by December 22, 2016 (the "**Late Claims Motions**"). [ECF No. 13802 at 5, ¶ 1]. If other parties wished to join in the Late Claims Motions, they were to file a joinder by January 6, 2017. *See id.* The Order to Show Cause further provided that "[a]ny plaintiff filing a joinder need not file a proof of claim until further order of the Court." *Id.* Pursuant to the Order to Show Cause, the relief sought by "Non-Ignition Switch Plaintiffs," defined as "[a]ll plaintiffs (whether asserting economic loss claims, or personal injury and/or wrongful death claims based on accidents that occurred prior to or after the closing of the 363 Sale) other than the Ignition Switch Plaintiffs," was stayed pending the Court's resolution of the 2016 Threshold Issues. *Id.* at 5, ¶ 2. The Order to Show Cause effectively established a deadline for filing late claim motions and joinders.

The Late Claims Motions were filed on December 22, 2016. [ECF No. 13806 (the "**Brown Rudnick Late Claims Motion**"); ECF No. 13807 (the "**Goodwin Procter Late Claims Motion**")]. In the Brown Rudnick Late Claims Motion, relief was sought on behalf of the "Ignition

-8-

Switch Plaintiffs," defined as "those plaintiffs who, as of November 30, 2009, owned or leased a vehicle with an ignition switch defect recalled in Recall No. 14V-047," and the "Non-Ignition Switch Plaintiffs," defined as "those plaintiffs who, as of November 30, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153." [ECF No. 13806, at ¶ 1, n. 1]. The Goodwin Procter Late Claims Motion sought relief on behalf of the "Ignition Switch Pre-Closing Accidents" (defined as plaintiffs whose vehicles contained ignition switch defect recalled in Recall No. 14V-047) listed on Exhibit A thereto. [ECF No. 13806, at 1].

Neither of the Late Claims Motions sought any relief on behalf of plaintiffs who owned or leased a Chevy Trailblazer or any other vehicle with the DDM Issue. On January 3, 2017, the Elliotts and others filed a joinder to the Late Claims Motions [ECF No. 13811] (the "**Joinder**"), in which they asserted, *inter alia*, "Mr. and Mrs. Elliott also seek to recover economic loss they suffered from a non-ignition switch safety hazard in another GM vehicle they purchased prior to the Sale." ECF No. 13811 at 1. The Joinder contains no mention whatsoever of the Elliotts' proposed class claims.

While certain plaintiffs with claims relating to the Ignition Switch Defect and other related defects[5] have entered into a proposed settlement agreement with the GUC Trust, the Elliotts' purported claims for the DDM Issue are not encompassed by the proposed settlement. Pursuant to a briefing schedule submitted to the Court on December 12, 2018, the Elliotts filed the instant Motion on January 21, 2019, more than nine years after the Bar Date and six-and-a-half years after the first of the DDM Recalls.

---

[5] In addition to parties with claims arising from the Ignition Switch Defect, the proposed settlement agreement includes plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

## LEGAL ARGUMENT

### A.     The Elliotts Had a Contingent Claim Within the Meaning of Section 101(5)(A) of the Bankruptcy Code.

In the Motion, the Elliotts first argue that they are "future claimants" who did not have a claim against Old GM as of the Bar Date, and thus their claims cannot be precluded by the Bar Date Order. Motion at 8-11. The Elliotts' argument reflects a fundamental misunderstanding as to what a "claim" is and when it arises for bankruptcy purposes.

A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). In defining "claim" in such a way, Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case," thus affording debtors "the broadest possible relief in the bankruptcy court." H.R. Rep. 95-595 (1978). The Second Circuit has held "that the term 'claim' is sufficiently broad to encompass any possible right to payment." *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997). The Supreme Court has similarly advanced the view that "claim" has "the broadest available definition." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)).

There is no doubt "a 'claim' can exist under the Code before a right to payment exists under [non-bankruptcy] law." *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010); *In re Caldor, Inc.-NY*, 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ("[C]reditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the Code"); *see also* 2 Collier on Bankruptcy ¶ 101.05 (16th ed. 2018) ("'Claim' may also include a cause of action or right to payment that has not yet accrued or become cognizable."). The Code's definition of claim expressly includes "contingent" claims—in other words, rights to

payment that are "possible," "uncertain," or "[d]ependent on something that might or might not happen in the future."  Black's Law Dictionary (10th ed. 2014); *see also In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982, 987 (Bankr. S.D.N.Y. 1992) ("[A] contingent claim is by definition a claim which has not yet accrued and which is dependent upon some future event that may never happen").  Because the Elliotts' right to payment was dependent on a subsequent event (the manifestation of the DDM Issue), their claim fits seamlessly within the definition of a contingent claim.  *See In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (observing that "the fact [the creditor] did not know the specific parameters of its liability . . . is precisely what made the claim contingent").

Applying this Circuit's well-established law, the Elliotts had a contingent or unmatured claim long before the bar date.  The Bar Date Order issued by this Court stated that "any holder of a Claim against the Debtors that is required but fails to file a Proof of Claim in accordance with this Bar Date Order . . . shall be forever barred, estopped and enjoined from asserting such Claim against each of the Debtors and their respective estates." ECF No. 4079 at 5.  Because the Elliotts held a claim, it was necessary to file a proof of claim before the court-imposed Bar Date in order to preserve their rights. *See In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007); *see also* Fed. R. Bankr. P. 3003(c)(3).

The applicable test for determining when a claim arises confirms that the Elliotts had a claim prior to the Bar Date.  Obviously, not every future right to payment amounts to a bankruptcy claim.  To deal with this uncertainty, courts employ several tests to distinguish between contingent or unmatured claims (which are, by definition, "claims" under § 101(5)) and other future claims (which may not be "claims" for bankruptcy purposes).  *See In re Johns-Manville Corp.*, 552 B.R. 221, 232 (Bankr. S.D.N.Y. 2016) (describing the "accrual test," the "conduct test," the "prepetition

-11-

relationship test," and the "fair contemplation test").  The Elliotts fail to discuss which test they believe the Court should apply and never explain whether or not the relevant test has been satisfied. In this matter, the Second Circuit has applied the "prepetition relationship test" to determine whether claimants, like the Elliotts, with economic loss claims arising from alleged defects in their GM vehicles had a claim against the Debtor at the time of Old GM's bankruptcy filing.  *Motors Liquidation*, 829 F.3d at 156-57.

In *Elliottt v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016), the Second Circuit addressed the issue of when "claims" identical to those of the Elliotts arise.  In so doing, the court applied its own version of the prepetition relationship test from the *Chateaugay* line of cases.[6]  The court stated that a claim exists for bankruptcy purposes when: (1) the conduct giving rise to the claim occurred pre-petition; and (2) there is "some minimum 'contact' or 'relationship'" between the parties such that the creditor's rights do not "depend entirely on the fortuity of future occurrences."  *Elliottt*, 829 F.3d at 156.

With respect to the "prepetition conduct" requirement, if a claim is contingent on future events, the claim must "result from pre-petition conduct fairly giving rise to that contingent claim." *Motors Liquidation*, 829 F.3d at 156 (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991)); *see also Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1577 (11th Cir. 1995) (holding that "an individual has a § 101(5) claim against a debtor" when "the basis for liability is the debtor's prepetition conduct").

---

[6] The Second Circuit has not explicitly referred to its test as the "prepetition relationship test," as articulated by the Eleventh Circuit in *Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1577 (11th Cir. 1995), but courts in this circuit recognize "the basic approach articulated in *Piper* is consistent with the Second Circuit's holding in *Chateaugay*" as both "require[] a pre-confirmation relationship between the claimant and the debtor." *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 705 (S.D.N.Y. 2012).

Turning to the second requirement, a prepetition relationship, "courts require some minimum 'contact' or 'relationship' that makes identifiable the individual with whom the claim does or would rest." *Motors Liquidation*, 829 F.3d at 156 (citations omitted); *see also Piper Aircraft*, 58 F.3d 1573 at 1577 (requiring that "events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor"). The purpose of this requirement is "[t]o avoid any practical and constitutional problems" that future claims sometimes entail. *Motors Liquidation*, 829 F.3d at 156. The relationship element focuses on "whether the relationship was one in which both parties knew liability could arise." *In re Johns-Manville Corp.*, 552 B.R. 221, 233 (Bankr. S.D.N.Y. 2016). Thus, "[a] claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts." *Id.* at 233–34 (quoting *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995)).

Applying the "prepetition relationship" test, the Second Circuit expressly held that claimants, like the Elliotts, with "economic loss claims arising from the ignition switch defect *or other defects*" had a pre-petition right to payment and thus possessed contingent claims pursuant to 11 U.S.C. § 101(5)(A). *Motors Liquidation*, 829 F.3d at 157 (emphasis added). Such claims "flow from the operation of Old GM automaker's business" (prepetition conduct) and the claimants came into contact with Old GM prior to the bankruptcy petition by virtue of owning GM cars (prepetition contact), "[y]et the ignition switch defect (and other defects) were only revealed . . . years later." *Id.* Notwithstanding, as the Second Circuit explained:

> The economic losses claimed by these individuals were 'contingent' claims. 11 U.S.C. § 101(5). That is, the ignition switch defect [and other defects] was there, but was not yet so patent that an individual could, as a practical matter, bring a case in court. The contingency standing in the way was Old GM telling plaintiffs that the ignition switch defect [or other defect] existed. In other words, Old GM's

creation of the ignition switch defect [and other defects] fairly gave rise to these claims, even if the claimants did not yet know.

*Id.* (citing *Chateaugay*, 944 F.2d at 1005).

Here, the Elliotts' claims fit squarely within the "prepetition relationship" test, as set forth in *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016). There is no doubt the conduct giving rise to the claim predated Old GM's bankruptcy, as the Chevy Trailblazer and the DDM were designed and manufactured prior to the Elliotts' purchase of the Chevy Trailblazer in 2006, three years prior to the commencement of the bankruptcy case. Likewise, the relationship or contact between the Elliotts and GM also predated the bankruptcy and came into existence no later than 2006, when the Elliotts purchased the Chevy Trailblazer from Old GM. As the Second Circuit explained, the fact that the Elliotts were unaware of the DDM Issue as of the Bar Date is of no moment—the Elliotts had a "claim" within the meaning of the Bankruptcy Code by virtue of Old GM's creation of the DDM Issue and the Elliotts' pre-petition purchase of the Chevy Trailblazer. *See id.* at 157.

Because the Elliotts had a contingent claim, it was incumbent upon them to file a proof of claim by the Bar Date in order to protect their rights, provided they received adequate notice.

**B.    The Elliotts Were "Unknown" Creditors of Old GM and, as such, Received Adequate Notice of the Bankruptcy and Bar Date.**

A due process prerequisite for discharging a creditor's claim is that the creditor be given proper notice. *See In re U.S.H. Corp. of New York*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998). To satisfy due process, a party seeking relief must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

In bankruptcy, whether notice to creditors is adequate depends on the particular creditor's status as either "known" or "unknown." *U.S.H. Corp. of New York.*, 223 B.R. at 658. "[A] 'known' creditor is one whose identity is either known or 'reasonably ascertainable by the debtor.'" *Id.* at 659 (*citing Tulsa Professional Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988)). A creditor is "reasonably ascertainable" if the debtor can uncover the identity of that creditor through "reasonably diligent efforts." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983). Reasonable diligence does not require "impracticable and extended searches . . . in the name of due process." *Mullane*, 339 U.S. at 317. "[C]reditors who hold only conceivable, conjectural or speculative claims are unknown." *Id.* The debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *U.S.H. Corp. of New York.*, 223 B.R. at 659 (quoting *Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 654 (M.D. Fla. 1991). A claimant may also be unknown when "[a] claim has yet to manifest itself, even though the claim may be related to the debtor's known conduct or activities undertaken before the commencement of the case, and likewise arises out of a prepetition relationship between the claimant and the debtor." 7 Collier on Bankruptcy ¶ 1109.07 (16th ed. 2018).

As stated above, the "known" versus "unknown" distinction determines the proper method of notice. When a creditor is unknown, publication notice meets the standards of constitutional due process. *See City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953) ("But when the names, interests and addresses of persons are unknown, plain necessity may cause a resort to publication."); *Chemetron Corp. v. Jones*, 72 F.3d 341, 348–49 (3d Cir. 1995)

-15-

("Publication in national newspapers is regularly deemed sufficient notice to unknown creditors");

*U.S.H. Corp. of New York*, 223 B.R. at 658 ("When a creditor is unknown to the debtor, publication

notice of the claims bar date may satisfy the requirements of due process.").

### 1. The Elliotts' Claim Was Not Known to Old GM.

The Elliotts contend that, "*if* Old GM knew or should have known" of the DDM issue, then

the Elliotts were "known" creditors and entitled to actual notice of the Bar Date.  Motion at 11-12

(emphasis added).  The Elliotts do not assert that Old GM actually knew of the DDM Issue prior

to the Bar Date.  Rather, the Elliotts assert that Old GM "very well *might have known* of" the DDM

Issue.  *Id.* 11 (emphasis added).  The apparent basis for the Elliotts' contention is entirely

conjectural.  The Elliotts broadly suggest that, "consistent with its corporate culture at the time,"

Old GM may have concealed the DDM Issue, "just as it did the ignition switch issue."  *Id.*  It is

clear the Elliotts are attempting to conflate the DDM Issue with the Ignition Switch Defect.  In a

deferred prosecution agreement ("**Deferred Prosecution Agreement**") between New GM and the

Office of the United States Attorney for the Southern District of New York, New GM admitted

that by the Spring of 2012 it failed to disclose the Ignition Switch Defect to the National Highway

Traffic Safety Administration ("**NHTSA**") and misled U.S. consumers about that same defect.

However, simply because New GM acknowledged such conduct with respect to one specific defect

does not mean that every recall is the result of similar conduct or that due process compels allowing

every owner of a recalled vehicle to file a claim against Old GM and the GUC Trust, no matter

how untimely.  As this Court previously observed about plaintiffs, like the Elliotts, who seek to

assert claims for defects unrelated to the Ignition Switch Defect:

> Yeah, I -- just a general observation. I'm not deciding on it, but I feel that -- look,
> I read Judge Gerber's decision.  I read the Second Circuit opinion. I find it hard to
> put my head around the notion that the existence of a recall translates into a due
> process violation. You know, cars have defects. Sometimes they can get recalls.

Sometimes they're discovered a little later and it's discovered, well, yeah, you know, we manufactured this car in 2008 and the recall is in 2015 or 2016. That doesn't -- I don't see how that translates into a due process violation . . . .

[ECF No. 13826 (Transcript of January 12, 2017 Status Conference 66:11-20)].

The Elliotts' Motion and proposed claim is devoid of allegations sufficient to substantiate any contention that Old GM knew of a DDM Issue in the Chevy Trailblazer as of the Bar Date. The Elliotts claim to have learned that the NHTSA's Office of Defective Investigation ("**ODI**") received a single complaint regarding a fire starting in the driver's door of 2006 Chevrolet Trailblazer, though there is no indication that the fire resulted from the DDM Issue. The Elliotts also state that, during its investigation, the ODI received 170 reports alleging a "thermal event," and that New GM acknowledged that it received 619 complaints relating to the DDM Issue, though the Elliotts fail to identify the number of complaints that were made prior to the Bar Date as opposed to near and after the first of the DDM Recalls in 2012 or break down the complaints by model. Even if *all* 619 complaints were received prior to the Bar Date and *all* of them pertained to the 2006 Chevrolet Trailblazer, it is far from clear that Old GM would have concluded that a model-wide recall was warranted, considering that Old GM produced 205,567 Chevrolet Trailblazers for sale in 2006 alone. *See* GM Partial Response Letter to ODI dated November 26, 2012, https://static.nhtsa.gov/odi/inv/2012/INRL-EA12004-54226P.pdf.

The Elliotts' suggestion that Old GM's potential receipt of a handful, relatively speaking, of consumer complaints prior to the Bar Date obligated Old GM to perform an "impracticable and extended" search to identify all potential claimants and then provide actual notice to them should be rejected out of hand. *Mullane*, 339 U.S. at 317. Such an effort would have thwarted one of the central purposes of reorganization, which is "to secure within a limited period the prompt and effectual administration of and settlement of the debtor's estate." *Chemetron Corp. v. Jones*, 72

-17-

F.3d 341, 346 (3d Cir. 1995) (citing *Katchen v. Landy*, 382 U.S. 323, 328 (1966)).  As the Second

Circuit noted in *Elliottt v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d

Cir. 2016), the need to move quickly was particularly pressing in this case, because "if Old GM

lingered in bankruptcy too long, operating expenses would accumulate and consumer confidence

in the GM brand could deteriorate, leaving Old GM no alternative but to liquidate and close once

and for all."  *Id.* at 145.  In the face of such risks, it is simply unreasonable to suggest that Old GM

should have conducted an extensive investigation of all consumer complaints across models,

endeavored to identify some common ground, and then attempted to ascertain whether a recall

may be necessary years in the future.

Because there is no basis to conclude that, in 2009, the existence of the Elliotts' alleged

claims was "reasonably ascertainable" by Old GM, the Elliotts were "unknown" creditors and only

entitled to publication notice of the Bar Date.  *U.S.H.*, 223 B.R. at 659.

### 2. This Court Should Reject the Elliotts' Efforts to Disturb the Bar Date Notice.

More than nine years after the Bar Date Notice was approved and published, the Elliotts

ask this Court to find that the Bar Date Notice was inadequate and thus invite all manner of alleged

claimants, previously unheard from, to assert a claim against Old GM's bankruptcy estate. This

Court should decline the Elliotts' request to open Pandora's Box because:  (i) the adequacy of the

Bar Date Notice is the "law of the case"; and (ii) the publication and contents of the Bar Date

Notice are more than sufficient.

### a. The Elliotts Are Barred From Challenging the Adequacy of the Bar Date Notice Given the Court's Prior Rulings.

A creditor's challenge to a bar date notice that was approved by the Court and published

more than nine years ago is barred by the law of the case doctrine.  "Under the law of the case

doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991). "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. These rules do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment." *Id.* "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (internal citations and quotations omitted). A court should adhere to its earlier decisions in the absence of "compelling reasons" to do otherwise, such as an intervening change in law, new evidence, or the need to correct a clear error of law or to prevent manifest injustice. *See In re Motors Liquidation Co.*, 576 B.R. 313, 321 (Bankr. S.D.N.Y. 2017) (internal citations omitted). By maintaining consistency in a court's rulings, the law of the case doctrine promotes "fairness to the parties, judicial economy, and the societal interest in finality." *Id.* (citing *U.S. v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009); *see also McGee v. Dunn*, 940 F.Supp.2d 93, 100 (S.D.N.Y. 2013) ("The objective of the law of the case doctrine includes promoting efficiency and avoiding endless litigation by allowing each stage of the litigation to build on the last and not afford an opportunity to reargue every previous ruling.") (internal citations and quotations omitted).

The straightforward application of the law of the case doctrine compels the conclusion that the Elliotts' extremely belated challenge to the Bar Date Notice is barred. Old GM filed the Bar Date Motion on September 2, 2009. The Ad Hoc Committee of Asbestos Personal Injury Claimants filed an objection to the Bar Date Motion on September 9, 2009, in which they raised some of the issues the Elliotts are complaining about now—namely, the formatting and language

-19-

of the Bar Date Notice and the time period for creditors to submits proofs of claim. ECF No. 3997. This Court held a hearing on the Bar Date Motion on September 15, 2009. As the Elliotts acknowledge, the Court expressly addressed the Bar Date Notice's alleged wordiness: "I'm not going to direct that the notice be rewritten, but I think that the objection that it was wordy and lawyeresque and legalesesque was well taken." [ECF No. 4081 (Transcript of September 15, 2009 Hearing at 37:7-9)]. The Court went on to state that, as a matter of "best practices," the debtors' community may want to consider rewording some of the language in future notices, but held that "I am not going to, today, order that something that would be a matter of best practices will be turned into a requirement, at least not in this case." *Id.* at 37:12-14. The Court did go on, however, to require that paragraph 6 of the Bar Date Notice be revised from "barred, estopped and enjoined" to "barred—that is forbidden—from asserting the claim." *Id.* at 38:6-9. The Court explained its reasoning for the change as follows: "I don't want to use three words where one is sufficient, and I want it to be of a type that a person of ordinary intelligence understands the consequence of not doing it." *Id.* at 38:9-12.

With that adjustment, the Court granted the Bar Date Motion and approved the Bar Date Notice. The Bar Date Order was entered shortly thereafter, in which the Court ordered that the Bar Notice is "hereby approved," and directed the one-time publication of the Bar Date Notice in the *Financial Times*, *The Wall Street Journal*, *The New York Times*, *USA Today*, *Detroit Free Press/Detroit News*, *Le Journal de Montreal*, *Montreal Gazette*, the *Globe and Mail*, and *The National Post*, "**which publication is hereby approved and shall be deemed good, adequate, and sufficient publication notice of the Bar Date and the procedures for filing Proofs of Claim in these cases**." ECF No. 4079 at 6-7 (emphasis added).

-20-

Thus, this Court previously "expressly resolved" the issues raised by the Elliotts with respect to the Bar Date Notice. *Aramony*, 254 F.3d at 410.[7]  In connection with another creditor's attempt to assert an untimely claim, this Court held that such a creditor has "no basis" to argue that there was a due process violation, because "[a]s an unknown creditor, notice by publication was constitutionally sufficient, and Old GM did publish notice of the Sale and of the Claim Bar Date in a number of global, national, and local newspapers." *Motors Liquidation Co.*, 576 B.R. at 776. The Court's prior rulings regarding the adequacy of the Bar Date Notice remain the law of the case.  There is no basis to allow the Elliotts to make an end run around the Bar Date Order by revisiting issues that have been litigated, decided and represented the law of the case for more than nine years.

### b.    The Publication and Contents of the Bar Date Notice Were Adequate.

Even if the Court was inclined to reconsider Judge Gerber's well-reasoned approval of the Bar Date Notice, the Bar Date Order should not be disturbed.  The Elliotts raise two objections to the Bar Date Notice:  (i) "the scope and intensity" of publication was not reasonably calculated to reach Old GM consumers in the District of Columbia; and (ii) the language of the Bar Date Notice was overly complex.  Neither contention has any merit.

With respect to the first objection, the Elliotts acknowledge that the Bar Date Notice was published in nine newspapers.  The Elliotts contend that, of those nine newspapers, only *USA Today* "might have potentially reached some small number of GM consumers across the country." Motion at 13.  This broad claim is unsupported by any evidence as to the reading habits of Old GM Consumers and fails to acknowledge that, in 2009, the three largest daily newspapers in the

---

[7] The fact that the Elliotts did not participate in the unsuccessful challenge to the Bar Date Notice is of no moment. *See In re Motors Liquidation Company*, 590 B.R. 39, 62 (S.D.N.Y. 2018) ("Plaintiffs, however, cite no precedent suggesting that a court is obligated to revisit a prior ruling on a question of law merely because certain parties did not participate in the earlier ruling or that it would be an abuse of discretion not to do so.").

United States were *The Wall Street Journal*, *USA Today* and *The New York Times*, in that order.[8] The Bar Date Notice was published in all three publications.

The cases relied upon by the Elliotts do not support their argument that due process obligated Old GM to publish the Bar Date Notice in every local or regional newspaper in the United States.  In *Hecht v. United Collection Bureau*, 691 F.3d 218 (2d Cir. 2012), a case which involved notice of a class certification and settlement, not a bankruptcy bar date, the notice in question was only published in *USA Today*.  The Second Circuit noted that "[w]e are aware of no case in our Circuit holding that a single notice published in a single publication satisfied either due process or Rule 23(b)(3) . . . . To the contrary, when courts have approved notice by publication, they have tended to do so where the notices either ran more than once or appeared in more than one publication."  *Id.* at 224-25 (citations omitted).  Here, the Bar Date Notice was not only published in *USA Today*, but also the two other largest newspapers in the United States and six other leading newspapers.

Similarly, in *In re New Century TRS Holdings, Inc.*, 528 B.R. 251 (D. Del. 2014), the challenged notice was published once in the national edition of *The Wall Street Journal* and *The Orange County Register*, the latter publication chosen because a large concentration of the debtors' employees were based in Orange County.  *See id.* at 258.  The district court observed that while *The Wall Street Journal* is a newspaper with national distribution, it is "not one—like *USA Today*—that necessarily involves a broad circulation among less than sophisticated, focused readers."  *Id.* at 260.  The district court concluded that "due process requires a re-do" and remanded to the bankruptcy court, though the district court's opinion was vacated and remanded by *In re New Century TRS Holdings, Inc.*, 612 Fed. Appx. 147 (3d Cir. 2015), albeit on other grounds, and

---

[8] *See* Martin Zimmerman, *Circulation drops at U.S. newspapers as readers turn to online news sources*, LOS ANGELES TIMES, October 27, 2009, http://articles.latimes.com/2009/oct/27/business/fi-newspapers27.

there is no indication on the bankruptcy docket that notice of the bar date was ever republished. More importantly, the district court's decision only supports the scope of publication here, as Old GM published the Bar Date Notice in both *The Wall Street Journal* and *USA Today*.

In *Wright v. Corning*, 679 F.3d 101 (3d Cir. 2012), the issue was not whether the scope of publication of the notice was sufficient (the notice in question was published, like the Bar Date Notice, in *The New York Times*, *The Wall Street Journal*, and *USA Toda*y, among other publications), but rather whether a subsequent change in law as to what constitutes a "claim" under the Bankruptcy Code justified relief from the plan and confirmation order. *See id.* at 103-04.

Simply put, the Elliotts have failed to provide the Court with any compelling reason to diverge from its prior finding that publication of the Bar Date Notice in nine major newspapers (including *USA Today* and the two other largest daily newspapers in the United States) was sufficient.

The Elliotts' challenges to the language and format of the Bar Date Notice fare no better. The Elliotts first complain that the Bar Date Notice did not expressly reference the DDM Issue, however there is no requirement that notice of a bar date identify every potential basis for a claim against the debtor. The Bar Date Notice states that parties with a "claim" against Old GM that arose prior to June 1, 2009 should file a proof of claim, and accurately describes a "claim" as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." [ECF No. 4079, Annex I, ¶ 1]. Further, at the Court's direction, the Bar Date Notice expressly states that any creditor who fails to file a proof of claim by the Bar Date "will be forever barred— that is forbidden—from asserting the claim." *Id.* at ¶ 6. While the Elliotts suggest, hyperbolically, that the Bar Date Notice could only be understood by "bankruptcy law experts," understanding of

terms like "contingent" and "unmatured" is not limited to bankruptcy scholars.  The Bar Date

Notice also advised readers, in bold font and capital letters, that "**YOU SHOULD CONSULT**

**AN ATTORNEY IF YOU HAVE ANY QUESTIONS, INCLUDING WHETHER TO FILE**

**A PROOF OF CLAIM**." *Id.*

The Elliotts also argue that, as the holders of future claims, they did not have a right to

payment at the time the Bar Date Notice was issued, so they could not have understood the Bar

Date Notice to refer to them.  As discussed above, this is incorrect as a matter of law.  The Elliotts

had a right to payment before the Bar Date, it was simply contingent or unmatured.  *Motors*

*Liquidation*, 829 F.3d at 157.

Finally, the Elliotts object to the size and formatting of the Bar Date Notice, arguing that it

was difficult to read.  Motion at 18-19.  The Elliotts contend that "a notice in written fine print"

violates due process, however the cases they cite do not stand for that proposition.  For example,

in *In re Greenwich Sentry, L.P.*, 471 B.R. 800 (Bankr. S.D.N.Y. 2012), the court held that due

process would not be offended by denying distribution to creditors who failed to file proofs of

interest where the bar date notice "unambiguously stated, in bold font and capital letters, that all

interest holders must file proofs of interest by the Extended Bar Date." *Id.* at 806-07.  Here, the

Bar Date Notice likewise alerted readers of the "**CONSEQUENCES OF FAILURE TO FILE**

**A PROOF OF CLAIM BY THE APPLICABLE BAR DATE,**" including that that any creditor

who fails to file a proof of claim by the Bar Date "***will be forever barred—that is forbidden—***

***from asserting the claim***."  ECF No. 4079, Annex I, ¶ 6 (emphasis in original).

In *First Assembly of God of Naples, Florida, Inc. v. Collier County, Fla.*, 20 F.3d 419 (11th

Cir. 1994), the notice in question concerned newly enacted zoning ordinances, not a bankruptcy

bar date.  Further, while the notice "was less than ¼ page in size, did not include a geographic

location map, and did not have a headline in 18 point type," the Eleventh Circuit did not hold that it was deficient, as the Elliotts suggest. *Id.* at 422. Rather, the Eleventh Circuit held that "the deficiencies in notice *alleged in this case* do not rise to the level of a federal constitution violation." *Id.* (emphasis added). That is, even if the Eleventh Circuit found that the size of the notice was insufficient, it did not amount to a due process violation. *See id.*

The Elliotts' citation to *In re Prudential Ins. Co. of America Sales Practices Litigation*, 962 F.Supp. 450 (D.N.J. 1997) is similarly misleading. First, the notice at issue concerned settlement of a class action. Second, the court's use of the term "readable" did not refer to the size of the font, but rather the overall length of the class notice. *See id.* at 528. The court recognized the tension in drafting a class notice that both contains the "requisite core information" but is not so long that interested parties "cannot manage the extensive information provided." *Id.* The court conducted an analysis of the contents of the class notice and concluded that it struck "an appropriate balance between inclusiveness and brevity" and otherwise comported with Rule 23 and due process. *Id.* at 528-34. Here, there is no allegation that the Bar Date Notice was overly inclusive. If anything, the Elliotts are arguing that the Bar Date Notice should have included greater detail.

In summary, the Elliotts are suggesting that, in order to satisfy due process, a debtor is obligated to take out a full-page ad in every national, regional and local newspaper in the country advising creditors of the bar date, identifying the basis for every potential claim against the debtor and providing an exhaustive explanation of what constitutes a "claim." Unsurprisingly, the Elliotts have failed to provide any authority for such a notion. Thus, there is no compelling reason to revisit the Court's prior approval of the contents and publication of the Bar Date Notice as "good, adequate and sufficient." ECF No. 4079 at 6.

### C.       The Elliotts Cannot Demonstrate Their Failure to Timely File a Proof of Claim Was the Result of Excusable Neglect.

Because the Elliotts had a "claim" as of the Bar Date and, as "unknown" creditors, received adequate notice of the Bar Date by publication, they were obligated to file a claim by the Bar Date. They failed to do so. The Elliotts' failure to file a proof of claim can only be excused under Bankruptcy Rule 9006(b)(1) if their failure to act was the result of "excusable neglect" under the test articulated by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380 (1993). The Elliotts cannot meet this standard because the doctrine of excusable neglect has no application where the decision of a creditor to stay out of a bankruptcy proceeding was based on legal error. In addition, where, as here, a Chapter 11 plan has been consummated, *see In re Motors Liquidation Co.*, 462 B.R. 494, 501 n.36 (Bankr. S.D.N.Y. 2012), courts must use "added caution" in evaluating claims of excusable neglect. *Atlas v. Chrysler, LLC (In re TALT)*, No. 10–02902, 2010 WL 2771841, at *3 (Bankr. S.D.N.Y. July 13, 2010). Finally, the Elliotts are unable to articulate any reason for the delay in asserting the late claim.

Under *Pioneer*, a court must consider four factors:  (i) the risk of prejudice to the debtor; (ii) the length of the delay and its potential impact on judicial proceedings; (iii) the reason for the delay, including whether it was within the reasonable control of the movant; and (iv) the movant's good faith. 507 U.S. at 395. The Second Circuit takes a "hard line" approach when applying *Pioneer* and deciding whether to allow a late-filed claim. *In re Enron Corp.*, 419 F.3d 115, 122 (2d Cir. 2005). In a typical case, three of the four *Pioneer* factors (prejudice, length of delay, and good faith) will "usually weigh in favor of the party seeking the extension," so courts focus on the third factor—the reason for the delay. *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003).

-26-

### 1.    The Reason for the Elliotts' Delay Precludes a Finding of Excusable Neglect.

The reason for the delay, including whether it was within the reasonable control of the creditor, precludes a finding of excusable neglect in this case.  The Elliotts' delay can be attributed to their misunderstanding of when a claim arises in bankruptcy, which constitutes a clear mistake of law.  It appears that the Elliotts subjectively believed, as a legal matter, that their claim arising from the DDM Issue did not constitute a "claim" under the Bankruptcy Code prior to the Bar Date.  If so, the Elliotts reached an incorrect legal conclusion because they in fact had a "claim" under the Bankruptcy Code prior to the entry of the Bar Date.  As this Court recently recognized, "a claimant's neglect [is] not excusable where its failure to comply with the rule was the result of a mistake of law." *In re Motors Liquidation Co.*, 576 B.R. 761, 775 (Bankr. S.D.N.Y. 2017).

The district court's opinion in *Michigan Self-Insurers' Security Fund v. DPH Holdings Corp.* is instructive.  In that case, the claimant was the Michigan Self–Insurers' Security Fund ("**Fund**"), which had been established to pay the workers' compensation obligations of self-insured employers that become insolvent and cannot make payments to their injured workers.  434 B.R. at 79.  When the debtor filed for bankruptcy, it was current on its workers' compensation payments.  *Id*.  After filing, the bankruptcy court entered an order stating the debtor was "authorized, but not directed, to pay or otherwise honor workers' compensation claims."  *Id.* at 80.

The bankruptcy court established a bar date of July 31, 2006.  *See id.*  The Fund received notice of the bar date but did not file a proof of claim.  *See id.*  In 2009, in connection with a modification of its reorganization plan, the debtor indicated that it would stop making workers' compensation payments.  *See id.*  After learning about this modification, the Fund filed two proofs of claim, to which the debtor objected.  *See id.*  The Fund moved to permit their late claims pursuant to Bankruptcy Rule 9006(b)(1).  *See id.* at 81.  The bankruptcy court sustained the debtor's

-27-

objection, ruling "that the Fund has not carried its burden to establish excusable neglect here in respect of its proof of claim." *Id.*

The district court affirmed the bankruptcy court's order on appeal.  The Fund's excuse for its failure to file a timely proof of claim was its erroneous belief that it did not possess a claim against the debtor as of the bar date because, at that time, "[a]ll information available to the [Fund] indicated that [d]ebtors were continuing to pay all of their workers' compensation obligations." *Id.* at 85.  Notwithstanding, "because 'there was always a risk' that [the debtor] would stop paying workers' compensation, the Fund was obligated to file a claim based on the contingency that [the debtor] would become unable to pay." *Id.*  In so finding, the district court noted that the definition of a claim in Section 101(5)(a) of the Bankruptcy Code states that a "claim" is "the right to payment, whether or not such right is . . . contingent[.]"  The Bankruptcy Code and Bankruptcy Rule 3003(c)(2) clearly state that contingent claims must be filed before the bar date. *Id.*  Because the reason for the Fund's delay was of a legal nature, and "[l]egal mistakes are usually not considered excusable neglect," this district court concluded that the bankruptcy court did not abuse its discretion in denying the Fund's motion for leave to file late proofs of claim. *Id.* at 85.

The Elliotts, like the creditor in *DPH Holdings*, erroneously believed that they did not have a claim as of the Bar Date.  This Court should similarly find that the Elliotts' mistake of law does not excuse their failure to file a timely proof of claim.  To the extent the DDM Issue had not materialized by the Bar Date, "there was always a risk" that a problem with the Chevy Trailblazer would arise and the Elliotts would have to pursue a claim against Old GM.

The Elliotts voluntarily opted not to file a claim before the bar date. This choice was based upon a legal error regarding the status of its claim.  As a result, the doctrine of "excusable neglect" is unavailing. *See Motors Liquidation*, 576 B.R. at 778-79; *see also Canfield v. Van Atta*

-28-

*Buick/GMC Truck*, 127 F.3d 248, 251 (2d Cir. 1997) (per curiam) (noting "general rule that a mistake of law does not constitute excusable neglect"); *DPH Holdings, Corp.*, 434 B.R. at 85 ("Legal mistakes are usually not considered excusable neglect.").

### 2. The Remaining *Pioneer* Factors Also Preclude a Finding of Excusable Neglect.

The Elliotts fare no better with respect to the remaining *Pioneer* factors. First, regarding prejudice to the Debtor, the Elliotts state in conclusory fashion that "the GUC Trust will not be prejudiced by permitting the Elliotts to assert their claims." Motion at 20. However, "[t]he prejudice to the Debtors is not traceable to the filing of any single additional claim but to the impact of permitting exceptions that will encourage others to seek similar leniency." *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010). Allowing even a single late claim risks inspiring similar efforts from creditors who also missed the bar date. M*eadows v. AMR Corp.*, 539 B.R. 246, 252 (S.D.N.Y. 2015) (finding that the allowance of late claims "years after the confirmation of the debtors' reorganization plan would create a serious risk of opening the floodgates to other potential late claims"). In addition, the Elliotts are not seeking leave to file a single late claim, but rather a late class claim on behalf of all residents of the District of Columbia who, prior to June 2009, either owner or leased a vehicle subject to Recall 14V-404. Motion, Ex. 1, Rider at ¶ 2. It defies belief to suggest that the GUC Trust will not be prejudiced by the assertion of a class claim nearly ten years after the Bar Date on behalf of an unknown, but certainly significant, number of claimants.

As other late-claims litigation in this case illustrates, *see, e.g.*, *In re Motors Liquidation Co.*, 576 B.R. 761 (Bankr. S.D.N.Y. 2017), determining whether a given creditor's "neglect" is sufficiently "excusable" frequently entails time-consuming litigation at great expense to the estate. The mere prospect of litigating additional motions to file post-Bar Date proofs of claim is enough

-29-

to prejudice the debtor. *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (finding "the legal fees the estate would potentially expend in litigating [late claims] supports a finding of prejudice"). This fear of rampant late-claims litigation is especially germane in a case like this one where the universe of potential creditors is practically limitless.

Second, the delay in filing the claim was substantial. The Bar Date in this case was November 30, 2009, and the Elliotts filed their Motion on January 21, 2019, almost a decade later. Even if this Court accepts the Elliotts' contention that they did not believe they had a claim until "the defects in the GM vehicles like theirs became known" (Motion at 13), the first of the DDM Recalls for the Vehicle was initiated in August 2012. *The Elliotts offer no explanation whatsover for their failure to file a proof of claim at that time or, indeed, to take any action against New GM or Old GM until nearly two years later.* By July 2014, New GM had initiated three recalls for the Vehicle, though the Elliotts claim that, by that point in time, they had been "enjoined from proceeding with their claims in any way," and "assured that their inability to file proofs of clams against the GUC Trust would not be used against them by the Trust later." Motion at 20. This is simply inaccurate. The Scheduling Order entered in May 2014 only stated that the GUC Trust would not count the time period between the entry of the Scheduling Order and the resolution of the 2014 Threshold Issues as part of a timeliness objection against claims "based directly or indirectly on the ignition switch issue." ECF No. 12697 at 3. There was no stay or other provision excusing the failure to file claims, and certainly no operative provision related to filing claims unrelated to the Ignition Switch Defect, such as claims arising from the DDM Issue. Indeed, it was not until the entry of the Order to Show Cause in December 2016 that this Court actually stayed the relief sought by "Non-Ignition Switch Plaintiffs" and ordered that no briefing on late claims motions filed on behalf of "Non-Ignition Switch Plaintiffs" shall take place pending such

stay.  ECF No. 13802 at 5, ¶ 2.  Thus, there was, at a minimum, a period of nearly four-and-a-half

years where the Elliotts were aware of their claim and could have asserted it yet failed to do so.

In absolute terms, a four-and-a-half year delay, let alone a seven-year delay for individual

or class claims, *far* exceeds delays that courts have found to be substantial in similar cases.  *See,*

*e.g., In re Enron Corp.*, 419 F.3d at 128 (finding that "claims filed as late as two years after the

bar date" represent the outer limits of what courts allow); *In re Dana Corp.*, No. 06–10354, 2008

WL 2885901, at *6 (Bankr. S.D.N.Y. 2008) (twenty-one month delay is substantial); *Enron*

*Creditors Recovery Corp.*, 370 B.R. at 103 (fifteen month delay is substantial); *In re AMR Corp.*,

492 B.R. 660, 667 (Bankr. S.D.N.Y. 2013) (finding that filing claim "more than five months after

the Court entered the Bar Date Order and more than three months after the Bar Date had passed"

was "significant").  Perhaps most importantly, during the period of the Elliotts' delay, the Debtors

sold substantially all their assets, confirmed a Chapter 11 plan of reorganization, and that plan was

substantially consummated.  Effectively all case activity occurred during the period when the

Elliotts sat on their rights.  This fact is dispositive.

As to the fourth and final element, there is no reason to suspect the Elliotts have acted in

bad faith.  Nevertheless, the presence of good faith is almost never a determinative factor in the

*Pioneer* analysis.  *See Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003) ("And

rarely in the decided cases is the absence of good faith at issue.").  The Elliotts' good faith cannot

singlehandedly overcome the fact that they have failed to meet the other requirements of excusable

neglect.

Because the Elliotts cannot demonstrate that their failure to file a timely proof of claim

constitutes excusable neglect, the Court should not allow them to pursue a late claim against the

GUC Trust.

## **CONCLUSION**

For the reasons above, this Court should deny the Motion in its entirety.


Dated:   New York, New York
         February 11, 2019

                              Respectfully submitted,

                    By:    /s/   Kristin K. Going
                          Kristin K. Going
                          Marita S. Erbeck
                          DRINKER BIDDLE & REATH LLP
                          1177 Avenue of the Americas, 41st Floor
                          New York, NY 10036-2714
                          Tel: (212) 248-3140
                          kristin.going@dbr.com
                          marita.erbeck@dbr.com

                          *Counsel for Wilmington Trust Company, as Trustee
                          for and Administrator of the Motors Liquidation
                          Company GUC Trust*