**Hearing: TBD**

Gary Peller
600 New Jersey Avenue, N.W.
Washington, DC 20001
(202) 662-9122
peller@georgetown.edu
*Counsel for Celestine Elliott and*
*Lawrence Elliott*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., ) | Case No.: 09-50026 (MG) |
| f/k/a General Motors Corp., et al., ) | |
| ) | |
| Debtors. ) | (Jointly Administered) |

# ELLIOTTS' REPLY TO OBJECTIONS
# TO THE ELLIOTTS' MOTION TO LIFT BAR DATE

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ....................................................................................................................... 4

    *1. Purchasers of a debtor's products which are not defective at the time of its bankruptcy filing but which may develop a hazardous defect at a later time do not hold "claims" under the Bankruptcy Code.* ........... 4

    *2. Non-Ignition Switch Plaintiffs such as the Elliotts did not receive constitutionally adequate notice of the Bar Date Order and therefore they are not bound by the Order.* ............................................................. 8

    *3. The Objectors' other contentions are without merit* ................................... 13

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITES

**Cases**                                                                                              **Page(s)**

*Baidoo v Blood-Dzraku*, 5 N.Y.S.3d 709 (N.Y. Sup. Ct. 2015) ................................................... 10
*Brody v. Vill. of Port Chester*, 434 F.3d 121 (2d Cir. 2005) ...................................................... 12
*Chi. Cable Commc'ns v. Chi. Cable Comm'n*, 879 F.2d 1540 (7th Cir. 1989) ............................ 12
*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145 (2d. Cir. 2014) ................... 8
*Elliott v. General Motors LLC*, 829 F.3d 135 (2d Cir. 2016) ................................................... 5, 8
*Fairchild Aircraft Inc. v. Campbell*, 184 B.R. 910 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998) ....................................................................... 3, 6
*Greenfield v. Village Indus., Inc.*, 483 F.2d 824 (3d Cir. 1973) ................................................. 10
*Hecht v. United Collection Bur., Inc.,* 691 F3d 218 (2d Cir 2012) ............................................. 10
*In re "Agent Orange" Product Liability Litigation*, 818 F2d 145 (2d Cir 1987) ......................... 11
*In re Arts de Provinces de France, Inc.,* 153 B.R. 144 (Bankr. S.D.N.Y. 1993) ......................... 13
*In re Beltrami Enters., Inc.,* 178 B.R. 389 (Bankr. M.D. Pa. 1994) ........................................... 14
*In re Chance Indus.*, 367 B.R. 689 (Bankr. D. Kan. 2006) ......................................................... 6
*In re Chateaugay Corp. ("Chateaugay I"),* 944 F. 2d 997 (2d Cir. 1991) .................................... 5
*In re Chemtura Corp.*, 505 B.R. 427 (S.D.N.Y. 2014) ............................................................... 12
*In re Hoffinger Indus., Inc.,* 307 B.R. 112 (Bankr. E.D. Ark. 2004) ............................................. 5
*In re Keene Corp.*, 188 B.R. 903 (Bankr. S.D.N.Y. 1995) ......................................................... 14
*In re Lehman Bros. Holdings Inc.*, 433 B.R. 113 (Bankr. S.D.N.Y. 2010) ................................. 14
*In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015) ....................................... 8-9
*In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) .......................................... 4
*In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088 (5th Cir. 1977) .......................... 12
*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir. 2001) .................... 10, 14
*In re Piper Aircraft Corp.*, 162 B.R. 619 (S.D. Fla. 1994),
  *aff'd* 58 F.3d 1573 (11th Cir. 1995) ......................................................................................... 6,7
*In re PT-1 Commc'ns, Inc.*, 292 B.R. 482 (Bankr. E.D.N.Y. 2003) ............................................ 14
*In re Ruffalo*, 390 U.S. 544 (1968) ........................................................................................... 12
*In re Savage Indus., Inc.*, 43 F.3d 714 (1st Cir. 1994) ................................................................. 9
*In re Scotts EZ SEED Litig.*, 2015 U.S. Dist. LEXIS 127844 ................................................... 10
*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ............................ 12
*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461 (1982) ............................................................ 9
*Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994) ............................................... 5, 6
*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ................................................... 10
*Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011) (*Grumman I*) ..................................................................................................... 5
*Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694 (S.D.N.Y. 2012) (*Grumman II*) .................................................................................................................. 10

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .................................. 10, 11
*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...................................................... 12
*SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008) ...................................... 4
*Thomas v. New York City,* 814 F. Supp. 1139 (E.D.N.Y. 1993) ...................................... 4
*Twigg v. Sears*, 153 F.3d 1222 (11th Cir. 1998) ............................................................ 12
*United States Pipe & Foundry Co. v. Adams (In re United States Pipe & Foundry Co.*, 577 B.R. 916 (Bankr. M.D. Fla. 2017) ................................................................................. 7
*UNR Industries v. Walker,* 224 B.R. 664, (Bankr. N.D. Ill. 1998) ................................. 6
*Whelton v. Educ. Credit Mgmt. Corp.*, 432 F.3d 150 (2d Cir. 2005) ............................ 9
*Wright v. Ownes Corning*, 679 F.3d 101 (3d Cir. 2012) ................................................. 8, 12
*Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994) ....................................... 6

**Other Authorities**

Brian Walters, *'Best Notice Practicable' in the Twenty-First Century*,
2003 *UCLA J.L. & Tech*. 4 .............................................................................................. 11
Jennifer Lee Case, Note, *Extra! Read All about It: Why Notice by Newspaper Publication Fails to Meet Mullane's Desire-to-Inform Standard and How Modern Technology Provides a Viable Alternative*, 45 Ga. L. Rev. 1095 (2011) .............................................................................. 11
Jordan S. Ginsberg, Comment, *Class Action Notice: The Internet's Time Has Come*,
2003 U. Chi. Legal F. 739 ..................................................................................................... 11
Philip P. Ehrlich, Comment, *A Balancing Equation for Social Media Publication Notice*, 83 U. Chi. L. Rev. 2163 (2016) .................................................................................................. 11
Wright & Miller, *Federal Practice & Procedure* § 1270 (3d ed. 2004) ............................. 4

Celestine Elliott and Lawrence Elliott (**"the Elliotts, or Non-Ignition Switch Plaintiffs"**) submit this reply brief ("**Reply**") in response to the Objections (**"the Objections"**) filed by the GUC Trust (**"the Trust"**), ECF No. 14417, and General Motors LLC (**"New GM"**), ECF No. 14418, and in further support of the relief requested in their Motion to Lift Bar Date (**"the Motion"**), ECF No. 14399.

## PRELIMINARY STATEMENT

When GM filed its bankruptcy petition on June 1, 2009, the Elliotts' 2006 Trailblazer was operating properly and there was no reason for the Elliotts to suspect that the vehicle might become hazardous *years later*. There was nothing to differentiate the Elliotts from the tens of millions of other GM vehicle owners whose GM vehicles were then functioning properly but which might later manifest hazards as parts wore down or, as in the case with the Trailblazer's defective power door module, as weather conditions corroded electrical connections and the vehicles became fire hazards.[1] As of GM's bankruptcy filing, the Elliotts and others owning GM vehicles that would later be recalled for replacement of the driver's power door module may have had a "pre-petition relationship" with GM, but they were not *identifiable* as parties who would later hold claims against GM. Accordingly, the Elliotts and the other Non-Ignition Switch

---

[1] This Reply assumes that GM neither knew nor had reason to know of the power door module defect when it filed its bankruptcy petition, and presents the Elliotts' contentions accordingly. The Trust does not dispute that if GM knew or should have known of the Trailblazer's door module defect prior to filing its bankruptcy petition, the Elliotts would been known creditors, like the ignition switch plaintiffs, entitled to actual rather than publication Notice. The Trust and New GM also do not dispute that no discovery has been conducted, either in this Court or in the related MDL proceedings, with respect to whether GM knew or should have known of the power door module defect prior to June 2009. The Elliotts submit that such discovery may be unnecessary because, as argued below, even assuming that GM did not know or have reason to know of the Trailblazer defect, the Elliotts' claims were not precluded by the publication Notice of the 2009 Bar Date Order. Should the Court rule otherwise, the Elliotts respectfully request the opportunity to develop a factual record through discovery as to whether GM knew or should have known of the power door module defect when it filed its petition.

1

Plaintiffs did not hold "claims" that could be discharged as part of GM's bankruptcy proceedings, even under the broad interpretation given the term by the Second Circuit Court of Appeals.

When GM published its Bar Date Notice, it presented no evidence to the Court to support GM's decision to limit notification to a one-time publication of a fine-printed and legalistically worded "legal notice" in the business pages of a handful of newspapers 45 days before the Bar Date. GM never informed the Court that, by this Notice, it intended to preclude the "future claims" of tens of millions of GM vehicle owners whose vehicles were then functioning properly but which might develop hazards in the future. GM's dissemination of the Notice, published in U.S. newspapers with a combined total circulation of less that 5 million, failed even potentially to expose more than a small fraction of the tens of millions of GM vehicle owners to the Notice. As GM, a worldwide marketer, knew well, a campaign that actually desired to reach GM vehicle owners would have included television, radio, internet, and social media advertising as the primary means to reach consumers. By June 2009, it was widely known that newspaper readership was in sharp decline, a fact reflected in GM's own advertising budgets. Burying the Bar Date Order Notice in the "Legal Notices" sections of newspapers ensured that its potential exposure would reach substantially fewer consumers than the total circulation of the newspapers might otherwise suggest. The scope and intensity of GM's "publication" of the Notice was not the "best practicable in the circumstances," as due process requires before that claims of absent parties may be precluded. It was, instead, a "mere gesture."

Even if GM consumers such as the Elliotts might have by some chance happened upon the Notice, the content of the Notice did not reasonably alert them that their "future claims" were to be barred. The Notice did not mention vehicle owners or consumers of GM products at all, nor

2

did it state that "future claims" were to be barred. The Notice merely quoted the statutory language defining claims without making any attempt to make those abstract legal terms comprehensible to nonlawyers and reasonable consumers. The courts themselves are divided over whether the statutory definition of a claim encompasses "future claims" like those of the Elliotts. It is implausible to think that simply quoting the statutory language reasonably communicated to the Elliotts or to other consumers that their rights were to be affected in the bankruptcy proceedings if their GM vehicles were to develop hazards in the future. The Trust's sad assertion that the Notice was nonetheless effective because it advised readers to "consult an attorney" betrays the failure of the Notice to communicate to reasonable consumers that their "future claims" would be barred. A notification that seeks to bind ordinary consumers does not satisfy due process standards if it requires lay readers to seek legal consultation in order to understand its terms.

Given that GM could have anticipated that many of the vehicles it manufactured would later develop hazards for which GM would be liable, it might have sought to have a future claims representative appointed, and it might have attempted to have set aside resources so that the claims of such "future creditors" would be handled fairly. Perhaps GM could have provided clear notice explicitly addressed to its consumers and forthrightly warning them in plain terms that GM's bankruptcy would foreclose their rights to sue should their vehicles develop hazards in the future for which GM would have otherwise been liable. Perhaps this would be a close case if GM sought to bring the future claims of vehicle owners into the bankruptcy process to be treated fairly alongside the claims of its other creditors. But GM did none of those things, and

accordingly the Bar Order failed to preclude the Elliotts and other GM vehicle owners holding possible "future claims" from bringing their claims now.[2]

## ARGUMENT

The Objectors' contend that the Elliotts' claims regarding defects in their 2006 Trailblazer are precluded by this Court's entry of the Bar Date Order. The Objectors accordingly bear the burden of demonstrating that the Elliotts had a "claim" under the Bankrupty Code, and that the Elliotts received constitutionally sufficient notice of the bar date. The burden of maintaining the affirmative defense of preclusion rests with the party raising the defense. *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 36 (1st Cir. 2008) (citing Wright & Miller, *Federal Practice & Procedure* § 1270 (3d ed. 2004)); *Thomas v. New York City,* 814 F. Supp. 1139, 1148 (E.D.N.Y. 1993) (citing various authorities).

> 1. *Purchasers of a debtor's products which are not defective at the time of its bankruptcy filing but which may develop a hazardous defect at a later time do not hold "claims" under the Bankruptcy Code.*

---

[2] As the Court concluded in *Fairchild Aircraft Inc. v. Campbell*, 184 B.R. 910, 931-33 (Bankr. W.D. Tex. 1995*), vacated on other grounds* 220 B.R. 909 (Bankr. W.D. Tex. 1998), a debtor must take affirmative steps to bring future claimants into the bankruptcy process with appropriate protections to assure a level of procedural fairness:

> The debtor must demonstrate to the bankruptcy court that it had sufficient knowledge of the nature and scope of the claims to be obligated to fairly anticipate having to provide for them as part of its financial restructuring, that these types of claims were indeed bankruptcy claims because it was practically and equitably possible to deal with such liabilities as claims, and that such claims were in fact dealt with fairly and responsibly. …Nor is there any dispute that the injuries occurred post confirmation and that the manifestation of those injuries occurred simultaneously with the injury. The undisputed facts also show that the debtor (actually in this case, the trustee) did not take the necessary steps to establish these liabilities as claims in the bankruptcy proceeding either directly or indirectly (though perhaps they could have been included). No claims were ever filed on behalf of these persons, and at no time did any party attempt to have a legal representative appointed. These claimants *could have been* claimants in the bankruptcy sense, for the debtor certainly had enough information to know that some of its planes might fall out of the sky, and that people injured or killed in those crashes would likely attempt (perhaps justifiably) to hold FAC responsible. The debtor could have, with a fair amount of precision, even estimated the number of such aircraft likely to crash, and the number of persons likely to be injured as a result. And the trustee could have then taken the steps that were taken in *A.H. Robins* and *Johns-Manville* to appoint a legal representative for these interests whose task it would have been to assure that appropriate steps were taken to protect or provide for those interests. Because these steps were not taken, though they could have been, these alleged claims cannot, at the end of the day, be treated as "bankruptcy claims."

4

As this Court has recognized, the issue of whether "future claims" constitute "claims" under the Bankruptcy Code, 11 U.S.C. § 101(5)(A), is an unsettled one. "'Despite its breadth, the term 'claim' has its limits, particularly in the area of future tort claims,'" *In re Motors Liquidation Co.*, 568 B.R. 217, 228 (Bankr. S.D.N.Y. 2017), *quoting Morgan Olson, LLC v. Frederico* (*In re Grumman Olson Indus., Inc.*), 445 B.R. 243, 251 (Bankr. S.D.N.Y. 2011) (*Grumman I*), *aff'd*, 467 B.R. 694 (S.D.N.Y. 2012) (*Grumman II*).

In its prior ruling in these proceedings, the Court of Appeals confirmed that it has not yet ruled on the scenario presented here, "the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim." *Elliott v. General Motors LLC*, 829 F.3d 135, 156 (2d Cir. 2016), *quoting* "*In re Chateaugay Corp.* ("*Chateaugay I*"), 944 F. 2d 997, 1004 (2d Cir. 1991). The Court stated that, at the very least, for a future claim to constitute a "claim" extinguishable in bankruptcy proceedings, there must be pre-petition contact or relationship between the debtor and the future claimant "that makes *identifiable* the individual with whom the claim does or would rest." *Id*. (*emphasis added*)

As this Court has observed, "[c]onsistent with the Second Circuit's interpretation, the Fifth Circuit has held that even under section 101(5)'s 'broad' definition of 'claim,' an action by plaintiffs who 'were *completely unknown and unidentified* at the time [the debtor] filed its petition and whose rights depended entirely on the fortuity of future occurrences' were not 'claims' that could be discharged upon the confirmation of a chapter 11 plan." *Id*., *quoting Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir. 1994) (*emphasis added*).

Under these principles, the Elliotts held no "claim" under the Bankruptcy Code when GM filed its petition because the Elliotts had then suffered no tortious consequence or injury, and

5

therefore could not be differentiated from any other purchaser of a GM product which might fail at some later time. Purchasers of a debtor's products which are not defective at the time of its bankruptcy filing but which may develop a hazardous defect later do not hold "claims" under the Bankruptcy Code because, despite their "pre-petition relationship," they are not identifiable as potential creditors. *See In re Chance Indus.*, 367 B.R. 689, 707-10 (Bankr. D. Kan. 2006) (purchaser of amusement ride had pre-petition relationship but no "claim" at time of seller's bankruptcy filing because injury had not yet occurred, despite claim that the pool was defectively designed); *In re Hoffinger Indus., Inc.,* 307 B.R. 112, 117-18 (Bankr. E.D. Ark. 2004) ("Just owning or eventually buying a preconfirmation produced pool… and maybe one day using it and being injured, is simply not enough…[Future claimants] simply do not hold claims under § 101(5), as defined and as limited by the "contingent or unliquidated" clause in § 502(c)).

The purpose of the "pre-petition relationship" test is to limit the definition of claims to *identifiable* creditors. Where future claimants are not identifiable despite a pre-petition relationship, courts hold that "future claimants" do not hold claims under the Code. "At a minimum, there must be evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings." *Lemelle*, *supra* at 1277; *see also Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994) (finding that Bankruptcy Court cannot enjoin plaintiffs from seeking to impose successor liability on purchasers where the injury occurred after the sale, confirmation of the plan or administration of the estate); *United States Pipe & Foundry Co. v. Adams (In re United States Pipe & Foundry Co.*, 577 B.R. 916, 924-25 (Bankr. M.D. Fla. 2017) (*Piper* test requires pre-petition relationship and an "identifiable" claimant); *Fairchild Aircraft Inc. v. Campbell*, 184 B.R. 910 (Bankr. W.D. Tex. 1995*), vacated on other*

6

*grounds* 220 B.R. 909 (Bankr. W.D. Tex. 1998) (extensively discussing the law regarding future claims and holding that executors of persons killed in an airplane crash following the bankruptcy of the plane manufacturer held future claims, not bankruptcy claims); *In re Piper Aircraft Corp.*, 162 B.R. 619, 622-29 (S.D. Fla. 1994), *aff'd* 58 F.3d 1573 (11th Cir. 1995) (concept of "claim" cannot be extended to include unidentified and presently unidentifiable potential claimants). "[U]nknown tort claims cannot be discharged and precluded from future recoveries unless their interests have been adequately represented within the bankruptcy proceeding." *UNR Industries v. Walker,* 224 B.R. 664, 672 (Bankr. N.D. Ill. 1998).

The Trust argues that the Elliotts and other Non-Ignition Switch Plaintiffs held "contingent claims" when GM filed its petition because GM had already completed the conduct upon which their claim would be based—the faulty design of the power door module—and only the contingency of product failure remained. The Objectors rely on the Court of Appeals' characterization that the Ignition Switch Plaintiffs held "contingent claims," with the only contingency being that GM notify them of the ignition switch defect. But the Trust ignores the critical distinctions between the situation of the ignition switch plaintiffs and those of Non-Ignition Switch Plaintiffs such as the Elliotts.

Unlike the Ignition Switch Plaintiffs, non-Ignition Switch Plaintiffs such as the Elliotts had not even suffered any injury when GM filed for bankruptcy. As the Court of Appeals treated the situation, the ignition switch defect immediately rendered vehicles containing the same ignition design dangerous to drive, and accordingly both the conduct giving rise to the claim *and the injurious consequence* of the conduct occurred pre-petition. The Ignition Switch Plaintiffs not only had a pre-petition relationship with GM, but were *identifiable* as creditors when GM filed its bankruptcy petition because GM knew or should have known about the defect, and

7

therefore had a legal duty to notify the owners of cars that *already were dangerous* because they contained the ignition switch defect of their claims. The only contingency was GM revealing the ignition switch defect, not the existence of the defect itself already existed and put the Ignition Switch Plaintiffs at risk.

Accordingly, the ignition switch plaintiffs did not present the situation that the Elliotts present, the "difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim." *Elliott v. General Motors LLC,* 829 F.3d at 156.  At the time of GM's bankruptcy filing, vehicles owned by Non-Ignition Switch Plaintiffs such as the Elliotts were functioning properly, and GM's conduct in designing the power door module defectively had not yet rendered the Elliott's Trailblazer dangerous; unlike the ignition switch plaintiffs, the Elliotts had suffered no tortious consequence or injury. Moreover, because neither GM not the Non-Ignition Switch Plaintiffs knew or had reason to know of the power door module defect, there was nothing to render Non-Ignition Switch Plaintiffs like the Elliotts *identifiable* as holders of claims against Old GM, differentiated from every other purchaser of a GM vehicle, and therefore they did not yet hold "claims" against GM that could be discharged as part of these proceedings.

*2. Non-Ignition Switch Plaintiffs such as the Elliotts did not receive constitutionally adequate notice of the Bar Date Order and therefore they are not bound by the Order.*

"[A] claim cannot be discharged if the claimant is denied due process because of lack of adequate notice." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 150 (2d. Cir. 2014), *citing Wright v. Owens Corning*, 679 F.3d 101, 107-08 (3d Cir. 2012); *see also*

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481-83 (1982); *Whelton v. Educ. Credit Mgmt. Corp.*, 432 F.3d 150, 154-55 (2d Cir. 2005).[3]

As this Court has noted, the Second Circuit, like many other courts, has held that "the Due Process Clause requires the best notice practical under the circumstances." *In re Motors Liquidation Co.*, 529 B.R. 510, 523-24 (Bankr. S.D.N.Y. 2015). Under the Code, the debtor, not the Court, is responsible for ensuring adequate notice. *See In re Savage Indus., Inc.*, 43 F.3d 714, 720 (1st Cir. 1994) ("Notice is the cornerstone underpinning bankruptcy code procedure. . . . Under the Code . . . the debtor in possession or trustee must ensure 'parties in interest' adequate notice and opportunity to be heard *before* their interests may be adversely affected.").

Even assuming that the Elliotts and other Non-Ignition Switch Plaintiffs held "claims" within the meaning of the Bankruptcy Code, the Trust has not set forth any basis from which the Court could conclude that the Trust carried its burden to demonstrate that the notice campaign undertaken satisfied the due process standard with respect to Non-Ignition Switch Plaintiffs whose vehicles were functioning properly at the time GM filed its petition. The Trust has simply invoked the talisman of "publication notice" in national newspapers, without regard for whether such notice was "the best notice practical under the circumstances."

---

[3] In light of this deeply rooted principle, the Trust's contention that the Court's entry of the Bar Date Order itself precludes the Elliott's due process challenge under the law of the case doctrine does not make sense. Such a ruling would preclude due process challenges across the board simply based on a Court's assertion that a given notice was reasonable at the time it was approved. That is not the law. In any event, the Code makes clear that it is the debtor, not the Court, who is responsible for ensuring proper notice. The sanction for the debtor's failure to discharge its notification duty is that the debtor loses the preclusive effect of any rulings it obtained on the basis of deficient notice. *See In re Savage Indus., Inc.*, 43 F.3d 714, 720 (1st Cir. 1994). In ny event, this Court itself expressly reserved judgment regarding whether the content of the Notice was sufficient to preclude vehicle owners from bringing suit if it did not explicitly describe the claims to be precluded *See In re Motors Liquidation Co.*, 529 B.R. at 574 n. 214. (The Court "does not need to decide and does not decide … the extent to which a detailed notice describing the types of claims Plaintiffs might assert…was required as a matter of due process law.")

9

First, as the district court concluded in *Grumman Olsen II*, 467 B.R. at 707, it is categorically impossible effectively to notify future claimants that their potential claims might be affected: "Because parties holding future claims cannot possibly be identified and, thus, cannot be provided notice of the bankruptcy, courts consistently hold that, for due process reasons, their claims cannot be discharged by the bankruptcy courts' orders."

Moreover, even if these obstacles were overcome, and even were the Court to rule that the future claims of unidentifiable parties who may be injured in the future by a debtor's products could constitute bankruptcy claims, and that some notice campaign could somehow effectively notify such parties, the Trust has failed to demonstrate that the notice campaign GM conducted was the best practical in the circumstances for notifying the target audience of each and every GM vehicle owner whose vehicle might someday develop hazards due to GM's faulty design.

Any fair evaluation of the scope and intensity of the notice campaign must start with an estimate of the target of the notice campaign. With respect to future hazards then unknown to both GM and Non-Ignition Switch Plaintiffs, all GM vehicle owners were in the same position, and notice had to be reasonably calculated to reach as many of approximately 75 million owners of vehicles produced by GM as was reasonably possible. As GM's own marketing efforts attest, by 2009, newspaper readership had already declined dramatically and newspaper publication no longer represented the "best practical" means of reaching consumers.[5] *See Hecht v. United*

---

[5] See, for example, *In re Scotts EZ SEED Litig.*, 2015 U.S. Dist. LEXIS 127844, at * 4 (rejecting newpaper publication notice which party had defended 'because,' in effect, 'that's the way it has always been done.' But times change, progress is made, and reliance on past practice cannot always carry the day."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir. 2001) (settlement notice appearing twice in *USA Today*, once each in *TV Guide* and *Parade Magazine*, and once in a Spanish-language general circulation newspaper in Puerto Rico insufficient to bind class member in Puerto Rico); *Greenfield v. Village Indus., Inc.*, 483 F.2d 824, 830 (3d Cir. 1973) (two- time publication in *Wall Street Journal* and *Philadelphia Evening Bulletin* "was insufficient notice under any standard of fairness, justice, or due process"); *Baidoo v Blood-Dzraku*, 5 N.Y.S.3d 709, 715 (N.Y. Sup. Ct. 2015) (publication notice "is almost guaranteed not to provide a defendant with notice of the action"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) ("But in this age of electronic communications, newspaper

10

*Collection Bur., Inc.,* 691 F3d 218, 225 (2d Cir 2012) (a more extensive campaign of notification beyond limited publication in a national periodical, including local publications and electronic media, was necessary to satisfy due process).

*Mullane* requires the publication notice be at least "reasonably certain to reach most of those interested in objecting." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950). The Trust's own source indicates that the total circulation of the national U.S. newspapers that GM utilized was less than 5 million, substantially less than 10% of the total target audience of some 55 million U.S. GM vehicle owners.[6] Without supplementation by television, radio, internet, and social media advertising, the publication campaign here was inadequate on its face. Notably, neither GM nor the Trust has presented any competent evidence that this reach for a target audience was reasonable, much less the best notice practical under the circumstances.

Finally, even were the scope and intensity of the Bar Date Notice publication adequate, the content and form of the notice itself failed to alert reasonable consumers to the possibility that their future claims would be affected by GM's bankruptcy. Under *Mullane*, "notice must be of

---

notice alone is not always an adequate alternative to individual notice."), *citing* Brian Walters, " 'Best Notice Practicable' in the Twenty-First Century," 2003 *UCLA J.L. & Tech*. 4; *In re "Agent Orange" Product Liability Litigation*, 818 F2d 145,167-68 (2d Cir 1987) (discussing additional forms of substitute notice, including advertisements on radio and television). *See also* Jennifer Lee Case, Note, *Extra! Read All about It: Why Notice by Newspaper Publication Fails to Meet Mullane's Desire-to-Inform Standard and How Modern Technology Provides a Viable Alternative*, 45 Ga. L. Rev. 1095, 1118-24 (2011) (suggesting that due to population mobility, declining newspaper readership, and increasing internet usage, newspapers no longer provide constitutionally adequate methods of notice); Jordan S. Ginsberg, Comment, *Class Action Notice: The Internet's Time Has Come*, 2003 U. Chi. Legal F. 739, 753 ("Courts mistakenly assume … that print media publication is the most accessible, fair, and efficient means of appealing to a large group of geographically diverse individuals."); Brian Walters, *"Best Notice Practicable" in the Twenty-First Century*, 7 UCLA J. L. & Tech. 1, 7-16 (2003) (arguing that the Internet, not newspapers, provides the "best notice practicable"). See generally, Philip P. Ehrlich, Comment, *A Balancing Equation for Social Media Publication Notice*, 83 U. Chi. L. Rev. 2163 (2016).

[6] Counsel's rough estimate based on public information regarding GM's market share and the total number of vehicles on the road in June 2009.

11

such nature as reasonably to convey the required information . . . ." 339 U.S. at 314. It "is not only necessary that the notice reach the parties affected but that it convey the required information…Surely the best notice practicable under the circumstances cannot stop with … generalities. [T[he substantive claims [must] be adequately described…*Twigg v. Sears*, 153 F.3d 1222, 1227 (11th Cir. 1998), *quoting In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1103-05 (5th Cir. 1977); *see also Brody v. Vill. of Port Chester*, 434 F.3d 121, 130 (2d Cir. 2005) (*same*); *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 517 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96 (2d Cir. 2005) (*same*). Due process requires notice not simply that there is a pending case or hearing, but of the nature of the charges or claims that will be adjudicated. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (due process requires that notice to absent parties "describe the action and the plaintiffs' rights in it"); *In re Ruffalo*, 390 U.S. 544, 551 (1968) (same); *Chi. Cable Commc'ns v. Chi. Cable Comm'n*, 879 F.2d 1540, 1546 (7th Cir. 1989) ("Parties must be notified of the precise issues to be raised in the hearing . . . .").

In cases in which bankruptcy notices have been upheld to preclude unknown creditors, the claims of unknown creditors are specifically described. *See*, *e.g*., *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (case involving harm caused by faulty shingles; bankruptcy notice specifically mentioned claims relating to roofing shingles); *In re Chemtura Corp.*, 505 B.R. 427, 431 (S.D.N.Y. 2014) (case involving harm caused by diacetyl food-flavoring; bankruptcy notice specifically mentioned diacetyl and the companies to which debtor had sold diacetyl).

Under these standards, it is clear that the Notice GM provided was inadequate. The Notice failed to mention GM vehicle owners, or to describe the future claims that they might have if their vehicles should become hazardous at a later time, and the intention of GM to seek discharge

12

of those claims. Moreover, its tiny font and dense placement of terms, and its exclusive reliance on legalistic definitions not reasonable comprehensible to the reasonable consumer meant that the Notice could not reasonably alert a consumer in the Elliotts' position that their interest would be affected by the bankruptcy proceedings. The Notice was constitutionally defective with respect to Non-Ignition Switch Plaintiffs such as the Elliotts, and consequently their claims are not precluded by the Bar Date Order.

   3. *The Objectors' other contentions are without merit*

The Objectors also contend that the Elliotts should have indicated that they intended to assert class and representative claims when they joined the late claims motion filed by other parties. But the Court's Scheduling Order required no such thing. Order to Show Cause of December 13, 2016 (No. 13802). In any event, as the Objectors are well aware, *all* economic loss claims asserted on behalf of vehicle owners in this and in the related MDL proceeding assert class claims, including those asserted by the Elliotts regarding each of their vehicles. There was no reasonable basis for the Trust to conclude that the Elliotts intended to assert individual claims for economic loss relating to their 2006 Trailblazer.

The Trust also contends that the Elliotts should have sued when New GM first issued a recall for the power door module in August 2012. But, as the Elliotts' proposed Proof of Claim makes clear, New GM represented as part of that recall that the defect in the power door module could be simply repaired by the application of a silicate coating. It was not until July 2014 when New GM disclosed that its August 2012 minimization of the defect was false and that the drivers' door module was so hazardous that it had to be replaced in order to render the vehicles safe. The Elliotts simply cannot be faulted for the misleading representations of New GM. Elliotts' Proposed Proof of Claims, Rider at ¶¶ 33, 36 ECF No. 14399, Ex. 3.

Finally, while the Elliotts maintain that their due process rights have been violated and thus the Bar Date Order cannot bind them without consideration of the *Pioneer* factors, they also submit that they satisfy those factors. Excusable neglect can be found where, as here, a claimant, through no fault of its own, was unaware of his or her claim prior to the bar date. *See In re Arts de Provinces de France, Inc.,* 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993); *In re PT-1 Commc'ns, Inc.*, 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003)*; see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir. 2001) (finding excusable neglect where notice did not reach plaintiff through no fault of plaintiff).

Contrary to the Trust's argument, the Elliotts' failure to file a timely proof of claim was not due to any "legal error," but rather due to the fact that they had no way of knowing that they would possess a claim against GM in the future and because GM failed to inform them in any fair way that their future claims would be barred by its bankruptcy. Neglect in filing a claim before the expiration of a clear bar date is excusable when the creditor, after conducting a reasonable amount of diligence, is justifiably confused or uncertain as to whether a particular transaction giving rise to a claim is or is not subject to the bar date order. See *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 126–27 (Bankr. S.D.N.Y. 2010).

Moreover, despite the Trust's speculation, it has presented no evidence that it will in fact be prejudiced by remaining claimants seeking to file late claims. The vast bulk of such claims are the subject of pending proposed settlement, and the Trust has identified no other outstanding claims which it fears might be filed. *See In re Beltrami Enters., Inc.,*178 B.R. 389, 392 (Bankr. M.D. Pa. 1994) (no prejudice found where "[n]o evidence was placed on the record to indicate that there were hordes of claimants ready to file claims should [the moving creditor] be allowed to file its claim late."); *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (same).

14

## CONCLUSION

The Trust and New GM have failed to carry their burden of demonstrating that the Elliotts' Trailblazer claims are precluded by the 2009 Bar Date Order. The Elliotts' motion to lift the bar date to permit submission of their proposed late claims should be granted. Alternatively, the Court should permit the Elliotts to develop a factual record with respect to whether the Bar Date Notice that GM disseminated satisfied due process requirements with respect to the Elliotts' claims, and whether GM knew or should have known of the power door module hazard prior to its bankruptcy filing.

Dated: February 19, 2019                                        Respectfully submitted,

*/s/ Gary Peller*
Gary Peller
600 New Jersey Avenue, N.W.
Washington, DC 20001
(202) 662-9122
peller@georgetown.edu
*Counsel for Celestine Elliott and*
*Lawrence Elliott*