DRINKER BIDDLE & REATH LLP                    **Relates to ECF Nos. 14392, 14393**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140
Facsimile:  (212) 248-3141
E-mail:  kristin.going@dbr.com
           marita.erbeck@dbr.com
Kristin K. Going
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                     :

**In re:**                               :               **Chapter 11 Case No.**
                                     :

**MOTORS LIQUIDATION COMPANY,** *et al,*  :      **09-50026 (MG)**
**f/k/a General Motors Corp.,** *et al*.       :

                                   :              **(Jointly Administered)**

    **Debtors.**                      :
                                   :
-----------------------------------------------------------------x

**OBJECTION OF WILMINGTON TRUST COMPANY, AS GUC TRUST**
**ADMINISTRATOR, TO AMERICAN AXLE & MANUFACTURING,**
**INC.'S MOTION TO INCLUDE THE TONAWANDA FORGE SITE IN**
**THE RACER TRUST OR, IN THE ALTERNATIVE, FOR AUTHORITY**
**TO FILE A LATE CLAIM AGAINST THE DEBTORS TO**
**PARTICIPATE IN DISTRIBUTIONS FROM THE GUC TRUST**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ............................................................................................. 1

II. BACKGROUND .............................................................................................................. 2

    A.     History of the Tonawanda Forge Site ................................................... 2

    B.     The Old GM Bankruptcy ..................................................................... 3

    C.     The Bar Date ........................................................................................ 4

    D.     American Axle Fails to File a Proof of Claim Prior to the Bar Date ................... 4

    E.     Creation of the GUC Trust and RACER Trust ..................................... 5

    F.     Designation of the Site as a Superfund Site ......................................... 6

III. LEGAL ARGUMENT ..................................................................................................... 6

    A.     American Axle Received Actual Notice of the Bankruptcy ................................ 6

    B.     American Axle Had a Contingent Claim Within the Meaning of Section
            101(5)(A) of the Bankruptcy Code. ........................................................ 9

         1.     American Axle Had a Pre-Bankruptcy Claim Under the Prepetition
                Relationship Test ................................................................... 12

         2.     American Axle Had a Pre-Bankruptcy Claim Under the Fair
                Contemplation Test ............................................................... 15

    C.     American Axle Cannot Demonstrate Its Failure to Timely File a Proof of
            Claim Was the Result of Excusable Neglect. ........................................ 20

         1.     The Reason for American Axle's Delay Precludes a Finding of
                Excusable Neglect ................................................................. 21

          2.     The Remaining Pioneer Factors Also Preclude a Finding of
                Excusable Neglect ................................................................. 24

    D.     Allowing American Axle to File a Late Proof of Claim Would Be Futile
            Because Its Claim Would Be Disallowed. ........................................... 26

    E.     The GUC Trust Takes No Position Regarding the Request to Include the
            Site in the RACER Trust ...................................................................... 28

CONCLUSION .................................................................................................................. 29

## TABLE OF AUTHORITIES

Cases                                                                          Page(s)

*In re AMR Corp.*,
   492 B.R. 660 (Bankr. S.D.N.Y. 2013)......................................................................25

*In re APCO Liquidating Tr.*,
   370 B.R. 625 (Bankr. D. Del. 2007) ...............................................................26, 27

*Atlas v. Chrysler, LLC (In re TALT)*,
   No. 10–02902, 2010 WL 2771841 (Bankr. S.D.N.Y. July 13, 2010) ....................20

*Matter of Baldwin-United Corp.*,
   55 B.R. 885 (Bankr. S.D. Ohio 1985)..................................................................27

*In re Best Prod. Co., Inc.*,
   140 B.R. 353 (Bankr. S.D.N.Y. 1992)..................................................................21

*In re Caldor, Inc.-NY*,
   240 B.R. 180 (Bankr. S.D.N.Y. 1999)....................................................................9

*Canfield v. Van Atta Buick/GMC Truck*,
   127 F.3d 248 (2d Cir. 1997) (per curiam).............................................................23

*In re Chateaugay Corp.*,
   53 F.3d 478 (2d Cir. 1995)...................................................................................14

*In re Chateaugay Corp.*,
   944 F.2d 997 (2d Cir. 1991)....................................................................... *passim*

*In re Chemtura Corp.*,
   443 B.R. 601 (Bankr. S.D.N.Y. 2011).....................................................26, 27, 28

*In re Dana Corp.*,
   No. 06-10354, 2008 WL 2885901 (Bankr. S.D.N.Y. 2008)..................................25

*In the Matter of the Disputed Regulatory Program Fees of GM Powertrain - Tonawanda Engine Plant American Axle & Manufacturing, Inc.*,
   2003 WL 1880837 (N.Y. Dept. Env. Conserv. March 27, 2003).............................8

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
   871 F. Supp. 2d 143 (E.D.N.Y. 2012) ...................................................................7

*In re Drexel Burnham Lambert Grp. Inc.*,
   148 B.R. 982 (Bankr. S.D.N.Y. 1992)..........................................................10, 27

*Elliott v. General Motors LLC (In re Motors Liquidation Co.)*,
   829 F.3d 135 (2d Cir. 2016)....................................................................12, 13, 14

*In re Enron Corp.*,
    419 F.3d 115 (2d Cir. 2005).........................................................................20, 25

*In re Enron Creditors Recovery Corp.*,
    370 B.R. 90 (Bankr. S.D.N.Y. 2007) ............................................................10, 25

*Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft*
    *Corp.*,
    58 F.3d 1573 (11th Cir. 1995) .....................................................................12, 13

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003)..........................................................................................9

*General Motors LLC v. Lewis Bros., LLC*
    Case No. 1:10-cv-00725-WMS-LGF (W.D.N.Y. September 2, 2010) ...................................3

*In re GM Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009)...................................................................3

*Greatamerican Fed. Sav. & Loan Ass'n v. Adcock Excavating, Inc.*,
    No. 89 C 3794, 1990 WL 51219 (N.D. Ill. Apr. 17, 1990)...........................................28

*In re Grossman's Inc.*,
    607 F.3d 114 (3d Cir. 2010)...........................................................................9, 19

*In re Grumman Olson Indus., Inc.*,
    467 B.R. 694 (S.D.N.Y. 2012)...........................................................................12

*In re Hills Stores Co.*,
    167 B.R. 348 (Bankr. S.D.N.Y. 1994)..................................................................23

*In re Houbigant, Inc.*,
    188 B.R. 347 (Bankr. S.D.N.Y. 1995)..................................................................16

*In re Johns-Manville Corp.*,
    552 B.R. 221 (Bankr. S.D.N.Y. 2016)............................................................ *passim*

*Johnson v. Home State Bank*,
    501 U.S. 78 (1991)..........................................................................................9

*In re Keene Corp.*,
    188 B.R. 903 (Bankr. S.D.N.Y. 1995)..................................................................24

*In re Lehman Bros. Holdings Inc.*,
    433 B.R. 113 (Bankr. S.D.N.Y. 2010)...............................................................7, 24

*Lemelle v. Universal Mfg. Corp.*,
    18 F.3d 1268 (5th Cir. 1994) .......................................................................14, 15

*In re Lyondell Chem. Co.*,
   442 B.R. 236 (Bankr. S.D.N.Y. 2011) .......................................................26, 27, 28

*In re Manville Forest Prod. Corp.*,
   209 F.3d 125 (2d Cir. 2000) ................................................................................10, 17

*In re Mazzeo*,
   131 F.3d 295 (2d Cir. 1997) ......................................................................................9

*Meadows v. AMR Corp.*,
   539 B.R. 246 (S.D.N.Y. 2015) .................................................................................24

*Michigan Self-Insurers' Security Fund v. DPH Holdings Corp. (In re DPH Holdings Corp.)*,
   434 B.R. 77 (S.D.N.Y. 2010) ........................................................................21, 22, 23

*In re Motors Liquidation Co.*,
   462 B.R. 494 (Bankr. S.D.N.Y. 2012) .....................................................................20

*In re Motors Liquidation Co.*,
   576 B.R. 761 (Bankr. S.D.N.Y. 2017) ............................................................. *passim*

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ....................................................................................................7

*Matter of Penn Cent. Transp. Co.*,
   42 B.R. 657 (E.D. Pa. 1984) .....................................................................................21

*Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*,
   507 U.S. 380 (1993) .......................................................................................20, 24, 25

*In re Piper Aircraft Corp.*,
   168 B.R. 434 (S.D. Fla. 1994) ..................................................................................19

*In re Placid Oil Co.*,
   463 B.R. 803 (Bankr. N.D. Tex. 2012), *aff'd*, 753 F.3d 151 (5th Cir. 2014) ..........14

*Saint Catherine Hosp. of Indiana, LLC v. Indiana Family & Soc. Servs. Admin.*,
   800 F.3d 312 (7th Cir. 2015) ....................................................................................19

*Silivanch v. Celebrity Cruises, Inc.*,
   333 F.3d 355 (2d Cir. 2003) .............................................................................20, 25

*In re U.S.H. Corp. of New York*,
   223 B.R. 654 (Bankr. S.D.N.Y. 1998) .......................................................................6

*In re Wedtech Corp.*,
   87 B.R. 279 (Bankr. S.D.N.Y. 1988) ........................................................................28

*In re XO Commc'ns, Inc.*,
    301 B.R. 782 (Bankr. S.D.N.Y. 2003) ...................................................................................7

## STATUTES, RULES & REGULATIONS

11 U.S.C. § 101(5)(A) .................................................................................................... *passim*

11 U.S.C. § 363 ................................................................................................................3

11 U.S.C. § 502(e)(1)(B) ...................................................................................... 26, 27, 28

15 U.S.C. § 2605 .............................................................................................................13

Fed. Bank. R. Proc. 3003(c) ..................................................................................... 10, 22

Fed. Bank. R. Proc. 9006(b)(1) ......................................................................................20

## OTHER AUTHORITIES

Collier on Bankruptcy (16th ed. 2018) ...................................................................... 10, 26

Black's Law Dictionary (10th ed. 2014) ........................................................................10

H.R. Rep. 95-595 (1978) ..................................................................................................9

# I. PRELIMINARY STATEMENT

The present motion turns on a basic legal question—whether a creditor who had a contingent claim at the time of bankruptcy and who received actual notice of the bankruptcy and Bar Date[1] should be allowed to pursue a late claim. For nine years, the movant, American Axle & Manufacturing, Inc. ("**American Axle**"), waited to prosecute its claim despite its knowledge of the facts underlying the claim. The claim arose out of the environmental contamination of a piece of property that took place decades before the Old GM bankruptcy. The facts, as articulated in American Axle's own papers, reveal it not only knew about the environmental contamination, but had also actively participated in administrative proceedings involving the contaminated property prior to the Old GM bankruptcy. Furthermore, American Axle was timely served with all notices throughout the Old GM bankruptcy proceeding, including notice of the filing itself, of the Sale, and of the Bar Date. Even with actual knowledge of the bankruptcy and actual knowledge of the property's contamination, American Axle nevertheless failed to file a proof of claim by the Bar Date.

In the Motion, American Axle seeks permission to assert a late claim against the GUC Trust because American Axle claims that it was unaware of "its interest" in the Old GM bankruptcy case. This entire argument is based on a flawed premise—that a creditor's subjective awareness of its claim is a prerequisite to having an actionable "claim" for bankruptcy purposes, and that a debtor bears some responsibility for making a creditor aware of the underlying basis of the claim. In making this argument, American Axle ignores Second Circuit law as to when a prepetition claim arises under section 101(5)(A) of the Bankruptcy Code. Consideration of the applicable case law makes clear that American Axle had a bankruptcy claim at the Bar Date, albeit a contingent or

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement bear the meaning given elsewhere in this Objection.

unmatured one.  Nevertheless, contingent creditors, like all other creditors, are required to file claims by the applicable bar date.  American Axle simply failed to do so and should be bound by this fact.

American Axle has now filed a motion seeking to file a late claim against the GUC Trust for costs associated with remediation of the contaminated property and, alternatively, for the property to be added to the RACER Trust as a property to be remediated in accordance with the Trust's mission (the "**Motion**"). [ECF No. 14392.]  However, for the reasons set forth more fully herein, the relief sought by American Axle is unavailable as a matter of law because (1) American Axle received actual notice of the Old GM bankruptcy and the Bar Date; (2) American Axle had a contingent claim at the Bar Date; (3) American Axle's failure to file a timely proof of claim was based upon its own misunderstanding about when a claim arises, and this mistake of law cannot qualify as excusable neglect; and (4) American Axle's filing of a late claim would be futile because the claim is not an allowable claim.   The Motion should be denied in its entirety.

## II. BACKGROUND

### A.    History of the Tonawanda Forge Site

The Tonawanda Forge Site (the "**Site**") is located in Erie County, New York.  The property was once part of the General Motors Tonawanda Engine Plant facility, which historically consisted of three major operations: the engine plant, the foundry complex, and the forge facility. [ECF No. 14393-4, at 4.]  Due to industrial processes taking place there, the Site became contaminated with hazardous materials.  [Id.]  On February 18, 1994, Old GM sold the Site to American Axle pursuant to an asset purchase agreement.  [ECF No. 14393-3, at 3.]  In the asset purchase agreement, Old GM disclosed to American Axle that the property was contaminated with mono or polychlorinated biphenyl ("**PCBs**").  See Certification of Marita S. Erbeck in Support of the GUC Trust Objection

(attached as Exhibit A) (the "**Erbeck Cert.**").[2]  The asset purchase agreement also provided for

the implementation of remedial plans to deal with hazardous materials located at the Site. *Id.*

During American Axle's tenancy, Old GM continued to investigate and remediate

environmental issues at the Site. [ECF No. 14393-2, at 4.]  In 2002 and 2003, the Site was the

subject of an administrative proceeding before the New York State Department of Environmental

Conservation. [ECF No. 14393-4, Exhibit B.]  American Axle, who was the then owner of the

Site, participated in the proceeding along with Old GM. [Id.]  The subsequent report, issued on

March 27, 2003, contained findings that the soil and groundwater at the Site contained elevated

levels of PCBs. [ECF No. 14393-4.]

## B.    The Old GM Bankruptcy

The circumstances surrounding the General Motors bankruptcy are well documented, so

this Objection offers only an abbreviated summary.  On June 1, 2009, General Motors Corporation

("**Old GM**") and affiliated entities (collectively, the "**Debtors**") petitioned for Chapter 11

bankruptcy protection in this Court. *In re GM Corp.*, 407 B.R. 463, 479–80 (Bankr. S.D.N.Y.

2009).  The same day, Old GM filed a sale motion seeking approval to sell substantially all of its

assets pursuant to 11 U.S.C. § 363 (the "**Sale**") to the entity that became New GM. *Id.*  On July 5,

2009, after addressing and dismissing numerous objections to the sale, the Court approved the

Sale. *Id.*  On July 10, 2009, the Sale officially closed, and New GM began operating in the

automaker business.

---

[2] A copy of the Asset Purchase Agreement By and Between American Axle & Manufacturing, Inc. and General Motors Corporation, dated February 18, 1994 was filed in *General Motors LLC v. Lewis Bros., LLC*, Case No. 1:10-cv-00725-WMS-LGF (W.D.N.Y. September 2, 2010).  The agreement is available as Exhibit 2 of the Affirmation of R. Hugh Stephens in Support of a Motion for a Preliminary Injunction and the Appointment of a Receiver, March 14, 2011, ECF No. 18-1.

C.    **The Bar Date**

On September 2, 2009, Old GM filed a motion requesting that the Court set a deadline (the

"**Bar Date**") for all proofs of claim relating to prepetition claims against Old GM or any of its

affiliated debtors that did not appear on schedules of assets and liabilities.  [See ECF No. 3940.]

The Bar Date motion contained a proposed form of notice of the Bar Date, the proposed procedures

for delivering such notice, and a proposed model proof of claim.  [Id.]  On September 16, 2009,

the Court issued an order approving the motion and establishing November 30, 2009 at 5:00 p.m.

(Eastern Time) as the Bar Date. [ECF No. 4079.]  The order further stated:

> [A]ny holder of a Claim against the Debtors that is required but fails
> to file a Proof of Claim in accordance with this Bar Date Order . . .
> shall be forever barred, estopped and enjoined from asserting such
> Claim against each of the Debtors and their respective estates (or
> filing a Proof of Claim with respect thereto), and each of the Debtors
> and their respective chapter 11 estates, successors, and property
> shall be forever discharged from any and all indebtedness or liability
> with respect to such Claim.

[Id. at 5.]

D.    **American Axle Fails to File a Proof of Claim Prior to the Bar Date**

American Axle was a known creditor at the time of the bankruptcy filing and received

*actual notice* of the bankruptcy.  Throughout the bankruptcy process, The Garden City Group, Old

GM's notice and claims agent, served American Axle with all required notices at numerous

addresses.  These notices included notice of the sale hearing [ECF No. 2852], notice of the order

confirming the Debtors' plan [ECF No. 10205], and notice of the Bar Date for filing proofs of

claim. [ECF No. 4238.]  Notwithstanding the notice of the bankruptcy and these critical events,

American Axle failed to file a proof of claim.

E.      **Creation of the GUC Trust and RACER Trust**

On March 29, 2011, the Court entered an order confirming the Debtors' second amended joint chapter 11 plan (the "**Confirmation Order**"). [ECF No. 9941.]  Pursuant to the Confirmation Order and the plan that it confirmed, the Debtors established the General Unsecured Creditors Trust (the "**GUC Trust**"), which has since that time been administered by Wilmington Trust Company.  Pursuant to the terms of the Plan and Confirmation Order, the GUC Trust holds certain assets of Old GM, and these assets have been used to pay creditors' unsecured claims on a pro rata basis.  At this time, the Debtors' unsecured creditors have received distributions in the amount of approximately 29.6% of allowed claims.

In addition to the GUC Trust, the plan also called for the creation of the Revitalizing Auto Communities Environmental Response Trust (the "**RACER Trust**").[3]  The RACER Trust's mission is to clean up and position for redevelopment properties owned by Old GM before its bankruptcy.  The Trust was formally established in March 2011 pursuant to a Consent Decree and Settlement Agreement [ECF No. 9836, Exhibit C] (the "**Settlement**").  The Settlement was entered into by the Debtors, the United States, 14 individual states, and the Saint Regis Mohawk Tribe. Each of the governmental entities who participated in the Settlement had filed timely proofs of claim to recover environmental remediation costs from Old GM. [Id. at 4.]  The Settlement covered 89 properties in 14 states that had suffered environmental contamination during Old GM's tenancy and were the subject of environmental response activities and other work. [Id. at 2.]  As consideration for participating in the Settlement and having properties added to the Trust, the government creditors agreed that their proofs of claim would be deemed satisfied and they would not receive any other distributions in the bankruptcy on account of those claims. [Id. at 56–57.]

---

[3] General information regarding the RACER Trust is available on the Trust's website, https://www.racertrust.org.

**F.**     **Designation of the Site as a Superfund Site**

In May 2013, the Site was listed as a Class 2 site in the State Registry of Inactive Hazardous Waste Sites (the list of State Superfund sites). [ECF No. 14393-3.]  With the present owner, Lewis Brothers LLC, no longer operating, American Axle asserts that it has now become concerned that it could be required to shoulder future remediation costs.  [ECF No. 14393-6.]  American Axle believes the environmental remediation efforts should be funded and handled by the RACER Trust and, through the Motion, it seeks to have the Site added to the RACER Trust. [ECF No. 14392.] If the Site cannot be included in the RACER Trust, American Axle seeks the alternative relief of leave to file a late claim against the GUC Trust.

For the reasons set forth more fully below, the Motion should be denied because (1) American Axle received actual notice of the bankruptcy and Bar Date; (2) American Axle had a contingent claim that needed to be filed by the Bar Date in order for it to be preserved; (3) American Axle's failure to file a claim was based upon a mistake of law and thus was not "excusable neglect"; and (4) American Axle's late claim would be futile because the claim would be disallowed on the merits.

### III. LEGAL ARGUMENT

**A.**     **American Axle Received Actual Notice of the Bankruptcy**

Through the Motion, American Axle has argued that not allowing it to pursue its late claim would deprive it of due process.  Because the company received actual notice of the Old GM bankruptcy, this position rings hollow and the request for leave to assert a late claim against the GUC Trust should be denied.

The due process prerequisite for discharging a creditor's claim in bankruptcy is that the creditor be given proper notice.  *See In re U.S.H. Corp. of New York*, 223 B.R. 654, 658 (Bankr.

S.D.N.Y. 1998).  To satisfy due process, a party seeking relief must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

American Axle does not dispute having received notice of the Old GM bankruptcy or the Bar Date, nor could it.  The Debtors' claims and noticing agent served American Axle with all necessary notices, including notice of the Sale, of the Confirmation Order, and, most importantly, of the Bar Date for filing proofs of claim.[4]  These notices were sent to American Axle at numerous addresses.  American Axle tries to avoid this fact and makes its case for a due process violation by saying it lacked "sufficient notice regarding *its interest* in the initial bankruptcy proceedings." [ECF No. 14393-6, at 14] (emphasis added).  However, due process does not obligate a debtor to notify creditors of the nature or scope of potential claims or to advise creditors regarding the viability or merits of such claims.  To the contrary, creditors themselves have the "responsibility to diligently investigate what claims they may have against the debtor." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 158 (E.D.N.Y. 2012); *see also In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 126 (Bankr. S.D.N.Y. 2010) ("Creditors act at their peril where they fail to adequately investigate and pursue their rights.").  By providing American Axle with actual notice of the "debtor's bankruptcy case and applicable bar date," the Debtor satisfied its due process obligations.  *In re XO Commc'ns, Inc.*, 301 B.R. 782, 792 (Bankr. S.D.N.Y. 2003) ("The

---

[4] In fact, American Axle was given notice throughout the Old GM bankruptcy.  See [ECF No. 2852], [ECF No. 4238], and [ECF No. 10205] (Affidavits of Service by Garden City Group, the Debtor's court-appointed noticing agent, of Notice of Interim Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates; Interim Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, and (II) Scheduling a Final Hearing; Notice of Sale Hearing to Sell Substantially All of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser; Notice of Bar Dates for Filing of Proofs of Claim; Notice and a Proof of Claim Form; Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date).

Due Process Clause of the Fifth Amendment dictates that a debtor's creditors receive notice of the *debtor's bankruptcy case and applicable bar date* so that creditors have an opportunity to make any claims they may have against the debtor's estate.") (emphasis added).

Moreover, American Axle's purported lack of notice regarding "its interest" in the bankruptcy does not align with the facts set forth in its Motion.  The 1994 asset purchase agreement that conveyed the Site to American Axle disclosed the presence of PCBs and other hazardous materials.[5]  [Erbeck Cert.]  Further, the Motion acknowledges that American Axle has known about environmental issues at the Site since before the Old GM bankruptcy, as "*during American Axle's tenancy* [i.e., from 1994 to 2008], Old GM investigated and remediated contaminants disposed by Old GM that pre-dated American Axle."  [ECF No. 14393-2, at 4] (emphasis added).  In fact, several years before the Old GM bankruptcy, American Axle was involved in administrative proceedings concerning the cleanup of PCBs at the Site.  *See In the Matter of the Disputed Regulatory Program Fees of GM Powertrain - Tonawanda Engine Plant American Axle & Manufacturing, Inc.*, 2003 WL 1880837, at *3 (N.Y. Dept. Env. Conserv. March 27, 2003).  Thus, even if due process did demand that creditors have notice of their individual interests in the proceeding (which it does not), American Axle had that notice.  It knew of the environmental contamination and knew that as a former owner and operator of the Site, it was a potentially responsible party under state and federal environmental law.  Given the facts, American Axle's

---

[5] Section 6.8 of the agreement states that "GM has informed [American Axle] that the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., may include, among other things, transformers and capacitors that may contain mono or polychlorinated biphenyl ("PCBs") dielectric or other materials." The agreement further provides that "[American Axle] hereby expressly releases and covenants not to sue GM with respect to environmental matters or conditions regarding the Assets, the Real Property, as defined in Section 1. 1 .1, or the Business, whether existing before or after the date of Closing, including, but not limited to, environmental matters arising from or related to the presence of PCBs, asbestos, wood floor blocks, ceiling and floor tiles, buildings, refractory brick and any substances, materials or structures at or about the Real Property, as defined in Section 1.1.1. or in or about the Assets."

interest in the bankruptcy proceedings was clear, and the suggestion that it has somehow been deprived of due process is simply not credible.

American Axle's actual knowledge of the Debtors' bankruptcy proceeding and its actual knowledge of the ongoing environmental remediation provided the information necessary for American Axle to guard its rights and file a claim. It failed to do so through no fault of Old GM.

**B.**     **American Axle Had a Contingent Claim Within the Meaning of Section 101(5)(A) of the Bankruptcy Code.**

Prior to filing the Motion, American Axle made no effort to pursue its claim. The best explanation for American Axle's failure to file a timely proof of claim is that it fundamentally misunderstands what a "claim" is and when it arises for bankruptcy purposes.

A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). In defining "claim" in such a way, Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case," thus affording debtors "the broadest possible relief in the bankruptcy court." H.R. Rep. 95-595 (1978). The Second Circuit has held "that the term 'claim' is sufficiently broad to encompass any possible right to payment." *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997). The Supreme Court has similarly advanced the view that "claim" has "the broadest available definition." *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)).

There is no doubt "a 'claim' can exist under the Code before a right to payment exists under [non-bankruptcy] law." *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010); *In re Caldor, Inc.-NY*, 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ("[C]reditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes

of the Code"); *see also* 2 Collier on Bankruptcy ¶ 101.05 (16th ed. 2018) ("'Claim' may also include a cause of action or right to payment that has not yet accrued or become cognizable."). The Code's definition of claim expressly includes "contingent" claims—in other words, rights to payment that are "possible," "uncertain," or "[d]ependent on something that might or might not happen in the future." Black's Law Dictionary (10th ed. 2014); *see also In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982, 987 (Bankr. S.D.N.Y. 1992) ("[A] contingent claim is by definition a claim which has not yet accrued and which is dependent upon some future event that may never happen"). Because American Axle's right to payment was dependent on a subsequent event (that is, the company's eventual liability for cleanup costs), its claim fits seamlessly within the definition of a contingent claim. *See In re Manville Forest Prod. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000) (observing that "the fact [the creditor] did not know the specific parameters of its liability . . . is precisely what made the claim contingent").

Applying this circuit's well-established law, American Axle had a contingent or unmatured claim long before the Bar Date. The Bar Date order issued by this Court stated that "any holder of a Claim against the Debtors that is required but fails to file a Proof of Claim in accordance with this Bar Date Order . . . shall be forever barred, estopped and enjoined from asserting such Claim against each of the Debtors and their respective estates." *In re Motors Liquidation Co.*, 576 B.R. 761, 766 (Bankr. S.D.N.Y. 2017). Because American Axle held a claim, it was necessary to file a proof of claim before the court-imposed Bar Date in order to preserve its rights. *See In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 94 (Bankr. S.D.N.Y. 2007); *see also* Fed. R. Bankr. P. 3003(c)(3).

In seeking to prosecute its claim now, American Axle essentially confirms it had a contingent claim while Old GM's bankruptcy was ongoing. American Axle never argues its claim

arose post-bankruptcy or that it was legally prevented from filing a proof of claim by the Bar Date.

Rather, American Axle explains it was "*unaware* of any potential claims it had against Old GM."

[ECF No. 14393-6, at 13] (emphasis added). In short, a contingent claim existed, but it had not

been identified by the holder. Further, American Axle never suggests that some subsequent event

transformed what was previously a speculative or unactionable right to payment into a legally

actionable claim. For example, there is no indication the company has actually been found liable

for cleanup costs or has actually paid anything toward environmental remediation. American Axle

only discusses "*potential* liability for the cleanup" or how "New York State *may* pursue it" and

"*may* seek to hold American Axle responsible for contamination." [See ECF 14393-6] (emphasis

added). As a practical matter, the sole difference between 2009 and 2019 is that American Axle

has since realized it might, in the future, want to seek contribution from Old GM. Said differently,

the only thing that changed was American Axle's subjective awareness of its claim. The facts

make clear that it held a contingent claim at the time of the Bar Date.

The applicable tests for determining when a claim arises confirm that American Axle had

a claim prior to the Bar Date. Obviously, not every future right to payment amounts to a

bankruptcy claim. To deal with this uncertainty, courts employ several tests to distinguish between

contingent or unmatured claims (which are, by definition, "claims" under section 101(5)) and other

future claims (which may not be "claims" for bankruptcy purposes). *See In re Johns-Manville*

*Corp.*, 552 B.R. 221, 232 (Bankr. S.D.N.Y. 2016) (describing the "accrual test," the "conduct test,"

the "prepetition relationship test," and the "fair contemplation test"). American Axle never

discusses which test it believes the Court should apply and never explains whether the relevant

test has or has not been satisfied. As the Court has previously explained, the Second Circuit has

applied both the "prepetition relationship test" and the "fair contemplation test" in cases involving

-11-

environmental claims. *Id*. at 232. Regardless of which test applies, American Axle had a claim against the Debtor at the time of Old GM's bankruptcy filing.

### 1.    American Axle Had a Pre-Bankruptcy Claim Under the Prepetition Relationship Test

In *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016), the Second Circuit addressed the issue of when "claims" arise. The court applied its own version of the prepetition relationship test from the *Chateaugay* line of cases.[6] The court stated that a claim exists for bankruptcy purposes when: (1) the conduct giving rise to the claim occurred pre-petition; and (2) there is "some minimum 'contact' or 'relationship'" between the parties such that the creditor's rights do not "depend entirely on the fortuity of future occurrences." *Elliott*, 829 F.3d at 156.

With respect to the "prepetition conduct" requirement, if a claim is contingent on future events, the claim must "result from pre-petition conduct fairly giving rise to that contingent claim." *Id.* (quoting *In re Chateaugay Corp.*, 944 F.2d 997, 1005 (2d Cir. 1991)); *see also Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1577 (11th Cir. 1995) (holding that "an individual has a § 101(5) claim against a debtor" when "the basis for liability is the debtor's prepetition conduct").[7] In this case, there is no doubt the conduct giving rise to the claim predated Old GM's bankruptcy by decades.

---

[6] The Second Circuit has not explicitly referred to its test as the "prepetition relationship test," as articulated by the Eleventh Circuit in *Piper Aircraft Corp.*, but courts in this circuit recognize "the basic approach articulated in *Piper* is consistent with the Second Circuit's holding in *Chateaugay*" as both "require[] a pre-confirmation relationship between the claimant and the debtor." *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 705 (S.D.N.Y. 2012).

[7] Although not a Second Circuit case, courts in this circuit have looked to the *Piper* court's articulation of the prepetition relationship test., *see, e.g.*, *Grumman Olson Industries*, 467 B.R. at 705, and this Court recently recognized "that the Second Circuit's 'fair contemplation' test was consistent with the well-known 'Piper test.'" *In re Motors Liquidation Co.*, 576 B.R. at 771.

The report by the New York State Department of Environmental Conservation found the Site is contaminated with polychlorinated biphenyl. [ECF No. 14393-4.]  PCBs were banned in the 1970s as part of the Toxic Substances Control Act. *See* 15 U.S.C. § 2605.  Accordingly, American Axle reasonably states that contamination took place prior to 1979 (at least 30 years before Old GM's bankruptcy).  Even if contamination continued after 1979, American Axle affirms it never used PCBs during its operations. [ECF No. 14393-6, at 9.]  Therefore, at the latest, the contamination took place before 1994, the year American Axle took possession of the property (at least 15 years before Old GM's bankruptcy).  Further, review of the asset purchase agreement between American Axle and Old GM makes clear that American Axle was actually aware of the environmental contamination as of 1994.  No matter the precise date, contamination of the Site— which is the "conduct fairly giving rise to [the] claim" and the entire "basis for liability"—occurred no less than 15 years before Old GM's bankruptcy.  Underscoring this point, American Axle openly admits "the environmental contamination at the Tonawanda Forge Site was caused by Old GM's *pre-bankruptcy activity*." [ECF No. 14393-9, at 13] (emphasis added).  By American Axle's own admission, the first requirement of the prepetition relationship test is satisfied.

Turning to the second requirement, a prepetition relationship, "courts require some minimum 'contact' or 'relationship' that makes identifiable the individual with whom the claim does or would rest." *Elliott*, 829 F.3d at 156 (citations omitted); *see also Piper Aircraft*, 58 F.3d at 1577 (requiring that "events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor").  The purpose of this requirement is "[t]o avoid any practical and constitutional problems" that future claims sometimes entail. *Elliott*, 829 F.3d at 156.  The relationship element focuses on "whether the relationship was one in which both parties knew liability could arise." *Johns-Manville Corp.*, 552 B.R. at 233.

-13-

Thus, "[a] claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts." *Id.* at 233–34 (quoting *In re Chateaugay Corp.*, 53 F.3d 478, 497 (2d Cir. 1995)).

Here, the "relationship" or "contact" between American Axle and Old GM came into existence no later than 1994 when American Axle entered into a contract with Old GM to acquire the Site.  From that point forward, the parties had a well-defined legal relationship based upon contractual privity.  Moreover, it was out of this legal relationship that the claim arose.  In other words, American Axle's contingent right to payment clearly did not "depend[] entirely on the fortuity of future occurrences," *Elliott*, 829 F.3d at 156, but was instead firmly rooted in the parties' longstanding relationship.  Because the parties had a prepetition relationship, the second requirement of this test is satisfied.

American Axle never discusses the prepetition relationship test.  Instead, the Motion centers on its awareness (or lack thereof) of its claim.  American Axle argues "[a]n important component of due process is whether a party was aware of their claims against a debtor at the time bankruptcy proceedings take place." [ECF No. 14393-6.]  It relies upon *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994) in support of this proposition.  However, *Lemelle* actually weighs against American Axle, as the ruling in *Lemelle* was based upon that court's application of the prepetition relationship test. *See In re Placid Oil Co.*, 463 B.R. 803, 814 (Bankr. N.D. Tex. 2012), *aff'd*, 753 F.3d 151 (5th Cir. 2014) (noting "that the 'pre-petition relationship test' was applied in *Lemelle*").

In *Lemelle*, the Fifth Circuit analyzed *Piper Aircraft* and *Chateaugay* and found those cases persuasive.  *Lemelle*, 18 F.3d at 1277.  The opinion is not concerned with the creditor's awareness of its claim, as American Axle would have it.  Rather, the crucial point was that the "record [was]

devoid of any evidence of *any pre-petition contact, privity, or other relationship* between [the debtor], on the one hand, and [the claimants], on the other." *Id.* (emphasis added).  The court found "the absence of *this evidence* [i.e., evidence of a prepetition relationship] preclude[d] a finding by the district court that the claims asserted by [the claimants] were discharged in [the debtor's] bankruptcy proceedings." *Id.* (emphasis added).  The court was quick to point out that if a prepetition relationship had existed between the parties, the analysis would have been different. *Id.* at 1278.  Because in this case, there is an undeniable relationship between the parties that has existed since many years before the bankruptcy filing, American Axle's reliance on *Lemelle* is misplaced.  If anything, this case favors the application of the pre-petition relationship test under which American Axle undoubtedly had a claim.

Because application of the prepetition relationship test establishes that American Axle had a prepetition "claim," it was required to file a proof of claim by the Bar Date if it wished to participate in any distribution from the GUC Trust.

### 2.    American Axle Had a Pre-Bankruptcy Claim Under the Fair Contemplation Test

A second, but closely related, test is the fair contemplation test.  Under this test, a contingent claim is a "claim" when "the occurrence of the contingency or future event that would trigger liability was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *In re Motors Liquidation Co.*, 576 B.R. at 771 (quoting *In re Chateaugay Corp.*, 944 F.2d at 1004).  The fair contemplation test essentially layers onto the prepetition relationship test an additional requirement that the parties contemplated the event triggering liability when their relationship began.  Thus, "[t]he difference between the relationship test and the fair contemplation test is that the fair contemplation test asks whether the

-15-

relationship has resulted in prepetition conduct that could, in the fair contemplation of the parties, give rise to liability under the non-bankruptcy law." *Johns-Manville Corp.*, 552 B.R. at 233.

The parties' relationship here—based on a contract and a transfer of property—had the clear potential to "give rise to liability under the non-bankruptcy law." In fact, the potential for liability was especially obvious, as the Site being transferred was an industrial site known by the parties to the transaction to be contaminated with hazardous materials. Applying the fair contemplation test, the "occurrence" or "future event" triggering liability is American Axle's incurrence of environmental liability, and the "original relationship" is the one created when the parties contracted to transfer the Site. The only question becomes whether the future event (the subsequent environmental liability) was contemplated when the parties' relationship began (the day the contract was signed).

Certainly, whether this occurrence was "within the actual or presumed contemplation of the parties" at the relationship's inception is best evidenced by the contract creating the relationship. Examining the asset purchase agreement plainly shows both parties were keenly aware of potential environmental liability. Indeed, the contract addresses environmental issues at length, with over thirty pages specifically dedicated to "Environmental Matters." American Axle was fully aware the property contained PCBs, as the agreement plainly discloses these contaminants. The agreement further creates mechanisms for environmental inspections, reporting, cleanup, and remediation. The agreement also obligated General Motors to indemnify American Axle for liabilities, damages, penalties, or fines related to various environmental claims, with some indemnities remaining in effect in perpetuity.[8] Without a doubt, future environmental

---

[8] In its Motion, American Axle does not state any particular legal basis for holding Old GM responsible. To the extent American Axle's claim is based upon the indemnification provisions of the asset purchase agreement, there is no doubt that such action constitutes a prepetition claim. *In re Houbigant, Inc.*, 188 B.R. 347, 358–59 (Bankr. S.D.N.Y. 1995)

liability was at the forefront of the parties' minds when the relationship was created, as conclusively shown by the parties' contract. Not only did the parties contemplate future environmental liability initially, subsequent events show that environmental liability remained a significant concern throughout the parties' relationship. The administrative proceedings in 2002 and 2003 revolved around the ongoing environmental remediation. At the absolute latest, American Axle knew in 2003 that liability for cleanup was a vital concern.

For American Axle to argue now that it was oblivious to a potential claim against Old GM until 2017 is completely incongruous with the contract it signed and the legal proceedings that it participated in. *See Manville Forest Prod.*, 209 F.3d at 129 (finding that "the terms of the indemnification agreements were so broad as to encompass all types of future liability, signaling that the parties actually or presumedly contemplated possible environmental liability . . ."). Future environmental claims were not just reasonably foreseeable—the parties actually contemplated and accounted for them. Even though no liability had been attributed to American Axle at the time of Old GM's bankruptcy, the company must have known such an outcome was at least probable if not entirely predictable. Thus, the requirement that the parties contemplated the event triggering liability is satisfied, and American Axle had a claim under the prepetition relationship test.

The case of *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) supports this conclusion. There, the Environmental Protection Agency wanted to recover costs the agency had incurred cleaning up hazardous waste released by the debtor, LTV Corporation, before bankruptcy. The Second Circuit was asked to determine the applicability of a bankruptcy discharge to claims for the *future costs* of cleaning up hazardous waste. The Second Circuit ultimately affirmed the district court's ruling that the environmental claims were "dischargeable in bankruptcy, *regardless of*

---

(holding that "a contractual indemnification claim exists as a contingent claim against the indemnitor as of the date the indemnification agreement is executed").

*when such costs are incurred*, as long as they concern[ed] a release or threatened release of hazardous substances that occurred before the debtor filed its Chapter 11 petition." *Id*. at 999 (emphasis added).   Remarkably, these discharged claims included claims related to releases the EPA had not determined LTV was responsible for and releases that had "not then been discovered by the EPA (or anyone else)." *Id.* at 1000.

The court based its ruling upon the "relationship" between environmental regulating agencies and those subject to regulation. *Id*. at 1005. According to the court, this relationship "provided sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.'" *Id*.  This was true even though the "EPA [did] not yet know the full extent of the hazardous waste removal costs that it may one day incur and seek to impose upon LTV"  and "it [did] not yet even know the location of all the sites at which such wastes may yet be found." *Id*.  Nevertheless, these uncertainties simply "render[ed] EPA's claim 'contingent,' rather than as placing it outside the Code's definition of 'claim.'" *Id*.

The Second Circuit's reasoning in *Chateaugay* is equally applicable in this case.  Like the EPA in *Chateaugay*, American Axle did not actually incur the costs it now wishes to recover until after the Bar Date.  However, this does not change the fact that the PCB contamination, like the contamination in *Chateaugay*, took place before bankruptcy.  Moreover, the parties' relationship, like the relationship between the EPA and LTV, clearly contemplated future environmental liability.  Thus, as with the environmental claims in *Chateaugay*, the claims here arose prepetition and cannot be pursued now.

According to American Axle, "whether a party was *aware* of their claims against a debtor at the time bankruptcy proceedings take place" is the key consideration in the analysis. [ECF No.

14393-6, at 11] (emphasis added).  The fact is, however, a creditor's subjective awareness of its claim is not an element of any court-recognized test for determining whether or when a claim exists.[9]  Assuming, *arguendo*, that a creditor's subjective awareness was relevant to the analysis, American Axle was aware of the environmental contamination and remediation efforts since 1994 when it acquired the property.  American Axle tries to downplay this fact by saying it was "unaware of *the extent* to which the Site was contaminated until December of 2017." [ECF No. 14393-6, at 16] (emphasis added).  This is irrelevant to the Court's analysis here.  American Axle knew from the asset purchase agreement that the property was contaminated, it knew that remediation efforts were taking place during its tenancy, and, finally, it actively participated in prepetition administrative proceedings regarding contamination at the Site.  American Axle's attempt to portray itself as a hapless victim is simply not convincing.

Regardless of which test applies, the conclusion is the same:  American Axle had a section 101(5) bankruptcy "claim" at the Bar Date, although it remained (and may still remain) contingent. All of the events forming the basis for the claim occurred years before Old GM's bankruptcy. Likewise, the relationship between the parties was firmly established long before the bankruptcy. Lastly, the contingent future environmental liability was clearly contemplated by the parties. Because American Axle had a contingent claim, it was incumbent upon the company to file a proof of claim by the Bar Date in order to protect its rights.

---

[9] Under the "conduct test," a claim arises based on when the conduct giving rise to the claim took place. *See, e.g.*, *Saint Catherine Hosp. of Indiana, LLC v. Indiana Family & Soc. Servs. Admin.*, 800 F.3d 312, 315 (7th Cir. 2015). The "prepetition relationship test" modifies the conduct test by requiring "not only that there was some prepetition conduct, but also that there was some prepetition relationship between the debtor's conduct and the claimant." *In re Piper Aircraft Corp.*, 168 B.R. 434, 439 (S.D. Fla. 1994). The "fair contemplation test" essentially layers onto the "prepetition relationship test" a requirement that the event triggering liability be contemplated by the parties when their relationship began. *In re Chateaugay Corp.*, 944 F.2d at 1004. The "accrual test," which has now been discredited, focused on when the right to payment arose. *In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010). Notably, "awareness" of a claim is immaterial under each test.

C.    **American Axle Cannot Demonstrate Its Failure to Timely File a Proof of Claim Was the Result of Excusable Neglect.**

American Axle's failure to file a proof of claim can only be excused under Bankruptcy Rule 9006(b)(1) if its failure to act was the result of "excusable neglect" under the test articulated by the Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380 (1993). American Axle cannot meet this standard because the doctrine of excusable neglect has no application where the decision of a creditor to stay out of a bankruptcy proceeding was based on ignorance or legal error.  In addition, where, as here, a Chapter 11 plan has been consummated, *see In re Motors Liquidation Co.*, 462 B.R. 494, 501 n.36 (Bankr. S.D.N.Y. 2012), courts must use "added caution" in evaluating claims of excusable neglect.  *Atlas v. Chrysler, LLC (In re TALT)*, No. 10–02902, 2010 WL 2771841, at *3 (Bankr. S.D.N.Y. July 13, 2010).

Under *Pioneer*, a court must consider four factors:  (i) the risk of prejudice to the debtor; (ii) the length of the delay and its potential impact on judicial proceedings; (iii) the reason for the delay, including whether it was within the reasonable control of the movant; and (iv) the movant's good faith.  507 U.S. at 395.  The Second Circuit takes a "hard line" approach when applying *Pioneer* and deciding whether to allow a late-filed claim.  *In re Enron Corp.*, 419 F.3d 115, 128 (2d Cir. 2005).  In a typical case, three of the four *Pioneer* factors (prejudice, length of delay, and good faith) will "usually weigh in favor of the party seeking the extension," so courts focus on the third factor—the reason for the delay. *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003).

1.    **The Reason for American Axle's Delay Precludes a Finding of Excusable Neglect.**

The reason for the delay, including whether it was within the reasonable control of the creditor, precludes a finding of excusable neglect in this case.  The apparent reason for the delay was either American Axle's unawareness of its claim or a fundamental misunderstanding of when a claim arises for bankruptcy purposes.  American Axle's proffered excuse essentially boils down to ignorance:  "American Axle did not even know of its potential claim against Old GM." [ECF No. 14393-6, at 16.]  Unfortunately, "ignorance of one's own claim does not constitute excusable neglect," and its mistaken belief that it had no claim to assert bars its claim now.  *In re Best Prod. Co., Inc.*, 140 B.R. 353, 359 (Bankr. S.D.N.Y. 1992); *see also Matter of Penn Cent. Transp. Co.*, 42 B.R. 657, 675 (E.D. Pa. 1984) (finding there is "no exception made for claims which were unknown to a claimant until after consummation of the Plan").

Similarly, American Axle's delay could be attributed to its misunderstanding of when a claim arises under bankruptcy law, which would constitute a clear mistake of law.  It appears that American Axle subjectively believed, as a legal matter, that its environmental liability had not accrued into a "claim" under the Bankruptcy Code prior to the Bar Date.  If so, American Axle reached an incorrect legal conclusion because it in fact had a "claim" under the Bankruptcy Code prior to the entry of the Bar Date.  As this Court very recently recognized, "a claimant's neglect [is] not excusable where its failure to comply with the rule was the result of a mistake of law." *In re Motors Liquidation Co.*, 576 B.R. at 775.

The district court's opinion in *Michigan Self-Insurers' Security Fund v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 434 B.R. 77 (S.D.N.Y. 2010) is instructive.  In that case, the claimant was the Michigan Self-Insurers' Security Fund ("**Fund**"), which had been established to pay the workers' compensation obligations of self-insured employers that become insolvent and

cannot make payments to their injured workers. 434 B.R. at 79. When the debtor filed for bankruptcy, it was current on its workers' compensation payments. *Id.* After filing, the bankruptcy court entered an order stating the debtor was "authorized, but not directed, to pay or otherwise honor workers' compensation claims." *Id.* at 80.

The bankruptcy court established a bar date of July 31, 2006. *See id.* The Fund received notice of the bar date but did not file a proof of claim. *See id.* In 2009, in connection with a modification of its reorganization plan, the debtor indicated that it would stop making workers' compensation payments. *See id.* After learning about this modification, the Fund filed two proofs of claim, to which the debtor objected. *See id.* The Fund moved to permit their late claims pursuant to Bankruptcy Rule 9006(b)(1). *See id.* at 81. The bankruptcy court sustained the debtor's objection, ruling "that the Fund has not carried its burden to establish excusable neglect here in respect of its proof of claim." *Id.*

The district court affirmed the bankruptcy court's order on appeal. The Fund's excuse for its failure to file a timely proof of claim was its erroneous belief that it did not possess a claim against the debtor as of the bar date because, at that time, "[a]ll information available to the [Fund] indicated that [d]ebtors were continuing to pay all of their workers' compensation obligations." *Id.* at 85. Notwithstanding, "because 'there was always a risk' that [the debtor] would stop paying workers' compensation, the Fund was obligated to file a claim based on the contingency that [the debtor] would become unable to pay." *Id.* In so finding, the district court noted that the definition of a claim in section 101(5)(a) of the Bankruptcy Code states that a "claim" is "the right to payment, whether or not such right is . . . contingent[.]" The Bankruptcy Code and Bankruptcy Rule 3003(c)(2) clearly state that contingent claims must be filed before the bar date. *Id.* Because the reason for the Fund's delay was of a legal nature, and "[l]egal mistakes are usually not

considered excusable neglect," this district court concluded that the bankruptcy court did not abuse its discretion in denying the Fund's motion for leave to file late proofs of claim. *Id.* at 85.

American Axle, like the creditor in *DPH Holdings*, erroneously believed that it did not have a claim as of the Bar Date. This Court should similarly find that American Axle's mistake of law does not excuse its failure to file a timely proof of claim. Just like the creditor in *DPH Holdings*, American Axle could not have known with absolute certainty whether it would ultimately be required to pay anything. Nonetheless, "there was always a risk" that the need for contribution would materialize and that American Axle would have to pursue a claim against Old GM. Arguably, American Axle's claim was less contingent than the Fund's claim, as the environmental contamination giving rise to American Axle's claim occurred years before the Bar Date and was well known.

Finally, in analyzing the reason for the delay, courts also "take[] into account the movant's sophistication." *In re Hills Stores Co.*, 167 B.R. 348, 351 (Bankr. S.D.N.Y. 1994). Here, American Axle is a public company that operates more than 90 facilities in 17 countries with billions of dollars in revenue and over 25,000 employees.[10] American Axle's status as a sophisticated creditor further proves it cannot characterize its failure to file a proof of claim as excusable neglect.

American Axle voluntarily opted not to file a claim before the bar date. This choice was based upon a legal error regarding the status of its claim. As a result, the doctrine of "excusable neglect" is unavailing. *See Motors Liquidation*, 576 B.R. at 778–79; *see also Canfield v. Van Atta Buick/GMC Truck*, 127 F.3d 248, 251 (2d Cir. 1997) (per curiam) (noting "general rule that a mistake of law does not constitute excusable neglect"); *DPH Holdings, Corp.*, 434 B.R. at 85 ("Legal mistakes are usually not considered excusable neglect.").

---

[10] https://www.sec.gov/Archives/edgar/data/1062231/000106223118000013/axl201710k.htm.

### 2.    The Remaining *Pioneer* Factors Also Preclude a Finding of Excusable Neglect.

American Axle fares no better with respect to the remaining *Pioneer* factors.  First,

regarding prejudice to the Debtor, American Axle states in conclusory fashion that there will be

"little prejudice to Old GM" if its claim is allowed. [ECF No. 14393-6, at 12.]   However, by

focusing exclusively on this one claim, American Axle fails to see the bigger picture.   "The

prejudice to the Debtors is not traceable to the filing of any single additional claim but to the impact

of permitting exceptions that will encourage others to seek similar leniency."   *Lehman Bros.*

*Holdings*, 433 B.R. at 121.  Allowing even a single late claim risks inspiring similar efforts from

creditors who also missed the bar date.  *Meadows v. AMR Corp.*, 539 B.R. 246, 252 (S.D.N.Y.

2015) (finding that the allowance of late claims "years after the confirmation of the debtors'

reorganization plan would create a serious risk of opening the floodgates to other potential late

claims").

As other late-claims litigation in this case illustrates, *see, e.g.*, *In re Motors Liquidation*

*Co.*, 576 B.R. 761 (Bankr. S.D.N.Y. 2017), determining whether a given creditor's "neglect" is

sufficiently "excusable" frequently entails time-consuming litigation at great expense to the estate.

The mere prospect of litigating additional motions to file post-bar date proofs of claim is enough

to prejudice the debtor.  *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (finding

"the legal fees the estate would potentially expend in litigating [late claims] supports a finding of

prejudice").  This fear of rampant late-claims litigation is especially germane in a case like this

one where the universe of potential creditors is practically limitless.

Second, the delay in filing the claim was substantial.  The Bar Date in this case was

November 30, 2009, and American Axle filed its Motion on December 21, 2018, almost a decade

later.  In absolute terms, a nine-year delay *far* exceeds delays that courts have found to be

-24-

substantial in similar cases. *See, e.g., Enron Corp.*, 419 F.3d at 128 (finding that "claims filed as late as two years after the bar date" represent the outer limits of what courts allow); *In re Dana Corp.*, No. 06-10354, 2008 WL 2885901, at *6 (Bankr. S.D.N.Y. 2008) (twenty-one month delay is substantial); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (S.D.N.Y. 2007) (fifteen month delay is substantial).  Notably, even if the delay were measured from when American Axle received the notification letter from New York State in December 2017, waiting a full year to act would still weigh against a finding of excusable neglect. *In re AMR Corp.*, 492 B.R. 660, 667 (Bankr. S.D.N.Y. 2013) (finding that filing a claim "more than five months after the Court entered the Bar Date Order and more than three months after the Bar Date had passed" was "significant").  Perhaps most importantly, during the period of American Axle's delay, the Debtors sold substantially all their assets, confirmed a Chapter 11 plan of reorganization, and that plan was substantially consummated.  Effectively all case activity occurred during the period when American Axle sat on its rights.  This fact is dispositive.

As to the fourth and final element, there is no reason to suspect American Axle has acted in bad faith.  Nevertheless, the presence of good faith is almost never a determinative factor in the *Pioneer* analysis.  *See Silivanch*, 333 F.3d at 366 ("And rarely in the decided cases is the absence of good faith at issue.").  American Axle's good faith cannot singlehandedly overcome the fact it has failed to meet the other requirements of excusable neglect.

Because American Axle cannot demonstrate its failure to file a timely proof of claim constitutes excusable neglect, the Court should not allow it to pursue a late claim against the GUC Trust.

D.    **Allowing American Axle to File a Late Proof of Claim Would Be Futile Because Its Claim Would Be Disallowed.**

American Axle's request to file a late proof of claim should fail for the independent reason that its claim is not allowable under section 502(e)(1)(b) and would thus be futile.  The statute provides that: "the court shall disallow any claim for reimbursement or contribution of any entity that is liable with the debtor . . . to the extent that—(B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim . . . ."   In addition to co-debtor situations created by contract, "section 502(e)(1)(B) applies to disallow contingent reimbursement or contribution claims created by statute." 4 Collier on Bankruptcy ¶ 502.06[d] (16th ed. 2018).  In explaining this provision, Collier gives the specific example of a claim for contribution arising under CERCLA. *Id.*  In such a case, the government is the primary obligee and may seek satisfaction of its claim against the debtor and from other parties who, under the statute, are obligated with the debtor for the same environmental liability.  Applying this section, bankruptcy courts have repeatedly found that creditors are prohibited from seeking contribution from a debtor where the debtor and creditor are jointly liable under environmental statutes and where the creditor has not yet expended any funds when the claim is made. *See, e.g.*, *In re Lyondell Chem. Co.*, 442 B.R. 236, 258 (Bankr. S.D.N.Y. 2011); *In re Chemtura Corp.*, 443 B.R. 601, 627 (Bankr. S.D.N.Y. 2011); *In re APCO Liquidating Tr.*, 370 B.R. 625, 637 (Bankr. D. Del. 2007).

By the express terms of section 502(e)(1)(B) of the Bankruptcy Code, three elements must be met for a claim to be disallowed under this section: (1) "the party asserting the claim must be liable with the debtor on the claim of a third party"; (2) "the claim must be contingent at the time of its allowance or disallowance"; and (3) "the claim must be for reimbursement or contribution."

-26-

*In re Lyondell Chem. Co.*, 442 B.R. at 243. All three elements are present here, which ultimately defeats American Axle's claim and renders a late filing futile.

First, American Axle admits it shares (or at least potentially shares) liability for cleanup of the Site as a potentially responsible party.  To be sure, American Axle's claim is premised on the theory that "if the Debtors pay less than their share of cleanup costs," [American Axle] will have to pay more," which is "the essence of co-liability." *Lyondell*, 442 B.R. at 253; *see also Matter of Baldwin-United Corp.*, 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985) ("By its very nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship.").  Thus, the co-liability element is present.

Second, American Axle's claim is contingent.  Environmental contribution claims remain contingent until the co-liable creditor *actually pays* for the cleanup or otherwise expends funds on account of the claim. *In re Chemtura Corp.*, 443 B.R. at 615 (holding "that claims for *future* remediation costs, not already paid for, are contingent, and satisfy the "Contingency" Element of section 502(e)(1)(B) doctrine"); *see also APCO Liquidating Tr.*, 370 B.R. at 636 ("The law is clear that 'the contingency contemplated by section 502(e)(1)(B) relates to both payment *and* liability.' . . . Therefore, a claimant's 'claim is contingent until their liability is established . . . *and* the co-debtor has paid the creditor.") (quoting *In re Drexel Burnham Lambert Group*, 148 B.R. 982 (Bankr. S.D.N.Y. 1992)).  Based upon its Motion, American Axle has yet to spend a single penny on environmental remediation.  Consequently, it cannot be known "whether [American Axle] will lay out the funds necessary to engage in the curative action, and, if so, to what extent," meaning that American Axle's claim necessarily remains contingent. *Lyondell*, 442 B.R. at 250.

Assuming American Axle's claim is no longer contingent, it should still be disallowed because it was certainly contingent at the Bar Date.  Letting a creditor whose claim would have

been disallowed under section 502(e)(1)(B) prosecute a late claim once the claim is no longer contingent would allow creditors to make an end-run around section 502(e)(1)(B).

Third, American Axle's claim is for "contribution" or "reimbursement" as those terms are used in § 502(e)(1)(b).  "Reimbursement" is a "a broad word which encompasses whatever claims a co-debtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable."  *In re Lyondell Chem. Co.*, 442 B.R. at 256 (quoting *In re Wedtech Corp.*, 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988)); *see also In re Chemtura Corp.*, 443 B.R. at 627 (finding that "the claims at issue plainly are for 'reimbursement' as that term is used in section 502(e)(1)(B)" where "[t]he Claimants seek repayment of money that they allege that *they will spend on environmental remediation*, and the Debtors and the Claimants, all [potentially responsible parties], are co-liable for environmental cleanup") (emphasis added).

Because American Axle's contingent claim seeks contribution or reimbursement from Old GM on a debt for which the parties are co-liable, all three elements of section 502(e)(1)(b) are present.  The Court should therefore deny American Axle's request to file a late claim against the GUC Trust because the claim would not be an allowable claim under section 502(e)(1)(B), making the late claim futile.  *See Greatamerican Fed. Sav. & Loan Ass'n v. Adcock Excavating, Inc.*, No. 89 C 3794, 1990 WL 51219, at *4 (N.D. Ill. Apr. 17, 1990) (affirming the bankruptcy court's refusal to allow a late-filed claim where "the application of § 502(e)(1)(B) [made] filing of a late claim futile.").

**E.**     **The GUC Trust Takes No Position Regarding the Request to Include the Site in the RACER Trust.**

The GUC Trust takes no position as to whether the Tonawanda Forge Site can be included in the RACER Trust at this time.

## **CONCLUSION**

For the reasons above, this Court should deny the Motion in its entirety.


Dated:    New York, New York
          February 22, 2019

                          Respectfully submitted,

                          By:    /s/   Kristin K. Going
                          Kristin K. Going
                          Marita S. Erbeck
                          DRINKER BIDDLE & REATH LLP
                          1177 Avenue of the Americas, 41st Floor
                          New York, NY 10036-2714
                          Tel: (212) 248-3140
                          kristin.going@dbr.com
                          marita.erbeck@dbr.com

                          *Counsel for Wilmington Trust Company, as Trustee for and Administrator of the Motors Liquidation Company GUC Trust*