DRINKER BIDDLE & REATH LLP                    **Relates to ECF Nos. 14392, 14393**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140
Facsimile:  (212) 248-3141
E-mail:  kristin.going@dbr.com
            marita.erbeck@dbr.com
Kristin K. Going
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                        :
**In re:**                              :          **Chapter 11 Case No.**
                                        :
**MOTORS LIQUIDATION COMPANY,** *et al,* :          **09-50026 (MG)**
**f/k/a General Motors Corp.,** *et al.* :
                                        :          **(Jointly Administered)**
    **Debtors.**                        :
                                        :
-------------------------------------------------------------x

**CERTIFICATION OF MARITA S. ERBECK**
**IN SUPPORT OF THE GUC TRUST OBJECTION**

MARITA S. ERBECK, of full age, under penalty of perjury, hereby certifies and states as

follows:

1.      I am an attorney at law of the State of New York, and I am a partner with the law

firm of Drinker, Biddle & Reath LLP, attorneys for the Wilmington Trust Company, as trustee for

and administrator of the Motors Liquidation Company GUC Trust.  I make this Certification in

support of the *Objection of Wilmington Trust Company, As GUC Trust Administrator, to American*

*Axle & Manufacturing, Inc.'s Motion to Include the Tonawanda Forge Site in the RACER Trust*

*or, in the Alternative, for Authority to File a Late Claim Against the Debtors to Participate in Distributions from the GUC Trust* (the "<u>Objection</u>").

2.        Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Asset Purchase Agreement by and between American Axle & Manufacturing, Inc. and General Motors Corporation, dated February, 18, 1994 (the "<u>Asset Purchase Agreement</u>") as it was filed by General Motors LLC in *General Motors LLC v. Lewis Bros., LLC et al.*, Case No. 1:10-cv-00725-WMS-LGF (W.D.N.Y. September 2, 2010) and as it appears on the public docket in that case.  I note that the Asset Purchase Agreement was redacted in connection with its filing in 2011, and not in connection with the Objection; the document attached as Exhibit A is exactly as it appears on the public docket in the *Lewis Bros.* litigation.  The Asset Purchase Agreement is also accessible on PACER as Exhibit 2 of the *Affirmation of R. Hugh Stephens in Support of a Motion for a Preliminary Injunction and the Appointment of a Receiver* [ECF No. 18-1] filed in the *Lewis Bros.* litigation on March 14, 2011.

I certify, under penalty of perjury, under the laws of the United States of America, that the foregoing statements are true and correct.


                                                                    <u>/s/ Marita S. Erbeck</u>
                                                                    Marita S. Erbeck

Dated:          February 22, 2019
                    New York, New York

# EXHIBIT A

Case 1:10-cv-00725-WMS-LGF   Document 18-1   Filed 03/14/11   Page 4 of 70

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

AMERICAN AXLE & MANUFACTURING, INC.

AND

GENERAL MOTORS CORPORATION

February 18, 1994

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is dated as of February 18, 1994, by and between AMERICAN AXLE & MANUFACTURING, INC., a Delaware corporation ("AAM"), and GENERAL MOTORS CORPORATION, a Delaware corporation ("GM").

The purpose of this Agreement is to set forth the terms and conditions applicable to the sale to AAM of the Assets of the Final Drive and Forge Business Unit heretofore conducted by GM through its Saginaw Division and the establishment by AAM and GM of a Strategic Partnership for the production of products formerly manufactured by the Final Drive and Forge Business Unit.

Now, Therefore, in consideration of that purpose and for good and valuable consideration had and received and the mutual covenants and agreements hereinafter set forth, AAM and GM agree as follows:

Definitions

The following terms, as used herein, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections to which they pertain):

"AAM" means American Axle & Manufacturing, Inc., a Delaware corporation.

"Affiliate" means a company, partnership or other entity in which a Party owns, directly or indirectly, more than fifty (50) percent of the outstanding capital stock or other equity interests.

"Agreement" means this Agreement including its Exhibits which are incorporated by reference herein.

"Ancillary Agreements" means, collectively, the Ancillary Agreements described in Section 8.1.4.

"Assets" see Section 1.1.

"Assumed Obligations" see Section 3.1.

"Authorized Signatory" means a person with the legal authority to act for, and whose signature shall be binding upon, a Party.

"Book Value" means the record amount of the Assets as shown on GM's books with inventories valued at the lower of actual cost (including actual burden rates) or market on a

first-in, first-out basis and otherwise determined in accordance with generally accepted accounting principles. Certain finished goods inventory will be valued at the selling price.

"Business" means the operations of the Final Drive and Forge Business Unit conducted heretofore and through the Closing by GM from manufacturing facilities located in Detroit, Michigan and Hamtramck, Michigan; Three Rivers, Michigan; Buffalo, New York; and Tonawanda, New York; and the leased office facility located in Saginaw, Michigan.

"Class A Preferred Stock" means AAM's Class A Variable Rate Non-Voting Convertible Preferred Stock, which shall have the terms set forth in AAM's Amended and Restated Certificate of Incorporation attached hereto as Exhibit 8.2.5.

"Class B Preferred Stock" means AAM's Class B 8% Non-Voting Preferred Stock, which shall have the terms set forth in AAM's Amended and Restated Certificate of Incorporation attached hereto as Exhibit 8.2.5.

"Closing" see Section 9.1.

"Contract" see Section 4.1.12.

"EDS" means Electronic Data Systems Corporation, a GM Affiliate.

"Employee Benefit Plan" means any Employee Pension Benefit Plan, Employee Welfare Benefit Plan or any other material vacation, severance, bonus or other benefit plan or program, whether or not subject to ERISA.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

"Environmental Laws" see Section 6.17.A.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Closing Date Statement" see Section 2.1.1.

"Excess Inventory" means Inventory (excluding Non-Productive Inventory) of which the on-hand quantity exceeds Requirements.

"Excluded Assets" see Section 1.2.

"Final Closing Date Statement" see Section 2.1.1.

"GM" means General Motors Corporation, a Delaware corporation, including its unincorporated division known as the Saginaw Division.

"GMCL" means General Motors of Canada Limited.

"GMCL Facility" means GMCL's facility in St. Catharine's, Ontario, Canada.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended.

"IAM" means the International Association of Machinists.

"including" means including without limitation unless otherwise specifically indicated.

"Inventory" see Section 1.1.2.D.

"knowledge" or "best knowledge" as it relates to the knowledge of GM or any of the Affiliates of GM means the knowledge of the Saginaw Finance Director, the Final Drive and Forge Business Unit Director, and the plant managers at each facility of the Business, after all reasonable inquiry with appropriate personnel of GM with respect to the subject matter involved.

"Non-Productive Inventory" means (i) Inventory of materials consumed in the manufacturing process but not incorporated into the finished products, and (ii) replacement parts used to service machines, both of which are recorded on the balance sheet of GM as an asset.

"Obsolete Inventory" means inventory for which no Requirements exist.

"Party" or "Parties" means AAM or GM or both.

"Permitted Encumbrances" see Section 4.1.4.C.

"Preferred Stock" means, collectively, the Class A Preferred Stock and the Class B Preferred Stock.

"Purchase Price" see Section 2.1.

"Real Property" see Section 1.1.1.

"Requirements" means the quantity of Inventory, excluding Non-Productive Inventory, necessary to meet all GM's requirements, including the GM parts and service organization, over the 6 months following the date of the Closing.

"Saginaw Sublease" see Section 8.1.9.

"Strategic Partnership" has the meaning set forth in the letter attached hereto as Exhibit 1.1; provided, however, that such term does not mean and shall not be deemed to imply that any partnership (as such term is understood under applicable partnership law) exists between GM or any of its Affiliates and AAM with respect to the imposition of liability to third parties including, with respect to tax matters; and neither AAM nor GM or any its Affiliates shall have the authority to legally bind or create any obligation on behalf of the other.

"Taxes" means any federal, state, local or foreign tax or assessment (including any interest or penalties).

"Tax Return" means any return, declaration, report, claim for refund or information return or statement, or any other similar filings, related to Taxes, including any schedule or attachment thereto.

"Technical Documentation" see Section 1.1.3.C.

"Transfer Documents" see Section 8.1.3.

"UAW" means the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America.

## I. CONVEYANCE OF THE ASSETS

1.1.   Assets. Upon the terms and subject to the conditions of this Agreement, at Closing GM shall sell, transfer, assign, convey and deliver to AAM, and AAM shall purchase, accept and acquire from GM, all of GM's right, title and interest in and to all of the assets, properties and rights (contractual or otherwise), exclusively used in or relating to the Business of every kind, nature and description, real, personal and mixed, tangible and intangible, known or unknown, wherever located (collectively, the "Assets"), except for the Excluded Assets described in Section 1.2, including the following:

1.1.1. Real Property. Fee simple title to all real property owned by GM and utilized in the Business, consisting of all interests of GM in the real property described or shown on Exhibit 1.1.1 attached hereto and made a part hereof, or, in the case of the Tonawanda, New York facility, the real property to be transferred to AAM as set forth in Exhibit 7.4, together with all appurtenan

rights, buildings, fixtures and improvements situated thereon, thereunder or therein (collectively the "Real Property"). Specifically, the Real Property shall include (i) good, valid and marketable indefeasible fee simple absolute title to each of the Detroit and Three Rivers, Michigan, and Buffalo, New York, properties described or shown on Exhibit 1.1.1., as well as the Tonawanda, New York property, as described on Exhibit 7.4., in each case free and clear of all mortgages, pledges, liens, security interests, encumbrances and restrictions of any nature other than Permitted Encumbrances (as defined in Section 4.1.4.), and (ii) all of GM's right, title, estate and interests in and to the real property leases listed in Exhibit 1.1.2.C. A current land survey showing improvements and easements on the owned Real Property will be provided prior to date of the Closing as more fully set forth in Section 7.3.A. The parties acknowledge that due to lack of timely availability of definitive surveys for each property, the descriptions and drawings constituting Exhibit 1.1.1 may be imprecise. Accordingly, the parties agree that prior to Closing, with each party acting reasonably and in good faith, definitive legal descriptions for each property shall be prepared in the case of the Tonawanda property and finalized as to the Detroit, Three Rivers and Buffalo properties based on the final accepted surveys described in Section 7.3. The parties further agree that the Assets shall include a subleasehold estate in favor of AAM for up to three full floors of the so-called Towers Building in Saginaw, Michigan presently prime leased by GM from an independent third party prime landlord. An acceptable Saginaw Sublease shall be finalized as a condition to Closing as set forth in Section 8.1.9.

1.1.2. Personal Property.

A.    All machinery and equipment, including material handling equipment, business machines, furniture, fixtures, tooling, testing equipment, in-factory vehicles, trucks, expense materials, model shop equipment, in-process containers, laboratory test equipment and fixtures (including those located at the Trilon test facility in Saginaw, Michigan), supplies, stores, hardware, office equipment, and other tangible personal property (including replacement, spare and maintenance parts designed for use with the Assets of the Business) owned by GM at the date of the Closing, and used exclusively in the current manufacture of products at or for the Business or

otherwise used exclusively in the Business, whether located on or near the Real Property or at the place of business of a vendor, including those items listed in Exhibit 1.1.2.A.

B.    All records located at the Real Property or related exclusively to the Business as of the Closing, but excluding any records which are subject to any privilege of the nature described on Exhibit 1.1.2.B. which would be lost if such records were transferred to AAM, a list of which will be delivered to AAM prior to Closing and excluding all GM internal environmental audit reports other than those referred to in Article VI hereof, all environmental bulletins prepared by GM and provided to the Business prior to the Closing, EMIS software and documents and Purdue University course materials.

C.    Subject to Article III, all claims and rights under contracts, agreements, contract rights, real and personal property leases, license agreements, franchise rights and agreements, policies, purchase and sales orders, quotations and executory commitments, instruments, guaranties, indemnifications, arrangements, and understandings of GM or any of its Affiliates (except EDS), whether oral or written, to which GM or any of its Affiliates (except EDS) is a party and relating exclusively to the Business, including the Contracts listed on Exhibit 1.1.2.C., but excluding the contracts listed on Exhibit 3.1.

D.    All inventory, including raw materials, component parts, work-in-process, Non-Productive Inventory and finished products owned by GM as of the date of Closing relating exclusively to the Business and whether or not reflected as assets on the books of the Business, wherever such inventories may be located, other than Excess Inventory and Obsolete Inventory (collectively "Inventory").

1.1.3. Patents and Technical Information.

A.    The patents listed in Exhibit 1.1.3, subject, however, to the reservation to GM or any of its Affiliates of a non-exclusive, non-transferable, royalty-free and irrevocable license for all purposes other than to make, have made, use or sell items which GM is obligated to pur-chase exclusively from AAM pursuant to the Component Supply Agreement, substantially the form of which is attached hereto as Exhibit 8.1.4.D. (the "Component Supply Agreement"), and for all purposes without limitation whatsoever upon expiration of the term or termination of the

Component Supply Agreement relative to any Family or Families (as defined in the Component Supply Agreement) of products.

B.    A non-exclusive, royalty-free and irrevocable license under all patents owned by GM and its Affiliates (other than EDS) which pertain, but not primarily, to the design or manufacture of the products of the Business (including components, parts and accessories designed or manufactured by Affiliates, subsidiaries, divisions or units of GM other than the Business heretofore conducted by GM through its Saginaw Division) to make, have made, use and sell the products of the Business and any other products developed or otherwise acquired by AAM. Unless otherwise agreed to by GM in writing, the license granted by this clause shall be sublicensable to third parties only to make, have made, use, and/or sell to or on behalf of AAM.

C.    All documented technical information ("Technical Documentation") currently in the files of the Business and owned by GM and its Affiliates (other than EDS) which pertains to the design or manufacture of the products of the Business (exclusive of components, parts and accessories designed or manufactured by Affiliates, subsidiaries, divisions or units of GM other than the Business as heretofore conducted by GM through its Saginaw Division); provided, however, that GM and its Affiliates may retain copies of such Technical Documentation and a non-exclusive, non-transferable, royalty-free and irrevocable license for all purposes other than to make, have made, use and sell items which GM is obligated to purchase exclusively from AAM pursuant to the Component Supply Agreement and for all purposes without limitation whatsoever upon expiration of the term or termination of the Component Supply Agreement relative to any Family or Families (as defined in the Component Supply Agreement) of products.

D.    A non-exclusive, royalty-free and irrevocable license under all Technical Documentation currently in the files of or available to the Business and owned by GM and its Affiliates (other than EDS) which relates, but not primarily, to the design or manufacture of the products of the Business (including components, parts and accessories designed or manufactured by Affiliates, subsidiaries, divisions or units of GM other than the Business heretofore conducted by GM through its Saginaw Division) to use such Technical Documentation to make, have made, use and sell the products of the Business and any other products developed or otherwise acquired by

AAM. Unless otherwise agreed to by GM in writing, the license granted by this clause shall be sublicensable to third parties only to make, have made, use, and/or sell to or on behalf of AAM.

1.1.4. <u>Government Licenses, Permits and Approvals</u>. All franchises, licenses, permits, consents, authorizations, approvals and certificates of any regulatory, administrative or other government agency or body issued to GM and that are currently used or will be used at the time of the Closing for the purpose of carrying on the Business or that relate to the Assets, including those listed in Exhibit 1.1.4 (the "Permits"), to the extent that GM or any of its Affiliates has the power, authority or right to transfer or assign such licenses, permits or approvals.

1.1.5. <u>Administrative Assets</u>. All of the books and records of GM relating exclusively to the Business or the Assets (exclusive of any such item subject to a privilege, the nature of which is identified on Exhibit 1.1.2.B. and a list of which will be delivered to AAM prior to the date of Closing), including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records (regardless of the media on which they are stored), purchasing materials and records, personnel records of employees (subject to Section 1.2.1), labor relations records, manufacturing and quality control records and procedures, research and development files extant at the Real Property or located outside the Real Property if such files relate exclusively to the patents listed in Exhibit 1.1.3 or products manufactured by the Business, records, data and laboratory books, billing records, accounting records, sale order files, tool routings, labor routings, inspection processes and equipment lists, picture process sheets, process procedures, equipment prints and specifications, facility blueprints, service blueprints and plant layouts and environmental records and reports (excluding all GM internal environmental audit reports other than those referred to in Article VI hereof, all environmental bulletins prepared by GM and provided to the Business prior to the Closing, EMIS software and documents and Purdue University course materials). GM shall make such information available to AAM in machine readable form to the extent it is in GM's files in such form.

1.1.6. <u>Legal Claims</u>. All actions, causes of action, judgments and claims or demands exclusively in favor of the Business of whatever kind or description, but excluding any such

actions, causes of action, judgments, claims or demands which are the subject of litigation commenced by or against GM or a GM Affiliate prior to the date of Closing.

    1.1.7.  <u>Emission Credits</u>.  All emission offsets and emission reduction credits which have accrued as a result of changes in operations or the shutdown of equipment or processes of the Business, to the extent such credits can be transferred by GM.

    1.2.  <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in Section 1.1 of this Agreement, the following rights, properties and assets ("Excluded Assets") shall not be included in the sale of Assets:

    1.2.1.  <u>Personnel and Medical Records</u>.  All personnel and medical records of employees and retired former employees of GM who worked at any time for any reason at the Business for whom a record exists on the date of the Closing; provided, however, AAM will be provided the originals of all personnel and medical records of former GM employees who have accepted employment with AAM.  Upon written request of GM, AAM shall promptly provide copies of any and all of these records to GM, at GM's sole expense.  AAM hereby agrees to provide all GM employees who have accepted employment with AAM with written notice that AAM has requested GM to deliver such employees' personnel and medical records to AAM.  If, within fourteen (14) days after receiving such notice, an employee notifies GM of his objection to having his medical records delivered to AAM, such employee's medical records may be retained by GM.

    1.2.2.  <u>Dispositions</u>.  All of the inventories, products, rights, properties and assets of the Business which shall have been transferred or disposed of by GM prior to Closing in the ordinary course of business; provided that (i) none of the Real Property shall be transferred or encumbered without the prior written consent of AAM, and (ii) the Saginaw Prime Lease shall not be terminated or extended or amended in a manner which adversely affects the Saginaw Sublease without the prior written consent of AAM.

    1.2.3.  <u>Trademarks</u>.  All GM trademarks, trade names and service marks, provided, however, AAM may sell or dispose of any existing Inventory of products bearing any GM trademark or related corporate name or trade name.

1.2.4. Third Party and GM Assets. All assets located at the Real Property owned by third parties, including EDS, listed in Exhibit 1.2.4, and that property of GM located at the Real Property and listed on Exhibit 1.2.4. Data processing hardware, software and know-how owned by EDS will be transferred, or the use thereof licensed, to AAM under the Agreement for Information Technology, attached hereto as Exhibit 8.1.4.i. Any property of GM listed on Exhibit 1.2.4. shall be provided by GM to AAM at no charge and GM agrees to keep such property in good working condition and to maintain such property at such levels as are reasonably necessary for AAM to provide to GM the services contemplated by the Component Supply Agreement.

1.2.5. Cash, Cash Equivalents and Accounts Receivable. All cash, bank accounts, cash equivalents and accounts receivable of the Business as of Closing.

1.2.6. Vehicles. All GM company vehicles, other than those listed on Exhibit 1.1.2.A.

1.2.7. Tax Refunds. Any refund of Taxes, or claim for refund of Taxes, of any kind relating to any period on or prior to the date of the Closing, and any deferred Tax assets of GM.

1.2.8. Litigation Matters. All actions, causes of action, judgments, claims or demands which are the subject of litigation commenced by or against GM or a GM Affiliate on or prior to the date of Closing.

1.2.9. EMIS. GM's environmental management information systems, computer software and related documentation.

1.2.10. Excluded Contracts. The contracts listed on Exhibit 3.1.

1.3. Exhibits. While the various Exhibits to this Agreement are intended to be complete, to the extent that any Assets are intended to be transferred to AAM pursuant to Section 1.1., or not retained by GM pursuant to Section 1.2., but do not appear on the applicable Exhibits, such Assets shall be the property of AAM. On and after the Closing, GM shall prepare, execute and deliver, at GM's expense, such further instruments of conveyance, sale, assignment or transfer, and shall take or cause to be taken such other or further action, as AAM shall reasonably request at any time or from time to time in order to perfect, confirm or evidence in AAM title to all or any part of the Assets or to consummate, in any other manner, the terms and conditions of this Agreement. Should it be determined after the date of the Closing that property, books, records or

other materials that were not intended to be transferred to AAM were transferred, AAM shall promptly return them at no cost to GM.

    1.4.   <u>Nonassignable Permits, Licenses, Leases and Contracts</u>.

    1.4.1.  <u>Nonassignability</u>. Except as otherwise provided in Section 1.4.3., to the extent that any contract or other agreement listed on Exhibit 1.1.2.C. or any license, permit or approval or any other contract, agreement or commitment included in the Assets is not capable of being assigned, transferred or subleased by the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a governmental entity), or if such assignment, transfer or sublease or attempted assignment, transfer or sublease would constitute a breach thereof, or a violation of any law, decree, order, regulation or other governmental edict, this Agreement shall not constitute an assignment, transfer or sublease thereof, or an attempted assignment, transfer or sublease thereof, unless any such consent or waiver is obtained.

    1.4.2.  <u>GM to Use All Reasonable Efforts</u>. GM shall, at its sole expense, use all reasonable efforts, and AAM shall cooperate with GM, to obtain the consents and waivers and to resolve the impediments to assignment referred to in Section 1.4.1, and to obtain any other consents and waivers necessary to convey to AAM any other of the Assets; provided, however, that neither GM nor AAM shall be obligated to pay any consideration therefor to the party from whom the consent or waiver is requested.

    1.4.3.  <u>Consents Required of GM or Its Affiliates</u>. Without limiting the generality of Section 1.4.2, GM shall, at its sole expense, obtain the consents and waivers and resolve the impediments to any assignment referred to in Section 1.4.1 with respect to which GM or any Affiliate (other than EDS) of GM is the party from whom consent is required.

    1.4.4.  <u>If Waivers or Consents Cannot be Obtained</u>. To the extent that the consents and waivers referred to in Section 1.4.1 are not obtained by GM, or until the impediments to transfer referred to therein are resolved, GM shall, during the two (2) year period commencing with the Closing, use all reasonable efforts, at its expense, to (i) provide to AAM the benefits of any permit or approval and of any contract, license or other agreement, all as referred to in Section 1.4.1, to the extent involving the Business, (ii) cooperate in any reasonable and lawful arrangement designed

to provide such benefits to AAM, without incurring any financial obligation to AAM other than to provide such benefits, and (iii) enforce for the account of AAM any rights of GM arising from the licenses, permits and approvals and the contracts or other agreements referred to in Section 1.4.1 against such issuer thereof or other party or parties thereto (including the right to elect to terminate in accordance with the terms thereof on the advice of AAM). At the end of such two (2) year period, GM shall have no further obligations hereunder with respect to such licenses, permits and approvals and such contracts and other agreements and the failure to obtain any necessary consent or waiver with respect thereto shall not be a breach of this Agreement.

1.4.5.  Obligation of AAM to Perform.  To the extent that AAM is provided the benefits pursuant to Section 1.4.3 of any license, permit or approval or any contract or other agreement, AAM shall perform, on behalf of GM, for the benefit of the issuer thereof or the other party or parties thereto the obligations of GM thereunder or in connection therewith, but only to the extent that (i) such action by AAM would not result in any material default thereunder or in connection therewith, and (ii) such obligation would have been an obligation assumed by AAM pursuant to Article III but for the nonassignability or nontransferability thereof, and if AAM shall fail to perform to the extent required herein, GM, without waiving any rights or remedies that it may have under this Agreement, may suspend its performance under Section 1.4.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied.

1.5.  St. Catharine's Equipment.  Title to and delivery of the St. Catharine's equipment shall occur on the date and in the manner set forth in the Option to Purchase Equipment Agreement to be executed by GM, the form of which is attached hereto as Exhibit 8.1.4.E. (the "St. Catharine's Option Agreement").

## II. PURCHASE PRICE.

2.1.  Purchase Price.  The purchase price (the "Purchase Price") for the Assets shall be equal to the sum of:

(i)  one hundred percent (100%) of the Book Value of the Inventory, (excluding Excess Inventory and Obsolete Inventory) less Seven Million Dollars ($7,000,000) (the "Inventory Purchase Price"), plus

designed to circumvent their intended responsibilities for the Transitioned Employees as set forth in Article V.

5.16  Miscellaneous.

5.16.1. Training.

A.    AAM will continue to participate in joint activities through the UAAW-GM Human Resource Center in the same manner as provided prior to the date of the Closing through September 14, 1996. This includes funding levels, the funding approval process, and full participation in jointly developed and negotiated programs. Upon the expiration of the 1993 GM-UAW Agreement, AAM's funding obligations will be met by a payment to the UAW-GM Human Resource Center in an amount equal to the accumulated funding obligation incurred by AAM during the life of the 1993 GM-UAW Agreement. AAM's funding rate for overtime hours will be based on the applicable GM corporate average overtime rate for U.S. markets. In the event and to the extent that AAM is required to pay any amounts determined by a rate in excess of GM's corporate average overtime rate for U.S. markets for such overtime hours, GM will promptly reimburse AAM for all such excess payments.

B.    AAM's Joint Program Representatives will be appointed by the Director of the UAW-General Motors Department for the duration of the 1993 GM-UAW Agreement.

C.    Individuals who are performing activities for the UAW-GM HRC will continue to do so for the duration of the 1993 GM-UAW Agreement unless notified to the contrary by the Director of the UAW-GM Department.


VI. ENVIRONMENTAL MATTERS

6.1.   GM's Environmental Reports/Post-Closing Matters.

6.1.1. Environmental Confidentiality Agreement. GM and AAM have entered into an Environmental Confidentiality Agreement regarding environmental matters which is dated September 15, 1993, and is attached hereto as Exhibit 6.1.1. (the "ECA"). GM and AAAM agree that the terms and conditions of the ECA are hereby amended so as to apply through the longest

indemnity period set forth in this Article VI. and shall take precedence over any provisions of this Article VI. inconsistent with the ECA.

6.1.2. Environmental Reports and Implementation of Remedial Plans.

A.    Environmental Reports. Before or after the date of Closing, GM will cause Haley & Aldrich or another independent environmental consultant selected by GM to conduct an environmental assessment, which may be performed in phases both prior to and after the date of Closing, to determine the Pre-Closing Environmental Condition of the Real Property, the nature and scope of which assessment will be determined by GM in its sole discretion. GM will provide copies of the final reports of such assessment or phases thereof (the "Environmental Reports"), as they become available, to AAM under the terms of the ECA. The following Environmental Reports have been delivered to AAM by GM prior to the date of Closing:

## PHASE I ENVIRONMENTAL SITE ASSESSMENTS

| | | | |
|---|---|---|---|
| 1. | Phase I Environmental Site Assessment<br>Saginaw Division - Buffalo Plant ("Buffalo Plant")<br>Buffalo, New York | by: | Haley & Aldrich, Inc.<br>Rochesteer, New York<br>File No. 70451-40<br>Decembeer 14, 1993 |
| 2. | Phase I Environmental Site Assessment<br>Saginaw Division - Tonawanda Forge Plant<br>Tonawanda, New York ("Tonawanda Plant") | by: | Haley & Aldrich, Inc.<br>Rochesteer, New York<br>File No. 70452-40<br>Decembeer 10, 1993 |
| 3. | Phase I Environmental Site Assessment<br>Saginaw Prop Shaft Facility<br>Three Rivers, Michigan | by: | Haley & Aldrich, Inc.<br>Clevelanad, Ohio<br>File No. 79010-40<br>Decembeer 10, 1993 |
| 4. | Phase I Environmental Site Assessment<br>Saginaw Division - General Motors Corporation<br>Detroit Gear & Axle Plant<br>Hamtramck/Detroit, Michigan | by: | Haley & Aldrich, Inc.<br>Clevelanad, Ohio<br>File No. 79012-40<br>Decembeer 15, 1993 |
| 5. | Phase I Environmental Site Assessment<br>Saginaw Division - Detroit Forge Facility<br>Detroit, Michigan | by: | Haley & Aldrich, Inc.<br>Clevelanad, Ohio<br>File No. 79013-40<br>Decembeer 10, 1993 |

The Environmental Reports will include action plans for any subsequent investigation, cleanup, remediation, and/or other actions which GM determines, in accordance with Section 6.1.2.B., should be or must be conducted under specifically applicable Environmental Laws, as existing and

in effect as of the date of Closing, to address Pre-Closing Environmental Conditions (the "Remedial Plan(s)"); provided, however, that the Remedial Plan(s) will provide for an action plan relating to the area at the Buffalo Plant described in the Phase I Environmental Site Assessment for the Buffalo Plant as the "Inactive Hazardous Waste Site" (also referred to as "Parking Lot #4") taking into consideration the factors set forth in Section 6.1.2.B(ii) or, if GM enters into a consent order with the State of New York to address such area, as required under such order. Such actions may include reporting/discussing environmental issues related to the Real Property with appropriate governmental agencies. GM will, in its sole discretion, determine whether such reports/discussions should or must be initiated with such governmental agencies. Subject to Section 6.12.5, AAM retains the right to make reports to governmental agencies if and to the extent required by Environmental Laws.

        B.    <u>Implementation of Remedial Plans</u>. AAM acknowledges and agrees that in determining whether an action should be conducted or is required to be conducted under any specifically applicable Environmental Laws, as existing and in effect as of the date of Closing, under Section 6.1.2.A. or 6.1.3. to address Pre-Closing Environmental Conditions: (i) the decision as to whether any Pre-Closing Environmental Condition should be addressed or is required to be addressed under any specifically applicable Environmental Law will be in GM's sole discretion; and (ii) GM will, to the extent not prohibited by law, utilize the following factors in developing the particular action to be undertaken or in determining that no action will be undertaken: (a) specific requirements, if any, under applicable Environmental Laws, as existing and in effect as of the date of Closing; (b) technical feasibility of the action(s); (c) economic reasonableness of the action(s); (d) continued industrial use of the Real Property, as defined in Section 1.1.1, substantially similar to its use by GM before the date of Closing; and (e) human health and environmental risk-based factors, including, but not limited to: (1) likely exposure pathways consistent with continued industrial use of the Real Property, as defined in Section 1.1.1, substantially similar to its use by GM before the date of Closing; (2) typical simulated exposure distributions consistent with such exposures; (3) fate and transport characteristics; (4) local geology and hydrogeology; and (5) toxicity of the material(s) in question. Unless or to the extent required by law or agency directive,

GM will not propose any action which would significantly and materially impair the ability of AAM

to produce products in the ordinary course of business as conducted by GM before the : date of

Closing without the prior consent of AAM, which consent will not be unreasonably withheld.

Subject to events of Force Majeure, GM will use reasonable efforts to commence implementation of

the Remedial Plans as expeditiously as practicable.  AAM agrees that GM will have access to the

Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1, after the date

of Closing consistent with Section 6.3 to undertake any activities under the Remedial Plans.

      C.     Agency Contact.  Unless specifically requested by GM or, subject to

Section 6.12.5, required by Environmental Laws, AAM acknowledges and agrees that AAM will

have no right to participate in any of GM's discussions/negotiations with any governmental

agencies and will not independently engage in any discussions/negotiations with any governmental

agencies regarding GM's activities hereunder, including, but not limited to, activities under any

Remedial Plan or Compliance Plan, as  hereafter defined, or any other issues related to the

environmental condition of the Real Property, including, but not limited to, any Pre-Closing

Environmental Conditions or Non-Compliance Matters, without the prior written consent of GM.

      D.     Notification of GM.  AAM agrees that it will, as soon as practical, notify GM

of any contact, whether written, verbal, or in person, by or with any governmental agency, agency

representative, or any other party regarding GM's activities at or any other issues related to the

environmental condition or compliance status of the Real Property, as defined in Section 1.1.1, the

Assets or the Business including, but not limited to, Pre-Closing Environmental Conditions, Non-

Compliance Matters or activities under a Remedial Plan or as defined hereafter, a Compliance Plan.

This provision will be effective through the end of the tenth year after the date of Closing, except

that it will remain in effect thereafter as to any Remedial Plan or Compliance Plan which is still

being implemented by GM at the end of such tenth year until the implementation of such plan has

been completed.

      E.     Scope of GM's Obligations.  Notwithstanding the foregoing, AAM

acknowledges and agrees that, except as specifically provided in Sections 6.1.2., 6.1.3., 6.2.1.,

6.8., 6.9., 6.12.2. or 6.12.4., GM will have no obligation to undertake or conduct any  cleanup,

-56-

remediation, and/or other actions with respect to any environmental conditions(s) or a non-compliance matter at the Real Property, as defined in Section 1.1.1, or concerning the Assets or Business, including, but not limited to, Pre-Closing Environmental Conditions or Non-Compliance Matters, or be liable to AAM or any third party for any such matters, and AAM will indemnify and defend GM therefrom in accordance with the provisions of Section 6.12.3.

F.    AAM's Review of Remedial Plans.  GM will provide AAM with a copy of the proposed Remedial Plan(s), as may be amended from time to time, subject to the terms of the ECA for undertaking and completing investigation, cleanup, remediation, and/or other actions to address Pre-Closing Environmental Conditions under Section 6.1.2.A. or 6.1.3.  AAM will have the right to review and comment on such Remedial Plan(s) prior to implementation by GM.  GM will cooperate reasonably with AAM in facilitating AAM's review of the Remedial Plan(s).  GM will consider AAM's comments on the Remedial Plans and, if requested by AAM, discuss AAM's comments on the Remedial Plans with AAM.  AAM will complete its review promptly, but in no event will AAM's review period exceed thirty (30) calendar days after AAM's receipt of any Remedial Plan unless additional time is reasonably required.  Any requests for additional time must be made in writing within the review period; provided, however, that in the event that a shorter time for review is made necessary as a result of the need to obtain the approval of a governmental agency or as a result of a requirement of a governmental agency, then AAM's review time will be shortened to a period which is reasonable under the circumstances as specified by GM.  If AAM does not object to the Remedial Plan(s) within the review period, GM will implement the Remedial Plan(s) as proposed or modified to address comments or objections from AAM consistent with this Section 6.1.2.F and as the Remedial Plan(s) may be amended from time to time.  Notwithstanding any comments by AAM on the Remedial Plan(s), any objection to the Remedial Plan(s) by AAM must be timely and must be based solely upon a showing by AAM that an action(s) set forth in the Remedial Plan(s) will significantly and materially impair the ability of AAM to produce products in the ordinary course of business as conducted by GM before the date of Closing.  If AAM makes such a showing, GM will modify its Remedial Plan(s) so as to not significantly and materially impair the ability of AAM to produce products in the ordinary course of business as conducted by GM before the date of

Closing. Notwithstanding and without limiting the foregoing, AAM may not object to any Remedial Plan: (i) because a different action(s) might take a shorter period of time, require less of a presence of GM or its representatives at the Real Property, as defined in Section 1.1.1., or be preferable to AAM; (ii) to require action(s) more stringent or materially different from that required under Environmental Laws, as existing and in effect as of the date of Closing; (iii) to require changes to an action(s) which was commenced or was substantially in place and/or negotiated prior to the date of Closing; or (iv) to require any modification or replacement of any personal property, building or fixture, or any process or material respecification where an alternative exists to address a Pre-Closing Environmental Condition. GM will have access to the Real Property, as defined in Section 1.1.1, after the date of Closing consistent with Section 6.3. to undertake any activities under the Remedial Plans. AAM will cooperate with GM in performing such post-closing activities.

G.    AAM's Environmental Reports.  AAM agrees to provide to GM, promptly upon request and during the longest indemnity period under this Article VI., copies of any environmental reports, data or assessments prepared or collected by or on behalf of AAM except those which are protected by the attorney-client privilege or the attorney-work product doctrine; provided , however, that no data relating to the quality, quantity or concentration of any emission, discharge or environmental medium or any constituent or contamination thereof at the Real Property, as defined in Section 1.1.1., or relating to the Assets will be subject to any such privilege or doctrine.

6.1.3. Post-Closing Matters.  If, during the first five (5) years after the date of Closing, AAM discovers a potential Pre-Closing Environmental Condition which was not a condition or matter identified, assessed or investigated in the Environmental Reports, GM will, with respect to such condition, take actions which GM determines should be conducted or must be conducted under specifically applicable Environmental Laws, as existing and in effect as of the date of Closing, so long as AAM establishes that such condition: (i) is significant and material; (ii) was in existence as of the date of Closing; and (iii) was not caused or significantly contributed to, significantly aggravated by, or significantly exacerbated by AAM. If AAM makes such a showing, such condition will be deemed a Pre-Closing Environmental Condition and GM will address such

condition under the provisions of Section 6.1.2. For purposes of Sections 6.1.3., 6.12.2. and 6.12.3, the condition will be deemed to be "significant and material" if the cost to remediate such condition, as reasonably determined or estimated using best engineering judgment, exceeds $45,000, exclusive of costs of investigation, evaluation, assessment, oversight, operation and maintenance, and any fines or penalties associated therewith. With respect to any significant and material Pre-Closing Environmental Condition subject to this Section 6.1.3. which becomes subject to a Remedial Plan under Section 6.1.2.B., GM will be responsible only for costs reasonably incurred by AAM with respect to investigation, evaluation and assessment with respect to such significant and material Pre-Closing Environmental Condition in excess of $50,000, and GM will reimburse AAM for any of its costs for investigation, evaluation and assessment in excess of $50,000; provided, however, that before AAM incurs costs in excess of $50,000 with respect to such investigation, evaluation and assessment, AAM will submit to GM for review and approval a work plan setting forth the nature of the investigative, evaluation and assessment work to be performed, an estimate using best engineering judgment of the cost thereof and the basis for undertaking such work. GM will expeditiously review and comment upon any such work plan and AAM will consider and, if reasonable, adopt GM's comments on the work plan. If, as modified, the work plan and the activities thereunder are reasonable in purpose, scope, cost, duration and extent, GM will not unreasonably withhold its approval of such work plan. With respect to GM's indemnification obligations under Section 6.12.2, GM will also be responsible only for costs with respect to each such significant and material Pre-Closing Environmental Condition in excess of $50,000 and AAM will be responsible for all such costs less than $50,000. The term "best engineering judgment" will mean the application of generally accepted engineering principles and cost estimation techniques to determine the cost of investigation, assessment, evaluation and performance of remediation of a Pre-Closing Environmental Condition based upon credible and verifiable facts, and confirmation and use of the factors set forth in Section 6.1.2.B.

    6.2.   GM's Environmental Compliance Audit(s); Environmental Permits.

    6.2.1.  Compliance Review.

A.    Compliance Plans and Implementation.  GM has retained Haley & Aldrich to conduct a review(s) of the compliance status of the operations of the Business with Environmental Laws, as existing and in effect as of the date of Closing.  GM has provided AAM with a copy of the final report(s) of this compliance review(s) subject to the terms of the ECA (the "Environmental Compliance Audits") as described below:

## ENVIRONMENTAL COMPLIANCE AUDITS

1.    Environmental Compliance Audit
Saginaw Buffalo Plant
**Buffalo, New York**

by:    Haley & Aldrich, Inc.
Cleveland, Ohio
File No. 70451-41
December 9, 1993

2.    Environmental Compliance Audit
**Saginaw Division - Tonawanda Forge Plant**
Tonawanda, New York

by:    Haley & Aldrich, Inc.
Cleveland, Ohio
File No. 70452-41
December 9, 1993

3.    Environmental Compliance Audit
Saginaw Division - Prop Shaft Facility,
**Three Rivers, Michigan**

by:    Haley & Aldrich, Inc.
Cleveland, Ohio
File No. 79010-41
December 10, 1993

4.    Environmental Compliance Audit
**Saginaw Division - Gear and Axle Facility**
Detroit, Michigan

by:    Haley & Aldrich, Inc.
Cleveland, Ohio
File No. 79012-41
December 8, 1993

5.    Environmental Compliance Audit
Saginaw Division - Detroit Forge Facility
**Detroit, Michigan**

by:    Haley & Aldrich, Inc.
Cleveland, Ohio
File No. 79013-41
December 10, 1993

GM will develop compliance plan(s) to address the matters to be set forth on Exhibit 6.2.1.A. before the date of Closing (which matters will be set forth based on the information contained in the * Environmental Compliance Audits) or which may be added after the date of the Closing as set forth below under Environmental Laws, as existing and in effect as of the date of Closing (the "Compliance Plans") to the extent such matters constitute Non-Compliance Matters or will address one or more of such Non-Compliance Matters in the manner set forth on Exhibit 6.2.1.A.  AAM and GM agree that the matters to be set forth on Exhibit 6.2.1.A. based on the Environmental Compliance Audits will be determined prior to the date of the Closing, and they each agree that it will be a condition precedent to each of their respective obligations to consummate the

transactions set forth in this Agreement that such determinations are mutually satisfactory to AAM and GM.  As soon as practicable, but in no event later than ninety (90) calendar days after the date of Closing, AAM may propose that additional  matters be added to Exhibit 6.2.1.A.  If GM reasonably determines that such matters were in existence as of the date of Closing and constituted a Non-Compliance Matter, such matters will be added to Exhibit 6.2.1.A. and will be addressed by GM in the Compliance Plans or in the manner set forth on Exhibit 6.2.1.A.  GM will be responsible only for addressing the Non-Compliance Matters set forth in the Compliance Plans in the manner described in the Compliance Plans or in Exhibit 6.2.1.A.  No Non-Compliance Matter will constitute a Pre-Closing Environmental Condition for purposes of this Agreement or otherwise.

        B.     <u>AAM's Review of Compliance Plans</u>.  GM will provide AAM with a copy of the proposed Compliance Plan(s), as may be amended from time to time, subject to the terms of the ECA.  AAM will have the right to review and comment on such Compliance Plan(s) prior to implementation by GM.  GM will cooperate reasonably with AAM in facilitating AAM's review of the Compliance Plan(s).  GM will consider AAM's comments on the Compliance Plan(s) and, if requested by AAM, discuss AAM's comments on the Compliance Plan(s) with AAM.  AAM will complete its review promptly, but in no event will AAM's review period exceed thirty (30) calendar days after AAM's receipt of any Compliance Plan unless additional time is reasonably required. Any requests for additional time must be made in writing within the review period; provided, however, that in the event that a shorter time for review is made necessary as a result of the need to obtain the approval of a governmental agency or as a result of a requirement of a governmental agency, then AAM's review time will be shortened to a period which is reasonable under the circumstances as specified by GM. If AAM does not object to the Compliance Plan(s) within the review period, GM will implement the Compliance Plan(s) as proposed or modified to address comments or objections from AAM consistent with this Section 6.2.1.B. and as the Compliance Plan(s) may be amended from time to time.  Notwithstanding any comments by AAM on the Compliance Plan(s), any objection to the Compliance Plan(s) by AAM must be timely and must be based solely upon a showing by AAM that an action(s) set forth in the Compliance Plan(s) will significantly and materially impair the ability of AAM to produce products in the ordinary course of business as

conducted by GM before the date of Closing.  If AAM makes such a showing, GM will modify its

Compliance Plan(s) so as to not significantly and materially impair the ability of AAM to produce

products in the ordinary course of business as conducted by GM before the date of Closing.

Notwithstanding and without limiting the foregoing, AAM may not object to any Compliance Plan:

(i) because a different action might take a shorter period of time, require less of a presence of GM

or its representatives at the Real Property, as defined in Section 1.1.1., or be preferable to AAM;

(ii) to require action(s) more stringent or materially different from that required under Environmental

Laws, as existing and in effect as of the date of Closing; (iii) to require changes to an action(s)

which was commenced or was substantially in place and/or negotiated prior to the date of Closing;

or (iv) to require any modification or replacement of any personal property, building or fixture, or

any process or material respecification where an alternative exists to address a Non-Compliance

Matter.  GM will have access to the Real Property, as defined in Section 1.1.1., after the date of

Closing consistent with Section 6.3. to undertake any activities under the Compliance Plans.  AAM

will cooperate with GM in performing such post-closing activities.  Subject to events of Force

Majeure, GM will use reasonable efforts to commence implementation of the Compliance Plans as

expeditiously as practicable.

        C.     Except as set forth in Section 6.8. or 6.9., AAM will be solely responsible

and liable for correcting and/or resolving any Non-Compliance Matter not set forth on

Exhibit 6.2.1.A. and AAM will indemnify and defend GM in connection with any such matter in

accordance with Section 6.12.3.  GM will reasonably cooperate with AAM in AAM's efforts in

addressing such matters.

    6.2.2.  Environmental Permits; Transfer.  Set forth on Exhibit 6.2.2. are all of the

environmental permits, licenses and authorizations identified by GM and issued with respect to  the

operations at the Real Property, as defined in Section 1.1.1. ("Environmental Permits").  Prior to the

date of Closing, GM will take all actions reasonably required to effect the transfer to AAM of the

Environmental Permits which can be transferred solely by notification to the applicable permitting

authority.  GM will use its best efforts to transfer to AAM all other Environmental  Permits which

require consent, review, approval or additional actions other than mere notification, and which may

be lawfully transferred to AAM. AAM will be solely responsible for: (i) obtaining or effecting the transfer of all Environmental Permits which are not transferable prior to the date of Closing under the two preceding sentences; and (ii) all other permits, licenses, authorizations and approvals required with respect to the Assets, the Real Property, as defined in Section 1.1.1, and the Business under Environmental Laws, as existing and in effect as of the date of Closing and thereafter, which have not been issued as of the date of Closing. GM and AAM agree to reasonably cooperate with one another in obtaining any consents, reviews or approvals necessary to transfer or obtain the Environmental Permits and in identifying, applying for and obtaining any permits, licenses, authorizations or approvals referred to in the preceding clause (ii) under Environmental Laws as existing and in effect as of the date of Closing. Any Environmental Permit transferred under this Section 6.2.2. will be considered to be an Asset of the Business transferred to AAM under this Agreement.

     6.3.   <u>Post-Closing Access to Real Property; Documentation of Actions</u>.

        A.    AAM acknowledges and agrees that, at any time after the date of Closing and, except where emergency conditions require otherwise, upon reasonable prior notice, GM and its representatives may come upon the Real Property, as defined in Section 1.1.1., to: (i) undertake any actions with respect to any Remedial Plan under Section 6.1.2. or 6.1.3.; (ii) undertake any actions with respect to any Compliance Plan under Section 6.2.1.; or (iii) undertake any actions under Sections 6.8., 6.9., 6.12.2. or 6.12.4. GM will keep AAM apprised of scheduled activities at the Real Property. AAM agrees to: (i) cooperate with GM and its representatives in obtaining any requisite governmental approvals, consents, authorizations, waivers, or permits which may be required in connection with Remedial Plans or Compliance Plans, and which will be obtained at GM's sole expense, to conduct such activities; (ii) not interfere with any actions instituted by GM before the date of Closing or under this Agreement or any Remedial Plan or Compliance Plan; (iii) do all things reasonably necessary and appropriate to allow GM to implement actions under this Agreement or any Remedial Plan or Compliance Plan; and (iv) exercise due care so as not to adversely affect the installation, operation, integrity or maintenance of any action or remedy existing or taken at or about the Real Property, as defined in Section 1.1.1., before the date of

Closing or thereafter under this Agreement or any Remedial Plan or Compliance Plan. Regarding activities undertaken pursuant to Sections 6.1.2., 6.1.3., 6.2.1., 6.8., 6.9., 6.12.2. or 6.12.4.B. and C., GM agrees to provide AAM with documentation detailing the actions taken by GM. AAM will cooperate with GM in performing such post-closing activities. GM will indemnify, defend and hold AAM harmless from any personal injury or property damage to a third party (including any AAM employee) or to AAM's property which occurs solely and directly as a result of GM's access to the Real Property pursuant to this Section 6.3. and which is due solely to GM's negligent act or omission; provided, however, no action taken or condition created as a result of GM's implementation of a Remedial Plan or a Compliance Plan will be subject to the foregoing indemnification. GM's indemnification obligation under the preceding sentence will not include any liability for consequential damages, special damages or incidental damages such as, by way of example and not limitation, loss of profits, loss of business opportunity, or any attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligation, and the procedures specified in Section 6.12.2.A. through H. will apply to any such claim for indemnification.

      B.     In connection with GM's access to the Real Property, as defined in Section 1.1.1., for any purpose under this Article VI., both GM and AAM will exercise best efforts to avoid unreasonably interfering with the actions, business and operations of the other party on and associated with the Assets, the Real Property, as defined in Section 1.1.1., and the Business and the access of each party thereto. GM will abide by all applicable health and safety requirements of AAM while conducting actions on the Real Property, as defined in Section 1.1.1. GM or its agents may need access to services, including potable water, electric and telephone utilities, security and possibly wastewater treatment facilities, in connection with its activities on the Real Property, as defined in Section 1.1.1., subsequent to the date of Closing. AAM will provide GM or its agents with access to such utilities and facilities, on GM's reasonable request, for all purposes authorized or required under this Article VI. Such access will be utilized by GM or its agents in a reasonable manner which will minimize interference with AAM's operation of the Business. GM will reimburse AAM for GM's share of the reasonable cost of providing such services

upon receipt from AAM of reasonably satisfactory evidence of the cost for such services based on a proportional share mutually agreed to by the parties.

      C.    In the event that GM requires access to the Real Property, as defined in Section 1.1.1., relating to the Tonawanda Forge Plant to investigate any environmental condition or to undertake any remedial action with respect to or relating to the adjacent GM Powertrain Division Engine Plant, AAM will grant GM such access as is reasonably necessary and which is consistent with the access provided under Sections 6.3.A. and B.

    6.4.   <u>Generator-Only Status</u>.  AAM acknowledges, warrants and agrees that it will not treat, store, or dispose of any hazardous substances, hazardous wastes, or toxic substances as those terms are defined under Environmental Laws, as may be amended from time to time, on, at or below the Real Property, as defined in Section 1.1.1., and will maintain generator-only status; provided, however, that AAM may: (i) temporarily or for a limited time period accumulate such substances or wastes as allowed under Environmental Laws without the necessity of a license or permit therefor; and (ii) use for lawful purposes and in a safe and environmentally appropriate and lawful manner commercial products which may contain such substances so long as and to the extent that AAM does not adversely affect or impact any property or operation of GM which may occur in the vicinity of the Real Property.  AAM will use its best efforts to obtain new identification numbers which are required under Environmental Laws for hazardous waste management activities with respect to hazardous waste generated by the Business at the Real Property after the date of Closing.  GM represents and warrants that no permit has been issued prior to the date of Closing with respect to the Business for operation of a hazardous waste treatment, storage or disposal facility under RCRA or any state law equivalent.

    6.5.   <u>Restrictions on Use and Transfer</u>.

      A.    AAM acknowledges, warrants and agrees that any contract, deed, transfer document or other instrument for transfer of any interest in, possession of, or right to use the whole or any part of the Real Property, as defined in Section 1.1.1., through sale, lease, license, easement or otherwise, including, but not limited to, any contract, deed, transfer document or other instrument for transfer of any such interest by and between GM and AAM in connection with

or pursuant to this Agreement, will incorporate the obligations of AAM and any subsequent user, occupant or transferee of the Real Property, as defined in Section 1.1.1., set forth in Sections 6.3., 6.4. and 6.5.B., and will restrict use of the Real Property, as defined in Section 1.1.1., from and after the date of Closing and, except as provided in the succeeding sentence, in perpetuity thereafter to industrial use and without access by members of the general public.  Such restriction will allow for customary office and other uses ancillary to the principal use of the Real  Property for industrial use, will provide that the restriction may be eliminated as an encumbrance upon the Real Property, as defined in Section 1.1.1., only with the written consent of GM, and will provide that it is directly enforceable by GM against AAM and any subsequent user, occupant or transferee of the Real Property, as defined in Section 1.1.1.

> B.    In the event AAM wishes to transfer all or any part of or any interest in the Real Property, as defined in Section 1.1.1., to a third party, it will require as a condition of any such transfer that the transferee covenant not to sue and release GM from all liability for any environmental matter or condition involving the Real Property, as defined in Section 1.1.1., and be bound by the provisions of this Article VI., other than AAM's indemnification obligations under Section 6.12.3 and assume the obligations of AAM under this Article VI., other than AAM's indemnification obligations under 6.12.3.; provided, however, that no such assumption will relieve AAM of its obligations under this Agreement.  In the case of any transfer to an Affiliate, the Affiliate will be required as a condition thereof to be bound by all of the provisions of this Article VI. including AAM's indemnification obligations under this Article VI. and assume all of AAM's obligations under the Article VI. including AAM's indemnification obligations under this Article VI.; provided, however, that no transfer to an Affiliate will relieve AAM of its obligations under this Agreement.  AAM will indemnify and defend GM against any claims asserted by such transferee against GM which are contrary to the provisions of this Article VI.

> 6.6.    Maintenance of the Real Property.  Except as set forth in any Remedial Plan or Compliance Plan, AAM acknowledges, warrants and agrees that, after the date of Closing, AAM will be solely responsible for maintenance of the Real Property, as defined in Section 1.1.1., and the Assets, including, but not limited to, any and all current or future structures, facilities, parking

lots, and storage areas, under contracts (including this Agreement), Environmental Laws, other laws and the common law.

6.7.    Compliance With Environmental Laws.    AAM acknowledges, warrants and agrees that: (i) after the date of Closing, AAM and any of AAM's successors, tenants, agents, employees, or contractors will comply in all material respects with all Environmental Laws applicable to the use of, operations at or occupancy of the Assets (including, but not limited to, the Real Property, as defined in Section 1.1.1., and any facilities, structures, parking lots, and storage areas thereon; and (ii) except as specifically otherwise provided in this Article VI., sole legal and financial responsibility for compliance with all Environmental Laws including hazardous waste management requirements, applicable to the use of, operations at or occupancy of the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., will be that of AAM.

6.8.    Responsibility for Transformers and Capacitors.

A.    GM has informed AAM that the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., may include, among other things, transformers and capacitors that may contain mono or polychlorinated biphenyl ("PCBs") dielectric or other materials. Prior to the date of Closing, GM will, at its cost, inspect identified PCB-containing transformers and provide to AAM a copy of the results of its inspection. GM will investigate and, if necessary, remediate any containment structure associated with a PCB-containing transformer determined during the course of such inspection to be leaking. Such remediation will be consistent with the provisions of the PCB Spill Cleanup Policy set forth at 40 CFR Part 761, Subpart G (1992). Either before or after the date of Closing, as the circumstances may require, GM will take such actions as may be required under TSCA so that GM can lawfully transfer such transformers to AAM as of or after the date of Closing.

B.    After the date of Closing, and without limitation of the other obligations of AAM under this Agreement, AAM agrees to use, store, mark, handle, transport, distribute in commerce, and/or dispose of properly the PCB transformers and capacitors, including, but not limited to, the PCB materials contained therein, in compliance with Environmental Laws and other laws.

C.    Other than as provided in Sections 6.8.A. and 6.8.D., AAM agrees that GM will have no further obligation or liability with regard to such PCB and PCB containing equipment or material, including, but not limited to, transformers and capacitors, and the PCB materials contained therein or any release thereof, after the date of Closing, and that AAM will be and remain solely liable and responsible for the proper handling, marking, transportation, distribution in commerce, storage, use, maintenance, repair, or disposal of such transformers and capacitors, including the PCB fluids contained therein or any release thereof, under contract (including this Agreement), Environmental Laws, other laws, and the common law, and AAM will indemnify and defend GM therefrom in accordance with Section 6.12.3.

D.    AAM acknowledges that an exterior building siding or cladding material known as "Galbestos" may be in use at the Tonawanda Plant and that such use may not presently be subject to a use authorization under 40 CFR Part 761 (1992).    With respect to such material, GM agrees that, if at any time within the first five (5) years after the date of Closing it is expressly determined by a regulation or final order of a governmental agency with jurisdiction in the matter duly promulgated or issued under TSCA and taking effect within such time period that such material may not lawfully remain in use, then GM will reimburse AAM for its reasonable and actual costs and expenses incurred in the removal and disposal of such material in the manner then required by TSCA, and in accordance with the plan and cost estimate approved by GM, and AAM will be solely responsible for all costs and expenses associated with the replacement of such material. If any such final order is issued, AAM will, if requested by GM, prosecute and perfect an appeal of such order or any affirmance thereof in the manner prescribed by GM and with counsel of GM's choice, and GM will in such event pay the cost and expenses incurred by AAM to appeal any such order or affirmance thereof; provided, however, that if GM has requested that AAM appeal such order and the appeal thereof is ongoing at the end of the five (5) year period set forth above, GM's obligations under this subsection will continue until the appeal has been finally determined *. Prior to any such removal and disposal, AAM will submit to GM for its approval, a plan and cost estimate for effecting such removal and disposal. Any removal, disposal or replacement costs incurred by AAM with respect to such material in the ordinary course of business or not mandated

by the regulation or order of a governmental agency promulgated or issued under TSCA after the date of Closing will be the sole responsibility of AAM and AAM will indemnify and defend GM therefrom in accordance with Section 6.12.3.

6.9.    Responsibility for Asbestos.

A.    GM has informed AAM that the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., may include, among other things, asbestos insulation and other asbestos-containing material ("ACM"). Either before or after the date of Closing, GM will, at its sole cost, engage an independent consulting firm to conduct a survey of all reasonably accessible ACM at the Real Property, as defined in Section 1.1.1., and to prepare a written report of its findings. Such survey will take into account the location, condition, friability, accessibility, and frequency and manner of use of and exposure to such ACM. Upon completion of the survey, GM will provide a copy thereof to AAM and agrees to remove or, at its option, repair only friable ACM identified in the survey which is excessively damaged and accessible and which poses an immediate threat of release to the general worker population.

B.    Except as provided in Section 6.9.A. and 6.9.C., after the date of Closing, and without limitation of the other obligations of AAM under this Agreement, AAM agrees that GM will have no further obligation or liability with regard to the presence, maintenance, handling, repair, use, removal, release, storage, or disposal of any ACM, and that AAM will be and remain solely liable and responsible for such activities under contract (including this Agreement), Environmental Laws, other laws, and the common law, and AAM will indemnify and defend GM therefrom in accordance with Section 6.12.3.

C.    Liability for Employee Asbestos-Related Claims will be borne by the parties as follows. AAM's portion of such liability will be equal to an amount determined by multiplying the aggregate liability for such claim by a fraction, the numerator of which fraction will be the period of employment of the claimant with AAM at the facility in question on and after the date of Closing, and the denominator of such fraction will be the total period of employment of such claimant with GM at the facility in question before the date of Closing and with AAM at the facility in question on and after the date of Closing. That portion of the aggregate liability for such claim

not allocated to AAM as provided in the preceding sentence will be GM's responsibility. For purposes of this Section 6.9.C., the term "Employee Asbestos-Related Claim" will mean lawsuits and claims brought or made by or on behalf of employees or former employees of the Business for personal injuries arising, or alleged to have arisen, from exposure to asbestos fibers, either before or after the Closing, on the Real Property, as defined in Section 1.1.1., including all claims for compensation pursuant to applicable worker's compensation or related or similar legislation.

6.10. No Arrangement for Disposal. GM and AAM acknowledge that the transactions contemplated by this Agreement constitute a sale and transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Assets or any substances or materials contained therein. AAM agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone.

6.11. GM's Inspection Rights. AAM acknowledges and agrees that GM has the right, at any time and at least semi-annually, and, except where emergency conditions require otherwise, upon reasonable notice, during the period of GM's indemnity obligations set forth in this Article VI., to inspect or audit the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., from time to time, to observe AAM's or its tenant's, agent's, employee's, or contractor's compliance with Environmental Laws and the provisions of this Agreement. During such inspection or audit, AAM agrees to provide all documents and information reasonably requested by GM and provide to GM the opportunity to interview AAM's employees relating to environmental matters, except such documents and information as are protected by the attorney-client privilege or attorney-work product doctrine; provided, however, that no data relating to the quality, quantity or concentration of any emission, discharge or environmental medium or any constituent or contamination thereof at the Real Property, as defined in Section 1.1.1., or relating to the Assets will be subject to any such privilege or doctrine. Any such inspection or audit, including employee interviews and assistance, will be coordinated with management personnel responsible for environmental compliance and will not unreasonably interfere with AAM's continued operation of the Business. This right of inspection does not constitute a duty on GM's

part to so inspect and in no event relieves AAM of any obligations under this Agreement or under the law.

6.12. <u>Condition of Assets; Indemnification Obligations</u>.

6.12.1. <u>Condition of Assets</u>.

A.    AAM acknowledges, warrants and agrees that, prior to the date of Closing, it has had the opportunity to and has examined and investigated the nature, environmental condition and compliance status of the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., and the Business. Except as set forth in Section 6.4., neither GM, nor any agent, attorney, employee, or representative of GM, has made any representation whatsoever regarding the nature, environmental condition or compliance status of the Assets, the Real Property, as defined in Section 1.1.1., or the Business by GM to AAM or any part thereof and that AAM in executing, delivering, and/or performing this Agreement has not relied upon any statement and/or information (including, but not limited to, any Environmental Report or Environmental Compliance Audit), to whomsoever made or given directly, orally or in writing, by any individual, firm, or corporation. The parties assume that the Environmental Reports and the Environmental Compliance audits do and will in the future accurately describe the condition of the soil, ground water and surface water at the Real Property and the environmental compliance status of the Assets and the Business. Neither GM nor AAM represents or warrants the accuracy or completeness of the Environmental Reports or the Environmental Compliance Audits, and AAM has entered into this Agreement based solely upon its own inspection, evaluation, review and analysis of such reports and audits and its rights under Sections 6.1.3. and 6.2.1.A.

B.    AAM acknowledges and agrees that, except as otherwise provided in this Article VI., it is purchasing the Assets, the Real Property, as defined in Section 1.1.1., and the Business in an "as is, where is" condition as of the date of Closing and without any right of action with respect to environmental matters or conditions against GM under contract (including this Agreement), Environmental Laws, other laws, the common law or in equity. Except for actions arising under Sections 6.8., 6.9., 6.12.2., 6.12.3.B.2. or 6.12.4., AAM hereby expressly releases and covenants not to sue GM with respect to environmental matters or conditions regarding the

Assets, the Real Property, as defined in Section 1.1.1, or the Business, whether existing before or after the date of Closing, including, but not limited to, environmental matters arising from or related to the presence of PCBs, asbestos, wood floor blocks, ceiling and floor tiles, buildings, refractory brick and any substances, materials or structures at or about the Real Property, as defined in Section 1.1.1., or in or about the Assets.

6.12.2. <u>GM's Indemnification</u>. GM agrees that for a period of five (5) years after the date of Closing and in accordance with the following terms and conditions, GM will indemnify, defend, and hold AAM harmless from and against any liabilities, damages, penalties, or fines, including, without limitation, reasonable attorney's fees, (but in no event will GM's agreement to indemnify AAM include consequential, special or incidental damages such as, by way of example and not limitation, loss of profits or loss of business opportunity, or any attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligations) to which AAM may be subjected as a result of an action, suit, complaint, formal notice of probable claim, or proceeding brought by a governmental agency or other third party (hereinafter "Claim"), but only to the extent such Claim is based upon a Pre-Closing Environmental Condition described in any Environmental Report or a significant and material Pre-Closing Environmental Condition which: (i) constitutes a violation of a specifically applicable Environmental Law, as existing and in effect as of the date of Closing, or (ii) results in an investigation or remediation obligation or liability being imposed under Environmental Laws, as existing and in effect as of the date of Closing. GM agrees that for the period commencing with the sixth year after the date of Closing and continuing through the tenth year after the date of Closing, and in accordance with the following terms and conditions, GM will indemnify, defend and hold AAM harmless from and against any liabilities, damages, penalties, or fines, including, without limitation, reasonable attorney's fees, (but in no event will GM's agreement to indemnify AAM include consequential damages, special damages or incidental damages such as, by way of example and not limitation, loss of profits or loss of business opportunity, or any attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligations) to

which AAM may be subjected as a result of any Claim, but only if and to the extent such Claim is based upon a Pre-Closing Environmental Condition which is disclosed in any Environmental Report or is a significant and material Pre-Closing Environmental Condition which arises under Section 6.1.3., and AAM establishes that: (i) AAM did not cause or significantly contribute to, significantly aggravate or significantly exacerbate such Pre-Closing Environmental Condition; (ii) AAM has substantially complied with and met in all material respects all of its obligations under this Article VI.; and (iii) GM's determination regarding if and to what extent actions taken or not taken with respect to any such Pre-Closing Environmental Condition was, and resulted in a condition that was, inconsistent with Environmental Laws, as existing and in effect as of the date of Closing. The foregoing indemnities will be effective as follows:

A.      AAM agrees that it will promptly, but in no event later than thirty (30) calendar days from the date of its discovery of facts which are reasonably likely to give rise to a demand by it for indemnification under this Article VI. or relating to any such Claim, notify GM in writing of such facts and potential Claim. AAM's written notice will specify in detail the particular facts and Environmental Law involved.

B.      AAM and GM will use best efforts to resolve promptly any disputes regarding any Claim hereunder.

C.      GM's indemnification obligations hereunder will be apportioned to the extent that a Claim results from, or GM's expenses are materially increased by, AAM's failure to provide timely notice as required under Section 6.12.2.A. No indemnification obligation exists if, without the prior written approval of GM, AAM has negotiated and/or agreed with a third party to conduct investigation, remediation, or other actions with respect to a Claim or to settle a Claim.

D.      After notification is given under Section 6.12.2.A., GM will be entitled, but not obligated, to assume the defense or settlement of any Claim or to participate in any negotiations or proceedings to settle or otherwise eliminate any Claim. If GM fails to elect in writing within thirty (30) calendar days after the notification referred to above to assume the defense or settlement, AAM may engage counsel to defend, settle or otherwise dispose of such Claim.

E.     In cases where GM has assumed the defense, settlement or disposition of a Claim, GM will be entitled to assume the defense or settlement thereof with counsel of its own choosing, and will be entitled to settle, compromise, decline to appeal, or otherwise dispose of the Claim without the consent or agreement of AAM; provided, however, that in such event GM shall obtain from the claimant a release in favor of AAM from all liability with respect to such Claim.

F.     In any case in which GM assumes the defense or settlement of a Claim and GM, in its sole discretion, so consents, AAM will be entitled to continue to participate at its own cost in any such action or proceeding or in any negotiations or proceedings to settle or otherwise eliminate any Claim for which indemnification is being sought and will have the right to employ its own counsel in any such case, but the fees and expenses of such counsel will be at the expense of AAM; otherwise, AAM will have no such right to participate in any such action or proceeding. In no event will GM be liable to any indemnified party for the cost of employing or using in-house legal counsel regardless of whether GM has, or has not, assumed the defense or settlement of such Claim.

G.     In the event indemnification is requested, GM and its representatives and agents will have access to the premises, books and records of the indemnified party or parties seeking such indemnification to the extent reasonably necessary to assist it in defending or settling any Claim; provided, however, that such access will be conducted in such manner so as not to interfere unreasonably with the operation of the Business.

H.     Until the expiration of the indemnification period under Section 6.12.2.I., AAM agrees to retain all documents with respect to all matters as to which indemnity may be sought under this Article VI. Before disposing of or otherwise destroying any such documents, AAM will give reasonable notice to such effect and deliver to GM, at GM's expense and upon its request, a copy of any such documents. In addition, each party to this Agreement agrees to use its reasonable efforts to cause its employees to cooperate with and assist GM in connection with any Claim for which indemnity is sought by AAM hereunder.

I.     Upon expiration of the ten (10) year period after the date of Closing, the indemnification requirements of this Section 6.12.2. will terminate and AAM will have no right of

action against GM for environmental matters or conditions relating to the Real Property, as defined
in Section 1.1.1., the Assets or the Business under contract (including this Agreement),
Environmental Laws, other laws, or the common law or in equity; provided, however, that : (i) in
the event a Claim is asserted before the end of such ten (10) year period, the obligation of GM to
indemnify and defend AAM will continue, but only as to such Claim; and (ii) in the event GM has
not completed a Remedial Plan before the end of such ten (10) year period, GM will nevertheless
complete the actions required under such Remedial Plan.

      J.    If GM, in addressing a Pre-Closing Environmental Condition under
Section 6.1.2 or 6.1.3 or in defending or resolving any Claim as to which it has indemnification
responsibility under this Article VI., remediates or incurs costs or damages with respect to a matter
for which a third party may be responsible or liable, AAM agrees to cooperate with GM in pursuing
any claim against such third party and will use its best efforts to assist GM and to  enable GM to
legally assert such claim against such third party and to recover GM's costs and damages against
such third party including, but not limited to, acting as the real party in interest and assigning
AAM's rights or cause of action against any such third party relating to such claim or the proceeds
thereof to GM.  With respect to any such action, GM agrees to defend, indemnify and hold AAM
harmless from and against any cost or liability to which AAM may be subjected as a result of
providing such assistance.

    6.12.3.  <u>AAM's Indemnification.</u>

      A.    AAM will indemnify, defend and hold GM harmless from and against any
Claims, including, without limitation, reasonable attorney's fees, (but in no event will AAM's
agreement to indemnify GM include consequential, special or incidental damages such as, by way
of example and not limitation, loss of profits or loss of business opportunity, or any attorney's or
consultant's fees or other expenses as to any matters as to which AAM has accepted its defense
and indemnity obligations) asserted against or to which GM may be subjected and which are
caused by, relate to or arise in connection with: (i) any breach by AAM of any warranty or
agreement by AAM under this Article VI.; (ii) any violation by AAM of any Environmental Law with
respect to the Assets, the Real Property, as defined in Section 1.1.1., or the Business; (iii) any

matter with respect to which AAM is obligated to indemnify GM under Section 6.1.2.E., 6.2.1.C., 6.5.B., 6.8.C., 6.8.D., 6.9.B., 6.9.C. or 6.16.4.A.; and (iv) except as provided in Section 6.12.3.B., any matter as to which GM is not obligated to indemnify AAM under Section 6.12.2. or 6.12.4., whether due to the passage of time beyond the applicable indemnity period, the fact that such matter is not within the scope of GM's indemnification obligations... or otherwise, including, but not limited to, Claims based on GM's actions, omissions or status, whether negligent or otherwise; Claims relating to a Pre-Closing Environmental Condition arisising during the second five (5) year period after the date of Closing which was significantly contributed to or significantly aggravated or significantly exacerbated by AAM; or Claims which were not discovered by AAM within five (5) years after the date of Closing. AAM's indemnification obligations will exist in perpetuity and will not be affected in any way by, or be merged into, the transactions contemplated under this Agreement, and all representations and warranties of AAM in this Article VI. will also survive the Closing.

B.    1.    With respect to any condition or matter which was not identified, assessed or investigated in the Environmental Reports and any condition or matter which is not a significant and material Pre-Closing Environmental Condition subject to Section 6.1.3, AAM's obligation to indemnify and defend GM under Section 6.12.3.A (iv) will be unconditional and absolute.

2.    With respect to any Pre-Closing Environmental Condition identified, assessed or investigated in the Environmental Reports and any condition or matter which constitutes a significant and material Pre-Closing Environmental Condition subject to Section 6.1.3, AAM will defend and indemnify GM against any Claim relating thereto and asserted against GM when and if it is determined by a final, non-appealable determination of a court or agency within jurisdiction over the matter that GM addressed such condition or matter in such a manner that the result was consistent with Environmental Laws, as existing and in effect as of the date of Closing, and will thereupon reimburse GM for all of GM's costs, including costs of defense, incurred with respect to such Claim prior to such determination. The parties agree that, solely with respect to Claims arising under this Section 6.12.3.B.2., either of them will have the right to seek a

declaratory judgment at any time (subject to any applicable statute of limitations) following the assertion of such Claims for the purpose of determining whether GM addressed the Pre-Closing Environmental Condition which is the subject of the Claim in such a manner that the result was consistent with Environmental laws as existing and in effect as of the date of Closing.

3.    Notwithstanding anything to the contrary elsewhere in this Section 6.12.3., AAM will be solely responsible for any cost, expense, liability, charge or assessment arising from or in connection with:    (i) the enactment or taking effect of any Environmental Law after the date of Closing; or (ii) the amendment or modification of or change in any Environmental Law, as existing and in effect as of the date of Closing.

C.    The foregoing indemnities will be effective as follows:

1.    GM agrees that it will promptly, but in no event later than thirty (30) calendar days from the date of its discovery of facts which are reasonably likely to give rise to a demand by it for indemnification under this Article VI. or relating to any such Claim, notify AAM in writing of such facts and potential Claim.  GM's written notice will specify in detail the particular facts and Environmental Law involved.

2.    GM and AAM will use best efforts to resolve promptly any disputes regarding any Claim hereunder.

3.    AAM's indemnification obligations hereunder will be apportioned to the extent that a Claim results from, or AAM's expenses are materially increased by, GM's failure to provide timely notice as required under Section 6.12.3.C.1. No indemnification obligation exists if, without the prior written approval of AAM, GM has negotiated and/or agreed with a third party to conduct investigation, remediation, or other actions with respect to a Claim or to settle a Claim.

4.    After notification is given under Section 6.12.3.C.1., AAM will be entitled, but not obligated, to assume the defense or settlement of any Claim or to participate in any negotiations or proceedings to settle or otherwise eliminate any Claim.  If AAM fails to elect in writing within thirty (30) calendar days after the notification referred to above to assume the defense or settlement, GM may engage counsel to defend, settle or otherwise dispose of such Claim.

5.    In cases where AAM has assumed the defense, settlement or disposition of a Claim, AAM will be entitled to assume the defense or settlement thereof with counsel of its own choosing, and will be entitled to settle, compromise, decline to appeal, or otherwise dispose of the Claim without the consent or agreement of GM; provided, however, that in such event AAM shall obtain from the claimant a release in favor of GM from all liability with respect to such Claim.

6.    In any case in which AAM assumes the defense or settlement of a Claim and AAM, in its sole discretion, so consents, GM will be entitled to continue to participate at its own cost in any such action or proceeding or in any negotiations or proceedings to settle or otherwise eliminate any Claim for which indemnification is being sought and will have the right to employ its own counsel in any such case, but the fees and expenses of such counsel will be at the expense of GM; otherwise, GM will have no such right to participate in any such action or proceeding. In no event will AAM be liable to any indemnified party for the cost of employing or using in-house legal counsel regardless of whether AAM has, or has not, assumed the defense or settlement of such Claim.

7.    In the event indemnification is requested, AAM and its representatives and agents will have access to the premises, books and records of the indemnified party or parties seeking such indemnification to the extent reasonably necessary to assist it in defending or settling any Claim; provided, however, that such access will be conducted in such manner so as not to interfere unreasonably with GM's operations. In addition, GM will use its reasonable efforts to cause its employees to cooperate with and assist AAM in connection with any Claim for which indemnity is sought by GM hereunder.

8.    If a Claim relates to a matter as to which both parties have indemnity obligations under this Article VI., then each party will be responsible for its proportionate share of the Claim unless otherwise specifically provided herein. The proportionate shares of the parties will be determined by the parties as soon as reasonably practicable based upon a determination of each party's relative contribution to the condition considering the respective chemical quantities and qualities of the contamination contributed or remaining after

remediation and the time periods involved. If the party against whom the Claim is asserted determines that the other party's potential liability with respect to such Claim is de minimis, no claim will be asserted against the other party with respect to such Claim. If the parties are jointly responsible for the Claim, the parties will jointly manage and respond to such Claim (unless otherwise agreed) and will agree upon a mutually acceptable resolution of such Claim, including any cleanup, remediation and/or other actions required in response to such Claim. The parties will use best efforts, good faith and sound and accepted engineering judgment in making the foregoing determinations. Where GM is solely responsible for a Claim or where the parties are jointly responsible for resolution of a Claim, any remediation, cleanup and/or other actions proposed by the parties to resolve such Claim must be consistent with the factors set forth in Section 6.1.2.B.

6.12.4. <u>GM's Additional Indemnities.</u>

A.    GM agrees to indemnify, defend  and hold AAM harmless from and against any Claims, including, without limitation, reasonable attorney's fees, (but in no event will GM's agreement to indemnify AAM include consequential, special or incidental damages such as, by way of example and not limitation, loss of profits or loss of business opportunity, or any  attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligations) to which AAM may be subjected as a result of any off-site treatment, off-site storage, off-site transportation, or off-site disposal of hazardous wastes, hazardous substances, or toxic substances, as those terms are defined under Environmental Laws, as existing and in effect as of the date of Closing, to or at a facility intended by GM to be used  for such purposes and such wastes or substances were generated by GM at the Real Property or in connection with the operation of the Business on or prior to the date of Closing or after the date of Closing in connection with the implementation by GM of any Remedial Plan. This indemnity will remain in effect in perpetuity. With respect to any written communication from a governmental agency relating to any off-site treatment, off-site storage, off-site transportation or off-site disposal of hazardous wastes, hazardous substances or toxic substances by GM relating to operation of the Business prior to the date of Closing, AAM will promptly forward any such communication to GM.

B.    GM agrees that, for a period of one (1) year after the date of Closing, GM will indemnify, defend and hold AAM harmless from and against any Claims, including, without limitation, reasonable attorney's fees, (but in no event will GM's agreement to indemnify AAM include consequential, special or incidental damages such as, by way of example and not limitation, loss of profits or loss of business opportunity, or any attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligations) relating to alleged violations of Environmental Laws, as existing and in effect as of the date of Closing, to the extent such Claims are based solely upon compliance monitoring reports, data, or other such submissions or disclosures made to a federal, state, or local agency prior to the date of Closing.  AAM agrees to cooperate reasonably with GM in any actions which are reasonably required to resolve any such Claim.  GM will have a right of access to the Real Property, as defined in Section 1.1.1., consistent with the provisions of Section 6.3. and will provide AAM with documentation describing the actions taken to resolve any such Claim.

C.    GM agrees that it will indemnify, defend, and hold AAM harmless from and against any Claim, including without limitation, reasonable attorney's fees, (but in no event will GM's agreement to indemnify AAM include consequential, special or incidental damages such as, by way of example and not limitation, loss of profits or loss of business opportunity, or any attorney's or consultant's fees or other expenses as to any matter as to which GM has accepted its defense and indemnity obligations) relating to any Non-Compliance Matter set forth on Exhibit 6.2.1.A. (as compiled in accordance with Section 6.2.1.A.), but only to the extent such Claim seeks compliance with an Environmental Law, as existing and in effect as of the date of Closing, and/or recovery of fines, penalties or other statutory sanctions or impositions for any alleged non-compliance therewith and, with respect to each such Non-Compliance Matter, such Claim is asserted after the date of Closing and within one (1) year after the date such Non-Compliance Matter was remedied or eliminated in the manner set forth in a Compliance Plan or Exhibit 6.1.2.A., as verified by an independent environmental consultant retained by GM.  GM will give AAM notice of any final report by such consultant setting forth its verification that such Non-

Compliance Matter has been remedied or eliminated in the matter set forth in a Compliance Plaan or Exhibit 6.1.2.A.

D.    The procedures set forth in Sections 6.12.2.A. through H. will apply to any Claim for which indemnification is sought under Section 6.12.4.A., B., or C. If a Claim is asserted which is covered by Section 6.12.4.B. or C. within the indemnification period provided therein for such Claim, then GM's defense and indemnity obligations will continue, beyond expiration of the indemnification period but only with respect to such Claim.

6.12.5.  No Third Party Claims Initiation.

A.    Except if and to the extent required by Environmental Laws and subject to Section 6.12.5.B., AAM acknowledges, warrants and agrees that it will not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to a Claim.

B.    If AAM believes that a disclosure, communication, or report is required to be made under any Environmental Law relating to any Pre-Closing Environmental Condition, Non-Compliance Matter, Remedial Plan or Compliance Plan, it will give GM prior written notice of the basis for that belief, including a reference to the specific Environmental Law which AAM believes requires such disclosure, communication or report, and the nature and content of the proposed disclosure, communication or report AAM believes is required to be made. In all cases, AAM will use its best efforts to avoid disclosure of matters related to GM's activities under this Agreement. AAM will afford GM a reasonable opportunity to evaluate whether it concurs with AAM's belief. Subject to Section 6.12.5.C., AAM will not make such disclosure, communication or report unless GM has consented thereto, which consent will not be unreasonably withheld.

C.    Nothing herein will constrain AAM's ability to: (i) comply with any specific requirements under Environmental Laws which would require disclosure of information about the environmental condition of the Business, the Real Property, as defined in Section 1.1.1., or the Assets; (ii) disclose information necessary to operate the Business in the ordinary course of business; or (iii) comply with any specific requirements under any other applicable laws,

regulations, ordinances, rules, orders, codes or permits which would require disclosure of such information in connection with the operation of the Business.

      D.    Until the expiration of the indemnification period under Section 6.12.2.I., AAM will notify GM of any portions of significant submittal(s) or disclosure(s) to the extent they relate to the environmental condition of the Business, the Real Property, as defined in Section 1.1.1., or the Assets to any governmental agency or other third party it intends to make under Section 6.12.5.C.  GM will have a reasonable time period in which to conduct its review of such submittal(s) or disclosure(s).  AAM will, if reasonably and timely requested by GM, incorporate GM's requests to modify such disclosure.  AAM will use its best efforts to avoid unnecessarily disclosing information about the environmental condition of the Business, the Real Property, as defined under Section 1.1.1, or the Assets.  AAM will have the right, however, to make such disclosures AAM reasonably deems necessary to fulfill its obligations under Environmental Laws, other applicable laws, or to operate the Business in the ordinary course of business as provided in Section 6.12.5.C., taking into account GM's reasonable requests regarding such disclosures.

      6.13.  Dispute Resolution.  The parties will use good faith, best efforts, and sound and accepted engineering judgment in making all determinations under this Article VI.  In the event of a dispute or disagreement under this Article VI., the parties will consult in good faith with each other and will use best efforts to resolve the matter.  It is the express intent of the parties that any such disputes or disagreements will be resolved through negotiation between the parties or, if mutually agreeable in each party's sole discretion, through a form of alternative dispute resolution; it being understood and agreed, however, that alternative dispute resolution and litigation hereunder will be viewed as the last resort.

      6.14.  Exclusive Remedies.  The rights and obligations provided in this Article VI. will be the exclusive remedies of the parties with respect to environmental matters and will be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

      6.15.  Non-assignability of Indemnities.  The parties respective indemnification rights in this Article VI. are personal to each of them and may not be assigned to any successor, assignee,

or any other third party without the prior written consent of the other party; provided, however, that AAM may assign such indemnities to any lender in the event such lender becomes a successor through foreclosure (or a deed in lieu thereof) to AAM's interests under this Agreement if GM consents to such assignment, which consent will not be unreasonably withheld.

6.16.  Miscellaneous.

6.16.1.  Exclusivity.  Notwithstanding any provisions of this Agreement to the contrary and except as provided in the ECA, this Article VI. will exclusively govern with respect to all matters related to Environmental Laws and the environmental conditions of the Assets, Real Property and the Business.  All of the representations, warranties, covenants, agreements and indemnities set forth in this Agreement, the Indemnity Agreement or any other agreement between the parties with respect to the transactions contemplated by this Agreement, other than those specifically set forth in this Article VI. and in the ECA, will be deemed to exclude all matters relating to the environmental condition of the Assets and the Real Property or compliance of the Assets, the Real Property and the Business with Environmental Laws.  For purposes of this Section 6.16.1., Real Property will have the meaning set forth in Section 1.1.1 of this Agreement.

6.16.2.  Reporting.  All reporting to governmental agencies or other reporting necessary or desirable in connection with Remedial Plans or Compliance Plans will be made by GM to the extent permitted by Environmental Laws.  AAM will cooperate reasonably with GM in connection with or to effectuate such reporting.  If Environmental Laws, as existing and in effect on the date of Closing, require reporting to be made solely with respect to or in connection with operations conducted by the Business prior to the date of Closing, whether such reporting is required to be made prior to or after the date of Closing, GM will prepare and submit such reports.  AAM will otherwise be responsible for all reporting with respect to or in connection with operation of the Business after the date of Closing.  Where Environmental Laws require reports to be submitted which cover a specific period of time and that period includes some time both before and after the date of Closing, and Environmental Laws will not permit separate reporting for pre and post-closing periods by GM and AAM, respectively, the parties hereto will cooperate reasonably to prepare and submit a joint report.

6.16.3. <u>Wastewater and Stormwater Services</u>. AAM and GM agree that they desire to enter into an agreement under which GM will provide certain industrial process wastewater, millwater, sanitary wastewater and stormwater conveyance and discharge services from the Tonawanda Plant to and through GM's nearby facilities after the date of Closing on mutually agreeable terms and conditions satisfactory to GM and AAM, but which will include environmental matters within its scope and related solely to the provision and use of such services (the "Services Agreement"). AAM and GM each agree that their entry into the Services Agreement will be a condition precedent to each of their respective obligations to consummate the transactions set forth in this Agreement.

6.16.4. <u>Changes in Environmental Laws</u>.

A.    Any cost, expense or additional activity rendered necessary by any modification or amendment of any Environmental Law, as existing and in effect as of the date of Closing, will, except as otherwise provided in this Article VI., be the sole responsibility of AAM and AAM will indemnify and defend GM therefrom in accordance with Section 6.12.3.

B.    Notwithstanding anything in this Agreement to the contrary, in the event any Environmental Law, as existing and in effect as of the date of Closing, is modified or amended to reduce the extent of remediation or compliance otherwise required before such amendment or modification, then GM will be entitled to avail itself of any such amendment or modification in performing its obligations under this Article VI.

6.16.5. <u>Disclosure and Non-Recordation</u>. AAM acknowledges, warrants and agrees that the materials, records, reports and documents provided by GM to AAM as of the date of the Closing adequately, lawfully and sufficiently disclose to AAM all environmental matters relevant to the Business, the Assets and Real Property, as defined in Section 1.1.1., such as to comply in form and substance with Section 10c of the Michigan Environmental Response Act ("MERA") (MCLA 299.610c). Without limiting any other provision of this Agreement, AAM hereby agrees that, to the extent permissible under law, AAM waives any right of AAM to receive, and waives and releases GM from any obligation to provide, any notice, disclosure document or other information or statement required by Section 10c of MERA to be provided by GM to AAM and which is related

to or concerns releases of materials or environmental conditions of, at or about, or environmental information concerning, the Real Property, as defined in Section 1.1.1., the Business or the Assets. AAM further waives and releases any claims it may or could at any time now or after the date of Closing have against GM in connection with or arising out of any such right or obligation including, but not limited to, any claim that any notice, disclosure document or other environmental information or statement provided by GM to AAM was inadequate, insufficient or incorrect in any way or was not, or was not properly, recorded or presented, sent or provided to AAM as required by Section 10c of MERA. The parties also agree that to the extent any obligation exists to record any such information or a notice thereof under Section 10c of MERA, such obligation will be AAM's; provided, however, that AAM will not record any such information or notice without GM's prior consent to and approval thereof, which consent and approval will not be unreasonably withheld.

6.17.  Definitions. For purposes of this Article VI., the following definitions will apply:

A.      "Environmental Laws" will mean all laws, ordinances, regulations, final orders and judgments concerning the subject of the introduction, emission, discharge or release of pollutants or contaminants into the air, soil or surface or ground water; the transportation, storage, treatment or disposal of waste materials; or the remediation or investigation of contamination of air, soil, or surface or ground water by pollutants, contaminants or waste materials including, but not limited to, CERCLA, RCRA, CWA, SWDA, CAA, TSCA, and EPCRA, and similar state and local laws, but will not include laws, ordinances, final orders, final judgments or regulations concerning primarily worker health or safety, including, but not limited to, OSHA, MCL §408.1001 et seq., NY Lab. Law §1 et seq. (Consol.), or NY Pub. Health Law §1 et seq. (Consol.). The foregoing terms have the following meanings:

"CAA" means the Clean Air Act, 42 U.S.C. §§ 7401, et seq., as amended.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq., as amended by, among other things, the Superfund Amendments and Reauthorization Act of 1986.

"CWA" means the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq., as amended.

"SWDA" means the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq., as amended.

"EPCRA" means the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001, et seq., as amended.

"RCRA" means the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq., as amended.

"TSCA" means the Toxic Substances Control Act, 15 U.S.C. §§ 52601, et seq., as amended.

B.    "Pre-Closing Environmental Condition" will mean the presence on the date of Closing of any hazardous substance, hazardous waste or toxic substance, as defined under Environmental Laws, as existing and in effect as of the date of Closing, in the soils, surface water or ground water in, on or under the Real Property in excess of the least stringent remediation standard acceptable under such Environmental Laws. In no event will the term include any contamination in or on any building, structure, improvement, fixture, appurtenance or equipment.

C.    "Force Majeure" will mean an occurrence or nonoccurrence arising from causes beyond the reasonable control of a party and which hinders or delays performance or compliance and includes, but is not limited to, failure of a governmental agency to review or to approve or disapprove a permit, license or plan.

D.    "Real Property" will mean for purposes of this Article VI. unless otherwise specifically provided only the land upon which the Business has been conducted and which is to be transferred by GM to AAM under this Agreement and will not include any buildings, structures, equipment, appurtenances, improvements, or fixtures located thereon.

E.    "Non-Compliance Matter" will mean a violation of a specifically applicable Environmental Law, as existing and in effect as of the date of Closing, relating to the operation of the Business as of the date of Closing and in no case will it include the release or presence of any hazardous substance, hazardous waste or toxic substance, as defined under Environmental Laws, pollutant or contaminant into or in the soils, surface water, ground water or any other

environmental medium in, on, or under the Real Property or in or on any building, structure,

improvement, appurtenance, fixture or equipment located thereon.

## VII. REAL PROPERTY MATTERS.

7.1.    Conveyance.  Conveyance by GM to AAM of the Real Property shall be by GM's

covenant deeds (for the Detroit and Three Rivers properties) and by bargain and sale deeds with

lien covenants (for the Buffalo and Tonawanda properties) in recordable form mutually satisfactory

to the parties, conveying to AAM or its nominee the Real Property, together with all rights,

privileges, easements and appurtenances thereto, subject only to Permitted Encumbrances, as set

forth on Exhibit 4.1.4., and those adjustments referred to in Section 1.1.1 mutually agreed by the

Parties to be Permitted Encumbrances.  Included among the Contracts listed in Exhibit 1.1.2.C are

certain recorded and unrecorded agreements, easements, restrictions and other encumbrances

relating to the Real Property.  AAM acknowledges receipt of such listed documents and agrees that

the same are Permitted Encumbrances.

7.2.    Title.

A.    For the Real Property at each of the Detroit, Three Rivers, Buffalo and

Tonawanda sites, GM shall, as assurance that, upon Closing, marketable fee simple title shall have

been conveyed to AAM, provide to AAM as a condition upon Closing an Owner's Fee Policy of Title

Insurance, on Form B-1970, with respect to the Real Property located at Detroit and Three Rivers

(the "Michigan Title Policies"), and on Form 1990, with respect to the Real Property located at

Buffalo and Tonawanda (the "New York Title Policies"), (i) in the respective amounts shown in

Exhibit 7.2.A attached hereto and made a part hereof (which amounts, however, shall not be

binding for purposes of allocating the Purchase Price described in Section 2.3), (ii) issued by

Commonwealth Land Title Insurance Company, as underwriter, with Land Title Agency, Inc. of

Cleveland, Ohio as agent (the "Title Company"), (iii) showing in Schedule A thereof the approved

survey description of such Real Property and each easement appurtenant thereto, (iv) with the

standard printed exceptions deleted, and otherwise showing in Schedule B thereof only the

Permitted Exceptions identified in Exhibit 4.1.4 attached hereto and made a part hereof (subject to

the affirmative insurance and cure requirements of Section 7.2.B hereof) and (v) containing such endorsements as may reasonably be requested by AAM, at AAM's sole cost and expense. Except for the cost of any endorsements referred to in Section 7.2.A (v), GM shall pay the entire cost of providing the Michigan Title Policies in the form described above and GM and AAM shall each pay one-half of the cost of providing the New York Title Policies in the form described above.

B.    If a defect in title (i.e., an exception not shown as a Permitted Encumbrance herein and not dischargeable by payments to be made at Closing) exists including any Survey Defects (as hereinafter defined), GM shall use reasonable efforts for and during a period of fifteen (15) days after obtaining notice of such defect(s) to affect a cure thereof or to obtain, with respect thereto, affirmative title insurance, reasonably satisfactory in form and substance to AAM. If GM fails to cure such title defect(s) or to obtain such insurance, within such period, AAM may, at its sole option (i) waive the defect(s) and accept title subject thereto, or (ii) extend the date of the Closing for a period not to exceed thirty (30) days to provide GM with additional time within which to affect such cure or obtain such insurance, or (iii) terminate this Agreement with respect to such Real Property or completely, in which event neither Party shall thereafter have any liability to the other in total or as to such property, as the case may be, and all funds previously paid or deposited by AAM relating to such Real Property, including all accrued interest, shall be returned to AAM. GM's obligation to use its reasonable efforts hereunder shall not require it to expend in excess of One Hundred Thousand Dollars ($100,000) in the aggregate to affect a cure or to obtain such affirmative insurance.

7.3.    Land Survey.

A.    Except for the survey of the Tonawanda, New York, property (which will be delivered by GM to AAM prior to the Closing), GM has delivered to AAM a survey of each parcel of Real Property (each a "Survey") made on the ground by a surveyor registered in the state such parcel of Real Property is located, in accordance with the 1992 minimum standard detail requirements for ALTA/ACSM Surveys, Urban, Suburban, Rural or Mountain and Marshland, as the case may be, including the following optional items from Table A: 1, 2, 3, 9, 10, 11 and 12, and dated as of a date after December 1, 1993, showing the Real Property, all known easements and

rights granted by license thereon which can be depicted on the Survey, all improvements (including fences and driveways), and access to and from a dedicated and accepted public right-of-way. Each such survey shall (i) be certified to AAM and its assigns, its mortgage lender, if any, in form reasonably satisfactory to AAM and to the Title Company, and (ii) comply with any requirements reasonably imposed by the Title Company as a condition to the removal of any exceptions from Schedule B to the respective Title Policies.

B.    In the event a Survey shows (i) lack of access to and from a dedicated and accepted public right-of-way, or (ii) a matter which, in the judgement of AAM reasonably exercised, materially interferes with the use of the Real Property for the Business (collectively "Survey Defects"), GM shall, at its expense, either (i) remove or correct such Survey Defects, (ii) cause such Survey Defects to be insured over by the Title Company, or (iii) otherwise reasonably address such Survey Defects within the period provided for the cure of Title Defects and otherwise subject to the provisions of Section 7.2(B). GM's obligation under this Section 7.3.B. shall not require it to expend in excess of One Hundred Thousand Dollars ($100,000) in aggregate to cure any Survey Defects.

7.4.    Special Provisions Relating to Tonawanda Real Property.

The Real Property located in Tonawanda, New York, which constitutes a portion of the Assets, is integrated with other GM facilities not included within the Assets. Exhibit 7.4 sets forth the actions required to be taken by GM and AAM in order to separate the Real Property at Tonawanda included within the Assets from the balance of the GM facilities currently integrated with such Real Property, all of which must be completed prior to Closing.

7.5.    Real Estate Prorations.

All real estate and taxes shall be prorated and allocated in accordance with Section 11.14.D. and all utility charges shall be prorated in accordance with Section 11.14.E.

7.6.    Special Provisions Relating to New York State Real Property Gains and New York State and Erie County Transfer Taxes.

A.    GM and AAM shall cause all necessary documents to be submitted to the New York State Department of Taxation and finance for a determination of the amount of tax, if

any, which will be imposed under the New York Tax on Gains Derived from Certain Real Property

Transfers (NY Tax Law Article 31-B) due as a result of this transaction. GM shall cause Form

TP-580 (Transferor Questionnaire) and AAM shall cause Form TP-581 (Transferee Questionnaire) to

be executed. Further, at Closing, GM shall deliver Form TP-584 (Real Estate Transfer Tax Return).

B.      GM shall be responsible for the payment of any Real Property Transfer Gains

Tax, New York Real Estate Transfer Tax (NY Tax Law Article 31) and the Erie County

Transportation Assistance Tax (Erie County Local Law No. 4-1990) due as a result of the

transactions contemplated by this Agreement, and shall indemnify and save AAM harmless from

and against any cost, liability and expense in connection therewith.

C.      The parties agree that the Questionnaires and Real Estate Transfer Tax

Return shall list the Consideration to be paid for the acquisition by AAM of the Interests in Real

Property as a result of the transactions contemplated by this Agreement to be the amounts set

forth on the Valuation Agreement attached as Exhibit 7.6.C. The parties further agree that these

amounts represent the fair market values of the Real Property interests in New York State involved

with this transaction and the amount of the Purchase Price apportioned to those Interests. The

capitalized terms in this Section 7.6.C. shall have the meanings set forth in NY Tax Law Articles 31

and 31-B and Erie County Local Law No. 4-1990.


VIII. CONDITIONS TO CLOSING.

8.1.   Conditions to Obligations of AAM. The obligation of AAM to consummate the

transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the

date of the Closing of the following conditions (any one or more of which may be waived in whole

or in part by AAM):

8.1.1. Legal Opinion. AAM shall have received from counsel to GM an opinion dated the

date of Closing and in form and substance satisfactory to AAM substantially to the effect of

Sections 4.1.1, 4.1.2 (without being subject to the approval of the GM Board of Directors) and

4.1.3.

needed to manufacture propeller shafts in accordance with the transition plan.  GM agrees that it shall indemnify AAM against any loss, liability, damage, or expense as a result of the foregoing without the same being subject to any minimum, deductible, threshold, or similar amount.

## XI.  MISCELLANEOUS.

11.1.   Waiver Of Compliance With Bulk Sales Laws and Hold Harmless Agreement.  AAM hereby waives compliance by GM with the provisions of the Bulk Sales Law of any state or foreign jurisdiction, and GM agrees to indemnify AAM against and hold AAM harmless from any and all claims, demands, liabilities, and obligations arising out of the failure or alleged failure of GM to comply with any such law in respect of the sale of the Assets to AAM.

11.2.   Notices.  Except as otherwise provided in Section 10.6.C. relating to certain notices that are to be sent to the Chief Tax Officer of the GM Tax Staff, all notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered or when sent via fax and first class mail, to the following:

| | |
|---|---|
| If to GM: | General Motors Corporation<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn: Treasurer<br>Fax No: (212) 418-3695 |
| With a copy to: | North American Truck Platform<br>Finance Director<br>31 E. Judson Street<br>Pontiac, Michigan 48342<br>Fax No: (810) 456-5979 |
| | and |
| | Office of General Counsel<br>New Center One Building<br>3031 West Grand Boulevard<br>P.O. Box 33122<br>Detroit, Michigan 48232 |
| If to AAM: | American Axle & Manufacturing, Inc.<br>1840 Holbrook Avenue<br>Detroit, Michigan 48212<br>Attn: Richard E. Dauch, President<br>Fax No: (313) 974-2070 |
| With a copy to: | Baker & Hostetler<br>3200 National City Center |

1900 East Ninth Street
Cleveland, Ohio 44114
Attn: R. Steven Kestner
Fax No: (216) 696-0740

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

11.3.    Assignment.  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties hereto, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld.

11.4.    Entire Agreement.  This Agreement represents the entire agreement and understandings between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

11.5.    Waiver.  Waiver by GM or AAM of any breach or of a failure to comply with any provision of this Agreement shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

11.6.    Amendment.  This Agreement may only be terminated or amended in writing by duly authorized representatives or officers of the Parties.

11.7.    Expenses.  Each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and with the consummation of the transactions contemplated hereby, except as otherwise expressly provided in this Agreement.

11.8.    Third Parties. .Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union, trust, or governmental entity other than the Parties hereto and their respective permitted successors and assigns, any claims, rights, or remedies under or by reason of this Agreement.

11.9.  Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

11.10.  Counterparts.  This Agreement has be executed by the Parties in two counterparts. Each fully executed counterpart shall be deemed an original.

11.11.  Governing Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan.

11.12.  Public Announcements.  GM and AAM will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by law and then only with such prior consultation.

11.13.  Sales or Transfer Taxes.  All costs relating to the Closing of the transactions contemplated hereby, including all sales taxes, documentary and stamp taxes, use taxes, gross receipt taxes in connection with the transfer of the Assets, as well as any permit, transfer and filing fees required in order to obtain governmental approvals and consents relating to the transactions contemplated by this Agreement and any related agreements, including the fees associated with AAM's filings under HSR, shall be paid by AAM; except that real estate transfer taxes and all charges incurred in filing and recording real property documents shall be paid by GM..

11.14.  Tax Matters.

A.    GM will be responsible for the preparation and filing of all applicable Tax Returns for the Business for all periods on or prior to the Closing as well as with respect to periods for which the consolidated, unitary and combined Tax Returns of GM will include the operations of the Business.  GM will make all payments required with respect to any such Tax Return.

B.    AAM will be responsible for the preparation and filing of all applicable Tax Returns for the Business for all periods after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary, and combined Tax Returns of GM will include the operations of the Business).  AAM will make all payments required with respect to any such Tax Return.

-104-

C.    GM and AAM will cooperate in connection with (i) the preparation of filing of any Tax Return, tax election, Tax consent or certification, or any claim for a Tax refund, (ii) any determination of liability for Taxes, and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Assets. Such cooperation includes direct access to engineering and contracting personnel.

D.    All real estate taxes and general assessments and personal property taxes shall be allocated and prorated between the Parties as of * the date of Closing in accordance with local practice. With respect to the Real Property at Tonawanda, if such Real Property is not separately assessed for real estate tax purposes, such real estate taxes shall be further pro rated based upon the portion of the property covered by the tax bills which is included within the Assets and that portion which is not included within the Assets as set forth on Exhibit 7.4.

E.    GM shall cause all utility meters to be read as of the date of the Closing. GM shall pay all utility charges through the date of the Closing and AAM shall be responsible for all utility charges relating to subsequent periods.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized signatories at Detroit, Michigan.

GENERAL MOTORS CORPORATION    AMERICAN AXLE & MANUFACTURING, INC.

By: _____    By: _____ President

Print Name: _John H. Monk Jr_    Print Name: _R. E. DAUCH_

JPG0945:35436:93001:CCM-08G.AGT
jpg 2/18/94

INDEX OF EXHIBITS

1.1          Strategic partnership letter

1.1.1        List of real estate sold.

1.1.2.A.     List of machinery and equipment sold.

1.1.2.B.     List of privileges.

1.1.2.C.     Listing of all purchase orders, sale agreements, etc., and agreements entered into in the
             ordinary course of business.

1.1.3.       Patents transferred.

1.1.4.       Licenses, Permits and Approvals transferred.

1.2.4.       Excluded Assets.

3.1.         Contracts, Licenses and Permits Not Assumed

4.1.4.       Permitted Encumbrances and Records

4.1.4.C.     Title and Condition of Real Property

4.1.6.       Pending litigation, investigations, inquiries.

4.1.7.       Patent and Technical Documentation Infringement

4.1.8.       List of Exceptions to Applicable Laws

4.1.10.      Consents

4.1.13       Regulatory Matters

4.1.15.      Restrictive Documents or Laws

4.1.17.B.    List of Unfair Labor Charges

4.1.19.      Certain Employee Benefit Plans

5.1.1.       Employees of the Business

6.1.1.       Environmental Confidentiality Agreement

6.2.1.A.     Environmental Compliance

6.2.2.       Environmental Permits

7.2.A.       Title Insurance Amounts

7.4.         Tonawanda Separation Plan

7.6.C.       Valuation Agreement

8.1.4.B.     Registration Rights Agreement

8.1.4.C.        Indemnification Agreement

8.1.4.D.        Component Supply Agreement

8.1.4.E.        Option to Purchase Equipment Agreement*

8.1.4.F.        Access and Security Agreement

8.1.4.G.        Transition Services Agreement

8.1.4.H.(i)     GMCL Purchase Order Agreement

8.1.4.H.(ii)    GMCL Supply Agreement

8.2.5.          Restated Certificate of Incorporation of AAM

8.2.6.          Bylaws of AAM