Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Maia S. Lichtenstein
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, *et al.*,<br>f/k/a General Motors Corp., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |

<u>**OBJECTION OF GENERAL MOTORS LLC TO THE PROPOSED SETTLEMENT AMONG THE MOTORS LIQUIDATION GUC TRUST AND THE SIGNATORY ECONOMIC LOSS AND PERSONAL INJURY PLAINTIFFS**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 12

I.      THE PRIOR SETTLEMENT .......................................................................................... 12

II.     THE PROPOSED SETTLEMENT ................................................................................. 13

ARGUMENT .......................................................................................................................... 20

I.      THE MOVANTS' PROPOSED SETTLEMENT VIOLATES THE
       CONSTITUTION AND SHOULD NOT BE APPROVED AS A MATTER OF
       LAW ........................................................................................................................... 21

II.     THE MOVANTS HAVE NOT AND CANNOT MEET THEIR BURDEN
       UNDER RULE 23(E) TO DEMONSTRATE WITH A SUITABLE BASIS IN
       THE RECORD THAT THE PROPOSED CLASSES COULD BE CERTIFIED
       OR THE SETTLEMENT APPROVED ........................................................................ 23

       A.      The Movants Have Failed to Provide Any Record, Let Alone a Suitable
              Record, Upon Which the Court May Determine the Likelihood of Final
              Settlement Approval and Class Certification, as Required under Rule
              23(e), Nor Can They. ........................................................................................ 27

       B.      The Court Does Not Have Any Basis, Let Alone a Suitable Basis, in the
              Record to Determine that the Proposed Settlement Is Substantively Fair.
              On its Face, the Proposed Settlement Is Unfair, Inadequate, and
              Unreasonable. .................................................................................................. 32

              1.      Movants Cannot Demonstrate that the Proposed Classes Are
                     Adequately Represented. ....................................................................... 33

               2.      The Relief Provided to the Proposed Classes Is Not Adequate. ............... 34

              3.      The Proposed Settlement Does Not Treat Class Members
                     Equitably. ............................................................................................ 36

       C.      Movants Cannot Separate Preliminary Approval Under Rule 23(e) From
              the Decision to Give Notice to the Proposed Classes and the Definition of
              the Proposed Classes. ....................................................................................... 37

III.    THE PROPOSED CLASSES CANNOT BE CERTIFIED ON A LIMITED
       FUND THEORY PURSUANT TO RULE 23(b)(1)(B) .................................................. 41

A.  The Proposed Classes Exceed the Constitutional Limits of Limited Fund Classes ................................................................................................. 42

    1.  Limited Fund Classes Are Rarely Approved Due to Constitutional Limitations .............................................................................. 43

    2.  A Limited Fund Class Is Not Appropriate in the Bankruptcy Context ................................................................................................. 45

B.  The Proposed Settlement Impermissibly and Unconstitutionally Premises a Limited Fund on Unliquidated Claims ................................................ 47

    1.  There Are No Liquidated Claims ................................................................ 48

    2.  There Is No Limited Fund ...................................................................... 56

C.  The Limited Fund Is Not Wholly Devoted to the Proposed Classes and Therefore Does Not Give Members of the Proposed Classes the Best Possible Relief, as the Constitution Requires ....................................... 61

    1.  The Limited Fund Is Impermissibly Shared Among Two Separate Classes and with Non-Class Members ....................................... 61

    2.  The Limited Fund Is Impermissibly Not Made Available to All Potential Creditors ..................................................................... 62

D.  Claimants Are Not Identified by a Common Theory of Recovery and Are Not Treated Equitably, as the Constitution Requires ............................ 63

IV.  THE PROPOSED CLASSES CANNOT BE CERTIFIED PURSUANT TO THE ECONOMIC LOSS PLAINTIFFS' ALTERNATIVE THEORY UNDER RULE 23(b)(1)(A) .............................................................................. 67

V.  THE PROPOSED SETTLEMENT FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(A) .............................................................. 70

A.  The Court Does Not Have Jurisdiction to Preliminarily Approve the Proposed Classes Because the Movants Cannot Establish Article III Standing ............................................................................ 72

B.  The Movants Cannot Satisfy Rule 23(a)(2)'s Commonality Requirements. ........ 74

C.  The Movants Cannot Satisfy Rule 23(a)(3)'s Typicality Requirements .............. 75

D.  The Movants Cannot Satisfy Rule 23(a)(4)'s Adequacy Requirements .............. 79

VI.  THE PROPOSED SETTLEMENT CONSTITUTES AN IMPERMISSIBLE PLAN MODIFICATION AND VIOLATES THE SALE AGREEMENT ................ 81

A.    The Proposed Settlement Constitutes an Impermissible Plan Modification by Providing the Economic Loss Plaintiffs with Recoveries that Deviate from the Plan .................................................................................................... 83

B.    Rules of Procedure Cannot Justify an Impermissible Plan Modification. ............ 87

C.    New GM Is Directly Impacted by the Movants' Attempt to Impermissibly Modify the Plan ................................................................................................. 89

VII.    THE INCLUSION OF THE PIWD PLAINTIFFS IS FUNDAMENTALLY INCOMPATIBLE WITH THE MOVANTS' LIMITED FUND THEORY .................... 91

VIII.    MOVANTS HAVE FAILED TO DEMONSTRATE COMPLIANCE WITH THE CLASS ACTION FAIRNESS ACT ................................................................. 94

IX.    CONSIDERATIONS OF JUDICIAL EFFICIENCY AND DEFERENCE TO THE MDL COURT WARRANT STAYING CONSIDERATION OF THE PROPOSED SETTLEMENT ......................................................................... 94

CONCLUSION .......................................................................................................... 96

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*Abraham* v. *WPX Energy Prod., LLC*,
    322 F.R.D. 592 (D.N.M. 2017) ................................................................69

*Amchem Prod., Inc.* v. *Windsor*,
    521 U.S. 591 (1997) ................................................................ *passim*

*In re Asalcol Antitrust Litig.*,
    907 F.3d 42 (2018) ................................................................68

*Baffa* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*,
    No. 89-CV-2923 DNE, 222 F.3d 52 (2d Cir. 2000) ........................70, 72

*Beck* v. *Status Game Corp.*,
    1995 WL 422067 (S.D.N.Y. July 14, 1995) ...............................74

*In re Best Prod. Co., Inc.*,
    177 B.R. 791 (S.D.N.Y.) ................................................................82

*In re BGI, Inc.*,
    465 B.R. 365 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ...................23, 24

*In re Boylan Int'l, Ltd.*,
    452 B.R. 43 (Bankr. S.D.N.Y. 2011) ...........................................82

*In re Citigroup Pension Plan ERISA Litig.*,
    241 F.R.D. 172 (S.D.N.Y. 2006) ...............................................63

*City of Detroit* v. *Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ................................................................25

*Costello* v. *Haller*,
    No. 05 C 0727, 2005 WL 6503626 (N.D. Ill. Sept. 23, 2005) ................82

*In re Daewoo Motor Am., Inc.*,
    488 B.R. 418 (C.D. Cal. 2011) ...............................................82

*De Leon* v. *Bank of Am., N.A.*,
    No. 09-CV-1251-ORL-28KRS, 2011 WL 13137935 (M.D. Fla. Aug. 31,
    2011) ................................................................27

*Denney* v. *Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)...........................................................................9, 67

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab.
Litig.*,
No. CIV. A. 98-20594, 1999 WL 782560 (E.D. Pa. Sept. 27, 1999) ...............................43, 50

*In re Digital Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ...........................................................................71

*Doe* v. *Karadzic*,
192 F.R.D. 133 (S.D.N.Y. 2000) ...........................................................................50

*East Tex. Motor Freight Sys. Inc.* v. *Rodriguez*,
431 U.S. 395 (1977)...........................................................................66

*In re FIRSTPLUS Fin., Inc.*,
248 B.R. 60 (Bankr. N.D. Tex. 2000)...........................................................................41

*Figueroa v. Sharper Image Corp.*,
517 F. Supp. 2d 1292, 1299 (S.D. Fla. 2007) ...........................................................................37

*Fleischman* v. *Albany Med. Ctr.*,
No. 1:06-CV-765, 2008 WL 2945993 (N.D.N.Y. July 28, 2008) ...........................................68

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990)...........................................................................70

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MC-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...................9, 35, 59

*In re Gen. Motors LLC Ignition Switch Litig.*,
257 F. Supp. 3d 372 (S.D.N.Y. June 30, 2017) ...........................................................59, 72, 73

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...........................................................................30, 65

*Hays* v. *Eaton Group Attorneys, LLC*,
No. CV 17-88-JWD-RLB, 2019 WL 427331 (M.D. La Feb. 4, 2019)...........................22, 26

*In re CF & I Fabricators of Utah, Inc.*, 199 B.R. 986 (Bankr. D. Utah 1996)...........................82

*In re Initial Pub. Offering Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) ...........................................................................28

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
No. 12-CV-2548 (VSB), 2017 WL 1273963 (S.D.N.Y. Mar. 31, 2017)...........................20

v

*In re Jafary*,
    333 B.R. 680 (Bankr. S.D.N.Y. 2005) ...................................................................40

*Jefferson* v. *Ingersoll Intern. Inc.*,
    195 F.3d 894 (7th Cir. 1999) .............................................................................39

*In re Joint E. & S. Dist. Asbestos Litig.*,
    982 F.2d 721 (2d Cir. 1992)........................................................................10, 61

*In re Katrina Canal Breaches Litig.*,
    628 F.3d 185 (5th Cir. 2010) .............................................................................61

*Klein* v. *O'Neal, Inc.*,
    No. 7:03-CV-102-D, 2006 WL 325766, (N.D. Tex. Feb. 13, 2006) ................................49, 50

*Kline* v. *Wolf*,
    702 F.2d 400 (2d Cir. 1983)..............................................................................71

*La Mar* v. *H & B Novelty & Loan Co.*,
    489 F.2d 461 (9th Cir. 1973) .............................................................................66

*Laurent* v. *PricewaterhouseCoopers, LLP*,
    No. 06-CV-2280 JPO, 2014 WL 2893303 (S.D.N.Y. June 26, 2014)..................................63

*Leach* v. *Standard Register Co.*,
    94 F.R.D. 192 (W.D. Ark. 1982) .........................................................................74

*Levitt* v. *J.P. Morgan Securities, Inc.*,
    710 F.3d 454 (2d Cir. 2013)................................................................................8

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)..............................................................................29

*Lujan* v. *Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................67

*Luppino* v. *Mercedes Benz USA*,
    718 F. App'x 143 (3d Cir. 2017) .........................................................................69

*In re Lyondell Chemical Co.*,
    Adv. Proc. 10-05525 (Bankr. S.D.N.Y. December 29, 2014), ECF No. 843 .........................51

*Mazzei* v. *Money Store*,
    829 F.3d 260 (2d Cir. 2016)..............................................................................70

*McLaughlin* v. *American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)..............................................................................67

*Moreno* v. *Deutsche Bank Americas Holding Corp.*,
    No. 15 CIV. 9936 (LGS), 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017)................................64

*In re Motors Liquidation Co.*,
    447 B.R. 150 (Bankr. S.D.N.Y. 2011). ....................................................................................57

*In re Motors Liquidation Co.*,
    591 B.R. 501 (Bankr. S.D.N.Y. 2018) ............................................................................12, 44

*In re New York Medical Group, P.C.*,
    265 B.R. 408 (Bankr. S.D.N.Y. 2001) ..................................................................................40

*In re NYSE Specialists Secs. Litig.*,
    240 F.R.D. 128 (S.D.N.Y. 2007) .........................................................................................71

*In re Oakhurst Lodge, Inc.*,
    582 B.R. 784 (Bankr. E.D. Cal. 2018) ............................................................................80, 82

*Oladapo* v. *Smart One Energy, LLC*,
    No. 15 CIV. 9936 (LGS), 2017 WL 5956907 (S.D.N.Y. Nov. 9, 2017)................................27

*Opperman* v. *Path, Inc.*,
    No. 13-CV-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ..................................68

*In re Ortiz* v. *Fibreboard, Corp.*,
    527 U.S. 815 (1999)................................................................................................... *passim*

*In re Partsearch Techs., Inc.*,
    453 B.R. 84 (Bankr. S.D.N.Y. 2011) (Glenn, J.)........................................................23, 24, 74

*In re Payment Card Interchange Fee Litig.*,
    827 F.3d 223 (2d Cir. 2016)..........................................................................................36, 74, 75

*In re Payment Card Interchange Fee Litig.*,
    No. 0-5MD-1720 (MKB) (JO),  2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ............... *passim*

*Phillips Petroleum Co.* v. *Shutts*,
    472 U.S. 797 (1985).............................................................................................................38

*Pipefitters Local 636 Ins. Fund* v. *Blue Cross Blue Shield of Michigan*,
    654 F.3d 618 (6th Cir. 2011) ..............................................................................................64

*Rapcinsky* v. *Skinnygirl Cocktails, L.L.C.*,
    No. 11 CIV. 6546 JPO, 2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) .........................................70

*In re Reserve Capital Corp.*,
    No. 03-60071, 2007 WL 1989285 (Bankr. N.D.N.Y. July 6, 2007) ......................................82

*Reynolds* v. *Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ...........................................................................23

*In re Rickel & Assocs., Inc.*,
   260 B.R. 673 (Bankr. S.D.N.Y. 2001) ...............................................................82

*In re S. White Transp., Inc.*,
   455 B.R. 509 (Bankr. S.D. Miss. 2011) ..............................................................82

*Salgado* v. *Piedmont Capital Corp.*,
   534 F. Supp. 938 (D.P.R. 1981) ........................................................................66

*Savino* v. *Computer Credit, Inc.*,
   164 F.3d 81 (2d Cir. 1998) ...............................................................................71

*Schoenbaum* v. *E.I. DuPont De Nemours and Co.*,
   No. 4:05CV01108ERW, 2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ..................28

*In re Sea Island Co.*,
   486 B.R. 559 (S.D. Ga. 2013) ...........................................................................82

*In re Simon II Litig.*,
   407 F.3d 125 (2d Cir. 2005) .............................................................................64

*Smith* v. *MCI Worldcom, Inc.*,
   No. 99-CV-681-H, 2000 WL 36726436 (N.D. Okla. Mar. 31, 2000) ..............71, 76

*Smook* v. *Minnehaha Cty.*,
   457 F.3d 806 (8th Cir. 2006) ............................................................................66

*Spann* v. *AOL Time Warner, Inc.*,
   219 F.R.D. 307 (S.D.N.Y. 2003) .......................................................................70

*Stott* v. *Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) .............................................................39, 53, 54

*In re Telectronics*,
   221 F.3d 870, 881 (6th Cir. 2000) .......................................................22, 39, 52, 55

*Toney–Dick* v. *Doar*,
   2013 WL 5295221 (S.D.N.Y. Sept. 16, 2013) ...................................................8, 63

*Trautz* v. *Weisman*,
   846 F. Supp. 1160 (S.D.N.Y. 1994) ...................................................................63

*In re U.S. Brass Corp.*,
   255 B.R. 189 (Bankr. E.D. Tex. 2000) ...............................................................80

*Wal-Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011) ............................................................................................... *passim*

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) .................................................................. 23

*In re Xpedior Inc.*,
    354 B.R. 210 (Bankr. N.D. Ill. 2006) ................................................................... 82

*In re Yellowstone Mountain Club, LLC*,
    460 B.R. 254 (Bankr. D. Mont. 2011) .................................................................. 82

*Yi Xiang* v. *Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) (appeal filed) ............................................. 67, 75

*In re Zyprexa Prod. Liab. Litig.*,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) .................................................................. 68

**STATUTES**

11 U.S.C. § 502 ......................................................................................................... 43

11 U.S.C. § 1127 ........................................................................................ 10, 76, 80, 85

28 U.S.C. § 157 .................................................................................................... 10, 76

28 U.S.C. § 1334 .................................................................................................. 10, 76

28 U.S.C. § 1715 ....................................................................................................... 91

28 U.S.C. § 2072 ....................................................................................................... 22

Alaska Unfair Trade Practices and Consumer Protection Act .................................... 58

RICO ......................................................................................................................... 59

South Carolina Regulation of Manufacturers, Distributors, and Dealers Act .............. 58

**OTHER AUTHORITIES**

U.S. Constitution Article III .............................................................................. *passim*

Fifth Amendment ........................................................................................................ 2

Seventh Amendment ............................................................................................... 2, 38

Fed. R. Civ. P. 23 .............................................................................................. *passim*

Fed. R. Evid. 702 ...................................................................................................... 44

Local Bankruptcy Rule 9014-2 ............................................................................................... 4, 25

Local Bankruptcy Rule 9019 ................................................................................................. *passim*

MANUAL OF COMPLEX LITIG. (4th ed. 2018) ............................................................ 24, 34, 36, 88

MCLAUGHLIN ON CLASS ACTIONS (15th ed. 2018) ..................................................... 31, 38, 41, 53

NEWBERG ON CLASS ACTIONS § 2:5 (5th ed. 2018) ..................................................................... 75

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

New GM[1] submits this objection (the "Objection") to the Rule 23 Motion [Docket No.

14408] filed by the Signatory Plaintiffs and the Rule 9019 Motion [Docket No. 14409] filed by

the GUC Trust for approval of the Proposed Settlement, which seeks to resolve both late-filed

Rule 23 class claims and late filed (and other potential) non-class personal injury claims and

respectfully represents:

## PRELIMINARY STATEMENT

1.     On February 1, 2019, the Movants filed the Settlement Motions, which together

ask this Court to (1) preliminarily certify two nationwide limited fund settlement classes (the

"Proposed Classes") of economic loss claimants (the "EL Plaintiffs") through an unprecedented

"hybrid" limited fund, non-opt out structure, (2) appoint as-yet-unidentified class representatives

and class counsel, and (3) approve and direct notice to the Proposed Classes and various known

and unknown personal injury and wrongful death claimants (the "PIWD Plaintiffs"), regardless

of whether they have filed claims.  The immediate question before this Court is whether it can

find, based on the woefully inadequate record before it, that it **likely will be able to certify two**

**nationwide limited fund classes** comprising, in the Movants' imprecise estimations, somewhere

between 9.5 million and 26 million individuals[2] pursuant to Rule 23(b)(1)(B) (or (b)(1)(A) in the

alternative), in accordance with the procedures set forth in Rule 23(e).  The answer is clearly no:

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings given to them in *General Motors LLC's
Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed
Settlement and (B) Grant Related Relief* [Bankr. Dkt No. 14431], filed on February 22, 2019 (the "Stay
Motion").

[2]    *Compare Tr. of Case Mgmt. Conference Before the Hon. Martin Glenn* (Dec. 20, 2018) ("Hr'g Tr. 12/20/2018")
at 4-5 (noting that approximately 11.4 million vehicles are subject to the Recalls at issue involving between
11.4 and 26 million individuals, but that the number may substantially decrease based on rulings from the MDL
Court); *with Tr. of Case Mgmt. Conference Before the Hon. Martin Glenn* (May 25, 2018) ("Hr'g Tr.
5/25/2018") at 24 (noting that in light of recent rulings by the MDL court, "don't hold me to the exact numbers,
but I think we're down to . . . nine-and-a-half million cars.").

on its face, certification of the Proposed Classes would violate the Constitution as well as Rule 23, *Amchem*, *Ortiz*, and related certification prerequisites.

2.       In *Ortiz* v. *Fibreboard Corp*., 527 U.S. 815, 845 (1999), the Supreme Court explained the "serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited rationale," and also expressed significant doubts as to whether limited fund classes should ever be approved in the mass tort context. The Proposed Settlement before the Bankruptcy Court represents one of the most adventurous and large-scale limited fund class settlements ever proposed, and is infected with a host of fundamental constitutional concerns. That the Proposed Settlement violates every requirement of Rule 23 only underscores its constitutional problems. But even if the Proposed Classes could be certified in theory, they cannot here because the Proposed Settlement impermissibly modifies the confirmed Plan and would breach the Sale Agreement.

**The Proposed Settlement Does Not Satisfy Rule 23(e)**

3.       The Proposed Settlement constitutes an unlawful end run around Rule 23's rigorous certification process for settlement classes.[3] Specifically, Rule 23(e) dictates the standard by which the Court must determine whether to preliminarily certify the Proposed Classes. As recently amended, Rule 23(e) provides that giving notice will only be justified if the parties show that "the court will **likely** be able to . . . **certify** the class for purposes of judgement on the proposal." (Fed. R. Civ. P. 23(e)(1)(B)(ii) (emphasis added). Whether the Court will "likely be able" to finally certify the Proposed Classes is not a "sneak peek" that delays the work of class certification until a later date. The amendments to Rule 23(e) require courts to more closely scrutinize proposed class action settlements; as Co-Lead Counsel has put it, amended

---

[3]    This process is even more stringent in non-opt out class actions such as this given the Fifth Amendment due process and Seventh Amendment jury trial violations raised by denying class members their day in court. *In re Ortiz*, 527 U.S. at 845-46.

2

Rule 23(e) is a "major, major shift" toward "frontloading" issues, including experts, before notice goes out.[4]

4.     Indeed, amended Rule 23(e) is a "more exacting" standard than before[5] and now makes clear that:

> The decision to give notice of a proposed settlement to the class is an **important event**.  It should be based on a **solid record** supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. . . . **At the time they seek notice to the class**, the proponents of the settlement should ordinarily **provide the court with all available materials** they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members.[6]

Simply put, the Movants must first satisfy the prerequisites of Rule 23(e), which require them, among other things, to provide necessary information upon which the Court could base a preliminary class certification determination.  The Movants have not only failed to provide this Court with a solid record—they have provided **no record at all**.

5.     The Movants cannot avoid the mandatory process set forth by amended Rule 23(e) just because they seek certification of settlement classes, as Rule 23 applies with equal (if not greater) force in the settlement context.  In fact, amended Rule 23(e) dovetails with two key Supreme Court cases:  *Amchem* and *Ortiz*.  In *Amchem Prods., Inc.* v. *Windsor*, the Supreme Court held that class certification requires "undiluted, **even heightened**, attention in the settlement context."  521 U.S. 591, 620 (1997) (emphasis added).  In *Ortiz*, the Supreme Court noted that "certification of a mandatory settlement class, however provisional technically,

---

[4]    *See Affirmation of Kyle J. Kimpler in Support of Objection of General Motors LLC to the Proposed Settlement Among the Motors Liquidation GUC Trust and the Signatory Economic Loss and Personal Injury Plaintiffs* (the "Kimpler Decl.") Ex. 35, Elizabeth Cabraser, Class Action and Litigation Update at the 23rd Annual Consumer Financial Services Institute (June 17, 2018), at 19.

[5]    *In re Payment Card Interchange Fee Litig.*, No. 0-5MD-1720 (MKB) (JO), 2019 WL 359981, at *12 (E.D.N.Y. Jan. 28, 2019).

[6]    2018 Advisory Committee Notes to the 2018 Amendments to Federal Rule of Civil Procedure 23(e) (the "Rule 23(e) Adv. Comm. Notes") (emphasis added).

effectively concludes the proceeding save for the final fairness hearing," and therefore requires "**rigorous adherence**" to Rule 23. 527 U.S. at 849 (emphasis added). As a result, parties seeking to settle limited fund classes "must present not only their agreement, but **evidence** on which the district court may ascertain the limit and the insufficiency of the fund, with support in **findings of fact** following a proceeding in which the **evidence is subject to challenge**." *Id.* (emphasis added). Notably, *Ortiz* cautioned courts against the "**uncritical adoption** . . . of figures agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy." *Id.* at 848 (emphasis added).

6.    In sum, to comply with amended Rule 23(e), *Amchem*, and *Ortiz*, this Court must develop by the March 11 hearing[7] a "solid record,"[8] supported by "specific evidentiary findings,"[9] and conclude that the Movants will "likely"[10] satisfy, on a final basis, each of the requirements under Rule 23(a), Rule 23(b), *Ortiz*, and Rule 23(e) with respect to the Proposed Classes. However, the Movants have not provided this Court with **any** record to make the necessary, specific factual findings required by Rule 23(e). The Settlement Motions refer vaguely to "Proffered Evidence," but the Movants have not presented any such "evidence" to this Court, and it appears that such evidence is simply material, principally including expert reports, that is currently subject to New GM's challenges in the MDL Court that Judge Furman will resolve in the near term.[11]

---

[7]    The March 11 hearing has not been designated as an evidentiary hearing in accordance with the Local Rules of this Court. Local Bankruptcy Rule 9014-2. As explained *infra*, New GM does not believe that a solid record can be made by the Movants on that date to preliminarily certify the Proposed Classes.

[8]    Rule 23(e) Adv. Comm. Notes.

[9]    *Ortiz*, 527 U.S. at 853.

[10]    Rule 23(e)(B).

[11]    As discussed in New GM's Stay Motion, the fact that the MDL Court is already evaluating the Proffered Evidence is a compelling reason to grant a stay of proceedings relating to the Proposed Settlement.

7.      Nor have the Movants fleshed out the parameters of the Proposed Settlement itself.  In fact, calling it a "settlement" is misleading, as what the EL Plaintiffs have submitted for the Court's preliminary approval is not a "settlement," but only a procedure for determining whether there can be a settlement that impermissibly defers many key elements of any actual class settlement until later stages of the proceedings.  (Movants' Objection to Stay Motion, Dkt. No. 14447, ¶ 32 ("The Settlement Motions seek to establish a framework to permit late claims to be filed and establish procedures for the Court to estimate the claims - in other words, a path to progress.").)  For example, the Proposed Settlement provides that many critical terms and issues will be negotiated and resolved **after final certification and the granting of releases**, including determining the liquidated amount of the EL Plaintiffs claims, whether there will be any Settlement Fund (*i.e.*, the Adjustment Shares) and, if so, its actual size, whether additional classes or subclasses are required, whether the EL Plaintiffs that received notice are actually eligible to participate, how to allocate any consideration among the two Proposed Classes or between the Proposed Classes and the PIWD Plaintiffs, and how much of the Settlement Fund will be devoted to attorneys' fees.  These are issues that Rule 23(e) requires the Court to consider as integral parts of any settlement at the preliminary certification hearing (*i.e.*, March 11) and therefore cannot be negotiated and determined, much less deferred, until **after** final certification and settlement approval.  Without the basic settlement terms and a sufficient record on which to evaluate those terms, as required under Rule 23(e), this Court cannot preliminarily approve the Proposed Settlement.

**The Proposed Settlement Does Not Satisfy the Constitution and Rule 23(b)**

8.      Even if the Movants at some point put forth a "solid record," however, the Proposed Classes cannot satisfy the requirements of the Constitution and Rule 23(b)(1)(B) (or (b)(1)(A) in the alternative) and therefore cannot be certified as a matter of law, no matter how

much evidence the Movants could muster.  As the Supreme Court unambiguously held in *Ortiz*,
Rule 23 and the Fifth and Seventh Amendments to the Constitution mandate that a fund can be a
"limited fund" only if three characteristics are met:  (1) "the totals of the aggregated **liquidated**
claims and the fund available for satisfying them, set definitely at the maximums, demonstrate
the **inadequacy of the fund** to pay all claims"; (2) "the **whole** of the inadequate fund [is] to be
devoted to the **overwhelming claims**"; and (3) "the claimants identified by a **common theory** of
recovery [are] treated **equitably** among themselves."  527 U.S. at 838-839 (emphasis added).

9.      The Proposed Classes violate **every** requirement set forth in *Ortiz*.  First, the
Proposed Classes are comprised **entirely** of unliquidated claims.  The EL Plaintiffs fail to point
to any controlling post-*Ortiz* decision that has certified a limited fund class whose members hold
wholly unliquidated claims.  Similarly, the so-called limited fund (*i.e.*, the Adjustment Shares) is
entirely speculative and will not exist unless EL Plaintiffs' claims reach the necessary $3 billion
threshold, which is not even theoretically possible unless the Court first certifies two nationwide
classes.  The EL Plaintiffs' argument for class certification is thus entirely circular: they claim
certification under a "limited fund" theory based on a non-existent fund that could exist only if
the Proposed Classes are first certified.  Furthermore, the size of any such fund will remain
unknown until the EL Plaintiffs' claims are liquidated, and even then will be based on the
fluctuating value of New GM's common stock at some future time.

10.     Second, the whole of the limited fund is **not** devoted exclusively to the Proposed
Classes.  Instead, the limited fund is shared with the PIWD Plaintiffs (regardless of whether they
have filed claims) as non-class members who have asserted their own claims.  This "hybrid"
approach is not recognized by any Federal Rule (much less Rule 23), and the Movants offer no
justification for sharing a limited fund created under Rule 23 with non-class members.  In fact,

such a hybrid approach is incompatible with the justification for certifying non-opt-out limited fund classes, which is to ensure equitable distribution to *class members* of a fund that is purportedly inadequate to pay *their* claims. *See*, *e.g.*, *Ortiz*, 527 U.S. at 838. Additionally, under the Proposed Settlement, none of the GUC Trust's current assets that could otherwise satisfy the EL Plaintiffs' claims go into the "limited fund," while the EL Plaintiffs are not guaranteed **any** monetary recovery. This is precisely the type of limited fund by agreement of the parties that *Ortiz* rejected, and it "hardly appears that [the Proposed Settlement] is the best that can be provided for class members." *Ortiz*, 527 U.S. at 860. It goes without saying that the best that could be provided to the Proposed Classes would be for the GUC Trust to make all of its current assets available to Plaintiffs, as it is otherwise required to do under the Plan.

11.    Third, the EL Plaintiffs do not share a "common theory of recovery," and they have no way of knowing whether they are being treated equitably. The EL Plaintiffs assert five different causes of action under the laws of 51 different jurisdictions relating to six different Recalls affecting approximately 120 different vehicle models. There is no basis—certainly in the record before this Court—to determine whether the EL Plaintiffs, whose claims may arise under many thousands of different combinations of applicable state law, unrelated Recalls, and disparate vehicle models share a "common theory of recovery." For example, some Recalls involve alleged ignition switch defects and airbag non-deployment, while others do not. There is also no basis to conclude that the EL Plaintiffs will be treated equitably given that no EL Plaintiff will know what portion, if any, of the limited fund he or she will receive, or the qualifications and criteria to be eligible to receive a distribution from the fund, until after the Proposed Settlement is approved on a final basis.

12.     That the Proposed Settlement is an "adventurous application of Rule 23(b)(1)(B)" that the Supreme Court "counsel[ed] against" is a vast understatement. *Ortiz*, 527 U.S. at 845. It is also wholly unnecessary in the context of this chapter 11 case. As the language of Rule 23(b)(1) confirms, a limited fund class is permissible only where "adjudications with respect to individual class members" would "impair or impede" the interests of other class members, and thereby "justif[y] the limit on an early feast to avoid a later famine." *Id*. at 838. Here, there can be neither feast nor famine because the Bankruptcy Code and the confirmed Plan already require an orderly Court supervised claims process, in place for almost eight years, with *pro rata* distributions to holders of allowed general unsecured claims (which the EL Plaintiffs purport to be). Simply put, there is **no risk** of "fund depletion" or "fund impairment," which is the very basis for limited fund classes.[12]

## The Proposed Settlement Does Not Satisfy Rule 23(a) and Other Certification Prerequisites

13.     Even setting aside the fatal flaws described above, the Proposed Settlement fails for the additional reason that the two Proposed Classes must still satisfy the key "prerequisites" for any class as set forth under Rule 23(a). These prerequisites are "numerosity," "commonality," "typicality," and "adequacy of representation," and the EL Plaintiffs must ultimately prove them "by at least a preponderance of the evidence." *See Levitt* v. *J.P. Morgan Securities, Inc.*, 710 F.3d 454, 465 (2d Cir. 2013). The Movants cannot meet this burden because they cannot satisfy the commonality, typicality, or adequacy of representation requirements for

---

[12] The Movants argue in the alternative that the classes can be certified under Rule 23(b)(1)(A), which protects against "inconsistent or varying adjudications with respect to individual class members." Fed. R. Civ. P. 23(b)(1)(A). One problem is that there is no risk of inconsistent adjudications. Only two claimants—Patricia Barker and Yvonne James-Bivins—filed late proofs of claim by the deadline set forth in this Court's December 2016 Order. Another problem is that the Movants' alternative Rule 23(b)(1)(A) theory is dead on arrival because "[c]ourts in this Circuit have repeatedly recognized that certification under Rule 23(b)(1)(A) is limited to claims for equitable relief." *See Toney-Dick* v. *Doar*, 2013 WL 5295221, at *4 (S.D.N.Y. Sept. 16, 2013) (citing as examples a utility acting toward customers, a government imposing a tax, and a riparian owner using water that would otherwise flow to the downriver owners) (citations omitted).

many of the same reasons that Rule 23(a) bars the motion for class certification by the economic

loss plaintiffs in the MDL (the "<u>MDL Plaintiffs</u>"), including:

- Under Rule 23(a)(2), no class may be certified unless there are questions of law or fact common to the class. The EL Plaintiffs in the Non-Ignition Switch Class assert 255 different causes of action involving five separate Recalls. Some of the Recalls are completely unrelated, which is why the MDL Plaintiffs have sought **separate and state-wide** putative classes for each Recall in the MDL Court.

- Under Rule 23(a)(3), the claims or defenses of the (as-yet unidentified) class representatives must be "typical" of the potentially millions of class members in the Proposed Classes. Even assuming arguendo that the EL Plaintiffs identified class representatives (they have not), the proposed class claims implicate the laws of 51 jurisdictions, and the EL Plaintiffs do not propose state-by-state classes or subclasses. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *18 (S.D.N.Y. July 15, 2016) ("subtle differences in state law can dictate different results for plaintiffs in different jurisdictions."). Additionally, as demonstrated in New GM's MDL class opposition, some individuals: disposed of their vehicles before the recalls, barring their claims (Bankr. Dkt. 14431-2, Ex. B-2 at 92); or assert claims under the laws of states where Judge Furman has ruled a manifest defect is required and cannot prove manifestation, barring their claims (*id.* at 92-93), to name just a few bars to typicality. Given these circumstances, it will be difficult to identify any Plaintiff who has claims or defenses that are typical of the Proposed (nationwide) Classes.

- Under Rule 23(a)(4) and Rule 23(e)(2)(A), the (as-yet unidentified) class representatives and their counsel must adequately protect the interests of the class. The Proposed Settlement fails to identify who the class representatives are, and thus, the EL Plaintiffs cannot establish that the interests of differently situated class members are adequately represented. In addition, where, as here, differences among the EL Plaintiffs (and differences in state laws) require subclasses, each subclass must be represented **during the negotiations** by separate class representatives and separate counsel.

14. In addition to Rule 23(a)'s express prerequisites, the Movants must also establish

that the alleged injuries in the Proposed Classes can be shown by common evidence because "no

class may be certified that contains members lacking Article III standing," which requires each

putative class member to "have suffered an 'injury in fact.'" *Denney* v. *Deutsche Bank AG*, 443

F.3d 253, 264 (2d Cir. 2006). Here, the Proposed Classes include EL Plaintiffs who have no

injury-in-fact or legally cognizable claims because the EL Plaintiffs' claims depend entirely on

the methodologies and reports of their key expert, Stefan Boedeker, whose analysis in the MDL

Court shows that 26.6% to 39.1% of respondents have no injury or damages under the EL Plaintiffs' theory.  (Bankr. Dkt. 14431-2, Ex. B-2 at 2, 24-32.)  At minimum, millions of putative class members have no Article III standing and this Court lacks subject-matter jurisdiction over substantial numbers (if not substantially all) of the EL Plaintiffs and their purported claims. Similarly, as further discussed in the MDL Summary Judgment Briefs, none of the EL Plaintiffs have any legally valid claims because New GM has provided free Recall repairs and they therefore received the benefit of the bargain.  (Bankr. Dkt. 14431-3, Ex. C-1 at 12-23).  As a result, millions of putative class members have no Article III standing and this Court lacks subject-matter jurisdiction over substantial numbers (if not all) of the EL Plaintiffs and their purported claims.

**The Proposed Settlement Seeks an Impermissible Plan Modification and Violates the Sale Agreement**

15.    And even if the Proposed Settlement satisfied Rule 23, it nonetheless constitutes an impermissible modification of the Plan, GUC Trust Agreement, and Sale Agreement.  In fact, the only aspect of the Proposed Settlement that reflects any "compromise" between the parties is their agreement that EC Plaintiffs and PIWD Plaintiffs will have allowed general unsecured claims but—in violation of the Plan and GUC Trust Agreement—will not be GUC Trust Beneficiaries and will not be entitled to recover from the $495 million in existing GUC Trust assets.  The other supposedly "key" elements of the Proposed Settlement—allowing the EC Plaintiffs' and PIWD Plaintiffs' late filed claims and commencing an estimation hearing to liquidate those claims—reflect no compromise at all; instead, the GUC Trust is consenting to the late filing of **every** late claim and agreeing to pursue an estimation of those claims in the **maximum** amounts possible.  If Movants attempted to settle the disputes concerning the permissibility of EC Plaintiffs and PIWD Plaintiffs' late claims and the allowed amount

thereof—but without modifying the Plan—then EC Plaintiffs and PIWD Plaintiffs would be entitled to receive "catch-up" distributions from the GUC Trust's current assets ($495 million) **plus** the Adjustment Shares (if any) until they received the same 29.6% recovery that other GUC Trust Beneficiaries have received to date.  (*See* Plan § 7.4; GUC Trust Agreement § 5.3.)

16.    Thus, the **sole purpose** of the Proposed Settlement is to ensure that the GUC Trust **does not have to comply with the distribution procedures in the Plan and the GUC Trust Agreement** and therefore can avoid providing the EC Plaintiffs and PIWD Plaintiffs catch-up distributions from the GUC Trust's current assets for the express benefit of the GUC Trust Beneficiaries (who also receive mandatory releases under the Proposed Settlement.)

17.    The Movants cannot use Rule 23(b)(1)(b) to effectuate modifications to the Plan and GUC Trust Agreement that the Bankruptcy Code and the Plan do not permit.  The Settlement Motions purport to invoke this Court's bankruptcy jurisdiction under 28 U.S.C. §§ 157 and 1334, and therefore must comply with section 1127(b) of the Bankruptcy Code.  *See In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 748 (2d Cir. 1992) (finding that proposed changes to creditors' distribution rights under confirmed plan constituted an impermissible plan modification that could not be approved under the bankruptcy court's jurisdiction).

18.    New GM has a direct financial interest in ensuring that only valid claims are allowed, and that existing GUC Trust Assets are fully used to satisfy the EL Plaintiffs' claims as required under the Plan and GUC Trust Agreement.  The Proposed Settlement seeks to trigger the Adjustment Shares which are payable by New GM.  Furthermore, many of the EL Plaintiffs in the Ignition Switch Class are pursuing successor liability claims against New GM in the MDL Court, and those EL Plaintiffs' recoveries from the GUC Trust bar—or, (if MDL Plaintiffs' position is correct), at a minimum, reduce—recovery from New GM in the MDL Court.

11

Therefore, New GM has a direct stake in ensuring that the GUC Trust adheres to the provisions of the Sale Agreement and the Plan that requires it to use its remaining assets to satisfy any additional allowed claims.

19.    Accordingly, for these and other reasons set forth herein, the Court should deny the Settlement Motions.

## BACKGROUND

### I.    THE PRIOR SETTLEMENT

20.    On May 3, 2018, the GUC Trust filed a motion in this Court seeking approval of a settlement (the "Prior Settlement"), which, like the Proposed Settlement here, purportedly resolved all of the EL Plaintiffs' claims.[13]  The Prior Settlement sought to resolve proposed proofs of claims asserted on behalf of millions of individuals under Rule 23(b)(3), but without complying with Rule 23.  The EL Plaintiffs filed a notice of amended Class Claims on April 24, 2018, with hundreds of pages of allegations regarding their (b)(3) class claims, which mirrored the Rule 23(b)(3) claims asserted in the MDL Action.[14]  At the status conference on May 25, 2018, this Court requested briefing on the "gating issue" of whether the Prior Settlement required compliance with Rule 23 and noted that "[i]f the issue was whether . . . economic loss classes should be certified, and that issue is in the process of being briefed in discovery or whatever before Judge Furman, I'm strongly disinclined to try and jump the gun and decide the issue before Judge Furman does."  (Hr'g Tr. 5/25/2018 at 22.)  Following a hearing on July 19, 2018,

---

[13]    *See Motion of Motors Liquidation Company GUC Trust to Approve (I) The GUC Trust Administrator's Actions and (II) The Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1141 and Bankruptcy Rules 3002 and 9019 and to (III) Authorize the Reallocation of GUC Trust Assets* [Docket No. 14293] (May 3, 2018).

[14]    *See Amended Exhibits A and B to Motion For An Order Granting Authority To File Late Class Proofs Of Claim, Dkt. No. 13806* [Dkt. No. 14280] (Apr. 24, 2018) (the "Proposed Class Claims").

this Court held that the Prior Settlement required, as an initial step, compliance with Rule 23.  *In re Motors Liquidation Co.*, 591 B.R. 501 (Bankr. S.D.N.Y. 2018).

## II.    THE PROPOSED SETTLEMENT

21.    On February 1, 2019, following this Court's decision that Rule 23 must be satisfied before any settlement can be approved, the Movants filed the Settlement Motions seeking approval of the Proposed Settlement.  Like the Prior Settlement, the Proposed Settlement seeks to settle all the EL Plaintiffs' and the PIWD Plaintiffs' claims (regardless of whether such PIWD claims were filed).  Also, like the Prior Settlement, the GUC Trust continues to "dispute[] that Plaintiffs are entitled to this (or any) level of damages" while simultaneously acknowledging that the "asserted damages in the Proffered Evidence is well in excess of the amount necessary to trigger" the maximum amount of Adjustment Shares.  (Rule 9019 Motion ¶ 44.)

22.    Unlike the Prior Settlement, however, the EL Plaintiffs no longer assert class claims under Rule 23(b)(3) (though the only Proposed Class Claims actually on file are still predicated solely on Rule 23(b)(3)).  Instead, the centerpiece of the Proposed Settlement are two nationwide non-opt-out "limited fund" classes pursuant to Rule 23(b)(1)(B) (or Rule 23(b)(1)(A) in the alternative), combined with a non-class PIWD settlement that acts like a class settlement in that it seeks to bind on a non-opt-out basis any potential or actual PIWD Plaintiff.  The first of the two Proposed Classes is for those owners and lessees of vehicles asserting late-filed economic loss claims against the GUC Trust related to the Delta Ignition Switch Defect (Recall No. 14V-047) (such putative class, the "Ignition Switch Class").    (Rule 23 Motion ¶ 41.) Notably, the vast majority of the EL Plaintiffs in the Ignition Switch Class are asserting claims against New GM on a theory of successor liability in the MDL Court, which likewise requires proof of Old GM's liability.  The second of the Proposed Classes is for those owners and lessees of vehicles asserting late-filed economic claims against the GUC Trust related to Non-Ignition

13

Switch Defects (Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118, and 14V-153) (together

with Recall 14V-047, the "Recalls") (such putative class, the "Non-Ignition Switch Class").  *Id.*

Both putative classes are represented by the same Co-Lead Counsel.  The EL Plaintiffs assert

identical causes of action under the laws of each of the 50 states and the District of Columbia in

the Bankruptcy Court and the MDL: (i) fraudulent concealment; (ii) unjust enrichment; (iii)

consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v)

negligence.  (Rule 23 Motion ¶ 35; 5ACC at 3-4.)

        23.     The Movants are unclear as to how many members are intended to be in the

Proposed Classes. While they state there were approximately 11.4 million Old GM vehicles

involved in the Recalls (Rule 23 Motion ¶ 76), they seek to perhaps send notices to multiple

owners of the same vehicle.  At the same time, the Signatory Plaintiffs recognize that (a) based

on MDL rulings already made, it has been determined that many of the owners of the 11.4

million vehicles have not suffered damages or have no legally viable claims,[15] and (b) based on

the MDL Briefing, a substantial number of the Old GM vehicle owners may not have suffered

damages.   For example, the MDL Court's prior ruling should govern—specifically, that

"Plaintiffs who sold, traded in, or returned their vehicles before the recalls "could not have

realized any 'diminished value' because they did not own the defective vehicles when the recalls

were announced." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 403

(S.D.N.Y. 2017) ("*FACC MTD Opinion*"); *see also In re Gen. Motors LLC Ignition Switch

Litig.*, 2017 WL 3443623, at *2 (S.D.N.Y. Aug. 9, 2017) (on reconsideration, stating that while

some claims might not require proof of damages, "Plaintiffs do not articulate a coherent theory

---

[15]   Although Co-lead Counsel stated at the May 25, 2018 hearing before this Court "I think we're down to –
instead of 11.4 million cars, we're down to **nine-and-a-half-million cars**." Hr'g Tr. 5/25/2018 at 24 (emphasis
added).)

of how a plaintiff who bought a vehicle with a concealed defect and sold the same vehicle before the defect was revealed can logically, if not legally, prove that he or she suffered damages").

24.    As noted, the Proposed Settlement also seeks to resolve all claims by the PIWD Plaintiffs (regardless of whether they filed claims in the Bankruptcy Court), many of whom are also MDL Plaintiffs, even though the PIWD Plaintiffs who support the Proposed Settlement are not part of either of the two Proposed Classes and will recover from the same "limited fund" that is for the benefit of the Proposed Classes.  The Proposed Settlement broadly defines "Pre-Closing Accident Plaintiffs" as "plaintiffs asserting personal injury or wrongful death clams based on or arising from an accident that occurred before the Closing Date involving an Old GM vehicle that was later subject to [the same recalls specified in connection with the economic loss claims]."  (Settlement Agreement, Preamble § S.c.)  A subset of such plaintiffs are represented by counsel who signed the agreement, and these 442 plaintiffs are specifically identified in the agreement, and expressly included in the Release Provision.  (*See* Settlement Agreement § 5.3.)[16]  However, the proposed settlement provides that the Adjustment Shares (if any) will be distributed to "Plaintiffs," defined to include "Pre-Closing Accident Plaintiffs" (*i.e.*, including all persons asserting pre-closing personal injury or wrongful death claims).  (*See* Settlement Agreement § 2.51.)  Similarly, it appears that the claims of *all* Pre-Closing Accident Plaintiffs (*i.e.*, not just the 442 PIWD Plaintiffs identified in the agreement) are being released, regardless of whether they have asserted claims against the GUC Trust in the Bankruptcy Court.[17]  In the

---

[16]    Of the 442 plaintiffs specifically identified in the agreement, 254 are already eligible for settlements as a result of agreements in principle reached by their lawyers and New GM in the last several months, and one is duplicate of a plaintiff already listed.  Of the remaining 187 named in the agreement, 186 filed or attempted to file proofs of claims in the Bankruptcy Court, and 85 of these have also filed claims in the MDL.

[17]    The Rule 23 Motion and its exhibits contain different, conflicting definitions with respect to the PIWD Plaintiffs purportedly covered by the Agreement, which (at least in the proposed notices) appear to improperly release the claims of **all** PIWD Plaintiffs, regardless of whether they have asserted claims or are signatories to the Proposed Settlement.  *See,* Rule 23 Motion Ex. C, Final Order ¶ 9 (release applies to "All Plaintiffs"), Ex. D, Short Form Notice at 1 (the Settlement includes "Affected Persons" in the United States who, prior to July

Proposed Settlement, the GUC Trust consents to the filing of late Proofs of Claim, but only for the "Signatory Plaintiffs," and thus retains its right to object to any non-signatory PIWD Plaintiff that files an individual claim seeking recovery outside the settlement (*i.e.*, from GUC Trust assets).  (Settlement Agreement § 3.)

26.    Notably, all of the PIWD Plaintiffs that signed the Settlement Agreement sought authorization to file late claims well after the deadline for filing late claims set forth in this Court's December 2016 Order.

26.    The Movants envision three primary "stages" of proceedings with respect to the Proposed Settlement.  (Rule 23 Motion ¶ 116.)

27.    First, the Movants ask this Court to preliminarily approve the Proposed Settlement under Rule 23 and certify the Proposed Classes under Rule 23(e) ("Stage One").  (*Id.*) Upon preliminary approval under Rule 23(e), the GUC Trust will ask the Court for authorization to spend up to $13.72 million for a "state of the art notice program."  (Rule 9019 Motion ¶ 116.) The Movants anticipate that the hearing to approve this relief will occur on March 11.  (Hr'g Tr. 12/20/2018 at 5.)  After some indeterminate period of time (the Signatory Plaintiffs' Objection to New GM's Stay Motion indicates that the final fairness hearing will occur in October 2019), the Movants will then seek the Court's final certification of the Proposed Classes and final approval of the Proposed Settlement.  Upon final approval, the Proposed Settlement will be binding on 26 million EL Plaintiffs, each of which will have been required—with no opt-out right—to provide mandatory releases to hundreds of third parties including the GUC Trust Beneficiaries, the

---

10, 2009, bought or leased certain Old GM vehicles or suffered personal injury or wrongful death in an accident involving certain Old GM vehicles."), Ex. G, Long Form Notice at 6 ("Under the Settlement, each Affected Person will be deemed to have forever waived and released (the 'Waiver') any claims . . . ."), Ex. E, DTC Notice, at 1 (describing release of claims by "Potential Plaintiffs," defined as "persons who have suffered such [economic loss or personal injury or wrongful death] losses or injuries, regardless of whether they are currently involved in the Recall Litigation" . . .).

Avoidance Action Trust, and the defendants in the term loan litigation.  At the time such releases become effective (at the conclusion of State One), the EL Plaintiffs will not know whether they have valid claims, whether the Settlement Fund has any value, or whether they are eligible to participate in the Proposed Settlement.  In short, they will not know whether they will receive any consideration in exchange for their release.

28.    Second, the Movants intend, only after the Proposed Settlement is "final" and the releases have been obtained and the GUC Trust has ensured that its existing hundreds of millions of dollars in assets will not be used to satisfy EL Plaintiffs' claims, to pursue an estimation of the EL Plaintiffs' and PIWD Plaintiffs' wholly unliquidated claims ("Stage Two").  (Rule 9019 Motion ¶ 9.)  The procedures for Stage Two (which will determine what relief, if any, is available to the EL Plaintiffs and PIWD Plaintiffs) will presumably be spelled out in the Estimation Motion, which has not been filed.  The Movants acknowledge that the EL Plaintiffs and PIWD Plaintiffs will receive **no recovery** at all (notwithstanding that the GUC Trust has more than $495 million in current assets) under the Proposed Settlement if this Court estimates their claims in an aggregate amount of $3 billion or less.  (*See*, *e.g.*, Rule 23 Motion, Ex. D., Short Form Notice.)  The Movants also concede that estimation of the EL Plaintiffs' claims will take into account and be shaped by future rulings of the MDL Court.  (*See, e.g.*, Settlement Agreement § 4.5.)  Thus, it is not until Stage Two (or later)—after the Proposed Classes have been finally certified, approved, and the mandatory comprehensive releases granted—that any of the EL Plaintiffs' (or the PIWD Plaintiffs') claims become liquidated and the number of Adjustment Shares (if any) in the Settlement Fund becomes known.  The only way the EL Plaintiffs will be notified of developments in Stage Two is if they voluntarily check the Settlement Website.  (Rule 23 Motion, ¶ 65, n. 37.)

17

29.     Third, after the EL Plaintiffs and PIWD Plaintiffs' claims become liquidated, the Movants anticipate seeking this Court's approval of "allocation and distribution procedures" ("Stage Three").  (Rule 23 Motion ¶ 116.)  Stage Three will therefore determine how to allocate the value (if any) in the Settlement Fund among and between the two Proposed Classes, on the one hand, and the PIWD Plaintiffs, on the other, and will be "guided by, and flow from, the Court's determinations in the estimation proceedings."  (Rule 23 Motion ¶ 117.)  How such value will be allocated is currently unknown.  Such allocation may require "additional or different subclasses [to] be created at [Stage Three], if necessary."  (*Id.*)  The allocation and distribution procedures developed in Stage Three will also spell out the "qualifications and criteria for the [EL] Plaintiffs to be eligible to receive distributions from any Adjustment Shares." (Settlement Agreement § 8(b).)  Notice of how the Settlement Fund will be allocated among the EL Plaintiffs and PIWD Plaintiffs, whether additional subclasses will be created, and the eligibility criteria to participate in the Proposed Settlement will not be mailed to the EL Plaintiffs, but instead will be posted via the Settlement Website at an unspecified date.  (Rule 23 Motion, Ex. G, Long Form Notice.)  In other words, putative class members will have to monitor the Settlement Website over the course of months (or longer) in order to learn how to file a claim seeking distribution from any Settlement Fund.  (*Id.*, at 7 ("**Eligibility and criteria for payment** will be submitted for approval to the Bankruptcy Court at a later date and will be **subject to notice on the Settlement Website only** and an opportunity to object.") (emphasis added).

30.     Although virtually nothing is disclosed about Stage Two and Stage Three, the Movants concede that events in these subsequent stages may rewrite or undo the final certification orders obtained in Stage One.  (Settlement Agreement § 4.5 (if the MDL Court enters an order in the MDL on New GM's pending summary judgment motion "that impacts the

18

size, scope or composition of the classes of Economic Loss Plaintiffs, the Parties shall, within

five (5) business days from entry of the applicable Opinion or Order, engage in good faith

negotiations regarding the applicable provisions of this Settlement Agreement impacted by said

decision"); *see also* Hr'g Tr. 12/20/2018 at 11 ("There is a possibility . . . that the class could be

decertified, re-jiggered.").)  Of course, how a "final" approved settlement can be decertified or

"re-jiggered" is never explained, and no authority or precedent is provided.

31.    Due to the structure of the Proposed Settlement, which defers liquidating the late

filed claims, ascertaining the value of the Settlement Fund, and deciding who may be eligible

and how to allocate value among eligible EL Plaintiffs until Stages Two and Three, core terms of

the Proposed Settlement are unknown when the Court is asked to preliminarily approve the

Proposed Settlement at Stage One.  Such missing information includes, for example:

(a) the amount of consideration, if any, a member of the Proposed Class will be paid in exchange for entering into the Proposed Settlement and granting a binding release (including if the Adjustment Shares are not triggered);

(b) the distribution or allocation formula which will determine the amount of money, if any, a class member might recover as the consideration for agreeing to enter into the Proposed Settlement and granting a release;

(c) when the consideration, if any, will be paid;

(d) what amount of attorneys' fees will be sought under the Proposed Settlement, including what percentage of the Settlement Fund such fees constitute;

(e) whether the two Proposed Classes will be treated the same or differently in connection with the distribution of Settlement Funds, and how class members of different Recalls in the Non-Ignition Switch Class will be treated relative to each other;

(f) what (if anything) the PIWD Plaintiffs will be paid;

(g) how a class member's liquidated claim amount will be finally determined;

(h) how the Proposed Settlement might be affected by rulings on the MDL Briefing; and

     (i)  who the proposed class representatives are and the basis for proposing them as class representatives.

## **ARGUMENT**

32.     The Proposed Settlement contemplates an unprecedented certification process that violates the Constitution and well-established and constitutionally mandated rules for class certification. The Movants must adhere to the requirements of Due Process as well as the procedural requirements of Rule 23(e) when seeking preliminary approval of a class. Here, they fail to do so because they have not provided the Court with any of the necessary information from which to evaluate whether it would likely certify the Proposed Classes, and the contemplated certification process does not seek to obtain and provide this information to the Court until after notice is provided to the prospective class members and others. *See* Fed. R. Civ. P. 23(e)(1)(B)(i)-(ii). Moreover, the Proposed Settlement improperly combines an alleged limited fund class with a non-class comprised of all PIWD claimants, who are bound and have no opt-out rights. Such a hybrid class settlement does not exist under the Rules and with good reason—it does not comport with Rule 23. In addition, the Proposed Settlement fails because the Movants, who in the first instance seek certification of a limited fund class under Rule 23(b)(1)(B), cannot satisfy the constitutional requirements set forth by the Supreme Court in *Ortiz*. Nor are they entitled to certification under Rule 23(b)(1)(A), which is limited to claims for equitable relief and is not available for the monetary damages requested here. *See Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 361–63 (2011) ("individualized monetary claims belong in Rule 23(b)(3)"); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, No. 12-CV-2548 (VSB), 2017 WL 1273963, at *13 (S.D.N.Y. Mar. 31, 2017) (same).

33.     Beyond these fatal obstacles to approval, the Proposed Settlement fails for additional reasons. To ultimately certify a class, the Movants must satisfy the various

prerequisites of Rule 23(a), but once again, the Proposed Classes cannot do so as a matter of law. Furthermore, the Movants' proposal constitutes an impermissible modification of the Plan and GUC Trust Agreement that violates the Bankruptcy Code, and is also a breach of the Sale Agreement. Thus, the Proposed Settlement should be rejected.  In any event, as set forth in New GM's Stay Motion, this Court should defer consideration of the Proposed Settlement until the MDL Court rules on the MDL Briefing.

## I.    THE    MOVANTS'    PROPOSED    SETTLEMENT    VIOLATES    THE CONSTITUTION AND SHOULD NOT BE APPROVED AS A MATTER OF LAW

34.    The Proposed Settlement is unconstitutional on its face and violates every requirement of a limited fund class settlement under Rule 23.  Under the Constitution, individual claims for unliquidated damages may not be extinguished in a mandatory class action, as Movants propose here.  *Ortiz*, 527 U.S. at 847-48, *citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (holding that the Due Process Clause requires that parties be afforded a right to opt out of any such class for monetary damages); *cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (holding that claims for individual monetary relief could not be brought in a mandatory Rule 23(b)(2) class, but must be brought under Rule 23(b)(3)).  Certification of Movants' proposed non-opt-out, unliquidated-monetary-damages classes would violate the Seventh Amendment rights of absent class members by preventing them from obtaining a jury trial on any legal issues, *Ortiz*, 527 U.S. at 845-846, and would also violate each putative class member's Fifth Amendment right to their day in court.  *Id*. at 846-48.  Moreover, Movants' proposed unitary settlement including two separate classes—for ignition-switch and non-ignition switch plaintiffs—would violate the Constitution's requirement that individuals with conflicting interests cannot be bound unless they are adequately represented by separate class representatives and counsel **during the settlement negotiations**.  *Ortiz,* 527 U.S.at 848 n.24

21

(noting "the constitutional requirement articulated in *Hansberry* v. *Lee*, 311 U.S. 32 (1940), that

'the named plaintiff at all times adequately represent the interests of the absent class members.'")

(quoting *Shutts*, 472 U.S. at 812); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721,

739 (2d Cir. 1992) ("Manville III"); *Amchem*, 521 U.S. at 627; *see also* Part II.A., *infra*.  Finally,

the Proposed Settlement classes may not be certified because they include millions of class

members without injury and without Article III standing.  See Part V.A.*, infra*.

35.    The Supreme Court has stated that a proposed limited fund class settlement

aggregating unliquidated damages claims -- like the one it rejected in *Ortiz* -- raises "serious

constitutional concerns," including Seventh Amendment and due process concerns associated

with denying putative class members the right to opt-out of a proposed settlement.  *Ortiz*, 527

U.S. at 845-846.  The Supreme Court referred to these concerns as "obvious":

> First, the certification of a mandatory class followed by settlement of its action for money
> damages **obviously** implicates the Seventh Amendment jury trial rights of absent class
> members. . . .  Second, and no less important, mandatory class actions aggregating
> damages claims implicate the due process principle of general application in Anglo–
> American jurisprudence that one is not bound by a judgment *in personam* in a litigation
> in which he is not designated as a party or to which he has not been made a party by
> service of process.

*Id.* at 845-846 (emphasis added) (internal quotations omitted).

36.    To balance these obvious concerns, the Supreme Court states that the Constitution

requires, among other things, assurances that the settlement is "the best that can be provided to

class members," *Id.* at 860, and that "claimants are receiving the maximum fund, not a

potentially significant fraction less."  *Id.* at 863.  Similarly, it is critical in this context that Rule

23(a)(4) be scrutinized and that proposed class representatives adequately represent the interests

of absent class members.  *Id.* at 848 n.24 (noting "the constitutional requirement articulated in

*Hansberry* v. *Lee*, 311 U.S. 32 (1940), that 'the named plaintiff at all times adequately represent

22

the interests of the absent class members.'") (quoting *Phillips Petroleum Co.* v. *Shutts*, 472 U.S. 797, 812 (1985)); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 739 (2d Cir. 1992) ("Manville III").

37.     It is upon this constitutional foundation that the Proposed Settlement and the particular requirements of Rule 23 must be assessed.  Here, without any evidence, the Movants are seeking this Court's approval of a settlement that binds as many as 26 million individuals to a mandatory settlement process that will allow as-yet-identified individuals to prosecute their unliquidated tort claims to share in a settlement fund that doesn't currently exist and that purposely excludes more than $495 million of existing assets that would otherwise constitute class members' primary source of recovery.

38.     The flaws of the Proposed Settlement are fundamental, numerous, and arise under each of the particular requirements of Rule 23, yet ultimately boil down to those "serious constitutional concerns" that the Supreme Court warned against in *Ortiz*.   Each of these constitutional defects—apparent on the face of the Proposed Settlement—cannot be cured, and preliminary approval must be denied.  Otherwise, for class member who lack standing, or the adequate representation and jury trial right required by the Due Process Clause and Seventh Amendment, the settlement and releases would be "nullities." *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223, 236 (2d Cir. 2016); *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001).

## II.    THE MOVANTS HAVE NOT AND CANNOT MEET THEIR BURDEN UNDER RULE 23(E) TO DEMONSTRATE WITH A SUITABLE BASIS IN THE RECORD THAT THE PROPOSED CLASSES COULD BE CERTIFIED OR THE SETTLEMENT APPROVED

39.     The central mandate of the Rules Enabling Act is that "rules of practice and procedure . . . shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(a)-

(b), *Amchem*, 521 U.S. at 613.   "Courts must be mindful that the Rule as now composed sets the requirements they are bound to enforce. . . . The text of a rule thus proposed and reviewed limits judicial inventiveness."   *Id.* at 620   ("Courts are not free to amend a rule outside the process Congress ordered, a process properly tuned to the instruction that rules of procedure 'shall not abridge . . . any substantive right.'") (citing 28 U.S.C. § 2072).   The preliminary approval determination by the Court under Rule 23(e) is an involved process that must occur prior to any approval of a class settlement and notice.   Because the Movants' three-stage plan for settlement and certification puts the cart before the horse by delaying substantive legal and factual findings required by Rule 23(e) to Stage Two (estimation) and Stage Three (allocation), well after final certification, it is "markedly different from the traditional paradigm." *Ortiz*, 527 U.S. at 864; *see* Rule 23 Motion at ¶¶ 116-117, 148.   Accordingly, the Court must "minimize[] potential conflict with the Rules Enabling Act," *Ortiz*, 527 U.S. at 842, particularly in cases where certification is sought under Rule 23(b)(1)(B) and "constitutional considerations of due process and the right to jury trial" are at stake.   *In re Telectronics*, 221 F.3d 870, 881 (6th Cir. 2000) (citing *Ortiz*, 527 U.S. at 845–46).

 Contrary to the Movants' assumptions underlying the Proposed Settlement, "this Court is not at liberty to merely rubberstamp approval" at the pre-notice certification stage under Rule 23(e). *Hays* v. *Eaton Group Attorneys, LLC*, No. CV 17-88-JWD-RLB, 2019 WL 427331, at *8 (M.D. La Feb. 4, 2019) (applying amended Rule 23(e)).   Rather, before this Court can direct notice to as many as 26 million purported class members under Rule 23(e), it must "exercise the highest degree of vigilance in scrutinizing [the] proposed settlement[]."   *Reynolds* v. *Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002).   The Movants therefore must obtain preliminary approval of the Proposed Settlement under Rule 23(e), by proving that "giving notice is justified by the

24

parties' showing that the court will **<u>likely</u>** be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal.  (Fed. R. Civ. P. 23(e)(1)(B)(i)-(ii) (emphasis added).)[18]

40.    On December 1, 2018, Rule 23(e) was amended to "alter the standards that guide a court's preliminary approval analysis."  *In re Payment Card Interchange Fee Litig.*, 2019 WL 359981, at *11.  Specifically, by requiring the Court to find that final approval and certification is "likely," the standard for such approval is now "**<u>more exacting</u>** than the prior requirement." *Id.* at *12 (emphasis added).

41.    Additionally, to approve a class settlement, a bankruptcy court must find that the proposed class claims are procedurally and substantively fair under Rule 23.  *See*, *e.g.*, *In re BGI, Inc.*, 465 B.R. 365, 378 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ("For the Settlement to be approved in bankruptcy court, the Settlement must be both procedurally **<u>and</u>** substantively fair under Rule 23.") (emphasis added); *In re Partsearch Techs., Inc.*, 453 B.R. 84, 98 (Bankr. S.D.N.Y. 2011) (Glenn, J.) (same); *In re WorldCom, Inc.*, 347 B.R. 123, 140 (Bankr. S.D.N.Y. 2006) ("It is also possible that the Settlement will fall within the appropriate range of reasonableness or fairness as is required for each party and therefore warrant approval under . . . Rule 23.").[19]  Thus, the Court necessarily has to consider procedural and substantive fairness at the preliminary approval stage to determine whether it will **<u>likely</u>** be able to finally certify the class and approve the settlement

---

[18]    *See also* Rule 23(e) Adv. Comm. Notes ("As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement **<u>only after</u>** determining that the prospect of class certification and approval of the Proposed Settlement justifies giving notice."  (emphasis added)).

[19]    A bankruptcy court must also find that the proposed class claims are procedurally and substantively fair under Federal Rule of Bankruptcy Procedure 9019.  *In re BGI, Inc.*, 465 B.R. at 378.  Because the requirements of Rule 9019 are coextensive with certain of the requirements of Rule 23, New GM does not address the requirements of Rule 9019 herein. *See, e.g., In re BGI, Inc.*, 465 B.R. at 379-382 (finding that "[a]lthough the factors articulated in *Grinnell* do not precisely mirror those enumerated in *Iridium* [], the reasons behind approving the Settlement are also applicable in the Bankruptcy Rule 9019 context."); *In re Partsearch*, 453 B.R. at 99-103 (noting that the Rule 9019 factors "'require the Court to engage in a similar analysis to that required under Rule 23, save that the Court must now judge the Settlement from the perspective of the estate's creditors,'" as opposed to the perspective of the class members).

after a fairness hearing. *See* Fed. R. Civ. P. 23(e)(1)(B); *see also* MANUAL FOR COMPLEX LITIG.

§ 21.632 (4th ed.) ("The judge must make a preliminary determination of the fairness,

reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of

the certification, proposed settlement, and date of the final fairness hearing.").

42.    The 2018 amendments to Rule 23(e) specify the procedural and substantive

factors to be considered prior to preliminary certification. The criteria that bears on whether a

class settlement is fair, reasonable, and adequate include, among other things, whether

representatives and counsel have adequately represented the class, whether the relief provided

under the settlement is adequate, and whether the proposal treats class members equitably

relative to each other. *See* Fed. R. Civ. P. 23(e)(2)(A)-(D). These pre-certification

considerations are the very things that the Movants expressly defer until Stages Two and Three.

43.    The Advisory Committee Notes to the amended Rule 23(e) recognize that "[t]he

goal of this amendment is not to displace any approval factor, but rather to focus the court and

the lawyers on the core concerns of procedure and substance that should guide the decision

whether to approve the proposal."[20] The enumerated factors "should always matter to the

decision whether to approve the proposal." *Id.*

---

[20]    Before the 2018 amendments, the Second Circuit analyzed the following factors to determine the substantive reasonableness of a settlement pursuant to Rule 23(e):

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*City of Detroit* v. *Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), abrogated by *Goldberger* v. *Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (internal citations omitted).

A.    **The Movants Have Failed to Provide Any Record, Let Alone a Suitable Record, Upon Which the Court May Determine the Likelihood of Final Settlement Approval and Class Certification, as Required under Rule 23(e), Nor Can They.**

44.    Under amended Rule 23(e)(1), "[t]he parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class." Fed. R. Civ. P. 23(e)(1)(A). Yet, Movants have not submitted any evidence upon which this Court could make the requisite findings under Rule 23(e) that "the court will **likely** be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i)-(ii) (emphasis added). Nor can Movants proffer any evidence in support of their motions at this stage, because the March 11 hearing has not been designated as an evidentiary hearing with witnesses in accordance with the Local Rules of this Court. *See* Local Rule 9014-2. EL Plaintiffs' purported reliance on the record before the MDL Court to support their Rule 23 Motion is unavailing. The record before the MDL Court shows that even if a similar record were developed before this Court, it would not justify preliminary approval of the Proposed Settlement. Furthermore, preliminary settlement approval certainly would not be justified without additional discovery, such as allowing New GM the opportunity to depose the as-yet-unidentified class representatives to determine their adequacy or to evaluate the data underlying the expert reports EL Plaintiffs intend to rely on here.

45.    During the December 20, 2018 case management conference, the Movants incorrectly implied that the 2018 amendments to Rule 23(e) somehow altered the standard set forth in *Ortiz*, which required that, as a preliminary matter, "the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund, **with support in findings of fact following a proceeding in which the**

**evidence is subject to challenge.**" *Compare Ortiz*, 527 U.S. at 849 (emphasis added), *with* 12/20/2018 Hrg. Tr. at 4, 37–38 ("[W]hat Mr. Basta failed to mention is that *Ortiz* was determined before the amendments to Rule 23 . . . .").

46.    Yet "[u]nder the new Rule 23(e) . . . it appears that courts **must assess** at the preliminary approval stage whether the parties have shown that the court will likely find that the factors weigh in favor of final settlement approval. **This standard appears to be more exacting than the prior requirement**." *In re Payment Card*, 2019 WL 359981, at *12 (emphasis added); *see also Hays*, 2019 WL 427331, at *3 ("The recent amendment to Rule 23(e) makes **clear** that its procedural safeguards apply to a 'class proposed to be certified for purposes of settlement' and requires the Court to **conclude** that it will **likely** be able, after final hearing, to certify the class.") (emphasis added).    Indeed, Co-Lead Counsel, who has decades of class action experience, has publicly described the amendment as a "major, major shift" toward:

> what is called **frontloading in the settlement approval process**. So rather than wait until the notice has gone out and the final approval hearing to come in with information, **with experts**, with all the details on the settlement, that now takes place at the front end before the notice goes out.[21]

47.    Even before the changes to Rule 23(e), however, courts had an "independent responsibility to ensure that the requirements of Rule 23(a) and (b) have been met." *See Oladapo* v. *Smart One Energy, LLC*, No. 15 CIV. 9936 (LGS), 2017 WL 5956907, at *8-11 (S.D.N.Y. Nov. 9, 2017) (concluding "[o]n the present record" the court "cannot recommend that the Class be preliminarily certified for settlement purposes," where, among other things, the movants had not presented "one iota" of evidence on the numerosity, typicality, and commonality requirements); *De Leon* v. *Bank of Am., N.A.*, No. 09-CV-1251-ORL-28KRS, 2011

---

[21]    Kimpler Decl., Ex. 35, Elizabeth Cabraser, Class Action and Litigation Update at the 23rd Annual Consumer Financial Services Institute (June 27, 2018), at 19.

WL 13137935, at *3 (M.D. Fla. Aug. 31, 2011) ("[T]he Court finds that the evidence and legal authority presented is insufficient to certify a class under Fed. R. Civ. P. 23(a) and (b)(3) . . . until the requirements for class certification are met, preliminary approval of the Settlement Agreement would be premature.").  The new Rule 23(e)(1) therefore still requires this Court to make substantive determinations that mandate **a suitable record prior to a decision to give notice**, rather than at some later stage of the litigation that may be more convenient for the Movants, so that it can "assess whether the parties have shown that the court will likely be able to grant final approval and certify the class." *In re Payment Card*, 2019 WL 359981, at *12.

48.     The Advisory Committee Notes on the 2018 amendments to Rule 23(e) explain that:

> The decision to give notice of a **proposed settlement** to the class is an **important event**. It should be based on a **solid record** supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. . . . **At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2)** and that they intend to make available to class members.    (Rule 23(e) Adv. Comm. Notes (emphasis added).)

49.     Furthermore, where, as here, "a class has not been certified, the [settling] parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class.  Although the standards for certification differ for settlement and litigation purposes,[22] the court cannot make the decision regarding the prospects for certification

---

[22]  The requirements for certifying a settlement class are no less rigorous than for certifying a litigation class. *Amchem*, 521 U.S. at 620 (noting that Rule 23 "demand[s] undiluted, even heightened, attention in the settlement context . . . for a court asked to certify a settlement class will lack the opportunity, [which is] present when a case is litigation, to adjust the class . . . ."); *accord Schoenbaum* v. *E.I. DuPont De Nemours and Co.*, No. 4:05CV01108ERW, 2009 WL 4782082, at *11 (E.D. Mo. Dec. 8, 2009) ("These arguments seem to presuppose that settlement class certification is less rigorous than litigation class certification . . . a position that the Supreme Court has clearly refuted.") (citing *Amchem*); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) ("A settlement-only class must meet all the requirements of Rule 23, with one

**without a suitable basis in the record**." *Id.* (footnote added).  The Advisory Committee Notes reinforce the holdings in *Amchem* and *Ortiz*.  In *Amchem*, the Supreme Court made clear that class certification requires "undiluted, **even heightened**, attention in the settlement context." *Amchem*, 521 U.S. at 621-22 (emphasis added).  In *Ortiz*, the Supreme Court held that threshold Rule 23(b)(1) issues should be evaluated "**independent of the agreement** of defendants and conflicted class counsel . . . following a proceeding in which the **evidence is subject to challenge**," rather than the "**uncritical adoption** . . . of figures agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy." *Id.* at 848-54 (emphasis added).

50.    Consequently, Rule 23(e) requires this Court to develop a "solid record" **now** to support the likelihood of final certification of the Proposed Classes and approval of the Proposed Settlement.  Although it appears the Movants are relying on the plaintiff's expert reports submitted in the MDL Action in an attempt to satisfy Rule 23(e), the Movants do not attach any of those reports and it is unclear what, if any, evidence they are relying on in the Settlement Motions.  Nor do the Movants include any other information regarding the value of any claims in their Rule 23 Motion.  (*See* Rule 23 Motion ¶ 107.)  Thus, the EL Plaintiffs cite no evidence[23] that could demonstrate that the Court will "likely" be able to approve the Proposed Classes under Rule 23(e)(2).  This lack of evidence coupled with the Movants' proposed framework that delays substantive legal and factual findings until "Stage Two"—*i.e.*, the estimation stage—is backwards and clearly at odds with Rule 23, as well as the Advisory Committee Notes and the

---

important exception: because the case will never go to trial, the court need not consider the manageability of the proceedings should the case or cases proceed to trial.").

[23]    There is no factual basis in the Berman or Cabraser declarations submitted by Movants to support preliminary approval or class certification.  If plaintiffs seek to put evidence into the record on reply or in advance of the March 11, 2019 hearing, New GM reserves the right to submit additional evidentiary materials to the court.

approach adopted by the MDL Court, which has not deferred consideration of summary
judgment and *Daubert* issues until after the certification decision.

51.     The Movants' position is directly at odds with *Ortiz* and *Amchem*, which prohibit
parties from either punting difficult questions until after certification or, as the Movants suggest,
seeking to have finally approved classes "decertified" or "re-jiggered" at a later date.  (Hr'g Tr.
12/20/2018 at 11.)   The EL Plaintiffs attempt to defer the creation of additional classes or
subclasses until Stage Three.  (*See* Rule 23 Motion ¶ 117 (noting that "Class members may be
differently situated" at Stage Three requiring "additional or different subclasses").)   However,
"where differences among members of a class are such that subclasses must be established,
[there is] no authority that permits a court to approve a settlement . . . on the basis of consents by
members of a unitary class, some of whom happen to be members of . . . distinct subgroups,
without creating subclasses." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d
242, 252 (2d Cir. 2011) (citations and quotation marks omitted).  As the *Amchem* court noted, "a
court asked to certify a **settlement class will lack the opportunity, present when a case is
litigated, to adjust the class** . . . ."  521 U.S. at 620 (emphasis added).

52.     The Movants must "actually prove—not simply plead—that their proposed class
satisfies each requirement of Rule 23 . . . ." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573
U.S. 258, 275 (2014), but they have failed to do so. Without developing a factual record to
support the necessary findings under Rule 23(a), (b), (e) and *Ortiz*, the Court cannot approve the
Proposed Settlement on even a preliminary basis.  *See Ortiz*, 527 U.S. at 843; *In re Payment*,
2019 WL 359981, at *11–12.

53.     In short, Rule 23(e) requires this Court to develop a "solid record" **now** to support
the likelihood of certification of the Proposed Classes.   It cannot be deferred to some

31

indeterminate time after the preliminary approval stage. Here, the Movants have failed to provide this Court with **any** record upon which it could undertake the analysis required by Rule 23(e), let alone the solid record this Court needs to satisfy amended Rule 23(e)'s "more exacting" standard. For this reason alone, the Court should deny the relief requested in the Settlement Motions.

54. Moreover, even if Movants developed an evidentiary record before this Court or somehow imported the record from the MDL Court, the Proposed Settlement **still** could not be preliminarily approved because the Proposed Classes cannot satisfy Rules 23(a) and 23(b). (*See e.g.*, *infra* at Section III, Section V; Bankr. Dkt. 14431-2, Ex. B-2 at 16-51, 90-98 (New GM's MDL Class Certification Opposition (discussing, among other things, MDL plaintiffs (including some of the same plaintiffs here) failure to comply with Rule 23(a), Article III, and the Rules Enabling Act)). Finally, without allowing New GM the opportunity to depose the as-yet-unidentified class representatives and to evaluate the data underlying the expert reports upon which Movants rely, this Court will have no evidentiary basis upon which to evaluate whether class certification would be likely under Rule 23(a) and 23(b). *See infra* at IV.

**B. The Court Does Not Have Any Basis, Let Alone a Suitable Basis, in the Record to Determine that the Proposed Settlement Is Substantively Fair. On its Face, the Proposed Settlement Is Unfair, Inadequate, and Unreasonable.**

55. To approve the Proposed Settlement, the Court must further determine whether it is substantively fair under Rule 23(e). This can occur "only after a hearing and only on finding that [the Proposed Settlement] is fair, reasonable, and adequate after considering:"

> whether (A) the class representatives and class counsel have adequately represented the class; . . . (C) the relief provided for the class is adequate . . .; and (D) the proposal treats class members equitably relative to each other. (Fed. R. Civ. P. 23(e)(2)(A), (C), (D).)

56.     As set forth below, the Movants have not provided any record, let alone the basic and necessary settlement terms, for this Court to determine whether the Proposed Settlement satisfies paragraphs (A), (C), and (D) of Rule 23(e)(2).

> **1.     Movants Cannot Demonstrate that the Proposed Classes Are Adequately Represented.**

57.     Rule 23(e)(2)(A) requires this Court to evaluate the likelihood that the "class representatives and class counsel have adequately represented the class" which invokes issues arising under Rule 23(a)(2) (commonality), Rule 23(a)(3) (typicality), and Rule 23(a)(4) (adequacy of representation) discussed in Section V below.

58.     Because "adequacy of the representation of the class is the **linchpin** to securing the preclusive effect of the class proceedings as to absent members" (McLaughlin on Class Actions § 4:26 (Oct. 2018) (emphasis added)), it is remarkable that the Proposed Settlement does not even identify the representatives of the Proposed Classes.  Therefore, this Court has **zero basis**—let alone a "suitable basis" or a "solid record"—to evaluate the likelihood that it will find the proposed representatives to be adequate.[24]

59.     But assuming for the moment that the proposed representatives are simply the named claimants in the Proposed Class Claims filed shortly before the Prior Settlement,[25] seven of the named claimants in the Proposed Class Claims are also proposed class representatives in

---

[24]    The Rule 23 Motion defines the "Ignition Switch Class Representatives" as the "prospective class representatives for the Ignition Switch Plaintiffs" and the "Non-Ignition Switch Class Representatives" as the "prospective class representatives for the Non-Ignition Switch Plaintiffs" (Rule 23 Motion p. 1.)  To add to the confusion, the Ignition Switch Class Representatives and the Non-Ignition Switch Class Representatives are together defined as the "Economic Loss Plaintiffs," a term that is defined in the Settlement Agreement to include all putative members of the Proposed Classes.  (Settlement Agreement Preamble § S.b.)  Movants now claim that New GM "feigns confusion" about who the class representatives are.  (Movants' Objection to Stay Motion, Dkt. No. 14447 at ¶ 46.)  However neither the Settlement Motions nor the Settlement Agreement identified the proposed class representatives.  Indeed, Section 2.67 of the Settlement Agreement provides that the proposed class representatives are identified on Schedule 3 thereto, but Schedule 3 instead identifies three PIWD Plaintiffs represented by two specific law firms.

[25]    Many of these named claimants were added to the Late Filed Claims, without Court authorization, after the deadline set forth in the Court's December 2016 Scheduling Order.

the MDL Court, where New GM has explained **based upon evidence** that such individuals are subject to unique defenses or otherwise assert claims that are not typical of the proposed statewide classes.  (Bankr. Dkt. No. 14431-2, Ex. B-2 at 16-98.[26])  To the extent that the MDL Court rules that any of the individuals who may be class representatives here cannot adequately represent the statewide MDL classes, it is hard to fathom how they could adequately represent any of the nationwide Proposed Classes in these proceedings.  In the absence of rulings from the MDL Court, this Court does not have any basis in the record to determine whether the unidentified proposed representatives are likely adequate, an inquiry rendered even more difficult by the fact that the named claimants in the Proposed Class Claims do not come from all 51 applicable jurisdictions.  The Proposed Class Claims, for example, list Frances Howard of Jackson, Mississippi as a named claimant, but do not include any named claimants from certain other states (*e.g.*, Alaska).  As a result, this Court would under these hypothetical facts have to find it likely that Ms. Howard (or some other claimant in the Proposed Class Claims) is an adequate representative of the EL Plaintiffs from Alaska because, among other things, her claims under Mississippi law are typical of claims under Alaska law (including for claims relating to different Recalls).  But the Movants have failed to provide this Court with any basis—let alone a suitable basis grounded in fact and law—to make such a determination.

### 2.    The Relief Provided to the Proposed Classes Is Not Adequate.

60.    Under Rule 23(e)(2)(C), the relief provided to class members must be adequate when taking into account: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness

---

[26]    *See also* Kimpler Declr. Ex. 1, 2/27/17 P. Barker MDL Dep. Excerpts, Ex. 2, P. Barker MDL Pltf. Fact Sheet, Ex. 3, 2/28/17 S. Benton MDL Dep. Excerpts, Ex. 4, 2/28/17 M. Benton MDL Depts. Excepts, Ex. 5, M. Benton MDL Pltf. Fact Sheet, Ex. 6, 3/2/17 C. Hardin MDL Dep. Excerpts, Ex. 7, C. Hardin MDL Pltf. Fact Sheet, Ex. 8, 3/3/17 E. Ramirez MDL Dep. Excerpts, Ex. 9, E. Ramirez MDL Ptf. Fact Sheet, Ex. 10, 5/9/17 K. Robinson MDL Dep. Excerpts, Ex. 11, K. Robinson MDL Pltf. Fact Sheet, Ex. 12, 5/31/17 P. Witherspoon MDL Dep. Excerpts, Ex. 13, P. Witherspoon MDL Pltf. Fact Sheet.

of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." (Fed. R. Civ. P. 23(e)(2)(C)(i)-(iv).)  Because the Movants propose a non-opt-out class, the Constitution and *Ortiz* require that the relief not only be adequate, but instead be "the best that can be provided to class members," 527 U.S. at 860, with "assurance that claimants are receiving the maximum fund, not a potentially significant fraction less." *Id.* at 863.

61.    Here, to determine that the relief is likely adequate, or the best that can be provided, this Court must predict the outcome of the Stage Two estimation procedure as well as the allocations in Stage Three, which, of course, depend on proceedings and methodology that the Movants have not disclosed and presumably will not do so until after final settlement approval and certification.  The Movants have made no showing regarding the likelihood of the Adjustment Shares threshold being met and have effectively conceded that this Court cannot evaluate the adequacy of the relief.  (Rule 23 Motion, Ex. D (proposed notice states that there is "no guarantee that the claims estimate order will require New GM to issue **any** shares," even though the EL Plaintiffs "will be prevented from pursuing [their] own lawsuit" because of the non-opt-out release.) (emphasis added).  Likewise, the proposed method of distribution is currently unknown, and expressly deferred until after certification.  Section 8 of the Proposed Settlement simply provides that either the Signatory Plaintiffs or an unidentified "administrator" shall—at a later time—develop "procedures for the administration and allocation to Plaintiffs of the Settlement Fund" and approve "qualification and criterion for Plaintiffs to be eligible to receive distributions from . . . the Settlement Fund."  The only aspect of the "proposed method of distributing relief" spelled out in the Proposed Settlement is that direct notice will not be

provided to the EL Plaintiffs, but rather they will be required to monitor a website to know if and when they must submit a claim. (*See* Proposed Settlement § 8(b).)

62.    Additionally, although attorneys' fees are to be taken into account under Rule 23(e)(2)(C)(ii), the Movants provide no information about attorneys' fees. The EL Plaintiffs propose that the procedure for determining attorneys' fees will be determined following final settlement and certification approval. (Rule 23 Motion at 6 n.10.) The Court therefore cannot evaluate, for purposes of final approval or class notice the effect of fees on the adequacy of the relief, or how they compare to the relief provided to the class. Indeed, because the class may recover nothing—and because this will not be known until after the estimation proceedings—an award of any attorneys' fees might be grossly unfair. *See* MANUAL OF COMPLEX LITIG. § 21.61 (4th ed.) (payment of attorneys' fees based on amount of allocated settlement funds, rather than the funds actually paid to class members, or in an amount exceeding damages awarded to class members, are "red flags").

### 3.    The Proposed Settlement Does Not Treat Class Members Equitably.

63.    The "claimants identified by a common theory of recovery [must be] treated equitably among themselves" under Rule 23(e)(2)(D) and *Ortiz*. *Ortiz*, 527 U.S. at 839. Although the Proposed Classes are nationwide classes, the Movants concede that the EL Plaintiffs assert claims under the laws of every state and the District of Columbia for: "(i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence." (Rule 23 Motion ¶ 35.) Given that the claims in the Proposed Classes arise under 255 different causes of action, relate to six separate Recalls, and involve approximately 120 vehicle models, the EL Plaintiffs have not established a common theory of recovery, particularly where the MDL Court has held that "subtle differences in state law can dictate different results for plaintiffs in different

36

jurisdictions." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *18.  To

determine whether the EL Plaintiffs are being treated equitably, the Court must first understand

whether the EL Plaintiffs are appropriately placed in nationwide classes, or whether differently

situated EL Plaintiffs require additional classes or subclasses.  Here, the Movants have made no

record to support any such finding.  Even if the Movants had provided a sufficient record,

however, the Court would still not be able to determine if they were treated equitably because

allocation does not occur until Stage Three, when the Movants concede that class members "may

be differently situated" and therefore may require "additional or different subclasses," (Rule 23

Motion ¶ 117), or even decertification.  (Hr'g Tr. 12/20/2018 at 11.)  How value (if there is any)

will be allocated among such subclasses is unknown.

66.    64.    Disproportionate treatment of class members is one of the "red flags" of a legally

improper settlement, and it cannot be evaluated without information about the allocation method.

*See* MANUAL OF COMPLEX LITIG. § 21.61 (4th ed.) (identifying recurring potential abuses of

which courts should be wary).  Because the Movants have not provided details about any

"procedures to resolve the difficult issues of treating such differently situated claimants with

fairness as among themselves," the Proposed Settlement is not substantively fair under Rule

23(e).  *Ortiz*, 527 U.S. at 856.

### C.    Movants Cannot Separate Preliminary Approval Under Rule 23(e) From the Decision to Give Notice to the Proposed Classes and the Definition of the Proposed Classes.

65.    Although the Settlement Motions initially sought an order "direct[ing] that notice

of the Settlement Agreement to the members of the Classes and Pre-Closing Accident Plaintiffs

be issued" (Rule 23 Motion ¶ 57), Movants have now abandoned that request and instead assert

that "notices will not be mailed until the population of the Classes is fixed by summary

judgement rulings that Judge Furman is anticipated to make."  (Movants' Objection to Stay

Motion, Dkt. No. 14447 at ¶¶ 6, 25.)  Movants now acknowledge, for example, that "if Judge

Furman rules on summary judgment that pre-recall sellers do not have claims, the proposed

Classes are reduced [from 26,180,000 potential members] to approximately 11,900,000

members."  (*Id*. at ¶ 6 n.6.)  Movants further say that they will "accommodate and assimilate

Judge Furman's rulings on summary judgment (which may impact the size of the Proposed

Classes) and *Daubert* **in the notice mailing**."  (*Id*. (emphasis added).)  As a result, in addition to

whether pre-Recall sellers have claims and can be included in the Proposed Classes,  Movants

recognize that other summary judgment issues, such as whether New GM's repairs provided EC

Plaintiffs with the benefit of their bargain and therefore negate any claims, could further reduce

the size of the Proposed Classes.   Nevertheless, Movants still ask that the Court "grant

preliminary approval with the understanding that notice mailing will not begin until Judge

Furman's forthcoming orders establish the universe of Plaintiffs here who will be able to pursue

claims."   (*Id*. at ¶ 82.)   This Court cannot, however, preliminarily approve the Proposed

Settlement under Rule 23(e) without knowing the "contours of the Classes" or the "universe of

Plaintiffs . . . able to pursue claims."  (*Id*. at ¶¶ 25, 82).

66.    This Court cannot enter a preliminary approval order under Rule 23(e) that is

entirely divorced from the sending of notice to Proposed Class members.  That is exactly what

Movants now ask.  For example, Movants initially described the Proposed Settlement as having

three stages, including approval and notice of the settlement in the first stage, estimation at the

second stage, and allocation and distribution in the third stage.  (Rule 23 Motion, ¶¶ 116, 148.)

Now, Movants describe the Proposed Settlement as moving in three "phases":

> The first is a "Preliminary Approval Phase," . . . .  The second phase, the "Notice
> and Comment Phase," begins if and when the Court grants preliminary approval .
> . . .  The last stages are, respectively, final approval following the final fairness
> hearing, then claims estimation proceedings, followed by approval of allocation

and    distribution    procedures    if    Adjustment    Shares    are    triggered.
(Objection to Stay Motion ¶ 23).  By separating the "Preliminary Approval Phase" from the
"Notice" phase, Movants have rendered Rule 23(e) meaningless.  After all, preliminary approval
and providing notice are inextricably linked.  *See* 2018 Advisory Committee Notes to the 2018
Amendments to Federal Rule of Civil Procedure 23(e) ("The decision to give notice of a
proposed settlement to the class is an important event.  It should be based on a solid record
supporting the conclusion that the proposed settlement will likely earn final approval after notice
and an opportunity to object.");  *see also Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d
1292, 1299 (S.D. Fla. 2007) (noting that, prior to recent amendments, "the **purpose of
preliminary approval is solely to communicate the proposed settlement to the class, review
and approve the proposed form of notice to the class, and to authorize the manner and
form of dissemination of the notice**.") (emphasis added).  Indeed, Plaintiffs' Rule 23 Motion
admits that "**[t]he role of the court at the preliminary approval stage is to determine
whether it is appropriate to send notice of a proposed settlement to the class**."  (Rule 23
Motion ¶ 50 (emphasis added));  *see also* Rule 26(e)(1) (at the preliminary approval stage,
"parties must provide the court with information sufficient to enable it to determine whether to
give notice of the proposal to the class.").  Movants cite no authority separating preliminary
approval from notice, as they now propose.  Instead, by conceding that notice cannot be sent now
given the centrality of the MDL Court's future rulings, plaintiffs concede that no settlement can
be preliminarily approved.  *See Carnegie* v. *Household Int'l, Inc.*, 371 F.Supp.2d 954, 957 (N.D.
Ill. 2005) (denying preliminary approval where "counsel are unable to tell me at this time how
many people may actually get notice.");  *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
2019 WL 387322, at *6 (N.D. Cal. Jan. 30, 2019) (denying motion for preliminary approval of

class action settlement because of due process and Rule 23(e) fairness violations resulting from

inadequate, inaccurate, and misleading proposed notice).

      67.    As important, it is impossible for this Court to preliminarily certify any classes

when Movants acknowledge that the very definition of those classes will change **after**

preliminary certification.  The proposed order that Movants submitted with their Rule 23 Motion

provides that:

> This Court, pursuant to Bankruptcy Rule 7023, hereby preliminarily certifies, subject to further consideration at the Fairness Hearing described below, the following classes of persons as settlement classes:
>
> > The "Ignition Switch Class" is defined as all persons asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.
> >
> > The "Non-Ignition Switch Class" is defined as all persons asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

(Rule 23 Motion, Proposed Order ¶ 3.)

      68.    But Movants now concede that the Proposed Classes may not include "**all**

**persons**" who "owned or leased a vehicle" subject to a Recall, but instead may—subject to

future rulings by the MDL Court—only include those persons who owned or leased a vehicle

subject to a Recall **and who didn't sell their vehicle prior to the Recalls**; a change in definition

that would reduce the size of the Proposed Classes by more than fifty percent.  Other past and

future summary judgment rulings from the MDL Court, such as manifest defect and benefit of

the bargain rulings, could also modify the "contours of the Classes."  In other words, Movants

now concede that future rulings by the MDL Court **will change the very definition of the**

**Proposed Classes** that they ask this Court to preliminarily certify on March 11.  Movants' own

proposed order, however, demonstrates that a precise definition of the Proposed Classes is necessary for this Court to enter any preliminary approval order under Rule 23(e).

69.    There is simply no basis under Rule 23 or otherwise for this Court to enter a preliminary approval order when the settling parties concede that the "universe of Plaintiffs [] who will be able to pursue claims" will be decided later—but before notice is sent.  (Objection to Stay Motion ¶ 82.)

## III.    THE PROPOSED CLASSES CANNOT BE CERTIFIED ON A LIMITED FUND THEORY PURSUANT TO RULE 23(b)(1)(B)

70.    Even if the Proposed Settlement is found to be substantively fair based upon some record that does not yet exist, however, Rule 23(e) still requires this Court to determine whether it will likely be able to certify the Proposed Classes.  Thus, the Movants cannot "dispense with the requirements of Rules 23(a) and (b)."  *Ortiz*, 527 U.S. at 864; *see also Amchem*, 521 U.S. at 593 (1997) ("Rule 23(e)'s settlement prescription was designed to function as an additional requirement, not a superseding direction, to the class-qualifying criteria of Rule 23(a) . . . ."); *In re Payment Card Interchange Fee Litig.*, 827 F.3d 223, 235 (2d Cir. 2016) (recognizing the "heightened risk of conflating the fairness requirements of Rule 23(e) with the independent requirement of 'rigorous adherence to those provisions of the Rule designed to protect absentees,' such as Rule[] 23(a) . . . .").

71.    The Movants simply cannot satisfy Rule 23(b)(1)(B).  The Movants request that the Court certify two putative limited fund classes under Rule 23(b)(1)(B).  (*See* Rule 23 Motion ¶ 91.)  Yet the Proposed Settlement violates every requirement of a "limited fund" class set forth in *Ortiz*.  Those requirements are themselves mandated by the Constitution and are therefore "presumptively necessary, and not merely sufficient, to satisfy the limited fund rationale":

(1) "the totals of the aggregated **liquidated** claims and the fund available for satisfying them, set definitely at their maximums, demonstrates the

41

inadequacy of the fund to pay all the claims";

(2) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims"; and

(3) "the claimants identified by a common theory of recovery [are] treated equitably among themselves."

*Ortiz*, 527 U.S. at 838-839, 842 (emphasis added). Furthermore, the *Ortiz* court held that a limited fund cannot be created simply by agreement of the settling parties, but rather, the settling parties must present "evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge." *Id.* at 849. The Proposed Classes do not meet any of the necessary characteristics of a limited fund class, and the Proposed Settlement is nothing more than a blatant attempt to create an artificial limited fund by agreement, one that leaves the GUC Trust with more than 97% of its assets untouched, and requires no contribution at all from the Avoidance Action Trust or hundreds of other persons and entities that will receive mandatory releases from as many as 26 million individuals. This is the precise result that *Ortiz* highlighted as insufficient to counterbalance the constitutional concerns associated with disposing of the jury trial and due process rights of millions of individuals.

### A.    The Proposed Classes Exceed the Constitutional Limits of Limited Fund Classes

72.    The Proposed Settlement fails out of the gate because the Proposed Classes do not solve any of the concerns that historically justified limited fund treatment. A limited fund class is meant to ensure that absent parties are represented "where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all." *Ortiz*, 527 U.S. at 836. Limited fund classes are rarely approved, however, as they raise serious constitutional concerns. *See* 1 McLaughlin on Class

Actions § 5:10 (15th ed. 2018).  The Supreme Court noted significant skepticism over whether limited fund settlements should be used at all in the mass tort context, and they certainly do not make sense in connection with a bankruptcy case with a confirmed plan where the GUC Trust assets are required to be distributed *pro rata* without any guaranteed percentage recovery, such that it is impossible that any individual claim would prejudice other claimants.  *See In re Motors Liquidation Co.*, 447 B.R. 150 (Bankr. S.D.N.Y. 2011); *see also* 1 McLaughlin on Class Actions § 5:10 (15th ed. 2018) (noting that the Supreme Court in *Ortiz* "expressed skepticism about [limited fund] settlements in the mass tort context").

## 1. Limited Fund Classes Are Rarely Approved Due to Constitutional Limitations

73.    Since *Ortiz*, courts "have enforced the strict limitations the Supreme Court imposed on the availability of limited fund class actions with **rare exception**."  1 McLaughlin on Class Actions § 5:10 (15th ed. 2018) (emphasis added).  According to McLaughlin on Class Actions, "after *Ortiz*, no decision, other than Judge Weinstein's now-reversed ruling in *In re Simon II Litigation*, [] has certified a 'limited fund' class involving unliquidated damages, while numerous courts have either denied (b)(1)(B) certification or decertified (b)(1)(B) classes that had been certified under pre-*Ortiz* law."  *Id.*[27]

74.    Limited fund classes are rare because they raise "serious constitutional concerns"—namely, Seventh Amendment and due process concerns.  *Ortiz*, 527 U.S. at 845-846 (noting that the Supreme Court "raised the flag on [this due process] issue" in *Phillips Petroleum*); *see Phillips Petroleum*, 472 U.S. at 812.  First, limited fund class actions are mandatory class actions, and as such, they effectively waive the Seventh Amendment rights of

---

[27]    Nor does Economic Loss Counsel's March 3, 2019 Objection to New GM's Motion to Stay cite any post-*Ortiz* decision certifying a Federal Rule 23 limited fund class involving unliquidated claims.

absent class members by preventing them from obtaining a jury trial on any legal issues they may have (such as the amount of their claim). *Id.* Second, non-opt-out limited fund class actions implicate the due process principle that everyone should have his or her day in court. *Ortiz*, 527 U.S. at 846. Certification under Rule 23(b)(1)(B) therefore "must be carefully scrutinized and sparingly utilized" because, unlike Rule 23(b)(3), Rule 23(b)(1)(B) does not contain the protection of opt-out provisions. *In re Telectronics*, 221 F.3d at 881; *see also* Rule 23 Motion ¶ 92 ("[T]he Classes will be mandatory, non-opt out Classes."). In *Ortiz*, the Supreme Court "disapproved a creative use of Rule 23(b)(1) that employed the 'limited fund' rationale to eliminate notice and opt-out rights." *Jefferson* v. *Ingersoll Intern. Inc.*, 195 F.3d 894, 897 (7th Cir. 1999). By contrast, in cases in which (unlike here) there is a true limited fund—a definite fund—and liquidated damages, "**the only question is how to divide up the pie**," and the opt-out choice is less of a due process concern. *In re Telectronics*, 221 F.3d at 881; *see Stott* v. *Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 328–29 (N.D. Tex. 2011). Here, as explained further below, there are many other questions, including most notably, what the liquidated amount of the EL Plaintiffs' claims is, and how to liquidate such claims, and whether a limited fund will exist and if so, its size and how it will be allocated, so the lack of an opt-out provision unnecessarily infringes upon jury trial and due process rights.

75.     A limited fund should also provide the "best" possible relief for the limited fund claimants. *Ortiz*, 527 U.S. at 839, 852, 860. This explains why *Ortiz* and other courts have concluded that the limited fund class concept is not intended to apply in the mass tort context, where it is difficult, if not impossible to assess what the best possible outcome for claimants is at the time of certification. Here, contrary to the Movants' assertion, the limited fund does not provide the "best possible relief" because the entire purpose of the Proposed Settlement is to

deprive the EL Plaintiffs of more than $495 million in GUC Trust assets (as well as any assets from the Avoidance Action Trust and the hundreds of other entities that will receive a release). (*See* Rule 23 Motion ¶ 112.)  The Movants' assertion that the Proposed Settlement would be a "better deal" for the EL Plaintiffs because it would exclusively entitle them to the value of up to 30 million Adjustment Shares (approximately $1.15 billion at present) despite depriving them of the remaining GUC Trust Assets is a hollow promise, because, among other things, it completely ignores their entitlements (if their late claims could be filed and ultimately allowed) to existing GUC Trust assets under the Plan and GUC Trust Agreement, it assumes that EL Plaintiffs' claims will exceed the approximate $3 billion threshold before any Adjustment Shares are issued, and it rests on assumptions such as the variable stock price of New GM and the completely unproven maximum allowance of the EL Plaintiffs' claims.  (*See* Rule 23 Motion ¶¶ 113–14.)

### 2.    A Limited Fund Class Is Not Appropriate in the Bankruptcy Context

76.    The paradigm of a limited fund, which addresses situations where there is a risk of depletion of funds or a race to the courthouse, is completely inapt here since the provisions of the Plan, together with applicable provisions of the Bankruptcy Code, require *pro rata* distributions to general unsecured creditors, with "catch-up" payments to later-resolved claims, such that the EL Plaintiffs with earlier-resolved claims could never recover more than the EL Plaintiffs with later-resolved claims.  The Plan is a "pot plan," which "refers to a 'pot' of money that Debtor is required to pay to the [t]rustee for distribution of creditors.  This 'pot' consists of a fixed amount of money and the percentage that a creditor ultimately receives depends on the number of claims filed in the bankruptcy case."  *In re Jafary*, 333 B.R. 680, 686 (Bankr. S.D.N.Y. 2005); *see also In re New York Medical Group, P.C.*, 265 B.R. 408, 411 n.2 (Bankr. S.D.N.Y. 2001) ("Under a 'pot plan,' the debtor pays a fixed amount, and the percentage that

each creditor receives depends on the total amount of allowed claims sharing the 'pot.'") (citing *In re Witkowski*, 16 F.3d 739, 741 (7th Cir. 1994)).   The Movants make no effort in the Settlement Motions to explain how, if any EL Plaintiff pursued his or her economic loss claims on an individual basis, such pursuit could meaningfully harm other absent class members, who have made no effort to pursue claims against the GUC Trust in the now five years since the Recalls were announced, and more than nine years since the claims bar date in this case.

77.   The Plan here contemplates that the GUC Trust will make *pro rata* distributions to general unsecured creditors and otherwise wind down the Debtors' estates.   The GUC Trust Agreement requires that distributions to holders of "Resolved Allowed General Unsecured Claims . . . shall provide such holders, as nearly as possible, with the exact same amount of distributions of each asset type as if such holders had been holders of Initial Allowed General Unsecured Claims."  GUC Trust Agreement § 5.3(b).)

78.   Accordingly, one EL Plaintiff could not exhaust the purported "limited" fund. *See In re FIRSTPLUS Fin., Inc.*, 248 B.R. 60, 75-76 (Bankr. N.D. Tex. 2000) ("Rule 23(b)(1)(B) refers to a situation where there is a finite amount of money to satisfy all claims and **wherein one plaintiff could exhaust the fund to the detriment of the other potential claimants**.") (emphasis added).   Because of the *pro rata* distribution scheme in place under the Plan for a finite sum, there is no risk of "fund depletion" or "fund impairment" of the GUC Trust assets through separate litigation, which is the very basis of limited fund cases.   Under the Plan, allowed claimants will get their *pro rata* share of what is available; there is no mechanism by which one claimant could receive more than that.  *See* 1 McLaughlin on Class Actions § 5:8 (15th ed. 2018) ("The basic purpose of Rule 23(b)(1)(B) is to protect plaintiffs in situations

where separate lawsuits might exhaust a defendant's resources . . . ."). No such concern exists here.

79.    Furthermore, there is a dramatic difference between (1) a non-opt-out, limited fund class where it is in every potential claimant's interest to divide up a limited or dwindling pot of assets—which is essentially the relief that bankruptcy law provides for—and (2) a non-opt-out, limited fund class where a dozen or so claimants seeks to forever bind millions of other claimants—whose claims are as of yet neither allowed nor liquidated—to a settlement that excludes nearly 97% of the defendant's assets. Because the limited fund class concept and bankruptcy law both solve for the "race-to-the-courthouse" problem, a limited fund class rationale simply does not apply in connection with a pot plan.[28] Not surprisingly, for the last several years, Co-lead Counsel has advocated for a Rule 23(b)(3) class—as they do in the MDL Court—and the Proposed Class claims devote hundreds of pages to such (b)(3) allegations.

### B.    The Proposed Settlement Impermissibly and Unconstitutionally Premises a Limited Fund on Unliquidated Claims

80.    According to the Supreme Court, "the first and most distinctive characteristic" of a limited fund class action is that "the totals of the aggregated **liquidated** claims and the fund available for satisfying them, set definitely at the maximums, demonstrate the inadequacy of the fund to pay all the claims." *Ortiz*, 527 U.S. at 838 (emphasis added). In other words, **the limited fund cannot be based on unliquidated claims**, and the class's liquidated claims must exceed the assets available to satisfy those claims.

---

[28]    The Plaintiffs' claim that *Ortiz* "itself suggested" "Rule 23(b)(1)(B) class settlements as an alternative to bankruptcy" is disingenuous at best. Rule 23 Motion ¶ 100. In fact, rather than supporting this proposition, the footnote the Movants cite warns that applying 23(b)(1)(B) in the bankruptcy context may create "incentives . . . [that] significantly undermine the protections for creditors built into the Bankruptcy Code." *Ortiz*, 527 U.S. at 860 n.34.

81.    Here, there are no liquidated claims, and the Movants have not presented any evidence on which this Court may ascertain the liquidated amount of the EL Plaintiffs' claims. Thus, this Court cannot certify the Proposed Classes based upon the Movants' proposed limited fund rationale.

### 1.    There Are No Liquidated Claims

82.    The Supreme Court in *Ortiz* expressly noted that a mandatory class action under Rule 23(b)(1)(B) is not intended to "aggregate **unliquidated** tort claims on a limited fund rationale." *Ortiz*, 527 U.S. at 843 (emphasis added); *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. CIV. A. 98-20594, 1999 WL 782560, at *7 (E.D. Pa. Sept. 27, 1999) ("The **obvious difficulty** facing the proposed . . . class is that, as in many mass tort limited fund classes, there are no liquidated claims.").

83.    Here, it is indisputable that the EL Plaintiffs' claims are unliquidated; otherwise, the Stage Two estimation would not be necessary.  The EL Plaintiffs assert that their claims total $72 billion (the PIWD Plaintiffs have previously argued their claims total billions of dollars too), while the GUC Trust continues to maintain that it has "meritorious defenses" against the claims of all EL Plaintiffs (Rule 9019 Motion ¶ 79), and the EL Plaintiffs may not have "any" damages at all.  The Movants seek to estimate (*i.e.*, liquidate) the EL Plaintiffs' claims only **after** the Court certifies the Proposed Classes.  (*See* Rule 23 Motion ¶ 24; *see also* Proposed Settlement ¶ E.)  There would be no need for estimation, of course, if the EL Plaintiffs' claims were liquidated because liquidated, non-contingent claims cannot be estimated under section 502(c) of the Bankruptcy Code.  *See* 11 U.S.C. § 502(c) ("There shall be estimated for purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . .") (emphasis added).

48

84.     Indeed, as this Court noted, the EL Plaintiffs do not have a single allowed or liquidated claim among the millions of claims that the Movants purportedly seek to resolve through the Proposed Settlement.  *See In re Motors Liquidation Co.*, 591 B.R. at 516 (". . . their claims are unliquidated and contingent.").  The Movants simply assert that the value of their claims "could equal or exceed $76.69 billion," based on "the conjoint analysis conducted by Plaintiff's experts."  (Rule 23 Motion ¶ 107.)  The Movants fail, however, to attach any report or declaration from the MDL Plaintiffs' expert, Mr. Boedeker, or any other evidence.  Regardless, in a May 2017 report, Mr. Boedeker provided wildly varying damages estimates for economic loss per vehicle—including "median" damages estimates from "$88 to $8094" per vehicle, which, using Boedeker's estimate of 11.96 million vehicles in his May 2012 Report would result in between $1 billion and $96 billion in alleged damages.  (05/09/2017 Boedeker GUC Trust Report at 33.)

85.     To determine the liquidated amount of EL Plaintiffs' claims, this Court would have to resolve numerous issues concerning the admissibility, reliability, and implications of Boedeker's reports and opinions.  As New GM has discussed in the *Daubert* Briefing before the MDL Court, Boedeker is not qualified and his analysis is speculative, unreliable, legally invalid, and does not comply with Rule 702 or *Daubert*.  (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1]; MDL *Daubert* Reply Brief [Bankr. Dkt. No. 14431-4, Ex. D-3].)  Boedeker has no Ph.D. and is not qualified to develop novel theories of economic loss based on "penalties" and "fixed supply" assumptions.  His sole qualification as a "user" of conjoint surveys is insufficient to support the novel methodology he employs.  Further, the very experts upon whom Boedeker claims to rely have reviewed Boedeker's work in the MDL and have roundly criticized it, including:

- Daniel McFadden, M.B.A., Ph.D., who won the Nobel Prize in Economics, and who Boedeker highlights as the author of peer-reviewed conjoint studies, concludes that Boedeker's report and methodology improperly deviate from standard economic methodologies set forth in the very literature Boedeker cites, and that his "conjoint analysis is deeply flawed and cannot produce any reliable results." Kimpler Decl. Ex. 14, 2/23/18 McFadden Rpt. ¶ 9; *see also* Kimpler Decl. Ex. 15, 8/13/18 McFadden Sur-Rebuttal Rpt.

- Shari Diamond, Ph.D., is the author of the *Reference Guide on Survey Research* in the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (3rd ed. 2011). Boedeker cites to and relies upon Dr. Diamond's work, claiming he has followed the best survey practices described in her Guide. But, as Dr. Diamond explains, Boedeker failed to comply with basic survey requirements as well as the generally accepted survey methodologies set forth in her Guide. Kimpler Decl. Ex. 16, 2/23/18 Diamond Rpt. ¶ 6; *see also* Kimpler Decl. Ex. 17, 8/13/18 Diamond Errata Rpt., Ex. 18, 8/13/18 Diamond Sur-Rebuttal Rpt.

- Peter Rossi, M.B.A., Ph.D, personally developed the Hierarchical Bayesian Choice-Based Conjoint, the most widely used method for conjoint analysis and the method Boedeker claims to use. Dr. Rossi concludes that Boedeker "invents his own measure of damage" that is "not endorsed by any economist that [he is] aware of"; and (ii) "does not provide any citations to research by economists endorsing this measure because support for this measure does not exist." *Id.,* Ex. 19, 2/23/18 Rossi Rpt. ¶¶ 3, 5, 8-9 10-11, App D; *see also Id.*, Ex. 20, 8/13/18 Rossi Sur-Rebuttal Rpt.

- John List, Ph.D., the former Chairman of the University of Chicago's Department of Economics and former Senior Economist on President Obama's Council of Economic Advisors, has written about and helped develop the now widely accepted economic principles for evaluating the reliability of stated preferences surveys like the one used by Boedeker. Dr. List concludes that Boedeker's "economic loss framework . . . does not follow accepted economic principles," his survey data "fail three necessary conditions for yielding reliable measures of consumer preferences," and his results, if taken at face value, show that many consumers "prefer defective cars – they benefit from product defects." *Id.*, Ex. 21, 2/23/18 List Rpt. ¶ 10; *see also id.*, Ex. 22, 8/13/18 List Sur-Rebuttal Rpt.

- Laurentius Marais, Ph.D., who holds a doctorate in mathematics and statistics and was a professor at Stanford University and the University of Chicago, concludes (i) Boedeker's reports and testimony "reflect basic errors that call into question his comprehension of and his basic competence in the statistical and mathematical methods he employs and relies upon," (ii) Boedeker's "simplistic mathematical recipe" for calculating damages "is internally incoherent and externally inconsistent with his assignment to measure plaintiffs' purported" economic damages, and (iii) "fail[s] to establish reliably the existence of—or to quantify meaningfully the magnitude of—any hypothetical economic damage to the hypothetical vehicle purchasers among his respondents, let alone any actual economic damage to actual purchasers of actual GM vehicles in the real world." *Id.*, Ex. 23, 2/23/18 Marais Rpt.

50

¶¶ 12-13, 24; *see also id.*, Ex. 24, 4/18/18 Supp. Marais Rpt., Ex. 25, 8/14/18 Marais Sur-Rebuttal Rpt.

86.     Consistent with settled law and economic and survey principles, these experts conclude that Boedeker's non-market-price and "penalty"-based damages methodology relies on concepts and principles that: (i) are not recognized in the field of economics, statistics, or survey design, (ii) improperly deviate from recognized economic principles; and (iii) result in unreliable and invalid conclusions.   As Dr. List noted, Boedeker's methodology and opinions are inconsistent with "what I have taught for more than 25 years on the very first day of my Economics 101 course." (*Id.*, Ex. 21, 2/23/18 List Rpt. ¶¶ 124-125.)

87.     Thus, before any class or settlement could be approved on a preliminary or final basis, this Court would have to consider:  (i) all of the MDL briefing relating to the admissibility of the Boedeker report, *see* MDL Class Cert. Briefing (Bankr. Dkt. No. 14431-2), MDL Summary Judgment Briefing (Bankr. Dkt. No. 14431-3), MDL Daubert Briefing (Bankr. Dkt. No. 14431-4), MDL Supplemental Letter Briefing (Bankr. Dkt. No. 14431-5); (ii) all of the expert reports New GM used to rebut Boedeker in the MDL, including those of Dr. McFadden, Dr. Diamond, Dr. Rossi, Dr. List and Dr. Marais; and (iii) whether, even if somehow admissible, Boedeker's methodology calculates legally cognizable damages, and does so on a class-wide basis. *See* Exs. 15-25 hereto.

88.     Moreover, even if Movants had introduced Boedeker's reports into the record before this Court, they would not support a finding of economic loss damages for the EL Plaintiffs:

- Boedeker's analysis ignores real-world market data showing that following New GM's recall announcements there was no common impact on the prices paid for at-issue vehicles, with the prices of a large fraction of vehicles (some 45%) appearing to be higher than expected after the recalls than before.  (MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 17-19; Kimpler Decl. Ex. 39, 8/13/18 Willig Sur-Rebuttal Rpt. ¶¶ 11, 25 ("there is nearly 100% probability that post-recall prices of at least 45% of at-issue GM vehicles were *higher* than

would be expected if they had not been recalled.", "[p]ost-recall prices of 94.7% of at issue GM vehicles were not below [by a statistically significant amount] the level that would be expected if they had not been recalled."); *see also* Ex. 36, 2/23/18 Willig Rpt.; Ex. 37, 3/19/18 Willig Supp. Rpt.; Ex. 38, 5/7/18 Willig Supp. Rpt.; Ex. 40, 2/23/18 Cornell Rpt.; Ex. 41, 8/13/18 Cornell Sur-Rebuttal Rpt. ¶¶ 3, 22-32 ("I find that marketplace evidence directly contradicts the results of Mr. Boedeker's new rebuttal survey and the damages calculations which rely on that survey, and thus establishes that both are unreliable."; "The results of my synthetic control analysis demonstrate to a high degree of statistical confidence that Mr. Boedeker's new survey results are inconsistent with marketplace evidence and thus not reliable or an accurate measure of economic losses incurred by potential classes."); Ex. 42, 2/23/18 Hanssens Rpt.; Ex. 43, 8/13/18 Hanssens Sur-Rebuttal Rpt. ¶¶ 5, 17-20 (finding that New GM sales and market shares did not decline following the recalls, even after correcting for plaintiffs' improper adjustments)).)

- Boedeker's analysis does not calculate the market prices consumers would have paid had defects been disclosed because his "fixed supply" assumption does not account for changes in willingness to sell at different prices. (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 30-35; MDL *Daubert* Reply Brief [Bankr. Dkt. No. 14431-4, Ex. D-3] at 13-19; MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 34-35.)

- Boedeker's analysis measures the impact of defect disclosures on demand and willingness-to-pay for packages of safety vehicles, not the price of vehicles generally or the at-issue GM vehicles specifically. (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 13-19; MDL *Daubert* Reply Brief [Bankr. Dkt. No. 14431-4, Ex. D-3] at 6-11; MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 35-36.)

- Boedeker's analysis relies on a defect-free assumption that purportedly measures the difference in demand for a vehicle that consumers "believe to be defect free" compared to a "vehicle where the defect was disclosed at the point of purchase." This is inconsistent with the undisputed evidence showing that the vast majority of vehicles will someday require a safety recall repair and that named plaintiffs reported being aware their vehicles may need recall repairs at the time of their purchase. (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 21-24; MDL *Daubert* Reply Brief [Bankr. Dkt. No. 14431-4, Ex. D-3] at 11-13; MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 38-39.)

- Boedeker's "averages" are entirely unrelated to the alleged injuries or damages suffered by any plaintiffs and so are improper "representative" evidence under *Tyson Foods Tyson Foods, Inc.* v. *Bouaphakeo*, 136 S. Ct. 1036 (2016). (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 45-46; MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 42-43.)

- Boedeker's classwide "median per vehicle" loss estimates are facially invalid. Classwide damages necessarily will depend on the relative mix of vehicles and individuals (*i.e.*, mix of new vs. used vehicles, average prices paid, etc.), but Boedeker assigns the same exact per-vehicle-loss to the 14v346 and 14v400 recall classes even though vehicles in the former recall were predominantly *new* purchased 2010-2014 Camaros, while the latter includes mostly pre-2005 vehicles purchased *used.* (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 45-46.)

- Boedeker fails to account for the fact that vehicle prices are determined by the negotiations between individual buyers and sellers of each vehicle, which are impacted by numerous factors including the response of both the seller and buyer to the defect disclosures. Plaintiffs' experts acknowledge that due to these negotiations some buyers might not pay less when defects are disclosed.  (MDLClass Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 30-32.)

- Over 95% of respondents across Boedeker's surveys have at least one "subjective value" (*i.e.*, estimated utility) reflecting irrational preferences, *e.g.*, preferring higher prices to lower prices, a vehicle with a defect to one without, a recall as compared to no recall, a later recall as compared to an earlier recall, a greater risk of injury to lesser risk of injury and, incredibly, the risk of death over the risk of only property damage to the vehicle.  (MDL *Daubert* Brief [Bankr. Dkt. No. 14431-4, Ex. D-1] at 20-21.)

- If credited as reliable and valid, Boedeker's own analysis shows that no class can be certified because between 26.6% and 39.1% of potential class members have no injury because they would be willing to pay the same amount *or more* when defects are disclosed (*i.e.*, they potentially paid less because defects were not disclosed).  (MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 24-32, 42-43.)

89.    In order to liquidate EL Plaintiffs' claims, this Court would also have to consider the arguments made by New GM in its MDL summary judgment motion.  These arguments either preclude the economic loss claims entirely, or at minimum reduce them to the point at which economic loss and personal injury claims could not trigger the Adjustment Share threshold:

- Plaintiffs do not have any benefit-of-the-bargain damages because New GM's recall repairs provided plaintiffs with the benefit of their bargain; plaintiffs' damages are limited to cost-of-repair, which is zero; and plaintiffs seek an impermissible double recovery of a fully repaired vehicle plus damages for an allegedly defective vehicle.  (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 13-19; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 3-10; *see also* MDL SJ Pls. Op. [Bankr. Dkt. No. 14431-3, Ex. C-2] at 4 n.1 ("Regarding Recall Nos. 14v118 (side-impact airbags) and 14v153 (power steering) . . . Plaintiffs acknowledge that the evidence now demonstrates that the remedies offered under those recalls are effective in repairing the defects."); Kimpler Decl. Ex. 26, 2/23/18 Fedullo Rpt. at 3 (concluding "[t]he remedies for each of these recalls sufficiently address the recall condition from an engineering standpoint"), Ex. 27, 8/30/2014 Final Report from the Virginia Tech Transportation Institution to General Motors at iii (concluding "VTTI believes the majority of existing ignition switch cases have been identified by GM, and the company's control strategies should result in a substantial reduction of unintended ignition deactivation cases").)

- The named plaintiffs have no evidence, whether fact or expert, to show that they overpaid for their particular vehicles so as to have benefit-of-the-bargain damages.  (MDL SJ Brief

[Bankr. Dkt. No. 14431-3, Ex. C-1] at 19-22, 31-32; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 10-15.)

- Plaintiffs generally defer to their experts on the amount of any overpayment or benefit-of-the-bargain damages. But their experts admit that they have not been asked to establish, and have no opinion regarding, the benefit-of-the-bargain damages for any named plaintiff. (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 22-24; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 10-15.)

- Certain plaintiffs have no evidence of a manifest defect, as required to recover under the laws of certain states.   (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 24-25; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 16-18.)

- Plaintiffs who disposed of their vehicles before the 2014 recalls (including K. Robinson, who is discussed in New GM's MDL summary judgment motion and is also a late claimant subject to the Proposed Settlement) could not have realized any benefit-of-the-bargain or lost-time damages. (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 26; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 18-20.)

- Plaintiffs in certain states cannot recover "lost time" damages without evidence of lost income or earnings.   (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 27-30; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 20-21.)

- Plaintiffs whose vehicles are subject to the Service Parts Recall (MY 2008-2010 Pontiac Solstice and G5, MY 2008-2010 Saturn Sky, MY 2008-2010 Chevrolet Cobalt, and MY 2008-2011 Chevrolet HHR vehicles covered under Recall No. 14v047) have no evidence their vehicles were repaired with a faulty switch, and thus have no claims under this recall. (MDL SJ Brief Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 32-33; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 21-22.)

- Certain plaintiffs cannot show reliance or causation as required for their consumer protection and fraudulent concealment claims. (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 34-46; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 22-26.)

- Plaintiffs have no viable state law causes of action, for multiple reasons set forth in New GM's summary judgment filings. (MDL SJ Brief [Bankr. Dkt. No. 14431-3, Ex. C-1] at 46-66; MDL SJ Reply Brief [Bankr. Dkt. No. 14431-3, Ex. C-3] at 226-34.)

In short, in order to determine the liquidated amount of EL Plaintiffs' claims, as required under

*Ortiz*, this Court would need to adjudicate myriad issues governing the likely amount (if any) of

EL Plaintiffs' claims—issues already fully briefed and pending before Judge Furman in the

MDL Court.

90.    Other courts have rejected proposed limited fund classes involving unliquidated claims.    In *Klein* v. *O'Neal, Inc.*, although the District Court for the Northern District of Texas "assume[d] arguendo that plaintiffs' claims [were] liquidated within the meaning of *Ortiz*," the court was "unable to reach a sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages."    7:03-cv-102-D, 2006 WL 325766, at *4–5 (N.D. Tx. Feb. 13, 2006).    The court determined that the "reliance on past settlements, although perhaps sufficient to generalize about the value of the claims, is inadequate to present a reliable total of the aggregated liquid claims."    *Id.* at *4.    The data was unreliable because there was "no evidence of cases tried or jury verdicts rendered."    *Id.*    Similarly, in *In re Diet Drugs*, the District Court for the Eastern District of Pennsylvania determined that the first characteristic was not met because there were no liquidated claims—"the absence of trial experience fail[ed] to provide a basis to determine the amount of the claims to be measured against the fund to be tendered."    *In re Diet Drugs*, 1999 WL 782560, at *8.

91.    The Movants cite *dicta* from a footnote in *Doe* v. *Karadzic*, 192 F.R.D. 133 (S.D.N.Y. 2000), involving claims for acts of genocide against an alleged war criminal, for the proposition that unliquidated claims can be certified under Rule 23(b)(1)(B) *if* there is a "'reasonable method by which to calculate, or even estimate with comfortable certainty, [defendant's] potential liability' to the class members."    (Rule 23 Motion ¶ 107 (citations omitted).)    But the Movants have not put forth a reasonable method to calculate their alleged damages.    And more importantly, *Karadzic* itself rejected class certification, and stated that although "[t]he [*Ortiz*] Court ostensibly left for another day the question of whether this subdivision may ever be used to aggregate individual tort claims," "[n]evertheless, its requirement of strict adherence to the traditional limited fund model may have sounded the death

55

knell for mass tort suits under Rule 23(b)(1)(B)." *Id.* at n.10. In any event, even courts that have discussed in *dicta* the *possibility* of certifying a Rule 23(b)(1)(B) class involving unliquidated claims after *Ortiz* have required either "jury verdicts" or "white-knuckle settlements" as a basis for estimation. *See Klein*, 2006 WL 325766, at *4–5; *In re Diet Drugs*, 1999 WL 782560, at *7. But neither "jury verdicts" nor "white-knuckle settlements" exist for the economic loss claims at issue here, and the four jury verdicts arising out of the Recalls at issue and involving personal injury claims all resulted in defense verdicts in favor of GM.

92.     Plaintiffs also rely heavily upon a district court decision affirmed in *Juris* v. *Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012), but that case involved a Rule 60(b) challenge to a limited fund class certified prior to Ortiz.   Id. at n.45  Indeed, the Eleventh Circuit specifically held that "the propriety *vel non* of Judge Pointer's Rule 23(b)(1)(B) certification is an issue which is not before us." Id.  Simply put, without liquidated claims, this Court cannot approve the Proposed Settlement under *Ortiz* and its progeny.[29]

### 2.      There Is No Limited Fund

93.     Not only do the Movants fail to satisfy *Ortiz*'s first requirement that the claims at issue must be liquidated, but there is also no record that the Settlement Fund is limited.  First, the Settlement Fund is comprised solely out of the contingent right to Adjustment Shares (*i.e.*, New GM stock), the value of which may fluctuate significantly over time.  The Movants ask this Court to presume triggering of the Adjustment Shares, and also that the value of such stock will

---

[29]    And as explained further below, it certainly makes no sense for both this Court and the MDL Court to decide the same issues at the same time, particularly given that the MDL Court is the same court that would hear any appeal of an order from this Court.  By way of example, New GM has objected to the MDL Plaintiffs' expert reports and methodology for economic loss damages prepared by Boedeker, including with respect to Mr. Boedeker's qualifications and underlying methodology.  In the context of prospective estimation, the MDL Court will rule on the admissibility of Mr. Boedeker's reports in the coming months, as well as whether even if otherwise admissible, Boedeker calculated legally cognizable damages, and damages on a common, classwide basis.  It makes no sense to have this Court conduct an estimation trial (or a duplicative *Daubert* hearing) until such ruling by the MDL Court.

not significantly change in the future.  Next, the Supreme Court squarely rejected the notion that a court can simply accept the parties' stipulation that a settlement fund is "limited."  *See Ortiz*, 527 U.S. at 821.[30]   Rather, the parties must present evidence from which the court "may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge."  *Id.*  at 849.

94.     The Movants define the "limited fund" as consisting, by agreement, solely of the contingent right to Adjustment Shares.  But in seeking late claims, the EL Plaintiffs described the available funds to satisfy their claims differently.  When it suited them, the EL Plaintiffs claimed an entitlement to all the GUC Trust's assets (currently consisting of $495 million-plus in net assets).  In other words, the GUC Trust contributes nothing to the alleged limited fund. (Rule 23 Motion at 4.)  The Supreme Court has been clear that a "limited fund" cannot be defined by the parties' agreement.  *See Ortiz*, 527 U.S. at 821, 839 ("limited fund" under Rule 23(b)(1)(B) does not apply where the available funds are limited only by agreement of the parties; "the whole of the inadequate fund [is] to be devoted to the overwhelming claims").  Certification of a class involving a limited fund created by agreement would violate the Constitution. *Ortiz* found that courts could not "deny[] any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed" without "assurance that claimants are receiving the maximum fund, not a potentially significant fraction less." *Ortiz*, 527 U.S. at 860, 863.  In short, for a defendant to get the benefit of mandatory releases from all class members, *Ortiz* found that the defendant must give, and the

---

[30]    In a prior litigation, Movants' counsel explained why the Supreme Court rejected the proposed settlement in *Ortiz*—reasons that apply equally to the Proposed Settlement in this case:  "*Ortiz* involved an anomaly—an artificially manufactured 'limited fund' created through a settlement agreement crafted by colluding attorneys. It was thus a stark and dubious departure from well-established limited fund precedent.  This 'adventurous' departure troubled the Supreme Court because it pushed the limits on aggregating 'individual tort claims.'" Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification at 15, *In re Lyondell Chemical Co.*, Adv. Proc. 10-05525 (Bankr. S.D.N.Y. December 29, 2014), ECF No. 843.

class members must receive, the maximum amount possible. The prohibition on creating limited funds by agreement is therefore aimed not only to determine whether the fund is actually limited, but also whether the defendant has contributed enough to justify the class members' deprivation of rights.

95.    Courts have repeatedly applied this rule to reject limited fund class settlements where the "funds available are limited only by agreement of the parties." *In re Telectronics* 221 F.3d at 874. In *Telectronics*, for instance, the Sixth Circuit held that a district court abused its discretion in approving a settlement in which the funds were "limited only by agreement of the parties, not because the funds [did] exist as a factual matter, and the amount contributed by the parents [was] small compared to their potential liability." *Id.* at 874.

96.    Indeed, even before the *Ortiz* decision, courts consistently denied motions for class certification under Rule 23(b)(1)(B) where there was a lack of evidence that a limited fund existed. 1 McLaughlin on Class Actions § 5:9 n.11 (15th ed.) (citing *In re Dennis Greenman Securities Litig.*, 829 F.2d 1539, 1546 (11th Cir. 1987) ("The [district] court made no specific findings of the defendants' financial status. Absent such findings the district court could not properly rely on this ground for certification."); *In re School Asbestos Litig.*, 789 F.2d 996, 1005 (3d Cir. 1986) (holding that the district court erred by certifying a Rule 23(b)(1)(B) class in the absence of a factual inquiry); *In re Bendectin Products Liability Litig.*, 749 F.2d 300, 306 (6th Cir. 1984) ("[T]he district court, as a matter of law, must have a fact-finding inquiry on this question and allow the opponents of class certification to present evidence that a limited fund does not exist.")).

97.    Here, the Proposed Settlement contemplates that this Court will uncritically accept the agreement between the GUC Trust and the EL Plaintiffs and the PIWD Plaintiffs that

a contingent right to an undetermined number of Adjustment Shares are the only assets available to EL Plaintiffs and therefore constitutes a limited fund. This violates the Supreme Court's holding that it is "**essential** that the fund be shown to be limited independently of the agreement of the parties to the action." *See Ortiz*, 527 U.S. at 864 (emphasis added).

98.     For the same reason, the Court must consider the financial assets of **all** parties that are receiving releases under the Proposed Settlement. If the Movants consider it necessary to provide releases to third parties, then they must believe that the EL Plaintiffs have colorable claims against such released parties. As in *Telectronics*, the Court must then consider the assets of those released parties in determining whether the fund is truly limited. *See In re Telectronics*, 221 F.3d at 870; *see also Stott* v. *Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 321 (N.D. Tex. Sept. 12, 2011) ("the settling parties decided that the settlement would only release those individuals who provided their financial information to the [c]ourt . . . .").

99.     The Movants' reliance on *Stott* for the proposition that the limited fund need not include every available asset is unavailing. (*See* Rule 23 Motion at ¶¶ 99, 101-105.) In *Stott*, the court found that "the amount of losses in this case is known and ascertainable," and that "an arbitrator 'could grant relief to an individual claimant and siphon assets away from the res without regard to any equitable concerns, thereby undermining the *pro rata* distribution this Court has deemed necessary." 277 F.R.D. at 328. Of course, neither of these circumstances is true here, and *Stott* explicitly distinguished its holding, noting that the facts before the court were "unlike in mass tort cases," where "[m]any courts have been reluctant to utilize the 'limited fund' device." *Id*. Further, although the court found that approval of a settlement that did not include all of the defendant's assets was proper, the court cautioned that "[t]his is not to say that approval of a 'limited fund' settlement without including all of a defendant's assets is appropriate in every

situation; instead, the Court comes to this conclusion in this particular case, taking the best interests of the class members into account, as instructed by *Ortiz*, and approving of a settlement that realistically provides the best possible recovery for the class as a whole." *Stott*, 277 F.R.D. at 334. In reaching this conclusion, the court found "after an intensive inquiry of the financial condition of [the defendant] and its registered representatives, which has included going through two fairness hearings, hearing substantial testimony, and reviewing dozens of financial reports," that the defendant could not contribute any more to the settlement "without violating the requirements for capital on hand established by the SEC, which regulates [the defendant stock broker]." *Id*. at 332-333. The district court noted that the amount contributed by the defendant "is not some arbitrary number that was randomly chosen," and based on extensive factual findings, concluded that the defendant's contribution was "**truly [] 'the best that can be provided for class members**.'" *Id* at 334 (citing *Ortiz*, 527 U.S. at 860). Here, of course, the GUC Trust's contribution to the Proposed Settlement is nothing more than an "arbitrary number that was randomly chosen," and the Movants have provided **no record and no rationale whatsoever** for why the GUC Trust could not contribute all, rather than less than 3%, of its total current assets to the Proposed Settlement. Without an evidentiary basis justifying why the GUC Trust cannot contribute more than 3% of its assets to the Proposed Settlement, this Court cannot conclude that it "truly is the best" that class members can receive. And even that 3% does not go to the proposed classes; instead, it is used to pay for notice.

100.    By itself, Movants' failure to satisfy the first requirement of a limited fund under *Ortiz* requires denial of class certification and rejection of the Proposed Classes and Proposed Settlement. *See In re Telectronics*, 221 F.3d at 877 (declining to decide the other requirements

for a limited fund because the first requirement was not met).  Nevertheless, the Movants further

fail to satisfy both of the other required *Ortiz* factors as well.

C.    **The Limited Fund Is Not Wholly Devoted to the Proposed Classes and Therefore Does Not Give Members of the Proposed Classes the Best Possible Relief, as the Constitution Requires**

101.    The Movants cannot show that certification under Rule 23(b)(1)(B) is likely

because the "whole of the inadequate fund" is not "devoted to the overwhelming claims," as

required by *Ortiz*. 527 U.S. at 839.  Here, the Proposed Settlement fails for two independent, yet

opposite reasons.  First, the limited fund is **not** wholly devoted to the Proposed Classes.  Second,

the limited fund is **not** wholly devoted to all who have unsatisfied claims against the GUC Trust.

By selectively picking and choosing which Old GM creditors are allowed to recover from the

"limited fund," the Movants ensure that the Proposed Settlement violates *Ortiz*.

1.    **The Limited Fund Is Impermissibly Shared Among Two Separate Classes and with Non-Class Members**

102.    The Proposed Settlement seeks to certify two separate nationwide Proposed

Classes (even though the MDL Plaintiffs have sought separate statewide classes for each Recall

for the Bellwether States) and then have **both** classes share in **one** limited fund.  However, each

limited fund class must independently satisfy the *Ortiz* criteria, so it is impossible for the limited

fund to be "wholly devoted" simultaneously to two separate limited fund classes.  The Movants

fail to cite to any case in which a court certified two completely separate limited fund classes that

shared in a single limited fund.  This unprecedented structure is even more alarming because the

Movants fail to disclose how the limited fund will be allocated among the two separate classes.

This Court cannot determine under *Ortiz* whether certification of a limited fund class represents

the "best that can be provided for class members" when two different classes share in the same

limited fund and the parties that negotiated the Proposed Settlement do not state how the fund
will be allocated.

103.    Compounding matters even further, the proposed limited fund is an
unprecedented "hybrid" structure because it is available not only to the two Proposed Classes,
but also to non-class claimants (*i.e.*, the PIWD Plaintiffs).  The Movants fail to explain why they
did not include the PIWD Plaintiffs in the proposed classes, notwithstanding the clear
requirements of *Ortiz*.  And even if they had, the PIWD Plaintiffs could not meet Rule 23's
requirements[31] (such as typicality, adequacy of representation, *Ortiz's* requirement that claims be
liquidated, etc.), as they must for any limited fund class to be certified.  But the Movants allow
for the PIWD Plaintiffs—who are not members of either of the two Proposed Classes—to also
share in the "limited fund."   (Rule 23 Motion ¶ 148 (discussing future allocation of the
settlement fund between the Proposed Classes and the PIWD Plaintiffs).)  Again, the Movants
fail to cite any precedent permitting non-class members to benefit from a Rule 23(b)(1)(B) class
limited fund, and the very notion is antithetical to *Ortiz*.

### 2.    The Limited Fund Is Impermissibly Not Made Available to All Potential Creditors

104.    The Movants' limited fund rationale suffers another fundamental flaw that Judge
Gerber previously recognized in these chapter 11 cases.  According to the Supreme Court in
*Ortiz*, "[a]ssuming, arguendo, that a mandatory, limited fund rationale could under some
circumstances be applied to a settlement class of tort claimants, it would be . . . **equally essential
under Rules 23(a) and (b)(1)(B) that the class include all those with claims unsatisfied at
the time of the settlement negotiations**."  *See Ortiz*, 527 U.S. at 864 (emphasis added).  Of

---

[31]    11/16/16 Bankr. Hr'g Tr. at 70:4-9 (Court noting that "[a]s to the accident plaintiffs, I would agree it couldn't
be a class proof of claim.").

course, the "limited fund" class posited by the Movants does not include "all those with claims

unsatisfied" against the GUC Trust, as there are thousands of Old GM creditors (*i.e.*, GUC Trust

Beneficiaries) that have unsatisfied claims against the GUC Trust and are not included as

putative members of the Proposed Classes.   Judge Gerber made the same point when certain

individuals asserting apartheid-related claims sought certification of a limited fund class earlier

in these cases:

> I don't think that a limited fund rationale would justify certification under
> Rule 23(b)(1) here.  Old GM's available value is, of course, limited, but
> the claim to that 'limited fund' isn't limited to the putative class action
> claimants.  Old GM has a large number of other creditors who likewise
> have claims against Old GM's assets.  **The 'limited fund' thus isn't to be
> shared solely amongst class action claimants, but instead must be
> shared by all of Old GM's creditors.**

*In re Motors Liquidation Co.*, 447 B.R. at 162 n.53 (Bankr. S.D.N.Y. 2011).

105.    Movants violate *Ortiz*'s second requirement by including some, but not all, Old

GM creditors in the Proposed Classes.

### D.    Claimants Are Not Identified by a Common Theory of Recovery and Are Not Treated Equitably, as the Constitution Requires

106.    *Ortiz* requires that limited fund classes contain "claimants identified by a common

theory of recovery [and] treated equitably among themselves." *Ortiz*, 527 U.S. at 839.  *Ortiz*

elaborates that a limited fund class should include "everyone who might state a claim **on a single

or repeated set of facts**, invoking a common theory of recovery." *Id.* (emphasis added); *see

also Diet Drugs*, 1999 WL 782560, at *9 ("To the extent that the causation analysis would be

different for those with valvular damage as opposed to the more rare PPH condition, there is a

fundamental difference in the theory of liability and the grounds for recovery between these two

classes . . . The individual question of whether a class member ingested Pondimin and for how

long is one that would complicate the claims administration process and, absent a costly

individual causation analysis, it would be difficult to ensure that those with a common theory of recovery are treated equitably among themselves.").

107.    Here, no common theory of liability based on a single or repeated set of facts is shared by all EL Plaintiffs.  The Proposed Settlement covers six recalls with different defects, different facts, and different fixes.  Some of the recalls involve ignition switch rotation, while others do not.  Some of the recalls involve airbag non-deployment, while others do not.  By way of example only, with respect to the Non-Ignition Switch Class, this Court must find it likely that the claims of the EL Plaintiffs who owned a new 2006 Chevrolet Monte Carlo subject to Recall 14V-355 (Impala Key Rotation Recall) under the Alaska Unfair Trade Practices and Consumer Protection Act share a "common theory of recovery" with the EL Plaintiffs who leased a 2004 Chevrolet Malibu subject to Recall 14V-153 (Electronic Power Steering Recall) under the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act, as well as with the EL Plaintiffs who owned a used 2008 Buick Enclave subject to Recall 14V-118 (Side Impact Airbag Recall) under the law of warranty of implied merchantability in North Dakota.  These determinations are necessary because, to the extent differences among applicable state laws and the factual circumstances of the various Recalls require the creation of subclasses within the Non-Ignition Switch Class, the Court must find that it can certify such subclasses at the requested March 11 hearing.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *18 ("[T]he Court will separately address each claim with respect to each jurisdiction, as subtle differences in state law can dictate different results for plaintiffs in different jurisdictions.") (emphasis added).  And if the Court cannot conclude that all members of the Non-Ignition Switch Class are identified by a common theory of recovery, then the Court cannot find that such class is likely to be certified under Rule 23(b)(1)(B) and *Ortiz*.

108.    New GM has already argued before the MDL Court based on evidence in the record before that Court that Plaintiffs (including the same Ignition Switch Plaintiffs covered by the Proposed Settlement) do not share a common theory of recovery, and the same is even more obvious here because EL Plaintiffs seek nationwide classes even though the MDL Plaintiffs are pursuing statewide classes given the MDL Court's identification of distinctions among various state laws that preclude any nationwide class.  (Bankr. Dkt. No. 14431-2, Ex. B-2 at 16-98.)[32]

109.    These individualized issues preclude any determination that all putative class members share a "common theory" of recovery. *See Diet Drugs*, 1999 WL 782560, at *9 ("The third traditional characteristic of a limited fund is that 'the claimants identified by a common theory of recovery [are] treated equitably among themselves.' *Ortiz*, 119 S.Ct. at 2311. . . .To the extent that the causation analysis would be different for those with valvular damage as opposed to the more rare PPH condition, there is a fundamental difference in the theory of liability and the grounds for recovery between these two classes.  Furthermore, even within the classes there are interests which make equitable distribution difficult.").

110.    Contrary to the EL Plaintiffs' argument, they may not use a "limited fund" class action to adjust bankruptcy allocation without subclasses with separate counsel representing the conflicting interests.  Because limited fund class certification aims to equitably distribute a limited fund on a *pro rata* basis, it must be inclusive of all claimants through the inclusion of subclasses as necessary.  *See Ortiz*, 527 U.S. at 854 (rejecting settlement because the class definition "excludes myriad claimants with causes of action, or foreseeable causes of action"); *id.* at 864 (requiring class to include "all those with claims unsatisfied at the time of the

---

[32]    *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *16 (dismissing the MDL Plaintiffs' proposed nationwide RICO claim); *id.* at *18 ("[D]espite the repetition it entails—the Court will separately address each claim with respect to each jurisdiction, as subtle differences in state law can dictate different results for plaintiffs in different jurisdictions."); *see generally In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372 (S.D.N.Y. 2017) (analyzing common law and statutes in various states).

settlement negotiations, with intra-class conflicts addressed by recognizing independently

recognized subclasses").

111.    Even the pre-*Ortiz* case on which the Movants rely plainly would not justify

approving the Proposed Settlement:

> We are therefore willing to permit the use of such a class action in
> the pending case, so long as there exists . . . appropriate
> designation of subclasses to provide assurance that the consent of
> groups of claimants who are being treated differently by the
> settlement is being given by those who fairly and adequately
> represent only the members of each group. ***The inevitable tension
> between the limited protections of Rule 23 and the more complete
> protections of the Bankruptcy Code is strained by any use of a
> mandatory non-opt-out class to settle claims against an insolvent
> entity that is subject to bankruptcy jurisdiction.  But that tension
> reaches the breaking point when, instead of the traditional
> limited fund settlement that achieves a pro rata reduction of the
> claims of all members of the plaintiff class, the rights of the
> plaintiff class are revised vis-à-vis each other and consent to the
> resulting settlement is given by representatives who purport to
> represent the undifferentiated class of plaintiffs as a whole*,
> *rather than the interests of each of the subclasses whose rights
> are being altered*.

*In re Joint E. and S. Dist. Asbestos Litig.*, 982 F.2d 721, 739 (2d Cir. 1992) (emphasis added);

*see* Rule 23 Motion ¶ 96.  Here, by contrast, the Movants place millions of "Non Ignition

Switch" class members together, including putting class members with key-rotation claims in the

same class with those who do not allege key rotation claims, and class members with airbag non-

deployment claims in the same class with those who do not allege airbag non-deployment

claims.

112.    Moreover, the Movants cannot prove equitable treatment, as required by *Ortiz*,

among class members because  (a) the "limited" fund is shared with non-class members (*i.e.*, the

PIWD Plaintiffs) and (b) the Movants do not allocate (among classes) or disclose eligibility

criteria until long after the Proposed Classes are certified and the Proposed Settlement is

approved, a fact that is recognized in the Proposed Notice to class members. *See* Proposed

Notice ¶ 6 ("The Settlement allows Affected Persons to assert claims against a Settlement Fund. .

. . Being defined as an Affected Person does not assure that you will receive any distribution

from the Adjustment Shares (or their value), or any other consideration (if any) contained in the

Settlement Fund"). Specifying the treatment of class members after-the-fact, as the Movants

seek to do here, is an independent basis for denying approval of the Proposed Settlement. *See In

re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194 (5th Cir. 2010). In *Katrina*, the Fifth

Circuit Court of Appeals, considering a similarly vague class settlement, held:

> [T]he settlement provides for the appointment of a special master to
> 'provide to the Court a recommended disposition and protocol with regard
> to the remaining [settlement fund], and treatment of Claims of Class
> members.' **This arrangement simply punts the difficult question of
> equitable distribution from the court to the special master, without
> providing any more clarity as to how fairness will be achieved**. **The
> lack of any 'procedures to resolve the difficult issues of treating such
> differently situated claimants with fairness as among themselves," . . .
> leads us to reverse the district court's order certifying this class**.

113.    Thus, the Movants fail to satisfy all three requirements for a limited fund class

under *Ortiz.*

## IV.    THE PROPOSED CLASSES CANNOT BE CERTIFIED PURSUANT TO THE ECONOMIC LOSS PLAINTIFFS' ALTERNATIVE THEORY UNDER RULE 23(b)(1)(A)

114.    The Movants incorrectly argue in the alternative that the Proposed Classes can be

certified under Rule 23(b)(1)(A), which provides that "[a] class action may be maintained if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would

establish incompatible standards of conduct for the party opposing the class . . . ." Fed. R. Civ.

P. 23(b)(1)(A).

115.    As an initial matter, there is little or no risk of inconsistent or varying adjudications in the Bankruptcy Court.   Only two claimants—Patricia Barker and Yvonne James-Bivins—filed late proofs of claim by the December 2016 deadline.   Those two EL Plaintiffs are represented by the same counsel who crafted the Proposed Settlement.

116.    In any event, as with Rule 23(b)(1)(B), there is limited availability for certification under Rule 23(b)(1)(A), and certification under this provision is "appropriate only in cases presenting minimal individual issues."  1 McLAUGHLIN ON CLASS ACTIONS § 5:2 (15th ed. 2018); *see Amchem*, 521 U.S. at 614 ("Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners).") (internal citations and quotation marks omitted).  But, "[i]f the factual circumstances of the putative class members vary in any material respect, the justification for (b)(1)(A) certification—avoidance of subjecting the defendant to incompatible judgments—is absent."  1 McLAUGHLIN ON CLASS ACTIONS § 5:2 (15th ed. 2018).

117.    Under *Wal-Mart*, only Rule 23(b)(3)—*not* Rule 23(b)(1)(A)—may be used to certify claims for **money damages**, unless the claims are *derivative* of claims held by a fund or other entity.  As a result, "**Courts in this Circuit have repeatedly recognized that certification under Rule 23(b)(1)(A) is limited to claims for equitable relief.**"  *Toney-Dick* v. *Doar*, 2013 WL 5295221, at *4 (S.D.N.Y. Sept. 16, 2013) (internal citations omitted) (emphasis added); *see also Laurent* v. *PricewaterhouseCoopers, LLP*, No. 06-CV-2280 JPO, 2014 WL 2893303, at *2 (S.D.N.Y. June 26, 2014) ("The Supreme Court has recently held that actions for monetary relief cannot be maintained under 23(b)(1) or (b)(2) unless the monetary relief is incidental to the

injunctive or declaratory relief.") (internal citations and quotation marks omitted); *In re Citigroup Pension Plan ERISA Litig.*, 241 F.R.D. 172, 180 (S.D.N.Y. 2006) (finding class certification under Rule 23(b)(1)(A) appropriate where plaintiffs sought injunctive relief); *Trautz* v. *Weisman*, 846 F. Supp. 1160, 1168 (S.D.N.Y. 1994) ("Class certification under Rule 23(b)(1)(A) is only proper where a class representative seeks injunctive relief to alter an on-going course of conduct which is either legal or illegal as to all members of the class.") (internal citations and quotation marks omitted).  Here, the claims are for money damages; thus, under Supreme Court and this Circuit's precedent, Rule 23(b)(1)(A) is not available.

118.    Even if there were claims for injunctive relief, the GUC Trust is under no obligation, nor is there a practical necessity, to treat all EL Plaintiffs identically.  For example, the GUC Trust could settle with the Ignition Switch Plaintiffs and litigate with the Non-Ignition Switch Plaintiffs, who have not proved a due process violation with respect to the Sale notice.  Furthermore, the same constitutional concerns apply to Rule 23(b)(1)(A) as they do to Rule 23(b)(1)(B), as there is no right to opt-out under Rule 23(b)(1)(A).  *See In re Simon II Litig.*, 407 F.3d 125, 133 (2d Cir. 2005) ("Suits under Rule 23(b)(1) are often referred to as 'mandatory' class actions because they are not subject to the Rule 23(c) provision for notice to absent class members or the opportunity for potential class members to opt out of membership as a matter of right.") (citing *Ortiz*, 527 U.S. at 833 n.13). [33]

119.    Finally, the mere existence of multiple claims is insufficient to implicate Rule 23(b)(1)(A).  If they were, almost any tort claims brought by multiple parties could be certified

---

[33]    *Compare Moreno* v. *Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2017 WL 3868803, at *9 (S.D.N.Y. Sept. 5, 2017) ("[d]efendants' reliance on Wal-Mart—which held that Rule 23(b)(2) does not permit the combination of 'individualized awards of monetary damages' and classwide relief—is misplaced.  In contrast to the claims in Wal-Mart, Plaintiffs' class claims under Rule 23(b)(1) are *derivative* in nature, not individualized.") (emphasis added).  Unlike the individual tort claims at issue in this case, *Moreno* concerned claims that were derivative of a claim for damages due to another entity, such as an ERISA plan.

under this section of Rule 23. *See* 2 Newberg on Class Actions § 4:7 (5th ed. 2018) ("The most important element of Rule 23(b)(1)(A) is the question of what constitutes 'incompatible standards of conduct' warranting certification. The critical answer is that courts generally will not certify a class under Rule 23(b)(1)(A) simply because separate damage actions may reach different results—inconsistent verdicts on liability or damages do not alone give rise to incompatible standards of conduct."). "Certification is not appropriate simply because some plaintiffs may be successful in their suits against a defendant while others may not." *Pipefitters Local 636 Ins. Fund* v. *Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 633 (6th Cir. 2011) (internal citations and quotation marks omitted).

120.    Thus, not only does class certification fail under Rule 23(b)(1)(B), it also fails under Rule 23(b)(1)(A).

## V.    THE PROPOSED SETTLEMENT FAILS TO SATISFY THE REQUIREMENTS OF RULE 23(A)

121.    The Proposed Settlement also fails to meet the requirements of Rule 23(a).  A proposed class—limited fund or otherwise—cannot be certified absent satisfaction of the four requirements set forth in Rule 23(a):  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Fed. Civ. R. P. 23(a).  The EL Plaintiffs "must actually *prove*— not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original) (internal citations omitted); *see also Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original).

122.    Further, it makes no difference that the Movants are "settling" class certification issues.  Notwithstanding the well-established principle that certification of settlement classes requires the same scrutiny as certification of litigation classes, the Signatory Plaintiffs have repeatedly stated that the two standards are "a lot different."  (Hr'g Tr. 12/20/2018 at 7; *see also* Plaintiffs' Feb. 13 Letter (arguing that there was no overlap with the MDL Court because "Your Honor is being asked to consider a *settlement* class under Rule 23(e), which involves considerations different from a litigation class . . . ."  (emphasis in original).)  However, a court "[c]onfronted with a request for settlement-only class certification" must apply "**undiluted, even heightened, attention** in the settlement context."  *Amchem*, 521 U.S. at 620 (emphasis added).  This Court also recognized that "Rule 23's standards for class certification—apart from consideration of whether the case would be manageable to try as a class action—are equally applicable and rigorous in the settlement context."  *Motors Liquidation Co.*, 591 B.R. at 526 (citation omitted).

123.    Moreover, as discussed in New GM's Stay Motion, these requirements depend on myriad complex factual and legal issues that have been subject to years of discovery and briefing in, and will ultimately be decided by, the MDL Court.  Notably, New GM has raised substantial problems with respect to the admissibility of the methodology and opinions of Stefan Boedeker, the Movants' designated expert, for attempting to find and then quantify alleged class-wide damages.  If the MDL Court rules that Mr. Boedeker's expert reports and opinions are not admissible, then the EL Plaintiffs will be unable to establish any injuries or damages at all even under this theory.  Moreover, even if admissible, New GM has explained that Boedeker's methodology does not calculate legally cognizable damages, and also fails to calculate damages on a class-wide basis.  Without injuries, there are no economic loss claims.  If a named Plaintiff

in the Proposed Classes here cannot state an economic loss claim, then he or she cannot have *common* or *typical* claims for purposes of Rule 23(a), or be a class representative. *E.g.*, *East Tex. Motor Freight Sys. Inc.* v. *Rodriguez*, 431 U.S. 395, 403-04 (1977); *Smook* v. *Minnehaha Cty.*, 457 F.3d 806, 814 (8th Cir. 2006); *La Mar* v. *H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973); *Salgado* v. *Piedmont Capital Corp.*, 534 F. Supp. 938, 953 (D.P.R. 1981).

124.    While the overlap of Rule 23(a) issues raised by the Movants in the Proposed Settlement and MDL Plaintiffs is undeniable and warrants a stay of proceedings in this Court, the Movants failure to establish Article III standing or satisfy Rule 23(a)'s requirements is nonetheless addressed below.

### A. The Court Does Not Have Jurisdiction to Preliminarily Approve the Proposed Classes Because the Movants Cannot Establish Article III Standing

125.    The Movants have failed to name a single class representative and thus cannot establish Article III standing for this reason alone. *See Yi Xiang*, 327 F.R.D. at 521. In addition, a class cannot be certified if it "contains members lacking Article III standing," which requires each member to "have suffered an 'injury in fact.'" *Denney*, 443 F.3d at 264 ("no class may be certified that contains members lacking Article III standing," which requires each member-Plaintiff to "have suffered an 'injury in fact.'") (internal citations omitted); *see also Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (noting that there is an "irreducible constitutional minimum of standing"). A "class must therefore be defined in such a way that anyone within it would have standing." *Denney*, 443 F.3d at 264.

126.    Movants do not meet the requirements of Article III, the Rules Enabling Act or Rule 23 because their Proposed Classes, as defined, likely contain large numbers of members who have not suffered an injury in fact. This is evidenced most notably by Mr. Boedeker's "conjoint survey" methodology, which shows in the MDL case that 26.6% to 39.1% of

72

respondents to Boedeker's survey had no injury, that is, they responded to Boedeker's survey by acknowledging that they would have paid the same amount or more for their Old GM vehicle **even if they knew about the defect and subsequent Recall**.  (Bankr. Dkt. 14431-2, Ex. B-2 at 26-32)  These EL Plaintiffs—as many as 10 million individuals using the upper level of the range (39.1%) and the upper level of EL Plaintiffs' estimated class size (26 million)—have no claims for benefit of the bargain damages.  Cases, including *McLaughlin* v. *American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), abrogated on other grounds by *Bridge* v. *Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008), "suggest that the Court of Appeals for the Second Circuit's skepticism about the utility of aggregate proof, and in particular statistical evidence, in obtaining justice for large numbers of mulcted individuals applies across-the-board to all types of cases not involving securities fraud. These decisions in effect rejected any fluid recovery theory to avoid the problems posed by the need for individualized proof of damages."  *In re Zyprexa Prod. Liab. Litig.*, 671 F. Supp. 2d 397, 445 (E.D.N.Y. 2009).  Courts considering similar methodologies have often found that they cannot prove an injury for all class members and therefore cannot support certification.  For instance, in *Opperman* v. *Path, Inc.*, the EL Plaintiffs used a conjoint survey to attempt to establish the class members' value of privacy in smartphone applications. No. 13-CV-00453-JST, 2016 WL 3844326, at *14 (N.D. Cal. July 15, 2016).  The *Opperman* court rejected this effort, noting that "[n]o damages number arising from this model will apply to all class members, particularly since some of the class members, by this measure, will not have been injured at all." *Id.*  Other courts have similarly rejected a proposed "single formula capable of assessing all damages among class members" based on "averages" where such a formula ignored "vast differences" in the circumstances facing each Plaintiff.  *Fleischman* v. *Albany Med. Ctr.*, No. 1:06-CV-765, 2008 WL 2945993, at *7 (N.D.N.Y. July 28, 2008); *see In re*

*Asalcol Antitrust Litig.*, 907 F.3d 42, 45 (2018) (reversing class certification where "approximately ten percent of the class had not suffered any injury attributable to defendants' allegedly anticompetitive behavior"). Therefore, even if Boedeker's report did not suggest that the proposed classes contained members who have not suffered an injury-in-fact, it certainly cannot be relied upon to prove that each proposed class member has suffered injury-in-fact.

127. This flaw alone warrants denial of the Proposed Settlement, because the Court cannot determine that it is likely to certify the Proposed Classes, which as currently defined includes millions of individuals with no injury-in-fact over whom the Court will not be able to exercise subject-matter jurisdiction. Although the analysis could end here, the reasons why the Movants are also unable to satisfy the requirements under Rule 23(a) are set forth below.

## B.     The Movants Cannot Satisfy Rule 23(a)(2)'s Commonality Requirements.

128. Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. Civ. R. P. 23(a)(2). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate **common answers** apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350 (internal citations omitted) (emphasis added).

129. The commonality requirement was "widely perceived to lack teeth before the Supreme Court's decision in *Wal–Mart*," but that changed when *Wal-Mart* "grafted the following requirements onto rule 23(a)(2): (i) that the common question is central to the validity of each claim that the proposed class brings; and (ii) that the common question is capable of a common answer." *Abraham* v. *WPX Energy Prod., LLC*, 322 F.R.D. 592, 642 (D.N.M. 2017) (citing *Wal-Mart*, 564 U.S. at 347-352).

74

130.    Here, common answers cannot be generated, as there are no class-wide or common injuries in this case, nor, for that matter, are there common liability questions, as the Recalls differ, the alleged defects differ, and the recall repairs differ.  *See Luppino* v. *Mercedes Benz USA*, 718 F. App'x 143, 146–47 (3d Cir. 2017).  In *Luppino*, plaintiffs "brought a class action against Mercedes-Benz, USA, LLC ('MBUSA') alleging that the wheels on the putative class vehicles [were] overly susceptible to cracking along the radius of the wheel rim, and claiming a right to damages based on breach of warranty and consumer fraud."  *Id.* at 144.  At the class certification stage, the Third Circuit concluded that "plaintiffs would not be able to offer common evidence from which a reasonable jury could find the existence of a design defect," *id.* at 146, because their experts could not establish common evidence of a uniform defect across systems.  The Third Circuit therefore found that plaintiffs had not submitted "common proof of a defect as to the class as a whole," and therefore could not meet the commonality requirement for class certification.  *Id.* at 146-147.  Here too, with respect to the Non-Ignition Switch Class, the alleged defects and recalls vary significantly.  Some involve ignition switch rotation, while others do not.  Some involve alleged airbag non-deployment, while others do not.  The EL Plaintiffs fail to point to any common issues of law or fact common to the Non-Ignition Switch Class.  The EL Plaintiffs are therefore unable to establish commonality with regard to the Non-Ignition Switch Class.

### C.    The Movants Cannot Satisfy Rule 23(a)(3)'s Typicality Requirements

131.    Under Rule 23(a)(3), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class."  Fed. Civ. R. P. 23(a)(3).  "Typicality requires that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *Mazzei* v. *Money Store*, 829 F.3d 260, 272 (2d Cir. 2016) (internal citations omitted); *see generally Rapcinsky* v.

*Skinnygirl Cocktails, L.L.C.*, No. 11 CIV. 6546 JPO, 2013 WL 93636, at *5-6 (S.D.N.Y. Jan. 9,

2013).

132.    The existence of unique defenses that are not shared by the class representatives

and class members cuts against a finding of typicality.  *See Baffa* v. *Donaldson, Lufkin &*

*Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *Gary Plastic Packaging Corp.* v. *Merrill*

*Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *Spann* v. *AOL Time*

*Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003).   A plaintiff cannot be a typical class

representative if his or her "problem could become the focus of cross-examination and unique

defenses at trial.""  *In re NYSE Specialists Secs. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007); *see*

*also Savino* v. *Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998); *Kline* v. *Wolf*, 702 F.2d

400, 402-03 (2d Cir. 1983).  And a "defendant need not show at the certification stage that [a]

unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote

considerable time to rebut the unique defense." *In re Digital Music Antitrust Litig.*, 321 F.R.D.

64, 97 (S.D.N.Y. 2017) (internal citations omitted).

133.    Again, the Movants' failure to identify class representatives makes it impossible

to establish typicality.  Based on the MDL, however, any class representatives the Movants are

likely to identify would be atypical.[34]

---

[34]    Although predominance is specifically discussed in Rule 23(b)(3), the analyses for predominance and typicality
overlap significantly.  "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently
cohesive to warrant adjudication by representation' and 'is similar to the requirement of Rule 23(a)(3) that
"claims or defenses" of the named representatives must be "typical of the claims or defenses of the class."' *In
re Ephedra Prod. Liab. Litig.*, 231 F.R.D. 167, 170–71 (S.D.N.Y. 2005) (rejecting certification of a proposed
class) (citing *Amchem*, 521 U.S. at 623 & n.18); *see also Wynn* v. *New York City Hous. Auth.*, 314 F.R.D. 122,
128 (S.D.N.Y. 2016), aff'd, 730 F. App'x 92 (2d Cir. 2018) ("Because the inquiries into commonality,
typicality, and predominance overlap, I consider them together here. . . .  [T]he claims of the class
representatives are not and cannot be typical of every individual class member . . . .  For similar reasons,
plaintiffs have failed to show that common issues predominate."); *Saleem* v. *Corp. Transp. Grp., Ltd.*, No. 12
CIV. 8450 JMF, 2013 WL 6061340, at *7 (S.D.N.Y. Nov. 15, 2013) (Furman, J.) (finding that class failed to
meet predominance and typicality for the same reason: "whether plaintiffs were properly classified as
independent contractors cannot be resolved through generalized proof, but rather requires individualized
examination into the extent of control that CTG exercised over each driver.  As a result, it cannot be said that

134.    As an initial matter, the Movants do not seek to certify state-by-state classes or subclasses.  This necessitates that any putative class representative, regardless of her state of residence, have claims and defenses that are typical of putative class members in all other 50 jurisdictions.  *Smith* v. *MCI Worldcom, Inc.*, No. 99-CV-681-H, 2000 WL 36726436, at *8 (N.D. Okla. Mar. 31, 2000) ("While factual differences alone will not defeat typicality, in this case the factual differences in conveyances create legal differences depending upon the applicable state law.").  Put differently, the Movants' insistence on **nationwide classes** means that the proposed representatives (who are unidentified) must be typical of the EL Plaintiffs asserting claims under the applicable state laws of 51 different jurisdictions and, with respect to the Non-Ignition Switch Class, among each of the five different Recalls included in that class.  As one example, Judge Furman ruled (or the MDL economic loss plaintiffs conceded)[35] that the manifest defect rule applied in eight states included in both of the Movants' Proposed Classes here, barring the claims of any alleged class members in these states whose vehicles did not experience the defect. Because this defense would be available to some but not all EL Plaintiffs, the Movants cannot establish typicality.  *See Baffa*, 222 F.3d at 59.

---

common questions predominate over individual ones or that the named Plaintiffs' claims are typical of those of the class.").

[35]   The MDL Court has held that a manifest defect is required for claims in various jurisdictions. For example, this Court ruled that New York and Texas require a manifest defect as a predicate for bringing a claim. *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 430-31, 452 (S.D.N.Y. 2017), *modified on reconsideration*, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017).  Plaintiffs also agree that at least the following states require a manifest defect: Arkansas, New Hampshire, North Carolina, North Dakota, South Carolina, and Utah.  The MDL Court has also ruled that Oklahoma requires a manifest defect for consumer fraud and breach of implied warranty claims, *see In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *36-37; that Pennsylvania requires a manifest defect for fraudulent concealment and breach of implied warranty claims, *see* 257 F. Supp. 3d at 438-440; and that Missouri requires a manifest defect for breach of implied warranty claims, *see In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *35.

135.    Furthermore, as New GM has argued before the MDL court, various named plaintiffs who are likely to be Plaintiffs in this action as well are subject to unique defenses, precluding any finding of typicality.  For example:

- Certain Plaintiffs disposed of their vehicles before the Recalls and did not have benefit-of-the-bargain damages.  *See FACC MTD Opinion*, 257 F. Supp. 3d 372, 403 (S.D.N.Y. 2017); MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 92.

- Certain plaintiffs are subject to the unique defense that they cannot show a manifest defect, and live in states where Judge Furman has ruled that the manifest defect defense applies.  (MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2] at 92-93.)

- Various plaintiffs are subject to unique defenses regarding lack of reliance and causation.  (*Id.* at 61-76.)

- Plaintiffs who bought Service Parts Vehicles cannot recover unless they prove their vehicles were repaired using a faulty switch.  (*Id.*)

- Individual negotiations factor into the prices consumers pay for cars.  And Boedeker's supposed difference in "average price" cannot establish class-wide injury regardless of bargaining differences, as well as differences in a vehicle's make, model, trim, options or whether it was new or used, or leased or purchased.  (*Id.* at 16-45.)

- Plaintiffs seek lost time damages, which is an individual issue.  (*Id.* at 46-48.)

- Differences exist among plaintiffs with respect to Old GM's alleged knowledge of defects over time, relative to when each plaintiff purchased his or her vehicle.  (*Id.* at 76.)

- Depending on the jurisdiction in which plaintiffs reside, differences exist in whether the economic loss rule bars fraudulent concealment claims.  The MDL Court has held that in Florida the economic loss rule bars the claims of EL Plaintiffs seeking diminished value or other economic damages such as those here.  *TACC MTD Op.*, 2016 WL 3920353, at *27-28.  The MDL Plaintiffs conceded that the economic loss rule likewise bars their fraudulent concealment claims under Wisconsin law.  *FACC MTD Op.*, 257 F. Supp. 3d at 460.

- Depending on the jurisdiction in which plaintiffs reside, differences exist in whether product liability statutes bar the EC claims. The MDL Court held that claims of Louisiana plaintiffs who owned New GM vehicles are barred by the Louisiana Products Liability Act, which provides the only method of recovery for their claims.  *TACC MTD Op.*, 2016 WL 3920353, at *28-29.

- Depending on the jurisdiction in which plaintiffs reside, differences exist in whether unjust enrichment claims are barred by a written warranty or an adequate remedy at law.

The MDL Court has held "that Plaintiffs in most of the jurisdictions in dispute cannot bring unjust enrichment claims where the subject matter is covered by a valid and enforceable contract or there is an adequate remedy at law." *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 275 (S.D.N.Y. 2018); *see also id.* at 343-46.[36]

Thus, even if Movants were to establish a similar record before this Court, they would be further incapable of establishing typicality under Rule 23(a).

### D.    The Movants Cannot Satisfy Rule 23(a)(4)'s Adequacy Requirements

136.    Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." Fed. Civ. R. P. 23(a)(4).  A class representative's interests cannot be in conflict with the interests of the class, and the class must be represented by adequate counsel. *In re Partsearch*, 453 B.R. at 95 (internal citations omitted).  So too must each subclass be represented by adequate counsel. *See In re Payment*, 827 F.3d at 233.  The class representative, however, cannot "simply lend[] his name to a suit controlled entirely by the class attorney." *Beck* v. *Status Game Corp.*, No. 89-CV-2923 DNE, 1995 WL 422067, at *6 (S.D.N.Y. July 14, 1995) (internal citations omitted).  A "class is entitled to an adequate representative, one who will check the otherwise unfettered discretion of counsel in prosecuting the suit." *Id.* (internal citations omitted).

---

[36]    Even on the limited and incomplete record that has been developed in the MDL concerning the non-Bellwether proposed class representatives (who overlap with the late claimants named in the Proposed Class claims), these same sorts of individualized issues already preclude a typicality finding.  For example, certain plaintiffs sold or traded in their vehicle prior to the announcement of the recalls in 2014.  (Kimpler Decl. Ex. 28, 6/22/17 S. Viens MDL Dep. Excerpts at 81:15-20); 5ACC ¶ 77 (Beazer); 5ACC ¶ 75; 5ACC ¶ 175 (Wittenberg).)  Likewise, plaintiff Shenyesa Henry agreed that since she donated the vehicle and did not attempt to sell it, that any alleged loss in value was never realized.  (Kimpler Decl. Ex. 29, S. Henry MDL Dep. Excerpts at 134:7-12.)  Some plaintiffs seek recovery of lost time damages, which is an individual issue that makes their claims untypical.  (*Id.*, Ex. 30, M. Lomardo MDL Dep. Excerpts at 161-63, Ex. 31, 4/11/17, R. Wyman MDL Dep. Excerpts at 156-57.)  Similarly, some plaintiffs never experienced a manifest defect in states, such as Texas, where it is a requirement.  (*Id.*, Ex. 32, 3/21/17 Stafford MDL Dep. Excerpts at 105:15-106:12 (Texas plaintiff), Ex. 33, 6/21/17 Simmons MDL Dep. Excerpts at 37:13-18 (Texas plaintiff).)  Given these individualized issues, which preclude a typicality finding even on an incomplete record, plaintiffs would likewise be unable to meet their burden of demonstrating typicality on a fuller record that will likely reveal even more problems.

137.    Moreover, "if the representative lacks any of the elements of 'typicality' and 'commonality,' the representative cannot be an 'adequate representative' of the putative class." *Leach* v. *Standard Register Co.*, 94 F.R.D. 192, 194 (W.D. Ark. 1982) (describing this proposition as "obvious[]").    The Supreme Court has also observed that the "requirements [commonality and typicality] therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement *also* raises concerns about the competency of class counsel and conflicts of interest." *Wal-Mart*, 564 U.S. at 349 n.5 (emphasis added).

138.    Since there are no class representatives identified in the Proposed Settlement, this Court has **zero basis**—let alone a "suitable" basis or a "solid record"—to evaluate the likelihood that it will find the proposed representatives to be adequate as required under Rule 23(e) and (a)(4).[37]    This fact alone is sufficient to prevent this Court from finding that the Proposed Classes can likely be certified.

139.    As noted above, the named claimants in the Proposed Class that are also proposed class representatives in the MDL Court are subject to unique defenses or otherwise assert claims that are not typical of the proposed classes.[38]    Furthermore, as the EL Plaintiffs admit, Proposed Class members may be differently situated in Stage Three, and "additional or different subclasses

---

[37]    "[W]hile a lead plaintiff who does not have standing to sue on every claim may not defeat typicality or adequacy of representation under Rule 23, it is still the case that '*there must be a named plaintiff* sufficient to establish jurisdiction over each claim advanced.'"    *Yi Xiang*, 327 F.R.D. at 520–21 (S.D.N.Y. 2018) (appeal filed) (emphasis added) (citing *Police & Fire Ret. Sys.* v. *IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013)). "Indeed, the Second Circuit has more than once held that '[t]o establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.'" *Id.* (internal citations and quotation marks omitted); *see also* 1 Newberg on Class Actions § 2:5 (5th ed. 2018) ("In a class action suit with multiple claims, at least one named class representative must have standing with respect to each claim.").

[38]    For example, in the MDL, deposition testimony of named class representatives demonstrate that any putative class representatives would be inadequate given their unwillingness to check the "otherwise unfettered discretion" of the proposed class counsel in this matter.    (*See* Kimlper Decl. Ex. 34, Excerpts from MDL Named Plaintiff Deposition Testimony (attached as Exhibit F to MDL Class Opp. [Bankr. Dkt. No. 14431-2, Ex. B-2]).)

can be created at that time." (Rule 23 Motion ¶¶ 117, 148.) But a lack of adequate representation for each subclass defeats Rule 23(a)(4)'s adequacy requirement, and cannot be rectified by the Court at a later date. *See In re Payment Card*, 827 F.3d at 234 ("a class divided . . . requires division into homogenous subclasses . . . with separate representation," and one thing "that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process. . . .").

140.    Finally, the Movants' failure to seek state-by-state subclasses—thus requiring the application of the varying law of 51 jurisdictions as to five separate causes of action—precludes any determination that any putative class representative would be "adequate" for purposes of Rule 23(a)(4). *See Smith* v. *MCI Worldcom, Inc.*, No. 99-CV-681-H, 2000 WL 36726436, at *8 (N.D. Okla. Mar. 31, 2000).

141.    Accordingly, because it is clear that the EL Plaintiffs will be unable to prove all of the requirements of Rule 23(a) by a preponderance of evidence, this Court should not preliminarily certify the Proposed Classes.

## VI.    THE PROPOSED SETTLEMENT CONSTITUTES AN IMPERMISSIBLE PLAN MODIFICATION AND VIOLATES THE SALE AGREEMENT

142.    The centerpiece of the Proposed Settlement is that the EL Plaintiffs and the PIWD Plaintiffs (who are potential holders of general unsecured claims) will be treated substantially differently than existing GUC Trust Beneficiaries (who also hold general unsecured claims). Indeed, the primary purpose of the Proposed Settlement is to "allow" the EC Plaintiffs' and PIWD Plaintiffs' claims but without entitling them to recover from the existing assets of the GUC Trust (approximately $495 million) or the Avoidance Action Trust. The existing GUC Trust Beneficiaries—unsecured creditors just like the EC Plaintiffs and PIWD Plaintiffs—stand to receive the remaining GUC Trust assets, additional recoveries from the Avoidance Action

Trust, and broad mandatory releases from the EC Plaintiffs, and presumably would not support any settlement between the GUC Trust and the EC Plaintiffs and PIWD Plaintiffs that permitted the EC Plaintiffs and PIWD Plaintiffs to recover from the GUC Trust in accordance with the existing provisions of the Plan and GUC Trust Agreement.

143.    Modifying the applicable distribution provisions of the Plan and GUC Trust Agreement is, in fact, the only element of the Proposed Settlement that reflects an arms' length bargaining between the GUC Trust, on the one hand, and the EC Plaintiffs and PIWD Plaintiffs, on the other.  The other disputed issues—whether the GUC Trust should consent to the late filing of the EC Plaintiffs' and PIWD Plaintiffs' claims, and allowed amount of those claims—are decided in an entirely one-sided manner:  the GUC Trust has agreed to waive any defenses to the late filed claims and has further agreed to support an estimation of those claims in the greatest amount possible.  In short, the Proposed Settlement gives EC Plaintiffs and PIWD Plaintiffs everything they seek, with the only catch being that they will not be entitled to recieve distributions in accordance with the operative provisions of the Plan and GUC Trust Agreement.  Thus, the **sole purpose** of the Proposed Settlement is to have this Court bless the division of assets between two different groups of unsecured creditors such that one group may retain 97% of existing GUC Trust Assets while the other's recourse is limited to a separate "Settlement Fund" that has no basis in the Plan or GUC Trust Agreement.  This arrangement unquestionably modifies key provisions of the substantially consummated Plan and independently justifies denying the Settlement Motions.

144.    The Proposed Settlement cannot be reconciled with the clear terms of the Plan. The law is clear:  where a chapter 11 plan has been confirmed and substantially consummated, it

cannot be modified except in narrowly prescribed circumstances not relevant here.[39] There is no question that the Plan was substantially consummated on March 31, 2011. (Plan § 12.2; Docket No. 10055.). The Settlement Motions seek to invoke this Court's bankruptcy jurisdiction under 28 U.S.C. §§ 157 and 1334, and therefore must comply with section 1127(b) of the Bankruptcy Code. *See In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 748 (2d Cir. 1992) (proposed changes to a confirmed plan constituted an impermissible plan modification that could not be approved under the bankruptcy court's jurisdiction).

145.     The GUC Trust may not use a limited fund class action settlement negotiated with counsel for some creditors to avoid the priorities and protections of the Bankruptcy Code. *See in In re Joint Eastern and Southern Dist. Asbestos Litig*, 14 F.3d 726 (2d Cir. 1993). Such a "self-evident evasion of the exclusive legal system established by Congress for debtors to seek relief" is "fraught with dangers," including that, unlike lawyers for a creditors' committee, class counsel's compensation may depend on reaching a settlement. *Id.* Here, there is no evidence that the interests of the class counsel and any proposed class representatives are aligned with the interests of purported class members who may be left with nothing if the Adjustment Shares threshold is not reached. *Cf. Ortiz.*, 527 U.S. at 853.

A.     **The Proposed Settlement Constitutes an Impermissible Plan Modification by Providing the Economic Loss Plaintiffs with Recoveries that Deviate from the Plan**

146.     The GUC Trust is required to distribute GUC Trust Assets (including the Adjustment Shares) "on a *pro rata* basis" to GUC Trust Beneficiaries. (GUC Trust Agreement § 5.4(b); Plan §§ 1.85, 1.98, 1.99 (GUC Trust Assets include Adjustment Shares).) As is

---

[39]     Critically, after a plan has been substantially consummated, that plan may no longer be modified except as expressly permitted by section 1127(e) of the Bankruptcy Code—a provision that applies only to individual debtors. *See In re Boylan*, 452 B.R. at 48 ("After a plan has been substantially consummated, modification is no longer an option except to the extent permitted by section 1127(e), which only applies to individual debtors.").

common in most chapter 11 plans, the Plan and GUC Trust Agreement have highly negotiated distribution provisions that govern, among other things, distributions to general unsecured creditors whose claims become allowed after other creditors have already received distributions. In particular, Section 7.4 of the Plan provides that if a claim becomes allowed on or after the Effective Date, the GUC Trust "shall, on the next applicable distribution date following when the Disputed Claim becomes an Allowed Claim, if all other conditions to such distribution have been satisfied, distribute to the holder thereof the distributions, if any, that such holder would have received had its Claim been Allowed on the Effective Date . . ." (Plan § 7.4 (emphasis added).)

147.    Section 5.3(a) of the GUC Trust Agreement similarly provides that the GUC Trust "shall deliver to each holder, if any, of a Disputed General Unsecured Claim or other Claim that has become a Resolved Allowed General Unsecured Claim during the prior calendar quarter" a catch-up distribution consisting of such creditors' "pro rata amount of GUC Trust Distributable Assets."  Section 5.3(b) of the GUC Trust Agreement clarifies the intent of these provisions:  "For the avoidance of doubt, **it is intended that the distributions to be made to holders of Resolved Allowed General Unsecured Claims in accordance with this Section 5.3 shall provide such holders, as nearly as possible, with the exact same amount of distributions of each asset type**, . . . **as if such holders had been holders of Initial Allowed General Unsecured Claims**." (GUC Trust Agreement § 5.3(b) (emphasis added).)

148.    Finally, Section 5.3(c) sets forth the procedures to follow if the GUC Trust lacks sufficient assets to fully catch-up creditors with allowed unsecured claims.  It provides that, if the GUC Trust "does not hold sufficient GUC Trust Distributable Assets to satisfy all Disputed General Unsecured Claims or other Claims, in each case, that became Resolved Allowed General Unsecured Claims during the prior calendar quarter," then the GUC Trust "**shall . . . distribute**

**all GUC Trust Distributable Assets that remain in the GUC Trust, or with the Debtors, as applicable, to the holders of such Resolved Allowed General Unsecured Claims pro rata by Claim amount**." (GUC Trust Agreement § 5.3(c) (emphasis added).)   To date, GUC Trust Beneficiaries have already received distributions of approximately 29.6% of their allowed claim amounts.  Thus, there can be no question that, if the EL Plaintiffs and PIWD Plaintiffs had more than $3 billion in allowed general unsecured claims (as they must to receive any consideration under the Proposed Settlement), then they would also be entitled to receive **all of the existing GUC Trust Assets** ($495 million being approximately 16.5% of $3 billion).

149.    The Proposed Settlement seeks to avoid this result by allowing the EL Plaintiffs' and PIWD Plaintiffs' claims and then violating Section 7.4 of the Plan and Section 5.3 of the GUC Trust Agreement by permitting the existing GUC Trust Beneficiaries to receive the remaining GUC Trust Assets that should otherwise be used to satisfy the EL Plaintiffs' and PIWD Plaintiffs' claims.  To accomplish this impermissible work-around, the Movants propose several other modifications to the Plan, GUC Trust Agreement, and Sale Agreement.  First, to avoid application of the Plan's distribution provisions, they agree that the EL Plaintiffs and PIWD Plaintiffs shall not constitute "GUC Trust Beneficiaries" even though, under the Proposed Settlement, they "could" hold allowed general unsecured claims under the Plan (which would be necessary to trigger the Adjustment Shares provision in the Sale Agreement).  (Settlement Agreement § 2.28 (defining "GUC Trust Beneficiaries" as all holders of allowed General Unsecured Claims but "for the avoidance of doubt, does not include Plaintiffs.").)  In addition, the Proposed Settlement carves the Adjustment Shares out of the definition of GUC Trust Assets.  (Settlement Agreement § 2.27 (defining "GUC Trust Assets" as being "deemed to exclude the Adjustment Shares.").)  These provisions constitute impermissible Plan modifications because

85

the Adjustment Shares are expressly included in the definition of "GUC Trust Assets" in the Plan, and the GUC Trust is only permitted to distribute GUC Trust Assets to GUC Trust Beneficiaries in accordance with the Plan and GUC Trust Agreement.  (*See* GUC Trust Agreement, Rec. E.)

150.    The Movants next seek to impermissibly amend the Sale Agreement by having the Adjustment Shares issued directly to the Settlement Fund, rather than to the GUC Trust. (Settlement Agreement § 6.1.2 (requiring that any Adjustment Shares "be promptly delivered by New GM to the Settlement Fund").)[40]  The Settlement Fund, in turn, is controlled by Co-Lead Counsel and PIWD Counsel (on behalf of the Signatory Plaintiffs) and not the GUC Trust.  (*Id.* at § 8.)  However, the Sale Agreement provides that "[n]either this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void . . ." (Sale Agreement § 9.5.)  The contingent right of the GUC Trust to receive the Adjustment Shares is a "right" or "interest" provided to it pursuant to section 3.2(c) of the Sale Agreement.  As a result, the GUC Trust may not transfer the right to receive the Adjustment Shares **to a Settlement Fund that is for the express benefit of individuals who are not GUC Trust Beneficiaries** without the written consent of New GM pursuant to the terms of the Sale Agreement.

151.    The end result of these machinations is ring-fencing the $495 million of existing GUC Trust Assets for the exclusive benefit of the current GUC Trust Beneficiaries, even though the Plan requires that these assets be used for catch-up distributions to the EL Plaintiffs and

---

[40]    Although the Movants would require that the Adjustment Shares be issued directly to the Settlement Fund, they somehow have them also pass through the GUC Trust, but only to the extent necessary for the GUC Trust to satisfy any applicable withholding taxes.  (Settlement Agreement § 7.)

PIWD Plaintiffs if their claims are ultimately allowed. The Proposed Settlement therefore constitutes a clear and impermissible rewriting of the Plan, GUC Trust Agreement, and Sale Agreement.[41]

**B.    Rules of Procedure Cannot Justify an Impermissible Plan Modification.**

152.    The Movants cannot use Bankruptcy Rule 9019 to modify the Plan in the manner they see fit. Bankruptcy Rule 9019 is a "rule of procedure [that] cannot override a substantive right provided for by the Bankruptcy Code when they conflict." *In re Oakhurst Lodge, Inc.*, 582 B.R. 784, 797 (Bankr. E.D. Cal. 2018). As a result, Bankruptcy Rule 9019 cannot "displace the rigorous standards for plan confirmation **and modification** in chapter 11. Such standards cannot be jettisoned when settling a dispute that invokes their application. **Rather, Rule 9019 must yield**." *Id.* at 798 (emphasis added). Therefore, the attempt by the Movants to "clothe" their requested relief "as a settlement" cannot excuse a plan modification in violation of section 1127 of the Bankruptcy Code. *In re U.S. Brass Corp.*, 255 B.R. 189, 194 (Bankr. E.D. Tex. 2000).

153.    Nor can the Movants use Rule 23, which is also a "rule of procedure [that] cannot override" section 1127 of the Bankruptcy Code. *In re Oakhurst Lodge*, 582 B.R. at 797. The Movants' reliance on *Manville III*,—a limited fund case decided before the Supreme Court's landmark decision in *Ortiz*—is unavailing. Among other things, the *Manville III* court observed that:

> [T]he inevitable tension between the limited protections of Rule 23 and the more complete protections of the Bankruptcy Code . . . reaches the breaking point when . . . the

---

[41]    The GUC Trust Agreement is an inextricable and essential component of the confirmed Plan, and any modification of creditors' rights set forth in the GUC Trust Agreement is a modification of the Plan. *See, e.g.*, GUC Trust Agreement § 2.2 ("The sole purpose of the GUC Trust is to implement the Plan on behalf, and for the benefit, of the GUC Trust Beneficiaries . . ."); *id.* at § 13.13(b) (except for certain exceptions, not relevant here, "[t]he GUC Trust Administrator may amend or supplement this Trust Agreement for any other purpose, but only on petition to, and with the approval of, the Bankruptcy Court . . ."); Confirmation Order ¶ 1 (noting that exhibits to the Plan (such as the GUC Trust Agreement) are "an integral part of the Plan and this Confirmation Order").

rights of the plaintiff class are revised vis-à-vis each other and consent to the resulting settlement is given by representatives who purported to represent the undifferentiated class of plaintiffs as a whole, rather than the interests of each of the subclasses whose rights are being altered.

*Manville III*, 982 F.2d. at 739.   The need for adequate representation of subclasses arises from the "serious constitutional concerns" associated with limited fund classes—namely, Seventh Amendment and due process concerns.   *Ortiz*, 527 U.S. at 845-846.   Such constitutional concerns underlie the Second Circuit's warning that  "where differences among members of a class are such that subclasses must be established, [there is] no authority that permits a court to approve a settlement . . . on the basis of consents by members of a unitary class, some of whom happen to be members of . . . distinct subgroups, without creating subclasses."  *In re Literary Works*, 654 F.3d at 252 (quoting *Manville III*, 982 F.2d at 743) (quotations omitted).   By seeking to bind up to 26 million individuals without any justification as to why subclasses are not needed to protect those individuals' constitutional rights, the Proposed Settlement violates the Constitution.   And these concerns cannot be deferred to a later stage, because "a court asked to certify a **settlement class will lack the opportunity, present when a case is litigated, to adjust the class** . . . ."   *Amchem*, 521 U.S. at 620 (emphasis added).

154.    The Movants also conveniently ignore the second holding in *Manville III*:  that, to the extent the judgment affirming the Manville settlement rested on bankruptcy jurisdiction, it was an impermissible modification of a substantially consummated plan.   Indeed, the *Manville III* proposition that the bankruptcy limitations on modifying a substantially consummated plan cannot be circumvented by modifying a plan-related document—such as the GUC Trust Agreement—has been repeatedly cited by federal bankruptcy courts.[42]   Setting aside the many

---

[42]    *In re Oakhurst Lodge*, 582 B.R. at 798 ("change in obligations and payment procedures for personal injury settlement trust deemed substantive and significant")") (citing *Manville III*, 982 F.2d at 747-48 ); *In re Sea Island Co.*, 486 B.R. 559, 570 (S.D. Ga. 2013); *In re S. White Transp., Inc.*, 455 B.R. 509, 521, n.13 (Bankr.

differences between the Manville Trust and the GUC Trust, the Movants have not sought to follow the blueprint set forth in *Manville III*, although such blueprint is no longer viable after *Ortiz*. Whereas *Manville III* rejected using bankruptcy jurisdiction to modify a confirmed plan, it left open the possibility (later foreclosed by *Ortiz)* of using a district court's diversity jurisdiction to restructure the trust entitlements of unliquidated tort claimants under the applicable state law governing that post-bankruptcy trust. But the Movants seek nothing of the sort here, and instead ask this Court to use its bankruptcy jurisdiction to certify a settlement that does nothing more than modify certain creditors rights under the Plan and GUC Trust Agreement. The Bankruptcy Code clearly prohibits such an attempt to modify the substantially consummated Plan.

### C.    New GM Is Directly Impacted by the Movants' Attempt to Impermissibly Modify the Plan.

155.    New GM has a direct financial interest in ensuring that existing GUC Trust Assets are used to satisfy the EL Plaintiffs' claims as required under the Plan. Many of the EL Plaintiffs in the Ignition Switch Class are pursuing successor liability claims against New GM in the MDL Court and those EL Plaintiffs are only entitled to a single satisfaction. As a result, the EL Plaintiffs' actual recoveries from the GUC Trust (including from the $495 million in existing assets) will bar, or (if MDL Plaintiffs are correct) reduce, the EL Plaintiffs from recovering from New GM in the MDL Court. The Proposed Settlement modifies the distribution provisions of the Plan and GUC Trust Agreement for the sole purpose of allowing the EL Plaintiffs' claims,

---

S.D. Miss. 2011), *In re Oakhurst Lodge*, 582 B.R. at 798 ("(change in obligations and payment procedures for personal injury settlement trust deemed substantive and significant)") (citing *Manville III*, 982 F.2d at 747-48 ); *rev'd and remanded*, 473 B.R. 695 (S.D. Miss. 2012), *aff'd*, 725 F.3d 494 (5th Cir. 2013); *In re Daewoo Motor Am., Inc.*, 488 B.R. 418, 424, n.1 (C.D. Cal. 2011); *In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 265 (Bankr. D. Mont. 2011); *In re Boylan*, 452 B.R. at 47; *In re Reserve Capital Corp.*, No. 03-60071, 2007 WL 1989285, at *8 (Bankr. N.D.N.Y. July 6, 2007), *aff'd sub nom. Hawkins* v. *Chapter 11 Tr.*, No. 03-60071, 2009 WL 701115 (N.D.N.Y. Mar. 13, 2009); *In re Xpedior Inc.*, 354 B.R. 210, 231 (Bankr. N.D. Ill. 2006); *Costello* v. *Haller*, No. 050727, 2005 WL 6503626, at *3-4 (N.D. Ill. Sept. 23, 2005); *In re Rickel & Assocs., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001); *In re CF & I Fabricators of Utah, Inc.*, 199 B.R. 986, 991 (Bankr. D. Utah 1996), *rev'd sub nom.* 214 B.R. 16 (Bankr. D. Utah 1997), *aff'd sub nom.* 150 F.3d 1233 (10th Cir. 1998); *In re Best Prod. Co., Inc.*, 177 B.R. 791, 802 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

but preventing the EL Plaintiffs from receiving distributions from the majority of existing GUC

Trust Assets.  Because the EL Plaintiffs' claims (along with the PIWD Plaintiffs' claims) are the

final disputed claims asserted against the GUC Trust (except for general unsecured claims

arising from the Term Loan Lender Litigation, if any), if they are allowed they would be entitled

to catch-up distributions and would be first in line to collect from the $495 million in GUC Trust

Assets.  Thus, to the extent the EL Plaintiffs are successful in pursuing claims against both the

GUC Trust and New GM, the Proposed Settlement would potentially harm New GM by as much

as $495 million.

156.    Further, the GUC Trust is a fiduciary and must exercise its power in a manner that

is consistent with the purpose of the GUC Trust Agreement, including to only seek the

Adjustment Shares "when and as appropriate," and when the GUC Trust is "so entitled." (GUC

Trust Agreement §§ 2.3(d), 2.4.)  In addition, the GUC Trust must exercise good-faith judgment.

(*Id*. § 8.1(b).)  The GUC Trust further agreed with New GM that it would only seek a Claims

Estimate Order if it determined that "allowed ***eligible claims are likely to exceed***" $35 billion.

(*Letter Agreement, September 23, 2011* [Bankr. Dkt. 14095] (emphasis added).)  Yet, as with

prior settlements, the GUC Trust refuses to anywhere assert that the EL Plaintiffs' and PIWD

Plaintiffs' claims would likely total the amount necessary to exceed the $35 billion threshold,

instead saying that the EL Plaintiffs' and PIWD Plaintiffs' claims "may" or "could" exceed such

threshold, while also maintaining that the EL Plaintiffs and PIWD Plaintiffs might not be entitled

to "any" damages.

157.    Finally, the Movants' attempt to rewrite the Plan, GUC Trust Agreement, and

Sale Agreement completely divests the GUC Trust from **any interest or stake whatsoever** in

the outcome of the estimation proceedings.  Upon final approval of the Proposed Settlement, the

GUC Trust would not owe any duties to the EL Plaintiffs and PIWD Plaintiffs (because they would be deemed not to constitute "GUC Trust Beneficiaries") and would have already received binding releases from all EL Plaintiffs and PIWD Plaintiffs so that it would lack any financial interest in the allowed amount of their claims.  Thus, the entity that the Plan vests with the primary responsibility of objecting to and settling general unsecured claims would be obligated to pursue an Estimation Order on account of claims that it has no stake in whatsoever.  Indeed, it does not appear that the GUC Trust would itself have standing to pursue an Estimation Order, since—by the time such order is sought—the EL Plaintiffs and the PIWD Plaintiffs would not be GUC Trust Beneficiaries and would have already provided complete releases to the GUC Trust.

158.    The Movants' efforts at rewriting the Plan, the GUC Trust Agreement and the Sale Agreement clearly impact New GM's rights.  The Confirmation Order provides that the Plan shall not "in any way modify or limit any protections or rights afforded to New GM under or in connection with the Bankruptcy Court order approving the 363 Transaction."  (Conf. Order ¶¶ 29, 58.)  The Proposed Settlement, however, provides that the GUC Trust will (a) assign its Adjustment Share rights under the Sale Agreement to a "Settlement Fund" controlled by Co-Lead Counsel and PIWD Counsel, (b) seek an estimation of aggregate allowed unsecured claims when it has no fiduciary or economic interest left in the resolution of those claims, and (c) treat those claims in a manner that directly violates the Plan.  Such efforts are squarely foreclosed by the Plan, the Confirmation Order, and Section 1127 of the Bankruptcy Code.

## VII.    THE INCLUSION OF THE PIWD PLAINTIFFS IS FUNDAMENTALLY INCOMPATIBLE WITH THE MOVANTS' LIMITED FUND THEORY

159.    As discussed above, the Proposed Settlement seeks to resolve the claims asserted by the PIWD Plaintiffs even though such PIWD Plaintiffs are excluded from the two Proposed Classes.  Under the Proposed Settlement, such PIWD Plaintiffs will be entitled to recover from

the same purported limited fund that has been created for the Proposed Classes (in violation of *Ortiz*) and will be required to release all interests in and claims against the GUC Trust and GUC Trust Beneficiaries.  Certain PIWD Plaintiffs, however, cannot be included in the Proposed Settlement because they have not filed late proofs of claims or are otherwise eligible to participate in settlement agreements reached with New GM.

160.    The Proposed Settlement appears to bind all "Pre-Closing Accident Plaintiffs," not only the PIWD Plaintiffs that are identified in the Proposed Settlement.  This is contrary to law because, among other things, the Proposed Settlement will **release claims of all Pre-Closing Accident Plaintiffs** against the GUC Trust and GUC Trust Beneficiaries **without the express consent of all Pre-Closing Accident Plaintiffs**.[43]    The Proposed Settlement defines "Pre-Closing Accident Plaintiffs" broadly as "plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident that occurred before the Closing Date involving an Old GM vehicle that was later subject to [the same recalls specified in connection with the economic loss claims]."  (Settlement Agreement ¶ S.)  A subset of such plaintiffs are represented by counsel who signed the agreement, and these 442 plaintiffs are specifically identified in the agreement, and expressly included in the Release Provision.  (*See* Settlement Agreement § 5.3.)  However, the Proposed Settlement provides that the Adjustment Shares will be distributed to "Plaintiffs," defined to include "Pre-Closing Accident Plaintiffs" (*i.e.*, including all persons asserting pre-closing personal injury/wrongful death claims).  (*See id.* ¶ 2.51.)  In turn, all such

---

[43]    *See,* for example, Rule 23 Motion Ex. C, Final Order ¶ 9 (release applies to "All Plaintiffs"), Ex. D, Short Form Notice (The Settlement includes 'Affected Persons' in the United States who, prior to July 10, 2009, bought or leased certain Old GM vehicles or suffered personal injury or wrongful death in an accident involving certain Old GM vehicles."), Ex. G, Long Form Notice ("Under the Settlement, each Affected Person will be deemed to have forever waived and released (the 'Waiver') any claims…."), Ex. E, DTC Notice, (describing release of claims by "Potential Plaintiffs," defined as "persons who have suffered such [economic or personal injury/wrongful death] losses or injuries, regardless of whether they are currently involved in the Recall Litigation").

Pre-Closing Accident Plaintiffs, not just the PIWD Plaintiffs that are identified in the Proposed Settlement, are required, without their consent, to release any and all claims against the GUC Trust and the GUC Trust Beneficiaries.

161.    Further, at least 45 of the 442 PIWD Plaintiffs specifically identified in the Proposed Settlement have not even filed proposed late proofs of claim.  Pursuant to the terms of the Proposed Settlement, the GUC Trust "consents to the filing of the Proofs of Claim" where "Proofs of Claim" is defined as "the late proofs of claim, including late class proofs of claim, that the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs and certain Pre-Closing Accident Plaintiffs sought authority to file pursuant to the Late Claims Motions and the Supplemental Late Claims Motion, and any amendments thereto filed prior to the execution of this Agreement."  (*See* Settlement Agreement §§ 2.56, 3.)  Accordingly, pursuant to the terms of the Proposed Settlement, where no proposed late proofs of claim have been filed, the GUC Trust cannot consent to such late filing and such claims therefore cannot be compromised or released pursuant to the Proposed Settlement (even though the Proposed Settlement purports to do so). Any PIWD Plaintiffs who have not filed proposed late proofs of claim cannot be included in the Proposed Settlement by its own terms.

162.    Finally, of the 442 PIWD Plaintiffs specifically identified in the Proposed Settlement, 254 are already eligible for settlements as a result of agreements in principle reached by their lawyers and New GM in the last several months.  The Movants' inclusion of the claims of these 254 PIWD Plaintiffs in the Proposed Settlement is therefore inappropriate.[44]

---

[44]    The Movants concede that inclusion of the PIWD Plaintiffs otherwise eligible for settlement with New GM within the Proposed Settlement is inappropriate.  (*See* Settlement Agreement § 2.56 ("For the avoidance of doubt, the Proofs of Claim do not include any proofs of claim filed by any client of Hilliard Martinez Gonzalez LLP or The Law Offices of Thomas J. Henry, including any parties who sought to file late claims pursuant to ECF No. 13807 and any related supplemental late claim motion (the "Hilliard Plaintiffs").  The Hilliard Plaintiffs shall not be entitled to any of the rights or benefits conferred under this Agreement.")

## VIII.  MOVANTS HAVE FAILED TO DEMONSTRATE COMPLIANCE WITH THE CLASS ACTION FAIRNESS ACT

163.    The Class Action Fairness Act ("CAFA") requires that "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each [defendant] shall serve upon the appropriate State official of each State in which a class member resides" a notice of any proposed class action settlement, together with certain specific information about the proposed settlement, including, "if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official."   28 U.S.C. § 1715(b).   If a putative class member "demonstrates that the notice required under subsection (b) has not been provided," that class member has the right to "refuse to comply with" and "choose not to be bound by the settlement agreement or consent decree."   28 U.S.C. § 1715(e).  On February 28, 2019, counsel for New GM asked counsel for the GUC Trust to provide copies of any notices sent pursuant to CAFA. Counsel for the GUC Trust has not responded.  If, in fact, the GUC Trust did not provide notices to the appropriate state officials in 50 jurisdictions by February 11, 2019 (10 days after the Proposed Settlement was filed), then the GUC Trust failed to comply with CAFA.  In sum, if Movants fail to comply with CAFA, potential class members may opt out, defeating the purported non-opt-out settlement structure and precluding preliminary or final approval.

## IX.    CONSIDERATIONS OF JUDICIAL EFFICIENCY AND DEFERENCE TO THE MDL COURT WARRANT STAYING CONSIDERATION OF THE PROPOSED SETTLEMENT

164.    As explained in the Stay Motion, the parties are engaged in a dispute over numerous issues in the MDL Court that directly bear on this Court's consideration of the Proposed Settlement.  The MDL Court's near-term rulings will undoubtedly provide the parties and this Court determinative guidance with respect to the likelihood that the Proposed Classes

can be certified.    Determining whether the Proposed Classes satisfy the requirements of Rule

23(a), for instance, depends on the specific factual and legal issues that already have been subject

to extensive discovery, motion practice, and bellwether trials in the MDL Court.    Also,

determining whether the Proposed Classes here are likely to be certified under Rule 23(e)

depends on factual and legal issues also already raised in summary judgment briefing currently

in front of the MDL Court.    *See*, *e.g.*, MANUAL FOR COMPLEX LITIG. § 21.631 (14th ed. 2018)

("The **outcomes** of parallel litigation may also inform the court and objecting class members

about the fairness, reasonableness, and adequacy of the proposed settlement.") (emphasis added).

This Court should defer consideration of the Proposed Settlement where it would be an

inefficient use of judicial resources to have two courts deciding the same issues—one after the

other, or substantially at the same time.    Here, the MDL Court has an extensive record and is

poised to rule on myriad issues that bear directly on the likelihood that the Court can certify the

Proposed Classes—the very analysis amended Rule 23(e) requires this Court to undertake now.

Indeed, the Movants acknowledge that the MDL Court's summary judgment decision may affect

"the size, scope or composition of the classes," (Settlement Agreement § 4.5), and that the GUC

Trust should have the unilateral right to terminate the settlement agreement if Co-Lead Counsel

appeals that summary judgment decision, (*See id.* § 10.2).    The Movants further concede that

"depending on what [the MDL Court] ultimately rules," there could be a "dramatic[] impact [on]

the size of the universe, therefore who gets noticed, therefore the cost of notice."[45]    (Bankr. Hr'g

Tr. 12/20/18 at 9, 14.)

165.    New GM respectfully directs this Court to the Stay Motion [Bankr. Dkt. 14431]

for a more detailed discussion as to why moving forward with the Proposed Settlement would

---

[45]    In light of the fact that the Rule 23 Motion exceeded the page limit set forth in the Case Management Order
[Bankr. Dkt. 12625, ¶ 13], New GM respectfully requests permission for this objection, which responds to both
the Rule 23 Motion and the Rule 9019 Motion, to exceed the page limit.

greatly hinder judicial efficiency, and would run the risk of inconsistent rulings between this Court and the MDL Court.

## **<u>CONCLUSION</u>**

166.    For the reasons set forth herein, New GM respectfully requests that the Court deny the Movants' Settlement Motions.

*[Remainder of Page Intentionally Left Blank]*

Dated: March 4, 2019
       New York, New York

/s/ Paul M. Basta
Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Maia S. Lichtenstein
PAUL, WEISS, RIFKIND, WHARTON &
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*