**DRINKER BIDDLE & REATH LLP**
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
E-mail: kristin.going@dbr.com
          clay.pierce@dbr.com
          marita.erbeck@dbr.com
Kristin K. Going
Clay J. Pierce
Marita S. Erbeck

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                              :
**In re**                                                     :          **Chapter 11 Case No.**
                                                              :
                                                              :
**MOTORS LIQUIDATION COMPANY,** *et al.*,                     :          **09-50026 (MG)**
**f/k/a General Motors Corp.,** *et al.*                      :
                                                              :          **(Jointly Administered)**
                                                              :
                        **Debtors.**                          :
---------------------------------------------------------------x

**AMENDED PRELIMINARY OBJECTION OF WILMINGTON TRUST COMPANY,**
**AS GUC TRUST ADMINISTRATOR, TO GENERAL**
**MOTORS, LLC'S MOTION PURSUANT TO SECTION 105(a) OF**
**THE BANKRUPTCY CODE TO (A) STAY PROCEEDINGS RELATING**
**TO THE PROPOSED SETTLEMENT AND (B) GRANT RELATED RELIEF**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ……………………………………………………………ii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND .................................................................................................. 3

    A.    The Old GM Bankruptcy and Sale to New GM ....................................... 3

    B.    Ignition Switch Recalls and Subsequent Late Claims Litigation.............. 4

    C.    The Settlement Between the GUC Trust and the Signatory Plaintiffs................................................................................................... 8

    D.    Relevant MDL Proceedings ................................................................... 10

LEGAL ARGUMENT....................................................................................... 11

    A.    New GM Ignores the High Threshold to be Satisfied in Order to Obtain a Stay of the Settlement Proceedings ......................................... 11

        1.    New GM Fails to Establish that a Stay Is Proper Under Bankruptcy Rule 5011 .................................................... 11

        2.    New GM Fails to Meet its Burden Under Section 105 of the Bankruptcy Code and the Court's Inherent Stay Power ................. 13

            a.  Factors One and Two – Interests of the Parties to the Settlement Proceedings ........................................... 14

            b.  Factor Three – Interests of the Courts …………………………16

            c.  Factors Four and Five – Interests of Non-Parties and the Public Interest ................................................................. 17

            d.  GM Dramatically Overstates the Overlap Between the Settlement Proceedings and the MDL........................................ 18

    B.    New GM is Neither a Party to, nor a Beneficiary of, the Settlement Agreement and Has No Standing to Request a Stay of the Settlement Proceedings......................................................................... 22

CONCLUSION …………………………………………………………………………23

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alumax Mill Prods., Inc. v. Congress Fin. Corp.*,
  912 F.2d 996, 1002 (8th Cir. 1990) ......................................................................22

*American Steamship Owners Mut. Protection and Indem. Ass'n, Inc. v. Lafarge N.
  Am., Inc.*,
  474 F.Supp.2d 474 (S.D.N.Y. 2007).....................................................................13

*Armco Inc. v. N. Atl. Ins. Co.*,
  No. 98 CIV. 6084 AGS, 1999 WL 173579 (S.D.N.Y. Mar. 29, 1999) ...................22

*Bhatia v. Piedrahita*,
  756 F.3d 211 (2d Cir. 2014)........................................................................... 22-23

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. E.P.A.*,
  630 F.Supp.2d 295 (S.D.N.Y. 2009).....................................................................16

*In re Chrysler LLC*,
  No. 09-50002 (AJG), 2009 WL 7386569 (Bankr. S.D.N.Y. May 20, 2009) ..........12

*Clinton v. Jones*,
  520 U.S. 681 (1997)...............................................................................................14

*Eichenholtz v. Brennan*,
  52 F.3d 478, 482 (3d Cir. 1995).............................................................................22

*Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*,
  No. 11 CIV. 4141 BSJ, 2012 WL 252139 (S.D.N.Y. Jan. 25, 2012) .....................15

*In re Gen'l Motors LLC Ignition Switch Litig.*,
  14-MD-2543 (JMF), 2018 WL 1638096 (S.D.N.Y. Apr. 3, 2018) .........................10

*In re Hagerstown Fiber Ltd. P'ship*,
  277 B.R. 181 (Bankr. S.D.N.Y. 2002)..............................................................15, 16

*In re Joint E. & S. Dist. Asbestos Litig.*,
  982 F.2d 721 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir.
  1993) ......................................................................................................................20

*In re Joint E. & S. Dist. Asbestos Litig.*,
  78 F.3d 764 (2d Cir. 1996).....................................................................................20

*Juris v. Inamed Corp.*,
  685 F.3d 1294 (11th Cir. 2012) .............................................................................19

*Kappel v. Comfort,*
914 F.Supp. 1056 (S.D.N.Y. 1996)..................................................................14, 17

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936).........................................................................................13, 14

*LaSala v. Needham & Co., Inc.*,
399 F.Supp.2d 421 (S.D.N.Y. 2005).................................................................13, 14

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
676 F.3d 83 (2d Cir. 2012)....................................................................................14

*In re Motors Liquidation Co.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part, rev'd in part, vacated in
part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.)*,
829 F.3d 135 (2d Cir. 2016)..................................................................................3, 4

*In re Motors Liquidation Co.*,
580 B.R. 319 (Bankr. S.D.N.Y. 2018)....................................................................16

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................................13

*Ofosu v. McElroy*,
98 F.3d 694 (2d Cir.1996).......................................................................................14

*Ortiz v. Fibreboard Corp*,
527 U.S. 815 (1999)...........................................................................................19, 21

*In re Quality Med. Consultants, Inc.*,
192 B.R. 777 (Bankr. M.D. Fla. 1995), *aff'd and remanded sub nom. United
States v. Quality Med. Consultants, Inc.*, 214 B.R. 246 (M.D. Fla. 1997) .............17

*In re Residential Capital, LLC*,
519 B.R. 890 (Bankr. S.D.N.Y. 2014)....................................................................12

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*,
No. 97-CV-11441-RDP, 2010 WL 11506713 (N.D. Ala. May 19, 2010)...............19

*Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*,
886 F. Supp. 1134 (S.D.N.Y. 1995)........................................................................14

*Volmar Distributors v. New York Post Co.*,
152 F.R.D. 36 (S.D.N.Y.1993) ...............................................................................14

## STATUTES, RULES & REGULATIONS

11 U.S.C. § 105(a) ............................................................................................... *passim*

28 U.S.C. § 1334(c) ............................................................................................12

28 U.S.C. § 1407 ...............................................................................................10

Fed. R. Bankr. P. 5011 ................................................................................11, 12, 13

Fed. R. Civ. P. 23 .............................................................................. *passim*

Fed. R. Civ. P. 23(b)(3) ...................................................................................10, 21

Fed. R. Civ. P. 23(b)(1)(B) .............................................................................. 19-21

## PRELIMINARY STATEMENT[1]

On February 22, 2019, New GM[2] filed its *Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* [ECF No. 14431] (the "**Stay Motion**").[3]  By the Stay Motion, New GM asks this Court to stay, *indefinitely*, all proceedings related to a settlement (the "**Settlement**," and the agreement documenting it, the "**Settlement Agreement**") between the GUC Trust and certain Ignition Switch Plaintiffs,[4] certain Non-Ignition Switch Plaintiffs,[5] and certain Pre-Closing Accident Plaintiffs[6] (the "**Settlement Proceedings**").  The Stay Motion indicated that New GM had "requested" a hearing date of March 11, and set an objection deadline of March 4.  Out of an abundance of caution, the GUC Trust is filing this objection now and reserves the right to supplement this objection once an actual schedule is set for the Stay Motion.

New GM's primary basis for requesting this stay is that it objects to the Settlement and class certification requested by the Plaintiffs.  Ironically, New GM previously sought a stay of a prior settlement motion between the GUC Trust and Plaintiffs on the basis that the prior settlement should be stayed because the parties did not contemplate class certification.  Now that the Ignition

---

[1]  The GUC Trust hereby submits this amended objection because the version filed earlier today inadvertently omitted a Table of Contents and a Table of Authorities.  Minor errors in certain citations have also been corrected.

[2]  Capitalized terms used but not otherwise defined in this Preliminary Statement shall bear the meaning given elsewhere in this Objection.

[3]  Also on February 22, 2019, New GM filed its *Motion to Withdraw the Reference of the Economic Loss Plaintiffs' Rule 23 Motion* in the MDL (the "**Withdrawal Motion**").

[4]  The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**").

[5]  The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs asserting economic loss claims or persons suffering economic losses who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

[6]  The term "**Pre-Closing Accident Plaintiffs**" shall mean those plaintiffs asserting personal injury or wrongful death claims or persons who suffered a personal injury or wrongful death arising from an accident that occurred prior to the Closing Date involving an Old GM vehicle that was later subject to Recall Nos. 14V-118, 14V-153, 14V-355, 14V-394, 14V-400, and 14V-540 and who have signed the Settlement Agreement.  Collectively, the Pre-Closing Accident Plaintiffs who have signed the Settlement Agreement, the Ignition Switch Plaintiffs, and the Non-Ignition Switch Plaintiffs are "**Plaintiffs**."

Switch Plaintiffs and Non-Ignition Switch Plaintiffs are seeking class certification, New GM is requesting a new stay because they claim now that class certification will bring a parade of horribles.  In fact, a majority of the Stay Motion is dedicated to arguing against the prospect of class certification.  This is likely because New GM's renewed request for a stay is supported by neither the law nor the facts.   New GM's Rule 23 arguments have no bearing on whether the Court should issue a stay of the Settlement Proceedings.  The issues that do matter – prejudice to the parties and judicial economy – weigh strongly in favor of moving forward with the Settlement Proceedings.  A stay of the Settlement Proceedings will result in prejudice to the GUC Trust, the Unitholders, and the Plaintiffs – in other words, virtually every constituency that looks to the GUC Trust under the Plan this Court confirmed.  With the settlement of the Avoidance Action Trust litigation, the Settlement Proceedings are the single remaining controversy standing in the way of final resolution of the trust and distributions on account of allowed claims.  The notion that New GM would seek to once again delay these proceedings and tie them up indefinitely is an outrage.  The Stay Motion itself is a waste of judicial resources and an abuse of process.  The Stay Motion should be denied in its entirety.

The Stay Motion also requires this Court to once again confront the fact that New GM does not have standing to request a stay of the Settlement Proceedings.  The Settlement Agreement does not impact New GM.  The Settlement is an agreement to allow late proofs of claim to be filed (not allowed, just filed) along with an agreement that the GUC Trust will seek estimation of the filed proofs of claim, something the GUC Trust is entitled to under the terms of the Plan, MSPA and Trust Agreement, regardless of whether there is a settlement or not.  New GM has every right to object if and when an estimation motion is filed, because that is when the Court's decision may impact its rights.  But that motion has not even been filed yet.  The Stay Motion should also be

denied because New GM had no right to file it in the first place, and New GM's continued strategy of attempted delay and obstruction is costing the GUC Trust a significant amount of money.

## BACKGROUND

### A.    The Old GM Bankruptcy and Sale to New GM

The circumstances surrounding the General Motors bankruptcy are well documented, so this Objection offers only an abbreviated summary.  On June 1, 2009, General Motors Corporation ("**Old GM**") and certain of its affiliates (collectively, the "**Debtors**") filed for chapter 11 bankruptcy protection in this Court and entered into an agreement (the "**Sale Agreement**") to sell substantially all of its assets to NGMCO, Inc. ("**New GM**") in exchange for, *inter alia*, New GM common stock and warrants.  *See In re Motors Liquidation Co.*, 529 B.R. 510, 535 (Bankr. S.D.N.Y. 2015), *aff'd in part, rev'd in part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016).

The Sale Agreement was amended on July 5, 2009 to, *inter alia*, add a feature requiring New GM to provide additional New GM common stock in the event that the amount of allowed general unsecured claims against the Old GM estate exceeds a threshold amount (the "**Purchase Price Adjustment**").  *See* AMSPA § 3.2(c).[7]  Specifically, the Purchase Price Adjustment provides that if the Bankruptcy Court issues an order finding that the estimated aggregate allowed general unsecured claims against the Old GM estate exceeds $35 billion, then within five business days thereof New GM will issue Adjustment Shares to the GUC Trust.  *See id.*  If such order estimates the aggregate allowed general unsecured claims at or in excess of $42 billion, New GM must issue 30 million Adjustment Shares, the maximum amount of Adjustment Shares that may

---

[7]    *See Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser, dated as of June 26, 2009* (the "**AMSPA**").

be required under the AMSPA. *See id.* On July 5, 2009, the sale was approved by the Bankruptcy Court. *See Elliott*, 829 F.3d at 146-47.

The Court established November 30, 2009 (the "**Bar Date**") as the deadline for filing proofs of claim against Old GM. *See In re Motors Liquidation Co.*, 529 B.R. at 535. As of December 31, 2018, the total amount of Allowed General Unsecured Claims against the Debtors' estate was $31,855,431,837.00 approximately $3.1 billion below the threshold for triggering the issuance of Adjustment Shares under the AMSPA.[8] As is well known to the court, this does not include any claims of Plaintiffs related to the Recalls (as defined herein).

## B.    Ignition Switch Recalls and Subsequent Late Claims Litigation

In February and March 2014, over four years after the Bar Date, New GM publicly disclosed the existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047, impacting approximately 2.1 million vehicles. After this first wave of recalls, New GM issued additional recalls in June, July and September of 2014 concerning defective ignition switches affecting approximately 10 million additional vehicles, NHTSA Recall Numbers 14V-355, 14V-394, 14V-400, and 14V-540. New GM issued other recalls for safety defects throughout 2014, including a March 2014 recall pertaining to approximately 1.2 million vehicles with defective side airbags, NHTSA Recall Number 14V-118, and another recall issued in March 2014 pertaining to over 1.3 million vehicles with defective power steering, NHTSA Recall Number 14V-153. Collectively, NHTSA Recall Numbers 14V-047, 14V-355, 14V-394, 14V-400, 14V-540, 14V-118 and 14V-153 are referred to herein as the "**Recalls**."

---

[8]    *See Motors Liquidation Company GUC Trust Quarterly Section 6.2(c) Report and Budget Variance Report as of Dec. 31, 2018, dated Jan. 24, 2019* [ECF No. 14402].

After the issuance of the Recalls, many owners and lessees of defective Old GM and New GM vehicles filed lawsuits against New GM.  New GM sought to enjoin that litigation by filing motions to enforce the Sale Order in the Bankruptcy Court.  *See Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated Apr. 21, 2014 [ECF No. 12620] (the "**Ignition Switch Plaintiffs Motion to Enforce**"); *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction Against Plaintiffs in Pre-Closing Accident Lawsuits*, dated Aug. 1, 2014 [ECF No. 12807] (the "**Pre-Closing Accident Plaintiffs Motion to Enforce**")[9]; and *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated Aug. 1, 2014 [ECF No. 12808] (the "**Non-Ignition Switch Plaintiffs Motion to Enforce**" and together with the Ignition Switch Plaintiffs Motion to Enforce and the Pre-Closing Accident Plaintiffs Motion to Enforce, the "**Motions to Enforce**").

In large part, the prosecution of the Motions to Enforce set in motion years of litigation over Plaintiffs' late claims, in this Court and on appeal, that was piecemeal and disjointed.[10] However, throughout the litigation, New GM's singular goal has been to obstruct and delay this Court's consideration of the Late Claims Motions.  Ultimately, in December 2016, this Court

---

[9]    The claims sought to be enjoined in that motion were limited to personal injury and wrongful death claims resulting from vehicles with the Ignition Switch Defect (*i.e.*, Recall No. 14V-047).  The Pre-Closing Accident Plaintiffs Motion to Enforce was also filed in conjunction with the launch of the Feinberg Protocol which "provided eligible Plaintiffs with an alternative (*i.e.*, a source of recovery under the Feinberg Protocol) to the enforcement of the Sale Order and Injunction against them."  According to the Pre-Closing Accident Plaintiffs Motion to Enforce, the Feinberg Protocol was developed and designed "for the submission, evaluation, and settlement of death or physical injury claims resulting from accidents allegedly caused by defective ignition switches in certain vehicles."  *Pre-Closing Accident Plaintiffs Motion to Enforce* [ECF No. 12807] at 2.

[10]    For a complete procedural history of late claims litigation between 2014 and December 2016, *see Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions (II) the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014 and 9019 and (III) Authorize the Reallocation of GUC Trust Assets* [ECF No. 14409] at 9-14.

issued the *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC That Involve Vehicles Manufactured by General Motors Corporation* [ECF No. 13802] (the "**Order to Show Cause**").  The Order to Show Cause identified five (5) threshold issues (the "**2016 Threshold Issues**") for resolution, including whether "the Ignition Switch Plaintiffs and/or Non-Ignition Switch Plaintiffs [defined in the Order to include plaintiffs asserting both economic loss and personal injury or wrongful death claims] satisfy the requirements for authorization to file late proof(s) of claim against the GUC Trust and/or are such claims equitably moot (the "**Late Proof of Claim Issue**")."[11]

The Order to Show Cause also established a December 22, 2016 deadline to file motions seeking authority to file late claims ("**Late Claims Motions**").[12]  *See* Order to Show Cause at 5, ¶ 1.  No additional issues (such as class certification, discovery, or the merits of a late proof of claim) would be addressed in these motions.  *See id.*  In addition, the procedures provided that briefing and adjudication of any Late Claims Motions filed by Non-Ignition Switch Plaintiffs and Pre-Closing Accident Plaintiffs would be stayed pending resolution of the other 2016 Threshold Issues.  *See id.* at 5, ¶ 2.  In accordance with the Order to Show Cause, on December 22, 2016, the Ignition Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident Plaintiffs filed Late Claims Motions.[13]  The motions attached proposed proofs of claim, including

---

[11]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3.

[12]    Pursuant to an Order to Show Cause, on December 22, 2016, the Economic Loss Plaintiffs and certain Pre-Closing Accident Plaintiffs who had not received notice of the Order to Show Cause, filed motions for authority to file late proofs of claim [ECF Nos. 13806, 13807], including late class proofs of claim; on July 28, 2017, certain Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14018], as supplemented on August 10, 2017, September 19, 2017, December 12, 2017 and July 19, 2018 [ECF Nos. 14046, 14112, 14195, 14346]; and on July 27, 2018, certain Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14350].  Pursuant to the Order to Show Cause, certain other Plaintiffs have filed joinders to these motions [ECF Nos. 13811, 13818].  On May 25, 2018, certain Pre-Closing Accident Plaintiffs filed a supplemental Late Claims Motion [ECF No. 14325].  The term "Late Claims Motions" as defined in this Motion encompasses all of these filings.

[13]    *See Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Dec. 22, 2016 [ECF No. 13806] (the "**Economic Loss Late Claim Motion**"); *Omnibus Motion by Certain Pre-Closing Accident Plaintiffs for*

proposed class proofs of claim asserted on behalf of purported class representatives for Ignition

Switch Plaintiffs and Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf

of certain Pre-Closing Accident Plaintiffs.  *See id.*[14]  Certain other Plaintiffs subsequently filed

joinders to the Late Claims Motions pursuant to the terms of the Order to Show Cause.

The proposed class claims addressed in the Ignition Switch Plaintiffs' and certain Non-

Ignition Switch Plaintiffs' Late Claims Motions (the "**Proposed Class Claims**") allege that Old

GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side

airbags, and defects in power steering for years prior to the Bar Date.[15]  The Proposed Class Claims

further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay

for defective vehicles and bear the costs of repairs while Old GM reaped the benefit of selling

defective vehicles at inflated prices and avoiding the costs of a recall.[16]

Based on these allegations, the Ignition Switch Plaintiffs and Non-Ignition Switch

Plaintiffs assert claims against the Old GM estate under the laws of each of the 50 states and the

District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer

protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.[17]

Certain Pre-Closing Accident Plaintiffs assert personal injury and wrongful death claims arising

from accidents they assert were caused by vehicles subject to Recall Nos.14V-047, 14V-118, 14V-

---

*Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths*, dated Dec. 22, 2016 [ECF No. 13807].

[14]    On April 24, 2018, the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed amended proposed class proofs of claim.  See *Notice of Filing of Amended Exhibits to Motion for an Order Granting Authority to File Late Class Proofs of Claim*, dated Apr. 25, 2018 [ECF No. 14280].

[15]    *See* Amended Exhibit A to the Economic Loss Late Claim Motion (the "**Proposed Ignition Switch Class Claim**"), ¶¶ 57-285; Exhibit B to the Economic Loss Late Claim Motion (the "**Proposed Non-Ignition Switch Class Claim**") ¶¶ 38-175.

[16]    *See, e.g.*, Proposed Ignition Switch Class Claim ¶ 374; Proposed Non-Ignition Switch Class Claim ¶ 278.

[17]    *See* Proposed Ignition Switch Class Claim ¶¶ 358-1697; Proposed Non-Ignition Switch Class Claim ¶¶ 262-1744.

7

153, 14V-355, 14V-394, 14V-400, and 14V-540 (collectively, the "**Personal Injury Claims**," and together with the Proposed Class Claims, the "**Claims**").

Subsequent to filing the Late Claims Motions, counsel for the proposed class representatives for the Ignition Switch Plaintiffs, the proposed class representatives for certain Non-Ignition Switch Plaintiffs, and counsel for certain Pre-Closing Accident Plaintiffs provided the GUC Trust with materials and expert reports describing in detail the factual background for their Claims, the alleged viability of the asserted Claims and the alleged amount of damages. This information has been refined and revised to incorporate and account for rulings by Judge Furman in the multi-district proceeding pending in the United States District Court for the Southern District of New York (the "**MDL**") regarding the viability of claims in certain states. Based on the information provided to the GUC Trust, depending on which estimate was used, estimated damages of Economic Loss Plaintiffs alone could equal or exceed $77 billion, an amount well in excess of the amount necessary to trigger New GM's obligation to issue the maximum amount of Adjustment Shares under the AMSPA.

Likewise, New GM presented the GUC Trust Administrator with expert reports and other evidence attempting to discredit the evidence described above. New GM has offered no alternative damage valuation method to the GUC Trust. Rather, New GM continues to allege that there is simply no basis for economic loss or personal injury damages, despite the fact that the GUC Trust understands that New GM has settled hundreds of personal injury cases with pre-sale personal injury plaintiffs that had previously been part of the settlement with the GUC Trust.

## C.    The Settlement Between the GUC Trust and the Signatory Plaintiffs

Following the filing of the Late Claims Motions and periodically in the time since, the GUC Trust has engaged in extensive negotiations to resolve the numerous complex issues raised by Plaintiffs' claims against the Old GM estate and the assets held and previously distributed by

the GUC Trust. These negotiations have most recently culminated in execution of the Settlement Agreement, which is effective as of February 1, 2019. The Settlement Agreement resolves the Late Claims Motions (including the Initial Late Claim Motions Issues) filed by the Signatory Plaintiffs and provides a mechanism (estimation) for the determination of the allowance of the Signatory Plaintiffs' claims, and the Signatory Plaintiffs' rights to GUC Trust Assets. The Settlement Agreement also contemplates Rule 23 certification for settlement purposes of the "**Ignition Switch Class**," defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047, and the "**Non-Ignition Switch Class**" (together with the Ignition Switch Class, the "**Classes**"), defined as plaintiffs asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-118, 14V-153, 14V-355, 14V-394, and 14V-400. Importantly, the Settlement Agreement also places the asserted claims of all Signatory Plaintiffs on the same track, correcting, for the most part, the disjointed approach introduced by New GM.

On February 1, 2019, the Economic Loss Plaintiffs filed the *Notice of Hearing and The Economic Loss Plaintiffs' Motion to: (1) Extend Bankruptcy Rule 7023 to These Proceedings; (2) Approve the Form and Manner Of Notice; (3) Grant Class Certification For Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel for Settlement Purposes; and (5) Approve the Settlement Agreement by and Among The Signatory Plaintiffs and the GUC Trust Pursuant To Rule 23* [ECF No. 14408] (the "**Class Certification Motion**"). Likewise, on February 1, 2019, the GUC Trust filed the *Notice of Hearing on Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions (II) the Settlement Agreement by and Among the Signatory Plaintiffs and the GUC Trust Pursuant*

to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014 and 9019 and

(III) Authorize the Reallocation of GUC Trust Assets [ECF No. 14409] (the "**Settlement Motion**").

## D.     Relevant MDL Proceedings

On June 9, 2014, the United Stated Judicial Panel on Multidistrict Litigation issued a

Transfer Order, pursuant to 28 U.S.C. § 1407, transferring putative economic loss class actions

against New GM to the Southern District of New York for coordinated or consolidated pretrial

proceedings before U.S. District Court Judge Jesse M. Furman.  *In re General Motors LLC Ignition*

*Switch Litig.*, Case No. 14-MD-2543 (JMF) ("MDL") [MDL ECF No. 1].

On October 14, 2014, plaintiffs in the MDL filed a Consolidated Complaint alleging

economic loss claims in connection with latent ignition switch defects in GM-branded vehicles

that the plaintiffs purchased or leased on or after July 11, 2009.  [MDL ECF No. 315].  Since 2014,

plaintiffs amended the Consolidated Complaint several times.  The current, operative complaint in

the MDL is the Fifth Amended Consolidated Complaint, which is 1,729 pages long, and was filed

on November 27, 2017.  [MDL ECF No. 4838].

On July 20, 2018, after years of contentious motion practice—none of which succeeded in

disposing of the MDL Economic Loss Plaintiffs' claims as New GM had repeatedly promised[18]—

the MDL Economic Loss Plaintiffs moved for class certification under Federal Rule of Civil

Procedure 23(b)(3) in three bellwether states: California, Missouri, and Texas.  [MDL ECF No.

5845].  That same day, New GM moved *in limine* to exclude certain expert reports relied upon by

---

[18]  *See, e.g., In re Gen'l Motors LLC Ignition Switch Litig.*, 14-MD-2543 (JMF), 2018 WL 1638096, at *1-2
(S.D.N.Y.  Apr. 3, 2018):

> [B]ased on New GM's view that a ruling on its proposed motion 'would materially advance the litigation
> and inform the Court's later decision on motion practice regarding class certification and summary
> judgment,' . . . the Court put aside [its] misgivings [about piecemeal motion practice and the prematurity of
> New GM's motion] and granted New GM leave to proceed . . . . Upon review of the parties' motion papers,
> the Court—regrettably—concludes that is initial misgivings were well founded and the New GM's motion
> is premature.

the MDL Economic Loss Plaintiffs in establishing their putative class claims for economic damages. [MDL ECF No. 5854]. New GM also moved for summary judgment against the bellwether MDL Economic Loss Plaintiffs that same day. [MDL ECF No. 5858]. All three motions are fully briefed and are *sub judice* before Judge Furman. Although the District Court is working expeditiously to review the pending motions on its docket, it is unknown when decisions on these three motions can be expected. Moreover, depending on the outcome, one or more ruling by Judge Furman on these issues may be subject to appeal to the Second Circuit, delaying the point at which such decision becomes "final."

## LEGAL ARGUMENT

### A.    New GM Ignores the High Threshold to be Satisfied in Order to Obtain a Stay of the Settlement Proceedings

The Stay Motion generically requests issuance of an indefinite stay. In support, New GM cites section 105 of the Bankruptcy Code. As alternative relief, New GM requests a stay of the Settlement Proceedings pending the district court's resolution of the Withdrawal Motion. Motion ¶ 24. Accordingly, New GM seeks a stay pending determination of the Withdrawal Motion pursuant to Bankruptcy Rule 5011 (though the rule is not discussed in the Stay Motion), or a stay of indefinite duration pursuant to the court's inherent powers and section 105 of the Bankruptcy Code. Under either standard, New GM's request for issuance of a stay should be denied.

### 1.    New GM Fails to Establish that a Stay Is Proper Under Bankruptcy Rule 5011

On February 22, 2019, New GM filed both the Stay Motion and the Withdrawal Motion, and asked for a stay pending determination of the Withdrawal Motion. Motion ¶ 24. When a party files a motion to withdraw the reference, the underlying bankruptcy proceedings are not

automatically stayed.[19]   In order to obtain a stay, the moving party must demonstrate "(a) the likelihood of prevailing on the merits[;] (b) that the [movant] will suffer irreparable harm if the stay is denied; (c) that the Debtors will not be substantially harmed by the stay; and (d) that the public interest will be served by granting the stay." *In re Residential Capital, LLC*, 519 B.R. 890, 904 (Bankr. S.D.N.Y. 2014) (alterations in original) (citations omitted).   The party seeking the stay bears the burden of proof on all these points. *Residential Capital*, 519 B.R. at 904 (citing *In re Chrysler LLC*, No. 09-50002 (AJG), 2009 WL 7386569, at *1 (Bankr. S.D.N.Y. May 20, 2009)).   To satisfy this burden, the movant must demonstrate, among other things, that there is a likelihood that its motion to withdraw the reference will be granted.  *Id.*

New GM comes nowhere near to meeting its burden based on the above standard.  Most importantly, it is highly questionable that Judge Furman will grant the Motion to Withdraw – which argues in favor of both mandatory withdrawal and permissive withdrawal "for cause."  New GM's arguments in support of withdrawal are similar to the arguments made in the Stay Motion and ring hollow.  Adjudication of the Rule 23 issues can be made in this Court and do not compel withdrawal.  Likewise, that judicial economy will be served by withdrawal – subjecting the GUC Trust, non-party to the MDL, to the jurisdiction of the district court for consideration of the Settlement – is laughable.  As will be set forth below in greater detail, the overlap of issues between proceedings in this Court and the MDL is an argument manufactured by New GM in order to make its case for further delay of consideration of the Settlement.  And withdrawal of the reference will cause unnecessary and inequitable delay of all Settlement Proceedings.  Likewise, New GM is

---

[19] Pursuant to Bankruptcy Rule 5011(c):

> The filing of a motion for withdrawal of a case or proceeding or for abstention pursuant to 28 U.S.C. § 1334(c) shall not stay the administration of the case or any proceeding therein . . . except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion.

Fed. R. Bankr. P. 5011(c).

unable to demonstrate irreparable harm absent issuance of a stay pending the district court's consideration of the Withdrawal Motion.  A stay cannot be issued under Bankruptcy Rule 5011(c).

> ### 2.    New GM Fails to Meet its Burden Under Section 105 of the Bankruptcy Code and the Court's Inherent Stay Power

Alternatively, New GM seeks a broad, indefinite stay of the Settlement Proceedings pursuant to section 105 of the Bankruptcy Code and the Court's inherent powers.  The GUC Trust acknowledges that a bankruptcy court has the inherent power to issue a stay of proceedings before it.  However, it is also important to remember that because a "stay is an intrusion into the ordinary processes of administration and judicial review," it is "not a matter of right;" rather, it is an "exercise of judicial discretion."  *Nken v. Holder*, 556 U.S. 418, 427 (2009); *see also LaSala v. Needham & Co., Inc.*, 399 F.Supp.2d 421, 427 (S.D.N.Y. 2005) (noting that "the decision whether to issue a stay is firmly within a [] court's discretion.") (quotations omitted).  Obtaining a stay can be difficult, as "[t]he party moving for a stay 'must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else.'"  *American Steamship Owners Mut. Protection and Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.*, 474 F.Supp.2d 474, 482 (S.D.N.Y. 2007) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).  Thus, "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."  *Landis*, 299 U.S. at 255.

Courts in the Second Circuit consider five factors when deciding whether a stay is appropriate:

1.   the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed;
2.   the private interests of and burden on the defendants;
3.   the interests of the courts;

13

4.  the interests of persons not parties to the civil litigation; and

5.  the public interest.

*Kappel v. Comfort*, 914 F.Supp. 1056, 1058 (S.D.N.Y. 1996) (citing *Volmar Distributors v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y.1993)). Courts considering stay applications must "exercise [their] judgment" and "must weigh competing interests and maintain an even balance" before reaching a conclusion. *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) (citing *Landis*, 299 U.S. at 254–55); *see also Ofosu v. McElroy*, 98 F.3d 694, 699 (2d Cir.1996) ("A request for a stay is an appeal to equity."). In balancing the *Kappel* factors on a case-by-case basis, "the basic goal is to avoid prejudice." *Volmar Distribution v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993). Another important consideration is the extent to which the issues in the cases overlap. At all times, "[t]he proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997).

Tellingly, New GM for the most part ignores the *Kappel* factors, instead focusing on Rule 23 and whether certification of the Economic Loss Plaintiff Class is permissible. New GM's failure to address the governing standard for a stay underscores both the weakness of its motion and New GM's ultimate objective—namely, to derail the Settlement by any means necessary, and thereby avoid the estimation of the Plaintiffs' claims and the possible triggering of the AMPSA's Purchase Price Adjustment provisions. Because New GM fails to meet any of the elements required for a stay, its motion should be denied in its entirety.

### a.    Factors One and Two – Interests of the Parties to the Settlement Proceedings

The GUC Trust has a legitimate interest in the expeditious resolution of the case. *LaSala*, 399 F. Supp. 2d at 428 ("Courts are generally reluctant to stay proceedings because they are concerned with vindicating the plaintiff's right to proceed with its case."); *see also Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1140

(S.D.N.Y. 1995).    In order to overcome a plaintiff's interest in proceeding expeditiously, defendants must demonstrate they will be prejudiced if a stay is not granted.  *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, No. 11 CIV. 4141 BSJ, 2012 WL 252139, at *5 (S.D.N.Y. Jan. 25, 2012).  Consideration of prejudice to the parties is thus the court's chief concern in considering whether to grant a stay. *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, No. 11 CIV. 4141 BSJ, 2012 WL 252139, at *5 (S.D.N.Y. Jan. 25, 2012) ("The greatest priority in deciding a motion to stay is avoiding prejudice to the parties."); *see also In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 199 (Bankr. S.D.N.Y. 2002).

In support of the Stay Motion, New GM baldly asserts "a stay of proceedings related to the Proposed Settlement will not prejudice any party."  Motion ¶¶ 78-79.  As a preliminary matter, it is worth noting that New GM is not a party to the Settlement Proceedings, and thus is in a poor position to assess whether a stay will prejudice the GUC Trust, the Unitholders of the GUC Trust or Plaintiffs.  The GUC Trust is unaware of any case granting a motion to stay by a non-party.  Putting these issues aside, however, it is clear that the potential for prejudice to the parties weighs against the issuance of any stay here.

The indefinite delay of the Settlement Proceedings sought by New GM will result in significant and tangible prejudice to the GUC Trust, a publicly traded entity.  Now that the term loan avoidance action has settled,[20] litigation over the Late Claims Motions is the last major dispute requiring resolution before the Trust can be wound down.  The stay will force the GUC Trust to remain open indefinitely.  The GUC Trust's inability to distribute its assets results in significant expense to the trust and its beneficiaries, as the cost of administration of the GUC Trust will continue during the period of any stay.  In addition, for as long as it remains open, the GUC Trust

---

[20]    The terms of the settlement are not yet publicly available, however the GUC Trust understands that a 9019 motion, which will make public the terms of that settlement and will seek approval thereof, will be filed with the Court soon.

remains vulnerable to additional late claims filings, as demonstrated by the recent motion of American Axle & Manufacturing, Inc. to file a proof of claim in this bankruptcy [ECF No. 14393], approximately ten years after the Bar Date and eight years after Plan approval. Finally, the GUC Trust is not a party to the MDL, and consideration of the Settlement between the GUC Trust and the Signatory Plaintiffs should not be deferred, while different parties engage in protracted litigation. The GUC Trust should not be forced to wait, and remain open, indefinitely. The prejudice is too great. Instead, the GUC Trust should have the right to proceed with consideration of its case – here, the Settlement Proceedings and adjudication of the Settlement Motion. Nothing in the Stay Motion should persuade the Court otherwise.

### b.    Factor Three – Interests of the Courts

A stay may be appropriate where it will "serve the interests of the courts by promoting judicial efficiency and 'minimiz[ing] the possibility of conflicts between different courts.'" *Catskill Mountains Chapter of Trout Unlimited, Inc. v. U.S. E.P.A.*, 630 F.Supp.2d 295, 304 (S.D.N.Y. 2009). This factor will not alone support issuance of a stay, however. *Hagerstown Fiber*, 277 B.R. at 199 (finding a stay appropriate where it will "promote judicial economy, avoidance of confusion and possible inconsistent results" *without* "working an undue hardship or prejudice against the plaintiff.").

Here, a stay of the Settlement Proceedings will promote neither efficiency nor judicial economy. In fact, granting the stay requested by New GM will lead to the exact opposite result. New GM asks the Court to bring the entire settlement process to a halt. Of course, this is the only the latest in a long line of efforts by New GM to stymie both the settlement of the Late Claim Motions and the estimation of the Plaintiff's Claims. New GM's objectives with respect to this issue have not been lost on the Court. *See, e.g.*, *In re Motors Liquidation Company*, 580 B.R. 319,

325 (Bankr. S.D.N.Y. 2018)[21]; Hearing Tr. Mar. 8, 2018 40:4-9[22]; Hearing Tr. May 25, 2018

40:15-41:24[23] and 49:25-50:2[24].  New GM seeks to stay the Settlement Proceedings in furtherance

of its overall litigation strategy.  The Court must not permit it to abuse section 105 of the

Bankruptcy Code in that way.

<b>c.    Factors Four and Five – Interests of Non-Parties and the Public Interest</b>

The fourth and fifth *Kappel* factors similarly weigh in favor of allowing the Settlement

Proceedings to continue.  New GM – a non-party – will not suffer any prejudice if the Settlement

Motion is adjudicated.  Indeed, in the Stay Motion, New GM points only to prejudice to the Court

and the judicial process as the prejudice that will result if the stay is not issued.  Motion at ¶¶ 83-

86.  Conversely, the interests of creditors not direct parties to the Settlement Proceedings

nevertheless have an interest in the "prompt resolution" of the issues addressed by the Settlement.

*See In re Quality Med. Consultants, Inc.*, 192 B.R. 777, 780 (Bankr. M.D. Fla. 1995), *aff'd and

remanded sub nom. United States v. Quality Med. Consultants, Inc.*, 214 B.R. 246 (M.D. Fla.

1997).  In addition, "[t]he continued delay and uncertainty which would arise upon an indefinite

stay of the [Settlement Proceedings] is contrary to the public interest."  *Id.*  The public interest is

undermined by preventing the Settlement, which will bring resolution to millions of personal

injury and other claims, from being considered.

---

[21]    "New GM's counsel had made it clear in open court for months that New GM would do whatever it could to prevent additional ignition switch defect claims to be filed and allowed in the bankruptcy case.  So it is no real surprise that New GM aggressively sought to torpedo any deal between the Signatory Plaintiffs and the GUC Trust . . . ."

[22]    "THE COURT: You know, Mr. Steinberg, when I said in the opinion that for months, New GM has made it clear that it would do everything it could to torpedo any settlement, I didn't make it up.  That's the position that you consistently -- you were very open about it, okay.  That's the reality of it. I – it's in my opinion. I stick by it."

[23]    "THE COURT: . . . from the day you presented the first proposed settlement, the approach of New GM is not now, never, never with exclamation marks at each point in the process. If it takes ten years, so it takes ten years. We'll see whether the Plaintiffs can last that long."

[24]    "THE COURT: But at every step of the process before me, New GM has done what it's entitled to do, assert every conceivable argument and right that it could possibly assert."

### d.    GM Dramatically Overstates the Overlap Between the Settlement Proceedings and the MDL

As noted above, New GM for the most part ignores the required elements for a stay and instead argues that the overlap between this bankruptcy and the MDL proceedings are so great, a stay is necessary to prevent this Court from issuing any order that would conflict with Judge Furman's determinations on class certification and the merits. The Court should reject this argument because, in fact, there are crucial differences between the issues before this Court and Judge Furman that render the chances for conflicting rulings exceedingly remote.

First, to state the obvious, the Bankruptcy Court and MDL the proceedings involve entirely different parties and different vehicles. Indeed, the proposed class definitions in the two proceedings make this crystal clear: the putative classes in the Bankruptcy Court are comprised of two groups of plaintiffs who assert economic loss claims and who, ***prior* to July 10, 2009**, owned or leased a vehicle with an ignition switch defect (Recall No. 14V-047 (the "Ignition Switch Class") or defects in ignition switches, side airbags, or power steering (NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153) (the "Non-Ignition Switch Class"). ELP Motion ¶ 41. In contrast, the putative classes and subclasses of residents from the three bellwether states—California, Missouri, and Texas—currently being litigated in the MDL are comprised of plaintiffs who purchased or leased vehicles, ***after* July 10, 2009**, in some instances with car defects entirely separate from those at issue in the bankruptcy.

The class certification proceedings in the two cases are also different in character and purpose. In the MDL, Judge Furman is adjudicating a multi-district product-liability action by tort plaintiffs against a solvent defendant under traditional mass tort principles. The expectation in the MDL is that New GM will continue as a going concern and the goal of the litigation is not to distribute all of New GM's assets. In the Bankruptcy, however, this Court is acting pursuant

18

to an approved plan of reorganization to maximize recoveries contemplated by the Plan, in a fair and equitable manner, to the debtor's unsecured creditors. Unlike New GM, the GUC Trust is not a going concern. It is a creature of bankruptcy and its purpose is distribute its remaining assets to the unsecured creditors of the debtor and then wind down. Under the approved Plan documents, this Court is empowered to, among other things, estimate claims made against the GUC Trust, determine which claims are allowable, and supervise an equitable distribution of the GUC Trust Assets. Thus, the unique tripartite framework contemplated by the proposed settlement—involving first settlement approval, then estimation of claims, and finally allocation and distribution—rightfully looks nothing like the process that an adjudicated motion for class certification against a fully-capitalized, going concern would look in a district court.

In *In re Silicone Gel Breast Implant Prods. Liab. Litig.* multiphase summary proceedings were found to be appropriate in the context of a limited fund settlement involving a company that was on the verge of insolvency because the alternative was that tort plaintiffs would recover little, if anything from the defendant otherwise.[25] *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, No. 97-CV-11441-RDP, 2010 WL 11506713, at *26 (N.D. Ala. May 19, 2010). The District Court in the *Breast Implant* cases approved the (b)(1)(B) settlement well before any allocation of the fund to the class could be determined because the secured lenders to the would-be debtor who agreed to put up the funds required a release and approval of the settlement as a condition to funding. So too here, the existing Unitholders of the GUC Trust require some finality and closure. Accordingly, New GM's protestations that preliminary approval cannot move forward because certain, limited rulings by the MDL court *may* impact later phases of the

---

[25] Subsequent appeals confirm that the multiphase summary process utilized in the *Breast Implant* cases comports with the mandates for Rule 23(b)(1)(B) classes under *Ortiz*, as discussed further below. *Juris v. Inamed Corp.*, 685 F.3d 1294, 1336 n.45 (11th Cir. 2012).

multiphase settlement proceedings contemplated here ring entirely hollow. New GM's purpose is clear. Its goal is to force each individual plaintiff to battle not only the GUC Trust, but each other, through litigation over the filing of late claims and then further litigation regarding entitlement to the limited assets of the GUC Trust. Last time it was class certification. This time it is anticipated rulings from the MDL. New GM will always manufacture an argument as to why this Court should not proceed with consideration of any settlement between the GUC Trust and the Plaintiffs.

Finally, the motions for class certification filed in the Bankruptcy and the MDL are brought under different subsections of Rule 23, and require fundamentally different analyses. Here, based on the guidance this Court provided by way of *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 725 (2d Cir. 1992), *opinion modified on reh'g*, 993 F.2d 7 (2d Cir. 1993) and *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 769 (2d Cir. 1996) (the "Manville Cases"), the plaintiffs seek to certify a mandatory limited fund class under Rule 23(b)(1)(B) for the principal purpose of adjusting the rights of certain creditor groups under a confirmed plan. As this Court observed, the *Manville* precedent contemplates the use of Rule 23(b)(1)(B) for just this purpose. New GM's own conduct has left the GUC Trust in a difficult predicament, with a significant, previously unknown class of would-be beneficiaries asserting untimely claims to the Trust assets. The settlement is designed and intended to address this predicament in precisely the manner contemplated by the Plan – by facilitating an estimation proceeding that could trigger issuance of the Adjustment Shares to provide some measure of relief to these Plaintiffs looking to the Trust without delaying inordinately distributions to the existing Unitholders.

Rule 23(b)(1)(B) authorizes non-opt-out classes for claims against a "limited fund" – class actions where: "(1) the prosecution of separate actions by . . . individual members of the

class would create a risk of . . . (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]" Rule 23(b)(1)(B).  Under the Supreme Court's decision in *Ortiz v. Fibreboard Corp*, 527 U.S. 815, 838-39 (1999), a court certifying a limited fund class must confirm that (1) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set at their maximums, demonstrates the inadequacy of the fund to pay all claims;" (2) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims;" and (3) "the claimants identified by a common theory of recovery [are] treated equitably among themselves." *Id.*

In any event, none of the above factors are at issue in the class certification motion sitting before Judge Furman.  The plaintiffs in the MDL seek to certify traditional Rule 23(b)(3) opt-out classes.  Unlike a Rule 23(b)(1)(B) class, a 23(b)(3) class does not involve a limited fund, nor is it focused on concerns that the fund may be depleted before all similarly situated individuals have an opportunity to have their claims adjudicated.[26]  In contrast, the central issue in the MDL will be whether common issues predominate over individualized issues.  By virtue of the structure of Rule 23, predominance is simply not an issue in limited fund class actions.

Because of the multiple, fundamental differences between the questions before the Bankruptcy and the MDL, New GM is simply incorrect when it argues that a stay of this case is necessary to protect the rulings of either this Court or the MDL Court.  As such, New GM's motion fails under its own weight.

---

[26] In this context, it is telling that New GM's papers completely gloss over the fact that the Second Circuit has found that the plaintiffs in this Court have had their due process rights violated.  No such similar finding has been made in the MDL litigation.

B.    **New GM is Neither a Party to, nor a Beneficiary of, the Settlement Agreement and Has No Standing to Request a Stay of the Settlement Proceedings**

Finally, New GM is not a party to the Settlement Agreement, nor is it a beneficiary thereof. Accordingly, New GM has no standing to object to its approval or seek a stay of the related proceedings.

In general, non-parties to a settlement agreement do not have standing to object to its approval. The only exception to this general principle is where "the settlement agreement *formally* strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial." *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (emphasis in original). This exception is very narrowly applied and "[i]n practice, such prejudice has only been found to exist in rare circumstances, such as when the settlement agreement strips a non-settling party of a claim for contribution or indemnification, or invalidates a non-settling party's contract rights." *Armco Inc. v. N. Atl. Ins. Co.*, No. 98 CIV. 6084 AGS, 1999 WL 173579, at *1 (S.D.N.Y. Mar. 29, 1999) (citing *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995); *Alumax Mill Prods., Inc. v. Congress Fin. Corp.*, 912 F.2d 996, 1002 (8th Cir. 1990)).

The *Bhatia* case is instructive. *Bhatia* involved settlement of a class action brought by investors related to the Madoff Ponzi scheme. Certain non-settling defendants claimed that a provision of the settlement agreement between plaintiffs and the settling defendants prejudiced the non-settling defendants because it required investors who made claims under the settlement agreement to submit to the jurisdiction of the court for purposes of the settlement agreement. The non-settling defendants claimed that this provision prejudiced them because it was detrimental to their right to assert that certain foreign investors' participation in the settlement should bar or limit claims in a litigation in the Netherlands; they wanted to be able to argue that the foreign investors

22

had already submitted to personal jurisdiction in U.S. Court. The Second Circuit found no formal prejudice. The provision of the settlement agreement only undercut the non-settling defendants' arguments regarding personal jurisdiction in the Netherlands action, it did not foreclose the argument. The Court noted that "[i]t is not . . . sufficient for the Non-Settling Defendants to show they were somehow 'undercut' through the loss of some practical or strategic advantage." *Id.* at 219.

New GM is not a party to the Settlement Agreement and is thus unable to object to, or otherwise affect, its consideration. New GM is not stripped of any legal claims or causes of action, nor are its contract rights affected. Not surprisingly, New GM's objections to the Settlement Agreement are strategic in nature, and the benefit they seek to gain in moving to stay the Settlement Proceedings is a tactical advantage only, and the Court should independently deny the Stay Motion on this basis.

## **CONCLUSION**

For the reasons above, this Court should deny the Motion in its entirety.


Dated: New York, New York

March 4, 2019

Respectfully submitted,

By:    /s/   Kristin K. Going
　　　　　　Kristin K. Going
　　　　　　Clay J. Pierce
　　　　　　Marita S. Erbeck
　　　　　　DRINKER BIDDLE & REATH LLP
　　　　　　1177 Avenue of the Americas, 41st Floor
　　　　　　New York, NY 10036-2714
　　　　　　Tel: (212) 248-3140
　　　　　　kristin.going@dbr.com
　　　　　　clay.pierce@dbr.com
　　　　　　marita.erbeck@dbr.com

　　　　　　*Counsel for Wilmington Trust Company, as Trustee for and Administrator of the Motors Liquidation Company GUC Trust*