*In re Motors Liquidation Company, et al. f/k/a General Motors Corp., et al.*
Case No. 09-50026 (MG) (Jointly Administered)

### RIDER TO PROOF OF CLAIM OF SHARON BLEDSOE (WHITE-WILLIAMS)

**Names of Claimant:** Sharon Bledsoe (White-Williams).

**Nature and Basis of Claim:**

1. Pursuant to this Proof of Claim, Sharon Bledsoe (who has married since the inception of the litigation and now is known as SharonWhite-Williams,"**Plaintiff**") asserts a claim against the bankruptcy estate of Motors Liquidation Company f/k/a General Motors Corporation ("**Old GM**") and its affiliated debtors and the Motors Liquidation Company General Unsecured Creditors Trust for personal injuries and property damage she sustained as a result of a Delta ignition switch defect in her 2008 Chevrolet Cobalt, which she purchased new from a Chevrolet dealer in December 2007,in the state of Georgia. As described below, she suffered personal injury, emotional distress, and property damage in two accidents caused by the dangerous ignition switch in the vehicle while driving in and a resident of Georgia. The first accident occurred on February 1, 2008. The second accident occurred on May 27, 2009. Plaintiff asserts claims arising under the common law of Georgia for negligence and fraud, as well claims arising from statute for breach of the implied warranty of merchantability, OCGA 11-2-314, and for violations of Georgia's Uniform Deceptive Trade Practices Act, §10-1-372 (2010).

**Old GM Falsely Promoted All of Its Vehicles as Safe, Reliable, and High-Quality**

2. A central theme in Old GM's brand-wide and model-specific advertising was to tout the safety of its vehicles through specific (and objectively false) promises of safety. The following are a few examples of such advertising. In general Old GM used brochures, print and TV advertisements to promote Old GM models as safe. Old GM undertook this

advertising campaign, and spent tens of millions of dollars in doing so, with the specific intent that consumers rely on those promises.

3. An Old GM print advertisement exclaimed in bold print: "**At GM, Safety Isn't One Thing, It's Everything**." GM-MDL2543-301025786.

4. A 2006 GM brand-wide marketing brochure contained a page dedicated to safety. The page was titled: "YOUR SAFETY AND SECURITY. IT'S OUR PRIORITY." Old GM then promised: "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety: protection before, during and— thanks to OnStar—after vehicle collisions." GM-MDL2543-301443177.

5. This theme was repeated in another marketing brochure for the Old GM brand, touting: "OUR PRIORITY—YOUR SAFETY AND SECURITY." Old GM then again promised: "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety: protection before, during and—

**Old GM's Practice of Concealing and Minimizing Safety Risks**

6. Old GM instituted policies and practices intended to conceal and minimize safety related risks in Old GM products from the Plaintiff, consumers, investors, litigants, courts, law enforcement officials, the NHTSA, and other governmental officials. In furtherance of its illegal scheme, Old GM trained and directed its employees and dealers to take various measures to avoid exposure of safety related product risks.

7. Old GM mandated that its personnel avoid exposing GM to the risk of having to recall vehicles with safety-related risks by limiting the action that Old GM would take with

respect to such risks to the issuance of a Technical Service Bulletin or an Information Service Bulletin.

8. Old GM directed its engineers and other employees to falsely characterize safety-related risks in their reports, business and technical records as "customer convenience" issues, to avoid being forced to recall vehicles as the relevant law requires, and/or to issue narrower recalls than the circumstances warranted.

9. Old GM trained its engineers and other employees in the use of euphemisms to avoid disclosure to the NHTSA and others of the safety risks posed by risks in Old GM products.

10. Old GM directed its employees to avoid the word "stall" in describing vehicles experiencing a moving stall, because it was a "hot word" that could alert the NHTSA and others to safety risks associated with Old GM products, and force Old GM to incur the costs of a recall. A "moving stall" is a particularly dangerous condition because the driver of a moving vehicle in such circumstances no longer has control over key components of steering and/or braking, and air bags will not deploy in any, increasingly likely, serious accident.

11. Old GM directed its engineering and other personnel to avoid the word "problem," and instead use a substitute terms, such as "issue," "concern," or "matter," with the intent of deceiving Plaintiff and other consumers and vehicle owners.

12. Old GM instructed its engineers and other employees not to use the term "safety" and refer instead to "potential safety implications."

13. Old GM instructed its engineers and other employees to avoid the term "defect" and substitute the phrase "does not perform to design."

14. Old GM's managerial practices were designed to ensure that its employees and officials would not investigate or respond to safety-related risks, and thereby avoid creating a record that could be detected by governmental officials, litigants or the public.

15. In a practice GM management labeled "the GM nod," Old GM managers were trained to feign engagement in safety related product risks issues in meetings by nodding in response to suggestions about steps that th company should take. Protocol dictated that, upon leaving the meeting room, the managers would not respond to or follow up on the safety issues raised therein.

16. Old GM's lawyers discouraged note-taking at critical product safety meetings to avoid creation of a written record and thus avoid outside detection of safety-related.

17. Old GM would change part design without a corresponding change in part number, in an attempt to conceal the fact that the original part design was risk. Old GM concealed the fact that it manufactured cars with intentionally mislabeled part numbers, making the parts difficult for Old GM, the Plaintiff, other consumers, law enforcement officials, the NHTSA, and other governmental officials to identify. Old GM directed dealers to misrepresent the safety risks associated with the product risks of its vehicles. Old GM followed this practice with respect to the dangerous ignition switched in Plaintiff's vehicle.

18. Old GM directed its lawyers and any outside counsel it engaged to act to avoid disclosure of safety related risks in Old GM products. These actions included settling cases raising safety issues, demanding that Old GM's victims agree to keep their settlements secret, threatening and intimidating potential litigants into not bringing litigation, and settling cases for amounts of money that did not require Old GM

managerial approval, so that management officials could maintain their veneer of ignorance concerning the safety related risks.

19. The systematic concealment of known defects was deliberate, as Old GM followed a consistent pattern of endless "investigation" and delay each time it became aware of a given defect. Old GM routinely chose the cheapest part supplier without regard to safety, and discouraged employees from acting to address safety issues.

20. Under the Transportation Recall Enhancement, Accountability and Documentation Act, 49 U.S.C. § 30101, et seq. ("TREAD Act"), and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must properly disclose the defect. If it is determined that the vehicle is defective, the manufacturer may be required to notify vehicle owners, purchasers, and dealers of the defect, and may be required to remedy the defect.

21. When a manufacturer with TREAD Act responsibilities is aware of safety defects and fails to disclose them as old GM has done, the manufacturer's vehicles are not safe.

22. Old GM has received reports of crashes and injuries that put it on notice of the serious safety issues presented by many of these defects. Old GM advanced its culture of concealment by actively denying liability for fatal accidents.

23. In 2005, Old GM customer Adam Powledge lost control of his vehicle, slamming into a highway median and killing himself and his four children. In the ensuing suit Ol GM nefariously framed the incident as a suicide, disavowing any connection between the accident and an electrical failure, despite Old GM's knowledge that the Malibu Mr. Powledge drove had a steering defect that likely was the real cause of the tragedy. Then, in April 2014, OLD GM finally admitted that Adam Powledge's Chevrolet Malibu had a

steering defect that was consistent with the loss of control over the vehicle that led to his death and that of his four children. The Powledge saga is but one dramatic example of the lengths that OLD GM, its attorneys, risk personnel, and others went to further the OLD GM campaign of denial and deceit.

24. Despite the dangerous nature of many of the defects and their effects on critical safety systems, OLD GM concealed the existence of the defects and failed to remedy the problems in an appropriate or timely manner.

    **A.**    **The Ignition Switch System Hazard**

25. The ignition switch in Plaintiff's vehicles and others containing the same ignition switch defect (the "Delta Ignition Switch Defect"), was prone to fail during ordinary and foreseeable driving situations. GM initially recalled 2.1 million Defective Ignition Switch Vehicles in February and March of 2014, including Plaintiff's vehicle.

26. More specifically, the ignition switch can inadvertently move from the "run" to the "accessory" or "off" position at any time during normal and proper operation of the Defective Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.

27. When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and unexpectedly loses engine power, power steering, and power brakes, and certain safety features are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes, serious injuries, and death.

28. In each of the accidents suffered by Plaintiff, she suddenly lost control of her vehicle when the power steering and brakes stopped working and the car switched off. Despite significant impact, the vehicle's airbags did not deploy.

29. The GM ignition switch systems are defective in at least three major respects.

30. First, some of the switches are simply weak; because of a faulty "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because some of the ignition switches are placed low on the steering column, the driver's knee can easily bump the key (or the hanging fob below the key) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost during ordinary operation of the vehicle, a driver is left without the protection of the airbag system even if he or she is traveling at high speeds.

31. Vehicles with defective ignition switches are therefore unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the vehicles.

32. Old GM failed to thoroughly conduct an industry standard Failure Modes and Effects Analysis ("FMEA") on the ignition systems in the Plaintiff's and similar vehicles during and after their design. FMEA is an engineering risk assessment technique used in design and failure analysis to define, identify, and eliminate known and/or potential failures, problems, and errors from the system/design before they reach the customer. An FMEA asks, "What happens if a failure actually occurs?" While Old GM and/or their suppliers conducted component-part FMEAs, Old GM did not conduct system-wide FMEAs, that

is, an FMEA for the system in which the component was included. This is a violation of industry standard engineering practices. Had system-level FMEAs been properly conducted, the downstream effects of the ignition switch defects—such as disabling the airbags—would have been identified at the design stage and before the Defective Ignition Switch Vehicles were sold.

33. Old GM induced Plaintiff to purchase a defective vehicle by omitting to disclose the safety defects the vehicles possessed, by representing GM cars as safe, and by representing Old GM as a company committed to safety.

**Old GM was aware of the defective ignition switch problem.**

34. The TREAD team was not staffed with enough personnel to meet GM's promise of safety. According to the Valukas Report, the TREAD team had between eight and 12 employees from 2003 through 2007 or 2008 with the responsibility of mining through the TREAD data on a month-by-month basis and preparing graphs for each of the 24 categories of data in an effort to identify any spikes in the number of accidents or complaints. Old GM then cut the TREAD team down to three employees and pared back the monthly data mining process.

35. In 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position. GM further learned that where the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.

36. Delphi Mechatronics ("Delphi"), the manufacturer of many of the defective ignition switches in the Defective Ignition Switch Vehicles including those in the

vehicles that gave rise to the February and March 2014 recalls, informed Old GM that the ignition switch did not meet Old GM's design specifications. Rather than delay production of the Saturn Ion in order to ensure that the ignition switch met specifications, Old GM's design release engineer, Ray DeGiorgio, simply lowered the specification requirements and approved use of ignition switches that he knew did not meet Old GM's specifications.

37. In 2004, Old GM engineers reported that the ignition switch in the Saturn Ion was so weak and the ignition placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

38. his defect was sufficiently serious for an Old GM engineer to conclude, in January 2004, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

39. A July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in GM-branded vehicles and the airbag system. The Siemens report concluded that when a GM-branded vehicle experienced a power failure, the airbag sensors were disabled. The Siemens report was distributed to at least five Old GM engineers. The Chevrolet Cobalt was in pre-production at this time.

40. In 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt. Old GM installed the same ignition switch in the 2005 Cobalt as it did in the Saturn Ion.

41. During testing of the Cobalt, Old GM engineer Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

42. In late 2004, while testing was ongoing on the Cobalt, Chief Cobalt Engineer Doug Parks asked Mr. Altman to investigate a journalist's complaint that he had turned off a Cobalt

vehicle by hitting his knee against the key fob.

43. Old GM opened an engineering inquiry known as a Problem Resolution Tracking System ("Problem Resolution") to evaluate a number of potential solutions to this moving engine stall problem. At this time, Problem Resolution issues were analyzed by a Current Production Improvement Team ("Improvement Team"). The Improvement Team that examined the Cobalt issue beginning in late 2004 included a cross-section of business people and engineers, including Altman and Lori Queen, Vehicle Line Executive on the case.

44. Doug Parks, Chief Cobalt Engineer, was also active in Problem Resolution. On March 1, 2005, he attended a meeting whose subject was "vehicle can be keyed off with knee while driving." Parks also attended a June 14, 2005 meeting that included slides discussing a NEW YORK TIMES article that described how the Cobalt's engine could cut out because of the ignition switch problem.

45. n 2005, Parks sent an email with the subject, "Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a 'plug' to go into the key that centers the ring through the middle of the key and not the edge/slot? This appears to me to be the only real, quick solution."

46. After considering this and a number of other solutions (including changes to the key position and measures to increase the torque in the ignition switch), the CPIT examining the issue decided to do nothing. OldGM engineer Gary Altman recently admitted that engineering managers (including himself and Ray DeGiorgio) knew about ignition switch problems in the Cobalt that could cause these vehicles to stall, and disable power steering and brakes, but launched the vehicle anyway because they believed that the vehicles

could be safely coasted off the road after a stall. Mr. Altman insisted that "the [Cobalt] was maneuverable and controllable" with the power steering and power brakes inoperable.

47. On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5). In the February 28, 2005 bulletin, Old GM provided the following recommendations and instructions to its dealers – but not to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
> In the case this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it. Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

48. On June 19, 2005, the NEW YORK TIMES reported that Chevrolet dealers were advising some Cobalt owners to remove items from heavy key rings so that they would not inadvertently move the ignition into the "off" position. The article's author reported that his wife had bumped the steering column with her knee while driving on the freeway and the engine "just went dead."

49. The NEW YORK TIMES contacted Old GM and Alan Adler, manager for safety communications, who provided the following statement: "In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is

running. Service advisers are telling customers they can virtually eliminate the possibility by taking several steps, including removing nonessential material from their key rings."

50. In connection with this NEW YORK TIMES article, Alder specifically told the editor that GM "had not had any complaints," which was false, as shown below.

51. Between February 2005 and December 2005, Old GM opened multiple Problem Resolution inquiries regarding reports of power failure and/or engine shutdown in Defective Ignition Switch Vehicles.

52. One of these, opened by quality brand manager Steve Oakley in March 2005, was prompted by Old GM engineer Jack Weber, who reported turning off a Cobalt with his knee while driving. After Oakley opened the PRTS, Gary Altman advised that the inadvertent shut down was not a safety issue

53. As part of the Problem Resolution, Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt and Pontiac G5 vehicles. Chase estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving.

54. In September 2005, Old GM received notice that Amber Marie Rose, a 16-year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on. During Old GM's investigation, it learned that the ignition switch in Amber's Cobalt was in the "accessory" or "off" position at the time of the collision. Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother.

55. In December 2005, Old GM issued Technical Service Bulletin 05-02-35-007. The

Bulletin applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions. The Bulletin explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort."

56. Old GM failed to disclose in this Technical Service Bulletin that it knew that there had been fatal incidents involving vehicles with the ignition switch defect. On November 17, 2005 – shortly after Amber's death and immediately before Old GM issued the December Bulletin – a Cobalt went off the road and hit a tree in Baldwin, Louisiana. The front airbags did not deploy in this accident. Old GM received notice of the accident, opened a file, and referred to it as the "Colbert" incident.

57. On February 10, 2006, in Lanexa, Virginia – shortly after Old GM issued the Technical Service Bulletin – a 2005 Cobalt flew off of the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

58. On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

59. In April 2006, Old GM design engineer Ray DeGiorgio approved a design change for the Chevrolet Cobalt's ignition switch, as proposed by Delphi. The changes included a new

detent plunger and spring and were intended to generate greater torque values in the ignition switch. These values, though improved, were still consistently below Old GM's design specifications. Despite its redesign of the ignition switch, Old GM did not change the part number for the switch.

60. Other Old GM personnel were aware of the change.

61. In congressional testimony in 2014, New GM CEO Mary Barra acknowledged that Old GM should have changed the part number when it redesigned the ignition switch, and that its failure to do so did not meet industry standard behavior.

62. In October 2006, Old GM updated Technical Service Bulletin 05-02-35-007 to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5. These vehicles had the same safety- related defects in the ignition switch systems as the vehicles in the original Bulletin.

63. On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy in this incident. Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

64. On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.

65. On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

66. On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

67. On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

68. On April 5, 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

69. On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

70. On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

71. On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal

airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

72. On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

73. On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

74. In February 2009, Old GM opened another Problem Resolution regarding the ignition switches in the Defective Ignition Switch Vehicles. Old GM engineers decided at this time to change the top of the Chevrolet Cobalt key from a "slot" to a "hole" design, as had originally been suggested in 2005. The new key design was produced for the 2010 model year. Old GM did not provide these redesigned keys to the owners or lessees of any of the vehicles implicated in prior Technical Service Bulletins, including the 2005-2007 Cobalts.

75. Old GM met with Continental Automotive Systems US, its airbag supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy. In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM ignition state changed from run" to "off" during the accident.

76. In early 2009 owner loyalty mailings, Old GM touted the quality and reliability of its vehicles as well as safety: **Safe**. x 37 of our 2009 models have five-star frontal crash safety ratings. We offer the safety and security of OnStar, including Automatic Crash Response, OnStar Vehicle Diagnostics, and Turn-By-Turn Navigation. Nobody else offers these services. Not Honda. Not Toyota. Not Ford. Not Chrysler. Not Nissan. Not Dodge.

77. A 2006 GMC *The Magazine* article titled "Not Just HOT AIR" discussed the importance of a vehicle's air bags. It advised that "Your vehicle's air bags are poised to help protect you in a moment's notice." Further: "When appropriate conditions arise, your vehicle's air bags inflate rapidly and powerfully to work with your safety belt system to help protect you in the event of a collision." This statement is false as GM's airbags do not deploy at critical times.

**Amount of Claim:** The Claim is asserted in an amount to be proven at trial (or via estimation proceeding in the bankruptcy court).

**Related Litigation:** Sharon Bledsoe is a Plaintiff in an action against General Motors LLC pending and consolidated in the *In re General Motors LLC Ignition Switch Litigation*, 14-md-2543 (JMF), *Bledsoe et al. v. General Motors LLC*, 1:14-cv-7631 (JMF).