Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, *et al.*,<br>f/k/a General Motors Corp., *et al.*,<br><br>                                                    Debtors. | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |

**GENERAL MOTORS LLC'S REPLY TO OBJECTIONS OF THE ECONOMIC LOSS
PLAINTIFFS AND WILMINGTON TRUST COMPANY, AS GUC TRUST
ADMINISTRATOR, TO NEW GM'S MOTION PURSUANT TO SECTION 105(a) OF
THE BANKRUPTCY CODE TO (A) STAY PROCEEDINGS RELATING TO THE
<u>PROPOSED SETTLEMENT AND (B) GRANT RELATED RELIEF</u>**

1

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

REPLY ARGUMENTS ........................................................................................................ 2

    A.    The Movants Concede That The Proceedings Before This Court And The MDL Court Are Inextricably Intertwined. ............................................................. 2

    B.    The Conceded Overlap Precludes Preliminary Certification. ................................ 4

    C.    New GM Does Not Seek An "Indefinite Stay." ...................................................... 5

    D.    New GM Has Standing To Seek A Stay Of Proceedings Relating To The Proposed Settlement ............................................................................................... 9

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Figueroa* v. *Sharper Image Corp.*,
    517 F.Supp.2d 1292 (S.D. Fla. 2007) ...................................................................................7

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) ................................................................................................11

*In re Motors Liquidation Co.*,
    580 B.R. 319 (Bankr. S.D.N.Y. 2018) .................................................................................11

*In re Motors Liquidation Co.*,
    591 B.R. 501 (Bankr. S.D.N.Y. 2018) .................................................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(e) .............................................................................................. passim

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

New GM[1] submits this reply to the Objections[2] filed by the signatory economic loss plaintiffs (the "Plaintiffs") and the GUC Trust, and respectfully represents as follows:

**INTRODUCTION**

1. The Objections confirm the propriety of New GM's requested stay. Although the Movants argue there is no "substantial overlap" between proceedings in this Court and the MDL Court, that contention falls flat once the Movants are forced to concede that they cannot send notice of the Proposed Settlement to the Proposed Classes until after various rulings from the MDL Court set the "contours" of the Proposed Classes. If the proceedings before the two courts were, as the Movants claim, "separate and distinct," there would be no reason for the Movants to delay sending notice to the Proposed Classes until after Judge Furman issues various rulings. The Movants' concession confirms the need for the stay.

2. To be sure, the Movants' concession is not limited to a procedural question of when to send notice to the Proposed Classes. Rather, by acknowledging that "notices will not be mailed until the **population of the Classes is fixed by summary judgment rulings that Judge Furman** is anticipated to make," the Movants also are conceding that they cannot define the Proposed Classes at this point, and will be unable to define the Proposed Classes until after Judge Furman rules on the MDL Briefing. (Plaintiffs' Obj. ¶ 25 (emphasis added).) The inability to define the

---

[1] Capitalized terms not defined herein have the meanings given to them in the Stay Motion [Docket No. 14431].

[2] *See The Economic Loss Plaintiffs' Objection to General Motors LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Related to the Proposed Settlement and (B) Grant Related Relief* [Docket No. 14447] (the "Plaintiffs' Obj."); and the *Amended Preliminary Objection of Wilmington Trust Company, as GUC Trust Administrator, to General Motors, LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Related to the Proposed Settlement and (B) Grant Related Relief* [Docket No.14453] (the "GUC Trust Obj.," and together with the Plaintiffs' Obj., the "Objections").

1

Proposed Classes, in turn, precludes this Court from entering a preliminary approval order under Rule 23(e) (which must, at a minimum, define the classes to be preliminarily certified).

3.  Ultimately, the difference between New GM's position and the Movants' position is semantics, not substance. New GM seeks a stay pending the MDL Court's rulings on the MDL Briefing which, the Movants assert, should come by June 1, 2019 (*i.e.*, in just a few months). The Movants now confirm they will not send notice until after such rulings. The **only** remaining difference between the parties' positions is whether this Court can enter a preliminary approval order under Rule 23(e) which may be completely undone following MDL Court rulings that will determine the "contours of the Classes" and the "universe of Plaintiffs . . . able to pursue claims." (*Id.* ¶¶ 25, 82).

4.  The Court should reject the Movants' approach for two reasons. First, it is neither procedurally nor substantively possible under Rule 23 to preliminarily certify classes that cannot be defined. Second, although the Plaintiffs say that "preliminarily adjudicating the Rule 23(e) Motion now certainly does not 'jump ahead' of the MDL Court" (*id.* ¶ 7), it in fact does exactly that by requiring the Court to decide now that it is likely to certify the currently defined Proposed Classes while simultaneously acknowledging that those very classes will change or be nullified entirely based on Judge Furman's future rulings. Accordingly, a stay is warranted.

## REPLY ARGUMENTS

**A.  The Movants Concede That The Proceedings Before This Court And The MDL Court Are Inextricably Intertwined.**

5.  The Movants repeatedly state that there is no material overlap between the proceedings before this Court and the MDL Court:

- "the issues before this Court under the Rule 23(e) Motion are completely **separate and distinct** from the issues in the MDL Briefing" (Plaintiffs' Obj. ¶ 8);

- "the issues before the MDL Court and this Court are **distinct and do not materially overlap**" (*id*. ¶ 12);

- "**the overlap of issues** between proceedings in this Court and the MDL **is an argument manufactured** by New GM" (GUC Trust Obj. p.12); and

- "class certification . . . in the Bankruptcy and the MDL are brought under different subsections of Rule 23, and require **fundamentally different** analyses" (*id*. p.20).

6.  But the Movants **repeatedly** contradict these assertions. For example, they now disclose (contrary to their Rule 23 Motion) that "notices will not be mailed until the population of the Classes is fixed by summary judgment rulings that Judge Furman is anticipated to make." (Plaintiffs' Obj. ¶ 25.) The Movants further say they will "accommodate and assimilate Judge Furman's rulings on summary judgment (which may impact the size of the Proposed Classes) and *Daubert* in the notice mailing, the final fairness hearing, and the claims estimation process." (*Id*. ¶ 32.) Notably, by recognizing that such rulings may affect the **final** approval hearing, they necessarily concede that these same rulings could impact the **preliminary** approval hearing.[3] In addition, to try to develop a record for purposes of amended Rule 23(e), the Movants now suggest that they intend to "further" supplement "the record in support of the Settlement Motions with . . . **discovery to date in the MDL Action**." (*Id*. ¶ 19 n.15 (emphasis added).) Indeed, "it cannot be underscored enough that, under any timetable, **this Court will benefit from the MDL Court's decisions** on summary judgment and *Daubert* issues **prior to** the final fairness hearing." (*Id*. ¶ 32 (emphasis added).) According to the Movants, "the most efficient way to proceed . . . is to grant preliminary approval with the understanding that **notice mailing will not begin until Judge Furman's forthcoming orders establish the universe of Plaintiffs** here who will be able to pursue claims." (*Id*. ¶ 82 (emphasis added).)

---

[3] *See* Fed. R. Civ. P. 23(e)(1)(B) ("The court must direct **notice** in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will **likely** be able to . . . **certify the class** for purposes of judgment on the approval.") (emphasis added).

3

7. Because the MDL Court's rulings dictate "the universe of [Bankruptcy Court] Plaintiffs here who will be able to pursue claims" (*id.*), it is implausible for the Movants to say that the two proceedings do not overlap, or that the overlap is an "argument manufactured by New GM." (GUC Trust Obj. p.12.)

### B. The Conceded Overlap Precludes Preliminary Certification.

8. The Movants' attempt to ignore the substantial overlap between the two proceedings by agreeing to delay sending notice of the Proposed Settlement until after the MDL Court rules on the Summary Judgment Briefing reveals a more fundamental issue: the Movants **cannot define the Proposed Classes** until after such rulings from the MDL Court. The proposed preliminary approval order that the Movants ask this Court to enter provides as follows:

> This Court, pursuant to Bankruptcy Rule 7023, hereby preliminarily certifies, subject to further consideration at the Fairness Hearing described below, the following classes of persons as settlement classes:
>
> The "Ignition Switch Class" is defined as all persons asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047.
>
> The "Non-Ignition Switch Class" is defined as all persons asserting economic loss claims who, prior to July 10, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in NHTSA Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.

(Preliminary Approval Order ¶ 3.) The Proposed Classes are defined to include "**all persons**" who "owned or leased a vehicle" subject to a recall, and therefore would include the maximum number of putative class members—some 26 million individuals. But the Movants now admit that "if Judge Furman rules on summary judgment that pre-recall sellers do not have claims, the Proposed Classes are reduced [from 26,180,000 potential members] to approximately 11,900,000 members." (Plaintiffs' Obj. ¶ 6 n.6.) A ruling by the MDL Court on this one issue alone, therefore, would reduce the size of the Proposed Classes by more than fifty-four percent. It would also **change the**

4

**definition and composition of the Proposed Classes** in the preliminary approval order, which would no longer include "all persons," but would instead only include "those persons . . . who owned or leased a vehicle . . . **and** who did not dispose of their vehicle before the Recalls." Rule 23's preliminary approval process is not so malleable; a party must seek approval of a specifically defined class, not one to be defined later. Given the Movants' admissions, this Court has no defined classes to preliminarily certify before the MDL Court's upcoming rulings.

9.  Moreover, whether pre-recall sellers have viable claims is only one issue that could reshape the Proposed Classes. Rulings (past and future) on certification in the Bellwether States, manifest defect, benefit-of-the-bargain damages, causation and reliance under applicable state law, and the admissibility and legal import of Boedeker's reports could all force the Movants to redefine the Proposed Classes, creating dozens of potential variations (or subclasses). Again, the Movants do not contest this, as they now concede that notice will not be sent "until **after** the contours of the **Classes are finalized**" and "until Judge Furman's forthcoming orders **establish the universe of Plaintiffs** here who will be able to pursue claims." (*Id*. ¶¶ 25, 82 (emphasis added).) But the "contours" of the Proposed Classes and the "universe of Plaintiffs . . . able to pursue claims" are included (as they must be) in the definition of the Proposed Classes, which is the centerpiece of the preliminary approval order that the Movants ask this Court to enter **now**. The Court cannot determine under Rule 23(e) that it is "likely" to certify the Proposed Classes without first knowing the "contours" of such classes. The Movants' certify-now-but-define-the-classes-later approach is procedurally wrong and substantively erroneous.

## C. New GM Does Not Seek An "Indefinite Stay."

10.  The Movants repeatedly and incorrectly argue that New GM seeks a "prolonged and indefinite" stay that would "freeze these proceedings *ad infinitum*." (*Id*. ¶¶ 4, 27; GUC Trust Obj. p.2.) In fact, New GM requested a "stay [of] proceedings relating to the Proposed Settlement

5

**pending** the MDL Court's rulings on the issues raised in the MDL Briefing." (Stay Motion ¶ 6 (emphasis added).) To be clear, New GM asks the Court to stay consideration of the Settlement Motions until the parties are able to assess the viability of the Proposed Settlement and the concomitant need to continue the stay following the MDL Court's upcoming rulings on the MDL Briefing. The Movants anticipate "Judge Furman's rulings on the MDL Briefing on or about June 1, 2019," which, if correct, would allow the parties and the Court to assess the Proposed Settlement with much more guidance from the MDL Court in just a few months. (Plaintiffs' Obj. ¶¶ 4, 6.)

11. New GM's requested relief is, in fact, not much different than what the Movants seek. As New GM explained in its Stay Motion, Section 4.5 of the Settlement Agreement provides that the Movants themselves believe it necessary to reevaluate and possibly reconfigure the Proposed Settlement after the MDL Court's rulings on the Summary Judgment Briefing.[4] Neither of the Objections even addresses Section 4.5 of the Proposed Settlement. And, as set forth above, the Movants have now confirmed that they will, in effect, "stay" the Proposed Settlement to the Proposed Classes (by not sending notice to the Proposed Classes) until after rulings on the MDL Briefing.

12. The primary difference between New GM's proposed schedule and the Movants' proposed schedule, it now seems, is that the Movants would have this Court enter a preliminary approval order under Rule 23(e) solely so that they can "utilize the time between [preliminary] approval and mailing to make progress by coordinating with their notice expert, Epiq, preparing

---

[4] Section 4.5 of the Proposed Settlement Agreement provides:

The Parties agree that, in the event that the District Court issues an Opinion or Order on the *Defendant General Motors LLC's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs* [GM MDL ECF No. 5859] ("**Summary Judgment Decision**") that impacts the size, scope or composition of the classes of Economic Loss Plaintiffs, the Parties shall, within five (5) business days from entry of the applicable Opinion or Order, engage in good faith negotiations regarding the applicable provisions of this Settlement Agreement impacted by said decision.

6

an efficient state of the art notice program, and obtaining registration data for the proposed Class members." (Plaintiffs' Obj. ¶ 6 n.6.) Nonetheless, such work would be undertaken "with the understanding that notice mailing will not begin until Judge Furman's forthcoming orders establish the universe of Plaintiffs here who will be able to pursue claims." (Plaintiffs' Obj. ¶ 82). As explained above, however, there is no basis under Rule 23 or otherwise for this Court to enter a preliminary approval order—the **sole purpose** of which is to **direct notice** to preliminarily certified classes—without first knowing the actual composition of those classes. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii) (giving **notice** will only be justified if the parties show that "the court will **likely** be able to . . . **certify the class** for purposes of judgement on the proposal") (emphasis added); *Figueroa* v. *Sharper Image Corp.*, 517 F.Supp.2d 1292, 1299 (S.D. Fla. 2007) (the "purpose of preliminary approval is **solely** to communicate the proposed settlement to the class . . . and to authorize the manner and form of dissemination of the notice") (emphasis added). In any event, the Movants' proposed schedule may save only a modest amount of time to obtain the registration data, but could result in significant expenditures on unnecessary notice-related costs.

13. To save any time at all, the Movants would have to obtain registration data for 26 million individuals **before** Judge Furman issues rulings on the MDL Briefing (which the Movants anticipate receiving by June 1). (Plaintiffs' Obj. ¶ 7 (based on the Movants' projected timeline, IHS/Polk would not begin providing registration data to Epiq until May 15, 2019, just before the Movants anticipate receiving Judge Furman's rulings). Obtaining such information before knowing the class definitions and contours, however, would be wasteful. At the December 20, 2018 status conference, counsel to the Signatory Plaintiffs confirmed that obtaining all registration data (*i.e.*, for 26 million individuals) from IHS/Polk would cost $13 million:

> Which brings us to the next issue, which is notice and notice costs. And, Your Honor, to fully appreciate that, there are two potential universes of

7

> class members. In universe one, we are looking at all Old GM registration holders up to the bar date. **Our best estimate is that's over 26 million registrants**. Not cars, because the cars may have been owned or leased by multiple parties, but 26 million registrants. **And the cost of updating those registrations** and getting enough information to be able to do mail notices and subsequent email notices or just the mail notices, **our best estimate is $13 million**.
>
> **Conversely**, there's an alternative universe, and that is one where you would take out or subtract anyone who sold their car before the bar date on the theory that you, by definition, therefore sold the car before the recall notices. **That's a universe that shrinks down to some 12 million registrants, and the cost of updating all those registrations** from the original loan or through as many successive purchasers up until the person who owned the car as of the bar date **is estimated at some $7 million**.
>
> And again, Your Honor, **that's just the cost of updating the registrations.** There's additional cost for mailing, additional cost for establishing and maintaining a website.

(Hr'g Tr. 12/20/2018 at 4-5 (emphasis added).) These statements are directly at odds with the Plaintiffs' assertion in their objection that the "bulk of the notice costs are associated with printing and mailing the notices." (Plaintiffs' Obj. ¶ 25.)

14. Again, New GM does not seek an "indefinite" stay. Instead, New GM seeks to stay proceedings until Judge Furman issues rulings on the MDL Briefing, after which time the parties can then assess the merits of the Proposed Settlement and the status of proceedings before the two Courts. This is not significantly different from the process now proposed by the Movants, who also intend to wait for rulings from the MDL Court.[5] The Movants' repeated assertions of the prejudice that such a stay would purportedly cause, therefore, ring hollow. At most, the requested stay would result in the Movants obtaining registration data after the MDL Court's rulings, although that short delay could save the Movants $6 million or more based on MDL Court rulings.

---

[5] This Court made a similar observation at the December 20, 2018 status conference: "the notion of the stay seems almost moot because he's **[Mr. Weisfelner's] suggesting that the class certification doesn't go forward here until Judge Furman has decided the summary judgment motions**." (Hr'g Tr. 12/20/2018 at 34 (emphasis added).)

8

> **D. New GM Has Standing To Seek A Stay Of Proceedings Relating To The Proposed Settlement.**

15. The GUC Trust's erroneous argument that the Settlement Agreement does not affect New GM and, therefore, New GM lacks standing to seek a stay, cannot be reconciled with the Movants' other admissions.

16. The GUC Trust concedes that "New GM has every right to object if and when an estimation motion is filed, because that is when the Court's decision may impact its rights." GUC Trust Obj. p.2.) That admission simply cannot be squared with the GUC Trust's position that the "Settlement Agreement does not impact New GM." (*Id.*) As the Plaintiffs note, "the Settlement proceeds in three stages. **In the first stage** (approval of the Settlement Agreement) **and the second stage** (estimation of Plaintiffs' claims), **Class Members have a common interest in maximizing the number of Adjustment Shares** . . . ." (Rule 23 Motion ¶ 116 (emphasis added).) The Plaintiffs further note that the Settlement Agreement "sets the stage for potentially distributing approximately $1.15 billion [*i.e.*, the Adjustment Shares] to satisfy the proposed Class Members' aggregate claims." (Plaintiffs' Obj. ¶ 63.) Indeed, whether the Proposed Classes include 26 million individuals, 12 million individuals, or no individuals will undoubtedly have a profound impact—or "set the stage"—on any estimation performed by the Court, which the GUC Trust concedes will affect New GM's rights. The "stages" of the Proposed Settlement are interrelated, not independent, and the Movants have made it clear that the purpose of **each stage**—**including certification**—is to maximize the probability that New GM will be forced to issue the maximum number of Adjustment Shares.

17. New GM also has standing because the GUC Trust has no incentive at all to scrutinize or contest the scope of the Proposed Classes. Rather, upon final approval of the Proposed Settlement in Stage One—which occurs simultaneously with final certification of the

9

Proposed Classes—the GUC Trust will, among other things: receive binding releases from all Plaintiffs; be guaranteed that the Plaintiffs cannot seek any recovery from existing GUC Trust Assets; have a Court order saying that the Plaintiffs are not GUC Trust Beneficiaries (and therefore the GUC Trust will owe no duties to the Plaintiffs); and have waived all defenses to the Plaintiffs' late claims (including late claim defenses and equitable mootness).[6] The end result of the "first stage" is that the GUC Trust will have ring-fenced virtually all of its $495 million of existing GUC Trust Assets while limiting the Plaintiffs solely to the Settlement Fund, which will not include any of the existing GUC Trust Assets. Under this arrangement, it is clear that the GUC Trust has no interest whatsoever in defending against or otherwise scrutinizing the propriety of the Proposed Classes. It is equally clear that the GUC Trust would never waive late claim defenses or support certification of nationwide classes including 26 million individuals if it did not believe that New GM—and not the GUC Trust—would be responsible for satisfying the Plaintiffs' claims. Indeed, the GUC Trust concedes that the "**principal purpose**" of seeking limited fund classes is to "adjust[] the rights of certain creditor groups under a confirmed plan," *i.e.*, to protect the GUC Trust's assets and ensure that Plaintiffs only have recourse to the Adjustment Shares. (GUC Trust Obj. p.20 (emphasis added).) Under these circumstances, New GM undoubtedly has a right to participate in all stages regarding approval of the Proposed Settlement.

18.     When the Movants raised similar standing arguments in connection with the Prior Settlement, this Court held that "New GM undisputedly has a stake in the outcome . . . . This Court's holding on the issue of whether the Movants must seek Rule 23 certification has a significant impact on New GM" and therefore "New GM has prudential, constitutional, and section

---

[6]     *See* Settlement Agreement at § 5.3 (requiring that Final Approval Order include broad "Release Provision" ensuring that all Plaintiffs release all claims against GUC Trust and other entities); *id*. § 2.28 (defining "GUC Trust Beneficiaries" to exclude all Plaintiffs); *id.* § 3 (GUC Trust consenting to the filing of late claims).

10

1109 standing." *In re Motors Liquidation Co.*, 591 B.R. 501, 512 n.15 (Bankr. S.D.N.Y. 2018). If New GM had standing to contest the **application of Rule 23** to the Prior Settlement, it clearly has standing to contest the **implementation of Rule 23** to the Proposed Settlement. As a result, there is no doubt that preliminary certification of the Proposed Classes has "a significant impact on New GM."

19. Finally, as this Court previously observed, New GM has cited "a number of cases that—accurately—suggest that a party who is the primary source of funding or whose exposure would be increased as the result of a settlement or other binding agreement can have standing." *In re Motors Liquidation Co.*, 580 B.R. 319, 350 (Bankr. S.D.N.Y. 2018). Here, the Proposed Settlement goes even further than the Prior Settlement, as New GM is no longer just the primary source of funding, it is the **only source** of funding (other than notice costs). The Proposed Settlement "is designed and intended to . . . facilitat[e] an estimation proceeding that could trigger issuance of the Adjustment Shares" (GUC Trust Obj. p.20), and "when a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed." *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 204 (3d Cir. 2011).

*[Remainder of Page Intentionally Left Blank]*

11

WHEREFORE, as set forth herein and in the Stay Motion, New GM respectfully requests a stay of proceedings relating to the Proposed Settlement pending the MDL Court's rulings on the MDL Briefing.

Dated: March 8, 2019
New York, New York

/s/ Paul M. Basta
Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
Dan Youngblut
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for General Motors LLC*

12