**BROWN RUDNICK LLP**
Edward S. Weisfelner
Howard S. Steel
7 Times Square
New York, NY  10036
Telephone:  (212) 209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

**STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, A PROFESSIONAL
CORPORATION**
Sander L. Esserman
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the Bankruptcy Court*

**HAGENS BERMAN
SOBOL SHAPIRO LLP**
Steve W. Berman (admitted pro hac vice)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: 206-623-7292
steve@hbsslaw.com

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch
Plaintiffs and Certain Non-Ignition Switch
Plaintiffs in the MDL Court*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                                             :
In re:                                                       :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,                          :          Case No.: 09-50026 (MG)
       f/k/a General Motors Corp., et al.,              :
                                                             :
                    Debtors.          :          (Jointly Administered)
-------------------------------------------------------------X

# THE ECONOMIC LOSS PLAINTIFFS'
## REPLY IN SUPPORT OF RULE 23(E) MOTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

I.    The Court Should Find That The Proposed  Settlement Likely Satisfies The
      Requirements Of Rule 23(A)...............................................................12

      A.    New GM's Standing Argument Fails Because Plaintiffs Have  Article III
            Standing And Absent Class Members Need Not Show Standing..............12

      B.    The Court Should Find That Rule 23(a)(2) Is Likely Satisfied Because  There
            Are Numerous Questions Of Law And Fact Common To The Classes. ...................14

      C.    The Court Should Find That Rule 23(a)(3)  Is Likely Satisfied Because
            Economic Loss Plaintiffs' Claims  Are Typical Of The Claims Of The
            Classes They Seek To Represent. ...............................................15

      D.    The Court Should Find That Rule 23(a)(4) Is Likely  Satisfied Because The
            Proposed Class Representatives Are Adequate. ........................................21

II.   Limited Fund Certification Under Rule 23(b)(1)(B) Is Appropriate  Because The
      Fund Is Inadequate, The Whole Of The Inadequate Fund  Is Devoted To Plaintiffs'
      Claims, And Class Members Will Be Treated Equitably......................................23

      A.    The Fund Is A Classically Limited Fund  Because It Is Inadequate To Satisfy
            All Claims. .........................................................................27

            1.    The Fund Here Is Paradigmatically Limited. ...................................27

            2.    The Court Need Not Try Plaintiffs' Claims In  Order To Value Those
                  Claims Before Approving Notice. ........................................30

            3.    The Court Need Not Find That The  Claims Are "Liquidated" Before
                  Approving Notice. .......................................................32

            4.    Ample Evidence Supports Plaintiffs' Claims....................................34

      B.    The Whole Of The Inadequate Fund Is Devoted To Plaintiffs' Claims. ...................37

      C.    Class Members Will Be Treated Equitably................................................42

III.  It Is Likely That The Court Will Be Able  To Certify The Classes Under Rule
      23(b)(1)(A). .........................................................................46

IV.   Movants Have Handily Satisfied The Requirements Of Revised Rule 23(e). ...................48

i

A.    The Amendments To Rule 23 Reinforce  Longstanding Practice In This Circuit Regarding  A Court's Role in Initially Evaluating A Proposed Settlement...........................................................................................48

B.    New GM's Notice Argument is Unavailing. ............................................................51

V.    The Settlement Agreement Does Not  Effectuate An Impermissible Plan Modification. .....................................................................................................52

A.    New GM Does Not Have Standing To Raise A Plan Modification Argument. .........52

B.    The Settlement Agreement Does Not Effectuate A Plan Modification. ...................54

C.    These Settlement Agreement Mechanics Are Permissible Under State Law. ...........58

VI.    The Pre-Closing Accident Plaintiffs Who Are Signatories To  The Settlement Agreement Are Properly Included In The Settlement. .......................................................60

VII.    The Requirements Of The Class Action Fairness Act Are Irrelevant  To Whether The Court Should Direct Notice Of The Settlement To The Classes................................61

VIII.    None of The Issues Being Decided In The MDL  Action Justify An Indefinite And Prejudicial Stay...................................................................................................61

CONCLUSION..............................................................................................62

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altrichter v. Inamed Corp. (In re Silicone Gel Breast Implant Products Liab.*
*Litig.)*,
2:97-CV-11441, 2010 WL 11506713 (N.D. Ala. May 19, 2010) ................................. *passim*

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................. 3

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ................................................................................................. 3

*Baby Neal v. Casey*,
43 F.3d 48 (3d Cir. 1994) ......................................................................................... 16

*Baker v. Wash. Mut. Fin. Grp., LLC*,
193 F. App'x 294 (5th Cir. 2006) ........................................................................ 23, 28, 29

*In re Baldwin-United Corp.*,
55 B.R. 885 (Bankr. S.D. Ohio 1985) ...................................................................... 31

*Bank of Del. v. Clark*,
249 A.2d 442 (Del. Ch. 1968) .................................................................................. 59

*Bd. of Comm'rs of Orleans Parish Levee Dist. v. Brinkmeyer (Katrina Canal*
*Breaches Litig.)*,
628 F.3d 185 (5th Cir. 2010) ............................................................................... 45, 46

*Beck v. Status Game Corp.*,
No. 89 Civ. 2923, 1995 WL 422067 (S.D.N.Y. 1995) ............................................. 22

*Becker v. Adams (In re Telectronics Pacing Sys., Inc.)*,
221 F.3d 870 (6th Cir. 2000) ................................................................................... 29

*In re Boylan Int'l, Ltd.*,
452 B.R. 43 (Bankr. S.D.N.Y. 2011) ........................................................................ 55

*Breeden v. Kirkpatrick & Lockhart, LLP*,
268 B.R. 704 (S.D.N.Y. 2001), *aff'd sub nom. Breeden v. Kirkpatrick &*
*Lockhart, LLC (In re Bennett Funding Grp.)*, 336 F.3d 94 (2d Cir. 2003) ........................... 53

*Broomfield v. Craft Brew Alliance, Inc.*,
No. 17-cv-01027, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) .................................... 35, 36

*Capsolas v. Pasta Res., Inc.*,
No. 10-cv-5595, 2012 WL 1656920 (S.D.N.Y. May 9, 2012) ..................................................3

*Charron v. Weiner*,
731 F. 3d 241 (2d Cir. 2013)..............................................................................................51

*In re Chemtura Corp.*,
448 B.R. 635 (Bankr. S.D.N.Y. 2011) .............................................................................31, 32

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).............................................................................................13, 49

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).............................................................................................................53

*In re ConAgra Foods Inc.*,
90 F. Supp. 3d 919 (C.D. Ca. 2015) ...................................................................................35

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010) ........................................................................................19

*Davidson v. Apple, Inc.*,
No. 16-cv-04942, 2018 WL 2325426 (N.D. Cal. May 8, 2018)...........................................36

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)..............................................................................................8, 12

*In re Dial Complete Mktg. & Sales Practices Litig.*,
320 F.R.D. 326 (D.N.H. 2017) ........................................................................................35, 36

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab.
Litig.*,
No. MDL 1203, CIV. A. 98–20594, 1999 WL 782560 (E.D. Pa. Sept. 27,
1999) ....................................................................................................................................33, 43

*Doe v. Karadzic*,
176 F.R.D. 458 (S.D.N.Y. 1997) ........................................................................................41

*Doe v. Karadzic*,
192 F.R.D. 133 (S.D.N.Y. 2000) ....................................................................................9, 32, 33

*Doral Ctr., Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*,
208 B.R. 812 (S.D.N.Y. 1997).............................................................................................56

*Dover v. British Airways, PLC (UK)*,
321 F.R.D. 49 (E.D.N.Y. 2017) ..........................................................................................13

*Dubowski v. Ash (In re AM Int'l Inc. Sec. Litig.),*
    108 F.R.D. 190 (S.D.N.Y.1985) ...........................................................22

*Dzielak v. Whirlpool Corp.,*
    No. 2:12–0089, 2017 WL 1034197 (D.N.J. Mar. 17, 2017)......................35

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.),*
    829 F.3d 135 (2d Cir. 2016).................................................................5

*Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.),*
    982 F.2d 721 (2d Cir. 1992).................................................26, 43, 58, 59

*Findley v. Falise (In re Joint E. & S. Dists. Asbestos Litig.),*
    878 F. Supp. 473 (E.D.N.Y. & S.D.N.Y. 1995), *aff'd*, 100 F.3d 944 (2d Cir.),
    *aff'd*, 100 F.3d 945 (2d Cir.), *aff'd in part, vacated in part*, 78 F.3d 764 (2d
    Cir. 1996) .....................................................................................58, 59

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.,*
    326 F.R.D. 592 (N.D. Cal. 2018).........................................................35, 36

*In re Gen. Motors LLC Ignition Switch Litig.,*
    339 F. Supp. 3d 262 (S.D.N.Y. 2018)....................................................17

*Goodman v. Lukens Steel Co.,*
    777 F.2d 113 (3rd Cir. 1985), *aff'd*, 482 U.S. 656 (1987).........................22

*Gross v. GFI Grp., Inc.,*
    14cv948, 2017 WL 3668844 (S.D.N.Y. Aug. 23, 2017) ...........................22

*Guido v. L'Oréal, USA, Inc.,*
    Nos. 2:11-cv-01067, 2:11-cv-05465, 2014 WL 6603730 (C.D. Cal. July 24,
    2014) ...............................................................................................35

*Hadley v. Kellogg Sales Co.,*
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) .................................................35, 36

*Harris v. Koenig,*
    271 F.R.D. 383 (D.D.C. 2010).............................................................10, 46

*Hawkins v. Chapter 11 Tr. (In re Res. Capital Corp. Hawkins Dev. LLC),*
    No. 6:07-cv-0766, 2009 WL 701115 (N.D.N.Y. Mar. 13, 2009) .................56

*Hernandez v. Merrill Lynch & Co.,*
    No. 11 Civ. 8472, 2012 WL 5862749 (S.D.N.Y. 2012) .............................3

*Hood v. Eli Lilly & Co. (In re Zyprexa Prod. Liab. Litig.),*
    671 F. Supp. 2d 397 (2d Cir. 2009) ......................................................14

v

*Juris v. Inamed Corp.*,
  685 F.3d 1294 (11th Cir. 2012) .......................................................................31

*Karcich v. Stuart (In re IKON Office Sols., Inc. Sec. Litig.)*,
  194 F.R.D. 166 (E.D. Pa. 2000).........................................................................3

*Klein v. O'Neal, Inc.*,
  No. 7:03-CV-102-D, 2006 WL 325766 (N.D. Tex. Feb. 13, 2006) ......................33

*Kramer v. Time Warner Inc.*,
  937 F.2d 767 (2d Cir. 1991)................................................................................4

*In re Lenovo Adware Litig.*,
  15-md-02634, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)..........................14, 36

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  11 MD 2262 Civ. 5723, 2018 WL 3475465 (S.D.N.Y. July 19, 2018)..............3, 48

*Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*,
  574 F.3d 29 (2d Cir. 2009).......................................................................17, 20, 23

*Lower E. Side People's Fed. Cred. Union v. Trump*,
  289 F. Supp. 3d 568 (S.D.N.Y. 2018).................................................................54

*Luppino v. Mercedes Benz USA*,
  718 F. App'x 143 (3d Cir. 2017) .......................................................................15

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997)...............................................................................15

*McLaughlin v. Amer. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)...............................................................................14

*McReynolds V. Richards-Cantave*,
  588 F. 3d 790 (2d Cir. 2009)..............................................................................13

*Microsoft Corp. v. Motorola, Inc.*,
  904 F. Supp. 2d 1109 (W.D. Wash. 2012)...........................................................35

*In re Mirant Corp.*,
  348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
  Claimholders v. New Mirant Entities*, No. 4:06-cv-744-A, 2006 WL 3780884
  (N. D. Tex. Dec. 26, 2006) ................................................................................56

*Morgan v. Herzog*,
  301 N.Y. 127 (1950) ..........................................................................................59

*In re Motors Liquidation Co.*,
447 B.R. 150 (Bankr. S.D.N.Y. 2011) ................................................................41

*In re Motors Liquidation Co.*,
529 B.R. 510 (Bankr. S.D.N.Y. 2015), *aff'd in part & vacated in part*, 590
B.R. 39 (S.D.N.Y. 2018) ......................................................................................5

*In re Motors Liquidation Co.*,
580 B.R. 319 (Bankr. S.D.N.Y. 2018) ..............................................................52

*In re Motors Liquidation Co.*,
591 B.R. 501 (Bankr. S.D.N.Y. 2018) ............................................25, 26, 53, 60

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) ..........................................................35, 36

*In re Nova Real Estate Inv. Tr.*,
23 B.R. 62 (Bankr. E.D. Va. 1982) ....................................................................32

*O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*,
981 F.2d 1450 (5th Cir. 1993) ............................................................................31

*Opperman v. Path, Inc.*,
13-cv-00453, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ..............................14

*Ortiz v. Chop't Creative Salad Co.*,
No. 13 Civ. 2541, 2014 WL 1378922 (S.D.N.Y. Mar. 25, 2014) ......................49

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)...................................................................................... *passim*

*Price v. L'Oréal USA, Inc.*,
17 Civ. 614, 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) ..............................35

*In re Residential Capital, LLC*,
Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Feb. 9, 2016), ECF No. 9609 ............3

*Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*,
177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ......................56

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993)..........................................................................15, 16

*Saleem v. Corp. Transp. Grp., Ltd.*,
12 Civ. 8450, 2013 WL 6061340 (S.D.N.Y. Nov, 15, 2013) (Furman, J.) ............16

*Sanchez-Knutson v. Ford Motor Co.*,
310 F.R.D. 529 (S.D. Fla. 2015).........................................................................35

*Savage & Accocs., P.C. v. Mandl (In re Teligent, Inc.)*,
  417 B.R. 197 (S.D.N.Y. 2009) ............................................................................54

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp.,
  Inc.)*,
  960 F.2d 285 (2d Cir. 1992) ...............................................................16, 21, 26

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ....................................................................16, 19

*State Gov't Creditors' Comm. for Prop. Damage Claims v. McKay (In re Johns-
  Manville Corp.)*,
  920 F.2d 121 (2d Cir. 1990) ..............................................................................55

*Stott v. Capital Fin. Servs., Inc.*,
  277 F.R.D. 316 (N.D. Tex. 2011) ..............................................23, 29, 31, 33

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015) ................................................................................13

*Tiro v. Public House Invs., LLC*,
  Nos. 11 Civ. 7679, 11 Civ. 8249, 2013 WL 2254551 (S.D.N.Y. May 22,
  2013) .....................................................................................................................3

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .......................................................................................12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................................................48

*Wenzel v. Partsearch Techs., Inc. (In re Partsearch Techs., Inc.)*,
  453 B.R. 84 (S.D.N.Y. 2011) .............................................................................17

*White v. Nat'l Football League*,
  822 F. Supp. 1389 (D. Minn. 1993) ...........................................................10, 47

*Williams v. Nat'l Sec. Ins. Co.*,
  237 F.R.D. 685 (M.D. Ala. 2006) ..............................................24, 28, 29

*Yi Xiang v. Inovalon Holdings, Inc.*,
  327 F.R.D. 510 (S.D.N.Y. 2018) .......................................................................12

**Statutes**

28 U.S.C. § 1332 ....................................................................................................60

11 U.S.C. § 502 ......................................................................................................31

11 U.S.C. § 1109 ....................................................................................................52

11 U.S.C. § 1123 ...................................................................................................57

11 U.S.C. § 1127 ...............................................................................................55, 59

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................... *passim*

Fed. R. Evid. 201 ....................................................................................................4

Klonoff, *Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B):
    Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L.
    Rev. 798 (2014) (available at https://www.gwlr.org/wp-
    content/uploads/2018/01/82-Geo.-Wash.-L.-Rev.-798.pdf) ....................................47

2 William B. Rubenstein; Alba Conte, Herbert B. Newberg, NEWBERG ON
    CLASS ACTIONS (5th ed. 2011) ..................................................................47, 60

The Economic Loss Plaintiffs[1] have moved for this Court to make the findings and take the steps contemplated at the preliminary approval stage of the Rule 23(e) settlement approval process.  They submit this reply (the "**Reply**") to New GM's Objection[2] and in further support of their Rule 23(e) Motion, and respectfully represent as follows.[3]

## PRELIMINARY STATEMENT

1.    The Rule 23(e) Motion and the 9019 Motion were filed on February 1, 2019. Beginning with its February 11th three page letter requesting a status conference, followed by its February 22nd forty-eight page motion for a stay[4] and its forty-seven page motion to withdraw the reference and, most recently, its ninety-six page Objection, New GM has, through repeated and grossly misleading contentions, sought to once again deflect, deny and delay.  New GM's obvious, scorched earth litigation tactics should be rejected.

2.    For the most part, New GM's 191 pages of repetitive argument in opposition to the Rule 23(e) Motion focuses on its baseless contention that this Court is being asked to somehow "jump ahead" or ignore anticipated rulings under consideration by Judge Furman in the MDL Action.  New GM points to three issues fully briefed in the District Court: (i) summary judgement, which could affect the size of the classes in these proceedings; (ii) *Daubert* rulings

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings given to them in *The Economic Loss Plaintiffs' Motion to:  (1) Extend Bankruptcy Rule 7023 to These Proceedings; (2) Approve the Form and Manner of Notice; (3) Grant Class Certification for Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel for Settlement Purposes; and (5) Approve the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Rule 23* [ECF No. 14408] (the "**Rule 23(e) Motion**").

[2]    *Objection of General Motors LLC to the Proposed Settlement Among the Motors Liquidation GUC Trust and the Signatory Economic Loss and Personal Injury Plaintiffs* [ECF No. 14449] (the "**Objection**").  New GM is the sole objecting party to the preliminary relief requested in the Rule 23(e) Motion, despite extensive notice provided under Bankruptcy Rule 2002 and widespread publicity.

[3]    Given that the Objection runs 96 pages—shattering the page limit set forth in the Case Management Order—the Economic Loss Plaintiffs respectfully request permission for this Reply to exceed the page limit.

[4]    *General Motors LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* [ECF No. 14431] (the "**Stay Motion**").

that could affect the admissibility of evidence in future proceedings here; and, finally, (iii) class certification rulings in three bellwether cases that New GM contends would be relevant to the certification issues in this Court.   These arguments are just simply wrong for the reasons previously outlined in the Stay Objection.[5]

3.    There are ***no*** rulings pending before the MDL Court that, to the extent relevant to the proceedings before this Court, cannot be accommodated at future contemplated stages of the Rule 23(e) Motion and subsequent estimation proceedings.  For the reasons set forth in the Rule 23(e) Motion, the Stay Objection, and this Reply, the Court has an ample record and compelling authority to overrule the Objection and enter the Preliminary Approval Order.

4.    New GM's Objection asserts that the Rule 23(e) Motion should be denied because:  (i) there is no record on which to base a determination that notice should be directed; (ii) the commonality, typicality, and adequacy of representation factors of Rule 23(a) cannot be met; (iii) the proposed Classes cannot be certified under Rule 23(b)(1)(B) or 23(b)(1)(A); (iv) the adequate representation, adequate relief, and equitable treatment of class members requirements of Rule 23(e)(2) cannot be met; and (v) the proposed Settlement effectuates an impermissible Plan modification.  Once again, New GM is wrong across the board.

5.    <u>First</u>, New GM claims, in effect, that this Court must conduct a full blown trial at the preliminary approval stage.  *See* Objection ¶¶ 39-53.  This is not the law.  A trial of all substantive issues is not required for final approval of the Settlement, let alone for preliminary approval.  Indeed, as the courts have repeatedly stated, the point of a class settlement is that

---

[5]    *General Motors LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* [ECF No. 14431] (the "**<u>Stay Motion</u>**"); *The Economic Loss Plaintiffs' Objection to General Motors LLC's Motion Pursuant to Section 105(a) of the Bankruptcy Code to (A) Stay Proceedings Relating to the Proposed Settlement and (B) Grant Related Relief* [ECF No. 14447] (the "**<u>Stay Objection</u>**").

"there be no trial."[6]  The recent amendments to Rule 23(e) do not change the practice in this Circuit of determining whether there is "'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness."[7]  Courts have made that determination regularly on written submissions.[8]

6.      Moreover, contrary to New GM's claims, the record is well developed and demonstrates that this Court should direct notice because the Court will likely be able to: (i) approve the Settlement; and (ii) certify the proposed Classes.  The Settlement is the result of arm's length and hard-fought negotiations and resolves the numerous complex issues raised by the Late Claims Motions.  These negotiations took place against the backdrop of five years of contentious litigation and the well-developed record of Old and New GM's longstanding and tragic cover-up of safety defects in millions of their vehicles.  During this time, a robust record regarding the Plaintiffs' claims against Old GM has been created; numerous complex issues related to the Plaintiffs' claims have been identified and litigated, with and without resolution;

---

[6]    *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (explaining that in determining whether to grant settlement class certification, the merits of plaintiffs' claims may be considered "to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"); *Karcich v. Stuart (In re IKON Office Sols., Inc. Sec. Litig.)*, 194 F.R.D. 166, 179, 181 (E.D. Pa. 2000) (explaining that in evaluating the fairness of a proposed settlement under Rule 23, "the court should avoid conducting a mini-trial").

[7]    *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262, 12 Civ. 5723, 2018 WL 3475465, at *1 (S.D.N.Y. July 19, 2018) (quoting *In re Traffic Exec. Ass'n E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980)).

[8]    *See Tiro v. Public House Invs., LLC*, Nos. 11 Civ. 7679, 11 Civ. 8249, 2013 WL 2254551, at *1 (S.D.N.Y. May 22, 2013) ("Preliminary approval of a settlement agreement requires only an 'initial evaluation' of the fairness of the proposed settlement on the basis of written submissions and an informal presentation by the settling parties."); *Hernandez v. Merrill Lynch & Co.*, No. 11 Civ. 8472, 2012 WL 5862749, at *1 (S.D.N.Y. 2012) (same); Order Preliminarily Approving Proposed Settlement with the Rothstein Plaintiffs and Providing for Notice, *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Feb. 9, 2016), ECF No. 9609 (granting preliminary approval of class settlement following consideration of the settlement and exhibits thereto and the submissions relating thereto); *Capsolas v. Pasta Res., Inc.*, No. 10-cv-5595, 2012 WL 1656920 at *1 (S.D.N.Y. May 9, 2012) (granting preliminary approval based on memorandum of law, declaration, and exhibits).

potential sources of recovery for the claims have been identified and quantified; and good faith, arm's length negotiations have been undertaken—all culminating in the Settlement Agreement.

7.    In determining whether the Economic Loss Plaintiffs have demonstrated that the Court will likely be able to:  (i) approve the Settlement, and (ii) certify the proposed Classes, this Court can draw on this extensive record, the supplemental declarations of Steve W. Berman and Edward S. Weisfelner filed contemporaneously herewith, and its own keen familiarity with the history of this mature litigation, including:[9]

The Settlement Agreement

- The terms of the Settlement Agreement, attached as **Exhibit A** to the Rule 23(e) Motion.

The Arm's Length Settlement Negotiations

- The declarations of Steve W. Berman and Elizabeth J. Cabraser in support of the Rule 23(e) Motion (attached as **Exhibits I and J** to the Rule 23(e) Motion), which demonstrate that the Settlement Agreement was negotiated at arm's length and that the Settlement is fair, reasonable, and adequate; and

- The declaration of David A. Vanaskey Jr. in support of the Settlement Agreement [ECF No. 14409-3], which demonstrates that the Settlement was negotiated at arm's length and is in the best interests of the GUC Trust, the Old GM estate, and the GUC Trust Beneficiaries.

The Prospective Class Representatives[10]

- The Proposed Class Claims [ECF No. 14280], which identify the proposed class representatives;[11] and

- The supplemental declaration of Steve W. Berman in support of the Settlement, which re-identifies the prospective class representatives.

---

[9]    The Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[10]    This record evidence once again rebuts New GM's claim that the prospective class representatives are unknown. *See, e.g.*, Objection ¶ 58.

[11]    The class representatives are also identified in the Stay Objection.

The Proposed Class Counsel

- The declarations of Steve W. Berman and Elizabeth J. Cabraser in support of the Rule 23(e) Motion (attached as **Exhibits I and J** to the Rule 23(e) Motion), which demonstrate their qualifications to be appointed as class counsel.

The Proposed Class Claims

- The Proposed Class Claims [ECF No. 14280], which set forth the allegations in support of the claims; and

- The Updated Economic Loss Plaintiffs' Summary of Support for Claim in the Bankruptcy Court (attached as Exhibit A to the Supplemental Berman Declaration), describing in detail the factual background for the Proposed Class Claims and the alleged viability of the asserted claims and the alleged amount of damages, which was provided to the GUC Trust in connection with settlement negotiations.[12]

The Common Violation Of Class Members' Due Process Rights

- The Proposed Class Claims, which set forth the allegations in support of the claims;

- The Updated Economic Loss Plaintiffs' Summary of Support for Claim in the Bankruptcy Court, describing in detail the factual background for the alleged violation of Class members due process rights;

- This Court's holding that the Ignition Switch Plaintiffs suffered a due process violation and that the obvious remedy would be leave to file late proofs of claims;[13] and

- The Second Circuit's holding that the Ignition Switch Plaintiffs were known certain creditors entitled to actual notice.[14]

The Class Members' Common Interest In Maximizing The Adjustment Shares

- The terms of the Sale Agreement, including Section 3.2(c), which requires New GM to issue Adjustment Shares in the event that the amount of Allowed General Unsecured Claims against the Old GM estate exceeds $35 billion;

- The terms of the Settlement Agreement; and

---

[12]  The Economic Loss Plaintiffs have moved to seal certain of the exhibits to the Supplemental Berman Declaration.

[13]  *See In re Motors Liquidation Co.*, 529 B.R. 510, 574, 583 (Bankr. S.D.N.Y. 2015), *aff'd in part & vacated in part*, 590 B.R. 39 (S.D.N.Y. 2018).

[14]  *See Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 159-61 (2d Cir. 2016).

- The GUC Trust's quarterly reports filed with this Court and the GUC Trust's SEC filings, which demonstrate the amount of Allowed General Unsecured Claims against Old GM's estate and the amount of remaining GUC Trust Assets.

The Amount Of Damages[15]

- The supplemental declaration of Steve W. Berman (the "**Supplemental Berman Declaration**") in support of the Settlement, which describes the Proffered Evidence and the amount of the Proposed Class Claims;

- The Updated Economic Loss Plaintiffs' Summary of Support for Claim in the Bankruptcy Court, describing the alleged amount of damages;

- The report by Stefan Boedeker (attached as Exhibit B to the Supplemental Berman Declaration), an expert on surveys and statistical sampling, analyzing the amount of alleged damages for the Proposed Class Claims based on a conjoint analysis conducted by Mr. Boedeker and the Berkeley Research Group, which was provided to the GUC Trust in connection with settlement negotiations; and

- The spreadsheets (attached as Exhibit C to the Supplemental Berman Declaration) setting forth refined estimates of the amount of damages taking into account rulings by Judge Furman in the MDL Action regarding the viability of claims in certain states, including the estimate that the total amount of the proposed Class members' claims could exceed $77 billion, which was provided to the GUC Trust in connection with settlement negotiations.

Potential Sources Of Recovery And The Relief Provided Under The Settlement[16]

- The terms of the Sale Agreement, including Section 3.2(c), which requires New GM to issue Adjustment Shares in the event that the amount of Allowed General Unsecured Claims against the Old GM estate exceeds $35 billion;

- The GUC Trust's quarterly reports filed with this Court and the GUC Trust's SEC filings, which demonstrate the amount of Allowed General Unsecured Claims against Old GM's estate and the amount of remaining GUC Trust Assets; and

- The declaration of Edward S. Weisfelner in support of the Settlement, which demonstrates that Class members are receiving a better deal under the Settlement Agreement than *seriatim* litigation would have produced.

---

[15] This record evidence expressly rebuts New GM's claim that the Economic Loss Plaintiffs have provided no evidence on which to ascertain the amount of the Proposed Class Claims and no evidence that the fund is limited.  *See* Objection ¶¶ 81, 93.

[16] This rebuts New GM's claim that there is no evidence that the fund is limited.  *See* Objection ¶ 93.

The Practical Requirement For The GUC Trust To Treat Class Members Alike

- The terms of the Plan and the GUC Trust Agreement, which demonstrate that the GUC Trust must treat each Ignition Switch Plaintiff and Non-Ignition Switch Plaintiff alike.

Discovery

- The substantial amount of discovery regarding the relevant defects that has taken place in the MDL Action (which includes information on Old GM's knowledge of the various defects) that informed the Updated Economic Loss Plaintiffs' Summary of Support for Claim in the Bankruptcy Court, including New GM's production of more than 4.7 million documents (totaling more than 23.4 million pages) and the parties' conduct of 759 depositions, including 454 depositions of case-specific witnesses, 102 depositions of current or former General Motors' employees, 126 depositions of experts related to bellwether cases, and 96 depositions of named plaintiffs in the Fifth Amended Consolidated Complaint, *see* Joint Letter, *In re Gen. Motors LLC Ignition Switch Litig.*, Case No. 14-md-02543-JMF (S.D.N.Y. Feb. 22, 2019), ECF No. 6501; and

- The Agreed and Disputed Stipulations of Fact Pursuant to the Court's Supplemental Scheduling Order, Dated July 11, 2014 [ECF No. 12826].

The Costs, Risks, And Delay Of Trial And Appeal

- This Court's familiarity with these cases and the history of this longstanding claims litigation; and

- The complex issues raised in this litigation, some resolved and some unresolved, as demonstrated by the prior rulings of this Court, the MDL Court, and the Second Circuit.

8.     New GM's assertion that the Economic Loss Plaintiffs have provided the Court with "no record at all" rings hollow. *See* Objection ¶ 4. The Court has more than a sufficient record to overrule New GM's Objection, find that the Court will likely be able to certify the Classes and approve the Settlement, and direct notice.

9.     Second, New GM's contention that the Economic Loss Plaintiffs cannot meet the commonality, typicality, and adequacy of representation factors of Rule 23(a) is unfounded. *See* Objection ¶¶ 128-40. According to New GM, variations among claims subject to different recalls and different state law demonstrate that there are no common questions of law and fact,

that Class representatives' claims are not typical of the claims of the class, and that the class representatives cannot adequately represent Class members. *See id.* New GM ignores the numerous commonalities among the proposed settlement Class members, the key being ***the common due process violation arising from the failure to provide Class members with constitutionally adequate notice of the Bar Date and the common interest in maximizing the Adjustment Shares***.[17] Simply put, Old GM treated all Class members identically. The record demonstrates that each Class member suffered from the same unlawful conduct of Old GM with respect to the failure to provide constitutionally adequate notice of the Bar Date, which caused the same type of injury and, thus, the Rule 23(a) requirements are met as more fully set forth herein. The pivotal issue of Old GM's failure to accord due process does not vary by state.

10. New GM also argues that the Settlement does not satisfy the requirements of Rule 23(a) because certain Class members were allegedly uninjured (and, thus, purportedly lack Article III standing). *See* Objection ¶¶ 125-27. It is well-settled that the presence of uninjured class members does not implicate standing issues.[18] Failure to accord due process is itself an injury, uniformly inflicted. Moreover, the record demonstrates that every purchaser overpaid for their cars and, thus, suffered economic injury.

11. <u>Third</u>, New GM's contentions that the proposed Classes cannot be certified under Rule 23(b)(1)(B) or 23(b)(1)(A) are meritless. New GM claims that a class can never be certified as a limited fund under Rule 23(b)(1)(B) if the class members' claims are unliquidated. *See* Objection ¶¶ 82, 90-92. By this claim, New GM self-servingly imports a restriction that is

---

[17] *See* Rule 23(e) Motion ¶¶ 55, 79-81, 83, 86.

[18] *See, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006) ("[P]assive members need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.")

not present in Rule 23(b)(1)(B) jurisprudence.  Where, as here, there is a reasonable method to estimate that the claims will likely exceed the available fund, such claims need not be liquidated to certify a limited fund class.[19]  This proceeding concerns a "classic" limited fund class action where the available funds—the Adjustment Shares—are undeniably insufficient to satisfy Class members' claims.[20]

12.    New GM also asserts that:  (i) the limited fund cannot be shared among two Classes and certain Pre-Closing Accident Plaintiffs; and (ii) the limited fund must be shared with all GUC Trust Beneficiaries.  *See* Objection ¶¶ 102-05.  However, the requirement that "the whole of the inadequate fund . . . be devoted to the *overwhelming* claims" is aimed at preventing a limited fund defendant from "benefit[ting] himself or claimants of lower priority by holding back on the amount distributed to the class," not preventing non-class members of equal priority from receiving funds.[21]   And the inclusion of GUC Trust Beneficiaries who have already received distributions and have no "common theory of recovery" with the proposed Classes runs counter to the goal of limited fund class actions to provide equitable distributions to those with similar claims.[22]

13.    New GM also asserts that proposed Class members have no common theory of recovery and, thus, subclasses are required now to ensure equitable treatment.  *See* Objection ¶¶ 106-12.  This is false because it blatantly ignores the proposed Class members' common interest in seeking the issuance of the maximum amount of Adjustment Shares and that any necessary subclasses may be formed in connection with the allocation of Adjustment Share value, as the

---

[19]    *See Doe v. Karadzic*, 192 F.R.D. 133, 140 n.11 (S.D.N.Y. 2000).

[20]    Even if Class members were to recover from the Remaining GUC Trust Assets, as well as the Adjustment Shares, those funds would be a limited fund insufficient to satisfy their claims.

[21]    *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 839 (1999).

[22]    *See id.* at 840-41, 864.

*Silicone* case instructs and supports.[23]    Accordingly, the Classes can be certified under Rule

23(b)(1)(B).

14.    In addition, New GM contends that the proposed Classes cannot be certified

under Rule 23(b)(1)(A) because certification under Rule 23(b)(1)(A) is purportedly unavailable

as a matter of law where monetary damages are sought.  *See* Objection ¶ 117.  This contention is

contrary to a well-reasoned line of authority and the purpose of the Rule.[24]  Accordingly, in the

alternative, the Court may certify the proposed Classes under Rule 23(b)(1)(A).

15.    Fourth, New GM's contention that the requirements of Rule 23(e)(2) are not met

is erroneous.  New GM contends that the Economic Loss Plaintiffs cannot demonstrate adequate

representation or equitable treatment of Class members under Rule 23(e)(2) because the

proposed Classes contain members whose vehicles were subject to different recalls and who

reside in different states.  *See* Objection ¶¶ 57-59, 63-64.  This recycles the contentions that New

GM raises under Rule 23(a) and, once again, ignores the common due process violation arising

from the failure to provide Class members with constitutionally adequate notice of the Bar Date

and the common interest in maximizing the Adjustment Shares.

16.    New GM also contends that the Economic Loss Plaintiffs cannot demonstrate that

the Settlement provides adequate relief until after it is known:  (i) how many, if any, Adjustment

Shares will be issued; (ii) the allocation and criteria for receiving distributions of Adjustment

Shares; and (iii) the amount of attorneys' fees requested.  *See* Objection ¶¶ 60-62.  Not so.  The

opportunity to trigger the Adjustment Shares provides adequate relief.  Moreover, proposed

---

[23]    *Altrichter v. Inamed Corp. (In re Silicone Gel Breast Implant Products Liab. Litig.)*, 2:97-CV-11441, 2010 WL 11506713 (N.D. Ala. May 19, 2010).

[24]    *See, e.g., White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993); *Harris v. Koenig*, 271 F.R.D. 383 (D.D.C. 2010).

09-50026-mg    Doc 14463    Filed 03/08/19    Entered 03/08/19 16:56:39    Main Document
Pg 21 of 74

distribution procedures are not required now to enable the Court to determine that it will likely be able to certify the proposed Classes.[25]

17.    <u>Finally</u>, New GM contends that the proposed Settlement cannot be approved because the Plaintiffs' waiver of rights to GUC Trust Assets impermissibly modifies the Plan. *See* Objection ¶¶ 152-54.  New GM lacks standing to raise this argument because New GM will not suffer an imminent and concrete harm from the purported Plan modification.  The only injury identified by New GM—the potential impact on its hypothetical future offset claim if certain Plaintiffs are successful on their successor liability claims in the MDL Action—is too speculative to satisfy standing requirements.  Furthermore, there is no impermissible plan modification under the Settlement Agreement.  That Plaintiffs will waive prospective and theoretical rights to potential future distributions of GUC Trust Assets does not change or modify the Plan or GUC Trust Agreement.  Indeed, the limited fund mechanics under the Settlement Agreement are expressly permitted under the Plan and GUC Trust Agreement.[26]  Even if the Settlement did modify payment provisions of the GUC Trust Agreement (it does not), such modifications are immaterial and permitted under state trust law to prevent frustration of the GUC Trust's stated purpose of distributing assets and winding down the Old GM estate.

18.    Accordingly, this Court should overrule the Objection, direct that notice of the Settlement be given to members of the Classes and enter the Preliminary Approval Order substantially in the form attached to the Rule 23(e) Motion as **<u>Exhibit B</u>**.

---

[25]    *See In re Silicone Gel Breast Implant Products Liab. Litig.*, 2010 WL 11506713.

[26]    *See* GUC Trust Agreement §§ 5.8, 11.3.

I.      **The Court Should Find That The Proposed
        Settlement Likely Satisfies The Requirements Of Rule 23(A).**

    A.      **New GM's Standing Argument Fails Because Plaintiffs Have
            Article III Standing And Absent Class Members Need Not Show Standing.**

19.     As it did in its Stay Motion, New GM raises again in the Objection the
unconvincing argument that Movants cannot establish Article III standing.[27]   As in the Stay
Motion, New GM seeks to manufacture a constitutional issue out of its mischaracterization of
Plaintiffs' conjoint expert's work.   Even putting aside the extent to which New GM utterly
misstates the expert work as a factual matter (*i.e.*, all class members are injured), as discussed
below, its statement that all class members must prove injury at class certification has been
rejected by the Supreme Court.

20.     In *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049-50 (2016), the
defendant "concede[d]" that Rule 23 does *not* require a finding that all class members are
injured, and the Court also rejected as "premature" the defendant's attempt to recast that same
argument.   Specifically, defendant Tyson Foods posed that courts are required at class
certification to determine whether there was a "mechanism to identify the uninjured class
members prior to judgment and ensure that uninjured members (1) do not contribute to the size
of any damage award and (2) cannot recover such damages." *Id.* at 1049.   The Court *rejected*
that argument. *See id.*

21.     Well before *Tyson*, it has been the law in the Second Circuit that passive class
members need not show standing. *See*, *e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64

---

[27]    New GM's puzzling assertion that there are no named plaintiffs as another infirmity for standing is addressed
below.   That there are dozens of proposed (and eminently typical) representatives belies this argument without
more.   New GM relies on an entirely inapposite case, *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510
(S.D.N.Y. 2018), which holds that a plaintiff who did not purchase securities in an IPO lacked statutory
standing to bring a Section 12 claim under the securities laws but was adequate to be a class representative for
their Section 11 claims.

(2d Cir. 2006) ("[P]assive members need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court.") (citing 1 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 2.7 (4th ed. 2002)); *see also*, *e.g.*, *Dover v. British Airways, PLC (UK)*, 321 F.R.D. 49 (E.D.N.Y. 2017) (certifying a class in which all members were exposed to wrongful fuel surcharge, even though a small portion of the class may not have actually paid a higher charge).

22.     Further, even when there are individual differences in damages (which here there are not because damages are not at issue and the members of the proposed Classes have a unitary interest in triggering the maximum Adjustment Shares), they do not defeat commonality or predominance (the latter of which is a Rule 23(b)(3) element *not at issue here*), especially when "the evidence necessary to make out such damages claims, while individual, is easily accessible." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).   In such instances, "individual damages considerations do not threaten to overwhelm the litigation." *Id.* Nor must damages be proven at class certification even in litigated Rule 23(b)(3) cases; all that is required "is that the plaintiffs must be able to show that their damage stemmed from the defendant's actions that created the legal liability." *Id.* (citation and internal quotation marks omitted).

23.     It bears repeating:   Rule 23 is not a post-trial motion; it is a pre-trial joinder mechanism; and Rule 23(e) is designed to avoid the cost, delay, and risk of trial and appeal on merits and damages issues by enabling the class-wide resolution of contested issues, including the contested issue of trial-purposes class certification itself.  *See, e.g.*, *McReynolds V. Richards-Cantave*, 588 F. 3d 790, 804 (2d Cir. 2009) (applying "*Grinnell*" factors).

24.     New GM's contention that the MDL plaintiffs' expert found that a certain percent of the population he studied was uninjured is false, and based on a pronounced mischaracterization of Mr. Boedeker's work. Mr. Boedeker's conjoint analysis took survey responses and, in combination with a market simulation, translated them into dollar values for individual features or groups of features offered in a car, including whether the car is defective. This allowed a comparison of the demand curve for a car without defects to a demand curve for a car with undisclosed defects, and the estimation of whether and how much consumers were overcharged—*all* consumers.

25.     New GM thus misstates the relevance of variation in willingness-to-pay in the Boedeker model, in that willingness-to-pay was not used to quantify economic losses. Mr. Boedeker showed that every purchaser overpaid for their cars, regardless of individual willingness-to-pay, which belies New GM's standing arguments.[28]

**B.      The Court Should Find That Rule 23(a)(2) Is Likely Satisfied Because There Are Numerous Questions Of Law And Fact Common To The Classes.**

26.     The Rule 23(e) Motion addresses in detail the commonality standard under Rule 23(a)(2) and how it is handily satisfied. *See* Rule 23(e) Motion ¶¶ 77-81.

---

[28]   New GM's reliance on cases where only a willingness-to-pay analysis was used is misplaced. *See, e.g.*, *Opperman v. Path, Inc.*, 13-cv-00453, 2016 WL 3844326 (N.D. Cal. July 15, 2016). While the class in *Opperman* included persons who could not have been injured by the wrongful conduct, here, "all class members were exposed to the same disclosure—that is no disclosure at all—and purchased the allegedly defective product. Although all class members may not prevail on the merits of their claims, plaintiffs' proposed classes do not include members 'who, by definition, could not have been injured.'" *In re Lenovo Adware Litig.*, 15-md-02634, 2016 WL 6277245, at * 15 (N.D. Cal. Oct. 27, 2016) (citation omitted). *Opperman* is also inapposite in that the plaintiff said it wanted to put an "inherent value" on privacy without the necessity of showing that the demand curve for the product would change. New GM's other cases are even more afield, in that they examine the irrelevant issue here of whether benefit-of-the-bargain damages are available under civil RICO when there is only an abstract expectation injury. *McLaughlin v. Amer. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *see also Hood v. Eli Lilly & Co. (In re Zyprexa Prod. Liab. Litig.)*, 671 F. Supp. 2d 397 (2d Cir. 2009). New GM thus overreads McLaughlin in suggesting that the opinion says anything about aggregate proof in this case.

27.     New GM does not challenge or address the overriding commonality of the issues related to the due process violation, and the common interest in triggering the Adjustment Shares (and at the maximum amount, at that).   If even a sole question is important enough, it satisfies commonality, so commonality would be satisfied here even if there were far more (or any) individualized issues about the defects themselves.  *See* Rule 23(e) Motion ¶ 77.  Yet there are not.

28.     New GM asserts (misleadingly) that commonality may not be satisfied when there are different defects and recalls.   *See* Objection ¶ 130.  Yet the only case it cites says no such thing (and, as shown in the Rule 23(e) Motion, that is not the law):  the sole case New GM cites found that (unlike here) common evidence of a design defect was lacking.  *See Luppino v. Mercedes Benz USA*, 718 F. App'x 143 (3d Cir. 2017).   Here New GM has admitted the existence of the Ignition Switch Defect, and has said not a word about the abundant and unquestionably common evidence of the other defects.  Thus, it is likely the Court will be able to find at final approval that commonality is satisfied.

C.      **The Court Should Find That Rule 23(a)(3)**
        **Is Likely Satisfied Because Economic Loss Plaintiffs' Claims**
        **Are Typical Of The Claims Of The Classes They Seek To Represent.**

29.     Next, New GM challenges typicality.  Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the class representatives and the class members.  *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993).  The Second Circuit has recognized that Plaintiffs may satisfy typicality even when the class representatives experience only a subset of a broad constellation of harms caused by the defendant's conduct.  *See Marisol A. v. Giuliani*, 126 F.3d 372, 376-77 (2d Cir. 1997); *see also*

*Baby Neal v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994). In fact, "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013).[29]

30.    In arguing that the proposed Class representatives do not meet the typicality requirement of Rule 23(a)(3), New GM ignores the record before this Court and the unique procedural posture of this case. New GM also misstates the law in an effort to ratchet up Plaintiffs' burden. New GM wrongly seeks to import Rule 23(b)(3)'s predominance requirement into Rule 23(a)'s typicality requirement, although here there is no predominance requirement at all because the parties are proceeding under an entirely different section of Rule 23, namely, Rule 23(b)(1)(B) (and alternatively Rule 23(b)(1)(A)).

31.    Typicality is satisfied here because "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 291 (2d Cir. 1992). The variations in fact patterns and potential defenses flagged by New GM do not defeat typicality because the Economic Loss Plaintiffs allege "that the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented." *Robidoux*, 987 F.2d at 936-37; *see*

---

[29]    New GM attempts to increase the Economic Loss Plaintiffs' burden by citing a series of cases that stand for the proposition that if typicality is not met, then predominance is not met, and, conversely, that if predominance is met, typicality is necessarily met. *See* Objection p. 76, n. 34. New GM cites no cases equating the two standards, and the more demanding predominance standard is simply *not* in play here. *See, e.g., Saleem v. Corp. Transp. Grp., Ltd.*, 12 Civ. 8450, 2013 WL 6061340, at *7 (S.D.N.Y. Nov, 15, 2013) (Furman, J.) ("the predominance inquiry is similar to, but more demanding than, the commonality inquiry"). Judge Furman's denial of certification in *Saleem* turned on the fact that class members could not be identified without an individualized inquiry. *See id.* (typicality not met where the question of "whether plaintiffs were properly classified as independent contractors cannot be resolved through generalized proof, but rather requires individualized examination into the extent of control that CTG exercised over each driver"). Here, in stark contrast, members of the proposed Classes are readily identified, and there are no other barriers to typicality.

*also Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*, 574 F.3d 29, 35-37 (2d Cir. 2009) (upholding typicality and adequacy findings in securities class including plaintiffs bringing different claims (under different sections of the Securities Act with different causation standards and based on different alleged misstatements or omissions) where claims arose from same course of events).

32.    Here, Old GM's conduct inflicted the same type of injury on the proposed Class representatives and all of the members of the proposed Classes.    The proposed Class representatives, like all members of the Classes, suffered a violation of their due process rights and lost their chance to timely file proofs of claim, and all incurred economic losses caused by the concealment of safety defects in their vehicles.    All "rely on the same legal theory" to prove Old GM's liability and recover for their claims[30]—namely, they seek "benefit of the bargain" damages because their cars were worth less than the price they paid for their defective vehicles. *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 276-277 (S.D.N.Y. 2018).

33.    New GM launches its attack on typicality with the false statement that the Economic Loss Plaintiffs have "failed to identify [the] class representatives."    Objection ¶ 133. Once again, as New GM must have known, the proposed representatives are the numerous Economic Loss Plaintiffs identified in the Proposed Class Claims filed with this Court and the subjects of the Late Claim Motion that will be resolved if the Court approves the Proposed Settlement.    There are 44 Economic Loss Plaintiffs serving as representatives of the Ignition Switch Class,[31] and there are 30 Economic Loss Plaintiffs serving as representatives of the Non-

---

[30]    *See Wenzel v. Partsearch Techs., Inc. (In re Partsearch Techs., Inc.)*, 453 B.R. 84, 95 (S.D.N.Y. 2011).

[31]    They are:  Patricia Barker, Marion Smoke, Camille Burns, Grace Belford, Ray Wieters, Michael And Sylvia Benton, Crystal Hardin, Esperanza Ramirez, Annet Tivin, Michael Pesce, Lisa Teicher, Maria E. Santiago,

Ignition Switch Class.[32]  Because New GM does not directly attack the typicality of the Class representatives, it effectively forfeits that line of attack.

34.    Further, New GM's list of issues that purportedly preclude typicality (Objection ¶ 135) shows the opposite: the issues are, first and foremost, irrelevant to the question of the first stages; issues that are *not* unique to individual plaintiffs (such as whether a state law allows for a certain remedy); and issues that in fact are quintessential *class* issues (such as whether omissions are material to a reasonable consumer, which is the properly stated version of what New GM says).

35.    For example, some of these defenses, far from being "unique," are raised by New GM with respect to virtually *every* Plaintiff, including, for example, New GM's claimed lack of "causation," its attack on the Economic Loss Plaintiffs' damage model crafted by Mr. Boedeker, and New GM's claimed lack of knowledge of the defects.  *See id.*  Other defenses are raised with respect to a discrete and large group of proposed Class members, such as those Plaintiffs who disposed of their vehicles prior to the Recalls and those who bought "Service Part Vehicles." *See id.*  Tellingly, as made clear by New GM's citation to the briefing in motions now pending in the Bellwether cases, *all* of these issues are pending before Judge Furman and will be resolved well prior to the Court's estimation proceedings.  *See id.*  Certifying the proposed Classes here will therefore allow this Court to apply Judge Furman's rulings on a class-wide basis, and

---

Neysa Williams, Jennifer Dunn, Dennis Walther, Heather Holleman, James Dooley, Philip Zivnuska, D.D.S., Robert Wyman, Colin Elliott, Diana Cnossen, Jacqueline Smith, David Cleland, Frances Howard, Kenneth Robinson, Patrice Witherspoon, Laurie Holzwarth, Wayne Wittenberg, Michael Amezquita, Lorraine De Vargas, Bernadette Romero, Sandra Levine, Michael Rooney, Bonnie Taylor, Paulette Hand, William Bernick, George Mathis, Mary Dias, Catherine Senkle, Shenyesa Henry, Lisa Simmons, Blair Tomlinson, D.D.S., and Stephanie Renee Carden.

[32]    They are:  Yvonne James-Bivins, Gerald Smith, Patricia Barker, Esperanza Ramirez, Wandell Littles Beazer, Stacey Bowens, Maria E. Santiago, Verlena Walker, Dennis Walther, Keith Nathan, Lyle Wirtjes, Melody Lombardo, Susan Viens, Diana Cnossen, Sophia Marks, David Price, Jacqueline Smith, Bryan Wallace, David Cleland, Frances Howard, Patrice Witherspoon, Lorraine De Vargas, Lisa Axelrod, Georgianna Parisi, Annette Hopkins, Catherine Senkle, Shenyesa Henry, Lisa Simmons, Malinda Stafford, and Stephanie Renee Carden.

including these potential claimants in the proposed Classes is fully appropriate in order to assure that all potential claimants may partake in the proceeds of the proposed Settlement.

36.    More fundamentally, New GM ignores that "typicality focuses chiefly on the nature of plaintiffs' claims, not on possible defenses to those claims." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. at 46 (citing *In re Flag Telecom Holdings*, 574 F.3d at 35). Thus, "the presence of individualized defenses . . . [is] generally regarded as no barrier to class certification." *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y. 2010) (citation omitted). The Economic Loss Plaintiffs' allegations of a universal and uniform concealment of material information from each Class member,  a universal and uniform denial of due process, and uniform "benefit of the bargain damages" easily satisfy Rule 23(a)(3)'s typicality requirement.

37.    New GM argues that this Court cannot certify a nationwide Class because no Class representative can "have claims and defenses that are typical of putative class members in all other 50 jurisdictions."  Objection ¶ 134.  According to GM, certification can only be accomplished (if at all) with the use of "state-by-state classes or subclasses." *Id.* Of course, as discussed above, *all* Class members have the same fundamental claims arising from the same common course of conduct, even though they may face a barrage of defenses. Once again, New GM's heavy focus on the existence of defenses is unavailing to impede preliminary approval.

38.    Moreover, New GM ignores the unique procedural posture of this case. The Economic Loss Plaintiffs now seek preliminary approval of a proposed Settlement *with the GUC Trust* that will eventually trigger a claims estimation process involving *all* Plaintiffs *which will take into account Judge Furman's relevant rulings* that, for example, a manifest defect is a

prerequisite to recovery in eight states.  *See* Objection ¶ 134.   New GM itself will be there to ensure that this takes place.

39.     And the Court will ultimately oversee the distribution of the proceeds of the Settlement to ensure that the distribution is equitable.  Presumably, an Economic Loss Plaintiff from a "manifestation required" state whose defect did not manifest will recover less than her counterpart in a state where manifestation is not required (any recovery for the "manifestation required" plaintiff being based on the chance that a dispositive ruling by Judge Furman might be reversed were it to be appealed).  But that allocation process will take place down the line; *at this stage, all Class members' interests are aligned and typicality is met* because if the Class representative's claims are not certified, *all* Class members will be without a remedy.  All Class members share an overriding interest in maximizing the total recovery.

40.     As the Second Circuit noted in affirming certification in another case where defendants tried to avoid certification by proffering dispositive defenses against class members with differing claims arising out of a common course of alleged misconduct:

> We are confident in the lower court's wisdom and ability to utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue orders ensuring "the fair and efficient conduct of the action."   Advisory Committee Note on Subdivision (d); *see Marisol A. v. Giuliani,* 126 F.3d 372, 379 (2d Cir.1997) (per curiam) (describing "ample tools" available to district court "to fulfill its responsibility" under Rule 23).

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d at 37.

41.     The same is true here, and typicality is met.

### D.    The Court Should Find That Rule 23(a)(4) Is Likely
####    Satisfied Because The Proposed Class Representatives Are Adequate.

42.    As demonstrated in the Stay Objection, the Economic Loss Plaintiffs readily establish adequacy here.[33]    That is to say, both prongs of Rule 23(a)(4) are met—the proposed Classes are represented by qualified and diligent counsel, and the proposed representatives have also discharged their duties and have no interests antagonistic to each other.    *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 291.

43.    Rather than grapple with the actual record at hand, New GM again claims that it does not know who the proposed Class representatives are and that, therefore, this Court has no basis for preliminarily finding adequacy of representation.    *See* Objection ¶ 138.    This is nonsense—as New GM well knows who the proposed representatives are,[34] especially since some 28 of the proposed Class representatives have already provided detailed Plaintiff Fact Statements, responded to document requests and interrogatories and been deposed in the MDL Action, creating a far more fulsome record on adequacy than in many class actions.    That level of commitment—responding to many rounds of discovery over the course of many years—speaks volumes as to the adequacy of the proposed representatives.

44.    New GM does not contest that the proposed Classes are adequately represented by proposed Class counsel.    *See* Objection ¶¶ 136-41.    However, according to New GM, counsel has not been adequately controlled by the proposed Class representatives in this case.    *Id.* ¶ 136 (citing *Beck v. Status Game Corp.*, No. 89 Civ. 2923, 1995 WL 422067, at *6 (S.D.N.Y. 1995), and suggesting that counsel's discretion has been "unfettered").    Apart from the conclusory and

---

[33]    *See* Stay Objection at 21-22.

[34]    *See supra* nn. 29-30, setting forth the names of the proposed Class representatives from the Proposed Class Claims filed with this Court.

false suggestion that no Class representatives have been identified, New GM offers scant support for its argument.

45.    Given the substantial involvement of the named Plaintiffs in this litigation and their knowledge of and agreement to the Settlement, this case is a far cry from *Beck,* where one of the named Plaintiffs had no "discussions with the attorneys in [the] case until two years after the complaint was filed," and the other was "unfamiliar with the facts of the case, and … unaware of [the] suit's existence or her role as a class representative," and "did not know how she came to be a class representative."  1995 WL 422067, at *7.  Any suggestion by New GM that one or more representatives is inadequate because they do not understand the long, complex and tortured history of this litigation cannot prevail.  In complex actions such as this one, named plaintiffs are not required to "have expert knowledge of all aspects of the case, . . . and a great deal of reliance on the expertise of counsel is to be expected."  *Dubowski v. Ash* (*In re AM Int'l Inc. Sec. Litig.),* 108 F.R.D. 190, 196-97 (S.D.N.Y.1985) (citing cases); *see also Goodman v. Lukens Steel Co.,* 777 F.2d 113, 124 (3rd Cir. 1985), *aff'd*, 482 U.S. 656 (1987); *Gross v. GFI Grp., Inc.*, 14cv948, 2017 WL 3668844, at *2 (S.D.N.Y. Aug. 23, 2017).

46.    New GM next repeats its already-rebutted arguments on commonality and typicality, and argues that adequacy is not satisfied because typicality and commonality are not met.  *See* Objection ¶ 137 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011) for the proposition that the requirements of commonality and typicality "tend to merge with the adequacy-of-representation requirement").  Because commonality and typicality are satisfied, *see supra* Sections I.B, I.C, however, this argument carries no weight.

47.    Finally, again ignoring the procedural posture of this case, New GM asserts that no finding of adequacy is possible in this case without the use of "state-by-state subclasses," and

chastises the Economic Loss Plaintiffs for correctly noting—as the Second Circuit did in *In re*

*Flag Telecom Holdings*, 574 F.3d at 37—that Rule 23 grants the trial court discretion to address

any later-arising conflicts through, *inter alia*, amended class definitions.  As discussed *supra* ¶

22, the interests of *all* Plaintiffs are fully aligned at this stage of the Settlement to trigger the

maximum number of Adjustment Shares.  If, at the close of that process, this Court deems it

necessary to create subclasses for distribution purposes, it is fully appropriate for this Court to do

so.

48.    Accordingly, this Court should find a very high likelihood that numerosity,

commonality, typicality and adequacy will be satisfied, as required by Rule 23(a)(1)-(4).

## II.    Limited Fund Certification Under Rule 23(b)(1)(B) Is Appropriate Because The Fund Is Inadequate, The Whole Of The Inadequate Fund Is Devoted To Plaintiffs' Claims, And Class Members Will Be Treated Equitably.

49.    New GM misstates the proper uses of Rule 23(b)(1)(B)—contending that limited

fund class actions are rarely used and that a limited fund class is uniquely inappropriate in

bankruptcy.  *See* Objection ¶¶ 70-79.  New GM is wrong on both counts.

50.    To be sure, courts post-*Ortiz*—as in the pre-*Ortiz* era—have not often certified

limited fund class actions, simply because the existence of a classic limited fund, outside of

bankruptcy, is unusual.  But where limited fund scenarios exist, courts since *Ortiz* have certified

Rule 23(b)(1)(B) class actions.  *See*, *e.g.*, *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316 (N.D.

Tex. 2011) (applying *Ortiz* and approving limited fund settlement of class investor claims);

*Altrichter v. Inamed Corp. (In re Silicone Gel Breast Implant Prods. Liab. Litig.)*, 2:97-CV-

11441, 2010 WL 11506713 (N.D. Ala. May 19, 2010) (exhaustively reviewing and applying

*Ortiz* requirements to deny a collateral attack on a prior settlement); *Baker v. Wash. Mut. Fin.*

*Grp., LLC*, 193 F. App'x 294 (5th Cir. 2006) (citing *Ortiz* to approve certification of mandatory

punitive damages settlement class under Rule 23(b)(1)(B)); *Williams v. Nat'l Sec. Ins. Co.*, 237 F.R.D. 685 (M.D. Ala. 2006) (applying *Ortiz* to approve a limited fund settlement that left a regulated entity with sufficient capital to continue operations).   The infrequent use of Rule 23(b)(1)(B) does not foreclose its application in a proper case; the critical inquiry here, as always, is whether the specific requirements of the rule are satisfied (and, as demonstrated below, in this case they are).

51.    New GM also contests the compatibility of Rule 23(b)(1)(B) and bankruptcy. Ample jurisprudence from the Supreme Court, the Second Circuit, and this Court supports a role for Rule 23(b)(1)(B) in bankruptcy in appropriate circumstances, such as this case.    *Ortiz* expressly recognized that "*there is no inherent conflict between a limited fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code . . . .*" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 n.34 (1999) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 292 (emphasis added)).   *Ortiz* even suggests that a defendant would need to be close to insolvent (if not insolvent) for the rule to apply when it stated that "[w]e need not decide here how close to insolvency a limited fund defendant must be brought as a condition of class certification" under Rule 23(b)(1)(B).   *Id.*   The Supreme Court's statement that there is no inherent conflict between limited fund class actions and the bankruptcy code eviscerates New GM's argument that Rule 23(b)(1)(B) is fundamentally incompatible with bankruptcy law.

52.    New GM also overlooks the tight fit between GUC Trust Assets and the traditional object of a limited fund.   As *Ortiz* recognized, historically a limited fund case typically involved multiple claims to a single, tangible "fund," such as a bank account, trust, insurance policy, or proceeds from the sale of an asset, and the claims were greater than the value of the "fund." *Id.* at 834-36.   Indeed, *Ortiz* expressly referred to "*trust assets*" as falling

within the "*[c]lassic*" limited fund class action. *Id.* at 834 (emphasis added). As a bankruptcy trust with fixed assets and no ongoing business, the GUC Trust certainly falls into the traditional rubric of a fixed resource to which, as *Ortiz* recognized, Rule 23(b)(1)(B) applies.

53.    The purpose of certifying a mandatory class is simply to assure all claimants are before the court where their sheer numbers, geographic dispersal, or lack of identification makes their individual joinder impractical. In a bankruptcy, all claimants are typically so joined by other means, such as the notice to creditors. But such notice failed here: All other categories of creditors have been invited to this Court except the settlement class members. Rule 23(b)(1) is the most practical and equitable way to join them now. Doing so does not require the inclusion of already present claimants in the class, and no case so holds.

54.    This Court, too, has acknowledged the compatibility of limited fund class actions and bankruptcy. Citing the Second Circuit, the Court found that "a mandatory non-opt-out [Rule 23](b)(1)(B) class action may be used to accomplish some readjustment of creditors' rights against an insolvent entity, without observing the protections of bankruptcy law" provided that any "groups of claimants who are being treated differently by the settlement" are fairly and adequately represented. *In re Motors Liquidation Co.*, 591 B.R. 501, 509 (Bankr. S.D.N.Y. 2018) (quoting *Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721, 737, 739 (2d Cir. 1992) ("*Manville III*")). Although *Manville III* pre-dates *Ortiz*, the Second Circuit's opinion is consistent with *Ortiz* because of the *Manville III* court's focus on adequate representation—groups of claimants may be treated differently as long as they are treated *equitably*. *Id.*; *see also Ortiz*, 527 U.S. at 855-56 (noting that "[f]air treatment in the older cases was characteristically assured by straightforward pro rata distribution of the limited fund," but observing that a simple pro rata approach may *not* be necessary provided that the settlement

"seek[s] equity by providing for procedures to resolve the difficult issues of treating . . .
differently situated claimants with fairness as among themselves"). This Court posited *Manville
III* as "guidance to the parties moving forward," 591 B.R. at 509, and the parties relied on
*Manville III* and similar cases in crafting the Proposed Settlement.

55.    *Manville III* is not the only Second Circuit opinion to discuss limited fund class
certification in the bankruptcy context. The Second Circuit approved applying Rule 23(b)(1)(B)
to a bankruptcy settlement in *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir.
1992), finding that the defendant's assets were finite, that ongoing litigation would decrease the
size of the limited fund, and that a settlement was necessary to prevent claimants from seeking
unfair advantage through individual litigation. *Id*. at 292-93.[35]  In discussing (and approving of)
*Drexel*, the *Manville III* Court endorsed the *Drexel* Court's finding that the settlement was "a
necessary prerequisite to a successful reorganization plan." *Manville III*, 982 F.2d at 738 (citing
*Drexel*, 960 F.2d at 293).

56.    Applying Rule 23(b)(1)(B) in a manner consistent with the fair, orderly, and
equitable distribution of assets insufficient to meet claims is *precisely* what the proposed
Settlement seeks to accomplish.  Thus, the proposed Settlement is entirely consistent with
bankruptcy law generally and, in the context of this specific litigation, necessary to expeditiously
resolve the predicament that Old GM itself created in depriving Plaintiffs and the putative
Classes of their due process rights to file timely claims.  Although the bankruptcy jurisprudence
under Rule 23(b)(1)(B) is not extensive, courts *have* applied and *will* apply the rule when the

---

[35]    While the court, in *dicta*, commented that a mandatory class action may not be appropriate in most bankruptcy
cases if assets are distributed on a "first come, first served" basis, *id.* at 292, the Second Circuit again approved
use of Rule 23(b)(1)(B) in the bankruptcy context in *Manville*, as discussed above.  And whatever trepidation
the Second Circuit may have with applying the rule in bankruptcy is alleviated by *Ortiz*'s equitable distribution
requirement—a requirement that is manifestly met here, as discussed in greater depth below.

Rule 23(b)(1)(B) requirements are satisfied.  So, the focus should be appropriately placed on those requirements and whether they are satisfied.  As set forth below, they most assuredly are.

**A.    The Fund Is A Classically Limited Fund
Because It Is Inadequate To Satisfy All Claims.**

**1.    The Fund Here Is Paradigmatically Limited.**

57.    The first prong of *Ortiz* is satisfied because the total amount of the Class members' aggregated claims, set at their maximums, far exceeds the funds available to satisfy them.  *See Ortiz*, 527 U.S. at 838.

58.    The Economic Loss Plaintiffs have proffered the reliable conjoint analysis of expert Stefan Boedeker estimating damages exceeding $77 billion, an appropriate tool to establish the limited nature of the fund.  *See* Supplemental Berman Declaration, Ex. B; *see also In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 2010 WL 11506713, at *2 (limited nature of settlement fund established by Ernst & Young report showing that company liabilities dwarfed assets).

59.    As explained in the Rule 23(e) Motion ¶¶ 105-07, there can be no doubt that the fund is inadequate.  If New GM's obligation to contribute 30 million Adjustment Shares is triggered (the maximum amount that may be required under the AMSPA), the value of those shares approximates $1.15 billion.  This is but 1.5% of Proposed Class Claims that exceed $77 billion, at their maximum; therefore, the fund will be wholly inadequate to satisfy the Class members' claims.  Indeed, even if the sizes of the Classes are substantially contracted by rulings that Judge Furman may make on summary judgment in the MDL Action, the maximum value of Class members' claims will continue to dwarf the aggregate value of the Adjustment Shares.  There is sufficient evidence at this juncture to conclude that the ultimate claims value will far exceed the value of the Adjustment Shares to grant preliminary approval.

60.    New GM contends that this Court cannot simply accept the parties' stipulation that a settlement fund is limited.  But that is not what the settling parties are asking the Court to do.  *First*, and as just outlined, the magnitude of Plaintiffs' claims supports a "probable cause" finding that the proposed Settlement will likely be approved and settlement classes ultimately certified—which is the standard at this phase in the proceedings.  It bears reiterating that, under new Rule 23(e), the Court is *not* at this time certifying settlement classes (either on a preliminary or final basis).  *Second*, and unlike in *Ortiz* and the other cases cited by New GM where no record was made of the value of the fund in comparison to the value of the likely claims (*see* Objection ¶ 96), the Court will be reviewing a fulsome record of evidence at the final approval that will enable *an independent valuation of Plaintiffs' claims*.

61.    New GM complains that the fund is not truly limited because GUC Trust Assets remaining after satisfaction of notice costs will be paid to the GUC Trust Beneficiaries.  *See* Objection ¶¶ 98-99.  But it is clear that Rule 23(b)(1)(B) jurisprudence does not require every last dollar be paid to the proposed class.  In *Silicone*, the defendant contributed no assets to the settlement, because its "assets existed only nominally when compared to its rapidly increasing commercial debt as well as the priority interests obtained by the senior secured note holders," 2010 WL 11506713, at *26, yet this did not preclude class certification.  In *Baker v. Wash. Mut. Fin. Grp., LLC*, 193 F. App'x 294 (5th Cir. 2006), the punitive damages limited fund was limited to $3.5 million when Washington Mutual's net worth was estimated to be between $50 and $70 million, yet the Fifth Circuit upheld the certification because Washington Mutual had ceased operations in the state and most of its remaining assets were on the verge of being depleted by a judgment in another court.  *Id.* at 298.  In *Williams v. Nat'l Sec. Ins. Co.*, 237 F.R.D. 685 (M.D. Ala. 2006), the court applied *Ortiz* to approve a limited fund settlement that left a regulated

entity with sufficient capital to continue operations.  And in *Stott v. Capital Fin. Servs.*, 277

F.R.D. 316 (N.D. Tex. 2011), the defendant was left with some assets that allowed it to continue

business (as required by its regulatory body), and additional insurance coverage remained

untapped because it was needed to resolve claims involving the defendant's sale of other

securities.  *Id.* at 332.  The *Stott* court observed that *Baker* and *Williams*:

> allowed for a "limited fund" settlement that preserved some of the assets and the
> operational capacity of the defendant, but where a searching court inquiry and the
> interests of the class as a whole would be served by approval of the settlement.
> *Baker* and *Williams* support approving a "limited fund" settlement that does not
> cause the settling defendant's insolvency by carefully considering all of the facts
> surrounding a company's financial condition and considering the Court's goal of
> ensuring the "the fair and equitable treatment of all claimants."

*Id.* at 334 (quoting *In re Reserve Fund Sec. & Derivative Litig.*, 673 F. Supp. 2d 182, 204

(S.D.N.Y. 2009)).[36]

62.     The facts here are unlike *Ortiz*, where the settlement left untouched the

defendant's $235 million in remaining assets and billions of dollars in untapped insurance assets,

and unlike *Becker v. Adams (In re Telectronics Pacing Sys., Inc.)*, 221 F.3d 870 (6th Cir. 2000)

(relied upon by GM), where the parent company of the defendant was worth over $5 billion, yet

the proposed settlement made those assets unreachable.  In contrast, the proposed Settlement

seeks to recover the maximum amount of Adjustment Shares and the Remaining GUC Trust

Assets are pledged to GUC Trust Beneficiaries.  That some assets are going to other creditors

does not render the fund "adequate" or contrary to *Ortiz*, as demonstrated by *Silicone* and *Stott*.

---

[36]  New GM asserts that *Stott* does not apply here because the *Stott* court concluded, only after a searching inquiry
based on the facts and circumstances at issue, that the settlement was in the best interests of the class.  *See*
Objection ¶ 99.  But this Court will be making the same searching inquiry at the appropriate time, to wit, during
the Final Approval Phase.

### 2.    The Court Need Not Try Plaintiffs' Claims In
### Order To Value Those Claims Before Approving Notice.

63.    New GM contends that the Court cannot determine at this time that the fund is inadequate without holding a full-blown trial of Plaintiffs' claims that includes weighing all liability and damages evidence, determining whether to admit expert testimony, and making rulings on all outstanding factual and legal issues. *See* Objection ¶¶ 80-100.  New GM is simply wrong.  No case at the preliminary approval stage requires such a trial, and New GM fails to cite a single opinion holding such.  As detailed *infra* in Section IV.A, the focus at this juncture— before the Court even contemplates class certification (which occurs at the Final Approval Phase)—is on the whether the negotiations were arm's-length, and whether there is "probable cause" to submit the proposal to the proposed Classes and then *later* hold a full-scale hearing as to fairness.

64.    New GM's attempt to distinguish Plaintiffs' principal authorities fails.   In *Silicone*, the court proceeded with a multi-phase settlement that *first* certified the class for valuation purposes before all issues were determined, including the distribution plan, and before all settlement-implementing measures were completed.  The distribution plan was created *after* initial notice was sent and *after* a subsequent distribution proceeding was held (after which another round of notice to the class was issued detailing the distribution plan).  2010 WL 11506713, at *13.  Thus, before initial notice was sent, the court had not made all of the factual and legal findings necessary to complete the approval process, as New GM insists must be done here.  While New GM tries to distinguish *Silicone* by pointing out that the settlement class was certified prior to *Ortiz* and that the Eleventh Circuit did not review the propriety of Rule 23(b)(1)(B) class certification, *see* Objection ¶ 92, New GM fails to advise the Court that the district court, in denying a collateral attack on the settlement in 2010, applied all of the *Ortiz*

factors and expressly found that the court's pre-*Ortiz* limited fund class certification was proper. Further, the Eleventh Circuit expressed confidence that the *Silicone* settlement might well have survived *Ortiz* review and did not share the defects that doomed the *Ortiz* settlement in the Supreme Court. *Juris v. Inamed Corp.*, 685 F.3d 1294, 1336 n.45 (11th Cir. 2012). *Silicone* remains a persuasive and valuable polestar for this Court to follow.

65.     New GM's contention that Plaintiffs cannot rely on *Stott* (*see* Objection ¶ 99) fares no better. The claims valuation conducted by the *Stott* court will ultimately be mirrored by this Court during the Final Approval Phase of the Proposed Settlement. This will ensure, as it did in *Stott*, that the Court approves "a settlement that realistically provides the best possible recovery for the class as a whole." *Stott*, 277 F.R.D. at 334. But the Court need not, at this preliminary stage, put the cart before the horse and conduct a liability and damages trial.

66.     Indeed, the exacting inquiry that New GM demands now will not even be conducted at the claims estimate stage. Estimating claims under Bankruptcy Code Section 502(c) "provides a means for a bankruptcy court to achieve reorganization, and/or distribution of claims, without awaiting the results of legal proceedings that could take a very long time to determine." *In re Chemtura Corp.*, 448 B.R. 635, 649-50 (Bankr. S.D.N.Y. 2011); *see also O'Neill v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 981 F.2d 1450, 1461 (5th Cir. 1993). A formal trial on the merits is not held, which "would eviscerate the purpose underlying § 502(c) . . . ." *In re Baldwin-United Corp.*, 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985).

67.     And while the court estimates "the expected value of a claim based on the probability of the success of various potential outcomes if decided on the merits," *Chemtura*, 448 B.R. at 650, courts in this District have rejected an "all or nothing basis" that awards "the full value of the claim if the claimant proves its case by a preponderance" but awards "a zero value if

the claimant fails to prove its claim." *Id.* An estimate is just that—an estimate. As one court has remarked: "An estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delay the matter." *In re Nova Real Estate Inv. Tr.*, 23 B.R. 62, 66 (Bankr. E.D. Va. 1982). Thus, while a detailed record of the value of Plaintiffs' claims compared the value of the fund will be developed at the Final Approval Phase, the *trial* that New GM now demands at this preliminary approval stage is unnecessary.

### 3.    The Court Need Not Find That The Claims Are "Liquidated" Before Approving Notice.

68.    New GM incorrectly asserts that the Economic Loss Plaintiffs' claims must be "liquidated" within the meaning of the Bankruptcy Code before the Court can determine that it is likely that the fund will be found to be inadequate. *See* Objection ¶¶ 82-92. Instead, the cases make clear that, upon a proper record at the final approval phase in a Rule 23(b)(1)(B) case, class members' claims need not be liquidated as long as there is a "reasonable method by which to calculate, or even estimate, with comfortable certainty, [defendant's] potential liability to the class members." *Doe v. Karadzic*, 192 F.R.D. 133, 140 n.11 (S.D.N.Y. 2000) (quoting *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. MDL 1203, CIV. A. 98–20594, 1999 WL 782560, at *7 (E.D. Pa. Sept. 27, 1999)). New GM's suggestion that only fully liquidated bankruptcy claims could satisfy *Ortiz* makes no sense, and flies in the face of the Supreme Court's admonition that that potential value of the claims is to be set at its "maximum[]." 527 U.S. at 838.

69.    Although New GM attempts to muddy the waters, its authorities present the same rule advocated by Plaintiffs: at the *final* approval stage, the Court can find the first prong of the *Ortiz* inquiry satisfied where there is sufficiently reliable evidence of class member damages

such that those damages, set at their maximum potential, exceed the value of the maximum potential funds available to pay the claims. *See Karadzic*, 192 F.R.D. at 140, n.11 (stating rule but denying certification on other grounds); *Stott*, 277 F.R.D. at 328 (determining that, based on the evidence regarding class members' damages presented to the court, "the amount contemplated is a 'sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages'" to determine that a limited fund exists) (citation omitted); *In re Diet Drugs*, 1999 WL 782560, at *7 (stating rule and denying final approval of mass tort claim under Rule 23(b)(1)(B), in part because of a lack of sufficiently reliable evidence as to aggregated liquidated value of class members' claims); *Klein v. O'Neal, Inc.*, No. 7:03-CV-102-D, 2006 WL 325766, at *4-5 (N.D. Tex. Feb. 13, 2006) (stating rule and denying non-settlement class certification of mass tort claim under Rule 23(b)(1)(B), in part because "plaintiffs' estimate of potential claim liability does not provide the court with any comfortable certainty of the total value of the claims.").

70.    By the time the Court is called upon to grant or deny class certification at the *final* approval stage, Judge Furman will have decided outstanding legal issues, including the validity of Mr. Boedeker's damages methodology.  By extrapolation, this Court will be able to determine the maximum value of the Economic Loss Plaintiffs' claims here.  The record before this Court on final approval will therefore be exceedingly reliable and exact.

71.    Even so, *here at the preliminary approval stage*, the Economic Loss Plaintiffs provide substantial reliable evidence as to the maximum value of their claims.  Based on reliable conjoint methodology routinely upheld by courts, the maximum value of the Classes' claims equals or exceeds $77 billion dollars.  Such is easily sufficient at the preliminary approval phase, and New GM cites no authority to the contrary.

4.    **Ample Evidence Supports Plaintiffs' Claims.**

72.    New GM unleashes a fusillade against Plaintiffs' claims in the MDL Action via several pages of improper, single-spaced sound-bites intending to summarize New GM's motion for summary judgment, *Daubert* motions, and opposition to Bellwether class certification. *See* Objection ¶¶ 85-89. While, for reasons articulated in this Reply, this is not the appropriate time and place to try Plaintiffs' claims, a few comments are in order to set the record straight here.

73.    In conducting massive discovery for over four years of litigation in the MDL Action, the MDL plaintiffs constructed a detailed, comprehensive, and compelling record of Old and New GM's liability and the damage wrought. As revealed in Plaintiffs' Opposition to General Motors LLC's Motion for Summary Judgment Against the Bellwether Economic Loss Plaintiffs, its associated Statement of Undisputed Material Facts, and the Economic Loss Plaintiffs Offer of Proof in support of bellwether class certification,[37] for years Old GM (and later New GM) knowingly sold millions of cars containing serious safety defects to unsuspecting consumers who paid a price reflecting the belief that the cars had no known safety defects. Old GM and New GM placed their customers and the public in grave danger by hiding the truth until New GM was finally forced to issue historic recalls of millions of defective vehicles in 2014. The recalls are themselves admissions of defects; the undisputed record also shows that Old GM and New GM knew the vehicles were defective when sold and failed to disclose this material information.

74.    New GM includes a lengthy attack on Plaintiffs' conjoint damages expert Stefan Boedeker, yet conjoint analysis is one of the most widely-used quantitative methods of market

---

[37]    These three documents, in unredacted form, are attached as **Exhibits E through G** to the Supplemental Berman Declaration. Because the supporting exhibits to these pleadings are voluminous, Plaintiffs have not included them but can provide them if the Court wishes to review the exhibits.

research and "has been used for decades as a way of estimating the market's willingness to pay for various product features." *Guido v. L'Oréal, USA, Inc.*, Nos. 2:11-cv-01067, 2:11-cv-05465, 2014 WL 6603730, at *5 (C.D. Cal. July 24, 2014).   Numerous courts across the country, including those evaluating Mr. Boedeker's testimony, have accepted choice-based conjoint analysis of the type that Mr. Boedeker proffers as a reliable methodology for calculating price premiums on a class-wide basis in consumer class actions, including to determine the "but-for" market value of automobiles with undisclosed defects.   *See, e.g.*, *Broomfield v. Craft Brew Alliance, Inc.*, No. 17-cv-01027, 2018 WL 4952519, at *14-20 (N.D. Cal. Sept. 25, 2018); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1106-1110 (N.D. Cal. 2018); *Price v. L'Oréal USA, Inc.*, 17 Civ. 614, 2018 WL 3869896, at *9-11 (S.D.N.Y. Aug. 15, 2018); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936 (N.D. Cal. 2018) (Boedeker was conjoint expert); *Dzielak v. Whirlpool Corp.*, No. 2:12–0089, 2017 WL 1034197, at *5-6 (D.N.J. Mar. 17, 2017); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 334 (D.N.H. 2017) (Boedeker was conjoint expert); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 601, 604-06 (N.D. Cal. 2018); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015); *In re ConAgra Foods Inc.*, 90 F. Supp. 3d 919, 1022-32 (C.D. Ca. 2015); *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1120 (W.D. Wash. 2012).   Mr. Boedeker's methodology hues closely to these widely-accepted conjoint principles.

75.   Mr. Boedeker estimates class-wide damages by comparing overall consumer demand for Old GM vehicles *with* knowledge of the defects at issue in this litigation (the but-for world) to overall consumer demand for Old GM vehicles *without* knowledge of those defects (the actual world).   The difference in the *with* and *without* demand curves, considered together with the actual supply of vehicles sold by Old GM to class members, provides class-wide proof

that all class members suffered economic losses as a result of Old GM's alleged wrongful conduct. Mr. Boedeker estimated aggregate demand curves based on regression analysis, which provides class-wide evidence that all class members suffered economic loss regardless of any individual willingness-to-pay. He then estimated damages by conducting a "but for" analysis in which Old GM sold the actual number of vehicles it sold in the real world but had to disclose the truth about those vehicles. This is the exact supply-side methodology—measuring damages based on the supply of products *actually* sold by the defendant to class members—that courts endorse without exception. *See, e.g.*, *Broomfield*, 2018 WL 4952519 (rejecting challenge to analysis by Mr. Boedeker); *Hadley*, 2018 WL 3954587.[38]

76.    New GM's assault on Mr. Boedeker's methodology fails.[39] For instance, New GM consistently mischaracterizes Mr. Boedeker's survey and his conjoint analysis of the responses gathered in that survey. *See* Objection ¶ 88. In particular, New GM falsely claims that Mr. Boedeker measures each individual survey respondent's willingness to pay for certain features of Old GM vehicles. To the contrary, he estimates *overall* demand for Old GM vehicles with consumer knowledge of the defects at the time of sale and overall demand for Old GM vehicles *without* consumer knowledge of the defects at the time of sale, and then measures the downward shift in the demand curve when consumers learn of defects at the time of sale. This empirically-determined downward shift, with supply fixed at the number of vehicles actually sold by Old GM to class members, provides class-wide proof of the losses suffered by class members.

---

[38]    *Accord In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936 (N.D. Cal. 2018); *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2018 WL 2325426 (N.D. Cal. May 8, 2018); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018); *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D.N.H. 2017); *In re Lenovo Adware Litig.*, 15-md-02634, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016).

[39]    *See* Plaintiffs' Opposition to New GM's *Daubert* Motion to Exclude the Opinions of Stefan Boedeker, an unredacted version of which is found at **Exhibit H** to the Supplemental Berman Declaration.

77.     New GM's many legal arguments against liability also do not withstand scrutiny. For instance, New GM contends that Plaintiffs did not suffer any benefit-of-the-bargain damages because New GM fixed the cars.  *See* Objection ¶ 89.  Yet, New GM's assertion that the Economic Loss Plaintiffs have no recoverable damages as a result of its belated recalls is inconsistent with the MDL Court's repeated holdings that the Economic Loss Plaintiffs' benefit-of-the-bargain damages were incurred at the point of sale *and* that post-sale facts have no relevance to benefit-of-the-bargain analysis.  Such is the law, and neither Old GM nor New GM can avoid responsibility for the economic impacts of its fraud with belated recalls that (even if effective) neither compensate the Economic Loss Plaintiffs for their overpayment nor deprive Old GM or New GM of their ill-gotten gains.  In any event, the record shows that the recall "remedies" for the defective ignition switches at issue here were *not* effective.

78.     In short, while it is not necessary to prove Plaintiffs' claims at this juncture, Plaintiffs have compelling, if not devastating, evidentiary retorts to New GM's mischaracterization of the factual record in the MDL.

**B.     The Whole Of The Inadequate Fund Is Devoted To Plaintiffs' Claims.**

79.     The second prong of *Ortiz*—that "the whole of the inadequate fund . . . be devoted to the overwhelming claims," *Ortiz*, 527 U.S. at 839—ensures that "the defendant . . . with the inadequate assets ha[s] no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class" and "the class as a whole [is] given the best deal . . . ."  *Id.*  The proposed Settlement furthers these goals.  It does not permit the GUC Trust "to benefit [itself] or claimants of lower priority by holding back on the amount distributed to the class . . . ."  *Id.*  The only amount "held back" is the Remaining GUC Trust Assets, which will be distributed to existing GUC Trust Beneficiaries and not retained by the GUC Trust or distributed

to claimants of lower priority.  And, as demonstrated *infra* in ¶¶ 85-88, the Classes are receiving

the "best deal" by obtaining *exclusive* access to the Adjustment Shares.

80.    New GM makes two arguments that are wholly unsupported, to wit, that the

limited fund is impermissibly shared between two classes and with non-class members and

(*inconsistently*) that the limited fund is impermissibly not made available to all creditors.  *See*

Objection ¶¶ 102-05.

81.    New GM cites no authority for its contention that the limited fund cannot be

shared between the two proposed Settlement Classes.  That is because *Ortiz* expressly approved

limited fund sharing amongst subclasses with adequate representatives, which is functionally no

different than two classes with adequate representatives.  No court has held otherwise.  The

pivotal inquiry becomes whether the classes (like any subclasses) are treated *equitably*, which is

the third and final *Ortiz* factor reviewed below.

82.    New GM likewise fails to cite any legal authority supporting its contention that

sharing the limited fund with certain Pre-Closing Accident Plaintiffs is impermissible.  Whether

the small handful of Pre-Closing Accident Plaintiffs remaining are included in the class or named

as individuals is immaterial at this point.  All Plaintiffs must be present and included in order for

an equitable allocation to occur.  The point is to achieve and inclusive and equitable distribution

of insufficient funds through joinder of all claimants.

83.    There are two ways to do this under the joinder provisions of the Federal Rules:

(1) name and join everyone, which is practicable for a relatively small group of claimants (like

the Pre-Closing Accident Plaintiffs who are signatories to the Settlement Agreement); or

(2) define them as a class for a group like the Economic Loss Plaintiffs who are so numerous that

individual joinder is impracticable.  Such an arrangement is completely consistent with *Ortiz*,

especially when the distribution is done equitably—as it will be.  Indeed, as *Ortiz* itself recounts, in tracing the history of the limited fund and the "antecedents of the mandatory class action," the point is not which joinder mechanism is used—all "similar claims" could be brought "directly or by representation before the court"—but that all were present in some form.  *See Ortiz*, 527 U.S. at 840-841.  In other words, because the GUC Trust Assets are being equitably distributed among all remaining GUC Trust Beneficiaries, the remaining "limited fund" is indeed being "devoted to the overwhelming claims."

84.    This procedure is also consistent with Rule 23(b)(1)(B) jurisprudence holding that the limited fund class itself need not receive 100% of all available value.  *See supra* ¶ 61 (citing *Silicone*; *Stott*; *Baker*; *Willliams*).

85.    And the classes are receiving the "best deal" under this structure, because obtaining exclusive access to the Adjustment Shares provides Class members with a better deal than they would receive if they successfully prosecuted the Proposed Class Claims and ultimately shared in Remaining GUC Trust Assets and Adjustment Shares on a *pro rata* basis with existing GUC Trust Beneficiaries.  There is sufficient evidence for the Court to preliminarily conclude that the proposed Settlement provides Class members with a superior chance of recovering substantial monies, particularly given Rule 23(e)(2)'s command that the Court consider "the costs, risks, and delay of trial and appeal."  The road to recovery via the late claims process is perilous.  The GUC Trust has asserted various defenses, including untimeliness and equitable mootness.

86.    Even if the Economic Loss Plaintiffs can overcome these defenses, the prospect of substantial recovery is dimmed by the possibility of sharing the Remaining GUC Trust Assets and Adjustment Shares with other GUC Trust Beneficiaries.  If the late claims process generates

the minimum amount necessary to trigger the issuance by New GM of the maximum amount of Adjustment Shares (approximately $10.15 billion), the amount of Allowed General Unsecured Claims would increase from about $31.85 billion to $42 billion. *See* Rule 23(e) Motion ¶ 113. This would leave approximately $1.6 billion to satisfy all claims (approximate value of the Adjustment Shares of $1.15 billion plus the $457.9 million value of the Remaining GUC Trust Assets). *See id.* And this amount would be distributed on a *pro rata* basis to all Allowed General Unsecured Creditors, providing each Plaintiff with a recovery of less than 4 cents on the dollar. *See id.*[40]

87.    In contrast, the proposed Settlement is a far superior outcome. It removes the litigation risks with respect to the GUC Trust's defenses, and sets the stage for potentially distributing approximately $1.15 billion to satisfy the proposed Class members' aggregate claims of $10.15 billion, which would provide each Plaintiff with approximately 11 cents on the dollar. *See id.* ¶ 114. And the same result obtains if proposed Class members' claims are estimated in an amount sufficient to trigger the Adjustment Shares but at a level that does not trigger the maximum amount of those Shares. This relatively simple math exercise demonstrates that the relief in the proposed Settlement is likely to be fair, reasonable, and adequate.[41]

88.    Similarly, New GM's contention that Rule 23(b)(1)(B) cannot be used unless all potential creditors are included in the class fails. There simply is no authority supporting this novel view which, of course, is the exact *opposite* of New GM's feigned concern about the limited fund being shared with non-class members. New GM quotes *Ortiz* as holding that the class must "include all those with claims unsatisfied at the time of the settlement negotiations,"

---

[40]    Rule 23(e) Motion p.38 n.45 (explaining why increasing the assets available for distribution by clawing back prior distributions of GUC Trust Assets is most improbable).

[41]    *See* Declaration of Edward S. Weisfelner filed contemporaneously herewith.

*Ortiz*, 527 U.S. at 864, but New GM left out the full clause, which gives the proper context. What the court actually said was that it was "equally essential *under Rules 23(a)* and (b)(1)(B) that the class include all those with claims unsatisfied at the time of the settlement negotiations, with intraclass conflicts addressed by recognizing independently represented subclasses." *Id.* (emphasis added). Thus, the court was referring to the need to ensure that all potentially adverse interests within the class had adequate representatives, an issue that was particularly at the forefront of the court's concern in *Ortiz* given the presence in the class of present and future asbestos claimants. The court was not referencing, for example, all claimants in a bankruptcy.

89.    New GM also cites Judge Gerber's opinion in *In re Motors Liquidation Co.*, 447 B.R. 150, 163 n.53 (Bankr. S.D.N.Y. 2011), for the proposition that a limited fund cannot be shared solely amongst class action claimants but must instead be shared by all creditors. But Judge Gerber's suggestion does not apply here. *First*, the motion before the Court was to certify a class under Rule 23(b)(3), not Rule 23(b)(1)(B), and Judge Gerber's statement about limited fund certification was *dicta* contained in a footnote to his discussion of *Doe v. Karadzic*, 176 F.R.D. 458 (S.D.N.Y. 1997), where a Rule 23(b)(3) motion had been converted to Rule 23(b)(1) given the defendant's limited resources.

90.    *Second*, the timing of Judge Gerber's *dicta* is important and further renders it inapplicable here. Judge Gerber was determining whether to certify a class of Apartheid victims at a time in this bankruptcy when many creditors were pressing competing claims. In the Court's words, "Old GM ha[d] a large number of other creditors who likewise have claims against Old GM's assets." 447 B.R. at 162 n.53. The context is completely different now, where the proposed Settlement, if approved, would wind down the administration of the GUC Trust and effectuate final distributions to GUC Trust Beneficiaries. The class, unlike other creditors, was

not invited to the creditors' table. *See Ortiz*, 527 U.S. at 841 n. 18. The 23(b)(1) settlement class categorically corrects that failure.

91.    Thus, rather than frustrate the purposes of bankruptcy law, as limited fund certification in favor of a small group of creditors may have done early in the proceedings, limited fund certification now *advances* the interests of all remaining parties who look to the GUC Trust to satisfy claims under the Plan—the GUC Trust Beneficiaries and the Plaintiffs.

### C.    Class Members Will Be Treated Equitably.

92.    New GM contends that the third prong of *Ortiz*—that claimants identified by a common theory of recovery be treated equitably among themselves—cannot be satisfied. More particularly, New GM argues that: (i) the Economic Loss Plaintiffs (a) do not advance a common theory of recovery because groups of plaintiffs were subject to different recalls; and (b) by virtue of residing in different states, pursue different causes of action that vary by jurisdiction, and that (ii) class members are not being treated equitably because the Economic Loss Plaintiffs have not yet proposed subclasses. *See* Objection ¶¶ 106-13.

93.    New GM mischaracterizes the applicable test. It is not that Class members have a common theory of recovery *and* are treated equitably; the test, as prescribed by *Oritz*, is that "the claimants identified by a common theory of recovery were treated equitably among themselves." *Ortiz*, 527 U.S. at 839. In other words, claimants who pursue similar theories of recovery must be treated equitably (which presupposes, of course, that claimants with different theories of recovery need not necessarily be treated equitably). Here, all Class members pursue common theories of recovery under state unfair and deceptive trade practices acts and discrete common law claims such as fraudulent concealment, implied warranty, and unjust enrichment; as discussed below, any material differences in the circumstances of groups of Class members will be accommodated, if necessary, through sub-classing at the allocation phase.

42

94.     Further, minor differences in state law will not vitiate the common theories of recovery that all Class members pursue to remedy Old GM's misconduct.  In arguing otherwise, New GM is attempting to import a predominance of common issues *litigation* standard under *Rule 23(b)(3)* to this proposed *settlement* under *Rule 23(b)(2)*.  Predominance is not a factor in evaluating settlement classes, let alone under Rule 23(b)(2) where it is not even a required element.[42]

95.     New GM argues that Judge Furman has precluded any approach that applies multi-state law, *see* Objection ¶ 108, but Judge Furman has made no such finding; the parties are proceeding with a three-state Bellwether class certification procedure at the MDL Court's suggestion and by agreement of the parties in order to facilitate the class certification process in the MDL Action.  But even if Judge Furman had found that common issues did not predominate by virtue of the nationwide scope of Plaintiffs before the MDL Court, that—again—would have no bearing here under Rule 23(b)(1)(B) where predominance is not relevant.

96.     Not surprisingly, New GM's cases do not support its incorrect common theory of recovery test.  *Diet Drugs* and *In re Joint E. & S. Dist. Asbestos Litig.* (*see* Objection ¶¶ 109-11) are inapposite because they involved a plethora of individual causation issues relating to drug and asbestos exposure and personal injuries and death, whereas here the focus is on a small set of vehicles subject to a smaller set of recalls and Old GM's common course of conduct in concealing those defects from the Classes and depriving Plaintiffs of their right to file timely claims in this bankruptcy.  *Even so, New GM overlooks the fact that the* <u>*Silicone*</u> *court certified a*

---

[42]    New GM also mischaracterizes the Plaintiffs' common interest.  Regardless of the defect in their vehicles, Class members have a common interest in maximizing the number of Adjustment Shares through Plaintiffs' claims for damages against Old GM, which they are permitted to bring because Plaintiffs have suffered a common due process violation.  All Plaintiffs and Class members alike are united in seeking to obtain the maximum amount of Adjustment Shares.

*nationwide class of tens-of-thousands of breast implant recipients—some with existing injuries and some without—who pursued diverse state-law claims.*

97.    Turning to New GM's assertion that the equitable treatment requirement mandates the creation of sub-classes at this early phase of the settlement, the case law demonstrates otherwise; the Court does not need to make decisions regarding sub-classing at this phase.  For example, in *Silicone*, the settlement, like the one proposed here, proceeded in a phased manner.  In the first phase, the court found that a limited fund existed, certified the limited fund class, and approved the settlement as fair, adequate, and reasonable and the product of non-collusive, good-faith bargaining.  2010 WL 11506713, at * 12.  In doing so, the court overruled objections to the settlement's lack of a predetermined plan for the fund's distribution, leaving the issue for later consideration as "not essential to determination of the initial question of whether the overall settlement fund available for distribution is adequate in the circumstances."  *Id.*  In the second phase, class counsel presented a distribution plan that called for a *pro rata* division of the entire settlement fund among all claimants without regard to each claimant's level of injury.  The court preliminarily approved the distribution plan, directed that it be explained in another notice sent to the class, then granted final approval of the distribution plan in which each claimant received approximately $725.  *Id.* at *13.

98.    In discussing the equitable treatment requirement, the *Silicone* court carefully observed that "equitable treatment" for limited fund purposes does not necessarily equate to "equal treatment" and, instead, requires that procedural safeguards be implemented to ensure that—to the extent that any class members are treated differently—all claimants are treated fairly.  *Id.* at *25.  This, of course, is consistent with *Ortiz*'s suggestion that a simple pro rata approach may *not* be necessary provided that the settlement "seek equity by providing for

procedures to resolve the difficult issues of treating . . . differently situated claimants with fairness as among themselves." 527 U.S. at 855-56.[43]

99.     Class certification is an equitable inquiry and sufficiently flexible to permit a phased approach. As in *Silicone*, the need for subclasses—if any—can be determined later in the distribution phase. For now, all members of the Classes are united by a common quest to obtain the largest amount of Adjustment Shares as is possible.

100.     Notably, this case does not present the types of conflicts that afflicted the doomed asbestos-related settlement in *Ortiz*, where there were conflicts between: (i) the currently injured, who wanted generous, immediate payments; and (ii) the interests of exposure-only plaintiffs, who wanted to ensure the availability of ample funds in the future. There were also conflicts between: (i) those who were exposed to Fibreboard's asbestos products before 1959 during the time period covered by the insurance policy with the most coverage; and (ii) those who were exposed after 1959, when policies with lower limits were in place. *See Ortiz*, 527 U.S. at 856-57. Because the settlement lacked structural safeguards to protect disparate groups of class members, "the conflict was as contrary to the equitable obligation entailed by the limited fund rationale as it was to the requirements of structural protection applicable to all class actions under Rule 23(a)(4)." *Id.* None of these intra-class inequity issues are present here, where all members of the proposed Classes were denied due process, suffered economic losses, and seek recovery from the same source.

101.     For similar reasons, New GM's reliance on *Bd. of Comm'rs of Orleans Parish Levee Dist. v. Brinkmeyer (Katrina Canal Breaches Litig.)*, 628 F.3d 185 (5th Cir. 2010), is

---

[43]     Notably, *Ortiz* cast doubt on the prospect that subclasses are always necessary to accommodate differences in the strengths of certain plaintiffs' claims. In commenting that "at some point there must be an end to reclassification with separate counsel" (*id.* at 857), the Court foresaw that there would likely be instances where sub-classing is not necessary to cover any and all potential conflicts that may arise.

misplaced. There, the settlement failed to include procedures for differentiating among class members possessing a wide variety of injuries at issue there—death, personal injury, and property damage. *Id.* at 193-94. This diversity of injury is simply not present here, where all Plaintiffs suffered the same type of damage—economic loss.

III.    **It Is Likely That The Court Will Be Able To Certify The Classes Under Rule 23(b)(1)(A).**

102.    New GM's arguments that Rule 23(b)(1)(A) cannot be satisfied fail. The requirements of Rule 23 (b)(1)(A) are met because the GUC Trust must treat the Ignition Switch Plaintiffs and the Non-Ignition Switch Plaintiffs alike as contingent GUC Trust Beneficiaries who hold disputed general unsecured claims that are subject to resolution. *See* Rule 23(e) Motion ¶ 122. Multiple adjudication of the same common issues, those regarding Old GM's knowledge and concealment of defects, could lead to inconsistent results.

103.    As an initial matter, having earlier professed not to know who the class representatives are (and then also saying that whoever they are, they are atypical), New GM now says that there are only two representatives who filed late proofs of claim and, as between the two of them, there are no risks of inconsistent judgments. *See* Objection ¶ 115. This ignores that the late proofs of claim were filed on class bases.

104.    New GM's core argument is that monetary damages are purportedly unavailable in a Rule 23(b)(1)(A) class, but this ignores the remedies Plaintiffs are seeking (equitable remedies under the terms of the Sale Order).

105.    New GM is also incorrect that monetary remedies (however denominated) are not available, or that they should not be available, in a Rule 23(b)(1)(A) class. In fact, this case is analogous to an ERISA case where the class's collective interest in triggering and maximizing the Adjustment Shares is similar to a suit on behalf of an ERISA plan. *See, e.g., Harris v.*

*Koenig*, 271 F.R.D. 383 (D.D.C. 2010) (Rule 23(b)(1)(A) class certified in ERISA action brought against the fiduciaries of an employee retirement and savings plan where the relief sought was "primarily monetary" and plaintiffs sought recoupment of loss to plans). Just as there is a legal/fiduciary requirement by plan fiduciaries not to discriminate between/among plan members, courts look at whether the party opposing the class has a *practical* or legal requirement to treat individual class members alike. 2 William B. Rubenstein; Alba Conte, Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 4:7 (5th ed. 2011).

106.    Even outside the paradigmatic ERISA/trust context, Rule 23(b)(1)(A) cases are appropriate where monetary relief is sought. *See, e.g., White v. Nat'l Football League*, 822 F. Supp. 1389 (D. Minn. 1993) ("even where a class action involves claims for money damages, mandatory non-opt-out class certification remains proper as long as the class claims for equitable or injunctive relief predominate over the claims for damages").

107.    Recently, Rule 23 expert and law professor Robert Klonoff analyzed this precise issue of monetary relief under Rule 23(b)(1)(A). *See generally* Klonoff, *Class Actions for Monetary Relief Under Rule 23(b)(1)(A) and (b)(1)(B): Does Due Process Require Notice and Opt-Out Rights?*, 82 Geo. Wash. L. Rev. 798 (2014) (available at https://www.gwlr.org/wp-content/uploads/2018/01/82-Geo.-Wash.-L.-Rev.-798.pdf). As Professor Klonoff noted, among other points: (a) the drafters of Rule 23(b)(1)(A) appeared to contemplate the inclusion of monetary remedies available under that sub-section; (b) the original cases cited for that sub-section included a monetary remedies case; and (c) the courts that have allowed monetary remedies under this sub-section have observed, rightly, that the section would be duplicative of Rule 23(b)(2) were it otherwise.

108.    Here, under the Plan and the GUC Trust Agreement, the GUC Trust must treat each Plaintiff claim alike as contingent GUC Trust Beneficiaries holding disputed general unsecured claims that are subject to resolution per the Settlement Agreement.    Likewise, Plaintiffs have suffered a common due process violation when they failed to receive constitutionally adequate notice of the Bar Date, are bringing general unsecured claims against Old GM for damages, and are seeking collectively to trigger the maximum amount of Adjustment Shares.  All class members are being treated the same for purposes of the Settlement: each is being given an equal and indivisible chance to attempt to trigger the maximum amount of Adjustment Shares.   Rule 23(b)(1)(A) is satisfied.

## IV.    Movants Have Handily Satisfied The Requirements Of Revised Rule 23(e).

### A.    The Amendments To Rule 23 Reinforce Longstanding Practice In This Circuit Regarding A Court's Role in Initially Evaluating A Proposed Settlement.

109.    As it did in its Stay Motion, New GM devotes considerable space in its Objection to suggesting that revised Rule 23(e) makes settlement approval impossible here.  Plaintiffs thus repeat the reasons this is wrong.

110.    Rule 23, as revised as of December 1, 2018, directs that the Court determine whether it "will be likely" to grant final approval under Rule 23(e)(2) and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B).  These recent amendments reflect the longstanding practice in this Circuit of determining whether there is "'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 11 MD 2262, 12 Civ. 5723, 2018 WL 3475465, at *1 (S.D.N.Y. July 19, 2018) (quoting *In re Traffic Exec. Ass'n E. R.R.s*, 627 F.2d 631, 634 (2d Cir. 1980).  This has involved an initial assessment of "procedural" fairness, focused on whether the settlement resulted from arm's-length negotiations informed by developed facts, *see Wal-*

*Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005), and of the agreement's

terms—collectively, the "*Grinnell* factors." *See, e.g.*, *Ortiz v. Chop't Creative Salad Co.*, No. 13

Civ. 2541, 2014 WL 1378922, at *11 (S.D.N.Y. Mar. 25, 2014) (citing *City of Detroit v.*

*Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

111.    The newly amended Rule 23 does not change this fundamental inquiry. *See* Fed.

R. Civ. P. 23(e)(2) advisory committee's note (observing "[c]ourts have generated lists of factors

to shed light on" whether a proposed settlement is "fair, reasonable, and adequate," and noting

"[t]he goal of this amendment is not to displace any factor"). But the Rule now "focus[es]" the

inquiry on "the primary procedural considerations and substantive qualities that should always

matter to the decision whether to approve the proposal," *id.*—that is, whether:

> (A) the class representatives and class counsel have adequately represented the
> class; (B) the proposal was negotiated at arm's length; (C) the relief provided for
> the class is adequate, taking into account: (i) the costs, risks, and delay of trial and
> appeal; (ii) the effectiveness of any proposed method of distributing relief to the
> class, including the method of processing class-member claims; (iii) the terms of
> any proposed award of attorney's fees, including timing of payment; and (iv) any
> agreement required to be identified under Rule 23(e)(3); and (D) the proposal
> treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Those factors, which largely reflect the *Grinnell* framework, are readily

satisfied here.

112.    Rule 23(e)(2)'s first two factors "look[] to the conduct of the litigation and of the

negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2)(A) & (B) advisory

committee's note. Here, the history of the case leaves no doubt about the arm's-length nature of

the settlement. As the Court is aware, following the filing of the hotly-contested Late Claims

Motions, the various parties, including the Economic Loss Plaintiffs, entered into settlement

negotiations with the GUC Trust and certain GUC Trust Beneficiaries culminating in the

completion of an agreement that the Economic Loss Plaintiffs considered final. Nevertheless,

49

the parties litigated *through trial* the question of whether the agreement was enforceable. This Court held it was not. This resulted in another round of negotiations, with final arm's-length discussions occurring after this Court's ruling as to the applicability of Rule 23. *See* Rule 23(e) Motion ¶¶ 5-7; 130-131 (noting the involvement, and relevance of the involvement, of capable, experienced counsel).

113.    Further, the negotiations in each instance were on the heels of heavily-contested litigation over whether Old GM violated due process and the knowledge of Old GM as to the defects at issue. *See* Rule 23(e) Motion ¶¶ 3-4. This is a mature record.

114.    Next, Rule 23(e)(2)(C) and (D) direct this Court to evaluate whether "the relief provided for the class is adequate" and "the proposal treats class members equitably relative to each other." This Court must also ultimately assess the Settlement's effectiveness in distributing relief to the Settlement Class. Fed. R. Civ. P. 23(e)(2)(C)(ii). Here, these elements are handily satisfied, as the Economic Loss Plaintiffs addressed in their Rule 23(e) Motion. *See* Rule 23(e) Motion ¶¶ 3-4. Notably, the Class members all have a common interest in maximizing the Adjustment Shares, have all suffered a common due process violation, and will all be subject to the same allocation process.[44] There are no future Class members.

115.    Turning to whether the Court will likely be able to certify a class, as the Advisory Committee Notes summarize, "if a class has not been certified, the parties must ensure that the court has a basis for concluding that it will be able, after the final hearing, to certify the class. Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record." Fed. R. Civ. P. 23(e)(2) advisory committee's note. Moreover, the risk of maintaining

---

[44]    The allocation stage will entail the involvement of Magistrate Judge Cott, S.D.N.Y.

litigation purposes class certification in the absence of settlement remains a factor for the court's consideration, as does the recognition that a class settlement reasonably eliminates this risk on both sides: "If the class has not yet been certified for trial, the court may consider whether certification for settlement would be granted were the settlement not approved." *Id*. The Second Circuit's class settlement approval factors, which expressly include "the risks of maintaining class action through trial," *see Charron v. Weiner*, 731 F. 3d 241, 247 (2d Cir. 2013), remain in full force and effect.

116. Thus, New GM is wrong to suggest that it is somehow harder to certify a class for settlement purposes than for litigation purposes. The point is whether there is a basis for this Court to conclude that it will likely be able to certify this proposed Rule 23(b)(1) class on the ample record presented. The timing proposed under the current schedule accommodates exactly that process.

### B.     **New GM's Notice Argument is Unavailing.**

117. Finally, New GM devotes several pages to the notice plan (*see* Objection ¶¶ 65-69) without actually identifying any infirmity with the notice plan except one that is addressed in the schedule: whether pre-recall purchasers have claims and, thus, whether they should receive notice of the Settlement. New GM offers no reason, let alone a constitutional reason, why the Plaintiffs' notice plan does not provide notice and opportunity to be heard to the settlement class whether or not it includes pre-recall sellers. Accordingly, the form and manner of notice should be approved.

V.    **The Settlement Agreement Does Not
Effectuate An Impermissible Plan Modification.**

A.    **New GM Does Not Have Standing To Raise A Plan Modification Argument.**

118.    New GM contends that permitting existing GUC Trust Beneficiaries, rather than

Plaintiffs, to receive the Remaining GUC Trust Assets constitutes an impermissible plan

modification.    To establish standing to raise the plan modification argument, New GM must

satisfy the three distinct requirements of standing: (i) prudential standing; (ii) constitutional

standing; and (iii) Bankruptcy Code Section 1109 standing.    *See In re Motors Liquidation Co.*,

580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018).    Prudential standing "bars litigants 'from asserting

the constitutional and statutory rights of others in an effort to obtain relief for injury to

themselves.'"    *Id.* (quoting *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d

636, 643 (2d Cir. 1988)).    Constitutional standing requires an injury "that is 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical.'"    *Id.* at 341 (quoting

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).    "Party in interest" standing under

Bankruptcy Code Section 1109(b) requires New GM to show that it is either a party enumerated

in the statute or "(1) have a 'direct' stake in the proceeding and (2) 'be a creditor of a debtor . . .

or be able to assert an equitable claim against the estate.'"    *Id.* at 342 (citation omitted).[45]    New

GM has failed to meet this burden and, thus, does not have standing to raise its plan modification

argument.

119.    New GM contends that any recoveries that Plaintiffs may receive from the GUC

Trust may offset New GM's liability in the MDL Court, and thus, New GM "has a direct

financial interest in ensuring that existing GUC Trust Assets are used to satisfy" Plaintiffs'

claims.    *See* Objection ¶ 155.    New GM would not suffer this purported "harm" of a reduced

---

[45]    This Court has already ruled that "New GM is no longer a creditor, as its proof of claim has been withdrawn."
*Id.* at 350.

offset unless and until the following occurs:  (i) the Settlement is approved; (ii) following the estimation proceedings, New GM is required to issue Adjustment Shares; (iii) Plaintiffs receive a recovery from the Adjustment Shares; (iv) those same Plaintiffs are successful in pursing successor liability claims against New GM (which are only asserted by Ignition Switch Plaintiffs); and (v) the MDL Court rejects New GM's argument that Plaintiffs' actual recoveries from the GUC Trust bars any recovery from New GM.

120.    New GM's alleged injury is too attenuated to afford New GM standing to assert its Plan modification argument.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-402 (2013) (theory of future injury is "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending'") (citation omitted); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 708 (S.D.N.Y. 2001) (no standing for party who lacks "a personal stake in the outcome of the current controversy"), *aff'd sub nom. Breeden v. Kirkpatrick & Lockhart, LLC (In re Bennett Funding Grp.)*, 336 F.3d 94 (2d Cir. 2003).

121.    This Court previously recognized this principle as it applies to New GM, stating in connection with the Prior Settlement that:

> [T]o the extent that the Proposed Settlement alters the Chapter 11 Plan, any harm to New GM appears speculative at this point.  Until all Claimants' claims are estimated and allowed, it is unknown whether New GM will be required to transfer any Adjustment Shares, and even if it is required to do so, whether New GM suffers any economic harm will depend on whether the Claimants are allowed to recover in both this case and in the multidistrict litigation before Judge Furman.

*In re Motors Liquidation Co.*, 591 B.R. at 508 n.10.  For the same reasons, this Court should find that the "injury" alleged by New GM is too speculative to demonstrate standing.

122.    New GM also contends that it will suffer harm because the GUC Trust would allegedly violate its obligations to New GM under the Side Letter, dated September 23, 2011, if

the GUC Trust seeks the Claims Estimate Order.  *See* Objection ¶ 156.  New GM grossly mischaracterizes the Side Letter, which simply states the GUC Trust Administrator's then-intention to delay a request for a Claims Estimate Order until it "determines, in its sole and absolute discretion, that the allowed eligible claims are likely to exceed $35 billion in the aggregate."[46]

123.    Accordingly, New GM lacks standing to raise its Plan modification argument.[47]

**B.    The Settlement Agreement Does Not Effectuate A Plan Modification.**

124.    New GM contends that the Settlement impermissibly modifies certain provisions of the Plan and GUC Trust Agreement governing distributions to GUC Trust Beneficiaries.  *See* Objection ¶¶ 146-49.  Those distribution provisions—Plan § 7.4 and GUC Trust Agreement § 5.3—provide for the GUC Trust to deliver to holders of claims that become Resolved General Unsecured Claims after the Effective Date a catch-up distribution of such creditors' *pro rata* amount of GUC Trust Distributable Assets.  *See* Plan § 7.4;[48] GUC Trust Agreement § 5.3.[49]  If

---

[46]    *See* Side Letter, attached as **Exhibit A** to the Settlement Agreement (emphasis added).  New GM also contends that the GUC Trust would lack financial incentive to oppose Plaintiffs at the estimation stage.  *See* Objection ¶ 157.  However, New GM is fully capable of pursuing its interests at the estimation phase and has no right to have the GUC Trust pursue those interests.

[47]    *See Lower E. Side People's Fed. Cred. Union v. Trump*, 289 F. Supp. 3d 568, 575-81 (S.D.N.Y. 2018) ("[A] highly attenuated chain of possibilities [ ] does not satisfy the requirement that threatened injury must be certainly impending."); *Savage & Accocs., P.C. v. Mandl (In re Teligent, Inc.)*, 417 B.R. 197, 211-12 (S.D.N.Y. 2009) (where settlement agreement did not require law firm to pay any money, law firm had no financial stake in outcome of the 9019 motion and lacked standing to oppose the motion).

[48]    Plan § 7.4 provides that:  If, on or after the Effective Date, any Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtors, the GUC Trust Administrator, or the Avoidance Action Trust Administrator, as applicable, shall, on the next applicable distribution date following when the Disputed Claim becomes an Allowed Claim, if all other conditions to such distribution have been satisfied, distribute to the holder thereof the distributions, if any, that such holder would have received had its Claim been Allowed on the Effective Date, except as otherwise provided herein.

[49]    GUC Trust Agreement § 5.3(c) provides that:  On any Distribution Date where the GUC Trust, or the Debtors, as applicable, does not hold sufficient GUC Trust Distributable Assets to satisfy all Disputed General Unsecured Claims or other Claims, in each case, that became Resolved Allowed General Unsecured Claims during the prior calendar quarter (or, in the case of a Distribution Date during the second calendar quarter, since the Initial Distribution Record Date), the GUC Trust Administrator shall (following the reservation of the Additional Holdback, the Reporting and Transfer Holdback, the Protective Holdback and the Taxes on

insufficient assets are available, all remaining GUC Trust Distributable Assets are distributed to such creditors on a *pro rata* basis. *See* Objection ¶ 148. New GM claims the proposed Settlement modifies these provisions because the Plaintiffs do not receive distributions from GUC Trust Assets under the proposed Settlement.

125. New GM also contends that the Settlement impermissibly modifies certain provisions of the Plan and GUC Trust Agreement by carving the Adjustment Shares out of the definition of GUC Trust Assets. *See* Objection ¶ 149.

126. Contrary to New GM's contentions, the terms of the Settlement providing for Plaintiffs to release rights to GUC Trust Assets and receive the exclusive benefit of the Settlement Fund do not effect an impermissible Plan modification under Bankruptcy Code Section 1127(b).[50]

127. The Bankruptcy Code does not define the term "modification." Instead, "courts determine what constitutes a 'modification' on a case-by-case basis." *In re Boylan Int'l, Ltd.*, 452 B.R. 43, 47 (Bankr. S.D.N.Y. 2011). In making this determination, courts have considered whether the changes alter "the legal relationships among the debtor and its creditors," remove or violate provisions in the plan, or are changes of substance. *Compare State Gov't Creditors' Comm. for Prop. Damage Claims v. McKay (In re Johns-Manville Corp.)*, 920 F.2d 121, 129 (2d Cir. 1990) (where a bankruptcy court order authorized trustee to seek approval of a plan to

---

Distribution Holdback in accordance with Sections 6.1(b), (c), (d) and (e) of this Trust Agreement, the sale by the Debtors of any GUC Trust Distributable Assets remaining to be sold pursuant to Section 2.3(e) hereof, and/or the sale or pledge of any GUC Trust Distributable Assets to the extent necessary and approved by the GUC Trust Monitor and/or the Bankruptcy Court, as applicable) distribute all GUC Trust Distributable Assets that remain in the GUC Trust, or with the Debtors, as applicable, to the holders of such Resolved Allowed General Unsecured Claims pro rata by Claim amount. Following such distribution, any remaining unsatisfied portion of such Resolved Allowed General Unsecured Claims, together with all remaining Disputed General Unsecured Claims and other Claims (including, without limitation, the Term Loan Avoidance Action Claims and the Other Avoidance Action Claims) shall be discharged and forever barred from assertion against the GUC Trust.

[50] *See* 11 U.S.C. § 1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . . .").

modify or suspend a claims resolution facility, obtaining approval of a proposed suspension did not modify the plan); *Hawkins v. Chapter 11 Tr. (In re Res. Capital Corp. Hawkins Dev. LLC)*, No. 6:07-cv-0766, , 2009 WL 701115, at *2-3 (N.D.N.Y. Mar. 13, 2009) (holding that order approving settlement did not constitute a plan modification where the settlement "did not involve any substantive changes, but rather accomplished the very objectives established in the Plan"); *In re Mirant Corp.*, 348 B.R. 725, 734-37 (Bankr. N.D. Tex. 2006) (holding that settlement providing for different treatment of Pepco's claims from the treatment specified by the plan did not constitute a plan modification because the plan reserved the debtors' rights to settle its disputes with Pepco, demonstrating an intent to allow flexibility in any such settlement), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 4:06-cv-744-A, 2006 WL 3780884 (N. D. Tex. Dec. 26, 2006), *with*, *Doral Ctr., Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812, 816 (S.D.N.Y. 1997) (where amendment to lease removing a right of first refusal was explicitly incorporated into plan, restoration of right of first refusal was an impermissible plan modification); *Resolution Tr. Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 801-02 (S.D.N.Y. 1995) (removing provision of plan enforcing subordination agreements—an essential element of the plan without which a group of banks would not have supported the plan or funded a settlement used to pay the debtors' general unsecured creditors—was an impermissible plan modification), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

128.    Here, the Settlement Agreement does not conflict with or modify the Plan.  New GM is required under the terms of the Sale Agreement to issue Adjustment Shares to the GUC Trust for the benefit of GUC Trust Beneficiaries once the estimated allowed general unsecured claims against the Old GM estates exceed $35 billion.  *See* Sale Agreement § 3.2(c).  Under the Settlement Agreement, Plaintiffs' waive their rights to the Remaining GUC Trust Assets (which

are, in any event, held as a reserve on account of the maximum amount of the 502(h) claim arising as a result of the Term Loan Avoidance Action Litigation) but receive exclusive access to these Adjustment Shares.[51]    To effectuate the Settlement Agreement, the Economic Loss Plaintiffs are seeking approval of a limited fund class settlement, not a modification of the Plan.

129.    Further, it is undisputed that Section 5.8 of the GUC Trust Agreement expressly permits the GUC Trust Administrator to "receive any assets or make any distribution in a manner that is not in technical compliance with this Trust Agreement," if the GUC Trust Administration, with the approval of the GUC Trust Monitor, "determines in good faith that it is necessary or desirable in order to carry out the intent and purposes of the Plan, the Confirmation Order and this Trust Agreement . . . ."  GUC Trust Agreement § 5.8.[52]  Further, Section 11.3 of the GUC Trust Agreement enables "any deviation from the provisions of Article V other than as contemplated by Section 5.8" provided that the GUC Trust Administrator obtains the "approval of the Bankruptcy Court."  GUC Trust Agreement § 11.3.  Thus, any purported deviation from the distribution procedures of the GUC Trust Agreement emanating from the Settlement is permitted under the GUC Trust Agreement.

130.    It is also undisputed that Section 13.13(a) of the GUC Trust Agreement expressly permits the GUC Trust Administrator, with the approval of the GUC Trust Monitor, to "amend or supplement" the GUC Trust Agreement "without notice to or consent of the Bankruptcy Court or any GUC Trust Beneficiary for the purpose of . . . making any other changes to this Trust

---

[51]    Moreover, nothing in the Plan prohibits holders of general unsecured claims from agreeing to accept less than their *pro rata* share of GUC Trust Assets, nor does it prevent parties from waiving equal treatment.  This accords with the technical requirement for confirmation of the Plan set forth in Section 1123(a)(4) of the Bankruptcy Code -- that the plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

[52]    Here, the Settlement maximizes recovery for the benefit of the GUC Trust Beneficiaries and removes an obstacle to issuing final distributions to GUC Trust Beneficiaries.  *See* Vanaskey Declaration.

Agreement that do not adversely affect the interests of the GUC Trust Beneficiaries or the DIP

Lenders in any material respect." GUC Trust Agreement § 13.13(a). Thus, even if the

Settlement Agreement mechanics do not fully comply with the GUC Trust Agreement (they do),

the GUC Trust has the right to modify the GUC Trust Agreement to effectuate the terms of the

Settlement Agreement.

131.    Accordingly, the Settlement Agreement mechanics do not modify the Plan.[53]

C.    **These Settlement Agreement Mechanics Are Permissible Under State Law.**

132.    Even if, *arguendo*, the Settlement Agreement mechanics do not fully comply with

the GUC Trust Agreement (they do), the Court could permit modifications to the GUC Trust

Agreement under applicable state trust law.

133.    For example, in *In re Joint E. and S. District Asbestos Litigation*, beneficiaries of

the Manville Trust (created pursuant to Manville's confirmed plan) sought to revise payment

procedures set forth in the trust agreement that would result in certain holders of Class-4 claims

being paid less than full amount of their claims as required under the terms of the Plan. *See In re

Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 728-31, 748 (2d Cir. 1992) ("*Manville III*").

Because the available assets were "grossly inadequate" to satisfy claims, if distributions

continued pursuant to the original trust instrument, certain claimants would recover while "many

hundreds of thousands of equally deserving claimants" would be left empty-handed. *See Findley

v. Falise (In re Joint E. & S. Dists. Asbestos Litig.)*, 878 F. Supp. 473, 479-81 (E.D.N.Y. &

S.D.N.Y. 1995), *aff'd*, 100 F.3d 944 (2d Cir.), *aff'd*, 100 F.3d 945 (2d Cir.), *aff'd in part,

vacated in part*, 78 F.3d 764 (2d Cir. 1996). The proposed revised payment provisions would

---

[53]    New GM also asserts that providing the Adjustment Shares to the Settlement Fund violates the Sale Agreement, which provides for Adjustment Shares to be delivered to the GUC Trust. *See* Objection ¶ 150. The Sale Agreement is not a plan-related document and thus this contention is irrelevant to the issue of whether the Settlement effectuates a modification of the Plan. Moreover, the Adjustment Shares pass through the GUC Trust for tax purposes.

enable distributions of the remaining assets to unpaid claimants on a *pro rata* basis. *See id.* at 481.

134.    Approval of a Rule 23(b)(1) non-opt out diversity class settlement that would approve those revisions was sought. *See* Manville III at 729-32. The Second Circuit first evaluated the settlement as an exercise of diversity jurisdiction, holding that the revisions to the trust agreement would be permitted under New York law. *See id.* at 745. However, the settlement could not approved without proper subclasses. *See id.* The Second Circuit then evaluated the settlement as an exercise of bankruptcy jurisdiction, and determined that the proposed revisions to the trust agreement (a plan-related document) effectuated a plan modification (by changing the provisions of a plan-related document and altering payment rights under the plan) in violation of Bankruptcy Code Section 1127(b). *See id.* at 747-48.

135.    Following further proceedings, on remand, state trust law was applied to approve the revisions to payment procedures. *See In re Joint E. & S. Dist. Asbestos Litig.*, 878 F. Supp. at 479. The opinion relied on the majority rule (recognized under New York and Delaware trust law) that "a court of equity may modify or deviate from the terms of a trust where, due to a change in circumstances, compliance with the terms of the trust would frustrate the trust's design." *See id.* at 481, 536, 540.[54] Applying this rule, the court determined that the stated purpose of the trust instrument—"to deliver fair, adequate and equitable compensation to bona fide beneficiaries"—could not be achieved absent the requested revisions. *See id.* at 481, 540.[55]

136.    Here, diversity jurisdiction exists because there is minimal diversity of citizenship (one plaintiff diverse from one defendant), 100 or more class members, and over $5 million in

---

[54]    *See, e.g.*, *Morgan v. Herzog*, 301 N.Y. 127, 138 (1950) (applying principle and modifying trust); *Bank of Del. v. Clark*, 249 A.2d 442, 448 (Del. Ch. 1968) (same).

[55]    New GM claims, without explanation or citation, that *Ortiz* foreclosed the possibility of using diversity court jurisdiction to modify a bankruptcy trust. *See* Objection ¶ 154. Nothing in *Ortiz* addresses this issue.

controversy in the aggregate. *See* 28 U.S.C. § 1332; 2 NEWBERG ON CLASS ACTIONS § 6:8 (5th ed. 2011). Under New York or Delaware law,[56] modification of payment procedures under the GUC Trust Agreement, to the extent necessary, is warranted to prevent frustration of the GUC Trust's purpose "to implement the Plan on behalf, and for the benefit, of the GUC Trust Beneficiaries, to serve as a mechanism for distributing the GUC Trust Distributable Assets . . . [and] to wind-down the Debtors' affairs . . . ." GUC Trust Agreement § 2.2. "Now faced with more than 11 million potential economic loss claims seven years after the Chapter 11 Plan was confirmed," *In re Motors Liquidation Co.*, 591 B.R. at 518, modifications are necessary to enable equitable distributions to members of the Classes and the timely wind-down of the Old GM estate. The Settlement maximizes recoveries for the benefit of the existing GUC Trust Beneficiaries and prevents delay in the issuance of final distributions, *see* Vanaskey Declaration, while also establishing a streamlined process for allowing Plaintiffs' claims and providing Plaintiffs a potential source of recovery from the Adjustment Shares, thus achieving the stated purpose of the GUC Trust.

137. Accordingly, to the extent that the Court determines that New GM has standing to raise its plan modification argument (it does not) and that the Settlement mechanics modify the GUC Trust Agreement and the Plan (they do not), the Economic Loss Plaintiffs respectfully request that the Court approve the Settlement as a permitted modification of the GUC Trust Agreement under state trust law.

## VI.    The Pre-Closing Accident Plaintiffs Who Are Signatories To The Settlement Agreement Are Properly Included In The Settlement.

138. New GM contends that Pre-Closing Accident Plaintiffs who "have not filed proofs of claims or are otherwise eligible to participate in settlement agreements reached with

---

[56]    Section 13.2 of the GUC Trust Agreement provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to rules governing conflicts of law."

New GM" cannot be included in the Settlement.  *See* Objection ¶ 159.   First, New GM misses

the mark as to which Pre-Closing Accident Plaintiffs are eligible to participate in the Settlement.

Only those Pre-Closing Accident Plaintiffs who are signatories to the Settlement Agreement are

subject to the Settlement Agreement, including the release provision and the opportunity to

obtain a recovery from the Settlement Fund.  To the extent that Pre-Closing Accident Plaintiffs

enter into settlements with New GM releasing their claims against the GUC Trust, those Pre-

Closing Accident Plaintiffs would, as a result, no longer be eligible to participate in the

Settlement.   That some Pre-Closing Accident Plaintiffs are currently "eligible" to settle with

New GM has no impact on whether the Court will likely be able to approve the Settlement.

Accordingly, the inclusion of certain Pre-Closing Accident Plaintiffs in the Settlement is

appropriate.

## VII.    The Requirements Of The Class Action Fairness Act Are Irrelevant To Whether The Court Should Direct Notice Of The Settlement To The Classes.

139.    New GM contends that if notice required under the Class Action Fairness Act was

not provided, then proposed Class members may opt out of the Settlement.  *See* Objection ¶ 163.

The GUC Trust is in process of complying with the Class Action Fairness Act.  In any event,

speculation regarding arguments that may be raised by Class members to opt-out of the

Settlement has no impact on whether the Court will likely be able to certify the Classes or

approve the Settlement and, thus, provides no basis for not directing notice to the Classes.

## VIII.   None of The Issues Being Decided In The MDL Action Justify An Indefinite And Prejudicial Stay.

140.    New GM contends that "numerous issues in the MDL Court" to be resolved in

"near-term rulings" "directly bear on this Court's consideration of the Proposed Settlement" and,

thus, an indefinite stay of proceedings should be granted.  *See* Objection ¶¶ 164-65.   To the

contrary, as explained in the Stay Objection, the issues before this Court under the Rule 23(e)

Motion are *separate and distinct* from the issues before the MDL Court.  Among other things,

the actions involve separate putative economic loss classes, different defendants, separate class

certification issues (including certification for settlement as opposed to trial, certification under

Rule 23(b)(1) as opposed to Rule 23(b)(3), and separate considerations for determining whether

the Rule 23(a) factors are met), and separate factual issues.

141.    In light of these differences and this Court's familiarly with the Plaintiffs' claims,

the GUC Trust and the governing documents at issue, a stay would not significantly promote

judicial economy.  Moreover, a stay would adversely affect the administration of the Old GM

bankruptcy proceedings and prejudice multiple parties by stalling the wind-down of the Old GM

estate, final distributions to GUC Trust Beneficiaries, and Plaintiffs' day in court with respect to

claims against Old GM.  Accordingly, New GM's request for a stay should be denied, as more

fully set forth in the Stay Objection.[57]

## CONCLUSION

WHEREFORE, the Economic Loss Plaintiffs respectfully request that the Court enter the

Preliminary Approval Order substantially in the form attached to the Rule 23(e) Motion as

**Exhibit B** and grant such other and further relief as is just and equitable.

---

[57] The hearing on the Rule 23(e) Motion, the 9019 Motion, and the Stay Motion has been adjourned *sine die*.  *See Order Adjourning March 11, 2019 Hearings Sine Die on (1) Motion of Economic Loss Plaintiffs for Class Certification (ECF Doc. # 14408), (2) Motion to Approve Compromise (ECF Doc. # 14409), (3) Motion to Stay Proceedings Related to Class Certification (ECF Doc. # 14431) and (4) Motion to File Under Seal (ECF Doc. # 14451)* [ECF No. 14459].

Dated: March 8, 2019
      New York, New York

                      Respectfully submitted,

                      */s/ Edward S. Weisfelner*
                      Edward S. Weisfelner
                      Howard S. Steel
                      BROWN RUDNICK LLP
                      Seven Times Square
                      New York, New York 10036
                      Tel: 212-209-4800
                      eweisfelner@brownrudnick.com
                      hsteel@brownrudnick.com

                      Sander L. Esserman
                      STUTZMAN, BROMBERG, ESSERMAN &
                      PLIFKA, A PROFESSIONAL CORPORATION
                      2323 Bryan Street, Ste 2200
                      Dallas, Texas 75201
                      Tel: 214-969-4900
                      esserman@sbep-law.com

                      *Designated Counsel for the Ignition Switch*
                      *Plaintiffs and Certain Non-Ignition Switch*
                      *Plaintiffs in the Bankruptcy Court*

                      Steve W. Berman (admitted pro hac vice)
                      HAGENS BERMAN SOBOL SHAPIRO LLP
                      1301 Second Avenue, Suite 2000
                      Seattle, WA 98101
                      Tel: 206-623-7292
                      steve@hbsslaw.com

                      Elizabeth J. Cabraser
                      LIEFF CABRASER HEIMANN &
                      BERNSTEIN, LLP
                      275 Battery Street, 29th Floor
                      San Francisco, California 94111
                      Tel: 414-956-1000
                      ecabraser@lchb.com

                      *Co-Lead Counsel for the Ignition Switch Plaintiffs*
                      *and Certain Non-Ignition Switch Plaintiffs in the*
                      *MDL Court*

64