UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
| | . | |
| MOTORS LIQUIDATION COMPANY, | . | Chapter 11 |
| et al., f/k/a GENERAL | . | (Jointly administered) |
| MOTORS CORP., et al, | . | |
| | . | One Bowling Green |
| | . | New York, NY 10004 |
| Debtors. | . | |
| | . | Tuesday, March 5, 2019 |
| . . . . . . . . . . . . . . . . . | . | 9:43 a.m. |

TRANSCRIPT OF MOTION TO ALLOW INCLUSION OF THE TONAWANDA FORGE
SITE IN THE RACER TRUST, OR IN THE ALTERNATIVE, FOR AUTHORITY
TO FILE A LATE CLAIM AGAINST THE DEBTORS TO PARTICIPATE IN
DISTRIBUTIONS FROM THE GUC TRUST(DOC. NO. 14392, 14393)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For American Axle            Hodgson Russ
Manufacturing               By:  JEFFREY C. STRAVINO, ESQ.
Holdings, Inc. and its           JAMES C. THOMAN, ESQ.
Affiliates:                 The Guaranty Building
                            140 Pearl Street, Suite 100
                            Buffalo, NY 14202-4040

For the GUC Trust:          Drinker, Biddle & Reath LLP
                            By:  MARITA S. ERBECK, ESQ.
                            600 Campus Drive
                            Florham Park, NJ 07932-1047
                            (973) 549-7076

For the United States       U.S. Attorney Office, SDNY
of America:                 By: DAVID S. JONES, ESQ.
                            86 Chambers Street
                            New York, NY 10007
                            (212) 637-2739

APPEARANCES CONTINUED

Audio Operator:             Jonathan, ECRO

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46038
                            (855) 873-2223
                            www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

APPEARANCES (Continued):

```
For the Revitalizing       Thompson & Knight, LLP
Auto Communities           By:  MICHAEL V. BLUMENTHAL, ESQ.
Environmental Response     900 Third Avenue, 20th Floor
Trust:                     New York, NY 10022-4728
                           (212) 751-3001


For the Economic Loss      Brown Rudnick LLP
plaintiffs:                By:  HOWARD S. STEEL, ESQ.
                           7 Times Square
                           New York, New York 10036
                           (212) 209-4917
```

3

1           (Proceedings commence at 9:43 a.m.)

2                 THE CLERK:  All rise.

3                 THE COURT:  All right.  Please be seated.  We're here

4      in Motors Liquidation Company, 09-50026.  This is a motion in

5      connection with the Tonawanda Forge site.  Let me have the

6      appearances, please.  First, the moving party.

7                 MR. STRAVINO:  Good morning, Your Honor.  Jeff

8      Stravino from Hodgson Russ on behalf of American Axle, and I

9      have with me my partner, Jim Thoman from Hodgson Russ --

10                THE COURT:  Thank you.

11                MR. STRAVINO:  -- on behalf of American Axle.

12                THE COURT:  Thank you.

13                MS. ERBECK:  Good morning, Your Honor.  Marita

14     Erbeck, Drinker, Biddle & Reath, on behalf of the GUC Trust.

15                MR. JONES:  And good morning, Your Honor.  David

16     Jones from the U.S. Attorney's Office, Southern District of New

17     York, for the United States.

18                MR. BLUMENTHAL:  Morning, Your Honor.  Michael

19     Blumenthal from Thompson & Knight on behalf of the RACER Trust.

20                THE COURT:  All right.  Go ahead, Counsel.

21                MR. STRAVINO:  Good morning, Your Honor.  We're here

22     today, American Axle's motion to include the former Tonawanda

23     Forge site in the RACER Trust, which was created approximately

24     eight years ago, back in March 2011.  The reason for the

25     request is that recently, the State of New York has contacted

4

1 American Axle to -- about environmental contamination that

2 currently exists at the site and has not sent a formal PRP

3 letter --

4        THE COURT:  American Axle has known about the

5 contamination since it acquired the property, correct, because

6 Old GM disclosed it to it.

7        MR. STRAVINO:  Correct, Your Honor.

8        THE COURT:  Go ahead.

9        MR. STRAVINO:  Yes, they did.  And --

10        THE COURT:  What year -- they acquired it in what

11 year, 1990 --

12        MR. STRAVINO:  In 1994, Your Honor.

13        THE COURT:  Go ahead.

14        MR. STRAVINO:  And for ten years, at least, GM was

15 cleaning up that property and cleaning up the PCBs that had

16 been in the, you know, on the property.  I think the relevant

17 issue, just to cut to the chase, is that when GM filed for

18 bankruptcy -- and American Axle sold the property in late 2008.

19 The closing occurred in early 2009.  The property is currently

20 owned by the Lewis Brothers.  We understand that the Lewis

21 Brothers are a defunct, non-operating Virginia LLC.

22        GM files for bankruptcy on June 1st, 2009.  The proof

23 of claim bar date was November 30th, 2009.  The other --

24        THE COURT:  And American Axle received notice of the

25 filing of the case, received notice of the bar date, correct?

5

1          MR. STRAVINO:  Yes, we did, Your Honor.  We're not

2    disputing that at all.  And the RACER Trust was created in

3    March 2011.

4          THE COURT:  For 89 properties that Old GM owned at

5    the time of the bankruptcy, correct?

6          MR. STRAVINO:  Mainly correct, except, Your Honor,

7    there were another property, at least we know, or part, that

8    was not owned by Old GM at that time but was adjacent or

9    contiguous, but where Old GM was the sole PRP.

10          THE COURT:  Right.  And none of the 89 properties had

11    been disposed of by Old GM between 1994, when it sold Tonawanda

12    to American Axle, and up to the time of the bankruptcy,

13    correct?  I mean, you're dealing with a very old --

14          MR. STRAVINO:  Almost.

15          THE COURT:  -- very old property, and the RACER Trust

16    was established to deal with environmental contamination at

17    properties that GM owned.  You say one of them was adjacent to

18    a property it owned at the time of the bankruptcy on June 1st,

19    2009, correct?

20          MR. STRAVINO:  Right.  So, Your Honor, it's not,

21    though, that no property -- it's not that every single property

22    or every single parcel that was part of the RACER Trust --

23          THE COURT:  It specifically identified and included

24    89 properties, and it had various provisions about -- that

25    resolved potential environmental liability claims against

6

1 Old GM.  These were -- none of the 90 properties were acquired

2 by New GM as part of the bankruptcy sale, correct?

3          MR. STRAVINO:  Correct.  And the Tonawanda Forge site

4 was not acquired by New GM, correct.

5          THE COURT:  Well, New GM hadn't owned it since 1994.

6 It would have been very hard for the -- for all of -- for New

7 GM to acquire it from Old GM.

8          MR. STRAVINO:  Right.  But at the end of the day,

9 Your Honor, we're talking about -- so I think the key

10 distinguishing factor here is we're talking about CERCLA

11 claims.  And CERCLA claims right now, arguably, are not ripe

12 for American Axle because we have not incurred any response

13 costs.  That being said, when would we become knowledgeable,

14 potentially, about a CERCLA claim, and it's only since the

15 State of New York provided us with this notice.

16          Also, Your Honor, I think it's relevant that the

17 State of New York, when they filed proofs of claim in this

18 case, they filed 21 of them.  And none -- they included other

19 sites across New York State, but they did not include the

20 Tonawanda Forge site.  So I think it's unfair and would be very

21 difficult and improper and inequitable to say, American Axle,

22 you should have known back in -- on June 1st, 2009, you should

23 have known that on March 31st, 2011, that there's some

24 potential environmental issue at this site and that you would

25 have a CERCLA claim.

7

1            THE COURT:  This isn't in the record of anything that
2    I've read in connection with the motion, but has American Axle
3    been identified as a PRP in connection with any other
4    properties that it owned at any time in the past?
5            MR. STRAVINO:  Yes, Your Honor.
6            THE COURT:  And at how many properties?
7            MR. STRAVINO:  I don't know the answer to that, Your
8    Honor.
9            THE COURT:  And going back how -- how far back in
10   time was American Axle identified as a PRP with respect to
11   properties -- you don't have to own the property to be
12   identified as a PRP, correct?
13           MR. STRAVINO:  Correct.  You --
14           THE COURT:  Sometime in the past, you allegedly owned
15   the property and there was some --
16           MR. STRAVINO:  Or operated --
17           THE COURT:  Owned or operated.
18           MR. STRAVINO:  -- owned or operated normally, Your
19   Honor, yes.
20           THE COURT:  And so do you know this -- again, this is
21   not in the record of the motions before me, but do you know how
22   many properties American Axle was identified as a PRP?
23           MR. STRAVINO:  I do not, Your Honor.  I'm frankly
24   representing American Axle with respect to this site.  I do know
25   of another site --

8

1           THE COURT:  They're not a stranger to issues of

2    environmental contamination.

3           MR. STRAVINO:  No, they're not, Your Honor.  But on

4    the other hand, they're also not --

5           THE COURT:  And the potential liability, CERCLA or

6    state parallels that -- potential liability where they owned

7    the property at the time the contamination is identified or

8    owned or operated it sometime in the past, and both state and

9    federal environmental laws make such parties as PRPs, correct?

10          MR. STRAVINO:  Correct, Your Honor, although what I

11   would say there is then does that mean -- and if that's the

12   rule, that's the rule that Your Honor will have -- that every

13   single GM site in the U.S., any party that ever owned or

14   operated on any of those sites should have filed a proof of

15   claim?  And I don't think that's --

16          THE COURT:  Whether they should have or not is not fo

17   me to determine.  They haven't, but -- let me ask you another

18   question.  I saw in the sale documents to American Axle, there

19   was disclosure of the PCB and other possible contamination, and

20   American Axle released Old GM from liability for it.  Is that

21   correct?

22          MR. STRAVINO:  Well, Your Honor, there was a -- there

23   were different indemnities that were in there and different

24   provisions, and depending on the type of problem and whether it

25   was something that had been disclosed before or after the sale

9

1  and GM was responsible for cleaning up.  And I think the key

2  point there is, Your Honor, as of 2004, upon information and

3  belief, American Axle, from everything we know, had been told

4  and seen in documents, never notified GM to say, you still need

5  to do some further cleanup.  New York State never notified GM

6  to say, you should do further cleanup.

7          So in 2009 when the bankruptcy was filed, again, New

8  York State filed 21 proofs of claim.  They didn't file with

9  respect to the site.  They filed with a bunch of other sites.

10  Nobody knew or -- it wasn't within the reasonable contemplation

11  of the parties.  It was not expected that there would be an

12  environmental issue with this site.

13          So that's the point.  That's why all these years

14  later, and frankly, that's why the State's letter and notice to

15  American Axle didn't just come out left field, it seemed to

16  come from another planet.  And -- but we do not believe that

17  it's --

18          THE COURT:  I've heard that before with respect to

19  environmental contamination and potential PRP responsibility.

20  Everybody is shocked that this has suddenly gotten this notice.

21  There's been no determination of American Axle's responsibility

22  with respect to Tonawanda, correct?

23          MR. STRAVINO:  No, there hasn't, Your Honor.

24          THE COURT:  All right.

25          MR. STRAVINO:  And that being said, maybe if other

10

1  parties arguing and there's been a bunch of other cases cited,

2  but I think, for example, if you look back to In re Chateaugay

3  from the Second Circuit in 1991, there, the Environmental

4  Protection Agency had already incurred some response costs.

5  Here, no response costs have been incurred.

6          If you look at the different cases also that we cited

7  on Page 6 of our reply papers -- and, for example, the Laidlaw

8  case from the Western District of New York, the Chicago

9  Milwaukee Railroad case, AM Intern.  Basically in Chicago

10 Milwaukee, the Court -- it's, granted, the Seventh Circuit, but

11 they had canvassed case law on the issue and determined that

12 creditors whose claims have arisen when they knew they had a

13 potential CERCLA claim before the close of the bankruptcy

14 proceedings.  Here, we did not know we had a potential CERCLA

15 claim.

16         THE COURT:  The purchase agreement disclosed -- in

17 1994 disclosed contamination by PCBs and other possible

18 contaminants.  This came as no surprise to American Axle.  They

19 knew it when they bought the property, correct?

20         MR. STRAVINO:  They knew that there were PCBs at the

21 site when they bought the property.  Correct, Your Honor.  But

22 if this -- if GM files for bankruptcy in 1997, we'd be in a

23 different situation.  If GM files for bankruptcy in 2002, we'd

24 be in a different situation.  If GM --

25         THE COURT:  You thought you were home-free.  I Mean,

11

1  that's --

2          MR. STRAVINO:  Right.  We thought because of when GM

3  files for bankruptcy, because there were no issues that we

4  understood at the site with GM or with the State, that --

5          THE COURT:  Do you understand what the concept of

6  contingent claims means --

7          MR. STRAVINO:  Yes, I do, Your Honor.

8          THE COURT:  -- in bankruptcy?  And don't you agree

9  that with respect to contamination that existed in the property

10 at the time American Axle acquired the property, that it had a

11 contingent claim that it could assert?

12         MR. STRAVINO:  No, I don't, Your Honor.

13         THE COURT:  Why not?

14         MR. STRAVINO:  Because the contingent claim is not

15 the fact that the contamination existed.  The contingent claim

16 is the fact you had a CERCLA or some other cause of action,

17 which American Axle did not have on June 1st, 2009.

18         THE COURT:  Doesn't have to be a cause of action

19 asserted.  I mean, if you look at the whole line of products

20 liability cases, the issue is whether American Axle had a

21 contingent claim, knowing that the property was contaminated

22 with PCBs, potentially other contaminants, at the time it

23 purchased the property.  That, you can't dispute.  It's in the

24 purchase agreement.  By 1994, had PCBs been identified as

25 really bad contamination for which property would -- might well

12

1  have to be remediated, depending on concentrations and whether

2  it's in the groundwater and the direction it's flowing?  You

3  agree with that?

4          MR. STRAVINO:  Yes, I do, Your Honor.

5          THE COURT:  Okay.  So they knew the property was

6  contaminated with PCBs.  They knew PCBs were a really bad

7  contaminant and potentially could be -- lead to remediation

8  costs, correct?

9          MR. STRAVINO:  At the time in 1994, yes, Your Honor.

10          THE COURT:  Okay.

11          MR. STRAVINO:  And in 2009 --

12          THE COURT:  And you're saying those circumstances

13  didn't give rise to a contingent claim as those terms have been

14  well-developed in bankruptcy case law?

15          MR. STRAVINO:  Well, Your Honor, I think that we have

16  to slice the salami a little thinner or get down and break it

17  down.  I had a law school professor I loved who said if you

18  don't understand, you know, a paragraph, break it down by the

19  sentence; the sentence, break it down by the phrase; phrase by

20  the word.  And I think you have to focus on environmental case

21  law in bankruptcy and contingency.  And there's the DMJ

22  Associates case from the Eastern District of New York from 2016

23  that we cited where the court had rejected a debtors' argument

24  that the occurrence in discovery of environmental contamination

25  prior to the filing of the debtor's bankruptcy petition

13

1  discharged CERCLA claims against it.  And I believe, Your

2  Honor, the key is we're talking about CERCLA here.  Otherwise,

3  again, as I said, then the law wouldn't just be in the GM case,

4  but anywhere, that if there was a --

5         THE COURT:  <u>Chateaugay</u> and subsequent case law in

6  this circuit and elsewhere distinguishes between liability or

7  cleanup costs for contamination within a property which can be

8  discharged and liability for preventing continuing pollution on

9  adjacent properties, things like that.  That's -- you agree

10  with that?  I mean, there's a difference.  You can -- you may

11  be able to discharge what the cleanup costs were on -- within

12  the four corners of this property.  The problem that can't be

13  discharged -- liability can't be discharged if the

14  contamination is crossing the -- continuing to cross the

15  boundaries, contaminate water wells on adjacent properties, and

16  an injunction is issued requiring PRPs to avoid that ongoing

17  contamination.  That's not dischargeable.  You agree with that?

18         MR. STRAVINO:  Yes, Your Honor.  But I don't know if

19  that's the case -- I don't believe that's the case here.  I

20  don't think we're talking about --

21         THE COURT:  You don't know because there hasn't been

22  -- the state hasn't, at this stage, made clear to American Axle

23  whether it -- whether the State believes it is responsible for

24  remediation costs or not.  They put you on notice -- put your

25  client on notice of the potential liability that they may

14

1  assert.  They haven't asserted it so far.  Correct?

2          MR. STRAVINO:  Well, two things, Your Honor.  One,

3  with respect to the offsite argument, I believe what's in the

4  record and what's public record from the DEC report and the DEC

5  ruling, my understanding is that because it's still -- there is

6  a GM Powertrain site adjacent to the former Tonawanda Forge

7  site and that --

8          THE COURT:  That New GM is operating?

9          MR. STRAVINO:  Correct ,yeah.  And my understanding

10 is that there had been environmental work and barriers and

11 other remedial work done to ensure that there was not any type

12 of flow of contamination across that property.  The GM

13 Powertrain site basically sits on the Niagara River in Buffalo.

14 There's the 190 there, and I think the concern is to prevent

15 that from going into the water.  The American Axle site is

16 behind it.

17         And so that was all done, and that was all taken care

18 of before 2004, before 2009, before 2011.  So again,

19 preventative measures, remedial measures were taken.  That's

20 where I think the facts here are key and distinguish from many

21 of the other, you know, general premises that we're talking

22 about.

23         So the fact -- you know, for example, if a party

24 spilled had a -- knew that a gallon of gasoline or ten gallons

25 of gasoline were spilled onsite at one point, does that mean

15

1  that they should then -- and they were an owner of a site 30

2  years later, get a notice of some bankruptcy that they should

3  be filing a proof of claim with respect to that?  I don't --

4  that, to me, seems like a problematic argument.  I know in --

5          THE COURT:  Is that what happened here?  They spilled

6  a gallon of PCBs and that was the only contamination on the

7  property?

8          MR. STRAVINO:  No.  It was -- well, we believe it was

9  -- we understand it's more than that, but --

10         THE COURT:  Then don't give me that as a

11  hypothetical.

12         MR. STRAVINO:  Understood, but if you think it's

13  cleaned up and that there aren't that many PCBs still there at

14  the time, then -- and the State doesn't say that it's not clean

15  up -- cleaned up, then why should you have to -- so I guess

16  maybe I was wrong with my analogy or my example, but if you

17  believe something's been cleaned up properly and nobody's

18  asserting a claim, none of the regulatory agencies -- we don't

19  believe EPA's asserted a claim.  We couldn't find exactly

20  everything with respect to EPA, but New York State, again,

21  filed 21 proofs of claim, some other ones in Western New York.

22  If they really thought this was a problem, they would have

23  asserted a claim there.

24         So that's our problem, Your Honor, respectfully why

25  we think that this is distinguishable, why we think it's

16

1  inequitable if we aren't included in the RACER Trust.

2          THE COURT:  Well, spell out for me how you think, in

3  2019, Tonawanda can be added to one of the properties in -- to

4  add to the 89 properties in the RACER Trust, all of which were

5  either owned or operated or, you said, adjacent to properties

6  that Old GM was operating at the time of the bankruptcy.

7  That's -- I don't follow, okay?  I thought that Mr. Jones's

8  argument was quite persuasive on the issue of you can't come

9  back in 2019 and add -- and modify a heavily negotiated

10  agreement that established the RACER Trust only as to 89

11  properties.  Lay that out for me.

12          MR. STRAVINO:  Well, Your Honor, I think that consent

13  orders and agreements can be amended, and there's case law that

14  allows the amendment.

15          THE COURT:  You're not a party to the consent order.

16          MR. STRAVINO:  Right.

17          THE COURT:  You're -- I don't see how you have

18  standing to even seek a modification of a heavily negotiated,

19  court-entered order that dealt with 89 properties that Old GM

20  owned or operated at the time of the bankruptcy.  Do you have

21  any -- let me ask you this.  Do you have -- what's your case

22  authority to support modifying the court orders that

23  established the RACER Trust for the 89 properties to add a

24  property that Old GM had sold in 1994?  What's your authority?

25          MR. STRAVINO:  Your Honor, we believe Federal Rule

17

1  60(b) allows standing on non-parties like American Axle, and we

2  cited <u>Dunlop v. Pan American World Airways, Inc.</u>, 672 F.2d 1044

3  (2d. Cir. 1982) for a holding that non-parties had standing to

4  modify a judgment where non-parties were sufficiently connected

5  with the initial lawsuit.

6        THE COURT:  How are you sufficiently connected to an

7  order that dealt with 89 specific properties, not including

8  this one, and established a mechanism to deal with

9  environmental liability, how it would be -- remediation would

10 be compensated or paid for for 89 specific properties?  That, I

11 don't see.

12        MR. STRAVINO:  Well, Your Honor, our understanding

13 and my interpretation and reading of the case law is that the

14 <u>Grace v. Leumi</u> Second Circuit case from 2006 had applied the

15 standard in <u>Dunlop</u> and determined that a party had standing,

16 and the key determination in that case and the lines of case

17 that they cited was whether the non-parties' interests are

18 strongly affected by a legal instrument --

19        THE COURT:  Your clients' interest are not affected

20 whatsoever by the 89 properties included in the RACER Trust,

21 correct?  You don't -- the -- how -- would you agree with that?

22        MR. STRAVINO:  Well, Your Honor, I would respond this

23 way.  Six-hundred-plus-million dollars was put in the RACER

24 Trust to clean up former GM or current GM properties.

25        THE COURT:  Eighty-nine specific properties, not

18

1  including Tonawanda that had been sold in 1994.

2           MR. STRAVINO:  And then, I respond to that with why

3  wasn't Tonawanda included, because nobody at the time thought

4  that it -- there was a contamination issue there.  The EPA

5  didn't.  The State didn't.  American Axle didn't.  Current

6  owners at the time presumably didn't.  I can't speak for them,

7  Lewis Brothers, and to the other parties.  So I can't disagree,

8  Your Honor, it wasn't included back then.  So -- but we do

9  think that our interest is greatly affected, and we also think

10 that given the amount of money that was put in the trust, now

11 it's going to be eight years ago later this money and the

12 amount that still remains and the --

13          THE COURT:  How much still remains?

14          MR. STRAVINO:  I believe it's in a few hundred

15 million dollars.  I'm not sure that's -- but that including

16 this one additional property for fairness --

17          THE COURT:  You think if this one's added that there

18 won't be a dozen or more motions made to include properties

19 that Old GM owned at some distant time in the past to add them

20 to the RACER Trust?  See what you did as to Tonawanda, Judge?

21          MR. STRAVINO:  I understand that argument, but we're

22 now eight years past the formation of RACER.

23          THE COURT:  Why don't you move on to your argument

24 about leave to file late claim.

25          MR. STRAVINO:  Okay.  Well, Your Honor, we

19

1  respectfully request that contrary to the -- I guess that we

2  already argued this a little bit, but contrary to the GUC Trust

3  position, we do not believe that our claim did exist prior to

4  the bar date in November 30, 2009.  And if that's what Your

5  Honor was asking -- are you talking about the --

6          THE COURT:  Well, if it didn't exist prior to the bar

7  date, you can't assert a late claim against Old GM in its

8  bankruptcy.

9          MR. STRAVINO:  Well --

10         THE COURT:  Isn't that true?

11         MR. STRAVINO:  It --

12         THE COURT:  If it didn't have a contingent claim as

13 of the petition date on June 1, 2009, American Axle can't

14 assert a claim against the GUC Trust standing in for Old GM,

15 correct?

16         MR. STRAVINO:  Perhaps, Your Honor, that's not --

17         THE COURT:  Can you answer that yes or no?

18         MR. STRAVINO:  I guess the answer -- I don't want to

19 give you a yes or no answer --

20         THE COURT:  Well, I know that.

21         MR. STRAVINO:  -- because I know you're saying --

22         THE COURT:  That's pretty obvious.

23         MR. STRAVINO:  It's --

24         THE COURT:  But you do have to answer my question.

25         MR. STRAVINO:  -- what's the definition of a claim,

20

1  what's the definition of a claim.

2          THE COURT:  Well, you said it didn't have a claim as

3  of June 1, 2009, the petition date.  If it didn't have a claim

4  as of the petition date, it couldn't assert the claim, timely

5  or untimely, in Old GM's bankruptcy, correct?

6          MR. STRAVINO:  Well, here's my concern why I don't

7  want to --

8          THE COURT:  Can you answer my question yes or no?

9          MR. STRAVINO:  I'm going to say no, Your Honor.

10         THE COURT:  Okay.  Tell me why.

11         MR. STRAVINO:  Because I believe with, for example,

12  ignition plaintiffs who perhaps didn't know at that time that

13  they had a claim, and then later on, there was a problem with

14  the car or --

15         THE COURT:  The Second Circuit held in the _Elliott_

16  case that the ignition switch defect was a known defect, known

17  to Old GM, not disclosed by Old GM, disclosed for the first

18  time in 2014 when New GM issued recalls.  The opinion recounts

19  -- and there was an investigation about it -- recounts Old GM's

20  knowledge about the ignition switch defect, the failure to

21  disclose it.  It's completely distinguishable from American

22  Axle, where it knew about PCB contamination because Old GM

23  disclosed it in the sale agreement, okay.

24         MR. STRAVINO:  So -- but if then, I guess, the

25  contamination existed, I don't think that, in 2009, provided

1 the basis for a claim, a CERCLA claim, but there were the

2 underlying -- you know, what Your Honor said before.  I'm not

3 trying to argue against what I said before.

4    THE COURT:  You say a CERCLA claim, but there could

5 be state law nuisance claims.  There could be a whole host of

6 potential claims arising from environmental contamination on

7 property, not just CERCLA liability.  States all have their own

8 versions of the CERCLA statute.  There's common law liability

9 in many states for nuisance.  There's a whole host of claims.

10    MR. STRAVINO:  But Your --

11    THE COURT:  So just deal with the issue of why you

12 believe American Axle should be permitted to file a late claim

13 now.  You started by -- in answering my question talking about

14 future claims.  Well, future claims don't cut it because you

15 wouldn't be able to file a proof of claim if a contingent claim

16 didn't exist as of the petition date.  Agreed?

17    MR. STRAVINO:  Agreed, Your Honor.  But I think -- I

18 guess I'll go with our final argument that we had made in our

19 papers, where we said that if American Axle's claim is not a

20 prepetition claim, it is not futile nor is it barred by

21 11 U.S.C. 502(e)(1)(B).  And there -- and this was at the end

22 of our reply papers that we briefly addressed, but in the

23 context of environmental liability, our understanding from

24 precedent is that 502(e)(1)(B) won't bar a private creditor's

25 claim or the relevant government agency does not file a claim

22

1  against the debtor.

2         And so at the time of the bar date, as well as --

3  well, at the time of the bankruptcy, at the time of the bar

4  date, there had been no government claims against the debtor.

5  There had been no private party claim against the debtor.  And

6  so we believe that because New York hadn't filed a claim, that

7  there was no co-liability element and therefore it's not

8  present here.

9         THE COURT:  Okay.  I (indiscernible).  Thank you.

10        MR. STRAVINO:  Okay.

11        THE COURT:  Let me hear from the GUC Trust next.

12        MS. ERBECK:  Good morning, Your Honor.  Marita

13  Erbeck, Drinker, Biddle & Reath, on behalf of the GUC Trust.  I

14  don't think anything that we've heard today really changes what

15  we've articulated in our papers and changes the fact that there

16  was sort of a classic contingent claim that existed as of the

17  bar date.  I'm going to just sort of hit on a few points.  I

18  won't sort of rehash everything that's in our papers.

19        You know, the Court sort of picked up on one of the

20  main themes of, I think, our papers and, you know, what I

21  intended for the presentation to be here today, and that's that

22  American Axle had notice of the environmental contamination as

23  early as 1994, rather, and also had actual notice of the

24  bankruptcy, the bar date.  Usually in late claim motions like

25  this, we're sort of arguing about whether someone's an unknown

23

1  creditor, whether we can sort of loop them in using publication

2  notice, but here, we sort of have the rare case of actual

3  notice of the bankruptcy and the bar date, and I think those

4  things are ally important to keep in mind.

5       Just with respect to, you know, whether or not a

6  contingent claim existed, I think this is sort of your classic

7  contingent claim.  Section 1055(a) of the Code is broad and is

8  broad by design.  It expressly includes contingent claims, and

9  those contingent claims are claims that are dependent on

10 something that may or may not happen in the future here.

11      THE COURT:  Like New York finally coming around and

12 saying clean it up.

13      MS. ERBECK:  Hey, you might be -- you might have to

14 pay.  That's exactly right.  You know, sort of the basis of the

15 claim, the foundation of the claim, is the contamination

16 itself.  And so to answer the question that Your Honor was

17 asking counsel for American Axle, you know, does this mean --

18 or the hypo that he presented, does this mean that everybody --

19 every, you know, owner or operator of every property that was

20 ever owned by Old GM had to -- would have to file a proof of

21 claim?  If they want to seek recovery or reimbursement for

22 environmental cleanup costs, the answer to that question is

23 yes, right?  In particular in this case where there was, again,

24 knowledge of the contamination and now actual knowledge of the

25 bankruptcy case.  And so I think here, we sort of have your

1  classic contingent claim.

2          American Axle talked a little bit about Chateaugay,

3  and I think Chateaugay is important, obviously, when we think

4  about contingent claims generally, but Chateaugay was also

5  important because it, you know, was really about environmental

6  claims, claims of the EPA.  And I just want to draw the Court's

7  attention to a little bit of language from Chateaugay.  It's at

8  Page -- 944 F.2d 1005.  And here, the Second Circuit says the:

9              "EPA does not yet know the full extent of the

10             hazardous waste removal costs that it may one day

11             incur and seek to impose upon LTV" --

12 -- that was the debtor --

13             -- "and it does not yet even know the location of all

14             the sites at which such wastes may yet be found. But

15             the location of these sites, the determination of

16             their coverage by CERCLA, and the incurring of

17             response costs by EPA are all steps that may fairly

18             be viewed, in the regulatory context, as rendering

19             EPA's claim 'contingent,' rather than as placing it

20             outside the Code's definition of 'claim.'"

21         And I think that's really important to keep in mind

22 here.  Here, we have American Axle sort of arguing that, we

23 didn't know in 2009 what the -- you know, that there would be

24 response costs, what the response costs would be, and I think,

25 you know, the Second Circuit in Chateaugay kind of tells us

1 that you still have to file your claim if you want to later

2 seek recovery again.  In particular here, there was actual

3 knowledge of the contamination.

4        I think the cases that were cited in the reply missed

5 the mark.  A few of them were mentioned today.  It was argued

6 so far today that Old GM was the sole PRP.  I think CERCLA kind

7 of tells us that while Old GM may have been the only PRP that

8 was, at that point, looked at for payment of some of these

9 environmental remediation costs, every owner and operator was a

10 potentially responsible party under CERCLA and applicable state

11 law.  I certainly think that sort of rings hollow.  While

12 American Axle argues that they were not aware of their CERCLA

13 claim, it's been acknowledged in the papers and here today that

14 they were aware of sort of the underlying contamination, and I

15 think that's dispositive of the issue.

16        Just to sort of hit very briefly on a few of the

17 cases that were mentioned today, the <u>Chicago, Milwaukee,</u>

18 <u>St. Paul & Pacific Railroad Company</u> case, the Seventh Circuit

19 case from 1992, I think American Axle wants to look to this

20 case for the standard of, you know, the factors that should be

21 considered, but I think it's also important to sort of read the

22 rest of that case.  In that case, the Seventh Circuit expressly

23 stated:

24            "When a potential CERCLA claimant can tie the

25            bankruptcy debtor to a known release of a hazardous

26

1          substance which this potential claimant knows will

2          lead to CERCLA response costs, and when this

3          potential claimant has, in fact, conducted tests" --

4  -- I think here maybe there weren't tests conducted but there

5  was actual knowledge --

6          -- "with regard to this contamination problem, then

7          this potential claimant has, at least, a contingent

8          CERCLA claim."

9          I think there's sort of similar language in the AM

10  International case that was mentioned here today.  I think in

11  that case, the court ultimately actually followed Chateaugay,

12  and I think that's sort of important.  Both ownership and

13  CERCLA were facts that were identified by that court as

14  important things to think about when you're deciding whether

15  something was fairly contemplated.  And then, in the DMJ

16  Associates case, the 2016 case from the Eastern District of New

17  York, American Axle cites this case for the proposition that a

18  claim hadn't -- didn't arise at the time that the creditor

19  became aware of the contamination but rather when the CERCLA

20  claim became available.  I think in that case, it's important

21  to know that there wasn't liability in that case because the

22  relevant section of CERCLA had not yet been enacted.  And so

23  there couldn't have been any sort of fair contemplation because

24  the statutory provision was not yet law.  So I think with

25  respect to those issues, the actual knowledge of the

27

1  contamination and CERCLA itself is dispositive of that issue.

2         I'll touch very briefly on _Pioneer_.  The _Pioneer_

3  standard is well known to the Court, and so I won't rehash it

4  of the four factors.  I think the factor that we're most

5  focused on today is the reason for the delay.  The motion

6  itself, the reply, and I think that we've heard here today can

7  be fairly characterized as American Axle sort of fundamentally

8  misunderstanding when they had a claim and what that claim was.

9         This Court has noticed, has identified, has

10 recognized before that a claimant's neglect is not excusable

11 when its failure to comply with the rule of filing a claim by

12 the bar date was the result of a mistake of law.  And counsel

13 argued here today that, you know, they just didn't think there

14 was a contamination issue anymore.  I think -- and essentially

15 that there -- they didn't have a claim because they hadn't yet

16 been asked to pay anything.

17        And I think the district court's opinion in _Michigan_

18 _Self-Insurers' Security Fund v. DPH Holdings_ is sort of

19 instructive on this point.  The claimant in that case was the

20 Michigan Self-Insurers' Security Fund, and that was a fund that

21 was created by state law essentially to pay for workers' comp.

22 claims when the employer became insolvent.  When the debtor in

23 that case filed bankruptcy in 2005, it was current on its

24 workers' comp. payments.  It was current on its workers' comp.

25 payments, you know, through the bankruptcy case, up to

28

1   confirmation.  And in connection with confirmation in that

2   case, the debtor essentially indicated that it was going to

3   stop making its workers' comp. payments.  And only at that

4   point did the fund in that case essentially try to file two

5   proofs of claim to address unpaid workers' comp. payments.  The

6   debtor objected to the claims because they were after the bar

7   date.  Then, the claimant in that case filed late claims

8   motions, as you would.  The debtor objected to those late

9   claims motions too, essentially saying, you had these claims,

10  they were contingent, you had these claims at the time of the

11  bar date and you had to assert them.  The bankruptcy court

12  agreed, and Judge Scheindlin in the district court also agreed.

13          Essentially, that's the same excuses here.  We -- I

14  didn't think I had a claim because they were current on their

15  payments, there was nothing for me to pay.  And I think

16  Judge Scheindlin's decision there is important to the issues

17  that we're sort of considering here today.  Even though the

18  fund in that case had no right to payment because the debtor

19  was still current at that time, same would go for American

20  Axle, that there was always a risk that the debtor would stop

21  making those workers' comp. payments.  I think likewise,

22  there's a risk -- there was always a risk that American Axle

23  would be identified as a source of funds for, you know, paying

24  for some of these environmental contamination costs.  There was

25  always a risk of that under CERCLA and applicable state law,

29

1  and so Judge Scheindlin recognized that the fund in that case

2  made a mistake of law, and that was ultimately fatal to its

3  motion to file a late claim.

4          And then, the final point that I will make is on the

5  futility point.  I think the reply brief and the argument here

6  today essentially was that the claim shouldn't be disallowed

7  because, A, there's no double-dip, which is sort of a policy,

8  you know, idea behind whether or not 502(e)(1)(B) should be

9  invoked, but also whether or not there was another claim that

10  was actually filed, right, so whether there's actual

11  co-liability in the sense of the bankruptcy claims.  And I

12  think with respect to that point, the APCO Litigation [sic]

13  Trust case that we cite in our papers is relevant to that

14  issue.  In that case, whether the claim was actually filed is

15  not the measure of whether or not 502(e)(1)(B) can be invoked

16  but rather the mere existence of multiple claims.  Again,

17  whether or not they were asserted is not relevant to that

18  analysis.

19          THE COURT:  Thank you.

20          MS. ERBECK:  That's all I have.  Thanks, Judge.

21          THE COURT:  Mr. Jones.

22          MR. JONES:  Good morning, Your Honor.  May it please

23  the Court.  Your Honor's question --

24          THE COURT:  Just make your appearance for the record.

25          MR. JONES:  Oh, sorry.  David Jones with the U.S.

30

1    Attorney's Office for the United States, opposing the motion.

2           Your Honor's questioning, I think, revealed a quite

3    fair grasp of our position, so I won't go on at length, but

4    because of the motion's importance to the United States,

5    especially the floodgates fear we have, which is very

6    substantial -- let me just spell out the core of our position.

7    The top line is -- what we're here for is to oppose any order

8    that would in any way make RACER Trust responsible for this

9    site.  We take no position on the late motion -- late claim

10   allowance portion of the motion.

11          First, as to the standing question that was briefly

12   touched on, I -- that's not the main thing we're hanging our

13   hat on because I think we have an overwhelmingly strong case as

14   to why the consent decree shouldn't be modified on the merits,

15   but I will pause to say that the Dunlop case on which American

16   Axle relies recognizes that ordinarily to modify a consent

17   decree, you have to be a party and to seek relief on that basis

18   and -- but said that in narrow circumstances, which the Court

19   emphasized were narrow, where a party is sufficiently close to

20   the underlying dispute and directly affected by it, they could

21   be allowed to seek such relief.  As the Court's questioning

22   also questioned -- I'm not at all convinced that's the case

23   here because the purpose of RACER is for the specific purpose

24   of cleaning up 89 listed and designated properties and is

25   specifically not for cleaning up or providing recourse for

31

1  properties where GM might -- that GM didn't have any ownership

2  interest in at the time of the petition.  But -- so formerly

3  owned properties were all consigned to the world of unsecured

4  claims in this case, and that's where, you know, the Tonawanda

5  Forge site at issue here belongs.

6          So -- and just to tease out a little bit why exactly

7  that is, American Axle talks about RACER -- the fact that RACER

8  did have certain responsibilities for non-owned sites.  That

9  was very limited.  I think there were two specific cleanup

10  obligations, one at Framingham, Massachusetts and one at the

11  Upper Ley Creek portion of the -- a site near Syracuse called

12  IFG Syracuse generally in our case.  Both of those met criteria

13  that were carefully explained in Docket Number 9311, which was

14  our statement in support of the settlement, and specifically

15  which something that American Axle hasn't acknowledged.  What

16  was necessary for those two sites to be included in RACER is

17  that they were immediately adjacent to GM-owned properties that

18  were very polluted and they were -- and GM, at the time of the

19  petition, was subject to an order to clean those up, those

20  adjacent properties, as part of its omnibus duty to remediate,

21  under environmental laws, an area that included their own

22  property and some -- and a spillover area. Again, that's not at

23  all the case here.  There was no order as, I think, American

24  Axle agrees.

25          But for those narrow exceptions, unowned sites are

32

1  not RACER's responsibility.  Again, that Docket Number 9311, at

2  Pages 11 and 12, talks about the basis for including what's in

3  the RACER Trust and its portfolio of responsibilities, and that

4  same document at Pages 32 to 37 explains and justifies why

5  other non-owned sites are not included in the RACER Trust.  A

6  number of objectors to the settlement said, me too, I should be

7  covered by that, as well, and we said, no, so sorry, we

8  sympathize with your problems, but, you know, the RACER Trust

9  can only exist to serve a core set of estate obligations.  And

10 that's true -- that's important not only as a matter of

11 prioritizing resources, but also because as a matter of law,

12 debtors are obliged to fully fund and comply with their

13 non-bankruptcy law obligations post-petition.  That is the

14 genesis of the obligation that led to the RACER Trust.  So you

15 have to clean and remediate your properties once you're

16 post-petition to meet your administrative claim obligations and

17 to meet your injunctive obligations.  That's also true about

18 areas where -- which you may not own but where you're subjected

19 to orders.  That doesn't apply to sites like the Tonawanda

20 Forge site.

21        So that really is the heart of our position.  Oh,

22 I'll just say something that came up in colloquy today where

23 the movant acknowledged that GM had largely remediated and

24 contained any positive spillout from the facility it owned in

25 that area is -- demonstrates that this is -- and explains why

33

1  this isn't that kind of property that could trigger RACER

2  obligations.  GM had already done the work to confine whatever

3  contamination it had to its own property, and so there was no

4  ongoing problem that the debtor could have been legally

5  required to address and fix and that would have triggered and

6  justified assignment to RACER.

7          Having drawn no questions, and I think that's the

8  heart of my position, I think I'll stop talking.  So thank you

9  very much, Your Honor.

10          THE COURT:  Thank you very much, Mr. Jones.

11          MR. JONES:  We request that RACER not be -- have its

12  mission diluted and that it be able to continue its good work.

13  Thank you.

14          THE COURT:  Thank you.

15          Mr. Blumenthal.

16          MR. BLUMENTHAL:  Good morning.  Michael Blumenthal

17  from Thompson & Knight on behalf of the RACER Trust.

18          Your Honor, I will not belabor the record.

19  Mr. Jones, who -- the U.S. Government is our beneficiary.  I

20  just want to point out two or three things.  I think it's

21  already been pointed out by Mr. Jones that the American Axle

22  property is not adjacent to any of the 89 properties that were

23  transferred by Old GM, which were owned by Old GM at the time

24  they were being transferred, and that the only property -- or

25  two properties that were included in the trust were adjacent to

34

1  the properties that were transferred to the trust and, more

2  importantly, were specifically funded under the consent decree

3  along with the other 89 properties.  There's a budget for each

4  property, Your Honor.  The amount that was funded by the

5  Government was not a gross amount just, here, go remediate 89

6  properties.  It was specific funding for each property.  We are

7  not allowed to take from one property for another.  It would

8  violate the consent decree.  And I think Your Honor may have

9  hit upon an important point, that --

10         THE COURT:  Accidents happen sometimes.

11         MR. BLUMENTHAL:  Yes, Your Honor.  The settlement --

12  the consent decree and settlement agreement was an agreement

13  among 14 states, the U.S. Government, and the Mohawk tribe, not

14  with properties owners, and it settled the proofs of claim that

15  were filed by the various governmental agencies.  It was only

16  for properties that Old GM owned at the time.

17         This particular property is adjacent to a New GM

18  facility, not ours.  There is absolutely no funding.  This

19  property was not owned by Old GM at the time of the petition

20  date and, moreover, has in excess of $4 million of liens

21  against it.  Under the consent decree, the properties that were

22  transferred into the trust were transferred in free and clear.

23  The -- as we indicated in the final paragraph of our objection,

24  I'll call it a limited response, the only way that you could

25  even consider this is sending notice out to 14 attorney

35

1  generals of the various states, the Mohawk tribe, and our

2  beneficiary, and somehow come up with third-party funding and

3  somehow release the liens from the property and transfer the

4  property in.  Those circumstances are not about to happen or

5  occur.  There would be a floodgate of litigation over that

6  issue.

7          The trust has a specific -- has specific authority to

8  do only what it is authorized to do.  We cannot take on

9  additional properties.  We're not allowed to.  And this really,

10 Your Honor, boils down, at this point in time, to a two-party

11 dispute between two non-debtors, New York State and American

12 Axle.  It has nothing to do with the trust or Old GM anymore.

13         THE COURT:  Thank you.

14         MR. BLUMENTHAL:  Thank you.

15         THE COURT:  All right.  Mr. Stravino, very briefly.

16         MR. STRAVINO:  Yes, Your Honor, briefly.

17         First, with respect to the GUC Trust arguments and

18 the citation to <u>Chateaugay</u>, again, at that point in time, the

19 critical distinction in that case between ours is that there

20 already was environmental remediation going on.  There was not

21 in ours at the time of the filing.

22         With respect to the <u>DMJ</u> case that was cited form the

23 Eastern District of New York from 2016, it was noted that

24 CERCLA's private cause of action under Section 107 arose in

25 2007.  But the sentence before that said, quote:

36

1        "Here, the third-party plaintiffs lacked knowledge as

2        to the existence of any claim whatsoever at the time

3        RCPA filed for bankruptcy protection."

4        So I believe, Your Honor, that was the principal

5    analysis by the court that it did not exist at the time, and we

6    have cited in our papers various cases about when CERCLA claims

7    actually become available.

8        With respect to the workers' compensation case, if an

9    environmental remediation was ongoing and was being funded and

10   GM filed for bankruptcy, then I could understand how you would

11   say we should file a proof of claim because they may not be

12   able -- just like the workers' comp. that was being funded and

13   there was a bankruptcy.  But, Your Honor, that's not the case

14   here.  Again, upon information and belief, even to the best of

15   our knowledge and, I assume -- I can't speak on behalf of the

16   State of New York, they didn't put in papers, but this was not

17   one of their 21 proofs of claim.  They did not think there was

18   an issue here.

19       Furthermore, we did not argue this earlier, but in

20   terms of when -- there had been -- the GUC Trust had taken a

21   position in the Gillespie matter where Mr. Gillespie was -- in

22   the 2017 decision, Mr. Gillespie was a former -- Your Honor's

23   familiar with the case.

24       THE COURT: I'm familiar with Mr. Gillespie.

25       MR. STRAVINO:  Yes.  And they said that his claim did

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

37

1  not arise until his conviction was overturned or reversed in

2  2012.  And so respectfully, Your Honor, we believe that

3  supports our position here.  So with respect to the workers'

4  compensation and that matter --

5          THE COURT:  What did I rule in Gillespie?

6          MR. STRAVINO:  Your Honor, that was -- you were not

7  favorable to us or to Mr. Gillespie, so acknowledged.  I'm just

8  saying what the --

9          THE COURT:  I don't think you're getting any mileage

10  out of the Gillespie decision.  Let's put it that way.

11          MR. STRAVINO:  Okay.  Well, I'll move on.  I'll take

12  that as a -- and briefly, Your Honor, with respect to Mr. Jones

13  saying that we thought that the -- I'll say "contamination" --

14  had already been contained.  I believe that's correct, but we

15  don't know, and now there's a question with respect to the

16  site.  We also thought that the entire site had been

17  remediated.

18          So -- and finally with respect to Mr. Blumenthal

19  saying that there would be a floodgate of litigation, I'm not

20  sure if we know that or could predict that, especially this

21  number of years later.  If this was very soon thereafter --

22          THE COURT:  Who thought American Axle was going to

23  come forward this many years later.

24          MR. STRAVINO:  Right.  And we thought -- you're

25  right.  We thought New York State would come after American

38

1  Axle.  But respectfully, Your Honor, we appreciate the Court's

2  time and consideration.  We rely on the arguments and our

3  papers.  We think the equitable result here is to both be

4  included in the RACER Trust or, in the alternative, to be able

5  to adjudicate the --

6          THE COURT:  All right.  I'm going to take the matter

7  under submission.  We're going to be in recess for about five

8  minutes, ten minutes, and then we'll resume on the next matter.

9  Thank you very much everybody.

10          UNIDENTIFIED:  Thank you.

11          MR. STRAVINO:  Thank you.

12      (Proceedings concluded at 10:55 a.m.)

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

39

# C E R T I F I C A T I O N

    I, Alicia Jarrett, court-approved transcriber, hereby
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.



ALICIA JARRETT, AAERT NO. 428      DATE:  March 11, 2019

ACCESS TRANSCRIPTS, LLC