**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:                                                                    **FOR PUBLICATION**

MOTORS LIQUIDATION COMPANY, f/k/a                                         Chapter 11
GENERAL MOTORS CORPORATION, *et al.*,
                                                                          Case No. 09-50026 (MG)
                                                                          (Jointly Administered)

                                                          Debtors.

-------------------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER DENYING AMERICAN AXLE'S MOTION**
**TO INCLUDE THE TONAWADA FORGE SITE IN THE RACER TRUST OR TO FILE**
**A LATE CLAIM AGAINST THE GUC TRUST**

*A P P E A R A N C E S :*

HODGSON RUSS LLP
*Counsel for American Axle & Manufacturing, Inc.*
140 Pearl Street, Suite 100
Buffalo, New York 14202
By:     James C. Thoman, Esq.
        Jeffrey C. Stravino, Esq.

DRINKER BIDDLE & REATH LLP
*Counsel for the GUC Trust*
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
By:     Kristen K. Going, Esq.
        Marita S. Erbeck, Esq.

UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK
*Counsel for the United States of America*
86 Chambers Street, Third Floor
By:     David S. Jones, Esq.

THOMPSON & KNIGHT LLP
*Counsel for the RACER Trust*
900 Third Avenue, 20th Floor
By:     Michael V. Blumenthal, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is American Axle & Manufacturing, Inc.'s ("American Axle")

motion ("Motion," ECF Doc. # 14393), seeking to include in the Revitalizing Auto Communities

Environmental Response Trust ("RACER Trust") real property located at 2390 and 2392

Kenmore Avenue, Tonawanda, New York (the "Site").  In the alternative, American Axle seeks

to file a late claim against the General Unsecured Creditors Trust ("GUC Trust").  In support of

the Motion, American Axle filed its memorandum of law ("American Axle's Brief," ECF Doc. #

14393-6).

Three parties filed objections to the Motion.  The United States Government objects to

the primary relief.  (ECF Doc. # 14435.)  The Wilmington Trust Company, as the administrator

of the GUC Trust, objects to the alternative relief.  ("GUC Trust Objection," ECF Doc. # 14432.)

Additionally, RACER Trust filed a response to the Motion.  (ECF Doc. # 14436.)  American

Axle filed a reply to the objections.  ("Reply," ECF Doc. # 14445.)

American Axle waited over nine years to assert its claim despite its knowledge of the

underlying facts.  This claim arose out of the environmental contamination at the Site that took

place decades before General Motors Corporation's ("Old GM") bankruptcy in June 2009.

American Axle acquired the Site from Old GM in 1994 and sold it in 2008.  At the time of the

acquisition, Old GM disclosed environmental contamination at the Site to American Axle.  In the

asset purchase agreement ("Agreement," ECF Doc. # 14432-1 at 3–60), American Axle released

Old GM from liabilities for numerous contaminants at the Site, and Old GM's indemnification

obligations expired 10 years after the transaction closed.  American Axle not only knew about

the environmental contamination but also participated in the administrative proceedings

involving the contaminated property before Old GM's bankruptcy.  Throughout Old GM's

2

bankruptcy proceeding, American Axle was timely served with all notices, including notice of the bankruptcy filing, the 363 sale, and the bar date ("Bar Date," November 30, 2009 at 5:00 p.m. (Eastern Time)). Despite actual knowledge of the bankruptcy and of the contamination, American Axle did not file a proof of claim by the Bar Date.

The Motion is **DENIED** in its entirety because (1) American Axle is not entitled to modify a consent decree that delineated the functions of the RACER Trust; (2) American Axle's due process was not violated; (3) American Axle had a prepetition, contingent claim; (4) American Axle's failure to timely file a proof of claim does not qualify as excusable neglect; and (5) section 502(e)(1)(B) disallows the claim.

## I.    BACKGROUND

### A.    History of the Site

The Site was once part of the Old GM's Tonawanda engine plant facility, which consisted of three major operations: the engine plant, the foundry complex, and the forge facility. ("Exhibit B to the Mark Williams Declaration," ECF Doc. # 14393-4, at 4.) Various industrial processes contaminated the Site. (*Id.*) On February 18, 1994, Old GM sold the Site to American Axle pursuant to the Agreement. ("Exhibit A to the Mark Williams Declaration," ECF Doc. # 14393-3, at 3.) In the Agreement, Old GM disclosed to American Axle that the property was contaminated with mono or polychlorinated biphenyl ("PCBs"). (*See generally* "Erbeck Certification," ECF Doc. # 14432-1.) Additionally, the Agreement provided for the implementation of remedial plans to deal with hazardous materials at the Site. (*Id.*)

During American Axle's tenancy, Old GM continued to investigate and remediate environmental issues at the Site. ("Mark Williams Declaration," ECF Doc. # 14393-2, at 4.) In 2002 and 2003, the Site was the subject of an administrative proceeding before the New York State Department of Environmental Conservation. (Exhibit B to the Mark Williams Declaration

3

at 2–3.)  American Axle, then owner of the Site, participated in the proceeding along with Old

GM.  (*Id.*)  The subsequent report, issued on March 27, 2003, contained findings that the soil and

groundwater at the Site contained elevated levels of PCBs.  (*Id.*)

### B.    Old GM's Bankruptcy

The circumstances surrounding the General Motors bankruptcy are well documented,

thus the Court offers an abbreviated summary.  On June 1, 2009, Old GM and affiliated entities

filed chapter 11 bankruptcy petitions in this Court.  *In re GM Corp.*, 407 B.R. 463, 479–80

(Bankr. S.D.N.Y. 2009).  On the same day, Old GM filed a motion seeking approval to sell

substantially all of its assets pursuant to 11 U.S.C. § 363 (the "Sale") to the entity that became

New GM.  *Id.*  On July 5, 2009, the Court approved the Sale after addressing and dismissing

numerous objections to the Sale.  *Id.*  On July 10, 2009, the Sale closed, and New GM began

operating in the automobile manufacturing business.

On September 2, 2009, Old GM filed a motion requesting that the Court set a Bar Date

for all prepetition claims against Old GM or any of its affiliated debtors ("Debtors") that did not

appear on the schedules of assets and liabilities.  (*See* ECF Doc. # 3940.)  The Bar Date motion

contained a proposed form of notice for the Bar Date, the proposed procedures for delivering

such notice, and a proposed model proof of claim.  (*Id.*)  On September 16, 2009, the Court

issued an order approving the Bar Date motion and establishing November 30, 2009 as the Bar

Date.  (ECF Doc. # 4079.)  The order stated:

> [A]ny holder of a Claim against the Debtors that is required but
> fails  to file a Proof of Claim in accordance with this Bar Date
> Order . . .  shall be forever barred, estopped and enjoined from
> asserting such Claim against each of the Debtors and their
> respective estates (or filing a Proof of Claim with respect thereto),
> and each of the Debtors and their respective chapter 11 estates,
> successors, and property shall be forever discharged from any and
> all indebtedness or liability with respect to such Claim.

4

(*Id.* at 5.)

American Axle was a known creditor at the time of the bankruptcy filing and received

actual notice of the bankruptcy.  Throughout the bankruptcy process, the Garden City Group,

Old GM's notice and claims agent, served American Axle with all required notices at numerous

addresses, including notice of the sale hearing (ECF Doc. # 2852), notice of the order confirming

the Debtors' plan (ECF Doc. # 10205), and notice of the Bar Date for filing proofs of claim (ECF

Doc. # 4238).  Notwithstanding every possible notice, American Axle did not file a proof of

claim.

### C.    Creation of the GUC Trust and RACER Trust

On March 29, 2011, the Court entered an order (the "Confirmation Order," ECF Doc. #

9941) confirming the Debtors' second amended joint chapter 11 plan (the "Plan," ECF Doc. #

9836).  Pursuant to the Confirmation Order and the Plan, the Debtors established the GUC Trust,

which has been administered by Wilmington Trust Company.  Pursuant to the terms of the Plan

and Confirmation Order, the GUC Trust holds certain assets of Old GM, and these assets have

been used to pay creditors' unsecured claims on a *pro rata* basis.  At this time, the Debtors'

unsecured creditors have received distributions in the amount of approximately 29.6% of

allowed claims.  (GUC Trust Objection at 11.)

In addition to the GUC Trust, the plan also called for the creation of the RACER Trust,

whose mission is to clean up and position for redevelopment properties owned or operated by

Old GM at the time of its bankruptcy.  The Trust was formally established in March 2011

pursuant to a consent decree.  ("Consent Decree," ECF Doc. 9836, Exhibit C.)  The Consent

Decree was entered by the Debtors, the United States, 14 individual states, and the Saint Regis

Mohawk Tribe.  Each of the governmental entities who participated in the Consent Decree

timely filed proofs of claim to recover environmental remediation costs from Old GM.  (*Id.* at 4.)

5

The Consent Decree covered 89 properties in 14 states that were contaminated during Old GM's

tenancy and were the subject of environmental response activities and other work. (*Id.* at 2.) As

consideration for participating in the Consent Decree and having properties added to the RACER

Trust, the government creditors agreed that their proofs of claim would be deemed satisfied and

they would not receive any other distributions in the bankruptcy on account of those claims. (*Id.*

at 56–57.)

In May 2013, the Site was listed as a Class 2 site in the State Registry of Inactive

Hazardous Waste Sites (the list of State Superfund sites). (*See* Exhibit A to the Mark Williams

Declaration.) Since the present owner of the Site, Lewis Brothers LLC, is a defunct entity,

American Axle has now become concerned that it could be required to shoulder future

remediation costs. (*See, e.g.* American Axle's Brief at 1–2.) American Axle believes that the

environmental remediation efforts should be funded and handled by the RACER Trust and,

through the Motion, it seeks to add the Site to the RACER Trust. (*Id.*) If the Site cannot be

included in the RACER Trust, American Axle seeks the alternative relief of leave to file a late

claim against the GUC Trust. (*Id.*)

## II.    DISCUSSION

### A.    American Axle Cannot Modify the Consent Decree

The Consent Decree governs the responsibilities and activities of the RACER Trust. The

Motion seeks to modify the Consent Decree to make the RACER Trust responsible for cleanup

or liability in connection with the Site. Thus, the Motion must satisfy the legal requirements for

the modification of a consent decree.

"Consent decrees have elements of both contracts and judicial decrees." *Frew ex rel.*

*Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Firefighters v. Cleveland*, 478 U.S. 501, 519

(1986)). Rule 60(b) of the Federal Rules of Civil Procedure authorizes a court to modify a

consent decree where, *inter alia*, "applying it prospectively is no longer equitable," or "any other reason . . . justifies relief" from its operation. FED. R. CIV. P. 60(b)(5)–(6); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) (stating that a consent decree is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees") (citations omitted). A court that enters a consent decree "retains the authority, and the responsibility, to make further amendments to [an] existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011).

Non-parties to the litigation giving rise to a consent decree may not collaterally attack it or appeal from it without intervening. *See Marin v. Ortiz*, 806 F.2d 1144, 1146 (2d Cir. 1986), *aff'd by equally divided court*, 484 U.S. 301 (1987) (stating that "collateral attacks on consent decrees entered in Title VII actions are not permitted"; the "proper course . . . would have been to intervene in the lawsuit from which the consent decree issued").

Moreover, when an appropriate party moves to modify a consent decree pursuant to Rule 60(b), the "party seeking modification bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383; *see also Barcia v. Sitkin*, 367 F.3d 87, 99 (2d Cir. 2004) ("[T]he party seeking an alteration bears the initial burden of establishing that a significant change in circumstances warrants the modification. This burden may be met by showing that there has been a significant change either in factual conditions or in law. If the party seeking modification meets this burden, the court then must consider whether the modification proposed is suitably tailored to the changed circumstance.") (citations and quotation marks omitted)).

7

Further, "equity countenances the modification of a[n] injunctive decree" if "a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 244 (S.D.N.Y. 2004) (quoting *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969) (internal quotation marks omitted)).

Assuming American Axle has standing to seek to modify the Consent Decree despite its non-party status and is not mounting an impermissible collateral attack, it fails to carry the burden of establishing a significant change in circumstances that would warrant a revision of the Consent Decree. American Axle contends that a significant change in circumstances has arisen in that New York State filed a lawsuit against American Axle under the Oil Spill Act and threatened to file a second lawsuit under CERCLA because American Axle is essentially the only owner in the Site's history that remains financially viable. (Reply at 7.) While this constitutes "a significant change in circumstances" from American Axle's perspective, it does not qualify as a significant change for the purpose of modifying the Consent Decree. As the party seeking to modify the Consent Decree, American Axle has failed to show a significant change either in factual conditions or in law. (*See id.* at 7.)

Furthermore, even assuming American Axle carries its burden in showing a significant change in circumstances, the inclusion of the Site, as the proposed modification, is not properly adapted to accomplishing the purposes of the RACER Trust. First, the RACER Trust's purpose is to remediate and restore 89 former GM properties that remained estate property as of the petition date. (*See* ECF Doc. # 9311.) Second, the Consent Decree did not make the RACER Trust generally responsible for environmental liabilities at sites that GM no longer owned as of the petition date. Rather, the United States and its environmental agencies filed one or more

8

proofs of claim or protective proofs of claim with respect to those liabilities and settled its proofs

of claim in a separate series of settlements under the Bankruptcy Code and the environmental

laws.  (*See* ECF Doc. ## 9943, 10453, 11564, 11881 (orders approving settlements between

Debtors and the United States on account of federal environmental proofs of claim).)  Any

departure from or expansion of the RACER Trust's critical mission would divert RACER Trust's

assets and risk undermining its success in its assigned tasks.  Lastly, granting such treatment to

the Site creates a precedent favoring similar accommodations for any number of other sites at

which claimants could assert that GM caused contamination that should be remediated by the

RACER Trust, notwithstanding the narrowly delineated responsibilities under the Consent

Decree—thereby seriously interfering with the trust's ability to perform its assigned function.

### B.    American Axle's Due Process Was Not Violated

American Axle argues that not allowing it to pursue its late claim would violate its due

process rights.  (Motion at 7–10.)  Because the company received actual notices throughout Old

GM's bankruptcy, this argument is unavailing.  The due process prerequisite for discharging a

creditor's claim in bankruptcy requires that the creditor be given proper notice.  *See In re U.S.H.

Corp. of New York*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998).  To satisfy due process, a party

seeking relief must provide "notice reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their

objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

Old GM's claims and noticing agent served American Axle with all necessary notices,

including notice of the Sale, the Confirmation Order, and, most importantly, the Bar Date for

filing proofs of claim.[1]  These notices were sent to American Axle at numerous addresses.  While

---

[1]        American Axle was given notice throughout Old GM's bankruptcy.  (*See* ECF Doc. ## 2852, 4238, and
10205) (Affidavits of Service by Garden City Group, the Debtor's court-appointed noticing agent, of Notice of

American Axle does not dispute having received these notices, it argues that it lacked "sufficient notice regarding *its interest* in the initial bankruptcy proceedings." (Motion at 14 (emphasis added).) Due process, however, does not obligate a debtor to notify creditors of the nature or scope of potential claims or to advise creditors regarding the viability or merits of such claims. To be clear, creditors themselves have the "responsibility to diligently investigate what claims they may have against the debtor." *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143, 158 (E.D.N.Y. 2012); *see also In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 126 (Bankr. S.D.N.Y. 2010) ("Creditors act at their peril where they fail to adequately investigate and pursue their rights."). By providing American Axle with actual notice of the "debtor's bankruptcy case and [of the] applicable bar date," Old GM satisfied its due process obligations. *In re XO Commc'ns, Inc.*, 301 B.R. 782, 792 (Bankr. S.D.N.Y. 2003) ("The Due Process Clause of the Fifth Amendment dictates that a debtor's creditors receive notice of the *debtor's bankruptcy case and applicable bar date* so that creditors have an opportunity to make any claims they may have against the debtor's estate.") (emphasis added).

Moreover, American Axle's purported lack of notice regarding "its interest" in the bankruptcy conflicts with the facts set forth in its Motion. The Agreement conveying the Site to American Axle disclosed the presence of PCBs and other hazardous materials.[2] (*See generally*

---

Interim Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates; Interim Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates, and (II) Scheduling a Final Hearing; Notice of Sale Hearing to Sell Substantially All of Debtors' Assets Pursuant to Master Sale and Purchase Agreement with Vehicle Acquisition Holdings LLC, a U.S. Treasury-Sponsored Purchaser; Notice of Bar Dates for Filing of Proofs of Claim; Notice and a Proof of Claim Form; Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date).)

[2]    Section 6.8 of the Agreement states that "GM has informed [American Axle] that the Assets, including, but not limited to, the Real Property, as defined in Section 1.1.1., may include, among other things, transformers and capacitors that may contain mono or polychlorinated biphenyl ("PCBs") dielectric or other materials." (Agreement at 31.)

Erbeck Certification.)  Further, American Axle has known about environmental issues at the Site since before Old GM's bankruptcy—"*during American Axle's tenancy* [from 1994 to 2008], Old GM investigated and remediated contaminants disposed by Old GM that pre-dated American Axle['s tenancy]."  (Mark Williams Declaration at 4 (emphasis added).)  In fact, several years before Old GM's bankruptcy, American Axle was involved in administrative proceedings concerning the cleanup of PCBs at the Site.  *See In the Matter of the Disputed Regulatory Program Fees of GM Powertrain—Tonawanda Engine Plant American Axle & Manufacturing, Inc.*, 2003 WL 1880837, at *3 (N.Y. Dept. Env. Conserv. March 27, 2003).  Thus, even if due process did demand that creditors receive notice of their individual interests in the proceeding, American Axle had that notice.  It knew of the environmental contamination and of the potential liability as a former owner and operator of the Site under state and federal environmental law.

### C.    American Axle Had a Contingent Claim Under Section 101(5)(A)

A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  By defining "claim" in such a way, Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case," thus affording debtors "the broadest possible relief in the bankruptcy court."  H.R. Rep. 95-595 (1978).  The Second Circuit has held "that the term 'claim' is sufficiently broad to encompass any possible right to payment."  *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997).  The Supreme Court has similarly advanced the view that "claim" has "the broadest available definition."  *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)).

There is no doubt "a 'claim' can exist under the Code before a right to payment exists under [non-bankruptcy] law."  *In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010); *In re*

*Caldor, Inc.-NY*, 240 B.R. 180, 192 (Bankr. S.D.N.Y. 1999) ("[C]reditor need not have a cause

of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for

purposes of the Code"); *see also* 2 COLLIER ON BANKRUPTCY ¶ 101.05 (16th ed. 2018) ("'Claim'

may also include a cause of action or right to payment that has not yet accrued or become

cognizable."). The Code's definition of claim expressly includes "contingent" claims—in other

words, rights to payment that are "possible," "uncertain," or "[d]ependent on something that

might or might not happen in the future." BLACK'S LAW DICTIONARY (10th ed. 2014); *see also*

*In re Drexel Burnham Lambert Grp. Inc.*, 148 B.R. 982, 987 (Bankr. S.D.N.Y. 1992) ("[A]

contingent claim is by definition a claim which has not yet accrued and which is dependent upon

some future event that may never happen").

        The GUC Trust contends that prior to filing the Motion, American Axle made no effort to

pursue its claim and that American Axle's failure to timely file a proof of claim resulted from its

misunderstanding as to what a "claim" is and when it arises for bankruptcy purposes. (GUC

Trust Objection at 9.) Further, the GUC Trust argues that American Axle had a contingent claim

under section 101(5)(A) of the Bankruptcy Code. (*Id.* at 9–11.) American Axle, however, does

not dispute the contingent nature of its claim and instead focuses on the two tests for when a

claim arises. (Reply at 8–12.) Because American Axle's right to payment depends on a

subsequent event, namely, American Axle's eventual liability for cleanup costs, its claim falls

within the definition of a contingent claim. *See Olin Corp. v. Riverwood Int'l Corp. (In re*

*Manville Forest Prod. Corp.)*, 209 F.3d 125, 129 (2d Cir. 2000) (observing that "the fact [the

creditor] did not know the specific parameters of its liability . . . is precisely what made the claim

contingent").

To date, American Axle's claim remains contingent.  American Axle never suggests that any subsequent event has transformed a speculative or unactionable right to payment into a legally actionable claim.  To be clear, American Axle has not been found liable for cleanup costs and has not paid a penny toward environmental remediation at the Site.  American Axle discusses only "*potential* liability for the cleanup" or how "New York State *may* pursue it" and "*may* seek to hold American Axle responsible for contamination."  (American Axle's Brief at 8, 18 (emphasis added).)  The Court agrees with the GUC Trust that as a practical matter, the only difference between 2009 and 2019 is that American Axle has since realized the future need to seek contribution from Old GM.

In the Motion, American Axle does not specify the basis of its claim against the GUC Trust.  It is unlikely that such claim derives from the Agreement due to a release by American Axle and an expiration of Old GM's indemnification obligations to American Axle.  First, the Agreement provides that "[American Axle] hereby expressly releases . . . GM with respect to environmental matters or conditions . . . arising from or related to the presence of PCBs, asbestos . . . ."  (Erbeck Certification at 35.)  Second, the Agreement states that "[u]pon expiration of the ten (10) year period after the date of Closing, the indemnification requirements . . . will terminate and AAM [American Axle] will have no right of action against GM for environmental matters or conditions . . . ."  (*Id.* at 38–39.)

In the Reply, American Axle advances a somewhat different argument that its claim is based on the right to pursue Old GM for Old GM's CERCLA liability.  (Reply at 4.)  This argument does not explicate how a CERCLA action would transform American Axle's contingent claim into a legally actionable claim.  In fact, American Axle does not have any CERCLA claim against the GUC Trust because American Axle has not resolved its liability to

13

the United States or a state.  The event that made American Axle uneasy and prompted the filing

of the Motion is a meeting with the Office of the New York State Attorney General to *discuss*

American Axle's *potential* liability for the cleanup of the Site.  (Motion at 1–2 (emphasis

added.))

### D.     American Axle's Contingent Claim Arose Prepetition Under the Prepetition Relationship Test

The Second Circuit has applied both the "prepetition relationship test" and the "fair

contemplation test" in cases involving environmental claims.  *See In re Johns-Manville*

*Corp.*, 552 B.R. 221, 232 (Bankr. S.D.N.Y. 2016) (describing the "accrual test," the "conduct

test," the "prepetition relationship test," and the "fair contemplation test"); *Olin Corp. v.*

*Riverwood Int'l (In re Manville Forest Prods.)*, 209 F.3d 125, 128 (2d Cir. 2000); *United States*

*v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004 (2d Cir. 1991).

In *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir.

2016), the Second Circuit addressed the issue of when a claim arises.  The court applied its own

version of the prepetition relationship test from the *Chateaugay* line of cases.  The court stated

that a claim exists for bankruptcy purposes when: (1) the conduct giving rise to the claim

occurred prepetition; and (2) there is "some minimum 'contact' or 'relationship'" between the

parties such that the creditor's rights do not "depend entirely on the fortuity of future

occurrences."  *Elliott*, 829 F.3d at 156.  With respect to the "prepetition conduct" requirement, if

a claim is contingent on future events, the claim must "result from pre-petition conduct fairly

giving rise to that contingent claim."  *Id.* (quoting *In re Chateaugay Corp.*, 944 F.2d at 1005);

*see also Epstein v. Official Comm. of Unsecured Creditors (In re Piper Aircraft Corp.)*, 58 F.3d

1573, 1577 (11th Cir. 1995) (holding that "an individual has a § 101(5) claim against a debtor"

when "the basis for liability is the debtor's prepetition conduct").

Here, the conduct giving rise to the claim predated Old GM's bankruptcy by decades. The report by the New York State Department of Environmental Conservation found that the Site is contaminated with PCBs. (*See* Exhibit B to the Mark Williams Declaration.) PCBs were banned in the 1970s as part of the Toxic Substances Control Act. *See* 15 U.S.C. § 2605. Even if contamination continued after 1979, American Axle affirms that it never used PCBs during its operations. (Motion at 9.) Therefore, at the latest, the contamination took place before 1994, the year American Axle took possession of the property (at least 15 years before Old GM's bankruptcy). Further, the Agreement makes clear that American Axle was acutely aware of the environmental contamination as of 1994. Regardless of the precise date, contamination of the Site—which is the conduct fairly giving rise to the claim and the entire basis for liability— occurred no less than 15 years before Old GM's bankruptcy. Moreover, American Axle concedes that "the environmental contamination at the Tonawanda Forge Site was caused by Old GM's *pre-bankruptcy activity*." (ECF Doc. # 14393-9, at 13 (emphasis added).) Thus, the first requirement of the prepetition relationship test is satisfied.

With respect to the second requirement of a prepetition relationship, "courts require some minimum 'contact' or 'relationship' that makes identifiable the individual with whom the claim does or would rest." *Elliott*, 829 F.3d at 156 (citations omitted); *see also Piper Aircraft*, 58 F.3d at 1577 (requiring that "events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor"). The purpose of this requirement is "[t]o avoid any practical and constitutional problems" that future claims sometimes entail. *Elliott*, 829 F.3d at 156. The relationship element focuses on "whether the relationship was one in which both parties knew liability could arise." *Johns-Manville Corp.*, 552 B.R. at 233. Thus, "[a] claim will be deemed pre-petition when it arises out of a relationship

recognized in, for example, the law of contracts or torts." *Id.* at 233–34 (quoting *LTV Steel Co.*

*v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir. 1995)).

The "relationship" between American Axle and Old GM came into existence in 1994

when American Axle entered the Agreement with Old GM to acquire the Site.  (GUC Trust

Objection at 20.)  Since then, the parties have had a well-defined legal relationship based upon

contractual privity.  Moreover, American Axle's contingent claim arose out of this legal

relationship.  Hence, American Axle's contingent right to payment clearly did not "depend[]

entirely on the fortuity of future occurrences," *Elliott*, 829 F.3d at 156, but was instead firmly

rooted in the parties' contractual relationship.  Because the parties had a prepetition relationship,

the second requirement of the "prepetition relationship test" is satisfied.

Because application of the prepetition relationship test establishes that American Axle

had a prepetition "claim," it was required to file a proof of claim by the Bar Date if it wished to

participate in any distribution from the GUC Trust.

### E.    American Axle's Contingent Claim Arose Prepetition Under the Fair Contemplation Test

As noted above, the Second Circuit has also applied the "fair contemplation test" in cases

involving environmental claims.  Under this test, a contingent claim is a "claim" within the

meaning of section 101(5) when "the occurrence of the contingency or future event that would

trigger liability was 'within the actual or presumed contemplation of the parties at the time the

original relationship between the parties was created.'"  *In re Motors Liquidation Co.*, 576 B.R.

761, 771 (Bankr. S.D.N.Y. 2017) (quoting *In re Chateaugay Corp.*, 944 F.2d at 1004).

Here, the "contingency" or "future event" triggering liability is American Axle's

incurrence of clean-up cost relating to the contamination at the Site.  As reflected in the

Agreement, such liability was within the actual contemplation of both Old GM and American

16

Axle.  The Agreement shows that both parties were keenly aware of potential environmental liabilities.  As a result of such awareness, the parties addressed environmental issues at length, dedicating over 30 pages to "Environmental Matters."  (Erbeck Certification at 17–51.) Moreover, the mechanisms outlined in the agreement for environmental inspections, reporting, cleanup, and remediation indicate the parties' actual contemplation of the contingency, namely, potential clean-up costs.  (*Id.*)  The agreement also obligated General Motors to indemnify American Axle for liabilities, damages, penalties, or fines related to various environmental claims.  (*Id.*)  Not only did the parties contemplate future environmental liability in the agreement, subsequent events show that environmental liability remained a significant concern throughout the parties' relationship.  The administrative proceedings in 2002 and 2003 revolved around the ongoing environmental remediation.  (Exhibit B to the Mark Williams Declaration at 2–3.)  At the latest, American Axle contemplated its environmental liabilities in 2003.  American Axle's purported oblivion to its contingent claim against Old GM is incongruous with the Agreement and the subsequent legal proceedings. *See Manville Forest Prod.*, 209 F.3d at 129 (finding that "the terms of the indemnification agreements were so broad as to encompass all types of future liability, signaling  that the parties actually or presumedly contemplated possible environmental liability . . . .").  Although American Axle incurred no environmental liability at the time of Old GM's bankruptcy, it knew that future liability was at least probable if not entirely predictable.  This is precisely when Old GM and American Axle accounted for and allocated risks associated with environmental liabilities in the Agreement.

Regardless of which test applies, the conclusion is the same: American Axle had a section 101(5) bankruptcy "claim" at the Bar Date, although it remained and still remains contingent.  All events forming the basis for the claim occurred years before Old GM's bankruptcy.  Likewise, the

relationship between the parties was firmly established long before the bankruptcy.  Lastly, the

parties contemplated the contingent environmental liability.  Because American Axle had a

prepetition, contingent claim, it was incumbent upon American Axle to file a proof of claim by

the Bar Date.

### F.    American Axle's Failure to Timely File a Proof of Claim Does not Qualify as Excusable Neglect.

American Axle's failure to file a proof of its contingent claim can only be excused under

Bankruptcy Rule 9006(b)(1) if its failure to act was the result of "excusable neglect" under the

test articulated by the Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507

U.S. 380 (1993).  American Axle cannot meet this standard because the doctrine of excusable

neglect does not apply to a creditor whose decision to stay out of a bankruptcy proceeding was

based on ignorance or legal error.  In addition, where, as here, a chapter 11 plan has been

consummated, courts must exercise "added caution" in evaluating arguments based on excusable

neglect.  *See Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 462 B.R.

494, 501 n.36 (Bankr. S.D.N.Y. 2012); *Atlas v. Chrysler, LLC (In re TALT)*, No. 10–02902, 2010

WL 2771841, at *3 (Bankr. S.D.N.Y. July 13, 2010).

Under *Pioneer*, a court must consider four factors: (i) the risk of prejudice to the debtor;

(ii) the length of the delay and its potential impact on judicial proceedings; (iii) the reason for the

delay, including whether it was within the reasonable control of the movant; and (iv) the movant's

good faith.  *Pioneer*, 507 U.S. at 395.  The Second Circuit takes a "hard line" approach when

applying *Pioneer* and deciding whether to allow a late-filed claim.  *Midland Cogeneration

Venture Ltd. P'ship (In re Enron Corp.)*, 419 F.3d 115, 128 (2d Cir. 2005).  In a typical case,

three of the four *Pioneer* factors (prejudice, length of delay, and good faith) will "usually weigh in

favor of the party seeking the extension," so courts focus on the third factor—the reason for the delay. *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003).

The reason for the delay, including whether it was within the reasonable control of the creditor, precludes a finding of excusable neglect in this case.  The reason for the delay was either American Axle's unawareness of its claim or a fundamental misunderstanding of when a claim arises for bankruptcy purposes.  American Axle's excuse essentially boils down to ignorance: "American Axle did not even know of its potential claim against Old GM."  (American Axle's Brief at 16.)  "[I]gnorance of one's own claim does not constitute excusable neglect," and its mistaken belief that it had no claim to assert bars its claim now.  *In re Best Prod. Co.*, 140 B.R. 353, 359 (Bankr. S.D.N.Y. 1992); *see also Matter of Penn Cent. Transp. Co.*, 42 B.R. 657, 675 (E.D. Pa. 1984) (finding there is "no exception made for claims which were unknown to a claimant until after consummation of the Plan").

Similarly, American Axle's delay could be attributed to its misunderstanding of when a claim arises under bankruptcy law, which constitutes a clear mistake of law.  It appears that American Axle may have subjectively believed, as a legal matter, that its environmental liability had not accrued into a "claim" under the Bankruptcy Code prior to the Bar Date.  If so, American Axle reached an incorrect legal conclusion because it, in fact, had a "claim" under the Bankruptcy Code prior to the Bar Date.  As this Court very recently recognized, "a claimant's neglect [is] not excusable where its failure to comply with the rule was the result of a mistake of law." *In re Motors Liquidation Co.*, 576 B.R. at 775.

In analyzing the reason for the delay, courts also "take[] into account the movant's sophistication." *In re Hills Stores Co.*, 167 B.R. 348, 351 (Bankr. S.D.N.Y. 1994).  Here, American Axle is a public company that operates more than 90 facilities in 17 countries with

19

billions of dollars in revenue and over 25,000 employees.  (GUC Trust Objection at 29.)

American Axle's status as a sophisticated creditor further proves that it cannot characterize its

failure to file a proof of claim as excusable neglect.

The remaining *Pioneer* factors weigh against a finding of excusable neglect.  First,

regarding prejudice to the Debtor, American Axle states in a conclusory fashion that there will be

"little prejudice to Old GM" if its claim is allowed.  (American Axle's Brief at 12.)  However, by

focusing exclusively on this one claim, American Axle misses the bigger picture.  "The prejudice

to the Debtors is not traceable to the filing of any single additional claim but to the impact of

permitting exceptions that will encourage others to seek similar leniency."  *Lehman Bros.*

*Holdings*, 433 B.R. at 121.  Allowing even a single late claim risks inspiring similar efforts from

creditors who also missed the bar date.  *Meadows v. AMR Corp.*, 539 B.R. 246, 252 (S.D.N.Y.

2015) (finding that the allowance of late claims "years after the confirmation of the debtors'

reorganization plan would create a serious risk of opening the floodgates to other potential late

claims").

As other late-claims litigation in this case illustrates, *see, e.g.*, *In re Motors Liquidation*

*Co.*, 576 B.R. 761, determining whether a given creditor's "neglect" is sufficiently "excusable"

frequently entails time-consuming litigation at great expense to the estate.  The mere prospect of

litigating additional motions to file post-bar-date proofs of claim is enough to prejudice the

debtor.  *In re Keene Corp.*, 188 B.R. 903, 913 (Bankr. S.D.N.Y. 1995) (finding "the legal fees the

estate would potentially expend in litigating [late claims] supports a finding of prejudice").  This

fear of rampant late-claims litigation is especially germane in a case like this one where the

universe of potential creditors is practically limitless.

Second, the delay in filing the claim is substantial. The Bar Date in this case was November 30, 2009, and American Axle filed its Motion on December 21, 2018, almost a decade later. In absolute terms, a nine-year delay far exceeds delays that courts have found to be substantial in similar cases. *See, e.g., Enron Corp.*, 419 F.3d at 128 (finding that "claims filed as late as two years after the bar date" represent the outer limits of what courts allow); *In re Dana Corp.*, No. 06-10354, 2008 WL 2885901, at *6 (Bankr. S.D.N.Y. 2008) (twenty-one month delay is substantial); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (S.D.N.Y. 2007) (fifteen month delay is substantial). Notably, even if the delay were measured from when American Axle received the notification letter from New York State in December 2017, waiting a full year to act would still weigh against a finding of excusable neglect. *In re AMR Corp.*, 492 B.R. 660, 667 (Bankr. S.D.N.Y. 2013) (finding that filing a claim "more than five months after the Court entered the Bar Date Order and more than three months after the Bar Date had passed" was "significant"). Most importantly, during American Axle's delay, the debtors sold substantially all their assets, confirmed a chapter 11 plan of reorganization, and substantially consummated that plan. Effectively all case activity occurred during the period when American Axle sat on its rights. Accordingly, this factor weighs against a finding of excusable neglect.

As to the fourth and final element, there is no reason to suspect American Axle has acted in bad faith. Nevertheless, the presence of good faith is almost never a determinative factor in the *Pioneer* analysis. *See Silivanch*, 333 F.3d at 366 ("And rarely in the decided cases is the absence of good faith at issue."). American Axle's good faith cannot singlehandedly overcome the fact that it has failed to meet the other requirements of excusable neglect.

### G.      Section 502(e)(1)(B) Disallows American Axle's Contingent Claim

American Axle's cannot file a late proof of claim for the independent reason that section 502(e)(1)(b) disallows its contingent claim. In relevant parts, section 502(e)(1)(B) provides that

21

"the court shall disallow any claim for reimbursement or contribution of any entity that is liable

with the debtor . . . to the extent that—(B) such claim for reimbursement or contribution is

contingent as of the time of allowance or disallowance of such claim . . . ." 11 U.S.C.

§ 502(e)(1)(B).  In addition to co-debtor situations created by contract, "section 502(e)(1)(B)

applies to disallow contingent reimbursement or contribution claims created by statute."  4

COLLIER ON BANKRUPTCY ¶ 502.06[d] (16th ed. 2018).  In explaining this provision, Collier gives

the specific example of a claim for contribution arising under CERCLA.  *Id.*  In such a case, the

government is the primary obligee and may seek satisfaction of its claim against the debtor and

from other parties who, under the statute, are obligated with the debtor for the same

environmental liability.  Applying this section, bankruptcy courts have repeatedly found that

creditors are prohibited from seeking contribution from a debtor where the debtor and creditor are

jointly liable under environmental statutes and where the creditor has not yet expended any funds

when the claim is made.  *See e.g.*, *In re Chemtura Corp.*, 443 B.R. 601, 627 (Bankr. S.D.N.Y.

2011); *In re Lyondell Chem. Co.*, 442 B.R. 236, 258 (Bankr. S.D.N.Y. 2011); *In re APCO

Liquidating Tr.*, 370 B.R. 625, 637 (Bankr. D. Del. 2007).

Section 502(e)(1)(B) of the Bankruptcy Code requires three elements for a claim to be

disallowed: (1) "the party asserting the claim must be liable with the debtor on the claim of a

third party"; (2) "the claim must be contingent at the time of its allowance or disallowance"; and

(3) "the claim must be for reimbursement or contribution."  *In re Lyondell Chem. Co.*, 442 B.R.

at 243.  All three elements are present here.

First, American Axle admits that it shares (or at least potentially shares) liability for

cleanup of the Site as a potentially responsible party.  American Axle's claim hinges on the

theory that "if the Debtors pay less than their share of cleanup costs," [American Axle] will have

to pay more," which is "the essence of co-liability." *Lyondell*, 442 B.R. at 253; *see also Matter of Baldwin-United Corp.*, 55 B.R. 885, 891 (Bankr. S.D. Ohio 1985) ("By its very nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship."). Thus, the co-liability element is present.

Second, American Axle's claim is contingent. Environmental contribution claims remain contingent until the co-liable creditor pays for the cleanup or otherwise expends funds on account of the claim. *In re Chemtura Corp.*, 443 B.R. at 615 (holding "that claims for future remediation costs, not already paid for, are contingent, and satisfy the 'Contingency' Element of section 502(e)(1)(B) doctrine") (emphasis in original); *see also APCO Liquidating Tr.*, 370 B.R. at 636 ("The law is clear that 'the contingency contemplated by section 502(e)(1)(B) relates to both payment and liability.' . . . Therefore, a claimant's 'claim is contingent until their liability is established . . . and the co-debtor has paid the creditor.") (quoting *In re Drexel Burnham Lambert Group*, 148 B.R. 982 (Bankr. S.D.N.Y. 1992)). Based upon its Motion, American Axle has yet to spend a single penny on environmental remediation. Consequently, it cannot be known "whether [American Axle] will lay out the funds necessary to engage in the curative action, and, if so, to what extent," meaning that American Axle's claim remains contingent. *Lyondell*, 442 B.R. at 250.

Third, American Axle's claim is for "contribution" or "reimbursement" as those terms are used in § 502(e)(1)(B). "Reimbursement" is a "a broad word which encompasses whatever claims a co-debtor has which entitle him to be made whole for monies he has expended on account of a debt for which he and the debtor are both liable." *In re Lyondell Chem. Co.*, 442 B.R. at 256 (quoting *In re Wedtech Corp.*, 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988)); *see also In re Chemtura Corp.*, 443 B.R. at 627 (finding that "the claims at issue plainly are for

23

'reimbursement' as that term is used in section 502(e)(1)(B)" where "[t]he Claimants seek

repayment of money that they allege that they will spend on environmental remediation, and the

Debtors and the Claimants, all [potentially responsible parties], are co-liable for environmental

cleanup").

In support of the argument that section 502(e)(1)(B) would not disallow its claim,

American Axle cites *In re Laidlaw USA, Inc.*, 287 B.R. 603, 605 (Bankr. W.D.N.Y. 2002).

(Reply at 8–10.)  There, the court addressed the narrow question whether section 502 bars a

contingent claim for contribution if the primary obligee has waived its claim against the debtor.

*Laidlaw* can be distinguished from the instant case because in *Laidlaw* the obligee—the State of

New York under CERCLA—settled with the co-obligor—the counterpart of American Axle.  In

the instant case, the State of New York has not reached a settlement with American Axle.  Thus,

unlike the *Laidlaw* co-obligor's claim, American Axle's claim for contribution remains

contingent as of the time of allowance or disallowance of such claim.

Because American Axle's contingent claim seeks contribution or reimbursement from

Old GM on a debt for which the parties are co-liable, all three elements of section 502(e)(1)(b)

are present.  The Court denies American Axle's request to file a late claim against the GUC Trust

because section 502(e)(1)(B) disallows the claim.  *See Greatamerican Fed. Sav. & Loan Ass'n v.

Adcock Excavating, Inc.*, No. 89 C 3794, 1990 WL 51219, at *4 (N.D. Ill. Apr. 17, 1990)

(affirming the bankruptcy court's refusal to allow a late-filed claim where "the application of §

502(e)(1)(B) [made] filing of a late claim futile.").

### III.   CONCLUSION

For the foregoing reasons, American Axle's Motion is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated:   March 22, 2019
          New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge