**HEARING DATE AND TIME: June 12, 2019 at 11 a.m. (Eastern Time)**
**OBJECTION DEADLINE: June 5, 2019 at 4:00 p.m. (Eastern Time)**

**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x

In re:                                                          Chapter 11

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,        Case No. 09-50026 (MG)
                                                                (Jointly Administered)


                                          Debtors.
----------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

                                                                Adversary Proceeding

                                          Plaintiff,            Case No. 09-00504 (MG)

                          against

JPMORGAN CHASE BANK, N.A., *et al.*,

                                          Defendants.
----------------------------------------------------------------------x


**MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE**
**ACTION TRUST FOR ENTRY OF AN ORDER PURSUANT TO**
**SECTION 105 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019**
**APPROVING THE SETTLEMENT BETWEEN THE PARTIES**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

JURISDICTION AND VENUE .......................................................................................... 1

PRELIMINARY STATEMENT ......................................................................................... 2

BACKGROUND ................................................................................................................. 5

    I.    OLD GM FILES FOR BANKRUPTCY, THE TERM LOAN IS PAID OFF,
        AND THE COMMITTEE COMMENCES THE TERM LOAN
        AVOIDANCE ACTION .......................................................................................... 5

    II.   THE PLAN IS CONFIRMED AND THE TERM LOAN AVOIDANCE
        ACTION IS TRANSFERRED TO THE AAT .......................................................... 6

    III.  THE AAT AND JPMORGAN LITIGATE PHASE I OF THE TERM LOAN
        AVOIDANCE ACTION CONCERNING THE EFFECTIVENESS OF THE
        2008 TERMINATION STATEMENT ..................................................................... 7

    IV.  THE PARTIES LITIGATE PHASE II OF THE TERM LOAN AVOIDANCE
        ACTION ................................................................................................................. 8

    V.   MEDIATION AND LITIGATION OF PHASE III OF THE TERM LOAN
        AVOIDANCE ACTION ....................................................................................... 10

    VI.  ANTICIPATED FURTHER LITIGATION AND THE UNCERTAINTY OF
        THE OUTCOME .................................................................................................. 12

    VII. THE SETTLEMENT AGREEMENT..................................................................... 15

    VIII. THE ANTICIPATED DISTRIBUTION TO AAT BENEFICIARIES .................... 18

BASIS FOR REQUESTED RELIEF................................................................................ 19

    I.    THE SETTLEMENT AGREEMENT SHOULD BE APPROVED BY THIS
        COURT PURSUANT TO BANKRUPTCY RULE 9019......................................... 19

    II.   THE *IRIDIUM* FACTORS WEIGH IN FAVOR OF APPROVING THE
        SETTLEMENT..................................................................................................... 20

        A.   The First Two Iridium Factors Favor Approval Of The Settlement............. 20

        B.   The Paramount Interest Of The Creditors And Other Interested Parties
            Favors Approval Of The Settlement Agreement ........................................... 23

       C.   The Settlement Agreement Satisfies The Remaining Iridium Factors .......... 23

NOTICE ..................................................................................................................................... 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*HSBC Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*,
466 B.R. 244 (Bankr. S.D.N.Y. 2012) ................................................................ 20

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005) ................................................................ 20

*In re Ambac Fin. Grp., Inc.*,
457 B.R. 299 (Bankr. S.D.N.Y. 2011) ........................................................... 20, 24

*In re Motors Liquidation Co.*,
555 B.R. 355 (Bankr. S.D.N.Y. 2016) ................................................................ 19

*In re Residential Cap., LLC*,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) ................................................................ 19

*Motorola, Inc. v. Official Comm. of Unsecured Creditors and JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ....................................................................... 4, 20

*Nuevo Pueblo, LLC v. Napolitano (In re Nuevo Pueblo, LLC)*,
608 F. App'x 40 (2d Cir. 2015) ...................................................................... 20

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*,
777 F.3d 100 (2d Cir. 2015) ..................................................................... 5, 6, 8

*U.S.H. Corp. of New York v. U.S. Home Corp. (In re U.S.H. Corp. of New York)*,
223 B.R. 654 (Bankr. S.D.N.Y. 1998) ................................................................ 24

**Statutes**

11 U.S.C. § 105 ...................................................................................... 1

11 U.S.C. § 502 ...................................................................................... 2

28 U.S.C. § 1334 ..................................................................................... 1

28 U.S.C. § 1409 ..................................................................................... 1

28 U.S.C. § 157 ...................................................................................... 1

**Rules**

Fed. R. Bank. P. 2002 ............................................................................... 24

Fed. R. Bank. P. 9019 .......................................................................................................... 1, 19, 24

Pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**")

and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

Wilmington Trust Company, solely in its capacity as trust administrator and trustee ("**Trust

Administrator**") of the Motors Liquidation Company Avoidance Action Trust (the "**AAT**"), as

established under the Debtors' Second Amended Joint Chapter 11 Plan (as confirmed, the

"**Plan**"), Bankr. Dkt. No. 9836,[1] requests entry of an order, substantially in the form attached

hereto as <u>Exhibit A</u> (the "**Approval Order**"): (i) approving the global settlement agreement

attached hereto as <u>Exhibit B</u> (the "**Settlement Agreement**")[2] that resolves all claims and cross-

claims asserted in the above-captioned adversary proceeding (the "**Term Loan Avoidance

Action**"); (ii) authorizing the AAT to take all actions necessary or appropriate to effectuate the

Settlement Agreement; and (iii) granting such other and further relief as the Court deems proper.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334; paragraph II of the order of the Court confirming the Plan, Bankr. Dkt. No. 9941 (the

"**Confirmation Order**"); Article XI of the Plan; and Paragraph K and Sections 8.1(e) and 13.3

of the Fourth Amended and Restated Motors Liquidation Company Avoidance Action Trust

Agreement attached hereto as <u>Exhibit C</u> (the "**AAT Agreement**").

---

[1] All references to the Bankruptcy Docket are to *In re Motors Liquidation Company f/k/a General Motors Corporation*, Case No. 09-50026.  All references to the Adversary Docket are to *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 09-00504.

[2] The signature pages for the non-JPMorgan Initial Required Term Lender Parties (as defined in the Settlement Agreement) have been omitted from Exhibit B.  A list of the non-JPMorgan Initial Required Term Lender Parties, all of whom have signed the Settlement Agreement, can be found on pages 1 through 83 of Schedule 1 to the Settlement Agreement.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § 1409.  The statutory predicates for the relief requested are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## PRELIMINARY STATEMENT

3.      The Settlement Agreement resolves all pending claims and cross-claims among all parties to the Term Loan Avoidance Action.  After years of hard-fought litigation, the Trust Administrator, with the approval of the AAT's monitor (the "**Trust Monitor**"), has concluded that this settlement is in the best interest of the AAT's beneficiaries when evaluated in light of the risks, costs, and delay associated with continued prosecution of the Term Loan Avoidance Action.

4.      The AAT was created with the sole objective of prosecuting the Term Loan Avoidance Action to realize value for the AAT's beneficiaries, which include the United States Department of the Treasury and Export Development Canada (the "**DIP Lenders**") and the unsecured creditors of Old GM (defined below).  The proposed settlement presents an opportunity for the AAT to realize its objective by resolving the Term Loan Avoidance Action on terms that will provide significant value for its beneficiaries and avoid the risks of further litigation.

5.      Under the proposed settlement, the AAT will receive $231 million (the "**AAT Settlement Payment**") which will allow for a substantial distribution to its beneficiaries after repayment of its lenders and other expenses.  In consideration for this payment, the AAT will dismiss with prejudice all claims asserted by the AAT against the hundreds of defendants in the Term Loan Avoidance Action (each a "**Term Lender**" and collectively the "**Term Lenders**") and release any potential claims against the Term Lenders and Simpson Thacher & Bartlett LLP ("**STB**").  Further, consistent with Section 502(h) of the Bankruptcy Code, the AAT Agreement,

2

and the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement

attached hereto as <u>Exhibit D</u> (the "**GUC Trust Agreement**"), the Term Lenders will have

allowed claims as unsecured creditor beneficiaries of both the Motors Liquidation Company

General Unsecured Creditors Trust (the "**GUC Trust**") and the AAT, in an aggregate amount

for each trust equal to the AAT Settlement Payment.

6.     The proposed settlement also resolves all related disputes between and among

(a) JPMorgan Chase Bank, N.A. ("**JPMorgan**"), in its individual capacity and as administrative

agent for the Term Loan (as defined below); (b) the Term Lenders other than JPMorgan (the

"**Non-JPMorgan Term Lenders**"); (c) STB, which served as JPMorgan's counsel in connection

with an unrelated financing transaction with Old GM (the "**Synthetic Lease**"); and (d) the GUC

Trust.  Among the claims that will be resolved are all pending and potential cross-claims of the

Non-JPMorgan Term Lenders against JPMorgan.  The proposed settlement also resolves disputes

between the GUC Trust and JPMorgan regarding payment of JPMorgan's defense costs for the

Term Loan Avoidance Action.  All parties—the AAT, most of the Non-JPMorgan Term

Lenders, JPMorgan, STB, and the GUC Trust—will provide full and final releases for all matters

relating to the Term Loan Avoidance Action, the actions commenced by the AAT against certain

Term Lenders in Delaware Court of Chancery (the "**Delaware Actions**"), the Synthetic Lease,

the Term Loan Agreement, the Delaware UCC-1 (defined below), and all related transactions.

7.     The proposed settlement would allow the parties to avoid what could be years of

further litigation in this Court and appellate courts, as well as the associated risks and costs of

continued litigation.  Although the AAT has diligently and zealously litigated the Term Loan

Avoidance Action to date, including through a number of appeals and a representative assets

trial, significant litigation remains to be completed.

8.      The AAT and the Term Lenders continue to dispute the classification and value of approximately 100,000 assets.  Absent approval of this settlement, a second trial will be held by the Court in the near future that will address remaining disputes regarding valuation methodology, classification of certain assets as fixtures or non-fixtures, and multiple other issues regarding the Term Lenders' collateral.  An additional trial would require tremendous effort by the parties and their respective expert teams, including drafting affirmative and rebuttal expert reports, conducting expert depositions, submitting pre-trial and possibly further summary judgment briefing to the Court, and conducting the trial.

9.      Absent a post-trial settlement, the additional trial in this action still would not fully and finally resolve the Term Loan Avoidance Action, leaving the asset classification of tens of thousands of assets still in dispute and requiring even further proceedings.  Further, absent a post-trial settlement, the parties anticipate appeals that would require ultimate resolution by the Second Circuit.

10.      Although there are pathways by which the AAT could recover more than the $231 million AAT Settlement Payment by litigating the Term Loan Avoidance Action to conclusion, there are also potential outcomes that would yield a lesser recovery.  JPMorgan and the Term Lenders continue to maintain that the Term Loan was over-secured and that the AAT therefore is not entitled to any recovery.  Were the Term Lenders to prevail on this position, the AAT would be unable to repay its funders and its beneficiaries would receive no recovery at all.

11.      In light of these considerations, and the significant and certain value to be realized by the AAT's beneficiaries under the proposed settlement, the Trust Administrator, with the approval of the Trust Monitor, has concluded that the proposed settlement is in the best interest of the AAT's beneficiaries and has decided to enter into the Settlement Agreement.

09-50026-mg    Doc 14505    Filed 05/13/19    Entered 05/13/19 16:19:12    Main Document
Pg 10 of 30

12.    For all the reasons discussed herein, the proposed settlement is fair and equitable,

satisfies the factors set forth in *Motorola, Inc. v. Official Comm. of Unsecured Creditors and*

*JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007),

and does not fall below the lowest point in the range of reasonableness.  Accordingly, the AAT

respectfully requests that the Court approve the Settlement Agreement.

## BACKGROUND

### I.    OLD GM FILES FOR BANKRUPTCY, THE TERM LOAN IS PAID OFF, AND THE COMMITTEE COMMENCES THE TERM LOAN AVOIDANCE ACTION

13.    In 2006, General Motors Corporation ("**Old GM**") obtained a syndicated secured

term loan (the "**Term Loan**") of approximately $1.5 billion from the Term Lenders, pursuant to

a term loan agreement (the "**Term Loan Agreement**").  *Official Comm. of Unsecured Creditors*

*of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777

F.3d 100, 101 (2d Cir. 2015) ("**Second Circuit 2015 Decision**").

14.    In connection with the Term Loan, the Term Lenders were granted a security

interest in a large number of Old GM's assets located at forty-two Old GM facilities (the

"**Collateral**").  *Id*.  Among other filings to perfect the Term Lenders' security interest in the

Collateral, JPMorgan caused the filing of a UCC-1 financing statement with the Delaware

Secretary of State that covered machinery and equipment constituting Collateral at the forty-two

Old GM facilities (the "**Delaware UCC-1**").  *Id.*

15.    On June 1, 2009 (the "**Petition Date**"), Old GM and certain of its subsidiaries

filed voluntary bankruptcy petitions and sought the Court's approval to sell substantially all of

the operating assets of Old GM and certain of its affiliates to a Government-sponsored entity

("**New GM**") in an expedited sale under Section 363 of the Bankruptcy Code (the "**363 Sale**").

In connection with its bankruptcy filing, the Court issued an order (the "**DIP Order**")

5

authorizing Old GM to obtain $33 billion in post-petition financing (the "**DIP Financing**").

Bankr. Dkt. No. 2529.  A portion of the DIP Financing was used by Old GM to repay the Term

Lenders in full, ahead of other creditors of Old GM, on the assumption that their claims arising

under the Term Loan Agreement were fully secured.  Bankr. Dkt. No. 2529 ¶ 19(a).

16.     However, shortly before entry of the DIP Order, the Official Committee of

Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the

"**Committee**") learned that the Term Lenders' security interests, in fact, may not all have been

perfected as of the Petition Date due to the filing of a termination statement relating to the

Delaware UCC-1 (the "**2008 Termination Statement**") months before the Petition Date.

*Second Circuit 2015 Decision*, 777 F.3d at 102.  Accordingly, the DIP Order, while conditionally

approving repayment of the Term Loan, preserved the right of the Committee to investigate and

bring actions based upon the purported perfection of the security interests related to the Term

Loan.  Bankr. Dkt. No. 2529 ¶ 19(d).  Subject to the carveout in the DIP Order, the Term

Lenders were repaid in full on June 30, 2009 (the "**Term Loan Repayment**").

17.     Following its investigation, the Committee commenced the Term Loan Avoidance

Action on July 31, 2009 to recover amounts alleged to have been improperly paid by Old GM to

the Term Lenders (the "**Transfers**"), based on the erroneous assumption that the Term Lenders'

security interests were fully perfected and the Term Loan fully secured.  Adv. Pro. Dkt. No. 1.

## II.     THE PLAN IS CONFIRMED AND THE TERM LOAN AVOIDANCE ACTION IS TRANSFERRED TO THE AAT

18.     JPMorgan and the Committee agreed to litigate the issue of whether the 2008

Termination Statement terminated the Term Lenders' security interest in the Collateral covered

solely by the Delaware UCC-1 ("**Phase I**") before litigating other issues in the case; the Court

approved proceeding in that manner.  *See, e.g.*, Adv. Pro. Dkt. Nos. 10, 17, & 82.

19.     By August 2010, approximately one year after commencement of the Term Loan

Avoidance Action, the Committee and JPMorgan had fully briefed Phase I cross-motions for

summary judgment.  *See* Adv. Pro. Dkt. No. 23.

20.     On March 29, 2011, the Court entered the Confirmation Order confirming the

Plan for Old GM's liquidation.  Bankr. Dkt. No. 9941.  Pursuant to Section 6.5 of the Plan, the

AAT was established to liquidate and distribute its non-administrative assets, which consist

entirely of the proceeds, if any, of the Term Loan Avoidance Action.  *See also* AAT Agreement

§ 2.2 (providing "[t]he sole purpose of the Trust is to liquidate and distribute its assets").  The

AAT Agreement provides that the AAT was created "for the benefit of the Trust Beneficiaries

and, to the extent received by the Trust, to distribute the Distributable Trust Assets to the Trust

Beneficiaries in accordance with the terms of the Plan, the Confirmation Order and this Trust

Agreement." *Id.* ¶ E (Background).  The AAT's beneficiaries are the DIP Lenders and the

holders of Allowed General Unsecured Claims (as defined in the AAT Agreement).  *Id.*

§§ 1.1(bbbbb) & (jj).  On December 15, 2011, prosecution of the Term Loan Avoidance Action

was transferred to the AAT.  Plan § 6.5.

## III.    THE AAT AND JPMORGAN LITIGATE PHASE I OF THE TERM LOAN AVOIDANCE ACTION CONCERNING THE EFFECTIVENESS OF THE 2008 TERMINATION STATEMENT

21.     On March 1, 2013, the Court denied the Committee's motion for partial summary

judgment and granted summary judgment in favor of JPMorgan, ruling that the filing of the 2008

Termination Statement was not effective and the security interests covered by the Delaware

UCC-1 remained perfected as of the Petition Date.  Adv. Pro. Dkt. No. 71.

22.     The AAT appealed the decision to the Second Circuit.  Adv. Pro. Dkt. No. 76.  On

January 21, 2015, after the Delaware Supreme Court answered a Delaware UCC question that

had been certified to it by the Second Circuit, the Second Circuit reversed the Court's grant of

summary judgment and remanded the matter to the Court with instructions to enter partial

summary judgment in favor of the AAT.  *Second Circuit 2015 Decision*, 777 F.3d at 105-06.

23.    On June 12, 2015, the Court entered partial summary judgment in favor of the

AAT as to the termination of the Delaware UCC-1.  Adv. Pro. Dkt. No. 96.  Thereafter, the AAT

filed an amended complaint and proceeded to serve it upon the Term Lenders.  *See, e.g.*, Adv.

Pro. Dkt. Nos. 91 & 94.  Numerous Term Lenders moved to dismiss the amended complaint, and

the Court denied those motions, Adv. Pro. Dkt. No. 643.

## IV.    THE PARTIES LITIGATE PHASE II OF THE TERM LOAN AVOIDANCE ACTION

24.    The parties then litigated the second phase ("**Phase II**") of the Term Loan

Avoidance Action.  The focus of Phase II was (a) determining the extent to which the Term

Lenders had a surviving perfected security interest in nearly two hundred thousand assets

("**Surviving Collateral**") as a result of the filing of 26 UCC-1 "fixture filings" in counties where

disputed assets were located, and (b) deciding the proper method for valuing the Surviving

Collateral.  *See* Adv. Pro. Dkt. No. 1015 at 1.

25.    In May 2016, the Court determined that it would hold a trial (the "**Representative**

**Assets Trial**") to determine if forty "Representative Assets" constituted collateral in which the

Term Lenders had a perfected security interest and what principles should be applied in valuing

those assets.  Adv. Pro. Dkt. No. 547 at 2.  The Representative Assets Trial also addressed three

additional issues regarding the scope of the Term Lenders' collateral: (a) whether a

Representative Asset that was subject to a capital lease constituted Surviving Collateral; (b)

whether the AAT was time-barred from challenging whether the Term Lenders had a perfected

security interest in the fixtures at GM's Lansing Delta Township facility; and (c) whether the

8

Term Lenders had a perfected security interest in the fixtures at GM's Powertrain Pontiac Engineering facility. *See* Adv. Pro. Dkt. No. 1015 at 28.

26.    In the summer and fall of 2016, the parties engaged in extensive discovery. Thirty-five fact witnesses were deposed, and more than 200,000 documents were produced. Twenty-nine expert reports were exchanged, and eighteen experts were deposed.

27.    The parties visited the three GM facilities where the majority of Representative Assets were located, and the parties visited two of the facilities a second time with the Court.

28.    In the leadup to trial, the parties filed voluminous pretrial briefs and eight motions *in limine*. Adv. Pro. Dkt. Nos. 864, 868-74, 900, & 903.

29.    The Representative Assets Trial commenced on April 24, 2017, and testimony concluded on May 5, 2017. The parties then submitted proposed findings of fact and conclusions of law to the Court. Adv. Pro. Dkt. Nos. 993 & 994. Closing arguments were heard by the Court on June 5, 2017. On September 26, 2017, the Court issued its decision on the Representative Assets Trial (the "**Phase II Decision**"). Adv. Pro. Dkt. No. 1015.

30.    The Phase II Decision addressed whether each Representative Asset constituted Surviving Collateral in which the Term Lenders had a perfected lien and set forth the principles that guided the Court's determinations. The Phase II Decision also determined the methodology to be applied in valuing the Representative Assets and decided the three additional issues presented to the Court concerning the scope of the Term Lenders' collateral. The Court explained that "[t]he parties agreed that after the issuance of this Opinion, they would attempt to settle as to the remaining disputed assets," recognizing that a negotiated resolution was desirable in light of the effort that would be required to adjudicate each disputed asset. *Id.* at 1.

31.    On October 10, 2017, the AAT sought leave for an interlocutory appeal from the portion of the Phase II Decision concerning the valuation methodology to be applied to assets that Old GM sold to New GM.  Case No. 17 Civ. 8712 (S.D.N.Y.), Dkt. No. 1.  The Term Lenders opposed the AAT's motion and, alternatively, cross-moved for interlocutory appeal.  *Id*., Dkt. Nos. 10-11.  On September 7, 2018, the District Court denied the AAT's motion for leave to take an interlocutory appeal.  *Id.*, Dkt. No. 19.

## V.    MEDIATION AND LITIGATION OF PHASE III OF THE TERM LOAN AVOIDANCE ACTION

32.    Following the Phase II Decision, the parties engaged in an intensive mediation effort to apply the principles from the Phase II Decision to their remaining disputes.  The AAT, JPMorgan (represented by Wachtell, Lipton, Rosen & Katz and Kelley Drye & Warren LLP), and certain other Term Lenders (represented by Munger, Tolles & Olson LLP; Jones Day; Davis Polk & Wardwell LLP; Kasowitz Benson Torres LLP; and Hahn & Hessen LLP) (such law firms representing JPMorgan and these certain Term Lenders, collectively, the "**Defendants Steering Committee Counsel**"), STB, the GUC Trust, and other interested parties participated in three mediation sessions aimed at a global resolution of the Term Loan Avoidance Action.  *See, e.g.*, Adv. Pro. Dkt. No. 1053 at 2-3.

33.    In parallel with the global mediation efforts, the AAT and the Defendants Steering Committee Counsel also worked towards reaching consensus on the classification and valuation of discrete categories of assets and participated in five in-person mediation sessions focused on those disputed categories.  Adv. Pro. Dkt. Nos. 1055 & 1072.   Additionally, the parties participated in numerous discussions and conference calls with the mediators in an effort to narrow and resolve issues.  The Trust Monitor and Trust Administrator participated in each

global mediation session and were kept apprised of all of the other mediation efforts. *See* Declaration of Arthur J. Gonzalez, dated May 8, 2019 (the "**Gonzalez Declaration**") ¶ 4.

34.     On July 3, 2018, the parties informed the Court that they had been unable to reach a global resolution of the Term Loan Avoidance Action. Adv. Pro. Dkt. No. 1055. The parties also notified the Court that they had reached discrete agreements as to the classification and valuation of certain of the previously disputed assets, without prejudice to their rights to challenge the Phase II Decision on appeal. Adv. Pro. Dkt. Nos. 1072 & 1072-1. As a result of the parties' discrete agreements reached in mediation, the AAT's maximum potential recovery before the Court (absent potential outcomes on appeal and excluding prejudgment interest) is approximately $600 million. Adv. Pro. Dkt. No. 1072-1.

35.     On September 7, 2018, the parties identified for the Court issues they viewed as appropriate for summary judgment and additional issues that, if resolved at trial, could materially facilitate reaching a global settlement. Adv. Pro. Dkt. No. 1075 at 3-6. On September 14, 2018, the Court established a briefing schedule for certain summary judgment motions, and a discovery and trial schedule for certain issues remaining to be resolved at trial (the "**Phase III Trial**"). Adv. Pro. Dkt. No. 1080 at 6-8, as amended by Adv. Pro. Dkt. No. 1094. The schedule contemplated that the Phase III Trial would address: (i) the appropriate methodology for valuing assets that were purchased by New GM out of plants left with Old GM; (ii) the appropriate methodology for valuing assets at two GM plants that the AAT contends were to be idled; (iii) whether two GM plants were specialized facilities under Ohio fixture law; (iv) the fixture classification of 11 additional representative assets; (v) the scope of the Term Lenders' security interest in certain Saturn equipment and assets designated as construction work in progress and the appropriate valuation methodology for those categories of assets; and (vi) whether the Term

11

Lenders had a security interest in assets subject to certain capital leases. Adv. Pro. Dkt. No.

1080 at 4-5, as amended by Adv. Pro. Dkt. No. 1112.

36.     The parties then briefed a number of motions: the Term Lenders' motion seeking

to estop the AAT from arguing for application of certain orderly liquidation values calculated by

KPMG to assets left behind with Old GM; cross-motions for partial summary judgment

concerning the correct application of Louisiana law in determining what constitutes the Term

Lenders' collateral at a GM facility in Shreveport, Louisiana; and the AAT's motion for partial

summary judgment to dismiss the Term Lenders' earmarking defense. Adv. Pro. Dkt. Nos.

1081, 1089, 1116, & 1128. The Court has issued decisions denying the Term Lenders' estoppel

motion, granting the AAT's motion for partial summary judgment regarding the application of

Louisiana law and denying the Term Lenders' motion regarding the same, and granting the

AAT's motion for partial summary judgment for dismissal of the Term Lenders' earmarking

defense. Adv. Pro. Dkt. Nos. 1145, 1166, & 1167.

37.     The AAT also moved for summary judgment seeking a determination that the

Second Circuit's ruling that the Delaware UCC-1 had been terminated was effective as to all of

the Non-JPMorgan Term Lenders. Adv. Pro. Dkt. No. 1085. The Court heard oral argument on

the motion on January 25, 2019 and had not decided the motion before the parties requested a

stay of the proceedings on February 1, 2019.

## VI.    ANTICIPATED FURTHER LITIGATION AND THE UNCERTAINTY OF THE
         OUTCOME

38.     From the fall of 2018 through February 2019, the parties engaged in additional

discovery, serving document and testimonial subpoenas on multiple third parties, conducting fact

depositions, reviewing produced documents, and conducting five additional site visits to current

and former GM facilities.  The parties also collectively disclosed 30 experts who would

potentially testify at the Phase III Trial.

39.     While the litigation continued, the parties also participated in further mediation

efforts, meeting in-person for all-day sessions on January 21, 2019, and again on January 30,

2019.  Those sessions bore fruit in the early hours of January 31, 2019, when the parties reached

an agreement in principle on the terms of the proposed settlement now before the Court.

40.     On February 1, 2019, the AAT informed the Court that the AAT, JPMorgan, the

Defendants Steering Committee Counsel, and the GUC Trust had reached an agreement in

principle to fully resolve the Term Loan Avoidance Action.  Adv. Pro. Dkt. No. 1168.  The

Court granted the requested stay of all deadlines to allow the parties to focus on finalizing their

settlement.  Adv. Pro. Dkt. No. 1169.

41.     Absent approval of the proposed settlement, the parties would be required to

return to their preparations for the Phase III Trial, including the exchange of initial and rebuttal

expert reports, taking and defending expert depositions, and the filing of motions *in limine* and

other pre-trial briefing.  The Phase III trial itself is projected to require approximately two weeks

and would then likely be followed by the submission of proposed findings of fact and

conclusions of law.

42.     In addition, absent approval of the proposed settlement, the cross-claims that

certain Term Lenders have asserted against JPMorgan would also proceed.  Although some

cross-claim discovery has been conducted, additional discovery has been subject to a stay, *see*

Adv. Pro. Dkt. No. 855 at 4-5, and the Court had previously extended the deadline for other

Term Lenders to assert cross-claims against JPMorgan, *see, e.g.*, Adv. Pro. Dkt. No. 1153.

Should the proposed settlement not be approved, litigation of the cross-claims would proceed simultaneously with the Phase III proceedings. *See* Adv. Pro. Dkt. No. 1163.

43.    The Court's eventual decision on the issues to be addressed at the Phase III Trial (the "**Phase III Decision**") would resolve some, but not all, of the remaining issues. The Court scheduled a 30-day period after entry of the Phase III Decision for the parties to engage in expedited mediation to reach a global resolution of the claims asserted in the Term Loan Avoidance Action, if possible. Adv. Pro. Dkt. No. 1080 at 8. In the event that future mediation were to be unsuccessful, the Court scheduled a 60-day period after entry of the Phase III Decision for the parties to complete additional discovery, with a third trial addressing the assets that remain disputed on a category-by-category, rolling basis, to commence 90 days from the Phase III Decision (the "**Final Trial**"). Adv. Pro. Dkt. No. 1080 at 8-9.

44.    Like the Phase III Trial, preparing for and participating in the Final Trial would be a substantial undertaking for the parties. The parties would likely require additional discovery and expert analysis. With tens of thousands of assets in dispute in the Phase III Trial and likely many thousands of assets still in dispute in advance of the Final Trial, the outcome of this litigation is uncertain, and the costs would be substantial.

45.    As discussed above, the maximum recovery for the AAT, pursuant to the Phase II Decision (absent a successful appeal of certain rulings and an award of prejudgment interest), is approximately $600 million. Adv. Pro. Dkt. No. 1072-1. Should the AAT not prevail on its claims regarding every remaining dispute, its recovery will be less than $600 million, in an amount either greater or less than the AAT Settlement Payment. The Term Lenders continue to maintain that the Term Loan is over-secured and that the AAT is not entitled to any recovery.

## VII.    THE SETTLEMENT AGREEMENT[3]

46.    The proposed settlement is a global resolution of all claims, asserted or that could be asserted, against all parties with potential exposure arising from the filing of the 2008 Termination Statement.  The parties to the Settlement Agreement include the substantial majority of the parties to the Term Loan Avoidance Action—the AAT, most of the Non-JPMorgan Term Lenders, and JPMorgan—as well as the GUC Trust and STB (the "**Parties**").

47.    At the core of the proposed settlement is the payment of $231 million to the AAT to resolve its claims in the Term Loan Avoidance Action.  Settlement Agreement § 1.

48.    The proposed settlement also provides for the allowance of Resolved Allowed General Unsecured Claims (as defined in the AAT Agreement) against the AAT in favor of certain Term Lenders and JPMorgan in the aggregate amount of $231 million, and provides that the AAT shall allocate these claims among the Term Lenders who become Parties to the Settlement Agreement in accordance with Schedule 1 of the Settlement Agreement (the "**Term Lender Parties**") and treat these claims in accordance with the terms of the AAT Agreement. *Id*. § 4(d).

49.    The GUC Trust is a signatory and necessary party to the Settlement Agreement for two reasons.  First, pursuant to the DIP Order, the GUC Trust reimbursed certain costs of JPMorgan associated with defending the Term Loan Avoidance Action, and the GUC Trust and JPMorgan dispute the scope of the GUC Trust's obligations in that regard.  *See* Settlement Agreement at 3 (Recitals).  Specifically, the GUC Trust contends that it has a right to recoup these payments to JPMorgan, and JPMorgan asserts that it is entitled to retain the payments and

---

[3] To the extent there is any conflict between this summary and the Settlement Agreement itself, the Settlement Agreement will govern in all respects.

also to be reimbursed for additional defense costs that have been incurred and continue to accrue.

*Id.* Second, the proposed settlement provides for the allowance of Resolved Allowed General

Unsecured Claims (as defined in the GUC Trust Agreement) against the GUC Trust in favor of

certain Term Lenders and JPMorgan in the aggregate amount of $231 million, and provides that

the GUC Trust shall allocate these claims among the Term Lender Parties in accordance with

Schedule 1 to the Settlement Agreement and treat these claims in accordance with the terms of

the GUC Trust Agreement. *Id.* § 4(c).

50.     STB is a signatory and necessary party to the Settlement Agreement due to its

potential exposure related to its representation of JPMorgan in connection with the Synthetic

Lease.

51.     The Settlement Agreement provides for the following broad, general releases

among the Parties and Non-Parties to the Settlement Agreement: (i) the AAT and the GUC Trust

will fully release JPMorgan, the other Term Lenders, all counter-parties to transactions (a "**Net**

**Proceeds Transaction**") whereby a Term Lender transferred, in whole or in part, its right to

receive the proceeds of the Term Loan Repayment ("**Net Proceeds Counter-Parties**"), STB,

and STB's professional liability insurers (the "**STB Insurers**") from all actions related in any

way to the Term Loan Avoidance Action, the Delaware Actions, the Synthetic Lease, the Term

Loan Agreement, the Delaware UCC-1, and any transactions, financing statements, collateral,

services, or legal advice related to any of the foregoing (the "**Released Matters**"), Settlement

Agreement §§ 3(a), (b); (ii) JPMorgan and the other Term Lenders will fully release the AAT,

the GUC Trust, the other Term Lenders (including  dissolved Term Lenders and, in the case of

JPMorgan, other non-party Term Lenders), STB, and the STB Insurers from all Released

Matters, *id*. §§ 3(d), (e); and (iii) STB will fully release the Term Lenders, the AAT, and the GUC Trust from all Released Matters, *id*. § 3(e).

52.     Further, there will be a mutual release among the DIP Lenders, JPMorgan, and STB. *See id*. § 1.  The private funders of the AAT—Cynthiana LLC and Earlham LLC and LW Holdco VI LLC (collectively, the "**Capital Providers**")—will also fully release JPMorgan and STB. *Id*.

53.     The Settlement Agreement provides for the order approving the proposed settlement to incorporate a bar order provision:  "Upon entry of this Order, any Person (other than a DIP Lender) that is not a signatory to the Settlement Agreement is permanently barred, enjoined, and restrained from contesting or disputing the reasonableness of the settlement, or commencing, prosecuting, or asserting any Actions, including, without limitation, Actions for contribution, indemnity, or comparative fault (however denominated and on whatsoever theory), arising out of or related to any Released Matters." *Id*. § 4(f).

54.     As of May 10, 2019, the AAT, the GUC Trust, STB, JPMorgan, and all of the clients represented by the Defendants Steering Committee Counsel that are still in existence (except for such clients who received in the aggregate no more than $10,000,000 and as agreed to by JPMorgan and STB) have executed the Settlement Agreement. *Id*. § 1.

55.     The Settlement Agreement provides that five business days prior to the hearing on this motion, all remaining clients represented by the Defendants Steering Committee Counsel (except as agreed to by JPMorgan and STB) and any additional Term Lenders that elect to do so will execute the Settlement Agreement. *Id*. §§ 1 & 11.

56.     Two business days before the hearing on this motion, each party who is funding the $231 million AAT Settlement Payment—according to the separate confidential agreements

17

that allocate responsibility for that payment—shall cause its respective share of the payment to be deposited into a law firm trust account. *Id*. §§ 1 & 5(a).

57.      After an order by this Court approving the Settlement Agreement becomes a final non-appealable order, the AAT, the GUC Trust, STB, and each law firm that is a member of the Defendants Steering Committee Counsel on behalf of its client(s) is required to confirm within three business days that all final closing conditions for the Settlement Agreement have been met. *Id*. §§ 1, 9(a) & 9(b).

58.      Upon confirmation that the final closing conditions are met, (i) the AAT Settlement Payment will be wired from the law firm trust accounts to the AAT; (ii) the AAT will cause executed stipulations of dismissal with prejudice to be filed in this Court and in Delaware Chancery Court, where the Delaware Actions are pending, and to be served on all relevant parties; (iii) JPMorgan will cause executed stipulations of dismissal of all cross-claims to be filed in this Court and served on all relevant parties; (iv) the AAT will circulate the Capital Provider releases and the DIP Lender release; and (v) STB shall circulate a duly executed release between STB and each STB Insurer extinguishing all actions by the STB Insurers in connection with the Released Matters. *Id*. §§ 1 & 2.

59.      In addition to the terms summarized above, the Settlement Agreement contains other provisions, including but not limited to those concerning conditions to consummating the Settlement Agreement and those concerning termination events, rights, and procedures. The Court is respectfully referred to the Settlement Agreement for the particulars of these terms.

## VIII.   THE ANTICIPATED DISTRIBUTION TO AAT BENEFICIARIES

60.      If the Court approves the proposed settlement and the AAT receives the AAT Settlement Payment, the AAT will first repay its funders, including the DIP Lenders, and the

Capital Providers.  AAT Agreement §§ 5.1(d)(i)-(iii).  The AAT also will fund the Segregated

Account (as defined in the AAT Agreement), which amounts will be distributed to the holders of

Allowed General Unsecured Claims at the same time as the initial distribution of settlement

proceeds.  *Id.* § 5.1(d)(iv).

61.    Thereafter, the AAT plans to seek approval from the Court to distribute the

proceeds of the settlement to its beneficiaries, as required by the AAT Agreement.  AAT

Agreement ¶ K.  All remaining funds held by the AAT, less costs and expenses for the AAT's

operations, *id*. § 5.5(b), will be distributed to the AAT's beneficiaries, *id*. § 5.1(d)(v).  The DIP

Lenders are entitled to receive thirty percent (30%) and holders of the Allowed General

Unsecured Claims are entitled to receive the amount in the Segregated Account plus seventy

percent (70%) of the funds distributed to the AAT's beneficiaries.  *Id*. § 1.1(e).

## BASIS FOR REQUESTED RELIEF

### I.    THE SETTLEMENT AGREEMENT SHOULD BE APPROVED BY THIS COURT PURSUANT TO BANKRUPTCY RULE 9019

62.    The Settlement Agreement should be approved under Bankruptcy Rule 9019,

which provides that the Court "may approve a compromise or settlement."  The decision to

approve a particular settlement under Rule 9019 lies within the sound discretion of the Court.  *In

re Residential Capital, LLC*, 497 B.R. 720, 750 (Bankr. S.D.N.Y. 2013).  And this discretion

should be exercised "in light of the general public policy favoring settlements."  *In re Residential

Capital, LLC*, 497 B.R. at 749 (quotations omitted).

63.    The bankruptcy court "must determine that a settlement under Bankruptcy Rule

9019 is fair, equitable, and in the best interests of the estate before it may approve a settlement."

*In re Motors Liquidation Co.*, 555 B.R. 355, 365 (Bankr. S.D.N.Y. 2016).  The settlement

proposed need not constitute the best possible outcome for the settling party, and the bankruptcy

court need not conduct an independent investigation into the reasonableness of the settlement.

*See In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005); *see also HSBC*

*Bank USA, Nat'l Ass'n v. Fane (In re MF Global Inc.)*, 466 B.R. 244, 247 (Bankr. S.D.N.Y.

2012) (stating "the court is not required to go so far as to conduct a trial on the terms to approve

a settlement").  Instead, the bankruptcy court must "canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness."  *Nuevo Pueblo, LLC v.*

*Napolitano (In re Nuevo Pueblo, LLC)*, 608 F. App'x 40, 42 (2d Cir. 2015) (quotations omitted).

64.    The Second Circuit has set forth the following seven interrelated factors (the

"***Iridium* Factors**") to evaluate whether a proposed settlement is fair and equitable:

> (1) the balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, with its
> attendant expense, inconvenience, and delay; (3) the paramount interests of
> creditors; (4) whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and the experience and
> knowledge of the bankruptcy court judge reviewing the settlement; (6) the nature
> and breadth of releases to be obtained by officers and directors; and (7) the extent
> to which the settlement is the product of arm's length bargaining.

*In re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 303 (Bankr. S.D.N.Y. 2011) (citing *In re Iridium*

*Operating LLC*, 478 F.3d at 462).

65.    Approval of the Settlement Agreement is justified under the *Iridium* Factors.

## II.    THE *IRIDIUM* FACTORS WEIGH IN FAVOR OF APPROVING THE SETTLEMENT

### A.    The First Two *Iridium* Factors Favor Approval of the Settlement

66.    The first two *Iridium* Factors—(1) the balance between the litigation's likelihood

of success and the settlement's benefits and (2) the likelihood of complex and protracted

litigation—are easily met.

67.    The complex and protracted nature of continued litigation overwhelmingly favors

the proposed global resolution of the action.  As set forth in Section VI, *supra*, in the absence of

20

a settlement at this stage in the litigation, there will be significant additional litigation and the resulting expenses and burdens of such additional litigation.  Further litigation will continue for a significant period of time, will deplete any ultimate recovery by the AAT, and will expose the AAT's beneficiaries to the added delay and uncertainty of litigation.

68.    There is at least one trial, and potentially two, left to be heard by the Court concerning the AAT's claims against the Term Lenders, followed by likely appeals.  Absent approval of the proposed settlement, the Court will need to decide the AAT's motion for summary judgment as to the defense of certain Term Lenders regarding the effectiveness of the 2008 Termination Statement, and the case will proceed to trial on the Phase III issues.  Extensive expert discovery, including up to 30 expert depositions, will proceed in advance of the Phase III Trial.  The issues to be tried in Phase III involve complex and novel questions about valuation methodology, premise of value, and interpretation and application of multiple states' laws regarding what constitutes a "fixture" for purposes of identifying the defendants' Surviving Collateral.

69.    And even with the tremendous effort required to litigate Phase III, it is unlikely that the Phase III Decision will resolve the entire case.  The Phase III Trial will specifically address 11 more representative assets, but tens of thousands of assets could still remain in dispute after the Phase III Trial.  Absent a negotiated resolution after the Court's Phase III Decision, the additional Final Trial would be required.  Although the Court has yet to decide the process by which it would determine the classification and valuation of each of the remaining disputed assets, the Final Trial would unavoidably require additional asset-by-asset discovery and expert testimony, as well as substantial resources expended by the parties and the Court.

70.     Moreover, even if the case were to be litigated to a decision following the Final

Trial, the parties would likely pursue appeals.  Any appeal would not only delay recovery to the

AAT's beneficiaries but also raise the possibility of continued proceedings before this Court,

deferring final resolution of the case even further into the future.

71.     In addition to delaying the resolution of this action and any recovery by the AAT,

continued litigation would also decrease the potential recovery to the AAT's beneficiaries, who

recover only after the litigation funders are paid.  *See* Section VIII, *supra*.  Continued litigation

will require the AAT to draw down further on its available litigation funding.  Thus, even if the

AAT ultimately succeeded through litigation in obtaining a recovery in an amount greater than

the proposed AAT Settlement Payment, the costs associated with continuing to litigate could

diminish the amount available for the AAT's beneficiaries.

72.     In comparison to the uncertain and costly litigation path, the Settlement

Agreement provides the AAT's beneficiaries with prompt, certain, and significant recoveries.

Under the Settlement Agreement, the AAT receives a lump sum payment of $231 million to

repay its funders in full and distribute substantial proceeds to its beneficiaries.  The certainty of

an immediate, significant recovery for the beneficiaries of the AAT justifies a settlement amount

that is less than the maximum total recovery potentially achievable, but also more than the

recovery that the AAT would receive in a number of possible litigation outcomes.

**B.    The Paramount Interest of the Creditors and Other Interested Parties Favors Approval of the Settlement Agreement**

73.    The <u>third</u> and <u>fourth</u> *Iridium* Factors—the paramount interests of creditors and whether other interested parties support the settlement—also favor approving the settlement.

74.    The Settlement Agreement provides a significant recovery for the unsecured creditors and the DIP Lenders that are the beneficiaries of the AAT and eliminates the costs and delay of further litigation.

75.    As mandated by Section 11.3(I)(a)(i) of the AAT Agreement, the Trust Monitor has considered the proposed settlement and concluded that it is in the best interest of the AAT's beneficiaries.  Gonzalez Decl. ¶ 5.

76.    Moreover, key interested parties support the proposed settlement.  The GUC Trust participated in the negotiation of the Settlement Agreement and is a party to it.  The DIP Lenders and the Capital Providers have executed releases of their claims against the Settlement Agreement's signatories in connection therewith.  Finally, other interested parties will have the opportunity to be heard in connection with this motion.  At the time of this motion, the AAT is not aware of anyone who is opposed to the settlement.

**C.    The Settlement Agreement Satisfies the Remaining *Iridium* Factors**

77.    With respect to the <u>sixth</u> *Iridium* Factor, the nature and breadth of releases, the Settlement Agreement provides for releases that are reasonable in light of the scope of the Term Loan Avoidance Action.  The releases cover the rights, claims, and causes of action relating to the Term Loan Avoidance Action, the Delaware Actions, the Synthetic Lease, the Term Loan Agreement, and the Delaware UCC-1.  These releases are necessary to achieve complete and final resolution of all of the claims asserted in this case.  *See In re Ambac Fin. Grp., Inc.*, 457

23

B.R. at 307 (releases acceptable because they were an integral and necessary aspect of settlement).

78.    Further, the notices required by the Settlement Agreement, outlined below, are reasonably calculated to ensure that all claimholders of the AAT and the GUC Trust, along with any other parties of interest, will be aware of this motion in advance of the hearing and prior to the bar order taking effect.  *See generally U.S.H. Corp. of New York v. U.S. Home Corp. (In re U.S.H. Corp. of New York)*, 223 B.R. 654, 658 (Bankr. S.D.N.Y. 1998).  This notice provision is adequate and reasonable for this motion and the relief requested herein, including the bar order, and complies with Bankruptcy Rule 2002.

79.    With respect to the _fifth_ and _seventh_ *Iridium* Factors, the global settlement is the product of arm's-length, good faith negotiations over the course of more than a year.  Counsel for the AAT has been aggressively prosecuting the Term Loan Avoidance Action since 2009 and is closely familiar with the issues that remain to be litigated, the pathways to recovery available to the AAT, and the likelihood of success on each of the issues that remain in dispute.

80.    In conclusion, the proposed settlement should be approved because it is fair and equitable to the AATs' beneficiaries, falls well within the range of reasonableness, and allows the AAT to realize significant value for its beneficiaries.

## NOTICE

81.    As set forth in the Settlement Agreement, notice of this motion will be given within five days of its filing to (a) the potential beneficiaries of the AAT, including the holders of Allowed General Unsecured Claims (as defined in the AAT Agreement); (b) the DIP Lenders; (c) the Capital Providers; (d) the Office of the United States Trustee for the Southern District of New York; (e) counsel to the Signatory Plaintiffs, as such term is defined in the settlement agreement by and among the Signatory Plaintiffs and the GUC Trust, dated as of February 1,

24

2019; (f) JPMorgan; (g) the Defendants Steering Committee Counsel; (h) all other Term Lender

counsel of record; (i) any other Term Lender recipient of the Term Loan Repayment at the

electronic or physical address provided to JPMorgan, as agent, by the Term Lender as of June

30, 2009 (or such other address, if any, as provided by such Term Lender to JPMorgan thereafter

in connection with the Term Loan Avoidance Action); (j) any Net Proceeds Counter-Party to a

Net Proceeds Transaction with JPMorgan; and (k) any Net Proceeds Counter-Party to a Net

Proceeds Transaction with a Non-JPMorgan Term Lender, provided that such Net Proceeds

Counter-Party is known to the employee or representative of such Non-JPMorgan Term Lender

who is responsible for supervising the defense of the Term Loan Avoidance Action.  Settlement

Agreement § 4(g).  Further, this motion shall be filed on the bankruptcy docket in the chapter 11

cases and will be published in *The New York Times* and *Investor's Business Daily*.  *Id*. § 4(h).

## CONCLUSION

WHEREFORE, the AAT respectfully requests that the Court enter an order substantially

in the form of the Approval Order attached as Exhibit A: (i) approving the Settlement

Agreement; (ii) authorizing the AAT to take all actions necessary or appropriate to effectuate the

Settlement Agreement; and (iii) granting such other and further relief as may be necessary.

Dated:  New York, New York
　　　　May 13, 2019

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher　　　　　
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*