UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . |  |
|  | . | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | . |  |
|  | . | One Bowling Green |
| Company, | . | New York, NY 10004 |
|  | . |  |
| Debtors. | . | Thursday, May 23, 2019 |
|  | . | 2:31 p.m. |

. . . . . . . . . . . . . . . .

TRANSCRIPT OF HEARING RE: MOTION TO FILE PROOF OF
CLAIM AFTER CLAIMS BAR DATE (CC: DOC. NOS. 14399,
14417, 14418, 14427, 14510)
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

| | |
|---|---|
| For Celestine Elliott<br>and Lawrence Elliott: | GARY PELLER, ESQ.<br>600 New Jersey Avenue Northwest<br>Washington, DC 20001<br>(202) 662-9122 |
| For Wilmington Trust<br>Company as GUC Trust<br>Administrator: | Drinker Biddle & Reath<br>By: KRISTIN K. GOING, ESQ.<br>1177 Avenue of the Americas<br>41st Floor<br>New York, NY 10036-2714<br>(202) 230-5177 |

APPEARANCES CONTINUED

| | |
|---|---|
| Audio Operator: | Matthew, ECR |
| Transcription Company: | Access Transcripts, LLC<br>517 Dell Road<br>Landing, NJ  07850<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

For New GM:                    King & Spalding
                               By:  ARTHUR J. STEINBERG, ESQ.
                               1185 Avenue of the Americas
                               New York, NY 10036-2601
                               (212) 556-2158

                               Paul, Weiss, Rifkind, Wharton &
                               Garrison LLP
                               By:  DANIEL A. YOUNGBLUT, ESQ.
                               1285 Avenue of the Americas
                               New York NY 10019-6064
                               (212) 373-3968

3

1        (Proceedings commence at 2:31 p.m.)

2              THE COURT:  All right.  Please be seated.  We're here

3    in <u>Motors Liquidation Company</u>, 09-50026.  May I have the

4    appearances, please.

5              MR. PELLER:  Gary Peller appearing for Celestine and

6    Lawrence Elliot, Your Honor.

7              MS. GOING:  Kristin Going on behalf of Wilmington

8    Trust as the GUC Trust administrator.

9              THE COURT:  Thank you.

10             Anybody else?

11             MR. STEINBERG:  Arthur Steinberg from King & Spalding

12   on behalf of New General Motors, and with me is Daniel

13   Youngblut from Paul Weiss, as well.

14             THE COURT:  Thank you.

15             Mr. Peller, go ahead.

16             MR. PELLER:  My clients, Lawrence and Celestine

17   Elliott, seek to recover for a defect in their 2007 Chevrolet

18   Trailblazer that they paid list price for at a DC Dealership in

19   2006.  The defect that they complain about is a non-ignition

20   switch.  It's a defect to the power door module, which creates

21   a fire risk in the vehicles.  The -- we are here today because

22   the GUC Trust opposes the motion of the Elliotts to file their

23   claim at this time on the ground that their claim is barred by

24   this Court's 2009 bar date order.

25             The Elliotts contend that they are not bound by that

4

1   order as, first matter, they joined the ignition switch and

2   certain non-ignition switch plaintiffs' papers with respect to

3   the non-applicability of the <u>Pioneer</u> factors in the context of

4   a denial of due process rights.  They -- this is -- presents a

5   very simple claim of preclusion.  Can a party who was not a

6   party to proceedings and was not provided notice and an

7   opportunity to be heard have a claim that arose years later

8   after the bankruptcy, have that claim precluded by a 2009

9   bankruptcy order, and we contend the answer is no.  As a

10  preliminary matter, the burden is on the party claiming

11  preclusion -- that is the GUC Trust -- to establish that the

12  Elliotts are precluded.

13          As we set out in our papers, there are several

14  factual possibilities because we haven't had the benefit of

15  discovery yet.  We don't really know which of these

16  possibilities this case fits in.

17          The first and simplest possibility is that like with

18  the ignition switch defect, if Old GM knew of the power door

19  module defect prior to their filing of bankruptcy, then

20  according to the ruling of the Second Circuit in the ignition

21  -- with respect to the ignition switch plaintiffs, the Elliotts

22  would have been denied their due process rights and would be

23  entitled -- would not be precluded by the bar order.  We don't

24  know if Old GM knew or not.  We have reason to think that they

25  might have.  It was a corporate culture that suppressed safety

5

1 information, and I won't go into the general corporate culture,

2 but we also have particular information that there were at

3 least one, if not more, fires in these vehicles prior to the

4 bankruptcy.  If Old GM knew or should have known, then the

5 Elliotts are in the same position as the other ignition switch

6 plaintiffs and should be entitled, as Judge Gerber had ruled,

7 to have the bar date placed aside.

8 　　　　　The -- in the event that neither GM nor the Elliotts

9 knew or had reason to know of this defect, the defect was an

10 initial unsuccessful recall in June 2013 for the Elliotts --

11 　　　　　THE COURT:  What do you mean was an unsuccessful

12 recall?

13 　　　　　MR. PELLER:  The -- as was GM's habit with other

14 safety issues, it minimized the extent of the risk and did a --

15 basically a Band-Aid job.  In this place, it applied a Silicoat

16 coating as opposed to what eventually it had to do in --

17 starting in July of 2014 at the recall when they finally said,

18 no, we have to replace the whole power door module.  And so it

19 was an unsuccessful recall that had to be all done again in

20 July of 2014.

21 　　　　　THE COURT:  Did -- there were three recalls relating

22 to the door module?

23 　　　　　MR. PELLER:  Well, the first two were -- the second

24 was an expansion of the first one.  So with respect to the

25 Elliotts, they lived in Washington, D.C.  I believe I'm right

6

1  that that recall did not occur until June of 2013, and that was

2  the recall in which New GM purported that a simple Silicoat

3  coating would fix the problem, but that was not true.

4          In any event, if neither GM nor the Elliotts knew or

5  had reason to know, the first problem with an attempt to use

6  the bar date order to preclude their claim is that they had no

7  claim at the time.  I know that the Court is familiar with the

8  controversy over the outer limits of what constitutes a claim

9  under Section 101 of the Bankruptcy Code, but this is, as we

10 see it, the paradigm example of what the Second Circuit has

11 repeatedly referred to as that very difficult case in which

12 although the conduct occurred pre-petition, as it must have

13 here -- that is, GM -- Old GM designed and installed the power

14 door module -- there was no tortious consequence, no injury and

15 no tortious consequence, until years after the bankruptcy.

16 This is the difficult case that tests the outer boundaries of

17 what constitutes a claim in bankruptcy, and it's our position

18 that under the reigning Second Circuit test, although it's -- I

19 think it's clear that there was a relationship, consumer and

20 manufacturer relationship, between Old GM and the Elliotts,

21 what the Second Circuit said in the GM case and said in prior

22 cases on the same issue is that the purpose of having a

23 relationship, requiring a relationship, is to render the

24 creditors identifiable in the bankruptcy process.

25          The problem here is that the Elliotts, like -- I

7

1  don't know, I think between 65 and 75 million other GM vehicle

2  owners who had GM vehicles at the time of the bankruptcy, their

3  vehicles are working fine.  They had no way to know, no reason

4  to know that your vehicles --

5          THE COURT:  Their vehicles were recalled.

6          MR. PELLER:  They weren't recalled under four years

7  after the bankruptcy, Your Honor.

8          THE COURT:  Okay.

9          MR. PELLER:  They had no way to know in 2009 that

10  they would later, at some point, have a claim because their

11  parts wore down or they rusted or they corroded, which is

12  basically what happened here.  Moisture was allowed to get into

13  the housing, and that's why there was --

14          THE COURT:  So the three recalls regarding the DDM

15  were August 16th, 2012, June 13th, 2013, and July 2nd, 2014.

16          MR. PELLER:  yes, Your Honor.  The June 13th one was

17  an expansion of an earlier, more limited one, in which GM

18  initially took the position that only vehicles in states that

19  had a lot of snow and the salt --

20          THE COURT:  So the view, as of those dates that their

21  vehicle allegedly had a DDM defect, correct?

22          MR. PELLER:  The earliest they could have known was

23  June 2013, when the recall was expanded to the District of

24  Columbia, where the Elliotts live.

25          THE COURT:  Okay.

8

1          MR. PELLER:  They did not know that this was a defect

2     that required replacement or any major work at all.  They were

3     assured that it was a simple defect that a spraying could cure.

4     And so, yes, they had some inkling at that time that something

5     was wrong with the power door switch in June of 2013, but, Your

6     Honor, they didn't know until July of 2014 that this is not a

7     minor defect that could be remedied easily but had --

8          THE COURT:  It wasn't until 2019, January 2019, that

9     you filed a motion to permit a late claim relating to the DDM

10    defect, correct?

11         MR. PELLER:  Well, Your Honor, we have been timely

12    with all our -- with -- Your Honor --

13         THE COURT:  Am I correct?

14         MR. PELLER:  -- had a stay of the non-ignition cases.

15    It --

16         THE COURT:  No, no, no, no, no, no, no.  Am I correct

17    that you did not file a motion for leave to file late claims

18    relating to the DDM defect until January 2019?

19         MR. PELLER:  No, Your Honor.  That's incorrect.  We

20    joined -- Your Honor, after the Second Circuit remand, issued

21    an order to show cause to deal with the late claims.  That

22    order to show cause provided that the ignition switch and

23    certain non-ignition switch plaintiffs would file a late claims

24    motion and that other parties --

25         THE COURT:  And you filed a joinder in a motion filed

9

1  by the economic loss claimants that specifically identified a

2  series of recalls not including the DDM defect, correct?

3          MR. PELLER:  We identified the power door module

4  defect --

5          THE COURT:  You did not identify --

6          MR. PELLER:  -- in January of 2017, Your Honor?

7          THE COURT:  You did not -- you filed a joinder in the

8  economic loss plaintiffs -- claimants' motion for leave to file

9  a late claim, as I permitted, and that motion specifically

10 identified a group of recall by recall number, not including a

11 DDM recall.  And you did not identify in your joinder -- you

12 couldn't -- joining -- how do you join a motion that relates to

13 a list of defects when that's -- yes, one of your -- one of

14 your clients' vehicles had one of those defects, as well, but

15 they didn't -- that motion did not identify the DDM defect.  Is

16 that true?

17         MR. PELLER:  Your Honor, the only ignition switch --

18 I'm having difficulty following.  Your Honor, I think that's

19 true if I'm following what you're saying.  This Court imposed a

20 stay on consideration of the non-ignition switch defect claims

21 relating to late claims motion and turned its attention to

22 consider the late claims motion of certain ignition switch

23 defect -- the ignition switch defect plaintiffs and certain

24 non-ignition switch defect plaintiffs, not including the

25 Elliotts.  Well, the Elliotts have waited patiently for years

10

1  to challenge the legal sufficiency of the notice in the -- in

2  these proceedings.  They were not -- they were only required to

3  file a joinder, which is what they did in January of 2017.

4  They were not asked at that time to identify any other

5  specifics about the claim.  In fact, the order to show cause

6  specifically said that an actual late claim would need not be

7  filed until further notice of the Court, and we did not file

8  the late claim at that time.  We filed it when the Court

9  permitted it in January of 2019.

10            May I continue, Your Honor?

11            THE COURT:  Just a second.

12            MR. PELLER:  Sure.

13            THE COURT:  The economic loss late claims motion, ECF

14  Docket 13806, specifically identified the following recalls:

15  14V047, 14V355, 14V394, 14V400, 14V118, 14V153.  On January 3,

16  2017, you filed a document in the Elliott joinder.  It's ECF

17  Docket Number 13811, and you said, quote -- you said Elliotts,

18  quote, "seek to recover for economic loss they suffered when

19  they purchased hazardous vehicles containing the Delta ignition

20  switch defect," and you went on, "for economic loss they

21  suffered in from a" -- it was a typo -- "non-ignition switch

22  safety hazard."  Other than referencing the Delta ignition

23  switch defect, you did not specifically identify -- and most

24  pertinent to what we're dealing with today, the DDM defect.

25            You joined a motion that sought leave to file late

11

1  claims, six specific recalls specifically identified.  That's

2  the motion you joined.  That -- the motion you joined didn't

3  ask for any relief with respect to a DDM defect, didn't list

4  it.  It listed specific recalls, and you simply filed a

5  joinder.  How do you add -- in a joinder, how do you add other

6  things that aren't included in the motion in your joinder?

7          MR. PELLER:  Your Honor, if you -- I'd point out that

8  neither the GUC Trust nor GM made this point.  Their complaint

9  was that we only indicated that we had individual claims, not

10 class --

11         THE COURT:  I'm asking you a question.

12         MR. PELLER:  I understand, Your Honor.  The

13 explanation is that according to the 2016 -- December 2016

14 order to show cause, scheduling order that we -- I think it was

15 December 2016 -- scheduling order that we responded to, we were

16 not required, as the other parties were represented by Brown

17 Rudnick and the other lead plaintiffs counsel, designated

18 counsel -- we were not required at that time to file a late

19 proof of claim.  Everyone in this courtroom understood that the

20 Elliotts' non-ignition switch claim was different than the

21 non-ignition switch claims being pursued by designated counsel.

22 That had been a source of controversy, the refusal of lead

23 counsel and designated counsel to include the power door module

24 defect within the claims that they would pursue.  The GUC Trust

25 is not surprised.  GM's not surprised.  No party, Your Honor,

12

1  is surprised that when the Elliotts filed with respect to

2  non-ignition switch defects in the joinder that you just read

3  from, what they were referring to was defects in their

4  Trailblazer.  The pleadings were on file in the MDL court, and

5  anyone could have easily looked them up.

6          THE COURT:  This is not the MDL court.  What relief

7  you're --

8          MR. PELLER:  I understand, Your Honor, but we weren't

9  required --

10         THE COURT:  Stop, don't interrupt me.

11         MR. PELLER:  My apologies, Your Honor.  I didn't mean

12 to.

13         THE COURT:  Whatever relief you are seeking from New

14 GM is not relief from the GUC Trust.

15         MR. PELLER:  I understand that, Your Honor.  I'm just

16 saying the GUC Trust is not surprised that we're suing over a

17 Trailblazer that's not listed in the heading of the certain

18 plaintiffs and -- ignition switch and non-ignition switch

19 plaintiffs.  They were required to file proofs of claim at that

20 time.  They indicated the specific recalls that they were

21 interested in, the specific defects.  We specifically and

22 explicitly were not required to file any proof of claim at that

23 time.  We were simply asked to file a --

24         THE COURT:  At what time ?

25         MR. PELLER:  -- joinder with the idea that we would

13

1 file --

2           THE COURT:  At what time?

3           MR. PELLER:  According to the order to show cause

4 2016, Your Honor, after the remand.  The Elliotts have been

5 trying to proceed .  The Elliotts wrote you -- I, on their

6 behalf, wrote a letter to this Court asking if we could proceed

7 with this due process claim for a non-ignition switch defect

8 that would not be encompassed in the settlement, it would not

9 be encompassed in the other parties' motion, and the matter

10 remained stayed.  It would be wrong and so unfair of Your Honor

11 to take the failure to list the specific recall number or the

12 failure to differentiate this defect from the other defects as

13 a basis for refusing to hear the Elliotts' claim, who have

14 waited so patiently --

15           THE COURT:  You could have filed a motion to file a

16 late claim with respect to the DDM defect at the same time that

17 the economic loss claimants filed their motion.  You didn't do

18 that.

19           MR. PELLER:  That's not correct, Your Honor.

20           THE COURT:  You decided to simply file a joinder in

21 their motion, which specifically related to identified defects,

22 not including the DDM defect.

23           MR. PELLER:  Your Honor, I --

24           THE COURT:  A joinder in somebody else's motion can't

25 go beyond what relief they're seeking.  You could have filed

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

14

1  your own separate motion then, and it wouldn't have been 2019

2  when, for the first time, you specifically identify a recall

3  related to the DDM defect.

4       MR. PELLER:  2019 is not the first time it's been

5  referenced, Your Honor.  It was referenced in the pro se

6  complaint that was filed in April of 2014 by Lawrence and

7  Celestine Elliott in the D.C. Superior Court.  Nobody is

8  surprised by this, Your Honor.  And if I could just conclude

9  this by asking leave of the Court to please submit further

10 papers on this point, I --

11      THE COURT:  No more papers, Mr. Peller.

12      MR. PELLER:  Well, let me just wrap it up, Your

13 Honor, by saying that I'm asking the Court to please review the

14 2016 scheduling order and order to show cause, which did not

15 authorize the Elliotts to file their own motion -- for

16 permission to file late claims.  It specifically only allowed

17 the designated counsel to so file and asked other parties to

18 join, if they'd wish to also file late claims.  It did not

19 require the filing of a late claim at that time, but to the

20 contrary, specifically said that no late claim needed to be

21 filed at that time.  And it did not contain any requirements

22 with respect to any identification or specification of the

23 claim, except the fact of joinder.  It would be extremely

24 unfair, Your Honor, to, after the Elliotts have been patient

25 and have tried to abide by this Court orders, have tolerated

15

1 contempt, threats from this Court for filing papers that the

2 Court didn't specifically permit, to now punish the Elliotts

3 for not understanding that they should have filed a paper that

4 was not permitted under the 26 [sic] -- or envisioned under the

5 26 [sic] scheduling order because, three years later, the Court

6 would say, oh, you should have said -- you should have filed a

7 separate paper and separate motion even though that wasn't

8 envisioned in the 26 [sic] scheduling order whatsoever.

9          THE COURT:  All right, Mr. Peller.  Thank you.

10          Ms. Goings.

11          MR. PELLER:  May I continue with my argument, Your

12 Honor?

13          THE COURT:  I thought you were done.

14          MR. PELLER:  Oh, no.  We have a whole argument about

15 why the order shouldn't apply unless you're just going to rule

16 on this basis.

17          THE COURT:  No, go ahead, Mr. Peller.  Go ahead.

18          MR. PELLER:  The -- there was a pre-petition

19 relationship, but the Elliotts were not identifiable, not

20 differentiated both from 75 million other vehicle owners

21 driving GM cars.  They did not have, under the reigning test, a

22 claim because although they were -- although they had a

23 pre-petition relationship, they were not identifiable.  As the

24 Court is aware, some courts, in setting forth the limits of

25 what can constitute a dischargeable claim, have given view to

16

1  the due -- the severe due process problems that would be

2  presented if a debtor tried to foreclose future claims for

3  future injury like in this case, and we rely on the <u>Grumman</u>

4  <u>Olson</u> case and several other cases that are mentioned in the

5  brief.

6          Proceeding now to the next point, even assuming there

7  were a claim -- which we don't believe there was a claim in

8  2009 in the path of the Elliotts, whose car at that time was

9  functioning well and they had no reason to believe that there

10  was any defect that would develop.  Even if those claims could

11  be foreclosed, say by the appointment of an unknown claims

12  master, the fact is that GM, Old GM, failed miserably to

13  provide the constitutionally required notice and opportunity to

14  be heard before the claims of tens of millions of GM vehicle

15  owners, whose vehicles may, at some point, develop a defect

16  that Old GM would have been liable for under the state consumer

17  protection law or implied warranties, as the Elliotts are

18  claiming.

19          The constitution required a form of notice that was

20  reasonably adapted and the best practical notice, as this Court

21  has said, in the circumstances to notifying those people,

22  75 million drivers, but GM chose to limit its notification to

23  publication in five or six national publications.  GM, at the

24  time, must have known, as its advertising budget would clearly

25  indicate, that by 2009, newspapers were a particularly poor

17

1  form to try to reach consumers. That's not the way GM tried to

2  reach its consumers at all.  Moreover, the notices were buried

3  in the legal notice sections of largely financial papers.  The

4  only way I believe that this notice could be upheld as

5  constitutionally sufficient is if this Court, following some

6  other but not all other bankruptcy courts, treated notice for

7  unknown creditors as if it were a mere formality, a simple

8  pretense, a legal fiction, because GM's notice here -- and I

9  direct the Court's attention our Exhibit 2 of our initial

10  motion -- was a Kafkaesque, incomprehensible, and bizarre

11  placement.  The -- it was completely consisted of legal terms

12  drawn from the statute.  It made no attempt to explain any of

13  the terms.  It was in a tiny font, even tinier than the other

14  legal notices surrounding it in the newspapers.  It was not

15  reasonably calculated to actually inform vehicle owners of the

16  possibility that their vehicles might develop future defects

17  and that GM would not be responsible for it.  And what it was

18  -- actually was a mere gesture, the talismanic idea that

19  publication notice is sufficient as long as it's in a national

20  publication, and then don't worry about it.  There's not a

21  scintilla of evidence in the record to support that Old GM ever

22  gave any consideration to the best ways to try to --

23          THE COURT:  Do you have any cases that say that

24  notice by publication is not sufficient with respect to unknown

25  creditors?

18

1          MR. PELLER:  Yes, Your Honor.  I mean, the <u>Hecht</u>

2  case.

3          THE COURT:  As to unknown creditors.

4          MR. PELLER:  Your Honor, the <u>Chemtura</u> case suggests

5  that if the notice in <u>Chemtura</u> had not listed the possibility

6  of exposure to the toxic chemical, then that notice would not

7  have been sufficient.  Judge Furman said in that opinion, a

8  notice that just gives bare notice and doesn't give any

9  information about what the claims might be is like getting no

10 notice at all.

11         THE COURT:  I have understood you to say that notice

12 by publication is not sufficient.

13         MR. PELLER:  Your Honor, if the notice by publication

14 does not contain the information necessary for the debtor to

15 identify -- I mean, for the creditor to identify if they might

16 have a claim, then it is insufficient.  We are fully supportive

17 of the idea that this Court's expressed in the past that

18 creditors also have a due diligence obligation to make sure

19 that they're keeping on top of their financial affairs, but

20 there would be no way.  It's an absurdity to expect that the

21 Elliotts, in 2009, having seen the legalistic notice in the

22 *Wall Street Journal* if they did run across it, to have known

23 that they needed to go to bankruptcy court to protect rights

24 that they might have in the future.  Think of the flood of

25 litigation in bankruptcy courts that this kind of ruling would

19

1  produce in mass tort litigation like this one.  Everybody's got

2  to come in, even before anybody suffered any injury, in order

3  to protect their rights because otherwise the bankruptcy court

4  is going to shut the door on their rights.

5        THE COURT:  And it's okay to come in ten years later

6  to try and raise these claims now?

7        MR. PELLER:  Your Honor, June 2013 was when GM -- New

8  GM first revealed that there was a problem.  They suggested it

9  was a minor problem that was easily fixable.  It was not until

10 July of 2014, when the Elliotts had already filed a pro se

11 complaint about both vehicles, that New GM indicated that this

12 was a serious defect and therefore there -- the Elliotts

13 conclude that they would have a claim.  So the Elliotts have

14 been stayed by this Court from -- according to the 2014

15 threshold issues.  They've had to waive for the court of

16 appeals to conclude, and then once the court of appeals

17 concluded, they specifically -- I don't have the docket number

18 -- they specifically wrote to this Court saying, can we please

19 proceed on our non-ignition switch defect claims for a

20 violation of due process.  This Court, at that time in 2016,

21 said we will proceed with the ignition switch plaintiffs and

22 certain other parties represented by designated counsel, and

23 this Court explicitly stayed the other consideration of the

24 application of the _Pioneer_ factors and other late claims motion

25 for non-ignition switch plaintiffs.  This is the first

20

1  opportunity that we have had.  We have pursued it diligently,

2  Your Honor.

3          THE COURT:  Are you done, Mr. Peller?

4          MR. PELLER:  Yes.

5          THE COURT:  Ms. Goings.

6          MS. GOING:  Thank you, Your Honor.  Kristin Going on

7  behalf of Wilmington Trust as the GUC Trust administrator.

8          Your Honor, I would like to address the Elliotts'

9  motion to file a late claim in two parts because the Elliotts'

10 motion to file a late claim sought not to file a late claim

11 just solely on their behalf but also in a representative

12 capacity on behalf of a purported class of claimants.  The

13 first time we were aware that the Elliotts were pursuing any

14 sort of class or representative claims was when the actual

15 proposed claim was filed in February of this year.

16         In the Elliotts' motion, they do, however, concede on

17 the first page that permission to file a proof of claim on

18 behalf of absent class members depended on the Court granting a

19 timely motion for class certification.  So on the very first

20 page of their pleadings, the Elliotts concede that they have

21 failed the fundamental issue and the threshold issue of having

22 a class certified under Rule 23.  We believe on that basis

23 alone, the class aspect of their motion for a late claims

24 filing should be denied.

25         As this Court ruled in September 25th of 2018,

1  bankruptcy courts in the Second Circuit have consistently held

2  that class representatives that seek to file a class claim on

3  behalf of themselves and absent class claimants must make a

4  motion to extend the requirements of Rule 23 to the contested

5  matter and then satisfy the requirements of Rule 23.  The

6  Elliotts have done none of that, and for that reason, their

7  motion to seek a late claim on behalf of that class should be

8  denied, and I'm prepared to move forward addressing whether or

9  not the Elliotts, individually, may have a basis to proceed

10 under a late claims motion.

11         THE COURT:  Go ahead.

12         MS. GOING:  Okay.  So, Your Honor, I also -- I want

13 to take a step back first, though, and talk about this concept

14 of ignition switch defect, ignition switch plaintiffs, and

15 non-ignition switch defect, non-ignition switch plaintiffs

16 because as Your Honor is very well aware, these are defined

17 terms.  These are terms of art that we have been using for

18 years in this Court.  "Ignition switch plaintiff" is one

19 recall, 047, and the defined term "non-ignition switch

20 plaintiff" and "non-ignition switch recall," at all times and

21 this includes your order to show cause, relates solely to five

22 recalls, and I can read them off if you'd like.

23         THE COURT:  Those are the five recalls that were

24 specifically identified in the economic loss plaintiffs' motion

25 that Mr. Peller joined.

22

1           MS. GOING:  That's correct.  They're 14V355, 14V394,

2  14V400, 14V118, 14V153.  None of these recalls are the DDM

3  recall, none of them relate to a door handle, and none of them

4  relate to a Trailblazer vehicle.  So when Mr. Peller speaks

5  about having a non-ignition switch plaintiff, that is not the

6  defined term, and he does not fall -- the Elliotts' Trailblazer

7  does not fall into the category of a non-ignition switch

8  plaintiff.  And --

9           THE COURT:  Am I correct that the other five recalls

10 that were specifically identified and identified as

11 non-ignition switch defects, they're all related, in a sense,

12 to the ignition switch.  The power steering would stop working.

13 All of them were tied in some fashion to an ignition switch

14 problem.

15          MS. GOING:  That's correct, Your Honor.

16          THE COURT:  Okay.

17          MS. GOING:  That is correct.  And I think to add

18 perhaps to the confusion, and this relates to the joinder that

19 the Elliotts filed, we need to keep in mind that the

20 Elliotts actually do own two vehicles.

21          THE COURT:  I understand that.

22          MS. GOING:  Right.

23          THE COURT:  And one of them --

24          MS. GOING:  Is defined term "ignition switch" --

25          THE COURT:  Yes.

23

1          MS. GOING:  -- the Chevy Cobalt '07.

2          THE COURT:  Correct.

3          MS. GOING:  So for that vehicle, they absolutely

4   would be filing the joinder because it was part and parcel of

5   the show cause order, but nothing in the show cause order

6   related to a 2006 or 2007 Chevy Trailblazer with a DDM defect.

7   The show cause order did not relate to any defects other than

8   the ones that we've identified here.

9          The Elliotts have alleged three main arguments, and

10  the first argument is that the bar date order and the notice

11  that was provided pursuant to the order was insufficient.  And

12  I think we can dispose of this rather quickly because the

13  Elliotts are challenging a file order that was entered in 2009.

14  They would need to do so under Rule 60(b).  They have not

15  attempted to even mention Rule 60(b) or assert any of its

16  application here.  They're also bound yes the doctrine of rule

17  of the case.  And furthermore, many of the issues that the

18  Elliotts are raising as concerns with regard to the notice were

19  actually issues that were raised by parties at the time the bar

20  date order was entered.  The asbestos plaintiffs themselves had

21  objected to the bar date notice and raised concerns about its

22  legalese and the ability of individuals to understand what it

23  meant.  The Court went back and forth, and in fact, the bar

24  date notice was modified based on that objection and the

25  concerns that were raised in -- on the record at that time.

24

1        As you noted, there are no cases that indicate that

2   Newspaper notice -- and here, we had notice in nine different

3   newspapers -- is not sufficient to provide unknown creditors

4   with notice.

5        Moving to their second argument, the Elliotts are

6   claiming that they are future claimants when, of course, they

7   have a contingent claim under 105 of the Bankruptcy Code.  And

8   Your Honor's <u>American Axle</u> opinion recently articulates the

9   broad scope of a contingent claim, which is a claim which has

10  not yet occurred and which is dependent on some future event

11  that may not ever happen.  And that's exactly what we have

12  here.

13       But even more importantly, this exact issue has

14  already been addressed by the Second Circuit in the original

15  <u>Elliott</u> decision.  And in that decision, the Second Circuit

16  says:

17       "Claimants like the Elliotts" --

18  -- and this is a quote --

19            -- "with economic loss claims arising from the

20            ignition switch defect or other defects had a

21            pre-petition right to payment and thus possessed

22            contingent claims within the meaning of Section

23            1015(a) of the Bankruptcy Code."

24       That's at 829 F.3d at 157.  So the Second Circuit has

25  already disposed of this issue and determined that, in fact,

25

1   claims of defects are contingent claims.  And furthermore, as

2   Your Honor has pointed out in other late claims motions, by

3   virtue of the fact that you're before us seeking to file a late

4   claim, there's an acknowledgment that you believe you have a

5   pre-petition claim to begin with.

6         Moving to the last issue where the Elliotts are

7   claiming that either the Pioneer factors do not apply to them,

8   or if they do, that they have met them, we believe, in fact,

9   you don't even need to get into the question of all of these

10  hypotheticals of what GM may have known and the possibility of

11  discovery because as Judge Bernstein has articulated in the

12  Queen Elizabeth Realty case, the Pioneer analysis applies to

13  known or unknown creditors.  The Pioneer analysis actually

14  applies whenever a claimant is seeking to file a late claim.

15  And that's because Rule 9006(b)(1) requires the application of

16  excusable neglect when you're seeking to file a late claim.  So

17  there is no analysis of whether or not you're a known or an

18  unknown creditor.  You must apply the Pioneer standard.

19        And so when we apply the Pioneer standard here, let's

20  just start with the length of delay.  And we have many

21  different dates, but -- and it is in the pleadings -- the

22  recall in 2012 was, in fact, issued to D.C. residents.  So the

23  Elliotts received notice of the first recall in 2012.  They

24  received another recall in June of 2013.  They filed their

25  first lawsuit in 2014 -- or in April of 2014, and then there

26

1   was a further recall after they filed their lawsuit in July of

2   2014.  But at no time in 2014 did the Elliotts take any action

3   to come to the bankruptcy court and seek to file a late proof

4   of claim.  They sat on their rights for years.  And we don't

5   even have to address what happened in 2016 or 2017 here in this

6   court because the fact of the matter is the Elliotts had an

7   obligation, if they were going to meet the Pioneer standards,

8   to come to this court and allege their motion to file a late

9   claim in 2012/2013/2014, when they had actual knowledge of this

10  defect.

11          Obviously, Your Honor, the length of delay here is

12  the most dispositive issue, but we can also address the risk of

13  prejudice to the debtor, clearly not only in the individual

14  capacity, but if they're seeking a class, this notion that any

15  party could just come before the bankruptcy court and have a

16  late claim filed for recalls, that would open up the floodgates

17  beyond imagine, and it would render it virtually impossible to

18  have an automotive bankruptcy because --

19          THE COURT:  Let me ask you a question.

20          MS. GOING:  -- recalls are a matter of course.

21          THE COURT:  Assume that Old GM knew about the DDM

22  defects and hadn't disclosed it.  Let's just assume for

23  purposes of my questions that similar to the ignition switch

24  defect, there was a due process violation, okay, at the time of

25  the bankruptcy.  Would the Pioneer factors still have to be

27

1 examined by the Court in determining whether to permit the late

2 claims motion once the Elliotts were aware of a claim or

3 potential claim against the GUC Trust as a successor to Old GM?

4           MS. GOING:  Absolutely, Your Honor.  And that is

5 really what the Queen Elizabeth case tells us.

6           THE COURT:  Right.  And one of the things -- so --

7 look, I -- as you know, I inherited this case from Judge Gerber

8 when the Elliott decision came down from the circuit.  In

9 December 2016, I entered an order to show cause, and it listed

10 exhibits -- issues to be addressed, one of which was can the

11 Ignition Switch Plaintiffs and/or Non-Ignition Switch

12 Plaintiffs -- capitalized defined terms -- satisfy the

13 requirements for authorization to file late proofs of claim

14 against the GUC Trust and/or are such claims equitably moot.

15 That's at Page 3 of that order.

16           The economic loss plaintiffs and the pre-closing

17 accident plaintiffs filed motions for leave to file a late

18 claim.  Mr. Peller was at the hearing when all of this was

19 discussed, and I think I said words to the effect of "it's time

20 to decide whether late claims can be filed."  The economic loss

21 claimants filed a motion specifically identifying six recalls.

22 Mr. Peller filed a joinder, and a joinder was permitted.  It

23 didn't identify recalls by number, but it did specifically

24 address the ignition switch defect, I think in capitals.  What

25 it didn't do was list the DDM or describe the DDM recall.  And

28

1  it would seem to me, at an absolute minimum, the <u>Pioneer</u>

2  factors began running no later than the deadline the Court gave

3  for filing late claims motions.

4          MS. GOING:  Your Honor, I would submit that the

5  <u>Pioneer</u> analysis starts in 2012/2013/2014 when they -- I mean,

6  the Pellers [sic] filed suit against New GM in April of 2014,

7  and then they took no action against Old GM.  I think the

8  Second Circuit, as you know, puts a very high standard on the

9  <u>Pioneer</u> requirements, and we have a situation here where years

10 went by, and we would -- admittedly, we would be in a very

11 different position right now if this was 2012/2013 and they

12 were seeking to file a late claim, but it's not.  It's 2019.

13 It's seven years later.  And they did take action against New

14 GM.  So there's no -- they're not contesting that they didn't

15 know as of --

16         THE COURT:  What's the status of the Elliotts' claims

17 in the MDL?  Do you know?

18         MS. GOING:  I don't, Your Honor.  If Mr. Peller --

19         THE COURT:  Mr. Peller.

20         MS. GOING:  -- wants to speak to that.

21         MR. PELLER:  The Elliotts have claims that are

22 stayed.  They're not consolidated within the consolidated

23 complaint, but they remain active in the MDL.

24         THE COURT:  Okay.  Thank you.

25         Go ahead, Ms. Going.  Anything else you want to add?

29

1         MS. GOING:  No, Your Honor.  I will just conclude by

2    saying that the Elliotts do not meet the <u>Pioneer</u> standard and

3    we would ask that the motion be denied.

4         THE COURT:  Thank you.

5         MS. GOING:  Thank you.

6         THE COURT:  Mr. Steinberg.

7         MR. STEINBERG:  Your Honor, just a few points, and I

8    join with the arguments raised by the GUC Trust in connection

9    with Mr. Peller's motion.

10         Just to correct the record, the ruling by Judge

11    Gerber with regard to the bar date was only with respect to

12    ignition switch plaintiffs and not Mr. Peller's client, and

13    that ruling itself was vacated by the Second Circuit when they

14    vacated the equitable mootness ruling.

15         THE COURT:  I'm not -- yeah.  That's where I'm kind

16    of -- not clear to me, because they vacated the equitable

17    mootness argument, where that leaves the Court, but go ahead.

18         MR. STEINBERG:  But I just wanted -- I think he said

19    that the -- that Judge Gerber ruled, and I wanted to clarify

20    that ruling didn't apply to him, and whatever that ruling was,

21    it was vacated.  The second thing is that Mr. Peller's car is a

22    2006 car that's at stake here, not a 2007 car.  I think he said

23    2007 in his presentation.  And the third thing is that in his

24    motion where -- for the --

25         THE COURT:  2006 Chevy Trailblazer.

30

1          MR. STEINBERG:  That's correct.  And in his motion

2   where he said that he was now going to seek, for the first

3   time, a class claim with respect to this recall, in Footnote 1

4   of his motion, he says that he's going to move expeditiously to

5   file the motion to, in fact, certify the class.  We're now four

6   months after the time that he filed that motion, and no motion

7   was filed, so he's untimely here, as well.

8          And the final point that I would make is that as you

9   look at the factors that are involved in -- after a person is

10  aware of the circumstance that would lead to a claim, what did

11  the person do, the Elliotts did something.  They didn't do

12  anything against Old GM and the GUC Trust.  They strategically

13  moved to sue New GM, and that was in 2014.  And now, we're five

14  years later.  And it's not like they did everything that they

15  possibly could as expeditiously as they can.  They

16  strategically chose how they wanted to move once they found out

17  what they wanted to do.  Thanks.

18          THE COURT:  Okay.  Thank you.

19          Mr. Peller.

20          MR. PELLER:  Your Honor, the Elliotts filed a pro se

21  complaint in April 2014 in the Circuit Court for the District

22  of Columbia.  They were not making any strategic decisions at

23  all.  Their pro se complaint, liberally construed, actually was

24  arguably a claim against Old GM.

25          THE COURT:  When did you begin representing them?

31

1          MR. PELLER:  I began representing them in June of

2   2014, Your Honor, a couple months after they had filed their

3   pro se.  But I want to speak particularly --

4          THE COURT:  And what did you do after you became

5   their counsel?

6          MR. PELLER:  The first thing we did was try to amend

7   their pro se complaint to clarify the claims.  They -- New GM

8   had moved to dismiss for failure to state a claim, so we moved

9   the judge in the District of Columbia to allow us to amend the

10  complaint.  New GM opposed that, received an order issued by

11  Judge Gerber specifically addressed to the Elliotts,

12  threatening them with contempt if they said anything before the

13  District of Columbia court.  The Elliotts have been repeatedly

14  threatened with contempt for filing papers without permission

15  of this court, and that's why this argument about delay, Your

16  Honor, is so unfair and so absurd.

17         In May of 2014, this Court entered a scheduling

18  order.  In that scheduling order, the Court very clearly said

19  that certain threshold issues would be considered and all other

20  issues, including issues related to late claims --

21         THE COURT:  Here's what --

22         MR. PELLER:  -- would be stayed.

23         THE COURT:  Here's --

24         MR. PELLER:  We were not permitted to file against

25  the --

32

1          THE COURT:  Here's what you said in the joinder you

2   filed on January 3, 2017, that you were joining, quote, "the

3   motions filed by other parties for leave to file late proofs of

4   claim."  That's what you said.

5          MR. PELLER:  Yes, Your Honor, and that's what we --

6          THE COURT:  The other parties filed motions for leave

7   to file late proofs of claim with respect to six specific

8   recalls that did not include the DDM defect.

9          MR. PELLER:  Yes, Your Honor.  Your Honor, the

10  parties -- I don't want to ask Mr. Steinberg to be a witness,

11  but we had lawyer discussions leading up to the order to show

12  cause.  Every -- all the attorneys understood that the

13  nonconsolidated, non-ignition switch claims like the claims of

14  the Elliotts would be handled by joinder.  We wouldn't be

15  required to file a late claims motion at that time.  But

16  then --

17         THE COURT:  You know, Mr. Peller, you're very precise

18  when you want to be and very vague when you seemingly want to

19  be.

20         MR. PELLER:  Your Honor, I'm not being vague.  We

21  were not required to state the basis of our late claim.

22         THE COURT:  Oh, really?

23         MR. PELLER:  So we joined a late claims --

24         THE COURT:  You were not?

25         MR. PELLER:  Well, if you rule the opposite, then

33

1  that'll be the ruling, but --

2          THE COURT:  You were not required to state the --

3  when you join somebody's motion that specifically defines the

4  class as those owning vehicles that were subject to six

5  specific recalls and you say, we join the motions filed by the

6  economic loss claimants --

7          MR. PELLER:  Your Honor, if we were encompassed

8  within that class, we wouldn't have had any reason to join at

9  all.

10         THE COURT:  Well, as to one vehicle, you are.

11         MR. PELLER:  As to the other -- yes, the Elliotts are

12  as to the other vehicle, but they joined to protect their

13  rights and specifically to protect their rights with respect to

14  this vehicle.

15         THE COURT:  All right.  I'll take --

16         MR. PELLER:  They don't have the same claims as the

17  other parties.

18         THE COURT:  I will --

19         MR. PELLER:  They're not --

20         THE COURT:  -- take the matter under submission.

21  We're adjourned.

22      (Proceedings concluded at 3:20 p.m.)

23                          *  *  *  *  *

24

25

34

1                    **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9
    
10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE:  May 25, 2019

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25