**HEARING DATE AND TIME: August 5, 2019 at 2:00 p.m. (Eastern Time)**
**OBJECTION DEADLINE: July 29, 2019 at 4:00 p.m. (Eastern Time)**

**BINDER & SCHWARTZ LLP**

Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Telephone: (212) 510-7008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x

In re:

MOTORS LIQUIDATION COMPANY, f/k/a
GENERAL MOTORS CORPORATION, *et al.*,

                                          Debtors.

Chapter 11

Case No. 09-50026 (MG)
(Jointly Administered)

-----------------------------------------------------------------------x

MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST, by and through the Wilmington Trust
Company, solely in its capacity as Trust Administrator and
Trustee,

                                          Plaintiff,

                against

JPMORGAN CHASE BANK, N.A., *et al.*,

                                          Defendants.

Adversary Proceeding

Case No. 09-00504 (MG)

-----------------------------------------------------------------------x

**MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE**
**ACTION TRUST FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS**
**105 AND 1142 OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 3020 APPROVING THE DISTRIBUTION PLAN TO THE**
**AVOIDANCE ACTION TRUST'S BENEFICIARIES**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

JURISDICTION AND VENUE ........................................................................................... 1

PRELIMINARY STATEMENT ........................................................................................... 2

BACKGROUND .................................................................................................................. 3

   I.   OLD GM FILES FOR BANKRUPTCY AND THE TERM LOAN AVOIDANCE
      ACTION IS FILED ................................................................................................ 3

   II.  THE DEBTORS' BANKRUPTCY AND THE CLAIMS PROCESS ................................ 5

   III. THE AAT, THE AAT'S BENEFICIARIES, AND RESOLUTION OF THE TERM
      LOAN AVOIDANCE ACTION ................................................................................ 6

   IV. REPAYMENT OF LITIGATION FUNDING AND OTHER EXPENSES AND
      OBLIGATIONS .................................................................................................... 8

   V.  HOLDBACK FOR ESTIMATED FEES AND EXPENSES ........................................... 10

   VI. PROPOSED DISTRIBUTION PLAN ....................................................................... 11

ARGUMENT ....................................................................................................................... 11

THE DISTRIBUTION PLAN SHOULD BE APPROVED ....................................................... 11

   I.   THE INITIAL DISTRIBUTION .............................................................................. 12

     A.  The AAT Plans to Make an Initial Distribution of Most of the Proceeds ......................... 13

     B.  The Distribution Plan Allows a Fair Opportunity for All Eligible Beneficiaries to
        Receive Distributions ......................................................................................... 14

   II.  THE FINAL DISTRIBUTION ................................................................................ 17

NOTICE .............................................................................................................................. 18

CONCLUSION .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re River Ctr. Holdings, LLC,*
    394 B.R. 704 (Bankr. S.D.N.Y. 2008) ......................................................................... 12

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,
    N.A. (In re Motors Liquidation Co.),*
    777 F.3d 100 (2d Cir. 2015) ................................................................................. 3, 4

**Statutes**

11 U.S.C. § 105(a) .......................................................................................... 1, 2, 12

11 U.S.C. § 1142(b) ........................................................................................ 1, 2, 11

28 U.S.C. § 1334 ................................................................................................... 1

28 U.S.C. § 1409 ................................................................................................... 2

28 U.S.C. § 157 .................................................................................................. 1, 2

**Other Authorities**

Restatement (Third) of Trusts § 77; 12 Del. C. § 101 ................................................. 11

**Rules**

Fed. R. Bank. P. 3020(d) .................................................................................. 1, 2, 11

TO:    **THE HONORABLE MARTIN GLENN**
    **UNITED STATES BANKRUPTCY JUDGE**

Pursuant to sections 105(a) and 1142(b) of title 11 of the United States Code (the

"**Bankruptcy Code**") and Rule 3020(d) of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), and in accordance with the Fourth Amended and Restated Motors

Liquidation Company Avoidance Action Trust Agreement attached hereto as Exhibit A (the

"**AAT Agreement**"), Wilmington Trust Company, solely in its capacity as trust administrator

and trustee ("**Trust Administrator**") of the Motors Liquidation Company Avoidance Action

Trust (the "**AAT**" or the "**Trust**"), as established under the Debtors' Second Amended Joint

Chapter 11 Plan (as confirmed, the "**Plan**"), Bankr. Dkt. No. 9836,[1] in the above-captioned

bankruptcy proceeding, requests entry of an order, substantially in the form attached hereto as

Exhibit B (the "**Distribution Order**"): (i) approving the AAT's plan for distributing proceeds to

its beneficiaries; (ii) approving the procedures for identifying holders of Allowed General

Unsecured Claims (as defined below) and the notice to be provided to them in the form attached

hereto as Exhibit C (the "**Notice Form**"); (iii) authorizing the AAT to take all other actions

necessary or appropriate to effectuate the distribution to its beneficiaries; and (iv) granting such

other and further relief as the Court deems necessary.

## JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§

157 and 1334; paragraph II of the order of the Court confirming the Plan, Bankr. Dkt. No. 9941

(the "**Confirmation Order**"); Article XI of the Plan; and Paragraph K and Sections 8.1(e) and

13.3 of the AAT Agreement.

---

[1] All references to the Bankruptcy Docket are to *In re Motors Liquidation Company f/k/a General Motors Corporation*, Case No. 09-50026.  All references to the Adversary Docket are to *Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 09-00504.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. § 1409.  The statutory predicate for the relief requested is

sections 105(a) and 1142(b) of the Bankruptcy Code and section 3020(d) of the Bankruptcy

Rules.

## PRELIMINARY STATEMENT

3.     The AAT was created to prosecute and then distribute the net proceeds of

the above-captioned adversary proceeding (the "**Term Loan Avoidance Action**") for the benefit

of the AAT's beneficiaries, which include the United States Department of the Treasury and

Export Development Canada (together, the "**DIP Lenders**") and the unsecured creditors of Old

GM (defined below).  After years of litigation, the AAT successfully resolved the Term Loan

Avoidance Action by entering into a global settlement agreement (the "**Global Settlement**

**Agreement**"), which was approved by the Court on June 13, 2019.  The AAT received the $231

million settlement payment on July 1, 2019 and is now in a position to distribute proceeds to its

beneficiaries.  The proposed distribution plan seeks to efficiently distribute funds to the AAT's

beneficiaries while also ensuring that all eligible beneficiaries receive notice of the distribution

and are afforded a fair opportunity to participate.

4.     According to the AAT's proposed distribution plan, the vast majority of

proceeds will be distributed in a single distribution.  A second, and final, distribution will then be

made by the AAT if there are sufficient remaining proceeds to warrant a further distribution after

all expenses are paid.

5.     To implement this proposed distribution plan, the AAT will promptly

make the 30% distribution to the DIP Lenders in accordance with wire instructions already

supplied to the AAT, and will give holders of Allowed General Unsecured Claims 60 days'

notice to provide the AAT with necessary address and tax information.  Any holders that fail to

respond within 60 days will forfeit their share of the proceeds.  The 60-day period for holders of

Allowed General Unsecured Claims to respond is reasonable because substantial efforts have

already been made to identify and contact beneficiaries.  The AAT wishes to provide a fair

opportunity for all beneficiaries to participate without unnecessarily prolonging the distribution

process.

6.      The AAT Agreement requires Court approval of this proposed distribution

plan.  The Court should approve the AAT's proposed distribution plan because it is consistent

with the AAT Agreement and will result in an efficient, fair distribution to the AAT's

beneficiaries.

## **BACKGROUND**

### I.      OLD GM FILES FOR BANKRUPTCY AND THE TERM LOAN AVOIDANCE ACTION IS FILED

7.      In 2006, General Motors Corporation ("**Old GM**"), pursuant to a term

loan agreement (the "**Term Loan Agreement**"), obtained a syndicated secured term loan (the

"**Term Loan**") of approximately $1.5 billion from a group of lenders (the "**Term Lenders**").

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank,*

*N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 101 (2d Cir. 2015) ("***Second Circuit 2015***

***Decision***").

8.      The Term Lenders were secured by a large number of Old GM's assets

located at forty-two Old GM facilities (the "**Collateral**").  *Id*.  Among other filings to perfect the

Term Lenders' security interest in the Collateral, JPMorgan Chase Bank, N.A. ("**JPMorgan**")

caused the filing of a UCC-1 financing statement with the Delaware Secretary of State that

covered machinery and equipment constituting Collateral at the forty-two Old GM facilities (the

"**Delaware UCC-1**").  *Id.*

9.      On June 1, 2009 (the "**Petition Date**"), Old GM and certain of its subsidiaries (the "**Debtors**") filed voluntary petitions for relief under the Bankruptcy Code and sought the Court's approval to sell substantially all of the operating assets of the Debtors to a Government-sponsored entity ("**New GM**") in an expedited sale under Section 363 of the Bankruptcy Code (the "**363 Sale**").

10.     In connection with its bankruptcy filing, the Court authorized the Debtors to obtain $33 billion in post-petition financing (the "**DIP Financing**") pursuant to the *Final Order Pursuant to Bankruptcy Code Sections 105(a), 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001 and 6004 (A) Approving a DIP Credit Facility and Authorizing the Debtors to Obtain Post-Petition Financing Pursuant Thereto, (B) Granting Related Liens and Super-Priority Status, (C) Authorizing the Use of Cash Collateral and (D) Granting Adequate Protection to Certain Pre-Petition Secured Parties* (the "**DIP Order**"), Bankr. Dkt. No. 2529.

11.     A portion of the DIP Financing was planned to be used by the Debtors to repay the Term Lenders in full and ahead of other creditors of Old GM, on the assumption that their claims under the Term Loan Agreement were fully secured.  Bankr. Dkt. No. 2529 ¶ 19.

12.     However, shortly before entry of the DIP Order, the Official Committee of Unsecured Creditors of Motors Liquidation Company f/k/a General Motors Corporation (the "**Committee**") learned that the Term Lenders' security interests, in fact, may not have been perfected as of the Petition Date due to the filing of a termination statement relating to the Delaware UCC-1 months before the Petition Date.  *Second Circuit 2015 Decision*, 777 F.3d at 102.  Accordingly, the DIP Order expressly preserved the right of the Committee to investigate and bring actions based upon the purported perfection of the security interests related to the

Term Loan.  Bankr. Dkt. No. 2529 ¶ 19(d).  Subject to the carveout in the DIP Order, the Term

Lenders were repaid in full on June 30, 2009 (the "**Term Loan Repayment**").

13.    Following its investigation, the Committee filed the Term Loan Avoidance

Action on July 31, 2009, to recover amounts alleged to have been improperly paid by Old GM to

the Term Lenders based on the erroneous assumption that the Term Lenders' security interests

were fully perfected and the Term Loan fully secured.  Adv. Pro. Dkt. No. 1.

## II.    THE DEBTORS' BANKRUPTCY AND THE CLAIMS PROCESS

14.    In the fall of 2009, the Debtors filed schedules of assets and liabilities and

statements of financial affairs.  Bankr. Dkt. Nos. 4060-78 & 4244-47.  The Debtors' schedules

included the addresses of known claim holders.  *See, e.g.*, Bankr. Dkt. No. 4061.

15.    A series of bar dates were established for filing proof of claims against the

Debtors.  Bankr. Dkt. Nos. 4079, 4586, & 4681; Plan § 8.1.

16.    The proof of claim form required each claimant to provide a name and

address where notices should be sent.  *See, e.g.*, Bankr. Dkt. No. 4079-1 at 1.  The claim form

laid out the requirements under Bankruptcy Rule 2002(g), which provides that a claimant has a

continuing obligation to keep the Court informed of its current address.  *Id*. at 2.

17.    The bar orders specified that any holder of a claim against the Debtors that

was required to, but failed to, file a proof of claim on or before an applicable deadline was

forever barred from asserting such claim against the Debtors.  Bankr. Dkt. Nos. 4079, 4586, &

4681; Plan § 8.3.

18.    Timely filed claims were then subject to a resolution process by which the

Debtors (a) prosecuted omnibus claims objections; (b) pursued claims settlements; (c) pursued

claims resolution under the Court-approved alternative dispute resolution procedures; and (d)

reconciled and allowed claims.  *See* Bankr. Dkt. No. 9213 at 3-4.  Following confirmation of the

Plan, the GUC Trust was created for the benefit of the unsecured creditors of the Debtors and took over the claims resolution process from the Debtors.   *See* Plan § 6.2.

## III.    THE AAT, THE AAT'S BENEFICIARIES, AND RESOLUTION OF THE TERM LOAN AVOIDANCE ACTION

19.    On March 29, 2011, the Court entered the Confirmation Order confirming the Plan for the Debtors' liquidation.  Bankr. Dkt. No. 9941.

20.    Pursuant to Section 6.5 of the Plan, the AAT was established to liquidate and distribute the net proceeds, if any, of the Term Loan Avoidance Action for the benefit of its beneficiaries.  *See also* AAT Agreement ¶ E (Background).

21.    On December 15, 2011, prosecution of the Term Loan Avoidance Action was transferred to the AAT.  Plan § 6.5.

22.    After many years of litigation, the AAT, JPMorgan, numerous Term Lenders, and certain other interested parties entered into the Global Settlement Agreement.  Adv. Pro. Dkt. No. 1168; *see* Adv. Pro. Dkt. No. 1182 at 7-18 for a summary of the litigation and an overview of the terms of the Global Settlement Agreement.

23.    On May 13, 2019, the AAT filed a 9019 motion for court approval of the Global Settlement Agreement (the "**9019 Motion**").  Adv. Pro. Dkt. No. 1182.

24.    Among many other parties, the AAT provided notice of the 9019 Motion to its beneficiaries.  *See Id*. ¶ 80.  There were no objections to the 9019 Motion.  And following a hearing on June 12, 2019, the Court granted the AAT's 9019 Motion and approved the Global Settlement Agreement (the "**Settlement Approval Order**").  Adv. Pro. Dkt. No. 1190.[2]

---

[2] Following consummation of the Global Settlement Agreement, a notice of appeal was docketed on the Main Bankruptcy Docket that appears to have been filed on June 27, 2019.  Bankr. Dkt. No. 14542.  On its face, the appeal does not seem to relate to the approval of the Global Settlement Agreement nor does it appear that the appellant has standing to appeal the Settlement Approval Order.  In any event, the parties to

25.    On July 1, 2019, the $231 million payment under the Global Settlement Agreement was transferred to the AAT, and the Term Loan Avoidance Action was dismissed. Bankr. Dkt. Nos. 14544 & 14545.

26.    Prior to entering into the Global Settlement Agreement, the AAT entered into separate settlement agreements with 26 individual Term Lenders.  According to the terms of each settlement agreement, the settling Term Lender repaid a portion of the Term Loan Repayment it received in exchange for the AAT dismissing the Term Lender from the Term Loan Avoidance Action.  *See, e.g.*, Adv. Pro. Dkt. No. 305 (notice of dismissal against one of the Term Lenders that had settled with the AAT).  Some of these individual settling Term Lenders retained their claims as unsecured creditors against the AAT in the amount of the settlement payment.  The remaining individual settling Term Lenders waived their claims against the AAT.

27.    Having now received the $231 million settlement payment, the AAT is in a position to distribute proceeds to its beneficiaries.  The AAT beneficiaries are the DIP Lenders, who are entitled to 30% of the distributable proceeds, and the holders of Allowed General Unsecured Claims, who are entitled to 70% of those proceeds.  AAT Agreement §§ 1.1(e) & (bbbbb).

28.    With reference to the relevant definition contained in the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated July 30, 2015, and attached hereto as Exhibit D (the "**GUC Trust Agreement**"), the holders of Allowed General Unsecured Claims under the AAT Agreement include holders of General Unsecured Claims that were allowed against the Debtors as of March 29, 2011, the initial distribution record

---

the Global Settlement Agreement have agreed that this appeal, which was filed *pro se*, has no effect on the now-final settlement.

date for the GUC Trust; holders of General Unsecured Claims that were disputed as of March 29,

2011 but have since been allowed; and Term Lenders to the extent and in the amount that they

have made a payment to the AAT and have not waived their claims as unsecured creditors under

section 502(h) of the Bankruptcy Code.[3]  GUC Trust Agreement ¶ F (Background) & § 1.1(ddd).

## IV.    REPAYMENT OF LITIGATION FUNDING AND OTHER EXPENSES AND OBLIGATIONS

29.    After receiving the $231 million payment under the Global Settlement

Agreement, the AAT promptly repaid its litigation funders to stop the accrual of interest and

other fees and expenses.  These payments were made in accordance with the distribution

provisions in the AAT Agreement.  Bankr. Dkt. No. 14437.

30.    First, the AAT paid the DIP Lenders the amounts that they funded for the

AAT's costs and JPMorgan's defense costs (the "**DIP Lender Advances**").  AAT

Agreement §§ 1.1(h) & 5.1(d)(i).  The DIP Lender Advances totaled $48,133,170, consisting of

$16.6 million in funding to the AAT ($1.6 million of initial funding plus $15 million additional

funding) plus $31,533,170 in JPMorgan defense costs.

31.    Second, the Trust Administrator paid Cynthiana LLC and Earlham LLC

(the "**CE Capital Providers**") in the amount of the CE Capital Providers' Entitlement (as

defined in the agreement between the CE Capital Providers and the AAT).  AAT Agreement

§ 5.1(d)(ii).  Because the Trust has drawn down the entire $15 million of available funds, the CE

Capital Providers' Entitlement was $29,771,958.91, which is $15 million multiplied by 1.9 plus

accrued interest.  Bankr. Dkt. No. 13957-2 (CE Capital Provision Agreement § 2.2).  Interest

---

[3] Allowed claims on account of the $231 million settlement payment to the AAT under the Global
Settlement Agreement are allocated among the Term Lenders as set forth in Schedule 1 to the Global
Settlement Agreement.

began to accrue at a rate of 9% on December 30, 2018, the 18-month anniversary of the date the initial funding from the CE Capital Providers was provided.  *Id.*

32.    Third, the Trust Administrator paid LW Holdco VI LLC (the "**LW Capital Provider**") in the amount of the LW Capital Provider's Entitlement (as defined in the agreement between the LW Capital Provider and the AAT).  AAT Agreement § 5.1(d)(iii). Because the Trust has drawn $1.5 million of the $10 million in available funds, the LW Capital Provider's Entitlement is $3 million, which is $1.5 million multiplied by 2.  Bankr. Dkt. No. 14413-2 (LW Capital Provision Agreement § 2.2(a)).  No interest was owed because the payment to the LW Capital Provider occurred before one year from the date the LW Capital Provider provided the $1.5 million in funding to the AAT.

33.    Fourth, the Trust Administrator paid $13.7 million into a segregated account (the "**GUC Trust Supplemental Cash**"), the amount the GUC Trust had provided to the AAT to fund litigation costs and expenses.  The GUC Trust Supplemental Cash is designated for distribution to the holders of allowed General Unsecured Claims, AAT Agreement § 5.1(d)(iv), and will be distributed at the same time as the initial distribution of Trust assets to the holders of allowed General Unsecured Claims, as detailed below, *id.* § 5.2(a).[4]

34.    The AAT also paid (or will imminently repay) expenses and fees owed to professional service providers, including approximately $3,399,913 that will be paid to Blank Rome LLP, which acquired a receivable owed to Dickstein Shapiro LLP for work performed for the AAT prior to the law firm's liquidation on December 31, 2015.  *See id.* § 8.3.

---

[4] The AAT also transferred $360,454—the unused portion of the $500,000 the GUC Trust had provided to the AAT for payment of U.S. Securities and Exchange Commission reporting costs—back to the GUC Trust.  *See* AAT Agreement § 2.3(e).

35.     Net of the above payments, approximately $133 million remains of the $231 million settlement payment.  Prior to receipt of the $231 million settlement payment, the AAT had $2,284,519.10 of funds remaining in its distribution account, consisting of funds from settlement payments received in individual settlements with Term Lenders before the Global Settlement Agreement was reached, and investment income.  This additional $2,284,519.10 is also available for distribution to the AAT's beneficiaries.  Plus, as already explained above, the GUC Trust Supplemental Cash in the amount of $13.7 million will also be included in the distribution to holders of allowed General Unsecured Claims.

## V.     HOLDBACK FOR ESTIMATED FEES AND EXPENSES

36.     In accordance with the AAT Agreement, before distributing the proceeds to the AAT's beneficiaries, the AAT must retain sufficient funds to pay its remaining fees and expenses, including fees and expenses it will incur up until the termination of the Trust.  *Id*. § 5.5(b).

37.     The AAT has prepared a budget for the expenses associated with distribution and windup (the "**Budget**"), in accordance with Section 6.3(a) of the AAT Agreement.  Consistent with the Budget, the AAT is withholding $7.5 million to meet its anticipated fees and expenses.  *Id*. § 5.5(b).

38.     The fees and expenses include such items as financial statement preparation, insurance, distribution and mailing expenses, and professional fees owed to the monitor of the Avoidance Action Trust (the "**Trust Monitor**"), the Trust Administrator, the company who will facilitate the distributions to the AAT's beneficiaries, and the AAT's legal counsel.

39.     The Budget reflects an anticipated change in compensation for the Trust Monitor in recognition of the Trust Monitor's diminished responsibilities now that the settlement

10

has been approved.  Instead of a fixed monthly payment, the Trust Monitor will bill the AAT

hourly for work performed on behalf of the Trust.

## VI.    PROPOSED DISTRIBUTION PLAN

40.    As described below, the AAT intends to make an initial distribution of the

AAT proceeds, minus the withheld fees and expenses, immediately to the DIP Lenders, and as

quickly as possible after notice to the holders of Allowed General Unsecured Claims has been

given and the time to provide necessary disbursement information has run.  A final distribution

will only be made if enough funds are left over after expenses are paid.  *See* AAT Agreement

§§ 5.1(f), 1.1(qq), & 2.6(b).

41.    The AAT's proposed distribution plan complies with the AAT Agreement

and promotes the prompt distribution of the AAT proceeds, thereby maximizing the recovery for

the AAT beneficiaries.  Accordingly, the AAT respectfully requests that the Court approve the

AAT's proposed distribution plan as outlined below.

## ARGUMENT

## THE DISTRIBUTION PLAN SHOULD BE APPROVED

42.    The AAT's proposed distribution plan is consistent with the purpose of the

AAT and the terms of the AAT Agreement, as well as applicable bankruptcy law.

43.    The sole purpose of the AAT is to liquidate and distribute its assets for the

benefit of the AAT's beneficiaries.  AAT Agreement ¶ E & § 2.2.  The AAT Agreement requires

the Trust Administrator to administer the AAT in such a way as to "maximiz[e] the property of

the Trust," *id*. § 8.1(I)(a), and to "not unduly prolong the existence of the Trust," *id*. § 2.5.

Under its fiduciary obligations, the Trust Administrator must reasonably and in good faith

exercise its discretion in carrying out these duties.  *See* Restatement (Third) of Trusts § 77; 12

Del. C. § 101.

44.     Moreover, approval of the AAT's proposed distribution plan is authorized by governing bankruptcy law.  Section 1142(b) of the Bankruptcy Code provides the Court with authority to direct any necessary party "to perform any [act] . . . that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b).  Under Bankruptcy Rule 3020(d), a bankruptcy court may issue any order "necessary to administer the estate."  Section 105(a) of the Bankruptcy Code further provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  These powers include the ability "to enforce and implement" earlier orders of the bankruptcy court.  *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008).

45.     The Trust's proposed plan for making distributions should be approved because it complies with the terms and objectives of the AAT Agreement and represents a proper exercise of the Trust Administrator's discretion.

## I.    THE INITIAL DISTRIBUTION

46.     To ensure that the distributions are made expeditiously and maximize recoveries by the AAT's beneficiaries as required by the AAT Agreement, the Trust Administrator plans to make one primary distribution of the proceeds of the Term Loan Avoidance Action as soon as practicable with the possibility of a further, final distribution if warranted.  The planned notice and deadline to respond provided to the AAT's beneficiaries ensures the initial distribution will be carefully made and encompass as many eligible beneficiaries as possible.

### A.    The AAT Plans to Make an Initial Distribution of Most of the Proceeds

47.    The planned initial distribution presents a practical way to balance the need to provide sufficient notice and time for claim holders to respond with the necessary tax information, with the reality that certain claim holders may not respond, regardless of how much time is allotted.

48.    The DIP Lenders will immediately receive their apportioned share of 30% of the total proceeds distributed.[5]  AAT Agreement § 1.1(e).  Holders of Allowed General Unsecured Claims entitled to a distribution will each receive their *pro rata* share of the 70% of remaining proceeds plus the GUC Trust Supplemental Cash, based on the formula found in Section 5.2 of the AAT Agreement.  *See id*. § 5.2(c).

49.    The Trust Administrator plans to provide holders of Allowed General Unsecured Claims with claims above the minimum distribution threshold of 25 dollars[6] with 60 days to supply the AAT with information necessary to receive a distribution, including confirmation of current address and tax information.  After the 60 days has elapsed, beneficiaries who fail to respond will be removed from the pool of eligible holders of Allowed General Unsecured Claims.[7]

---

[5] Treasury is entitled to 83.8983051063830% and EDC is entitled to 16.1016948936170% of these advances.

[6] Under the AAT Agreement, the Trust Administrator may not make a payment under $25 to any holder of an Allowed General Unsecured Claim "under any circumstance."  AAT Agreement § 5.6.

[7] If the AAT becomes aware that a mailing to a potential claimholder bounces back, then the AAT will take reasonable measures to try to identify an alternative address for any such potential beneficiary before causing that claim holder to forfeit its right to receive the distribution.  Ultimately, it is the responsibility of claim holders to ensure that their contact information is correct and up to date.

50.    Holders of Allowed General Unsecured Claims with claims above the minimum distribution threshold of $25 who provide the necessary information to the AAT will receive the initial distribution.  AAT Agreement §§ 5.1(d)(v) & 5.2.

51.    The Trust Administrator will also calculate how many units are held by each holder of Allowed General Unsecured Claims, using the ratio of $1,000 worth of claims for each unit, and will reflect each holder's units in its records.  AAT Agreement § 5.2(a).[8]  The units are not tradeable but instead assist the Trust Administrator in making future distributions, if any, and provide a practical way for the Trust Administrator to calculate and keep track of each holder's *pro rata* share of the distributed proceeds.  *See Id*. §§ 3.4(a) & 1.1(rr).

52.    The above distribution plan complies with the Trust Administrator's obligations under the AAT Agreement, which requires the Trust Administrator to make distributions "in an expeditious but orderly manner . . . and not unduly prolong the existence of the Trust."  AAT Agreement § 2.5.

**B.    The Distribution Plan Allows a Fair Opportunity for All Eligible Beneficiaries to Receive Distributions**

53.    Based on the steps already taken to identify accurate addresses for holders of Allowed General Unsecured Claims and the additional steps that the AAT plans to take to locate claim holders, the proposed 60-day window to allow holders of Allowed General Unsecured Claims to respond and provide necessary information is reasonable.

---

[8] Based on the amount of distributable proceeds, holders of Allowed General Unsecured Claims worth less than $1,000 also do not meet the minimum distribution threshold.  Technically, the AAT Agreement provides that holders of claims that do not meet the minimum distribution threshold nonetheless receive units, in case additional proceeds are later recovered that raise their claims above the distribution threshold.  AAT Agreement § 5.6.  Because the AAT will not receive any further proceeds, however, these claim holders will never meet the minimum threshold.  Accordingly, the Trust Administrator will not distribute units to such claim holders.

54.    Before holders of Allowed General Unsecured Claims can receive a distribution, the Trust Administrator must first confirm certain basic information, including name, address and tax withholding information.  *See* AAT Agreement §§ 6.8 & 7.5.  Holders of Allowed General Unsecured Claims who do not respond to the AAT with this basic information within 60 days of notice being sent will forfeit their eligibility as a claim holder.[9]  After the 60-day time-period has run, those claim holders who have not responded will be eliminated from the AAT register.  In any instance where the AAT becomes aware that notice was not received at the address to which it was sent, the AAT will take reasonable measures to try to identify an alternative address for any such potential beneficiary before causing that claimholder to forfeit its right to receive the distribution.  The Trust Administrator will assign units and calculate pro rata shares based only on the interests of the remaining eligible holders of Allowed General Unsecured Claims.  Having a firm timeline will ensure that the AAT can efficiently fulfill its distribution obligations.

55.    The 60-day period for holders of claims to respond is reasonable because the AAT and the GUC Trust already have made substantial efforts to identify correct information for holders of Allowed General Unsecured Claims.  The GUC Trust, as successor to the Debtors, maintains records with the known addresses of the holders of Allowed General Unsecured Claims.  *See* GUC Trust Agreement § 6.11.  As part of ensuring the accuracy of its claimholder information, the GUC Trust has corresponded with and collected updated address information for holders of Allowed General Unsecured Claims and has corrected that information based upon any change of address forms received.  *See* Bankr. Dkt. No. 11330 ¶¶ 30-31 (describing these and other steps taken by the GUC Trust to contact and maintain information about the holders of

---

[9] A copy of the form of notice that the AAT plans to send is attached hereto as <u>Exhibit C</u>.

Allowed General Unsecured Claims).  The AAT Agreement contemplates that the AAT will rely on this work by the GUC Trust and will not need to duplicate its efforts.  AAT Agreement § 8.5 (requiring Trust Administrator to communicate with GUC Trust Administrator to obtain information "which shall be necessary or desirable in order for the Trust Administrator to make timely distributions"); *see also id*. § 8.1(I)(a) (requiring Trust Administrator to coordinate with GUC Trust Administrator "to maximize efficiency in distribution to general unsecured creditors").

56.    In addition, the AAT has recently contacted the holders of Allowed General Unsecured Claims to provide updated information concerning the AAT's tax status and to serve the AAT's motion to approve the Global Settlement Agreement and motion to extend the duration of the AAT.  Although not required, the AAT also plans to take additional steps to verify certain claimholders' addresses when mail is returned as undeliverable, including undertaking electronic database searches to try and locate current addresses.

57.    Finally, the AAT also will make distribution information available to its beneficiaries by posting relevant information on the GUC Trust website.

## II.    THE FINAL DISTRIBUTION

58.    After the initial distribution is made and all expenses are paid, the AAT will begin the process of winding up in accordance with the AAT Agreement.  *See* AAT Agreement § 4.2.  In the event that the AAT has net remaining funds in excess of $10 million, then the AAT Agreement requires that those funds be distributed to its beneficiaries.  *Id.* §§ 5.6(f) & 2.6(c).  If the net remaining funds are less than $10 million, the AAT may donate the funds to a qualifying organization or dispose of them in another way as recommended by the Trust Administrator and approved by the Bankruptcy Court.  *Id.*  In its discretion, likely guided by the costs of making a second distribution, the AAT may elect to make a second distribution even where the remaining proceeds available for distribution are less than $10 million.

59.    In the event that a final distribution is required, or the Trust decides that one is justified even though not required, then the AAT would distribute the remaining funds in the same percentages to the same beneficiaries as described above.  AAT Agreement §§ 1.1(e) & 5.4(c).[10]  Should there be any money remaining after this final distribution, the AAT will donate the funds according to the provisions in the AAT Agreement.  *Id.* §§ 5.6 & 2.6(c).

60.    The Court should authorize the Trust Administrator to make this final distribution (if needed) as set forth above without the need to seek further Court approval.  This will allow the AAT to avoid the costs of an additional motion and maximize distributions to its beneficiaries.

---

[10] If any initial distributions are returned or not cashed by any claim holders, these claim holders will be eliminated from the AAT's register and their units reapportioned to other claim holders.

**<u>NOTICE</u>**

61.    Notice of this motion will be given to (a) the potential beneficiaries of the AAT, including the holders of Allowed General Unsecured Claims (as defined in the AAT Agreement); (b) the DIP Lenders; (c) the CE Capital Providers and the LW Capital Provider; (d) the Office of the United States Trustee for the Southern District of New York; (e) JPMorgan; (f) the Defendants Steering Committee Counsel, which includes Wachtell, Lipton, Rosen & Katz; Kelley Drye & Warren LLP; Munger, Tolles & Olson LLP; Jones Day; Davis Polk & Wardwell LLP; Kasowitz Benson Torres LLP; and Hahn & Hessen LLP; and (g) all other Term Lender counsel of record.  Further, this motion will be filed on the bankruptcy docket in the chapter 11 cases and will also be published on the GUC Trust website at https://www.mlcguctrust.com/.

## **CONCLUSION**

WHEREFORE, the AAT respectfully requests that the Court enter an order substantially in the form of the Distribution Order attached as Exhibit B: (i) approving the AAT's plan for distributing proceeds to its beneficiaries; (ii) approving the Notice Form; (iii) authorizing the AAT to take all other actions necessary or appropriate to effectuate the distribution to its beneficiaries; and (iv) granting such other and further relief as the Court deems necessary.

Dated:  New York, New York
       July 8, 2019

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Neil S. Binder
Lindsay A. Bush
Lauren K. Handelsman
366 Madison Avenue, 6th Floor
New York, New York 10017
Tel: (212) 510-7008

*Attorneys for the Motors Liquidation
Company Avoidance Action Trust*

19