Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, *et al.*, f/k/a General Motors Corp., *et al.*, | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |

**OBJECTION AND RESERVATION OF RIGHTS OF GENERAL
MOTORS LLC WITH RESPECT TO MOTION OF AVOIDANCE ACTION TRUST
FOR ENTRY OF AN ORDER APPROVING THE PROPOSED DISTRIBUTION PLAN**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

OBJECTION............................................................................................................................... 9

    A.     The Plan, the Avoidance Trust Agreement and the GUC Trust Agreement
Contain Uniform Eligibility Criteria for Determining Which Creditors Are
Capable of Holding Allowed General Unsecured Claims and Being Trust
Beneficiaries. ....................................................................................................... 9

    B.     Wilmington Trust's Conflicting Legal Position in Connection with the
Proposed Settlement............................................................................................. 13

    C.     The Plan, the Avoidance Trust Agreement and the GUC Trust Agreement
Each Require Adequate Reserves for Disputed General Unsecured Claims........ 20

REQUEST FOR ADJOURNMENT OF HEARING..................................................................... 22

CONCLUSION........................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Recovery Tr.*,
  634 F.3d 678 (2d Cir. 2011).................................................................7, 17

*Adelphia Recovery Tr.* v. *Goldman, Sachs & Co.*,
  748 F.3d 110 (2d Cir. 2014).........................................................18

*In re Airadigm Commc'ns, Inc.*,
  616 F.3d 642 (7th Cir. 2010) .......................................................19

*Am. Nat. Bank of Jacksonville* v. *Fed. Deposit Ins. Corp.*,
  710 F.2d 1528 (11th Cir. 1983) ...................................................19

*In re CCT Commc'ns, Inc.*,
  420 B.R. 160 (Bankr. S.D.N.Y. 2009)........................................18

*City of San Diego* v. *Amoco Chemical Co., et al*,
  No. 98-cv-00474, Dkt. No. 184 (S.D. Cal. July 9, 1999) ......................18

*DeGuiseppe* v. *Vill. of Bellwood*,
  68 F.3d 187 (7th Cir. 1995) ........................................................19

*Embraer S.A.* v. *Dougherty Air Tr., LLC*,
  348 F. Supp. 3d 246 (S.D.N.Y. 2018)........................................17

*Helfand* v. *Gerson*,
  105 F.3d 530 (9th Cir. 1997) ......................................................19

*Intellivision* v. *Microsoft Corp.*,
  784 F. Supp. 2d 356 (S.D.N.Y. 2011), *aff'd,* 484 F. App'x 616 (2d Cir. 2012)......................17

*King* v. *Herbert J. Thomas Mem'l Hosp.*,
  159 F.3d 192 (4th Cir. 1998) ......................................................18

*In re Motors Liquidation Corp.*,
  591 B.R. 501 (Bankr. S.D.N.Y. 2018)..........................................4

*New Hampshire* v. *Maine*,
  532 U.S. 742 (2001).....................................................................17

*Pegram* v. *Herdrich*,
  530 U.S. 211 (2000).....................................................................18

*Scarano* v. *Cent. R. Co. of N. J.*,
    203 F.2d 510 (3d Cir. 1953)................................................................................19

*Slater* v. *United States Steel Corp.*,
    871 F.3d 1174 (11th Cir. 2017) ........................................................................18

*United States* v. *Watkins*,
    623 F. Supp. 2d 514 (S.D.N.Y. 2009)...............................................................16

*Wight* v. *BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)............................................................................7, 18

## STATUTES

11 U.S.C. § 1127(b) ...................................................................................................7

11 U.S.C. § 1127(e) ...................................................................................................7

## OTHER AUTHORITIES

Federal Practice & Procedure, Wright & Miller et al., § 4477 (2d ed.).......................17

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC ("New GM") submits this objection and reservation of rights (the "Objection") in opposition to the Distribution Plan Approval Motion (the "Motion")[1] filed by Wilmington Trust Company ("Wilmington Trust"), in its capacity as the Trust Administrator for the Motors Liquidation Company Avoidance Action Trust (the "Avoidance Trust"), for approval of distributions to the Avoidance Trust's beneficiaries, including general unsecured creditors of the Debtors' estates, and respectfully states as follows:[2]

## **PRELIMINARY STATEMENT**

1.      The Motion raises fundamental questions about who is capable of holding an "Allowed General Unsecured Claim" as that term is defined in the Plan, the Avoidance Trust Agreement, and the GUC Trust Agreement, and thus who can be a beneficiary of—and therefore receive distributions from—the Avoidance Trust and the GUC Trust.  In the Motion, Wilmington Trust takes the legal position that the Economic Loss Plaintiffs, who are presently seeking allowance of General Unsecured Claims (*i.e.*, the Proposed Class Claims) in connection with the GUC Trust's pending motion for approval of the proposed class settlement (the "Proposed

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings given to them in *Motion of Motors Liquidation Company Avoidance Action Trust for Entry of an Order Pursuant to Sections 105 and 1142 of the Bankruptcy Code and Bankruptcy Rule 3020 Approving the Distribution Plan to the Avoidance Action Trust's Beneficiaries* [ECF No. 14552], filed on July 8, 2019.  Reference is made to the Fourth Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement attached as Exhibit A to the Motion (the "Avoidance Trust Agreement") and the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement attached as Exhibit D to the Motion (the "GUC Trust Agreement").

[2]   On July 23, 2019, Wilmington Trust filed the *Motion of Wilmington Trust Company, As GUC Trust Administrator, For An Order (A) Authorizing the Expedited Payment of Excess GUC Distributable Assets Pursuant to Section 5.4 of the GUC Trust Agreement, and (B) Approving Such Distribution As An Appropriate Exercise of the GUC Trust Administrator's Rights, Powers and/or Privileges Pursuant to Section 8.1(e) of the GUC Trust Agreement* [ECF No. 14565]  (the "GUC Trust Distribution Motion").  This Objection only addresses the Avoidance Trust's Motion.  New GM intends to file a separate objection to the GUC Trust Distribution Motion on or before the August 5, 2019 objection deadline.

Settlement"),[3] are not capable of holding "Allowed General Unsecured Claims" and are equally not capable of being trust beneficiaries. While New GM does not oppose that position, it files this Objection to prevent Wilmington Trust from subsequently taking a contrary legal position on the same issue with respect to the Economic Loss Plaintiffs in connection with the Proposed Settlement.

2.     Pursuant to the pending Motion, the Avoidance Trust seeks to distribute approximately $128 million of litigation proceeds to its beneficiaries.[4]  The Avoidance Trust's beneficiaries include, among others, holders of ***Allowed General Unsecured Claims***, who are entitled to receive 70% of such proceeds, plus $13.7 million in GUC Trust Supplemental Cash, for an aggregate total of approximately $103 million.  Pursuant to the proposed distribution plan set forth in the Motion (the "Proposed Distribution Plan"), none of these proceeds would be distributed to—or reserved for—the Economic Loss Plaintiffs.  The basis for such exclusion, according to Wilmington Trust, is that the Economic Loss Plaintiffs, pursuant to the applicable definitions and

---

[3]     *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions, (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019, and (III) Authorize the Reallocation of GUC Trust Assets* [ECF No. 14409] (Feb. 1, 2019) (the "9019 Motion"); *Economic Loss Plaintiffs' Motion to (1) Extend Bankruptcy Rule 7023 to These Proceedings; (2) Approve the Form and Manner of Notice; (3) Grant Class Certification for Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel for Settlement Purposes; and (5) Approve the Settlement Agreement by and among the Signatory Plaintiffs and the GUC Trust Pursuant to Rule 23* [ECF No. 14408] (Feb. 1, 2019) (the "Rule 23 Motion").  This Objection focuses exclusively on the treatment of the Economic Loss Plaintiffs (as defined in the 9019 Motion) given the asserted magnitude of the Proposed Class Claims (as defined in the 9019 Motion) and does not focus on the Pre-Closing Accident Plaintiffs (as defined in the 9019 Motion) that were subject to the Proposed Settlement because many of the Pre-Closing Accident Plaintiffs' claims have been resolved pursuant to settlements reached with New GM.

[4]     The Avoidance Trust asserts that, after the repayment of various litigation funding and other expenses, it will distribute (i) approximately $133 million of proceeds from the Global Settlement Agreement resolving the Term Loan Avoidance Action, *plus* (ii) $2.3 million from individual settlements with Term Lenders, *minus* (iii) $7.5 million withheld for windup expenses pursuant to the Budget.

provisions of the Plan and Avoidance Trust Agreement, are not legally capable of holding "Allowed General Unsecured Claims."

3.      Wilmington Trust argues, "[w]ith reference to the relevant definition contained in the [GUC Trust Agreement]," that the "holders of Allowed General Unsecured Claims under the [Avoidance Trust] Agreement include holders of General Unsecured Claims that were allowed against the Debtors *as of March 29, 2011*, the initial distribution record date for the GUC Trust; [and] holders of General Unsecured Claims that were disputed *as of March 29, 2011* but have since been allowed . . . ."  (Motion ¶ 28 (emphasis added).)  In other words, Wilmington Trust is taking the legal position that the Economic Loss Plaintiffs could never hold Allowed General Unsecured Claims nor be Avoidance Trust beneficiaries because the Economic Loss Plaintiffs' Proposed Class Claims were neither Allowed nor Disputed *as of March 2011*, and nothing that happens subsequent to March 2011 could ever change that result.  Those defined terms are embedded in the Plan, which has been substantially consummated and cannot be modified at this time.

4.      Wilmington Trust previously advanced the same legal argument under the GUC Trust Agreement, which similarly defines "GUC Trust Beneficiaries" as being only those holders of General Unsecured Claims that were either Allowed or Disputed *as of March 2011*.  (GUC Trust Agreement, Recital F.)  As recently as March 2017, Wilmington Trust took the position— as it does currently in the Motion—that "Plaintiffs are not and have never been GUC Trust beneficiaries" because "[t]hose beneficiaries include holders of allowed general unsecured claims

3

as of March 31, 2011; [and] holders of disputed claims as of March 31, 2011, that were later allowed."[5]

5.      In connection with the Proposed Settlement, however, Wilmington Trust, in its capacity as the GUC Trust administrator, has taken the exact opposite legal position.  On that issue, Wilmington Trust asserts that Economic Loss Plaintiffs' General Unsecured Claims "could equal or exceed $77 billion." (9019 Motion ¶ 42.)  Wilmington Trust seeks an order "estimating [Economic Loss] Plaintiffs' aggregate ***Allowed General Unsecured Claims***." (Proposed Settlement Agreement § 2.20 (emphasis added).)  Wilmington Trust admits that the "key objective" of the Proposed Settlement is to trigger the maximum amount of Adjustment Shares by seeking the maximum amount of ***Allowed General Unsecured Claims***.  *See In re Motors Liquidation Corp.*, 591 B.R. 501, 514 (Bankr. S.D.N.Y. 2018).  That is because New GM's obligation to issue Adjustment Shares under the Sale Agreement is based solely on the estimation of "***Allowed General Unsecured Claims***."[6]  It is also because, pursuant to the terms of the GUC Trust Agreement, Wilmington Trust is ***only*** permitted to distribute the Adjustment Shares to GUC Trust Beneficiaries that hold Allowed General Unsecured Claims.[7]  In short, when talking about the Proposed Settlement and trying to utilize the Adjustment Shares as the sole basis to satisfy the

---

[5]    *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of* Pioneer *and Tolling to Plaintiffs' Motions to File Late Claims* (the "Pioneer Br.") [ECF No. 13879] (Mar. 7, 2017) at p. 5.

[6]    *See In re Motors Liquidation Corp.*, 591 B.R. at 518 ("[t]he relevant documents consistently refer to the estimation of 'Allowed General Unsecured Claims' when discussing the estimation of possible claims in the context of the issuance of Adjustment Shares").

[7]    The GUC Trust is only permitted to distribute "GUC Trust Distributable Assets," including the Adjustment Shares, to "GUC Trust Beneficiaries" in accordance with the Plan and GUC Trust Agreement.  *See* GUC Trust Agreement, Rec. E, Rec. F, § 2.2.  In addition, the GUC Trust is prohibited from assigning its rights under the Sale Agreement (as defined in the 9019 Motion).  *See* Sale Agreement § 9.5 ("Neither this Agreement nor any of the rights, interests or obligations provided by this Agreement may be assigned or delegated by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment or delegation without such prior written consent shall be null and void. . . .").

Economic Loss Plaintiffs' Claims (as compared to using the substantial funds that the Avoidance Trust and GUC Trust now seek to distribute to others), Wilmington Trust argues that Economic Loss Plaintiffs **can hold** Allowed General Unsecured Claims and **can be** GUC Trust Beneficiaries **notwithstanding** that the Proposed Class Claims were neither Allowed nor Disputed as of March 2011.

6.      If Wilmington Trust consistently applied its "Proposed Settlement position" in this chapter 11 case, and it were somehow true that Plaintiffs were entitled to $77 billion in Allowed General Unsecured Claims,[8] then total Allowed General Unsecured Claims would comprise (i) approximately $32 billion (being the current amount of Allowed General Unsecured Claims), *plus* (ii) the $77 billion of claims asserted by the Economic Loss Plaintiffs, for a total of approximately $109 billion of Allowed General Unsecured Claims.[9]   In that scenario, the Economic Loss Plaintiffs would hold approximately 70% of all Allowed General Unsecured Claims and therefore be entitled to 70% (or $72 million) of the upcoming Avoidance Trust distribution to holders of Allowed General Unsecured Claims.  In addition, Economic Loss Plaintiffs would be entitled to receive all future GUC Trust distributions until such time that they were "caught up" with the recoveries of current holders of GUC Trust Units.

7.      Wilmington Trust, however, does not contemplate that any portion of the $103 million in proceeds being distributed by the Avoidance Trust to holders of Allowed General Unsecured Claims will be distributed to the Economic Loss Plaintiffs, nor does it contemplate maintaining any reserve for Economic Loss Plaintiffs pending the ultimate resolution of the

---

[8]    New GM vigorously disputes the Proposed Class Claims, including any suggestion that they could equal or exceed $10 billion, much less $77 billion.

[9]    *See GUC Trust Quarterly Reports as of March 31, 2019* [ECF No. 14526] (June 10, 2019) at p. 16.

5

Proposed Class Claims. In support of its pending Motion, Wilmington Trust instead takes the position that—because the Proposed Class Claims were neither Allowed nor Disputed as of March 2011—Economic Loss Plaintiffs can never hold Allowed General Unsecured Claims nor be beneficiaries of the Avoidance Trust, *even if* the Economic Loss Plaintiffs and the GUC Trust ultimately prevail in their litigation efforts and the Court were to allow the Proposed Class Claims in the amount of $77 billion. In seeking approval of the Proposed Distribution Plan, Wilmington Trust asks the Court to adopt and accept the same legal position.

8.      Under applicable law, if the Court adopts Wilmington Trust's legal position on this Motion, then the Court must also reject the Proposed Settlement. The Proposed Settlement is predicated on the GUC Trust taking precisely the opposite legal position, specifically, the position that Economic Loss Plaintiffs are capable of holding Allowed General Unsecured Claims notwithstanding that their Proposed Class Claims were neither Allowed nor Disputed as of March 2011. New GM objects to Wilmington Trust taking entirely inconsistent legal positions in two motions presently pending before the Court. Wilmington Trust cannot be permitted to argue that (i) for purposes of this Motion, the Economic Loss Plaintiffs' failure to assert Proposed Class Claims before March 2011 prohibits the Economic Loss Plaintiffs from holding Allowed General Unsecured Claims and being considered Avoidance Trust beneficiaries, while simultaneously arguing that (ii) for purposes of seeking approval of the Proposed Settlement, the *same failure* to assert Proposed Class Claims before March 2011 does not also prohibit the Economic Loss Plaintiffs from holding Allowed General Unsecured Claims and being GUC Trust Beneficiaries, *especially* where the applicable definitions in the Avoidance Trust Agreement and GUC Trust Agreement are the same. Indeed, Wilmington Trust concedes that its determination as to which creditors hold Allowed General Unsecured Claims and are eligible for distributions from the

6

Avoidance Trust is made "with reference to the relevant definition contained in the [GUC Trust Agreement]" and that the Avoidance Trust "will rely on" the GUC Trust to determine the universe of holders of Allowed General Unsecured Claims.  (Motion ¶¶ 28, 55.)  Wilmington Trust cannot take (and ask the Court to adopt) one legal position when it seeks to expedite distributions, but then take (and ask the Court to adopt) precisely the opposite legal position when it seeks to satisfy the Proposed Class Claims by triggering the Adjustment Shares.  This Court should not allow Wilmington Trust to play "fast and loose" by simultaneously advancing opposite, contradictory legal positions, which, as the Second Circuit has recognized, "puts the integrity of the judicial process at risk."   *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011); *Wight* v. *BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits.").

9.      The substantially consummated Plan requires *pro rata* treatment for a single class of Allowed General Unsecured Claims, a requirement that cannot now be modified.  *See* Plan § 4.3; 11 U.S.C. § 1127(b).  There is no question that the Plan was substantially consummated on March 31, 2011, and the law is clear that where a chapter 11 plan has been confirmed and substantially consummated, that plan may no longer be modified except as expressly permitted by section 1127(e) of the Bankruptcy Code, which applies only to individual debtors.  If the Economic Loss Plaintiffs are barred from distributions from the Avoidance Trust because they cannot satisfy the definitional requirements in the Plan and Avoidance Trust Agreement for holding "Allowed General Unsecured Claims," then that interpretation must be applied to all matters in this chapter 11 case, including with respect to the GUC Trust Agreement and the Proposed Settlement.

10.    If Economic Loss Plaintiffs are capable of holding Allowed General Unsecured Claims, are capable of being GUC Trust or Avoidance Trust beneficiaries, and are therefore potentially entitled to assets of either trust (including the Adjustment Shares), then Wilmington Trust is bound by the applicable provisions of the Avoidance Trust Agreement and GUC Trust Agreement and must reserve for such disputed claims.  Like the GUC Trust Agreement, the Avoidance Trust Agreement requires the Avoidance Trust to reserve for Disputed General Unsecured Claims by providing that the Avoidance Trust "shall . . . retain sufficient GUC Distributable Trust Assets as the Trust Administrator shall determine . . . as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount . . . ."  (Avoidance Trust Agreement § 5.5(a).)  By contending that Economic Loss Plaintiffs are not capable of holding Allowed General Unsecured Claims, however, Wilmington Trust has taken the legal position that it has no obligation to establish a reserve for them.

11.    New GM notes that allowing distributions to proceed before the Court approves the Proposed Settlement will significantly impair any prospect of a consensual resolution with the Economic Loss Plaintiffs.  Presently, the Economic Loss Plaintiffs could look to the Avoidance Trust (with $103 million in available assets), and the GUC Trust (with approximately $450 million in available assets) for a potential recovery.  Should the Court allow the Avoidance Trust and the GUC Trust to distribute most or all of their available assets now, such assets will be unavailable and could never be available in any global resolution of or recovery for the Economic Loss Plaintiffs' claims (both in this Court and in the MDL Court (as defined in the Rule 23 Motion)).

8

## **OBJECTION**

A.    **The Plan, the Avoidance Trust Agreement and the GUC Trust Agreement Contain Uniform Eligibility Criteria for Determining Which Creditors Are Capable of Holding Allowed General Unsecured Claims and Being Trust Beneficiaries.**

12.    Pursuant to the Plan, holders of Allowed General Unsecured Claims are entitled to, among other things, their Pro Rata Share of GUC Trust Units and their Pro Rata Share of proceeds from the Avoidance Trust.  (Plan §§ 4.3(a)-(c).)  Wilmington Trust is the trust administrator for both the Avoidance Trust and the GUC Trust.

13.    The definitional terms and provisions governing distribution and reserve mechanisms set forth in the Plan, the Avoidance Trust Agreement and the GUC Trust Agreement are nearly identical.  Each of the three foundational documents defines holders of Allowed General Unsecured Claims as those creditors whose claims were either Allowed or Disputed as of March 2011.  The Plan, for example, provides that **both** the Avoidance Trust and the GUC Trust shall make distributions to "each holder of an Allowed General Unsecured Claim *as of the Distribution Record Date*," and to "holders of Disputed General Unsecured Claims *as of the Distribution Record Date* whose Claims are subsequently Allowed."  (Plan §§ 4.3(a)-(c) (emphasis added).)  The Distribution Record Date is defined as being the Confirmation Date, which occurred on March 29, 2011.  (Plan § 1.55.)[10]   Accordingly, Wilmington Trust argues that the Plan does not contemplate that the GUC Trust or the Avoidance Trust would ever make distributions to holders

---

[10]    *See Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date* [ECF No. 10151].

of Claims that were neither Allowed nor Disputed as of March 29, 2011. The Avoidance Trust

Agreement and GUC Trust Agreement contain similar provisions.

14.     The Avoidance Trust Agreement defines "Trust Beneficiaries" as "holders of the

DIP Credit Agreement Claims and holders of Allowed General Unsecured Claims." (Avoidance

Trust Agreement § 1.1(bbbbb).)   The Agreement then defines "Allowed General Unsecured

Claims" as being "(i) the Initial Allowed General Unsecured Claims, and (ii) the Resolved Allowed

General Unsecured Claims." (*Id*. § 1.1(f).)  Initial Allowed General Unsecured Claims are defined

in Section 5.2(a) as being those "General Unsecured Claims that are allowed ***as of the Initial GUC***

***Record Date***."  Wilmington Trust claims that the "Initial GUC Record Date" is synonymous with

the "Distribution Record Date" set forth in the Plan, *i.e.*, March 29, 2011.  (Motion ¶ 28.)[11]

Resolved Allowed General Unsecured Claims are defined in the Avoidance Trust Agreement as

"Disputed General Unsecured Claims that are allowed after the Initial GUC Record Date," and

"Disputed General Unsecured Claims" are defined as "General Unsecured Claims against the

Debtors that are Disputed (as defined in the Plan) ***as of the Initial GUC Record Date***." (Avoidance

Trust Agreement §§ 1.1 (kk) and (ffff) (emphasis added).)  According to Wilmington Trust, to

qualify as a Trust Beneficiary of the Avoidance Trust, a general unsecured creditor must either

have an Allowed claim as of March 29, 2011 or a Disputed claim as of March 29, 2011 that

subsequently becomes Allowed.

15.     The GUC Trust Agreement similarly defines "GUC Trust Beneficiaries" as being

limited to holders of "Initial Allowed General Unsecured Claims" and "Resolved Allowed General

---

[11]   Section 5.2(a) of the Avoidance Trust Agreement defines the "Initial GUC Record Date" as being a date established by the Trust Administrator prior to the first distribution, "which date shall be the last day of the calendar next preceding the date of such distribution."  The Motion does not reference this provision but instead claims that the determination of who holds Allowed General Unsecured Claims is made "with reference to the relevant definition contained in the [GUC Trust Agreement]."  Motion ¶ 28.

Unsecured Claims," with both classes being defined in reference to those creditors whose claims were either Allowed or Disputed *as of March 2011*. The Agreement provides:

> The GUC Trust is being created on behalf of, and for the benefit of, (i) the holders of General Unsecured Claims against the Debtors that are allowed *as of the Initial Distribution Record Date* (the "<u>Initial Allowed General Unsecured Claims</u>") and (ii) (a) the holders of General Unsecured Claims against the Debtors that are Disputed ("<u>Disputed General Unsecured Claims</u>") *as of the Initial Distribution Record Date* and that are allowed after the Initial Distribution Record Date in accordance with the claims resolution procedures administered under the Plan (to the extent so resolved); . . . (collectively, the "<u>Resolved Allowed General Unsecured Claims</u>" and, together with the Initial Allowed General Unsecured Claims, the "<u>Allowed General Unsecured Claims</u>"). The holders of Allowed General Unsecured Claims, and any holders of Units acquired, directly or indirectly, by transfer from holders of Allowed General Unsecured Claims, in their capacities as beneficiaries of the GUC Trust, are sometimes referred to as the "<u>GUC Trust Beneficiaries</u>."

(GUC Trust Agreement, Rec. F (emphasis added).) The Initial Distribution Record Date is defined as being the Effective Date of the Plan, *i.e.*, March 31, 2011. Accordingly, Wilmington Trust takes the legal position that to qualify as a GUC Trust Beneficiary, a creditor must either have an Allowed claim as of March 31, 2011 or a Disputed claim as of March 31, 2011 that subsequently becomes Allowed.

16.    Each of the Plan, the Avoidance Trust Agreement, and the GUC Trust Agreement contains nearly identical provisions for determining which creditors may hold Allowed General Unsecured Claims (as defined in those agreements) and therefore qualify as trust beneficiaries, and which creditors are entitled to receive distributions from the Avoidance Trust and GUC Trust.

17.    Wilmington Trust places great weight on these provisions, and in particular the importance of March 2011 as being a critical cut-off date. Specifically, in discussing who qualifies as an Avoidance Trust beneficiary, Wilmington Trust takes the following position:

> With reference to the relevant definition contained in the Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated July 30, 2015, and attached hereto as <u>Exhibit D</u> (the "<u>GUC Trust</u>

11

Agreement"), ***the holders of Allowed General Unsecured Claims under the [Avoidance Trust] Agreement include holders of General Unsecured Claims that were allowed against the Debtors as of March 29, 2011***, the initial distribution record date for the GUC Trust; ***holders of General Unsecured Claims that were disputed as of March 29, 2011 but have since been allowed***; and Term Lenders to the extent and in the amount that they have made a payment to the [Avoidance Trust] and have not waived their claims as unsecured creditors under section 502(h) of the Bankruptcy Code.

(Motion ¶ 28 (emphasis added).)  This is the same position Wilmington Trust previously took with respect to determining who was eligible to be a GUC Trust Beneficiary.  Based on the same provisions set forth immediately above, Wilmington Trust previously stated:[12]

Moreover, the Plan and Confirmation Order are clear: ***the only parties that may receive GUC Trust assets*** (other than those to whom the GUC Trust is liable for its costs and expenses) ***are those that held Allowed Claims or Disputed Claims (to the extent allowed) as of the Effective Date***; those that are or may be subject to disgorgement pursuant to an avoidance action brought on behalf of the Debtors' creditors (to the extent that such disgorgement actually occurs); or those that hold publicly-traded units issued by the GUC Trust (collectively, the "GUC Trust Beneficiaries"). ***There can be no dispute that Plaintiffs do not fall within this universe.***

More recently, in March 2017, Wilmington Trust again asserted:[13]

The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust assets and GUC Trust Units to the GUC Trust's defined beneficiaries.  Dkt. 13031, Ex. 4 § F. ***Those beneficiaries include holders of allowed general unsecured claims as of March 31, 2011; holders of disputed claims as of March 31, 2011, that were later allowed***; and holders of freely traded GUC Trust Units. ***Plaintiffs are not and have never been GUC Trust beneficiaries***.

18.    If Wilmington Trust is correct and, based on the applicable provisions of the Plan, the Avoidance Trust Agreement, and the GUC Trust Agreement, only those creditors with Allowed or Disputed Claims ***as of March 2011*** are capable of holding Allowed General Unsecured Claims

---

[12]    *The Participating Unitholders' and GUC Trust Administrator's Opening Memorandum of Law Respecting the Equitable Mootness Threshold Issue* [ECF No. 12983] ("Equitable Mootness Br.") (Nov. 5, 2014), ¶ 2 (emphasis added).

[13]    Pioneer Br. at p. 5 (emphasis added).

and capable of being trust beneficiaries, then the claims resolution process in this chapter 11 case

is complete, and the Economic Loss Plaintiffs cannot hold Allowed General Unsecured Claims,

qualify as trust beneficiaries, or be entitled to distributions from either the Avoidance Trust or the

GUC Trust.    This position also forecloses any attempt to trigger the Adjustment Shares and

distribute them to the Economic Loss Plaintiffs because the GUC Trust does not have authority

under the GUC Trust Agreement to distribute the Adjustment Shares to anyone other than GUC

Trust Beneficiaries (*i.e.*, holders of Allowed General Unsecured Claims).[14]

19.    However, Wilmington Trust takes the exact opposite legal position in connection

with the Proposed Settlement, thereby necessitating this Objection.  Under applicable law, a party

cannot take one legal position and ask the Court to adopt it in one phase of a case, only to turn

around and take the precise opposite position and ask the Court to adopt it in another phase of the

case.

**B.    Wilmington Trust's Conflicting Legal Position in Connection with the Proposed Settlement.**

20.    Although the Economic Loss Plaintiffs had neither Allowed nor Disputed General

Unsecured Claims as of March 2011, Wilmington Trust, in the 9019 Motion and with respect to

the Proposed Settlement, does not take the position that Economic Loss Plaintiffs are legally

incapable of holding Allowed General Unsecured Claims or being GUC Trust Beneficiaries.

Rather, pursuant to the Proposed Settlement, Wilmington Trust takes the precise opposite position,

and seeks entry of an order that would grant Economic Loss Plaintiffs an "Allowed General

---

[14]    The GUC Trust Agreement and Avoidance Trust Agreement are part of the Plan.  *See* Plan § 12.14 ("The Exhibits
to the Plan and the Plan Supplement are incorporated into and as part of the Plan as if set forth herein.").  These
Plan documents are part of a substantially consummated Plan that cannot be modified.  As the GUC Trust has
previously represented before this Court, "fashioning relief for [Economic Loss] Plaintiffs out of the GUC Trust's
assets [if they were capable of holding Allowed General Unsecured Claims] would also require a significant, and
highly prejudicial, modification of the substantially-consummated Plan."  Equitable Mootness Br. ¶ 2.

Unsecured Claim" of $10 billion or more, and then provide the Economic Loss Plaintiffs with GUC Trust Assets for the maximum amount of Adjustment Shares (*i.e.*, 30,000,000 shares of New GM stock).

21.    There is no legally permissible way to provide the Economic Loss Plaintiffs with the consideration contemplated under the Proposed Settlement ***unless*** Wilmington Trust agrees that the Economic Loss Plaintiffs are legally capable of holding Allowed General Unsecured Claims and being GUC Trust Beneficiaries.  The GUC Trust Agreement leaves no question that GUC Trust Beneficiaries (*i.e.*, holders of Allowed General Unsecured Claims) are the only entities entitled to GUC Trust Assets; it provides that "the GUC Trust Beneficiaries shall be the ***sole beneficiaries of the GUC Trust Distributable Assets and of the GUC Trust***."  (GUC Trust Agreement § 3.1(a).)  As discussed, "GUC Trust Beneficiaries" are defined as holders of "Allowed General Unsecured Claims," which, Wilmington Trust argues, is defined in Recital F of the GUC Trust Agreement as being limited to Allowed or Disputed Claims as of March 2011.  All of the consideration contemplated under the Proposed Settlement constitutes GUC Trust Distributable Assets.  The Adjustment Shares (referred to as "Additional Shares" in the GUC Trust Agreement) are expressly defined as being part of the "GUC Trust Common Stock Assets," and are part of the "GUC Trust Securities Assets," which, in turn, comprise part of the overall universe of GUC Trust Distributable Assets.  (*Id*. at Rec. E(i)-(ii).)  The Adjustment Shares can ***only*** be distributed to holders of Allowed General Unsecured Claims.

22.    To provide the Economic Loss Plaintiffs access to the Adjustment Shares, Wilmington Trust therefore seeks to allow the Proposed Class Claims as Allowed General Unsecured Claims.  Pursuant to the Proposed Settlement, Wilmington Trust will "seek entry of an Estimation Order," which the Proposed Settlement defines as "an order of the Bankruptcy Court

estimating Plaintiffs aggregate ***Allowed General Unsecured Claims***.''   (Proposed Settlement Agreement § 2.20 (emphasis added).)   Although Wilmington Trust asserts that—based on the "Proffered Evidence"—Economic Loss Plaintiffs' claims "could equal or exceed $77 billion," the parties have agreed to file an Estimation Motion estimating the "***allowed General Unsecured Claims*** of Economic Loss Plaintiffs . . . in an amount that . . . could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares."   (9019 Motion ¶ 42; Proposed Settlement Agreement § 6.1.1 (emphasis added).)   In short, despite taking the opposite legal position in the Motion and the GUC Trust Distribution Motion, Wilmington Trust takes the position in the 9019 Motion in support of the Proposed Settlement that Economic Loss Plaintiffs legally can have Allowed General Unsecured Claims, and is actively seeking to allow such claims at no less than $10 billion.

23.   Perhaps recognizing the inherent conflict between its competing legal positions that (i) Economic Loss Plaintiffs cannot hold Allowed General Unsecured Claims or be beneficiaries of the Avoidance Trust because their claims were neither Allowed nor Disputed as of March 2011, while also maintaining that (ii) Economic Loss Plaintiffs are entitled to billions of dollars in Allowed General Unsecured Claims and distributions of significant GUC Trust Assets, Wilmington Trust repeatedly seeks "comfort orders" from the Court to pre-approve its actions and its interpretations of the Plan and GUC Trust Agreement.   In connection with the Proposed Settlement, Wilmington Trust "seeks a determination by the Court that entry into the Settlement and a motion seeking estimation of Allowed General Unsecured Claims . . . is an appropriate exercise of the GUC Trust Administrator's rights, powers, and/or privileges." (9019 Motion ¶ 53.) It states that, "given the import of both the Settlement and the estimation of allowed General Unsecured Claims, it is necessary, appropriate, and desirable to ask the Court at this time whether

15

the actions the GUC Trust Administrator proposes to take in connection therewith are permissible and appropriate," and notes that "the Court has continuing jurisdiction to interpret, implement, or enforce the GUC Trust Agreement." (*Id.* ¶ 57.)  Ultimately, Wilmington Trust "is seeking instruction regarding actions it proposes to take *based on its interpretation of the relevant documents*." (*Id.* (emphasis added).)  Similarly, in the recently filed GUC Trust Distribution Motion, Wilmington Trust also seeks a comfort order that making a distribution, which will also *exclude* the Economic Loss Plaintiffs, is an "appropriate exercise[] of the GUC Trust Administrator's rights, powers, and/or privileges," and "whether the actions the GUC Trust Administrator proposes to take in connection therewith are permissible and appropriate." (GUC Trust Distribution Motion ¶¶ 32, 36.)

24.    The Court cannot condone—much less give a comfort order approving—Wilmington Trust's blatantly inconsistent legal positions advanced simultaneously before this Court.  It is simply improper for Wilmington Trust to take the position in this Motion that Economic Loss Plaintiffs cannot legally hold Allowed General Unsecured Claims or be beneficiaries of the Avoidance Trust because their claims were neither Allowed nor Disputed as of March 2011, but at the same time in connection with the Proposed Settlement and the 9019 Motion take the position that Economic Loss Plaintiffs are capable of holding billions of dollars in Allowed General Unsecured Claims and receiving distributions of significant GUC Trust Assets.  In seeking the approval of both the Motion and the Proposed Settlement, Wilmington Trust asks this Court to abuse its discretion and force a result by adopting one definition of Allowed General Unsecured Claims for purposes of making distributions under the Motion, but adopting just the opposite definition of Allowed General Unsecured Claims in order to approve the Proposed Settlement.

25.    Wilmington Trust may not simultaneously (or otherwise) advance, and this Court should not countenance, opposing legal positions.  Under the "well-established doctrine of judicial estoppel," courts have both the power, and responsibility, to safeguard the judicial process.  *United States* v. *Watkins*, 623 F. Supp. 2d 514, 517 (S.D.N.Y. 2009) (internal citations omitted).  The Supreme Court itself has stated that the purpose of judicial estoppel is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire* v. *Maine*, 532 U.S. 742, 749–750 (2001) (internal citations and quotation marks omitted).[15]

26.    A party *cannot* take opposing legal positions in the same case based simply on the potential benefit they hope to accrue at that specific time.  To do so threatens the very integrity of the judicial process.  Indeed, "[i]n the Second Circuit, '[a] party puts the integrity of the judicial process at risk not only when it knowingly lies ***but when it takes a position in the short term knowing that it may be on the verge of taking an inconsistent future action***.'"  *Embraer S.A.* v. *Dougherty Air Tr., LLC*, 348 F. Supp. 3d 246, 256 (S.D.N.Y. 2018) (quoting *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011)) (emphasis added).  Further, "[a] court ***cannot*** ignore a party's opportunistic use of inconsistent representations when one allegation serves an argument at one stage of a case and the other serves an argument at a later stage."  *Intellivision* v. *Microsoft Corp.*, 784 F. Supp. 2d 356, 365 (S.D.N.Y. 2011), *aff'd,* 484 F. App'x 616 (2d Cir. 2012) (emphasis added) ("Permitting plaintiffs' opportunistic, last-minute about-face would have

---

[15]    *See also* Federal Practice & Procedure, Wright & Miller et al., § 4477 (2d ed.):

> Courts do not relish the prospect that an adept litigant may succeed in proving a proposition in one action, and then succeed in proving the opposite in a second.  At worst, successful assertion of inconsistent positions may impose multiple liability on an adversary or defeat a legitimate right of recovery.  At best, the judicial system is left exposed to an explicit demonstration of the frailties that remain in adversary litigation and adjudication.  The theories of judicial estoppel that reduce these risks do not draw directly from the fact of adjudication.  Instead, they focus on the fact of inconsistency itself.

unfairly advantaged plaintiffs and imposed an unfair detriment on Microsoft, and would have

created a risk of inconsistent results that could damage judicial integrity.").

27.     In fact, the Supreme Court held in *Pegram* v. *Herdrich* that "[j]udicial estoppel

generally prevents a party from prevailing in one phase of a case on an argument and then relying

on a contradictory argument to prevail in another phase," precisely what Wilmington Trust seeks

to do in the present Motion (phase one) and then in the Proposed Settlement (phase two).  530 U.S.

211, 228 n.8 (2000).

28.     Allowing Wilmington Trust to proceed would have grave repercussions.  It would

allow parties to advance inconsistent positions and

> "encourage[] parties to alter their positions . . . as they deem their litigation
> needs to change, leaving courts to unravel previously closed proceedings.
> Doing so would allow parties an opportunity to play fast and loose with the
> requirements of the bankruptcy process and inject an unacceptable level of
> uncertainty into its results—exactly the result that the doctrine of judicial
> estoppel is intended to avoid."

*Adelphia Recovery Tr.* v. *Goldman, Sachs & Co.*, 748 F.3d 110, 119–20 (2d Cir. 2014); *see also*

*Wight* v. *BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to

prevent a party who plays fast and loose with the courts from gaining unfair advantage through the

deliberate adoption of inconsistent positions in successive suits."); *In re CCT Commc'ns, Inc.*, 420

B.R. 160, 169 (Bankr. S.D.N.Y. 2009) ("The [judicial estoppel] doctrine serves two purposes: to

preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn

positions, and to protect judicial integrity by avoiding the risk of inconsistent results in the two

proceedings."); *City of San Diego* v. *Amoco Chemical Co.*, *et al*, No. 98-cv-00474, Dkt. No. 184,

at *20 (S.D. Cal. July 9, 1999) ("[T]he court is concerned that the City is altering its theory to fit

the situation.  The court cautions the City that it will enforce the doctrine of judicial estoppel to

prevent a party from playing fast and loose with inconsistent factual or legal positions.").[16]

29.    If Wilmington Trust's position is that only those creditors that held Allowed or

Disputed claims *as of March 2011* are legally capable of holding "Allowed General Unsecured

Claims," then Wilmington Trust should immediately withdraw from the Proposed Settlement

Agreement.  On the other hand, if Wilmington Trust's position is that Economic Loss Plaintiffs

potentially have $10 billion or more of "Allowed General Unsecured Claims," then it must

immediately withdraw the Motion and maintain an appropriate reserve for such claims, as would

be required under virtually any chapter 11 plan, and as is certainly required under the Plan and

applicable trust agreements.

---

[16]    There is a long history of circuit courts recognizing these principles of judicial estoppel.  *See Slater* v. *United States Steel Corp.*, 871 F.3d 1174, 1180–81 (11th Cir. 2017) ("Stated simply, the doctrine of judicial estoppel rests on the principle that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."); *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662–63 (7th Cir. 2010) ("Application of judicial estoppel seems particularly appropriate in the setting of this case, in which the parties were assisting the bankruptcy court in interpreting the meaning of the 2000 Plan."); *King* v. *Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998) ("Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation."); *Helfand* v. *Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) (noting, in addressing inconsistent interpretations of a trust document: "The district court properly found these two positions to be incompatible interpretations of Mr. Helfand's testamentary intent. . . .  The greater weight of federal authority, however, supports the position that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion.  The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal."); *DeGuiseppe* v. *Vill. of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995) ("[C]ourts are under no compulsion to heed the shifting theories of chameleonic litigants."); *Am. Nat. Bank of Jacksonville* v. *Fed. Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) ("Judicial estoppel is applied to the calculated assertion of divergent sworn positions.  The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings."); *Scarano* v. *Cent. R. Co. of N. J.*, 203 F.2d 510, 512–13 (3d Cir. 1953) ("The rule we apply here need be and is no broader than this.  A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention.  Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate.  And this is more than affront to judicial dignity.  For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.").

19

C.    **The Plan, the Avoidance Trust Agreement and the GUC Trust Agreement Each Require Adequate Reserves for Disputed General Unsecured Claims.**

30.    As discussed, to be a beneficiary of either the Avoidance Trust or the GUC Trust, a creditor must hold either an Allowed General Unsecured Claim or a Disputed General Unsecured Claim that subsequently becomes Allowed.  Because Economic Loss Plaintiffs do not presently hold Allowed General Unsecured Claims, the only way in which they could one day hold Allowed General Unsecured Claims or become GUC Trust or Avoidance Trust Beneficiaries is if they are presently considered to hold Disputed General Unsecured Claims.

31.    Section 7.2 of the Plan requires both the GUC Trust and Avoidance Trust to "withhold from the property to be distributed to holders of beneficial interests in the GUC Trust or the Avoidance Trust" an amount sufficient to pay Disputed General Unsecured Claims in the event they later become Allowed General Unsecured Claims.

32.    Section 5.5 of the GUC Trust Agreement requires the GUC Trust to "retain sufficient GUC Trust Distributable Assets as the GUC Trust Administrator shall determine . . . as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount. . . ."  Accordingly, the GUC Trust is required to reserve for all "Disputed General Unsecured Claims" in the "Maximum Amount."[17]

33.    The Avoidance Trust Agreement contains identical provisions to the GUC Trust Agreement.  Section 5.5(a) requires Wilmington Trust to "retain sufficient GUC Distributable

_____

[17]    "Maximum Amount" is defined as "with respect to any Disputed General Unsecured Claim, (x) the amount agreed to by the Debtors and/or the GUC Trust Administrator and the holder of such claim . . .; (y) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Bankruptcy Code Section 502(c); or (z) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the holder of such claim, or in the case of unliquidated claims, the amount estimated by the Debtors and/or the GUC Trust Administrator with the approval of the GUC Trust Monitor. . . ."  GUC Trust Agreement § 1.1(kkk)(A).

20

Trust Assets . . . as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount."[18]

34.    The purpose of the reserve requirements in both the GUC Trust Agreement and Avoidance Trust Agreement is to ensure that holders of Disputed General Unsecured Claims that subsequently become Allowed General Unsecured Claims receive their Pro Rata Share of distributions.  The Avoidance Trust Agreement provides, similar to the GUC Trust Agreement, that if a Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, then Wilmington Trust is required to distribute the "pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved Allowed General Unsecured Claim would have received had such Resolved General Unsecured Claim been an Initial Allowed General Unsecured Claim." (Avoidance Trust Agreement, § 5.3(b)(i); GUC Trust Agreement, § 5.3(a)(i) (same).)  In addition, each trust agreement provides:

> For the avoidance of doubt, it is intended that the distributions to be made to holders of Resolved Allowed General Unsecured Claims in accordance with this Section 5.3 shall provide such holders, as nearly as possible, with the exact same amount of distributions […] as if such holders had been holders of Initial Allowed General Unsecured Claims.

(Avoidance Trust Agreement § 5.3(d); GUC Trust Agreement § 5.3(b).)

35.    Accordingly, if Wilmington Trust's position is that Economic Loss Plaintiffs are legally capable of holding Allowed General Unsecured Claims and being beneficiaries of the GUC Trust or Avoidance Trust, then Wilmington Trust—pursuant to the terms of the Plan, the GUC Trust Agreement and the Avoidance Trust Agreement—must maintain a disputed claims reserve

---

[18]    The Avoidance Trust Agreement requires the Avoidance Trust to utilize the GUC Trust Administrator's estimation of the Maximum Amount pursuant to the GUC Trust Agreement.  Avoidance Trust Agreement § 1.1(sss).

for Economic Loss Plaintiffs until such time as the Proposed Class Claims are finally resolved. But since Wilmington Trust has concluded that the Economic Loss Plaintiffs are not capable of holding Allowed General Unsecured Claims, then the Court should not permit Wilmington Trust to play "fast and loose" and take the opposite position in connection with the Proposed Settlement.

## **REQUEST FOR ADJOURNMENT OF HEARING**

36.     As described above, on July 23, 2019, Wilmington Trust filed the GUC Trust Distribution Motion and noticed it for hearing on August 12, 2019 at 10:00 a.m.  Given the substantial overlap of issues raised by the Avoidance Trust's Motion and the GUC Trust Distribution Motion, New GM respectfully requests that the hearing on the Motion be adjourned from August 5, 2019 at 2:00 p.m. to August 12, 2019 at 10:00 a.m., or at a later time, to be heard at the same time as the GUC Trust Distribution Motion, at which time the Court will have the benefit of all parties' pleadings with respect to both motions.

## **CONCLUSION**

37.     This Court should follow applicable law, including binding precedent in the Second Circuit, to uphold the integrity of the legal process and deny the Motion.  It should not permit Wilmington Trust to take, or ask this Court to adopt, conflicting legal positions regarding the Plan, the Avoidance Trust Agreement, and the GUC Trust Agreement.  Accordingly, Wilmington Trust should not be permitted to make significant distributions of Avoidance Trust assets based on one interpretation of "Allowed General Unsecured Claims" that categorically excludes the Economic Loss Plaintiffs, only to turn around and take the opposite legal position regarding "Allowed General Unsecured Claims" that categorically includes Economic Loss Plaintiffs when seeking to trigger the Adjustment Shares.

38.     New GM has a substantial interest in ensuring that Wilmington Trust takes a consistent legal position as to the interpretation of "Allowed General Unsecured Claims" in the

Avoidance Trust Agreement and GUC Trust Agreement, as well as which creditors are—and are not—capable of being Trust Beneficiaries. New GM's alleged obligation to issue Adjustment Shares is inextricably tied to how Wilmington Trust—and ultimately the Court—interprets the meaning of "Allowed General Unsecured Claims," interprets the importance of the March 2011 record date under the Plan, the GUC Trust Agreement and the Avoidance Trust Agreement, and determines who qualifies as a Trust Beneficiary. New GM further has an economic interest in ensuring that the Economic Loss Plaintiffs, to the extent they have valid claims, receive the maximum possible amount of distributions from the Avoidance Trust and GUC Trust. Ensuring maximum distributions on Allowed General Unsecured Claims has obvious consequences to the "limited fund" arguments advanced in connection with the Proposed Settlement, but also impacts New GM's potential liability for asserted successor liability claims in the MDL Action (as defined in the Rule 23 Motion).

WHEREFORE, for all of the reasons set forth herein New GM respectfully requests that this Court: (a) adjourn the hearing on the Motion to August 12, 2019 at 10:00 a.m. (or such other later hearing date at which the Court will consider the GUC Trust Distribution Motion); (b) approve the Motion and the Proposed Distribution Plan on the express basis that Economic Loss Plaintiffs are not legally capable of holding Allowed General Unsecured Claims (as defined in the Avoidance Trust Agreement) because the Proposed Class Claims were neither Allowed nor Disputed as of March 2011; (c) in the alternative, deny the Motion and enforce the provisions of the Avoidance Trust Agreement which require a reserve for Disputed General Unsecured Claims; and (d) grant such other and further relief as the Court may deem just and proper. New GM reserves all of its rights to object to, raise issues with, contest, or otherwise respond to the Motion, the Proposed Distribution Plan, the Proposed Settlement, and any and all distributions or actions

23

taken by the Avoidance Trust and the GUC Trust.  Nothing herein is intended or shall be construed

as a waiver or limitation of any of New GM's right or remedies, all of which are fully preserved.

[*Remainder of page intentionally left blank*]

Dated:  July 29, 2019
       New York, New York

*/s/ Paul M. Basta*         

Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Counsel for General Motors LLC*