Paul M. Basta
Aidan Synnott
Kyle J. Kimpler
Sarah Harnett
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for General Motors LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, *et al.*,<br>f/k/a General Motors Corp., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |

## OBJECTION OF
## GENERAL MOTORS LLC TO GUC TRUST DISTRIBUTION MOTION

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

OBJECTION .......................................................................................................................... 9

    A.    Wilmington Trust's Inconsistent Legal Positions Regarding the Criteria For Holding Allowed General Unsecured Claims. ................................................. 10

        1.    The Plan and the GUC Trust Agreement Contain Uniform Eligibility Criteria for Determining Which Creditors Are Capable of Holding Allowed General Unsecured Claims and Being Trust Beneficiaries. ........................................................................................... 11

        2.    Wilmington Trust's Conflicting Legal Position In Connection With the Proposed Settlement ....................................................................... 14

    B.    Wilmington Trust's Inconsistent Legal Positions Regarding Its Ability To Make Distributions Before the Proposed Settlement Is Approved. ...................... 19

        1.    The Plan and the GUC Trust Agreement Both Require Adequate Reserves for Disputed General Unsecured Claims. .................................. 19

        2.    Wilmington Trust's Conflicting Position In Connection With the Proposed Settlement ..................................................................................... 22

    C.    Wilmington Trust's Inconsistent Legal Positions Regarding Class Certification Pursuant to a Rule 23(B)(1)(B) "Limited Fund" Theory ................ 24

    D.    The Court Should Not Give Wilmington Trust A "Comfort Order." ................... 27

CONCLUSION ...................................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Recovery Tr.*,
    634 F.3d 678 (2d Cir. 2011)...............................................................................8

*Adelphia Recovery Tr.* v. *Goldman, Sachs & Co.*,
    748 F.3d 110 (2d Cir. 2014)........................................................................17, 23

*In re Airadigm Commc'ns, Inc.*,
    616 F.3d 642 (7th Cir. 2010) .............................................................................18

*Am. Nat. Bank of Jacksonville* v. *Fed. Deposit Ins. Corp.*,
    710 F.2d 1528 (11th Cir. 1983) ........................................................................18

*In re CCT Commc'ns, Inc.*,
    420 B.R. 160 (Bankr. S.D.N.Y. 2009)..............................................................17

*City of San Diego* v. *Amoco Chemical Co., et al*,
    No. 98-cv-00474, Dkt. No. 184 (S.D. Cal. July 9, 1999) .....................................17

*DeGuiseppe* v. *Vill. of Bellwood*,
    68 F.3d 187 (7th Cir. 1995) ..............................................................................18

*Embraer S.A.* v. *Dougherty Air Tr., LLC*,
    348 F. Supp. 3d 246 (S.D.N.Y. 2018)...............................................................16

*Helfand* v. *Gerson*,
    105 F.3d 530 (9th Cir. 1997) .............................................................................18

*Intellivision* v. *Microsoft Corp.*,
    784 F. Supp. 2d 356 (S.D.N.Y. 2011), *aff'd,* 484 F. App'x 616 (2d Cir. 2012).....................16

*King* v. *Herbert J. Thomas Mem'l Hosp.*,
    159 F.3d 192 (4th Cir. 1998) .............................................................................18

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2001)...........................................................................................16

*In re Motors Liquidation Corp.*,
    591 B.R. 501 (Bankr. S.D.N.Y. 2018)..............................................................4

*Ortiz* v. *Fibreboard Corp.*,
    527 U.S. 815 (1999).....................................................................................6, 25

*Pegram* v. *Herdrich*,
    530 U.S. 211 (2000)........................................................................14, 17

*In re Peierls Family Inter Vivos Trusts*,
    59 A.3d 471 (Del. Ch. 2012), *aff'd*, 77 A.3d 249 (Del. 2013)............................7, 27

*Scarano* v. *Cent. R. Co. of N. J.*,
    203 F.2d 510 (3d Cir. 1953)....................................................................18

*Slater* v. *United States Steel Corp.*,
    871 F.3d 1174 (11th Cir. 2017) ...............................................................18

*In re Trusteeship Created by Am. Home Mortg. Inv. Tr.*
    *2005-2*, 2014 WL 3858506 (S.D.N.Y. July 24, 2014)......................................27

*United States* v. *Watkins*,
    623 F. Supp. 2d 514 (S.D.N.Y. 2009)........................................................16

*Wight* v. *BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)...................................................................8, 17

### OTHER AUTHORITIES

Federal Practice & Procedure, Wright & Miller et al., § 4477 (2d ed.).........................16

McLaughlin on Class Actions § 5.8 (15th ed. 2018) ...................................................26

Newberg on Class Actions (5th Ed.) § 4:16 .............................................................6

RESTATEMENT (THIRD) OF TRUSTS § 71 cmt. d, (2007)...............................................27

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

General Motors LLC ("New GM") submits this objection (the "Objection") in opposition

to the GUC Trust Distribution Motion (the "Motion")[1] filed by Wilmington Trust Company

("Wilmington Trust"), in its capacity as the Trust Administrator for the Motors Liquidation

Company GUC Trust (the "GUC Trust"), for approval of expedited distributions to the GUC

Trust's beneficiaries, and states as follows:

## PRELIMINARY STATEMENT

1.    Like the Avoidance Trust Distribution Motion[2] recently filed by Wilmington

Trust,[3] the Motion raises fundamental questions—and fundamental inconsistencies—about who is

capable of holding an "Allowed General Unsecured Claim" as that term is defined in the Plan and

the GUC Trust Agreement, and thus who can be a beneficiary of—and therefore receive

distributions from—the GUC Trust.  In addition to highlighting the contrary legal positions that

Wilmington Trust is simultaneously taking regarding the definition of Allowed General Unsecured

Claims, the Motion raises other inconsistent positions Wilmington Trust is presently advancing

before this Court, such as its prior assertion that the Court must resolve the Economic Loss

Plaintiffs' claims *before* making any further distributions, and the "limited fund" that Wilmington

---

[1]    *Motion of Wilmington Trust Company, as GUC Trust Administrator, for an Order (A) Authorizing the Expedited Payment of Excess GUC Distributable Assets Pursuant to Section 5.4 of the GUC Trust Agreement, and (B) Approving Such Distribution as an Appropriate Exercise of the GUC Trust Administrator's Rights, Powers and/or Privileges Pursuant to Section 8.1(e) of the GUC Trust Agreement* (July 23, 2019) [ECF No. 14565]. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

[2]    *See Motion of Motors Liquidation Company Avoidance Action Trust for Entry of an Order Pursuant to Sections 105 and 1142 of the Bankruptcy Code and Bankruptcy Rule 3020 Approving the Distribution Plan to the Avoidance Action Trust's Beneficiaries* (July 8, 2019) [ECF No. 14552] (the "Avoidance Trust Distribution Motion"). On July 29, 2019, New GM filed an Objection and Reservation of Rights with respect to the Avoidance Trust Distribution Motion [ECF No. 14572] (the "AAT Objection").

[3]    Wilmington Trust is the trust administrator for both the GUC Trust and the Motors Liquidation Company Avoidance Action Trust (the "Avoidance Trust").

Trust claims exists to satisfy the Proposed Class Claims.[4]  New GM files this Objection to prevent Wilmington Trust from taking contrary legal positions on the same issues with respect to the Economic Loss Plaintiffs in connection with the Proposed Settlement.[5]

2.      In the Motion, Wilmington Trust seeks to distribute $320 million of Excess GUC Distributable Assets on an expedited timeline to existing holders of GUC Trust Units, without maintaining any reserve for Economic Loss Plaintiffs, or the few remaining personal injury plaintiffs.  As New GM explained in the AAT Objection, based on Wilmington Trust's own statements before this Court, Wilmington Trust believes that the Economic Loss Plaintiffs could potentially hold as much as $77 billion in Allowed General Unsecured Claims, which if true, means that Economic Loss Plaintiffs would hold approximately 70% of all Allowed General Unsecured Claims.  (*See* AAT Obj. ¶ 6.)  If the Economic Loss Plaintiffs are capable of holding Allowed General Unsecured Claims, then the applicable provisions of the Plan and GUC Trust Agreement ***require*** Wilmington Trust to maintain a sufficient reserve for such disputed claims. (*See* Plan § 7.2; GUC Trust Agreement § 5.5.)  Because current holders of GUC Trust Units have received distributions totaling approximately 30% of their Allowed claim amounts, the Economic

---

[4]    *See Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions, (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002, 9014, and 9019, and (III) Authorize the Reallocation of GUC Trust Assets* (Feb. 1, 2019) [ECF No. 14409] (the "9019 Motion"); *Economic Loss Plaintiffs' Motion to (1) Extend Bankruptcy Rule 7023 to These Proceedings; (2) Approve the Form and Manner of Notice; (3) Grant Class Certification for Settlement Purposes Upon Final Settlement Approval; (4) Appoint Class Representatives and Class Counsel for Settlement Purposes; and (5) Approve the Settlement Agreement by and among the Signatory Plaintiffs and the GUC Trust Pursuant to Rule 23* (Feb. 1, 2019) [ECF No. 14408] (the "Rule 23 Motion").  Reference is made to the settlement agreement attached as Exhibit A to the 9019 Motion (the "Proposed Settlement Agreement").  This Objection focuses on the treatment of the Economic Loss Plaintiffs (as defined in the 9019 Motion) given the asserted magnitude of the Proposed Class Claims (as defined in the 9019 Motion) and does not focus on the Pre-Closing Accident Plaintiffs (as defined in the 9019 Motion) that were subject to the Proposed Settlement because many of the Pre-Closing Accident Plaintiffs' claims have been resolved pursuant to settlements reached with New GM.

[5]    The GUC Trust's distribution Motion raises additional concerns than those raised by New GM in the AAT Objection.

Loss Plaintiffs would be entitled to catch-up distributions from the GUC Trust until such time that their Allowed General Unsecured Claims had also received distributions totaling approximately 30% of their Allowed claim amounts.[6]  In other words, if Economic Loss Plaintiffs are capable of holding Allowed General Unsecured Claims, and such Allowed Claims were to exceed approximately $1.3 billion, then the Economic Loss Plaintiffs would be entitled to ***all*** of the GUC Trust's assets, which would total (following the catch-up distribution on the 502(h) Claim) approximately $390 million.

3.      But as it did in the Avoidance Trust Distribution Motion, Wilmington Trust once again takes the legal position that the Economic Loss Plaintiffs are not capable of holding "Allowed General Unsecured Claims" and equally are not capable of being GUC Trust Beneficiaries.  The Motion asserts that the GUC Trust "was created on behalf of, and for the benefit of holders of (i) general unsecured claims that are allowed ***as of the Initial Distribution Record Date*** [*i.e.*, March 31, 2011]; [and] (ii) general unsecured claims that are disputed ***as of the Initial Distribution Record Date*** [*i.e.*, March 31, 2011] . . . "  (Mot. ¶ 9 (emphasis added).)  According to Wilmington Trust "[t]hese categories of claims are defined in the GUC Trust Agreement as Allowed General Unsecured Claims." (*Id.*)  Thus, because the Economic Loss Plaintiffs' Proposed Class Claims were neither Allowed nor Disputed ***as of March 2011***, Wilmington Trust asserts that they are not within the "categories of claims" that qualify as Allowed General Unsecured Claims.[7]

---

[6]     *See* Motors Liquidation Company GUC Trust Form 10-K for the Fiscal Year Ended March 31, 2019 p. 3.

[7]     The Participating Unitholders, who also support the Proposed Settlement, advance the same argument. *See The Participating Unitholders' Joinder to the Motion of Wilmington Trust Company, as GUC Trust Administrator, For an Order (A) Authorizing the Expedited Payment of Excess GUC Trust Distributable Assets Pursuant to Section 5.4 of the GUC Trust Agreement, and (B) Approving Such Distribution as an Appropriate Exercise of the GUC Trust Administrator's Rights, Powers, and/or Privileges Pursuant to Section 8.1(e) of the GUC Trust Agreement* (July 30, 3019) [ECF No. 14576] (the "Unitholders' Joinder") ¶ 1.

4.      Again, this position directly contradicts the legal position Wilmington Trust takes in connection with the Proposed Settlement, where Wilmington Trust seeks to resolve Economic Loss Plaintiffs' Claims through an estimation process that could grant Economic Loss Plaintiffs ***Allowed General Unsecured Claims*** in an amount equal to or exceeding $10 billion.  Wilmington Trust is determined to grant Economic Loss Plaintiffs' Allowed General Unsecured Claims because the primary goal of the Proposed Settlement is to trigger the maximum amount of Adjustment Shares as the only source of recovery for the Economic Loss Plaintiffs while ensuring that Economic Loss Plaintiffs do not share in any other GUC Trust Assets.  The issuance of Adjustment Shares is, of course, conditioned solely on the estimation of ***Allowed General Unsecured Claims***.  *See In re Motors Liquidation Corp.*, 591 B.R. 501, 518 (Bankr. S.D.N.Y. 2018) ("The relevant documents consistently refer to the estimation of 'Allowed General Unsecured Claims' when discussing the estimation of possible claims in the context of the issuance of Adjustment Shares.").  But if Economic Loss Plaintiffs are capable of having Allowed General Unsecured Claims, Wilmington Trust must establish a reserve for such claims as part of the Motion.

5.      Just like the Avoidance Trust Distribution Motion, the legal contradictions espoused by Wilmington Trust are obvious:  when seeking to avoid its reserve obligations and expedite distributions to other creditors, Wilmington Trust adopts the legal position that Economic Loss Plaintiffs ***are not capable*** of holding Allowed General Unsecured Claims, but when seeking approval of the Proposed Settlement and issuance of Adjustment Shares, Wilmington Trust adopts the opposite legal position that Economic Loss Plaintiffs ***are capable*** of holding Allowed General Unsecured Claims.

4

6.      It is no answer that Wilmington Trust has entered into the Proposed Settlement Agreement with Economic Loss Plaintiffs that would, if approved, release Economic Loss Plaintiffs' claims to the assets that Wilmington Trust now seeks to distribute.  The Proposed Settlement has not been approved, and New GM believes that it can never be approved for a multitude of reasons.  An unapproved settlement does not provide any legal basis for Wilmington Trust to take inconsistent legal positions in connection with its distribution and reserve obligations under the Plan and GUC Trust Agreement.  That the Economic Loss Plaintiffs also object to the Motion only underscores that the Proposed Settlement cannot justify the relief requested in the Motion.[8]

7.      The Motion highlights several other inconsistencies with respect to Wilmington Trust's actions relating to the Proposed Settlement, on the one hand, and its proposed expedited distribution of $320 million of GUC Trust Assets under the Motion (the "Proposed Distribution"), on the other hand.  For example, in seeking approval of the Proposed Settlement, Wilmington Trust argued that "[c]ontinuation of protracted litigation" with the Economic Loss Plaintiffs  "*will . . . delay any further GUC Trust distributions*"  and therefore "[t]his Court should approve" the Proposed Settlement because resolution of Economic Loss Plaintiffs' Claims would  "*prevent further delay in distributions of remaining GUC Trust Assets . . .*"  (9019 Mot. ¶¶ 4, 11 (emphasis added).)  Now, Wilmington Trust asks this Court to ignore the assertions it makes in the 9019 Motion, insisting that it can make expedited distributions of Excess GUC Trust Distributable Assets to holders of GUC Trust Units (the "Unitholders") *without* first resolving Economic Loss

---

[8]      *See The Economic Loss Plaintiffs' Omnibus Objection to (I) Motion of Motors Liquidation Company Avoidance Action Trust for an Order Approving the Distribution Plan; (II) Motion of Wilmington Trust Company, as GUC Trust Administrator, for an Order Authorizing the Expedited Payment of Excess GUC Trust Distributable Assets; and (III) Motion of Wilmington Trust Company, as GUC Trust Administrator, for an Order Authorizing the Expedited Distribution to Holders of 502(h) Claims* (July 29, 2011) [ECF No. 14571] ("Plaintiffs' Obj.").

Plaintiffs' Claims and *regardless* of the status of the Proposed Settlement or whether Economic Loss Plaintiffs' Claims against the Debtors' estates are *ever* resolved. These legal positions cannot be reconciled.

8.    Similarly, in connection with the Proposed Settlement, Wilmington Trust argues that the GUC Trust constitutes a "limited fund" within the meaning of Rule 23(b)(1)(B), and therefore seeks the extraordinary relief of certifying mandatory non-opt-out classes. As discussed in New GM's Objection to the Proposed Settlement [ECF No. 14449] (the "Proposed Settlement Objection"), a "limited fund" is legally improper in this case and Wilmington Trust's current actions only highlight those legal infirmities. By this Motion, Wilmington Trust seeks to dissipate $320 million in assets that could otherwise be used to satisfy the Proposed Class Claims. As Economic Loss Plaintiffs and the GUC Trust argued, the purpose of the "limited fund" doctrine is to address situations where "if the claims are adjudicated one by one, the fund will run out before the claimants do. Early claimants' suits are therefore 'dispositive of the interests' of the other claimants . . ." (Rule 23 Mot. ¶ 94 (citing 2 Newberg on Class Actions (5th Ed.) § 4:16).) The irony here should not be lost on the Court: Wilmington Trust is *actively seeking* to distribute $320 million of its allegedly "limited funds" to some creditors (*i.e.*, current Unitholders), while *simultaneously claiming* that the individual pursuit of claims by *other purported creditors* (*i.e.*, Economic Loss Plaintiffs) should be prohibited due to the limited nature of its assets and the risk that some of those creditors might collect before others. Under controlling Supreme Court precedent, a defendant cannot voluntarily choose to create a limited fund by deciding to pay its preferred creditors, and a fund cannot be "limited" under Rule 23 where it is used to pay non-class member claimants. *See Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815, 864 (1999) (holding that "it would be essential that the fund be shown to be limited independently of the agreement of the

6

parties to the action").  Wilmington Trust's request that it be permitted to dissipate $320 million

of assets to non-class members while simultaneously seeking certification of a "limited fund" class

violates every tenet of *Ortiz*:  if approved, the Motion guarantees that the "limited fund" will ***not***

be "set definitely at the maximum[]," that the "whole of the inadequate fund" will ***not*** be "devoted"

to satisfying class claims, and that the "limited fund" has been impermissibly manufactured and

was not "limited independently of the agreement of the parties."  *Id*. at 838–839, 865.  While the

Court need not decide the propriety of "limited fund" class certification in connection with this

Motion, it should not ignore the legal and factual inconsistency between Wilmington Trust's

Proposed Distribution and the "limited fund" legal theory that it simultaneously advances in the

Proposed Settlement.

9.    Wilmington Trust's request for "instructions" from the Court highlights its own

misgivings about the relief its seeks.  For example, in 2016, after Wilmington Trust was aware that

the Economic Loss Plaintiffs were asserting late claims, but before the parties first entered into

any proposed settlement, Wilmington Trust made a $112 million distribution of GUC Trust Assets

without seeking Court approval or "instructions."[9]  Similarly, Wilmington Trust does not seek

"instructions" in connection with its Section 502(h) Distribution Motion.[10]  But Wilmington Trust,

for unexplained reasons, believes that it requires the Court's guidance on the present Motion, and

therefore it is "desirable to ask the Court at this time whether the actions the GUC Trust

Administrator proposes to take in connection [with the Proposed Distribution] are permissible and

appropriate."  (Mot. ¶ 36.)

---

[9]    *See* GUC Trust Letter (Oct. 26, 2016) [ECF No. 13780].

[10]    *Motion of Wilmington Trust Company, as GUC Trust Administrator, For An Order Authorizing Expedited Distribution to Holders of 502(h) Claims Resulting from the AAT Settlement Agreement Pursuant to Sections 5.3 and 5.8 of the GUC Trust Agreement* (July 23, 2019) [ECF No. 14566] (the "Section 502(h) Distribution Motion").

10.     Courts, however, do not provide trustees instructions unless there is "a live dispute capable of resolution." *In re Peierls Family Inter Vivos Trusts*, 59 A.3d 471, 478 (Del. Ch. 2012), *aff'd*, 77 A.3d 249 (Del. 2013).  Here, Wilmington Trust does not even tell the Court what dispute necessitates its requests for instructions, but rather seeks a generic "comfort order." Although it fails to identify the dispute that requires the Court's instruction, it is obvious that Wilmington Trust is looking for permission to exclude the Economic Loss Plaintiffs from the Proposed Distribution.  If Wilmington Trust were to identify the disputes for which it seeks the Court's instruction in both the Motion and the Proposed Settlement, it would be readily apparent that Wilmington Trust was asking the Court to adopt fundamentally conflicting legal positions. Wilmington Trust seeks instructions on a binary issue:   either the Plan and the GUC Trust Agreement require the Economic Loss Plaintiffs to have asserted a claim by March 2011 to be capable of holding Allowed General Unsecured Claims or they do not so require.  There can be no middle ground on this issue, and by seeking the Court's instructions, Wilmington Trust asks the Court to decide this binary issue one way in connection with the Motion (but the opposite way in connection with the Proposed Settlement).

11.     The Court should decline Wilmington Trust's invitation to provide a generic comfort order in the face of these fundamentally inconsistent legal positions.  Wilmington Trust cannot take (and ask the Court to adopt) one legal position when it seeks to expedite $320 million in distributions, but then take (and ask the Court to adopt) precisely the opposite legal position when it seeks to satisfy the Proposed Class Claims by triggering the Adjustment Shares.  This Court should not allow Wilmington Trust to play "fast and loose" by simultaneously advancing opposite positions, which, as the Second Circuit has recognized, "puts the integrity of the judicial process at risk."   *See In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011); *Wight* v.

8

*BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits.").

12.    As it did in the AAT Objection, New GM also notes that allowing Wilmington Trust to make distributions before the Court addresses the Proposed Settlement will significantly impair any prospect of a consensual resolution with the Economic Loss Plaintiffs.  Presently, the Economic Loss Plaintiffs could look to the Avoidance Trust (with $103 million in available assets), and the GUC Trust (with approximately $450 million in available assets) for a potential recovery. Should the Court allow Wilmington Trust to distribute most or all available assets in the GUC Trust or Avoidance Trust, such assets will be unavailable and could never be available in any global resolution of or recovery for the Economic Loss Plaintiffs' claims (both in this Court and in the MDL Court).  The Economic Loss Plaintiffs also observed the benefits of delaying distributions until after a mediation with all interested parties.  (*See* Plaintiffs' Obj. ¶ 1 (opposing distributions prior to a judicial resolution of the Proposed Settlement or a mediated resolution).)

## OBJECTION

13.    Pursuant to the Motion, Wilmington Trust seeks to distribute approximately $320 million of Excess GUC Trust Distributable Assets on an expedited basis to holders of Allowed General Unsecured Claims.  (Mot. ¶ 5.)  However, ***none*** of the $320 million of GUC Trust Assets that Wilmington Trust seeks to distribute would be distributed to—or reserved for—the Economic Loss Plaintiffs.  The basis for such exclusion, according to Wilmington Trust, is that the Economic Loss Plaintiffs, pursuant to the applicable definitions and provisions of the Plan and GUC Trust Agreement, are not legally capable of holding "Allowed General Unsecured Claims" because their claims were neither Allowed nor Disputed as of March 2011.  Wilmington Trust also suggests that it is appropriate to exclude the Economic Loss Plaintiffs from the Proposed Distribution "given

9

the [] current status of the settlement agreement" between the GUC Trust and Economic Loss

Plaintiffs. (Mot. ¶ 36.) These contentions are plainly inconsistent with other legal positions that

Wilmington Trust is simultaneously advancing before this Court.

**A.    Wilmington Trust's Inconsistent Legal Positions Regarding the Criteria For Holding Allowed General Unsecured Claims.**

14.    For purposes of seeking this Court's approval of the expedited distributions

contemplated by the Motion, Wilmington Trust again relies on the importance of March 2011 as

the critical cut-off date for determining who is capable of holding Allowed General Unsecured

Claims and thus qualify as a GUC Trust Beneficiary. Wilmington Trust asserts that:

> Pursuant to the GUC Trust Agreement, ***the GUC Trust was created on behalf of, and for the benefit of holders*** of (i) general unsecured claims that are ***allowed as of the Initial Distribution Record Date***; (ii) general unsecured claims that are ***disputed as of the Initial Distribution Record Date*** but are later allowed pursuant to the claims resolution procedures; (iii) Term Loan Avoidance Action Claims and Other Avoidance Action Claims in the amount collected against the respective defendants. ***These categories of claims are defined in the GUC Trust Agreement as Allowed General Unsecured Claims***.

(Mot. ¶ 9 (emphasis added).)[11]

15.    The Participating Unitholders, the parties that stand to immediately benefit from

the Proposed Distribution, take the same position. They argue that the "relief requested by the

Motion is consistent with the Plan and GUC Trust Agreement." (Unitholders' Joinder ¶ 4.) In

particular, the Participating Unitholders assert:

> The GUC Trust was established for the benefit of Old GM's unsecured creditors whose claims were pending as of the commencement of Old GM's chapter 11 cases and have remained pending for more than 10 years. The Plan provides that the holders of Allowed General Unsecured Claims ***as of the Distribution Record Date (i.e., Plan confirmation)*** receive distributions pursuant to the Plan '[a]s soon as reasonably practicable' after

---

[11]    Wilmington Trust similarly states in the Section 502(h) Distribution Motion that "Disputed General Unsecured Claim" is defined as "unsecured claims against the Debtors that are Disputed as of the Initial Record Date." *See* Section 502(h) Distribution Mot. ¶ 5 n.2.

the Effective Date and thereafter on a quarterly basis to the extent assets are available for distribution.

(*Id.* ¶ 1 (emphasis added).)  Wilmington Trust's and the Participating Unitholders' argument is rooted in the provisions of the substantially consummated Plan and GUC Trust Agreement.[12]

### 1.    The Plan and the GUC Trust Agreement Contain Uniform Eligibility Criteria for Determining Which Creditors Are Capable of Holding Allowed General Unsecured Claims and Being Trust Beneficiaries.

16.    Pursuant to the Plan, holders of Allowed General Unsecured Claims are entitled to, among other things, their Pro Rata Share of GUC Trust Assets.  (Plan §§ 4.3(a)–(c).)  Both the Plan and the GUC Trust Agreement define holders of Allowed General Unsecured Claims as those creditors whose claims were either Allowed or Disputed *as of March 2011*.  The Plan, for example, provides that the GUC Trust shall make distributions to "each holder of an Allowed General Unsecured Claim *as of the Distribution Record Date*," and to "holders of Disputed General Unsecured Claims *as of the Distribution Record Date* whose Claims are subsequently Allowed." (*Id.* (emphasis added).)  The Distribution Record Date is defined as being the Confirmation Date, which occurred on March 29, 2011.  (*Id.* § 1.55.)[13]  Accordingly, Wilmington Trust argues that the Plan does not contemplate that the GUC Trust would ever make distributions to holders of Claims that were neither Allowed nor Disputed as of March 29, 2011.

17.    Similarly, the GUC Trust Agreement defines "GUC Trust Beneficiaries" as being limited to holders of "Initial Allowed General Unsecured Claims" and "Resolved Allowed General

---

[12]    The GUC Trust Agreement is part of the substantially consummated Plan that cannot be modified.  *See* Plan § 12.14 ("The Exhibits to the Plan and the Plan Supplement are incorporated into and as part of the Plan as if set forth herein.").  As the GUC Trust has previously represented before this Court, "fashioning relief for [Economic Loss] Plaintiffs out of the GUC Trust's assets [if they were capable of holding Allowed General Unsecured Claims] would also require a significant, and highly prejudicial, modification of the substantially-consummated Plan."  *The Participating Unitholders' and GUC Trust Administrator's Opening Memorandum of Law Respecting the Equitable Mootness Threshold Issue* (Nov. 5, 2014) [ECF No. 12983] ("Equitable Mootness Br.") ¶ 2.

[13]    *See Notice of (I) Entry of Order Confirming Debtors' Second Amended Joint Chapter 11 Plan and (II) Occurrence of Effective Date* (May 3, 2011) [ECF No. 10151].

Unsecured Claims," with both classes being defined in reference to those creditors whose claims

were either Allowed or Disputed *as of March 2011*. The GUC Trust Agreement provides:

> The GUC Trust is being created on behalf of, and for the benefit of, (i) the holders of General Unsecured Claims against the Debtors that are allowed *as of the Initial Distribution Record Date* (the "Initial Allowed General Unsecured Claims") and (ii) (a) the holders of General Unsecured Claims against the Debtors that are Disputed ("Disputed General Unsecured Claims") *as of the Initial Distribution Record Date* and that are allowed after the Initial Distribution Record Date in accordance with the claims resolution procedures administered under the Plan (to the extent so resolved); . . . (collectively, the "Resolved Allowed General Unsecured Claims" and, together with the Initial Allowed General Unsecured Claims, the "Allowed General Unsecured Claims"). The holders of Allowed General Unsecured Claims, and any holders of Units acquired, directly or indirectly, by transfer from holders of Allowed General Unsecured Claims, in their capacities as beneficiaries of the GUC Trust, are sometimes referred to as the "GUC Trust Beneficiaries."

(GUC Trust Agreement, Rec. F (emphasis added).) The Initial Distribution Record Date is defined

as being the Effective Date of the Plan, *i.e.*, March 31, 2011. Accordingly, Wilmington Trust takes

the legal position that to qualify as a GUC Trust Beneficiary, a creditor must either have an

Allowed claim as of March 31, 2011 or a Disputed claim as of March 31, 2011 that subsequently

becomes Allowed.

      18.     The Motion is not the first time that Wilmington Trust has taken this position with

respect to determining who is eligible to be a GUC Trust Beneficiary. In 2014, based on the same

provisions of the Plan and GUC Trust Agreement, Wilmington Trust stated:[14]

> Moreover, the Plan and Confirmation Order are clear: *the only parties that may receive GUC Trust assets* (other than those to whom the GUC Trust is liable for its costs and expenses) *are those that held Allowed Claims or Disputed Claims (to the extent allowed) as of the Effective Date*; those that are or may be subject to disgorgement pursuant to an avoidance action brought on behalf of the Debtors' creditors (to the extent that such disgorgement actually occurs); or those that hold publicly-traded units

---

[14]    Equitable Mootness Br. ¶ 2 (emphasis added).

issued by the GUC Trust (collectively, the "GUC Trust Beneficiaries"). *There can be no dispute that Plaintiffs do not fall within this universe.*

More recently, in March 2017, Wilmington Trust again stated:[15]

> The GUC Trust is a liquidating trust with the primary purpose of resolving disputed claims and distributing GUC Trust assets and GUC Trust Units to the GUC Trust's defined beneficiaries. Dkt. 13031, Ex. 4 § F. *Those beneficiaries include holders of allowed general unsecured claims as of March 31, 2011; holders of disputed claims as of March 31, 2011, that were later allowed*; and holders of freely traded GUC Trust Units. *Plaintiffs are not and have never been GUC Trust beneficiaries*.

19.    Pursuant to the Motion, Wilmington Trust again takes the legal position that Economic Loss Plaintiffs cannot hold Allowed General Unsecured Claims or be GUC Trust Beneficiaries because their claims were neither Allowed nor Disputed as of March 2011.  (Mot. ¶ 9.)

20.    If Wilmington Trust is correct and, based on the applicable provisions of the Plan and the GUC Trust Agreement, only those creditors with Allowed or Disputed Claims *as of March 2011* are capable of holding Allowed General Unsecured Claims and being GUC Trust Beneficiaries, then the claims resolution process in this chapter 11 case is complete, and the Economic Loss Plaintiffs cannot hold Allowed General Unsecured Claims, qualify as GUC Trust beneficiaries, or be entitled to distributions from the GUC Trust.[16]  This position also forecloses any attempt to trigger the Adjustment Shares and distribute them to the Economic Loss Plaintiffs because the GUC Trust does not have authority under the GUC Trust Agreement to distribute the

---

[15]    *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of* Pioneer *and Tolling to Plaintiffs' Motions to File Late Claims* (Mar. 7, 2017) [ECF No. 13879] ( "Pioneer Br.") p. 5 (emphasis added).

[16]    According to the most recent GUC Trust Quarterly Report, Wilmington Trust "released a general claim contingency that comprised the remaining Disputed General Unsecured Claims of $50.0 million."  *Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports as of June 30, 2019* (July 30, 2019) [ECF No. 14578] p. 7.  That is to say, according to Wilmington Trust there are no remaining Disputed General Unsecured Claims.

Adjustment Shares to anyone other than GUC Trust Beneficiaries (*i.e.*, holders of Allowed General Unsecured Claims).

21.    However, Wilmington Trust takes the opposite legal position in connection with the Proposed Settlement, thereby necessitating this Objection.  Simply put, a party cannot take one legal position and ask the Court to adopt it in one phase of a case, only to turn around and take the precise opposite position in the next phase of the case.  *See Pegram* v. *Herdrich*, 530 U.S. 211, 228 n.8 (2000).

## 2.    Wilmington Trust's Conflicting Legal Position In Connection With the Proposed Settlement.

22.    Although the Economic Loss Plaintiffs had neither Allowed nor Disputed General Unsecured Claims as of March 2011, Wilmington Trust, in the 9019 Motion and with respect to the Proposed Settlement, does not take the position that Economic Loss Plaintiffs are incapable of holding Allowed General Unsecured Claims.  Rather, pursuant to the Proposed Settlement, Wilmington Trust takes the precise opposite position, and seeks entry of an order that would grant Economic Loss Plaintiffs an "Allowed General Unsecured Claim" of $10 billion or more, and then provide the Economic Loss Plaintiffs with GUC Trust Assets for the maximum amount of Adjustment Shares (*i.e.*, 30,000,000 shares of New GM stock).

23.    The GUC Trust Agreement leaves no question that GUC Trust Beneficiaries (*i.e.*, holders of Allowed General Unsecured Claims) are the only entities entitled to GUC Trust Assets; it provides that "the GUC Trust Beneficiaries shall be the ***sole beneficiaries of the GUC Trust Distributable Assets and of the GUC Trust***."  (GUC Trust Agreement § 3.1(a) (emphasis added).)  As discussed, "GUC Trust Beneficiaries" are defined as holders of "Allowed General Unsecured Claims," which is defined in Recital F of the GUC Trust Agreement as being limited to Allowed or Disputed Claims as of March 2011.  All the consideration contemplated under the Proposed

Settlement constitutes GUC Trust Distributable Assets.  The Adjustment Shares (referred to as "Additional Shares" in the GUC Trust Agreement) are expressly defined as being part of the "GUC Trust Common Stock Assets" and "GUC Trust Securities Assets," which, in turn, comprise part of the overall universe of GUC Trust Distributable Assets.  (*Id*. Rec. E(i)–(ii).)  The Adjustment Shares can *only* be distributed to holders of Allowed General Unsecured Claims.

24.    To provide the Economic Loss Plaintiffs access to the Adjustment Shares, Wilmington Trust therefore seeks to allow the Proposed Class Claims as *Allowed General Unsecured Claims*—a legal impossibility given Wilmington Trust's legal position in the distribution Motion.  Pursuant to the Proposed Settlement, Wilmington Trust will "seek entry of an Estimation Order," which the Proposed Settlement defines as "an order of the Bankruptcy Court estimating Plaintiffs aggregate *Allowed General Unsecured Claims*."  (Proposed Settlement Agreement § 2.20 (emphasis added).)  Although Wilmington Trust asserts that—based on the "Proffered Evidence"—Economic Loss Plaintiffs' claims "could equal or exceed $77 billion," the parties have agreed to file an Estimation Motion estimating the "*allowed General Unsecured Claims* of Economic Loss Plaintiffs . . . in an amount that . . . could equal or exceed $10 billion, thus triggering the issuance of the maximum amount of the Adjustment Shares."  (9019 Mot. ¶ 42; Proposed Settlement Agreement § 6.1.1 (emphasis added).)  In short, Wilmington Trust has told this Court that Economic Loss Plaintiffs could have Allowed General Unsecured Claims and is actively seeking to allow such claims at no less than $10 billion.

25.    Wilmington Trust's "Proposed Settlement position" that Economic Loss Plaintiffs' *can* hold Allowed General Unsecured Claims directly contradicts Wilmington Trust's "distribution Motion position" that Economic Loss Plaintiffs *cannot* hold Allowed General Unsecured Claims or be GUC Trust Beneficiaries.  If Economic Loss Plaintiffs *cannot* hold

15

"Allowed General Unsecured Claims" and receive distributions of GUC Trust Assets, then there

is no legal basis to conclude otherwise in connection with the Proposed Settlement.

26.    Given this Court's obligation to safeguard the judicial process, it should not permit

Wilmington Trust to take conflicting legal positions.    Under the "well-established doctrine of

judicial estoppel," courts have both the power, and responsibility, to safeguard the judicial process.

*United States* v. *Watkins*, 623 F. Supp. 2d 514, 517 (S.D.N.Y. 2009) (internal citations omitted).

The Supreme Court itself has stated that the purpose of judicial estoppel is "to protect the integrity

of the judicial process by prohibiting parties from deliberately changing positions according to the

exigencies of the moment."    *New Hampshire* v. *Maine*, 532 U.S. 742, 749–750 (2001) (internal

citations and quotation marks omitted).[17]

27.    A party *cannot* take opposing stances in the same case based simply on the potential

benefit they hope to accrue at that specific time.    This threatens the very integrity of the judicial

process.    Indeed, "[i]n the Second Circuit, '[a] party puts the integrity of the judicial process at risk

not only when it knowingly lies *but when it takes a position in the short term knowing that it*

*may be on the verge of taking an inconsistent future action*.'"    *Embraer S.A.* v. *Dougherty Air*

*Tr., LLC*, 348 F. Supp. 3d 246, 256 (S.D.N.Y. 2018) (quoting *In re Adelphia Recovery Tr.*, 634

F.3d 678, 696 (2d Cir. 2011)) (emphasis added).    Further, "[a] court *cannot* ignore a party's

opportunistic use of inconsistent representations when one allegation serves an argument at one

stage of a case and the other serves an argument at a later stage."    *Intellivision* v. *Microsoft Corp.*,

---

[17]    *See also* Federal Practice & Procedure, Wright & Miller et al., § 4477 (2d ed.):

> Courts do not relish the prospect that an adept litigant may succeed in proving a proposition in one action,
> and then succeed in proving the opposite in a second.    At worst, successful assertion of inconsistent positions
> may impose multiple liability on an adversary or defeat a legitimate right of recovery.    At best, the judicial
> system is left exposed to an explicit demonstration of the frailties that remain in adversary litigation and
> adjudication.    The theories of judicial estoppel that reduce these risks do not draw directly from the fact of
> adjudication.    Instead, they focus on the fact of inconsistency itself.

784 F. Supp. 2d 356, 365 (S.D.N.Y. 2011), *aff'd*, 484 F. App'x 616 (2d Cir. 2012) (emphasis added) ("Permitting plaintiffs' opportunistic, last-minute about-face would have unfairly advantaged plaintiffs and imposed an unfair detriment on Microsoft, and would have created a risk of inconsistent results that could damage judicial integrity.").

28.     In fact, the Supreme Court held in *Pegram* v. *Herdrich* that "[j]udicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," precisely what Wilmington Trust seeks to do in the present Motion (phase one) and then in the Proposed Settlement (phase two).  530 U.S. 211, 228 n.8 (2000).

29.     Allowing Wilmington Trust to proceed would have grave repercussions and:

> "encourage[] parties to alter their positions . . . as they deem their litigation needs to change, leaving courts to unravel previously closed proceedings. Doing so would allow parties an opportunity to play fast and loose with the requirements of the bankruptcy process and inject an unacceptable level of uncertainty into its results—exactly the result that the doctrine of judicial estoppel is intended to avoid."

*Adelphia Recovery Tr.* v. *Goldman, Sachs & Co.*, 748 F.3d 110, 119–20 (2d Cir. 2014); *see also Wight* v. *BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits."); *In re CCT Commc'ns, Inc.*, 420 B.R. 160, 169 (Bankr. S.D.N.Y. 2009) ("The [judicial estoppel] doctrine serves two purposes: to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions, and to protect judicial integrity by avoiding the risk of inconsistent results in the two proceedings."); *City of San Diego* v. *Amoco Chemical Co., et al.*, No. 98-cv-00474, Dkt. No. 184, at *20 (S.D. Cal. July 9, 1999) ("[T]he court is concerned that the City is altering its theory to fit

the situation. The court cautions the City that it will enforce the doctrine of judicial estoppel to prevent a party from playing fast and loose with inconsistent factual or legal positions.").[18]

30.    Given Wilmington Trust's position that only those creditors that held Allowed or Disputed claims *as of March 2011* are capable of holding "Allowed General Unsecured Claims," then Wilmington Trust should immediately withdraw from the Proposed Settlement Agreement. On the other hand, if Wilmington Trust's position is that Economic Loss Plaintiffs potentially have $10 billion or more of "Allowed General Unsecured Claims," then it should withdraw the Motion, as it must maintain an appropriate reserve for such claims, as would be required under virtually any chapter 11 plan, and as is certainly required under the Plan and the GUC Trust Agreement.

---

[18] There is a long history of circuit courts recognizing these principles of judicial estoppel. *See Slater* v. *United States Steel Corp.*, 871 F.3d 1174, 1180–81 (11th Cir. 2017) ("Stated simply, the doctrine of judicial estoppel rests on the principle that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."); *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662–63 (7th Cir. 2010) ("Application of judicial estoppel seems particularly appropriate in the setting of this case, in which the parties were assisting the bankruptcy court in interpreting the meaning of the 2000 Plan."); *King* v. *Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998) ("Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation."); *Helfand* v. *Gerson*, 105 F.3d 530, 535 (9th Cir. 1997) (noting, in addressing inconsistent interpretations of a trust document, "The district court properly found these two positions to be incompatible interpretations of Mr. Helfand's testamentary intent. . . . The greater weight of federal authority, however, supports the position that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion. The integrity of the judicial process is threatened when a litigant is permitted to gain an advantage by the manipulative assertion of inconsistent positions, factual or legal."); *DeGuiseppe* v. *Vill. of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995) ("[C]ourts are under no compulsion to heed the shifting theories of chameleonic litigants."); *Am. Nat. Bank of Jacksonville* v. *Fed. Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) ("Judicial estoppel is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings."); *Scarano* v. *Cent. R. Co. of N. J.*, 203 F.2d 510, 512–13 (3d Cir. 1953) ("The rule we apply here need be and is no broader than this. A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention. Such use of inconsistent positions would most flagrantly exemplify that playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate. And this is more than affront to judicial dignity. For intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.").

**B.    Wilmington Trust's Inconsistent Legal Positions Regarding Its Ability To Make Distributions Before the Proposed Settlement Is Approved.**

31.    In seeking a "comfort order" to proceed with the Proposed Distribution, Wilmington Trust asserts that its actions are appropriate "given the [] current status of the settlement agreement entered into between the GUC Trust Administrator and a purported class of economic loss plaintiffs alleging a right to file late claims against the GUC Trust."  (Mot. ¶ 36.) However, the existence of the Proposed Settlement Agreement, which has not yet been approved or implemented, does not permit Wilmington Trust to avoid its obligations to reserve for Disputed General Unsecured Claims under the Plan and GUC Trust Agreement.  Further, and as discussed below, Wilmington Trust's contention is contradicted by the positions it has advanced in connection with the Proposed Settlement and therefore should be rejected by the Court.

**1.    The Plan and the GUC Trust Agreement Both Require Adequate Reserves for Disputed General Unsecured Claims.**

32.    As discussed, to be a GUC Trust Beneficiary, a creditor must hold either an Allowed General Unsecured Claim or a Disputed General Unsecured Claim that subsequently becomes Allowed.  Because Economic Loss Plaintiffs do not presently hold Allowed General Unsecured Claims, the only way in which they could one day hold Allowed General Unsecured Claims or become GUC Trust Beneficiaries is if they are presently considered to hold Disputed General Unsecured Claims.[19]

33.    Section 7.2 of the Plan requires Wilmington Trust to "withhold from the property to be distributed to holders of beneficial interests in the GUC Trust" an amount sufficient to pay

---

[19]    *See also* Rule 23 Motion ¶ 122 ("Under the Plan and the GUC Trust Agreement, the GUC Trust must treat each Ignition Switch Plaintiff and Non-Ignition Switch Plaintiff alike as contingent GUC Trust Beneficiaries holding ***disputed general unsecured claims that are subject to resolution per the Settlement Agreement***.") (emphasis added); *The Economic Loss Plaintiffs' Reply in Support of Rule 23(e) Motion* (Mar. 8, 2019)  [ECF No. 14463] ¶ 102 (same).

Disputed General Unsecured Claims in the event they later become Allowed General Unsecured Claims.  Section 5.5 of the GUC Trust Agreement requires the GUC Trust to "retain sufficient GUC Trust Distributable Assets as the GUC Trust Administrator shall determine . . . as would be distributable (I) to all holders of Disputed General Unsecured Claims at the time outstanding as if all Disputed General Unsecured Claims were allowed at the Maximum Amount. . . ." Accordingly, the GUC Trust is required to reserve for all "Disputed General Unsecured Claims" in the "Maximum Amount."[20]

34.    The purpose of the GUC Trust Agreement's reserve requirement is to ensure that holders of Disputed General Unsecured Claims that subsequently become Allowed General Unsecured Claims receive their Pro Rata Share (as defined in the Plan) of distributions in accordance with the distribution scheme set forth in the Plan.  The GUC Trust Agreement provides that if a Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, then Wilmington Trust is required to distribute the "pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved Allowed General Unsecured Claim would have received had such Resolved General Unsecured Claim been and Initial Allowed General Unsecured Claim."  (GUC Trust Agreement, § 5.3(a)(i).)  The GUC Trust Agreement further provides:

> For the avoidance of doubt, it is intended that the distributions to be made to holders of Resolved Allowed General Unsecured Claims in accordance with this Section 5.3 shall provide such holders, as nearly as possible, with the exact same amount of distributions . . . as if such holders had been holders of Initial Allowed General Unsecured Claims.

---

[20]    "Maximum Amount" is defined as "with respect to any Disputed General Unsecured Claim, (x) the amount agreed to by the Debtors and/or the GUC Trust Administrator and the holder of such claim . . .; (y) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Bankruptcy Code Section 502(c); or (z) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim filed by the holder of such claim, or in the case of unliquidated claims, the amount estimated by the Debtors and/or the GUC Trust Administrator with the approval of the GUC Trust Monitor. . . ."  GUC Trust Agreement § 1.1(kkk)(A).

(GUC Trust Agreement § 5.3(b).)

35.    Accordingly, if Wilmington Trust's position, as advanced in the 9019 Motion, is that Economic Loss Plaintiffs are capable of holding Allowed General Unsecured Claims and being GUC Trust Beneficiaries, then Wilmington Trust—pursuant to the terms of the Plan and the GUC Trust Agreement—must withdraw the Motion and maintain a disputed claims reserve for the Economic Loss Plaintiffs until such time as the Proposed Class Claims are resolved.

36.    Wilmington Trust's unsupported suggestion in the Motion that "the current status of the settlement agreement" somehow excuses its reserve obligations under the Plan and GUC Trust Agreement is baseless.  Wilmington Trust points to no provision in the Plan or the GUC Trust Agreement which provides that a not-yet-approved settlement agreement excuses Wilmington Trust from its obligations.  In fact, Wilmington Trust points to nothing at all in support of this contention.

37.    The Economic Loss Plaintiffs also reject Wilmington Trust's suggestion that an unapproved settlement agreement allows Wilmington Trust to distribute $320 million of GUC Trust Assets *as if* the Proposed Settlement was already approved.  (*See generally* Plaintiffs' Obj.) According to the Economic Loss Plaintiffs:  "[I]n the event that the Settlement Motions are not approved in their entirety, it would be highly prejudicial to the Economic Loss Plaintiffs to be deprived of any opportunity to obtain a pro rata recovery from assets currently held by the GUC Trust and Avoidance Action Trust."  (*Id.* ¶ 4.)  As the Economic Loss Plaintiffs recognize, if the Motion and Avoidance Trust Distribution Motion are approved "[t]he distributions planned under the Motions will render the GUC Trust and Avoidance Action Trust bereft of assets."  (*Id.* ¶ 17.)

38.    These concerns are amplified by the fact that Wilmington Trust has the right to terminate the Proposed Settlement Agreement if, among other things, a preliminary approval order

21

has not been entered by September 15, 2019.  (*See* Proposed Settlement Agreement § 10.2.)  The proposed Settlement Agreement provides that, upon termination, the parties' "respective interests, rights, remedies and defenses shall be fully restored without prejudice as if this Agreement . . . had never existed and the Parties shall be returned to their respective positions *status quo ante*."  (*Id.*)  But if Wilmington Trust is permitted to distribute most or all of the available assets in the GUC Trust or the Avoidance Trust now, then the Economic Loss Plaintiffs will not be restored to their pre-settlement position.  Ultimately, the Motion represents an impermissible end-run around this Court's approval of the Proposed Settlement by seeking to obtain ***now*** the primary advantage of the Proposed Settlement to the GUC Trust, *i.e.*, the ability to ring-fence its remaining assets for the exclusive benefit of current Unitholders rather than use those assets to satisfy the Proposed Class Claims.[21]

39.     Accordingly, the mere existence of the Proposed Settlement does not provide a basis for Wilmington Trust to violate the express terms of the GUC Trust Agreement and the Plan, which require Wilmington Trust to reserve from distribution the "Maximum Amount" of Economic Loss Plaintiffs' Claims.

### 2.     Wilmington Trust's Conflicting Position In Connection With the Proposed Settlement.

40.     Although Wilmington Trust states in the Motion that, "given the [] current status" of the Proposed Settlement, it is permissible to distribute $320 million of GUC Trust Assets on an ***expedited timeline***, it took a very different position in connection with the Proposed Settlement.

---

[21]    As set forth in New GM's Proposed Settlement Objection, the creation of two separate classes of Allowed General Unsecured Claims that recover from two different sources constitutes an impermissible plan modification and violates the Plan's requirement that holders of Allowed General Unsecured Claims receive *pro rata* distributions from the GUC Trust.

41.    Specifically, Wilmington Trust has repeatedly argued that the Proposed Settlement should be approved precisely to *avoid* further delaying GUC Trust distributions.  In 2018, in connection with seeking approval of a prior settlement agreement between the GUC Trust and the Economic Loss Plaintiffs, Wilmington Trust argued:[22]

> This Court should approve the Settlement because it will substantially reduce costs and the expenditure of resources, eliminate the risk of uncertain litigation outcomes, *and prevent further delay in distributions of remaining GUC Trust Assets*, without disturbing the recovery expectations of other creditors and Unitholders.

*Earlier this year*, in connection with seeking approval of the Proposed Settlement, Wilmington Trust again argued that approval of the Proposed Settlement was necessary because "protracted litigation" with the Economic Loss Plaintiffs would "*delay any further GUC Trust distributions*." (9019 Mot. ¶ 4 (emphasis added).)  That is, pursuant to the Motion, Wilmington Trust is seeking authorization (and the Court's approval) to distribute GUC Trust Assets on an expedited basis *before* the Proposed Settlement is approved and *regardless* of whether or how the Economic Loss Plaintiffs' Proposed Class Claims are ultimately resolved; whereas, pursuant to the 9019 Motion, Wilmington Trust is seeking Court approval of the Proposed Settlement *based on* Wilmington Trust's express desire to avoid further delaying distributions to Unitholders.  These legal positions cannot be reconciled and show that Wilmington Trust is playing "fast and loose" with the parties and the Court.  *Adelphia Recovery Tr.*, 748 F.3d at 119.

---

[22] *Motion of Motors Liquidation Company GUC Trust to Approve (I) the GUC Trust Administrator's Actions and (II) the Settlement Agreement By and Among the Signatory Plaintiffs and the GUC Trust Pursuant to Bankruptcy Code Sections 105, 363, and 1142 and Bankruptcy Rules 3002 and 9019 and to (III) Authorize the Reallocation of GUC Trust Assets* (May 3, 2018) [ECF No. 14293] ¶ 12 (emphasis added); *see also id* ¶ 83 (noting that the proposed settlement would "prevent[] delay in distributing remaining GUC Trust Assets").

23

**C.**     **Wilmington Trust's Inconsistent Legal Positions Regarding Class Certification Pursuant to a Rule 23(B)(1)(B) "Limited Fund" Theory.**

42.     According to Wilmington Trust, "[a]s of July 1, 2019, the GUC Trust continues to hold approximately $443,800,000 in reserve in respect of the potential unsecured claims of the defendants in the Term Loan Avoidance Action," which "is no longer necessary" in light of the AAT Settlement Agreement.  (Mot. ¶ 21, 23.)  After making catch-up distributions on the 502(h) Claim of approximately $68 million, the GUC Trust will have approximately $375 million in GUC Trust Distributable Assets **plus** an additional approximately $15 million in GUC Trust Distributable Assets that Wilmington Trust has historically reserved as a general contingency fund for remaining Disputed General Unsecured Claims, for an aggregate sum of $390 million in available GUC Trust Distributable Assets.  This $390 million in GUC Trust Distributable Assets can only be used for one of two purposes:  (1) maintaining a reserve for, and potentially making distributions on, the Proposed Class Claims, or (2) making further distributions to holders of Allowed General Unsecured Claims that have already received a recovery of approximately 30%. Wilmington Trust has been remarkably consistent in this regard:  whether by the Proposed Settlement or the present Motion, it has repeatedly and consistently **chosen** to attempt to distribute the remaining $390 million in GUC Trust Distributable Assets to current Unitholders to increase their recovery beyond the 30% already received.[23]  But as is now plainly clear, that $390 million **could be used**—and pursuant to the applicable *pro rata* distribution provisions in the Plan and

---

[23]    The only exception is Wilmington Trust's proposed use of $14 million to pay notice costs under the Proposed Settlement.  *See* 9019 Mot. ¶ 50.

GUC Trust Agreement *must be used*—to satisfy the Proposed Class Claims asserted by Economic Loss Plaintiffs.[24]

43.    Notwithstanding the existence of $390 million in available GUC Trust Distributable Assets, Wilmington Trust asks this Court to find—after it first gets approval to distribute $320 million of those assets to others—that the GUC Trust qualifies as a "limited fund." In Wilmington Trust's view, the *only* assets the Court should consider in addressing the quantum of the "limited fund" it proposes is the Adjustment Shares; it argues that the Court should *not consider* the other $390 million in assets that are plainly available to satisfy the Proposed Class Claims (if permitted and allowed).  Far from being a "classic limited fund" (Rule 23 Mot. ¶ 15), this is a classic "bait-and-switch" in which Wilmington Trust first seeks to dissipate nearly all its available assets only to later claim that its assets are limited and insufficient.

44.    As set forth in the Proposed Settlement Objection, under controlling Supreme Court precedent, the GUC Trust may not manufacture a Rule 23(b)(1)(B) limited fund—precisely what Wilmington Trust attempts to do here.  *See Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815 (1999).  In *Ortiz*, the Supreme Court found it "essential that the fund be shown to be limited independently of the agreement of the parties" and held that a fund can only be considered a "limited fund" if three characteristics are met:  (a) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims," (b) "the whole of the inadequate fund [is] to be devoted to the overwhelming claims," and (c) "the claimants identified by a common theory of recovery [are] treated equitably among themselves."  *Id.* at 838–839, 864.

---

[24]    If the Proposed Class Claims became Allowed General Unsecured Claims in the amount of $2.9 billion or less, the $320 million that Wilmington Trust seeks to distribute pursuant to the Motion will have been the only GUC Trust Assets available to satisfy such Allowed General Unsecured Claims.

45.    Approval of the Motion would confirm that Wilmington Trust could not avail itself of a "limited fund" class in connection with the Proposed Settlement.[25]  *First*, asking this Court's permission to distribute $320 million of available assets only to later claim "limited fund" status is precisely the type of "limited-by-agreement" arrangement that the Supreme Court struck down in *Ortiz*.  This Court could never make the "essential" finding that the fund was "limited independently of the agreement of the parties," if that party appeared before it only months earlier seeking permission to dissipate more than 80% of its available assets.  *Second,* Wilmington Trust will never be able to demonstrate that the limited fund was "set definitely at the maximum[]" after it previously sought to distribute $320 million to existing Unitholders.  *Third,* Wilmington Trust could never demonstrate that "the whole of the inadequate fund" is devoted to class members after it first sought permission to distribute $320 million to ***non-class members***.  Indeed, seeking to distribute $320 million to non-class members on an expedited basis now is entirely ***inconsistent*** with the very purpose of a "limited fund" class.  "The basic purpose of Rule 23(b)(1)(B) is to protect plaintiffs in situations where separate lawsuits might exhaust a defendant's resources . . . ." McLaughlin on Class Actions § 5.8 (15th ed. 2018).  Here, Wilmington Trust is seeking Court approval to exhaust its resources for the benefit of other non-class creditors, while simultaneously claiming that allowing Economic Loss Plaintiffs to opt out of the Proposed Settlement would risk exhausting the GUC Trust's limited resources.  Once again, these competing positions cannot be reconciled.

---

[25]    For the reasons set forth in the New GM's Proposed Settlement Objection, there is no basis to certify a "limited fund" class regardless of whether the Motion is approved or not.  For example: (i) the Economic Loss Plaintiffs do not allege any *liquidated* claims, resulting in a total amount that is entirely speculative; (ii) the "limited fund" is impermissibly shared among two separate classes with non-class members, and it is not made available to all potential creditors; and (iii) the Economic Loss Plaintiffs do not share a common theory of liability because the claims cover six recalls, five different causes of action, the laws of 51 jurisdictions, and 120 different vehicle models.

46.    The Proposed Distribution brings the many legal infirmities of the Proposed Settlement squarely into focus and, indeed, demonstrates the fundamental absurdity of the GUC Trust and Economic Loss Plaintiffs' assertion of a limited fund while Wilmington Trust ring-fences hundreds of millions of dollars of other assets for the sole benefit of existing Unitholders.  As set forth in the Proposed Settlement Objection, such machinations are clearly impermissible and amount to nothing more than an attempt to modify the *pro rata* distribution provisions in the substantially consummated Plan.  (*See* Proposed Settlement Obj. ¶ 151.)

**D.    The Court Should Not Give Wilmington Trust A "Comfort Order."**

47.    In 2016, aware of Economic Loss Plaintiffs' asserted claims, Wilmington Trust made a distribution of $112 million without seeking Court approval or instructions.  (*See GUC Trust Letter* (Oct. 26, 2016) [ECF No. 13780].)  Similarly, Wilmington Trust does not seek "instructions" in connection with its Section 502(h) Distribution Motion.

48.    Wilmington Trust believes, however, that it is "necessary, appropriate, and desirable to ask the Court at this time whether the actions the GUC Trust Administrator proposes to take in connection [with the Proposed Distribution] are permissible and appropriate."  (Mot. ¶ 36.)  Wilmington Trust's request for "a determination by the Court" that the Proposed Distribution is an "appropriate exercise of [Wilmington Trust's] rights, powers, and/or privileges" is improper.  (*Id.* at ¶ 6.)  Courts do not have jurisdiction to provide a generic "comfort order" to a trustee; rather, courts may provide appropriate instructions only where there is a dispute over the proper application of a trust document.  *See Peierls Family*, 59 A.3d at 478 (holding that instructions are "not appropriate when the trust agreement expressly authorizes the contemplated action [because] [s]uch a request consumes judicial resources unnecessarily and ***does not present a live dispute capable of resolution***") (emphasis added); RESTATEMENT (THIRD) OF TRUSTS § 71 cmt. d, (2007) ("Because of concern regarding burdens on the judicial system and unwarranted

costs and delays in trust administration, a trustee or beneficiary normally is not entitled to instructions with respect to the administration of a trust unless there is some reasonable doubt about the extent of the trustee's powers or duties or about proper interpretation of the trust provisions."); *In re Trusteeship Created by Am. Home Mortg. Inv. Tr. 2005-2*, 2014 WL 3858506, at *12 (S.D.N.Y. July 24, 2014) (noting that trustees may seek instruction "about how to resolve immediate and difficult issues of interpretation of governing documents").  Here, Wilmington Trust does not identify any dispute under the applicable provisions of the GUC Trust Agreement that warrants its request for instructions.

49.    In light of the numerous inconsistencies between Wilmington Trust's "distribution Motion positions" and its "Proposed Settlement positions," it is no surprise that it seeks guidance from this Court before proceeding.  To recap Wilmington Trust's various contradictory legal and factual positions:

- For purposes of the Motion, the Economic Loss Plaintiffs' failure to assert Proposed Class Claims before March 2011 prohibits the Economic Loss Plaintiffs from holding Allowed General Unsecured Claims, but for purposes of seeking approval of the Proposed Settlement, the ***same failure*** to assert Proposed Class Claims before March 2011 does not also prohibit the Economic Loss Plaintiffs from holding Allowed General Unsecured Claims.

- For purposes of the Motion, the Court should authorize an ***expedited*** distribution of GUC Trust Assets ***before*** the Proposed Settlement is approved by the Court, but for purposes of the Proposed Settlement, the "[c]ontinuation of protracted litigation" with the Economic Loss Plaintiffs "***will . . . delay any further GUC Trust distributions***" and therefore "[t]his Court should approve" the Proposed Settlement because resolution of Economic Loss Plaintiffs' Claims would "***prevent further delay in distributions of remaining GUC Trust Assets***."[26]

- For purposes of the Motion, the Court should authorize Wilmington Trust to distribute hundreds of millions of dollars to non-class members, which assets, pursuant to the Plan and the GUC Trust Agreement, must be reserved

---

[26]    9019 Mot. ¶¶ 4, 11 (emphasis added).

09-50026-mg    Doc 14586    Filed 08/05/19    Entered 08/05/19 15:30:47    Main Document
Pg 33 of 35

to potentially satisfy the Proposed Class Claims, but for purposes of the Proposed Settlement, the Court should find that the GUC Trust's only available assets are the Adjustment Shares and should prohibit class-members from opting out of the Proposed Settlement due to the risk that they might receive distributions from the GUC Trust and deplete its limited resources, which are purportedly insufficient to satisfy Economic Loss Plaintiffs' Claims.

50.     Ultimately, Wilmington Trust's request for instructions to resolve a not-yet-identified dispute or "difficult issue of interpretation" is simply a disguised request that the Court permit Wilmington Trust to take one legal position now in connection with the distribution Motion without jeopardizing Wilmington Trust's ability to take the complete opposite legal position in connection with the Proposed Settlement.  But whether the Plan and GUC Trust Agreement require the Economic Loss Plaintiffs to have asserted claims by March 2011 to be eligible to hold Allowed General Unsecured Claims is a binary issue:  the documents either require claims to have been asserted by March 2011 or they do not.  By seeking "instructions" from the Court, Wilmington Trust asks the Court to answer this binary question one way or the other, even though Wilmington Trust claims that the *plain language* of the Plan and GUC Trust Agreement require claims to have been filed by March 2011 and therefore there is no dispute.

51.     The Court should not issue a generic comfort order to bless Wilmington Trust's contradictory positions, and Wilmington Trust offers no basis on which the Court should provide such comfort.

## CONCLUSION

52.     This Court should follow applicable law, including binding precedent in the Second Circuit, to uphold the integrity of the legal process.  It should not permit Wilmington Trust to take conflicting legal and factual positions regarding the Plan and the GUC Trust Agreement.  Accordingly, Wilmington Trust should not be permitted to distribute $320 million of GUC Trust Assets on an expedited timeline based on one legal position concerning "Allowed General

29

Unsecured Claims" that categorically excludes the Economic Loss Plaintiffs, only to turn around and take the opposite legal position regarding "Allowed General Unsecured Claims" that categorically includes Economic Loss Plaintiffs when seeking to trigger the Adjustment Shares.

53.    New GM has a substantial interest in ensuring that Wilmington Trust takes a consistent legal position as to the interpretation of "Allowed General Unsecured Claims" in the GUC Trust Agreement, as well as which creditors are—and are not—capable of being GUC Trust Beneficiaries.  New GM's contingent obligation to issue Adjustment Shares is inextricably tied to how the Court enforces the terms that define "Allowed General Unsecured Claims," and who may qualify as a GUC Trust Beneficiary.  New GM further has an economic interest in ensuring that the Economic Loss Plaintiffs, to the extent they have valid claims, receive the maximum possible amount of distributions from the GUC Trust.  As discussed herein, the Motion has obvious implications with respect to the "limited fund" arguments advanced in connection with the Proposed Settlement, and ensuring maximum distributions on Allowed General Unsecured Claims also impacts New GM's potential liability for asserted successor liability claims in the MDL Action (as defined in the Rule 23 Motion).

WHEREFORE, for all of the reasons set forth herein New GM respectfully requests that this Court:  (a) deny the Motion and grant such other and further relief as the Court may deem just and proper; or (b) in the alternative, approve the Motion and authorize the distribution described therein but only on the express basis that Economic Loss Plaintiffs are not capable of holding Allowed General Unsecured Claims (as defined in the GUC Trust Agreement) because the Proposed Class Claims were neither Allowed nor Disputed as of March 2011.  New GM reserves all of its rights to object to, raise issues with, contest, or otherwise respond to the Motion, the Proposed Settlement, and any and all distributions or actions taken by the GUC Trust.  Nothing

herein is intended or shall be construed as a waiver or limitation of any of New GM's right or

remedies, all of which are fully preserved.


Dated:    August 5, 2019
          New York, New York

                                        /s/ Paul M. Basta
                                        Paul M. Basta
                                        Aidan Synnott
                                        Kyle J. Kimpler
                                        Sarah Harnett
                                        PAUL, WEISS, RIFKIND, WHARTON &
                                        GARRISON LLP
                                        1285 Avenue of the Americas
                                        New York, New York 10019
                                        Telephone:  (212) 373-3000
                                        Facsimile:  (212) 757-3990

                                        Arthur Steinberg
                                        Scott Davidson
                                        KING & SPALDING LLP
                                        1185 Avenue of the Americas
                                        New York, New York 10036
                                        Telephone:  (212) 556-2100
                                        Facsimile:  (212) 556-2222

                                        *Counsel for General Motors LLC*