UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | . | Case No. 09-50026-mg |
| IN RE: | . |  |
|  | . | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | . |  |
|  | . | One Bowling Green |
| Company, | . | New York, NY 10004 |
|  | . |  |
| Debtors. | . | Monday, August 12, 2019 |
|  | . | 10:09 a.m. |

. . . . . . . . . . . . . . .

   TRANSCRIPT OF MOTION OF MOTORS LIQUIDATION COMPANY AVOIDANCE
ACTION TRUST FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 106 AND
1142 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3020 APPROVING
   THE DISTRIBUTION PLAN TO THE AVOIDANCE ACTION TRUSTS
   BENEFICIARIES (CC: DOC# 14551, 14552, 14571, 14572, 14575,
14577, 14597, 14598); MOTION OF WILMINGTON TRUST COMPANY, AS
 GUC TRUST ADMINISTRATOR, FOR AN ORDER AUTHORIZING EXPEDITED
  DISTRIBUTION TO HOLDERS OF 502(h) CLAIMS. (CC: DOC# 14566,
14571, 14575, 14586, 14587, 14602); MOTION OF WILMINGTON TRUST
 COMPANY, AS GUC TRUST ADMINISTRATOR, FOR AN ORDER AUTHORIZING
  THE EXPEDITED PAYMENT OF EXCESS GUC DISTRIBUTABLE ASSETS
 PURSUANT TO SECTION 5.4 OF THE GUC TRUST AGREEMENT. (CC: DOC#
        14565, 14571, 14576, 14599, 14600)
       **BEFORE THE HONORABLE MARTIN GLENN**
       **UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

For Wilmington Trust        McDermott Will & Emery
Company as GUC Trust        By:  KRISTIN K. GOING, ESQ.
Administrator:              340 Madison Avenue
                           New York, NY 10173-1922
                           (212) 547-5429

APPEARANCES CONTINUED

Audio Operator:            Karen, ECR

Transcription Company:     Access Transcripts, LLC
                           517 Dell Road
                           Landing, NJ  07850
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
        transcript produced by transcription service.

2

APPEARANCES (Continued):

For General Motors, LLC: King & Spalding
                        By:  ARTHUR J. STEINBERG, ESQ.
                             SCOTT DAVIDSON, ESQ.
                        1185 Avenue of the Americas
                        New York, NY 10036-4003
                        (212) 556-2164

                        Paul Weiss Rifkind Wharton &
                        Garrison LLP
                        By:  KYLE J. KIMPLER, ESQ.
                             PAUL M. BASTA, ESQ.
                        1285 Avenue of the Americas
                        New York, NY 10019-6064

For Participating       Akin Gump Strauss Hauer & Feld LLP
Unitholders:            By: DANIEL GOLDEN, ESQ.
                        One Bryant Park
                        New York, NY 10036-6745
                        (212) 872-1000

For the Ignition Switch Brown Rudnick LLP
plaintiffs and certain  By: EDWARD S. WEISFELNER, ESQ.
non-Ignition Switch     7 Times Square
plaintiffs:             New York, NY 10036
                        (212) 209-4917

For JPMorgan Chase      Wachtell, Lipton, Rosen & Katz
Bank, N.A.:             By:  HAROLD S. NOVIKOFF, ESQ.
                        51 West 52nd Street
                        New York, NY 10019-6150
                        (212) 403-1000

For Export Development  Vedder Price
Canada:                 By:  MICHAEL L. SCHEIN, ESQ.
                        1633 Broadway, 31st Floor
                        New York, NY 10019
                        (212) 407-6920

For the Avoidance       Binder & Schwartz, LLP
Action Trust:           By:  NEIL BINDER, ESQ.
                             ERIC B. FISHER, ESQ.
                             LINDSAY BUSH, ESQ.
                        366 Madison Avenue, 6th Floor
                        New York, NY 10017
                        (212) 933-4551

3

APPEARANCES (Continued):

For the United States        U.S. Attorney Office, SDNY
of America:                  By: DAVID S. JONES, ESQ.
                             86 Chambers Street
                             New York, NY 10007
                             (212) 637-2739


TELEPHONIC APPEARANCES:

For the Ignition Switch      Stutzman Bromberg Esserman & Plifka
Plaintiffs:                  By: SANDER L. ESSERMAN, ESQ.
                             2323 Bryan Street, Suite 2200
                             Dallas, TX 75201-2689
                             (214) 969-4900



4

1          (Proceedings commence at 10:09 a.m.)

2          THE COURT:  All right.  Please be seated.  We're here

3  in Motors Liquidation Company, 09-50026.  I have all the

4  appearances in front of me.  We're just going to begin.

5          MS. GOING:  Good morning, Your Honor.  Kristin Going,

6  McDermott, Will & Emery on behalf of the GUC Trust.  Your

7  Honor, we filed an agenda for today's hearings on Friday for

8  the three motions, and I would propose that we go in that order

9  starting with the AAT's motion.  And if that's acceptable, I'll

10  cede the podium to Mr. Fisher.

11          THE COURT:  Sure.  Thank you.

12          MR. FISHER:  Good morning, Your Honor.  Eric Fisher

13  from Binder & Schwartz on behalf of the avoidance action trust.

14

15          Our trust, Your Honor, has one asset and it has one

16  job.  The only asset that our trust was entrusted with is the

17  term loan litigation against JPMorgan and that syndicate of

18  other term loan lenders, and our job is to maximize the value

19  of that litigation and then to distribute the proceeds of the

20  litigation to our trust beneficiaries.  Our trust agreement, in

21  Section 2.5, says that we're supposed to make that distribution

22  in a way that is, quote, "expeditious but orderly," closed

23  quote.

24          After all of our waterfall obligations are paid, the

25  beneficiaries of our trusts share 70 percent/30 percent.  70

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

5

1  percent of our distributions go to allowed general unsecured

2  claimholders, and 30 percent of our distributions go to the DIP

3  lenders.  There has been no objection whatsoever to the

4  distribution proposed to be made to the DIP lenders, to the 30

5  percent.  So I think to the extent there's any controversy --

6  and I'll explain why I don't really think there is -- it

7  relates to the distribution to be made to allowed unsecured

8  claimholders.

9         And I think it's important to point out that there's

10 been no objection filed to the plan of the -- of distribution

11 itself.  No one claims that the plan doesn't make sense,

12 doesn't comply with the confirmed plan, doesn't comply with the

13 trust agreement.  No one has objected to the mechanics or any

14 other facet of the distribution plan itself.  The only

15 objections really are an effort to delay the distribution and

16 to delay it in a manner that's potentially indefinite.

17        There were three responses filed to our motion to

18 have our distribution plan approved, an objection by the

19 economic loss plaintiffs, an objection by New GM, and a letter

20 from a pro se individual named Cheryl England.  From among

21 those three, Ms. England is the only allowed claimholder of our

22 trust.  And as I read her letter, she's not really objecting to

23 the plan of distribution.  She says that when people rush, they

24 tend to make mistakes and we should proceed cautiously.  So we

25 take that to heart, and I assure Your Honor that if our plan of

6

1  distribution is approved, we will try to proceed carefully and

2  avoid making mistakes.

3          So that brings us really to the objections of New GM

4  and to the economic loss plaintiffs.  New GM is not a

5  beneficiary of our trust, and New GM has no other interest in

6  our trust.  Their objection to our plan of distribution is

7  grounded in their opposition to the proposed settlement between

8  the GUC Trust and the economic loss plaintiffs.  We are not

9  parties to that settlement, and New GM will not suffer and does

10 not claim that they will suffer any injury if our distribution

11 plan is approved.  So for all those reasons, they both lack

12 standing and the objection is without merit, Your Honor.  Even

13 if they were to have standing to be heard.

14          With respect to the economic loss plaintiffs, they

15 too are not beneficiaries of our trust.  If their proposed

16 settlement with the GUC trust is ultimately approved, they

17 would have no right of recovery from the AAT.  That's one of

18 the terms of that proposed element.  Their objection instead is

19 grounded in a hypothetical scenario about what might happen in

20 some future event if their settlement is not approved and if

21 then a whole series of other events happen that results in them

22 having allowed unsecured claims at some unknowable point in the

23 future.  Your Honor, that kind of speculative, unknowable, and

24 indefinite delay to our distribution plan would be to the

25 severe detriment of our current known beneficiaries and does

7

1    not constitute a basis to delay our distribution plan.

2           Our case, the term loan litigation, was filed more

3    than ten years ago.  At the time it was filed, it was filed by

4    the unsecured creditors' committee.  And since these objections

5    would threaten to hold up the distributions to unsecured

6    creditors, I think it is worth keeping in mind that unsecured

7    creditors of our trust in particular have waited a very long

8    time for their distributions.  Our proposed plan complies in

9    all respects with the confirmed plan of reorganization with our

10   trust agreement.  There are no objections to particulars of our

11   distribution, plan and for all those reasons we think it should

12   be approved and that we should be allowed to make distributions

13   in an expeditious, orderly manner.

14           THE COURT:  Let me ask you a few questions,

15   Mr. Fisher.  There are no objections to the repayment of the

16   DIP lenders, from whom 30 percent is supposed to go, right?

17           MR. FISHER:  Correct.

18           THE COURT:  Okay.  And I would break the rest of your

19   motion down into two components, the 502(h) claims and then

20   what I would refer to as the excess distribution claims.

21           As to the 502(h) claims, which directly arise from

22   the settlement that I previously approved, as to wish there

23   were no objections, I'm inclined to approve the distribution to

24   the 502(h) claimants.  That's what I already approved.

25           As to the excess distributions, which would go to all

1  general allowed creditors, why shouldn't that distribution be

2  made by the AAT to the GUC Trust?  Because if I'm reading the

3  documents correctly, isn't it the AAT that proposes to make

4  those excess distributions?  101615

5            MR. FISHER:  So, Your Honor, we, the AAT, don't

6  really refer to those distributions as excess distributions.

7            THE COURT:  Well, the GUC Trust does, and that --

8            MR. FISHER:  Right, because we'd never made a

9  distribution --

10           THE COURT:  Correct.  But --

11           MR. FISHER:  -- because we've never had proceeds to

12 distribute.  The way our trust works with respect to allowed

13 unsecured claimholders is we distribute on a pro rata basis to

14 all allowed unsecured claimholders.  By virtue of Your Honor

15 having approved the settlement agreement, the 502(h) claimants

16 are allowed unsecured claimholders.  And I, of course, note and

17 agree that there were no objections to the allowance of their

18 502(h) claims at the time of settlement approval.  But the way

19 our trust document works is we make those distributions

20 directly to unsecured claimholders, not by the GUC Trust.

21           THE COURT:  Does the Court have the authority to

22 order that your distribution plan be modified to require that

23 the distributions other than to the 502(h) claimants be made to

24 the GUC Trust?

25           Look, the -- here's the issue from my standpoint, and

9

1    I guess when Ms. Goings argues the excess distribution motion.

2    Particularly in light of Judge Furman's recent ruling rejecting

3    the Boedeker conjoint analysis, it throws into serious question

4    whether the proposed settlement between the economic loss

5    plaintiffs and the GUC Trust can be approved.  That's not

6    before me today.

7         I've made clear at prior hearings, and no one has

8    really disputed this point, that when Judge Furman decides

9    issues relevant to both the proceedings in this court and in

10   the MDL, I have no intention of ruling on those same issues.

11   There is obviously a motion to withdraw the reference that's

12   pending before Judge Furman, which is for him to decide.  And I

13   know that there's a hearing before Judge -- a conference

14   scheduled before Judge Furman on Thursday.  There were requests

15   put this hearing off until after the conference.  I leave on

16   vacation tomorrow morning.  I asked whether the moving parties

17   to the motions today consented to the adjournment.  They

18   didn't, so we're going forward.

19        The -- let me put it this way.  There are a lot of

20   questions that -- assuming that the matters go forward in this

21   court, there are obviously important questions that are going

22   to have to be addressed, see what Judge Furman decides what

23   he's going to do and then what this Court is going to do.  And

24   I'm not inclined -- I'm not ready to rule at the moment, but

25   I'm not inclined to authorize distributions to all of the

10

1  general unsecured creditors beyond the 502(h) claims, which I

2  already approved as part of the settlement, until there's

3  greater clarity.

4         With that said, I don't see any reason for the AAT to

5  have to continue its existence.  It could wind down very

6  rapidly, you know, make the 502(h) -- pay the DIP lenders back,

7  make the 502(h) distributions, pay the balance of the funds

8  after whatever expenses you -- the AAT has to the GUC Trust.

9  And then, it's my plan to proceed.  Obviously, I -- with

10 respect to the proposed settlement, I had adjourned it all,

11 saying -- well, let me stop there.  That -- Ms. Goings, please

12 sit down.

13        MR. FISHER:  So, Your Honor, JUST with respect to the

14 economic loss plaintiffs, just to be clear about the avoidance

15 action trust, I'm aware of Judge Furman's decision, and I've

16 read it.  We are not parties to --

17        THE COURT:  I know that.

18        MR. FISHER:  -- settlement, and so I'm in no position

19 to express a view about it.

20        In terms of the notion of the AAT paying the proceeds

21 that would otherwise be available for distribution to allowed

22 unsecured claimholders to the GUC Trust --

23        THE COURT:  Go could from one pocket at Wilmington

24 Trust to another pocket at Wilmington Trust.

25        MR. FISHER:  Right.  So no party has suggested that,

11

1   and I have not had an opportunity to consider it.

2         THE COURT:  Well, I pored -- my clerks and I pored

3   over the underlying documents to see was there anything in the

4   AAT formation agreement or the GUC Trust agreement that would

5   somehow preclude me from directing that the funds be paid over

6   to the GUC Trust, and I couldn't find anything.

7         THE COURT:  The only subtlety that I'll point out,

8   which is just something that he would all need to consider in

9   considering this idea, is that the population of unsecured

10  beneficiaries who get distributions from the AAT is not

11  entirely coterminous with the GUC Trust.  And that's because

12  our distributions go to original allowed unsecured

13  claimholders.  Our interests in our trust have never been

14  tradable.  So the population of distributees from the GUC

15  Trust, because the MLTQU units are tradable, may be different

16  from -- in other words, it's --

17        THE COURT:  So what happened where people traded

18  their claims away and you say yours -- your group of

19  beneficiaries is different?

20        MR. FISHER:  People were not able to trade away their

21  interests in future distributions from the AAT.  I'm not saying

22  that that's not some issue that couldn't be worked through and

23  there'd be just two distributions schemes coming through our

24  trust.  I just pointed out it's something that --

25        THE COURT:  Okay.  All right.  That's fair.

12

1        MR. FISHER:  -- would need to be ironed out.

2        THE COURT:  Thanks, Mr Fisher.

3        Ms. Going.

4        MS. GOING:  Your Honor, Kristin Going on behalf of

5   the GUC Trust.  I just want to put a finer point on that issue

6   in the proposal that the Court has raised.  The GUC Trust makes

7   distributions to unitholders, and those are tradable.  The

8   units are tradable, and those go out through DTC.  The AAT

9   makes their distribution to the original general unsecured

10  population.  And as I understand it from conversations with the

11  AAT -- and I do not purport to be very versed in there AAT

12  agreement, but they are literally going to be making a

13  distribution to the original claimholders.  They are not, you

14  know, tradable.  Those are not securities.  So if that money

15  were to be turned over to the GUC Trust, we don't have a

16  mechanism and we don't -- I mean, that would also require kind

17  of wholesale amendments to the GUC Trust agreement because our

18  agreement only contemplates making distributions to unitholders

19  and not this population of general unsecured creditors,

20  under -- the original general unsecured creditors, I guess I

21  would say.  It's two separate and distinct populations

22        THE COURT:  That, I wasn't aware of.

23        Mr. Fisher, how much does the AAT -- assuming I grant

24  your motion, how much is the AAT going to distribute to general

25  unsecured creditors?  It's beyond the amount of -- it's excess

13

1   of the 502(h) claims, right?

2          MR. FISHER:  Well, the 502(h) claims, Your Honor, get

3   treated as allowed unsecured claims, and so the distribution to

4   them would be pari passu with all the other allowed unsecured

5   claimholders.  So we would have to base the distribution off of

6   the allowed claimholders as they stand as of the distribution

7   date.

8          THE COURT:  Yeah.  But --

9          MR. FISHER:  I think, Your Honor, the, the catchup

10  distribution to the 502(h) claimants, namely for 29 percent to

11  bring them on par with distributions that have been made thus

12  far, that's a distribution that does get made by the GUC Trust

13  because the GUC Trust has made all distributions to unsecured

14  creditors to this point in the case, and that's part of the GUC

15  Trust's distribution motion.  And so this distinction between

16  502(h) claimants and the excess distribution, I think is more

17  properly a distinction made with respect to the GUC trust.

18         We will have approximately -- I'm using very round

19  numbers -- so $100 million for distribution to allowed general

20  unsecured claimholders.  We're not in the claims allowance

21  business, so --

22         THE COURT:  I know.  How --

23         MR. FISHER:  So our trust agreement just says et the

24  records from the GUC trust and distribute to all allow general

25  unsecured claims as of that date, including the 502(h) claims.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1          THE COURT:  How much would have to be distributed by

2  the AAT to bring the 502(h) claimholders to equal amounts that

3  have already been distributed to unsecured creditors?

4          MR. FISHER:  Right.  So the AAT --

5          THE COURT:  I thought there was like $66 million.

6          MR. FISHER:  So this is helping to clarify, I think,

7  the terms.  To be brought current with distributions that have

8  been made to other unsecured creditors, the 502(h) claims have

9  to be distributed -- the 502(h) claimants need to get

10  approximately 29 percent of their allowed claim of $231

11  million.  That is a payment that would be made by the GUC

12  Trust.  That's where the catchup distribution comes from.

13  Because our trust has never made any distributions to any

14  creditors, we don't owe anyone catchup distribution.  We're

15  going to need to calculate the $100 million dollars across the

16  pool of allowed general unsecured claimants and then make the

17  AAT distribution.  So we don't owe creditors any money yet

18  because we've never made a distribution or performed that

19  calculation.

20          THE COURT:  Okay.

21          MR. FISHER:  I hope that clarifies.

22          THE COURT:  Just makes everything more complicated

23  than I thought it was.

24          Ms. Going, why don't you argue your motion.  I'm

25  going to give everybody a chance to respond to both of them at

1  the same time.

2        MS. GOING:  Your Honor, Kristin Going on behalf of

3  the GUC Trust, and this -- our first motion is, in fact, the

4  502(h) distribution motion, and this is what has been

5  characterized already as the "catchup payment."  And you are

6  correct.  It's $68 million, the purpose of which is to catch up

7  the term loan lenders to the 29 percent that has already been

8  paid to allowed unsecured claimholders.

9        The 502(h) motion is not asking Your Honor to approve

10 the 502(h) claim.  As you already indicated --

11        THE COURT:  I did.

12        MS. GOING:  -- that claim has already been approved

13 pursuant to the settlement agreement.  This motion is simply

14 regarding timing.  And the timing here is specific because

15 under the terms of the GUC Trust agreement --

16        THE COURT:  Quarterly.

17        MS. GOING:  That's right.  And one day difference.

18 The claim arose on July 1st because that's the date in which

19 the term loan lenders made their payment.  Had they made that

20 payment one day earlier on June 30th, we would not even be

21 making this motion, Your Honor, because we would have already

22 been in the process of preparing to make that distribution of

23 the catchup payment and also, you know, in addition,

24 distributing the units, the actual securities so that the term

25 loan lenders can receive any additional payments on account of

16

1  their newly allowed 502(h) claim.

2        So this motion, Your Honor, is simply about the

3  timing.  And if we did not bring this motion, then pursuant to

4  the terms of the GUC Trust agreement, we would be required to

5  make this distribution promptly after the close of this third

6  quarter, which would be sometime after October.

7        To the extent Your Honor has any questions simply

8  about the timing?

9        THE COURT:  Well, I -- as to the timing of the 502(h)

10 payments, I don't, in theory, have a problem to expediting

11 those payments, although what I would be inclined to do is, for

12 example, permit payments after September 1st -- well, September

13 2nd because of Labor Day, whatever the day after the Labor --

14 after Labor Day holiday is.  If somebody thinks they have the

15 ability to seek a stay from a district court, for example, to

16 whatever I wind up ordering, I don't want payments going out

17 tomorrow if there's -- you know, I don't see a point in keeping

18 it alive until October, but that's with respect to the 502(h)

19 payments.

20       With respect to the excess distributions, let me say

21 a couple things.  It could be years before there is finality to

22 a whole range of issues.  Judge Furman's recent summary

23 judgment decision applies to three states, but -- and I suppose

24 issues will be raised at the conference with Judge Furman.

25 I've already arranged for one of my law clerks to be able to

17

1   listen to that hearing.  So I don't know what -- I have no idea

2   what Judge Furman is going to do, what the various parties in

3   interest are going to argue before Judge Furman.  But, you

4   know, unless some court higher than this one orders otherwise,

5   I don't intend to keep hundreds of millions of dollars tied up

6   for years to come before there are further distributions to

7   allowed unsecured creditors.

8         Judge Furman's decision with respect to conjoint

9   analysis, it seems to me, changes the landscape greatly, both

10  in the MDL with respect to the economic loss claimants and in

11  this court with respect to the proposed settlement.  The

12  underpinning of that settlement here was the Boedeker conjoint

13  analysis.  It was on the basis of that that the economic loss

14  plaintiffs asserted that there was $77 billion in claims.  I'm

15  not deciding any issues today, but other than what I've said

16  all along, I'm not going to decide things that Judge Furman has

17  already decided.

18        I was going to say months ago, but maybe years ago

19  now.  I don't know.  When I urged the economic loss plaintiffs

20  and the GUC Trust to try and reach settlement, I at least

21  remember making some comment where you -- that I certainly

22  didn't want to be in a position of having to address a

23  disgorgement motion if claims of economic loss plaintiffs were

24  subsequently allowed and there was no money left to pay them,

25  and I am no more inclined to have that situation arise now than

1  I did when I first raised that issue.

2          I certainly didn't -- let me come back to questions I

3  asked Mr. Fisher.  And I hadn't focused on that there were two

4  populations of beneficiaries from the AAT versus the GUC Trust.

5  I would -- I'm not ruling yet, but my strong preference would

6  be if the result today or soon thereafter is that I approve the

7  payments to the DIP lenders, I approve the 502(h) payments but

8  reserve decision with respect to additional amounts, I would

9  hope that the AAT and the GUC Trust could find a way to enable

10 the AAT to pass that mantle to the GUC Trust.  I don't know how

11 complicated those accounting issues would be, but to have an

12 order that reflected, okay, there's no reason for the AAT to

13 remain in existence anymore.  The GUC Trust recognizes as to

14 the portion of funds that are going to come from the AAT to go

15 to general unsecured creditors.  It's one population who's

16 entitled to distributions there.  And then as to your excess

17 distribution motion, it's a different population.  That

18 shouldn't be an insurmountable problem.

19         Go ahead.

20         MS. GOING:  Your Honor -- well, on the AAT

21 distribution, if the AAT's distribution is approved, then there

22 would be nothing --

23         THE COURT:  Well, I'm only -- if I only approve it in

24 part, if I approve the portion where they make the 502(h) -- I

25 already approved that.  I permit them to make that distribution

19

1  and remaining funds go to the GUC trust.

2              MS. GOING:  But --

3              THE COURT:  And you all figure out how that would --

4  who has an entitlement to those funds.

5              MS. GOING:  Okay.  So I guess under what you're just

6  proposing now -- and I'm going to treat it somewhat as a

7  hypothetical because I'm not arguing on behalf of the AAT or

8  the term lenders or the other allowed unsecured creditors, but

9  I think what you're proposing highlights the fact that you just

10  said you've already allowed the 502(h) claims.

11             THE COURT:  Yes.

12             MS. GOING:  That's correct.  But the other

13  beneficiaries of the AAT trust, they have already also been

14  allowed general unsecured creditors.  So the idea that they

15  would somehow not be treated the same seems inequitable because

16  they're all -- they're just -- there are two groups that are

17  now allowed unsecured creditors.  And it would be withholding

18  money potentially indefinitely for individuals that don't even

19  have disputed claims.

20             THE COURT:  It isn't going to be indefinitely on my

21  watch.  It may be some other judge is going to conclude that.

22  It is not going to be indefinite.  But go ahead.

23             MS. GOING:  Okay.  But the AAT trust agreement

24  provided for a distribution mechanism and didn't have any

25  contingencies for a holdback.  It said when the claims are

20

1   allowed and the money comes in, they need to be paid.  And

2   similarly under the GUC Trust agreement, right, the GUC Trust

3   agreement was created and contemplated that there was going to

4   be a claims allowance process, and the terms of the GUC Trust

5   agreement set forth when the claims can be paid, which is once

6   they're allowed, and also provides for what needs to be

7   reserved for.  And that's disputed unsecured claims.  And I

8   understand Your Honor's concerns with the settlement --

9          THE COURT:  You entered into a settlement --

10          MS. GOING:  Your Honor, we --

11          THE COURT:  -- that was going to provide for some

12   unknown amount of additional class claims being allowed.  Okay.

13   The question remains whether that's going to be approved or

14   not.  If it's not approved, then it goes back to the drawing

15   board of the motion to allow late class claims.  So my

16   understanding of -- and I've -- you know, it's been a long time

17   since I've had to deal with this issue.  If a bankruptcy

18   court -- I have a motion to allow a late class claim.  If I

19   don't, there's authority -- I'm not saying it necessarily would

20   be what the court would do here -- that I would permit putative

21   class members to file individual claims, late claims.  Okay

22   And it may be that under Judge Furman's damages decisions,

23   those claims are not worth much, but who knows.  Okay.  But

24   they're not worth what the conjoint analysis would show.  Okay.

25   But that my recollection -- and I haven't gone -- I did not go

21

1 back to look at this, but just going by memory where the motion

2 to allow a late class claim -- to allow a class claim, forget

3 the late part, allow a class claim, if it's denied, you're

4 supposed to give the putative class members a chance to file

5 individual claims.

6    So if that's what happened -- I mean, certifying a

7 class if benefit of the bargain is no longer on the table, it

8 just struck me in reading Judge Furman's decision that it would

9 be very difficult for the economic loss plaintiffs to certify a

10 non opt-out class if everything hinged on whether somebody

11 could prove that, well, they had lost wages when they were

12 taking their car in for repair or whatever.  The class size may

13 be completely different.  Lots of things Judge Furman left in

14 his decision.  He wasn't going to go on and reach those others

15 decisions.  He set up a conference.  I don't know how that's

16 all going to shake down.  Okay.

17    But it's conceivable that I could say I deny leave to

18 file a late class claim, permit leave to file individual late

19 claims by economic loss plaintiffs, give them some -- how many

20 are going to file claims?  I don't know how many would actually

21 be able to meet the damages standards.  I don't -- that's all

22 speculative at this point.

23    MS. GOING:  And _Pioneer_.

24    THE COURT:  Completely speculative.  But you entered

25 into the settlement.

1          MS. GOING:  But, Your --

2          THE COURT:  So don't tell me that I ought to approve

3   excess distributions to all allowed claims when your motion to

4   approve a class settlement is pending.

5          MS. GOING:  But, Your Honor, that's exactly why you

6   should allow --

7          THE COURT:  That's exactly why I shouldn't.

8          MS. GOING:  But this is -- as you well know, this is

9   settlement agreement 3.0, right.  This is not new information.

10  The fact that the avoidance action trust had a reserve of --

11  let's call it $450 million and the fact that the avoidance

12  action trust and the term loan lenders were in active

13  settlement discussions and mediation, that was all happening

14  concurrently with our negotiations over the settlement

15  agreement, at least settlement agreement 2.0 and 3.0.

16         The economic loss plaintiffs could have asked for

17  some sort of holdback or some sort of protection or some sort

18  of anything with regards --

19         THE COURT:  That's what they're asking for now.

20         MS. GOING:  They're asking -- but it's not what they

21  negotiated for, and it wasn't part of the settlement.  The --

22         THE COURT:  Well, you negotiated two.

23         MS. GOING:  The --

24         THE COURT:  Don't tell me you -- this is an agreement

25  you signed.

23

1          MS. GOING:  We did, and we signed an agreement

2   whereby they were speaking solely -- and they were taking the

3   risk as to whether or not the accordion would be triggered and

4   they would not look to any of the remaining $450 million that

5   was sitting with the GUC Trust.  That's the agreement.

6          THE COURT:  Boy, you really -- you're making an

7   argument that I find highly questionable in light of the fact

8   that, you know, you negotiated a settlement, got rejected, you

9   went back and negotiated a second settlement.  It hasn't been

10  ruled on yet.

11         A key component of that settlement was that if it was

12  approved, the economic loss claimants agreed no -- they would

13  not seek disgorgement of any distributions to general allowed

14  unsecured claimholders.  Settlement doesn't get approved, there

15  is no agreement not to seek disgorgement.  There's no agreement

16  as to whether -- what the entitlement of late claimants would

17  be if late claims are allowed.  You supported that settlement.

18  You supported it the first time when there would've been no

19  disgorgement.  You supported it the second time when there was

20  no disgorgement.  And I find it highly questionable that you

21  would stand here now and say, in light of all that's happened,

22  I should just go ahead and permit the excess distributions so

23  there's essentially no money left in the GUC Trust if the

24  economic loss plaintiffs wind up with allowed claims.

25         MS. GOING:  But, Your Honor --

24

1          THE COURT:  That's what you're arguing.

2          MS. GOING:  -- because --

3          THE COURT:  Isn't it?

4          MS. GOING:  -- absent the settlement --

5          THE COURT:  Isn't that what you're arguing?

6          MS. GOING:  No, because absent the settlement

7  agreement, we would be back to arguing over whether or not they

8  even have a right to file a late claim, which we've always

9  asserted that they don't.

10          THE COURT:  Okay.  All right.  Let me hear from the

11  other side.

12          Go ahead.

13          MR. FISHER:  Thank you.

14          THE COURT:  I'm sorry.  Let me hear from other

15  counsel, but I'll give you another chance, Mr. Fisher.

16          MR. FISHER:  Thank you, Your Honor.

17          MR. GOLDEN:  Morning, Your Honor.  Daniel Golden,

18  Akin Gump Strauss Hauer & Feld.

19          THE COURT:  Good morning, Mr. Golden.

20          MR. GOLDEN:  Counsel for the participating

21  unitholders.

22          Your Honor, I am prepared to go forward and support

23  the joinder and reply that we filed in support of the GUC Trust

24  distribution motion.  But before I get there, I'd like to

25  address a couple of the items that Your Honor has raised this

25

1   morning.

2           Number one, I hope we have clarified the distinction

3   between the population of the AAT and the beneficiaries of the

4   GUC Trust.  I was actually heartened to hear that although you

5   think that there may be -- it may be years before there is

6   finality of all the issues at the MDL, it's not your intention

7   to, for years, hold up the distribution of hundreds of millions

8   of dollars that are in question today.

9           THE COURT:  A higher court may decide that, but I --

10          MR. GOLDEN:  I --

11          THE COURT:  -- that's not my intention.

12          MR. GOLDEN:  Appreciate that, Your Honor.  You did

13  make a statement, though, Your Honor, that you think that in

14  light of Judge Furman's decision, I think the words were "it

15  throws into question whether the proposed settlement can be

16  approved."

17          The GUC Trust is not a party to the MDL proceedings.

18  The unitholders of the GUC Trust are strangers to the MDL

19  proceedings.  So by way of example, there's a conference

20  scheduled for Thursday.  I don't know that we're invited to

21  attend.

22          THE COURT:  You'll probably be in the audience, but

23  you know --

24          MR. GOLDEN:  Presumably.  Your Honor, but as I read

25  Judge Furman's decision, it goes to the issue of the quantum of

26

1  damages that the economic loss plaintiffs may be able to

2  ultimately sustain.  Maybe they can sustain the burden of their

3  damages, maybe they can't.  But that issue is a risk that the

4  economic loss plaintiffs took on themselves in exchange for

5  entering into the settlement agreement with the GUC Trust, a

6  settlement agreement actively negotiated by the participating

7  unitholders and continues to be supported by the unitholders.

8       So just so that there's no ambiguity, what the GUC

9  Trust promised under that proposed settlement agreement was to

10 consent to the late filing of the putative class claims.  What

11 the economic loss plaintiffs agreed to was not to look to prior

12 distributions, not to look to current assets, have the

13 opportunity before Your Honor to estimate their claims, but

14 there's no guarantee that the estimate would have been in an

15 amount sufficient to trigger the accordion or the adjustment

16 shares.  That's their risk, not the GUC Trust's risk.

17      THE COURT:  GUC Trust risks that I decline to approve

18 a settlement that would require the court to certify a non

19 opt-out class.  Is that right?

20      MR. GOLDEN:  Yes.

21      THE COURT:  Okay.

22      MR. GOLDEN:  That is part and parcel and is an

23 integral part of the settlement.

24      THE COURT:  And in light of Judge Furman's ruling,

25 the issue is not before me today, I understand that.  But I

27

1  don't -- the path forward to certifying a non opt-out class in

2  light of Judge Furman's ruling is highly doubtful, highly

3  doubtful.  Possible.  There will be creative arguments, you

4  know, be raised.  But if I don't -- well, go ahead, Mr. Golden.

5           MR. GOLDEN:  Your Honor, I just -- I do want to

6  recount some recent history that may well bear on a

7  demonstration of the economic loss plaintiffs' motivation here.

8  Back in 2015, the GUC Trust announced, notified, sent a notice

9  that it intended to make a distribution, an access distribution

10 of approximately 135 million.  Judge Gerber was sitting --

11 presiding over the GM cases at that time.

12          The economic loss plaintiffs said, not so quick, we

13 don't think that distribution should be made.  There was an

14 evidentiary hearing.  Judge Gerber found that there would be

15 material prejudice to the unitholders if there was a stay of

16 that distribution and ordered the economic loss plaintiffs to

17 post a bond of $10.6 million in order to obtain a stay.

18          THE COURT:  When was that decision in relation to the

19 Second Circuit's Elliott decision --

20          MR. GOLDEN:  It was --

21          THE COURT:   -- when they vacated Judge Gerber's

22 ruling on --

23          MR. GOLDEN:  I think it was before.

24          THE COURT:  Yes, it was.

25          MR. GOLDEN:  I think --

1            THE COURT:  Absolutely before.

2            MR. GOLDEN:  I think it was before.

3            THE COURT:  Okay.  That -- you know, that's about --

4    the Second Circuit decided about the time I inherited the case.

5            MR. GOLDEN:  The economic loss plaintiffs declined to

6    post bond.  Distribution was made.

7            THE COURT:  Okay.  And the Second Circuit reversed

8    Judge Gerber, and with respect to this -- and vacated his

9    ruling with respect to equitable mootness.

10           MR. GOLDEN:  Yes.

11           THE COURT:  And that's why we're here.

12           MR. GOLDEN:  Yes.  In 2016, which I believe was after

13   the decision, a further proposed distribution was to be made by

14   the GUC Trust.  In that situation, I think it was $112 million

15   to be distributed.  The economic loss plaintiffs, for whatever

16   reason, decided not to do anything with respect to that

17   distribution, and that distribution was made.

18           The economic loss plaintiffs, represented by highly

19   qualified counsel, saw the lay of the land, saw what the Second

20   Circuit did, and decided that it was in its clients' best

21   interests to enter into a settlement agreement with the GUC

22   Trust.  All the settlement agreements have been largely the

23   same basic apparatus.

24           THE COURT:  You did a great job in protecting your

25   clients' interests in limiting any recovery to the adjustment

29

1  shares.

2           MR. GOLDEN:  And that's -- but don't, but it should

3  not be minimized that that was the prize that the economic loss

4  plaintiffs had their eyes on.

5           THE COURT:  Mr. Golden, let me say this.  What my

6  concern is, is that Judge Furman's decision has seriously

7  altered the landscape of this case in a way that's not

8  addressed in the briefing before me.  And I want -- it may be

9  that in a matter of weeks or a month or sometime soon, I agree

10 with you that excess distribution should be made to allowed

11 unsecured claimholders.  But I'm -- I've been struggling since

12 I got -- and, you know, Mr. Steinberg filed a copy -- you know,

13 New GM's counsel, whoever filed it.  I had already seen the --

14 I had already read the decision.  I've read it several times.

15 And without the benefit of the parties having a chance to

16 address what the impact of that decision here is, I've

17 obviously spent time thinking about it, a lot of time thinking

18 about it in a short period of time, but that's not the same as

19 giving the parties in interest with a chance to address it.

20           And when I made my statement about it's not my

21 intention to keep this -- quite a large amount of money tied up

22 indefinitely because it could go -- that could be a very long

23 period of time, I'm not prepared to rule today that the GUC

24 Trust should make those excess distributions.  That isn't

25 deciding the issue ultimately, but what I'm saying is on what I

30

1  have today, which has not -- you know, Mr. Weisfelner's

2  position is that, oh, you'll have plenty of time.  You know,

3  Judge Furman has <u>Daubert</u> motions, Judge Furman has other stuff.

4  All that -- you know, you can go forward, you can certify the

5  class.  You know, he hasn't decided the class issues before him

6  because I think Mr. Weisfelner acknowledged it could make a

7  difference between 29 million or 11 million class members.  And

8  I've been holding this because I -- I'm not prepared to have

9  notice go out to 29 million or 11 million without some greater

10 certainty about what's the class.  And I wasn't -- you know,

11 that's before Judge Furman.  Well, the conjoint analysis

12 decision, we'll see.  I think it has a substantial impact on

13 class, class size or any class, here or in the district court.

14        So I don't see it -- look, I don't see any reason to

15 hold off in the AAT paying the DIP lenders the 30 percent

16 they're owed or paying -- somebody paying the 502(h) claimants

17 to bring them to parity with distributions that have been made

18 to general unsecured creditors.  I didn't realize this

19 different population issue.  Okay.  But I'm just -- I don't --

20 do you want your clients to be faced with the potential for

21 disgorgement if money goes out to them?  You want to have to

22 argue that issue?

23        MR. GOLDEN:  Your Honor, I think if I asked my

24 clients, they would prefer getting the --

25        THE COURT:  Yeah, money in hand today.

31

1            MR. GOLDEN:  Absolutely.

2            THE COURT:  Sure.

3            MR. GOLDEN:  Absolutely, Your Honor.

4            THE COURT:  Well, I would rather not have to deal

5   with the issue of --

6            MR. GOLDEN:  Well, you just asked me about my

7   clients.

8            THE COURT:  Yeah.

9            MR. GOLDEN:  Okay.

10            THE COURT:  Take the money and run.

11            MR. GOLDEN:  Well, it's not "run."  They're real

12   institutions.

13            THE COURT:  I didn't mean it in that sense.  I --

14   okay.

15            MR. GOLDEN:  But I do want to point out, Your

16   Honor -- look, I'm not gonna beat a dead horse.  If Your Honor

17   is not prepared to rule today and to reserve on the issue of

18   the excess distributions, that's Your Honor's prerogative.  But

19   I do want to make sure that everybody understands that the risk

20   was on the economic loss plaintiffs.  So, for example, if the

21   settlement had been approved when we get to the settlement, but

22   that at the estimation proceeding, they could not convince the

23   court that they had claims somewhere in the neighborhood of

24   3 billion or more  -- let's remember --

25            THE COURT:  To get up to 35 billion.  I understand.

32

1          MR. GOLDEN:  To get to the triggering amount.

2          THE COURT:  Yeah, I understand.

3          MR. GOLDEN:  That would have been the end of the

4   story.  They would have given up their rights.  There was no

5   guarantee.  As Ms. Going said, they didn't bargain for an

6   escape hatch in that situation.  And frankly, I think if we had

7   to go back, if they -- if the settlement was disapproved --

8          THE COURT:  And maybe you'll persuade me of that in a

9   couple of weeks.  I don't know, you know.

10         MR. GOLDEN:  So one thing I would ask Your Honor is,

11  look, I understand that there are dueling courts with respect

12  to the issue.

13         THE COURT:  It's not dueling.  Judge Furman -- I --

14  you know, the one thing that nobody -- I don't -- you know, I

15  haven't heard disagreement from any of the counsel here that,

16  you know, I've been told these issues, this group of issues is

17  pending before Judge Furman, and I've said, look, I -- he's

18  going to rule on them, I'm not going to secondguess or review

19  things that he's done, and I haven't heard anybody raise

20  questions about that.  Maybe there'll be some arguments about

21  why the rule ought to be different in bankruptcy Court and the

22  district court.  You know -- look, he can withdraw the

23  reference and -- but whether he does or not, if he keeps -- if

24  it stays here, I still don't plan -- there may be -- I don't

25  know whether -- you know, it's not a final decision that he's

33

1  entered.  I don't know whether there can be further appellate

2  activity from his recent ruling or not.  There's conference

3  before him later this week.

4          MR. GOLDEN:  So two requests I would make, Your

5  Honor, is that we set a specific adjourn date for this motion.

6          THE COURT:  Well, we will.  We will.  I --

7          MR. GOLDEN:  And number two, I would request that we

8  deal today with the issue of GM's standing with respect to its

9  opposition to the distribution motion, that the standing issue

10 has infected these cases throughout.  Your Honor is the author

11 of a well-reasoned decision regarding GM's standing in

12 connection with the -- one of the prior versions.

13         THE COURT:  That's because you liked it, and they --

14 you know, but anyway.

15         MR. GOLDEN:  That's correct, but they didn't take an

16 appeal.  And that -- the facts haven't changed, and so that

17 every time that GUC Trust and the unitholders want to do

18 something, they are going to be confronted with GM's opposition

19 if there's any chance that what -- the relief that's being

20 sought may have some hypothetical conjectural impact on the

21 adjustment shares.

22         THE COURT:  For today -- let me just say, Mr. Golden,

23 that for today, I don't think where I am in my thinking would

24 change one bit whether New GM has standing or doesn't have

25 standing.

34

1          MR. GOLDEN:  Is that a ruling?

2          THE COURT:  No.  I -- it's how I'm feeling about it

3   for the moment.

4          MR. GOLDEN:  Your Honor, unless you have other

5   questions and we can get to a specific adjourn day time, I'm

6   prepared to cede the podium.

7          THE COURT:  All right.  I mean, probably what I would

8   do if we go in the route that I'm headed is ask you all to

9   confer and try and work out a briefing schedule, and you'll get

10  it on my calendar pretty quickly.  I mean, that's not -- you

11  know, I've let a long time go since the settlement motion was

12  on.  I adjourned it.  And, you know, I adjourned it because

13  there were issues -- important issues pending before Judge

14  Furman.  While he and I have said before, he and I have

15  communicated from time to time, we did not discuss in advance

16  what he was going to rule on, which motions, whatever.  So I

17  got a copy right after he ruled, but it's his decision.  We --

18  he and I didn't discuss it, but it has an impact here.

19         So I mean -- what I'd like to try and do is deal with

20  those issues -- well, as to the DIP lenders and the 502(h).

21  502(h), I've already decided.  I want to find a way for those

22  distributions to be made.  I would like to find a way that the

23  AAT doesn't have to stay in existence if it's not necessary for

24  it to do that, but it may Not be.  Okay.

25         And then as to the other issues, you know, I mean

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

1  some of this may be guided by what happens before Judge Furman

2  on Thursday.  I don't know.  I -- you know, I've told you that

3  I've arranged to have one of my law clerks listen in to the

4  hearing.  So whether it -- there's any rulings or not, I don't

5  know, but at least I will be in -- I won't be in town.  I'm

6  out -- I leave on vacation tomorrow.

7          Okay.  Let me hear from other counsel.

8          MR. GOLDEN:  Thank you, Your Honor.

9          MR. NOVIKOFF:  Morning, Your Honor.  Harold Novikoff,

10  Wachtell, Lipton, Rosen & Katz, for JPMorgan Chase Bank, N.A.

11          Your Honor, I'm going to be very brief because I just

12  heard you to say decided the 502(h) issue, which is really what

13  I'm here to talk about, and I appreciate Your Honor's ruling on

14  that.  I think I understood Your Honor to say you would like to

15  delay any distribution on that until after September 2nd.

16          THE COURT:  I -- look, I don't -- you know, I'm

17  leaving on vacation tomorrow morning.  I don't want to suddenly

18  find a stay motion on my docket while I'm in an airplane in a

19  race to -- you know, I want to allow enough time if

20  somebody --I haven't entered in order.  I don't have a stay

21  motion.  It's denied in advanced.  If somebody wants to make a

22  stay motion, they're gonna have to go to the district court to

23  get it.  Okay.  But I want to, at least, provide enough time

24  that if there is going to be a stay motion, somebody can go to

25  the district court to ask for it.

36

1           MR. NOVIKOFF:  Okay.  Your Honor, I understand Your

2   Honor's position.

3           THE COURT:  And it just seemed to me that given this

4   is the 12th, you know, September 3rd is the day after Labor

5   Day, something like that.

6           MR. NOVIKOFF:  But could I seek a minor clarification

7   on that --

8           THE COURT:  Go ahead.  Sure.

9           MR. NOVIKOFF:  -- which is, the GUC Trust needs to go

10  through a process before it can send out the money to the term

11  lenders.  It needs to -- my understanding is they want to send

12  a letter out, get account information, et cetera, and they need

13  that information in hand before they could send anything out.

14  Could I ask that they be permitted at least to start that

15  process before the 2nd?

16          THE COURT:  Absolutely.  I just don't want the

17  distributions made until, you know, September 3rd.  I'm

18  using -- I picked a number that would give -- if somebody's

19  going to try and get a stay from another court, they've got

20  enough time to do that.  I think all of the -- I'm saying

21  I've -- I think I've already approved the 502(h), and I don't

22  see a reason to have to wait until October for those

23  distributions to be made.  Okay.  So please go ahead, figure it

24  all out, but don't make the distributions until -- if September

25  3rd is the day after Labor Day.  You know, if somebody's going

37

1  to seek a stay from the district court, I wouldn't advise

2  waiting until Labor Day weekend to ask for it.

3          MR. NOVIKOFF:  Thank you, Your Honor.

4          THE COURT:  Okay.

5          MS. GOING:  Your Honor, we would be happy to submit a

6  revised order specifying September 3rd or September 4th if

7  you'd like us to do that today.

8          THE COURT:  Okay.  I really would -- what I -- let me

9  hear from others, and then we'll talk some more.

10          Go ahead, Mr. Weisfelner.

11          MR. WEISFELNER:  Your Honor, Ed Weisfelner, Brown

12  Rudnick, on behalf of the plaintiffs.  Judge, it's not my

13  intention to snatch defeat from the jaws of victory, but I do

14  want to speak briefly, and in particular as to the alternative

15  form of relief that we sought in our papers.

16          Your Honor, I want to start by agreeing that Judge

17  Furman's decision presents, in our view, an inflection point in

18  this case at a minimum.  And I think it's an inflection point

19  that we and the other parties in this court can and should take

20  advantage of.  But let me just run through my argument and then

21  get to the specific requests that I have.

22          Your Honor, the settlement agreement that reference

23  has been made to is something that we, the plaintiffs, continue

24  to support.  Your Honor knows that it was designed from the GUC

25  Trust's and beneficiaries' perspective to avoid:  number one, a

1  challenge to their remaining assets; number two, avoid

2  disgorgement on past distributions; and number three, avoid

3  further litigation expense and risks.  Now the motion that the

4  GUC Trust has filed seeks to change the status quo by removing

5  the biggest risk to the beneficiaries that led to the

6  settlement agreement in the first place by having the remaining

7  assets distributed early and without an adjudication of the

8  settlement agreement they entered into.

9          Now what also concerns us, Judge, quite frankly, is

10  that in the settlement agreement itself, the GUC Trust reserved

11  to itself a unilateral right to pull the plug on the settlement

12  agreement as early as mid-September.  And what I didn't hear

13  Ms. Going tell you is that they're not going to rely on that

14  mid-September provision that gives them the unilateral right to

15  yank the agreement.  There was also a meet-and-confer

16  obligation in the settlement agreement that specifically

17  anticipated the decision by Judge Furman, which has happened.

18  We were then supposed to meet and confer within five days of

19  that decision to see where we go from here.

20          THE COURT:  Have you done that yet?

21          MR. WEISFELNER:  Well, I had something of a meet and

22  confer with Mr. Golden, but I haven't heard from Ms. Going, and

23  I don't know if that's because she was in the middle of her

24  move from one firm to the other, but it didn't take place.

25          We understand the GUC Trust's reliance on provisions

39

1  of the plan, the GUC Trust agreement, all that good stuff, but
2  what I think that alliance misses is the facts on the ground
3  subsequently.  You know, they rely on the provisions that say
4  only allowed claims as with dates certain or only disputed
5  claims data as of a date certain are their beneficiaries, the
6  only people entitled to a distribution.  What that reliance
7  ignores is the reality that Old GM knowingly sold cars with
8  serious safety defects.

9         THE COURT:  This part, you can spare me.  I mean, I'm
10  going to let -- letting you make your argument.  I'm very
11  mindful of that.

12         MR. WEISFELNER:  Gotcha.  My only point is that the
13  courts have already determined that the plaintiffs' due process
14  rights were violated with respect to the plan, with respect to
15  the bar date.  I think that extends to their ability to rely on
16  trust documents that will predicate it on certain assumptions
17  that turned out not to be true and before there was an
18  adjudication of a violation of our due process rights.

19         THE COURT:  Well, although I -- I would note, I think
20  this is correct.  The Second Circuit vacated the equitable
21  mootness ruling but hasn't decided whether the -- whether it's
22  equitably moot.  They vacated the ruling.

23         MR. WEISFELNER:  I agree, Judge.  I agree.  But let's
24  assume for the moment that the GUC Trust and its beneficiaries
25  continue to support the settlement agreement.  And look, I

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

40

1 know, as well if not better than anybody else, that the

2 settlement agreement has been years in the making, and we're on

3 a third iteration.  I want to focus on the settlement agreement

4 itself because I think Your Honor put your finger on it.

5       The settlement agreement really -- what it boils down

6 to is in two different parts.  The first question that it

7 raises is the court's ability to acknowledge a late claim,

8 either on a classwide basis or on an individual basis, through

9 the facts and circumstances of this case when married up

10 against the Pioneer factors allow for an allowance of a late

11 claim.

12      The second part of the analysis is the settlement

13 that we've entered into, where we forego any entitlement to

14 claw back existing proceedings.  We end up litigation.  We take

15 the risk of the estimation of our claims.  It's that portion of

16 the settlement agreement that had all sorts of Rule 23

17 implications that raise the ire of New General Motors on

18 whether or not you can enter into a settlement that affects

19 absentee members of the class without compliance with their

20 version of what will Rule 23 required.  But --

21      THE COURT:  Well, let me just -- let me interrupt.  I

22 mean, the -- and I may be wrong and get no parties have had a

23 chance to brief this before me, but it -- the underpinning of

24 the settlement is a limited fund 23(b)(1) class.  The limited

25 fund hinged on getting above $35 billion.

41

1            MR. WEISFELNER:  Correct.

2            THE COURT:  And that's been thrown into substantial

3 doubt.

4            MR. WEISFELNER:  Correct.  I understand.

5            THE COURT:  That's saying it generously, frankly.

6            MR. WEISFELNER:  Sure.  But again, putting that

7 element of the settlement agreement to the side, assume the

8 settlement agreement falls apart for any reason including the

9 fact that Ms. Going decides to pull the plug in the middle of

10 September.  My point is that what appeared to be

11 non-controversial but for the <u>Pioneer</u> defenses that they had

12 raised historically is whether or not the remedy for denial of

13 due process with regard to the bar date is the ability to file

14 a claim, putting aside the equitable mootness question for the

15 nons.  My point is that if our claims are allowed on a

16 classwide basis, individually, there then have to be a

17 determination --

18            THE COURT:  When you say individual, allowed on

19 the -- it's -- if I don't allow -- if I allow late claims but

20 don't permit a late class claim, I -- is -- and I haven't --

21 I'm not ruling out any of this, but my recollection is I'm

22 supposed to give putative --

23            MR. WEISFELNER:  An opportunity for people to file,

24 sure.

25            THE COURT:  -- class members an opportunity to file

42

1  claims.

2       MR. WEISFELNER:  And my point is at that point, we'd

3  be into a claims --

4       THE COURT:  A nightmare.

5       MR. WEISFELNER:  -- objection process or claim

6  estimation process.  And, Your Honor, you're right.  The

7  Boedeker report, which took a beating in front of Judge Furman,

8  said there were $77 billion worth of potential damages.  Just

9  so that Your Honor is clear, as when and if we get to a

10 determination in the bankruptcy court as to the value of those

11 claims, it's not going to be the discredited Boedeker report

12 that we were rely on.  We have backup as to what the damages

13 are.  But here's the important -- final point that I want to

14 make.  Seventy-seven billion, big number.  Less than two

15 billion, a fraction of that number.  Why do I talk about less

16 than two billion?

17      THE COURT:  That's what they need to get above 35.

18      MR. WEISFELNER:  No.

19      THE COURT:  No?

20      MR. WEISFELNER:  The two billion, less than two

21 billion, is significant because if the class or the individuals

22 ever convince Your Honor that they have claims -- and I forgot

23 the exact number, somewhere between a billion and

24 three-quarters and two billion, if that's the allowed amount of

25 the claim, it will never trigger the accordion.  But guess

43

 1  what?  On a catchup theory, we eat every dime that's left in

 2  the GUC Trust in order to get to the same 30 percent that

 3  everyone else has gotten.  So the target of 77 was relevant in

 4  terms of the accordion feature.  A two billion or less target

 5  is relevant to sucking up the entirety of the GUC Trust

 6  distribution.

 7          THE COURT:  And New GM would be very happy, you know.

 8  You can --

 9          MR. WEISFELNER:  GM would be very happy.  You're

10  right, Your Honor.  And it's not my job nor intent to make New

11  GM happy, but sometimes it is what it is.

12          Your Honor, I also think it's important that the GUC

13  Trust and beneficiaries' current position is inconsistent with

14  the position that they took in the motion to approve the

15  settlement agreement, where they urged Your Honor to get on to

16  resolving the settlement agreement as quickly as possible and

17  get to estimation so they could make distributions out of the

18  GUC Trust.  The clear implication is we can't make any further

19  distributions, having entered into the settlement agreement,

20  until Your Honor adjudicates the settlement agreement.  And

21  now, they're taking a completely different tact.

22          Your Honor, I want to get to Judge Furman's decision

23  and the second form of relief that we sought in our responsive

24  papers.

25          We asked, first of all, to adjourn the distribution

44

1  motion until this Court could adjudicate the settlement

2  agreement.  I understand Your Honor's concern, and I understand

3  the GUC Trust and beneficiaries' concern that their

4  distribution's not being held up forever.  I don't know what's

5  going to happen with regard to their right to pull the plug in

6  the middle of September and make the settlement agreement, in

7  effect, moot.  The -- but the second thing that we asked the

8  Court to consider was an adjournment of these motions pending

9  court-ordered mediation.  And I say that because, again, I

10  think we're at an inflection point.  The decision on New GM's

11  summary judgment does, I suggest to Your Honor, require that

12  everyone go back to their corners and figure out what their

13  risk/rewards are in ongoing litigation.  I'm not in a position

14  to concede that the decision in any way is case dispositive.

15  And frankly, Your Honor's view of the impact of Judge Furman's

16  decision on the whole notion of conjoint analysis, with all due

17  respect, I think is wrong.

18          I think the problem that Judge Furman identified with

19  regard to the Boedeker report comes down to a simple fact.  He

20  wanted market value to be determinative of the difference

21  between the price at which the cars were sold and the price at

22  which the cars would have been sold if the known defect were

23  known to all of the parties.  And the missing link, as far as

24  Furman's concerned, based on my reading and I'm no expert, is

25  that we didn't have any indication of the number of cars that

45

1  Old GM would have sold at the discounted price that the

2  plaintiffs would have been willing to buy the defective car.

3       Now, frankly, Your Honor, in my own mind, I see a

4  disconnect because what we do know as a matter of fact is that

5  Old GM knew in 2005, 2006, 2007, up until 2009, that it was

6  selling cars with a serious safety defect.  It's already

7  entered into a resolution of its criminal liability and paid

8  quite a big fine.  My point is, I think if we're looking for

9  the number of cars that Old GM was prepared to sell with a

10 known defect at a slightly reduced cost, well that reduced cost

11 is the damages that it was willing to incur down the road.  It

12 took the risk.

13      THE COURT:  Mr. Weisfelner, I've had no communication

14 with Judge Furman other than seeing -- reading his decision,

15 but he just -- he granted summary judgment.  He didn't just

16 grant a <u>Daubert</u> motion and say, you're going to have to come up

17 with a new damage theory.

18      MR. WEISFELNER:  I --

19      THE COURT:  He granted summary judgment for New GM.

20      MR. WEISFELNER:  Yes, he did in three bellwether

21 cases, but it's not conclusive or determinative as to where

22 he's going to go from here on the remaining issues in the case

23 or the application of his summary judgment decision beyond the

24 bellwether.  Your Honor, there's also -- I know Your Honor saw

25 it because you read it multiple times, like we all did, the

46

1 judge's own commentary that on the motion for summary judgment

2 relative to the conjoint analysis, this was a, quote, "close

3 call."  Among the options that are available to the

4 plaintiffs -- and it'll be someone else's call, not mine -- is

5 a motion for reconsideration, is a request for an interlocutory

6 appeal.

7 There are lots of, for lack of better term, "balls that are up

8 in the air."

9          THE COURT:  I agree.

10          MR. WEISFELNER:  Your Honor knows that Judge Furman

11 expects the plaintiffs and New GM to be available in a chambers

12 conference.  Your Honor mentioned that to Mr. Golden.

13 Mr. Golden indicated to Your Honor, we don't know if we're

14 invited, but Your Honor noted that they're more likely to be in

15 the audience at some point.  I just want to attempt to wrap

16 this all up, wrap it all up in the perspective of everyone

17 that's got an incentive to participate in the settlement.

18          And rather than rely on an invitation being made at

19 the conference, Your Honor has the ability, in connection with

20 my request in my papers, for mandatory mediation.  And when I

21 look at this from the perspective of the GUC Trust

22 beneficiaries and the timing of distribution, mediation doesn't

23 have to take 120 days like Judge Swain ordered in Puerto Rico

24 that we're all dealing with currently.  Mediation could be 30

25 days.  It could be 60 days.  And mediation isn't a gun to

47

1   someone's head.  If you don't like the way the mediation's

2   going, the mediation results in an impasse.  But given where we

3   are today, given the incentives that the GUC Trust

4   beneficiaries had to avoiding years of additional litigation

5   and risk to their current anticipated distribution, let alone

6   their prior distribution, given New GM's exposure to

7   potentially $1 billion worth of new stock if we can overcome,

8   if we can overcome the summary judgment decision, not to

9   mention all the exposure that New GM continues to have in

10  remaining claims at the MDL level, given our incentive after

11  years of waiting and, unlike the beneficiaries, without getting

12  any interim distributions along the way and suffering our own

13  legal expenses, whereas everyone else is getting paid for what

14  they do here and what they had been doing over the years, we

15  have every incentive in the mediation to want to see, within a

16  30/60-day period, can we all align our respective interests in

17  light of the inflection point we've reached.

18          THE COURT:  Let me ask you a couple of questions,

19  Mr. Weisfelner.  Do you object to the AAT's payment to the DIP

20  lenders?

21          MR. WEISFELNER:  No.

22          THE COURT:  Do you object to the 502(h) payments?

23          MR. WEISFELNER:  Your Honor, I'm inclined to say let

24  it go for the following reason.  It is, at best, a catchup

25  payment to the same percentage everyone else has got.  We can

48

1  likewise get to a catchup to the same level.  The problem is we

2  eat all the remaining assets after that.  So in terms of

3  balancing the prejudices and because they anticipated a --

4        THE COURT:  I already approved the 502.  You didn't

5  object to that.

6        MR. WEISFELNER:  I was going to say, and because

7  they -- well, I didn't object to it in reliance --

8        THE COURT:  You were in the courtroom.

9        MR. WEISFELNER:  I don't know that I was.

10        THE COURT:  You were.  You were.

11        MR. WEISFELNER:  Okay.

12        THE COURT:  You were definitely here.

13        MR. WEISFELNER:  Your Honor --

14        THE COURT:  I -- you know, you're not forgettable.

15        MR. WEISFELNER:  Well, the 502(h) payments --

16        THE COURT:  You sat quietly unusually, but --

17        MR. WEISFELNER:  I think we were sort of staring at

18  you for the most part, but I think, Your Honor, the point is --

19        THE COURT:  You've never hesitated to object when you

20  have an objection.

21        MR. GOLDEN:  Your Honor, I think the 502(h) payment

22  does not present anywhere near the potential prejudice that the

23  excess distribution or the early distribution that the GUC

24  Trust itself wants to make to our ability to get to a result

25  that gives us some recompense for the injuries that we believe

49

1  we've suffered and can prove, can prove in the bankruptcy court

2  if Your Honor ever gets around estimating a claim, individual

3  or class, and in the MDL.  So, Your Honor, for all those

4  reasons, while I appreciate that we're going to take a period

5  of time before we come back and --

6          THE COURT:  Only a little time.

7          MR. GOLDEN:  Only a little time.  I wonder whether or

8  not we'd all be better off if the GUC Trust and Mr. Golden's

9  clients were told that, you're going to spend the time in a

10 mediation involving New GM that you want to invite yourself to

11 Judge Furman's courtroom, where we could advise Judge Furman

12 that they're now part of the mediation.  I think Judge Furman

13 would --

14         THE COURT:  I'm going to be in Montana.

15         MR. WEISFELNER:  What's that?

16         THE COURT:  I'm going to be in Montana.

17         MR. WEISFELNER:  And that's where I wish I was going

18 to be on Thursday, but I will be in front of Judge Furman.  I

19 think we'll all be in the courtroom.  Having everyone marching

20 to chambers as mediation parties, as directed by Your Honor, I

21 think would be a major benefit that the entire process could

22 benefit from.

23         THE COURT:  Thank you, Mr. Weisfelner.

24         MR. WEISFELNER:  Thank you.

25         PA2:  Good morning, Your Honor.  Kyle Kimpler from

50

1  Paul Weiss on behalf of New GM.  And first, let me just

2  apologize to the Court.  I'm recovering from a little bit of a

3  cold.  I don't always sound this bad.

4       Your Honor, I'm going to be very brief, two minutes.

5  I have a couple of points to make, and then if you want to ask

6  any questions, that'd be great.

7       First, New GM does not object to the distribution to

8  the DIP lenders or the distribution on the 502(h) claim.  We

9  are here because -- and I think the Court --

10       THE COURT:  Do you have standing?

11       MR. KIMPLER:  We believe we do have standing, and let

12  me tell you why.  We're here because we believe, and I think

13  the Court picked up on this earlier, that what's really going

14  on here is not all that different than what was going to go on

15  under the proposed settlement.  The idea under the proposed

16  settlement was let's take all of the assets that currently

17  exist in the GUC Trust, let's send them over to the

18  unitholders.  Let's leave the plaintiffs looking only to New

19  GM.  Last year, in your decision on class certification, you

20  found that that was something we had standing in.

21       What's going on, the motions before you today

22  accomplish the same thing.  Let's take all of the money in the

23  GUC Trust and send it to the unitholders, and if the settlement

24  falls apart or the plaintiffs need to look for a recovery, they

25  can look to New GM for the adjustment shares.  The issues are

1  the exact same.  It's how do you look at allowed unsecured

2  claims.  Last year, when you found that we did have standing,

3  the question was can you allow a class claim that has not been

4  certified.  The question today is, can you allow a claim if it

5  wasn't filed in March 2011.  So the issue is the same.  The

6  purpose of what they're doing is the same, to leave the

7  plaintiffs looking to New GM for any recovery.  So yes, we

8  think we do have standing and -- for the same reasons you found

9  last year.

10        Your Honor, I wanted to make just three quick points.

11  First, as we said a lot in our objections, we believe that the

12  only basis in the motions was reliance on a  position that

13  unless a claim was filed in -- by March of 2011, it is not

14  possible to have an allowed claim.  It is not possible to be a

15  GUC Trust beneficiary.  We believe they are still sticking to

16  that position.  It's in their reply papers.  We've heard again

17  here today.  If there's not a settlement, you can never be a

18  GUC Trust beneficiary.

19        THE COURT:  They can if I allow late claims.

20        MR. KIMPLER:  So if there's a question over that

21  issue, if it's not clear, then it's a binary outcome.  Either

22  you have to have asserted a claim by 2011, in which case the

23  proposed settlement can not work, or if you can because Your

24  Honor can allow it -- and we know that they want to allow them

25  to file late claims -- then you should reserve for the claims.

52

1  We believe they are taking fundamentally inconsistent legal

2  positions, and it's not because one of them is just tied up in

3  a settlement.  They're asking you to enter two orders, an order

4  today which you indicated you're not likely to order, but to

5  allow the money to go out because you can't hold claims, and

6  then an order later on in an estimation trial that says, yes,

7  you can hold claims.  We believe those cannot be reconciled.

8          The last point, Your Honor, I want to make very

9  quickly is we saw in the GUC Trust reply paper and again here

10 today that there is a desire to go forward with settlement, the

11 proposed settlement.  As Mr. Weisfelner noted, there is a

12 provision in that settlement that says if Judge Furman were to

13 issue a ruling, the parties would meet and confer and think

14 about how it impacts the settlement.  But apparently without

15 that, they have decided to still go forward.  And I think you

16 heard from Mr. Golden that, of course, they want to go forward

17 because in their view, all the risks is on Mr. Weisfelner's

18 side.  The problem with that, Your Honor, is that to certify

19 the classes under a settlement theory, under Rule 23(e), you're

20 going to have to find that it is not just reasonable to the GUC

21 Trust but that it is fair and equitable to the class members.

22 As you've noted, the likelihood that the plaintiffs can meet

23 the threshold so that they could get recovery under that

24 settlement is in serious question.

25          THE COURT:  Well, whether or not they can meet the

53

1  threshold -- how do I certify a non opt-out class if there is

2  no common issue about damages?

3          MR. KIMPLER:  Absolutely.

4          THE COURT:  It's not even a question of --

5          MR. KIMPLER:  It's not --

6          THE COURT:  That's without regard to the $35 billion

7  figure.

8          MR. KIMPLER:  Correct.  It's not just Rule 23(b).

9  It's 23(a)(2).  There have to be common issues.  If all we're

10  talking about is how much did it cost, how much lost wages did

11  you have -- lose when you had to go get repaired, those are

12  probably not susceptible to common proof.

13          The other thing that we would say is when you read

14  the settlement papers, they make much to do about how the GUC

15  Trust have studied the proffered evidence.  That proffered

16  evidence has now been thrown into question --

17          THE COURT:  Spare me that argument.  Okay.  That's --

18          MR. KIMPLER:  So we're just -- we are uncertain right

19  now if they are going forward with the settlements, and if they

20  are, you know, how they are sticking to -- remember, the

21  settlement requires the GUC Trust to seek an estimation order

22  that finds $10 billion of claims.  What we've heard today is

23  that they're still going to do that notwithstanding the

24  opinions.

25          Your Honor, so that was the only points I wanted to

54

1  make, and if you have any questions, I'm happy to address them.

2          THE COURT:  Thank you.

3          MR. KIMPLER:  Actually, Your Honor -- I'm sorry.  You

4  mentioned earlier that you wanted to have some supplemental

5  briefing sometime in the future.  At least from my perspective,

6  I wasn't quite clear what that was intended to cover.  And I

7  can leave that for later in the hearing if you'd prefer.

8          THE COURT:  Okay.  Thank you.

9          MR. KIMPLER:  Thank you, Your Honor.

10          THE COURT:  Ms. Going.

11          MS. GOING:  Your Honor, Kristin Going on behalf of

12  the GUC Trust.  I have three short replies.

13          First, I won't keep anyone in suspense, and I'm happy

14  to put on the record that the GUC trust is not exercising its

15  termination right under the settlement agreement on September

16  15th.  We fully intend to proceed with the settlement agreement

17  right now.

18          As for the meet and confer, I would be delighted to

19  meet and confer as soon as the economic loss plaintiffs have a

20  path forward and understand what it is that that they are going

21  to do.  But as I understand it, they don't have such a path.

22          THE COURT:  So there's a hearing -- there's a

23  conference scheduled before Judge Furman.  It's his decision.

24          MS. GOING:  Right.

25          THE COURT:  It's -- whether you agree with it or

55

1  disagree with it, it's a remarkable, in my view, carefully

2  crafted opinion.  He may be right, he may be wrong.  Obviously,

3  parties disagree.  But it's a very careful, carefully done

4  opinion.  And, you know, either he'll change his view or a

5  higher court above him will, at some point, change it.  But

6  I'm -- you call it meet and confer or mediation, I --

7          MS. GOING:  Well, Your Honor, those are two --

8          THE COURT:  Just stop a second.  I'm not ordering

9  mediation.  I hope that the parties will engage again.  I think

10 you all need -- I don't know what position the economic loss

11 plaintiffs will take with Judge Furman this week and whether

12 they're going to say they need more time to figure out what

13 they want to do.  But you know, there, there's a conference

14 scheduled.  I don't plan to keep millions or even hundreds of

15 millions of dollars held hostage until here -- you know, from

16 here until there is a final, final, final resolution of the

17 issues.  I'm not prepared to see the money go out today for

18 excess distributions.

19         I want the DIP lenders repaid.  I want the 502(h)

20 claims paid to equalize their distribution with amounts that

21 have been paid in the past.  I would like for the AAT and the

22 GUC Trust to find a way for the GUC Trust to take on

23 recognizing two -- maybe it's not possible.  I don't know.  But

24 I wasn't aware that -- it didn't dawn on me that they were

25 separate populations of parties entitled further distributions.

56

1          It seems to me that keeping requiring the AAT to

2   remain in existence for -- you know, is -- should be

3   unnecessary.  Wilmington Trust is the trustee of both trusts.

4   Am I right about that?

5          MS. GOING:  Yes, Your Honor.

6          THE COURT:  Okay.  Different capacities, but it's the

7   same trustee.  Okay.  There's gotta be a way to solve that

8   issue.

9          I -- this is what I want to happen.  I want you all

10  to work out a briefing schedule, including New GM.  I'm not

11  deciding the standing issue.  They'll file it in -- you know,

12  they'll file a brief anyway.  It wouldn't -- frankly, the

13  comment I made earlier, I think I would be at the same point

14  whether New GM has standing or doesn't have standing at this

15  point.

16         I hope you'll go back to mediation.  It's part of

17  figuring out the path forward.  If you can't, we're going to

18  go -- you know, if you don't come up with some other proposed

19  resolution, I will decide claims.  Okay.

20         MS. GOING:  Your Honor, I have one last --

21         THE COURT:  Go ahead.

22         MS. GOING:  -- point just on New GM's standing.  I

23  would ask that you rule on that issue after the briefing is

24  fine, but there's a real concern now that we are down to this

25  last pot of money, right, that anyone and everyone can come out

57

1  of the woodwork and start raising issues and objecting to

2  whatever the GUC Trust is trying to do in terms of making these

3  final distributions.  We are -- I mean we've been in a winddown

4  situation, right, since 2011, but there has to be, you know,

5  some sort of protection that we are not going to be fending off

6  anyone and everyone who wants to come before Your Honor to

7  object to any distributions that the GUC Trust is trying to

8  make.

9          THE COURT:  I'm not ruling on standing today.  Is

10 that clear?

11         MS. GOING:  Thank you.

12         THE COURT:  One way or the other.

13         Mr. Fisher.

14         MR. FISHER:  Your Honor, this is more by way of

15 clarification than argument.

16         THE COURT:  Sure.

17         MR. FISHER:  It's just with respect to the

18 distribution on account of the 502(h) claims, the objective is

19 to, of course, treat those claims such that those creditors

20 catch up to and are treated the same as other allowed unsecured

21 creditors.  That would require the catchup distribution from

22 the GUC Trust on or about September 3rd or whatever the Court's

23 order provides.  The AAT then, it would -- if it were ordered

24 to make the distribution to the DIP lenders and it's, of

25 course, been confirmed that there is no objection to that

58

1  distribution --

2          THE COURT:  There were no objections to repaying the

3  DIP lenders.

4          MR. FISHER:  Right.  So the AAT cannot make a

5  distribution to the 502(h) claimants ahead of any other

6  unsecured creditors because then they would be getting treated

7  favorably.  And I don't think anyone is asking for the AAT to

8  make a distribution to 502(h) claimants to the exclusion of

9  other unsecured creditors.  I just wanted to be explicit and

10 clear about that.

11         THE COURT:  Well, here's what -- the orders -- the

12 proposed orders that were submitted don't work for me.  I want

13 an order that directs the payment of the DIP lenders.  It can

14 be a separate order, and maybe it should be a separate order in

15 case there are -- no one's complaining about -- no one's

16 objecting to the payment -- repayment -- the payment of 30

17 percent to the DIP lenders.  A separate order that should deal

18 with payment of the 502(h) claimants with language that makes

19 clear that their distributions are to be brought equal to the

20 distributions that have been made to unsecured creditors.

21         I would like for you, if possible, to deal with the

22 balance of the funds so that they could go to the GUC Trust.

23 And I understand there are two different pools of -- two

24 different populations with inarguable entitlement to them.  See

25 whether you can work that out in such a way that -- because

1  it's the same trustee -- that you can deal with the language

2  that will recognize, yes, there are two different entitlements,

3  but that -- if I understand you correctly, Mr. Fisher, because

4  of the two different populations, there are some of your

5  beneficiaries who have not received distributions that would

6  equalize them to the GUC Trust beneficiaries.  Is that correct?

7           MR. FISHER:  No, Your Honor, our distributions would

8  be on top of the 29 percent that has been received by all

9  allowed unsecured --

10          THE COURT:  That's what I don't want to happen.  I

11  want that money above the 29 percent to be held.  My preference

12  is that the GUC Trust hold it, that the order reflect that

13  the -- there may be different entitlement above that, but I

14  don't don't see a reason why the AAT should have to stay in

15  existence to do that.

16          MR. FISHER:  And my only suggestion in that regard,

17  Your Honor, is that the distribution on account of the DIP

18  lenders is very straightforward.  Distribution by the GUC Trust

19  on account of the 502(h) claims to bring those claims current

20  to the 29 percent is very straight forward.  I understand the

21  efficiency impetus behind Your Honor's recommendation that the

22  AAT find a way to turn the proceeds over to the GUC Trust and

23  allow for a single trust to make all distributions going

24  forward, even if there are two different populations.  And I

25  think that that just requires some fresh thinking and working

60

1  through trust documents to figure out what the cost benefits of

2  that truly are.  And I wouldn't want that to hold up any of the

3  other --

4           THE COURT:  No, that's fine.  I went through the

5  trust -- I went through all these documents to see if there was

6  some impediment to my saying, put the money in -- I didn't

7  realize -- maybe I should have realized that there were two

8  separate populations of beneficiaries.  I didn't see that part.

9  Okay.  I looked to see whether there was something in the

10 organic documents that would prevent me from directing, give

11 the rest of the money to the GUC Trust to hold.  And maybe it

12 isn't such a big deal.  I'm trying to minimize the burden and

13 the expense going forward.

14          Okay.  What I would like you to do is see whether you

15 can work that out.  If you can agree, put it in the form of a

16 proposed order to do it.  If you can't --

17          MS. GOING:  And I would --

18          THE COURT:  Go ahead, Ms. Going.

19          MS. GOING:  --  just say, Your Honor, we're more than

20 happy to have those discussions, but just to expectations,

21 that's going to take a week or more for us to go through the

22 documents and try and come up with a solution, in terms of

23 alerting the Court.

24          THE COURT:  You're not saying that -- do the payments

25 to the 502(h) claims have to wait or no?

61

1          MS. GOING:  No.  I was strictly speaking to this

2   notion of coming up with a proposed order to --

3          THE COURT:  That's fine because I wasn't going to let

4   the money go in any event.

5          MS. GOING:  Right.  Right.  So --

6          THE COURT:  The fact -- I'm away until August 20th.

7   Hopefully, by then, you can find the -- provide me with the

8   orders, Mr. Fisher, that will approve the payment to the DIP

9   lenders that will authorize -- and I guess this has to come

10  from you, Ms. Going --

11         MS. GOING:  That's right.

12         THE COURT:  -- authorize the payments to the 502(h)

13  claimants.

14         MS. GOING:  We will do that today.

15         THE COURT:  And I'm reserving decision as to what

16  happens to the balance.

17         Try and agree on a briefing schedule.  That includes

18  New GM.  I will -- you can -- if you want to address the

19  standing issue again, address the standing issue again to make

20  it fresh in my mind.  I'm aware of the standing issue, but you

21  can incorporate prior arguments if you want from a prior

22  decision.

23         MS. GOING:  And that briefing schedule, the briefing

24  will be on the impact of the Furman decision as it relates to

25  the --

62

1            THE COURT:  And I think you'll see what happens.

2            MS. GOING:  -- excess distribution.

3            THE COURT:  You know, Thursday may have some bearing

4    on that.

5            MS. GOING:  Sure.

6            THE COURT:  Okay.  And you all can get a date from

7    Deanna, my courtroom deputy, for further hearing on it, but

8    that may be impacted -- I think you ought to wait until after

9    Thursday until the path forward before Judge Furman is clear.

10           Okay.  And, look, I -- the Second Circuit vacated

11   Judge Gerber's mootness ruling.  It did not conclude that it

12   was not moot.  It vacated the mootness ruling.  There are -- I

13   think there are arguments that can be made on all sides -- I

14   think there's more than two sides -- as to whether or not, in

15   spite of the history that's occurred, that the Court could

16   determine equitable mootness applies.  Are the issues different

17   with respect to disgorgement than they are with respect to the

18   balance of the assets in the GUC Trust?  Creditors'

19   expectations fit into the mootness analysis, but it's been

20   certainly, since the Second Circuit's _Elliott_ decision, anybody

21   who's traded claims has to have been aware that there was a

22   risk that late claims motions would be made.  They would be

23   allowed on a class basis or an individual basis.  So I think

24   creditor expectations, you know, arguments can be made on both

25   sides about it.

63

1          So if, hypothetically, the court concludes, yeah, I'm

2    going to permit late claims, I'm not going to permit late class

3    claims, I'm going to allow -- set a period of time for economic

4    loss plaintiffs to file individual claims, and then I can't

5    imagine how many you're going to file.  It can be lots, it can

6    be a small number, I don't know.  And then, they'll have to be

7    resolved.  You can -- you know, the GUC Trust will object to

8    them or not.  I don't know.

9          That path forward is very uncertain.  And frankly,

10   what it -- and I think everybody is at risk.  I think New GM is

11   at risk because the accordion shares are still very much

12   potentially at play.  Maybe they think they've hit a home, you

13   know, a home run with Judge Furman's decision, maybe a double

14   or triple or, you know, or it may get reversed or whatever.

15   But it's still at risk.  You know, their calculation may be

16   it's not a billion dollars at risk, but it's still a

17   substantial risk, and they ought to come to the table in trying

18   to resolve the economic loss claims in this court.

19         Let me ask Mr. Steinberg or Mr. Basta a question

20   in -- and I don't know what you want to -- this deals with the

21   personal injury/wrongful death claims.  And I know you've

22   provided me with status letters.

23         Go ahead.  Whoever wants to address the issue.

24   You've provided me with status letters indicating that New GM

25   had settled most of the personal injury/wrongful death claims.

64

1  I don't know -- there was nothing in any of those letters that

2  suggested that any of that was -- you know, nothing that

3  (indiscernible) was coming from the GUC Trust.  I assumed New

4  GM was paying that.  It hasn't affected where New GM stands in

5  terms of the amount of allowed claims at this point.

6           Go ahead.

7           MR. KIMPLER:  Good afternoon -- or good morning, Your

8  Honor.  It's Kyle Kimpler again from Paul Weiss.

9           THE COURT:  You've got five minutes in the morning

10 left.

11          MR. KIMPLER:  I'll be done in that.

12          THE COURT:  Yeah, it's okay.

13          MR. KIMPLER:  Your Honor, you are correct.  The

14 settlements have been with New GM money.  They do not count

15 towards allowed unsecured claims.  We also always try to get

16 releases for the GUC Trust.  As far as numbers go, I believe we

17 were here the first time, Paul Weiss, before you about a year

18 and a half ago.  At that time, there were approximately --

19          THE COURT:  Is it that long?  Gosh.

20          MR. KIMPLER:  -- there were approximately 700

21 personal injury claims on this docket.  We believe today that

22 we have settled 625 or so.  There are about 80, 85 claims

23 remaining.  We believe all of those claims were filed well

24 after the January 2017 deadline set by this Court.  I believe

25 they're all represented by the Lisa Norman firm.

1          THE COURT:  Is there any further effort being made to

2  resolve those?

3          MR. KIMPLER:  Your Honor, for many of them, and I

4  think for most, New GM has no information about those claims,

5  and so we have not been able to validate them.

6          THE COURT:  Ask.

7          MR. KIMPLER:  I would have to -- Your Honor, in

8  fairness, I would have to check with our MDL counsel on the

9  communications.  I don't know.

10         THE COURT:  Okay.  Thank you.

11         MR. KIMPLER:  Thank you.

12         THE COURT:  All right.  Anybody else want to be

13  heard?

14         MR. FISHER:  Your Honor, I'm sorry to keep rising.

15         THE COURT:  No, go ahead, Mr. Fisher.

16         MR. FISHER:  It's just that the -- in terms of

17  finding the most efficient way for the GUC Trust and the AAT to

18  make distributions to unsecured creditors, it occurs to me even

19  just sitting here that there are also tax implications that

20  need to be thought through.  That may take some time.  It's of

21  course very important to both trusts, their respective tax

22  treatment.  It might require applications to the IRS to ensure

23  that that wouldn't affect the tax treatment, which is all to

24  say that I think it's optimistic to think that this is

25  something we could do in a week or two.  I certainly, on behalf

66

1  of --

2        THE COURT:  Well, what would have happened if I

3  granted the motions today?

4        MR. FISHER:  We would then have proceeded to make

5  distributions as quickly as possible.  And once we succeeded in

6  distributing all of the cash, that process, in and of itself,

7  does take some time.  We would've been in a position to start

8  winding down our trust.

9        THE COURT:  What about the tax issues?

10       MR. FISHER:  The tax -- we have been recognized by

11 the IRS as a liquidating trust, and so we need to ensure that

12 we don't do anything that would in any way jeopardize that

13 status such that the proceeds received by the trust would be

14 taxable.  That's not my area of expertise, but I know it's a

15 very sensitive, obviously, and important consideration.

16       THE COURT:  Mr. Fisher, I'm very happy to have you

17 appear before me on behalf of the AAT.  And if it is not

18 feasibly to promptly wind down the AAT trust by transferring

19 the money to the GUC -- the remaining funds to the GUC Trust,

20 so be it.  My goal is very simple.  I am trying to simplify the

21 path forward.  If I'm making it more complicated, I won't do

22 it, but I just --

23       MR. FISHER:  Your Honor, we certainly share that

24 goal, and we'll work with the GUC trust to explore what modes

25 are available for us to achieve exactly that objective.

67

1          THE COURT:  So we're clear, what I'm going to get for

2  now is an order permitting the payment to the DIP lenders and

3  order permitting the payment to the 502(h) claims to bring them

4  to the 29 percent.  And decision as to any further

5  distributions are reserved.

6          And as to -- let me ask.  Mr. Weisfelner, do you

7  intend to appeal an order providing for distribution to the DIP

8  lenders, the 502(h) claimants?

9          MR. WEISFELNER:  My intention is irrelevant.  I'd

10  have to confer with co-leads.  My guess is that there'll be no

11  appeal.

12          THE COURT:  All right.  Well, then I can't resolve

13  it today.  Let's have distributions pursuant to the orders may

14  be made on or after September 3rd.  Okay.  So if there is going

15  to be an appeal, don't wait until Labor Day to file it.  The

16  same for New GM, although I think New GM indicated it didn't

17  object to either of those.  So it's really the economic loss

18  plaintiffs.

19          MR. WEISFELNER:  I understand, Your Honor.

20          THE COURT:  Mr. Weisfelner --

21          MR. WEISFELNER:  I will endeavor to get an answer --

22          THE COURT:  -- if you can, in the next day or two,

23  work out that the economic loss plaintiffs don't intend to

24  appeal, communicate that, and then there's no reason to wait

25  until --

68

1          MR. WEISFELNER:  That was going to be my suggestion,

2   Your Honor, that I be afforded an opportunity --

3          THE COURT:  Okay.  So when I get an order, it'll

4   either provide for payments on or after or commit the payments

5   immediately if there's not going to be any -- I just wanted to

6   make sure that I didn't order distributions immediately and

7   then everybody's scurrying around to try and get a stay or

8   something like that.

9          MR. WEISFELNER:  Your Honor, I'm going to approach

10  the microphone gingerly because I've already heard what Your

11  Honor said with regard to mediation.  And here's the reality on

12  the ground.  New GM and the Colbys (phonetic) were involved in

13  discussions that, had they been successful, would have resolved

14  both the MDL and the Chapter 11 proceedings.  Those

15  discussions, which Judge Furman -- I don't know if he directed

16  it, but he was anticipating they were going to happen --

17  pre-date or coextensive with the discussions that New GM had

18  successfully with the personal injury and wrongful death

19  claimants.

20          I think it's fair to say -- not telling tales out of

21  school -- that New GM's position had always been, why are we

22  the exclusive piggy bank for resolution of the economic loss

23  claims?  You need to involve the GUC Trust and the GUC Trust

24  beneficiaries.  Their position had been, we had a settlement

25  agreement, we've given it to the office, we're not giving any

69

1  more.  And I fear that a continued dialogue among the parties

2  without the benefit of some oversight, someone underscoring if

3  not for the professionals, who I think are well versed in what

4  the risks are, but the underlying businesspeople, the true

5  parties in interest, to understand what their risks are.  And

6  again, in a mediation, that could be very short lived.  It

7  could be subject to whatever Judge Furman decides Thursday.

8  But a mediation with some structure and some individual who can

9  decide to call in people and say, this is my understanding of

10  the risk and here's where I think might happen and, you know,

11  you got piece together contributions from Party A,

12  contributions from Party B, in the hopes that it satisfies

13  Party C.

14         I just think without the benefit of adult

15  supervision, for lack of a better term, we've tried this

16  before.  And I think given the inflection point associated with

17  Judge Furman's decision, frankly in my view, rather than brief

18  Your Honor on the impact of Judge Furman's decision, which we

19  can all do -- if it's helpful to the Court, we should do it --

20  I'd rather spend the time and energy seeing if we can't resolve

21  this.  We'll know in the space of a couple of weeks if it's

22  resolved.

23         THE COURT:  Mr. Weisfelner, I'm all in favor of

24  proceeding down the dual path.  You're going to agree on a date

25  for briefing.  You're going to get a date for argument before

70

1   me.  You've got a hearing before Judge Furman on Thursday.  It

2   makes good sense to me for you all to come to a resolution.

3   You'll do it with a hearing date before me.  What's going

4   happen before Judge Furman, Judge Furman will decide.  You

5   know, take Mr. Golden and Mr. Steinberg and Mr. Basta to lunch

6   and Ms. Going and see if you can come to an agreement to

7   proceed with a mediation.  What you'll do that -- and I hope

8   you will.  I hope you all will.  It makes good sense for all of

9   you because the path forward is very uncertain.  Okay.

10           The implications of Judge Furman's decision for class

11  certification not only in the district court, which he did not

12  decide yet, but in this court, as well, great potential impact

13  on that.  Judge Furman granted summary judgment.  He didn't

14  just decide to <u>Daubert</u> motion.  Yes, he did it on three -- for

15  three states, but the -- agree on a briefing schedule.  Agree

16  on a hearing date.  If you go to mediation and you decide

17  you're all making progress and want to put out the hearing

18  date, I'll certainly -- what I did for today.  You wanted the

19  hearing date put off.  Mr. Fisher and Ms. Going did not.  I

20  wouldn't move it.  I typically ask whether all parties' motions

21  consent.  Yes, there are times even without consent, I'll go

22  ahead and move it, but we'll move forward in what I consider to

23  be parallel paths.  Hopefully, you can -- your side can raise

24  with judge Furman on Thursday mediation.  Who is -- he's had a

25  retired judge or a district judge?

71

1          MR. WEISFELNER:  I think it was Magistrate Cott who's

2  been involved in some mediation efforts, and I think there was

3  Layn Phillips --

4          THE COURT:  Judge Phillips.

5          MR. WEISFELNER:  But, you know, finding the right

6  mediator, I don't think is going to be the issue.  Getting at

7  least one of the three parties willing to mediate may be our

8  only issue.

9          THE COURT:  Buy Mr. Golden lunch.

10         MR. WEISFELNER:  If I have to, I will, Your Honor.

11  And I would be glad to.  And I don't think we have to

12  necessarily do it over a meal.  He and I have had preliminary

13  conversations along this line, and I'm sure we'll continue to

14  do so.

15         THE COURT:  All right.  I had been contemplating

16  entering an opinion after today's hearing.  I'm not going to do

17  that.  Since there is essentially largely agreement on the two

18  parts that I am granting, I'm going to reserve -- well, we'll

19  call it reserve decision as the rest is going to be

20  supplemental briefing before I do that.  So I will hold off.  I

21  can issue an opinion at this point.

22         Anything else anybody wants to say before we adjourn?

23  We're adjourned.

24     (Proceedings concluded at 12:05 p.m.)

25                         *  *  *  *  *

72

# **C E R T I F I C A T I O N**

1

2

3      I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8

9



10

11  ALICIA JARRETT, AAERT NO. 428    DATE:  August 13, 2019

12  ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25