UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: | . Case No. 09-50026-mg |
| | . |
| MOTORS LIQUIDATION COMPANY, | . Chapter 11 |
| | . |
| | . One Bowling Green |
| Debtors. | . New York, NY 10004 |
| | . |
| | . Tuesday, December 10, 2019 |
| . . . . . . . . . . . . . . . . . | . 11:06 a.m. |

TRANSCRIPT OF (CC: DOC# 14637, 14639) CASE MANAGEMENT
CONFERENCE CONCERNING SCHEDULE FOR BRIEFING
OF LATE CLAIMS MOTIONS
**BEFORE THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY COURT JUDGE**


APPEARANCES:

| | |
|---|---|
| For Wilmington Trust Company as GUC Trust Administrator: | McDermott Will & Emery<br>By:  KRISTIN K. GOING, ESQ.<br>340 Madison Avenue<br>New York, NY 10173-1922<br>(212) 547-5429 |
| For the Avoidance Action Trust: | Binder & Schwartz, LLP<br>By:  ERIC B. FISHER, ESQ.<br>366 Madison Avenue, 6th Floor<br>New York, NY 10017<br>(212) 933-4551 |


APPEARANCES CONTINUED.


| | |
|---|---|
| Audio Operator: | Matthew, ECRO |

| | |
|---|---|
| TRANSCRIBED BY: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46038<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

2

```
APPEARANCES (Continued):

For Participating          Akin Gump Strauss Hauer & Feld LLP
Unitholders:               By: DANIEL GOLDEN, ESQ.
                                NAOMI MOSS, ESQ.
                                DAVID ZENSKY, ESQ.
                           One Bryant Park
                           New York, NY 10036-6745
                           (212) 872-1000

For General Motors, LLC:   King & Spalding
                           By:  ARTHUR J. STEINBERG, ESQ.
                                SCOTT DAVIDSON, ESQ.
                           1185 Avenue of the Americas
                           New York, NY 10036-4003
                           (212) 556-2164

                           Paul Weiss Rifkind Wharton &
                           Garrison LLP
                           By:  KYLE J. KIMPLER, ESQ.
                                PAUL M. BASTA, ESQ.
                           1285 Avenue of the Americas
                           New York, NY 10019-6064
                           (212) 373-3253

For Export Development     Vedder Price
Canada:                    By:  MICHAEL L. SCHEIN, ESQ.
                           1633 Broadway, 31st Floor
                           New York, NY 10019
                           (212) 407-6920

For the Ignition Switch    Brown Rudnick LLP
plaintiffs and certain     By: EDWARD S. WEISFELNER, ESQ.
non-Ignition Switch        7 Times Square
plaintiffs:                New York, NY 10036
                           (212) 209-4917

For the Economic Loss      Hagens Berman Sobol Shapiro, LLP
Plaintiffs:                By:  STEVE W. BERMAN, ESQ.
                           1301 Second Avenue, Suite 2000
                           Seattle, WA 98101
                           (206) 623-7292

For the Hilliard-Henry     Goodwin Proctor, LLP
Plaintiffs:                By:  WILLIAM WEINTRAUB, ESQ.
                           620 Eight Avenue
                           New York, NY 10018
                           (212) 813-8839
```



APPEARANCES (Continued):


For Certain Ignition        GARY PELLER, ESQ.
Switch Plaintiffs:          600 New Jersey Avenue Northwest
                            Washington, DC 20001
                            (202) 662-122

TELEPHONIC APPEARANCES:

For Certain 389 Ignition Andrew Myers, P.C.
Switch Pre-Closing          By: LISA M. NORMAN, ESQ.
Accident Plaintiffs:        1885 Saint James Place, 15th Floor
                            Houston, TX 77056
                            (713) 850-4245



4

1          (Proceedings commence at 11:06 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.  We're here in Motors

4    Liquidation, 09-50026.

5               Ms. Going, I want to hear from you first.

6               MS. GOING:  Thank you, Your Honor.  Your Honor, I was

7    going to go through an update of where we are and then discuss

8    the briefing schedule and the broad swath of issues that we

9    think we can move forward on right now, but before I do that,

10   the letter that we filed related to the ignition switch

11   litigation briefing, and AAT filed a responsive letter, and I

12   would suggest maybe you hear from them first.

13              THE COURT:  No.  I want to hear from you first.

14              MR. GOLDEN:  Okay.  Excellent.

15              So, Your Honor, I think --

16              THE COURT:  Let me just say, I've read all the

17   correspondence that has been submitted.  Go ahead.

18              MS. GOING:  Okay.  Understood.  So I think, you know,

19   since we've been before you in August, you know, we spent a lot

20   of time reviewing your comments and concerns over the

21   settlement agreement that you espoused at the August hearing,

22   and then, you know, really drilling down on Judge Furman's

23   August 6th decision.  And then, on August 15th, for the first

24   time, the GUC Trust participated in the status conference

25   before Judge Furman in the MDL.

5

1        As you are aware, the GUC Trust is not a party to the

2   MDL, but we were invited to participate in that status

3   conference by the economic loss plaintiffs, so we attended and

4   also participated in a chambers conference with Judge Furman,

5   which was -- at which time we were invited to participate in a

6   mediation that had already been scheduled by the economic loss

7   plaintiffs and New GM for September 11th in LA before their

8   mediator, Judge Layn Phillips.

9        We understand that the economic loss plaintiffs and

10   New GM had engaged in prior mediation sessions with Judge Layn

11   Phillips, and both the GUC Trust and the unitholders' counsel

12   agreed to attend the September 11th mediation session in an

13   attempt to reach a global mediation resolution.

14        The parties all exchanged mediation statements.  We

15   conducted a full day of mediation on September 11th, and all I

16   can tell you is that that mediation was not successful.  The

17   parties continued to have extensive discussions with both each

18   other and the mediator after that mediation session, but no

19   additional mediation sessions have occurred to date.

20        THE COURT:  Has Judge Phillips declared an impasse in

21   the mediation?

22        MS. GOING:  He has not, Your Honor, and in fact, at

23   the request of the GUC Trust and the unitholders' counsel, we

24   are having a -- what we believe is a last-chance mediation,

25   immediately after this session -- this court session today.  So

6

1  we are --

2              THE COURT:  Today?

3              MS. GOING:  All the -- yes.  The parties are

4  traveling.

5              THE COURT:  Is Judge Phillips here?

6              MS. GOING:  He is.  He was here already for another

7  mediation, and he agreed to stay to take on this mediation.

8  But on the impasse issue -- and I was going to address this

9  later, but I just want to say, you know, here, unlike I think

10 in the AAT litigation, the parties, themselves, are not

11 incentivized to declare an impasse and, in fact, as you've

12 heard from -- from Mr. Weisfelner and the economic loss

13 plaintiffs, they're seeking delay at every turn.  So we are

14 struggling with the notion that we have -- we have parties to

15 this mediation process who believe that they're better off

16 delaying because that's their leverage over the GUC Trust.  But

17 like I said, we're having a final mediation today, immediately

18 after this hearing.

19             THE COURT:  Where is that?

20             MS. GOING:  It's in Kirkland's offices.  So --

21             THE COURT:  I'm just curious about why you sent your

22 letter requesting a conference here because, as I understand

23 it, Judge Furman has a case management conference on December

24 19th.  Is that the date?

25             MS. GOING:  It's December 18th.

7

```
 1              THE COURT:  December 18th?

 2              MS. GOING:  Yes.  But,  Your Honor, we -- I mean, we

 3  were actually seeking a status conference before Your Honor --

 4  we were hoping for something in November, but also our briefing

 5  schedule that we've proposed is narrow, and we believe -- we're

 6  seeking --

 7              THE COURT:  Well, that you proposed, but not

 8  everybody agrees with you.

 9              MS. GOING:  Well, they -- we may hear differently

10  today, but as far as the meet and confers, we had gotten to

11  resolution on the issues that we proposed to brief.  I had

12  understood that the parties agreed to the issues, they just

13  didn't agree to the timing that we proposed, and those --

14              THE COURT:  But -- so your letter requesting a

15  conference was October 22 --

16              MS. GOING:  Correct.

17              THE COURT:  -- of 2019.  Had Judge Furman already set

18  the December 18th status conference?

19              MS. GOING:  I believe he had.  But, Your Honor, the

20  issues that we're proposing to brief before you are not

21  impacted by Judge Furman's rulings whatsoever.

22              THE COURT:  Really?

23              MS. GOING:  Yeah.  Because they don't go to the

24  merits of the late claims.  They go to the issues of whether or

25  not the economic loss plaintiffs and the remaining personal
```

8

1   injury plaintiffs have a right to file late claims before Your

2   Honor.

3         THE COURT:  Well, let me just make clear.  In my

4   mind, whether to permit late class claims is very dependent on

5   what Judge Furman does --

6         MS. GOING:  I --

7         THE COURT:  -- and I made that clear before.

8         MS. GOING:  No.  I understand that, Your Honor.  And

9   that's why what we're --

10        THE COURT:  I only want to do this one more time.

11  Only one more time.

12        MS. GOING:  Your Honor, we couldn't agree more.

13        THE COURT:  So I don't want to do it piecemeal.  I

14  want to make it crystal clear.  Okay?

15        MS. GOING:  Okay, Your Honor.  But I think there are

16  two separate issues.  One is, do they have the ability to file

17  a late claim, and then we --

18        THE COURT:  They do if I say so.

19        MS. GOING:  -- address the merits of the late claim?

20        THE COURT:  They do if I say so.

21        MS. GOING:  Okay, Your Honor.  We weren't

22  proposing --

23        THE COURT:  If I thought that they had absolutely no

24  chance of being able to prevail on late claims, I'd probably

25  just say, go away.  I mean, I wouldn't say it quite that way,

1  but serious issues they're raising, and I only want to do it

2  once.

3          MS. GOING:  I understand that, Your Honor, but we

4  weren't suggesting that the class claims issue get addressed

5  right now.  There's other issues that this Court was prepared

6  to take up back in 2017 to move the late claims issues forward.

7          THE COURT:  Okay.  Tell me -- I know I've got a stack

8  of correspondence in front of me -- tell me what issues that

9  you think that I should take up.

10         MS. GOING:  Well, let me go to the letter.  So the --

11 just starting with --

12         THE COURT:  And I have the letter here.  Where --

13         MS. GOING:  Okay.

14         THE COURT:  -- are you looking at?

15         MS. GOING:  So I'm looking at Page 2 --

16         THE COURT:  Yes.

17         MS. GOING:  -- Romanette ii.

18         THE COURT:  Okay.

19         MS. GOING:  And these are literally just what we're

20 proposing is supplementing the briefing that's already been

21 done on these two issues, and this was set for oral -- it was

22 awaiting oral argument back in --

23         THE COURT:  On Page 2 on your proposed issues, "to be

24 addressed by the parties in their briefs are to be as follows."

25 You have Romanette I through iv.  So you're proposing those

10

1  four --

2            MS. GOING:  Correct.

3            THE COURT:  -- issues to be addressed?

4            MS. GOING:  Correct.  And right now, I'm speaking

5  specifically about Romanette ii, which has already been

6  briefed.

7            THE COURT:  Well, let's go through each of them.

8  Your letter has four items listed, Romanette I through iv.

9            MS. GOING:  Correct.

10           THE COURT:  Go through each of them.

11           MS. GOING:  Okay.  So, Your Honor, the first issue

12 that we propose to brief, we believe if we were successful

13 would be dispositive entirely and the -- it would eliminate the

14 economic loss plaintiffs' claims --

15           THE COURT:  Just let me get one paragraph of why you

16 think they should be barred from seeking recovery.

17           MS. GOING:  Because it goes to the question of what's

18 the proper remedy for a due process violation, and there are

19 claims in the Southern District that say, post-confirmation,

20 the remedy for a party that didn't receive notice and the

21 ability to file a late claim is not to file a late claim under

22 9006, but rather to allow that claim to assert its rights

23 against a reorganized debtor, which here would be New GM, which

24 the economic loss plaintiffs are already doing.

25           THE COURT:  Your position is as a matter of law, the

11

1  economic loss plaintiffs, assuming that for each of the recall

2  notices you've listed one of them here, but let's just assume

3  for purposes of discussion that for each recall, if due process

4  was violated, are you saying as a matter of law, they cannot

5  assert claims against the GUC Trust?  They cannot be permitted

6  to assert claims against the GUC Trust?

7            MS. GOING:  That is correct.

8            THE COURT:  And what is the case law you're relying

9  on for that?

10           MS. GOING:  In re St. James Mechanics [sic], 434 B.R.

11 54 --

12           THE COURT:  Just say that slowly.

13           MS. GOING:  Oh, sorry.

14           THE COURT:  434 B.R. --

15           MS. GOING:  54.

16           THE COURT:  Uh-huh.

17           MS. GOING:  Eastern District, 2010.

18           THE COURT:  Eastern District of New York?

19           MS. GOING:  Yes.  Judge Grossman.  And then Adam

20 Glass Service, Inc. v. Federated Department Stores, 173 B.R.

21 840.

22           THE COURT:  What court?

23           MS. GOING:  Eastern District.

24           THE COURT:  Eastern District New York?

25           MS. GOING:  New York.

12

1          THE COURT:  What year?

2          MS. GOING:  1994.

3          THE COURT:  Who was the author?

4          MS. GOING:  That, I do not have in --

5          THE COURT:  Okay.

6          MS. GOING:  -- front of me.

7          THE COURT:  The name of that one again?  I'm sorry.

8          MS. GOING:  Adam Glass Services, Inc.

9          THE COURT:  Okay.  All right.  Go to Romanette ii.

10         MS. GOING:  So these, Your Honor, again, are the issues

11 that were in the initial late claims briefing.

12         THE COURT:  Right.  And your position is they have to

13 satisfy the Pioneer claims?

14         MS. GOING:  Yes, Your Honor.

15         THE COURT:  And do you have any cases that support that

16 position or where a court has found that there was a due process

17 violation in failing to give them notice?

18         MS. GOING:  The Queen Elizabeth case, Your Honor which

19 actually was issued -- I think that decision was issued sometime

20 in 2018.

21         THE COURT:  Do you have a cite to it?

22         MS. GOING:  I do not have --

23         THE COURT:  Okay.

24         MS. GOING:  -- a cite handy, but that case established

25 that anytime you have a party who is requesting a late claim,

13

 1  they are subject to the <u>Pioneer</u> standard.

 2          THE COURT:  Okay.  Go to Romanette iii.

 3          MS. GOING:  This is --

 4          THE COURT:  That's the same thing?

 5          MS. GOING:  It's essentially the same thing.

 6          THE COURT:  And you don't believe -- if <u>Pioneer</u>

 7  applies, you don't think they can satisfy <u>Pioneer</u>?

 8          MS. GOING:  That's correct.

 9          THE COURT:  Why?

10          MS. GOING:  Because of the fact that they did make a

11  calculated litigation strategy to pursue New GM, rather than to

12  pursue the GUC Trust as soon as the claimants were alerted of the

13  recalls.

14          THE COURT:  Okay.  And what cases support you on that?

15  What are you relying on?

16          MS. GOING:  <u>Pioneer</u>, generally.

17          THE COURT:  Okay.

18          MS. GOING:  But it's more than just, you know, a

19  calculation of timing.

20          THE COURT:  Are any of the <u>Pioneer</u> cases you're relying

21  on where there was a due process violation and failing to give

22  notice?

23          MS. GOING:  I'm not sure, Your Honor.  I haven't looked

24  at that specifically.

25          THE COURT:  All right.  Go to Romanette iv.

1          MS. GOING:  This is the equitable mootness issue, Your

2    Honor.

3          THE COURT:  Well, is there a particular case you're

4    relying on with facts at all similar to this?

5          MS. GOING:  No, Your Honor.  I think that's been our

6    struggle all along.  That this is a very unique circumstance.

7          THE COURT:  It is.

8          MS. GOING:  We don't have a lot of factually

9    analogous case law.

10          THE COURT:  Unfortunately.

11          MS. GOING:  Yes.  But, I mean, on the equitable

12   mootness point, you know, I will say that when the Second Circuit

13   ruled on <u>Elliott</u>, they said that equitable mootness bears only

14   whether or not it's a proper remedy, and so here, you know, we

15   would be arguing that equitable mootness bars the proposed claim

16   as the proper remedy for a due process violation.

17          THE COURT:  Say that again.

18          MS. GOING:  That equitable mootness goes to the

19   question of whether or not the claims sought against the GUC

20   Trust is the proper remedy.

21          THE COURT:  What's -- what do you think is the -- is

22   there any remedy that they could seek?

23          MS. GOING:  Well, their remedy is against New GM.

24          THE COURT:  Well, does it have to satisfy successor

25   liability standards to have a claim against New GM?  Other than

1 potential state law successor liability theories, is there

2 another theory which the economic loss plaintiffs can assert

3 against New GM to be able to recover with their economic loss

4 claims resulting from Old GM's failure to give notice of the

5 defects, known defects?

6          MS. GOING:  Well, if the free and clear provisions

7 don't apply --

8          THE COURT:  Yes.

9          MS. GOING:  -- because of the due process remedy --

10          THE COURT:  Yes.  Then what?

11          MS. GOING:  -- then they're entitled to pursue New GM.

12          THE COURT:  Okay.  So the GUC Trust position is,

13 without regard to a state law successor liability theory, if the

14 economic loss plaintiffs were denied due process, it's the GUC

15 Trust's position that the free and clear sale provisions of the

16 sale order don't apply, and they are entitled to proceed against

17 New GM for their economic loss claims?

18          MS. GOING:  That's correct.

19          THE COURT:  And what case are you relying on for that?

20          MS. GOING:  Again, Your Honor, we don't have any -- I

21 mean, it's --

22          THE COURT:  I bet Mr. Steinberg is going to disagree

23 with you --

24          MS. GOING:  Well, I bet he is.

25          THE COURT:  -- or Mr. Basta, one or both of them

16

1  probably.  Okay.

2        So that's what -- you told me what the GUC Trust

3  position is, and you'll have a chance to brief it no doubt, but

4  can you point to any case law that supports your contention that

5  without regard to state law successor liability, the economic

6  loss plaintiffs are entitled to pursue claims against New GM if

7  their claim is not barred by the sale order because of a due

8  process violation?

9        MS. GOING:  Well, Your Honor, no, I can't point to one

10 case, and that's the challenge here because we're building on,

11 you know, the unique fact situation that we have in different

12 stages.

13       THE COURT:  Okay.  All right.  Are there any other

14 issues other than Romanettes I through iv on Page 2 of your

15 October 22nd letter, which is ECF Docket Number 13625, that you

16 believe should appropriately be addressed in briefing before this

17 Court?

18       MS. GOING:  Your Honor, the only other issue I would

19 raise is that as we said in our letter, we were proposing to

20 narrow this briefing and focus it on the 047, the defined term

21 "ignition switch defect."  That is also what was contemplated

22 previously with regard to the Pioneer issues.

23       I do believe, but this is not my motion to make, but

24 I'm going to raise it, that the economic loss plaintiffs have

25 come before you and spent a lot of time talking about the fact

1  that they have these other due process violations, but there has

2  been no motion, and as we sit here today, all of those other

3  recalls have received -- it's our position they've received all

4  the notice that they're entitled to which is publication notice.

5          So I think it's time --

6          THE COURT:  Did -- let me ask you this.  Did Old GM --

7  well, let's talk about the other recalls.  Based on everything

8  you know, isn't it correct that those were known defects to Old

9  GM?

10          MS. GOING:  No.  No.

11          THE COURT:  You don't believe any of them were known

12  defects?

13          MS. GOING:  No.

14          THE COURT:  So the --

15          MS. GOING:  The Valukas report --

16          THE COURT:  -- the -- stop.  Airbags.  If the switch --

17  ignition switch turns to the off position, rotates to the off

18  position, the airbags don't function, correct?

19          MS. GOING:  That's correct.  That's what they've said.

20          THE COURT:  Okay.  And there was a subsequent recall

21  for airbags as well, correct?

22          MS. GOING:  That's right.

23          THE COURT:  And so if there was a due process violation

24  with respect to the ignition switch defect, why is it you don't

25  believe that there was a known defect with respect to the airbags

1  which would not deploy when the ignition switch rotated to the

2  off position?

3        MS. GOING:  Because the federal government spent

4  extensive time and energy doing an in-depth investigation of what

5  GM knew and when, and at the end of the day, after the Valukas

6  report, and after everything else, the only thing that they came

7  away with was the fact that GM knew about the 047 defined term

8  "ignition switch recall," and that is part and parcel of the

9  deferred prosecution agreement.

10       There is nothing in the deferred prosecution agreement

11  regarding knowledge of any of the other defects.

12       THE COURT:  One way or the other.

13       MS. GOING:  One way or the other.  And you, yourself,

14  have noted before, Your Honor, that cars have defects all the

15  time.  We've all received defect notices.

16       THE COURT:  Do you acknowledge that the recall for the

17  airbag defect related to the ignition switch defect because when

18  the ignition switch rotated to the off position, airbags wouldn't

19  deploy?

20       MS. GOING:  No.  I don't, Your Honor.

21       THE COURT:  Okay.  All right.

22       MS. GOING:  Because --

23       THE COURT:  You're more -- I don't live with this.

24       MS. GOING:  Because the airbag presumably couldn't --

25  wasn't defective.  It was the fact that it didn't deploy because

19

1  of the ignition switch defect.  The airbag was probably perfectly

2  fine --

3            THE COURT:  Okay.

4            MS. GOING:  -- had it actually --

5            THE COURT:  Had the ignition --

6            MS. GOING:  -- been on.

7            THE COURT:  -- switch not rotated to the off position?

8            MS. GOING:  Correct.

9            THE COURT:  And so there was a recall for the airbags,

10  correct?

11            MS. GOING:  I believe so, but I don't even think --

12            THE COURT:  Mr. Steinberg is shaking his head no.

13            MS. GOING:  -- the airbags are part and parcel of these

14  other --

15            THE COURT:  Okay.  All right.

16            MS. GOING:  -- recalls that we're --

17            THE COURT:  What about power steering?

18            MS. GOING:  -- talking about.

19            THE COURT:  As I understood, the power steering, when

20  the ignition switch rotated to the off position, power steering

21  failed, as well, correct?

22            MS. GOING:  That's correct.  But again, that's the same

23  as the airbag.  We don't know --

24            THE COURT:  Okay.

25            MS. GOING:  -- that there was a defect of the power

1  steering.  We just know that --

2              THE COURT:  So if --

3              MS. GOING:  -- when the car turns off, power steering

4  ceases to work.

5              THE COURT:  So if, for example, if the economic loss

6  plaintiffs were able to show that -- could show damages as a

7  result of the ignition switch, airbag, power steering, those

8  would all fall within the same issue about the ignition switch?

9              MS. GOING:  No.

10             THE COURT:  Really?

11             MS. GOING:  No.

12             THE COURT:  Okay.  All right.  We'll deal with that in

13 the future then.  Okay?  Anything else you want to raise?

14             MS. GOING:  Your Honor, like I said -- well, actually,

15 I want to take you through where Judge Furman's motion practice

16 stands right now.

17             THE COURT:  Okay.

18             MS. GOING:  So you have an understanding of where

19 things are there because, again, we don't believe that anything

20 that we're asking Your Honor to address now has any impact.  The

21 issues that we just went through will not be impacted by Judge

22 Furman's rulings.

23             He -- the economic loss plaintiffs have filed a motion

24 for reconsideration.

25             THE COURT:  That I'm aware of.

21

1            MS. GOING:  In the alternative, they've asked --

2            THE COURT:  And I think Mr. Weisfelner had attached a

3  copy of the reconsideration motion to his letter.

4            MS. GOING:  Okay.  And they also sought interlocutory

5  appeal in the alternative.  That motion has been fully briefed

6  since October 18th.  New GM filed renewed summary judgment

7  motions on the economic loss plaintiffs' remaining damages

8  allegation, which is a lost time and wages claim, and New GM also

9  filed a motion in limine to strike their damages expert on loss

10  wages.

11            Those motions have also been fully briefed since

12  October 11th and --

13            THE COURT:  Has there been argument scheduled?

14            MS. GOING:  They have not been scheduled and there is a

15  status conference on December 18th.

16            THE COURT:  All right.

17            MS. GOING:  But I will note, because I think that this

18  -- the theme, that I want you to be cognizant of, that the

19  economic loss plaintiffs also asked Judge Furman to delay the

20  briefing schedule in his court because there was mediation.  And

21  what Judge Furman said in denying their request is, in the

22  interests of keeping the litigation moving forward, he was not

23  going to extend that briefing schedule.

24            THE COURT:  When does -- it is completely briefed now?

25            MS. GOING:  Yes.

22

1           THE COURT:  Okay.

2           MS. GOING:  Since October 18th.

3           THE COURT:  All right.

4           MS. GOING:  Also of relevance, New GM withdrew its

5  motion to withdraw the reference with regard to the economic loss

6  plaintiffs' motion for class certification before Your Honor, and

7  in the -- the only thing I did want to -- no, there's a couple of

8  things.  I want to make clear to Your Honor that the challenge

9  that we're facing is the need to move forward with the litigation

10 here because there is not going to be --

11          THE COURT:  I agree.

12          MS. GOING:  -- a settlement 4.0.  No.

13          THE COURT:  I --

14          MS. GOING:  When I say there isn't going to be a

15 settlement 4.0, there's not going to be -- that's what -- the

16 only thing we've learned over these last four months is that we

17 cannot do a settlement just with the economic loss plaintiffs and

18 we are not going to get to a settlement unless New GM is a

19 participant in it.

20          When I was preparing for today, I actually came across

21 one of your statements back from January of 2017, where you said,

22 the thing that gets cases close to a resolution is to move

23 forward in whatever court it's in.

24          THE COURT:  We are going to move forward, Ms. Going.

25          MS. GOING:  Okay.  Thank you, Your Honor.

1           And then the only --

2           THE COURT:  The only question for me is, what issues

3   are going to be briefed now?  We are moving forward.

4           MS. GOING:  Understood.  The last thing I wanted to

5   address is we do have the -- the good news is we only have nine

6   remaining personal injury wrongful death claims that you would

7   have seen Lisa Norman file that status report?

8           THE COURT:  I did.

9           MS. GOING:  Okay.

10          THE COURT:  And I think she's on the phone.

11          MS. GOING:  I believe she is.  We -- I did not get a

12  chance to confirm this with her but based on our own reconciling

13  of the claims in analysis, we believe that two of those nine are

14  047 and that the other seven are these non-ignition switch.  I'm

15  just pointing that out.  And also, they -- none of these nine are

16  -- have any cases pending in the MDL.

17          THE COURT:  That was going to be my question actually.

18          MS. GOING:  Right.  And Ms. Norman doesn't believe they

19  have cases pending anywhere else.  They're just seeking recovery

20  from the GUC Trust.

21          In addition, I had proposed to the parties, keeping

22  with, you know, assuming the briefing schedule that we had

23  proposed, I had suggested opening briefs to be due on January

24  14th with reply briefs on February 4th.

25          Lisa Norman did respond to me yesterday that those

24

1   dates were acceptable to her.

2           THE COURT:  Were?

3           MS. GOING:  They were.  She was -- yes.  Those dates

4   were acceptable.

5           THE COURT:  Did you have a date for a reply brief?

6           MS. GOING:  We were doing simultaneous, so it was --

7           THE COURT:  Okay.

8           MS. GOING:  -- January 14th and February 4th.

9           THE COURT:  All right.  Okay.  Anything else you want

10  get out there?

11          MS. GOING:  That's all, Your Honor.

12          THE COURT:  Okay.  Thank you, very much.

13          Mr. Weisfelner?  Oh, Mr. Golden.  Go ahead, Mr. Golden.

14          MR. GOLDEN:  Thank you, Your Honor.  Daniel Golden --

15          THE COURT:  When's your retirement date, Mr. Golden?

16          MR. GOLDEN:  It's coming up.  It's part of my

17  presentation.  Daniel Golden, Akin Gump Strauss Hauer Feld --

18          THE COURT:  I apologize I won't be here to attend the,

19  whatever the shindig that your firm has invited half the world

20  to, but I'm just unavailable for it.  Otherwise, I'd be there.

21  But go ahead, Mr. Golden.

22          MR. GOLDEN:  Thank you, Your Honor.  I did want to make

23  a point.  With me today is David Zensky and Naomi Moss.  David

24  Zensky, I think Your Honor is familiar with, one of my litigation

25  partners, and Naomi Moss, I'm pleased to say as of January 1 will

1 be my partner.  I say that for two events, one, you've stolen a

2 little bit of my thunder.  I am retiring from the active practice

3 of law come year-end.  I have committed to the clients, so I will

4 continue on in this matter.

5          I am also facing a rather involved orthopedic surgery

6 on January 7th which will take me out of the box for

7 approximately two months, so Mr. Zensky and Ms. Moss will be able

8 substitutes for me.

9          Your Honor, I rise because I want to make the

10 participating unitholders' position well-known or known to the

11 Court.  We do, in fact, support entry of an order today by Your

12 Honor setting forth the scope of the briefing and the timing for

13 that briefing schedule.

14          You had a little colloquy with Ms. Going about the four

15 issues to be briefed.  We think they are narrowly drawn.  We

16 think that they are necessary positions in order to get to our

17 ultimate goal, which is a distribution -- no secret.  It's a

18 distribution of the assets of the GUC Trust.

19          THE COURT:  I should have asked Ms. Going, but what is

20 -- what are the -- what's the amount of assets available for

21 distribution?

22          MR. GOLDEN:  You know, Your Honor, there is a pending

23 motion for $320 million, and there's an additional approximately

24 --

25          MR. FISHER:  100 million.

1          MS. GOING:  A hundred.

2          MR. GOLDEN:  -- 100 million that could be distributed.

3          Now one thing I'll put out, and I think it's probably

4  pretty obvious.  The longer the trust stays open, the more the

5  administrative expenses.  The trust runs at about ten million a

6  year, so there's a real need on the part of the participating

7  unitholders to try and get -- bring this to conclusion as quickly

8  as possible.

9          I want to come back to the narrowly drawn point, Your

10 Honor.  So for example, in the meet and confers -- and I don't

11 think I'm telling tales out of school -- one of the issues was

12 should we brief class certification.  And a lot of people pointed

13 out that that is an issue currently pending before Judge Furman.

14 You have said on several occasions, you are not going to take on

15 issues that's before Judge Furman, and we've decided to leave

16 that alone.  We think that we can prevail on those without having

17 to actually get to class certification.  That means --

18         THE COURT:  Let me ask you this.  Are the issues for

19 class certification substantially the same before Judge Furman as

20 they would be here?

21         MR. GOLDEN:  I think they will be, Your Honor.

22         THE COURT:  That's what I was -- it was not clear to

23 me.

24         MR. GOLDEN:  So I think -- well, it's dependant upon

25 ultimately what Judge Furman does with the reconsideration motion

1   and the interlocutory appeal.  But if at the end of the day, the

2   only claims that remain because the Boedeker report is not

3   countenance, and the benefit of the bargain isn't going to be

4   satisfactory to demonstrate damages, the economic loss claimants

5   are really left with lost time, lost wages.  We think by

6   definition, it would be -- I don't want to argue the merits here.

7   We're not getting to.  But by definition, we don't think that a

8   class consisting of parties who have lost wages is going to be

9   susceptible of class certification.

10          Your Honor, one thing that Ms. Going pointed out, where

11  we are is a dramatically different position than we were back in

12  August when Your Honor was upset, frankly, with us that we were

13  making a distribution motion when the pending settlement between

14  the GUC Trust and the economic loss --

15          THE COURT:  I wasn't upset with you.

16          MR. GOLDEN:  Okay.  I take that back.  I amend that

17  statement.

18          But Your Honor seemed to be, if not upset, somewhat

19  puzzled by the fact that we were making a distribution motion

20  when the settlement hadn't even been heard yet.  Well, okay.  We

21  understand that, but now the settlement's not on the table

22  anymore.

23          THE COURT:  Doesn't that complicate your life further

24  because if the issue becomes whether the economic loss claimants

25  are entitled to recover from the GUC Trust -- let's say you put

1  aside the issue of whether unitholders who received distributions

2  would have to cough those back, but just from -- just the issue

3  of the funds that are available in the GUC Trust or in the AAT,

4  it seemed to me then, and still seems to me now, a real question.

5  How can I approve further distributions from the GUC Trust, until

6  it's determined whether economic loss plaintiffs and the nine

7  personal injury/wrongful death plaintiffs are entitled to recover

8  from the GUC Trust?  That's what is bothering me then.  That's

9  still what bothers me now.

10         MR. GOLDEN:  And it's because of that that we have

11  actually set forth four issues to be briefed, which we believe if

12  we prevail on any one of them, that will be the end of the story

13  for the economic loss plaintiffs.  They will not be able to file

14  late claims against the GUC Trust, and they will have gone

15  through all of their remedies and come up short.

16         So they have a remedy.  They continue to have a remedy

17  against New GM.  And I'll just come back to a question that you

18  asked Ms. Going, what authority do we have in light of the

19  determined due process violation for the 07-047 claimants?  The

20  authority is the Second Circuit.  The Second Circuit said:

21         "In light of the due process violation, they are not

22         going to force the injunction in the sale order.  And

23         therefore, the economic loss plaintiffs who were

24         subject to the due process violation have every right

25         to assert the claims that they might have asserted

1              against Old GM, they can now assert them against New

2              GM."

3         THE COURT:  May I ask you this?  It's that last piece

4    that you just stated that I don't remember reading in the Second

5    Circuit's opinion.  The Second Circuit vacated an equitable

6    mootness.  The Second Circuit clearly found a due process

7    violation.

8         MR. GOLDEN:  And as a result, did not enforce the

9    injunction.

10        THE COURT:  Let me just -- yeah, right.  But where does

11   the Second Circuit say or is there other authority that says that

12   if the injunction is not enforceable, QED, economic loss

13   plaintiffs have a claim for economic losses against New GM?

14        MR. GOLDEN:  Okay.  And I don't have the opinion in

15   front of me.  I don't know if there's a specific cite, but the

16   proof is in the pudding.  That has been exactly since the Second

17   Circuit -- what New GM -- or I'm sorry, what the economic loss

18   plaintiffs have, in part, been suing New GM for.  This ongoing

19   MDL litigation includes claims of the economic loss plaintiffs

20   arising out of the 047 recall, which obviously was a car

21   manufactured by Old GM.  They are asserting those claims --

22        THE COURT:  So why did Judge Furman have to go through

23   a state-by-state analysis of whether successor liability claims

24   can -- which is a state law theory, not a federal theory.  Why

25   did he have to go through a state-by-state analysis to see

1  whether successor liability claims can be asserted against New GM

2  if it's simple?  It's a rule of federal common law or derived

3  somehow from the Bankruptcy Code that if they're -- if the

4  injunction in the sale order is unenforceable, it means that as a

5  matter of federal bankruptcy law that the economic loss claimants

6  can recover -- if they can establish their damages, liability and

7  damage, they can recover it against New GM.  That's what I don't

8  see, Mr. Golden.

9       MR. GOLDEN:  And Your Honor, my answer to the question

10  -- but there are people here from New GM who know this better

11  than I do.  My understanding of why Judge Furman went through a

12  state-by-state analysis was not so much whether those states

13  recognized successor liabilities, but whether those states

14  recognized the damage theory of benefit of the bargain.

15       THE COURT:  He did that, certainly.  He's got a whole

16  lot of opinions that I've read.  I didn't go back to read them

17  preparing for today.  There are quite a few opinions.  But I am

18  correct that he went through a state-by-state analysis of state

19  law, successor liability, whether the economic loss claimants can

20  assert claims against New GM.  Yes, he's gone through the state

21  law damage remedies, benefit of the bargain, what have you.  Does

22  the state law require manifestation in order to be able to assert

23  a damage claim?  Those are all state issues.

24       What -- maybe I misunderstood you.  I thought you were

25  telling me that you think as a matter of federal law, bankruptcy

31

1  law, given the due process violation, that the economic loss

2  claimants can assert damages claims against New GM.

3      MR. GOLDEN:  That is what I'm saying, and -- but

4  underlying those claims that they are now seeking to assert

5  against New GM are part of their fifth amended complaint asserted

6  against New GM is a determination whether the damages that

7  they're asserting, whether they're cognizable in the various

8  states where those occurred.

9      THE COURT:  But if you're -- that's what I'm having

10  some problem understanding you because if you're telling me that

11  as a matter of federal law, without regard to state successor

12  liability law, they're entitled to pursue their claims against

13  New GM, you're saying, but they're state law claims --

14      MR. GOLDEN:  Yes.

15      THE COURT:  -- and subject to state law damages.  And

16  so where -- I don't know of any case that says that absent

17  successor liability, the economic loss claimants can assert

18  damages claims against New GM.  I know you've been fighting about

19  that, but absence successor liability, I'm sure Mr. Steinberg or

20  Mr. Basta is going to tell me their view, and they probably don't

21  agree with you about it, but -- okay.  I think I understand your

22  position.

23      MR. GOLDEN:  So Your Honor, you have said many times,

24  and I don't think I need to remind you, but you quoted -- you've

25  been quoted in this very case that we're not going to wait years

32

1  --

2          THE COURT:  We're not.

3          MR. GOLDEN:  -- for the distributions to be made.

4          THE COURT:  We're not.  I actually feel quite badly

5  that this has gone on as long as it has.  And I thought, you

6  know, when I defined the list of issues -- at the party's urging,

7  we put off the issue of late claims -- late class claims.  And in

8  good faith, I think you and your clients and the GUC Trust

9  attempted to reach a settlement.  It is what it is.

10         MR. GOLDEN:  And we have -- I think we have exhibited

11 tremendous good faith in that regard.

12         THE COURT:  I'm not questioning.  Okay.

13         MR. GOLDEN:  We have tried to settle three different

14 times, a variety of factors that are well-known to Your Honor.

15         THE COURT:  I only know about two times.  Was there a

16 third?

17         MR. GOLDEN:  Well, you know with the trial we had when

18 the contract was disavowed.

19         THE COURT:  Right.  That's tone.

20         MR. GOLDEN:  And you know the second settlement, which

21 you ruled against.

22         THE COURT:  Okay.

23         MR. GOLDEN:  And then there's a pending third one,

24 which is no longer pending because the GUC Trust has terminated

25 it.

33

1        We have also, as a volunteer, quite frankly,

2   participated in the mediation.  It has not gone quickly.  We are

3   not there yet.  Ms. Going is correct that it was at our --

4        THE COURT:  Maybe you'll have success with Judge

5   Phillips today, huh?

6        MR. GOLDEN:  We will.  And Your Honor, I'll be very

7   frank.  I'm always frank with the Court.  We urged the

8   mediator --

9        THE COURT:  Oh, okay.

10       MR. GOLDEN:  Not true, Your Honor.  That, I can

11  categorically say.

12       We urged the mediator to have another mediation session

13  because what I didn't want to have happen because it's apparent

14  from the letter responses you've gotten that not everybody

15  believes we should go forward on this briefing schedule.  Ms.

16  Weisfelner says in his letter, "Well, we should wait to see what

17  Judge Furman says.  We should also wait to see the outcome of the

18  mediation."

19       I didn't want the continuation of the mediation to stop

20  Your Honor or think maybe we shouldn't approve the briefing

21  schedule today.  So we --

22       THE COURT:  You're not suggesting to me you're going

23  forward with the mediation just to provide you with cover.

24       MR. GOLDEN:  No.  No, Your Honor, because we --

25       THE COURT:  Okay.

34

1          MR. GOLDEN:  We have and we will continue to

2    participate in good faith.  But I have a lack of confidence that

3    it will ultimately prevail.  Maybe it will, and then no harm, no

4    foul.  Nobody will have put pen to paper yet on the briefing

5    schedule.  But I feel very strongly that without a briefly

6    schedule, there will be a -- there may well be a lack of effort

7    in connection with the ongoing mediation effort.

8          Your Honor, we think the issues are narrowly drawn, as

9    I said.  I might have had some different answers than Ms. Going.

10   We went through the four factors in terms of case law support.

11   We're not here to argue the merits, but --

12          THE COURT:  No, you're not.

13          MR. GOLDEN:  We do think that if the GUC

14   Trust/participating unitholders prevail on any one of those three

15   issues, that will be the end of that, at least as far as the 047

16   claimants.

17          Now, there may be a question in your mind why have we

18   not expanded the briefing to the non-ignition switch claimants.

19   Well, I think the answer is probably obvious.  There is no due

20   process violation determination with respect to that.  I know

21   that there may be some question in your mind what people actually

22   think, whether it was known or not known, but there's no judicial

23   finding --

24          THE COURT:  Correct.

25          MR. GOLDEN:  -- that they are subject to due process

1 violation.  Well, that presents a dilemma for them.  If we

2 prevail on one of these three -- one of these four issues,

3 whether they have and ultimately can obtain a due process

4 violation or not, it won't make much difference because they're

5 going to be subject to -- if not through collateral estoppel or

6 res judicata, they're going to have the same obstacles to face in

7 trying to assert late claims.  If they can't establish a due

8 process violation, that means that they got constitutionally good

9 notice.  And I doubt that because they -- they were entitled to

10 publication notice.  That's all they were entitled to.  And

11 therefore, they're going to have a very tough time demonstrating

12 that they satisfied the pioneer factors.

13          THE COURT:  Okay.

14          MR. GOLDEN:  So we thought let's take a small subset.

15 Let's narrow the issues to be litigated.  We -- as I said, we

16 expressly did not include class certification.  If, in fact, we

17 don't win on all four of these or any of these four issues, we

18 will have to go through Phase 2.

19          THE COURT:  Your argument about class certification, at

20 least the central point, is if Judge Furman's decision was

21 correct with respect to the Boedeker analysis, that the economic

22 loss plaintiffs can't satisfy the requirements for class

23 certification because damages Ms. Going talks about, time and

24 lost wages, are individual issues.

25          MR. GOLDEN:  Yes.  Your Honor, I don't have anymore,

36

1  unless --

2          THE COURT:  Thank you very much.

3          MR. GOLDEN:  Thank you.

4          THE COURT:  Yeah, and I'm glad that you're not leaving

5  these cases.  I hope your surgery goes well.

6          MR. GOLDEN:  Thank you, Your Honor.

7          THE COURT:  Let me hear from Mr. Fisher, and

8  then -- Mr. Weintraub, I thought you were out of these cases.

9          MR. WEINTRAUB:  I did too, Your Honor.  If I could take

10 30 seconds --

11         THE COURT:  Go ahead.  All right.  Come on.

12         MR. WEINTRAUB:  -- to correct the record, Your Honor.

13         THE COURT:  Who are you representing?

14         MR. WEINTRAUB:  Good morning, Your Honor.  William

15 Weintraub of Goodwin Procter for the Hilliard-Henry plaintiffs,

16 who have settled with certain exceptions.  And that's what I

17 wanted to just clue the Court into.  We filed something last

18 night.  I don't know if the Court had a chance to look at it yet,

19 just to let the Court know, in light of this status conference,

20 we wanted the Court to know the status of our two late claims

21 motions.

22         The Court may recall we filed a late claims motion,

23 which related to the ignition switch defect, and then a

24 supplemental late claims motion for what I'll call the lower-case

25 ignition switch defect.  In the MDL proceeding, our -- really our

1  client, Mr. Hilliard and Mr. Henry, withdrew for certain of their

2  clients.  And then, we filed notices of withdrawal in this court

3  with respect to the same former clients.  But we did not withdraw

4  the motion as to those persons because they need the opportunity

5  to decide if they want to prosecute on their own, either pro se

6  or by finding replacement counsel.

7        So with respect to those, there are 54 claims that are

8  not withdrawn.  We haven't withdrawn the motion, so the motions

9  are still pending technically, with respect to those 54 people,

10  so any  motion practice here would have to be on notice to them,

11  and they'll have to decide whether or not to respond.

12        THE COURT:  Can I impose a deadline for them to decide?

13        MR. WEINTRAUB:  Yes, Your Honor.  You could do whatever

14  you want, pretty much.

15        THE COURT:  Well, without getting reversed about it, I

16  mean, I just -- I would like some clarity as to whether they're

17  in, whether they're out.

18        MR. WEINTRAUB:  I think, Your Honor, my thought was --

19  and I don't know what's going to come from today's hearing, but

20  there will be, at some point, further motion practice with

21  respect to denying claimants that were mentioned earlier.  I

22  think these 54 people -- and there's actually additional people

23  I'll talk about in a moment -- would get the same notice, and

24  they would have to come to Court, or they would be defaulted.

25        But if the Court wanted to issue an order to show cause

38

1 and make them do something, I'm sure the Court could do that.

2          THE COURT:  Well, they're individuals, so they can

3 appeal pro se, I guess.  But I just -- I'd like to find a way to

4 get some clarity.  I don't want to disadvantage them if they

5 wanted to stay in the case, but --

6          MR. WEINTRAUB:  Sure.  Without saying too much, I

7 think, by and large, these are people that have not been

8 responsive or cooperative, so I don't know what happens when they

9 get served yet again.

10          THE COURT:  All right.  Thank you very much,

11 Mr. Weintraub.

12          MR. WEINTRAUB:  Just one more piece, Your Honor.

13          THE COURT:  Go ahead.  Yeah, go ahead.

14          MR. WEINTRAUB:  The Court may recall that we did settle

15 with New GM, and as part of the pleading we filed last night, we

16 are withdrawing the proofs of claim for 187 settling claimants,

17 but there were 5 non-settling claimants.  And we are not

18 withdrawing the proofs of claim, obviously, for the non-settling

19 claim, nor are we withdrawing the motion.  So they fall into the

20 same category as the 54, so there's a --

21          THE COURT:  You're continuing to represent them?

22          MR. WEINTRAUB:  No, we're not, Your Honor.  We've

23 withdrawn from that, so they're in the same boat.  They'll either

24 need to get replacement counsel or appear pro se.  And for the

25 benefit of the Court, if you do look at our pleading, we have

1  schedules what -- so it identifies each person, who they are, and

2  if they were subject to either the non-settling group or the

3  withdrawing group.  And we're prepared to provide Counsel with

4  the names and addresses of the people who have really still alive

5  pending late claims motion, so they can be served with whatever

6  the Court decides they be served with.

7        THE COURT:  All right.  Thank you very much.

8        MR. WEINTRAUB:  Thank you, Your Honor.

9        THE COURT:  Ms. Going, quickly.

10        MS. GOING:  Your Honor, I would just actually ask for

11  administrative convenience.  If nothing else, if we could get a

12  deadline for them to have to provide us with names and addresses,

13  like by the end of this week.  And also indications if they're --

14  what ignition switch defect they are.

15        THE COURT:  Mr. Weintraub, can you --

16        MR. WEINTRAUB:  Yes, there is --

17        THE COURT:  Is that -- okay.  So Mr. Weintraub has

18  agreed to provide you with the names and addresses of the -- I

19  guess it's the 54 claims that have not been withdrawn, and the 5

20  non-settling claimants.  He'll provide you with names and

21  addresses.  And can you also identify which recall that

22  they're --

23        MR. WEINTRAUB:  Yeah, we can do that.

24        THE COURT:  Okay.  Fine.

25        MR. WEINTRAUB:  Because clear in each separate motion

40

1  what they're --

2      THE COURT:  All right.  He'll do that by the end of the

3  week.

4      MS. GOING:  Okay.  And I think there was another

5  category of 107.

6      THE COURT:  He told me about 187 -- no, he said 187 are

7  withdrawn, 5 are non-settling claimants, 54 other individuals

8  have not withdrawn the claim.  So he's provided you with a total

9  of 59, I guess.

10     MR. WEINTRAUB:  That's correct.

11     THE COURT:  Okay.  Mr. Fisher?

12     MR. FISHER:  Good morning, Your Honor.  Eric Fisher

13 from Binder & Schwartz on behalf of the Avoidance Action Trust.

14 I want to just very briefly describe the world from the point of

15 view of the Avoidance Action Trust.

16     We received our settlement payment in connection with

17 the term loan litigation in June of this year, in the amount of

18 $231 million.  We promptly moved for the Court's approval of a

19 comprehensive distribution plan, to distribute that money out to

20 our beneficiaries.  We were last before the Court on August 12th,

21 and at that time, the Court authorized the Avoidance Action Trust

22 to go forward with distributions to the DIP lenders, to treasury

23 and the Government of Canada, our 30-percent beneficiaries.  And

24 the Court put on hold the remainder of our distribution plan,

25 with respect to allowed unsecured claim holders.

1           We have completed the distribution to the DIP lenders,

2    consistent with the order that the Court entered shortly after

3    that --

4           THE COURT:  May I ask, Mr. Fisher, what's the remaining

5    amount you are currently holding?

6           MR. FISHER:  On a net basis, it's approximately

7    $100 million to be distributed, Your Honor.

8           THE COURT:  Okay.  Go ahead.  I'm sorry.

9           MR. FISHER:  And at the conference, in connection with

10   putting the distribution to allowed unsecured claim holders on

11   hold, the Court asked the parties to advise the Court about their

12   respective views about the impact of Judge Furman's decision,

13   which had been issued just the week before, its impact on the

14   motions that were then before the Court.

15          We complied with that request.  We submitted a letter

16   on October 28th where we shared the AAT's views of what the

17   impact was on our distribution motion.  And I think it's

18   important to note, Your Honor, that the letter has gone

19   completely unresponded to.  And we made essentially two points.

20          THE COURT:  What's the ECF docket number of your

21   letter, do you know?

22          MR. FISHER:  Of course.  It's ECF Number 14631, Your

23   Honor.

24          THE COURT:  Okay.  Go ahead.

25          MR. FISHER:  And basically, our points were if before

42

1   Judge Furman's decision the economic loss plaintiffs faced a very

2   long, very uncertain, and very speculative path to ultimately

3   achieving their goals and having claims, in the wake of Judge

4   Furman's decision, the path only got longer and more difficult

5   and more speculative.  And then at the conference, Mr. Weisfelner

6   had raised the prospect that, "Well, even if we don't someday get

7   class cert, we still have individual claims that could be

8   asserted."

9        THE COURT:  Yeah, 11-and-a-half million are going to

10  file proofs of claim, right?

11       MR. FISHER:  Right.  And Your Honor, we -- in light of

12  that point, we went back, looked at our trust agreement, and also

13  at around the same time, documents from the economic loss

14  plaintiff litigation were becoming unsealed.  We are not a party

15  to the litigation.  We're not an insider in any way to that

16  litigation.  And what we learned is that the nature of any

17  individual claim for damages is such that even if someday the

18  Court were to allow late claims, and even if individual

19  claimants, economic loss plaintiffs were to come forward and file

20  individual claims, they would not be entitled to recover from our

21  trust because our trust has a $25 minimum distribution threshold.

22  And just the economics of it are such that in order to be

23  entitled to that distribution, you'd have to have an allowed

24  claim in an amount of at least $8,000.

25       And in this hypothetical scenario, the truth is you'd

43

1  likely need an even larger allowed claim because the claim pool

2  would only be further diluted by economic loss plaintiffs

3  asserting claims.  So it just seemed to us, in light of Judge

4  Furman's decision, that we were in for indefinite, unknowable

5  delay with regard to a litigation to which we are a stranger, and

6  where the prospect of an actual claim against our trust seems so

7  remote that it was then back in August, and it is even now more

8  firmly our view that our distribution should be authorized to the

9  remainder of our beneficiaries.

10        THE COURT:  Let me ask you a completely hypothetical

11  question.  What if Judge Furman changes his mind and says, "I was

12  wrong.  The Boedeker analysis can be used to establish damages."

13  What would your position be then?

14        MR. FISHER:  Well, Your Honor, I think even before -- I

15  mean, I think if the Boedeker decision had gone in favor of the

16  economic loss plaintiffs, what I've read is that they were

17  looking at a potential trial in January 2020, which would then be

18  followed inevitably by appeals and so on.  And so even if the

19  litigation had been breaking their way, we're still talking about

20  a very long, uncertain path to class cert.

21        THE COURT:  I understand that, but I mean, I've already

22  said, I think what was my concern.  And that is, yeah, there are

23  lots of hoops that -- and I'm not waiting for all appellate

24  proceedings and everything else to be done, but if the economic

25  loss claimants -- they believe based on the Boedeker analysis

44

1  that they could prove damages, you know, a huge sum of damages --

2  yeah.  There are a lot of limited funds in the GUC Trust,

3  including the 100 million that the AAT has.  And at some point

4  then if they establish their entitlement, you know, it could be

5  really nasty issues about claw-backs and things like that.

6          My reluctance, and it remains -- and I would love -- I

7  would like to be able to order the distribution of the remaining

8  funds, but my concern is am I compounding the problem if, you

9  know, we go through the briefing, we have argument, and I

10  conclude yes, laid claims, yes, laid class claims, and they're

11  able to establish very, very large damages, where's the money

12  going to come from?  That was my concern before, and it remains

13  my concern now.

14          I tried to explore, and you convinced me that I

15  couldn't do this, could you transfer the funds to the GUC Trust

16  and have the AAT go out of business so that then, you know, would

17  reduce the administrative expenses.  But I was convinced I was --

18  I couldn't do that.

19          MR. FISHER:  And Your Honor, we certainly share the

20  Court's goal.  We would like to go out of business.  We would

21  like to distribute the remainder of our proceeds.  And at the end

22  of the day, I suppose, there is no escaping some kind of

23  balancing that has to happen here.  We have known beneficiaries

24  who have been waiting, one could say, more than ten years for

25  their distribution because the term loan case was filed in 2009.

1  And we -- and I also should note that there never have been any

2  objections to the actual mechanics of our proposed distribution

3  plan, so it is a good distribution plan.

4         And the question is, should those known claim holders

5  have to wait indefinitely in light -- and get tangled up in a

6  litigation to which they are strangers where the prospect of

7  recoveries are so remote and depends on so many contingencies.

8  And so on behalf of the AAT, our view is that, no, we should not

9  be tangled up in that mess.  You know, we are a discrete trust.

10 It is a discrete group of assets.  It doesn't leave the economic

11 loss plaintiffs with no possible remedy.  And that the Court

12 should act where it can to trim the case and get money out into

13 the intended -- to the intended beneficiaries.

14         THE COURT:  Thank you very much.

15         I'm going to hear from Mr. Steinberg next, and then I'm

16 going to shift over to that side.  Or well, who -- somebody from

17 New GM.  Sorry.  Steinberg was in my line of sight.  That's --

18         MR. KIMPLER:  Fair enough.  For the record, Kyle

19 Kimpler from Paul Weiss on behalf of New GM.

20         THE COURT:  Thank you, Mr. Kimpler.

21         MR. KIMPLER:  Your Honor, I was going to just quickly

22 address, I think, two issues.  First, on the briefing, as we said

23 in our letter, we don't really view ourselves as having a primary

24 role in that briefing.  I think we'll take more of a

25 supplementary role.  If you would like, there were a couple of

46

1  issues, I think, when you were going through with Ms. Going on

2  the issues, I can give you at least our perspective, not

3  intending to fully resolve that today.

4          THE COURT:  Please go ahead.

5          MR. KIMPLER:  The first one is the question is whether

6  where there's a due process violation whether the proper remedy

7  is only to go after the reorganized company.  I think what we

8  would say for that, at least at this stage, is two things.  One,

9  this is not a reorganized company.  New GM is not the reorganized

10  Debtor.  It is the purchaser under a 362 sale.  And I think when

11  you read the cases that she cited, the St. James case in

12  particular, you'll see that distinction does matter.

13          And let me say why.  If you look at that case, you'll

14  see that a very critical link in the analysis is that the plan

15  had a discharge under 1141 that discharged all claims, whether

16  filed or not.  And so, therefore, the Court found even

17  if -- basically, you cannot have a late claim post-confirmation

18  and said you can go after the reorganized debtor.  Here, of

19  course, you have a liquidating case.  There is no discharge.  You

20  can draw your own conclusions, and we're happy to brief it as

21  well.  But I think you will see that that is a pretty important

22  distinction.

23          The second thing, there was a fair bit of back and

24  forth on, Your Honor, was the question of how successor liability

25  is being handled currently in the MDL.  It is certainly our view

1  that the briefing to date, which has been substantial, has

2  focused on state-by-state successor liability analyses.  Judge

3  Furman has made decisions on some of those.  We are not aware of

4  any argument or briefing about a kind of a federal overlay to

5  that.  And so we're not aware of that case law, but again, happy

6  to brief that if you would like.

7       Your Honor, the second thing, unless you have anything

8  on the briefing that you'd like to ask me about, the only thing I

9  was going to mention is there is a mediation plan for this

10 afternoon.  New GM is going to that mediation in good faith, and

11 as always, we are looking for ways to get a global settlement.

12      THE COURT:  Let me ask, New GM successfully settled

13 most of the personal injury wrongful death claims, pre-sale

14 accident personal injury wrongful death claims.  It sounds like

15 it's down to 68.  Is that the right number?

16      MR. KIMPLER:  I think the outer-bound is --

17      THE COURT:  Fifty-four claims that --

18      MR. KIMPLER:  I think the outer-bound is 68.  I think

19 as Mr. Weintraub noted, a large number of those are people that

20 have not been responsive, and so we don't really have information

21 to do anything with.

22      THE COURT:  Is there still any effort ongoing to

23 resolve the remaining personal injury, wrongful death claims for

24 pre-sale accidents?

25      MR. KIMPLER:  Your Honor, there are ongoing personal

48

1  injury mediations.  Those are mostly, I believe at this point,

2  focused on claims that have been asserted, at least in the MDL.

3  And of course, if there are claims in the bankruptcy court, those

4  would wrap up.  I do not believe on the calendar currently there

5  is any planned mediation for the nine claims for Ms. Norman or

6  with the withdrawn claims that Mr. Weintraub has noted.

7       THE COURT:  Okay.  The -- taking the nine claims from

8  Ms. Norman, was there an effort to resolve those in mediation?

9       MR. KIMPLER:  I do not believe there's been a mediation

10 on those.  If I'm mistaken about that, I can submit a letter to

11 correct.

12      THE COURT:  Ms. Norman, you're on the phone, I believe.

13 Has there been a mediation with respect to -- and in your letter

14 to the Court, you identified specifically the nine.  Has there

15 been any mediation effort to resolve those nine?

16      MS. NORMAN:  I do not believe that personal injury

17 counsel has mediated those nine.  My original 389 claimant group

18 consisted of personal injury plaintiffs that were represented by

19 eight total personal injury firms, and I don't believe that --

20 and New GM can correct me if I'm wrong, but I don't believe that

21 Kirkendall Dwyer has mediated those nine claims.

22      THE COURT:  Thank you.  I would encourage you to -- Mr.

23 Kimpler, to see whether, you know, resolve them or not, but there

24 ought to be an effort to try and mediate the remaining personal

25 injury wrongful death claims.

1          I think back -- you know, Judge Gerber retired in

2    January 2016, that's when I took over Motors Liquidation.  There

3    were hundreds of pre-sale, you know, personal injury, wrongful

4    death claims.  I encouraged mediation to try and resolve them.

5    It wasn't because of my encouragement, but you know, New GM has

6    been quite successful.  I hope that the plaintiffs felt that way

7    too.  But you know, many of the -- most of the claims got

8    resolved.  They're down to a finite number of claims.  I think

9    you ought to reach out to the plaintiff's counsel in those cases

10   to see whether you can get them scheduled for mediation, see

11   whether you can resolve those additional claims.

12          MR. KIMPLER:  Your Honor, I'm happy to discuss that

13   with my client, and I hear you loud and clear.

14          THE COURT:  Okay.

15          MR. KIMPLER:  Just for the record, I would -- I believe

16   these remaining claims have additional complications is what I

17   would say.

18          THE COURT:  And I'm not --

19          MR. KIMPLER:  So --

20          THE COURT:  What I'm urging you is, is if there hasn't

21   been -- you know, if there's already been mediation, and it led

22   to an impasse, and it's not going to be resolved, okay.  But if

23   they haven't -- if there has not been an effort to mediate,

24   complications or not, there ought to be an effort, and hopefully

25   you can resolve some more.

50

 1             Mr. KIMPLER:  Your Honor, we hear you, and we will do

 2   it.

 3             THE COURT:  Thank you very much, Mr. Kimpler.

 4             MR. KIMPLER:  Thank you.

 5             THE COURT:  Okay.  Mr. Weisfelner?

 6             MR. WEISFELNER:  Thanks, Judge.

 7             THE COURT:  Nice to see you again, Mr. Weisfelner.

 8             MR. WEISFELNER:  Nice to be here.

 9             Judge, given the little over an hour that our

10   adversaries got to speak, I hardly know where to start, but I'll

11   give it a shot.

12             In the letter --

13             THE COURT:  You've rarely been at a loss for words, Mr.

14   Weisfelner.

15             MR. WEISFELNER:  In the letter that you got on October

16   22nd from Ms. Going, she listed five matters that she thought

17   were susceptible of briefing.  I'll get to those matters in a

18   minute, but I just want to note for the record the obvious.

19   These issues, along with a whole bunch of other issues, once upon

20   a time, were settled between the GUC Trust and its unitholder

21   beneficiaries, on the one hand, and the economic loss, and for

22   that matter, personal injury, wrongful death claimants on the

23   other hand.

24             Now, based on Judge Furman's August decision, the GUC

25   Trust, with the full cooperation of the unitholders, decided to

51

1   withdraw from the settlement, unilaterally.  And in so doing,

2   they decided, Number 1, not to wait for resolution of our request

3   for reconsideration or certification.  And as Ms. Going

4   indicated, that's been fully briefed and pending before Judge

5   Furman.  And the briefs were substantial.  Beyond that, the GUC

6   Trust and the unitholders decided not to wait for the resolution

7   of mediation.

8           Now, I heard Ms. Going articulate that from her

9   perspective, and maybe Mr. Golden shares this perspective, the

10  mediation will have its last chance today.  Well, if that's true,

11  that's a self-defined last chance.  That's not a mediator

12  declaring an impasse.  It's them saying, "We're not going to give

13  this any further effort."

14          Now, in fairness, they did participate in good faith.

15  They did shlep out to California, Newport Beach in particular,

16  not Los Angeles, by the way, for what amounted to an all-day

17  mediation.

18          The only other thing I wanted to harp on by way of

19  preliminary remarks is, to a large extent, you are being implored

20  by the two trusts at issue to engage in fairness.  We've been

21  waiting so long, that we shouldn't be required to wait any

22  longer.  Well, let's explore that.  In the first instance --

23          THE COURT:  Let me -- I'm only stopping you to

24  say -- because I don't believe that the people on your side of

25  the courtroom should have to wait longer either.  They're

52

1  entitled to a resolution.  Everyone's entitled to a resolution.

2  If the economic loss plaintiffs are entitled to a recovery

3  because they satisfy, you know, the Bankruptcy Rules for late

4  claims, and they established damages, they are to recover.  And

5  they've waited long enough.  The unitholders who are entitled to

6  further distributions have waited long enough.

7          So I'm not faulting any of you.  I've been patient as

8  well.  But it's time to move forward.

9          MR. WEISFELNER:  And again, Your Honor, we're not

10 disputing that it's time to move on.  It's how we move on.

11         THE COURT:  All right.  Let me ask you this,

12 Mr. Weisfelner, on Page 2 of your letter, which is ECF -- is your

13 October 23rd letter, ECF Docket 14627, on the second page of it,

14 you say, in part, "We think there are nuances involved in the

15 issues, as framed by the GUC Trust, that should be considered

16 before the parties are sent off to brief those issues.  For

17 example, New GM contends that the finding of a due process

18 violation was only as to the 2009 sale order and not with regard

19 to the bargaining order.  These and other subtle issues should be

20 explored before briefing is ordered."

21         I really do only want to do this one more time.

22         MR. WEISFELNER:  And --

23         THE COURT:  And let me finish, and then I'll give you a

24 chance.

25         And so I really -- if you have other issues that you

53

1  believe need to be addressed, I need them -- you don't have to do

2  it while you're standing there.  I need them set down in writing.

3  I'm going to want -- after today's hearing, I want all sides to

4  go off and draft a proposed order identifying all of the issues

5  that each side believes needs to be addressed.

6       And while I may not agree with every issue that each

7  side wants to address, I'm more inclined to say let's get them on

8  the table now.  Let's get them briefed.  Let's get a hearing date

9  set.

10       Mr. Peller, who is sitting in the back, wrote a -- the

11  Court a brief letter where he wants the ability to file a short -

12  - you know, the parties are to go forward with the briefing, he

13  wants to be able to file supplemental briefs, and I agree.  I'm

14  happy to hear from you, Mr. Peller, when you come up.  But I

15  thought his request was entirely reasonable.

16       I think that to the extent and they're, you know,

17  lurking in the background is the issue, does New GM have standing

18  with respect to these issues, but I think what Mr. Basta and Mr.

19  Steinberg in their letter to the Court, they think that most of

20  it is going to get addressed by the other parties.  They're not

21  looking to duplicate.  I don't want to have to decide the issue

22  right now of do they have standing on this or not, but I'm

23  prepared to let them file briefs as well.  Let's get all the

24  briefs in.  We'll get an argument scheduled.  But that's how I

25  want to proceed at this point.

54

1          I think what I'd like to do is Judge Furman has the

2   status conference scheduled for the 18th.  My thought was to have

3   you all try, after that conference, to work out a proposed order

4   identifying specific -- just the way, you know, we did it with

5   the, you know identify -- when I issued the order to show cause,

6   Judge Gerber had done it before identifying the issues that had

7   to be addressed.  We got it down.  We went ahead.  Everybody --

8   you know, you all decided -- not you all, GUC Trust and the

9   economic loss plaintiffs decided to put off some issues while

10  they tried to resolve it.  We are where we are.  Okay.

11          MR. WEISFELNER:  And the only thing I wanted to

12  address, Your Honor --

13          THE COURT:  Go ahead.

14          MR. WEISFELNER:  -- is two points.  Number one,  what

15  are the right issues for the parties to brief and for  Your Honor

16  to decide, if in fact the goal is let's try to get this done

17  once, and only once.  The second thing I want to try and resolve

18  is when do the parties revert back to their libraries and their

19  computers and start to work on this briefing.

20          On the first issue, I do have additional detail I can

21  share with you today --

22          THE COURT:  Go ahead.

23          MR. WEISFELNER:  -- or articulate in a separate writing

24  --

25          THE COURT:  The first issue that Ms. Going identified?

55

1          MR. WEISFELNER:  The first issue, I think to be clear,

2    is it all depends on the law of successor liability.  Because

3    absent a determination of successor liability, the mere fact that

4    you were deprived of due process does not automatically mean that

5    you have one potential defendant and that's New GM.

6          In a situation where GM sold itself to New GM, which in

7    point of fact was a sale to the Treasury that then revolved or

8    devolved to being New GM, we believe that absent being able to

9    successfully argue that successor liability ought to apply, the

10   argument doesn't bear any weight.  And in point of fact, Judge

11   Furman has resolved any number of state law based claims on a

12   state-by-state basis as to whether successor liability applies,

13   and unfortunately, many of the resolutions have gone against us

14   and in favor of New GM.

15         THE COURT:  I'll ask you the same question I asked Ms.

16   Going earlier.  Is -- do the economic loss claimants have a legal

17   basis to recover against New GM other than through state law

18   successor liability?

19         MR. WEISFELNER:  Not that I'm aware of.  Understand

20   that I'm not the lead counsel --

21         THE COURT:  I understand.

22         MR. WEISFELNER:  -- in front of Judge Furman, but I do

23   tend to review the pleadings pretty well.  That's not --

24         THE COURT:  I'll hear Mr. Berman, as well.

25         MR. WEISFELNER:  That's not to say that there aren't

1  claims against New GM that are still being prosecuted, as

2  someone's mentioned before, lost wages, lost time.  There's also

3  a contention that New GM is liable for the failure to give

4  adequate -- and then argue adequate means written notice -- to

5  known claimants, because there's a gap between when Old GM failed

6  to advise the Court and failed to take --

7          THE COURT:  First recalls were in 2014.

8          MR. WEISFELNER:  -- its action.  But it then also -- we

9  think there was a gap between the sale and the bar date.  And by

10  then, New GM is in charge.  And if New GM, by virtue of the

11  knowledge it obtained from Old GM, is responsible for the failure

12  to do formal, written notice to known claimants, then we're still

13  pursuing that claim.

14          The other concern I have is the generalized focus on

15  wanting to ferret out the rights and remedies that belong to the

16  047 recall victims, shall we say, as opposed to all of the recall

17  victims.

18          And Your Honor, what the GUC Trust now positions itself

19  as saying is there is no way from the record to be able to

20  determine a due process violation for anyone other than the 047,

21  which was the subject of prior judicial proceedings.  Nonsense,

22  we say.  The bridge between determining a due process violation,

23  between 047 and the balance, if not all of the recall victims, is

24  not a bridge too far.  And one wonders, if one wants to do this

25  once and only once, whether we piecemeal out the implications for

57

1  047 only to then have to turn to the implications for the other

2  recall --

3          THE COURT:  Let me ask.  Is there evidence in the

4  record whether Old GM knew about the other defects that were

5  later the subject of other recalls in 2014?

6          MR. WEISFELNER:  We believe there is ample evidence,

7  and I'll give Your Honor a sense of it, as Your Honor has already

8  suggested.  Putting aside the airbag defect that was the subject

9  of your colloquy and the steering wheel defect, all of the other

10 defects had to do with an ignition switch.  Different model cars,

11 different ignition switch, either the first generation that was

12 defective, or the second generation that was equally defective --

13         THE COURT:  Were they always defective over the

14 rotation issue?

15         MR. WEISFELNER:  They were always defective as to a low

16 torque.  And, again, not only am I not involved in the MDL, I'm

17 not a scientist.  But from everything I've read, both in the

18 reports and in the deferred prosecution agreement, and common

19 sense logic, if there was a known defect with regard to this

20 particular ignition switch, all of the other recalls are

21 virtually identical to the first switch.

22         THE COURT:  May I ask you this?  Are the economic loss

23 claimants prepared to address the due process issues with respect

24 to the other defects based on the existing record?

25         MR. WEISFELNER:  Your Honor, I'm not sure that we could

58

1  specifically rely on the existing records without, you know, some

2  additional discovery.  I don't know the answer to your specific

3  question.  And again, with a view towards let's do it once, and

4  you would also think that you want to do this based on legal

5  principles as opposed to disputed facts, as part and parcel of

6  addressing with Your Honor what specific suggestions that we have

7  on what to brief, I will have an answer for you as to that

8  question.

9        My fear, however, is there may be a modicum of

10  additional discovery.  Understand the way we did it --

11        THE COURT:  So many years after -- I mean, I can't

12  imagine --

13        MR. BERMAN:  Your Honor, with --

14        THE COURT:  Mr. Berman, go ahead.  Just identify

15  yourself on the record.

16        MR. BERMAN:  Steve Berman for the economic loss

17  claimants.

18        THE COURT:  Nice to see you, Mr. Berman.

19        MR. BERMAN:  Good to see you again, Your Honor.  We've

20  taken all the discovery we need on any of the defects that we

21  would pursue in this Court.

22        THE COURT:  All right.  Thank you very much,

23  Mr. Berman.

24        MR. WEISFELNER:  The other thing I wanted to remind

25  Your Honor of, and the parties, is the way we got to the

59

1  determination that the 047 switch was known -- a known defect,

2  and therefore the determination that known claimants were

3  entitled to written notice, was through a process that went   on

4  for quite a number of weeks, if not months, between us and New

5  GM, sitting in a conference room trying, point by point, to come

6  to an agreement as to a stated fact.

7          I'm not sure how much of that back and forth we'll

8  need, based on Mr. Berman's comments.  It suggests to me that,

9  you know, we can do --

10          THE COURT:  Is this really New GM's issue?  I mean,

11  because the issue is did Old GM know about the other defects.

12  I'm not sure why New GM's point of view on that is pertinent to

13  the inquiry.

14          MR. WEISFELNER:  Your Honor, frankly, neither am I,

15  other than I know how we did it the first time around.  And  New

16  GM took an active role in the setting forth of uncontested facts

17  that would lead to a legal conclusion.

18          THE COURT:  Okay.

19          MR. WEISFELNER:  Now, again, their argument number two,

20  our concern with that is there's been many arguments, written

21  arguments that we've read, and have crafted ourselves, as to

22  whether or not Pioneer factors are applicable to a denial of due

23  process --

24          THE COURT:  I've wondered about that.

25          MR. WEISFELNER:  -- where you have it --

1          THE COURT:  I don't have an -- you know, I certainly

2   haven't ruled on it, but I just -- I puzzled about it, because

3   Pioneer didn't involve a due process violation.

4          MR. WEISFELNER:  Correct.  And then the next concern we

5   have is the so-called "tolling" issue.  Well, the tolling issues

6   could only apply to the non-initcap Ignition Switch Defect

7   claimants.  So if we're going to ignore everyone other than 047,

8   which I don't think is the right thing to do, then I don't

9   understand why tolling is ever an issue.

10          Number three is the same as number two, just written

11  differently, as Ms. Going acknowledged when she was at the

12  podium.  And the final issue, can you -- even if you can satisfy

13  Pioneer, whether or not it's applicable, should those claims

14  nevertheless be disallowed or dismissed on the ground of

15  equitable mootness.  Here may be the only place where we agree

16  that briefing on that topic, and perhaps that topic alone --

17          THE COURT:  We're not doing one issue.  We're getting

18  everything on the table.

19          MR. WEISFELNER:  And my suggestion was this, that you

20  don't need to go to any other issue.  If Your Honor were to

21  determine equitable mootness in favor of the GUC Trust and in

22  opposition to the economic loss plaintiffs, that's game over.

23          THE COURT:  Yeah, but what we're going to do -- that

24  ought to be one of the issues that's addressed.  I hate to put

25  everybody through this burden, but we're going to brief all the

61

1    issues that get identified.  And if I miraculously decide that I

2    decide one issue a particular way and everything else becomes

3    moot after that, well, that's what will happen.  But I don't want

4    to go through, have briefing on the issue of equitable mootness,

5    have argument on it, you know, in January or February or

6    whatever, and then render a decision, and decide equitable

7    mootness doesn't bar claims, and then have briefing on other

8    issues.

9         So we've got -- in fairness to the people on your side

10   of the table, and in fairness to the GUC Trust and New GM, we're

11   going to do it once.  Now I would --

12        MR. WEISFELNER:  The only other point that I --

13        THE COURT:  -- say I have to be careful what I ask for,

14   because I'll wind up with a lot of briefs.

15        MR. WEISFELNER:  The only other point I wanted to make

16   with regard -- in response to a question you raised -- I can't

17   remember if it was to Mr. Golden or Ms. Going, you asked if the

18   class certification issues before Judge Furman are the same or

19   different than the class certification issues that may apply to

20   late claims in the bankruptcy.  And let me say this about that.

21   I don't think that they overlap.  I think the question of

22   certification of a class claim for purposes -- originally it was

23   for purposes of estimation, and are still being done for purposes

24   of estimation, are quite different.

25        I also want to make sure Your Honor is aware of the

1  fact that while Judge Furman has so far made a determination

2  about Boedeker's qualifications as an expert to speak to the

3  issue of benefit of the bargain damages, and reached the

4  conclusion, as I understand it, that because Boedeker didn't

5  reach the question of how many cars would New GM be willing to

6  sell as defective cars with an agreed upon discount because of

7  the defect -- I think the answer is if GM knew they were selling

8  defective cars, the answer was all of them.  And that's a very

9  simple way of saying why we disagree with the class cert decision

10 that Judge Furman -- or the implications for class certification

11 that the judge entered.

12         Remember, everyone believes that class certification

13 would be difficult because the damage theory put forward by

14 Boedeker has been knocked out by Judge Furman.  I just want Your

15 Honor to be crystal clear that as, when and if it comes time to

16 prove damages before this Court, we will rely on    non-Boedeker

17 expert witnesses that do have formal damage calculations

18 available to present.  They won't be limited to benefit of the

19 bargain theories.  They'll take into account lost time, lost

20 wages, and other damages that have been asserted in the class

21 action complaint --

22         THE COURT:  So not based on a conjoint analysis.

23         MR. WEISFELNER:  It will not be based on Boedeker's

24 conjoint analysis that, according to Furman, lacked the market

25 test when viewed from the perspective of how many defective cars

1  would GM be willing to sell at a depressed price.

2              THE COURT:  What will it be based on?

3              MR. WEISFELNER:  Excuse me?

4              THE COURT:  What will it be based on?

5              MR. WEISFELNER:  What will any analysis --

6              THE COURT:  What will your -- you're telling me that

7  the economic loss plaintiffs have another theory of damages that

8  does not depend on the Boedeker analysis.  And I'm not deciding

9  the merits of now.  But obviously it's something that you and

10  your colleagues have thought about.  And what -- can you briefly

11  explain to me what the theory is?

12              MR. WEISFELNER:  I cannot because Your Honor --

13              THE COURT:  Maybe Mr. Berman will --

14              MR. WEISFELNER:  -- was incorrect in assuming that I've

15  been involved in those discussions or analysis.

16              THE COURT:  All right.

17              MR. WEISFELNER:  Co-leads may very well --

18              MR. BERMAN:  I'll be glad --

19              MR. WEISFELNER:  -- speak to it.

20              THE COURT:  Mr. Berman, do you want to --

21              MR. BERMAN:  Can I speak from here, Your Honor?

22              THE COURT:  Yes, you can.

23              MR. BERMAN:  It will be a conjoined analysis, but

24  obviously we've hired another expert who's taken a look at what

25  Boedeker did, Professor Gans, G-A-N-Z -- S -- G-A-N-S, who's

1  confirmed what he believes is the reliability of Mr. Boedeker's

2  work, and he's taken into account Judge Furman's concerns and

3  he's going to address those concerns.  So we're -- you know,

4  we've learned a lesson from the judge and we're going to --

5          THE COURT:  Is that -- without going into detail about

6  it, have you raised with Judge Furman at this stage that the

7  economic loss plaintiffs have other experts who you believe will

8  be able to -- and I know you're still challenging his ruling, but

9  have you told him yet that you have other experts you think are

10  going to do this?  Are you going to tell him on the 18th?

11          MR. BERMAN:  No.  Well, I don't know -- I don't know

12  exactly what's going to happen on the 18th --

13          THE COURT:  I don't either, but --

14          MR. BERMAN:  -- because I surmise that he's waiting to

15  see if the mediation has been successful.  Because until he

16  issues his --

17          THE COURT:  I really hope you go and mediate and get

18  this all resolved, okay?

19          MR. BERMAN:  Well --

20          THE COURT:  I won't keep you much longer.  What time is

21  the mediation?

22          MR. WEISFELNER:  As soon as this is over.

23          MR. BERMAN:  As soon as we're done here.

24          THE COURT:  Okay.  Let's get this over with.  Go ahead.

25          MR. BERMAN:  Okay.  But to finish, what I've told Judge

1  Furman is these were test cases, and we've learned from his

2  orders and we're ready to start the new cases with some different

3  thoughts, so he knows we're -- and GM contests that.  They think

4  it's all over, that this ruling applies.

5          THE COURT:  All right.  Thank you.

6          MR. WEISFELNER:  The only other point I wanted to make

7  is --

8          THE COURT:  Go ahead, Mr. Weisfelner.

9          MR. WEISFELNER:  -- one of timing, before we rush out

10  of here.  And that is that, look, the mediation, if it's going to

11  be successful, is likely going to either succeed or be dead by

12  the end of the year.  And I, for one, would rather start the

13  briefing sometime in January, rather than have to be writing

14  during the holiday season.

15          THE COURT:  Well, let me tell you what I would like, is

16  -- I think you addressed this.  I believe it will take some time

17  for you all to agree on a proposed order that specifically

18  identifies all of the issues that should be briefed.  I don't

19  believe that Ms. Going's letter to the Court, identifying the

20  four issues, sufficiently addresses the issues that the Court

21  should address.

22          So I'm going to give you all -- and I do think -- I

23  don't know what's going to happen on the 18th, but we ought to

24  see what happens -- you ought to see what happens on the 18th.

25  So I'm -- and with the holidays.  I'm going to require that by

66

1  January 15, 2020 that you all have attempted to negotiate an

2  agreed form of order identifying the issues and a proposed

3  schedule for briefing.  If you're unable to reach agreement, each

4  side -- or there may be more than two sides -- should submit

5  their proposal, and I will resolve it.  I generally -- just so --

6  and doing this, because I really want to do this once.

7          While, Ms. Going, you may not think that an issue that

8  Mr. Weisfelner or Mr. Berman -- believe is an issue, I'm likely

9  to say no, we're going to brief the issue.  You disagree, fine.

10  But you'll brief it.

11          So I'm giving you until -- all of you until January

12  15th to try and come up with a proposed order that specifically

13  identifies the issues that will be addressed, and a schedule for

14  the briefing.  Okay?

15          You know, so in all likelihood, Mr. Weisfelner, briefs

16  are going to be due sometime in mid-February for the first round

17  of briefs.

18          MR. WEISFELNER:  Understood.

19          THE COURT:  And to the extent that you can agree on

20  simultaneous filings of briefs, or minimize -- and page limits,

21  get that all worked out.  Okay?

22          MR. WEISFELNER:  Last issue.

23          THE COURT:  Go ahead.

24          MR. WEISFELNER:  From my perspective.  We heard from

25  counsel to the AAT, and I don't know if Your Honor remembers the

name Beth Andrews.  She was a witness during the trial on the

enforceability of the agreement that the GUC Trust wanted to get

rid of.

Our understanding is Beth Andrews is the person to whom

counsel for the AAT reports, in addition to some guy named

Gonzalez, that I think used to be a judge in this very

courthouse.

THE COURT:  Who might be sitting in the back of the

courtroom.

MR. WEISFELNER:  And he might even be sitting here.

And I've been loathe to address Judge Gonzalez on any of these

issues, notwithstanding that he is my client in unrelated

matters, because I want to respect, you know, the chain of title

here.

THE COURT:  Just go along with your argument,      Mr.

Weisfelner --

MR. WEISFELNER:  Here's my concern.  You know, the AAT,

we believe, I think the GUC Trust believes, I think the unit

holders believe, I think New GM believes, ought to be at a

minimum part of the briefing issues that Your Honor sets up.

More than that, you know, it would be lovely to have

them participate in the mediation, which to date they've refused

to come near, either as a volunteer or as a directed party.  I

don't know what conclusion to reach.  I don't know what to

suggest to Your Honor.  But it is a problem from all of the

1 participating mediating parties, which I just thought I'd call to

2 your attention.

3           THE COURT:  I'm not going to get into that issue.  Okay

4 --

5           MR. WEISFELNER:  I hear you.

6           THE COURT:  -- Mr. Weisfelner?  Okay.

7           MR. WEISFELNER:  Thank you, Judge.

8           THE COURT:  Anybody else have any last words?

9           Ms. Going, very briefly.

10           MS. GOING:  Your Honor, just a couple of things.  I

11 have no desire to have the AAT participate in our briefing on

12 ignition switch issues --

13           THE COURT:  I don't want to hear about the AAT, okay?

14           MS. GOING:  Okay.  I did want to point you, which may

15 or may not be helpful, to the Second Circuit decision on the

16 issue of the ignition switch defined term non ignition   switch

17 --

18           THE COURT:  It will be all -- I have that opinion that

19 deals with -- because Judge Furman asked the question, ignition

20 switch plaintiffs, non ignition switch plaintiffs.  One of the

21 opinions I issued addresses that matter.

22           MS. GOING:  No, not --

23           THE COURT:  Let's not get into it today.  Okay?

24           MS. GOING:  But this is where they specifically

25 remanded the non ignition switch defects for determination of

1  whether or not there was a due process violation.  That's in the

2  Second Circuit decision.

3         THE COURT:  Well, Mr. Berman says he can do it on the

4  existing record.  So -- but we're going to deal with it.

5         MS. GOING:  And my last point is just I want to make

6  sure that you understand the universe -- when we are talking

7  about 047, that entire universe of vehicles is 2.4 -- maybe it's

8  -- it's either 2.4 or it's in the range of the universe of 2.4

9  million vehicles.  That's the absolute ceiling of vehicles.  That

10 includes pre and post.  So we're not talking about the tens of

11 millions of vehicles anymore.  We're talking about a universe of

12 two plus million vehicles.  I just want to make sure that you

13 understand that.

14        THE COURT:  Mr. Golden.

15        MR. GOLDEN:  Thank you, Your Honor.  I just have three

16 questions, Your Honor.  Number one, I know you've sent the

17 parties out to come back and hopefully agree upon the full

18 breadth of the briefing issues, but you indicated that you may

19 have some disagreement with the issues to be briefed as set forth

20 and -- I was wondering whether the Court had any guidance for us

21 --

22        THE COURT:  No.  I don't.  When I said I might have

23 some disagreement, you know, hopefully you all will come up with

24 a form of order consensual.  And I think when the Court entered

25 the order to show cause on the 2016 issues, I think I said then I

70

1  probably wouldn't have drafted some of them using the same

2  language, but I wasn't going to -- but because the parties had

3  come to an agreement, I didn't -- that's what I did.

4       So that was my intent, Mr. Golden, was I want the

5  parties to try and work out an agreement on the framing of the

6  issues that will be briefed.  And unless something is -- I view

7  as completely off the wall, I'm not going to, you know, flyspeck

8  what's done.  Okay?

9       MR. GOLDEN:  Second question, Your Honor.  Because I

10 really want to get this done and make this effective.

11      THE COURT:  Yes.

12      MR. GOLDEN:  We did have two meet and confers.  I

13 thought we had total agreement on the scope.  Apparently we

14 don't.  I guess people are entitled to change their mind.

15      But is there still the admonition that you don't want

16 briefed an issue that's pending before Judge Furman?  For

17 example, class certification.

18      THE COURT:  To the extent that the arguments that would

19 be made here are ones that are pending before Judge Furman, the

20 answer is I don't want those briefed.  But it did seem to me that

21 there are differences between certification in the bankruptcy

22 court and certification of -- in the MDL against New GM.

23      MR. GOLDEN:  We agree.

24      THE COURT:  And so I've made clear I'm not going to

25 address the issues -- the specific issues that are pending before

71

1  Judge Furman.  Okay?  But to the extent that the issues are

2  different -- Mr. Weisfelner thinks they are -- I think there may

3  be issues that are particular and unique to the bankruptcy case

4  in terms of certifying late claims.  Okay?   The issues that

5  people feel are unique to the bankruptcy case, I do want

6  addressed.  Okay?

7           MR. GOLDEN:  Thank you.  And last point.  I just want

8  to make sure we have an understanding that the evidentiary record

9  is complete.  We are briefing based upon --

10          THE COURT:  Are you satisfied with the evidentiary

11 record?

12          MR. GOLDEN:  I am, Your Honor.

13          THE COURT:  Okay.  And Mr. Berman has indicated he is,

14 too.

15          MR. BERMAN:  Yes.  If we're allowed to use all the

16 facts in the MDL, yes, the record is complete.  That's the

17 discovery I'm talking about.  We've --

18          MR. GOLDEN:  Well --

19          MR. BERMAN:  -- done the discovery -- excuse me,  Mr.

20 Golden.

21          THE COURT:  Hold on.

22          MR. GOLDEN:  Sorry, Mr. Berman.

23          MR. BERMAN:  We've done the discovery in the MDL.  To

24 the extent we need facts to support our due process violations,

25 we've done that discovery, and they have had access to it.

1              THE COURT:  Mr. Golden, go ahead.

2              MR. GOLDEN:  No.  Your Honor, I think you might recall

3  there was -- and Mr. Weisfelner made reference to it -- a

4  grueling effort to get to a state of stipulated facts upon which

5  the 2016 briefing was done.

6              THE COURT:  Mr. Golden, you know, I'm going to see what

7  if -- I'll read the record.  I'll read what each side relies on

8  to support their position.  There isn't going to be  -- what's

9  clear is neither side is going to request discovery; that, to the

10 extent that the parties are arguing, they're arguing from the

11 existing record, which includes the discovery that was taken in

12 the MDL.

13             MR. GOLDEN:  I know, Your Honor, but the GUC Trust

14 wasn't a part to the litigation or a party to that discovery --

15             THE COURT:  Well, I will see what is presented to me.

16 Okay?  Does the GUC Trust want to take discovery?

17             MR. GOLDEN:  No.

18             THE COURT:  Ms. Going, you want to do discovery?

19             MS. GOING:  We do not, Your Honor.

20             THE COURT:  Okay.

21             MS. GOING:  But we certainly want --

22             THE COURT:  That's the answer then.

23             MS. GOING:  -- access to the discovery that is being

24 discussed.

25             THE COURT:  Okay.  You'll get -- work out with other

1  counsel and the MDL or otherwise, that you get full access to

2  whatever discovery has been taken in the MDL.  There is not going

3  to be any discovery.  The arguments regarding due process

4  violations with respect to the other product recalls will be

5  based on the -- all discovery taken to date.  Okay.  Nobody has

6  asked for discovery.

7          Mr. Fisher.

8          MR. FISHER:  Yes.  Your Honor, in response to Mr.

9  Weisfelner's comments, we've made the point very clearly that

10  this bundle of thorny, interesting, constitutional and bankruptcy

11  issues are not -- these are not our issues.  Because at the end

12  of the day, even if the economic loss plaintiffs overcome all of

13  them, they don't have a claim against our trust.

14          And just to add to that, and they can't through a class

15  claim expand rights that they wouldn't have as individual

16  claimants.  And we put that in our letter as well.  And that's

17  why I was hoping today that --

18          THE COURT:  Mr. Fisher, do you wish to add that to the

19  list of issues to be addressed?

20          MR. FISHER:  Yes, Your Honor.

21          THE COURT:  Please do then.  Okay?  That will get

22  addressed as well.  Okay?  I'm not trying to be abrupt.  I want

23  all the issues before me.  And you know, I engaged before

24  becoming a judge in lots of difficult settlement issues, class

25  actions, non class actions, and I heard lots of people including

74

1  myself say, no, this is it.  Either, you know --   "it ends

2  today."  And then, lo and behold, it wasn't really the last word,

3  and cases settle.

4        So I don't think any of you should think that if you

5  walk out of the mediation session today with Judge Phillips that

6  really needs to be the end of it.  Okay?  I'm sure you will all

7  approach it seriously and in good faith, and we'll see where you

8  get to.

9        So the first date that I'm scheduling is the January

10 15th date.  I'm serious about that date.  But the proposed order

11 that's going to be submitted to me will include a reasonable

12 briefing schedule.

13       It isn't going to extend out forever, Mr. Weisfelner.

14 Okay?

15       Have a good afternoon.  Good luck in the mediation.

16 We're adjourned.

17      (Proceedings concluded at 12:50 p.m.)

18

19

20

21

22

23

24

25



75

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

ALICIA JARRETT, AAERT NO. 428      DATE:  December 11, 2019

ACCESS TRANSCRIPTS, LLC

