Hearing Date: March 26, 2020 at 2:00 p.m.
Objection Deadline: March 12, 2020
Reply Deadline: March 23, 2020

**COLE SCHOTZ P.C.**
Mark Tsukerman, Esq.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Telephone: (212) 752-8000
Facsimile: (212) 752-8393
mtsukerman@coleschotz.com

*Bankruptcy Counsel for Robert Randall Buchanan,
Individually and as Administrator of the
Estate of Glenda Marie Buchanan*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, *et al.*<br>f/k/a General Motors Corp., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No.: 09-50026 (MG)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 14667 and 14674** |

**ROBERT RANDALL BUCHANAN'S OBJECTION TO MOTION BY GENERAL
MOTORS LLC TO ENFORCE THE BANKRUPTCY COURT'S JULY 5, 2019 SALE
ORDER AND INJUNCTION AND THE RULING IN CONNECTION THEREWITH,
<u>WITH RESPECT TO ROBERT RANDALL BUCHANAN</u>**

Robert Randall Buchanan, individually and as administrator of the estate of Glenda Marie Buchanan ("**Buchanan**" or the "**Plaintiff**"), by and through his undersigned counsel, hereby files this objection (the "**Objection**") to the *Motion of General Motors LLC to Enforce the Bankruptcy Court's July 5, 2009 Sale Order and Injunction and the Ruling in Connection Therewith, with respect to Robert Randall Buchanan* [Docket No. 14667] (the "**Motion**") and respectfully states as follows:

1

60807/0001-19968820v4

**INTRODUCTION**

1. The limited issue before the Court is whether the Plaintiff has properly asserted an independent failure-to-warn claim and related punitive damages claim against General Motors LLC ("**New GM**") in his First Amended Complaint for Damages (the "**Amended Complaint**").[1] Despite New GM's mischaracterization of Plaintiff's claims and allegations, the Plaintiff does **not** allege or seek (nor does he purport to seek) punitive damages against New GM based on or in connection with any (a) liability of Motors Liquidation Company (f/k/a General Motors Corporation) ("**Old GM**") that New GM assumed in connection with the § 363 sale (the "**Sale**," and the order approving the Sale, the "**Sale Order**"), (b) successor liability theory, or (c) knowledge or conduct of Old GM. As is evident from the Amended Complaint, the Plaintiff's punitive damages claim is based **solely** on New GM's *own* post-Sale knowledge and egregious misconduct in failing to warn the Plaintiff's late wife (and continued failure to warn hundreds of thousands of other GM vehicles owners) regarding a defect in a critical safety feature in her GM vehicle – a safety feature comparable in importance to that of a safety belt. Accordingly, the answer to the limited question presented is a resounding yes.

2. The Plaintiff's claims arise from an accident that occurred approximately five and half years after the Sale. On February 8, 2011, Glenda Marie Buchanan, the Plaintiff's wife, purchased a used 2007 Chevrolet Trailblazer SUV (the "**Trailblazer**"). (Amended Complaint at ¶ 26). On November 10, 2014, she was driving the Trailblazer in Paulding County, Georgia, when she inexplicably lost control and the Trailblazer rolled over and crashed into a ditch across the roadway. Mrs. Buchanan suffered severe injuries in the accident which ultimately led to her death. (*Id.* at ¶¶ 28-29).

---

[1] A copy of Plaintiff's Amended Complaint is attached hereto as **Exhibit A**.

3. On May 3, 2016, the Plaintiff, as Mrs. Buchanan's surviving spouse and administrator of her estate, commenced an action against New GM in Georgia state court (the "**State Court**") to recover damages for the pain and suffering and wrongful death of Mrs. Buchanan. The Plaintiff alleges that the accident was caused by a defective "steering wheel angle sensor" (or "**SWAS**") in the Trailblazer. The SWAS is a critical component of the Trailblazer's Electronic Stability Control ("**ESC**"), a technology designed to improve and control a vehicle's stability and steering control, particularly during emergency maneuvers. (Amended Complaint at ¶¶ 17, 19). GM's version of this ESC technology is called the StabiliTrak system. New GM touts its StabiliTrak system as "the most significant safety feature since the development of the safety belt." (*Id.* at ¶ 18). Critically, however, if a vehicle's SWAS is defective and fails, it disables the StabiliTrak, which significantly increases the risk of a fatal rollover crash. (*Id.* at ¶ 44). The theory of Plaintiff's case is that the defective SWAS installed in her Trailblazer failed, disabling the StabiliTrak, causing her to lose control of the vehicle, which led to the fatal accident. (*E.g.*, *id.* at ¶¶ 39, 40).

4. More importantly for purposes of this proceeding, the Plaintiff also alleges that New GM knew the SWAS in her Trailblazer (as well as in hundreds of thousands of other GM vehicles)[2] was defective. Plaintiff alleges New GM inherited knowledge of the SWAS defect from Old GM employees and records (*e.g.*, Amended Complaint at ¶¶ 11, 22-25), and even specifically identifies an Old GM employee who became a New GM employee and whose knowledge of the defect is to be imputed to its principal, New GM, under applicable law. (*Id.* at ¶ 23-25). Despite this knowledge, however, New GM has chosen not to warn owners of the

---

[2] Plaintiff alleges that the defective SWAS that was installed in her Trailblazer also was installed in 777,808 other 2006-2009 Chevrolet Trailblazer and GMC Envoy, 2006-2007 Buick Rainier, 2006-2009 Saab 9-7x and 2006-2007 Isuzu Ascender vehicles (the "**Subject Vehicles**"). (Amended Complaint at ¶ 21).

3

Subject Vehicles of the defective SWAS. (*Id.* at ¶ 27). Plaintiff alleges New GM's failure to warn Mrs. Buchanan of the defective SWAS before her accident proximately caused her fatal injuries. (*Id.* at ¶ 45). Plaintiff's punitive damages claim is predicated exclusively on New GM's own knowledge, actions, and inactions regarding the defective SWAS utilized in the Trailblazer and continuing to be utilized in the Subject Vehicles. (*Id.* at ¶ 52).

5.     The Plaintiff asserts five counts in the Amended Complaint. Counts I and II assert Product Liability claims assumed by New GM in the Sale Agreement. In accordance with applicable Georgia law, these claims allege and encompass any Old GM liability arising from Old GM's failure to warn. Count III asserts a failure-to-warn claim against New GM based solely on New GM's own knowledge and conduct. **Count III is an independent claim**. Count IV asserts a claim for general and special damages, *i.e.*, compensatory damages. Count V asserts a claim against New GM for punitive damages based expressly on New GM's own conduct: *to wit*, "through its conduct in failing to warn of a known defect in the Subject Vehicles, including the Trailblazer, demonstrated, and continues to demonstrate, an entire want of care, evidencing a reckless indifference and disregard to the consequences of its actions." (*Id.* at ¶ 52). **Count V is an independent claim**.

## OBJECTION

**A.     Plaintiff's Claim for Punitive Damages is Based Solely on New GM's Post-Closing Knowledge and Conduct, and Accordingly, is a Properly Pleaded Independent Claim**

6.     It is settled law in this case, as discussed below, that "Post-Closing Accident Plaintiffs," such as Buchanan, may pursue, and New GM must defend, claims for failure to warn and related punitive damages arising from New GM's own post-Sale conduct. New GM presumably does not dispute this point, nor can it.

7.      Rather, New GM's objection to the Amended Complaint is that "the alleged Independent Claim asserted by Buchanan . . . is not based on ***any*** expressly-stated New GM volitional conduct, or any identified post-363 sale event." (Motion at ¶ 7 (emphasis in original)). New GM states that "it did not manufacture, design or sell the Subject Vehicle," and Plaintiff "does not allege any relationship between New GM and Mrs. Buchanan." (*Id.*). As such, New GM contends Count III of the Amended Complaint is "nothing more than a 'failure to warn' claim that allegedly Old GM had as the manufacturer and original seller of the Subject Vehicle." (Motion at ¶ 2).

8.      As demonstrated below, New GM has simply ignored, mischaracterized, and glaringly failed to address Plaintiff's multiple allegations regarding New GM's independent knowledge and inaction regarding the SWAS defect. Furthermore, as explained below, New GM is asserting arguments which have already been considered and rejected by this Court and the District Court in multiple decisions and orders, including, but not limited to, the District Court's May 29, 2018 decision in *In re Motors Liquidation Co.*, 590 B.R. 39 (S.D.N.Y. 2018) (the "**DC May 2018 Decision**") and this Court's November 9, 2015 decision (sometimes referred to as the "Imputation Decision") in *In re Motors Liquidation Company*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (the "**November 2015 Decision**").

> **(i)    The Amended Complaint Sufficiently Alleges and Identifies Post-Closing Knowledge and Conduct of New GM Upon Which to State Independent Claims for Failure-to-Warn and Punitive Damages**

9.      In the DC May 2018 Decision, Judge Furman, in analogous circumstances, rejected New GM's "knowledge bootstrapping" argument when he affirmed this Court's decision to allow the Pitterman plaintiffs' complaint to pass through the bankruptcy gate. *See* 590 B.R. at 61, *aff'g In re Motors Liquidation Co.*, 568 B.R. 217, 230-31 (Bankr. S.D.N.Y.

5

2017) (the "**Pitterman Decision**") (permitting the Pitterman plaintiffs to pursue failure-to-warn claim based on New GM's post-Closing conduct).

10. Judge Furman observed that the Pitterman plaintiffs' complaint alleged, in its entirety:

> Despite information and knowledge available and known to defendant [New GM], including knowledge of numerous 'rollaway' incidents caused by the defects described herein in which numerous people, especially children, were catastrophically injured or killed, the defendant [New GM] took no steps after June 2009 to directly notify and/or warn owners or the public of these defects.

590 B.R. at 61. Judge Furman thus concluded: "[o]n its face, therefore, the amended complaint alleges that New GM had independent knowledge of the alleged defect *after* the Closing Date of the 363 Sale and that its duty to warn arose from that knowledge; **despite New GM's claims to the contrary, the amended complaint does not attempt to 'bootstrap' the knowledge or conduct of Old GM onto purportedly Independent Claims**." *Id.* (emphasis added). Directly addressing the same objection New GM is making here, Judge Furman concisely explained:

> New GM may ultimately be right in arguing that, given its lack of a relationship with the Pitterman Plaintiffs and other factors, it did not have a post-sale duty to warn them. But that is a question of *nonbankruptcy* law for the Connecticut District Court to decide in the first instance (subject to appellate review). The sole question for the Bankruptcy Court—and for this Court here—is whether the allegations in the Pitterman Plaintiffs' amended complaint were sufficient to state an Independent Claim so as to proceed through the bankruptcy gate. The Court concludes that they were.

*Id.* (internal record citation omitted).

11. In this case, the Plaintiff's Amended Complaint includes significantly more allegations regarding New GM's knowledge than the Pitterman complaint apparently did. But putting aside all other allegations, paragraph 27 of the Amended Complaint analogously states:

> Despite its knowledge of the high failure rates of the SWAS in the Subject Vehicles, including Mrs. Buchanan's vehicle, and that the SWAS had well-known

6

technology issues, New GM chose not to warn Mrs. Buchanan of the defective SWAS in her Trailblazer on or before November 10, 2014.

Therefore, on its face, the Amended Complaint alleges New GM had independent knowledge of the SWAS defect in Mrs. Buchannan's Trailblazer. Additionally, the Amended Complaint states, *inter alia*:

- "Old GM's and New GM's component supplier, Alps Electric (North America), Inc. ("Alps") manufactured the SWAS in Mrs. Buchanan's Trailblazer," (¶ 20), and the Subject Vehicles. (¶ 21).

- "[A]lmost immediately upon the first sale of the 2006 model year vehicles[,]" "Old GM began receiving high rates of warranty claims for SWAS failures in the Subject Vehicles[.]" (¶ 22). "The warranty claims were so high that Old GM attempted to get Alps to reimburse GM for the cost of these warranty claims." (¶ 23).

- "New GM emerged out of bankruptcy and continued the business of Old GM with many, if not most, of Old GM's employee, and on information and belief, with most of the same senior-level management, officers, and directors, as well as its records, tests, and documents generated in the creation of the defective steering wheel angle sensors." (¶ 11).

- "The Design Release Engineer for the SWAS, Paul Shaub, as well as other Old GM employees, knew that the technology had "well known issues," meaning the SWAS in the Subject Vehicles were failing at a high rate and disabling the StabiliTrak system." (¶ 23).

- "Mr. Shaub, as well as numerous other Old GM employees, became New GM employees. After becoming New GM employees, New GM also chose not to warn owners and operators of the Subject Vehicles that these sensors were failing at high rates and that these failures disabled the StabiliTrak in their vehicles." (¶ 25).

12. Based on these allegations and others, it is evident that Plaintiff has alleged independent claims for failure to warn and punitive damages based on New GM's own knowledge and conduct, not Old GM's. New GM's assertions in the Motion that Plaintiff has not alleged or identified New GM conduct upon which to base an independent claim are simply not credible.

7

> **(ii)    Consistent with this Court's November 2015 Decision, Allegations in the Amended Complaint that New GM Inherited Knowledge from Old GM Employees and Records are Permissible Predicates for an Independent Claim and Pass Through the Gate**

13.    Although it is less than clear from the Motion, New GM's position appears to be that the Plaintiff cannot base an independent claim on allegations that New GM acquired knowledge from Old GM employees and records, and that those allegations somehow transform Plaintiff's independent claim into a disguised successor liability claim.  If that is New GM's argument, however, it is in direct contravention of this Court's rulings in the November 2015 Decision and were already rejected therein.

14.    In the November 2015 Decision, the Court addressed, among other issues, pleading objections relating to the imputation of knowledge to New GM, which it framed and defined as follows:

> the extent to which knowledge of New GM personnel who came over from Old GM may be imputed to New GM; whether the contents of documents generated by Old GM personnel and delivered to New GM under the 363 Sale may be deemed, for notice purposes, to be documents of which New GM may be found to have notice as a matter of nonbankruptcy (agency or other) law; and related issues with respect to imputation, including, most significantly, where arguments for imputation should be decided (the "**Imputation Issue**").

541 B.R. at 107.  Also, the Court addressed pleading issues relating to the assertion of punitive damages claims against New GM, including (although framed by the Court in somewhat different terms) whether punitive damages may be sought against New GM based solely upon New GM's knowledge (including imputed knowledge) and conduct (the "**Punitive Damages Issue**").[3]  *See id* at 107-108.

---

[3] Although Punitive Damages Issue in the November 2015 Decision was addressed in the context of claims arising out of "ignition switch defects," this Court and the District Court have since confirmed that this Court's rulings apply with equal force to independent claims of Post-Closing Accident Plaintiffs involving Old GM vehicles

8

(A) *<u>The Imputation Issue:</u>* The Court's rulings on the Imputation Issue are cogently set forth in the judgment dated December 4, 2015 (the "**December 2015 Judgment**"), memorializing its holdings, which provides, in pertinent part:

> With respect to Independent Claims, **knowledge of Old GM may be imputed to New GM, if permitted by nonbankruptcy law, to the extent such knowledge was "inherited" from Old GM if such information (a) was actually known to a New GM employee (*e.g.,* <u>because it is the knowledge of the same employee</u> or because it was communicated to a New GM employee), or (b) could be ascertained from New GM's books and records, even if such books and records were transferred by Old GM to New GM as part of the 363 Sale and, therefore, first came into existence before the 363 Sale**. Accordingly, allegations in pleadings starting with "New GM knew…" or "New GM was on notice that…" are permissible. For causes of action where nonbankruptcy law permits imputation of knowledge to New GM using the above principles, it is possible for such knowledge, depending on the specific circumstances, to be imputed to New GM as early as the first day of its existence.

(December 2015 Judgment at ¶ 4) (emphasis added). Furthermore, the December 2015 Judgment provides:

> Imputation of knowledge to New GM turns on application of applicable nonbankruptcy law to the specifics and context of the factual situation and the particular purpose for which imputation is sought, and it must be based on identified individuals or identified documents. The extent to which plaintiffs must identify specific matters alleged to be known, by whom and by what means, and the legal ground rules necessary to establish imputation as a matter of nonbankruptcy law are questions for the nonbankruptcy courts hearing plaintiffs' claims and allegations to decide.

(December 2015 Judgment at ¶ 5). In summary, the Court "ruled simply that **<u>allegations of imputation to New GM premised on the knowledge of New GM employees, or documents in New GM's files, get through the bankruptcy court gate</u>**. After that, issues as to the

---

which are not based on the ignition switch defect. *See In re Motors Liquidation Co.*, 590 B.R. at 61 (holding that this Court "appropriately applied the analysis from the Second Circuit Opinion to the case of plaintiffs without the Ignition Switch Defect to conclude that the Sale Order cannot be read, consistent with either due process or bankruptcy law, to preclude Independent Claims predicated solely on New GM conduct").

9

60807/0001-19968820v4

propriety of imputation in particular contexts in particular cases are up to the judges hearing those cases." *In re Motors Liquidation Co.*, 541 B.R. at 128 (emphasis added).

    (B)  *The Punitive Damages Issue:*  Regarding the Punitive Damages Issue, the Court recognized and held that "New GM might have acquired relevant knowledge when former Old GM employees came over to New GM or New GM took custody of what previously were Old GM records. **Reliance on that, for punitive damages purposes, is permissible**." *Id.* at 122 (emphasis added). The Court expounded that: "to the extent New GM employees actually had knowledge relevant to post-Sale accident claims or Independent Claims (even if it was inherited), **plaintiffs in actions asserting such claims are free to base punitive damages claims on evidence of such knowledge to the extent nonbankruptcy law permits**. *Id.* (emphasis added). Additionally, addressing certain of New GM's "four contexts" in which punitive damages issues come up, the Court concluded that "**punitive damages may still be sought in actions based on post-Sale accidents involving vehicles manufactured by Old GM to the extent the punitive damages claims are premised on New GM action or inaction after it was on notice of information 'inherited" by New GM, or information developed by New GM post-Sale**." *Id.* at 123 (emphasis added). Moreover, in addressing New GM's objection to claims alleging a post-sale duty to warn, the Court held that whether or not New GM had a post-sale due to warn was a question of non-bankruptcy law, which was **not** "properly within the Court's providence to decide." *Id.* at 129. Accordingly, the Court would neither decide the issue of nonbankruptcy law, nor "block the claim based on predictions as to how another court might decide it." *Id.*

  15. Here, pursuant to the Court's rulings in the November 2015 Decision, the Plaintiff's allegations regarding New GM's knowledge and conduct, including those that are

10

60807/0001-19968820v4

predicated on Old GM employees and files, are permissible and pass through the bankruptcy gate. *See id.* at 108 ("By reason of the Court's limited 'gatekeeper' role, allegations of that knowledge or notice, **even if alleged in general terms**,[4] can pass through the 'gate,' with nonbankruptcy courts determining the extent to which they have been alleged sufficiently specifically to warrant findings of imputation." (emphasis added)). Further, the Plaintiff is free to base its punitive damages claim on allegations and evidence of New GM's inherited knowledge. *See id.* at 122. Those allegations also are permissible and pass through the gate.

16. Tellingly, but not surprisingly, New GM only makes passing reference to this Court's November 2015 Decision in its Motion and fails to even mention this Court's rulings on the Imputation Issue and Punitive Damages Issue discussed therein. The Court's November 2015 decision was never appealed by New GM or any other party, remains law of the case, and dictates the outcome of this matter – that is, denial of the Motion.

### (iii) New GM's Reliance on the *Reichwaldt and Pitterman* Cases is Unavailing

17. The two principal cases cited by New GM in support of the Motion – *In re Motors Liquidation Co.*, 576 B.R. 313 (Bankr. S.D.N.Y. 2017) ("*Reichwaldt*") and the Pitterman Decision – are unavailing. The issues presented in those cases are not present here, and consequently, they support denial of the Motion.

18. In *Reichwaldt*, the proposed amended complaint impermissibly conflated the conduct of Old GM and New GM by "simply adding 'and GM LLC'" to paragraphs concerning Old GM conduct. *See Reichwaldt*, 576 B.R. at 322. Further, the proposed amended complaint

---

[4] Of course, in this case, the Plaintiff did not just allege imputation "in general terms," but specifically alleged and identified, among other things, an Old GM employee who became and New GM employee and whose knowledge of the SWAS defect may be imputed to New GM under applicable Georgia law.

11

60807/0001-19968820v4

mischaracterized the Sale, implying that New GM is the successor to Old GM, "without reference to the Assumed Liabilities defined in the Sale Order." *Id.* Further, the proposed amended complaint did not identify New GM conduct other than to refer to "a series of public statements from New GM CEO Marry Barra, made to Congress in the context of the ignition switch scandal." *Id.*[5]

19. Similarly, the *original* complaint in *Pitterman* case (before it was amended and approved by this Court and the District Court) in certain instances failed to properly distinguish between Old GM and New GM, by conflating the two are lumping them together. *See Pitterman Decision* at 221 (noting that "the Pitterman Complaint frequently refers to both Old GM's and New GM's conduct in the same numbered paragraph, making it difficult to determine exactly which claims are based solely on New GM's alleged wrongful conduct and which are based on Old GM's conduct that the Pitterman Plaintiffs' argue are assumed Liabilities"). As noted above, however, the Pitterman Decision does not support New GM's Motion because the Court allowed the Pitterman plaintiffs' revised complaint (including an independent claim for failure-to-warn) to pass through the gate, and on appeal, the District Court rejected New GM's arguments directed towards the *revised* Pitterman complaint, which are the same arguments New GM is making here.

20. In this case, unlike the *Reichwaldt* and *Pitterman* cases, the Amended Complaint properly distinguishes between Old GM and New GM and does **not** contain any generalized

---

[5] Additionally, in *Reichwaldt*, the plaintiff was attempting to bring a punitive damages claim in connection with "Assumed Liabilities," arguing that she was not bound by the Court's November 2015 Decision and December 2015 Judgment. As discussed, Buchannan is not seeking and does not purport to seek punitive damages in connection with any Assumed Liability or any conduct of Old GM. Thus, the res judicata and law of the case arguments the Court was faced with in *Reichwaldt* have no application here.

12

allegations lumping Old GM and New GM together or conflating the two. While there are references in the Amended Complaint to Old GM conduct (including Old GM employees and records), those references are necessary and permissible because they are accurate and do **not** blur the distinction between Old GM and New GM.[6] Furthermore, unlike in *Reichwaldt*, the Amended Complaint fairly and accurately describes the § 363 Sale and New GM's assumption of liabilities in connection therewith, specifically referring to and quoting the definitions in the Sale Agreement. Moreover, unlike in *Reichwaldt*, as demonstrated above, the Amended Complaint specifically identifies New GM's independent knowledge and conduct both in general and specific terms.

21. In the final analysis, the allegations in the Amended Complaint are properly alleged and clearly state independent claims against New GM for failure to warn and corresponding punitive damages.

**B.** **The Plaintiff May Pursue Any and All Discovery of New GM's Post-Closing Knowledge and Conduct in Support of His Independent Claims, including the Deposition of Ms. Barra, to the Extent Permissible Under Georgia Law**

22. Evidently, the real purpose of New GM's Motion is not to bar Plaintiff's punitive damages claim, but rather to gain perceived leverage in its efforts to block the Plaintiff's ability to depose New GM's Chief Executive Officer, Mary Barra. Indeed, New GM filed this Motion almost four years after the Plaintiff first asserted its punitive damages claim and **only after** the State Court issued a decision and order denying New GM's motion for a protective order and ordering the deposition of Ms. Barra (the "**Discovery Order**").[7]

---

[6] Indeed, New GM tacitly concedes this point in its Motion, noting that the Amended Complaint cleaned up certain improper allegations but "did not solve the fundamental problem of seeking to hold New GM liable for punitive damages based on Old GM conduct." (Motion at ¶ 6).

[7] A copy of the Discovery Order is attached hereto as **Exhibit B**.

13

23. New GM had opposed Ms. Barra's deposition primarily on the basis of the so-called "Apex Doctrine," which would impose presumptive hurdles on a plaintiff's ability to seek discovery (or deposition testimony) from high-ranking corporate executives. The State Court agreed with the Plaintiff, however, that "[c]ontrary to New GM's assertions there is no express or implied law in Georgia for the 'apex doctrine.'" Furthermore, the State Court concluded:

> Plaintiff's attempt to depose Ms. Barra appears in the Court's discretion to be a reasonably calculated attempt to discover evidence that might be admissible in a trial of this action. Particularly, Ms. Barra made numerous public statements (and gave sworn testimony before Congress) during recent GM Ignition switch defect litigation that might reasonably be construed to lead to the discovery of admissible evidence in this action. The "Speak Up for Safety" program,[8] as well as Ms. Barra's further statements about GM's safety culture and efforts to investigate and eliminate safety issues, justify Ms. Barra's deposition. Whether or no GM has implemented, or not implemented, the safety approaches that Barra has previously testified about also is discoverable.

(Discovery Order at p. 3).

24. New GM has filed an application for interlocutory appeal of the Discovery Order, which is currently pending before the Georgia Court of Appeals (the "**State Appellate Court**"). New GM's argument on appeal is based the alleged availability of the "apex doctrine" under Georgia law, which the State Court disagreed with. In addition, however, New GM now also asserts that Ms. Barra's deposition should not be allowed because it could only pertain to Plaintiff's "improper" punitive damages claim and, therefore, violates the Sale Order and this Court's other orders. New GM is incorrect on multiple levels.[9]

---

[8] When Ms. Barra became CEO in January of 2014, she had instituted a "Speak Up for Safety" program at GM in response to the GM ignition switch defect cover-up and problems identified in the Valukas Report.

[9] Putting aside New GM's spurious independent claim argument addressed herein, New GM is incorrect. Plaintiff asserts Ms. Barra's deposition is also relevant to his other claims. Although the Plaintiff raised the punitive damages issue at the discovery hearing before the State Court, the punitive damages issue was not the primary basis for requiring Ms. Barra's deposition. Accordingly, the State Court did not limit its Discovery Order requiring Ms. Barra's deposition to the issue of punitive damages. The Georgia courts will of course determine any disputed issues of relevancy concerning Ms. Barra's deposition to Plaintiff's claims under applicable Georgia law.

14

25.     To be sure, as this Court noted in *Reichwaldt*, the proper scope of discovery is a matter for the Georgia court, not a matter for this Court. *Reichwaldt*, 576 B.R. at 319. The limited question for this Court is whether the Amended Complaint "impermissibly alleges Independent Claims by relying on Old GM conduct." *Id.* With respect to the latter question, Plaintiff respectfully submits, for all the reasons discussed above, the Plaintiff's Amended Complaint does **not** violate the Sale Order. The Plaintiff has stated and properly pleaded independent claims for failure to warn and punitive damages based **solely** on New GM own conduct and actions. Having stated such claims, the Plaintiff is free to pursue any and all discovery regarding New GM's own knowledge and conduct in support thereof, including by taking the deposition of Ms. Barra, to the extent permissible under applicable Georgia law. The Plaintiff requests that the Court so hold in its Order denying the Motion.

**WHEREFORE**, for the foregoing reasons, Buchanan respectfully requests that the Court deny the Motion and granting such other and further relief as this Court finds just and proper.

Dated: March 12, 2020

                                               Respectfully submitted,

                                               /s/ *Mark Tsukerman*
                                               Mark Tsukerman
                                               **COLE SCHOTZ P.C.**
                                               1325 Avenue of the Americas, 19th Floor
                                               New York, NY 10019
                                               Telephone: (212) 752-8000
                                               Facsimile: (212) 752-8393
                                               mtsukerman@coleschotz.com

                                               *Bankruptcy Counsel for Robert Randall*
                                               *Buchanan, Individually and as*
                                               *Administrator of the Estate of Glenda*
                                               *Marie Buchanan*