# Exhibit A

```
 1                STATE COURT OF COBB COUNTY

 2                    STATE OF GEORGIA

 3   ROBERT RANDALL BUCHANAN          )
     INDIVIDUALLY AND AS             )
 4   ADMINISTRATOR OF THE ESTATE OF   )
                                      )
 5   GLENDA MARIE BUCHANAN            )    CIVIL FILE NUMBER
                                      )       16-A-1280
 6   vs.                              )
                                      )
 7   GENERAL MOTORS, LLC              )

 8                              *******

 9            Transcript of the proceedings had in the

10       above-styled case before THE HONORABLE CARL BOWERS,

11       State Court Judge, at the Cobb County Courthouse,

12       Marietta, Georgia, commencing the 27th day of January,

13       2020, before Lisa Bergeron, Certified Court Reporter,

14       commencing at 10:03 a.m.

15                         Pages 1 - 46

16   FOR THE PLAINTIFF ROBERT RANDALL BUCHANAN:
     Patrick Alan Dawson, Esq.
17   Lance Cooper, Esq.
     The Cooper Firm
18   531 Roselane Street, Suite 200
     Marietta, Georgia 30060
19   (770)427-5588

20   FOR THE DEFENDANT GENERAL MOTORS, LLC:
     C. Bradford Marsh, Esq.
21   Myrece R. Johnson, Esq.
     Swift, Currie, McGhee & Hiers
22   The Peachtree, 1355 Peachtree Street, N.E., Suite 300
     Atlanta, Georgia 30309
23   (404)874-8800

24

25   LISA BERGERON BERG, CCR - OFFICIAL, COBB COUNTY STATE COURT
```

```
 1   Michael P. Cooney, Esq.
     Brian T. Smith, Esq.
 2   Dykema Gossett PLLC
     400 Renaissance Center
 3   Detroit, Michigan 48243
     (313)568-6955
 4
     Rachel M. Lary, Esq.
 5   Brian P. Kappel, Esq.
     Michael L. Bell, Esq.
 6   Christopher C. Yearout, Esq.
     Lightfoot Law
 7   The Clark Building
     400 20th Street North
 8   Birmingham, Alabama 35203
     (205)581-0700
 9
     Thomas M. Klein, Esq.
10   C. Megan Fischer, Esq.
     Klein Thomas
11   20 East Thomas Road, Suite 2200
     Phoenix, Arizona 85012
12   (602)935-8301

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2          THE COURT:  All right.  At this time, the Court will

3     call the case of Robert Randall Buchanan, Individually and

4     as Administrator of the Estate of Glenda Marie Buchanan;

5     versus General Motors, LLC.  Case number 16-A-1280.

6          We are here today on the Defendant's Motion for a

7     Protective Order.  And you're Mr. Marsh, correct?

8          MR. COONEY:  Mr. Cooney, Your Honor.

9          THE COURT:  Mr. Cooney.  Excuse me, I apologize.

10         MR. COONEY:  May I have a seat?

11         THE COURT:  You may.

12         MR. COONEY:  All right, thank you, Your Honor.

13         As you said, Your Honor, this is GM's Motion for a

14    Protective Order under Rule 26C, to prevent the

15    deposition of Mary Barra, GM's Chairman and Chief

16    Executive Officer.

17         There's good cause for entry of the order, Your

18    Honor.  Ms. Barra has no information, much less relevant

19    information regarding the product that's at issue in this

20    product liability suit.  And the order is necessary to

21    protect her from annoyance, embarrassment, oppression and

22    undue burden.

23         As established by Ms. Barra's sworn affidavit, she

24    has no information related to the design, the performance,

25    or any investigation into safety of the steering wheel

1          angle sensor that's at issue in this case, to the extent

2          there is an issue about whether there's some conduct of GM

3          that gave rise to an allegedly poor design, a failure to

4          be aware of that allegedly poor performance, or some

5          examination of the safety of that component on the road.

6               It's undisputed, she has no information regarding

7          any of those topics, can not add any relevant information

8          to that inquiry.

9               The Plaintiff's have seemed most focused on deposing

10         Ms. Barra about a 2018 decision by GM Safety Group not to

11         conduct a field recall with regard to the component at

12         issue, because they concluded it wasn't justified.  And

13         there's plenty of people that were involved in that

14         decision, plenty of people that could be deposed, but Ms.

15         Barra's not one of them because as she said, she's not

16         involved in that process and has no relevant information

17         about the process.

18              The Plaintiff's contention essentially is well, as

19         Chief Executive Officer of the company, and someone who

20         has spoken about GM's commitment to safety, she has to

21         answer for the decision of that commitment.  And as

22         Plaintiffs point out at page, I think, 20 of their

23         Response, this safety group that they're talking about

24         has, since 2014, reviewed something like 25,000

25         submissions.

1          So under Plaintiff's kind of view of what the law

2     should be, any time -- and of those 25,000, by the vast

3     majority of them, do not result in field actions.

4          Plaintiff's ultimate position here is as CEO, any

5     time a litigant disagrees with the decision of General

6     Motors and the Safety Group about any of those

7     submissions, the CEO is fair game for a deposition.  Of

8     course, if that were the law, that's how it works out,

9     she'd be a full-time deponent, not a CEO.

10         Your Honor, a little bit of background, I know we've

11    covered it in the Briefs, but so this arises out of a --

12    this incident arises out of a November, 2014 car wreck.

13    Glenda Buchanan was driver, single-vehicle accident.

14    Vehicle gets off the right-hand side of the road in a

15    curve, she jerks the wheel, over-corrects, whatever, but

16    the vehicle ends up careening across the roadway into a

17    deep ravine, hits a tree, and unfortunately she suffers a

18    fatal injury.

19         Plaintiffs claim that that happened because the -- an

20    electronic stability control system on the vehicle was

21    disabled, and that it would've made a difference.  GM

22    disagrees.  GM says stability controls can do various

23    things, but it doesn't make a difference in this kind of

24    accident.  But that's the claim.  And the allegations --

25    the reason the stability control was not operating was

1          because a component of the system, this steering wheel

2          angle sensor was bad, and the system senses that and

3          disables the system.

4               So as you've read, GM, in 2018, four years after the

5          crash, as a result of this lawsuit, submits this incident

6          and this allocation to its Speak Up for Safety program,

7          which is a new program begun in 2014.  So it comes into

8          2018 after this lawsuit.  And the Speak Up for Safety

9          process is intended to evaluate potential claims and make

10         decisions about whether or not they support a field action

11         or product recall.  And Your Honor, I don't have a screen,

12         but may I approach with a --

13              THE COURT:  Yes, sir.

14              MR. COONEY:  -- couple -- couple documents.

15              THE COURT:  I won't bite you, I promise.  Now,

16         Stephanie might, I don't know.

17              MR. COONEY:  And Your Honor, this is just -- this is

18         a little schematic that I made, and it's just intended to

19         demonstrate that this is a formal process, with various

20         levels of review.  They get progressively higher in terms

21         of seniority of people that look at it.  Company employees

22         are encouraged to submit issues of potential vehicle or

23         workplace safety.  There's an initial safety and

24         compliance and categorization team, which is made up of

25         some senior investigators, engineers, that kind of make a

1          first call.  Does it merit investigation or is it really

2          not something that's appropriate for that?  And there's

3          another potential investigation review team that again

4          does this analysis: Does this issue, based on the data

5          we've collected, support a formal, open investigation?

6          Then it get's their further review, which is an open

7          investigation.  It's a bunch of senior GM engineers and

8          managers.  And then finally the last group, the Safety and

9          Field Action Decision Authority is the group of senior

10         vice presidents from around the Corporation who make

11         decisions whether to have a safety recall.

12             My point, again, is this submission went through this

13         process.  There's various people at each phase of this

14         process who are knowledgeable about what was investigated

15         and the basis for the decision.

16             To date, none of the people who've made the decision

17         that's at issue here, that Plaintiff takes disagreement

18         with, have been deposed.  Those are the people that have

19         information about the decision.  Those are the people who

20         can support a claim, if that's the argument, that GM made

21         the wrong decision.

22             Instead, Plaintiff wants to depose, as we know,

23         Ms. Barra.  And in reading their response, they offer just

24         a couple explanations for why they want to do that, that

25         I'd like to talk to Your Honor about just -- just briefly.

1          They say at the very beginning of the Response that

2     Ms. Barra has discoverable information about GM's efforts

3     to find and fix the steering wheel angle sensor issue in

4     this case.  There's no citation, there's no facts, there's

5     no deposition testimony, there's no documents that they

6     offer to support that assertion.  All we have is her

7     affidavit that says, "I know nothing about any of that."

8          It's -- it's -- I understand what they want it to

9     say, but the facts are, as we sit here today, that there's

10    no evidence in this case anywhere that she has or should

11    have information about this particular component on this

12    particularly vehicle.

13         Plaintiff goes on to say they want to depose

14    Ms. Barra, as GM's CEO, about GM culture that has allowed

15    this sensor defect to remain -- to remain and linger, is

16    kind of a phrase used.  And then, as you saw in the

17    response, and this is the part we're gonna hear about here

18    this morning, this is about GM's investigation of a

19    different part, a different component called an ignition

20    switch.  Which Mr. Cooper undoubtedly knows a lot about,

21    and some decisions and some conclusions that were reached

22    about corporate activity that led to a product that ended

23    up in some vehicle recalls.  And he wants to argue in this

24    case, which I appreciate, that that same conduct must have

25    led to GM making poor decisions on other products, and

1       maybe this is one of them.

2           Maybe I should be able to demonstrate that the same

3       Corporate conduct that led to this bad part, this ignition

4       switch, is the same conduct that led to, you know, this,

5       what he claims, is a defective steering wheel angle

6       sensor.

7           And, you know, I understand the argument, but of

8       course, the only way you could make that connection is to

9       talk to someone who knows about the activity that led to

10      the design, the analysis of the performance of the sensor,

11      that evaluated the safety of the sensor.  Unless somebody

12      has some knowledge about the activity, the corporate

13      conduct that gave rise to the part at issue in this case,

14      there's not much to be gained from that deposition.  But

15      that's what they're asking to do.

16          The appropriate person deposed would be someone who

17      has knowledge about the design and performance.  And

18      whether the Corporate conduct Mr. Cooper wants to cite

19      from this ignition switch issue existed here.  Well, it

20      turns out Plaintiff understands that.  They've already

21      asked for that deposition.

22          The second page I gave you, Your Honor, is a copy of

23      a -- Plaintiff's -- a paragraph from Plaintiff's second

24      amended Corporate Deposition Notice of GM.  And they've

25      asked for, in that notice, that very witness.  Someone who

1          knows about whether -- to what extent the Corporate

2          conduct and Corporate culture and practices, including

3          those discussed in the Lucas Report, played a role in the

4          design of this sensor.  That deposition's been scheduled,

5          Your Honor, I think it's for February 4th.

6               My point is, that's the appropriate path for

7          discovery on that issue, not talking to a CEO who, based

8          on the record before us, knows absolutely nothing about

9          it.

10              The argument that Plaintiffs make about this desire

11         to get into corporate culture is premised on the assertion

12         the Plaintiff makes in their Brief, that there was this --

13         that this sensor, like the ignition switch, remained and

14         lingered as a problem at General Motors.  That's an

15         assertion.  They say in their Brief, or Plaintiff says in

16         his Brief, that this sensor was on GM's fix it plate for

17         years, had been before various committees, perplexed GM

18         for years.  That GM has investigated the matter slowly and

19         for many years.

20              I appreciate attorney argument, Your Honor, but

21         that's all that is.  There's no citations to any of those

22         assertions.  There is no evidence that anybody at General

23         Motors ever concluded that there was a problem in the

24         sensor.  That we needed to fix it.  But that they should

25         have known about it and failed fix it.

1              Now, that's all game for discovery.  That's all open

2         for discovery in the case.  I get that.  But I want to be

3         clear that Plaintiff is kind of implying that he's already

4         created a record of -- that this has been on GM's fix it

5         plate for years, and now he should be able to ask Mary

6         Barra about it.  He hasn't even gotten to the first step

7         of establishing that anybody at GM ever concluded that

8         this product was an issue that needed to be fixed.

9         Plaintiff's next argument, just got a couple more,

10        Your Honor, is that, this shows up on page 10 of the

11        Brief, that he should be able to depose Ms. Barra about

12        GM's specific failures and the new safety program.  In

13        other words, he wants to ask her about why GM, he thinks,

14        made the wrong decision when they reviewed this issue in

15        2018.  He wants to -- he wants to have her answer for what

16        he thinks is a wrong decision.

17             A couple of points.  There's -- implied in

18        Plaintiff's argument is this idea that what he thinks was

19        GM's wrong decision about this sensor in 2018, somehow let

20        to this accident.  Led to Ms. Buchanan's unfortunate

21        death.  That time line doesn't work.

22             The accident occurred in 2014.  Whatever allegedly

23        wrong decision GM made in 2018 could not be a proximate

24        cause of whatever cause of action he would be hoping to

25        support, such as a failure to warn theory.  Whatever GM

1        did in 2018 can't be the basis of a failure to warn -- an

2        issue in 2014.  That seems to be kind of implied in his

3        argument, that it would've made a difference.  I want to

4        be clear that that's not where we are.  But again, Your

5        Honor, ultimately, Ms. Barra has no information about the

6        point at issue.

7            Plaintiff is alleging the failure by GM to do certain

8        things.  To fix, to identify the dealer component.  But he

9        hasn't established anybody at GM ever thought they should

10       have done or did, and then he wants to ask her about it,

11       recognizing going in that she knows nothing about it.

12           Finally, Your Honor, kinda last, thrown into

13       Plaintiff's brief is the idea that even if Ms. Barra

14       doesn't know anything, we should be able to depose her

15       just to establish that fact.

16           Well again, that kind of goes and takes me back to my

17       initial statement.  If that's the standard for taking CEO

18       depositions, then any time, you know, a CEO does what CEOs

19       do: They make comments about commitments to safety, the

20       environment, anti-harassment, workplace safety, those

21       statements would subject them to deposition if somebody, a

22       litigant, disagrees with their -- with something the

23       company did that the litigant claims is inconsistent with

24       that general concept.  And -- again, Your Honor, if that's

25       the standard, CEOs would spend their time giving

1    depositions.

2         I'm not saying that CEOs should never be deposed.

3    I'm not claiming that there'd not be circumstances where a

4    CEO has direct, relevant knowledge of an issue.  Clearly,

5    make them subject to deposition.  But in a case here where

6    there is absolutely no connection between the CEO and the

7    product defect being alleged, the Plaintiff cannot stand.

8    Basis under Rule 26, that discovery seeking relevant

9    information, rather than an opportunity to put a CEO on a

10   hot seat, ask questions the CEO doesn't have an answer to,

11   with the goal of trying to attempt to embarrass, attempt

12   to belittle, attempt to make suggestions about what a CEO

13   should or shouldn't do, that are not -- that have no basis

14   in fact.

15        The information about this claim is available from

16   lots of other people, and that would -- should be the

17   proper and directed scope of discovery.

18        Briefly on the law, Your Honor, which I know you have

19   on our Briefs, there is no Georgia law that stands for the

20   proposition that a high-ranking official who has no role

21   and information, that's been undisputed based on sworn

22   evidence does not have relevant information, should be

23   deposed merely because of their roles as CEO, and an

24   allegation that the company has acted inconsistent with

25   some policy or issue adopted by the CEO.

1          The Plaintiff -- I guess ultimately, there's been a

2     lot of debate in the papers about State versus Federal

3     Court.  Ultimately, Your Honor, our point, if I had to

4     bring it down to one, the conclusion is that both Georgia

5     Courts and the Federal Courts recognized that while

6     everyone can be subject to deposition, there has to be a

7     relevancy connection.  And that high-ranking executives

8     fully create a tremendous potential for abuse and

9     harassment, and that they, as a result, there has to be a

10    showing or some evidence that justifies a deposition.  For

11    all the reasons that I've said here probably more than a

12    couple times, that showing doesn't exist here, and good

13    cause is to prevent the deposition.

14         Your Honor, there's been a suggestion that the

15    standard this Court is to apply comes under this Bridges

16    decision, and that it's on us to show substantial evidence

17    of bad faith.  That comes, again, only from this Bridges

18    decision.  And if you followed the citations in the

19    Bridges decision, it takes you back to a 1961 Federal

20    Court case out of Connecticut, which says the same thing.

21    But like the Bridges decision, it doesn't say a word about

22    it.  Of course, the Federal Courts today certainly don't

23    apply that standard.

24         The standard's what's in the Court rule.  Good cause

25    shown for protection.  And showing that the discovery is

1       not seeking relevant information.

2            There's no explanation, Bridges or any other

3       decision, as to how a court might apply a substantial

4       evidence of bad faith standard, what the factors are to

5       address that.  And again, ultimately Your Honor, our point

6       is it's not important.  But if that were the standard,

7       Your Honor, it's hard to imagine a case that doesn't fit

8       it better.  We have a Plaintiff seeking the deposition of

9       a CEO who because I've probably said it, again, too many

10      times, undisputed, doesn't have any relevant information

11      about the product at issue.

12           I think the Court can conclude that, you know, what's

13      the reason for that deposition?  It's to put the CEO in a

14      position, not to get relevant information, but to attempt

15      to harass and abuse.

16           Finally, Your Honor, the Plaintiff cites a variety of

17      cases where courts have allowed the depositions of CEOs.

18      And again, no doubt that there are lots of circumstances

19      under which a CEO might justify being deposed.  But in all

20      the cases that Plaintiff cites, they fall into one of two

21      categories.  One is that there was just a bald statement

22      that the witness didn't know anything.  No sworn

23      affidavit, no evidence, and the Courts took exception with

24      a lawyer standing up, saying, "You can't depose this

25      person because they don't know anything."  Or evidence

1        that the CEO or other high-ranking executive actually had

2        relevant information as to a specific incident.

3            Neither of those circumstances exist here.  We made a

4        showing of a lack of knowledge through her affidavit, and

5        there's been no showing that she has any connection to any

6        of the incidents or issues alleged here.

7            I anticipate that you'll hear a lot about a ignition

8        switch, the safety investigation program.  GM's new safety

9        program.  GM's commitment to safety.  None of that, again,

10       changes.  But ultimately, it's really a fundamental

11       premise of our argument, Your Honor.  And that is

12       Plaintiff is trying to prove a defect in this steering

13       angle sensor, both in it's original design, it's

14       performance, and GM's failure to recall it.

15           He points to -- the only thing he points to is what

16       he claims is high warranty data.  There's no evidence that

17       anybody at GM ever concluded that warranty data was

18       because of some particular problem that it was high, or

19       more importantly, that it -- evidence in a defect in the

20       product.

21           And I should -- I guess I should add, Your Honor,

22       that the reason that GM's safety group closed this

23       investigation is stated in the paperwork.  It's not a

24       mystery.  Their conclusion was that there had not been any

25       other reports of -- on the steering wheel angle sensor

1       failure causing an accident, much less an injury or death.

2       And they also recognized that kind of consistent with

3       where -- the way these systems operate, electronic

4       stability control, it is a feature that is intended to

5       work in certain particular driving circumstances.  The

6       vast majority of the time while driving a vehicle, it's

7       not engaged.

8            But if it's disabled, the vehicle retains all of its

9       normal control systems.  Braking, steering.  I mean,

10      vehicles for decades before did reduction of ESC.  In the

11      '90s and 2000s, we drove for years without ESC.  Even in

12      this vehicle, you have the option to turn off the ESC.

13           The point is, the GM people concluded that it -- the

14      lack of this feature doesn't make a vehicle unsafe, and --

15      and as soon as it's disabled, the driver gets two warning

16      signs, dashboard warning signs.  A light indicates it's

17      disabled, and then a digital message that says, "ESC

18      Disabled.  Seek Service."

19           So because the vehicle was not unsafe to drive and

20      there's a -- two signs telling the driver go get service,

21      they concluded that the vehicle shouldn't -- it didn't

22      merit a safety recall.

23           And my point is Plaintiff can take issue with that.

24      They can dispute whether GM made the right decision about

25      that, again, four years after this crash.  But what they

1          can't establish is that Mary Barra has any information

2          about the investigation that led to that decision, or

3          whether it was the right decision.

4                 Thank you.

5                 THE COURT:   Thank you, Mr. Cooney.   Mr. Cooper?

6                 MR. COOPER:   Thank you, Your Honor.

7                 May it please the Court, again, Lance Cooper here on

8          behalf of Mr. Buchanan.

9                 We are not asking for this deposition to harass Ms.

10         Barra, or to do anything other than obtain relevant

11         information to the issues in the case.

12                And as I said, we've prepared a short PowerPoint here

13         to streamline the argument, and hopefully add to what's

14         already in the Briefs.

15                Why depose Ms. Barra?  Her deposition is reasonably

16         calculated to lead to admissible evidence.   That's the

17         bottom line.   How is it relevant?   It's relevant to Mr.

18         Buchanan's punitive damages claim.   There's a punitive

19         damages claim under Georgia law, and the conduct even

20         after the incident is admissible in certain circumstances,

21         and particularly in this circumstance.

22                And finally, she is the only witness who can answer

23         certain questions that the jury must consider.   In looking

24         at these questions, this is the background in the case.

25                Ms. Buchanan is driving a 2007 Chevrolet Trailblazer.

```
 1        And as Counsel talked about, it was offered with
 2     Stabilitrak as a standard safety feature.  What is
 3     Stabilitrak?  Stabilitrak, according to GM, is a
 4     technology that helps the driver avoid collisions.  And in
 5     particular, a document produced by GM in this case, GM
 6     brags about Stabilitrak as being life-saving technology,
 7     is a milestone in taking crash-avoidance to a new level.
 8     The best crash is the crash you avoid.  And this is the
 9     most important statement in the document produced by GM,
10     "Stabilitrak is the most significant safety feature since
11     the development of the safety belt."  In other words, it's
12     critical, it's a critical safety feature.
13        How does it work?  It's real simple.  For example, in
14     this case, the driver's driving down the road, say he
15     swerves to avoid a deer and he begins to slide out.
16     Braking on the vehicle allows the vehicle to stay in the
17     path of travel, as opposed to slide out and go off the
18     road and cause a crash.  That's essentially how it works.
19        It's a critical safety feature, and this is a
20     document produced by General Motors in this case.  "It
21     reduces the risk of fatal rollover crashes by up to
22     80 percent."  In other words, you see here, here's the
23     crashes without Stabilitrak, here's the crashes with
24     Stabilitrak, and that's the difference between life and
25     death.  It's an incredible safety feature that General
```

1    Motors rightly put on this vehicle in order to protect Ms.

2    Buchanan from exactly what happened to her.  And that is

3    losing control, rolling over and being killed.

4        It works -- you don't need to get into all the

5    details other than this, there's a steering angle sensor

6    in the steering wheel, that if you -- the angle hits a

7    certain position, the Stabilitrak kicks in.  And then the

8    vehicle knows "I've gotta brake because I've gotta keep

9    this driver under control."  And that's how it works.

10       The sensor's a critical component to the Stabilitrak

11   system.  And all it is, it's a sensor that's in the

12   steering wheel column, and it monitors the steering wheel

13   angle, and critically, if it fails for some reason,

14   Stabilitrak will not work on that vehicle.

15       THE COURT:  Is electronics stability control and

16   Stabilitrak the same thing?

17       MR. COOPER:  Yes, Your Honor.  I apologize.  I should

18   have made that point clear.  That's GM's trade name for

19   electronic stability control is Stabilitrak.  It's the

20   same thing.

21       This is background on the -- the steering wheel angle

22   sensor, because that's really the focus of this case, the

23   sensor itself was made by a company called ALPS.  It was

24   submitted -- sent to Delphi, who assembled it into the

25   steering system.  And then GM ultimately put all this in

1       the vehicle which ended up being the 2007 Trailblazer.

2           This kind of an overview of how it works.  You got

3       your vehicle dynamics, your vehicle trajectory gets into a

4       certain position.  The sensors kick in and the ESC system

5       kicks in, and among the sensors is the steering angle

6       sensor.  So we get to the 2007 Trailblazer, and one

7       question is, "Well, what's the relevant scope of vehicles?

8       Is this -- is this one of a few vehicles, or how many

9       vehicles have this type of sensor?"  And then again,

10      another GM-produced document, 777,809 vehicles have this

11      exact same sensor.  They were made between 2006 and 2009,

12      and it's a variety of GM SUVs.

13          And what has GM learned?  GM learns from the

14      beginning this steering wheel angle sensor, the acronym is

15      SWAS here in the -- both in the Brief and here in the

16      PowerPoint, fails miserably from the beginning.

17          Counsel talked about warranty data as being

18      inconclusive.  It's not conclusive.  This is when

19      Ms. Buchanan's -- and this is all in attachments to the

20      Brief, Ms. Buchanan's vehicle was built on March 1st of

21      2007.  For that month, GM analyzed it and determined that

22      100 vehicles out of every thousand had a steering wheel

23      angle sensor fail.  Ten percent of the vehicles made her

24      month failed.

25          In other works, in ten percent of those vehicles, the

1          Stabilitrak was inoperable for a period of time.  These

2     vehicles came in as warranty claims and they paid the

3     claims because there was a defect in the sensor.  It goes

4     up to almost three -- over 300, in 2007, for the same

5     sensor, for this model year, for this -- this particular

6     month in 2007.  It's a model year 2008, but they made it

7     in 2007.

8          In other words, there's no dispute that these numbers

9     are extraordinarily high.  Thirty percent failure rate for

10    a particular model year.  Extraordinarily high.  And

11    that's what GM knows.  They have all of these -- they have

12    these warranty claims back in the -- in the early -- late

13    2000, early 2010, timeframe.  Tens of thousands of them.

14         Ms. Buchanan, Mrs. Marie Buchanan and her husband

15    Randall, she's born on August -- in August of '72.  She's

16    married to Randall.  She works in -- worked at service at

17    Home Depot.  That's Ms. Buchanan and her husband.

18         What about her Trailblazer?  She buys it in

19    February 2011.  It has 30,000 miles.  GM knows at that

20    time they have paid on tens of thousands of warranty

21    claims for this sensor.  And they've never done a thing to

22    notify customers about these defects.  What they do is

23    they wait until a complaint happens, and then they pay the

24    warranty claim.  But they don't proactively tell anybody

25    about these sensor failures.

1           By the date of the accident, November 10th, 2014, she

2       had about 87,000 miles on the vehicle.  They still had

3       never told her anything about these tens of thousands of

4       claims involving these defective sensors.

5           So what happens on November 10th of 2014, she's

6       driving on Friendship Church Road in Douglasville.  She

7       stops to talk to Randall's mother.  And her husband lived

8       next door.  She's traveling to visit her Nan, a relative.

9       She's properly belted.  And there's a witness, Kristen

10      King, that was following her the whole way for about

11      five miles, that says she was driving normally.  Nothing

12      unusual about what was happening.

13          Unfortunately, she gets two -- for some unknown

14      reason, because she's passed away, she gets two tires off

15      the right side of the road, and she steers to get back on

16      the road, and what happens?  Her Stabilitrak's not

17      working.  And because her Stabilitrak's not working, she

18      slides off the other side, goes down into a ravine, and

19      she's killed.

20          This is GM's marketing document, as far as what

21      Stabilitrak's supposed to do.  When this starts to happen,

22      it kicks in and the vehicle straightens out.  What

23      happened to her?  This is a police diagram.  It didn't

24      kick in, and she lost control and died as a result.

25          This is the location of the crash.  It's a two-lane

1      road.  Pretty typical.  She got two tires off,

2      unfortunately.  And she died as a result.  She ends up --

3      she's belted in the vehicle, she goes down a ravine, her

4      airbags don't work, there's something wrong with the

5      vehicle.  She can't tell us what it is because she passed

6      away.

7          So we filed a lawsuit on May 3rd of 2016.  We served

8      discovery.  But critically, we get -- our engineers get

9      together with the GM engineers and they do what's called a

10     download using a scan tool on the vehicle.  And what does

11     it show?  CO455, steering wheel angle sensor performance.

12     In other words, there's a failure code in this vehicle.

13     The steering wheel angle sensor failed at the time of the

14     incident, which caused her Stabilitrak not to work.

15         Now this is where Mary Barra's involvement in this

16     case becomes important.  GM has in-house counsel

17     investigating the case.  And Scott Paxton, Scott Paxton,

18     who's General Counsel, on May 21st of 2018, submits the

19     Buchanan case to this Speak Up for Safety program, as

20     Counsel talked about a moment ago.

21         What is the SUSP program, as it's known as?  The SUSP

22     program is a safety program created.  It wasn't just a

23     part of -- they say in their Brief it was created during

24     Mary Barra's time as CEO.  It wasn't created -- it was not

25     only created during her time as CEO, she created it.

1          She's the CEO in 2014.  She created this program.  She's

2     the one that had a personal knowledge of the program, how

3     it was set up, and how it was supposed to work.  And it

4     arose, as Counsel talked about -- why did she create the

5     program?  It arose out of the GM ignition switch defect

6     cover-up that we were very involved in with a case in

7     front of Judge Tanksley.

8          Now let's talk about the cover up in a nutshell,

9     because it's critical to this case.  March 10th, Brooke

10    Melton was driving her 2005 Cobalt in Paulding County.  A

11    defective ignition switch turned her car off, causing her

12    to lose control.  She's killed when her Cobalt crashes

13    into another car.  GM knew about the ignition switch is

14    turning cars off since the early 2000s, just like they've

15    known about the steering sensors failing since the

16    mid-2000s.

17         GM investigated and decided this is not a safety

18    issue.  Just like in this case, they've investigated and

19    decided it's not a safety issue.  GM denied there were any

20    other lawsuits or complaints, just like in this case,

21    where they've denied there are any lawsuits or complaints.

22    Judge Tanksley entered an Order, and then GM produces

23    dozens of lawsuits and complaints.

24         The Melton's experts exposed the defect, and then GM

25    was forced to recall ultimately close to 30 million cars

1        as a result.

2            So what happens here is that GM is in crisis mode,

3        once this was all uncovered.  GM is in crisis mode, and so

4        Mary Barra turns to Antonin Valukas, an attorney up in

5        Chicago, I believe, who had worked with GM in the past, to

6        do an independent investigation of the ignition switch

7        problem.  And he concludes that there are all sorts of

8        problems within GM's culture.  They had a resistance to

9        raising safety issues, there's this GM salute.

10           In other words, you had these meetings, but you

11       decide not to do anything.  A GM nod, the same thing.

12       Silos, one person doesn't know what the other person is

13       doing.  And this is what's critical in this case.  He

14       specifically says in his investigation, "GM has this

15       obsessive focus on finding root cause before acting."  In

16       other words, if we don't find the specific, exact root

17       cause, we're just not gonna act in a particular case,

18       which they have done for years in the ignition switch

19       problem.

20           And here's Ms. Barras, and we have this in the Brief,

21       as far as statements that she made.  She then took the

22       Valukas report and realized we need to use this in order

23       to do two things:  One is address the issues with the

24       press and Congress, which were going on.  But also, to

25       talk to our employees about how we're gonna change our

1        culture.  And so these are the statements she makes,

2        talking about the ignition switches and the recalls:  "GM

3        must embrace a safety culture where safety and quality

4        come first,"  Barra said at a company Town Hall meeting.

5        Which she's launched this SUSP program in a Town Hall with

6        employees.  "GM employees should raise safety concerns

7        quickly and forcefully and be recognized for doing so."

8            In other words, "We're gonna be different, we're

9        gonna proactively be involved with this."  And this is her

10       words about her program and how her program is supposed to

11       work within GM.  And as she put it also, "The lack of

12       action was a result of broad, bureaucratic problems and

13       the failure of individual employees from several

14       departments to address the safety problem.  Repeatedly,

15       individuals failed to disclose critical pieces of

16       information that could have fundamentally changed the

17       lives of those impacted by a faulty ignition switch."

18           Then she goes on, and this is probably -- these are

19       the most important statements.  She tells employees, "If

20       you are aware of a potential problem affecting safety or

21       quality, and you don't speak up, you are part of the

22       problem.  And that is not acceptable.  If you see a

23       problem that you still don't believe is being handled

24       properly, bring it to the attention of your supervisor.

25       If you still don't believe it's being handled properly,

1     contact me directly."  In other words, "I'm gonna be

2     involved with this SUSP program."

3          And then Mr. Paxton, and this is frankly unique.

4     I've never had this in a case, where an in-house lawyer

5     who's working on the case for GM, and defending GM in the

6     case, he's so concerned about what's going on here, he

7     submits the case to SUSP, because he wants it investigated

8     to determine what happened here.  And he submits it to

9     SUSP, and so what does GM do?  And this, again, is

10    relevant to Ms. Barra, because what we need to look at is

11    did GM do what Mary Barra promised the public, including

12    the citizens of Cobb County, what they would do when faced

13    with a circumstance like this?  So they -- Ms. Zilincik is

14    the investigator for SUSP.

15         The way it works is Mr. Paxton submitted the SUSP

16    program to some sort of source on the Internet -- I mean

17    on the in-house directory, and it was forwarded to her,

18    and she becomes the official investigator of the SUSP

19    program.  What's Ms. Zilicik's involvement with this?

20    This is a critical safety program, a lawyer submitted it

21    to be investigated, it's involving Stabilitrak.  So I

22    deposed Ms. Zilincik.  And she was a rookie.  I said,

23         Q: "Have you ever worked on a case before this, as a

24    product investigator, which related to electronic

25    stability control in a GM vehicle?"

1          A:  "No, this is the only case I've had."

2          They put a lady on it who is not --

3          THE COURT:  You deposed her in this case?

4          MR. COOPER:  Excuse me?

5          THE COURT:  You deposed her in this case?

6          MR. COOPER:  Yes.

7          THE COURT:  All right.

8          MR. COOPER:  Yes.  This is a deposition we took last

9     April, I believe --

10         THE COURT:  All right.

11         MR. COOPER:  -- in this case.

12         This a document she prepared, which talks about she

13    acknowledges -- she recognizes the way this -- in which

14    the crash happened, and again, also, there's a recognition

15    that the crash should've got a -- there should never have

16    been a crash if Stabilitrak had been working.

17         Ms. Zilincik then, when asked about her role in this

18    case, and evaluating the electronic stability control,

19    because that was her evaluation, she doesn't understand

20    it's a primary safety feature.

21         Q: "ESC is not a main safety feature?"

22         A: "Right, not a primary safety feature."

23         This is the lead investigator who's been assigned by

24    GM, who testifies it's not even a primary safety feature.

25    No wonder it got closed without doing anything.  She

1       didn't understand -- it said -- I showed her the chart

2       that GM produced.  It says, "The effect of ESC on

3       rollovers per single vehicle crash event," what does this

4       chart show?  She says, "This is not my expertise.  I'm not

5       sure where this, you know, where he got this data.  So I

6       wouldn't be able to explain it."  Didn't understand the

7       data produced by GM.

8               But she does know, this is critical, she and GM know

9       when she calculated the data, there were 78,176 steering

10      wheel angle sensor failures.  There were 777,000 vehicles

11      made, over a 10 percent failure rate for these sensors.

12      Every one of these is a sensor failure, including warranty

13      claims, including customer complaints in addition to

14      warranty claims, TREAD (phonetic), which is data submitted

15      to the Federal Government, and then legal claims.

16              And what does GM do?  Again, this goes back to Mr.

17      Valukas and the SUSP program Mary Barra set up.  Ms.

18      Zilincik met with the experts who are evaluating this.

19      And I asked him -- excuse me, I asked Mr. -- Ms. Vilicik.

20          Q: "Did any of the technical experts ever confirm

21      there was a bad sensor in this vehicle?"

22          A: "They never communicated that to me."

23          Q: "Did you ever ask them?"

24          A: "Yes, I did ask them."

25          Q: "And what did they tell you?"

1          And this is five years -- excuse me, four years after

2     the crash.

3          A: "They told me they were in the middle of working

4     on it at the time."

5          In other words, they're still investigating.  What

6     specifically Mr. Valukas was critical of, and Ms. Barra

7     said would never happen, and that is we're not gonna just

8     investigate to investigate, we're gonna come to

9     conclusions and take actions, which they didn't do.  And

10    they still haven't done.

11         Now, Counsel said, let me be sure I get this right,

12    in his argument said, "We argue in our Brief that the

13    sensor issue remained and lingered," and he said, "There

14    is no conclusion about a problem with the sensor."  In

15    other words, that no one has ever concluded there was a

16    problem with the sensor within GM.

17         Well, this is an e-mail produced by Ms. Zilincik

18    where she went out and talked to the original engineers

19    who were involved with the sensor.  And she went out in

20    August of 2018 and talked to these gentlemen.  I don't

21    know if it was via the phone or in person.  She was trying

22    to figure out what's the background on this sensor and

23    these warranty claims, because they are high.  And she

24    said Mr. Abram and Mr. Shaub, this is Mrs. Zilincik saying

25    she spoke to Mr. Abram and Mr. Shaub.  "They told me they

1        always knew SAS [sic] warranty was high, and even tried to

2        do some cost recovery from the supplier with no success."

3        In other words, they've known from the beginning that

4        these things are failing, they're failing at a high rate,

5        and we're trying to get -- we tried to get our money back

6        from ALPS.  Why?  Because the technology at the time --

7        excuse me.  They say it was the technology at the time

8        with known issues.  In other words, the engineers at GM

9        told Ms. Zilincik, "Yes, the warranty claims were high.

10       We tried to get our money back from the supplier because

11       we knew there were problems with technology at the time."

12          They've known about it since 2006 and 2007, just like

13       they knew about the ignition switch problem for all that

14       time.  It's not -- it's not as what they say, us falsely

15       saying the sensor remained and lingered.  It -- it's

16       remained since the two -- early-to-the-mid 2,000s, excuse

17       me.  And then this is where Ms. Zilincik does exactly what

18       Ms. Barra and Mr. Valukas said they should never do again.

19          This is her presentation where it says, "Root Cause:

20       Based on information that is available today, the root

21       cause of the SUSP vehicle accident is inconclusive as to

22       whether unavailability of the stability control system

23       contributed to the cause of the accident."  Is that right?

24       Yes, that's right.

25          So contrary to Counsel's argument where he says, "GM

1      has determined that Stabilitrak would not have made a

2      difference," it disagrees that it would have made a

3      difference.  It believes it would not have made a

4      difference.  At best, the testimony from GM right now is

5      it's inconclusive.  They didn't find a root cause, it's

6      inconclusive.  So what do they do?  They close the

7      investigation without doing anything.  Exactly what Ms.

8      Barra said shouldn't happen under these circumstances.

9      And again, Mr. Valukas -- GM did not learn from Mr.

10     Valukas.  Mr. Valukas in the report says, "But the search

11     for a root cause became the basis for doing nothing to

12     resolve the problem for years."  This is Mr. Valukas'

13     report, that Ms. Barra took and said, "This is never gonna

14     happen again under my watch.  I'm gonna be involved with

15     this."

16          "The lengthy search for root causes diverted GM from

17     it's obligations and failed to produce the required

18     urgency to bring the matter to fast closure," exactly

19     what's happening here.  As Ms. Zilincik said, they're

20     still investigating this.  And then there's no one

21     responsible to determine whether the SWAS is defective.

22     I asked her, I said.

23          Q:  "Isn't it one of the responsibilities of you in

24     this OIR to determine, based on the evidence you present,

25     whether there is a defect in the vehicle, and the OIR is

1       just one of the investigating committees?  Don't you have

2       one of those responsibilities?"

3            A:  "Not necessarily, no."

4            And she says, "That's not the main objective.  The

5       main objective is to define a condition, and the effect of

6       the vehicle -- an effect to the vehicle performance.

7       That's the key thing."

8            So this is the objective:  To find the condition and

9       what's the effect on vehicle performance?  Well, the

10      condition is, the SWAS failed.  We know that because

11      that's in the DTC.

12           The effect is the Stabilitrak won't work when the

13      SWAS fails.  Yet GM says, as we say in our Brief, they

14      continue to fail.  As of today, they continue to fail.

15           Now, the affidavit of Ms. Barra is important.

16           Excuse me, Your Honor.  I'm gonna get a glass of

17      water.

18           GM had Ms. Barra sign an affidavit which says she

19      implemented the Speak Up For Safety program.  It was

20      implemented, she implemented it.  She says, "I don't

21      conduct these SUSP investigations, nor have I ever, and do

22      not receive individual reports about each investigation

23      conducted on the part of SUSP."  She says she wasn't

24      involved in this SUSP investigation.  In other words, and

25      she says, "I don't have any direct, unique knowledge about

34

1       this, either the Trailblazer, SWAS -- I don't have any

2       direct," excuse me, "any unique specialized or superior

3       knowledge regarding a SUSP investigation of the SWAS."

4           What this shows is GM has done what Valukas

5       criticized, they've siloed Ms. Barra.  In other words, you

6       have a situation here where she knows that she set up a

7       program, and GM has shut -- has closed the investigation

8       without going forward.  And then she has now -- she knows

9       about this incident because she's aware of the incident,

10      because she signed the affidavit.  And yet, she's aware of

11      this incident, she promised consumers back in 2014, "I'm

12      gonna," you know, "GM's gonna do the right thing when

13      these investigations occur."  And then apparently she

14      hasn't done anything in response to this.  In other words,

15      Ms. Barra knows now -- now knows and has done nothing.

16          Again, if you are aware of what the essential

17      safety -- problem affecting safety or quality and don't

18      speak up, you're a part of the problem.  She's aware of

19      this now.  She's aware of this problem and has not done

20      anything.  Or -- and she needs to answer questions

21      regarding what she knows and when she knew it.  And in

22      particular she can answer these types of questions, and

23      that is: You set up this program, you made certain

24      representations to the public about the program, it's not

25      working in this case.  And she needs to be aware of that

1        and asked questions about it.

2            As we say in our Brief and just reference here,

3        Melton and Buchanan are eerily similar.  Young woman --

4        Melton is a young woman killed in Paulding County, '05

5        Cobalt, defective part, investigation, no root cause.

6        Buchanan, young woman killed in Paulding County, 2007

7        Trailblazer, defective parts, steering angle sensor,

8        investigation and no root cause is found.  That's where we

9        are as of today's date.

10           Why depose her?  Again, it's reasonably calculated to

11       lead to the discovery of admissible evidence, testimony

12       relevant to punitive damages claims, and she's the only

13       witness who can answer certain questions.  She made the

14       commitment, she needs to answer the questions why this

15       investigation was closed with no root cause.

16           And this final part of the argument goes to Counsel's

17       argument about, "Well, evidence after 2014 is not relevant

18       because that's when the crash occurred."  And the

19       relevance of Ms. Barra's testimony goes to the punitive

20       damages claim, and the jury will be charged in this case

21       on punitive damage pattern instruction.  Among other

22       things, they're to consider the nature and egregiousness

23       of the Defendant's conduct.  This is the critical one, the

24       extent and duration of the Defendant's wrongdoing and the

25       likelihood of its reoccurrence.  And the profitability of

1          the Defendant's wrongdoing.

2               Those will all be factors to consider and the extent

3          and duration of the wrongdoing is today.  There are tens

4          of thousands, if not hundreds of thousands of these

5          vehicles on the road, and GM has done nothing -- and with

6          defective steering wheel angle sensors, and GM's done

7          nothing to warn consumers about that.

8               What's the law in Georgia on that?  A manufacturer

9          has a duty to warn months, years or even decades after the

10         date of first sale of the product.  And that's not just

11         warn Ms. Buchanan, that's warning all consumers, because

12         that's relevant to the punitive damage claim.  And

13         finally, post-incident conduct is admissible.

14              THE COURT:  Do you have any other pending cases filed

15         at this time that assert a problem with the steering wheel

16         angle sensor case?

17              MR. COOPER:  I do not.

18              THE COURT:  Are you aware of any pending, period?

19              MR. COOPER:  We're aware --

20              THE COURT:  Across the country.

21              MR. COOPER:  We are aware of other incidents where

22         rollovers have occurred, and we're taking a deposition on

23         that in a couple of weeks on other similar incidents.  So

24         that discovery is ongoing.

25              THE COURT:  Yes, sir.

1          MR. COOPER:  And I'll make the point, I think it's an

2     important point, that was the same argument GM made to

3     Judge Tanksley in Melton.  Same exact argument.  There are

4     no other lawsuits.  The Plaintiff should not be entitled

5     to this discovery.

6          Mary Barra has superior knowledge of the SUSP program

7     and how it's supposed to work, she has to answer -- she

8     should answer questions as to why it hasn't worked in this

9     case.

10         To go through the law, briefly.  It's in the Brief.

11    The Bridges quote is -- you've got it in the Brief, but I

12    think that the most important quote is from Judge Land, as

13    we say in page 31 of our Brief, and when he says, "The

14    Court is unpersuaded by Defendant's implication that we

15    have a caste litigation system which divides witnesses

16    into two classes:  A privileged class that must be

17    protected from the inconveniences associated with

18    litigation, and everyone else who must put aside private

19    matters temporarily for the administration of justice."

20         We are not asking to depose Ms. Barra to harass her,

21    we're simply deposing her to ask her about why it's taken

22    place this way.  In other words, the ignition switch

23    problem occurred, you recognized it, you said you were

24    gonna change your business practices.  Your safety

25    culture.  And it hasn't changed.

```
 1              Even if there was only one incident.  Say this is the

 2         only incident ever.  There are tens of thousands of cars

 3         on these roads.  What happens tomorrow when a mother's

 4         driving her daughter, and the Stabilitrak doesn't work?

 5         And she hasn't been told, and there's a fatal crash.  And

 6         we come back and say, "Well, there was only one incident

 7         before, now we're gonna do something, because now there's

 8         two.  And two is double one."  I suggest that one is

 9         plenty.  And that Ms. Barra should answer questions

10         regarding this matter because she made promises to the

11         consumers back in 2014.  "This is the way we're gonna do

12         business."  And in this case it's undisputed they haven't

13         done business this way, Your Honor.  They have not done

14         business the way she promised.

15              We have an investigation into a fatal accident that

16         was closed not because they determined it's conclusive

17         that sensor had nothing to do with this, it was closed

18         because, "We don't know.  And if we don't know, then we're

19         gonna close it."  That's what happened here.

20              Now, they come in and say now, "Well, we do believe

21         it didn't work," but according to the investigation and

22         according to Ms. Zilincik, she acknowledged, "We don't

23         know, it was inconclusive."

24              And so for that reason, we respectfully request we

25         should be at -- we should be permitted to depose Ms.
```

1       Barra.

2            THE COURT:  Thank you, Mr. Cooper.  Mr. Cooney, are

3       you aware of any other pending litigation -- pending

4       litigation involving the assertion that there's a problem

5       with the steering wheel angle sensor?

6            MR. COONEY:  No, Your Honor.  And I should add there

7       was a comment made about some ongoing discovery, and it's

8       not taking place in this case.  There've been no --

9       there've been no notices to General Motors of an

10      allegation such as made in this case, Your Honor.  So I'm

11      not sure what Counsel is referring to.  But it's not

12      discovery about this case, or any case that we're aware

13      of.

14           Your Honor, he said that the basis for the deposition

15      was punitive damages.  Not to get too far into the weeds,

16      but the Defendant in this case is General Motors, LLC,

17      sometimes referred to as New GM.  The company that built

18      this truck is Old GM.  And the Second Circuit has held

19      that New GM cannot be on the hook for punitive damages

20      based on vehicles produced and sold by Old GM.  And it's a

21      defense.  We're certain the case hasn't been Briefed

22      because until this hearing, that wasn't the basis for why

23      he was claiming he was deposing Ms. Barra.  It doesn't

24      show up in their Response anywhere, so I apologize if I

25      didn't anticipate that and address it ahead of time.

1          But if -- even if that weren't the case, he's

2     premising the deposition on a defect he has yet to prove.

3     He's making these allegations that GM has concluded that

4     high warranty led them to conclude that the lack of ESC or

5     a disabled ESC is a safety detail, it makes vehicles

6     unsafe.  Well we can debate that, but GM's safety folks

7     have concluded that the lack of an ESC does not make a

8     vehicle unsafe to drive, and a driver was given immediate

9     notice continuous notice of that condition.

10          Now that might -- people may debate, and that's what

11    this case is gonna be about.  But to the extent he's

12    proposing here that GM has concluded that this was a

13    mistake that we missed, and therefore Mary Barra should be

14    asked about it, he's kinda putting the cart before the

15    horse.  He's hasn't even talked to the people who designed

16    the product, and looked at the warranty data at the time.

17    Did they conclude it was a problem?  He hasn't talked to

18    the decision-makers in the safety investigation process,

19    who concluded that it wasn't the basis for a recall.

20          He's deposed one person on this issue, the

21    investigator, this Ms. Zilincik, who's job it was, as

22    she's testified, "My job is only to collect and report.

23    I'm not the decision-maker.  I'm not an expert in ESC.

24    There's others on the committee that have that expertise.

25    I present the facts to them and note what they decide."

1          He hasn't talked to those people about the basis for

2      their decision.  He hasn't established that they concluded

3      rightly or wrongly that this condition is a defect.  This

4      decision -- this issue has not been the subject of any

5      meaningful discovery in the case, yet he wants to conclude

6      there's a defect, and then depose Ms. Barra about why GM

7      didn't take certain action that he says they should've

8      done.

9          To the extent, if you take punitive damages off the

10     table, Your Honor, it's a point I made before, all of this

11     activity that he wants to hook Ms. Barra into takes place

12     after this crash.  He -- I guess he's withdrawn the

13     implication that that decision would give rise to a cause

14     of action for failure to warn, because it would come too

15     late.  But still, if he wants to talk about the people who

16     designed the product and prior to this accident knew or

17     should've known something about it's performance, that's

18     the claim.  They should've known this warranty rate was

19     too high.  They should've done something about it, and

20     they didn't.  He hasn't even begun to do that in the case.

21         Instead, he wants to jump to the CEO, who knows

22     nothing about it, to say that -- and again, she wasn't CEO

23     at the time of the design and this high warranty claim

24     he's talking about.  He's trying to bring her into this

25     only as a result of the post-crash investigation process.

```
 1            Your Honor, to kinda get back to the theme I started

 2       with, the Plaintiff has a claim in this case that GM got

 3       it wrong.  I get that.  And there's people he can talk to

 4       about, you know, to try to prove that up.  He hasn't done

 5       that.  He wants to depose a CEO purely on the basis that

 6       he thinks he has evidence of a product defect, that he

 7       thinks he can demonstrate that GM should have done

 8       something differently.  That he thinks, sitting here

 9       today, or in 2018, that what GM decided was different than

10       what Ms. Barra promised.

11            But he hasn't talked to the people about the basis

12       for that decision.  All he's gonna get from her is that,

13       "I don't know about this.  I wasn't a part of this

14       investigation."  What's the purpose of that deposition?

15       To, you know, to attempt to belittle her in a video

16       deposition about topics she wasn't involved in, without

17       first doing any of the underlying discovery to determine,

18       you know, whether -- whether the facts are such that she

19       would've done something.  Or anyone else should've done

20       something.

21            Thank you, Your Honor.

22            THE COURT:  Thank you, sir.

23            MR. COOPER:  Your Honor, can I make --

24            THE COURT:  No --

25            MR. COOPER:  Can I make one point, just to --
```

1          THE COURT:  No, he's got the last word.  But I will

2     ask you to prepare an order for me in a few moments.

3          This is the Court's ruling:  Apex Rule does not apply

4     here.  Though it's not been directly asserted that it

5     does, it does not apply.  There is no corollary for that

6     Federal rule applicable in the state of Georgia.

7          The Plaintiff here has asserted relevance, this Court

8     finds, to the taking of the deposition of Ms. Barra, and

9     the Court further finds that the Defendant has not shown

10    good cause why a protective order should issue today.

11    It's not really a close call for this Court, to be

12    perfectly candid.

13         So I will respectfully deny the Motion.  And Mr.

14    Cooper, if you'll prepare an Order of the finding and

15    submit it to the Court for signature.

16         MR. COOPER:  Yes, Your Honor.

17         THE COURT:  Thank you.

18         MR. MARSH:  Your Honor, could I be heard?  Brad

19    Marsh.  Would you consider a Certificate?

20         THE COURT:  I'll consider whatever you file, sure.

21         MR. MARSH:  Say it again?

22         THE COURT:  I'll consider whatever you file.

23         MR. MARSH:  Revenue file?

24         THE COURT:  I'll consider whatever --

25         MR. MARSH:  Oh, okay.

1          THE COURT:  -- you file.

2          MR. MARSH:  So once the Order's in, can we submit

3     that by just paper?  Send it in a letter to you?

4          THE COURT:  If you want to file a Motion for

5     Certificate of Review, you need to file that with the

6     Clerk of Court.

7          MR. MARSH:  Right.  Thank you, Judge.

8          THE COURT:  Sure.

9          MR. COONEY:  Thank you.

10          MR. COOPER:  Thank you, Your Honor.

11          (Court was in recess.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3    GEORGIA: COBB COUNTY

 4         The foregoing proceedings were taken down by me as a

 5    Certified Court Reporter in the State of Georgia, and the

 6    questions and answers thereto were recorded by me, reduced to

 7    typewriting and proofed by me, personally.

 8         I further certify that I am neither kin nor counsel to any

 9    party, am not in the regular employ of counsel for any party

10    and am in nowise interested in the outcome of said case.

11         This certification is expressly withdrawn and denied upon

12    the disassembly or photocopying of the foregoing transcript of

13    proceedings or any part thereof, including exhibits, unless

14    said disassembly or photocopying is done by the undersigned

15    certified court reporter and the signature and original seal is

16    attached thereto.

17    This 10th day of March, 2020.

18    Lisa Bergeron-          Digitally signed by Lisa
                              Bergeron-Berg
      Berg                    Date: 2020.03.11 15:07:28 -04'00'
19    _____

20    LISA BERGERON
      Certified Court Reporter
21    Certificate Number 2881

22

23

24

25
```