**MCDERMOTT WILL & EMERY LLP**
340 Madison Ave.
New York, New York 10173
Telephone: (212) 547-5429
Facsimile: (646) 417-7313
E-mail: kgoing@mwe.com
Kristin K. Going

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

<u>HEARING DATE AND TIME:</u> **April 23, 2020**
**@ 9:30 a.m. EDT**

<u>OBJECTION DEADLINE:</u> **April 16, 2020**
**@ 4:00 p.m. EDT**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|  |  |
| :--- | :--- |
| **In re** | : |
|  | : |
|  | : |
| **MOTORS LIQUIDATION COMPANY,** *et al.*, | : |
| **f/k/a General Motors Corp.,** *et al.* | : |
|  | : |
| **Debtors.** | : |

**Chapter 11 Case No.**

**09-50026 (MG)**

**(Jointly Administered)**

-----------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING THE GUC TRUST ADMINISTRATOR'S ACTIONS;**
**(II) APPROVING THE SETTLEMENT AGREEMENT AND THE RELEASE**
**AGREEMENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY**
**PROCEDURE 9019; AND (III) AUTHORIZING THE REALLOCATION OF**
<u>**GUC TRUST ASSETS**</u>

**PLEASE TAKE NOTICE** that on March 27, 2020, the Motors Liquidation

Company GUC Trust (the "**GUC Trust**"), formed by the above-captioned debtors

(collectively, the "**Debtors**") in connection with the Debtors' Second Amended Joint Chapter

11 Plan dated March 18, 2011, filed a motion (the "**Motion**") for an order, pursuant to

sections 105(a), 363 and 1142(b) of title 11 of the United States Code, Federal Rule of

Bankruptcy Procedure 9019 and section 8.1 the Second Amended and Restated Motors

Liquidation Company GUC Trust Agreement dated as of July 30, 2015, approving certain

actions to be undertaken by the GUC Trust Administrator, approving a settlement agreement

and a release agreement and authorizing the reallocation of GUC Trust Assets, all as more

fully described in the Motion, and that a hearing will be held before the Honorable Martin

Glenn, United States Bankruptcy Judge, sitting jointly with the Honorable Jesse M. Furman,

United States District Court Judge for the Southern District of New York, in the Courtroom

of the Honorable Jesse M. Furman,  located at 40 Centre Street, New York, NY 10007, or,

subject to further order of the Courts, by telephone, on **April 23, 2020 at 9:30 a.m. (Eastern**

**Time)**, or as soon thereafter as counsel may be heard.

       **PLEASE TAKE FURTHER NOTICE** that any responses or objections to this Motion

must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local

Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically

in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest,

on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a

hard copy delivered directly to Judge Glenn's Chambers), in accordance with the customary

practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and

served in accordance with General Order M-399 and on (i) McDermott Will & Emery LLP,

attorneys for Wilmington Trust Company as GUC Trust Administrator, 340 Madison Avenue,

New York, New York 10173 (Attn: Kristin K. Going, Esq.); (ii) FTI Consulting, as the GUC

Trust Monitor, 3 Times Square, 11th Floor New York, NY 10036 (Attn: Conor Tully); (iii)

Paul, Weiss, Rifkind, Wharton & Garrison LLP, attorneys for General Motors, LLC, 1285

Avenue of the Americas, New York, NY 10019 (Attn: Kyle J. Kimpler, Esq.); (iv) Brown

Rudnick LLP, attorneys for the Economic Loss Plaintiffs, 7 Times Square, New York, NY

10036, (Attn: Edward S. Weisfelner, Esq); (v) Akin Gump Strauss Hauer & Feld LLP,

attorneys for the Participating GUC Trust Unitholders, One Bryant Park, New York, New York

10036 (Attn: David M. Zensky, Esq.); and (vi) the Office of the United States Trustee for the

Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006,

New York, New York 10014 (Attn: William K. Harrington, Esq.), so as to be received no later than **April 16, 2020 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, the GUC Trust Administrator may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
        March 27, 2020

McDERMOTT WILL & EMERY LLP

By:    /s/   Kristin K. Going
       Kristin K. Going
       340 Madison Avenue
       New York, New York 10173
       Tel: (212) 547-5429
       E-mail: kgoing@mwe.com

       *Attorneys for the Motors Liquidation*
       *Company GUC Trust Administrator*

**MCDERMOTT WILL & EMERY LLP**
340 Madison Ave.
New York, New York 10173
Telephone:  (212) 547-5429
Facsimile:  (646) 417-7313
E-mail: kgoing@mwe.com
Kristin K. Going

*Attorneys for the Motors Liquidation Company
GUC Trust Administrator*

**HEARING DATE AND TIME:** April 23, 2020
@ 9:30 a.m. EDT

**OBJECTION DEADLINE:** April 16, 2020
@ 4:00 p.m. EDT

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                                  :
In re:                                                            :    **Chapter 11**
                                                                  :
**MOTORS LIQUIDATION COMPANY,** *et al.*,                         :    **Case No. 09-50026 (MG)**
**f/k/a General Motors Corp.,** *et al.*                          :
                                                                  :    **(Jointly Administered)**
**Debtors.**                                                      :
                                                                  :
-----------------------------------------------------------------x

**MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE GUC
TRUST ADMINISTRATOR'S ACTIONS; (II) APPROVING THE
SETTLEMENT AGREEMENT AND THE RELEASE AGREEMENT
PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE
9019; AND (III) AUTHORIZING THE REALLOCATION OF
GUC TRUST ASSETS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

JURISDICTION .........................................................................................................................4

BACKGROUND .........................................................................................................................5

I.      Old GM's Bankruptcy and the Creation of the GUC Trust ....................................5

II.     Recalls and Subsequent Proceedings in the Bankruptcy Court and Second Circuit ............5

III.    Developments Following The Second Circuit's Decision ..................................7

IV.     Plaintiffs' Alleged Claims Against Old GM .........................................................9

V.      The Excess Distribution Motion ........................................................................10

VI.     The Settlement Agreement ................................................................................12

RELIEF REQUESTED.............................................................................................................15

BASIS FOR RELIEF REQUESTED.........................................................................................15

I.      The Court Should Find the Settlement is an Appropriate Exercise of the GUC Trust
        Administrator's Authority and Approve the Proposed Actions.........................................15

II.     The Court Should Authorize the Reallocation of $50 Million of GUC Trust Assets........19

III.    The Settlement Will Confer Benefits Greater than Those that Would be Obtained
        Through Further Litigation .................................................................................20

        A.      Plaintiffs' Claims Raise Numerous Complex Litigation Issues ...........................22

                a.      The Complexity of the Issues ..................................................22

                b.      The Risks of Continued Litigation..............................................26

        B.      The Benefits of Settling Exceed the Potential Benefits of
                Continued Litigation .............................................................................27

        C.      The Settlement Agreement Satisfies the Remaining Iridium Factors....................28

NOTICE....................................................................................................................................29

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana
   Corp.),
   412 B.R. 53 (S.D.N.Y. 2008)................................................................................27

In re Adelphia Commc'ns Corp.,
   327 B.R. 143 (Bankr. S.D.N.Y. 2005)....................................................................20

Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs,
   Inc.),
   156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).........................20

In re Am. Home Mort. Inv. Trust
   2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867 .......................17

In the Matter of the Application of U.S. Bank Nat'l Ass'n,
   No. 651625/2018, NYSCEF No. 1 (N.Y. Sup. Ct. April 4, 2018) .........................16

In re Chateaugay Corp.,
   10 F.3d 944 (2d Cir. 1993)....................................................................................24

Elliott v. General Motors LLC,
   829 F.3d 135 (2d Cir. 2016)...........................................................................5, 6, 24

In re Hibbard Brown & Co., Inc.,
   217 B.R. 41 (Bankr. S.D.N.Y. 1998)......................................................................20

Mosser v. Darrow,
   341 U.S. 267 (1951)...............................................................................................16

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
   LLC),
   478 F.3d 452 (2d Cir. 2007)...................................................................................21

In re Motors Liquidation Co.,
   529 B.R. 510 (Bankr. S.D.N.Y. 2015)..................................................5, 6, 24, 25

In re Motors Liquidation Co.,
   571 B.R. 565 (Bankr. S.D.N.Y. 2017), aff'd in part, vacated in part, 590 B.R.
   39 (S.D.N.Y. 2018) ................................................................................................6

In re Motors Liquidation Co.,
   531 B.R. 354 (Bankr. S.D.N.Y. 2015)......................................................................7

Nellis v. Shugrue,
    165 B.R. 115 (S.D.N.Y. 1994) .............................................................................20

Newman v. Stein,
    464 F.2d 689 (2d Cir. 1972) .............................................................................20

In re Peierls Family Inter Vivos Trusts,
    59 A.3d 471 (Del. Ch. 2012) ...........................................................................17

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson,
    390 U.S. 414 (1968) .........................................................................................21

In re Purofied Down Prods. Corp.,
    150 B.R. 519 (S.D.N.Y. 1993) .....................................................................20, 21

In re Tronox Inc.,
    No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17,
    2015) ...........................................................................................................17, 18

In re W.T. Grant, Co.,
    699 F.2d 599 (2d Cir. 1983) .............................................................................20

**Statutes and Rules**

11 U.S.C. § 105 ...................................................................................5, 15, 20, 29

11 U.S.C. § 363 ...............................................................................................5, 15

11 U.S.C. § 1142 .............................................................................................5, 15

28 U.S.C. § 157 ....................................................................................................4

28 U.S.C. § 1334 ..................................................................................................4

28 U.S.C. § 1408 ..................................................................................................4

28 U.S.C. § 1409 ..................................................................................................4

Fed. R. Bankr. P. 9019 .................................................................................. *passim*

Fed. R. Civ. P. 23 .................................................................................1, 2, 3, 9, 15

By and through its undersigned counsel, the Motors Liquidation Company GUC Trust

(the "GUC Trust") respectfully submits this *Motion for Entry of an Order Approving (I) the*

*GUC Trust Administrator's Actions; (II) the Settlement Agreement and the Release Agreement*

*Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (III) the Reallocation of GUC*

*Trust Assets* (the "Motion"), seeking approval of certain actions taken and to be taken by the

GUC Trust in furtherance of the settlement, and entry of an order approving the Settlement

Agreement and the Release Agreement.[1]  In support of this Motion, the GUC Trust respectfully

represents as follows:

## PRELIMINARY STATEMENT

1.      The GUC Trust first seeks the Court's approval of several steps that serve as

conditions precedent to the approval and implementation of a global settlement agreement

among it, New GM, and named plaintiffs (representing a putative class of economic loss

plaintiffs, the "Plaintiffs," and together with the GUC Trust and New GM, the "Parties").

Assuming the Court approves the conditions precedent, the GUC Trust also seeks the Court's

approval for the GUC Trust to enter into and, subject to final approval by the MDL Court,

effectuate the Settlement Agreement, including authorization to reallocate a total of

$50,000,000.00 in GUC Trust Assets (as that term is defined in the GUC Trust Agreement) to

fund $2,000,000.00 of Settlement Implementation Expenses upon entry of the MDL Court's

order preliminarily approving the Settlement Agreement under Federal Rule of Civil Procedure

23, and a payment of $48,000,000.00 by the GUC Trust into the Common Fund to be established

---

[1]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Settlement Agreement,
a copy of which is attached hereto as Exhibit A.

as a Qualified Settlement Fund after the Settlement Agreement is finally approved by the MDL

Court and the Final Effective Date occurs.

2.    The Settlement Agreement resolves both multidistrict litigation that has been

pending before the MDL Court and the litigation surrounding the Late Claims Motions and, with

respect to the GUC Trust, Proposed Proofs of Claim filed by certain Plaintiffs seeking class

certification in the Bankruptcy Case.  The settlement also resolves the *Motion of Wilmington*

*Trust Company, as GUC Trust Administrator, for an Order (A) Authorizing the Expedited*

*Payment of Excess GUC Distributable Assets Pursuant to Section 5.4 of the GUC Trust*

*Agreement, and (B) Approving Such Distribution as an Appropriate Exercise of the GUC Trust*

*Administrator's Rights, Powers and/or Privileges Pursuant to Section 8.1(e) of the GUC Trust*

*Agreement*, filed 7/23/2019, ECF No. 14565 (the "Excess Distribution Motion").

3.    At the same time, the Settlement preserves claims the Plaintiffs and New GM may

have against the AAT, which is not a party to the Settlement Agreement.

4.    Simultaneous with the filing of this Motion, the Parties have sought withdrawal of

the reference as to the Late Claims Motions in order to seek preliminary and final approval of the

Settlement Agreement, pursuant to Rule 23 of the Federal Rules of Civil Procedure, before the

MDL Court.  However, the Parties have <u>not</u> sought to withdraw the reference with regard to the

GUC Trust's pending Excess Distribution Motion, claims remaining against the AAT, or the

Court's exclusive jurisdiction over the GUC Trust Agreement.[2]  By this Motion the GUC Trust

seeks this Court's approval of the actions taken by the GUC Trust in furtherance of the

Settlement, and approval of the Settlement Agreement and the Release Agreement pursuant to

---

[2]    The Parties also have not sought to withdraw the reference with respect to litigation outside the scope of the Settlement, specifically the late claims motions filed by persons alleging personal injuries or wrongful death.  See Settlement Agreement at § VII, ¶ 140; see also Bankr. ECF No. 14661 (scheduling order concerning parties seeking to file late claims against the GUC Trust alleging personal injury and wrongful death.)

Bankruptcy Rule 9019.  The Parties are not asking this Court to address any issues relating to

Federal Rule of Civil Procedure 23.

5.    This Court's entry of an order approving the Motion (the "<u>GUC Trust Approval</u>

<u>Order</u>") is a condition precedent to the MDL Court's entry of an order preliminarily approving

the Settlement Agreement.  In addition to approving the actions the GUC Trust intends to

undertake in furtherance of the Settlement, the GUC Trust Approval Order provides for, *inter*

*alia*, (i) the resolution of the Excess Distribution Motion, pursuant to which the GUC Trust shall

make an Excess Distribution of $300,000,000.00 to Unitholders; (ii) approval of the GUC

Trust's entry into the Release Agreement, which provides New GM with a release from all

liability relating to, *inter alia*, the Bankruptcy Case, the Late Claims Motions and the Adjustment

Shares, while also providing that New GM will release the GUC Trust from all liability relating

to, *inter alia*, the Bankruptcy Case, the Late Claims Motions, and any payments New GM has

made on account of personal injury or wrongful death claimants; (iii) reallocation of a total of

$50,000,000.00 of GUC Trust Assets, consisting of $2,000,000.00 to fund Settlement

Implementation Expenses, and $48,000,000.00 to be paid to into the Common Fund within 30

days of the Final Effective Date in full satisfaction and release of any claims by Plaintiffs against

the GUC Trust and (iv) preservation of Plaintiffs' and New GM's claims against the AAT, if

any, so that Plaintiffs and New GM can continue to seek recovery from the AAT on account of

Proposed Proofs of Claim that will be deemed filed, but recoverable solely as against the AAT,

pursuant to the Settlement Agreement.

6.    The Excess Distribution, the Release Agreement and the reallocation of $50,000,000.00 of GUC Trust Assets will be effectuated upon entry of the GUC Trust Approval Order.[3]

7.    The Settlement Agreement and the Release Agreement were the product of vigorous, arm's-length negotiations, including negotiations conducted over the course of several mediation sessions before former United States District Court Judge Layn R. Phillips, the MDL Court-Appointed Economic Loss Settlement Mediator.  (A declaration by the MDL Court-Appointed Economic Loss Settlement Mediator is attached hereto as Exhibit C.)  At all times, the GUC Trust sought to minimize the amount it would need to pay, while at the same time reduce the risk of further extensive litigation, and expedite its ability to make distributions to the Unitholders.  The GUC Trust respectfully submits that authorizing the GUC Trust to consummate the transactions contemplated by the Settlement Agreement, including entry into the Release Agreement, is in the best interest of the GUC Trust and all of its beneficiaries.

8.    Once effective, the Settlement Agreement will resolve the contentious litigation and disputes with economic loss plaintiffs that have sought to assert claims against the GUC Trust and which has been ongoing in the Bankruptcy Court for many years, bringing the GUC Trust much closer to its goal of making a final distribution and winding down.

## **JURISDICTION**

9.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

10.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]    The form of GUC Trust Approval Order is attached hereto as Exhibit B.

11.     The statutory predicates for the relief sought in this Motion are Bankruptcy Code

sections 105(a), 363, and 1142 and Bankruptcy Rule 9019.

## BACKGROUND

### I.     Old GM's Bankruptcy and the Creation of the GUC Trust

12.     On June 1, 2009, General Motors Corporation ("Old GM") and certain of its

affiliates (collectively, the "Debtors") filed for chapter 11 bankruptcy protection in this Court

and entered into an agreement to sell substantially all of its assets to NGMCO, Inc. (now known

as "New GM") in exchange for, *inter alia*, New GM common stock and warrants.[4]  See In re

Motors Liquidation Co., 529 B.R. 510, 535 (Bankr. S.D.N.Y. 2015).  On July 5, 2009, the sale

was approved by the Bankruptcy Court.  See Elliott v. General Motors LLC, 829 F.3d 135, 146-

47 (2d Cir. 2016).

13.     In September 2009, the Court established November 30, 2009 (the "Bar Date") as

the deadline for filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529

B.R. at 535.

14.     On March 29, 2011, the Court entered an order confirming the Plan, which,

among other things, authorized the creation of the GUC Trust pursuant to the terms set forth in

the GUC Trust Agreement.  See id. at 535-36.

### II.     Recalls and Subsequent Proceedings in the Bankruptcy Court and Second Circuit

15.     In February and March 2014, over four years after the Bar Date, New GM

publicly disclosed the existence of the defective ignition switches and conducted a recall,

---

[4]      The Sale Agreement also provided that in the event the Bankruptcy Court determined that estimated
aggregate allowed general unsecured claims against Sellers' estates exceed $35,000,000,000.00, New GM would be
obligated to provide additional shares of New GM stock (defined as the Adjustment Shares) to the Old GM
bankruptcy estate.   The total aggregate amount of allowed general unsecured claims is approximately $32.086
billion, approximately $2.914 billion below the Adjustment Shares threshold.

NHTSA Recall Number 14v047, impacting approximately 2.1 million vehicles. After this recall,

New GM conducted additional recalls in 2014 affecting approximately 10 million additional

vehicles. Owners, purchasers and lessees of GM vehicles that are subject to some of these

additional recalls are included in the Class definition in the Settlement Agreement. They are:

NHTSA Recall Numbers 14v355, 14v394, 14v400, 14v346, 14v118, and 14v153 (collectively,

with NHTSA Recall Number 14v047, the "Recalls").

16.    Many owners and lessees of Old GM and New GM vehicles subject to the Recalls

filed lawsuits against New GM. New GM sought to enjoin certain litigation by filing motions to

enforce the Sale Order in the Bankruptcy Court (the "Motions to Enforce").

17.    On April 15, 2015, the Bankruptcy Court issued its *Decision on Motion to

Enforce Sale Order*, In re Motors Liquidation Co., 529 B.R. 510 (the "Enforcement Decision")

[ECF No. 13109]. The Bankruptcy Court held that the "Ignition Switch Plaintiffs"[5] were known

creditors who did not receive constitutionally adequate notice of the Sale from Old GM. See id.

18.    The Bankruptcy Court further held that while "late claims" filed by claimants

might still be allowed against the GUC Trust, assets transferred to the GUC Trust under the Plan

could not now be tapped to pay them under the doctrine of equitable mootness. Id. at 529; see

also June 2015 Judgment ¶ 6. On direct appeal, the Second Circuit vacated this equitable

mootness ruling as an advisory opinion. See Elliott, 829 F.3d at 168-69. "As to claims asserted

by certain non-ignition switch plaintiffs," the Second Circuit "vacate[d] the bankruptcy court's

---

[5]    The term "Ignition Switch Plaintiff" has been used throughout this proceeding to refer to economic loss
plaintiffs whose vehicles were subject only to NHTSA Recall No. 14v047. See In re Motors Liquidation Co., 571
B.R. 565, 572–73 (Bankr. S.D.N.Y. 2017), aff'd in part, vacated in part, 590 B.R. 39 (S.D.N.Y. 2018) ("It is clear
from the April Decision that Judge Gerber used the terms 'Ignition Switch Defect' to mean only the defect in the
Subject Vehicles that gave rise to NHTSA Recall No. 14v047, and plaintiffs without the specific Ignition Switch
Defect—whether the defect in their cars involved the ignition switch or not—were therefore not Ignition Switch
Plaintiffs.").

decision to enjoin those claims," see In re Motors Liquidation Co. ("MLC III"), 531 B.R. 354,

360 (Bankr. S.D.N.Y. 2015), and remanded for further proceedings, including a determination as

to whether those certain non-ignition switch plaintiffs received constitutionally adequate notice

of the Sale. Id. at 166.

### III.    Developments Following The Second Circuit's Decision

19.    In December 2016, after remand by the Second Circuit, the Bankruptcy Court

issued the *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims

Asserted Against General Motors LLC That Involve Vehicles Manufactured by General Motors

Corporation* [ECF No. 13802] (the "Order to Show Cause").  The Order to Show Cause

identified five (5) threshold issues (the "2016 Threshold Issues") for resolution in light of the

Second Circuit decision.  Relevant here is the issue of whether "the Ignition Switch Plaintiffs

and/or Non-Ignition Switch Plaintiffs [defined in the Order to include plaintiffs asserting both

economic loss and personal injury or wrongful death claims][6] satisfy the requirements for

authorization to file late proof(s) of claim against the GUC Trust and/or are such claims

equitably moot."[7]

20.    The Order to Show Cause also established a December 22, 2016 deadline to file

motions seeking authority to file late claims.  See Order to Show Cause at 5 ¶ 1.  No additional

issues (such as class certification, discovery, or the merits of a late proof of claim) would be

addressed in these motions.  See id.  In addition, the Order to Show Cause provided that briefing

and adjudication of any motions to file late claims filed by Non-Ignition Switch Plaintiffs and

---

[6]    The term Non-Ignition Switch Plaintiffs refers to all plaintiffs (or claimants asserting late claims) other than
Ignition Switch Plaintiffs.

[7]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against
General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old
GM")*, dated Dec. 13, 2016 [ECF No. 13802], at 2-3.

Pre-Closing Accident Plaintiffs would be stayed pending resolution of the other 2016 Threshold

Issues. See id. at 5 ¶ 2.

21.    In accordance with the Order to Show Cause, on December 22, 2016, the Ignition

Switch Plaintiffs, certain Non-Ignition Switch Plaintiffs, and certain Pre-Closing Accident

Plaintiffs[8] filed motions seeking the Court's permission to file late proofs of claim against the

GUC Trust.[9] The motions attached proposed proofs of claim, including proposed class proofs of

claim asserted on behalf of purported class representatives for Ignition Switch Plaintiffs and

Non-Ignition Switch Plaintiffs, and 175 individual proofs of claim on behalf of certain Pre-

Closing Accident Plaintiffs. See id.[10] Certain other Plaintiffs asserting purported economic loss

claims subsequently filed joinders to the late claims motions filed on December 22, 2016

pursuant to the terms of the Order to Show Cause.[11]

22.    Since various economic loss plaintiffs first sought to file late claims against the

GUC Trust in 2016, the GUC Trust has attempted to resolve the issues surrounding the potential

economic loss late claims in three separate instances.  The Settlement Agreement represents the

---

[8]    The term "Pre-Closing Accident Plaintiffs" refers to plaintiffs asserting personal injury or wrongful death claims based on or arising from an accident involving an Old GM vehicle that occurred before the closing of the bankruptcy sale.  Any purported late personal injury or wrongful death claims of the Pre-Closing Accident Plaintiffs are not being settled by the Settlement Agreement.

[9]    See Motion for an Order Granting Authority to File Late Class Proofs of Claim, dated Dec. 22, 2016 [ECF No. 13806] (the "Economic Loss Late Claim Motion"); Omnibus Motion by Certain Pre-Closing Accident Plaintiffs for Authority to File Late Proofs of Claim for Personal Injuries and Wrongful Deaths, dated Dec. 22, 2016 [ECF No. 13807].

[10]    On April 24, 2018, the Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs filed a notice with the Court purporting to amend the proposed class proofs of claim.  See Notice of Filing of Amended Exhibits to Motion for an Order Granting Authority to File Late Class Proofs of Claim, dated Apr. 25, 2018 [ECF No. 14280]. On May 25, 2018, certain Pre-Closing Accident Plaintiffs filed a supplemental late claims motion [ECF No. 14325].

[11]    These joinders are located at ECF Nos. 13811 and 13818.  In addition, on July 28, 2017, well after the deadline set forth in the Order to Show Cause, certain additional Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14018], as supplemented on August 10, 2017, September 19, 2017, December 12, 2017 and July 19, 2018 [ECF Nos. 14046, 14112, 14195, 14346]; and on July 27, 2018, certain other Pre-Closing Accident Plaintiffs filed a motion for authority to file late proofs of claim [ECF No. 14350].

GUC Trust's fourth attempt at resolving issues related to the economic loss plaintiffs' potential late claims against the GUC Trust.

23.     All of the prior settlement attempts failed.  This Settlement Agreement is being pursued pursuant to Bankruptcy Rule 9019 and Federal Rule of Civil Procedure 23, and truly represents a resolution of all outstanding issues that the GUC Trust, Plaintiffs and New GM have fought over for the last six years.

24.     As set forth in the Settlement Agreement, the Plaintiffs and New GM seek to preserve any claims that they may have against the Avoidance Action Trust, which is not a party to this Settlement Agreement.  The GUC Trust takes no position with regard to the dispute between the AAT, New GM and the Plaintiffs, but seeks this Court's authority to, effective upon the Final Effective Date of the Settlement, permit the filing of the Proposed Proofs of Claim on behalf of the Class in the Bankruptcy Case provided that, notwithstanding anything to the contrary in the Plan or the GUC Trust Agreement, such Proposed Proofs of Claim shall be solely recoverable, if at all, from the AAT and shall not be recoverable, directly or indirectly, from the GUC Trust or its assets.  Furthermore, the GUC Trust seeks a determination that the Proposed Proofs of Claim will not trigger any obligations relating to Disputed General Unsecured Claims under the GUC Trust Agreement after the Final Effective Date has occurred and the GUC Trust has recorded the Proposed Proofs of Claim on its claims register.

## IV.    Plaintiffs' Alleged Claims Against Old GM

25.     In their Proposed Proofs of Claim, the Plaintiffs that filed the Late Claims Motions allege that Old GM knew about the Ignition Switch Defect, other unintended key rotation defects, a defect in side airbags, and a defect in electric power steering for years prior to

the Bar Date.[12]  The Proposed Proofs of Claim further allege that Old GM concealed the

existence of these defects, causing purchasers to overpay for defective vehicles and bear the

costs of repairs while Old GM reaped the benefit of selling defective vehicles at inflated prices

and avoiding the costs of a recall.[13]  Based on these allegations, the Plaintiffs that filed Late

Claims Motions assert claims against the Old GM estate under the laws of each of the 50 states

and the District of Columbia for: (i) fraudulent concealment; (ii) unjust enrichment; (iii)

consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v)

negligence.[14]  The Plaintiffs that filed the Late Claims Motions have argued that their alleged

damages on a class wide basis are valued at billions of dollars, and have also claimed they would

have the ability to "claw-back" distributions that the GUC Trust has previously made to

Unitholders.[15]

## V.    The Excess Distribution Motion

26.    Integral to its duties under the GUC Trust Agreement is the obligation of the GUC

Trust Administrator to determine what, if any, distributions should be made to Unitholders on a

quarterly basis.  The amount that is available to be distributed at any given time is defined as

"Excess GUC Distributable Assets"[16] in the GUC Trust Agreement, and is calculated after

---

[12]    See Amended Exhibit A to the Economic Loss Late Claim Motion (the "Proposed Ignition Switch Class Claim"), ¶¶ 57-285; Exhibit B to the Economic Loss Late Claim Motion (the "Proposed Non-Ignition Switch Class Claim") ¶¶ 38-175.

[13]    See, e.g., Proposed Ignition Switch Class Claim ¶ 374; Proposed Non-Ignition Switch Class Claim ¶ 278.

[14]    See Proposed Ignition Switch Class Claim ¶¶ 358-1697; Proposed Non-Ignition Switch Class Claim ¶¶ 262-1744.

[15]    To date, Unitholders have received a recovery totaling approximately 29.6%.

[16]    "Excess GUC Trust Distributable Assets" means "(i) the amount of the GUC Trust Distributable Assets held by the GUC Trust, or the Debtors, as applicable (after providing for all distributions then required to be made in respect of Resolved Allowed General Unsecured Claims), minus (ii) the amount of the GUC Trust Distributable Assets (A) necessary for the satisfaction of Claims in the amount of the Aggregate Maximum Amount pursuant to Section 5.3(a)(i), (B) comprising the Additional Holdback, the Reporting and Transfer Holdback, the Protective Holdback and the Taxes on Distribution Holdback pursuant to Sections 6.1(b), (c), (d) and (e), and (C) remaining, if

determining what reserves or holdbacks are required pursuant to the terms of the GUC Trust

Agreement.

27.    In June 2019, as a result of the settlement and resolution of the Term Loan

Avoidance Action Claims, the GUC Trust was no longer required to reserve in excess of

$400,000,000.00 for potential claims by the lenders, and those funds became GUC Trust

Distributable Assets.  Pursuant to its obligation under the GUC Trust Agreement, upon the

release of the more than $400,000,000.00 reserve, the GUC Trust calculated the amount

necessary for reserves and holdbacks and determined that it had a $320,880,639.00 Excess

Distribution payable to the Unitholders.  While the GUC Trust Administrator is not required to

obtain Court approval to make an Excess Distribution under the terms of the GUC Trust

Agreement, in July 2019 the GUC Trust Administrator filed the Excess Distribution Motion

seeking Court approval to make an *expedited* Excess Distribution of $320,880,639.00, to which

both the Plaintiffs and New GM objected.  The Settlement Agreement provides for the resolution

of the Excess Distribution Motion whereby the GUC Trust shall make an Excess Distribution of

$300,000,000.00 (rather than the full $320,880,369.00) upon entry of the GUC Trust Approval

Order.

28.    Also effective as of the Excess Distribution Date, and in consideration of making

the Excess Distribution, the GUC Trust will grant New GM the GUC Trust Release (and receive

the New GM Release from New GM), pursuant to which New GM and the GUC Trust will

---

any, to be sold by the Debtors pursuant to Section 2.3(e) hereof."  Motors Liquidation Company GUC Trust
Agreement, Article 1.1(x).

release one another of all claims and liabilities related to, *inter alia*, the Bankruptcy Case, the

Late Claims Motions, and/or the Adjustment Shares.[17]

## VI.    The Settlement Agreement

29.     The Settlement Agreement will resolve (a) all economic loss actions resulting

from the Recalls asserted against both New GM and the GUC Trust; (b) the GUC Trust's

pending Excess Distribution Motion; and (c) certain potential claims between the GUC Trust and

New GM (including any issue concerning the Adjustment Shares).  The Settlement Agreement

reflects an integrated, commercially reasonable, and comprehensive settlement of the Plaintiffs'

putative class claims against the GUC Trust and New GM, and of any and all claims between the

GUC Trust and New GM.  Each component and protection contained in the Settlement

Agreement was heavily negotiated among the Parties and forms part of the overall Settlement.

The key terms of the Settlement are as follows:

**Class Certification and Notice:**

    a.    A single settlement class comprised of "all Persons who, at any time as of or
          before the Recall Announcement Date of the Recall(s) applicable to the Subject
          Vehicle, owned, purchased and/or leased a Subject Vehicle in any of the fifty
          states, the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, and
          all other United States territories or possessions" comprised of five Subclasses as
          defined in the Settlement Agreement, will be certified in accordance with Federal
          Rule of Civil Procedure 23.  See Settlement at § I, ¶ 12.[18]  The settlement class
          also consists of five (5) subclasses relating to specific Recalls.

    b.    Notice to the class will be accomplished through a combination of the Short Form
          Notice, Summary Settlement Notice, notice through the Settlement website, Long
          Form Notice, and other applicable notice.  The Class Action Settlement
          Administrator will be responsible for disseminating notices, establishing the
          settlement website and toll free telephone number, and taking the other steps
          required under the Settlement Agreement to ensure notice to the class complies

---

[17]     After the $300,000,000.00 Excess Distribution is made and a reserve is put in place for the $50,000,000.00
settlement payment, the GUC Trust will still have in excess of $70,000,000.00 remaining in the GUC Trust.

[18]     Persons who properly and timely request to opt-out of the Settlement will not be part of the Class and not
bound by the Settlement.  See Settlement at IV.

with the Federal Rules of Civil Procedure and Constitutional Requirements.  See id. at § III.B-F.

c.  The Settlement Implementation Expenses will be paid by New GM, the GUC Trust and Class Counsel, in accordance with Section II.A, par. 80 of the Settlement Agreement.  If the Court approves the proposed GUC Trust Approval Order and the MDL Court enters the Preliminary Approval Order, the Common Fund will be established as a Qualified Settlement Fund into which New GM will pay $8,800,000.00, the GUC Trust will pay $2,000,000.00, and Plaintiffs' Class Counsel will pay all additional amounts required for such Settlement Implementation Expenses that must be incurred prior to the Final Effective Date.

**Common Fund:**

d.  After final approval of the Settlement Agreement by the MDL Court and the occurrence of the Final Effective Date, there will be additional payments into the Common Fund in the amount of $48,000,000.00 from the GUC Trust and a $61,200,000.00 payment from New GM.

e.  Class Members who timely and properly submit a Settlement Claim will be eligible to receive a payment from the Net Common Fund pursuant to the Allocation Decision attached to the Settlement Agreement.  The Class Action Settlement Administrator will be responsible for reviewing and evaluating the Settlement Claims.  The Class Action Settlement Administrator will also be responsible for paying valid and approved Settlement Claims pursuant to the terms of the Claim Process and Allocation Decision described in the Settlement Agreement and Exhibits 2 and 10 attached thereto.

**Bankruptcy Court and MDL Court Approvals:**

f.  Pursuant to this Motion, the Bankruptcy Court is being asked to approve the GUC Trust's authority, as an appropriate exercise of the GUC Trust Administrator's rights, powers and privileges, to consummate the transactions specified in the Settlement Agreement, including (i) the actions contemplated pursuant to Paragraphs 142 and 143 of the Settlement Agreement on the Final Effective Date, intended to allow the Plaintiffs and New GM to preserve claims, if any, against the AAT, including, permitting the Proposed Proofs of Claim to be late filed and listed as Disputed General Unsecured Claims on the claims registry, but not recoverable, directly or indirectly, from the GUC Trust or its assets; (ii) making an Excess Distribution of $300,000,000.00 to Unitholders, (iii) entering into the Release Agreement, and (iv) reallocating $50,000,000.00 of GUC Trust Assets to pay $2,000,000.00 of Settlement Implementation Expenses and $48,000,000.00 in exchange for the Class Members' Release.   Entry of the GUC Trust Approval Order is supported by all Parties to the Settlement Agreement and is a condition precedent to entry of the Preliminary Approval Order, the Excess Distribution of $300,000,000.00, and the consummation of the Settlement.  See id. at § I, ¶ 35; § VII, ¶ 141.

g.  Contemporaneous with the filing of this Motion, the Parties have filed motions with the MDL Court to (a) grant the Joint Motion of (i) General Motors LLC, (ii) the Motors Liquidation Company GUC Trust, (iii) the Plaintiffs and (iv) Plaintiffs' Class Counsel to Withdraw the Reference of the Economic Loss Plaintiffs' Motion for an Order Granting Authority to File Late Class Proofs of Claim (and Proposed Proofs of Claim) and Related Filings ("Joint Motion to Withdraw the Reference") and (b) grant the Joint Motion by (i) General Motors LLC, (ii) the Motors Liquidation Company GUC Trust, (iii) the Plaintiffs and (iv) Plaintiffs' Class Counsel for Preliminary Approval of Class Action Settlement, such that notice can be provided to the Class.  See id. at § VII, ¶ 140; § IX, ¶¶ 157-129.

h.  Assuming (i) the GUC Trust Approval Order is entered by this Court, (ii) the Joint Motion to Withdraw the Reference is granted by the MDL Court, and (iii) the MDL Court enters the Preliminary Approval Order, the Parties will request a final fairness hearing before the MDL Court and seek a Final Order and Final Judgment approving the Settlement and the Settlement Agreement.  See id. at § IX, ¶¶ 157, 160.

**Releases:**

i.  Upon the Final Effective Date of the Settlement Agreement, each Class Member will release the "Released Parties" (which include New GM, Old GM, and the GUC Trust) from any and all claims of any kind related to the Subject Vehicles, including claims that have not yet been asserted.[19]  See id. at § VI.A, ¶¶ 113-126. Additionally, the GUC Trust and New GM will release the Plaintiffs and their counsel from any and all causes of action related to the Actions.  However, the Plaintiffs and New GM will not release claims against the AAT.  See id. at § VI.B, ¶ 127.

j.  Upon the Excess Distribution Date, the GUC Trust and New GM will grant one another the releases set forth in the Release Agreement, releasing, *inter alia*, all claims relating to the Bankruptcy Case, the Actions, the Subject Vehicles or the Adjustment Shares, See Settlement at § VI.C, ¶¶ 128-138.

**Attorneys' Fees:**

k.  Plaintiffs' Class Counsel will make on behalf of all plaintiffs' counsel, and New GM will not oppose, an application to the MDL Court for an award of attorneys' fees and expenses in the amount of up to $34,500,000.00.  This award, not to exceed $34,500,000.00, will be the sole compensation paid by New GM for all plaintiffs' counsel for work incurred that inured to the benefit of the Class.  See id. at § VIII.

---

[19]     Class Members are not releasing claims for personal injury, wrongful death or actual physical property damage arising from an accident involving a Subject Vehicle

## RELIEF REQUESTED

30.     By this Motion, the GUC Trust respectfully requests that this Court, pursuant to

Bankruptcy Code Sections 105, 363 and 1142, and Bankruptcy Rule 9019, enter the GUC Trust

Approval Order in substantially the form attached hereto, approving the actions to be taken by

the GUC Trust Administrator pursuant to the terms of the Settlement Agreement, including (i)

the GUC Trust's immediate distribution of $300,000,000.00 in resolution of the Excess

Distribution Motion, (ii) approval of the GUC Trust's entry into the Release Agreement, (iii)

approval of the GUC Trust's entry into the Settlement Agreement,  (iv) authorization to

reallocate $2,000,000.00 of GUC Trust Assets to fund Settlement Implementation Expenses, and

(v) upon final approval of the Settlement Agreement by the MDL Court pursuant to Federal Rule

of Civil Procedure 23 and upon the occurrence of the Final Effective Date, authorization to (a)

reallocate $48,000,000.00 of GUC Trust Assets to fund the GUC Trust's portion of the

Settlement, and (b) permit the filing of the Proposed Proofs of Claim, provided that such

Proposed Proofs of Claim shall solely be recoverable, if at all, from the AAT, and shall not be

recoverable, directly or indirectly, from the GUC Trust or its assets.  For the avoidance of doubt,

the GUC Trust is not requesting that this Court adjudicate class issues related to the Settlement

Agreement, opine on compliance with F.R.C.P. 23, or adjudicate the merits of the Proposed

Proofs of Claim with respect to the AAT.  The Parties contemplate that the MDL Court will rule

on all issues relating to class certification, the sufficiency of the settlement and the

implementation of the claims administration process in order to create a uniform and consistent

process.

## BASIS FOR RELIEF REQUESTED

### I.     The Court Should Find the Settlement is an Appropriate Exercise of the GUC Trust Administrator's Authority and Approve the Proposed Actions

31.     The GUC Trust seeks a determination by the Court that the (i) immediate distribution of $300,000,000.00 to Unitholders, (ii) entry into the Release Agreement pursuant to which, *inter alia*, the GUC Trust terminates its right to seek the Adjustment Shares, (iii) reallocation of $2,000,000.00 of GUC Trust Assets to fund Settlement Implementation Expenses upon the MDL Court's entry of the Preliminary Approval Order and the reallocation of $48,000,000.00 of GUC Trust Assets upon the Final Effective Date, and (iv) entry into the Settlement itself, including the provisions seeking to preserve claims against the AAT (if any), is an appropriate exercise of the GUC Trust Administrator's rights, powers, and/or privileges.

32.     Section 8.1(e) of the GUC Trust Agreement provides:

> where the GUC Trust Administrator determines, in its reasonable discretion, that it is necessary, appropriate, or desirable, the GUC Trust Administrator will have the right to submit to the Bankruptcy Court . . . any question or questions regarding any specific action proposed to be taken by the GUC Trust Administrator with respect to the [GUC Trust Agreement], the GUC Trust, or the GUC Trust Assets . . . . Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the GUC Trust Administrator.

GUC Trust Agreement § 8.1(e).

33.     The GUC Trust Administrator has previously sought the Court's approval of certain proposed actions, utilizing section 8.1(e) of the Trust Agreement.  Because the Settlement Agreement resolves many matters that have been before the Court for over six years, and seeks to preserve claims against the AAT while releasing those claims against the GUC Trust, such approval is appropriate here.

34.     "The practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment."  Mosser v. Darrow, 341 U.S. 267, 274 (1951); see also In the Matter of the Application of U.S. Bank Nat'l Ass'n, No. 651625/2018, NYSCEF No. 1 (N.Y. Sup. Ct.

April 4, 2018) (petition seeking an order, following an estimation proceeding, that instructs and authorizes trustees to make distributions pursuant to method proposed); In re Am. Home Mort. Inv. Trust 2005-2, No. 14 Civ. 2494 (AKH), 2014 U.S. Dist. LEXIS 111867, at *29-30 (explaining that "[t]rust instruction proceedings are a well-established procedure by which trustees (and other affected parties) can seek judicial guidance from the court about how to resolve immediate and difficult issues of interpretation of governing documents"), In re Peierls Family Inter Vivos Trusts, 59 A.3d 471, 477 (Del. Ch. 2012) (noting that a "request for judicial relief involving a trust can be appropriate in many circumstances").

35.    Judge Wiles considered a similar request for instruction in In re Tronox Inc., No. 09-10156 (MEW), 2015 Bankr. LEXIS 1974 (Bankr. S.D.N.Y. June 17, 2015). In that matter, the trustee of the Tronox Incorporated Tort Claims Trust (established under the Tronox debtors' plan of reorganization, and governed by a trust agreement and a set of trust distribution procedures) filed a motion seeking instruction regarding whether the trustee was correct with respect to certain past action. See id. at *1-2. The court noted that because the trustee was seeking "'comfort' as to actions already taken rather than . . . 'instructions' as to what the [t]rustee should do going forward in administering the [t]rust," it had "some skepticism as to whether the motion . . . [was] an appropriate request for instructions." Id. at *21. The court based its skepticism on the notion that "[o]rdinarily a [t]rustee seeks instructions when it has not yet taken action and where the [t]rustee is unsure as to what to do, and may even face liability for an incorrect choice." Id. (citations omitted). The court further noted that the request before it was "not really a request for 'instructions' as to how to interpret the existing [t]rust documents[,]" but "more of a request for an advisory opinion as to whether a proposed change to the" trust distribution procedures "would be consistent (or inconsistent) with the terms of the

[debtors' plan] and the vested rights of claimants." Id. at *22.  Noting, however, that it was

"plain that further litigation – and thereby further delays in distributions to the beneficiaries of

the [t]rust, who [had] already been waiting for many years – [were] inevitable unless some

binding clarification of these issues is provided[,]" and based upon the conclusion that the court,

under the plan, had "continuing jurisdiction over any issue relating to the interpretation and

application of the [t]rust [a]greement" and the trust distribution procedures, the court found that

it was "appropriate" to exercise its jurisdiction and issue the ruling as requested.  Id. at *23.

36.      Similar to the circumstances extant in Tronox, this Court has continuing

jurisdiction to interpret, implement, or enforce the GUC Trust Agreement.  Plan § 11.1(i); see

also GUC Trust Agreement § 8.1(e).  Unlike the Tronox trustee, however, the GUC Trust

Administrator is seeking instruction regarding actions it proposes to take based on its

interpretation of the relevant documents.  Based on the foregoing, it is well within the Court's

authority to issue a ruling "approv[ing] . . . [the described] proposed action" by the GUC Trust

Administrator.  GUC Trust Agreement § 8.1(e).

37.      Specifically, the GUC Trust seeks the Court's authority to agree to permit

Plaintiffs' proposed late filed proofs of claim to be filed and recorded on the claims register as

Disputed General Unsecured Claims, provided that these late filed proofs of claim would be of

no force and effect against the GUC Trust and would be recoverable solely from the AAT.

38.      The Court should also find that it is an appropriate exercise of the GUC Trust

Administrator's authority to (i) make the Excess Distribution in the amount of $300,000,000.00,

(ii) enter into the Release Agreement which includes the GUC Trust's release of any right to seek

the Adjustment Shares, and (iii) enter into the Settlement Agreement which requires the GUC

Trust to pay $50,000,000.00 to resolve all matters relating to the Late Claims Motions against the GUC Trust.

## II.    The Court Should Authorize the Reallocation of $50 Million of GUC Trust Assets

39.    Pursuant to the Settlement Agreement, the GUC Trust is responsible for making two payments into the Common Fund that will be established as a Qualified Settlement Fund and will be used to pay the Settlement Claims of Class Members.  The Settlement Agreement provides that the GUC Trust must pay into the Common Fund (i) $2,000,000.00 within thirty (30) days of the later of entry of the GUC Trust Approval Order, the Withdrawal Order and Preliminary Approval Order, and (ii) $48,000,000.00 within thirty (30) days of the Final Effective Date.  (see Settlement Agreement § II.A, ¶¶ 80-81].  The GUC Trust respectfully requests authority to reallocate $50,000,000.00 from otherwise distributable assets of the GUC Trust for use in making its payments into the Common Fund.

40.    Under the terms of the GUC Trust Agreement, all monies currently held by the GUC Trust (other than those this Court previously reallocated to pay the fees and expenses of the GUC Trust for 2020) constitute Excess GUC Trust Distributable Assets.  Pursuant to Section 6.1(b) of the GUC Trust Agreement, the GUC Trust Administrator must obtain Monitor and Court approval to reallocate assets that would otherwise be distributed to GUC Trust Beneficiaries.  See GUC Trust Agreement § 6.1.  Accordingly, the GUC Trust requests authority to reallocate $50,000,000.00 of otherwise distributable assets for the purposes of making its payment into the Common Fund.  Such reallocation is warranted to fund the GUC Trust portion of the Common Fund because these payments will enable the GUC Trust to resolve the only remaining material disputed claims, and thereby wind up its affairs and make final distributions sooner, ultimately eliminating the substantial costs of further litigation and greatly reducing the remaining life of the GUC Trust.

### III.    The Settlement Will Confer Benefits Greater than Those that Would be Obtained Through Further Litigation

41.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  This Court also has authority to approve the GUC Trust's entry into a settlement under Bankruptcy Code section 105(a), which empowers it to issue any order that is "necessary or appropriate."  11 U.S.C. § 105(a).

42.    The authority to approve a compromise or settlement is within the sound discretion of the Court.  See Newman v. Stein, 464 F.2d 689, 692 (2d Cir. 1972).  The Court should exercise its discretion "in light of the general public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citation omitted); see also Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged . . . ." (citation omitted)).

43.    When exercising its discretion, the Court must determine whether the settlement is fair and equitable, reasonable, and in the best interests of the estate.  See, e.g., Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Tr. Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994); In re Purofied Down Prods. Corp., 150 B.R. 519, 523 (S.D.N.Y. 1993).  Where "the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement . . . ."  In re Hibbard, 217 B.R. at 46.

44.    The Court need not decide the numerous issues of law and fact raised in the underlying dispute, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'"  In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting In re W.T. Grant, Co., 699 F.2d 599, 608 (2d Cir.

1983)); see also In re Purofied, 150 B.R. at 522 ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute] . . . .").

45.   The Court evaluates whether, from the GUC Trust's perspective, entry into the Settlement Agreement is fair and equitable based on "the probabilities of ultimate success should the claim be litigated," and "an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

46.   Courts in this jurisdiction consider the following Iridium factors in determining whether approval of a settlement is warranted:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

47.   Each of the Iridium factors supports approval of the GUC Trust's entry into the Settlement Agreement and the terms of the settlement easily fall above the lowest point in the range of reasonableness.  Thus, the Settlement Agreement should be approved under Bankruptcy Rule 9019.

A.    **Plaintiffs' Claims Raise Numerous Complex Litigation Issues**

48.    The first two <u>Iridium</u> factors—(1) the balance between the litigation's likelihood of success and the settlement's benefits; and (2) the likelihood of complex and protracted litigation—are easily met.  With respect to the first factor, the complex and protracted nature of continued litigation overwhelmingly favors the proposed global resolution.  Considering the novel and complex nature of the issues, there is no guarantee as to what the result of additional litigation would be.  Moreover, the litigation has already been ongoing for five years and could very easily continue for another five.  If the Settlement is not approved, the resulting litigation expenses will deplete the GUC Trust's resources and reduce the ultimate recovery for the GUC Trust's beneficiaries.  Conversely, the benefits of near-term, certain resolution are clear.  Settlement allows the GUC Trust to avoid additional costs, expedite distributions, and secure a guaranteed result that is favorable to the GUC Trust's beneficiaries.

49.    Second, as detailed below, continued litigation over Plaintiffs' claims raises significant, complex issues of law.

a.    *The Complexity of the Issues*

50.    As the Court is surely aware, this litigation is fraught with difficult issues, both legal and factual.  Indeed, for the litigation to progress to a point where a final decision on the merits of the Plaintiffs' claims could be rendered, the Court would first have to resolve several tiers of threshold issues.

51.    As an initial matter, the Plaintiffs who filed the Late Claims Motions must show they are entitled to even file late proofs of claim, and there is a dispute over the standard for

obtaining leave to file late claims.[20]  Those Plaintiffs have argued that creditors may assert late

claims based solely on a showing that they have suffered a due process violation related to the

Bar Date.[21]  Accordingly, those Plaintiffs maintain that their late claims ought to be allowed

without reference to the Pioneer factors governing excusable neglect.  The GUC Trust has taken

the position that such Plaintiffs are precluded from asserting late claims because of, among other

things, their strategic delay in pursuing claims against the GUC Trust after the Recalls.[22]  There

are also questions that must be resolved regarding whether equitable mootness applies,

eliminating the late claimants' ability to recover from the GUC Trust on any claims that they

could be permitted to file.

52.    Another challenge stems from the fact that all the Plaintiffs that filed Late Claims

Motions rely upon a due process violation in arguing that Pioneer does not apply to their late

claims.  The due process violation that the Bankruptcy Court found and the Second Circuit

affirmed applied only to the Sale Notice and the subset of economic loss plaintiffs whose

vehicles contained an "Ignition Switch Defect."  The term "Ignition Switch Defect," as used

throughout this case, refers exclusively to the defect in the vehicles that gave rise to NHTSA

Recall No. 14v047.  Thus, a due process violation has not been legally established with respect

to a majority of the Plaintiffs who filed Late Claims Motions, and there has never been a ruling

by any court that any actual or potential claimant was denied due process in connection with the

notice of the Bar Date.

---

[20]    Pursuant to that certain *Order Disallowing Certain Late Filed Claims* entered on February 8, 2012 [ECF No. 11394] a late claim may be deemed timely filed if the GUC Trust consents to such late filing or the Bankruptcy Court grants the claimant leave to file a late claim.

[21]    See, e.g., *The Ignition Switch Plaintiffs' Brief on the Initial Late Claim Motions Issues*, dated Mar. 6, 2017 [ECF No. 13872].

[22]    See *Opening Brief of GUC Trust Administrator and Participating Unitholders on the Applicability of Pioneer and Tolling to Plaintiffs' Motions to File Late Claims*, dated Mar. 6, 2017 [ECF No. 13873].

53.     Before these plaintiffs (including both Ignition Switch Plaintiffs and Non-Ignition

Switch Plaintiffs) can rely upon a due process violation as grounds for allowing their late claims,

such violation must first be established.  Without a doubt, establishing a due process violation

would necessitate an enormous amount of additional fact discovery.  This is especially true with

respect to Non-Ignition Switch Plaintiffs, which were not the subject of the Second Circuit's

ruling on the adequacy of the Sale notice.  This discovery, in turn, would require substantial

amounts of time, effort, and resources to complete.  Moreover, regardless of whether the Court

finds there was a due process violation or finds there was not a violation, the Court's decision

would certainly be appealed, causing greater delay.

54.     Even if these plaintiffs were able to establish a due process violation for all

Plaintiffs with respect to the Bar Date notice, that finding would not resolve the question of

whether the Plaintiffs were entitled to file late claims.  The GUC Trust has argued that even if

there was a due process violation, the claimants would still need to satisfy each of the *Pioneer*

factors in order to obtain authority to file late proofs of claim.

55.     Another complex issue is whether the doctrine of equitable mootness is applicable

to bar the late claimants' claims.[23]  In the Bankruptcy Court's decision in April 2015,[24] it applied

the five <u>Chateaugay</u> factors and determined that if the late claims were allowed, the GUC Trust

assets could not be accessed to pay them under the doctrine of equitable mootness.[25]  The

Bankruptcy Court found, among other things, that any relief would "knock the props out" from

the transactions in which GUC Trust Unitholders acquired their units.[26]  Allowing billions of

---

[23]     <u>See</u> <u>In re Chateaugay Corp.</u>, 10 F.3d 944, 952-53 (2d Cir. 1993).

[24]     <u>In re Motors Liquidation Co.</u>, 529 B.R. 510 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in
part sub nom.  <u>Elliott v. General Motors LLC (In re Motors Liquidation Co.)</u>, 829 F.3d 135 (2d Cir. 2016).

[25]     <u>See</u> <u>In re Motors Liquidation Co.</u>, 529 B.R. at 598.

[26]     <u>Id.</u>

dollars of additional claims against the GUC Trust, in the Bankruptcy Court's view, would be "extraordinarily unjust" given the unitholders' expectation that the universe of claims against the GUC Trust would decrease over time, not increase, following the 2009 Bar Date.[27]  While the Second Circuit vacated the Bankruptcy Court's equitable mootness ruling as advisory because no plaintiff had attempted to file a claim against the GUC Trust at that time, the equitable mootness defense could be raised now that Plaintiffs have sought to file late claims against the GUC Trust.

56.    Even if Bankruptcy Court claimants could obtain authorization to file late proofs of claim, additional complex issues would certainly arise from continued litigation of Plaintiffs' claims.  The Bankruptcy Court would still need to decide whether class certification for the proposed class claims would be appropriate.  In addition, the GUC Trust could raise objections to allowance of these class claims.  This could lead to extensive additional litigation and delay, as concurrent events in the MDL have already demonstrated.

57.    All this litigation would not ultimately resolve the case.  The significant legal questions detailed above can all be properly characterized as "threshold issues."  In other words, these issues are barriers preventing the Plaintiffs from filing late claims, but none of these issues relate to the ultimate question of whether or not the Plaintiffs have meritorious claims. Assuming the Court finds in favor of the Plaintiffs on all these issues, this would still be followed by a time-consuming and expensive claims allowance process to determine which of the Plaintiffs actually hold a valid claim.  In sum, while the GUC Trust believes that it has meritorious defenses to the claims of all Plaintiffs, the resolution of the numerous, complex issues raised by the litigation over Plaintiffs' claims is uncertain, and, as further set forth below, would result in significant expense and delay.

---

[27]        Id.

**b.**    *The Risks of Continued Litigation*

58.    Litigation of these complex issues has been ongoing for years, consuming large

sums of money and countless hours of labor for the Parties and this Court.  In the absence of a

settlement, there is a high likelihood of even more expensive, protracted, and contentious

litigation that will consume significant estate funds and expose the estate to risk and uncertainty.

Further complicating this particular litigation is its close nexus with the MDL proceedings and its

structure as a proposed class action.  Because overlapping issues are being litigated in the

Bankruptcy Court and in the MDL, litigation in this Court will likely not be resolved prior to the

resolution of certain issues in the MDL.  This fact will further delay distributions and the

ultimate winding-up of the GUC Trust's affairs.  For example, Judge Furman recently granted

the request of the Plaintiffs' in the MDL for certification of an interlocutory appeal of the MDL

Court's order from August 6, 2019, which granted partial summary judgment in favor of New

GM.  Absent settlement, the GUC Trust's litigation in this Court will be held up by this appeal

(and probably other future appeals).

59.    By comparison, settling the litigation provides the Parties with greater certainty

and eliminates the significant cost and delay of litigation.  Likewise, the Settlement allows the

GUC Trust to make a large distribution to the Unitholders and eliminates a major impediment to

the GUC Trust making a final distribution and winding up its affairs.

60.    In addition, the Settlement Agreement provides several benefits beyond avoiding

continued litigation.  The Settlement removes a major impediment to winding down the GUC

Trust.  The resolution of Plaintiffs' claims against the GUC Trust and waiver of certain rights

and claims eliminates the likelihood of complex and protracted litigation, including with respect

to attempts by Plaintiffs asserting late claims to enjoin further GUC Trust distributions, thus

preventing delay in distributing remaining GUC Trust Assets and protecting Unitholders from the risk of claw-back or recapture of prior distributions.

61.    The terms of the Settlement Agreement reflect a reasonable assessment by the GUC Trust of the substantial time and expense of litigating Plaintiffs' claims, balanced against the benefits of more near-term, efficient and certain resolution of Plaintiffs' claims against the GUC Trust.  The benefits of the Settlement in the near term to the GUC Trust outweigh the benefit of potential long-term success through the protracted litigation of complex issues.

**B.    The Benefits of Settling Exceed the Potential Benefits of Continued Litigation**

62.    The Settlement easily satisfies the third and fourth <u>Iridium</u> factors—the paramount interests of creditors and whether other interested parties support the settlement. Prolonging the litigation will increase the GUC Trust's costs and decrease the amount of GUC Trust Assets available to satisfy creditors' claims.  Approving the Settlement Agreement, on the other hand, avoids the significant expense and uncertainty associated with continued litigation, and maximizes and expedites distributions to current GUC Trust Unitholders.  Not surprisingly, the GUC Trust, New GM, the Plaintiffs, Plaintiffs' Class Counsel and the Participating Unitholders—all support the Settlement Agreement.  <u>See</u> <u>Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)</u>, 412 B.R. 53, 61 (S.D.N.Y. 2008) (affirming approval of settlement of claims of 7,500 asbestos personal injury claimants where, *inter alia*, the creditors' committee and ad hoc bondholders' committee supported the settlement).

63.    Accordingly, for all of the reasons set forth above, the GUC Trust's entry into the Settlement Agreement easily meets the third and fourth <u>Iridium</u> factors and allows the GUC Trust to implement the express purpose of the GUC Trust Agreement.  GUC Trust Agreement § 2.2 (stating that the "sole purpose of the GUC Trust is to implement the Plan on behalf of, and

for the benefit of the GUC Trust Beneficiaries"); GUC Trust Agreement § 4.2 (stating that "in no event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan.").

### C.    The Settlement Agreement Satisfies the Remaining Iridium Factors

64.    With respect to the sixth Iridium factor, "the nature and breadth of releases to be obtained by officers and directors," the Settlement Agreement releases any and all rights, claims and causes of action that any Plaintiff may assert against the GUC Trust, the GUC Trust Administrator, the GUC Trust Assets, and Unitholders.  Moreover, Plaintiffs have not asserted claims against the GUC Trust Administrator, which, in the circumstances of this case, is most similar to officers and directors of the debtor as contemplated by the sixth Iridium factor. Importantly, the notice procedures set forth in Plaintiffs' motion seeking a Preliminary Approval Order contemplate a comprehensive individualized mailing and email program whereby Class Members receive a concise summary of the Settlement Agreement and instructions for accessing a website dedicated specifically to the Settlement.  All Class Members will have the opportunity and right to be heard by the MDL Court in connection with the Settlement, and the ability to opt out of it.

65.    With respect to the fifth and seventh Iridium factors, competent and experienced counsel to the Parties, who have been litigating these issues for years, actively engaged in arms'-length, good faith negotiations overseen by an experienced mediator, former United States District Court Judge Layn R. Phillips, the Court-Appointed Economic Loss Settlement Mediator, to reach the Settlement Agreement and the Release Agreement.  (See Decl. of Layn Phillips,

attached as <u>Exhibit C</u>.)  The GUC Trust, having considered the uncertainties, delay, and cost that would be incurred by further litigation, submit that the Settlement Agreement is fair, reasonable, appropriate, and in the best interests of the GUC Trust.

66.     At bottom, while the GUC Trust has strong litigation defenses, and believes it would be highly likely to succeed, in the unlikely event Plaintiffs prevailed and were awarded damages on a class basis, such class claims would almost certainly lead to the Plaintiffs receiving all of the remaining funds in the GUC Trust and possibly subject the Unitholders to litigation over whether the Plaintiffs could "claw-back" funds already distributed by the GUC Trust.[28]  The GUC Trust's agreement to resolve these claims by paying $50,000,000.00 to the Class, which allows it to make an immediate distribution to its Unitholders of $300,000,000.00 and leaves approximately $70,000,000.00 remaining in the GUC Trust, is reasonable and in the best interests of the GUC Trust and its beneficiaries.  Therefore, the GUC Trust's entry into the Settlement Agreement pursuant to Bankruptcy Rule 9019 is warranted, and the Settlement Agreement should be approved.

### <u>NOTICE</u>

67.     Notice of this Motion has been provided in accordance with the Court-approved notice procedures.  See *Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [ECF No. 10183].  Notice of this Motion has also been provided to any other required notice parties under Section 6.1(b)(iv) of the GUC Trust Agreement.  The Parties submit that no other or further notice need be provided.

---

[28]     For the avoidance of doubt, the GUC Trust disputes that any basis exists for any Plaintiff or putative Class to "claw back" any prior distributions made by the GUC Trust to its Unitholders.

## **CONCLUSION**

68.     WHEREFORE, the Parties respectfully request that the Court enter the GUC

Trust Approval Order, substantially in the form attached as Exhibit B hereto, (i) approving the

actions to be undertaken by the GUC Trust Administrator under the terms and conditions of the

Settlement Agreement; (ii) approving the Settlement Agreement and Release Agreement and

authorizing the GUC Trust to enter into the Settlement Agreement and the Release Agreement;

(iii) authorizing the reallocation of $50,000,000.00 of GUC Trust Assets; (iv) authorizing the

$300,000,000.00 Excess Distribution to be made immediately and (v) granting such other relief

as is just and equitable.

Dated: New York, New York          Respectfully submitted,
      March 27, 2020

                                        /s/   Kristin K. Going

                              **McDERMOTT WILL & EMERY LLP**
                              Kristin K. Going
                              340 Madison Ave.
                              New York, New York 10173
                              Telephone:  (212) 547-5429
                              Facsimile:  (646) 417-7313
                              E-mail: kgoing@mwe.com

                              *Attorneys for the Motors Liquidation*
                              *Company GUC Trust*