# EXHIBIT A

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 2 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document
Pg 1 of 6

Paul M. Basta
Kyle J. Kimpler
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Bankruptcy Counsel for General Motors LLC*

Richard C. Godfrey, P.C.
Wendy L. Bloom
Andrew Bloomer, P.C.
Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Telephone:  (312) 862-2000
Facsimile: (312) 862-2200

*MDL 2543 Counsel for General Motors LLC*

Counsel for Additional Parties Listed on the
Signature Page

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MOTORS LIQUIDATION COMPANY, et al.,<br>f/k/a General Motors Corp., et al.,<br><br>                               Debtors. | Chapter 11<br><br>Case No. 09-50026 (MG)<br><br>(Jointly Administered) |
| In re:<br><br>GENERAL MOTORS LLC<br>IGNITION SWITCH LITIGATION<br><br>*This Document Relates To*<br>*All Economic Loss Actions* | No. 14-MD-2543 (JMF)<br>No. 14-MC-2543 (JMF)<br><br>Hon. Jesse M. Furman |

**NOTICE OF JOINT MOTION AND JOINT MOTION OF (i) GENERAL MOTORS LLC,**
**(ii) THE MOTORS LIQUIDATION COMPANY GUC TRUST, AND (iii) THE**
**ECONOMIC LOSS PLAINTIFFS TO WITHDRAW THE REFERENCE OF THE**
**ECONOMIC LOSS PLAINTIFFS' MOTION FOR AN ORDER GRANTING**
**AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM AND RELATED FILINGS**

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 3 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document
Pg 2 of 6

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on April 23, 2020, at 9:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Jesse M. Furman, United States District Judge for the Southern District of New York, located at 40 Centre Street, New York, NY 10007, or subject to further order of the Court, by telephone, the parties to a proposed class Settlement Agreement[1]— (i) New GM; (ii) the Motors Liquidation Company GUC Trust (the "GUC Trust"); and (iii) economic loss Plaintiffs seeking to represent classes of purchasers and lessees of certain recalled GM vehicles (collectively, the "Settling Parties") — will and hereby do move the Court for an order withdrawing the reference to the Bankruptcy Court of certain matters as described below.

The Settling Parties today filed a motion in this Court seeking preliminary approval of the Settlement Agreement.  Docket No. 7816.  The proposed class Settlement Agreement is intended to resolve the economic loss claims asserted against New GM pending in this Court, as well as putative economic loss class claims plaintiffs seek to file against the GUC Trust in the Bankruptcy Court, which are the subject of the Economic Loss Plaintiffs' Motion for an Order Granting Authority to File Late Proofs of Claims, filed in the Bankruptcy Court on December 22, 2016 (the "Initial Late Claims Motion"; collectively with the filings listed in notes 2 and 3, the "Late Claims Motions"), as amended on April 24, 2018.[2]

In order to effectuate the preliminary and final approval of the proposed class Settlement

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Memorandum (as defined below) in support of this Motion or, if not otherwise defined in that Memorandum, in the Settlement Agreement.

[2]    *See Notice Of Filing Of Amended Exhibits To Motion For An Order Granting Authority To File Late Class Proofs Of Claim* on April 24, 2019 (Bankr. Docket No. 14280) ("Notice of Amended Exhibits").  The Settling Parties' request encompasses this Notice as well.  The parties dispute the propriety of the amendment and reserve all rights and defenses.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A - Motion to Withdraw the Reference Papers    Pg 4 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document Pg 3 of 6

Agreement, the Settling Parties seek to withdraw, for cause, the reference to the Bankruptcy Court of the Late Claims Motions and the putative class proofs of claims the plaintiffs sought to file through the Late Claims Motions.[3]  *See* 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown.").  The proposed comprehensive class Settlement requires approval pursuant to Federal Rule of Civil Procedure 23 and withdrawing the reference would promote efficiency and uniformity in the administration of the law and, in particular, the approval process of the Settling Parties' Settlement Agreement.

Accordingly, for these reasons, and for the reasons more fully set forth in the accompanying *Joint Memorandum Of Law By (i) General Motors LLC, (ii) The Motors Liquidation Company GUC Trust, And (iii) The Economic Loss Plaintiffs In Support Of Their Motion To Withdraw The Reference Of The Economic Loss Plaintiffs' Motion For An Order Granting Authority To File Late Class Proofs Of Claim And Related Filings* (the "Memorandum"), the Settling Parties respectfully request that this Court withdraw the reference to the Bankruptcy Court of (i) the Initial Late Claims Motion, (ii) the Notice of Amended Exhibits, (iii) the Peller Joinder,[4] and (iv) the Groman Plaintiffs' Joinder.[5]

---

[3]  Certain parties also filed joinders to the Initial Late Claims Motion, as permitted by the Bankruptcy Court's December 13, 2016 Order To Show Cause.  Bankr. Docket No. 13802; *see also* Bankr. Docket No. 13811 ("Peller Joinder"); Bankr. Docket No. 13818 ("Groman Plaintiffs' Joinder").  The economic loss plaintiffs that filed these joinders are members of the proposed Settlement Class.  The Settling Parties also request withdrawal of these joinders as to their economic loss claims, as related filings.

[4]  This joinder primarily seeks to assert late economic loss claims.  However, Sharon Bledsoe, one of the plaintiffs who filed the joinder, seeks to assert both late economic loss claims and a late personal injury claim.  The Settling Parties do not seek to withdraw the reference with respect to that portion of this joinder that relates to Ms. Bledsoe's personal injury claim. In addition, the Bankruptcy Court previously denied Celestine Elliott's and Lawrence Elliott's request for permission to file a late proof of claim with respect to their 2006 Chevrolet Trailblazer.  Accordingly, that portion of this joinder has been resolved by the Bankruptcy Court and is therefore not subject to this Motion.

[5]  As set forth in the Settlement Agreement, the Economic Loss Plaintiffs and New GM will continue to pursue Proposed Proofs of Claim against the Avoidance Action Trust ("AAT") and its assets in the Bankruptcy Court notwithstanding approval of the Settlement Agreement, and the Settling Parties do not seek to withdraw the

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 5 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document
Pg 4 of 6

For the avoidance of doubt, the Settling Parties do not request that this Court withdraw the reference with respect to any other matters currently pending before the Bankruptcy Court, including (i) the GUC Trust Motion; (ii) the GUC Trust Approval Order; (iii) the Excess Distribution Motion; (iv) personal injury or wrongful death claims in the Bankruptcy Case relating to the Subject Vehicles; (v) claims and Actions asserted against the AAT, Old GM or the Old GM Bankruptcy Estates to the extent such claims or Actions are recoverable solely against the AAT or its assets; and/or (vi) individual claims or motions, if any, in the Bankruptcy Case filed by a Person who would have been a Class Member who becomes an Opt-Out.

A proposed order is attached as Exhibit 13 to the Settlement Agreement, and is also attached as Exhibit 3 to the Memorandum in support of the Joint Motion.

---

reference with respect to such claims against the AAT.  Settlement Agreement ¶ 142.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 6 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document
Pg 5 of 6

Dated: March 27, 2020

Respectfully submitted,

/s/ Paul M. Basta
Paul M. Basta
Kyle J. Kimpler
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Richard C. Godfrey, P.C.
Wendy L. Bloom
Andrew Bloomer, P.C.
Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*MDL 2543 Counsel for
General Motors LLC*

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Bankruptcy Counsel for General Motors LLC*

**HAGENS BERMAN SOBOL SHAPIRO
LLP**

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

/s/ Steve W. Berman

/s/ Elizabeth J. Cabraser

Steve W. Berman
Sean R. Matt
Andrew M. Volk
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
seam@hbsslaw.com
andrew@hbsslaw.com

Elizabeth J. Cabraser
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
ecabraser@lchb.com

Rachel Geman
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
rgeman@lchb.com

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

*Interim Lead Counsel for Plaintiffs and the
Proposed Class*

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 7 of 269

09-50026-mg    Doc 14693    Filed 03/27/20    Entered 03/27/20 20:02:31    Main Document
Pg 6 of 6

**MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**

*/s/ Kristin K. Going_____*

Kristin K. Going
340 Madison Ave.
New York, New York 10173
Telephone:  (212) 547-5429
Facsimile:  (646) 417-7313
E-mail:  kgoing@mwe.com

*Counsel for the Motors Liquidation Company*
*GUC Trust Administrator*

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 8 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 1 of 23

Paul M. Basta
Kyle J. Kimpler
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Arthur Steinberg
Scott Davidson
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

*Bankruptcy Counsel for General Motors LLC*

Richard C. Godfrey, P.C.
Wendy L. Bloom
Andrew Bloomer, P.C.
Mark J. Nomellini
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654-3406
Telephone:  (312) 862-2000
Facsimile: (312) 862-2200

*MDL 2543 Counsel for General Motors LLC*

Counsel for Additional Parties Listed on the
Signature Page

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, et al., f/k/a General Motors Corp., et al., | Case No. 09-50026 (MG) |
| Debtors. | (Jointly Administered) |
| In re: | |
| GENERAL MOTORS LLC IGNITION SWITCH LITIGATION | No. 14-MD-2543 (JMF) No. 14-MC-2543 (JMF) |
| *This Document Relates To All Economic Loss Actions* | Hon. Jesse M. Furman |

**JOINT MEMORANDUM OF LAW BY (i) GENERAL MOTORS LLC, (ii) THE**
**MOTORS LIQUIDATION COMPANY GUC TRUST, AND (iii) THE ECONOMIC LOSS**
**PLAINTIFFS IN SUPPORT OF THEIR MOTION TO WITHDRAW THE REFERENCE**
**OF THE ECONOMIC LOSS PLAINTIFFS' MOTION FOR AN ORDER GRANTING**
**AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM AND RELATED FILINGS**

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 9 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 2 of 23

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................5

I.    OLD GM'S BANKRUPTCY, THE SALE OF ASSETS TO NEW GM, AND THE
      ESTABLISHMENT OF A LATE CLAIMS DEADLINE. ....................................................5

II.   THE ECONOMIC LOSS PLAINTIFFS' MOTION IN BANKRUPTCY COURT
      FOR AN ORDER GRANTING AUTHORITY TO FILE LATE PROOFS OF
      CLAIMS. ....................................................................................................................6

III.  THE MDL 2543 LITIGATION OVERLAPS WITH THE BANKRUPTCY
      COURT LITIGATION AND SPECIFICALLY THE LATE CLAIMS MOTIONS. ............7

IV.   THE PROPOSED CLASS SETTLEMENT WOULD RESOLVE THE PUTATIVE
      CLASS CLAIMS IN MDL 2543 AND CLASS CLAIMS AGAINST THE GUC
      TRUST IN THE BANKRUPTCY COURT. ......................................................................9

ARGUMENT ......................................................................................................................10

I.    WITHDRAWAL OF THE REFERENCE IS PROPER IN ORDER TO
      EFFECTUATE THE PROPOSED CLASS SETTLEMENT. ............................................11

II.   PERMISSIVE WITHDRAWAL WILL PROMOTE EFFICIENCY AND
      UNIFORMITY. ..........................................................................................................13

III.  VARIOUS *ORION* FACTORS DO NOT APPLY BECAUSE THE SETTLING
      PARTIES AGREE THAT WITHDRAWAL OF THE REFERENCE IS
      NECESSARY FOR APPROVAL AND IMPLEMENTATION OF THE
      PROPOSED CLASS SETTLEMENT. ..............................................................................16

CONCLUSION ....................................................................................................................16

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 10 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 3 of 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*1800Postcards, Inc. v. Morel*,
    153 F. Supp. 2d 359 (S.D.N.Y. 2001)............................................................................3, 14, 15

*In re AremisSoft Corp. Sec. Litig.*,
    210 F.R.D. 109 (D.N.J. 2002)................................................................................................12

*In re Casimiro*,
    2006 WL 1581897 (E.D. Cal. June 6, 2006) ........................................................................15

*In re Dana Corp.*,
    379 B.R. 449 (S.D.N.Y. 2007)..............................................................................................11

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)..............................................................................................3, 12

*In re Durso Supermarkets, Inc.*,
    170 B.R. 211 (S.D.N.Y. 1994)..............................................................................................15

*In re Ephedra Prod. Liab. Litig.*,
    329 B.R. 1 (S.D.N.Y. 2005)..................................................................................................14

*In re G.M. Crocetti, Inc.*,
    2008 WL 4601278 (S.D.N.Y. Oct. 15, 2008) ......................................................................13

*In re GCC-Chase, LLC*,
    2016 WL 4427042 (Bankr. W.D.N.C. July 29, 2016) ..........................................................13

*In re Guthrie*,
    2013 WL 2350355 (Bankr. E.D. Mich. May 2, 2013) ..........................................................13

*Mishkin v. Ageloff*,
    220 B.R. 784 (S.D.N.Y. 1998)..................................................................................3, 11, 15

*In re Motors Liquidation Co.*,
    538 B.R. 656 (S.D.N.Y. 2015)..............................................................................................14

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016)....................................................................................................6

*In re Orion Pictures Corp.*,
    4 F.3d 1095, 1101 (2d Cir. 1993)..........................................................................................11

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 11 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 4 of 23

*In re Parmalat Finanziaria S.p.A.*,
   320 B.R. 46 (S.D.N.Y. 2005)...................................................................................................14

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
   507 U.S. 380 (1993).........................................................................................................................7

*Providence Real Estate Venture, LLC v. Great Circle Capital, LLC*,
   2016 WL 4134571 (W.D.N.C. Aug. 2, 2016)..........................................................................13

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
   269 B.R. 139 (D. Md. 2001) .....................................................................................................12

*In re Reliance Sec. Litig.*,
   2002 WL 35645209 (D. Del. Feb. 8, 2002) .......................................................................3, 12

*ResCap Liquidating Trust v. PHH Mortgage Corp.*,
   518 B.R. 259 (S.D.N.Y. 2014)...................................................................................................15

*Scott v. AIG Prop. Cas. Co.*,
   2017 WL 1380607 (S.D.N.Y. Apr. 17, 2017).........................................................................11

*Solutia, Inc. v. FMC Corp.*,
   2004 WL 1661115 (S.D.N.Y. July 27, 2004) ........................................................................15

*In re Standing Order of Reference Re: Title 11*,
   Case No. 1:12-mc-32 (S.D.N.Y. Feb. 1, 2012)......................................................................10

**Statutes**

28 U.S.C. § 157(d) .............................................................................................................................2, 10

28 U.S.C. § 1334...................................................................................................................................10

**Rules**

Federal Rule of Civil Procedure 23 ........................................................................................ *passim*

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 12 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 5 of 23

## **INTRODUCTION**

Today, a motion was filed in this Court seeking preliminary approval of a nationwide class

settlement of economic loss claims arising from seven recalls of GM vehicles in 2014, including

claims for vehicles manufactured or sold before and after Old GM sold substantially all of its assets

in a 2009 bankruptcy sale to New GM.[1]   The parties to that preliminary approval motion

(collectively, the "Settling Parties") are (i) General Motors LLC ("New GM"); (ii) the Motors

Liquidation Company GUC Trust (the "GUC Trust"); and (iii) plaintiffs seeking to represent

classes of purchasers and lessees of the recalled vehicles.[2]   The proposed settlement includes the

economic loss claims asserted against New GM pending in this Court, as well as putative economic

loss class claims plaintiffs seek to file against the GUC Trust in the Bankruptcy Court, which are

the subject of the Economic Loss Plaintiffs'[3] Motion for an Order Granting Authority to File Late

Proofs of Claims, filed in the Bankruptcy Court on December 22, 2016 (the "Initial Late Claims

Motion"; collectively with the filings listed in notes 4 and 6, the "Late Claims Motions"), as

amended on April 24, 2018.[4]   Bankr. Docket No. 13806, attached as Ex. 1.   In order to effectuate

the preliminary and final approval of the proposed Settlement Agreement,[5] the Settling Parties

seek to withdraw the reference as to the Late Claims Motions and the putative class proofs of

---

[1]   *See* Joint Motion for Preliminary Approval of Class Settlement, Certification of Class for Purposes of Settlement, Approval of Notice Procedures, and Appointment of Class Counsel & Class Representatives ("Preliminary Approval Motion"), Docket No. 7816.

[2]   The Settlement Agreement defines the proposed Class and its subclasses, and also lists the specific vehicles and recalls covered by the Agreement.

[3]   The economic loss plaintiffs who filed the Initial Late Claims Motion are among the economic loss plaintiffs who are parties to the Settlement Agreement.

[4]   *See Notice Of Filing Of Amended Exhibits To Motion For An Order Granting Authority To File Late Class Proofs Of Claim* on April 24, 2019 [Bankr. Docket No. 14280] ("Notice of Amended Exhibits").   The Settling Parties' request for withdrawal of the reference encompasses the Notice of Amended Exhibits as well.   The parties dispute the propriety of the amendment and reserve all rights and defenses.

[5]   In the Settlement Agreement, the Settling Parties agree to seek withdrawal of the reference with respect to the Late Claims Motions.   Settlement Agreement ¶ 140.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 13 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 6 of 23

claims the plaintiffs sought to file through the Late Claims Motions against the GUC Trust.[6]

The Settling Parties seek to withdraw the reference for the Late Claims Motions because their proposed comprehensive class settlement requires approval pursuant to Federal Rule of Civil Procedure 23 and withdrawing the reference would promote efficiency and uniformity in the administration of the law and, in particular, the approval process of the Settling Parties' Settlement Agreement. Once this Court withdraws the reference as to the Late Claims Motions, it may then (for the reasons discussed more fully in the memoranda in support of the Preliminary Approval Motion filed today) preliminarily approve the proposed Settlement Agreement with respect to both (i) the class claims sought to be asserted against the GUC Trust and (ii) the class claims asserted against New GM. The proposed class settlement is intended to resolve, among other things, the various disputes at issue in the Late Claims Motions pertaining to the GUC Trust. Accordingly, if the proposed class settlement receives final approval by this Court, the Late Claims Motions will become moot and the Proposed Proofs of Claim asserted thereby will be resolved as against the GUC Trust.[7]

For the reasons that follow, because the settlement of the proposed bankruptcy class claims against the GUC Trust is overlapping and interlocking with the settlement of class claims pending in this Court, permissive withdrawal of the reference is warranted.[8] *See* 28 U.S.C. § 157(d) ("The

---

[6]    Certain parties also filed joinders to the Initial Late Claims Motion, as permitted by the Bankruptcy Court's December 13, 2016 Order To Show Cause. Bankr. Docket No. 13802; *see also* Bankr. Docket No. 13811 ("Peller Joinder"); Bankr. Docket No. 13818 ("Groman Plaintiffs' Joinder"). The economic loss plaintiffs that filed these joinders are members of the proposed Settlement Class. The Settling Parties also request withdrawal of these joinders as to their economic loss claims, as related filings.

[7]    If, however, this Court denies either preliminary or final approval, the Settlement Agreement provides and the Settling Parties will jointly request that the Late Claims Motions be returned to the Bankruptcy Court. Settlement Agreement ¶ 168.j. Further, and as set forth in the Settlement Agreement, the Economic Loss Plaintiffs and New GM will continue to pursue Proposed Proofs of Claim (as defined in the Settlement Agreement) against the Avoidance Action Trust ("AAT") and its assets in the Bankruptcy Court notwithstanding approval of the Settlement Agreement, and the Settling Parties do not seek to withdraw the reference with respect to such claims against the AAT. *Id.* ¶ 142.

[8]    The Settling Parties seek withdrawal of the reference only as to (i) the Initial Late Claims Motion (with its

2

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 14 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 7 of 23

district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party for cause shown."); *see also, e.g.*, *Mishkin v. Ageloff*, 220 B.R. 784, 800 (S.D.N.Y. 1998) (withdrawal of reference in core proceedings was warranted, because the proceedings were "overlapping and interlocking"); *1800Postcards, Inc. v. Morel*, 153 F. Supp. 2d 359, 367 (S.D.N.Y. 2001) (where facts, transactions and issues underlying creditors' committee's complaint overlapped with claims pending in the District Court, "efficiency counsels withdrawing the referral of the Committee's claims").

First, district courts regularly withdraw the reference in order to facilitate or effectuate a class or other settlement involving both bankruptcy and non-bankruptcy claims and parties. *See*, *e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 288 (2d Cir. 1992) (noting that district court withdrew certain claims from the bankruptcy court pursuant to 28 U.S.C. § 157(d) to "facilitate settlement"), *affirming In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 915 (S.D.N.Y. 1991) (noting that "the Court withdrew the reference as to all of the Debtors' Chapter 11 cases, retained jurisdiction of the Securities Litigation Claims and other non-core, non-related matters and re-referred all core matters to the Bankruptcy Court"); *In re Reliance Sec. Litig.*, 2002 WL 35645209, at *6 n.7 (D. Del. Feb. 8, 2002), *opinion corrected*, 2002 WL 35645207 (D. Del. Mar. 20, 2002) (noting that district court agreed to grant an uncontested motion to withdraw the reference, which was "necessary for the implementation of the settlement").

---

proposed class proofs of claim), (ii) the Notice of Amended Exhibit, (iii) the Peller Joinder, and (iv) the Groman Plaintiffs' Joinder; all other litigation against the GUC Trust will remain before and proceed in the Bankruptcy Court.

Additionally, the GUC Trust filed today in the Bankruptcy Court a Bankruptcy Rule 9019 motion ("GUC Trust Motion") seeking approval of, among other things:  (i) the GUC Trust's entry into and performance of the terms and conditions of the proposed settlement; (ii) the GUC Trust's release of claims against New GM for Adjustment Shares under Section 3.2(c) of the Amended and Restated Master Sale Purchase Agreement; and (iii) the GUC Trust's distribution of $300 million in GUC Trust Assets to its unitholders.  The Settling Parties do not seek withdrawal of the reference as to the GUC Trust Motion and have noticed a joint hearing of this Court and the Bankruptcy Court at which time the GUC Trust Motion will be presented.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 15 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 8 of 23

Second, withdrawal of the reference will promote efficiency and uniformity in the administration of the law. The proposed Settlement Agreement filed today covers both putative class claims against New GM that are before this Court and putative class claims against the GUC Trust that are before the Bankruptcy Court. The proposed Settlement Agreement involves: (i) a single agreement among the GUC Trust, New GM, and Plaintiffs and Plaintiffs' Class Counsel,[9] on behalf of purchasers and lessees of Old GM and New GM vehicles subject to the seven (7) recalls asserting class claims against the GUC Trust and New GM (Settlement Agreement at 1, ¶¶ 12, 57); (ii) a single Common Fund that will be distributed pursuant to the Allocation Decision (*id.* ¶¶ 17, 81); (iii) a single negotiation over Attorneys' Fees and Expenses (*id.* ¶ 149); (iv) a single Class Action Settlement Administrator (*id.* ¶¶ 13, 95-102); (v) a single Qualified Settlement Fund Administrator and Trustee (*id.* ¶¶ 57, 78-79); (vi) a single Settlement Claim Review Protocol and Settlement Claim Form (*id.* ¶¶ 83-85); (vii) a single Short Form Notice, Summary Settlement Notice, and Long Form Notice (*id.* ¶¶ 86-90); and (viii) a single objection process (*id.* ¶¶ 108-111).[10] In the interests of efficiency and uniformity, a single Court should consider whether the Settlement Agreement should be approved. It would be wasteful and judicially inefficient, as well as risk inconsistent rulings, for two Courts to simultaneously consider all of the Rule 23 issues relevant to preliminary and final approval of the same Settlement Agreement—particularly where one of those Courts (the MDL Court) would sit in review of the other Court's decision.

Moreover, efficiency and uniformity will also be served because of the overlap between the class claims asserted against New GM and those sought to be asserted against the GUC Trust.

---

[9]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Settlement Agreement.

[10]   The proposed Settlement Agreement was negotiated among the same counsel for economic loss plaintiffs in both the Bankruptcy Court and this Court, as well as counsel for the GUC Trust and New GM—all under the supervision and with the mediation assistance of the Honorable Layn Phillips, retired U.S. District Court Judge.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 16 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 9 of 23

Both sets of claims involve many of the same vehicle models, six of the same recalls,[11] alleged damages arising from overpayment at purchase, and millions of the same proposed class members. To the extent that Class Members wish to object to the Settlement Agreement, it would be more efficient to address these objections in a single Court. It would also reduce the administrative burden on Class Members, as well as potential confusion as to which Court has jurisdiction over their claims. Given this substantial overlap, withdrawal of the reference will result in the most efficient use of judicial resources.

Finally, withdrawal of the reference will promote efficiency and uniformity because determining whether to approve the proposed settlement of the class claims sought to be asserted against the GUC Trust and those asserted against New GM will involve application and consideration of the same Federal Rule of Civil Procedure 23 legal standards. Withdrawal of the reference will permit these legal standards to be uniformly applied to the proposed Settlement Agreement by this Court.

Accordingly, for these reasons, this Court should withdraw the reference of the Late Claims Motions from the Bankruptcy Court, such that any objections to the Preliminary Approval Motion and final approval of the Settlement Agreement are filed in and determined by this Court.

**BACKGROUND**

## I.    OLD GM'S BANKRUPTCY, THE SALE OF ASSETS TO NEW GM, AND THE ESTABLISHMENT OF A LATE CLAIMS DEADLINE.

On June 1, 2009, Old GM filed a Chapter 11 bankruptcy petition. On July 5, 2009, the Bankruptcy Court entered an order authorizing New GM's purchase of substantially all of Old GM's assets.[12]

---

[11]    *See* n.16, *infra*, and accompanying text.

[12]    The sale was memorialized in the Amended and Restated Master Sale And Purchase Agreement By And Among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation And Chevrolet-Saturn Of Harlem,

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 17 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 10 of 23

After the Sale, the Bankruptcy Court entered an order establishing November 30, 2009 as the deadline for general unsecured creditors to file proofs of claims against Old GM. In *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), the Second Circuit held, among other things, that plaintiffs with claims against the Old GM estate relating to the Delta ignition switch defect were not provided adequate notice of the sale of assets from Old GM to New GM.[13] The Second Circuit also vacated the Bankruptcy Court's equitable mootness ruling with respect to plaintiffs' ability to file late claims as premature because plaintiffs had not sought to file any claims against the GUC Trust at the time of the ruling, but such ruling was without prejudice to the GUC Trust's ability to raise that issue again in the future. *Id.* at 168 & n.31.

Following the Second Circuit's ruling, plaintiffs were required by the Bankruptcy Court to seek leave to file "late claims" motions related to recalls by December 22, 2016.[14]

## II.    THE ECONOMIC LOSS PLAINTIFFS' MOTION IN BANKRUPTCY COURT FOR AN ORDER GRANTING AUTHORITY TO FILE LATE PROOFS OF CLAIMS.

On December 22, 2016, two economic loss claimants filed the Initial Late Claims Motion, seeking to assert proposed nationwide class claims against the GUC Trust under Rule 23(b)(3).

One claimant, Patricia Barker (who is also a plaintiff in MDL 2543), sought leave to file a class claim against the GUC Trust on behalf of an "Ignition Switch Class," defined as "all persons in the United States who, as of November 30, 2009, either owned or leased a defective Old GM vehicle included in Recall No. 14V-047." Initial Late Claims Motion at 12.

---

Inc., as Sellers, And NGMCO, Inc., Dated As Of June 26, 2009, and effectuated in the Bankruptcy Court's July 5, 2009 Order (i) Authorizing Sale Of Assets Pursuant To Amended And Restated Master Sale And Purchase Agreement With NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (ii) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In Connection With The Sale; And (iii) Granting Related Relief (the "363 Sale" or the "Sale"). Bankr. Docket No. 2968.

[13]    The Second Circuit did not address whether there had been any Due Process violation with respect to the other recalled vehicle defects that are the subject of the Late Claims Motions.

[14]    "If other plaintiffs wish to join in a Late Claim Motion, they . . . [were required to] file a joinder (not to exceed two pages) with the [Bankruptcy] Court by January 6, 2017." Bankr. Docket No. 13802 at 5.

6

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 18 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 11 of 23

The second claimant, Yvonne James-Bivins (who is also a plaintiff in MDL 2543), sought leave to file a class claim against the GUC Trust on behalf of a "Non-Ignition Switch Class," defined as "all persons in the United States who, as of November 30, 2009, either owned or leased a defective Old GM vehicle included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153." *Id.*

On April 24, 2018, plaintiffs filed the Notice of Amended Exhibits, which Plaintiffs contend added 58 additional claimants to the proposed class claims annexed to the Initial Late Claims Motion. Bankr. Docket No. 14280. Each of these additional 58 claimants were also named plaintiffs in the operative MDL complaint.

Certain issues raised by the Late Claims Motions have been briefed, but not yet decided in the Bankruptcy Court.[15] Bankr. Docket Nos. 13871, 13872, 13873, 13882, 13883, 13884.

## III.    THE MDL 2543 LITIGATION OVERLAPS WITH THE BANKRUPTCY COURT LITIGATION AND SPECIFICALLY THE LATE CLAIMS MOTIONS.

In 2014, the Judicial Panel on Multidistrict Litigation established MDL 2543, and transferred to this Court claims related to ignition-switch and other alleged defects in vehicles manufactured by Old GM and New GM that were subject to certain recalls. The Fifth Amended Consolidated Complaint ("5ACC") filed by plaintiffs in MDL 2543 alleges economic loss class claims against New GM on behalf of those who purchased or leased certain Old GM or New GM vehicles. *See* 5ACC ¶ 34 (generally defining class as "[a]ll persons who bought or leased (i) a Delta Ignition Switch Vehicle on or before February 14, 2014; (ii) a Low torque Ignition Switch

---

[15]    The briefing schedule for preliminary issues raised by the Late Claims Motions was established in the Bankruptcy Court's March 2, 2017 Order. Bankr. Docket No. 13869. The briefing encompassed "(i) the issue ("**Applicability of *Pioneer* Issue**") of whether the proponents of the Late Claim Motions must satisfy the standard set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) in order to obtain authority to file late proofs of claim, and (ii) the issue ("**Tolling Issue**," and with the Applicability of *Pioneer* Issue, the "**Initial Late Claim Motions Issues**") as to whether and as of when some or all of the proponents of the Late Claim Motions are the beneficiaries of a tolling agreement with respect to the time for filing the Late Claim Motions." *Id.* at 2.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 19 of 269

09-50026-mg   Doc 14695   Filed 03/27/20   Entered 03/27/20 20:18:28   Main Document
Pg 12 of 23

Vehicle prior to July 3, 2014; (iii) a Knee-to-Key Camaro Defect Vehicle prior to July 3, 2014;

(iv) a Side Airbag Defect Vehicle prior to March 17, 2014; and/or (v) a Power Steering Defect

Vehicle prior to April 1, 2014").

There is considerable overlap between the economic loss claims asserted against New GM

in MDL 2543 and the claims sought to be asserted against the GUC Trust in the Bankruptcy Court:

- Overlapping Plaintiffs.  Patricia Barker and Yvonne-James Bivins assert class claims in both the Initial Late Claims Motion and in the MDL.  *Compare* Initial Late Claims Motion at 12 *with* 5ACC ¶¶ 58, 64.  In addition, all of the additional claimants named in the Notice of Amended Exhibits are also plaintiffs in the MDL.

- Overlapping Plaintiffs' Counsel.  Steve Berman and Elizabeth Cabraser, who were appointed as Co-Lead Counsel by this Court, represent economic loss claimants seeking certification of class claims in both the Bankruptcy Court (along with designated counsel Ed Weisfelner and Sandy Esserman) and the MDL.

- Overlapping Putative Economic Loss Classes.  The putative Delta Ignition Switch class in the Bankruptcy Court includes many of the same members as the putative Delta Ignition Switch class in the MDL.  *Compare* Initial Late Claims Motion at 12 ("all persons in the United States who, as of November 30, 2009, either owned or leased a defective Old GM vehicle included in Recall No. 14V-047") *with* 5ACC ¶ 34 (general definition of class includes "All persons who bought or leased (i) a Delta Ignition Switch Vehicle on or before February 14, 2014. . . .").

- Overlapping Recalls.  Six of the recalls at issue in the Bankruptcy Court are the same as the recalls at issue in the MDL:  (i) MDL Delta Ignition Switch (14v047); (ii) Lacrosse / Impala Slotted Key (14v355); (iii) CTS / SRX Key Bump & Inadvertent Rotation (14v394); (iv) Malibu / Impala Inadvertent Key Rotation (14v400); (v) SIAB Wiring Harness (14v118); and (vi) Electric Power Steering Assist (14v153).[16]

- Overlap With Respect to Successor Liability Claims.  Plaintiffs are required to prove Old GM's liability to prevail on both (i) claims against the GUC Trust in the Bankruptcy Court and (ii) their successor liability claims against New GM in the MDL.

- Overlapping Damages Theories.  Claimants in the Bankruptcy Court, like plaintiffs in the MDL, seek purported economic loss damages relating to overpayment at purchase.

---

[16]   The Camaro Ignition Key Bump (14v346) recall, which only involves New GM vehicles, is at issue in the MDL but is not asserted in the Bankruptcy Court.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 20 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 13 of 23

- • Overlapping Causes of Action. The proposed economic loss class proofs of claim attached to the Initial Late Claims Motion include the same causes of action that are asserted in the MDL, including: (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence. Initial Late Claims Motion at 13-14; 5ACC at 3-4. These overlapping claims raise the same legal issues being addressed in the MDL.

## IV. THE PROPOSED CLASS SETTLEMENT WOULD RESOLVE THE PUTATIVE CLASS CLAIMS IN MDL 2543 AND CLASS CLAIMS AGAINST THE GUC TRUST IN THE BANKRUPTCY COURT.

The proposed Settlement Agreement filed today covers both the class claims alleged against New GM in this Court and those alleged against the GUC Trust in the Bankruptcy Court.[17] The terms of the proposed Settlement Agreement are set forth in a single agreement entered into by the GUC Trust, New GM, and Plaintiffs (as defined in the Settlement Agreement). This proposed Settlement Agreement involves:

- • One Common Fund. The Settlement Agreement establishes a single Common Fund, to be funded by New GM and the GUC Trust, that will be allocated among putative class members. Settlement Agreement ¶¶ 17, 78, 81.

- • One Class Comprised of Five Subclasses. The Settlement Agreement seeks to certify a settlement Class, comprised of five Subclasses, to settle all putative economic loss class claims in this Court and those against the GUC Trust in the Bankruptcy Court. Id. ¶¶ 4, 12.

- • One Short Form Notice, Summary Settlement Notice, and Long Form Notice. The Settlement Agreement establishes a single Short Form Notice, Summary Settlement Notice, and Long Form Notice, all to be issued by a single entity. Id. ¶¶ 86-90.

- • One Class Action Settlement Administrator. The Settlement Agreement provides for a single Class Action Settlement Administrator to be appointed by the MDL Court to implement the Class Notice, the Settlement Claims Process, receipt and maintenance of requests of Class Members to become an Opt-Out, and other aspects of administration required pursuant to the Settlement Agreement. Id. ¶¶ 13, 95-102.

- • One Qualified Settlement Fund Administrator and Trustee. The Settlement Agreement establishes a single Qualified Settlement Fund Administrator and Trustee to implement the process for distributing the proceeds of the Qualified Settlement Fund. Id. ¶¶ 57, 78-

---

[17]    A true and complete copy of the Settlement Agreement was filed contemporaneously with the Preliminary Approval Motion. Docket No. 7815.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 21 of 269

09-50026-mg   Doc 14695   Filed 03/27/20   Entered 03/27/20 20:18:28   Main Document
Pg 14 of 23

79.

- One Claiming Process.  The Settlement Agreement establishes a single Settlement Claim Review Protocol for reviewing claims.  *Id.* ¶ 83, 85 & Ex. 10.

- <u>One Settlement Claim Form</u>.  The Settlement Agreement establishes a single Settlement Claim Form for submitting claims.  *Id.* ¶ 84 & Ex. 9.

- <u>One Objection and Opt-Out Process</u>.  The Settlement Agreement establishes a single process for requesting exclusion from the alleged classes and a single process for objecting to the fairness, reasonableness, or adequacy of the proposed settlement.  *Id.* ¶¶ 104-111.  Likewise, the Settlement Agreement contemplates a single fairness hearing.  *Id.* ¶ 22.

The Court's evaluation and approval of these provisions of the Settlement Agreement will be the same for the class claims sought to be asserted against the GUC Trust in the Late Claims Motions and asserted in the 5ACC.  Given that, there is no reason to have two courts separately and independently rule on preliminary and final approval; nor would withdrawing the reference preclude the two courts from sitting jointly so that the Bankruptcy Court can simultaneously consider the GUC Trust Approval Motion.

## <u>ARGUMENT</u>

United States District Courts have "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a), (b).  In the Southern District of New York, such cases and proceedings are referred automatically from the District Court to the Bankruptcy Court.  *See In re Standing Order of Reference Re: Title 11*, Case No. 1:12-mc-32 (S.D.N.Y. Feb. 1, 2012).

28 U.S.C. § 157(d) provides for withdrawal of the reference "for cause" (*i.e.*, permissive withdrawal).   Here, permissive withdrawal is appropriate, [18] and indeed is necessary for

---

[18]   The Settling Parties do not seek mandatory withdrawal of the reference.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 22 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 15 of 23

consideration and approval of the Settlement Agreement. This Court should therefore withdraw
the reference to the Bankruptcy Court of the Late Claims Motions.

In *In re Orion Pictures Corp.*, the Second Circuit enumerated certain factors relevant in
determining whether there is "cause" to withdraw the reference, including: "whether the claim or
proceeding is core or non-core, whether it is legal or equitable, and considerations of efficiency,
prevention of forum shopping, and uniformity in the administration of bankruptcy law." 4 F.3d
1095, 1101 (2d Cir. 1993). However, applying these factors is not a straightforward mechanical
exercise, but instead an analysis that relies on the District Court's "discretion." *In re Dana Corp.*,
379 B.R. 449, 454 (S.D.N.Y. 2007). Moreover, the *Orion* factors are "non-exhaustive," *Scott v.
AIG Prop. Cas. Co.*, 2017 WL 1380607, at *2 (S.D.N.Y. Apr. 17, 2017), and courts may consider
"other related factors." *Orion*, 4 F.3d at 1101.

Here, the most important factor demonstrating cause is the need to bring all claims and
parties into a single forum for consideration of whether the Settlement Agreement should be
approved. District Courts regularly withdraw the reference in situations where it is necessary to
facilitate or effectuate a settlement involving claims (including class claims) and parties in both
the Bankruptcy Court and District Court. *See* authorities cited in Section I, *infra*. "[T]he [other]
critical question is efficiency and uniformity," *Mishkin*, 220 B.R. at 800 (citing *Orion*, 4 F.3d at
1100), and, here, withdrawing the reference best achieves these objectives, as discussed in Section
II, *infra*. Finally, several of the *Orion* factors are not relevant here, where the withdrawal of the
reference is necessary for approval and implementation of a settlement and the Settling Parties are
not asking this Court to decide the Late Claims Motions on the merits. *See* Section III, *infra*.

I.    **WITHDRAWAL OF THE REFERENCE IS PROPER IN ORDER TO
EFFECTUATE THE PROPOSED CLASS SETTLEMENT.**

The Settling Parties agree that withdrawal of the reference is appropriate and necessary to

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 23 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 16 of 23

effectuate the proposed Settlement.  The Settlement Agreement covers claims and parties in both this Court and the Bankruptcy Court, and withdrawal of the reference is necessary to bring all claims and parties subject to the proposed Settlement Agreement into a single forum, subject to a single court's jurisdiction.  As described above, the proposed Settlement Agreement settles the claims of a single proposed Class via a single Settlement Agreement.  *See* Background Section IV, *supra*.  It would be inefficient and risk inconsistent rulings for two Courts to preliminarily or finally rule on the components of a single Settlement Agreement and its provisions.  Once the Court withdraws the reference, all claims and parties subject to the proposed Settlement Agreement will be before this Court.

District Courts regularly withdraw the reference in order to facilitate or effectuate a class or other settlement involving both bankruptcy and non-bankruptcy claims and parties.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 288 (noting that the district court judge withdrew certain claims from the bankruptcy court pursuant to 28 U.S.C. § 157(d) to "facilitate settlement"), *affirming In re Drexel Burnham*, 130 B.R. at 915 (noting that "the Court withdrew the reference as to all of the Debtors' Chapter 11 cases, retained jurisdiction of the Securities Litigation Claims and other non-core, non-related matters and re-referred all core matters to the Bankruptcy Court"); *In re Reliance Sec. Litig.*, 2002 WL 35645209, at *6 n.7 (noting that district court agreed to grant an uncontested motion to withdraw the reference, which was "necessary for the implementation of the settlement"); *In re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. 109, 115 (D.N.J. 2002) (noting that after the parties filed a stipulation of settlement, the district court granted a motion to withdraw the reference, "ensuring that this [District] Court would maintain jurisdiction over the entire matter"); *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 269 B.R. 139, 146 (D. Md. 2001) (noting that district court entered an order granting a motion for withdrawal of reference with

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 24 of 269

09-50026-mg   Doc 14695   Filed 03/27/20   Entered 03/27/20 20:18:28   Main Document
Pg 17 of 23

respect to certain subsidiaries' participation in a Global Settlement Agreement because "the

matters in question are closely related to the settlement reached by the Trustee"); *In re GCC-Chase,*

*LLC*, 2016 WL 4427042, at *1 (Bankr. W.D.N.C. July 29, 2016) (recommending that district court

withdraw the reference of an adversary proceeding for the limited purpose of ordering a global

mediation between the parties to the adversary proceeding and a nearly identical case pending in

district court), adopted and approved by *Providence Real Estate Venture, LLC v. Great Circle*

*Capital, LLC*, 2016 WL 4134571, at *1 (W.D.N.C. Aug. 2, 2016); *In re Guthrie,* 2013 WL

2350355, at *2-3 (Bankr. E.D. Mich. May 2, 2013) (recommending that district court withdraw

the reference in order to enter a proposed consent order when the parties' agreement was

conditioned on such withdrawal of the reference), consent order noting withdrawal of the reference

entered by District Court in Case No. 2:13-cv-11964 (E.D. Mich. June 5, 2013), attached as Ex. 2.

Withdrawal here is likewise appropriate for approval and implementation of the Settlement

Agreement.  Thus, cause exists for permissive withdrawal of the reference.

## II.   PERMISSIVE   WITHDRAWAL   WILL   PROMOTE   EFFICIENCY   AND UNIFORMITY.

Withdrawal of the reference here will also promote efficiency and uniformity.  The

proposed Settlement Agreement covers both putative class claims against New GM that are

pending in this Court in the 5ACC and proposed class claims against the GUC Trust that are before

the Bankruptcy Court via the Late Claims Motions.  Where, as here, the Bankruptcy Court and the

District Court would face nearly identical issues and arguments absent withdrawal, "concerns of

judicial efficiency" constitute a "higher interest" justifying withdrawal.  *In re G.M. Crocetti, Inc.*,

2008 WL 4601278, at *5 (S.D.N.Y. Oct. 15, 2008) ("Failure to withdraw the reference in this case

would subject the parties to the risk of inconsistent verdicts on these issues, not to mention

significant inefficiency and expense from having to duplicate efforts and litigate the same issues

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 25 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 18 of 23

twice.").   Indeed, given the substantial overlap and identity of issues here, withdrawal of the reference will result in the most efficient use of judicial resources.  *See In re Motors Liquidation Co.*, 538 B.R. 656, 663 (S.D.N.Y. 2015) (citing "judicial efficiency" as a "higher interest" that may warrant withdrawal of the reference, but declining to withdraw the reference because Judge Gerber was already "fully versed" in the underlying issues that plaintiffs previously sought to withdraw from the Bankruptcy Court); *see also In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 50–51 (S.D.N.Y. 2005); *In re Ephedra Prod. Liab. Litig.*, 329 B.R. 1, 4 n.1 (S.D.N.Y. 2005).  This is particularly true where, as here, the MDL Court is already steeped in the issues giving rise to the Settlement Agreement.

*First*, as discussed above, the proposed settlement would resolve the class claims against the GUC Trust and New GM under the terms of a single Settlement Agreement.  *See* Argument Section I, *supra*.  It would be impractical and inefficient for the District Court and Bankruptcy Court to separately evaluate and rule on the same proposed Settlement Agreement.   Such a procedure would be especially inefficient because the District Court would be tasked with deciding any appeal of the Bankruptcy Court's rulings.  Instead, once the Court withdraws the reference, all claims subject to the proposed Settlement Agreement and the Preliminary Approval Motion will be before this Court, promoting efficiency.

*Second*, in addition to the fact that the proposed Settlement Agreement presents a unified procedure for resolving the bankruptcy and non-bankruptcy economic loss claims subject to the proposed Settlement Agreement under a single umbrella, there is also overwhelming overlap between the class claims against New GM and the class claims sought to be asserted against the GUC Trust.  *See* Background Section III, *supra*.  Given this overlap, withdrawal of the reference will result in the most efficient use of judicial and party resources.  *See*, *e.g.*, *1800Postcards, Inc.*,

14

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 26 of 269

09-50026-mg   Doc 14695   Filed 03/27/20   Entered 03/27/20 20:18:28   Main Document
Pg 19 of 23

153 F. Supp. 2d at 367; *Mishkin*, 220 B.R. at 800.

*Third*, preliminary approval of the settlement of the class claims against the GUC Trust
will involve application of the same legal standards as preliminary settlement approval of the class
claims against New GM.  Both sets of claims require application of Federal Rule of Civil Procedure
23(e), Rule 23(a), and Rule 23(b).  These legal standards should not be applied by two different
Courts, which would create a risk of inconsistent rulings—which, if they occurred, would result in
an appeal to and ultimate decision by the District Court.  Withdrawal of the reference will permit
these legal standards to be uniformly applied to the proposed Settlement Agreement by this Court.

Finally, courts regularly hold that where, as here, a bankruptcy proceeding shares
overlapping questions of law and fact with an already pending District Court action, the reference
should be withdrawn.  *See*, *e.g.*, *Solutia, Inc. v. FMC Corp.*, 2004 WL 1661115, at *3 (S.D.N.Y.
July 27, 2004) (granting motion to withdraw reference; noting "[b]y litigating this non-core matter
in the district court, judicial resources will be conserved instead of having two courts administer
two rounds of briefing and argument on the same issues."); *see also 1800Postcards, Inc.*, 153 F.
Supp. 2d at 367; *Mishkin*, 220 B.R. at 800; *In re Casimiro*, 2006 WL 1581897, at *6 (E.D. Cal.
June 6, 2006) ("Although bankruptcy courts are empowered to oversee class actions, there is little
reason to assume that they regularly do so.  On the other hand, the district court has long experience
in the management of this complex class of litigation."); *ResCap Liquidating Trust v. PHH
Mortgage Corp.*, 518 B.R. 259, 265-66 (S.D.N.Y. 2014) (finding that withdrawal of the reference
was warranted to, *inter alia*, prevent duplicative work); *In re Durso Supermarkets, Inc.*, 170 B.R.
211, 213-14 (S.D.N.Y. 1994) (noting "unnecessary costs could be avoided by a single proceeding
in the district court").  The substantial overlap between the two proceedings and the gains in
efficiency and uniformity to be achieved by withdrawal of the reference provide further cause for

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 27 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 20 of 23

withdrawal here.

III.    **VARIOUS *ORION* FACTORS DO NOT APPLY BECAUSE THE SETTLING PARTIES AGREE THAT WITHDRAWAL OF THE REFERENCE IS NECESSARY FOR APPROVAL AND IMPLEMENTATION OF THE PROPOSED CLASS SETTLEMENT.**

Here, the Settling Parties do not ask this Court to withdraw the Late Claims Motions in order to decide that motion on the merits.  Instead, if the Court approves the proposed Settlement Agreement, it will necessarily resolve the Late Claims Motions and claims against the GUC Trust (though not claims against, or recoverable from, the AAT), because the proposed class proofs of claims against the GUC Trust in those Motions are among the claims encompassed by the Settlement Agreement.[19]

Because the Settling Parties are seeking withdrawal of the reference as to the Late Claims Motions only in order to facilitate the approval and implementation of the proposed Settlement Agreement, several of the *Orion* factors are irrelevant to the withdrawal analysis here.  For example, whether the Late Claims Motions concern a core matter is irrelevant when approval of the proposed Settlement Agreement will not require the Court to decide the merits of the Late Claims Motions.  Similarly, whether the Late Claims Motions seek legal or equitable relief is irrelevant, because relief will be provided through the proposed Settlement Agreement.  Nor is forum shopping a concern here, because the Settling Parties all agree that the proper forum for consideration of the proposed Settlement Agreement is the District Court, as that is the only forum where both bankruptcy and non-bankruptcy claims can be resolved together.

<u>CONCLUSION</u>

The Settling Parties respectfully request that this Court withdraw the reference as to:  (i) the

---

[19]    If this Court does not finally approve the settlement, the Settling Parties submit that the Late Claims Motions should be returned to the Bankruptcy Court.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 28 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 21 of 23

Initial Late Claims Motion, (ii) the Notice of Amended Exhibits, (iii) the Peller Joinder, and (iv) the Groman Plaintiffs' Joinder so that the Court can take jurisdiction over all parties and claims covered by the proposed Settlement Agreement.  For the avoidance of doubt, the Settling Parties do not request that this Court withdraw the reference with respect to any other matters currently pending before the Bankruptcy Court, including (i) the GUC Trust Motion; (ii) the GUC Trust Approval Order; (iii) the Excess Distribution Motion; (iv) personal injury or wrongful death claims in the Bankruptcy Case relating to the Subject Vehicles; (v) claims and Actions asserted against the AAT, Old GM or the Old GM Bankruptcy Estates to the extent such claims or Actions are recoverable solely against the AAT or its assets; and/or (vi) individual claims or motions, if any, in the Bankruptcy Case filed by a Person who would have been a Class Member who becomes an Opt-Out.  A proposed order is attached as Exhibit 13 to the Settlement Agreement, and is also attached as Exhibit 3 hereto.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 29 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 22 of 23

Dated: March 27, 2020                           Respectfully submitted,


                                                */s/ Paul M. Basta*
Richard C. Godfrey, P.C.                        Paul M. Basta
Wendy L. Bloom                                  Kyle J. Kimpler
Andrew Bloomer, P.C.                            PAUL, WEISS, RIFKIND, WHARTON &
Mark J. Nomellini                               GARRISON LLP
KIRKLAND & ELLIS LLP                            1285 Avenue of the Americas
300 N. LaSalle                                  New York, New York 10019
Chicago, IL 60654-3406                          Telephone: (212) 373-3000
Telephone: (312) 862-2000                       Facsimile: (212) 757-3990
Facsimile: (312) 862-2200

                                                Arthur Steinberg
*MDL 2543 Counsel for*                          Scott Davidson
*General Motors LLC*                            KING & SPALDING LLP
                                                1185 Avenue of the Americas
                                                New York, New York 10036
                                                Telephone: (212) 556-2100
                                                Facsimile: (212) 556-2222


                                                *Bankruptcy Counsel for General Motors LLC*


**HAGENS BERMAN SOBOL SHAPIRO**          **LIEFF CABRASER HEIMANN**
**LLP**                                  **& BERNSTEIN, LLP**

*/s/ Steve W. Berman*                    */s/ Elizabeth J. Cabraser*

Steve W. Berman                          Elizabeth J. Cabraser
Sean R. Matt                             275 Battery Street, 29th Floor
Andrew M. Volk                           San Francisco, CA 94111
1918 Eighth Avenue, Suite 3300           Telephone: (415) 956-1000
Seattle, WA 98101                        Facsimile: (415) 956-1008
Telephone: (206) 623-7292                ecabraser@lchb.com
Facsimile: (206) 623-0594
steve@hbsslaw.com
seam@hbsslaw.com                         Rachel Geman
andrew@hbsslaw.com                       250 Hudson Street, 8th Floor
                                         New York, NY 10013
                                         Telephone: (212) 355-9500
*Interim Lead Counsel for Plaintiffs and the*    Facsimile: (212) 355-9592
*Proposed Class*                         rgeman@lchb.com


                                         *Interim Lead Counsel for Plaintiffs and the*
                                         *Proposed Class*

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 30 of 269

09-50026-mg    Doc 14695    Filed 03/27/20    Entered 03/27/20 20:18:28    Main Document
Pg 23 of 23

MCDERMOTT WILL & EMERY LLP

*/s/ Kristin K. Going*_____

Kristin K. Going
340 Madison Ave.
New York, New York 10173
Telephone:  (212) 547-5429
Facsimile:  (646) 417-7313
E-mail:  kgoing@mwe.com

*Counsel for the Motors Liquidation Company*
*GUC Trust Administrator*

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 31 of 269

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:18:28    Exhibit 1 -
Late Class Claims    Pg 1 of 231

# Exhibit 1

**Status Conference: January 12, 2017 at 9:00 a.m. (Eastern Time)**
**Opposition Deadline: TBD**

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  206-623-7292
Email: steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  414-956-1000
Email: ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the MDL Court*

Edward S. Weisfelner
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Email: eweisfelner@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  214-969-4900
Email:  esserman@sbep-law.com

*Designated Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the Bankruptcy Court*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                             :
In re:                                                       :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,                          :          Case No.: 09-50026 (MG)
            f/k/a General Motors Corp., et al.,              :
                                                             :
                                         Debtors.            :          (Jointly Administered)
-------------------------------------------------------------X

**MOTION FOR AN ORDER GRANTING**
**<u>AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

JURISDICTION ............................................................................................................. 7

BACKGROUND ............................................................................................................. 7

I.     The Recalls. ......................................................................................................... 7

II.    The Bar Date And Late Filed Claims Orders. ..................................................... 9

III.   Proceedings In The Bankruptcy Court and Second Circuit Following The
       Disclosure Of Numerous Defects In Old GM And New GM Vehicles. ............ 10

IV.    The Plaintiffs' Proposed Class Claims Against Old GM. ................................... 12

ARGUMENT .................................................................................................................. 14

I.     The Ignition Switch Plaintiffs Should Be Permitted To File The  Proposed
       Ignition Switch Class Claim In Accordance With The April 2015 Decision. .... 14

II.    The Plaintiffs Should Be Permitted Under Bankruptcy Rule 9006(b)(1)
       To File The Proposed Class Claims Under A Theory Of Excusable Neglect. .... 15

       A.    Legal Standard For Leave To File A Late  Claim Under A Theory Of
             Excusable Neglect. .................................................................................... 15

       B.    The Plaintiffs' Failure To File Timely Proofs Of Claim Was Caused By
             Old GM's Actions, And Was Not Within The Plaintiffs' Control. ............ 16

       C.    The Remaining Pioneer Factors Weigh Strongly In Favor Of Allowing
             The Plaintiffs To File The Proposed Class Claims. ................................... 18

             i.    Allowing The Plaintiffs To File The  Proposed Class Claims Will
                   Not Prejudice The Debtor. ............................................................... 19

             ii.   Under The Circumstances, The Length Of Delay Is Acceptable And
                   Allowing The Plaintiffs To File The Proposed Class  Claims Will Not
                   Adversely Impact The Current Judicial Proceedings. ..................... 20

             iii.  The Plaintiffs Acted In Good Faith With Respect To Filing The
                   Proposed Class Claims. .................................................................... 22

NOTICE ........................................................................................................................... 23

CONCLUSION ................................................................................................................ 23

## TABLE OF AUTHORITIES

Page(s)

**Cases**

City of New York v. N.Y., New Haven & Hartford R.R. Co.,
    344 U.S. 293, motion to modify denied, 345 U.S. 901 (1953)...............................14

Elliott v. General Motors LLC (In re Motors Liquidation Co.),
    829 F.3d 135 (2d Cir. 2016).................................................................... passim

In re AMR Corp.,
    492 B.R. 660 (Bankr. S.D.N.Y. 2013)...................................................14

In re Arts des Provinces de France, Inc.,
    153 B.R. 144 (Bankr. S.D.N.Y. 1993)...............................................17, 19

In re BGI, Inc.,
    476 B.R. 812 (Bankr. S.D.N.Y. 2012)..................................................19

In re Ciena Capital LLC,
    No. 08-13783 (AJG), 2010 WL 3156538 (Bankr. S.D.N.Y. Aug. 10, 2010).........................21

Indian Motocycle Assocs., Inc. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel
    Burnham Lambert Grp., Inc.,
    151 B.R. 674 (Bankr. S.D.N.Y.), aff'd, 157 B.R. 532 (S.D.N.Y. 1993) .................................14

In re Enron Creditors Recovery Corp.,
    370 B.R. 90 (Bankr. S.D.N.Y. 2007)........................................................15, 18, 22

In re Interstate Cigar Co.,
    150 B.R. 305 (Bankr. E.D.N.Y. 1993)...................................................16

In re Keene Corp.,
    188 B.R. 903 (Bankr. S.D.N.Y. 1995).....................................................19

In re Motors Liquidation Co.,
    529 B.R. 510 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated
    in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.),
    829 F.3d 135 (2d Cir. 2016)..................................................................... passim

In re PT-1 Commc'ns, Inc.,
    292 B.R. 482 (Bankr. E.D.N.Y. 2003)..........................................................17, 21

In re Residential Capital, LLC,
    Case No. 12-12020 (MG), 2015 WL 515387 (Bankr. S.D.N.Y. Feb. 6, 2015).......................16

In re Residential Capital, LLC,
  Case No. 12-12020 (MG), 2015 WL 2256683 (Bankr. S.D.N.Y. May 11, 2015)...................22

In re Thomson McKinnon Sec. Inc.,
  130 B.R. 717 (Bankr. S.D.N.Y. 1991)............................................................................14, 15

Lone Star Indus., Inc. v. Rankin Cnty., Mississippi Bd. of Supervisors (In re N.Y. Trap
  Rock Corp.),
  153 B.R. 642 (Bankr. S.D.N.Y. 1993)......................................................................................17

Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),
  419 F.3d 115 (2d Cir. 2005).................................................................................... passim

Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,
  507 U.S. 380 (1993).................................................................................................. passim

Williams v. KFC Nat'l Mgmt. Co.,
  391 F.3d 411 (2d Cir. 2004), cert. dismissed 544 U.S. 1012 (2005)......................................16

**Statutes**

28 U.S.C. § 157.........................................................................................................................7

28 U.S.C. § 501.........................................................................................................................7

28 U.S.C. § 1334.......................................................................................................................7

28 U.S.C. § 1408.......................................................................................................................7

28 U.S.C. § 1409.......................................................................................................................7

**Other Authorities**

Fed. R. Bankr. P. 3002.............................................................................................................7

Fed. R. Bankr. P. 3003.............................................................................................................7

Fed. R. Bankr. P. 9006.................................................................................................... passim

Fed. R. Civ. P. 23.....................................................................................................................6

The Ignition Switch Plaintiffs and certain Non-Ignition Switch Plaintiffs respectfully submit, under Bankruptcy Rule 9006(b)(1), this *Motion For An Order Granting Authority To File Late Class Proofs of Claim* (the "**Motion**").[1]   In support of the Motion, the Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Bankruptcy Court held in the April 2015 Decision that:  (i) the Ignition Switch Plaintiffs' due process rights were violated in connection with the November 30, 2009 Bar Date; and (ii) the "obvious" remedy for the due process violation was to grant the Ignition Switch Plaintiffs leave to file late claims.[2]   These holdings were not appealed.

2.      On July 13, 2016, the Second Circuit issued an Opinion upholding the Bankruptcy Court's finding that Old GM knew of the Ignition Switch Defect prior to its June 2009 bankruptcy filing and that the Ignition Switch Plaintiffs were "known" creditors of Old GM whose due process rights were violated.   See Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135, 159-61 (2d Cir. 2016) (the "Opinion").

3.      The Second Circuit vacated the Bankruptcy Court's holding in the April 2015 Decision that, under the doctrine of equitable mootness, GUC Trust Assets could not be tapped to pay any late claims.   See id. at 168-69.

---

[1]     The term "**Ignition Switch Plaintiffs**" shall mean those plaintiffs who, as of November 30, 2009, owned or leased a vehicle with an ignition switch defect included in Recall No. 14V-047 (the "**Ignition Switch Defect**"). The term "**Non-Ignition Switch Plaintiffs**" shall mean those plaintiffs who, as of November 30, 2009, owned or leased a vehicle with defects in ignition switches, side airbags, or power steering included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and 14V-153.  The Ignition Switch Plaintiffs and Non-Ignition Switch Plaintiffs are collectively defined herein as the "**Plaintiffs**." Except where otherwise indicated, references to "ECF No. _" are to docket entries in the Bankruptcy Court proceedings: In re Motors Liquidation Co., Bankr. Case No. 09-50026 (MG).

[2]     See In re Motors Liquidation Co., 529 B.R. 510, 574, 583, 598 (Bankr. S.D.N.Y. 2015), aff'd in part, rev'd in part, vacated in part sub nom. Elliott v. General Motors LLC (In re Motors Liquidation Co.), 829 F.3d 135 (2d Cir. 2016) (the "**April 2015 Decision**").

1

4.    Based on these developments, through this Motion, Plaintiffs seek authority to file two late Proposed Class Claims.[3]  The Proposed Class Claims assert claims against the GUC Trust for:  (i) fraudulent concealment; (ii) unjust enrichment; (iii) consumer protection claims; (iv) breach of the implied warranty of merchantability; and (v) negligence.

5.    The Proposed Class Claims allege that Old GM knew about the Ignition Switch Defect, other defects in ignition switches, defects in side airbags, and defects in power steering for years prior to the Bar Date.  The Proposed Class Claims further allege that Old GM concealed the existence of these defects, causing Plaintiffs to overpay for defective vehicles and bear the costs of repairs while Old GM reaped the benefit of selling defective vehicles by depriving the purchasers of the benefits of their bargains, and thus making them pay more than the cars were worth.

6.    The Motion should be granted as to the Ignition Switch Plaintiffs under the Bankruptcy Court's April 2015 Decision or, in the alternative, under Bankruptcy Rule 9006(b)(1), and, as to the Non-Ignition Switch Plaintiffs, under Bankruptcy Rule 9006(b)(1).[4]

7.    As set forth herein, the Plaintiffs clearly meet the Pioneer factors for establishing excusable neglect for leave to file late proofs of claim: "[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith."  Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).  It is now common knowledge that Old GM fraudulently concealed the Ignition

---

[3]    Attached hereto as **Exhibit A** is a proposed class claim asserted on behalf of Patricia Barker as purported class representative of the Ignition Switch Plaintiffs (the "**Proposed Ignition Switch Class Claim**").  Attached hereto as **Exhibit B** is a proposed class claim asserted on behalf of Yvonne James-Bivins as purported class representative of the Non-Ignition Switch Plaintiffs (the "**Proposed Non-Ignition Switch Class Claim**," together with the Proposed Ignition Switch Class Claim, the "**Proposed Class Claims**").

[4]    The Non-Ignition Switch Plaintiffs reserve all rights to assert that they can file late claims as known creditors who did not receive actual notice of the bar date subject to ongoing discovery in the MDL proceeding.

Switch Defect, a serious safety defect that has caused at least 124 deaths and 274 serious injuries.
The Second Circuit found that "[t]he facts paint a picture that ***Old GM did nothing***, even as it
knew that the ignition switch defect impacted consumers." Elliott, 829 F.3d at 159 (emphasis
added). "[A]s early as August 2001, at least some Old GM engineers understood that turning off
the ignition switch could prevent airbags from deploying[,]" and "[b]y May 2009, at the latest,
Old GM personnel had essentially concluded that the ignition switch, moving stalls, and airbag
non-deployments were related." Id. at 149, 160.[5]

8.    By contrast, the Ignition Switch Plaintiffs were unaware of the Ignition Switch
Defect, which "was not yet so patent that an individual could, as a practical matter, bring a case
in court. The contingency standing in the way was Old GM telling plaintiffs that the ignition
switch defect existed." Id. at 157. Instead, Old GM concealed the Ignition Switch Defect—a
practice that was continued by New GM following the 363 Sale. Although New GM admitted
that it had sufficient knowledge to require disclosure of the Ignition Switch Defect by 2012,[6] it
was not until February and March of 2014, *almost five years* after the 363 Sale, that New GM
finally disclosed the Ignition Switch Defect and issued a recall of vehicles.

9.    As part of its deliberate, systematic, and callous cover-up of the Ignition Switch
Defect, Old GM failed to provide the Ignition Switch Plaintiffs with the notice required by
constitutional due process with respect to the November 30, 2009 Bar Date for filing proofs of
claim against Old GM. See In re Motors Liquidation Co., 529 B.R. 510, 574 (Bankr. S.D.N.Y.

---

[5]    As set forth in more detail *infra* ¶¶ 21-23, later recalls of vehicles with defective ignition switches concerned
defects that are substantially identical to the Ignition Switch Defect. The Second Circuit did not distinguish
between the various recalls for defective ignition switches.

[6]    See Verified Compl., United States v. $900,000,000 in U.S. Currency, No. 15 Civ. 7342 (S.D.N.Y. Sept. 17,
2015) [ECF No. 1], at Ex. C ¶¶ 3, 7-11. Under the terms of this deferred prosecution agreement with the
Department of Justice, New GM forfeited $900 million in exchange for avoiding criminal prosecution in
connection with the company's deception of the government and the public with regard to the Ignition Switch
Defect. See id. at Ex. A.

2015).  It is undisputed that this failure to appropriately notice the Ignition Switch Plaintiffs

precluded them from filing timely proofs of claim.  See id.[7]

10.    The Bankruptcy Court concluded that the "obvious" remedy for this deprivation

of due process is "leave to file late claims."  See id. at 583.  Specifically, the Bankruptcy Court

held that "[the Ignition Switch] Plaintiffs **may file late claims, and to the extent otherwise**

**appropriate such late claims may hereafter be allowed**[.]"  Id. at 598 (emphasis added).  This

finding was not appealed.  Therefore, the Bankruptcy Court should grant the Ignition Switch

Plaintiffs leave to file the late Proposed Ignition Switch Class Claim as clearly permitted by the

April 2015 Decision.

11.    Old GM's concealment of known defects extended far beyond the Ignition Switch

Defect.  As the Second Circuit noted, "Old GM knew about moving stalls and airbag non-

deployments in certain models . . . ."  Elliott, 829 F.3d at 160.  This knowledge extended to the

Non-Ignition Switch Plaintiffs' vehicles, which, like vehicles with the Ignition Switch Defect,

were prone to moving stalls and/or, loss of power brakes and power steering, and/or airbag non-

deployment.[8]  Indeed, the recall notices for many of the Non-Ignition Switch Plaintiffs' vehicles

warn of keys in the ignition moving out of "run" position, turning off the engine, and causing

---

[7]    The Ignition Switch Plaintiffs who owned or leased Old GM vehicles with the Ignition Switch Defect between
July 11, 2009 and November 30, 2009 asserted claims against New GM for its fraudulent concealment of the
right to file a claim against Old GM.  See Fourth Amended Consolidated Complaint, In re Gen. Motors LLC
Ignition Switch Litig., No. 14-MD-2543 (JMF) (S.D.N.Y. Sept. 15, 2016) [ECF No. 3356].  This claim is
subject to an appeal before the District Court for the Southern District of New York with briefing scheduled to
be completed by January 16, 2017.  See Order No. 114, In re Gen. Motors LLC Ignition Switch Litig., No. 14-
MD-2543 (JMF) (S.D.N.Y. Oct. 14, 2016) [ECF No. 3431].  The Ignition Switch Plaintiffs reserve all rights
with respect to this claim.

[8]    See Proposed Non-Ignition Switch Class Claim ¶¶ 23-30, 34, 38-39, 43-70, 73-74, 77-81, 85-92, 98-106, 109,
119-25 (describing, inter alia, customer complaints, injuries and deaths, internal emails, and communications to
dealerships related to the defects in the Non-Ignition Switch Plaintiffs' vehicles).  Discovery for the Non-
Ignition Switch Plaintiffs' claims is ongoing in the MDL proceeding.

airbag non-deployment—the same issues created by the Ignition Switch Defect.[9]  Similar to the

Ignition Switch Defect, these defects were not disclosed until recalls were issued in 2014.

     12.    As a result of Old GM's concealment of the Ignition Switch Defect and other

defects, the Plaintiffs had no knowledge that their vehicles were defective and, as a result, no

control over their ability to file a timely proof of claim.  Thus, the key Pioneer factor in

determining whether excusable neglect exists—the reason for delay—is met and granting the

Plaintiffs leave to file the Proposed Class Claims is appropriate under Fed. R. Bankr. P.

9006(b)(1).[10]

     13.    The remaining Pioneer factors provide additional support for a finding of

"excusable neglect."  First, there is no danger of prejudice to the debtor, given that Old GM has

liquidated.  The size of the Plaintiffs' claim is likely to be significant and could potentially serve

to challenge the recovery already obtained by other creditors with allowed general unsecured

claims.  However, and even assuming that prior distributions to other creditors cannot be upset,

partial relief still can be fashioned by granting Plaintiffs exclusive access and/or priority as to

any value generated under the accordion feature, the remaining assets held by the GUC Trust,

and assets of the Avoidance Action Trust.[11]  Given that Old GM was aware of the Plaintiffs'

claims at the time the Plan was negotiated and confirmed, and chose not to disclose them, the

only party substantially prejudiced was the Plaintiffs.

---

[9]    See Proposed Non-Ignition Switch Class Claim ¶¶ 19-20, 33, 37; June 20, 2014 recall notice, attached to the *Declaration of Edward S. Weisfelner in Support of Designated Counsel's Opposition to New GM's Motions for Enforcement of Sale Order and Injunction*, dated December 16, 2014 [ECF No. 13026] (the "**Weisfelner Decl.**"), Ex. G; July 2 and July 3, 2014 recall notices, attached to the Weisfelner Decl. as Ex. H.

[10]   To the extent the Non-Ignition Switch Plaintiffs are required to further prove that they were known creditors of GM, they will attempt to do so at the appropriate time after the conclusion of any necessary discovery.

[11]   Plaintiffs reserve the right to seek to claw back distributions of GUC Trust Assets to effectuate *pari passu* recoveries for any Allowed General Unsecured Claims obtained by Plaintiffs.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 41 of 269
09-50026-mg   Doc 13806   Filed 12/23/16   Entered 12/23/16 16:08:56   Main Document
Late Class Claims   Pg 10 of 23   Pg 11 of 231

14.     Second, the Plaintiffs have acted diligently to advance the Proposed Class Claims

and the delay in filing, if one exists, is insubstantial.  The Bankruptcy Court tolled the Plaintiffs'

time to file the Motion until final resolution of all Threshold Issues, including appeals.[12]  Thus,

the relevant delay, if any can be said to exist, is the minimal time that has elapsed since entry of

the Second Circuit's order denying New GM's petition for panel rehearing or rehearing *en banc*

(the "**Order Denying Rehearing**").[13]  Further, given that New GM has filed a petition for writ

of *certiorari* with the United States Supreme Court, the Plaintiffs' time to file the Motion may be

further tolled.[14]

15.     Third, the Plaintiffs acted in good faith, failing to file timely proofs of claim

solely because Old GM failed to disclose the numerous defects in its vehicles.  Indeed, Old GM

admittedly disregarded its duty to issue a timely recall or provide constitutionally adequate

notice in connection with the Ignition Switch Defect.

16.     Accordingly, this Court should grant the Plaintiffs leave to file the Proposed Class

Claims.  Thereafter, the Plaintiffs intend to seek application of Federal Rule of Civil Procedure

23 to the Proposed Class Claims and to certify the proposed classes and subclasses at the

---

[12]   See *Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect Thereto, and (III) Adversary Proceeding No. 14-01929*, dated May 16, 2014 [ECF No. 12697] (the "**Scheduling Order**") at 3 (ordering that "the GUC Trust agree[d] that it shall not assert a timeliness objection to any claims that the Plaintiffs may attempt to assert against the Old GM bankruptcy estate and/or the GUC Trust, based directly or indirectly on the ignition switch issue, as a result of Plaintiffs' delay in asserting such claims" during the period starting May 16, 2014, and continuing through 30 days from the entry of a final order with no pending appeals with respect to the Threshold Issues); *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770], at 4-5 (listing threshold issues relating to the Ignition Switch Defect for judicial determination by the Bankruptcy Court (the "**Threshold Issues**")).

[13]   See *Order*, Elliott v. General Motors LLC (In re Motors Liquidation Co.), Docket No. 15-2884-bk(L) (2d Cir. Sept. 14, 2016) [ECF No. 443].

[14]   See Petition for Writ of Certiorari, General Motors LLC v. Elliott, No. 16-764 (Dec. 13, 2016).

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 42 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 16:08:56    Main Document
Late Class Claims    Pg 11 of 28    of 231

appropriate time after the conclusion of any necessary discovery, including the discovery taking

place in In re General Motors LLC Ignition Switch Litigation, MDL No. 2543 (JMF) (S.D.N.Y.).


## JURISDICTION

17.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

18.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.    The statutory predicates for the relief sought in this Motion are Bankruptcy Code

Section 501 and Bankruptcy Rules 3002, 3003 and 9006.

## BACKGROUND

I.    **The Recalls.**

20.    In February and March 2014, New GM for the first time publicly disclosed the

existence of the Ignition Switch Defect and issued a recall, NHTSA Recall Number 14V-047.

This recall impacts approximately 1.6 million vehicles owned or leased by Ignition Switch

Plaintiffs.

21.    Following this recall, New GM issued three additional recalls in June and July

2014 affecting approximately 8.7 million vehicles with defective ignition switches owned or

leased by Non-Ignition Switch Plaintiffs.[15]  These vehicles contain ignition switches with defects

substantially similar to the Ignition Switch Defect.[16]

22.    The June 20, 2014 recall, NHTSA Recall Number 14V-355, concerned the

"ignition key slot defect."[17]  The recall notice identified similar issues to those in vehicles with

---

[15]    See June 20, 2014 recall notice, attached to the Weisfelner Decl. as Ex. G; July 2 and July 3, 2014 recall
notices, attached to the Weisfelner Decl. as Ex. H.

[16]    See Proposed Non-Ignition Switch Class Claim ¶¶ 16-21, 31-42.

[17]    See June 20, 2014 recall notice, attached to the Weisfelner Decl. as Ex. G.

the Ignition Switch Defect—keys in the ignition moving out of the "run" position, turning off the
engine, causing loss of power steering and power brakes, as well as airbag non-deployment.[18]
Old GM was long aware of the ignition key slot defect.  For example, emails from 2005 from an
Old GM design engineer to other Old GM employees describe the defect, pinpoint the cause as
weak detent plungers, and recognize that "this is a serious safety problem."[19]  Old GM also
received numerous consumer reports of complaints, crashes, injuries and deaths linked to the
safety defect from 2001 through the end of its corporate existence.[20]

23.    The July 2 and 3, 2014 recalls, NHTSA Recall Numbers 14V-394 and 14V-400,
concerned the "unintended ignition rotation defect," yet another defect in which keys in the
ignition moved out of the "run" position, turning off the engine and causing loss of power
steering and power brakes as well as airbag non-deployment.[21]  Old GM was aware of this defect
for years.  For example, Old GM issued a voicemail to dealerships in 2003 identifying the defect,
issued work orders to increase the detent plunger force on ignition switches for many of these
vehicles, and received numerous consumer reports regarding the defect.[22]

24.    Throughout 2014, New GM issued numerous other recalls for safety defects,
including the approximately one million vehicles with defective side airbags and defective power
steering owned or leased by Non-Ignition Switch Plaintiffs.[23]  NHTSA Recall Number 14V-118
concerned defective side airbags and NHTSA Recall Number 14V-153 concerned defective
power steering.  Old GM was aware of these additional defects, as evidenced by, *inter alia*,

---

[18]    See id.

[19]    See E-mail from Laura Andres, General Motors, to Jim Zito, General Motors (Aug. 30, 2005, 3:39 p.m.)
(GMHEC000442219), attached to the Weisfelner Decl. as Ex. C.

[20]    See Proposed Non-Ignition Switch Class Claim ¶¶ 26-30.

[21]    See July 2 and July 3, 2014 recall notice, attached to the Weisfelner Decl. as Ex. H.

[22]    See Proposed Non-Ignition Switch Class Claim ¶¶ 43-70.

[23]    See id. ¶¶ 72-74, 83-86.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 44 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 16:08:56    Main Document
Late Class Claims    Pg 13 of 28    14 of 231

warranty claims, customer complaints, dealer reports to Old GM call centers, and internal investigations.[24]

25.    While Old GM knew about these defects, the Plaintiffs did not learn of their existence until New GM issued the recalls in 2014.

## II.    The Bar Date And Late Filed Claims Orders.

26.    In September 2009, approximately two months after the 363 Sale, the Bankruptcy Court entered an Order establishing November 30, 2009 as the Bar Date for filing proofs of claim against Old GM.  See In re Motors Liquidation Co., 529 B.R. at 535.

27.    Early in 2012, the GUC Trust filed a motion to disallow late filed claims.  See id. at 537.  In February 2012, the Bankruptcy Court issued the Late Filed Claims Order, which establishes that:

> all claims filed against [Old GM] on or after the date of entry of this Order shall be deemed disallowed (each, a "**Late Claim**"), except any Late Claim (i) which amends a timely filed claim, (ii) which is filed with the written consent of the GUC Trust, or (iii) *as to which the Court has entered an order deeming such late Claim timely filed*[.][25]

28.    The Late Filed Claims Order provides that "***nothing in this Order shall prevent any claimant submitting a Late Claim from filing a motion with the Court seeking to have its Late Claim deemed timely filed[.]***"  Late Filed Claims Order at 2 (emphasis added).

---

[24]    See, e.g., id. ¶¶ 77-81, 88-92.

[25]    *Order Approving Motion Pursuant to Bankruptcy Rule 3003 and Section 105(a) of the Bankruptcy Code for an Order Disallowing Certain Late Filed Claims*, dated February 8, 2012 [ECF No. 11394] (the "**Late Filed Claims Order**") at 1-2 (second emphasis added).

## III.    Proceedings In The Bankruptcy Court and Second Circuit Following The Disclosure Of Numerous Defects In Old GM And New GM Vehicles.

29.    In April 2014, New GM sought to enjoin numerous class actions arising out of the Ignition Switch Defect by filing the Ignition Switch Motion to Enforce.[26]    New GM subsequently filed a Motion to Enforce with respect to Non-Ignition Switch Plaintiffs in August 2014; however, all issues were "deferred pending the determination of the issues" presented by the Ignition Switch Motion to Enforce.[27]

30.    The Bankruptcy Court identified Threshold Issues relating to the Ignition Switch Motion to Enforce, including "[w]hether any or all of the claims asserted in the Ignition Switch Actions are claims against the Old GM bankruptcy estate (and/or the GUC Trust)" and, if so, whether such claims should "nevertheless be disallowed/dismissed on grounds of equitable mootness . . . ."[28]

31.    In April and June 2015, the Bankruptcy Court entered its April 2015 Decision and Judgment on the Threshold Issues and certified each for direct appeal to the Second Circuit.[29]    In the April 2015 Decision, the Bankruptcy Court held that Old GM failed to provide constitutionally adequate notice of the Bar Date to the Ignition Switch Plaintiffs.  See In re Motors Liquidation Co., 529 B.R. at 525.  The Bankruptcy Court held that "[b]y reason of its failure to provide the Plaintiffs with either the notice required under the Safety Act or any other

---

[26]    See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction*, dated April 21, 2014 [ECF No. 12620] (the "**Ignition Switch Motion to Enforce**").

[27]    See *Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 to Enforce the Court's July 5, 2009 Sale Order and Injunction (Monetary Relief Actions, Other Than Ignition Switch Actions)*, dated August 1, 2014 [ECF No. 12808]; In re Motors Liquidation Co., 529 B.R. at 523.

[28]    See *Supplemental Scheduling Order Regarding (I) Motion of General Motors LLC Pursuant to 11 U.S.C. §§ 105 and 363 To Enforce the Court's July 5, 2009 Sale Order and Injunction, (II) Objection Filed by Certain Plaintiffs in Respect thereto, and (III) Adversary Proceeding No. 14-01929*, dated July 11, 2014 [ECF No. 12770], at 3; In re Motors Liquidation Co., 529 B.R. at 539-40.

[29]    See In re Motors Liquidation Co., 529 B.R. at 597-98; *Judgment*, dated June 1, 2015 [ECF No. 13177] (the "**Judgment**"); *Order, Pursuant to 28 U.S.C. § 158(d), and Fed. R. Bankr. P. 8006(e), Certifying Judgment for Direct Appeal to Second Circuit*, dated June 1, 2015 [ECF No. 13178].

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 46 of 269
09-50026-mg   Doc 13806   Filed 12/22/16   Entered 12/22/16 18:29:24   Main Document
Late Class Claims   Pg 16 of 231   Pg 15 of 28

form of written notice, Old GM failed to provide the Plaintiffs with the notice that due process

requires.  And because that failure prejudiced them in filing timely claims, the Plaintiffs were

prejudiced as a result."  Id. at 574 (footnote omitted).  Thus, the Ignition Switch Plaintiffs' due

process rights were violated.  See id.  This holding was not appealed.

32.     The Bankruptcy Court expressly recognized that "[t]he remedy with respect to the

denial of notice sufficient to enable the filing of claims before the Bar Date is obvious.  That is

leave to file late claims.  And the Court may grant leave from the deadline imposed by the

Court's Bar Date Order[.]"  Id. at 583.  Thus, the Bankruptcy Court instructed that the Ignition

Switch Plaintiffs may file late claims.  See id. at 598.  Likewise, the Judgment states that:

> Plaintiffs were prejudiced by the failure to receive the notice due process required
> of the deadline ("**Bar Date**") to file proofs of claim against the Old GM
> bankruptcy estate.  Any Plaintiff may petition the Bankruptcy Court (on motion
> and notice) for authorization to file a late or amended proof of claim against the
> Old GM bankruptcy estate.

See Judgment ¶ 6.

33.     However, under the doctrine of equitable mootness, the April 2015 Decision and

Judgment provide that GUC Trust Assets cannot be tapped to pay any late claims filed by the

Plaintiffs that might be allowed.  See In re Motors Liquidation Co., 529 B.R. at 529; Judgment ¶

6. On direct appeal, the Second Circuit vacated that ruling as an advisory opinion.  See Elliott,

829 F.3d at 168-69.

34.     In September 2016, the Second Circuit issued its mandate remanding the case to

the Bankruptcy Court for further proceedings consistent with the Opinion.[30]  Thereafter, the

Bankruptcy Court issued an Order to Show Cause identifying initial issues to be addressed on

---

[30]   Mandate, Elliott v. General Motors LLC, Docket Nos. 15-2844(L), 15-2847(XAP), 15-2848(XAP) (2d Cir.
Sept. 30, 2016) (ECF No. 454).

remand.[31]    Among these issues is whether "the Ignition Switch Plaintiffs and/or Non-Ignition
Switch Plaintiffs satisfy the requirements for authorization to file late proof(s) of claim against
the GUC Trust and/or are such claims equitably moot . . . ."[32]

## IV.    The Plaintiffs' Proposed Class Claims Against Old GM.

35.    The proposed class in the Proposed Ignition Switch Class Claim consists of all
persons in the United States who, as of November 30, 2009, either owned or leased a defective
Old GM vehicle included in Recall No. 14V-047.[33]    The approximate number of defective
vehicles owned by members of this proposed class is 1.6 million.[34]

36.    The proposed class in the Proposed Non-Ignition Switch Class Claim consists of
all persons in the United States who, as of November 30, 2009, either owned or leased a
defective Old GM vehicle included in Recall Nos. 14V-355, 14V-394, 14V-400, 14V-118 and
14V-153.[35]    The approximate number of defective vehicles owned by members of this proposed
class is approximately 9.8 million.[36]

---

[31]    *Order to Show Cause Regarding Certain Issues Arising from Lawsuits with Claims Asserted Against General Motors LLC ("New GM") that Involve Vehicles Manufactured by General Motors Corporation ("Old GM")*, dated Dec. 13, 2016 (ECF No. 13802) (the "**Order to Show Cause**").

[32]    Id. at 3.

[33]    These vehicles include: 2005-2010 Chevy Cobalt; 2006-2010 Chevy HHR; 2007-2010 Pontiac G5; 2007-2010 Saturn Sky; 2003-2007 Saturn Ion; and 2006-2010 Pontiac Solstice.  See Proposed Ignition Switch Class Claim ¶ 303.  Claims for breach of implied warranty and negligence are asserted on behalf of two subclasses consisting of persons with vehicles sold or leased as new prior to November 30, 2009 in certain states.  See id. ¶¶ 304-05.

[34]    See id. ¶ 5.

[35]    These vehicles include: 2005-2009 Buick Lacrosse; 2000-2010 Chevrolet Impala; 2000-2005 Cadillac Deville; 2006-2010 Cadillac DTS; 2006-2010 Buick Lucerne; 2000-2008 Chevrolet Monte Carlo; 2003-2010 Cadillac CTS; 2004-2006 Cadillac SRX; 1997-2005 Chevrolet Malibu; 2000-2005 Pontiac Grand Am; 2004-2008 Pontiac Grand Prix; 1998-2002 Oldsmobile Intrigue; 1999-2004 Oldsmobile Alero; 2008-2010 Buick Enclave; 2009-2010 Chevrolet Traverse; 2008-2010 Acadia; 2008-2010 Saturn Outlook; 2004-2009 Chevrolet Malibu; 2004-2006 Chevrolet Malibu Maxx; 2009-2010 Chevrolet HHR; 2010 Chevrolet Cobalt; and 2005-2009 and 2008-2009 Pontiac G6.  See Proposed Non-Ignition Switch Class Claim ¶ 4.  Claims for breach of implied warranty and negligence are asserted on behalf of two subclasses consisting of persons with vehicles sold or leased as new prior to November 30, 2009 in certain states.  See id. ¶¶ 2, 8.

[36]    See id. ¶ 5.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 48 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 16:03:50    Main Document
Late Class Claims    Pg 15 of 218 of 231

37.    The Proposed Class Claims allege that Old GM failed to disclose, and actively concealed, the defective ignition switches, including the Ignition Switch Defect, defective side airbags and defective power steering, despite knowing about these defects for years.[37]    The Proposed Class Claims further allege that Old GM's corporate culture devalued safety and emphasized cost cutting, as evidenced by, *inter alia*, instructing employees not to use words like "defect," "problem" or "safety."[38]    In addition, the Proposed Class Claims allege that, as part of its campaign of deception, Old GM led the Plaintiffs to believe that Old GM vehicles were safe and reliable through various advertisements and press releases claiming, *inter alia*, that Old GM vehicles have "surprising levels of safety," "[v]ehicle safety is paramount at GM," and "GM is a leader in automotive safety."[39]

38.    Based on these allegations, the Proposed Class Claims assert claims for:

(i)    fraudulent concealment arising from, *inter alia*, Old GM's failure to disclose and active concealment of the various defects in Old GM vehicles;[40]

(ii)    unjust enrichment arising from Old GM's inequitable retention of the benefits of selling and leasing defective cars for more than they were worth while avoiding the costs of a recall and additional lawsuits at the expense of the Plaintiffs;[41]

(iii)    violation of consumer protection statutes arising from Old GM's deceptive, unfair, and/or unlawful business practices, including false representations of the quality of Old GM vehicles and concealment of the various defects in its vehicles;[42]

(iv)    breach of the implied warranty of merchantability arising from Old GM supplying vehicles with safety defects in breach of its implied warranty that its vehicles were merchantable and fit for their ordinary purpose;[43] and

---

[37]    See Proposed Ignition Switch Class Claim ¶¶ 9-258; Proposed Non-Ignition Switch Class Claim ¶¶ 9-146.

[38]    See Proposed Ignition Switch Class Claim ¶¶ 244-58; Proposed Non-Ignition Switch Class Claim ¶¶ 147-61.

[39]    See Proposed Ignition Switch Class Claim ¶¶ 259-99; Proposed Non-Ignition Switch Class Claim ¶¶ 162-216.

[40]    See Proposed Ignition Switch Class Claim ¶¶ 316-33; Proposed Non-Ignition Switch Class Claim ¶¶ 233-50.

[41]    See Proposed Ignition Switch Class Claim ¶¶ 334-44; Proposed Non-Ignition Switch Class Claim ¶¶ 251-61.

[42]    See Proposed Ignition Switch Class Claim ¶¶ 345-89; Proposed Non-Ignition Switch Class Claim ¶¶ 262-306.

[43]    See Proposed Ignition Switch Class Claim ¶¶ 390-407; Proposed Non-Ignition Switch Class Claim ¶¶ 307-26.

(v)  negligence arising from Old GM's breach of its duty to design and manufacture a
safe product by supplying vehicles with safety defects and failing to warn
purchasers of the defects in its vehicles.[44]

## ARGUMENT

I.    **The Ignition Switch Plaintiffs Should Be Permitted To File The
Proposed Ignition Switch Class Claim In Accordance With The April 2015 Decision.**

39.    The Bankruptcy Court's April 2015 Decision held that Old GM violated the

Ignition Switch Plaintiffs' due process rights by failing to provide them constitutionally adequate

notice of the Bar Date.   See In re Motors Liquidation Co., 529 B.R. at 574.   It expressly

recognized that the appropriate remedy for this due process violation was leave to file late

claims, concluding that the Ignition Switch Plaintiffs "may file late claims, and to the extent

otherwise appropriate such late claims may hereafter be allowed . . . ."   See id. at 583, 598.

Thus, because the April 2015 Decision clearly endorsed the filing of late claims by the Ignition

Switch Plaintiffs, the Motion to file those late claims should be granted.

40.    The remedy identified in the April 2015 Decision is supported by case law.  A bar

date is not enforced when a known creditor fails to receive constitutionally adequate notice

thereof.  See City of New York v. N.Y., New Haven & Hartford R.R. Co., 344 U.S. 293, 296-97

(finding that the bar date order could not be sustained absent constitutionally appropriate notice),

motion to modify denied, 345 U.S. 901 (1953); In re AMR Corp., 492 B.R. 660, 663 (Bankr.

S.D.N.Y. 2013) ("The bar date is strictly enforced except when a known creditor is not listed on

the schedules and fails to receive notice of the bar date."); Indian Motocycle Assocs., Inc. v.

Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 151 B.R. 674,

680-82 (Bankr. S.D.N.Y.) (holding that known creditor who did not receive actual notice of bar

date could file late proof of claim), aff'd, 157 B.R. 532 (S.D.N.Y. 1993); In re Thomson

---

[44]    See Proposed Ignition Switch Class Claim ¶¶ 408-18; Proposed Non-Ignition Switch Class Claim ¶¶ 327-37.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 50 of 269
09-50026-mg   Doc 13806   Filed 12/22/16   Entered 12/22/16 18:08:20   Main Document
Late Class Claims   Pg 19 of 28
09-50026-mg   Doc 14695-1   Filed 12/22/16   Entered 12/22/16 09:56:24   Exhibit 1
Pg 20 of 231

McKinnon Sec. Inc., 130 B.R. 717, 720-21 (Bankr. S.D.N.Y. 1991) (holding that known creditor

was not time-barred when debtor failed to give actual notice of the bar date order).

41.     Old GM failed to provide the Ignition Switch Plaintiffs notice of the Bar Date as

required by due process.   See In re Motors Liquidation Co., 529 B.R. at 574.   Thus, as the

Bankruptcy Court has already concluded, the Ignition Switch Plaintiffs should be granted leave

to file the Proposed Ignition Switch Class Claim.

## II.     The Plaintiffs Should Be Permitted Under Bankruptcy Rule 9006(b)(1) To File The Proposed Class Claims Under A Theory Of Excusable Neglect.

### A.     Legal Standard For Leave To File A Late Claim Under A Theory Of Excusable Neglect.

42.     Bankruptcy Rule 9006(b)(1) provides that a court may permit late proofs of claim

where the failure to file a claim by the bar date "was the result of excusable neglect." Fed. R.

Bankr. P. 9006(b)(1).   The determination of excusable neglect "is an equitable one, taking

account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co.

v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).

43.     The Supreme Court has identified four factors—known as the Pioneer factors—in

determining whether there has been excusable neglect:

> [1] the danger of prejudice to the debtor, [2] the length of the delay and its
> potential impact on judicial proceedings, [3] the reason for the delay, including
> whether it was within the reasonable control of the movant, and [4] whether the
> movant acted in good faith.

Id. (citation and footnote omitted).

44.     All four Pioneer factors need not favor the movant in order to permit a late claim.

See In re Enron Creditors Recovery Corp., 370 B.R. 90, 101 (Bankr. S.D.N.Y. 2007).   Of the

four, the factor given the most weight is the reason for filing a late claim, including whether a

timely filing was within the creditor's reasonable control.   See, e.g., Midland Cogeneration

Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 122 (2d Cir. 2005);

Williams v. KFC Nat'l Mgmt. Co., 391 F.3d 411, 415-16 (2d Cir. 2004) ("[T]he reason for the

delay . . . predominates, and the other three [factors] are significant only in close cases."), cert.

dismissed 544 U.S. 1012 (2005); In re Residential Capital, LLC, Case No. 12-12020 (MG), 2015

WL 515387, at *5 (S.D.N.Y. Feb. 6, 2015) ("[T]his Court should focus it analysis 'primarily on

the reason for the delay, and specifically whether the delay was in the reasonable control of the

movant.'") (citation omitted).

### B.   The Plaintiffs' Failure To File Timely Proofs Of Claim Was Caused By Old GM's Actions, And Was Not Within The Plaintiffs' Control.

45.    It was Old GM's decision to conceal the Ignition Switch Defect and other defects,

and its failure to provide constitutionally adequate notice of the Bar Date Order that prevented

the Plaintiffs from complying with the Bar Date Order.  The key Pioneer factor—whether the

failure to file a timely proof of claim was under the control of the claimant—thus weighs heavily

in favor of permitting the Plaintiffs to file the Proposed Class Claims, as the Plaintiffs did not

receive constitutionally adequate notice of the Bar Date.

46.     Where a creditor is unaware of a bar date due to circumstances beyond the

creditor's control, including the debtor's failure to give appropriate notice, there is no question

that the creditor's "neglect" is excusable.  See, e.g., Pioneer, 507 U.S. at 398-99 (noting that, in

assessing culpability of counsel in the late filing, a significant consideration was "the unusual

form of notice employed" that failed to indicate the significance of the bar date); In re Interstate

Cigar Co., 150 B.R. 305, 310-11 (Bankr. E.D.N.Y. 1993) (known creditor established excusable

neglect when debtor failed to provide actual notice of the bar dates and actively misled creditor

about possible claims it may have against the debtor).

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 52 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 15:08:56    Main Document
Late Class Claims    Pg 21 of 22 of 231

47.     For example, in <u>In re Arts des Provinces de France</u>, the debtors sent notice of the bar date to "D&D," a creditor, in contravention of a Notice of Appearance requesting that all notices be directed to D&D's counsel. <u>See</u> <u>In re Arts des Provinces de France, Inc.</u>, 153 B.R. 144, 147 (Bankr. S.D.N.Y. 1993). In addition, the debtors failed to list D&D as a creditor on their schedules. <u>See</u> <u>id.</u> Although D&D received actual notice of the bar date, and forwarded it to its counsel prior to the bar date, the court found excusable neglect "because the delay could have been avoided if the debtors had complied with bankruptcy procedure by properly listing D&D as a creditor and serving notice of the bar date on D&D's counsel . . . ." <u>Id.</u> Thus, D&D's late proof of claim was deemed timely filed. <u>See</u> <u>id.</u>

48.     Similarly, excusable neglect is found when a claimant, through no fault of its own, is unaware of its claim prior to the bar date. <u>See</u> <u>In re PT-1 Commc'ns, Inc.</u>, 292 B.R. 482, 489 (Bankr. E.D.N.Y. 2003) (allowing filing of late claim where movant, who received notice of the bar date, had "no reason on the basis of the facts known to it prior to the Bar Date to conclude that it had a claim against" the debtor); <u>cf.</u> <u>Lone Star Indus., Inc. v. Rankin Cnty., Mississippi Bd. of Supervisors (In re N.Y. Trap Rock Corp.)</u>, 153 B.R. 642, 647 (Bankr. S.D.N.Y. 1993) (finding that excusable neglect may exist when untimely filing of a proof of claim "was beyond [claimant's] control, in that it did not receive notice of the bar date and it did not learn of the existence of [its] claim until after the bar date expired").

49.     Here, as the Second Circuit found, the Ignition Switch Plaintiffs' ability to pursue claims against Old GM was fully contingent on "Old GM telling plaintiffs that the ignition switch defect existed." <u>See</u> <u>Elliott</u>, 829 F.3d at 157. But Old GM never publicly disclosed the Ignition Switch Defect. <u>See</u> <u>id.</u> at 149-50. Old GM's fraudulent concealment of the Ignition Switch Defect, despite its duty to provide notice to the Ignition Switch Plaintiffs under the Safety

Act prior to the Bar Date, eliminated any possibility that the Ignition Switch Plaintiffs could timely file claims with respect to the Ignition Switch Defect.  See In re Motors Liquidation Co., 529 B.R. at 574 ("[T]he denial of timely notice of the Old GM Bar Date prejudiced the Plaintiffs with respect to any claims they might have filed against Old GM.").

50.    Likewise, neither Old GM nor New GM publicly disclosed the numerous other defects plaguing Old GM and New GM vehicles until Spring and Fall of 2014.  The Non-Ignition Switch Plaintiffs had no knowledge of these defects and no reason to conclude that they had a claim against Old GM as of the Bar Date.

51.    Moreover, Plaintiffs are taking every reasonable step to pursue their claims against Old GM.  Given the tolling mechanism under the May 16, 2014 Scheduling Order, ongoing discovery with respect to the defects, the Order Denying Rehearing, and New GM's petition for writ of *certiorari* with the United States Supreme Court, it would not have been efficient or practical for Plaintiffs to have asserted proofs of claim any earlier.

52.    In sum, the circumstances that delayed the Plaintiffs' Proposed Class Claims—Old GM's cover-up of the Ignition Switch Defect and other defects—were beyond the Plaintiffs' control.  Had Old GM provided the Plaintiffs with adequate notice and appropriately disclosed the existence of the defects, there would have been no delay in filing.  Accordingly, this Pioneer factor heavily supports granting leave to file the Proposed Class Claims.

### C.    The Remaining Pioneer Factors Weigh Strongly In Favor Of Allowing The Plaintiffs To File The Proposed Class Claims.

53.    The remaining Pioneer factors—prejudice, length of delay, and good faith—are typically given less weight than the reason for the delay and "usually weigh in favor of the party seeking the extension."  Midland Cogeneration, 419 F.3d at 122 (citation omitted); see also In re Enron Creditors Recovery Corp., 370 B.R. at 101 (explaining that courts in the Second Circuit

focus on the reason for delay and, in the typical case, find that the remaining factors favor the movant).  Nevertheless, each of these factors weighs in favor of granting the Motion.

### i.    Allowing The Plaintiffs To File The
Proposed Class Claims Will Not Prejudice The Debtor.

54.    The first of the remaining Pioneer factors is whether permitting a late proof of claim will prejudice the debtor.  See Pioneer Inv. Servs., 507 U.S. at 395.  In determining whether the debtor will be prejudiced by the late claim, a court looks to "the adverse impact that a late claim may have on the judicial administration of the case," including such factors as "the size of the late claim in relation to the estate, whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, [and] the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated."    In re Keene Corp., 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); see also In re BGI, Inc., 476 B.R. 812, 824 (Bankr. S.D.N.Y. 2012).

55.    As an initial matter, the GUC Trust cannot claim prejudice because Old GM was aware of the Plaintiffs' claims at the time of the Bar Date and Plan, but failed to make appropriate disclosures to enable the Plaintiffs to timely advance their claims.  See In re Arts des Provinces de France, 153 B.R. at 147.  Moreover, allowing the Plaintiffs to file the Proposed Class Claims likely will not disrupt the administration of the GUC Trust.  The GUC Trust Administrator has the right to allow or oppose the Plaintiffs' Proposed Class Claims on the merits.[45]    The GUC Trust has no plans to wind down in the near term and currently has administrative reserves of approximately $41.4 million, subject to increase upon Bankruptcy

---

[45]    See *Second Amended and Restated Motors Liquidation Company GUC Trust Agreement, dated as of July 30, 2015, by and among Wilmington Trust Company, as trust administrator and trustee of the GUC Trust and FTI Consulting, Inc., as trust monitor of the GUC Trust*, dated as of July 30, 2015 (the "**GUC Trust Agreement**"), § 5.1.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 55 of 269
09-50026-mg   Doc 13806   Filed 12/22/16   Entered 12/22/16 15:08:58   Main Document
Late Class Claims   Pg 24 of 25   of 231

Court order.[46]   A remedy for the Plaintiffs may be fashioned, even without upsetting
distributions already made, by granting them exclusive access to any value generated under the
accordion feature and as to the remaining assets held by the GUC Trust.  In addition, should the
Proposed Class Claims be allowed, the Plaintiffs may also be entitled to the proceeds, if any, of
the Avoidance Action Trust.[47]

56.   The accordion provision requires New GM to issue additional shares of New GM
common stock to the GUC Trust if and when the aggregate amount of allowed unsecured claims
against Old GM exceeds $35 billion.[48]   Unitholders could not reasonably expect the potential
value of the accordion feature to flow to them as existing claims do not trigger the additional
consideration under the accordion feature.  Such value will only be triggered if and when
Plaintiffs' claims are allowed at an amount that carries the aggregate allowed general unsecured
claim amount over the threshold.

57.   Accordingly, this <u>Pioneer</u> factor supports granting the Motion.

**ii.   Under The Circumstances, The Length Of Delay Is
Acceptable And Allowing The Plaintiffs To File The Proposed Class
<u>Claims Will Not Adversely Impact The Current Judicial Proceedings</u>.**

58.   While there is no bright line for determining what length of delay is acceptable in
seeking to file a late proof of claim, "courts generally consider the degree to which, in the
context of a particular proceeding, the delay 'may disrupt the judicial administration of the
case.'"   <u>Midland Cogeneration</u>, 419 F.3d at 128 (citations omitted).

---

[46]   <u>See</u> *Motors Liquidation Company GUC Trust Quarterly GUC Trust Reports as of September 30, 2016*, dated Nov. 11, 2016 [ECF No. 13788], at 13; *Motors Liquidation Company Quarterly GUC Trust Reports as of June 30, 2016*, dated Aug. 12, 2016 [ECF No. 13731], at 20; GUC Trust Agreement § 6.1.

[47]   <u>See</u> *Second Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement*, dated August 25, 2016 [ECF No. 13747-1], at §§ 1.1(e), 1.1(f), 1.1(cc), 1.1(qqq), 5.1(d), 5.2, 5.3.

[48]   <u>See</u> *Second Amended and Restated Master Sale and Purchase Agreement, by and among General Motors Corporation, Saturn LLC, Saturn Distribution Corporation and Chevrolet-Saturn of Harlem, Inc., as Sellers, and NGMCO, Inc., as Purchaser*, dated as of June 26, 2009, § 3.2(c).

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 56 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 16:02:56    Main Document
Late Class Claims    Pg 25 of 26    Pg 26 of 231

59.    Here, the Plaintiffs acted diligently in filing the Motion.  The relevant delay, if any can be said to exist, is the insubstantial time that has elapsed since entry of the Order Denying Rehearing.  See In re Ciena Capital LLC, No. 08-13783 (AJG), 2010 WL 3156538, at *3 (Bankr. S.D.N.Y. Aug. 10, 2010) (eighteen month delay not substantial); In re PT-1 Commc'ns, Inc., 292 B.R. at 489 (delay of three and a half months after discovery of alleged liability not substantial).

60.    Moreover, any delay should be discounted and the GUC Trust should be deemed to be on notice that the Plaintiffs had claims against the Old GM estate as of the Bar Date because of Old GM's knowledge of the Ignition Switch Defect and other defects, which Old GM failed to disclose.  See In re Ciena Capital LLC, 2010 WL 3156538, at *3 (holding that the "length of delay" Pioneer factor weighed in favor of allowing the late claim because, inter alia, the debtors were on notice since prior to the bar date that the claim "existed in some capacity").

61.    Finally, the timeliness evaluation "take[s] into account the creditor's explanation for delay.  Thus, a long delay . . . with a strong explanation might be more acceptable than a short delay with a weak explanation . . . ."  Midland Cogeneration, 419 F.3d at 129.  The Plaintiffs have a historically strong explanation for their delay in filing the Proposed Class Claims—Old GM's and New GM's concealment of the Ignition Switch Defect and other defects, which New GM's CEO Mary Barra admits was "unacceptable."[49]  Thus, this Pioneer factor supports granting the Motion.

---

[49]    See The GM Ignition Switch Recall: Why Did It Take So Long?, Hearing Before the H.R. Subcomm. on Oversight and Investigations, Comm. on Energy and Commerce (2014), available at http://docs.house.gov/committee/Calendar/ByEvent.aspx?EventID=102033.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 57 of 269
09-50026-mg    Doc 13806-1    Filed 02/27/19    Entered 02/27/19 16:08:56    Main Document
Late Class Claims    Pg 28 of 227 of 231

### iii.    The Plaintiffs Acted In Good Faith With
### Respect To Filing The Proposed Class Claims.

62.    The last <u>Pioneer</u> factor considers whether the claimant acted in good faith in seeking to file the late claim.  <u>See Pioneer Inv. Servs.</u>, 507 U.S. at 395.  A claimant is found to act in good faith when they move to file a late claim upon learning of the alleged liability and there is no evidence of bad faith.  <u>See</u> <u>In re Enron Creditors Recovery Corp.</u>, 370 B.R. at 104 (holding that the "good faith" <u>Pioneer</u> factor weighed in favor of allowing the late claim that was mistakenly filed against the wrong entity where there was "no indication in the record that [the movant] acted in a manner other than in good faith in seeking to file [the] proof of claim."); <u>In re Residential Capital, LLC</u>, Case No. 12-12020 (MG), 2015 WL2256683, at *10 (Bankr. S.D.N.Y. May 11, 2015) (finding that "the absence of any allegation that [the creditor] did not act in good faith" would support the allowance of a late-filed claim).

63.    Here, there are no facts showing that the Plaintiffs have acted in bad faith.  To the contrary, the Plaintiffs' position is due directly and exclusively to the bad faith actions of Old GM and New GM.  By concealing the Ignition Switch Defect and numerous other defects, Old GM and New GM prevented the Plaintiffs from learning the facts necessary to determine that they had claims against Old GM.  Old GM's actions clearly prevented the timely filing of claims by failing to provide constitutionally adequate notice of the Bar Date to Plaintiffs.  Indeed, the Bankruptcy Court recognized that the remedy for Old GM's violation of the Ignition Switch Plaintiffs' due process rights was "obvious," and required permitting the Ignition Switch Plaintiffs to file late claims.  <u>In re Motors Liquidation Co.</u>, 529 B.R. at 583.

64.    Therefore, the <u>Pioneer</u> factors are satisfied, and the Plaintiffs should be permitted to file the Proposed Class Claims.

### NOTICE

65.    Notice of this Motion has been provided to the Notice Parties set forth in the

Order to Show Cause and all entities that receive electronic notice from the Court's ECF system.

### CONCLUSION

WHEREFORE, the Plaintiffs respectfully request that this Court enter an Order,

substantially in the form attached hereto as **Exhibit C**, granting the Plaintiffs leave to file the

Proposed Class Claims.

[*Remainder of the page intentionally left blank*]

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 59 of 269
09-50026-mg    Doc 13806    Filed 12/22/16    Entered 12/22/16 16:09:56    Main Document
Late Class Claims    Pg 28 of 231    Pg 29 of 231

Dated:  December 22, 2016
        New York, New York            Respectfully submitted,

            BROWN RUDNICK LLP

             */s/ Edward S. Weisfelner*

            Edward S. Weisfelner
            Howard S. Steel
            BROWN RUDNICK LLP
            Seven Times Square
            New York, New York 10036
            Tel: 212-209-4800
            Email: eweisfelner@brownrudnick.com
            Email: hsteel@brownrudnick.com

            Sander L. Esserman
            STUTZMAN, BROMBERG, ESSERMAN &
            PLIFKA, A PROFESSIONAL CORPORATION
            2323 Bryan Street, Ste 2200
            Dallas, Texas 75201
            Tel: 214-969-4900
            Email: esserman@sbep-law.com

            *Designated Counsel for the Ignition Switch*
            *Plaintiffs and Certain Non-Ignition Switch*
            *Plaintiffs in the Bankruptcy Court*

            Steve W. Berman (admitted *pro hac vice*)
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1918 Eighth Avenue, Suite 3300
            Seattle, WA 98101
            Tel: 206-623-7292
            Email: steve@hbsslaw.com

            Elizabeth J. Cabraser
            LIEFF CABRASER HEIMANN & BERNSTEIN,
            LLP
            275 Battery Street, 29th Floor
            San Francisco, California 94111
            Tel: 414-956-1000
            Email: ecabraser@lchb.com

            *Co-Lead Counsel for the Ignition Switch*
            *Plaintiffs and Certain Non-Ignition Switch*
            *Plaintiffs in the MDL Court*

09-50026-mg    Doc 13805-1    Filed 03/27/16    Entered 03/27/16 16:08:28    Exhibit 1 of
Late Class Claims    Pg 30 of 231

**Status Conference: January 12, 2017 at 9:00 a.m. (Eastern Time)**
**Opposition Deadline: TBD**

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  206-623-7292
Email: steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Telephone:  414-956-1000
Email: ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the MDL Court*

Edward S. Weisfelner
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Telephone: 212-209-4800
Email: eweisfelner@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, P.C.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone:  214-969-4900
Email:  esserman@sbep-law.com

*Designated Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the Bankruptcy Court*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                                    :
In re:                                              :          Chapter 11
MOTORS LIQUIDATION COMPANY, et al.,                 :          Case No.: 09-50026 (MG)
            f/k/a General Motors Corp., et al.,     :
                                                    :
                            Debtors.                :          (Jointly Administered)
---------------------------------------------------------------X

## NOTICE OF MOTION FOR AN ORDER GRANTING
## <u>AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM</u>

PLEASE TAKE NOTICE that upon the annexed *Motion For An Order Granting*

*Authority To File Late Class Proofs of Claim*, dated December 22, 2016 (the "**Motion**") of the

Ignition Switch Plaintiffs and Certain Non-Ignition Switch Plaintiffs (collectively, the

"**Plaintiffs**"),[1] and pursuant to the Court's *Order to Show Cause Regarding Certain Issues Arising From Lawsuits With Claims Asserted Against General Motors LLC ("New GM") That Involve Vehicles Manufactured By General Motors Corporation ("Old GM")*, entered on December 13, 2016 [ECF No. 13802] (the "**OSC**"), a status conference on the Motion will be held before the Honorable Martin Glenn, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on **January 12, 2017 at 9:00 a.m. (Eastern Time)** (the "**January 12 Status Conference**").   Pursuant to the OSC, at the January 12 Status Conference the Bankruptcy Court will set a briefing schedule for the Motion, including deadlines for objections and replies.

PLEASE TAKE FURTHER NOTICE that, pursuant to the OSC, any plaintiff wishing to join the Motion shall file a joinder (not to exceed two pages) with the Bankruptcy Court by **no later than January 6, 2017** (the "**Joinder Deadline**").  Failure to join the Motion by the Joinder Deadline by a party purporting to have a claim against the GUC Trust as an Ignition Switch Plaintiff or Non-Ignition Switch Plaintiff may impact such party's ability to participate in and benefit from the forthcoming proceedings on the Motion and the Late Proof of Claim Issue (as defined in the OSC).

[*Remainder of the page intentionally left blank*]

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 62 of 269
09-50026-mg    Doc 13805-1    Filed 03/27/16    Entered 03/27/16 16:08:28    Exhibit 1 -
Late Class Claims    Pg 8 of 32    of 231

Dated: December 22, 2016
      New York, New York

Respectfully submitted,

BROWN RUDNICK LLP

*/s/ Edward S. Weisfelner*
Edward S. Weisfelner
Howard S. Steel
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
Tel: 212-209-4800
eweisfelner@brownrudnick.com
hsteel@brownrudnick.com

Sander L. Esserman
STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA, A PROFESSIONAL CORPORATION
2323 Bryan Street, Ste 2200
Dallas, Texas 75201
Tel: 214-969-4900
esserman@sbep-law.com

*Designated Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the Bankruptcy Court*

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: 206-623-7292
Email: steve@hbsslaw.com

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
Tel: 414-956-1000
Email: ecabraser@lchb.com

*Co-Lead Counsel for the Ignition Switch*
*Plaintiffs and Certain Non-Ignition Switch*
*Plaintiffs in the MDL Court*

09-50026-mg    Doc 13806-1    Filed 02/27/20    Entered 02/27/20 19:09:50    Exhibit A -
Proposed Ignition Switch Class Claim    Late Class Claims 2032 of 231    Pg 1 of 108

# Exhibit A

**Proposed Ignition Switch Class Claim**

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:03:56    Exhibit A - Proposed Ignition Switch Class Claim    Pg 2 of 108
Late Class Claims 30 of 23    Pg 2 of 108

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor  (Check Only One): | Case No. 09-50026 | Your Claim is Scheduled As Follows: |
|---|---|---|

☒ Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐ MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐ MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐ MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.)    09-13558 (REG)

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): Patricia Barker, on behalf of Proposed Class

Name and address where notices should be sent:

Patricia Barker
c/o Steve W. Berman, Hagens Berman Sobol Shapiro LLP,
1918 8th Avenue, Suite 3300, Seattle, WA  98101

Telephone number:  (206) 623-7292
Email Address:  steve@hbsslaw.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
*(If known)*

Filed on:_____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim.  If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

**1. Amount of Claim as of Date Case Filed, June 1, 2009:**    $  See attached.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:**    See attached.
*(See instruction #2 on reverse side.)*

**3. Last four digits of any number by which creditor identifies debtor:** _____

    **3a. Debtor may have scheduled account as:** _____
    *(See instruction #3a on reverse side.)*

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:**  ☐ Real Estate  ☐ Motor Vehicle  ☐ Equipment  ☐ Other
**Describe:**

**Value of Property:** $_____  **Annual Interest Rate**___%

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

| Date:12/22/16 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Patricia Barker, on behalf of the Proposed Class  *Patricia A. Barker* | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.
**Modified B10 (GCG) (12/08)**

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 19:09:50    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 3 of 108

**ATTACHMENT TO PROOF OF CLAIM OF PATRICIA BARKER UNDER B.R. 7023
ON BEHALF OF PURCHASERS OF DELTA IGNITION SWITCH VEHICLES.**

## I.    PRELIMINARY STATEMENT

1.    By this Proof of Claim, Patricia Barker, on behalf of a proposed Nationwide Class

under B.R. 7023,  of owners and lessees of Delta Ignition Switch Vehicles, as defined herein

(collectively, the "Class"), assert unliquidated claims against the debtor, Motors Liquidation

Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.    More specifically, Claimant alleges claims of fraudulent concealment, unjust

enrichment and consumer protection violations on behalf of the following proposed Class

pursuant to B.R. 7023:

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Delta Ignition Switch Vehicle.

Claimant also alleges claims of breach of the implied warranty of merchantability and negligence

on behalf of proposed Subclasses of persons who owned or leased a Delta Ignition Switch

Vehicle as of November 30, 2009, and who reside in jurisdictions that recognize such claims as

set forth herein.

3.    Ms. Barker, a resident of Wilmington, California, purchased a new 2005 Saturn

Ion in Torrance, California in March 2005, and she still owns it to this day.  The ignition switch

that GM used in the Ion (the so-called "Delta Ignition Switch") was dangerously defective, and

left the car prone to sudden unintended stalling, the loss of power steering and power brakes, and

an inoperable airbag.  From the time she bought the car until she received a recall notice in 2014,

Ms. Barker was unaware of the ignition switch defect.

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors
LLC, is referred to herein as "New GM."

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:06    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 4 of 108

4.      As defined more specifically herein, "Delta Ignition Switch Vehicles" include each of the following model/years of GM Vehicles ultimately subject to NHTSA Recall No. 14-V-047, provided they were sold or leased prior to November 30, 2009:  (i) 2005-2010 Chevrolet Cobalt; (ii) 2006-2010 Chevrolet HHR; (iii) 2007-2010 Pontiac G5; (iv)  2007-2010 Saturn Sky; (v) 2003-2007 Saturn ION; and (vi) 2006-2010 Pontiac Solstice.

5.      All told, there are approximately 1.6 million Delta Ignition Switch Vehicles at issue in this Proof of Claim.

6.      GM was aware of the defects in the Delta Ignition Switch Vehicles, and the defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

7.      GM induced Claimant and the Class to purchase and retain the Delta Ignition Switch Vehicles under false pretenses, and thus deprived Class Members of the benefit of their bargain and saddled them with dangerously defective cars that were worth less than they would have been in the absence of the defects.  Many Class Members also incurred repair costs and other expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at Class Members' expense.

8.      Claimant therefore files this Proof of Claim on behalf of the Class to recover the damages caused by GM's conduct under consumer protection statutes, the law of fraudulent concealment and unjust enrichment, which is essentially the same under the laws of each of the 50 states and the District of Columbia.  Claimant also brings claims for breach of the implied warranty of merchantability under California law, and on behalf of a Class of persons living in other states where the law provides a similar claim (the "Implied Warranty Subclass.")  Finally, Claimant brings a claim for negligence on behalf of herself, other California residents, and residents of other states where the law provides a similar clam (the "Negligence Subclass.")

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:36    Exhibit A -
Proposed Late Class Claim    Pg 5 of 108

## II.    THE DELTA IGNITION SWITCH DEFECT

9.    Approximately 1.6 million vehicles manufactured by GM and sold prior to the

Bar Date for claims in GM's bankruptcy contained a defective ignition switch and cylinder. The

ignition switch in these vehicles, the Delta Ignition Switch Vehicles, is prone to fail during

ordinary and foreseeable driving situations.

10.    In each of the Delta Ignition Switch Vehicles, GM installed the same defective

ignition switch in an unreasonable position on the steering cylinder that can cause the vehicle to

stall, disable the power steering and power brakes, and disable the airbag system in normal and

foreseeable driving circumstances.

11.    More specifically, the ignition switches can inadvertently move from the "run" to

the "accessory" or "off" position at any time during normal and proper operation of the Delta

Ignition Switch Vehicles. The ignition switch is most likely to move when the vehicle

is jarred or travels across a bumpy road; if the key chain is heavy; if a driver inadvertently

touches the ignition key with his or her knee; or for a host of additional reasons. When the

ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and

unexpectedly loses engine power, power steering, and power brakes, and certain safety features

are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes,

serious injuries, and death.

12.    The Delta Ignition Switch system is defective in at least three major respects.

First, the switches are simply weak and consequently can inadvertently move from the "run" to

the "accessory" or "off" position.  Second, because the ignition switches are placed low on the

steering column, the driver's knee can easily bump the key (or the hanging fob below the key)

and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position.

Third, when the ignition switches move from the "run" to the "accessory" or "off" position, the

vehicle's power is disabled. This also immediately disables the airbags. Thus, when power is lost

during ordinary operation of the vehicle, a driver is left without the protection of the airbag

system even if he or she is traveling at high speeds. GM was aware of safer alternative designs

that would have prevented the non-deployment of airbags caused by the ignition switch defects,

but chose not to employ them, in part to avoid disclosure of the Delta Ignition Switch Defect and

its tragic consequences.

13.    Vehicles with the Delta Ignition Switch Defect are therefore unreasonably prone

to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily

harm or death to the drivers and passengers of the vehicles.

14.    For the purposes of this Proof of Claim, the Delta Ignition Switch Vehicles

include the following vehicles, provided that they were sold or leased prior to November 30,

2009:

| DELTA IGNTION SWITCH VEHICLES |
|---|
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

15.    Alarmingly, GM knew of the Delta Ignition Switch Defect and its tragic

consequences for many years, but concealed its knowledge from consumers and regulators.  As

the Bankruptcy Court found, "at least 24 … GM personnel…, including engineers, senior

managers, and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior

to the Sale Motion, as early as 2003."  *In re Motors Liquidation Co*., 529 B.R. 510, 538 (Bankr.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit A -
Proposed Late Class Claim / Class Claim 2 Pg 7 of 108

S.D.N.Y. 2015).  On appeal, the Second Circuit Court of Appeals affirmed this finding.  *Elliot v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 161 (2d Cir. 2016).

16.    GM chose not to disclose and remedy the Delta Ignition Switch Defect as it was legally obligated to do under the Safety Act, state consumer protection laws, and the law of fraudulent concealment, unjust enrichment, implied warranty and negligence, among other laws.

17.    Instead, GM concealed the defects from the early 2000's through the end of its corporate existence—and continued to tout the safety and reliability of its vehicles—including the Delta Ignition Switch Vehicles.

A.    **Before It Sold Any Of The Delta Ignition Switch Vehicles, GM Knew The Ignition Switch Design Was Defective, But Approved The Substandard Switches Anyway, And Concealed These Material Facts From The Class.**

18.    Well before the first Delta Ignition Switch Vehicles eventually subject to Recall No. 14-V-047 were sold, GM knew the ignition switches were defective.  In the late 1990's and early 2000's, GM and one of its suppliers, Eaton Mechatronics, finalized the specifications for the ignition switch for the Saturn Ion—the first of the Delta Ignition Switch Vehicles eventually subject to Recall No. 14-V-047, introduced in model year 2003.  Eaton Corporation sold its Vehicle Switch/Electronic Division to Delphi Automotive Systems ("Delphi") on March 31, 2001.  Delphi went on to manufacture the defective ignition switch for GM.

19.    In 2001, during pre-production testing of the 2003 Saturn Ion, GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position.  GM also knew that when the ignition switch moved from "run" to "accessory" or "off," the vehicle's engine would stall and/or lose power.  GM engineers identified two "causes of failure," namely, "[l]ow contact force and low detent plunger force."  The "detent" is part of the ignition switch's inner workings that keeps the switch from rotating from one setting to another unless the driver turns the key.

5

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit A -
Proposed Amended Class Claim Class 49 of 234 Pg 8 of 108

20.     The GM Design Release Engineer assigned to the Delta Ignition Switch, Ray

DeGiorgio, noticed problems with the prototype switches provided by Delphi during early

testing of the switch.  In correspondence in September 2001, DeGiorgio stated that 10 of 12

prototype switches from Delphi failed to meet engineering requirements, and the "failure is

significant."  DeGiorgio noted that GM "must ensure this new design meets engineering

requirements."

21.     But GM did not correct this significant failure.  Instead, DeGiorgio approved the

use of ignition switches that he knew did not meet GM's required specifications.

22.     In fact, validation testing conducted by Delphi in late 2001 showed that the Delta

Ignition Switch consistently failed to meet the torque values in GM's required specifications.

These tests included a test to determine whether the torque required to rotate the switch from

"run" to "accessory" complied with the specification.  The January 2002 test report denoted the

design failure by stating "Not OK" next to each result.

23.     In February 2002, Delphi asked GM to approve production for the substandard

Delta Ignition Switch and submitted a Production Part Approval Process ("PPAP") request.

Even though testing of the ignition switch revealed that it did not meet the original specifications

set by GM and that the switch would fail, GM approved it anyway.  The defective ignition

switch was then used in the Delta Ignition Switch Vehicles, unbeknownst to Claimant and the

Class.

**B.    GM Received Many Complaints And Reports Of Vehicles Stalling Due To The Delta
Ignition Switch Defect, And Concealed That Material Information From The Class.**

24.     In 2003, almost immediately after it sold the first of the Delta Ignition Switch

Vehicles that eventually led to Recall No. 14-V-047, the 2003 Saturn Ion, GM began receiving

complaints of vehicles stalling while driving due to the Delta Ignition Switch Defect.

09-50026-mg   Doc 13896-1   Filed 03/27/20   Entered 03/27/20 29:09:88   Exhibit A -
Proposed Ignition Switch Class Claim 23 Pg 9 of 108

25.    In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician stated that the weight of several keys on the key ring had worn out the ignition switch. GM replaced the switch and closed the matter.

26.    GM employees were also having problems with their own model year 2003 and 2004 Ions that used the Delta Ignition Switch. A January 9, 2004 report from GM employee Gerald A. Young concerning his 2003 Ion informed GM that "[t]he ignition switch is too low. All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk." The report characterized the problem as "a basic design flaw [that] should be corrected if we want repeat sales."

27.    In a February 19, 2004 report concerning his 2004 Saturn Ion, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee). On several occasions, I inadvertently turn[ed] the ignition key off with my knee while *driving down the road.* For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

28.    In an April 15, 2004 report concerning his 2004 Saturn Ion, GM employee Raymond P. Smith reported experiencing an inadvertent shut-off: "I thought that my knee had inadvertently turned the key to the off position."

29.    On July 4, 2004, a vehicle occupant died after her 2004 Saturn Ion (which contained the Delta Ignition Switch) left the road at a high speed and struck a utility pole head on. The airbag did not deploy. GM was aware of this incident.

30.    GM concealed these and other similar manifestations of the Delta Ignition Switch Defect.

09-50026-mg   Doc 13896-1   Filed 03/27/20   Entered 03/27/20 20:00:00   Exhibit A -
Proposed Ignition Switch Class Claim   Pg 10 of 108

C.   **By 2004, GM Engineers Understood The Need To Correct The Delta Ignition Switch Defect But Failed To Act To Disclose Or Correct The Defect.**

31.    By 2004, GM knew that the Delta Ignition Switch Defect posed a safety concern, and that remedial action was necessary.  For example, in October 2004, GM internally documented incidents in which GM engineers verified that the ignition switch inadvertently turned out of the "run" position.  The cause of the problem was found to be "low key cylinder torque/effort."

32.    In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt.  GM installed the same Delta Ignition Switch in the 2005 Cobalt as it did in the Saturn Ion. As the Cobalt moved into production, it too—like its Saturn Ion predecessor—sustained inadvertent ignition switch shut-offs that resulted in moving stalls.  Instead of implementing a solution to this safety problem, GM engineers and higher-ups debated partial solutions, short-term fixes, and cost.

33.    GM engineers independently encountered the Delta Ignition Switch Defect in early test drives of the Cobalt, before it went to market.  The GM engineers pinpointed the problem of engine shut-off in the Cobalt and were "able to replicate this phenomenon during test drives."  Despite this knowledge, GM told no one.

34.    According to GM, its engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions."  But after considering the cost and amount of time it would take to develop a fix, GM did not implement a fix, and the vehicles went to market with the Delta Ignition Switch Defect.

35.    During testing of the Cobalt, GM Program Engineering Manager Gary Altman observed an incident in which a Cobalt suddenly lost engine power because the ignition switch moved out of the "run" position during vehicle operation.

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 11 of 108

36.    Around the time of the Cobalt launch, more reports surfaced of moving stalls caused by a driver bumping the key fob or chain with his knee.  At a 2004 press event associated with the launch of the Cobalt in Santa Barbara, California, a journalist informed Doug Parks, the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain.  GM's Doug Parks asked Gary Altman, the GM Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix.

37.    DeGiorgio learned about the Cobalt press event discussion of the moving stall issue and was approached by a GM engineer who suggested that DeGiorgio should "beef up" the ignition switch and increase the torque.  He did not do so.

38.    As soon as the Chevrolet Cobalt hit the market in late 2004, GM immediately started getting similar complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."  GM engineers determined that the low torque in the ignition switch could cause the key to move from the "run" to the "accessory" or "off" position under ordinary driving conditions with normal key chains because "detent efforts on ignition switch are too low, allowing key to be cycled to off position inadvertently."  Specifically, in February 2005, GM engineers concluded that "there are two main reasons that we believe can cause a lower effort in turning the key: a lower torque detent in the ignition switch … [and a] low position of the lock module [on] the [steering] column."

39.    On November 22, 2004, engineers in GM's High Performance Vehicle Operations group wrote  DeGiorgio and informed him that their group had repeatedly experienced moving stalls during a track test of the Cobalt SS (the high-performance version of the Cobalt) when the

9

driver's knee "slightly graze[d]" the key fob. A GM engineer forwarded this complaint to

DeGiorgio, and explicitly asked DeGiorgio whether there was "a specification on the

force/torque required to keep that switch in the RUN position." He also asked DeGiorgio: "If so,

is the switch meeting that spec? If not, what are the options for implementing a stronger spring?"

Once again, DeGiorgio did not act, and neither did GM.

40.    When driving the Cobalt, GM employees, customers, and members of the

automotive press found repeatedly that they would hit the key fob or keychain with their knee,

and the car would turn off. As noted, GM received some of these reports before the Cobalt's

launch, and others afterwards. Despite the many complaints describing the moving stalls and

customers' safety concerns, GM covered up the fact of the defect and made safety assurances to

the driving public, its customers, and the Class, upon which they reasonably relied. GM received

reports from dealers documenting this problem and advised dealers to tell customers to modify

their key chains.

41.    On February 28, 2005, GM issued a bulletin to its dealers regarding engine-

stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac

G5).

42.    In the February 28, 2005 bulletin, GM provided the following recommendations

and instructions to its dealers—but not to the public in general:

> There is potential for the driver to inadvertently turn off the
> ignition due to low key ignition cylinder torque/effort. The
> concern is more likely to occur if the driver is short and has a large
> heavy key chain.
>
> In the cases in which this condition was documented, the driver's
> knee would contact the key chain while the vehicle was turning.
> The steering column was adjusted all the way down. This is more
> likely to happen to a person that is short as they will have the seat
> positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to
> determine if this may be the cause. The customer should be
> advised of this potential and to take steps, such as removing
> unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each
> step. If the condition exhibited is resolved without completing
> every step, the remaining steps do not need to be performed.

43.    This bulletin was issued by GM as an effort to assuage disgruntled Delta Ignition

Switch Vehicle owners who actually complained to GM Dealers, and further GM's fraudulent

scheme to conceal the Delta Ignition Switch Defect from, regulators, and consumers – including

the Class.

**D.    GM Closes Its First Internal Investigation Of The Delta Ignition Switch Defect,
Deciding To Take No Action Because Of Cost.**

44.    Despite the serious safety issues posed by the Delta Ignition Switch Defect, GM

took no action to correct the defect and instead covered it up.

45.    On November 19, 2004, GM opened an engineering inquiry known as a Problem

Resolution Tracking System ("PRTS") to evaluate a number of potential solutions to address the

Delta Ignition Switch Defect in the Chevrolet Cobalt. At this time, Problem Resolution issues

were analyzed by a Current Production Improvement Team ("CPIT"). The CPIT that examined

the Cobalt issue beginning in late 2004 included a cross-section of business people and

engineers, including Altman, Chief Cobalt Engineer Doug Parks, and Lori Queen, Vehicle Line

Executive on the case.

46.    In early 2005, and as part of the PRTS, Parks sent an email with the subject,

"Inadvertent Ign turn-off." In the email, Parks wrote, "For service, can we come up with a 'plug'

to go into the key that centers the ring through the middle of the key and not the edge/slot? This

appears to me to be the only real, quick solution."

11

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit A -
Proposed Ignition Switch Class Claim Later Class Claims PCL6 of 234    Pg 14 of 108

47.    After considering this and a number of other solutions (including changes to the
key position and measures to increase the torque in the ignition switch), the CPIT examining the
issue decided to do nothing.  Indeed, by March 2005, the GM Cobalt Program Engineering
Manager ("PEM") issued a "directive" to close the 2004 PRTS "with no action."[2]  According to
GM's internal documents, the design change was refused because of time, i.e., because the "lead-
time for all solutions is too long," and money, i.e., because the "tooling cost and piece price are
too high…."[3]

48.    The 2004 PRTS was closed because "none of the solutions represents an
acceptable business case"—a standard phrase used by GM personnel for closing a PRTS without
action because of cost.[4]  In deciding to do nothing to correct the serious safety defect that existed
in its vehicles, GM simply shrugged off the issue entirely.  What is more, GM downplayed the
severity of the safety threat, rating the specter of a moving stall (even at highway speeds) with a
severity level of 3—on a scale of 1 (most severe) to 4 (least severe).  GM did not explain what, if
any, criteria existed for an "acceptable business case" or otherwise justify its decision to do
nothing.  David Trush, the DRE for the ignition cylinder, explained that to present an
"acceptable business case," a solution should solve the issue, be cost effective, and have an
acceptable lead time to implement the change.[5]  But one of the very solutions proposed by
Trush—changing the key from a slot to a hole configuration—would have cost less than one
dollar per vehicle.

---

[2] GMHEC000001735 (Nov. 19, 2004).

[3] GMHEC000001735.

[4] GMNA PRTS+ Closure Codes (Close w/out Action) (Effective Dec. 2007) [DOC ID GMCB-000000977300].
Valukas Report at 69, fn. 271.

[5] Valukas Report at 69.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:08   Exhibit A -
Proposed Intervenors' Class Claim   Pg 15 of 108

49.     Here, as elsewhere in the story of the Delta Ignition Switch Defect, the corporate culture within GM was one in which no one was held responsible and no one took responsibility.[6]

**E.     Complaints Continued And Serious Accidents Came To GM's Attention In 2005.**

50.     After the Cobalt program team closed the November 19, 2004, PRTS with no action taken, additional complaints of Cobalt stalls and inadvertent ignition switch shut-offs continued to come into GM's Brand Quality Group.[7]

51.     In March 2005, Jack Weber, a GM engineer, reported that during "heel-toe downshifting" in a Cobalt SS with a manual transmission (a high-performance Cobalt model), his knee contacted the key fob and key ring, which caused "pulling on the key to move it to the 'Off' position."[8]

52.     In May 2005, a customer demanded that GM repurchase his Cobalt.  The complaint was that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and the key chain or fob.[9]  GM Brand Quality Manager Steven Oakley forwarded this information internally at GM, stating that the ignition switch "goes to the off position too easily shutting the car off."[10]  DeGiorgio was one of the GM personnel who received this email chain, which effectively stated that the customer's car, as well as others at the dealership, had ignition switches with insufficient torque and cause the car to

---

[6] Valukas Report at 71.

[7] Valukas Report at 75.

[8] Email from Jonathan L. Weber, GM, to Rajiv Mehta, GM, et al. (March 9, 2005), at 22 (attached to FPR0793/2005/US) [DOC ID GMHEC000019677]. Valukas Report at 76, fn. 303.

[9] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, fn. 308.

[10] Email from Steven Oakley, GM, to Arnaud Dessirieix, GM (May 2, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76, fn. 309.

shut off while driving.[11]  This email chain specifically included a request for an ignition switch "at the high end of the tolerance spec."[12]

53.    By May 2005, GM personnel thus had multiple reports of moving stalls and were receiving buyback requests for Cobalts following complaints that consumers made to dealers.[13]

54.    The problem of moving stalls and the ignition switch turning off in GM Delta Ignition Switch Vehicles continued throughout 2005, and was discussed within GM and in the media.  In May and June 2005, reviewers from two newspapers, including the New York Times, wrote about how they or a family member had inadvertently turned a Cobalt off with their knees.[14]  On May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again."  In furtherance of covering up the material safety hazard posed by the Ignition Switch Defect, one of GM's in-house vehicle safety lawyers emailed a colleague to marshal evidence for the press that the risk of moving stalls was "remote" and "inconsequential."  He wrote that he did not want to be criticized for failing to "defend a brand new launch."[15]

---

[11] Email from Joseph Joshua, GM, to Joseph Manson, GM, Raymond DeGiorgio, GM, et al. (May 4, 2005) [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 77, fn. 312.

[12] Email from Joseph Joshua, GM, to Steven Oakley, GM, et al. (May 4, 2005) (noting "[w]e have asked the ign switch DRE for a switch at the high end of the tolerance spec") [DOC ID 000077753011; GMNHTSA000337483]. Valukas Report at 76-77, fn. 310.

[13] J&B Interview of Steven Oakley, May 23, 2014. Valukas Report at 78, fn. 315.

[14] Jeff Sabatini, "Making a Case for Ignitions That Don't Need Keys," *New York Times*, June 19, 2005; *see also* Christopher Jensen, "Salamis, Key Rings and GM's Ongoing Sense of Humor," *Plain Dealer (Cleveland)*, June 26, 2005.

[15] Valukas Report at 86.

09-50026-mg    Doc 13896-1    Filed 02/27/20    Entered 02/27/20 29:09:88    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 17 of 108

55.    In June 2005, a Senior Delphi Project Engineer stated in an email that the

"Cobalt is blowing up in [GM's] face in regards to the car turning off with the driver's

knee."[16]

56.    A GM customer filed the following complaint about a 2005 Cobalt prone to

moving stalls on June 29, 2005:

> Dear Customer Service:
>
> This is a safety/recall issue if ever there was one. … The problem
> is the ignition turn switch is poorly installed.  Even with the
> slightest touch, the car will shut off while in motion.  I don't have
> to list to you the safety problems that may happen, besides an
> accident or death, a car turning off while doing a high speed ….[17]

57.    In July 2005, a 2005 Chevrolet Cobalt crashed in Maryland, killing the teenage

driver.[18]  Calspan Crash Data Research Center was assigned by the NHTSA Special Crash

Investigation Program to conduct a Special Crash Investigation (or "SCI"), which found "that the

frontal airbag system did not deploy" and the "[Sensing Diagnostic Module (or "SDM")] data

indicated that the 'vehicle power mode status' was in 'Accessory.'"[19]  The August 15, 2005, SCI

report found that the vehicles SDM data recorded the "vehicle power mode status" of the ignition

switch had shifted from "run" to "accessory."  NHTSA continued the SCI and GM failed to

report the crash to NHTSA until the third quarter of 2005.[20]  Upon information and belief, GM

subsequently entered into a confidential settlement agreement with the victim's mother.

---

[16] SC-000084.

[17] Customer complaint (June 29, 2005) [DOC ID 000014669078; GMNHTSA000540683].  Valukas Report at 89, fn. 379.

[18] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[19] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation Case No. CA05-049, Vehicle: 2005 Chevrolet Cobalt (July 2005) (the "2005 SCI Report").

[20] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation to Gay P. Kent, Director, General Motors Corp. (Mar. 1, 2006) and Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (Apr. 6, 2006), (GMHEC 00198137-198210); (GMHEC00197893).

58.    Inside GM, the defect was raised with the Product Investigations ("PI") unit.  The PI group was charged with solving significant engineering problems, including safety problems; it was the primary unit charged with investigating and resolving potential safety defects.[21]  GM Product Investigations Manager Doug Wachtel assigned PI employee Elizabeth Kiihr to investigate the Cobalt ignition switch shut-off.  Wachtel's team looked at early data from the field and found 14 incidents related to the Delta Ignition Switch Defect.

59.    The PI group also tried to recreate the problem themselves.  Doug Wachtel and Gay Kent drove a Cobalt around GM's property in Warren.  Kent had a long and heavy key chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so that her jeans caused friction against the fob.[22]  Wachtel also reproduced the stall in the Cobalt test drive by contact with the key chain.[23]

60.    Notwithstanding the media reporting, the customer complaints, and its replication of moving stalls in the field, the PI team did not recommend a safety recall on vehicles with the Delta Ignition Switch Defect.[24]  GM knew that a defect existed in its vehicles, but did nothing to disclose the truth or warn consumers or the Class, nor did GM correct the defect in vehicles that it had already sold, or in vehicles it continued to manufacture, sell, warrant, and represent as safe.

**F.    GM Engineers Proposed Design Modifications To The Delta Ignition Switch In 2005, But GM Management Rejected The Proposed Changes Because Of Cost.**

61.    GM's knowledge of the serious safety problem grew, but still the Company made no disclosure.  In February 2005, GM engineers met to analyze how to address the Delta Ignition

---

[21] Valukas Report at 86.

[22] TREAD Search Results (June 28, 2005) [DOC ID 000005586004; DOC ID 000005586005; DOC ID 000005586006]. Valukas Report at 86-87, fn. 367.

[23] Valukas Report at 87.

[24] Valukas Report at 87.

Switch Defect.[25]  Indeed, between February 2005 and December 2005, GM opened multiple

PRTS inquiries concerning reports of power failure and/or engine shutdown in the Delta Ignition

Switch Vehicles.

62.    GM engineers internally recognized that there was a need to do something in

order to address the Delta Ignition Switch Defect.  For example, GM engineers investigated a

possible key slot change as "containment" of the defect, and generated development cost and

time estimates.[26]

63.    In May 2005, GM opened PRTS N182276 (the "2005 PRTS") to analyze the

ignition switch in the 2005 Chevrolet Cobalt following continued customer complaints that the

"vehicle ignition will turn off while driving."[27]  GM acknowledged in the 2005 PRTS that it

had previously considered the same issue in the 2004 PRTS and "[d]ue to the level of buyback

activity that is developing in the field, Brand Quality requests that the issue be reopened."[28]  In

other words, customers were asking GM to take back the defective cars, yet GM said nothing to

customers or the Class about the safety risks.  Instead, GM continued to market and warrant the

Delta Ignition Switch Vehicles as safe.  The 2005 PRTS proposed that GM re-design the key

head from a "slotted" to a "hole" configuration.  After initially approving the proposed fix, GM

reversed course and again declined to implement it.[29]

64.    As part of one of the many PRTS inquiries opened in 2005, quality brand

manager Steve Oakley asked William Chase, a GM warranty engineer, to estimate the warranty

---

[25] GMHEC000001733 (Nov. 19, 2004).

[26] GMHEC000001734 (Nov. 19, 2004).

[27] 2005 PRTS, originated May 17, 2005, GMHEC000001742-54.

[28] GMHEC000001743.

[29] February 24, 2014 GM Submission to NHTSA – Chronology Re:  Recall of 2005-2007 Chevrolet Cobalt and 2007 Pontiac G5 Vehicles (or "February GM Chronology"), at 1; March 11, 2014 GM Submission to NHTSA – Chronology Re: Recall of 2006-2007 Chevrolet HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles (or "March GM Chronology") at 1; April Chronology at 2.

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 19:09:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 20 of 108

impact of the Delta Ignition Switch Defect in the Cobalt and Pontiac G5 vehicles.  Chase

estimated that for Cobalt and G5 vehicles on the road for 26 months, 12.40 out of every 1000

vehicles would experience inadvertent power failure while driving.  Still, GM did nothing.

65.    At a June 7, 2005 Vehicle and Process Integration Review ("VAPIR") meeting at

GM, the Cobalt VAPIR team discussed potential solutions to the inadvertent shut-off issue.

Around this same time, GM asked DeGiorgio to propose a change to the ignition switch that

would double the torque required to turn the switch.[30]  DeGiorgio identified two alternatives.

The first was to use a switch under development for the Saturn Vue and the Chevrolet Equinox

(the "GMT 191").   Because the GMT 191 switch was superior to the current ignition switch

both electrically and mechanically, DeGiorgio referred to it as the "gold standard of ignition

switches."[31]  Alternatively, DeGiorgio proposed redesigning the ignition switch already in Delta

platform vehicles.  Part of DeGiorgio's plan included adding a second detent plunger.[32]

66.    At the June 14, 2005 VAPIR meeting, additional proposed fixes were presented—

categorized as either "short-term" or "long-term" solutions.  The short-term solution was to use a

smaller key ring and to change the key going forward with a new key head design that used a

hole instead of a slot.[33]  The "long-term" solutions included DeGiorgio's idea of replacing the

Delta Ignition Switch with the GMT 191, or "gold standard" switch, which would double the

torque needed to shut off the ignition.  The implementation of the new switch was targeted for

---

[30] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[31] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[32] J&B Interview of Raymond DeGiorgio, May 7-8, 2014.  Valukas Report at 79.

[33] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID
000011020041; GMNHTSA000218772].  Valukas Report at 80, fn. 331.

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 29:09:86    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 21 of 108

MY 2007 or MY 2008 vehicles, at a cost of just $1.00/vehicle, plus tooling costs which were not known at that time.[34]

67.    The presentation for this VAPIR meeting also included discussion of press coverage describing the Delta Ignition Switch Defect that GM engineers experienced earlier in 2005:  inadvertent shut-off of the ignition switch and moving stalls.  The presentation included GM's official public relations statement regarding the issue reassuring the public and the Class that the vehicle was "still controllable."[35]

68.    Also on June 14, 2005, similar complaints surfaced of "inadvertent ignition shut-offs" in the Solstice, which used the same defective Delta Ignition Switch as the Cobalt and the Ion. A GM engineer emailed DeGiorgio and other GM personnel involved in evaluating short-term and long-term fixes for the ignition switch, informing them that Solstice testing showed the "ignition inadvertently turns off when hit."  The engineer noted that the complaint was "very similar to the ones on the Cobalt" and suggested that the same "preventative measures" under discussion for the Cobalt should be taken for the Solstice.[36]

69.    On June 17, 2005, GM engineer Al Manzor conducted testing on the defective Delta Ignition Switch, and the proposed GMT 191 ignition switch, at GM's Milford Proving

---

[34] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 333.

[35] X001 Ignition Cylinder Effort … Next Actions VAPIR Presentation (June 14, 2005), at 1 [DOC ID 000011020041; GMNHTSA000218772].  Valukas Report at 80-81, fn. 334.

[36] Email from Devin Newell, GM, to Raymond DeGiorgio, GM, et al. (June 14, 2005) [DOC ID 000001748037; GMNHTSA000218756]. Valukas Report at 81, fn. 336.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:86   Exhibit A -
Proposed Ignition Switch Class Claim of 23g 22 of 108
Later Class Claims PCR 4

Ground[37] to evaluate how the switches performed in the Cobalt using a key with a slotted key head versus a key head with a hole.[38]

70.   They also demonstrated that the rotational torque required to move the key out of "run" was 10 N-cm, below the Specification of 15 to 25 N-cm.  However, neither Manzor, nor anyone else interviewed, compared the test results to the actual specification.[39]

71.   Later in June 2005, the VAPIR approved a fix for existing customers—a plug that could be inserted into keys when customers came to the dealer reporting problems—and a change to the key for production in the future (a change that was not implemented).  On July 12, 2005, GM also issued another Preliminary Information to dealers, this time explaining (only for the 2005 Cobalt and 2005 Pontiac Pursuit) that a fix was available (the key insert).  The key change (and the insert) did not, however, address the core problem of the low torque of the ignition switch or the placement of the ignition switch on the steering cylinder; indeed, the engineers still regarded the key head design change as only a temporary solution—or, as one GM engineer described it, a "band-aid."[40]

72.   Manzor said he discussed his safety concerns about the Cobalt, including the potential for airbag non-deployment, with Parks, Altman, and a safety engineer, Naveen Ramachandrappa Nagapola.[41]

---

[37] The Milford Proving Ground is a GM engineering facility designed for vehicle research, development, and testing in Milford, Michigan.  It has extensive test tracks for vehicle testing under a range of road conditions.  Valukas Report at 81, fn. 337.

[38] X001 Ignition Cylinder Effort … Next Actions" (June 19, 2005) [DOC ID 000012140574; GMNHTSA000218793]; J&B Interview of Alberto Manzor, May 1, 2014; e mail from Gay Kent, GM, to Deb Nowak-Vanderhoef, GM, et al.(June 14, 2005) [DOC ID S006878_000038279].  Valukas Report at 81, fn. 338.

[39] J&B Interview of Doug Parks, May 1-2, 2014; J&B Interview of Alberto Manzor, May 1, 2014.  Valukas Report at 82, fn. 341.

[40] Valukas Report at 82-83.

[41] J&B Interview of Alberto Manzor, May l, 2014.  Valukas Report at 83, fn. 347.

73.    Ignoring the Delta Ignition Switch Defect did not make the problem or reported incidents go away.

**G.    Rather Than Implementing A Safety Recall And Fixing The Known Delta Ignition Switch Defect, GM Sent An Inadequate Technical Service Bulletin To GM Dealers In Late 2005 That Advocated The Removal Of Heavy Items From Key Rings.**

74.    Throughout 2005, various committees within GM considered proposed fixes, but rejected them as too costly.  In December 2005, rather than issuing a safety recall on the Delta Ignition Switch Defect, GM sent Technical Service Bulletin ("TSB") 05-02-35-007 to GM dealers, titled "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs" for the Chevy Cobalt and HHR, Saturn Ion, and Pontiac Solstice vehicles.[42]  The TSB explained that "[t]here is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder/torque."

75.    When GM issued this TSB, it removed from the dealer database the July 12, 2005 Preliminary Information (which had accurately used the word "stall"). The TSB also did not accurately describe the danger posed by the Delta Ignition Switch Defect and went only to GM dealers, not to the public or the Class.[43]  In the TSB, GM did not mention the possibility of airbag non-deployment, engine stalls, and loss of power steering or power brakes.

76.    Evidencing GM's fraudulent concealment, multiple GM employees confirmed that GM intentionally avoided using the word "stall" in the TSB to dealers.[44]

77.    GM Quality Service Manager, Steve Oakley, who drafted the December 2005 TSB, stated the term "stall" is a "hot" word that GM did not use in TSBs because *it may raise a concern about vehicle safety*, which "*suggests GM should recall the vehicle*, *not issue a*

---

[42] TSB 05-02-35-007, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and No DTCs," (Oct. 2006), at GMHEC000329773.

[43] March 2014 GM chronology; GMHEC000329773.

[44] Valukas Report at 91-93; (citing GMHEC000329773).

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:08:06    Exhibit A -
Proposed Ignition Switch Class Claim   Pg 24 of 108

*bulletin."*[45]  In addition, GM personnel stated that "there was concern about the use of 'stall' in a

TSB because such language might draw the attention of NHTSA."[46]  The December 2005 TSB

was intentionally misleading and incomplete.

       78.     GM chose not to disclose the true nature of the Delta Ignition Switch Defect and

remedy the problem.  Instead, in the December 2005 TSB, GM instructed its dealers to give

customers who brought in their vehicle complaining about stalling "an insert for the key ring so

that it goes from a 'slot' design to a hole design" to prevent the key rings from moving up and

down in the slot.  "[T]he previous key ring" was "replaced with a smaller" one; this change was

intended to keep the keys from hanging as low as they had in the past.[47]  GM created over

10,000 key plug inserts as a purported cheap fix for the defect.[48]  According to GM's records, its

dealers provided key inserts to only 474 customers who brought their vehicles into dealers for

service.[49]  But the band-aid failed because GM abandoned the key redesign effort.[50]

Furthermore, while GM made the key insert available to consumers of previously purchased

vehicles, it did not, at the same time, change the key for cars that were rolling off the assembly

line and those yet to be produced.  Thus, GM denied new car purchasers even the "band-aid" its

engineers proposed.[51]

       79.     Still there was no recall though GM was squarely on notice of the Delta Ignition

Switch Defect, as it continued to receive complaints of fatalities and injuries.  Rather than issue

the necessary safety recall, GM chose to continue the cover-up.

---

[45] Valukas Report at 92, fn. 390, emphasis added.

[46] Valukas Report at 93, fn. 392.

[47] Valukas Report at 1-2; March GM Chronology at 2; April GM Chronology at 2.

[48] Valukas Report at 93-94.

[49] February GM Chronology at 2.

[50] Valukas Report at 94.

[51] Valukas Report at 94.

09-50026-mg    Doc 13805-1    Filed 02/27/16    Entered 02/27/16 29:09:86    Exhibit A -
Proposed Ignition Switch Class Claims  Pg 57 of 231    Later Class Claim  Pg 25 of 108

**H.    GM Authorized A Design Change To The Delta Ignition Switch In 2006, But Masked The Existence Of The Change By Keeping The Same Part Number.**

80.    GM covertly authorized a design change for the defective ignition switch in 2006.

81.    In late 2005 and early 2006, DeGiorgio discussed with Delphi a proposal to put a stronger spring and plunger into the ignition switch.[52]  An internal Delphi document indicates that this switch design—with a longer detent spring-plunger—was the same as the longer detent spring-plunger design originally drafted by Delphi in 2001.[53]  In other words, GM had this option available before the defective Delta Ignition Switches were ever approved. [54]

82.    In April 2006, DeGiorgio authorized Delphi to implement changes to fix the Delta Ignition Switch Defect.[55]  The design change "was implemented to increase torque performance in the switch."[56]  On April 26, 2006, DeGiorgio approved an ignition switch with a longer detent plunger by signing what is called a Form 3660, giving Delphi permission to begin manufacturing the longer parts for the switch.[57]  The Form 3660 stated, "[n]ew detent plunger (Catera spring/plunger) was implemented to increase torque force in switch."[58]  Each Form 3660 has to link back to a master work order, and this one did as well.  But the work order to which it linked was only for the electrical improvements to the ignition switch; the work order did not mention

---

[52] Email from Arturo Alcala, Delphi to Raymond DeGiorgio, GM, John B. Coniff, Delphi, et al. (Jan. 6, 2006) [DOC ID 000051786002; GMNHTSA000257777]. Valukas Report at 97, fn. 401.

[53] Drawing 741-76307-T [DOC ID GMHEC000003206]; 2001 Long Detent Spring Drawing, Drawing 741-79378 (2001) [Ex. A.3.a(2) 2001 Long Detent Spring Drawing]; 2001 Short Detent Spring Drawing, Drawing 741-75259 (2001) [Ex. A.3.a (1) 2001 Short Detent Spring Drawing]; email from Antero Cuervo, Delphi, to Lyle Miller, Delphi (Oct. 29, 2013) [DOC ID 000004253527; GMNHTSA000223906]. Valukas Report at 97, fn. 402.

[54] Valukas Report at 97.

[55] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[56] General Motors Commodity Validation Sign-Off (April 26, 2006, GMHEC000003201).

[57] General Motors Commodity Validation Sign Off (April 26, 2006) GMHEC000003201.

[58] Form 3660 (April 26, 2006), at 3 [DOC ID 000004253529; GMNHTSA000223924].  Valukas Report at 98, fn. 406.

the change to the spring and plunger.[59]  GM fraudulently concealed and acted to suppress and

cover up this material fact.

83.    Delphi documents suggest that the new ignition switch went into production

sometime after June 26, 2006.[60]  Although the design of the ignition switch changed, *the part

number remained the same*.[61]

84.    Consumers, NHTSA, the driving public, and the Class were unaware of the

change, because GM "*concealed the fact*" of the design change and "*failed to disclose this

critical information*," with devastating consequences.[62]

85.    In congressional testimony in 2014, GM CEO Mary Barra acknowledged that GM

should have changed the part number when it redesigned the Delta Ignition Switch, and that its

failure to do so did not meet industry standard behavior.  Former New GM engineers term GM's

failure to change the part number a "cardinal sin" and "an extraordinary violation of internal

processes."

**I.    The Fatalities Resulting From The Ignition Switch Defect And The Cover-Up Came
To GM's Attention As Early As 2004.**

86.    GM's legal department received notice of the first Ion airbag non-deployment

claim in January 2004 involving a 2004 Saturn Ion.  The first Cobalt crash came to GM's

attention in September 2005.[63]

87.    On November 17, 2005—immediately before GM issued the December Technical

Service Bulletin—a Cobalt went off the road and hit a tree in Baldwin, Louisiana.  The front

---

[59] EWO 302726 (Feb. 19, 2004) [DOC ID 000000000080; GMNHTSA000220667]. Valukas Report at 98, fn. 407.

[60] Valukas Report at 99.

[61] Valukas Report at 100 (emphasis added).

[62] Valukas Report at 34 (emphasis added).

[63] Valukas Report at 103, fn. 419.

09-50026-mg    Doc 13806-1    Filed 03/27/20    Entered 03/27/20 23:05:36    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 27 of 108

airbags did not deploy in this accident.  GM received notice of the accident, opened a file, and

referred to it as the "Colbert incident."

88.    In January 2006, a 2005 Chevy Cobalt struck several trees as a result of the Delta

Ignition Switch Defect.  The driver died en route to the hospital.[64]  The vehicle's power mode

status was in "accessory" at the time of the crash and the airbag did not deploy when it should

have.[65]

89.    On February 10, 2006, in Lanexa, Virginia—shortly after GM issued the TSB—a

2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident, *supra*, the

frontal airbags failed to deploy.  The download of the SDM (the vehicle's "black box") showed

the key was in the "accessory/off" position at the time of the crash.  GM received notice of this

accident, opened a file, and referred to it as the "Carroll incident."

90.    On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road

and struck a utility pole.  The frontal airbags did not deploy in this incident.  The download of

the SDM showed the key was in the "accessory/off" position at the time of the crash.  GM

received notice of this incident, opened a file, and referred to it as the "Oakley incident."

91.    In September 2006, GM became aware of an incident in which a 2004 Saturn Ion

left the road and struck a utility pole head on.  The airbag did not deploy and the driver was

wearing her seatbelt, but was pronounced dead at the scene.  GM identified this crash as one in

which the airbag should have deployed, and internally acknowledged that the airbag likely would

have saved the driver's life.[66]  GM engineers agreed that "1) the airbags … should have

---

[64] Calspan Corporation, Calspan On-Site Air Bag Non-Deployment Investigation, Case No. CA05-049, Dec. 12, 2006 [DOC ID GMCB-000000073786; GMHEC100026303]; GM, Activity Notes form, File No. 501661, Jan. 31, 2006 [DOC ID 000001660023; GMNHTSA000200717]. Valukas Report at 110, fn. 453.

[65] Crash Data Retrieval System, [redacted] SDM Data, Sept. 14, 2005 [DOC ID 000001660011; GMNHTSA000200688].  Valukas Report at 110, fn. 454.

[66] Valukas Report at 112, fn. 463, 464.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 29:09:86    Exhibit A -
Proposed Later Class Claims Class Claim nof 231 g 28 of 108

deployed; 2) the SDM did not record the crash event, for unknown reasons;… and 4) it is

reasonably likely that deployment of the driver airbag would have prevented [] death in this

accident."[67]  Still, GM admitted nothing and represented that its cars were safe.

92.      On October 24, 2006, a crash occurred in which a 2005 Cobalt left the road and

struck a telephone box and two trees.  There were fatalities and severe injuries, and the airbag

did not deploy.  GM's Alan Adler emailed Dwayne Davidson, Senior Manager for TREAD

Reporting at GM, and others, copying Gay Kent, Jaclyn Palmer, Brian Everest, and Doug

Wachtel, with the subject line "2005 Cobalt Air Bags—Fatal Crash; Alleged Non-

Deployment."[68]

93.      In October 2006, a 2005 Chevy Cobalt was involved in a crash in Wisconsin

which resulted in the deaths of the front right and rear right passengers.  NHTSA assigned

Indiana University Transportation Research Center to investigate the crash.  The vehicle was

inspected on November 6, 2006.[69]  GM reported the crash later in 2006 in an Early Warning

Reporting ("EWR") filing with NHTSA.[70]  NHTSA requested additional information from GM

in May of 2007, and GM responded a month later.[71]

94.      In 2007, two analyses of the fatalities in the Wisconsin Cobalt crash—one by

Wisconsin State Trooper Keith Young and another by the Indiana University researchers

discussed above—both independently concluded that the movement of the ignition switch from

"run" to "accessory" caused the 2006 accident, the airbag non-deployment, and the tragic deaths.

---

[67] Valukas Report at 113, fn. 474.

[68] Valukas Report at 113-114.

[69] Indiana Univ. Transp. Research Ctr., On-site Air Bag Non-deployment Investigation Case No. IN06-033, Vehicle: 2005 Chevrolet Cobalt (Oct. 2006) (hereinafter the "2006 SCI Report").

[70] Letter from Christina Morgan, Chief, Early Warning Division, Office of Defects Investigation, to Gay P. Kent, Director, General Motors Corp. (May 7, 2007); Letter to Christina Morgan from Gay P. Kent, Director, Product Investigations (June 7, 2007) (GMHEC00198410-198414).

[71] GMHEC00197898.

Trooper Young was able to reach this accurate conclusion examining GM's own engineering documents.

95.    Internal GM documents show that the company received at least 248 reports of airbag non-deployment in MY 2005 vehicles.[72]  Internal documents also showed that GM received at least 134 reports of air bag non-deployment in MY 2006 vehicles.[73]

**J.    GM Responded To Growing Evidence Of Fatalities By Updating The Technical Service Bulletin To Dealers About Heavy Key Chains.**

96.    In October 2006, GM updated the December 2005 Service Bulletin to include additional make and MY vehicles, namely:  the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, and 2007 Pontiac Solstice and G5.  As it had previously done, GM avoided acknowledging the Delta Ignition Switch Defect and this time blamed the problem on short people and heavy key rings, stating:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they will have the seat positioned closer to the steering column.  In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain.[74]

97.    Despite the TSB to dealers, the Delta Ignition Switch Vehicles remained on the road endangering the lives and livelihoods of the Class and the public.

---

[72] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[73] GM Internal Summary Points on Airbag Non-Deployment for Cobalt, G5 and Pursuit (Aug. 2013).

[74] GMHEC000143093; GM Technical Service Bulletin, "Information on Inadvertent Turning Off of Key Cylinder, Loss of Electrical System and no DTCs," (Oct. 25, 2006), at GMHEC000138614.

09-50026-mg    Doc 13806-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit A -
Proposed Intervenors Class Claims    Pg 62 of 231    Pg 30 of 108

**K.    GM Knew Of And Tracked Multiple Accidents Involving The Delta Ignition Switch
Defect But Avoided Scrutiny By Misleading The Class, The Public, And Regulators.**

98.    GM knew that people were being killed and seriously injured because of the Delta

Ignition Switch Defect in its vehicles and the resulting loss of power and airbag non-deployment.

99.    In March 2007, GM met with NHTSA and discussed the July 29, 2005 fatal crash

involving Amber Rose.[75]  At this meeting, NHTSA informed GM that the airbags in Ms. Rose's

Cobalt did not deploy, causing Ms. Rose' death, and that data retrieved from the crashed

vehicle's diagnostic system indicated that the ignition was in the "accessory" position.  This was

no surprise to GM; it had been secretly tracking ignition switch related accidents for some time.

By the end of 2007, GM identified 10 other accidents, including 4 where the ignition switch had

moved into the "accessory" position.[76]

100.    Thus, by the end of 2007, GM knew of at least 10 frontal collisions involving the

Delta Ignition Switch Vehicles in which the airbag did not deploy.[77]

101.    For the next two years, GM continued to receive complaints and continued to

investigate frontal crashes in which the airbags did not deploy in Delta Ignition Switch Vehicles,

but did not disclose the crucial safety information to the Class of unsuspecting drivers of the

vehicles.

102.    In April 2007, as part of its investigation into the July 2005 Maryland Cobalt

crash that killed Amber Rose, NHTSA received a 2006 SCI report stating that the "crash is of

special interest because the vehicle was equipped with … dual stage air bags that did not

---

[75] GM Feb. 24, 2014, Letter to NHTSA, GM February Chronology.

[76] GM Feb. 24, 2014, Letter to NHTSA, GM February chronology.

[77] Letter from M. Carmen Benavides, Dir., Prod. Investigations & Safety Regulations, GM, to Nancy Lewis,
Assoc. Adm'r for Enforcements, NHTSA, Attach. B-573.6(c)(6) at 2 (February 24, 2014), *available at*
http://democrats.energycommerce.house.gov/sites/default/files/ documents/Letter-Benavides-Lewis-2014-02-24.pdf
(or "Benavides Letter").

09-50026-mg   Doc 13896-1   Filed 03/27/20   Entered 03/27/20 29:09:58   Exhibit A -
Proposed Ignition Switch Class Claim   Pg 31 of 108

deploy."[78]   The SCI Report concluded that the air bags did not deploy "as a result of the impact

with the clump of trees, possibly due to the yielding nature of the tree impact or power loss due

to the movement of the ignition switch just prior to impact."[79]   The Electronic Data Recorder for

the vehicle indicated that the ignition switch was in "accessory" mode at the time of impact.[80]

The SCI Report also found that the investigation demonstrated that contact with the ignition

switch could result in "engine shut down and loss of power."[81]

103.     In August 2007, GM met with its airbag supplier, Continental, to review SDM

data from a 2005 Chevrolet Cobalt crash where the airbags failed to deploy.[82]

104.     The next month, in September of 2007, the Chief of the Defects Assessment

Division ("DAD") within NHTSA's Office of Defects Investigation ("ODI") proposed an

investigation of "frontal airbag non-deployment in the 2003-2006 Chevrolet Cobalt/Saturn Ion"

vehicles.[83]   In an email, the Chief of DAD within ODI noted that the "issue was prompted by a

pattern of reported non-deployments in VOQ [("Vehicle Owner Questionnaire")] complaints that

was first observed in early 2005."[84]   The email stated that NHTSA had "discussed the matter

with GM," but that GM had assured NHTSA that "they see no specific problem pattern."[85]

NHTSA's Greg Magno stated:

> Notwithstanding GM's indications that they see no specific
> problem, DAD perceives a pattern of non-deployment in these
> vehicles that does not exist in their peers and that their

---

[78] 2006 NTHSA SCI Report.

[79] 2006 NTHSA SCI Report at ii.

[80] 2006 NTHSA SCI Report at 7.

[81] 2006 NTHSA SCI Report at 7.

[82] Continental Automotive Sys. US, Inc., Field Event Analysis Report, GMHEC00003143-3153, GM Mar. 11, 2014 Letter to NHTSA, GM March chronology at 2.

[83] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[84] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[85] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit A -
Proposed Ignition Switch Class Claim of 231    Pg 32 of 108
Later Class Claims PC 64

circumstances are such that, in our engineering judgment, merited
a deployment, and that such a deployment would have reduced
injury levels or saved lives.[86]

105.    In November 2007, NHTSA's ODI considered a proposal to investigate the non-
deployment of airbags in 2003-2006 Chevy Cobalt and Saturn Ion vehicles.[87]  The review was
prompted by 29 complaints, 4 fatal crashes, and 14 field reports that NHTSA knew about.[88]
Again, GM not only failed to act, but it worked to thwart the agency's efforts, in furtherance of
its fraud and concealment to the detriment of the Class.

106.    As part of the cover-up, GM tried to avoid full regulatory investigation and
disclosure by claiming that it was unaware of any problem in its vehicles.  Furthermore, GM
knew that the airbag system in the Delta Ignition Switch Vehicles would be disabled when the
ignition switch moved from the "run" to the "accessory" position.  The airbag system, in other
words, was disabled when the vehicle lost power.  GM knew, however, that NHTSA believed
that in most, if not all, vehicles, the airbag systems were operable for several seconds following a
power loss.  Although GM knew that NHTSA was mistaken, it did not correct NHTSA's
mistaken belief.

107.    From 2001 until July 10, 2009, GM was repeatedly put on notice of the Delta
Ignition Switch Defect and received reports of deaths and injuries in Chevy Cobalts and other
GM vehicles involving airbag failures and/or steering failures, yet acted at every turn to
fraudulently conceal the danger from the Class.  Examples include, but are not limited to the
following:

- 2005: 26 Cobalt Death and Injury Incidents, including 1
  death citing "airbag" as the component involved.

---

[86] Email from Chief of DAD, ODI, to NHTSA staff (Sept. 5, 2007), NHTSA-HEC-004491.

[87] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

[88] DAD Panel (Nov. 17, 2007), at NHTSA-HECC-004462-4483.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing "airbag" as the component involved and 4 deaths listing the component involved as "unknown."

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing "airbag" as the component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing "airbag" as the component involved and 2 deaths listing the component involved as "unknown."[89]

**L.    In 2009, As Injuries And Deaths Continued To Mount, GM Opened Yet Another Internal Investigation Of The Ignition Switch Defect, But Continued To Conceal Information About The Defect From Its Customers And The Class.**

108.    In February 2009, GM initiated yet another internal investigation of the Delta Ignition Switch Defect which resulted in a redesign of the ignition key for the 2010 model/year Cobalt.[90]  However, GM took no remedial action in response to the investigation and continued to conceal the facts. Consequently, deaths, injuries, and incidents continued to occur related to the Delta Ignition Switch Defect.  As one GM employee put it when the Delta Ignition Switch Defect was raised again internally at GM:

> "Gentleman!  This issue has been around since man first lumbered out of sea and stood on two feet.  In fact, I think Darwin wrote the first PRTS on this and included as an attachment as part of his Theory of Evolution."[91]

109.    Some within GM were not mincing words.  Yet GM chose to conceal the truth from the Class, and the death and injury toll mounted.

110.    Again, in April 2009, a 2005 Chevy Cobalt was involved in a crash in Pennsylvania which resulted in the deaths of the driver and front passenger.[92]  The crash was

---

[89] NHTSA Cobalt Chronology prepared by the Center for Auto Safety, February 27, 2014.

[90] GM Feb. 24, 2014 Letter To NHTSA, GM Feb. chronology at 2; Valukas Report at 132-133; GM PRTS Complete Report (1078137)—GMNHTSA000018925.

[91] Memo, Joseph R. Manson, Feb. 18, 2009, GMHEC000282093.

[92] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.: CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

31

investigated by NHTSA.[93]  The 2009 SCI Report noted that data from the Cobalt's SDM

indicated that the ignition switch was in "accessory" mode at the time of the crash.[94]  Still, GM

refused to issue a recall or notify the Class of the danger.

### M.    Right Up Until Its Bankruptcy Filing, GM Concealed Its Knowledge Of The Ignition Switch Defect And Its Devastating Consequences.

111.    Beginning in 2007, GM Field Performance Assessment engineer John Sprague

maintained a spreadsheet of accidents involving the Cobalt airbag non-deployment, along with

the vehicle power mode status.  To gather the data for the spreadsheet, Sprague sent SDMs from

crash vehicles to Continental (the SDM manufacturer) so that it could access information that

GM could not.[95]  After receiving the data from Continental, Sprague collected information

regarding the Cobalt crashes and power mode status, added it to the spreadsheet, and discovered

that, in fact, the power mode status was recorded as "off" or "accessory" in many accidents.[96]

112.    Sprague continued to maintain his spreadsheet through and beyond the end of

GM's corporate existence.  In doing so, Sprague noticed a pattern—the problem of non-

deployment of airbags did not appear to be present in MY 2008 and later Cobalts.  That led him

to question whether there had been some change in the Cobalt from MY 2007 to MY 2008.[97]

113.    Sprague brought his spreadsheet on the ignition switches and vehicles losing

power while driving to a meeting with DeGiorgio in 2009 and the two of them reviewed it

together.[98]  Still no action was taken.  Instead there were more non-productive meetings.

---

[93] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").

[94] Calspan Corp. Crash Data Research Ctr., Calspan On-site Air Bag Non-deployment Investigation SCI Case No.:  CA09022, Vehicle:  2005 Chevrolet Cobalt (Apr. 2009) (the "2009 SCI Report").  SDM Data Report, attached to 2009 SCI Report.

[95] Valukas Report at 134.

[96] J&B Interview of John Sprague, May 27, 2014.  Valukas Report at 135, fn. 596.

[97] Valukas Report at 137.

[98] Valukas Report at 138, fn. 616.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:80    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 35 of 108

114.    In May 2009, GM again met with its SDM supplier, Continental, and asked for
data in connection with another crash involving a 2006 Chevy Cobalt where the airbags failed to
deploy.[99]  In a report dated May 11, 2009, Continental analyzed the SDM data and concluded
that the state changed from "run" to "off" during the accident.  According to Continental, this, in
turn, disabled the airbags.  GM did not disclose this finding to NHTSA, despite its knowledge
that NHTSA was interested in non-deployment incidents in Chevrolet Cobalt vehicles.  Yet
again, in the face of mounting death tolls, GM did not correct the Delta Ignition Switch Defect,
take the Delta Ignition Switch Vehicles off the road, or warn its consumers or the Class.
Sprague's secret spreadsheet of accidents simply grew.

115.    The next month, in June 2009, GM filed a Chapter 11 petition.  The bankruptcy
sale to "New GM" became effective on July 10, 2009, and the Bar Date for filing proofs of claim
was set for November 30, 2009.

### III.    OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES.

116.    In addition to the Delta Ignition Switch Defect summarized above, GM sold
vehicles with dozens of other defects—many of which were known to and concealed by GM, and
remained concealed until New GM conducted a parade of recalls in 2014.

117.    In many cases, the available evidence suggests that GM was aware of the defects.
In any event, the defects are the product of GM's systemic valuation of cost-cutting and
devaluation of safety, making it likely that GM was aware of each of the following defects
summarized below.

---

[99] Continental Automotive Sys. US, Inc., Field Event Analysis Report GMHEC00003129-3142.

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 23:03:36    Exhibit A -
Proposed Later Class Claims    Class Claim    Pg 36 of 108

A.    **Ignition Lock Cylinder Defect In Vehicles Also Affected By The Delta Ignition
Switch Defect.**

118.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[100]  Though the

vehicles are the same as those affected by the Delta Ignition Switch Defect,[101] the lock cylinder

defect is distinct.

119.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

key while the engine is not in the "off" position.  If the ignition key is removed when the ignition

is not in the "off" position, unintended vehicle motion may occur.  That motion could cause a

crash and injury to the vehicle's occupants or pedestrians.  Some of the vehicles with faulty

ignition lock cylinders may fail to conform to Federal Motor Vehicle Safety Standard number

114, "*Theft Prevention and Rollaway Prevention*."[102]

120.    According to New GM's Chronology that it submitted to NHTSA on April 23,

2014, the ignition lock cylinder defect recall arose out of the notorious recalls for the Ignition

Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice, Saturn

ION, and Saturn Sky vehicles.[103]

121.    New GM noted several hundred instances of potential key pullout issues in

vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances

identified from records relating to customer and dealer reports to GM call centers, 479 instances

identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA VOQ

information.  New GM investigators also identified 16 roll-away instances associated with the

---

[100] New GM Letter to NHTSA dated April 9, 2014.

[101] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[102] New GM Notice to NHTSA dated April 9, 2014, at 1.

[103] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:00    Exhibit A -
Proposed Late Class Claim    Ignition Switch Class Claim    Pg 37 of 108

key pullout issue from records relating to customer and dealer reports to GM call centers and legal claims information.

122.    New GM also considered the possibility that some vehicles may have experienced key pullout issues at the time they were manufactured by GM, based on information that included the following:  (a) a majority of instances of key pullouts that had been identified in the recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition, repair order data indicated vehicles within that population had experienced a repair potentially related to key pullout issues as early as 47 days from the date on which the vehicle was put into service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key pullout issues was initiated in June 2005, which resulted in an engineering work order to modify the ignition cylinder going forward.

123.    A majority of the key pullout instances identified involved 2003-2004 model year Saturn Ion and 2005 model year Chevrolet Cobalt vehicles.  An April 3, 2014 New GM PowerPoint identified 358 instances of key pullouts involving those vehicles.

124.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles, the April 3 PowerPoint materials discussed the number of days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road) and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the MY 2003 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days from its "In Service Date;" with respect to the MY 2004 Saturn Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with respect to the MY 2005 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early as 173 days from its "In Service Date;" and with respect to the MY 2006 Chevrolet Cobalt, a

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit A -
Proposed Intervenors Class Action Pg 38 of 108

vehicle was reported as experiencing a potential key pullout repair as early as 169 days from its "In Service Date." The length of time between the "In Service Date" and the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

125.    The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the Chevrolet Cobalt (PRTS N 183836). According to PRTS N 183836: "Tolerance stack up condition permits key to be removed from lock cylinder while driving." The "Description of Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up exists in between the internal components of the cylinder." According to a "Summary," "A tolerance stack up condition exists between components internal to the cylinder which will allow some keys to be removed." The Problem Resolution identified the following "Solution": "A change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that exist in the cylinder."

126.    In response to PRTS N 183836, GM issued an engineering work order to "[c]hange shape of ignition cylinder sidebar top from flat to crowned."

127.    According to the work order: "Profile and overall height of ignition cylinder sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes. Profile of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

128.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward. An entry in Problem Resolution made on March 2, 2007 stated: "There were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles…." A "Summary" in Problem Resolution stated: "Because there were no incidents of the key coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this

09-50026-mg   Doc 13895-1   Filed 03/27/20   Entered 03/27/20 20:09:58   Exhibit A -
Proposed Interclass Claims Pt 1 of 2   Pg 39 of 108

PRTS issue should be closed." PRTS N 183836 was the only PRTS discussed at the April 3, 2014, Decision Committee meeting, although it is not the only engineering or field report relating to potential key pullout issues.

129.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to Federal Motor Vehicle Safety Standards and Regulations ("FMVSS") 114. In addition, the Decision Committee concluded that a defect related to motor vehicle safety existed, and decided to recall all vehicles covered by the Ignition Switch Defect recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could result in a vehicle crash and occupant or pedestrian injuries. For vehicles that were built with a defective ignition cylinder that have not previously had the ignition cylinder replaced with a redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new ignition/door keys for each vehicle.

**B.    Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

130.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue vehicles.[104] In the affected vehicles, the ignition key can be removed when the vehicle is not in the "off" position.[105] If this happens, the vehicle can roll away, increasing the risk for a crash and occupant or pedestrian injuries.[106]

131.    Following New GM's April 9, 2014 recall announcement regarding ignition switch defects, New GM reviewed field and warranty data for potential instances of ignition cylinders that permit the operator to remove the ignition key when the key is not in the "off"

---

[104] *See* August 7, 2014 Letter from New GM to NHTSA.

[105] *Id.*

[106] *Id.*

09-50026-mg    Doc 13806-1    Filed 02/27/20    Entered 02/27/20 20:09:56    Exhibit A -
Proposed Interlocutory Appeal PCl 2 of 234    Pg 40 of 108

position in other vehicles outside of those already recalled.[107]  New GM identified 152 reports of vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in the MY 2002-2004 Saturn Vue vehicles.[108]

132.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and July 24, 2014, New GM instituted a safety recall on July 31, 2014.[109]

## C.    "Second Wave" Ignition Switch Defects In Millions Of GM Vehicles.

133.    In addition to the vehicles subject to the Delta Ignition Switch Defect, GM manufactured millions of other vehicles subject to the same or substantially similar ignition switch defects (collectively, "Defective Ignition Switch Vehicles").  In each case, the ignition switch defects caused unintended stalling with the attendant shut-down of critical systems, including power steering, power brakes, seatbelt pretensioners, and airbags.

134.    While these millions of vehicles with defective ignition switches were not recalled until 2014, the evidence suggests that GM was long aware of the defects, well prior to the bankruptcy Sale.

### 1.    The Defective Ignition Switch Vehicles that were eventually subject to the June 20, 2014 recall for the "ignition key slot defect."

135.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for ignition switch, or ignition key slot, defects (NHTSA Recall No. 14-V-355).  New GM announced to NHTSA and the public that the recall concerns an ignition key slot defect.

136.    Approximately 2,349,095 of the vehicles subject to this recall were made by GM and sold prior to November 30, 2009, and are therefore at issue in this Proof of Claim.

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

137.    The following vehicles were included in the June 20, 2014 recall:  2005-2009
Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac
DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

138.    The recall notice states, "In the affected vehicles, the weight on the key ring
and/or road conditions or some other jarring event may cause the ignition switch to move out of
the run position, turning off the engine."

139.    Further, "[i]f the key is not in the run position, the air bags may not deploy if the
vehicle is involved in a crash, increasing the risk of injury.  Additionally, a key knocked out of
the run position could cause loss of engine power, power steering, and power braking, increasing
the risk of a vehicle crash."

140.    The vehicles included in this recall were built on the same platform and their
defective ignition switches are likely due to weak detent plungers, just like the Cobalt and other
Delta Ignition Switch Vehicles recalled in February and March of 2014 in Recall No. 14-V-047.

141.    GM was long aware of the ignition switch defect in these vehicles, as
demonstrated by the following facts, all of which were known to GM:

a.      On or about August 25, 2005, Laura Andres, a GM design engineer, wrote
a description of ignition switch issues that she experienced while operating a 2006 Chevrolet
Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I
was driving about 45 mph, where the road changes from paved to gravel & then back to paved,
some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.
The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition
detent, because in a road test in the parking lot it also shut off."

09-50026-mg   Doc 14805-1   Filed 03/27/20   Entered 03/27/20 20:09:38   Exhibit A -
Proposed Ignition Switch Class Claim of 231   Pg 42 of 108

b.      GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on

August 25, 2005 to four other GM employees.  Mr. Dickinson asked, "Is this a condition we

would expect to occur under some impacts?"

c.      On August 29, 2005, GM employee Jim Zito forwarded the messages to

Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being

sensitive to road bumps?"

d.      Mr. DeGiorgio responded the same day, stating, "To date there has never

been any issues with the detents being too light."

e.      On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito

and copied ten other GM employees, including Ray DeGiorgio.  Ms. Andres, in her email, stated,

"I picked up the vehicle from repair.  No repairs were done. . . . The technician said there is

nothing they can do to repair it.  He said it is just the design of the switch.  He said other

switches, like on the trucks, have a stronger detent and don't experience this."

f.      Ms. Andres' email continued:

> I think this is a serious safety problem, especially if this switch is on
> multiple programs.  I'm thinking big recall.  I was driving 45 mph when I
> hit the pothole and the car shut off and I had a car driving behind me that
> swerved around me.  I don't like to imagine a customer driving with their
> kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I
> think you should seriously consider changing this part to a switch with a
> stronger detent.

142.    New GM has tried to characterize the recall of these 3.14 million vehicles as

being different than the recall for the ignition switch defect in the Delta Ignition Switch Vehicles

when in reality, and for all practical purposes it is for exactly the same defect that creates exactly

the same safety risks.

143.    From 2001 to the end of its corporate existence in July of 2009, GM received

numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to

this safety defect.  The following are examples of just a few of the many reports and complaints

regarding the defect that GM received and/or knew about:

144.   A January 23, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on January 23, 2001, in which the following was reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

145.   A June 12, 2001 complaint filed with NHTSA involving a MY 2000 Cadillac

Deville and an incident that occurred on June 12, 2001, in which the following was reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

146.   A January 27, 2003 complaint filed with NHTSA involving a MY 2001 Cadillac

Deville and an incident that occurred on January 27, 2003, in which the following was reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK  NHTSA ID Number:
> 10004759.

147.   A September 18, 2007 complaint filed with NHTSA involving a MY 2006

Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was reported

that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER
> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER

41

SUSTAINED MINOR INJURIES TO HIS WRIST. THE
VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
DEALER WAS NOTIFIED AND STATED THAT THE CRASH
HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
CURRENT AND FAILURE MILEAGES WERE 21,600. THE
CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

148.    An April 2, 2009 complaint filed with NHTSA involving a MY 2005 Buick

LaCrosse and an incident that occurred on April 2, 2009, in which the following was reported:

POWER STEERING WENT OUT COMPLETELY, NO
WARNING JUST OUT. HAD A VERY HARD TIME
STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
NHTSA ID Number: 10263976.

149.    The approval and implementation of the defective ignition switches resulted in

part from GM's systemic valuation of cost-cutting over safety, and the many disincentives to

flagging or taking responsibility for safety issues at GM.

150.    GM was aware of the so-called "ignition key slot" defect for years yet continued

to sell these Defective Ignition Switch Vehicles, and did nothing to either warn the public or

correct the defect in these vehicles.

**2.    The Defective Ignition Switch Vehicles giving rise to the July 2 and 3 recalls
for so-called "unintended ignition rotation" defects.**

151.    On July 2, 2014, New GM recalled 554,328 vehicles in the United States for

ignition switch defects (Recall No. 14-V-394).  The July 2 recall applied to MY 2003-2014

Cadillac CTS vehicles and MY 2004-2006 Cadillac SRX vehicles.

152.    The recall notice explains that the weight on the key ring and/or road conditions

or some other jarring event may cause the ignition switch to move out of the "run" position,

turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy

in the event of a collision, increasing the risk of injury.

09-50026-mg   Doc 13895-1   Filed 02/27/20   Entered 02/27/20 20:09:56   Exhibit A -
Proposed Intervenor Class Claim   Pg 45 of 108

153.    On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United

States for ignition switch defects (Recall No. 14-V-400).

154.    The following vehicles were included in Recall No. 14-V-400:  1997-2005

Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005

Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-

2004 Oldsmobile Alero.

155.    The recall notice states that the weight on the key and/or road conditions or some

other jarring event may cause the ignition switch to move out of the "run" position, turning off

the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is

involved in a collision, increasing the risk of injury.

156.    In both of these recalls, New GM notified NHTSA and the public that the recall

was intended to address a defect involving unintended or "inadvertent key rotation" within the

ignition switch of the vehicles.  As with the ignition key defect announced June 20, 2014,

however, the defects for which these vehicles have been recalled is directly related to the ignition

switch defect in the Cobalt and other Defective Ignition Switch Vehicles and involves the same

safety risks and dangers.

157.    All of the vehicles involved in Recall No. 14-V-400 were manufactured by GM

and sold or leased prior to November 30, 2009, as were approximately 400,000 of the vehicles

involved in Recall No. 14-V-394.

158.    Once again, the unintended ignition rotation defect is substantially similar to and

relates directly to the other ignition switch defects, including the defects that gave rise to the

initial recall of the Delta Ignition Switch Vehicles in February and March of 2014.  Like the

other ignition switch defects, the unintended ignition key rotation defect poses a serious and

dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

159.    The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the Delta Ignition Switch Vehicles and the other Defective Ignition Switch Vehicles:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

160.    The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to GM, and was the basis for a change that was made to a use stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

161.    GM was long aware of the defects in these vehicles, as the following facts indicate, as well as others not pled herein:

a.    In January of 2003, GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his MY 2003 Pontiac Grand Am.

b.    During the investigation, GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The

09-50026-mg   Doc 13895-1   Filed 03/27/20   Entered 03/27/20 20:08:56   Exhibit A -
Proposed Intervenor Class Claims   Pg 47 of 108

customer was able to recreate the shutdown event by driving over a speed bump at

approximately 30-35 mph.

        c.      The customer's key ring was allegedly quite heavy.  It contained

approximately 50 keys and a set of brass knuckles.

        d.      In May 2003, GM issued a voicemail to dealerships describing the

defective ignition condition experienced by the customer in the Grand Am.  GM identified the

relevant population of affected vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero,

and Pontiac Grand Am.

        e.      GM did not recall these vehicles.  Nor did it provide owners and/or lessees

with notice of the defective condition.  Instead, its voicemail directed dealerships to pay attention

to the key size and mass of the customer's key ring.

        f.      On July 24, 2003, GM issued an engineering work order to increase the

detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile

Alero, and Pontiac Grand Am vehicles.  GM engineers allegedly increased the detent plunger

force and changed the part number of the ignition switch.  The new parts were installed

beginning in MY 2004 Malibu, Alero, and Grand Am vehicles.

        g.      GM issued a separate engineering work order in March 2004 to increase

the detent plunger force on the ignition switch in the Pontiac Grand Prix.  GM engineers did not

change the part number for the new Pontiac Grand Prix ignition switch.

        h.      GM design engineer Ray DeGiorgio signed the work order in March 2004

authorizing the part change for the Grand Prix ignition switch.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:86    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 48 of 108

162.    From 2002 to the end of its corporate existence, GM received numerous reports

from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.

The following are just a handful of examples of some of the reports known to GM.

163.    A September 16, 2002 complaint filed with NHTSA regarding a MY 2002

Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the

following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK  NHTSA ID Number: 8018687.

164.    A November 22, 2002 complaint filed with NHTSA involving a MY 2003

Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

165.    A January 21, 2003 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED, THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

166.    A June 30, 2003 complaint filed with NHTSA regarding a MY 2001 Oldsmobile

Intrigue which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number: 10026252.

167.    A March 11, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK  NHTSA ID Number: 10062993.

168.    A March 11, 2004 complaint with NHTSA regarding a MY 2003 Oldsmobile

Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSESSED AS OF
> YET. THEY WANT ME TO TRY TO SELL IT. CAN YOU
> HELP ?*AK  NHTSA ID Number: 10061898.

09-50026-mg    Doc 14695-1    Filed 02/27/20    Entered 02/27/20 20:09:50    Exhibit A -
Proposed Later Class Claims Class C P 2 of 231    Pg 50 of 108

169.    A July 20, 2004 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, involving an incident that occurred on July 9, 2004, in which the following was reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA  NHTSA ID Number:
> 10082289.

170.    An August 2004 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.  NHTSA ID
> Number:  10089418.

171.    A report in August of 2004 involving a MY 2004 Chevrolet Malibu incident that

occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.  NHTSA ID
> Number: 10087966**.**

172.    An October 23, 2004 complaint with NHTSA regarding a MY 2003 Chevrolet

Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN
> ELECTRICAL SYSTEM FAILURE. AS A RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
> ID Number: 10044624**.**

09-50026-mg    Doc 14595-1    Filed 03/27/20    Entered 03/27/20 20:09:58    Exhibit A -
Proposed Interim Class Claims Class Claim 234 of 108

173.    An April 26, 2005 complaint filed with NHTSA involving a MY 2005 Pontiac

Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-
> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER
> GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
> CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6)  NHTSA ID Number: 10118501.

09-50026-mg   Doc 13805-1   Filed 02/27/20   Entered 02/27/20 20:05:08   Exhibit A -
Proposed Ignition Switch Class Claim   Pg 52 of 108

174.   A May 2005 complaint filed with NHTSA regarding a MY 2004 Chevrolet

Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR.  NHTSA ID Number: 10123684.

175.   A June 2, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand Am

incident that occurred on February 18, 2005, in which the following was reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY ARE LOST.*MR *NM.  NHTSA ID
> Number: 10124713.

176.   An August 12, 2005 complaint filed with NHTSA involving a MY 2003 Cadillac

CTS, regarding an incident that occurred on January 3, 2005, in which it was reported that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES SINCE JANUARY. THE DEALER TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

177.   An August 26, 2005 complaint with NHTSA regarding a MY 2004 Pontiac Grand

Am incident that occurred on August 26, 2005, in which the following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
> FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
> ME WITH NO POWER STEERING AND NO WAY TO
> REGAIN CONTROL OF THE CAR UNTIL COMING TO A
> COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
> IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 20:09:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 53 of 108

> THE CAR FAILED TO START AT ALL NOT EVEN TURNING
> OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
> GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
> CONTROL MODULE" IN THE CAR. AT THIS TIME THE
> PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
> MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
> IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
> I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
> MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
> TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
> THE CAR CONTINUED TO START AND SHUT OFF ALL
> THE WAY TO THE SERVICE GARAGE WHERE IT WAS
> AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
> MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
> FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
> WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
> POSSIBLE THE "POWER CONTROL MODULE". AT THIS
> TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
> FOR TRAVEL. *JB  NHTSA ID Number: 10134303.

178.    A September 22, 2005 complaint filed with NHTSA involving a MY 2005

Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

> DT: 2005 CADILLAC CTS – THE CALLER'S VEHICLE WAS
> INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
> UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
> VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
> WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
> INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
> VEHICLE HAS NOT BEEN INSPECTED BY THE
> DEALERSHIP, AND INSURANCE COMPANY TOTALED
> THE VEHICLE. THE CALLER SAW NO REASON FOR THE
> AIR BAGS NOT TO DEPLOY.  TWO INJURED WERE
> INJURED IN THIS CRASH.  A POLICE REPORT WAS
> TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
> 10137348.

179.    A September 29, 2006 complaint filed with NHTSA involving a MY 2004

Cadillac CTS and an incident that occurred on September 29, 2006, in which the following was

reported:

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 20:09:58    Exhibit A -
Proposed Ignition Switch Class Claim Class Claim Pg 54 of 108

DT*: THE CONTACT STATED AT VARIOUS SPEEDS
WITHOUT WARNING, THE VEHICLE LOST POWER AND
WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
WITHOUT WARNING, THE VEHICLE STALLED ON
SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
REPLACED THE THROTTLE TWICE AND THE THROTTLE
BODY ASSEMBLY HARNESS, BUT THE PROBLEM
PERSISTED. *AK UPDATED 10/25/2006 – *NM  NHTSA ID
Number: 10169594.

180.    An April 18, 2007 complaint filed with NHTSA involving a MY 2004 Cadillac

SRX, regarding an incident that occurred on April 13, 2007, in which it was reported that:

TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
ENGINE STALLED WITHOUT WARNING AND CAUSED
ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
VEHICLE WAS ABLE TO RESTART A FEW MINUTES
AFTER THE CRASH. THE DEALER AND MANUFACTURER
WAS UNABLE TO DIAGNOSE THE FAILURE. THE
MANUFACTURER HAD THE VEHICLE INSPECTED BY A
CADILLAC SPECIALIST WHO WAS UNABLE TO
DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
TO STALL. THE CURRENT AND FAILURE MILEAGES
WERE 48,000.  NHTSA ID Number: 10188245.

181.    A September 20, 2007 complaint filed with NHTSA involving a MY 2007

Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it was

reported that:

TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER
HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
CURRENT MILEAGE WAS 11,998.  NHTSA ID Number:
10203516.

182.    A September 24, 2007 complaint filed with NHTSA involving a MY 2004

Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the following

was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

183.    A June 18, 2008 complaint filed with NHTSA involving a MY 2006 Cadillac

CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER SWITCH THAT CONTROLS THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP
> EXPLAINED THAT THEY COULD NOT IDENTIFY THE
> FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR
> THEM TO DIAGNOSE THE FAILURE PROPERLY. THE
> CURRENT AND FAILURE MILEAGES WERE 43,000.
> NHTSA ID Number: 10231507.

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 20:08:68    Exhibit A -
Proposed Intervenors Class Claims Pg 56 of 108

184.    An October 14, 2008 complaint filed with NHTSA involving a MY 2008 Cadillac

CTS and an incident that occurred on April 5, 2008, in which it was reported that:

> WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE
> NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN
> OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO
> 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL
> 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE
> DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3
> TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM
> BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD
> CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD
> TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I
> HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT.
> *TR  NHTSA ID Number: 10245423.

185.    A November 13, 2008 complaint with NHTSA regarding a MY 2001 Oldsmobile

Intrigue, in which the following was reported:

> L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE.
> WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY
> STALLS AND HESITATES. IN ADDITION, THE
> INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE
> AT RANDOM. THE VEHICLE FAILED INSPECTION AND
> THE CRANKSHAFT SENSOR WAS REPLACED, WHICH
> HELPED WITH THE STALLING AND HESITATION;
> HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL
> ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR
> WAS REPLACED, THE VEHICLE FAILED TO START.
> HOWEVER, ALL OF THE INSTRUMENT PANEL
> INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS
> ATTEMPTS TO START THE VEHICLE, HE HAD IT
> JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO
> START. WHILE DRIVING HOME, ALL OF THE LIGHTING
> FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE
> VEHICLE LOST ALL ELECTRICAL POWER AND POWER
> STEERING ABILITY. THE CONTACT MANAGED TO PARK
> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000.  NHTSA ID
> Number: 10248694.

186.    A December 10, 2008 complaint filed with NHTSA regarding a MY 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN
> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
> OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
> WAS RANDOM. *TR  NHTSA ID Number: 10251280.

187.    A March 31, 2009 complaint filed with NHTSA regarding a MY 2005 Chevrolet

Malibu incident that occurred on May 30, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

188.    New GM has publicly admitted that at least 7 crashes, 8 injuries, and 3 deaths are

linked to this serious safety defect.  However, in reality, the number of reports and complaints is

much higher.

189.    Moreover, notwithstanding years of notice and knowledge of the defect, on top of

numerous complaints and reports from consumers, including reports of crashes, injuries, and

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:08:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 58 of 108

deaths, GM continued to sell these Defective Ignition Switch Vehicles and neither warned the public nor implemented a recall.

### 3. The Defective Ignition Switch Vehicles which gave rise to the September 4, 2014 recall.

190.    On September 4, 2014, New GM recalled, *inter alia,* 2008-2009 Pontiac G8 vehicles for yet another ignition switch defect (NHTSA Recall No. 14-V-540).  New GM's letter to NHTSA stated the total number of affected vehicles as 46,783—but that includes an indeterminate number of 2011-2013 Chevrolet Caprices manufactured and sold by New GM.

191.    New GM explains that, in these Defective Ignition Switch Vehicles, "there is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position."  New GM admits that, when this happens, "engine power, and power braking will be affected, increasing the risk of a crash."  Moreover, "[t]he timing of the key movement out of the 'run' position, relative to the activation of the sending algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[110]

192.    This recall is directly related to the other ignition switch recalls and involves the same safety risks and dangers.  The defect poses a serious and dangerous safety risk because the key in the ignition switch can rotate and consequently cause the ignition to switch from the "on" or "run" position to the "off" or "accessory" position, which causes the loss of engine power, stalling, loss of speed control, loss of power steering, loss of power braking, and increases the risk of a crash.  Moreover, as with the ignition switch torque defect, if a crash occurs, the airbags may not deploy.

---

[110] New GM's Part 573 Safety Recall Report, Sept. 4, 2014.

56

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit A -
Proposed Ignition Switch Class Claim - Later Class Claims PCR Pg 59 of 108

193.    The recall occurred after New GM "analyzed vehicle test results, warranty data, TREAD data, NHTSA Vehicle Owner Questionnaires, and other data."[111]

194.    Once again, the production of these Defective Ignition Switch Vehicles was a product of GM's systemic devaluation of safety issues, and GM knew or should have known of this defect.

**D.    Safety Defects Of The Airbag Systems Of GM Vehicles.**

**1.    Wiring harness defect.**

195.    On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn Outlook vehicles for a dangerous defect involving airbags and seatbelt pretensioners.

196.    The affected vehicles were sold with defective wiring harnesses.  Increased resistance in the wiring harnesses of driver and passenger seat-mounted, side-impact airbag in the affected vehicles may prevent the side impact airbags, front center airbags, and seat belt pretensioners from deploying in a crash.  The vehicles' failure to deploy airbags and pretensioners in a crash increases the risk of injury and death to the drivers and front-seat passengers.

197.    Once again, the available evidence suggests that GM knew of the dangerous airbag defect but failed to take the requisite remedial action.

198.    As the wiring harness connectors in the side impact airbags corrode or loosen over time, resistance will increase.  The airbag sensing system will interpret this increase in resistance as a fault, which then triggers illumination of the "SERVICE AIR BAG" message on the vehicle's dashboard.  This message may be intermittent at first and the airbags and pretensioners will still deploy.  But over time, the resistance can build to the point where the

---

[111] *Id.*

SIABs, pretensioners, and front center airbags will not deploy in the event of a collision.[112]  The

problem relates to the use of tin, rather than a more solid material, to connect wire harnesses.

199.    GM knew that in 2008 there was an increase in warranty claims for airbag service

on certain of its vehicles and determined it was due to increased resistance in airbag wiring.  A

September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors

was causing the increased resistance in the airbag wiring.  GM issued  a technical service bulletin

on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC

Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using

Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM began the

transition back to gold-plated terminals in certain vehicles and suspended all investigation into

the defective airbag wiring without taking further action.[113]

200.    Thus, through the remainder of its corporate history, GM failed to remedy the

known hazards caused by the wiring harness defect.

### 2.    Front passenger airbag defect.

201.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY

2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an

indeterminate number of which were manufactured by GM and sold prior to the Bar Date in

GM's bankruptcy.[114]

202.    In the affected vehicles, in certain frontal impact collisions below the airbag

deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of

---

[112] *See* New GM Notice to NHTSA dated March 17, 2014, at 1.

[113] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

[114] *See* March 31, 2014 Letter from New GM to NHTSA.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit A -
Proposed Intervenors' Class Claims    Pg 61 of 108

the collision (especially given the passenger-side airbag housing is plastic).[115]  These vehicles

therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior

Impact."[116]

**E.    Safety Defects Of The Seat Belt Systems In GM Vehicles.**

**1.    Seat belt connector cable defect.**

203.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY

2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-

2010 Saturn Outlook vehicles with a dangerous safety belt defect.

204.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to

the vehicle at the outside of the front outboard seating positions can fatigue and separate over

time as a result of occupant movement into the seat.  In a crash, a separated cable could increase

the risk of injury to the occupant."[117]

**2.    Seat belt retractor defect.**

205.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible

vehicles with a seat belt retractor defect.

206.    In the affected vehicles, the driver's side front seat belt retractor may break,

causing the seat belt webbing spooled out by the user not to retract.[118]  In the event of a crash, a

seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of

injury to the driver.[119]

---

[115] *Id.*

[116] *Id.*

[117] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[118] *See* New GM's June 11, 2013 Letter to NHTSA.

[119] *See id.*

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:05:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 62 of 108
Later Class Claims    PC 84 of 231

**F.    Safety Defects Affecting The Brakes In GM Vehicles.**

   **1.    Brake light defect.**

   207.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million

MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-

2010 Saturn Aura vehicles with a dangerous brake light defect.

   208.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes

are applied or illuminate when the brakes are not engaged; the same defect can disable cruise

control, traction control, electronic stability control, and panic brake assist operation, thereby

increasing the risk of collisions and injuries.[120]

   209.    Once again, GM knew of the dangerous brake light defect for years but did not

take anything approaching the requisite remedial action.

   210.    According to New GM, the brake defect originates in the Body Control Module

connection system.  "Increased resistance can develop in the [Body Control Module] connection

system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS)

circuit that can cause service brakes lamp malfunction."[121]  The result is brake lamps that may

illuminate when the brakes are not being applied and may not illuminate when the brakes are

being applied.[122]

   211.    The same defect can also cause the vehicle to get stuck in cruise control if it is

engaged, or cause cruise control to not engage, and may also disable the traction control,

electronic stability control, and panic-braking assist features.[123]

---

[120] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

[121] *Id.*

[122] *Id.*

[123] *Id.*

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:58   Exhibit A -
Proposed Ignition Switch Class Claim   Pg 63 of 108

212.     New GM now acknowledges that the brake light defect "may increase the risk of a crash."[124]

213.     As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may ***not*** turn on when the driver ***does*** depress the brake pedal.[125]

214.     During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[126]  GM and its part supplier Delphi decided that applying dielectric grease to the [Body Control Module] C2 connector would be "an effective countermeasure to the fretting corrosion."[127]  Beginning in November 2008, the Company began applying dielectric grease in its vehicle assembly plants.[128]

215.     On December 4, 2008, GM issued a Technical Service Bulletin recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[129]  One month later, in January 2009, GM recalled only a small subset of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[130]

216.     Not surprisingly, the brake light problem was far from resolved.

---

[124] *Id.*

[125] *Id.* at 2.

[126] *Id.*

[127] *Id.*

[128] *Id* at 3.

[129] *Id.* at 2.

[130] *Id.*

09-50026-mg    Doc 13805-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 64 of 108

217.    GM sat on and concealed its knowledge of the brake light defect for the remainder of its corporate existence, and did not even consider available countermeasures (other than the application of grease that proved ineffective).

**2.    Reduced brake performance defect.**

218.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and 2009 Pontiac G3 vehicles.[131]  Affected vehicles may contain brake fluid which does not protect against corrosion of the valves inside the anti-lock brake system module, affecting the closing motion of the valves.[132] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[133]

**G.    Safety Defects Affecting The Steering In GM Vehicles.**

**1.    Sudden power-steering failure defect.**

219.    Between 2003 and 2010, over 1.3 million GM vehicles in the United States were sold with a safety defect that caused the vehicle's electric power steering to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries.

220.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles—almost all of which were manufactured by GM and sold prior to the passing of the Bar Date in GM's bankruptcy.

---

[131] *See* July 28, 2014 Letter from New GM to NHTSA.

[132] *Id.*

[133] *Id.*

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:05:00   Exhibit A -
Proposed Interclass Claims Class Claim PG 7 of 231   Pg 65 of 108

221.    As with the ignition switch defects and many of the other defects, GM was long aware of the power steering defect but refused to take proper remedial action.

222.    When the power steering fails, a message appears on the vehicle's dashboard, and a chime sounds to inform the driver.  Although steering control can be maintained through manual steering, greater driver effort is required, and the risk of an accident is increased.

223.    Documents released by NHTSA show that GM (and then New GM) waited years to recall nearly 335,000 Saturn Ions for power-steering failure – despite receiving nearly 4800 consumer complaints and more than 30,000 claims for warranty repairs.  That translates to a complaint rate of 14.3 incidents per thousand vehicles and a warranty claim rate of 9.1 percent.  By way of comparison, NHTSA has described as "high" a complaint rate of 250 complaints per 100,000 vehicles.[134]  Here, the rate translates to 1430 complaints per 100,000 vehicles.

224.    NHTSA database records show complaints from Ion owners as early as June 2004, with the first injury reported in May 2007.

225.    NHTSA has linked approximately 12 crashes and 2 injuries to the power-steering defect in the Ions.

**2.    Loss of electric power steering assist defect.**

226.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 for a steering defect that may result in a sudden loss of electric power steering assist.[135]

227.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

---

[134] *See Search Saety Problems,* NHTSA, https://www-odi.nhtsa.dot.gov/cars/problems/defect/-results.cfm?action_number=EA06002&Search Type= QuickSearch&summary=true (last visted Dec. 8, 2016).

[135] *See* NHTSA Campaign Number 15V064000.

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 29:09:06    Exhibit A -
Proposed Ignition Switch Class Claims    Pg 66 of 108

**H.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac
Vehicles.**

228.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY
2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu
Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

229.    In the affected vehicles, the shift cable may fracture at any time, preventing the
driver from switching gears or placing the transmission in the "park" position.  According to
New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying
the park brake, the vehicle could roll away and a crash could occur without prior warning."[136]

**I.    Light Control Module Defect.**

230.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008
Chevrolet Aveo vehicles with a light control module defect.[137]  New GM later updated the
number of affected vehicles to 218,000.

231.    In the vehicles, heat generated within the daytime running lamp module in the
center console in the instrument panel may melt the module and cause a vehicle fire.[138]

**J.    Electrical Short In Driver's Door Module Defect.**

232.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007
Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007
GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x
vehicles with a defect that can cause an electrical short in the driver's door module.[139]

---

[136] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

[137] *See* May 30, 2014 Letter from New GM to NHTSA.

[138] *Id.*

[139] *See* July 2, 2014 Letter from New GM to NHTSA.

233.    In the affected vehicles, an electrical short in the driver's door module may occur that can disable the power door lock and window switches and overheat the module.  The overheated module can then cause a fire in the affected vehicles.

**K.    Low-Beam Headlight Defect.**

234.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007 Chevrolet Corvette vehicles with a low-beam headlight defect.

235.    In the affected vehicles, the underhood bussed electrical center housing can expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**L.    Fuel Pump Module Defect.**

236.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

237.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:08:08    Exhibit A - Proposed Late Class Claim Class Claim    Pg 68 of 108

dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**M.    Overloaded Feed Defect.**

238.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

239.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

**N.    Headlamp Driver Module Failure.**

240.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x for headlamp driver module failure.[140]  The number of affected vehicles was later modified to 269,586.

241.    In the affected vehicles, the headlamp driver module can overheat and fail, causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the roadway and reducing visibility of the vehicle to oncoming traffic.

**O.    Valve Cover Gasket Defect.**

242.    On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[141]  New GM later increased the number of affected vehicles to 50,948, and noted that this also includes 2004 Pontiac Grand Prix vehicles.

---

[140] *See* NHTSA Campaign Number 14V755000.

[141] *See* NHTSA Campaign Number 15V201000.

243.    In these vehicles the valve cover gasket may leak causing engine oil to drip onto

the exhaust manifold increasing the risk of fire.

## IV.    GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES.

244.    In a 2008 internal presentation, GM instructed its employees to avoid using the

following judgment words:[142]

| | | |
|---|---|---|
| Always | detonate | Maniacal |
| Annihilate | disemboweling | Mutilating |
| Apocalyptic | enfeebling | Never |
| Asphyxiating | evil | potentially-disfiguring |
| Bad | evicscerated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | Problem |
| big time | failed | Safety |
| brakes like an "X" car | flawed | safety related |
| Cataclysmic | genocide | Serious |
| Catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | Startling |
| chaotic | grisly | Suffocating |
| Cobain | gruesome | Suicidal |
| condemns | Hindenburg | Terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | Tomblike |
| critical | impaling | Unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

245.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in

place of accurate descriptions of material safety defects such as the ignition switch defects and

the other defects discussed herein.  To avoid disclosure of the material safety risks, and

---

[142] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit A -
Late Class With Class Claim    Pg 192 of 231
Proposed Ignition Switch Class Claim    Pg 70 of 108

furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[143]

246.    GM knew its Delta Ignition Switch Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in the Delta Ignition Switch Vehicles, and the other defective GM Vehicles, GM repeatedly blamed accidents on driver error.

247.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety.  Additional examples of GM's cavalier approach to safety follow.

248.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

249.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture."  The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[144]  As a result, "GM personnel failed to raise significant issues to key decision-makers."[145]

---

[143] NHTSA Consent Order at Exhibit B (emphasis added).

[144] *Id.* at 252.

[145] *Id.* at 253.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:58   Exhibit A -
Proposed Late Class With Class Claim   Pg 171 of 108

250.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues.  For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

251.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[146]

252.    The focus of GM on cost-cutting also made it harder for personnel to discover safety defects, as in the case of the "TREAD Reporting team."

253.    GM used its TREAD database (known as "TREAD") to store the data required to be reported quarterly to NHTSA under the TREAD Act.[147]  TREAD was the principal database used by GM to track incidents related to its vehicles.[148]  Generally, the TREAD Reporting team consisted of employees who conducted monthly searches and prepared scatter graphs to identify spikes in the number of accidents or complaints with respect to various GM vehicles.  The TREAD Reporting team reports went to a review panel and sometimes spawned investigations to determine if any safety defect existed.[149]

254.    GM severely understaffed the TREAD Reporting team and did not provide it with the resources to obtain the advanced data mining software to better identify and understand potential defects, thereby making it far less likely that safety defects would be remediated.[150]

255.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and

---

[146] Valukas Report at 251.

[147] *Id*. at 306.

[148] *Id*.

[149] *Id*. at 307.

[150] *Id*. at 307-308.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:06   Exhibit A -
Late Class with Class Claim   Pg 104 of 231
Proposed Ignition Switch Class Claim   Pg 72 of 108

pointing outward towards others, indicating that the responsibility belongs to someone else, not me."[151]

256.    Similarly, GM had a siloed culture, designed to cabin information relating to potential safety defects rather than reveal such information.

257.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'" which was "when everyone nods in agreement to a proposed plan of action, but then leaves the room with no intention to follow through, and the nod is an empty gesture."[152]

258.    According to the Valukas Report, part of the failure to properly correct the Delta Ignition Switch Defect was due to problems with GM's organizational structure[153] and a corporate culture that did not care enough about safety.[154]  Other culprits included a lack of open and honest communication with NHTSA regarding safety issues,[155] and the improper conduct and handling of safety issues by lawyers within GM's Legal Staff.[156]

## V.    GM PROMOTED ALL OF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DELTA IGNITION SWITCH VEHICLES.

259.    Throughout its history, GM regularly used print media, press releases, and television and video media to represent its vehicles as safe, reliable, quality products that provide great value to purchasers, and retain their value over time better than other manufacturers' vehicles.  GM also used these media to present itself as an honest, above-board, values-oriented company with integrity. In truth, however, GM was concealing serious safety hazards and endangering its own customers.

---

[151] Valukas Report at 255.

[152] Valukas Report at 256.

[153] Id. at 259-260.

[154] Id. at 260-61.

[155] Id. at 263.

[156] Id. at 264.

260.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding

quality and great value…  That's leadership, that's GM."[157]

261.    In 1989, a GM commercial represented:

> "Fact:  GM cars have held their resale value better than any other
> U.S. make."[158]



262.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[159]



---

[157] https://www.youtube.com/watch?v=h19lFAwGDwU.

[158] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

[159] https://www.youtube.com/watch?v=_hR7-7eKufQ.

263.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and

safe:

> We are fans and nothing keeps us from the game.  We need cars
> and trucks as reliable as we are.  Season after season.  And when
> the game is over, we need to know that what got us there will also
> get us safely home.  Delivering cars and trucks that fans count on
> is what makes us General Motors.[160]

264.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the

car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn

ION sets itself apart from competitors with innovative features, unique personalization

opportunities and surprising levels of safety, sophistication and fun."[161]

265.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala

"offers a comprehensive safety package, solid body structure, room for five passengers, plenty of

cargo space, a surprising number of amenities for the price, and a track record of outstanding

quality, reliability and durability."[162]

266.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and

acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and

comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's

history."[163]

267.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo

that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[164]

---

[160] https://www.youtube.com/watch?v=Dt12Gti12iA.

[161] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[162] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

[163] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[164] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

268.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix that explained that "[s]afety is always a high priority for Grand Prix."[165]

269.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

> [S]ince 1997, the new Malibu has offered buyers excellent performance, safety and comfort in a trim, stylish package.  For 2003, Chevrolet Malibu remains a smart buy for those who want a well-equipped midsize sedan at an attractive price. … Designed for individuals or families with high expectations of quality, reliability, safety, driving pleasure, and affordability, the Malibu appeals to domestic and import owners.[166]

270.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining that, "[t]he ION sedan and quad coupe are designed to carry on the Saturn tradition of being at the top of the class when it comes to safety and security.  The world-class structural design provides the foundation for this focus on safety.  The steel spaceframe's front and rear crush zones help absorb the energy of a crash while protecting the integrity of the safety cage."[167]

271.    On October 4, 2003, GM's website stated that "[m]otor vehicle safety is important to GM and to our customers.  It is at the top of mind in many of the thousands of decisions that are made every day in engineering and manufacturing today's cars, trucks, and SUVs/ Motor vehicle safety is a significant public health concern in the U.S., and GM is proud to partner with government agencies, emergency responders and health care workers in addressing that challenge."[168]

---

[165] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

[166] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[167] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

[168] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle _shopping/suv_facts/100_safety/index.html.



272.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"

which highlighted safety features such as electronic stability control.  GM stated:  "We want to

bring this kind of safety, security and peace-of-mind to all of our customers because it's the right

thing to do, and because only GM can do it."

09-50026-mg    Doc 13896-1    Filed 03/27/20    Entered 03/27/20 29:09:58    Exhibit A -
Proposed Ignition Switch Class Claim   Pg 177 of 108



> **Only GM**
>
> For example, we recently launched a new corporate adver-
> tising campaign under the theme, "Only GM." It's part of
> an effort to use the GM brand more aggressively and with
> more purpose, to show that we're leading the industry in
> ways that only GM can.
>
> The "Only GM" campaign began by highlighting our plans to
> equip all our cars and trucks sold to retail customers in the
> United States and Canada with OnStar and StabiliTrak, GM's
> electronic stability control system. We want to bring this kind
> of safety, security and peace-of-mind to all of our customers
> because it's the right thing to do, and because only GM can
> do it. We also want potential customers to know that GM
> offers them great value, and that buying GM matters. (For
> more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

273.    And in the same Report, under the banner "Peace of mind," GM represented that
"[o]nly GM can offer its customers the assurance that someone is looking out for them and their
families when they're on the road," and that  "[t]his commitment to safety makes GM the only
automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety
protection before, during and after vehicle collisions."

(GM's 2004 Annual Report, p. 22.)

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:05:06    Exhibit A -
Late Class Claim ROC 110 of 291
Proposed Ignition Switch Class Claim    Pg 78 of 108

274.    On May 10, 2004, GM's website announced that its "aim is to improve motor vehicle safety for customers, passengers, and other motorists.  Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these expectations and to protect customers and their families while they are on the road."  The website continued, "GM is committed to continuously improving the crashworthiness and crash avoidance of its vehicles, and we support many programs aimed at encouraging safer motor vehicle use…."[169]

275.    On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM, and we constantly strive to make our cars and trucks safe.  We also continue our support for groups such as the National SAFE KIDS Campaign, and a number of programs aimed at encouraging safer motor vehicle use."[170]

276.    GM's June 4, 2004, website published a message from its CEO, Rick Wagoner, on corporate responsibility.  Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance of corporate responsibility and the value of sustainable development, we at General Motors are fortunate to have inherited a legacy of doing business the right way.  It's a great asset.  And, it's a huge obligation … one we take very seriously.  What we call "winning with integrity" is not an optional or occasional behavior at GM.  Integrity is one of our core values, and a way of doing business that helps us realize our company's full potential….In short, "winning with integrity" is much more than a one-time exercise at GM. It's how we work every day.  It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[171]

277.    In its 2005 Annual Report, GM stated:  "We are driving quality and productivity even further."  "Lasting quality—That is why restoring confidence in quality is just as important

---

[169] http://web.archive.org/web/20040510221647/http://www.gm.com/company/gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[170] http://web.archive.org/web/20040604055658/http://www.gm.com/company/gmability/sustainability/reports/03/safety.html.

[171] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability/sustainability/reports/03/wagoner_message.html.

09-50026-mg     Doc 13805-1     Filed 12/27/16     Entered 12/27/16 23:05:56     Exhibit A -
Proposed Ignition Switch Class Claim     Pg 79 of 108

as design in rebuilding our brands…. We are focused on providing our customers with the best

quality experience over the lifetime of GM ownership."



278.   The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly

designed packages that lead the segment in performance, safety, efficiency and capability."[172]

279.   On September 9, 2005, GM's website described its safety technology as "Helping

You Avoid a Crash" and "Giving the driver information never possible before."[173]

---

[172] GM's 2005 Annual Report, p. 23.

[173] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/
safety/avoid_crash/index.html.

09-50026-mg    Doc 13896-1    Filed 02/27/20    Entered 02/27/20 20:05:56    Exhibit A -
Proposed Ignition Switch Class Claim Late Class Claim    Pg 112 of 291180 of 108



280.    At the same time GM announced what it called the next big step in safety:[174]

No matter what vehicle you drive, your safety is vital.  GM is
looking out for you—you deserve that peace of mind on the road.
Which is why at GM, we've taken the next big step in our
commitment to provide more customers with more safety and
security.



281.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM
stated:

---

[174] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:38    Exhibit A -
Late Class Witim ClassaClaim-of 281181 of 108
Proposed Ignition Switch Class Claim  Pg

 From an all-new family of full-size pickup trucks and SUVs to
carlike crossovers to small cars and a near-complete revitalization
of the Saturn portfolio, General Motors is introducing several new
or significantly redesigned vehicles for the 2007 model year—
stylish products that leverage GM's global resources to deliver
value, brand-distinctive design character, safety, fuel efficiency,
relevant technologies and quality to the North American market.[175]

282.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM

represented that the "Lucerne's body structure is engineered to provide maximum occupant

protection and minimum intrusion under a wide range of impact conditions."[176]

283.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented:

"[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces

Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[177]

284.    GM's website on August 9, 2006, stated:[178]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces.
Vehicle-based safety strategies generally fall into three categories:

BEFORE:  Collision avoidance—technologies designed to help the
driver avoid potential crashes (sometimes called 'active safety'
technologies),

DURING:  Crashworthiness—designs and technologies that help
mitigate the injury potential of a crash (sometimes called 'passive
safety'), and

AFTER:  Post-crash—systems that can help alert emergency
rescue to a crash and help provide information to aid rescue
specialists.

    …

---

[175] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[176] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[177] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[178] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/
sustainability/reports/05/400_products/7_seventy/471.html.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 82 of 108

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

285.    GM's website on September 6, 2006, stated:[179]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

\*    \*    \*

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well.  GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash.  GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

286.    GM stated on its website in October 29, 2006 it is a leader in automotive safety

and that its safety leadership extends as far back as the birth of GM.[180]

---

[179] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.

[180] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/ safety/safety_firsts/index.html.

09-50026-mg    Doc 13896-1    Filed 02/27/20    Entered 02/27/20 20:09:36    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 83 of 108



287.    In a video published on January 2, 2007, GM's Vice Chairman of Product

Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has

predominately been known for customer service, fair dealers, honest dealers and having happy

buyers."[181]

288.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure

and Safety Integration, stated "[o]ur aim is to improve motor vehicle safety for customers,

passengers and other motorists.  Our customers expect and demand vehicles that help them to

avoid crashes and reduce the risk of injury in case of a crash.  We strive to exceed these

expectations and to protect customers and their families while they are on the road."  Further,

Lange stated, "GM is committed to continuously improving the crashworthiness and crash

avoidance of its vehicles…."[182]

289.    In its 2007 Annual Report, GM stated:

> In 2007, we continued to implement major improvements to our
> U.S. sales and marketing strategy.  Over the past two years, we've

---

[181] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[182] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:58    Exhibit A - Proposed Ignition Switch Class Claim    Pg 84 of 108

re-focused our marketing efforts to emphasize the strength and value of our products and brands….

We also continued to make progress in our long-term effort to improve quality….

We've also witnessed, since 2005, an 89 percent reduction in vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

290.    Moreover, GM represented that it "actively studies trends of claims" to take

action to improve vehicle quality:



**POLICY, WARRANTY AND RECALLS**
Provisions for estimated expenses related to policy and product warranties are made at the time products are sold. These estimates are established using historical information on the nature, frequency, and average cost of claims. We actively study trends of claims and take action to improve vehicle quality and minimize claims. Actual experience could differ from the amounts estimated requiring adjustments to these liabilities in future periods.

(GM 2007 Annual Report, p. 74.)

291.    In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve,

GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's

transformation is being driven by high-quality cars and trucks that look great, drive great, are

fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated, "[n]o other

automaker provides such a diverse lineup of cars and trucks that meets the needs of customers

that range from college studies to contactors.  And our five-year, 100,000-mile powertrain

warranty—the most comprehensive in the industry—adds even more value to the bottom line,

demonstrating that we are putting our money where our mouth is on vehicle quality."[183]

292.    On August 1, 2007, GM represented that:

The Cobalt enters the 2008 model year on the heels of a successful
'07 model year, which introduced several significant
enhancements, including more powerful Ecotec engines.  For '08,

_____

[183] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:05:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 85 of 108

the Cobalt builds on that powerful foundation with a streamlined
model lineup and more standard safety and convenience
equipment…."[184]

293.    On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's

value story with new features and revisions that add to its safety and efficiency, including the

addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models…."[185]

294.    In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM

represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter

aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and

side curtain airbags are standard on all models."[186]

295.    In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM

represented that the "Lucerne's body structure is designed to provide maximum occupant

protection and minimum intrusion under a wide range of impact conditions.  Active safety and

handling features offered on Lucerne include a four-channel anti-lock braking system and

traction control; an auto-level rear suspension that automatically adjusts the vehicle height for

heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which

senses emergency braking situations and boosts power as needed."[187]

296.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM

represented that the "Grand Prix's convenience and safety features are perfect for drivers who

enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand

---

[184] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20
chevrolet%20car%20oview.html.

[185] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20
chevrolet%20car%20oview.html.

[186] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[187] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit A - Proposed Ignition Switch Late Class Claim    Pg 186 of 108

Prix remains a driver's car inside and out.  The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps."[188]

297.    GM's website on January 15, 2008, stated "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[189]

298.    In February 2008, GM aired a Chevy Malibu commercial during The Grammy's which stated the Chevy Malibu was "built to last" "because safety should last a lifetime."  The commercial used images of a child being raised to adulthood, in order to convey protection and safety.[190]

299.    On its website in March of 2008, GM stated it was delivering the best cars and trucks in its 100-year history, and that it was "Obsessed with Quality."  The website also spoke of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into each of its designs to help protect you in a collision—and keep one from occurring in the first place."[191]

---

[188] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

[189] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[190] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[191] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/; http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



## VI.    CLASS ALLEGATIONS.

300.    Under B.R. 7023, Claimant files this Proof of Claim on behalf of herself and a proposed Class and Subclasses initially defined below.

301.    Excluded from the Class and thee Subclasses are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

### A.    The Class.

302.    Claimant alleges claims, under the consumer protection, fraudulent concealment and unjust enrichment laws of each state and the District of Columbia (all of which are the same or substantially similar):

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Delta Ignition Switch Vehicle.

85

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:56   Exhibit A -
Late Class Claim Proposed Ignition Switch Class Claim   Pg 120 of 231 88 of 108

303.   "Delta Ignition Switch Vehicles" include the following, provided they were

purchased or leased prior to November 30, 2009:

| DELTA IGNTION SWITCH VEHICLES |
| --- |
| · 2005-2010 Chevy Cobalt |
| · 2006-2010 Chevy HHR |
| · 2007-2010 Pontiac G5 |
| · 2006-2010 Pontiac Solstice |
| · 2007-2010 Saturn Sky |
| · 2003-2007 Saturn ION |

**B.      The Delta Ignition Switch Implied Warranty Subclass.**

304.   Claimant also alleges implied claims under the substantially similar laws of the

following jurisdictions for the Delta Ignition Switch Implied Warranty Subclass on behalf of

persons with vehicles sold or leased as new prior to November 30, 2009:  Alaska, Arkansas,

California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana,

Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana,

Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,

North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas,

Utah, Virginia, West Virginia, and Wyoming.

**C.      The Delta Ignition Switch Negligence Subclass**

305.   Claimant also alleges negligence claims under the substantially similar laws of the

following jurisdictions for the Delta Ignition Switch Negligence Subclass on behalf of persons

with vehicles sold or leased as new prior to November 30, 2009:  Arkansas, California,

Maryland, Louisiana and Ohio.

### D.    The Class And The Subclasses Meet The Requirements For Class Certification.

306.    Individual joinder of all Class or Subclass members is impracticable, given that GM manufactured and sold approximately 1.6 million Delta Ignition Switch Vehicles in the United States.

307.    The Class disclaims recovery, in this Proof of Claim, for physical injury resulting from the safety defects alleged herein.  But the increased risk of injury from the defects serves as an independent justification for the relief sought by Claimant and the Class.

308.    The Class can be readily identified using registration records, sales records, production records, and other information kept by GM's successor, New GM, or third parties in the usual course of business and within their control.

309.    Questions of law and fact are common to the Class and predominate over questions affecting only individual members, including the following:

1.    Whether the Delta Ignition Switch Vehicles suffer from safety defects;

2.    Whether GM fraudulently concealed the defect;

3.    Whether GM misrepresented that the Delta Ignition Switch Vehicles were safe;

4.    Whether GM engaged in fraudulent, deceptive or unfair acts or practices by failing to disclose that the Delta Ignition Switch Vehicles were designed, manufactured, and sold with safety defects and that GM systematically valued cost-cutting over safety;

5.    Whether GM was unjustly enriched at the expense of Claimant and the Class;

6.    Whether GM breached the implied warranty of merchantability in connection with the Delta Ignition Switch Vehicles;

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 29:09:58   Exhibit A -
Proposed Late Class Claims Class Claim   Pg 90 of 108

7.      Whether GM was negligent in its design and manufacture of the Delta

Ignition Switch Vehicles, and/or in failing to warn of the known defect and failing to recall the

vehicles; and

8.      Whether Claimant and the Class are entitled to a remedy as a result of

GM's fraudulent, inequitable and/or negligent conduct.

310.    Claimant's claims are typical of the claims of the Class and Subclass members,

and arise from the same course of conduct by GM.  The relief Claimant seeks is typical of the

relief sought for the absent Class and Subclass members.

311.    Claimant will fairly and adequately represent and protect the interests of all absent

Class and Subclass members.  Claimant is represented by counsel competent and experienced in

product liability, consumer protection, and class action litigation, as well as counsel experienced

in bankruptcy litigation.

312.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all the individual Class and Subclass members

is impracticable.  Because the damages suffered by each individual Class Member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class Members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.  B.R. 7023

provides the Court with authority and flexibility to maximize the benefits of the class mechanism

and reduce any management challenges that may arise.

313.    The prosecution of separate actions by the individual Class and Subclass members

would create a risk of inconsistent or varying adjudications for individual Class and Subclass

members.  The conduct of this action as a class action presents far fewer management

09-50026-mg    Doc 13805-1    Filed 02/27/20    Entered 02/27/20 20:09:06    Exhibit A -
Proposed Late Class Claim Switch Class Claim    Pg 91 of 108

difficulties, conserves judicial resources and the parties' resources, and protects the rights of
each Class Member.

314.    Claimant is not aware of any obstacles likely to be encountered in the
management of this action that would preclude its maintenance as a class action.  Claimant
anticipates providing appropriate notice to be approved by the Court after discovery into the size
and nature of the Class and Subclasses.

315.    Absent a class action, most Class Members would likely find the cost of litigating
their claims prohibitively high and would therefore have no effective remedy at law.  Because of
the relatively small size of the individual Class Members' claims, it is likely that only a few
Class Members could afford to seek legal redress for GM's misconduct.

## VII.    THE CLASS' AND SUBCLASSES' CLAIMS

**A.    Class Claims**

**1.    Fraudulent concealment.**

316.    Claimant realleges and incorporates by reference all paragraphs as though fully
set forth herein.

317.    This claim is brought on behalf of the Class.

318.    The law of fraudulent concealment is essentially identical in each state, as
virtually every state, including California, where Claimant resides, generally follows the
principles of §§ 550 and 551 of the RESTATEMENT (SECOND) OF Torts.

319.    Under Section 550, "[o]ne party to a transaction who by concealment or other
action intentionally prevents the other from acquiring material information is subject to the same
liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that
the other was thus prevented from discovering."

320.    Under Section 551:

(1)   One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2)  One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a)  matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b)  matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c)  subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d)  the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

321.   As alleged above and discussed below, GM's fraudulent concealment of the safety defects and other material information concerning the Delta Ignition Switch Vehicles renders GM liable to Claimant and the Class under the law of fraudulent concealment of each state and the District of Columbia.

322.   GM concealed and suppressed material facts concerning the quality and safety of GM vehicles in general and in the Delta Ignition Switch Vehicles in particular.

09-50026-mg    Doc 13806-1    Filed 03/27/20    Entered 03/27/20 20:00:00    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 193 of 108
Late Class Claim    Pg 125 of 291

323.    GM concealed and suppressed material facts concerning the culture of GM – a culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

324.    GM concealed and suppressed material facts concerning the safety defects alleged herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did not reveal known safety defects, including the Delta Ignition Switch Defect, to regulators or consumers.

325.    GM did so in order to boost confidence in its vehicles, including the Delta Ignition Switch Vehicles, and falsely assure owners, purchasers and lessees of the Delta Ignition Switch Vehicles that GM was a reputable manufacturer that stood behind its vehicles after they were sold and ensured that its vehicles were safe and reliable.  The false representations were material to consumers, both because they concerned the quality and safety of the Delta Ignition Switch Vehicles and because they played a significant role in the value of the vehicles.

326.    GM had a duty to disclose the Delta Ignition Switch Defect because it was known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew the facts were not known to or reasonably discoverable by Claimant and the Class.  These omitted and concealed facts were material because they directly impact the value of the Delta Ignition Switch Vehicles purchased or leased by Claimant and the Class.  Whether a product is safe and reliable, and whether the manufacturer stands behind the product, is a material concern to a consumer.

327.    GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Delta Ignition

Switch Vehicles.  Having provided information to the Class, GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the TREAD Act.

328.    GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and it did so at the expense of Claimant and the Class.

329.    GM concealed and suppressed the defects in the Delta Ignition Switch Vehicles with the intent to deceive Claimant and the Class.

330.    Claimant and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Claimant's and the Class' actions were justified.  GM was in exclusive control of the material facts and such facts were not known to the public, Claimant, or the Class.

331.    Because of the concealment and/or suppression of the facts, Claimant and the Class sustained damage.  Had they been aware of the safety defects in their Delta Ignition Switch Vehicles and GM's disregard for safety, Claimant and the Class either would have paid less for their vehicles or would not have purchased them at all.   Claimant and the Class did not receive the benefit of their bargain as a result of GM's fraudulent concealment.

332.    More specifically, Claimant and the Class were damaged by GM's fraudulent concealment in at least the following ways:

a.    Class Members were fraudulently induced into purchasing their Delta Ignition Switch Vehicles and/or paying more than they otherwise would have had the defect been revealed.

09-50026-mg   Doc 13895-1   Filed 02/27/20   Entered 02/27/20 20:08:56   Exhibit A -
Proposed Late Class Claim Class Claim   Pg 195 of 108

b.      Class Members remained in possession of vehicles of diminished

value which GM would otherwise have been compelled to fix or replace.

c.      Class Members incurred expense and loss in connection with their

efforts to repair the defective Delta Ignition Switches and/or eliminate or reduce

the risks and costs to which they were exposed by the Delta Ignition Switch

Vehicles.

d.      Class Members incurred the inconvenience and expense of having

a recall repair done.

333.    Without limitation, Claimant and the Class therefore seek a full refund of the

purchase price paid for their Delta Ignition Switch Vehicles (or the overpayments they made for

the vehicles) together with any and all other available compensatory, incidental and

consequential damages (save for personal injury damages) they may have suffered as a result of

their leasing and/or ownership of a Delta Ignition Switch Vehicle, and punitive damages given

the extremely outrageous and reprehensible conduct perpetrated by GM to keep and increase the

numbers of highly-dangerous Delta Ignition Switch Vehicles on the road in order to avoid the

expense and adverse publicity of the requisite safety recall.

**2.      Unjust enrichment.**

334.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

335.    This claim is brought on behalf of the Class.

336.    The law of unjust enrichment is essentially identical in each state, including

California, where Claimant resides.

337.    GM received and retained a benefit from the Claimant and the Class and inequity

resulted.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:58   Exhibit A -
Proposed Late Class Claim   Pg 96 of 108
Late Class Claim   Pg 128 of 291

338.    GM benefitted from selling and leasing the Delta Ignition Switch Vehicles, whose value was artificially inflated by GM's concealment of the defect as well as systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Claimant and the Class overpaid for their defective Delta Ignition Switch Vehicles and were forced to pay other costs.

339.    In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

340.    Thus, Claimant and all Class Members conferred a benefit on GM.

341.    It was inequitable for GM to retain these benefits.

342.    Claimant and the Class were not aware of the true facts about their Delta Ignition Switch Vehicles, and did not benefit from GM's conduct.

343.    GM knowingly accepted the benefits of its unjust conduct.

344.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**3.    Consumer Protection Claims**

345.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

346.    This claim is brought on behalf of the Class.

347.    The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting commerce…."  15 U.S.C. § 45.

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 20:08:58    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 197 of 108

348.    Because Claimant is a California resident, her consumer protection claims are

pled under California law.  However, the Class states claims under the consumer protection

statutes of every U.S. jurisdiction.

### a.    Violations of the California Consumer Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*)

349.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

350.    GM was a "person" under CAL. CIV. CODE § 1761(c).

351.    Claimant and Class Members are "consumers," as defined by CAL. CIVIL CODE

§ 1761(d), who purchased or leased one or more Delta Ignition Switch Vehicles.

352.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts

or practices undertaken by any person in a transaction intended to result or which results in the

sale or lease of goods or services to any consumer[.]"  CAL. CIV. CODE § 1770(a).  GM engaged

in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, *et seq*., as described

above and below, by, among other things, concealing the known defects in the Delta Ignition

Switch Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities

which they do not have; representing that the vehicles are of a particular standard, quality, and

grade when they are not; advertising the vehicles with the intent not to sell or lease them as

advertised; and representing that the subject of a transaction involving a Delta Ignition Switch

Vehicle has been supplied in accordance with a previous representation when it has not.

353.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

354.    In the course of its business, GM concealed the defects in the Delta Ignition

Switch Vehicles as described herein and otherwise engaged in activities with a tendency or

capacity to deceive.  GM also engaged in unlawful trade practices by employing deception,

95

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:86    Exhibit A -
Proposed Late Class with Class Claim    Pg 98 of 108

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission, of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Delta Ignition Switch Vehicles.

355.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by Claimant and the Class.

356.    By failing to disclose and by actively concealing the defects in the Delta Ignition Switch Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the CLRA.

357.    In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class' vehicles.

358.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class, about the true safety and reliability of their vehicles.

359.    GM intentionally and knowingly misrepresented material facts regarding the Delta Ignition Switch Vehicles with the intent to mislead the Class.

360.    GM knew or should have known that its conduct violated the CLRA.

361.    GM made material statements about the safety and reliability of the Delta Ignition Switch Vehicles that were either false or misleading.

362.    GM owed the Class a duty to disclose the true safety and reliability of the Delta Ignition Switch Vehicles, because  GM:

   a.    Possessed exclusive knowledge about the defects in the Delta Ignition Switch Vehicles;

   b.    Intentionally concealed the foregoing from the Class;

   c.    Made incomplete representations about the safety and reliability of the Delta Ignition Switch Vehicles, while purposefully withholding material facts from the Class that contradicted these representations; and/or

    d.       Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

363.    Because GM fraudulently concealed the defects in the Delta Ignition Switch Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the defects.  Had the Class been aware of the defects in their vehicles, they would have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

364.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

365.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the Delta Ignition Switch Defect in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.  The Class also incurred repair and recall costs, as alleged above.

366.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

367.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

368.    Under CAL. CIV. CODE § 1780(b), the Class seek an additional award against of up to $5,000 for each Class Member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  GM knew or should have known that its conduct was directed to one or more Class Members who are senior citizens or disabled persons.  GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or

welfare of the senior citizen or disabled person.  One or more Class Members who are senior

citizens or disabled persons were substantially more vulnerable to GM's conduct because of age,

poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of

them suffered substantial physical, emotional, or economic damage resulting from GM's

conduct.

369.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE

§ 1780(e), and any other just and proper relief available under the CLRA.

          **b.**    **Violations of the California Unfair Competition Law ("UCL")
(CAL. BUS. & PROF. CODE § 17200,** *et seq.***)**

370.    Claimant realleges and incorporates by reference all paragraphs as though fully

set forth herein.

371.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent

business act or practices."  GM engaged in unlawful, fraudulent, and unfair business acts and

practices in violation of the UCL.

372.    GM violated the unlawful prong of § 17200 by the following:

      a.    violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as
set forth above.

      b.    violation of the National Traffic and Motor Vehicle Safety
Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its
regulations.  Federal Motor Vehicle Safety Standard
("FMVSS") number 573 governs a motor vehicle
manufacturer's responsibility to notify NHTSA of a motor
vehicle defect within five days of determining that the
defect is safety related.  *See* 49 C.F.R. § 573.6.  GM
violated these reporting requirements by failing to report
the defects in the Delta Ignition Switch Vehicles within the
required time, and failing to timely recall all impacted
vehicles.

373.    GM also violated the "fraudulent" prong of CAL. BUS. & PROF. CODE § 17200 by concealing the defects in the Delta Ignition Switch Vehicles, information that was material to a reasonable consumer, while it touted the safety and reliability of the vehicles.

374.    GM also violated the unfair prong of CAL. BUS. & PROF. CODE § 17200 because the acts and practices set forth above, including devaluing safety and concealing the defects in the Delta Ignition Switch Vehicles, offend established public policy, and also because the harm GM caused consumers greatly outweighs any benefits associated with those practices.  GM's conduct also impaired competition within the automotive vehicles market and prevented the Class from making fully informed decisions about whether to lease, purchase and/or retain their vehicles.

375.    In the course of its business, GM concealed the defects in Class Members' vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Delta Ignition Switch Vehicles.

376.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

377.    GM knew of serious defects affecting the Delta Ignition Switch Vehicles owned or leased by the Class.

378.    By failing to disclose and by actively concealing the defects in Class Members' vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and deceptive business practices in violation of the UCL.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit A -
Proposed Ignition Switch Class Claim of Pg 102 of 108
Later Class Actions   Pg 134 of 231

379.    In the course of GM's business, it willfully failed to disclose and actively
concealed the dangerous risk posed by the defects in Class Members' vehicles.

380.    GM's unfair or deceptive acts or practices were likely to and did in fact deceive
reasonable consumers, including Class Members, about the true safety and reliability of their
vehicles.

381.    GM intentionally and knowingly misrepresented material facts regarding the
Delta Ignition Switch Vehicles with the intent to mislead the Class.

382.    GM knew or should have known that its conduct violated the UCL.

383.    As alleged above, GM made material statements about the safety and reliability of
the Delta Ignition Switch Vehicles that were either false or misleading.

384.    GM owed the Class a duty to disclose the true safety and reliability of the Delta
Ignition Switch Vehicles, because GM:

> a.    Possessed exclusive knowledge about the defects in the
>        Delta Ignition Switch Vehicles;
>
> b.    Intentionally concealed the foregoing from the Class;
>
> c.    Made incomplete representations about the safety and
>        reliability of the Delta Ignition Switch Vehicles, while
>        purposefully withholding material facts from the Class that
>        contradicted these representations; and/or
>
> d.    Had duties under the TREAD Act and related regulations to
>        disclose and remedy the defects.

385.    Because GM fraudulently concealed the defects in the Delta Ignition Switch
Vehicles, Delta Ignition Switch Vehicle owners were deprived of the benefit of their bargain
since the vehicles they purchased were worth less than they would have been if they were free
from the defects.  Had Class Members been aware of the defects in their vehicles, they would
have either not bought their Delta Ignition Switch Vehicles or would have paid less for them.

386.    GM's concealment of the defects in the Delta Ignition Switch Vehicles was material to the Class.

387.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Delta Ignition Switch Defect, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

388.    As a direct and proximate result of GM's violations of the UCL, Class Members have suffered injury-in-fact and/or actual damage.

389.    Claimant requests that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Class Members any money lost as the result of GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

**B.    Subclass Claims**

**1.    Breach of the Implied Warranty of Merchantability**

390.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

391.    This claim is brought on behalf of the Delta Ignition Switch Implied Warranty Subclass.

392.    The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Delta Ignition Switch Implied Warranty Subclass state claims.

393.    Because Claimant is a California resident, her implied warranty claims is pled
under California law.

        **a.**        **Violations of the Song-Beverly Warranty Act for Breach of Implied
Warranty of Merchantability (Cal. Civ. Code §§ 1791.1 & 1792)**

394.    Claimant realleges and incorporates by reference all paragraphs as though fully
set forth herein.

395.    Claimant and Delta Ignition Switch Implied Warranty Subclass Members are
"buyers" within the meaning of CAL. CIV. CODE § 1791(b).

396.    The Delta Ignition Switch Vehicles are "consumer goods" within the meaning of
CIV. CODE § 1791(a).

397.    GM was the "manufacturer" of the Defective Vehicles within the meaning of
CAL. CIV. CODE § 1791(j).

398.    GM impliedly warranted to Claimant and Delta Ignition Switch Implied Warranty
Subclass Members that Delta Ignition Switch Vehicles were "merchantable" within the meaning
of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Delta Ignition Switch Vehicles did not
have the quality that a buyer would reasonably expect, and were therefore not merchantable.

399.    CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that
> goods are merchantable" means that the consumer goods meet
> each of the following:
>
> (1)    Pass without objection in the trade under the contract
> description.
>
> (2)    Are fit for the ordinary purposes for which such goods are
> used.
>
> (3)    Are adequately contained, packaged, and labeled.
>
> (4)    Conform to the promises or affirmations of fact made on
> the container or label.

09-50026-mg    Doc 13805-1    Filed 02/27/20    Entered 02/27/20 20:08:58    Exhibit A -
Proposed Late Class Claims    Pg 137 of 231
Ignition Switch Class Claim    Pg 105 of 108

400.    The Delta Ignition Switch Vehicles would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accident, and an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

401.    Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death., the Delta Ignition Switch Vehicles are not safe to drive and thus not fit for ordinary purposes.

402.    The Delta Ignition Switch Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Claimant and Delta Ignition Switch Implied Warranty Subclass Members to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Delta Ignition Switch Vehicles.

403.    GM breached the implied warranty of merchantability by selling Delta Ignition Switch Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles during ordinary driving conditions,  the failure of power steering and power brakes, and the disablement of the vehicles' airbags.  The defects deprived Claimant and Delta Ignition Switch Implied Warranty Subclass Members of the benefit of their bargain.

404.    Notice of breach is not required because Claimant and Delta Ignition Switch Implied Warranty Subclass Members did not purchase their automobiles directly from GM.

09-50026-mg    Doc 13806-1   Filed 02/27/20   Entered 02/27/20 20:09:50    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 106 of 108
Later Class Claims    Pg 106 of 108

405.   As a direct and proximate result of GM's breach of its duties under California's
Lemon Law, Claimant and Delta Ignition Switch Implied Warranty Subclass Members received
goods whose dangerous condition substantially impaired their value.  .

406.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimant and Delta Ignition Switch
Implied Warranty Subclass Members are entitled to damages and other legal and equitable relief
including, at their election, the purchase price of their vehicles, or the overpayment or diminution
in value of their vehicles.

407.   Under CAL. CIV. CODE § 1794, Claimant and Delta Ignition Switch Implied
Warranty Subclass Members are entitled to costs and attorneys' fees.

**2.   Negligence**

408.   Claimant realleges and incorporates by reference all paragraphs as though fully
set forth herein.

409.   This claim is brought on behalf of the Delta Ignition Switch Negligence Subclass.

410.   The law of negligence is substantially similar under the laws of all the
jurisdictions whose residents are included in the Delta Ignition Switch Negligence Subclass.

411.   GM designed, manufactured and sold or otherwise placed in the stream of
commerce Delta Ignition Switch Vehicles, as set forth above.

412.   GM had a duty to design, manufacture, and sell only a product that would be safe
for its intended and foreseeable uses and users, including the use to which its products were put
by Claimant and the Delta Ignition Switch Negligence Subclass.  GM breached its duties to the
Delta Ignition Switch Negligence Subclass because it was negligent in the design, development,
manufacture, and testing of the Delta Ignition Switch Vehicles it manufactured and sold.

413.   GM was negligent in the design, development, manufacture, testing, and/or
"certification" of the Delta Ignition Switch Vehicles because it knew, or in the exercise of

09-50026-mg    Doc 13896-1    Filed 03/27/20    Entered 03/27/20 20:09:38    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 107 of 108
Later Class Claims    Pg 139 of 231

reasonable care should have known, that the vehicles equipped with defective ignition systems
pose an unreasonable risk of death or serious bodily injury to Delta Ignition Switch Negligence
Subclass Members, passengers, other motorists, pedestrians, and the public at large, because they
are susceptible to incidents in which the vehicles suddenly stall, and the brakes, power steering,
seatbelt pretensioners, and airbags are rendered inoperable.

414.    GM thus "failed to exercise reasonable care in the manufacture of [its Defective
Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails
to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he
should recognize as involving an unreasonable risk of causing physical harm to those who use it
for a purpose for which the manufacturer should expect it to be used and to those whom he
should expect to be endangered by its probable use, is subject to liability for physical harm
caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

415.    GM further breached its duties to Delta Ignition Switch Negligence Subclass by
supplying directly or through a third person defective Delta Ignition Switch Vehicles to be used
by such foreseeable persons as Delta Ignition Switch Negligence Subclass when:

a.    GM knew or had reason to know that the vehicles were dangerous or likely to be
dangerous for the use for which they were supplied; and

b.    GM failed to exercise reasonable care to inform customers of the dangerous
condition or of the facts under which the vehicles are likely to be dangerous.

416.    GM had a continuing duty to warn and instruct the intended and foreseeable users
of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to
using the vehicles. Delta Ignition Switch Negligence Subclass Members were entitled to know

105

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:03:56    Exhibit A -
Proposed Ignition Switch Class Claim    Pg 108 of 108

that the vehicles, in their ordinary operation, were not reasonably safe for their intended and ordinary purposes and uses.

417.    GM knew or should have known of the defects described herein.  GM breached its duty to Delta Ignition Switch Negligence Subclass Members because it failed to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the vehicles when ordinary care and reasonable prudence so demanded.

418.    As a direct and proximate result of GM's negligence, the Delta Ignition Switch Negligence Subclass suffered damages.  The damages include overpayment for the Delta Ignition Switch Vehicles and repair and recall costs, as discussed above.

*    *    *    *

419.    The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver of Claimant's rights against any person, entity or property; (b) a consent by Claimant to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any objection or other proceeding commenced in this case or any related case; (c) a waiver of the right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court.

# Exhibit B

**Proposed Non-Ignition Switch Class Claim**

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A - Motion to Withdraw the Reference Papers   Pg 172 of 269

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A - Proposed Non-Cash Out... Class Claim   Pg 2 of 89

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | | PROOF OF CLAIM |
|---|---|---|

Name of Debtor (Check Only One):                                Case No. 09-50026

☒Motors Liquidation Company (f/k/a General Motors Corporation)    09-50026 (REG)
☐MLCS, LLC (f/k/a Saturn, LLC)    09-50027 (REG)
☐MLCS Distribution Corporation (f/k/a Saturn Distribution Corporation)    09-50028 (REG)
☐MLC of Harlem, Inc. (f/k/a Chevrolet Saturn of Harlem, Inc.)    09-13558 (REG)

**Your Claim is Scheduled As Follows:**

NOTE: This form should not be used to make a claim for an administrative expense arising **after** the commencement of the case, but may be used for purposes of asserting a claim under 11 U.S.C. § 503(b)(9) (see Item # 5). All other requests for payment of an administrative expense should be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (the person or other entity to whom the debtor owes money or property: Yvonne James-Bivins, on behalf of Proposed Class

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
Yvonne James-Bivins

c/o Steve W. Berman, Hagens Berman Sobol Shapiro LLP,
1918 8th Avenue, Suite 3300, Seattle, WA 98101

**Court Claim Number:**
(If known)

Telephone number: (206) 623-7292
Email Address: steve@hbsslaw.com

Filed on:

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:

If an amount is identified above, you have a claim scheduled by one of the Debtors as shown. (This scheduled amount of your claim may be an amendment to a previously scheduled amount.) If you agree with the amount and priority of your claim as scheduled by the Debtor and you have no other claim against the Debtor, you do not need to file this proof of claim form, EXCEPT AS FOLLOWS: If the amount shown is listed as DISPUTED, UNLIQUIDATED, or CONTINGENT, a proof of claim MUST be filed in order to receive any distribution in respect of your claim. If you have already filed a proof of claim in accordance with the attached instructions, you need not file again.

1. Amount of Claim as of Date Case Filed, June 1, 2009:        $ See attached.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. If all or part of your claim is entitled to priority, complete item 5. If all or part of your claim is asserted pursuant to 11 U.S.C. § 503(b)(9), complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. Basis for Claim:   See attached.
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor:

   3a. Debtor may have scheduled account as:
   (See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff:   ☐ Real Estate   ☐ Motor Vehicle   ☐ Equipment   ☐ Other
Describe:

Value of Property: $_____   Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim, if any: $_____

Basis for perfection:

Amount of Secured Claim: $_____   Amount Unsecured: $_____

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain in an attachment.

5.   **Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).
☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
☐ Value of goods received by the Debtor within 20 days before the date of commencement of the case - 11 U.S.C. § 503(b)(9) (§ 507(a)(2))
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
   **Amount entitled to priority:**
      $
*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

Date:12/22/16 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Yvonne James-Bivins, on behalf of the Proposed Class | FOR COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:08:56    Exhibit B -
Proposed Non-Ignition Switch Class Claim Pg 3 of 89

**ATTACHMENT TO PROOF OF CLAIM OF YVONNE JAMES-BIVINS UNDER B.R.
7023 ON BEHALF OF PURCHASERS OF DEFECTIVE GM VEHICLES.**

## I.    PRELIMINARY STATEMENT

1.    By this Proof of Claim, Yvonne James-Bivins, on behalf of a proposed

Nationwide Class under B.R. 7023,  of owners and lessees of Defective GM Vehicles, as defined

herein (collectively, the "Class"), assert unliquidated claims against the debtor, Motors

Liquidation Company, f/k/a General Motors Company (hereinafter "GM").[1]

2.    More specifically, Claimant alleges claims of fraudulent concealment, unjust

enrichment and consumer protection violations on behalf of the following proposed Class

pursuant to B.R. 7023:

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Defective GM Vehicle.

Claimant also alleges claims of breach of the implied warranty of merchantability and negligence

on behalf of proposed Subclasses of persons who owned or leased a Defective GM Vehicle as of

November 30, 2009, and resided in jurisdictions that recognize such claims as set forth herein.

3.    Ms. James-Bivins, a resident of Altadena, California, purchased a new 2006

Cadillac CTS in Alhambra, California on January 9, 2006, and she still owns it to this day.  The

ignition switch that GM used in the CTS (a "Low-Torque Ignition Switch") was dangerously

defective, and left the car prone to sudden unintended stalling, the loss of power steering and

power brakes, and an inoperable airbag.  From the time she bought the car until she received a

recall notice in 2014, Ms. James-Bivins was unaware of the ignition switch defect.

4.    As detailed more specifically herein, "Defective GM Vehicles" include each of

the following vehicles provided they were sold or leased prior to November 30, 2009:

---

[1] In keeping with the convention used in this and other courts, GM's successor corporation, General Motors
LLC, is referred to herein as "New GM."

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 29:08:88    Exhibit B -
Proposed Non-Ignition Switch Class Claim    Pg 4 of 89

    (i)      Low Torque Ignition Switch Defect Vehicles (the vehicles included in Recall Nos. 14-V-355, 14-V-394, and 14-V-400:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2010 Cadillac DTS, 2006-2010 Buick Lucerne, 2006-2008, and Chevrolet Monte Carlo; 2003-2010 Cadillac CTS and 2004-2006 Cadillac SRX; and 1997-2005 Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005 Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-2004 Oldsmobile Alero);

    (ii)     Side Airbag Defect Vehicles (the vehicles included in Recall No. 14-V-118: 2008-2010 Buick Enclave, 2009-2010 Chevrolet Traverse, 2008-2010 GMC Acadia, and 2008-2010 Saturn Outlook); and

    (iii)    Power Steering Defect Vehicles (the vehicles included in Recall No. 14-V-153: 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2006 and 2008-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura).

5.     All told, there are approximately 9.8 million Defective GM Vehicles at issue in this Proof of Claim.

6.     GM was aware of the defects in the Defective GM Vehicles, and the defects resulted from GM's devaluation of and disregard for safety, as detailed in part herein.

7.     GM induced Claimant and the Class to purchase and retain the Defective GM Vehicles under false pretenses, and thus deprived Class Members of the benefit of their bargain and saddled them with dangerously defective cars that were worth less than they would have been in the absence of the defects.  Many Class Members also incurred repair costs and other expenses as a direct result of GM's fraudulent conduct, and GM was unjustly enriched at Class Members' expense.

8.     Claimant therefore files this Proof of Claim on behalf of the Class to recover the damages caused by GM's conduct under consumer protection statutes, the law of fraudulent concealment and unjust enrichment, which is essentially the same under the laws of each of the 50 states and the District of Columbia.  Claimant also brings claims for breach of the implied warranty of merchantability under California law and on behalf of a Class of persons living in

2

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed Non-Ignition Switch Class Claim    Pg 5 of 89

other states where the law provides a similar claim (the "Defective GM Vehicle Implied

Warranty Subclass"). Finally, Claimant brings a claim for negligence on behalf of herself, other

California residents, and residents of other states where the law provides a similar clam (the

"Defective GM Vehicle Negligence Subclass").

## II.    THE LOW TORQUE IGNITION SWITCH DEFECTS

9.    New GM's belated recall of the Defective GM Vehicles occurred in 2014 in the

wake of the stunning revelation that GM and New GM had manufactured and sold some 2.1

million vehicles with a dangerous ignition switch defect (the "Delta Ignition Switch Defect").

The Delta Ignition Switch Vehicles were recalled beginning in February 2014 in NHTSA Recall

No. 14-V-047, and the GM vehicles subject to that recall are the subject of the Proof of Claim

filed by Patricia Barker on December 22, 2016, and the Attachment to that Proof of Claim is

incorporated herein by reference.

10.    The Delta Ignition Switch Vehicles contained ignition switches that can

inadvertently move from the "run" to the "accessory" or "off" position at any time during normal

and proper operation of the vehicles. The ignition switch is most likely to move when the

vehicle is jarred or travels across a bumpy road; if the key chain is heavy; if a driver

inadvertently touches the ignition key with his or her knee; or for a host of additional reasons.

When the ignition switch inadvertently moves out of the "run" position, the vehicle suddenly and

unexpectedly loses engine power, power steering, and power brakes, and certain safety features

are disabled, including the vehicle's airbags. This leaves occupants vulnerable to crashes,

serious injuries, and death.

11.    The Delta Ignition Switch System is defective in at least three major respects.

First, the switches are simply weak; because of a faulty "detent plunger," the switch can

inadvertently move from the "run" to the "accessory" position. Second, because the ignition

3

switches are placed low on the steering column, the driver's knee can easily bump the key (or the

hanging fob below the key) and cause the switch to inadvertently move from the "run" to the

"accessory" or "off" position.  Third, when the ignition switch moves from the "run" to the

"accessory" or "off" position, the vehicle's power is disabled.  This also immediately disables

the airbags.  Thus, when power is lost during ordinary operation of the vehicle, a driver is left

without the protection of the airbag system even if he or she is traveling at high speeds.

12.    GM was aware of safer alternative designs for airbag systems that would have

prevented the non-deployment of airbags caused by the Delta Ignition Switch Defect as well as

the other Low Torque Ignition Switch Defects detailed herein, but chose not to employ them—

whether by way of recall of GM vehicles on the road or a design change for GM vehicles it

continued to manufacture—in part to avoid disclosure of the defective ignition switches and their

tragic consequences.

13.    In June and July 2014, New GM conducted three additional recalls of more than

10.4 million vehicles for ignition switches with low torque ("Low Torque Ignition Switch

Defects"):  Safety Recalls No. 14-V-355, 14-V-394, and 14-V-400.  Aproximately 8.7 milllion of

these Low Torque Ignition Switch Defect Vehicles were manufactured and sold by GM.

14.    Each of these three recalls involves the same defect (low-torque switches that

inadvertently move out of the "run" position on rough roads or due to a weight hanging from the

key or knee interaction with the switch) with the same adverse effect (loss of power to steering,

brakes, and airbag).

15.    The defects that gave rise to each of these recalls were well-known to GM long

before it filed for bankruptcy in June 2009.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:38    Exhibit B -
Proposed Non-Ignition Switch Class Claim    Pg 7 of 89

### a.    Low Torque Safety Recall No. 14-V-355.

16.    On June 20, 2014, New GM recalled 3,141,731 vehicles in the United States for ignition switch, or ignition key slot, defects (Recall No. 14-V-355).

17.    Approximately 2,349,095 of the vehicles subject to this recall were made and sold by GM.

18.    The following vehicles were included in the June 20, 2014 recall:  2005-2009 Buick Lacrosse, 2006-2014 Chevrolet Impala, 2000-2005 Cadillac Deville, 2006-2011 Cadillac DTS, 2006-2011 Buick Lucerne, and 2006-2008 Chevrolet Monte Carlo.

19.    The recall notice states, "In the affected vehicles, the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  New GM's internal description of the defect was similar:  "The ignition switch may inadvertently move out of the 'run' position if the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event."  Thus, all models involved in Safety Recall No. 14-V-355 have a common defect.

20.    The recall notice also explains that, "[i]f the key is not in the run position, the air bags may not deploy if the vehicle is involved in a crash, increasing the risk of injury. Additionally, a key knocked out of the run position could cause loss of engine power, power steering, and power braking, increasing the risk of a vehicle crash."  This is similar to how New GM internally described the *effect* of the defect:  "If the ignition switch moves out of the 'run' position, there is an effect on power steering and power braking."  In addition, the timing of the key movement out of the "run position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-355.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:58    Exhibit B -
Proposed Non-Ignition Switch Class Claim    Pg 8 of 89

21.    The root cause of the defect was as follows:  "The ignition switch torque

performance may be below target curve.  The system torque performance may be insufficient to

resist energy generated from weight hanging on slotted key."

22.    The vehicles included in this recall were built on the same platform and their

defective ignition switches have weak detent plungers, just like the Cobalt and other Delta

Ignition Switch Vehicles recalled in February and March of 2014.

23.    GM was aware of the ignition switch defect well before it filed for bankruptcy.

The information known to GM included the following facts:

a.    On or about August 25, 2005, GM design engineer Laura Andres wrote a

description of ignition switch issues that she experienced while operating a 2006 Chevrolet

Impala on the highway.  Ms. Andres stated, "While driving home from work on my usual route, I

was driving about 45 mph, where the road changes from paved to gravel & then back to paved,

some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.

The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition

detent, because in a road test in the parking lot it also shut off."

b.    GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' account on

August 25, 2005, to four other GM employees.  Mr. Dickinson asked, "Is this a condition we

would expect to occur under some impacts?"

c.    On August 29, 2005, GM employee Jim Zito forwarded the messages to

Ray DeGiorgio (the GM Design Research Engineer for the notorious Delta Ignition Switch) and

asked, "Do we have any history with the ignition switch as far as it being sensitive to road

bumps?"

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:58    Exhibit B -
Proposed Non-Ignition Switch Class Claim    Pg 9 of 89

d.      Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

e.      On August 30, 2005, Ms. Andres sent an email to GM employee Jim Zito and copied ten other GM employees, including Mr. DeGiorgio.  Ms. Andres, in her email, stated, "I picked up the vehicle from repair.  No repairs were done. . . .  The technician said there is nothing they can do to repair it.  He said it is just the design of the switch.  He said other switches, like on the trucks, have a stronger detent and don't experience this."

f.      Ms. Andres' email continued:  "I think this is a serious safety problem, especially if this switch is on multiple programs.  I'm thinking big recall.  I was driving 45 mph when I hit the pothole and the car shut off and I had a car driving behind me that swerved around me.  I don't like to imagine a customer driving with their kids in the back seat, on I-75 and hitting a pothole, in rush-hour traffic.  I think you should seriously consider changing this part to a switch with a stronger detent."

24.      Senior executives and engineers at GM knew that some of the information relayed to allay Ms. Andres' concerns was inaccurate.  For example, Mr. DeGiorgio knew that there had been "issues with detents being too light."  Instead of relaying those "issues," Mr. DeGiorgio falsely stated that there were no such "issues."

25.      From 2001 until the bankruptcy Sale in 2009, GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.  The following are examples of just a few of the many reports and complaints regarding the defect that GM knew before the bankruptcy Sale:

26.    GM knew of a January 23, 2001 complaint filed with NHTSA involving a 2000

Cadillac Deville and an incident that occurred on January 23, 2001, in which the following was

reported:

> COMPLETE ELECTRICAL SYSTEM AND ENGINE
> SHUTDOWN WHILE DRIVING. HAPPENED THREE
> DIFFERENT TIMES TO DATE. DEALER IS UNABLE TO
> DETERMINE CAUSE OF FAILURE. THIS CONDITION
> DEEMED TO BE EXTREMELY HAZARDOUS BY OWNER.
> NHTSA ID Number: 739850.

27.    GM knew of a June 12, 2001 complaint filed with NHTSA involving a 2000

Cadillac Deville and an incident that occurred on June 12, 2001, in which the following was

reported:

> INTERMITTENTLY AT 60 MPH VEHICLE WILL STALL OUT
> AND DIE. MOST TIMES VEHICLE WILL START UP
> IMMEDIATELY AFTER. DEALER HAS REPLACED MAIN
> CONSOLE 3 TIMES, AND ABS BRAKES. BUT, PROBLEM
> HAS NOT BEEN CORRECTED. MANUFACTURER HAS
> BEEN NOTIFIED.*AK  NHTSA ID Number: 890227.

28.    GM knew of a January 27, 2003 complaint filed with NHTSA involving a 2001

Cadillac Deville and an incident that occurred on January 27, 2003, in which the following was

reported:

> WHILE DRIVING AT HIGHWAY SPEED ENGINE SHUT
> DOWN, CAUSING AN ACCIDENT. PLEASE PROVIDE ANY
> ADDITIONAL INFORMATION.*AK   NHTSA ID Number:
> 10004759.

29.    GM knew of a September 18, 2007 complaint filed with NHTSA involving a

2006 Chevrolet Impala and an incident that occurred on September 15, 2006, in which it was

reported that:

> TL*THE CONTACTS SON OWNS A 2006 CHEVROLET
> IMPALA. WHILE DRIVING APPROXIMATELY 33 MPH AT
> NIGHT, THE CONTACTS SON CRASHED INTO A STALLED
> VEHICLE. HE STRUCK THE VEHICLE ON THE DRIVER

> SIDE DOOR AND NEITHER THE DRIVER NOR THE
> PASSENGER SIDE AIR BAGS DEPLOYED. THE DRIVER
> SUSTAINED MINOR INJURIES TO HIS WRIST. THE
> VEHICLE SUSTAINED MAJOR FRONT END DAMAGE. THE
> DEALER WAS NOTIFIED AND STATED THAT THE CRASH
> HAD TO HAVE BEEN A DIRECT HIT ON THE SENSOR. THE
> CURRENT AND FAILURE MILEAGES WERE 21,600. THE
> CONSUMER STATED THE AIR BAGS DID NOT DEPLOY.
> THE CONSUMER PROVIDED PHOTOS OF THE VEHICLE.
> UPDATED 10/10/07 *TR NHTSA ID Number: 10203350.

30.     GM knew of an April 2, 2009 complaint filed with NHTSA involving a 2005 Buick LaCrosse and an incident that occurred on April 2, 2009, in which the following was reported:

> POWER STEERING WENT OUT COMPLETELY, NO
> WARNING JUST OUT. HAD A VERY HARD TIME
> STEERING CAR. LUCKY KNOW ONE WAS HURT. *TR
> NHTSA ID Number: 10263976.

   **b.     Low Torque Safety Recalls No. 14-V-394 and 14-V-400.**

31.     On July 2, 2014, New GM recalled 554,328 vehicles in the United States for ignition switch defects (Recall No. 14-V-394).

32.     The July 2 recall applied to the 2003-2014 Cadillac CTS and the 2004-2006 Cadillac SRX.  Approximately 450,000 of the vehicles involved in Recall No. 14-V-394 were manufactured and sold by GM.

33.     The recall notice explains that the weight on the key ring and/or road conditions or some other jarring event may cause the ignition switch to move out of the "run" position, turning off the engine.  Further, if the key is not in the "run" position, the airbags may not deploy in the event of a collision, increasing the risk of injury.  Internally, New GM characterized the defect as "The ignition switch may move from RUN to ACCESSORY or OFF due to driver interaction with the key or due to the weight of objects on the key ring."  Thus, all vehicles subject to Safety Recall No. 14-V-394 have the same defect.

9

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:88   Exhibit B -
Proposed New Ignition Switch Class Claim   Pg 12 of 89

34.     New GM internally described the effect of the defect as follows:  "This will result
in a partial loss of electrical power and turn off the engine.  Power steering/braking will be
affected and the air bags may not deploy if the vehicle is involved in a crash, increasing the risk
of injury or fatality."  Thus the effect of the defect is the same for all models involved in Safety
Recall No. 14-V-394.

35.     On July 3, 2014, New GM recalled 5,877,718 additional vehicles in the United
States for ignition switch defects (Recall No. 14-V-400).

36.     The following vehicles were included in Recall No. 14-V-400:  1997-2005
Chevrolet Malibu, 2000-2005 Chevrolet Impala, 2000-2005 Chevrolet Monte Carlo, 2000-2005
Pontiac Grand Am, 2004-2008 Pontiac Grand Prix, 1998-2002 Oldsmobile Intrigue, and 1999-
2004 Oldsmobile Alero.  All of the vehicles involved in Recall No. 14-V-400 were manufactured
and sold by GM.

37.     The recall notice states that the weight on the key and/or road conditions or some
other jarring event may cause the ignition switch to move out of the "run" position, turning off
the engine.  If the key is not in the "run" position, the airbags may not deploy if the vehicle is
involved in a collision, increasing the risk of injury.  Thus, all vehicles subject to Safety Recall
No.14-V-400 have the same defect.

38.     New GM described the effect of the defect as follows:  "If the key ring is carrying
added weight and the vehicle goes off road or experiences some other jarring event, it may
unintentionally move the key away from the 'run' position.  If this occurs, engine power, power
steering and power braking will be affected, increasing the risk of a crash.  The timing of the key
movement out of the 'run' position, relative to the activation of the sensing algorithm of the
crash event, may result in the airbags not deploying, increasing the potential for occupant injury

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit B -
Proposed New Class Claims Class-Claim   Pg 13 of 89

in certain kinds of crashes."  Thus, the effect of the defect is the same for all models involved in Safety Recall No. 14-V-400.

39.     The root cause of the defect is as follows:  "The ignition switch torque performance may be below target curve.  The system torque performance may be insufficient to resist energy generated from weight hanging on slotted key."

40.     Once again, the unintended ignition rotation defect is substantially similar to and relates directly to ignition switch defects, including the Delta Ignition Switch Vehicles and the other Low Torque Ignition Switch Defects.  Like the other ignition switch defects, the unintended ignition key rotation defect poses a serious and dangerous safety risk because it can cause a vehicle to stall while in motion by causing the key in the ignition to inadvertently move from the "on" or "run" position to the "off" or "accessory" position.  Like the other ignition switch defects, the unintended ignition key rotation defect can result in a loss of power steering, power braking, and increase the risk of a crash.  And as with the other ignition switch defects, if a crash occurs, the airbags will not deploy because of the unintended ignition key rotation defect.

41.     The unintended ignition key rotation defect involves several problems, and they are identical to the problems in the other GM vehicles with defective switches:  a weak detent plunger, the low positioning of the ignition on the steering column, and the algorithm that renders the airbags inoperable when the vehicle leaves the "run" position.

42.     The 2003-2006 Cadillac CTS and the 2004-2006 Cadillac SRX use the same Delphi switch and have inadequate torque for the "run"-"accessory" direction of the key rotation. This was known to GM, and was the basis for a change that was made to a stronger detent plunger for the 2007 and later model years of the SRX model.  The 2007 and later CTS vehicles used a switch manufactured by Dalian Alps.

43.     GM was aware of the defects in these vehicles well before it filed for bankruptcy in 2009.  GM's knowledge is evidenced by the following non-exclusive list of incidents:

a.     In January 2003, GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his 2003 Pontiac Grand Am.

b.     During the investigation, GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem.  The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30 to 35 mph.

c.     GM knew that the customer's key ring was allegedly quite heavy.  It contained approximately 50 keys and a set of brass knuckles.

d.     In May 2003, GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am.  GM identified the relevant population of defective vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am:

> This information goes out to Chevrolet, Oldsmobile and Pontiac dealers and concerns the 1999 through 2003 Chevrolet Malibu, Oldsmobile Alero and Pontiac Grand Am. This voicemail provides information about a condition that may be driving no trouble found claims on customer vehicles on part replacements such as BCMs, ignition lock cylinders, ignition switches and also some PCMs, ABS modules, door lock modules, restraint control system and theft security system replacements.  We were able to capture a customer's vehicle for the complaint of intermittent vehicle shuts off while driving.  At times this vehicle would start up and then shut off for no apparent reason.  Sometimes no codes would set and sometimes multiple codes would set.  In both instances the vehicle would immediately restart.  The customer had brought the vehicle in to the dealership four times.  On the first three trips the condition could not be duplicated.  On the fourth trip back the dealership service manager noticed the customer's excess size key

09-50026-mg    Doc 13896-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit B -
Proposed Note Ignition Switch Class Claim... Pg 15 of 89

ring and mass. The condition was duplicated using the customer's full key ring, which was not left at the dealership on prior visits. The actual cause of this customer's condition was that over bumps the mass and weight of the customer's key ring forces the dash mounted key lock cylinder switch out of its switch detent and allows the key to rotate back one sixteenth of an inch from the on position towards the accessory position. This amount of key movement will shut the vehicle off and create this customer's complaint. Also, when the vehicle is started and the key is quickly released between the ignition lock spring and weight and mass of the key chain, the key can snap back just past the on position detent and allow the engine to shut off. Noting the size of the customer's key ring, replacing the ignition lock cylinder with another one of the same would not have corrected this issue. Additionally, when the ignition is turned off in this type of manner, depending on which module is communicating on the data line at the time, is dependent on whether or not DTC codes will set and which codes will set. The DTCs that set most consistently during this condition was usually the communication or serial data codes DTC U1040, U1088, U1255, C1298, B, as in boy, 2958 and/or B, as in boy, 2960. As we investigated this condition further we also found that it was not uncommon for customers to have a number of items attached to their key rings. In many instances, especially when the vehicle was in for service overnight, the customer usually left only the vehicle key and key fob. Large key rings with multiple items attached can also be responsible for customer complaints of the vehicle shuts off while shifting into park on column mounted ignition lock cylinders. This is caused when the customer is shifting from a drive gear upward into park and an item on the key ring hits the ignition lock cylinder key tabs on the way up and moves the switch back out of the on detent position. Please be aware that these conditions can be caused by excessive key size and mass from the customer's key ring, and attention to this detail should be paid to allow you to better and more properly diagnose the customer's complaint. I also wanted to thank Rob Maziac, the service manager at Art Moran, in Michigan, for his efforts here in assisting General Motors with this issue. And many of you others who have taken the time out of your busy schedules and assisted us in the identification on many other issues. I appreciate your time. Thanks. [GM-MDL2543-300732518]

e.    GM did not recall these vehicles. Nor did it provide owners and/or lessees with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 29:09:86   Exhibit A -
Proposed New Ignition Switch Class Claim   Pg 16 of 89

f.      GM engineers had "recommended a higher spring rate from day one," as
"this would be the least costly fastest fix."

g.      On July 24, 2003, GM issued an engineering work order to increase the
detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile
Alero, and Pontiac Grand Am vehicles.  GM engineers allegedly increased the detent plunger
force and changed the part number of the ignition switch.  The new parts were installed
beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.  No recall was done at
the time to increase detent plunger force in prior models.

h.      GM issued a separate engineering work order in March 2004 to increase
the detent plunger force on the ignition switch in the Pontiac Grand Prix, ostensibly to "maintain
commonality" between the Grand Prix and the Malibu, Grand Am, and the Alero.  This change
was made only in production vehicles beginning in 2005, and no recall was done at the time to
increase detent plunger force in prior models.  GM engineers did not change the part number for
the new Pontiac Grand Prix ignition switch.

i.      GM design engineer Ray DeGiorgio signed the work order in March 2004
authorizing the part change for the Grand Prix ignition switch without changing the part number.
An Engineering Group Manager approved the design change "w/o part number change."  GM's
decision not to change the part number is a violation of generally accepted engineering
standards.  For example, the American Society of Mechanical Engineers ("ASME") issued
ASME Y14.100-2004, Engineering Drawing Practices, which sets forth essential minimum
requirements for engineering drawings and related documentation practices.  Such standards are
generally relied upon by automotive engineers (indeed, a GM engineer was on the ASME Y14
Standards Committee at the time ASME Y14.100-2004 was approved).  ASME Y14.100-2004,

14

09-50026-mg    Doc 13896-3    Filed 02/27/20    Entered 02/27/20 20:08:58    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 17 of 89

Section 6.8.1 governs "Change Requiring New Identification" and provides that "New PINs [part identification numbers] shall be assigned when a part or item is changed in such a manner that any of the following conditions occur:  (a) When performance or durability is affected to such an extent that the previous versions must be discarded or modified for reasons of safety or malfunction."  GM redesigned the switch "for reasons of safety or malfunction."  ASME Y14.100-2004, Section 6.8.1, applies here and mandates that GM should have changed the part number.  GM's decision not to change the part number is also a violation of generally accepted inventory management standards and practices, which dictate that a modification that is necessary to meet product safety specifications requires a part number change.

        j.      On or around August 25, 2005, Laura Andres, a GM design engineer, sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway.  Ms. Andres' email stated:

> While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it.  The car shut off.  I took the car in for repairs.  The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off.

        k.      GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four GM employees.  Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

        l.      On August 29, 2005, GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

        m.      Mr. DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light."

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 18 of 89

44.    From 2002 to the time of the bankruptcy Sale, GM received numerous reports

from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect.

The following are just a handful of examples of some of the reports known to GM.

45.    GM knew of a September 16, 2002 complaint filed with NHTSA regarding a

2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the

following was reported:

> WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON
> INTO A STEEL GATE, AND THEN HIT THREE TREES.
> UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED.
> CONTACTED DEALER. PLEASE PROVIDE FURTHER
> INFORMATION. *AK  NHTSA ID Number**: 8018687.

46.    GM knew of a November 22, 2002 complaint filed with NHTSA involving a 2003

Cadillac CTS involving an incident that occurred on July 1, 2002, in which it was reported that:

> THE CAR STALLS AT 25 MPH TO 45 MPH, OVER 20
> OCCURANCES, DEALER ATTEMPTED 3 REPAIRS. DT
> NHTSA ID Number: 770030.

47.    GM knew of a January 21, 2003 complaint filed with NHTSA involving a 2003

Cadillac CTS, in which the following was reported:

> WHILE DRIVING AT ANY SPEED,THE VEHICLE WILL
> SUDDENLY SHUT OFF. THE STEERING WHEEL AND THE
> BRAKE PEDAL BECOMES VERY STIFF. CONSUMER FEELS
> ITS VERY UNSAFE TO DRIVE. PLEASE PROVIDE ANY
> FURTHER INFORMATION.  NHTSA ID Number: 10004288.

48.    GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001

Oldsmobile Intrigue, which involved the following report:

> CONSUMER NOTICED THAT WHILE TRAVELING DOWN
> HILL AT 40-45 MPH BRAKES FAILED, CAUSING
> CONSUMER TO RUN INTO THREES AND A POLE. UPON
> IMPACT, AIR BAGS DID NOT DEPLOY. *AK  NHTSA ID
> Number: 10026252.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:00    Exhibit B -
Proposed Note Class Claims    Pg 19 of 89

49.    GM knew of a March 11, 2004 complaint filed with NHTSA involving a 2004

Cadillac CTS involving an incident that occurred on March 11, 2004, in which the following was

reported:

> CONSUMER STATED WHILE DRIVING AT 55-MPH
> VEHICLE STALLED, CAUSING CONSUMER TO PULL OFF
> THE ROAD. DEALER INSPECTED VEHICLE SEVERAL
> TIMES, BUT COULD NOT DUPLICATE OR CORRECT THE
> PROBLEM. *AK NHTSA ID Number: 10062993.

50.    GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003

Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED,
> THE HYDRAULIC BRAKES & STEERING FAILED DUE TO
> THE ENGINE DYING. THERE IS NO SET PATTERN, IT
> MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE
> NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE,
> THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN
> GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES
> A DAY FOR 5 DAYS, ETC., ETC. IN EVERY OCURRENCE, IT
> TAKES APPROXIMATELY 10 MINUTES BEFORE IT WILL
> START BACK UP. AT HIGH SPEEDS, IT IS EXTREMELY
> TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE
> DEALER, UNDER EXTENDED WARRANTY, THE
> REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS.
> THE DEALER CANNOT ASCERTAIN, NOR FIX THE
> PROBLEM. IT HAPPENED TO THE DEALER AT LEAST
> ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL
> ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR
> IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT
> WAS CONSIDERED A USED CAR. GM HAS DENIED OUR
> CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO
> USED CARS. THE CAR HAS BEEN PERMANENTLY
> PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO
> BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE.
> THIS HAS RESULTED IN A BADLUCK SITUATION FOR US.
> WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE
> PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO
> SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER
> 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF
> THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET.
> THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP
> ?*AK NHTSA ID Number: 10061898.

51.     GM knew of a July 20, 2004 complaint filed with NHTSA involving a 2004

Cadillac SRX, involving an incident that occurred on July 9, 2004, in which the following was

reported:

> THE CAR DIES AFTER TRAVELING ON HIGHWAY. IT
> GOES FROM 65 MPH TO 0. THE BRAKES, STEERING, AND
> COMPLETE POWER DIES. YOU HAVE NO CONTROL OVER
> THE CAR AT THIS POINT. I HAVE ALMOST BEEN HIT 5
> TIMES NOW. ALSO, WHEN THE CARS DOES TURN BACK
> ON IT WILL ONLY GO 10 MPH AND SOMETIMES WHEN
> YOU TURN IT BACK ON THE RPM'S WILL GO TO THE
> MAX. IT SOUNDS LIKE THE CAR IS GOING TO EXPLODE.
> THIS CAR IS A DEATH TRAP. *LA   NHTSA ID Number:
> 10082289.

52.     GM knew of an August 23, 2004 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED.
> WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF
> BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL
> TIMES, BUT PROBLEM RECURRED. *AK.   NHTSA ID
> Number:  10089418.

53.     GM knew of a report in August of 2004 involving a 2004 Chevrolet Malibu

incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER
> COULD NOT FIND ANY DEFECTS. *JB.   NHTSA ID
> Number: 10087966.

54.     GM knew of an October 23, 2004 complaint filed with NHTSA regarding a 2003

Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE   CONTINUOUSLY   EXPERIENCED   AN
> ELECTRICAL   SYSTEM   FAILURE.   AS   A   RESULT,
> THERE'WAS AN ELECTRICAL SHUT DOWN WHICH
> RESULTED IN THE ENGINE DYING/ STEERING WHEEL
> LOCKING UP, AND LOSS OF BRAKE POWER.*AK  NHTSA
> ID Number: 10044624.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:50    Exhibit B -
Proposed New Ignition Switch Class Claim Pg 21 of 89

55.    GM knew of an April 26, 2005 complaint filed with NHTSA involving a 2005

Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the

following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX]
> PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE
> STALLS/ LOSS OF POWER IN THE ENGINE. WHILE
> DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES
> POWER. YOU CONTINUE TO PRESS THE ACCELERATOR
> PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE
> BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED
> WHILE DRIVING NORMALLY WITHOUT TRYING TO
> ACCELERATE AND ALSO WHILE TRYING TO
> ACCELERATE. THE CAR HAS LOST POWER WHILE
> TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST
> POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR
> HAS LOST POWER WHILE JUST DRIVING DOWN THE
> ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS
> WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]-
> MODULE, POWERTRAIN CONTROL-ENGINE
> REPROGRAMMING. 01/24/2005 [XXX]-
> SOLENOID,PRESSURE CONTROL-REPLACED. 02/04/2005
> [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]-
> PEDAL,ACCELERATOR-REPLACED. DEALERSHIP
> PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-
> 293-3500. DEALERSHIP HAS ADVISED THAT THEY DO
> NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE
> BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC
> WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH
> PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY
> WERE GOING TO RESEARCH THE PROBLEM AND SEE IF
> ANY OTHER GRAND PRI WAS REPORTING LIKE
> PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC
> IS THEY WANT US TO COME IN AND TAKE ANOTHER
> GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS
> CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT
> IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2
> MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE
> PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA.
> *AK *JS INFORMATION REDACTED PURSUANT TO THE
> FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
> 552(B)(6) NHTSA ID Number: 10118501.

56.    GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004

Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN
> HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO
> WARNING THAT THIS WOULD HAPPEN. THE CAR WAS
> SERVICED BEFORE FOR THIS PROBLEM BUT IT
> CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE
> HORN FUSE HAS BEEN REPLACED TWICE, AND THE
> BLINKER IS CURRENTLY OUT. THE STEERING COLLAR
> HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED
> TO BE A NEW CAR.  NHTSA ID Number: 10123684.

57.    GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on February 18, 2005, in which the following was

reported:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE
> DRIVING AND THE POWER STEERING AND BRAKING
> ABILITY    ARE    LOST.*MR    *NM.    NHTSA    ID
> Number: 10124713.

58.    GM knew of an August 12, 2005 complaint filed with NHTSA involving a 2003

Cadillac CTS, regarding an incident that occurred on January 3, 2005, in which it was reported

that:

> DT: VEHICLE LOST POWER WHEN THE CONSUMER HIT
> THE BRAKES. THE TRANSMISSION JOLTS AND THEN THE
> ENGINE SHUTS OFF. IT HAS BEEN TO THE DEALER 6
> TIMES    SINCE    JANUARY.    THE    DEALER    TRIED
> SOMETHING DIFFERENT EVERY TIME SHE TOOK IT IN.
> MANUFACTURER SAID SHE COULD HAVE A NEW
> VEHICLE IF SHE PAID FOR IT. SHE WANTED TO GET RID
> OF THE VEHICLE.*AK THE CHECK ENGINE LIGHT
> ILLUMINATED. *JB  NHTSA ID Number: 10127580.

59.    GM knew of an August 26, 2005 complaint with NHTSA regarding a 2004

Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was

reported:

WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR
FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING
ME WITH NO POWER STEERING AND NO WAY TO
REGAIN CONTROL OF THE CAR UNTIL COMING TO A
COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED
IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER
THE CAR FAILED TO START AT ALL NOT EVEN TURNING
OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE
GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION
CONTROL MODULE" IN THE CAR. AT THIS TIME THE
PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2
MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME
IN A MUCH MORE HAZARDOUS CONDITION BEING THAT
I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50
MPH AND HAD TO TRAVEL ACROSS TWO LANES OF
TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT.
THE CAR CONTINUED TO START AND SHUT OFF ALL
THE WAY TO THE SERVICE GARAGE WHERE IT WAS
AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL
MODULE". IN ANOTHER TWO WEEKS TIME THE CAR
FAILED TO START AND WHEN DIAGNOSED THIS TIME IT
WAS SAID TO HAVE "ELECTRICAL PROBLEMS"
POSSIBLE THE "POWER CONTROL MODULE". AT THIS
TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE
FOR TRAVEL. *JB  **NHTSA ID Number:** 10134303.

60.    GM knew of a September 22, 2005 complaint filed with NHTSA involving a

2005 Cadillac CTS, concerning an incident that occurred on September 16, 2005, in which the

following was reported:

DT: 2005 CADILLAC CTS—THE CALLER'S VEHICLE WAS
INVOLVED IN AN ACCIDENT WHILE DRIVING AT 55 MPH.
UPON IMPACT, AIR BAGS DID NOT DEPLOY. THE
VEHICLE WENT OFF THE ROAD AND HIT A TREE. THIS
WAS ON THE DRIVER'S SIDE FRONT. THERE WERE NO
INDICATOR LIGHTS ON PRIOR TO THE ACCIDENT. THE
VEHICLE HAS NOT BEEN INSPECTED BY THE
DEALERSHIP, AND INSURANCE COMPANY TOTALED
THE VEHICLE. THE CALLER SAW NO REASON FOR THE
AIR BAGS NOT TO DEPLOY. . TWO INJURED WERE
INJURED IN THIS CRASH. T A POLICE REPORT WAS
TAKEN. THERE WAS NO FIRE. *AK  NHTSA ID Number:
10137348.

09-50026-mg    Doc 13896-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit B -
Proposed New Ignition Switch Class Claim?    Pg 24 of 89

61.    GM knew of a September 29, 2006 complaint filed with NHTSA involving a

2004 Cadillac CTS and an incident that occurred on September 29, 2006, in which the following

was reported:

> DT*: THE CONTACT STATED AT VARIOUS SPEEDS
> WITHOUT WARNING, THE VEHICLE LOST POWER AND
> WOULD NOT ACCELERATE ABOVE 20 MPH. ALSO,
> WITHOUT WARNING, THE VEHICLE STALLED ON
> SEVERAL OCCASIONS, AND WOULD NOT RESTART. THE
> VEHICLE WAS TOWED TO THE DEALERSHIP, WHO
> REPLACED THE THROTTLE TWICE AND THE THROTTLE
> BODY ASSEMBLY HARNESS, BUT THE PROBLEM
> PERSISTED. *AK UPDATED 10/25/2006—*NM  NHTSA ID
> Number: 10169594.

62.    GM knew of an April 18, 2007 complaint filed with NHTSA involving a 2004

Cadillac SRX, regarding an incident that occurred on April 13, 2007, in which it was reported

that:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. THE
> ENGINE STALLED WITHOUT WARNING AND CAUSED
> ANOTHER VEHICLE TO CRASH INTO THE VEHICLE. THE
> VEHICLE WAS ABLE TO RESTART A FEW MINUTES
> AFTER THE CRASH. THE DEALER AND MANUFACTURER
> WAS UNABLE TO DIAGNOSE THE FAILURE. THE
> MANUFACTURER HAD THE VEHICLE INSPECTED BY A
> CADILLAC SPECIALIST WHO WAS UNABLE TO
> DIAGNOSE THE FAILURE. THE DEALER UPDATED THE
> COMPUTER FOUR TIMES, BUT THE ENGINE CONTINUED
> TO STALL. THE CURRENT AND FAILURE MILEAGES
> WERE 48,000.  NHTSA ID Number: 10188245.

63.    GM knew of a September 20, 2007 complaint filed with NHTSA involving a

2007 Cadillac CTS, in connection with an incident that occurred on January 1, 2007, in which it

was reported that:

> TL*THE CONTACT OWNS A 2007 CADILLAC CTS. WHILE
> DRIVING 40 MPH, THE VEHICLE SHUT OFF WITHOUT
> WARNING. THE FAILURE OCCURRED ON FIVE SEPARATE
> OCCASIONS. THE DEALER WAS UNABLE TO DUPLICATE
> THE FAILURE. AS OF SEPTEMBER 20, 2007, THE DEALER

09-50026-mg    Doc 13895-3    Filed 02/27/20    Entered 02/27/20 20:09:56    Exhibit B -
Proposed New Ignition Switch Class Claim Pg 25 of 89

HAD NOT REPAIRED THE VEHICLE. THE POWERTRAIN
WAS UNKNOWN. THE FAILURE MILEAGE WAS 2,000 AND
CURRENT MILEAGE WAS 11,998.    NHTSA ID Number:
10203516.

64.    GM knew of a September 24, 2007 complaint filed with NHTSA involving a

2004 Cadillac SRX, regarding an incident that occurred on January 1, 2005, in which the

following was reported:

> TL*THE CONTACT OWNS A 2004 CADILLAC SRX. WHILE
> DRIVING 5 MPH OR GREATER, THE VEHICLE WOULD
> SHUT OFF WITHOUT WARNING. THE DEALER STATED
> THAT THE BATTERY CAUSED THE FAILURE AND THEY
> REPLACED THE BATTERY. APPROXIMATELY EIGHT
> MONTHS LATER, THE FAILURE RECURRED. THE DEALER
> STATED THAT THE BATTERY CAUSED THE FAILURE
> AND REPLACED IT A SECOND TIME. APPROXIMATELY
> THREE MONTHS LATER, THE FAILURE OCCURRED
> AGAIN. SHE WAS ABLE TO RESTART THE VEHICLE. THE
> DEALER WAS UNABLE TO DUPLICATE THE FAILURE,
> HOWEVER, THEY REPLACED THE CRANK SHAFT
> SENSOR. THE FAILURE CONTINUES TO PERSIST. AS OF
> SEPTEMBER 24, 2007, THE DEALER HAD NOT REPAIRED
> THE VEHICLE. THE POWERTRAIN WAS UNKNOWN. THE
> FAILURE MILEAGE WAS 8,000 AND CURRENT MILEAGE
> WAS 70,580.  NHTSA ID Number: 10203943.

65.    GM knew of a June 18, 2008 complaint filed with NHTSA involving a 2006

Cadillac CTS and an incident that occurred on June 17, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2006 CADILLAC CTS. WHILE
> DRIVING 60 MPH AT NIGHT, THE VEHICLE SHUT OFF
> AND LOST TOTAL POWER. WHEN THE FAILURE
> OCCURRED, THE VEHICLE CONTINUED TO ROLL AS IF IT
> WERE IN NEUTRAL. THERE WERE NO WARNING
> INDICATORS PRIOR TO THE FAILURE. THE CONTACT
> FEELS THAT THIS IS A SAFETY HAZARD BECAUSE IT
> COULD HAVE RESULTED IN A SERIOUS CRASH. THE
> VEHICLE WAS TAKEN TO THE DEALER TWICE FOR
> REPAIR FOR THE SAME FAILURE IN FEBURARY OF 2008
> AND JUNE 17, 2008. THE FIRST TIME THE CAUSE OF THE
> FAILURE WAS IDENTIFIED AS A GLITCH WITH THE
> COMPUTER    SWITCH    THAT    CONTROLS    THE
> TRANSMISSION. AT THE SECOND VISIT, THE SHOP

EXPLAINED THAT THEY COULD NOT IDENTIFY THE FAILURE. IT WOULD HAVE TO RECUR IN ORDER FOR THEM TO DIAGNOSE THE FAILURE PROPERLY. THE CURRENT AND FAILURE MILEAGES WERE 43,000. NHTSA ID Number: 10231507.

66.     GM knew of an October 14, 2008 complaint filed with NHTSA involving a 2008

Cadillac CTS and an incident that occurred on April 5, 2008, in which it was reported that:

WHILE DRIVING MY 2008 CTS, WITH NO ADVANCE NOTICE, THE ENGINE JUST DIED. IT SEEMED TO RUN OUT OF GAS. MY FUEL GAUGE READ BETWEEN 1/2 TO 3/4 FULL. THIS HAPPENED 3 DIFFERENT OCCASIONS. ALL 3 TIMES I HAD TO HAVE IT TOWED BACK TO THE DEALERSHIP THAT I PURCHASED THE CAR FROM. ALL 3 TIMES I GOT DIFFERENT REASONS IT HAPPENED, FROM BAD FUEL PUMP IN GAS TANK, TO SOME TYPE OF BAD CONNECTION, ETC. AFTER THIS HAPPENED THE 3RD TIME, I DEMANDED A NEW CAR, WHICH I RECEIVED. I HAVE HAD NO PROBLEMS WITH THIS CTS, RUNS GREAT. *TR  NHTSA ID Number: 10245423.

67.     GM knew of a November 13, 2008 complaint with NHTSA regarding a 2001

Oldsmobile Intrigue, and an incident that occurred on July 1, 2004, in which the following was

reported:

L*THE CONTACT OWNS A 2001 OLDSMOBILE INTRIGUE. WHILE DRIVING 35 MPH, THE VEHICLE CONTINUOUSLY STALLS AND HESITATES. IN ADDITION, THE INSTRUMENT PANEL INDICATORS WOULD ILLUMINATE AT RANDOM. THE VEHICLE FAILED INSPECTION AND THE CRANKSHAFT SENSOR WAS REPLACED, WHICH HELPED WITH THE STALLING AND HESITATION; HOWEVER, THE CHECK ENGINE INDICATOR WAS STILL ILLUMINATED. DAYS AFTER THE CRANKSHAFT SENSOR WAS REPLACED, THE VEHICLE FAILED TO START. HOWEVER, ALL OF THE INSTRUMENT PANEL INDICATORS FLASHED ON AND OFF. AFTER NUMEROUS ATTEMPTS TO START THE VEHICLE, HE HAD IT JUMPSTARTED. THE VEHICLE WAS THEN ABLE TO START. WHILE DRIVING HOME, ALL OF THE LIGHTING FLASHED AND THE VEHICLE SUDDENLY SHUT OFF. THE VEHICLE LOST ALL ELECTRICAL POWER AND POWER STEERING ABILITY. THE CONTACT MANAGED TO PARK

> THE VEHICLE IN A PARKING LOT AND HAD IT TOWED
> THE FOLLOWING DAY TO A REPAIR SHOP. THE VEHICLE
> IS CURRENTLY STILL IN THE SHOP. THE VEHICLE HAS
> BEEN RECALLED IN CANADA AND HE BELIEVES THAT IT
> SHOULD ALSO BE RECALLED IN THE UNITED STATES.
> THE FAILURE MILEAGE WAS UNKNOWN AND THE
> CURRENT MILEAGE WAS 106,000. NHTSA ID
> Number: 10248694.

68.    GM knew of a December 10, 2008 complaint filed with NHTSA regarding a 2004

Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following

was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING
> APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF,
> THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD
> TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE,
> PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR
> HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND
> FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I
> COULD HAVE BEEN ON THE HIGHWAY AND BEEN
> KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN
> OUT AS WELL THOUGH THIS PARTICULAR INCIDENT
> WAS RANDOM. *TR  NHTSA ID Number: 10251280.

69.    GM knew of a March 31, 2009 complaint filed with NHTSA regarding a 2005

Chevrolet Malibu incident that occurred on May 30, 2008, in which it was reported that:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU.
> THE CONTACT STATED THAT THE POWER WINDOWS,
> LOCKS, LINKAGES, AND IGNITION SWITCH
> SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE
> VEHICLE TO THE DEALER AND THEY REPLACED THE
> IGNITION SWITCH AT THE COST OF $495. THE
> MANUFACTURER STATED THAT THEY WOULD NOT
> ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE
> THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES
> AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN
> CORRECTING THE FAILURES. THE FAILURE MILEAGE
> WAS 45,000 AND CURRENT MILEAGE WAS 51,000.  NHTSA
> ID Number: 10263716.

70.     New GM has publicly admitted that it was aware of at least 7 crashes, 8 injuries,
and 3 deaths linked to this serious safety defect before deciding to finally implement a recall.
However, in reality, the number of reports and complaints is much higher.

71.     Notwithstanding years of notice and knowledge of the defect, on top of numerous
complaints and reports from consumers, including reports of crashes, injuries, and deaths, GM
did not implement a recall involving this defect at any time before the bankruptcy Sale.

### III.     SIDE-IMPACT AIRBAG WIRING HARNESS DEFECT

72.     On March 17, 2014, New GM recalled nearly 1.2 million MY 2008-2013 Buick
Enclave, 2009-2013 Chevrolet Traverse, 2008-2013 GMC Acadia, and 2008-2010 Saturn
Outlook vehicles in Safety Recall No. 14-V-118 for a dangerous defect involving airbags and
seatbelt pretensioners.  More than 275,000 of these vehicles were manufactured and sold by GM.

73.     In a March 31, 2014 letter to NHTSA, New GM described the defect as follows:

> Corrosion and/or loose crimps in the driver and passenger seat
> mounted side impact airbag (SIAB) wiring harness connectors can
> cause an increase in resistance.  The airbag sensing system will
> interpret an increase in resistance as a fault.  A fault will illuminate
> the airbag readiness light on the instrument cluster and a
> 'SERVICE AIR BAG' message in the Driver Information Center
> (DIC), and set a Diagnostic Trouble Code (DTC).  At first, at
> lower levels of resistance, the light and DIC message may be
> intermittent and the airbags and pretensioners will still deploy.
> Over time, the resistance may reach a level where the SIABs, front
> center side airbag, if equipped, and pretensioners will not deploy in
> a crash.

Thus, all models involved in Safety Recall No. 14-V-118 have a common defect.

74.     Internally, New GM described the *effect* of the defect as follows:  "If the
resistance reaches a high enough level, the SIABs, driver's center side airbag, or pretensioners
may not deploy in a crash."  Thus, the effect of the defect is the same for all models involved in
Safety Recall No. 14-V-118.

75.     Once again, GM knew of the dangerous airbag defect but never took the requisite

remedial action at any time prior to the bankruptcy Sale.

76.     The SIAB module is mounted to the seat back structure and has a direct electrical

connection to the inflator.  The wiring harness routes from the airbag, attaches to the seat

suspension, secures to the seat structure, and mounts to the front edge of the seat.  The mating

socket side of the connector is on a breakout from the body harness that exits through an opening

in the carpet.[2]



**Fig. 1 Connecter location and setup**[3]

77.     In 2007, GM launched the GMC Acadia and Saturn Outlook using a Delphi

Metropak 150 connector for the driver and passenger SIABs.  Personnel at GM's plant in

Lansing Delta Township ("LDT") expressed concern with respect to using that connector

because the orientation required the operator to reach in and behind the connector to install the

connector position assurance clip.[4]  The blind installation and limited hand clearance prompted

LDT to issue Problem Resolution Tracking System ("PRTS") N208096 so that it could meet

---

[2] GM-MDL2543-000698574, sheet 2, row 1686.

[3] GM-MDL2543-402353770.

[4] GM-MDL2543-000698574, sheet 2, row 1686.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 30 of 89

production requirements.[5]  To meet these requirements, GM replaced the Delphi Metropak

connecter with a two way connector that was easier to connect—it could be locked with a one-

handed single motion.[6]

78.    But in June 2008, GM found that even after corrections had been made to prevent

claims related to wire routing and terminal crimping, there were still significant SIAB warranty

claims for May 2008-built vehicles.[7]

79.    GM knew that, from September 2, 2008 through September 16, 2008, three pairs

of failed parts were analyzed by supplier JST,[8] which concluded that the issue was fretting

corrosion.[9]  A GM current production PRTS opened in October 2008 confirmed that the issue

was indeed fretting corrosion.[10]  GM Problem Resolution Process Engineer Vinod Katothia

found that fretting corrosion of non-noble metals (tin in this case) is the result of the continual

rupture of oxide films on the contact surfaces caused by motion of the contact interface.[11]

80.    In November 2008, GM released a field service "rework" for MY 2008

vehicles.[12]  GM dealers were advised to clear the terminal of debris and apply Nyogel 760G, a

grease that seals electrical contacts from oxygen, moisture, aggressive gasses and other hostile

elements.  No action was taken for MY 2009 vehicles.

81.    Thus, before the bankruptcy Sale, GM knew that in 2008 there had been an

increase in warranty claims for airbag service on certain of its vehicles and determined it was due

---

[5] GM-MDL2543-402353770.

[6] GM-MDL2543-000698574, sheet 2, row 1686; GM-MDL2543-303352291 (EWO CSXTJ); GM-MDL2543-303352291 (Supply Contract).

[7] GM-MDL2543-402353770.

[8] GM-MDL2543-304666870.

[9] *Id.*

[10] GM-MDL2543-300128031.

[11] *Id.* at p.11.

[12] GM-MDL2543-302802992 (TSB 08-09-41-011).

to increased resistance in airbag wiring.  GM further knew that a September 2008 analysis of the tin connectors revealed that corrosion and wear to the connectors was causing the increased resistance in the airbag wiring.  GM knew that  a technical service bulletin had been issued on November 25, 2008, for 2008-2009 Buick Enclave, 2009 Chevy Traverse, 2008-2009 GMC Acadia, and 2008-2009 Saturn Outlook models, instructing dealers to repair the defect by using Nyogel grease, securing the connectors, and adding slack to the line.  Finally, GM had also begun the transition back to gold-plated terminals in certain vehicles and suspended all investigation into the defective airbag wiring without taking further action.[13]

82.    Despite this clear knowledge of the defect, GM failed to take appropriate remedial action at any time prior to the bankruptcy Sale.

### IV.    THE POWER STEERING DEFECT

83.    Between 2003 and 2010, over 1.3 million GM and New GM vehicles in the United States were sold with a safety defect that causes the vehicle's electric power steering to suddenly fail during ordinary driving conditions and revert back to manual steering, requiring greater effort by the driver to steer the vehicle and increasing the risk of collisions and injuries (the "Power Steering Defect").   Approximately 1 million of these vehicles were manufactured and sold by GM.

84.    The affected vehicles are MY 2004-2006 and 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2005-2009 Pontiac G6, 2004-2007 Saturn Ion, and 2008-2009 Saturn Aura vehicles.  All of these recalls were subject to Safety Recall No. 14-V-153.

---

[13] *See* New GM Notification Campaign No. 14V-118 dated March 31, 2014, at 1-2.

85.     In a March 28, 2014 letter to NHTSA, New GM described the Power Steering

Defect as follows:  "The subject vehicles equipped with electric power steering (EPS) may

experience a sudden loss of power steering assist that could occur at any time while driving."

Thus, all models involved in Safety Recall No. 14-V-153 have a common defect.

86.     New GM internally described the *effect* of the defect as follows:

> The Driver Information Center (DIC) displays "PWR STRG", a
> diagnostictrouble code is set, and the power steering assist is lost.  A
> chime is momentarily activated to alert the driver to the DIC message.
> Steering control is maintained, although greater driver effort is required at
> low vehicle speeds.  Typically, at the next ignition cycle, power assist is
> regained and the DIC message is off.

In its March 28, 2014 letter to NHTSA, New GM acknowledged that steering that requires

greater driver effort at low vehicle speeds "could result in an increased risk of a crash."  Thus,

the effect of the defect is the same for all models involved in Safety Recall No. 14-V-153.

87.     As with the ignition switch defects and many of the other defects that led to

recalls in 2014, GM was aware of the Power Steering Defect but never took anything

approaching full remedial action at any time prior to the bankruptcy Sale.

88.     In 2003, GM began receiving customer complaints regarding loss of power

steering in Ions, and in 2004, GM instituted a "Customer Satisfaction program" for 2004 Malibu

in which dealers were instructed to replace the steering column if a customer complained.

Despite acknowledging the problem, GM did not initiate any recall.

89.     In response to a NHTSA Preliminary Investigation into potential Power Steering

Defect in the 2005-2006 Pontiac G6, GM extended warranty coverage for the 2005-06 G6 and

2005 Malibu and Malibu Maxx to replace the steering column assembly.  But GM initiated no

recall.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:05:50   Exhibit B -
Proposed Non-Ignition Switch Class Claim   Pg 33 of 89

90.     NHTSA has linked approximately 12 crashes and 2 injuries to the Power Steering
Defect in the Ions.  The first injury was reported in May 2007, and was known to GM.

91.     In September 2011, after NHTSA began to make inquiries about the safety of the
Saturn Ion, New GM acknowledged that it had received almost 3,500 customer reports claiming
a sudden loss of power steering in 2004-2007 Ion vehicles.  Many of those were received by GM
prior to the bankruptcy Sale.

92.     By the time New GM finally recalled the Saturn Ion in March 2014, NHTSA had
received more than 1,200 complaints about the vehicle's power steering—many of them during
the time of GM.

93.     Despite its knowledge of this defect, GM failed to initiate a recall or take other
necessary remedial measures at any time prior to the bankruptcy Sale.

## V.     OTHER DEFECTS PLAGUED DOZENS OF MODELS OF GM VEHICLES

94.     In addition to the Defective GM Vehicles at issue in this Proof of Claim, and the
Delta Ignition Switch Vehicles at issue in the Proof of Claim field by Patricia Barker, GM sold
vehicles with dozens of other defects—many of which were known to and concealed by GM, and
remained concealed until New GM conducted a parade of recalls in 2014.

95.     In many cases, the available evidence suggests that GM was aware of the defects.
In any event, the defects are the product of GM's systemic valuation of cost-cutting and
devaluation of safety, making it likely that GM was aware of each of the following defects
summarized below.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:08:58    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 34 of 89

A.    **Ignition Lock Cylinder Defect In Vehicles Also Affected By The Delta Ignition
Switch Defect.**

96.    On April 9, 2014, New GM recalled 2,191,014 GM-branded vehicles with faulty

ignition lock cylinders, including approximately 1.6 million vehicles sold by GM.[14]  Though the

vehicles are the same as those affected by the Delta Ignition Switch Defect,[15] the lock cylinder

defect is distinct.

97.    In these vehicles, faulty ignition lock cylinders can allow removal of the ignition

key while the engine is not in the "off" position (the "Ignition Lock Cylinder Defect").  If the

ignition key is removed when the ignition is not in the "off" position, unintended vehicle motion

may occur.  That motion could cause a crash and injury to the vehicle's occupants or pedestrians.

Some of the vehicles with faulty ignition lock cylinders may fail to conform to FMVSS number

114, "*Theft Prevention and Rollaway Prevention*."[16]

98.    According to New GM's Chronology that it submitted to NHTSA on April 23,

2014, the Ignition Lock Cylinder Defect recall arose out of the notorious recalls for the Delta

Ignition Switch Defect in the Chevrolet Cobalt, Chevrolet HHR, Pontiac G5, Pontiac Solstice,

Saturn ION, and Saturn Sky vehicles.[17]

99.    New GM noted several hundred instances of potential key pullout issues in

vehicles covered by the previous ignition switch recalls, and specifically listed 139 instances

identified from records relating to customer and dealer reports to GM call centers, 479 instances

identified from warranty repair data, 1 legal claim, and 6 instances identified from NHTSA

vehicle owner questionnaire information.  New GM investigators also identified 16 roll-away

---

[14] New GM Letter to NHTSA dated April 9, 2014.

[15] Namely, MY 2005-2010 Chevrolet Cobalts, 2006-2011 Chevrolet HHRs, 2007-2010 Pontiac G5s, 2003-2007 Saturn Ions, and 2007-2010 Saturn Skys.  *See id.*

[16] New GM Notice to NHTSA dated April 9, 2014, at 1.

[17] *See* Attachment B to New GM's letter to NHTSA dated April 23, 2014 ("Chronology").

32

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 35 of 89

instances associated with the key pullout issue from records relating to customer and dealer
reports to GM call centers and legal claims information.

100.    New GM also considered the possibility that some vehicles may have experienced
key pullout issues at the time they were manufactured by GM, based on information that
included the following:  (a) a majority of instances of key pullouts that had been identified in the
recall population were in early-year Saturn Ion and Chevrolet Cobalt vehicles, and in addition,
repair order data indicated vehicles within that population had experienced a repair potentially
related to key pullout issues as early as 47 days from the date on which the vehicle was put into
service; and (b) an engineering inquiry known within GM as a Problem Resolution related to key
pullout issues was initiated in June 2005, which resulted in an engineering work order to modify
the ignition cylinder going forward.

101.    A majority of the key pullout instances identified involved MY 2003-2004 Saturn
Ion and MY 2005 Chevrolet Cobalt vehicles.  An April 3, 2014 New GM PowerPoint identified
358 instances of key pullouts involving those vehicles.

102.    In addition, with respect to early-year Saturn Ion and Chevrolet Cobalt vehicles,
the April 3 2014 Decision Committee meeting PowerPoint materials discussed the number of
days that elapsed between the "In Service Date" of those vehicles (the date they first hit the road)
and the "Repair Date."  The April 3 PowerPoint stated that, with respect to the MY 2003 Saturn
Ion, a vehicle was reported as experiencing a potential key pullout repair as early as 47 days
from its "In Service Date;" with respect to the MY 2004 Saturn Ion, a vehicle was reported as
experiencing a potential key pullout repair as early as 106 days from its "In Service Date;" with
respect to the MY 2005 Chevrolet Cobalt, a vehicle was reported as experiencing a potential key
pullout repair as early as 173 days from its "In Service Date;" and with respect to the MY 2006

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:08    Exhibit B -
Proposed New Class Claims    Class Claim?Pg 36 of 89

Chevrolet Cobalt, a vehicle was reported as experiencing a potential key pullout repair as early

as 169 days from its "In Service Date."  The length of time between the "In Service Date" and

the "Repair Date" suggested that these vehicles were defective at the time of manufacture.

103.    The PowerPoint at the April 3, 2014 Decision Committee meeting also discussed

a Problem Resolution that was initiated in June 2005 which related to key pullout issues in the

Chevrolet Cobalt (PRTS N 183836).  According to PRTS N 183836:  "Tolerance stack up

condition permits key to be removed from lock cylinder while driving."  The "Description of

Root Cause Investigation Progress and Verification" stated, "[a]s noted a tolerance stack up

exists in between the internal components of the cylinder."  According to a "Summary," "A

tolerance stack up condition exists between components internal to the cylinder which will allow

some keys to be removed."  The Problem Resolution identified the following "Solution":  "A

change to the sidebar of the ignition cylinder will occur to eliminate the stack-up conditions that

exist in the cylinder."

104.    In response to PRTS N 183836, GM issued an engineering work order to

"[c]hange shape of ignition cylinder sidebar top from flat to crowned."

105.    According to the work order:  "Profile and overall height of ignition cylinder

sidebar [will be] changed in order to assist in preventing key pullout on certain keycodes.  Profile

of sidebar to be domed as opposed to flat and overall height to be increased by 0.23mm."

106.    According to PRTS N 183836, this "solution fix[ed] the problem" going forward.

An entry in Problem Resolution made on March 2, 2007 stated:  "There were no incidents of the

key coming out of the ignition cylinder in the run position during a review of thirty vehicles. . . ."

A "Summary" in Problem Resolution stated:  "Because there were no incidents of the key

coming out of the ignition cylinder in the run position during a review of thirty vehicles[,] this

34

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed Note Class Claims    Part 7 of 31    Pg 37 of 89

PRTS issue should be closed."  PRTS N 183836 was the only PRTS discussed at the April 3,
2014, Decision Committee meeting, although it is not the only engineering or field report
relating to potential key pullout issues.

107.    This data led the Decision Committee to conclude that MY 2003-2004 Saturn Ion
vehicles and 2005 and some MY 2006 Chevrolet Cobalt vehicles failed to conform to FMVSS
number 114.  In addition, the Decision Committee concluded that a defect related to motor
vehicle safety existed, and decided to recall all vehicles covered by the Ignition Switch Defect
recalls to prevent unintended vehicle motion potentially caused by key pullout issues that could
result in a vehicle crash and occupant or pedestrian injuries.  For vehicles that were built with a
defective ignition cylinder that have not previously had the ignition cylinder replaced with a
redesigned part, the recall called for dealers to replace the ignition cylinder and provide two new
ignition/door keys for each vehicle.

**B.    Ignition Lock Cylinder Defect Affecting Over 200,000 Additional GM Vehicles.**

108.    On August 7, 2014, New GM recalled 202,155 MY 2002-2004 Saturn Vue
vehicles.[18]  In the affected vehicles, the ignition key can be removed when the vehicle is not in
the "off" position.[19]  If this happens, the vehicle can roll away, increasing the risk for a crash and
occupant or pedestrian injuries.[20]

109.    Following New GM's April 9, 2014 recall announcement regarding ignition
switch defects, New GM reviewed field and warranty data for potential instances of ignition
cylinders that permit the operator to remove the ignition key when the key is not in the "off"

---

[18] *See* August 7, 2014 Letter from New GM to NHTSA.

[19] *Id.*

[20] *Id.*

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit B -
Proposed Note Ignition Switch Class Claim?31 Pg 38 of 89

position in other vehicles outside of those already recalled.[21]  New GM identified 152 reports of

vehicle roll away and/or ignition keys being removed when the key is not in the "off" position in

the MY 2002-2004 Saturn Vue vehicles.[22]

110.    After reviewing this data with NHTSA on June 17, 2014, July 7, 2014, and

July 24, 2014, New GM instituted a safety recall on July 31, 2014.[23]

## C.    Front Passenger Airbag Defect.

111.    On March 17, 2014, New GM issued a noncompliance recall of 303,013 MY

2009-2014 GMC Savana and Chevrolet Express vehicles with a front passenger airbag defect, an

indeterminate number of which were manufactured by GM and sold prior to the Bar Date in

GM's bankruptcy.[24]

112.    In the affected vehicles, in certain frontal impact collisions below the airbag

deployment threshold, the panel covering the airbag may not sufficiently absorb the impact of

the collision (especially given the passenger-side airbag housing is plastic).[25]  These vehicles

therefore do not meet the requirements of FMVSS number 201, "Occupant Protection in Interior

Impact."[26]

## D.    Safety Defects Of The Seat Belt Systems In GM Vehicles.

### 1.    Seat belt connector cable defect.

113.    On May 20, 2014, New GM issued a safety recall for nearly 1.4 million MY

2009-2014 Buick Enclave, 2009-2014 Chevrolet Traverse, 2009-2014 GMC Acadia, and 2009-

2010 Saturn Outlook vehicles with a dangerous safety belt defect.

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *See* March 31, 2014 Letter from New GM to NHTSA.

[25] *Id.*

[26] *Id.*

114.    In the affected vehicles, "[t]he flexible steel cable that connects the safety belt to
the vehicle at the outside of the front outboard seating positions can fatigue and separate over
time as a result of occupant movement into the seat.  In a crash, a separated cable could increase
the risk of injury to the occupant."[27]

### 2.    Seat belt retractor defect.

115.    On June 11, 2014, New GM recalled 28,789 MY 2004-2011 Saab 9-3 Convertible
vehicles with a seat belt retractor defect.

116.    In the affected vehicles, the driver's side front seat belt retractor may break,
causing the seat belt webbing spooled out by the user not to retract.[28]  In the event of a crash, a
seat belt that has not retracted may not properly restrain the seat occupant, increasing the risk of
injury to the driver.[29]

## E.    Safety Defects Affecting The Brakes In GM Vehicles.

### 1.    Brake light defect.

117.    On May 14, 2014, New GM issued a safety recall of approximately 2.4 million
MY 2004-2012 Chevrolet Malibu, 2004-2007 Malibu Maxx, 2005-2010 Pontiac G6, and 2007-
2010 Saturn Aura vehicles with a dangerous brake light defect.

118.    In the affected vehicles, the brake lamps may fail to illuminate when the brakes
are applied or illuminate when the brakes are not engaged; the same defect can disable cruise
control, traction control, electronic stability control, and panic brake assist operation, thereby
increasing the risk of collisions and injuries.[30]

---

[27] *See* New GM Notice to NHTSA dated May 19, 2014, at 1.

[28] *See* New GM's June 11, 2013 Letter to NHTSA.

[29] *See id.*

[30] *See* New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:56   Exhibit B -
Proposed Note Ignition Switch Class Claim 231 Pg 40 of 89

119.   Once again, GM knew of the dangerous brake light defect for years but did not take anything approaching the requisite remedial action.

120.   According to New GM, the brake defect originates in the Body Control Module connection system.  "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp malfunction."[31]  The result is brake lamps that may illuminate when the brakes are not being applied and may not illuminate when the brakes are being applied.[32]

121.   The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[33]

122.   New GM now acknowledges that the brake light defect "may increase the risk of a crash."[34]

123.   As early as September 2008, NHTSA opened an investigation for MY 2005-2007 Pontiac G6 vehicles involving allegations that the brake lights may turn on when the driver does not depress the brake pedal and may *not* turn on when the driver *does* depress the brake pedal.[35]

124.   During an investigation of the brake light defect in 2008, GM discovered elevated warranty claims for the brake light defect for MY 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 2.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit B -
Proposed Late Class Claims   Class Claim 231   Pg 41 of 89

the problem.[36]  GM and its part supplier Delphi decided that applying dielectric grease to the

[Body Control Module] C2 connector would be "an effective countermeasure to the fretting

corrosion."[37]  Beginning in November 2008, the Company began applying dielectric grease in its

vehicle assembly plants.[38]

      125.    On December 4, 2008, GM issued a Technical Service Bulletin recommending

the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-

2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-

2009 Saturn Aura vehicles.[39]  One month later, in January 2009, GM recalled only a small subset

of the vehicles with the brake light defect—8,000 MY 2005-2006 Pontiac G6 vehicles built

during the month of January 2005.[40]

      126.    Not surprisingly, the brake light problem was far from resolved.

      127.    GM sat on and concealed its knowledge of the brake light defect for the remainder

of its corporate existence, and did not even consider available countermeasures (other than the

application of grease that proved ineffective).

      **2.**      **Reduced brake performance defect.**

      128.    On July 28, 2014, New GM recalled 1968 MY 2009-2010 Chevrolet Aveo and

2009 Pontiac G3 vehicles.[41]  Affected vehicles may contain brake fluid which does not protect

against corrosion of the valves inside the anti-lock brake system module, affecting the closing

---

[36] *Id.*

[37] *Id.*

[38] *Id* at 3.

[39] *Id.* at 2.

[40] *Id.*

[41] *See* July 28, 2014 Letter from New GM to NHTSA.

39

motion of the valves.[42] If the anti-lock brake system valve corrodes it may result in longer brake pedal travel or reduced performance, increasing the risk of a vehicle crash.[43]

**F.    Electric Power Steering Assist Defect.**

129.    On February 4, 2015, New GM announced a recall of 69,633 MY 2006-2007 Chevrolet Malibu, 2006-2007 Chevrolet Malibu Maxx and 2006-2007 Pontiac G6 vehicles for a steering defect that may result in a sudden loss of electric power steering assist.[44]

130.    When a vehicle suffers from loss of power steering assist, the driver must exert greater effort to steer the vehicle and risk of a crash increases.

**G.    Transmission Shift Cable Defect Affecting 1.1 Million Chevrolet And Pontiac Vehicles.**

131.    On May 19, 2014, New GM issued a safety recall for more than 1.1 million MY 2007-2008 Chevrolet Saturn Aura, 2004-2008 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, and 2005-2008 Pontiac G6 vehicles with dangerously defective transmission shift cables.

132.    In the affected vehicles, the shift cable may fracture at any time, preventing the driver from switching gears or placing the transmission in the "park" position.  According to New GM, "[i]f the driver cannot place the vehicle in park, and exits the vehicle without applying the park brake, the vehicle could roll away and a crash could occur without prior warning."[45]

---

[42] *Id.*

[43] *Id.*

[44] *See* NHTSA Campaign Number 15V064000.

[45] *See* New GM letter to NHTSA Re: NHTSA Campaign No. 14V-224 dated May 22, 2014, at 1.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit B -
Proposed Note Class Claims    Pg 43 of 89

**H.    Light Control Module Defect.**

133.    On May 16, 2014, New GM issued a safety recall of 217,578 MY 2004-2008

Chevrolet Aveo vehicles with a light control module defect.[46]  New GM later updated the

number of affected vehicles to 218,000.

134.    In the vehicles, heat generated within the daytime running lamp module in the

center console in the instrument panel may melt the module and cause a vehicle fire.[47]

**I.    Electrical Short In Driver's Door Module Defect.**

135.    On June 30, 2014, New GM issued a safety recall of 181,984 MY 2005-2007

Chevrolet Trailblazer, 2006 Chevrolet Trailblazer EXT, 2005-2007 Buick Rainier, 2005-2007

GMC Envoy, 2006 GMC Envoy XL, 2005-2007 Isuzu Ascender, and 2005-2007 Saab 9-7x

vehicles with a defect that can cause an electrical short in the driver's door module.[48]

136.    In the affected vehicles, an electrical short in the driver's door module may occur

that can disable the power door lock and window switches and overheat the module.  The

overheated module can then cause a fire in the affected vehicles.

**J.    Low-Beam Headlight Defect.**

137.    On May 14, 2014, New GM issued a safety recall of 103,158 MY 2005-2007

Chevrolet Corvette vehicles with a low-beam headlight defect.

138.    In the affected vehicles, the underhood bussed electrical center housing can

expand and cause the headlamp low beam relay control circuit wire to bend.  When the wire is

repeatedly bent, it can fracture and cause a loss of low-beam headlamp illumination.  The loss of

---

[46] *See* May 30, 2014 Letter from New GM to NHTSA.

[47] *Id.*

[48] *See* July 2, 2014 Letter from New GM to NHTSA.

09-50026-mg    Doc 13895-1    Filed 02/27/20    Entered 02/27/20 20:05:56    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 44 of 89

illumination decreases the driver's visibility and the vehicle's conspicuity to other motorists, increasing the risk of a crash.

**K.    Fuel Pump Module Defect.**

139.    On September 18, 2012 New GM recalled a total of 40,859 vehicles, including certain 2007 MY Chevrolet Equinox and Pontiac Torrent vehicles originally sold or currently registered in Arizona, California, Nevada, and Texas; MY 2007 Chevrolet Cobalt, Pontiac G5, and Saturn ION vehicles originally sold or currently registered in Arizona, California, Florida, Nevada, or Texas; MY 2008 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arizona; and MY 2009 Chevrolet Cobalt and Pontiac G5 vehicles originally sold or currently registered in Arkansas, Arizona, California, Nevada, Oklahoma, or Texas.

140.    In affected vehicles, the plastic supply or return port on the fuel pump module may crack, which may cause a fuel leak. The customer may notice a fuel odor while the vehicle is being driven or after it is parked. If the crack becomes large enough, fuel may be observed dripping onto the ground and vehicle performance may be affected. If an ignition source were present, a fire could occur.

**L.    Overloaded Feed Defect.**

141.    On July 2, 2014, New GM recalled 9,371 MY 2007-2011 Chevrolet Silverado HD and 2007-2011 GMC Sierra HD vehicles with an overloaded feed defect.

142.    In the affected vehicles, an overload in the feed may cause the underhood fusible link to melt due to electrical overload, resulting in potential smoke or flames that could damage the electrical center cover and/or the nearby wiring harness conduit.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed Note Ignition Switch Class Claim    Pg 45 of 89

## M.    Headlamp Driver Module Failure.

143.    On October 25, 2014, New GM announced a recall of 273,182 vehicles, including the MY 2006-2009 Buick LaCrosse, 2006-2007 Buick Rainier, Chevrolet Trailblazer, GMC Envoy, 2006 Chevrolet Trailblazer EXT, GMC Envoy XL, 2006-2008 Isuzu Ascender, and Saab 9-7x vehicles for headlamp driver module failure.[49]  The number of affected vehicles was later modified to 269,586.

144.    In the affected vehicles, the headlamp driver module can overheat and fail, causing the headlamps and daytime running lights to fail, reducing the driver's ability to see the roadway and reducing visibility of the vehicle to oncoming traffic.

## N.    Valve Cover Gasket Defect.

145.    On April 6, 2015, New GM announced a recall of 1207 MY 2004 Buick Regal, 2004 Chevrolet Impala and 2004 Chevrolet Monte Carlo vehicles for a valve cover gasket defect.[50]  New GM later increased the number of affected vehicles to 50,948, and noted that this also includes 2004 Pontiac Grand Prix vehicles.

146.    In these vehicles the valve cover gasket may leak causing engine oil to drip onto the exhaust manifold increasing the risk of fire.

## VI.    GM'S PRODUCTION OF DEFECTIVE GM VEHICLES AND ITS SERIAL FAILURE TO CONDUCT NECESSARY SAFETY RECALLS STEMMED FROM ITS SYSTEMIC DEVALUATION AND DISREGARD OF SAFETY ISSUES IN ITS VEHICLES

147.    In a 2008 internal presentation, GM instructed its employees to avoid using the following judgment words:[51]

    Always                      detonate               maniacal

---

[49] *See* NHTSA Campaign Number 14V755000.

[50] *See* NHTSA Campaign Number 15V201000.

[51] NHTSA Consent Order at Exhibit B, 2008 Q1 Interior Technical Learning Symposium.

| | | |
|---|---|---|
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | eviscserated [*sic*] | power [*sic*] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | Hobbling | Titanic |
| crippling | Horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

148.    In Orwellian fashion, GM instructed its employees to substitute euphemisms in place of accurate descriptions of material safety defects such as the ignition switch defects and the other defects discussed herein.  To avoid disclosure of the material safety risks, and furtherance of the cover-up, GM instructed its employees to make the following word substitutions:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"[52]

149.    GM knew its Delta Ignition Switch Vehicles and other Defective GM Vehicles were killing and maiming GM customers, and that it had sold and was selling millions of

---

[52] NHTSA Consent Order at Exhibit B (emphasis added).

vehicles with a plethora of other safety defects, yet at the same time it instructed its employees to avoid the words "defect" or "safety." Instead of publicly admitting the dangerous safety defects in the Defective GM Vehicles, GM repeatedly blamed accidents on driver error.

150.    GM's censorship of the words necessary to discuss and remediate safety defects was emblematic of its systematic denigration of safety. Additional examples of GM's cavalier approach to safety follow.

151.    GM made very clear to its personnel that cost-cutting was more important than safety, deprived its personnel of necessary resources for spotting and remedying defects, trained its employees not to reveal known defects, and rebuked those who attempted to "push hard" on safety issues.

152.    "[T]here was resistance or reluctance to raise issues or concerns in the GM culture." The culture, atmosphere and supervisor response at GM "discouraged individuals from raising safety concerns."[53] As a result, "GM personnel failed to raise significant issues to key decision-makers."[54]

153.    The focus on cost-cutting at GM created major disincentives to personnel who might wish to address safety issues. For example, those responsible for a vehicle were responsible for its costs, but if they wanted to make a change that incurred costs and affected other vehicles, they also became responsible for the costs incurred in the other vehicles.

154.    As another cost-cutting measure at GM, parts were sourced to the lowest bidder, even if they were not the highest quality parts.[55]

---

[53] *Id*. at 252.

[54] *Id*. at 253.

[55] Valukas Report at 251.

45

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 29:09:86   Exhibit B -
Proposed New Ignition Switch Class Claim 231 Pg 48 of 89

155.    The focus of GM on cost-cutting also made it harder for personnel to discover

safety defects, as in the case of the "TREAD Reporting team."

156.    GM used its TREAD database (known as "TREAD") to store the data required to

be reported quarterly to NHTSA under the TREAD Act.[56]  TREAD was the principal database

used by GM to track incidents related to its vehicles.[57]  Generally, the TREAD Reporting team

consisted of employees who conducted monthly searches and prepared scatter graphs to identify

spikes in the number of accidents or complaints with respect to various GM vehicles.  The

TREAD Reporting team reports went to a review panel and sometimes spawned investigations to

determine if any safety defect existed.[58]

157.    GM severely understaffed the TREAD Reporting team and did not provide it with

the resources to obtain the advanced data mining software to better identify and understand

potential defects, thereby making it far less likely that safety defects would be remediated.[59]

158.    So institutionalized was the "phenomenon of avoiding responsibility" at GM that

the practice was given a name:  "the 'GM salute,'" which was "a crossing of the arms and

pointing outward towards others, indicating that the responsibility belongs to someone else, not

me."[60]

159.    Similarly, GM had a siloed culture, designed to cabin information relating to

potential safety defects rather than reveal such information.

---

[56] *Id*. at 306.

[57] *Id*.

[58] *Id*. at 307.

[59] *Id*. at 307-308.

[60] Valukas Report at 255.

160.    Similar to the "GM salute" was a related phenomenon, "known as the 'GM nod,'"
which was "when everyone nods in agreement to a proposed plan of action, but then leaves the
room with no intention to follow through, and the nod is an empty gesture."[61]

161.    According to the Valukas Report, part of the failure to properly correct the Delta
Ignition Switch Defect was due to problems with GM's organizational structure[62] and a
corporate culture that did not care enough about safety.[63]  Other culprits included a lack of open
and honest communication with NHTSA regarding safety issues,[64] and the improper conduct and
handling of safety issues by lawyers within GM's Legal Staff.[65]  Claimant believes and
thereupon alleges that this same systematic denigration of safety issues fostered the manufacture
and failure to recall the Defective GM Vehicles.

## VII.    GM PROMOTED ALLOF ITS VEHICLES AS SAFE, RELIABLE AND HIGH QUALITY—INCLUDING THE DEFECTIVE GM VEHICLES

162.    Throughout its history, GM regularly used print media, press releases, and
television and video media to represent its vehicles as safe, reliable, quality products that provide
great value to purchasers, and retain their value over time better than other manufacturers'
vehicles.  GM also used these media to present itself as an honest, above-board, values-oriented
company with integrity. In truth, however, GM was concealing serious safety hazards and
endangering its own customers.

163.    A GM print advertisement exclaimed in bold print:  "**At GM, Safety Isn't One
Thing, It's Everything**."[66]

---

[61] Valukas Report at 256.

[62] *Id*. at 259-260.

[63] *Id*. at 260-61.

[64] *Id*. at 263.

[65] *Id*. at 264.

[66] GM-MDL2543-301025786.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed New Ignition Switch Class Claim?  Pg 50 of 89

164.    A 1988 GM commercial stated: "GM meets your challenge.  With outstanding quality and great value . . . .  That's leadership, that's GM."[67]

165.    In 1989, a GM commercial represented "Fact:  GM cars have held their resale value better than any other U.S. make."[68]



166.    A 1990 GM Pontiac commercial stated:  "GM is putting quality on the road."[69]



---

[67] https://www.youtube.com/watch?v=h19lFAwGDwU.

[68] https://www.youtube.com/watch?v=Bg8CAt5ZhdI.

[69] https://www.youtube.com/watch?v=_hR7-7eKufQ.

167.    A 1998 General Motors Commercial proclaimed that GM cars were reliable and safe:

> We are fans and nothing keeps us from the game.  We need cars and trucks as reliable as we are.  Season after season.  And when the game is over, we need to know that what got us there will also get us safely home.  Delivering cars and trucks that fans count on is what makes us General Motors.[70]

168.    GM explained that the 2003 Saturn ION had "surprising levels of safety" in the car's Product Information:  "Bringing a new charge into the small-car segment, the 2003 Saturn ION sets itself apart from competitors with innovative features, unique personalization opportunities and surprising levels of safety, sophistication and fun."[71]

169.    On July 1, 2003, GM issued a press release explaining that the 2004 Impala "offers a comprehensive safety package, solid body structure, room for five passengers, plenty of cargo space, a surprising number of amenities for the price, and a track record of outstanding quality, reliability and durability."[72]

170.    In a July 1, 2003 press release GM stated that "[e]nhanced handling and acceleration are always paramount for Pontiac enthusiasts, and these, plus added safety and comfort measures, make the 2004 Pontiac lineup one of the most exciting in the division's history."[73]

171.    On July 1, 2003, GM issued a press release about the 2004 Chevrolet Monte Carlo that explained that "[a]ttention to safety and security is also key to Monte Carlo's success."[74]

---

[70] https://www.youtube.com/watch?v=Dt12Gti12iA.

[71] https://archives.media.gm.com/division/2003_prodinfo/03_saturn/03_Ion/index.html.

[72] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/impala/index.html.

[73] https://archives.media.gm.com/division/2004_prodinfo/pontiac/pdf/04_Pontiac_Overview.pdf.

[74] https://archives.media.gm.com/division/2004_prodinfo/chevrolet/cars/monte_carlo/ index.html.

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 29:09:56   Exhibit B -
Proposed Ignition Switch Class Claim    Pg 52 of 89

172.    On July 1, 2003, GM issued a press release about the 2004 Pontiac Grand Prix

that explained that "[s]afety is always a high priority for Grand Prix."[75]

173.    In its Product Information for the 2003 Chevrolet Malibu, GM explained that:

> [S]ince 1997, the new Malibu has offered buyers excellent
> performance, safety and comfort in a trim, stylish package.  For
> 2003, Chevrolet Malibu remains a smart buy for those who want a
> well-equipped midsize sedan at an attractive price…. Designed for
> individuals or families with high expectations of quality,
> reliability, safety, driving pleasure, and affordability, the Malibu
> appeals to domestic and import owners.[76]

174.    On July 1, 2003, GM issued a press release about the 2004 Saturn Ion explaining

that:

> The ION sedan and quad coupe are designed to carry on the Saturn
> tradition of being at the top of the class when it comes to safety
> and security.   Theworld-class structural design provides the
> foundation for this focus on safety.  The steel spaceframe's front
> and rear crush zones help absorb the energy of a crash while
> protecting the integrity of the safety cage.[77]

175.    On October 4, 2003, GM's website stated that:

> Motor vehicle safety is important to GM and to our customers.  It
> is at the top of mind in many of the thousands of decisions that are
> made every day in engineering and manufacturing today's cars,
> trucks, and SUVs/ Motor vehicle safety is a significant public
> health concern in the U.S., and GM is proud to partner with
> government agencies, emergency responders and health care
> workers in addressing that challenge."[78]

---

[75] https://archives.media.gm.com/division/2004_prodinfo/pontiac/grand_prix/index.html.

[76] https://archives.media.gm.com/division/2003_prodinfo/03_chevrolet/03_malibu/ index.html.

[77] https://archives.media.gm.com/division/2004_prodinfo/saturn/ion/index.html.

[78] http://web.archive.org/web/20031004014908/http://www.gm.com/automotive/vehicle
_shopping/suv_facts/100_safety/index.html.



176.    In 2004, GM's marketing campaign incorporated a new phrase "Only GM,"

which highlighted safety features such as electronic stability control.  GM stated:  "We want to

bring this kind of safety, security and peace-of-mind to all of our customers because it's the right

thing to do, and because only GM can do it."



> **Only GM**
>
> For example, we recently launched a new corporate adver-
> tising campaign under the theme, "Only GM." It's part of
> an effort to use the GM brand more aggressively and with
> more purpose, to show that we're leading the industry in
> ways that only GM can.
>
> The "Only GM" campaign began by highlighting our plans to
> equip all our cars and trucks sold to retail customers in the
> United States and Canada with OnStar and StabiliTrak, GM's
> electronic stability control system. We want to bring this kind
> of safety, security and peace-of-mind to all of our customers
> because it's the right thing to do, and because only GM can
> do it. We also want potential customers to know that GM
> offers them great value, and that buying GM matters. (For
> more details, go to *onlygm.com*.)

(GM's 2004 Annual Report, p. 6.)

177.    And in the same Report, under the banner "Peace of mind," GM represented that
"[o]nly GM can offer its customers the assurance that someone is looking out for them and their
families when they're on the road," and that "[t]his commitment to safety makes GM the only
automobile manufacturer able to offer a full range of cars, trucks and SUVs that provide safety
protection before, during and after vehicle collisions."

(GM's 2004 Annual Report, p. 22.)

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:03:50    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 55 of 89

178.    On May 10, 2004, GM's website announced that its

> aim is to improve motor vehicle safety for customers, passengers,
> and other motorists. Our customers expect and demand vehicles
> that help them to avoid crashes and reduce the risk of injury in case
> of a crash. We strive to exceed these expectations and to protect
> customers and their families while they are on the road.

The website continued, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles, and we support many programs aimed at encouraging safer

motor vehicle use…."[79]

179.    On June 4, 2004, GM's website stated that "[v]ehicle safety is paramount at GM,

and we constantly strive to make our cars and trucks safe. We also continue our support for

groups such as the National SAFE KIDS Campaign, and a number of programs aimed at

encouraging safer motor vehicle use."[80]

180.    GM touted safety for the Malibu and Malibu Maxx, stating in a brochure that

"Safety is built into the heart of the all-new 2004 Chevrolet Malibu sedan and Malibu Maxx

extended sedan," specifically highlighting the airbags.[81]

181.    GM's June 4, 2004, website published a message from its CEO, Rick Wagoner,

on corporate responsibility. Mr. Wagoner wrote:

> At a time when current events remind us of the critical importance
> of corporate responsibility and the value of sustainable
> development, we at General Motors are fortunate to have inherited
> a legacy of doing business the right way. It's a great asset. And,
> it's a huge obligation … one we take very seriously. What we call
> "winning with integrity" is not an optional or occasional behavior
> at GM. Integrity is one of our core values, and a way of doing
> business that helps us realize our company's full potential….In
> short, "winning with integrity" is much more than a one-time

---

[79] http://web.archive.org/web/20040510221647/http://www.gm.com/company/
gmability/safety/?section=Company&layer=GMAbility2&action=open&page=1.

[80] http://web.archive.org/web/20040604055658/http://www.gm.com/company/
gmability/sustainability/reports/03/safety.html.

[81] GM-MDL2543-302128438.

09-50026-mg    Doc 13806-1    Filed 02/27/20    Entered 02/27/20 20:09:38    Exhibit B -
Proposed Note Ignition Switch Class Claim Pg 56 of 89

exercise at GM. It's how we work every day.  It's a philosophy that transcends borders, language, and culture, and something we promote by creating an environment within our company that supports, and demands, proper business conduct.[82]

182.    In its 2005 Annual Report, GM stated:  "We are driving quality and productivity even further."  "Lasting quality—That is why restoring confidence in quality is just as important as design in rebuilding our brands….  We are focused on providing our customers with the best quality experience over the lifetime of GM ownership."



183.    The 2005 GMC Yukon, Tahoe, and Cadillac Escalade were touted as "distinctly designed packages that lead the segment in performance, safety, efficiency and capability."[83]

184.    On September 9, 2005, GM's website described its safety technology as "Helping You Avoid a Crash" and "Giving the driver information never possible before."[84]

---

[82] http://web.archive.org/web/20040604055939/http://www.gm.com/company/gmability
/sustainability/reports/03/wagoner_message.html.

[83] GM's 2005 Annual Report, p. 23.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 227 of 269

09-50026-mg    Doc 13896-1    Filed 02/27/20    Entered 02/27/20 20:08:00    Exhibit B -
Proposed Note Glass Claims Class Claim  Pg 57 of 89



185.    At the same time GM announced what it called the next big step in safety:[85]

No matter what vehicle you drive, your safety is vital.  GM is
looking out for you—you deserve that peace of mind on the road.
Which is why at GM, we've taken the next big step in our
commitment to provide more customers with more safety and
security.



---

[84] http://web.archive.org/web/20050909184042/http://www.gm.com/company/gmability/
safety/avoid_crash/index.html.

[85] http://web.archive.org/web/20050909225925/http://www.gm.com/company/onlygm/.

55

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:08:56    Exhibit B -
Proposed New Ignition Switch Class Claim?   Pg 58 of 89

186.    A 2005 Pontiac G6 brochure makes "**SAFETY ASSURANCES**," including standard "dual-stage front airbags."[86]  A brochure for the 2008 Pontiac G6 promised that "safety is all around you.  Standard equipment includes dual-stage frontal driver and front passenger air bags," that would—presumably—actually work.[87]

187.    In a July 12, 2006 press release regarding GM's 2007 model year lineup, GM stated:

> From an all-new family of full-size pickup trucks and SUVs to carlike crossovers to small cars and a near-complete revitalization of the Saturn portfolio, General Motors is introducing several new or significantly redesigned vehicles for the 2007 model year— stylish products that leverage GM's global resources to deliver value, brand-distinctive design character, safety, fuel efficiency, relevant technologies and quality to the North American market.[88]

188.    In an August 1, 2006 press statement for the 2007 Cadillac Lucerne, GM represented that the "Lucerne's body structure is engineered to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions."[89]

189.    In an August 1, 2006 press statement for the 2007 Cadillac DTS, GM represented: "[d]esigned and engineered with occupant safety and protection in mind, the DTS reinforces Cadillac's long-standing reputation for safe occupant environments in premium vehicles."[90]

190.    GM's website on August 9, 2006, stated:[91]

MAKING VEHICLES SAFER

GM strives to make each new model safer than the one it replaces. Vehicle-based safety strategies generally fall into three categories:

---

[86] GM-MDL2543-301463441

[87] GM-MDL2543-302131852.

[88] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2007/07%20 corporate%20oview.html.

[89] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/07 index.html.

[90] https://archives.media.gm.com/us/cadillac/en/product_services/r_cars/r_c_DTS/07 index.html.

[91] http://web.archive.org/web/20060809103405/http://www.gm.com/company/gmability/ sustainability/reports/05/400_products/7_seventy/471.html.

BEFORE: Collision avoidance—technologies designed to help the driver avoid potential crashes (sometimes called "active safety" technologies),

DURING: Crashworthiness—designs and technologies that help mitigate the injury potential of a crash (sometimes called "passive safety"), and

AFTER: Post-crash—systems that can help alert emergency rescue to a crash and help provide information to aid rescue specialists.

\* \* \*

GM vehicles are designed to help protect occupants in the 'first' collision, which acts to deform the vehicle structure and change the velocity of the vehicle's center of mass. Also, GM vehicles are designed to help reduce injury risk for occupants in the 'second' collision, which is between the vehicle interior as it responds to the forces imposed by object that collides with the vehicle, and the occupants.

191.    GM's website on September 6, 2006, stated:[92]

Helping drivers avoid crashes and making vehicles safer is a priority for GM.

\* \* \*

Motor vehicle safety involves not only the design of the vehicle, but the manner in which it is driven, and the driving environment as well.  GM is committed to researching and implementing programs and technologies that enhance the safety of vehicles. GM wants to assist drivers to operate their vehicles to avoid hazards, and to help protect occupants in the event of a vehicle crash.  GM also focuses on the circumstances that occur after a crash.

GM's vehicle safety priorities are guided by analysis of the real-world experience that customers have with motor vehicles.

192.    GM stated on its website in October 29, 2006 that it was a leader in automotive

safety and that its safety leadership extends as far back as the birth of GM.[93]

---

[92] http://web.archive.org/web/20060906083227/http://www.gm.com/company/gmability /sustainability/reports/05/400_products/7_seventy/470.html.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:56    Exhibit B -
Proposed Note Ignition Switch Class Claim?    Pg 60 of 89



193.    A 2006 GM brand-wide marketing brochure contained a page dedicated to safety. The page was titled:  "YOUR SAFETY AND SECURITY.  IT'S OUR PRIORITY."  GM then promised:  "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[94]

194.    This theme was repeated in another marketing brochure for the GM brand, touting: "OUR PRIORITY—YOUR SAFETY AND SECURITY."  GM again promised: "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety:  protection before, during and—thanks to OnStar—after vehicle collisions."[95]

---

[93] http://web.archive.org/web/20061029080834/http://www.gm.com/company/gmability/safety/safety_firsts/index.html.

[94] GM-MDL2543 -301443177.

[95] GM-MDL2543-301463604; *see also* GM-MDL2543-302767597.

58

195.    A 2006 GMC *The Magazine* article titled "Not Just HOT AIR" discussed the importance of a vehicle's air bags.  It advised that "Your vehicle's air bags are poised to help protect you in a moment's notice."  Further: "When appropriate conditions arise, your vehicle's air bags inflate rapidly and powerfully to work with your safety belt system to help protect you in the event of a collision."[96]

196.    Safety was an express selling point in a 2006 HHR brochure touting the "HHR Selling Advantage" of "Added Safety and Security," including "enhanced airbag protection."[97] A 2006 GM press release for the HHR added that that "HHR is designed to protect occupants in the event of a crash" through such "safety features" such as "dual-stage frontal air bags."[98]  A 2007 HHR marketing brochure reiterated the GM "WE'VE GOT YOUR BACK" promise, explaining that "Chevrolet is committed to keeping you and your family safe."[99]  Marketing copy for the HHR promised that the "HHR is designed to protect occupants in the event of a crash" in ad copy from 2008 and 2009.[100]

197.    In a print ad for the 2006 Buick LaCrosse, GM represented: "Occupant safety received high priority in the design of LaCrosse—with the goal of providing excellent protection in the event of a collision."[101]

198.    The promise of "Safety" was central to a GM press release for the 2006 Saturn Outlook: "Saturn Outlook is designed to protect passengers before, during and after a crash."[102]

---

[96] GM-MDL2543-100223694.

[97] GM-MDL2543-301464481-82.

[98] GM-MDL2543-301452586.

[99] GM-MDL2543-3023158819.

[100] GM-MDL2543-301452598; GM-MDL2543-301458742.

[101] GM-MDL2543-006787272.

[102] GM-MDL2543-301451107.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:38    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 62 of 89

199.    A marketing brochure for the 2007 Buick Lucerne promised "PROTECTION

BEYOND PROTECTION:"

> Lucerne was designed with safety and protection as top priorities. Helping occupants avoid serious injury in the event of a crash was a given. But our engineers were committed to doing much more. Like helping the driver avoid crashes.… If a crash is unavoidable, Lucerne's six air bags and industry leading technology will be there to help protect.

200.    In a video published on January 2, 2007, GM's Vice Chairman of Product

Development, Bob Lutz, stated "Saturn has always been a great brand" and that it "has

predominately been known for customer service, fair dealers, honest dealers and having happy

buyers."[103]

201.    On GM's website on January 6, 2007, Bob Lange, Executive Director, Structure

and Safety Integration, stated:

> Our aim is to improve motor vehicle safety for customers, passengers and other motorists. Our customers expect and demand vehicles that help them to avoid crashes and reduce the risk of injury in case of a crash. We strive to exceed these expectations and to protect customers and their families while they are on the road."

Further, Lange stated, "GM is committed to continuously improving the crashworthiness and

crash avoidance of its vehicles."[104]

202.    In its 2007 Annual Report, GM stated:

> In 2007, we continued to implement major improvements to our U.S. sales and marketing strategy. Over the past two years, we've re-focused our marketing efforts to emphasize the strength and value of our products and brands….
>
> We also continued to make progress in our long-term effort to improve quality….

---

[103] https://www.youtube.com/watch?v=Kd1Kg0BBdto&list=UUxN-Csvy_9sveql5HJviDjA.

[104] http://web.archive.org/web/20070106044410/http://www.gm.com/company/gmability /safety/.

We've also witnessed, since 2005, an 89 percent reduction in
vehicle recall campaigns involving safety and non-compliance.

(GM 2007 Annual Report, p. 7.)

203.    Moreover, GM represented that it "actively studies trends of claims" to take

action to improve vehicle quality:



(GM 2007 Annual Report, p. 74.)

204.    In an August 1, 2007 press release introducing GM's 2008 lineup, Mark LaNeve,

GM North America Vice President, Vehicle Sales, Service and Marketing, stated "GM's

transformation is being driven by high-quality cars and trucks that look great, drive great, are

fuel-efficient and provide genuine value to our customers."  Further, LaNeve stated,

> No other automaker provides such a diverse lineup of cars and
> trucks that meets the needs of customers that range from college
> studies to contactors.  And our five-year, 100,000-mile powertrain
> warranty—the most comprehensive in the industry—adds even
> more value to the bottom line, demonstrating that we are putting
> our money where our mouth is on vehicle quality.[105]

205.    On August 1, 2007, GM represented that:

> The Cobalt enters the 2008 model year on the heels of a successful
> '07 model year, which introduced several significant
> enhancements, including more powerful Ecotec engines.  For '08,
> the Cobalt builds on that powerful foundation with a streamlined
> model lineup and more standard safety and convenience
> equipment…."[106]

---

[105] https://archives.media.gm.com/us/gm/en/product_services/vehicles/2008/08gmna_ overview.html.

[106] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20
chevrolet%20car%20oview.html.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 20:08:08    Exhibit B -
Proposed New Ignition Switch Class Claim?    Pg 64 of 89

206.    On August 1, 2007 GM represented that "[t]he 2008 Impala reinforces the brand's value story with new features and revisions that add to its safety and efficiency, including the addition of standard StabiliTrack electronic stability control on 2LT, LTZ and SS models …."[107]

207.    In an August 1, 2007 press statement for the 2008 Buick LaCrosse, GM represented that the "LaCrosse is built with a strong 'safety cage' structure and a full-perimeter aluminum engine cradle that directs impact energy away from passengers.  Anti-lock brakes and side curtain airbags are standard on all models."[108]

208.    In an August 1, 2007 press statement for the 2008 Buick Lucerne, GM represented that the

> Lucerne's body structure is designed to provide maximum occupant protection and minimum intrusion under a wide range of impact conditions.  Active safety and handling features offered on Lucerne include a four-channel anti-lock braking system and traction control; an auto-level rear suspension that automatically adjusts the vehicle height for heavy loads; and four-channel StabiliTrack electronic stability control with brake assist, which senses emergency braking situations and boosts power as needed.[109]

209.    In an August 1, 2007, press statement for the 2008 Pontiac Grand Prix, GM represented that the

> Grand Prix's convenience and safety features are perfect for drivers who enjoy the precise handling characteristics of a sporty, family-friendly package.  The 2008 Grand Prix remains a driver's car inside and out.  The active and passive safety features on the Grand Prix include standard four-wheel disc brakes, traction control and daytime running lamps.[110]

---

[107] https://archives.media.gm.com/us/chevrolet/en/product_services/r_cars/08%20 chevrolet%20car%20oview.html.

[108] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lacrosse/ 08index.html.

[109] https://archives.media.gm.com/us/buick/en/product_services/r_cars/r_c_lucerne/ 08index.html.

[110] https://archives.media.gm.com/us/pontiac/en/product_services/r_cars/r_c_grandprix/ index.html.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:08   Exhibit B -
Proposed New Ignition Switch Class Claim   Pg 65 of 89

210.   A 2008 Buick Enclave brochure said, "From the outset, safety and protection
were top priorities in the design of the Enclave. . . .  If a crash is unavoidable, Enclave's
advanced safety technology will be there to help protect." [111]

211.   GM's website on January 15, 2008, stated "GM incorporates a total safety
philosophy into each of its designs to help protect you in a collision—and keep one from
occurring in the first place."[112]

212.   In February 2008, GM aired a Chevy Malibu commercial during The Grammy's
which stated the Chevy Malibu was "built to last" "because safety should last a lifetime."  The
commercial used images of a child being raised to adulthood, in order to convey protection and
safety.[113]

213.   On its website in March of 2008, GM stated it was delivering the best cars and
trucks in its 100-year history, and that it was "Obsessed with Quality."  The website also spoke
of "Continuous Safety," and represented that "GM incorporates a total safety philosophy into
each of its designs to help protect you in a collision—and keep one from occurring in the first
place."[114]

---

[111] GM-MDL2543-303150775.

[112] http://web.archive.org/web/20080115004426/http://www.gm.com/explore/safety/.

[113] https://www.youtube.com/watch?v=EgNQ2tns0Gs.

[114] http://web.archive.org/web/20080303182635/http://www.gm.com/corporate/;
http://web.archive.org/web/20080305021951/http://www.gm.com/explore/; and
http://web.archive.org/web/20080311045525/http://www.gm.com/explore/safety.



214.    In early 2009 owner loyalty mailings, GM touted the quality and reliability of its

vehicles as well as safety:

> **Safe**.
> - 37 of our 2009 models have five-star frontal crash safety ratings.
> - We offer the safety and security of OnStar, including Automatic Crash Response, OnStar Vehicle Diagnostics, and Turn-By-Turn Navigation.  Nobody else offers these services.  Not Honda.  Not Toyota.  Not Ford.  Not Chrysler.  Not Nissan.  Not Dodge.[115]

215.    Brochures for the 2009 and 2010 Cadillac CTS contain the tagline, "**THE ONLY**

**PLACE WHERE WE PLAY IT SAFE,**" claiming that "Passenger safety is one of the first and

most important considerations throughout the engineering process" and that "[o]f course, the

---

[115] GM-MDL2543-100182783 (footnotes omitted).

ultimate luxury is passenger safety.  So it's needless to say that this aspect of the CTS has been scrutinized with utmost care."[116]

216.    A marketing brochure for the 2009 Saturn VUE asked, "Can good looks keep you Safe?"  The answer:  "The Saturn VUE Compact SUV.  Six air bags.  StabiliTrak vehicle stability control system.  OnStar.  Now safety isn't a luxury."[117]

## VIII.    CLASS ALLEGATIONS

217.    Under B.R. 7023, Claimant files this Proof of Claim on behalf of herself and a proposed Class and Subclasses initially defined below.

218.    Excluded from the Class and the Subclasses are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of GM; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

### A.    The Class.

219.    Claimant alleges claims, under the consumer protection, fraudulent concealment and unjust enrichment laws of each state and the District of Columbia (all of which are the same or substantially similar):

> All persons in the United States who, as of November 30, 2009,
> either owned or leased a Defective GM Vehicle.

220.    "Defective GM Vehicles" include the following, provided they were owned or leased as of November 30, 2009:

---

[116] GM-MDL2543-302127737; GM-MDL2543-301626861.

[117] GM-MDL2543-100222943.

| DEFECTIVE GM VEHICLES |
| --- |
| · 2005-2009 Buick Lacrosse |
| · 2000-2010 Chevrolet Impala |
| · 2000-2005 Cadillac Deville |
| · 2006-2010 Cadillac DTS |
| · 2006-2010 Buick Lucerne |
| · 2000-2008 Chevrolet Monte Carlo |
| · 2003-2010 Cadillac CTS |
| · 2004-2006 Cadillac SRX |
| · 1997-2005 Chevrolet Malibu |
| · 2000-2005 Pontiac Grand Am |
| · 2004-2008 Pontiac Grand Prix |
| · 1998-2002 Oldsmobile Intrigue |
| · 1999-2004 Oldsmobile Alero |
| · 2008-2010 Buick Enclave |
| · 2009-2010 Chevrolet Traverse |
| · 2008-2010 Acadia |
| · 2008-2010 Saturn Outlook |
| · 2004-2009 Chevrolet Malibu |
| · 2004-2006 Chevrolet Malibu Maxx |
| · 2009-2010 Chevrolet HHR |
| · 2010 Chevrolet Cobalt |
| · 2005-2006 and 2008-2009 Pontiac G6 |

**B.     The Defective GM Vehicle Implied Warranty Subclass.**

221.    Claimant also alleges implied claims under the substantially similar laws of the
following jurisdictions for the Defective GM Vehicle Implied Warranty Subclass on behalf of
persons with Defective GM Vehicles sold or leased as new prior to November 30, 2009:  Alaska,
Arkansas, California, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas,
Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri,
Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North
Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota,
Texas, Utah, Virginia, West Virginia, and Wyoming.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 69 of 89

**C.      The Defective GM Vehicle Negligence Subclass.**

222.     Claimant also alleges negligence claims under the substantially similar laws of the following jurisdictions for the Defective GM Negligence Subclass on behalf of persons with Defective GM Vehicles sold or leased as new prior to November 30, 2009: Arkansas, California, Maryland, Louisiana and Ohio.

**D.      The Class And The Subclasses Meet The Requirements For Class Certification.**

223.     Individual joinder of all Class or Subclass Members is impracticable, given that GM manufactured and sold approximately 9.8 million Defective GM Vehicles in the United States.

224.     The Class disclaims recovery, in this Proof of Claim, for physical injury resulting from the safety defects alleged herein.  But the increased risk of injury from the defects serves as an independent justification for the relief sought by Claimant and the Class.

225.     The Class can be readily identified using registration records, sales records, production records, and other information kept by GM's successor, New GM, or third parties in the usual course of business and within their control.

226.     Questions of law and fact are common to the Class and predominate over questions affecting only individual members, including the following:

1.      Whether the Defective GM Vehicles suffer from safety defects;

2.      Whether GM fraudulently concealed the defects;

3.      Whether GM misrepresented that the Defective GM Vehicles were safe;

4.      Whether GM engaged in fraudulent, deceptive or unfair acts or practices by failing to disclose that the Defective GM Vehicles were designed, manufactured, and sold with safety defects and that GM systematically valued cost-cutting over safety;

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:56   Exhibit B -
Proposed Late Class Claims   Pg 21 of 231 Pg 70 of 89

5.      Whether GM was unjustly enriched at the expense of Claimant and the

Class;

6.      Whether GM breached the implied warranty of merchantability in

connection with the Defective GM Vehicles;

7.      Whether GM was negligent in its design and manufacture of the Defective

GM Vehicles, and/or in failing to warn of the known defects and failing to recall the vehicles;

and

8.      Whether Claimant and the Class are entitled to a remedy as a result of

GM's fraudulent, inequitable and/or negligent conduct.

227.    Claimant's claims are typical of the claims of the Class and Subclass Members,

and arise from the same course of conduct by GM.  The relief Claimant seeks is typical of the

relief sought for the absent Class and Subclass Members.

228.    Claimant will fairly and adequately represent and protect the interests of all absent

Class and Subclass Members.  Claimant is represented by counsel competent and experienced in

product liability, consumer protection, and class action litigation, as well as counsel experienced

in bankruptcy litigation.

229.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all the individual Class and Subclass Members

is impracticable.  Because the damages suffered by each individual Class Member may be

relatively small, the expense and burden of individual litigation would make it very difficult or

impossible for individual Class Members to redress the wrongs done to each of them

individually, and the burden imposed on the judicial system would be enormous.  B.R. 7023

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:56   Exhibit B -
Proposed New Ignition Switch Class Claim   Pg 71 of 89

provides the Court with authority and flexibility to maximize the benefits of the class mechanism and reduce any management challenges that may arise.

230.    The prosecution of separate actions by the individual Class and Subclass Members would create a risk of inconsistent or varying adjudications for individual Class and Subclass Members.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

231.    Claimant is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Claimant anticipates providing appropriate notice to be approved by the Court after discovery into the size and nature of the Class and Subclasses.

232.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct.

## IX.    THE CLASS' AND SUBCLASSES' CLAIMS

**A.    Class Claims.**

**1.    Fraudulent concealment.**

233.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

234.    This claim is brought on behalf of the Class.

235.    The law of fraudulent concealment is essentially identical in each state, as virtually every state, including California, where Claimant resides, generally follows the principles of Sections 550 and 551 of the Restatement (Second) of Torts.

236.    Under Section 550, "[o]ne party to a transaction who by concealment or other

action intentionally prevents the other from acquiring material information is subject to the same

liability to the other for pecuniary loss as though he had stated the nonexistence of the matter that

the other was thus prevented from discovering."

237.    Under Section 551:

(1)   One who fails to disclose to another a fact that he knows may
justifiably induce the other to act or refrain from acting in a
business transaction is subject to the same liability to the other as
though he had represented the nonexistence of the matter that he
has failed to disclose, if, but only if, he is under a duty to the other
to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise
reasonable care to disclose to the other before the transaction is
consummated,

(a)  matters known to him that the other is entitled to know because
of a fiduciary or other similar relation of trust and confidence
between them; and

(b)  matters known to him that he knows to be necessary to prevent
his partial or ambiguous statement of the facts from being
misleading; and

(c)  subsequently acquired information that he knows will make
untrue or misleading a previous representation that when made was
true or believed to be so; and

(d)  the falsity of a representation not made with the expectation
that it would be acted upon, if he subsequently learns that the other
is about to act in reliance upon it in a transaction with him; and

(e)  facts basic to the transaction, if he knows that the other is
about to enter into it under a mistake as to them, and that the other,
because of the relationship between them, the customs of the trade
or other objective circumstances, would reasonably expect a
disclosure of those facts.

238.    As alleged above and discussed below, GM's fraudulent concealment of the

safety defects and other material information concerning the Defective GM Vehicles renders GM

09-50026-mg   Doc 13896-3   Filed 03/27/20   Entered 12/27/20 20:09:08   Exhibit B -
Proposed New Ignition Switch Class Claim   Pg 73 of 89

liable to Claimant and the Class under the law of fraudulent concealment of each state and the
District of Columbia.

239.   GM concealed and suppressed material facts concerning the quality and safety of
GM vehicles in general and in the Defective GM Vehicles in particular.

240.   GM concealed and suppressed material facts concerning the culture of GM—a
culture characterized by cost-cutting, avoidance of dealing with safety issues and a shoddy
design process.

241.   GM concealed and suppressed material facts concerning the safety defects alleged
herein, and that it valued cost-cutting over safety and took steps to ensure that its employees did
not reveal known safety defects, including the defects in the Defective GM Vehicles, to
regulators or consumers.

242.   GM did so in order to boost confidence in its vehicles, including the Defective
GM Vehicles, and falsely assure owners, purchasers and lessees of the Defective GM Vehicles
that GM was a reputable manufacturer that stood behind its vehicles after they were sold and
ensured that its vehicles were safe and reliable.  The false representations were material to
consumers, both because they concerned the quality and safety of the Defective GM Vehicles
and because they played a significant role in the value of the vehicles.

243.   GM had a duty to disclose the defects in the Defective GM Vehicles because they
were known and/or accessible only to GM who had superior knowledge and access to the facts,
and GM knew the facts were not known to or reasonably discoverable by Claimant and the
Class.  These omitted and concealed facts were material because they directly impact the value
and safety of the Defective GM Vehicles purchased or leased by Claimant and the Class.

Whether a product is safe and reliable, and whether the manufacturer stands behind the product, is a material concern to a consumer.

244.    GM also had a duty to disclose because it made many affirmative representations about the safety, quality, and lack of defects in GM vehicles, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the defects in the Defective GM Vehicles.  Having provided information to the Class, GM had the duty to disclose not just the partial truth, but the entire truth.  Finally, GM had monitoring and disclosure duties under the TREAD Act.

245.    GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost GM money, and it did so at the expense of Claimant and the Class.

246.    GM concealed and suppressed the defects in the Defective GM Vehicles with the intent to deceive Claimant and the Class.

247.    Claimant and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Claimant's and the Class's actions were justified.  GM was in exclusive control of the material facts and such facts were not known to the public, Claimant, or the Class.

248.    Because of the concealment and/or suppression of the facts, Claimant and the Class sustained damage.  Had they been aware of the safety defects in their Defective GM Vehicles and GM's disregard for safety, Claimant and the Class either would have paid less for their vehicles or would not have purchased them at all.   Claimant and the Class did not receive the benefit of their bargain as a result of GM's fraudulent concealment.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:08:56   Exhibit B -
Proposed New Ignition Switch Class Claim   Pg 75 of 89

249.   More specifically, Claimant and the Class were damaged by GM's fraudulent
concealment in at least the following ways:

a.   Class Members were fraudulently induced into purchasing their
Defective GM Vehicles and/or paying more than they otherwise would have had
the defect been revealed.

b.   Class Members remained in possession of vehicles of diminished
value which GM would otherwise have been compelled to fix or replace.

c.   Class Members incurred expense and loss in connection with their
efforts to repair the Defective GM Vehicles and/or eliminate or reduce the risks
and costs to which they were exposed by the vehicles.

d.   Class Members incurred the inconvenience and expense of having
a recall repair done.

250.   Without limitation, Claimant and the Class therefore seek a full refund of the
purchase price paid for their Defective GM Vehicles (or the overpayments they made for the
vehicles) together with any and all other available compensatory, incidental and consequential
damages (save for personal injury damages) they may have suffered as a result of their leasing
and/or ownership of a Defective GM Vehicle, and punitive damages given the extremely
outrageous and reprehensible conduct perpetrated by GM to keep and increase the numbers of
highly-dangerous Defective GM Vehicles on the road in order to avoid the expense and adverse
publicity of the requisite safety recall.

**2.   Unjust enrichment.**

251.   Claimant realleges and incorporates by reference all paragraphs as though fully
set forth herein.

252.   This claim is brought on behalf of the Class.

253.    The law of unjust enrichment is essentially identical in each state, including California, where Claimant resides.

254.    GM received and retained a benefit from Claimant and the Class and inequity resulted.

255.    GM benefitted from selling and leasing the Defective GM Vehicles, whose value was artificially inflated by GM's concealment of the defects as well as systemic safety issues that plagued the GM brand, for more than they were worth, at a profit, and Claimant and the Class overpaid for their Defective GM Vehicles and were forced to pay other costs.

256.    In addition, GM benefitted by avoiding the costs of a recall and other lawsuits, and further benefitted from its statements about the success of GM.

257.    Thus, Claimant and all Class Members conferred a benefit on GM.

258.    It was inequitable for GM to retain these benefits.

259.    Claimant and the Class were not aware of the true facts about their Defective GM Vehicles, and did not benefit from GM's conduct.

260.    GM knowingly accepted the benefits of its unjust conduct.

261.    As a result of GM's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**3.    Consumer Protection Claims.**

262.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

263.    This claim is brought on behalf of the Class.

264.    The consumer protection laws are essentially similar in each state, as virtually every state has adopted consumer protection laws that are modeled after the Federal Trade

Commission Act, which makes unlawful "unfair or deceptive acts or practices in or affecting commerce…." 15 U.S.C. § 45.

265.    Because Claimant is a California resident, her consumer protection claims are pled under California law.  However, the Class states claims under the consumer protection statutes of every U.S. jurisdiction.

<h4>a.    Violations of the California Consumer Legal Remedies Act (CAL. CIV. CODE § 1750 <em>et seq.</em>).</h4>

266.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

267.    GM was a "person" under CAL. CIV. CODE § 1761(c).

268.    Claimant and Class Members are "consumers," as defined by CAL. CIV. CODE § 1761(d), who purchased or leased one or more Defective GM Vehicles.

269.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a).  GM engaged in unfair or deceptive acts or practices that violated CAL. CIV. CODE § 1750, <em>et seq.</em>, as described above and below, by, among other things, concealing the known defects in the Defective GM Vehicles, representing that the vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the vehicles are of a particular standard, quality, and grade when they are not; advertising the vehicles with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving a Defective GM Vehicle has been supplied in accordance with a previous representation when it has not.

270.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 20:09:56   Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 78 of 89

271.   In the course of its business, GM concealed the defects in the Defective GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective GM Vehicles.

272.   GM knew of serious defects affecting the Defective GM Vehicles owned or leased by Claimant and the Class.

273.   By failing to disclose and by actively concealing the defects in the Defective GM Vehicles, which it marketed as safe, reliable, and of high quality GM engaged in unfair and deceptive business practices in violation of the CLRA.

274.   In the course of GM's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the Class Members' vehicles.

275.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class Members, about the true safety and reliability of their vehicles.

276.    GM intentionally and knowingly misrepresented material facts regarding the Defective GM Vehicles with the intent to mislead the Class.

277.   GM knew or should have known that its conduct violated the CLRA.

278.   GM made material statements about the safety and reliability of the Defective GM Vehicles that were either false or misleading.

279.    GM owed the Class a duty to disclose the true safety and reliability of the Defective GM Vehicles, because GM:

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 20:05:56    Exhibit B -
Proposed New Ignition Switch Class Claim    Pg 79 of 89

    a.      Possessed exclusive knowledge about the defects in the Defective GM Vehicles;

    b.      Intentionally concealed the foregoing from the Class;

    c.      Made incomplete representations about the safety and reliability of the Defective GM Vehicles, while purposefully withholding material facts from the Class that contradicted these representations; and/or

    d.      Had duties under the TREAD Act and related regulations to disclose and remedy the defects.

280.    Because GM fraudulently concealed the defects in the Defective GM Vehicles, the vehicle owners and lessees were deprived of the benefit of their bargain since the vehicles they purchased or leased were worth less than they would have been if they were free from the defects. Had the Class been aware of the defects in their vehicles, they would have either not bought or leased their Defective GM Vehicles or would have paid less for them.

281.    GM's concealment of the defects in the Defective GM Vehicles was material to the Class.

282.    The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles. Had they been aware of the truth about the Defective GM Vehicles, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all. The Class also incurred repair and recall costs, as alleged above.

283.    As a direct and proximate result of GM's violations of the CLRA, the Class has suffered injury-in-fact and/or actual damage.

284.    Under CAL. CIV. CODE § 1780(a), the Class seeks monetary relief for the harm caused by GM's violations of the CLRA as alleged herein.

285.    Under CAL. CIV. CODE § 1780(b), the Class seeks an additional award against of up to $5,000 for each Class Member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  GM knew or should have known that its conduct was directed to one or more Class Members who are senior citizens or disabled persons.  GM's conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Class Members who are senior citizens or disabled persons were substantially more vulnerable to GM's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from GM's conduct.

286.    The Class further seeks costs of court, attorneys' fees under CAL. CIV. CODE § 1780(e), and any other just and proper relief available under the CLRA.

> **b.    Violations of the California Unfair Competition Law ("UCL") (CAL. BUS. & PROF. CODE § 17200, *et seq.*).**

287.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

288.    CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  GM engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

289.     GM violated the unlawful prong of § 17200 by the following:

    a.    violations of the CLRA, CAL. CIV. CODE § 1750, *et seq*., as set forth above.

    b.    violation of the National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. §§ 30101-30170, and its regulations. FMVSS number 573 governs a motor vehicle manufacturer's

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 23:09:58    Exhibit B -
Proposed New Ignition Switch Class Claim... Pg 81 of 89

> responsibility to notify NHTSA of a motor vehicle defect within
> five days of determining that the defect is safety related. *See* 49
> C.F.R. § 573.6.  GM violated these reporting requirements by
> failing to report the defects in the Defective GM Vehicles within
> the required time, and failing to timely recall all impacted vehicles.

290.    GM also violated the "fraudulent" prong of § 17200 by concealing the defects in

the Defective GM Vehicles, information that was material to a reasonable consumer, while it

touted the safety and reliability of the vehicles.

291.    GM also violated the unfair prong of § 17200 because the acts and practices set

forth above, including devaluing safety and concealing the defects in the Defective GM

Vehicles, offend established public policy, and also because the harm GM caused consumers

greatly outweighs any benefits associated with those practices.  GM's conduct also impaired

competition within the automotive vehicles market and prevented the Class from making fully

informed decisions about whether to lease, purchase and/or retain their vehicles.

292.    In the course of its business, GM concealed the defects in Class Members'

vehicles as described herein and otherwise engaged in activities with a tendency or capacity to

deceive.  GM also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, fraud, misrepresentations, or concealment, suppression or omission of any material

fact with intent that others rely upon such concealment, suppression or omission, in connection

with the sale and lease of the Defective GM Vehicles.

293.    GM's actions, as set forth above, occurred in the conduct of trade or commerce.

294.    GM knew of serious defects affecting the Defective GM Vehicles owned or

leased by the Class.

295.    By failing to disclose and by actively concealing the defects in Class Members'

vehicles, which it marketed as safe, reliable, and of high quality, GM engaged in unfair and

deceptive business practices in violation of the UCL.

09-50026-mg   Doc 13896-1   Filed 02/27/20   Entered 02/27/20 20:09:50   Exhibit B -
Proposed New Class Claims Class Claim   Pg 82 of 89

296.     In the course of GM's business, it willfully failed to disclose and actively

concealed the dangerous risk posed by the defects in Class Members' vehicles.

297.     GM's unfair or deceptive acts or practices were likely to and did in fact deceive

reasonable consumers, including Class Members, about the true safety and reliability of their

vehicles.

298.      GM intentionally and knowingly misrepresented material facts regarding the

Defective GM Vehicles with the intent to mislead the Class.

299.     GM knew or should have known that its conduct violated the UCL.

300.     As alleged above, GM made material statements about the safety and reliability of

the Defective GM Vehicles that were either false or misleading.

301.     GM owed the Class a duty to disclose the true safety and reliability of the

Defective GM Vehicles, because GM:

> a.     Possessed exclusive knowledge about the defects in the Defective
> GM Vehicles;
>
> b.     Intentionally concealed the foregoing from the Class;
>
> c.     Made incomplete representations about the safety and reliability of
> the Defective GM Vehicles, while purposefully withholding
> material facts from the Class that contradicted these
> representations; and/or
>
> d.     Had duties under the TREAD Act and related regulations to
> disclose and remedy the defects.

302.     Because GM fraudulently concealed the defects in the Defective GM Vehicles,

the vehicle owners were deprived of the benefit of their bargain since the vehicles they

purchased were worth less than they would have been if they were free from the defects.  Had

Class Members been aware of the defects in their vehicles, they would have either not bought

their Defective GM Vehicles or would have paid less for them.

09-50026-mg   Doc 14695-1   Filed 03/27/20   Entered 03/27/20 29:09:86   Exhibit B -
Proposed New Ignition Switch Class Claim 231Pg 83 of 89

303.   GM's concealment of the defects in the Defective GM Vehicles was material to the Class.

304.   The Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose the defects in their vehicles.  Had they been aware of the truth about the Defective GM Vehicles, Class Members either would have paid less for their vehicles or would not have purchased or leased them at all.

305.   As a direct and proximate result of GM's violations of the UCL, Class Members have suffered injury-in-fact and/or actual damage.

306.   Claimant requests that this Court enter such orders or judgments as may be necessary, including an order and judgment restoring to the Class Members any money lost as the result of GM's unfair, unlawful, and deceptive trade practices, including restitution and disgorgement of any profits GM received as a result of its unfair, unlawful, and/or deceptive practices, as provided in CAL. BUS. & PROF. CODE § 17203, CAL CIV. PROC. CODE § 384 and CAL. CIV. CODE § 3345; and for such other relief as may be just and proper.

**B.     Subclass Claims.**

**1.     Breach of the Implied Warranty of Merchantability.**

307.   Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

308.   This claim is brought on behalf of the Defective GM Vehicle Implied Warranty Subclass.

309.   The implied warranty laws are essentially similar in each state whose residents are part of this Subclass, as every such state has adopted the Uniform Commercial Code ("U.C.C.") and similarly construed the relevant provisions such that Claimants and the Defective GM Vehicle Implied Warranty Subclass state claims.

310.    Because Claimant is a California resident, her implied warranty claim is pled under California law.

>    **a.    Violations of the Song-Beverly Warranty Act for Breach of Implied Warranty of Merchantability (C**AL**. C**IV**. C**ODE **§§ 1791.1 & 1792).**

311.    Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

312.    Claimant and Defective GM Vehicle Implied Warranty Subclass Members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

313.    The Defective GM Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

314.    GM was the "manufacturer" of the Defective GM Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

315.    GM impliedly warranted to Claimant and Defective GM Vehicle Implied Warranty Subclass Members that Delta Ignition Switch Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Defective GM Vehicles did not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

316.    CAL. CIV. CODE § 1791.1(a) states:

>    "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
>    (1)    Pass without objection in the trade under the contract description.
>
>    (2)    Are fit for the ordinary purposes for which such goods are used.
>
>    (3)    Are adequately contained, packaged, and labeled.
>
>    (4)    Conform to the promises or affirmations of fact made on the container or label.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit B -
Proposed Note Class Claims Class Claim 231 Pg 85 of 89

317.    The Defective GM Vehicles would not pass without objection in the automotive trade because of the dangerous defects that created an unreasonable likelihood of accident, and/or an unreasonable likelihood that such accidents will cause serious bodily harm or death to vehicle occupants.

318.    Because of the ignition switch defects that cause sudden unintended stalling to occur, with the attendant shut down of power steering and power brakes and the nondeployment of airbags in the event of a collision, thereby causing an increased likelihood of serious injury or death, the Low Torque Ignition Switch Defect Vehicles are not safe to drive and thus not fit for ordinary purposes.

319.    The Power Steering Defect Vehicles are inherently defective and not fit for ordinary purposes in that there are defects in the vehicles that can cause the loss of power steering, resulting in an increased risk of accident.

320.    The Side Airbag Defect Vehicles are inherently defective and not fit for ordinary purposes in that there are defects in the wiring harness connectors that can cause the side impact airbags and seatbelt pretensioners not to deploy in the event of a collision, thereby causing an increased likelihood of serious injury or death.

321.    The Low Torque Ignition Switch Defect Vehicles are not adequately labeled because the labeling fails to disclose the ignition switch defects and does not advise Claimant and Defective GM Vehicle Implied Warranty Subclass Members to avoid attaching anything to their vehicle key rings.  GM failed to warn about the dangerous safety defects in the Defective GM Vehicles.

322.    GM breached the implied warranty of merchantability by selling Defective  GM Vehicles containing defects leading to the sudden and unintended shutdown of the vehicles

09-50026-mg    Doc 13896-1    Filed 03/27/20    Entered 03/27/20 20:09:56    Exhibit B -
Proposed New Class Claims    Pg 86 of 89

during ordinary driving conditions, and/or the failure of power brakes and/or power steering, and/or the disablement of the vehicles' airbags and seatbelt pretensioners. The defects deprived Claimant and Defective GM Vehicle Implied Warranty Subclass Members of the benefit of their bargain.

323. Notice of breach is not required because Claimant and Defective GM Vehicle Implied Warranty Subclass Members did not purchase their automobiles directly from GM.

324. As a direct and proximate result of GM's breach of its duties under California's Lemon Law, Claimant and Defective GM Implied Warranty Subclass Members received goods whose dangerous condition substantially impaired their value.

325. Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Claimant and Defective GM Implied Warranty Subclass Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

326. Under CAL. CIV. CODE § 1794, Claimant and Defective GM Implied Warranty Subclass Members are entitled to costs and attorneys' fees.

**2.    Negligence.**

327. Claimant realleges and incorporates by reference all paragraphs as though fully set forth herein.

328. This claim is brought on behalf of the Defective GM Vehicle Negligence Subclass.

329. The law of negligence is substantially similar under the laws of all the jurisdictions whose residents are included in the Defective GM Vehicle Negligence Subclass.

330. GM designed, manufactured and sold or otherwise placed in the stream of commerce Defective GM Vehicles, as set forth above.

09-50026-mg    Doc 14695-1    Filed 03/27/20    Entered 03/27/20 29:09:88    Exhibit B -
Proposed New Ignition Switch Class Claim231    Pg 87 of 89

331.    GM had a duty to design, manufacture, and sell only products that would be safe

for their intended and foreseeable uses and users, including the use to which the Defective GM

Vehicles products were put by Claimant and the Defective GM Vehicle Negligence Subclass.

GM breached its duties to the Defective GM Vehicle Negligence Subclass because it was

negligent in the design, development, manufacture, and testing of the Defective GM Vehicles it

manufactured and sold.

332.    GM was negligent in the design, development, manufacture, testing, and/or

"certification" of the Defective GM Vehicles because it knew, or in the exercise of reasonable

care should have known, that the vehicles posed an unreasonable risk of death or serious bodily

injury to Defective GM Vehicle Negligence Subclass Members, passengers, other motorists,

pedestrians, and the public at large, because they were susceptible to incidents in which the

vehicles suddenly stall, and/or the brakes and/or power steering, and/or airbags and seatbelt

pretensioners were rendered inoperable.

333.    GM thus "failed to exercise reasonable care in the manufacture of [its Defective

Vehicles]", in violation of RESTATEMENT (SECOND) OF TORTS § 395 ("A manufacturer who fails

to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he

should recognize as involving an unreasonable risk of causing physical harm to those who use it

for a purpose for which the manufacturer should expect it to be used and to those whom he

should expect to be endangered by its probable use, is subject to liability for physical harm

caused to them by its lawful use in a manner and for a purpose for which it is supplied.").

334.    GM further breached its duties to the Defective GM Vehicle Negligence Subclass

by supplying directly or through a third person defective vehicles to be used by such foreseeable

persons as the Defective GM Vehicle Negligence Subclass members when:

09-50026-mg    Doc 13895-1    Filed 03/27/20    Entered 03/27/20 20:08:58    Exhibit B -
Proposed New Class Claims    Pg 228 of 231    Pg 88 of 89

a.    GM knew or had reason to know that the vehicles were dangerous or likely to be
dangerous for the use for which they were supplied; and

b.    GM failed to exercise reasonable care to inform customers of the dangerous
condition or of the facts under which the vehicles are likely to be dangerous.

335.    GM had a continuing duty to warn and instruct the intended and foreseeable users
of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to
using the vehicles. Defective GM Vehicle Negligence Subclass Members were entitled to know
that the vehicles, in their ordinary operation, were not reasonably safe for their intended and
ordinary purposes and uses.

336.    GM knew or should have known of the defects described herein.  GM breached
its duty to Defective GM Vehicle Negligence Subclass Members because it failed to warn and
instruct the intended and foreseeable users of its vehicles of the defective condition of the
vehicles and the high degree of risk attendant to using the vehicles, and it failed to recall the
vehicles when ordinary care and reasonable prudence so demanded.

337.    As a direct and proximate result of GM's negligence, the Defective GM Vehicle
Negligence Subclass members suffered damages.  The damages include overpayment for the
Delta Ignition Switch Vehicles and repair and recall costs, as discussed above.

*      *      *      *

338.    The filing of this Proof of Claim is not, nor shall it be deemed to be, (a) a waiver
of Claimant's rights against any person, entity or property; (b) a consent by Claimant to the
jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim or any

objection or other proceeding commenced in this case or any related case; (c) a waiver of the

right to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy

Court.

# Exhibit C

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                             :

In re:                                    :          Chapter 11

MOTORS LIQUIDATION COMPANY, et al.,  :          Case No.: 09-50026 (MG)

         f/k/a General Motors Corp., et al.,  :

                                             :

                        Debtors.       :          (Jointly Administered)

-----------------------------------------------------------X

### ORDER GRANTING MOTION FOR AN ORDER GRANTING
### AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM

      Upon the motion (the "**Motion**")[1] of the Ignition Switch Plaintiffs and certain Non-Ignition

Switch Plaintiffs pursuant to Bankruptcy Rule 9006(b)(1) seeking entry of an order granting

authority to file the Proposed Class Claims; and due and proper notice of the Motion having been

provided and it appearing that no other or further notice need be given; and the Court having

found and determined the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefore; it is

hereby

      **ORDERED** that the Motion is GRANTED; and it is further

      **ORDERED** that the Plaintiffs are granted leave to file the Proposed Class Claims, which

shall be deemed timely filed.

**IT IS SO ORDERED.**

Dated: _____, 2016
       New York, New York

                                  _____
                                  MARTIN GLENN
                                  United States Bankruptcy Judge

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 262 of 269

09-50026-mg    Doc 14695-2    Filed 03/27/20    Entered 03/27/20 20:18:28    Exhibit 2 -
Guthrie Exhibit    Pg 1 of 5

# Exhibit 2

09-50026-mg   Doc 14696-1   Filed 03/27/20   Entered 03/27/20 21:11:57   Exhibit A -
Motion to Withdraw the Reference Papers   Pg 263 of 269
09-50026-mg   Doc 14695-2   Filed 03/27/20   Entered 03/27/20 20:18:28   Exhibit 2 -
Guthrie Exhibit   Pg 2 of 5
Case 2:13-cv-11964-DPH-MAR   ECF No. 7   filed 08/05/13   PageID.728   Page 1 of 4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In re:                                     Case No. 2:13-cv-11964-DPH-MAR

**DANIELL GUTHRIE,**                        Hon. Denise Page Hood

      Debtor.                              Magistrate Judge Mark A. Randon

_____/

**ORDER RESOLVING
UNITED STATES TRUSTEE'S MOTION FOR CONTEMPT
AND FOR OTHER RELIEF AND SETTING PAYMENT SCHEDULE**

This matter came before the Court after it withdrew the reference of this matter to the

Bankruptcy Court.  This Court withdrew the reference on the recommendation of the Bankruptcy

Court.  That recommendation was made specifically so this Order could be entered in this Court

rather than the Bankruptcy Court; and could be enforced by this Court because of its broader

powers.

This Order is entered on the stipulation of the United States Trustee and Vernon Taylor, a

Bankruptcy Petition Preparer, by their respective counsel.

**IT IS ORDERED** that:

1.      The Settlement Agreement entered into by Vernon Taylor and the United States

Trustee, filed in Bankruptcy Case No. 07-58703-TJT, Docket # 101, is adopted by this Court and

the parties are bound by its terms per their agreement.

2.      The permanent injunctions entered by the Bankruptcy Court in Bankruptcy Case

No. 07-58703-TJT are adopted by this Court and are now Orders and Injunctions of this Court;

and enforceable by this Court and its broader powers.  They are,

        a.      The *Consent Judgment* entered on November 8, 2007, Docket  18, and

b.    The *Order Finding Vernon C. Taylor in Contempt and for Further Proceedings*, Docket #40, entered on October 31, 2011.

3.    The Proposed Findings of Fact and Conclusions of Law submitted by the United States Trustee on February 19, 2013, Docket #92 in Bankruptcy Case No. 07-58703-TJT, except for paragraphs 32 and 38, are adopted by this Court as its Finding of Fact and Conclusions of Law.

4.    Vernon Taylor shall pay $100.00 on the first business day of each month beginning on May 1, 2013, by delivering certified funds to the United States Trustee, made out to the following Debtors:

|  | Case Name | Case No. | Amount Owed |
|---|---|---|---|
| 1. | Arlene Johnson | 08-44522 | $ 2,000.00 |
| 2. | Cato Johnson | 08-43139 | $ 2,000.00 |
| 3. | Kelly Vaughn | 08-40824 | $ 2,000.00 |
| 4. | Kelly Vaughn | 08-42578 | $ 2,000.00 |
| 5. | Delmar Williams | 08-48460 | $ 2,000.00 |
| 6. | Vonzella Johnson | 08-48461 | $ 2,000.00 |
| 7. | Algernon Bell | 08-48978 | $ 2,000.00 |
| 8. | Latonya Wright | 08-51580 | $ 2,000.00 |
| 9. | Rochelle K. Collins | 10-63595 | $ 2,000.00 |
| 10. | Raquel Johnson | 11-44555 | $ 2,500.00 |
| 11. | Celina D. Cason | 11-41480 | $ 2,000.00 |
| 12. | Melinda Young | 11-43176 | $ 2,000.00 |
| 13. | Joslynn T. Woodard | 11-49530 | $ 2,000.00 |
| 14. | Tajuana R. Robinson | 11-42370 | $ 2,000.00 |
| 15. | Kimberly L Gill | 11-50124 | $ 2,000.00 |
| 16. | Portia M. Smith | 11-53566 | $ 2,000.00 |
| 17. | Phillip P. Harris | 12-40177 | $ 2,000.00 |
| 18. | Priscilla A. Dixon | 12-40521 | $ 2,000.00 |
| 19. | Tamara M. Ingram | 12-40042 | $ 2,000.00 |
|  | | **TOTAL** | **$ 38,500.00** |

5.     The payments will be made payable to each Debtor, beginning with No. 1, on a rotating and continuing basis until each of the Debtors has been paid in full. The obligation to pay will begin or began on May 1, 2013 and continues each month thereafter.

6.     Vernon Taylor shall electronically submit a monthly statement to the United States Trustee reporting:

      a.     Whether he is still working for Ray Richards,

      b.     Whether he has earned any money other than under the employment of Ray Richards,

      c.     How he has earned other money,  and

      d.     How much he has earned.

7.     The Statement shall be sent by email to Paul.Randel@usdoj.gov and Karen.Riggs@usdoj.gov unless Taylor is notified of a different email address.

8.     Vernon C. Taylor shall appear at the Office of the United States Trustee on a mutually agreed upon date for a deposition in six to nine months.

9.     This Court may, without consulting the parties because they have already agreed, assign the litigation of any disputes regarding compliance with this Order to the Bankruptcy Court for Findings of Fact and Conclusions of Law.  Also by agreement of the parties, those Findings and Conclusions will be binding on them and this Court may rely on them as if made in this Court when deciding what, if any, remedies to impose.  This Court will have all remedies available to it that are available to Federal Courts established under Article III of the United States Constitution and will not be limited in any way because this matter originated in the Bankruptcy Court.

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 266 of 269
09-50026-mg    Doc 14695-2    Filed 03/27/20    Entered 03/27/20 20:18:28    Exhibit 2 -
Guthrie Exhibit    Pg 5 of 5
Case 2:13-cv-11984-DPH-MAR    ECF 3/27/20    filed 06/05/13    PageID.74    Page 4 of 4

10.    Ray Richards' representation of Vernon Taylor will terminate thirty days after entry of this Order unless it is terminated earlier by proper procedure or extended by a new agreement.  After that date, unless Taylor is represented by counsel, service on Vernon Taylor will be accomplished by first class mail to: Vernon Taylor,  16878 Glastonbury Road, Detroit, MI 48219.

SO ORDERED.

Dated:  June 5, 2013                           s/Denise Page Hood
                                                             DENISE PAGE HOOD
                                                             U.S. DISTRICT COURTJUDGE

I hereby certify that a copy of this order was served upon the attorneys of record on this date, June 5, 2013, by electronic and/or ordinary mail.

                                                             s/LaShawn R. Saulsberry
                                                             Case Manager

4

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 267 of 269

09-50026-mg    Doc 14695-3    Filed 03/27/20    Entered 03/27/20 20:18:28    Exhibit 3 -
Withdrawal Order    Pg 1 of 3

# Exhibit 3

09-50026-mg    Doc 14696-1    Filed 03/27/20    Entered 03/27/20 21:11:57    Exhibit A -
Motion to Withdraw the Reference Papers    Pg 268 of 269

09-50026-mg    Doc 14695-3    Filed 03/27/20    Entered 03/27/20 20:18:28    Exhibit 3 -
Withdrawal Order    Pg 2 of 3

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE: ) | No. _____ |
| ) | |
| MOTORS LIQUIDATION COMPANY ) | Hon. Jesse M. Furman |

**[PROPOSED] ORDER GRANTING GENERAL MOTORS LLC'S,
THE MOTORS LIQUIDATION COMPANY GUC TRUST'S, AND ECONOMIC LOSS
PLAINTIFFS' JOINT MOTION TO WITHDRAW THE REFERENCE OF THE
ECONOMIC LOSS PLAINTIFFS' MOTION FOR AN ORDER GRANTING
AUTHORITY TO FILE LATE CLASS PROOFS OF CLAIM AND RELATED FILINGS**

On March __, 2020, (i) General Motors LLC; (ii) the Motors Liquidation Company GUC Trust) (the "GUC Trust"); and (iii) plaintiffs seeking to represent classes of purchasers and lessees of the recalled vehicles (collectively, the "Settling Parties") filed a Joint Motion To Withdraw The Reference Of The Economic Loss Plaintiffs' Motion For An Order Granting Authority To File Late Class Proofs Of Claim And Related Filings.  Docket No. ___ (the "Motion").[1]

Upon consideration of the Settling Parties' Motion, and for good cause shown, it is hereby ORDERED that:

1. The Settling Parties' Motion is hereby GRANTED, substantially for the reasons set forth in their memorandum of law in support of the Motion.  Docket No. _____.

2. Pursuant to 28 U.S.C. § 157(d), this Court accordingly withdraws, for cause, the reference to the Bankruptcy Court of (i) the Economic Loss Plaintiffs' Motion For An Order Granting Authority To File Late Class Proofs Of Claim (Bankr. Docket No. 13806); (ii) the Economic Loss Plaintiffs' Notice Of Filing Of Amended Exhibits To Motion For An Order

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Settlement Agreement.

Granting Authority To File Late Class Proofs Of Claim (Bankr. Docket No. 14280); (iii) the Joinder Of Certain Ignition Switch, Non-Ignition Switch, And Pre-Sale Accident Plaintiffs To The Pending Motions For Leave To File Late Proofs Of Claim (Bankr. Docket No. 13811)[2]; and (iv) the Joinder Of Groman Plaintiffs To Motion For An Order Granting Authority To File Late Class Proofs Of Claim (Bankr. Docket No. 13818).[3]

3. For the avoidance of doubt, this Court does not withdraw the reference with respect to any other matters currently pending before the Bankruptcy Court, including (i) the GUC Trust Motion; (ii) the GUC Trust Approval Order; (iii) the Excess Distribution Motion; (iv) personal injury or wrongful death claims in the Bankruptcy Case relating to the Subject Vehicles; (v) claims and Actions asserted against the AAT, Old GM or the Old GM Bankruptcy Estates to the extent such claims or Actions are recoverable solely against the AAT or its assets; and/or (vi) individual claims or motions, if any, in the Bankruptcy Case filed by a Person who would have been a Class Member who becomes an Opt-Out.

SO ORDERED.

Dated: _____, 2020
    New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[2] This joinder primarily seeks to assert late economic loss claims. However, Sharon Bledsoe, one of the plaintiffs who filed the joinder, seeks to assert both late economic loss claims and a late personal injury claim. The reference is not withdrawn with respect to that portion of this joinder that relates to Ms. Bledsoe's personal injury claim. In addition, the Bankruptcy Court previously denied Celestine Elliott's and Lawrence Elliott's request for permission to file a late proof of claim with respect to their 2006 Chevrolet Trailblazer. Accordingly, that portion of this joinder has been resolved by the Bankruptcy Court and is therefore not subject to this Order.

[3] As set forth in the Settlement Agreement, the Economic Loss Plaintiffs and New GM will continue to pursue Proposed Proofs of Claim (as defined in the Settlement Agreement) against the Avoidance Action Trust ("AAT") and its assets in the Bankruptcy Court notwithstanding approval of the Settlement Agreement, and the Settling Parties do not seek to withdraw the reference with respect to such claims against the AAT. Settlement Agreement ¶ 142. Accordingly, the reference is not withdrawn as to the Proposed Proofs of Claim against AAT.

2