UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | . | Case No. 09-50026-mg |
|  | . | Chapter 11 |
|  | . |  |
| MOTORS LIQUIDATION COMPANY, | . | One Bowling Green |
|  | . | New York, NY 10004 |
|  | . |  |
| Debtors. | . | Thursday, July 23,2020 |
| . . . . . . . . . . . . . . . . | . | 2 p.m. |

TRANSCRIPT OF HEARING USING ZOOM FOR GOVERNMENT RE:  LATE
CLAIMS MOTION.  (DOC. NOS. 14018, 14046, 14112, 14195, 14325,
14346, 14643, 14644, 14658, 14661, 14676, 14690, 14715, 14716,
14723, 14724, 14744, 14745,14756, 14757, 14760);
HEARING USING ZOOM FOR GOVERNMENT RE:  MOTION TO ALLOW
WILMINGTON TRUST TO TRANSFER SETTLEMENT DIRECTLY TO ESCROW
(DOCUMENT NO. 14753, 14757, 14758, 14760)
**BEFORE THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY COURT JUDGE**

TELEPHONIC APPEARANCES:

For Wilmington Trust      McDermott Will & Emery, LLP
Company, as Trust         By:  KRISTIN GOING, ESQ.
Administrator and         340 Madison Avenue
Trustee of the Motors     New York, NY  10173-1922
Liquidation GUC Trust:    (212) 547-5482

For Additional Ignition   Andrews Myers, P.C.
Switch Pre-Closing        By:  LISA NORMAN, ESQ.
Accident Plaintiffs:      1885 Saint James Place, 15th Floor
                          Houston, TX  77056
                          (713) 850-4200

APPEARANCES CONTINUED

Audio Operator:           Court ECR Personnel

Transcription Company:    Access Transcripts, LLC
                          517 Dell Road
                          Landing, NJ  07850
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):

For the Economic          Brown Rudnick LLP
Loss Plaintiffs:          By:  EDWARD WEISFELNER, ESQ.
                          Seven Times Square
                          Times Square Tower
                          New York, NY  10036
                          (212) 209-4800

For Participating         Akin Gump Strauss Hauer & Feld LLP
Unitholders:              By:  DAVID M. ZENSKY, ESQ.
                          One Bryant Park
                          New York, NY  10036-6745
                          (212) 872-1000


ALSO PRESENT:

For Billy England:        DAVID V. SCOTT
```

1      (Proceedings commence at 2 p.m.)

2          THE COURTROOM DEPUTY:  Okay.  Appearances for July

3  23rd at two o'clock.

4          Hello, Mr. Scott.  Can you unmute?

5          MR. SCOTT:  Okay.  I'm here.

6          THE COURTROOM DEPUTY:  Hello, Mr. Scott, hi.  Can you

7  please just give your appearance for the record?

8          MR. SCOTT:  Okay.  It's -- my name is David Scott,

9  and I'm appearing for the claimants in Billy England -- in

10 Billy England's claim against the -- whatever General Motors

11 is.

12         THE COURTROOM DEPUTY:  Thank you, Mr. Scott.  Your

13 appearance is noted, and I'll put you back in the waiting room

14 until we start.

15         MR. SCOTT:  Fine and dandy.

16         THE COURTROOM DEPUTY:  All right.  Have a nice day.

17         MR. SCOTT:  You too.

18         THE COURTROOM DEPUTY:  Talk to you soon.

19         Hello, Mr. Zensky?

20         MR. ZENSKY:  Yes.  I can hear you.

21         THE COURTROOM DEPUTY:  Hi.  How are you?

22         MR. ZENSKY:  I'm fine.  How are you?

23         THE COURTROOM DEPUTY:  Good.  Can you please give

24 your appearance for the record?

25         MR. ZENSKY:  David Zensky of Akin Gump Strauss Hauer

4

1  & Feld for the participating unitholders.

2          THE COURTROOM DEPUTY:  Thank you so much.  I will put

3  you back into the waiting room, and I'll admit everyone when

4  we're ready to get started.

5          MR. ZENSKY:  Is my name appearing okay?  Because I

6  didn't -- it didn't prompt me to enter anything, but I see

7  "D. Zensky at the top."

8          THE COURTROOM DEPUTY:  Yeah.  I'll just put your

9  first and last name, so no one gets confused, but there's only

10 one person with the name of Zensky, and it's not that many

11 people.  So we're good. Don't worry.

12         MR. ZENSKY:  I'm one of a kind.  Are we supposed

13 to --

14         THE COURTROOM DEPUTY:  You're one of a kind.

15         MR. ZENSKY:  Are we supposed to start at two o'clock?

16         THE COURTROOM DEPUTY:  Yes.  At two o'clock.

17         MR. ZENSKY:  Good.  Okay.  I'll try to be productive,

18 meanwhile.

19         THE COURTROOM DEPUTY:  All right.

20         MR. ZENSKY:  Thank you.

21         THE COURTROOM DEPUTY:  You're welcome.

22         MR. ZENSKY:  I'm going to go on mute.

23         THE COURTROOM DEPUTY:  Sure.

24         Hello, Ms. Moss.  Can you unmute your line?

25         MS. MOSS:  Sure.

5

1          THE COURTROOM DEPUTY:  Hi.  Can you please give your

2 appearance for the record?

3          MS. MOSS:  Naomi Moss, Akin Gump Strauss Hauer &

4 Feld, on behalf of the participating unitholders.

5          THE COURTROOM DEPUTY:  Thank you so much.  I'll put

6 you back in the waiting room for now, and then I'll have

7 everyone come in at the same time.

8          MS. MOSS:  Okay, great.  Thanks.

9          THE COURTROOM DEPUTY:  Hi, Ms. Going.

10          MS. GOING:  Hi.

11          THE COURTROOM DEPUTY:  Hi.  How are you?

12          MS. GOING:  I'm good.

13          THE COURTROOM DEPUTY:  Good.  Can you please give

14 your appearance for the record?

15          MS. GOING:  Kristin Going, McDermott Will & Emery on

16 behalf of the GUC Trust Administrator.

17          THE COURTROOM DEPUTY:  Thank you.  I'll put you back

18 in the waiting room, and then we'll admit everyone when the

19 hearing is about to begin.

20          MS. GOING:  Great.  Thank you.

21          THE COURTROOM DEPUTY:  Okay.  You're welcome.

22          Hello.  The party with -- that checked in with a

23 111178, can you unmute yourself?  I'm asking you to unmute.

24          MR. DAVIDSON:  Hi.  It's Scott Davidson; I'm going to

25 change my name now.

6

1          THE COURTROOM DEPUTY:  Okay.  Thank you,

2    Mr. Davidson.

3          MR. DAVIDSON:  There you go.

4          THE COURTROOM DEPUTY:  Thank you.  Perfect.  Can you

5    please give your appearance for the record?

6          MR. DAVIDSON:  Sure.  Scott Davidson from King &

7    Spalding, LLP, on behalf of General Motors, LLC.

8          THE COURTROOM DEPUTY:  Okay, thank you.  I will put

9    you back in the waiting room for now, and then I'll admit

10   everyone at the same time when the hearing is about to begin.

11         MR. DAVIDSON:  Thank you very much.

12      (Pause)

13         THE COURTROOM DEPUTY:  -- resume the recording and

14   continue taking appearances.  I'm admitting Lisa Norman.

15   Ms. Norman, I'm asking you to unmute your line.

16         MS. NORMAN:  I've done so.  Thank you.

17         THE COURTROOM DEPUTY:  Hi.  Could you please give

18   your appearance for the record?

19         MS. NORMAN:  Lisa Norman on behalf of the movement --

20   the movants, the Additional Ignition Switch Pre-Closing

21   Accident Plaintiffs.

22         THE COURTROOM DEPUTY:  Thank you so much.  I will put

23   you into the waiting room until the hearing is ready to begin.

24         MS. NORMAN:  Thank you.

25         THE COURTROOM DEPUTY:  All right.  I will pause the

7

1  recording momentarily.

2       (Pause)

3            THE COURTROOM DEPUTY:  Recording again.

4            Admitting Michael Schein.  Michael?

5            MR. SCHEIN:  Yes.

6            THE COURTROOM DEPUTY:  Hi, Michael.  How are you?

7            MR. SCHEIN:  Good.  How are you doing?

8            THE COURTROOM DEPUTY:  Good.  Can you please give

9  your appearance for the record?

10            MR. SCHEIN:  Sure.  Michael Schein, Vedder Price, on

11  behalf of Export Development Canada.

12            THE COURTROOM DEPUTY:  Thank you so much.  I will

13  place you back in the waiting room for now.

14            Mr. Vanaskey?  Mr. Vanaskey?  I'm asking you to

15  unmute your line, please.

16            THE COURTROOM DEPUTY:  Okay.  David Vanaskey has

17  joined -- and from -- on behalf of the Wilmington Trust

18  Company, as Trust Administrator.

19            Whose number starts with 585?  The party whose number

20  starts with 585-313-4804, please speak up.

21            MR. D'AMATO:  Rick D'Amato from Akin Gump.

22            THE COURTROOM DEPUTY:  Okay.  How do -- I'm having

23  some technical difficulty for some reason.  Okay.  And you're

24  calling on -- you're on behalf of the participating

25  unitholders, correct?

1          MR. D'AMATO:  That's correct.

2          THE COURTROOM DEPUTY:  Thank you.

3          Hello.  Mr. Weisfelner?  Mr. Weisfelner?

4          MR. WEISFELNER:  Yes.

5          THE COURTROOM DEPUTY:  Hi.  Can you please give your

6    appearance for the record?

7          MR. WEISFELNER:  Certainly.  Edward Weisfelner, Brown

8    Rudnick, LLP, appearing as designated counsel for the economic

9    loss plaintiffs.

10          THE COURTROOM DEPUTY:  Thank you so much.  I will put

11   you back in the waiting room for now.

12          Mr. Golden?  Mr. Golden, please give your appearance

13   for the record.  Please -- I'm asking you to unmute your line.

14   Please unmute your line.

15          MR. GOLDEN:  Apologies.  Daniel Golden.

16          THE COURTROOM DEPUTY:  Hi.

17          MR. GOLDEN:  Hi.  Daniel Golden, Akin Gump Strauss

18   Hauer & Feld, counsel for the participating unitholders.

19          THE COURTROOM DEPUTY:  Thank you so much.

20          MR. GOLDEN:  Thank you.

21          THE COURTROOM DEPUTY:  The party with the number that

22   begins 302 -- the party whose number begins with 302-593-3052

23   -- sorry, 302-593-0252, can you please identify yourself?  I

24   do not have your number on my list.  Please identify yourself

25   for the record, or you'll be put in the waiting room, and you

1  will not be able to join the hearing.

2             MS. ANDREWS:  Beth Andrews.

3             THE COURTROOM DEPUTY:  Thank you, Ms. Andrews.

4             MS. ANDREWS:  Yes.  Thank you.

5             THE COURTROOM DEPUTY:  And can you please give your

6  full appearance for the record?

7             MS. ANDREWS:  I'm with Wilmington Trust, the GUC

8  Trust.

9             THE COURTROOM DEPUTY:  Thank you very much.

10            MS. ANDREWS:  Thank you.

11            THE COURTROOM DEPUTY:  Caitlin Griffin?

12            MS. GRIFFIN:  Yes.  Hello.

13            THE COURTROOM DEPUTY:  Hi.  Can you please give your

14 appearance for the record?

15            MS. GRIFFIN:  My name is Caitlin Griffin, Akin Gump

16 Strauss Hauer & Feld, on behalf of the participating

17 unitholders, and I'm on just a listen-only line.

18            THE COURTROOM DEPUTY:  That's fine.  We need to take

19 all the appearances.  Thank you very much.  I'll put you back

20 in the waiting room.

21            The party whose phone number begins with

22 313-284-7244, please identify yourself.  Okay.  That would be

23 U-D-A-Y, last name is G-O-R-R-E-P-A-T-I, and on a listen-only

24 line with the ABI.

25            The party whose number is 212-57 -- 547-5518, please

10

1  identify yourself.

2           MR. HUTTENLOCHER:  Hi.  This is Michael Huttenlocher

3  from McDermott Will & Emery, and with me is Daniel Thomson from

4  McDermott Will & Emery.

5           THE COURTROOM DEPUTY:  Thank you very much.

6           The party whose number starts with 585-313-4804?

7           MR. D'AMATO:  Rick D'Amato from Akin Gump on behalf

8  of the participating unitholders.

9           THE COURTROOM DEPUTY:  Okay.  Sorry, Mr. D'Amato.  I

10 wasn't able to rename you before.  Thank you.

11          The party whose number starts with 917-689-2593?

12          MR. TULLY:  Connor Tully.

13          THE COURTROOM DEPUTY:  I'm sorry.  Can you repeat

14 that?

15          MR. TULLY:  Sure.  Connor Tully.

16          THE COURTROOM DEPUTY:  Thank you.  And Mr. Tully is

17 on behalf of FTI Consulting.

18          MR. TULLY:  That's correct.

19          THE COURTROOM DEPUTY:  And you're representing the

20 GUC Trust Monitor.  Is that correct?

21          MR. TULLY:  Yes.

22          THE COURTROOM DEPUTY:  Thank you.

23          MR. TULLY:  Thank you.

24          THE COURTROOM DEPUTY:  And the party whose number

25 starts with 212-209-4800, can you please identify yourself?

11

1          MR. WEISFELNER:  Yes.  I'm Ed Weisfelner, Brown

2    Rudnick.

3          THE COURTROOM DEPUTY:  Thank you, Mr. Weisfelner.

4          Okay.  I am going to admit everyone in the waiting

5    room and give them a few instructions.  I'm just waiting for

6    parties to be admitted.

7          Okay.  Good afternoon.  We are going to start the

8    hearing in Motors Liquidation momentarily.  I just have a few

9    announcements.  If everyone could please make sure that they

10   state their name each time they speak on the court record and

11   also if you have any electronic devices that are on in the

12   background, please mute them.  Also, please keep in mind that

13   this hearing is a court proceeding, and any recording other

14   than the official court version is prohibited.  No party may

15   record images or sounds from any location.  And you must

16   conduct yourself in a manner as you would in a courtroom.

17         All right.  Judge?

18         THE COURT:  All right.  Thank you very much, Deanna,

19   and good afternoon to everybody.  We're here in Motors

20   Liquidation Company, Case Number 09-50026.  I would only add to

21   what Deanna has said, that an audio transcript -- audio

22   recording of today's hearing is provided to the court by Zoom

23   for Government.  Anybody wishing to order a transcript will do

24   so through the court in the normal fashion.  As Deanna said,

25   it's very important that anytime you speak, you begin by

12

1   identifying yourself so we can have a clear audio record as

2   well.

3          We have two matters on the calendar this afternoon,

4   two contested matters.  The first is the motion of claimant

5   Billy England, to allow Wilmington Trust to transfer settlement

6   proceeds directly to escrow.  That's filed as ECF Docket Number

7   14753.  Wilmington Trust, on behalf of the GUC Trust, has filed

8   a response, which is at 14758.

9          Mr. Scott, I believe you're arguing on behalf of the

10  claimant.  Why don't you begin?

11      (Pause)

12          THE COURTROOM DEPUTY:  Judge, I'm asking him to

13  unmute his line.

14          THE COURT:  Okay.

15          THE COURTROOM DEPUTY:  Mr. Scott?

16          MR. SCOTT:  I got it.  Pardon me.

17          THE COURT:  Good afternoon.

18          MR. SCOTT:  I'm -- anyhow, as I was saying -- well,

19  hopefully -- I'll just go ahead.  Let me say one thing, Judge,

20  if I may.  I'm from southern Indiana, and I practice in

21  Kentucky -- mostly in Kentucky and southern Indiana and I have

22  not been treated any better in my own home country than I have

23  by your clerks and your court staff.  You know, New York is

24  famous for not being friendly and -- but you all -- either

25  that's not true or you all are the exception to the rule

13

1 because had it not been -- when I originally filed this, you

2 know, Billy England -- tried to perfect Billy's claim, that --

3 it -- I only had a week to get it done because the people who

4 were supposed to do it who were real bankruptcy lawyers didn't

5 do it and had it not been for them, I would not have made it in

6 time.

7        But anyhow, going back to this particular issue.  We

8 -- the settlement -- and the other thing I want to make clear

9 too is that, to the extent that it's taken since 2013 to today

10 to get this resolved, none of that is the trust's fault, that's

11 all mine.  But the important thing is, is that the issue is

12 still the same.

13        The settlement, which is stated to be $65,000 -- and

14 it was my assumption that it actually was less than that

15 because it involves stock and things like that, so -- but

16 anyhow, what I wanted to do, and I've explained in the brief,

17 is that under Kentucky law -- this is a survivor's claim.  It

18 was originally Billy England's wife, Fannie England's, claim.

19 She died unrelated to the event and Ford -- I mean, General

20 Motors filed bankruptcy, and then we wound up before the court.

21 There was an objection we filed because the court -- I mean,

22 obviously the trustee knew absolutely nothing about

23 Fannie England's claim, and so we provided them with

24 documentation in terms of medical and literature as to why it

25 was a legitimate claim.  And one of the things I would point

14

1   out is that the settlement of $65,000, whether it's for $65,000

2   or less, is considerably less than the value of this claim had

3   liability not been an issue.

4          Now, normally, the Court would be asking me about

5   that if we had gone before the court down there, but one of the

6   problems is that if we were to take this to the home county

7   where Billy lived at the time of his death, this would be --

8   you know, we'd have to open an estate, and we'd have to publish

9   it, and this recovery would be available to Billy's creditors,

10  and he had more than a few, unfortunately.  And the other thing

11  is, obviously, it increases the expense to the heirs, which in

12  this case are Billy's two children.

13         If it is -- the one thing that I -- I'm not sure what

14  the Court's familiarity is with routine practice in personal

15  injury cases, but I assume it's not -- that no one really

16  disputes on whether -- I assume there have been a lot of

17  personal injury lawyers before the Court because of the GM

18  claims, but in a routine personal injury case or wrongful death

19  case, however the claim is processed, whether it goes before a

20  guardian court before a guardian, it goes before a -- and it

21  would go before a wrongful -- the court on a wrongful death

22  case, however, it's processed, the funds from that settlement

23  wind up in the attorney's escrow account.  It would be

24  deposited into the account, and it is distributed from that

25  escrow account.

15

1          In fact, I know that -- I don't know if GM ever did

2    it, but both Ford and Hyundai and some others made it a

3    practice of actually just depositing money -- instead of

4    sending large checks through the mail, they just made direct

5    deposits into the attorney's escrow account.

6          Also, in those normal cases, the tax ID number would

7    be the lawyer's tax ID number, no matter who paid the

8    settlement or a verdict, which always made me extremely

9    nervous.  But still, that's how it was done and so far -- and,

10   well -- it's not going to happen now because I'm retired, and

11   this is literally my second-to-last pending case, and hopefully

12   the other one goes away this month too, but that's how it was

13   -- that's how it has always been done, and that's why I

14   requested that we do this in this particular case.  The clients

15   are protected.  They also filed affidavits agreeing that that's

16   what they would prefer, and it's my understanding that the

17   trust doesn't object to the process; they just did not feel

18   that they had authority to do it without some direction from

19   the Court.

20          THE COURT:  Mr. Scott, let me ask you this.  Is it a

21   fair statement that the issue here is whether the $65,000 of

22   settlement proceeds are an asset of Billy England's estate, in

23   which case they would need to be disposed of through a Kentucky

24   proceeding, as to which you've expressed the concern that

25   Mr. England's creditors would have a right to recover.

16

1  Whether --

2            MR. SCOTT:  Right.

3            THE COURT:  So is this an estate asset or, under

4  Kentucky law, does the right to receive these proceeds pass to

5  Mr. England's son and daughter.  Is that a fair statement?

6            MR. SCOTT:  Yes.  Yes.

7            THE COURT:  Okay.

8            MR. SCOTT:  Yes.  And under Kentucky law, it clearly

9  would pass to them.  It would not -- there are certain assets

10 that would not need to be run through the estate.  If it is run

11 through the estate, then it becomes estate asset and would be

12 available to creditors.

13           THE COURT:  So what I struggled with, Mr. Scott, is,

14 under the Kentucky statutes, this appears to be an estate asset

15 that would have to go through the court in Kentucky, and I

16 understand from the standpoint of his son and daughter, the

17 difficulty is if the other creditors against Mr. England's

18 estate were to be able to recover ahead of the children, there

19 would be nothing left for them.  I understand that.  But could

20 you point me to the relevant provision of Kentucky law that you

21 rely on for being able to make the distribution directly to the

22 children?

23           Whether it goes through your escrow account or not, I

24 think the issue from my standpoint is if they go into your

25 escrow account, does it still have to be dealt with through an

17

1   appropriate judicial proceeding in Kentucky and if the -- if

2   Mr. England's creditors have the right to it, they're the ones

3   who will get it, but what is -- is there a Kentucky statute or

4   case law that you're relying on to support your argument that

5   the distribution should be made to you and then from you to the

6   son and daughter?

7           MR. SCOTT:  Well, only the fact that there are -- the

8   only assets that need to pass through the estate are, you know

9   -- I'm not sure.  Let me back up a minute and just say, I'm not

10  sure I can answer the Court's question because, you know, were

11  this a wrongful death case, which it is not, it would not --

12  it's not -- in other words, those can be -- those don't have to

13  go before a court to be settled.  They're -- they are -- they

14  belong to the people who are listed as -- and in this case,

15  were this a wrongful death case, his -- the children would have

16  received the money, would have received it directly, but this

17  isn't a wrongful death case; it's a survival case.

18          And so I would have to say that it's -- that it is --

19  I could, perhaps, find a case that allow -- would allow this to

20  go through without the estate, but I hadn't looked for that

21  because, you know, well, I'm -- you know, I was a trial lawyer

22  and what I started to say about bankruptcy I can say about

23  estates, I know enough about that to write all I know on a

24  matchbook -- the back of a matchbook cover and have room to

25  sign my name, so I hadn't looked at it specifically from that

18

1  perspective and I can't provide the Court with a case or -- and

2  it's not clear in the statute.

3          THE COURT:  All right.  I understand your arguments.

4  I haven't -- I'm going to -- well, let me hear from the GUC

5  Trust counsel.  I'm going to take it under submission because I

6  haven't resolved the matter.  I think, obviously, this doesn't

7  involve bankruptcy law, it's not bankruptcy issues under

8  Kentucky law as to whether, essentially, this is an estate

9  asset available to Mr. England's creditors or whether it can be

10 distributed directly to his son and daughter.

11         So I spent a considerable amount of time studying

12 Kentucky law, and I'm not ready to make a decision on it but

13 let me hear from the GUC Trust counsel.

14         MR. SCOTT:  Sure.

15         THE COURT:  Thank you very much, Mr. Scott.

16         MR. SCOTT:  Okay.

17         MS. GOING:  Good afternoon, Your Honor.  Kristin

18 Going on behalf of the GUC Trust.

19         Your Honor, as we stated, we don't object to the

20 relief that is being sought.  We are simply looking for the

21 Court's guidance as well.  This is an allowed claim.  The

22 schedule of the allowed claim amount is $65,000.  Given the

23 current distributions, that means that they would be entitled

24 to units giving them a cash distribution of approximately

25 $19,000.

19

1       So the sole issue here, from the GUC Trust

2   perspective, is getting authority and identifying the entity

3   who is now the claimholder so that this distribution can be

4   made.

5       THE COURT:  Thank you very much, Ms. Going.  I'm

6   going to take it under submission.  I'm not going to let this

7   linger very long, but it involves Kentucky law, statutory it

8   seems to me, issues and not bankruptcy law.  But nevertheless,

9   I need to follow the law in determining the outcome.  So I will

10  take it under submission and hopefully be able to issue an

11  opinion in the not too distant future.  Thank you very much.

12      Again, Mr. Scott, thank you very much for appearing

13  remotely today, and I should say, my courtroom deputy, Deanna

14  Anderson, has been really central to being able to do Zoom

15  hearings.  She's spent time with all of the lawyers who will

16  argue in any of the matters before me by Zoom to make sure they

17  understand how it works and, you know, everyone experiences

18  some delay in getting checked in, but for security reasons,

19  using Zoom for Government, we have to use the waiting room

20  feature and check all lawyers in, so that takes a little extra

21  time.  So thank you to Deanna for that.

22      And with respect to the issue of the motion of claim

23  of Billy England to allow Wilmington Trust to transfer

24  settlement directly to escrow, the matter is submitted.  All

25  right.  Thank you.

20

1        MR. SCOTT:  Thank you.

2        THE COURT:  We'll move onto the next -- and, Mr.

3 Scott, you're either welcome to stay or excuse yourself as you

4 wish.

5        MR. SCOTT:  I have would -- I have academic interest

6 in the additional cases, but I will -- I'll pass.  Thank you

7 very much.

8        THE COURT:  Okay.  Thank you very much, Mr. Scott.

9        All right.  So the next matter on the calendar today

10 is the omnibus motion by Certain Ignition Switch Pre-Closing

11 Accident Plaintiffs for authority to file late proofs of claim

12 for personal injuries and wrongful death.  It's ECF Docket

13 Number 13807.  There have been -- and also, the motion by

14 Additional Ignition Switch Pre-Closing Accident Plaintiffs for

15 authority to file late proofs of claim for personal injuries

16 and wrongful death and that is ECF Docket Number 14018.

17        There have been many pleadings and filings in support

18 of and in opposition to the two pending motions.  We'll begin

19 with Ms. Norman.

20        MS. GOING:  Your Honor --

21        THE COURT:  Go ahead, Ms. Going.

22        MS. GOING:  -- if I may.  This is Kristin Going.  I

23 apologize.  I think I should address this one first because

24 ECF, the 13807?

25        THE COURT:  Yes.

21

1          MS. GOING:  This is actually the motion from Goodwin

2    Procter.

3          THE COURT:  Yes.  I'm sorry.  Go ahead.  Yeah --

4          MS. GOING:  Okay.

5          THE COURT:  -- you explained that.  Go ahead,

6    Ms. Going.

7          MS. GOING:  Thank you, Your Honor.  So, Kristin

8    Going, again, on behalf of the GUC Trust.

9          So, Your Honor, the omnibus motion, ECF 13807, and

10   the supplemental motion that was filed at ECF 14325, these are

11   -- this matter concerns the 59 remaining plaintiffs that were

12   formerly represented by Goodwin Procter.  Goodwin Procter had

13   filed this motion and the supplement, and on December 9th,

14   2019, Goodwin Procter filed a notice of withdrawal.  And the

15   notice explained that while most of these -- their clients had

16   settled their claims, they were withdrawing as counsel for the

17   non settling movants, but they specifically were not

18   withdrawing this motion or the supplement.  So these motions

19   would remain live with respect to these 59 movants.

20         On January 23rd of 2020, the GUC Trust filed a motion

21   to establish a deadline for the remaining movants to indicate

22   their intention to prosecute the motions and this Court entered

23   a show cause order establishing February 26th of 2020 as a

24   deadline for any of these 59 movants to file a notice of their

25   intention to either proceed pro se or to retain counsel.

22

1        To date, none of these 59 movants have indicated any

2   intention to prosecute the motions.  None of them filed

3   anything prior to the show cause order deadline.  And on

4   April 20th, 2020, the GUC Trust filed its omnibus objection

5   requesting that these 59 movants under the Goodwin Procter

6   motions be denied for failure to prosecute.

7        THE COURT:  Okay.

8        MS. GOING:  So we would --

9        THE COURT:  Go ahead.

10       MS. GOING:  -- ask that that motion be denied.

11       THE COURT:  All right.  And the order to show cause

12  was at ECF 14658 and thank you for correcting me.  I've been

13  looking at the agenda, and it wasn't clear, but I fully

14  understand what this application is.  And as you've said,

15  Ms. Going, no responses were filed by any of the 59 with

16  respect to the order to show to cause, which established the

17  February 26th deadline for the remaining late claim movants to

18  file a notice of intention to proceed and they did not do so.

19       So your omnibus objection to these pre-closing

20  plaintiffs is -- your objection is sustained.

21       MS. GOING:  Thank you, Your Honor.  We will submit --

22       THE COURT:  Okay.

23       MS. GOING:  -- the order.

24       THE COURT:  Submit the order.

25       MS. GOING:  Yes.

23

1          THE COURT:  Thank you very much.

2          MS. GOING:  Thank you.

3          THE COURT:  All right.  All right.  Now we'll move on

4    to the motion by the Additional Ignition Switch Pre-Closing

5    Accident Plaintiffs for authority to file late proofs of claim.

6    That is ECF Docket Number 14018, and on that, Ms. Norman, we'll

7    have you proceed first.

8          MS. NORMAN:  Thank you very much, Your Honor.  We are

9    bankruptcy counsel for the movants.  At one point, we

10   represented 389 plaintiffs.  Those were represented by ten

11   different personal injury law firms that were handling their PI

12   claims.  But as of today, all but 20 of those original 389

13   claims have settled.  So the motion before you today pertains

14   to those 20 remaining plaintiffs.

15         To begin, the April 2015 decision that was made, the

16   bankruptcy court held that the Ignition Switch Plaintiffs were

17   known creditors who didn't receive actual notice of the

18   November 2009 bar date for filing proofs of claim against the

19   debtor in this case.  That notice failure prejudiced their

20   ability to file timely claims and violated their due process

21   rights.  The bankruptcy court at that time identified that the

22   obvious remedy for that due process violation would be allowing

23   them to have leave to file late claims.

24         The appeal took place at the Second Circuit.  The

25   Second Circuit agreed with the bankruptcy court that the

24

1  Ignition Switch Plaintiffs had suffered a due process violation

2  and remanded it back to the bankruptcy court for further

3  proceedings.

4          In December of 2016, you issued the order to show

5  cause identifying initial issues that were going to be

6  addressed on remand, and pursuant to that order, the original

7  Ignition Switch Plaintiffs filed their motion to allow late

8  claims.  I will note that we were not retained at that time,

9  and my plaintiffs, the 20 that are still here, had no notice of

10  that order, and it wasn't until July of 2017 that they became

11  aware that the order had been issued and that there was still a

12  motion pending, which --

13          THE COURT:  How did they become aware of it,

14  Ms. Norman?

15          MS. NORMAN:  It's my understanding that Mr. Hilliard

16  may have communicated to some of the other personal injury

17  lawyers that were handling these claims, that he had a motion

18  for late claims that was pending, and at that time, that was

19  when the other personal injury lawyers began to figure out

20  whether or not they would be allowed to also join in that

21  motion.

22          They, at that time, became aware of the December 2016

23  order.  Not knowing whether or not they'd be allowed to join in

24  on the same relief that those similarly-situated plaintiffs

25  were seeking, they went ahead and retained our office to file

25

1   our motion.

2         And while the original motion that was filed by --

3   I'll just call it "the Hilliard plaintiffs," the original

4   Ignition Switch Plaintiffs was pending -- while it was still

5   pending, the Court issued an order providing for briefing on

6   two issues, which related to whether or not the plaintiffs

7   would have to satisfy the Pioneer factors in order to file late

8   claims and whether the GUC Trust Agreement to toll any

9   timeliness objections to file late proofs of claim would apply

10  to certain plaintiffs seeking authority to do so.  So while

11  that motion was still pending, and those -- and before any

12  briefing has started on those issues, that's when we filed our

13  motion.

14        After it was filed, of course, there were two

15  different opportunities or settlement motions I should say,

16  that were filed before the court, where we participated in or

17  were parties to the settlement agreements with the GUC Trust.

18  Of course, as you know, that ultimately, neither of those

19  settlement agreements were approved, but we've been involved in

20  this litigation essentially for two years now.

21        THE COURT:  Let me ask you this.  When I looked at

22  the timing --

23        MS. NORMAN:  Yes.

24        THE COURT:  -- of your involvement, it seems to have

25  -- be closely connected to the settlement negotiations that

26

1  went on between the GUC Trust and economic loss plaintiffs and

2  also pre-closing acc plaintiffs as well.  Were you involved in

3  the negotiations?

4         MS. NORMAN:  Not until the tail end.  We filed our

5  motion, and I believe it may have been Danny Golden, I'm not

6  sure, someone reached out to us at some point to let us know

7  that there were some negotiations taking place, and then we

8  became involved in them at that time and became parties to that

9  first settlement agreement.  And my office --

10        THE COURT:  You filed your application to appear pro

11 hac vice in this case on July 27, 2017.  It's at ECF Docket

12 14012.

13        MS. NORMAN:  That's correct.

14        THE COURT:  And you filed the first set of late

15 claims motions on July 28th, the next day, 14018.

16        MS. NORMAN:  That is correct.

17        THE COURT:  And that seems to have fallen pretty

18 squarely in the period when settlement negotiations were

19 ongoing.

20        MS. NORMAN:  Yes.  We certainly found that out.

21        THE COURT:  And how is it that you found that out?

22        MS. NORMAN:  I believe those discussions took place

23 with -- I mean, I personally learned of it -- I believe it was

24 Danny that -- Mr. Golden that made the call to me.  I don't

25 know if any of the personal injury plaintiffs' lawyers that

27

1  were representing these claimants knew of it beforehand or not,

2  and if so, when they would have known about it.

3          THE COURT:  Well, let me ask you another question.

4  Of the 20 claimants that you're representing in connection with

5  the motion now, am I correct that only four of them allegedly

6  had vehicles that were subject to recall 14V047.  Is that

7  correct?

8          MS. NORMAN:  I believe there are four that are

9  confirmed.  There are 12 that I have not been able to confirm

10 that yet.

11         THE COURT:  Well, there are four where you've

12 specifically identified the 14V047 recall as involved with

13 their vehicles, correct?

14         MS. NORMAN:  That is correct.

15         THE COURT:  All right.  And that actually is the

16 recall on which Judge Gerber and the Second Circuit ruled only

17 with respect -- those are the so-called "Ignition Switch

18 Plaintiffs," correct?

19         MS. NORMAN:  That is correct.

20         THE COURT:  And that Ignition Switch Plaintiffs has

21 been a defined term, both by -- well, by all three, by

22 Judge Gerber, by the Second Circuit, and then by me after

23 succeeding to take over these cases, correct?

24         MS. NORMAN:  That is correct.

25         THE COURT:  All right.  And I take it you agree with

28

1  the GUC Trust brief that no court has decided that there was a

2  due process -- that there has been a due process violation with

3  respect to any recalls other than the 14V047, correct?

4          MS. NORMAN:  That is correct.

5          THE COURT:  All right.  And I've spent time with my

6  law clerks, we've gone through all 20 of your prospective -- of

7  your clients, not prospective clients -- your clients, and for

8  many of them, there's been no specific recall that's been

9  identified to their vehicles.  Is that correct?

10         MS. NORMAN:  That's correct.  That information was

11 not provided at -- to my office.  The personal injury lawyers

12 may have that information, but at the time that we filed our

13 motion, no, I did not have that information.

14         THE COURT:  All right.  And is it --

15         MS. NORMAN:  We requested it and provided -- what we

16 were able to obtain, we provided with the proofs of claim.

17         THE COURT:  All right.  As to, I believe, two of your

18 clients, Chaz Grant (phonetic) and David Pier (phonetic), the

19 proofs of -- the proposed proofs of claim identifies specific

20 vehicles for Chaz Grant, a 1996 Pontiac Grand Am, and for

21 David Pier, a 1997 Pontiac Grand Am.  And in the work that my

22 chambers and I have done on this, those vehicles do not seem to

23 have been subject to any of the 14 recalls that have, sort of,

24 figured in the -- any of the late claims litigation.  Have you

25 done anything to confirm that?

1          MS. NORMAN:  I have not been able to confirm what

2     recall their particular vehicle was.

3          THE COURT:  Well, but their -- I mean, for those two,

4     specific vehicles were identified: a 1996 Pontiac Grand Am and

5     a 1997 Pontiac Grand Am.  And are any of the 14 recalls that

6     have been involved in any of these disputes applicable to the

7     1996 Pontiac Grand Am or the 1997 Pontiac Grand Am?

8          MS. NORMAN:  To be perfectly candid, I do not know

9     the answer to that question, Your Honor.

10          THE COURT:  Well, what's the basis for a proposed

11     late claim for Mr. Grant and Mr. Pier when they've identified

12     their vehicles, and there's no recall with respect to them?

13          MS. NORMAN:  They were presented as having first

14     learned of the bankruptcy and the defects with their car when

15     that 047 recall came out.  It was my understanding that the 047

16     recall was at issue with regard to their accidents.  I have not

17     been provided documentation to confirm that one way or the

18     other at this time.  We did some discovery early in 2017.  My

19     office presented one of our claimants for deposition, but there

20     hasn't been much done within this bankruptcy case related to

21     the discovery on the underlying claims.

22          THE COURT:  Okay.  Do you agree that the so-called --

23     the defined term "Ignition Switch Plaintiffs" applies to those

24     whose vehicles were subject to the 14V047 recall?

25          MS. NORMAN:  I do, Your Honor.  And I will -- I

30

1  recognize that these 20 remaining claimants, the information we

2  have may not be as clear as the other 370 that we've already

3  dealt with, but I've presented to you the information that we

4  have at this time.  If it would be helpful to Your Honor to

5  have additional information -- pardon me one moment.  I'm not

6  sure if you can hear the noise in the background.

7       THE COURT:  No.  Go ahead.  You're coming through.  I

8  hear some background noise, but I hear you clearly.  Go ahead,

9  Ms. Norman.

10      MS. NORMAN:  I think my neighbor is mowing his lawn.

11      THE COURT:  We're all living under difficult

12  circumstances these days.

13      MS. NORMAN:  Yes.  I didn't understand that today

14  would -- whether you wanted evidence presented to you today or

15  not.  If you want evidence with regard to these claimants or

16  would like to hear from any of these claimants, I'm certainly

17  -- I can certainly supplement to the extent that any such

18  evidence exists or present them to you.

19      THE COURT:  I think, you know, in fairness,

20  Ms. Norman, Mr. Grant's accident happened in --

21      MS. NORMAN:  Two thousand --

22      THE COURT:  -- August 2006, and Mr. Pier's accident

23  occurred in January 2005.

24      MS. NORMAN:  That is correct.

25      THE COURT:  And here we are in, you know,

31

1   July of 2020, and in deciding whether or not to permit late

2   claims on behalf of any of the 20 to be filed, I have to look

3   at all the facts and circumstances and what's been shown so

4   far.  I'm not looking to protract these proceedings by opening

5   them up further unless necessary.  So let me ask a few more

6   questions if I can?

7              MS. NORMAN:  Yes.

8              THE COURT:  Bear with me a second if you would.

9              MS. NORMAN:  No problem.

10  &&& Ilene Starts Here &&& 56:10

11             THE COURT:  So with respect to -- let me take

12  Joann Donato -- well, there's a group -- let me say this.

13  There's a group of claimants who were involved in -- allegedly

14  involved in multi-vehicle accidents.  So for Donato, the

15  proposed proof of claim -- and she is an ignition switch

16  plaintiff.  I mean, she's alleged that 14V047 was the recall

17  involved.  But the description says, "Car accident, other

18  driver ran a red light, airbag did not deploy resulting in

19  bodily harm."

20             And there are a group of the claimants where there

21  were multi-car accidents: Bertha Brown, four-car accident, car

22  slipped in rain, airbag did not deploy, resulting in bodily

23  harm.  Rodney Gentry, car crashed into tree, slid off of black

24  ice, airbag did not deploy, resulting in bodily harm.  They go

25  on.  I mean, I could list of all of them, but there are quite a

32

1  few of them.

2          The first question I have -- some of them were

3  involved in two car accidents, two or more car accidents, where

4  the proof of claim indicates that some other driver ran a red

5  light.  For Riley, car crash, hit by delivery van, airbag did

6  not deploy, resulting in bodily injury.

7          So I guess my immediate question is whether any of

8  your clients received compensation resulting from the accidents

9  in which they were in.  So two of the proposed proofs of claim

10  for Chaz Grant -- no, hold on, not those two.  Excuse me.  Bear

11  with me again.

12          MS. NORMAN:  No problem.

13          THE COURT:  Yeah.  Chaz Grant received compensation

14  for accident and prior medical bills, and Melinda Lynch,

15  recover money for medical bills.  So the proofs of claim had a

16  section entitled "Prior or Current Litigation," but I want to

17  be clear -- and those are the only two --

18          MS. NORMAN:  That is correct.

19          THE COURT:  -- Chaz Grant and Melinda Lynch, who

20  provided any response to that.

21          MS. NORMAN:  That's correct.

22          THE COURT:  And my question is whether any of the

23  remaining claimants that you represent recovered any damages as

24  a result of the accidents they were involved in, whether it was

25  through litigation or otherwise, because sometimes litigation

33

1  is never filed and a recovery is had.  And because there were

2  no responses, I don't know -- I want to be clear that you're

3  representing that no one else recovered any money.

4       MS. NORMAN:  Yes.  What I asked them to do was, if

5  they had been involved in any other litigation, to identify

6  that litigation.  If they were not involved in any other

7  litigation, then they could leave it blank.  And so if they --

8  and so there were only two of the 20 left that had been

9  involved in other litigation.

10      THE COURT:  And do you know whether any of the other

11 18 recovered money without ever actually initiating litigation?

12 Because, as I say, I mean, some of these show that, you know,

13 Bertha Brown involved in a four-car accident; Joann Donato, car

14 accident, other driver ran a red light.

15      MS. NORMAN:  It's my understanding they did not, but

16 I'd have to confirm that with them.

17      THE COURT:  So with respect to -- and I know you

18 dispute whether the Pioneer factors apply or not, but let's

19 assume for purposes of discussion that the Court concludes that

20 the Pioneer factors apply in determining whether to permit late

21 claims.

22      One of the things that strikes me about this, unlike

23 the economic loss plaintiffs, who were not on notice of any

24 product defects before the 2014 recalls, the 20 claimants that

25 you represent were involved in accidents that occurred at least

34

1   six years before the recalls.  Did any of those plaintiffs

2   investigate whether there was any product defect with respect

3   to the manufacture or design of the vehicle that contributed to

4   their accident?

5              So many of these, as I pointed out, refer to airbag

6   did not deploy.  And so my understanding is every lawyer who

7   has a client involved in any serious accident where there have

8   been injuries will immediately inquire whether there was

9   something about the vehicle that was defective.  And airbags

10  not deploying in any serious accident is like at the top of the

11  list.

12             And so while I understand that the economic loss

13  claimants could argue that they had no notice of the defect

14  until there was a recall, well, their car hadn't even been

15  involved in an accident, but anybody who'd been involved in an

16  accident, a serious accident where the airbag did not deploy,

17  which is specifically listed on many of your clients' proposed

18  claims, why weren't they on inquiry notice?

19             In most products liability cases, there is never a

20  recall involved.  The lawyers quickly, you know, they do

21  accident reconstruction, they have experts who examine the

22  vehicle.  The airbag not deploying is something pretty serious,

23  okay.  So what can you tell me about whether any of your

24  clients, were they represented by other lawyers before you

25  represented them?

35

1        MS. NORMAN:  Yes.  I did not represent them until

2   July of 2017, and at least with regard to the 20 that are

3   remaining in this case, most of them did not have any personal

4   injury council until that time as well.  They were not involved

5   in the MDL and didn't have any other products liability

6   litigation going on.

7        THE COURT:  Well, wasn't the fact that they were

8   involved in a serious accident -- and one of them I know was

9   the driver was deceased or something -- was involved in serious

10  accidents where the airbag did not deploy, weren't they on

11  inquiry notice to determine whether there was a defect that --

12  a product defect -- manufacturing, design, whatever -- that

13  resulted in and contributed to the severity of the injury,

14  et cetera?

15       MS. NORMAN:  Potentially, but I think it's going to

16  be a very fact-intensive inquiry and would be different for

17  each of the individuals.

18       THE COURT:  All right.  Why don't you go on with

19  your argument.  Go ahead

20       MS. NORMAN:  No problem.  Both the April 2015

21  decision and controlling case law we believe are clear that

22  creditors such as the 20 remaining plaintiffs in our motion who

23  suffered due process violation may assert late claims and need

24  not rely on the Pioneer factors to demonstrate excusable

25  neglect.  And thus granting the motion and designating these

1  plaintiffs as -- these plaintiffs' proposed claims as timely

2  without conducting a _Pioneer_ review would be proper and would

3  give fair faith and fidelity to that April 2015 decision.

4          In addition to the impediment of the late-filed

5  claims order, the April 2015 decision also held that any of the

6  late claims filed by ignition switch pre-closing accident

7  plaintiffs would be barred as equitably moot.  The combined

8  effect of that equitable mootness ruling and the late-filed

9  claims order essentially rendered the act of seeking permission

10 to file a late claim would have been a waste of time or

11 resources at that time.

12         THE COURT:  Well, don't -- let me stop you there

13 because I was a litigator before I became a bankruptcy judge

14 and, you know, plaintiffs' lawyers are generally extremely

15 careful, even if there is an adverse ruling on a particular

16 issue that's important to them, to file a protective lawsuit

17 because they want to be sure that any statute of limitation is

18 tolled, any other period is tolled.  So Judge Gerber had

19 decided there was a due process violation, but they couldn't

20 recover from the GUC Trust, and there was an appeal.

21         Why shouldn't -- in order to protect their rights,

22 weren't anybody involved who had a vehicle with one of these

23 problems required to file either a protective proof of claim,

24 you know, if it's late filed, why didn't they file a motion for

25 leave to file late claim?  There was obviously litigation

37

1 against new GM.  So, I mean, is the fact that Judge Gerber

2 decided there is a due process violation, but you can't recover

3 from the GUC Trust, how does that excuse any claimant from

4 filing a protective motion to file a late claim?  Because it

5 was an appeal.

6 　　　　　MS. NORMAN:  Yes, there was an appeal.  None of my

7 claimants were parties to that appeal, but there was

8 essentially an uninterrupted period of seven years where there

9 was no legitimate basis to even seek allowance to file late

10 claims.  It wasn't until the Second Circuit vacated the

11 equitable mootness ruling in July of 2016 that they would even

12 have a basis to argue that they should be permitted to file

13 late claims.  Based on the rulings up until that time, there

14 would have been no basis to even do so.

15 　　　　　THE COURT:  Well, sure, because they believe -- if

16 they believe that Judge Gerber was wrong.  He was correct in

17 saying there was a due process violation, but he's wrong in

18 saying there's equitable mootness.  I'll file a protective

19 motion to file late claim.  We'll keep it on hold until the

20 appellate process is done.

21 　　　　　I mean, with respect to -- and I think you in your

22 papers point to this, that Judge Gerber, in May of 2014,

23 included a tolling provision, although that tolling provision

24 only applied to specific named plaintiffs.  It didn't apply to

25 anybody other than the specifically named plaintiffs.  But that

38

1  tolling provision protected the rights of any of those other

2  people.  They didn't have to take any further action at that

3  point.  So why -- the tolling agreement doesn't apply to any of

4  the 20 that you are dealing with now.  Do you agree with that?

5         MS. NORMAN:  Well, even if the genesis of the

6  tolling --

7         THE COURT:  Do you agree with -- no, just let's deal

8  with this.  Do you agree with me that Judge Gerber's order that

9  provided a tolling provision, the tolling order is at ECF

10  Docket 12697, that tolling order does not apply to any of your

11  20 clients?

12         MS. NORMAN:  I don't think that it could because we

13  didn't enter the case for three more years.

14         THE COURT:  Okay.  All right.  So you can't get any

15  mileage from the fact that as to certain specifically

16  identified people, there was a tolling order that didn't apply

17  to any of your clients?

18         MS. NORMAN:  Well, I think that the tolling agreement

19  addressed the ignition switch issues and certainly the -- well,

20  the tolling agreement was between the GUC Trust and the

21  economic loss plaintiffs.  It was made part of the ordered

22  provisions in that scheduling order because the Court didn't --

23  the Court wanted coordinated briefing on the ignition switch

24  issues.  And so I think that our plaintiff -- my plaintiffs

25  fall within the same category of similarly situated plaintiffs

39

1   that that agreement would have applied to.

2         THE COURT:  Judge Gerber's order applied to capital P

3   Plaintiffs, which included 54 ignition switch economic loss

4   plaintiffs that are listed in Schedule 1 to that motion,

5   correct?

6         MS. NORMAN:  That is correct.

7         THE COURT:  All right.  So that order didn't apply to

8   any of your people.

9         MS. NORMAN:  Not economic loss plaintiffs.  I will

10   say adjudication of the late claims motion ahead of the Court's

11   determination of any of those four threshold issues that were

12   set forth in that scheduling order would not have necessarily

13   made any sense at that time.  I mean, absent a determination of

14   the late claims motion either would have been premature or just

15   outright denied because, without the due process violation

16   finding, any claims that would have been filed at that time

17   would have been late and disallowed per se.

18         THE COURT:  Am I also correct -- and I'm changing the

19   subject slightly here a little bit -- two of your clients,

20   Deborah Overcast and Kenneth Salm, S-A-L-M, have never filed

21   proposed proofs of claim?

22         MS. NORMAN:  Mr. Salm, when I looked back, I do not

23   see one for him.  Let me see, Overcast?  You are correct,

24   Your Honor.

25         THE COURT:  All right. So 18 of the 20, there are at

40

1  least proposed proofs of claim not for those -- not for

2  Overcast and Salm?

3          MS. NORMAN:  Yes, Your Honor.

4          THE COURT:  Do you have -- have you come forward with

5  any evidence that there was a due process violation for any

6  other than the four of your clients who allege that their

7  vehicles were subject to 14 -- what did I say, 14V041 -- 047,

8  excuse me.

9          MS. NORMAN:  With respect to the fact that they -- I

10 think it's undisputed that no one received actual -- no one

11 that had the 047 recall could have received actual notice of

12 the 2009 bar date since the recall itself was not known until

13 2014.

14         THE COURT:  But there's no -- there's been no

15 evidence that Old GM knew and failed to disclose the defects

16 other than the 047, correct?

17         MS. NORMAN:  Correct.  Only the 047.

18         THE COURT:  Okay.  All right.  Go ahead.

19         MS. NORMAN:  Essentially, Your Honor, because the

20 late claims issues were not right until the due process and

21 equitable mootness issues were decided, it would not have been

22 prudent to necessarily pursue late claims back in 2014.

23         While my particular set of plaintiffs did not learn

24 of even the ability to file late claims motions until after the

25 December 2016 show cause order had been entered, they did so

41

1   while the original late claims motion for the ignition switch

2   plaintiffs was still pending and before briefing on any of

3   those issues was required.  They've participated in the

4   litigation for the last two years and have been before your

5   Court since that time.  They briefed the issues when it became

6   ordered by this Court to do so, and I would respectfully

7   request that the Court enter an order to allow them leave to

8   file their proposed late claims.

9           THE COURT:  All right.  Tell me, with respect to

10  Sheryl El-Cheikh -- I'm probably mispronouncing her name, last

11  name is E-L hyphen C-H-E-I-K-H.

12          MS. NORMAN:  Yes.

13          THE COURT:  The date of that injury was in September

14  of 2001?

15          MS. NORMAN:  That is correct.

16          THE COURT:  And what was the -- what is the alleged

17  defect that was subject to a recall?

18          MS. NORMAN:  It was my understanding it's the

19  ignition switch, your Honor, the 047.

20          THE COURT:  That's not listed on the proof of claim,

21  is it?

22          MS. NORMAN:  It is not.

23          THE COURT:  What kind of vehicle was she driving?

24          MS. NORMAN:  She was driving a 1999 Oldsmobile Alero.

25          THE COURT:  Where is that?  Because I didn't find

42

1  that on the proof of claim.

2          MS. NORMAN:  It's on the proof of claim summary form.

3  It says year and model of vehicle, 1999 Oldsmobile Alero.

4          THE COURT:  And was that brand and year subject to

5  any recall?

6          MS. NORMAN:  It's the 047 recall.

7          MR. WEISFELNER:  Judge, just for the record, that

8  vehicle was not subject to the 047 recall.

9          THE COURT:  Thank you, Mr. Weisfelner.

10         MR. WEISFELNER:  It was only as I recall the '05 and

11  '06 vehicles of specific models.

12         THE COURT:  Okay.

13         MR. WEISFELNER:  So I think Ms. Norman has that

14  wrong.

15         THE COURT:  Okay.

16         MS. NORMAN:  Okay.  Thank you.  Thank you,

17  Mr. Weisfelner.

18         I stand corrected, Your Honor.

19         THE COURT:  All right.  Go ahead.  Is there anything

20  else you want to add at this point?  And I'll give you a chance

21  to reply as well.

22         MS. NORMAN:  Nothing further of this Honor -- at this

23  time, Your Honor.

24         THE COURT:  All right.  Ms. Going, are you going to

25  respond?

43

1          MS. GOING:  Yes, your Honor.  Thank you.

2    Kristin Going on behalf of the GUC  Trust.

3          Your Honor, why don't I start with the Chaz Grant and

4    David Pier claims that you were inquiring about, and those are

5    1996 and 1999 Pontiac Grand Ams.  And I -- it sounds like you

6    and your clerk may have done some of the same legwork that we

7    did, and that is if you go on the National Highway Traffic

8    Safety Administration website, which is www.nhtsa.gov, you can

9    put in the make and model of a vehicle, and it then brings you

10   to a screen which identifies any and all recalls that have been

11   conducted for that vehicle.  And when you click on the number

12   of recalls, the website then identifies the recall information,

13   the year it was recalled, and the circumstances surrounding

14   that recall.

15         So I actually went through the exercise myself last

16   night, and I can tell you that neither of these two vehicles

17   were subject to any recalls after the year 2007.  So they were

18   not part of any of the recalls that were the subject of the

19   so-called ignition switch litigation or any of the recalls that

20   were issued in 2014.

21         In fact, any and all recalls involving these vehicles

22   occurred prior to the bar date.  And so, on that basis alone,

23   we would ask that the late claim for these two individuals be

24   denied because they're simply not even part of the ignition

25   switch, and there was no recall in 2014 that affected these

44

 1   vehicles.

 2           I would ask that you take judicial notice of the

 3   NHTSA website, and if Your Honor would like, I would be happy

 4   to provide screenshots of this vehicle information to you as a

 5   supplemental exhibit after the hearing.

 6           THE COURT:  Go ahead with your argument.

 7           MS. GOING:  Okay.  And just to kind of close the loop

 8   on the NHTSA website, the -- we have done that exercise with

 9   the information that we were able -- you know, that we had from

10   the proofs of claim, and that is how we were able to identify

11   any recall numbers, to the extent we were able, on the GUC

12   Trust exhibit that we submitted just to keep track of the 20

13   parties.

14           THE COURT:  Yeah, I just -- it's a minor thing, but

15   with respect to the amended GUC Trust exhibit that you provided

16   to the Court, let me find -- with respect to Ryan Dullen --

17           MS. GOING:  Yes.

18           THE COURT:  -- you list the date of the injury as

19   2014.  I think it's actually 2004.

20           MS. GOING:  Oh, apologies, your Honor.  I'll correct

21   that.

22           THE COURT:  I assume that's just a typo.

23           MS. GOING:  Yes.

24           THE COURT:  And I do have a question with respect to

25   Bertha Brown, the vehicle, a 2004 Chevrolet Classic Malibu.

45

1  Your exhibit lists the recall as 14V400, and for some reason we

2  thought it was actually 14V153.  Are you able to confirm

3  whether -- I may be wrong about it, but --

4          MS. GOING:  I -- we had thought based on the website

5  that it was 400.

6          THE COURT:  Okay.  All right.  Thank you.  All right.

7  Go ahead with your argument.

8          MS. GOING:  Okay.  So I also want to just briefly

9  address the number of plaintiffs we're talking about here

10 today, because when Andrews Myers first filed their brief in

11 support of the late claims back in March of 20 -- March 27th,

12 they identified 12 potential claimants, and it was on

13 April 20th, the day that our reply brief was actually due, that

14 Andrews Myers filed an additional document that listed eight

15 additional plaintiffs that were not part of their original

16 motion filing.  And two of those in particular, that is Salm

17 and Overcast, they had never been referenced before in any of

18 the pleadings that the Andrews Myers firm had filed.

19         THE COURT:  And as to those two, they've never filed

20 a proposed proof of claim.

21         MS. GOING:  That is correct.

22         THE COURT:  All right.  That I understand.

23         MS. GOING:  Okay.  Thank you, your Honor.

24         THE COURT:  Even to this day, they've never filed a

25 proposed proof of claim.

1          MS. GOING:  That is correct.  Right.  So while we

2   would ask that the -- those eight plaintiffs would be denied

3   the ability to file late claims on the basis that they didn't

4   comply with the January 28th of 2020 scheduling order, we're

5   prepared to, you know, argue holistically regarding all 20

6   because, regardless, we believe that the Pioneer standards

7   apply to all 20.

8          It doesn't matter if they are defined term "ignition

9   switch" or, you know, some other kind of non-ignition switch

10  claimant, and that's for the simple reason that anytime a party

11  is seeking to file a late claim, the excusable neglect standard

12  found in Bankruptcy Rule 9006 applies.  And both this Court and

13  the Second Circuit in Enron have found that you must apply the

14  excusable neglect standard when a party is seeking to file a

15  late claim.

16         Now, the burden of proving that excusable neglect

17  standard lies with the party seeking to file the late claim,

18  and as we all know, the Pioneer standard for excusable neglect

19  has four prongs: the danger of prejudice to the debtor; the

20  delay -- the length of delay and the potential impact on the

21  judicial proceedings; the reason for the delay, including

22  whether it was a reasonable -- within the reasonable control of

23  the movant; and whether the movant acted in good faith.

24         The Second Circuit has repeatedly focused primarily

25  on the reason for the delay, including whether it was in the

47

1   reasonable control of the movement -- movant.  So that is the

2   factor that I am going to address today.

3           And I want to draw the Court's attention to the

4   original Andrews Myers filing, the original motion they filed

5   back on July 28th of 2017, that's at Docket 14018.  And in that

6   original motion to file a late claim, Footnote 4 states:

7           "The movants prepared and signed their proofs of

8           claim while the appeal of the April 2015 decision was

9           pending to the Second Circuit.  Because such claims

10          were moot at the time they were prepared and barred

11          by this Court's late-filed claims order, in order to

12          preserve claimant and judicial resources, the movants

13          determined, in consultation with counsel to the GUC

14          Trust, not to file and seek allowance of these claims

15          until after the Second Circuit ruled on the mootness

16          issue."

17          Now, as your Honor knows, McDermott nor myself was

18  representing the GUC Trust at this time, but I've consulted

19  with my client and they don't have any memory of these

20  discussions.  But, more importantly, there's no stipulation or

21  agreement reflecting that the GUC Trust had agreed to any sort

22  of tolling or delay by these plaintiffs in seeking to file late

23  claims.

24          THE COURT:  Well, let me ask you this, Ms. Going.

25          MS. GOING:  Yes.

48

1          THE COURT:  As to the four claimants who have

2    specifically identified the 047 recall, it's Donato, Riley,

3    Stephenson, and Gillis.

4          MS. GOING:  Yes.

5          THE COURT:  Donato's motion for leave to file late

6    claim was September 20 -- September 19, 2017; Riley, the same

7    date; Stephenson, the same date; Gillis, December 12, 2017.

8          The Elliot decision was handed down on July 13, 2016.

9    The Supreme Court denied cert on April 24, 2017.  Elliott, and

10   Judge Gerber's decision before it, dealt with a due process

11   violation relating to the 047 recall.  So the decision doesn't

12   become final until April 24, 2017.  Should that be the relevant

13   date for the Court to determine whether late claims should be

14   filed?

15         So, you know, as to three of the now proposed

16   claimants, they filed their leave to file late claim on

17   September 19th, 2017.  Do I look at the gap period from

18   April 24, 2017, to September 19, 2017, in deciding whether to

19   permit late claims for those four?

20         I realize, and I think Ms. Norman agreed, that none

21   of her clients were subject to the tolling order that

22   Judge Gerber had entered.  But nevertheless Judge Gerber had

23   ruled due process violation equitably moot until the Second

24   Circuit vacates the equitable mootness ruling.  The game

25   arguably changed, but that doesn't become final until

49

1  April 24, 2017, when the Circuit Court denies cert.  So is that

2  the relevant gap period, April to September?

3         MS. GOING:  I don't believe it is, Your Honor.  And

4  for the primary reason that I think that would render

5  meaningless your December 12th, 2016, show cause order where

6  you required parties to file proposed late proofs of claim and

7  then file joinders to any of those motions.  And particularly

8  in the footnote that I just read to you, what I would point out

9  is what this footnote tells us is that these plaintiffs

10 actually, while they decided not to participate in the

11 bankruptcy proceeding, they had prepared proofs of claim.  They

12 just decided not to file them, and they apparently also just

13 decided not to comply with the show cause order, so --

14        THE COURT:  Ms. Norman says they didn't know about

15 it.

16        MS. NORMAN:  Yeah.  And I will tell you, your Honor,

17 that footnote --

18        THE COURT:  No.  I'll give you a chance to reply,

19 Ms. Norman.  Okay?

20        MS. NORMAN:  No problem.

21        THE COURT:  Let Ms. Going go on.  I'll give you a

22 chance.

23        Go ahead, Ms. Going.

24        MS. GOING:  And furthermore, Your Honor, I think in

25 starting the clock, so to speak, at the time that the Supreme

50

1   Court, you know, declined cert on the equitable mootness issue

2   is frankly a bit convoluted, right, in light of the fact that

3   we did have -- you had entered a show cause order.  You had

4   started a process for parties to come forward and file proposed

5   proofs of claim.  And then, you know, the notion that you could

6   argue, I didn't have to comply, or that order didn't apply to

7   me because I was waiting for some final order on it on truly a

8   tangential issue, right?  It did not prevent them from filing a

9   proof of claim.  It may have factored into whether or not they

10  wanted to spend the money because perhaps, you know, it weighed

11  on what they thought the likelihood of success would be.   But

12  nothing in a Second Circuit appeal or the cert was prohibitive

13  for any party to come forward in the Bankruptcy Court and file

14  that motion.

15          THE COURT:  Okay.  Go ahead.

16          MS. GOING:  Thank you, your Honor.  So we believe,

17  based on the timing here, that the relevant time of inquiry at

18  a minimum should start at the recall date because then they're

19  on notice of this recall.  But as you pointed out, Your Honor,

20  these are also personal injuries, so they were on actual notice

21  at the time of the accident.

22          So by starting the clock at the date of the recall,

23  we're actually being even more generous, right, because these

24  accidents occurred many, many years before the recall date.

25  But if we start at the recall date of 2014, and look at what

51

1  actions the plaintiffs did.  They really -- they sat on their

2  rights, and I think it's clear that this was a calculated

3  decision not to come forward and file proposed proofs of claim

4  because they thought the likelihood of success was low, but

5  that's not the standard.  The standard is that you have to come

6  forward and assert your rights, and the Court needs to look at

7  the reason for the delay, and it wasn't within the movant's

8  control.  Post-2014, there was nothing preventing them from

9  coming forward and asserting their rights.

10         And for that reason, we don't even think that there's

11  a distinction that should be made between the ignition switch

12  defined term "047 recall" and the non-ignition switch because

13  none of them can meet the _Pioneer_ standard, particularly on the

14  reason for the delay.

15         And I would further add that I think that there is a

16  good-faith element here that must be looked at because, as you

17  pointed out, the first motion to file a late claim is made

18  within days of the announcement that settlement discussions

19  have begun.  So again --

20         THE COURT:  I think 17 of these 20 were parties to

21  the proposed settlements.  Is that fair?

22         MS. GOING:  Yes.

23         THE COURT:  Okay.

24         MS. GOING:  Yes, it is, Your Honor.

25         THE COURT:  Go ahead.

52

1          MS. GOING:  And, again, these plaintiffs have the

2     burden of proving the excusable neglect.  They haven't met that

3     burden.  They have not even provided enough information for the

4     Court to understand what claims they're actually pursuing

5     because, you know, we are guessing here at what recalls they

6     are alleging in many of these.  We don't even have a vehicle,

7     make, or model.  So, in fact, they have never provided any

8     evidence that these vehicles and these claimants may actually

9     even fall within the 2014 recalls.

10          THE COURT:  That absence of details, is it your view

11    that that should figure into a Court's analysis of whether to,

12    in the exercises of discretion, to permit late claims to be

13    filed?  You have something they filed many years later, and it

14    doesn't provide you with enough details to know what kind of

15    car they had, whether it was subject to a recall, what the

16    circumstances of the accident or the injuries were.

17          MS. GOING: That's absolutely right, Your Honor,

18    because they were required to create a proposed proof of claim,

19    and this proposed proof of claim doesn't even provide the most

20    fundamental basic information to allow parties to -- you know,

21    we're not even talking about amounts, just understanding the

22    basis of the claim that they're asserting.

23          THE COURT:  Okay.  Anything else you want to add?

24          MS. GOING:  That's it, Your Honor.

25          THE COURT:  All right.  Does anybody else wish to be

53

1  heard in opposition to the motion to permit late claims by the

2  20 putative claimants?

3      MR. ZENSKY:  Yes, Your Honor.  David Zensky of Akin

4  Gump Strauss Hauer & Feld for the participating unitholders.

5  Can you hear me okay, Your Honor?

6      THE COURT:  Absolutely, Mr. Zensky.  I'm looking at

7  your fireplace behind you.

8      MR. ZENSKY:  Thank you.  It's a pleasure to see you,

9  Your Honor.  I will be brief.

10     As you know, our clients joined in the GUC Trust

11  opposition to the motions and supplements filed by Ms. Norman

12  on behalf of her clients, and that's at Docket 14273.

13     Let me just dive in and address the four claimants

14  that you've identified, Your Honor, that did allege in their

15  proposed proofs of claim that they had a car that was subject

16  to the 047 recall.

17     As you know, the GUC Trust papers have raised the

18  issue of whether there is really an extant due process ruling

19  with respect to that recall, but I'll assume that there is and

20  I think Your Honor has assumed as much as well.

21     Notwithstanding that, we think it is crystal clear as

22  a matter of law that Pioneer applies, notwithstanding a due

23  process violation.  The GUC Trust has been arguing that for

24  years, and Ms. Norman and her clients presumably are aware of

25  that, that that has been the GUC Trust position.

54

1      Your Honor, you ruled as much in your dealing with

2  Mr. Peller's clients, the Elliotts, with respect to the DDM

3  defect.  You said explicitly, I'll assume that there was a due

4  process violation with respect to that defect, and then you

5  went on to apply _Pioneer_, and Judge Furman affirmed to you just

6  last month.

7      So it seems undeniable, at least to me, Your Honor,

8  with all respect, that _Pioneer_ does apply.  We have argued that

9  _Pioneer_ puts the burden on the claimants to come forward with

10  evidence to support the four factors and that the factors cut

11  in the claimant's favor.  Ms. Norman quite rightly said this is

12  a fact- intensive inquiry, but today was the day for that fact-

13  intensive inquiry, not another hearing down the road.  And it

14  seemed obvious to me, Your Honor, that when you issued your

15  order last week setting today's hearing up as an evidentiary

16  hearing, it was very clear under Local Rule 9014 that you were

17  giving further notice that you expected evidence on these

18  issues.

19      If we arrive, as I believe we are, that the burden is

20  on the putative late claimant, the absence of evidence in the

21  record is really the beginning and end of Your Honor's

22  resolution of this.  It was not incumbent on the GUC Trust to

23  come forward with evidence to disprove excusable neglect.  It

24  was incumbent on Ms. Norman and her clients to come forward

25  with evidence to show that the delay was the product of

55

1   excusable neglect.

2        Ms. Norman has told you, and I fully credit it, that

3   she was first retained in July of 2017, and as Your Honor

4   pointed out, she filed her motion within a day of filing her

5   pro hac vice application.  But that doesn't stand as any

6   explanation, even if it was in the form of an affidavit, as to

7   what happened for the 13 years leading up to that.

8        As Your Honor pointed out, these are serious personal

9   injury cases where personal injury lawyers do an investigation,

10  but let's leave all that aside.  The recall notices went out in

11  2014.  It was an airbag defect that the ignition switch

12  shutting off resulted in, and the four claimants who say they

13  were -- had a car within that recall all say their airbag

14  didn't disclose.  So there has to be some evidence that shows

15  excusable neglect, why those four parties did not come to the

16  Bankruptcy Court to prosecute a late proof of claim.  And you

17  have no evidence before you by which you could find excusable

18  neglect.

19        I think that should be really the beginning and the

20  end of the decision, Your Honor.  None of the other plaintiffs

21  or potential plaintiffs have identified 047, and therefore,

22  there's not even a basis to evaluate whether there is or is not

23  a due process violation, but if the 047 -- if the four 047

24  plaintiffs can't get in the door, the same goes for the rest of

25  them.

56

1          THE COURT:  Thank you, Mr. Zensky.  Anything else you

2   want to add?

3          MR. ZENSKY:  I think that's it, Your Honor.

4          THE COURT:  All right.

5          MR. ZENSKY:  Thank you for your time.

6          THE COURT:  All right. Does anybody else wish to be

7   heard?

8          MR. WEISFELNER:  Your Honor, Ed Weisfelner of Brown

9   Rudnick, designated bankruptcy counsel for the economic loss

10  plaintiffs.

11         I want to start by acknowledging that we don't have a

12  dog in this hunt, and as a consequence, Your Honor may very

13  well decide you don't need to hear from me.  The only reason

14  I'm speaking up is I've invested an hour and a half into this

15  hearing, and I had a couple of observations if Your Honor

16  doesn't mind.

17         Your Honor, I'm concerned and I have a lot of

18  sympathy, not so much for Ms. Norman's plaintiffs, but for

19  Ms. Norman herself.  We worked pretty closely with her during a

20  couple of aborted efforts to get to a global resolution.  And I

21  am struck by the fact that once upon a time we had about 400

22  plaintiffs represented by ten different personal injury firms.

23  Ms. Norman herself told you that her 20 remaining clients got

24  notice of what was going on in the bankruptcy proceeding,

25  probably from Mr. Hilliard, who as Your Honor knows is one of

57

1  the plaintiff designated counsel in the class action

2  litigation.

3          I take some comfort in the fact that these 20

4  remaining plaintiffs had an opportunity to settle with

5  General Motors, and they had personal injury lawyers that were

6  representing them.  There is a reason, Your Honor, why

7  General Motors didn't settle with these folks, and I'd suggest

8  the reason they didn't settle with these folks is because GM

9  appreciated that, with the exception of the four plaintiffs

10 that have identified the 047 vehicles, the rest could not

11 justify the fact that the bar date came and went years before,

12 and that they were involved in accidents that should have put

13 them and their personal injury lawyers on notice and cause them

14 to discern whether or not there was any justification for

15 reopening the bar date.

16         I agree with Mr. Zensky that there is no possibility

17 for the other 16 plaintiffs to get through the door and believe

18 it's only possible for the four who claimed to have 047

19 vehicles.  And even they, Your Honor, I'd suggest, based on

20 everything I've heard and read, haven't met the Pioneer

21 factors.  That's really all I had.

22         THE COURT:  Thank you very much, Mr. Weisfelner.

23         Anybody else wish to be heard before I turn back to

24 Ms. Norman?

25         Ms. Norman.

58

1        MS. NORMAN:  Yes, Your Honor.  I wanted to address

2   some of the issues that Ms. Going raised.

3        With regard to the supplemental brief, I wanted to

4   make sure the record was clear.  When we filed our brief

5   initially, we had sent out and requested feedback as to who had

6   settled with GM and who had not.  And so we asked anyone that

7   was -- had not settled with New GM to let us know.  When we

8   filed our brief, it was based upon those that had identified

9   themselves at that time.  Everyone else we believed had

10  settled.

11       THE COURT:  Am I -- can you just -- am I correct that

12  it was their personal injury counsel who dealt with the

13  settlements with GM rather than you?

14       MS. NORMAN:  That is correct.

15       THE COURT:  All right.

16       MS. NORMAN:  Because there were ten different

17  personal injury firms involved, I saw that there would be an

18  inherent conflict if I had any  knowledge of what was going on

19  in the settlements, and so --

20       THE COURT:  No, I fully understand that.

21       MS. NORMAN:  Okay.  So when we were contacted and

22  told that there were some people who weren't able to finalize

23  settlements with GM, I informed personal injury counsel we had

24  already filed our brief and that I didn't know whether or not

25  we would -- whether or not you would even want to hear from

59

1  them, but that I would certainly supplement to make sure that

2  they were identified.  And so that's the -- that's how the

3  supplemental briefing issue --

4          THE COURT:  Yeah, look, I am concerned about the late

5  filings.  I've been very clear what the deadline for your

6  filing was.  You did comply with respect to a group of them,

7  and then you had two further filings trying to add more people.

8  So I -- and I understand the arguments about that.

9          MS. NORMAN:  Right.  With respect to the footnote, I

10  wanted to make sure the record is clear.  None of my claimants

11  had any proofs of claim prepared prior to retaining me.  I do

12  believe that that is the product of some cutting and pasting

13  from a motion that may have been filed from someone else, and

14  so while it is part -- while it is in my brief and I should

15  have caught it, I don't want the record to be unclear.

16          My plaintiffs did not have proofs of claim filed

17  before they retained me.  They did not prior to 2017.  Some of

18  them had not retained counsel prior to 2017.  And the

19  supplements to the late claims motion arose whenever additional

20  plaintiffs would contact personal injury counsel.  They were

21  informed that we do not know whether or not any of these late

22  claims will be allowed.  We've already filed a motion.  We will

23  supplement and put your name before the Court, but made fully

24  aware of what the deadlines were that had already passed.

25          As Mr. Weisfelner indicated, you know, General Motors

60

1 settled the majority of our claims, 370 of my 390.  So the last

2 20, respectfully, I've provided you everything that I have.  I

3 understand that it may be less than what you want, but

4 certainly we've provided everything to the Court we have at

5 this time.

6        THE COURT:  You know, part of my concern about that,

7 Ms. Norman, and I'm not going to review case law about it, but

8 even with timely filed proofs of claim where there's an

9 objection to the proof of claim that's filed by a debtor or a

10 successor committee, that the claim fails to state a claim,

11 I've held and there are other cases that apply the normal

12 federal pleading standards under Iqbal and its progeny.

13 Looking at these proofs of claim extremely generously, very few

14 -- very, very few set forth any facts from which a Court could

15 determine that they've stated a claim.

16        You know, when they haven't identified so many years

17 -- one of them was an accident in 2001.  Where they haven't

18 even identified the vehicle they owned or anything about the

19 accident, or what the alleged recall is, but you can't tell if

20 you don't know what the vehicle is.  I'm left to say, what is

21 there -- you know, in deciding whether to grant relief to file

22 late claims, has somebody shown some basis for having a claim?

23 So that's one of the things I look at and consider.

24        It may be with timely filed proofs of claim I may

25 give someone a chance to amend, but that's a different --

61

1  completely different circumstance where they have a timely

2  filed claim, there was an objection to it, and I'm asked to

3  determine whether there's sufficient grounds to allow it to go

4  forward.  Here, so many years after these alleged events, how

5  anybody would investigate, find the vehicle, probably

6  impossible at this stage.  Okay.

7         So I'm -- you know, I understand you're playing the

8  deck you were dealt, okay, but it's very hard when I look at

9  the 20.  Four of them, yes, I understand they say 047.  As to

10  the others, some of them have identified some other recalls,

11  but most of them don't have enough information to even tell

12  what vehicle, what recall, et cetera, any circumstances of the

13  accident, so I'm troubled by all that.

14         Anything else you want to --

15         MS. NORMAN:  No, I understand.  As you can see, the

16  information that we requested that they provide us with these

17  last 20, the information may not be as plentiful as some of the

18  others that we had, but these are the last remaining claims

19  that we have.

20         THE COURT:  Okay.  All right.  I'm going to take it

21  under submission.  You know, I'll try to decide reasonably

22  promptly.  I've got a bunch of other things on my plate, but

23  it's time for some certainty about what's going to happen going

24  forward.  And I appreciate you and the other counsel who have

25  appeared today to do this by Zoom.  A lot of the hearings I do

62

1  by telephone.  It was unclear to me, as Mr. Zensky pointed out.

2  I designated this as an evidentiary hearing.  I tried to draw

3  out whether there was going to be -- what direct evidence, any

4  cross-examine -- examination, et cetera.  It's one of the

5  reasons we did Zoom.  But it's -- I find it preferable in a

6  long hearing like this one to actually see the lawyers as well

7  as hear them over the telephone.  So I appreciate all of you

8  participating today.  The matter is deemed submitted, and we're

9  adjourned.  Thank you very much.

10         MS. NORMAN:  Thank you, Your Honor.

11         THE COURTROOM DEPUTY:  Judge?

12         THE COURT:  Yes.

13         THE COURTROOM DEPUTY:  Judge?  Hi, it's Deanna.

14  Could you make me host?  Somehow you got -- became host and my

15  host duties were taken away.

16         THE COURT:  All right.  Let me see if I can -- how to

17  do this.

18         THE COURTROOM DEPUTY:  Yeah, under participants I

19  think or --

20         THE COURT:  Okay.

21         THE COURTROOM DEPUTY:  -- up above.

22         THE COURT:  I will -- bear with me, Deanna.  Okay.

23  Let me find you.

24         THE COURTROOM DEPUTY:  Yeah, it should be

25  mg.chambers.

63

1          THE COURT:  Yeah.  Okay.  I'm making you the host.

2    You're it.

3          THE COURTROOM DEPUTY:  All right, perfect.  All

4    right.  I'll stop the recording now.  Thanks, Judge.

5          THE COURT:  Thank you very much, everybody.  We're

6    adjourned.

7          MS. NORMAN:  Thank you, Your Honor.

8       Proceedings concluded at 11:28 a.m.)

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2

3            I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, and to the best of my ability.

7

8

9    _____

10   LISA LUCIANO, AAERT NO. 327        DATE:  August 4, 2020

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15           **C E R T I F I C A T I O N**

16

17           I, Ilene Watson, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter, and to the best of my ability.

21

22

23   _____

24   ILENE WATSON, AAERT CET/CERT 447   DATE:  August 4, 2020

25   ACCESS TRANSCRIPTS, LLC