**MCDERMOTT WILL & EMERY LLP**
340 Madison Ave.
New York, New York 10173
Telephone: (212) 547-5429
Facsimile: (646) 417-7313
E-mail: kgoing@mwe.com
Kristin K. Going

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

**HEARING DATE AND TIME:** March 16, 2021
                                        @ 3:00 p.m. EDT

**OBJECTION DEADLINE:**        **March 9, 2021**
                                        **@ 4:00 p.m. EST**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                                    :
**In re**                                                           :         **Chapter 11 Case No.**
                                                                    :
                                                                    :         **09-50026 (MG)**
**MOTORS LIQUIDATION COMPANY,** *et al.,*                           :
**f/k/a General Motors Corp.,** *et al.*                            :         **(Jointly Administered)**
                                                                    :
                                    **Debtors.**                    :
-----------------------------------------------------------------x

NOTICE OF HEARING ON THE GUC TRUST ADMINISTRATOR'S MOTION
FOR AN ORDER AND FINAL DECREE PURSUANT TO BANKRUPTCY CODE
SECTION 350, BANKRUPTCY RULE 3022 AND LOCAL RULE 3022-1 (I) CLOSING
THE CHAPTER 11 CASE, (II) AUTHORIZING THE WIND-DOWN AND
DISSOLUTION OF THE GUC TRUST AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on March 2, 2021, Wilmington Trust

Company, solely in its capacity as trust administrator and trustee (in such capacity, the "**GUC**

**Trust Administrator**"[1]), of the Motors Liquidation Company GUC Trust (the "**GUC Trust**"),

formed by the above-captioned debtors (collectively, the "**Debtors**") in connection with the

Debtors' Second Amended Joint Chapter 11 Plan dated March 18, 2011, filed a motion (the

"**Motion**") for entry of an order and final decree (i) authorizing the wind-down and dissolution

of the GUC Trust, (ii) approving procedures for making a final distribution, (iii), authorizing

the termination of the Units, (iv) discharging and exculpating the GUC Trust Administrator,

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion
(defined below).

the GUC Trust Monitor and their respective employees and professionals, (v) authorizing the destruction of books and records, (vi) closing the Remaining Case, and (vii) terminating Epiq's engagement, and that a hearing (the "**Hearing**") on the Motion will be held before the Honorable Judge Martin Glenn, United States Bankruptcy Judge, in Room 523 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on **March 16, 2021 at 3:00 p.m. (Eastern Standard Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to this Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and served in accordance with General Order M-399 and on (i) McDermott Will & Emery LLP, attorneys for Wilmington Trust Company as GUC Trust Administrator, 340 Madison Avenue, New York, New York 10173 (Attn: Kristin K. Going, Esq.); (ii) FTI Consulting, as the GUC Trust Monitor, 3 Times Square, 11th Floor New York, NY 10036 (Attn: Conor Tully); and (iii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: William K. Harrington, Esq.), so as to be received no later than **March 9, 2021 at 4:00 p.m. (Eastern Standard Time)** (the "**Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that pursuant to the provisions of General Order M-543 ("**General Order M-543**"), dated March 20, 2020, the Hearing will be

conducted telephonically.  Any parties wishing to participate in the Hearing must make arrangements through CourtSolutions LLC.  Instructions to register for CourtSolutions LLC are attached to General Order M-543.

**PLEASE TAKE FURTHER NOTICE** that if no objections are timely filed and served with respect to the Motion, Wilmington Trust Company, acting in its capacity as GUC Trust Administrator may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  New York, New York
         March 2, 2021

McDERMOTT WILL & EMERY LLP

By:   _/s/  Kristin K. Going_____
       Kristin K. Going
       340 Madison Avenue
       New York, New York 10173
       Tel: (212) 547-5429
       E-mail: kgoing@mwe.com

       *Attorneys for the Motors Liquidation*
       *Company GUC Trust Administrator*

**MCDERMOTT WILL & EMERY LLP**
340 Madison Ave.
New York, New York 10173
Telephone: (212) 547-5429
Facsimile: (646) 417-7313
Kristin K. Going
Daniel Thomson
E-mail: kgoing@mwe.com
          dthomson@mwe.com

*Attorneys for the Motors Liquidation Company*
*GUC Trust Administrator*

<u>HEARING DATE AND TIME</u>: **March 16, 2021**
                                          **@ 3:00 p.m. EDT**

<u>OBJECTION DEADLINE</u>:      **March 9, 2021**
                                          **@ 4:00 p.m. EST**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re:**                                                        :    **Chapter 11**
                                                                  :
**MOTORS LIQUIDATION COMPANY,** *et al.,*                         :    **Case No. 09-50026 (MG)**
**f/k/a General Motors Corp.,** *et al.*                          :
                                                                  :    **(Jointly Administered)**
**Debtors.**                                                      :
                                                                  :
------------------------------------------------------------------x

## THE GUC TRUST ADMINISTRATOR'S MOTION FOR AN ORDER AND FINAL DECREE PURSUANT TO BANKRUPTCY CODE SECTION 350, BANKRUPTCY RULE 3022 AND LOCAL RULE 3022-1 (I) CLOSING THE CHAPTER 11 CASE, (II) AUTHORIZING THE WIND-DOWN AND DISSOLUTION OF THE GUC TRUST, AND (III) GRANTING RELATED RELIEF

Wilmington Trust Company, in its capacity as trust administrator and trustee of the

Motors Liquidation Company GUC Trust (the "<u>GUC Trust Administrator</u>," and such trust, the

"<u>GUC Trust</u>"), hereby files this motion (the "<u>Motion</u>")[1], pursuant to sections 105(a), 350(a), 544,

and 1142(b), of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 3020(d) and

3022 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 3022-1

---

[1] Capitalized terms used but not defined in this Motion have the definitions ascribed to such terms in the GUC Trust Agreement and Plan, as applicable.

of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), for

entry of an order and final decree (the "Order and Final Decree"), substantially in the form

attached hereto as **Exhibit A**, closing the Remaining Case (as defined below), authorizing the

wind-down and dissolution of the GUC Trust, and granting the related relief described herein.[2]

In support of this Motion, the GUC Trust Administrator submits the declaration of David A.

Vanaskey attached hereto as **Exhibit B**.  In further support, the GUC Trust Administrator

respectfully represents as follows:

### PRELIMINARY STATEMENT

Over twelve years ago, in the midst of what became known as the automotive industry

crisis, General Motors Corporation filed for bankruptcy.  The bankruptcy filing, which remains

one of the largest chapter 11 bankruptcy cases ever filed, contemplated a unique expedited sale

process supported by debtor-in-possession financing from the United States Treasury and the

government of Canada.  The consummation of the sale of substantially all General Motors

Corporation's assets in the first month of the bankruptcy case paved the way for the successful

revitalization of the automaker.

However, after the sale closed, the work in the chapter 11 bankruptcy case had just

begun.  Scheduled and filed claims against the bankrupt automaker totaled in excess of $220

billion, and Old GM still had to formulate and seek confirmation of the Plan.  Once the Plan was

confirmed, much of the remaining work shifted to the GUC Trust Administrator.

---

[2] The GUC Trust previously filed an application for a final decree closing all other associated cases [Docket No. 12361] along with a closing report pursuant to Local Rule 3022-1.  Final decrees for those cases were entered on April 18, 2013.

**BACKGROUND**

A.    **Case Background**

1.      On June 1, 2009, General Motors Corporation ("Old GM") and certain of its
affiliates (collectively, with Old GM, the "Debtors") filed for chapter 11 bankruptcy protection
in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy
Court" or "Court").  That same day, Old GM filed a sale motion seeking approval to sell
substantially all its assets pursuant to 11 U.S.C. § 363 to the entity now known as General Motors
Company ("New GM").

2.      On June 25, 2009, the Bankruptcy Court entered an order [Docket No. 2549]
approving the retention and employment of The Garden City Group as claims and noticing agent
for the Debtors.  The Garden City Group was subsequently acquired by Epiq, which continues to
maintain the Debtors' bankruptcy website and claims register.

3.      On July 5, 2009, an order [Docket No. 2968] was entered approving the sale of
substantially all of the Debtors' assets to New GM.  The sale closed July 10, 2009, and New GM
began operating in the automaker business.

4.      Following the sale, Old GM continued to operate as a debtor in possession in its
bankruptcy cases.  Old GM filed a motion to establish a bar date for all proofs of claim relating
to prepetition claims against Old GM, along with proposed procedures for providing notice of
the bar date.  The Court issued an order [Docket No. 4079] granting the bar date motion,
approving the form of notice, and establishing November 30, 2009 as the bar date for filing
unsecured claims.

5.      Thereafter, on March 29, 2011, the Bankruptcy Court confirmed the *Debtors'
Second Amended Joint Chapter 11 Plan* [Docket No. 9941-1] (the "Plan").  The Plan provided

for the creation of several post-confirmation trusts, including the GUC Trust and the Motors

Liquidation Company Avoidance Action Trust (the "AAT").  On March 31, 2011, the Plan

became effective [Docket No. 10055].

6.        On April 18, 2013, the Bankruptcy Court entered final decrees pursuant to

Bankruptcy Code section 350(a) closing the Debtors' chapter 11 cases, with the exception of

Case No. 09-50026, Motors Liquidation Company (the "Remaining Case"), which was to remain

open for the continued administration of the Debtors' estates and any potential matters pertaining

to the Debtors' cases that may arise.[3]

**B.**        **The GUC Trust**

7.        The GUC Trust was established pursuant to Article VI of the Plan.  Pursuant to

the *Amended and Restated Motors Liquidation Company GUC Trust Agreement* dated as of June

11, 2012 (as subsequently amended, the "GUC Trust Agreement"), Wilmington Trust Company

was named the GUC Trust Administrator.  The primary purposes of the GUC Trust are to resolve

Disputed General Unsecured Claims, distribute trust assets to GUC Trust Beneficiaries, and wind

down the estates of the dissolved Debtors, including through the resolution of the Residual

Wind-Down Claims.  In a private letter ruling, the IRS determined that, for tax purposes, the

GUC Trust constituted a Qualified Settlement Fund ("QSF") within the meaning of section

1.468B-1 of the Treasury Regulations.

8.        On the effective date of the Plan, the GUC Trust was vested with the authority

and the responsibility of resolving, at that time, approximately 4,460 disputed general unsecured

claims against the Debtors' estates.  In addition, upon the dissolution of the Debtors, the GUC

---

[3] *See, e.g.*, *Final Decree Pursuant to Section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022 Closing Certain of the Debtors' Chapter 11 Cases* [ECF No. 9], MLCS, LLC (f/k/a Saturn, LLC), Case No. 09-50027 (Apr. 18, 2013).

Trust assumed the additional responsibility of resolving 191 remaining disputed secured, administrative expense, and priority claims.

9.      The GUC Trust Agreement provided for an initial three year life, ending on March 31, 2014.  During those initial three years, the GUC Trust Administrator made substantial progress on the tasks and duties assigned to it.  Of the initial $8.2 billion in disputed general unsecured claims, only approximately $80.6 million in disputed claims remained.  By the spring of 2014, of the initial $232.7 million in disputed Residual Wind-Down Claims, only approximately $511,000 of such claims remained at the time of the initial proposed termination date of the GUC Trust.

10.     As of the date of this Motion, the GUC Trust Administrator has resolved all 191 disputed secured, administrative expense and priority claims that were transferred to the GUC Trust upon the dissolution of the Debtors, and all distributions on account of those claims have been made.

11.     Pursuant to the GUC Trust Agreement, holders of Disputed General Unsecured Claims and Term Loan Avoidance Action Claims become entitled to receive distributions of shares of common stock in General Motors Company ("New GM Common Stock") and warrants to purchase New GM Common Stock (together, with the New GM Common Stock, the "New GM Securities") from the GUC Trust if, and to the extent that, such Disputed General Unsecured Claims and/or Term Loan Avoidance Action Claims become Allowed General Unsecured Claims.

12.     In addition, under the Plan, each holder of an Allowed General Unsecured Claim retained a contingent right to receive, on a pro rata basis, additional reserved New GM Securities and cash, if any, to the extent such assets are not required for the satisfaction of previously

Disputed General Unsecured Claims or Term Loan Avoidance Action Claims.  The GUC Trust

issued units in respect of these contingent rights at a rate of one unit per $1,000 in amount of

Allowed General Unsecured Claim, subject to rounding under the GUC Trust Agreement.

13.    Beginning in December 2011, the GUC Trust Administrator, in consultation with

the GUC Trust Monitor, determined that the current and projected future administrative and

reporting costs associated with the GUC Trust substantially exceeded the wind-down cash

designated to pay these costs.  Accordingly, the GUC Trust Administrator (with the approval of

the GUC Trust Monitor) sought the Court's permission to liquidate a portion of the New GM

Securities for the purposes of funding GUC Trust cost overruns.  From 2011 to 2015, the Court

entered a series of orders authorizing the GUC Trust Administrator to liquidate New GM

Securities for the purposes of funding these administrative and reporting costs.

14.    On June 3, 2015, the GUC Trust Administrator filed a motion [Docket No. 13186]

seeking the Court's permission to exercise GUC Trust's holdings of warrants to purchase shares

of New GM Common Stock and to liquidate the GUC Trust's holdings of New GM Common

Stock (including the New GM Common Stock received from the exercise of the New GM

Warrants).  On July 2, 2015, the Court entered an order [Docket No. 13271] authorizing the

GUC Trust Administrator to convert some or all of the New GM Warrants in its possession into

shares of New GM Common Stock and to liquidate all, or substantially all, of the shares of New

GM Common Stock.  Subsequently, the GUC Trust Administrator liquidated all of the GUC

Trust's holdings of New GM Securities.  After August 2015, all future distributions on account

of Allowed Claims were paid solely in cash.  32,086,501 total Units have been issued.  The GUC

Trust has distributed $614,272,758.00 in cash to holders of Allowed General Unsecured Claims,

which amounts to a 30.7% recovery for such holders on account of their Allowed Claims.

15.    The GUC Trust Agreement provides in section 4.1 (Duration) that the GUC Trust

shall remain and continue in full force and effect until

> (x)    *the earlier of*:
>
> > (i)    the date on which (A) all of the GUC Trust Distributable Assets have been distributed by the GUC Trust Administrator in accordance with this Trust Agreement, the Plan, the Liquidation Order and the Confirmation Order, and (B) if the Residual Wind-Down Assets are transferred to the GUC Trust upon the dissolution of the Debtors, the GUC Trust Administrator has completed the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets; and
> >
> > (ii)    the third anniversary of the Effective Date,
> >
> > *or*
>
> (y)    such shorter or longer period authorized by the Bankruptcy Court upon application of the GUC Trust Administrator with the approval of the GUC Trust Monitor (I) in order to resolve all Disputed General Unsecured Claims, the Term Loan Avoidance Action and other Avoidance Actions, and (II) to complete the resolution of the Residual Wind-Down Claims and distribution of the Residual Wind-Down Assets.

16.    The Bankruptcy Court previously entered orders on February 6, 2014, January 29,

2015, December 7, 2015, February 21, 2017, March 6, 2018, and January 23, 2019 extending the

duration of the GUC Trust.  Pursuant to the most recent order [Docket No. 14401], the GUC

Trust is currently scheduled to terminate after March 31, 2021.

17.    The GUC Trust Agreement further provides in section 4.2 (Dissolution of the

GUC Trust) that, "[n]otwithstanding anything to the contrary in this Trust Agreement, in no

event shall the GUC Trust Administrator unduly prolong the duration of the GUC Trust, and the

GUC Trust Administrator shall, in the exercise of its reasonable business judgment and in the

interests of all GUC Trust Beneficiaries, at all times endeavor to terminate the GUC Trust as

soon as practicable in accordance with the purposes and provisions of this Trust Agreement and the Plan."

18.    As of the date hereof, the GUC Trust has made the distributions required under the Plan and GUC Trust Agreement with the exception of (i) repayment of amounts owing to the DIP lenders[4] and (ii) one final "clean-up" distribution (the "Final Distribution"), which the GUC Trust Administrator expects to make following the Bankruptcy Court's entry of the Order and Final Decree.  For reasons that will be discussed below, the GUC Trust Administrator is requesting approval of special procedures for making the Final Distribution.

## C.    The Avoidance Action Trust

19.    The AAT was created to prosecute and then distribute the proceeds of the avoidance action styled *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. et al.*, Adv. Pro. No. 09-00504 (the "Term Loan Avoidance Action").  The AAT is governed by the *Fourth Amended and Restated Motors Liquidation Company Avoidance Action Trust Agreement*, dated February 25, 2019 (the "AAT Agreement").

20.    The Term Loan Avoidance Action was commenced by the official committee of unsecured creditors in the Debtors' chapter 11 cases against JPMorgan Chase Bank, N.A., individually and as administrative agent, and various lenders party to a term loan agreement, dated as of November 29, 2006, between Old GM, as borrower, JPMorgan Chase Bank, N.A., as agent, and various institutions as lenders.

21.    After years of litigation, the AAT successfully resolved the Term Loan Avoidance Action by entering into a settlement agreement with the defendants to that action that resolved all

---

[4] Pursuant to the Plan and GUC Trust Agreement, certain segregated funds shall be returned to the DIP Lenders "after the affairs of the GUC Trust have been finally wound up and concluded."  See, Section 2.6(e) of the GUC Trust Agreement.  The GUC Trust Administrator has conferred with the DIP Lenders regarding the amount to be returned upon the closing of the case, and shall return these funds to the DIP Lender on or about March 31, 2021.

pending claims and cross-claims among the parties to the Term Loan Avoidance Action (the "AAT Settlement"). Pursuant to the AAT Settlement, the Avoidance Action Trust received a $231 million settlement payment in exchange for dismissing with prejudice the Term Loan Avoidance Action and releasing any potential claims against the defendants and certain other entities.

22.    On May 13, 2019, the AAT filed a motion [Docket No. 14505] with the Bankruptcy Court seeking approval of the AAT Settlement. A hearing on that motion was held on June 12, 2019, during which the Bankruptcy Court approved the AAT Settlement from the bench for the reasons stated on the record. The following day, the Bankruptcy Court entered an order [Docket No. 14530] granting the AAT's motion.

23.    On July 8, 2019, the AAT filed a motion [Docket No. 14552] with the Bankruptcy Court seeking approval to distribute the proceeds of the AAT Settlement to the AAT's beneficiaries (the "AAT Distribution Motion"). On April 24, 2020, the Bankruptcy Court entered an order [Docket No. 14731] granting the AAT Distribution Motion.

24.    The AAT is in the process of making final distributions to its beneficiaries in accordance with the terms of the Plan and AAT Agreement and will file its own motion seeking to wind down that trust.

**D.    The Recall Litigation**

25.    By 2014, the GUC Trust was approaching its initial estimated termination date. The GUC Trust Administrator had performed a significant portion of the claims resolution process, along with its other responsibilities set forth in the GUC Trust Agreement. However, in February 2014, New GM announced recalls of certain GM vehicles due to a defect in their ignition switches. After the initial recalls, New GM issued dozens more recalls relating to the

-9-

faulty ignition switches and various other defects.  These recalled vehicles included both vehicles

manufactured prior to the Old GM bankruptcy filing and after the Old GM bankruptcy filing.  In

response to the recalls, numerous class-action lawsuits and thousands of individual lawsuits were

filed against New GM, claiming the defects caused wrongful death, personal injuries, property

damage, and economic losses.  The cases were transferred to Judge Jesse M. Furman in the

United States District Court for the Southern District of New York (the "District Court") for

pretrial proceedings under the case *In re General Motors LLC Ignition Switch Litigation*, Case

No. 14-MD-2543 (JMF) (the "MDL").[5]

26.    In addition to seeking relief from New GM in the District Court, certain personal

injury and wrongful death plaintiffs (the "PIWD Plaintiffs") and certain economic loss plaintiffs

(the "Economic Loss Plaintiffs") also sought to file late proofs of claim against Old GM in the

Bankruptcy Court, alleging damages in excess of $76 billion.  Significant and contentious

litigation ensued for six years between the PIWD Plaintiffs, the Economic Loss Plaintiffs, the

GUC Trust, and New GM.  While the recall litigation continued, the GUC Trust resolved all

other unsecured claims against the Old GM bankruptcy estate.

27.    By early 2020, the majority of the PIWD Plaintiffs had settled their claims with

New GM.  On April 20, 2020, the GUC Trust filed an omnibus objection [Docket No. 14724]

requesting that the remaining PIWD Plaintiffs' claims be denied, and on August 8, 2020, the

Bankruptcy Court entered an order [Docket No. 14774] denying the remaining PIWD Plaintiffs'

claims.

28.    With respect to the Economic Loss Plaintiffs, a settlement was reached in the

spring of 2020 between the GUC Trust, New GM, and the Economic Loss Plaintiffs that would

---

[5] Pleadings and orders in the MDL are cited as [MDL Docket No. ##].

finally resolve the longstanding litigation between the parties in both the Bankruptcy Court and
District Court.  Under the terms of the settlement, the GUC Trust paid a total of $50 million to
resolve all litigation involving the Economic Loss Plaintiffs.  To facilitate the settlement, the
parties withdrew the reference with regard to the actions filed or asserted in the Bankruptcy
Court and requested certification of a settlement class under Rule 23 of the Federal Rules of
Civil Procedure.

29.     On April 27, 2020, following a joint hearing before the Bankruptcy Court and
District Court, the District Court entered an order [MDL Docket No. 7877], which, among other
things, preliminarily approved the settlement and directed the settlement parties to provide notice
to prospective class members.  After the settlement was preliminarily approved, the settlement
agreement was amended to include the AAT (as amended, the "Global Settlement"), which
would bring complete resolution of all disputes concerning the Economic Loss Plaintiffs' claims.

30.     On December 18, 2020, the District Court conducted a hearing (the "Fairness
Hearing") to consider, among other things, (i) whether the terms and conditions of the Global
Settlement were fair, reasonable, and adequate and should be approved, (ii) whether the proposed
class and subclasses should be finally certified for settlement purposes, and (iii) whether a final
judgment should be entered dismissing the Economic Loss Claimants' actions with prejudice.
Following the Fairness Hearing, the District Court entered an order [MDL Docket No. 8306]
certifying the settlement class and approving the Global Settlement on a final basis.  On or about
February 17, 2021, the GUC Trust Administrator made the final $48 million settlement payment,
thereby resolving all remaining claims against the Debtors' estates and effectively bringing this
case to its long-awaited conclusion.

## JURISDICTION

31.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)

and 1334(b), paragraph II of the order dated as of March 29, 2011 confirming the Plan [ECF No.

9941], Article XI of the Plan, and Sections 4.1 and 6.1 of the GUC Trust Agreement.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409.

## REQUESTED RELIEF

32.     By this Motion, the GUC Trust Administrator seeks entry of the Order and Final

Decree, substantially in the form attached hereto as **Exhibit A**:

      (i)     Authorizing the wind-down and dissolution of the GUC Trust;

      (ii)    Approving procedures for making the Final Distribution;

      (iii)   Authorizing the termination of the Units;

      (iv)   Discharging and exculpating the GUC Trust Administrator, the GUC Trust

            Monitor, and their respective employees and professionals;

      (v)    Authorizing the destruction of the books and records;

      (vi)   Closing the Remaining Case; and

      (vii)  Terminating Epiq's engagement.

## BASIS FOR REQUESTED RELIEF

33.     This Court has authority to enter the Order and Final Decree authorizing the relief

requested herein pursuant to the terms of the Plan and GUC Trust Agreement, Bankruptcy Code

sections 105(a), 350(a), 544, and 1142(b) and Bankruptcy Rules 3020(d) and 3022.

34.     Section 11.1 of the Plan provides that the Court shall retain "exclusive jurisdiction

of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan

-12-

pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes: . . . (i) To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the GUC Trust, . . . the GUC Trust Agreement, . . . any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing . . . ."

35.    Section 13.3 of the GUC Trust Agreement further provides that "the Bankruptcy Court shall have exclusive and continuing jurisdiction over the GUC Trust and the GUC Trust Administrator, including the administration and activities of the GUC Trust and the GUC Trust Administrator . . . ."

36.    In addition, both the Bankruptcy Code and the Bankruptcy Rules provide that the Court may issue any order necessary to consummate the transactions contemplated under the Plan.  Specifically, section 1142(b) gives the Court authority to direct any party "to perform any [act] . . . that is necessary for the consummation of the plan."  11 U.S.C. §1142(b); *see also Hosp. & Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re JohnsManville Corp.)*, 7 F.3d 32, 34 (2d Cir. 1993) (finding that bankruptcy courts retain postconfirmation jurisdiction in chapter 11 proceedings to the extent provided by the plan).  Similarly, Bankruptcy Rule 3020(d) provides that, "[n]otwithstanding entry of the order of confirmation, the court may issue any other order necessary to administer the estate."  Finally, the Court also has inherent powers under Bankruptcy Code section 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

A.    **Wind-Down and Dissolution of the GUC Trust**

37.    First, the GUC Trust Administrator requests that the Court authorize the wind-down and dissolution of the GUC Trust.

-13-

38.     Section 4.1 of the GUC Trust Agreement provides that the GUC Trust is to

remain in existence until (1) all "Disputed General Unsecured Claims," "the Term Loan

Avoidance Action," "other Avoidance Actions," and the "Residual Wind-Down Claims"[6] have

been resolved and all "Residual Wind-Down Assets"[7] have been distributed.  As of the date

hereof, all such claims have been resolved.  The only assets of the GUC Trust that have not yet

been distributed are those assets that will be distributed as part of the Final Distribution shortly

after entry of the Order and Final Decree, and prior to March 31, 2021.

39.     Section 4.2 of the GUC Trust Agreement further instructs the GUC Trust

Administrator not to "unduly prolong the duration of the GUC Trust" and to "at all times

endeavor to terminate the GUC Trust as soon as practicable."

40.     In accordance with the Court's prior order, the GUC Trust is scheduled to

terminate on March 31, 2021.  However, because the purposes of the GUC Trust under the Plan

and GUC Trust Agreement have been achieved, the GUC Trust Administrator believes that there

is no sound business purpose for the GUC Trust remaining in existence.  Moreover, the GUC

Trust Administrator believes that allowing the GUC Trust to remain in existence longer than

necessary would contravene the GUC Trust Agreement's directive to terminate the trust as

quickly as is practicable.

41.     Following entry of the Order and Final Decree, the GUC Trust Administrator will

make the Final Distribution, close the GUC Trust's bank accounts, destroy the GUC Trust's

---

[6] Defined in section 1.1(aaaa) of the GUC Trust Agreement as "the Administrative Expenses (but not including DIP
Credit Agreement Claims and any claims related thereto), Priority Tax Claims, Priority Non-Tax Claims, and
Secured Claims (in each case whether Allowed or Disputed) remaining at such time as the Residual Wind-Down
Assets are transferred to the GUC Trust pursuant to Section 2.7 of this Trust Agreement."

[7] Defined in section 1.118 of the Plan as "the Cash necessary to fund the resolution of Administrative Expenses,
Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, and the Cash reserved to pay such
Administrative Expenses and Claims."

books and records, complete the tax reporting for payments made in 2021, file any required tax

returns, comply with an IRS audit (if any), acquire a tail insurance policy, and pay the fees of

professionals for services rendered in winding down the trust (collectively, the "Remaining

Tasks").  Once the Remaining Tasks have been completed, the GUC Trust Administrator will

terminate the GUC Trust in accordance with section 3808 of the Delaware Act governing the

termination and dissolution of Delaware statutory trusts.

42.     Following entry of the Order and Final Decree, the GUC Trust will likewise cease

to qualify as a Qualified Settlement Fund.  There are, essentially, three tax-related requirements

that allow a QSF to terminate per the applicable IRS regulations—the QSF (1) no longer has any

assets, (2) will not receive any more transfers, and (3) the court's continuing jurisdiction has

ceased.  Following the Final Distribution, all GUC Trust Assets will have been fully disbursed to

the GUC Trust Beneficiaries.  Moreover, all GUC Trust Assets have already been transferred to

the GUC Trust, and the GUC Trust is entitled to no further transfers under the Plan.  Finally, the

Court's jurisdiction will cease upon the closing of the Remaining Case and the dissolution of the

GUC Trust.

43.     Because the GUC Trust has fulfilled its purposes under the Plan and GUC Trust

Agreement, the GUC Trust Administrator requests that the Court enter the Order and Final

Decree authorizing the wind-down and dissolution of the GUC Trust.

**B.**     **Procedures for Making the Final Distribution**

44.     The GUC Trust Administrator further requests that the Court approve the GUC

Trust Administrator's proposed procedures for effectuating the Final Distribution (the "Final

Distribution Procedures").  The Final Distribution Procedures are necessary to provide a

distribution to Allowed Claimholders that have never received a distribution on account of their

Allowed Claims, and never took possession of the Units they were entitled to under the terms of the Plan and GUC Trust Agreement.

45.     Approximately 474 of the GUC Trust Beneficiaries have not claimed their respective Units.  Consequently, as of the date hereof, the GUC Trust continues to hold 8,968 Units (the "<u>Unclaimed Units</u>").

46.     In anticipation of making the Final Distribution, the GUC Trust Administrator sent a letter (the "<u>Final Notice Letter</u>") to the parties entitled to the Unclaimed Units notifying them that the GUC Trust is being wound down and requiring them to respond to the Final Notice Letter by February 22, 2021.  As of that date, 153 beneficiaries (the "<u>Responding Beneficiaries</u>") responded to the Final Notice Letter and notified the GUC Trust Administrator that they were unable to comply with the procedures for claiming their Units.  The remaining beneficiaries (the "<u>Non-Responding Beneficiaries</u>") have never contacted the GUC Trust regarding their Units.

47.     Pursuant to the GUC Trust Agreement, holders of disputed general unsecured claims become entitled to receive distributions of cash from the GUC Trust if, and to the extent that, such disputed general unsecured claims are resolved and become allowed claims. Specifically, Section 5.3 of the GUC Trust Agreement provides:

> As promptly as practicable following the beginning of each calendar quarter . . . the GUC Trust Administrator, with the approval of the GUC Trust Monitor, shall deliver to each holder, if any, of a Disputed General Unsecured Claim[8] or other Claim that has become a Resolved Allowed General Unsecured Claim[9] during the prior calendar quarter . . . a distribution consisting of: (i) the pro rata amount of GUC Trust Distributable Assets that the holder of such Resolved Allowed General Unsecured Claim would have received had such Resolved Allowed General

---

[8] "Disputed General Unsecured Claim" is defined by the GUC Trust Agreement as unsecured claims against the Debtors that are Disputed as of the Initial Distribution Record Date in accordance with the claims resolution procedures administered under the Plan.

[9] "Resolved Allowed General Unsecured Claim" is defined by the GUC Trust Agreement as Claims (a) to the extent and in the amount collected by the Avoidance Action Trust against the respective defendants in the Term Loan Avoidance Action, and (b) Other Avoidance Action Claims, to the extent and in the amount collected against the respective defendants in the underlying litigation.

Unsecured Claim been an Initial Allowed General Unsecured Claim, including the aggregate amount of Excess GUC Trust Distributable Assets that the holder would have received had it been the holder of Units . . . on each Excess Distribution Record Date . . . .; and (ii) a number of Units as provided [elsewhere in the GUC Trust Agreement].

GUC Trust Agreement § 5.3(a).

48.    Thus, the Responding Beneficiaries are entitled to a cash distribution of a value sufficient to bring their recovery in line with all other Unitholders, and they are also entitled to Units in order to participate in any future distributions.

49.    However, given that the GUC Trust is at the end of its life and will only be making one more distribution, estimated to total less than $10 million, the Responding Beneficiaries would only receive a de minimis distribution on account of their Units.

50.    Therefore, the GUC Trust Administrator proposes sending the Responding Beneficiaries only their cash distribution and then cancelling the Units they would have otherwise been entitled to receive prior to making the Final Distribution.

51.    Section 3.3(a) of the GUC Trust Agreement governs the procedures that must be complied with in order for a holder of an allowed general unsecured claim to receive a distribution from the GUC Trust.  One such requirement is that "holders of Allowed General Unsecured Claims must designate a direct or indirect participant in DTC with whom such holder has an account."  Due to the minimal value of their Units, the Responding Beneficiaries have been unable to comply with the DTC designee requirement.  Accordingly, the GUC Trust Administrator proposes to cancel the Responding Beneficiaries' Units, but still provide them with the cash distribution they would have otherwise been entitled to receive.  Following the cash distribution, the Responding Beneficiaries will be entitled to no further distributions.

52.    Section 5.8 of the GUC Trust Agreement governs distributions that are not in compliance with the aforementioned procedures.  That section provides:

[I]n the event that the GUC Trust Administrator determines in good faith that it is necessary or desirable in order to carry out the intent and purposes of the Plan, the Confirmation Order, the Liquidation Order and this Trust Agreement to receive any assets or make any distribution in a manner that is not in technical compliance with this Trust Agreement, the GUC Trust Administrator shall be permitted to receive assets or make, or cause to be made, distributions in such manner, but only with the approval of the GUC Trust Monitor; *provided, however*, that no such distribution shall result in any holder of an Allowed General Unsecured Claim receiving a distribution in excess of the distribution that such holder would have received had such claim been an Initial Allowed General Unsecured Claim or shall unfairly discriminate among the holders of Units. Except as aforesaid or as otherwise provided in the Plan, the Confirmation Order, the Liquidation Order or this Trust Agreement, no payment or distribution out of the GUC Trust Assets shall be made to, or on behalf of, a GUC Trust Beneficiary or any other person except in strict accordance with the terms of this Trust Agreement, the Plan, the Liquidation Order and the Confirmation Order, unless such payment or distribution shall have been approved by the Bankruptcy Court.

53.    The GUC Trust Administrator has determined in good faith that cancelling the Responding Beneficiaries' Units and providing them with only the cash component of their distribution is appropriate.  This alternative is more favorable and consistent with the purposes of the Plan and the GUC Trust Agreement than the alternative, which would be to have the Responding Beneficiaries forfeit their entire distribution.  Accordingly, the GUC Trust Administrator submits that the Court should approve these alternative procedures.

54.    With respect to the Non-Responding Beneficiaries, the GUC Trust intends to cancel their Units and redistribute the amounts that would have been paid on account of those Units to those GUC Trust Beneficiaries that have complied with the procedures for claiming their Units.  Section 3.3(b) of the GUC Trust Agreement provides "that if a holder [of an Allowed General Unsecured Claim] has not complied with the requirements of Section 3.3(a) prior to the final Distribution Date, then (i) the Units otherwise distributable to such holder or holders *shall be deemed cancelled and not outstanding*, and (ii) the GUC Trust Distributable Assets otherwise distributable to such holders . . ., including in respect of Units otherwise

distributable to such holder, *shall be distributed pro rata to all holders of Units then outstanding on the final Distribution Date*."  GUC Trust Agreement § 3.3(b) (emphasis added).

55.      As mentioned, the GUC Trust Administrator provided a Final Notice Letter to the beneficiaries entitled to the Unclaimed Units.  With respect to the Non-Responding Beneficiaries, the GUC Trust Administrator intends to cancel their Unclaimed Units.  These Final Distribution Procedures with respect to Non-Responding Beneficiaries are consistent with the requirements of section 3.3(b) for distributing the remaining GUC Trust assets.

56.      The GUC Trust Administrator requests that the Court approve these Final Distribution Procedures so that all Allowed Claimholders can receive a recovery on account of their Allowed Claim, and the remaining value held by the GUC Trust can be distributed to the appropriate parties as contemplated by the Plan and GUC Trust Agreement.

57.      Furthermore, after making the Final Distribution, there will be no further distributions on account of the Units and the GUC Trust Administrator submits that cancelling the Units is appropriate in order to avoid and confusion or inconsistency in the marketplace. Thus, the GUC Trust Administrator seeks the Court's approval to instruct the Depository Trust Company to delist the Units after delivery of the Final Distribution.

**C.      Discharge and Release of the GUC Trust Administrator, the GUC Trust Monitor, and Related Parties**

58.      Under the Plan and the GUC Trust Agreement, the GUC Trust is responsible for, *inter alia*, resolving disputed claims, making distributions to the GUC Trust's beneficiaries, and not unduly prolonging the duration of the Liquidation Trust.  *See* Plan § 6.2(b), GUC Trust Agreement §§ 2.2 and 4.2.  The GUC Trust Monitor is charged with "oversee[ing] the activities of the GUC Trust Administrator as set forth in the GUC Trust Agreement."  Plan § 6.2(f).

59.     The GUC Trust Administrator and GUC Trust Monitor have fulfilled their respective duties.  All claims against the GUC Trust have been resolved and all assets have been distributed or, with respect to the Final Distribution, will be distributed shortly after entry of the Order and Final Decree.  As such, the GUC Trust Administrator submits that it is proper for the Court to release and discharge the GUC Trust Administrator and GUC Trust Monitor of their duties and obligations under the Plan and GUC Trust Agreement, with the exception of those limited remaining duties and obligations related to the Remaining Tasks.

60.     Further, section 12.6 of the Plan provides that, to the maximum extent permitted by law, neither the GUC Trust Administrator, the GUC Trust Monitor, nor any of their respective members, officers, directors, employees counsel, advisors, professionals, or agents (collectively, the "Related Parties"), shall have or incur any liability to any holder of a claim or interest for any act or omission in connection with, related to, or arising out of the Debtors' chapter 11 cases or the GUC Trust Agreement (with the exception of actions found to be willful misconduct, gross negligence, fraud, malpractice, criminal conduct, unauthorized use of confidential information that causes damages, breach of fiduciary duty, and *ultra vires* acts).  *See* Plan § 12.6.

61.     Section 9.4 of the GUC Trust Agreement similarly provides that the GUC Trust Administrator and Related Parties shall be exculpated by all persons from any and all claims, causes of action and other assertions of liability arising out of the discharge of their respective powers and duties conferred by the Plan, the Confirmation Order, the Liquidation Order, the GUC Trust Agreement, or any order of the Bankruptcy Court (subject to the same limitations as section 12.6 of the Plan).  *See* GUC Trust Agreement § 9.4.

62.     Accordingly, the GUC Trust Administrator requests that the Order and Final Decree expressly discharge and release the GUC Trust Administrator, the GUC Trust Monitor,

and the Related Parties from all liability related to the GUC Trust and the Debtors' chapter 11

cases, subject to the limitations in section 12.6 of the Plan and section 9.4 of the GUC Trust

Agreement.

**D.    Destruction of Books and Records**

63.    Section 4.3 of the GUC Trust Agreement provides:

> The GUC Trust Administrator shall retain the books, records and files that shall
> have been delivered to or created by the GUC Trust Administrator until distribution
> of all the GUC Trust Assets and the resolution of the Residual Wind-Down Claims
> and distribution of the Residual Wind-Down Assets.   At the GUC Trust
> Administrator's discretion, all of such records and documents may be destroyed at
> any time following the later of (x) final distribution of the GUC Trust Assets and
> completion of the resolution of the Residual Wind-Down Claims and distribution
> of the Residual Wind-Down Assets, if applicable, unless such records and
> documents are necessary to fulfill the GUC Trust Administrator's obligations
> pursuant to Articles VI and VIII hereof and subject to any joint prosecution and
> common interests agreement(s) to which the GUC Trust Administrator may be
> party, and (y) the date until which the GUC Trust Administrator is required by
> applicable law to retain such records and documents.

64.    Bankruptcy Code section 554(a) provides that "[a]fter notice and a hearing, the

trustee may abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).

65.    Because the books and records are no longer necessary to winding up the

Remaining Case, the Plan has been substantially consummated, and the GUC Trust has been

fully administered, the books and records are simply of no value, and the GUC Trust should not

be required to incur any further costs associated with maintaining and storing the books and

records—an asset with no value.  The GUC Trust Administrator has therefore determined, in its

discretion, that that books and records should be destroyed, as authorized under Section 4.3 of

the GUC Trust Agreement.  Accordingly, the GUC Trust Administrator submits that the relief

requested herein with respect to the Debtors' books and records is necessary, prudent and in the

best interests of the Debtors' estates, and should therefore be granted.

E.    **Final Decree Closing the Remaining Case**

66.    Section 6.2(q) of the Plan provides:

When all Disputed Claims (other than Asbestos Personal Injury Claims and Property Environmental Claims) filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, all of the GUC Trust Assets and all Avoidance Action Trust Assets, if applicable, have been distributed in accordance with the Plan, and all Allowed Administrative Expenses (other than the DIP Credit Agreement Claims), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims have been satisfied in accordance with the Plan, the GUC Trust Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. Notice of such application shall be given electronically, to the extent practicable, to those parties who have filed requests for notices and whose electronic addresses remain current and operating.

67.    As of the date hereof, all claims against the Avoidance Action Trust and GUC Trust have been resolved and the GUC Trust's assets have been fully distributed (with the exception of the Final Distribution described above).  Accordingly, as provided in section 6.2(q) of the Plan, the GUC Trust Administrator brings this Motion seeking to close the Remaining Case in accordance with the applicable Bankruptcy Code provisions and Bankruptcy Rules.

68.    Bankruptcy Code section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case."  11 U.S.C. § 350(a).  Bankruptcy Rule 3022, which implements section 350, provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case."  Fed. R. Bankr. P. 3022.

69.    The Bankruptcy Code does not define "fully administered."  Courts, however, have looked to the following factors in deciding whether a final decree shall be issued:

(i)    Whether the order confirming the plan has become final;

(ii)    Whether deposits required by the plan have been distributed;

(iii)    Whether the property proposed by the plan to be transferred has been transferred;

-22-

(iv)    Whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan;

(v)    Whether payments under the plan have been commenced; and

(vi)    Whether all motions, contested matters, and adversary proceedings have been finally resolved.

1991 Advisory Comm. Note to Fed. R. Bankr. P. 3022 (the "Advisory Committee Note").

70.    Courts in the Second Circuit and elsewhere apply the factors set forth by the Advisory Committee Note. *See, e.g.*, *In re IDC Servs., Inc.*, No. 93 B 45992 (SMB), 1998 WL 547085, at *3 (S.D.N.Y. Aug. 28, 1998); *In re Gates Comm. Chapel of Rochester, Inc.*, 212 B.R. 220, 224 (Bankr. W.D.N.Y. 1997).

71.    Although courts should apply and weigh the factors, no one factor is dispositive. *See In re Kliegel Bros.*, 238 B.R. 531, 542 (Bankr. E.D.N.Y. 1999); *In re JMP-Newcor Int'l*, 225 B.R. 462, 465 (Bankr. N.D. Ill. 1998). Rather, the six factors act as mere guidelines to aid a court in its determination. *Kliegel Bros*, 238 B.R. at 541-42 ("The factors set forth in the [Advisory Committee] Note are plainly an aid or checklist that serves to insure that there is no unfinished business before the Court or in the case."); *In re Mold Makers, Inc.*, 124 B.R. 766, 768–69 (Bankr. N.D. Ill. 1990) ("all of the factors in the Committee Note need not be present before the Court will enter a final decree").

72.    In addition to the Advisory Committee Note factors, courts have considered whether the plan of reorganization has been substantially consummated. *See, e.g.*, *Gates Cmty., Chapter of Rochester*, 212 B.R. 220, 224 (Bankr. W.D.N.Y. 1997) ("[S]everal courts have concluded that a Chapter 11 case should be considered 'fully administered' when it reaches the point of substantial consummation as defined in Section 1101(2)") (citations omitted); *Walnut Assocs. v. Saidel*, 164 B.R. 487, 493 (E.D. Pa. 1994) (same).

73.     Both this Court and Judge Gerber previously found that the Plan has been

substantially consummated.  *Morgenstein v. Motors Liquidation Co. (In re Motors Liquidation*

*Co.)*, 462 B.R. 494, 501 n. 36 (Bankr. S.D.N.Y. 2012) (Gerber, J.) ("[T]he Plan already has been

substantially consummated."), *aff'd* 12-cv-01746-AJN, ECF No. 21, 2012 U.S. Dist. LEXIS

190892 (S.D.N.Y. Aug. 9, 2012); *In re Motors Liquidation Co.*, 598 B.R. 744, 759 (Bankr.

S.D.N.Y. 2019) (Glenn, J.) (noting the Debtors have "confirmed a chapter 11 plan of

reorganization, and substantially consummated that plan").

74.     Ultimately, courts have wide discretion in determining whether to close a chapter

11 case and "Bankruptcy Rule 3022 is intended to allow bankruptcy courts flexibility in

determining whether an estate is fully administered."  *In re Federated Dep't Stores, Inc.*, 43 F.

App'x 820, 823 (6th Cir. 2002) (affirming issuance of final decree despite outstanding litigation

of claims that could take many years to resolve); *see In re Shotkoski*, 420 B.R. 479, 483 (B.A.P.

8th Cir. 2009) ("[W]e believe that the decision as to whether an estate is 'fully administered' is

one that falls within the discretion of the bankruptcy judge."); *see also In re Johnson*, 402 B.R.

851, 856 (Bankr. N.D. Ind. 2009) (holding that the decision to close a case calls for a "flexible,

case-by-case evaluation" weighing the costs and benefits).

75.     In this case, all the factors identified in the Advisory Committee Note and all the

elements of substantial consummation have been satisfied.  Specifically, the confirmation order

has become final; all transfers contemplated by the Plan and GUC Trust Agreement have

occurred; the successor of the Debtor (i.e., New GM) has assumed the business the Debtors; and

all adversary and contested matters have been resolved.  Further, all actions contemplated by

section 6.2(q) of the Plan have been performed.  There can be no question that, at this juncture,

the Remaining Case is ripe for closure.

76.     Based upon the foregoing, the GUC Trust Administrator respectfully requests that the Court enter the Order and Final Decree closing the Remaining Case.

**F.      Termination of Epiq**

77.     In addition to the foregoing, the GUC Trust Administrator requests that all services of Epiq with respect to the Debtors' chapter 11 cases be terminated.  Since the effective date of the Plan, Epiq has continued to maintain the Debtors' bankruptcy website and docket (available at https://dm.epiq11.com/case/mlc/dockets).  After the Remaining Case is closed, the GUC Trust Administrator requests permission to terminate Epiq's engagement.

78.     As noted above, all claims against the Debtors have been resolved.  Pursuant to the terms of the Plan, all payments and distributions under the Plan and GUC Trust Agreement have been made or will be made shortly after entry of the Order and Final Decree.  Accordingly, the GUC Trust Administrator submits that the termination of Epiq's engagement is appropriate under the circumstances.  The GUC Trust Administrator requests that Epiq be directed to comply with the instructions and guidelines set forth by the Clerk's Office with respect to procedures for preparation of a final claims register in accordance with the provisions of Local Rule 5075-1.

## CLOSING REPORT

79.     Pursuant to Local Rule 3022-1, a consolidated closing report for Old GM will be filed within 14 days after entry of the Final Decree.

## NOTICE

80.     Electronic notice of this Motion has been provided in accordance with the Court-approved notice procedures.  *See Sixth Amended Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rules 1015(c) and 9007 Establishing Notice and Case Management Procedures*, dated May 5, 2011 [Docket No. 10183].  Notice of this Motion has also been provided to all

holders of GUC Trust Units.  Additionally, the GUC Trust Administrator will file this Motion as an exhibit with the Securities and Exchange Commission under Form 8-K.  The GUC Trust submits that no other or further notice need be provided.

## **CONCLUSION**

WHEREFORE, for the reasons stated herein, the GUC Trust respectfully requests that the Court enter the Order and Final Decree granting the relief requested herein and such other relief as the Court deems appropriate.

Dated: New York, New York
      March 2, 2021

Respectfully submitted,

   /s/  *Kristin K. Going*

**MCDERMOTT WILL & EMERY LLP**
Kristin K. Going
Daniel Thomson
340 Madison Ave.
New York, New York 10173
Telephone:    (212) 547-5429
Facsimile:    (646) 417-7313
E-mail:    kgoing@mwe.com
          dthomson@mwe.com

*Attorneys for the Motors Liquidation
Company GUC Trust*